UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

**CR**11   186-01S

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) Criminal No. |
| v. | ) |
| | ) In violation of: |
| | ) |
| JOSEPH CARAMADRE | ) Counts 1 to 26: 18 U.S.C. § 1343 |
| | ) (Wire Fraud) |
| and | ) |
| | ) Counts 27-32: 18 U.S.C. § 1341 |
| RAYMOUR RADHAKRISHNAN | ) (Mail Fraud) |
| | ) |
| Defendants. | ) Count 33: 18 U.S.C. § 371 |
| | ) (Conspiracy) |
| | ) |
| | ) Counts 34-59: 18 U.S.C. § 1028(a)(7) |
| | ) (Identity Fraud) |
| | ) |
| | ) Counts 60-64: 18 U.S.C. §1028A(a)(1) |
| | ) (Aggravated Identity Theft) |
| | ) |
| | ) Count 65: 18 U.S.C. §§ |
| | ) 1957(a) and (b)(1) and (2) |
| | ) (Money Laundering) |
| | ) |
| | ) Count 66: 18 U.S.C. § 1512(b)(3) |
| | ) (Witness Tampering) |

INDICTMENT

The Grand Jury charges that:

GENERAL ALLEGATIONS
PARTIES, PERSONS and ENTITIES

FILED
NOV 17 2011
U.S. DISTRICT COURT
DISTRICT OF RHODE ISLAND

At all times relevant to this Indictment, unless stated herein:

1.    Defendant JOSEPH CARAMADRE ("CARAMADRE") was a licensed

attorney and a certified public accountant.  In addition,

from at least in or about 1995 through at least in or about August 2003, CARAMADRE was licensed to market insurance products and securities.

2.      CARAMADRE did business through an entity called Estate Planning Resources.  On or about January 18, 2006, in the State of Rhode Island, CARAMADRE caused Estate Planning Resources, Inc. ("Estate Planning Resources") to be incorporated.  CARAMADRE was the President, CEO and majority owner of Estate Planning Resources.

3.      From at least 1995 through 1997, the offices of Estate Planning Resources were located at 51 Jefferson Boulevard, Warwick, Rhode Island.  From 1997 until November 2007, the offices of Estate Planning Resources were located at 400 Reservoir Avenue, Providence, Rhode Island.  In or about November 2007, the offices of Estate Planning Resources moved to 1000 Chapel View Boulevard, Suite 270, Cranston, Rhode Island, where they remained through at least December 2010.

4.      From in or about July 2007 through at least December 2010, defendant RAYMOUR RADHAKRISHNAN ("RADHAKRISHNAN") was an employee of Estate Planning Resources.

5.      JOHN DOE #1, an unindicted co-conspirator whose true identity is known to the Grand Jury, was a licensed insurance broker who was registered with broker-dealer Lifemark Securities, Corp. ("Lifemark"), headquartered in Rochester,

New York.  Although JOHN DOE #1 never had an ownership interest in Estate Planning Resources, he maintained an office within the office space of Estate Planning Resources.

6.      JOHN DOE #2, an unindicted co-conspirator whose true identity is known to the Grand Jury, was a licensed insurance broker.  From in or about November 2000 through in or about October 2006, JOHN DOE #2 was registered with Lifemark.  From in or about October 2006 though 2009, JOHN DOE #2 was registered with broker-dealer The Leaders Group, Inc., ("Leaders Group"), headquartered in Littleton, Colorado.

7.      In or about 2006, JOHN DOE #2 became the owner of twenty percent of Estate Planning Resources.

8.      JOHN DOE #3, an unindicted co-conspirator whose true identity is known to the Grand Jury, was a licensed insurance broker who was registered with broker-dealer Fortune Financial Services, Inc. ("Fortune Financial"), headquartered in New Brighton, Pennsylvania.

9.      Numerous persons and corporate entities, both known and unknown to the Grand Jury, made investments through CARAMADRE and Estate Planning Resources and are collectively referred to herein as "investors" or "CARAMADRE's clients."

10.      The following corporate entities (collectively, "Broker-Dealers") acted as intermediaries between customers and Insurance Companies: LifeMark; Leaders Group; Fortune

Financial; and Sammons Securities Corp. ("Sammons").

11.      The following corporate entities (collectively, the "Insurance Companies") offered for sale investment products known as variable annuities (hereinafter "annuities"): Metropolitan Life Insurance Company ("MetLife"), Genworth Life Insurance Company ("Genworth"), Midland National Life Insurance Company ("Midland National"), Hartford Life Insurance Company ("Hartford Life"), ING Life Insurance & Annuity Company ("ING"), Western Reserve Life Insurance Company ("Western Reserve"), Transamerica Life Insurance Company ("Transamerica"), Jefferson National Life Insurance Company ("Jefferson National"), Minnesota Life Insurance Company ("Minnesota Life"), Nationwide Life Insurance Company ("Nationwide"), Pacific Life Insurance Company ("Pacific Life"), Golden American Life Insurance Company ("Golden American"), Allmerica Financial Life Insurance and Annuity Company ("Allmerica"), AXA Equitable Life Insurance Company ("AXA Equitable"), American Skandia Life Assurance Company ("American Skandia"), Lincoln Benefit Life Company ("Lincoln Benefit"), Security Benefit Life Insurance Company ("Security Benefit"), Travelers Life and Annuity Company ("Travelers"), The Life Insurance Company of Virginia ("Life of Virginia"), and American National Insurance Company ("American National").

12.      The following corporate entities (collectively the "Bond Issuers") offered for sale to the public corporate bonds that contained survivorship options: American General Financial, Inc., Bank of America, Bank Hapoalim BM, Bear Stearns Co., Carolina First Bank, Caterpillar Financial Services, Corp., CIT Group, Inc., Compass Bank, Countrywide Financial, Corp., Countrywide Home Loan, Inc., Fannie Mae, Federal Home Loan Mortgage Corp., Federal National Mortgage Association, Federated Capital, Corp., First Bank Pr., Ford Motor Credit Corp., Freddie Mac, General Electric Corp., General Motors, Corp., Genworth, GMAC, John Hancock Life Insurance Co., Hartford Life, Hartford Life Global, HSBC Financial, International Lease Finance Corp., Lassalle Bk Na Chicago Ill., Lassalle Fndg LLC, Lehman Bros Holdings, Inc., Marshall & Isley Corp, MBIA Inc., Mercantile Bk Orlando Fl, Merrill Lynch Co., Protective Life, Provident Bank of Cincinnati, OH, Providian Natl Bank, Prudential Financial, SLM Corp., Standard FedBank Troy Mich., Tennessee Valley Authority, and Western Bank Pr.

13.      The following corporate entities (collectively "the Brokerage Houses") were entities through which individuals could open brokerage accounts in which death-put bonds could be purchased: TD Ameritrade Inc. ("Ameritrade"), E*Trade Securities, LLC ("E*Trade"), Lifemark Securities Corp.

("Lifemark"), Pershing LLC ("Pershing"), Scottrade, Inc.
("Scottrade"), Fidelity Investments ("Fidelity"), Kane Reid
Securities Group, Inc., d/b/a TradeKing ("TradeKing") and
Charles Schwab & Co, Inc. ("Charles Schwab").

## OVERVIEW OF VARIABLE ANNUITIES

14.     Under the terms of certain variable annuities offered by
the Insurance Companies, individuals or corporations could
deposit funds with the Insurance Companies and select a
specific fund or sub-account in which their monies would be
deposited.  On an application to open an annuity, the
applicant could identify who the annuitant would be and
choose the "annuitization date" - the date on which the
annuity payments would commence.

15.     In addition to providing the owner of an annuity with
the opportunity to invest his/her money in a variety of
funds, the Insurance Companies also offered certain death
benefits to be payable upon the death of the annuitant.  The
death benefits varied by company, but always included a
guarantee that all premiums previously paid by the annuity
owner would be returned, regardless of the cash value in the
annuity at the time of death.  This death benefit guaranteed
that, upon the death of the annuitant, the annuity owner
would, at a minimum, receive the full amount of money paid
into the annuity and therefore would not sustain any actual

losses incurred in the investment.

16.        In addition to guaranteeing a return of premiums paid,
many of the Insurance Companies offered other benefits that
were triggered by the death of the annuitant.  These benefits
included a guaranteed rate of return, often in the amount of
5-7 percent per year.  Under the terms of this death benefit,
the annuity owner would be guaranteed a specified rate of
return upon the death of the annuitant, irrespective of any
actual losses that had occurred in the annuity investment.

17.        Moreover, many of the Insurance Companies offered
additional benefits to the annuity owner, including paying
bonus payments of up to five percent of all amounts deposited
into the annuity.  Some Insurance Companies also offered
"death benefit riders" and "earning enhancement riders,"
under which the Insurance Companies would pay additional sums
upon the death of the annuitant.

18.        Under federal regulations, insurance brokers such as
CARAMADRE, JOHN DOE #1, JOHN DOE #2 and JOHN DOE #3 were not
permitted to submit applications for annuities directly to
the Insurance Companies.  Rather, Broker-Dealers (such as
LifeMark and Leaders Group) were required to act as
intermediaries between the customer and the Insurance
Companies.  One of the primary duties of the Broker-Dealers
was to determine whether an annuity was "suitable" for the

-7-

particular customer.  The Broker-Dealers examined a number of factors when making this suitability determination, including the time horizon for the investment, the investment experience of the investor, the source of funds, and the annual income and net worth of the investor.

### OVERVIEW OF DEATH-PUT BONDS

19.      Under the terms of the prospectuses issued with certain corporate bonds, the Bond Issuers allowed for bonds to be owned jointly by two individuals with rights of survivorship. These corporate bonds typically had a maturity date - a date at which the bonds could be redeemed at full face value – that was years or decades away.  These bonds were available for purchase on the secondary market for a price below the full face value.  However, under the terms of the survivorship provisions in the prospectuses authorizing the issuance of the bonds, the bonds could be redeemed at full face value by a bond owner immediately upon the death of the bond's co-owner.

20.      These corporate bonds with survivorship clauses, known in the industry and referred to herein as "death-put bonds," allowed for full, immediate redemption of the full face value of the bond as if the maturity date had arrived upon the death of one of the two co-owners of the bond.

21.      Individuals wishing to jointly own death-put bonds could do so through a brokerage account with rights of survivorship in the names of the two individuals who are to own the bonds jointly.  The brokerage accounts relevant to this Indictment were all opened through the Brokerage Houses identified in Paragraph 13 above.

### COUNTS 1 through 26
### (Wire Fraud)
### 18 U.S.C. § 1343

22.      The allegations contained in paragraph one (1) through twenty one (21) of the General Allegations of this Indictment are realleged and are incorporated by reference as if fully set forth herein.

### THE FRAUD SCHEME

23.      From an unknown date, but at least as early as in or about January 1995, and continuing through in or about August 2010, in the District of Rhode Island and elsewhere, the defendants

### JOSEPH CARAMADRE
### and
### RAYMOUR RADHAKRISHNAN

knowingly devised and intended to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations and promises.

## OBJECTS OF THE SCHEME TO DEFRAUD

24.     It was the object of the scheme to defraud for CARAMADRE
and RADHAKRISHNAN to unlawfully enrich themselves, JOHN DOE
#1, JOHN DOE #2, JOHN DOE #3, and CARAMADRE's friends, family
members and clients by fraudulently obtaining millions of
dollars from the Insurance Companies and Bond Issuers.

25.     It was further an object of the scheme to defraud for
CARAMADRE and RADHAKRISHNAN to obtain the identity
information and signatures of terminally-ill and elderly
individuals for use in furtherance of their scheme to obtain
money from the Insurance Companies and Bond Issuers.

26.     It was further an object of the scheme to defraud for
CARAMADRE and RADHAKRISHNAN to profit from the deaths of
terminally-ill and elderly individuals.  Using the identity
information of terminally-ill and elderly people, CARAMADRE,
RADHAKRISHNAN and others known and unknown to the Grand Jury
caused to be purchased over 200 annuities, deposited at least
$125,000,000 into these annuities and fraudulently obtained
more than $15,000,000 from the Insurance Companies. Moreover,
CARAMADRE and RADHAKRISHNAN used the identity information of
terminally-ill and elderly people to open approximately 77
brokerage accounts in which thousands of death-put bonds were
purchased.  Upon the deaths of the terminally-ill
individuals, CARAMADRE and RADHAKRISHNAN, together with

others known and unknown to the Grand Jury, exercised the survivorship options in these death-put bonds and fraudulently obtained more than $10,000,000 from the Bond Issuers.

## THE MANNER AND MEANS OF THE SCHEME TO DEFRAUD

The manner and means by which defendants CARAMADRE and RADHAKRISHNAN accomplished the objects of the scheme to defraud included, among others, the following:

27.    It was part of the scheme to defraud that CARAMADRE and RADHAKRISHNAN fraudulently obtained millions of dollars by making material misrepresentations and omissions to (1) terminally-ill and elderly people, their family members and care-givers, in order to obtain identity information and signatures for use in furtherance of the scheme; (2) Insurance Companies; (3) Bond Issuers; and (4) intermediaries, including Brokerage Houses and Broker-Dealers.

### Genesis of the scheme

28.    It was part of the scheme to defraud that CARAMADRE devised a strategy in which annuities and death-put bonds would be purchased using the names of terminally-ill and elderly individuals with short life expectancies as annuitants and account co-owners.  This strategy guaranteed the return of principal (and other death benefits) on all

annuities purchased and allowed for the redemption of death-put bonds at full face value upon the deaths of the terminally-ill and elderly individuals.  CARAMADRE employed this strategy with respect to annuities from at least 1995 through 2010 and with respect to death-put bonds from 2006 through 2010.  RADHAKRISHNAN joined the scheme when he was hired by CARAMADRE in 2007. The success of this strategy depended on using the names, social security numbers, dates of birth and other identifying information (hereinafter "identity information") of large numbers of terminally-ill and elderly individuals.

### Obtaining the identity information of terminally-ill people

29.      It was further part of the scheme to defraud that, beginning as early as 1995 and continuing throughout the scheme, CARAMADRE obtained and caused to be obtained the identity information of terminally-ill and elderly individuals by means of false and materially misleading representations and omissions.  CARAMADRE then used the identity information of the terminally-ill and elderly individuals to enrich himself, RADHAKRISHNAN, JOHN DOE #1, JOHN DOE #2, JOHN DOE #3, his family, friends and clients.

30.      It was further part of the scheme to defraud that CARAMADRE and RADHAKRISHNAN sought individuals with a life expectancy of six months or less to serve as annuitants on

annuities.  CARAMADRE and RADHAKRISHNAN sought individuals with a life expectancy of three months or less to serve as co-owners of death-put bonds.

31.     It was further part of the scheme to defraud that during the mid-1990's, CARAMADRE obtained and used the identity information of terminally-ill people suffering from Acquired Immunity Deficiency Syndrome ("AIDS") in Rhode Island compassion centers.

32.     It was further part of the scheme to defraud that CARAMADRE obtained and used the identity information of elderly and terminally-ill individuals who had previously purchased life insurance policies or conducted other business through Estate Planning Resources or through CARAMADRE's law practice, and thereby had already provided their identity information.

33.     It was further part of the scheme to defraud that in or about October 2007, CARAMADRE and RADHAKRISHNAN placed an advertisement ("the advertisement") in the *Rhode Island Catholic* newspaper, previously known as *The Providence Visitor,* for the purpose of identifying terminally-ill individuals to be used in furtherance of their fraud scheme. The advertisement (and subsequent versions thereof) ran weekly until in or about December 2008.  The advertisement provided that a "Compassionate Organization" and a "Church

Benefactor" were providing a $2,000 cash gift to terminally-ill individuals and their families that could be used for any purpose, including funeral expenses, healthcare costs and gifts to family members.

34.     It was further part of the scheme to defraud that the advertisement did not, in any way, indicate that the terminally-ill individuals would be asked to provide their social security numbers, dates of birth and other identifying information so that the defendants could enrich themselves and others by investing in financial products that allowed them to profit upon the deaths of the terminally-ill individuals.

35.     It was further part of the scheme to defraud that CARAMADRE and RADHAKRISHNAN obtained the identity information of terminally-ill individuals who responded to the advertisement by means of materially false and misleading representations and omissions.

36.     It was a further part of the scheme to defraud that from in or about November 2007 through in or about 2009, RADHAKRISHNAN met with terminally-ill individuals and their family members who responded to the advertisement.  During the initial meeting, RADHAKRISHNAN informed these individuals that he worked for a philanthropist who wished to help terminally-ill individuals by giving them funds, typically in

the amount of $2,000.

37.      It was a further part of the scheme to defraud that during the initial meeting with the terminally-ill individual and/or their family members, RADHAKRISHNAN made an assessment of the likely amount of time the individual had left to live. If the individual appeared to RADHAKRISHNAN to have a life expectancy greater than six months, RADHAKRISHNAN provided the individual with the initial $2,000 check and ceased further contact with the ill individual.  If, however, RADHAKRISHNAN concluded that the individual was likely to die within weeks or months, he informed the terminally-ill individual and/or family member, at the conclusion of the initial meeting, that he had good news for them and that more funds may soon become available.

38.      It was a further part of the scheme to defraud that during the initial meeting with the terminally-ill individual, RADHAKRISHNAN obtained the signature of the terminally-ill individuals on a document entitled "Terminal Illness Philanthropy Account Receipt," which merely documented that the individuals had received $2,000. CARAMADRE and RADHAKRISHNAN then, for a number of individuals, copied and forged the signatures of the terminally-ill individuals on applications to open joint brokerage accounts.

39.       It was a further part of the scheme to defraud that, for individuals determined to have a short life expectancy, RADHAKRISHNAN often held a second meeting with the terminally-ill individuals and/or their family members. During this second meeting, RADHAKRISHNAN informed the terminally-ill individuals and/or their family members that he had received approval from the philanthropist to provide them with additional funds, typically in the amount of $3,000-$4,000.

40.       It was a further part of the scheme to defraud that during this second meeting, RADHAKRISHNAN gave the terminally-ill individuals and/or their family members signature pages to sign.  These signature pages were typically pages from applications to open annuities and/or brokerage accounts using the identities of the terminally-ill individuals.  In order to cause the terminally-ill individuals and/or their family members to sign these signature pages, RADHAKRISHNAN made numerous material misrepresentations and omissions to the terminally-ill individuals and their family members, including:

          a.  stating or indicating that the purpose of the documents they were asked to sign was simply to document the charitable giving for the records of the purported philanthropist, CARAMADRE;

b.  informing the terminally-ill individuals that the purpose of the documents they were asked to sign was to open an insurance policy or an account in which a family member of the terminally-ill individual would be the beneficiary;

c.  informing the terminally-ill individuals that the purpose of the documents they were asked to sign was to open an account, the profits of which would be utilized to assist other terminally-ill individuals;

d.  informing the terminally-ill individuals that the purpose of the documents they were asked to sign was to open an account that would provide a "tax shelter" or other tax benefits to others; and

e.  intentionally failing to inform the terminally-ill individuals that CARAMADRE and others stood to make substantial profits upon their deaths.

41.    It was a further part of the scheme to defraud that CARAMADRE and RADHAKRISHNAN falsely advised certain terminally-ill individuals and/or their family members that they would not be liable for any losses that could potentially occur in the accounts on which they were identified as co-owners.  In truth and in fact, CARAMADRE proceeded to purchase financial products on margin in these accounts and thereby exposed the terminally-ill co-owners to

-17-

liability for any losses that ensued.

42.     It was a further part of the scheme to defraud that CARAMADRE and RADHAKRISHNAN falsely represented to terminally-ill individuals, their family members and their care-givers that the terminally-ill individuals could not incur any tax obligations for monies paid to them.

43.     It was a further part of the scheme to defraud that CARAMADRE and RADHAKRISHNAN falsely represented to terminally-ill individuals, their family members and their care-givers that the provision of funds by CARAMADRE need not be reported to the government and that it could have no effect on the terminally-ill persons' eligibility to receive government benefits such as Medicaid and Supplemental Security Income (SSI).

44.     It was further part of the scheme to defraud that CARAMADRE and RADHAKRISHNAN proceeded to use the identity information of the terminally-ill and elderly individuals, without their knowledge or consent, on applications to purchase annuities and to open joint brokerage accounts with rights of survivorship.

45.     It was a further part of the scheme to defraud that in instances where CARAMADRE or RADHAKRISHNAN received consent from a terminally-ill individual to use his/her name on a single or small number of annuities, CARAMADRE and

-18-

RADHAKRISHNAN proceeded to apply for numerous annuities in which that terminally-ill individual was named as the annuitant, without his/her knowledge or consent.

46.     It was a further part of the scheme to defraud that once CARAMADRE and RADHAKRISHNAN obtained or forged the signatures of the terminally-ill individuals on account-opening documents, they submitted applications to open annuities and brokerage accounts in which the terminally-ill individuals were identified as the annuitants or co-owners.

## Falsely notarizing signatures of terminally-ill people

47.     It was a further part of the scheme to defraud that CARAMADRE and RADHAKRISHNAN caused employees of Estate Planning Resources to falsely notarize the signatures of some of the terminally-ill individuals.

## Misrepresentations to Nurses and Social Workers

48.     It was a further part of the scheme to defraud that CARAMADRE and RADHAKRISHNAN told social workers and nurses, including those working for Home and Hospice Care of Rhode Island and the Visiting Nurses Association, that they were solely operating a philanthropic program and that terminally-ill individuals would receive a gift of $2,000, with "no strings attached." CARAMADRE and RADHAKRISHNAN intentionally concealed from these social workers and nurses that CARAMADRE and others stood to make a substantial profit upon the deaths

of their patients. From in or about November 2007 through in or about February 2009, these social workers and nurses referred terminally-ill patients to CARAMADRE and RADHAKRISHNAN, without knowledge that their patients were being asked to provide their social security numbers and other identifying information so that the defendants could enrich themselves and their clients by opening brokerage accounts and annuities in the names of their patients.

### Recruitment of Investors

49.     It was a further part of the scheme to defraud that CARAMADRE attracted capital from wealthy and prominent individuals and corporations as investors by telling them that he discovered a "loophole" which permitted the use of terminally-ill persons as "measuring lives," or annuitants, on annuities and co-owners on joint brokerage accounts used to purchase death-put bonds. CARAMADRE entered into profit-sharing agreements with some of these outside investors, pursuant to which CARAMADRE received a significant percentage of all profits earned.

### Sharing of Commissions

50.     It was a further part of the scheme to defraud that JOHN DOE #1 and JOHN DOE #2 received millions of dollars in commissions from the Insurance Companies for the annuities purchased using terminally-ill and elderly annuitants. Upon

receipt of these commissions, JOHN DOE #1 and JOHN DOE #2 shared their commissions with CARAMADRE. After CARAMADRE gave up his securities license in or about 2003, he was prohibited under the securities laws from sharing commissions earned by licensed agents on the sale of securities such as annuities. To disguise the fact that he was sharing commissions from the sale of annuities, CARAMADRE instructed JOHN DOE #1 to falsely indicate on checks payable to CARAMADRE that the commission-sharing payments he was making were for "legal fees" or "rent."

### Misrepresentations to Corporate Entities

51.     It was further part of the scheme to defraud that CARAMADRE and RADHAKRISHNAN made and caused to be made material misrepresentations and omissions to various corporate entities, including Insurance Companies, Bond Issuers, Broker-Dealers and Brokerage Houses.

### Misrepresentations to Insurance Companies

52.     It was part of the scheme to defraud that CARAMADRE and RADHAKRISHNAN fraudulently represented to Insurance Companies that the terminally-ill persons named as annuitants knowingly and intentionally agreed to do so by submitting applications which contained signatures obtained by fraud and the identity information of terminally-ill individuals, without their knowledge or consent.

-21-

53.     It was a further part of the scheme to defraud that JOHN DOE #1, with the knowledge of and at the direction of CARAMADRE, falsely and fraudulently represented to Insurance Companies that some of the annuity owners were "friends," "clients" or "acquaintances" of the terminally-ill individuals who were named as annuitants.

54.     It was a further part of the scheme to defraud that after their agency relationships were terminated by various Insurance Companies upon discovery that the annuity applications involved terminally-ill individuals, CARAMADRE, JOHN DOE #1 and JOHN DOE #2 proceeded to submit applications to other Insurance Companies that were unaware of the scheme.

55.     It was a further part of the scheme to defraud that after a number of the Insurance Companies had terminated CARAMADRE, JOHN DOE #1 and JOHN DOE #2, CARAMADRE enlisted the assistance of JOHN DOE #3.   JOHN DOE #3, at the behest of CARAMADRE, agreed to submit applications for annuities using terminally-ill individuals as annuitants to the same Insurance Companies that had already terminated CARAMADRE, JOHN DOE #1 and JOHN DOE #2 for this activity.

## Misrepresentations to LifeMark

56.     It was further part of the scheme to defraud that CARAMADRE and JOHN DOE #1 made material misrepresentations to representatives of Broker-Dealer Lifemark, in order to conceal and further the fraud scheme.

57.     It was a further part of the scheme to defraud that CARAMADRE and JOHN DOE #1 provided false information to representatives of LifeMark concerning the manner in which the annuitants and co-owners for brokerage accounts were identified and whether they were being paid by CARAMADRE.

58.     It was a further part of the scheme to defraud that JOHN DOE #1, with the knowledge of and at the direction of CARAMADRE, falsely submitted forms to Lifemark attesting that the annuitants had not received any compensation.

59.     From at least in or about November 2006 through at least in or about March 2008, JOHN DOE #1, with the knowledge of and at the direction of CARAMADRE, provided false information to Lifemark concerning the relationship between the annuitants and the owners of the annuities, including CARAMADRE.

## Misrepresentations to Brokerage Houses

60.     It was part of the scheme to defraud that CARAMADRE and RADHAKRISHNAN falsely represented to the Brokerage Houses that the terminally-ill persons named as co-owners of joint brokerage accounts knowingly and intentionally agreed to become co-owners by submitting applications which contained signatures of terminally-ill persons which were forged or obtained by fraud.

61.     It was a further part of the scheme to defraud that CARAMADRE and RADHAKRISHNAN provided false contact information (including false phone numbers, e-mail addresses and street addresses) for the terminally-ill individuals identified as co-owners on the applications to open brokerage accounts. Defendants intentionally provided false contact information for the terminally-ill individuals so as to make it more difficult for the respective companies to make contact with the terminally-ill individuals and to prevent the terminally-ill individuals and their families from learning about the existence of the accounts.

62.     It was a further part of the scheme to defraud that CARAMADRE and RADHAKRISHNAN provided false and fraudulent information concerning the finances and investment history of the terminally-ill individuals listed as co-owners of the brokerage accounts.

-24-

63.        From in or about January 2008 through in or about
September 2008, CARAMADRE and RADHAKRISHNAN made
misrepresentations to representatives from Brokerage Houses
concerning the purpose of the numerous joint accounts that
had been opened in the names of CARAMADRE and other
individuals (who, unbeknownst to the Brokerage Houses, were
all terminally-ill).  CARAMADRE and RADHAKRISHNAN falsely
told Brokerage House representatives that the co-owners of
the accounts (the terminally-ill individuals) were estate
planning clients of CARAMADRE, that a portion of the invested
funds came from the co-owners and that "succession plans" had
been created in which the profits made in the accounts would
flow to the estates of the co-owners upon their deaths.
Moreover, CARAMADRE and RADHAKRISHAN intentionally withheld
from the Brokerage Houses that the co-owners were terminally-
ill.

### Obtaining Death Certificates

64.        It was further part of the scheme to defraud that
CARAMADRE and RADHAKRISHNAN obtained death certificates
following the deaths of the terminally-ill individuals by
falsely representing to city and town officials throughout
the State of Rhode Island that CARAMADRE was acting as the
attorney for the deceased individuals and that death
certificates were sought for estate planning purposes.  In

truth and in fact, CARAMADRE was not the attorney for these terminally-ill individuals and the death certificates were not sought for estate planning purposes.  Rather, the death certificates were sought so that CARAMADRE and RADHAKRISHNAN could submit the death certificates to Insurance Companies and Bond Issuers in order to enrich themselves and others.

### Efforts to Conceal the Scheme

65.     It was further part of the scheme to defraud that CARAMADRE and RADHAKRISHNAN took steps to conceal their use of terminally-ill individuals from the Insurance Companies, Broker-Dealers, Brokerage Houses and Bond Issuers.

66.     It was a further part of the scheme to defraud that, to avoid detection by the Insurance Companies, CARAMADRE, RADHAKRISHNAN, JOHN DOE #1, JOHN DOE #2 and JOHN DOE #3 caused to be opened numerous annuities with a smaller amount of funds and then made larger deposits of funds into the annuities once the companies approved the applications and issued the policies.

67.     It was a further part of the scheme to defraud that CARAMADRE and RADHAKRISHNAN attempted to avoid detection of their use of terminally-ill annuitants by delaying the submission of death claims following the death of the annuitants.  By delaying the submission of death claims, defendants delayed the time by which the Insurance Companies

were able to learn that the annuitants had died shortly after the issuance of the annuities.

68.     It was a further part of the scheme to defraud that CARAMADRE concealed his true ownership in many of the annuities and bonds by purchasing the annuities and bonds in the names of his relatives, in the name of D.D. (CARAMADRE's accountant), in the name of W.C. (another attorney associated with Estate Planning Resources), in the name of corporations CARAMADRE established and in the name of RADHAKRISHNAN (collectively, the "nominee owners").

69.     It was further part of the scheme to defraud that CARAMADRE used his law practice to conceal the scheme through various methods, including depositing checks jointly payable to deceased co-owners into CARAMADRE's law office account, by seeking death certificates falsely claiming he was the attorney for the deceased, and by representing to companies that he was the attorney for the terminally-ill individuals so as to prevent the companies from communicating directly with the terminally-ill individuals.

## SPECIFIC INSTANCES BY WHICH THE
## OBJECTS OF THE FRAUD SCHEME WERE ACCOMPLISHED

In furtherance of the scheme to defraud, and to accomplish its objects, the following specific acts, among numerous others, were committed in the District of Rhode Island and elsewhere:

### Caramadre uses AIDS Patients as Annuitants

70.     In or about 1995 and 1996, CARAMADRE visited a Rhode Island compassion center for terminally-ill AIDS patients in an attempt to obtain the identity information of AIDS patients. CARAMADRE met with several persons suffering from AIDS, including Getahun Aynalem ("Aynalem"). CARAMADRE paid several AIDS patients for their identity information. CARAMADRE offered to pay Aynalem for his identity information, but Aynalem refused.

71.     In or about 1996, the exact date being unknown, CARAMADRE obtained Aynalem's identity information.

72.     On or about November 6, 1996, CARAMADRE, acting as a registered representative, submitted to Allmerica an application to purchase an annuity using Aynalem's identity information and listing Aynalem as the annuitant, without Aynalem's knowledge or consent.

73.     On or about October 24, 1995, CARAMADRE caused annuity applications to be submitted to Golden American which named a terminally-ill person suffering from AIDS, Sara Paneto

("Paneto"), as the annuitant on behalf of CARAMADRE clients, "FC," and "NM."

74.     On or about February 23, 1998, at the behest of CARAMADRE, JOHN DOE #2 caused an annuity application to be submitted to Life of Virginia using Paneto as the annuitant on behalf of a CARAMADRE client, "VF."

75.     On or about January 31, 2000, at the behest of CARAMADRE, JOHN DOE #1 caused an annuity application to be submitted to Pacific Life using Paneto as the annuitant on behalf of a CARAMADRE client, "VF."

76.     On or about April 3, 2001, CARAMADRE caused death benefit claims to be submitted to Golden American which falsely represented the existence of a relationship between Paneto and CARAMADRE's clients, the contract owners, "FC," and "NM."

### Caramadre obtains and uses
### Deborah Blowers' identity information

77.     In or about February of 1995, CARAMADRE contacted the spouse of a terminally-ill person, Deborah Blowers ("Blowers"), and offered to obtain a small life insurance policy for Blowers.  In the course of obtaining this life insurance policy, CARAMADRE obtained Blowers' identity information, including her name, date of birth, and social security number.

78.      From on or about April 13, 1995, through on or about September 28, 1995, CARAMADRE submitted applications to Golden American to purchase four different annuities naming Blowers as the annuitant.  These annuity applications were each submitted by CARAMADRE without the knowledge or consent of Blowers or her spouse.  These annuities were owned by four of CARAMADRE's clients and CARAMADRE received a commission on the sale of each of these annuities.

<u>Caramadre continues to use
terminally-ill people as annuitants</u>

79.      On or about July 30, 2002, CARAMADRE, acting as a registered representative, submitted an application to purchase an annuity to Pacific Life using a terminally-ill person, Angela Ancona, as the annuitant on behalf of a CARAMADRE client, "NM."

80.      On or about August 15, 2003, at the behest of CARAMADRE, John Doe #1 submitted an application to purchase an annuity to Nationwide using a terminally-ill person, Carl Ruggieri, as the annuitant on behalf of a CARAMADRE client, "GH."

81.      On or about October 23, 2003, CARAMADRE purchased a variable annuity for himself from Genworth using a terminally-ill person, Carl Ruggieri, as the annuitant.

### Caramadre uses the identity information
### of a family member

82.     In or about September 2004, CARAMADRE agreed to draft a will for Alfred LaMonte ("LaMonte"), who was terminally-ill. LaMonte was the father of CARAMADRE's brother-in-law. CARAMADRE falsely told LaMonte and LaMonte's son that LaMonte's signature was needed so that a donation could be made to a charity in LaMonte's name.

83.     From on or about October 12, 2004, through on or about April 28, 2005, CARAMADRE caused to be purchased from Travelers and Genworth four annuities naming LaMonte as the annuitant. These annuities, which were owned by CARAMADRE, his wife and his parents, were purchased without LaMonte's knowledge or consent.

### Caramadre uses the identity information
### of clients and acquaintances

84.     Robert Mizzoni ("Mizzoni") was the childhood bus driver of CARAMADRE who later became an insurance client. In or about May 2004, CARAMADRE purchased an annuity for himself from Nationwide using Mizzoni's identity information and naming Mizzoni as the annuitant, without Mizzoni's knowledge or consent. On the annuity application, CARAMADRE falsely provided his parents' address as the address of Mizzoni.

85.     Donald Duarte ("Duarte") was a terminally-ill person who was an acquaintance of CARAMADRE. In or about November 2006, CARAMADRE met with Duarte and his spouse. CARAMADRE made

-31-

material misrepresentations and omissions to Duarte and Duarte's spouse.  At CARAMADRE's direction, JOHN DOE #1 subsequently met with Duarte and Duarte's spouse and obtained Duarte's signature.

86.     On or about November 7, 2006, CARAMADRE opened a joint brokerage account for himself at Pershing, naming Duarte as the co-owner, without the knowledge or consent of Duarte or his spouse.

87.     On or about December 1, 2006, CARAMADRE purchased an annuity from Jefferson National for himself through a nominee entity, ADM Associates, using Duarte as the annuitant, without the knowledge or consent of Duarte or his spouse.

88.     Norman Robichaud ("Robichaud") was a terminally-ill person whose spouse worked in the same building as CARAMADRE. In or about September 2007, Robichaud and his spouse allowed CARAMADRE to use Robichaud's name on a small number of annuities in exchange for $5,000.  CARAMADRE then proceeded, without Robichaud or his spouse's knowledge or consent, to open approximately eleven (11) annuities naming Robichaud as the annuitant, as well as a joint brokerage account naming Robichaud as the co-owner.  Neither Robichaud nor his spouse agreed to open a brokerage account.

## Misrepresentations to Those Who Responded
## to Advertisement in Catholic Newspaper

89.      In or about October 2007, CARAMADRE and RADHAKRISHNAN

placed an advertisement that ran weekly in the *Rhode Island*

*Catholic* newspaper, previously known as *The Providence*

*Visitor*.  This advertisement provided a telephone number for

terminally-ill individuals to call to receive $2,000.  This

advertisement (and its subsequent iterations) provided that a

"Compassionate organization" and a "Church benefactor" were

providing a $2,000 cash gift to terminally-ill individuals

and their families that could be used for any purpose,

including funeral expenses, healthcare costs and gifts to

family members.

## Forging the Signatures of Terminally-Ill
## Individuals Who Responded to Advertisement

90.      From in or about November 2007 through in or about April

2009, RADHAKRISHAN met with dozens of terminally-ill

individuals who responded to the advertisement that had been

placed in the *Rhode Island Catholic*.  During the initial

meeting, RADHAKRISHNAN obtained the signature of the

terminally-ill individual on a document that was unrelated to

the opening of any kind of account or annuity, typically a

document titled "Terminal Illness Philanthropy Account

Receipt."  After obtaining the signature of the terminally-

ill individuals on this document, CARAMADRE and RADHAKRISHAN

-33-

proceeded to forge the signatures of a number of these individuals on applications to open joint brokerage accounts in their names.

## Forgeries of Bertha Howard's Signature

91.     In or about January 2008, RADHAKRISHNAN met twice with a terminally-ill person, Bertha Howard ("Howard"), and her daughter. After providing false and misleading information concerning the purpose of an account that was to be opened in Howard's name, RADHAKRISHAN attempted to secure the signatures of Howard on an application to open an Ameritrade brokerage account. Howard, however, was too ill to provide a legible signature.

92.     Without the knowledge and consent of Howard or her daughter, CARAMADRE and RADHAKRISHNAN proceeded to cause Howard's signature to be forged five times on an application to open a joint brokerage account at Ameritrade between Howard and W.C., an associate of and nominee for CARAMADRE.

## Forgeries of Dennis Flori's Signature

93.     In or about April 2008, RADHAKRISHNAN met twice with a terminally-ill person, Dennis Flori, Sr. ("Flori"), and members of his family. RADHAKRISHNAN falsely told Flori and his family that an account would be opened on behalf of Flori's family solely as an act of philanthropy. After obtaining Flori's identity information and signature on a

document, CARAMADRE and RADHAKRISHNAN submitted an application to Ameritrade to open an account in the names of CARAMADRE and Flori which contained forgeries of Flori's signature.

### Forgeries of Sonia Gonzalez's Signature

94.     In or about April 2008, Sonia Gonzalez ("Gonzalez"), a 45 year-old Rhode Islander, was terminally-ill with breast cancer and was hospitalized at Women and Infants' Hospital in Providence, Rhode Island.

95.     On or about April 3, 2008, RADHAKRISHAN visited Gonzalez, her husband, her sister and a nurse in Gonzales' hospital room. During this meeting, RADHAKRISHAN provided Gonzalez with a $2,000 check made payable to Gonzalez's sister and explained that these funds were a charitable gift. RADHAKRISHNAN also caused Gonzalez to sign a document titled "Terminal Illness Philanthropy Account Receipt," documenting that Gonazales had received this $2,000.

96.     On or about April 8, 2008, CARARAMADRE and RADHAKRISHNAN caused to be filed with Ameritrade an application to open a joint brokerage account in the names of CARAMADRE and Gonzalez which contained forged signatures of Gonzalez.

### Forgeries of John Kivalos' Signature

97.    On or about June 12, 2008, RADHAKRISHNAN met with John Kivalos ("Kivalos"), a terminally-ill person, and his wife. During this meeting, RADHAKRISHNAN provided Kivalos with a check for $2,000 and indicated that the funds were a charitable gift.

98.    On or about June 13, 2008, CARAMADRE and RADHAKRISHNAN submitted an application to Ameritrade to open a joint brokerage account in the names of CARAMADRE and Kivalos which contained forged signatures of Kivalos.

### Forgeries of Pia Bernardo's Signature

99.    On or about June 17, 2008, RADHAKRISHNAN met with Pia Bernado ("Bernado"), a terminally-ill person, and her daughter. RADHAKRISHNAN fraudulently obtained Bernado's identity information including her name, date of birth, social security number, and her mother's maiden name. After obtaining Bernado's identity information, CARAMADRE and RADHAKRISHNAN proceeded to cause Bernado's signature to be forged five times on an application to open a joint brokerage account at Ameritrade between Bernado and CARAMADRE. On one of the forged signatures, CARAMADRE and RADHAKRISHNAN caused the wrong first name for Bernado to be forged.

### Using Signatures of Terminally-Ill
### Individuals Obtained by Fraud

100.     In addition to forging the signatures of a number of
terminally-ill individuals, CARAMADRE and RADHAKRISHNAN
obtained signatures of numerous other terminally-ill
individuals on brokerage account and annuity opening
documents by means of false misrepresentations and omissions.
RADHAKRISHNAN gave a variety of false explanations as to why
their signatures were required, including misrepresenting the
nature and purpose of documents the terminally-ill persons
were asked to sign.  CARAMADRE and RADHAKRISHNAN concealed
from the terminally-ill individuals and their family members
the essential truth of why they were seeking their
signatures: so that CARAMADRE and RADHAKRISHNAN could cause
death-put bonds and annuities to be purchased in the names of
the terminally-ill individuals, thereby generating
substantial profits for CARAMADRE upon their deaths.

101.     On or about January 14, 2008, RADHAKRISHNAN met with
Patrick Garvey and made false representations and omissions
to obtain Garvey's signature.

102.     On or about January 18, 2008, RADHAKRISHNAN met with
James Kimball and his friend and made false representations
and omissions to obtain Kimball's signature.

103.     On or about February 2, 2008, RADHAKRISHNAN met with
Charles Perry and his wife and made false representations and

omissions to obtain Perry's signature.

104.    On or about February 8, 2008, RADHAKRISHNAN met with Antonio DeCastro and his daughter and made false representations and omissions to obtain DeCastro's signature.

105.    On or about February 26, 2008, RADHAKRISHNAN met with Edwin Rodriguez and made false representations and omissions to obtain Rodriguez's signature.

106.    On or about March 4, 2008, RADHAKRISHNAN met with John Lang and his wife and made false representations and omissions to obtain Lang's signature.

107.    On or about March 19, 2008, RADHAKRISHNAN met with Donna Perotta and her sister-in-law and made false representations and omissions to obtain Perotta's signature.

108.    On or about April 1, 2008, RADHAKRISHNAN met with Michael Mallane and his wife and made false representations and omissions to obtain Mallane's signature.

109.    On or about April 2, 2008, RADHAKRISHNAN met with the granddaughter of Vincent Moretti, an elderly Rhode Islander, and made false representations and omissions to cause Moretti's granddaughter to sign documents on Moretti's behalf.

110.    On or about May 5, 2008, RADHAKRISHNAN met with Augusta Escobar de Rodas and her grandson and made false representations and omissions to obtain Escobar de Rodas'

signature.

111.     On or about June 18, 2008, RADHAKRISHNAN met with Arthur Culotta and his children and made false representations and omissions to obtain Culotta's signature.

112.     On or about June 24, 2008, RADHAKRISHNAN met with Robert Cazeault and his wife and made false representations and omissions to obtain Cazeault's signature.

113.     On or about June 30, 2008, RADHAKRISHNAN met with the son of Hattie Strobel, an elderly Rhode Islander, and made false representations and omissions to induce Srobel's son to sign documents on Strobel's behalf.

114.     On or about August 11, 2008, RADHAKRISHNAN met with Maria Nina and her daughter and made false representations and omissions to obtain Nina's signature.

115.     On or about September 11, 2008, RADHAKRISHNAN met with Sandra Bulpitt and her husband and made false representations and omissions to obtain Bulpitt's signature.

116.     On or about November 19, 2008, RADHAKRISHNAN met with Nathan Lee and his friend and made false representations and omissions to obtain Lee's signature.

117.     On or about February 1, 2009, RADHAKRISHNAN met with Richard Wiley and made false representations and omissions to obtain Wiley's signature.

118.     On or about February 24, 2009, RADHAKRISHNAN met with

William Hazelwood and his wife and made false representations and omissions to obtain Hazelwood's signature.

119.     On or about March 20, 2009, RADHAKRISHNAN met with Bruce Marshall and his wife and made false representations and omissions to obtain Marshall's signature.

120.     On or about March 27, 2009, RADHAKRISHNAN met with Linda Barbeau and her daughter and made false representations and omissions to obtain Barbeau's signature.

## Misrepresentations to Midland National

121.     On or about June 28, 2006, JOHN DOE #1, at the direction of CARAMADRE, submitted an application to Midland National to purchase an annuity.  The application listed the owner of the annuity to be J.R., a client of CARAMADRE, and the annuitant to be Robert Carnevale, a terminally-ill Rhode Islander.

122.     On or about July 13, 2006, JOHN DOE #1, at the direction of CARAMADRE, falsely informed a representative of Midland National, that J.R. and her husband were friends of Robert Carnevale.

123.     On or about December 20, 2006, JOHN DOE #1, at the direction of CARAMADRE, submitted to Midland National an application to purchase an annuity.  The application listed the owner of the annuity to be T.M., a client of CARAMADRE, and the annuitant to be Donald Duarte, a terminally-ill Rhode Islander.

124.     On or about January 2, 2007, JOHN DOE #1, at the

direction of CARAMADRE, falsely informed a representative of

Midland National that T.M. and Donald Duarte were

acquaintances.

125.     On or about July 3, 2007, JOHN DOE #1, at the direction

of CARAMADRE, submitted an application to Midland National to

purchase an annuity.  The application listed the owner to be

CARAMADRE and the annuitant to be Lily Ianiero, a terminally-

ill Rhode Islander.  The application falsely identified Lily

Ianiero to be a client of CARAMADRE.

126.     On or about July 6, 2007, JOHN DOE #1, at the direction

of CARAMADRE, falsely informed a representative of Midland

National that he believed that CARAMADRE and Lily Ianiero

shared a "friendship relationship" as well as a "client

relationship."

127.     On or about December 1, 2007, RADHAKRISHNAN applied to

open an annuity at Midland National with annuitant Denise

Egan, a terminally-ill Rhode Islander.  On the application

form, RADHAKRISHNAN falsely stated that he and Egan were

friends.

128.     On or about December 1, 2007, RADHAKRISHNAN wrote a

$20,000 check to Midland National to accompany the

application he submitted to purchase an annuity with Denise

Egan.  On or about February 25, 2008, RADHAKRISHNAN wrote an

-41-

additional check from his personal bank account to Midland National for $780,000 to be added to the Egan annuity. Unbeknownst to Midland National, all of the money invested into this annuity belonged to CARAMADRE.

129.    On or about December 13, 2007, RADHAKRISHNAN completed a Sammons Security Company Client Data Sheet that was required to purchase the Midland National annuity with Denise Egan. On this Client Data Sheet, RADHAKRISHNAN falsely wrote that he was employed at a company called Networked Display Systems, where he had an annual income of greater than $250,000 and a net worth of greater than $1,000,000.

## Misrepresentations to American National

130.    On or about June 13, 2007, JOHN DOE #1, at the direction of CARAMADRE, submitted to American National an application to purchase an annuity.  The application listed the owner of the annuity to be E.R., a client of CARAMADRE, and the annuitant to be Robert Carnevale, a terminally-ill Rhode Islander.

131.    On or about June 21, 2007, JOHN DOE #1 sent an e-mail to a representative of American National, falsely stating that E.R. and Robert Carnevale were friends.

## Misrepresentations to Lifemark

132.     On or about November 7, 2006, JOHN DOE #1, at the direction of CARAMADRE, submitted an application to Lifemark to open a joint brokerage account between CARAMADRE and Donald Duarte, a terminally-ill Rhode Islander.

133.     On or about November 8, 2006, JOHN DOE #1 sent an e-mail to a Lifemark representative, falsely stating that CARAMADRE and Donald Duarte had a "business affiliation."

134.     On or about March 12, 2008, JOHN DOE #1 submitted to Lifemark a Transamerica annuity application in which the owner was E.R., a client of CARAMADRE, and the annuitant was Patrick Garvey.

135.     On or about March 17, 2008, JOHN DOE #1 sent an e-mail to a Lifemark representative, falsely stating that Patrick Garvey was a client of EPR and that Garvey and CARAMADRE had a "business relationship."

136.     On or about April 10, 2008, during an on-site audit of JOHN DOE #1's offices within Estate Planning Resources, CARAMADRE made misrepresentations to LifeMark representatives, including falsely representing that the individuals listed as annuitants were not being compensated in any way and that some of these individuals had agreed to serve as annuitants because CARAMADRE, at the request of the local Catholic Diocese, had paid for the funeral expenses of

a family member.

137.     On or about May 12, 2008, JOHN DOE #1 submitted a
Hartford Life annuity application to Lifemark in which the
listed owner was JOHN DOE #2 and the annuitant was Lucille
Horton, a terminally-ill Rhode Islander.

138.     On or about May 12, 2008, JOHN DOE #2 executed a
Lifemark "Assurances of Annuity Owner" form, in which he
falsely represented that Horton had not received any
compensation in exchange for being named as an annuitant.

## Misrepresentations to Ameritrade

139.     From on or about December 19, 2007, through on or about
July 8, 2008, CARAMADRE and RADHAKRISHNAN opened
approximately 35 joint brokerage accounts at Ameritrade.
These Ameritrade accounts were owned jointly by CARAMADRE (or
one of his nominee owners) and terminally-ill Rhode
Islanders.  In these accounts, CARAMADRE and RADHAKRISHNAN
purchased thousands of death-put bonds.  Upon the deaths of
the terminally-ill co-owners, CARAMADRE and RADHAKRISHNAN
caused these bonds to be redeemed at full face value,
generating millions of dollars in profit.

140.     On or about January 4, 2008, CARAMADRE and RADHAKRISHNAN
submitted an application to Ameritrade to open a joint
brokerage account in the names of CARAMADRE and Patrick
Garvey.  On the application to open this account and the

-44-

accompanying Margin/Options Account Upgrade Form, CARAMADRE and RADHAKRISHNAN provided a false telephone number for Garvey and provided false information concerning Garvey's finances, investment experience and investment objectives.

141.    On or about January 18, 2008, CARAMADRE and RADHAKRISHNAN submitted an application to Ameritrade to open a joint brokerage account in the names of CARAMADRE and James Kimball, a terminally-ill Rhode Islander.  On the application to open this account and the accompanying Margin/Options Account Upgrade Form, CARAMADRE and RADHAKRISHNAN provided a false telephone number for Kimball and provided false information concerning Kimball's finances, investment experience and investment objectives.

142.    On or about February 8, 2008, CARAMADRE and RADHAKRISHNAN submitted an application to Ameritrade to open a joint brokerage account in the names of W.C. and Antonio DeCastro, a terminally-ill Rhode Islander.  Although W.C. is listed as the primary owner on this account, all funding for this account came from CARAMADRE.  On the application to open this account and the accompanying Margin/Options Account Upgrade Form, CARAMADRE and RADHAKRISHNAN provided a false telephone number for DeCastro and provided false information concerning DeCastro's finances, investment experience and investment objectives.

143.     In or about February 2008, CARAMADRE made false representations to an Ameritrade representative concerning CARAMADRE's investment strategy, his relationship with the co-owners on his brokerage accounts and the source of funding for these accounts.

144.     On or about March 4, 2008, CARAMADRE and RADHAKRISHNAN submitted an application to Ameritrade to open a joint brokerage account in the names of CARAMADRE and Edwin Rodriguez.  On the application to open this account and the accompanying Margin/Options Account Upgrade Form, CARAMADRE and RADHAKRISHNAN provided a false telephone number for Rodriguez and provided false information concerning Rodriguez's finances, investment experience and investment objectives.

145.     On or about March 6, 2008, CARAMADRE and RADHAKRISHNAN made false representations to an Ameritrade official concerning CARAMADRE's relationship with the account co-owners and the source of funding for the joint brokerage accounts.

146.     On or about April 22, 2008, CARAMADRE and RADHAKRISHNAN submitted an application to Ameritrade to open a joint brokerage account in the names of CARAMADRE and Dennis Flori, a terminally-ill Rhode Islander.  The application forms contained forgeries of Flori's signature.

-46-

147.     On or about June 17, 2008, CARAMADRE and RADHAKRISHNAN

submitted an application to Ameritrade to open a joint

brokerage account in the names of CARAMADRE and Pia Bernardo,

a terminally-ill Rhode Islander.  The signatures of Bernardo

on the application opening documents were forged.

148.     On or about June 27, 2008, CARAMADRE and RADHAKRISHNAN

submitted an application to Ameritrade to open a joint

brokerage account in the names of CARAMADRE and Robert

Cazeault, a terminally-ill Rhode Islander.  On the

application to open this account and the accompanying

Margin/Options Account Upgrade Form, CARAMADRE and

RADHAKRISHNAN provided a false telephone number for Cazeault

and provided false information concerning Cazeault's

finances, investment experience and investment objectives.

### Misrepresentations to E*Trade

149.     From on or about July 17, 2008, through on or about

August 20, 2008, CARAMADRE and RADHAKRISHNAN opened

approximately eight joint brokerage accounts at E*Trade.

These E*Trade accounts were owned jointly by CARAMADRE and

terminally-ill Rhode Islanders.  In these accounts, CARAMADRE

and RADHAKRISHNAN purchased numerous death-put bonds.  Upon

the deaths of the terminally-ill co-owners, CARAMADRE and

RADHAKRISHNAN caused these bonds to be redeemed at full face

value, generating substantial profits.

-47-

150.     On or about August 7, 2008, CARAMADRE and RADHAKRISHNAN

submitted an application to E*Trade to open a joint brokerage

account in the names of CARAMADRE and Betty Esser, a

terminally-ill Rhode Islander.  On the application to open

this account and the accompanying Options Trading

Application, CARAMADRE and RADHAKRISHNAN provided a false

telephone number for Esser and provided false information

concerning Esser's investment experience.

151.     On or about August 11, 2008, CARAMADRE and RADHAKRISHNAN

submitted an application to E*Trade to open a joint brokerage

account in the names of CARAMADRE and Maria Nina, an elderly

Rhode Islander.  On the application to open this account and

the accompanying Options Trading Application, CARAMADRE and

RADHAKRISHNAN provided a false telephone number for Nina and

provided false information concerning Nina's investment

experience.

152.     On or about August 11, 2008, CARAMADRE and RADHAKRISHNAN

caused an employee of Estate Planning Resources to falsely

notarize Nina's signature on a document submitted to E*Trade

granting power of attorney to RADHAKRISHNAN.

153.     On or about September 5, 2008, CARAMADRE and

RADHAKRISHNAN met with representatives of E*Trade at the

offices of Estate Planning Resources.  During this meeting,

CARAMADRE made false and fraudulent representations to

E*Trade representatives concerning the purpose of the eight E*Trade joint accounts, the relationship between CARAMADRE and the co-account owners and the source of funding for the accounts.

## Misrepresentations to Charles Schwab

154.    From on or about February 4, 2009, through on or about April 8, 2009, CARAMADRE and RADHAKRISHNAN opened approximately 7 joint brokerage accounts at Charles Schwab. These Charles Schwab accounts were owned jointly by CARAMADRE, CARAMADRE's wife, RADHAKRISHNAN, and others associated with CARAMADRE together with terminally-ill Rhode Islanders.  In these accounts, CARAMADRE, RADHAKRISHNAN and others purchased hundreds of death-put bonds.  Upon the deaths of the terminally-ill co-owners, CARAMADRE and RADHAKRISHNAN caused these bonds to be redeemed at full face value, generating substantial profits.

155.    On or about February 4, 2009, CARAMADRE and RADHAKRISHNAN submitted an application to Charles Schwab to open a joint brokerage account in the names CARAMADRE's wife and Michael Sgambato.  On the application to open this account, CARAMADRE and RADHAKRISHNAN provided a false telephone number and e-mail address for Sgambato and provided false information concerning Sgambato's income, net worth and investment experience.

156.        On or about February 24, 2009, CARAMADRE and

RADHAKRISHNAN submitted an application to Charles Schwab to

open a joint brokerage account in the names of RADHAKRISHNAN

and William Hazelwood, a terminally-ill Rhode Islander.

Although RADHAKRISHNAN is listed as the primary owner on this

account, all funding for this account came from CARAMADRE.

On the application to open this account, CARAMADRE and

RADHAKRISHNAN provided a false telephone number and e-mail

address for Hazelwood and provided false information

concerning Hazelwood's income, net worth and investment

experience.

157.        On or about March 20, 2009, CARAMADRE and RADHAKRISHNAN

submitted an application to Charles Schwab to open a joint

brokerage account in the names of JOHN DOE #2's wife and

Bruce Marshall, a terminally-ill Rhode Islander.  On the

application to open this account, CARAMADRE and RADHAKRISHNAN

provided a false telephone number and e-mail address for

Marshall and provided false information concerning Marshall's

income, net worth and investment experience.

158.        On or about March 27, 2009, CARAMADRE and RADHAKRISHNAN

submitted an application to Charles Schwab to open a joint

brokerage account in the names of W.C. and Linda Barbeau, a

terminally-ill Rhode Islander.  On the application to open

this account, CARAMADRE and RADHAKRISHNAN provided a false

telephone number and e-mail address for Barbeau and provided false information concerning Barbeau's income, net worth and investment experience.

## Misrepresentations to TradeKing

159.     From on or about February 2, 2009, through on or about February 5, 2009, CARAMADRE and RADHAKRISHNAN caused to be opened two brokerage accounts at TradeKing.  In these accounts, CARAMADRE and RADHAKRISHNAN purchased numerous death-put bonds.  Upon the deaths of the terminally-ill co-owners, CARAMADRE and RADHAKRISHNAN caused these bonds to be redeemed at full face value, generating substantial profits.

160.     On or about February 2, 2009, CARAMADRE and RADHAKRISHNAN submitted an application to TradeKing to open a joint brokerage account in the names of CARAMADRE's wife and Richard Wiley, a terminally-ill Rhode Islander.  On the application to open this account, CARAMADRE and RADHAKRISHNAN provided a false telephone number for Wiley and provided false information concerning Wiley's income, net worth and investment experience.

## Misrepresentations Made to Secure Death Certificates

161.     On or about May 6, 2008, RADHAKRISHNAN executed an Application for a Certified Copy of a Death Record at the Town Hall of Cranston, Rhode Island, in an effort to obtain the death certificate of Vincent Moretti, who had been a co-

owner with CARAMADRE on an Ameritrade brokerage account. In this Application, RADHAKRISHNAN falsely represented that Estate Planning Resources was a law firm representing Moretti and that the death certificate was sought for "estate planning" purposes.

162.    On or about May 30, 2008, RADHAKRISHNAN executed an Application for a Certified Copy of a Death Record at the Town Hall of Coventry, Rhode Island, in an effort to obtain the death certificate of Donna Perotta, who had been a co-owner with CARAMADRE on an Ameritrade brokerage account. In this Application, RADHAKRISHNAN falsely represented that Estate Planning Resources was a law firm representing Perotta and that the death certificate was sought for "estate planning" purposes.

163.    On or about May 30, 2008, RADHAKRISHNAN executed an Application for a Certified Copy of a Death Record at the Town Hall of Johnston, Rhode Island, in an effort to obtain the death certificate of Michael Mallane, who had been a co-owner with W.C. on an Ameritrade brokerage account. In this Application, RADHAKRISHNAN falsely represented that Estate Planning Resources was a law firm representing Mallane and that the death certificate was sought for "estate planning" purposes.

## Execution of the Scheme: Wires

164.     On or about the dates specified below, in the District

of Rhode Island and elsewhere, for the purpose of executing

the aforementioned scheme and artifice to defraud, and

attempting to do so, and aiding and abetting each other, the

defendants,

**JOSEPH CARAMADRE**
**and**
**RAYMOUR RADHAKRISHNAN**

did knowingly transmit and cause to be transmitted by means

of wire communication in interstate commerce the materials

set forth below:

| Count | Date | Terminally Ill Person | From | To | Material |
|---|---|---|---|---|---|
| 1 | 2/13/08 | Antonio DeCastro | Citizens Bank account of Law Offices of Joseph Caramadre | First Nat'l Bank of Omaha, f/b/o TD Ameritrade | Wire transfer of $200,000 into joint Ameritrade account of DeCastro |
| 2 | 3/5/08 | John Lang | Citizens Bank account of Law Offices of Joseph Caramadre | First Nat'l Bank of Omaha, f/b/o TD Ameritrade | Wire transfer of $200,000 into joint Ameritrade account of Lang |
| 3 | 3/26/08 | Michael Mallane | Citizens Bank account of W.C. | First Nat'l Bank of Omaha, f/b/o TD Ameritrade | Wire transfer of $200,000 into joint account of W.C. & Michael Mallane |
| 4 | 4/23/08 | Vincent Moretti | Estate Planning Resources | Ameritrade | Facsimile transmission of joint account application |
| 5 | 6/16/08 | Robert Mizzoni | Estate Planning Resources | Nationwide Life Insurance Company | Facsimile transmission of "fund to fund" exchange authorization |
| 6 | 6/18/08 | Pia Bernardo | Citizens Bank account of Law Offices of Joseph Caramadre | First Nat'l Bank of Omaha, f/b/o TD Ameritrade | Wire transfer of $300,000 into joint Ameritrade account of Bernardo |

| 7 | 6/24/08 | John Gonsalves | Citizens Bank account of Law Offices of Joseph Caramadre | First Nat'l Bank of Omaha, f/b/o TD Ameritrade | Wire transfer of $30,000 into joint Ameritrade account of Gonsalves |
|---|---------|----------------|------------------------------------------------------|-----------------------------------------------|---------------------------------------------------------------------|
| 8 | 6/25/08 | Dennis Flori | Citizens Bank account of Law Offices of Joseph Caramadre | First Nat'l Bank of Omaha, f/b/o TD Ameritrade | Wire transfer of $15,000 into joint Ameritrade account of Flori |
| 9 | 6/25/08 | Edwin Rodriguez | Citizens Bank account of Law Offices of Joseph Caramadre | First Nat'l Bank of Omaha, f/b/o TD Ameritrade | Wire transfer of $280,000 into joint Ameritrade account of Rodriguez |
| 10 | 6/25/08 | James Kimball | Citizens Bank account of Law Offices of Joseph Caramadre | First Nat'l Bank of Omaha, f/b/o TD Ameritrade | Wire transfer of $20,000 into joint Ameritrade account of Kimball |
| 11 | 6/30/08 | Robert Cazeault | Citizens Bank account of Law Offices of Joseph Caramadre | First Nat'l Bank of Omaha, f/b/o TD Ameritrade | Wire transfer of $300,000 into joint Ameritrade account of Cazeault |
| 12 | 7/1/08 | Hattie Strobel | Citizens Bank account of Law Offices of Joseph Caramadre | First Nat'l Bank of Omaha, f/b/o TD Ameritrade | Wire transfer of $300,000 into joint Ameritrade account of Strobel |
| 13 | 7/23/08 | Charles Perry | Citizens Bank account of Law Offices of Joseph Caramadre | First Nat'l Bank of Omaha, f/b/o TD Ameritrade | Wire transfer of $10,000 into joint Ameritrade account of Perry |
| 14 | 8/13/08 | Maria Nina | Estate Planning Resources | E*Trade | Facsimile transmission of joint account application |
| 15 | 8/13/08 | John Kivalos | Citizens Bank account of Law Offices of Joseph Caramadre | First Nat'l Bank of Omaha, f/b/o TD Ameritrade | Wire transfer of $20,000 into joint Ameritrade account of Kivalos |
| 16 | 9/19/08 | Augusto Escobar de Rodas | Citizens Bank account of Law Offices of Joseph Caramadre | First Nat'l Bank of Omaha, f/b/o TD Ameritrade | Wire transfer of $19,000 into joint Ameritrade account of Escobar de Rodas |
| 17 | 9/19/08 | Sonia Gonzalez | Citizens Bank account of Law Offices of Joseph Caramadre | First Nat'l Bank of Omaha, f/b/o TD Ameritrade | Wire transfer of $26,000 into joint Ameritrade account of Gonzalez |
| 18 | 10/3/08 | Donna Perotta | Citizens Bank account of Law Offices of Joseph Caramadre | First Nat'l Bank of Omaha, f/b/o TD Ameritrade | Wire transfer of $12,000 into joint Ameritrade account of Perotta |

| 19 | 10/31/08 | Sandra Bulpitt | Estate Planning Resources | Western Reserve | Facsimile transmission of Delivery and Receipt Acknowledgment for annuity in which Bulpitt was the annuitant |
| 20 | 2/2/09 | Richard Wiley | Estate Planning Resources | TradeKing | Electronic submission of joint account application |
| 21 | 2/10/09 | Arthur Culotta | Citizens Bank account of Raymour Radhakrishnan | National Financial Service, LLC | Wire transfer of $400,000 into joint Fidelity account of Culotta |
| 22 | 2/18/09 | Patrick Garvey | Citizens Bank account of Law Offices of Joseph Caramadre | First Nat'l Bank of Omaha, f/b/o TD Ameritrade | Wire transfer of $105,000 into joint Ameritrade account of Garvey |
| 23 | 2/24/09 | William Hazelwood | Estate Planning Resources | Charles Schwab | Electronic submission of joint account application |
| 24 | 3/27/09 | Linda Barbeau | Estate Planning Resources | Charles Schwab | Electronic submission of joint account application |
| 25 | 9/1/09 | Bertha Howard | TD Ameritrade | Estate Planning Resources | E-mail of quarterly statement |
| 26 | 9/30/09 | Bruce Marshall | e-mail address of Radhakrishnan | Charles Schwab | statement of account in which Marshall was co-owner |

Each in violation of Title 18, United States Code, Sections 1343 and 2.

## Counts 27-32
## Mail Fraud
## 18 U.S.C. 1341

165.     The Grand Jury realleges and incorporates by reference,
as if fully set forth herein, the General Allegations
(paragraphs 1-21), the Fraud Scheme (paragraph 23), the
Objects of the Scheme to Defraud (paragraphs 24-26), the
Manner and Means of the Scheme to Defraud (paragraphs 27-69)
and the Specific Instances By Which the Objects of the Fraud
Scheme Were Accomplished (paragraphs 70-163).

### Execution of the Scheme: Mailings

166.     On or about the dates specified below, in the District
of Rhode Island and elsewhere, for the purpose of executing
the aforementioned scheme and artifice to defraud, and
attempting to do so, and aiding and abetting each other, the
defendants,

JOSEPH CARAMADRE
and
RAYMOUR RADHKRISHNAN

did knowingly cause to be delivered by United States mail or
a private or commercial interstate carrier, according to the
directions thereon, and receive from the United States mail
or a private or commercial interstate carrier, the materials
set forth below:

| Count | Defendant(s) | Date | Terminally ill Person(s) | From | To | Material |
|---|---|---|---|---|---|---|
| 27 | CARAMADRE | 1/2/09 | Donald Duarte | Midland National | T.M. | check for $113,057 death benefit paid on death of Duarte |
| 28 | CARAMADRE RADHAKRISHNAN | 1/5/09 | Nathan Lee | Raymour Radhakrishnan | Pacific Life | letter exercising 20 day free look |
| 29 | CARAMADRE RADHAKRISHNAN | 3/15/09 | Richard Wiley | Estate Planning Resources | TradeKing | trading author- ization |
| 30 | CARAMADRE | 4/2009 | Getahun Aynalem | First Allmerica Life Insurance Company | A.H. | variable annuity quarterly statement |
| 31 | CARAMADRE RADHAKRISHNAN | 4/8/10 | Denise Egan Doris Hoyle Betty Esser Margaret Orlyck | Caramadre | E*Trade | death certifi- cates |
| 32 | CARAMADRE | 6/3/10 | Alfred LaMonte | MetLife | John Doe#1 | claim response letter |

Each in violation of Title 18, United States Code, Sections 1341 and 2.

**COUNT 33**
**Conspiracy to Commit Offenses Against the United States**
**18 U.S.C. §371**

167.     The General Allegations contained in paragraphs one (1) through twenty-one (21) of this Indictment are realleged in this Count and are incorporated by reference as if fully set forth herein.

168.     Beginning in or about July 2007 and continuing at least through August 2010, in the District of Rhode Island and elsewhere,

**JOSEPH CARAMADRE**
**and**
**RAYMOUR RADHAKRISHNAN**

did knowingly and willfully conspire with each other and with others known and unknown to the Grand Jury to commit and attempt to commit offenses against the United States as follows:

    a.   Mail Fraud, in violation of 18 U.S.C. § 1341;

    b.   Wire Fraud, in violation of 18 U.S.C. § 1343;

    c.   Identity Fraud, in violation of 18 U.S.C. § 1028(a)(7); and

    d.   Aggravated Identity Theft, in violation of 18 U.S.C. § 1028A(a)(1).

**Objects of the Conspiracy**

169.     The Objects of the Conspiracy were the same as the Objects of the Scheme to Defraud which occurred subsequent to the formation of the conspiracy in or about July 2007 and continuing

through August 2010. Accordingly, the allegations in paragraphs 24-25, to the extent they concern events that took place in or after July 2007, are incorporated by reference and realleged as if fully set forth herein.

## The Manner and Means of the Conspiracy

170.    The Manner and Means of the Conspiracy were the same as the Manner and Means of the Scheme to Defraud which occurred subsequent to the formation of the conspiracy in or about July 2007 and continuing through August 2010. Accordingly, the allegations in paragraphs 27-30 and 33-69, to the extent they refer to the Manner and Means that took place in or after July 2007, are incorporated by reference and realleged as if fully set forth herein.

## Overt Acts in Furtherance of the Conspiracy

171.    The Overt Acts in Furtherance of the Conspiracy were the same as the Specific Instances By Which the Objects of the Fraud Scheme Were Accomplished which occurred subsequent to the formation of the conspiracy in or about July 2007 and continuing through August 2010. Accordingly, the allegations in paragraphs 89-120, 127-129 and 134-163 are incorporated by reference and realleged as if fully set forth herein.

All in violation of Title 18, United States Code, Section 371.

<u>Counts 34-59</u>
<u>Identity Fraud</u>
18 U.S.C. § 1028(a)(7)

<u>Introduction</u>

172.     The Grand Jury realleges and incorporates by reference paragraphs 1-21 and 24-163 of this Indictment as if fully set forth herein.

173.     On or about the dates set forth below, in the District of Rhode Island and elsewhere, the defendants,

**JOSEPH CARAMADRE**
**and**
**RAYMOUR RADHAKRISHNAN**

did knowingly transfer, possess and use, without lawful authority, means of identification, to wit, names, social security numbers, dates of birth, mother's maiden names, driver's license numbers, and state identification numbers of other persons, listed below, with the intent to commit, and to aid and abet each other, in connection with unlawful activity that constitutes a violation of Federal law, to wit, Wire Fraud, in violation of 18 U.S.C. 1343, and Mail Fraud, in violation of 18 U.S.C. 1341:

| Count | Date | Defendant | Name of Individual Whose Means of Identification Was Used | Use of Means of Identification |
|-------|------|-----------|-----------------------------------------------------------|---------------------------------|
| 34 | 12/20/06 | Caramadre | Donald Duarte | Midland National Annuity Application |
| 35 | 1/4/08 | Caramadre Radhakrishnan | Patrick Garvey | Ameritrade Account Application |
| 36 | 1/18/08 | Caramadre Radhakrishnan | James Kimball | Ameritrade Account Application |
| 37 | 2/1/08 | Caramadre Radhakrishnan | Charles Perry | Ameritrade Account Application |
| 38 | 2/1/08 | Caramadre Radhakrishnan | Bertha Howard | Ameritrade Account Application |
| 39 | 2/8/08 | Caramadre Radhakrishnan | Antonio DeCastro | Ameritrade Account Application |
| 40 | 3/4/08 | Caramadre Radhakrishnan | John Lang | Ameritrade Account Application |
| 41 | 3/4/08 | Caramadre Radhakrishnan | Edwin Rodriguez | Ameritrade Account Application |
| 42 | 3/19/08 | Caramadre Radhakrishnan | Donna Perotta | Ameritrade Account Application |
| 43 | 3/25/08 | Caramadre Radhakrishnan | Michael Mallane | Ameritrade Account Application |
| 44 | 4/8/08 | Caramadre Radhakrishnan | Sonia Gonzalez | Ameritrade Account Application |
| 45 | 4/22/08 | Caramadre Radhakrishnan | Dennis Flori | Ameritrade Account Application |
| 46 | 5/5/08 | Caramadre Radhakrishnan | Augusto Escobar de Rodas | Ameritrade Account Application |
| 47 | 6/17/08 | Caramadre Radhakrishnan | Pia Bernardo | Ameritrade Account Application |
| 48 | 6/13/08 | Caramadre Radhakrishnan | John Kivalos | Ameritrade Account Application |
| 49 | 6/23/08 | Caramadre Radhakrishnan | John Gonsalves | Ameritrade Account Application |
| 50 | 6/27/08 | Caramadre Radhakrishnan | Robert Cazeault | Ameritrade Account Application |
| 51 | 6/30/08 | Caramadre Radhakrishnan | Hattie Strobel | Ameritrade Account Application |
| 52 | 8/11/08 | Caramadre Radhakrishnan | Maria Nina | E*Trade Account Application |
| 53 | 10/15/08 | Caramadre Radhakrishnan | Sandra Bulpitt | Western Reserve Life Annuity Application |

| 54 | 12/18/08 | Caramadre Radhakrishnan | Nathan Lee | Western Reserve Annuity Application |
| 55 | 2/2/09 | Caramadre Radhakrishnan | Arthur Culotta | Fidelity Investments Account Application |
| 56 | 2/2/09 | Caramadre Radhakrishnan | Richard Wiley | TradeKing Acct. Application |
| 57 | 2/24/09 | Caramadre Radhakrishnan | William Hazelwood | Charles Schwab Account Application |
| 58 | 2/26/09 | Caramadre Radhakrishnan | Bruce Marshall | Charles Schwab Account Application |
| 59 | 3/27/09 | Caramadre Radhakrishnan | Linda Barbeau | Charles Schwab Account Application |

Each in violation of 18 U.S.C. §§ 1028(a)(7) and 2.

## COUNTS 60-64
## AGGRAVATED IDENTITY THEFT
## 18 U.S.C. §§ 1028A(a)(1)

174.    The Grand Jury realleges and incorporates by reference paragraphs 1-21 and 24-163 of this Indictment as if fully set forth herein.

175.    On or about February 1, 2008, CARAMADRE and RADHAKRISHNAN submitted to Ameritrade an application to open a joint brokerage account in the names of W.C. and Bertha Howard.  The signatures of Howard on the Ameritrade account opening documents are forgeries and were submitted to Ameritrade without Howard's knowledge or consent.

176.    On or about April 8, 2008, CARAMADRE and RADHAKRISHNAN submitted to Ameritrade an application to open a joint brokerage account in the names of CARAMADRE and Sonia Gonzalez.  The application forms contain forgeries of Gonzalez's signature and

were submitted to Ameritrade without Gonzales' knowledge or
consent.

177.     On or about April 22, 2008, CARAMADRE and RADHAKRISHNAN
submitted to Ameritrade an application to open a joint brokerage
account in the names of CARAMADRE and Dennis Flori.   The
application forms contain forgeries of Flori's signature.

178.     On or about June 13, 2008, CARAMADRE and RADHAKRISHNAN
submitted to Ameritrade an application to open a joint brokerage
account in the names of CARAMADRE and John Kivalos.   The
application forms contain forgeries of Kivalos' signature and
were submitted without Flori's knowledge or consent.

179.     On or about June 17, 2008, CARAMADRE and RADHAKRISHNAN
submitted to Ameritrade an application to open a joint brokerage
account in the names of CARAMADRE and Pia Bernardo.   The
signatures of Bernardo on the Ameritrade account opening
documents are forgeries and were submitted to Ameritrade without
Bernardo's knowledge or consent.

180.     On or about the dates set forth below, in the District of
Rhode Island and elsewhere, defendants JOSEPH CARAMADRE and
RAYMOUR RADHAKRISHNAN, during and in relation to the felony
offenses of Wire Fraud (18 U.S.C. § 1343) and Mail Fraud (18
U.S.C. § 1341), did knowingly transfer, possess, and use,
without lawful authority, means of identification of other
persons, to wit names, social security numbers, dates of birth,

government issued driver's license and identification numbers of the individuals set forth below:

| Count | Date | Identity Used | Use of Identity | Material |
|-------|------|---------------|-----------------|----------|
| 60 | 2/1/08 | Bertha Howard | forged signature, name, social security number and date of birth | TD Ameritrade application |
| 61 | 4/8/08 | Sonia Gonzalez | forged signature, name, social security number and date of birth | TD Ameritrade application |
| 62 | 4/22/08 | Dennis Flori | forged signature, name, social security number and date of birth | TD Ameritrade application |
| 63 | 6/13/08 | John Kivalos | forged signature, name, social security number and date of birth | TD Ameritrade application |
| 64 | 6/17/08 | Pia Bernardo | forged signature, name, social security number and date of birth | TD Ameritrade application |

Each in violation of 18 U.S.C. §§ 1028A(a)(1) and (c)(5) and 18 U.S.C. § 2.

## COUNT 65
### Monetary Transaction Derived from Specified Unlawful Activity
### 18 U.S.C. §§ 1957(a) and (b)(1) and (2)

181.    The Grand Jury realleges and incorporates by reference paragraphs 1-21 and 24-163 of this Indictment in their entirety as if fully set forth herein.

182.    In or about December 2007, in order to conceal his involvement in the purchase of an annuity from Midland National, CARAMADRE purchased an annuity from Midland National by falsely and fraudulently purchasing the annuity in the name of

RADHAKRISHNAN.   The annuity application falsely listed RADHAKRISHNAN as the true owner of the annuity, despite the fact that all monies deposited for this annuity were provided by CARAMADRE.   In addition, the death benefit paid on this annuity was forwarded to CARAMADRE by RADHAKRISHNAN.

183.     The Midland National annuity purchased by CARAMADRE in the name of RADHAKRISHNAN identified the annuitant as Denise Egan ("Egan"), a terminally-ill Rhode Islander.   The application falsely described Egan as a "friend" of RADHAKRISHNAN.

184.     In order for the RADHAKRISHNAN/Egan annuity application to be accepted by Midland National, RADHAKRISHNAN was required to provide information concerning his employment and net worth. This information was required by Midland National, and Broker-Dealer Sammons, to ensure that the annuity was a suitable investment.   CARAMADRE and RADHAKRISHNAN falsely informed Midland National and Sammons that RADHAKRISHNAN was employed at Networked Display Systems, that his annual income at Networked Displayed Systems was greater than $250,000 and that his net worth was greater than $1,000,000.

185.     On or about November 30, 2007, CARAMADRE wrote a $20,000 check to RADHAKRISHNAN from a Citizens Bank account in the name of the Law Offices of CARAMADRE.   RADHAKRISHNAN negotiated that $20,000 check and deposited the proceeds into his Citizens Bank account.   On or about December 1, 2007, RADHAKRISHNAN wrote a

check from his Citizens Bank account in the amount of $20,000 to Midland National.  This check accompanied the Midland National annuity application in the name of RADHAKRISHNAN with annuitant Egan.

186.     On or about February 21, 2008, CARAMADRE wrote a $780,000 check to RADHAKRISHNAN from a Citizens Bank account in the name of the Law Offices of CARAMADRE.  RADHAKRISHNAN deposited that $780,000 check into his Citizens Bank account.  On or about February 25, 2008, RADHAKRISHNAN wrote a check from his Citizens Bank account in the amount of $780,000 to Midland National. This $780,000 check was for funds to be added to the Midland National annuity that had been opened the name of RADHAKRISHNAN with annuitant Egan.

187.     On or about February 4, 2009, Midland National paid the death claim submitted by RADHAKRISHNAN by issuing a check to RADHAKRISHNAN in the amount of $883,743.72.  RADHAKRISHNAN deposited this check into his Citizens Bank account.

188.     On or about February 9, 2009, RADHAKRISHNAN wrote a check from his Citizens Bank account to CARAMADRE in the amount of $883,743.72.  On or about February 9, 2009, CARAMADRE caused that check to be deposited into his Citizens Bank account in the name of the Law Offices of CARAMADRE.

189.      On or about February 9, 2009, in the District of Rhode
Island,

**JOSEPH CARAMADRE**
**and**
**RAYMOUR RADHAKRISHNAN**

did knowingly engage and attempt to engage in a monetary
transaction by and through or to a financial institution,
affecting interstate or foreign commerce, in criminally deprived
property of a value greater than $10,000; that is CARAMADRE and
RADHAKRISHNAN caused to be written a check from the Citizens
Bank account of RADHAKRISHNAN in the amount of $883,743.72 to
CARAMADRE, such property having been derived from specified
unlawful activity, that is Mail Fraud, in violation of 18 U.S.C.
§ 1341, and Wire Fraud, in violation of 18 U.S.C. § 1343.

In violation of 18 U.S.C. § 1957(a) and (b)(1) and (2).

## COUNT 66
## WITNESS TAMPERING
## 18 U.S.C. § 1512(b)(3)

190.     The Grand Jury realleges and incorporates by reference
paragraphs 1-21 and 24-163 of this Indictment as if fully set
forth herein.

191.     On or about April 19, 2010, a United States Postal
Inspector (the "Postal Inspector") investigating this case
telephoned T.M. and asked if he would speak with him in
connection with an ongoing investigation of JOSEPH CARAMADRE.
T.M. agreed to meet with the Postal Inspector.

192.     Prior to T.M.'s meeting the Postal Inspector, T.M. called
CARAMADRE and informed him that the Postal Inspector wished to
speak with him about CARAMADRE.  During this conversation,
CARAMADRE falsely told T.M. that the money CARAMADRE had
previously paid him was for work T.M. had performed in
CARAMADRE's house.

193.     On or about April 20, 2010, the Postal Inspector met with
T.M. and asked him if a $2,000 check he received from CARAMADRE
was a payment for referring a terminally-ill individual to
CARAMADRE.  T.M. intentionally lied to the Postal Inspector,
telling him that the check was not a payment for referring a
terminally-ill individual to CARAMADRE, but rather was payment
for construction work that T.M. had performed in CARAMADRE's
house.

194.     The information T.M. provided the Postal Inspector, at the behest of defendant JOSEPH CARAMADRE, was false in that the aforementioned check was not in payment for any work that T.M. had completed at CARAMADRE's house.  Rather, the $2,000 check was a payment CARAMADRE made to T.M. for referring a terminally-ill individual to CARAMADRE.

195.     On or about April 20, 2010, in the District of Rhode Island, defendant

### JOSEPH CARAMADRE

did knowingly and corruptly persuade, and attempt to corruptly persuade another person, and engage in misleading conduct toward another person, with intent to hinder, delay and prevent the communication to a law enforcement officer of information related to the commission or possible commission of a Federal offense.

In violation of 18 U.S.C. § 1512(b)(3).

## FORFEITURE ALLEGATIONS

**The Grand Jury further charges that:**

The allegations of Count One through Thirty-Two (paragraphs 1-166) are realleged and incorporated by reference herein for the purpose of seeking forfeitures pursuant to the provisions of Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c).

As a result of the offenses alleged in Counts 1 through 32 of this Indictment, in violation of Title 18, United States Code, Sections 1341 and 1343,

JOSEPH CARAMADRE
and
RAYMOUR RADHAKRISHNAN

herein, upon conviction, shall forfeit to the United States any and all property, real or personal, which constitutes, or is derived from, proceeds traceable to such violations, including, but not limited, to the following:

    (a)   the real property and buildings located at 90 Beechwood Drive, Cranston, Rhode Island, having a deed recorded in Cranston City Hall, Cranston Rhode Island, said property having been purchased by defendant CARAMADRE on February 20, 2004;

    (b)   one black 2009 Cadillac Escalade automobile, bearing Vehicle Identification Number 1GYFK26219R241982; said vehicle having been purchased by defendant CARAMADRE in 2009;

    (c)    one white 2005 Rolls-Royce Phantom automobile, bearing Vehicle Identification Number SCA1S68495UX07761; said vehicle having been purchased by defendant CARAMADRE in 2005; and

    (d)    one black 2007 Mercedes-Benz S550 automobile, bearing Vehicle Identification Number WDDNG86X37A147282; said vehicle having been purchased by defendant CARAMADRE in 2007.

In addition, the United States moves for a money judgment in the amount representing the remaining amount of criminally derived proceeds in violation of 18 U.S.C. §§ 1341 and 1343 after taking into consideration the above described assets and funds already recovered from third parties.

### Substitute Assets

If any of the property described above as being subject to forfeiture, as a result of the act or omission of a defendant:

a.    cannot be located upon the exercise of due diligence;

b.    has been transferred, sold to or deposited with a third party;

c.    has been placed beyond the jurisdiction of the Court;

d.    has been substantially diminished in value; or

e.    has been commingled with other property which cannot be divided without difficulty; it is the intent of the United States, pursuant to 21 U.S.C. 853(p), to seek to forfeit any other property of the defendants(s) up to the value of the property listed above.

All pursuant to Title 18, United States Code, Section 981(a)(1)

(C) and Title 28, United States Code, Section 2461(c).

A TRUE BILL:

**REDACTED**

Date: 11/17/11

PETER F. NERONHA
United States Attorney

LEE H. VILKER
Assistant U.S. Attorney

JOHN P. MCADAMS
Assistant U.S. Attorney

STEPHEN G. DAMBRUCH
Criminal Chief
Assistant U.S. Attorney