UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) Criminal No. 11-186-S |
| v. | ) |
| | ) |
| JOSEPH CARAMADRE | ) |
| | ) |
| and | ) |
| | ) |
| RAYMOUR RADHAKRISHNAN | ) |
| | ) |
| Defendants. | ) |

GOVERNMENT'S OPPOSITION TO
DEFENDANTS' MOTION TO SUPPRESS RULE 15 DEPOSITIONS

The United States of America, by and through its undersigned attorneys, hereby opposes Defendants Joseph Caramadre and Raymour Radhakrishnan's "Motion To Suppress Rule 15 Depositions," (hereinafter "Motion to Suppress").[1]

The defendants seek to suppress the testimony of the few terminally-ill individuals who were still alive in 2009 despite the fact that the defendants were represented at the depositions by highly competent attorneys who vigorously cross-examined each of the terminally-ill individuals on every fact relevant to this case. Defendants' constitutional rights were well protected throughout the deposition process. Defendants' motion to suppress this testimony is

_____

[1]Defendant Caramadre filed the motion (Document #36); Defendant Radhakrishnan moved to join and adopt Caramadre's motion as if it were his own (Document #37).

1

nothing but an attempt to prevent the jury from hearing testimony that is powerfully incriminating – testimony from the terminally-ill individuals that they had no knowledge that their identities were to be used on any brokerage accounts or annuities. (See transcripts of depositions of Richard Wiley, Edwin Rodriguez, Robert Mizzoni, Patrick Garvey and Anthony Pitocco, attached to this Memorandum.)[2]  As the defendants' constitutional rights were safeguarded throughout the deposition process, the motion to suppress should be denied.

BACKGROUND

A. **Rule 15 Motion and Court Authorized Depositions**

On September 14, 2009, the Government filed a motion requesting authorization to depose nine[3] individuals who were terminally-ill pursuant to Federal Criminal Procedure Rule 15(a)(1) (hereinafter "Motion to Take Rule 15 Depositions", attached as Exhibit 1).  That Rule provides that "[a] party may move that a prospective witness be deposed in order to preserve testimony for trial.  The Court may grant the motion because of exceptional circumstances and in the interest of

_____

[2]As the Court is aware, the Government's motion was filed in sealed proceeding Msc. 09-84S.  The parties filed an "Assented to Motion to Unseal" that matter so that documents and transcripts filed therein could be made part of the record in the criminal case, Cr. No. 11-186S.  In a chambers conference, the Court directed the parties to appropriately redact portions of the documents.  A separate filing containing the redacted record of Msc. 09-84S will be filed as soon as possible.  The parties agreed that the Exhibits attached to this filing are redacted according to the Court's direction and therefore may be attached to this filing.

[3]The request was later modified to ten depositions.

justice." The Government advised the Court that it was investigating Caramadre and Radhakrishnan in connection with a scheme to defraud insurance companies and bond issuers by making misrepresentations to terminally-ill people in order to induce them to sign documents and provide identity information in furtherance of the scheme. (Id. at 1-2). During a hearing on the motion on September 17, 2009, the Government spelled out the theory of prosecution and the testimony it sought to elicit from the terminally-ill individuals. See excerpts below at pp. 5-6.

On September 22, 2009, the Court issued an Order authorizing the Government to take the depositions. Two of the proposed deponents, Alfred Sanford and Anthony Lancelotti, died before their depositions could be taken. Another proposed deponent, Jason Veveiros, was too ill to have his deposition taken; he died in December 2010 at age 32. Richard Wiley's deposition was taken September 30, 2009; Mr. Wiley passed away November 15, 2009 at age 79. Robert Mizzoni's deposition was taken October 23, 2009; Mr. Mizzoni passed away on January 23, 2012 at age 88. Leon Bradshaw's deposition was taken December 1, 2009; Mr. Bradshaw died October 12, 2010 at age 74. Patrick Garvey's deposition was taken November 20, 2009; Mr. Garvey passed away at age 62 on April 22, 2011. Anthony Pitocco's deposition was taken April 21, 2010; Mr. Pitocco passed away November 25, 2011 at age 73. Edwin Rodriguez' deposition was taken October 5, 2009. Mr. Rodriguez, age 35, is alive but his diagnosis remains terminal. It is unknown at this time whether

3

he will be able to testify at trial.

In addition, defendants Caramadre and Radhakrishnan took the deposition of their own witness, Charles Buckman, pursuant to Rule 15. The Government did not object to the deposition of Mr. Buckman. Mr. Buckman is alive, but it is unknown whether he will be able to testify at trial. The defendants' Motion to Suppress does not indicate whether they intend to present Mr. Buckman's testimony at trial or whether they seek to suppress the testimony of their own witness as well.

Caramadre and Radhakrishnan were physically present and represented by counsel at the depositions of Mizzoni, Bradshaw, Pitocco, and Rodriguez. Radhakrishnan was physically present with his attorney, Jeffery Pine, for the deposition of Mr. Wiley; Caramadre elected not to attend the Wiley deposition but his attorney, Robert Flanders, attended and vigorously cross-examined Mr. Wiley. The deposition of Garvey took place in Las Vegas, Nevada. Radhakrishnan was physically present for the deposition, along with his attorney. Caramadre and his attorney elected to participate by live video-conferencing.

**B.    The Government repeatedly advised the defendants of the theory of prosecution and nature of charges against them**

Defendants argue in an ambiguous 5th Amendment due process claim, without citing a single point of authority, that the depositions should be suppressed because the defendants "were prejudiced by not having been given notice of the charges against them before participating in the depositions." (Def. Motion at 4-5). Nothing could be further from

4

the truth, as prior to the depositions the defendants were repeatedly given notice of the nature of the charges under consideration, the theory of prosecution, and the relevance and subject matter of the witnesses' testimony.

In its motion to take the Rule 15 Depositions, the Government stated that Caramadre and Radhakrishnan:

> [E]stablished a program to benefit terminally ill individuals living in Rhode Island, pursuant to which terminally ill individuals would be given a few thousand dollars. The names of many of these individuals (approximately 112) were subsequently used as "measuring lives" on bonds and annuities that were issued. That is, upon the death of these terminally ill individuals, the owner of the bond or annuity stands to make substantial sums from the bond issuers and insurance companies, collectively totaling many millions of dollars.

(Exh. 1, Gov't Motion to Take Rule 15 Depositions, at 1).

The Government further elaborated on the nature and relevance the deponents' testimony:

> Many of these individuals have informed law enforcement that they believed the money they received was a gift and that they had no knowledge that their names were being used in the applications for bonds or annuities. The defense has asserted that these terminally ill individuals were all fully informed that their names would be used in these bonds or annuities and understood that those providing them with a few thousand dollars stood to make substantial sums upon their deaths. Clearly, the testimony of these nine individuals who are still alive is critical to this investigation. And, unfortunately, as described below, it is equally clear that these individuals are unlikely to be alive if and when a trial is commenced in this case. Their testimony therefore needs to be preserved.

(_Id_. at 1-2).

The Government followed up its initial motion with a "Memorandum

In Support of its Motion to Take Rule 15 Depositions," attached as

Exhibit 2.  The Government stated:

> [I]t appears that the targets of the investigation made
> material misrepresentations and omissions to terminally ill
> hospice patients in order to obtain their identity
> information and signatures for use on documents.  These
> documents were then used to obtain lucrative financial
> instruments which paid substantial sums to the targets upon
> the death of the terminally ill person.

Exh. 2 at 1.

Moreover, during the hearing on the Government's Motion to Take

Rule 15 Depositions, the Court inquired into the theory of prosecution.

Addressing the Court, AUSA McAdams stated:

> ...[T]here is a viable theory of prosecution, and that is, if
> I may summarize it, that the targets, or some of the targets
> made false material representations to these terminally-ill
> individuals in order to induce them to provide information
> and to sign documents, including identity information, which
> was then used to perpetrate a fraud on these financial
> service companies.

(Transcript of hearing, September 17, 2009, attached as Exhibit 3, at

p. 20).

Indeed, in a Memorandum of Law submitted to the Court by defense

counsel in opposition to the Rule 15 depositions (which was

incorporated by reference in the Defendants' Motion to Suppress),

defendants themselves acknowledged that the Government had described

the theory of prosecution to them:

> As represented to defense counsel (but not in the
> Government's papers) the Government has suggested that either
> the annuity companies, or insurance companies, or bond
> issuers were induced to part with funds as a result of
> misrepresentations made by one or more of the targets to the

6

> prospective deposition witnesses; or that the witnesses
> themselves were defrauded because in reliance of
> misrepresentations allegedly made by one or more of the
> targets, they were deprived of the right to seek additional
> compensation for themselves.

(Memorandum of Targets, attached hereto as Exhibit 4, at 7).

Defense counsel further elaborated that these allegations "sound in mail or wire fraud" but then questioned whether the testimony would be material. Id. at 7. What defense counsel left out from its objection was that in a meeting at the United States Attorney's Office prior to filing its Motion to Take Rule 15 Depositions, counsel for the Government informed defense counsel[4] that the investigation was examining possible identity theft and aggravated identity theft charges in addition to mail and/or wire fraud. The Government followed up that meeting by referring counsel for the defendants to specific case law which addressed concerns defense counsel raised regarding the materiality of misrepresentations made to the terminally-ill individuals in order to obtain money from the insurance companies and bond issuers. (See E-mail from AUSA Lee Vilker to Attorney Robert Flanders, attached as Exhibit 5).

All of these summaries of the theory of prosecution are consistent with the theory of prosecution alleged in the Indictment. Indeed they are "substantially similar," if not identical, to the manner and means

---

[4]At the time, both Caramadre and Radhakrishnan were represented by Robert Flanders, Esq and his firm, Hinckley, Allen & Snyder, LLP.

of the fraud scheme and the conspiracy[5] alleged in the Indictment,

which states:

> It was part of the scheme to defraud that CARAMADRE and
> RADHAKRISHNAN fraudulently obtained millions of dollars by
> making material misrepresentations and omissions to (1)
> terminally-ill and elderly people, their family members and
> care-givers, in order to obtain identity information and
> signatures for use in furtherance of the scheme; (2)
> Insurance Companies; (3) Bond Issuers; and (4)
> intermediaries, including Brokerage Houses and Broker-
> Dealers.

Indictment, ¶27.

Prior to the depositions, the Government repeatedly advised the

defendants of the nature of the crimes it was investigating.  The

Government described the offenses "with sufficient clarity to show a

violation of law, and enable the accused to know the nature and cause

of the accusation against him." See e.g., United States v. Allard, 864

F.2d 248 (1st Cir. 1989); United States v. Fusaro, 708 F.2d 17, 23 (1st

Cir. 1983), cert. denied, 464 U.S. 1007,(1983).

### C.   Discovery was provided to the Defendants in advance of the depositions

As part of its Order authorizing the Rule 15 depositions, the

Court directed that "the Government must make a full disclosure to the

Targets of all materials which would be discoverable in the usual

course under Fed. R. Crim. P. 16 including any and all Brady and Jencks

---

[5]Paragraph 170 of the Indictment reads: "The Manner and
Means of the Conspiracy were the same as the Manner and Means of
the Scheme to Defraud which occurred subsequent to the formation
of the conspiracy in or about July 2007 and continuing through
August 2010."

statements." *Opinion and Order*, In re: Grand Jury Proceedings, 697
F.Supp.2d. 262 at 275.  The Government fully complied with this
directive, providing the defendants with all of the evidence in its
possession.  See e.g., "Cover Letter from AUSA Vilker to Counsel dated
9/23/2009", (Sealed Ex A to Msc. 09-84S Document 19) (providing "the
totality of information obtained by the Government in this
investigation as of the date of this letter" as discovery materials in
advance of depositions).  Following this initial discovery production,
the Government continued to supplement discovery as more documentation
was received so that the defendants had every document in the
Government's possession concerning each witness before the commencement
of each deposition.

D.  **The factual nature of the testimony of the Rule 15 deponents
was limited in scope**

Although Caramadre and Radhakrishnan executed a complex fraud
scheme to obtain money from the insurance companies and bond issuers,
the factual nature of their involvement with the terminally-ill
deponents was not complex.  With respect to each deponent, either
Caramadre or Radhakrishnan had one or two meetings with the terminally-
ill person, meetings which ranged from 15 minutes to over an hour.
Thus, the fundamental factual issues were simple: what happened during
those brief meetings and what representations were made by the
defendants.

In the September 17, 2009 hearing, on the Government's Motion to
Take Rule 15 Depositions, the Government specifically described how the

depositions of the terminally-ill individuals related to the theory of

prosecution and witnesses.   AUSA Vilker stated:

> And your Honor, if I might address, I understand the concern
> you raised about how will the Defendants know exactly what
> the charges are and what our theory is, that would be spelled
> out in an indictment.   And that argument is very well taken;
> however this is not factually a very complex case as far as
> these witnesses go.   They were all approached by one of the
> targets.   They were told certain things about why they were
> getting money and they signed some forms, usually in one or
> two meetings.   It's going to be very easy for the targets to
> understand that the crux of their testimony is what they were
> told about the documents they were signing, whether they
> were told that it was just charity or whether they were told
> that any annuities or bonds would be purchased.   It's really
> not rocket science.   And making an argument that it's
> completely impossible to predict what this case will be and
> exactly how we're going to charge it, in my view, is really
> misleading.   These people had one or two interactions with
> some of the targets in this case, and they can very easily be
> asked the same exact questions that they would be asked if
> they were at trial, which is what was told to you, what was
> the reason you accepted this money, did you have any idea
> that your name was going to be used.   It's not that
> complicated.

(Transcript of September 17, 2009 hearing, attached as Exhibit 3, at p.

33).   Thus, the facts surrounding each deponent's involvement were

extremely limited in scope.   Indeed, each deponent's involvement in

this case was so limited factually that, two years later, defendants

cannot cite even to a single question they would ask of the deponents

now that was not already asked during the depositions.

<u>ARGUMENT</u>

I.   <u>The Depositions Are Admissible Trial Testimony</u>

   A.   <u>Rule 15 authorizes pre-indictment depositions</u>

The defendants seek to suppress the depositions for the same reasons they opposed the taking of the depositions in the first place, namely their claim that Rule 15 does not authorize pre-indictment depositions.  The Government argued, and the Court held, that Rule 15 authorizes the Court to permit pre-indictment depositions in exceptional circumstances and the interests of justice; that exceptional circumstances were warranted allowing the Government to conduct the depositions; and that the interests of justice warranted allowing the Government to conduct the depositions.  *Opinion and Order*, <u>In re: Grand Jury Proceedings</u>, 697 F.Supp.2d 262, 269 (D.RI 2010).  For the reasons set forth in its request and in the Court's Opinion and Order, the Government maintains that this decision was correct.

While the defendants incorporate by reference their earlier arguments, they offer no new authority for their position.  (Motion to Suppress at 1).  Accordingly, the depositions are admissible, subject to the Federal Rules of Evidence and the defendants' constitutional rights.

Moreover, even assuming *arguendo* that there was a violation of Rule 15 (which the Government vigorously denies), the defendants fail to articulate a reason why a violation of Rule 15 would require the extreme remedy that the jury should not hear the testimony.

It is a general principle that relevant evidence is admissible unless otherwise prohibited by the Constitution, statute, the Federal Rules of Evidence, or case law.  See F.R.E. 402; United States v. Foley, 871 F.2d 235 (1st Cir. 1989).  Even assuming, *arguendo*, that the Court erred in permitting the depositions to be taken pursuant to Rule 15, the fact is that the depositions constitute relevant, material evidence.  Procedural errors are not a basis for the extreme sanction of excluding admissible evidence from trial.  Cf. United States v. Payner, 447 U.S. 727, 735-36 (1980)(Courts may not suppress evidence on generalized public policy grounds); United States v. Goncalves, 642, F.3d 245, 250 (1st Cir. 2011)(same); United States v. Santana, 6 F.3d 1, 10 (1st Cir. 1993)(recognizing society's interest in fully informed adjudication).  "'Any apparent limitation upon the process of discovering truth in a federal trial ought to be imposed only upon the basis of considerations which outweigh the general need for untrammeled disclosure of competent and relevant evidence in a court of justice.'" Payner, 447 U.S. at 735, quoting Elkins v. United States, 364 U.S. 206, 216 (1960).  "The exclusionary rule is an extreme sanction designed to deter misconduct rather than to punish the errors of judges and magistrates."  United States v. Leon, 468 U.S. 897, 916, (1984). Where, as here, the Government sought Court approval to conduct Rule 15 depositions in order to protect the defendants' confrontation clause rights, there is simply no reason to exclude the depositions on the basis of an alleged Rule 15 error.  Rather, the Court should evaluate

their admissibility as it would any other evidence: according to the Federal Rules of Evidence and applicable case law, particularly in the context of F.R.E. 804(a)(4)&(b)(1) (regarding prior testimony of unavailable witnesses) and Crawford v. Washington, 541 U.S. 36 (2004).

As discussed below, the depositions in this case satisfy the requirements of both F.R.E. 804(a)(4)&(b)(1) and Crawford.

**B.    The Depositions Are Admissible Under F.R.E 804(a)(4)&(b)(1) (Prior Testimony of an Unavailable Witness)**

Federal Rule of Evidence 804(a)(4) defines an "unavailable witness" as one who is "unable to testify at the hearing because of death or then existing physical or mental illness or infirmity." F.R.E. 804(b)(1) states that former testimony by an unavailable witness is not excluded by the hearsay rule if it is:

> Testimony given as a witness at another hearing of the same or a different proceeding, or in a deposition taken in compliance with law in the course of the same or another proceeding, if the party against whom the testimony is now offered ... had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination.

There is no dispute that the witnesses are "unavailable."[6]   Thus, the issue on which admissibility turns is whether the defendants had an "opportunity and similar motive" to develop the witnesses' testimony through cross-examination.   United States v. Salerno, 505 U.S. 317,

---

[6]Mr. Wiley, Mr. Mizzoni, Mr. Garvey, and Mr. Pitocco are unavailable to testify by reason of death. Whether Mr. Rodriguez' health will be strong enough to enable him to testify during the trial is unknown at present. If Mr. Rodriguez is available to testify at trial, it will not be necessary to introduce his deposition at trial.

320-321 (1992); Delaware v. Fensterer, 474 U.S. 15, 19-20 (1985); United States v. Omar, 104 F.3d 519, 523 (1st Cir. 1997).

Similar motive does not mean identical motive; therefore the similar-motive inquiry is inherently factual, depending upon the similarity of issues and the context of the questioning. Salerno, 505 U.S. 317, 326 (Blackmun, J. Concurring). See also United States v. Lombard, 72 F.3d 170, 188 (1st Cir. 1995), cert. denied, 520 U.S. 1266 (1997)(party against whom testimony is offered must have had similar, not necessarily identical, motive to develop adverse testimony in prior proceeding).

The First Circuit has held that "for purposes of Rule 804(b)(1), we focus narrowly on a party's motive and opportunity to develop particular testimony on a particular issue." United States v. Bartelho, 129 F.3d 663, 672 (1st Cir. 1997); see also United States v. DiNapoli, 8 F.3d 909, 912 (2nd Cir. 1993)(same test). Similar motive is determined by whether the questioner is on the same side of the same issue in both proceedings and whether the questioner had a substantially similar interest in asserting that side of the issue. Bartelho, 129 F.3d at 672. Under that test, the similar-motive inquiry under Rule 804(b)(1) requires scrutiny of the factual and procedural context of each proceeding to determine both the issue in dispute and the intensity of interest in developing the particular issue by the party against whom the disputed testimony is offered. Id.

In this case, defendants Caramadre and Radhakrishnan had a

14

similar, if not identical, motive to cross-examine each of the
deponents.   Their motive was to attempt to establish that no
misrepresentations were made by seeking to impeach and discredit the
witnesses' testimony that they never consented to being named as
annuitants and/or account co-owners.   As shown below, the defendants
vigorously cross-examined each of the witnesses on these precise issues
in an attempt to demonstrate bias and to impeach their memory and
credibility.   Since the defendants had substantially the same motive
for cross-examination during the depositions that they would at trial,
the depositions are admissible under Rule 804(b)(1).

### C.   Defendant's Confrontation Clause Rights Were Protected

Prior to 2004, out-of court, testimonial statements by unavailable
witnesses were admissible if they (1) had been subject to prior cross-
examination or (2) otherwise bore adequate indicia of reliability.   See
Ohio v. Roberts, 448 U.S. 56, 66 (1980).   Addressing the latter
category in Crawford v. Washington, 541 U.S. 36 (2004), the Supreme
Court held that a witness's out-of-court testimonial statements are
inadmissible unless the defendant had a prior opportunity to cross-
examine the witness, regardless of other indicia of reliability.
Nothing in Crawford purports to alter the law regarding out-of court
testimonial statements which were, as here, subject to cross-
examination.   "The Sixth Amendment demands what the common law
required: unavailability and a prior opportunity for cross-
examination."   Crawford, 541 U.S. 36 at 68.   "The Framers would not have

allowed admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." Id. at 53-54. "The common law in 1791 conditioned admissibility of an absent witness's examination on unavailability and a prior opportunity to cross-examine.  The Sixth Amendment therefore incorporates those limitations." Id. at 54.

Both post-Crawford and pre-Crawford, the law is well established that the testimony of an unavailable witness subject to prior cross-examination is admissible pursuant to Rule 804; all that is required is that the defendant had similar, not identical, motive for cross examination. See, e.g., United States v. Alexander, -F.3d-, 2012 WL 48214 (testimony from earlier suppression hearing admissible because motive similar); United States v. West, 790 F.Supp 2d 673 (N.D. IL, 2011)(Rule 15 depositions of material witnesses admissible because motive and opportunity to cross was similar); Trignones v. Bissonnette, 296 F.3d 1 (1st Cir. 2002)(testimony admissible because defendant had sufficient opportunity to cross-examine witness at suppression hearing); Barthelo, 129 F.3d at 672 (prior testimony inadmissible because motive was different); United States v. Lombard, 72 F.3d 170, 188 (1st Cir. 1995)(defendant had similar motive to cross-examine at earlier state trial); United States v. Vartanian, 245 F.3d 609, 614 (6th Cir. 2001)(prior testimony from civil case admissible in criminal case because motive similar); United States v. Mejia, 376 F.Supp 2d. 460,

461 (S.D.N.Y., 2005)(testimony from prior trial admissible because motive similar); United States v. Munoz-Franco, 124 F. Supp.2d 32, 35-36 (D. Puerto Rico, 2000) (depositions can be admissible at criminal trial but prosecution failed to prove similar motive to develop testimony).

As will be seen below, Caramadre and Radhakrishnan were given, and took advantage of, the opportunity to cross-examine each of the deposed witnesses. The defendants were on "the same side of the issue" in the depositions as they will be at trial, and their motive and opportunity to develop the testimony was at least "substantially similar," if not "identical" to their motive at trial. The witnesses were under oath, subject to unlimited cross-examination and the ability to lodge objections, all factors which the First Circuit has held support admissibility under 804(b)(1) and "assuage any reasonable Confrontation Clause concerns." United States v. McKeeve, 131 F.3d 1, 10 (1st Cir. 1997).

Moreover, the First Circuit has approved the admission of videotaped Rule 15 depositions in criminal trials pursuant to F.R.E. 804. See e.g., United States v. Acevedo-Ramos, 842 F.2d 5, 8 (1st Cir. 1988); United States v. Keithan, 751 F.2d 9, 12 (1st Cir. 1984). Videotaped depositions provide the jury the "opportunity to observe the testimonial demeanor of the witnesses," which "enhances important Confrontation Clause values, including the perception of fairness in criminal trials." McKeeve, 131 F.3d at 11; see also Maryland v. Craig,

17

497 U.S. 836, 846 (1990).

### D.   **Defendants Effectively Cross-Examined Each of the Deponents**

Caramadre and Radhakrishnan seek to suppress the testimony of the few "measuring lives" who were still alive when this investigation commenced by arguing that prior counsel was unable to "prepare[] a more effective attack" and "better prepare[] to bring out evidence in support of those facts consistent with his defense." (Motion to Suppress at 5). This argument is belied by the thorough cross-examinations that defense counsel conducted of each of the deponents.

Despite subsequently receiving a 72-page speaking Indictment, as well as discovery including tens of thousands of pages of documentary evidence and the statements of every witness in the case, Caramadre and Radhakrishnan fail to articulate a single question they would have asked if the depositions instead occurred post-Indictment or at trial.

The Government cannot begin to imagine what could have been asked of the deponents in their hours long cross-examinations that was not already asked. In any event, even if the defendants were able to identify new, different, or additional lines of questioning based on evidence discovered after the depositions were conducted, the admissibility of the depositions would not be affected. This is because a failure to develop particular testimony despite the same issue and level of interest at each proceeding does not constitute a lack of opportunity or a dissimilar motive for purposes of Rule 804(b)(1). _Bartehlo_, 129 F.3d at 672, n.9. See also United States v.

Zurosky, 614 F.2d 779, 793 (1st Cir. 1979).  The failure of a defendant to discover potentially useful evidence at the time of the former proceeding does not constitute a lack of opportunity to cross-examine. United States v. Koon, 34 F.3d 1416, 1427,(9th Cir. 1994) *reversed on other grounds*, 518 U.S. 81 (1995).  See also Thomas v.Cardwell, 626 F.2d 1375, 1386 n. 34 (9th Cir. 1980), *cert. denied,* 449 U.S. 1089 (1981).  It is the opportunity to cross-examine, rather than the scope or efficacy of its employment, which is important under Rule 804(b)(1).

"Often information will surface after a trial which, if known to a defense attorney, would have made the cross-examination of a witness more thorough or even more advantageous to the defendant. Nevertheless, that lack of information does not make the opportunity for cross-examination ineffective even though the cross-examination itself is less than optimal for the defendant." Koon, 34 F.3d 1416, 1427, quoting Thomas, at 1386 n. 34.

The same applies here.  Caramadre and Radhakrishnan did not lack the opportunity to cross-examine the deponents. See e.g., Koon, 34 F.3d at 1427; United States v. McClellan, 868 F.2d 210, 215 (7th Cir. 1989) ("the emphasis in [the Rule 804(b)(1)] inquiry is upon the motive underlying the cross-examination rather than the actual exchange that took place"); United States v. Salim, 855 F.2d 944, 953-54 (2nd Cir. 1988)(under Rule 804(b)(1), (defendant is entitled to "'an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might

19

wish.'") (quoting <u>Delaware v. Fensterer,</u> 474 U.S. 15, 20, (1985) (emphasis in original).

Contrary to their claim that they were unable to properly prepare for cross-examination, the defendants prepared and executed effective confrontation of the deponents.  Caramadre and Radhakrishnan were represented by highly competent attorneys (including a former Rhode Island Supreme Court Justice and a former Rhode Island Attorney General).  The theories of prosecution (fraud and identity theft) were spelled out to the defense prior to the depositions and the facts surrounding each witness were limited to a couple of brief meetings with one or the other of the defendants.

On direct examination, each of the deponents testified concerning their brief interactions with the defendants and stated that they had no knowledge that their identities were to be used on any brokerage accounts or annuities.

On cross-examination, each of the witnesses was extensively and thoroughly cross-examined in an effort to discredit their memories and impeach their credibility.  The deponents were challenged in numerous ways, including their ability to recall, possible biases and even criminal history (for one of the deponents).  In short, it is difficult to imagine what defense counsel could now ask of these witnesses that was not already inquired of during their prior testimony.

### 1. **Deposition of Richard Wiley**

The first deposition in this case, on September 30, 2009, was of Richard Wiley ("Wiley"). At the time, Wiley was a 79 year old man suffering from terminal cancer. Wiley passed away shortly after the deposition, on November 15, 2009. (A transcript of the Wiley deposition is attached as Exhibit 6.)

On direct examination, Wiley was asked about his two interactions with defendant Radhakrishnan and the brokerage account that had been opened in his name with the wife of defendant Caramadre:

> Q. Okay. What, if anything, did he say these documents were for?
> (Objection)
>
> A. He didn't say any -- any specific thing, just that he would match me up with somebody and that was it.
>
> Q. Now, this document, Government Exhibit 1, says, "Brokerage Account" on it. Did Mr. Radhakrishnan say anything to you about a brokerage account?
>
> A. No.
>
> Q. Did you have any knowledge that a brokerage account in your name would be opened?
>
> A. No.
>
> Q. Did you give your consent to open any type of account?
>
> A. No.

(Exh. 6 at 29-30)

Following his direct examination, Wiley was subjected to hours of cross-examination in which the attorneys for the defendants vigorously challenged Wiley's memory of his interactions with Radhakrishnan, his

understanding of the documents he signed and his meetings with the
Government.

The attorney for Radhakrishnan, Jeffrey Pine, Esq., was the first
to cross-examine Wiley.  Pine is a former Attorney General for the
State of Rhode Island and an accomplished criminal defense attorney.
Pine used this opportunity to probe the details of Wiley's interactions
with Radhakrishnan in an effort to discredit Wiley's memory and
credibility.  The following is an example of this line of inquiry:

> Q.   Okay.  Had he talked about any kind of accounts that --
>      during that first meeting, had  he talked about any kinds of
>      accounts or programs that you might be interested in getting
>      involved in?
>
> A.   No.
>
> Q.   And do you have a specific memory that he did not mention
>      that or you just don't remember?
>
> A.   Well, he didn't.  I mean I -- my recollection is he never
>      said anything about any specific accounts in anything.
>
> Q.   Okay.  So you don't remember whether he mentioned any kind of
>      financial programs or accounts or investment opportunities or
>      anything like that?
>      (Objection)
>
> Q.   You don't have a memory of that --
>
> A.   No, I don't.
>
> Q.    -- as we sit here today?  But you do have  a memory of him
>      saying, "We need to match you up with somebody"?
>
> A.   Yeah.  But I don't know if it was somebody, with what or who.
>
> Q.   Okay.  But you do have that -- you have a specific memory of
>      that as we sit here?
>
> A.   Yeah.

* * *

22

Q.   And do you have a memory sitting here today of Raymour going over this document with you?  It's entitled "Brokerage Account" and there's other

A.   No, no, no.  No, I did not.

Q.   And are you saying he didn't or you don't remember it?

A.   He didn't go over it with me.

                    *  *  *

Q.   Right, okay.  And isn't it true that – that Raymour went through -- in a blank version went through this document and some of those terms with you on that second meeting?  Isn't that true that that's what he did?

A.   No.

Q.   You don't remember that or he didn't do it?

A.   He didn't do it.

Q.   Okay.  Did he read from any document that -

A.   He read, whisked right through very fast.

                    *  *  *

Q.   Okay.  Did you ask him any questions about what it meant?

A.   No.

Q.   Did you understand what it meant in some of those terms that I just talked about?

A.   I understand some of those terms you're talking about.

(Exh. 6 at 78-79, 83, 86-87)

     After defendant Radhakrishnan's attorney completed his questioning

of Wiley, the attorney for Caramadre, Robert Flanders, Esq., a former

Rhode Island Supreme Court justice and experienced criminal defense

attorney, continued in an effort to call into question Wiley's memory

of his interactions with Radhakrishnan and the documents that were

                              23

presented to him:

Q.   You signed a bunch of documents for Raymour, didn't you?

A.   Yes.

Q.   And he read to you from these documents, didn't he?

A.   He read about a half a paragraph as we went to another one and right down the line.

Q.   And he read to you from each of them, correct?

A.   A little bit of something.

Q.   And you read -- and you read some of them yourself, didn't you?

A.   No.

Q.   You partially read some of them, didn't you?

A.   A little bit with -- with him.

Q.   Yeah.

A.   And he said, "Sign here and here," so...

Q.   And he spent an hour and a half with you going over these documents, didn't he?

A.   About -- well, I don't about an hour and a half, but it seemed like a long time to me.

Q.   Yup.  And he -- and he had actually two meetings with you where he showed you these documents; isn't that right?

A.   I recollect one meeting.

         *  *  *  *
Q.   All right.  And he went through and he read the documents partially to you as you say?

A.   Yeah.

Q.   And -- and -- explained to you what this was going to involve?

24

A.   No.  He never explained what it was going to involve.

Q.   He just read from the documents?

A.   Yeah.

Q.   Okay.  And did you tell him that you didn't understand what
     he was saying?

A.   No.  I just -- I wanted the money so I went along with it.

Q.   That's right.  And you then invited him to come back again,
     right, to sign them up and get your money?

A.   Yes, I did.

                         *  *  *

Q.   At any point after he read to you from the documents and
     talked with you for an hour and a half at this second
     meeting, did you tell him, "I don't want to do this"?

A.   No.

Q.   Did you tell him, "I don't understand what you're talking
     about"?

A.   No, I didn't.

Q.   And after he got finished in talking with you and reading
     from the documents, you  decided to go ahead and sign them,
     Didn't you?

A.   Certainly, I did.

(Exhibit 6 at 123-127)

     In short, both defendants were afforded the opportunity to be

present as their counsel aggressively cross-examined Wiley about every

aspect of his brief interactions with Radhakrishnan, his understanding

of the documents that he signed and his meetings with the FBI that

preceded the deposition.  It cannot reasonably be argued that

defendants were denied an opportunity to effectively confront Wiley

                              25

concerning the facts of this case.

### 2. Edwin Rodriguez

On October 5, 2009, the parties deposed Edwin Rodriguez ("Rodriguez"). Rodriguez is a 35 year-old man who is paralyzed from the waist down and is suffering from osteomyelitis, a terminal chronic bone disorder. Since the deposition, Rodriguez's health has continued to deteriorate as he has endured operations and other medical procedures. It is uncertain if he will be physically able to testify at trial. (A transcript of Rodriguez's deposition is attached as Exhibit 7.)

On direct examination, the Government inquired of Rodriguez into the details of his two interactions with Radhakrishnan and his knowledge of the annuity and brokerage account that were opened in his name:

Q.   What, if anything, did Raymour say to you when you signed
     this -- the third page of this document about any kind of
     brokerage account?
     (Objections)

A.   No, he said nothing about no brokerage account.

Q.   Do you recall ever reading any words that said brokerage
     account?

A.   No.

                    *  *  *

Q.   Well, what understanding, if any, did you have as to whether
     you were entering into an agreement with Joseph Caramadre?
     (Objections)

                    *  *  *

Q.   Do you have -- what, if anything, did Raymour say to you about opening up an account in your name at Ameritrade?

A.   None whatsoever.

Q.   Did you have any idea any kind of accounts were going to be opened in your name?

A.   No.

Q.   At the time you signed Government Exhibits 1 through 6, what knowledge, if any, did you have of whether Raymour or anyone else to -- to make any money upon your death?

A.   None whatsoever.

                        *  *  *

Q.   Before you met with anyone from the Government in this case, what knowledge, if any, did you have of any accounts being opened or existing in your name at Ameritrade?

A.   None.

(Exh. 7 at 31-33, 40, 55)

Following the direct examination, counsel for Radhakrishnan aggressively questioned Rodriguez concerning a wide range of matters, including the medications he was taking (Exh. 7 at 75-77), his physical condition (id. at 78-82), his employment history and income (id. at 84-87), his meetings with the Government (id. at 97-98), and even his criminal history resulting from events that took place more than 14 years before (id. at 113-119). The bulk of the cross-examination, however, consisted of an attempt by counsel to impeach Rodriguez's testimony that he was never told that an account or annuity would be opened in his name:

Q.   What did he tell you about -- what did he explain to you about why he was there and what the wealthy gentleman was

                              27

going to do for people?

A.    He said that he would probably help me out with some money
and that he would pay part of my expenses for my funeral
expenses.

Q.    Uh-hum.

A.    That's about it.

                    *  *  *  *

Q.    Did Raymour force you to sign that document?

A.    No.
                    *  *  *  *

Q.    But you would agree that on the document itself, right above
where you signed, it says -- on one page it says, Account
Agreement, does it not?

                (Witness perusing document.)

Q.    Right above where you signed?

A.    Account Agreement.

Q.    Account Agreement.  And on the next page right above where
you signed, it says, Options Account Agreement, does it not?

A.    Yes.  Yes, it does.

Q.    And an account agreement is different  from a receipt, isn't
it?

A.    I believe so.  I don't know.  All these papers are -- I'm --
I'm learning about all these accounts and the things like
that now.

Q.    And it's your testimony that Raymour did not explain what it
is to have an account –

A.    No.

Q.    -- or an account option?

A.    No.
                    *  *  *  *

                        28

Q.   Raymour force you to sign?

A.   No.

Q.   Okay.  He never forced you to sign anything, did he?

A.   No.

(Exh. 7 at 88, 101-102, 107, 124).

Following this examination, Attorney Flanders picked up where Attorney Pine left off, attempting to impeach Rodriguez's testimony that he was never advised that an annuity or brokerage account would be opened in his name:

Q.   If you look at Exhibit 3, which is entitled Agreement and Acknowledgement, on Page 3, if you turn to the third page --

A.   Uh-hum.

Q.   -- is that your signature?

A.   Yes.  Yes, it is.

Q.   All right.  So you don't deny that you signed this document?

A.   Yes, I signed this.

Q.   Okay.  And do you remember whether this document had any of the writing filled in on it other than your signature when you signed it?

A.   No.

Q.   You don't remember?

A.   I don't think -- I don't think it had everything.  All the papers, I believe, were blank.

* * * *

Q.   And you also signed the Government's Exhibit 4 which is an Account Application document, didn't you?

A.   Where?

Q.   On the second page.

A.   Yes, I did.

                    *  *  *  *

Q.   When you signed it, did it have next to your name "Account
     Co-Owner" as it does now?

A.   Yeah, if it --

Q.   Was that there when you signed it?

A.   Yes.

Q.   In the big block letters next to the No. 9 above your
     signature did it have "Account
     Agreement" there?

A.   Yes.

Q.   Those were on the document when you signed it?

A.   Yes.   They had to be.

                    *  *  *  *

Q.   But did Raymour block it out so you couldn't read it?

A.   No.   He just explained it was all for  the money.   That's
     about it.

Q.   Did he tell you not to read it?

A.   No.

                    *  *  *  *

Q.   And you made the decision, when you signed the documents,
     that I don't -- I'm not going to read them; I'll just sign
     them?

A.   Yes, because he explained that it was for that.   Seemed
     like a nice guy and -- and they told me that he already
     done it for other people, so it was okay.

                    *  *  *  *

                          30

Q.   Let me show you Government's Exhibit 8.  Is this another
     one of the documents that you signed when -- in 2009 when
     you met with Raymour?

A.   Yes.  It got my signature.

Q.   And, again, this is a document that right above your name
     says, "Annuitant"?

A.   Yes.

Q.   That was on it when you signed it?

A.   It had to be.  Even if I read it, I don't know what
     annuitant means.  I didn't know what that means.

Q.   Did you ask Raymour what it meant?

A.   No, I never read it, so I never talked nothing about that.

Q.   So you never asked any questions, you just signed because you
     wanted the money?

A.   Yeah.  It was all about they saying helping -- helping me
     out.

(Exhibit 7 at 134-35, 138-39, 142-43, 153).

     The above are just excerpts of the lengthy and aggressive cross-

examination that counsel for defendants conducted of Rodriguez.  This

cross-examination attempted, over and over again, to call into doubt

Rodriguez's testimony that he was never told that any annuities or

accounts would be opened in his name.  The confrontation rights of

defendants Caramadre and Radhakrishnan were well protected during this

deposition.

### 3.  Robert Mizzoni

     Robert Mizzoni ("Mizzoni"), who was 85 years old and suffering

from a variety of ailments, was deposed by the parties on October 23,

2009.   Mizzoni passed away on January 23, 2012.   During his direct

examination, Mizzoni explained that he had known defendant Caramadre

since Caramadre was a child, when Mizzoni was Caramadre's school bus

driver.   (A transcript of Mizzoni's testimony is attached as Exhibit

8.)   Mizzoni testified about a meeting he had with Caramadre in 2004

and the annuity that Caramadre subsequently opened in Mizzoni's name.

On direct examination, Mizzoni testified that he was never advised by

Caramadre that an annuity would be opened in his name or that Caramadre

stood to make any death benefits upon his death:

> Q.   Okay.  Now, that day in Mr. Caramadre's office, when he gave
> you the $2000, what, if anything, did Mr. Caramadre say to
> you about an annuity?
>
> MR. TRAINI:  Objection.
>
> A.   Nothing, nothing about annuity.
>
> Q.   Okay.  What, if anything, did Mr. Caramadre tell you about
> him opening up any Kind of contract using your name?
>
> MR. TRAINI:  Objection.
>
> A.   He didn't tell me nothing about that.
>
> Q.   Okay.
>
> A.   I just got the check and off I went.
>
> Q.   Okay.  What consent, if any, did you give Mr. Caramadre to
> open up an annuity in your name?
>
> A.   What consent?  Who gave it to him?  I didn't give it to him.

(Exh. 8 at 23-24).

Following Mizzoni's direct examination, Attorney Flanders

commenced a lengthy cross-examination.   Flanders' examination concerned

a variety of issues, including challenging Mizzoni on his understanding of the difference between life insurance and annuities (Exh. 8 at 76-84), reviewing Mizzoni's history of receiving insurance, tax and other advice from Caramadre (Exh. 8 at 43-48), inquiring of the details of his meetings with the FBI (Exh. 8 at 65-75) and even attempting to discredit Mizzoni by inquiring into Mizzoni's apparent decision years prior to remove his wife as the beneficiary on his life insurance policy during a time in which he and his wife were separated. (Exh. 8 at 49-56) Attorney Flanders also vigorously challenged Mizzoni's testimony that Caramadre never told him that an annuity would be opened in his name:

> Q. Did -- did you have a conversation with him before then?
>
> A. What conversation? See you later. That's the conversation.
>
> Q. You don't remember him telling you about what the check was for?
>
> A. No. Never. Nobody told me that, nothing, what it was for.
>
> Q. All right. Didn't you believe that as a result of that meeting, you had entered into some investment with Mr. Caramadre?
>
> A. No. No. No. No. No. No. No.
>
>                  * * * *
>
> Q. Did he say that to you when he met with you in his office that day?
>              (Objection)
>
> A. In his office the only thing he told me was what do you want to do, give -- you want to give half to your wife, half to me? That's all he ever said. We -- we didn't go into the -- the biography, none of that stuff.

Q.   Isn't it true that you signed some documents?

A.   I didn't sign nothing.

(Exhibit 8 at 61-62).

Although defendant Radhakrishnan was not even mentioned during Mizzoni's testimony (as Radhakrishnan did not begin working for Caramadre until 3 years after the Mizzoni annuity was purchased), Radhakrishnan was present during the deposition and his counsel was afforded the opportunity to examine Mizzoni.  Attorney Pine took full advantage of this opportunity by further examining Mizzoni concerning his testimony that he had no knowledge that an annuity would be opened in his name:

Q.   Well, what -- what I understood you to say was you weren't aware that he was doing it, right?

A.   But -- but how many -- how many names can you do?  You realize if you got 50 names on a slip and with your name on it, you're the lawyer, who's going to suffer?  Who's going to suffer?

Q.   But he never asked you for any money –

A.   No.

Q.   -- to put into this investment, he did?

A.   No, that ain't the point

Q.   He put his own money on.

A.   Yeah, but it ain't the point.  The point is when I see my name on there is a dead body.  That's like buying a dog and letting him die.

(Exh. 8 at 122).

### 4. Patrick Garvey

Patrick Garvey ("Garvey") was deposed in Las Vegas, Nevada on November 20, 2009. Garvey had moved to Las Vegas in 2008. The targets and their counsel were all invited to personally attend Garvey's deposition. Defendant Radhakrishnan and his counsel attended the deposition in person. Defendant Caramadre and his counsel elected to participate in the deposition from Rhode Island via live video-conferencing. (A transcript of the Garvey deposition is attached as Exhibit 9.)

At the time of the deposition, Garvey was a 62 year-old man suffering from severe heart failure that was incurable without a heart transplant for which he did not qualify. Garvey passed away on April 22, 2011. During his direct examination, Garvey was asked about his brief interactions with defendant Radhakrishnan, the documents that bore his signature and the 2 brokerage accounts and 4 annuities that were opened in his name. Garvey was adamant that Radhakrishnan never told him that any annuities or accounts would be opened in his name and further testified that a number of the signatures of his name on the account opening documents appeared to be forgeries:

Q. Now, you mentioned that Raymour gave you documents to sign?

A. Yes.

Q. Okay. What, if anything, did Raymour say to you about the documents he wanted you to sign?

A. He said they were a formality that Mr. Caramadre required to keep accounts of what he has paid out and people that he has paid it to –

\* \* \* \*

Q.   Okay.  Now, at the time that you were signing the forms in front of Raymour, what, if anything, did Raymour say to you about opening any kind of account in your name?

A.   Nothing.

Q.   What, if anything, did Raymour say to you about opening any kind of brokerage account in your name?

A.   Nothing.

Q.   What, if anything, did Raymour say to you about any annuities being opened in your name?

A.   Never.  Nothing.  Never mentioned.

Q.   What consent, if any, did you give to Raymour to open up any kind of account in your name?

A.   None whatsoever.

Q.   What consent, if any, did you give to Raymour to have any annuities opened in your name?

A.   None whatsoever.

\* \* \* \*

Q.   Now, if you look at the second page, do you see the name Patrick Garvey -- the apparent signature of Patrick Garvey at the bottom of the page next to account co-owner?

A.   I do.

Q.   Okay.  Is that your signature?

A.   It doesn't look like it.

(Exhibit 9 at 28-30, 34).

After Garvey's direct examination was completed, counsel for Radhakrishnan commenced a lengthy and aggressive cross-examination of Garvey.  During this cross-examination, Attorney Pine attempted to

impeach Garvey's credibility by questioning him on a range of issues, including prior statements he made to an investigator, his meetings with the Government and the fact that the Government and an insurance company had paid for his lodging for a week prior to the deposition due to Garvey's recent homeless status. In addition to all of these subject matters, Attorney Pine focused on Garvey's brief meetings with Radhakrishnan and his understanding of the documents that were presented to him:

Q. All right. You also said that you didn't read the document.

A. No.

Q. Okay. Did Raymour prevent you from reading the document when he gave it to you?

A. No. But it was done so fast, he had so many documents coming at me –

Q. Well, did he take them away quickly, or did he allow you the opportunity to read them, if you wanted to?

A. One, one, and then another one. But he allowed me to read them.

        * * * *

Q. Do you have a memory today of what he told you on those days?

A. If I am correct, Raymour turned around and told me, "These papers here are just a formality for Mr. Caramadre so he can keep an account of the people and the money that he is putting out."

Q. And that's what you remember about it?

A. Yeah, that's exactly what I remember.

Q. Is it your testimony that you never saw any documents that referenced a brokerage account or an annuity application?

A.   Never seen it.

Q.   That's your testimony?

A.   Yeah.

                    *  *  *  *

Q.   And you didn't -- even though you had a chance to read it,
     you didn't read it?

A.   Right.

Q.   For whatever reason?

A.   Yeah.

Q.   Okay.  And that's --

A.   Everything -- everything was, "This is just a formality.
     It's just a formality."  I thought nothing of it.  I signed,
     and that was it.

(Exhibit 9 at 113-114, 125, 128)

Following the cross-examination conducted by Attorney Pine,

Attorney Flanders continued to press Garvey on his testimony that he

was unaware of any kind of account or annuity being opened in his name:

Q.   But you knew it was an account?  You knew it was an account,
     and you knew it was bonds?

     (Objection)

A.   No, I didn't.  No, I did not know it was an account or bonds.
     I -- he said, "This is the way we write some checks out,"
     that's all.  He didn't say what it was for, what he was going
     to do with it, or nothing.  I didn't think nothing of it.  I
     thought if it reads, "New account and bonds," maybe that's
     where the money is coming from.  I don't know.

Q.   Weren't you agreeable to signing documents that Raymour
     presented to you and in some cases read to you in exchange
     for the money that you were being given?

A.   No.  Here was some --

Q.   Are you trying --

A.   There were some documents that I signed, but I'm telling you
     those are the ones that  he brought over and said, "These
     have got to be signed," and (indicating), one, two, three,
     four. Sign them," that was it.

                    *  *  *  *
Q.   Okay.  And did he do anything to prevent you from reading the
     -- what was on the  documents that you were signing?

A.   No.

(Exh. 9 at 181-82).

## 5.  Anthony Pitocco

The deposition of Antony Pitocco ("Pitocco") took place on April

21, 2010.  At that time, Pitocco was 73 years old and suffering from

terminal lung cancer.  Pitocco passed away on November 25, 2011.

During his deposition, Pitocco was questioned about the two

annuities that had been opened in his name.  (A transcript of the

Pitocco deposition is attached as Exhibit 10.)   On direct examination,

Pitocco testified that he never saw the ad that had been placed in the

Catholic paper, that he was unaware of any program to help terminally-

ill individuals, that he never met defendant Radhakrishnan or received

any money from Radhakrishnan, and that he was unaware that any

annuities had been opened in his name.  (Exh. 10 at 19-25)

When shown a copy of the Western Reserve annuity application that

bore his name and apparent signature, Pitocco testified that he was

never asked to serve as an annuitant and that the signature on the

application form was not his:

                         39

Q.    Okay.  There appears to be written the name of Anthony
      Pitocco.

A.    Yes.

Q.    Is that your signature?

A.    No.  No.  Wait a minute.  That's my signature but I didn't
      write that one.

Q.    Okay.  That's your name?

A.    My name.  Let me put it that way, that's my name.

Q.    But did you sign it?

A.    No.

Q.    Okay.  Now, if you go back to the first  page of this
      document, the owner of this  annuity is a company listed as
      Conreal, LLC, if you look at it right here.

A.    Okay.

Q.    Have you ever heard of that company before?

A.    Never.

                         *  *  *  *

Q.    Okay.  Now, did you have any knowledge that this company,
      Conreal, LLC, would be opening an annuity with you listed as
      the annuitant?

A.    That was a total shock after I found out what an annuity is
      --

(Exh. 10 at 28-29).

Following his direct examination, counsel for Radhakrishnan

commenced his cross-examination of Pitocco.  Attorney Pine began by

asking detailed questions concerning Pitocco's financial circumstances

and health (Exh. 10 at 57-72).  He then proceeded to press Pitocco on

his testimony that he had never met Radhakrishnan in his life:

                              40

Q.  Now, you testified a little earlier that the gentleman
    sitting next to me, Raymour Radhakrishnan, you had not seen
    before in your life?

A.  Right.

Q.  Is that true?

A.  That's true.

Q.  You never saw him before?

A.  Never saw him before.

Q.  He never came to your house?

A.  Never came to my house.

(Exh. 10 at 77).

Following this line of inquiry, Attorney Pine moved on to question
Pitocco concerning his prior dealings with the Government and insurance
company representatives.  (Exh. 10 at 80-90)  He then attempted to
impeach Pitocco's testimony by collecting signature exemplars from him
and showing him document after document that purportedly bore his
signature and asking if those signatures were forgeries as well:

Q.  Is that your "A"?

A.  The middle initial I think I says --

Q.  Yeah.

A.  -- does not look like my "A".

Q.  The way you make an "A"?

A.  The way I make an "A", if I make an "A".

Q.  Okay.

A.  It's very rare I make an "A".

41

Q.   Okay.

A.   Unless it's required by whatever – whatever I'm signing for.

Q.   Could I ask you to write your signature --

A.   Sure.

Q.   -- on that piece of paper?

A.   It's not going to be the same.

Q.   Can I ask you to do it ten times?

A.   Yes.   Yes.   Ten times?

Q.   Ten times.   Take your time and skip a line between each time.

(Exh. 10 at 101-102).

As with the prior depositions, Attorney Pine's lengthy cross-examination was followed by a vigorous cross-examination conducted by Attorney Flanders.   Flanders began his questioning by inquiring of Pitocco into the contacts he had with Government and insurance company representatives concerning this case.   (Exh. 10 at 133-152).   Counsel then attempted to impeach Pitocco's credibility by inquiring into the amount of pain medication Pitocco was then taking.   Following these questions, Attorney Flanders continued the prior line of inquiry concerning Pitocco's testimony that he did not sign the annuity applications:

Q.   When you were shown Exhibit 11, I think, by either myself or Mr. Vilker, you commented that your middle name was spelled out on that document?

A.   Right.

42

Q.   And did you say something to the effect that you don't usually give out your middle name?

A.   Yeah, it's rare.  It's rare.

Q.   Okay.  Usually when you are talking with somebody or giving out information about yourself, you just go by the middle initial "A"?

A.   If -- if they say to me we want your middle initial, I go just by the "A".  If they say spell it out, well, then I spell it out.

Q.   Okay.

A.   And if nobody says nothing, you'll never see it.

Q.   Right.  You might just sign something --

A.   I just sign Anthony Pitocco.  That's it.

Q.   Right.  Similar to what's on many of the documents.

A.   And the only time I ever spelled - signed "AP" is when I was in business to verifY somebody else's number or there was a mistake and I just -

Q.   Right.

A.   -- to verify that I made the correction.  Like usually it's a check.  I -- I might screw up a check and, you know, the bank ain't going to cash it.

Q.   Right.

A.   So underneath it I'll put "AP" and the bank will cash it.

Q.   And if you were requested to initial a document that you had signed or reviewed or read, might you also put "AP"?

A.   No.  No.  No, because it isn't required.

Q.   Okay.  If somebody asked you to do that?

A.   No.

Q.   Well --

A.   There's got to be a reason to ask me.  Why -- why do you want
     me to verify my own signature?

(Exh. 10 at 130-132).

In each of the five depositions cited above, defendants Caramadre and Radhakrishnan were afforded and took advantage of the opportunity to confront the deponents.  The theories of prosecution - fraud and identity theft based on material misrepresentations and omissions made to the terminally-ill people in order to induce them to sign account documents- were well know to the parties and remained consistent in the Indictment.  The interactions each of these witnesses had with one or the other of the defendants was extremely limited (if at all), consisting of a couple of brief meetings in which a check was provided and a few documents were signed.  Due to the limited nature of the interactions these witnesses had with the defendants, there was only one relevant area of inquiry, namely what each witness knew about his identity being used on annuities and brokerage accounts opened by the defendants and what, if anything, the defendants represented to them.  The defendants utilized highly skilled and respected attorneys to conduct extensive and vigorous cross-examinations of each of the deponents.  The defendants' confrontation clause rights were well protected.

## II. The Rule 15 Depositions Are Not a Form of Grand Jury Abuse

Caramadre and Radhakrishnan also claim the depositions should be suppressed because "the use of these depositions as evidence in [the] trial would be unlawful as an impermissible use of the Grand Jury as a

prosecution tool." (Motion to Suppress at 2). Their claim is baseless. There would have been no need to go to the Court and seek authorization for Rule 15 depositions if the Government's goal was to present the terminally-ill witnesses' testimony to the Grand Jury. The Government could have simply interviewed the witnesses, or deposed them, then provided the information to the Grand Jury, without providing notice to the defendants, and without opportunity to cross-examine. The investigative powers of the Grand Jury are wide ranging and the rules of evidence do not apply.

> The Grand Jury occupies a unique role in our criminal justice system. It is an investigatory body charged with the responsibility of determining whether or not a crime has been committed. Unlike the Court, whose jurisdiction is predicated on a specific case or controversy, the Grand Jury can investigate merely on suspicion that the law is being violated, or even just because it wants assurance that it is not.

United States v. R. Enterprises, 498 U.S. 292, 297 (1991); see, also, Branzenburg v. Hayes, 408 U.S. 665, 701 (1972); United States v. Morton Salt Co., 338 U.S. 632, 642-43 (1950). Far from a form of grand jury abuse, the whole purpose of seeking Rule 15 depositions was to preserve trial testimony from witnesses who would almost certainly be unavailable at the time of trial, and to protect to the confrontation rights of the defendants. During the hearing on the Government's motion, the Government addressed the Court on this very issue:

> Mr. McAdams:   And your Honor, what we are essentially proposing here is to protect the Defendants' Sixth Amendment Rights... We could have simply gone in an ex-parte proceeding...taken these depositions...

45

The Court:     That would have allowed you to get the testimony
before the Grand Jury.  It wouldn't have allowed
you to avoid Crawford.

Mr. McAdams:    It would not have allowed us to avoid Crawford,
exactly.

(Exh. 3 at 16-17).

Mr. McAdams:    So we would be in a situation where there's case
law out there that says we can do it but in order to protect the
defendant's Crawford  rights, we think the appropriate way to do
it is ... to secure their testimony for trial so that it's
available at that point.  And not only secure it at trial, but so
the defendants have an opportunity to cross-examine those
witnesses.

(Id. at 22).

Mr. Vilker:    Right now, we're just trying to preserve some
testimony so when it comes to trial, these people
have a voice.

(Id. at 36).

Moreover, in its Order authorizing the Rule 15 depositions, the

Court made clear that the depositions were not to be presented to the

Grand Jury.  The Court wrote: "While the Court may not order that the

Government refrain from using such depositions in the Grand Jury, the

Court takes the Government counsel at their word that this is not the

purpose and intent of the depositions; use of the depositions at Grand

Jury therefore would subject counsel to the remedial and disciplinary

authority of this Court." *Opinion and Order,* In Re: Grand Jury

Proceedings, 697 F.Supp. 262, 275 (D. R.I. 2010).  Accordingly, the

defendant's grand jury abuse claim is in reality a backdoor allegation

of prosecutorial misconduct.  The Government, of course, strictly

adhered to the Court's directive and no information regarding the

46

depositions was presented to the Grand Jury.  Caramadre has been
repeatedly advised of this fact and, indeed, the transcripts of every
witness that appeared before the Grand Jury have been provided to the
defendants.  The defendants therefore know full well that neither the
depositions themselves nor any testimony about what was said during the
depositions was ever presented to the Grand Jury.  Although Caramadre
on one hand states that he "accepts the Government's representation
that none of the depositions were presented to the Grand Jury," he then
proceeds to "question[] how well the Grand Jury could have been
insulated from hearing any of the evidence disclosed in these
depositions."  (Motion to Suppress at 3).  Caramadre's "questions" of
Grand Jury abuse fall well short of particularized proof required to
make an allegation of Grand Jury abuse.  See United States v. Mechanik,
475 U.S. 66, 74, (1986)(O'Connor, J., Concurring).  They are, at best, a
baseless attempt to sidetrack this prosecution, and at worst, reckless
and unsubstantiated claims of prosecutorial misconduct.

It is hornbook law that there is a presumption of regularity for
all Government proceedings before the Grand Jury. United States v.
Johnson, 319 U.S. 503, 513 (1943); Mechanik, 475 U.S. 66, 74, (O'Connor,
J., Concurring); United States v. Flemmi, 254 F.3d 24, 28 (1st Cir,
2001)("Although the Grand Jury operates under judicial supervision, it
is essentially an independent institution. In recognition of this
status, courts afford Grand Jury proceedings a presumption of
regularity"); United States v. Brothers Construction Co. Of Ohio, 219

47

F.3d 300 (4th Cir. 2000)(same); <u>United States v. Rogers</u>, 960 F.2d 1501, 1512 (10th Cir. 2000)(same). "Prosecutors have been accorded similar leeway in presenting their cases to the Grand Jury." <u>Mechanik</u>, 475 U.S. at 74,(1986)(O'Connor, J., Concurring).

This presumption alone should end all inquiry into Caramadre's allegation that the Government somehow misused the Grand Jury process. A party asserting a claim of Grand Jury abuse must shoulder a heavy burden. <u>Flemmi</u> 254 F.3d at 28; <u>United States v. Badger,</u> 983 F.2d 1443, 1458 (7th Cir. 1993); <u>United States v. Jenkins</u>, 904 F.2d 549, 559 (10th Cir. 1990). This is because the presumption of regularity of Grand Jury proceedings generally may be dispelled only upon a showing of "'particularized proof of irregularities in the Grand Jury process.'" <u>United States v. R. Enterprises Inc.</u>, 498 U.S. 292 at 301, (1991) (quoting <u>Mechanik</u>, 475 US 66 at 75 (O'Connor, J., Concurring); <u>United States v. Samson,</u> - F.Supp 2d -, 2011 WL 5022651 (D. Mass. 2011).

Although the Government could simply rely on that presumption of regularity, it affirmatively repeats its representations that the depositions were never presented to the Grand Jury. That Caramadre cannot cite a single example of the depositions being presented to the Grand Jury is proof enough that his allegations of misconduct are baseless and may well fall short of counsel's obligations to make good faith filings.

Caramadre suggests that because the Indictment includes some charges related to the deponents, the Grand Jury must have been

"tainted by exposure to evidence they should never have been exposed to." (Def. Mem. at 3). This argument is specious. The Grand Jury considered all the evidence that was presented to it - including hundreds of documents and more than 100 witnesses - and decided that there was probable cause that the defendants committed each of the crimes charged. In reaching this decision, the Grand Jury considered an abundance of evidence - none of which consisted of the Rule 15 depositions.

Caramadre's argument that the Government misused the Grand Jury process should be rejected.

### III. Response to Allegations in Caramadre's Footnote

In a footnote in Caramadre's Memorandum of Law, Caramadre argues that the Government "misstated" to the Court that there were 112 terminally-ill individuals used by the defendants and that due to this misstatement there was no urgent need to record the testimony of the few individuals who were still alive at the time. This argument borders on frivolous. At the time of the hearing on the Rule 15 depositions, the Government had yet to receive many records from the companies involved and was simply relying or oral reports from each company concerning the number of terminally-ill individuals involved in this scheme. In fact, during the hearing the Government advised the Court that the 112 total was a "rough" approximation. (Transcript of Hearing, Exh. 3, at 12). See also Government's Motion to Take Rule 15 Depositions (Exh. 1) (estimating "approximately 112" terminally-ill

people used as measuring lives); Government's Supplemental Memorandum (Exh. 2) at 2 (same).   As has been relayed to Caramadre's counsel on numerous occasions, the Government at that time was advised that there were approximately 112 such individuals, of which only 9 were still alive (a 10th individual, Leon Bradshaw, was subsequently later discovered to still be alive and the Court authorized his deposition). We now know that were actually 103 terminally-ill and/or elderly individuals used by the defendants on annuities and brokerage accounts. Caramadre cannot possibly be suggesting that because there were 103, and not 112, "measuring lives" used by the defendants, there was somehow less urgency in deposing the few who were still alive at the time; and yet he is.

Caramadre also suggests that because the Indictment charges conduct that began in 1995, there were not "exceptional circumstances" that justified the taking of the depositions of the few individuals who were still alive in September 2009.   To the contrary, the scope and length of defendants' conduct only increased the urgency of the need to preserve the testimony of the few terminally-ill individuals who were still alive at the time.   That this scheme targeted terminally-ill individuals has led to predictable results.   Sadly, 99 of the 103 people utilized by the defendants as "measuring lives" have since died. Indeed, of the 10 terminally-ill individuals the Government was authorized to depose, 3 were too ill to be deposed and subsequently died and 5 were deposed and subsequently died.   Two of the deponents

are still alive as of the date of this Memorandum, but continue to suffer from very serious illnesses.  After a two year investigation, apart from Caramadre's own mother, whom he also used as a "measuring life," the Government has located only one other person used by Caramadre as a "measuring life" who is still alive today - a man who had full blown AIDS in 1996 but miraculously recovered after the AIDS cocktail became available.  The Rule 15 depositions allowed the Government to preserve a critical piece of trial testimony in this case, *i.e.*, what the defendants represented (or failed to represent) to the actual individuals whose identities were used on annuities and bond accounts.

### Conclusion

For the reasons set forth herein, the Defendants' Motion to Suppress the Rule 15 Depositions should be denied.

Respectfully submitted,

PETER F. NERONHA
UNITED STATES ATTORNEY

/s/ John P. McAdams
JOHN P. McADAMS
Assistant U.S. Attorney

LEE H. VILKER
Assistant U.S. Attorney
U.S. Attorney's Office
50 Kennedy Plaza, 8th Floor
Providence, RI 02903

## CERTIFICATE OF SERVICE

I, hereby certify that on this 29th day of March, 2012, I caused the within Government's Response to Defendants' Motion to Suppress Rule 15 Depositions to be served via the Court's Electronic Filing System on:

**For Joseph Caramadre:**
Michael J. Lepizzera, Esq.
James T. McCormack, Esq.


**For Raymour Radhakrishnan:**
Olin Thompson, Esq.


/s/John P. McAdams
John P. McAdams
Assistant U.S. Attorney
United States Attorney's Office
50 Kennedy Plaza, 8th Floor
Providence, RI 02903
John.p.mcadams@usdoj.gov

52