# GOVERNMENT
# EXHIBIT 6

In Re Grand Jury Proceedings                    Richard G. Wiley

Page 1

 1                  UNITED STATES DISTRICT COURT

 2                FOR THE DISTRICT OF RHODE ISLAND

 3

 4

 5     IN RE:   GRAND JURY PROCEEDINGS

 6

 7

 8

 9

10

11

12              Videotaped deposition of RICHARD G. WILEY,

13     a Witness herein, taken on behalf of the United

14     States Attorney, on WEDNESDAY, SEPTEMBER 30, 2009,

15     scheduled at 9:11 a.m., at Watch Hill Care & Rehab,

16     77 Watch Hill Road, Westerly, Rhode Island, before

17     Diane J. DeStefano, Registered Professional Reporter,

18     a Notary Public in and for the State of Rhode Island.

19

20

21

22                  Vivian S. Dafoulas & Associates
                         50 Fieldstone Drive
23                    East Greenwich, RI 02818
                          (401) 885-0992
24

25

In Re Grand Jury Proceedings

Richard G. Wiley

```
 1    APPEARANCES:
 2    FOR THE UNITED STATES ATTORNEY:
 3         UNITED STATES ATTORNEY
           BY:   JOHN P. MCADAMS, ESQUIRE
 4               LEE H. VILKER, ESQUIRE
           50 KENNEDY PLAZA, 8TH FLOOR
 5         PROVIDENCE, RHODE ISLAND 02903
 6    FOR RAYMOUR RADHAKRISHNAN:
 7         JEFFREY B. PINE, ESQUIRE
           321 SOUTH MAIN STREET, SUITE 302
 8         PROVIDENCE, RHODE ISLAND 02903
 9    FOR ███████████████:
10         MacFADYEN, GESCHEIDT & O'BRIEN
           BY:   JOHN A. MacFADYEN, ESQUIRE
11         101 DYER STREET
           PROVIDENCE, RHODE ISLAND 02903
12
      FOR ███████████████:
13
           ANTHONY M. TRAINI, ESQUIRE
14         56 PINE STREET, SUITE 2
           PROVIDENCE, RHODE ISLAND 02903
15
      FOR JOSEPH CARAMADRE:
16
           HINCKLEY, ALLEN & SNYDER LLP
17         BY:   ROBERT G. FLANDERS, JR., ESQUIRE
           50 KENNEDY PLAZA, SUITE 1500
18         PROVIDENCE, RHODE ISLAND 02903
19
      ALSO PRESENT:  RAYMOUR RADHAKRISHNAN
20
                     FBI AGENT PAMELA McDAID
21
      VIDEOGRAPHER:  ODI JIN WONG
22
23
24
25
```

In Re Grand Jury Proceedings                                    Richard G. Wiley

1                           I N D E X

2     WITNESS                                              PAGE

3     RICHARD G. WILEY

4         Direct Examination by Mr. McAdams            11

5         Cross-Examination by Mr. Pine                54

6         Cross-Examination by Mr. Flanders           112

7         Redirect Examination by Mr. McAdams         143

8         Recross-Examination by Mr. Pine             146

9         Further Examination by Mr. McAdams          150

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

In Re Grand Jury Proceedings                           Richard G. Wiley

Page 4

1                        E X H I B I T S

GOVERNMENT'S:
2    NO.   DESCRIPTION                                        PAGE

3    1    Agreement and Acknowledgment                        24

4    2    Limited Trading Authorization                       29

5    3    TradeKing Premier Account Statement                 38

6    4    April 6, 2009 letter from Shawn P. Moylan

7    5    TradeKing

8    6    April 21, 2009 Revised Account Profile
          from Fidelity Investments
9
     7    July 24, 2009 letter to Richard Wiley
10        with attachments                                    50

11   OBJECTORS':
     NO.   DESCRIPTION                                        PAGE
12
     A    Written objection                                    7
13

14

15

16

17

18

19

20

21

22

23

24

25

In Re Grand Jury Proceedings                    Richard G. Wiley

---

**Page 5**

1  (Government's Exhibits 1 through 7 were premarked)
2      THE VIDEOGRAPHER: We are now recording and
3  on the record. My name is Odi Jin Wong. I am a
4  legal video specialist for National Video Reporters,
5  Inc. Today is September 30th, 2009 and the time is
6  9:11 a.m. This is the deposition of Richard Wiley in
7  the matter of "In Re Grand Jury Proceedings." This
8  deposition is being taken at 77 Watch Hill Road,
9  Westerly, Rhode Island.
10      The court reporter is Diane DeStefano.
11  Counsel, please state your appearances for the record
12  and the court reporter will administer the oath.
13      MR. McADAMS: This is John McAdams,
14  Assistant United States Attorney representing the
15  United States in this deposition.
16      MR. VILKER: My name is Lee Vilker. I am
17  also an Assistant United States Attorney representing
18  the government in this deposition.
19      MR. PINE: Jeffrey Pine. I represent
20  Raymour Radhakrishnan.
21      MR. RADHAKRISHNAN: Raymour Radhakrishnan.
22      MR. FLANDERS: Robert Flanders representing
23  Joseph Caramadre.
24      MR. TRAINI: Anthony Traini representing
25  ▮▮▮▮▮▮▮▮▮

---

**Page 6**

1      MR. MacFADYEN: John MacFadyen representing
2  ▮▮▮▮▮▮▮
3      MR. McADAMS: This is John McAdams, United
4  States Attorney.
5      RICHARD G. WILEY,
6  called as a witness and having first been duly
7  sworn, testifies as follows:
8      MR. McADAMS: This is John McAdams,
9  Assistant United States Attorney speaking.
10  Mr. Wiley, before we ask you questions, before we
11  begin asking you questions, I just want to note for
12  the record that -- that counsel for all the named
13  targets are present. The named targets have been
14  invited. Mr. Raymour Radhakrishnan is present.
15  ▮▮▮▮▮▮▮▮ Joseph Caramadre and ▮▮▮▮▮▮▮▮
16  ▮▮▮▮▮▮ are not present, however their counsel is
17  here.
18      This deposition is being taken pursuant to
19  Rule 15 of the Rules of Criminal Procedure pursuant
20  to an order authorized by United States District
21  Court Judge William Smith. Counsel for the targets
22  have provided to the government a written objection
23  which the government and counsel have agreed they
24  will preserve for purposes of the record. We can
25  mark it as Deposition Exhibit A.

---

**Page 7**

1      MR. TRAINI: I would ask that the
2  stenographer mark the -- the two-page written
3  objection as Exhibit A to the deposition, and I'm
4  handing the original to the stenographer.
5      (Whereupon, Exhibit A was marked.)
6      MR. McADAMS: Counsel and the -- the
7  government have also discussed that this deposition
8  is not a typical civil deposition. This is a --
9  preserving trial testimony for a trial if one occurs
10  in this matter. To that end, counsel will make
11  objections if -- if they have them. They will make
12  them contemporaneously in order to give the
13  questioner an opportunity to rephrase the question or
14  ask differently if necessary.
15      We've also discussed the fact that if
16  counsel for any of the targets makes an objection,
17  that all targets reserve that objection for purposes
18  of the record so that we don't need to have each
19  counsel repeat the same objection on the record.
20      MR. TRAINI: John, if -- if you don't mind,
21  just to clarify something. My understanding of the
22  deposition procedure that's being used is that this
23  is, in fact, similar to a Rule 27 deposition in that
24  the objections that we're required to make now are
25  only as to the form of the questions.

---

**Page 8**

1      We automatically have our right to raise
2  our other objections, whatever they might be, at the
3  time that the deposition is offered. We don't have
4  to make specific depositions (sic) to relevancy,
5  materiality at this stage in this proceeding. Do
6  you understand it differently?
7      MR. VILKER: I do understand it
8  differently. This is something -- in having
9  discussed this with a number of other people who have
10  done this, this is the equivalent of being in court
11  on trial.
12      Unlike a deposition in a typical civil case
13  where later there's typically an opportunity to
14  introduce the live testimony in court, this will
15  likely be the government's only opportunity to
16  present this witness. So, therefore, if you have any
17  objections, whether it be to form or not to form, you
18  must state them contemporaneously in order to give us
19  an opportunity to rephrase the question.
20      You might have a legitimate objection and
21  we want to have a right to think about the objection
22  and rephrase it in a way that the question will not
23  be ultimately disallowed, the answer disallowed.
24      MR. PINE: I mis --
25      MR. TRAINI: It was my understanding, Lee,

---

Richard G. Wiley

In Re Grand Jury Proceedings

Page 9

1  is that the way it works is that other than to form,
2  we can make our other objections later on and they
3  get edited out of the video.
4      MR. VILKER: The -- no. It's the later on
5  part that we're having a disagreement with.
6      MR. TRAINI: Well, we ought to get that
7  resolved --
8      MR. PINE: Yeah.
9      MR. TRAINI: -- before we go too much
10  further down the line.
11      MR. VILKER: Well, you preserve the
12  objection --
13      MR. TRAINI: Right.
14      MR. VILKER: -- and you can make the
15  objection. You can say, "This calls for hearsay," to
16  which we have a choice at that point, or vice versa
17  when you're doing the questioning, to say, "Well, we
18  don't believe that's objectionable and please answer
19  the question," and then you've --you've preserved the
20  objection and the judge can later rule on it. Or if
21  we believe that it -- we agree with your objection,
22  we then have the right to rephrase the question.
23      MR. FLANDERS: Our position is that
24  objections as to substance are reserved for later at
25  trial or whenever you attempt to introduce this. We

Page 10

1  understand your position differs with that but I want
2  it to be on the record as saying that our position is
3  we're not waiving the right to make substantive
4  objections now simply by not presenting them.
5      We will raise any objections as to form but
6  our position is that we reserve the right to make
7  substantive objections later. And we understand that
8  you differ with that and are taking the position that
9  we have to raise them now. We disagree.
10      MR. VILKER: Okay.
11      MR. TRAINI: Also, while we're at it, since
12  we're putting things on the record, in support of
13  Mr. Flanders' statement, given the fact that we have
14  no indictment, we have no charges, we have no theory
15  of prosecution, we believe that it's relatively
16  impossible for us to state with particularity grounds
17  for objection as to relevance, materiality, and a
18  whole bunch of other things, and so we wouldn't be in
19  a position to effectively do that anyway.
20      And not withstanding any other provisions
21  of the rules or -- and we respect your position on --
22  on the objections, we'll make the objections that we
23  feel we can make and reserve whatever we can't until
24  the time that you attempt to use the deposition I
25  think.

Page 11

1      MR. VILKER: Okay. This -- we obviously
2  have a disagreement on this point and I -- I think
3  you've preserved your argument for the record. Just
4  for the record, the remark that you just made about
5  not having a theory of prosecution, I believe that to
6  be incorrect and I believe I've advised each of you
7  on a number of theories that we are proceeding on in
8  this investigation.
9      So for the record, I -- we -- the
10  government's position is that you are not proceeding
11  in this deposition with no possible theory of
12  prosecution and no idea of what we're investigating.
13  But I think in your Defense Exhibit A, you've
14  preserved your objections on those grounds and I just
15  think that the deposition should proceed at the
16  moment.
17      DIRECT EXAMINATION
18  BY MR. McADAMS:
19      Q.  Good morning, Mr. Wiley.
20      A.  Morning.
21      Q.  My name is John McAdams and I'm an
22  attorney for the government. I'm going to ask you
23  some questions. And you understand that you're
24  under oath now?
25      A.  Yes.

Page 12

1      Q.  Okay. And you have an obligation to tell
2  the truth?
3      A.  Yes.
4      Q.  Okay. Mr. Wiley, how old are you?
5      A.  I'm just about 80.
6      Q.  Just about 80 years old?
7      A.  Yeah.
8      Q.  Okay. And --
9      A.  Four days short of it.
10      Q.  Birthday this week?
11      A.  Next week.
12      MR. McADAMS: Happy birthday in advance.
13      Q.  Mr. Wiley, what is the current state of
14  your health?
15      A.  Not too good I'm afraid.
16      Q.  Do you know what your diagnosis is?
17      A.  Yeah. Stage IV cancer.
18      Q.  Stage IV cancer?
19      A.  And other little things connected with it.
20      Q.  Have you been given a prognosis by a
21  medical physician as to how long you're expected to
22  live?
23      A.  Well, the Veterans Hospital doctor, I can
24  give you his name, the oncologist at the V.A.
25  Hospital in New Haven, he gave me --

6 (Pages 9 to 12)

In Re Grand Jury Proceedings

Richard G. Wiley

Page 13

1    MR. FLANDERS: I'm going to object to
2 hearsay testimony.
3    Q.   Do you have an understanding as to how
4 long you're expected to live?
5    A.   I was expected to live three months.
6    Q.   And when was that?
7    A.   That was a year ago.
8    Q.   So it's your understanding a year ago you
9 were expected to live for three more months?
10    A.   Three more months, yes.
11    Q.   And do you have any idea what -- what your
12 life expectancy is now?
13    A.   The good Lord knows. I don't.
14    Q.   Okay.
15    A.   No.
16    Q.   Now, Mr. Wiley, are you able to understand
17 my questions?
18    A.   Yes.
19    Q.   Okay. Are you under any medications that
20 affect your ability to understand?
21    A.   Not to my knowledge.
22    Q.   Okay. What type of medications do you
23 take?
24    A.   Well, medications. Optivan, morphine,
25 which I'm not taking yet, tramadol, Levsin.

Page 14

1    Q.   And you --
2    A.   That's what I'm taking now.
3    Q.   Okay. And you indicated you -- you're
4 subscribed -- prescribed morphine but you're not
5 taking it?
6    A.   No.
7    Q.   Okay. Has anything affected your ability
8 to understand what I'm asking you today?
9    A.   Not to my knowledge.
10    Q.   Okay. Mr. Wiley, how long has it been
11 since you retired?
12    A.   60 years.
13    THE REPORTER: How many years?
14    THE WITNESS: 60.
15    Q.   60 years?
16    A.   Yes.
17    Q.   What -- when did you last work?
18    A.   I last worked part time at Avondale
19 Boatyard in Avondale, Rhode Island, for two hours
20 per week per -- two days per week, two hours.
21    Q.   When you indicated that you last worked 60
22 years, do you mean you retired when you were 60?
23    A.   I was forced to. I had a stroke.
24    Q.   You had a stroke when you were 60 years
25 old?

Page 15

1    A.   No, when I -- when I was 20 -- 30 -- 20 --
2 let's see. 28 years old I believe it was.
3    Q.   Okay. And you stopped working at that
4 point?
5    A.   Yes.
6    Q.   Okay. What type of work did you do?
7    A.   Well, I worked for the Town of West
8 Hartford.
9    Q.   West Hartford, Connecticut?
10    A.   Yes.
11    Q.   Okay. How much education do you have,
12 Mr. Wiley?
13    A.   Well, two years of college.
14    Q.   Two years of college?
15    A.   Yeah.
16    Q.   Okay. I want to turn your attention now,
17 Mr. Wiley. Have you ever met a man by the name of
18 Raymour Radhakrishnan?
19    A.   Yes.
20    Q.   Okay. And do you see him in this room
21 today?
22    A.   Yes, I do.
23    MR. McADAMS: Okay. Let the record reflect
24 that Mr. Radhakrishnan was identified by Mr. Wiley.
25    Q.   Could you tell us how you met

Page 16

1 Mr. Radhakrishnan?
2    A.   Well, I met him actually through hospice.
3 They said that a certain philanthropist in I guess
4 it was Providence area, was helping out people on
5 the -- on the way out so to speak.
6    Q.   When you say on the way out, you mean near
7 the end of their lives?
8    A.   Yes.
9    MR. PINE: Objection.
10    MR. TRAINI: I'm going to object to the
11 hearsay nature of this particular question.
12    MR. McADAMS: I think this is just
13 background at this point, but we'll -- we'll -- he
14 can answer it, so I'm going to ask him to answer the
15 question.
16    MR. TRAINI: I understand that but just as
17 a kind of a logistical matter, I don't -- I'm not
18 trying to make this difficult for the witness and I
19 don't want to continually interrupt you, so -- and I
20 know ordinarily you wouldn't be able to do this in
21 court, but unless you have some objection to it,
22 maybe you will agree that we can object to lines of
23 questioning if you're doing it on a continuous basis
24 like this conversation about his conversation with
25 hospice, for example. All those questions are

7  (Pages 13 to 16)

Richard G. Wiley

In Re Grand Jury Proceedings

Page 17

1  objectionable on hearsay grounds.
2      I just don't want to keep doing it on every
3  single question. We'll be here forever and it's
4  going to be a lot more difficult for the witness. Do
5  you have a problem with -- with handling the
6  objections that way?
7      MR. McADAMS: I don't have any problem with
8  that.
9      MR. VILKER: I prefer specific objections.
10     MR. McADAMS: Well, then we're going to ask
11 that you make a specific objection if you have one.
12 I'm going to ask -- I've asked him to answer the
13 question and your objection came after his answer so
14 --
15 BY MR. McADAMS:
16     Q.  So when did you meet Mr. Raymour
17 Radhakrishnan?
18     A.  Well, I met him -- he came to the house,
19 and he represented somebody, I didn't know the
20 gentleman's name at the time, but he came from --
21 hospice actually were the people that evidently
22 either they got ahold of him or he got ahold of
23 them. And they offered me a certain amount of money
24 to help me over the transition period. Now, what
25 the transition period would have been I don't really

Page 18

1  know. I mean I suppose it was the three years or
2  whatever that -- or as long as I kept living. It
3  was -- they gave it to me to --
4      Q.  Okay.
5      A.  -- help me out.
6      Q.  I want to ask you to focus on when -- when
7  Mr. Raymour Radhakrishnan met you. You said he came
8  to your house?
9      A.  Yes.
10     Q.  Okay. And do you remember what time of
11 year that was approximately?
12     A.  I think it was in early January.
13     Q.  Okay. Of this -- this year, 2009?
14     A.  Yes.
15     Q.  Okay. And when he came to your house,
16 what did he say to you?
17     MR. TRAINI: Objection.
18     MR. PINE: Objection.
19     MR. McADAMS: What's the basis of that
20 objection?
21     MR. TRAINI: Hearsay.
22     MR. McADAMS: Well, it's a statement of a
23 party opponent.
24     MR. TRAINI: If this is a conspiracy case,
25 it's a Petrozziello objection.

Page 19

1      MR. McADAMS: Well, I'm going to ask you to
2  answer that question.
3      THE WITNESS: What was it again now?
4      Q.  What -- what did Mr. Radhakrishnan say to
5  you when he came to your house?
6      A.  Well, he -- he said that he represented
7  this philanthropist in Providence area who was
8  giving out of the generosity of his heart I guess,
9  which I later found out different, a -- a certain
10 amount of money to help with the transition period.
11     Q.  Okay. When you -- when you say that he
12 told you that a philanthropist in the Providence
13 area was giving out a certain amount of money to
14 help with the transition period, what did you
15 understand that to mean?
16     A.  Well, a -- a -- a gift.
17     MR. TRAINI: Objection.
18     MR. McADAMS: The same objection?
19     MR. TRAINI: Yes.
20     MR. McADAMS: Okay. I'm going to ask you
21 to answer.
22     Q.  So he -- could you repeat your answer?
23     A.  Well, it was that it was money to help me
24 die on I guess or help me, you know, through the
25 parents or whoever -- well, I don't have any anyhow

Page 20

1  -- just help settle up my debts or whatever you have
2  at the -- towards the end, funeral expenses or
3  whatever.
4      Q.  So you understood this was a gift from a
5  philanthropist?
6      MR. MacFADYEN: Objection.
7      MR. TRAINI: Objection, leading.
8      MR. FLANDERS: Objection.
9      MR. PINE: Objection, leading.
10     MR. McADAMS: Well, it's developing of --
11     MR. TRAINI: Objection.
12     MR. McADAMS: I'm going to ask you to
13 answer the question.
14     Q.  Did you understand this to be a gift from
15 a philanthropist?
16     MR. PINE: Objection.
17     MR. MacFADYEN: Objection.
18     MR. TRAINI: Objection.
19     MR. FLANDERS: Objection.
20     A.  Yes, I did.
21     Q.  Okay. Let me rephrase that. What did you
22 understand this money to be?
23     MR. MacFADYEN: Objection.
24     MR. FLANDERS: Objection.
25     MR. PINE: Objection.

8 (Pages 17 to 20)

Richard G. Wiley

In Re Grand Jury Proceedings

Page 21

1     MR. TRAINI: Objection. Calls for hearsay.

2    **Q.  What did you understand this money to be?**

3    A.  Well, I just stated it. I thought it was

4 for -- to help me out with my -- my expenses with

5 burial expenses and things of that sort.

6    **Q.  Okay. What, if anything, did Mr. Raymour**

7 **(sic) say to you about a charitable program for the**

8 **terminally ill?**

9     MR. TRAINI: Objection.

10   A.  He didn't say a word to me that I

11 remember --

12   **Q.  What did he --**

13   A.  -- about a charitable...

14   **Q.  Okay. What, if anything, did he tell you**

15 **about what you were going to have to do in return**

16 **for getting the money?**

17    MR. PINE: Objection.

18   A.  Nothing.

19   **Q.  Nothing?**

20   A.  It just -- he had me sign -- sign over all

21 my ID. My driver's license he asked for, my --

22 three types of ID.

23    MR. MacFADYEN: Motion to strike.

24 Nonresponsive.

25   **Q.  Okay. Let -- let me ask you in a**

Page 22

1 **different way. Did Mr. Raymour (sic) say anything**

2 **about what you would have to do in return for the**

3 **money?**

4    MR. MacFADYEN: Objection

5    MR. FLANDERS: Objection.

6    MR. PINE: Objection. Leading.

7    MR. TRAINI: Objection. Calls for hearsay.

8    MR. McADAMS: You can answer the question.

9 I'm going to repeat it. Your objection is noted.

10   **Q.  What, if anything, did he say about what**

11 **you needed to return -- do in return for the money?**

12   A.  Well, he just said you had to sign some

13 papers. He said that they'd been taken once before

14 and that's why he wanted the ID, and all I had to do

15 was sign some papers and he was going to match me up

16 with somebody. I don't know who he was going to

17 match me up with, what he was going to match me up

18 with.

19    So I said, "Okay. I'll" -- he --

20 eventually, about ten days later, he -- nine I guess

21 it was, he brought down some papers for me to sign

22 and that was it. Then he paid me off in cash.

23    MR. MacFADYEN: Motion to strike.

24 Nonresponsive.

25   **Q.  Okay. Mr. Wiley, he came back ten days**

Page 23

1 later; is that correct?

2    MR. FLANDERS: Objection.

3    MR. MacFADYEN: Objection.

4   A.  Nine or ten days later.

5   **Q.  Okay. So at some point --**

6   A.  Or --

7   **Q.  -- he returned to your house?**

8    MR. FLANDERS: Objection

9   A.  Yeah.

10   **Q.  Okay. And when he returned to your house,**

11 he -- did he bring some papers for you to sign?

12   A.  Yes.

13    MR. MacFADYEN: Objection.

14   **Q.  What kind of papers were they?**

15   A.  Well, it was just an agreement that if I

16 signed these, he would give me the money. So I

17 signed them and that was it.

18   **Q.  Okay. Did he --**

19    MR. MacFADYEN: Motion to strike.

20 Nonresponsive.

21   **Q.  Did you read the papers that he gave to**

22 **you?**

23   A.  Partially.

24   **Q.  Okay. What did you understand them to**

25 **say?**

Page 24

1   A.  I didn't understand them to say anything

2 really truthfully.

3   **Q.  Okay. And did Mr. Raymour Radhakrishnan**

4 **explain them to you?**

5   A.  Not really.

6   **Q.  Okay. When you say not really, what do**

7 **you mean?**

8   A.  Well, he -- he said I just have to --

9    MR. TRAINI: Objection.

10    MR. PINE: Objection.

11   A.  -- match these up with somebody. I don't

12 know what he meant by that.

13   **Q.  Okay.**

14    MR. MacFADYEN: Motion to strike.

15 Nonresponsive.

16   **Q.  At this point I'm going to show you a**

17 **document that's been marked as Government Exhibit 1,**

18 **and underneath there's a notation that says, "Wiley**

19 **9-30-09." And I'm going to ask you to look at this**

20 **document, Mr. Wiley, and I'm going to turn to the**

21 **last page. It's a three-page document. Do you see**

22 **that?**

23   A.  Right.

24   **Q.  Do you see your -- is that your signature**

25 **on there?**

Vivian S. Dafoulas & Associates (401) 885-0992

In Re Grand Jury Proceedings                                    Richard G. Wiley

Page 25

1     A.  Could be.
2     Q.  Does it look like your signature?
3     A.  It looks pretty close to it but I don't
4  think it's -- Wiley is spelled the same way as I
5  usually spell it.
6     Q.  Okay.
7     A.  Although I never spell it the same any --
8  any one time.
9     Q.  Now, this document, at the top of it, it
10  says, "Agreement and Acknowledgement."  Do you
11  remember seeing this document before?
12     MR. TRAINI:  Objection.  Time frame.
13     Q.  Before today?
14     A.  No.  I never saw it before.
15     Q.  Okay.  Now, in the first paragraph, it
16  says, "This Agreement and Acknowledgement"--
17     MR. TRAINI:  Objection.
18     MR. PINE:  Objection.
19     MR. TRAINI:  Reading from the document.
20     MR. PINE:  It's not an exhibit.
21     MR. McADAMS:  It may be at a point in time
22  that this document is in evidence.  For now --
23     MR. TRAINI:  But it's not in evidence.
24     MR. McADAMS:  That's your objection.
25  Understood.  We'll -- all right.

Page 26

1     Q.  This document, Mr. Wiley, in the first
2  paragraph it says, "This Agreement and
3  Acknowledgement is made and entered into as of the
4  22nd day of January 2009, by and between Paula
5  Caramadre, an individual with an address of 90
6  Beechwood Drive, Cranston, Rhode Island, 02921,"
7  and then it says in parentheses, "(Funds Provider),
8  and Richard Wiley, an individual with an address of
9  388 Shore Road."  And then it says in parentheses,
10  "(Co-Owner)."  Now, have -- when -- had you ever
11  seen or heard of the name Paula Caramadre before?
12     MR. PINE:  Objection.
13     A.  Never.
14     Q.  Okay.  When you signed documents that
15  Mr. Radhakrishnan provided to you, did they have
16  other peoples' names in them?
17     MR. PINE:  Objection.
18     A.  No, I don't remember.  I don't think so.
19     Q.  You don't think so.  Okay.  Thank you.  Is
20  that your handwriting?
21     A.  Where?  No.
22     Q.  Up here in the first paragraph?
23     A.  No.
24     Q.  Mr. Wiley, I'm going to point your
25  attention to the second paragraph, excuse me, the

Page 27

1  paragraph that's numbered 2 in this exhibit, and it
2  says, "In exchange for the" --
3     MR. TRAINI:  Objection.
4     MR. PINE:  Objection.
5     Q.  It says, "In exchange for the Co-Owner's
6  agreement to become a joint tenant in the Account,
7  the Funds Provider has paid the Co-Owner the sum of
8  $5,000."  Okay.  Did Mr. Radhakrishnan pay you
9  $5,000?
10     MR. PINE:  Objection.
11     A.  No.
12     Q.  Did he pay you any money?
13     A.  Yes.  He paid me three.
14     Q.  3,000 or --
15     A.  3,000.
16     Q.  Okay.  And when did he pay you $3,000?
17     A.  Well, he paid me right after he -- I
18  signed the things and the -- the -- the slips that
19  he had.  I don't know whether they were that --
20  those papers or -- or other papers for sure, but I
21  don't think I -- I never saw that I don't believe
22  before.  And he never delivered me $5,000.  Like I
23  say, he delivered three in cash.
24     Q.  So he paid you in cash?
25     A.  Yes.  Now I figured out the reason finally

Page 28

1  through my dumb skull.
2     MR. MacFADYEN:  Motion to strike.
3     MR. PINE:  Motion to strike.
4     Q.  When you got the $3,000 from
5  Mr. Radhakrishnan, did he tell you there would be
6  any additional money that you would be paid?
7     MR. TRAINI:  Objection.
8     MR. PINE:  Objection.
9     A.  No.  No, he didn't say there would be any
10  additional money paid to me, no.
11     Q.  Did he -- did you have any additional
12  conversations with him at that time?
13     A.  No.  He paid me and he left.
14     Q.  Did he say anything to you when he left?
15     MR. PINE:  Objection.
16     A.  Sure.  "I'll never see you again
17  probably."
18     Q.  Okay.  How long did you look at the papers
19  before you signed them?
20     A.  That I couldn't tell you.  Not -- not very
21  long.
22     Q.  Did you understand what --
23     A.  He --
24     Q.  -- they said?
25     A.  -- handed them to me like this, and he --

Page 29

1  "Sign here and sign here," and that was it.
2       MR. MacFADYEN: Motion to strike.
3  Nonresponsive.
4    Q.  What did he say to you while he asked you
5  to sign the papers?
6       MR. PINE: Objection.
7       MR. TRAINI: Objection.
8    A.  That I can't remember, if anything.
9    Q.  Okay. What, if anything, did he say these
10 documents were for?
11      MR. PINE: Objection.
12      MR. TRAINI: Objection.
13      MR. MacFADYEN: Objection.
14   A.  He didn't say any -- any specific thing,
15 just that he would match me up with somebody and
16 that was it.
17   Q.  Now, this document, Government Exhibit 1,
18 says, "Brokerage Account" on it. Did
19 Mr. Radhakrishnan say anything to you about a
20 brokerage account?
21   A.  No.
22      MR. TRAINI: Objection.
23   A.  No.
24   Q.  Did you have any knowledge that a
25 brokerage account in your name would be opened?

Page 30

1    A.  No.
2    Q.  Did you give your consent to open any type
3  of account?
4    A.  No.
5    Q.  Did you have any knowledge of opening an
6  account with Paula Caramadre?
7    A.  No.
8    Q.  Did you give your consent to
9  Mr. Radhakrishnan to open accounts in your name?
10   A.  No.
11   Q.  Okay. Mr. Wiley, I want to show you
12 another document and this one has been marked
13 Government Exhibit 2, Wiley 9-30-09. Can you take a
14 look at that document, sir? And I'm going to point
15 you to the -- where it says, "Co-Owner." Is that
16 your name?
17   A.  That's my name.
18   Q.  Okay. Is that your signature under there?
19   A.  No.
20   Q.  Are you sure it's not your signature?
21   A.  I'm almost positive it's not my signature.
22   Q.  What makes you think it's not your
23 signature?
24   A.  The Gay. Richard Gay Wiley is -- I
25 usually sign it Richard G. Wiley.

Page 31

1    Q.  Okay. Now, above -- above the line where
2  your signature appears, whether you put it there or
3  not, it's printed Richard Wiley. Did you -- is that
4  your handwriting?
5    A.  No.
6    Q.  Okay. What about the date that's marked,
7  3/15/09, is that your handwriting?
8    A.  I couldn't say for sure.
9    Q.  When you -- do you recall -- let me
10 rephrase that question. I'm going to point your
11 attention to the other box here that says, "Paula
12 Caramadre," and there's a signature there. Do you
13 recall seeing that name on any papers that you
14 signed?
15   A.  No, I don't.
16   Q.  Okay. And down on the bottom here,
17 right-hand corner, there's a signature and it says
18 "Notary Public." Do you see that?
19   A.  I see it.
20   Q.  Okay. When you signed papers with
21 Mr. Radhakrishnan, was there a notary public there?
22   A.  No.
23   Q.  Nobody -- did anybody notarize your name?
24   A.  Not to my knowledge.
25   Q.  And now I think you told us earlier that

Page 32

1  it was early January or sometime in January when you
2  met Mr. --
3    A.  Well, there was a little snow on the
4  ground so it probably was early January.
5    Q.  Okay. And then -- then when he came back
6  with papers, it was a week or so later?
7       MR. TRAINI: Objection.
8       MR. PINE: Objection. Leading.
9    Q.  How long was it until he came back with
10 the papers?
11   A.  Nine days.
12   Q.  Okay.
13   A.  Approximately nine days.
14   Q.  Okay. Did he come back at any point in
15 time after that second visit?
16   A.  I think he came back once but I'm not
17 sure.
18   Q.  Was there a point in time when he came
19 back with an attorney?
20   A.  No.
21   Q.  Mr. Flanders?
22   A.  He came back eventually when -- well, it
23 was when -- when I first -- first met Flanders, he
24 came to my house. She came to my house, and they
25 interviewed me.

11  (Pages 29 to 32)

In Re Grand Jury Proceedings

Page 33

1    Q.   So I guess what I'm asking you is other
2    than the time when Mr. Flanders came to your house
3    to interview you and the two times that you've
4    described to us in approximately January when
5    Mr. Radhakrishnan visited you, were there any other
6    visits that he made to you?
7    A.   Not that I can remember.
8    Q.   Okay.  This document, Government's Exhibit
9    2, says at the top of it --
10        MR. PINE:  Objection.  He hasn't
11   authenticated it as his own signature.
12        MR. McADAMS:  Your objection is as to
13   whether this is in evidence?
14        MR. PINE:  Yes.
15        MR. TRAINI:  It isn't in evidence.
16        MR. McADAMS:  Assuming for argument's sake
17   that it were in evidence, is your objection basically
18   the fact that I'm reading from a document that's not
19   in evidence?  Is that what your objection is?
20        MR. PINE:  He hasn't identified it
21   properly.
22        MR. McADAMS:  Okay.  It could come in
23   another way, so I'm just trying to understand exactly
24   what your objection is.
25        MR. TRAINI:  Well, the objection is that

Page 34

1    you're reading from a document --
2        MR. McADAMS:  That's not --
3        MR. TRAINI:  -- that's not in evidence and
4    hasn't been authenticated so --
5        MR. McADAMS:  Okay.
6        MR. TRAINI:  -- that's the objection.
7        MR. McADAMS:  Understood.
8    Q.   The document says at the top, "Limited
9    Trading Authorization."  And do you recall ever
10   giving your authorization to Mr. Radhakrishnan to
11   engage in trading activity?
12   A.   No.
13   Q.   Do you recall ever giving your
14   authorization to Paula Caramadre to engage in
15   trading activity?
16   A.   No.  No.
17   Q.   Now, this document also says that it's --
18   the "Signatures on this page must be notarized.
19   Mail original (fax copies will not be accepted) to:
20   TradeKing 5455 North Federal Highway, Suite E, Boca
21   Raton, Florida."
22        MR. TRAINI:  Objection.
23   Q.   Are you familiar with any company called
24   TradeKing?
25   A.   Never heard of them before I got involved

Page 35

1    in this.
2    Q.   Okay.  Did you ever have a trading account
3    with TradeKing?
4    A.   No.
5    Q.   Did you ever consent to have somebody,
6    Mr. Radhakrishnan or anyone else, open an account in
7    your name at TradeKing?
8    A.   No.
9    Q.   Do you own a computer, Mr. Wiley?
10   A.   No.  I own nothing in the electronic line.
11        MR. PINE:  I'm sorry, I didn't hear that.
12        MR. FLANDERS:  I can't hear the witness.
13   Q.   Can you --
14   A.   I own nothing in the electronic line.
15   Q.   Did you ever go on a computer and open an
16   account?
17   A.   I didn't.  A car dealer did.  Not a car
18   dealer but my -- a man who works on my cars did at
19   Dunn's Corners.
20   Q.   Did that have anything to do with the
21   financial account?
22   A.   No.  No, heavens no.  It was for a used
23   windshield wiper motor for an old Porsche.
24   Q.   So you're talking about a -- your car
25   dealer buying a part for --

Page 36

1    A.   Yeah.  I assumed that that was what it
2    was.  A gentleman called me up --
3    Q.   Let -- let me stop you there and ask you a
4    question.  When is the first time you heard of a
5    company called TradeKing?
6        MR. FLANDERS:  Objection.
7    A.   Well, I got a -- a telephone call from
8    somebody and they asked me if I --
9    Q.   Without telling us what they said to you,
10   you indicated that you got a telephone call from
11   somebody at TradeKing?
12   A.   I believe it was TradeKing.
13        MR. MacFADYEN:  Objection.
14        MR. TRAINI:  Objection.
15   Q.   What was the nature of that phone call,
16   without telling us what anybody said.
17        MR. TRAINI:  Objection.  Still calls for
18   hearsay.
19   A.   They asked --
20        MR. PINE:  Move to strike.
21   A.   Well, they asked if I had any business
22   with this Paula Carmad -- Carmadre (sic), and I said
23   I'd never even heard of the woman before.
24        MR. PINE:  Move to strike.
25        MR. McADAMS:  Do you need a tissue?

Richard G. Wiley

In Re Grand Jury Proceedings

Page 37

1  THE WITNESS: I'll get it if I need it.
2  I've got some.
3  MR. McADAMS: We have some tissues here.
4  There you go.
5  THE WITNESS: Thanks.
6  Q.  Mr. Wiley, do you know a woman by the name
7  of Paula Caramadre?
8  A.  No.  I said I never heard of her before.
9  Q.  What about a person by the name of Joseph
10  Caramadre?
11  A.  No.  I never heard of him.
12  Q.  Okay.  So I take it if you never heard of
13  him, then you never met him?
14  A.  No.
15  MR. TRAINI: Objection.
16  MR. PINE: Objection.
17  Q.  Okay.  Did Mr. Raymour say anything to you
18  about them?
19  MR. TRAINI: Objection.
20  MR. PINE: Objection.
21  MR. FLANDERS: Objection.
22  MR. MacFADYEN: Objection.
23  A.  No, just that there was a philanthropist.
24  Q.  And you don't know what the
25  philanthropist's name was?

Page 38

1  MR. TRAINI: Objection.
2  A.  I didn't know his name.
3  Q.  Did you know what the philanthropist's
4  name was?
5  A.  No, I did not.
6  MR. FLANDERS: Objection.
7  MR. TRAINI: Objection.
8  MR. MacFADYEN: Objection.
9  Q.  Okay.  Did Mr. Raymour tell you what his
10  name was?
11  MR. TRAINI: Objection.
12  A.  No, he did not.
13  Q.  Are you aware that a -- an account was
14  opened at TradeKing in your name, in the --
15  A.  No.
16  Q.  No.  Are you aware that it was a -- that
17  there was a joint account opened in the name of
18  yourself and a woman named Paula Caramadre?
19  MR. FLANDERS: Objection.
20  MacFADYEN: Objection.
21  MR. TRAINI: Objection.
22  MR. PINE: Objection.
23  A.  No.  I was not.
24  MR. TRAINI: It's leading and asked and
25  answered.

Page 39

1  Q.  Are you aware of an account at TradeKing
2  in your name that had over $300,000 in it?
3  MR. PINE: Objection.
4  MR. TRAINI: Objection.
5  A.  No.
6  MR. McADAMS: What's that objection for?
7  MR. TRAINI: Leading.
8  MR. PINE: Leading.
9  Q.  What knowledge, if any, do you have of an
10  account opened at TradeKing?
11  A.  None until all this business came up.
12  Q.  Did you ever receive copies of statements
13  from TradeKing accounts?
14  A.  No.  I don't even know who TradeKing is.
15  Q.  I'm going to show you a document that's
16  marked Government Exhibit 3.  Can you take a look at
17  that?  Do you see that?
18  A.  Yup.
19  Q.  Okay.  And do you see the address line?
20  A.  Yes.
21  Q.  Can you read that?
22  A.  Richard G. Wiley, joint something or
23  other, with Paula M. Caramadre.
24  Q.  Okay.  Did you ever receive any types of
25  financial statements from TradeKing?

Page 40

1  A.  No.
2  Q.  Okay.  Do you know what is at 1000 Chapel
3  View Boulevard in Cranston, Rhode Island?
4  A.  No.
5  Q.  Have you ever lived there?
6  A.  Never been there.  Haven't been to
7  Cranston.
8  Q.  What knowledge, if any, do you have of an
9  account in your name at Fidelity Investments?
10  A.  Never heard of them.
11  Q.  Fidelity Investments, have you ever heard
12  of them?
13  A.  Never.
14  Q.  Did you ever open an account with them?
15  A.  No.
16  Q.  Did you ever give consent to anyone to
17  open an account in your name there?
18  A.  No.
19  Q.  Mr. Wiley, I want to show you a document
20  that's marked as Government Exhibit 4.  Can you take
21  a look at that for me, please?
22  A.  Well --
23  Q.  Do you recognize that?
24  A.  No, I don't really.  "... TradeKing spoke
25  to you about a brokerage account opened in your

13 (Pages 37 to 40)

In Re Grand Jury Proceedings

Richard G. Wiley

Page 41

1  name." (Witness reading document.) Well, I never
2  even talked to TradeKing.
3      Q.  Well, I believe you said earlier that you
4  talked to them on the phone; is that correct?
5      MR. PINE:  Objection.
6      MR. TRAINI:  Objection.
7      MR. MacFADYEN:  Objection.
8      MR. FLANDERS:  Objection.
9      Q.  Okay.
10     A.  The man had called me (unintelligible).
11     Q.  Do you recall receiving anything in the
12  mail from TradeKing subsequent to your phone call?
13     A.  Oh, I received a bunch of -- oh, I don't
14  know what the hell I -- now I'm getting confused.
15     Q.  Did you receive any papers in the mail
16  from them, from TradeKing?
17     MR. TRAINI:  Objection.
18     A.  I don't think so.
19     Q.  Okay.  I want to -- this is part of the
20  same exhibit, okay, that you just looked at, Exhibit
21  4.
22     MR. PINE:  Objection.
23     MR. TRAINI:  Objection.
24     MR. MacFADYEN:  Objection.
25     MR. FLANDERS:  Objection.

Page 42

1      Q.  The second page, do you recognize that
2  part of it?
3      MR. PINE:  Objection.
4      A.  No.
5      Q.  Okay.  That's the second page, and I'm
6  going to turn --
7      A.  Oh, all right.  Now I -- now I'm getting
8  familiar with it.  That --
9      Q.  Why don't you look at it again and see if
10  you recognize it.
11     MR. FLANDERS:  What are you showing the
12  witness?
13     MR. McADAMS:  This is Government Exhibit 4.
14     MR. FLANDERS:  What part?
15     MR. McADAMS:  Second page.
16     THE WITNESS:  This is where I signed 26
17  different things?
18     Q.  Well, do you recognize it?  Do you know
19  what it is?
20     A.  No, I don't really.
21     MR. TRAINI:  Objection.
22     Q.  Okay.  Let me turn -- let me ask you this.
23  I'm going to turn to page 16.  At the bottom of it,
24  it says 16 of 16.
25     A.  Now I recognize it.

Page 43

1      Q.  Okay.  Is that your signature?
2      A.  That's not my signature.  Somebody printed
3  my name.
4      Q.  Okay.  Where it's printed here underneath,
5  is that your signature?
6      A.  I don't -- the Richard is definitely not,
7  but -- and -- and Wiley is not.  The only thing that
8  -- anything like any of my signatures is the G.
9      Q.  Okay.  Well, do you recall -- do you know
10  Special Agent Pamela McDaid from the FBI?
11     A.  I do.
12     Q.  Okay.  And do you recall meeting with her
13  regarding some paperwork from TradeKing?
14     MR. TRAINI:  Objection.
15     MR. PINE:  Objection.
16     THE WITNESS:  Is that where it was from?
17     Q.  Do you recall meeting with her regarding
18  any paperwork from TradeKing?
19     MR. PINE:  Objection.
20     MR. TRAINI:  Objection.
21     A.  Yes.  She came down and helped me fill out
22  some papers because I didn't know -- they had a lot
23  of things asking me if I had electronic stuff and I
24  didn't want to sign anything that was going to be
25  wrong because I don't know a damn thing about

Page 44

1  electronics and I --
2      MR. MacFADYEN:  Move to strike.
3  Nonresponsive.
4      MR. FLANDERS:  I can't hear the witness.
5  Can we have that question read back, please?  It was
6  very hard to hear Mr. Wiley.
7      MR. McADAMS:  Hold on, Mr. Wiley, the court
8  reporter is going to read your answer back.
9      (Whereupon, the last answer was read by the
10  reporter.)
11     MR. TRAINI:  In case you didn't hear it,
12  there was a motion to strike that as nonresponsive.
13     MR. McADAMS:  Okay.
14     Q.  Do you recall meeting with Special Agent
15  McDaid regarding paperwork from TradeKing?
16     MR. TRAINI:  Objection.  Asked and
17  answered.
18     MR. PINE:  Objection, the same.
19     MR. McADAMS:  Well, you said it was
20  nonresponsive so I'm asking.
21     A.  Yes.
22     Q.  Okay.  Now, is Government Exhibit 4 the
23  paperwork that you were referring to when you met
24  with prof -- with Special Agent McDaid?
25     MR. PINE:  Objection.

14  (Pages 41 to 44)

Richard G. Wiley

In Re Grand Jury Proceedings

Page 45

1    MR. TRAINI: Objection.

2    A.  Yes, I believe it is.

3    Q.  Could you explain what happened when you

4 met with Special Agent McDaid and those paper --

5 those papers were completed?

6    MR. TRAINI: Objection. Calls for hearsay.

7    A.  I mailed them back to the person who sent

8 them to me and wanted me to -- I sent them back to

9 -- I don't know whether it was TradeKing or who it

10 was so I sent them back.

11   Q.  Did you actually write the answers on the

12 papers?

13   A.  Yes.

14   Q.  Did you write them or did prof -- Special

15 Agent McDaid?

16   MR. PINE: Objection.

17   MR. TRAINI: Objection.

18   MR. MacFADYEN: Objection.

19   MR. FLANDERS: Objection.

20   A.  I wrote them in.

21   Q.  You wrote the answers. Okay. Did you

22 read the questions?

23   A.  I read them with her so that I would

24 understand them because some of them involved

25 electronic stuff that I didn't know anything about.

Page 46

1 Like I say, I didn't want to write down something

2 that was wrong.

3   MR. TRAINI: Motion to strike.

4 Nonresponsive.

5   Q.  Are the answers that are on that paper

6 your answers?

7   MR. PINE: Objection.

8   A.  Yes.

9   Q.  Did Special Agent McDaid tell you what to

10 write on that document?

11   A.  No.

12   Q.  Mr. Wiley, at some point did

13 Mr. Radhakrishnan come back to your house with

14 Mr. Flanders?

15   A.  I said he came back once.

16   Q.  Do you recall when the -- when that was?

17   A.  That was -- I'm not sure of the date but

18 it was, I would say, late -- late in the summer.

19   Q.  In the summertime?

20   A.  Or fall.

21   Q.  Okay. And when you had that meeting, who

22 else was there besides Mr. Flanders and

23 Mr. Radhakrishnan?

24   A.  There was Chief David Sayles of the

25 Westerly Police Department.

Page 47

1   Q.  Mr. --

2   A.  I mean the fire department.

3   Q.  And who is Mr. Sayles?

4   A.  He's the chief of the fire department.

5   Q.  Okay. And how do you know him?

6   A.  Through the fire department.

7   Q.  Okay. And where did that meeting happen?

8   A.  At my house at 388 Shore Road.

9   Q.  Okay. And was that meeting recorded?

10   A.  Yes, it was.

11   Q.  Okay. At whose direction was it recorded?

12   A.  The government's I believe.

13   Q.  Did you say the government?

14   A.  Yeah.

15   Q.  Okay. And by that do you mean the FBI?

16   A.  Yes.

17   Q.  Okay. And so you knew that it was being

18 recorded at that time?

19   MR. MacFADYEN: Leading.

20   A.  Yes.

21   Q.  Okay. What, if anything, did

22 Mr. Radhakrishnan say to you at that meeting?

23   MR. PINE: Objection.

24   MR. TRAINI: Objection.

25   A.  I cannot remember. It -- it -- people

Page 48

1 were talking back and forth. I don't remember.

2   Q.  Okay. Do you remember anything about the

3 meeting?

4   A.  Yes.

5   Q.  What do you remember?

6   A.  Well, I remember that -- when they wired

7 -- wired Chief Sayles up.

8   Q.  You remember that the FBI wired Chief

9 Sayles up?

10   A.  Yes.

11   MR. TRAINI: Objection. Leading.

12   MR. McADAMS: I'm just trying to clarify if

13 that's what he said.

14   MR. TRAINI: It's still an objection.

15   Q.  What else do you remember?

16   A.  Well, they stayed maybe about an hour, and

17 I can't remember any one specific thing about it.

18   Q.  Was there any discussion about any

19 payments to you?

20   MR. PINE: Objection.

21   MR. TRAINI: Objection.

22   A.  No.

23   Q.  After that meeting, did you receive any

24 correspondence from Mr. Radhakrishnan?

25   A.  I can't remember.

15 (Pages 45 to 48)

Richard G. Wiley

In Re Grand Jury Proceedings

Page 49

1    Q.   Do you remember if anything was sent to
2  you?
3    A.   No. I don't believe anything was sent to
4  me that would -- would have been from
5  Mr. Radhakrishnan.
6    Q.   All right. So you didn't receive anything
7  from him after that?
8    A.   No. I --
9    Q.   Did -- after the $3,000 that you received
10  from Mr. Radhakrishnan back in January, did you ever
11  receive any additional monies from him?
12    A.   No, I didn't.
13    MR. TRAINI: Objection.
14    MR. McADAMS: What's the basis of that
15  objection?
16    MR. TRAINI: You asked that about 30
17  questions ago and he answered it.
18    Q.   Okay. At -- at any point after you met
19  with Mr. Flanders and Mr. Radhakrishnan, did you
20  receive additional money?
21    A.   No, I did not.
22    Q.   Was there any discussion about the $5,000
23  that the Exhibit 1 indicated you were paid?
24    MR. PINE: Objection.
25    MR. TRAINI: Objection.

Page 50

1    A.   Well, I objected because I never received
2  it. I didn't -- he never gave me $5,000.
3    MR. TRAINI: Motion to strike.
4  Nonresponsive.
5    Q.   Did you have a conversation with
6  Mr. Radhakrishnan about being paid $3,000 versus
7  $5,000?
8    MR. TRAINI: Objection.
9    MR. PINE: Objection.
10    MR. TRAINI: Leading. Calls for hearsay.
11    A.   The $3,000 was it, period. They never
12  offered any more. They -- they never offered any to
13  Mr. Sayles or anything else.
14    Q.   Did you ever have an agreement with
15  Mr. Radhakrishnan to defer some of the payment that
16  he was going to make to you in January to a later
17  point in time and have money paid to Mr. Sayles?
18    MR. PINE: Objection.
19    MR. TRAINI: Objection.
20    MR. MacFADYEN: Objection.
21    MR. TRAINI: Leading.
22    Q.   Well, I -- I objected but now
23  Mr. Radhakrishnan he -- he I don't think offered me
24  anything to -- for Mr. Sayles. I think he thought
25  that over somebody from hospice --

Page 51

1    THE REPORTER: I'm sorry. I'm sorry, "I
2  thought he -- I don't think he offered anything to
3  Mr. Sayles," I think he what?
4    A.   Offered money through hospice to
5  Mr. Sayles because they were the ones that he --
6  said something about Mr. Sayles. They held 3,000 --
7  I mean they held $1500 aside for Mr. Sayles.
8    Q.   What, if anything --
9    MR. TRAINI: Motion to strike.
10    Q.   What, if anything, did Mr. Radhakrishnan
11  say to you about paying -- deferring some of the
12  payment to you to a later time?
13    MR. PINE: Objection.
14    MR. TRAINI: Objection.
15    MR. MacFADYEN: Objection.
16    A.   Didn't say a word.
17    Q.   Okay. I want to show you a document
18  that's been marked as Government's Exhibit No. 7,
19  okay? And can you see the top of it, who it's
20  addressed to?
21    A.   Addressed to me.
22    Q.   Okay. And I'm going to turn to the second
23  page. Do you -- it's a two-page letter. Do you
24  recall receiving this letter?
25    A.   No.

Page 52

1    Q.   Okay.
2    A.   Never saw it before. First time I've seen
3  it.
4    Q.   At the bottom of the second page, there's
5  a photocopy of a check made payable to Richard
6  Wiley?
7    MR. TRAINI: Objection.
8    A.   I never saw that.
9    Q.   Did you ever receive a check for $2,000?
10    A.   No.
11    Q.   Mr. Wiley, what, if anything, did you have
12  as an understanding of your obligations, what you
13  had to do in return for the money that you were
14  being given by Mr. Radhakrishnan?
15    MR. TRAINI: Objection.
16    A.   Die. That's all, just die. It would -- I
17  would die.
18    Q.   And then what would happen?
19    MR. PINE: I'm sorry, I didn't hear that.
20    A.   Die. I -- I believe that they were
21  waiting for me to die so as soon as I croaked, they
22  had made some money off of me.
23    MR. TRAINI: Move to strike.
24    Q.   What did you understand the purpose of the
25  money that was given to you was for?

16 (Pages 49 to 52)

Richard G. Wiley

In Re Grand Jury Proceedings

Page 53

1     MR. TRAINI: Objection.

2     A.   To help -- I stated once before to help

3  when I needed money for expenses to die with and to

4  help settle maybe a -- bills that I had.

5     Q.   At the time that you signed the documents

6  that Mr. Radbakrishnan gave you, did you have any

7  knowledge that other people would make money off of

8  that?

9     MR. TRAINI: Objection.

10    MR. PINE: Objection.

11    MR. MacFADYEN: Objection.

12    A.   No.

13    MR. McADAMS: I have no other questions at

14  this time. So, Mr. Wiley, I'm done asking you

15  questions and the other attorneys are going to be

16  able to ask you questions. Do we want to -- does

17  anybody need to take a break?

18    MR. PINE: Does he need a break?

19    MR. McADAMS: I want to make sure how

20  you're feeling.

21    THE WITNESS: Well, I'm feeling --

22    MR. McADAMS: Do you need the bathroom or

23  anything like that?

24    THE WITNESS: Not yet, no.

25    MR. McADAMS: Do you want a drink of water?

Page 54

1     THE WITNESS: I'm okay for the time being.

2     MR. McADAMS: Okay. Just make sure you

3  tell us, okay, if you're feeling anything like that.

4     THE VIDEOGRAPHER: Off the record for a

5  second. The time is 10:05. Off the record.

6        (OFF THE RECORD)

7     THE VIDEOGRAPHER: The time is 10:08. We

8  are back on the record.

9        CROSS-EXAMINATION

10  BY MR. PINE:

11    Q.   Good morning, Mr. Wiley.

12    A.   Good morning.

13    Q.   My name is Jeffrey Pine. I am an

14  attorney. I represent Raymour Radbakrishnan. I'm

15  going to ask you some questions. If you don't

16  understand a question that I ask, please let me know

17  and I'll rephrase it. Okay?

18    A.   Okay.

19    Q.   You indicated that you're at Stage IV

20  cancer, correct?

21    A.   Right.

22    Q.   And when were you first diagnosed with

23  cancer?

24    A.   I was first diagnosed -- let's see if I've

25  got the exact date in here in -- well, at the V.A.

Page 55

1  Hospital in West Haven. If I can get the exact date

2  for you --

3     Q.   Approximately. Do you have a

4  recollection?

5     A.   Well, that was about a year ago.

6     Q.   About a year ago?

7     A.   A year, a year and three months.

8     Q.   Okay. Prior to that, what was your health

9  like prior to a year and three months ago?

10    A.   Average.

11    Q.   Okay. Did you have any serious illnesses?

12    A.   Well, I've busted up everything on my

13  left-hand side. Hip. Not hip. What's the other --

14    THE REPORTER: I'm sorry, I can't hear you.

15    A.   The hip I've broken, my leg has been

16  broken. Everything on my left-hand side and when I

17  was twenty -- shortly after I got out of the Army,

18  maybe three years -- it would have been '53, about

19  '55, '54, '55 -- I had a stroke, a massive stroke.

20    Q.   Okay. And how old were you when you had

21  the stroke? You were in your twenties did you say?

22    A.   Twenties. That's why -- that's why I said

23  I quit. I was out what, 60 years.

24    Q.   Right. You did not work for the past 60

25  years --

Page 56

1     A.   60 years.

2     Q.   -- or so? And did you have a military

3  background?

4     A.   I had a military background.

5     Q.   And you got discharged from the Army at

6  some point?

7     A.   Yeah.

8     Q.   And what did you do for income after you

9  had the stroke and recovered from the stroke?

10    A.   I lived off my parents I'm sorry to say.

11    Q.   Okay. Did you receive any --

12    A.   But I did do some menial part-time work.

13    Q.   Right.

14    A.   Mow lawns, mow a few lawns here and there.

15  And then I worked two hours a day in the Avondale

16  Boatyard running a little store they had there. Not

17  much of a job.

18    Q.   Yeah. I think you said a couple of days a

19  week, a couple of hours a day?

20    A.   A couple, yeah.

21    Q.   Was that after you had the stroke that you

22  were able to do that?

23    A.   Yeah. It wasn't really much of a job. It

24  was just collecting cash for the cash register.

25    Q.   Okay. And how --

17 (Pages 53 to 56)

In Re Grand Jury Proceedings                                   Richard G. Wiley

Page 57

1    A.   It was not physical work.
2    Q.   How did your stroke affect you mentally or
3  physically?
4    A.   Well, I can't get this -- this arm will
5  only go up to here, and just the whole left-hand
6  side is -- is screwed up.
7    Q.   Okay
8    A.   Pardon the expression.
9    Q.   And it's been that way since you were in
10  your 20s and 30s?
11    A.   Yeah.
12    Q.   Okay
13    A.   Well, actually, it -- I had gotten better
14  for about four years, four or five years, and lately
15  it's been going downhill, boom.
16    Q.   Right.
17    A.   And then I just recently had two or three
18  minor strokes.
19    Q.   When was that?
20    A.   The last one was about two weeks ago.
21    Q.   Okay.
22    A.   And they picked me up off the floor and
23  the next day put me in Westerly Hospital and they
24  transferred me to where I am here.
25    Q.   Okay. And that was a couple of weeks ago?

Page 58

1    A.   That was about ten days ago, eight to ten
2  days ago.
3    Q.   Okay. So you were in the Westerly
4  Hospital as recently as ten days ago or so?
5    A.   Oh, yeah. I was in there about ten days
6  ago.
7    Q.   And it was your understanding at that time
8  that you had suffered a stroke of some sort?
9    A.   Yeah.
10    Q.   Okay. Did you have a -- I think you said
11  you had a stroke before that in the past several
12  months or --
13    A.   Well, a minor one.
14    Q.   Minor?
15    A.   Several. I mean it -- just enough to
16  knock me out a little bit.
17    Q.   Right. And how did they affect you
18  mentally or physically?
19    A.   Slowed me right down. I mean every time
20  anything like this happens, the left-hand side gets
21  worse.
22    Q.   Right, right. What about mentally and
23  your ability to understand things, remember things
24  or --
25    A.   That's all right.

Page 59

1    Q.   That's all right?  The stroke did not
2  affect those --
3    A.   Seems to be okay. The only thing that
4  I've had that might have been connected with it was
5  I fell out of a -- a chair in my kitchen, hit my
6  head good and hard.
7    Q.   When was that?
8    A.   That was after the stroke. And so I -- my
9  friend, Mr. Sayles, he's been driving me because it
10  affected my eyesight.
11    Q.   Okay.
12    A.   I have double vision now.
13    Q.   And did you have that fall after you got
14  out of the Westerly Hospital?
15    A.   No. I --
16    Q.   Before?
17    A.   Before.
18    Q.   Okay.
19    A.   And while it -- while it didn't affect my
20  memory or anything like that, it slowed me down as
21  far as doing things around the house. I mean I
22  could -- I still cooked my own meals and all that
23  sort of stuff.
24    Q.   Right.
25    A.   Read books, even though I -- it's strange.

Page 60

1  My eyesight is double on certain things and so I
2  can't drive a car.
3    Q.   Right.
4    A.   But it limited me to -- just about
5  everything.
6    Q.   How long have you been at the Watch Hill
7  Nursing Home here?
8    A.   I think about ten days.
9    Q.   Okay. When you got out of
10  Westerly Hospital --
11    A.   I was put -- they brought me by
12  ambulance --
13    Q.   -- they sent you here?
14    A.   -- to here.
15    Q.   And is the plan for you to stay --
16    A.   No.
17    Q.   -- here or are you going back at some
18  point?
19    A.   I'm going to get the hell out of here.
20    Q.   Okay. I can understand. How long were
21  you in the hospital just this past time? How long
22  were you there?
23    A.   Up there, I was overnight.
24    Q.   Overnight?
25    A.   They picked me up. I guess one of my

18  (Pages 57 to 60)

Richard G. Wiley

In Re Grand Jury Proceedings

Page 61

1  friends came down and found me on the floor.
2      Q.   At your house?
3      A.   Yeah, underneath a pile of chairs at the
4  house. So he -- he called Dave Sayles and Dave
5  Sayles called and got the ambulance and they hauled
6  me up to Westerly Hospital.
7      Q.   Okay.
8      A.   And I've been here since then.
9      Q.   Who was the friend that found you in your
10 house that made the call?
11     A.   The -- I guess Dave Sayles called the
12 ambulance.
13     Q.   Okay.
14     A.   The fire chief. He has a lot of pull in a
15 little town and --
16     Q.   Right. But who was it that found you in
17 your house?
18     A.   A friend of mine from all over on -- at --
19 near the boatyard. His name is -- oh, let me think
20 now. I know it was my old -- but I can't remember
21 it right -- right this second.
22     Q.   If it comes to you that's fine, you can --
23     A.   Yeah.
24     Q.   -- you can tell me. And you said that you
25 were on several medications on a regular -- do you

Page 62

1  take those on a regular basis?
2      A.   Well, I've been taking them here on a
3  regular basis.
4      Q.   Right.
5      A.   I didn't take any medications on a regular
6  basis other than some pills that helped me sleep --
7      Q.   Okay.
8      A.   -- a little bit at night. But I don't
9  make a practice of it if I can help it.
10     Q.   And you said that you were not on morphine
11 today. Do you get regular doses of morphine other
12 than today?
13     A.   No. I don't take it.
14     Q.   Okay.
15     A.   They offer it to me and I won't take it.
16     Q.   Are you in pain on a daily basis?
17     A.   A minor amount.
18     Q.   Okay. And I think you said that you take
19 Optivan?
20     A.   I guess that was one of the ones I read
21 off.
22     Q.   Okay.
23     A.   I don't even know what half that stuff is
24 for.
25     Q.   Okay. Prior to the stroke that sent you

Page 63

1  to the Westerly Hospital, I think you said you had a
2  couple of others?
3      A.   Yeah. I --
4      Q.   When did those occur?
5      A.   Oh, about a month before I had a minor one
6  driving in the car. I managed to go up on the
7  sidewalk and knock over the -- the dummy sign, so
8  they drove me home in an ambulance and dropped the
9  car off and then brought me back in the police
10 cruiser. And -- but I've had that, and I've had
11 them and I don't do anything about it.
12     Q.   Okay. But you had some sort of a car
13 accident --
14     A.   I didn't, no.
15     Q.   -- a minor car accident?
16     A.   What I did is I ran up -- up on the
17 sidewalk --
18     Q.   Uh-hum.
19     A.   -- dumped the dummy over, just pushed it
20 over.
21     Q.   Right.
22     A.   I was in the process of putting it back
23 up, a lady came along, and she says, "You need
24 help?" I says, "No, I can get it all right." She
25 said, "I'd better call the police." Nosy old woman.

Page 64

1  But -- so that's how I got home.
2      Q.   So is it fair to say as recently as over
3  the summer you were driving, this past summer?
4      A.   Oh, I was driving up until just before I
5  went to the hospital.
6      Q.   Okay. All right. During the time that
7  you were living with -- I think you said you were
8  living off your family or parents -- did you receive
9  any government subsidies, SSI, or other government
10 programs as income?
11     A.   I got ten percent.
12     Q.   Ten percent of what?
13     A.   Of the military pay which amounted to just
14 about nothing.
15     Q.   Okay
16     A.   $19 --
17     Q.   All right. Military?
18     A.   -- a month.
19     Q.   A pension of some sort?
20     A.   Yeah.
21     Q.   Anything else from the government, any
22 other --
23     A.   No.
24     Q.   -- government programs?
25     A.   Well --

19 (Pages 61 to 64)

Richard G. Wiley

In Re Grand Jury Proceedings

Page 65

1    Q.   Were you -- I'm sorry, go ahead.
2    A.   I've never been on any government subsidy.
3    Q.   Okay. I'm just wondering if as a result
4  of the stroke that you had way back when you were a
5  young man, if you were determined to be disabled and
6  therefore they -- they paid you on a regular basis,
7  on a monthly basis?
8    A.   Oh, no, no. That came at discharge time.
9  They discharged me with a military discharge for --
10 for medical purposes.
11   Q.   Okay. So you never got SSI or anything --
12   A.   No.
13   Q.   -- any program like that?
14   A.   No.
15   Q.   Okay.
16   A.   No.
17   Q.   And how long have you lived at your
18 current address, your current home?
19   A.   Oh, about ten years.
20   Q.   Okay. Do you live there with anybody?
21   A.   No. I wish I did.
22   Q.   Okay. You live by yourself?
23   A.   Yeah.
24   Q.   Okay.
25   A.   If I had somebody there, it'd probably be

Page 66

1  better for me than being in a place like a nursing
2  home, being home because --
3    Q.   Right.
4    A.   -- at home I can get around much -- much
5  easier. Here they won't let me move, which has
6  nothing to do with this business but...
7    Q.   No, I understand. But I'm just looking
8  for some background.
9    A.   Yeah.
10   Q.   Was that a house -- is that a house that
11 you own?
12   A.   No. I had it on reverse mortgage.
13   Q.   Okay.
14   A.   And that's running out.
15   Q.   Okay. At some point did you purchase the
16 home or did you rent it?
17   A.   I -- I bought it outright.
18   Q.   Okay.
19   A.   And then I put a reverse mortgage on it.
20   Q.   Okay. But when you bought it outright,
21 that was about ten years ago, and you've lived there
22 since?
23   A.   Yeah.
24   Q.   All right. Before that, where did you
25 live?

Page 67

1    A.   I lived down in the beach area in a home
2  my parents had. I converted the garage to a -- an
3  apartment and lived there --
4    Q.   How long did you live --
5    A.   -- year-round.
6    Q.   I'm sorry.
7    A.   I lived there year-round. I either lived
8  in West Hartford or I've lived in Weekapaug, Rhode
9  Island for all my life.
10   Q.   Okay. Was that the first home that you
11 purchased, this home that you bought --
12   A.   Yes.
13   Q.   -- about ten years ago? Okay.
14   A.   Yeah.
15   Q.   Over the course of your life, I imagine
16 you've owned a number of motor vehicles?
17   A.   A few. Yeah, quite a few.
18   Q.   Have you had bank accounts at local banks
19 or a --
20   A.   Local bank.
21   Q.   -- credit union?
22   A.   Local bank here, local bank West Hartford.
23   Q.   West Hartford. Okay. And any in Rhode
24 Island, in Westerly?
25   A.   Yes. Westerly. Washington Trust.

Page 68

1    Q.   All right. And at Washington Trust, did
2  you have a checking account, a savings account, or
3  what kind of accounts?
4    A.   Both checking and savings.
5    Q.   Okay.
6    A.   Not much of an account but --
7    Q.   Right.
8    A.   -- I had them there.
9    Q.   Did you own those by yourself?
10   A.   Yeah.
11   Q.   And in terms of family, family members, I
12 understand you talked about your parents. Any
13 brothers or sisters?
14   A.   I have a sister. We're not talking.
15 We've -- since my father died, we -- we have split.
16   Q.   Okay.
17   A.   There is no family relationship now.
18   Q.   All right. Just so -- so one sister and
19 no other siblings?
20   A.   No.
21   Q.   Okay. Ever been married or had children?
22 I take it no?
23   A.   No.
24   Q.   No, okay. Do you have a life insurance
25 policy?

Vivian S. Dafoulas & Associates  (401) 885-0992

Richard G. Wiley

In Re Grand Jury Proceedings

Page 69

1      A.   No.
2      Q.   At the present time, do you have checking
3   accounts and savings accounts and bank accounts at
4   --
5      A.   Yeah, minor accounts.
6      Q.   All right.  Have you ever invested in the
7   stock market or securities of any kind?
8      A.   No.  My parents did but not me.
9      Q.   All right.  And you referenced Chief
10  Sayles on a number of occasions.  He's, I take it, a
11  good friend of yours?
12     A.   Good friend of mine, personal friend.
13     Q.   All right.  And how long have you known
14  him would you say?
15     A.   Oh, 50 years I guess, maybe a little more.
16     Q.   Okay.  And did you see him on a regular
17  basis?  When you were out at your home and -- well,
18  did you see him on a regular basis?
19     A.   Yeah.  He came down the house, and we'd
20  see each other at the boatyard.  I've known him, and
21  he's a member of the Westerly Yacht Club which I'm
22  also a member.  Our boats were next to each other in
23  the slips.
24     Q.   Uh-hum.  Did you have your own boat?
25     A.   Yes.

Page 70

1      Q.   What kind?
2      A.   Daytona.
3      Q.   How long did you own that?
4      A.   Oh, 10, 12, 14 years, somewhere around
5   there.
6      Q.   How long ago?  Going how far back?
7      A.   Three years ago it sunk.
8      Q.   Okay.  But before that --
9      A.   I sold it.  I got rid of it.
10     Q.   Okay.
11     A.   I had it -- I guess I had it 15 years or
12  better, maybe 20 years.
13     Q.   Okay.  And you were asked some questions
14  by Mr. McAdams.
15         MR. McADAMS:  I'm over here.
16     Q.   And he's with the -- he's with the United
17  States Attorney's Office.  Before today, have you
18  met him?
19     A.   Yes.
20     Q.   How many times?
21     A.   Yesterday.
22     Q.   Okay.  And I'm not asking what he asked
23  you, but I assume he asked you some questions and
24  answers, things like that, right?
25     A.   Yeah.

Page 71

1      Q.   Okay.  And assisting him is Mr. Vilker,
2   seated next to him.  Have you ever met Mr. Vilker
3   before?
4      A.   Yes.
5      Q.   Okay.
6      A.   Yesterday.
7      Q.   Yesterday also?  Did you meet either of
8   them before yesterday?
9      A.   No.
10     Q.   Oh, okay.  So over the summer or August,
11  September, before you got -- got ill, you had not
12  met either Mr. Vilker or Mr. McAdams?
13     A.   No.
14     Q.   I take it you met Pamela McDaid of the FBI
15  on at least one occasion?
16     A.   Yes.
17     Q.   Okay.  Was -- was Chief Sayles with you on
18  the first time that you met Raymour?
19     A.   Yes.
20     Q.   Okay.  He was at your house?
21     A.   Yes.
22     Q.   And was the meeting a three-way meeting
23  between you, Raymour, with Chief Sayles being there?
24     A.   No.  Actually, it was between me and
25  Raymour.

Page 72

1      Q.   Uh-hum.
2      A.   But I'd asked the chief to be with me
3   because I wasn't sure of myself.
4      Q.   Okay.
5      A.   You know.
6      Q.   I take it that as a good friend, you
7   relied on his judgment and --
8      A.   Yes.
9      Q.   -- trusted his judgment to bounce things
10  off him?
11     A.   Yeah.
12     Q.   Okay.  And did that meeting come about as
13  a result of a contact that was made with you by
14  Sandy Romano of hospice?
15     A.   Yes.
16     Q.   And you know who Sandy Romano is?
17     A.   Yeah.
18     Q.   Okay.  And she was a person that worked at
19  hospice while --
20     A.   Hospice.  She's my --
21     Q.   -- they were taking care of you?  I'm
22  sorry?
23     A.   She is my counselor or whatever they call
24  it.
25     Q.   Okay.

21  (Pages 69 to 72)

Richard G. Wiley

In Re Grand Jury Proceedings

Page 73

1    A.   Advisor.
2    Q.   And I take it you have a favorable opinion
3  of her?
4    A.   Well, yes and no.
5    Q.   Tell me about that.
6    A.   She weighs so God damn much she broke down
7  -- broke down my chair when she -- when she sits in
8  it.
9    Q.   All right.  That would lead to the
10  unfavorable part, right?
11    A.   That was the unfavorable part.
12    Q.   What was favorable about her?
13    A.   Well, she's helped me out with my fuel
14  oil --
15    Q.   Okay.
16    A.   -- just does things like that.  She --
17  she's kind of like a mentor toward me, you know,
18  helps me here and there.  She's done things for me.
19  I wish she'd fix the chair.
20    Q.   Was she the first one that mentioned
21  Raymour to you?
22    A.   Yes.
23    Q.   And what did she tell you about Raymour
24  and what he was proposing?
25    A.   She told me -- she didn't tell me he was

Page 74

1  proposing anything particular.  She told me that
2  there was a philanthropist in Providence or up in
3  that area that was -- well, he had just heard giving
4  out money to people that were on their way out, you
5  know, helping them to try to clear up their bills or
6  whatever when they croaked.  So I believed
7  everything she said, and I think she believed
8  everything --
9    Q.   Uh-hum.
10    A.   -- too.
11    Q.   And --
12    A.   So I -- she got ahold of Raymour and
13  Raymour got ahold of me, and that -- that's the
14  first thing I knew of Raymour.
15    Q.   Okay.  So you gave her your permission to
16  reach out to that philanthropist?
17    A.   Yes.
18    Q.   And did you express to her at that point
19  in time that you were interested in hearing more
20  about it, that you needed some money?
21    A.   Well, I told her I could always use money.
22  If somebody offered you $3,000, you're going to take
23  it, aren't you?
24    Q.   Sure.  Did you know how much was being
25  offered?

Page 75

1    A.   They said between two and three.
2    Q.   Okay.  And that's what she told you
3  beforehand?
4    A.   She said that's what they have, and she
5  said they got screwed once and that didn't concern
6  me but that was the reason they needed all the IDs
7  and stuff.
8    Q.   Okay.
9    A.   Which I gave them.
10    Q.   Okay.  And so a meeting was set up and
11  Raymour came to your house --
12    A.   Yeah.
13    Q.   -- in mid-January?  Does that sound about
14  right?
15    A.   Yeah.
16    Q.   And that meeting lasted for quite a while,
17  didn't it?
18    A.   Not too long.
19    Q.   How long do you think it lasted?
20    A.   Oh, maybe an hour and a half at the most.
21    Q.   Okay, an hour and a half.  And -- and what
22  did he tell you at that meeting?  What did he go
23  over with you during that hour and a half?
24    A.   He just explained that this gentleman was
25  giving out money to people that I guess they thought

Page 76

1  that needed it, and all I had to do was sign up and
2  I'd get it and so I did.
3    Q.   Uh-hum.
4    A.   And --
5    Q.   He didn't give you any money at that first
6  meeting, did he?
7    A.   No, no.
8    Q.   And he didn't ask you to sign any
9  documents at that first meeting, did he?
10    A.   I'm not sure of that.  He may have.  I --
11  I doubt it though.
12    Q.   Okay.
13    A.   So --
14    Q.   You don't have any memory of him doing
15  that at -- as we sit here today, you don't remember
16  him offering you any documents to sign at that first
17  meeting, do you?
18    A.   I don't remember.
19    Q.   Okay.  And during that discussion with
20  Raymour, did you have a positive opinion of him?
21    A.   Yeah.
22    Q.   Okay.  What -- what opinion did you
23  express to Mr. Sayles about Raymour after the
24  meeting?
25    A.   Well, I said to Dave, I said, "Dave," I

22  (Pages 73 to 76)

Richard G. Wiley

In Re Grand Jury Proceedings

Page 77

1    said, "what do you think?"  "Well," he says, "take
2    it. They can't put you in jail when you're in the
3    ground."  And I mean it made sense to take it.
4        Q.  Uh-hum.
5        A.  I could use it.  And so I -- I mean hell,
6    anybody's a damn fool not to take it, but I don't
7    know.
8        Q.  And other than talking about the money
9    that he was going to give you, what else -- what
10   other topics did he cover during that first meeting?
11       A.  Oh, not too many things, just general
12   conversation and --
13       Q.  Did he ask you questions about your
14   background, your history, that kind of thing?
15       A.  No.  We talked about cars that I'd owned
16   and cars that he's owned and just general
17   conversation.
18       Q.  Okay.  And how did the meeting end in
19   terms of what was going to happen next after that
20   first meeting?
21       A.  Well, after the first meeting, he said, "I
22   need seven or nine days, nine or ten days to match
23   you up."
24       Q.  Uh-hum.
25       A.  Well, match me up with what I don't know.

Page 78

1    I still don't know.
2        Q.  Well, did you ask him what he meant by
3    that?
4        A.  No, I didn't.
5        Q.  Why not?
6        A.  Why not?  Because I wanted the -- the
7    three -- three grand.
8        Q.  Right.  But what was your understanding
9    when he used the phrase, "We're going to match you
10   up"?  He must have been referring to something.
11       A.  Well, I'm sure he was but I didn't ask
12   him.
13       Q.  Okay.  Had he talked about any kind of
14   accounts that -- during that first meeting, had he
15   talked about any kinds of accounts or programs that
16   you might be interested in getting involved in?
17       A.  No.
18       Q.  And do you have a specific memory that he
19   did not mention that or you just don't remember?
20       A.  Well, he didn't.  I mean I -- my
21   recollection is he never said anything about any
22   specific accounts in anything.
23       Q.  Okay.  So you don't remember whether he
24   mentioned any kind of financial programs or accounts
25   or investment opportunities or anything like that?

Page 79

1            MR. McADAMS:  Objection.
2        A.  No.
3            MR. McADAMS:  He's asked and answered.
4        Q.  You don't have a memory of that --
5        A.  No, I don't.
6        Q.  -- as we sit here today?  But you do have
7    a memory of him saying, "We need to match you up
8    with somebody"?
9        A.  Yeah.  But I don't know if it was
10   somebody, with what or who.
11       Q.  Okay.  But you do have that -- you have a
12   specific memory of that as we sit here?
13       A.  Yeah.
14       Q.  Okay.  And there came a point after that
15   first meeting, after he left and after you had the
16   discussion with Mr. Sayles, where you called
17   Raymour, did you -- didn't you?
18       A.  No.  I don't believe I ever called him.
19       Q.  Okay.  How did the second meeting come
20   about?
21       A.  He called me --
22       Q.  Okay.
23       A.  -- asked if it was all right if he came
24   down.
25       Q.  I'm sorry?

Page 80

1        A.  He called me and asked me if it was all
2    right if he came down the house.
3        Q.  So it was your memory that he called you
4    and not the other way around?
5        A.  Yeah.
6        Q.  Okay.  And how long after that first
7    meeting is it your memory that he called you?
8        A.  Well, he said, "I'll probably be back in
9    nine days, eight or nine days."  And then he called
10   up and he said, "Are you going to be home about two
11   o'clock?"  And I specifically remember around two
12   o'clock.  And he came down and then he gave me the
13   cash and paid me off or whatever you want to call
14   it.
15       Q.  Okay.  So there was a second meeting?
16       A.  Yeah.
17       Q.  And that --
18       A.  And that was the one -- I believe it was
19   the second meeting.  I don't think I -- he wanted to
20   come down a third time and I said no.
21       Q.  Okay.
22       A.  But the second meeting I believe is when
23   he paid -- paid me and paid me off.
24       Q.  Okay.  And isn't it true that meeting
25   lasted a while also just as the first meeting did?

23 (Pages 77 to 80)

Page 81

1    A.   Not very long.

2    Q.   How long would you say the second meeting

3  was?

4    A.   About the same time.

5    Q.   An hour and a half?

6    A.   An hour and a half. Maybe an hour and a

7  half. I don't know.

8    Q.   Okay. But it wasn't ten minutes or

9  fifteen minutes or anything like that?

10    A.   Oh, no, no, no.

11    Q.   Okay. So he was there for a while with

12  you?

13    A.   Yeah.

14    Q.   Was Mr. Sayles there for that second

15  meeting?

16    A.   No.

17    Q.   Okay. So it was just you --

18    A.   I didn't -- I didn't see any need.

19    Q.   Okay. And what was the discussion during

20  that second meeting with Raymour? What did you talk

21  about?

22    A.   Cars mainly.

23    Q.   Right.

24    A.   We didn't talk about anything about any

25  investments or anything.

Page 82

1    Q.   No? Did he show you any documents that

2  related to investments?

3    A.   No.

4    Q.   Okay. Did he ask for your signature on

5  anything relating to an account or an investment?

6    A.   Well, he asked me for my signature when he

7  paid me.

8    Q.   Right. Did he pay --

9    A.   That's -- that's when I signed --

10    Q.   Right.

11    A.   -- the papers and he gave me the money.

12    Q.   Right. You said he paid you at that first

13  -- at that second meeting?

14    A.   Second meeting.

15    Q.   Okay.

16    A.   I believe it was the second.

17    Q.   Right. And Mr. McAdams showed you what

18  they marked for identification purposes as

19  Government Exhibit No. 1.

20    A.   Yeah.

21    Q.   And he asked you if that looked like your

22  -- your signature on the -- on the third page of

23  that document, and I think you indicated that it

24  didn't -- you couldn't be sure it was yours?

25    A.   I couldn't be sure it was mine. The G

Page 83

1  doesn't look anything like I usually sign.

2    Q.   Okay. So you don't have a memory of

3  signing that document as we sit here today, do you?

4    A.   No.

5    Q.   Okay. And you're saying it doesn't even

6  look like your full signature in terms of the

7  Richard and the Wiley? That doesn't look like

8  yours?

9    A.   The Richard and the Wiley look somewhat

10  like it.

11    Q.   Somewhat. Uh-hum.

12    A.   And I'm no handwriting expert and I'm not

13  even a good penmanship, but the G doesn't look like

14  it's -- no --

15    Q.   Okay.

16    A.   -- it doesn't.

17    Q.   And do you have a memory sitting here

18  today of Raymour going over this document with you?

19  It's entitled "Brokerage Account" and there's other

20  --

21    A.   No, no, no. No, I did not.

22    Q.   And are you saying he didn't or you don't

23  remember it?

24    A.   He didn't go over it with me.

25    Q.   Okay.

Page 84

1    A.   At least I've never seen it on this piece

2  of paper.

3    Q.   Okay.

4    A.   I never saw anything with a $5,000 on it.

5    Q.   Okay. Is it possible he went over this

6  document and it wasn't filled in, that he went over

7  a blank --

8    A.   I --

9    Q.   -- form of it?

10    A.   He could have done whatever he wanted with

11  it. I wasn't there.

12    Q.   Well, when he was with you, is it possible

13  that he went over a blank version without this

14  writing on it? Is that possible?

15    A.   He could have, yes.

16    Q.   Okay. And on the second page, there's

17  actually no writing, it's all typed. Is it possible

18  that he went through that page even though there's

19  no handwriting on it?

20    A.   Very much so.

21    Q.   Okay. And then on the third page, it's a

22  signature page and --

23    A.   I never signed anything with Paula

24  Caramadre's --

25    Q.   Right, right.

24 (Pages 81 to 84)

Richard G. Wiley

In Re Grand Jury Proceedings

Page 85

1    A.   -- name on it.

2    Q.   Is it possible that that page -- prior to

3  your signing it, is it possible that that page, when

4  he showed it to you, did not have Paula Caramadre on

5  it, that it was, in fact, blank?

6    A.   It could very well have been.

7    Q.   Okay.  Do you know what it means to be a

8  co-owner of something?

9    A.   Yeah.

10    Q.   What do you understand that to mean?

11    A.   Well, you're a joint owner in property of

12  some sort.

13    Q.   Sure.  It could be a car --

14    A.   A boat.

15    Q.   -- or an account?  You and I could be a

16  co-owner of a bank account, couldn't we?

17    A.   We could.

18    Q.   If we agreed?

19    A.   If we agreed.

20    Q.   If we wanted to, right?

21    A.   That's right.

22    Q.   Okay.  So you understand the concept of

23  being a joint owner?

24    A.   Yeah.

25    Q.   And do you understand the concept of being

Page 86

1  a joint tenant?

2    A.   That's usually in property --

3    Q.   Right.

4    A.   -- of some sort.

5    Q.   Have you heard the phrase joint tenant

6  with right of survivorship?  Over the course of your

7  life, have you heard that phrase?

8    A.   I've heard it, yes.

9    Q.   Okay.  Being a joint tenant with a right

10  of survivorship, what do you understand that to

11  mean?

12    A.   Well, your son or your daughter or whoever

13  inherits the property through joint survivorship.

14    Q.   Okay.  So whoever passes away first, the

15  joint tenant inherits the --

16    A.   Well, I don't know about that part of it

17  but I --

18    Q.   Okay.

19    A.   -- I assume it sounds reasonable.

20    Q.   Right, okay.  And isn't it true that --

21  that Raymour went through -- in a blank version went

22  through this document and some of those terms with

23  you on that second meeting?  Isn't that true that

24  that's what he did?

25    A.   No.

Page 87

1    Q.   You don't remember that or he didn't do

2  it?

3    A.   He didn't do it.

4    Q.   Okay.  Did he read from any document that

5  --

6    A.   He read, whisked right through very fast.

7    Q.   Okay.

8    A.   And --

9    Q.   And did he -- I'm sorry.

10    A.   And so I just listened as well as I could

11  and --

12    Q.   Uh-hum.

13    A.   -- that was it.

14    Q.   Okay.  Did you ask him any questions about

15  what it meant?

16    A.   No.

17    Q.   Did you understand what it meant in some

18  of those terms that I just talked about?

19    A.   I understand some of those terms you're

20  talking about.

21    Q.   Okay.  And you understand -- I take it

22  from your earlier question -- question and answer,

23  you did not, during the course of your life, own an

24  investment account or a brokerage account of that

25  nature.  Am I correct about that?

Page 88

1    A.   No, I never had any accounts.

2    Q.   Okay.  But you're familiar with what a

3  broker does for people?

4    A.   Well, I had an uncle that was a broker so

5  I understood something about it.

6    Q.   He was a stock broker of some sort?

7    A.   (Non-verbal response.)

8        THE REPORTER:  Is that a yes?

9        THE WITNESS:  What?

10        THE REPORTER:  Did you say yes?  Was that a

11  yes to that question?

12    A.   I understand.

13    Q.   In addition to that document that I just

14  referred to that's been Government 1 for ID,

15  identification, did Raymour go over any other

16  documents with you during that second meeting that

17  you said lasted about an hour and a half?

18    A.   Not to my knowledge.

19    Q.   Okay.  And am I correct that during the

20  course of both the first and the second meeting, you

21  gave --

22        MR. PINE:  Are you all right?  Do you want

23  -- if you want to take a break, we can absolutely --

24        THE WITNESS:  It's just that I've got a

25  cartilage up here that's out of place and it hurts

25 (Pages 85 to 88)

In Re Grand Jury Proceedings

Richard G. Wiley

Page 89

1  every once in a while.
2      MR. PINE: All right. I'm just saying if
3  you want to take any kind of a break, nobody here
4  will argue with you. All right? Just say it.
5      THE WITNESS: I'm all right.
6      MR. PINE. Okay. It's up to you.
7  BY MR. PINE
8      Q.  Is it fair to say that during the course
9  of the first and second meeting, that you gave
10  Raymour information about yourself, driver's license
11  information, Social Security number information,
12  other kinds of information that were personal to
13  you? Is that --
14     A.  Yes.
15     Q.  Okay. And you did that because he
16  requested that information from you, and what was
17  your understanding of the reason that you were going
18  to be giving him that information?
19     A.  Well, I had been told that they had had --
20  previously they gave money out to people, the same
21  -- under, you know, the same conditions, that needed
22  money and -- and somebody took quite a bit of money
23  from them and then turned around and I guess they
24  either -- he didn't say specifically what they used
25  it for but they -- they -- they turned around and

Page 90

1  sued the people that put up the fund.
2      Q.  And this is information that you got from
3  Raymour?
4      A.  I got it from Sandy Romano and -- and
5  Raymour that they needed a verification. Naturally,
6  you're not going to give away $3,000 --
7      Q.  Right.
8      A.  -- without some identification of who
9  you're giving it to.
10     Q.  Uh-hum.
11     A.  Now, it -- it can be used for two purpose
12  -- two purposes. They use it to take -- buy
13  something in your name with, they use it -- they can
14  use it for almost anything, but he didn't indicate
15  that he -- he was using it for buying any stocks or
16  bonds or anything of that sort. Naturally, I would
17  not have done it.
18     Q.  Well, did he indicate to you that he was
19  using it in conjunction with you being a co-owner --
20     A.  No.
21     Q.  -- as is referenced on that form?
22     A.  Definitely not.
23     Q.  Well, have you ever given out your Social
24  Security number or personal information in order to
25  be a -- as a receipt for getting money? You

Page 91

1  wouldn't ordinarily do that, would you?
2      A.  No.
3      Q.  But you did on this occasion?
4      A.  Well, I did it on that occasion mainly
5  because they told me that they had to see it. Now,
6  I -- I don't know what -- I would not go and just
7  hand anybody my IDs unless I trusted them.
8      Q.  Right. Right.
9      A.  And I trusted Raymour that everything was
10  on the up and up. They were working through Social
11  Security -- not Social Security. They were working
12  through hospice, which is a legitimate organization,
13  so I had no -- no doubts about it being all okay.
14  Sandy Romano, she was the one that first brought it
15  up. She was hospice and she had no doubts about it
16  being all right.
17     Q.  Right.
18     A.  And the other one, the nurse, she said it
19  was okay so I went along with it.
20     Q.  But you do agree that Raymour both used
21  the phrase, "We're going to match you up with
22  somebody," and read through documents --
23     MR. McADAMS: Objection.
24     Q.  -- to you?
25     A.  No.

Page 92

1      MR. McADAMS: Objection. Assuming facts
2  not in evidence.
3      Q.  Did -- you have said that Raymour
4  referenced both matching you up with somebody,
5  correct --
6      A.  Yes.
7      Q.  -- you talked about that earlier today,
8  and that he also read through some documents for
9  you on that --
10     MR. McADAMS: Objection to that question.
11     Q.  -- second meeting?
12     MR. McADAMS: That's not what he testified.
13     Q.  Did Raymour read through some documents
14  with you on that second occasion?
15     A.  Well, a little bit. He read like a top
16  paragraph on something like that and that was it.
17     Q.  Okay.
18     A.  And I didn't fully understand what it was
19  all about. It was not about -- at the time I -- it
20  didn't have anything to say about buying stocks,
21  bonds or anything of that sort. I had no idea what
22  it -- what he wanted my IDs for.
23     Q.  But you gave him your ID --
24     A.  But I --
25     Q.  -- information?

26 (Pages 89 to 92)

Page 93

1    A.   Yup, I guess.
2    Q.   And you said you understand what the
3  concept and meaning is of being a co-owner of a --
4    A.   Yes.
5    Q.   -- particular account?
6    A.   Yes.
7    Q.   And he spent -- you also agree he spent an
8  hour and a half with you on both occasions or
9  approximately that?
10   A.   Well, approximately. I don't know whether
11 -- a lot of, you know, there was a lot of talk along
12 with it.
13   Q.   Now, you were asked by the FBI to record a
14 meeting with Raymour and Attorney Flanders; is that
15 correct?
16   A.   They asked me if I would allow them to use
17 my house and I said yes.
18   Q.   Okay. And to -- beyond use your house, to
19 wear a wire; is that correct?
20   A.   Yes.
21   Q.   Okay. Had you ever done that before?
22       THE WITNESS: What, wear a wire?
23       MR. PINE: Wear a wire, right.
24   A.   No, I haven't.
25   Q.   Act for the FBI and undercover, all that?

Page 94

1    A.   (Non-verbal response.)
2       THE REPORTER: Excuse me. You have to say
3  -- you have to answer verbally. Is that --
4    A.   No. I...
5       THE REPORTER: Okay. Thank you.
6    Q.   And -- but you agreed to do that?
7    A.   Yeah.
8    Q.   Okay. And you didn't tell either Raymour
9  or Mr. Flanders that you were doing that?
10   A.   No.
11   Q.   The FBI asked you not to tell them that,
12 right?
13   A.   Not necessarily.
14   Q.   Well, what was your --
15   A.   I made up my mind --
16   Q.   Okay.
17   A.   -- once I found out what was going on --
18   Q.   Okay.
19   A.   -- with the accounts.
20   Q.   Okay. You were paid the money that
21 Raymour talked about in the initial meeting, weren't
22 you? You were paid money?
23   A.   Not in the initial meeting.
24   Q.   No, but the money that he referred to in
25 the initial meeting from a philanthropist, you

Page 95

1  received that money, didn't you?
2    A.   Yes, I did.
3    Q.   What did the FBI agent tell you in order
4  to persuade you to wear a wire?
5       MR. McADAMS: Objection. He said that
6  wasn't the basis of his decision to wear the wire.
7       MR. PINE: Okay.
8       MR. McADAMS: And hearsay.
9    A.   Yup. Well, when I heard that they were
10 taking money from the people who were down and out
11 and using it to their advantage, rather than the
12 advantage of the people whose parents were on the
13 way out, dying or who -- whatever it was, I decided
14 that what they were doing was not very ethical
15 and --
16   Q.   Okay.
17   A.   -- and that pissed me off. Pardon the
18 expression.
19   Q.   Okay. And you said when you found out
20 that they were taking money from people. Isn't that
21 what you just said? They didn't take any money from
22 you, did they?
23   A.   No, they didn't take any money. They were
24 taking money away from the survivors of people in
25 this joint tenant business deal that they had cooked

Page 96

1  up. They were --
2    Q.   Well, in your case, who were they taking
3  the money from?
4    A.   They --
5    Q.   They weren't taking -- I'm sorry, go
6  ahead.
7    A.   Well, they were taking it from themselves
8  in a way.
9    Q.   What do you mean? They weren't taking any
10 of your money, were they?
11   A.   No, no.
12   Q.   And they weren't taking it from any
13 relative of yours?
14   A.   No.
15   Q.   -- because you didn't have a joint account
16 with any relative of yours?
17   A.   No. Well, they were taking it from the
18 poor people that -- that needed it and using them as
19 an excuse to open bank accounts and joint accounts
20 and things of that sort so that they --
21   Q.   But they weren't using any of your
22 money --
23   A.   No --
24   Q.   -- to open an account?
25   A.   -- they weren't. No, they weren't.

Page 97

1    Q.   They didn't take any money out of your
2    account?
3    A.   No, they didn't.
4    Q.   Okay.  And, in fact --
5    A.   Just the whole thing is a non --
6    nonethical thing to do.
7    Q.   Well, did the agent tell you that they
8    were taking money from you?
9    A.   No.
10   Q.   I thought that's what you said.
11   A.   But I still didn't like the idea, period.
12   It was wrong.
13   Q.   And so that's why you agreed to wear the
14   wire?
15   A.   That's why I agreed to wear the wire.
16   Q.   Isn't it fair to say that you received
17   money from the philanthropist that otherwise you
18   would not have received?
19   A.   That's very true.  Very true and very
20   fair.  But when somebody comes along and offers you
21   money and you -- you took -- I mean I took it.  I'd
22   be foolish not to.  But then afterwards, once I
23   found out, I could have paid them back right away
24   and given their money right back if I'd known
25   what was going on.

Page 98

1    Q.   You would have given the money back?
2    A.   I would have given the money back.
3    Q.   Did you ever attempt to do that?
4    A.   No.
5    Q.   You haven't --
6    A.   No.
7    Q.   -- attempted to do that?  Do you recall a
8    not just a second meeting with Raymour but a third
9    meeting with him?
10   A.   No, I don't.
11   Q.   Okay.  This meeting would have happened
12   sometime after the meeting that you had in -- with
13   him in mid to late January where --
14   A.   January, sometime in January.
15   Q.   Do you recall that?
16   A.   No.
17   Q.   No, okay.  So as we sit here today, you
18   don't recall any follow-up meeting other than the
19   time that he came to your house with Attorney
20   Flanders?
21   A.   Just the payoff meeting was all.
22   Q.   Right.  The second meeting?
23   A.   Yeah, yeah.
24   Q.   And showing you what the government marked
25   for identification as No. 2, do you recognize that

Page 99

1    form?
2    A.   I recognize the names on there but I don't
3    recognize that form at all.
4    Q.   Okay.  Is it possible that form was shown
5    to you in a blank version at some point?
6    A.   Could very well have been.
7    Q.   Shown to you by --
8    A.   I don't know.
9    Q.   -- by Raymour?
10   A.   Don't know.
11   Q.   Is it possible he read to you from the
12   form or talked about the form with you?
13   A.   He could have.  He could have.  I mean I
14   can't say for sure.  He was sitting there and I was
15   sitting here and --
16   Q.   Right.  So it's certainly possible that he
17   did, you just don't have a memory of it?
18   A.   Don't have a memory of it and can't say.
19   Like I say, I can't -- I can't be sure but that does
20   look something like my signature.
21   Q.   All right.  And you were asked about your
22   signature on that -- on that form?
23   A.   Yeah.  That does look something like --
24   Q.   It looks something like it?
25   A.   Yup.  The G doesn't look right and I would

Page 100

1    usually sign my name Richard G. Wiley.
2    Q.   Right.
3    A.   Richard G.  My mother always used to use
4    her -- her maiden initial.
5    Q.   Uh-hum.
6    A.   So I used to use it.
7    Q.   Okay.  But you're not positive about that
8    being your signature on that document?
9    A.   I'm not positive.
10   Q.   Okay.  And you don't have a memory of
11   signing it as we sit here today?
12   A.   No, I don't.
13   Q.   Okay.  This also in the block -- in the
14   blocks refers to -- it's the preprinted part.  It
15   refers to somebody being an account owner and
16   somebody else being an account co-owner.  You
17   understand what those terms mean?
18   A.   Owner, co-owner, yes.
19   Q.   And an account co-owner and an account
20   owner, you understand that?
21   A.   The owner and a co-owner is partners with
22   him in whatever it happens --
23   Q.   Right.
24   A.   -- to be.
25   Q.   And in the other block it says "Authorized

In Re Grand Jury Proceedings                                      Richard G. Wiley

Page 101

1  Agent." You understand when somebody -- somebody is
2  acting as an agent?
3      A.   Agent, yeah.
4      Q.   Okay.  That's -- those are not foreign or
5  unknown terms to you?
6      A.   No.  It could be a --
7      Q.   Okay.
8      A.   -- an attorney or a mentor of some sort --
9      Q.   Sure.
10     A.   -- or whatever.
11     Q.   During the course of --
12         MR. McADAMS:  Do you need to take a break?
13  I'm sorry.
14         MR. PINE:  No, that's all right.
15         MR. McADAMS:  Mr. Wiley, do you want to
16  take a few minutes for a break?
17         MR. PINE:  I think it's probably a good
18  time to break, sure.
19         MR. McADAMS:  Why don't we take a break?
20  We'll go get a nurse for you, come and get you, feed
21  you some lunch, and we'll -- we'll figure out what
22  we're going to do while you're doing that.  Is that
23  okay, Mr. Wiley?
24         THE WITNESS:  It's okay with me.
25         MR. McADAMS:  Okay, thanks.  Thank you.

Page 102

1          THE VIDEOGRAPHER:  The time is 11:01.  Off
2   the record.
3              (RECESS)
4          THE VIDEOGRAPHER:  The time is 11:19.
5   We're back on the record.
6   BY MR. PINE:
7       Q.   Mr. Wiley, before we broke, I had asked
8   you a couple of questions regarding your interaction
9   with Agent McDaid of the FBI.  Do you recall we just
10  discussed that?
11         THE WITNESS:  Well, what do you mean by
12  interact?
13         MR. PINE:  I'm sorry?
14         THE WITNESS:  You mean wanting to use the
15  house?
16         MR. PINE:  Use the house, wear a wire, that
17  kind of thing.
18     A.   Yes.
19     Q.   And she obviously spoke with you -- I'm
20  sorry.  She obviously spoke with you before that
21  day, before that took place, right?
22     A.   Yeah.
23     Q.   And I think you said as a result of
24  information that she gave you, that you got, quote,
25  pissed off.  Didn't you say that a little while ago?

Page 103

1      A.   Well, when I found out what your client
2  was using -- before I got a little bit upset.
3      Q.   Uh-hum.
4      A.   And although he was delivering monies to
5  the people, they had no idea that he was being used
6  either.
7      Q.   Well, you don't know what other people --
8      A.   I don't know.
9      Q.   -- knew or didn't know?
10     A.   I don't know but I'm assuming --
11     Q.   Right.  But --
12     A.   -- that this is what happened.
13     Q.   But -- but what did she tell you about
14  what he was supposed to be doing?
15         MR. McADAMS:  Objection, hearsay.
16         MR. MacFADYEN:  Objection.  Calls for
17  hearsay.
18     A.   Nothing -- nothing specific.
19     Q.   Well, did she tell you that they were
20  taking money from people?
21     A.   No, she didn't.
22     Q.   I thought you said that before.
23     A.   No, no, not taking money from people.
24     Q.   Well --
25     A.   I indicated that they were using a --

Page 104

1  well, kind of a flimflam way of --
2          THE REPORTER:  Kind of a -- excuse me, kind
3  of a --
4      A.   Flimflam way of getting clients so to
5  speak.
6      Q.   And was that her expression?
7      A.   No, that's my expression.
8      Q.   Well, but what did she tell you that they
9  were doing --
10         MR. McADAMS:  Objection.  Calls for
11  hearsay.
12     Q.   -- to persuade you to wear a wire?
13         MR. McADAMS:  Objection.
14     A.   Well -- well, what I heard was they were
15  looking to get the owner of that Camrades (sic)
16  there to find out -- get them prosecuted for the way
17  they were operating.
18     Q.   Okay.
19     A.   It was not ethical, it was not proper and
20  --
21     Q.   So she -- did she mention specific names?
22  You said the owner of the --
23     A.   Well, the --
24     Q.   -- did you say Caramadre?
25     A.   Ca -- Camadre (sic) or --

Vivian S. Dafoulas & Associates (401) 885-0992

Page 105

1    MR. McADAMS: Objection.

2    MR. MacFADYEN: Objection.

3    A.   -- whatever you want to...

4    Q.   Yeah.  And they were looking to prosecute

5  him?

6    MR. McADAMS: Objection on the hearsay

7  grounds again.

8    Q.   Is that what she -- she told you that they

9  were looking to do?

10    MR. MacFADYEN: Same objection.

11    MR. McADAMS: Objection. Hearsay.

12    A.   No. More or less she didn't tell me any

13  specific thing. They -- evidently Raymour was

14  representing them but they were using I think

15  Raymour too to go out and get the clients for them.

16    Q.   Uh-hum.

17    A.   And I don't know what they were paying

18  him, what -- what -- what was going on but it was to

19  me what I call a shady operation.

20    Q.   Okay.  And --

21    A.   No good stockbroker would --

22    Q.   And you drew that conclusion --

23    A.   Conclusion.

24    Q.   -- based on a conversation that you had

25  with her?

Page 106

1    MR. McADAMS: Objection. Hearsay.

2    Q.   Is that correct?

3    A.   Not entirely with her.

4    Q.   Who -- who else did you speak with?

5    A.   I talked with Sandy. She was my woman who

6  -- adviser from the -- what do you call it?

7    Q.   From hospice?

8    A.   Hospice.

9    Q.   Right.  Did you have a conversation with

10  Sandy after your meetings with Raymour?

11    A.   Several conversations.

12    Q.   Okay.

13    A.   She came to the house.

14    Q.   And did she ever express to you any

15  disapproval --

16    MR. McADAMS: Objection. Hearsay.

17    MR. MacFADYEN: Objection. Hearsay.

18    Q.   -- about what Raymour was doing?

19    A.   Well, she never said to me, you know...

20    Q.   Do you still have a favorable opinion of

21  Sandy?

22    A.   Not really.

23    Q.   Because of the chair episode or for other

24  reasons?

25    THE WITNESS: Because of what?

Page 107

1    MR. PINE: I thought you said she broke a

2  chair of yours.

3    A.   Oh, no. That --

4    Q.   But I'm asking do you have a favorable

5  opinion of her or unfavorable opinion of her for

6  other reasons?

7    A.   That -- that had -- no, I don't think too

8  much of her as a -- a representative of hospice.

9    Q.   Okay.  Did you have any contact with any

10  other FBI agents other than Pamela McDaid?

11    A.   No.

12    Q.   And how many --

13    A.   Wait a minute, wait a minute. Just the

14  fellow that came down and wired.

15    Q.   Okay.

16    A.   He was the only other.

17    Q.   Okay.  And how many conversations did you

18  have with her?

19    THE WITNESS: Who, Pamela?

20    MR. PINE: Yeah.

21    A.   Well, she's become like more or less of a

22  personal sort of a friend, and she came down and

23  said hello. She brought her son down.

24    Q.   Brought her son down?

25    A.   She was both interested in boating and she

Page 108

1  had just bought a -- bought a boat. It was a

2  friendly conversation.

3    Q.   Okay.  And did she come down on more than

4  one occasion I -- I take it?

5    A.   Yeah. She came down to see how I was

6  doing physically.

7    Q.   Right.

8    A.   And brought me something, you know, baked

9  me some stuff, cookies and stuff, but that was it.

10    Q.   So she brought you --

11    A.   She didn't bribe me.

12    Q.   No, I understand, but she brought you

13  baked goods of some sort?

14    A.   Yeah.

15    Q.   And she introduced you to her son; is that

16  correct?

17    A.   Just -- yeah. Nice -- nice boy, good boy.

18    Q.   Did she introduce you to him on more than

19  one occasion or just once?

20    A.   Just once.

21    Q.   And did she spend a while with you, spend

22  some time with you?

23    A.   About half an hour or so.

24    Q.   And during --

25    A.   Conversation and just general pleasurable

30 (Pages 105 to 108)

Richard G. Wiley

In Re Grand Jury Proceedings

Page 109

1 afternoon conversation.
2    Q. Okay. And was part of that conversation
3 devoted to the business practices of Raymour and --
4 and Mr. Caramadre or other individuals?  In part of
5 that conversation, did that come up?
6    THE WITNESS:  Camadre (sic)?
7    MR. PINE: I'll strike that.
8    Q. Was part of the conversation devoted to
9 the business practices of Raymour?
10    MR. McADAMS: Objection for hearsay.
11    A. Well, somewhat.  She expressed her
12 opinion, I expressed my opinion.
13    Q. Okay. And what opinion did she express to
14 you?
15    A. Well --
16    MR. McADAMS: Objection. Hearsay.
17    A. -- neither one -- neither one was very
18 favorable.
19    Q. Right.
20    A. But that -- that's about as far as it
21 went.
22    Q. All right. Did she talk -- I thought
23 before the break you referenced that they were
24 taking money from poor people or people who deserved
25 the money --

Page 110

1    A. Well --
2    Q. -- or something like that.
3    A. -- I probably said what I didn't mean.
4    Q. All right.
5    A. I don't know, but it seems to me the
6 people that needed the money were the children or
7 mothers or fathers of whoever was on the way out.
8    Q. Uh-hum.
9    A. Not the Camrades or Camrade (sic).
10    Q. I --
11    A. I used to work for somebody named Camrade
12 so I get them --
13    Q. I understand. So she expressed certain
14 opinions to you and you, in turn, expressed certain
15 opinions to her --
16    A. Yeah.
17    MR. McADAMS: Objection. Hearsay.
18    Q. -- during those conversations, correct?
19    A. Yeah, some, but we didn't talk about it
20 much.
21    Q. Okay. But enough that she got your
22 agreement to record a meeting with Raymour and an
23 attorney, right?  She was able to convince you to do
24 that?
25    THE WITNESS: To get Raymour to talk with

Page 111

1 an attorney?
2    Q. No. To have a conversation at your house
3 with Raymour and an attorney, right?
4    A. Well, I volunteered.
5    Q. Right.
6    A. They didn't put any bite on me.
7    Q. Well, did you suggest, "I'll wear a wire,"
8 or did she ask you to wear a wire?
9    A. I didn't suggest anything.
10    Q. Okay. She asked you?
11    A. I was asked if it was all right if they
12 could record somebody.
13    Q. Right. And you agreed?
14    A. Yeah.
15    Q. Based on the information that she had
16 given you?
17    A. Well, yes, for where else would I have got
18 it?
19    Q. Naturally. Did -- you said that when you
20 were with Raymour, you had a favorable opinion of
21 him, right, when -- during those meetings --
22    A. Yeah.
23    Q. -- that you had? Did he ever force you to
24 do anything?
25    A. No.

Page 112

1    Q. Ever coerce you?
2    THE WITNESS: Why would he? Why would he?
3    MR. PINE: I don't know.
4    Q. He never did?
5    A. No.
6    MR. PINE: Okay. That's all I have.
7    THE VIDEOGRAPHER: Are we off the record?
8    MR. PINE: Sure.
9    THE VIDEOGRAPHER: We're going off the
10 record. The time is 12 -- 11:30.
11    (OFF THE RECORD)
12    THE VIDEOGRAPHER: The time is 11:31. Back
13 on the record.
14    CROSS-EXAMINATION
15 BY MR. FLANDERS:
16    Q. Good morning, Mr. Wiley.
17    A. Hi.
18    Q. My name is Robert Flanders and I represent
19 Joseph and Paula Caramadre.
20    A. Hi.
21    Q. You and I have met before?
22    A. That's right.
23    Q. I was at your house in -- earlier in the
24 summer I think. Is that right?
25    A. Yeah. Well, yes, it was early summer.

31 (Pages 109 to 112)

Page 113

1    Q.  Right.  And that was the first time you
2  and I had met?
3    A.  Met.
4    Q.  I was with Raymour and you were there with
5  Mr. Sayles?
6    A.  Right.
7    Q.  And this was the meeting that was recorded
8  secretly, right?
9    A.  Right.
10   Q.  You didn't tell me that you were recording
11 that meeting?
12   A.  No, I didn't.  No, I didn't.
13   Q.  And that was the meeting that the FBI was
14 there before and after the meeting speaking with you
15 about it?
16   A.  They came and asked me permission and I
17 gave them permission.
18   Q.  And is that -- is that Ms. McDaid or the
19 FBI agent, Pamela McDaid?
20   A.  Yes.
21   Q.  When is the first time you met Ms.
22 McDaid?
23   A.  God, I don't know.  The first time she
24 came to my house.
25   Q.  How did she come to -- how did --

Page 114

1    A.  Or called, called up and she -- I don't
2  know exactly.  I can't really remember to tell you
3  the truth.
4    Q.  How did it come to pass that she showed up
5  at your house?
6    A.  I don't know.
7    Q.  Did she just show up on her own?  Had you
8  ever talked to her?
9    A.  I never talked to -- no, I never talked to
10 her.  I may have talked to her on the telephone.
11   Q.  Is it -- is it your best recollection that
12 you spoke with her on the telephone before she
13 showed up at your house for the first time?
14   A.  No, I -- I can't remember.
15   Q.  Did you invite her over the house or did
16 she come on her own?
17   A.  I believe she came on her own.  I'm not
18 sure.  I didn't recollect inviting any -- anybody to
19 -- to the house.
20   Q.  And when you first met with her, when she
21 arrived at your house on her own, was that in the
22 wintertime of this year?
23   A.  Not this year.  It was -- I can't
24 remember.
25   Q.  Well, was it after you had met with

Page 115

1  Raymour and signed up the documents and gotten your
2  money?
3    A.  That's right, yeah.
4    Q.  Okay.  So after you had had your meetings
5  with Raymour and signed up the documents and
6  received your money from Raymour, sometime after
7  that, Ms. McDaid showed up at your house --
8    A.  Yes.
9    Q.  -- is that right?  How much time had
10 passed roughly?
11   A.  I can't say really.  I can't remember.
12   Q.  And did she have a conversation with you
13 at this meeting at your house?
14   A.  Yeah.  Well, naturally we had to speak.
15   Q.  And as a result of having this
16 conversation Ms. -- with Ms. McDaid, what did you
17 understand was going on?
18     MR. MacFADYEN:  Objection.  Hearsay.
19     MR. McADAMS:  Objection.  Calls for
20 hearsay.
21   A.  Well, I understand then -- then that they
22 were more or less using people.
23   Q.  Who's "they"?
24   A.  The Camadres (sic) for investment purposes
25 which, to me, was not very ethical.

Page 116

1    Q.  Why?
2    A.  Why?  Because the people didn't know they
3  were making money off them.
4    Q.  How do you know?
5    A.  I found out.
6    Q.  From who?
7    A.  I'd rather not say.
8    Q.  Well, you're going to have to, sir.
9    A.  All right.  Well, I found out from Pam and
10 I found out from other -- no.  I -- no, there was
11 nobody else that told me.  I was thinking Sandy did
12 but it was -- Pam told me that they were using the
13 people.  And that was -- made me form -- informed.
14     MR. MacFADYEN:  Objection.  Nonresponsive.
15 Motion to strike.
16   Q.  Did she say to you that it was unethical?
17   A.  No.  I knew it was unethical.
18   Q.  Did you consider it unethical for people
19 to have joint accounts together?
20   A.  No.
21   Q.  What's unethical, sir?
22   A.  They were taking older people on -- on
23 their death beds and offering them $3,000, which is
24 fine, there's nothing wrong with giving people money
25 if they need it, but it seems they were using it to

Richard G. Wiley

In Re Grand Jury Proceedings

Page 117

1  invest in themselves as a family.
2      Q.   Would you agree that that was proper if
3  the people they spoke with agreed to do that?
4      A.   If they got 50 percent of it, half and
5  half, if it was a joint account like.
6      Q.   So -- so your objection is that they
7  weren't being paid enough money?
8      A.   Well, they -- they didn't know that the
9  Camarades were using them to enhance their own
10 station in life with stocks and bonds and things.
11     Q.   Is that what Ms. McDaid told you?
12         MR. McADAMS: Objection.
13     A.   No.
14         MR. McADAMS: Hearsay.
15     A.   She didn't tell me that exactly.
16     Q.   Well, how did you find that out then, sir?
17 Who told you that?
18     A.   I heard it through -- more or less through
19 the grapevine.
20     Q.   What grapevine?
21     A.   It was -- it was expressed by some of the
22 people that came to the house. They -- for
23 instance, Sandy, she -- although she was the one
24 that introduced it, she I think knew that they were
25 making money off the clients.

Page 118

1      Q.   And did she tell you that?
2         MR. MacFADYEN: Objection.
3         MR. McADAMS: Objection. Hearsay.
4      A.   She did not tell me that.
5      Q.   Well, how do you know she -- she knew
6  this?
7      A.   I don't know for sure.
8      Q.   You're just assuming this?
9      A.   Well, why would the government bother to
10 go after them?
11     Q.   How did you know the government was
12 bothering to go after them? Did Ms. McDaid tell you
13 that?
14     A.   She came to the house, went into a card,
15 and asked me if I had any business -- it all started
16 with that telephone call when they said they were
17 going to go further with it.
18     Q.   Who's "they"?
19     A.   A Mr. -- somebody from down Louisiana I
20 believe it was.
21     Q.   So somebody from TradeKing?
22         THE WITNESS: Is that where TradeKing is?
23         MR. FLANDERS: I don't know. I'm asking
24 you.
25     A.   I don't know where TradeKing is.

Page 119

1      Q.   Well, who was it? Who was it that you
2  spoke with?
3      A.   It was -- I forgot what the man's name is
4  at -- I can't -- I can't tell you exactly what his
5  name was but I think it was Hart. Not Hart. I've
6  got so God damn many things going on at once here.
7  But I know that...
8      Q.   All right. So you got a telephone call
9  from somebody asking you about an account you had
10 opened supposedly?
11     A.   Yes. And that's -- that's when I first
12 heard about it.
13     Q.   And then you had a visit from Ms. McDaid
14 connected with that?
15     A.   Then I had a visit from the FBI. It must
16 have been connected with that because they said,
17 "We're going to go further into investigating this."
18     Q.   Who said that?
19     A.   The person on the telephone.
20     Q.   Did Ms. McDaid tell you that as well?
21     A.   No.
22     Q.   Did she tell you the government was
23 thinking about prosecuting the Caramadres?
24     A.   After she -- she came to the house and
25 told me that they were looking into it, and that was

Page 120

1  after the phone call from down south somewhere.
2      Q.   Okay.
3      A.   Louisiana.
4      Q.   Now, didn't -- didn't you actually meet
5  with Ms. McBaid -- Ms. McDaid to go over some
6  paperwork that you had received from this brokerage
7  firm?
8         THE WITNESS: What brokerage firm?
9         MR. FLANDERS: TradeKing.
10     A.   Oh, TradeKing, yes. I don't know who
11 TradeKing is. I can't -- she came to the house
12 because I didn't know how to fill out the forms. I
13 didn't even know what they were asking half of them.
14 So I was -- I was upset and I called her and asked
15 her if she could come down and tell me what this was
16 all about, and she did and she -- she helped me.
17     Q.   And she worked with you to actually fill
18 out the form?
19     A.   She told me -- read it and she said,
20 "Well, you have no computers here so just write no."
21     Q.   Didn't she actually write in the answers
22 on the form?
23     A.   No, I did.
24     Q.   Okay.
25     A.   As far as I know.

Vivian S. Dafoulas & Associates (401) 885-0992

In Re Grand Jury Proceedings                              Richard G. Wiley

Page 121

1    Q.   Let's take a look at that.  That's Exhibit
2    4.  Take a look at this.  This is a letter dated
3    April 6th, 2009 to you from this fellow Shawn Moylan
4    at TradeKing; is that right?
5    A.   I don't remember a man by the name of
6    Shawn Moylan.
7    Q.   Do you remember getting this letter?
8    A.   No.
9    Q.   All right.  The second page is a document
10   that's entitled "Affidavit of Fraud."  Do you see
11   that?
12   A.   Yup.
13   Q.   Is this the document you and Ms. McDaid
14   filled out together?
15   A.   I don't believe so.  Let me look at
16   another one.
17   Q.   Sure.  Take your time.
18   A.   I signed it -- again, let me look.
19   Q.   Again, we're looking at Exhibit 4 and at
20   the back there's a -- this might be clearer.  If you
21   take a look at the document that's been marked as an
22   exhibit, at the back, let me direct your attention
23   to the last page.  Okay.
24   A.   That's me.
25   Q.   Is that your signature?

Page 122

1    A.   That is.
2    Q.   Okay.  Is that your handwriting, "No
3    account"?
4    A.   "No account."
5    Q.   Did Ms. McDaid write in --
6    A.   No.
7    Q.   -- answers for you?
8    A.   No.
9    Q.   Is that your handwriting on -- on page --
10   A.   I believe so.
11   Q.   -- page 17?
12   A.   I believe so.
13   Q.   Was she reading to you from this document
14   as you were filling it out?
15   A.   Well, I was reading and she was reading, a
16   little of both.
17   Q.   You were both reading it together?
18   A.   Together.
19   Q.   Okay.
20   A.   A round circular table.
21   Q.   And who else was there when you filled
22   this out?
23   A.   Nobody.
24   Q.   Just the two of you?
25   A.   Right.

Page 123

1    Q.   Okay.  And she helped you to fill out the
2    answers?
3    A.   No.  All she did was tell me that I had
4    none of these things so that, "You should say no,"
5    and -- and I did.
6    Q.   Did she show you a copy of Government's
7    Exhibit 2?  If I can have that please?
8    A.   Okay.  I signed that?
9    Q.   Yup.  Did she show you this document that
10   you had signed, Exhibit 2?
11   A.   I can't remember.
12   Q.   Do you remember signing this document for
13   Raymour?
14   A.   What, the same one?  No, I don't --
15   Q.   You do admit --
16   A.   -- remember all -- all that.
17   Q.   You signed a bunch of documents for
18   Raymour, didn't you?
19   A.   Yes.
20   Q.   And he read to you from these documents,
21   didn't he?
22   A.   He read about a half a paragraph as we
23   went to another one and right down the line.
24   Q.   And he read to you from each of them,
25   correct?

Page 124

1    A.   A little bit of something.
2    Q.   And you read -- and you read some of them
3    yourself, didn't you?
4    A.   No.
5    Q.   You partially read some of them, didn't
6    you?
7    A.   A little bit with -- with him.
8    Q.   Yeah.
9    A.   And he said, "Sign here and here," so...
10   Q.   And he spent an hour and a half with you
11   going over these documents, didn't he?
12   A.   About -- well, I don't about an hour and a
13   half, but it seemed like a long time to me.
14   Q.   Yup.  And he -- and he had actually two
15   meetings with you where he showed you these
16   documents; isn't that right?
17   A.   I recollect one meeting.
18   Q.   Well, you had the first meeting --
19   A.   Yup.
20   Q.   -- with Mr. Sayles, right, where he
21   explained to you what this was all about; is that
22   right?
23   A.   Yeah.
24   Q.   And at that meeting, he showed you the
25   blank forms of the documents that he was going to

In Re Grand Jury Proceedings                                    Richard G. Wiley

Page 125

1  use and explained to you how it would work?
2      A.  I don't remember him showing me any blank
3  forms.
4      Q.  Well, didn't he discuss with you -- didn't
5  he have documents that he showed you at that
6  meeting?
7      THE WITNESS:  The second meeting?
8      MR. FLANDERS:  No, the first meeting when
9  Mr. Sayles was there.
10     A.  He did, yeah.
11     Q.  All right.  And he went through and he
12 read the documents partially to you as you say?
13     A.  Yeah.
14     Q.  And -- and -- explained to you what this
15 was going to involve?
16     A.  No.  He never explained what it was going
17 to involve.
18     Q.  He just read from the documents?
19     A.  Yeah.
20     Q.  Okay.  And did you tell him that you
21 didn't understand what he was saying?
22     A.  No.  I just -- I wanted the money so I
23 went along with it.
24     Q.  That's right.  And you then invited him to
25 come back again, right, to sign them up and get your

Page 126

1  money?
2      A.  Yes, I did.
3      Q.  And, in fact, he came back nine or ten
4  days later with the same documents and asked you to
5  sign them up?
6      A.  I don't know why I can't remember whether
7  they're the same documents or not.
8      Q.  Okay.  But he came back with documents,
9  right, and again he read to you from the documents?
10     A.  I can't remember.
11     Q.  Well, you don't deny that he read to you
12 from the documents, do you?
13     A.  Well, I -- he denied -- I can't deny that
14 he didn't read something from some documents.
15     Q.  Okay.  At any --
16     A.  I didn't see them.
17     Q.  At any point after he read to you from the
18 documents and talked with you for an hour and a half
19 at this second meeting, did you tell him, "I don't
20 want to do this"?
21     A.  No.
22     Q.  Did you tell him, "I don't understand what
23 you're talking about"?
24     A.  No, I didn't.
25     Q.  And after he got finished in talking with

Page 127

1  you and reading from the documents, you decided to
2  go ahead and sign them, didn't you?
3      A.  Certainly, I did.
4      Q.  And you knew you had to sign them in order
5  to get the 3,000 or whatever number the thousands of
6  dollars you received?
7      A.  Three, right.
8      Q.  And -- and he actually paid you that
9  money, didn't you -- didn't he?
10     A.  Yes, he did.
11     Q.  Okay.  And have you ever offered to return
12 that money?
13     A.  No, I haven't but I could.
14     Q.  But you haven't to date?
15     A.  No.
16     Q.  Despite knowing that you have signed
17 documents authorizing a joint account to be created
18 --
19     A.  No, no.
20     Q.  -- you have not offered to return that
21 money?
22     MR. McADAMS:  I'm going to object to a good
23 faith --
24     THE WITNESS:  Not --
25     MR. McADAMS:  -- basis for this question

Page 128

1  when counsel is aware of an offer made to counsel at
2  this meeting to return the money and you indicated
3  that you were going to ask Mr. Caramadre if he wanted
4  the money back, so I'd ask if you'd question yourself
5  if you have a good faith basis for this question.
6      MR. FLANDERS:  I have a very good faith
7  basis for it.  He just told me --
8      MR. McADAMS:  We have a recording.
9      MR. FLANDERS:  -- he never offered to
10 return it and he didn't.
11     THE WITNESS:  Mr. Sayles did.
12 BY MR. FLANDERS:
13     Q.  But you -- you never did, did you?
14     A.  (Non-verbal response.)
15     Q.  You never indicated that --
16     THE REPORTER:  Excuse me.
17     Q.  You never did, did you?
18     A.  I never did, no.
19     Q.  Now, isn't it true, sir, that as a result
20 of meeting with Raymour, you are $3,000 richer than
21 you were before that meeting?
22     A.  Yes.
23     Q.  And you haven't ever lost any money on
24 account of meeting with Raymour, have you?
25     A.  No.

In Re Grand Jury Proceedings                                      Richard G. Wiley

Page 129

1    Q.   Or with the Caramadres?
2    A.   No.
3    Q.   And you disclaim any interest in any joint
4    account that was created; is that right?
5    A.   Right.
6    Q.   So if there is a joint account that bears
7    your name, you're telling us you have no interest in
8    any monies that are in there; is that right?
9    A.   No, not right.
10   Q.   What -- what -- what are you saying?
11   A.   Anything that I signed concerning this
12   whole matter was done in a state of duress more or
13   less and to me it just did not seem ethical. I mean
14   there's nothing wrong with having joint accounts
15   with people, but the thing is taking somebody like
16   me who they damn well know is going to grab for it
17   more or less, the cash, because they need it at that
18   point in their life, they need to help pay up their
19   bills maybe, buy a funeral plot. And they were
20   using the money for their own benefit, not the -- if
21   you say like a trust, it was not for the benefit of
22   a trust, it was for their personal gain.
23   Q.   Did you think this was unethical at any
24   time when you signed the documents?
25   A.   I cannot say really yes or no to that.

Page 130

1    That's a beauty. I -- I don't know.
2    Q.   Did you think it was unethical when you
3    took $3,000 from Raymour?
4    A.   No.
5    Q.   In fact, you didn't think anything was
6    unethical until after you'd met with Ms. McDaid;
7    isn't that right?
8    A.   Not --
9    Q.   Wasn't that the first time?
10   A.   Yeah, yeah, yeah, yeah, more or less.
11   Q.   Yeah, because she told you that these
12   people were taking money from poor people, right?
13   Right?
14   MR. McADAMS: Objection.
15   MR. MacFADYEN: Objection.
16   A.   No, she didn't tell me they were taking
17   money from poor people.
18   Q.   What did she tell you that made you think
19   it was unethical?
20   MR. MacFADYEN: Objection.
21   MR. McADAMS: Objection. Hearsay.
22   A.   The fact that there was money given to
23   people for investment purposes and then they used it
24   for themselves with this -- what was it, TradeKing
25   business.

Page 131

1    Q.   And you thought that was unethical?
2    A.   Yeah, I thought that was unethical.
3    Q.   Even if you or others agreed to it?
4    A.   Well, I agreed to it when I -- I guess
5    when I signed up with Raymour.
6    Q.   Right.
7    A.   But had I known, I would not have signed
8    up with them.
9    Q.   When you say had you known, didn't he go
10   over it with you in detail?
11   A.   He didn't go over it in any detail
12   whatsoever.
13   Q.   All right. You have had these documents
14   at least since I provided you with a copy of them,
15   right?
16   THE WITNESS: When -- when did you provide
17   me one?
18   Q.   Didn't I give you copies when we met this
19   year at your house when you secretly recorded the
20   meeting?
21   A.   No. I don't remember you doing that.
22   Q.   You don't remember me giving you the
23   documents?
24   A.   No. I don't remember that.
25   Q.   Leaving you and Mr. Sayles with copies of

Page 132

1    everything that you signed?
2    A.   No. I don't remember that and I don't
3    think Mr. Sayles will either.
4    Q.   Is it possible you just don't remember?
5    A.   No, I would remember.
6    Q.   You remember me giving you the documents?
7    A.   No, I don't remember you giving me any
8    documents.
9    Q.   Okay. Now, you were sent a copy --
10   MR. FLANDERS: If I can have the exhibits
11   that were marked, please.
12   MR. McADAMS: I gave you an entire set.
13   MR. FLANDERS: I thought we -- we were
14   going to be using the originals --
15   MR. McADAMS: The reason I gave you the
16   entire set was so that you could have a copy to use.
17   It's the only one that --
18   MR. FLANDERS: I thought you wanted the
19   witness to see the originals.
20   MR. McADAMS: They're all the same except
21   for --
22   MR. FLANDERS: Except that some are better
23   copies.
24   MR. McADAMS: -- some are a better copy.
25   But here you go. You can have all of mine.

Vivian S. Dafoulas & Associates (401) 885-0992

In Re Grand Jury Proceedings

Richard G. Wiley

Page 133

1  BY MR. FLANDERS:
2    Q.   The government marked as Exhibit 3 a
3  document that appears to be an account statement for
4  TradeKing with your name on it; is that right?
5    A.   Yup.
6    Q.   When did you first see this?
7    A.   When did I first see it?  I don't
8  remember.  I don't recollect but I think -- no, I
9  never -- I never saw it maybe until yesterday or
10  today.  But I know I never saw any document with my
11  name on it with anywhere near that sort of money on
12  there.
13    Q.   Before today, have you -- did you see
14  Exhibit 1, the Agreement and Acknowledgment?
15    A.   I never saw that.
16    Q.   You never saw that before today?
17    A.   No.  Yesterday or today.
18    Q.   First time?
19    A.   First time.
20    Q.   Do you admit that that's your signature on
21  the third page of Exhibit 1?
22    A.   That looks like it.  That does look like
23  it.
24    Q.   Okay.  Is it your recollection that this
25  was one of the documents that Raymour read to you

Page 134

1  when you met?
2    A.   I don't know.  He's sitting right where he
3  is and I'm over here, and he was sitting on -- on
4  the floor.  And we had a -- one of those little old
5  wooden tables, and he was reading and flipping over
6  like this, and I was sitting in the chair.
7    Q.   Okay.
8    A.   And I don't remember seeing that.
9    Q.   Going back to Exhibit 3, which is the
10  account that is with TradeKing, did you invest any
11  money in this account?
12    A.   No.
13    Q.   And --
14    A.   I had no money to invest.
15    Q.   Okay.  And you have no -- so any money
16  that was put into this account didn't come from you?
17    A.   No.
18    Q.   And do you have any claim to any of the
19  money in the account?
20    A.   Why would I; I never put anything into it.
21    Q.   Is that answer no, that you have no claim?
22    A.   No claim.
23    Q.   Okay.  So if this -- if this account were
24  to be liquidated immediately, you would have no
25  claim to any assets?

Page 135

1    MR. McADAMS:  Objection.
2    Q.   Is that right?
3    A.   I wouldn't think so --
4    Q.   All right.
5    A.   -- if I had nothing in it.  But who knows,
6  somebody could put something in it and say I did and
7  I -- and I didn't.
8    Q.   But -- but to your knowledge, you haven't
9  put any money into it?
10    A.   Nothing.  Don't even know who they are.
11    MR. FLANDERS:  Okay.  Why don't we stop
12  here.  I have a few more questions but I think I'm
13  almost done.
14    MR. McADAMS:  Well, it's about five of
15  twelve.  Do you think you want to do your last five
16  minutes and be done and we'll go on to the next
17  questioner?
18    MR. FLANDERS:  Let's -- let's break here
19  and then we'll take it from there.
20    THE VIDEOGRAPHER:  We're going off the
21  record.  The time is 11:58.
22    (Lunch recess)
23    THE VIDEOGRAPHER:  The time is 1:03.  We're
24  back on the record.
25  BY MR. FLANDERS:

Page 136

1    Q.   Good afternoon, Mr. Wiley.
2    A.   Good afternoon again.
3    Q.   We're back -- back on the record again.
4  When Mr. Pine was questioning you previously, he
5  asked you about medications that you were taking?
6    A.   Yes.
7    Q.   And you -- you pulled out that little
8  black book in your pocket to reference what it is
9  that you're taking by way of medications.  What is
10  that little black book?
11    A.   It's just a -- where I've got all my
12  medical crap down there, New Haven Veterans Hospital
13  one.  Nothing particular, just --
14    Q.   Does it -- does it have a listing of the
15  medications that you take?
16    A.   Yeah.
17    Q.   Would you be willing to provide us with a
18  copy of that?
19    A.   What, the medications?  Sure.
20    Q.   Yeah, the -- and anything else about your
21  health that's in that book?
22    A.   Well, you can get it from the V.A.
23    Q.   But can -- would you give us a copy of
24  that?
25    A.   Yeah, but it doesn't -- I -- I need --

Richard G. Wiley

In Re Grand Jury Proceedings

Page 137

1  need this. I'll give you a copy. I'll give you a
2  copy of that. Here's the medications. It's not
3  much, nothing that says I'm nuts although I think
4  you hope it does.
5     Q.  Although what?
6     A.  I think you hope it does. No way. Not
7  much it's just -- it's got all the doctors listed
8  down there that works on me and the oncologist and
9  all.
10    Q.  If we could just get a copy of that page?
11    A.  Oh, I'll give it to you.
12    Q.  Okay. You don't -- you don't -- you can
13  -- you don't have to take it out. You can just --
14  they'll make a copy of it.
15       MR. McADAMS: May I make a suggestion?
16  Maybe we'll just read it into the record?
17       MR. FLANDERS: Yeah. Why don't we just
18  read this into the record and you can get the
19  spelling from her. But it's dated the 9/24 and it
20  says lactulose as of 9/23. That's L-A-C-T-U-L-O-S-E.
21  trazadone, T-R-A-Z-A-D-O-N-E. Also on medication as
22  needed for seizure, R-E-S-P-. distress, agitation,
23  pain, and it looks like secretions. And then the
24  medicines are listed as Ativan, A-T-I-V-A-N,
25  morphine, Ativan again. It looks like tramadol,

Page 138

1  T-R-A-M-A-D-O-L.
2     A.  I don't know for sure.
3     Q.  And Levsin, L-E-V-S-I-N.
4     A.  Right.
5     Q.  Did you write that down?
6     A.  The nurse did at my request.
7     Q.  And that represents the medications you're
8  presently taking?
9     A.  That I'm presently taking.
10    Q.  Okay. Now, do you have a will, Mr. Wiley?
11    A.  Yup.
12    Q.  Who is the beneficiary of your will?
13       THE WITNESS: At the present time?
14       MR. FLANDERS: Right.
15    A.  I have listed Mr. Sayles and Mr. -- oh,
16  what the hell, Trebisacci. I'm not sure how you
17  spell his name. Nicholas. Not Nick, I mean -- oh,
18  I forgot his first name. Now you're going to say I
19  forgot but...
20    Q.  And who is that other individual that you
21  just mentioned?
22    A.  Trebisacci. He owns the Westerly Marina
23  boatyard.
24    Q.  Okay.
25    A.  Another personal friend, another friend.

Page 139

1     Q.  So he's a friend. Okay. And do you know
2  how they share under your will, in what percentages?
3     A.  I don't know. I don't think there will be
4  anything for them anyhow, but I didn't make any
5  percentages. I forgot the lawyer's name, but there
6  is a will and it's made out up in -- it's in
7  Westerly, I guess recorded in Westerly. I don't
8  know whether or not they record the wills in the
9  town hall.
10    Q.  Do you know what lawyer drew it up?
11    A.  A friend of Mr. Sayles. And I forgot his
12  name.
13    Q.  When did you prepare this will?
14    A.  Oh, several months ago.
15    Q.  This year though?
16    A.  This year, yes.
17    Q.  When did you prepare it relative to
18  signing up and -- with Raymour?
19    A.  Oh, hell, way afterwards.
20    Q.  After that?
21    A.  Yeah.
22    Q.  Okay. Does -- does -- to your knowledge,
23  does Mr. Sayles know that he is a beneficiary under
24  your will?
25    A.  Yes. I told him he was.

Page 140

1     Q.  Now, going back to the time between the
2  first meeting you had with Raymour earlier this year
3  when Mr. Sayles was present, and the second meeting
4  that you had with Raymour alone when you signed up
5  the documents and received the money, the $3,000
6  from him. You were asked some questions about how
7  the second meeting came about, and I think you told
8  us that you received a call from Raymour to set up
9  that second meeting. Is that right?
10    A.  Yes. You see, when it was first set up,
11  they said it takes nine, ten, fifteen days to match
12  up. And so it was maybe nine, ten days later he
13  called, called me up and asked if it was all right
14  if he came down at two o'clock. He did and he
15  arrived.
16    Q.  Okay. Did you have any telephone
17  conversations that you initiated between the initial
18  meeting with Raymour and Mr. Sayles and the second
19  meeting where you signed up the documents?
20    A.  I can't remember.
21    Q.  Do you have phone --
22    A.  I -- go ahead.
23    Q.  Do you have telephone records that would
24  show what calls you made?
25    A.  Well, I might have. Sometimes I save them

38 (Pages 137 to 140)

Page 141

1  but usually I just toss out the phone bills. The
2  phone company would have them probably.
3     Q.  Okay.  Would you be willing to look for
4  those records and produce them if you have them to
5  us?
6     A.  Yeah.  Now, I've --
7        MR. McADAMS:  Objection to the relevance
8  and this is trial testimony.
9     A.  Well, I'm thinking about what -- what
10  dates would -- what month it would be, what dates it
11  would be.
12     Q.  Well, that's why I'm asking for the
13  records.  If you made telephone calls, that would
14  show it.
15     A.  Yeah.
16     Q.  Would you be willing to produce copies of
17  that for us?
18     A.  If I could find them, I would.
19     Q.  Okay.
20     A.  I'll look and see.  I've got a box that I
21  keep all my old bills in.  I could probably find a
22  copy and saying paid or -- it's paid or whatever.
23        MR. FLANDERS:  Okay.  Okay, that's all I
24  have.
25        MR. McADAMS:  We have one more attorney,

Page 142

1  Mr. -- oh, two more.  Excuse me, two more attorneys
2  to question you.
3        MR. FLANDERS:  Do you want to come over
4  here, John?
5        MR. MacFADYEN:  No.
6        THE VIDEOGRAPHER:  Can we go off the
7  record, please?
8        MR. MacFADYEN:  No, we're on the record.
9  ███████████ my client's name, has not been
10  mentioned today and at this juncture I simply don't
11  know what, if anything, might be his exposure, what
12  the government's theory might be, and under those
13  circumstances, I can't formulate any kind of line of
14  inquiry, and consequently I'm not going to ask any
15  questions today.
16        MR. TRAINI:  On behalf of ███████████,
17  without restating it, I adopt Mr. MacFadyen's
18  position.  And I also, for the same reason, will not
19  be asking any questions today.
20        MR. McADAMS:  Mr. Wiley, that means that
21  I'm going to ask you a few more questions.  It's
22  what's called redirect examination.
23        THE WITNESS:  Okay.
24        MR. McADAMS:  And then we'll be done.
25        THE WITNESS:  Good.

Page 143

1            REDIRECT EXAMINATION
2  BY MR. McADAMS:
3     Q.  Mr. Wiley, Mr. Pine asked you some
4  questions about some of the documents that we showed
5  you and he asked you how much time you had spent
6  when you met with Mr. Raymour Radhakrishnan.  And
7  you had testified I believe that on the two
8  meetings, each time it was about an hour and a half?
9     A.  Hour, hour and a half, if it was that
10  long.
11     Q.  Okay.
12     A.  It may have been an hour.  I -- I don't
13  know.
14     Q.  How much of that time that you met with
15  him did you spend going over the documents?
16     A.  Well, most of it but not -- well, I can't
17  say -- I can't say all of it because we -- we talked
18  and shooted the bull a little bit.  But I didn't
19  actually go over the documents themselves, each --
20  each one.  I looked at them and glanced at them and
21  signed them.
22     Q.  Do you have an idea of how much time you
23  spent sort of chitchatting as opposed to how much
24  time you spent discussing the documents?
25        MR. PINE:  Objection.

Page 144

1        MR. MacFADYEN:  Asked and answered.
2     A.  I don't really know.
3     Q.  Okay.  One of the documents, Mr. Wiley, is
4  what we've been calling Government Exhibit 1, and it
5  has some language in here.  For example, paragraph 1
6  says, "The Funds Provider and the Co-Owner" --
7        MR. TRAINI:  Objection.
8        MR. McADAMS:  What's the basis of the
9  objection?
10        MR. TRAINI:  This document is not in
11  evidence.
12        MR. McADAMS:  Okay.
13        MR. TRAINI:  And you're reading from the
14  document.
15        MR. McADAMS:  Understood.
16     Q.  Paragraph 1 says, "The Funds Provider and
17  the Co-Owner are joint tenants with right of
18  survivorship in the above-referenced brokerage
19  account."  Okay.  Did Mr. Raymour explain to you
20  when you were going over these documents, who the
21  funds providers was?
22        MR. TRAINI:  Objection.
23     A.  No.
24     Q.  Did he say anything to you about entering
25  into a joint tenant agreement?

In Re Grand Jury Proceedings                    Richard G. Wiley

Page 145

1      MR. TRAINI: Objection.
2    A.  No.
3    Q.  What, if anything, did he say about joint
4  tenants?
5    A.  Nothing.
6      MR. TRAINI: Objection.
7    Q.  Did he go over each paragraph with you in
8  detail?
9      MR. TRAINI: Objection.
10    A.  No.
11    Q.  What, if anything, did he say about what
12  your rights would be under this agreement?
13      MR. TRAINI: Objection.
14    A.  Nothing.
15    Q.  Paragraph 7 states in part --
16      MR. TRAINI: Objection.
17    Q.  -- that, "As a result of the optional
18  redemption feature, the securities could yield a
19  substantial profit for the Funds Provider if the
20  Co-Owner dies before the Funds Provider and the
21  securities are in the Account at the time of the
22  Co-Owner's death."  What, if anything, did
23  Mr. Raymour (sic) say to you about substantial
24  profit being realized as a result of this agreement?
25    A.  Nothing.

Page 146

1      MR. TRAINI: Objection.
2    A.  Nothing.
3    Q.  What, if anything, did he say to you about
4  entering into any type of contract or joint account
5  agreement?
6      MR. TRAINI: Objection.
7    A.  Nothing.
8      MR. McADAMS: Okay.  I have no further
9  questions for you, Mr. Wiley.  Thank you.
10      MR. PINE: Could I use the mike or a mike?
11      RECROSS-EXAMINATION
12  BY MR. PINE:
13    Q.  Mr. Wiley.
14    A.  Yes.
15    Q.  In response to several -- excuse me,
16  several questions that Mr. McAdam (sic) just asked
17  you, you answered "nothing" in terms of what Raymour
18  went over with you?
19    A.  Well, nothing -- nothing in specific about
20  anything.
21    Q.  Well, that's my question.  Do you have --
22  as we sit here today, you've talked about the fact
23  that Raymour went through the documents, you had a
24  chance to read the documents, you discussed the
25  documents over the course of that hour, an hour and

Page 147

1  a half --
2    A.  Well --
3    Q.  -- correct?
4    A.  -- it probably was not an hour, an hour
5  and a half.
6    Q.  But --
7    A.  And it was very quickly.  We read the --
8  he read them off, the top off, and then why I signed
9  them and that was it.
10    Q.  Right, right.  So he did go through them
11  with you?
12    A.  Yeah, but not to any extent to explain to
13  me what they were.
14    Q.  Right.  But my question is when you just
15  responded to Mr. McAdam that he didn't say this or
16  he didn't say that, as we sit here today do you have
17  a specific memory of that, or you don't recall
18  whether he -- he said something about those terms?
19    A.  Well, I cannot say -- truthfully, I cannot
20  say, but I do not have any -- any -- any specific
21  time element or -- or anything along that line.  I
22  know that we spent just a very little while reading
23  them over and that was it.
24    Q.  So if I understand you correctly, you're
25  not saying he didn't cover it, you're saying you

Page 148

1  don't remember today --
2    A.  To what extent, no.
3    Q.  -- to what extent it was covered; isn't
4  that correct?
5    A.  Yes, to an ex -- well, I was going to say
6  to an extent again but --
7    Q.  What's that?
8    A.  -- it's true.  I was going to say to an
9  extent again.  I do not re --
10    Q.  Right.  But you have testified about him
11  going through the documents with you so --
12    A.  Briefly.  Put it that way.
13    Q.  Well, didn't you say earlier that you
14  spent most of the time --
15    A.  It was no hour, hour and a half.
16    Q.  I'm sorry?
17    A.  It was no hour, an hour and a half I don't
18  believe.
19    Q.  Well, you didn't talk about cars or the
20  Red Sox for that hour and a half, did you?
21    A.  No.  We did for a little while afterwards.
22    Q.  Part of the meeting?
23    A.  Yeah.
24    Q.  And another part of the meeting was
25  devoted to Raymour explaining the program to you and

                    40  (Pages 145 to 148)

In Re Grand Jury Proceedings                Richard G. Wiley

---

Page 149

1   the gift of the money and the --
2      A.   A little bit.  No, he didn't say about the
3   gift of the money.  He just said that it was a
4   philanthropist --
5      Q.   Correct.
6      A.   -- from Providence.
7      Q.   That's what I mean.
8      A.   And it didn't take him very long to say
9   that.
10     Q.   But you also have testified that in the
11  meetings, he went over the documents with you?
12     A.   Yeah.  He -- well, he showed them to me
13  like you just showed them to me here.
14     Q.   Correct.
15     A.   Very brief.
16     Q.   And we've also established that you
17  understood and understand today many of the terms
18  that are referenced in those documents, like joint
19  account, co-owner?
20     A.   Oh, certainly.
21     Q.   Okay.  And --
22     A.   I understand.
23     Q.   So when you said to Mr. McAdam --
24     A.   I had parents who had --
25     Q.   I'm sorry?

---

Page 150

1      A.   I had parents who had stocks and bonds and
2   things of that sort.
3      Q.   Sure, sure.
4      A.   So I naturally understood from them
5   telling me.
6      Q.   Correct.  So when you said to Mr. McAdam
7   did he reference a particular term and you answered
8   that he did not, you're not saying that you remember
9   every minute of that meeting and he didn't refer to
10  something, are you?
11     A.   No.
12     Q.   You're saying you don't recall every
13  minute of that meeting?
14     A.   Not every minute of everything.
15     Q.   Correct.
16     MR. McADAMS:  Mr. Wiley --
17     MR. PINE:  Nothing further.
18     MR. McADAMS:  Mr. Wiley --
19     MR. PINE:  I object to any re-redirect.
20          FURTHER EXAMINATION
21  BY MR. McADAMS:
22     Q.   Mr. Wiley, did you have an understanding
23  of what the documents were that you were signing?
24     A.   No.
25     Q.   And did you have an --

---

Page 151

1      MR. PINE:  Objection.
2      Q.   -- understanding of what it was that you
3   were entering into at that time?
4      MR. PINE:  Objection.  Note the objection
5   --
6      A.   No.
7      MR. PINE:  -- to re-redirect.
8      A.   No.
9      MR. McADAMS:  No further questions.
10     THE VIDEOGRAPHER:  The time is 1:21.  The
11  deposition is concluded.  We're off the record.
12        (Adjourned at 1:21 p.m.)
13
14
15
16
17
18
19
20
21
22
23
24
25

---

Page 152

         C E R T I F I C A T E
1   I, Diane J. DeStefano, a Notary Public in and for the
2   State of Rhode Island, duly commissioned and
    qualified to administer oaths, do hereby certify that
3   the foregoing deposition of Richard G. Wiley a
    Witness in the above-entitled cause, was taken before
4   me on behalf of the United States Attorney, at 77
    Watch Hill Road, Westerly, Rhode Island,
5   on September 30, 2009, that previous to examination
    of said witness, who was of lawful age, he was first
6   sworn by me and duly cautioned and sworn to testify
    the truth, the whole truth, and nothing but the
7   truth, and that he thereupon testified as in the
    foregoing manner as set out in the aforesaid
8   transcript.

    I further certify that the foregoing deposition was
10  taken down by me in machine shorthand and was later
    transcribed by computer and that the foregoing
11  deposition is a true and accurate record of the
    testimony of said witness.
12
    Pursuant to Rule 5(d) and 30(f) of the Federal Rules
13  of Civil Procedure, original transcripts shall not be
    filed in court; therefore, the original is delivered
14  and retained by the United States Attorney's Office.
15  A correction and signature page was not requested.
16
    IN WITNESS WHEREOF I hereunto set my hand this
17  16th day of October , 2009
18
    Diane J. DeStefano, Notary Public
19
20
21
22
23
24
25

Vivian S. Dafoulas & Associates (401) 885-0992