# GOVERNMENT
# EXHIBIT 7

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND


IN RE:   GRAND JURY PROCEEDINGS


Videotaped deposition of **EDWIN RODRIGUEZ**, a Witness herein, taken on behalf of the United States Attorney, on MONDAY, OCTOBER 5, 2009, 11:10 A.M., at 1403 Warwick Avenue, Apartment No. 339, Warwick, Rhode Island, before Vivian S. Dafoulas, Registered Merit Reporter/Certified Realtime Reporter.



CONDENSED COPY

Vivian S. Dafoulas, RMR-CRR
50 Fieldstone Drive
East Greenwich, RI   02818-2064
(401) 885-0992

## Page 2

```
 1   APPEARANCES:
 2
 3   FOR THE UNITED STATES ATTORNEY:
 4       UNITED STATES ATTORNEY
         BY:  LEE H. VILKER, ESQUIRE
             JOHN P. McADAMS, ESQUIRE
 5       50 KENNEDY PLAZA, 8TH FLOOR
         PROVIDENCE, RI  02903
 6
 7   FOR RAYMOUR RADHAKRISHNAN:
 8       JEFFREY B. PINE, ESQUIRE
         321 SOUTH MAIN STREET, SUITE 302
 9       PROVIDENCE, RI  02903
10
11   FOR JOSEPH CARAMADRE:
12       HINCKLEY, ALLEN & SNYDER LLP
         BY:  ROBERT G. FLANDERS, JR., ESQUIRE
13       50 KENNEDY PLAZA, SUITE 1500
         PROVIDENCE, RI  02903
14
15   FOR ████████████
         MacFADYEN, GESCHEIDT & O'BRIEN
16       BY:  JOHN A. MacFADYEN, ESQUIRE
         101 DYER STREET
17       PROVIDENCE, RI  02903
18
19   FOR ███████████
         ANTHONY M. TRAINI, ESQUIRE
20       56 PINE STREET - SUITE 2
         PROVIDENCE, RI  02903
21
22   ALSO PRESENT:  JOSEPH CARAMADRE
                    RAYMOUR RADHAKRISHNAN
23
         FBI AGENT PAMELA McDAID
24
25   VIDEOGRAPHER:  ODI JIN WONG
```

## Page 4

```
 1                  I N D E X
 2   EXHIBITS                PAGE
 3   1  Terminal Illness Philanthropy Account    24
        Receipt
 4
 5   2  Copy of $2000 check dated 2/26/08.       26
 6   3  Agreement and Acknowledgement March 4, 2008  30
 7   4  Ameritrade Account Application           37
 8   5  Ameritrade Limited Trading Authorization  45
 9   6  Ameritrade Margin/Options Account Upgrade  47
        Form
10   7  Annuitant Acknowledgement                65
11   8  Document "Options below are available for  69
        RetireReady Extra Variable Annuity"
12
13   9  Signatures page                          70
14   10 Signatures and Acknowledgements page     70
15   11 Signature and Acknowledgements page      71
16   12 Signature(s) of Authorization Acceptance  72
17   13 Copy of $3500 check 3/7/08               57
18   14 2008 Consolidated Forms 1099             57
19
20   A  Written objection                         7
21
22
23
24
25
```

## Page 3

```
 1                  I N D E X
 2   WITNESS                         PAGE
 3   EDWIN RODRIGUEZ
 4   EXAMINATION BY MR. VILKER        10
 5   EXAMINATION BY MR. PINE          73
 6   EXAMINATION BY MR. FLANDERS     131
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

## Page 5

```
 1        VIDEOGRAPHER:  We are now recording and
 2   on the record.
 3        My name is Odi Jin Wong and I'm a legal
 4   video specialist for National Video Reporters,
 5   Inc.
 6        Today is October 15th, 2009 -- sorry,
 7   October 15 -- October 5, 2009 and the time is
 8   11:10 a.m.
 9        This is the deposition of Edwin
10   Rodriguez in the matter of In Re Grand Jury
11   Proceedings.
12        This deposition is being taken at the
13   residence of Edwin Rodriguez at 1403 Warwick
14   Avenue, Warwick, Rhode Island.
15        The court reporter is Vivian Dafoulas.
16        Counsel, please state your appearances
17   for the record and the court reporter will then
18   administer the oath.
19        MR. VILKER:  Lee Vilker, Assistant
20   United States Attorney for the Government.
21        MR. McADAMS:  John McAdams, Assistant
22   United States Attorney also for the Government.
23        MR. TRAINI:  Anthony Traini for ██████
24   ████████████████████
25        MR. FLANDERS:  Robert Flanders for
```

Vivian S. Dafoulas & Associates
(401) 885-0992

Page 6

1  Joseph Caramadre.
2      MR. MacFADYEN:  John MacFadyen for
3  ███████████████
4      MR. PINE:  Jeffrey Pine for Raymour
5  Radhakrishnan.
6      MR. RADHAKRISHNAN:  Raymour
7  Radhakrishnan.
8      MR. CARAMADRE:  Joseph Caramadre.
9      MR. FLANDERS:  Let's record that Agent
10  McDaid is also here.
11              EDWIN RODRIGUEZ,
12  having been first duly sworn, was deposed and
13  testified as follows:
14      COURT REPORTER:  Would you state your
15  name, please.
16      THE WITNESS:  Edwin Rodriguez.
17      COURT REPORTER:  Please spell your last
18  name.
19      THE WITNESS:  R-O-D-R-I-G-U-E-Z.
20      MR. TRAINI:  Before we begin the
21  testimony, the -- the objectors would like to
22  place on the record some objections to the
23  deposition.
24      First of all, we can, I think,
25  incorporate by reference the objections that were

Page 7

1  made at the deposition taken last week of Richard
2  Wiley.
3      MR. VILKER:  Sure.
4      MR. TRAINI:  And those objections appear
5  in the transcript of that deposition.  We will
6  incorporate those by reference.
7      We will also provide to the court
8  reporter another copy of the written objection
9  that was made in the beginning of the Wiley
10  proceeding so that it can be marked as an exhibit
11  to the transcript of this deposition.
12  Miss Dafoulas.
13      (Whereupon, Exhibit A was marked.)
14      MR. TRAINI:  In addition to the written
15  objection, we also incorporate by reference from
16  the Wiley deposition the statements that we made
17  at the commencement of that deposition relative to
18  making objections in these depositions.
19      That is, that we specifically reserved
20  our rights to make all objections other than
21  substantive objections -- I mean we reserve our
22  rights to make our substantive objections at the
23  time the deposition is offered as opposed to
24  attempting to make all of them during the
25  deposition; and that we would object as to form as

Page 8

1  the deposition questions proceeded.
2      Also with respect to -- at least with
3  respect to ███████████ and ████████████████ -- I
4  haven't asked Mr. Pine and Mr. Flanders about this
5  as to their clients -- we also lodge a general
6  objection to the entire deposition on relevancy
7  grounds because the discovery information that
8  we've been provided thus far does not indicate any
9  connection with either of our clients, and until
10  the matter is connected, we object on relevancy
11  grounds but we will not object to every single
12  question and state that it's irrelevant because
13  that will unnecessarily delay the taking of the --
14  of the deposition.
15      And we also will lodge now a standing
16  Petrozziello objection to any testimony by
17  Mr. Rodriguez that relates to conversations that
18  he had with anyone other than our clients, on
19  Petrozziello grounds, without having to make them
20  every single time there is a statement made
21  because that will also unnecessarily delay the
22  deposition, and considering the conditions under
23  which this deposition is being taken, we are
24  trying to not inconvenience Mr. Rodriguez or the
25  other people present.

Page 9

1      So I think that's our objections unless
2  somebody wants to add something else.
3      MR. FLANDERS:  I would just join in on
4  behalf of Mr. Caramadre to the Petrozziello
5  objection.
6      MR. PINE:  I would join that also on
7  behalf of Mr. Radhakrishnan.
8      MR. MacFADYEN:  And I would just -- I
9  would like to add one thing for the record that we
10  had an agreement with the government in the last
11  deposition that an objection lodged by one counsel
12  will be deemed to be lodged by all counsel and my
13  understanding is that that procedure will be
14  followed in this deposition as well.
15      MR. VILKER:  My only response -- my only
16  response as to those is we -- we are in agreement
17  that an objection by one counsel is preserved for
18  all counsel, that you all don't need to be
19  objecting to the same question.
20      I do want to reiterate the position that
21  we took before the Wiley deposition that we
22  believe these are -- this is the equivalent of
23  trial testimony, and if there is an objection, it
24  should be stated so that the questioner has an
25  opportunity to rephrase the question in case the

3 (Pages 6 to 9)

1  question was, in fact, objectionable, and that
2  failure to object at this point, in the
3  government's view, will be waiving that objection.
4      I understand we have a disagreement on
5  that point and I think we both preserved that
6  point for the record.  Are we ready to proceed?
7      EXAMINATION
8  BY MR. VILKER:
9      Q.  Good morning, Mr. Rodriguez.
10     A.  Good morning.
11     Q.  Mr. Rodriguez, do you understand that
12 you are now under oath?
13     A.  Yes.
14     Q.  And that you have sworn to tell the
15 truth, the whole truth and nothing but the truth?
16     A.  Yes.
17     Q.  Mr. Rodriguez, my name is Lee Vilker;
18 I'm an attorney for the government, and the way
19 this is going to work today is I'm going to be
20 asking you a series of questions and once I've
21 completed my questions, each of -- each of the
22 attorneys present have -- will have an opportunity
23 to examine you.
24     I will sit here while I'm asking you
25 questions and then I anticipate switching seats

1  with -- with whoever the next lawyer is asking
2  questions.
3      A.  Uh-hum.
4      Q.  We are in your house and we appreciate
5  you hosting us here.  If there is any time that
6  you need a break, that you want to have some
7  lunch, that you need to go to the bathroom, that
8  you want to take a rest, just let us know.  We --
9  we are here, we want to inconvenience you as
10 little as possible.
11     Mr. Rodriguez, how old are you?
12     A.  I'm thirty-three.
13     Q.  Okay.  And what's your current address?
14     A.  1403 Warwick Ave.
15     Q.  Okay.  Do you have any children?
16     A.  Yes.
17     Q.  How many children do you have?
18     A.  One.
19     Q.  And is it a boy or a girl?
20     A.  A girl.
21     Q.  And what's her name?
22     A.  Luz Beth.  L-U-Z, B-E-T-H.
23     Q.  And how old is Luz Beth?
24     A.  She's 16.
25     Q.  Now, could you just describe to us in

1  general terms what your medical condition is now?
2      A.  Right now I have osteomyelitis.  It's on
3  the hip, and it eats your bone little by little,
4  so it already ate my hip.  It's already in the
5  pelvis.  So it eats your bone and then it gets to
6  your spine and kills you.
7      Q.  Now, was there an event that happened in
8  your life that triggered this illness?
9      A.  Yes.  I fell and trying to climb back to
10 the wheelchair, I did a split and my joint popped
11 out.
12     Q.  Okay.  And was there a time in which you
13 were injured by way of a gunshot?
14     A.  Yes.  I'm paralyzed because I was
15 carjacked and shot in Providence.
16     Q.  And when did that happen?
17     A.  1994.
18     Q.  Now, is it myelitis or osteomyelitis?
19     A.  Osteomyelitis.
20     Q.  Do you know how far the osteomyelitis
21 has progressed?
22     A.  The last time it was in the pelvis.
23     Q.  And has any -- any doctors given you any
24 kind of prognosis of how much longer you have to
25 live?

1      MR. FLANDERS:  Objection.
2      MR. VILKER:  You can answer the
3  question.
4      A.  It was six months to three years.
5      Q.  And when did you get this prognosis?
6      MR. FLANDERS:  Objection.
7      A.  It was 2007, late 2007.
8      Q.  Now, are you on any kind of medication
9  now?
10     A.  Yes.
11     Q.  What kinds of medications are you on?
12     A.  I got a list over there, if you want to
13 get it.
14     Q.  Do you know what the medication is for?
15     A.  Yes.  For bladder.  Right now I'm in a
16 lot of pain so I get Dilaudid all the time to my
17 chest and --
18     Q.  Okay.
19     A.  -- and a lot of other medication but
20 they're just for spasms.
21     Q.  Okay.  Do any of the medications you are
22 taking affect your ability to understand what I'm
23 asking you?
24     A.  No.
25     Q.  Do you understand what's -- what's going

Page 14

1   on here today?
2   A. Yes.
3   Q. Now, at any time during your illness,
4   was there a time in which you were under the care
5   of a hospice?
6   A. Yes.
7   Q. And approximately when was that?
8   A. Early 2008.
9   Q. And do you recall the name of the
10  hospice?
11  A. Rhode Island Hospice.
12  Q. And where -- were you -- were you living
13  at the hospice?
14  A. Sometimes when I used to get sick, and
15  then I used to go back home.
16  Q. Okay. And you've now been released from
17  the hospice?
18  A. Yes.
19  Q. Now, do you know a woman named Joni
20  Fortin?
21  A. Yes, I do.
22  Q. And how do you know Ms. Fortin?
23  A. She's a social worker from hospice.
24  Q. And what role did Miss Fortin have in
25  taking -- helping to take care of you?

Page 15

1   A. A social worker just advocating for me
2   and helping me out in any way she could.
3   Q. Now, did there come a time in which
4   Ms. Fortin raised with you the possibility of you
5   getting some money?
6   A. Yes.
7   Q. What, if anything, did Ms. Fortin say to
8   you about a way in which you could get some money?
9   MR. TRAINI: Objection.
10  MR. VILKER: You can answer.
11  A. She said that there is a Raymond, that
12  he comes -- he's -- he works for a wealthy other
13  individual and that they help everybody out at
14  hospice with some kind of money --
15  Q. Okay.
16  A. -- and the funeral expenses or
17  something, the funeral expenses.
18  Q. And you -- was this -- did she have this
19  conversation with you when you were staying at the
20  hospice?
21  A. Yes.
22  Q. And this was at the beginning of 2008?
23  A. Yes.
24  Q. Now, what, if anything, did Miss Fortin
25  say to you concerning what you needed to do to get

Page 16

1   any money from this wealthy individual?
2   MR. PINE: Objection.
3   A. Just to -- to meet with the person that
4   is working for Raymond.
5   Q. And how did you respond to what
6   Miss Fortin told you?
7   A. Well, at the time it sounded okay
8   because it was money and then to -- to -- for the
9   funeral expenses.
10  Q. Okay.
11  A. So at the time we thought I was going to
12  die quickly and so I -- I was like, okay.
13  Q. And did you give any instructions to --
14  to Miss Fortin?
15  A. No. She said that he -- he'll -- he'll
16  be coming by. She'll call him.
17  Q. Now, I'd like you to look on the couch,
18  and the person sitting closest to you, and if you
19  could just take a look, and ask if you recognize
20  that individual.
21  A. Yes.
22  Q. And who is he?
23  A. Raymond.
24  Q. Did you know his name to be Raymond or
25  Raymour?

Page 17

1   A. Raymour or Raymond.
2   Q. You knew him to be Raymour?
3   A. Raymour or Raymond sometimes.
4   Q. And did you meet with him on a number of
5   occasions?
6   A. Yes.
7   MR. VILKER: If the record could reflect
8   that the witness has identified Raymour
9   Radhakrishnan as the individual he met with.
10  Q. Okay. Now, do you remember the first
11  time in which you met with -- who I will refer
12  from this point on as Raymour?
13  A. Okay.
14  Q. Do you remember the first time?
15  A. Yes.
16  Q. And when was that first time?
17  A. It was early 2007 -- I mean 2008.
18  Q. And where did that meeting take place?
19  A. I believe it was in my house, the last
20  house I used to live in.
21  Q. And what house was that?
22  A. 17 Euclid Ave.
23  Q. In Warwick?
24  A. Yes.
25  Q. Now, other than yourself and Raymour,

Page 18

1 was there anybody else there that day?
2    A.  Yes.  My brother.
3    Q.  And what's your brother's name?
4    A.  Melvin Rodriguez.
5    Q.  And was anybody else connected to Melvin
6 there as well?
7    A.  Yes.  His girlfriend Amy.
8    Q.  So it was you, Raymour, your brother
9 Melvin and his girlfriend Amy at that first
10 meeting?
11    A.  Yes.
12    Q.  Now, what do you recall, if anything,
13 Raymour saying during this meeting?
14       MR. MacFADYEN:  Objection.
15 Petrozziello.
16       MR. TRAINI:  Objection.
17       MR. PINE:  Objection.
18       MR. VILKER:  You can answer.
19    A.  Raymond?
20    Q.  Raymour.
21    A.  Raymour.  I'm sorry.  He showed me some
22 papers to sign and he said that that was for the
23 money and the -- the funeral expenses.
24    Q.  Now, what, if anything, did Raymour say
25 about the individual he worked for?

Page 19

1       MR. MacFADYEN:  Same objection.
2    A.  He said that he was a wealthy man and he
3 liked helping people out so he was helping
4 everybody at hospice.
5    Q.  Now, did -- did Raymour mention that
6 individual's name?
7       MR. FLANDERS:  Objection.
8       MR. MacFADYEN:  Same objection.
9    A.  Yes.
10    Q.  And what did he say this individual's --
11 individual's name was?
12       MR. FLANDERS:  Objection.
13       MR. MacFADYEN:  Same objection.
14    A.  Caramora, Caramora (phonetic) I think it
15 was.
16    Q.  Now, during this meeting, was there any
17 discussion about the amount of money that you
18 would be receiving?
19       MR. MacFADYEN:  Same objection.
20    A.  It was he said about probably 2000 or
21 so, something like that.
22    Q.  Now -- and I know you partially answered
23 this question but just to make sure I have the
24 full answer, during this first meeting, what, if
25 anything, did Raymour say was the reason why you

Page 20

1 were getting that $2000?
2       MR. FLANDERS:  Objection.
3       MR. MacFADYEN:  Same objection.
4    A.  Because the -- the gentleman he was
5 working for was a wealthy man and he was trying to
6 help people out.
7    Q.  Now, during that first meeting, did you
8 get any money from Raymour?
9    A.  No.
10    Q.  Did you get a check from Raymour?
11       MR. PINE:  Objection.  Leading.
12    A.  After.
13    Q.  Did there come a time in which you
14 received some payment from Raymour?
15    A.  Yes.
16    Q.  When was that time?
17    A.  About a month later when I saw him.
18    Q.  Now, during that first meeting, what, if
19 anything, did Raymour say to you about any
20 documents you needed to sign?
21       MR. MacFADYEN:  Objection.
22    A.  He said I need to sign --
23       MR. MacFADYEN:  Petrozziello.
24       MR. VILKER:  Go ahead.
25    A.  I need to sign some papers for the

Page 21

1 funeral expenses and to see if I -- I'm legible
2 (sic) for the money.
3       MR. VILKER:  Okay.
4       MR. FLANDERS:  What was -- what was that
5 last word?
6       THE WITNESS:  If I was elig... for the
7 money.
8       MR. FLANDERS:  If he was --
9       MR. VILKER:  Eligible for the money.
10    Q.  And did Raymour have those documents
11 with him during that first -- first time?
12    A.  Yes.
13    Q.  And did you -- did you sign a number of
14 documents?
15    A.  Yes.
16    Q.  Do you remember today approximately how
17 many documents you signed that day?
18    A.  Like I say, around six.
19    Q.  Now, approximately how much time did you
20 spend looking over these documents before you
21 signed them?
22    A.  Not very much -- a lot.  He showed me
23 one paper that said the $2000 and something about
24 the funeral expenses and then all the other papers
25 were about that same thing to sign them.

6 (Pages 18 to 21)

1    Q.  Okay.  Did you read through the -- the
2  documents after the one that mentioned the $2000,
3  did you read through those documents?
4    A.  No.
5    Q.  Did Raymour read any of those documents
6  to you?
7    A.  No.  He just explained that it was for
8  the money.
9    Q.  Are you an attorney, Mr. Rodriguez?
10    A.  No.
11    Q.  Did you -- did you have any legal
12  training?
13    A.  No.
14    Q.  Did you ask a lawyer to review the
15  documents that you were reading before you signed
16  them?
17    A.  No.
18    Q.  Why didn't you?
19    A.  It seemed like a good deal and he seemed
20  like a really nice guy, so...
21    Q.  Did -- you mentioned your brother Melvin
22  was there --
23    A.  Yes.
24    Q.  -- during the first meeting?  Did Melvin
25  review those documents before you signed them?

1    A.  No.
2    Q.  Did you ask him to review those
3  documents?
4    A.  No.
5    Q.  Did his girlfriend Amy review those
6  documents?
7      MR. PINE:  Objection.
8    A.  No.
9    Q.  Did you -- putting aside the first
10  document that I will show you in a minute that
11  mentioned the $2000, did you understand the terms
12  of any of the other documents you were signing?
13    A.  No.  He just said that it was all about
14  the money and the funeral expenses --
15    Q.  Okay.
16    A.  -- that I needed to sign some papers.
17    Q.  And did you go ahead and sign the
18  documents?
19    A.  Yes, I did.
20    Q.  After you signed these documents, did
21  Raymour provide you with a copy of any of the
22  documents you signed?
23    A.  No.
24    Q.  And do you have in your possession any
25  of the documents that you signed that day?

1    A.  No.
2    Q.  I'd like to show you what's been
3  marked -- premarked as Government's Exhibit 1.
4  Are you able to hold it?
5    A.  Yes.
6    Q.  Now, Mr. Rodriguez, did you -- does this
7  document look familiar to you?
8    A.  Yes, it does.
9    Q.  Is this one of the documents that
10  Raymour gave you to -- to sign that day --
11    A.  Yes, he did.
12    Q.  -- or to look at that day?
13    A.  Yes.
14    Q.  Do you see a name, a signature under --
15  above the word "Recipient"?
16    A.  Yes.
17    Q.  Whose name is that?
18    A.  Melvin Rodriguez.
19    Q.  And do you see where it says, "Brother"?
20    A.  Yes.
21    Q.  Because he's your brother?
22    A.  Yes.
23    Q.  So you -- you weren't the person that
24  signed this document?
25    A.  No.

1    Q.  But you did receive it --
2    A.  Yes.
3    Q.  -- and review it?  Do you recall --
4    A.  Because I didn't have a bank account.  I
5  believe it was my brother that was -- that was
6  going to be on the check under his name.
7    Q.  Okay.  Now, what, if anything, do you
8  recall Raymour saying to you about this particular
9  document?
10      MR. MacFADYEN:  Objection.
11  Petrozziello.
12      MR. VILKER:  You can go ahead.
13    A.  He just showed me received $2000 from
14  philanthropy program and I read it and it sounded
15  okay.
16    Q.  Now, was this document, Exhibit 1,
17  presented to you before or after any of the other
18  documents you were asked to sign?
19      MR. FLANDERS:  Objection.
20    A.  No, it was -- all the papers were
21  together.
22    Q.  Okay.  But do you recall the order of
23  the papers?  Was this --
24    A.  This is the first one.
25    Q.  So it's your recollection that this was

Page 26

1   the first document that Raymour gave you?
2       MR. FLANDERS:  Objection.
3       A.  Yes.
4       Q.  Let me ask it another way then.  What's
5   your recollection in terms of the order of
6   documents that you were given?
7       A.  This was the first one.
8       Q.  Now, I want to show you now -- I'll take
9   the original back from you -- Government Exhibit
10  2.
11      Let me just one more thing before -- on
12  Exhibit 1.  Does Exhibit 1 have a date on it?
13      A.  Yes.
14      Q.  Okay.  What's the date on Exhibit 1?
15      A.  The 26th of February.
16      Q.  Of what year?
17      A.  '08.
18      Q.  And does that appear to be the date that
19  Raymour came --
20      A.  Yes.
21      Q.  -- and met with you?
22      A.  Yes.
23      Q.  I'd like to show you Government Exhibit
24  2.
25      A.  Okay.

Page 27

1       Q.  Do you recognize that document,
2   Mr. Rodriguez?
3       A.  Yes.  This is the copy of the check that
4   I received.
5       Q.  Okay.  And what is the date on that
6   check?
7       MR. TRAINI:  Objection.
8       A.  2/26/2008.
9       Q.  And what is the amount of the check?
10      MR. TRAINI:  Objection.
11      A.  $2,000.
12      Q.  And who is this check given to?
13      MR. TRAINI:  Objection.
14      A.  It was, I believe, mailed to my brother.
15      Q.  Okay.  And do you know why it was sent
16  to your brother instead of to you?
17      MR. TRAINI:  Objection.
18      A.  Because he had a bank account and I
19  didn't.
20      Q.  Did you tell Raymour that you did not
21  have a bank account?
22      A.  Yes.
23      Q.  Okay.  And, again, the date is
24  February 26th of 2008?
25      A.  Yes.

Page 28

1       MR. TRAINI:  Objection.
2       Q.  Now, after the first meeting you had
3   with Raymour that you testified was on
4   February 26th of 2008 --
5       MR. FLANDERS:  February 26th did you
6   say?
7       MR. VILKER:  Yes.
8       Q.  -- did you have any subsequent meetings
9   with Raymour?
10      A.  No.  When I received this money, I was
11  in the hospital and he showed up and visited me.
12      Q.  Okay.
13      A.  And he gave -- he gave -- he talked to
14  me.  He said you received --
15      MR. TRAINI:  Objection.  Petrozziello.
16      A.  -- the money.
17      MR. VILKER:  You can proceed.
18      A.  Have you received the money?  I was,
19  yes.  And that the -- the funeral expenses are
20  paid.  And he gave me a -- I believe it was like
21  550 cash.
22      Q.  Okay.  So there was a -- there was a
23  second meeting that you had with him?
24      A.  Yes.
25      MR. TRAINI:  Objection.

Page 29

1       Q.  Approximately how much time had passed
2   between the first meeting in which you signed
3   the -- the various documents and the second time
4   where Raymour came to the hospital?
5       A.  Like I say, a month and a couple of
6   weeks.
7       Q.  Okay.  Now, in addition to Exhibit 1
8   that -- that you've already looked at, did Raymour
9   give you any other documents for you to sign that
10  day?
11      A.  Yes.
12      Q.  Now, what, if anything, did Raymour say
13  to you was the purpose of the other documents he
14  was asking you to sign?
15      A.  It was for --
16      MR. TRAINI:  Objection.
17      MR. PINE:  Objection.
18      MR. MacFADYEN:  Objection.
19      A.  It was for the money and for the funeral
20  expenses.
21      Q.  And when you say for the money, what do
22  you mean?
23      A.  For the $2000 --
24      Q.  Okay.
25      A.  -- and for the funeral expenses.

1    Q. Okay. Now, I'd like to show you -- I
2   can take that back -- what's been marked as
3   Government Exhibit 3. On the top of this page, do
4   you see the language "Agreement and
5   Acknowledgement"?
6    A. Yes.
7    Q. Okay. If you can turn to the final page
8   of this agreement, the third page --
9    A. Yes.
10    Q. -- do you see your signature?
11    A. Yes.
12    Q. So you signed this form?
13    A. Yes, I did.
14    Q. Does it have a date on which you -- is
15   written that you signed it?
16    A. I never put the date but it says 4
17   March, 4 of March.
18    Q. Do you recall meeting with Raymour on
19   March 4th of 2008?
20    A. No.
21    Q. Now, if you can turn back to the first
22   page and take a look at both the first page and
23   the second page, do you see your signature
24   anywhere on the first or second page?
25    A. No, I really don't. Where?

1    Q. Do you see your handwriting anywhere on
2   the first or second page of this document?
3    A. No.
4    Q. Okay. Do you know whether you were ever
5   shown the first or second page of this document?
6    A. No.
7    Q. You don't know or you were not shown?
8    A. I'm not sure.
9    Q. You're not sure?
10    A. No. I don't think I've seen this.
11    MR. PINE: I'm sorry. I didn't hear
12   that.
13    A. I don't think I seen this.
14    Q. You don't think you've seen the first
15   two pages of this document?
16    MR. FLANDERS: Objection.
17    A. No.
18    Q. Now, the -- first paragraph, the
19   first line says, "Brokerage Account."
20    A. Okay.
21    Q. What, if anything, did Raymour say to
22   you when you signed this -- the third page of this
23   document about any kind of brokerage account?
24    MR. MacFADYEN: Objection.
25   Petrozziello.

1    MR. TRAINI: Objection.
2    MR. PINE: Objection.
3    A. No, he said nothing about no brokerage
4   account.
5    Q. Do you recall ever reading any words
6   that said brokerage account?
7    A. No.
8    Q. Now, the first -- if you could just look
9   at the first paragraph of that?
10    A. Okay.
11    Q. It says that "This agreement and
12   acknowledgement is made and entered as of the 4th
13   day of March, 2008, by and between Joseph
14   Caramadre," an individual with an address," in
15   Cranston, "or the funds provider, and Edwin
16   Rodriguez, an individual with an address of 17
17   Euclid Ave in Warwick, Rhode Island"?
18    A. Yes.
19    Q. What, if anything, did you know about
20   entering into any agreements with an individual by
21   the name of Joseph Caramadre?
22    A. None. I just knew that he said he was a
23   lawyer, Raymour, and -- but he worked for
24   Joseph --
25    Q. Okay.

1    A. -- but and that was -- that was it.
2    Q. Okay. Did you understand, at any point
3   in time, that you were entering into any kind of
4   agreement with Joseph Caramadre?
5    MR. PINE: Objection.
6    A. No.
7    MR. PINE: Leading.
8    A. No.
9    Q. Well, what understanding, if any, did
10   you have as to whether you were entering into an
11   agreement with Joseph Caramadre?
12    MR. TRAINI: Objection.
13    MR. PINE: Objection.
14    A. None.
15    Q. Now, Paragraph No. 1, states: "The
16   funds provider and the co-owner are joint tenants
17   with rights of survivorship in the
18   above-referenced brokerage account."
19    Do you know what the term "joint tenants with
20   right of survivorship" means?
21    A. No. No.
22    Q. Did -- what, if anything, did Raymour
23   say to you about you becoming a joint tenant of
24   any kind?
25    A. None.

Page 34

1      MR. MacFADYEN:  Objection.
2  Petrozziello.
3      A.  None.
4      Q.  He didn't say anything to you about
5  that?
6      A.  No.
7      Q.  Did he say anything about having any --
8  well, strike that.
9      Did Raymour use the term "right of
10  survivorship" with you?
11      MR. MacFADYEN:  Objection.  Hearsay.
12  Petrozziello.
13      A.  No.
14      Q.  Now, Paragraph No. 2 says:  "In exchange
15  for the co-owner's agreement to become a joint
16  tenant in the account, the funds provider has paid
17  the co-owner the sum of $3500."  Do you see that?
18      A.  Yes.
19      Q.  Was this amount -- did you ever see this
20  amount written in at the time that you signed any
21  of these documents?
22      A.  No.
23      Q.  Did you, in fact, receive $3500 from
24  Raymour on the date that you signed these forms?
25      A.  No.

Page 35

1      Q.  How much did you receive?
2      A.  I received 2000, and then he came over
3  at the hospital where I was sick again and he gave
4  me 550 and he shook my hand and said good-bye.
5      Q.  So the total amount you ever received
6  from Raymour was 2550?
7      MR. TRAINI:  Leading.  Objection.
8      A.  No.
9      Q.  How much was the total amount that you
10  received?
11      A.  I received then 250 the last time I saw
12  him, cash, but it was to sign again the papers --
13      Q.  Okay.
14      A.  -- the same ones.  Just to do it all
15  over --
16      Q.  Okay.
17      A.  -- for the money.
18      Q.  Okay.  So on how many -- just to be
19  clear -- on how many different occasions did
20  Raymour give you money?
21      A.  The check was to my brother.  He gave me
22  cash 550.
23      Q.  Okay.
24      A.  And then he gave me this -- this last
25  time I saw him on 2009, he said to sign the papers

Page 36

1  all over again and it probably won't be as much as
2  2000 but it will be some money again, and he gave
3  me 250 in cash.
4      Q.  And that's all the amount that you got
5  from him?
6      A.  Yes.
7      Q.  Now, if you look at Paragraph 7 --
8      A.  Okay.
9      Q.  -- the very last sentence, you see where
10  it starts off "As a result," on the second line up
11  from the bottom?
12      A.  Yes.
13      Q.  It reads:  "As a result of this optional
14  redemption feature, the securities could yield a
15  substantial profit for the funds provider if the
16  co-owner dies before the funds provider..."  And
17  it continues on to the next page.  "...and the
18  securities are in the account at the time of the
19  co-owner's death."
20      A.  Yes.
21      Q.  Okay.  As I read that to you now, do you
22  understand what that means?
23      A.  I believe is for -- sounds like for
24  money if I die.
25      Q.  Okay.  Now, what, if anything, did

Page 37

1  Raymour say to you before you signed these
2  documents about what -- about anyone being able to
3  make any money upon your death?
4      MR. MacFADYEN:  Objection.
5      A.  None.
6      MR. MacFADYEN:  Petrozziello.
7      A.  None whatsoever.
8      Q.  Do you see the phrase "could yield a
9  substantial profit"?
10      A.  What was that?
11      Q.  Do you see the bottom line where it
12  says, "The securities could yield a substantial
13  profit"?
14      A.  Yes.
15      Q.  What, if anything, did Raymour say to
16  you about any profit whatsoever that could be made
17  by Joseph Caramadre in this case?
18      MR. MacFADYEN:  Same objection.
19      A.  None.
20      Q.  What was the answer?
21      A.  None whatsoever.
22      Q.  Now, I'd like to show you what's been
23  marked as Government Exhibit 4.  Let me take that
24  back.  The front page of Exhibit 4 says,
25  "Ameritrade Account Application."  Do you see

Page 38

1   that?
2       A.  Yes.
3       Q.  Okay.  Do you see your signature or
4   handwriting anywhere on the first page of this
5   document?
6       A.  No.
7       Q.  Now, if you flip to the next page,
8   Page 2 of Exhibit 4 --
9       A.  Uh-hum.
10      Q.  -- do you see your signature?
11      A.  Yes.
12      Q.  And above your signature, do you see the
13  signature of Joseph Caramadre?
14      A.  Yes.
15      Q.  Do you see next to your name a date?
16      A.  Yes.
17      Q.  It appears to be March 4th of 2008?
18      A.  Yes.
19      Q.  Is that your handwriting?
20      A.  No.
21      Q.  If you look at the date next to
22  Mr. Caramadre's name, now it's 3-4-2008; does that
23  appear to be your handwriting?
24      A.  No.
25      Q.  Did you sign this document --

Page 39

1       A.  Yes.
2       MR. VILKER:  Okay.  Let me finish.
3       Q.  Do you recall if you signed this
4   document at the same time you signed the documents
5   I previously gave you?
6       A.  Yes.
7       Q.  Okay.  Now, if you look at Page 3 of
8   this document, the final paragraph, do you again
9   see your signature?
10      A.  Yes.
11      Q.  Okay.  And do you see the date of --
12  next to your signature 3/4/2008?
13      A.  Yes.
14      Q.  Is that your handwriting?
15      A.  No.
16      Q.  Do you see the signature of Joseph
17  Caramadre above your name?
18      A.  Yes.
19      Q.  And do you see the date where it says
20  3 -- next to Mr. Caramadre's signature, 3-4-2008?
21      A.  Yes.
22      Q.  Is that your handwriting?
23      A.  No.
24      Q.  Now, do you -- in your -- on the front
25  page of this document where it says Account

Page 40

1   Application, again, is there any indication of
2   your handwriting anywhere on this front page?
3       A.  No.
4       Q.  Do you know, as you're sitting here
5   today, whether you were shown the front page of
6   this document before you signed the next two
7   pages?
8       A.  No.
9       Q.  No, you don't know or no, you weren't
10  shown?
11      A.  No, I wasn't shown this.
12      Q.  Do you have -- what, if anything, did
13  Raymour say to you about opening up an account in
14  your name at Ameritrade?
15      A.  None whatsoever.
16      Q.  Did you have any idea any kind of
17  accounts were going to be opened in your name?
18      A.  No.
19      Q.  Now, the -- this lists that the Account
20  Owner is Joseph A. Caramadre in this Paragraph 2;
21  and Paragraph 3, it says Account Co-Owner, and
22  it's your name, Edwin Rodriguez.
23      What knowledge, if any, did you have of
24  becoming co-owners in an account in Ameritrade
25  with Joseph Caramadre?

Page 41

1       A.  None whatsoever.
2       Q.  Now, do you see under your name your
3   date of birth?
4       A.  Yes.
5       Q.  Is your date of birth 9/23/1976?
6       A.  Yes.
7       Q.  And do you see next to the date of birth
8   your social security number?
9       A.  Yes.
10      Q.  And then do you see the name of your
11  daughter Luz?
12      A.  Yes.  That's my -- my -- that's not Luz
13  as Luz Beth.  This is my mother's name.
14      Q.  I see.  That's the name of your mother.
15  Okay.  And do you see a few lines down, the next
16  line down, your address at the time?
17      A.  Yes.
18      Q.  And do you see a few lines down, is that
19  your phone number?
20      A.  It was.  It probably was.  I really
21  don't remember.
22      Q.  That may have been your phone number at
23  Euclid Avenue?
24      A.  That probably may have been.
25      Q.  Now, did you provide your date of birth

11 (Pages 38 to 41)

1    and social security number to Raymour?
2       A.  No, I don't think so.
3       Q.  Okay.  Do you -- do you recall him
4    asking you for this -- your social security
5    number?
6          MR. TRAINI:  Objection.
7       A.  To tell you the truth, I -- I really
8    think he -- he asked me for it but it wasn't for
9    this.
10      Q.  But do you recall any conversations --
11      A.  No.  I really don't remember.
12         MR. VILKER:  Let me just finish the
13   question.
14         THE WITNESS:  Okay.
15         MR. VILKER:  It's hard when it's in the
16   middle of the question.
17         THE WITNESS:  Sorry.
18         MR. VILKER:  That's okay.
19      Q.  Do you recall any conversations with
20   Raymour concerning your social security number?
21         MR. TRAINI:  Objection.
22      A.  No.
23      Q.  Did you -- before you signed the second
24   and third pages of this document, did you read
25   those pages?

1       Q.  -- Illness Philanthropy Account receipt?
2       A.  Yes.
3       Q.  So you read through Exhibit 1?
4          MR. FLANDERS:  Objection.
5       A.  Yes.
6       Q.  Okay.  But you -- what was your
7    understanding of what the remaining documents you
8    were signing after Exhibit 1?
9          MR. FLANDERS:  Objection.
10      A.  It was all for that --
11         MR. TRAINI:  Objection.
12      A.  It was all for the -- every -- all for
13   that and I believe it was for one -- I don't know
14   if he said for my doctors -- how do you call that,
15   when your doctor gives information?
16      Q.  A release of information?
17      A.  Yes.
18      Q.  Okay.  And that was your entire
19   understanding of what the other documents were?
20         MR. PINE:  Objection.
21      A.  Yes.  That's what it was.
22         MR. TRAINI:  Objection.
23         MR. FLANDERS:  Objection.
24         MR. MacFADYEN:  Objection.
25      Q.  Now, I'm going to show you Government

1       A.  No, I did not.
2       Q.  Okay.  Approximately how much time did
3    you have these two pages in your hand before you
4    signed them?
5       A.  Well, just pretty fast.
6       Q.  And what was your understanding of the
7    reason why you were being asked to sign these
8    documents?
9          MR. FLANDERS:  Objection.
10         MR. TRAINI:  Objection.
11      A.  It was just for the money and the
12   funeral expenses.
13      Q.  The money being the $2000 you were to
14   get?
15      A.  Yes.
16      Q.  Did Raymour read any part of this
17   document to you?
18         MR. TRAINI:  Objection.
19      A.  No.  I just saw the first document and
20   that's why I was -- I thought I was signing just
21   for the 2000 and funeral expenses.
22      Q.  Okay.  By the first document, you -- are
23   you referring to Government Exhibit 1 which is
24   Terminal --
25      A.  Yes.

1    Exhibit 5.  This document is titled Limited
2    Trading Authorization?
3       A.  Yes.
4       Q.  Now, do you see under Account Co-owner
5    your signature?
6       A.  Account -- yes.
7       Q.  Okay.  Do you see the date above your
8    signature 3-4-2008?
9       A.  Yes.
10      Q.  Is that date in your handwriting?
11      A.  No.
12      Q.  Do you see the name on the -- the left
13   side of the document of Account Owner being Joseph
14   A. Caramadre?
15      A.  Yes, I do.
16      Q.  Did Mr. Caramadre sign this document in
17   your presence?
18      A.  No.
19      Q.  Before today, have you ever met or seen
20   Mr. Caramadre?
21      A.  No.
22      Q.  Do you see the date above
23   Mr. Caramadre's name of 3/4/2008?
24      A.  Yes.
25      Q.  Is that date in your handwriting?

12 (Pages 42 to 45)

Page 46

1    A.  No.
2    Q.  Now, did you -- what, if anything, did
3 Raymour say to you about providing any kind of
4 trading authorization?
5    A.  None whatsoever.
6       MR. TRAINI:  Objection.
7       MR. FLANDERS:  Objection.
8       MR. MacFADYEN:  Objection.
9       MR. PINE:  Objection.
10      MR. VILKER:  If you can just wait until
11 they finish their objection --
12      THE WITNESS:  I'm sorry.
13      MR. VILKER:  -- and then you can answer
14 the question.
15      A.  None whatsoever.
16   Q.  Did you read this document before you
17 signed it?
18   A.  No.
19   Q.  Did you ask anyone else to read it
20 before you signed it?
21   A.  No.
22   Q.  What was your understanding of the
23 reason why you were signing this document?
24      MR. TRAINI:  Objection.
25   A.  The same thing.  All of -- for the 2000

Page 47

1 and for the funeral expenses.
2    Q.  Did you -- what knowledge, if any, did
3 you have of providing Raymour with trading
4 authorization for an Ameritrade account?
5       MR. TRAINI:  Objection.
6    A.  None whatsoever.
7    Q.  Did you know anything about any
8 Ameritrade account?
9    A.  No.
10   Q.  I'd like to show you Government
11 Exhibit 6.  Here you go.
12      Now, Government Exhibit 6 is titled
13 Margin/Options Account Upgrade Form.
14      Before I ask you any other questions, do you
15 have any idea what a margin is?
16   A.  No.
17   Q.  Okay.  Or what -- what different options
18 may exist on an Ameritrade account?
19   A.  No.
20   Q.  Now, again, if you turn to the third
21 page of this document, do you see your signature?
22   A.  Yes.
23   Q.  Okay.  And do you see the date next to
24 your signature of 3-4-2008?
25   A.  Yes.

Page 48

1    Q.  Is that date written in your
2 handwriting?
3    A.  No.
4    Q.  Do you see the name above that of the
5 apparent signature of Joseph Caramadre?
6    A.  Yes.
7    Q.  Do you see the date next to his
8 signature of 3-4-2008?
9    A.  Yes.
10   Q.  Is that date in your handwriting?
11   A.  No.
12   Q.  Do you recall at the time that you
13 signed your signature to this Government Exhibit 6
14 whether Mr. Caramadre's signature was already on
15 this form at the time?
16   A.  No.
17   Q.  No, you don't recall or no, it wasn't?
18   A.  No, I don't think it was.
19   Q.  Now, if you go back -- again, if you
20 could turn to the next page, Page 4 of this
21 document --
22   A.  Uh-hum.
23   Q.  -- do you see a signature on that page?
24   A.  Yes.
25   Q.  And is there a date again written next

Page 49

1 to your signature?
2    A.  Yes.
3    Q.  Of 3-4-2008?
4    A.  Yes.
5    Q.  Is that date in your handwriting?
6    A.  No.
7    Q.  Do you see again the apparent signature
8 of Joseph Caramadre above your signature?
9    A.  Yes.
10   Q.  Is the date of 3-4-2008 --
11   A.  Yes.
12   Q.  -- next to Mr. -- do you see that date?
13   A.  Yes.
14   Q.  Is that date in your handwriting?
15   A.  No.
16   Q.  Now, do you recall whether when you
17 signed this page, whether the signature of Joseph
18 Caramadre was already on the page at the time you
19 signed it?
20   A.  No.
21      MR. VILKER:  Again, it may be part of my
22 --
23   A.  No.  I don't think it was.
24   Q.  Now, how much time would you estimate
25 that you spent looking at these last two pages of

Vivian S. Dafoulas & Associates
(401) 885-0992

Page 50

1     this Government Exhibit 6 before you signed them?
2      A.  None whatsoever.  Just signed it.
3      Q.  And what, if anything, did Raymour say
4     was the purpose of this document?
5          MR. MacFADYEN:  Objection.
6          MR. TRAINI:  Objection.
7      A.  Same thing.  All of them was for that.
8      Q.  Now, if you look at the first two pages
9     of this Margin/Options Account Upgrade Form, do
10    you see your signature or handwriting --
11      A.  Where?
12      Q.  On the first two pages of this document.
13      A.  Okay.
14      Q.  Just take a look at that and tell me if
15    you see your name -- excuse me -- if you see your
16    signature or handwriting anywhere on these first
17    two pages.
18      A.  No.
19      Q.  Are you looking at the second page as
20    well?
21      A.  That's not my signature, no.
22          COURT REPORTER:  Sorry?
23      A.  No, that really isn't my signature.
24      Q.  Do you see any of your handwriting on
25    the first two pages?

Page 51

1      A.  The second page, I don't -- I don't
2    recall this.
3      Q.  Okay.
4      A.  It might be but I don't think so.
5      Q.  Okay.  As you sit here today, do you
6    have any knowledge of whether the first two pages
7    of this document titled Margin/Options Account
8    Upgrade Form were shown to you before you signed
9    the third and the fourth page?
10      A.  No.
11          MR. VILKER:  And it's the same problem
12    with me asking that question.
13      Q.  Do you have -- do you know whether they
14    were presented to you or do you not remember?
15          MR. FLANDERS:  Objection.
16      A.  I don't remember.
17      Q.  You don't remember?
18      A.  No, I don't think --
19          MR. FLANDERS:  Objection.
20      Q.  I'm sorry?
21      A.  I don't think so, no.
22          MR. VILKER:  Now, I'll take that back
23    from you.
24      Q.  Now, all of these documents that I just
25    showed to you, were these signed at -- on one

Page 52

1    occasion with Raymour there?
2          MR. FLANDERS:  Objection.
3          MR. MacFADYEN:  Objection.
4      A.  Yes.
5      Q.  Let me ask you another way.  On how many
6    occasions did you meet with Raymour when you
7    signed all these documents?
8          MR. TRAINI:  Objection.
9      A.  One.
10      Q.  Okay.
11      A.  Once.
12      Q.  Now, at the time that you signed these
13    documents and received -- subsequently received
14    $2000, what knowledge, if any, did you have of any
15    accounts being opened up in your name?
16      A.  None whatsoever.  I -- I would have not
17    signed it.
18      Q.  What, if anything, did Raymour tell you
19    at any time about any accounts being opened in
20    your name?
21          MR. TRAINI:  Objection.
22          MR. MacFADYEN:  Objection.
23      A.  None whatsoever.
24      Q.  What, if anything, did Raymour tell you
25    at any time concerning any annuities being opened

Page 53

1    up in your name?
2          MR. TRAINI:  Objection.
3          MR. MacFADYEN:  Objection.
4      A.  None.
5      Q.  During this first meeting that you had
6    with Raymour that you testified was in early 2008,
7    what, if anything, did Raymour say to you during
8    that meeting concerning any annuities that would
9    be opened up in your name?
10          MR. TRAINI:  Objection.
11          MR. MacFADYEN:  Objection.
12          MR. FLANDERS:  Objection.
13      A.  None whatsoever.
14      Q.  During that first meeting with Raymour,
15    what, if anything, did he say to you about any
16    accounts being opened up in your name?
17          MR. PINE:  Objection.
18          MR. TRAINI:  Objection.
19          MR. FLANDERS:  Objection.
20          MR. MacFADYEN:  Objection.
21      A.  None.
22      Q.  During any subsequent meeting with
23    Raymour, did he say anything to you, one way or
24    the other, about whether any accounts would be
25    opened up in your name?

14 (Pages 50 to 53)

Page 54

1          MR. PINE:  Objection.
2          MR. TRAINI:  Objection.
3          MR. MacFADYEN:  Objection.
4      A.  None.
5      Q.  What consent, if any, did you give to
6  have any accounts opened up in your name?
7          MR. PINE:  Objection.
8      A.  None.  But could I say something?
9      Q.  Sure.
10     A.  Why -- why would I give him the power to
11 get money off me if I have a daughter and I have
12 my brother?  I would never give Raymond -- I don't
13 know him -- I mean the -- the -- the knowledge so
14 that he could do all these papers and get money
15 from me.
16         MR. FLANDERS:  Objection.  Motion to
17 strike.
18         MR. TRAINI:  Motion to strike.
19 Nonresponsive.
20     Q.  Okay.  What knowledge -- at the time you
21 signed these documents, what knowledge did you
22 have of whether Raymour or anybody else stood to
23 make any money upon your death?
24         MR. FLANDERS:  Objection.  What
25 document?

Page 55

1          MR. TRAINI:  Objection.
2      A.  None whatsoever.
3      Q.  Did I just show you a series of
4  documents that were marked Government Exhibits 1
5  through 6?
6      A.  Yes.
7      Q.  At the time you signed Government
8  Exhibits 1 through 6, what knowledge, if any, did
9  you have of whether Raymour or anyone else to --
10 to make any money upon your death?
11     A.  None whatsoever.
12     Q.  Before you met with anyone from the
13 government in this case, what knowledge, if any,
14 did you have of any accounts being opened or
15 existing in your name at Ameritrade?
16     A.  None.
17     Q.  What, if anything, do you know about any
18 money being deposited into any Ameritrade account
19 in your name?
20     A.  None.
21     Q.  What knowledge, if any, do you have of
22 any purchase of corporate bonds being made by
23 Joseph Caramadre?
24     A.  None.
25     Q.  What knowledge do you have of any bonds

Page 56

1  being purchased in your name from General Motors
2  Corporation?
3      A.  None.
4      Q.  What knowledge do you have of any bonds
5  being purchased in your name from Countrywide
6  Finance?
7      A.  None.
8      Q.  What knowledge do you have of any bonds
9  being purchased in your name from CIT Group?
10     A.  None.
11     Q.  Now, I'd like to show you what I've
12 identified as Government Exhibit 13.
13 Mr. Rodriguez, Government 13 is from Ameritrade
14 and it's entitled 2008 Consolidated Forms 1099.
15         MR. FLANDERS:  That's not what I have.
16         MR. PINE:  That's not 13, I don't think.
17         MR. VILKER:  It's not?
18         MR. FLANDERS:  13 is a check.
19         MR. VILKER:  My 13 is --
20         MR. PINE:  This is 13.
21         MR. VILKER:  Did I put the wrong number
22 on them?
23         MR. FLANDERS:  What's the title of the
24 document?
25         MR. VILKER:  I apologize.

Page 57

1          MR. PINE:  There are actually two 13s.
2          MR. VILKER:  There's two 13s.  Let me
3  just cross this out.  This will now become
4  Government Exhibit 14.
5          MR. TRAINI:  Which one is 14 now?
6          MR. VILKER:  14 is 2008 Consolidated
7  Forms 1099 from Ameritrade.  It's my error.  I put
8  two Exhibit 13s.
9      Q.  Now, looking now at what's been
10 identified as Government Exhibit 14, which is
11 entitled 2008 Consolidated Forms 1099, I'll ask if
12 you've ever seen this document before.
13     A.  No.
14     Q.  Now, do you see that the recipients of
15 this document on the top of the corner are Joseph
16 A. Caramadre and Edwin Rodriguez?
17     A.  Yes.
18     Q.  Do you know the -- have you ever -- let
19 me ask you:  Have you ever lived in the address
20 listed in this letter of 1000 Chapel View
21 Boulevard, Suite 270, in Cranston?
22     A.  No.
23     Q.  Have you ever been to that address?
24     A.  No.
25     Q.  Now, this document, if you go down to

15 (Pages 54 to 57)

Page 58

1  the first -- the first box that says 1099 Interest
2  Income, it says Line 1, do you see Line 1 in this?
3      A.  Yes.
4      Q.  It says, "Interest income not included
5  on Line 3," it says, "Amount $44,163"?
6          MR. TRAINI:  Objection.
7      Q.  $44,163.61?
8          MR. PINE:  Objection.
9      Q.  Do you see --
10     A.  Yes.
11     Q.  Do you see that amount?
12     A.  Yes, I do.
13     Q.  What knowledge, if any, did you have of
14 more than $44,000 in interest being made on the --
15 on any accounts in your name at Ameritrade?
16         MR. PINE:  Objection.  He hasn't
17 identified the exhibit.
18         MR. TRAINI:  Objection.
19     A.  None whatsoever.
20         MR. PINE:  Move to strike.
21     Q.  Do you know anything about any interest
22 being paid on any Ameritrade account?
23         MR. TRAINI:  Objection.
24         MR. PINE:  Objection.
25     A.  No.

Page 59

1      Q.  Did you receive any interest that was
2  made on these Ameritrade accounts in your name?
3          MR. TRAINI:  Objection.
4          MR. PINE:  Objection.
5      A.  No.
6      Q.  Now, if you go down to Line 2 in the box
7  below, do you see where it says, "Stocks, bonds,
8  et cetera reported to IRS"?
9          THE WITNESS:  Where?
10         MR. VILKER:  Right here.
11     A.  Yes.
12     Q.  Do you see the line under that that
13 says, "Gross proceeds less commissions and options
14 premiums"?
15     A.  Yes.
16     Q.  And do you see the amount $3,230,162?
17         MR. PINE:  Objection.
18         MR. PINE:  Objection.
19     A.  Yes, I do.
20     Q.  What knowledge, if any, do you have of
21 the purchase of more than $3.2 million worth of
22 financial instruments in this account?
23         MR. TRAINI:  Objection.
24     A.  None whatsoever.
25         MR. PINE:  Move to strike.

Page 60

1      Q.  Now, going back to the first meeting
2  that you had with Raymour, do you recall how that
3  meeting ended?
4      A.  Just that it was -- he'll stay in touch
5  and whenever the -- the check will come in the
6  mail.
7      Q.  Okay.  Now, there came a time, I believe
8  you mentioned earlier, that you had a second
9  meeting with Raymour?
10     A.  Yes.
11     Q.  And where did that meeting take place?
12     A.  I believe it was in Roger Williams
13 Hospital.
14     Q.  Okay.  And other than yourself and
15 Raymour, was anybody else there that day?
16     A.  No.
17     Q.  What do you recall Raymour saying to you
18 at the time he -- he came to the hospital?
19         MR. TRAINI:  Objection.
20         MR. PINE:  Objection.
21     A.  He just said that this is the last time
22 I'll see him and he gave me $550 and said the
23 funeral expenses were paid, you have a good
24 brother, I remember that, and that was about it.
25     Q.  Did Raymour ask you to sign any other

Page 61

1  documents on that occasion?
2      A.  No.
3          MR. TRAINI:  Objection.
4      Q.  Now, did there come a third time in
5  which you met with Raymour?
6      A.  Yes.
7      Q.  And where did that meeting take place?
8      A.  That took place in New Bedford Rehab
9  Center.
10     Q.  And do you recall approximately when
11 that meeting took place?
12     A.  That took place early 2009.
13     Q.  Okay.  And was there anyone else there
14 during that meeting?
15     A.  Yes.
16     Q.  Who else was there?
17     A.  My brother, his girlfriend.
18     Q.  How was that meeting -- did Raymour call
19 and tell you he was going to be coming before?
20         MR. TRAINI:  Objection.
21     A.  He called my brother.
22     Q.  Were you expecting him to come that day?
23     A.  Yes, because he said that --
24         MR. TRAINI:  Objection.
25     A.  -- to see if I wanted to do the same

16 (Pages 58 to 61)



Page 62

```
 1   thing all over again.
 2       Q.  Okay.  That's what he said to your
 3   brother?
 4       MR. TRAINI:  Objection.
 5       A.  Yes.
 6       Q.  Now --
 7       A.  That's what my brother told me.
 8       MR. TRAINI:  Objection.
 9       MR. PINE:  Objection.
10       MR. FLANDERS:  Move to strike.
11       Q.  Now, how -- how long did this third
12   meeting with Raymour take at the New Bedford Rehab
13   facility?
14       A.  About 20 minutes to a half an hour.
15       Q.  Now, what, if anything, did Raymour say
16   to you during this meeting at the rehab?
17       MR. TRAINI:  Objection.
18       MR. PINE:  Objection.
19       MR. MacFADYEN:  Objection.
20       A.  He just said that see if I wanted to do
21   this all over again, the money for -- it wasn't
22   going to be as much but he will try to get me some
23   more money.
24       Q.  Did Raymour explain when he said do this
25   all over again, what he was referring to?
```

Page 63

```
 1       MR. TRAINI:  Objection.
 2       A.  Yes.  The -- the money-wise.  Like the
 3   $2000, that -- that he'll probably get me almost
 4   that amount again.
 5       Q.  And what did you understand this to
 6   mean?
 7       MR. TRAINI:  Objection.
 8       A.  That it was just for more money.
 9       Q.  But what did you understand the purpose
10   of this money to be?
11       MR. TRAINI:  Objection.
12       A.  For -- again, for the same thing.  I'm
13   dying, to help me.
14       Q.  Now, when Raymour said this to you,
15   how -- how did you respond?
16       A.  I said okay.
17       Q.  And did Raymour give you money that day?
18       A.  Yes.  When I signed the papers, he gave
19   me $250.
20       Q.  Was this in cash or a check?
21       A.  Cash.
22       Q.  Now, you said that he had additional
23   forms for you to sign that day?
24       A.  Yes.
25       Q.  Now, what, if anything, did Raymour say
```

Page 64

```
 1   to you that third meeting at the rehab facility
 2   concerning the purpose of the forms you were to
 3   sign?
 4       MR. TRAINI:  Objection.
 5       MR. MacFADYEN:  Objection.
 6       A.  It was just for the -- to see if I
 7   could -- the -- the money all over again.
 8       Q.  And did you read these forms before you
 9   signed them?
10       MR. PINE:  Objection as to the form.
11       A.  No.
12       Q.  Okay.  Did Raymour read them to you?
13       MR. TRAINI:  Objection.
14       A.  No.  He just said that it was the same
15   thing as the last time.
16       MR. TRAINI:  Move to strike.
17       Q.  What explanation, if any, did Raymour
18   give you of what the contents of the forms were?
19       MR. TRAINI:  Objection.
20       A.  It was for the money to see if he could
21   help me out again.
22       Q.  After -- after you signed these forms,
23   did Raymour provide you with a copy of them?
24       A.  No.
25       Q.  Who, if anyone, did you ask to review
```

Page 65

```
 1   the forms before you signed them?
 2       A.  Nobody.
 3       Q.  I'd like to show you Government
 4   Exhibit 7.  Do you see -- turning to the second
 5   page of Exhibit 7, which is entitled Annuitant's
 6   Acknowledgement, do you see your signature?
 7       A.  Yes.
 8       Q.  And do you see a date of
 9   January 1/14/2009?
10       A.  Yes.
11       Q.  Did you write that date in?
12       A.  No.
13       Q.  And does the date below, apparently next
14   to Raymour's signature, that's also 1/14/09?
15       A.  Yes.
16       Q.  Did you write that date in?
17       A.  No.
18       Q.  Now, turning to the first page, do you
19   see the initials "E.R." on the left side of the
20   document?
21       A.  Yes.
22       Q.  Okay.  Did you write those initials in?
23       A.  Yes.
24       MR. FLANDERS:  I'm sorry.  I didn't hear
25   that.
```

17 (Pages 62 to 65)

Page 66

1      MR. VILKER:  He said yes.
2   BY MR. VILKER:
3      Q.  Did you read any of this document before
4   you put your initials on the first page and signed
5   the second page?
6      A.  No, I did not.
7      Q.  Okay.  Do you see the handwritten
8   portion on the top of the document?
9      A.  Yes.
10      Q.  And do you see the name Paula Bizier?
11      A.  Yes.
12      Q.  Do you know anyone Paula Bizier?
13      A.  No, I do not.
14      Q.  And do you see where it says, "Contract
15   Annuitant:  Edwin Rodriguez"?
16      A.  Yes.
17      Q.  And it says, "Annuity Company:
18   Nationwide."  Do you see that?
19      A.  Yes.
20      Q.  My question is the -- the top part
21   that's handwritten in, was that handwritten in at
22   the time Raymour presented these documents to you
23   for your signature?
24      A.  No, they weren't.
25      Q.  So Nationwide was never written in on

Page 67

1   this document?
2      MR. FLANDERS:  Objection.
3      MR. MacFADYEN:  Objection.
4      MR. TRAINI:  Objection.
5      A.  No.
6      Q.  Now, did you understand when you signed
7   this document -- or let me rephrase that.
8      What understanding, if any, did you have when
9   you signed this document about whether any annuity
10   would be opened up under your name?
11      MR. TRAINI:  Objection.
12      A.  None whatsoever.
13      Q.  What, if anything, did Raymour tell you
14   about -- about any kind of annuity being opened
15   up --
16      MR. TRAINI:  Objection.
17      Q.  -- under your name?
18      MR. TRAINI:  Objection.
19      A.  None whatsoever.
20      Q.  If you turn to Page 2 of this
21   document --
22      A.  Yes.
23      Q.  -- do you see the top paragraph where it
24   reads:  "My sole purpose as annuitant under the
25   annuity contract is to be a measuring life for the

Page 68

1   purposes of the account death benefit guarantee.
2   Furthermore, I understand that a death benefit
3   guarantee will be paid to the annuity contract
4   beneficiary upon the death of the contract
5   annuitant."
6      As I just read that to you, do you understand
7   what that means?
8      A.  I believe it was for somebody getting
9   money for -- for me when I die.
10      Q.  What, if anything, did Raymour say to
11   you at the time that this document was presented
12   to you about someone else getting money upon your
13   death?
14      MR. PINE:  Objection.
15      MR. TRAINI:  Objection.
16      A.  None.
17      Q.  Do you see the term "measuring life"
18   that I read?  What, if anything, did Raymour say
19   to you about you serving as a measuring life?
20      MR. PINE:  Objection.
21      A.  None.
22      Q.  What knowledge, if any, did you have of
23   whether -- of whether anyone else stood to make
24   any money upon your death?
25      MR. TRAINI:  Objection.

Page 69

1      A.  None.
2      Q.  Now, let me take that back.  Let me show
3   you Government Exhibit 8.  Do you recognize your
4   signature on this document?
5      A.  Yes.
6      Q.  Did you read through this document
7   before you signed it?
8      A.  No.
9      Q.  What did you understand the purpose of
10   this document to be?
11      MR. TRAINI:  Objection.
12      A.  For more money.  The same thing as the
13   last time.
14      Q.  More money to whom?
15      A.  To me, for me.
16      MR. TRAINI:  Another objection to that
17   document, Mr. Vilker, is that at least what we
18   have marked as Exhibit 8 is one page that just
19   says Page 4 of 6.  I don't know where the other
20   pages are or what the rest of the document is
21   or --
22      MR. VILKER:  Okay.
23      MR. TRAINI:  -- how he can be examined
24   what he understood the document to be if we only
25   have this one page, unless there's more to this

18 (Pages 66 to 69)

Page 70

1 exhibit and I don't have it.
2     MR. VILKER: Okay. I understand your
3 objection.
4 BY MR. VILKER:
5     Q. I'd like to show you Government
6 Exhibit 9. Do you see your signature on
7 Government Exhibit 9?
8     A. Yes.
9     Q. And do you see the word next to your
10 signature of "Annuitant"?
11     A. Yes.
12     Q. What -- at the time you signed this
13 document, what understanding, if any, did you have
14 of whether you are agreeing to be an annuitant in
15 any kind of annuity?
16     MR. TRAINI: Objection.
17     A. None whatsoever.
18     MR. TRAINI: Same objection as the last
19 exhibit, Mr. Vilker.
20     A. None whatsoever. I don't even know what
21 it is, what -- what that means.
22     MR. VILKER: Okay. I can take that back
23 from you.
24     Q. Okay. Government Exhibit 10, is that
25 your signature on Government Exhibit 10?

Page 71

1     A. Yes.
2     Q. And why did you sign this document?
3     A. What was that?
4     Q. Why did you sign this document?
5     MR. TRAINI: Objection.
6     A. Same thing. It was all papers for
7 the -- for more money --
8     Q. Okay.
9     A. -- to help me out.
10     Q. Did you read any of the language, the
11 typed-in language above your signature?
12     A. No.
13     MR. TRAINI: Same objection as to the
14 previous two exhibits.
15     MR. VILKER: Okay. I can take that
16 back.
17     Q. I'll show you Government Exhibit 11. Do
18 you recognize your signature on this document?
19     A. Yes.
20     Q. How much time, if any, did you spend
21 reading this document before you signed it?
22     A. None.
23     Q. Did -- how much time, if any, did
24 Raymour spend reading this document to you before
25 you signed it?

Page 72

1     MR. TRAINI: Objection.
2     A. None. None.
3     MR. TRAINI: Same objection as to the
4 previous Exhibits 8, 9 and 10.
5     Q. Now, I'd like to show you Government
6 Exhibit 12. Do you recognize your signature?
7     A. Yes.
8     Q. Okay. Did you read this document before
9 you signed it?
10     A. No.
11     Q. Is this document part of the -- part of
12 the set of documents that Mr. -- excuse me -- that
13 Raymour provided you in the earlier part of 2009?
14     MR. TRAINI: Objection.
15     A. Yes.
16     Q. How much time altogether did you spend
17 on that day in 2009 in the rehab facility going
18 over the documents Raymour asked you to sign?
19     A. None.
20     MR. VILKER: I'll take that back from
21 you.
22     MR. TRAINI: I also have the same
23 objection to this one as to the previous
24 Exhibits 8, 9, 10 and 11.
25     MR. VILKER: Okay. Just one moment.

Page 73

1     (P A U S E)
2     MR. VILKER: I don't have any further
3 questions.
4     VIDEOGRAPHER: We are going off the
5 record. The time is 12:20.
6     (R E C E S S)
7     VIDEOGRAPHER: The time is 12:30. We
8 are going back on the record.
9     EXAMINATION
10 BY MR. PINE:
11     Q. Good afternoon, Mr. Rodriguez.
12     A. Good afternoon.
13     Q. My name is Jeffrey Pine. I'm an
14 attorney for Raymour Radhakrishnan. I'm going to
15 be asking you some questions just as Mr. Vilker
16 did, and if you don't understand the question,
17 I'll be happy to rephrase it. If you answer, I'll
18 assume you understood the question and are
19 answering truthfully --
20     A. Uh-hum.
21     Q. -- okay? Do you know what medications
22 you are on today during this deposition?
23     A. I could get the paper.
24     Q. Do you know without referring to a list
25 what you -- what you took today or yesterday?

Page 74

1  A.  I'm on Dilaudid pump for pain --
2  Q.  Right.
3  A.  -- for the pain.
4  Q.  Right.
5  A.  And I'm on Cepharil for the infection,
6  the urine.  I'm on baclofen for spasms, Valium for
7  spasms.  Just a couple more.  I don't remember the
8  name.
9  Q.  Are you on a medication known as
10 metoprolol?
11 A.  Metoprolol?
12 Q.  Is that familiar to you?
13 A.  Probably.  I don't know.
14 Q.  Okay.  You're not sure?
15 A.  No.
16 Q.  Are you on a medication known as
17 Fragmin?
18 A.  Fragmin?
19 Q.  Does that ring a bell?
20 A.  Yes.
21 Q.  I'm sorry?
22 A.  Yes.
23 Q.  Yes, you are on that today?  Okay.  Are
24 you on a medication known as senna or Colace?
25 A.  Yes.

Page 75

1  Q.  Are you on a medication known as
2  Miralax?
3  A.  Yes.
4  Q.  Are you on a medication known as
5  oxybutynin?
6  A.  Yes.
7  Q.  Those are all familiar to you?
8  A.  Yes.
9  Q.  And you take them on a daily basis,
10 including today?
11 A.  Yes.
12 Q.  Does somebody administer those
13 medications to you or do you take them yourself?
14 A.  What was that?
15 Q.  Does somebody give you those medications
16 or do you take them yourself?
17 A.  I take them myself.
18 Q.  Okay.  You're on diazepam?
19 A.  Yes.
20 Q.  And what about gabapentin?
21 A.  Yes.
22 Q.  What about meloxicam?
23 A.  Yes.
24 Q.  That rings a bell also?
25 A.  Uh-hum.

Page 76

1  Q.  You're on it?  Okay.  What about --
2  (Interruption by door bell.)
3  VIDEOGRAPHER:  Let's go off the record.
4  It's 12:32.
5  (P A U S E)
6  VIDEOGRAPHER:  Going back on the record.
7  12:33.
8  BY MR. PINE:
9  Q.  Going back on the record, we were
10 momentarily interrupted by a delivery of your
11 medications I take it?
12 A.  Yes.
13 Q.  Okay.  And I just noticed that you
14 signed a receipt for that?
15 A.  Yes.
16 Q.  Did you read the entire form before you
17 signed it?
18 A.  No.  I already know what it is for.
19 Q.  Okay.  Are you on a medication known as
20 mirtazapine?
21 A.  Mirtazapine?  I believe so.
22 Q.  And what about Spiriva?
23 A.  Spiriva, yes.
24 Q.  And what about Macrodantin?
25 A.  I believe so.  If -- if she goes to the

Page 77

1  room, she can get the paper.  I'll tell you all my
2  medications.
3  Q.  Okay.  But you would agree with the
4  medications that I've asked you about, that you
5  take all of those on a daily basis?
6  A.  Yeah.  I don't -- some names I don't
7  recall.
8  Q.  A couple that you don't recognize?
9  A.  Yes.
10 Q.  And does that affect your ability to
11 answer questions today?
12 A.  No.
13 Q.  Does it affect your ability to recall
14 events that happened a year or more ago?
15 A.  No.
16 Q.  You have a good recall for those events
17 that you talked about?
18 A.  Yes.
19 Q.  Do you live here with anybody else?
20 A.  No.
21 Q.  Okay.  And are you able to take care of
22 yourself?
23 A.  Yes.  Some people come --
24 Q.  Okay.
25 A.  -- to help me out, CNA in the morning --

20 (Pages 74 to 77)

Page 78

1    Q.  Okay.
2    A.  -- and in the afternoon.
3    Q.  And what -- what functions does your
4  brother perform for you at the moment?
5    A.  At the moment?
6    Q.  What does he do for you?
7    A.  Right now he's just -- he's working --
8    Q.  Okay.
9    A.  -- and he drives trucks, so he's hardly
10 at home, so he can't come that much.
11   Q.  What do you have him do?  Do you have
12 him do any of your business affairs, legal
13 affairs, other types --
14   A.  No.
15   Q.  -- types of things?
16   A.  No.
17   Q.  Do you rely on him for his opinion or
18 judgment or anything?
19   A.  No, nothing.
20   Q.  What about in 2008, was your
21 relationship the same then as it is now?
22   A.  Yes.
23   Q.  Are you close with your brother?
24   A.  Yes.
25   Q.  Was your brother present during that

Page 79

1  first meeting with Raymour back on February 26th,
2  2008?
3    A.  Yes.
4    Q.  And where did that meeting take place?
5    A.  I believe it was in my house.
6    Q.  Okay.  In what room of your house?
7    A.  I believe it was in my dining room and
8  then the living room.
9    Q.  Okay.  Was your brother in the same room
10 as you throughout that meeting?
11   A.  Yes, I believe so.
12   Q.  So he would have been able to listen to
13 and hear what Raymour was talking about during
14 that meeting, correct?
15   A.  I believe so, yes.
16   Q.  You mentioned somebody else there as
17 well.  Was that a girlfriend of your brother?
18   A.  Amy, yes.
19   Q.  Now, you -- you indicated when you
20 testified earlier that you were connected to
21 Raymour through Joni Fortin --
22   A.  Yes.
23   Q.  -- is that correct?  She was your social
24 worker at the hospice program?
25   A.  Yes.

Page 80

1    Q.  How long did you know her before
2  February of 2008?
3    A.  About a month or more.
4    Q.  Okay.  How long have you been under
5  hospice care?
6    A.  I was there until September 23rd, 2008.
7    Q.  I'm sorry?  Say that again.
8    A.  September 23rd, 2008.
9    Q.  Well, 2008 or '7?
10   A.  '8.  I was from early -- in the
11 beginning of 2008 until September.
12   Q.  Okay.  So did you first start with
13 hospice in early 2008?
14   A.  Yes.
15   Q.  Okay.  And what was the reason that you
16 had to go to hospice?
17   A.  Because the osteomyelitis was really
18 painful.
19   Q.  And I think you said that in late 2007
20 you were given a prognosis by a doctor saying that
21 you had six months to three years to live?
22   A.  Yes.
23   Q.  When is the last time that you saw a
24 doctor relating to your various conditions?
25   A.  I believe it was early 2009.

Page 81

1    Q.  Earlier this year?
2    A.  Uh-hum.
3    Q.  When is the last time a doctor gave you
4  any kind of prognosis or a prediction about your
5  life expectancy?
6    A.  He hasn't since that date.
7    Q.  Since that date two years ago?
8    A.  Yeah, no.
9    Q.  So at no time when you've seen a doctor
10 since 2007 for various medical appointments has
11 any doctor expressed to you your prognosis or
12 prediction in terms of your life expectancy --
13   A.  I went --
14   Q.  -- since 2007?
15   A.  I went when I was in the hospital, when
16 I was in New Bedford Rehab --
17   Q.  Right.
18   A.  -- and I went for a second opinion, and
19 they told me that the osteomyelitis already ate my
20 hip and is eating my pelvis and it's going to kill
21 me because it's going to eat all my bones.
22   Q.  Right.  I understand that they may have
23 expressed that opinion.  Did they give you any
24 opinion about your life expectancy when you were
25 at the New Bedford facility?

21 (Pages 78 to 81)

Page 82

1    A.  No, he did not.
2    Q.  Okay.  So the last time you received any
3  kind of prediction would have been that time late
4  in 2007 --
5    A.  Yes.
6    Q.  -- when that doctor gave you that?
7  Okay.  What did Joni Fortin tell you about Raymour
8  before you met with him?
9    A.  She said that if I -- he was working for
10  a wealthy man and -- and that he -- he helps out
11  people in hospice that are dying.
12    Q.  The wealthy man was being generous with
13  his money?
14    A.  Yes.
15    Q.  And do you recall seeing any type of
16  advertisement or did she refer to any type of
17  advertisement about that?
18    A.  No.  But she -- she said something about
19  in the newspaper they write that.
20    Q.  Right.  So she referred to something in
21  the newspaper about this wealthy man helping out
22  people who were in hospice?
23    A.  Uh-hum.
24    Q.  Isn't that correct?
25    A.  Yes.

Page 83

1    Q.  Do you know whether or not either you or
2  your brother had a copy of that ad when you first
3  met with Raymour?
4    A.  No.
5    Q.  No, you don't know or no, you don't
6  recall?
7    A.  No, I don't recall.
8    Q.  Okay.  Do you know if you had a copy of
9  that ad?
10    A.  No.
11    Q.  And you don't know if your brother did?
12    A.  No.
13    Q.  And when she mentioned the fact that
14  there was a wealthy man who was being generous
15  with his money, you agreed to meet with that
16  person?
17    A.  Yes, I did.
18    Q.  Sounded like a pretty good offer?
19    A.  Yes, it did.
20    Q.  Were you working at the time?
21    A.  No.  I'm paralyzed.  I can't work.
22    Q.  Right.  I understand that.  And how long
23  have you been paralyzed?  I think you said the
24  carjacking was in 1994?
25    A.  1994, yes.

Page 84

1    Q.  And have you been confined to a
2  wheelchair since that time?
3    A.  Yes, I have.
4    Q.  Have you worked since that time?
5    A.  No, I haven't.  I worked in one job.
6  That's about it.
7    Q.  Okay.  And how long ago was that?
8    A.  That was 2006.
9    Q.  What kind of job was that?
10    A.  I mean 1996.
11    Q.  1996.  Okay.  What kind of job was that
12  back in 1996?
13    A.  It was in -- it was just putting coins
14  like in these things just to show me how to do
15  work and then get me a job.
16    Q.  And how long did that last?
17    A.  About three months.
18    Q.  Okay.  What do you rely upon for income
19  month to month or year to year?
20    A.  SSI.
21    Q.  SSI.  Did you ever receive any kind of a
22  settlement from the carjacking episode that put
23  you -- made you injured and put you in the
24  wheelchair?
25    A.  Yes, I did.

Page 85

1    Q.  And when was that settlement?
2    A.  2008.
3    Q.  2008?
4    A.  (Witness nods head.)
5    Q.  When in 2008?
6    A.  Probably like June.
7    Q.  So just a year ago?
8    A.  No, no.  I mean -- I'm sorry.  1998.
9    Q.  Okay.  Because this would have been a
10  long period of time there.  So 1998?
11    A.  Yes.
12    Q.  And who did you receive that settlement
13  from?
14    A.  That was from the State.
15    Q.  Okay.  From the Victim of Violent Crime
16  Fund?
17    A.  Yes.
18    Q.  For people who are injured in violent
19  crimes?
20    A.  Yes.
21    Q.  How much money did you get from that
22  fund?
23    A.  25,000.
24    Q.  And you had filed a claim for that?
25    A.  What was that?

Page 86

1    Q.  At some point before that, did you file
2  a claim to get the money?
3    A.  Yes.
4    Q.  File paperwork to get the money?
5    A.  Yes.
6    Q.  With the treasurer's office I presume?
7    A.  Yes.
8    Q.  Okay.  Did anybody help you with that?
9  Did you have an attorney or did you --
10   A.  Yes, an attorney helped.
11   Q.  So you got $25,000 as a result of that
12  kind of settlement and, other than that, you've
13  been living off of SSI.  Any other forms of income
14  or sources of income?
15   A.  No, but I was with my ex, she used to
16  get welfare.  That's about it.
17   Q.  I'm sorry?
18   A.  When I was with my ex and my daughter,
19  she used to get welfare.
20   Q.  Okay.
21   A.  And then when I was with my daughter
22  until 2006, I was a single father, I had welfare
23  income too --
24   Q.  Okay.
25   A.  -- for my daughter.

Page 87

1    Q.  So you received SSI as well as AFDC or
2  one --
3    A.  Yes.
4    Q.  -- one of the welfare benefit programs?
5      So when Joni Fortin mentioned that there was
6  a wealthy man who was being a generous individual
7  to people who are in the hospice program, that
8  certainly sounded appealing to you, did it not?
9    A.  Yes.
10   Q.  And you agreed to meet with that
11  individual or his representative?
12   A.  His representative, yes.
13   Q.  And that meeting, that first meeting,
14  took place -- took place on the morning of
15  February 26th, 2008, didn't it?
16   A.  Something -- something -- something like
17  that.
18   Q.  Okay.  And that was at your home on
19  Euclid Avenue?
20   A.  I believe so.
21   Q.  And that's what I referred to earlier
22  that your brother was there for that meeting as
23  well --
24   A.  Uh-hum.
25   Q.  -- correct?

Page 88

1    A.  Yes.
2    Q.  Okay.  And during that first meeting,
3  what did Raymour explain to you about why he was
4  there and what the generous individual was doing?
5      MR. MacFADYEN:  Objection.  I'd like to
6  make a continuing line of objection to questions
7  that ask for Mr. Radhakrishnan's statements in
8  this regard.
9      MR. PINE:  You can answer.
10   Q.  What did he tell you about -- what did
11  he explain to you about why he was there and what
12  the wealthy gentleman was going to do for people?
13   A.  He said that he would probably help me
14  out with some money and that he would pay part of
15  my expenses for my funeral expenses.
16   Q.  Uh-hum.
17   A.  That's about it.
18   Q.  How long did that first meeting last the
19  morning of February 26th?
20   A.  I don't remember.
21   Q.  Could it have been as much as an hour?
22   A.  Maybe.  I don't think so.  Probably a
23  half an hour maybe.
24   Q.  Half an hour?
25   A.  Maybe, you know.

Page 89

1    Q.  I'm sorry?
2    A.  I really don't recall, so...
3    Q.  Okay.  You don't have a specific
4  memory --
5    A.  Yeah.
6    Q.  -- of the length of time?
7    A.  Yes.
8    Q.  But you do recall the meeting?
9    A.  Yes.
10   Q.  But not necessarily whether it was a
11  half-hour or an hour?
12   A.  Yes.
13   Q.  And did you express to Raymour during
14  that meeting that, in fact, you could use the
15  money?
16   A.  Yes.
17   Q.  Did Raymour tell you, after explaining
18  the purpose of the money, that he would have to
19  check with his -- his boss before he would put it
20  through?  Did he express that to you?
21   A.  He said that I had to sign some papers
22  and then he'll go through his boss and that's how
23  I will receive my money.
24   Q.  Okay.  So it's fair to say at that first
25  meeting, money did not change hands at that

23 (Pages 86 to 89)

Page 90

1   moment?
2       A.  No.
3       Q.  Okay.  However, was there an agreement
4   to set up a second meeting after the first
5   meeting?
6       A.  No, there wasn't.
7       Q.  No?  But you indicated that he said he
8   was going to go check with his boss?
9       A.  Yes.  He just -- I just needed to sign
10  the papers and that -- that it will go through,
11  everything will go through.
12      Q.  When you say sign the papers, what
13  papers are you referring to?
14      A.  The papers that I signed.  He showed me
15  the first one for the 2000.
16      Q.  Right.  And that's Exhibit 1?
17      A.  Yes.
18      Q.  Okay.  And that's -- that's a document
19  that -- that you did not sign, did you?
20      A.  No.
21      Q.  Your brother signed it?
22      A.  Yes.
23      Q.  And, in fact, your brother received the
24  money for that?
25      A.  Yes, because he had a bank account.

Page 91

1       Q.  He had a bank account; you did not?
2       A.  Yes.
3       Q.  Okay.  And isn't it true that your
4   brother received that money on that very same day?
5       A.  No.
6       Q.  Okay.  Was there a second meeting that
7   same day?
8       A.  No.  I believe it was mailed.
9       Q.  You believe it was mailed?
10      A.  Yes.
11      Q.  Was there -- but was there a second
12  meeting following the first meeting in the
13  morning?
14      A.  The second meeting for -- it was for
15  Joni Fortin, the one that -- the social worker --
16      Q.  Right.
17      A.  -- he went with my brother supposedly
18  to -- to pay the expenses for the funeral.
19      Q.  Okay.  When you say "he," who is that?
20      A.  Raymond.
21      Q.  Okay.  And when did he do that,
22  according to your understanding?
23      A.  About a couple of weeks later.
24      Q.  Okay.  I think you said, when you were
25  asked questions by Mr. Vilker, that it was about a

Page 92

1   month later that you got the first 2000?
2       A.  Something like that.
3       Q.  Well, was it a week, two weeks, three
4   weeks, a month, what do you think it was?
5       A.  Yeah, a month, three weeks, a month.
6       Q.  And you have a memory of that?
7       A.  Receiving it, yes.
8       Q.  Okay.  Who did you receive the money
9   from?
10      A.  My brother received it from Raymond.
11      Q.  And is it your memory that your brother
12  received that money, the initial money, from
13  Raymour through the mail?
14      A.  I believe so.  I don't really --
15      Q.  Okay.  Do you have any memory of a
16  second meeting that same day, February 26th, 2008?
17      A.  No, I don't.
18      Q.  Because you've been referring to a
19  second meeting happening --
20      A.  Later on.
21      Q.  -- sometime later?
22      A.  Yes.
23      Q.  So as we sit here today, do you have any
24  memory of Raymour meeting again on that same day
25  after he had checked with his boss?

Page 93

1       A.  No.
2       Q.  No memory of that.  Okay.  You would
3   agree on Exhibit 2 -- if you can't see that, I'll
4   be happy to show it to you -- you would agree on
5   Exhibit 2 that the date on that check is
6   February 26th, 2008?
7       A.  Yes.
8       Q.  And it's made out to Melvin, your
9   brother?
10      A.  Yes.
11      Q.  And is that the check that you are
12  talking about that was not received until weeks
13  later in the mail?
14      A.  Yes.
15      Q.  Okay.  Would it surprise you to know
16  that Melvin actually received that check on
17  February 26th and, in fact, cashed that check on
18  February 26th --
19          MR. VILKER:  Objection.
20      Q.  -- the very same day?
21          MR. VILKER:  Objection.  Assuming facts
22  not in evidence.
23      Q.  Would it surprise you to hear that?
24      A.  No.
25      Q.  It would not surprise you to hear that?

24 (Pages 90 to 93)

Page 94

1    A.  No.  I really don't recall.
2    Q.  Okay.  So you don't recall whether or
3  not Melvin actually received the check that very
4  same day and, in fact, cashed and endorsed that
5  check that very same day?
6       MR. VILKER:  Same objection.
7    A.  No.
8    Q.  I could be right about that, couldn't I?
9       MR. VILKER:  Objection.
10   A.  No problem.
11   Q.  Okay.  So it wouldn't have been weeks
12  later that you received that, it would have been
13  as early as that very same day, isn't that
14  correct?
15   A.  I don't think so.
16   Q.  You don't think so but you wouldn't --
17  would you be surprised to know that that's what
18  happened?
19       MR. VILKER:  Objection.
20   A.  No.
21   Q.  After the first meeting on the 26th, did
22  you and Melvin have a chance to discuss the
23  proposal that Raymour had talked about?  Did you
24  talk to your brother about what Raymour had
25  presented to you?

Page 95

1    A.  Yes.
2    Q.  And did both you and Melvin have a
3  favorable opinion of that?
4    A.  Yes.  It was fine.
5    Q.  You wanted the money?
6    A.  Yes.
7    Q.  Okay.  And Melvin didn't argue with
8  that, did he?
9    A.  No.
10   Q.  Did you speak with Joni Fortin after
11  that first meeting on the 26th and, assuming that
12  there was a second meeting, did you speak with her
13  after that -- that day, February 26th?
14   A.  Yes.  I'm -- I'm still in touch with
15  her.
16   Q.  Okay.  And did you talk to her about the
17  proposal that Raymour had made to you on the 26th?
18   A.  Yes.
19   Q.  And did you give her as well as Melvin a
20  favorable impression of what Raymour was
21  proposing?
22   A.  Yes.
23   Q.  Is it fair to say that Raymour presented
24  you with additional documents to review and sign
25  and was making other proposals to you about

Page 96

1  receiving more money; isn't that fair to say?
2       MR. VILKER:  Objection.
3    A.  No, not -- not until 2009.
4    Q.  Okay.  Well, you've testified that you
5  were shown -- or that you signed additional
6  documents in 2008?
7    A.  That first time I signed all of the
8  documents that I -- that I signed.
9    Q.  Okay.  And you acknowledged on Exhibit 3
10  that your signature appears on the third page of
11  that document, isn't that correct?
12   A.  Yes.
13   Q.  That's your signature?
14   A.  Yes.
15   Q.  And it's your testimony that you signed
16  that on the same day that you first met with
17  Raymour?
18   A.  Yes.
19   Q.  Not at a later time?
20   A.  No.
21   Q.  This document refers to a brokerage
22  account on Page 1?
23   A.  Uh-hum.
24   Q.  And I believe you testified that when
25  you signed Page 3, you did not -- you were not

Page 97

1  shown Page 1 or 2; is that your testimony?
2    A.  Yes.
3    Q.  You were just shown the last page?
4    A.  Uh-hum.
5    Q.  When is the first time that you saw
6  Page 1 or 2 of this document?  Is it today or
7  sometime before today?
8    A.  Probably right now.
9    Q.  Right now?
10   A.  Uh-hum.
11   Q.  Had you ever seen this document before
12  Mr. Vilker showed it to you today?
13   A.  No.  Probably today.
14   Q.  Okay.  Did you ever meet Mr. Vilker
15  before today?
16   A.  Yes.
17   Q.  And how long ago was that?
18   A.  About almost two weeks ago.
19   Q.  Okay.  And at that meeting he did not
20  show you this document or ask you about it?
21   A.  I believe so.  I don't know.
22   Q.  You don't know?
23   A.  I believe so.
24   Q.  Believe so what?
25   A.  I believe he showed me it.

Page 98

1    Q.  So when you said this was the first time
2  you saw it today, that's not accurate, is it?
3    A.  To tell you the truth, I really don't
4  recall.
5    Q.  Okay.  Have you met on any occasion with
6  Agent McDaid of the FBI?
7    A.  Yes.
8    Q.  And was that before or after meeting
9  with Mr. Vilker?
10    A.  Before.
11    Q.  Before?  How many times did you meet
12  with her?
13    A.  I believe it was twice.  Twice before
14  she came alone and then she came with him.
15    Q.  Okay.  And on -- on the occasion before
16  she came with him, did she show you this document
17  in Exhibit 3?
18    A.  I don't think so.
19    Q.  Okay.  And you also acknowledged your
20  signature on Exhibit 4 which is titled an
21  Ameritrade Account Application?
22    .  (Witness perusing document.)
23    A.  Yes.  This is my signature.
24    Q.  Okay.  And did you sign that form?
25    A.  Yes.

Page 99

1    Q.  And in several spots, did you not?
2    A.  No.  Just here.
3    Q.  And what about on the other pages, does
4  your signature appear on any of the other pages?
5    A.  Yes.  Over here appears twice.
6    Q.  Okay.  So that's your signature?
7    A.  Yes.
8    Q.  Did Raymour force you to sign that
9  document?
10    A.  No.
11    Q.  Okay.  Was it your understanding that
12  you would receive additional money from Raymour?
13    A.  No.  It was just the $2000.
14    Q.  Well, hadn't you already received the
15  $2000 before signing that document?
16    A.  These are you're saying the second time
17  I saw -- on 2009 that I saw him?
18    Q.  No.  Before 2009.
19    A.  No, I mean --
20    Q.  When you signed these documents, it was
21  in 2008, wasn't it?
22    A.  Yes.  All of them.
23    Q.  Right.  And it was your understanding --
24  your testimony is that this related to the $2000?
25    A.  Uh-hum.

Page 100

1    Q.  But you would agree that this is a
2  completely separate document from Exhibit 1 which
3  is purely a receipt?
4    A.  Uh-hum.  Yeah.
5      MR. VILKER:  Objection.  I don't know
6  what that means, completely separate.  Obviously
7  it's two different documents.
8      MR. PINE:  That's right.
9  BY MR. PINE:
10    Q.  You would agree that they're two
11  separate documents with different forms and
12  different language --
13    A.  Yes --
14    Q.  -- from each other?
15    A.  -- but I signed them all at that time.
16    Q.  Right.  And this is entitled a receipt.
17  You know what a receipt is obviously?
18    A.  Yeah.
19    Q.  Having received -- it acknowledges your
20  receipt of certain money, does it not?
21    A.  I believe so.  I don't know.
22    Q.  Okay.  This is not entitled a receipt,
23  it's entitled an Account Application?
24    A.  Yes, but I didn't know that.
25    Q.  Well, did you ask him any questions

Page 101

1  about it?
2    A.  No, because it was all presented to me
3  in the same -- at the same time.
4    Q.  Well, did Raymour explain any of it to
5  you before you signed?
6    A.  He just said it was about the funeral
7  expenses and the $2000.
8    Q.  But you would agree that on the document
9  itself, right above where you signed, it says --
10  on one page it says, Account Agreement, does it
11  not?
12      (Witness perusing document.)
13    Q.  Right above where you signed?
14    A.  Account Agreement.
15    Q.  Account Agreement.  And on the next page
16  right above where you signed, it says, Options
17  Account Agreement, does it not?
18    A.  Yes.  Yes, it does.
19    Q.  And an account agreement is different
20  from a receipt, isn't it?
21    A.  I believe so.  I don't know.  All these
22  papers are -- I'm -- I'm learning about all these
23  accounts and the things like that now.
24    Q.  And it's your testimony that Raymour did
25  not explain what it is to have an account --

26 (Pages 98 to 101)

Page 102

1     A.  No.
2     Q.  -- or an account option?
3     A.  No.
4     Q.  You indicated that he met with you at
5  the hospital?
6     A.  Yes.
7     Q.  And which hospital was that?
8     A.  Which time?
9     Q.  Prior to 2009 at New Bedford, there was
10  another meeting at another facility, wasn't there,
11  Roger Williams?
12     A.  That was before -- that was after he
13  gave me the $2000.
14     Q.  Right.  So after he gave you the $2000,
15  you met with him, he came to Roger Williams
16  Hospital to see you?
17     A.  Yes, he did.
18     Q.  Isn't that correct?
19     A.  Yes, he did.
20     Q.  And do you know when that was?
21     A.  Probably a month or two before -- after
22  I got my --
23     Q.  And at that meeting, he gave you some
24  more money, did he not?
25     A.  Yes.  550.

Page 103

1     Q.  Okay.  Did he have you sign any
2  documents at that meeting?
3     A.  No.
4     Q.  None?
5     A.  None.
6     Q.  Okay.  And so he just gave you some
7  money?
8     A.  Yes.  He said that.  He did give me some
9  money.
10     Q.  All right.  But you had already
11  received -- I think you just said you had already
12  received the $2000?
13     A.  Yes.
14     Q.  So didn't this money have an additional
15  purpose to it?
16     MR. VILKER:  Objection.
17     A.  No.  He said it was -- no, he said it
18  was all generous of -- from him.
19     Q.  I'm sorry?
20     A.  It was from him, generous.
21     Q.  Right.  But you had already been paid
22  initially for your expenses and funeral expenses
23  and other things and that's why you received the
24  $2000?
25     A.  Yes.

Page 104

1     Q.  Okay.  This was additional to that?
2     A.  Yes.
3     Q.  And you didn't argue with that?
4     A.  No.
5     Q.  And nobody forced you to take it either?
6     A.  No.
7     Q.  Was Melvin at that meeting at Roger
8  Williams?
9     A.  No.
10     Q.  Just you and Raymour?
11     A.  Yes.
12     Q.  And did you say on direct examination
13  from Mr. Vilker that you did sign other documents
14  at that Roger Williams meeting?
15     A.  No.
16     Q.  Okay.  Exhibit 3 that we referenced a
17  few minutes ago is entitled a Brokerage Account?
18     A.  Yes.
19     Q.  Do you know what it means to have a
20  brokerage account?
21     A.  No.
22     Q.  Do you know what it is to be a joint
23  tenant?
24     A.  No.
25     Q.  Do you know what a tenant is?

Page 105

1     A.  No.
2     Q.  Do you rent this apartment?
3     A.  Yes, I'm renting this.
4     Q.  Okay.  So you know what a tenant means?
5     A.  Yes.
6     Q.  And if you rented it with somebody else,
7  do you know what a -- a joint tenant means?
8     A.  No.
9     Q.  Okay.  So that's a term with which you
10  are not familiar?
11     A.  What do you mean?
12     Q.  Do you know what it means to be a joint
13  tenant with somebody?
14     A.  Like having a lease?
15     Q.  Could be.
16     A.  Yeah.  Having a lease.
17     Q.  And what does it mean?
18     A.  To have a -- you have a year lease or a
19  year to pay rent.
20     Q.  Okay.
21     A.  Something like that.
22     Q.  And if you're a joint tenant, does that
23  mean that you have that lease with somebody else,
24  that you share it?
25     MR. VILKER:  Objection.  Calls for a

27 (Pages 102 to 105)

Page 106

1    legal conclusion.
2        MR. PINE:  You can answer.
3        A.  No, I don't recall that.  I don't know
4    that.
5        Q.  So you don't know what the concept of
6    being a joint tenant with somebody else would
7    mean?
8        A.  No.
9        MR. VILKER:  Same objection.
10       Q.  Do you know what it means to be an
11   account owner, to own an account?
12       A.  Yes.
13       Q.  Do you know what it means to be a
14   co-owner with somebody?
15       A.  Yes.
16       Q.  Okay.  So the term on Exhibit 5 above
17   your name where you signed, it says, "Account
18   Co-Owner"?
19       A.  Yes.
20       Q.  You know what that means?
21       A.  Account co-owner.
22       Q.  Right.
23       A.  Yes.
24       Q.  And that is your signature?
25       A.  Yes.

Page 107

1        Q.  Raymour force you to sign?
2        A.  No.
3        Q.  Okay.  He never forced you to sign
4    anything, did he?
5        A.  No.
6        Q.  And he explained throughout that he
7    worked for a generous individual who was willing
8    to give you money for various expenses, didn't he?
9        A.  For being in hospice and just to me --
10   he said just for general -- he could give some
11   money out to people that are dying --
12       Q.  Right.  And that was --
13       A.  -- and he was generous.
14       Q.  And that was agreeable to you?
15       A.  Yes.
16       Q.  And you signed various forms because
17   that was agreeable to you?
18       A.  Yes.
19       Q.  And, in fact, didn't -- didn't your
20   brother receive a check for $3500 after he
21   received the check for $2000?
22       A.  No.
23       Q.  Okay.  Is that the first you've heard of
24   that?
25       A.  Yes.

Page 108

1        Q.  I believe you said with respect to
2    Paragraph 7 of this brokerage account agreement --
3    Mr. Vilker read Paragraph 7.  Do you see that
4    paragraph?
5        A.  Yes.
6        Q.  And when he asked you a question, when
7    he was asking you questions about Paragraph 7, I
8    think you said it sounds like someone gets money
9    if you die?
10       A.  Yes.
11       Q.  Does that ring a bell?
12       A.  Yes.
13       Q.  Is that your understanding of
14   Paragraph 7 as you look at it?
15       A.  Yes.
16       Q.  Okay.  And that would have been your
17   understanding of Paragraph 7 if Raymour had
18   explained it that day too as well, correct?
19       A.  Yes, but I never -- he never explained
20   me this.
21       Q.  But if he had gone over what it means to
22   be a joint tenant as the document reflects, you
23   would understand, based on Paragraph 7, what
24   Paragraph 7 means, that somebody may get money if
25   you pass away?

Page 109

1        MR. VILKER:  Objection.
2        A.  Yes, but it was all today that I seen
3    it.
4        Q.  I understand that's your testimony but
5    you do understand the meaning of that paragraph
6    based --
7        A.  Yes, now --
8        Q.  -- on what I've shown you?
9        A.  Yes, I know.
10       Q.  Okay.  Did -- in your meetings with
11   Mr. Vilker or Agent McDaid, did anybody ever
12   suggest to you that you did anything wrong by
13   signing these documents or receiving that money?
14       A.  No.
15       Q.  You don't believe you did anything
16   wrong, do you?
17       A.  No.
18       Q.  All right.  And Exhibit 5, which I
19   showed you before and you signed, is a one-page
20   document.  You would agree that that was presented
21   to you as a one-page document, correct?
22       MR. VILKER:  Objection.
23       MR. PINE:  You can answer.
24       A.  This was all together with all the
25   papers when I signed it.

Page 110

1      Q.  Right.  And that page is familiar to you
2  because you've seen it before?
3      A.  No.  I just signed it.  I'm not familiar
4  with it.
5      Q.  Okay.  You don't recognize it?
6      A.  No.  I just signed it.
7      Q.  Okay.  And when -- when you signed it on
8  the day that it reflects, were you given an
9  opportunity to read it by Raymour?
10     A.  No.  No.  He explained to me that it was
11  all for the funeral expenses and the $2000 --
12     Q.  Okay.  But --
13     A.  -- so all these papers I signed them
14  believing that.
15     Q.  Right.  But did you have a chance to
16  read that page when you signed it?
17     A.  If I -- if I would want to, yes.
18     Q.  Right.  He didn't just present it in one
19  second and snatch it away, did he?
20     A.  No.  I just signed it.
21     Q.  Right.  So you had a chance to read it
22  if you chose to, didn't you?
23     A.  Yes.
24         MR. PINE:  Okay.  One moment, please.
25             ( P A U S E )

Page 111

1  BY MR. PINE:
2      Q.  After you received the check that was
3  made out to Melvin for the $2000, do you know what
4  Melvin did with that -- with that money?
5      A.  Yes.
6      Q.  Did he pay certain expenses?
7      A.  We bought some things.
8      Q.  Okay.  Did you pay for any funeral
9  expenses with it?
10     A.  No.
11     Q.  You used it for other things that you
12  chose to use it for?
13     A.  Yes.
14     Q.  And so when Raymour was offering you
15  additional money, what was your intention on what
16  to do with it?
17     A.  Put it away.
18     Q.  Okay.  When he gave you the 550 in cash
19  at the hospital, what did you do with it?
20     A.  Paid some bills.
21     Q.  And you said you were unaware of any
22  check being written to Melvin in early March of
23  2008?
24     A.  No.
25     Q.  Okay.  Did you receive any -- any of the

Page 112

1  proceeds from any check that Melvin received in
2  2008 other than the $2000 that you talked about?
3      A.  No.  Just the $2000.
4      Q.  Okay.  Did Melvin handle your money
5  affairs for you?
6      A.  He just cashed my check or something.
7      Q.  In other words, if you got an SSI check
8  or whatever --
9      A.  Yeah.
10     Q.  -- Melvin would be the one dealing with
11  that?
12     A.  Yes.
13     Q.  Okay.  And from that -- for a check that
14  you would have received, would Melvin give you a
15  portion of that check so that you could use it on
16  your own?
17         THE WITNESS:  My check?
18         MR. PINE:  Yes.
19     A.  Yes.  It was all given to me to pay all
20  of my bills.
21     Q.  Yes.  Okay.  And did you actually have
22  any kind of a checking account to write your bills
23  with -- pay your bills with?
24     A.  No.  I just pay them.  Cash, money
25  orders.

Page 113

1      Q.  Now, you said that your injury occurred
2  in 1994 --
3      A.  Yes.
4      Q.  -- correct?  And that you've been
5  confined to a wheelchair since that time?
6      A.  Yes.
7      Q.  Going back probably 15 years or so?
8      A.  Yes.
9      Q.  Since that time, am I correct by saying
10  that you've had several arrests and court matters?
11     A.  Yes, I have.
12     Q.  Okay.  Am I correct that in 1999 you
13  received a three-year suspended sentence with
14  three years probation for selling firearms to a
15  minor?
16         MR. VILKER:  Objection.  Inadmissible
17  under Rule 609 and Rule 403 but you can answer the
18  question.
19     Q.  Am I correct that you are the same
20  individual Edwin Rodriguez --
21     Q.  -- that received a three-year suspended
22  sentence and three years probation on March 1st,
23  1999 for selling firearms to a minor?
24         MR. VILKER:  Same objection.

Page 114

1   A.  Yes.
2   Q.  That's you?
3   A.  Uh-hum.
4   Q.  And that was in Providence Superior
5   Court?
6   A.  Yes.
7   Q.  Okay.  And on that same day, did you
8   also receive three years suspended sentence and
9   three years probation for charges of felony
10  assault and conspiracy on a Providence case as
11  well?
12       MR. VILKER:  Same objection.
13  A.  Yes.  It was the -- the charges for
14  the -- for the gun, for the -- selling the gun to
15  a minor, they were dropped.  They told me if I
16  don't get in trouble in six months, that I'll be
17  okay and then I got in trouble by being in a car
18  with my brother and somebody else and that's what
19  they charged me with.  Since it didn't -- it
20  didn't -- it didn't go to six months, they'll put
21  you -- you gotta get -- take the charge --
22  Q.  Okay.
23  A.  -- 'cause I signed it.
24  Q.  So -- so you agree with me that on
25  March 1st, 1999 you received three years

Page 115

1   suspended, three years probation --
2   A.  Yes.
3   Q.  -- on charges of selling firearms to a
4   minor as well as felony assault and conspiracy; is
5   that correct?
6   A.  Yes.
7        MR. VILKER:  I would like to object to
8   every question, and have a standing objection to
9   any question on this witness's criminal history as
10  being inadmissible, so I don't have to object to
11  every question.
12  Q.  And in May of 2007, did you receive one
13  year suspended sentence and one year probation on
14  a charge of simple assault out of Kent County
15  State Court in Rhode Island?
16  A.  Yes.
17  Q.  In 1996, on September 3rd, did you
18  receive one year suspended and one year probation
19  on a charge of domestic assault in Providence
20  District Court?
21  A.  I believe so.  I don't -- I don't recall
22  that.
23  Q.  Well, would it refresh your memory that
24  you were violated on that charge and wound up
25  doing 90 days, is that --

Page 116

1   A.  No.
2   Q.  -- is that you?
3   A.  I didn't do 90 days.
4   Q.  Okay.  Have you ever served prison time?
5   A.  Yes, when I -- I had the gun charges.
6   Q.  Okay.  And how much time did you serve
7   on the gun charges?
8   A.  Since they gave me six months -- I had
9   probation, they gave me six months and that -- and
10  if I do the six months, the charges would be
11  dropped.
12  Q.  So did you serve?
13  A.  I -- I served a month.
14  Q.  You served a month?  At the ACI?
15  A.  Yes, I did.
16  Q.  Okay.  And then you were released?
17  A.  Yes.
18  Q.  And did you serve at Minimum Security?
19  A.  Yes.
20  Q.  And in 2002, did you receive one year
21  suspended, one year probation for violating a no
22  contact order in Kent County District Court?
23  A.  Yes.
24  Q.  And who was that no contact order
25  relating to?

Page 117

1   A.  My girlfriend.  She came over and the
2   cops came and she was there.
3   Q.  Okay.  And she had taken out a no
4   contact order against you?
5   A.  No.  They -- they put it for domestic
6   dispute.  The -- the -- when you go to court
7   for -- for charges like that, they just put it on.
8   Q.  Right.
9   A.  She tried to take it out but they
10  didn't -- she didn't get it.
11  Q.  And, in fact, had you gone to court for
12  domestic dispute involving her?
13  A.  No, I wasn't -- domestic dispute, yes.
14  Q.  Yes --
15  A.  Yes.
16  Q.  -- you did.  And that's why the no
17  contact order issued?
18  A.  Yes.
19  Q.  All right.  And you had prior domestic
20  assaults before this one, isn't that correct?
21  A.  No, domestic -- domestic assault, no.
22  Q.  Did you have one in 1995 where you --
23  where you received one year probation on a
24  domestic assault?
25  A.  No, I don't recall that.

1    Q.   That's not you?  And in 2002, did you
2  pay a fine on a charge of domestic vandalism?
3    A.   Yeah.  That was the domestic dispute.
4    Q.   Okay.
5    A.   I stabbed her -- the tire.
6    Q.   You stabbed her at the time?
7    A.   No.  I stabbed a tire, a tire.
8    Q.   Okay.  What did you do?
9    A.   It was an -- it was an argument and back
10  and forth and she said that she wasn't going to
11  take my daughter to see her mother.
12    Q.   So you vandalized her tire?
13    A.   Yes, I did.
14    Q.   With a weapon?
15    A.   A little knife.
16    Q.   A knife.  Okay.  When you met with
17  Raymour in early 2009, he presented you with an
18  additional form to sign, did he not?
19    A.   Yes.
20    Q.   And how did that meeting come about?
21  Did he call you or did you call him?
22    A.   No, he called my brother.
23    Q.   Okay.  He called your brother and do you
24  know what that conversation was about with your
25  brother?

1    A.   My brother just told me if you -- if I
2  wanted to do the papers again for a little bit
3  more money to help me out.
4    Q.   Okay.  So your brother related to you
5  that -- something to the effect that Raymour is
6  going to come around, he's going to offer you some
7  more money and you have to sign some paperwork?
8    A.   Yes.
9    Q.   And that was okay with your brother?
10    A.   Yes.
11    Q.   He didn't object to that?
12    A.   No.
13    Q.   And he didn't express any disapproval of
14  that to you, did he?
15    A.   No.
16    Q.   And you were agreeable to that?
17    A.   Yes, I did.
18    Q.   So as a result of that conversation, and
19  any conversation you had with your brother,
20  Raymour came to the New Bedford facility where you
21  were recuperating at that time, is that right, in
22  January 19 -- January of 2009?
23    A.   Yes.  New Bedford Rehab Center.
24    Q.   Right.  And, in fact, he presented you
25  with this form, both pages, which is Exhibit 7, in

1  January of 2009, did he not?
2    A.   Yes.  I believe so.
3    Q.   Okay.  And, in fact, your signature
4  appears on the second page, right?
5    A.   Yes.
6    Q.   And if you flip it, your initials appear
7  on the first page?
8    A.   Yes.
9    Q.   And those initials signify that you read
10  and understand the document?
11        MR. VILKER: Objection.
12    Q.   Don't they?
13    A.   No, I never read it.
14    Q.   Well, of the many times that you were
15  arrested, were you ever presented with a Miranda
16  rights form by any of the police officers who
17  arrested you?
18        MR. VILKER: Objection.
19    A.   What do you mean by that?
20    Q.   When they gave -- when you were arrested
21  on those times, did they ever read you your rights
22  and, in fact, present you with a form?
23        MR. VILKER: Objection.
24    A.   Yes.
25    Q.   You are familiar with that form, right?

1    A.   I believe so.  I don't know.
2    Q.   It has the Miranda rights, you have the
3  right to remain silent?
4    A.   Yes.
5    Q.   All right.  You've seen that, correct?
6    A.   Yes.
7    Q.   Were you ever asked to initial that form
8  or sign that form?
9    A.   In court?  Yes.
10    Q.   No.  Either in court or at the police
11  station.
12    A.   No.
13    Q.   You were never asked to sign or initial
14  that kind of form?
15    A.   No.
16    Q.   Would you agree that when somebody signs
17  or initials a particular form, it's done so to
18  show that they read the form?
19        MR. VILKER: Objection.
20    A.   No.  He explained to me that it was the
21  same thing.
22    Q.   The same thing as a year ago?
23    A.   Yeah, for more money but it wouldn't be
24  2000; it would probably be something around that.
25    Q.   Right.  But you initialed a particular

Page 122

1   paragraph that says, "I understand as the named
2   annuitant in this variable annuity contract, I am
3   not contributing any funds to the annuity
4   contract, and I have no rights of ownership."
5   That's where your initials appear on that form?
6       A.   Yeah.  He just told me to put initials
7   there.
8       Q.   Did he tell you where to put the
9   initials or did you decide where to put the
10  initials?
11      A.   No.  I just put them there.
12      Q.   Okay.  And the top paragraph of that
13  form says, "That I am of sound mind and I am
14  entering into this agreement voluntarily and I
15  consent to be the contract annuitant out of my own
16  free will and without duress."  Do you disagree
17  with that language?
18          MR. VILKER:  Objection.
19      Q.   Do you have any disagreement with that?
20      A.   No, I'm not.
21      Q.   You don't disagree with that?
22      A.   Could you read it again?
23      Q.   It says, "That I am of sound mind and I
24  am entering into this agreement voluntarily and I
25  consent to be the contract annuitant out of my own

Page 123

1   free well and without duress."  That's what it
2   says, right?
3           MR. VILKER:  Objection --
4       A.   Yes.
5           MR. VILKER:  -- to that's what it says.
6   He can testify that's what it says but he's
7   already testified that he had no idea what he was
8   signing.
9       A.   I -- I didn't read nothing, none of
10  that.
11          MR. PINE:  We'll let him testify for
12  now.
13      A.   I didn't read none of those pages.  I
14  just signed them and that was it.  He told me it
15  was the same thing as the last time.
16      Q.   But you signed it because you thought
17  you were going to get additional money upfront,
18  didn't you?
19      A.   No, not upfront.  He said in the -- when
20  all these papers go through, he would send a check
21  again.
22      Q.   In the short term?
23      A.   Yes.
24      Q.   Not years down the road?
25      A.   No.

Page 124

1       Q.   But short term?
2       A.   Yes.
3       Q.   When the papers went through, that's
4   what I mean upfront.
5       A.   Yeah.
6       Q.   And you understood that you were going
7   to be getting additional money upfront --
8       A.   Yes.
9       Q.   -- isn't that correct?
10      A.   Yes.
11      Q.   And he didn't force you to sign these
12  papers, did he?
13      A.   No.
14      Q.   You did so voluntarily of your own free
15  will?
16      A.   Yes.
17      Q.   You are an intelligent person; you
18  understand what it means to sign documents, don't
19  you?
20          MR. VILKER:  Objection.
21      A.   Yes, but I didn't read them.
22      Q.   Well, but you signed them and you
23  initialed this one --
24      A.   Yes.
25      Q.   -- didn't you?

Page 125

1       A.   Yes.
2       Q.   Okay.  And do you recall how long the
3   meeting lasted at the New Bedford facility on
4   January 14th, 2009?
5       A.   About twenty minutes, half an hour.
6       Q.   Okay.  Twenty minutes?
7       A.   Uh-hum.
8       Q.   And during the course of that
9   conversation or meeting, did Raymour talk about
10  anything else besides this particular form?
11      A.   No.
12      Q.   Just talked about this, this -- this
13  offer?
14      A.   Yes.  He said it was the same thing as
15  the last time --
16      Q.   Okay.
17      A.   -- to receive some money, and I signed
18  them.
19      Q.   Right.  And when -- I think you said on
20  direct examination that you didn't understand at
21  the time -- or you said something like why would
22  I -- why would I give my approval so that somebody
23  could get money from me; do you remember saying
24  that to Mr. Vilker?
25      A.   Yes.

32 (Pages 122 to 125)

1    Q.  What did you understand or who told you
2  that somebody was going to be getting money from
3  you?
4    A.  I understand it now.
5    Q.  What do you understand now?
6    A.  That he was supposedly going to get
7  money.  I didn't know that.
8    Q.  From you?
9    A.  Yes.
10    Q.  You were going to pay him money?
11    A.  No.  He was going to get money
12  supposedly on my death.
13    Q.  Right.  But you weren't -- you weren't
14  contributing any money to him, were you?
15    A.  No.
16    Q.  You didn't have any money to
17  contribute --
18    A.  No.
19    Q.  -- to him?
20    A.  No.
21    Q.  So that nobody was getting money from
22  you, were they?
23        MR. VILKER:  Objection.
24    A.  I don't know that.
25    Q.  Well, did Raymour ever ask you for any

1  money?
2    A.  No.
3    Q.  You never gave Raymour any money?
4    A.  No.
5    Q.  And who suggested to you that -- who
6  first suggested to you that, by the way, do you
7  know that they were going to get some money if you
8  passed away?  Who first said that to you?
9    A.  When I saw all the -- the FBI.
10    Q.  Right.  What did she tell you?
11        MR. VILKER:  Objection.
12    A.  She -- she -- she asked me all the
13  questions, why did I sign them, how did I read
14  them.  And then I asked, what was this about, and
15  she said you signed some papers releasing
16  supposedly him for -- when I die, some -- for him
17  to receive money for me for my death.  That was
18  the first time I knew all about this.
19    Q.  And did she tell you that that was
20  illegal?
21        MR. VILKER:  Objection.
22    Q.  Did she express to you that that was
23  against the law?
24        MR. VILKER:  Objection.
25    A.  Yes.

1    Q.  She said that?
2    A.  Yes, it's against the law.
3    Q.  Okay.
4    A.  If you -- if you don't know what you're
5  signing, that's against the law.
6    Q.  But she suggested to you that that
7  process by which you signed this was against the
8  law, is that -- that's what you just said?
9        MR. VILKER:  Objection.
10    A.  No.  That all this -- if he -- if you
11  are doing this and you don't know that you sign
12  all this, that's against the law.
13    Q.  Okay.  And that's what she told you?
14    A.  Uh-hum.
15        MR. PINE:  Okay.  If I could just have a
16  moment.
17        ( P A U S E )
18  BY MR. PINE:
19    Q.  Do you know if sometime in 2008 if Joni
20  Fortin ever called Raymour to ask if he could help
21  you out to get a felony cleared from your record?
22        MR. VILKER:  Objection.
23    A.  No, I don't recall that.
24    Q.  Did you know if she ever called Melvin
25  for that reason?

1        MR. VILKER:  Objection.
2    A.  No.
3    Q.  Did Melvin ever talk to you about that
4  possibility?
5        MR. VILKER:  Objection.
6    A.  No.
7    Q.  In addition to the medications that are
8  prescribed to you, during 2008, did you ever use
9  drugs on a recreational basis?
10    A.  No.
11    Q.  Prior to 2008?
12    A.  No.
13    Q.  Did you ever use narcotics, illegal
14  narcotics?
15    A.  No.  I just use my -- my pills.
16    Q.  Just yours?
17    A.  Yes.
18    Q.  So you weren't present at any point in
19  time when Melvin referred to that with Raymour?
20        MR. VILKER:  Objection.
21    A.  No.
22    Q.  And so if Melvin -- if Melvin said that
23  he was concerned that you would spend the money on
24  junk --
25        MR. VILKER:  Objection.

Page 130

1  Q.  -- do you have any idea what he was
2  referring to?
3      MR. VILKER: Objection.
4  A.  No.  He was living with me, my brother;
5  he knew what I was doing.
6  Q.  Okay.  And it's your testimony that you
7  didn't use any of your money for recreational
8  narcotics?
9  A.  No.
10  Q.  When you -- when you signed Exhibit 7
11  that I've shown you before -- that's the one I
12  showed you before from January of 2009 --
13  A.  Yes.
14  Q.  -- were you paid any money at that time?
15  A.  Yes.  $250 in cash.
16  Q.  Was Melvin paid any money at that time?
17  A.  No.
18      MR. PINE: Nothing further.  Thank you.
19      MR. VILKER: Do you want to take a
20  little break?
21      THE WITNESS: No.  It's okay.
22      MR. VILKER: You're okay to keep going?
23  Okay.  We'll switch attorneys.
24      VIDEOGRAPHER: Shall we go off the
25  record?  The time is 1:30.  We'll go off the

Page 131

1  record.
2      (Off the record discussion.)
3      VIDEOGRAPHER: The time is 1:35.  We're
4  back on the record.
5          EXAMINATION
6  BY MR. FLANDERS:
7  Q.  Good afternoon, Mr. Rodriguez.
8  A.  Good afternoon.
9  Q.  My name is Robert Flanders and I'm an
10  attorney representing Joseph Caramadre.
11  A.  Okay.
12  Q.  I'm going to ask you to take a look at a
13  document that the government marked as Exhibit 1
14  for identification.  This document is entitled
15  Terminal Illness Philanthropy Account Receipt?
16  A.  Yes.
17  Q.  Is this a document that you reviewed
18  with Mr. Raymour Radhakrishnan in early 2008?
19  A.  Yes, I believe so.
20  Q.  And did you read that document?
21  A.  He showed me the first paragraph,
22  explained what -- what it was, some of the things
23  were for.
24  Q.  He did show it to you and explained it
25  to you?

Page 132

1  A.  He -- he explained that it was for the
2  $2000.
3  Q.  And was it filled in or was it blank at
4  the time he showed it to you?
5  A.  Umm...
6  Q.  Do you remember?
7  A.  I believe it was -- I don't know if it
8  was blank or filled in.
9  Q.  You can't remember which?
10  A.  No.
11  Q.  But you do remember him showing you the
12  document and explaining it to you?
13  A.  Yes.  He said this is -- all the papers
14  were together and this was in the front.
15  Q.  All right.  And is this the document
16  that your brother Melvin signed on your behalf?
17  A.  Yes.
18  Q.  And did you authorize him to do that?
19  A.  Yes.  Because he was going to -- he
20  asked if I had a bank account; I said no.
21  Q.  So you told Raymour it was okay for
22  Melvin to sign this for you?
23  A.  Yes, I told him.
24  Q.  And did you authorize him to go and cash
25  the check for $2000?

Page 133

1  A.  Yes, I did.
2  Q.  So if we look at Exhibit 2, which is the
3  check itself that I'm handing you, that's made out
4  to Melvin Rodriguez for $2000 and it's dated
5  February 26th, 2008 and that was for philanthropy
6  it says?
7  A.  Yes.
8  Q.  And you see it's signed by Joseph
9  Caramadre?
10  A.  Yes.
11  Q.  And you authorized this check to be made
12  out to Melville so he could cash it for you?
13  A.  Yes.
14  Q.  To Melvin.  I'm sorry.
15  A.  Yes.
16  Q.  And, to your knowledge, did Melvin, in
17  fact, cash that check?
18  A.  Yes, he did.
19  Q.  And that was -- that was for the $2000
20  that you were going to get for being somebody that
21  would be eligible for this kind of a payment
22  because you were sick?
23  A.  Yes.
24  Q.  But in addition to this document that
25  Raymour showed you, he also showed you other

34 (Pages 130 to 133)

Page 134

1   documents when -- when you met with him in early
2   2008, right?
3       A.  There were some -- there were some all
4   together.
5       Q.  Okay.  And was one of the documents that
6   you were shown this Exhibit 3?
7       A.  No.  I don't think so.  I don't remember
8   this.
9       Q.  You don't remember seeing that?
10      A.  No.
11      Q.  If you look at Exhibit 3, which is
12  entitled Agreement and Acknowledgement, on Page 3,
13  if you turn to the third page --
14      A.  Uh-hum.
15      Q.  -- is that your signature?
16      A.  Yes.  Yes, it is.
17      Q.  All right.  So you don't deny that you
18  signed this document?
19      A.  Yes, I signed this.
20      Q.  Okay.  And do you remember whether this
21  document had any of the writing filled in on it
22  other than your signature when you signed it?
23      A.  No.
24      Q.  You don't remember?
25      A.  I don't think -- I don't think it had

Page 135

1   everything.  All the papers, I believe, were
2   blank.
3       Q.  Okay.  Was -- was the front page blank
4   as well?
5           MR. VILKER:  Objection.
6       A.  I don't think I seen this first page.
7       Q.  How do you know whether you saw it?
8       A.  I don't -- that's what I'm saying, I
9   don't think I seen it.
10      Q.  Because you have no memory of seeing it?
11      A.  No, I just don't remember seeing this
12  $3000, all this, no.  I don't think I've seen
13  this.
14      Q.  It says $3500 there, right?
15      A.  Yes.  I don't remember seeing none of
16  this.
17      Q.  Was that blank when you looked at it?
18      A.  I'm telling you I don't remember seeing
19  this page.
20      Q.  Do you remember that $3500 was paid on
21  account of this?
22      A.  No.
23      Q.  Do you know that you got extra money
24  beside the $2000 that was paid to your brother
25  Melvin?

Page 136

1       A.  No.
2       Q.  You are not aware that your brother was
3   paid $3500 on account of signing this document?
4       A.  No.
5       Q.  I'm going to show you this document that
6   the government marked Exhibit 13.
7       Do you see Exhibit 13 is a check dated
8   March 4th payable to your brother Melvin?
9       A.  Yes.
10      Q.  And that's the same amount as shown on
11  the agreement and acknowledgement that's been
12  marked as Exhibit 3?
13      A.  Yes.
14      Q.  And, in fact, it's dated the same date
15  as this agreement, isn't it, March 4th?
16      A.  What do you mean?  The check and this?
17      Q.  The check and the agreement and
18  acknowledgement, which is Exhibit 3, they are both
19  dated March 4th, aren't they?
20      A.  No.  This one is dated the seventh, the
21  check.
22      Q.  I'm sorry.  It's dated the seventh.
23  Okay.  And what does it say in the line beneath
24  it?  It says a new account, do you see that?
25      A.  Yes.

Page 137

1       Q.  Are you saying that Melvin never
2   received this?
3       A.  To my knowledge, no.
4       Q.  If he did, he never told you about it?
5       A.  No.
6       Q.  But you received some additional money
7   beyond the 2000, correct?
8       A.  Yes.
9       Q.  And what did you understand that
10  additional money was for, for signing these
11  papers?
12      A.  No.  Out of generous from him.
13      Q.  But you had to sign -- you knew you had
14  to sign some additional papers to get that money?
15      A.  No.  The 550 I didn't sign no more
16  papers.
17      Q.  Well, you signed all of these papers,
18  didn't you?
19      A.  Yeah.  The 2009 you're saying?
20      Q.  The 2008.  You signed a bunch of papers?
21      A.  Yes.
22      Q.  And one of them was Exhibit 3 which is
23  this Agreement and Acknowledgement?
24      A.  Which one, the one in the back you're
25  saying?  Yes.

Vivian S. Dafoulas & Associates
(401) 885-0992

1   Q.  Exhibit 3, you signed that document?
2   A.  Yes, it's my signature.
3   Q.  And you also signed the Government's
4   Exhibit 4 which is an Account Application
5   document, didn't you?
6   A.  Where?
7   Q.  On the second page.
8   A.  Yes, I did.
9   Q.  And you signed it on or about March 4th
10  of 2008?
11  A.  I don't think the -- the date was on it.
12  Q.  When did you sign it, as best as you can
13  remember?
14  A.  I think I signed all these papers the
15  same date --
16  Q.  Okay.
17  A.  -- I received the first time.
18  Q.  And when you signed this, did it have
19  the first page on it?
20  A.  I don't think so.
21  Q.  When you signed it, did it have next to
22  your name "Account Co-Owner" as it does now?
23  A.  Yeah, if it --
24  Q.  Was that there when you signed it?
25  A.  Yes.

1   Q.  And the account owner's signature -- I'm
2   sorry -- account co-owner's signature was next to
3   your name at the time -- at the time you signed
4   it?
5   A.  It had to be.
6   Q.  And if you look at the third page of
7   this Exhibit 4 --
8       MR. VILKER:  Could I suggest that if
9   you're done with other documents, take them back
10  from the witness so he doesn't have to --
11      MR. FLANDERS:  Sure.
12      MR. VILKER:  -- struggle with them,
13  please?
14      MR. FLANDERS:  Keep Exhibit 4 if you
15  would.
16      THE WITNESS:  Which one?
17  Q.  If you look at the last page of
18  Exhibit 4 --
19  A.  Yes.
20  Q.  -- it's the same one you signed on the
21  second page but you also --
22  A.  The last page or the second page?
23  Q.  I'm sorry.  The second -- the third page
24  of Exhibit 4.
25  A.  Yes.

1   Q.  In the big block letters next to the No.
2   9 above your signature did it have "Account
3   Agreement" there?
4   A.  Yes.
5   Q.  Those were on the document when you
6   signed it?
7   A.  Yes.  They had to be.
8   Q.  Well, they wouldn't have to be --
9   A.  Yeah, they had to be --
10  Q.  -- but it was?
11  A.  -- because it was there.
12  Q.  It was there, as far as you remember?
13  A.  I don't -- I didn't read them, none of
14  these.
15  Q.  But did Raymour block it out so you
16  couldn't read it?
17  A.  No.  He just explained it was all for
18  the money.  That's about it.
19  Q.  Did he tell you not to read it?
20  A.  No.
21  Q.  And your recollection, as you testified
22  here today under oath, is that those words
23  "Account Agreement" were there?
24  A.  I don't -- I don't recall.  It probably
25  was there.  I didn't read none of this.

1   Q.  That bears your signature, does it not?
2   A.  Yes.
3   Q.  And, again, next to your signature it
4   says, "Account Co-Owner"?
5   A.  Yes.
6   Q.  That was on the document when you signed
7   it?
8   A.  I didn't read it.
9   Q.  It was -- to your knowledge, was it
10  there?
11  A.  I don't know.  I didn't read it.  I just
12  signed them.
13  Q.  Did you deliberately make the decision
14  not to read them?
15  A.  Yes, because he explained to me that it
16  was all for the funeral expenses --
17  Q.  But did he -- did he --
18  A.  -- and the money.  That was about it.
19  Q.  -- but did he in any way tell you not to
20  read the documents?
21  A.  No.  He just explained to me before I
22  signed them.
23  Q.  He explained to you that this was money
24  you could use for your funeral expenses?
25  A.  Money for -- for the $2000 and for the

1    funeral expenses.
2        Q.   So in addition to the $2000, there was
3    going to be money for your funeral expenses?
4        A.   Yes.
5        Q.   And do you understand that, in fact, you
6    were paid money for the funeral expenses?
7        A.   I believe so.
8        Q.   And you wanted to receive that money,
9    right?
10       A.   No, I believe they went to the funeral.
11       Q.   But you wanted him to pay for your
12   funeral expenses?
13       A.   They -- they offered, yes.
14       Q.   And you wanted to receive -- you wanted
15   him to do that?
16       A.   Sure.
17       Q.   And, in fact, your understanding is he
18   did do that?
19       A.   I believe so.
20       Q.   And you were grateful for him doing it?
21       A.   Of course.
22       Q.   And you signed these documents because
23   you wanted him to do that?
24       A.   Yes.
25       Q.   And you made the decision, when you

1    signed the documents, that I don't -- I'm not
2    going to read them; I'll just sign them?
3        A.   Yes, because he explained that it was
4    all for that.  Seemed like a nice guy and -- and
5    they told me that he already done it for other
6    people, so it was okay.
7        Q.   Who told you that?
8        A.   The social worker that they -- he had
9    done it.
10       Q.   When you signed the third page of
11   Exhibit 4, did you see where -- next to No. 12 it
12   says, "Options Account Agreement"?
13       A.   Which one?
14       Q.   Exhibit 4 that is in your hand, Page 3.
15       A.   Page 3, this one?  Yes.
16       Q.   The one with your signature on it?
17       A.   Yes.  There's two of them though with
18   signature.
19       Q.   It's Page 3, the third page.
20       A.   The second and the third, yes.
21       Q.   And do you see where it says, "Options
22   Account Agreement" after No. 12 right above your
23   signature?
24       A.   Yes.
25       Q.   And do you see at the top of the page in

1    even bigger letters it says, "Options Account"?
2        A.   Yes.
3        Q.   Were those on the document when you
4    signed it?
5        A.   They probably were.  I didn't read it.
6            MR. FLANDERS:  Okay.  Thank you.
7        Q.   Showing you Exhibit 5.  The document
8    says, "Limited Trading Authorization."  Does this
9    document bear your signature on the upper right
10   under Account Co-Owner?
11       A.   Yes.
12       Q.   And did you sign it at the same meeting
13   you've been testifying about with Raymour the
14   first time you met with him?
15       A.   Yes.
16       Q.   And do you see under -- the words
17   "Account Co-Owner" above your signature?
18       A.   Yes, I do.
19       Q.   Were those words there when you signed
20   this?
21       A.   They probably were.  I didn't read them.
22       Q.   And was the word Limited Trading
23   Authorization in block capped letters at the top?
24       A.   Yeah, they're there.
25       Q.   Did Raymour tell you not to read this?

1        A.   No.
2        Q.   Did he prevent you from reading it in
3    any way?
4        A.   No.
5        Q.   Did he tell you this was a different
6    document than what it was?
7        A.   No.  He said all these papers are for
8    the money and the funeral expenses.
9        Q.   And they were for the money and the
10   funeral expenses, weren't they?
11       A.   Yes.
12           MR. VILKER:  Objection.
13       A.   Supposedly that's what it was for.
14       Q.   Well, you did get money, didn't you?
15       A.   Yes.
16       Q.   And you did get your funeral expenses
17   paid, didn't you?
18       A.   I believe so, yeah.
19       Q.   And you were willing to sign these
20   documents to make that happen?
21       A.   Yes.
22       Q.   And you didn't even want to read them
23   you so much wanted that money and the funeral
24   expenses paid, right?
25       A.   He just seemed like a nice guy.  They

Page 146

1 told me he'd done it already, so it was okay with
2 me.
3 Q. Showing you Exhibit 6 that the
4 government marked for identification. This is a
5 document that on the first page under title it
6 says, "Ameritrade Margin/Options Account Upgrade
7 Form"?
8 A. Yes.
9 Q. If you turn to the third page of the
10 Government's Exhibit 6, there are signature lines
11 and one of them appears to bear your name --
12 A. Yes.
13 Q. -- is that your signature?
14 A. Yes, it is.
15 Q. Is this one of the documents you signed
16 when you first met with Raymour?
17 A. My signature is there, so yes, I did
18 sign.
19 Q. When you signed this, did you notice
20 that next to your name it says, "Account
21 Owner/Authorized Agent Signature"?
22 A. No. I didn't read it.
23 Q. Was it there when you signed it?
24 A. I don't know. I didn't read it.
25 Q. So are you telling us that no matter

Page 147

1 what was in these documents, you didn't read them?
2 A. No. Because he explained to me that it
3 was for this first page so I signed all these
4 papers just for the funeral expenses and the --
5 the $2000.
6 Q. But it was -- you got more than 2000,
7 didn't you?
8 A. Yes. After -- after that, he gave me
9 500 in cash and that's -- he said that's the last
10 time we'll see each other probably.
11 Q. So you did -- you did get additional
12 money after you signed these documents?
13 A. Yes. He visited me in the hospital.
14 Q. Then you told us that after you -- he
15 paid a visit to you in the hospital and gave you
16 $550 in cash, you had another visit from him, is
17 that right?
18 A. Yes. In 2009.
19 Q. Okay. And on that occasion, he wanted
20 you to sign more documents, is that right?
21 A. Yes. For the same thing, for more
22 money.
23 Q. Okay. So you knew to get more money you
24 had to sign more documents?
25 A. Yes.

Page 148

1 Q. And there's one other document that you
2 signed, Government Exhibit 7, which I'll hand you
3 now entitled Annuitant Acknowledgement?
4 A. Yes. For my initials.
5 Q. And so you initialed the first page you
6 told us and then you also signed the second
7 page --
8 A. Yes.
9 Q. -- didn't you?
10 A. Yes.
11 Q. And right underneath your signature on
12 the second page it says, "Annuitant's Signature"?
13 A. Yes.
14 Q. Was -- was this document -- were those
15 words on it when you signed it?
16 A. Yes, they were but I didn't -- I don't
17 know why -- I didn't know what that means. I
18 didn't think it was all for this.
19 Q. Right next to your initials on the first
20 page, it says, "I understand that as the named
21 annuitant in this variable annuity contract, I am
22 not contributing any funds to the annuity
23 contract."
24 Let's just stop right there. Did you
25 contribute any funds to this annuity contract?

Page 149

1 A. No.
2 Q. Were you asked to contribute any funds
3 to this annuity contract?
4 A. No.
5 Q. In fact, you never contributed any funds
6 to any contract that you may have signed, is that
7 right?
8 A. No.
9 Q. On the contrary, you received money for
10 the things that you signed, is that right?
11 A. Yes.
12 Q. And you and your brother, to the extent
13 you authorized him to receive the payments, are
14 thousands of dollars richer because of the fact
15 that Raymour -- Raymour came into your life,
16 correct?
17 A. Yes. He said that he was working for a
18 wealthy man.
19 Q. And you received the money from Raymour
20 but you never gave him any money, is that right?
21 A. No.
22 Q. So as far as Raymour is concerned and
23 whoever was -- he was working for, they did right
24 by you, is that right?
25 MR. VILKER: Objection.

38 (Pages 146 to 149)

1    A.  To my knowledge up to now.
2    Q.  When you say up to now --
3    A.  Because now I understand that this is
4  all for when I die they receive money off my
5  death.
6    Q.  And who told you that?
7    A.  When I -- when I came -- when I saw
8  the -- when she -- when she explained to me.
9    Q.  Who is "she"?
10    A.  The -- the agent.
11    Q.  Mrs. -- Ms. Pamela McDaid?
12    A.  Yes.
13    Q.  The FBI agent?
14    A.  Yes.
15    Q.  She explained all this to you?
16    A.  Yes.
17    Q.  When did she explain all this to you?
18    A.  The first time that we met.
19    Q.  And when was that?
20    A.  About three weeks ago.
21    Q.  And she came in and said to you that
22  what -- what did she say to you?
23        MR. VILKER:  Objection.
24    A.  She -- she asked me if I knew who
25  Raymour was.  She showed me a picture.  I said,

1  "Yes, he was -- he was -- I met him a couple of
2  times and he helped me out."
3      And she was like, "Well, tell me what
4  happened."  And I -- I explained to her what
5  happened.  And then she -- I asked her what was it
6  about and when I -- she -- she told me what was it
7  about.
8    Q.  Did she suggest to you that something
9  wrong had gone on here?
10        MR. VILKER:  Objection.
11        MR. MacFADYEN:  Objection.
12    A.  No.  She said they put money for my
13  death when I die.  That they -- I sign papers
14  without knowing that it was for money for when I
15  die, they'll get money.
16    Q.  She suggested to you that if you signed
17  papers that when you die --
18    A.  She said that --
19    Q.  -- they'll get money?
20        MR. VILKER:  Objection.
21    A.  Yeah, that when I die, they'll --
22  they'll receive money off me.  That was the whole
23  trick that they were doing.
24    Q.  The whole trick that they were doing?
25    A.  Yeah.

1    Q.  Is that what she said?
2        MR. VILKER:  Objection.
3    A.  No, the whole -- I'm saying the whole,
4  everything that they were doing when I signed
5  these -- all these papers, that's what they were
6  doing.
7    Q.  And you think it's a trick?
8    A.  Well, they -- they tricked me really
9  good because I didn't -- I didn't want them to
10  take money off my death.
11    Q.  And is that the opinion you formed after
12  talking with Agent McDaid?
13    A.  Yes.  Why would I give him and Raymond
14  money off my death when I got my daughter?
15    Q.  Maybe because they gave you thousands of
16  dollars to do it?
17        MR. VILKER:  Objection.
18    A.  No, I didn't know none of that.
19    Q.  Pardon me?
20    A.  I didn't know that they was -- that they
21  were taking.
22    Q.  Did you -- do you know it now?
23    A.  Yes.
24    Q.  Have you attempted to give the money
25  back, sir?

1    A.  No.
2    Q.  Have you attempted to in any way cancel
3  the contracts?
4    A.  No.  I don't know how to do none of
5  this.
6    Q.  Let me show you Government's Exhibit 8.
7  Is this another one of the documents that you
8  signed when -- in 2009 when you met with Raymour?
9    A.  Yes.  It got my signature.
10    Q.  And, again, this is a document that
11  right above your name says, "Annuitant"?
12    A.  Yes.
13    Q.  That was on it when you signed it?
14    A.  It had to be.  Even if I read it, I
15  don't know what annuitant means.  I didn't know
16  what that means.
17    Q.  Did you ask Raymour what it meant?
18    A.  No, I never read it, so I never talked
19  nothing about that.
20    Q.  So you never asked any questions, you
21  just signed because you wanted the money?
22    A.  Yeah.  It was all about they saying
23  helping -- helping me out.
24    Q.  And they did?
25    A.  Yeah.

Page 154

1    Q.   But you knew that -- you knew for them
2  to help you out, you had to sign these documents?
3    A.   Yes.
4    Q.   And you deliberately chose not to read
5  them?
6    A.   Yes, because he explained for what it
7  was.
8    Q.   Could you take a look at Exhibit 9?  Was
9  this another -- a document that you signed in
10  front of Raymour in 2009?
11    A.   Which one, this one?
12    Q.   Exhibit 9 that you're holding.
13    A.   Yeah, probably.
14    Q.   And is that another document where you
15  signed right next to your name that says,
16  "Annuitant"?
17    A.   Yes.
18    Q.   I'm handing you Exhibit 10.  Is
19  Exhibit 10 another document that you signed in
20  2009 in front of Raymour?
21    A.   Yes.
22    Q.   And next to your name does this one also
23  say, "Annuitant's Signature"?
24    A.   Yes, it does.
25    Q.   But you didn't read this document

Page 155

1  either, right?
2    A.   No.
3    Q.   Showing you Exhibit 11.  Is this a
4  document that you willingly signed for Raymour?
5    A.   Yes.
6    Q.   And is Exhibit 11 a document where you
7  also signed as the proposed annuitant?
8    A.   Yes.
9    Q.   Showing you Exhibit 12 from the
10  government.  Is that yet another document that you
11  willingly signed next to a typed-in signature
12  block that says, "Annuitant's Signature"?
13    A.   Yes.
14         MR. VILKER:  I'm objecting to -- excuse
15  me -- I'm objecting to the word "willingly."  I'm
16  not sure what it means.
17         MR. FLANDERS:  Well, let's find out.
18  BY MR. FLANDERS:
19    Q.   Did you willingly sign these documents?
20    A.   Yes.
21    Q.   No one forced you to do it?
22    A.   No.
23    Q.   You did it because you wanted the money
24  for the funeral expenses and the $2000 that he was
25  giving away to people in your condition --

Page 156

1    A.   Yes.
2    Q.   -- correct?  So would you agree with me
3  that you signed these willingly?
4    A.   Yes.
5    Q.   Showing you the government's final
6  exhibit, 14.  This is a document that says,
7  "Ameritrade, Joseph Caramadre and Edwin
8  Rodriguez," is that right?
9    A.   Yes.
10    Q.   And the government showed you numbers
11  that -- in this document $3 million and so forth,
12  right?
13    A.   Yes.
14    Q.   Do you know whether any of the
15  investments in this account made money or lost
16  money?
17    A.   What do you mean?
18    Q.   Do you know whether this account made
19  money for its owners or lost money?
20    A.   No.
21    Q.   Would it surprise you to know that this
22  money lost -- this account lost thousands of
23  dollars?
24         MR. VILKER:  Objection.
25    A.   I don't know that.

Page 157

1    Q.   Do you now understand, sir, that you
2  have signed various documents in which you have
3  consented to be an annuitant?
4         MR. VILKER:  Objection.
5    A.   I -- I signed them but I didn't know
6  that -- I didn't know what annuitant and orders
7  means.
8    Q.   Do you now know that you have signed
9  them as an annuitant?
10         MR. VILKER:  Objection.
11    A.   Now, yes.
12    Q.   Did the government, through Ms. McDaid,
13  show you copies of these documents?
14    A.   No, not all this.
15    Q.   Not all of this?
16    A.   No.
17    Q.   Did they show you some of them?
18    A.   Yes.
19    Q.   But not all of them?
20    A.   No.
21    Q.   Did Ms. McDaid make any representations
22  to you about whether Mr. Caramadre, the
23  philanthropist, was making any money as a result
24  of the documents you signed?
25         MR. VILKER:  Objection.

Page 158

1    A.  What was that?
2    Q.  Did Ms. McDaid say anything to you about
3  whether Mr. Caramadre or Raymour were making any
4  money off of the documents you signed?
5    A.  No.  She said when -- if I -- if I die,
6  they make money off me.
7    Q.  She said if you died, they'd make money
8  off you?
9        MR. VILKER:  Objection.
10    A.  Yes.
11    Q.  She didn't tell you that it's possible
12  that they might lose money?
13        MR. VILKER:  Objection.
14    A.  No.
15    Q.  Or might not make any money?
16    A.  No.
17    Q.  She just told you that when you die,
18  they'll make money off of you?
19        MR. VILKER:  Objection.
20    A.  Yeah, that's what they were doing.
21    Q.  Did she tell you that they were doing
22  that with other people as well besides you?
23        MR. VILKER:  Objection.
24    A.  No.  I don't think so.
25    Q.  Did she tell you that they were taking

Page 159

1  advantage of people like you who were sick and
2  trying to make money off them when they died?
3        MR. VILKER:  Objection.
4    A.  I don't recall that.
5    Q.  You don't recall it but you don't deny
6  she told you that?
7        MR. VILKER:  Objection.
8    A.  No, I don't -- I don't think she told me
9  that.  She told me that they were doing it to me.
10    Q.  And until she told you that, did you
11  have any problem or any unfavorable opinion of
12  Mr. Caramadre or Raymour?
13    A.  No.
14    Q.  You never complained to any of the
15  authorities about the dealings they had with you?
16    A.  No.
17    Q.  You never went to the FBI or the
18  government and said, this is a terrible thing
19  they've done to me?
20    A.  No.  I didn't know this.  I didn't know
21  they do this.
22    Q.  As you sit here, do you have any
23  interest in paying back the money to
24  Mr. Caramadre?
25        MR. VILKER:  Objection.

Page 160

1    A.  No.  It's -- it was a gift supposedly.
2    Q.  So you are not interested in undoing
3  what's been done?
4        MR. VILKER:  Objection.
5    A.  About the -- them taking money?  Yes.
6    Q.  What money?  Taking what money?
7    A.  Supposedly if I die.
8    Q.  But they're not taking any money from
9  you, sir; are they?
10    A.  No, but they are making money off my
11  death.
12    Q.  And would you give the money back to
13  stop that from happening?
14    A.  If I had to.
15    Q.  Well, what do you mean if you had to?
16        MR. VILKER:  Objection.
17    A.  If I -- if I had to.  I don't know.
18    Q.  You haven't offered to give it back
19  though, have you?
20    A.  No.
21    Q.  And you don't -- as you sit here, you
22  don't know whether they're going to make money off
23  your death or not, do you?
24    A.  Well, it says it here, right?
25    Q.  Pardon me?

Page 161

1    A.  Don't it say it in the papers?
2        MR. VILKER:  Objection.
3    Q.  No.  That's what Ms. McDaid told you.
4  The papers don't say that.  That's what she told
5  you, right?
6        MR. VILKER:  Objection.
7    A.  She said that they were -- if I died,
8  they'll make money off me.
9    Q.  But that's what she said, not in the
10  papers?
11        MR. VILKER:  Objection.
12    A.  I think so.  I don't know.
13        MR. FLANDERS:  That's all we have.
14        VIDEOGRAPHER:  The time is 2:05.  Off
15  the record.
16        (Off the record.)
17        VIDEOGRAPHER:  Going back on the record.
18        MR. MacFADYEN:  For the reasons
19  previously stated in the Wiley deposition,
20  Mr. Hanrahan has no questions of this witness.
21        MR. TRAINI:  Same is true of
22  Mr. Maggiacomo, for the same reasons that
23  Mr. MacFadyen stated in the Wiley deposition.
24        MR. VILKER:  And the government has no
25  redirect.  We're done.

41 (Pages 158 to 161)

Page 162

1       VIDEOGRAPHER: The time is 2:05 and the
2  deposition is concluded. We are off the record.
3       (Adjourned at 2:05 p.m.)
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 164

1           WITNESS SIGNATURE
2  DEPOSITION OF:
3  EDWIN RODRIGUEZ
   OCTOBER 5, 2009
4
5
6       I hereby certify that I have read the
7  foregoing transcript and the same contains a true
8  and accurate recording of my answers to the
9  questions therein set forth, subject to the
10  change(s) and/or correction sheet(s) attached.
11
12       _____
            SIGNATURE OF DEPONENT
13
14  STATE OF_____
15
16       Subscribed and sworn to before me
17  this_____day of_____, 2009.
18       _____
            NOTARY PUBLIC
19
20  (My commission expires:_____)
21
22
23
24
25

Page 163

1   STATE OF RHODE ISLAND AND PROVIDENCE PLANTATIONS
2   KENT, Sc.
3
4       C E R T I F I C A T I O N
5
6       I, VIVIAN S. DAFOULAS, do hereby certify that
7   I am expressly approved as a person qualified and
8   authorized to take depositions pursuant to Rules
9   of Civil Procedure of the Superior Court,
10  especially but without restriction thereto, under
11  Rule 30(e) of said Rules; that the witness was
12  first sworn by me; that the transcript contains a
13  true record of the proceedings.
14      IN WITNESS WHEREOF, I have hereunto set my
15  hand this 8th day of October, 2009.
16
17      _____
        Vivian S. Dafoulas/RMR-CRR
18      Notary Public
        (401) 885-0992
19      (My commission expires 1/4/2010.)
20
21
22
23
24
25

Page 165

1           CORRECTION SHEET
2
   DEPOSITION OF:
3  EDWIN RODRIGUEZ
   OCTOBER 5, 2009
4
5  PAGE # LINE #
6
   NOW READS:        CORRECTION REQUESTED:
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

42 (Pages 162 to 165)