# GOVERNMENT

# EXHIBIT 8

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND


IN RE:   GRAND JURY PROCEEDINGS


          Videotaped deposition of **ROBERT MIZZONI**, a

Witness herein, taken on behalf of the United

States Attorney, on FRIDAY, OCTOBER 23, 2009,

10:39 A.M., at 400 New River Road, Apartment 104,

Manville, Rhode Island, before Vivian S. Dafoulas,

Registered Merit Reporter/Certified Realtime

Reporter.



              Vivian S. Dafoulas, RMR-CRR
                   50 Fieldstone Drive
              East Greenwich, RI   02818-2064
                     (401) 885-0992

Page 2

1  APPEARANCES:
2
3  FOR THE UNITED STATES ATTORNEY:
4      UNITED STATES ATTORNEY
       BY: LEE H. VILKER, ESQUIRE
           JOHN P. McADAMS, ESQUIRE
5      50 KENNEDY PLAZA, 8TH FLOOR
       PROVIDENCE, RI  02903
6
7  FOR RAYMOUR RADHAKRISHNAN:
8      JEFFREY B. PINE, ESQUIRE
       321 SOUTH MAIN STREET, SUITE 302
9      PROVIDENCE, RI  02903
10
11 FOR JOSEPH CARAMADRE:
12     HINCKLEY, ALLEN & SNYDER LLP
       BY:  ROBERT G. FLANDERS, JR., ESQUIRE
       50 KENNEDY PLAZA, SUITE 1500
13     PROVIDENCE, RI  02903
14
15 FOR ▮▮▮▮▮▮▮▮▮▮▮▮▮▮
       MacFADYEN, GESCHEIDT & O'BRIEN
16     BY:  C. LEONARD O'BRIEN, ESQUIRE
       101 DYER STREET
17     PROVIDENCE, RI  02903
18
19 FOR ▮▮▮▮▮▮▮▮▮▮▮▮
       ANTHONY M. TRAINI, ESQUIRE
20     56 PINE STREET - SUITE 2
       PROVIDENCE, RI  02903
21
22 ALSO PRESENT:  JOSEPH CARAMADRE
23             RAYMOUR RADHAKRISHNAN
               ELIZABETH MIZZONI
               FBI AGENT PAMELA McDAID
24
25 VIDEOGRAPHER: MIRANDA GLOVER

Page 4

1          I N D E X
2  EXHIBITS          PAGE
3  1 America's MarketFlex Annuity Application   27
4  A Written objection          8
5  B Midland Beneficiary Change Request 3/20/95  48
6  C Midland Beneficiary Change Request 2/2/96  53
7  D FBI 302                 63
8  E Nationwide 11/6/08 letter to Mizzoni   81
9  F United HealthCare documents     97
10 G Quarterly statement for account 01-583-1625 110
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 3

1          I N D E X
2  WITNESS                 PAGE
3  ROBERT MIZZONI
4  EXAMINATION BY MR. VILKER      10
5  EXAMINATION BY MR. FLANDERS    41
6  EXAMINATION BY MR. PINE       106
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 5

1      VIDEOGRAPHER:  We are now recording and
2  on the record.  My name is Miranda Glover.  I am a
3  legal video specialist for National Video
4  Reporters, Inc.  Our business address is 7 Cedar
5  Drive, Woburn, Massachusetts.  Today is
6  October 23rd, 2009, and the time is 10:39 a.m.
7      This is the deposition of Robert Mizzoni
8  for grand jury proceedings.
9      This deposition is being taken at 400
10 New River Road, Manville, Rhode Island.
11     The court reporter is Vivian Dafoulas.
12 Counsel will state their appearances and the court
13 reporter will administer the oath.
14     MR. VILKER:  My name is Lee Vilker.  I'm
15 an Assistant United States Attorney and I'm here
16 on behalf of the United States.
17     MR. McADAMS:  My name is John McAdams,
18 and I am also an Assistant United States Attorney
19 here on behalf of the United States.
20     MR. FLANDERS:  I am Robert Flanders and
21 I'm representing Joseph Caramadre.
22     THE WITNESS:  You have to speak a little
23 slower because I got a hearing aid.  If you go too
24 fast, I won't catch nothing.  You know what I
25 mean?

Vivian S. Dafoulas & Associates
(401) 885-0992

Page 6

1          MR. PINE:  Jeffrey Pine here on behalf
2   of Raymour Radhakrishnan.
3          MR. TRAINI:  Anthony Traini here on
4   behalf of ███████
5          MR. O'BRIEN:  Leonard O'Brien on behalf
6   of ███████
7          MR. VILKER:  If the record will also
8   reflect that Mr. Caramadre and Mr. Radhakrishnan
9   are here as well.
10         MR. TRAINI:  Mr. Vilker, before you
11  begin, if I might just put the usual objections on
12  the record.
13         First of all, the objections that have
14  been previously made at -- at the other
15  depositions of Mr. Wiley and Mr. Rodriguez are
16  incorporated by reference here.  They appear in
17  the transcripts.
18         THE WITNESS:  I can't hear.
19         MR. TRAINI:  -- of those depositions,
20  and that includes the -- the position that was
21  taken by the objectors relative to the conduct of
22  the depositions with respect to which objections
23  would be reserved and which ones will be stated,
24  and that we believe that it was appropriate for us
25  to hold our substantive objections for -- for the

Page 7

1   time the depositions would be used.
2          In addition to that, we have a written
3   objection which I have filed with the stenographer
4   this morning and asked that she mark it as
5   exhibit -- or an exhibit to this transcript, which
6   is the same written objection I filed in the other
7   two cases.
8          Also, we lodged the last time, and we'll
9   do so again, a standing Petrozziello objection to
10  any testimony that relates to conversations that
11  would be objectionable on Petrozziello grounds
12  without having to do that with respect to every
13  question that may be asked.
14         And we also would add that we had an
15  agreement with the government in the previous
16  depositions that any objection lodged by one
17  counsel would serve as an objection for all the --
18  all counsel.
19         And beyond that, we will make whatever
20  other objections we feel are appropriate as the
21  deposition proceeds, but we want to be clear that
22  we are incorporating all of the ones that we made
23  previously as they relate to these depositions,
24  including the -- and, again, this one was on
25  behalf of myself and Mr. MacFadyen the last time,

Page 8

1   Mr. O'Brien this time, we had a general relevancy
2   objection to the deposition in its entirety unless
3   and until the matter is connected to either of our
4   clients.
5          So having said that, and subject to
6   whatever anybody else has to say, we are prepared
7   to proceed.
8          (Whereupon, Defendant's Exhibit A was
9   marked.)
10         MR. O'BRIEN:  I do want to make the
11  point on behalf of ███████that I join in
12  that objection also.  It is my understanding that
13  we are not waiving objections in substance.
14         MR. VILKER:  Okay.  As far as what Mr.
15  Traini just said, the government does agree -- the
16  government does agree that an objection by one
17  counsel will be considered an objection by all
18  counsel.
19         As far as the other objections raised, I
20  believe the government responded to those in the
21  prior depositions and we would just incorporate
22  our responses to your objections in this
23  deposition.
24         MR. TRAINI:  Mr. Vilker, just one last
25  thing.  I believe I heard, unless I heard -- and

Page 9

1   Ms. Dafoulas can go back and look at the
2   transcript for us -- but when Ms. Glover was
3   announcing the proceeding at the beginning
4   deposition, I think she said this deposition was
5   taken for grand jury purposes.
6          MR. VILKER:  The name of the -- the
7   court's order, the caption in which these
8   depositions were -- were authorized was in re
9   grand jury proceedings.
10         MR. TRAINI:  Right.
11         MR. VILKER:  It was under that.  That's
12  not to mean that these -- these depositions will
13  be used in grand jury and, in fact, they are for
14  trial testimony.
15         MR. TRAINI:  I understand.  I just want
16  to make sure that was -- that was clear.
17         MR. VILKER:  Okay.
18         MR. TRAINI:  Okay.
19         MR. VILKER:  Good morning, Mr. Mizzoni.
20         ROBERT MIZZONI,
21  having been first duly sworn, was deposed and
22  testified as follows:
23         COURT REPORTER:  Would you state your
24  name, please.
25         THE WITNESS:  Robert Mizzoni.

3 (Pages 6 to 9)

1          COURT REPORTER: Please spell your last
2   name.
3          THE WITNESS: M-I-Z-Z-O-N-I.
4                    EXAMINATION
5   BY MR. VILKER:
6       Q.  Good morning, Mr. Mizzoni.
7       A.  Good morning.
8       Q.  My name again is Lee Vilker; I'm with
9   the United States Attorney's Office for the
10  District of Rhode Island.
11         Mr. Mizzoni, do you understand that you have
12  been put under oath and have sworn to tell the
13  truth, the whole truth and nothing but the truth?
14      A.  Right.
15      Q.  Okay.  Mr. Mizzoni, I understand you may
16  have -- you have some hearing difficulties.  If I
17  ask any question that you can't hear or can't
18  understand, just please let me know and -- and
19  I'll repeat it or rephrase it.
20      A.  That's like usually in court.  That's
21  all.
22      Q.  Yes.  Yes.
23      A.  It makes it easier.
24      Q.  Right.  If there's something -- if
25  there's something I say or any of the other

1   attorneys say that you can't hear or understand --
2       A.  Right.
3       Q.  -- let us know and we'll repeat it.
4       A.  Okay.  I'll do that.
5       Q.  And if you could also wait until the
6   question is finished before you provide your
7   answer, it will just make the record --
8       A.  Okay.
9       Q.  -- much, much easier for the court
10  reporter.
11      A.  Okay.
12      Q.  Mr. Mizzoni, how old are you now?
13      A.  I'll be 86 next month.
14      Q.  And -- and where do you currently live?
15  Where do you currently live?
16      A.  Cranston.  16 Winton Street.
17      Q.  That's -- do you currently -- are we
18  right now in -- in Manville, Rhode Island?
19      A.  Manville, Rhode Island, right.
20      Q.  And is the address where we are at now,
21  400 New River Road?
22      A.  Right.
23      Q.  Where did you live before moving to --
24  to this address in Manville, Rhode Island?
25      A.  I was in 16 Winton Street, Cranston,

1   Rhode Island.
2       Q.  Okay.  And -- and approximately how long
3   have you lived in this location?
4       A.  Here?
5       Q.  Yes.
6       A.  Two years.
7       Q.  And how long did you live in the -- the
8   address in Cranston?
9       A.  Five.
10      Q.  Are you -- are you married, Mr. Mizzoni?
11      A.  Yes.
12      Q.  And what is your wife's name?
13      A.  Elizabeth Mizzoni.
14      Q.  Do you have children?
15      A.  I got one.
16      Q.  And a boy or a girl?
17      A.  A good boy.
18      Q.  And how old is he?
19      A.  He's -- he's going to be 32 this week.
20      Q.  Okay.  And are you working now,
21  Mr. Mizzoni?
22      A.  Me?  I can't work.
23      Q.  You are retired?
24      A.  I'm a diabetic.  I can't work no more.
25      Q.  For how long have you been retired?

1       A.  I would say 12 years.
2       Q.  And what was your occupation before you
3   retired about 12 years ago?
4       A.  Truck driver.
5       Q.  A truck driver?
6       A.  Truck driver.
7       Q.  And were you a truck driver your entire
8   career?
9       A.  I was with the Teamsters.  I was a
10  Teamster.
11      Q.  You're a Teamster?  Okay.
12      A.  Then I went to work for the State of
13  Rhode Island, Department of Children and Their
14  Families.
15      Q.  And what did you do for -- for DCYF?
16      A.  I started off as a bus driver.  That's
17  how I got the job.  Then I became property control
18  and supply.
19      Q.  Now, Mr. Mizzoni, do you suffer from a
20  number of physical ailments?
21      A.  Do I have any physical ailments?
22      Q.  Yes.
23      A.  I started off with the arteries and when
24  I got there in the hospital, they found me with
25  the -- my heart, had to put stents to keep the

Page 14

1    blood flowing, you know, to keep it flowing right
2    and since they done the job, so far I'm -- I'm
3    pretty good.
4        Q.  Okay.  And do you also -- you mentioned
5    before that you have diabetes?
6        A.  Yes.  I became a diabetic.
7        Q.  Okay.  How long have you been a
8    diabetic?
9        A.  Eight years.
10       Q.  Now, without going through each one, are
11   you on some medications now?
12       A.  Yes.
13       Q.  Do any of the medications that you are
14   taking affect your ability to understand the
15   questions that I'm asking you?
16       A.  If they affected me?  Why -- the
17   medicine?
18       Q.  Yes.  Can you understand what I'm
19   asking?
20       A.  Yeah, I understand what you're saying.
21       Q.  Okay.  Can you understand what's
22   happening today here?
23       A.  I'm going to try.
24       Q.  Okay.  Now, do you know an individual
25   named Joseph Caramadre?

Page 15

1        A.  Yes.
2        Q.  And, in fact, do you see Mr. Caramadre
3    here today?
4        A.  Yes, he is.
5        Q.  And can you --
6        A.  Right there.
7        Q.  -- point to him?
8        A.  Joe.
9        Q.  You know him as Joe?
10       A.  Joe.
11           MR. VILKER:  Okay.  If the record could
12   please reflect that the witness has identified
13   Mr. Caramadre.
14       Q.  For how long have you known Joseph
15   Caramadre?
16       A.  From when they were little kids.  They
17   come -- I used to take them to the school bus.
18   Five children, all from his family.
19       Q.  So you would take Mr. Caramadre and four
20   of his siblings --
21       A.  Right.
22       Q.  -- on the school bus?
23       A.  Yeah, on the school bus, take them to
24   church -- to school, the Catholic school, St.
25   Mary's.

Page 16

1        Q.  Okay.  He went to St. Mary's School?
2        A.  They went to St. Mary's, yeah.
3        Q.  And where is Saint -- St. Mary's School
4    located?
5        A.  St. Mary's is down by the cemetery.
6        Q.  In what city?
7        A.  It's Cranston.
8        Q.  Cranston.  Okay.  Now, do you know
9    Mr. Caramadre -- Joseph Caramadre's parents?
10       A.  Do I know the parents?
11       Q.  Yes.
12       A.  Yes, I do.
13       Q.  And how do you know his parents?
14       A.  Well, when they came from the old
15   country, his father was working for the state too
16   but his father was, you know, a good man and his
17   mother was a good man too -- a good woman, and I
18   asked him -- we met in church, okay?
19       Q.  Okay.
20       A.  We met in church because I was an usher
21   in St. Mary's Church for 11 years so that's how I
22   got to know the family real well, you know.
23       Q.  Would you consider yourself to have been
24   friends with the Caramadre family?
25       A.  I was friends with Joe because that's

Page 17

1    how I knew him, you know, through the -- the --
2    Joe, through the parents.  I got to know Joe good.
3        Q.  Okay.  Did you, in fact, attend Joseph
4    Caramadre's wedding?
5        A.  I think so.  I don't remember.  But I
6    think I did go.
7        Q.  Okay.
8        A.  My wife and I.
9        Q.  Did Mr. Caramadre, Joseph Caramadre, at
10   any point, perform any kind of accounting work for
11   you?
12       A.  Counsel work?
13       Q.  Accounting.
14       A.  Yes.
15       Q.  What -- what did he do for you?
16       A.  He handled my social -- not the -- the
17   income tax papers.
18       Q.  Okay.  And how many years ago
19   approximately did he do your tax returns?
20       A.  Christ, I would say 20 years, 35 years.
21       Q.  Okay.  Now, I want to turn your
22   attention to 2004, about five years ago.  Where
23   was your wife Elizabeth working at that time?
24       A.  St. Mary's School.
25       Q.  And what was her position there?

Page 18

1      A.   Principal.
2      Q.   And do you know whether Joseph
3   Caramadre's children attended St. Mary's School?
4      A.   Yes, they did.
5      Q.   Now, do you recall having a conversation
6   with Joseph Caramadre in 2004 at the school
7   concerning a way in which you could make some
8   money?
9      A.   Receive some money?
10     Q.   A way in which you could make some
11  money.
12     A.   No.
13     Q.   Okay.
14     A.   At that time, no.
15     Q.   Okay.  But did there come a time in
16  which you had a conversation with Mr. Caramadre?
17     A.   Yes.
18     Q.   Okay.  And where did -- do you remember
19  where this conversation took place?
20     A.   Well, the day I was away, he talked to
21  my wife first, okay, that he wanted to talk to me.
22  He says -- he told my wife, tell Bob I want to
23  talk to him.  That's how I got to go with him.
24     Q.   Okay.  And then did you yourself speak
25  to Mr. Caramadre?

Page 19

1      A.   What's that?
2      Q.   Did you then speak to Joseph Caramadre?
3      A.   Yeah.
4      Q.   Okay.  And what did he tell you?
5      A.   He told me opportunities could happen,
6   come to my office; I got -- I got something for
7   you.  So I went.
8      Q.   Okay.  And did he -- did he say at all
9   what that opportunity was?
10     A.   The opportunity -- he didn't say -- just
11  told me everything is legal, don't -- not to
12  worry, and I did.
13     Q.   So he told you there was some
14  opportunity for you to make money?
15     A.   Yeah.  Right.
16          MR. FLANDERS:  Objection.  Leading.
17  BY MR. VILKER:
18     Q.   Okay.  Was it -- was it your
19  understanding that Mr. Caramadre was offering you
20  an opportunity to make some money?
21          MR. FLANDERS:  Objection.  Leading.
22          MR. VILKER:  You can answer.
23     A.   Yeah.
24     Q.   Did Mr. Caramadre -- well, what, if
25  anything, did Mr. Caramadre say to you about an

Page 20

1   opportunity that you would have to make money?
2      A.   Opportunity.  Opportunity.  In other
3   words, how I'm going to get the opportunity to
4   grab -- get money from him, from Joe, okay?  And
5   it would happen as I go along.  In other words,
6   from month to month, whatever it was going to be.
7      Q.   Okay.
8      A.   But that was -- that was -- to be
9   honest, he -- I went to his office, the day I came
10  to his office, he gave me a check for $2000.
11     Q.   Okay.
12     A.   That was it.
13     Q.   Okay.  So I want to -- shortly after
14  that first conversation with Mr. Caramadre, did
15  you, in fact, go to his office?
16     A.   I didn't go there the same week.
17     Q.   Okay.
18     A.   I wait for a phone call --
19     Q.   Okay.
20     A.   -- which I did.  I waited for the phone
21  call.  Then I went to the office.
22     Q.   Okay.
23     A.   He worked in the -- the Calart's --
24  Calart's Flower Shop on Reservoir Avenue.
25     Q.   Okay.

Page 21

1      A.   And I went there and when I went in,
2   there was a secretary, his brother -- his brother
3   used to work there too -- and they gave me a check
4   for $2000 and I went.  That was it.
5      Q.   Okay.  When Mr. Caramadre gave you the
6   check for $2000, was anybody else in the room
7   besides you and Mr. Caramadre?
8      A.   There was a couple of people.  There was
9   a secretary, his -- his secretary took it when I
10  walked in, his brother John worked there.
11     Q.   Okay.
12     A.   And there was another woman.  I don't
13  know -- I don't know the other name.
14     Q.   Okay.  And approximately how long did
15  this whole meeting last in Mr. Caramadre's office?
16     A.   I would say about 10, 15 minutes or so.
17     Q.   Okay.  Now, what, if anything, did
18  Joseph Caramadre say to you about the reason he
19  was giving you a $2000 check?
20     A.   He didn't say nothing.
21          MR. TRAINI:  Objection.
22     A.   He just gave me the 2000.
23     Q.   Okay.
24     A.   He says there's more to come.
25     Q.   Okay.

Page 22

1    A.   That's -- that's what I did, listened to
2    what he told me.
3    Q.   Okay.  Did he explain to you any -- any
4    reason why he was giving you $2000?
5    A.   No.
6         MR. TRAINI:  Objection.
7    A.   I didn't know nothing.  I never ask
8    questions anyway.
9    Q.   And did he, in fact, give you a check
10   for $2000?
11   A.   2000.  He asked me if I want to --
12        MR. TRAINI:  Objection.
13   A.   -- to give half to my wife.  I said,
14   well, I'm going to give her half.
15   Q.   Okay.
16   A.   It was a thousand for me, a thousand for
17   her.
18   Q.   But what was the total amount that he
19   gave you that day?
20   A.   2000.
21   Q.   And did you -- did you deposit that
22   check into your bank account?
23   A.   Yes, it went to the bank account.
24   Q.   Now, do you recall that day that he gave
25   you the $2000 whether he asked you to sign any

Page 23

1    documentation?
2         MR. TRAINI:  Objection.
3    A.   I didn't sign nothing.  I got the check
4    and off I went.
5    Q.   You don't recall -- you don't believe
6    you signed any documents that day?
7         MR. FLANDERS:  Objection.  Leading.
8    A.   I didn't sign nothing.
9    Q.   Let me just rephrase it then.  Did you
10   sign any documents that day?
11        MR. O'BRIEN:  Objection.
12   A.   Did I sign any documents?  No.  Because
13   I know him well, so I figure what's the sense of
14   me signing a document?
15        MR. TRAINI:  Objection.  Move to strike.
16   Q.   Okay.  Now, that day in Mr. Caramadre's
17   office, when he gave you the $2000, what, if
18   anything, did Mr. Caramadre say to you about an
19   annuity?
20        MR. TRAINI:  Objection.
21   A.   Nothing, nothing about annuity.
22   Q.   Okay.  What, if anything, did
23   Mr. Caramadre tell you about him opening up any
24   kind of contract using your name?
25        MR. TRAINI:  Objection.

Page 24

1    A.   He didn't tell me nothing about that.
2    Q.   Okay.
3    A.   I just got the check and off I went.
4    Q.   Okay.  What consent, if any, did you
5    give Mr. Caramadre to open up an annuity in your
6    name?
7    A.   What consent?  Who gave it to him?  I
8    didn't give it to him.
9    Q.   What consent, if any, did you give to
10   Joseph Caramadre to use your date of birth or
11   social security number on any annuity?
12   A.   Well, I didn't get -- I don't know how
13   he got the social security number.  Because the
14   only way he could get that, when he filed my
15   income taxes, my social security number was there.
16   Q.   Okay.
17   A.   He had copies of the papers.
18        MR. TRAINI:  Objection.  Move to strike.
19   Q.   That day when you met with
20   Mr. Caramadre, did he ask you that day what your
21   social security number was?
22        MR. TRAINI:  Objection.  Leading.
23   A.   He never asked me that, nothing.  I just
24   got the check and off I went.
25   Q.   Okay.

Page 25

1    A.   To get my social security number, I
2    don't know how he got it and -- and what -- what
3    it was going to be used for.  I don't know.
4         MR. TRAINI:  Objection.  Move to strike.
5    A.   So I just waxed his car, went out and I
6    waxed his car.  He had a car.  I waxed it for him
7    and I took it off and when the car was finished, I
8    took it back to him.  That was the end of that.
9    Then I didn't hear no more from Joe.
10   Q.   You waxed -- did you say you waxed his
11   car that day?
12   A.   Not that day, the -- the following day
13   or the following week.
14   Q.   And how -- how did that come about?
15   A.   Well, he wanted to have the car cleaned.
16   I used to clean cars on the side, okay?
17   Q.   Okay.
18   A.   I -- I used to work at the state and on
19   days that, you know, slow days, I used to wax cars
20   in the garage, my garage.
21   Q.   Okay.
22   A.   And I had it done for him, you know.
23   Q.   Okay.  Did Mr. Caramadre ask you to wax
24   his car?
25   A.   Yeah.  He -- he called me up, he says,

Vivian S. Dafoulas & Associates
(401) 885-0992

Page 26

1  "You want to wax my car?" I says, "Yeah, okay."
2  So he says, "Come and get it," and I did.
3      Q.   And did -- did he pay you for waxing his
4  car?
5          MR. TRAINI:  Objection.
6      A.   Yes.
7      Q.   And do you recall how much you received
8  for waxing his car?
9      A.   I think 50 bucks.
10     Q.   Now, you testified that -- that years
11 before this, Mr. Caramadre had completed your tax
12 returns?
13     A.   Do my tax returns?
14     Q.   Right.
15     A.   He did them, yes.
16     Q.   Okay.  This is -- this was before the
17 day that he gave you the $2000?
18     A.   No.  No.
19     Q.   Okay.  Well, how many years ago did
20 Mr. Caramadre do your -- your taxes?
21     A.   My taxes?  Every year.
22     Q.   Okay.  But was this -- when was the last
23 time he had done the taxes?
24     A.   Maybe 2004.
25     Q.   He had done your 2004 taxes you believe?

Page 27

1      A.   Maybe, yeah.
2      Q.   Okay.
3      A.   Some time like that.  Whatever it was,
4  you know --
5      Q.   Okay.
6      A.   -- it was done.  He took care of them
7  all the time.
8      Q.   Okay.  Now, I want to show you a
9  document that I've marked as Government Exhibit 1.
10     A.   I got to wear my glasses.  Excuse me.
11         ( P A U S E )
12     A.   What's this?  Contract owner, Caramadre.
13 What -- what is it?
14     Q.   Well, Mr. Mizzoni, this document is
15 titled at the top, America's MarketFlex Annuity
16 Application and there's the name of an insurance
17 company --
18     A.   Nationwide.
19     Q.   -- Nationwide Life Insurance Company.
20 Prior to meeting with the government a couple of
21 days ago, had you ever seen this document before?
22     A.   No.  Never.  I don't even know what this
23 is.
24     Q.   Do you -- do you see your handwriting
25 anywhere on this document?

Page 28

1      A.   Huh?
2      Q.   Do you see your handwriting anywhere on
3  this document?
4      A.   No, not on this.
5      Q.   Now, did Mr. Caramadre ever show you an
6  application for an annuity?
7      A.   No.
8      Q.   Did he ever discuss with you an
9  application for an annuity?
10         MR. TRAINI:  Objection.
11     A.   No.  I had -- I had an insurance with
12 a -- a company that he sold me insurance was -- I
13 don't even remember -- my wife knows the name.
14 What's the name of that insurance?
15         MR. VILKER:  If I could just stop you
16 there, Mr. Mizzoni.  You can't ask your wife
17 questions --
18         THE WITNESS:  Okay.
19         MR. VILKER:  -- in the middle of a
20 deposition.
21     Q.   At a prior point, did you purchase an
22 insurance policy from Mr. Caramadre?
23     A.   I bought one, one insurance policy
24 through him.
25     Q.   Now --

Page 29

1      A.   Joe made me stop -- stop the John
2  Hancock, and I turned around and bought this
3  Nationwide, whatever you call it.
4      Q.   Okay.
5      A.   And I went to the office up there one
6  day.  I had to sign a paper up -- I'm going back
7  quite a few years now --
8      Q.   Okay.
9      A.   -- on Jefferson Boulevard, okay?
10     Q.   Okay.
11     A.   The building where he was working.  He
12 had his office up there.  So I went up there, I
13 signed the -- signed the paper for the insurance
14 company, and he said he was going to come to my
15 house which he did.  Everything -- everything was
16 working fine then.
17     Q.   Okay.
18     A.   There was no trouble at all, you know.
19 Now I see this.  I said what the hell, they're
20 selling my body?  I mean I don't believe in this.
21     Q.   Just to make it clear, is it your
22 testimony that a long time before any of this
23 happened, Mr. Caramadre had sold you another life
24 insurance policy?
25         MR. FLANDERS:  Objection.

8 (Pages 26 to 29)

Page 30

```
1       A.  He sold me, yes, another policy.
2       Q.  Okay.  Now, if you -- if you look at
3   the -- the part of the first page of this document
4   which says "Contract Owner," do you see the name
5   of Joseph Caramadre as the owner of this account
6   contract?
7           MR. TRAINI:  Objection.
8       A.  I never seen this one.  That's what I'm
9   saying.
10      Q.  But if you look at it now, do you see
11  Mr. Caramadre's name as the contract owner?
12          MR. TRAINI:  Objection.
13      Q.  If I could just point to the right
14  place.  I'm pointing to the -- to the -- the
15  letters --
16      A.  Yeah, his name is right there.
17      Q.  -- the letters under Contract Owner.
18      A.  I never seen this.  That's what I say.
19          MR. TRAINI:  Excuse me, Mr. Vilker.  I
20  just want to make sure my objection is clear so I
21  don't have to keep making it.  I'm objecting on
22  the grounds that the document --
23          THE WITNESS:  Then way down below --
24          MR. TRAINI:  -- isn't in evidence.
25          MR. VILKER:  If you could just wait one
```

Page 31

```
1   second, Mr. Mizzoni.
2           MR. TRAINI:  And the document has never
3   been identified by the deponent, and so you're
4   actually -- you are testifying from a document
5   that's not in evidence and hasn't been identified
6   by anybody.  That's my objection.
7           MR. VILKER:  Okay.  I understand that.
8   BY MR. VILKER:
9       Q.  Now, Mr. Mizzoni, do you see the next
10  section below Mr. Caramadre's name where it says
11  "Annuitant" in black?  And again let me point it
12  out to you if you're having trouble reading it.
13      A.  Yeah.
14      Q.  Do you see your name under that of
15  Robert J. Mizzoni?
16      A.  Yeah, that's my name but I never
17  signed -- I never write it that way.  It's not my
18  writing.
19      Q.  Now, do you see under your name there's
20  an address and there's one address that's --
21  that's crossed out; do you see that?
22      A.  Yes.  That was Winton Street, 16 Winton
23  Street.
24      Q.  Right.  And do you know what -- did you
25  ever live at 16 Winton Street?
```

Page 32

```
1       A.  Did I live on that street?
2       Q.  Yes.
3       A.  Yes.  I had my home in there --
4       Q.  Okay.  Is that where you were living in
5   2004?
6       A.  -- before I bought this house.
7       Q.  Now, next to the address that's crossed
8   out is 459 Budlong Road?
9       A.  Right.
10      Q.  Okay.
11      A.  459 Budlong Road?  I didn't live on
12  Budlong -- Budlong Road.
13      Q.  You never lived on Budlong Road?
14      A.  No.
15      Q.  Did you ever have your mail sent there?
16      A.  Not that I know of.  I never got any
17  mail there.  Why would I want to send mail to
18  Budlong Road when I didn't live there?
19      Q.  Did you ever tell Joseph Caramadre that
20  you lived on Budlong Road?
21      A.  No.  Joe lived there, not me.
22      Q.  Joe, Joe Caramadre lived there?
23      A.  When they were kids, yeah.
24      Q.  Do you know if that's the house of
25  Joseph Caramadre's parents?
```

Page 33

```
1       A.  Yeah, right.
2       Q.  Now, do you see under the -- the address
3   is a date of birth 11/15/23.  Is that your date of
4   birth?
5       A.  Yep.
6       Q.  And below that is a social security
7   number that ends with the digits 8173?
8       A.  8173, yeah.
9       Q.  Is that your social security number?
10      A.  Yeah.
11      Q.  The date that Mr. Caramadre -- just let
12  me finish the question -- the date that
13  Mr. Caramadre gave you the $2000 --
14      A.  Yeah.
15      Q.  -- did he ask you on that occasion what
16  your date of birth was?
17      A.  No.
18      Q.  On the date that Mr. Caramadre gave you
19  the $2000, did he ask you what your social
20  security number was?
21      A.  No.
22      Q.  Okay.  Now, do you see the next section
23  that's -- that's entitled "Beneficiary"?
24      A.  Yeah.  I'm trying to find out who it is.
25  It's his wife or his girl -- or his sister.
```

Vivian S. Dafoulas & Associates
(401) 885-0992

Page 34

1    Q.  Do you see the name Paula Caramadre?
2    A.  Yeah.
3    Q.  And you're not sure if Paula Caramadre
4  means his -- his wife or his sister?
5    A.  Either one.  I don't know who they are.
6    Q.  Okay.
7    A.  I know his sister by the name of Paula.
8    Q.  Okay.  Now, what, if anything, did
9  Joseph Caramadre tell you about applying for any
10  kind of annuity in your name in which Paula
11  Caramadre would be the beneficiary?
12    A.  Never.
13       MR. FLANDERS:  Objection.
14       MR. TRAINI:  Objection.
15    A.  Never.  Nobody ever told me nothing.
16    Q.  Did you have -- what understanding did
17  you have of whether there would be an annuity
18  applied for in which you would be the annuitant
19  and Paula Caramadre would be the beneficiary?
20       MR. TRAINI:  Objection.
21    A.  Why would it be -- why wouldn't my name
22  go there or my wife's name?  That's what I'm
23  trying to find out, why it's all -- it's all done
24  like this.  To me, this is not -- not right.
25       MR. TRAINI:  Move to strike.

Page 35

1    Q.  Now, if you could turn to the fourth
2  page of this document.
3    A.  Fourth page?
4    Q.  Yes.  It's the next to the last page.
5    A.  Yes.  Next to the last.  This one here?
6    Q.  No.  The one before that.  Let me
7  just --
8    A.  There we are.
9    Q.  Yes, that's the page.  Do you see the
10  bottom section that's titled Registered
11  Representative Information?  Let me -- again let
12  me just point to it.
13    A.  Yes.  That's what I'm looking at.
14       MR. TRAINI:  Objection.
15    Q.  Do you see a name next -- next to the
16  word "Name" it says, "Edward L. Maggiacomo, Jr."?
17       MR. TRAINI:  Objection.
18    A.  No, I didn't even know who he was.
19    Q.  My question was, do you see on this
20  document --
21    A.  Yes.
22    Q.  -- the name Edward Maggiacomo, Jr.?
23       MR. TRAINI:  Objection.
24    A.  Where he got this here, I don't know.
25    Q.  Okay.  Well, let me just ask you the

Page 36

1  next question then.  Do you know who Edward
2  Maggiacomo, Jr. is?
3    A.  Who he is?
4    Q.  Yes.
5    A.  He used to have the bank.  I don't know
6  if it was him or his father had the bank on
7  Cranston Street.  Then they closed up, they went
8  broke.
9       MR. TRAINI:  Objection.  Move to strike.
10    A.  The building is still standing.
11    Q.  Okay.  So you know of the Maggiacomo
12  family?
13    A.  No.
14       MR. TRAINI:  Objection.
15    A.  No.  I do not know the Maggiacomo
16  family.
17    Q.  Have you ever spoken with Edward
18  Maggiacomo?
19    A.  No, I never did.
20    Q.  Do you see the firm name LifeMark
21  Securities under Mr. Maggiacomo's name?
22       MR. TRAINI:  Objection.
23    Q.  Again, let me just point it out to you.
24  This here.
25    A.  Life Work?

Page 37

1    Q.  LifeMark Securities.
2    A.  Life Work Securities, what's that?
3    Q.  Okay.  Did you ever, to your knowledge,
4  speak with anyone from LifeMark or Life Work
5  Securities Corporation?
6    A.  No.
7    Q.  Okay.  Did you ever speak with
8  Mr. Maggiacomo about any kind of annuity?
9    A.  No, I never -- I told you I didn't know
10  who the guy was.  Who wants to talk to a guy if
11  you don't know them, you know.
12       MR. VILKER:  Okay.
13       MR. TRAINI:  Move to strike.
14    Q.  Now, if you can turn to the -- the next
15  page, the last page.
16    A.  The next page.  This?  Okay, this one.
17    Q.  Yes, that's the right page.  Now, if you
18  can look inside, do you see a big box in the
19  middle of the page?
20    A.  Yeah.  Where it says Highway -- Highest
21  Anniversary?
22    Q.  Right.  Do you see a box that's checked
23  that reads:  "Highest Anniversary or 5 percent
24  Death Benefit Rider"?
25    A.  Yeah.

10 (Pages 34 to 37)

Page 38

1      Q.  Okay.
2      A.  I never seen this anyway.
3      Q.  Well, what, if anything, did
4   Mr. Caramadre tell you about him obtaining any
5   kind of death benefit upon your death?
6          MR. TRAINI:  Objection.
7      A.  He never did.  No one ever talked to me
8   about death benefit.  Nobody.
9      Q.  What, if anything, did Mr. Caramadre
10  tell you about him or Paula Caramadre receiving
11  any kind of benefit upon your death?
12         MR. TRAINI:  Objection.
13     A.  Nobody.  Not a soul.
14     Q.  They didn't say anything to you about
15  that?
16     A.  No.
17     Q.  Now, at the time that you accepted the
18  $2000 from Mr. Caramadre, did you believe that
19  Mr. Caramadre stood to make any amount of money?
20         MR. TRAINI:  Objection.
21     A.  Well, I believed him because he says
22  he's going to give me money as -- as it comes once
23  a month.
24         MR. TRAINI:  Move to strike.
25     A.  By the month, he says, you're going to

Page 39

1   be upgraded yourself.
2      Q.  Okay.  So what, if anything, did
3   Mr. Caramadre say to you about you getting any
4   additional money beyond the $2000?
5          MR. TRAINI:  Objection.
6      A.  I don't remember nothing like that.
7      Q.  What, if anything, did Mr. Caramadre say
8   to you about you receiving monthly payments?
9          MR. TRAINI:  Objection.
10         MR. FLANDERS:  Objection.
11     A.  That's the only thing he told me.  I
12  will receive money, you know.  He didn't say how
13  much, what the amount was going to be or was it
14  going to be maybe 2000 or 1000.  I don't know.
15  But he says he's going to give me money.  I said
16  okay.  I went along with him.  You know, I'd known
17  him as a good friend.  Why -- why would I want to
18  lie, you know?
19     Q.  Now, as you left -- as you left
20  Mr. Caramadre's office --
21     A.  Yeah.
22     Q.  -- that day in 2004, what did you expect
23  to happen as far as any future payments you would
24  receive?
25         MR. TRAINI:  Objection.

Page 40

1      A.  You got me -- you got me over a barrel
2   on that one.
3      Q.  You didn't know?
4      A.  Didn't know, no, of course not.
5      Q.  Did you ever receive -- after that
6   $2000, did you ever receive any additional money
7   from Joseph Caramadre?
8      A.  No, I didn't receive any more money.
9      Q.  Okay.  Have you heard from Joseph
10  Caramadre?
11     A.  No.  I haven't seen -- when I met him --
12  the only time I used to see him is when he comes
13  to church.  If he didn't come to church, I
14  wouldn't see him.  And he went to a different
15  church.
16         MR. VILKER:  I have no more questions.
17         THE WITNESS:  Okay.
18         MR. VILKER:  At this point, I'm going to
19  switch seats with one of -- I don't know who's
20  going to go first.  I'm going to switch seats with
21  Mr. Flanders --
22         THE WITNESS:  Okay.  Whatever.
23         MR. VILKER:  -- and he's going to ask
24  you --
25         MR. FLANDERS:  I'd like to just question

Page 41

1   him from here --
2          MR. VILKER:  Oh, sure.  I guess I'm not
3   switching seats.
4          MR. FLANDERS:  -- unless -- unless he
5   can't hear me from here.
6          MR. VILKER:  It might be difficult.
7              EXAMINATION
8   BY MR. FLANDERS:
9      Q.  Good morning, Mr. Mizzoni.
10     A.  Good morning.  Good morning.
11     Q.  Can you hear me all right?
12     A.  I can hear but speak just the way you
13  are doing it now so I can hear you.
14     Q.  If you -- if you don't hear me, just let
15  me know.
16     A.  I'll go like this.
17     Q.  Please.  All right.  Now, you testified
18  earlier, when Mr. Vilker was questioning you, that
19  you've known Joe and his family for many years, is
20  that right?
21     A.  Right.
22     Q.  Did you stay in contact with Joe after
23  he graduated from St. Mary's School?
24     A.  Him?
25     Q.  Yes.

11 (Pages 38 to 41)

Vivian S. Dafoulas & Associates
(401) 885-0992

Page 42

1    A.  No.  He -- he became a lawyer.
2    Q.  Right.
3    A.  He became a lawyer.
4    Q.  But did you still continue your
5  relationship with Joe?
6    A.  Oh, when I seen him in church, yeah.
7    Q.  But didn't you tell us that you went to
8  him from time to time to provide tax services?
9    A.  Yeah, right.  He used to do my taxes.
10    Q.  Right.  And did you go to him to seek
11  financial and legal advice from time to time?
12    A.  When I needed it.  If I needed it, yeah.
13    Q.  Okay.  And did you, in fact, need to get
14  financial advice and legal advice from time to
15  time from Joe?
16    A.  Legal advice for what?
17    Q.  Well, any -- any kind of advice.
18    A.  No.
19    Q.  Did you talk to him about getting
20  advice?
21    A.  No.
22    Q.  Okay.
23    A.  If I needed it, I would have told him.
24    Q.  All right.  And were there occasions
25  when you did, in fact, meet with him to get advice

Page 43

1  on various matters?
2    A.  No, the only thing he told me -- he used
3  to advise me when he was doing my taxes if I'm
4  doing it right or wrong.  That's the only thing.
5    Q.  Didn't Joe assist you in -- when you and
6  your wife Elizabeth purchased your first home?
7    A.  Yes.
8    Q.  So you went to him on that occasion,
9  didn't you?
10    A.  On that occasion.
11    Q.  All right.  And you recall him assisting
12  you in securing a mortgage for your first house?
13    A.  Yes.
14    Q.  Okay.  And did he help you with
15  refinancing that house and getting a new mortgage?
16    A.  A new mortgage?
17    Q.  Yes.
18    A.  I got the mortgage when we first got
19  that house.
20    Q.  Okay.  But when you -- you bought other
21  houses besides that one?
22    A.  Yeah.
23    Q.  And did Joe help you get other mortgages
24  when you requested him?
25    A.  We didn't have to.  We didn't need him

Page 44

1  at that time, not when you buy a second -- I
2  bought three houses one after another.  I didn't
3  need him or anybody else.  I didn't need nobody
4  else when I bought the house, the banks.
5    Q.  My question, Mr. Mizzoni, is did you go
6  to Mr. Caramadre and ask him --
7    A.  No.
8    Q.  -- to help you to get mortgage
9  financing?
10    A.  No, I didn't need him.
11    Q.  Did he help you on the first house?
12    A.  Just the first house.
13    Q.  All right.  So that's one occasion that
14  you went to him for some help and advice, right?
15    A.  No, because he used to come to my house
16  to do my taxes and he says to me if I need you,
17  I'll call you -- call me.  That's all what he says
18  to me.
19    Q.  All right.  And did you need him to help
20  you get a mortgage?
21    A.  No.  At the time he got the mortgage,
22  yeah, he got it for me.
23    Q.  Okay.  You asked him to do that --
24    A.  Yeah, I asked him.
25    Q.  -- right?  And -- and you also told us

Page 45

1  that -- that you bought life insurance through
2  him?
3    A.  I bought an insurance policy off him
4  when he was working for some company.  I even
5  forget the name.
6    Q.  And he prepared income tax returns for
7  you and your wife?
8    A.  All the time.
9    Q.  For years and years, is that right?
10    A.  Yeah.
11    Q.  And how much did Joe charge you to
12  prepare the income tax returns?
13    A.  Nothing.
14    Q.  Never charged you a dime?
15    A.  No.
16    Q.  How much did he charge you to get the
17  mortgage for you for your first house?
18    A.  I don't remember the price.
19    Q.  Did he -- did you pay him any money?
20    A.  No.
21    Q.  Why -- why do you think he never charged
22  you for doing your taxes?
23    MR. VILKER:  Objection.
24    A.  I don't know why.  You're asking a
25  question that I -- I -- how can you -- how can you

12 (Pages 42 to 45)

Page 46

1  answer a question that you don't know, never heard
2  of?
3      MR. VILKER:  That's my objection.
4  BY MR. FLANDERS:
5      Q.  Did -- did you and Mrs. Mizzoni trust
6  Joe to do the right job?
7      A.  Well, sure, because we had known him
8  since he was this high.
9      Q.  All right.  And he was -- he was someone
10 that was a trusted friend of yours?
11     A.  Of course.  I figure he was a good
12 friend.
13     Q.  All right.  Was he someone you could
14 rely on?
15     A.  At that time, yeah.
16     Q.  And is it -- is it fair to say that you
17 also went to him on occasions for financial
18 advice?
19     A.  For what?
20     Q.  For any kind of financial advice?
21     A.  No.
22     Q.  All right.  Do you remember that there
23 came a time when you and your wife separated?
24     A.  Yeah.
25     Q.  And you -- did you go to Joe about

Page 47

1  advice concerning that situation?
2      A.  He didn't want to have nothing to do
3  with it.
4      Q.  But you did go to him to talk to him
5  about it?
6      A.  What?
7      Q.  You did go and see him?
8      A.  Yeah, I went to see him.  Something
9  about the -- he asked me how come you separated.
10 Do you need anything?  Didn't need nothing at that
11 time.
12     Q.  Okay.  But he offered you friendship at
13 that time?
14     A.  At that time, yeah.
15     Q.  Was he -- was that something that was
16 helpful to you?
17     A.  At that time, yeah.  It would have been
18 helpful.  I went one way, my wife went the other
19 way.
20     Q.  And did you, in fact, during the
21 separation from Elizabeth, ask Joe to change the
22 beneficiary on your life insurance?
23     A.  Not that I've heard.  I don't think so.
24     Q.  You don't remember --
25     A.  No.

Page 48

1      Q.  -- you had a Midland Life Insurance
2  policy --
3      A.  No.
4      Q.  -- where you asked him to change the
5  beneficiary?
6      A.  The only -- the only insurance policy we
7  got was the big one, the one that was going to --
8  my -- my beneficiary would have been my wife all
9  the way through no matter what; okay?
10     MR. FLANDERS:  I'm going to have this
11 marked as Defense Exhibit 1 -- Defense Exhibit B.
12 Showing this to Mr. Vilker.
13     (Whereupon, Defendant's Exhibit B was
14 marked.)
15     MR. FLANDERS:  If you could just please
16 hand that to Mr. Mizzoni.
17     THE WITNESS:  Midland, that's it.
18 That's the name of the company.
19 BY MR. FLANDERS:
20     Q.  Right.  If you look at the top, of that
21 document --
22     A.  Yeah.
23     Q.  -- first of all, is that your signature
24 on the document at any place, do you see where --
25     A.  Right on the bottom.

Page 49

1      Q.  Is that -- is that your signature?
2      A.  That's my signature, Robert J. Mizzoni.
3      Q.  And this document is a Beneficiary
4  Change Request that you signed?
5      A.  That I signed?  A request for what?
6      Q.  To change the beneficiary on the
7  document.
8      A.  Contingent beneficiary?  I changed that?
9      Q.  Do you -- do you remember signing --
10     A.  No, I didn't.
11     Q.  -- this document?
12     A.  I don't remember this.
13     Q.  Okay.
14     A.  This here I don't remember.  I got a
15 nephew.
16     Q.  Were you, in fact, separated from your
17 wife in 1995 or 1996 when you signed this
18 document?
19     MR. VILKER:  For the record, I'm
20 objecting to this line of questions on the grounds
21 of relevancy but you can answer the question.
22     A.  This is my handwriting.  I know that.
23     Q.  All right.  And it's a Change of
24 Beneficiary Request, isn't it?
25     A.  Yeah, but where does it say there the

13 (Pages 46 to 49)

Page 50

1   word request?  I don't see where it says request.
2       Q.   Am I correct that at the top of the
3   document it says Beneficiary Change Request?
4       A.   Where is this?
5       Q.   Right here on the top upper right-hand
6   corner.
7       A.   Yeah.  It's right here, yeah.
8       Q.   And does it say that your -- it says --
9       A.   Primary beneficiary.
10      Q.   And that's who?
11      A.   That's who, Robert Mizzoni.
12      Q.   That's you?
13      A.   No.  No.  It's not to me.  My son.
14      Q.   So you were asking that your son be
15  named the beneficiary under this policy?
16      A.   The policy could have been two people.
17  My nephew, too, was involved.  This is the one
18  when my brother died, his father died young, and
19  he's my godchild, so I put him in there too.
20      Q.   So do you remember asking Mr. Caramadre
21  to prepare this document for you to sign?
22      A.   I signed it.
23      Q.   Do you remember asking --
24      A.   No.  Didn't ask nothing.
25      Q.   Okay.

Page 51

1       A.   I just signed that paper on the bottom,
2   way at the bottom.  That's it.  That's the only
3   thing I ever signed.
4       Q.   All right.  But this is -- this is
5   insurance that you got through Mr. Caramadre?
6       A.   I don't know if it works that way.
7       Q.   Well, didn't -- didn't you tell us that
8   you bought insurance from Mr. Caramadre?
9       A.   Yeah.
10      Q.   All right.  And is this one --
11      A.   From Midland.
12      Q.   Pardon me?
13      A.   From the same company which you got your
14  hand on --
15      Q.   Right.  And didn't --
16      A.   -- midland Insurance.
17      Q.   And didn't you go to Mr. Caramadre to
18  ask him to change the beneficiary on that policy?
19      A.   I must have went up there in order -- if
20  it's my handwriting.
21      Q.   It is your handwriting, isn't it?
22      A.   Yeah.  It's my handwriting on the
23  bottom.
24      Q.   Right.  And didn't --
25      A.   Not -- not the printing.

Page 52

1       Q.   I understand.  But didn't you ask
2   Mr. Caramadre --
3       A.   I didn't ask.  He knew -- he knew what
4   to do with it.
5       Q.   He knew what to do with it?
6       A.   Yeah.  He's a lawyer.
7       Q.   And you trusted him to do what needed to
8   be done?
9       A.   Of course.  I used to trust him with
10  anything --
11      Q.   All right.
12      A.   -- at that time.
13      Q.   And this is what you wanted to be done,
14  correct?
15      A.   At that time, yeah.
16      Q.   And the reason you wanted it to be done
17  was because you and your wife were separated then?
18      A.   Yeah.  At that time we were separated
19  and then we got back not long right after it.
20      Q.   And when you got back together, you
21  changed it back to -- to having your wife be the
22  beneficiary again?
23      A.   Yeah, right.
24      Q.   And you went to Joe again to have that
25  done?

Page 53

1       A.   No, I didn't have that done.  Bobby
2   Bevilacqua had it done.  He's got it.
3       Q.   I'm going to show you a document that
4   I'm going to ask to be marked Exhibit C and ask if
5   you can identify this as the document whereby you
6   changed the -- the beneficiary again back to your
7   wife.
8           MR. VILKER:  I'd like to take a look at
9   it.
10          THE WITNESS:  Look at it.
11          MR. FLANDERS:  Let Mr. Vilker take a
12  look at it, please.
13          (Whereupon, Defendant's Exhibit C was
14  marked.)
15          MR. VILKER:  I'm objecting to the
16  admission of this document on the ground of
17  relevancy and any questions concerning this
18  document or changes to beneficiary back to 1996 as
19  being irrelevant.
20      Q.   Showing you what we've marked as Exhibit
21  C, is that another document that's marked as a
22  beneficiary change?  And does it bear your
23  signature?
24      A.   My signature down here but who wrote all
25  this?  Who wrote all this in here?

14 (Pages 50 to 53)

Page 54

1    Q.  The question is, is that a document
2 whereby you signed authorizing the change of the
3 beneficiary --
4    A.  Yeah.
5    Q.  -- back to your wife?
6    A.  Yeah.  It's my name, my name is here but
7 the writing is -- only here is my name.  This here
8 has nothing to do with me at the top.  Okay?  All
9 that there, the only thing is my name is on that
10 paper.
11    Q.  Right.  And this --
12    A.  It doesn't say -- it doesn't say that I
13 requested it, okay?  It should -- all that letter
14 that's in there before my name, my name is the
15 only thing I signed on that piece of paper.
16    Q.  Okay.  Didn't you ask Joe Caramadre to
17 put your wife Elizabeth back as the beneficiary
18 under the policy?
19    A.  Never put her, never did.  The only
20 thing I put down, I signed a piece of paper.
21    Q.  No, I'm asking you, did you ask Joe --
22    A.  No, not at that time.
23    Q.  -- to change the policy?
24    A.  Not at that time.
25    Q.  But didn't you just tell us previously

Page 55

1 that you, in fact, changed it back to your wife?
2    A.  Yeah.  I put it back to her with Joe --
3 with Bobby Bevilacqua.  In fact, he's still --
4 he's alive.  He's still alive.
5    Q.  Okay.  So you do admit that, at some
6 point, you asked Joe to change the beneficiary
7 back to your wife?
8    A.  I don't remember that at all.  I don't
9 remember hearing it, let's put it that way.
10    Q.  But you admit that -- that this is your
11 signature?
12    A.  It's my signature.  The paper might have
13 been blank when I signed it.  I don't print; I
14 write.
15    Q.  Now, isn't it true that for many years
16 Joe was very helpful to your wife in -- in various
17 ways?
18        MR. VILKER:  Objection.
19    A.  In the school department, yeah.
20    Q.  And in what way was he helpful in the
21 school department?
22    A.  I don't know in what way.
23    Q.  Well, do you remember Joe recommending
24 your wife to be the principal at St. Mary's
25 School?

Page 56

1    A.  No, I don't remember that.
2    Q.  Do you remember that he was supporting
3 your wife in various ways when she was the
4 principal there?
5        MR. VILKER:  Objection.
6    A.  He helped her in a lot of ways.
7    Q.  Okay.  And you knew that?
8    A.  I knew that because I was -- I wasn't
9 there but I knew.  My wife would tell me.
10    Q.  All right.  And do you think your wife
11 relied on Joe's advice when she was principal?
12        MR. VILKER:  Objection.
13    A.  Why not?
14    Q.  All right.  And when you say why not,
15 because he was somebody that you and your wife
16 trusted?
17    A.  If you don't trust your own friend, who
18 the hell are you going to trust?
19    Q.  Okay.  Do you know whether Joe was paid
20 anything to assist your wife?
21    A.  Not that I know of, unless the priest
22 give him any money.
23    Q.  Okay.  Do you know that he helped her
24 with the cash flow accounting at the school?
25    A.  The what?

Page 57

1    Q.  The accounting work at the school.
2    A.  Not that I know of.  The only guy that
3 helped my wife that I know of was Renza
4 (phonetic), John Renza.  Used to be the head of
5 Social Security.
6    Q.  Did -- did Joe help your wife at the
7 school with budgeting?
8    A.  I don't know about that.
9    Q.  But you know that he helped her?
10    A.  I can't say I did or not because I
11 wasn't there.
12    Q.  Right.  But your wife told you that he
13 was being very helpful, right?
14    A.  He was helpful but I don't know about
15 the way he was helpful.
16    Q.  All right.  And from what all -- from
17 what your wife told you, is it fair to say that
18 she, too, had a high degree of trust and
19 confidence in him?
20        MR. VILKER:  Objection.
21    A.  What?
22    Q.  That your wife had a lot of trust and
23 confidence in Joseph Caramadre?
24        MR. VILKER:  Objection.
25    A.  Well, because he was a good friend of

15 (Pages 54 to 57)

Page 58

1  the family's, my family.
2      Q.  So isn't it correct, Mr. Mizzoni, that
3  for all the years leading up to the time when you
4  met with him in his office and he gave you the
5  $2000 in 2004, that you and your wife were good
6  friends with Joe Caramadre?
7      A.  Yeah, at that time.
8      Q.  And you trusted him?
9      A.  Why not?  We used to go to the same
10  church together, we used to meet together, talk,
11  and that was it.
12      Q.  All right.
13      A.  I never went anywhere else.
14      Q.  All right.  Isn't the case that sometime
15  in the spring of 2004 you had a meeting with
16  Mr. Caramadre at which you testified he gave you
17  $2000?
18      A.  What?
19      Q.  At some time in the spring of 2004 you
20  met with Mr. Caramadre at his office and he gave
21  you $2000?
22      A.  Yeah.  He gave me 2000.
23      Q.  Was that sometime in the spring of 2004?
24      A.  I don't know if it was the spring,
25  whatever.

Page 59

1      Q.  Okay.
2      A.  I was -- it could have been warm
3  weather.  It was kind of nice out.
4      Q.  All right.  Does that sound like it was
5  about the time when it happened?
6      A.  Like what happened?
7      Q.  When you met with him and he gave you
8  the $2000.
9      A.  Yeah, what?  What?
10      Q.  Does it sound like that occurred in the
11  spring, around the spring of 2004?
12      A.  For what?
13      Q.  For meeting with him when he gave you
14  the $2000.
15      A.  He told me -- he told me in church he
16  was going to give me -- he didn't say he was going
17  to give me 2000 until I got to his office.
18      Q.  All right.  I'm just trying to put the
19  time --
20      A.  Okay.
21      Q.  Was it about the spring of 2004?
22      A.  Maybe it was.  I don't remember.
23      Q.  Okay.
24      A.  I've been a sick man for the last eight
25  years.

Page 60

1      Q.  Now, you told us earlier that you
2  understood the purpose of that meeting was so that
3  potentially Joe could give you some money?
4      A.  He was going to go -- he says he was
5  going to follow up with it.  He told my wife that,
6  so I went to see him, what it -- what it's all
7  about and I explained it.  And that was it.
8      Q.  All right.
9      A.  That was the end of it.  I got the check
10  and I was good-bye.  And I haven't seen Joe since.
11      Q.  All right.
12      A.  Even in church he used to -- instead of
13  coming through the altar to go out, he used to go
14  out the side doors so I never seen him again.
15      Q.  All right.
16      A.  He went to a different church.
17      Q.  But he did give you money when you met
18  on that occasion, right?
19      A.  The one day he gave me a check in the
20  office.
21      Q.  Right.
22      A.  That was it.  Forget about it.  Put a
23  book on it or put a lock on it.
24      Q.  That's all I'm asking.  Did -- did you
25  have some conversation with him --

Page 61

1      A.  For what?
2      Q.  -- on that occasion when you came into
3  his office?  You told us you met for 10 or 15
4  minutes, right?
5      A.  Yeah.  10, 15 minutes.
6      Q.  And you talked with each other during
7  that time?
8      A.  No, I didn't actually talk.  I was
9  talking to a woman, his secretary that was there,
10  until he got ready to talk to me.  But he says, "I
11  got something for you."
12      Q.  All right.
13      A.  He got the check and he gave it to me.
14      Q.  Did -- did you have a conversation with
15  him before then?
16      A.  What conversation?  See you later.
17  That's the conversation.
18      Q.  You don't remember him telling you about
19  what the check was for?
20      A.  No.  Never.  Nobody told me that,
21  nothing, what it was for.
22      Q.  All right.  Didn't you believe that as a
23  result of that meeting, you had entered into some
24  investment with Mr. Caramadre?
25      A.  No.  No.  No.  No.  No.  No.  No.

Page 62

1    Q.  I thought you told us that you believed
2  that you were going to get some sort of monthly
3  payments after that.
4    A.  He said it.  He said it.
5    Q.  When did he say that?
6      MR. TRAINI:  Objection.
7    A.  Not to me.  He told my wife that, that I
8  would get some opportunity to get more money.
9      MR. TRAINI:  Objection.
10    A.  I said, fine.  That's good.  That's
11  good, good to know.
12    Q.  Did he say that to you when he met with
13  you in his office that day?
14      MR. TRAINI:  Objection.
15    A.  In his office the only thing he told me
16  was what do you want to do, give -- you want to
17  give half to your wife, half to me?  That's all he
18  ever said.  We -- we didn't go into the -- the
19  biography, none of that stuff.
20    Q.  Isn't it true that you signed some
21  documents?
22    A.  I didn't sign nothing.
23    Q.  Okay.  Didn't you tell --
24    A.  I didn't have to sign nothing.
25    Q.  Did you tell Ms. McDaid of the FBI that

Page 63

1  you signed documents that day?
2    A.  I signed documents?
3    Q.  Did you tell Ms. McDaid, the FBI agent,
4  that you signed documents for Joe Caramadre that
5  day?
6    A.  The only time that I signed was my -- my
7  insurance company.
8    Q.  You did sign an insurance policy that
9  day?
10    A.  No, not that day.
11    Q.  Some other time?
12    A.  Yeah.  That was the -- the one -- this
13  one here, the one you said the name of the
14  company.  That one here.
15    Q.  All right.  Other than the insurance
16  policy, did you sign any documents?
17    A.  No.  Nothing.  I didn't have to sign
18  with him.
19    Q.  All right.
20    A.  I didn't have to sign with him.
21      MR. FLANDERS:  May I have this marked as
22  the next exhibit, please, Exhibit D?
23      (Whereupon, Defendant's Exhibit D was
24  marked.)
25      MR. VILKER:  I'm objecting to the use or

Page 64

1  admission of Exhibit D, which is the interview
2  report by law enforcement.  I think Mr. Flanders
3  is entitled to ask questions of this witness.
4  This is not a document that can be admitted into
5  evidence.
6      MR. FLANDERS:  Okay.
7  BY MR. FLANDERS:
8    Q.  Did you -- have you met with Pamela
9  McDaid?
10    A.  Yeah, I met Pamela.  I met her when she
11  came over here and she said she was an FBI.
12    Q.  When -- when did you meet with Pamela
13  McDaid?
14    A.  Two or three weeks ago or something like
15  that.
16    Q.  How many times have you met with her?
17    A.  What?
18    Q.  How many times have you met with
19  Ms. McDaid?
20    A.  I met her that day she came and now
21  today.
22    Q.  Okay.  And what -- did she come here to
23  meet with you?
24    A.  What?
25    Q.  Did she come here to meet with you at

Page 65

1  your house?
2    A.  She come right over here.  I didn't
3  really know who she was.
4    Q.  Okay.  So you met with her on -- when
5  was that?
6    A.  A couple of weeks ago.
7    Q.  Okay.  And how long did you meet with
8  her?
9    A.  About a half hour.
10    Q.  All right.  Who else was present during
11  that meeting?
12    A.  Nobody.  Me and my wife.
13    Q.  Okay.  And what did she say to you about
14  this situation?
15      MR. VILKER:  Objection.
16    A.  The situation of what?
17    Q.  What did she say to you during that
18  meeting?
19      MR. VILKER:  Objection.
20    A.  The taxes.  That's all.
21    Q.  What?
22    A.  We were talking about the taxes that I
23  used to give Joe to do for me.
24    Q.  Did she say anything about any
25  investigation?

17 (Pages 62 to 65)

Page 66

1     A.  Investigation?  No.
2     Q.  Why did she say she was there?
3         MR. VILKER:  Objection.
4     A.  She was there to tell us about -- she
5   showed me a piece of paper where the -- the first
6   one, the one that's signed, that -- that his
7   wife -- his wife, if I -- if I should die, she --
8   she -- she's going to collect everything.  She's
9   going to collect a million dollars.
10    Q.  She told you that Joe's wife was going
11  to collect a million dollars?
12        MR. VILKER:  Objection.
13    A.  Well, it's Paula -- Paula Caramadre.
14  She's on there, the thing right there.
15    Q.  On Exhibit 1, she's --
16    A.  I wouldn't have got a dime, not even my
17  wife.  If I were to -- if he had put my wife's
18  name there, I would have said, go ahead, because
19  how much longer can I live?  I'm 86 years old
20  coming up.
21    Q.  All right.  But did --
22        THE WITNESS:  Don't get me mad, please.
23        MR. VILKER:  If I could interject for
24  one moment, I'm concerned that Mr. Mizzoni might
25  be getting a little stressed and his wife has

Page 67

1   indicated that --
2         MR. FLANDERS:  Then we should take a
3   break.
4         MR. VILKER:  Would you like to take a
5   little break now before --
6         THE WITNESS:  What's that?
7         MR. VILKER:  Would you like to take --
8   take a short break?
9         THE WITNESS:  Yeah.  Go ahead.
10        VIDEOGRAPHER:  The time is 11:34.  We're
11  off the record.
12        (  R E C E S S  )
13        VIDEOGRAPHER:  We're now back on the
14  record at 11:39.
15  BY MR. FLANDERS:
16    Q.  Again, Mr. Mizzoni, if you need to take
17  a break at any time --
18    A.  Go ahead.
19    Q.  -- please let me know --
20    A.  Go ahead.
21    Q.  -- and we'll stop immediately, all
22  right?
23        We were talking about the meeting that you
24  had with Agent McDaid a few weeks ago.
25    A.  Yeah.

Page 68

1     Q.  And I was asking you what she said to
2   you about this investigation that's going on.  Did
3   she talk about any investigation?
4     A.  Not that I know.  Because she's an FBI,
5   she don't relate her -- her business to me.  It
6   would be foolish if she did.
7     Q.  Did she tell you what they were
8   investigating?
9         MR. VILKER:  Objection.
10    A.  No.  The investigation she says,
11  we're -- we're investigating Joe Caramadre.  That
12  was it.
13    Q.  For what?
14    A.  I don't know for what.  I didn't call
15  them.  They come -- they came to my house.
16    Q.  You called them?
17    A.  No.  No.  No.  Never happen.
18    Q.  They just showed up at your house?
19    A.  She come in here with an okay from the
20  office, whatever office she's from.  She came
21  here, we let her in and she's -- she was
22  presentable.
23    Q.  All right.
24    A.  So we sat her down.  Until I seen a gun,
25  I didn't know she was a gun -- she was a gun moll.

Page 69

1     Q.  She had a gun on her?
2     A.  Yeah, she carried a gun.  She was on
3   duty --
4     Q.  And did she say --
5     A.  -- so she came up here.  I happened to
6   see it because she carried it right here on the
7   hip.
8     Q.  Did she say why she was meeting with
9   you?
10    A.  The only thing she told me about there's
11  some information about Joe -- Joe Caramadre.
12  That's all.
13    Q.  What information did she tell you?
14    A.  She told me that they were -- they were
15  checking him out.
16    Q.  For what?
17        MR. VILKER:  Objection.
18    A.  On insurance of people that die.  She
19  had a list of names so he could bury everybody and
20  he would become a multi-multi-millionaire.
21  You want to know the truth?
22    Q.  She said that to you?
23        MR. VILKER:  Objection.
24    A.  What?
25    Q.  Did she say that to you?

18 (Pages 66 to 69)

Page 70

1      MR. VILKER: I'm just objecting to the
2  question.
3      A. I'm answering your question.
4      Q. I know you are. Did she tell you that
5  he would become a multi-multi-millionaire?
6      A. Yeah. He would become a
7  multi-millionaire with all the names that he had.
8  She showed me the names but I didn't know one, not
9  one of them. I didn't know not one of them but
10 until I seen my own.
11     MR. VILKER: Objection.
12     Q. And what did she tell you about what
13 these names represented?
14     A. They represented death. That's what
15 they were for. If a person -- if a person -- I
16 would have like to have gone in Iraq. You want to
17 know the truth? I'd just as soon go into it. If
18 I could make money that kind of way, oh, boy, oh,
19 boy.
20     Q. Did that make you upset?
21     A. What?
22     Q. Did that make you upset?
23     A. Make me upset? Because my body is going
24 to be sold without my wife getting a dime. How do
25 you feel? How do you feel? How do you feel if I

Page 72

1      A. No. Why?
2      Q. That's what I'm asking you.
3      A. What did I -- I never play, gamble. I
4  gamble -- I gamble with my own when I go to the
5  casino.
6      Q. But you -- you've never given him any
7  money, have you?
8      A. No.
9      Q. And he's never taken any money from you,
10 has he?
11     A. No.
12     Q. In fact, you are $2000 richer from
13 having met with him in 2004, right?
14     A. Yeah, but look who I'm up against. Look
15 at the trouble I'm up against. Look at the
16 trouble he's causing for me, my life. I only got
17 maybe another -- another -- life -- how much
18 longer can I last with this baloney?
19     Q. What did -- what did Ms. McDaid tell you
20 that Joe stood to gain upon your death?
21     A. She didn't say nothing. She didn't say
22 nothing. We guessed it after looking at the form
23 here, after this form, I said, Holy Christ, they
24 are -- they are selling my body? That's just
25 what's happening. They're doing business with the

Page 71

1  was to bury you and you got insurance and your
2  wife don't get nothing. What happens? She's
3  going to commit suicide or come -- come after me.
4  No way is it going to happen to me, I got news for
5  you. He better drop this policy in a hurry. If
6  they don't, I'll sue. How about that one?
7      Q. So you were angry at Joe Caramadre after
8  you met with Ms. McDaid?
9      A. He's a good -- to me, he's still a good
10 friend, okay? Because we all make mistakes,
11 remember that. But this is a big one. This is a
12 big one. It comes up this way.
13     If I died today, he would have collected all
14 that goddamn money when my wife wouldn't have
15 gotten a dime. This is what I'm trying to bring
16 out.
17     See, you guys think it's just sit down and
18 look at papers, this guy, but when you find out
19 how much he's going to get, a $20,000 policy, and
20 boy, this is going to pay off -- look at the
21 beneficiary. Paula, his wife.
22     Q. Did you -- have you lost any money in
23 dealing with Joe Caramadre?
24     A. Lost money?
25     Q. Yes.

Page 73

1  undertakers. I've got an undertaker as my
2  godchild but I'm going to -- I want this goddamn
3  thing dropped in a hurry.
4      Q. When was the first time you learned that
5  you had agreed to become an annuitant?
6      MR. VILKER: Objection.
7      A. I didn't know nothing.
8      MR. VILKER: That's assuming a fact very
9  much not in evidence.
10 BY MR. FLANDERS:
11     Q. At some point, did you learn that --
12     A. The day that she came here.
13     Q. Is that the first time you learned that?
14     A. Yeah. He was here.
15     Q. Who? Mr. Vilker was here too?
16     A. Yeah, he was here.
17     Q. When was he here?
18     THE WITNESS: When did you come? Do you
19 remember the day?
20     MR. VILKER: I can't answer the
21 questions.
22     A. Okay. I don't know the date. I don't
23 know the day.
24     Q. Did he accompany Ms. McDaid when she
25 visited with you?

Page 74

```
1       A.  He sat down and talked to me.  He was
2  asking me questions.
3       Q.  The same day that Mrs. McDaid was here?
4       A.  I don't remember that.
5       Q.  But on another occasion, was Mr. Vilker
6  here as well?
7       A.  There was another guy.  The tall one
8  right there.
9       Q.  Mr. McAdams was here?
10      A.  Yeah.
11      Q.  And what did they talk to you about?
12      A.  The same thing.
13      Q.  Which is what?
14      A.  They were asking me questions like this
15 here.  That's what they were doing.  They were
16 checking me out to see if I was telling them the
17 truth.
18      Q.  Yes.
19      A.  Yeah, right.
20      Q.  And what were you telling them?
21      A.  I was telling them what I seen here.
22 How do you think I feel?
23      Q.  All right.
24      A.  How do you think I feel?
25      Q.  Did they show you the names of other
```

Page 75

```
1  people?
2       A.  Oh, yeah.  I've seen a lot of names.
3  Boy, were there names.  You got to be a rich
4  bastard, believe me.
5       Q.  And -- and what did they tell you about
6  those names?
7            MR. VILKER:  Objection.
8       A.  He's going to collect on all those
9  policies.
10      Q.  He's what?
11      A.  He's going to collect on all those
12 policies.
13      Q.  And how much is he going to collect?
14           MR. VILKER:  Objection.
15      A.  I don't know what he's going to collect.
16 Over here he's going to collect quite a bit of
17 money.
18      Q.  How much do you think he's collecting
19 on -- on this situation?
20           MR. VILKER:  Objection.
21      A.  $20,000.  It's got to be quite a bit.
22      Q.  Who -- who told you that?
23           MR. VILKER:  Objection.
24      A.  Huh?
25      Q.  Who told you that he's going to collect
```

Page 76

```
1  $20,000?
2       A.  It says it right here on the paper.  He
3  bought the policy for 20 grand, $20,000 policy --
4       Q.  Where does it --
5       A.  -- he's going have to pay for it.
6       Q.  Where does it say $20,000?
7       A.  I got it here.
8            MR. VILKER:  Objection.  The document
9  speaks for itself.
10      Q.  You told us, sir, that this paper says
11 it was $20,000.  Can you show us on Exhibit 1
12 where there is a reference to $20,000?
13      A.  I can't show you on this.
14           MR. VILKER:  Objection.
15      Q.  Well, you just told us it was there.
16      A.  Not on -- on this paper.  Was that on
17 this one?
18           MR. VILKER:  Again, I can't --
19           MR. FLANDERS:  You can't ask Mr. Vilker
20 to answer the questions.
21           THE WITNESS:  Okay.
22      Q.  I know you met with him and he told you
23 certain things but now you have to answer the
24 questions; okay?
25           Is there anything on this paper or anyplace
```

Page 77

```
1  else that talks about Mr. Caramadre getting
2  $20,000 when you die?
3       A.  It's paid for $20,000 on the records.
4  The way the records went through, they ain't
5  there, I ain't got them.  I'm not a bookkeeper.
6       Q.  Is it the case that there's nothing on
7  Exhibit 1 that says anything about $20,000?
8            MR. VILKER:  Objection.  Exhibit 1 is in
9  evidence and I think it speaks for itself.
10           MR. FLANDERS:  You can answer the
11 question.
12           MR. VILKER:  If you know.
13           THE WITNESS:  Huh?
14           MR. VILKER:  If you know the answer.
15           MR. FLANDERS:  Every question is if he
16 knows it; okay?
17 BY MR. FLANDERS:
18      Q.  Is there anything on Exhibit 1 that
19 mentions $20,000?
20      A.  I ain't got the papers.  Let me look.
21           (P A U S E)
22           (Witness perusing document.)
23      A.  I see the paper with the thing on it.
24      Q.  Do you think he's going to get a million
25 dollars after you die?
```

20 (Pages 74 to 77)

Page 78

1    MR. VILKER:  Objection.
2    A.  Looks that way.
3    Q.  It does?
4    A.  Yeah.
5    Q.  And is that an opinion you formed after
6    meeting with Ms. McDaid and Mr. Vilker?
7    MR. VILKER:  Objection.
8    Q.  Is it?
9    A.  No, not that I know of.
10   Q.  Well, how did you -- how did you come to
11   the conclusion that he's going to get --
12   A.  I seen that in black and white.
13   Q.  And where was it --
14   A.  First payment is $10,000.  Right here.
15   Q.  Where is that?
16   A.  Right here.  Right here.
17   Q.  Is that -- does that indicate --
18   A.  That's right.  That says --
19   Q.  $10,000, not $20,000; is that right?
20   A.  10,000.  He had to buy -- buy the
21   policy, a $20,000 policy.  He had to pay for it.
22   What is he going to get the policy for nothing?
23   Q.  Are you saying that he bought the policy
24   and paid --
25   A.  The policy says right here initial

Page 79

1    purchase payment submitted was 10,000.
2    Q.  Right.  And do you have any reason to
3    believe that it's a $20,000 policy?
4    A.  It's a $20,000 policy.
5    Q.  How do you know that?
6    A.  I seen it in black and white.
7    Q.  Where and when?
8    A.  That's what I'm trying to see, if I can
9    find it.  All these papers, all this here to me is
10   all phoney, all the writing, all phoney.  At least
11   half of this stuff in here that I don't even know
12   of.
13   Q.  Do you know whether, in fact, he paid
14   $10,000 to buy an annuity?
15   A.  I don't know if he paid it.  He must
16   have.  Why would he get -- why would he get a
17   document?
18   Q.  All right.  Did you give him any of that
19   money to buy that?
20   A.  Not me, I didn't give him no money.
21   Q.  By the way, do you think this is a life
22   insurance policy?
23   A.  A what?
24   Q.  Do you think this is a life insurance
25   policy?

Page 80

1    A.  Yeah, it's life insurance.  In case I
2    die, they collect the money.  Who's going to
3    collect it?  Who's going to collect it?
4    Q.  Did you --
5    A.  I mean you're a lawyer, you ought to
6    know.
7    Q.  Did anyone tell you that it's not a life
8    insurance policy; that it's an annuity?
9    A.  An annuity?  What -- who -- where does
10   it go to, the annuity?
11   Q.  Did anyone tell you it's an annuity?
12   A.  Yeah.
13   Q.  Who?
14   A.  The girl, the -- the FBI.
15   Q.  And were you -- were you contacted also
16   by Nationwide Insurance?
17   A.  No, not yet.
18   Q.  Never?
19   A.  Never.  They haven't contacted me.  The
20   only thing we get a bill for them when we got to
21   pay every month.  Every month.
22   Q.  What bill?
23   A.  A bill for paying the insurance.
24   Q.  You get a bill for paying insurance from
25   Nationwide?

Page 81

1    A.  Right.
2    Q.  And this is the insurance that you
3    yourself have purchased?
4    A.  What?
5    Q.  Is this insurance that you yourself have
6    purchased?
7    A.  That's the purchase -- Joe bought that
8    policy quite a while ago.  They said we're going
9    to pay cheap money.  Pay cheap money all right.
10   MR. VILKER:  Okay.  I'm going to show
11   you a document that I'd like marked as the next
12   exhibit.
13   (Whereupon, Defendant's Exhibit E was
14   marked.)
15   THE WITNESS:  The policy isn't worth 10
16   cents, that one there.  We already tried to
17   collect some to find out.  I got guys that I could
18   go to right away like that.
19   Q.  Showing you a document that's been
20   marked Exhibit E, is this a letter that you
21   received from Nationwide?
22   A.  What?
23   Q.  Is this a letter you received from
24   Nationwide?
25   A.  Not a letter.  We -- we get a bill every

21 (Pages 78 to 81)

1    month to pay the bill.
2        Q.   No, look at -- look at this document.
3    What is this document?
4        A.   This one here?
5        Q.   Exhibit E, what is that?
6        A.   Annuity.
7        Q.   All right.
8        A.   Case No. 01-583-1625.
9        Q.   Does this have your signature on it?
10       A.   Yeah, way on the bottom.
11       Q.   Right.  And is this all your handwriting
12   on it?
13       A.   I don't know if it's my handwriting.
14       Q.   Well, look at it and tell us.
15       A.   No, this can't be my handwriting.  The
16   only thing that's my handwriting is the Robert J.
17   Mizzoni.
18       Q.   So you didn't write the rest of this
19   information?
20       A.   The color of ink.
21       Q.   Okay.
22       A.   Right there to prove it that I did
23   not -- I signed it but the rest of it ain't my
24   writing.
25       Q.   Do you remember getting this document?

1        A.   No.
2        Q.   Why did you sign it?
3        A.   I must have signed it at the office at
4    that time.
5        Q.   At whose office?
6        A.   Where did I go?  Joe's office?
7        Q.   Isn't this a letter that you got and
8    sent back to Nationwide?
9        A.   I don't remember that.
10       Q.   So you don't remember getting this?
11       A.   Not that I remember it.
12       Q.   And you don't remember answering the
13   questions in the document?
14       A.   They are saying where I said no on the
15   annuity.
16       Q.   Do you remember answering these -- these
17   questions?
18       A.   I don't remember that either because
19   that's not my writing.  You're saying it's my
20   writing.  It's not my writing at all because I can
21   write different than that.  If I have to write
22   left-handed, it won't come out the same.
23       Q.   Do you know whether your wife Elizabeth
24   spoke with anybody from Nationwide?
25       A.   Ask her.  She's here.

1        Q.   But do you know, sir?
2        A.   I don't know.  I don't go and
3    investigate my wife.  We pay the bills and that's
4    it.
5        Q.   Now, when you say that you were -- after
6    meeting with Mr. Caramadre and receiving the $2000
7    that he gave to you --
8        A.   Yeah.
9        Q.   -- you were expecting to get other
10   payments from him?
11       A.   That's what he told us.
12       Q.   Okay.
13       A.   He told us that, he told my wife that.
14       Q.   Did you -- did you, in fact, get any
15   additional payments?
16       A.   No.  Never.
17       Q.   Okay.  Did you ever call him up and ask
18   him why not?
19       A.   No, I didn't bother.
20       Q.   Why?
21       A.   Because I see him every time in church.
22   Why do I want to call him up when I can talk to
23   him face to face?
24       Q.   And when you saw him in church, did you
25   talk to him?

1        A.   He walked away.  He'd gone the other
2    way.  How do I talk?  You want me to yell at him
3    in church?
4        Q.   Okay.  So even though you thought you
5    were supposed to get additional payments from some
6    investment that was being --
7        A.   Whatever he's gone through.  I don't
8    know.  I didn't make -- I didn't make these
9    things.  He did it.
10       Q.   All right.  You never -- you never
11   contacted him to ask about it?
12       A.   Never.
13       Q.   And you never complained to him --
14       A.   Never.
15       Q.   -- about it?
16       A.   Never did -- never seen him enough to
17   say, to talk with him, to say hello to him, good
18   morning.
19       Q.   Well, why didn't you pick up the phone
20   and call him?
21       A.   Why should I call him?  I don't want to
22   call him.  I figure he's busy, he wants to do what
23   he wants to do.  I don't know if he wants to
24   continue to do what he's doing.  You're gonna give
25   money out, you gotta get -- you gotta have a

1   reason for it.
2      Q.   Did anybody tell you not to talk with
3   him?
4      A.   Nobody.
5      Q.   Nobody?
6      A.   Nobody. Nobody.
7      Q.   Nobody from Nationwide?
8      A.   Nobody. His own brother I talked to,
9   John. He never said a word. Just kept his mouth
10  shut. So I'm keeping my mouth shut now; okay?
11     Q.   Okay.
12     A.   Joe never talked to me in church either.
13  Good morning, Bob, how are you doing? How are you
14  feeling? I've been sick eight years. You capish?
15     Q.   Now, a few days ago, Mr. Caramadre left
16  a voice message for you --
17     A.   A voice message?
18     Q.   -- on your telephone?
19     A.   On my telephone? When?
20     Q.   Did he?
21     A.   When? I don't know.
22     Q.   Did Mr. Caramadre try and contact you a
23  few days ago?
24     A.   Tuesday? Maybe he did. I don't know.
25  I wasn't home.

1   If it was there, I would have -- I would have
2   heard it. How did the FBI come to me? Huh? Tell
3   me why. How did the FBI come to me? For what
4   reason?
5      Q.   Has Joe ever done you any wrong that you
6   know of?
7      A.   No. He never talked to me. When he
8   gave me the money that day, bingo, that was it,
9   okay? Fair enough with you?
10     Q.   And -- and you've never talked to him
11  since?
12     A.   No, since. I haven't seen him since.
13     Q.   Before this situation, has he ever done
14  any harm to you?
15     A.   What?
16     Q.   Before this, has he ever done any harm
17  to you?
18     A.   No. Why would you say -- why would he
19  do harm to me? I don't bother nobody. I didn't
20  tell the FBI to come over here. But how they
21  come -- why do they come to my house? Why?
22     Q.   And you blame Joe for the fact that the
23  FBI came to see you?
24     A.   Well, they showed -- my name was on that
25  list with Joe's name on it.

1      Q.   Okay.
2      A.   I got doctors' visits that I go
3   sometimes two, three a day, three a day. I got
4   doctors and I just cancelled two of them because I
5   got too many to go to. I can't -- I can't keep
6   throwing up $20 bills every time I go. You got
7   money to give me to go to the doctors?
8      Q.   Did you or your wife call up the FBI or
9   Mr. Vilker and tell them that Mr. Caramadre tried
10  to get ahold of you?
11     A.   Never. Why would I want to call the FBI
12  for? Well, that's a stupid question, believe me.
13     Q.   So you never -- you never attempted to
14  call them --
15     A.   No. Never.
16     Q.   -- and tell them that Mr. Caramadre --
17     A.   Why would I want to call the cops?
18     Q.   -- was trying to contact you?
19     A.   Mamma mia, I'm telling you.
20     Q.   Now, if Mr. Caramadre tried to get ahold
21  of you and speak with you, would you have spoken
22  with him?
23     MR. VILKER: Objection.
24     A.   Maybe I would have. I don't remember
25  any call. I got -- I got an answering machine.

1      Q.   The list that the FBI --
2      A.   Yeah, Maggiacomo's name was on it too.
3      Q.   And so based on that, you think that
4   he's done something wrong by you?
5      MR. VILKER: Objection. Irrelevant what
6   he thinks.
7      A.   That's it. He must've.
8      Q.   Because his name is on the list the FBI
9   showed you?
10     A.   On the FBI list. Why would they put FBI
11  people -- I never went on an FBI list, okay?
12     Q.   So just the fact that he's on an FBI
13  list means he's done something wrong?
14     A.   The name is on the paper from the FBI.
15     MR. VILKER: Objection.
16     Q.   And what does that mean?
17     MR. VILKER: Objection.
18     A.   It means he must've been in trouble. I
19  don't know. They want maybe information from me
20  if I knew -- what I knew about him and when she
21  did, I said yeah, I know him. I grew him up. He
22  grew up with me. I used to be his driver.
23     MR. TRAINI: Objection. Move to strike.
24     MR. VILKER: I'm -- again, I want to
25  articulate my objection for the record. What

Page 90

1    Mr. Mizzoni may think or may not think as to what
2    Mr. Caramadre is being investigated for, what he's
3    done wrong, what he hasn't done wrong, his own
4    state of mind is completely irrelevant. The only
5    relevance is what this witness can testify as to
6    the actual facts as he knows them to be.
7         MR. TRAINI: And I join in Mr. Vilker's
8    objection and further object to the statement that
9    Mr. Mizzoni made about Mr. Maggiacomo's name being
10   on some FBI list.
11        THE WITNESS: They wanted to know if I
12   knew Maggiacomo. I don't know. I knew that the
13   bank was there. I never knew him. I never met
14   him. Get a guy from -- a stiff from the cemetery,
15   bring him out, I know him.
16   BY MR. FLANDERS:
17        Q.  Now, Mr. Mizzoni, I want to go back to
18   the money that you received from Mr. Caramadre.
19        A.  Yeah. Go ahead.
20        Q.  Was it one check or two checks?
21        A.  One check.
22        Q.  All right.
23        A.  He says to me, "How do you want the
24   check? Do you want half to your wife? You're
25   going to give half to your wife?"

Page 91

1         I said, "Yeah. I'm going to give a thousand
2    to her and a thousand to me." It was one check
3    written out for 2000.
4         Q.  Do you remember who the check was
5    payable to?
6         A.  To me. My name was on it. That's what
7    he wanted. He wanted me, he didn't want my wife.
8    I gave my -- my wife the check. I would have
9    given it to her anyway.
10        Q.  At the time when you received that check
11   from Mr. Caramadre --
12        A.  Yeah, where is it now?
13        Q.  No, I'm asking you -- did you think he
14   was doing anything to try and deceive you?
15        A.  I don't think so. He just gave me the
16   check and off I went. See you later, and I took
17   off.
18        Q.  And isn't it true that you made that
19   $2000 from him tax free?
20        A.  Yeah. Why?
21        Q.  And --
22        A.  I didn't have to claim the tax.
23        Q.  Do you remember meeting with
24   Mr. Maggiacomo in Joe's office?
25        A.  No. I don't even know who he was until

Page 92

1    today I seen him now for the first time. I know
2    that they had the bank.
3         Q.  But you know there were other people
4    present at this meeting?
5         A.  What?
6         Q.  There were other people present when you
7    met with Joe in his office?
8         A.  There were a couple of women there.
9    There was a secretary and somebody else and his
10   brother. That's it. When I stood there, didn't
11   stay that long, the door was open, off I went. I
12   told you that 100 times already.
13        Q.  And you were -- you were happy to have
14   received the $2000 from his office?
15        A.  Of course. I didn't know what it was
16   all about. He didn't -- he didn't say what it was
17   about. He said opportunity, opportunity is going
18   to happen; you're going to get more money. That's
19   all I heard. The opportunities happened but I
20   didn't get no more money. Everything got shut
21   off.
22        Q.  Going back to the Government's
23   Exhibit 1, where you indicated that you used to
24   live at 16 Winton Street?
25        A.  16 Winton Street.

Page 93

1         Q.  Right. That was your address?
2         A.  Right.
3         Q.  Did you tell Mr. Caramadre that you
4    might be moving and, therefore, you would want to
5    use a different address?
6         A.  When?
7         Q.  When you met with him and got the $2000.
8         A.  Maybe. I don't know. I don't remember
9    even telling him that.
10        Q.  You did move from time to time, didn't
11   you?
12        A.  I moved from time to time.
13        Q.  And did you -- did you tell Joe that you
14   didn't like to receive mail on anything?
15        A.  No.
16        Q.  Do you remember telling Joe on that
17   occasion that it was okay to use his parents'
18   mailing address for --
19        A.  No. Completely no.
20        Q.  Now, is it your testimony, sir, that you
21   thought when you received the $2000 from Joe --
22        A.  Yeah.
23        Q.  -- that you were not only going to get
24   that $2000, but that you were going to get monthly
25   payments?

Page 94

```
 1        A.  That's what he said.  I'm telling you --
 2   you what he said.
 3        Q.  Yes.
 4        A.  His mouth --
 5        Q.  And he --
 6        A.  -- not my mouth.
 7           MR. TRAINI:  Objection.
 8        Q.  And he was going -- he was going to have
 9   to pay $10,000, right?
10           MR. VILKER:  Objection.
11        Q.  Is that what you understand?
12        A.  Yeah.
13        Q.  And he was going to give you 2000 and
14   then you were going to get monthly payments; is
15   that what your testimony is?
16        A.  That's what I understood.
17           MR. TRAINI:  Objection.
18        A.  He'll come out with something.  That's
19   not my idea, it's his idea.
20        Q.  And what were you doing in exchange for
21   that?
22        A.  What was I doing?  Nothing.  Nothing.
23   Nothing.  I was working -- I was working for the
24   State of Rhode Island.
25        Q.  He was just doing this as a gift for
```

Page 95

```
 1   you?
 2        A.  What the hell do I know?  He says -- he
 3   told somebody I loved him -- he loved me.  He
 4   still says it today.
 5        They don't find good people like me around.
 6   That's why the FBI come over and check me to make
 7   sure I was all right.
 8        Q.  Did -- after you met with Joe in 2004,
 9   weren't there occasions when you went back to him
10   for advice again?
11        A.  Maybe one time ask him a different favor
12   or something but he couldn't do what he wanted to
13   do.  He says I'm doing big work now.  I wanted him
14   to do a Workmen's Comp case.  He refused me.  How
15   about that one?  I don't forget.
16        Q.  Didn't you and your wife ask him to help
17   you collect a $15,000 (sic) reimbursement for a
18   hearing aid you lost?
19        A.  Yeah.  I never got it.  He -- he didn't
20   want to do it.  He didn't want to do it.
21        Q.  It was $1500?
22        A.  15.  That's what they cost.  16, not 15,
23   $1600.  That's one of these right here.  I had to
24   buy a new one.
25        Q.  And you -- you went back to him and
```

Page 96

```
 1   asked him to help you try and get that?
 2        A.  I went in church and said to him, I
 3   says, Joe, I says, I got a case.  He's -- if it's
 4   a Workmen's Comp, out, because he's handling
 5   bigger work.  That's -- that's his words, not
 6   mine.
 7        Q.  But you did ask him to help try and get
 8   reimbursement for the $1500, right?
 9        A.  Of course.  He's a lawyer.  Why wouldn't
10   I ask a lawyer?
11        Q.  All right.  And this was after you met
12   with him in 2004?
13        A.  Yeah.  That's after.
14        Q.  And after --
15        A.  This was after.
16        Q.  And this was after months had gone by
17   and you had not received any monthly payments?
18        A.  No, I didn't receive a dime anymore.
19        Q.  And you didn't say --
20        A.  I said something must have happened for
21   him to stop.
22        Q.  And you didn't say a word to him about
23   it, did you?
24        A.  No, I didn't because I never seen him
25   anymore.
```

Page 97

```
 1        Q.  Well, you told us you saw him in church?
 2        A.  In church, a couple a couple of times he
 3   came.  That was the end of that.  He went to a
 4   church up in -- in -- where Bobby Tasca lives.
 5        Q.  Right.
 6        A.  Yeah.
 7        Q.  But when you saw him in church, you
 8   didn't bring up anything about not --
 9        A.  I didn't have to at that time.
10        Q.  And --
11        A.  Just like I'm going to eat a dish of
12   macaroni tomorrow, make sure I get it tomorrow.
13   That's what you're telling me.
14        Q.  But you asked him if he would help you
15   get $1500 for the hearing aid you lost, right?
16        A.  I told him that right away in church.
17   He says to me, I don't handle that kind of case
18   anymore.  He could have done anything he wanted.
19        Q.  Do you have any knowledge whether he
20   made any efforts to try and help you get the $1500
21   for the hearing aid you lost?
22        A.  No.  I'm as honest as the day is long.
23   Nobody's asked me anything.  They refused me, two
24   lawyers.  He refused me and another guy refused
25   me.  They don't want to handle the small cases
```

Page 98

1  because they had to fight the city.
2      MR. FLANDERS: I'm going to have this
3  marked as the next exhibit, please.
4      (Whereupon, Defendant's Exhibit F was
5  marked.)
6      MR. VILKER: I am objecting to the use
7  of Exhibit F on the grounds that it's irrelevant
8  and also on the grounds there's a yellow sticky
9  note that is attached to Exhibit F, and there's
10 been no evidence that the sticky note was
11 originally part of this exhibit, and the overall
12 objection is completely irrelevant but --
13 BY MR. FLANDERS:
14     Q.  If you would look at this Exhibit F,
15 Mr. Mizzoni. Have you ever seen this document
16 before?
17     A.  Yes. It says my wife -- my wife wrote
18 this out. My wife wrote it out. That's honest.
19     Q.  And did she send that document to Joe?
20     A.  What document? She sent it where? To
21 Joe. She must have sent him a letter. I don't
22 know.
23     Q.  Is that her -- is that your wife's
24 handwriting on the sticky note?
25     A.  My wife's name is here, my name is

Page 99

1  there. 2/18 -- 2/18/05.
2      Q.  That's March 18th, 2005?
3      A.  Huh? It's 3/18/05.
4      Q.  Okay. That's the date of the document?
5      A.  What document?
6      Q.  The one in your hand. Exhibit F. Is
7  that the date of the document?
8      A.  This says somebody sent this to my wife.
9      Q.  And did your wife send that to Joe?
10     A.  She must have. I don't remember.
11     Q.  Is that your wife's handwriting?
12     A.  My wife does the bookkeeping for me
13 because I was not feeling any -- any well, any
14 good with -- with my health, okay?
15     Q.  Is that your wife's handwriting --
16     A.  Yes, it is.
17     Q.  -- on the yellow sticky note?
18     A.  It is.
19     Q.  And what does it say?
20     A.  Elizabeth Mizzoni. She's telling him
21 the stuff about the time she wrote the letter to
22 him.
23     Q.  No. What does it say on the yellow
24 sticky note?
25     A.  "Joe, copies of what I sent. Liz."

Page 100

1      Q.  So does that indicate that she sent
2  these to Joe?
3      A.  She sent Joe to me. She sent it -- he
4  sent it back home.
5      Q.  So is it your understanding that your
6  wife was asking Joe to help on this?
7      A.  No. I don't know. My wife used to
8  handle my affairs. She still does today.
9      Q.  Okay.
10     A.  She still does today. Why -- why would
11 I stop that? She's trying -- she's trying to help
12 out but it didn't work out that way either. So
13 what happened? It tells you right here.
14     Q.  But, in any event, after June of 2004
15 when you met with Mr. Caramadre, you were still
16 going to him seeking for -- for his help, is that
17 right?
18     A.  Seeking his help but he did -- seeking
19 his help because he caused the seeking of help
20 when he went to her and told her about tell your
21 husband I want to see Bob; he told her to see Bob;
22 I got things going for him. He'll be sitting
23 pretty. These words that she used. This is
24 nothing. This is nothing. Be thankful that she
25 wrote the letter.

Page 101

1      Q.  What you just told us about happened
2  before 2004, right?
3      A.  Huh? It didn't happen in 2004.
4      Q.  It happened before 2004?
5      A.  This is 3000 -- this is '05.
6      Q.  Right. And you were still going to
7  Mr. Caramadre in 2005 asking him to help you,
8  right?
9      A.  No. My wife sent this here bill --
10     Q.  Yes.
11     A.  -- to him but it come back.
12     Q.  And you were okay with that, right?
13     A.  Huh?
14     Q.  You were okay with that?
15     A.  I was okay with this?
16     Q.  Yes.
17     A.  What?
18     Q.  With your wife going to Joe to ask for
19 some help.
20     A.  Well, maybe she did. I don't know. I
21 told you I can't even drive a car anymore on the
22 account of that, on account of this here.
23 Understand? I'm lucky I'm alive. They're going
24 to become lawyers. I could become a better
25 lawyer, believe me when I told you.

Vivian S. Dafoulas & Associates
(401) 885-0992

Page 102

1    Q.  Now, you told you, Mr. Mizzoni, that you
2  thought that Mr. Caramadre stood to gain more
3  money than he invested --
4    A.  Right.
5    Q.  -- on your death --
6    A.  Yeah.
7    Q.  -- is that right?
8    A.  Yeah, right.
9    Q.  Would you feel differently about this if
10  the account value was less than what he invested?
11    A.  I don't give a goddamn what he said.
12    MR. VILKER:  I object.
13    A.  I know the money is going to be -- it's
14  not going to come to us.  It's going to come to
15  his family.  Okay?
16    Q.  You are assuming that he's going to get
17  money, but what if the account value is less than
18  what he invested?
19    A.  We don't know that.
20    MR. VILKER:  Objection.
21    A.  He don't know.  He must know it.
22    MR. VILKER:  Objection.
23    A.  He signed the papers.  His name come up
24  on all of -- all the list with all the rest of the
25  names on that piece of paper that I've seen.  Must

Page 103

1  have been about 18, 20 of them.  Where did they
2  come from?
3    Q.  This is the one that Ms. McDaid showed
4  you?
5    A.  Where did all these names -- yeah, I
6  seen it.
7    Q.  The one that she showed you?
8    A.  One the feds -- the FBI showed me.
9    Q.  And that's Ms. McDaid, right?
10    A.  Yeah.  When they showed me -- when I
11  seen my name on there and it said that they got
12  the annuity, now they got to put $20,000 to buy
13  insurance to get that kind of money, what is it,
14  100 percent?  Right here.  100 percent, Paula
15  Caramadre.  Come on, come on.
16    MR. VILKER:  I'm moving to strike.
17    A.  Smarten up.  You guys are supposed to be
18  a lawyer.  You're making me feel like a jerk.
19  You're trying to make me feel like a jerk but I'm
20  not.
21    MR. VILKER:  Okay, Mr. Mizzoni, I'm
22  moving to strike that answer and making another
23  objection to what Mr. Mizzoni may know or may
24  believe he knows happened with this policy is
25  completely irrelevant.  Mr. Mizzoni's only

Page 104

1  relevance is what happened factually that he's
2  already testified to.
3    THE WITNESS:  It's a shame the way you
4  have to go through this there for one person.
5  This is one person.  That's one person, Joe.
6    MR. FLANDERS:  There's no question
7  pending, sir, okay?
8    THE WITNESS:  Huh?
9    MR. FLANDERS:  There's no question
10  pending.  I'm finished with my cross-examination.
11    THE WITNESS:  It's a shame.
12    MR. FLANDERS:  We're going to take a
13  break for a minute.
14    VIDEOGRAPHER:  The time is 12:16.  We're
15  now off the record.
16        ( R E C E S S )
17    VIDEOGRAPHER:  We are now back on the
18  record at 12:24.
19    MR. VILKER:  For the record, the
20  government is objecting to these additional
21  questions as counsel for Mr. Caramadre has already
22  indicated that he had no further questions and,
23  therefore, his examination should be complete.
24
25

Page 105

1        EXAMINATION
2  BY MR. FLANDERS:
3    Q.  Mr. Mizzoni, when you left
4  Mr. Caramadre's office in 2004 with the $2000
5  check that he gave you, did you think that you
6  were going to have some opportunity to do business
7  with him again?
8    A.  Sure.  He says to me, he told my wife
9  that.  Then he told me that day over there at the
10  office, and that was it.  I don't -- I don't --
11    Q.  And were you disappointed that, in fact,
12  you never had any --
13    A.  I didn't know what happened.  I wasn't
14  disappointed.  I don't get disappointed that way.
15  I figure something must have happened to Joe that
16  he had to stop it.  That was it.  I didn't relate
17  it, nothing, just kept quiet.  I'm not that type
18  of a guy that hurts you or anybody else, you know.
19    Q.  But you had an expectation that you were
20  going to have business opportunities --
21    A.  Yeah, that's what I figured I was going
22  to get that opportunity.
23    Q.  -- things with him, but that never
24  happened?
25    A.  It didn't happen.

27 (Pages 102 to 105)

Page 106

1     MR. FLANDERS: That's all I have.
2     THE WITNESS: I feel bad because, you
3  know, go ahead.
4     MR. TRAINI: For -- for the same reasons
5  that were stated by Mr. MacFadyen at the
6  conclusion of the direct examination at the Wiley
7  deposition and restated by Mr. MacFadyen at the
8  conclusion of the Rodriguez deposition, I have no
9  questions at this time on behalf of
10 ████████████
11     MR. O'BRIEN: And on behalf of
12 ████████ I'm going to join in on those
13 comments and adopt what Mr. Traini just said as
14 well as the earlier comments made by my partner,
15 John MacFadyen.
16     MR. PINE: I would like to ask a couple
17 of questions on behalf of Raymour Radhakrishnan.
18     EXAMINATION
19 BY MR. PINE:
20  Q.  Mr. Mizzoni, I'm Jeff Pine. I represent
21 Raymour Radhakrishnan.
22  A.  Yeah.
23  Q.  We were introduced before. I just have
24 a few questions --
25  A.  Okay.

Page 107

1  Q.  -- as a follow-up to what we've been
2  asking. I won't keep you long.
3     You were shown Exhibit 1. You were asked
4  about --
5  A.  Yeah.
6  Q.  -- several questions about that. Is it
7  your understanding that that's a life insurance
8  policy or something else?
9     MR. VILKER: Objection. This witness's
10 understanding on that issue is irrelevant.
11     MR. PINE: Well, I don't think so.
12     MR. VILKER: Okay.
13     MR. PINE: I think it's very relevant.
14 BY MR. PINE:
15  Q.  Is it your understanding that that's a
16 life insurance policy on your life or something
17 else?
18  A.  No, I don't think so.
19  Q.  You think it's a life insurance policy?
20  A.  Yeah.
21  Q.  Do you know what an annuity is?
22  A.  It should be the money that's being put
23 down.
24  Q.  Right. Do you understand that
25 Mr. Caramadre invested money of his own --

Page 108

1  A.  Yeah.
2  Q.  -- involved in this -- in this
3  particular transaction; that he put his own money
4  on the line in this transaction. Do you
5  understand -- you agree with that?
6  A.  Yeah, but the point I'm trying to bring
7  out, you guys've gotta bring out, you are buying
8  my body, no way.
9  Q.  I understand. I understand where you're
10 coming from.
11  A.  Okay.
12  Q.  My only question is, do you understand
13 that he invested his own money --
14  A.  Yeah, I understand.
15  Q.  -- to purchase this annuity?
16  A.  Yeah.
17  Q.  And he paid $10,000?
18  A.  Yeah.
19  Q.  That's what the document said. And do
20 you understand that the value of that annuity can
21 go up or --
22  A.  Or down.
23  Q.  -- or it can go down?
24  A.  Yeah. Right.
25  Q.  And he's assuming the risk on that?

Page 109

1     MR. VILKER: Objection.
2  Q.  Do you understand that when you purchase
3  an annuity that he's bearing the risk --
4  A.  Yeah. Right.
5  Q.  -- of that? Do you know the value or
6  did anybody tell you the value of this annuity as
7  of now, as of October 2009? Did anybody tell you
8  the value?
9  A.  No.
10  Q.  Did anybody suggest to you --
11  A.  No. No. Nobody ever suggested
12 anything. I didn't know nothing about that.
13  Q.  Right. And when you met with Agent
14 McDaid or Mr. Vilker or anybody else, did anybody
15 suggest to you that somebody was going to make
16 hundreds of thousands of dollars or millions of
17 dollars when you pass away? Did anybody suggest
18 that to you?
19     MR. VILKER: Objection.
20  A.  No.
21  Q.  What did they tell you?
22     MR. VILKER: Objection.
23  A.  They said there's big money involved,
24 that's all they said.
25  Q.  Big money?

Page 110

1     A.  They didn't say how much.
2     Q.  Right.
3     A.  They just said just big money.
4     Q.  Did they use that phrase "big money
5  involved"?
6     A.  Yeah, I would say.
7        MR. VILKER:  I'm objecting to that
8  answer.  Moving to strike.
9     Q.  Did they ever tell what the value of
10  that annuity is today, that $10,000 that was
11  originally invested by Mr. Caramadre, did they
12  tell you that?
13        MR. VILKER:  Objection.
14     A.  No.
15     Q.  They just used the phrase "big money
16  involved"?
17     A.  That's what they said.
18        MR. PINE:  Could I have this marked for
19  identification, please?
20        (Whereupon, Defendant's Exhibit G was
21  marked.)
22  BY MR. PINE:
23     Q.  Can you take a quick look at that?  I'm
24  just going to look over your shoulder, if I can --
25     A.  All right.  Come on.

Page 111

1     Q.  -- while you are looking at it.
2     A.  That's what I can see here.
3     Q.  Okay.  Can I show you the second page of
4  it?
5     A.  Yeah.
6     Q.  And this is America's MarketFlex
7  Annuity?
8     A.  Okay.
9     Q.  That's the company that you were shown
10  before, right?
11     A.  Yeah.
12     Q.  And showing you on the line Purchase
13  Payments, it shows the original purchase price was
14  10,000 --
15     A.  Yeah.
16     Q.  -- which correlates to what you were
17  shown before --
18     A.  Yeah.  Right.
19     Q.  -- as to what he paid, right?  And then
20  ending value, ending contract value as of 9/30/09,
21  which is about three weeks, does it indicate that
22  right now that $10,000 is worth $6930; is that
23  what that indicates?
24     A.  Yeah.
25     Q.  And, in fact, there's been a loss over

Page 112

1  time of about $3000, correct?
2     A.  Yeah.
3     Q.  Did any -- did anybody from the FBI or
4  the U.S. Attorney's office --
5     A.  No, nobody.
6     Q.  -- ever tell you that?
7     A.  No.  They didn't know it either.
8     Q.  Well, they used the phrase "big money"?
9        MR. VILKER:  Objection.
10     A.  Well --
11     Q.  That's what you said.  Did they ever
12  tell you that it really wasn't big money; it was
13  $6000 they were talking about?
14     A.  They didn't know.
15        MR. VILKER:  Objection.
16     A.  They didn't know.  They couldn't have
17  known.  If they had known, they would have told
18  me, right?
19        MR. PINE:  That's assuming they told you
20  the truth.
21        MR. VILKER:  Objection.
22  BY MR. PINE:
23     Q.  That's assuming they were shooting
24  straight with you, isn't it?
25        MR. VILKER:  Move to strike the question

Page 113

1  and the answer.
2        MR. PINE:  Well, his answer speaks for
3  itself.
4        MR. VILKER:  Our objection speaks for
5  itself.
6  BY MR. PINE:
7     Q.  Does it change your opinion of anything
8  in terms of what Mr. Caramadre did to find out
9  that he's actually lost some money on his
10  investment?
11        MR. VILKER:  Objection.  Irrelevant what
12  this witness's opinion is.
13        MR. PINE:  He may answer.  You can
14  answer.
15     Q.  Does it change your opinion of any of
16  this transaction that he lost money on his own
17  investment?
18     A.  I'm going to call it the way it was
19  written out.  Even though he put the money down, I
20  don't know that; okay?
21     Q.  Right.
22     A.  I don't know nothing.  But my body was
23  being sold as buried.  If I died today, he would
24  have got the money.  Who else?  Who else?
25     Q.  Even accepting that as true, if you died

1   today he'd get his money, do you agree with me
2   that he would get less money back than he
3   originally invested?
4          MR. VILKER: Objection. First of all,
5   this witness's opinion is irrelevant on that.
6   Second of all, that's just flat wrong. If you
7   continue to look on the document, the death
8   benefit value is --
9          MR. PINE: Okay.
10         MR. VILKER: -- actually greater than
11  $10,000.
12     Q.  All right. Well, then let's ask him if
13  that's big money.
14         On this line it says the death benefit value
15  is $12,764.52. Did anybody ever tell you that
16  figure when they were talking about the value that
17  he might get in the event that you passed away?
18         Did anybody ever tell you the entire
19  investment of $10,000 is worth 12,000 now?
20     A.  No. No.
21     Q.  They just used the phrase "big money"
22  and they showed you a list of names, didn't they?
23     A.  Well, I'm going to go through -- that's
24  only one person. Imagine when you got a list of
25  them, when you see a list of a hundred people with

1   their names written down on paper and they says
2   that's what they're investigating. You want to
3   know the truth?
4      Q.  Right.
5      A.  They're investigating that there.
6   Why -- why is the FBI stepping in on it? Why?
7      Q.  Well, what did they tell you why they
8   were stepping in on it?
9          MR. VILKER: Objection. It's
10  irrelevant. Hearsay.
11     Q.  What did they say to you about that list
12  of names?
13     A.  Well, they just said that we're -- we're
14  checking out the names, there's too many of them.
15     Q.  And did they suggest to you that
16  Mr. Caramadre had done something wrong?
17         MR. VILKER: Objection. Irrelevant and
18  hearsay.
19     A.  No. They didn't say he done something
20  wrong. They didn't say -- they told me that he --
21  there's nothing to worry about because if they
22  find a different thing where they found him wrong,
23  then they can investigate better but right now
24  it's up in the air. Find out what they're going
25  to do. I don't know what they're going to do. I

1   don't think you know.
2      Q.  Based on your conversations with them,
3   do you think he did anything wrong?
4          MR. VILKER: Objection. Irrelevant.
5      A.  I can't say that.
6      Q.  You don't know that?
7      A.  No.
8      Q.  What if the whole thing was legal --
9          MR. VILKER: Objection.
10     Q.  -- would that affect your opinion?
11         MR. VILKER: Objection. Irrelevant.
12         MR. PINE: I'm just wondering.
13         MR. VILKER: Still objecting.
14     A.  Well, knowing Joe as a kid, okay, I
15  always took him for granted because he's -- he was
16  a kid growing up in my era and I took him to
17  school as a little younger and he was only a
18  little kid, five of them, the whole family, and
19  I -- you know, to me, it breaks my heart to see
20  what they're doing. When they showed me the
21  names, you want to see, I got -- I got sick when I
22  looked at all the names.
23     Q.  But did you get sick because you thought
24  that because there were a lot of names on the list
25  that he had done something wrong with those names?

1          MR. VILKER: Objection.
2      A.  The list was -- the list was
3   investigation --
4      Q.  Right.
5      A.  -- so...
6      Q.  That's what the FBI told you?
7          MR. VILKER: Objection.
8      A.  No, they showed it to me.
9      Q.  Right. They showed that list to you?
10     A.  They showed me the list. Why would they
11  show me a list if it wasn't true?
12         MR. VILKER: Objection. Move to strike.
13     A.  Come on.
14     Q.  Did the fact that there were a lot of
15  names on that list upset you?
16         MR. VILKER: Objection.
17         THE WITNESS: He's right. You're right.
18         MR. VILKER: You can answer the
19  question. I'm just objecting for the record.
20     A.  I'll tell you, what I went through
21  today, I won't want to go through it again.
22     Q.  I understand.
23     A.  It's a shame. It's a shame, actually a
24  shame, but the FBI's got a job to do, they do it.
25  We got a job to do and we do it. That's it.

1   Q.   I get -- I have the impression because
2   you know Joe a long period of time since he was a
3   boy, you know him pretty well, you trusted him for
4   a long time, didn't you?
5       A.   Yeah.
6   Q.   And you relied on him for a lot of
7   advice over the years?
8       A.   Yeah.
9   Q.   And you have no reason to believe that
10   he would ever do you any harm, do you?
11       A.   I didn't -- I didn't -- I didn't bring
12   the people here.
13   Q.   Right.
14       A.   You people brought them here.
15   Q.   But knowing him as you do, do you
16   ever -- have you ever had the belief or opinion
17   that he would ever do you any harm, knowing him?
18       A.   No, I don't think he would hurt me.
19   Q.   Okay.
20       A.   I -- I believe that.
21   Q.   Okay.
22       A.   Like I said, anybody makes mistakes.
23   You know what I mean?  We all make mistakes.
24   That's why they put erasers on pencils.
25   Q.   Right.  Did the FBI ever suggest to you

1   that he made a mistake about anything?
2       MR. VILKER:  Objection.
3       A.   They didn't say nothing.  They just told
4   me I got a list of names here that has to be done
5   and we have to investigate it.  That's it.
6   Q.   Okay.
7       A.   So I closed the book like that.  She
8   gave me a paper, she closed it up, and I didn't
9   get to see nothing.  I spoke to my -- my buddy
10   here.
11   Q.   Your buddy Mr. Vilker?  Did he ever
12   suggest to you that Joe had made some mistakes
13   relevant to those names on the list?
14       A.   Nobody -- nobody -- nobody knows that.
15       MR. VILKER:  Objection.
16       A.   Nobody is going to know that either.
17   Q.   He might not have done anything wrong,
18   isn't that right?
19       MR. VILKER:  Objection.
20       A.   That's right.
21   Q.   Right.
22       A.   We're exactly the same thing.  I said
23   the same thing.  We all make mistakes.
24   Q.   And do you understand that -- that he
25   invested the $10,000 out of his own pocket just

1   like he gave you the $2000 out of his own pocket?
2   He's entitled to do that, isn't he?
3       MR. VILKER:  Objection.
4       A.   Yeah, he can do what he wants.  If he
5   wants to give me 50 --
6   Q.   Right.
7       A.   -- I'll take 50,000.
8   Q.   You're not going to argue, right?
9       A.   He can give me all the money he wants.
10   Q.   And if he wants to invest $10,000 of his
11   own money, he has the right to do that, doesn't
12   he?
13       MR. VILKER:  Objection.
14       A.   Yeah.  As long as he's got a slip for
15   it, give him a piece of paper with a signature.
16   Q.   And if he wants to take a risk by buying
17   a particular investment, it may go up, it may go
18   down; we don't know?
19       A.   That's the stock market now.  Now you're
20   talking stock market.
21   Q.   Well, but it's also an annuity which can
22   go up or down in value, isn't it?
23       A.   Yeah.
24   Q.   And if he wants to take a risk --
25       A.   I bought a policy through Joe, okay,

1   that Nationwide, whatever it is, the company.
2   Q.   Yes.
3       A.   Do you know that the policy -- when Joe
4   told me was going to be a big policy, the goddamn
5   thing ain't worth the money.  We can't collect it
6   even if -- even if I live another five more years,
7   I would never be able to collect that money.
8   Q.   Why is that?
9       A.   Because by the time you get through
10   paying for it, forget about it.  You're gone.
11   They're going to make us live longer.  I hope I
12   make a hundred, honest to God.
13       MR. PINE:  I hope so.
14       THE WITNESS:  I'm going 86 next month.
15       MR. PINE:  I hope so too.
16       THE WITNESS:  The state pays me more
17   money.  I get a check from the state, remember.
18   I'm retired from the state.  I'm retired from the
19   Teamsters, and Social Security.
20   Q.   But you would agree if Joe wants to make
21   an investment of $10,000 --
22       A.   He can make it.
23   Q.   -- he can do that?
24       A.   He can do that.
25   Q.   He bears the risk?

31 (Pages 118 to 121)

Page 122

1  A.  But we're not questioning that.  The
2  questioning part was on the paper on the -- on the
3  form.
4  Q.  Well, what -- what I understood you to
5  say was you weren't aware that he was doing it,
6  right?
7  A.  But -- but how many -- how many names
8  can you do?  You realize if you got 50 names on a
9  slip and with your name on it, you're the lawyer,
10  who's going to suffer?  Who's going to suffer?
11  Q.  But he never asked you for any money --
12  A.  No.
13  Q.  -- to put into this investment, he did?
14  A.  No, that ain't the point.
15  Q.  He put his own money on.
16  A.  Yeah, but it ain't the point.  The point
17  is when I see my name on there is a dead body.
18  That's like buying a dog and letting him die.
19  Q.  And it upset you that -- it sounds to me
20  that it upset you that you weren't aware that he
21  was making that investment?
22  A.  Making an investment.  It was shown to
23  me by black and white.
24  Q.  By the FBI?
25  A.  Yeah.

Page 123

1  Q.  Along with a whole list of names?
2  A.  Yeah.
3  Q.  Right.
4  A.  How do you -- how do you try to win this
5  case by saying the FBI come in and checked that
6  out?  Once they clear this thing, then they say,
7  okay, Joe.  That's how you're going to do it,
8  not -- not the way they're doing it.  They're
9  making a big stink out of it, a lot of people --
10  Q.  Right.
11  A.  -- but the FBI's got a right to do it.
12  You got a right to become a lawyer.
13  Q.  Right.
14  A.  Well, that's the same thing right there.
15  Q.  And he has a right to respond to
16  whatever the FBI is saying about him, doesn't he?
17  A.  Right.  Right.  He's a lawyer.
18  Q.  Right.  He has the right to defend
19  himself --
20  A.  Well --
21  Q.  -- right?
22  A.  Right.
23  Q.  Okay.
24  A.  But the point I'm trying to bring out,
25  they're putting -- my name is on that list that

Page 124

1  they had.  God knows how many friends of mine are
2  on that list.
3  They're going to go through the same thing
4  I'm going through now.  I'm -- at my age, at 86
5  years old, I've got to go through with lawyers.
6  Q.  Right.
7  A.  How many of them?  One, two, three,
8  four, five, six, seven, eight, nine, 10 people,
9  including the secretary.
10  Q.  Ten lawyers and 11 opinions.
11  A.  That's a sin.  That's a sin.
12  MR. PINE:  All right.  I'm not going to
13  bother you anymore with any other questions.  I
14  appreciate you answering my questions.  Thank you.
15  MR. VILKER:  I have no further questions
16  either.
17  THE WITNESS:  No more questions.
18  MR. VILKER:  No more questions.  I guess
19  we're all done, Mr. Mizzoni.  Thank you for your
20  time today.
21  THE WITNESS:  Hum?
22  MR. VILKER:  Thank you for your time
23  today.
24  THE WITNESS:  Okay.  You've been a good
25  person anyway.  You're right on the ball.

Page 125

1  VIDEOGRAPHER:  The time is 12:42.  The
2  deposition is concluded.  We are now off the
3  record.
4  (Adjourned at 12:42 p.m.)
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

32 (Pages 122 to 125)

Page 126

1  STATE OF RHODE ISLAND AND PROVIDENCE PLANTATIONS
2  KENT, Sc.
3
4  C E R T I F I C A T I O N
5
6  I, VIVIAN S. DAFOULAS, do hereby certify that
7  I am expressly approved as a person qualified and
8  authorized to take depositions pursuant to Rules
9  of Civil Procedure of the Superior Court,
10  especially but without restriction thereto, under
11  Rule 30(e) of said Rules; that the witness was
12  first sworn by me; that the transcript contains a
13  true record of the proceedings.
14  IN WITNESS WHEREOF, I have hereunto set my
15  hand this 26th day of October, 2009.
16
17
    Vivian S. Dafoulas, RMR-CRR
18  Notary Public
    (401) 885-0992
19  (My commission expires 1/4/2010.)
20
21
22
23
24
25

Page 128

1  CORRECTION SHEET
2
   DEPOSITION OF:
3  ROBERT MIZZONI
   OCTOBER 23, 2009
4
5  PAGE # LINE #
6
   NOW READS:          CORRECTION REQUESTED:
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 127

1  WITNESS SIGNATURE
2  DEPOSITION OF:
3  ROBERT MIZZONI
   OCTOBER 23, 2009
4
5
6  I hereby certify that I have read the
7  foregoing transcript and the same contains a true
8  and accurate recording of my answers to the
9  questions therein set forth, subject to the
10  change(s) and/or correction sheet(s) attached.
11
12  _____
    SIGNATURE OF DEPONENT
13
14  STATE OF_____
15
16  Subscribed and sworn to before me
17  this_____day of_____, 2009.
18  _____
    NOTARY PUBLIC
19
20  (My commission expires:_____)
21
22
23
24
25

33 (Pages 126 to 128)