# GOVERNMENT

# EXHIBIT 9

**Condensed Transcript**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

In re Grand Jury Proceedings
MC NO. 09-84
~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

**VIDEOTAPED DEPOSITION OF**

**PATRICK GARVEY**

November 20, 2009
9:40 a.m.

2300 West Sahara, Suite 770
Las Vegas, Nevada

Heidi K. Konsten, RPR, CCR # 845



Toll Free: 800.845.3376
Facsimile: 702.382.2050

Suite 770
2300 West Sahara Avenue
Las Vegas, NV 89102
www.esquiresolutions.com

ESQUIRE
an Alexander Gallo Company

### 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND
******

In re Grand Jury Proceedings

MC NO. 09-84

VIDEOTAPED DEPOSITION OF
PATRICK GARVEY

November 20, 2009
9:40 a.m.

2300 West Sahara, Suite 770
Las Vegas, Nevada

Heidi K. Konsten, RPR, CCR # 845

### 2

APPEARANCES OF COUNSEL

For the Government:
LEE H. VILKER, ESQ.
JOHN P. McADAMS, ESQ.
U.S. Department of Justice
United States Attorney's Office
50 Kennedy Plaza, 8th Floor
Providence, Rhode Island 02903
(401) 709-5055
(401) 709-5017 Fax
lee.h.vilker@usdoj.gov

For Raymour Radhakrishnan:
JEFFREY B. PINE, ESQ.
Law Offices of Jeffrey B. Pine, Esq.
321 South Main Street
Suite 302
Providence, Rhode Island 02903
(401) 351-8200
(401) 351-9032 Fax
jbp@pinelaw.com

For Transamerica Life Insurance Company:

BROOKS R. MAGRATTEN, ESQ.
Pierce Atwood
10 Weybosset Street
Suite 400
Providence, Rhode Island 02903
(401) 558-5113
(401) 588-5166 Fax
bmagratten@pierceatwood.com

Also present: Stephen E. Souza
Raymour Radhakrishnan
Brian Bywaters, Videographer
Diano Garvey

******

### 3

VIDEOTELEPHONIC APPEARANCES OF COUNSEL
For Joseph Caramadre:
ROBERT G. FLANDERS, JR., ESQ.
Hinckley, Allen & Snyder
50 Kennedy Plaza
Suite 1500
Providence, Rhode Island 02903
(401) 274-2000
(401) 277-9600 Fax
rflanders@haslaw.com

For ████████:

JOHN A. MacFADYEN, III, ESQ.
MacFadyen, Gescheldt & O'Brien
101 Dyer Street
3rd Floor
Providence, Rhode Island 02903
(401) 751-5090
(401) 751-5096 Fax
jmacfadyen@mgolaw.com

For ████████:
ANTHONY M. TRAINI, ESQ.
Anthony M. Traini, P.C.
56 Pine Street
Suite 200
Providence, Rhode Island 02903
(401) 621-4700

For Lifemark Securities Corp:

JOSEPH V. CAVANAGH, JR., ESQ.
Blish & Cavanagh, LLP
Commerce Center
30 Exchange Terrace
Providence, Rhode Island 02903
(401) 831-8900
(401) 751-7542 Fax
jvc@blishcavlaw.com

Also present: Pamela McDade
Tamara Hardy
Joseph Caramadre

### 4

INDEX

PATRICK GARVEY                                    Page

Direct Examination by Mr. Vilker            11
Cross-Examination by Mr. Pine              100
Cross-Examination by Mr. Flanders        168

EXHIBITS
No.       Description                           Page
1    1/8/2008 Check # 6833                 6
2    1/8/2008 Check # 8637                 6
3    December 24, 2007, Dawn Abbott      6
     letter
4    January 3, 2008, Mary Grogan letter  6
5    Social security and Rhode Island     6
     Identification card
6    Terminal Illness Philanthropy        6
     Account Receipt
7    Ameritrade Account Application       6
8    Rhode Island Catholic - December 6,  6
     2007
9    Ameritrade Margin/Options Account    6
     Upgrade Form
10   Limited Trading Authorization        6
11   9/29/09 Check # 7164713              6
12   Transamerica Landmark Variable       6
     Annuity
13   Lifemark Acknowledgment of           6
     Annuitant
14   America's Market Flex Annuity        6
     Application
15   Lifemark Acknowledgment of           6
     Annuitant
16   Scottrade Brokerage Account          6
     Application
17   Scottrade Margin Agreement           6
18   Scottrade Limited Trading            6
     Authorization



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.845.3376
Facsimile: 702.382.2050

Suite 770
2300 West Sahara Avenue
Las Vegas, NV 89102
www.esquiresolutions.com



**Page 5**

EXHIBITS (continued)

| No. | Description | Page |
|-----|-------------|------|
| 19 | ING Deferred Variable Annuity Application | 6 |
| 20 | Lifemark Acknowledgment of Annuitant | 6 |
| 21 | American Skandia Variable Annuity Application Form | 6 |
| 22 | Annuitant Acknowledgment | 6 |
| 23 | Bank of America Brokerage Account Application | 6 |
| 24 | Banc of America Margin Account Application and Agreement | 6 |
| 25 | Banc of America Trading Authorization | 6 |
| 26 | 2/20/08 Garvey/Caramadre letter | 6 |
| 27 | 2/20/08 Garvey/Radhakrishnan letter | 6 |
| 28 | 4/14/08 Check # 8818 | 6 |
| 29 | UPS Shipping Document 9/9/09 | 6 |
| 30 | UPS Shipping Document 9/8/09 | 6 |
| 31 | Package of documents | 6 |
| A | Objections | 9 |
| B | List of Signatures | 101 |
| C | 4/14/08 Check # 8818 | 164 |

**Page 6**

1  DEPOSITION OF PATRICK GARVEY
2  November 20, 2009
3  (Exhibit Nos. 1 - 31 were
4  previously marked for
5  identification and are attached
6  hereto.)
7
8  THE VIDEOGRAPHER:  This is tape
9  number one to the videotaped deposition of Patrick
10 Garvey in the matter of United States vs.
11 Caramadre, being heard before the United States
12 District Court for the District of Rhode Island,
13 Case No. 0984.
14    This deposition is being held at
15 2300 West Sahara Avenue, Suite 770, Las Vegas,
16 Nevada, on November 20th, 19 -- I'm sorry, 2009,
17 at 9:40 a.m.
18    My name is Brian Bywaters with
19 Esquire Solutions.  The court reporter is Heidi
20 Konsten.
21    Counsel and all present, will you
22 please introduce yourselves and affiliations,
23 after which the witness will be sworn.
24    MR. VILKER:  Okay.  This is Lee
25 Vilker.  I'm an Assistant United States Attorney

**Page 7**

1  for the government.
2    MR. PINE:  Jeffrey Pine representing
3  Raymour Radhakrishnan.
4    MR. RADHAKRISHNAN:  Raymour
5  Radhakrishnan.
6    MR. MAGRATTEN:  Brooks Magratten
7  representing Transamerica Life Insurance Company.
8    MR. SOUSA:  Stephen Souza, postal
9  inspector.
10   MR. McADAMS:  John McAdams, Assistant
11 United States Attorney.
12   THE WITNESS:  Patrick Garvey.
13   THE COURT REPORTER:  Can we have all
14 present via video conference please identify
15 yourselves.
16   MR. FLANDERS:  Robert Flanders for
17 Joseph Caramadre.
18   MR. MacFADYEN:  John MacFadyen for
19 ████████████
20   MR. TRAINI:  Anthony Traini for
21 ████████████
22   MR. CAVANAGH:  Joseph Cavanagh for
23 Lifemark.
24   MS. McDADE:  Pam McDade, FBI.
25   MS. HARDY:  Tamara Hardy, FBI.

**Page 8**

1    MR. VILKER:  I believe Mr. Caramadre
2  is also present.
3    MR. MAGRATTEN:  Yes, he is.
4
5  Whereupon,
6     PATRICK GARVEY,
7  was called as a witness, and having been first duly
8  sworn to testify to the truth, was examined and
9  testified as follows:
10
11   MR. VILKER:  Okay.  May I begin with
12 the questions, or do you have anything that you
13 would like to get on the record?
14   MR. PINE:  I think we should put on
15 the record the objections that we have lodged in
16 previous depositions.  To that end, I'm submitting
17 as an exhibit the objections -- a written version
18 of the objections that were lodged at the
19 beginning of the Wiley deposition, which were also
20 marked as an exhibit in the Rodrigues deposition.
21   I would ask that it be marked for
22 this deposition, as well.  And I believe in prior
23 depositions, we have also lodged standing
24 Petrosielo objections to any testimony by
25 Mr. Garvey that relates to conversations that he


ESQUIRE
an Alexander Gallo Company

Toll Free: 800.845.3376
Facsimile: 702.382.2050

Suite 770
2300 West Sahara Avenue
Las Vegas, NV 89102
www.esquiresolutions.com



**9**

```
 1   had with anyone other than our clients on
 2   Petrosielo grounds, without us having to make
 3   those objections every single time there is a
 4   statement that is made, in order to avoid
 5   unnecessary delay.  So we are lodging an ongoing,
 6   standing Petrosielo objection.
 7              (Exhibit A was marked for
 8              identification and is attached
 9              hereto.)
10         MR. MacFADYEN:  I don't think the
11   government needs to add anything else on these
12   objections.  We've stated on the record in the
13   prior depositions our positions on your
14   objections, and we incorporate our positions to
15   your objections in this deposition here.
16         Anything else?
17         MR. MacFADYEN:  Yeah.  John
18   MacFadyen.
19              I would also like to interpose a
20   standing relevance objection unless and until my
21   client is somehow connected to these proceedings,
22   and then two procedural points.  One is we're
23   reserving our right to lodge substantive
24   objections unless -- at the time these depositions
25   might be used.
```

**10**

```
 1              And, secondly, we've had an existing
 2   agreement that an objection by one counsel will be
 3   deemed an objection for all, and I -- and I would
 4   like to establish, for the record, that that
 5   agreement is in effect for these proceedings.
 6         MR. VILKER:  On your second point,
 7   the government is in agreement that an objection
 8   by counsel will be considered an objection by all
 9   counsel.
10              However, on your first point, the
11   government's deposition has been and continues to
12   be that if you have an objection to a specific
13   question, you need to raise that objection at the
14   time the question is asked so the questioner has
15   an opportunity to rephrase the question.  The
16   government's position is that objections will not
17   be preserved if they're not raised during these
18   depositions.
19              I understand we have a difference of
20   opinion on that issue.
21         MR. MAGRATTEN:  Transamerica joins in
22   the government's position on that point.
23         MR. VILKER:  Okay.
24         UNIDENTIFED SPEAKER:  I couldn't
25   hear --
```

**11**

```
 1         MR. MacFADYEN:  Brooks, we want to
 2   hear you.
 3         MR. MAGRATTEN:  Can you hear me now?
 4         MR. MacFADYEN:  Yes.
 5         MR. MAGRATTEN:  Transamerica joins
 6   the government in its position as to objections
 7   raised at this deposition.
 8         MR. TRAINI:  This is Mr. Traini on
 9   behalf of ▮▮▮▮▮▮▮▮▮▮.  I join in all three of
10   the points raised by Mr. MacFadyen, and those --
11   those have been our positions, I believe, in the
12   earlier depositions, and we reiterate them here.
13
14              EXAMINATION
15   BY MR. VILKER:
16    Q   Okay.  Good morning, Mr. Garvey.
17    A   Good morning.
18    Q   My name is Lee Vilker.  I'm Assistant
19   United States Attorney representing the government
20   in this case.
21        I'm going to be the first attorney
22   asking you some questions.  If at any time I ask
23   something that is not clear or that you would like
24   me to rephrase, let me know, and I'll do my best
25   to rephrase it.  Also, if at any time you need a
```

**12**

```
 1   break, please let us know, and we'll stop and --
 2   and give you that break.
 3    A   Okay.
 4    Q   Mr. Garvey, how old are you now?
 5    A   Sixty-two and a half.
 6    Q   And where were you born?
 7    A   Providence, Rhode Island.
 8    Q   Okay.  If you can just speak up a little
 9   bit.
10    A   Providence, Rhode Island.
11    Q   Okay.  And are you -- this deposition is
12   in Las Vegas.
13        Are you now living in Las Vegas?
14    A   Yes, I am.
15    Q   Okay.  And when did you first move to
16   Las Vegas?
17    A   About -- I believe about eight months
18   ago.
19    Q   And prior to that time, had you lived
20   your entire life in Providence?
21    A   Rhode Island.
22    Q   Are you married, Mr. Garvey?
23    A   I am.
24    Q   And how long have you been married for?
25    A   33 years, going on 34.
```



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.845.3376
Facsimile: 702.382.2050

Suite 770
2300 West Sahara Avenue
Las Vegas, NV 89102
www.esquiresolutions.com

13

1    Q    Okay.  Are you working now?
2    A    No.
3    Q    Okay.  When -- what was your profession
4    when you were working?
5    A    I started off in landscaping, and then I
6    went into jewelry designing, and I'm a design mold
7    maker.
8    Q    Okay.  Now, have you, in the last few
9    years, had any kind of health problems?
10   A    I have.
11   Q    And what health problems have you had?
12   A    Two heart attacks, one that killed me
13   for a minute and 30 seconds.  They brought me
14   back.  They turned around and told me that if I
15   lived for three months, that there was a chance I
16   would live longer.
17        Here in Nevada, I was rushed into the
18   hospital.  My kidneys started shutting down, and
19   my liver started shutting down.  Which was to be
20   expected, because that's what the doctors told me.
21   They gave me some warning signs, and that's what
22   they told me would happen, among a few other
23   things.
24        So I stayed in the hospital here in
25   Nevada, and then they cut me loose.  And they told

14

1    me that, "Mr. Garvey, you're going to die, and
2    you're going to die soon."
3        I said, "Okay.  Thank you."
4    Q    Okay.  Have you been told by any medical
5    professionals what the condition of your heart is
6    now?
7    A    Oh, yeah.
8    Q    And what have they told you?
9    A    I sat down with five doctors.  Their
10   names, I don't know.  Some of them I do.
11   Dr. Zing, John Abbott, and there was some other
12   ones that I didn't know.  They turned around and
13   told me, they said, "Mr. Garvey, one side -- you
14   took a massive heart attack.  One side of your
15   heart does not work at all."
16        The other side that is working, which
17   would be this side -- okay.  You're looking at it,
18   it would be your right side.  I believe it's the
19   aorta valve or one of the valves that is going up,
20   is ripped all the way down.  It's pumping blood
21   and fluid out, and it's going into my lungs and
22   into my stomach.  And then I blow up, and I have
23   to go into the hospital, and then they drain it
24   from the back.  Okay.
25        The last time they drained it, I -- they

15

1    took out 51 pounds of fluid, 11 2-liter bottles of
2    fluid.  And they told me that, "It doesn't look
3    good for you, Mr. Garvey.  You will need a heart
4    transplant, and without one, you will die."
5        So I've been told twice that I'm going
6    to die.  And other times -- Dr. Zing turned around
7    and told me, he said, "Patrick," he said, "I'm
8    going back now."  He said, "I'm going to go over
9    your X-ray again," whatever.  He said, "If I can
10   help you," he said, "I'll come back and talk to
11   you."  He never came back.
12        Dr. John Abbott turned around and
13   explained to me that Dr. Zing said, "There isn't a
14   doctor in the United States that would touch you."
15   Q    Okay.  Mr. Garvey, are you on any kind
16   of medications now?
17   A    Yes, I am.
18   Q    Do any medications that you're currently
19   taking affect your ability to understand what's
20   happening today?
21   A    Yes.  I can forget, and then it will
22   come back.  Okay.  And I can forget.  But -- and I
23   might get a little bit dizzy sometimes.
24   Q    And, again, if you need a break, if
25   you're feeling dizzy, let us know, and we'll take

16

1    a break.
2        So you said there is a medication
3    that -- that can affect your memory?
4    A    Yeah.  It's -- it's Valium.
5    Q    And how does this generally affect your
6    memory?
7    A    Well, I -- I really don't know.  I mean,
8    you can ask me a question, okay, I can turn my
9    head and forget.  And then I have to think what
10   that question was, then it comes back to me, and I
11   can answer that question.
12   Q    Okay.  Now, Mr. Garvey, I want to take
13   you back to December of 2007.
14        Were you living in Rhode Island at that
15   time?
16   A    I was.
17   Q    Okay.  And did you attend a church in
18   Rhode Island?
19   A    I did.
20   Q    And what was the name of that church?
21   A    The Church of Holy Name.
22   Q    Okay.  And where was the Church of Holy
23   Name located?
24   A    In -- on Camp Street in Rhode Island.
25   Q    Okay.  Now, in your time at that church,



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.845.3376
Facsimile: 702.382.2050

Suite 770
2300 West Sahara Avenue
Las Vegas, NV 89102
www.esquiresolutions.com

Patrick Garvey                                        November 20, 2009

|  | 17 |
|---|---|
| 1 | did you become familiar with a woman named Margo |
| 2 | Meo? |
| 3 | A   Yes, I did. |
| 4 | Q   And how did you know Ms. Meo? |
| 5 | A   I grew up with Margo. We went to Summit |
| 6 | Avenue School together. I knew her from -- she |
| 7 | went to a Catholic school. I moved on to like |
| 8 | Nathan Bishop, which was parochial. I knew -- |
| 9 | I've known her all of my life. |
| 10 | Q   Okay. Now, did you tell Ms. Meo about |
| 11 | your health condition? |
| 12 | A   Yes, I did. |
| 13 | Q   Okay. Now, in late -- in late 2007, was |
| 14 | there a time in which Ms. Meo told you about a way |
| 15 | in which you could make some money? |
| 16 | MR. PINE: Objection; leading. |
| 17 | THE WITNESS: Yes. |
| 18 | BY MR. VILKER: |
| 19 | Q   Okay. Well, let me rephrase that. |
| 20 | What, if anything, did Ms. Meo say to |
| 21 | you about a way in which you could make some |
| 22 | money? |
| 23 | MR. FLANDERS: Objection. |
| 24 | THE COURT REPORTER: Who objected? |
| 25 | MR. PINE: That was Mr. Flanders. |

|  | 19 |
|---|---|
| 1 | terminally ill, you get $2,000. Call me at this |
| 2 | number." |
| 3 | UNIDENTIFED SPEAKER: Objection; move |
| 4 | to strike. |
| 5 | THE COURT REPORTER: Gentlemen, I |
| 6 | don't know who is speaking. |
| 7 | MR. FLANDERS: I'll identify myself. |
| 8 | Flanders. Robert Flanders. |
| 9 | BY MR. VILKER: |
| 10 | Q   Okay. So you saw this pamphlet in the |
| 11 | church? |
| 12 | A   Yes. |
| 13 | MR. FLANDERS: Objection; leading |
| 14 | question. |
| 15 | BY MR. VILKER: |
| 16 | Q   Now, what did -- |
| 17 | MR. FLANDERS: Flanders. |
| 18 | BY MR. VILKER: |
| 19 | Q   What, if anything, did you do when you |
| 20 | saw that pamphlet in the church? |
| 21 | A   I -- I kind of I looked at it like |
| 22 | there's got to be a catch, or I don't believe it. |
| 23 | And that's what I told Margo. |
| 24 | Q   Okay. And how did Margo respond to |
| 25 | that? |

|  | 18 |
|---|---|
| 1 | BY MR. VILKER: |
| 2 | Q   You can answer the question. |
| 3 | A   Margo was in church. Margo come up to |
| 4 | me, and she had a pamphlet. Now, the pamphlet, I |
| 5 | guess the church -- that the people who printed it |
| 6 | up run it through the church. Okay. So she |
| 7 | showed me the pamphlet, and I figured that it was |
| 8 | legal, it was up to date. It's in a church, and |
| 9 | the church -- |
| 10 | MR. FLANDERS: Objection; move to |
| 11 | strike, nonresponsive. |
| 12 | BY MR. VILKER: |
| 13 | Q   Okay. Well, what do you remember the |
| 14 | pamphlet saying? |
| 15 | A   The pamphlet said that -- |
| 16 | UNIDENTIFED SPEAKER: Objection. |
| 17 | UNIDENTIFED SPEAKER: Objection; |
| 18 | hearsay. |
| 19 | THE COURT REPORTER: Gentlemen, I'm |
| 20 | going to need you to identify yourself. I can't |
| 21 | tell who is speaking. |
| 22 | MR. FLANDERS: It's Flanders -- |
| 23 | Mr. Flanders. |
| 24 | MR. TRAINI: And Mr. Traini. |
| 25 | THE WITNESS: It said, "If you're |

|  | 20 |
|---|---|
| 1 | MR. PINE: Objection. |
| 2 | THE WITNESS: Margo said no. She |
| 3 | said, "Call this number." She says, "I'm telling |
| 4 | you, you are a candidate for $2,000." |
| 5 | BY MR. VILKER: |
| 6 | Q   Okay. Now, did you call the number that |
| 7 | day? |
| 8 | A   No. |
| 9 | Q   Okay. Did there come a time in which |
| 10 | Ms. Meo again brought up this program with you? |
| 11 | A   Yes, she did. |
| 12 | Q   And approximately how much time had |
| 13 | passed from the first time that she discussed it |
| 14 | with you? |
| 15 | A   Maybe a week. |
| 16 | Q   Okay. And what did she say during this |
| 17 | conversation? |
| 18 | MR. FLANDERS: Objection. Flanders. |
| 19 | THE WITNESS: She said, "Patrick, |
| 20 | you -- you should call this number. I'm telling |
| 21 | you, that you will get $2,000" -- |
| 22 | BY MR. VILKER: |
| 23 | Q   Okay. |
| 24 | A   -- she says. |
| 25 | Q   And was that -- was the phone number in |



**ESQUIRE**
an Alexander Gallo Company

Toll Free: 800.845.3376
Facsimile: 702.382.2050

Suite 770
2300 West Sahara Avenue
Las Vegas, NV 89102
www.esquiresolutions.com

---

**21**

1   the pamphlet?
2       A   Yes.
3       Q   Okay.  And did you at that point call
4   that number?
5       A   At one -- no.  No.  It was a little bit
6   longer.
7       Q   Okay.  Do you remember how much after
8   that second conversation with Ms. Meo you called
9   the number?
10      A   Yeah, I went home -- I went home, and I
11  thought about it.
12      Q   Okay.
13      A   And I said, "Well, Margo is telling me
14  to call it, call it, call it, call it."  She's
15  hounding me, so I call it.
16      Q   Okay.
17      A   And I spoke to Raymour.
18      Q   Okay.
19      A   And he --
20      Q   Okay.  Well, did you -- okay.  You spoke
21  to a man over the phone?
22      A   Yes, I did.
23      Q   And did this man tell you what his name
24  was?
25      A   Yes, he did.

**22**

1       Q   And what did he say his name was?
2       A   He said his name was Raymour.
3       Q   Now, what if anything did you say to
4   Raymour during this conversation?
5       A   I told him that I read the -- the ad
6   that he had in the pamphlet, and he said, "Yes."
7   He said, "If you're terminally ill," he said, you
8   know -- he said, you -- "There's a chance you
9   could get $2,000."
10          He said, "Could I come to your house?"
11  And I told him where I lived, and he was there in
12  15 minutes.  When he got there --
13      Q   Okay.  Let me just stop you there.
14          During that phone conversation, did you
15  tell Raymour anything about your health condition?
16      A   Yes, I did.
17      Q   And what did you tell him?
18      A   I told him that I took a heart attack,
19  and that there's a chance I only had three months
20  to live, and that there was -- I needed a heart
21  transplant, basically.
22      Q   Okay.  And you indicated that Raymour
23  told you he would come to your house afterwards?
24      A   Yes, he did.
25      Q   And how long did he say it would take to

**23**

1   get to your house?
2       A   He didn't.  He was there in 15 minutes.
3       Q   Okay.  He came to your house 15 minutes
4   after this conversation?
5       A   I'll say.
6       Q   Now, once Raymour got to your house,
7   what, if anything, did he say to you inside the
8   house?
9       A   He told me -- it's hard to remember,
10  it's been so long.  But we talked about the
11  $2,000, and he turned around and told me, he says,
12  "I have a check," and he pulled out a check.  And
13  he put it on the table, and he said, "This check
14  is for $2,000."  He said, "I am authorized by
15  Mr. Caramadre to write this check out to you, and
16  this will go to you."
17          I said, "Okay."
18          He said, "I need to see documents, if
19  you have them, of your illness, or I have to get
20  in touch with your doctors and whatever."
21          So I had documents in the house.  I
22  brought them out, I showed them to Mr. Raymour,
23  and I believe his words were, "You're right,
24  Mr. Garvey, you're going to die.  And I can turn
25  around, and I'm going to write this check out

**24**

1   now."  And he did, and he gave me the check.
2       Q   Okay.  What, if anything, did Raymour
3   tell you during that first meeting was the reason
4   why this Mr. Caramadre was giving away money?
5       A   He told me that Mr. Caramadre had a
6   brain tumor that was cancerous, and that he was a
7   philanthropist, and that he was dying.  And he
8   wanted to give the poor people and the people that
9   were ill or -- the people that were ill some money
10  to try to help them along before they died.
11      Q   Okay.  Now, I want to show you what I'm
12  marking -- I have marked already as
13  Government Exhibit 1, and ask you to take a look
14  at that.
15          Do you recognize this document,
16  Mr. Garvey?
17      A   It appears to be the check that I got.
18      Q   Okay.  And it's indicated January 8th,
19  2008?
20      A   It is.
21      Q   Does that appear to be about the time
22  that you met with Raymour that first day?
23      A   I would say so.
24      Q   Okay.  Now, what, if anything, did
25  Raymour tell you that this $2,000 was for?

---



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.845.3376
Facsimile: 702.382.2050

Suite 770
2300 West Sahara Avenue
Las Vegas, NV 89102
www.esquiresolutions.com



25

1    A   He told me that the check was for
2   Mr. Caramadre.  It came from him because he had a
3   brain tumor, and he had cancer, and that he was
4   dying.  And he wanted to turn around and help the
5   people that were ill, help them out, and he would
6   give them money that way.
7    Q   Okay.  And what -- what did you believe
8   this $2,000 was for?
9    A   Well, I wasn't sure, so I said to
10  Raymour, I said, "I'm going to ask you right now,
11  if there's anything illegal about this check or
12  these documents that -- that, you know, are going
13  down, I don't want no part of it."
14       He turned around and told me, he says,
15  "Mr. Garvey, I assure you that this is all legal,
16  and there will be no taxes on your end." He says,
17  "Worry about nothing."
18   Q   Now, during that first meeting, did
19  Raymour ask you to sign some forms?
20   A   I don't think so.  I'm not -- I'm not
21  sure.
22   Q   Okay.  Was there a second meeting that
23  you had with Raymour?
24   A   Yes, there was.
25   Q   Okay.  And how did that second meeting

26

1   come about?
2    A   I called Raymour.
3    Q   And how much after the first meeting did
4   you call Raymour?
5    A   I'm not sure.  About a month, maybe,
6   three weeks, and --
7    Q   And what --
8    A   And I --
9    Q   And why did you call Raymour?
10   A   I asked him for some more money.
11   Q   Okay.  You called him to ask him if you
12  could get more money?
13   A   Right.
14   Q   And how did he respond?
15   A   He said, "I will come over to your
16  house." He came over -- he came over to my house,
17  I let him in.  He come upstairs, we talked for a
18  little bit.  And then he says, "I have another
19  check." He said, "And Mr. Caramadre said that I
20  am allowed to write this out for $2,000 and give
21  it to you."
22   Q   Okay.  Now, I would like to show you
23  Government Exhibit 2.
24   A   But with that check --
25   Q   Sure.

27

1    A   -- papers started flying towards me.
2   Now --
3    Q   Okay.  I'm going to ask you about those
4   papers in a moment.
5        But I would like you to take a look at
6   Government Exhibit 2 and ask if you -- take your
7   time to look at it, and ask if you recognize this
8   check.
9    A   I don't -- explain.
10   Q   Okay.  Did you --
11       MR. PINE:  I'm sorry.  I didn't hear
12  that.  I don't --
13       THE WITNESS:  Explain.
14  BY MR. VILKER:
15   Q   Okay.  Let me try to rephrase that.
16       You said you received a second check on
17  the second time that Raymour came to the house?
18   A   Correct.
19   Q   Okay.  And was the second check -- well,
20  how much was the second check for?
21   A   2,000.
22   Q   Okay.  And you have before you
23  Government Exhibit 1 and Government Exhibit 2, two
24  different checks, each for $2,000?
25   A   Right.

28

1    Q   Does it appear by looking at Government
2   Exhibit 2, that this would be the second check
3   that Raymour gave you, if you can tell by looking
4   at the check?
5    A   I would say yes.
6    Q   Okay.  Now, do you see in the memo
7   section on the second check, Government Exhibit 2,
8   it says, "New accounts - bonds."
9        Did you see that notation at the time
10  that Raymour gave you the check?
11   A   No.
12   Q   Okay.  Did you have any conversations
13  with Raymour about what that language, "New
14  accounts - bonds," means?
15   A   No.
16   Q   Now, you mentioned that Raymour gave you
17  documents to sign?
18   A   Yes.
19   Q   Okay.  What, if anything, did Raymour
20  say to you about the documents he wanted you to
21  sign?
22   A   He said they were a formality that
23  Mr. Caramadre required to keep accounts of what he
24  has paid out and people that he has paid it to --
25   Q   Okay.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.845.3376
Facsimile: 702.382.2050

Suite 770
2300 West Sahara Avenue
Las Vegas, NV 89102
www.esquiresolutions.com

Patrick Garvey                                          November 20, 2009

---

**29**

1    A   -- in that form.
2    Q   Okay.  Do you recall approximately how
3  many forms that you were given to sign?
4    A   Three or four.
5    Q   Okay.  Now, did Raymour read any of
6  these forms to you?
7    A   Yes.
8    Q   Okay.  Which forms do you remember him
9  reading to you?
10   A   I don't remember.
11   Q   Okay.  Now, I want to show you what I
12 have marked as Government Exhibit 6, and ask if
13 you take your time and look at that, and ask if
14 that form looks familiar to you?
15   A   No.
16   Q   Do you recall seeing a form in which the
17 number $2,000 was on the form?
18   A   No.
19   Q   Okay.  Do you see your -- well, what
20 appears to be the signature of Patrick Garvey in
21 this form?
22   A   Yes, I do.
23   Q   Okay.  Does that appear to be your
24 signature?
25   A   I'm not sure.

**31**

1  Raymour to have any annuities opened in your name?
2    A   None whatsoever.
3    Q   Now, what, if anything, did Raymour say
4  to you about any money anyone else can make as a
5  result of you signing any documents?
6    A   Just that Mr. Caramadre gave out the
7  money so he could help people that were ill, and
8  that was for his records and whatever.
9    Q   Okay.  Now, I want to show you
10 Government Exhibit 3 and Government Exhibit 4, and
11 ask if you recognize these.
12   A   Yes, I do.  This one, and I recognize
13 this one.
14   Q   Okay.  And what are Government Exhibits
15 3 and 4?
16   A   These are from the hospital.  These are
17 from -- one is from -- I believe one is from Dawn
18 Abbott, and I believe one is from Mary Grogan.
19   Q   And what are these documents about?
20   A   These are about my heart.
21   Q   And did you provide these documents to
22 Raymour when he came to meet with you?
23   A   I did.  I brought them with me.
24   Q   Now, I want to take -- you to take a
25 look at Government Exhibit 5.

---

**30**

1    Q   Okay.  But as you look at this form
2  today, it doesn't look familiar to you?
3    A   No.
4    Q   Okay.
5    A   I didn't see this form.
6        MR. FLANDERS:  Objection; move to
7  strike.  Flanders.
8  BY MR. VILKER:
9    Q   Okay.  Now, at the time that you were
10 signing the forms in front of Raymour, what, if
11 anything, did Raymour say to you about opening any
12 kind of account in your name?
13   A   Nothing.
14   Q   What, if anything, did Raymour say to
15 you about opening any kind of brokerage account in
16 your name?
17   A   Nothing.
18   Q   What, if anything, did Raymour say
19 about any annuities being opened in your name?
20   A   Never.  Nothing.  Never mentioned.
21   Q   What consent, if any, did you give to
22 Raymour to open up any kind of account in your
23 name?
24   A   None whatsoever.
25   Q   What consent, if any, did you give to

**32**

1    A   Okay.
2    Q   Okay.  Do you recognize on Government
3  Exhibit 5 what appears to be your social security
4  card?
5    A   I do.
6    Q   Okay.  And do you also recognize what
7  appears to be a copy of your Rhode Island
8  identification card?
9    A   I do.
10   Q   Did you provide these documents to
11 Raymour?
12   A   I did.
13   Q   Okay.  Do you know how he -- he made a
14 copy of them?
15   A   Yes.  He asked me if I knew a place
16 where he could get these Xeroxed off, and would I
17 mind if he had them Xeroxed off.  I said, "There's
18 a place up at the end of the street on the
19 right-hand side, there's a gas station.  They have
20 a machine in there.  You go in, you'll have to pay
21 for it."
22       And he said, "May I take your license
23 and your" -- not your license, "your
24 identification and your social security card, and
25 take them up there and have them Xeroxed off and

---



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.845.3376
Facsimile: 702.382.2050

Suite 770
2300 West Sahara Avenue
Las Vegas, NV 89102
www.esquiresolutions.com

Patrick Garvey                                      November 20, 2009

---

33

1   then bring them back to you?"
2       I said, "Yes, you may."
3       Q   Okay. Now, what consent, if any, did
4   you give Raymour to use your social security
5   number to open up any accounts or annuities?
6       MR. PINE:  Objection.
7       THE WITNESS:  None whatsoever.
8       MR. PINE:  Pine.
9   BY MR. VILKER:
10      Q   Okay. Did you have any knowledge that
11  your social security number was being used to open
12  up --
13      A   No, I did not.
14      Q   Just let me finish the question,
15  Mr. Garvey.
16          Did you have any knowledge that your
17  social security number was being used to open up
18  any accounts or annuities?
19      A   To be perfectly honest with you,
20  absolutely no.
21      Q   Okay. Now, I would like to show you
22  Government Exhibit 7.  Now, Government Exhibit 7
23  is entitled, "Ameritrade Account Application."
24          Do you see at the bottom of the first
25  page, your name listed as the --

---

34

1       A   Yep.
2       Q   -- coowner?
3       A   Yep.
4       Q   Okay.
5       A   Not mine.
6       Q   Okay. When you say not yours, your
7   signature you're talking about, or your
8   handwriting?
9       A   Right here, after three, it says Patrick
10  Garvey.  I did not write that.
11      Q   Okay. So the writing on the first page
12  is not yourself?
13      A   No, I never seen this page.
14      Q   Now, if you look at the second page, do
15  you see the name Patrick Garvey -- the apparent
16  signature of Patrick Garvey at the bottom of the
17  page next to account coowner?
18      A   I do.
19      Q   Okay. Is that your signature?
20      A   It doesn't look like it.
21      Q   Okay. Now, do you see the date next to
22  the --
23      A   Yes.
24      Q   -- the name of Patrick Garvey?
25      A   Yes.

---

35

1       Q   Do you -- is that date, 1-4-08, in your
2   handwriting?
3       A   Yes, I see it.
4       Q   Okay. Is that your handwriting, that
5   date?
6       A   It doesn't look like it.
7       Q   Okay. Do you see above that there's a
8   signature that appears to be of Joseph Caramadre
9   above your -- above your name?
10      A   I don't know his signature.
11      Q   Okay. But can you read it, that it says
12  Joseph Caramadre?
13      A   Yes, I can.
14      Q   And next to that there's a date that
15  says 1-4-2008?
16      A   Correct.
17      Q   Is that date in your handwriting?
18      A   No.  Never seen this document.
19      Q   Okay. Now, if you look at the next
20  page, do you -- do you see next to account coowner
21  is written the name Patrick Garvey at the -- the
22  last signature on this page?
23      A   I see it.
24      Q   Okay. Does that appear to be your
25  signature?

---

36

1       A   No.
2       Q   Now, the dates -- do you see two dates
3   written in next to the signatures of 1/4/2008?
4       A   I do.
5       Q   Okay. Are either of these dates in your
6   handwriting?
7       A   No. And I never seen this document,
8   neither.
9       Q   Okay. Now, if you turn to the front of
10  the page, the first page of this document of
11  Exhibit 7, do you recall Raymour ever showing you
12  a document that was to open an account with
13  Ameritrade?
14      A   Never.
15      Q   Okay. Now, did you have any knowledge
16  that an account in your name and in Joseph
17  Caramadre's name was being opened at Ameritrade?
18      A   No.
19      Q   Now, if you look at account coowner
20  information, in the first page, you see your name
21  as the full legal name?
22      A   Yeah.
23      Q   Okay. If you look down several lines
24  where it says work number, do you see the number
25  of (401) --

---



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.845.3376
Facsimile: 702.382.2050

Suite 770
2300 West Sahara Avenue
Las Vegas, NV 89102
www.esquiresolutions.com

Patrick Garvey                                November 20, 2009

---

37

1    A    Yeah.
2    Q    -- 941-9273?  Was that your work number,
3    if you remember?
4    A    I can't remember.
5    Q    Okay.  Now, I would like to show you
6    Government Exhibit 8.  Take a look at that.  This
7    is -- Government Exhibit 8 is from the Rhode
8    Island Catholic Magazine on December 6th, 2007.
9         And if you can turn to the second page,
10   do you see in front of you an advertisement that
11   begins, "Terminal illness?  $2,000 in cash
12   immediately available"?
13   A    Yes.
14   Q    Do you see a phone number in that
15   advertisement?
16   A    Yes.
17   Q    And what is that phone number?
18   A    941-9273.
19   Q    Okay.  Now, if you go back and look at
20   Exhibit 7, the Ameritrade account application,
21   does that appear to be the same phone number that
22   was listed in the ad -- the advertisement in the
23   Rhode Island Catholic?
24   A    Yes.
25   Q    Having seen this document, does it

---

38

1    refresh your recollection --
2    A    Yes.
3    Q    -- of whether or not 941-9273 was your
4    number?
5    A    No, it wasn't.  I wasn't my number.
6    Q    Okay.
7    A    It was not mine.  I think this was
8    Raymour's number.
9    Q    Okay.  Now, if you turn your
10   attention -- if you go back to the Ameritrade
11   application, Exhibit 7, if you can turn to the
12   last page of this document, it's a three-page
13   document.  If you can just put down the sheet so
14   you can be seen.
15   A    Oh, okay.
16   Q    Do you see the section in paragraph 11
17   that says account coowner?
18   A    Yes, I do.
19   Q    Okay.  And if you go back, just to
20   refresh your memory, you are listed as the account
21   coowner on the front page of this document.
22        Is it true that you have -- it says zero
23   dependents.  You have no children, that's correct?
24   A    Correct.
25   Q    Okay.  Now, the next line says that,

---

39

1    "Funds available for options trading, $50,000
2    plus."
3         First of all, do you know what options
4    trading is?
5    A    No.
6    Q    Did you have at the time, January 4th,
7    2008, more than $50,000 available?
8    A    Absolutely not.
9    Q    Okay.  How much money did you have at
10   the time?
11   A    Twenty bucks, maybe.
12   Q    Okay.  Did you -- is that X in this
13   document where it says, "More than $50,000," did
14   you write that X in?
15   A    No.  I never seen this document.
16   Q    Okay.  Did Raymour ask you how much in
17   funds you had available?
18   A    No.
19   Q    Okay.  Now, the next box over says,
20   "Years of investment experience," and it's marked,
21   "6 - 9."
22        At this time in January 4th of 2008, had
23   you had any investment experience?
24   A    No, not really.
25   Q    Did you have six to nine years of

---

40

1    investment experience?
2    A    No.
3    Q    Now, the next box over -- well, still on
4    the box of investment experience, did you mark
5    that as -- that X next to 6 - 9?
6    A    No.  I never seen this document.
7    Q    Okay.  Did Raymour ask you about your
8    investment experience?
9    A    No.
10   Q    The next box over is investment
11   knowledge.
12        Do you see how it's marked with an X
13   next to "Extensive"?
14   A    Wait a minute.  Say this again.
15   Q    Let me just point this out to you, the
16   next box over.
17   A    Okay.
18   Q    It says here, where it says investment
19   knowledge --
20   A    Uh-huh.
21   Q    -- do you see how it's -- the X is next
22   to the box?
23   A    Yes, I do.
24   Q    Next to the word "extensive"?
25   A    Yes.

---



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.845.3376
Facsimile: 702.382.2050

Suite 770
2300 West Sahara Avenue
Las Vegas, NV 89102
www.esquiresolutions.com

Patrick Garvey                                             November 20, 2009



**41**

1    Q   Do you consider yourself to have
2  extensive knowledge of investments?
3    A   No.
4    Q   Did Raymour ever ask you about your
5  investment knowledge?
6    A   No.
7    Q   Now, it says -- if you go over the next
8  box, it says, "Average transaction size, $2,001 to
9  $5,000." That box is marked off.
10       Did you have any transactions whatsoever
11 with investments?
12   A   No. I never seen this document.
13   Q   So that -- that information that you
14 had, your average transaction size was between
15 $2,000 and 5,000, is incorrect?
16   A   Yes. The only money I had was the money
17 that -- that Mr. Raymour gave me.
18   Q   Okay. Now, it says -- if you go down to
19 the next line, all the way to the left, it says,
20 "Number of transactions per year." 10 to 19 box
21 is marked off.
22       Did you have 10 to 19 investment
23 transactions per year prior to signing this
24 document?
25   A   No.

**42**

1    Q   All right. The next box says, "Types of
2  transactions. Check all that apply, stocks,
3  bonds, and options."
4        Had you had --
5    A   None.
6    Q   You had no --
7    A   No.
8    Q   -- transactions with any of those?
9        And again, do you know what "options"
10 refers to? Do you know what an option is?
11   A   Wait a minute. Yeah, an option is you
12 can or you can't.
13   Q   Okay.
14   A   The only option I had was with Raymour.
15   Q   Okay. Now, the next box over says,
16 "What are your investment objectives?" And the
17 boxes that are marked are "growth" and "income."
18       Did you ever discuss with Raymour
19 anything about what your investment objectives
20 were? Do you want me to point out where I'm
21 referring to?
22   A   Yeah.
23   Q   It's this here.
24   A   Okay. No.
25   Q   Okay. Now, the -- the final box on the

**43**

1  second row to the right says, "What type of
2  activity do you plan to conduct in your options
3  account?" And the box is marked, "Purchase
4  options."
5        Do you see that?
6    A   Yeah.
7    Q   Okay. Did you plan to purchase any
8  options?
9    A   No.
10   Q   Do you know what that means, to purchase
11 an option?
12   A   Right. The only thing I planned was to
13 get $2,000 off of Mr. Raymour.
14   Q   Okay. Now, we can finish with that
15 document. And I would like to show you Government
16 Exhibit No. 9.
17   A   Boy, when I leave here, right, I'm going
18 to be a lawyer myself. Okay.
19   Q   Exhibit 9 is entitled, "TD Ameritrade
20 Margins/Options Account Upgrade Form."
21       Does this document look familiar to you?
22   A   No, never seen it.
23   Q   Now, if you turn to page three of this
24 document, do you see under the second signature at
25 the bottom the name written in Patrick Garvey?

**44**

1    A   Yes.
2    Q   Does that appear to be your handwriting?
3    A   I don't know.
4    Q   Okay.
5    A   I'm not sure.
6    Q   You're not sure. Okay.
7        Now, do you see next to your name is a
8  date 1/4/2008?
9    A   No.
10   Q   Okay. The question I have -- because
11 you're anticipating my question, but did you -- is
12 that date your handwriting?
13   A   No.
14   Q   Okay. Is the date above that next to
15 the name Joseph Caramadre, 1/4/2008, did you write
16 that date in your handwriting?
17   A   No. I never seen this document.
18   Q   Okay. And you're not sure if this is
19 your signature or not?
20       MR. PINE: Objection; asked and
21 answered.
22 BY MR. VILKER:
23   Q   Okay. We can -- we can move on.
24       Now, if you look at the next page of
25 this document, page four, do you see, again,



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.845.3376
Facsimile: 702.382.2050

Suite 770
2300 West Sahara Avenue
Las Vegas, NV 89102
www.esquiresolutions.com

Patrick Garvey                                      *November 20, 2009*

---

**45**

1  the -- the name written out Patrick Garvey?
2  A   Yes.
3  Q   Did that appear to be your signature?
4  A   Yes.
5  Q   Okay.  Now, do you see next to your
6  signature, Patrick Garvey, the date 1-04-2008?
7  A   Yes.
8  Q   Is that in your handwriting?
9  A   No.
10  Q   And do you see above that, next to the
11  signature of Joseph Caramadre, 1/4/2008, is that
12  date with the slashes in your handwriting?
13  A   No.
14  Q   Okay.  Now, as you look at this document
15  and you take a look at the first two pages of this
16  document, do you see your handwriting anywhere on
17  the first two pages of this document?
18  A   I see my name, but that's not my
19  handwriting.
20  Q   Okay.  Now, do you know, as you
21  indicated that the last page was your signature,
22  do you know whether or not --
23  A   I'm not sure.
24  Q   Okay.  So you're not sure if the last
25  page is your signature?

**46**

1  A   Right.
2  Q   But do you know whether or not Raymour
3  ever showed you the first two pages of this
4  document?
5  A   I never seen these documents.  None of
6  them.  None of them.  The reason -- the reason I'm
7  saying the last one, it doesn't look like my
8  handwriting.  "Garvey" I don't spell that way.  I
9  don't spell it that way at all.  Okay.  I always
10  swing a line on the V.  There's none there.  Okay.
11  The R is not there.  I'm going to stick with my
12  first answer, I'm going to say no, it's not my --
13  it's not -- I --
14  Q   Okay.  So as you're looking at it now a
15  second time, your -- your opinion is that this is
16  not your signature on either the third or fourth
17  page of this document?
18  MR. FLANDERS:  Objection, Flanders,
19  leading.
20  BY MR. VILKER:
21  Q   Well, let me just strike that and ask
22  again.
23  Upon looking at this document again,
24  what is your view on whether the signatures on the
25  third and fourth page of this Government Exhibit 9

**47**

1  is your signature?
2  MR. PINE:  Objection.
3  THE WITNESS:  Okay.
4  MR. PINE:  Objection; Pine.
5  THE WITNESS:  Okay.  I'm going to
6  say --
7  BY MR. VILKER:
8  Q   You can answer.
9  A   Huh?
10  Q   No, please answer.  I'm sorry.
11  A   Okay.  It don't even look -- it don't
12  even look like my signature.
13  Q   Okay.  I think you're going to have to
14  speak more clearly, Mr. Garvey.
15  A   All right.
16  MR. PINE:  Just for the record, my
17  objection is asked and answered, and he's
18  attempting to impeach his own witness.
19  MR. VILKER:  I'm just attempting to
20  clarify his testimony.
21  MR. FLANDERS:  That's not possible.
22  THE WITNESS:  I'm not -- I'm not --
23  I'm not sure on this.  I'm not sure.
24  BY MR. VILKER:
25  Q   Okay.  Now --

**48**

1  A   But I've never seen this document,
2  neither.
3  Q   Okay.  Now, if you look at the second
4  page of this document where it's under the
5  section, "Account Coowner Information" -- it looks
6  like it's this page right here.
7  A   Uh-huh.
8  Q   Okay.  Do you see your name and social
9  security number?
10  A   I see my name, my date of birth.
11  Q   I'm sorry, not your social security.
12  Your name and date of birth?  I apologize.
13  A   Yes.
14  Q   Okay.  Do you see that same phone number
15  that we talked about before next to work number?
16  A   Yes.
17  Q   Okay.  And, again, that wasn't your
18  phone number?
19  A   No.
20  Q   Now, if we turn to the fourth page of
21  this document, the last page?
22  A   Yep.
23  Q   Okay.  Do you see this section in the
24  paragraph eight, "Account Coowner"?
25  A   Uh-huh.



Toll Free: 800.845.3376
Facsimile: 702.382.2050

Suite 770
2300 West Sahara Avenue
Las Vegas, NV 89102
www.esquiresolutions.com

ESQUIRE
an Alexander Gallo Company

Patrick Garvey                                        November 20, 2009



49

1    Q   Okay. And, again, does this -- well,
2    let's go one by one.
3        This indicates you had more than $50,000
4    available for options trading?
5    A   No.
6    Q   Okay. But did you have more than
7    $50,000 available for options trading?
8    A   No.
9    Q   Okay. Was your years of investment
10   experience ten plus?
11   A   No.
12   Q   Did you have extensive investment
13   knowledge?
14   A   No.
15   Q   Was your average transaction size
16   between $2,001 and $5,000?
17   A   The money I got off of Raymour is what I
18   had.
19   Q   Okay. Did you have 10 to 19
20   transactions per year?
21   A   No.
22   Q   And just jumping over to the last one,
23   did you plan to conduct purchase options in this
24   account?
25   A   No, and I don't -- I've never seen this

50

1    document.
2    Q   Okay. Now, if you can take a look at
3    Government Exhibit 10, Government Exhibit 10 is
4    entitled, "Limited Trading Authorization."
5    A   Yeah.
6    Q   First of all, do you see your name under
7    account coowner, Patrick Garvey?
8    A   I do.
9    Q   Okay. Do you see what appears to be a
10   signature under your name?
11   A   Yes, I do.
12   Q   Is that your signature?
13   A   No, it's not.
14   Q   Now, are the dates -- you see the date
15   above your -- well, is there any handwriting of
16   yours at all on this page?
17   A   No. I never seen this document at all.
18   Q   Okay. Now, what, if anything, did
19   Raymour say to you about providing him with any
20   kind of trading authorization?
21   A   Nothing.
22   Q   Okay. Do you know, as you're sitting
23   here today, what a limited trading authorization
24   is?
25   A   I would assume that you're going to

51

1    trade something to somebody, and it's only going
2    to be for a certain amount, if I'm correct. I
3    don't know.
4    Q   Okay. Now, I want to show you
5    Government Exhibit 11. Now, Government Exhibit 11
6    is a check made out to Joseph A. Caramadre and
7    yourself, Patrick Garvey.
8        Have you ever seen this check?
9    A   No. No.
10   Q   Okay. And is the -- check is in the
11   amount of $254,152.39?
12   A   Absolutely not.
13   Q   Okay. Did Mr. Caramadre ever ask you to
14   endorse this check?
15   A   No.
16   Q   Did you ever get any proceeds of this
17   money?
18   A   No.
19   Q   Now, did -- the documents that have just
20   been shown to you are by a company called
21   Ameritrade.
22       Did Raymour ever mention the name
23   Ameritrade to you when he met with you?
24   A   No.
25   Q   Now, I would like to show you Government

52

1    Exhibit 12. Now, Exhibit 12 is entitled,
2    "Transamerica Landmark Variable Annuity."
3        Did -- I guess my first question is, did
4    Raymour ever mention anything to you about a
5    company called Transamerica?
6    A   No.
7    Q   Did he ever say anything to you about
8    opening up any kind of annuity with Transamerica?
9    A   No, not at all.
10   Q   Okay. Now, I would like to turn your
11   attention to page 11 of this document. It just
12   says at the bottom, 11 of 12.
13   A   There's 9 of 12, 10 of 12, and 11.
14   Eleven, oh, come on. Okay. All right.
15   Q   Do you see the final line next to
16   annuitant signature, parentheses, "If not owner,"
17   and then it's written Patrick J. Garvey?
18   A   Yeah.
19   Q   Does that appear to be your handwriting?
20   A   No.
21   Q   Now, if you take a look at the rest of
22   this document, do you see anywhere else in this
23   document any of your handwriting?
24   A   No.
25   Q   Okay. So as you go through this



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.845.3376
Facsimile: 702.382.2050

Suite 770
2300 West Sahara Avenue
Las Vegas, NV 89102
www.esquiresolutions.com

Patrick Garvey                                     November 20, 2009

| 53 | 55 |
|---|---|
| 1  document, do you know one way or the other whether | 1  A   None. |
| 2  you saw any other pages or any pages at all of | 2  Q   Now, if you turn to the next page, do |
| 3  this document when you met with Raymour? | 3  you see the paragraph at the top, number seven, |
| 4  A   No. I -- no. I never seen these -- | 4  that's entitled, "Guaranteed Death Benefits"? |
| 5  these pages before. | 5  A   Yep. |
| 6  Q   Okay. Now, what, if anything, did | 6  Q   Okay. And do you see the box that's |
| 7  Raymour say to you about applying for any kind of | 7  checked below that says, "Double Enhanced Death |
| 8  annuity? | 8  Benefit"? |
| 9  A   Nothing. | 9  A   Yes. |
| 10  Q   Okay. What consent, if any, did you | 10  Q   And do you see the next box that is |
| 11  give Raymour to have your name be used as an | 11  checked below that says, "Additional Death |
| 12  annuitant in any annuities? | 12  Distribution"? |
| 13  A   I didn't. | 13  A   Yes. |
| 14  Q   At the time that you received the -- | 14  Q   And it says, "Issue age is 0 to 80"? |
| 15  either of the $2,000 checks from Raymour and you | 15  A   Yes. |
| 16  signed some documentation, what knowledge, if any, | 16  Q   Okay. What, if anything, did Raymour |
| 17  did you have of any annuities being applied for in | 17  tell you about any enhanced or other death |
| 18  your name? | 18  benefits that the owner of any annuities would |
| 19  A   None. | 19  get? |
| 20  Q   Now, if you look at the top of | 20  A   Raymour told me that if I was to die, |
| 21  Exhibit 12 under the paragraph one, annuitant, do | 21  and some -- this is the way I remember it:  If I |
| 22  you see your name, your address at the time, your | 22  was to die and someone else was to get some money, |
| 23  social security number, and your date of birth? | 23  nobody could turn around and try to claim any part |
| 24  A   Yes. | 24  of that money. |
| 25  Q   And that information is all correct? | 25  Q   Okay. Did Raymour tell you how other |

| 54 | 56 |
|---|---|
| 1  A   Correct. | 1  people could get money after you died? |
| 2  Q   Okay. Now, paragraph two is entitled | 2  A   No. |
| 3  ownership. And it says the name of the owner is a | 3  Q   What did -- what did you think, as you |
| 4  person by the name of Estela Rodrigues with an | 4  were there that day, as to how other people might |
| 5  address of 330 Sowams Road in Barrington, Rhode | 5  be able to get money after you died? |
| 6  Island. | 6  A   I figured maybe they would be ill and |
| 7       Do you know who Estela Rodrigues is? | 7  they would sign up, whatever. You know, I didn't |
| 8  A   No. | 8  really go into it, you know. He just told me that |
| 9  Q   Have you ever met with anyone named | 9  if I died and -- and someone came forward and |
| 10  Estela Rodrigues? | 10  tried to get part of the money that was issued |
| 11  A   No, nor have I ever heard of her. | 11  or -- to someone else, they could not touch it. |
| 12  Q   Okay. Did you have any idea of Estela | 12  They could not get one part of it. None. |
| 13  Rodrigues would be the owner of an annuity in | 13  Q   Okay. When Raymour mentioned the |
| 14  which your name would be listed as the annuitant? | 14  fact -- or the statement -- when Raymour -- let me |
| 15  A   No. | 15  strike that. |
| 16  Q   Okay. | 16       When Raymour made the statement to you |
| 17  A   Absolutely not. | 17  that someone else could make money, did he mention |
| 18  Q   Now, if you turn to the next page of | 18  that any annuities or accounts would be opened in |
| 19  this document, and do you see where in paragraph | 19  your name? |
| 20  four, it says initial purchase payment of | 20       MR. PINE:  Objection; leading. Pine. |
| 21  $290,000. I'll show you, it's right here. | 21       THE WITNESS:  No. |
| 22  A   I see it. | 22  BY MR. VILKER: |
| 23  Q   Okay. What knowledge, if any, did you | 23  Q   Okay. Well, let me rephrase that, then, |
| 24  have of $290,000 that was the initial payment on | 24  based on the objection. |
| 25  this annuity to Transamerica? | 25       What, if anything, did Raymour tell you |



Toll Free: 800.845.3376
Facsimile: 702.382.2050

Suite 770
2300 West Sahara Avenue
Las Vegas, NV 89102
www.esquiresolutions.com

ESQUIRE
an Alexander Gallo Company

Patrick Garvey                                    November 20, 2009

57

1    about whether any annuities or accounts would be
2    opened in your name?
3        MR. PINE:  Objection; leading.  Pine.
4        THE WITNESS:  Never told me nothing.
5    BY MR. VILKER:
6        Q    Okay.  Now, if you turn to the final
7    page of this document, and under part -- under
8    number one there's a name under -- number one is
9    entitled, "Registered Representative," and there's
10   a name, Edward Maggiacomo.
11       Let me point it out to you.  I believe
12   it's the next page, right there.
13       A    Edward Maggiacomo.  Yeah, I see it.
14       Q    Do you know who Edward Maggiacomo is?
15       A    No, I don't.
16       Q    Have you ever spoken with Edward
17   Maggiacomo?
18       A    No, I didn't.
19       Q    Okay.  Did you speak with Mr. Maggiacomo
20   about this or any other annuity?
21       A    No.
22       Q    Now, do you see the firm name Lifemark
23   Securities Corp that's a few lines down?
24       A    Yes, I see it.
25       Q    Have you ever spoke with anyone from

58

1    Lifemark Securities Corp?
2        A    I know nothing about Lifemark
3    Securities, and I've never spoken with anyone.
4        Q    Okay.
5        A    I've never heard of it.
6        Q    Okay.  Now, I'd like to show you
7    Government Exhibit 13 now.  Government Exhibit 13
8    is entitled, "Acknowledgment of Annuitant."
9        Do you see the name written at the
10   bottom Patrick J. Garvey?
11       A    Uh-huh.
12       Q    Does that appear to be your handwriting?
13       A    It does.
14       Q    Okay.  Do you know -- did you read this
15   document at the time that you signed it?
16       A    Nope.  It was -- this document -- I
17   believe the -- no.
18       Q    Okay.  Do you know -- do you see the
19   other parts of this document that are handwritten,
20   and you see your name handwritten at the top, "I,
21   Patrick Garvey"?
22       A    (Nodding head.)
23       Q    Okay.  Do you see that?
24       A    Yep.
25       Q    Okay.  And do you see the next

59

1    paragraph, how the name Estela Rodrigues and
2    $290,000 are written in?
3        A    Yep.
4        Q    Do you know whether at the time you
5    signed this document, whether that information was
6    handwritten into the document at the time?
7        A    No, I -- I don't think any of this was
8    written into the document.  I was just handed the
9    document to sign, and then handed another one, and
10   then handed another one, but there was nothing up
11   here.
12       Q    Okay.  Did Raymour read this document to
13   you?
14       A    No.
15       Q    Okay.  Did he explain to you what you
16   were supposedly acknowledging?
17       A    No, never did.
18       Q    How much time would you estimate that
19   you had the documents in your hand that you were
20   signing?
21       A    That's how much.
22       Q    Okay.  And what does that mean in terms
23   of --
24       A    In other words, it was handed to me,
25   "Sign it, sign it, sign it, sign it, sign it, sign

60

1    it," real quick.
2        Q    Now, are you -- have you ever had any
3    legal training?
4        A    No.
5        Q    Did you ask an attorney to review the
6    documents before you signed them?
7        A    No.
8        Q    Did you ask anybody to review the
9    documents before you signed them?
10       A    No.
11       Q    After you signed the documents with
12   Raymour, did he leave you with a copy of them?
13       A    He took them with him.
14       Q    Okay.  Now, I want to show you
15   Government Exhibit 14.  Exhibit 14 is entitled,
16   "America's Market Flex Annuity Application," and
17   it's from Nationwide Life Insurance Company.
18       What, if anything, did Raymour say to
19   you about Nationwide Life Insurance Company?
20       A    Never seen this document, nor has he
21   ever said anything to me about it.
22       Q    Okay.  Now, what, if anything, did
23   Raymour say to you about opening up any kind of
24   annuity with Nationwide Life Insurance Company?
25       A    Never said nothing.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.845.3376
Facsimile: 702.382.2050

Suite 770
2300 West Sahara Avenue
Las Vegas, NV 89102
www.esquiresolutions.com

Patrick Garvey                                    November 20, 2009



**61**

1    Q   Now, if you look through this document,
2  please let me know if you have seen -- if you see
3  your handwriting or your signature anywhere on
4  this document.
5    A   Unless I missed it, I don't see my name
6  here at all.  Wait a minute.
7    Q   Okay.  So it doesn't appear to be your
8  handwriting anywhere in this document?
9    A   No.
10    Q   Okay.  Do you know, as you look at this
11  now, whether Raymour even showed you this
12  document?
13    A   No.
14    Q   Okay.  No, you don't know or, no, he
15  didn't show it to you?
16    A   That document?
17    Q   It's the same document as Exhibit 14.
18    A   No, this was never shown to me.  Never.
19  Never.
20    Q   Now, if you look at the front page, the
21  owner of this annuity is listed as Agostini
22  C-O-N-S, which I can tell you is Agostini
23  Construction Company.
24       Do you know anybody -- have you heard of
25  Agostini Construction Company before?

**62**

1    A   No.  No.
2    Q   Okay.  Did you ever speak with anybody
3  from Agostini Construction Company?
4    A   No.
5    Q   At any point in time, did you have any
6  knowledge that Agostini Construction Company was
7  opening up an annuity that listed you as the
8  annuitant?
9    A   I didn't know it, but I see my name here
10  now, the front page.  No, I never seen this
11  document.
12    Q   Okay.  Now, if you turn to the third
13  page of this document --
14    A   Yeah.
15    Q   -- do you see at the top how it says
16  initial purchase payment submitted, $1 million?
17    A   I see it.
18    Q   Did you have any knowledge that
19  $1 million was paid on this annuity?
20    A   No, absolutely not.  This is getting
21  better and better.
22    Q   Now, if you turn to page -- what is
23  listed as -- just the next to the last page of
24  this document --
25    A   The next to the last?

**63**

1    Q   Yes.
2    A   Okay.
3    Q   And at the bottom where it says No. 2,
4  "Names and Signatures," under Agostini
5  Construction is the name Paula Bizier,
6  B-I-Z-I-E-R.
7       Do you see that?
8    A   Yes.
9    Q   Do you know who Paula Bizier is?
10    A   No.
11    Q   Have you ever spoken to her in your
12  life?
13    A   No.  I have no idea who she is.
14    Q   Okay.  I would like to show you
15  Government Exhibit 15.  And 15 is -- is entitled
16  "Acknowledgment of Annuitant."  And my first
17  question is have you -- if you look at the bottom,
18  the name Patrick Garvey is written.
19       Do you know if that is your signature?
20    A   There is not an R in there.  There is
21  not a V in there.  There's supposed to be an E in
22  there, there's not an E in there.  The only thing
23  is -- I'm not sure.
24    Q   Okay.  Now, does this document look
25  familiar to you?

**64**

1    A   No, I've never seen this document.
2    Q   Did you ever see a document in which it
3  was handwritten in that the owner was Agostini
4  Construction, and an annuity was being purchased
5  in the amount of $1 million?
6    A   No.  I never seen it, and I've never
7  heard of Agostini Construction.
8    Q   Okay.  Did Raymour read this document to
9  you?
10    A   No.
11    Q   And how much time -- if that is, in
12  fact, your signature, how much time would you have
13  had that document in front of you?
14       MR. PINE:  Objection.
15       THE WITNESS:  As fast as he could
16  read it, and he could read pretty fast.
17  BY MR. VILKER:
18    Q   Okay.  What does that mean, as fast as
19  he could read it?
20    A   I would say 40 seconds, 50 seconds.
21    Q   Okay.  You had this one particular
22  document in front of you for 50 seconds or --
23       MR. PINE:  Objection.
24       THE WITNESS:  No, if it was in front
25  of me, it would have been in front of me for 50



Toll Free: 800.845.3376
Facsimile: 702.382.2050

Suite 770
2300 West Sahara Avenue
Las Vegas, NV 89102
www.esquiresolutions.com

Patrick Garvey                                                November 20, 2009

---

65

1   seconds.
2   BY MR. VILKER:
3       Q   Okay.  How many documents would have
4   been in front of you for 50 seconds?
5       A   Quite a bit.
6       Q   Okay.
7       A   Quite a bit.
8       Q   Okay.  Now, I would like to show you
9   Government Exhibit 16.  Okay.  Exhibit 16 is
10  entitled, "Scottrade Brokerage Account
11  Application."
12       And I guess my first question is did
13  Raymour ever mention to you anything about opening
14  up a brokerage account at Scottrade?
15      A   No.
16      Q   Did he ever mention the name Scottrade
17  to you?
18      A   No.
19      Q   Do you see the sign that the -- the
20  right side of the page that is listed coapplicant,
21  and it says your name, Patrick Garvey?
22      A   Yes.
23      Q   Okay.  That was your address at the
24  time?
25      A   It was.

---

66

1       Q   Okay.  And do you see that same
2   telephone number we talked about before?
3       A   Yes.
4       Q   Okay.  And that wasn't your number?
5       A   No.
6       Q   Now, do you see the other side of the
7   page that says, "Applicant, Joseph A. Caramadre"?
8       A   Yeah.
9       Q   Okay.  What, if anything, did Raymour
10  say to you about you opening up any kind of
11  account with Joseph Caramadre?
12      A   He never said nothing to me about
13  opening an account.  Everything was basically the
14  check, $2,000.
15      Q   Okay.  Now, do you see at the bottom of
16  this page two signatures that appear to read
17  Patrick Garvey?
18      A   I see them.
19      Q   Okay.  Do those appear to be your
20  signatures?
21      A   I'm not sure.
22      Q   Now, I want you to take a look at
23  Government Exhibit 17.  Government Exhibit 17 is
24  entitled, "Scottrade Margin Agreement."
25       Do you know what a margin agreement is?

---

67

1       A   No.
2       Q   Did Raymour tell you anything about any
3   kind of margin agreement?
4       A   No.
5       Q   Now, if you turn to the second page of
6   this form, do you see the name Patrick J. Garvey,
7   the handwritten name, and then there's apparently
8   a signature that says Patrick Garvey.
9        Is that your signature?
10      A   This one, no.
11      Q   Okay.  Do you know whether you've
12  seen -- whether you've seen this document before?
13      A   I've never seen this document before.
14      Q   Okay.  Now, I would like to show you
15  Government Exhibit 18.  Exhibit 18 is entitled,
16  "Scottrade Limited Trading Authorization with
17  Rights of Distribution."
18       Do you see under joint account owner --
19      A   Yep.
20      Q   -- again, the name is written Patrick
21  Garvey.
22       Does that appear to be your signature?
23      A   No.
24      Q   Now, what, if anything, did Raymour tell
25  you about giving to him limited trading

---

68

1   authorization in a Scottrade account?
2       A   Nothing.
3       Q   Now, I would like to show you
4   Exhibit 19.  Exhibit 19 is entitled, "ING Golden
5   Select Deferred Variable Annuity Application."
6        Do you recognize this document?
7       A   No, I've never seen this document.
8       Q   Okay.  If you turn to page -- which is
9   the last page of your document there, the last
10  page of Exhibit 19, do you see under annuitant's
11  signature handwritten Patrick Garvey.
12       Does that appear to be your signature?
13      A   I have to say no.
14      Q   And do you see the date of 1/20/08?
15  Does that appear to be your handwriting, that
16  date?
17      A   No.
18      Q   Okay.  Now, if you -- let's go back to
19  the first page of the document.
20       What, if anything, did Raymour say to
21  you about opening up an annuity with a company
22  called ING?
23      A   Nothing.
24      Q   Okay.  What, if anything, did Raymour
25  say about a company named ING?

---



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.845.3376
Facsimile: 702.382.2050

Suite 770
2300 West Sahara Avenue
Las Vegas, NV 89102
www.esquiresolutions.com

Patrick Garvey                                    November 20, 2009



### 69

1     A   Nothing.
2     Q   Again, if you look at the owner of this
3  document -- of this annuity, it again is listed as
4  Agostini Construction Company.
5        Do you see that?
6     A   I see it.
7     Q   Okay.  Did you know that Agostini
8  Construction had also opened up an annuity using
9  your name with ING?
10    A   No.
11    Q   Okay.  Had you spoken with anyone at
12 Agostini Construction about an ING annuity?
13    A   No way, no.
14    Q   What consent, if any, did you give to
15 have your name, date of birth, and social security
16 number used for Agostini Construction to open up
17 an annuity with your name being used as the
18 annuitant?
19    A   None.
20    Q   Now, if you look at page -- it's the
21 fourth page of this document, and it's paragraph
22 number four.
23        Do you see at the top how it says,
24 "Initial Investment," and $1 million is crossed
25 out, and then it says $835,000?

### 70

1     A   I do.
2     Q   What, if anything, do you know about any
3  payment of $835,000 to ING?
4     A   Nothing.  I don't know nothing.  I never
5  seen this document.
6     Q   Okay.  And at the bottom of that page,
7  do you see the name written -- excuse me, Edward
8  Maggiacomo -- L. Maggiacomo, Jr.?
9     A   I do.
10    Q   Okay.  Did you discuss with
11 Mr. Maggiacomo this ING annuity?
12    A   No.  I don't know who he is.
13    Q   And if you can turn to the last page of
14 this document, again, do you see the -- in
15 handwriting the owner signature of Paula J.
16 Bizier?
17    A   Uh-huh.
18    Q   Okay.
19    A   Yep.
20    Q   Did you ever speak with Ms. Bizier about
21 this ING application?
22    A   No.
23    Q   This ING annuity?
24    A   No.  I never met her.
25    Q   Okay.  I would like to show you

### 71

1     Exhibit 20.  Exhibit 20 is entitled,
2  "Acknowledgment of Annuitant."
3        And I would ask you if the signature at
4  the bottom of this page is yours?
5     A   Yes.
6     Q   Okay.  Now, when you filled out this
7  form, do you know whether any of the information
8  that is handwritten on this form was already on
9  the document?
10    A   I don't think it was.
11    Q   Okay.  Did you read this form before you
12 signed it?
13    A   Yeah, it's right here.  He said, "Sign
14 your name right here," and I signed my name right
15 here, and that was it.
16    Q   Okay.  Did you read all -- do you see
17 all the bullet points going down this form?
18    A   No.  No.
19    Q   Did you read through these bullet
20 points?
21    A   I don't think this was on here.  I don't
22 think it was on this paper.
23    Q   Okay.  But putting aside the handwritten
24 information, the text of this document, what is
25 typed in, did you -- did you read the typed

### 72

1  language before you signed it?
2     A   I don't understand.
3     Q   Okay.  The -- do you see how on this
4  document above your signature --
5     A   Yeah, it says Patrick.
6     Q   -- there's information that's written in
7  pen, and then there's information that's typed out
8  in type, the rest of the document that has already
9  been a part of the -- part of the text?
10    A   Yeah.
11    Q   Okay.  My question is did you read
12 through any of this stuff, any of the language on
13 this document before you signed it?
14    A   No.  No.
15    Q   Okay.  Now, I would like to show you
16 Exhibit 21.  Now, Exhibit 21, Mr. Garvey, is
17 entitled, "American Skandia Variable Annuity
18 Application Form."
19        Do you recognize this document?
20    A   Never seen it.
21    Q   Now, what, if anything, did Raymour tell
22 you about opening up an annuity in your name at a
23 company called American Skandia?
24    A   Never told me nothing.
25    Q   Did Raymour mention the name of American



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.845.3376
Facsimile: 702.382.2050

Suite 770
2300 West Sahara Avenue
Las Vegas, NV 89102
www.esquiresolutions.com

Patrick Garvey                                      November 20, 2009

---

73

1    Skandia to you?
2        A   No, he did not.
3        Q   Now, the -- if you turn to the -- again,
4    the -- actually, I think it's the seventh page of
5    this document.  This is Exhibit 21.  And under
6    annuitant is the name written Patrick Garvey.
7            Is that your signature?
8        A   I'm not sure.
9        Q   Okay.  Now, do you see -- other than
10   what may or may not be your signature on page
11   seven, do you see your handwriting anywhere else
12   on this document?
13       A   Yes.
14       Q   And where do you see your handwriting?
15       A   On the second page.
16       Q   Okay.
17       A   Ownership information.
18       Q   Okay.  Under D there where it says
19   annuitant?  Okay.  You see your name,
20   Patrick Garvey?
21       A   Right.
22       Q   That looks like your handwriting that
23   wrote that in?
24       A   No.
25       Q   Okay.  I wasn't asking if you see your

74

1    name anyway.  I was saying if you see your
2    handwriting anywhere on the document.
3        A   That's not my handwriting.
4        Q   Okay.  So my original question was other
5    than what may or may not be your signature that we
6    just discussed, do you see your handwriting
7    anywhere else on the document?
8        A   No.
9        Q   Okay.  Just flip through all the pages
10   just to make sure.
11       A   You said my handwriting?
12       Q   Correct.  Other than the signature,
13   which you have already testified about.
14       A   No.
15       Q   So do you know, other than the signature
16   page, which may or may not have your signature,
17   whether or not Raymour showed you the remainder of
18   this document?
19       A   Raymour never showed me any of these
20   documents, none of them.  None of these pages, I
21   didn't see them.  He didn't show them to me.  I
22   would remember.  I would remember.  He didn't show
23   me any of these.
24           And I wouldn't have signed them, period.
25   Because I would have known that I was leading into

75

1    big trouble.  I wouldn't have done it.
2        Q   Okay.  Now, the first page of this
3    annuity application with American Skandia lists
4    the owner as Joseph A. Caramadre.
5            Do you see the telephone number under
6    Mr. Caramadre?  Do you see the number (401)
7    941-9273?
8        A   No.  I'm on the first page.
9        Q   I'm sorry.  The first page -- you're
10   looking right at it, where it says owner.
11           Okay.  Do you see that telephone number?
12       A   Oh, yeah.  Yeah.
13       Q   Yes.  So that -- is that the same number
14   that's listed in the Rhode Island Catholic
15   advertisement?  And that's in Exhibit 8, second
16   page.
17       A   That's it.
18       Q   Okay.
19       A   Yes.
20       Q   Okay.  Now, what knowledge, if any, did
21   you have of Mr. Caramadre being the owner of an
22   annuity with American Skandia of an annuity in
23   which you were named as the annuitant?
24       A   I had no knowledge whatsoever.  All I
25   knew is what -- that Mr. Caramadre was some type

76

1    of lawyer, and like I had told you earlier, a
2    philanthropist, which was told to me by
3    Mr. Raymour.  And that he was terminally ill, and
4    he gave away money to people that were ill and
5    going to die, and that was it.
6        Q   Okay.
7        A   Those documents, I don't know where
8    these documents came from.  Okay.  Now, I came
9    here to tell the truth.  It's hard for me to look
10   at my signatures and -- you know, I'm trying to be
11   honest, as honest as I can.  So if I say yes, it's
12   because I slash my V.  Okay?  And I always put the
13   E in there.  Some of these don't even have the V
14   and the E in them.
15       Q   Okay.
16       A   I would not sign anything like that.  I
17   have to turn around and put that slash in there
18   and whatever.  But I've never seen these
19   documents, none of them.
20       Q   Okay.
21       A   And if I did see them, I'm telling you
22   right now, okay, and this is all honesty, there
23   was nothing up here.
24       Q   You're saying there's nothing -- there's
25   nothing handwritten in the documents?

---



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.845.3376
Facsimile: 702.382.2050

Suite 770
2300 West Sahara Avenue
Las Vegas, NV 89102
www.esquiresolutions.com

Patrick Garvey                                          November 20, 2009

77

1      A   There was nothing up here.
2      Q   Okay.
3      A   Just down here, sign.  I signed.
4      Q   Okay.
5      A   That was it.
6      Q   Okay.  Now, I would like to show you
7   Government Exhibit 22, and if you need -- we've
8   been going a while.  If you feel like you need a
9   break -- do you want to take a ten-minute break?
10     A   Yeah.
11         MR. VILKER:  Okay.  Let's take a
12   ten-minute break, everybody.
13         THE VIDEOGRAPHER:  This is the end of
14   tape number one to the videotaped deposition of
15   Patrick Garvey.  The time is 11:08 a.m.  We're off
16   the record.
17         (Whereupon, a short recess was
18         taken.)
19         THE VIDEOGRAPHER:  This is tape
20   number two to the videotaped deposition of Patrick
21   Garvey.  The time is 11:30 a.m.  We're on the
22   record.
23   BY MR. VILKER:
24     Q   Okay.  Good morning, again, Mr. Garvey.
25     A   Good morning.

78

1      Q   Mr. Garvey, you have before you
2   Government Exhibit 22.  That's entitled,
3   "Annuitant Acknowledgment."
4      A   Okay.
5      Q   And if you turn to the second page, does
6   that appear to be your signature?
7      A   Yes.
8      Q   Now, do you know, as you look at this
9   document, whether Raymour showed you the first
10   page of this document, as well?
11     A   No.
12     Q   No, you don't know or, no, you weren't
13   shown it?
14     A   No, I was not shown it.
15     Q   Now, you earlier testified about a
16   number of the documents that you had never seen
17   them before.
18     A   Correct.
19     Q   Did you meet with the -- myself and
20   another couple of representatives from the
21   government a couple of weeks ago?
22     A   Yes, I did.
23     Q   Did we show you some of these documents?
24     A   All of them.
25     Q   Okay.

79

1      A   I seen them all.
2      Q   Okay.  So when you testified that you
3   had never seen these documents before, were you
4   including that prior meeting with the government?
5      A   No, I was -- I never seen them in front
6   of Raymour.  Raymour never gave me any of these
7   papers.
8      Q   Okay.
9      A   The ones that I said I never seen, I
10   never seen them in Raymour's office.  He never
11   presented them to me.
12     Q   Okay.  Or in your house?
13     A   Or in my house.  Excuse me, I didn't
14   mean to say his office.
15     Q   Okay.
16     A   My house.  My office.
17     Q   Okay.  Now, Mr. Garvey, I would like you
18   to take a look at Government Exhibit 23.  Now,
19   this is entitled, "Brokerage Account Application,
20   Banc of America Investment Services, Inc."
21         If you turn to the fourth page of this
22   document, do you see the name Patrick Garvey
23   written?
24     A   I do.
25     Q   Okay.  And does that appear to be your

80

1   signature?
2      A   No.
3      Q   Okay.  Now, what, if anything, did
4   Raymour say to you about any kind of brokerage
5   account agreement with Banc of America?
6      A   Never said nothing.
7      Q   Did he ever mention the name Banc of
8   America?
9      A   No.
10     Q   Now, do you see how Exhibit 23, other
11   than the signatures on the fourth page, contains
12   no information written in?
13     A   The fourth page?
14     Q   Right.
15     A   My signature is there.
16     Q   Okay.  I got -- I just wasn't being
17   clear.
18         If you look at the first page of this
19   document, do you see how there's nothing contained
20   in any of the boxes?
21     A   Correct.
22     Q   Okay.  Was that how the documents
23   Raymour presented to you appeared at the time that
24   you signed any of them?
25     A   No.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.845.3376
Facsimile: 702.382.2050

Suite 770
2300 West Sahara Avenue
Las Vegas, NV 89102
www.esquiresolutions.com

Patrick Garvey                                                November 20, 2009

---

81

1        MR. FLANDERS: Objection. Flanders.
2        THE WITNESS: No. This -- none of
3   this was here. The only thing that was on the
4   paper was on the bottom, and it was small writing,
5   writing going across. That was it. The top of
6   the page was blank.
7   BY MR. VILKER:
8        Q   Okay. Let me show you know Government
9   Exhibit 24. Oh, I'm sorry, I gave you the wrong
10  one.
11       Exhibit 24 is titled, "Margin Account
12  Application and Agreement" with Banc of America.
13       What, if anything, did Raymour say to
14  you about opening up a margin account with Banc of
15  America?
16       A   Never did, never said nothing.
17       Q   Okay. Now, do you see the signature
18  line that --
19       A   Yes, I do.
20       Q   It has the signature, the customer
21  Joseph Caramadre, and the next line says,
22  "Signature joint tenant," and it has the name
23  Patrick Garvey.
24       A   Yes, I do.
25       Q   Is that your handwriting?

---

82

1        A   I believe so.
2        Q   Okay. Did you -- did you read through
3   this document before you signed it?
4        A   No.
5        Q   Now, I want to show you Government
6   Exhibit 25. This is entitled "Banc of America
7   Investment Services Trading Authorization."
8        If you turn to the second page of this
9   document, does that appear to be your signature?
10       A   No. Nope.
11       Q   Okay. Now, Mr. Garvey, I can finish up
12  with that document now. We're done with that one.
13       Now, we've just gone through a number of
14  documents opening up various accounts in your
15  name; is that correct?
16       A   That's correct.
17       Q   Now, at the time that you received the
18  money from Raymour and signed some documents, what
19  knowledge, if any, did you have of any accounts or
20  annuities that would be opened in your name?
21       A   Absolutely none.
22       Q   What, if anything, did Raymour tell you
23  about any accounts or annuities that would be
24  opened up in your name?
25       A   Absolutely nothing. He told me nothing.

---

83

1        Q   Did Raymour -- you saw -- strike that.
2        You saw a number of documents
3   referencing the names of different companies
4   including Ameritrade, Transamerica, ING, American
5   Skandia -- excuse me, American Skandia,
6   Nationwide, as well as Scottrade.
7        Did Raymour ever mention any of these
8   companies to you?
9        A   No. No.
10       Q   Now, after you signed -- excuse me,
11  after you received the $4,000 from Raymour and
12  signed some documents, did you take it upon
13  yourself to write letters to Joseph Caramadre and
14  to Raymour Radhakrishnan?
15       A   Yes, I did.
16       Q   Okay. And why did you do that?
17       A   Well, I was grateful for what they did
18  for me, and I -- just my way of showing my
19  appreciation.
20       Q   Okay. What -- what were you grateful
21  for?
22       A   Well, I was grateful for the money, and
23  knowing that I was going to die, and I told -- if
24  I died, and I went to heaven, I would tell God
25  that they were doing good, and that they helped me

---

84

1   out and they helped other people out. However, I
2   didn't know that they weren't.
3        Q   Okay. Well, let me show you Government
4   Exhibit 26, and ask you to take your time and read
5   through that exhibit.
6        A   Yes.
7        Q   Okay. And what is this exhibit?
8        A   It's a letter that I wrote to
9   Mr. Caramadre thanking him for the money and the
10  help that he gave me.
11       Q   Okay. And -- and is there a date
12  written on top?
13       A   2/20/08.
14       Q   Now --
15       A   I didn't put that there.
16       Q   You didn't put the date there?
17       A   No.
18       Q   That's not your handwriting?
19       A   No. No.
20       Q   Okay. Now, but the rest of your
21  document is your writing?
22       A   Correct.
23       Q   Now, if you look at the third paragraph
24  it reads, "I will tell God of a man who has helped
25  me and a lot of others and has asked for nothing

---



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.845.3376
Facsimile: 702.382.2050

Suite 770
2300 West Sahara Avenue
Las Vegas, NV 89102
www.esquiresolutions.com

Patrick Garvey                                          November 20, 2009

85

1    in return."
2         What did you mean when you told
3    Mr. Caramadre that you would tell God of a man who
4    has asked for nothing in return?
5         A    If I went to heaven -- I mean, he gave
6    me 2,000, 2,000, and whatever, right?  And that
7    that helped me out, and that God would turn around
8    and when he died, he would turn around and help
9    him out.
10        Q    Did you -- at the time that you wrote
11   this letter, did you believe that Mr. Caramadre
12   had received something in return?
13        MR. PINE:  Objection; leading.
14        THE WITNESS:  No.  No, absolutely
15   not.
16   BY MR. VILKER:
17        Q    Okay.  Well, what, if anything, did you
18   believe Mr. Caramadre had received by the time you
19   had written this letter on February 20th?
20        A    Absolutely nothing.  He turned on --
21   Mr. Raymour turned around and told me that he was
22   doing it to turn around and help people that were
23   terminally ill, that were poor.  That was what was
24   told to me, and that's why I wrote that note, and
25   that was it.

86

1         Q    At the time you wrote this letter in
2    apparently February of 2008, what knowledge, if
3    any, did you have of any accounts or annuities
4    being opened up in your name?
5         A    Absolutely positively none.
6         Q    Now, I want to show you Government
7    Exhibit 27 and ask if you'd take a moment to read
8    through that.
9         A    Yes, I recognize this.
10        Q    And what is this exhibit?
11        A    This -- I thanked Mr. Raymour for
12   turning around and going to Mr. Caramadre and
13   talking him into giving me some money, and I got
14   the money and --
15        Q    Okay.
16        A    -- and that was it.
17        Q    Okay.  You entitled this letter -- or
18   you start this letter, "To Raymour, a man I
19   consider my dear friend."
20        A    Right.
21        Q    Was that -- did you consider Raymour to
22   be a dear friend at that time?
23        A    He seemed like a honest man.  I mean, he
24   was so -- you know, he just -- I never figured,
25   you know, that he would be a thief.  I just --

87

1         MR. PINE:  Move to strike.
2         THE WITNESS:  I mean, he just seemed
3    to be a nice guy.
4         MR. PINE:  Move to strike.
5    BY MR. VILKER:
6         Q    Now, and what was the purpose of writing
7    this letter to Raymour?
8         A    To let him know how I felt.
9         Q    Which was how?
10        A    I -- I liked him.  I thought he was a
11   good person, and I wanted to thank him for what he
12   did for me.
13        Q    Okay.  Now, if you take a look at
14   Exhibit 28 -- and before I ask you about this
15   particular exhibit, you have testified that you
16   received two different checks from Raymour both in
17   the amount of $2,000?
18        A    Correct.
19        Q    And those checks were shown to you -- I
20   believe they were Exhibits 1 and 2, correct?
21        A    Correct.
22        Q    Now, other than those two checks, were
23   there any -- was there any other occasion in which
24   Raymour gave you money?
25        A    He gave me a thousand dollars cash.

88

1         Q    Okay.  And when was that?
2         A    That was the last -- after -- let's see,
3    he gave me two checks, and then a thousand
4    dollars.  That would be the third one.
5         Q    Okay.  When you -- when he gave you the
6    third thousand dollars, how did that -- where did
7    that meeting take place?
8         A    My house.
9         Q    Okay.  And how did it -- did you contact
10   Raymour?
11        A    Yes.
12        Q    Okay.  And why did you contact Raymour?
13        A    For money.
14        Q    Okay.  You were asking him for more
15   money?
16        A    Yeah.
17        Q    And how did he respond?
18        A    He told me he would bring me a check,
19   and he would have to give me some cash, and I said
20   that's fine with me.
21        Q    Okay.  Now, did he show you any checks
22   that day?
23        A    No, he just brought $1,000.
24        Q    Okay.  And as you look at Exhibit 28,
25   which is a check dated April 14th of 2008 for


ESQUIRE
an Alexander Gallo Company

Toll Free: 800.845.3376
Facsimile: 702.382.2050

Suite 770
2300 West Sahara Avenue
Las Vegas, NV 89102
www.esquiresolutions.com

89

1    $2,000, does this check look familiar to you?
2       A   No. Nope.
3       Q   Okay.  In total, how much do you
4    remember receiving from Raymour?
5       A   $2,000, $2,000, $1,000.
6       Q   Okay.  So a total of $5,000?
7       A   5,000.
8       Q   Now, I would like to jump forward to
9    September of this year, 2009, a couple of months
10   ago.
11          Did you -- where were you living at that
12   time?
13      A   3555 Lake Mead.
14      Q   Okay.  Is that here in Las Vegas?
15      A   In Las Vegas.
16      Q   Okay.  Now, did you receive a phone call
17   from Raymour?
18      A   I did.
19      Q   And what did Raymour say to you during
20   this conversation?
21      A   He told me, he said, "Patrick," he said,
22   "I'm going to send you some documents."  He said,
23   "I color-coded them the way you're to sign them.
24   I need you to sign them and give them right back
25   to the postman, and get it back to me as quickly

90

1    as you can."
2          And I said, "No problem.  I'll send it
3    back."  And then I hung up.
4       Q   Well, let me just stop you there.
5          What, if anything, did Raymour say to
6    you during this conversation about any money you
7    would be given to sign these documents?
8       A   He told me he would give me $3,000 if I
9    signed them.
10      Q   Okay.  And how did you respond?
11      A   I turned around and told him -- well, I
12   told him, I said, "Okay, no problem."  And then I
13   read the documents.
14      Q   Okay.  Let me just keep -- show you some
15   exhibits as you're discussing them.
16          First of all, I want to show you
17   Government Exhibit 29.
18      A   Yeah.
19      Q   Okay.  How much after the conversation
20   with Raymour did you receive the documents?
21      A   The next day.
22      Q   Okay.  Now, do you -- in Exhibit 29,
23   does it indicate from whom -- strike that.
24          Does it indicate who sent the documents?
25      A   It would be Joseph Caramadre, Law

91

1    Offices of Joseph Caramadre, 1000 Chapel View
2    Boulevard, 270, Cranston, Rhode Island.
3       Q   And are you listed as the recipient?
4       A   Yeah, Patrick Garvey.
5       Q   And is the date of shipment above that
6    9/4/09?
7       A   I believe so, yes.
8       Q   Was there included in the package
9    a return slip for you to send the documents back?
10      A   Yes.
11      Q   Now, I want to show you Government
12   Exhibit 30.
13          Is that the return slip?
14      A   That's it.
15      Q   Okay.  And it would be sent from you
16   back to Joseph Caramadre?
17      A   Yes, he sent me an envelope to put these
18   back on.  They were already filled out.  It was
19   filled out, he said, "Put them in the envelope,
20   seal the envelope, give it back to the
21   postmaster."
22      Q   Now, what, if anything, did Raymour tell
23   you was the reason that he wanted you to sign
24   these documents?
25      A   He didn't.  And it was funny, I didn't

92

1    ask.  Okay.  What was --
2       Q   Well, let me just -- before we get
3    there, let me show you Exhibit 31.
4       A   These are the documents.
5       Q   Okay.  Now, this is not the original
6    documents?
7       A   Right.
8       Q   Okay.  What did you do with the original
9    documents?
10      A   I gave them to you people.
11      Q   Okay.  Did you provide it to a postal
12   inspector you met with a couple of weeks ago?
13      A   No.
14      Q   Who did you provide it to?
15      A   You people.
16      Q   Okay.  The -- on top of these documents,
17   was there a sticky note with some handwriting?
18      A   Not that I remember.
19      Q   Okay.  Well, if you look at -- if you
20   look at Exhibit 31, do you see the handwritten
21   information?  It's this exhibit here.
22      A   Yeah.  I see that.  Yeah.
23      Q   And it says -- I mean, excuse me,
24   "Mr. Garvey, I have used a yellow tab for all the
25   places you have to sign, and a green tab for all



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.845.3376
Facsimile: 702.382.2050

Suite 770
2300 West Sahara Avenue
Las Vegas, NV 89102
www.esquiresolutions.com

Patrick Garvey                                    November 20, 2009



93

1    the places that your wife has to sign.  Thanks,
2    Raymour."
3         Okay.  Do you recall seeing that --
4    A    Yes.
5    Q    -- with the original packet?
6    A    Yes.
7    Q    Okay.  And did the document have a
8    number of signature lines that both you and your
9    wife were supposed to sign?
10   A    Yes.
11   Q    Now -- and you looked through the
12   documents in Exhibit 31, and I know you have given
13   the original over to the government.
14   A    Yeah.
15   Q    But through the pages in front of you,
16   do these appear to be the pages that were
17   contained in the UPS package that Raymour sent to
18   you in September of 2009?
19   A    Yes.
20   Q    Okay.  Now, I want to turn your
21   attention to one page in particular, which is the
22   sixth page of this document.  Let me just get it
23   for you.
24   A    No, I'm just looking at something.
25   Q    Okay.

94

1    A    Okay.
2    Q    Let me see.  Now, on the sixth page of
3    this document at the bottom, there's -- it
4    indicates that it's for Scottrade use only?
5    A    Yes.
6    Q    Okay.  What, if anything, did Raymour
7    tell you about why he wanted you to sign a
8    document that was for Scottrade use?
9    A    He really didn't say nothing.  He
10   just -- he just -- he just said he needed me to
11   sign these documents and get them back to him as
12   fast as possible.
13   Q    Okay.  Now --
14   A    And that he would give me $3,000.
15   Q    Now, if you look at -- if you turn the
16   page, the -- this page, the next page is entitled,
17   "Annuitant Acknowledgment," and it's for -- the
18   annuity owner is Agostini Construction, you're
19   listed as the annuitant, and the annuity company
20   is Nationwide.
21        And then the next page has a similar
22   document with Estela Rodrigues and Transamerica
23   Life.
24   A    Uh-huh.
25   Q    And then the final page has another

95

1    document with Agostini Construction and ING.
2         Did you read through these documents
3    that Raymour sent to you?
4    A    Some of them, but I -- I knew something
5    was wrong, so these -- these were not going back
6    to Raymour, no way.
7    Q    Okay.  The paragraph above -- below
8    where your name is written on all of these
9    documents reads that, "I am of sound mind and I am
10   entering into this agreement voluntarily and I
11   consent to be the contract annuitant out of my own
12   free will and without duress."
13        Had you consented to be a contract
14   annuitant for any of these annuities?
15   A    No.  No.
16   Q    And did you sign any of these documents?
17   A    No.
18   Q    And did you send them back to Raymour?
19   A    No.  I gave them to you guys.
20   Q    Okay.  Now, after you received these
21   documents from Raymour, did you have any
22   subsequent conversations with him?
23   A    Yes.  He called me and he asked me if I
24   sent the documents, and I said no.
25   Q    And did --

96

1    A    And he said, "Why not?"
2    Q    Just --
3    A    I said, "What do you think, I'm a fool?"
4    Q    If you can just speak more clearly, it's
5    hard to understand you.
6    A    I said, "What do you think, I'm a fool?"
7    Q    And how did he respond?
8    A    And he turned around and said to me,
9    "Well, then, Mr. Garvey, we'll be talking again."
10   And I said, "Yes, we will."
11   Q    Okay.
12   A    And I gave the documents to you people.
13   Because when I got them documents and he wanted
14   them back that fast, I knew.  I knew right then
15   and there, I said, "This is too big.  This is way
16   over your head.  Don't even -- just go through
17   the -- take them -- give them to the government,
18   give them to anybody, but give them to a legal
19   official and let them turn around and handle it,
20   because you don't want no part of this."
21   Q    Now, did you ever receive that $3,000
22   from Raymour?
23   A    No.  He told me, he said, "You mail it
24   out, I'll mail a check out to you for 3,000."
25        I said, "Yeah.  Right.  Sure.  See you



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.845.3376
Facsimile: 702.382.2050

Suite 770
2300 West Sahara Avenue
Las Vegas, NV 89102
www.esquiresolutions.com

Patrick Garvey                                    November 20, 2009

### 97

1   later, pal."
2      Q   But you didn't mail the documents back?
3      A   No, I didn't mail nothing out.
4      Q   Okay.  Now, Mr. Garvey, I would like to
5   again turn your attention to the beginning of
6   September of 2009.
7          Did there come a time in which a private
8   eye or a private detective from an insurance
9   company paid you a visit in Las Vegas?
10     A   Yes.
11     Q   Now, and the first time you met with
12  him, did -- what do you remember telling him that
13  day?
14     A   He said to me, he said, "I know you're
15  in bad health" or something like that, and I said,
16  "No, I'm in good health."
17     Q   Why did you say that?
18     A   Because I didn't want no part of it.  I
19  knew it was coming from this paperwork.  I knew,
20  and I didn't want no part of it.  And he just -- I
21  mean, I chased him out of there, and he come back,
22  either the next day or the day after.  And I had
23  calmed down, I let him in.
24         And -- I'm trying to think of what he
25  asked me.  He asked me -- he asked me how my

### 98

1   health was.  And, again, I said, "There's nothing
2   wrong with my health.  My health is fine."
3          And at some point, we started talking
4   about the case of what is going on, and he asked
5   me if I knew Raymour.  First I said no, then I
6   said yes.  I turned around and told him that I was
7   going to Idaho because I had family up there and
8   whatever.
9          I lied.  I didn't tell the truth because
10  I didn't want to get involved.  I wanted away from
11  this.  I knew what -- like I'm here now.  I'm in
12  front of all you people.  I don't understand still
13  what I've done wrong.  Okay?  And this guy has put
14  me in trouble.  If I never get another $5,000 from
15  anybody, it will be a blessing.
16         And I just wanted away from it.  So I
17  did lie to Frank, and then finally I told Frank I
18  knew Raymour and whatever.
19     Q   Okay.  So Frank was the name of the
20  investigator?
21     A   Yes.
22     Q   Okay.  And you told him a number of
23  things that weren't true?
24     A   Right.
25     Q   Okay.

### 99

1      A   Going to Rhode Island and -- you know,
2   but I did go to Rhode Island.
3      Q   Okay.  Why did you tell Frank some
4   things that weren't true?
5      A   Well, I didn't want no part of it.  I
6   didn't want to get into it.  And I was afraid
7   that -- see, you guys have a way of changing
8   words.  I can say one thing, okay, you can make it
9   sound different or put it in any context you want
10  to.  So I -- I just basically tried to get out of
11  it.
12         And then when I knew I couldn't get out
13  of it, then I just turned around and told Frank
14  this and this, "I did this, this, that.  I got a
15  phone call.  This happened, that happened," and
16  that was it.
17     Q   Okay.
18     A   And that was the truth.  I told him the
19  truth after that.  He seemed to be a nice guy, and
20  he told me, he said, "Patrick, you're in no
21  trouble.  No trouble at all."
22         I said, "Are you lying to me, or are you
23  just" --
24         He says, "No, I'm telling you the truth.
25  You're in no trouble at all."

### 100

1          I said, "Okay.  Then I'll talk to you."
2      Q   Okay.  Now, are you telling the truth as
3   you testify here, too?
4      A   Oh, yes.  Oh, yeah.  Oh, yeah.
5          MR. VILKER:  Okay.  I have no further
6   questions.
7          MR. PINE:  Can we switch seats?
8          THE WITNESS:  Like I said --
9          MR. VILKER:  You just have to wait
10  for the questions to come.
11
12         EXAMINATION
13  BY MR. PINE:
14     Q   Mr. Garvey, before we begin the
15  questioning, first let me introduce myself.  My
16  name is Jeffrey Pine.  I represent Raymour
17  Radhakrishnan.
18         Before we begin the questioning, I would
19  like to give you a piece of paper, and I'm going
20  to ask you to sign your name ten times.  Not
21  slowly, not quick, just normal signatures that you
22  would endorse something with.
23         Okay?
24     A   Okay.
25         MR. PINE:  All set.  I would ask that



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.845.3376
Facsimile: 702.382.2050

Suite 770
2300 West Sahara Avenue
Las Vegas, NV 89102
www.esquiresolutions.com

Patrick Garvey                                        November 20, 2009

| 101 | 103 |
|---|---|

**101**

1   this be marked as Defense Exhibit A -- B.  Okay.
2          (Exhibit B was marked for
3          identification and is attached
4          hereto.)
5   BY MR. PINE:
6      Q   Mr. Garvey, early in your testimony, you
7   talked about your present health condition, and
8   you said that because of some medications that you
9   take, it does affect your memory?
10     A   Yeah.
11     Q   Isn't that true?
12     A   Correct.
13     Q   And these events that we're talking
14  about, for the most part, occurred almost two
15  years ago, February --
16     A   Correct.
17     Q   -- January, March of 2008.
18         Do you have a clear memory of meeting
19  with Raymour on those occasions that you met with
20  him?
21     A   I believe so.
22     Q   Do you have a clear memory of the
23  specifics of the meetings?
24     A   I believe so.
25     Q   Do you remember details of the meetings?

**103**

1      A   Correct.
2      Q   And that's the time that he also went
3   through some documents with you in requesting your
4   signature?
5      A   Well, he didn't go through them.
6      Q   Well, I thought you said on direct
7   examination that he read the forms to you.
8          Do you recall saying that a while back?
9      A   Some of them.
10     Q   He read some of the forms to you.
11         Do you remember how many forms he read
12  to you?
13     A   No.
14     Q   But he said -- you're clear in your
15  memory that he read some of the forms to you; is
16  that correct?
17     A   I'm not sure.
18     Q   You don't remember today which ones he
19  read to you?
20     A   No.
21     Q   But you have a memory and you said it on
22  direct and now again on cross, you have a memory
23  of him reading some of those forms to you; isn't
24  that correct?
25     A   Yes.

**102**

1      A   Questionable.
2      Q   Questionable as to whether you remember
3   the details?
4      A   Questionable.
5      Q   How long did the first meeting last?  Do
6   you have a memory of that?
7      A   Half hour.
8      Q   Do you remember where -- where in your
9   house the meeting took place?
10     A   In the kitchen.
11     Q   Was anyone else present?
12     A   No.
13     Q   Just you and Raymour?
14     A   That's correct.
15     Q   Okay.  Do you remember how long the
16  second meeting lasted?
17     A   A little longer, because he brought some
18  papers for me to sign.
19     Q   Right.  You went through some
20  documents --
21     A   Right.
22     Q   -- for your signature?
23         And that's the time when you were
24  presented with a number of documents for your
25  signature?

**104**

1      Q   Okay.  And the second meeting lasted
2   longer because of that?  There was more paperwork
3   involved, wasn't there?
4      A   There was.
5      Q   Okay.  Now, you first become interested
6   in Raymour's program and his philanthropy through
7   Margo Meo?  Is that the right pronunciation?
8      A   Correct.
9      Q   You knew her for a long time?
10     A   Correct.
11     Q   And she pointed you in the direction of
12  Raymour and Mr. Caramadre because, A, you needed
13  money and, B, they had money to give away; isn't
14  that true?
15     A   Correct.
16     Q   And that was something of interest to
17  you, especially because of the fact that you were
18  ill?
19     A   Correct.
20     Q   How -- how were you feeling -- you said
21  you had a heart attack -- I thought you said a
22  serious heart attack --
23     A   Yeah.
24     Q   -- in late -- was it '07, or when was
25  the serious one that you referenced?



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.845.3376
Facsimile: 702.382.2050

Suite 770
2300 West Sahara Avenue
Las Vegas, NV 89102
www.esquiresolutions.com

## 105

1   A   I believe it was in -- it was in '08.
2   The beginning of '08. I'm not sure. All -- or
3   '07. I don't know.
4   Q   Well, you produced some medical records?
5   A   Records.
6   Q   Some medical letters?
7   A   Right. Whatever they said, that's --
8   Q   Okay. And how were you feeling
9   recovering from your illnesses when you met with
10  Raymour in '08?
11  A   My equillibrum was off, dizziness. I
12  would forget things. It was just hard to put
13  things together.
14  Q   Okay. Was it like -- like now, that you
15  said sometimes you forget things, and then maybe
16  they come back, and then you forget?
17  A   Right.
18  Q   Kind of on and off, it sounds like?
19  A   Yeah.
20  Q   Is that -- is that a fair
21  characterization?
22  A   Yes.
23  Q   It comes and goes?
24  A   Yes, it does.
25  Q   Okay. Are some days better than others?

## 106

1   A   Yeah, they are.
2   Q   Are some parts of the day better than
3   others? In other words, is there any regular --
4   A   I never know. I mean, I can turn around
5   and look at you and turn my head right now and
6   forget your name.
7   Q   Gotcha. Okay. I understand.
8   A   And then it will come back to me.
9   Q   Right.
10  A   Because then I'll think, "What's his
11  name? What's his name? What's his name?"
12  Q   Okay. That makes it -- I understand
13  now. That makes it clear.
14      Now, we agree that you were very willing
15  and able to accept the money that he gave you, the
16  $2,000 check?
17  A   Yes.
18  Q   In fact, you went out and cashed it?
19  A   Yes.
20  Q   He gave you a second check for $2,000?
21  A   Yes.
22  Q   You went out and cashed that?
23  A   Yes.
24  Q   No dispute about that, right?
25  A   No dispute.

## 107

1   Q   And, in fact, you appreciated what he
2   was doing for you?
3   A   Yes, I did.
4   Q   And you wrote that in the letters that
5   were referenced?
6   A   Yes, I did.
7   Q   You spoke very highly of him?
8   A   Yes, I did.
9   Q   You were hoping that God would bless
10  this person?
11  A   Yes, I did.
12  Q   And these -- the two letters that you
13  wrote on February 20th were after the two meetings
14  that you had where he paid you money; isn't that
15  correct?
16  A   Correct.
17      MR. MAGRATTEN: Objection.
18  BY MR. PINE:
19  Q   Did he pay you any money at one meeting
20  or two meetings?
21  A   He paid me -- when he came to the house,
22  I got a check.
23  Q   Right.
24  A   He left. When he came back to the house
25  the second time, I got a check.

## 108

1   Q   Okay.
2   A   He left. When he came back to the house
3   the third time, I got $1,000.
4   Q   Okay.
5   A   He left. That's how the money trail
6   went.
7   Q   The first two checks that you received
8   were for $2,000 each?
9   A   Correct.
10  Q   And those were in January of '08? In
11  fact, that's the date --
12  A   Correct.
13  Q   -- on the checks.
14      And the letters that you wrote were on
15  February 20th, correct?
16  A   Correct.
17  Q   And that was after you had met with him
18  two times; isn't that correct?
19  A   Correct.
20  Q   Okay. In fact, the first check notes in
21  the memo, "Philanthropy"? That was the initial
22  check?
23  A   Right. Right.
24  Q   And that was for the purpose of
25  assisting you with expenses or whatever you needed



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.845.3376
Facsimile: 702.382.2050

Suite 770
2300 West Sahara Avenue
Las Vegas, NV 89102
www.esquiresolutions.com

Patrick Garvey                                                November 20, 2009

---

**109**

1   it for; isn't that right?
2       A   Whatever it means.  I don't know what it
3   means.
4       Q   Well, philanthropy is generosity,
5   charity, right?
6       A   Okay.
7       Q   And, in fact, showing you Exhibit 6,
8   this is entitled, "Terminal Illness Philanthropy
9   Account."  This is a receipt that you signed when
10  you got that check for $2,000, the philanthropy
11  check, isn't that -- do you recognize that?
12      A   I can't remember.
13      Q   You don't remember?
14      A   No.
15      Q   Is it possible you signed that when you
16  gave -- when he gave you the $2,000?
17      A   I don't remember.
18      Q   Okay.  So as we sit here today, you
19  don't have a memory of seeing or signing this
20  document, but you could have?
21      A   Yeah, I could have.  It looks like my
22  signature.
23      Q   Okay.  It looks like your signature.
24          You don't think anybody forged your
25  signature on this, do you?

---

**111**

1       A   No.
2       Q   You think they typed it afterwards?
3       A   That's what I think, yeah.
4       Q   Well, okay.  But, in any event, do you
5   think that the title was there, "Terminal Illness
6   Philanthropy Account Receipt"?
7       A   I don't know.
8       Q   Okay.  But you do have a -- you do have
9   a memory of getting the $2,000?
10      A   Yes, I do.
11      Q   And you have a memory of cashing the
12  check?
13      A   Yes.
14      Q   And you believe it's your signature on
15  the receipt, this document, which is No. 6 --
16  Exhibit 6, right?
17      A   Yeah.  Yeah, I think -- I think so.
18      Q   It makes sense, doesn't it?
19      A   I think so.
20      Q   Well, if I gave you money -- does it
21  make sense that if I give you money, I might
22  include a receipt to show that the money was paid
23  to you?
24          MR. VILKER:  Objection.
25          THE WITNESS:  Well, not really,

---

**110**

1       A   No.
2       Q   Okay.
3       A   I hope not.
4       Q   And this particular receipt states that
5   the reason that they gave you $2,000 was for
6   hospice or medical expenses or home health care,
7   it was to help you through your recuperation,
8   wasn't it?
9       A   Well, the thing is, okay, the papers I
10  signed, okay, had writing from here down.  They
11  didn't have writing up here.
12      Q   Well, did this particular paper, the
13  receipt, do you have a memory of whether or not it
14  was typed out like this before or whether -- are
15  you saying that it was just a signature line on a
16  blank piece of paper?
17      A   No.  This here, this here, this here --
18      Q   Yeah.
19      A   -- this is what he did, he read them out
20  like this.
21      Q   Right.
22      A   Nothing was up here, nothing.
23      Q   What about the typed part?
24      A   Nope.
25      Q   You don't think it was there?

---

**112**

1   because he never said I had to sign any receipts
2   or anything like that.
3   BY MR. PINE:
4       Q   All right.  But you also said you don't
5   remember whether you did or didn't?
6       A   Right.
7       Q   All right.  And you indicated that on
8   another occasion, he gave you cash?
9       A   Yeah.
10      Q   A thousand dollars?
11      A   Yes.
12      Q   And you accepted that, as well?
13      A   I did.
14      Q   For the same reasons, I suppose?  You
15  wanted and needed the money?
16      A   Exactly.
17      Q   And you were agreeable to accepting the
18  money?
19      A   I did.
20      Q   And you've identified your signatures on
21  a -- you were shown a number of documents,
22  correct, by Mr. Vilker?
23      A   Correct.
24      Q   And you have identified your
25  signature --

---



Toll Free: 800.845.3376
Facsimile: 702.382.2050

Suite 770
2300 West Sahara Avenue
Las Vegas, NV 89102
www.esquiresolutions.com

ESQUIRE
an Alexander Gallo Company

Patrick Garvey                                              November 20, 2009

113

1      A   I wasn't shown a number of documents.  I
2   was asked to sign a number of documents.
3      Q   No, I'm referring to -- I'm referring to
4   today.
5          Mr. Vilker showed you a number of
6   documents that we've numbered?
7      A   Oh, okay.  Yeah.
8      Q   And on many of them, you said that was
9   your signature?
10     A   Yeah.
11     Q   Okay.  And then on others, you said --
12     A   It wasn't.
13     Q   -- you weren't sure or no?
14     A   I wasn't sure, yeah.
15     Q   Okay.  And I was keeping track as we
16  went, and on No. 20, which is entitled
17  "Acknowledgment of Annuitant," you identified that
18  as your signature today when you were asked the
19  question by Mr. Vilker.  On this particular
20  exhibit, you said, yes, that's your signature?
21     A   Okay.
22     Q   All right.  You also said that you
23  didn't read the document.
24     A   No.
25     Q   Okay.  Did Raymour prevent you from

114

1   reading the document when he gave it to you?
2      A   No.  But it was done so fast, he had so
3   many documents coming at me --
4      Q   Well, did he take them away quickly, or
5   did he allow you the opportunity to read them, if
6   you wanted to?
7      A   One, one, and then another one.  But he
8   allowed me to read them.
9      Q   Okay.  And this particular one is
10  called, "Acknowledgment of Annuitant," and you had
11  the opportunity to read that, you just said?
12         MR. VILKER:  Objection.
13  BY MR. PINE:
14     Q   You just said that, right?
15     A   Well, I -- I'm not sure.  Because like I
16  said, the papers came at me that fast, "Sign it,
17  sign it," pull it back.  "Sign it," pull it back.
18     Q   Right.
19     A   "Sign it," pull it back.
20     Q   But you just said he gave you the
21  opportunity to read it?
22     A   He gave me the opportunity to read it.
23     Q   Okay.  He didn't prevent you -- he
24  wasn't covering it up or --
25     A   No, no.

115

1      Q   -- preventing you from reading it?
2      A   No.
3      Q   Okay.
4      A   No.  He put them down on the paper, he
5   said, "Sign it there, sign it there, sign it
6   there, sign it there."
7      Q   Okay.
8      A   That was it.
9      Q   Now, you also, when we were going
10  through -- where Mr. Vilker was going through --
11         MR. McADAMS:  Is that -- he moved his
12  physical position.  He's not in the camera
13  anymore.  Can you move him --
14  BY MR. PINE:
15     Q   Oh, I guess they want you to slide more
16  towards the middle.
17         Now, when Mr. Vilker was questioning
18  you, you also said on No. 22 in response to the
19  question, you said that that was your signature.
20         Okay?  Do you remember telling
21  Mr. Vilker that a little while ago?
22     A   Yes.
23     Q   Okay.  And on No. 24, you said the same
24  thing.  Here we are.  On 24, you said the same
25  thing, that that was your signature.  You said, "I

116

1   believe so."
2      A   Yep, I believe so.
3      Q   Okay.  So there's -- we agree, then,
4   that you recognize and identify your signature on
5   at least those documents, correct?
6      A   I believe so, yes.
7      Q   Okay.  And that, therefore, indicates
8   that you were presented with those documents at
9   the time of the writing of the signature, the
10  signing of the signature?
11     A   Correct.
12     Q   Isn't that correct?
13     A   Correct.
14     Q   Okay.
15     A   But, Mr. Pine, I don't know how to get
16  this across, this here was not here.
17     Q   So what you're --
18     A   If I seen margin account or application
19  of agreement, then I would have stopped and read
20  this.
21     Q   Okay.
22     A   Okay.  This was not here.  I'm saying it
23  could have been put on later.
24     Q   You think it was put on later?
25     A   I think it was.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.845.3376
Facsimile: 702.382.2050

Suite 770
2300 West Sahara Avenue
Las Vegas, NV 89102
www.esquiresolutions.com

Patrick Garvey                                           November 20, 2009



**117**

1    Q   Okay.  So somehow -- you trusted
2  Raymour, didn't you?
3    A   Yeah, I did, but --
4    Q   And --
5    A   That's why I'm saying to you, it
6  wasn't -- it wasn't there.
7    Q   It's your belief -- well, it's your
8  belief that somehow they presented you with part
9  of this document and then created the rest of it?
10   A   (Nodding head.)
11   Q   That's what you think.
12   A   That's what I think.
13   Q   All right.
14   A   That's what I think.  Because, like I
15  said, I was handed a paper, "Sign it right here,"
16  on the X or wherever, right, got it back, here's
17  another one.  I mean, it wasn't --
18   Q   Well, is it that it wasn't there, or you
19  didn't look carefully enough --
20   A   No, it wasn't there.
21   Q   -- to see it?
22   A   Oh, I would have seen it.  I would have
23  seen it, because I wouldn't have signed it.
24   Q   Well --
25   A   I wouldn't have signed it.

**118**

1    Q   You signed other things?
2    A   Not like that, though.  Not like the
3  other ones you got.
4    Q   What's -- what's so sinister about this?
5    A   Well, it's getting into something, and I
6  didn't want to get into nothing.  This was
7  supposed to be something out of goodwill, you
8  know, and from their heart, whatever.  And then
9  it -- if I'd have seen that going into something,
10  company or agreement or whatever, then the
11  questions would have been asked, and I would have
12  read it.
13   Q   Well, isn't it possible that because you
14  wanted -- you wanted Raymour and Mr. Caramadre to
15  continue to pay you money that you needed --
16   A   No.
17   Q   -- isn't it -- no?
18   A   No.
19   Q   Well, you said that you were very
20  agreeable to that?
21   A   I was agreeable, but, I mean, I did
22  not -- I'm not lying to turn around to get the
23  money.  No, I didn't do that.
24   Q   What do you mean you're not lying to
25  turn around and get the money?

**119**

1    A   I thought you were going to turn around
2  and say, "Well, did you lie to turn around and get
3  the money?"
4    Q   No, I'm not asking you if you're lying
5  to turn around.  I'm asking isn't it possible that
6  you were agreeable to signing various documents
7  that he was presenting to you because, in exchange
8  for that, he was being very philanthropic to you?
9  That was something that you were interested in?
10   A   Well, I signed -- I signed documents
11  that I said I signed, but they were not like that.
12   Q   Okay.
13   A   That I can tell you.
14   Q   All right.  Now, you said on No. 19, as
15  an example, that that wasn't your signature,
16  right?  You said 24 was and 19 wasn't.  That's
17  what you told Mr. Vilker a little while ago.
18       Are those signatures -- do they look
19  different to you?
20   A   Yeah, they do.
21   Q   Well, the P is -- what's different?
22   A   See the V?  See the V?
23   Q   Yeah.
24   A   See the line coming down this way?  See
25  the V?  See the line going up that way?

**120**

1    Q   Well, there's a line going up that way
2  on No. 19.
3    A   No, it's going down.
4    Q   So what about the --
5    A   It's going down, the V.
6    Q   What about -- what about the Patrick,
7  does that look similar to you?  The way the P is
8  made, the way the I is dotted in the same spot,
9  the T, the way the K is looped, doesn't that look
10  similar, if not identical?  That's what I'm
11  asking, look at the Patrick.
12   A   No.
13   Q   You don't think so?
14   A   No, I don't think so.
15   Q   Okay.
16   A   I don't think so at all.
17   Q   In any event, you don't have a memory of
18  signing No. 19, and you don't -- and you don't
19  believe that's your signature?
20   A   No.
21   Q   So therefore, do you believe somebody
22  put your signature on that?
23   A   Well, I'm not saying that.  You are.
24   Q   Well, how did it get there?
25   A   I have no idea.  I have no idea.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.845.3376
Facsimile: 702.382.2050

Suite 770
2300 West Sahara Avenue
Las Vegas, NV 89102
www.esquiresolutions.com

Patrick Garvey                                            November 20, 2009

121

1    Q   Well, if you didn't write it, who did?
2  Somebody else, right?
3    A   I guess.  I don't know.
4    Q   Unless you wrote it?
5    A   I didn't write it, I can tell you that.
6    Q   Well, then somebody else must have put
7  your signature on there.
8    A   If you say so.
9    Q   Well, I'm not saying so.  I'm asking
10  you.
11    A   If you say so.
12    Q   What do you believe?
13    A   I don't -- I believe whatever you
14  believe.  You tell me.  I'm not trying to be a
15  wise guy, Mr. Pine.
16    Q   I understand.  I'm not saying you are.
17    A   I'm just trying to answer the best way I
18  can.
19    Q   I'm just trying to clarify.  Because as
20  you went through them, several documents you said,
21  "Yes, it's mine," and others you said, "No, it's
22  not."
23        And if it's not yours, then the
24  question -- natural question would be, well, how
25  did it get there?

122

1        MR. VILKER:  I'm going to object to
2  this.  He said it's not his signature, he has no
3  knowledge of how the signature got there, so I
4  don't understand what you're trying to get at.
5        THE WITNESS:  I told you, I don't
6  know how it got there.
7  BY MR. PINE:
8    Q   Okay.
9    A   It could have been him who signed it, it
10  could have been anybody.  I don't know.  I don't
11  know.  Just like I told him, this top part here,
12  okay, on the papers I signed was not here, was not
13  here.  Was here on the bottom, okay, and then
14  later on, now they appear on the paper.
15    Q   Now, on -- so there was some, like 19
16  that you said no, it's not yours, and there were
17  some, like 20, 22, 24, that you said it was yours.
18  And then there were a couple in between that you
19  said you're not sure.
20    A   Okay.
21    Q   And that's -- No. 21 you said not sure.
22  Okay.
23        Is there something about 21 that is any
24  different from 20 or 24 or 19 that makes you
25  unsure?

123

1    A   It just -- it don't look like my
2  handwriting.
3    Q   Well --
4    A   Garvey is -- it just -- Garvey doesn't
5  look -- it doesn't look like my handwriting.
6    Q   Okay.  How many times a year do you
7  think you sign something in your normal life?
8  Hundreds?
9    A   Hundreds.
10    Q   Thousands?
11    A   Probably thousands.  Okay.
12    Q   We all do?
13    A   True.
14    Q   When you write out a check, when you do
15  anything?
16    A   True.
17    Q   Do you think you sign exactly the same
18  every single time?
19    A   Oh, no way.
20    A   Of course not.
21    A   No way.
22    Q   Nobody could do that.
23    A   I'm -- I'm just saying to you, I don't
24  think it's my signature.
25    Q   Okay.  But you would agree that in the

124

1  normal course of human events, we don't sign our
2  names the same way the same time every time?
3        MR. VILKER:  Objection.
4  BY MR. PINE:
5    Q   Would you -- would you agree with that?
6        MR. VILKER:  I'm objecting on what
7  he's going --
8        THE WITNESS:  Not really, because if
9  you're --
10        MR. VILKER:  I'm just objecting to
11  the question.  If you want to ask him does he sign
12  his signatures the same every time, that's fine.
13  But saying in the normal course of human events is
14  pretty -- pretty broad.
15        MR. PINE:  It's quoting the
16  declaration.
17  BY MR. PINE:
18    Q   Do you think that in your life -- you're
19  60 years old, lived an active life.  Do you think
20  you've signed your name exactly the same every
21  time every day?
22    A   I -- I don't know.  I -- I really don't
23  know.
24    Q   All right.
25    A   I don't know, you know.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.845.3376
Facsimile: 702.382.2050

Suite 770
2300 West Sahara Avenue
Las Vegas, NV 89102
www.esquiresolutions.com

Patrick Garvey                                    November 20, 2009

---

125

1    Q   Now, you said that Raymour explained
2  some of the forms to you, right?
3    A   Correct.
4    Q   Do you have a memory today of what he
5  told you on those days?
6    A   If I am correct, Raymour turned around
7  and told me, "These papers here are just a
8  formality for Mr. Caramadre so he can keep an
9  account of the people and the money that he is
10 putting out."
11   Q   And that's what you remember about it?
12   A   Yeah, that's exactly what I remember.
13   Q   Is it your testimony that you never saw
14 any documents that referenced a brokerage account
15 or an annuity application?
16   A   Never seen it.
17   Q   That's your testimony?
18   A   Yeah.
19   Q   You never saw those until -- until you
20 were shown those by --
21   A   Right.
22   Q   Who showed you first?
23   A   The government.
24   Q   Mr. Vilker or Mr. Postal Inspector?
25 Who?

---

127

1    A   Not -- not the papers that had this on
2  it or had any of this writing up here on the top.
3  Like I said, and I'll say it for the last time,
4  here down, this writing might have been here, some
5  of it, there was some writing up here, but up here
6  there was no writing.
7    Q   Okay.
8    A   No margin account application or
9  agreement was on this paper.
10   Q   Okay.  And --
11   A   Whether it was put on later on, I have
12 no idea.
13   Q   Okay.
14   A   But I wouldn't have signed it, no way.
15   Q   Okay.  But you did sign one of the forms
16 that said acknowledgment of annuitant?  You
17 identified that.
18   A   Let's see.
19   Q   And you said that you -- you didn't read
20 it?
21       UNIDENTIFED SPEAKER:  What document
22 is that, Mr. Pine?
23       MR. VILKER:  No. 20.  No. 20.
24 BY MR. PINE:
25   Q   And you said you didn't read it, but you

---

126

1    A   I think it was -- I think it was Lee.
2      Wasn't it you, Lee?
3    Q   He's not allowed to --
4      MR. VILKER:  Whatever your memory is.
5      THE WITNESS:  Are you saying that --
6      MR. PINE:  He's not allowed to give
7  you the answers until he questions you.
8      THE WITNESS:  I don't know, to be
9  honest with you.
10 BY MR. PINE:
11   Q   Okay.  But it's your testimony that
12 until somebody from the government showed you
13 those documents, you had not seen them before?
14   A   No.
15   Q   So it's not the case that you signed
16 those documents and you participated in the
17 program because you wanted the money that Raymour
18 was giving you?
19   A   Right.
20   Q   That's correct that you -- that's not --
21 that's not how it went?
22   A   I signed the papers for the money.
23   Q   Right.
24   A   But --
25   Q   We agree with that.

---

128

1  said that --
2    A   Right, right.
3    Q   -- the form was the form.
4    A   Yeah.
5    Q   And you didn't -- even though you had a
6  chance to read it, you didn't read it?
7    A   Right.
8    Q   For whatever reason?
9    A   Yeah.
10   Q   Okay.  And that's --
11   A   Everything -- everything was, "This is
12 just a formality.  It's just a formality."  I
13 thought nothing of it.  I signed, and that was it.
14   Q   And you understood that you were getting
15 paid money by a philanthropist, money that you
16 needed and wanted?
17   A   Right.
18   Q   And so you were agreeable to signing
19 certain forms?
20   A   Well, it all depends on what they were.
21 I mean, you know, he brought them up.  I don't
22 know what they were.
23   Q   You -- you gave the information about
24 your social security number, you gave that --
25   A   I gave --

---



Toll Free: 800.845.3376
Facsimile: 702.382.2050

Suite 770
2300 West Sahara Avenue
Las Vegas, NV 89102
www.esquiresolutions.com

Patrick Garvey                                          November 20, 2009

---

129

1      Q   -- voluntarily?  Nobody hacked into your
2  computer and took it?
3      A   No.
4      Q   Right?  You gave that to them?
5      A   But he -- yes.
6      Q   Yes, right?
7      A   Yes.
8      Q   Okay.
9      A   Yes.
10     Q   Now, when you met with this Mr. Stevens,
11  did he identify himself the first time he showed
12  up?
13     A   Yes.
14     Q   And he had -- who did he identify
15  himself as?
16     A   Private eye.
17     Q   Working for who?
18     A   He didn't say.
19     Q   Okay.  Did you ask?
20     A   No, I didn't ask.
21     Q   Private eyes don't show up on your door
22  every day?
23     A   Oh, yeah, they do.
24     Q   Do they?
25     A   I mean, not every day, but he did that

---

130

1  day.
2      Q   That day, right.
3          Was that unusual for him to knock on the
4  door and say, "I'm a private eye"?
5      A   I never had a private eye come to my
6  door, so I don't know.
7      Q   Okay.  Well, why wouldn't you have asked
8  him who he worked for and what it was about?
9      A   Because I didn't want to talk to him at
10  all.
11     Q   Okay.  And so it's clear and we agree
12  that when he asked you certain questions, you lied
13  to the guy?
14     A   This is --
15     Q   You told him you didn't know anything
16  about anything?
17     A   No.  No, this is after I let him in the
18  house.  This is the second time he came around to
19  the house.  He came more than once.
20     Q   Right, but the --
21     A   The first time he never got in the
22  house.  He never got in the house.
23     Q   What happened the first time?  He stayed
24  outside of the house?
25     A   I told him, "Get out of here, or I'll

---

131

1  knock you down the stairs."
2      Q   Okay.  And did he -- did he agree to
3  that, did he --
4      A   He left.
5      Q   Okay.  He left.
6          So you didn't even answer any --
7      A   Nothing.
8      Q   He didn't even ask and you didn't answer
9  any questions?
10     A   Nope.  And then --
11     Q   And so -- but you didn't ask who he was
12  representing as a private eye or what it was
13  about?
14     A   No.  He just told me, "I'm a private
15  eye."
16     Q   Just the fact that he was a private
17  eye --
18     A   He was a private eye.
19     Q   -- was enough to tell you, "I don't want
20  anything to do with you"?
21     A   Yeah.
22     Q   Okay.  He comes back, right?
23     A   Correct.
24     Q   And does he identify himself a second
25  time?

---

132

1      A   Yes.
2      Q   Okay.  And who does he -- by name or by
3  who he was working for?
4      A   He said, "I'm a private eye."
5      Q   Okay.  Did you ask --
6      A   He said, You are in -- you said, "You
7  are in no trouble.  You have done nothing wrong,
8  so don't be afraid."  He said, "I just want to
9  talk to you."
10     Q   Okay.
11     A   And I said, "Okay."
12     Q   And so --
13     A   I had calmed down, you know.
14     Q   Right.
15         Was it the same day or late --
16     A   Another day.
17     Q   -- a different day?  Okay.
18     A   And I let him in.
19     Q   Yeah.
20     A   And we talked.  And he told me, he said,
21  "You're in no trouble," again.  I don't know how
22  many times he said it, but he said -- he said,
23  "Don't worry about nothing."  He said, "You didn't
24  do nothing wrong."
25     Q   But did you ask him who he was working

---



Toll Free: 800.845.3376
Facsimile: 702.382.2050

Suite 770
2300 West Sahara Avenue
Las Vegas, NV 89102
www.esquiresolutions.com

ESQUIRE
an Alexander Gallo Company

Patrick Garvey                                    November 20, 2009

### 133

1  for, whether he was with the government or with
2  some private firm?
3      A   I always thought that a private eye,
4  okay, works for himself.
5      Q   Okay.
6      A   I didn't know a private eye works for a
7  company or a --
8      Q   Well, did you think somebody was paying
9  him to go out and spend some time with you?
10     A   No, I thought they do it on their own.
11     Q   All right.
12     A   And then they pick up their tab at the
13 end.
14     Q   From who?
15     A   I don't know.  I don't know.
16     Q   So you didn't ask whether he was working
17 for --
18     A   No.  No.
19     Q   -- an insurance company?
20     A   No.
21     Q   You understand now that he was?  He was
22 working for Transamerica Life?
23     A   Yeah.
24     Q   And do you understand that they have
25 filed a civil lawsuit in federal court about all

### 134

1  of this?
2      A   No.
3      Q   Are you aware of that, Transamerica has
4  sued a number of people, including you, in federal
5  court?
6      A   Yeah.  Yeah.  Yeah.
7      Q   Okay.  You're aware of that?
8      A   Yeah.
9      Q   Okay.  But he didn't identify himself as
10 working for Transamerica --
11     A   No, no.
12     Q   -- on that first occasion?
13     A   No.
14     Q   But he did ask you some questions?
15     A   He didn't have time to do nothing.  All
16 he said is, "I'm a private eye."
17     Q   Right.  The second -- I'm sorry, the
18 second time, did he identify himself as working
19 for Transamerica?
20     A   I can't remember.
21     Q   Okay.
22     A   He might have.  He might have.  I don't
23 know.  I can't remember.
24     Q   Did he ask you the question on the
25 second occasion, "Do you know Joseph Caramadre?

### 135

1  Have you ever met him?"
2      A   No, he asked me if I knew Raymour.
3      Q   Okay.  And did you say that you knew
4  Raymour, or did you deny that you knew Raymour?
5      A   I denied it the first time, and then I
6  turned around and waited.  And then he was
7  talking, I could see that he wasn't out to get me.
8  So I turned around and I told him, I said, "Yes, I
9  do know Raymour."
10     Q   Did you tell him that on the first -- on
11 that second meeting with him, or was that at a
12 later meeting with him?
13     A   That was the second meeting.
14     Q   So in the course of the second meeting,
15 is it your memory that you at first denied knowing
16 Raymour, and then later in that same meeting,
17 admitted that you did know him?
18     A   Correct.
19     Q   That's your memory?
20     A   Correct.
21     Q   Okay.  It's clear that the first time
22 that he asked you that, you -- you lied to him,
23 because you knew Raymour?  So when you said you
24 didn't, that was a lie?
25     A   That was a lie.

### 136

1      Q   Okay.  And did he ask you how your
2  health was that first -- that second meeting?
3      A   No.  He told me how it was.
4      Q   He told you how your health was?
5      A   Yeah.  He said, "I know you've got a
6  heart problem.  I know you're a sick man.  I'm not
7  here to turn around and get you upset or anything
8  that is going to happen to you."
9      Q   Did you tell him, "My health is fine.  I
10 have no problems"?
11     A   Yes, I did.
12     Q   Okay.  That's not true?
13     A   No.  No.  I told him later on that it
14 wasn't true, too.
15     Q   And you don't have a memory of him
16 asking you whether or not you knew Mr. Caramadre?
17 You don't remember that?
18     A   No, he did ask.
19     Q   Okay.
20     A   But he asked me about Raymour first.
21     Q   Okay.
22     A   And then he asked me about Caramadre.
23     Q   And did you tell him that you didn't
24 know Joe -- Joseph Caramadre?
25     A   I don't know him.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.845.3376
Facsimile: 702.382.2050

Suite 770
2300 West Sahara Avenue
Las Vegas, NV 89102
www.esquiresolutions.com

Patrick Garvey                                                    November 20, 2009

<table>
<tr><td>

**137**

1    Q   That you were unfamiliar with the name?
2    A   No, I know the name.
3    Q   Did you tell him you ever heard of him?
4    A   All he asked me is, "Do you know Joseph
5    Caramadre?"
6    Q   And what did you say?
7    A   I said no.
8    Q   Okay. Did you tell him, "I never heard
9    of this person"?
10   A   No.
11   Q   That's your memory, that you never
12   heard -- that you told him you never heard of the
13   person?
14       MR. VILKER: Objection. He just said
15   he didn't say that.
16       MR. PINE: What was that?
17       THE WITNESS: I didn't say that.
18       MR. VILKER: He just said he didn't
19   say that.
20       THE WITNESS: I didn't say that.
21   BY MR. PINE:
22   Q   Okay. Sorry.
23       Do you remember what you said to him?
24       MR. VILKER: On what subject?
25       MR. PINE: About Mr. Caramadre.

</td><td>

**139**

1    A   Right, but that's because I had to feel
2    him out. I sat there and feel him out. Once I
3    felt him out, then I said, "He's okay."
4    Q   Okay. But on the first go around, you
5    were not truthful with him, right?
6    A   That's what I said.
7    Q   Okay. But after that, are you saying
8    that you built up some trust --
9    A   Yes.
10   Q   -- with the guy?
11   A   I sure did.
12   Q   Okay.
13   A   And I liked the man. I thought he was a
14   good man.
15   Q   Okay. You got along with him?
16   A   Sure.
17   Q   Okay. Do you remember him coming back
18   about a week later on September 11th?
19   A   I remember coming back. I don't know
20   whether it a week later.
21   Q   All right. Well, do you remember him
22   coming back about a week later?
23   A   Yeah.
24   Q   Okay. Did he come in that day, also?
25   A   Yes.

</td></tr>
<tr><td>

**138**

1        THE WITNESS: I -- I told him that
2    Raymour -- no, I did bring up Mr. Caramadre's
3    name. I told him that Raymour worked for
4    Mr. Caramadre.
5    BY MR. PINE:
6    Q   Okay.
7    A   And Mr. Caramadre was the one that would
8    give Raymour the money, and money -- and Raymour
9    would turn around and bring the money to me.
10   Q   Okay. My question, then, is at any time
11   during the course of that second meeting, did you
12   ever tell Mr. Stevens about Caramadre, "I never
13   heard of that person. I never met such a person
14   with that name"? Did you ever say that, or do you
15   remember ever saying that?
16   A   I don't remember, to be honest with you.
17   Q   Is it possible you said that?
18   A   I don't think so.
19   Q   That when he first asked --
20   A   Because if I let him in my house, I
21   would have trusted him and I wouldn't have lied to
22   him. You know, I would have tried to --
23   Q   Well, but you said that you didn't --
24   the first time you were asked, you said you didn't
25   know Raymour?

</td><td>

**140**

1    Q   And did he ask you other questions about
2    your contacts with Raymour?
3    A   Yes.
4    Q   Okay. And at this point, had he
5    identified himself as representing Transamerica?
6    A   Yes, I think so.
7    Q   Okay. And did he ask you at the end of
8    that interview if you would allow a visit by
9    people associated with Transamerica?
10   A   Yes, he did.
11   Q   Okay. And did you respond to him,
12   "What's in it for me"?
13   A   No. I said, "No."
14   Q   Okay. So you said, "No" as opposed to,
15   "What's in it for me?"
16   A   No. I said, "No, I don't want them in
17   my house."
18   Q   Okay. Did you ever indicate to him that
19   if they, Transamerica, wanted all of the
20   information, that you would expect something from
21   them in return?
22   A   Yes.
23   Q   Okay. So you did say that to him?
24   A   Yes.
25   Q   So, in other words, if they -- "If you

</td></tr>
</table>



Toll Free: 800.845.3376
Facsimile: 702.382.2050

Suite 770
2300 West Sahara Avenue
Las Vegas, NV 89102
www.esquiresolutions.com

ESQUIRE
an Alexander Gallo Company

Patrick Garvey                                    November 20, 2009

---

141

1   guys want information from me, you got to give me
2   something back"?
3       A   Correct.
4       Q   Like money?
5       A   Correct.
6       Q   Okay.  So the information, from your
7   point of view on that day, was for sale, right?
8       A   Correct.
9       Q   Okay.  And did you even mention the
10  information is not only for sale, but you're going
11  to have to come up with ten grand?
12      A   Maybe.
13      Q   Well, you're laughing.
14      A   Maybe, yeah.
15      Q   I think you remember that.
16      A   Yeah.
17      Q   Okay.
18      A   Maybe.
19      Q   So in response to the gentleman from
20  Transamerica asking you for information about this
21  whole episode, your response was, "You pay me ten
22  grand, I'll give you some information," basically?
23      A   Could be, yeah.
24      Q   Okay.  Where -- where are you living
25  right now?

---

142

1       A   At the Palace Station Casino.
2       Q   Okay.  Is that a hotel?  I'm not
3   familiar.
4       A   It's a casino.
5       Q   It's a casino.
6           And how long have you stayed there?
7       A   Seven days, eight days.
8       Q   Okay.  What happened seven or eight days
9   ago that you were not in your home and that you
10  were at a casino living?
11      A   Well, we were staying with my wife's
12  brother.  We moved out of 3555 Lake Mead, and we
13  went to my brother and stayed there.  And then we
14  were out and we came back, and her brother turned
15  around and advised us, he said, "Here's your bags.
16  Leave."
17      Q   Okay.
18      A   "And don't come back."
19      Q   And you have --
20      A   And I said, "Why?"
21          And he said, "The FBI was here from
22  Rhode Island.  One was a lady, and one was a guy."
23  He said, "I don't need the FBI at my house."
24      Q   Okay.
25      A   He said, "So as long as you guys are

---

143

1   here, the FBI might come back."  He said, "So
2   leave, and don't come back."
3       Q   Okay.
4       A   And that was it.
5       Q   So you had noplace to go?
6       A   No.
7       Q   And so you've been at this casino for
8   about seven or eight days?
9       A   Correct.
10      Q   And who's been paying the bill?
11      A   I'm not sure.
12      Q   You haven't been paying the bill.
13      A   How do you know?
14      Q   Well, because Mr. Vilker told me that
15  the federal government was paying the bill, that's
16  why.
17      A   I just had to throw that in there.
18      Q   Are you aware of that?
19      A   Yes.
20      Q   Are you aware of the fact that a company
21  associated with Transamerica is also -- has also
22  paid part of your expenses?
23      A   Yes.
24      Q   Okay.  So for the past week, and I don't
25  know -- how long is that going to continue?  Did

---

144

1   they tell you?
2       A   Yeah.
3       Q   Until when?
4       A   Today.
5       Q   Today.  Once you've been -- once you've
6   been deposed, they're not going to pay the bill
7   anymore?
8       A   No.
9       Q   Okay.  But until you're being deposed,
10  they're paying you -- paying the bill for you,
11  both of those entities, right?
12      A   I -- I guess, yeah.
13      Q   Well, you were the one who said on
14  October 11th --
15      A   I just answered your question.
16      Q   Yeah, I know.  I know.
17          And you were the one on October 11th who
18  said if they want the information, then you're
19  going to expect something in return?
20      A   My favorite saying.
21      Q   Your favorite saying.  I understand.
22          It looks like they accomplished -- they
23  accommodated your wishes?
24          MR. VILKER:  Objection.
25          THE WITNESS:  Well, they didn't do it

---



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.845.3376
Facsimile: 702.382.2050

Suite 770
2300 West Sahara Avenue
Las Vegas, NV 89102
www.esquiresolutions.com

Patrick Garvey                                     November 20, 2009

---

145

1  for money.  They didn't do it for money, I'm
2  telling you that right now.
3  BY MR. PINE:
4       Q  Okay.
5       A  I went to Frank -- I mean, Frank came to
6  me -- when I met Frank in my house, I started
7  talking to Frank, and then he turned around and he
8  set up -- he asked me, he said, "Can I set up a
9  meeting?"  And I said -- here or my house?  And I
10  said, "No."  He said, "Can I set up a meeting
11  somewhere?"
12       I said, "Yes, you can."
13       Q  Right.
14       A  He said, "Will you go to it?"
15       And I said, "Yes, I will."  Okay.  I
16  went to that deposition.  I gave a deposition.
17       Q  You gave a deposition?  When?
18       A  Not -- I don't know when it was.  It
19  was --
20       Q  Well, this is a deposition.
21       A  Oh, all right.
22       Q  What -- what are you referencing?
23       A  Well, I turned around and -- you know, I
24  talked to Frank.
25       Q  Right.

---

146

1       A  And he told me -- I don't know.  I don't
2  know what it was.
3       Q  Okay.
4       A  I don't know what it was.
5       Q  Do you remember having a phone
6  conversation -- well, who else was at the meeting?
7       A  I don't know.
8       Q  Were there other people?  When you say
9  gave a deposition, that's what I'm trying to get
10  to.
11       A  Yeah, there were other people.
12       Q  All right.  Where was it?
13       A  It was at one of the casinos.
14       Q  And when was it?
15       A  I don't know.
16       Q  Well, more than a week ago, right?
17       A  Yeah, I would say so.
18       Q  Two weeks ago?
19       A  Yeah, I would say so.
20       Q  Okay.  Was anybody from the federal
21  government, FBI, postal, Mr. Vilker or somebody on
22  his staff, was anybody else there from the
23  government?
24       A  Can we come back to this question?
25       Q  Do you want to think about it?

---

147

1       A  No.  No.
2       Q  To the best --
3       MR. VILKER:  I think -- yeah, I think
4  it might be a good time for a break.
5       MR. PINE:  Well, I -- do you need a
6  break?
7       THE WITNESS:  Yeah.
8       MS. GARVEY:  Yes, he needs one.
9       THE WITNESS:  Do I ever need a break.
10       MR. PINE:  Fair enough.  I would ask
11  Mr. Vilker not to talk to the witness during
12  cross.
13       THE VIDEOGRAPHER:  Off the record at
14  12:43 p.m.
15       (Whereupon, a short recess was
16  taken.)
17       THE VIDEOGRAPHER:  On the record at
18  12:57 p.m.
19  BY MR. PINE:
20       Q  Mr. Garvey, before the prosecutor asked
21  for a break, I was asking you about a meeting that
22  you had -- that you were recalling with members of
23  Transamerica.
24       A  Yes.
25       Q  And I was asking if you remembered who

---

148

1  else was at the meeting.
2       A  Lee.
3       Q  Okay.  When you say Lee, Mr. Vilker?
4       A  Yeah.  Mr. Vilker.  This man, this man,
5  this man.
6       Q  All right.  You're referencing
7  Mr. Souza, the postal inspector, and Mr. McAdams?
8       A  Right.
9       Q  Was that meeting out here or back in
10  Rhode Island?
11       A  It was here.
12       Q  Here.  Okay.  So they flew out to
13  interview you together?
14       A  Correct.
15       Q  To interview you together.  Okay.
16       Was Agent McDade from the FBI there?
17       A  I don't know.
18       Q  Okay.  Do you recall any other people
19  being there?
20       A  No.
21       Q  Okay.  Did you -- did they ask you
22  questions and you answered questions, I assume?
23       A  Something to that effect, yeah.
24       Q  Okay.  Were you asked to sign any
25  statements or anything like that?

---



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.845.3376
Facsimile: 702.382.2050

Suite 770
2300 West Sahara Avenue
Las Vegas, NV 89102
www.esquiresolutions.com

Patrick Garvey                                      November 20, 2009

## 149

1   A   No.
2   Q   Was the meeting recorded in any way?
3   A   No.
4   Q   Okay.  How long did the meeting last?
5   A   I think it was over in about a -- about
6   an hour or two hours.
7   Q   Okay.  I would ask if you have any
8   records of that meeting?
9       MR. VILKER:  There are no -- that was
10  attorney preparation of a witness for trial.
11  BY MR. PINE:
12  Q   Okay.  Was that the only time that you
13  met with those people?
14  A   Yes.
15  Q   Okay.  Now, at that meeting, was it
16  discussed whether or not -- where you would be
17  staying and who would be paying for the lodging?
18  A   No.  No.
19  Q   Did that come about later?
20  A   Later.
21  Q   Okay.  And who did you deal with in the
22  discussions of how your lodging with your wife
23  would be paid for?
24  A   Frank.
25  Q   Frank?

## 150

1   A   Frank.
2   Q   Okay.  On behalf of Transamerica?
3   A   I guess, wherever he works.
4   Q   Okay.  Now, you said that by the time he
5   had come back the second time and he was in your
6   home for a while and you were answering questions,
7   you felt like you got to know him a little better?
8   A   Uh-huh.
9   Q   And you trusted him, correct?
10  A   Correct.
11  Q   So that's why you were being forth --
12  more forthcoming than originally?
13  A   Correct.
14  Q   Right.
15      Do you recall him coming back towards
16  the end of September after that second meeting
17  that was happening in the earlier part of
18  September?
19      MR. MAGRATTEN:  Objection to form.
20  BY MR. PINE:
21  Q   Do you recall him coming to see you in
22  late September?
23  A   I don't remember.
24  Q   Okay.  Do you recall -- did you ever
25  tell him in one of his meetings with you at your

## 151

1   residence that you and your wife were moving to
2   Idaho?
3   A   I did.
4   Q   Was that the truth?
5   A   It was a lie.
6   Q   That was a lie.
7       And isn't it true that that statement
8   happened well after the meeting that you had in
9   your house where you were answering questions and
10  feeling more comfortable with him?
11  A   I really -- I really don't know.
12  Q   Okay.
13  A   I really can't remember.
14  Q   But in any event, at the time that you
15  told him that you were moving to Idaho in two or
16  three weeks, that was -- that was a lie?
17  A   That's a lie, that's true.
18  Q   Okay.  And, in fact, did you have a
19  later phone conversation with Mr. Stevens in
20  October of 2009?
21  A   I don't know.  Pertaining to what?
22  Q   Pertaining to these events.  He wanted
23  to speak to you some more?
24  A   I don't recall.
25  Q   Okay.

## 152

1   A   To be honest with you.
2   Q   Did you ever tell Mr. Stevens that you
3   had returned to Rhode Island to search for the
4   person who was involved in stealing your identity?
5   A   No.
6   Q   You never said that to him?
7   A   No.
8   Q   Okay.  Are you sure about that?
9   A   I'm positive.
10  Q   Okay.
11  A   I'm positive.
12  Q   As sure as anything else you've talked
13  about?
14  A   I'm positive, 100 percent.
15  Q   Okay.  I'm not asking you whether you
16  returned to Rhode Island, I'm asking you whether
17  you told him you returned to Rhode Island.
18  A   No, I told him I was going to Idaho.
19  And then when we got back, I seen Frank.
20  Q   Right.
21  A   I did tell him I went to Rhode Island.
22  Q   Okay.  All right.  So just to clarify,
23  I'm not asking you whether you did go to Rhode
24  Island.  I'm asking you whether you told Frank you
25  went to Rhode Island.



Toll Free: 800.845.3376
Facsimile: 702.382.2050

Suite 770
2300 West Sahara Avenue
Las Vegas, NV 89102
www.esquiresolutions.com

ESQUIRE
an Alexander Gallo Company

Patrick Garvey                                          November 20, 2009

---

153

1    A   Yes. Yes.
2    Q   All right. And that you had -- and that
3    wasn't true, because you didn't go to
4    Rhode Island?
5    A   That was true.
6    Q   What's that?
7    A   That was true.
8    Q   What's true?
9    A   I went to Rhode Island.
10   Q   When?
11   A   When I went to Idaho. I didn't go to
12   Idaho, I went to Rhode Island.
13   Q   Okay. When did you go to Rhode Island?
14   A   After I got the papers from Mr. Raymour
15   that I had to sign.
16   Q   Okay. So you were able to travel to
17   Rhode Island sometime in September of 2009?
18   A   Whatever it was.
19   Q   And how did you get there?
20   A   I drove.
21   Q   With your wife?
22   A   Yeah.
23   Q   Okay. The two of you drove cross
24   country?
25   A   I did.

---

154

1    Q   And when you go to Rhode Island, how
2    long did you spend there?
3    A   One night.
4    Q   And then what did you do?
5    A   I drove back.
6    Q   Okay. So in -- was this in September of
7    2009?
8    A   Whatever it was, yeah.
9    Q   Okay. So how many days did it take you
10   to drive to Rhode Island?
11   A   I got to Rhode Island in three and a
12   half days, and I got back here in three and a half
13   days.
14   Q   And you were able to do that physically
15   in your condition?
16   A   I didn't drive. My wife did.
17   Q   Right. But I'm saying, making the trip?
18   A   Yeah. I just sat back, that's all.
19   Q   Okay. When you got to Rhode Island for
20   that day, what did you do?
21   A   Well, I went to see Margo. But in order
22   to give you this story, I have to back up a little
23   bit.
24   Q   All right.
25   A   Will you allow me to back up a little

---

155

1    bit?
2    Q   Go ahead.
3    A   Okay. After I got the papers, I called
4    Margo Meo, and I turned around and told her that I
5    received papers from Raymour, and that he wanted
6    me to sign these papers. And I said, "They got my
7    name written all over them, whatever." And I
8    said, "He offered me $3,000."
9        And I said, "I want to bring them down
10   to you. I want you to take a look at them and
11   tell me what you know about them." I said, "Can I
12   park my car in your yard?" She said, "Yes."
13       Okay. Then she said -- they call me PJ,
14   right, nickname. She says, "PJ, I got to go,
15   right now. Right now. I'll call you right back."
16       That was the last time I heard from
17   Margo. I told Diane, "Get your clothes together,
18   whatever. We're going to Rhode Island."
19   Q   Okay.
20   A   We went down to Rhode Island. I went to
21   Margo's house. Rang the door, no answer. Both
22   cars were there. Okay. All seven cars were in
23   the vicinity. Okay. She wouldn't answer the
24   door.
25       Called her phone, she wouldn't answer

---

156

1    her phone. Called her cell phone, she wouldn't
2    answer her cell phone. I waited, waited, waited,
3    waited. Next morning came, so I pull the car out
4    onto the street. Okay.
5    Q   Where did you stay overnight?
6    A   In the car.
7    Q   In the car. Okay.
8    A   I pulled the car out on the street, and
9    I said, "I'll catch her when she goes to work, you
10   know, and I'll ask her then."
11       Okay. Well, just before -- when she got
12   ready to go to work, she jumped on her cell phone
13   and called me on my cell phone. And she ranted
14   and raved and screamed. She wasn't making no
15   sense.
16       She said to me, "I know what you're
17   trying to do to Raymour." She says, "After he's
18   been so good to you and given you money, and
19   you're trying to do this to him."
20       I said, "Margo, what are you talking
21   about? Do what?"
22   Q   Okay.
23   A   Now --
24   Q   All right. Let me just ask a question.
25   So did you ever meet with her, or did

---



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.845.3376
Facsimile: 702.382.2050

Suite 770
2300 West Sahara Avenue
Las Vegas, NV 89102
www.esquiresolutions.com

Patrick Garvey                                    November 20, 2009

157

1    you just speak with her?
2        A    I spoke with her.
3        Q    Okay.
4        A    And Danny was there, too.
5        Q    Who is Danny?
6        A    Danny is her built-in boyfriend, I
7    guess.
8        Q    Okay.  All right.
9            Did you -- did you do anything else
10   while you were in Rhode Island, other than
11   speaking to her?
12       A    No.  I turned around and I -- I changed
13   the oil in the car, had it changed, whatever,
14   right.  Got some coffee, and then headed back.
15       Q    What, three days back?  Another three
16   days on the road back?
17       A    Three and a half days.
18       Q    Three and a half days.
19           And whose car did you take?
20       A    Mine.
21       Q    Okay.
22       A    My wife's.
23       Q    Your wife's.
24           Is that a Rhode Island or a Las Vegas
25   car -- or a Nevada car?

158

1        A    Nevada car.
2        Q    Okay.  So when you told Mr. Stevens,
3    Frank, that you had returned to Rhode Island to
4    search for a person, that was true?
5        A    Yeah, it was.
6        Q    Okay.
7        A    But I didn't tell him I went to Rhode
8    Island to search for a person.
9        Q    Okay.  But you did tell him you went to
10   Rhode Island?
11       A    I went to Rhode Island.
12       Q    Okay.  Did you also tell him that you --
13   you had received a call from the FBI?
14       A    I don't -- I don't recall.
15       Q    Did you get a call from the FBI at some
16   point from an Agent Pamela McDade, a female?
17       A    I think I did.
18       Q    Okay.  Did you speak with her?
19       A    No.
20       Q    And did she ask you any questions about
21   this?
22       A    I just hung up.
23       Q    In that -- and did you tell Frank that
24   in October of 2009, that Agent McDade had called
25   you, and that you didn't speak to her?

159

1        A    I told him I got a call from the FBI.
2        Q    Yeah.  Okay.
3            Did you tell him in that same
4    conversation that -- did you ask him to call back
5    a few days later when you had a new location?
6        A    I don't recall.
7        Q    Okay.  Did you tell him that you would
8    be willing to meet with attorneys from a law firm
9    known as Pierce Atwood?
10       A    I don't know who Pierce Atwood is.
11       Q    Okay.  Did you tell him that you would
12   be willing to meet with representatives of
13   Transamerica, a company that he was --
14       A    Yes.
15       Q    Okay.  So you did indicate at that point
16   a willingness --
17       A    Yeah, right.
18       Q    -- to meet with those folks?
19       A    Yeah, correct.
20       Q    Did you also tell Frank on that occasion
21   that you would either clam up or disappear
22   altogether if you were not compensated for your
23   time and knowledge of the case?  Did you tell him
24   that?
25       A    Not -- no, not like that.

160

1        Q    Sounds similar to what you said before?
2        A    Yeah, but not like that.  I would clam
3    up, no, I wouldn't say that.
4        Q    Did you use that phrase?
5        A    No.  I just turned around and told him,
6    I said, "Look," I said, "I'm not going to say
7    nothing.  I'm not going to get into this."
8        Q    Unless?
9        A    Unless, you know --
10       Q    You're compensated?
11       A    Yeah, reimbursed or compensated.  But
12   not clam up.
13       Q    Isn't it true that in the spring of
14   2008, at the time that you wrote these letters
15   about Raymour and Mr. Caramadre, that you also
16   referred people to them to be helped?  Do you
17   recall that?
18       A    Yeah, I do.
19       Q    Did you refer a guy --
20       A    One person, yeah.
21       Q    A guy named Bruce?
22       A    Bruce, yeah.
23       Q    And who was Bruce?  A friend of yours?
24       A    No, just a guy that used to hang out in
25   the city, and I would see him when I would go to



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.845.3376
Facsimile: 702.382.2050

Suite 770
2300 West Sahara Avenue
Las Vegas, NV 89102
www.esquiresolutions.com

Patrick Garvey                                    November 20, 2009

---

161

1    the city.
2        Q    Right.  And you --
3        A    And you used to protect my wife.  When
4    my wife used to get out of work and go to the
5    city, she would make sure nobody bothered her.
6        Q    Is Bruce a big guy?
7        A    Yeah, he's a big guy.
8        Q    And you referred Bruce to Raymour --
9        A    I did.
10       Q    -- so that he could participate in the
11   program --
12       A    I did.
13       Q    -- that you were participating in?
14       A    I did.
15       Q    Right?  Did you ever tell Raymour that
16   he might get a call from another woman that you
17   had met at a doctor's appointment or something?
18       A    No.
19       Q    Do you recall that?
20       A    No, I don't recall that.
21       Q    Some woman that had a family member die
22   of cancer, and you knew of a guy named Raymour?
23       A    No, you got -- you got me mixed up with
24   Danny.  That's Margo's boyfriend.
25       Q    All right.

---

162

1        A    Raymour gave her $1,000, I believe.
2        Q    But it wasn't a referral from you?
3        A    No.
4        Q    Just Bruce?
5        A    I believe it was $1,000.
6        Q    Okay.
7        A    He got that from Margo.  Margo set it
8    up.  It was Danny's wife, and after two -- soon
9    after that, I guess the divorce got paid off and
10   went through, and Danny and Margo are living
11   happily ever after.
12       Q    Did you ask Raymour for money before you
13   came out to Las Vegas?
14       A    No.  I asked him for money when I got
15   here.
16       Q    Okay.  And did he pay you --
17       A    No.
18       Q    -- money?
19       A    No.
20       Q    Do you recall getting a check from him
21   for $2,000 in April of 2008, in addition to the
22   other $2,000 checks that we've talked about?
23       A    I got a total of $5,000 off of Raymour.
24       Q    And you said --
25       A    Nothing else.

---

163

1        Q    Well, you said that that was -- are you
2    sure about that?
3        A    I'm positive.
4        Q    All right.
5        A    I'm positive.
6        Q    Positive about that as anything else?
7        A    That's right.
8        Q    Okay.
9        A    I'm positive.
10       Q    You got 2,000 in January through a
11   check?
12       A    Yeah.
13       Q    That's been marked as an exhibit.
14       A    Yeah.
15       Q    You got 2,000 again in another check in
16   January?
17       A    Yeah.
18       Q    And you got a thousand in cash also?
19       A    Correct.
20       Q    Let me show -- I'm going to ask that
21   this be marked Defendants' C, I guess.
22            I'm going to show you this.  Do you
23   recognize what is going to be marked as
24   Defendants' C?
25            (Exhibit C was marked for

---

164

1            identification and is attached
2            hereto.)
3        MR. VILKER:  I'm going to object to
4    the admission of Exhibit C -- Defense Exhibit C.
5    The only check that was ever turned over to us by
6    the defense did not have the back of the check, so
7    this is a new document.  And just like the
8    government has obligations to turn over documents
9    to the defense in this case, the defense has
10   obligations to turn over to the government.
11           Since we have not been provided with
12   a copy of this document, we're objecting to it
13   being admitted or questioned about.
14       MR. PINE:  All right.  Well, I'm
15   going to ask --
16       THE WITNESS:  I never seen this.
17   Never.
18   BY MR. PINE:
19       Q    So you don't recognize --
20       A    No.
21       Q    -- that top part of the document?
22       A    It was never given to me.
23       Q    Okay.
24       A    Not that check.
25       Q    Do you recognize your signature on the

---



Toll Free: 800.845.3376
Facsimile: 702.382.2050

Suite 770
2300 West Sahara Avenue
Las Vegas, NV 89102
www.esquiresolutions.com

Patrick Garvey                                          November 20, 2009

---

165

1 back?
2   A   Nope.  That's not my signature.
3   Q   Okay.
4   A   Listen to me, Mr. Pine.  I got $5,000
5 off of Raymour.
6   Q   Okay.
7   A   If I got six, I would tell you six.
8   Q   Okay.
9   A   5,000.  Not this.  This check, I never
10 seen this check.
11   Q   All right.
12   A   I don't know where that check came from.
13   Q   Do you see that notation on the top, it
14 says, "Rhode Island ID number"?  What number is
15 there?
16   A   51474.
17   Q   Is there a 1 -- 18?
18   A   18, yeah.
19   Q   -- 51474?
20   A   Yeah.
21   Q   What is your license number?
22   A   1851474.  Yeah.
23   Q   It appears to match?
24   A   Yeah.
25   Q   And that's a notation on this check

166

1 which would be a reflection of if somebody cashed
2 it, isn't it?  Isn't that what the bank does when
3 you cash a check?
4   A   No.  No, unless somebody turned around
5 and just wrote it on there.  Somebody could have
6 wrote that on there before it went to the bank,
7 before it went anywhere.
8   Q   Okay.  Well, there is a stamp from
9 Citizens on the back of that check, isn't there?
10   A   That's what it is, yeah.
11   Q   And there's a name on the back of the
12 check of Patrick Garvey, correct?
13   A   I'm telling you, I didn't get that
14 check.  You -- you got too many checks.  Too many
15 checks.  Okay.
16   Q   Just --
17   A   One of them is bogus.
18   Q   All right.  You agree that your name is
19 on the back?
20   A   Yep.
21   Q   You agree that it's endorsed by
22 Citizens, it's stamped by Citizens?
23   A   Yeah.
24   Q   Correct?  On April 15th of '08, correct?
25   A   Yeah.

167

1   Q   And you agree that the ID number on the
2 top part is exact -- is an exact match for your
3 license number?  Do you agree with that?
4   A   Yeah.  I also agree that he had my
5 social security number and my identification
6 number.
7   Q   Okay.  You agree the check is made out
8 to you?
9   A   Yep.
10   Q   For $2,000?
11   A   Correct.
12   Q   Okay.  April 14th of '08?
13   A   I didn't get that check.
14   Q   All right.  You're still sure about
15 that?
16   A   I'm positive.
17   Q   Okay.
18   A   Unless -- unless it -- one of them other
19 checks is not right, but he never gave me $6,000,
20 no way.
21       MR. MAGRATTEN:  May I see that
22 exhibit, please.
23       MR. PINE:  Sure.
24       THE WITNESS:  Lee --
25       MR. VILKER:  You have to --

168

1       MR. PINE:  You're not allowed to talk
2 now.
3       THE WITNESS:  Oh.
4       MR. PINE:  I have nothing further.
5 Thank you, Mr. Garvey.  Somebody else is going to
6 have a turn, so --
7       MR. VILKER:  Okay.  Anybody in Rhode
8 Island want to take over?
9       MR. FLANDERS:  Yes, I have a few
10 questions.
11
12       CROSS-EXAMINATION
13 BY MR. FLANDERS:
14   Q   This is Robert Flanders, and I'm an
15 attorney for Mr. Joseph Caramadre.
16   A   Yes, Mr. Flanders.
17   Q   Is it still morning in Las Vegas?
18   A   I haven't looked outside.  I think it
19 is.
20   Q   Okay.  Well, good morning, then.
21       Is it true, Mr. Garvey, that even as we
22 speak today, that you have never met with
23 Mr. Caramadre?
24   A   That's true.
25   Q   Okay.  So whatever you know about

---



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.845.3376
Facsimile: 702.382.2050

Suite 770
2300 West Sahara Avenue
Las Vegas, NV 89102
www.esquiresolutions.com

Patrick Garvey                                          November 20, 2009

---

169

1   Mr. Caramadre was told to you by others; is that
2   right?
3       A   Raymour.
4       Q   All right. And this woman, Margo, you
5   mentioned, said some things about Mr. Caramadre,
6   as well?
7       A   She might have.
8       Q   Okay. In any event, you haven't met
9   with him, and you never have tried to contact him?
10      A   No, sir.
11          MR. PINE: Bob, could I -- not to
12  interrupt. Could you lean forward so that you're
13  in the camera view. Right now you're not.
14          MR. FLANDERS: Certainly. I'm sorry.
15          MR. PINE: That's fine. Thank you.
16  BY MR. FLANDERS:
17      Q   Okay. So you've been shown a bunch of
18  documents today that appear to have a signature on
19  them that has your name; is that right?
20      A   Yes, sir.
21      Q   And some of them you told them -- you
22  told us that it appears to be your signature,
23  correct?
24      A   Yes, sir.
25      Q   And others you're not sure about?

---

170

1       A   Yes, sir.
2       Q   And others you don't think it appears to
3   be your signature?
4       A   No.
5       Q   Is -- in other words, do -- some of
6   those signatures don't appear to match what you
7   believe to be your signature?
8       A   That's correct.
9       Q   But is it fair to say that even you, in
10  looking at them, had some difficulty in making a
11  decision as to whether it was your signature or
12  not?
13      A   Yes.
14      Q   Now, do you have any reason to believe,
15  as we sit here today, that Mr. Caramadre knew that
16  any of those signatures weren't yours?
17          MR. MAGRATTEN: Objection.
18          MR. VILKER: Yeah, the government
19  joins in that objection.
20          MR. PINE: You can answer.
21          THE WITNESS: Repeat the question,
22  please.
23  BY MR. FLANDERS:
24      Q   Do you have any reason to believe that
25  when Mr. Caramadre received these documents, that

---

171

1   he had any reason to believe that those weren't
2   your signatures on them?
3       A   No.
4          MR. MAGRATTEN: Objection.
5          THE WITNESS: No.
6   BY MR. FLANDERS:
7       Q   Okay. And do you have any reason to --
8   to believe that Mr. Caramadre knew that any of
9   these documents had been altered in any way from
10  when they were shown to you?
11          MR. MAGRATTEN: Objection.
12          MR. VILKER: Objection.
13          You can answer the question.
14          THE WITNESS: I'll say no.
15  BY MR. FLANDERS:
16      Q   And isn't it the case that as a result
17  of your interactions with Raymour, that you had a
18  very good feeling about Mr. Caramadre?
19      A   I did.
20      Q   In fact, you told Raymour and
21  Mr. Caramadre that you were willing, because of
22  the fact that they paid you money, to help them
23  out?
24      A   No.
25      Q   You didn't tell them that?

---

172

1       A   No, I didn't.
2       Q   Well, take a look at Exhibit 26, please.
3   That's the letter you wrote to Mr. Caramadre.
4          MR. PINE: 26?
5          MR. VILKER: 26.
6          MR. PINE: Let me see if I can help
7   you here. I don't know if they're in order.
8          Let me see if I can find mine. I'm
9   just going to -- I have my copy of it, Bob. 26.
10  BY MR. FLANDERS:
11      Q   Is this a copy of a letter that you
12  wrote --
13      A   Right.
14      Q   -- to Mr. Caramadre --
15      A   Correct.
16      Q   -- in February of 2008?
17      A   Correct.
18      Q   And that's your signature at the bottom?
19      A   Correct.
20      Q   And right before you signed your name to
21  this document, you said, and I'm quoting, "While
22  I'm still around, if you need my help for any
23  reason, please get in touch with me, and I will be
24  there for you."
25          Did you tell Mr. Caramadre that?

---



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.845.3376
Facsimile: 702.382.2050

Suite 770
2300 West Sahara Avenue
Las Vegas, NV 89102
www.esquiresolutions.com

173

1   A   In this -- in this letter, yes, I did.
2   Q   Okay. And did you mean it?
3   A   Yes, I did, but not -- not in a -- in a
4   way to bring people to Raymour or in a way to turn
5   around and do anything illegal. I meant if he
6   needed help landscaping, I do landscaping. I
7   would be more than glad to come over and give him
8   a good price or do it for nothing or whatever.
9   That's the way I meant that.
10   Q   Do you think that you have done anything
11   illegal for Mr. Caramadre?
12   A   I ain't done nothing illegal, for
13   Mr. Caramadre or anybody else.
14   Q   Do you think Mr. Caramadre has?
15   A   Yes, I do.
16   MR. VILKER: Objection. Objection.
17   BY MR. FLANDERS:
18   Q   And why?
19   MR. VILKER: Objection, again.
20   BY MR. FLANDERS:
21   Q   What is that?
22   A   Let me -- let me rephrase that again.
23   All right?
24   A   Sure.
25   A   I don't know about Mr. Caramadre, but --

174

1   Q   Well, that's -- all I'm asking you about
2   is Mr. Caramadre.
3   A   Okay.
4   Q   Do you have any reason to believe that
5   he's done anything illegal?
6   MR. VILKER: Objection.
7   MR. MAGRATTEN: Objection. Let the
8   witness answer his question, please.
9   THE WITNESS: Through Raymour, he
10   might have done something illegal. That's what
11   I'm saying.
12   BY MR. FLANDERS:
13   Q   What? What?
14   A   Through Raymour.
15   MR. PINE: Move to strike.
16   BY MR. FLANDERS:
17   Q   What, sir? What?
18   A   Well, I'm here. Look at me, look at
19   what I'm in to.
20   Q   What do you mean look at you and what
21   you're in to? What are you in to?
22   MR. VILKER: Objection.
23   THE WITNESS: Testifying here,
24   testifying there, doing this, doing that. I ain't
25   done nothing wrong.

175

1   BY MR. FLANDERS:
2   Q   So do you think that because you're here
3   testifying and into this, as you say, that Raymour
4   and Mr. Caramadre may have done something illegal?
5   A   Why would Mr. Raymour want me to sign
6   these documents that were color-coded and get them
7   back to him right away?
8   MR. PINE: Move to strike,
9   nonresponsive.
10   THE WITNESS: Huh?
11   BY MR. FLANDERS:
12   Q   Do you think that indicated that he did
13   something illegal?
14   A   Yes, I do.
15   Q   And what is that?
16   A   I don't know. I don't know. But I
17   think he did.
18   Q   Have you been convicted of any crimes,
19   sir?
20   A   No.
21   Q   You've got a clean criminal record?
22   A   I believe so.
23   Q   Are you sure about that?
24   A   Yeah, I'm sure about that.
25   Q   Have you given any exemplars of your

176

1   signature to the government? Have you signed
2   documents for the government with your name on it?
3   A   Are you talking about the people here?
4   Q   Any of them that are there or anybody
5   else with the government.
6   A   Not that I know of.
7   Q   They haven't asked to have you sign a
8   document showing them your signature?
9   A   Not that I know of.
10   Q   Now, isn't it true that you willingly
11   gave Raymour information showing him your
12   identity, including your social security number
13   and other information that's unique to you?
14   MR. MAGRATTEN: Objection.
15   THE WITNESS: That's unique to me?
16   BY MR. FLANDERS:
17   Q   Yes.
18   A   You mean that's that -- that's mine?
19   Q   That's yours.
20   A   Yes.
21   Q   And you willingly gave that to him?
22   A   I did.
23   Q   And knew he took that away with him,
24   correct?
25   A   Yes, I did.


ESQUIRE
an Alexander Gallo Company

Toll Free: 800.845.3376
Facsimile: 702.382.2050

Suite 770
2300 West Sahara Avenue
Las Vegas, NV 89102
www.esquiresolutions.com

Patrick Garvey                                    *November 20, 2009*

---

177

1    Q    And you allowed him to use that, right?
2    A    Yes, I did.  He told me that --
3    Q    You expect --
4    A    He told me that he -- he would have to
5    turn around and Xerox it off.  He needed it for
6    his files.
7    Q    And that was okay by you?
8    A    That was okay by me.  At that time I --
9    Q    And you --
10   A    At that time I trusted Raymour.
11   Q    And you expected that he would give that
12   to Mr. Caramadre for his use, as well, correct?
13   A    I don't know what he was going to do
14   with it, to be honest with you.
15   Q    But you knew, according to what he told
16   you, that he worked for Mr. Caramadre?
17   A    Right.
18   Q    Right?
19   A    Correct.
20   Q    And that what he was doing was on behalf
21   of Mr. Caramadre?
22   A    Correct.
23   Q    Including obtaining and using your
24   identification information?
25        MR. MAGRATTEN:  Objection to form.

---

178

1    BY MR. FLANDERS:
2    Q    Is that right?
3    A    Well, I didn't know he was going to use
4    that, and I didn't know that Caramadre was going
5    to get it.  He didn't tell me.  He just said he
6    needed my social security number, and he needed my
7    driver's license or my identification.  Do I have
8    it?  And I said, "Yes, I do."
9        I showed him both -- both pieces, and he
10   said to me, "Is there a place where I can have
11   these faxed off?"
12       I said, "Up the street, you go up the
13   street, it's a gas station."  He had them faxed
14   off, came back, gave me back my identification,
15   and that was it.  He left.
16   Q    And he kept the copies that he had made,
17   right?
18   A    Right, correct.
19   Q    And that was fine -- that was okay with
20   you?
21   A    Yes, it was.  At the time, yes.
22   Q    Okay.  And at the time you were being
23   paid, and you understood that in return for being
24   paid, you were giving certain information to
25   Raymour, right?

---

179

1        MR. MAGRATTEN:  Objection.
2        MR. VILKER:  Objection.
3        THE WITNESS:  No, I wasn't giving no
4    information to -- all I gave -- I gave him my
5    social security number.  He said he needed it.
6    Okay.
7    BY MR. FLANDERS:
8    Q    And you -- and you gave him that?
9    A    I provided it to him, yes.
10   Q    And you gave it to him willingly?
11   A    Yes.
12   Q    He didn't coerce it from you, right?
13       MR. MAGRATTEN:  Objection.
14       THE WITNESS:  Well, there was a
15   little talk in between.  All -- I'm going -- see,
16   he's never asked me for any identification.  He
17   turned around and said to me something like,
18   "Well, I'm going to need to see your social
19   security number, and I'm not going to need to see
20   your driver's license."
21       And I said, "I don't have a driver's
22   license."
23       He said, "Well, do you have any
24   identification?"
25       I said, "Yes."

---

180

1        He said, "Well, I'm going to need to
2    see that this time," and with that --
3    BY MR. FLANDERS:
4    Q    And he told -- and he told you he needed
5    that to open the account that he was --
6    A    No, he didn't.
7    Q    Right?
8        MR. MAGRATTEN:  Objection.
9        THE WITNESS:  No.  No, he didn't.  He
10   never said that.
11   BY MR. FLANDERS:
12   Q    Well, when he gave you the check for the
13   $2,000 that's been marked as Exhibit 2, it said
14   "New account, bonds," at the bottom left, didn't
15   it?  Take a look at it.
16   A    He told me it's just -- he told me that
17   it's just a different way of writing out a check,
18   and the other checks were written out different.
19   Q    But you admit, you took that check and
20   cashed it, right?
21   A    Yes.
22   Q    And it had on it, "New account, bonds"?
23   A    Right.  He didn't tell me what the
24   account or the bonds were for.  He didn't tell me.
25   Q    I understand that.

---



**ESQUIRE**
an Alexander Gallo Company

Toll Free: 800.845.3376
Facsimile: 702.382.2050

Suite 770
2300 West Sahara Avenue
Las Vegas, NV 89102
www.esquiresolutions.com

Patrick Garvey
November 20, 2009

## 181

1  A  He didn't tell me what I was getting
2  into.
3  Q  But you knew it was an account?  You
4  knew it was an account, and you knew it was bonds?
5  MR. MAGRATTEN: Objection to form.
6  THE WITNESS: No, I didn't.  No, I
7  did not know it was an account or bonds.  I -- he
8  said, "This is the way we write some checks out,"
9  that's all.  He didn't say what it was for, what
10  he was going to do with it, or nothing.  I didn't
11  think nothing of it.  I thought if it reads, "New
12  account and bonds," maybe that's where the money
13  is coming from.  I don't know.
14  BY MR. FLANDERS:
15  Q  Weren't you agreeable to signing
16  documents that Raymour presented to you and in
17  some cases read to you in exchange for the money
18  that you were being given?
19  A  No.  Here was some --
20  Q  Are you trying --
21  A  There were some documents that I signed,
22  but I'm telling you those are the ones that he
23  brought over and said, "These have got to be
24  signed," and (indicating), one, two, three, four.
25  "Sign them," that was it.

## 182

1  Q  Well, you also told us that he let you
2  look at them and, in some cases, read them to you,
3  right?
4  A  Not all of them, no.  No.  He read like
5  one --
6  Q  But he read some of them to you?
7  A  One.  Maybe one.  Maybe one.
8  Q  You told us -- you told us that maybe
9  one of the documents that you looked at, you
10  looked at 40, 50 seconds, right?
11  A  Well --
12  Q  Did you?
13  A  I said that Raymour turned around and
14  gave me -- no.  Yeah, you're right.
15  Q  Yeah what?
16  A  Yes, you're right.
17  Q  That he did leave it in front of you for
18  50 seconds?
19  A  I guess.
20  Q  Okay.  And did he do anything to prevent
21  you from reading the -- what was on the documents
22  that you were signing?
23  A  No.
24  Q  The truth is, you were willing to sign
25  the documents because Raymour was giving you money

## 183

1  to sign them, right?
2  MR. VILKER:  Objection as to form.
3  THE WITNESS:  No.  No.
4  BY MR. FLANDERS:
5  Q  Wasn't he giving you money?
6  A  Yeah, he was giving me money, but I
7  signed -- I signed them because he asked me to
8  sign them.
9  Q  And you wouldn't have signed them if he
10  hadn't given you the money, right?
11  A  Oh, yes, I would have.
12  Q  Oh, the money had nothing to do with you
13  signing it?
14  A  No, the money had plenty to do with it.
15  But I would have signed them.  I would have signed
16  them.  I trusted him at that time, and I would
17  have signed them.
18  Q  So what did the money have to do with
19  it?
20  MR. MAGRATTEN:  Objection to form.
21  MR. VILKER:  Objection.
22  BY MR. FLANDERS:
23  Q  You told us it had plenty to do with it,
24  sir.  What did it have to do with it?
25  A  The money -- he come over and gave me a

## 184

1  check for $2,000 or whatever he come over to give
2  it to me.  He asked me to sign some documents, I
3  signed the documents, that was it.
4  Q  And then you called him up and asked him
5  to come back and pay you some more money, right?
6  A  This was later on.
7  Q  Yeah.
8  A  Yeah.
9  Q  And --
10  A  Correct.
11  Q  And he asked you to sign additional
12  documents for the more money you wanted, right?
13  A  Correct.
14  Q  And you signed them?
15  A  Yes, I did.
16  Q  And you signed them willingly, correct?
17  A  Yes, I did.
18  Q  Now, did Raymour mention to you that you
19  were going to be matched up with another person --
20  A  No.
21  Q  -- as an investor?
22  A  No.
23  Q  Never said anything about that?
24  A  No, never.
25  Q  But your memory about what happened is



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.845.3376
Facsimile: 702.382.2050

Suite 770
2300 West Sahara Avenue
Las Vegas, NV 89102
www.esquiresolutions.com

Patrick Garvey

November 20, 2009

185

1   not very good, is it?
2         MR. MAGRATTEN: Objection.
3         MR. VILKER: Objection.
4         THE WITNESS: It's not bad. It's not
5   bad. I can -- I can remember the parts where he
6   turned around and got me in trouble. See, like
7   this here, hooking me up -- who is this Rodrigues
8   that got $290,000 in my name? Who is she? I
9   never met her. I don't know her. And he's
10  getting -- I'm giving her $290,000. Do I look
11  like I got $290,000?
12  BY MR. FLANDERS:
13      Q    Did you give 290,000 to anybody?
14      A    No. I would have kept it for myself. I
15  wouldn't give it to nobody if I had it. I
16  wouldn't give it to nobody.
17      Q    I believe that.
18           The truth is, sir, that you haven't
19  given any money to anybody, you have only taken
20  money from Raymour and Mr. Caramadre; isn't that
21  right?
22           MR. MAGRATTEN: Objection.
23           THE WITNESS: Well, I wouldn't say
24  taken it. I would say it was a gift, because
25  that's the way they put it in the filer, it's a

186

1   gift.
2   BY MR. FLANDERS:
3       Q    And the truth -- the truth is, you're
4   thousand of dollars richer from having met Raymour
5   than you would have been if he never came into
6   your life; isn't that right?
7       A    I wouldn't -- I wouldn't say that.
8       Q    Well, you wouldn't, but it's true, isn't
9   it? You haven't lost a dime, but you're thousands
10  of dollars richer because Raymour came into your
11  life?
12      A    Well, you see, I made money from
13  Mr. Raymour because he --
14      Q    You made money from him?
15      A    Well, how did he get the money, the
16  $290,000 to give Mrs. Rodrigues? So how much
17  money did he make or Mr. Caramadre? How much
18  money did they make?
19      Q    Do you have -- do you know whether they
20  made or lost any money?
21      A    It said $290,000 between Mrs. Rodrigues,
22  that I gave it to her. I didn't give her no
23  200 --
24      Q    You didn't give anybody any money, you
25  just took money, sir?

187

1       A    Right.
2       Q    Right?
3       A    Right. So who got the $290,000?
4       Q    Do you know whether Mr. Caramadre or
5   Raymour got any of that money?
6       A    It went somewhere. I know she didn't
7   get it.
8       Q    Do you know whether they got any of it?
9       A    No, I don't.
10      Q    Have you been harmed in any way by being
11  involved with Raymour or Mr. Caramadre?
12           MR. VILKER: Objection. And what do
13  you mean by "harmed"?
14  BY MR. FLANDERS:
15      Q    Have you lost any money, 1 cent?
16      A    Yeah.
17      Q    What is that?
18      A    I had to drive to Rhode Island, drive
19  back from Rhode Island.
20      Q    Did Mr. Caramadre or Raymour cause you
21  to -- do anything to cause you to drive to
22  Rhode Island?
23      A    Yeah. Mr. Raymour sent me a package,
24  and I wanted Margo to see the package and tell me
25  what she knew about it.

188

1       Q    But that was a decision you made, right?
2   Raymour didn't tell you about that?
3       A    Well, had I have not gotten the package,
4   I wouldn't have gone to Rhode Island.
5       Q    All right. But Raymour didn't tell you
6   to go to Rhode Island to meet with Margo, did he?
7       A    No. No.
8       Q    And the fact of the matter is you, sir,
9   are thousands of dollars richer from having met
10  with Raymour, and now the government is paying for
11  your living expenses at some casino, right?
12           MR. VILKER: Objection as to form.
13           THE WITNESS: I'm not going to say
14  I'm thousands of dollars richer, because I'm not.
15  BY MR. FLANDERS:
16      Q    You just told us that they gave you
17  $5,000, and you --
18      A    What's $5,000? What's $5,000? I mean,
19  that was given to me -- that was given to me a
20  long time ago.
21      Q    And you didn't turn it down, though, did
22  you?
23      A    No. Would you?
24      Q    You were happy to take the money, just
25  like you're happy to take the government's money



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.845.3376
Facsimile: 702.382.2050

Suite 770
2300 West Sahara Avenue
Las Vegas, NV 89102
www.esquiresolutions.com

Patrick Garvey

November 20, 2009

---

189

1  so you can live in the casino now, right?
2      MR. VILKER:  Objection.
3      THE WITNESS:  No, I'm not.  No, I'm
4  not.  And I don't think that's fair -- I don't
5  think that's fair for you to say that.
6  BY MR. FLANDERS:
7      Q  Well, is it true?
8      A  It's true.
9      Q  Aren't you taking -- it is true, isn't
10 it?
11     A  I'm living in the casino.
12     Q  And the government is paying for you to
13 do it?
14     A  Yes, they are.
15     Q  And you're happy to take the money from
16 them, just like you took it from Mr. Caramadre?
17     A  No, I'm not happy about it.
18     Q  But you're doing it, aren't you?
19     A  I have to do it, because I have no other
20 place to go okay.
21     MR. FLANDERS:  That's all I have.
22     MR. MacFADYEN:  John MacFadyen.  For
23 the reasons stating in the Wiley deposition, I
24 don't have any questions for this witness.
25     MR. TRAINI:  This is Mr. Traini on

---

190

1  behalf of ██████████ and I join in
2  Mr. MacFadyen's remarks.  For the same reason we
3  stated in the Wiley deposition, I have no
4  questions of Mr. Garvey.
5      MR. VILKER:  Okay.  This is Lee
6  Vilker again for the government.  We have no
7  redirect, and therefore I believe this is the
8  close of the criminal portion of this deposition.
9      And I would just request at this
10 point that we -- that we start a new proceeding
11 under the civil caption.  And I will not be asking
12 any questions at this civil proceeding, and I'll
13 turn it over to Mr. Magratten as soon as the court
14 reporter is ready.
15     THE VIDEOGRAPHER:  This is the end of
16 tape number two and concludes the videotaped
17 deposition of Patrick Garvey in the matter of
18 United States vs. Caramadre.  The time is
19 1:38 p.m.  We're off the record.
20     (Whereupon, the deposition
21         concluded at 1:38 p.m.)
22
23
24
25

---

191

1      CERTIFICATE OF COURT REPORTER
2
   STATE OF NEVADA    )
3                     ) ss:
   COUNTY OF CLARK    )
4
5      I, Heidi K. Konsten, Certified Court Reporter
6  licensed by the State of Nevada, do hereby certify
7  that I reported the deposition of PATRICK GARVEY,
8  commencing on November 20, 2009, at 9:40 a.m.
9      Prior to being deposed, the witness was duly
10 sworn by me to testify to the truth.  I thereafter
11 transcribed my said stenographic notes via
12 computer-aided transcription into written form,
13 and that the transcript is a complete, true and
14 accurate transcription and that a request was not
15 made for a review of the transcript.
16     I further certify that I am not a relative,
17 employee or independent contractor of counsel or
18 any party involved in the proceeding, nor a person
19 financially interested in the proceeding, nor do I
20 have any other relationship that may reasonably
21 cause my impartiality to be questioned.
22     IN WITNESS WHEREOF, I have set my hand in my
23 office in the County of Clark, State of Nevada,
24 this December 22nd, 2009.
25
   _____
   Heidi K. Konsten, RPR, CCR No. 845
   Heidi K. Konsten, RPR, CCR No. 845

---



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.845.3376
Facsimile: 702.382.2050

Suite 770
2300 West Sahara Avenue
Las Vegas, NV 89102
www.esquiresolutions.com