# GOVERNMENT
# EXHIBIT 10

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND


IN RE:   GRAND JURY PROCEEDINGS


Videotaped deposition of **ANTHONY A. PITOCCO**, a Witness herein, taken on WEDNESDAY, APRIL 21, 2010, 10:15 A.M., at the offices of Chisholm, Chisholm & Kilpatrick, One Turks Head Place, Providence, Rhode Island, before Vivian S. Dafoulas, Registered Merit Reporter/Certified Realtime Reporter.



Vivian S. Dafoulas, RMR-CRR
50 Fieldstone Drive
East Greenwich, RI  02818-2064
(401) 885-0992

Page 2

```
1   APPEARANCES:
2
3   FOR THE UNITED STATES:
4      UNITED STATES ATTORNEY
       BY: LEE H. VILKER, ESQUIRE
5          JOHN P. McADAMS, ESQUIRE
       50 KENNEDY PLAZA, 8TH FLOOR
6      PROVIDENCE, RI 02903
7
8   FOR RAYMOUR RADHAKRISHNAN:
9      JEFFREY B. PINE, ESQUIRE
       321 SOUTH MAIN STREET, SUITE 302
10     PROVIDENCE, RI 02903
11
12  FOR JOSEPH CARAMADRE:
13     HINCKLEY, ALLEN & SNYDER LLP
       BY: ROBERT G. FLANDERS, JR., ESQUIRE
14     50 KENNEDY PLAZA, SUITE 1500
       PROVIDENCE, RI 02903
15
16  FOR ████████████████████████████
17     MacFADYEN, GESCHEIDT & O'BRIEN
18     BY: JOHN A. MacFADYEN, ESQUIRE
       101 DYER STREET
19     PROVIDENCE, RI 02903
20
21  FOR WESTERN RESERVE LIFE ASSURANCE CO.:
22     PIERCE ATWOOD
       BY: MICHAEL J. DALY, ESQUIRE
23     10 WEYBOSSET STREET, SUITE 400
       PROVIDENCE, RI 02903
24
25
```

Page 3

```
1   FOR THE WITNESS:
2      CHISHOLM CHISHOLM & KILPATRICK LLP
       BY: J. SCOTT KILPATRICK, ESQUIRE
3      ONE TURKS HEAD PLACE, SUITE 1313
       PROVIDENCE, RI 02903
4
5
6   FOR FORTUNE FINANCIAL SERVICES:
7      NIXON PEABODY LLP
       BY: ARMANDO E. BATASTINI, ESQUIRE
       ONE CITIZENS PLAZA, SUITE 500
8      PROVIDENCE, RI 02903
9
10
11
12
13  ALSO PRESENT: JOSEPH CARAMADRE
                RAYMOUR RADHAKRISHNAN
14
              STEPHEN E. SOUZA, POSTAL INSPECTOR
15
16  VIDEOGRAPHER: LAWRENCE HOLMES
17
18
19
20
21
22
23
24
25
```

Page 4

```
1              I N D E X
2   WITNESS                    PAGE
3   ANTHONY A. PITOCCO
4   EXAMINATION BY MR. VILKER        10
5   EXAMINATION BY MR. PINE          57
6   EXAMINATION BY MR. FLANDERS     133
7   EXAMINATION BY MR. VILKER       155
```

Page 5

```
1              I N D E X
2   EXHIBITS                   PAGE
3   For the Government:
4   1  WRL Variable Annuity Application        24
5   2  Annuitant Acknowledgement WRL           35
6   3  Annuitant Acknowledgement Pacific Life  38
7   4  "14. Signature and Acknowledgements" C000070 40
8   5  "8. Signatures"                         40
9   6  "7. Owner Signature(s)"                 42
10  7  "14. Signature and Acknowledgement" C000073 42
11  8  Check No. 9254 $3,000 made to Cash      43
12  9  One-page handwritten document C000065  122
13  10 Copy of Radhakrishnan NH driver's license 45
14  11 Pacific Value Variable Annuity Application 33
15  12 Pacific Life Withdrawal Request
16  13 Copies of checks $3000 to Cash and      53
       $2000 to Thomas Maltais
17
18  FOR THE DEFENSE:
19  A  Objection                             8
20  B  Gosetti Affidavit 8/14/09             99
21  C  Pitocco signature exemplar           103
22  D  Gosetti Affidavit 9/4/09             146
23
24
25
```

Vivian Dafoulas & Associates
(401) 885-0992

Page 6

1     VIDEOGRAPHER: We are now recording and
2  on the record.
3     My name is Larry Holmes. I'm a legal
4  video specialist for National Video Reporters,
5  Incorporated.
6     Our business address is 7 Cedar Drive in
7  Woburn, Mass. Today's date is April 21st, 2010,
8  and the time is 10:15 a.m.
9     This is the deposition of Anthony
10  Pitocco In Re Grand Jury Proceedings.
11     This deposition is being taken at One
12  Turks Head Place in Providence, Rhode Island.
13     The court reporter is Vivian Dafoulas of
14  Vivian S. Dafoulas & Associates.
15     Counsel will state their appearances and
16  the court reporter will administer the oath.
17     MR. VILKER: Lee Vilker, Assistant
18  United States Attorney for the United States.
19     MR. KILPATRICK: Scott Kilpatrick
20  representing the witness, Anthony Pitocco.
21     MR. McADAMS: John McAdams, Assistant
22  United States Attorney for the Government.
23     MR. SOUZA: Steve Souza, Postal
24  Inspector.
25     MR. CARAMADRE: Joseph Caramadre.

Page 7

1     MR. FLANDERS: Robert Flanders for
2  Joseph Caramadre.
3     MR. MacFADYEN: John MacFadyen for
4  ████████████, and I'm also going to be speaking
5  for ████████████ per authorization of Anthony
6  Traini.
7     MR. PINE: Jeffrey Pine for Raymour
8  Radhakrishnan.
9     MR. BATASTINI: Armando Batastini on
10  behalf of Fortune Financial Services,
11  Incorporated.
12     MR. RADHAKRISHNAN: Raymour
13  Radhakrishnan.
14     MR. DALY: Michael Daly for Western
15  Reserve Life Insurance Company.
16     ANTHONY A. PITOCCO,
17  having been first duly sworn, was deposed and
18  testified as follows:
19     COURT REPORTER: Would you state your
20  name, please?
21     THE WITNESS: Anthony A. Pitocco.
22     COURT REPORTER: Would you spell your
23  last name?
24     THE WITNESS: P-I-T-O-C-C-O.
25     COURT REPORTER: Thank you.

Page 8

1     MR. MacFADYEN: Before we get started
2  with the questioning, on behalf of Mr. Hanrahan
3  and Mr. Maggiacomo, I'd like to incorporate the
4  objections that we have previously made both in
5  writing and orally.
6     I would like to offer the written
7  objection to be marked as Exhibit A that we have
8  previously offered in the depositions.
9     I'd also like to state for the record
10  our standing objection on the grounds of relevancy
11  and under United States vs. Petrozziello.
12     To those general objections I would like
13  to add an additional one, that is, the risk of
14  premature disclosure of this deposition.
15     This is a matter that is currently being
16  litigated before Judge Smith in the District
17  Court.
18     I'd also like to repeat for the record
19  our position that our substantive objections are
20  reserved until -- unless and until the time the
21  Government may seek to make use of the deposition.
22     And, finally, the procedural rule
23  that -- that has been applied throughout these
24  depositions that an objection by one counsel
25  constitutes an objection by all.

Page 9

1     MR. VILKER: In response from the
2  Government, the final point that you made we are
3  in agreement with, that an objection by one
4  counsel is an objection by all.
5     The remaining of your points the
6  Government has already responded in prior
7  depositions. I don't think there is a need to go
8  into detail here.
9     We do believe that if there is a
10  substantive objection, it should be raised now so
11  that the questioning attorney has an opportunity
12  to rephrase the question, and our position on the
13  propriety and the relevance of these objections --
14  of these depositions has been stated before, and
15  we incorporate our comments in the prior
16  deposition.
17     MR. FLANDERS: This is Robert Flanders.
18  I'd like to join in the objections that were just
19  read into the record by Mr. MacFadyen on behalf of
20  Joseph Caramadre and the other clients I
21  represent, including Estate Planning Resources,
22  Inc., and Harrison Condit, and Conreal,
23  C-O-N-R-E-A-L.
24     MR. PINE: And Jeffrey Pine on behalf of
25  Mr. Radhakrishnan. I would join in the objections

Page 10

1    as stated by Mr. MacFadyen as well as
2    Mr. Flanders.
3              EXAMINATION
4    BY MR. VILKER:
5        Q.  Good morning, Mr. Pitocco.
6        A.  Good morning.
7        Q.  As I just said, my name is Lee Vilker.
8    I'm an Assistant United States Attorney, and I'm
9    going to be the one that's going to begin asking
10   you questions.
11           When I'm through with my questions, the other
12   attorneys in this room will get a chance to ask
13   you questions.
14       A.  Okay.
15       Q.  And before we begin, I just wanted to
16   let you know that if at any time you need a break,
17   if you are not feeling well, you need to get a
18   bite to eat or you just need to rest, just please
19   let us know and we'll take a break whenever you
20   need to.
21           And also if I'm asking any questions that you
22   don't understand exactly what I'm asking, let me
23   know and I'll rephrase it, okay?
24       A.  Thank you.
25       Q.  Okay.  How old are you, Mr. Pitocco?

Page 11

1        A.  73.  I'll be 74 December 6th this year.
2        Q.  Okay.  And where do you currently live?
3        A.  332 Cherry Hill Road, Johnston, Rhode
4    Island.
5        Q.  Okay.  And how long have you lived
6    there?
7        A.  It's coming up -- in fact it's just
8    about four years.
9        Q.  Okay.  So since about 2006?
10       A.  I would say since 2005.
11       Q.  Okay.  And are you married?
12       A.  Yes.
13       Q.  And for how long have you been married?
14       A.  Fifty-three years.
15       Q.  And do you have children?
16       A.  Yes.
17       Q.  Okay.  How many children do you have?
18       A.  Three (sic).
19       Q.  Are they all boys?
20       A.  Three -- three boys and one girl.
21       Q.  Okay.  And what are their names?
22       A.  James.  Because I go in order.  Anthony
23   is the oldest.  Doreen is my daughter, she's
24   second to the oldest.  Then there's Jimmy, and
25   Robert and then I got a great granddaughter.

Page 12

1        Q.  Okay.  I'll ask you some questions now,
2    Mr. Pitocco, about your health.
3            Were you diagnosed with some kind of cancer a
4    number of years ago?
5        A.  Yes.
6        Q.  And what kind of cancer was that?
7        A.  The name I don't know.
8        Q.  Okay.  Was it -- was it in your lungs?
9        A.  Yes.  My lungs.
10       Q.  Okay.  And when approximately were you
11   first diagnosed?
12       A.  You want the exact date?
13       Q.  No, just -- just generally, if you can
14   remember how many years ago approximately.
15       A.  I retired September 8th of -- I think it
16   was '04.
17       Q.  Okay.
18       A.  And I got detected the cancer four days
19   later.
20       Q.  Okay.  And were you given a diagnosis at
21   that time of -- of how much your -- your life
22   expectancy would be?
23       A.  Yes.  Five months.
24       Q.  So back in '04 you were told that you
25   had five months to live?

Page 13

1        A.  Right.
2        Q.  And you certainly have far beaten that
3    diagnosis?
4        A.  Yes.  I'm a thickhead.
5        Q.  Okay.  That's good to know.  In addition
6    to the -- and have you received over the years a
7    series of treatments for the lung cancer?
8        A.  Oh, yeah.  I think -- radiation I think
9    was 42 treatments.  The chemo was -- I can't tell
10   you the chemo because sometimes it was done in --
11   in -- in the oncology center across the street
12   from the base building from Rhode Island, and some
13   was done right in my bed, my -- my room --
14       Q.  Okay.
15       A.  -- and at that time there they had me
16   very heavily drugged --
17       Q.  Okay.
18       A.  -- so I couldn't even say one.  I
19   imagine one.  I'll just, you know, elaborate,
20   but --
21       Q.  Okay.
22       A.  -- but they gave it to me in order for
23   me to be here.
24       Q.  Okay.  So in addition to the lung
25   cancer, have you had other health problems the

Vivian Dafoulas & Associates
(401) 885-0992

Page 14

1  last few years?
2      A.  Yes.
3      Q.  Okay.  What -- what other problems have
4  you had?
5      A.  Well, the original lung cancer was the
6  right side which they couldn't save, so they
7  blocked it out.
8      I think a year ago November a PET scan at
9  Rhode Island Hospital showed that I had a lung
10  cancer in my left lung now and that was determined
11  to be melanoma.  That I know.  That was on the
12  left side.
13      So the only way to save me again was we
14  gambled, we flipped the coin.  Let's cut it out.
15  You don't cut melanoma out because melanoma,
16  you're gone.  That was a year ago November.  They
17  cut it out; I'm here.
18      Q.  Do you also suffer from diabetes?
19      A.  Yes.  No. 1.
20      Q.  Okay.  And do you have another -- other
21  health problems such as colitis?
22      A.  I've got colitis.
23      Q.  Now, I see that you have an
24  apparatus in your nose to help you breathe?
25      A.  Uh-hum.

Page 15

1      Q.  How long have you had that?
2      A.  I had that when they had to take out
3  the -- the melanoma tumor in my left lung because
4  that would have been too much.  There wouldn't
5  have been no -- because when they take out, I
6  guess, they take the lung and your ball (sic) I
7  guess they explained it to me as a balloon.
8      Q.  Okay.
9      A.  The balloon got smaller and there wasn't
10  enough volume so the only way they could do it to
11  save me was, you know, was that way there.
12      Q.  And you need -- you need the flow of
13  oxygen to --
14      A.  I've got to have it 24 hours a day but,
15  you know, for a very short distance but it's got
16  to be walking (sic) or else I'll go down.
17      Q.  Okay.  Now, are you currently taking any
18  medications?
19      A.  Yes.
20      Q.  Okay.
21      A.  I was just going to say don't even ask
22  me how many.
23      Q.  Are you taking a lot of medications?
24      A.  Yes, very.
25      Q.  Do any of these medications that you are

Page 16

1  taking affect your ability to understand what's
2  going on today?
3      MR. FLANDERS:  Objection.
4      A.  Well, all depends on the question.
5      Q.  Okay.
6      A.  I will put it, if you're going to ask me
7  a simple two and two, I can answer four.
8      Q.  Okay.
9      A.  If you're going to go 20 million times
10  one, I ain't going to be able to do it today.
11      Q.  Okay.  So does the medication that you
12  are taking affect your ability to -- to kind of do
13  complicated tasks?
14      MR. FLANDERS:  Objection.
15      A.  Not at times, no.
16      Q.  Okay.
17      A.  This won't be considered a complicated
18  task, let me put it the other way.
19      Q.  Okay.  Does any of the medication that
20  you are taking affect your memory, to your
21  knowledge?
22      MR. FLANDERS:  Objection.
23      A.  I don't believe so because I don't know
24  what the question is.
25      Q.  Okay.

Page 17

1      A.  And if it reflects my memory, I ain't
2  going to know if it was right or wrong, so that's
3  a tough question.
4      Q.  Okay.  Well, if I ask a question and you
5  don't remember, just please say that you don't
6  remember, okay?
7      A.  I don't remember.
8      Q.  Okay.  Now, Mr. Pitocco, has anyone ever
9  given you money because of your -- your illness?
10      A.  No.
11      Q.  To the best of your knowledge, has
12  anyone ever given any of your family members money
13  because of your terminal illness?
14      A.  You're talking family or anybody?
15      Q.  Well, just take anybody.  Let me
16  rephrase the question.
17      A.  Yes.
18      Q.  Okay.  And who -- who received money
19  because of your terminal illness?
20      A.  My own sons and my daughter.
21      Q.  Okay.  And who did they get money from?
22      A.  They got money from my own friends and
23  my own daughter.
24      Q.  Okay.  So they gave you money to help
25  you?

**Page 18**

1   A.  No.  No.  No.  That ain't what you says.
2   Q.  Okay.  So I'm not understanding what you
3  are saying.
4   A.  I -- I took the question as did anybody
5  give any of my family money.
6   Q.  Okay.
7   A.  I think that's what you said.
8   Q.  That is what I said.
9   A.  All right.
10   Q.  So who gave somebody in your family
11  money?
12   A.  I got four children.  Four children help
13  each other out.
14   Q.  Okay.
15   A.  So it could have been any one of the
16  four children at any given time.
17   Q.  Okay.  So your four children were
18  helping one another out?
19   A.  Oh, yeah, we all were.
20   Q.  Okay.  Do you know whether any members
21  of your family received any money from any outside
22  sources, meaning somebody not in your family,
23  because of your terminal illness?
24   A.  No.
25   Q.  You don't know or they did not receive?

**Page 19**

1   A.  I don't know.  I don't know their
2  personal --
3   Q.  Okay.  Now, before your -- your
4  involvement in this case --
5   A.  Yeah.
6   Q.  -- and in speaking with the Government
7  and investigators and insurance company, had you
8  ever heard of any kind of program in which money
9  would be given to terminally ill individuals?
10   A.  No.
11   Q.  Do you read the Catholic paper?
12   A.  No.
13   Q.  Have you ever seen an ad in the Catholic
14  paper advertising for money to be given to
15  terminally ill people?
16   A.  No.
17   Q.  Did you yourself ever call any phone
18  number to determine whether you could receive
19  money because of your terminal illness?
20   A.  No.
21   Q.  Did you ever authorize anyone in your
22  behalf to make any phone calls to see if you could
23  receive money because of your terminal illness?
24   A.  No.
25   Q.  Now, does the name of Raymour

**Page 20**

1  Radhakrishnan mean anything to you?
2   A.  Never heard of it.
3   Q.  Okay.  I want you to take a look at the
4  third individual sitting from your right.  He has
5  a brown suit and he just waved to you.  Does he
6  look familiar to you?
7   A.  No, not really.
8   Q.  Okay.  Do you think you've ever seen him
9  before?
10   A.  Not to my knowledge.  It's a possibility
11  on the street or something but I don't recognize
12  him.
13   Q.  You don't remember him ever giving you
14  any kind of papers to sign?
15   A.  No.
16   Q.  Okay.  Do you remember him ever giving
17  you any money?
18   A.  No.
19   Q.  You don't -- that did not happen?
20   A.  That did not happen.
21    MR. VILKER:  I would like the record to
22  reflect that the witness has viewed
23  Mr. Radhakrishnan in -- in this conference room
24  and has determined -- has stated that he does not
25  recognize him.

**Page 21**

1    MR. PINE:  Objection.  The record speaks
2  for itself.
3    MR. VILKER:  Okay.
4  BY MR. VILKER:
5   Q.  Now, have you ever met a man named
6  Joseph Caramadre?
7   A.  Never.
8   Q.  Okay.  Have you ever -- prior to your
9  meeting with the -- with the Government and the
10  insurance company in this case, have you ever
11  heard of him before?
12   A.  No.
13   Q.  Okay.  Did Mr. Caramadre ever give you
14  any money?
15   A.  Never.
16   Q.  Did you ever hear of a company called
17  Estate Planning Resources?
18   A.  Never.
19   Q.  Did you ever receive any money from
20  Estate Planning Resources?
21   A.  Never.
22   Q.  Have you ever received any money from
23  the law offices of Joseph Caramadre?
24   A.  Never.
25   Q.  Have you ever received money from

Vivian Dafoulas & Associates
(401) 885-0992

Page 22

1    anyone, outside of your family members and your
2    children, to -- to help you because you are
3    terminally ill?
4        A.   Never.
5        Q.   Okay.
6        A.   I mean no.  The answer is no.
7        Q.   Okay.  Did you want to clarify that with
8    something else?
9        A.   I mean you're talking like, "Dad, I went
10   to pick up your medicine; I paid for it a hundred
11   dollars."
12       Q.   Okay.
13       A.   If you want to consider that, but if you
14   are talking money because of my illness, my
15   illness was in the thousands.
16       Q.   Okay.
17       A.   So if you want to clarify it as, you
18   know, did they help you?  Yeah.  They went to the
19   drugstore and picked up the prescription.  When
20   they come back, give them -- they said they don't
21   want it.
22       Q.   Okay.  Do you -- do you need to take a
23   drink of water?  It sounds like your voice is
24   getting --
25       A.   That's my throat sometimes.

Page 23

1        Q.   Okay.
2        A.   (Inaudible.)
3        Q.   Okay.  If you need a break and you want
4    to take a drink and take a break, please let me
5    know.
6        A.   Sometimes my voice will sound like I'm
7    going to start crying or something and then all of
8    a sudden it's -- it's clear.
9        Q.   Okay.  Now, outside of some help that --
10   that you received from your family members and
11   your children, have you ever received any money
12   from any other third party or outside individual
13   or organization because of your illness?
14       A.   Yes.
15       Q.   Okay.  Who is that?
16       A.   The Gas Company.  Was it ATT?  I don't
17   know.  They keep changing the -- my initials.
18   They gave me, after fighting with them for four
19   years, $250 towards my gas bill --
20       Q.   Okay.
21       A.   -- a year.
22       Q.   So outside of your immediate family
23   members and the Gas Company, have you received any
24   other financial assistance --
25       A.   No.

Page 24

1        Q.   -- because of your illness?
2        A.   No.
3            MR. VILKER:  Okay.  Now, I want to show
4    you a document that has been marked as Government
5    Exhibit 1.
6            THE WITNESS:  Now I gotta -- I got old I
7    told you.  I'm 73.
8            MR. VILKER:  Okay.
9            THE WITNESS:  I thought I forgot it
10   home.  It was on the bottom.  And if anybody gets
11   hungry, I'll just share my peanut butter with
12   them.
13           MR. VILKER:  Sounds like a plan.
14           THE WITNESS:  Now, you want me to --
15   excuse me.
16   BY MR. VILKER:
17       Q.   Okay.  Are you able to --
18       A.   Yes.
19       Q.   -- with these glasses to read this?
20       A.   Oh, yeah.  These are the glasses for it.
21   It goes this far.
22       Q.   Okay.  So, Mr. Pitocco, this is --
23   Government Exhibit 1 is an application for an
24   annuity with a company called Western Reserve
25   Life.

Page 25

1            Have you -- prior to meeting with anyone in
2    connection with this investigation, had you heard
3    of Western Reserve Life?
4        A.   Never.
5        Q.   Did you have any knowledge of any kind
6    of an annuity being opened up in which you were
7    listed as the annuitant?
8        A.   I have no knowledge of any insurance
9    company in the past 40 years, what they sell, what
10   they're going to give you, what they're going to
11   do --
12       Q.   Okay.
13       A.   -- in the last 40 years --
14       Q.   Okay.
15       A.   -- so this means Greek to me.
16       Q.   So you never agreed with anyone to have
17   your name used as the annuitant on this Western
18   Reserve Life annuity?
19           MR. FLANDERS:  Objection.  Leading.
20           MR. VILKER:  Well, let me rephrase that.
21       Q.   Did you ever agree to have your name
22   used as an annuitant on this Western Reserve Life
23   annuity?
24       A.   First, I don't know what annuitant
25   means; second, never.  If it has anything to do

Page 26

1  with insurance, never.
2     Q.  Okay.  Now, the first paragraph of this
3  listed as No. 1 has your name.  Is that your
4  correct address?
5     A.  332 Cherry Hill Road.
6     Q.  Okay.  And is that your correct social
7  security number?
8     A.  I'd like to know how but 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.
9     Q.  Okay.  And is that your correct date of
10 birth?
11    A.  12/6/36.
12    Q.  Okay.  Is any of that information that I
13 just listed written in your handwriting?
14    A.  No.
15    Q.  Now, do you see the telephone number
16 below that?
17    A.  Yes.
18    Q.  It reads (401)941-9273.  Do you know
19 what that phone number is?
20    A.  No.
21    Q.  It's not your home number?
22    A.  My home number?  Never seen it before.
23    Q.  Okay.  Now, did you ever give anyone
24 your social security number and date of birth to
25 use in opening any kind of account or annuity?

Page 27

1     A.  No.  No.  Never.  Especially in the
2  last -- no, they didn't even require it then.  I
3  would say no, not in the past -- before the year
4  2000.
5     Q.  Okay.  Do you have -- if you look at the
6  last page of this -- excuse me -- Page 9 of 10,
7  there is a date that says January 9th of 2009?
8        THE WITNESS:  You say 9 of 10?
9        MR. VILKER:  Right.
10    A.  That's 7, 10.  Here's 9.
11    Q.  Okay.  Do you see it says "Date" and it
12 says "1/9/2009"?
13    A.  At the bottom, okay.
14    Q.  Okay.  At around that time at the
15 beginning of 2009 or the end of 2008, did you give
16 anybody your social security number that you can
17 remember?
18    A.  No.  No one.
19    Q.  Do you have any idea how your name ended
20 up here on this annuity?
21    A.  I have no idea whatsoever.
22    Q.  Okay.  Now, if you're looking at Page 9,
23 do you see the final line that says "Annuitant
24 Signature"?
25    A.  The last line.

Page 28

1     Q.  Okay.  There appears to be written the
2  name of Anthony Pitocco.
3     A.  Yes.
4     Q.  Is that your signature?
5     A.  No.  No.  Wait a minute.  That's my
6  signature but I didn't write that one.
7     Q.  That's your name?
8     A.  My name.  Let me put it that way, that's
9  my name.
10    Q.  But did you sign it?
11    A.  No.
12    Q.  Okay.  Now, if you go back to the first
13 page of this document, the owner of this annuity
14 is a company listed as Conreal, LLC, if you look
15 at it right here.
16    A.  Okay.
17    Q.  Have you ever heard of that company
18 before?
19    A.  Never.
20    Q.  Do you know who John Connelly is?
21    A.  No.
22    Q.  Have you ever spoken to anyone from
23 Conreal, LLC, to the best of your knowledge?
24    A.  To the best of my knowledge, unless --
25 no.

Page 29

1     Q.  Okay.  Now, did you have any knowledge
2  that this company, Conreal, LLC, would be opening
3  an annuity with you listed as the annuitant?
4     A.  That was a total shock after I found out
5  what an annuity is --
6     Q.  Okay.
7     A.  -- that -- I don't know his name.  The
8  big guy that come to my door.  I haven't seen him
9  again.
10    Q.  Okay.  This is one of the -- this was
11 the attorney for the insurance company?
12    A.  Yeah.  That's what he was.
13    Q.  Okay.  So he -- he was the first one
14 that showed you this annuity application?
15    A.  "You signed this annuity -- annuity."
16 "What's an annuity?"
17    Q.  Okay.
18    A.  And he tried and explain to me what it
19 is and what it does.
20    Q.  Okay.
21    A.  And I said, "You're talking to the wrong
22 guy.  I have no idea what you're talking about."
23    Q.  Okay.  And that was the first time
24 anyone explained --
25    A.  Anyone.  At my door, right in my front

Page 30

1  door.
2      MR. VILKER:  Okay.  You have to, just
3  for the court reporter, let me ask the question
4  and then you answer it.
5      Q.  So my question was, when this attorney
6  for the insurance company came to your door, did
7  he show you this -- this document?
8      A.  No.  Not this particular document.
9      Q.  Okay.  He talked to you about an annuity
10 that had your name on it?
11     A.  That's what it was.
12     Q.  Okay.  And is that --
13     A.  No, he talked to me about -- if you want
14 to put it that way -- annuity, you talk to my
15 namer (phonetic), not that he showed me
16 anything --
17     Q.  Okay.
18     A.  -- other than -- it wasn't -- it wasn't
19 even this paper.  I don't know which paper it was.
20 It was like the last line where he would sign and
21 the rest was --
22     Q.  Okay.
23     A.  -- it wasn't -- it wasn't -- how can I
24 say it?  It wasn't something that was all filled
25 out and everything else and I signed it, no.

Page 32

1  who Harrison Condit is?
2      A.  No idea whatsoever.
3      Q.  Did you ever meet with Harrison Condit?
4      A.  No.
5      Q.  Okay.  There's a company, a firm name
6  listed that says "Fortune Financial Services"?
7      A.  No.
8      Q.  You've never heard of that company?
9      A.  No.
10     Q.  Okay.
11     A.  Wait a minute.  Other than the paperwork
12 that you -- that they sent me in the mail.
13     Q.  Okay.
14     A.  Prior to that, never.
15     Q.  Okay.  What paperwork did they send you
16 in the mail?
17     A.  I don't know.  I was getting paperwork.
18 I don't even open them, that's how much I'm
19 interested.  In fact, probably, Scott, they
20 must've been about, what, about that thick?
21     Q.  Okay.
22     A.  Didn't even open up the mail.
23     Q.  Okay.
24     A.  Just put it in the same pile.  Get it
25 out of my house.

Page 31

1      Q.  Okay.  But -- but that was the first
2  time you had ever heard --
3      A.  Ever.
4      Q.  -- of annuities?
5      A.  Ever.  I didn't even know who the guy
6  was or what they were talking about.
7      Q.  Okay.  And was that the first time that
8  you -- when you said you were shocked, was that
9  the first time that you learned that you had some
10 kind of involvement with this annuity?
11     A.  Yes.
12     Q.  Now, Page 10, the very last page,
13 there's a section called "Registered
14 Representative/License Agent."
15     A.  Okay.  I see it.
16     Q.  And it lists the name of a person named
17 Harrison Condit.  Do you know who --
18     A.  On No. 2?
19     Q.  Let me just point it out for you, this
20 right here.
21     A.  Oh, we're up here?  All right.  All
22 right.  You was on 1.
23     Q.  Yes.  Under Paragraph No. 1.
24     A.  Yeah.
25     Q.  It says "Harrison Condit."  Do you know

Page 33

1      Q.  Okay.
2      A.  I know nothing about this thing.  I
3  don't want to know nothing about it.
4      Q.  Okay.  And the mail you believe was
5  coming from Fortune Financial Services?
6      A.  Everybody, including the Postal to --
7  you name it.  Everybody I think that was involved
8  in this case sent me a -- a folder about that big.
9      Q.  Okay.  So you received information from
10 the insurance company as well?
11     A.  The insurance company as well --
12     Q.  Okay.
13     A.  -- to my recollection.  I might --
14     Q.  Okay.
15     A.  -- I might be wrong because there was so
16 many that I have to assume if they all the -- the
17 other ones sent it, they sent it.
18     Q.  Okay.
19     A.  That's an assumption now.
20     Q.  Okay.  Now I want to show you now what
21 I've marked as Government Exhibit 11.  I'll take
22 that from you.
23     A.  They even knew what my middle name was.
24     Q.  Okay.  Now, Exhibit 11 is an annuity
25 application with a company called Pacific Life.

9 (Pages 30 to 33)

Page 34

1  Have you ever heard of Pacific Life?
2      A.  Never.
3      Q.  And, again, you are listed in Paragraph
4  No. 1 as the annuitant on this annuity.
5      Did you ever authorize anyone to open up an
6  annuity with Pacific Life with your name on it?
7      A.  Never.  No.  Which is -- which is
8  proper, "never" or "no"?
9      Q.  Either one.  Whatever the truth is.
10     A.  Never or no.
11     Q.  Okay.  Now, the owner on this annuity in
12 Paragraph 2 is listed as a man named George
13 Hanrahan, and it has his mailing address, his date
14 of birth.  Do you know who George Hanrahan is?
15     A.  Never heard of the name.
16     Q.  Okay.  You never spoke with him?
17     A.  Never spoke with him and never seen or
18 heard of that name.
19     Q.  Okay.
20     A.  Not even accidentally in the paper.
21     Q.  Okay.  Now, did you -- is this the first
22 time you've seen this particular document?
23     A.  Yeah.  I've never seen it before.
24     Q.  So before me asking this question today
25 about this Pacific Life annuity, did you have any

Page 35

1  idea that another annuity was opened up in your
2  name at a company called Pacific Life?
3      A.  No idea.  I had no knowledge.
4      Q.  Okay.  And if you can turn to Page 6 of
5  this document, which is Government Exhibit 11.
6      A.  Did you say 6?
7      Q.  Yes.  That's it, right.  Do you see at
8  the bottom again the name of the registered
9  representative as Harrison Condit?
10     A.  All right.  Now, when you say that, I'm
11 looking for somebody that signed.
12     Q.  Okay.
13     A.  All right.  No.  I don't know the guy.
14     Q.  Okay.  So you never spoke with
15 Mr. Condit about this annuity either, right?
16 Never?
17     A.  No.  Never.
18     MR. VILKER:  Okay.  So that's all I have
19 for that document.  Get it out of your way.
20     Q.  Now, I'd like to now show you Government
21 Exhibit 2.
22     Mr. Pitocco, Exhibit 2 is entitled "Annuitant
23 Acknowledgement" and it states that the annuity
24 contract owner is Conreal, LLC; it lists you as
25 the annuitant and the company as Western Reserve

Page 36

1  Life.
2      Before meeting with the -- the Government or
3  the insurance investigator in this case, had you
4  ever seen this document before?
5      A.  Never.
6      Q.  Okay.  If you can turn to the second
7  page of this document --
8      THE WITNESS:  Oh, this document?
9      MR. VILKER:  Yes.
10     THE WITNESS:  I'm sorry.
11     MR. VILKER:  Yes.  The second page of
12 it.  There's a second page.  The next -- the next
13 page.
14     THE WITNESS:  All right.  I got mixed up
15 between this document and the second page.
16     MR. VILKER:  I'm sorry.  The second page
17 of this document.
18     THE WITNESS:  All right.
19     Q.  Okay.  Do you see above the line
20 "Annuitant Signature"?
21     A.  Yes.
22     Q.  Does that appear to be your signature?
23     A.  No.
24     Q.  And is the date next to it "12-10-08,"
25 is that date in your handwriting?

Page 37

1      A.  No.
2      Q.  Okay.  And it says below that, it says
3  "Witness," and there's a name "Raymour
4  Radhakrishnan" with a signature below it.
5      Did you ever sign any kind of document in
6  front of Raymour Radhakrishnan?
7      A.  No.
8      Q.  Now, if you turn to the first page of
9  this document --
10     A.  This document?
11     Q.  Yes.  The same document.  Do you see
12 next to the paragraph, second paragraph, there's
13 initials "AP"?
14     A.  Yes.
15     Q.  Are those initials in your handwriting?
16     A.  I would say no.  I would have to say no
17 because I don't recall signing anything AP.  Last
18 time I signed that was when I was in the
19 construction business 40 years ago.
20     Q.  Okay.  Now, the first full paragraph of
21 this document says that I am of sound mind and I
22 am entering into this agreement voluntarily and I
23 consent to be the contract annuitant out of my own
24 free will and without duress.
25     Did you, in fact, consent to be the annuitant

Vivian Dafoulas & Associates
(401) 885-0992

Page 38

1 in this annuity that was opened by Conreal, LLC?
2     A.  No.
3     Q.  Now, I'd like to show you -- I'll take
4 that from you -- Government Exhibit 3.
5     A.  A lot of money.
6     Q.  Okay.  Exhibit 3 is another Annuitant
7 Acknowledgement form.
8         THE WITNESS:  Excuse me.
9         MR. VILKER:  Yes.
10        THE WITNESS:  Do you mind if I take a
11 look at the other paper you just took away?
12        MR. VILKER:  Sure.
13        THE WITNESS:  I just want to see
14 something.
15        MR. FLANDERS:  Can we have a reference
16 to what the witness is viewing?
17        MR. VILKER:  Yes.  The witness is now
18 examining Government Exhibit 2 and Government
19 Exhibit 3 together.
20        THE WITNESS:  Thank you.
21        MR. VILKER:  Okay.
22        THE WITNESS:  I got what I wanted.
23        MR. VILKER:  Okay.
24 BY MR. VILKER:
25     Q.  Now, this Annuitant Acknowledgement is

Page 39

1 for the Pacific Life annuity I showed you a moment
2 ago.
3     A.  Yeah.
4     Q.  And do you recall ever seeing this
5 particular document, Exhibit 3?
6     A.  This one?
7     Q.  Yes.  Before you were shown it by the
8 Government in this case.
9     A.  No.
10    Q.  Okay.
11    A.  I don't see anything on here I
12 recognize.  That's why I'm looking at it.
13    Q.  Okay.  Now, if you turn to the second
14 page of this Exhibit 3, again there's a signature
15 above "Annuitant Signature".  Is that your
16 signature?
17    A.  No.
18    Q.  Definitely not?
19    A.  No.
20    Q.  And, again, it indicates that the
21 signature was witnessed by Raymour Radhakrishnan.
22 Did you ever sign any documents in front of
23 Mr. Radhakrishnan?
24    A.  No.
25    Q.  And, again, if you turn back to the

Page 40

1 first page of this document, do you see the
2 initials "AP" --
3     A.  Yes.
4     Q.  -- at the side?
5     A.  Yes.
6     Q.  Does that appear to be your handwriting?
7     A.  No.
8     Q.  Okay.  Now I'd like to show you
9 Exhibit 4.  Okay.  Exhibit 4 -- excuse me -- is
10 a -- is a one-page document that's listed as
11 Page 8 of 9, and it indicates in the document that
12 this is from a company called AXA Equitable.  Have
13 you heard of that company before?
14    A.  No.
15    Q.  Did anyone ever mention opening up any
16 kind of annuity with AXA Equitable?
17    A.  No.  No.
18    Q.  Does that appear to be your signature?
19    A.  No.
20    Q.  And what about the handwriting with the
21 city and state and the date?
22    A.  Definitely not.
23    Q.  Okay.  I'd like to now show you -- let
24 me take that from you.  I would like to now show
25 you Exhibit 5.

Page 41

1     A.  Excuse me.  Maybe it's a stupid
2 question; maybe it's off the record.
3         MR. VILKER:  We're on the record now,
4 Mr. Pitocco.
5         THE WITNESS:  Okay.
6         MR. KILPATRICK:  Why don't you just wait
7 for a question, okay?
8         THE WITNESS:  Okay.
9 BY MR. VILKER:
10    Q.  Okay.  Exhibit 5 is another form and it
11 indicates that the entity is PALAC and there is a
12 signature at the bottom next to Annuitant.  Is
13 that your signature?
14    A.  Where do you see PALAC?
15    Q.  Let me just point it out for you.  It's
16 says it right here.
17    A.  Okay.  You're seeing up there?  I was
18 looking down here.
19    Q.  Yes, it's says it in the text.
20    A.  No.  No.  I don't know what that is.  I
21 don't even know what it is.
22    Q.  Okay.  And do you know -- is the
23 signature next to the word "Annuitant," is that
24 your handwriting?
25        THE WITNESS:  Where are you talking, the

11 (Pages 38 to 41)

Page 42

1  bottom?
2      MR. VILKER: Yes.
3      THE WITNESS: The last line?
4      MR. VILKER: Yes.
5   A. No.
6   Q. Okay. I want to show you another
7  document. This is Government Exhibit 6 and
8  this -- briefly is that -- you see the signature
9  under the word "Annuitant"?
10  A. Yeah.
11  Q. Is that your handwriting?
12  A. No.
13  Q. What about the date 12-10-08,
14  12-10-2008, is that your handwriting?
15  A. No.
16  Q. Let me show you now Exhibit 7. The
17 second paragraph of Exhibit 7 -- I'll point it out
18 for you -- indicates that this is for a company
19 called ING USA Annuity and Life Insurance Company.
20  A. Okay.
21  Q. I'm just pointing it out to you now like
22 that. Have you ever heard of a company called ING
23 USA Annuity and Life Insurance Company?
24  A. No.
25  Q. Did anybody mention to you at any time

Page 44

1   A. Huh?
2   Q. Do you see how it's written in the memo
3  line "Philanthropy"?
4   A. Is that what that is? I don't know. I
5  guess so.
6   Q. Okay. Do you understand that
7  philanthropy means charity?
8   A. I'm starting to but I still don't yet.
9  I still don't know what it means. I'm being
10 honest with you.
11  Q. Okay. If you take my word that it means
12 that it's a gift --
13     MR. PINE: Objection.
14  Q. -- did you ever receive $3000 as any
15 kind of gift?
16     MR. PINE: Objection.
17  A. No.
18  Q. Have you -- before being shown this
19 check by the Government, had you seen this check
20 before?
21  A. No.
22  Q. And you never got any cash?
23  A. Never.
24  Q. And you are not the one that cashed this
25 check?

Page 43

1  opening up an annuity with ING in which you would
2  be the annuitant?
3   A. No.
4   Q. If you look down at the bottom of this
5  document, there's also a line that says "Annuitant
6  Signature," and it has apparently the name Anthony
7  Pitocco written out. Is that your handwriting?
8   A. No.
9   Q. Now, have you ever received any checks
10 or cash from any individual in connection with you
11 opening up or agreeing to have opened up an
12 annuity?
13  A. No.
14  Q. Okay. Now, I want to show you
15 Government Exhibit 8. Now, Government Exhibit 8
16 is a check made out to cash for $3000, and it's
17 dated December 10th of '08. Did you receive this
18 check?
19  A. No.
20  Q. Okay.
21  A. No.
22  Q. Did you ever cash this check?
23  A. No.
24  Q. Do you see how it's written in the --
25 the -- the memo line "Philanthropy"?

Page 45

1   A. No.
2   Q. Now, if you keep that in front of you --
3   A. Why isn't it -- why isn't the back --
4   Q. Hold on a second. If you keep that in
5  front of you and you look at Government Exhibit 10
6  while you are looking at Government Exhibit 8, now
7  does Exhibit -- I hope you can see it -- does
8  Exhibit 10 --
9   A. I can move it wherever you want. I can
10 even put this on the floor for you.
11  Q. No, that's fine.
12  A. No, no. I'll make all the room you
13 need.
14  Q. Okay.
15  A. We're going to do it once, we're going
16 to do it right.
17  Q. Now, does Exhibit 10 appear to have some
18 letters and numbers on it?
19  A. Yes.
20  Q. Okay. Does it have what appears to be
21 the letters "NH" that I point to here?
22  A. It doesn't look like "NH" to me but...
23  Q. Okay. And there are a series of numbers
24 in this row that appear to be 05RN84111. I don't
25 know if you can read that.

Vivian Dafoulas & Associates
(401) 885-0992

Page 46

1    A.  Yeah.  90 percent of it.
2    Q.  Okay.  Now, I'd like you to take a look
3  at Exhibit 10 which is a public record of the --
4  from the New Hampshire Department of Safety,
5  Division of Motor Vehicles, of the license and the
6  license number of an individual named Raymour
7  Radhakrishnan.  Do you see the I.D. number on the
8  top of this?
9    A.  Yeah.
10    Q.  Okay.  And is that I.D. number listed as
11  05RNR8411 (sic)?
12    A.  You want what I take it for?
13      MR. PINE:  Objection.
14    Q.  No, I'm just asking --
15      MR. PINE:  Objection.  It speaks for
16  itself.
17    Q.  Okay.  Is this -- is this --
18    A.  You want me to see that as I read it?
19    Q.  Yes.  All I'm asking you is that the
20  number that is on this -- this document from the
21  New Hampshire Department of Safety.
22      MR. PINE:  Objection.
23    A.  I seen this part yes, part -- part no.
24    Q.  Okay.
25    A.  I'd say about 50/50.

Page 47

1    Q.  Okay.  Now, did Raymour Radhakrishnan
2  ever give you $3000 in cash?
3    A.  No.
4    Q.  Did he ever give, to the best of your
5  knowledge, any members of your family any cash?
6    A.  That would be impossible.
7    Q.  Now, do you have any idea how your name
8  and social security number could have ended up on
9  these two annuity applications?
10    A.  My idea it just came about probably
11  three or four weeks ago.
12      MR. VILKER:  Okay.
13      MR. MacFADYEN:  Objection.
14    Q.  Okay.  Well, what happened three or four
15  years ago?
16      MR. PINE:  Objection.
17      MR. VILKER:  You can -- you can answer.
18      THE WITNESS:  I can answer?
19      MR. VILKER:  Yes.
20    A.  All right.  One -- could be anyone in
21  this office -- sent me a letter or something as to
22  the people that were involved in this whole thing
23  and there was a list of them on the left-hand side
24  and one of them I recognized as his occupation
25  what it was or it is today was Maggiacomo.

Page 48

1    Q.  Okay.
2    A.  That's the first thing that entered in
3  my mind because I done business with Maggiacomo.
4  It was 48 years ago.
5    Q.  Okay.  So a long time ago you did
6  business with somebody in the Maggiacomo family?
7      MR. MacFADYEN:  Objection.
8    A.  Yes, but he still -- he comes from the
9  town and everything and he still knows that, you
10  know --
11    Q.  Okay.
12    A.  -- he's like -- I don't know.  Forget
13  it.
14    Q.  Now, do you have a son that is named
15  Jimmy?
16    A.  Yes.
17    Q.  Is James his full name?
18    A.  Yeah.  James is his full name.
19    Q.  Now, does Jimmy have an ex-wife?
20    A.  Yes.
21    Q.  And does that ex-wife have a brother
22  who's named Thomas Maltais?
23    A.  Yes.
24    Q.  And do you -- and is Mr. Maltais's
25  ex-wife named Karen?

Page 49

1    A.  Yes.
2    Q.  Okay.  Do you know where Karen Maltais
3  used to work?
4    A.  Yes.
5    Q.  Where is that?
6    A.  I found out from my son, this -- this
7  company.
8      MR. MacFADYEN:  Objection.
9      MR. PINE:  Move to strike.
10    Q.  Okay.  Have you come to learn that Karen
11  Maltais used to work for --
12      MR. PINE:  Objection.
13    Q.  -- Mr. Caramadre?
14      MR. MacFADYEN:  Objection.
15      MR. FLANDERS:  Objection.
16      MR. VILKER:  You can state your
17  objection and he can answer the question.
18    A.  Yeah.
19      MR. PINE:  Move to strike.
20    Q.  Now, did you ever speak with Thomas or
21  Karen Maltais about some kind of program out of
22  which you could get money because you were
23  terminally ill?
24    A.  No.
25    Q.  Did you ever give your social security

Page 50

1 number to Thomas or Karen Maltais?
2 A. No.
3 Q. Did you ever authorize your son Jimmy to
4 give the Maltaises your social security number?
5 A. No. He doesn't know it. No one knows
6 it. Not even my wife.
7 Q. Okay. Did you ever have any
8 conversations with Thomas Maltais or Karen Maltais
9 about opening up an annuity in your name?
10 A. No.
11 Q. Okay. How often over the last few years
12 do you see Thomas Maltais?
13 A. Honest personal opinion, I -- I'm living
14 in Johnston -- what did I say, four, five years?
15 Prior to that.
16 Q. So you haven't seen him in years?
17 A. No. It was something like they were --
18 they were married 18 years maybe. My grand -- no,
19 not that long. My grandson is -- I'm going to get
20 killed over here with dates with my grandchildren.
21 Jimmy's 15. Had Jimmy when she was two -- I would
22 say 16 years ago --
23 Q. Okay.
24 A. -- when they got married.
25 Q. Okay.

Page 51

1 A. It was with --
2 Q. Okay.
3 A. It had to be prior to that. They had no
4 babies yet. They just got married. So it had to
5 be probably 18 years ago.
6 Q. Okay. And so I take it in the last
7 several years you've never had any conversations
8 with the Maltaises about any kind of annuity being
9 opened in your name?
10 A. No. None whatsoever. A couple of
11 birthday parties, when my son had birthday parties
12 for my grandchildren, they would be there --
13 Q. Okay.
14 A. -- but it was far and often.
15 Q. Okay.
16 A. Sometimes Tommy would be there,
17 sometimes she would show up.
18 Q. Okay.
19 A. But as far as often and normal, number
20 one, they wasn't getting along good.
21 Q. Okay.
22 A. So sometimes they probably had a fight
23 at home, I ain't going to your -- you know, I
24 ain't going to his -- because he's there. I'm
25 talking routine. You guys are all lawyers.

Page 52

1 Q. Okay.
2 A. Sometimes he goes and sometimes they
3 don't.
4 MR. KILPATRICK: Mr. Pitocco, I just
5 instruct the witness, listen to the question and
6 try to confine your answer to the question, okay?
7 THE WITNESS: Yes. Yes, I will.
8 MR. KILPATRICK: Thank you.
9 BY MR. VILKER:
10 Q. So, Mr. Pitocco, do you have any
11 knowledge of Thomas Maltais being involved in any
12 way in getting your name on these annuities I
13 showed you?
14 A. No knowledge whatsoever.
15 Q. Do you have any knowledge of Thomas
16 Maltais being involved in any way in getting you
17 or any member of your family some cash because of
18 your illness?
19 A. No.
20 Q. Do you know one way or the other whether
21 Thomas Maltais was ever paid information for --
22 for -- excuse me -- strike that.
23 Was ever -- do you know one way or the other
24 whether Thomas Maltais was ever paid to give your
25 information to Joseph Caramadre?

Page 53

1 MR. FLANDERS: Objection.
2 A. No.
3 Q. Do you know whether or not Thomas
4 Maltais ever received any money in connection with
5 referring your name to any kind of program?
6 MR. MacFADYEN: Objection.
7 MR. PINE: Objection.
8 A. No.
9 Q. Now, I'd like to show you Exhibit 13.
10 Exhibit 13 is a little hard to read. The top
11 check, the front of the check is the same as
12 Exhibit 8.
13 MR. PINE: Objection.
14 Q. It's made out to cash.
15 MR. PINE: Objection. You're
16 testifying; you're not asking questions.
17 MR. VILKER: I'm assisting the witness
18 to read the document.
19 MR. PINE: I don't think so.
20 Q. Are you able to read the document?
21 A. No. I don't know what it's about.
22 Q. Okay. Well, do you see the top check?
23 A. Yes.
24 Q. And can you see what it's made out to?
25 A. I recognize something about it.

14 (Pages 50 to 53)

Page 54

1    Q.   Okay.  Who is it made out to?
2    A.   Cash.
3    Q.   Okay.  And what's the amount of cash?
4    A.   3000.
5    Q.   Okay.  Did you ever receive this check?
6    A.   Never.
7    Q.   Now, if you look at the signature on the
8  back of the check --
9    A.   Yes.
10    Q.   -- is that your signature?
11    A.   No.
12    Q.   Did you ever receive any -- any cash
13  from this check?
14    A.   No.
15    Q.   Now, can you see the check number on the
16  top right corner of the first check?
17    A.   Oh, I can't even -- 8254?
18    Q.   That's right.  Now, if you look at the
19  very next check --
20    A.   Yeah.
21    Q.   -- and can you see the check number on
22  that?
23    A.   Yeah.  8255.
24    Q.   And what is the -- can you read the date
25  on this -- on the bottom check?

Page 55

1    A.   12/11/2005.
2    Q.   Okay.
3    A.   That's -- that's the way it reads it to
4  me.
5    Q.   Okay.  Well, let me go back and show you
6  Government Exhibit 8 which is --
7    A.   It's an 8.  I'm sorry.  That's an 8.
8  That's an 8.
9    Q.   Okay.
10    A.   Why did I take it -- that little tip
11  where he crossed the 8.
12    Q.   Okay.  And can you see who this check is
13  made out to?
14    A.   Tommy.
15    Q.   Tommy who?
16    A.   Maltais.
17    Q.   And what's the amount of that check?
18    A.   2000.
19    Q.   And does it say in the memo line
20  anything?
21    A.   Yeah, but I can't read it.  Referral?
22    Q.   Okay.
23    A.   It might have said referral.  That's
24  what it looks like to me.
25    Q.   Do you know anything -- is this the

Page 56

1  first time you've seen this, this second check?
2    A.   I've never seen this stuff.
3    Q.   Do you know anything about Thomas
4  Maltais receiving $2000 as a referral from the law
5  offices of Joseph Caramadre?
6    A.   No.  Absolutely nothing.
7      MR. VILKER:  May I have a moment?
8      ( P A U S E )
9      MR. VILKER:  I have no further
10  questions, Mr. Pitocco.  Thank you.
11      MR. PINE:  Does the witness need a
12  break?
13      MR. VILKER:  Do you need a break?
14      THE WITNESS:  No, I need a sip.  This is
15  about it for now.
16      MR. VILKER:  Can we go off the record
17  for a minute?
18      VIDEOGRAPHER:  Stand by, folks.
19      THE WITNESS:  I'd rather -- I'd rather
20  go straight through.  I can't miss -- as you know,
21  I cannot miss my doctor's appointment if I have to
22  walk out.
23      MR. KILPATRICK:  We are on a break right
24  now so we are off the record.
25      VIDEOGRAPHER:  The time is now

Page 57

1  11:05 a.m.  We are now off the record.
2      (Off-the-record.)
3      VIDEOGRAPHER:  The time is now
4  11:07 a.m.  We are now back on the record.
5      EXAMINATION
6  BY MR. PINE:
7    Q.   Mr. Pitocco -- is it Pitocco or Pitocco?
8    A.   Pitocco.
9    Q.   Pitocco.  Because everybody is saying it
10  differently.
11    A.   I have -- I have some beauties.
12    Q.   I want to at least get it right.
13  Mr. Pitocco, my name is Jeffrey Pine.
14    A.   Excuse me.  I still got my bifocals on.
15    Q.   Okay.
16    A.   My mistake.  I was reading.  And I don't
17  want to leave them on here because I get them
18  mixed up.  Sorry about that.
19      MR. PINE:  No problem.
20      THE WITNESS:  Yeah, you look a little
21  better.
22  BY MR. PINE:
23    Q.   Okay.  My name is Jeffrey Pine.  I
24  represent Raymour Radhakrishnan and I'm going to
25  be asking you some questions this morning.

15 (Pages 54 to 57)

Page 58

1    A.  Okay.
2    Q.  And if there is anything that you don't
3  understand, please tell me and I'll rephrase it.
4    A.  Okay.
5    Q.  If you answer a question, I'm going to
6  assume that you are answering it honestly,
7  truthfully and to the best of your memory; okay?
8    A.  Correct.
9    Q.  Okay.  You told us that back in 2004 you
10  were diagnosed with lung cancer?
11    A.  I believe it was 2004, September.
12    Q.  Okay.  And I gather that since that
13  time, you've had regular doctor appointments to
14  treat yourself, right?
15    A.  Yes.
16    Q.  Okay.  And in 2004 I think you said that
17  the doctor told you that you had five months to
18  live based on the --
19    A.  That's -- that's --
20    Q.  -- based on the diagnosis?
21    A.  Yes.
22    Q.  Where was the lung cancer situated in
23  2004 when you first received the diagnosis?
24    A.  Right lung.
25    Q.  Okay.  Had you been a smoker?

Page 60

1  would say 50 percent of that was smoke; 50 percent
2  of that was waste.
3    Q.  Okay.
4    A.  It wasn't -- it wasn't really inhaling
5  and smoke in my lungs and I think that's what made
6  me beat them.
7    Q.  Okay.  But we can agree that for a
8  period of 25 years at some -- with some frequency
9  you were a smoker?
10    A.  Yes.  I agree with that.
11    Q.  Okay.  Where did you work when you
12  worked?
13    A.  Self-employed.
14    Q.  And what was your profession?  What was
15  your job?
16    A.  Construction.  Building construction,
17  road construction.
18    Q.  Did you own a company?
19    A.  Owned the company.  In fact, I remodeled
20  Custom House Street right across the street for
21  Ray LaFazia.
22    Q.  Okay.  Does that company still exist?
23    A.  No.
24    Q.  Okay.  None of the children took it
25  over?

Page 59

1    A.  Twenty years ago.
2    Q.  Okay.
3    A.  Twenty years ago prior to five years ago
4  so you're talking what, 25 years ago.
5    Q.  Okay.  Had you quit at some point?
6    A.  Yeah.  I quit what, 15 years prior to
7  that.
8    Q.  Okay.  How many years did you smoke?
9    A.  20, 20, 20.  I would say I started when
10  I was what, 16, 17, take 15 in between, 15, maybe
11  -- maybe -- off and on I would say maybe 25.
12    Q.  Twenty-five years?
13    A.  Yes.  But it wasn't the 25 of a normal
14  smoker.
15    Q.  What do you mean?
16    A.  A normal smoker, smokes, smokes.  I
17  worked in an office exactly almost similar to
18  this.  In fact, it looks like it.
19    My ashtray is there.  You light up the
20  cigarette, you take a puff, you put it in the
21  ashtray.  The phone rings.  You're on the phone.
22  The secretary comes in, I've got to have you sign
23  these papers and everything.  By the time you take
24  the second puff, that's what you got was ashes.
25    So it really wasn't -- you're smoking.  I

Page 61

1    A.  I wouldn't allow them to.
2    Q.  Okay.  Why is that?
3    A.  Because of the conditions and the -- the
4  laws that my favorite politicians put across the
5  table, I didn't agree with them.
6    Q.  And at some point did you retire?
7    A.  Yes.
8    Q.  When did you retire?
9    A.  I believe it was on September 4th -- no.
10  Yeah, it was probably the third week of September
11  of 2004.
12    Q.  Okay.  And I think that's when you said
13  immediately thereafter you got diagnosed with --
14    A.  Four days was my retirement.
15    Q.  And did you sell the business?
16    A.  Please?
17    Q.  Did you sell the business when you --
18    A.  No.  I liquidated it.
19    Q.  Okay.  Since September of 2004, have you
20  worked?
21    A.  No.  Yes, I did.  I took a part-time job
22  for most of the attorneys in the city of
23  Providence.
24    Q.  Doing what?
25    A.  Doing when they had a case where there

16 (Pages 58 to 61)

Page 62

1    was a conflict between the client and the
2    insurance company.
3        Q.  Okay.
4        A.  What -- what they want -- what they
5    wanted for money and what they didn't; what was
6    fair and what wasn't fair.
7        Q.  And what did you do?
8        A.  I went in there, evaluated it at a fair
9    price what the job was actually worth and what
10   they should actually get for -- for the funds.
11       Q.  So attorneys would hire you to evaluate
12   their own -- their cases?
13       A.  Estimator.  Let me put it, an estimator
14   to estimate the damage.  That would be easier.
15       Q.  And would those be construction cases or
16   personal injury cases or what kinds of cases?
17       A.  They were all construction cases.
18       Q.  All construction cases?
19       A.  Yes.
20       Q.  So they would bring you in as a
21   consultant of some sort?
22       A.  Consultant agreeable to both parties.
23       Q.  Okay.  And would you mediate those kinds
24   of cases?
25       A.  I would say sort of.  In other words, I

Page 63

1    would go in there first.  They would have what
2    they would call a public adjuster that they would
3    hire and pay themselves, the -- the -- the owner
4    of the property, and -- and the insurance company
5    I guess paid you as an attorney to hire somebody,
6    you know, to do -- and it was me against them and
7    after he come up with his and mine, he says, "What
8    do you think?"
9        I said, "You want to know something?  In this
10   particular case I think you pay him because I
11   don't think he knew what he was talking about."
12       Q.  And how many years did you do that?
13       A.  I done that probably not too long of a
14   period of time because my family was on my case.
15       Q.  Why is that?
16       A.  They didn't want me to do nothing
17   anymore.
18       Q.  Okay.
19       A.  They forced me to retire.  Not force me.
20   They're constantly on my back.  You're going to
21   retire.  You're going to retire.  When are you
22   going to retire, when you're a hundred?
23       Q.  And when did you eventually stop doing
24   that?
25       A.  The day they told me that I had cancer.

Page 64

1        Q.  I think they told you that you had
2    cancer a few days after you retired from your
3    construction business.
4        A.  No, no, no.  I never said that in my
5    life.
6        Q.  Did you tell us earlier --
7        A.  Four days after I retired I went out on
8    my motor home in Maine.  I got up four days after,
9    I had terrific chest pains, and I said to my -- I
10   had my grandchildren with me.  I said, "I think
11   we're going to call this one quits."
12       They said, "Why?"  I said, "I can't take the
13   pain anymore."  She says, "Well, we can always
14   come back next week or the week after."
15       Went home, went to the doctor's and that's
16   when it all came into one big nutshell.
17       Q.  And what job were you working when they
18   told you that you had cancer?
19       A.  I wasn't.  I retired.
20       Q.  What job had you retired from when they
21   told you you had cancer?
22       A.  Oh, I wasn't doing nothing for about
23   four, five months.  I was just waiting for them to
24   finish my motor home because I had it custom
25   built.

Page 65

1        Q.  I guess what I'm trying to find out is
2    when you did this mediation or settling of claims
3    between insurance companies and individuals who
4    were represented by lawyers, when did you do that?
5        A.  Oh, that was long before my cancer.  It
6    had to be prior to 2004.
7        Q.  How many years prior?
8        A.  That I always done it on the side.
9        Q.  Okay.  Did you do that while you were
10   owning your own construction company?
11       A.  Yes.
12       Q.  Which did you stop doing first, the
13   construction company business or the consulting
14   business?
15       A.  I don't recall.
16       Q.  When did you liquidate the construction
17   company?
18       A.  When?  It had to be sometime after the
19   treatments of the radiation and the chemo when my
20   family says that's it.
21       Q.  So sometime after you were diagnosed,
22   you liquidated the construction company, correct?
23       A.  It could've been -- it had to be a
24   month --
25       Q.  Okay.

17 (Pages 62 to 65)

Page 66

1    A.  -- or so because I was still on the
2  chemo and -- and -- and radiation.
3    Q.  Okay.
4    A.  So I don't expect it to be the next day
5  when you are 100 percent out.
6    Q.  What was the source of your income in
7  the years 2005, 2006, 2007 and 2008?
8    A.  I don't recall.
9    Q.  Well, did you earn any money?
10    A.  Of course I earned money.
11    Q.  Who did you earn it from him?
12    A.  Different -- I still got my -- my other
13  three sons that are working for my business, for
14  the business.
15    Q.  Which business?
16    A.  The construction business.
17    Q.  I thought you said you liquidated the
18  business?
19    A.  You didn't say when.
20    Q.  I asked you when.
21    A.  Did I answer you?  No, I didn't answer
22  you, no.  I don't, no.
23    Q.  When did you liquidate the construction
24  business?
25    A.  After I got the cancer.  That's exactly

Page 67

1  what my answer was.  It can't be any different
2  because that's the way it went.
3    Q.  And you got your cancer in 2004,
4  September, correct?
5    A.  I believe so, give or take a week, two
6  weeks, give or take three months.
7    Q.  And how shortly after that did you
8  liquidate the construction business?  Do you
9  understand the question?
10    A.  Part of it.
11    Q.  Which part don't you understand?
12    A.  The tricky part.
13    Q.  I'm not trying to trick you.
14    A.  No, I ain't saying the tricky part.
15  Enough -- enough to confuse me.
16    Q.  All right.  If you are confused, I'll
17  try to rephrase it.
18    You told us sometime after you were diagnosed
19  with cancer, around September of 2004, you
20  liquidated your construction business --
21    A.  Right.
22    Q.  -- correct?
23    A.  Right.
24    Q.  When did that happen?
25    A.  Okay.  First you got to understand

Page 68

1  construction, you are the father and you got sons.
2  That doesn't mean to say that I go to work every
3  day.
4    I might have still been going in one or two
5  days a week to help them out and I might have got
6  in my motor home with my grandchildren and took
7  off for a week, take them to Florida; take them to
8  Disney World; take them down to Memphis.  I'm
9  still on the payroll.
10    And then -- and then do sideline work.  If --
11  if Ray LaFazia calls me up, "Tony" -- "Ray, I'm
12  retired, you know that."
13    "You've got to do me this one favor.  You've
14  got to do me this one favor."  Everybody you've
15  got to do this one favor.
16    Now, when you say are you retired?  When did
17  you retire?  When I done Ray LaFazia -- LaFazia?
18  Excuse me.  I'm on medication so the words don't
19  come out right.
20    Did I quit when I done the -- the last job
21  for him?  Did I do it for Gemma and his daughter
22  when he was with Cascone (phonetic), and then
23  poor -- poor guy passed away.
24    When was the last one?  I don't recall.  But
25  it could have been any one of -- of them because

Page 69

1  it wasn't full time.
2    Maybe I didn't -- for three weeks probably
3  didn't -- maybe three, maybe a month I haven't
4  heard from him, then I get a phone call.  "Tony,
5  right away, you got to -- take -- take a couple of
6  hours tomorrow, go do this job for me."
7    And this is why I say it isn't a tricky
8  question because it really isn't because you
9  don't -- I assume you don't know how it -- how it
10  works.
11    Q.  Well, I'm trying to find out how it
12  works and I asked you a pretty simple question
13  which was when did you liquidate your construction
14  business?  Are you telling us you don't know?
15    MR. VILKER:  I'm going to object.  The
16  witness has answered this question to the best of
17  his ability several times, so the objection is
18  asked and answered.
19  BY MR. PINE:
20    Q.  Can we agree that you don't recall when
21  you liquidated your construction business?
22    A.  We can put it down that way.
23    Q.  Okay.  You don't remember?
24    A.  No.
25    Q.  Okay.  During the years 2005, 2006,

18 (Pages 66 to 69)

Page 70

1  2007, 2008, were you deriving an income from any
2  line of work?
3      A.  Income?  No.
4      Q.  Did you receive money from any business?
5      A.  No.
6      Q.  What did you live on?
7      A.  My sons, my family and my social
8  security --
9      Q.  Okay.
10     A.  -- because I retired at 65 -- I mean
11  2005.
12     Q.  Okay.  So they helped -- your family
13  helped you out?
14     A.  Oh, yeah.  They're still helping me out.
15  They have to.
16     Q.  They have to because you are not a man
17  of great means?
18     A.  No.  I can't carry that big check I get
19  when the mailman takes it to me every week.  I'm
20  being sarcastic.
21     Q.  I understand.  So in 2008 how would you
22  describe your financial situation?
23     A.  2008?  Exactly on my W-2 forms.
24     Q.  Okay.
25     A.  Exactly -- you want the exact number?

Page 71

1      Q.  No.
2      A.  Or you want --
3      Q.  Just a description.  How would you
4  characterize your financial situation in 2008?
5      A.  Maybe I can feed my cat but I don't own
6  a cat.
7      Q.  Okay.
8      A.  If that -- if that's really being
9  sarcastic, I'm not.
10     Q.  Okay.
11     A.  Show me somebody that lives on 15,000,
12  you and your wife.  That answers the question
13  right there.  End of case.
14     Q.  So it's fair to say if somebody offered
15  you a sum of money, you would be interested in
16  that kind of an offer?
17     MR. VILKER:  Objection.
18     A.  No, I won't.  No, I won't.
19     Q.  No?
20     A.  No way.  Not this guy.  You got the
21  whole city of Providence and half of the state to
22  verify that all the way back -- some of you guys
23  remember Broomhead (phonetic).  I walked out of
24  Broomhead's office.
25     MR. KILPATRICK:  Keep -- keep your

Page 72

1  answers responsive to the questions, Mr. Pitocco.
2  BY MR. PINE:
3      Q.  You indicated that -- strike that.
4      When is the last time that a doctor gave you
5  a prognosis on how long you have to live?
6      A.  Prognosis I get and when we talk?  Could
7  be tomorrow.
8      Q.  What has the doctor told you?
9      A.  Could be tomorrow.  And it could be five
10  years from now.  In your particular case, we gave
11  you five months when we detected it.
12     Q.  That's what the doctor said to you?
13     A.  Right.  Now you're going five years and
14  a half --
15     Q.  Right.  So they were wrong?
16     A.  -- and you're still here.  Right.  Now
17  they've just proved themselves wrong again and
18  they admitted it.  We're wrong again.
19     Q.  Right.
20     A.  You've gone five years and eight months
21  and you got -- you got melanoma cancer, that skin
22  cancer, does not grow on internal and it's the
23  quick one.  They found it on the third lobe of the
24  lung.  So they had to operate right away which was
25  November.

Page 73

1      Q.  Of last year?
2      A.  I think it was last year or the year
3  before.
4      Q.  Okay.  And last year, November, did any
5  doctor tell you how long they expected you to have
6  to live?
7      A.  No.
8      Q.  So when is the last time anybody told
9  you that you had a certain amount of time to live?
10  When is the last time anybody said that?
11     A.  I don't recall.
12     Q.  Was it years ago?
13     A.  I don't recall.
14     Q.  Okay.
15     A.  It could be; it couldn't be.
16     Q.  All right.  You don't remember?
17     A.  No.
18     Q.  Okay.  Now, in November of 2008, you
19  knew a man named Tom Maltais, did you not?
20     A.  I know Tommy 18, 20 years.
21     Q.  Right.
22     A.  That I met him probably 19 times in them
23  19 years.
24     Q.  Okay.  He was married to somebody in
25  your family?

Page 74

1    A.   Yes.  Not my family; his family.
2    Q.   Married to one of your son's relatives?
3    A.   His sister.
4    Q.   Yes.  So you knew him, clearly you knew
5  him?
6    A.   Yeah, more or less.  Not -- not to know
7  him to say let's go to a ballgame.  I knew him
8  that I met him at my daughter-in-law's house.
9    Q.   Right.
10    A.   Because they're having a party.  "Hi,
11  Tommy.  How are you doing?  How've you been?
12  How's work?  You're still working?"  Bah, bah,
13  bah.  Then he'd turn the TV on.  He's sit there
14  the rest of the day and watch football.
15    Q.   If he picked up the phone and called
16  you, you'd know who it was that was calling you?
17    A.   After he told me.
18    Q.   Yes.
19    A.   Not by his voice.
20    Q.   Right.  But if he identified himself,
21  you would know who he was?
22    A.   I would know you too if you called me
23  and says I'm so and so.
24    Q.   Okay.  And at any point in time in
25  November of 2008, did he ever talk to you about

Page 75

1  getting you some money because of your illness to
2  help you out with your illness?
3    A.   I haven't talked or seen Tommy before I
4  moved to Johnston and that was either four or five
5  years ago.
6    Q.   How long has he not been a member of
7  your family because of the divorce?
8    A.   If you want to call him not a member,
9  he's more a member now than before.
10    Q.   Why do you say that?
11    A.   Because they get along better now than
12  they did when they were married and I said, "Why
13  did you get a divorce?"
14    Q.   So he still has contact then with his
15  ex-wife?
16    A.   Who?
17    Q.   Tom.  Does he not?  He gets along
18  with --
19    A.   Tommy didn't get divorced.  My son got a
20  divorce.
21    Q.   Okay.  I'm sorry.  I apologize.  Your
22  son got divorced?
23    A.   My son got the divorce.
24    Q.   And he still has contact with Tommy?
25    A.   Because them and his two kids.

Page 76

1    Q.   Right.  Okay.
2    A.   And he takes care of his two kids.
3    Q.   So Tommy and your son still have regular
4  contact?
5    A.   No, they do not get along.  Never did
6  and they still don't.
7    Q.   Who's getting along better now after the
8  divorce then?
9    A.   Well, she's coming out like -- smelling
10  like a rose.  Him, he has nothing to do with it.
11    Q.   Who is "him"?
12    A.   Tommy.
13    Q.   Okay.
14    A.   To my knowledge.
15    Q.   Does Tommy have contact with your son
16  Jimmy?
17    A.   As far as I know, no.
18    Q.   Okay.  But you wouldn't know if they
19  did?
20    A.   No.
21    Q.   Okay.  Did Tommy ever call you in
22  November of 2008 in order to explain to you a
23  program that would get you some money because of
24  your illness?
25    A.   They've been married close to 20 years,

Page 77

1  plus they went out, never called my house.
2    Q.   Did anybody talk to you about a program
3  that would give you some money because of your
4  illness?
5    A.   No.
6    Q.   Now, you testified a little earlier that
7  the gentleman sitting next to me, Raymour
8  Radhakrishnan, you had not seen before in your
9  life?
10    A.   Right.
11    Q.   Is that true?
12    A.   That's true.
13    Q.   You never saw him before?
14    A.   Never saw him before.
15    Q.   He never came to your house?
16    A.   Never came to my house.
17    Q.   Now, in the fall of 2008, you were
18  living at the same address, correct, Cherry Hill
19  Road?
20    A.   Yes.
21    Q.   Living there with your wife?
22    A.   Yes.
23    Q.   And did your wife work at the time?
24    A.   Never worked in her life.  I wouldn't
25  allow it.

Vivian Dafoulas & Associates
(401) 885-0992

Page 78

1     Q.   So is it fair to say the two of you
2   would be in the house together during the day?
3     A.   Correct.
4     Q.   Okay.  Did she help take care of you?
5     A.   Yes.
6     Q.   Okay.  And you never had a meeting where
7   Mr. Radhakrishnan came to your house, is that
8   correct?
9     A.   Is that the end of it?
10    Q.   That's the question.
11    A.   No.
12    Q.   He never came to your house and never
13  gave you any money?
14    A.   Never.
15    Q.   Okay.  Would it surprise you to know
16  that he can describe your house?
17        MR. VILKER:  Objection.
18    A.   Anybody can do it.  Anybody can.  My
19  grandchildren can describe it.
20    Q.   That's because they've been there,
21  haven't they?
22    A.   No.  They've been there, yeah.
23    Q.   Right.
24    A.   But they've also been with their
25  cousins, which is the same age, and they come

Page 79

1   over.  At parties we have them over the house.
2     Q.   Would it surprise you to know he can
3   describe the interior of your house?
4         MR. VILKER:  Objection.
5     A.   Come on, give me a break.
6         MR. VILKER:  That is not your client's
7   deposition.  He'll have a chance to testify.
8         MR. PINE:  I didn't hear the answer.
9     A.   To my knowledge, no.
10    Q.   Now, you've been presented with certain
11  documents?
12    A.   Yes.
13    Q.   Okay.  And you've indicated that you
14  don't recognize your signature on any of those
15  documents?
16    A.   That's correct.
17    Q.   Is that correct?
18    A.   There might have been one or two.  The
19  front looked good, the back, forget it, or vice
20  versa.
21    Q.   Which one or two would those be where
22  the front looked good and the back --
23    A.   I think I pointed them out when I was --
24  when I was looking at them.
25    Q.   All right.  Well --

Page 80

1     A.   When I said this is -- forget it.
2     Q.   All right.  If I can have the exhibits,
3   I'll try to make it easier for you.
4     A.   I don't like to do it that way.  Why
5   don't you give them to me and this is the one that
6   looks it and one that looks like that.  I don't
7   like to separate that way.
8     Q.   Well, I'm going to do it my way, okay?
9     A.   All right.  Let's do it your way.  We'll
10  make a try and come out your way.  Make everybody
11  happy today.
12    Q.   I'm showing you Exhibit 1 and Page 9
13  which contains a signature, and I'll ask you if
14  you recognize that.
15        THE WITNESS:  This one?
16        MR. PINE:  Yes.
17    A.   I recognize the name.
18    Q.   Okay.
19    A.   I don't recognize the signature.
20    Q.   Not the signature?
21    A.   Would that -- that -- that would be
22  putting it in the words you're looking?
23    Q.   Did you ever tell anybody that that
24  signature, quote, looks like my signature?
25    A.   First time someone, whoever it was,

Page 81

1   looked at me, I says, "Get it away from me.
2   Forget it.  That's a disgrace to my name."
3     Q.   Who did you tell that to?
4     A.   I don't know who showed it to me the
5   first time.  I told you, youse all got packets
6   this high and you're asking me questions like that
7   there, who showed it to me.
8     Q.   Was it a man or a woman?
9     A.   Number one, I think I said from the
10  beginning, as they came in the door from the
11  mailman, I got them and I threw them in the pile
12  without even opening them.
13    Q.   Those were the statements that you
14  received from an insurance company?
15    A.   They were everything from a copy of a
16  check of 250,000 to -- to something, and I said,
17  boy, if this is really true, I'm a
18  multimillionaire all of a sudden.
19    Q.   So you got copies of a lot of documents,
20  didn't you?
21    A.   No, I didn't.  I said I threw -- one or
22  two?  One envelope I opened up?
23    Q.   You said stacks of documents.
24    A.   Right.  That I threw in the pile.
25    Q.   Right.

21 (Pages 78 to 81)

Page 82

1    A. Whoever wanted them, come and get them.
2 I'm going to say the truth. I gave them to Scott
3 because I mentioned it to Scott that I was getting
4 them and I was going up my son's house because he
5 lives in the country and I was burning them. I
6 don't want no part of this because everything is
7 twisted to me.
8    Q. When did you give them to Scott, just
9 recently?
10    A. No. No. No. That's when they all --
11 when this first started, everybody was sending me
12 junk.
13    MR. KILPATRICK: He's referring to the
14 pleadings in the case.
15    A. Who's from a judge, who's from this one,
16 who's from that, who's from the post office, who's
17 from the -- the attorney general.
18    Q. Okay.
19    A. I don't understand that language. Why
20 keep them? It's no good to me.
21    Q. Okay. You said that at some point in
22 time a tall individual came to your house and
23 started asking you questions and that's how you
24 found out about all this?
25    A. He was the number one guy and I think

Page 83

1 Scott mentioned the name.
2    Q. Okay. Do you remember that fellow's
3 name?
4    A. No. I forgot. Tall, blond-headed guy,
5 probably six-foot-three.
6    Q. Okay. He came to your house?
7    A. Yes.
8    Q. Did he show you any documents when he
9 came to your house?
10    A. Yes, he did.
11    Q. Okay. Did he show you the document
12 that's been identified as Exhibit No. 1?
13    A. I've got to see No. 1. No, he didn't.
14 I can tell you right now.
15    Q. Okay. Did he show you other documents?
16    A. Not other. He showed me one other
17 document.
18    Q. Did that document have your signature on
19 it?
20    A. Yes.
21    Q. Okay. Did you identify it as your
22 signature?
23    A. I said it looks like mine but it isn't
24 mine.
25    Q. And that was presented to you by a male

Page 84

1 individual?
2    A. Male individual. He had a female with
3 him.
4    Q. A female was with him?
5    A. Whoa, whoa, whoa. No.
6    Q. Because I thought you said the male was
7 --
8    A. I think he had glasses on. The first
9 time I think he had glasses. The second time he
10 came with the female, which is from the Postal or
11 Federal or something, and I told her
12 she's -- she's not allowed in my house anymore.
13    Q. Why is that?
14    A. Their attitude.
15    Q. What was their attitude?
16    A. Too sarcastic for me.
17    Q. The female?
18    A. I don't -- I don't talk that way.
19    Q. Okay. What did she say that turned you
20 off?
21    A. Oh, I have no -- I can't remember what
22 she said.
23    Q. Well, what was the nature of the
24 conversation that upset you like that?
25    A. I can't -- I don't remember.

Page 85

1    Q. What was --
2    A. All I know is I didn't want her in my
3 house and I didn't want to talk to her.
4    Q. What was her name?
5    A. I don't know but she got this thing
6 that -- this badge she flashed. She went down I
7 think even to my son's place of business which I
8 really got perturbed.
9    Let me put it this way: It's a miracle I'm
10 sitting here. The only way you could get me is
11 probably through a judge and a rescue squad
12 because the deal was I'll help youse; my children
13 stay out of it and she did not keep my children
14 out of it.
15    She was the first one to break the rule. She
16 went down where he worked. He's got four more
17 years to go to retire. She went and knocked on
18 the door. Where? The Federal Building Downcity.
19 He's a supervisor down there. He's got 17 years,
20 he's got three more to go. He fouls up, she --
21 she's got a problem, she fools around with it. He
22 gets hurt by her going down there.
23    Q. Right.
24    A. No one is allowed in that building
25 but -- no one is allowed but flash your little

22 (Pages 82 to 85)

Page 86

1   badge, you get anyplace.
2        MR. KILPATRICK:  We are going to take a
3   break after your next question.
4        MR. PINE:  Not as far I'm concerned,
5   unless the witness needs it.
6     Q.  When -- so now --
7     A.  Because now you -- when youse involve my
8   son --
9     Q.  Right.
10    A.  -- youse -- youse better give me a
11  break.
12    Q.  That upset you, right?
13    A.  Very, very upset me.
14    Q.  And you said we --
15    A.  Because youse are trying to push them
16  into my supposedly problem --
17    Q.  Right.
18    A.  -- that I had.
19    Q.  And once -- who told you you had a
20  problem?  Did she tell you you had a problem?
21    A.  I said supposedly.
22    Q.  Right.
23    A.  I did not say I had a problem.
24    Q.  Did she ever tell you that supposedly
25  you had a problem?

Page 87

1     A.  I don't think I gave her a chance.
2     Q.  You didn't like her?
3     A.  No.  That ain't the way, especially if
4   that was her true position, that ain't the way you
5   treat people.
6     Q.  And you said she broke the deal that you
7   made with her?
8     A.  Not with her.  Who's ever was involved
9   in this.
10    Q.  Okay.  But she came with somebody?
11    A.  Right.
12    Q.  Okay.  And the deal was you would answer
13  their questions as long as they didn't bother your
14  family?
15    A.  Right.
16    Q.  Okay.  And once they bothered your
17  family --
18    A.  It was the way the questions and the
19  way -- the way they done it.  It wasn't that they
20  bothered my family.
21    Q.  Well --
22    A.  I said my family knows nothing about
23  this --
24    Q.  They involved your --
25    A.  -- keep them out.

Page 88

1     Q.  They involved your family?
2     A.  They started to involve, going to their
3   place of business.  One is a big superintendent
4   from New York.  He was -- he was well enough, he
5   met with you guys, he'd meet with every one of
6   youse.  If you say you want to meet, he'll meet
7   with you as long -- as long as Scott says it's
8   okay, my -- my son ain't hiding nothing.
9        MR. KILPATRICK:  Mr. Pitocco, I want you
10  to confine your answers to the question.
11       THE WITNESS:  All right.
12       MR. KILPATRICK:  Okay?
13  BY MR. PINE:
14    Q.  And once they involved your family like
15  you just described, at that point did you tell
16  them I don't want any part of this anymore?
17    A.  If this is what you're going to do, I
18  don't want no part of it.
19    Q.  Right.  And you told them, you told
20  somebody that, didn't you?
21    A.  The woman.
22    Q.  All right.  Same woman?
23    A.  Yes.
24    Q.  And did she come back again after you
25  told her that?

Page 89

1     A.  I don't recall.
2     Q.  Okay.  Are you aware that your
3   deposition was supposed to have happened a couple
4   of times before this?
5     A.  Yes, I'm aware of that.
6     Q.  And did you receive notice about the
7   dates for those depositions back in January and
8   probably even before that?
9     A.  Possibly because they might have been in
10  that stack --
11    Q.  Right.
12    A.  -- that I -- that I threw and I didn't
13  care.
14    Q.  Are you aware -- you didn't care?
15    A.  I don't care.
16    Q.  You didn't want to show up, did you?
17    A.  I'm dying of cancer.  Why would I care?
18  Why would I care?
19    Q.  Did anybody ever tell you that you have
20  some sort of a problem with this whole affair?
21    A.  In what sense?  And then I can answer
22  you.
23    Q.  Did anybody ever tell you that you
24  personally had some sort of a legal problem with
25  any of this?

23 (Pages 86 to 89)

Page 90

1    MR. VILKER: Objection.
2    A.  What do you mean by "legal"?
3    Q.  That you might be in some sort of hot
4  water over this.
5    A.  No. No. No. No. Nobody told me that.
6    Q.  Okay. So the woman did not ever express
7  that to you?
8    A.  No. That wasn't -- that wasn't -- no.
9  No.
10    Q.  You said that -- that you were presented
11  with this --
12    A.  They did lie to my sons about it.
13    Q.  How did that -- how did that happen?
14    A.  The woman that went to the Federal
15  Building Downcity --
16    Q.  Right.
17    A.  -- said -- he said, "What are you
18  doing?" My -- my -- my -- she said, "Your father
19  is in trouble."
20    MR. VILKER: Objection. This is
21  hearsay.
22    Q.  Okay. So they told -- they told your
23  son when they saw him at the Federal Building that
24  your father, meaning you, were in some kind of
25  trouble --

Page 91

1    MR. VILKER: Objection --
2    MR. KILPATRICK: Objection.
3    Q.  -- correct?
4    MR. KILPATRICK: You can answer.
5    A.  Say that again. I wasn't paying
6  attention.
7    Q.  I'm sorry.
8    A.  I'm sorry. That was my mistakes.
9    MR. PINE: Well, they were objecting.
10  That's okay.
11    Q.  At some point, they -- it got back to
12  you that they went down to the Federal Building
13  where your son worked and said that you were in
14  some kind of trouble, correct?
15    MR. VILKER: Objection.
16    A.  I would imagine so.
17    Q.  Because that's what they told you?
18    A.  The minute they left the door, he's on
19  his cell phone.
20    MR. KILPATRICK: Move to strike.
21    MR. VILKER: I join in that motion.
22    Q.  Right? And that got back to you?
23    A.  Yes.
24    MR. KILPATRICK: Move to strike.
25    MR. VILKER: Still objecting and move to

Page 92

1  strike.
2    Q.  And was the woman that we've been
3  talking about, did she -- was she the one that
4  carried the badge?
5    A.  Yes.
6    Q.  Okay. And when you heard that from your
7  son, that must have upset you?
8    A.  Of course it did.
9    Q.  Okay. And is that the reason that you
10  didn't appear at the deposition that was scheduled
11  back in January?
12    A.  No. I didn't know there was a
13  deposition in January because I never opened the
14  paperwork.
15    Q.  Okay. The document that you said that
16  they did not show you in the first --
17    A.  January? January I might have been --
18  that was this January?
19    Q.  Yes.
20    A.  I might have been in the hospital.
21    Q.  Okay.
22    A.  I'm not positive.
23    Q.  All right.
24    A.  But I think around the first of the year
25  I was hospitalized.

Page 93

1    Q.  Now --
2    A.  That could have been the reason.
3    Q.  Now, when -- do you know -- do you know
4  when it was that that woman visited your son at
5  the Federal Building? Do you know -- do you know
6  when that would have occurred?
7    A.  No.
8    Q.  Last year sometime?
9    A.  Was it three months went by, January,
10  February, March? No. I couldn't even guess.
11    Q.  Could it have been last summer?
12    A.  Not that -- no, not that far back, no.
13  I would probably say late fall. Possibility it
14  broke into this year here but --
15    Q.  Okay.
16    A.  -- but that's -- that's so farfetched
17  that I couldn't even -- I can't even comment on
18  it.
19    Q.  Do you remember what the document was
20  that they showed you at that first time that they
21  came to your house?
22    A.  Yes. I told you.
23    Q.  Is it one of the ones --
24    A.  A document with a signature along the
25  bottom that I signed --

24 (Pages 90 to 93)

Page 94

1    Q.  Is it one of the ones --
2    A.  -- with nothing at the top.
3    Q.  Is it one of the ones -- I'll let you
4  look at the pile if you see it.
5    A.  Oh, I could never -- I could never do
6  that now.  What are we talking now, six months?
7    Q.  Well, that's -- I didn't know.  Do you
8  remember the document that you saw?
9    A.  No.  You know -- you know when he came
10  to my door.
11    Q.  What's that?
12    A.  We're going to be straight.  You know
13  when he came to my door.  Don't say you don't know
14  when.
15    MR. KILPATRICK:  Mr. Pitocco, please
16  confine your answers to the questions, okay?  You
17  have a doctor's appointment to get to.  We'd like
18  to get you there on time.
19    THE WITNESS:  I can find excuses if I
20  have to.  Say the truth over here.  That's what
21  it's supposed to be, the truth over here.
22    MR. KILPATRICK:  Just -- just listen to
23  the questions and answer the questions,
24  Mr. Pitocco, okay?
25    THE WITNESS:  I could see a document.  I

Page 95

1  don't know if this is the one, similar to this,
2  where -- something like that.
3    Q.  Is that how they showed it to you?
4    A.  No.  No.  No.  No.  What I'm saying
5  is --
6    Q.  Okay.
7    A.  -- without this here, just -- just the
8  bottom part.
9    Q.  Okay.  And that's how --
10    A.  In other words, what he showed me --
11    Q.  I understand.
12    A.  -- was this.
13    Q.  That's how --
14    A.  There was nothing there, if that --
15    Q.  Right.  I understand.
16    A.  Now, whether it was this particular
17  document, I can't answer that --
18    Q.  Okay.
19    A.  -- because it's so far back.
20    Q.  But, in any event, whatever document
21  similar to that they might have showed you, you
22  told them that's not my signature?
23    A.  No.  No.
24    Q.  Did they identify themselves --
25    MR. KILPATRICK:  Objection.  Move to

Page 96

1  strike.
2    Q.  Did they identify themselves as to who
3  they represented or where they were from when they
4  came to your door?
5    A.  I believe they did but I don't recall.
6  One might have said the post office.
7    Q.  The postal inspector?
8    A.  Yeah, the small -- the small guy.
9    Q.  Okay.
10    A.  Might have said that but I don't recall.
11    Q.  Is he in the room today?  Is that --
12    A.  No.
13    Q.  Are any of the people that came to your
14  house that day in the room?
15    A.  I don't have my glasses on.  He looked
16  similar to -- to him but it wasn't him.
17    Q.  No?
18    A.  I don't think so.
19    MR. PINE:  Let the record reflect he
20  pointed in the direction of Mr. Souza.
21    Q.  But you don't know if that's him or not?
22    A.  No, but something about his features or
23  something.  He's got glasses.
24    Q.  Uh-hum.
25    A.  But I can't say it was -- it was him.

Page 97

1    Q.  And I thought you said that one of the
2  times that somebody came to your house was a tall
3  fellow six-foot-three?
4    A.  That's who he -- if it was him, that's
5  who he was with.  That's the first person I met I
6  says from this deal.
7    Q.  Right.
8    A.  Was a guy who rang the doorbell, a
9  stranger.
10    Q.  Okay.
11    A.  And he says, "I've got to ask you a
12  couple of questions."
13    Q.  Was he by himself that day?
14    A.  No, he wasn't.  I say he was with
15  somebody similar to him.
16    Q.  On any occasion when somebody came to
17  your door to talk to you or to ask you some
18  questions --
19    A.  Never.
20    Q.  -- were there two people?
21    A.  Always.
22    Q.  Okay.  In any event, when these people
23  showed you documents that might be similar to
24  those, you told them that's not my signature?
25    MR. KILPATRICK:  Objection.  Move to

25 (Pages 94 to 97)

Page 98

1   strike.
2       A.  Very rare were we speaking about
3   documents.
4       Q.  Okay.
5       A.  And if they did, and whatever they
6   showed me, I would tell them that's not my
7   signature.
8       Q.  Okay.  And did you tell him --
9       A.  If it really wasn't my signature but --
10      Q.  If it really wasn't?
11      A.  -- but I don't remember any signature
12  from this whole thing --
13      Q.  Right.
14      A.  -- that they showed me because I signed
15  nothing from this whole thing.
16      Q.  Okay.  And you've gone through those
17  documents and told us that that does not -- those
18  are not your signatures, correct?
19      A.  Right.  Whatever you want to know, piece
20  by piece.
21      Q.  Did you ever tell -- my question is
22  looking at No. Page 9, did you ever tell anybody
23  that that signature looks like your signature?
24      A.  Possibly.  Possibly I could have told
25  somebody.

Page 99

1       Q.  Okay.
2       A.  I -- I -- I just told youse that it
3   looks like my signature but it isn't.
4       Q.  Okay.  But it looks like it?
5       A.  So that won't be any different than the
6   other ones.
7       MR. PINE:  Okay.  Can I have this marked
8   as a defense exhibit?  Might be B.
9       (Whereupon, Defendant's Exhibit B was
10  marked.)
11  BY MR. PINE:
12      Q.  I'm showing you this document and I'd
13  ask you if that's your signature.
14      A.  Looks like my signature but I don't know
15  if it is.
16      Q.  Okay.  You don't know if it is because
17  you don't have a memory of signing it?
18      A.  No.  A memory of signing has nothing to
19  do with it.  I don't go by when I sign something.
20      Q.  Okay.
21      A.  I go by what it looks like.
22      Q.  So it looks like but you're not sure?
23      A.  I'm not sure that it is -- that it is.
24      Q.  Okay.  Can I have that back?
25      A.  Why I say that?  Whenever I sign my name

Page 100

1   in anything, just like any businessman, you sign a
2   check, just like he signed, whoever he is, you go
3   like this.
4       Q.  It comes out --
5       A.  I do the same thing.
6       Q.  Right.  If you're signing documents --
7       A.  It isn't --
8       Q.  It's not perfect?
9       A.  It's not that meticulous, let me put it
10  to you that way.
11      Q.  It's fair to say you were in business
12  for --
13      A.  Forty-six years.
14      Q.  -- forty-six years.  You've signed a lot
15  of documents in your day?
16      A.  A lot.
17      Q.  You were the boss?
18      A.  I'm the owner and the boss.
19      Q.  Right.  And it's fair to say that not
20  every signature of yours that you ever signed
21  looks exactly like every signature that you
22  signed?
23      A.  I would agree but they look nothing like
24  that.
25      Q.  That's fine.

Page 101

1       A.  They look like scribble.
2       Q.  Right.
3       A.  There ain't one on there that looks like
4   scribble.
5       Q.  Okay.  But you've indicated that you are
6   not even sure that this is your signature?
7       A.  Well, I can tell by the "A" in between
8   Anthony A. Pitocco.
9       Q.  Right.
10      A.  That's teaching a kid in the first
11  grade -- in the fifth grade how to sign an "A",
12  make an "A".  That ain't my signature.
13      Q.  Okay.  So you don't make --
14      A.  It's my name.
15      Q.  Right.  I understand.
16      A.  But that's not my signature.
17      Q.  Is this your "A"?
18      MR. VILKER:  I think the witness needs
19  to look at the exhibit again.
20      MR. PINE:  Sure.
21      MR. VILKER:  And know which one you are
22  talking about.
23      Q.  Is that your "A"?
24      A.  The middle initial I think I says --
25      Q.  Yeah.

26 (Pages 98 to 101)

Page 102

1    A. -- does not look like my "A".
2    Q. The way you make an "A"?
3    A. The way I make an "A", if I make an "A".
4    Q. Okay.
5    A. It's very rare I make an "A".
6    Q. Okay.
7    A. Unless it's required by whatever --
8  whatever I'm signing for.
9    Q. Could I ask you to write your
10  signature --
11    A. Sure.
12    Q. -- on that piece of paper?
13    A. It's not going to be the same.
14    Q. Can I ask you to do it ten times?
15    A. Yes. Yes. Ten times?
16    Q. Ten times. Take your time and skip a
17  line between each time.
18    A. Can we make a notation that I got
19  45 milligrams of morphine in me?
20    Q. Sure. Does that affect your ability
21  to --
22    A. I would say so, 45 milligrams of
23  morphine.
24    Q. Okay.
25    A. You want the full name?

Page 103

1    Q. Yes.
2    A. And that's nothing special. That's my
3  normal dose twice a day.
4    Q. Right. I think you said that you don't
5  ordinarily put the middle initial "A" unless it's
6  required.
7    A. Right.
8    Q. So do the first five without the middle
9  initial and do the second five with it, okay?
10    A. The first five is with it?
11    Q. With. Either way. It doesn't matter.
12  That's fine.
13    A. I done it the opposite. It doesn't
14  matter.
15    Q. That's fine. It's not a test. We're
16  just looking for your sample.
17    (Witness signs signatures on document.)
18    THE WITNESS: That's no practicing.
19  That's nothing. That's just the way it come out
20  of my hand.
21    MR. PINE: I understand. I'd ask that
22  that be marked as Defense C. Thank you. With
23  your permission may I date this? This is going to
24  be an exhibit and I'm just putting the date.
25    (Whereupon, Defendant's Exhibit C was

Page 104

1  marked.)
2    THE WITNESS: Do you mind if I take a
3  sip?
4    MR. PINE: No. Whatever you need.
5  BY MR. PINE:
6    Q. Have you ever met a woman named Melanie
7  Gosetti? Melanie Gosetti.
8    A. Never in my life.
9    Q. Okay. That name does not ring any bell?
10    A. Not even a Marilyn rings a bell.
11    Q. But Melanie doesn't either?
12    A. No.
13    Q. Okay.
14    A. I've been married 52 years. I don't
15  meet no girls.
16    Q. I'm not suggesting that you met her --
17    A. That was a little joke --
18    Q. Okay. All right.
19    A. -- to break up the humor over here a
20  little bit.
21    Q. Fair enough. I wasn't suggesting
22  anything. My question is, in conjunction with any
23  of this case, have you ever met with a woman who
24  goes by the name of Melanie Gosetti?
25  G-O-S-E-T-T-I.

Page 105

1    A. No. Seriously, no.
2    Q. Okay. Last year did you ever -- were
3  you ever introduced to somebody who is named
4  Melanie Gosetti?
5    A. Don't ring a bell, no.
6    Q. Did you ever give any kind of a
7  statement of the events, questions and answers to
8  a person named Melanie Gosetti?
9    A. The answer would be no and even then, I
10  would have to know what are we talking about? I
11  met her -- I was with my wife in the market and
12  she asked a question? I mean --
13    Q. No. I'm talking about something a
14  little more formal than that; not just bumping --
15    A. No.
16    Q. -- into somebody at the market.
17    A. No. That's impossible.
18    Q. Okay.
19    A. No, I did not meet a girl named Marilyn.
20    Q. Melanie. Just so --
21    A. I got it right.
22    Q. All right. Melanie?
23    A. Melanie.
24    Q. Did a woman named Melanie ever come to
25  your house and ask you questions about this?

Vivian Dafoulas & Associates
(401) 885-0992

Page 106

1    THE WITNESS: About this particular
2  case?
3        MR. PINE: Yes.
4    A.  No. No.
5    Q.  Okay. Did a woman named Melanie Gosetti
6  ever come to your house as recently as September
7  of 2009 just a few -- several months ago and come
8  to your house and ask you questions about this
9  whole set of events, what we're talking about
10  today?
11    A.  Never. The only woman I had was at my
12  house --
13    Q.  Was the one that we talked about?
14    A.  No. No. No. You're talking serious?
15    Q.  Yeah.
16    A.  Was -- I tried for food stamps. I had
17  tried for help with my gas bill and stuff like
18  that there.
19    Q.  Okay.
20    A.  They were the only women that ever
21  stepped in my door.
22    Q.  And that's separate. We can agree --
23    A.  That's why I said --
24    Q.  Right.
25    A.  -- what did she come in my house for?

Page 107

1  No.
2    Q.  Assuming --
3    A.  No.
4    Q.  -- Melanie is not with the gas
5  company --
6    A.  No.
7    Q.  -- she's not with the food stamp people.
8    A.  No. I just don't want to get it mixed
9  up that I says no and then Melanie did.
10    Q.  Okay. And so what I'm asking you is in
11  conjunction with this case, this whole matter that
12  we are asking you questions about today.
13    A.  Okay. Okay.
14    Q.  And where the other people came to your
15  house, the woman that you didn't get along with
16  and the other people --
17    A.  Okay.
18    Q.  -- did anybody by the name of Melanie
19  Gosetti ever come to your house and ask you
20  questions and answers about -- about this case?
21    A.  No.
22    Q.  Okay. You indicated that the phone
23  number on Exhibit 1 is not your phone number --
24    A.  No.
25    Q.  -- that 941.

Page 108

1    A.  No.
2    Q.  What was your phone number at the time
3  that you lived -- and may still have the same
4  number -- at Cherry Hill Road? What's your phone
5  number?
6    A.  It's still the same one.
7    Q.  What is that?
8    A.  401 --
9    Q.  Yes.
10    A.  -- 231-0201.
11    Q.  Is that your house line?
12    A.  That's the only line I got.
13    Q.  Okay. No cell phone?
14    A.  Oh, my cell. All right. My cell phone.
15    Q.  All right. What's your cell phone, do
16  you know?
17    A.  When the hell do I ever call my cell
18  phone?
19    Q.  I know.
20    A.  I don't know. I guess you would have to
21  have my son or call T-Mobile to see what it is
22  because I never call my cell. That's an emergency
23  only because they worry about me when I go on the
24  road if anything happens.
25    Q.  Okay.

Page 109

1    A.  I would be -- this -- I would be giving
2  you the most falsest number you've ever seen.
3    Q.  And we can -- we can try to figure out
4  what it is. When did you --
5    A.  If you want, I can give it to Scott and
6  Scott can give it to you. I got no problem with
7  that.
8    Q.  That's fine.
9    A.  I just call T-Mobile.
10    Q.  Is that who it's with?
11    A.  Yeah.
12    Q.  Okay.
13    A.  Give them my code and they would relate
14  my thing.
15    Q.  How long have you had the cell phone?
16    A.  I don't know about this particular
17  number but maybe 16 years when they first came
18  out.
19    Q.  Okay. A long time?
20    A.  Or even longer. Yeah. I was in
21  construction.
22    Q.  Okay.
23    A.  Without -- without a cell phone, you
24  don't exist.
25    Q.  And has it always been with T-Mobile?

Vivian Dafoulas & Associates
(401) 885-0992

Page 110

1    A.   No.
2    Q.   If I direct your attention to 2008 --
3    A.   That's T-Mobile.
4    Q.   T-Mobile.  And is it the same number
5  that you have now?
6    A.   I don't know.
7    Q.   All right.
8    A.   Possibly yes, possibly no.
9    Q.   Do you think it's changed since late
10  2008?
11    A.   I don't know.  That's --
12    Q.   Okay.
13    A.   That's -- that's something where you
14  lose -- they break -- they lose it on the
15  construction site and they say, "Boss?"  "What?"
16  "We need another phone."
17    Q.   Right.
18    A.   Now, what phone they send, and you give
19  to your help --
20    Q.   But in 2008 you weren't working at
21  construction sites, were you?
22    A.   No.  I'm just using that as a --
23    Q.   So what I'm saying is in 2008 do you
24  think that you had the same phone number as you
25  have today?

Page 111

1    A.   In 2008, yes.
2    Q.   Okay.
3    A.   That I can say yes.
4    Q.   And that we can find out because you
5  will tell Scott?
6    A.   Yeah.  That I can -- I don't even have
7  to -- I can tell him yes.
8    Q.   Okay.
9    A.   But I'll do it anyway to verify it.
10        MR. PINE:  That's fine.  Thank you.
11        THE WITNESS:  Excuse me.
12        MR. PINE:  I'm sorry.
13        THE WITNESS:  Part on my cell phone, my
14  son is a trailer truck driver.  He drives all up
15  and down the East Coast.  At times I let him use
16  mine, so some of them numbers you might see New
17  Jersey and everything, and the other number would
18  be his main office where he pulls the trailer out
19  of the terminal.
20    Q.   Okay.
21    A.   That's how you can tell.
22    Q.   Okay.  So there might be numbers on the
23  bill that your son has used or your son has
24  called?
25    A.   There might be 50 numbers, probably one

Page 112

1  might be --
2    Q.   But, in any event, we can agree that the
3  number that you're going to give Scott was the
4  number that you would have had back in 2008?
5    A.   The phone number itself, yes.
6    Q.   The phone number itself.
7    A.   Yes, I have no problem with that.
8    Q.   And the home number 231-0201, have you
9  had that for a long time I assume?
10    A.   I believe I had that one when I moved to
11  Johnston because I lived in Foster.
12    Q.   Okay.
13    A.   And you couldn't transfer a Foster
14  exchange.
15    Q.   Right.
16    A.   Foster was 647.  Johnston is 231.
17    Q.   And you've lived in Johnston you said
18  for four years?
19    A.   Four, four and a half years.
20    Q.   Okay.  And is your carrier in Johnston
21  for the 231 number, is that a Verizon number or
22  a --
23    A.   That's a Verizon number.  That's a
24  T-Mobile number.
25    Q.   The home number is T-Mobile as well?

Page 113

1    A.   The 231, yeah.
2    Q.   Okay.
3    A.   No.  No.  No.  No.  No.  Wait a minute.
4  Wait a minute.
5    Q.   You got me confused.
6    A.   231-0201 is my house phone.
7    Q.   And who is that with?
8    A.   That's --
9    Q.   Who do you pay the phone bill?
10    A.   Verizon.
11    Q.   Okay.  And --
12    A.   And the other one is T-Mobile, the cell
13  phone.
14    Q.   All right.  Okay.  That makes sense.
15    A.   Like I says, you've got to give me a
16  chance to think --
17    Q.   That's fine.
18    A.   -- because the morphine slows you down.
19  I can't help it.
20    Q.   Does it affect your memory sometimes --
21    A.   Not the memory.
22    Q.   -- the morphine?
23    A.   Not the memory.  It slows you down.  In
24  other words, you give me a minute to think about
25  it after you ask me the question, the answer is

29 (Pages 110 to 113)

Page 114

1  there.
2      Q.  Uh-hum.
3      A.  But if you give me the question and you
4  expect me to give you a quick response, you might
5  get it and you might not.
6      Q.  Okay.  And if I do that, if I make that
7  mistake because I get into it, let me know and you
8  have all the time you need to slow down, okay?
9      A.  All right.
10     Q.  Because I'm not trying to get a quick
11 answer if it's not right.
12     You don't know the name of the woman with the
13 badge, do you?
14     A.  No.  I don't want to know.  That's how
15 bad she was and she works for the Federal.  I got
16 to pay her out of my social security.
17     Q.  We all do.  Did she ever --
18     A.  It hurts more.  You didn't retire yet.
19     Q.  Did she ever come to your house and ask
20 you questions and answers that you -- you gave
21 her?
22     In other words, did she ever come to your
23 house and visit with you and take questions and
24 answers with you?
25     A.  To be honest with you, you had asked me

Page 115

1  a question before and I want to retract that.
2      Q.  All right.
3      A.  Let's get -- let's get the record
4  straight.
5      Q.  Sure.
6      A.  She was the only person that ever came
7  to my house alone.
8      Q.  Okay.
9      A.  Unless one of Scott's men -- I probably
10 wouldn't even recognize them in here -- dropped
11 something off that he wanted me to sign or pick
12 something up or Scott personally stopped by.
13     Q.  Okay.
14     A.  So there was an individual alone but
15 other than that, not --
16     Q.  Dealing with Scott, that's your lawyer?
17     A.  Her?  She came in once and that was it.
18     Q.  Okay.
19     A.  Never been in my house after that.
20     Q.  When she came to your house, was your
21 wife there?
22     A.  No.
23     Q.  Your wife was not there?
24     A.  No.  I wouldn't allow my wife in there
25 with her.

Page 116

1      Q.  Okay.
2      A.  My wife would have threw her over the
3  deck.  Not -- not for anything but because of my
4  condition.
5      Q.  I understand.
6      A.  They protect me like -- like --
7  like -- like you wouldn't believe it.  I don't
8  like it but...
9      Q.  When the woman with the badge came
10 alone, and your wife you don't believe was there,
11 did you sit down with her in a room and talk to
12 her?
13     A.  She came in the kitchen.
14     Q.  Yes.
15     A.  This was the second time.  I took her
16 like a normal -- you know, I've got to be
17 respectable.  I mean give me a break.
18     Q.  Right.
19     A.  You know, being in business so many
20 years, no matter how bad you got something against
21 somebody, you got to try and override it.
22     Q.  Uh-hum.
23     A.  So I invite her in, sit down.  "Can I
24 help you?"
25     "Yeah, I got to ask you a few questions and

Page 117

1  then I'll be on my way."
2      Q.  Okay.
3      A.  What the questions were, I don't know.
4  Did she ask me questions?  Yes.  What they were, I
5  don't know.  What did you say?  I don't know
6  because --
7      Q.  Okay.  But you do remember the
8  interview?
9      A.  -- her coming in alone, asking me some
10 questions, me answering them, whether that's what
11 she wanted or didn't, I answered them.  I didn't
12 deny them.
13     I didn't do anything.  You know, I was trying
14 to help in this -- in this time here I'm trying to
15 help, you know, this case, but then when it
16 started to get a little, you know...
17     Q.  What?  It started to get a little what?
18     A.  A little -- I don't know -- just --
19 just -- just didn't fit me.  Not that I was
20 getting edgy because of what went on.  It just
21 didn't fit me.  I didn't feel comfortable.
22     Q.  Before she sat down and asked you
23 questions in your kitchen, what did she tell you
24 about the case?
25     A.  Oh, I don't know.

30 (Pages 114 to 117)

Page 118

```
1      Q.  Did she talk to you beforehand?
2      A.  She probably did the first time for all
3   I know.  There's a possibility she did on the
4   first time.
5      Q.  She made two separate visits to your
6   house?
7      A.  Two separate visits to my house and both
8   times I think -- I'm almost positive they were --
9   they were just her.
10     Q.  Okay.  And when was it -- was it during
11  the first time or the second time where you
12  clearly were not taking a liking to her?
13     A.  Oh, that was definitely after she left
14  the first time.
15     Q.  Okay.
16     A.  I said to my wife I don't even -- I
17  said, "The girl that came here today," I says, "I
18  don't think I'm going to let her in."
19     "No, don't do that.  You're going to
20  embarrass me."  I says, "Am I going to embarrass
21  you?  Go down to Wal-Mart.  Go buy -- buy me an
22  ice cream cone if you're going to get
23  embarrassed."
24     Q.  Was your wife there the first time that
25  she came, the woman came?
```

Page 119

```
1      A.  I don't recall.
2      Q.  The first time --
3      A.  She was in the house.
4      Q.  Okay.
5      A.  I invite her in the house the front door
6   to sit down like a normal person.  Would you like
7   a cup of coffee or what?  Whether my wife was
8   there at that particular time, I can't -- I don't
9   know.
10     Q.  Did the woman ask questions and answers
11  both times that she was there or just one time?
12     A.  No.  She asked questions.  She asked
13  questions both times.
14     Q.  And --
15     A.  The second time I cut it short.
16     Q.  Okay.  Prior to her asking questions the
17  first time, did she give you any information about
18  what this was all about?
19        MR. VILKER:  Objection.  Hearsay.  Go
20  ahead.
21     A.  She could have.  I don't know.
22     Q.  Do you remember what she said?
23     A.  No.  Hey, this was just starting then.
24  Look, I -- I have no idea.  I don't recall.  Don't
25  have no idea.
```

Page 120

```
1      Q.  Okay.
2      A.  Don't remember.  Whatever terminology
3   you want to use, I don't know.
4      Q.  Did she show you any photographs of
5   anybody on either occasion?
6      A.  Yes.  She showed me his photograph.
7      Q.  And what did you --
8      A.  She's the only one who showed me.
9      Q.  Okay.  And --
10     A.  My answer was no.
11     Q.  That you didn't recognize him?
12     A.  No, I didn't recognize him.
13     Q.  And when she mentioned his name, you
14  didn't recognize his name either?
15     A.  No.  I have -- I have to say, as we sit
16  here, I don't recall but that would be the proper
17  answer.  If I don't recognize him, I didn't
18  recognize him then so --
19     Q.  Okay.
20     A.  -- so it would be I don't recall.
21     Q.  Do you recall her telling you before
22  either interview that they were investigating
23  somebody who was taking money from old people --
24        MR. VILKER:  Objection.
25     Q.  -- or sick people?
```

Page 121

```
1      A.  I don't recall that.
2      Q.  Could she have said that?
3         MR. VILKER:  Objection.
4      A.  She could have said anything.  Stuff
5   like that there really -- I don't recall her
6   saying something like that.
7      Q.  Okay.  I may have misspoken.  Did she
8   ever say that they were investigating a man who
9   was taking money from sick people?
10        MR. VILKER:  Objection.
11        MR. KILPATRICK:  Objection.
12     A.  No.
13     Q.  You don't recall it or she didn't say
14  it?
15     A.  No, I don't believe she recalled using
16  them exact words that she's taking money from old
17  people.
18     Q.  Right.  Did she say --
19        MR. KILPATRICK:  Move to strike.
20     Q.  Did she say something similar to that --
21        MR. VILKER:  Objection.
22     Q.  -- the same idea?
23     A.  Possibly but that statement that you
24  made don't ring a bell.
25        MR. PINE:  Okay.
```

31 (Pages 118 to 121)

Vivian Dafoulas & Associates
(401) 885-0992

Page 122

1      MR. KILPATRICK: Move to strike.
2      Q.  You did say something about your social
3   security number?
4      A.  Right.
5      Q.  And I think you said no one knows it,
6   like your kids, your wife?
7      A.  You -- you asked me about my family
8   knowing it.
9      Q.  Yes.  Does your family know it?
10     A.  And I says no.
11     Q.  Okay.
12     A.  We didn't say that nobody knows it.
13     Q.  Okay.  Does anybody in your family know
14  it?
15     A.  No.
16     Q.  Okay.
17     A.  Not even my wife.
18     Q.  Okay.  And you know it by heart, don't
19  you?
20     A.  You've been in the hospital that long,
21  you better know it or you don't get no needle, you
22  don't get nothing.
23     Q.  And I'm showing you Government's
24  Exhibit No. 9.
25     A.  Yeah.

Page 123

1      Q.  And ask you to take a look at that
2   document.  Does your social security --
3      A.  That ain't my social security number.
4   That ain't my social security number.
5      Q.  Okay.
6      A.  That's 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.
7      Q.  Say again.
8      A.  They come close.  It's 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.
9      Q.  Okay.  So is the number on that document
10  accurate or not accurate?
11     A.  Inaccurate.
12     Q.  I'm just looking for a Government's
13  exhibit.  I think it's 1.  Do you have it, a copy
14  of it?
15     MR. VILKER:  I have my own copy.
16     Q.  Could I see that document?
17     A.  Yeah.
18     MR. PINE:  Thanks.
19     Q.  Well, maybe it's a question of the
20  writing but looking at No. 1, Exhibit 1, is
21  that -- is that the correct number for your social
22  security number?
23     A.  The one at the top -- that is perfect.
24     Q.  Okay.  And showing you Exhibit 9 --
25     A.  Yeah.

Page 124

1      Q.  -- doesn't that look like 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?
2      A.  No, it doesn't.
3      Q.  What does it look like?
4      A.  It looks like 634 and I don't even have
5   my reading glasses on.
6      Q.  Okay.
7      A.  That's how bad it is.
8      Q.  So it's a legibility issue looks like?
9      A.  That's a zero?
10     Q.  I'm only asking --
11     A.  You mean to you it's -- all right.  I
12  misunderstood you.
13     Q.  But to you, it doesn't look like one?
14     A.  Oh, no.
15     Q.  You agree if it were a zero, that would
16  be accurate?
17     A.  That would be accurate.
18     Q.  Okay.  If it's a zero, we are okay?
19     A.  It's 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.
20     Q.  And what was your mother's maiden name?
21     A.  Ricci, R-I-C-C-I.
22     Q.  Okay.
23     A.  Where does this come in the picture?
24  Now we're getting my great grandmother in this
25  picture?

Page 125

1      Q.  No.  I'm referring to --
2      A.  Wait a minute now.  Excuse me.  We're
3   getting deeper, deeper into my family?
4      MR. KILPATRICK: Mr. Pitocco, he's just
5   reading off an exhibit.
6      THE WITNESS:  Let's make sure.
7      MR. KILPATRICK: He's reading off an
8   exhibit.
9      THE WITNESS:  Because we start off with
10  nobody and we got six of them in here already.
11  This time I ain't worried about the clock.
12  BY MR. PINE:
13     Q.  I understand.  I was referencing the
14  same Exhibit No. 9 because it looks like there is
15  a reference -- does it say there mother and then
16  the name Ricci?
17     A.  I recognize the mother but I don't
18  recognize the -- the -- the way they wrote mother.
19     Q.  Okay.
20     A.  That is her name, R-I-C-C-I.
21     Q.  Okay.  That is her name.  So that's --
22  excuse me -- that's accurate in terms of her name?
23     A.  Right.
24     Q.  And it's also accurate in terms of your
25  social security number assuming that's a zero?

32 (Pages 122 to 125)

Page 126

1    A.   Assuming that's a zero.
2    Q.   Assuming that's a zero.  Okay.  And do
3  you know your driver's license number?  You got it
4  with you?
5    A.   I ain't even got it with me.
6    Q.   Okay.
7    A.   I can tell you three numbers of it.  I
8  think it's 0503.
9    Q.   I'm not -- I'm not going to ask.  It's
10  not a question ---
11    A.   What I'm saying is --
12    Q.   I wondered if you knew it.
13    A.   I've been driving 52 years, I never got
14  a ticket.  So I never got pulled over, so...
15    Q.   Can you read on this piece of paper, and
16  it might be difficult, where it says license
17  number, can you read those numbers?
18    A.   Man, that's a -- that's a good one.  I
19  don't think these are going to help me.  Now this
20  is 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.  Now, that looks like a zero.
21    Q.   Whereabouts?
22    A.   You want to compare it with the other
23  two?
24    Q.   On this?  On this?
25    A.   Yeah.  Right there, yeah.

Page 127

1    Q.   That looks like 036?
2    A.   That's -- that's my social security
3  number.
4    Q.   Okay.  Just for the record, I'm showing
5  you the same document that I showed you before.
6    A.   As though I read that as what?
7    Q.   I think you told me you thought it was a
8  6 before?
9    A.   That wasn't -- that wasn't the document.
10    Q.   It wasn't the document?
11    A.   That wasn't the document you showed me.
12    Q.   All right.  But we can agree on this
13  document --
14    A.   Right.
15    Q.   -- that's 036, that is accurate?
16    A.   That is accurate.
17    Q.   And the name Ricci is accurate?
18    A.   The name Ricci is accurate.
19        MR. PINE:  And can you read the -- he
20  needs to go off of the tape.  We ran out of tape.
21        THE WITNESS:  Let me take another look
22  at it, a good look at it.
23        VIDEOGRAPHER:  The time is now
24  12:13 p.m.  This is the end of Tape 1.  We are now
25  off the record.

Page 128

1        (RECESS)
2        VIDEOGRAPHER:  The time is now 12:23.
3  This is the beginning of Tape 2.  We are now back
4  on the record.
5  BY MR. PINE:
6    Q.   Mr. Pitocco --
7    A.   Yes.
8    Q.   -- when we broke, I think you said you
9  wanted to take another look at Exhibit 9 --
10    A.   Yeah.
11    Q.   -- that's in front of you?
12    A.   Yeah.
13    Q.   Have you had a chance to do that?
14    A.   Yes.
15    Q.   Okay.  There's a portion of that that
16  says license number?
17    A.   Yes.
18    Q.   Can you read that line, the numbers on
19  that line?
20    A.   To me it looks like 53031 and a 64.  No.
21  No.  No.  Because the last -- wait a minute.
22  53 -- 53071 -- now the last two either look like
23  14 or 64.
24    Q.   Okay.  Do you know whether or not that's
25  an accurate reflection of your license number?

Page 129

1    A.   No.
2    Q.   And I think you said you could produce
3  your license but you don't have it today?
4    A.   I don't have it.
5    Q.   Okay.  Earlier you told us that you were
6  on morphine?
7    A.   Yes.
8    Q.   How long have you taken morphine?  How
9  long have you been on it?
10    A.   Since 2004 when I got --
11    Q.   Okay.
12    A.   -- when I got cancer.
13    Q.   Did you take it in 2008?
14    A.   Oh, yeah.  I got -- I got to take it
15  twice a day.
16    Q.   Okay.
17    A.   But it's the long acting.  It isn't like
18  I take morphine and you get the reaction.  So it's
19  not the morphine that youse all aware of.
20    Q.   Okay.  Did you take it twice a day in
21  2008?
22    A.   Yes, I did.
23    Q.   And was it the same dosage as now?
24    A.   Same thing.
25    Q.   How many milligrams would you say?

33 (Pages 126 to 129)

Page 130

1    A.  I take 30 milligrams of morphine sulfate
2  at 9:00 a.m. and 9:00 p.m. --
3    Q.  Okay.
4    A.  -- seven days a week.
5    Q.  And that would have been the case also
6  in 2008?
7    A.  And this morning.
8    Q.  Okay.  When you were shown Exhibit --
9  could I just see --
10   A.  Yes.
11   Q.  When you were shown Exhibit 11, I think,
12 by either myself or Mr. Vilker, you commented that
13 your middle name was spelled out on that document?
14   A.  Right.
15   Q.  And did you say something to the effect
16 that you don't usually give out your middle name?
17   A.  Yeah, it's rare.  It's rare.
18   Q.  Okay.  Usually when you are talking with
19 somebody or giving out information about yourself,
20 you just go by the middle initial "A"?
21   A.  If -- if they say to me we want your
22 middle initial, I go just by the "A".  If they say
23 spell it out, well, then I spell it out.
24   Q.  Okay.
25   A.  And if nobody says nothing, you'll never

Page 131

1  see it.
2    Q.  Right.  You might just sign something --
3    A.  I just sign Anthony Pitocco.  That's it.
4    Q.  Right.  Similar to what's on many of the
5  documents.
6    A.  And the only time I ever spelled --
7  signed "AP" is when I was in business to verify
8  somebody else's number or there was a mistake and
9  I just --
10   Q.  Right.
11   A.  -- to verify that I made the correction.
12 Like usually it's a check.  I -- I might screw up
13 a check and, you know, the bank ain't going to
14 cash it.
15   Q.  Right.
16   A.  So underneath it I'll put "AP" and the
17 bank will cash it.
18   Q.  And if you were requested to initial a
19 document that you had signed or reviewed or read,
20 might you also put "AP"?
21   A.  No.  No, because it isn't required.
22   Q.  Okay.  If somebody asked you to do that?
23   A.  No.
24   Q.  Well --
25   A.  There's got to be a reason to ask me.

Page 132

1  Why -- why do you want me to verify my own
2  signature?
3    Q.  Or that you read something.
4    MR. VILKER:  Objection.  Speculative.
5    A.  No.  No.
6    Q.  All right.  Well, when you rent a car,
7  don't they usually have you sign off with
8  initials?
9    A.  I never rented a car in my life.
10   Q.  Showing you No. 3, those are your
11 initials in the margin there, the left margin?
12   A.  Yes.
13   Q.  Does that look like your writing?
14   THE WITNESS:  The "AP"?
15   MR. VILKER:  Yes.
16   A.  No.
17   Q.  Why is that?
18   A.  Because there's three -- there's three
19 periods after my initials.  Why would I want three
20 periods?
21   Q.  Where do you see three periods?
22   A.  One in the middle of the "A", one in the
23 middle of the "P" and one in the middle of the "A"
24 again.
25   Q.  Is that why you don't think it's yours?

Page 133

1    A.  No.  Not only that, there's other little
2  features that the way -- the way it's done.  I
3  would never -- I would never go A dot, P dot -- I
4  mean A dot, A dot, P dot.  I don't know of anybody
5  who would.
6    Q.  And what about No. 2?  Does that look
7  like your initials?
8    A.  Same thing.  No.  Number one, the -- the
9  top of the "P" is too flat and that's got three
10 dots too.  Somebody's got a three-dot habit when
11 they sign three initials.
12   MR. PINE:  I have nothing further.
13   EXAMINATION
14 BY MR. FLANDERS:
15   Q.  Mr. Pitocco --
16   A.  Yes.
17   Q.  -- I'm Bob Flanders.  I'm an attorney
18 for Mr. Caramadre.
19   A.  Okay.
20   Q.  Good afternoon.  I just want to ask you
21 a few questions about the meetings that you had
22 with these people that said they were from the
23 Federal Government.
24   A.  Right.
25   Q.  Other than the woman with the badge, did

34 (Pages 130 to 133)

Page 134

1  you meet with any other representatives of the
2  Federal Government?
3      A.  I -- I couldn't answer that.  I don't
4  know.
5      Q.  How about any of these gentlemen in the
6  room here today, the people to your left,
7  Mr. Vilker, this fellow right to your immediate
8  left here, Mr. Vilker?
9      A.  I think I met him the other day with
10  you.
11     Q.  Mr. McAdams you're indicating?
12     A.  He was with you, wasn't he?
13     MR. KILPATRICK:  Just answer
14  Mr. Flanders' questions --
15     THE WITNESS:  Okay.
16     MR. KILPATRICK:  -- to the best of your
17  ability.
18     A.  If I recall, to the best of my
19  recollection, I believe -- excuse me, I forgot
20  your name.
21     MR. SOUZA:  Steve Souza.
22     A.  Steve Souza.  Souza rings a bell.  That
23  rings a bell of the post office.  You work for the
24  post office?
25     MR. SOUZA:  Yes, I do.

Page 135

1      THE WITNESS:  See now, I remember that
2  far back but yet I can't remember yesterday.  This
3  is what I'm trying to tell you.
4      Q.  Are you --
5      A.  I never -- never met him in my life.
6  The closest I came to meeting him, you're not
7  going to believe it.
8      Q.  That's Mr. Caramadre you're pointing to?
9      A.  Yeah.  I seen his picture in the paper.
10     Q.  Okay.
11     A.  And he lives four doors down from my
12  house.
13     Q.  In Cranston?
14     A.  No.  My house where I'm living.  That's
15  what his address shows in the newspaper.
16     Q.  Okay.
17     A.  It can't be I says.  This is a mistake.
18  I never seen the guy.  I'm inside of Walgreens and
19  everything else.
20     Q.  So when -- when did you meet with these
21  people from the Federal Government?
22     A.  Oh, they -- they pop in.  They call up.
23  "Can we stop by?  We only want to ask you a couple
24  of questions" or "We got a paper we want to
25  read and sign" and stuff like that.

Page 136

1      Q.  Is this at your house?
2      A.  Oh, yeah.  Everything is at my house.
3  The only time I've been out of my house to do
4  anything was at Scott's office right here today.
5  Other than today, I've never been out of that
6  house for anything to do with this meeting.
7      Q.  So it's fair to say then that the people
8  from the Federal Government when they came to see
9  you, popped in on you, came to your house?
10     A.  Came to my house.
11     Q.  And did they come on several occasions?
12     A.  Every now and then they'll pop in and
13  they'll pop in with their little Dick Tracey
14  badge.
15     Q.  And how many of them -- how many
16  different people from the Government were you
17  dealing with?
18     A.  Oh, God, but they always come in pairs.
19  That's the only thing I can answer.
20     Q.  Except for this one agent that -- the
21  woman that came alone?
22     A.  She came alone twice.
23     Q.  Okay.
24     A.  Maybe the second time there was another
25  girl with her.

Page 137

1      Q.  Okay.
2      A.  But the first time she was alone.  One
3  of the -- one of the two times I recall she was
4  alone.
5      Q.  It's true then that you've had a number
6  of visits from various federal agents --
7      A.  Right.
8      Q.  -- in connection with this matter?
9      A.  Right.
10     Q.  And is it also true that you don't
11  remember everything that happened at those
12  meetings?
13     A.  Oh, I can remember probably 90 percent
14  of them because it doesn't have to do with this
15  case; it has to do with, I don't want to talk to
16  you; there's the door and don't come back.
17     Q.  I'm just talking about this case.  Have
18  you had federal agents coming to you and visiting
19  with you on matters other than this case?
20     A.  Federal?  No.  Post office.
21     Q.  Okay.  Well, from the post office wasn't
22  he talking to you about these -- these annuity
23  applications and so forth?
24     A.  I don't recall, to be honest with you.
25  I don't recall.

35 (Pages 134 to 137)

Vivian Dafoulas & Associates
(401) 885-0992

Page 138

1      Q.   When you got upset with this woman
2   agent, let's call her Ms. McDaid, Pamela McDaid --
3          MR. VILKER: Objection.
4      Q.   -- does that -- does that name ring a
5   bell to you?
6          MR. VILKER: Objection. Move to strike
7   the question.
8      A.   No. No.
9      Q.   Did -- did you get a call from your son
10  that indicated that she had come to visit with him
11  at his place of business?
12         MR. VILKER: Objection.
13         MR. KILPATRICK: Objection. Move to
14  strike.
15     A.   It wasn't a female. It was a male at
16  his place of business.
17     Q.   Okay. And what did your son say to you
18  about that visit?
19         MR. VILKER: Objection.
20     A.   He was pretty upset. Wanted to know
21  what trouble I was in.
22     Q.   And is it true that you -- you didn't
23  want your son or any of your family members for
24  that matter to know about your involvement in this
25  thing?

Page 139

1      A.   Right. Like I says --
2      Q.   Is that true?
3      A.   That is 100 percent true. I told you,
4   like I said before, I don't know if everybody
5   heard you, I dealt with lawyers for 40 years and I
6   know the way the system works, and if they're not
7   involved in any way in the case, send them to
8   California on vacation or they're going to be
9   involved in the case, they're going to ask
10  questions that have six parts to them and no
11  matter which one they pick, they're involved in
12  the case. And I didn't want that to happen to my
13  son.
14     Q.   And --
15     A.   That's the reason.
16     Q.   And you didn't want it to happen to any
17  other family members either?
18     A.   No.
19     Q.   And so you went to some lengths to keep
20  them out of it, isn't that right?
21         MR. VILKER: Objection.
22     A.   Especially my wife.
23     Q.   And how did -- how did you do that?
24     A.   How did I do that? "Barbara, Scott
25  called up and he's coming over today," I says,

Page 140

1   "and go shopping. Take whatever money you need
2   and get out of here."
3          She go "Why?" "There's only one person in
4   this case in this house and that's between me and
5   Scott." And what happens is, it started where it
6   wasn't me and Scott and that's when I started to
7   blow up.
8      Q.   When did you get Scott involved?
9      A.   When I needed a lawyer. When I says
10  when they started ringing that doorbell like
11  crazy.
12     Q.   Who is "they"?
13     A.   Whoever it was, and then they come to --
14     Q.   We know it was people from the
15  Government --
16         MR. VILKER: Objection. We don't know.
17     Q.   -- is that right? That were ringing
18  your doorbell like crazy.
19     A.   Oh, God, that front doorbell. In fact,
20  we didn't use the front doorbell. Any of you guys
21  use the front doorbell anymore?
22     Q.   Who are you talking to, the Government
23  agents here?
24     A.   I'm talking to anybody who came to my
25  house.

Page 141

1      Q.   Well, who came to your house besides the
2   Government?
3      A.   I don't know. Postal.
4      Q.   They're the Government, aren't they?
5   Postal Service, that's the Government?
6      A.   I'm construction. Excuse me. I'm
7   construction.
8      Q.   Okay.
9      A.   Who belongs to the Government, who works
10  for whom and who works for that.
11     Q.   Okay. What's your level of education,
12  sir?
13         THE WITNESS: Mine?
14         MR. FLANDERS: Yes.
15     A.   I would say high school and probably a
16  few years at Worcester Polytech Engineering.
17     Q.   Did people from the insurance company
18  come to visit you as well?
19     A.   I think that was the tall guy, the first
20  guy that ever showed up that wanted to show me
21  that first -- I don't know. I don't know. I'm --
22  I'm going to say something I'm going to be sorry
23  for later.
24     Q.   Well, other than the tall guy -- by the
25  way, did he give you his name?

Vivian Dafoulas & Associates
(401) 885-0992

Page 142

1    A.  Yes.
2    Q.  Was that Brooks Magratten?
3    A.  Brooks.  That's him.
4    Q.  So Mr. Magratten from the Aegon
5  Insurance Companies came to see you?
6    A.  Right.  He's the big tall guy, yeah.
7    Q.  And he showed you some documents?
8    A.  He's the -- he's the original, the first
9  thing I ever heard about this case was him ringing
10 the doorbell, introduced himself.  "I'm sorry to
11 bother you."  That stuff I remember.  "But I only
12 got a couple of real quick questions, if you can
13 help me."
14      And I said, "What does it involve?"  He said,
15 "About an insurance policy you took out."
16      I said, "Insurance policy I took out?"
17 "Yeah."
18      I said, "I can't take an insurance policy."
19 He said "Why?"  I said, "I'm banded (sic).  I'm a
20 pilot.  I can't take out no insurance policy
21 unless I give up my pilot's license and I'm not
22 giving up my pilot's license."
23      MR. KILPATRICK:  Mr. Pitocco, I want you
24 to listen to the question --
25      THE WITNESS:  Yeah.

Page 143

1      MR. KILPATRICK:  -- and answer only the
2  question.  Mr. Flanders knows exactly what he's
3  doing.  Just answer the question.  If he wants to
4  know more, he'll ask you.
5    Q.  Other than --
6      MR. KILPATRICK:  Excuse me.  You have a
7  doctor's appointment at 1:00 o'clock.
8      THE WITNESS:  All right.
9      MR. KILPATRICK:  We'll need to leave in
10 about seven minutes if you are going to make that
11 appointment.
12      THE WITNESS:  We can stretch it a little
13 bit.  As long as I -- I want to satisfy everybody.
14      MR. KILPATRICK:  I'm going to leave it
15 to your judgment.
16      THE WITNESS:  And if I have to come
17 back, I'll come back, but I want everybody
18 satisfied straight on the board.
19 BY MR. FLANDERS:
20   Q.  All right.  Other than Mr. Magratten,
21 were there any other representatives of the
22 insurance companies that came to see you that you
23 remember?
24   A.  I don't know.  There was a lot that come
25 and see me.  Whether they were involved with the

Page 144

1  insurance company or not, I'm being honest with
2  you, I don't know.  There was too many.
3    Q.  Were there any women from the insurance
4  company?
5    A.  Oh, yeah.  Most of them took a woman
6  with them, I guess, to take notes or whatever.
7    Q.  Okay.  Did any woman come alone to
8  visit?
9    A.  No.  Yes.  Yes.  Yes.  One woman.
10   Q.  Other than Miss -- other than the person
11 from the Federal Government that you told us about
12 with the badge --
13   A.  No.  No.
14   Q.  -- from the insurance company --
15   A.  There was another one.
16   Q.  Okay.  Who was that?
17   A.  A young girl.  She was talking.  Young
18 girl.  Who did she work for?  I don't know.  Some
19 part of the Government, but there was one girl
20 that did come alone.
21   Q.  And she worked for some part of the
22 Government but --
23   A.  Whether she worked for the Government, I
24 don't know but she was involved in this case
25 because that's all she talked about.

Page 145

1    Q.  Did you work with anyone from the
2  insurance companies to prepare affidavits?
3    A.  No.  No.  No.  No.
4    Q.  No.
5    A.  I won't allow that in my -- no, no, no.
6  That's out of the question.
7    Q.  Well, showing you a document that's been
8  marked as Exhibit B, is that a document you
9  signed?
10   A.  Document D?
11   Q.  It's Exhibit B.
12   A.  No.
13   Q.  You didn't sign that?
14   A.  I didn't sign that.
15   Q.  Okay.
16   A.  That's my name but I didn't sign that.
17   Q.  All right.  Let me show you another --
18   A.  Wait a minute.  Excuse me.  Let me see
19 that.
20      MR. FLANDERS:  May I have this marked as
21 Exhibit D, please?
22      MR. VILKER:  I think he should put his
23 reading glasses on.
24      THE WITNESS:  I didn't put any on.  I
25 said, boy, I said, my reading glasses got weak.

Vivian Dafoulas & Associates
(401) 885-0992

Page 146

1  Like I said, we're going to do it, we're going to
2  do it right. No, that ain't mine. I just want to
3  make sure positively.
4      (Whereupon, Defendant's Exhibit D was
5  marked.)
6      Q. I'm showing you Exhibit D which appears
7  to be another document. Is that your signature on
8  Exhibit D?
9      A. No.
10     Q. Thank you.
11     A. No.
12     Q. So is it your statement, sir, that
13  nobody from the insurance companies attempted to
14  get you to sign affidavits in this case?
15     A. No. None of the insurance company. It
16  wasn't -- it wasn't the insurance company. In
17  fact, I'll be honest, nobody -- nobody at my house
18  ever asked me to sign anything --
19     Q. All right.
20     A. -- whether it was insurance or whatever.
21     Q. Did any of the people from the insurance
22  company ask to speak with your son?
23     A. Yes. Scott.
24     Q. He's from the insurance company?
25     A. No. He's my lawyer.

Page 147

1      Q. But my question is did anybody from the
2  insurance companies that were knocking at your
3  door --
4      A. No.
5      Q. -- did they attempt to speak with your
6  son?
7      A. No. No. No. I would shut them off so
8  fast, it would be pathetic. That would be my
9  son's call, not mine.
10     Q. Did you ever get upset with anyone from
11  the Government or from the insurance companies
12  because they wanted to try and talk to your son?
13     A. No.
14     Q. Did you ever tell them that talking to
15  your son is off limits?
16     A. Other than the woman from -- that I told
17  I don't want her in my house.
18     Q. The one with the badge?
19     A. Yes.
20     Q. Other than that woman, did you tell
21  anybody --
22     A. No.
23     Q. -- from the insurance companies --
24     A. No.
25     Q. -- that they were not to talk to your

Page 148

1  son?
2      A. No. They're old enough. They know.
3  Forty-seven years old, he knows what to do and
4  what to say.
5      Q. But when that -- when somebody from the
6  Government went and talked to your son and he
7  called you about it, that really upset you, right?
8      A. It really did.
9      Q. And why did you -- why did you blame the
10  woman with the badge for that?
11     A. I didn't blame the woman with the badge.
12  Where did that come from?
13     Q. I'm sorry. I thought you said that
14  after telling her that you didn't want anybody
15  from the Government to contact your son, they went
16  ahead and did it and after that, you wouldn't let
17  her back in the house. Did you say that?
18     A. I don't think I said it that way, no.
19     Q. Okay. Tell me what the situation is
20  then.
21     A. Can you read it back?
22     Q. No. No. Just answer my question. At
23  some point, did you inform the Government that you
24  didn't want them talking with your son?
25     A. Right.

Page 149

1      Q. And then they went ahead and did it
2  anyway?
3          MR. VILKER: Objection.
4      A. Right.
5      Q. And you got upset when the Government --
6  when your son called you and told you that?
7          MR. VILKER: Objection.
8      Q. Right.
9      A. I don't think my son called me and told
10  me that. I think someone else did.
11     Q. Oh, who?
12     A. I don't know.
13     Q. How did you find out?
14     A. I don't think -- I don't know. A phone
15  call.
16     Q. But not from your son?
17     A. I don't think it was from my son.
18     Q. So what did you do about it when you
19  heard that?
20     A. I just told him hang up on her. Don't
21  call this number or this house again and hang up.
22     Q. Who did you say that to?
23     A. My son.
24     Q. So your son did tell you?
25     A. About her, that she called him.

Vivian Dafoulas & Associates
(401) 885-0992

Page 150

1   Q.  Yes.
2   A.  Yes.  Yeah, he told me.  I just said it,
3   yeah.
4   Q.  And you told your son if she calls
5   again, hang up on her?
6   A.  Yes.
7   Q.  Did you say anything to the Government
8   about it?
9   A.  I don't want to talk to the Government,
10  no.  I didn't say nothing to the Government.  What
11  am I going to tell the Government?  I don't even
12  have a Government phone number.
13  Q.  But they are coming to your house and
14  ringing your doorbell?
15  A.  No, they ain't coming to my house.  She
16  was the last one to come to my house --
17  Q.  When did she --
18  A.  -- until she p'd me off.
19  Q.  Why did she "p" you off?
20  A.  It was -- it was about the conversation
21  she -- she was getting into.
22  Q.  Like what?
23  A.  I don't recall.
24  Q.  You can't remember what it is she did
25  that angered you?

Page 151

1   A.  No.  I cannot remember that.
2   Q.  Was it her attitude?
3   A.  I would say 50 percent was her attitude.
4   Q.  Okay.  And did you tell her you didn't
5   want her ever to come back again?
6   A.  I told her don't bother coming back.  I
7   don't want to talk to you.  I have nothing to say
8   to you.  I have nothing to say about this case and
9   I don't want to talk to you.
10  Q.  Does your wife know about this situation
11  that you are involved in?
12  A.  Not to this extent, no way.
13  Q.  But did she sit in on any of these
14  meetings?
15  A.  Never.  I won't allow it.
16  Q.  Not with the Government?
17  A.  Not with anybody.
18  Q.  Not -- not -- not with the insurance?
19  A.  Not with anybody.
20  Q.  Not with any of the insurance companies?
21  A.  Not with anybody.  She's not involved
22  with this.  Why would I have her get involved?
23  You already got five of my kids in here.  You want
24  me to add six?  My wife --
25  MR. KILPATRICK:  Mr. Pitocco, listen to

Page 152

1   the question --
2   THE WITNESS:  All right.
3   MR. KILPATRICK:  -- and answer the
4   question.
5   Q.  So you're telling us your wife never sat
6   in on any of the meetings that you had --
7   A.  No.
8   Q.  -- with anybody from the Government or
9   the insurance companies?
10  A.  No.  If she happened to be in the house
11  at any given time, if, she would ask if you would
12  like a cup of coffee.  That's the extent.
13  If you said no, she disappeared like -- well,
14  then I'm going -- well, then if you don't want
15  coffee, I'm going to the store.
16  Q.  And turning to Mr. Maltais, did you have
17  telephone conversations with him at all recently?
18  A.  I told you if I met him four times in 20
19  years he married my son (sic), it would be a
20  miracle.
21  Q.  I'm not asking you about meeting him.
22  A.  No.
23  Q.  Did you have telephone conversations
24  with him?
25  A.  No.  Never called him, never talked to

Page 153

1   Tommy on the phone.
2   Q.  I notice you call him Tommy.  Are you --
3   are you friendly with him?
4   A.  Everybody calls him Tommy.  Nobody calls
5   him Thomas.
6   Q.  Or Tom?  You called him Tommy.
7   A.  They call him Tommy.
8   Q.  Are you friendly with him?
9   A.  He's married to my son's -- married
10  to -- his sister is married to my son.  Naturally
11  if they're having a birthday party for my
12  granddaughters and he's there, "Hey, Tony, how are
13  you doing?"
14  Q.  Okay.
15  A.  All right?  "How's business?"  "Hey,
16  looks pretty good."
17  Q.  So you might have had some conversations
18  with him?
19  A.  To that extent.  That's it.
20  Q.  And you might have had telephone
21  conversations with him?
22  A.  No telephone conversations.  No.  No.
23  Q.  None that you can remember anyway?
24  A.  No.  No.  No.  No.  No.  No.  No
25  telephone conversations.

39 (Pages 150 to 153)

Page 154

1    Q.  So if we were to subpoena your telephone
2  records --
3    A.  Subpoena them.
4    Q.  -- you're telling us there wouldn't be
5  anything there that would --
6       MR. VILKER:  Objection.
7    Q.  -- reflect you had telephone
8  conversations?
9       MR. VILKER:  Objection.
10    A.  I'll pay for them.  Subpoena them.  What
11  else do you want me to say?
12    Q.  And would you be prepared to take a lie
13  detector test?
14       MR. VILKER:  Objection.
15       MR. KILPATRICK:  Objection.
16    A.  No way in hell.
17       MR. VILKER:  Objection.  Move to strike.
18       MR. KILPATRICK:  Objection to form.
19    A.  That's off -- that's off of my list.
20       MR. VILKER:  Move to strike.
21       MR. KILPATRICK:  Move to strike.
22    Q.  Why is that?
23    A.  I don't believe in it.
24       MR. VILKER:  Move to strike.
25       MR. KILPATRICK:  Move to strike.

Page 156

1    Q.  And no one ever did?
2    A.  No.  Not morphine.  Where are you going
3  to get the morphine.
4    Q.  I'm saying no one ever gave you $3000 in
5  cash?
6       MR. PINE:  Objection.
7    A.  Never, never.
8       MR. VILKER:  Okay.  Nothing further.
9       MR. KILPATRICK:  No questions.
10       VIDEOGRAPHER:  Stand by, folks.  The
11  time is now 12:49 p.m.  This is the end of Tape 1
12  (sic) and the conclusion of the deposition.  We
13  are now off the record.  Mics are down.
14       (Adjourned at 12:49 p.m.)
15
16
17
18
19
20
21
22
23
24
25

Page 155

1       MR. FLANDERS:  That's all I have.
2       MR. MacFADYEN:  I just have a brief
3  statement for the record.  On behalf of
4  ██████ and ██████████, I have no
5  questions for this witness for the reasons stated
6  in previous depositions.
7       MR. VILKER:  I have two questions on
8  redirect.
9           EXAMINATION
10  BY MR. VILKER:
11    Q.  Mr. Pitocco, do you have any memory of
12  anyone ever giving you $3000 in cash?
13    A.  The answer is no.
14    Q.  Is that something that --
15    A.  That's off the record, I wish.  Never.
16  I'm sorry.
17    Q.  Notwithstanding the morphine that you've
18  been on, is that something that you would
19  remember?
20       MR. PINE:  Objection.  Hypothetical.
21    A.  You better remember, you die.
22    Q.  Okay.  But would you remember if someone
23  had given you $3000?
24       MR. PINE:  Same objection.
25    A.  Oh, yeah, of course.

Page 157

1  STATE OF RHODE ISLAND AND PROVIDENCE PLANTATIONS
2  KENT, Sc.
3
4    C E R T I F I C A T I O N
5
6    I, VIVIAN S. DAFOULAS, do hereby certify that
7  I am expressly approved as a person qualified and
8  authorized to take depositions pursuant to Rules
9  of Civil Procedure of the Superior Court,
10  especially but without restriction thereto, under
11  Rule 30(e) of said Rules; that the witness was
12  first sworn by me; that the transcript contains a
13  true record of the proceedings.
14    IN WITNESS WHEREOF, I have hereunto set my
15  hand this 3rd day of May, 2010.
16
17
         Vivian S. Dafoulas, RMR-CRR
18       Notary Public
         (401) 885-0992
19       (My commission expires 1/4/2014.)
20
21
22
23
24
25

Vivian Dafoulas & Associates
(401) 885-0992

Page 158

1        WITNESS SIGNATURE
2    IN RE GRAND JURY PROCEEDINGS
3    DEPOSITION OF:
4    ANTHONY A. PITOCCO
     April 21, 2010
5
6
7        I hereby certify that I have read the
8    foregoing transcript and the same contains a true
9    and accurate recording of my answers to the
10   questions therein set forth, subject to the
11   change(s) and/or correction sheet(s) attached.
12
13
     _____
     SIGNATURE OF DEPONENT
14
15   STATE OF_____
16
17       Subscribed and sworn to before me
18   this_____day of_____, 2010.
19   _____
     NOTARY PUBLIC
20
21   (My commission expires:_____)
22
23
24
25

Page 159

1        CORRECTION SHEET
2
     DEPOSITION OF:
3    ANTHONY A. PITOCCO
     April 21, 2010
4
5    PAGE # LINE #
6
     NOW READS:         CORRECTION REQUESTED:
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

41 (Pages 158 to 159)