IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

_____

United States of America

      vs.                      Criminal No. 11-186-S

Joseph Caramadre and
Raymour Radhakrishnan

_____

### DEFENDANT JOSEPH CARAMADRE'S REPLY MEMORANDUM OF LAW IN SUPPORT OF HIS MOTION TO SUPPRESS THE RULE 15 VIDEO DEPOSITIONS

Defendant Joseph Caramadre ("Caramadre") files this reply memorandum of law in support of his previously filed Motion to Suppress the government's use of the so-called Rule 15 video depositions at trial and in response to the Government's opposition thereto.  While the Government's extensive fifty-two (52) page memorandum of law (exclusive of exhibits) attempts to persuade the Court that the admission of those depositions will not impair the Defendant's constitutional rights, the reality of the matter is that Caramadre's Fifth and Sixth Amendment rights will be irreparably trampled upon if the depositions are admitted at trial. After reading this memorandum of law, Caramadre submits that this Court should readily conclude that the proposed use of the depositions at trial are improper and therefore must be suppressed.[1]  Caramadre will now proceed to explicate the nature of those constitutional and procedural infirmities.

I.      <u>Introduction</u>

The Government attempts to make short shrift of the systemic problems it created by electing not to follow basic rudimentary procedure inherent in every criminal proceeding.  The

---

[1] In addition, Caramadre will address the flawed nature of the underlying Rule 15 proceedings which led this Court to authorize the taking of the depositions in the first place.

Government alone was the party who decided to proceed in this extraordinary but needless fashion.  It was the prosecution who orchestrated this procedural chaos under the pre-text of a purported need to preserve "trial" testimony before the return of any indictment in this case.[2]  It was the Government who chose to skip over the indictment, arraignment, discovery and pre-trial motion stages extended to a defendant in any basic adversarial criminal proceeding.

This Court forewarned the Government back on September 17, 2009 about the dangers of proceeding in this fashion.

The Court stated at the September 17, 2009 hearing:

THE COURT:  Well, no one could say that you're not trying.  If I were to deny this motion, you would have certainly tried to do it pre-indictment, and none of the targets could claim that you didn't expend every effort to try to get this information prior to bringing an indictment. And actually, it would be by virtue of their efforts that they stopped you from doing so.

So it would be kind of hard, I think, for them to complain that you failed to secure the testimony pre-indictment if they're the ones that stopped you from doing so.

If you then move forward, **got the indictment, _and then sought to preserve the testimony for trial, seems to me the Government is in a much safer position in terms of the admissibility of that testimony at trial_.** (Emphasis added).

The Government chose to ignore the Court's admonitions and thirty-one (31) months later, after traveling down a long, windy road paved by its actions, the very process used by the Government makes the Rule 15 depositions constitutionally infirm.  Again, this problem was self-generated by the Government:  it chose the path of taking pre-indictment depositions and it had the ability to first obtain an indictment and move to take post-indictment depositions, but it

---

[2] But for Anthony Pitocco's deposition which took place on April 21, 2010, the remaining Rule 15 depositions conducted pursuant to the Court's September 22, 2009 historic decision all occurred prior to the Grand Jury swearing in its first witness.  Based on Caramadre's partial review of the discovery produced by the Government to date, it appears that the Grand Jury did not begin to hear evidence until late January 2010.

chose not to do so.  The Government was not forced to go down this road.

Before reaching the Government's spurious claims that Caramadre's counsel had the opportunity to "effectively" cross-examine the deponents during the infancy stages of the pre-indictment proceedings, Caramadre finds it necessary to address the erroneous record the Government supplied the Court during the Rule 15 proceedings.

II.     <u>The Government's representations in support of their Request for Rule 15 Depositions</u>.

In his initial filing to suppress the video depositions, Caramadre alerted this Court that the Government misstated a number of important facts which formed the basis for the Court's self-described "close call" in allowing the Rule 15 depositions to proceed.  The misstatements included the Government's assertion that 112 terminally ill individuals were used as measuring lives as part of Caramadre's program and only 9 remained alive.  The Government's pitch to the Court back in September of 2009 asserted that these depositions were critical in order to preserve testimony and to possibly avoid a crime from going undetected and unprosecuted.

Responding to Caramadre's assertions, the Government goes on to tell the Court today that they stand by the numbers they provided at that time (9 out of 112 measuring lives).  The Government claims that its representation of 112 was an approximation and, in fact, the total number of measuring lives actually participating in the "program" was 103.  Reading between the lines, it seems like the Government takes the position that 103 is close enough to 112 and thus nothing is wrong.  Well, a couple of things are significantly wrong with the Government's arithmetic.  First, basic math tells us that 103 does not equal 112. Second, after this long investigation of approximately 2.5 years, the Government tells us <u>today</u> that they have identified 103 individuals who were utilized as measuring lives.  The issue raised by the defense isn't whatthe Government knows today but instead what the Government knew back in September of

2009 when they represented to the Court that only "9 out of 112 measuring lives who participated in this program" were alive to tell their story.

If the Government's agents had identified 112 persons to the prosecution team back in September 2009, then the Government should identify the names of those 112 measuring lives as this information may prove to be exculpatory.[3]  Caramadre finds it highly suspect that the Government purportedly received 112 names back in 2009 (which 31 months later turns out only to be 103 names) in light of Caramadre voluntarily providing to the government on September 3, 2009 a list of names that also contained a group of individuals that "coincidently" totaled 112 individuals.[4]  A copy of the September 3, 2009 email and September 4, 2009 exchange of emails between Caramadre's counsel and AUSA Vilker together with the lists is attached hereto as Exhibit A.  The reason the Government's assertion is so suspect is that the Government moved to take the Rule 15 depositions within days of receiving Caramadre's list.[5]

The second list identifying 156 individuals who responded to the advertisement is significant in many respects.  The list breaks down into two (2) categories.  Before describing the two (2) categories, it must be noted that the 156 persons identified in this list received approximately two thousand dollars ($2,000.00) for responding to the advertisement or other referral made in this timeframe.[6]  So the record is crystal clear, there were no hitches or

---

[3] Caramadre requests that the Government produce this information in advance of the hearing on the Motion to Suppress scheduled for April 19, 2012.

[4] Importantly this initial Caramadre list specifically stated that the 112 individuals did not act as measuring lives.  A second list provided by Caramadre on September 4, 2009, totaling 156 names, which incorporated the original 112 individuals that were not measuring lives.

[5] The Government filed its request to take Rule 15 depositions on September 15, 2009.

[6] Caramadre gifted over $300,000.00 to these individuals who responded to the advertisement without any requirement that any individual serve as a measuring life in conjunction with an investment.  The numbers show that approximately only 25% actually participated as a measuring life.  To sum up, Caramadre gave away approximately $224,000.00 to those who requested the philanthropic gift but who ultimately never participated in any investment vehicle.

4

impediments for the person to receive the $2,000.00 as advertised.  There was no negotiation or any requirement that an individual agree to serve as a measuring life in any type of investment vehicle.  If the individual met the requirements of the advertisement, the $2,000.00 was given by Caramadre with no questions asked.[7]

The point of the matter is when the Court made this precedent setting "close call" it was under the impression that only 9 out of 112 alleged "victims" were alive and available to give testimony.  This was flat out wrong.  The 112 individuals identified by Caramadre's counsel during the early stages of this investigation were not victims at all.  To the contrary, the 112 individuals were all recipients of a generous philanthropic gift from Caramadre who all benefitted from the advertisement.

The other serious wrinkle associated with the Government's assertion was its erroneous insistence that a crime would go unprosecuted unless the Court allowed the depositions.[8]  The Government vigorously asserted that, without these depositions, a guilty Defendant could escape prosecution because he was clever enough to select terminally ill individuals as part of his scheme.  The Government repeatedly emphasized the critical nature of this testimony:

> There is no dispute between the parties that the testimony of these individuals is critical to the outcome of the investigation and any criminal case they may ensue."  … "clearly, the testimony of these 9 individuals who are still alive is critical to this investigation.  And, unfortunately, as described below, it is equally clear that these

---

[7] Not only were there no questions asked but, as the evidence will show at trial, money was customarily given away without any supporting medical information  Some persons who received the $2,000.00 philanthropic gift could have been turned away.  The Government's own investigation shows how one person who sought monies under the program for his sick spouse reported to Caramadre and Radhakrishnan that his spouse passed away before meeting to receive the $2,000.00.  Although this person could have justifiably been turned away, the individual still received a philanthropic gift of $2,000.00.

[8] The Government initially requested a total of nine (9) depositions to be taken of certain individuals.  The Government later requested and obtained permission to take the deposition of another named individual, Leon Bradshaw.

individuals are unlikely to be alive if and when a trial is commenced
in this case.

See Government's Notice of Motion to Take Depositions
September 15, 2009.

In its correspondence to the court of September 17, 2009, the Government repeated the
assertion that the testimony of the proposed deponents was necessary for the prosecution of the
case: "in this case, each of the proposed deponents testimony is material because it is necessary
to establish, what, if any, material misrepresentations and/or omissions were made to each of
them by the targets in furtherance of the fraud scheme…time is of the essence, and any delay
could result in a serious miscarriage of justice, as it will inevitably result in the unavailability of
the witnesses due to their near certain deaths." (Oral Argument before this Honorable Court on
September 17, 2009).   The Government persisted that it would not be able to prosecute the
guilty parties absent this deposition testimony:

> So the circumstances themselves are so exceptional that there were
> no remedy available to the Government to secure their testimony for a
> future result, this scheme would be unprosecutable in all contexts.
> (Transcript, September 17, 2009, Government's Motion To Take
> Deposition Testimony)

At that hearing the Government persisted in its claim that absent these depositions a
grave injustice would result:  "…and, in the interest of justice, in order to prevent what may very
will be - - what would be a miscarriage of justice…" (September 17, 2009 Transcript at pg. 26)
"…we know there is not a lot of law.   We know there is not a lot of precedent.   We just believe
that this is such an extraordinary fact pattern where all these witnesses are on their deathbed that
without judicial intervention and your authority now, a grave, grave injustice would take place."
(September 17, 2009 Transcript at pg. 37)

The Government continued to impress upon its reoccurring theme that absent these

depositions they would not be able to prosecute this case and a guilty Defendant would go free:

> This is the interest of justice.   Without intervening and taking the depositions now, these witnesses will be gone, and, by and large, this will be a extremely difficult case to prove.  And basically, it's a case that is directed at terminally ill individuals.    And by preventing us from at least recording their testimony with them there, with them having a chance to cross-examine, it is basically saying you can have a scheme directed at terminally ill individuals and, guess what, you can never be charged for it.  (TR, page 36)

The Government's constant drumbeat that a crime would go unprosecuted without the depositions was obviously considered and heard by the court when it stated:

> It seems to me that the rights that you are talking about, are not denying that they are real, but they seem more speculative and hypothetical then the interest or the rights that the Government is asserting, which is, look, if we don't have this testimony, then there is no case, it all goes away.  Which means as long as you pick on people who are ready to die, you get away with the crime. (TR, page 45).

The Government's argument was certainly effective. In rendering a decision which it notably termed "a close call", the court opined:

> "[A] potential criminal scheme targeting terminally ill individuals should not escape prosecution simply because of the foresight to utilize the dying, none of whom would ever be able to take the stand." (Opinion and Order, page 28).

As noted earlier, the Government ultimately moved to take ten (10) depositions.  The Government wound up taking a total of six (6) depositions.  One (1) of the ten (10) deponents the Government urged the Court to permit it to take was Charles Buckman.   Despite the Government's original claim of urgency to take his deposition in the interests of justice to ascertain if a crime had been committed, the Government curiously passed on Buckman.  The defense suggests that the Government purposely avoided taking Buckman's deposition because

he was favorable to the defense.[9]

Of the six remaining depositions conducted pre-indictment, two (2) deponents, Leon Bradshaw and Anthony Pitocco, are not named in the indictment, and thus the Government is not claiming they were victims.   The remaining four (4), Patrick Garvey, Robert Mizzoni, Edwin Rodriguez, and Richard Wiley, were named in the indictment as part of the 35 individuals the Government claims were "victims".   Thus, the number of alleged "victims" in this case dwarfs the proportionally small number of deponents, and thus belies the Government's claim that absent this deposition testimony this case could have never been prosecuted.   Whatever evidence the deponents could add to this case would, in the light most favorable to the Government's arguments, be considered merely cumulative, certainly not key, critical, or necessary for the prosecution of this case.   For this reason alone, these depositions should be suppressed.   The Government should not be allowed to tip the balance of a close case in its favor with claims of necessity that now, with the benefit of hindsight, were clearly without merit.

III.    <u>Caramadre did not receive adequate notice of the potential charges against him prior to the depositions</u>.

The importance of a Defendant receiving actual notice of the charges against him cannot be overstated.   Our Supreme Court has held that providing a Defendant with "…real notice of the true nature of the charge against him, (is) the first and most universally recognized requirement of due process." <u>Smith v. O'Grady</u>, 312 U. S. 329, 334, 61 S. Ct. 572, 574, quoted in <u>Henderson v. Morgan</u>, 426 U. S. 637, 645, 96 S. Ct. 2253, 2257, cited also in <u>Marshall v. Lonberger</u>, 459 U. S. 422, 436, 103 S. Ct. 843,852 (1983).

The Supreme Court, in <u>Russell v. United States</u>, 369 U.S. 749, 763-764, 82 S. Ct. 1038 (1962), set forth the criteria by which the sufficiency of an indictment is to be measured, and

---

[9] Upon learning that the prosecution had elected not to preserve his testimony, the defense moved to take his deposition.  As should be no surprise, Buckman testified favorably for the defense.

directed courts to assess, first, whether the indictment "contains the elements of the offense intended to be charged, and sufficiently apprises the Defendant of what he must be prepared to meet;…an indictment is only sufficient if it (1) contains the elements of the charged defense, (2) gives the Defendant adequate notice of the charges, and (3) protects the Defendant against double jeopardy."   Hamling v. United States, 418 U.S. 87, 117, 94 S. Ct. 2087 (1974).   "No principle of procedural due process is more clearly established than that notice of the specific charge, and a chance to be heard in a trial on the issues raised by the charge, if desired, are among the constitutional rights of every accused in a criminal proceeding in all courts, state or federal."   Russell, *supra* 369 U.S. 763-764.

The Supreme Court reiterated in Russell that "it is an elementary principle of criminal pleading, that where the definition of an offense, whether it be at common law or by statute, 'includes generic terms, it is not sufficient that the indictment shall charge the offense in the same generic terms as in the definition; but it must state the species, it must descend to particulars.'" 369 U.S. at 764.   "In an indictment upon a statute, it is not sufficient to set forth the offense in the words of the statute, unless those words are themselves fully, directly and expressly, without any uncertainty or ambiguity, set forth all the elements necessary to constitute the offense intended to be punished…" *id*. "The language of the statute undoubtedly may be used in the general description of an offense, but it must be accompanied with such a statement of the facts and circumstances as well inform the accused of the specific offense, coming under the general description, with which he is charged." *id*.

An indictment generally referring to a violation of a statute, must "fully, directly and expressly, without any uncertainty or ambiguity, set forth the elements necessary to constitute the offense intended to be punished." Hamling v. United States, 418 U. S. 87, 117-118, 94 S. Ct.

2087(1974).    This requires a description of the offense to be accompanied by a statement of facts that will inform the Defendant of the specific offense with which he is charged. *id*.

The indictment in the instant case may satisfy these requirements, but the Government's perfunctory description of its theory of prosecution given prior to the depositions, certainly does not.   Indeed, the complexity and detail of the 72 page indictment stands in stark contrast to the abbreviated description given by the Government of the charge or charges the targets might face. (The word "might" is significant because, of course, the Defendants were not Defendants at the time but were targets, and thus were actually not charged with anything.   This fact certainly compounded the lack of notice of even the potential charges, and placed the targets in the disadvantageous position of having to wonder if the questions they asked, or did not ask, at these depositions would in fact play a role in shaping the charges that would, or would not be brought against them thereafter.)

The Government's thumbnail sketch of the potential charges against the Defendants mentioned misrepresentations made to the terminally ill individuals, but made no mention that the potential charges included misrepresentations to nurses and social workers (indictment, page 19), misrepresentations to Lifemark (page 23), misrepresentations to brokerage houses (page 24), misrepresentations to Tradeking (51), misrepresentations to e-Trade (page 47), misrepresentations to AmeriTrade (page 44), misrepresentations to Lifemark, American National, and others as well, including misrepresentations in connection with obtaining death certificates.   The decision on which questions to ask at trial is shaped by a comprehensive analysis of the whole case after having received and considered discovery, obtained other evidence through investigation, and otherwise prepared the case for trial.

Likewise, there was no mention by the Government of potential conspiracy charges, or

any of the details necessary to sufficiently make such allegations, such as the identity of the conspirators, the acts committed by the conspirators, or the duration of each alleged conspirator's involvement in the conspiracy.   Again, this is all information which a defendant must be provided in order to adequately prepare for and take trial testimony, even when that trial testimony is in the form of a Rule 15 pre-indictment, pre-trial deposition.

## IV.   Caramadre's defense strategy

The Government points out to the Court that the Defendant has failed to articulate what specifically he would do differently if the cross-examination were to occur today.  First, counsel for Caramadre counters that the defense is still in the process of reviewing the voluminous discovery produced by the Government.  Defense counsel is in no position to cross-examine witnesses or to otherwise start this trial today.[10]  That being said, defense counsel will attempt to give the Court examples of how this pre-indictment testimony is constitutionally infirm.[11]

The Government asserts that while the indictment itself as a whole is rather complex the issues surrounding the cross-examination of each of the deponents was not complex at all.  The Government attempts to boil down the scope of cross-examination to whether the deponent understood the nature of his dealings with Caramadre and/or Radhakrishnan.  In its simplest form, the Government suggests that defense counsel vigorously challenged each deponent's testimony as to whether or not they understood that they agreed to allow the Defendant(s) to use

---

[10] The November 2012 start date for trial is aggressive in light of the complexity of the indictment, the number of transactions and the time span involved.  Nonetheless, defense counsel will be ready by the scheduled trial date in order to afford Caramadre his right to a speedy trial claimed in this matter.

[11] Caramadre understands that the Court wants to hear the probing admissibility question surrounding the Rule 15 depositions at this stage of the proceeding in order to keep the case on track for a trial start date of November 2012. With that in mind, the defense will attempt to articulate as best as defense counsel can why the use of the video depositions at trial will result in a violation of Caramadre's 5th and 6th Amendment rights.   Notwithstanding, Caramadre reserves the right to challenge the admissibility of the video depositions up to and during the actual use of those depositions at trial if this Court rules today that the depositions are admissible.

their name as a measuring life.  The Government repeatedly enumerated in its papers that the defendants were formerly represented by highly regarded and esteemed lawyers and hence they should have no complaint about the pre-indictment process.[12]

In arguing that the Defendants had an opportunity to cross-examine the deponents, the Government takes a rather a simplistic approach as to what constitutes an opportunity to cross-examine and to present a defense to the criminal charges presented in this indictment.  It is certainly not enough to claim that the Defendants had well known criminal defense lawyers who attacked the witnesses' memory about whether or not they knew the ins and outs of why they received money from the Defendants.

Caramadre's counsel was certainly given an opportunity to cross-examine in the sense that he was afforded an opportunity to sit across the table from each of the individual deponents and ask questions.  However, trials are not conducted in a vacuum.  No competent defense lawyer cross-examines a witness without having a plan as to how the cross-examination fits into the general defense theme being presented at trial.

Flanders strategy was to challenge the deponents' general recollection that they were not aware that part of the money the deponent received was in exchange for their agreement to allow Caramadre to designate the deponent as a measuring life.  Let's assume for a moment that Flanders indeed had a real opportunity to challenge the veracity of the deponent's recollection of the transaction.  That temporal opportunity does not come close to satisfying Caramadre's Fifth and Sixth Amendment rights in this pending proceeding.  Can the Government please explain

---

[12] Although the Government's description of the legal positions held by predecessor counsel for Caramadre (Flanders – former Rhode Island Supreme Court Associate Justice) and Radhakrishnan (Pine – former Rhode Island Attorney General) is indeed correct, those prestigious titles have no bearing whatsoever on this Court's adjudication of the instant issues.  The propriety over the use of the depositions at trial has nothing to do with the curriculum vitae of defense counsel.  Instead, the question of admissibility will hinge upon, *inter alia,* whether the use of the depositions at trial passes constitutional muster.

how Flanders – in most cases two (2) years before the actual indictment was handed down by the Grand Jury – could possibly formulate and shape a trial defense to an indictment that simply didn't exist?  What the Government neglects to comprehend in this exercise of whether the depositions are admissible or not is the idea that effective cross-examination has nothing to do with affording the defendants an opportunity (essentially a chance) to ask probing questions. Quite frankly, much more is at stake here.  A defendant's Sixth Amendment right to effective representation means much more than affording his lawyer an opportunity to take a shot to discredit a witness thru adverse questioning without understanding the entire landscape and all of the evidence.   No good lawyer worth his bar license would just blindly question a witness without having a full command of <u>all the charges and all the evidence and then, after digesting the state of the evidence, formulating a trial strategy and defense theme to be presented at trial.</u>

While the undersigned counsel commends Flanders for his valiant efforts exhibited at the various depositions, the task assigned to Flanders was an impossible one that could have been handled only by the likes of Carnac the Magnificent.[13]  If these depositions are allowed to be played at trial, this counsel is stuck with the blind strategy which Flanders was forced to develop to an otherwise unknown indictment.[14]

The blind strategy Caramadre was forced to literally wing may not be the actual trial

---

[13] Carnac the Magnificent was a "mystic from the east" played by Johnny Carson who could physically divine unseen answers to unknown questions found in a sealed envelope.  Flanders, in the role of Carnac, was required to divine questions to unseen charges in an uncharged indictment.

[14] Yet another probing question is whether Caramadre's lawyer was in a position to formulate a defense strategy beneficial to Caramadre alone.  Although Caramadre and Radhakrishnan had separate criminal defense counsel at the depositions, Caramadre's counsel continued to represent Radhakrishnan in the civil proceedings concerning these very same issues.  The nature of this dual representation may have required a <u>Foster</u> type analysis and, possibly even a <u>Foster</u> warning, which would have occurred at the arraignment had an indictment been returned before the taking of the depositions.  <u>See</u> <u>United States v. Foster</u>, 469 F.2d 1 (1st Cir. 1972).

strategy he will utilize at trial.[15]   While trial counsel is not obligated to publicly divulge his overall defense to the Government's case, the Court should understand that there are other real defenses to this indictment which will exonerate the defendant of the charges.

A significant part of the Government's case charges that Caramadre is criminally liable for the deponent's lack of understanding of why each individual received money.  With respect to the five (5) depositions the defendant believes the Government will seek to introduce, it is undisputed that Caramadre was only involved in one (1) meeting with one (1) of those deponents as it relates to the use of the deponent as a measuring life.  Radhakrishnan met with the other four (4) deponents without Caramadre's presence.

Without the benefit of any indictment or an opportunity to view any of the various discovery and *Jencks* Act materials in this case, which this defense counsel is currently assessing[16], Flanders was forced to make a rather uninformed and blind decision as to the overall strategy of his cross-examination and therefore limiting the future trial strategy.  This Herculean task was not something any lawyer could have divined pre-indictment in a case of this complexity and magnitude.[17]

The Government's naked claim that counsel sat across a table from the deponents and asked some questions does not pass constitutional muster as the cross-examination could not be considered effective in the context of the actual indictment.  It should be Caramadre's trial

---

[15] The trial strategy back in 2009 did not consider the fact that two (2) of the then four (4) targets would escape indictment and turn out to be cooperating witnesses for the Government.  Any trial strategy developed without this information is inherently defective.

[16] Although no official count has been made by defense counsel, counsel has been told that the number of pages dumped in the laps of the defense is in the range of hundreds of thousands of pages.  Defense counsel has certainly reviewed a good portion of the materials but has not had the opportunity to review and fully digest all the materials nor has he completed his own investigation; all necessary precursors to formulating a final trial strategy.

[17] Flanders embarked upon a strategy of directly attacking the veracity of witnesses' recollection of the transaction at hand.  Without divulging his trial strategy at this point, Caramadre represents that the shot gun approach taken by predecessor counsel may indeed not even be close to the theme this defense will present to the jury at the time of trial.

counsel alone, the one equipped with the scope of the indictment and knowledge of all the evidence bearing on these transactions (both charged and uncharged), who should conduct the trial in this case unimpaired by necessarily uniformed decisions made by prior counsel some two (2) years before the actual indictment was handed down, and primarily before the grand jury heard even one witness.

The Government contends that the Defendants should have no complaint over the use of the depositions at trial since the Government provided the Defendants with *Jencks* materials in its possession before the deposition occurred.   The Government goes on to argue that the Defendants rights were fully protected since counsel for the Defendants had every stitch of paper in the Government's possession which related to the individual deponent and <u>which existed at the time the deposition took place</u>.  The Government's pitch to the Court falls far short traveling a mere 55 feet from the pitcher's mound and bouncing a woeful 5.5 feet short of the plate.[18]

The Wiley deposition took place approximately four (4) months before the Grand Jury heard any evidence in this matter.  Taking the Government's representation as true that it turned over all relevant *Jencks* materials in its possession before each deposition, this Court must be mindful that this indictment was not returned until November 17, 2012 which is more than two (2) years after the Government first took Wiley's deposition.  Hence, the Government's attempt to lead this Court down the track of "the Government turned over everything it had in its possession at the time the depositions took place" is not probative of whether these depositions are admissible at trial.   To the contrary, the proper inquiry should center on what other information developed over the next two (2) years, after the depositions were taken, which would

---

[18] The Court should have no inclination to swing at this wildly misguided pitch.

impact not only the Defendant's ability to effectively cross-examine the individual deponents but also his entire defense strategy.

Again, this is not an easy task for undersigned counsel to tackle at this stage of the post-indictment stage of the proceedings.   Notwithstanding the ongoing review of the voluminous discovery and *Jencks* materials provided by the government, counsel for Caramadre will attempt to shed some light on this matter after reviewing just part of the discovery materials handed over thus far by the Government.

Edwin Rodriguez

At the time of Rodriguez' deposition, taken on October 5, 2009, the Government had only one interview report from a meeting on September 2, 2009.[19]   During his deposition Rodriguez denied any knowledge that he was a measuring life on various accounts and he also denied receiving a check in the amount of $3,500.00.   The 302 report, prepared following the September 2, 2009 interview, fairly tracked Rodriguez' deposition testimony.   Of direct import to the issue at hand, however, at the time of the deposition, the Government had not interviewed Rodriguez' brother, Melvin Rodriguez, his sister-in-law [Melvin's wife], Amy Rodriguez or Joan Fortin, the Hospice social worker that referred Rodriguez to Caramadre after she had been told of the advertisement in the newspaper.

Melvin was interviewed May 21, 2010, Amy was interviewed November 19, 2010 and Joan Fortin was interviewed March 17, 2010, all several months after the deposition had concluded.   Despite Rodriguez' testimony to the contrary, both Melvin and Amy confirmed that he had, in fact, received two checks from Radhakrishnan (Melvin confirmed that the first check was in the amount of $2,000.00 and the second check was in the amount of $3,500.00), that Melvin had used $2,000.00 of the money to purportedly pay funeral expenses on Rodriguez'

---

[19] A review of the discovery shows that more than one meeting likely took place.

behalf and that he had given Rodriguez $1,500.00 in cash from the $3,500.00 check. Joan Fortin confirmed that she also understood that money had been paid for Rodriguez' funeral expenses.

Unfortunately, the then targets, and now defendants, did not have the benefit of this very crucial information, and could not confront Rodriguez with this contradictory evidence, because the evidence simply did not exist when the deposition was taken. This is precisely the type of prejudice that has been foisted upon Caramadre because of the Government's unilateral decision to prematurely take the Rule 15 depositions, before any evidence had actually been presented to the Grand Jury.

<u>Wiley Deposition</u>

A proper and thoughtful cross-examination of Wiley would necessarily take into consideration much more than just attacking Wiley's recollection of his conversations with Radhakrishnan.[20] A number of factors include the nature and timing of (i) Wiley's dealings with Radhakrishnan; (ii) Wiley's interaction with representatives of Rhode Island Home Hospice Care ("Hospice")[21]; and (ii) Caramadre's direct contact with Hospice's upper management and legal counsel. Had these depositions not been rushed into before the beginning of time[22], counsel for Caramadre would have been allotted an opportunity to view all of the evidence in this case, not just witness statements between investigating agents and the deponents.

A review of the discovery shows that Wiley began to receive hospice assistance beginning in August of 2008. Some point afterwards, a hospice care worker referred Wiley to Radhakrishnan. Wiley did not meet Radhakrishnan until sometime in January 2009 to review his

---

[20] This is especially true for Caramadre since he never met Wiley or had any direct dealings with him. Radhakrishnan was the individual who solely met and discussed the transactions with Wiley.

[21] Wiley testified that a Hospice worker assigned to his case referred him to Radhakrishnan.

[22] Quite the opposite from waiting until the 11th hour, these depositions were taken well before the 1st tick of the speedy trial clock in this case. More aptly described, these depositions were taken pre-indictment, pre-investigation which adds up to nothing more than premature.

eligibility to serve as a measuring life.  Wiley received $3,000.00 cash on or about February 5, 2009.  The significance of these dates has little meaning unless and until counsel reviews the other evidence produced by the Government following the indictment in this case.  The Government's chief allegation against Caramadre is that he was at the center of a "scheme" that misled the measuring lives.  Nothing is farther than the truth.

The Government's theory of its case, however, begins to crumble when one examines Caramadre's own actions and words when it comes to Hospice well before any interaction with Wiley takes place.  The Government's own investigation shows that Caramadre had a number of meetings with top administrators at Hospice including their legal counsel explaining his program involving a philanthropic gift of $2,000.00 (otherwise known as Program A) and a secondary program where he offered additional monies to individuals should they chose to serve as a measuring life in an investment vehicle (also known as Program B).

The Government's own discovery shows that Hospice officials memorialized in writing Caramadre's disclosure and explanation of Program A and Program B to Hospice as early as the spring of 2008.  After Caramadre disclosed the nature of both programs to Hospice officials so that the program could be fully understood and endorsed by Hospice, Hospice asked its outside counsel to meet with Caramadre to pass upon the program.  As counsel has learned in reviewing discovery, Hospice's counsel testified that he met with Caramadre in or about late spring 2008.

There are other things going on during this same time period which are crucial to Caramadre's case.  In or about early May of 2008, a complaint was registered by a family member of a prospective measuring life to a local priest.  The family member had initially received a $2,000.00 check in response to the advertisement.  At some point after receiving the $2,000.00, a second meeting with the family members took place at their home to review the

possibility of the terminally ill individual participating in Program B.  Radhakrishnan and Walter

Craddock[23] appeared on behalf of Estate Planning Resources, Inc. to discuss the nature of the

investment and the monies the family would receive in return for their agreement to allow an

investor to designate the ill individual as a measuring life.  Also present at the meeting at the

request of the family members was a representative of Hospice.

After Radhakrishnan and Craddock explained the details of the program, the family

members indicated that they were not interested in the program.  The family members apparently

became upset with the nature of the program and declined to participate.[24]  Two (2) important

events happen as a result of this meeting.  First, the family member wrote to her local priest

objecting to the program.  More importantly, the Hospice representative reported back to her

supervisors what Radhakrishnan and Craddock disclosed to the family about investments being

opened up utilizing the names of the terminally ill individuals as measuring lives.  According to

the discovery produced by the Government, Hospice thereafter instructed its social workers to

make no more referrals of Hospice patients to Estate Planning Resources, Inc. until Hospice

looked into the matter.

Hospice certainly looked into the matter by referring Estate Planning Resources, Inc. to

its legal counsel to vet the program.  After legal counsel met with Caramadre and ostensibly gave

his client the green light to proceed with referring Hospice patients to Estate Planning Resources,

Inc., Hospice invited Caramadre and Radhakrishnan to its headquarters to give a presentation to

the social workers and nurses about the program.  Again, the Government's investigation shows

---

[23] Craddock is a retired Cranston police officer who served as the chief of police at the end of his law enforcement career.  Craddock was a retired police officer at the time of this meeting. Craddock was an attorney who worked at Estate Planning Resources, Inc. who accompanied Radhakrishnan during this particular visit to explain the nature of Program B.

[24] This evidence cuts against the Government's allegation that the Defendants engaged in a scheme to defraud by neglecting to disclose the nature of Program B.

that gathering took place on February 3, 2009 where a handout was presented to the Hospice workers explaining the program.

The import for purposes of formulating a viable defense to the Government's charges cannot go unnoticed. How credible are the Government's charges that Caramadre and/or Radhakrishnan lied to Wiley in January and February of 2009 when Caramadre himself is meeting with Hospice officials and counsel in the spring of 2008 and disclosing his proposed designation of terminally ill individuals in connection with investment vehicles? Over the remaining course of 2008 and early 2009, Caramadre is communicating with Hospice management which leads up to the presentation Caramadre and Radhakrishnan gave to Hospice personnel on February 3, 2009. Two (2) days later, Wiley receives $3,000.00 for his participation in Program B. Bluntly put, none of this adds up for the Government.

According to the timetable provided by Wiley, Hospice did not refer Wiley to Estate Planning Resources, Inc. until well after Caramadre had met with Hospice's counsel and upper management. The early May 2008 meeting attended by Radhakrishnan and Craddock which prompted the Hospice representative to report back to her supervisors about the investment side of Estate Planning Resources, Inc.'s program is also important. The discovery produced by the Government indicates that, after receiving this report, Hospice management instructed its personnel not to make any further referrals to Estate Planning Resources, Inc. until otherwise instructed. Since Caramadre's prior defense counsel did not have the benefit of post-indictment discovery, Caramadre was effectively precluded from questioning Wiley about any of the information contained in the discovery that the Government had not yet developed themselves during their own investigation.

Caramadre wasn't present at any of the meetings with the measuring lives with the exception of Mizzoni. Radhakrishnan alone met with Bradshaw, Wiley, Pitocco, and Rodriguez.[25] The straight out attack of the individual witnesses by Caramadre's counsel has now cemented Caramadre's trial strategy. How could Flanders possibly divine Caramadre's trial strategy for an indictment that wasn't handed down until two (2) years later? Bottom up, he couldn't formulate any real trial strategy.[26] Accordingly, he was left with no option other than a knee-jerk reaction to attack the witness which may not be an appropriate trial strategy.

There are other possible theories for Caramadre to present to a jury in this case which might explain the discrepancy in the testimony of these measuring lives when it comes to their understanding of the documents they were asked to sign. The next discussion may shed some possible light for the testimonial discrepancies.

Leon Bradshaw

The Government curiously asks the Defendants its intention as to whether it intends to use the deposition of Charles Buckman at the time of trial. First, no differently than the position it takes with respect to the depositions the Government proposes to use at trial, this Defendant cannot (nor should it be forced at this stage of the proceeding) to identify what witnesses it will call at trial or disclose its general trial strategy. It is much too early for counsel to identify the exact witnesses it will call never mind provide the Court with its final closing argument.[27]

---

[25] Radhakrishnan did nothing wrong when meeting with these four (4) measuring lives.

[26] The undersigned counsel hasn't even formulated a defense to this case. To do so would be reckless as counsel is still roaming thru and evaluating the voluminous documents produced by the Government in this case. Pre-indictment counsel for the targets were in no position whatsoever to mount a defense to a case that didn't exist and to an investigation still in its infancy stages.

[27] This analysis is not performed in a vacuum. Caramadre and Radhakrishnan are presumed innocent and the Government must prove them guilty beyond a reasonable doubt. They are not required to prove anything. The defendant is not bound to call the witnesses he will identify on his witness list to be filed with the Court on August

The lingering question is whether the Government intends to play any of the depositions it neglected to attach to its memorandum of law in support of its objection to the Defendant's Motion to Suppress.  As the Court is well aware, there were a total of seven (7) Rule 15 depositions taken in conjunction with the Court's Rule 15 Order.  Six (6) of the depositions were taken by the Government.  Only the Buckman deposition was taken by the defendants.[28]

Interestingly enough, the Government also seems to be turning its back and possibly shielding the prospective jurors' eyes and ears from the video testimony of Leon Bradshaw ("Bradshaw").  Bradshaw was a witness called by the Government.[29]  Again, this was a witness who the Government convinced the Court to allow the Government to question and preserve his testimony for trial.

The Court accepted the Government's arguments in making its "close call" to allow the depositions to proceed.  After all the hullaballoo, the Government, for reasons it only knows, has presumably decided not to use the Leon Bradshaw video deposition.  What "evidence" did Leon Bradshaw provide that now causes the Government to keep it from the jury, after convincing the

---

1, 2012.  That list only requires a party to identify "possible" defense witnesses.  There is no obligation to call any of the witnesses named on the witness list.

[28] This deposition was only taken after the Government made it known that it had no intention of preserving Buckman's testimony.  This occurred after the Government convinced the Court to allow it to take the deposition.  The Government's motive for not taking Buckman's deposition is readily apparent after viewing his testimony.  Buckman made it clear that he knew exactly what he was signing and that he consented to the use of his name as a measuring life.  There is a reason why the Government is sprinting as fast as it can from this "powerful" testimony.  The defense submits that it is the Government, not the defendants, who are attempting to prevent the jury from hearing all of the evidence in this case.  A criminal investigation and trial is nothing more than a search for the truth.  The Government hid from the truth in not following thru on its own prior request to depose Buckman and now continues to avoid Buckman's testimony by not attaching his deposition to the Government's papers filed with this Court.  Caramadre attaches Buckman's deposition transcript as <u>Exhibit B</u>.  This will be filed separately in order to first redact the deposition in accordance with the Order of this Court.

[29] Caramadre's description of a witness being "called" means the party who took the deponent's deposition.  Put another way, it was the party who conducted the direct examination.

Court that the deponent's testimony was vitally necessary to its case?[30]   A fair reading of Leon

Bradshaw's transcript will quickly answer any questions as to why no criminal charges were

filed as it relates to Bradshaw.

On direct examination, Bradshaw testified in response to questions from AUSA Vilker as

to what Radhakrishnan told him when Bradshaw and Radhakrishnan met:

A. Now – now, the exact words he [Radhakrishnan] came to see me, yes, I remember money, yes, yeah, because that's all I'm interested in. You say money to me, I – I done forgot everything else you said.  (Exhibit C, pg. 18, lines 3-6).

A. You know, you know, these questions, man, are something when you ask me.  You see my mind is money.  See that's all I could see is money, you know what I mean? And when you ask me questions like that, see, see, because these people I'm dealing with, I got no reason to think nothing about these people. (Exhibit C, pg. 20, lines 13-19).

A. You got some money to give me, give it to me.  (Exhibit C, pg. 20, line 25; pg. 21, line 1).

A. Just like you sitting right here now, I got no reason to think nothing about you.  You put some money on the table, I'm gonna take it.  (Exhibit C, pg. 21, lines 3-5).

A. I got no reason at all –

Q. Okay.

A.  -- you know? And that's the way it was with him, you know? Yes, he [Radhakrishnan]  might have – he said a lot of things that went right over my head.

(Exhibit C, pg. 21, lines 7-11).

The transcript reveals that Bradshaw received a total of $6,000.00 as a result of his

dealings with Radhakrishnan.  Bradshaw first received a $2,000.00 check at one meeting with

---

[30] Counsel will separately file Bradshaw's deposition in order to first confer with counsel to redact the appropriate parts of the deposition transcript in accordance with this Court's Order.

Radhakrishnan and later received a $4,000.00 check during a subsequent meeting. The Government inquiry about those checks went as follows:

> Q.  Okay. Well, you did get a $2,000.00 check from him [Radhakrishnan]?
>
> A.  Yeah, yeah.
>
> Q.  What did you do with the check after you received it?
>
> A.  What did I do with it? Citizens Bank. I went and cashed it.
>
> Q.  Okay. Now, what, if anything, did Raymour say to you when he gave you this check as to what you were receiving this money for?
>
> A.  Man, if he said something to me, I didn't hear it.
>
> Q.  Okay.
>
> A.  All right?  And I'm not saying he didn't say nothing, and I'm not saying he did, because I didn't hear it.  All I seen was $2,000.  That what I seen. That's all I cared about.
>
> Exhibit C at pgs. 22-23.
>
> Q.  Okay. You're not sure then –
>
> A.  No.
>
> Q.  – what exactly Raymour said about Joseph Caramadre?
>
> A.  I can't tell you something that I'd have to make up.
>
> Exhibit C at pg. 24, lines 14-19.

Bradshaw went on to testify further about the notation "New Account Set-up" that appears in the memo section of the $4,000.00 check[31]:

---

[31] The evidence will show at trial that most, if not all, of the checks given to individuals for their agreement to serve as either an annuitant on an annuity or a co-account owner for a bond account expressly provided in the memo section of the check that the purpose of the monies tendered to the individuals was for setting up a new account. This secondary check must be distinguished from the initial $2,000.00 check received by any individual who responded to the advertisement offering $2,000.00 for terminally ill persons.  This $2,000.00 check was purely philanthropic and came with no strings attached.  Most, if not all, of the $2,000.00 philanthropic checks contained

Q.  Okay. Now, do you see on the memo line of this check --

A.  Yeah.

Q.  -- how it's written "New" and then abbreviation for "Accounts"?

A.  Yeah.

Q.  And then "setup" right here"

A.  Yeah.

Q.  Okay.  Did you – did you notice those words when you got this check?

A.  Yeah, see that's what I'm trying to say to you, you know what I mean? Like I know this is gonna sound stupid, man, but all I see on this check is $2,000, $4,000, Citizens Bank that I can cash it.  And I mean I could care less about anything else on there.

Q.  Okay. So –

A.  I'm telling you like it is.  I know it sounds stupid.

Exhibit C at pg. 26.

Q.  Okay.

A.  That's what I'm interested in, where I could cash it and get the money.

Q.  Okay. So –

A.  I could care less about anything else.

Exhibit C at pg. 27.

AUSA Vilker keeps pressing Bradshaw about whether he saw those words "New Account Set-up" on the check and Bradshaw replies:

Q.  So do you recall one way or the other whether you even noticed –

A.  Don't even –

Q.  -- those words?

the word "philanthropy" in the memo section.  This distinction between the two (2) types of checks is certainly one with a significant difference which will be at the centerpiece of this trial.

> A.  Well, I gotta see it, I gotta see it, but it – it don't register.
>
> Q.  Okay.
>
> A.  You know, I gotta see it.  It's impossible for me not to see it.
>
> Exhibit C at pg. 27.

AUSA Vilker asks what, if anything, Radhakrishnan told Bradshaw the $4,000 was for and Bradshaw finally replied:

> Q.  Oh, man, I don't know what he said.  I don't know what he said.  If I could put some words together, I would either be lying or I would be making up something that he said.

Finally, Bradshaw testifies in response to the Government's question concerning Radhakrishnan reading parts of the documents that Bradshaw signed:

> A.  I mean I remember him [Radhakrishnan] saying something to me, you know, but here again it meant nothing to what he was saying to me.  You know, at least, you know, as long as I didn't hear him say he was gonna cut my head off or take my life, nothing else meant nothing there, you know what I mean?  And that's just the way it is.  Nothing meant nothing, you know, unless it was something that would get me screwed up, like take my life or something or he was gonna cut my arm or take my arms or give my life away or something, you know.
>
> Exhibit C at pg 32, lines 3-13.

Although there are many more interesting statements by Bradshaw found throughout the transcript, the foregoing excerpts should inform the Court why the indictment fails to include any charges associated with Bradshaw and, more importantly, why the Government is the party who wants to keep evidence (like this testimony) from the jury in this case.[32]

Anthony Pitocco

The strangest twist by the Government concerning its proposed use of the Rule 15 depositions comes with the testimony of Anthony Pitocco. The Government proposes to

---

[32] It must be pointed out that all of the exculpatory excerpts cited herein were culled from the Government's direct examination of Bradshaw.

knowingly put before the jury testimony which, in a light most favorable to Pitocco, is completely unreliable and, in a darker light, may rise to the level of perjury.

Pitocco's questionable testimony appears at pages 146-147 of his deposition transcript. Following a direct examination by the Government wherein Pitocco denied signing any of the account forms, in an exchange with Caramadre's counsel, Pitocco incredibly denied signing two (2) affidavits presumably prepared by counsel for Western Reserve in support of civil cases filed in this very Court.  These affidavits, dated August 14, 2009 and September 4, 2009 respectively, state that he [Pitocco] did not knowingly enter into any annuity contracts concerning Western Reserve.  These affidavits are attached and incorporated in the Complaint filed with this Court in the matter of *Western Reserve vs. Joseph Caramadre, Raymour Radhakrishnan, Conreal LLC, Harrison Condit and Fortune Financial Services,* C.A. No. 09-470-S.  Pitocco expressly denied signing anything related to this investigation, whether related to the account creation, or whether prepared by Western Reserve's counsel in the civil litigation.  As a result, Pitocco was either lying at his deposition or he was not able to competently testify.  On the other hand, if he was telling the truth, then Western Reserve submitted a false affidavit in the civil litigation.

Consequently, the Government's proposed use of Pitocco's video deposition at trial will only serve to add a fourth (4th) ring to this classic three (3) ring circus.[33]   Introduction of Pitocco's testimony at trial will create a need for the defense to call witnesses who would otherwise be collateral and unnecessary but for this testimony.  For example, if the Government is allowed to use this questionable testimony at trial, the defense will have no choice but to call, at a minimum, Attorney Brooks Magratten, Western Reserve's counsel, and Wendy Gosselin

---

[33] Pitocco's refusal to acknowledge his signature on these two (2) affidavits purportedly drafted by Western Reserve's counsel has rippling effects in the civil pond as well.

(Magratten's employee) who notarized Pitocco's signature on each of the affidavits Pitocco denied signing.[34]

The Government's attempt to introduce this highly questionable testimony is rather perplexing especially in light of the fact that Pitocco is not expressly associated with any particular substantive count in the so-called "speaking" indictment. Pitocco's name is not even mentioned in the seventy-two (72) page indictment.[35]

Putting aside the questionable nature of Pitocco's testimony and, if he indeed committed perjury, whether the Government would be allowed to present his testimony to the jury, his testimony is not relevant or material to the issues in this case. This case is already complicated enough. The parties shouldn't add any unnecessary intricacies.[36]

Conclusion

A review of the United States Attorney's own bulletin unequivocally demonstrates the fallacy of the government's assertion in this case that Caramadre's counsel effectively cross examined the deponents. In the July 2000 issue of the United States Department of Justice *United States Attorneys' Bulletin*, published pursuant to 28 CFR § 0.22(b), the United States Attorney's office provided a detailed primer titled "Effective Cross-Examination: a Practical Approach for Prosecutors". Instructively, the article sets for the following commandments for effective cross-examination:

---

[34] Caramadre and Radhakrishnan were amongst the civil defendants named in Western Reserve's Third Amended Complaint filed with this Court charging these defendants with fraud in the factum (Count I) and fraudulent inducement (Count II). This Court recently dismissed all civil charges against Caramadre and Radhakrishnan in that particular lawsuit. Although Caramadre and Radhakrishnan have been fully exonerated of the civil charges brought in connection with the Pitocco transaction, Western Reserve continues to press forward with its civil Complaint against other civil defendants. The affidavit which Pitocco denies signing during Rule 15 deposition is prominently incorporated in Western Reserve's Complaint.

[35] The indictment is silent on the Pitocco transaction despite the "speaking" nature of this indictment.

[36] Allowing this testimony would force the parties to litigate issues not part of the indictment. The Grand Jury did not return any charges of any kind including identity theft related to Pitocco.

### III.  Be Prepared

With cross-examination, as with any other aspect of trial, there is no substitute for preparation.  Preparing for cross is not an easy task…..

**A.  Master the facts.**
You should have a strangle-hold on *all* of the facts of the case, ***not just the ones you consider necessary to prove your case***.  Mastery of the facts maximizes your supply of refutation evidence and your arsenal of safe questions.  Do not simply rely on investigative reports.  Invariably there are facts omitted from the reports which become significant during the course of the trial.

1. **Witnesses.  *Thoroughly familiarize yourself with the testimony of all potential witnesses, even those you do not intend to call***.  Some may become important once the defendant's trial strategy becomes apparent.[37]
2. **Physical and documentary evidence.  *Be familiar with all evidentiary items, even those you do not intend to introduce***….
3. **Statements.  *Know all relevant statements***….If the case involves a conspiracy, familiarize yourself with all known coconspirator statements….

**B.  Identify the defense theory of the case.**
One of the benefits of mastering the facts is that it helps you identify the defense theory of the case….[emphasis added]   United States Attorneys' Bulletin, July 2000, Volume 48, Number 2, pages 13-14.

The government created process forced upon the defendants and this Court in September 2009 violated every one of the United States Attorneys' own commandments for effective cross-examination.  The then targets where certainly not prepared for the tsunami of evidence and counts eventually unleashed by the government in its November 2011 indictment when they were forced to cross-examine the deponents in the Rule 15 depositions.  They could not possibly have known the facts, the witnesses, the documentary evidence or the numerous statements that are all contained in the discovery and *Jencks* materials provided years after the depositions were taken.

---

[37] Clearly the article is written for the prosecution, however, the points made apply equally to the defense.

If it is imperative for a prosecutor to know and understand the defense theory of the case to effectively cross-examine witnesses, imagine how important it is for the defense to know its own theory of the case.  Without the benefit of knowing the precise charges they were facing, or having the mountain of documentary evidence and witness statements, that were only provided in the past several months, Caramadre could not possibly have effectively cross-examined the deponents.

The Rule 15 depositions taken in this case were actually not designed to preserve trial testimony, notwithstanding the government's assertions to the contrary.  They were actually discovery tools.  Although the government set forth possible theories of prosecution and the possible crimes involved, it in no way provided any sort of detail concerning the precise factual allegations that it sought to preserve via the depositions.  Instead the defendants were left to cross examine witnesses to in effect "discover" the details of the allegations against them.  The targets and now defendants became, in effect, co-investigators for the government.  With every question they asked in their purported "effective cross examination", they discovered new information that the government will now use against the defendants.[38]   These depositions turned the adversarial system, which is the bedrock of our criminal justice jurisprudence, whereby the government makes specific allegations to which the defendants then defend themselves, completely on its head.  The government's strenuous assertion that the Defendant's constitutional rights were fully protected because they had the opportunity to cross examine the deponents pre-indictment, is akin to the parties asking this court to rule on the admissibility of specific questions without knowing their context, the nature of the evidence previously submitted

---

[38] Every attorney with any modicum of skill knows that to effectively cross examine a witness, you never, ever ask a question to which you do not know the answer.  In these depositions, because the government decided to proceed pre-indictment, defense counsel had no idea what the answer were going to be because they had no idea as to what they were alleged to have said and/or not said to the deponents, except what they were learning for the first time when the government commenced its direct examination.

or the precise charges levied against the defendants.  Just as such a request would be dismissed out of hand, so should the government's request to use the Rule 15 depositions.

Respectfully submitted,
JOSEPH CARAMADRE
By and through his Attorneys

/s/ Michael J. Lepizzera, Jr.
Michael J. Lepizzera, Jr. (#4995)
Lepizzera & Laprocina, Counsellors at Law, Ltd
117 Metro Center Boulevard, Suite 2001
Warwick, Rhode Island 02886
Tel. (401) 739-7397
Fax (401) 691-3558
Email:  mlepizzera@leplap.com

Respectfully submitted,
JOSEPH CARAMADRE
By and through his Attorneys

/s/ James T. McCormick
James T. McCormick (#2614)
McKENNA & McCORMICK
128 Dorrance Street, Suite 330
Providence, RI 02903-2814
Tel: (401) 831-2970
Fax: (401) 751-1797

CERTIFICATE OF SERVICE

I hereby certify that on April 11, 2012, a copy of the foregoing Defendant Joseph Caramadre's Reply Memorandum of Law in Support of His Motion to Suppress the Rule 15 Depositions was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the Court's CM/ECF System.

/s/ Michael J. Lepizzera, Jr.