**Caramadre textmap**

**Buckman, Charles 12-17-09 video depo1**

Full-size Transcript

Prepared by:

DOJ-USARI

Thursday, February 23, 2012

---

1

```
1              UNITED STATES DISTRICT COURT
2          FOR THE DISTRICT OF RHODE ISLAND
3
4       IN RE:  GRAND JURY PROCEEDINGS
5
6
7              Videotaped deposition of CHARLES BUCKMAN, a
8       Witness herein, taken on THURSDAY, DECEMBER 17,
9       2009, 11:06 A.M., at the Hampton Inn Hotel, 945
10      Douglas Pike, Smithfield, Rhode Island, before
11      Vivian S. Dafoulas, Registered Merit
12      Reporter/Certified Realtime Reporter.
13
14
15
16
17
18
19
20
21
22
23
24              Vivian S. Dafoulas, RMR-CRR
                  50 Fieldstone Drive
25             East Greenwich, RI  02818-2064
                    (401) 885-0992
```

---

2

```
1   APPEARANCES:
2
3   FOR THE UNITED STATES ATTORNEY:
4       UNITED STATES ATTORNEY
        BY:  JOHN P. McADAMS, ESQUIRE
5            LEE H. VILKER, ESQUIRE
        50 KENNEDY PLAZA, 8TH FLOOR
6       PROVIDENCE, RI  02903
7
8   FOR RAYMOUR RADHAKRISHNAN:
9       JEFFREY B. PINE, ESQUIRE
        321 SOUTH MAIN STREET, SUITE 302
10      PROVIDENCE, RI  02903
11
12  FOR JOSEPH CARAMADRE:
13      HINCKLEY, ALLEN & SNYDER LLP
        BY:  ROBERT G. FLANDERS, JR., ESQUIRE
14           MATTHEW H. PARKER, ESQUIRE
        50 KENNEDY PLAZA, SUITE 1500
15      PROVIDENCE, RI  02903
16
17  ████████████████
18      MacFADYEN, GESCHEIDT & O'BRIEN
        BY:  JOHN A. MacFADYEN, ESQUIRE
19      101 DYER STREET
        PROVIDENCE, RI  02903
20
21  ████████████████
22      ANTHONY M. TRAINI, ESQUIRE
        56 PINE STREET - SUITE 2
23      PROVIDENCE, RI  02903
24
25
```

---

3

```
1   FOR THE LEADERS GROUP, INC.:
2       EDWARDS ANGELL PALMER & DODGE, LLP
        BY:  JOHN B. ROSENQUEST III, ESQUIRE
3       2800 FINANCIAL PLAZA
        PROVIDENCE, RI  02903
4
5   FOR WESTERN RESERVE LIFE ASSURANCE CO.:
6       PIERCE ATWOOD
        BY:  MICHAEL J. DALY, ESQUIRE
7       10 WEYBOSSET STREET, SUITE 400
        PROVIDENCE, RI  02903
8
9   FOR THE WITNESS:
10      R. DANIEL PRENTISS, ESQUIRE
        ONE TURKS HEAD PLAZA, SUITE 380
11      PROVIDENCE, RI  02903
12
    VIA TELEPHONE:  DOUGLAS J. FRIEDNASH, ESQUIRE
13
14  ALSO PRESENT:   JOSEPH CARAMADRE
                    RAYMOUR RADHAKRISHNAN
15
                    FBI AGENT PAMELA McDAID
16                  STEPHEN E. SOUZA, POSTAL INSPECTOR
17                  MEGHAN JOPE
18  VIDEOGRAPHER:   ODI JIN WONG
19
20
21
22
23
24
25
```

5

I N D E X

| WITNESS | PAGE |
|---|---|
| CHARLES BUCKMAN | |
| EXAMINATION BY MR. PINE | 12 |
| EXAMINATION BY MR. FLANDERS | 59 |
| EXAMINATION BY MR. McADAMS | 71 |
| EXAMINATION BY MR. PINE | 135 |
| EXAMINATION BY MR. FLANDERS | 147 |

Buckman, Charles 12-17-09 video depo1

I N D E X

| EXHIBITS | PAGE |
|---|---|
| FOR THE DEFENDANTS | |
| 1 Terminal Illness Philanthropy Account Receipt | 18 |
| 2 Check No. 9117 for $2000 | 17 |
| 3 Agreement and Acknowledgement – Charles | 32 |
| 4 Annuitant Acknowledgement – Genworth | 25 |
| 5 Annuitant Acknowledgement – Nationwide | 25 |
| 6 Annuitant Acknowledgement – Hartford Life | 25 |
| 7 Annuitant Acknowledgement – Western Reserve | 25 |
| 8 Annuitant Acknowledgement – ING | 25 |
| 9 E*Trade Power of Attorney – Charles | 34 |
| 10 E*Trade Investment Account Application | 34 |
| 11 E*Trade Options Trading Application | 34 |
| 12 Check No. 9160 $4000 | 37 |
| 13 Agreement and Acknowledgement – Maureen | 39 |
| 14 Annuitant Acknowledgement – Nationwide | 40 |
| 15 Annuitant Acknowledgement – Western Reserve | 40 |
| 16 Annuitant Acknowledgement – Genworth | 40 |
| 17 Check No. 9161 $4000 | 42 |
| 18 E*Trade Power of Attorney – Maureen | 43 |
| 19 E*Trade Options Trading Application | 44 |
| 20 E*Trade Investment Account Application | 44 |
| 21 ING Deferred Variable Annuity Application | 45 |

Buckman, Charles 12-17-09 video depo1

6

| 22 WRL Variable Annuity Application – Charles | 47 |
|---|---|
| 23 Genworth Variable Annuity Application | 48 |
| 24 WRL Variable Annuity Application – Maureen | 49 |
| FOR THE GOVERNMENT | |
| 1 Check No. 9117 $2000 | 78 |
| 2 Terminal Illness Philanthropy Account Receipt | 78 |
| 3 Agreement and Acknowledgement – Charles | 78 |
| 4 Agreement and Acknowledgement – Maureen | 79 |
| 5 E*Trade Investment Account Application | 79 |
| 6 E*Trade Investment Account Application | 80 |
| 7 Annuitant Acknowledgement – ING | 80 |
| 8 Annuitant Acknowledgement – Western Reserve | 81 |
| 9 Annuitant Acknowledgement – Hartford Life | 81 |
| 10 Annuitant Acknowledgement – Nationwide | 81 |
| 11 Annuitant Acknowledgement – Genworth | 82 |
| 12 Annuitant Acknowledgement – Nationwide | 82 |
| 13 Annuitant Acknowledgement – Western Reserve | 83 |
| 14 Annuitant Acknowledgement – Genworth | 83 |
| 15 "16. Telephone Authorization" | 83 |
| 16 "16. Telephone Authorization" | 86 |
| 17 ING Deferred Variable Annuity Application | 87 |
| 18 Genworth Variable Annuity Application | 88 |
| 19 Check No. 9161 $4000 | 89 |

Buckman, Charles 12-17-09 video depo1

7

| 20 Check No. 9160 $4000 | 90 |
|---|---|
| 21 WRL Variable Annuity Application | 91 |
| 22 Genworth Variable Annuity Application | 92 |
| 23 WRL Variable Annuity Application | 93 |
| 24 "16. Telephone Authorization" | 95 |
| 25 "18. Fraud Warnings" | 95 |
| 26 "14. Signatures and Acknowledgements" | 97 |
| 27 Hartford Leaders Request for Variable Annuity | 122 |
| 28 Nationwide – Application for Individual Flexible Purchase Payment – Charles | 122 |
| 29 Nationwide – Application for Individual Flexible Purchase Payment – Maureen | 122 |

Buckman, Charles 12-17-09 video depo1

9

```
 1        VIDEOGRAPHER:  We are now recording and
 2   on the record.  My name is Odi Jin Wong.  I'm a
 3   legal video specialist for National Video
 4   Reporters, Inc.
 5        Our business address is 7 Cedar Drive,
 6   Woburn, Massachusetts.  Today is December 17th,
 7   2009, and the time is 11:06 a.m.
 8        This is the deposition of Charles
 9   Buckman in the matter of In Re Grand Jury
10   Proceedings in the U.S. District Court for the
11   District of Rhode Island.
12        This deposition is being taken at the
13   Hampton Inn at 945 Douglas Pike, Smithfield, Rhode
14   Island.  The court reporter is Vivian Dafoulas.
15        Counsel will state their appearances for
16   the record and the court reporter will administer
17   the oath.
18        MR. PINE:  Jeffrey Pine representing
19   Raymour Radhakrishnan.
20        MR. FLANDERS:  Robert Flanders for
21   Joseph Caramadre.
22        MR. MacFADYEN:  John MacFadyen ████
23   ██████████████████████████
24        MR. TRAINI:  Anthony Traini ████████
25   ██████████
```

Buckman, Charles 12-17-09 video depo1

```
 1        MR. McADAMS:  John McAdams, Assistant
 2   United States Attorney for the United States.
 3        MR. VILKER:  Lee Vilker, Assistant U.S.
 4   Attorney for the Government.
 5        MR. DALY:  Mike Daly for Western Reserve
 6   Life Assurance Company.
 7        MR. ROSENQUEST:  John Rosenquest for The
 8   Leaders Group.
 9        MR. PRENTISS:  Dan Prentiss for the
10   deponent.
11        MR. RADHAKRISHNAN:  Raymour
12   Radhakrishnan.
13        MR. CARAMADRE:  Joseph Caramadre.
14        CHARLES BUCKMAN,
15   having been first duly sworn, was deposed and
16   testified as follows:
17        COURT REPORTER:  Would you state your
18   name, please.
19        THE WITNESS:  Charles Buckman.
20        COURT REPORTER:  Would you spell your
21   last name?
22        THE WITNESS:  B-U-C-K-M-A-N.
23        MR. MacFADYEN:  Before we start the
24   testimony, I'd like to put something on the
25   record.
```

Buckman, Charles 12-17-09 video depo1

10

```
 1        We maintain our objections to the use of
 2   the pre-indictment Rule 15 procedure.  We want to
 3   make clear that by participating in this
 4   deposition, we are in no way waving those
 5   objections.
 6        Our attendance here is simply to ensure
 7   that there be a full and complete presentation of
 8   what was ordered over our objection by the Federal
 9   District Court.
10        In our view, this deposition could just
11   as well be -- have been taken by the government.
12   There does not seem to be any indication in the
13   discovery that the government elected not to take
14   this deposition due to Mr. Buckman's health.
15   Rather it's -- the decision-making seems to be
16   tactical.  That is certainly the government's
17   prerogative.
18        However, from our point of view, we want
19   to make sure that there is a full and complete
20   compliance with the District Court order, an order
21   with which we originally objected and we continue
22   to maintain our objections.
23        Secondly, I just want to lay out some
24   ground rules.  These are ones that have been
25   discussed in prior depositions.  That is to say,
```

Buckman, Charles 12-17-09 video depo1

11

```
 1   first that an objection made by one counsel will
 2   be deemed to be an objection made by all; and
 3   secondly, that we reserve our objections as to
 4   substance until the time that this deposition may
 5   be -- may be later used.  Of course objections as
 6   to form will be made as the questions are being
 7   asked.
 8        Finally, we want to reaffirm our
 9   standing objection on Petrozziello grounds and on
10   relevancy grounds so that we don't have to
11   interpose that objection at every instance.  Thank
12   you.
13        MR. McADAMS:  With respect to the
14   government's response to that, first of all, the
15   government would maintain that the taking of this
16   deposition is, in fact, a waiver of the previous
17   objections by the targets to the use of Rule 15
18   depositions.
19        The government took that position in
20   response to the targets/defendants' request to
21   take this deposition.
22        It is certainly inconsistent with the
23   defendants' position that the taking of Rule 15
24   depositions is contrary to law for the defendants
25   to move to take the deposition and to -- and to
```

Buckman, Charles 12-17-09 video depo1

12

```
1    take the deposition.
2            With respect to the other objections
3    that were just noted with respect to the method by
4    which objections are made -- are -- as taken
5    during the course of the deposition, the
6    government just renews its previously stated
7    response to that.
8            However, with respect to the objection
9    of a standing Petrozziello objection, the
10   government would note that this is a witness being
11   called by all four of the targets.
12           This motion was moved for by all four;
13   this is not one -- one witness -- excuse me -- one
14   defendant's witness and, therefore, that -- that
15   objection has no basis.
16           This is the witness of the calling
17   parties and they cannot object to their own
18   questions that they put to their own witness.
19                   EXAMINATION
20   BY MR. PINE:
21      Q.   Good morning, Mr. Buckman.
22      A.   Good morning.
23      Q.   My name is Jeffrey Pine.  I previously
24   introduced myself to you.  I represent Raymour
25   Radhakrishnan.  I'm going to be -- initially I'll
```

Buckman, Charles 12-17-09 video depo1

13

```
1    be asking you some questions about your contacts
2    with Raymour and other individuals; okay?  If I
3    don't --
4       A.   That's fine.
5       Q.   If I don't explain a question thoroughly
6    or if it's confusing in any way, please let me
7    know; I'll be happy to rephrase it.
8       A.   Okay.
9       Q.   I want to make sure that your answers
10   are based on an understanding of the questions
11   that I'm asking; okay?
12      A.   Yep.
13      Q.   Where do you presently live?
14      A.   216 Third Avenue, Woonsocket, Rhode
15   Island, 02895.
16      Q.   Okay.  How long have you lived there?
17      A.   It will be one year this -- this month
18   it will be one year.
19      Q.   And who do you live there with?
20      A.   Myself, my daughter and her baby.
21      Q.   Okay.  Prior to that, did you live in
22   Woonsocket also at a different address?
23      A.   Yes, I did.
24      Q.   Where was that?
25      A.   It was 118 -- 118 Seventh Ave,
```

Buckman, Charles 12-17-09 video depo1

14

```
1    Woonsocket, Rhode Island.
2       Q.   Okay.  Were you living there in 2008?
3       A.   Yes, I was.
4       Q.   And with whom did you live there?
5       A.   My wife, my daughter, and a fellow that
6    was helping me with my wife.  Tyler Bain
7    (phonetic) was his name.
8       Q.   Now, directing your attention to the
9    summer of 2008, did you have occasion to meet an
10   individual by the name of Raymour Radhakrishnan?
11      A.   Yes, I did.
12      Q.   And how did you first come about meeting
13   him?
14      A.   It started -- my wife was having -- she
15   had cancer and she was critical with cancer and
16   the visiting -- we had a visiting nurse, came two
17   or three days a week, and she mentioned it to my
18   wife.
19           She said -- she showed us a flier and wanted
20   to know if we ever got our $2000.  My wife said,
21   "What are you talking about?"  We had no idea.  So
22   she gave us the flier.  She said, "Please call
23   this number and tell them that I told you to
24   call."  It was a nurse.
25      Q.   Okay.  Who was the visiting nurse?  What
```

Buckman, Charles 12-17-09 video depo1

15

```
1    was her name?
2       A.   Carol Jackson was her name.
3       Q.   Okay.
4       A.   And she worked for the VNA.
5       Q.   And she was attending to your wife's --
6       A.   Yes.
7       Q.   -- medical issues?
8       A.   Yes.
9       Q.   Okay.
10      A.   And so she gave us the flier and told me
11   to call this number, so I did, and I talked to
12   Raymour and he made an appointment to come out to
13   my house.
14      Q.   Okay.
15      A.   And that's how I met him.
16      Q.   Okay.  Do you remember what the flier
17   had said in general?  What it talked about?
18      A.   Yeah.  It was people term -- terminally
19   ill, cancer, whatever, terminally ill patients
20   will receive $2000 to spend however they wanted.
21      Q.   Uh-hum.
22      A.   I don't remember exactly the word for
23   word but -- and -- and that was it.
24      Q.   Okay.  Were you aware of that flier
25   before Miss Jackson mentioned it to you?
```

Buckman, Charles 12-17-09 video depo1

16

1    A.    I had no idea what she was even talking
2    about.
3    Q.    Okay.  How long a period of time had she
4    spent with you and your wife before mentioning
5    this flier and Raymour?
6    A.    Two or three months I think.
7    Q.    Okay.  So you had a good relationship
8    with her?
9    A.    Oh, yeah.  We knew her.
10   Q.    Okay.  After you spoke to Raymour, was
11   an appointment made for him to come out and visit
12   you?
13   A.    Yes.
14   Q.    And did he, in fact, do that?
15   A.    Yes, he did.
16   Q.    And he came to your house?
17   A.    Yes, he did.
18   Q.    Okay.  And what was the nature of that
19   first meeting with Raymour?
20   A.    Stopped there to visit with us and --
21   and just a friendly visit like -- like all fun --
22   Q.    Okay.
23   A.    -- more or less.
24   Q.    Did he talk about --
25   A.    He was a gentlemen and he said -- and he

Buckman, Charles 12-17-09 video depo1

17

1    said he had a check for us.
2    Q.    Okay.
3    A.    And he asked who do I make it out and
4    then he -- he was in a rush.  He had other places
5    he had to go that day, if I can remember
6    correctly.
7    Q.    Okay.
8    A.    Said, "Mr. Buckman, I'd like to stay
9    longer but I have other appointments."  He was
10   very polite and so he gave us the check and he
11   left.
12   Q.    And what was the amount of the check?
13   A.    It was $2000.
14         (Whereupon, Defendant's Exhibit No. 2
15   was marked.)
16   Q.    Okay.  And did you sign any paperwork in
17   conjunction with getting that check of $2000?
18   A.    No, I did not --
19   Q.    Let me show you Defendant's 2 for
20   identification --
21   A.    -- that I can remember anyway.
22   Q.    -- and I'd ask you if you recognize
23   that -- that document.
24   A.    Yes, I do.
25   Q.    And what do you recognize it to be?

Buckman, Charles 12-17-09 video depo1

18

1    A.    That's the check, I think, that he gave
2    me for the $2000.
3    Q.    Okay.  And that was made out to you?
4    A.    Yes.
5    Q.    And you received it?
6    A.    Yes.  And the reason he made it out to
7    me is I'm the one with the bank account.  My wife
8    and I decided to just make the check out to me.
9    Q.    Okay.  And did either you or your wife
10   endorse and deposit or cash that --
11   A.    Yes, we did.
12   Q.    -- that check?
13   A.    I did.
14         (Whereupon, Defendant's Exhibit No. 1
15   was marked.)
16   Q.    Okay.  I'm showing you a document that's
17   Defendant's 1 and I'd ask you to take a look at
18   that document and tell me if your signature
19   appears on that.
20   A.    Yes.  That is my signature.
21   Q.    Okay.  And that document is entitled
22   Terminally Ill Receipt?
23   A.    Yes.
24   Q.    And was that given to you on that day
25   that you received the check?

Buckman, Charles 12-17-09 video depo1

19

1    A.    To be honest with you, I don't remember.
2    Q.    Okay.
3    A.    I -- I really don't remember.
4    Q.    Do -- do you recognize your signature on
5    there?
6    A.    It is my signature.  Definitely.
7    Q.    Okay.
8    A.    Anything I signed he read it to me,
9    so...
10   Q.    I was going to ask you.  Did he explain
11   the purpose of the $2000 to you when he wrote that
12   check to you?
13   A.    Yes, he did.
14   Q.    Okay.
15   A.    But he told -- I don't remember exactly
16   what he said but everything he explained --
17   Q.    Okay.
18   A.    -- thoroughly.
19   Q.    Would you have signed this document
20   without him explaining it to you?  In other words,
21   would you have put your signature on the page if
22   he didn't explain it?
23   A.    Well, my wife had read it probably.
24   Q.    Okay.  And your wife was present?
25   A.    Yes.

Buckman, Charles 12-17-09 video depo1

20

```
 1      Q.   Okay.  And this is dated the fifth of
 2  August, which is the same date --
 3      A.   Yeah.
 4      Q.   -- as the check that was written --
 5      A.   Yeah.
 6      Q.   -- to you?
 7      A.   Probably did that.
 8          MR. PINE:  I'll ask that they be marked
 9  full.
10  BY MR. PINE:
11      Q.   Did he explain the background of the
12  $2000, who he was representing?
13          MR. McADAMS:  Objection.  Leading.
14          MR. PINE:  I'm sorry?
15          MR. McADAMS:  Objection.  Leading.
16  BY MR. PINE:
17      Q.   Did he explain the background and
18  purpose of the $2000 to you?
19      A.   He did briefly.
20      Q.   What did he say, if you recall, in
21  general?
22      A.   I think he mentioned his boss's name.
23      Q.   Uh-hum.
24      A.   Mr. Joseph -- I can't remember his last
25  name.
```

Buckman, Charles 12-17-09 video depo1

21

```
 1      Q.   Okay.
 2      A.   I'm sorry.  But -- and -- and the reason
 3  for the $2000 but I don't remember everything he
 4  said.
 5      Q.   Okay.
 6      A.   But he did tell me something about it.
 7      Q.   Okay.
 8      A.   Like I said, he couldn't stay long that
 9  day.
10      Q.   Okay.
11      A.   He -- he forgave himself for being in
12  such a rush and so I -- I don't really remember
13  everything that was happening.
14      Q.   Did he talk to you about whether or not
15  he would come back at a future time?
16      A.   Yes, he did.
17      Q.   And what -- what do you recall him
18  telling you about that?
19          THE WITNESS:  About coming back?
20          MR. PINE:  Yes.
21      A.   He says, "If you don't mind, I'll call
22  you at a later date and I'd like to set up another
23  meeting with you and come back to visit with you
24  and your wife."
25      Q.   Okay.
```

Buckman, Charles 12-17-09 video depo1

22

```
 1      A.   And I said, "Fine."
 2      Q.   And did that second meeting ever take
 3  place?
 4      A.   Anybody that comes to my house and gives
 5  me $2000 is welcome anytime.
 6      Q.   A welcome visitor?
 7      A.   Yes.
 8      Q.   Were arrangements made, at some point,
 9  for him to come back and visit?
10          MR. FRIEDNASH:  I cannot hear anything.
11  This is Doug Friednash.  I'm not sure if the
12  speaker is working there or not but I apologize if
13  I'm interrupting.
14          MR. ROSENQUEST:  We've got you on
15  speaker phone right next to the witness.  Dan, can
16  you try the volume thing?
17          MR. PRENTISS:  Can you hear now?
18          MR. FRIEDNASH:  I can hear you now.  I
19  haven't heard anything in the last 20 minutes.
20          MR. ROSENQUEST:  I'll fill you in.
21  BY MR. PINE:
22      Q.   I believe -- I think my last question
23  was to the effect of were arrangements made for
24  him to come out and visit you on a second
25  occasion?
```

Buckman, Charles 12-17-09 video depo1

23

```
 1      A.   Yes.
 2      Q.   Do you remember whether you called him
 3  or he called you?
 4      A.   I think he called me.
 5          MR. PINE:  Okay.
 6          MR. FRIEDNASH:  I can't hear anything
 7  now, too, if somebody is speaking.
 8          MR. ROSENQUEST:  Doug, I'm sorry.  We're
 9  making the best use of the available technology.
10  We can't -- I really -- there's a large group here
11  and we can't have this be a distraction I'm
12  afraid.
13          MR. FRIEDNASH:  I understand.
14          MR. ROSENQUEST:  Okay.  We'll do the
15  best we can.
16          MR. FRIEDNASH:  Okay.  Whoever was
17  talking just now I can hear you, so I don't know
18  if that's where the mic needs to be, but thank
19  you.
20          MR. ROSENQUEST:  The -- the phone is
21  right -- right next to the deponent.
22          THE WITNESS:  Maybe it's me.
23          MR. FRIEDNASH:  Thank you.
24          THE WITNESS:  Because I'm not speaking,
25  I'm turning my head.
```

Buckman, Charles 12-17-09 video depo1

24

```
 1          MR. FLANDERS:  Move the phone over,
 2    John.  Move the phone to the middle.
 3          THE WITNESS:  I'm sorry.
 4          MR. PINE:  That's okay.
 5    BY MR. PINE:
 6     Q.   I think you indicated that Raymour
 7    called you to set up the second appointment?
 8     A.   Yeah, I'm pretty sure.
 9     Q.   And did he come out to your house on a
10    second occasion?
11     A.   Yes, he did.
12     Q.   And what was the nature of that second
13    meeting?
14     A.   He had all the -- the forms with him.
15    First of all, he wanted to know if we knew what an
16    annuity was.  That was the first thing he -- he
17    said.
18     Q.   And do you remember what you or your
19    wife responded?
20     A.   I was not familiar and my wife said she
21    was and Raymour said, well -- so he said, "Well,
22    I'm going to read these documents to you."
23     Q.   Uh-hum.
24     A.   That's what he said.
25     Q.   Okay.
```

Buckman, Charles 12-17-09 video depo1

25

```
 1     A.   That was the purpose.  So he read -- he
 2    had the annuities with him and he read each one
 3    and he said, "Anytime, you know, if you don't
 4    understand anything I'm saying, stop me and I will
 5    go over it with you so you fully understand
 6    everything I'm reading."  And so that's -- and he
 7    gave my wife more, so she understood what he was
 8    talking, you know, about those documents than I
 9    did.
10     Q.   And she was present for that second
11    meeting?
12     A.   Yeah.
13     Q.   Was it just the three of you?
14     A.   Yes.  At that meeting, yes.
15     Q.   And that was at your home also?
16     A.   Yes, it was, at Seventh Ave.
17     Q.   And you indicated that he presented you
18    with various documents and that he went over them?
19     A.   Yeah, very completely.
20          (Whereupon, Defendant's Exhibits No. 4,
21    No. 5, No. 6, No. 7 and No. 8 were marked.)
22     Q.   Okay.  I'm going to show you what have
23    been marked 4, 5, 6, 7 and 8, and I'm going to
24    show you Exhibit 4, and ask you to take a look at
25    that and tell me if you recognize the document or
```

Buckman, Charles 12-17-09 video depo1

26

```
 1    your signature on the document.
 2     A.   That is my signature or my initials.
 3     Q.   And on the second page?
 4     A.   That's my signature.
 5     Q.   And is this a document that Raymour
 6    would have gone over with you on that date in the
 7    second meeting?
 8          MR. McADAMS:  Objection.  Leading.
 9     A.   Yes.
10     Q.   Is that a document that Raymour went
11    over with you?
12     A.   Yes, it is.
13     Q.   Okay.  Did he explain it to you?
14     A.   I understood when he read it to me.
15          MR. PINE:  Okay.
16          MR. McADAMS:  I'm going to object just
17    briefly.  The documents that you are identifying
18    by exhibit number have different exhibit numbers.
19          MR. PINE:  Yes, I changed them.
20          MR. McADAMS:  So if you wouldn't just
21    mind telling us the title of the document --
22          MR. PINE:  Okay.  Sure.
23          MR. McADAMS:  -- so we know which one we
24    are looking at.
25          MR. PINE:  Okay.  For the record, I'm
```

Buckman, Charles 12-17-09 video depo1

27

```
 1    showing the witness a -- an Annuitant
 2    Acknowledgement.  The annuity company in this case
 3    is Genworth.
 4          MR. McADAMS:  This is going to be
 5    Exhibit 4?
 6          MR. PINE:  Yes.
 7    BY MR. PINE:
 8     Q.   Showing you that exhibit again,
 9    Mr. Buckman, did -- did Raymour read that to you
10    and your wife?
11     A.   I'm pretty sure he did.
12     Q.   Okay.  And did you have any questions
13    that you recall?
14     A.   I didn't.
15     Q.   Okay.
16     A.   My wife might have but I don't think I
17    did.
18     Q.   Do you remember him answering questions
19    that you had or that your wife had?
20     A.   Yes.
21     Q.   Okay.
22     A.   He did.
23     Q.   Okay.  Showing you Exhibit 5 -- and I
24    think you indicated that those are your initials
25    on the first page?
```

Buckman, Charles 12-17-09 video depo1

28

1   A.   Yes, it is.

2   Q.   And your signature --

3   A.   Yes, it is.

4   Q.   -- appears on the second page?

5   A.   Yep.

6   Q.   Okay.  And showing you Exhibit 5, which

7   is an Annuitant Acknowledgement, the annuity

8   company being Nationwide, showing you that

9   document, and also directing your attention to the

10  initials on the first page and the signature on

11  the second page --

12  A.   My initials.

13  Q.   -- do you recognize that?

14  A.   Yes, I do.

15  Q.   Okay.  Is it yours?

16  A.   Yes, it is.

17  Q.   Okay.  And did Raymour explain or read

18  that document to you --

19  A.   Yes, he did.

20  Q.   -- and your wife?

21  A.   Yes, he did.

22  Q.   Do you remember you and your wife having

23  questions about this particular document?

24  A.   I don't remember.

25  Q.   Okay.  Showing you Exhibit 6, which is

29

1   an Annuitant Acknowledgement, and the annuity

2   company is Hartford Life, and again directing your

3   attention to the initials on the first page as

4   well as the signature on the second page, do you

5   recognize that?

6   A.   Those are my initials.  That is my

7   signature, and I don't recognize the -- but that

8   is my initials so I'm sure he read it to me.

9   Q.   Okay.

10  A.   Anything I signed he had read to me.

11  Q.   Okay.  And that goes for any of the

12  documents --

13  A.   Everything he showed me.

14  Q.   He read --

15  A.   Everything --

16  Q.   Okay.

17  A.   -- I mean that I signed --

18  Q.   Yes.

19  A.   -- he read, yes.

20  Q.   So that was part of the normal routine

21  of the day?

22  A.   Yes.

23  Q.   Okay.  Showing you No. 7, which is an

24  annuity -- Annuitant Acknowledgement, the annuity

25  company being Western Reserve Life, I'd ask you

30

1   the same question about the initials as well as

2   your --

3   A.   Signature?

4   Q.   -- what is the signature on the second

5   page and ask if you recognize that.

6   A.   Yes, I do.

7   Q.   Also your initials and your signature?

8   A.   Yes, they are.

9   Q.   And showing you a fifth document also

10  titled Annuitant Acknowledgement, the annuity

11  company being ING, and again directing your

12  attention to the initials on the document as well

13  as the signature on the second page of the

14  document, I'd ask you the same question about

15  whether you recognize those -- that signature and

16  those initials.

17  A.   Yes, I do.

18  Q.   Okay.

19  A.   Those are my initials and that is my

20  signature.

21  Q.   And am I correct in asking you whether

22  all five of those were presented to you and your

23  wife on that same occasion?

24  A.   Yes.

25  Q.   Okay.  And you signed all five --

31

1   A.   All.

2   Q.   -- that day?

3   A.   Yeah.

4   Q.   And did you understand that as an

5   annuitant, that --

6   MR. McADAMS:  Objection.  Leading.

7   Q.   Did you understand that as an

8   annuitant -- what was your understanding of your

9   role as an annuitant after signing these

10  documents?  What was going to happen with that

11  particular document?

12  A.   My understanding was, and -- and -- a

13  group of people that make an investment and then

14  they could get -- could make money --

15  Q.   Okay.

16  A.   -- if someone dies from -- from this

17  thing that they were doing for us.

18  Q.   Okay.

19  A.   And -- and I didn't care how much money

20  they made.  I know I got a lot of money from them.

21  Q.   Okay.

22  A.   So that's all it was.  That's -- that's

23  my understanding.

24  Q.   So you did have an understanding that

25  when either you or your wife passed away, that

**32**

```
1   someone else would make some money?
2       A.   Yes, I did.
3       Q.   Okay.  Did you have any problem with
4   that?
5       A.   None.
6       Q.   Any disagreement?
7       A.   No.
8       Q.   Okay.  And Raymour explained that to
9   you?
10      A.   Yes.
11      Q.   Okay.
12      A.   He told me someone is going to make a
13  lot of money.
14      Q.   I'm directing your attention now to a
15  document that I've marked as Defendant's 3 which
16  is titled Agreement and Acknowledgement Brokerage
17  Account and ask if you can identify the document
18  and whether you recognize your -- a signature
19  which is on the third page.
20      A.   That is my signature.
21      Q.   Okay.  And do you recognize that
22  document as a document you would have signed on a
23  particular day?
24      A.   I -- I can't tell you.
25      Q.   If you remember today.
```

**33**

```
1       A.   I really don't.
2       Q.   Okay.  But it is your signature?
3       A.   It definitely is my signature and it was
4   read to me --
5       Q.   Okay.
6       A.   -- at that time.
7       Q.   And so you are saying that this document
8   as well as the other documents were read to you?
9       A.   Yes.
10      Q.   Okay.
11      A.   Anything that I signed.
12      Q.   Okay.
13      A.   I didn't sign anything unless it was
14  read to me.
15      Q.   Do you recall whether or not you or your
16  wife had any questions about what is titled a
17  Brokerage Account?
18      A.   I don't -- I don't remember.
19      Q.   Okay.  That's fine.
20      A.   I wish my wife was here to help me with
21  this.
22      Q.   I understand.  We are just asking for
23  your best memory.
24      A.   She knew way more than I did.
25      Q.   Believe me, we understand it goes back
```

**34**

```
1   several months, more than a year.
2       A.   At that time I was telling you I had --
3   it seemed like tons of people were in and out of
4   my house all the time visiting with my wife and
5   people -- people that she worked with, her bosses,
6   her friends, her family, my friends, my family.
7   People in and out of my house all the time.  I
8   can't remember.  It's just hard for me to remember
9   everything that went on.
10      Q.   That's fine.
11      A.   I apologize.
12      Q.   Everybody here -- everybody here is just
13  asking for your best memory.  That's all.
14      A.   I apologize if I -- please forgive me, I
15  don't mean to be --
16      Q.   I'm going to show you a few more
17  documents, if that's okay.
18      A.   Sure.
19           MR. PINE:  I'm marking Defendant's 9 a
20  document entitled E*Trade Financial Power of
21  Attorney; No. 10, E*Trade Financial Complete
22  Investment Account Application; and No. 11,
23  E*Trade Financial Options Trading Application.
24           (Whereupon, Defendant's Exhibits No. 9,
25  No. 10, No. 11 were marked.)
```

**35**

```
1       Q.   I'm going to show you these documents
2   and ask if you can identify any of the signatures
3   that appear on any of those pages of the document.
4       A.   Okay.  Page 2, that is my signature.
5       Q.   Okay.
6       A.   Just on Page 2.
7       Q.   Okay.  And that's your signature on
8   Page 2?
9       A.   Yes.
10      Q.   And would this have also been a document
11  that Raymour presented to you on that date?
12      A.   Yep.
13      Q.   And with respect to No. 10, entitled
14  Complete Investment Account Application, I'll show
15  you that and if you take a look at it and let me
16  know if you can recognize any of the signatures
17  that appear on any of those pages.
18      A.   Page 3 is my signature.
19      Q.   Okay.
20      A.   Page 4 is mine, that's mine.
21      Q.   Okay.
22      A.   And there's no other ones.
23      Q.   And there is information that appears on
24  Page 1 of this document Defendant's 10.  Do you
25  recognize your name and the information that
```

**36**

```
1   appears on the page on Page 1 on the right-hand
2   side?  Do you recognize your name?  Even if you
3   didn't write it, do you recognize --
4        A.   Yes.
5        Q.   -- the information?
6        A.   Yes.
7        Q.   And does that accurately reflect your
8   address at the time?
9        A.   Yes.
10       Q.   Does it accurately reflect your date of
11  birth?
12       A.   Yes, it does.
13       Q.   And does it accurately reflect your
14  social security number?
15       A.   Yes, it does.
16       Q.   Okay.  And did you give Raymour that
17  information --
18       A.   Yes.
19       Q.   -- during that meeting?
20       A.   Yep.
21       Q.   Okay.
22       A.   I don't think there is any other way.  I
23  did give it to him.
24       Q.   Okay.  And with respect to Exhibit 11,
25  which is titled Options Trading Application, can
```

**37**

```
1   you take a look at that and let me know if you
2   recognize any of the signatures on that page or on
3   the second page?
4        A.   Yes.  That's my signature.
5        Q.   Okay.  And did you sign that --
6        A.   Page 2.
7        Q.   I'm sorry?
8        A.   On Page 6 is my signature.
9        Q.   Okay.  Did you sign that on that day as
10  well --
11       A.   Yes.
12       Q.   -- along with the other documents?
13       A.   Yeah.
14       Q.   Did Raymour read this document to you as
15  well as the others?
16       A.   Every one.
17       Q.   Okay.  And if you had questions, you
18  would have asked?
19       A.   Yes.
20            MR. PINE:  Okay.
21            (Whereupon, Defendant's Exhibit No. 12
22  was marked.)
23       Q.   I'm showing you what I'm marking as
24  Defendant's 12, a check numbered 9160, and I'm
25  going to show that to you and ask if you can
```

**38**

```
1   identify this particular check and --
2        A.   I -- I know he gave me a check for $4000
3   but I don't remember --
4        Q.   Okay.
5        A.   -- what the check looked like.
6        Q.   Okay.
7        A.   I don't remember all that.
8        Q.   But you do have a memory of him --
9        A.   Yes.
10       Q.   -- paying you $4000 --
11       A.   Yes.
12       Q.   -- that day?  Or was it at a later time?
13       A.   No.
14       Q.   That day?
15       A.   Yeah.  At the second meeting.
16       Q.   Yes.
17       A.   Yes.
18       Q.   And this particular check indicates that
19  it is for "New account setup - Charles."  Did you
20  understand that accounts were being set up --
21       A.   Yes.
22       Q.   -- in your name?  Yes?
23       A.   Yes.
24       Q.   Did you have any objection or
25  disagreement with that?
```

**39**

```
1        A.   None at all.
2        Q.   Okay.
3        A.   No.
4        Q.   Now, did -- did Raymour also open
5   accounts in your wife's name during that meeting?
6   Did he present her with documents similar to the
7   ones that I've shown you about him -- about you?
8        A.   We both signed, yes.
9        Q.   Okay.  And were you present when that
10  happened?
11       A.   Yes, I was.
12       Q.   You were all present for the meeting?
13       A.   Yes.
14            (Whereupon, Defendant's Exhibit No. 13
15  was marked.)
16       Q.   Okay.  I'm going to show you what I'm
17  marking as Defendant's 13, and that's titled
18  Agreement and Acknowledgement Brokerage Account.
19  I believe it was premarked as 15 and I'm marking
20  it now as 13.
21            Showing you Defendant's 13, and asking you to
22  take a look at all the pages and tell me if you
23  recognize any of the signatures that appear on
24  Page 3 of that account -- of that document.
25       A.   My wife's signature.
```

40

```
1         Q.    Okay.  And --
2         A.    That's her signature.
3         Q.    And you clearly are familiar with her
4   signature?
5         A.    Absolutely.
6         Q.    And did she sign that with you in that
7   second meeting?
8         A.    Yes, she did.
9         Q.    Okay.  Did Raymour take the time to read
10  documents to her as well as to you?
11        A.    Yes, he did.
12              MR. PINE:  Okay.  And I'm going to have
13  three documents marked that are titled Annuitant
14  Acknowledgement.  They were previously premarked
15  16, 17 and 18.  And for the record, I'm going to
16  mark them as 14, 15 and 16.
17              (Whereupon, Defendant's Exhibits No. 14,
18  No. 15 and No. 16 were marked.)
19        Q.    Showing you Defendant's 14, I'd ask you
20  to take a look at this particular document
21  entitled Annuitant Acknowledgement and I would ask
22  you if you recognize any of the signatures that
23  appear on that document on the second page?
24        A.    Yes.  Those are my wife's initials.
25        Q.    Okay.
```

Buckman, Charles 12-17-09 video depo1

41

```
1         A.    She did.
2         Q.    And that's on Page 1?
3         A.    Yes.  I'm sorry.  Yes.  Page -- there's
4   no numbers on the page but it's the first page in
5   this.
6         Q.    All right.
7         A.    It's her initials and that is her
8   signature on the next page.
9         Q.    Okay.  And with respect to No. 15, I'd
10  ask you the same questions --
11        A.    Okay.
12        Q.    -- if you could direct your attention to
13  that.
14        A.    That's her initials on the first page
15  and the second one, that's her signature.  That is
16  her signature.
17        Q.    Okay.  And showing you No. 16.
18        A.    Same thing.  It's her initials on the
19  front and on the second page it's her -- her
20  signature.
21        Q.    Okay.  And you were present for her
22  signing all three of these annuitant
23  acknowledgements?
24        A.    Yes, sir, I was.
25              MR. PINE:  And I'm going to mark as
```

Buckman, Charles 12-17-09 video depo1

42

```
1   Defendant's 17 what was premarked as No. 12 and
2   it's a check in the amount of $4000.
3               (Whereupon, Defendant's Exhibit No. 17
4   was marked.)
5         Q.    And I'm going to show that to you and
6   ask if you can identify that --
7         A.    Yes.
8         Q.    -- particular document?
9         A.    Yeah.
10        Q.    Did Raymour pay both you and your wife
11  $4000 on that day?
12        A.    He gave two checks.  It was -- we
13  each -- I signed both of them.
14        Q.    Okay.
15        A.    He made them both out to me, I told him
16  this.
17        Q.    Right.
18        A.    Because I'm the one who had the account
19  so my wife says make them out to Charlie so be
20  made them both out to me.
21        Q.    Okay.  That's because you had the
22  account?
23        A.    Yes.
24        Q.    And on the memo portion of this
25  particular check No. 9161, does it indicate that
```

Buckman, Charles 12-17-09 video depo1

43

```
1   this was new account set up for Maureen?
2         A.    Yes.
3         Q.    Okay.  And is that consistent with
4   your --
5         A.    Exactly.
6         Q.    -- memory of the day?  So on that
7   particular day, be wrote a total of two checks for
8   $8000 --
9         A.    Correct.
10        Q.    -- total?
11              (Whereupon, Defendant's Exhibit No. 18
12  was marked.)
13        Q.    Showing you what was premarked as 19 and
14  I'm marking as 18, and again directing your
15  attention to the three pages of this particular
16  document, which is entitled E*Trade Financial
17  Power of Attorney, I'd ask if you recognize any of
18  the signatures that appear on any of those pages.
19        A.    My wife's signature is on Page 2.
20        Q.    Okay.
21        A.    That's it.
22        Q.    Okay.  And you recognize her
23  signature --
24        A.    Yes, I do.
25        Q.    -- on the second page?  And this would
```

Buckman, Charles 12-17-09 video depo1

45

```
 1   have also been a document that was reviewed or
 2   read to you that day?
 3        A.   Yes, sir.
 4             (Whereupon, Defendant's Exhibit No. 19
 5   was marked.)
 6        Q.   Okay.  Showing you what's marked as --
 7   showing you what was premarked as 21 and I'm
 8   marking as 19, if you could take a look at No. 19
 9   and tell me if you recognize any of the signatures
10   that appear on any of those pages.
11        A.   My wife's signature is on Page 6.
12        Q.   Okay.  The second page of this
13   particular document?
14        A.   Yes.  Yes.
15        Q.   And her signature appears there?
16        A.   Yes.
17        Q.   And you recognize that?
18        A.   Yes, I do.
19             MR. PINE:  Okay.
20             (Whereupon, Defendant's Exhibit No. 20
21   was marked.)
22        Q.   And with respect to No. 20, which is
23   Complete Investment Account Application, again
24   directing your attention to these pages, and
25   whether you recognize or can identify any of the
```

```
 1   signatures on that -- on that document.
 2        A.   Her signature is on Page 3.  That's it
 3   on this one.
 4        Q.   Okay.
 5        A.   Page 3, Maureen's signature.
 6        Q.   And the information that appears on ?age
 7   1, is that information accurate as it relates to
 8   your wife in terms of her name, her address, her
 9   date of birth, her social security number?
10        A.   Yeah.  Yes, it is.
11        Q.   Okay.  And is that information that she
12   gave to Raymour --
13        A.   Yes.
14        Q.   -- on that day?
15        A.   Yeah.  Yes.
16             (Whereupon, Defendant's Exhibit No. 21
17   was marked.)
18        Q.   I'm going to show you what was
19   previously premarked as No. 26 and I'm going to
20   mark it as No. 21.  It's titled ING Golden Select
21   Application, and ask if you can identify any of
22   the signatures that appear on this nine-page
23   document.  You can take your time to take a look
24   at it --
25        A.   Okay.
```

46

```
 1        Q.   -- to identify -- if you can identify
 2   any of those -- these signatures, let me know.
 3        A.   This is my signature.
 4        Q.   Okay.  And that is on the --
 5        A.   Page 8 of 9.
 6        Q.   Okay.
 7        A.   And that's -- that's it that I can see.
 8        Q.   And that's your signature that appears
 9   on that document?
10        A.   Yes, it is.
11        Q.   And that document was an application
12   with ING for a deferred variable annuity, and was
13   that -- was this document also read or explained
14   to you in terms of the purpose?
15        A.   Yes, it was.
16        Q.   Okay.  Did you have any questions or
17   objections to it?
18        A.   I don't remember but --
19        Q.   Okay.
20        A.   -- but if I did, he would have answered
21   it.
22        Q.   Okay.  He was --
23        A.   I don't remember, to be honest with you.
24        Q.   That's fine.  You don't have a specific
25   memory?
```

47

```
 1        A.   Of questions, right.
 2        Q.   Was Raymour cooperative in terms of
 3   questions that you did ask that day?
 4        A.   Very.  Yes.
 5             (Whereupon, Defendant's Exhibit No. 22
 6   was marked.)
 7        Q.   And showing you No. 22, which is
 8   entitled WRL Freedom Premier Variable Annuity
 9   Application, and showing you this document and
10   asking whether you recognize any signature that
11   appears in the contents of that document.
12        A.   My signature is on Page 9 of 10.
13        Q.   Okay.  And that was also signed on that
14   same day during the same --
15        A.   Yes.
16        Q.   -- session?  Did -- did Raymour spend a
17   lengthy period of time with you that day?
18        A.   Yes, he did.
19        Q.   Okay.  He wasn't hurrying out to
20   something else on that day because you said the
21   first day he was going somewhere else?
22        A.   Yeah.  He had other people to meet with
23   or whatever.
24        Q.   On this day did he spend a sufficient
25   time with you?
```

48

```
1    A.   On the next time, yes, he did.
2    Q.   Right.  Okay.
3    A.   I don't remember how long but it was a
4  period of time.
5    Q.   Right.  At any time did he hurry you
6  through the documents?
7    A.   No, he did not.
8    Q.   Did he take his time?
9    A.   Yeah.
10   (Whereupon, Defendant's Exhibit No. 23
11 was marked.)
12   Q.   Okay.  And showing you No. 23, which is
13 a Genworth Variable Annuity Application, and
14 asking you if you recognize any signatures that
15 appear on this document.
16   A.   My signature is on this one.
17   Q.   Okay.  And you recognize your signature
18 there as well?
19   A.   That is my signature.  That was my
20 signature.
21   Q.   Okay.  And did you understand that in
22 all three of these applications, that you were
23 applying to be the annuitant for these various
24 annuities that were being opened?  Did you
25 understand --
```

Buckman, Charles 12-17-09 video depo1

49

```
1    A.   Yes, sir.
2    Q.   Okay.  And that someone else was the
3  owner of that annuity, correct?
4    A.   Yes, sir.
5    Q.   And you understood that --
6         MR. McADAMS:  Objection.  Leading.
7    Q.   Did you understand that that owner --
8         MR. McADAMS:  Objection.  Leading.
9    Q.   -- would -- could make money upon either
10 your death or your wife's death?
11        MR. McADAMS:  Objection.  Leading.
12        MR. PINE:  You can answer.
13   Q.   Did you have that understanding at that
14 time?
15   A.   Yes.
16   Q.   Okay.  Did you have any objections to
17 that?
18   A.   Not at all.
19   (Whereupon, Defendant's Exhibit No. 24
20 was marked.)
21   Q.   Okay.  I'm showing you what was
22 previously marked as 25 and I'm marking it as
23 No. 24.  This is a WRL Freedom Premier Variable
24 Annuity Application and I'd ask you if you
25 recognize any of the signatures that are depicted
```

Buckman, Charles 12-17-09 video depo1

50

```
1  in this document.  You can take a look.
2    A.   That's my wife's signature on Page 9.
3    Q.   Okay.
4    A.   And that's it.
5    Q.   And you recognize her signature on
6  this --
7    A.   Yes.
8    Q.   -- as well?
9    A.   Yes, I do.
10   Q.   Okay.  There were a number of documents
11 that we've just gone over.  It took a fair amount
12 of time to do that with you just today without
13 going through them and you've identified your
14 signature.  Am I correct that Raymour went over
15 each of these documents with you and your wife?
16   A.   Yes, he did.
17   Q.   Okay.
18   A.   You are correct.
19   Q.   And he paid each -- both you and your
20 wife $4000 during that same meeting for that?  For
21 total -- you have to answer verbally.
22   A.   I'm sorry.  I'm sorry.
23   Q.   That's okay.
24   A.   I don't know if that's why he gave me
25 the 4000, and I had no -- I didn't know he was
```

Buckman, Charles 12-17-09 video depo1

51

```
1  going to give me any money.
2    Q.   Okay.
3    A.   I signed those papers and afterwards he
4  said I have two checks here.
5    Q.   Okay.
6    A.   I didn't know, you know, receiving any
7  money --
8    Q.   Okay.
9    A.   -- so --
10   Q.   You were still willing to enter --
11   A.   Yes.
12   Q.   -- into these programs --
13   A.   Yes.  Yep.
14   Q.   -- whether or not money was involved?
15   A.   Exactly.
16   Q.   And in the end he did pay you some
17 money?
18   A.   Yes, he did.
19   Q.   Okay.  And that was for the two checks
20 for the 4000?
21   A.   Yes.
22   Q.   And did you appreciate that?
23   A.   Absolutely.
24   Q.   Did you thank him?
25   A.   Very much so.
```

Buckman, Charles 12-17-09 video depo1

52

1    Q.    Okay.  At some point, did you have
2    further contact with Raymour during that year,
3    2008?  After this -- these transactions all
4    happened, did you have further contact in 2008
5    with Raymour?
6    A.    I know he called me after my wife's
7    death.  He gave me his condolences and then -- and
8    he said, "Mr. Buckman, if there is anything you
9    ever need or anything we can ever do for you,
10   please feel free to call."
11   Q.    Okay.
12   A.    I never did, of course, but he did.
13   Q.    He made the offer?
14   A.    Yeah.
15   Q.    When did your wife pass away?
16   A.    September 17th.
17   Q.    Of 2008?
18   A.    Yes.  I'm sorry.  Yes.
19   Q.    And moving forward to 2009, were you
20   contacted by any representative of an insurance
21   company at some point in 2009?
22   A.    Yes, I was.
23   Q.    And do you recall how that contact came
24   about?
25   A.    It was in 2008 --

53

1    Q.    Okay.
2    A.    -- when the first insurance company
3    came.
4    Q.    And what do you recall about that?
5    A.    Those two guys they were from -- they
6    told me they were from Florida.  I was on my way
7    out the door and I was really in a hurry.  I
8    figured it was very important and they barged
9    their way in.  I was really upset with them.
10       They said, "Mr. Buckman, I'm all the way from
11   Florida."  I said, "Well, you have to come back."
12       "Well, I'm all the way from Florida and I
13   just can't come back anytime."  So I was upset but
14   I said, "Okay.  I'll give you five minutes," which
15   was 45 minutes it ended up.
16       They started questioning me about all -- some
17   of the things you just did, and this and that, and
18   what did you do with the money.
19       I said, "What do you care what I did with the
20   money?"  "Did you spend it all?"  He's asking me
21   those types of questions, and -- and they told me
22   it was about -- you know, that they were
23   questioning me about the checks that I got and why
24   I got them and -- and that was the first contact I
25   had with insurance companies.

54

1    Q.    Okay.
2    A.    And I was very upset with them.
3    Q.    Okay.  And why were you upset with them?
4    A.    They like -- I felt like they barged
5    into my house.
6    Q.    Uh-hum.
7    A.    I asked them not to.  I said I was in a
8    hurry.  It was something to do with some medical
9    thing, I forget exactly what it was, but I was on
10   my way out the door and they wouldn't take no for
11   an answer.
12   Q.    At some point --
13   A.    And they came back four, five times
14   after that too.
15   Q.    Okay.  I was going to ask you that.
16   A.    Yeah.
17   Q.    They came back?
18   A.    Yeah.
19   Q.    And did you have any phone conversations
20   with Raymour during this period of time when they
21   were --
22   A.    I called him the first time when they
23   came because I was confused.  I didn't know what
24   all this was about.
25   Q.    Right.

55

1    A.    That's the only time.  I called him just
2    to let him know they were in my house.
3    Q.    And --
4    A.    I didn't know the reason why.  I hope I
5    didn't do something wrong but the $2000 check, I
6    just -- I didn't know.
7    Q.    Right.
8    A.    That's the only reason I called him.
9    Q.    What, if anything, did Raymour tell you
10   in terms of how to handle it?
11   A.    "Mr. Buckman, we're so sorry.  We
12   apologize so much for anybody intruding your home
13   and bothering you."
14   Q.    Right.
15   A.    He was all apologies about that
16   happening to me.
17   Q.    Okay.
18   A.    And he -- he will call them or whatever
19   and he hoped that that will never happen to me
20   again.  He was all apologies.
21   Q.    Okay.
22   A.    That was -- that was --
23   Q.    At any point, did you ask him how you
24   should answer the questions or anything like that?
25       MR. McADAMS:  Objection.  Leading and

56

```
 1  hearsay.
 2      A.  No.  Well, he did say tell the truth.
 3          MR. PINE:  Okay.
 4          MR. McADAMS:  Objection.  Hearsay.
 5      Q.  How did that come about?
 6          MR. McADAMS:  Objection.  Hearsay.
 7      Q.  In other words, you just said Raymour
 8  said to you just tell the truth.  How did that
 9  come about in the conversation?
10      A.  When these guys asked me questions.
11          MR. McADAMS:  Objection.
12          MR. PINE:  You can answer.
13      A.  I said, you know, I'm just telling him
14  what happened.  I didn't -- I didn't know what was
15  going to happen to me for taking the $2000.  It
16  sounded like I was a criminal or something they
17  were making me feel, and he said, "Just tell them
18  the truth.  If anybody asks you, just tell them
19  the truth."
20      Q.  Okay.
21      A.  "That's it.  Just be honest."  Okay.
22  That's what I'm trying to do anyway.
23      Q.  That's a good way to be.
24      A.  Because I did nothing wrong anyway, so
25  there was nothing wrong to begin with.
```

Buckman, Charles 12-17-09 video depo1

57

```
 1          MR. PINE:  If I could just have a
 2  moment.
 3          ( P A U S E )
 4  BY MR. PINE:
 5      Q.  Mr. Buckman, tell us about your medical
 6  condition now and what you suffer from.
 7      A.  COPD.
 8      Q.  Okay.
 9      A.  Chronic lung disease.
10      Q.  That's obstructive pulmonary --
11      A.  Yes.
12      Q.  -- disease?  And how do you feel on a
13  daily basis?  You need oxygen obviously?
14      A.  As a matter of fact, after this meeting,
15  tomorrow I'm going to be going to the hospital.
16      Q.  Oh, I'm sorry to hear that.
17      A.  Every -- like every three months I have
18  to go to the hospital and get R&R, rebuilt and
19  recuperate, I guess, so I can get back to
20  breathing regular again.
21      Q.  Does it affect your ability to
22  understand or answer the questions?
23      A.  Oh, absolutely not.
24      Q.  And what was your medical condition back
25  in 2008 when you first had --
```

Buckman, Charles 12-17-09 video depo1

58

```
 1      A.  Same thing.
 2      Q.  Okay.  Did it affect your ability to
 3  make decisions or involve yourself in these
 4  transactions?
 5      A.  So far it hasn't disturbed my mental --
 6  just my lungs.
 7      Q.  Just your lungs.  Okay.
 8      A.  So far.  That I know about anyway.
 9      Q.  And how long have you suffered from
10  COPD?
11      A.  Ten years.
12      Q.  Okay.
13      A.  Now it's worse.
14      Q.  Right.
15      A.  It's getting worse all the time.
16      Q.  After that first meeting and the number
17  of documents that we've gone over that you signed,
18  various applications and acknowledgements,
19  et cetera, did you understand that those were not
20  documents that were just a receipt for money;
21  those were other documents for other purposes?
22          MR. McADAMS:  Objection.  Leading.
23          MR. PINE:  You can answer.
24      A.  Yes, I understood that.
25      Q.  And that was explained to you by
```

Buckman, Charles 12-17-09 video depo1

59

```
 1  Raymour?
 2      A.  Yeah.
 3          MR. PINE:  That's all I have.  Thank
 4  you.
 5              EXAMINATION
 6  BY MR. FLANDERS:
 7      Q.  Hi, Mr. Buckman.  I'm Bob Flanders.  You
 8  and I met each other --
 9      A.  Yes.
10      Q.  -- last June, is that right?
11      A.  That's correct.
12      Q.  I came over your house?
13      A.  Correct.
14      Q.  And we spoke.  I represent
15  Mr. Caramadre, Mr. Joseph Caramadre.  Other than
16  today, did you -- have you ever met Mr. Caramadre
17  previously?
18      A.  Today is the first time now I met the
19  gentleman.
20      Q.  Did you understand that -- well, did you
21  have any understanding of what Mr. Caramadre's
22  role in all of this was that you've been asked
23  about?
24      A.  Ah... Everybody that I -- like Raymour
25  worked for him.  I know that.
```

Buckman, Charles 12-17-09 video depo1

**60**

```
1     Q.   Okay.
2     A.   The checks were his that I received were
3  from him.
4     Q.   So did you understand that the money you
5  were getting --
6     A.   It's his business, whatever, the
7  company.
8     Q.   -- was coming --
9     A.   Right.
10    Q.   Did you understand the money you
11 received was from Mr. Caramadre?
12    A.   Yes.
13    Q.   And how did you feel about that?
14    A.   I felt good to have the money.  I don't
15 know what do you mean by -- because they were from
16 him you mean?
17    Q.   Yes.
18    A.   All right.  I don't know what you meant
19 by how do I feel.
20    Q.   Were you grateful to Mr. Caramadre?
21    A.   Oh, absolutely.
22    Q.   Did you tell Raymour that?
23    A.   Absolutely.
24    Q.   And do you still --
25    A.   I told him that -- you asked me did I
```

Buckman, Charles 12-17-09 video depo1

**61**

```
1  tell Raymour that?
2     Q.   Yes.
3     A.   What I told Raymour was my wife, I can't
4  thank him enough -- and this he can tell you -- I
5  could not thank him enough, him and his boss, for
6  supplying my wife with the best days of her life
7  for the couple of months before she passed away
8  and to this day I'll be forever grateful.
9        No matter what they -- I could care less how
10 much they got.  I know that my wife had the best
11 time of her life because of what they did for her
12 and I'll never be thankful enough.  Well,
13 that's --
14    Q.   In going over these documents with you,
15 did Raymour do anything whatsoever to discourage
16 you from reading the documents?
17    A.   Oh, no.  Absolutely not.
18    Q.   And did he attempt to explain to you and
19 your wife how these annuities and joint accounts
20 would work?
21    A.   Yes, he did.
22    Q.   And did you understand that by signing
23 these documents --
24        MR. McADAMS:  Objection.  Leading.
25    Q.   -- that Raymour presented to you, that
```

Buckman, Charles 12-17-09 video depo1

**62**

```
1  you would be allowing your name to be used so that
2  someone else could attempt to make money from
3  that?
4     A.   Correct.  I did understand that.
5     Q.   Did -- did the documents that Raymour
6  showed to you contain all of the printed material
7  that's now on them?
8     A.   Yes, it did.
9     Q.   They were in substantially the same form
10 at the time you read them as you see them now?
11    A.   Correct.  When I answer that question
12 just to be --
13    Q.   Sure.
14    A.   -- truthful, I don't know word for word
15 what was on those documents, but I know every
16 document that I signed, it was the same as it was
17 when I signed it.  I mean I don't know -- my
18 signature is on them and I know he read whatever I
19 signed --
20    Q.   Okay.
21    A.   -- so --
22    Q.   Did you notice whether any of the
23 printed material that now appears on the documents
24 that you were shown was missing?
25    A.   No, I did not.
```

Buckman, Charles 12-17-09 video depo1

**63**

```
1     Q.   Now, did you notice that the documents
2  now have other signatures on them?
3     A.   Yes.
4     Q.   Were those signatures on them other than
5  yours and your wife's when they were shown to you?
6     A.   I really don't remember --
7     Q.   Okay.
8     A.   -- to be honest with you.
9     Q.   Did Raymour explain at any point that an
10 attempt would be made to match you up with other
11 investors?
12        MR. McADAMS:  Objection.  Leading.
13    A.   Could you repeat that?  I'm sorry.
14 Forgive me.
15    Q.   Did Raymour say anything to you about an
16 attempt being made to match you up with other
17 people who would invest money with you in joint
18 accounts?
19        MR. McADAMS:  Objection.
20    A.   I don't remember that, if he did or he
21 didn't.
22    Q.   Did you and your wife, from time to
23 time, receive statements of some of the accounts
24 that were opened in your name?
25    A.   Yes, I did.
```

Buckman, Charles 12-17-09 video depo1

64

```
1        Q.   And these were statements from insurance
2    companies?
3        A.   Yes.
4        Q.   And did those statements show --
5    were -- were they received by you at your home
6    address?
7        A.   Yeah.  They were sent to my home
8    address.
9        Q.   And would you receive them periodically?
10       A.   Yes, I did.
11       Q.   And did those statements show that there
12   was substantial money being invested in the
13   account?
14       A.   Yes, it was.
15       Q.   Thousands of dollars?
16       A.   Yes.
17       Q.   And -- and did you do a -- do anything
18   with respect to that -- that information that was
19   provided to you?
20       A.   I called Raymour.  I told him that I had
21   them.
22       Q.   Okay.
23       A.   And they don't belong to me.  To pick
24   them up.  He said it was fine.  I just told him
25   that I was receiving them.
```

65

```
1        Q.   All right.  And did your wife also --
2        A.   The only reason I opened them, they
3    were -- they were sent to me --
4        Q.   Yes.
5        A.   -- in my name.
6        Q.   And did your wife also receive such
7    statements?
8        A.   No.  She had passed away before they
9    started coming.
10       Q.   Okay.  And do you remember how
11   frequently you received the statements?
12       A.   I think -- I'm not positive -- once a
13   month.
14       Q.   Okay.
15       A.   I'm pretty sure.  I'm not positive.
16       Q.   Could it be once every two or three
17   months?
18       A.   It could have been.
19       Q.   Okay.
20       A.   I'm not -- I'm not positive.
21       Q.   You mentioned a woman by the name of
22   Carol Jackson?
23       A.   Yes.
24       Q.   And she was a visiting nurse?
25       A.   VNA.
```

66

```
1        Q.   Was this someone that you trusted?
2        A.   Well, just from knowing her from -- I
3    only known her like two or three months.  You
4    know, that's the first time I met her when she
5    came over to treat my wife.
6        Q.   Okay.
7        A.   She seemed okay.  I mean she seemed
8    trustworthy.
9        Q.   And you mentioned that she was the one
10   who referenced calling the number on the ad that
11   you saw?
12       A.   Yes.
13       Q.   Did she say anything in particular about
14   Raymour?
15       A.   She didn't mention anybody's name.
16       Q.   Okay.  Did she at any point?
17       A.   It sounded like she knew them because
18   she said tell them that I told you to call.
19       Q.   Okay.
20       A.   But they didn't seem to know her when I
21   asked.
22       Q.   Did you have any other discussions with
23   her about Raymour, about whether he was
24   trustworthy?
25       A.   No.  Nothing.
```

67

```
1        Q.   Okay.  What was Raymour's manner in
2    dealing with you and your wife?
3        A.   What his personality was?
4        Q.   Yes.
5        A.   He was a perfect gentleman.  He come in
6    my house, introduced himself, Mr. and
7    Mrs. Buckman.  He never called me by my first
8    name.  Mr. Buckman.  I told him he could call me
9    Charlie but still it was Mr. Buckman.  He asked if
10   he could sit down.  I said, yeah, absolutely, and
11   he -- he -- he's just as kind as can be.  Very
12   much of a gentleman.
13       Q.   Did hospice through or -- or the VNA
14   indicate to you in any way that they had had other
15   good experiences in referring people to Raymour?
16            MR. McADAMS:  Objection.  Leading.
17       A.   No.
18       Q.   Did they mention that they had referred
19   other people using the ad that they showed you?
20            MR. McADAMS:  Objection.  Leading.
21       A.   No.  But it sounded like the way she
22   says, I understood, did you get your money?  Like
23   someone else had got it.  That's how it seemed to
24   me, like she's already done this before.
25       Q.   Okay.
```

68

```
1       A.   The way she said it.  I don't know.  She
2  didn't say she did or anybody else had.
3       Q.   Did you have any further communications
4  with Carol Jackson about the fact that you had
5  followed up on her recommendation?
6       A.   I might have.
7       Q.   Did you tell her that --
8       A.   I think -- I'm not positive but I think
9  I might have.
10      Q.   She continued to come to the house, did
11 she?
12      A.   Yes.
13      Q.   And did she, at any time, mention to you
14 that they had obtained a legal opinion about --
15           MR. McADAMS:  Objection.  Leading.
16      Q.   -- the kind of program that -- that they
17 had -- that Raymour had presented to you?
18      A.   No.  I don't think we ever had a
19 discussion.
20      Q.   Did -- did she mention by name an
21 attorney named Jeffrey Chase-Lubitz who had given
22 an opinion to them?
23           MR. McADAMS:  Objection.  Leading.
24      A.   No.
25           MR. FLANDERS:  That's all I have.  Thank
```

Buckman, Charles 12-17-09 video depo1

69

```
1  you.  Excuse me.
2                 ( P A U S E )
3  BY MR. FLANDERS:
4       Q.   Now, you met with me, Mr. Buckman, last
5  June, is that right?  Did you have any meeting at
6  some point with any of the gentlemen here from the
7  government?
8       A.   Yes.  These two gentlemen here and the
9  lady over there.
10      Q.   Okay.  Let the record reflect that you
11 are referring to Mr. McAdams, Mr. Vilker --
12      A.   Yes.
13      Q.   -- and Ms. McDaid?
14      A.   Yes.
15      Q.   Who was also present, right?
16      A.   Correct.
17      Q.   You met with all three of them?
18      A.   Yes.
19      Q.   When did you meet with them?
20      A.   I can't -- I don't remember the date
21 that it was.  A couple of weeks ago.
22      Q.   Okay.  What did they tell you as to why
23 they were meeting with you?
24      A.   They were going over all these forms.
25 They were checking to see if this was legal or
```

Buckman, Charles 12-17-09 video depo1

70

```
1  not, with these -- with these documents.
2       Q.   Okay.
3       A.   And the FBI lady told me they think it
4  was fraud.  That's what she said.
5       Q.   Say that again.
6       A.   She said it was fraud.  They got them on
7  fraud on these documents.  The FBI lady told me
8  that outright.
9       Q.   Can you remember exactly what she said?
10      A.   No.  She said we have a case here.
11 It's -- it's concerning fraud.  We think they --
12 they got millions of dollars on fraud with these
13 documents.  That's what the FBI lady told me --
14      Q.   And the FBI lady --
15      A.   -- and that's why we're investigating
16 this.
17      Q.   And that's what Ms. McDaid said to you?
18      A.   Yes, if that's her name.  Just like
19 that.
20      Q.   Did they tell you that they were going
21 to be taking your deposition?
22      A.   Yes.
23           MR. FLANDERS:  Okay.  Thank you.
24           THE WITNESS:  You're welcome.
25           MR. PINE:  Thank you.
```

Buckman, Charles 12-17-09 video depo1

71

```
1            MR. MacFADYEN:  For ████████████
2  the reasons previously stated at the previous
3  depositions I have no questions for the witness.
4            MR. TRAINI:  And like Mr. MacFadyen, ████
5  ████████████████████ for the same reasons
6  previously stated by both Mr. MacFadyen and myself
7  at other proceedings, I have no questions.
8            MR. McADAMS:  I can proceed with
9  cross-examination but would you like to take a
10 break before we go to the next part, Mr. Buckman?
11           THE WITNESS:  Yes.
12           MR. McADAMS:  Why don't we take a brief
13 break?
14           VIDEOGRAPHER:  The time is 12:11.  Off
15 the record.
16                ( R E C E S S )
17           VIDEOGRAPHER:  The time is 12:22.  Back
18 on the record.
19                EXAMINATION
20 BY MR. McADAMS:
21      Q.   Good afternoon, Mr. Buckman.
22      A.   Good afternoon.
23      Q.   My name is John McAdams and I'm an
24 attorney for the government.  We met before,
25 correct?
```

Buckman, Charles 12-17-09 video depo1

72

1    A.   Yes.

2    Q.   Okay.  And I just want to ask you some

3  questions about some of the things that Mr. Pine

4  asked you about and Mr. Flanders as well as some

5  of the documents that we looked at today.

6    A.   Okay.

7    Q.   All right?  Now, before we get into

8  that, I wanted to just ask you, what was your

9  understanding of why Mr. Caramadre was giving you

10 money?

11   A.   At the very beginning I was thinking

12 there was like a tax write-off for his taxes that

13 he was giving money to people like us that needed

14 it at the time.  My wife was dying with cancer.  I

15 thought it would be a write-off for his taxes.  I

16 didn't know.  That's what I was thinking at the

17 very beginning.

18   Q.   Okay.  So it was your understanding that

19 this was some type of --

20   A.   I had no idea.  I'd never met the man.

21 I didn't know anything about anything.  But that's

22 what I thought in the beginning.

23   Q.   And what, if anything, did Raymour tell

24 you about why Mr. Caramadre wanted to give you

25 money?

73

1    A.   He asked me if I knew what -- asked my

2  wife and I -- if we knew what annuities were.

3  That's not why he gave me the money though.  In

4  the beginning he gave me the money for -- I

5  thought it was for the tax purposes for their

6  company.  I thought that would be a write-off for

7  them, and then he explained to us about the

8  annuities afterwards, and to use our name in the

9  annuities to make an investment.

10   Q.   And he -- and he paid you to do that,

11 right?

12   A.   No.  He didn't pay me to do it.  He

13 didn't offer me 5 cents to sign my name.  It was

14 after I had signed my name and everything, he

15 offered us those checks which I didn't know was

16 coming.

17   Q.   Okay.  One of the things I want to ask

18 you about is, you met with Raymour twice, is that

19 right?

20   THE WITNESS:  What we are talking about

21 here?

22   MR. McADAMS:  Yes.

23   A.   I believe so, but I'm not positive.  It

24 could have been more.  As I was trying to explain,

25 there was many people coming in my house at that

74

1  time.  My wife wasn't feeling well.  We had

2  doctors, we had nurses, we had friends that she

3  worked with.

4    Q.   But your -- your memory is that he -- he

5  came --

6    A.   I know that twice that he was there.

7    Q.   Okay.

8    A.   I know that for sure.  It could have

9  been more.  I'm not positive.

10   Q.   Might have been three times?

11   A.   Could have been, yeah, three, four

12 times.  I'm not positive.

13   Q.   But not seven, eight, nine times, right?

14   A.   I don't think so.

15   Q.   And when he came the first time, that

16 was in the beginning of August of 2008?

17   A.   I think so.

18   Q.   Okay.  And how -- how -- and he spent, I

19 believe you testified, about five minutes?

20   A.   It had to be in August.  Maybe 10

21 minutes.  Not very long at all.

22   Q.   It was a very short meeting?

23   A.   Very, very short.

24   Q.   And that's when you testified that he --

25 he gave you the check for $2000?

75

1    A.   Yeah.

2    Q.   He said, who should I make it out to?

3    A.   Yes.

4    Q.   And is that when you gave him your

5  social security number and driver's license?

6    A.   I don't believe so.  He didn't take any

7  information at that time.

8    Q.   But there was a second meeting a couple

9  of weeks later?

10   A.   Yes.

11   Q.   And that's when --

12   A.   A week or two later.  I'm not positive.

13   Q.   And it was at that second meeting that

14 you signed all the documents?

15   A.   Most of them.  I'm not sure it was all

16 of them at that meeting or we had another.  I

17 don't remember.  But most of them I know I signed

18 the second meeting.

19   Q.   And I believe when you were interviewed

20 previously, you indicated that Mr. Raymour showed

21 you about five or six documents, is that correct?

22   A.   In the -- the -- yes.  In the second

23 meeting, not the first one.

24   Q.   In the first meeting there were no

25 documents?

76

1    A.   There were no documents, nothing.

2    Q.   And in the second meeting there were

3 five or six documents?

4    A.   Yes.

5    Q.   Did they all appear to be more or less

6 the same document?

7    A.   To me it did, yes.

8    Q.   And you -- you testified that he spent

9 how much time with you at that second meeting?

10   A.   It was quite a long time.  I don't

11 remember exactly.

12   Q.   Do you -- do you remember being

13 interviewed about that before and telling the FBI

14 agent that it was about an hour, perhaps an hour

15 and 15 minutes?

16   A.   Yeah.

17   Q.   Is that consistent with your memory?

18   A.   I don't know.  I was guessing because I

19 said I wasn't positive.  It could have been an

20 hour, an hour and 15 minutes.

21   Q.   But it wasn't four, five hours?

22   A.   I don't think it was five hours, no.

23   Q.   And other than the times when Raymour

24 came to your house, you never met with him

25 anywhere else, did you?

Buckman, Charles 12-17-09 video depo1

---

77

1    A.   No.  Never.

2    Q.   You never went to his office?

3    A.   That's the only time I saw him was at my

4 house.

5    Q.   Okay.  And -- and the only times that

6 you met with him, your wife, Maureen, was with

7 you?

8    A.   Yes.

9    Q.   And she, to your knowledge she didn't

10 ever meet with Raymour at any other time, did she?

11   A.   No.

12   Q.   She never went to his office?

13   A.   No.

14   Q.   In fact she was very sick at this point

15 in time?

16   A.   I don't know where his office is.

17   Q.   You don't even know where his office is?

18   A.   Right.  Correct.

19   Q.   Okay.  Well, one of the things that I

20 want to do -- and it's going to take a few

21 minutes, Mr. Buckman -- is I'd like to show you

22 some of those documents that -- that Mr. Pine

23 asked you about and point to some of the dates on

24 them and ask you to identify them, if that's okay.

25      So what I'd like to do is first show you

Buckman, Charles 12-17-09 video depo1

---

78

1 Government Exhibit 1 and ask you if you could note

2 the date on that.

3    A.   Yes.

4    Q.   What is the date there, sir?

5    A.   August 5th.

6    Q.   And that's the check for $2000?

7    A.   Yes.

8    Q.   That's August 5th of 2008?

9    A.   Yes.

10   Q.   All right.  And I'd like to have you

11 take a look at Government Exhibit 2, which is the

12 charitable receipt document.  Would you take a

13 look at the date on that?

14   A.   Yes.  August 5th.

15   Q.   Okay.  And I'd like you to take a look

16 at Government Exhibit No. 3, which is the

17 Agreement and Acknowledgement document between

18 Mr. Caramadre and -- and yourself.

19   A.   Yes.

20   Q.   And if you take a look, it indicates the

21 date on there and tell us what that is.

22   A.   The 20th of August.

23   Q.   So, at this point now, we've got

24 documents that show two different dates, August 5

25 and August 20th?

Buckman, Charles 12-17-09 video depo1

---

79

1    A.   Right.

2    Q.   Okay.

3    A.   See, I might've -- I must've signed them

4 that day then.

5    Q.   All right.

6    A.   I don't remember.

7    Q.   And I'd like to show you Government

8 Exhibit 4 which is another agreement --

9    A.   Yeah.

10   Q.   -- acknowledgement --

11   A.   Sure.

12   Q.   -- acknowledgement document.  What's the

13 date on that?

14   A.   That's the 20th of August also.

15   Q.   So this is another document on

16 August 20th?

17   A.   Yeah.

18   Q.   And I'd like to show you Government

19 Exhibit No. 5, which is the E*Trade Financial

20 Investment Account Application, and I'll turn your

21 attention to the third page and ask you to take a

22 look at that.  What's the date there?

23   A.   August 20th also.

24   Q.   And that's your wife's signature?

25   A.   My wife's signature.

Buckman, Charles 12-17-09 video depo1

80

1   Q.   Okay.  Now, I'd like you to take a look
2 at Government Exhibit 6 which is another E*Trade
3 Financial -- this one in your name -- and ask you
4 what the date is on that one.
5   A.   The 20th also.  It's my signature.
6   Q.   August 20th, 2008?
7   A.   Yes.
8   Q.   So now we've seen some documents on
9 August 5th, 2008 and August 20th, 2008?
10   A.   Correct.
11   Q.   Okay.  Now I'd like you to take a look
12 at Government Exhibit No. 7, and ask you to look
13 on the second page and see what the date on that
14 document is.
15   A.   The 21st of August.
16   Q.   Now, when you take a look at that date,
17 is that your handwriting on there?
18   A.   Yes, it is.
19   Q.   Is that your handwriting for the date?
20   A.   Yes, it is.
21   Q.   Okay.
22   A.   No.  I don't know if that's me, the
23 date, but that's my signature.
24   Q.   The name is your signature but the date
25 is --

Buckman, Charles 12-17-09 video depo1

81

1   A.   I didn't -- I didn't write the date in.
2   Q.   And let me --
3   A.   They were all dated when I signed them I
4 think.
5   Q.   I'd like you to look at Government
6 Exhibit 8 and ask you if you could take a look at
7 the second page and tell us what the date is on
8 that one.
9   A.   August 21st, 2008.
10   Q.   All right.  And is that your handwriting
11 on the date on that?
12   A.   Yes, it is.  Not on the date, no.
13   Q.   Just the signature?
14   A.   Just the signature.
15   Q.   Thank you.  And I'd like you to take a
16 look at Government Exhibit No. 9 which is another
17 Annuitant Acknowledgement between ADM Associates
18 and yourself with a company called Hartford Life?
19   A.   Yes.
20   Q.   Is that --
21   A.   The 21st, that's my signature but not my
22 signature on the date.
23   Q.   Okay.  And I'd like you to take a look
24 at Government Exhibit No. 10 which is another
25 Annuitant Acknowledgement this time between

Buckman, Charles 12-17-09 video depo1

82

1 yourself, ADM Associates and a company called
2 Nationwide.  Would you take a look and tell us the
3 date on that?
4   A.   August 21st.  It's not my signature on
5 the date.  It is my signature.
6   Q.   On the document?
7   A.   Yes.
8   Q.   And the next one is Government
9 Exhibit No. 11 and this is an Annuitant
10 Acknowledgement between yourself, ADM Associates
11 with a company Genworth.  Would you take a look at
12 the second page and tell us what the date is on
13 that?
14   A.   That's also August 21st.  It's not my
15 signature on the date but it's my signature on the
16 document.
17   Q.   And the next one is Government
18 Exhibit No. 12, which is an Annuitant
19 Acknowledgement between Maureen Buckman, your
20 wife, Natco Home Fashions and Nationwide.  Would
21 you take a look at the -- date on that one?
22   A.   It is her signature, my wife's signature
23 on the document, and it's not her date, signature
24 on the date.
25   Q.   And what does the date indicate?

Buckman, Charles 12-17-09 video depo1

83

1   A.   That's the 21st of August also.
2   Q.   August 21, 2008?
3   A.   Yes, 2008, correct.
4   Q.   All right.  And Government Exhibit 13
5 which is another Annuitant Acknowledgement between
6 your wife --
7   A.   That's her initials, that's her
8 signature and that's not her signature on the
9 date, but it's her signature on the --
10   Q.   And is it also August 21st?
11   A.   Yes.
12   Q.   And Government Exhibit 14, another
13 Annuitant Acknowledgement document between your
14 wife and Genworth Financial --
15   A.   Yeah.  That's her signature on the
16 document but not on the date.
17   Q.   And that's also August 21?
18   A.   August 21st.
19   Q.   All right.  Now, I'd like you to also
20 take a look here at Government Exhibit 15, which
21 is a document that was produced by the defense
22 which indicates at the top of it:  "16.  Telephone
23 Authorization."  Would you take a look at that?
24   A.   Yes.
25   Q.   Do you see your signature at the bottom

Buckman, Charles 12-17-09 video depo1

84

1  of that?

2       A.   Yes.

3       Q.   And what's the date indicated on there?

4       A.   August 21st, '08.

5       Q.   And is that your handwriting on the

6  signature?

7       A.   Yes.  No.  My signature, yes, it is.

8       Q.   But what about the date?

9       A.   No.

10      Q.   Okay.  Now, Mr. Buckman, you noticed

11  this document is just essentially a signature page

12  of a document?

13      A.   Yes.

14      Q.   And, in fact, it says at the bottom of

15  it Page 9 of 10?

16      A.   Yes.

17      Q.   And there's no other signatures on the

18  document, is there?

19      A.   On this one?  No.

20      Q.   In other words, where it says, "Owner's

21  signature," it's blank?

22      A.   Correct.

23      Q.   And where it says, "Joint Owner's

24  Signature," it's blank?

25      A.   Correct.

85

1       Q.   Okay.  Is this what the documents that

2  Raymour showed you typically looked like when you

3  signed them?

4       A.   Yes.

5       Q.   Okay.  In fact, he gave you documents

6  like this to sign at the end?

7       A.   Yes, he did.

8       Q.   A whole series of signature pages?

9       A.   Yes.

10      Q.   And you don't really know whether or not

11  you saw the prior eight pages, do you?

12      A.   I don't recall, no.  No, I don't.

13      Q.   In fact, you don't remember what any of

14  the documents you signed looked like, isn't that

15  correct?

16      A.   To be honest with you, I don't.

17      Q.   You just know he came to your house, he

18  read you some documents, and then when he was done

19  reading them, he had you and your wife sign a

20  whole series of documents?

21      A.   I don't know if that's where, as he

22  read, the signature, sign at that time, then he

23  continued reading.

24      Q.   Okay.  So he read, he said, "Sign here"?

25      A.   I don't think he read it all in here

86

1  until he said sign it and we signed it as he was

2  reading it.

3       Q.   Okay.  But you signed blank documents

4  and you don't know whether there were preceding

5  pages before you signed them?

6       A.   No.  Right.

7       Q.   Okay.  Now, I'd like you to take a look

8  at Government Exhibit 16 --

9       A.   I don't think I did anyway.

10      Q.   -- and is that your signature on there?

11      A.   Yes, it is my signature.

12      Q.   And what's the date on that document?

13      A.   August 21st, '08.

14      Q.   Now, this is another signature page

15  document, correct?

16      A.   Yes.

17      Q.   And it also is blank with all the

18  information except for your signature?

19      A.   That's correct.

20      Q.   And the date is written in someone

21  else's handwriting, correct?

22      A.   Correct.

23      Q.   And this is the format that you were

24  handed documents by Raymour to sign?

25      A.   Yes.

87

1       Q.   Now, I'd like to turn your attention to

2  Government Exhibit No. 17, which is an ING

3  Deferred Variable Annuity Application.  We're

4  going to come back to some of these documents but

5  I want to focus your attention on the signature

6  page, which is identified at the bottom of it as

7  Page 8 of 9, and ask if you could take a look at

8  that.

9       A.   Okay.

10      Q.   Is that your signature?

11      A.   Yes, it is.

12      Q.   And what's the date indicated there?

13      A.   August 26, 2008.

14      Q.   Okay.  So August 26 of 2008?

15      A.   Yes, August 26.

16      Q.   So now we've got documents -- so now

17  we've seen documents that have been signed on

18  August 5th, August 20th?

19      A.   21st.

20      Q.   August 21st, August 26th?

21      A.   Correct.

22      Q.   Is that your handwriting above the date

23  on that document?

24      A.   No, it isn't.

25      Q.   All right.  Now, I'd like you to take a

88

```
1    look at Government Exhibit No. 18, which is a
2    Variable Annuity Application for a company called
3    Genworth, and ask you to look at the signature
4    page here and tell us what signature is there?
5         A.   That's my wife's signature.
6         Q.   And what is the date there?
7         A.   The 27th of August, '08.
8         Q.   Okay.  So August 27th, 2008?
9         A.   Right.
10        Q.   And is that your wife's handwriting that
11   wrote the date it is?
12        A.   Yes, it is.  No, not the date but the
13   signature is hers.
14        Q.   So now we're up to five days, is that
15   right?
16        A.   Yes.  It is five days.
17        Q.   All in August of 2008 --
18        A.   Right.
19        Q.   -- at this point?  Now, I believe you
20   testified that when Raymour gave you the check for
21   $2000, you took it that day and cashed it?
22        A.   I think I did, yes.
23        Q.   What about the -- the second check?
24        A.   One of them I cashed.  It was that day
25   or the next day and another one I didn't cash
```

Buckman, Charles 12-17-09 video depo1

89

```
1    until after my wife had passed away.
2         Q.   And he also -- you also testified that
3    when Raymour came the first time, he -- he wrote
4    out the check right in front of you and he said,
5    "Who do I make it out to?"
6         A.   Exactly.
7         Q.   What about the second time?
8         A.   Same thing.
9         Q.   Okay.  He wrote it out right in front of
10   you?
11        A.   Yes.
12        Q.   And you were able to cash it that day?
13             MR. PINE:  Objection.
14        A.   I could've, yes.
15        Q.   You obviously didn't cash it before you
16   got it?
17        A.   No.
18        Q.   I'd like you to take a look --
19        A.   I don't remember if I cashed it that day
20   or the next day, but yeah.
21        Q.   And do you see, what check is that?
22        A.   It's a check for $4000.
23        Q.   And is that the one that indicates "New
24   account set up - Maureen"?
25        A.   Yes.
```

Buckman, Charles 12-17-09 video depo1

90

```
1         Q.   Do you know of the two checks which one
2    you cashed first, the two $4000 checks?
3         A.   I don't remember.  I do not.
4         Q.   But you received them both the same day?
5         A.   Yeah, we got them both the same time.
6         Q.   And what's the date on that check?
7         A.   The 29th of August.
8         Q.   Okay.  So we're up to six days in August
9    now --
10        A.   Right.
11        Q.   -- August 29th, 2008?  Now, I would like
12   to have you take a look at Government
13   Exhibit No. 20 and ask you if you recognize that.
14        A.   Yep.
15        Q.   What is that?
16        A.   This is another $4000 check.
17        Q.   That's the other one --
18        A.   Made out the same date, 8 -- August
19   29th.
20        Q.   It's, again, dated August 29th --
21        A.   Right.
22        Q.   -- 2008?  Okay.  And you received the
23   two checks at the same time?
24        A.   Yes.
25        Q.   And you testified that you had no idea
```

Buckman, Charles 12-17-09 video depo1

91

```
1    that Raymour was going to give you any more money?
2         A.   I had no idea.
3         Q.   You went through and signed all these
4    documents?
5         A.   Right.
6         Q.   And then at the end, he told you I'm
7    going to pay you some money?
8         A.   No.  He just said, "Who do I make these
9    out to?"  I said, "Make what out to?"
10        Q.   Okay.
11        A.   He said, "These checks."
12        Q.   And as you went through and signed these
13   documents, he never said anything to you about I'm
14   going to be paying you money today?
15        A.   No, he did not.
16        Q.   Okay.  I'd like to look at -- have you
17   look at Government Exhibit No. 21, and turn your
18   attention to the signature page which says at the
19   bottom of it, Page 9 of 10.  Could -- could you
20   take a look at that?
21        A.   Sure.
22        Q.   Is that your signature?
23        A.   Yes, it is.
24        Q.   Okay.  And what is it dated?
25        A.   September 5th, 2002.
```

Buckman, Charles 12-17-09 video depo1

92

```
1      Q.   2002 or 2008?

2      A.   2008.  I'm sorry.

3      Q.   So this is another date, September 5th,

4   2008?

5      A.   Right.

6      Q.   And now this is a signature page and you

7   testified that when you signed the document, the

8   other signatures weren't there, correct?

9      A.   I don't recall.

10     Q.   Okay.  So this one -- this signature of

11  Joseph Caramadre, you don't recall that being

12  there when you signed?

13     A.   I don't remember it.

14     Q.   Okay.  And so this is September 5th of

15  2008.

16     Now I'd like to show you Government

17  Exhibit No. 22.  Actually before we go to 22, that

18  wasn't your handwriting on the date on

19  September 5, 2008, was it?

20     A.   No, it was not.

21     Q.   Now I'd like you to look at Government

22  Exhibit 22 which is the Genworth Life and Annuity

23  Insurance Company application and turn to the

24  signature page which says Page 4 of 6 at the

25  bottom.  Do you see your signature on there?
```

Buckman, Charles 12-17-09 video depo1

93

```
1      A.   My signature's there.

2      Q.   And what's the date next to your

3   signature?

4      A.   September 8th, 2008.

5      Q.   Okay.  And is that your handwriting for

6   the signature?

7      A.   For the signature it's not.

8      Q.   The signature --

9      A.   The signature, yes; the date is not.

10     Q.   The date you didn't write --

11     A.   Correct.

12     Q.   -- but the signature you did?

13     A.   Yes.

14     Q.   Now, I'd like you to take a look at

15  Government Exhibit No. 23, again the signature

16  page.  22 was on September 8, 2008.  And have you

17  take a look at Exhibit 23.  What -- whose

18  signature is that at the bottom?

19     A.   That's my wife's.

20     Q.   And what's the date on there?

21     A.   September 9, '04 -- September 9th, 2008.

22     Q.   September 9th, 2008?

23     A.   Looks like 9.

24     Q.   And is that your handwriting?

25     A.   It's my wife's handwriting.
```

Buckman, Charles 12-17-09 video depo1

94

```
1      Q.   On the date is it --

2      A.   No, it's not my handwriting.

3      Q.   And it's not your wife's handwriting on

4   the date either?

5      A.   I don't think so, no.

6      Q.   Now that is, by my count, Mr. Buckman,

7   nine times, nine different dates --

8      A.   Okay.

9      Q.   -- with your signature or your wife's

10  signature between August 5th, 2008, and

11  September 9th of 2008.

12     A.   Okay.

13     Q.   Now, did Raymour come to your house and

14  have you sign documents nine times?

15     A.   I -- I didn't think he did.

16     Q.   In fact, your wife passed away on

17  September 17th?

18     A.   On the 17th, yes.

19     Q.   So Raymour wasn't there signing

20  documents a week before she passed away, was he?

21     A.   I don't recall him being there.

22     Q.   So is it fair to say that you don't know

23  when those documents were signed?

24     A.   I -- no.

25     Q.   Is it possible that Raymour had you sign
```

Buckman, Charles 12-17-09 video depo1

95

```
1   documents and that he put other information in

2   later after you signed them?

3           MR. FLANDERS:  Objection.

4      A.   I'm not sure --

5      Q.   You don't know?

6      A.   -- to be honest with you.  I suppose --

7   I suppose anything is possible but I don't know if

8   that happened or it didn't happen.

9      Q.   Okay.  I'd like you to take a look at

10  Government Exhibit No. 24.

11     A.   Yes.

12     Q.   What -- what is that?

13     A.   It's my wife's signature.

14     Q.   And is it your wife's signature at the

15  bottom of a signature page that otherwise doesn't

16  have any -- any information filled out?

17     A.   It doesn't have anything except for my

18  wife's signature.

19     Q.   It doesn't have a date either, does it?

20     A.   Nothing, no, on this one.

21     Q.   And I'd ask you to take a look at

22  Government Exhibit No. 25.

23     A.   Right.

24     Q.   I'll ask you what that is.

25     A.   It's the same thing.
```

Buckman, Charles 12-17-09 video depo1

96

```
 1    Q.   It's another company's --
 2    A.   With nothing but --
 3    Q.   -- signature page?
 4    A.   -- my wife's signature.
 5    Q.   And this one says Page 6 of 6?
 6    A.   Right.
 7    Q.   You have no idea whether you saw or your
 8  wife saw Pages 1 through 5?
 9    A.   I don't know.
10    Q.   So when you testified that Raymour read
11  every word to you, isn't it fair to say that you
12  really don't know if there were pages of documents
13  that he didn't read to you?
14        MR. PINE:  Objection.
15        MR. FLANDERS:  Objection.
16    A.   Well, if -- that's -- that's -- anything
17  that I signed, he had read.
18    Q.   So when you say anything that you
19  signed, you mean the page that you signed?
20    A.   If we signed this page, he read this to
21  me.
22    Q.   Okay.  But you have no idea if he read
23  the five pages --
24    A.   The first five before --
25    Q.   -- that went before?
```

Buckman, Charles 12-17-09 video depo1

97

```
 1        MR. PINE:  Objection.
 2    A.   -- I don't remember.  I don't remember.
 3    Q.   And I'd like you to look at Government
 4  Exhibit 26.  What is that?
 5    A.   It's another one with just my wife's
 6  signature.
 7    Q.   No date?
 8    A.   With nothing else on it and that's her
 9  signature.
10    Q.   Okay.
11    A.   It's Page 8 of 9.
12    Q.   Did Raymour leave copies of the
13  documents with you after he left?
14    A.   I -- I don't know.  I don't think so.
15  If he did, I don't know where they are.
16    Q.   And you testified that it was about an
17  hour or so that -- that you were with Raymour and
18  he -- and he explained these documents to you, is
19  that correct.
20    A.   Yes.  That's correct.
21    Q.   And he went through every word of every
22  page that you signed?
23    A.   Yes.
24    Q.   And you understood what -- what he --
25  what he --
```

Buckman, Charles 12-17-09 video depo1

98

```
 1    A.   Some of it I did.  My wife understood a
 2  lot more than I did.
 3    Q.   Well, what is your understanding of an
 4  annuity?  What is an annuity?
 5    A.   An annuity -- it's a -- it's like an
 6  insurance type it's my understanding and it's paid
 7  over time but like an insurance.  When my wife
 8  passed away, he would get money all the time.
 9    Q.   Who would get money all the time?
10    A.   Whoever made the investment --
11    Q.   Okay.  Now --
12    A.   -- in the insurance.
13    Q.   Do you have an understanding as to what
14  an annuitant is in an annuity?
15    A.   That's the person who took it out, isn't
16  that correct or not?
17    Q.   Well, I'm asking you what your
18  understanding is.
19    A.   I don't know.
20    Q.   Okay.  So you don't know what an
21  annuitant is?
22    A.   No.  I didn't even know what anything
23  about that was.
24    Q.   Did Raymour explain to you that an
25  annuity -- that an annuitant is the person who
```

Buckman, Charles 12-17-09 video depo1

99

```
 1  would receive a stream of income payments in an
 2  annuity?
 3    A.   Yes.
 4        MR. FLANDERS:  Objection.
 5    A.   That's what I just said.  The person who
 6  took -- paid for the policy, that's what I thought
 7  it was --
 8    Q.   Okay.  So --
 9    A.   -- the annuitant.
10    Q.   Well, what was your understanding of
11  what you were going to be in connection with these
12  annuities?
13    A.   Nothing.  I would get nothing from them.
14    Q.   He told you that --
15    A.   That was my understanding.
16        MR. FLANDERS:  Let him finish the
17  answer.
18    Q.   Go ahead.  Finish your answer, please.
19    A.   My understanding was I would get
20  nothing, and that was fine with me.
21    Q.   And that's because Raymour told you that
22  we're opening these accounts, we're going to use
23  your name but you have no right to any of this
24  money?
25        MR. FLANDERS:  Objection.
```

Buckman, Charles 12-17-09 video depo1

100

```
1        A.   He didn't word it like that, no, he did
2   not.
3        Q.   How did he word it?
4        A.   "Mr. Buckman, if you wouldn't mind, if I
5   read these things to you, and then we'll go over
6   it, and you would sign -- if you're satisfied with
7   everything I read to you, you sign it."
8        Q.   Okay.  I do want to go --
9        A.   They said they were going to make an
10  investment.  That's how it was worded and -- and
11  their company was going to get lots of money --
12       Q.   Okay.
13       A.   -- some day, and would you mind signing
14  it?  Not at all.  And I'm doing all this because
15  of the $2000 he had given me before, I was so
16  grateful to him, I would have signed anything I
17  think.
18       Q.   I mean that's really what it was all
19  about, wasn't it, Mr. Buckman, you were so
20  thankful and appreciative of what Raymour did for
21  you in terms of --
22       A.   Very.
23       Q.   -- giving you $2000 that you were
24  willing to do anything for him?
25       A.   Almost, yeah.
```

Buckman, Charles 12-17-09 video depo1

101

```
1        Q.   And you're still willing because you
2   really appreciate the money?
3        A.   He seemed very honest, very -- and I
4   didn't care.  It was just an investment like.
5        Q.   Okay.  I want to show you Government
6   Exhibits 7, 8, 9, 10, and 11.  Could you just take
7   a look at each of those?  Is Government 7 an
8   Annuitant Acknowledgement between yourself --
9        A.   Right.
10       Q.   -- and ADM Associates and a company
11  called ING?
12       A.   Yes.
13       Q.   Okay.  And you signed that, right?
14       A.   Yes, I did.
15       Q.   And you testified on direct that this
16  was one of the documents that Raymour explained to
17  you and read every --
18       A.   Right.
19       Q.   -- word to you before you signed, right?
20       A.   Right.
21       Q.   I just want to read some of this to you
22  and ask you what your understanding of it was.
23       A.   I wish I'd paid more attention.
24       Q.   It says, "I understand that as the named
25  annuitant in this variable annuity contract, I am
```

Buckman, Charles 12-17-09 video depo1

102

```
1   not contributing any funds to the annuity contract
2   and I have no rights of ownership or control of
3   said annuity control (sic) and that the owner can
4   terminate the annuity at any time."
5        Q.   What's your understanding of what that means?
6        A.   That I have no right to any money that
7   might be coming in.
8        Q.   Okay.
9        A.   And he could terminate me at any time.
10       Q.   And it says, "If the annuity contract
11  should specify any rights or rights in my favor as
12  the annuitant, I do hereby waive those rights in
13  favor of the policy owner.  Furthermore, neither I
14  nor my heirs, executors, administrators or assigns
15  shall receive or be entitled to receive any
16  benefit or benefits at any time from the annuity
17  contract nor be entitled to share in the proceeds
18  of the annuity contract."
19       A.   Right.
20       Q.   What's your understanding of what that
21  means?
22       A.   That I would get nothing.  I'm not
23  entitled to anything at any time.  I can't get
24  anything --
25       Q.   Okay.
```

Buckman, Charles 12-17-09 video depo1

103

```
1        A.   -- me or any of my --
2        Q.   So you understood that you had no rights
3   to any money in this?
4        A.   Exactly.
5        Q.   Now, did Raymour tell you -- actually
6   let me strike that question.
7        I want to show you -- take a look at
8   Government's Exhibit 7, 8, 9, 10, and 11, and I'm
9   going to suggest to you that -- and that these
10  are -- these are all the same document with the
11  exception that the name of the annuity company is
12  different.
13       A.   Okay.
14       Q.   But I want you to take a look at that
15  and tell me if you agree with me on that.
16       A.   Okay.
17            (Witness perusing document.)
18       A.   They're all different.
19       Q.   When you say they're all different, you
20  mean --
21       A.   Different companies.
22       Q.   Different companies but otherwise it's
23  the same document?
24       A.   Same document but different companies.
25       Q.   Right.  Okay.  Now --
```

Buckman, Charles 12-17-09 video depo1

104

1     A.   I messed them up.

2     Q.   That's okay.  Just to be clear, these

3 are all annuity acknowledgement forms in which you

4 are agreeing to waive any rights that you might

5 have in an annuity.

6     A.   Exactly.

7     Q.   All right.  And, therefore, a company

8 called ING and the annuity owner is going to be

9 ADM Associates.  Actually, the annuity owner is

10 ADM Associates in all of these.  Who is ADM

11 Associates?

12     A.   I have no clue.

13     Q.   Did Raymour tell you who they are?

14     A.   I didn't ask.

15     Q.   Okay.  Did you have any intent to enter

16 into a contract with ADM Associates?

17     A.   No.

18     MR. PINE:  Objection.

19     Q.   And it's your understanding that you

20 weren't paid for anything; you -- you just -- this

21 was -- you had no idea that you were going to be

22 paid money?

23     A.   Absolutely not.

24     Q.   Okay.  I want to show you again

25 Government Exhibit No. 4 which is entitled

Buckman, Charles 12-17-09 video depo1

---

105

1 Agreement and Acknowledgement and ask you to take

2 a look at that.

3     A.   Okay.

4     Q.   If you can, just read that first

5 paragraph.

6     A.   "The Funds Provider and Co-owner are

7 joint tenants with right of survivorship in the

8 above-referenced -- referenced brokerage account."

9     Q.   Okay.  That's actually the second

10 paragraph.  I'll take it back and read it to you.

11     You want me to read this?

12     Q.   Up here, what the agreement references.

13     A.   "This agreement and acknowledgement is

14 made and entered into as of the 20th day of

15 August, 2008, by and between Joseph Caramadre, an

16 individual with an address of..."  It gives his

17 address here.  I can't read.  "90 Beechwood Drive,

18 Cranston, Rhode Island, (Funds Provider), and

19 Maureen Buckman, an individual with an address of

20 118 Seventh Avenue, Co-owner."

21     Q.   And I'd like you to just -- you can hang

22 on to it.  Would you read Paragraph 2?

23     A.   "The Funds Provider..."

24     Q.   Where it says, No. 2?

25     THE WITNESS:  No. 2?

Buckman, Charles 12-17-09 video depo1

---

106

1     MR. McADAMS:  Yes.

2     A.   "In exchange for the Co-owner's

3 agreement to become a joint tenant in the account,

4 the Funds Provider has paid the Co-owner the sum

5 of $4000."

6     Q.   Okay.  So what's your understanding of

7 what this document is?

8     A.   What it just said.

9     Q.   That you were being paid $4000?

10     A.   Right.

11     Q.   To enter into a contract?

12     A.   Right.

13     Q.   With Mr. Caramadre?

14     A.   Exactly.

15     Q.   Okay.  So -- and this was a document

16 that -- that has your signature on it?

17     A.   Yes.

18     MR. FLANDERS:  Objection.

19     MR. PINE:  Objection.

20     MR. McADAMS:  Let me rephrase that.

21     Q.   It's a document that does not have your

22 signature on it, correct?

23     A.   It's my wife's signature.  That's why I

24 said yes.

25     Q.   Excuse me.  It's your wife's signature?

Buckman, Charles 12-17-09 video depo1

---

107

1     A.   Right.

2     Q.   And you were present when this -- this

3 occurred?

4     A.   That's what I meant when I said yes.

5     Q.   And was it your understanding that your

6 wife was being paid in exchange for signing these

7 documents or what was your understanding of the

8 money your wife was being paid for?

9     MR. FLANDERS:  Objection.

10     A.   It was the same as mine.

11     Q.   Now, you testified before that you

12 weren't being paid --

13     A.   Right.

14     Q.   -- you had no idea --

15     A.   Right.  That's what I'm saying, I did

16 not get paid to sign anything, to my

17 understanding.

18     Q.   Okay.  Let me --

19     A.   Even though it says that, I didn't -- I

20 didn't realize I was being paid to sign anything.

21     Q.   Okay.  Let me just have you look at

22 Government Exhibit No. 3 which is an agreement and

23 an acknowledgement, the same document with respect

24 to yourself.  If you would look at the signature

25 page.

Buckman, Charles 12-17-09 video depo1

108

1    A.   The signatures?  That's my signature.

2    Q.   Okay.  And is that also -- why don't you

3  read Paragraph 2 on the first page of that

4  document?

5    A.   Yes.  It's the same thing I just read.

6    Q.   It says that in exchange for being paid

7  $4000 --

8    A.   Right.

9    Q.   -- you've agreed to become a joint

10 tenant --

11   A.   Right.

12   Q.   -- in an account?  Okay.  So it's your

13 testimony that you didn't know that you were being

14 paid $4000 to sign these documents?

15   A.   No.  What I said was when he come over

16 my house with $4000, two checks, I had no idea he

17 was coming over to give me any money whatsoever.

18 That's how I left it.

19   Q.   Okay.  But I think what you testified

20 to -- and I want to make sure we are clear on

21 this -- is that --

22   A.   Okay.

23   Q.   -- you testified that as you signed the

24 documents, you didn't know that you were going to

25 be paid $4000, and then it was at the end that he

Buckman, Charles 12-17-09 video depo1

109

1  pulled out the checkbook again and gave you $4000?

2    A.   Right.

3    Q.   Okay.  So this document says --

4    A.   He was going to give me $4000.

5    Q.   -- he was going to give you $4000?

6    A.   Right.

7    Q.   So when you testified that he read every

8  word to you before you signed --

9    A.   Right.

10   Q.   -- any documents, you don't remember him

11 reading to you I'm paying you $4000, do you?

12   A.   He might have.  He might have.  If

13 that's what he said, he read it to me, but what

14 I'm saying, I wasn't expecting any money.

15   Q.   Okay.  So even though the paper said you

16 were going to be paid $4000 --

17   A.   Right.

18   Q.   -- you didn't expect it?

19   A.   Right.  I didn't care if I got it or I

20 didn't.

21   Q.   And that's because he was telling you

22 that what these papers say is not what I really

23 mean, correct?

24        MR. FLANDERS:  Objection.

25        MR. PINE:  Objection.

Buckman, Charles 12-17-09 video depo1

110

1    A.   No.

2    Q.   Well, then why -- why would he give you

3  a paper that says he's going to give you $4000 but

4  you don't really think he's going to pay you

5  $4000?

6        MR. PINE:  Objection.  Argumentative.

7    A.   I might have made a mistake.  I don't

8  remember if I got the $4000.  I'm almost positive

9  after all these forms were signed and filled out,

10 he gave me two checks for 4000 each and I don't

11 know if that was part of that.  I got the 4000

12 before I signed that or after?  But I thought I

13 got it after --

14   Q.   Okay.

15   A.   -- I signed all the papers.

16   Q.   Do you know if you even saw this page?

17 It doesn't have your signature on it.

18   A.   I don't remember.

19   Q.   It may be that you didn't even see the

20 page that said you were being paid $4000, isn't

21 that correct?

22        MR. PINE:  Objection.

23        MR. FLANDERS:  Objection.

24   A.   I'm not -- that's not a cover-up for me.

25 I want to say what I said.  I mean if --

Buckman, Charles 12-17-09 video depo1

111

1    Q.   I'm not trying to cover you.

2    A.   Okay.

3    Q.   I'm just trying to understand.  Is it

4  possible -- let me rephrase the question.

5    A.   Of course it's possible.

6    Q.   So it's possible that you didn't see

7  this page when you signed the third page?

8        MR. FLANDERS:  Objection.

9        MR. PINE:  Objection.

10   A.   It's possible.

11   Q.   The other thing I want to show you next

12 is Government Exhibit 11 which is the -- an

13 Annuitant Acknowledgement again between ADM

14 Associates, yourself and this company called

15 Genworth.  Those are your initials under the first

16 paragraph?

17   A.   Yes, sir.

18   Q.   Why don't you read that paragraph above

19 your initials?

20   A.   Sure.  "That I am of sound mind and I am

21 entering into this agreement voluntarily and I

22 consent to be the contract annuitant out of my own

23 free will and without duress.  I have received no

24 compensation for allowing the owner to use me as

25 an annuitant nor have I made any arrangement for

Buckman, Charles 12-17-09 video depo1

112

1  myself or anyone that survives me to receive
2  compensation at some future date."
3      Q.    When you were going through these
4  documents and you testified that you had some
5  questions for Raymour, was one of the questions
6  that you had for him why you were signing one
7  document that said you were being paid $4000 in
8  order to enter into a contract and another
9  document that was saying you were not being paid
10 anything to enter into a contract?
11     A.    No.
12     Q.    You didn't ask him about that?
13     A.    No.
14     Q.    Did you even realize that was going on
15 at the time?
16     A.    No.  No.
17     Q.    When Raymour was explaining what
18 annuities are to you, did he tell you that it's
19 illegal under Rhode Island law to pay a person to
20 serve as annuitant?
21         MR. FLANDERS:  Objection.
22         MR. PINE:  Objection.
23     A.    No.
24     Q.    He didn't tell you that?
25     A.    No.

Buckman, Charles 12-17-09 video depo1

---

113

1      Q.    Did he tell you that Rhode Island
2  General Law says in part that no company or
3  representative of the company may allow or give
4  directly or indirectly as inducement to any person
5  to purchase insurance or securities any valuable
6  consideration or inducement of any kind not
7  specified in the policy?
8         MR. PINE:  Objection.
9         MR. FLANDERS:  Objection.
10     Q.    Did he say anything to you?
11     A.    I don't remember him saying that.
12     Q.    And so when -- when in Government
13 Exhibit 11 it indicates that if any annuity
14 contract should specify any rights or rights in my
15 favor as the annuity, I do hereby waive those
16 rights in favor of the policy owner, did you have
17 a conversation with Raymour about that provision?
18     A.    No, I did not.
19     Q.    Did you have any understanding as to
20 what that was?
21     A.    That he would be the beneficiary, not
22 me.
23     Q.    Okay.
24     A.    They're in charge of whatever money
25 there was; not me.

Buckman, Charles 12-17-09 video depo1

---

114

1      Q.    Is it fair to say, Mr. Buckman, that --
2  that with respect to the documents that you were
3  being asked to sign by Raymour, that he
4  essentially indicated to you that -- that in
5  return for receiving the money that Mr. Caramadre
6  was giving you, he needed you to sign some
7  documents and that you had no right to any future
8  money that he might or Mr. Caramadre or anyone
9  else would make?
10         MR. PINE:  Objection.
11     A.    Yeah.
12     Q.    That's fair to say?
13     A.    Yeah, I guess so.
14     Q.    I'd like to turn your attention now to
15 Government Exhibit No. 6 which is this E*Trade
16 Financial document and Mr. Pine had asked you some
17 questions about this document.
18     I don't remember what exhibit number he used
19 for it but he asked you about the identifying
20 information in the co-applicant section.  Do you
21 remember that?  For the co-account holder rather.
22     A.    Yeah.
23     Q.    And he asked you to verify that that was
24 accurate; that that was your name?
25     A.    Yeah.

Buckman, Charles 12-17-09 video depo1

---

115

1      Q.    And that your address was accurate?
2      A.    Yeah.
3      Q.    Okay.  And he asked you if your social
4  security number was accurate, correct?
5      A.    Yes.
6      Q.    One of the questions that he didn't ask
7  you was whether or not the phone number listed
8  under your name or your phone number, whether
9  that was accurate.  I'd like you to take a look at
10 that number and tell us if that's accurate.
11     A.    I -- let me see -- I don't -- I don't
12 remember.
13     Q.    Was that ever your phone number?
14     A.    I don't remember.
15     Q.    Was that ever your phone number?
16     A.    Is that my number?
17     Q.    The telephone number under your name
18 where it says business phone; is that your phone
19 number?
20     A.    It is not the phone I have now.  I don't
21 remember what my phone number was as I said.
22     Q.    That's Raymour's number, isn't it?
23         MR. PINE:  Objection.
24     A.    I'm not sure.  It could be.  I don't
25 know his number.  I'd have to look it up.

Buckman, Charles 12-17-09 video depo1

116

1    Q.  And that's the same number that was on
2 the ad that you had to call, wasn't it?
3    A.  I don't know.  I don't know the
4 number --
5    Q.  Okay.
6    A.  -- off the top of my head.  I can look.
7 I have it in my wallet.
8    Q.  You have the ad in your wallet?
9    A.  No.  I have his number.
10    Q.  Okay.
11    A.  I have it on a card, a business card.
12    Q.  Okay.  Let me ask you some other
13 questions about this document, Government Exhibit
14 No. 6, and this was one of the documents that you
15 testified that contained your signature?
16    A.  Yes.
17    Q.  And you testified that this was a
18 document that Raymour read every word to you
19 before you signed?
20    A.  Yes.
21    Q.  I'd like to turn your attention to the
22 page where it's titled Options Trading
23 Application.  If you could take a look at that.
24    A.  Okay.
25    Q.  Now, if you could look at the section

Buckman, Charles 12-17-09 video depo1

117

1 that says -- it's a little bit difficult to read,
2 but where it says, "Co-account holder, if
3 applicable," and it indicates some boxes that are
4 checked?
5    A.  Yeah.
6    Q.  All right.  I'd like to turn your
7 attention to where it says, "Options Trading
8 Experience."
9    A.  Yep.
10    Q.  What type of experience do you have
11 trading options?
12    A.  None.
13    Q.  What type of financial investment
14 experience do you have?
15    A.  None.
16    Q.  What about your wife?
17    A.  None.
18    Q.  Okay.  Have you ever been involved in
19 trading options on any level?
20    A.  Never.
21    Q.  Okay.  What is options trading?
22    A.  I have no idea.
23    Q.  Okay.  Now, there's a box there that's
24 checked, if you notice, and it says, "Covered
25 calls."  Do you see that that's checked?

Buckman, Charles 12-17-09 video depo1

118

1    A.  Yes.
2    Q.  What are covered calls?
3    A.  I have no idea.
4    Q.  Did you tell Raymour that you had
5 experience doing covered calls?
6    A.  No.
7    Q.  Did he ask you about your investment
8 experience?
9    A.  No.
10    Q.  So when he read every word of every page
11 to you, did he tell you that, Mr. Buckman, I'm
12 going to check off that you've got experience in
13 covered calls?
14    A.  I -- I don't remember saying that.
15    Q.  Now, what about -- there's also a box
16 there that's checked off that says, "Covered
17 puts."  Do you see that?
18    A.  Yes.
19    Q.  What are covered puts?
20    A.  I have no clue.
21    Q.  Do you have any clue what puts are?
22    A.  No.
23    Q.  Covered or uncovered?
24    A.  No.
25    Q.  The next section it says, "Purchases"?

Buckman, Charles 12-17-09 video depo1

119

1    A.  Right.
2    Q.  Do you have any understanding of what
3 purchases are --
4    A.  No.
5    Q.  -- in the trading context?  Is it fair
6 to say that you did not tell Raymour to put
7 these -- this information on this form?
8    A.  I did not tell him to do this, no.
9    Q.  And you didn't authorize anybody to
10 represent to some company that you had trading
11 experience --
12    A.  No.
13    Q.  -- in covered calls?
14    A.  Not that I recall.
15    Q.  Was it your understanding when you were
16 signing documents for Raymour that you were giving
17 him the authorization to represent to -- to
18 companies that you had experience in trading?
19       MR. PINE:  Objection.
20    A.  No, I don't remember.
21    Q.  Okay.  Now, I'd like you to look at the
22 next section down.  It says, "Years of
23 experience."  Do you see that?
24    A.  Yeah.
25    Q.  And under stocks it says how many years?

Buckman, Charles 12-17-09 video depo1

120

```
 1      A.    Ten.
 2      Q.    Do you have ten years of stocks --
 3      A.    No.
 4      Q.    -- experience?  It also says, "Bonds"?
 5      A.    No.
 6      Q.    It says 10 years?
 7      A.    Right.
 8      Q.    You don't have 10 years bonds
 9 experience?
10      A.    Correct.
11      Q.    And it also says, "Options"; you don't
12 have 10 years options experience?
13      A.    Correct.
14      Q.    And you don't have 10 years of futures
15 experience either, do you?
16      A.    Correct.
17      Q.    And you never told Raymour that you did?
18      A.    No.
19      Q.    And if you could just turn to the very
20 next page, is that your -- is that your signature
21 on that document?
22      A.    Yes, it is.
23      Q.    So is it fair to say, Mr. Buckman, that
24 even though your signature is on that document,
25 that -- that you don't -- would not verify the
```

Buckman, Charles 12-17-09 video depo1

121

```
 1 information that's in that document?
 2           MR. FLANDERS:  Objection.
 3      A.    Right.
 4      Q.    That's fair to say?
 5      A.    Yeah.
 6      Q.    And that you never intended to represent
 7 to E*Trade Financial any of the information
 8 respecting you in that document, did you?
 9           MR. PINE:  Objection.
10           MR. FLANDERS:  Objection.
11      A.    No.
12           MR. McADAMS:  Thank you.
13      Q.    Do you know if you even saw that page
14 that we were looking at the options trading?
15      A.    I don't remember.
16      Q.    It's possible that you never even saw
17 it?
18           MR. FLANDERS:  Objection.
19      A.    It's possible.  But he did hand us
20 whatever papers we signed, all the forms he had in
21 his hand.  He said -- gave them to my wife, you
22 can go over them, look at them yourself; take your
23 time, read them if you wish, or I'll just read
24 them to you.
25      Q.    And you indicated it was about five or
```

Buckman, Charles 12-17-09 video depo1

122

```
 1 six documents?
 2      A.    It was quite a bit.
 3      Q.    Okay.  And how many pages do you think
 4 it was all told?
 5      A.    Oh, my God, I don't remember.
 6      Q.    Do you remember -- do you remember --
 7      A.    I couldn't really guess.
 8      Q.    Do you remember when you were
 9 interviewed by an investigator and you told that
10 person that it was about 20 pages?
11           MR. FLANDERS:  Objection.
12      A.    I don't remember.
13      Q.    Okay.  Now, if I were to represent to
14 you that the documents that I'm showing you today,
15 which would include Government Exhibit 27, the
16 Hartford Leaders Variable Annuity Application,
17 Government Exhibit 28, the Nationwide Life
18 Insurance Company application with respect to
19 yourself, and Government Exhibit 29, which is a
20 Nationwide application with respect to your wife,
21 would it surprise you to learn that there are 28
22 different documents here that we are showing you
23 today?
24      A.    Right.
25           MR. FLANDERS:  Objection.
```

Buckman, Charles 12-17-09 video depo1

123

```
 1      A.    The question is --
 2      Q.    Twenty-eight different documents.
 3      A.    Right.
 4      Q.    Is that consistent with what you are
 5 seeing today?
 6           MR. FLANDERS:  Objection.  You haven't
 7 even shown him all the documents.
 8           MR. McADAMS:  Okay.  I've shown him up
 9 to 26.
10      Q.    I'll show you now Government Exhibit 27
11 and ask you to take a look at that.  What is that?
12      A.    I don't know what it is.
13      Q.    Is it -- does it indicate that the title
14 is a Hartford Leaders Product Suite Request for
15 Variable Annuity at the top of the document?
16      A.    Yes, it does.
17      Q.    And does it have under Section 4,
18 Annuitant, does it indicate that -- your name?
19      A.    Yes.
20      Q.    Do you know if you've ever seen this
21 document before?
22      A.    I don't recall seeing this.
23      Q.    And this document is -- if you want to
24 count -- that document is 14 pages; would you
25 agree with me on that?
```

Buckman, Charles 12-17-09 video depo1

124

```
1          A.    Yeah.
2          Q.    Okay.  So that document alone is 14
3    pages.  Is it possible that, Mr. Buckman, that
4    there were a number of documents that you never
5    saw --
6                MR. FLANDERS:  Objection.
7          Q.    -- that Raymour used your name on?
8                MR. FLANDERS:  Objection.
9                MR. PINE:  Objection.
10         A.    It's possible.
11         Q.    Because I mean really you have no idea
12   what he did when you weren't there, correct?
13         A.    No.
14               MR. FLANDERS:  Objection.
15               MR. PINE:  Objection.
16         Q.    And would you take a look at Government
17   Exhibit No. 29 and tell us what that is?
18         A.    I don't know.
19         Q.    What is it titled?
20               THE WITNESS:  Right here?
21               MR. McADAMS:  Yes.
22         A.    Nation -- Nationwide Life Insurance
23   Company.
24         Q.    All right.  And whose name is the
25   annuitant in Section 1c which is about where your
```

Buckman, Charles 12-17-09 video depo1

125

```
1    thumb is?
2          A.    I am.  Oh, what is it?  That's the one.
3          Q.    Right here, sir.
4          A.    Oh, right here.  Me.  Charles Buckman.
5          Q.    And Government Exhibit 29, is this a
6    Nationwide Life Insurance application in your
7    wife's name?
8          A.    Yes, it is.
9          Q.    Okay.  Now, if I were to represent to
10   you that these documents totaled about 143 pages,
11   would that be surprising to you?
12               MR. FLANDERS:  Objection.
13               MR. PINE:  Objection.
14         A.    No.
15         Q.    And you indicated that Raymour spent
16   approximately an hour or so going through all the
17   documents with you?
18         A.    (Witness nods head.)
19               MR. FLANDERS:  Objection.
20               MR. McADAMS:  You nodded.  You need to
21   say yes or no.
22         A.    Yes.  I'm sorry.
23         Q.    Now, Mr. Buckman, you were -- you've
24   been interviewed a number of times with respect to
25   these annuities and accounts, is that correct?
```

Buckman, Charles 12-17-09 video depo1

126

```
1          A.    Yes.
2          Q.    And the first time that you were
3    interviewed, it was some folks from an insurance
4    company?
5          A.    Yes.
6          Q.    Okay.  And subsequent to that, at some
7    point in time, you were interviewed by
8    Mr. Flanders; do you recall that?
9          A.    Yes.
10         Q.    And Mr. Flanders recorded that meeting
11   with you?
12         A.    I think he might have.  I'm not
13   positive.  I think he did.
14         Q.    Did he tell you that he was going to
15   record it for you?
16         A.    Yes.
17         Q.    Okay.  Who else besides Mr. Flanders was
18   there?
19         A.    It was just him.
20         Q.    Okay.  And how long did you meet with
21   Mr. Flanders?
22         A.    Forty-five minutes maybe --
23         Q.    And how long did you meet --
24         A.    -- or less.  I don't remember for sure.
25         Q.    How long did you meet with him before
```

Buckman, Charles 12-17-09 video depo1

127

```
1    the recording device was turned on?
2          A.    Five, ten minutes.
3          Q.    And do you recall when you met with
4    Mr. Flanders and that interview was recorded,
5    that -- that he asked you about the insurance
6    company people coming in investigating you --
7    investigating and asking you questions?
8          A.    Yes.
9          Q.    And do you remember that you told
10   Mr. Flanders in that interview that at the end of
11   that meeting that they told you that you didn't do
12   anything wrong?
13         A.    Yes.
14         Q.    And do you remember that Mr. Flanders
15   also told you he didn't think you did anything
16   wrong?
17         A.    Correct.
18         Q.    And you also testified that you were
19   later interviewed by an FBI agent, is that
20   correct?
21         A.    Correct.
22         Q.    Okay.  Ms. McDaid?
23         A.    Correct.
24         Q.    And is it fair to say that she also told
25   you that you didn't do anything wrong?
```

Buckman, Charles 12-17-09 video depo1

128

```
1        MR. PINE:  Objection.
2    A.   Right.  She did.
3    Q.   And when you met with the government,
4  were you also told that you didn't do anything
5  wrong?
6    A.   Correct.
7    Q.   Now, you have an attorney representing
8  you today, is that correct?
9    A.   Right.
10   Q.   Okay.  What's his name?
11   A.   Dan.
12   Q.   Dan what?
13   A.   I don't know his last name.  I don't
14 remember.
15   Q.   And you are not paying for that
16 attorney, are you?
17        MR. PINE:  Objection.
18   A.   No.  I'm not.
19   Q.   Who is paying for that attorney?
20        MR. PINE:  Objection.
21   A.   I have no idea.
22   Q.   You have no idea?
23   A.   No, I don't.
24   Q.   Did you -- did you seek out to have an
25 attorney represent you?
```

Buckman, Charles 12-17-09 video depo1

129

```
1    A.   No, I did not think I would need one.
2    Q.   You didn't think you needed one
3  because --
4    A.   An attorney, right.
5    Q.   -- nobody ever indicated to you that you
6  did?
7        MR. PINE:  Objection.
8    A.   Right.  I didn't think I was in any
9  trouble.
10   Q.   Wasn't it Raymour who got you the
11 attorney?
12        MR. PINE:  Objection.
13   A.   I don't know that.
14   Q.   Do you remember when you met with the
15 government and you were asked about being
16 represented by Mr. Prentiss that we asked you who
17 was paying for your attorney?
18   A.   Yes.
19   Q.   And do you remember what you said?
20        MR. PINE:  Objection.
21   A.   I said Raymour's boss or whatever and
22 then I said I really don't know that for sure.
23 I've never seen --
24   Q.   You said you weren't sure but you
25 thought it was Mr. Caramadre?
```

Buckman, Charles 12-17-09 video depo1

130

```
1    A.   That's what I thought at the time but I
2  don't know.
3    Q.   How much time did you spend preparing
4  for today's deposition?
5        MR. PINE:  Objection.
6    A.   I don't know, 20 minutes before you got
7  here.
8    Q.   Did you meet with the attorneys other
9  than today?
10   A.   No.
11   Q.   And I just want to ask you some other
12 questions about some of these documents.  You
13 indicated that you don't know who ADM Associates
14 is --
15   A.   Correct.
16   Q.   -- is that correct?
17   A.   Correct.  That is correct.
18   Q.   Do you know who Nationwide is?
19   A.   No.
20   Q.   Have you ever heard of them before?
21   A.   No, I don't.  I haven't.
22   Q.   Did you ever intend to enter into a
23 contract with ADM Associates and Nationwide?
24        MR. PINE:  Objection.
25        MR. FLANDERS:  Objection.
```

Buckman, Charles 12-17-09 video depo1

131

```
1    A.   No, I did not.
2    Q.   Do you know who Hartford Life is?
3    A.   No, I do not.
4    Q.   Had you ever heard of them before?
5    A.   No.
6    Q.   Is that -- did Raymour tell you anything
7  about Hartford Life?
8    A.   No.
9    Q.   Did you ever intend to enter into any
10 contract with ADM Associates related to Hartford
11 Life?
12        MR. PINE:  Objection.
13   A.   No, I did not.
14   Q.   Have you ever heard of Western Reserve
15 Life?
16   A.   No.
17   Q.   Did Raymour tell you anything about
18 Western Reserve Life?
19   A.   No, not that I remember.
20   Q.   Did you ever intend to enter into a
21 contract with ADM Associates related to Western
22 Reserve Life?
23   A.   No.
24   Q.   Have you ever heard of ING?
25   A.   I've heard of them but I don't know --
```

Buckman, Charles 12-17-09 video depo1

132

1   Q.   Did you ever --

2   A.   -- anything about them.

3   Q.   -- ever intend to enter into a contract

4   with ADM Associates and ING?

5   A.   No.

6   Q.   Have you ever heard of a company by the

7   name of Genworth?

8   A.   I've heard the name.

9   Q.   And did you ever intend to enter into a

10  contract with ADM Associates and Genworth?

11  A.   No.

12  Q.   Did you ever hear of a company -- other

13  than this case, have you ever heard of a company

14  called E*Trade Financial?

15  A.   No, sir.

16  Q.   Did you ever intend to enter into a

17  joint account with Joseph Caramadre at E*Trade

18  Financial?

19  A.   No, sir.

20  Q.   To your knowledge, did your wife,

21  Maureen, ever intend to enter into an agreement --

22  an account, a joint account, with Joseph Caramadre

23  at E*Trade Financial?

24       MR. FLANDERS:  Objection.

25       MR. PINE:  Objection.

Buckman, Charles 12-17-09 video depo1

---

133

1   A.   Not that I know of.

2   Q.   Have you ever heard of a company called

3   Natco Home Fashions?

4   A.   No, sir.

5   Q.   Have you ever heard of a company called

6   Nationwide?

7   A.   Not, just -- no.

8   Q.   Just in relation to this case?

9   A.   No.  No, sir.

10  Q.   To your knowledge, did your wife,

11  Maureen Buckman, ever intend to enter into a

12  contract with Natco Home Fashions related to

13  Nationwide?

14  A.   Not to my understanding.

15  Q.   Ever heard of a company called Natco

16  Products Corp.?

17  A.   No, sir.

18  Q.   To your knowledge, did your wife ever

19  intend to enter into a contract between herself,

20  Natco Products Corp. and Western Reserve Life?

21       MR. PINE:  Objection.

22  A.   No.  I don't know that.  I don't think

23  so.

24  Q.   To your knowledge, did your wife ever

25  intend to enter into a contract with that same

Buckman, Charles 12-17-09 video depo1

---

134

1   company, Natco Products Corp., and an annuity

2   company called Genworth Financial?

3        MR. FLANDERS:  Objection.

4   A.   Not that I know of.

5   Q.   Did you ever have the intent to enter

6   into a contract with ADM Associates related to

7   ING?

8        MR. PINE:  Objection.

9   A.   No, sir.

10  Q.   I apologize if I already asked you this,

11  but did you ever have any intent to enter into a

12  contract with ADM Associates and a company called

13  Hartford Leaders?

14       MR. FLANDERS:  Objection.

15       MR. PINE:  Objection.

16  A.   No.  I'm not sure.

17  Q.   Mr. Buckman, is it fair to say that --

18  that you really are not sure what documents that

19  you signed and that you were just grateful to get

20  the money from Mr. Raymour and so --

21       MR. PINE:  Objection.

22  Q.   -- willingly signed documents at his

23  request?

24       MR. PINE:  Objection.

25       MR. FLANDERS:  Objection.

Buckman, Charles 12-17-09 video depo1

---

135

1   A.   I don't want to say something that

2   wrong.  I got the money but it wasn't to sign

3   documents.  I'm very grateful for the money that I

4   received but I would have signed them whether I

5   had that or I didn't.  It had no bearing on me

6   signing anything --

7   Q.   Is it fair to say that you --

8   A.   -- the money that I received.

9   Q.   You were so grateful to Mr. Raymour that

10  you would have signed anything he asked you to?

11       MR. PINE:  Objection.

12  A.   Almost.

13  Q.   I'm sorry, sir.  Can you repeat your

14  answer?  I didn't hear you.

15  A.   Almost.

16  Q.   Almost anything?

17  A.   Yeah.

18       MR. McADAMS:  Thank you.  I have no

19  further questions.

20            EXAMINATION

21  BY MR. PINE:

22  Q.   Mr. Buckman, do you want to take a

23  break?

24  A.   No.

25       MR. PINE:  Okay.

Buckman, Charles 12-17-09 video depo1

136

```
1     THE WITNESS:  Thank you.
2     Q.    Directing your attention to the
3  government's exhibits that Mr. McAdams showed you,
4  and I'm specifically referring to 7, 8, 9, 10, 11,
5  12, 13, these are all Annuitant Acknowledgements,
6  are they not, that you signed?
7     A.    Yes.  Yes.
8     Q.    Okay.  And your initials appear on the
9  first page after the first paragraph?
10     A.    Correct.
11     Q.    And am I correct that that first
12  paragraph indicates that you are agreeing to be an
13  annuitant of your own free will and voluntarily?
14     A.    Exactly what it says, yes.
15     Q.    Nobody ever forced you to sign anything,
16  did they?
17     A.    Absolutely not.
18     Q.    And did it matter to you who the actual
19  owner of the annuity was going to be down the
20  road?
21     A.    It did not.
22     Q.    Okay.  Did you care to even ask Raymour
23  about who the owner might be?
24     A.    I never asked.
25     Q.    Okay.  But you understood that you were
```

Buckman, Charles 12-17-09 video depo1

137

```
1  going to be the annuitant and you were agreeing to
2  do that?
3     A.    Correct.
4     Q.    For the benefit of somebody else?
5     A.    Correct.
6     Q.    And did you understand that certain
7  accounts were going to be opened -- after you
8  signed those documents, that certain accounts
9  would be opened by Raymour or somebody associated
10  with Raymour?
11     A.    Right.
12        MR. McADAMS:  Objection.  Leading.
13     A.    I did.
14     Q.    Did you ask who those accounts were
15  going to be opened with, which companies were
16  going to be used?
17     A.    I did not ask.
18     Q.    Okay.  And you were shown Exhibits --
19  Government Exhibits 27, 28 and 29.  27 is with
20  Hartford, 28 is with Nationwide, 29 is also --
21  also with Nationwide.  And am I correct that your
22  signature is not on any of those documents?
23     A.    Oh, right.  I'll have to look at them.
24     Q.    Sure.
25     A.    If it's not on there, it's not on there.
```

Buckman, Charles 12-17-09 video depo1

138

```
1  Do I have to look at them or can I just take your
2  word?
3        MR. PINE:  You can take a look at them.
4     Q.    Your signature is not on No. 27?
5     A.    Not on that, no, it's not.
6     Q.    And that's a document that was filed
7  with Hartford Leaders Product Suite --
8     A.    Right.
9     Q.    -- correct?  Okay.  Your name is there?
10     A.    Yes.
11     Q.    Okay.  And 28, is your signature on that
12  one?
13     A.    My signature is not on that one.
14     Q.    Okay.
15     A.    My name is there but my signature is
16  not.
17     Q.    And 29?
18        (Witness perusing document.)
19     A.    I'm -- I'm a little slow.  No.
20     Q.    Your signature?
21     A.    Maureen's name is on here but --
22     Q.    Right.
23     A.    -- not her signature.
24     Q.    But not any signature by her.  And am I
25  correct that the dates that appear on 27, 28 and
```

Buckman, Charles 12-17-09 video depo1

139

```
1  29, they're dates that appear on various pages of
2  these documents?
3     A.    Yeah.
4     Q.    Okay.  And in that situation was it
5  September 9th --
6     A.    Yes.
7     Q.    -- that appears as the date on that
8  document?
9     A.    Right.
10     Q.    And that's after you signed the various
11  agreements with Raymour, isn't that correct?
12     A.    That's correct.
13     Q.    And would that also be true for
14  Exhibit 28, directing your attention to a page
15  on -- Page 5 of Exhibit 28 by the Government that
16  there is a date in September that appears on that
17  document, when that was --
18     A.    Yes.
19     Q.    -- signed and filed?  And that's
20  September 5th?
21     A.    The 5th.
22     Q.    Okay.  Also after you agreed to be an
23  annuitant?
24     A.    Right.
25     Q.    Okay.  And with respect to No. 29, is
```

Buckman, Charles 12-17-09 video depo1

140

```
1  there also a date that appears on the fifth page
2  of that document?
3       A.   Yes, there is.  It's the 27th.
4       Q.   Of August?
5       A.   Yes.
6       Q.   And that's also after you signed what
7  are Government Exhibits 7, 8, 9, 10 and 11?
8       A.   Right.
9       Q.   Okay.  So at some point, wasn't it your
10 understanding that in signing the various annuity
11 acknowledgements, that Raymour was going to use
12 that information and open up various accounts?
13      A.   Yes.
14      Q.   Didn't you understand --
15      A.   Yes.
16      Q.   -- and you agreed with that?
17      A.   Yes, I understood that.  I understood
18 that.
19      Q.   And you gave him permission to do that?
20      A.   Yes, I did.
21      Q.   You never told him not to do it?
22      A.   No.
23      Q.   And you said that you were of sound mind
24 and agreed to be the annuitant for certain
25 accounts that he was going to open, isn't that
```

Buckman, Charles 12-17-09 video depo1

141

```
1  correct?
2       A.   That's correct.
3       Q.   Okay.  And you understood that you were
4  not going to have any rights to that annuity?
5       A.   I understood that.
6       Q.   Someone else would?
7       A.   Right.
8       Q.   He didn't force you into that, did he?
9       A.   No.
10      Q.   Did he force you to do anything?
11      A.   No.
12      Q.   Okay.  You were also asked on cross by
13 Mr. McAdam (sic) about the -- I believe it's
14 Government's Exhibit 3 and 4.  Let me just grab
15 those.  And showing you Government Exhibit 3 and
16 4, and that they both -- one of them bears your
17 signature and one of them bears your wife's
18 signature.  I'll just show those to you to refresh
19 your memory.
20      A.   This is my signature.  August 20th.
21      Q.   Right.  And your wife's as well?
22      A.   Yes.
23      Q.   Okay.  And those two documents reflect
24 the fact in that paragraph on the first page that
25 you were going to be paid $4000 by agreeing to
```

Buckman, Charles 12-17-09 video depo1

142

```
1  be -- to open up this brokerage account as a
2  co-tenant --
3       A.   Right.
4       Q.   -- isn't that correct?
5       A.   That's what it says, yeah.
6       Q.   Okay.  And, in fact, didn't you, in
7  fact, receive $4000 --
8       A.   Yes.
9       Q.   -- within a very short time after
10 signing that agreement?
11      A.   Yes, I did.
12      Q.   Okay.  And that would be reflected in
13 check No. 9161 and also check No. 9160?
14      A.   Right.
15      Q.   Aren't those in the exact same amount --
16      A.   Right.
17      Q.   -- as those documents reflect you were
18 going to be paid?
19      A.   Right.  Yeah.
20      Q.   And you received those within eight or
21 nine days --
22      A.   Right.
23      Q.   -- of signing that agreement?  And by
24 signing this agreement, you were also -- you were
25 agreeing with the terms contained in the agreement
```

Buckman, Charles 12-17-09 video depo1

143

```
1  that Raymour went over with you, isn't that
2  correct?
3       A.   (Witness nods head.)
4       Q.   You have to say --
5       A.   I'm sorry.  Yes.
6       Q.   And you are agreeing that a brokerage
7  account could be opened in your name and in the
8  name of somebody else?
9       A.   Yes.
10      Q.   You didn't know who that other person
11 was going to be?
12      A.   I had no idea.
13      Q.   Okay.  And did you care?
14      A.   I could care less.
15      Q.   It didn't matter?
16      A.   It didn't matter to me.
17      Q.   And did you sign the brokerage account
18 and did your wife sign the brokerage account
19 agreement both voluntarily and of your own free
20 will?
21           MR. McADAMS:  Objection.
22      A.   Yes, we did.
23      Q.   And with respect to the documents that
24 you were shown with E*Trade Financial, Mr. McAdam
25 asked you about the phone number on it, Exhibit 5
```

Buckman, Charles 12-17-09 video depo1

144

1  for instance, but with respect to the social
2  security number, the date of birth, your wife's
3  name and address, all of that is accurate; isn't
4  that correct?
5      A.   Yeah.  That's the way I looked at, yes.
6      Q.   And also for you, is that information
7  also accurate for you with respect to name,
8  address, gender --
9      A.   That's correct, this pack.
10      Q.   -- social security and date of birth?
11      A.   Yeah.
12      Q.   And in signing the documents with
13  E*Trade Financial that Raymour presented to you,
14  did you understand that E*Trade Financial would be
15  used with relation to the various accounts that
16  were going to be opened --
17          MR. McADAMS:  Objection.
18      Q.   -- that E*Trade Financial was going to
19  be a vehicle by which you could invest or they
20  could invest?
21          MR. McADAMS:  Objection.
22      A.   I didn't really know what they were
23  going to do.
24      Q.   Okay.  Did you have any questions about
25  E*Trade Financial and --

Buckman, Charles 12-17-09 video depo1

145

1      A.   No, I had no questions.
2      Q.   Did it matter to you?
3      A.   It didn't matter.
4      Q.   Okay.  Did he, at any time, force you to
5  sign anything with respect to E*Trade Financial?
6      A.   No, he did not.
7      Q.   Did you do so completely voluntarily?
8      A.   Absolutely.
9      Q.   With an understanding that the accounts
10  were going to be opened by Raymour or his
11  associates?
12          MR. McADAMS:  Objection.
13      A.   Yes.
14      Q.   And you didn't have any disagreement
15  with that?
16      A.   Absolutely none.
17      Q.   Okay.  And I think you testified on both
18  direct and cross that Raymour gave you the
19  opportunity to read and/or question the documents
20  that you were being presented with?
21      A.   Yes, he did.
22      Q.   And although you don't remember specific
23  questions, did your wife at some points along the
24  way have questions about the various documents or
25  investments?

Buckman, Charles 12-17-09 video depo1

146

1      A.   She asked a few questions.
2      Q.   Okay.  And Raymour was --
3      A.   Yeah.
4      Q.   -- cooperative in answering those?
5      A.   I thought she understood.
6      Q.   Okay.
7      A.   Yep.
8      Q.   Okay.  And did you look to her judgment
9  in part in entering into these transactions?
10          MR. McADAMS:  Objection.  Beyond the
11  scope.
12      A.   Yes.
13          MR. PINE:  You can answer.
14      A.   Yes, I did.
15      Q.   Did she have more experience in
16  financial affairs as you were -- during the course
17  of your marriage than you did?
18          MR. McADAMS:  Objection.
19      A.   Yes.
20      Q.   Would you say that she asked more
21  questions during this time than you did?
22      A.   Pretty much all the questions.
23      Q.   Okay.  And you were there when she
24  signed these documents as well?
25      A.   Yes.

Buckman, Charles 12-17-09 video depo1

147

1          MR. PINE:  I have nothing further.
2          MR. FLANDERS:  Just a few questions.
3          THE WITNESS:  Sure.
4                     EXAMINATION
5  BY MR. FLANDERS:
6      Q.   Mr. McAdam (sic) asked you about the
7  dates on these various documents.  Do you remember
8  he went through all that?
9      A.   Correct.
10      Q.   When you signed the documents that you
11  signed with Raymour, at that time, you did not --
12  did you date the documents?
13      A.   I did not.
14      Q.   Okay.  And did you care what date was
15  put on the documents later?
16      A.   It didn't matter to me.
17      Q.   With respect to the number of times you
18  met with Raymour, as you sit here today, do you
19  have a firm memory as to exactly how many times
20  you met with him?
21      A.   No, I do not.
22      Q.   Do you have a memory as to how long the
23  meetings with him took?
24      A.   I couldn't tell you, you know.
25      Q.   So you say at -- at one point I think

Buckman, Charles 12-17-09 video depo1

148

1  you said it may have been an hour?
2      A.   That's what I thought.  An hour, hour
3  and a half.
4      Q.   Might it have been longer?
5      A.   Could have been.
6      Q.   And as to the number of documents, do
7  you have any idea of -- is it -- did you review a
8  large number of documents with Raymour?
9      A.   It was quite a few.  I don't remember
10  how many but there was quite a few.
11      Q.   At any point did you become impatient
12  with him reading all the documents to you?
13      A.   Well, a little bit.  I wanted to get it
14  over with.
15      Q.   Did you, at any point, say to him, do
16  you really have to go through this line by line
17  with me?
18      A.   To myself but I knew that be had to.
19  You know, he wanted to make sure that we
20  understood, so I really didn't say anything.  But
21  I knew that my wife wasn't feeling well at the
22  time and I just -- I was more concerned about her
23  sitting there listening and everything else.
24      Q.   And you were asked about, on Exhibit 5,
25  about a business phone number that appeared on an

Buckman, Charles 12-17-09 video depo1

149

1  E*Trade Financial application.  You don't have a
2  business phone, do you?
3      A.   I don't have a business phone.
4      Q.   Did you ever -- would you have had any
5  objection to Raymour putting down his business
6  phone number?
7          MR. McADAMS:  Objection.
8      A.   Not at all.
9      Q.   Or you using his mailing address?
10      A.   Not at all.
11          MR. FLANDERS:  Thank you.  That's all I
12  have.
13          THE WITNESS:  Okay.
14          MR. McADAMS:  I have no recross.
15          MR. PINE:  I believe that completes the
16  criminal deposition.
17          VIDEOGRAPHER:  The time is 1:37 and the
18  deposition is concluded.  We are off the record.
19          (Adjourned at 1:37 p.m.)
20
21
22
23
24
25

Buckman, Charles 12-17-09 video depo1

150

1  STATE OF RHODE ISLAND AND PROVIDENCE PLANTATIONS
2  KENT, Sc.
3
4          C E R T I F I C A T I O N
5
6      I, VIVIAN S. DAFOULAS, do hereby certify that
7  I am expressly approved as a person qualified and
8  authorized to take depositions pursuant to Rules
9  of Civil Procedure of the Superior Court,
10  especially but without restriction thereto, under
11  Rule 30(e) of said Rules; that the witness was
12  first sworn by me; that the transcript contains a
13  true record of the proceedings.
14      IN WITNESS WHEREOF, I have hereunto set my
15  hand this 29th day of December, 2009.
16
17          _____
18          Vivian S. Dafoulas, RMR-CRR
            Notary Public
18          (401) 885-0992
19          (My commission expires 1/4/2010.)
20
21
22
23
24
25

Buckman, Charles 12-17-09 video depo1

151

1              WITNESS SIGNATURE
2  IN RE GRAND JURY PROCEEDINGS
3  DEPOSITION OF:
4  CHARLES BUCKMAN
    December 17, 2009
5
6
7      I hereby certify that I have read the
8  foregoing transcript and the same contains a true
9  and accurate recording of my answers to the
10  questions therein set forth, subject to the
11  change(s) and/or correction sheet(s) attached.
12
13          _____
14              SIGNATURE OF DEPONENT
15  STATE OF_____
16
17      Subscribed and sworn to before me
18  this_____day of_____, 20__.
19          _____
              NOTARY PUBLIC
20
21  (My commission expires:_____)
22
23
24
25

Buckman, Charles 12-17-09 video depo1

152

1              CORRECTION SHEET

2

3    DEPOSITION OF:
     CHARLES BUCKMAN
4    December 17, 2009

5    PAGE # LINE #

6

7    NOW READS:              CORRECTION REQUESTED:

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Buckman, Charles 12-17-09 video depo1

153

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Buckman, Charles 12-17-09 video depo1