**Caramadre textmap**

*Bradshaw, Leon 12.1.09 video depo*

Full-size Transcript

Prepared by:

DOJ-USARI

Thursday, February 23, 2012

---

1

```
 1   00001:01            UNITED STATES DISTRICT COURT
 2       02          FOR THE DISTRICT OF RHODE ISLAND
 3       03
 4       04
 5       05  IN RE:  GRAND JURY PROCEEDINGS
 6       06
 7       07
 8       08
 9       09
10       10
11       11
12       12          Videotaped deposition of LEON BRADSHAW,
13       13  a Witness herein, taken on behalf of the United
14       14  States Attorney, on TUESDAY, DECEMBER 1, 2009, at
15       15  700 Westminster Street, Providence, Rhode Island,
16       16  scheduled at 1:00 p.m., before Diane J. DeStefano,
17       17  Registered Professional Reporter, a Notary Public in
18       18  and for the State of Rhode Island.
19       19
20       20
21       21
22       22
23                    Vivian S. Dafoulas & Associates
24       23               50 Fieldstone Drive
25                    East Greenwich, RI 02818
```

---

2

```
 1       24                  (401) 885-0992
 2       25
 3   00002:01  APPEARANCES:
 4       02  FOR THE UNITED STATES ATTORNEY:
 5       03     UNITED STATES ATTORNEY
 6              BY:  LEE H. VILKER, ESQUIRE
 7       04          JOHN P. McADAMS, ESQUIRE
 8              50 KENNEDY PLAZA, 8TH FLOOR
 9       05     PROVIDENCE, RHODE ISLAND 02903
10       06  FOR RAYMOUR RADHAKRISHNAN:
11       07     JEFFREY B. PINE, ESQUIRE
12              321 SOUTH MAIN STREET, SUITE 302
13       08     PROVIDENCE, RHODE ISLAND 02903
14       09  ███████
15       10     MacFADYEN, GESCHEIDT & O'BRIEN
16              BY:  JOHN A. MacFADYEN, ESQUIRE
17       11     101 DYER STREET
18              PROVIDENCE, RHODE ISLAND 02903
19       12
20       13  ███████
21       14     ANTHONY M. TRAINI, ESQUIRE
22              56 PINE STREET, SUITE 2
23       15     PROVIDENCE, RHODE ISLAND 02903
24       16  FOR JOSEPH CARAMADRE:
25       17     HINCKLEY, ALLEN & SNYDER LLP
```

---

3

```
 1              BY:  ROBERT G. FLANDERS, JR., ESQUIRE
 2       18     50 KENNEDY PLAZA, SUITE 1500
 3              PROVIDENCE, RHODE ISLAND 02903
 4       19
 5       20  ALSO PRESENT:  RAYMOUR RADHAKRISHNAN
 6                         JOSEPH CARAMADRE
 7       21              STEPHEN E. SOUZA, POSTAL INSPECTOR
 8       22  VIDEOGRAPHER:  LARRY HOLMES, NATIONAL VIDEO REPORTERS
 9       23
10       24
11       25
12   00003:01             I N D E X
13       02  WITNESS                              PAGE
14       03  LEON BRADSHAW
15       04     Direct Examination by Mr. Vilker      8
16       05     Cross-Examination by Mr. Pine        55
17       06     Cross-Examination by Mr. Flanders    98
18       07
19       08
20       09
21       10
22       11
23       12
24       13
25       14
```

```
 1   15
 2   16
 3   17
 4   18
 5   19
 6   20
 7   21
 8   22
 9   23
10   24
11   25
12   00004:01            E X H I B I T S
13         GOVERNMENT'S:
14         02  NO.   DESCRIPTION                        PAGE
15         03  (Government Exhibits 1 through 8 were premarked)
16         04  1   Photocopy of $2,000 check payable to
17             Leon Bradshaw dated 8/4/2008          21
18         05
19         2   Photocopy of $4,000 check payable to
20         06  Leon Bradshaw dated 9/2/2008          25
21         07  3   Brokerage Account Agreement And
22             Acknowledgement, 8/13/2008            35
23         08
24         4   E*Trade Financial Complete Investment
25         09  Account Application                   40
```

```
 1   10  5   E*Trade Financial Options Trading
 2           Application                             46
 3   11
 4   6   E*Trade Financial Power of Attorney
 5   12  form                                        51
 6   13  7   E*Trade Financial Securities Investment
 7           Account statement                       53
 8   14
 9   8   Brokerage Account Agreement And
10   15  Acknowledge Account, undated                34
11   16
12   17  DEFENDANTS':
13       NO.   DESCRIPTION                           PAGE
14   18
15   A   Written objection of defense counsel        6
16   19
17   B   Photocopy of $4,000 check payable to
18   20  Leon Bradshaw dated 9/2/2008                68
19   21  C   Photocopy of $2,000 check payable to
20       Leon Bradshaw dated 8/4/2008                68
21   22
22   D   Photocopy of identifying information of
23   23  Leon Bradshaw                               109
24
25
```

```
                                                        6
 1   00005:01        TUESDAY, DECEMBER 1, 2009, 1:06 P.M.
 2   02         THE VIDEOGRAPHER:  We are now recording and
 3   03  on the record.  My name is Larry Holmes.  I am a
 4   04  legal video specialist for National Video Reporters,
 5   05  Incorporated.  Our business address is 7 Cedar Drive,
 6   06  Woburn, Mass., 01801
 7   07         Today's date is December 1st, 2009, and the
 8   08  time is 1:06 p.m.  This is the deposition of Leon
 9   09  Bradshaw in the matter of In Re: Grand Jury
10   10  Proceedings.  This deposition is being taken at 700
11   11  Westminster Street, in Providence, Rhode Island.  The
12   12  court reporter is Diane DeStefano of Vivian Dafoulas
13   13  & Associates.  Counsel will state their appearances
14   14  and the court reporter will administer the oath.
15   15         MR. VILKER:  Okay.  This is Lee Vilker,
16   16  Assistant United States Attorney for the Government.
17   17         MR. McADAMS:  John McAdams, Assistant
18   18  United States Attorney for the Government.
19   19         MR. PINE:  Jeffrey Pine for Raymour
20   20  Radhakrishnan.
21   21         MR. RADHAKRISHNAN:  Raymour Radhakrishnan.
22   22         MR. FLANDERS:  Robert Flanders for Joseph
23   23  Caramadre.
24   24         MR. CARAMADRE:  Joseph Caramadre.
25   25         MR. MacFADYEN:  John MacFadyen ███████
```

```
                                                        7
 1   00006:01  ███████
 2   02         MR. TRAINI:  Anthony Traini ███████
 3   03  ███████
 4   04         MR. SOUZA:  And I'm Stephen Souza, Postal
 5   05  Inspector.
 6   06              LEON BRADSHAW,
 7   07  called as a witness and having first been duly
 8   08         sworn, testifies as follows:
 9   09         THE REPORTER:  Please state your full name
10   10  for the record.
11   11         THE WITNESS:  Leon Bradshaw.
12   12         MR. TRAINI:  Mr. Vilker.
13   13         MR. VILKER:  Yes.
14   14         MR. TRAINI:  Before you get started, if we
15   15  could just put on record our objections that we've
16   16  made in the past to the deposition.  The initial
17   17  objections are the ones that are contained in the
18   18  written objection document that we have filed with
19   19  each of the depositions up to now, and I have another
20   20  copy of that to give to Ms. DeStefano to mark as an
21   21  exhibit to the transcript.
22   22         (Defendants' Exhibit A was marked for
23   23  identification.)
24   24         In addition to the objections that are
25   25  stated, we reiterate all of the objections that we've
```

9

```
1  00007:01  made on the record at each of the previous
2        02  depositions, including without limitation the
3        03  standing Petrozziello objection so that we do not
4        04  have to inconvenience the deponent or unnecessarily
5        05  delay the deposition by objecting to each and every
6        06  question on Petrozziello grounds.
7        07        And also I believe we had a -- an agreement
8        08  that an objection by one counsel is an objection for
9        09  all counsel, and we reiterate all of those positions
10       10  and incorporate by reference any other objections we
11       11  made from the records of the previous depositions.
12       12        MR. MacFADYEN:  And I would -- sorry.  ▮▮▮▮
13       13  ▮▮▮▮▮▮▮▮ John MacFadyen.  I would also like
14       14  just to state for the record that it is our position
15       15  that we can reserve substantive objections to the
16       16  time when this deposition might be later used.  I
17       17  appreciate the Government takes issue with that
18       18  particular position, but it is the position we have
19       19  asserted throughout these depositions.
20       20        MR. VILKER:  Okay.  I'm Lee Vilker for the
21       21  Government.  I don't think we need to belabor this
22       22  discussion much more.  The Government incorporates
23       23  its responses to the objections raised by counsel in
24       24  this case, incorporates our responses made in the
25       25  previous four depositions.
```

```
1  00008:01        We are agreeable that an objection for one
2        02  counsel will serve as an objection for -- for all.
3        03  Again, it is our position that an objection needs to
4        04  be raised for it to be preserved and the parties have
5        05  agreed to disagree on that point for now.  Okay.  Is
6        06  everybody okay?  Are we ready to proceed?  Okay.
7        07                    EXAMINATION
8        08  BY MR. VILKER:
9        09    Q.    Good afternoon, Mr. Bradshaw.  My name is
10       10  Lee Vilker.  I'm an Assistant United States Attorney
11       11  and I'll be asking you questions first on behalf of
12       12  the Government.  First, you understand that you've
13       13  been put under oath today and are -- have sworn to
14       14  tell truth, the whole truth, and nothing but the
15       15  truth?
16       16    A.    Yeah.
17       17    Q.    Okay.  Now, how -- how old are you,
18       18  Mr. Bradshaw?
19       19    A.    Seventy-three.
20       20    Q.    Okay.  And where were you born?
21       21    A.    Richmond, Virginia.
22       22    Q.    And how long did you live in Virginia?
23       23    A.    Um, wow.  Let's see, this is -- I guess I
24       24  would say about 18 years I guess.
25       25    Q.    Okay.
```

10

```
1  00009:01    A.    No, wait a minute.  When I went in the
2        02  service, I was 18 years old.  Yeah, about 18 years,
3        03  yeah.
4        04    Q.    Okay.  And did there come a point in time
5        05  when you moved to Rhode Island?
6        06    A.    Yeah.  That was a long time after that
7        07  though.
8        08    Q.    Okay.  Well, just when generally did you
9        09  -- did you move to Rhode Island then?
10       10    A.    Rhode Island, December 27th, 1974.
11       11    Q.    Okay.
12       12    A.    Wait a minute.  Wrong.  '77.
13       13    Q.    Okay.  And are you retired now?
14       14    A.    Yeah.
15       15    Q.    Okay.  How long have you been retired?
16       16    A.    62.
17       17    Q.    Since you were 62 years old?
18       18    A.    Yeah.
19       19    Q.    Okay.  So about 11 years?
20       20    A.    Yes.
21       21    Q.    What did you do for your career?
22       22    A.    Well, I'm a certified alcohol counselor.
23       23    Q.    And where did you work?
24       24    A.    Well, I worked here, I worked in
25       25  Connecticut and here, yeah.
```

11

```
1  00010:01    Q.    Okay.  You helped people that were dealing
2        02  with alcohol abuse?
3        03    A.    Yeah.  Well, I set up programs and I ran
4        04  programs.
5        05    Q.    Okay.  Now, I want to ask you some
6        06  questions about your health.  Was there a time that
7        07  -- that you -- that you learned that you had cancer?
8        08    A.    A time that I learned that I had cancer?
9        09    Q.    Yes.  Well, did -- was there a time that
10       10  you had cancer?
11       11    A.    Well, when I learned I had cancer, I had
12       12  the tumor in Rhode Island when I went to the
13       13  hospital.
14       14    Q.    And did you get treatment for -- for that
15       15  tumor?
16       16    A.    Yeah, yeah.
17       17    Q.    Okay.  And what's the state of -- of your
18       18  cancer now?  Are you -- are you --
19       19    A.    Well, as far as I know, as far as I know,
20       20  I'm supposed to be cancer free.
21       21    Q.    Okay.
22       22    A.    Okay?  And they're dealing with my lungs.
23       23  That's as far as I know, okay?
24       24    Q.    Okay.  And what's the -- you mentioned
25       25  your lungs.  What's the condition of your lungs?
```

12

```
1   00011:01    A.    Well, I've got -- I've just got bad lungs,
2   02    man, you know.  I can't -- I can't get into a lot of
3   03    doctor's terms.  They've got all kinds of terms.  I
4   04    don't know.  My lungs is bad, that's all.
5   05    Q.    Okay.
6   06    A.    You know, it's breathing, my breathing.
7   07    I'm just bad.  They're just bad.
8   08    Q.    Okay.  And do you -- you're on oxygen now?
9   09    A.    Yeah, all the time.  Yeah.
10  10    Q.    Okay.  And you need the oxygen to help you
11  11    breathe?
12  12    A.    I need it all the time, yeah.
13  13    Q.    Okay.
14  14    A.    24 hours.
15  15    Q.    Okay.  Now, are you on any medications at
16  16    all now that affect your ability to understand the
17  17    questions that I'm asking?
18  18    A.    No.  I'm under medication but I understand
19  19    what you're saying.
20  20    Q.    Okay.
21  21    A.    I think so, if you put them in the right
22  22    words.
23  23    Q.    Okay.  Well, if at any point I ask a
24  24    question that you're not sure I'm asking --
25  25    A.    I'm gonna -- yeah, I'll ask you.
```

13

```
1   00012:01    Q.    Yeah.
2   02    A.    I don't have no point in asking you
3   03    nothing.
4   04    Q.    Ask me and I'll repeat it.
5   05    A.    Yeah.
6   06    Q.    Okay.  Now, at one point did you have a
7   07    nurse that was named Cathy?
8   08    A.    I've got a nurse that's named Cathy now.
9   09    Q.    Okay.  She's still your nurse now?
10  10    A.    Yeah, if you're talking about the one that
11  11    comes to see me.
12  12    Q.    Okay.  How often does Cathy come to see
13  13    you?
14  14    A.    Oh, man.  Cathy -- I don't know.  Two,
15  15    three times a month maybe.
16  16    Q.    Okay.
17  17    A.    You know.  She comes anytime I need it.
18  18    Q.    Okay.
19  19    A.    All I gotta do is call up.
20  20    Q.    Okay.  And was Cathy coming to see you
21  21    back in the middle of 2008, last year?
22  22    A.    I would think so, yeah.
23  23    Q.    Okay.
24  24    A.    I think so, yeah.
25  25    Q.    Okay.  And did she come here to visit you
```

14

```
1   00013:01    in your apartment?
2   02    A.    Yeah.
3   03    Q.    Okay.  Now, did there come a point in time
4   04    in which Cathy spoke to you about a way in which you
5   05    could make some money?
6   06    A.    Well, the way you put that, that's not --
7   07    that's not the way she came to me.
8   08    Q.    Well, what did she say to you?
9   09    A.    Not the way you put it.
10  10    Q.    What did she say to you?
11  11    A.    If I can remember correctly, and I hope
12  12    I'm right, you know, she said to me about -- how did
13  13    she say it -- about, you know, people -- people like
14  14    me, meaning in my condition I guess, I don't know,
15  15    they was -- somebody was giving away money.  I mean
16  16    that's just the way it was, somebody was giving away
17  17    money.
18  18    Q.    Okay.
19  19    A.    And, you know, she was gonna look into it
20  20    for me and that's what happened.
21  21    Q.    Were you interested in this when she first
22  22    told you about it?
23  23    A.    If they're gonna give me money, yeah, I'm
24  24    interested.  If you say you're gonna give me money
25  25    I'm interested, yeah, right here now, yeah.
```

15

```
1   00014:01    Q.    Okay.  Did you -- did you -- did you place
2   02    any phone calls after she told you about it or did
3   03    Cathy?
4   04    A.    No.  I didn't place nothing, no.
5   05    Q.    Okay.  Was there a time after you had this
6   06    conversation with Cathy in which you spoke to
7   07    somebody on the phone about -- about the possibility
8   08    of you getting some money?
9   09    A.    Not about the possibility of me getting
10  10    some money, no, no.  I remember speaking to -- I
11  11    think it's Raymour.  I spoke to him on the phone,
12  12    yeah.
13  13    Q.    Okay.  And what do you -- what do you
14  14    remember Raymour saying to you on the phone?
15  15    A.    It wasn't about getting no money.
16  16    Q.    Well, what do you remember him saying
17  17    then?
18  18    A.    He just wanted to see me.  He wanted to
19  19    see me.
20  20    Q.    Okay.  And did he -- did -- did you end up
21  21    meeting with Raymour?
22  22    A.    He came to my house, yeah.
23  23    Q.    And this is your apartment here in
24  24    Providence?
25  25    A.    Right here, yeah.
```

16

```
1   00015:01    Q.   Okay.  And -- and you -- you pointed to a
2   02   man named Raymour.  Do you see that person here
3   03   today?
4   04       A.   Yeah.  I see the guy right there, yeah.
5   05       Q.   Okay.  That's --
6   06       A.   Yeah.  I know, yeah.
7   07       Q.   And that's the man that you met with?
8   08       A.   He came to my house, yeah.
9   09           MR. VILKER:  Okay.  Now -- and just let the
10  10   record please reflect that the witness has identified
11  11   Mr. Radhakrishnan.
12  12       Q.   Now, when Raymour got to your house that
13  13   first time what, if anything, did he say to you?
14  14       A.   Oh, man.
15  15       Q.   That you can remember.
16  16       A.   I'm going to tell you something and I'm
17  17   being honest with you, man, that's gonna be hard to
18  18   do.  Like I'm sitting here talking to you --
19  19       Q.   Uh-hum.
20  20       A.   -- and when I see you about an hour from
21  21   now, I don't even know what you said to me.
22  22       Q.   Okay.
23  23       A.   And that's the truth, you know.  He said
24  24   so many things.  I couldn't even actually repeat one
25  25   thing.  It would be luck if I said anything to you
```

Bradshaw, Leon 12.1.09 video depo

17

```
1   00016:01   what he said.
2   02       Q.   Okay.  Well, let me ask you some more
3   03   direct questions then.  What, if anything, did
4   04   Raymour say to you about any money that you could
5   05   receive?
6   06           THE WITNESS:  Giving me money?
7   07           MR. VILKER:  Yes.
8   08       A.   No, he didn't come to me like that.
9   09       Q.   Okay.  Well, what did he say about any
10  10   money that you could get?
11  11       A.   I don't know how he said money.  He said
12  12   -- I don't know.  Here's the impression I got, okay?
13  13   Now, here's the impression I got when he left, when
14  14   he left me, right?  The impression I got -- now,
15  15   this will probably figure out what he said to me, I
16  16   don't know, but the impression I got from him was
17  17   that there was some rich guy who was giving away
18  18   money to people like me and I was entitled to some
19  19   of it.
20  20       Q.   Okay.
21  21       A.   And that there were other people that were
22  22   like -- I don't know how many other people, and that
23  23   I was the last one that -- to get in on this thing,
24  24   whatever it is.
25  25       Q.   Okay.
```

Bradshaw, Leon 12.1.09 video depo

18

```
1   00017:01    A.   That's the impression he gave me.
2   02       Q.   Okay.
3   03       A.   Now -- now, the exact words he came to me,
4   04   yes, I remember money, yes, yeah, because that's all
5   05   I'm interested in.  You say money to me, I -- I done
6   06   forgot everything else you said.
7   07       Q.   All right.
8   08       A.   That's the way it is, you know what I
9   09   mean?
10  10       Q.   Okay.
11  11       A.   And -- and -- and -- and -- and yes.
12  12       Q.   Okay.
13  13       A.   That's what it is.
14  14       Q.   Did -- did Raymour, during that first
15  15   meeting, say anything to you about the amount of
16  16   money that you would get?
17  17       A.   No.  Not really, no.
18  18       Q.   Okay.  Did he say anything about rounding
19  19   the money or how he would calculate how much money
20  20   you would get?
21  21       A.   Well, the -- the -- the -- the -- the
22  22   thing of rounding out a round figure, yeah, once it
23  23   had got to -- to what he was giving me at the end,
24  24   and he made a thing of rounding out a figure or
25  25   something like that, but that was after the money,
```

Bradshaw, Leon 12.1.09 video depo

19

```
1   00018:01   the check and all that kind of stuff.
2   02       Q.   Okay.
3   03       A.   You know, that wasn't before that.
4   04       Q.   Okay.  So during that first meeting with
5   05   Raymour, did you get any money that time?
6   06       A.   No.
7   07       Q.   Okay.  Was there a time that Raymour paid
8   08   you another visit in your apartment?
9   09       A.   Yeah.
10  10       Q.   Okay.  And do you know about how much time
11  11   had passed between that first visit and the second
12  12   visit?
13  13       A.   Oh, wow, man.  My buddies know, I don't.
14  14   And I'm guessing this, all right?
15  15       Q.   Okay.
16  16       A.   I'm guessing this and I -- I don't know.
17  17   Wow, man.  I don't really know, man, but I'll tell
18  18   you what, I'm gonna say -- I gonna say it was maybe
19  19   three or four weeks.
20  20       Q.   Okay.
21  21       A.   I'm just gonna say that.  That -- that
22  22   could be far from the truth --
23  23       Q.   Okay.
24  24       A.   -- all right?
25  25       Q.   That's your best memory as you sit here?
```

Bradshaw, Leon 12.1.09 video depo

20

```
1   00019:01      A.    Yeah, because that -- I -- I can't say
2   02   that I'd bet my life on it because I don't know.
3   03      Q.    Okay.  Now, do you know how the second
4   04   meeting came about, who set it up?
5   05      A.    Who set it up.  That's a good question.
6   06   Wow.  I don't know.  Did Cathy say something to me
7   07   about -- about -- I don't know.  Cathy could have
8   08   said something to me --
9   09      Q.    Okay.
10  10      A.    -- about it but he called me and said will
11  11   you see me, I guess.  I don't know.
12  12      Q.    Okay.
13  13      A.    You know, you know, these questions, man,
14  14   are something when you ask me.  You see my mind is
15  15   money.  See that's all I could see is money, you
16  16   know what I mean?  And when you ask me questions
17  17   like that, see, see, because these people I'm
18  18   dealing with, I got no reason to think nothing about
19  19   these people.
20  20      Q.    Right.
21  21      A.    You see what I mean?  Here's my nurse,
22  22   here's -- you know what I mean?  What do I need to
23  23   think about them for?
24  24      Q.    Okay.
25  25      A.    You got some money to give me, give it to
```

21

```
1   00020:01   me.
2   02      Q.    Okay.
3   03      A.    Just like you sitting right here now, I
4   04   got no reason to think nothing about you.  You put
5   05   some money on the table, I'm gonna take it.
6   06      Q.    Okay.
7   07      A.    I got no reason at all --
8   08      Q.    Okay.
9   09      A.    -- you know?  And that's the way it was
10  10   with him, you know?  Yes, he might have -- he said a
11  11   lot of things that went right over my head.
12  12      Q.    Okay.  Now --
13  13      A.    You know.
14  14      Q.    -- did you -- during that second visit
15  15   with -- with Raymour, did he give you any money on
16  16   that occasion?
17  17      A.    Well, no, he didn't give it to me, he -- I
18  18   think he -- I think he told me --
19  19      Q.    Okay.
20  20      A.    -- what it was and what this was.
21  21      Q.    Okay.  Well, let me show --
22  22      A.    I don't know if he had a check then or
23  23   not.  I forget.
24  24      Q.    All right.  Well, let me show you what I
25  25   have marked as Government Exhibit 1 and ask you to
```

22

```
1   00021:01   take a look at it.
2   02      A.    That looks good.
3   03      Q.    Okay.  Is that a check to you in the
4   04   amount of $2,000?
5   05      A.    Yeah, yeah.
6   06      Q.    Okay.  And do -- do you recall Raymour
7   07   giving you this check?
8   08      A.    Yeah.
9   09      Q.    Yes?
10  10      A.    Yeah.  Yeah, it looks like it.  I don't
11  11   know if that was it or not.  It looks like it.
12  12      Q.    Okay.
13  13      A.    It fools me.  At this point it would.
14  14      Q.    Okay.  Well, you did get a $2,000 check
15  15   from him?
16  16      A.    Yeah, yeah.
17  17      Q.    What did you do with the check after you
18  18   received it?
19  19      A.    What did I do with it?  Citizens Bank.  I
20  20   went and I cashed it.
21  21      Q.    Okay.  Now, what, if anything, did Raymour
22  22   say to you when he gave you this check as to what
23  23   you were receiving this money for?
24  24      A.    Man, if he said something to me, I didn't
25  25   hear it.
```

23

```
1   00022:01      Q.    Okay.
2   02      A.    All right?  And I'm not saying he didn't
3   03   say nothing, and I'm not saying he did, because I
4   04   didn't hear it.  All I seen was $2,000.  That's what
5   05   I seen.  That's all I cared about.
6   06      Q.    Okay.  What was your understanding then of
7   07   why you were receiving this money?
8   08      A.    My understanding was some rich guy had
9   09   left some money for some people that was on the way
10  10   out, and I figured I was one of them people on the
11  11   way out, you know --
12  12      Q.    Okay.
13  13      A.    -- because they had brought me back, all
14  14   right?  And so, you know, this guy was giving us
15  15   money, that's all.
16  16      Q.    Okay.
17  17      A.    Because -- because it was said there by
18  18   somebody that I was on the end of it.  I was the
19  19   last one.
20  20      Q.    Okay.
21  21      A.    You know what I mean?  I just got in on
22  22   it.  There was some more people.  I don't know about
23  23   them, you know.
24  24      Q.    Okay.  Now, did -- did Raymour ever
25  25   mention the name to you of Joseph Caramadre?
```

24

```
1   00023:01     A.    I heard that name, yeah.  He came.  He
2   02   came -- he came around me, yeah.
3   03        Q.    Okay.  And what do you remember him
4   04   saying?
5   05        A.    What it was, you know, again, man, you
6   06   know, I could care less about Caramadre.  I don't
7   07   know nothing about Caramadre.  He's telling me all
8   08   this.  That's all I care about is right there.
9   09        Q.    Okay.
10  10        A.    You know what I mean?  Now -- now, you
11  11   know, I don't know what, you know.  As far as I'm
12  12   concerned, he could have been the guy who was giving
13  13   the money away.
14  14        Q.    Okay.  You're not sure then --
15  15        A.    No.
16  16        Q.    -- what exactly Raymour said about Joseph
17  17   Caramadre?
18  18        A.    I can't tell you something that I'd have
19  19   to make up.
20  20        Q.    Okay.  No, we just want you to tell
21  21   whatever you remember.
22  22        A.    Yeah.  I've heard the name, yeah.
23  23        Q.    Okay.
24  24        A.    Yes.  The name was mentioned, yeah.
25  25        Q.    Okay.
```

25

```
1   00024:01     You know, he could have been the guy who
2   02   was giving the money away.
3   03        Q.    Okay.
4   04        A.    I don't know, you know.
5   05        Q.    Okay.  Now, after the time that Raymour
6   06   gave you this $2,000 check --
7   07        A.    Right.
8   08        Q.    -- the second time --
9   09        A.    Right.
10  10        Q.    -- that you met with him, did he come to
11  11   your -- your apartment again?
12  12        A.    Well, now the next time he came was about
13  13   the $4,000.
14  14        Q.    Okay.  And he -- the next time he came he
15  15   gave you another $4,000?
16  16        A.    Not another, the first one.
17  17        Q.    Okay.  But he gave you $2,000 and then --
18  18        A.    Yeah.
19  19        Q.    -- he gave you $4,000?
20  20        A.    Yeah, yeah.
21  21        Q.    So just to be clear, the total amount that
22  22   you received was $6,000?
23  23        A.    $6,000, yeah.
24  24        Q.    Okay.  Now, I would like to show you
25  25   Government Exhibit 2.  Does this look like the
```

26

```
1   00025:01  $4,000 check that you received?
2   02        A.    It looks like it, yeah.
3   03        Q.    Okay.  And Raymour gave you this check on
4   04   the third meeting you had with him?
5   05        A.    Let's see.  One, two, yeah, I guess you
6   06   could say it was the third, yeah, the third meeting.
7   07        Q.    Okay.  Now, do you see on the memo line of
8   08   this check --
9   09        A.    Yeah.
10  10        Q.    -- how it's written "New" and then
11  11   abbreviation for "Accounts"?
12  12        A.    Yeah.
13  13        Q.    And then "Setup" right here?
14  14        A.    Yeah.
15  15        Q.    Okay.  Did you -- did you notice those
16  16   words when you got this check?
17  17        A.    Yeah, see that's what I'm trying to say to
18  18   you, you know what I mean?  Like I know this is
19  19   gonna sound stupid, man, but all I see on this check
20  20   is $2,000, $4,000, Citizens Bank that I can cash it.
21  21   And I mean I could care less about anything else on
22  22   there.
23  23        Q.    Okay.  So --
24  24        A.    I'm telling you like it is.  I know it
25  25   sounds stupid.
```

27

```
1   00026:01     Q.    Right.  You --
2   02        A.    You know what I mean?  I mean maybe if I
3   03   was a rich guy, a businessman or something like
4   04   that, if I was in the business, maybe I wouldn't be
5   05   doing this.
6   06        Q.    Right.
7   07        A.    But I'm interested in that.
8   08        Q.    Okay.
9   09        A.    That's what I'm interesting in, where I
10  10   could cash it and get the money.
11  11        Q.    Okay.  So --
12  12        A.    I could care less about anything else.
13  13        Q.    So do you recall one way or the other
14  14   whether you even noticed --
15  15        A.    Don't even --
16  16        Q.    -- those words?
17  17        A.    Well, I gotta see it, I gotta see it, but
18  18   it -- it don't register.
19  19        Q.    Okay.
20  20        A.    You know, I gotta see it.  It's impossible
21  21   for me not to see it.
22  22        Q.    Okay.
23  23        A.    But it just don't register, you know what
24  24   I mean?
25  25        Q.    Did -- did you ever ask Raymour why this
```

28

```
 1  00027:01  was --
 2      02      A.    Well, I don't need --
 3      03      Q.    -- new account --
 4      04      A.    All --
 5      05            MR. VILKER:    Just if you could, because for
 6      06  the -- for the court reporter --
 7      07            THE WITNESS:   Right.
 8      08            MR. VILKER:    -- it's difficult if you're
 9      09  answering while --
10      10            THE WITNESS:   Oh, okay.
11      11            MR. VILKER:    -- I'm asking.
12      12            THE WITNESS:   Okay, I'm sorry.
13      13            MR. VILKER:    So I just don't want to --
14      14            THE WITNESS:   Okay.
15      15            MR. VILKER:    -- mess up the -- the record
16      16  here.
17      17      Q.    My question was did you ever -- did you
18      18  ever ask Raymour or did he ever tell you anything
19      19  about why the words "New Account Setup" were written
20      20  on this check?
21      21      A.    I didn't even know it was, what you said
22      22  to me.
23      23      Q.    Okay.
24      24      A.    So I had no reason to ask him.  That don't
25      25  even ring a bell to me, you know.
```

Bradshaw, Leon 12.1.09 video depo

29

```
 1  00028:01  Okay.  Now, when you got this $4,000
 2      02  check --
 3      03      A.    Yup.
 4      04      Q.    -- what, if anything, did Raymour tell you
 5      05  that this check was for?
 6      06      A.    Well, I don't know.  He was running
 7      07  something down.  Same thing as this I guess.  Same
 8      08  thing he said to me about this is that, as far as
 9      09  I'm concerned.
10      10      Q.    And what is that?
11      11      A.    Oh, man, I don't know what he said.  I
12      12  don't know what he said.  If I could put some words
13      13  together, I would either be lying or I would be
14      14  making up something that he said.
15      15      Q.    Okay.
16      16      A.    You know what I mean?  Like names or
17      17  things that I've heard him say, yes, I know that
18      18  because I, you know, I pick up something like a
19      19  person's name or whatever else, but to frame right
20      20  what he said to me --
21      21      Q.    Okay.  Without -- without --
22      22      A.    Not unless he said to me that he was
23      23  taking me up and he was gonna bang me.  I would have
24      24  remembered that --
25      25      Q.    Okay.
```

Bradshaw, Leon 12.1.09 video depo

30

```
 1  00029:01      A.    -- you know.
 2      02      Q.    Okay.  But what -- but what --
 3      03  Mr. Bradshaw, what did you believe in your mind that
 4      04  this $4,000 check was for?
 5      05      A.    What did I believe in my mind it was?  I
 6      06  believed that somebody had given some money, all
 7      07  right, to a suffering person or a person that, you
 8      08  know, bad health, wasn't going to die or whatever,
 9      09  and just was giving them the money.  Now, I know how
10      10  stupid that sounds but that's what I, you know,
11      11  because -- because the way it came to me as if it
12      12  was a lot of us, see, and I wasn't the only one.
13      13      Q.    Okay.
14      14      A.    You know.  It was -- I don't know how many
15      15  they said it was, but I was getting on the end of
16      16  it.
17      17      Q.    Okay.
18      18      A.    And I said, wow, it sounds good, man, you
19      19  know.  And, you know, so, hey, what the hell, you
20      20  know.
21      21            MR. MacFADYEN:   Objection.  Nonresponsive,
22      22  and also it doesn't relate to what he actually heard
23      23  or perceived.
24      24            MR. VILKER:   I believe his understanding of
25      25  why he was receiving the money is relevant and
```

Bradshaw, Leon 12.1.09 video depo

31

```
 1  00030:01  therefore admissible, and I believe it was responsive
 2      02  to the question.
 3      03      Q.    Okay.  Now, during -- during these
 4      04  meetings that you had with Raymour, did he ask you
 5      05  to sign any documents?
 6      06      A.    Yeah.  I signed some papers, yeah.
 7      07      Q.    Okay.  Do you recall as you're sitting
 8      08  here today about how many documents you signed?
 9      09      A.    Wow, man, let's see.  One, two, three.  I
10      10  don't know.  I'm going to guess about six maybe.  I
11      11  don't know.  I'm just guessing that because I don't
12      12  know.
13      13      Q.    Okay.  Did you read these documents
14      14  yourself before you signed them?
15      15      A.    No.  No, I don't read them, no.
16      16      Q.    Approximately how much time did you
17      17  spend looking at these documents before you signed
18      18  them?
19      19      A.    I just glanced at it and signed.
20      20      Q.    Okay.  Did Raymour read those documents to
21      21  you before you signed them?
22      22      A.    Word for word?  No, not -- not the whole
23      23  document, no.
24      24      Q.    Okay.
25      25      A.    No.
```

Bradshaw, Leon 12.1.09 video depo

32

```
1   00031:01    Q.    Do you remember him reading parts of the
2       02   documents to you?
3       03       A.    I mean I remember him saying something to
4       04   me, you know, but here again it meant nothing to
5       05   what he was saying to me.  You know, at least, you
6       06   know, as long as I didn't hear him say he was gonna
7       07   cut my head off or take my life, nothing else meant
8       08   nothing there, you know what I mean?
9       09           And that's just the way it is.  Nothing
10      10   meant nothing, you know, unless it was something that
11      11   would get me screwed up, like take my life or
12      12   something or he was gonna cut my arm or take my arms
13      13   or give my life away or something, you know.
14      14       Q.    Okay.
15      15       A.    Then I would have wanted to, you know,
16      16   really get into it, you know.  But everything --
17      17   hey, you're giving away 2, $4,000, give it.  You got
18      18   some more?  Give me some more.
19      19       Q.    Okay.  So you didn't really care what was
20      20   on the documents you were signing?
21      21       A.    Well, care.  When you say care, I don't --
22      22   I don't think it's nothing illegit to care about.  I
23      23   mean what do I need to care about?
24      24       Q.    Okay.
25      25       A.    You know?  You know, what do I need to
```

33

```
1   00032:01   care about?
2       02       Q.    Okay.
3       03       A.    You know what I mean?  That's -- that's,
4       04   you know, I mean if I thought it was something to
5       05   care about, I wouldn't be stupid enough to put my
6       06   name on it.
7       07       Q.    Okay.
8       08       A.    You know.
9       09       Q.    Now, have you ever had any kind of legal
10      10   training?
11      11       A.    Legal training.
12      12       Q.    Law school?
13      13       A.    What do you mean?
14      14       Q.    You're not an attorney?
15      15       A.    In the street, yeah.  You gotta be an
16      16   attorney in the street, yeah.
17      17       Q.    Better than most of us I'm imagining, but
18      18   you haven't had any formal legal training.  Now, did
19      19   you ever ask to have an attorney review the
20      20   documents that you were signing?
21      21       A.    No.  I didn't think I needed it.
22      22       Q.    Did you ever ask anyone else that you
23      23   knew --
24      24       A.    No.
25      25       Q.    -- to review the documents?
```

34

```
1   00033:01       A.    No.
2       02       Q.    Okay.
3       03       A.    See that, see those questions you're
4       04   asking me right there, see this thing to me was
5       05   never that big --
6       06       Q.    Okay.
7       07       A.    -- at all, you know what I mean?  You
8       08   know, this was never that big at all, you know what
9       09   I mean?  Like say you sitting in here, all of you
10      10   are sitting in here and you said, "Leon, wow, we got
11      11   a thousand dollars for you."  What do I care?  Why
12      12   do I need an attorney?  All you guys are attorneys,
13      13   all you sitting here, what do I need you for?
14      14       Q.    All right.
15      15       A.    Give me the thousand and go.  Do the
16      16   paperwork and get on out of here and let me have it,
17      17   you know what I mean?
18      18       Q.    Now, what do you remember, Mr. Bradshaw,
19      19   if anything, that Raymour told you that these
20      20   documents were for?
21      21       A.    Oh, see, here again, here again, if I
22      22   could remember word for word what he said, I would.
23      23   Believe me, I would have no problem telling you.
24      24       Q.    Okay.
25      25       A.    But everything I say about what he said,
```

35

```
1   00034:01   I'm gonna be guessing and I'm gonna be just saying
2       02   stuff --
3       03       Q.    Okay.
4       04       A.    -- and it ain't gonna come out right
5       05   because I don't know.
6       06       Q.    Okay.
7       07       A.    You know, I don't know.  I just don't
8       08   remember, man.
9       09       Q.    Okay.  Now, did -- did Raymour make any
10      10   copies while you were there of any of the documents
11      11   that you were signing?
12      12       A.    I didn't see none, no.
13      13       Q.    Okay.  Did he leave behind with you any of
14      14   the copies of any of the documents you signed?
15      15       A.    No.
16      16       Q.    Okay.  Now, I would like to show you
17      17   Exhibit 8.  Let me just put this here.  Now, if you
18      18   could turn to the -- the -- the third page of this
19      19   exhibit.  Okay.  Do you see an "x"?
20      20       A.    Yeah.
21      21       Q.    And is that your signature after that?
22      22       A.    Yeah.
23      23       Q.    Okay.  So this appears to be one of the
24      24   documents that you signed with Raymour?
25      25       A.    Yeah, yeah.
```

36

```
1   00035:01    Q.    Okay.
2        02              MR. FLANDERS:  Just a second.  Did --
3        03              MR. VILKER:  I said Exhibit 8.
4        04              MR. FLANDERS:  Oh, I'm sorry, 8.
5        05              MR. VILKER:  Yup.
6        06              MR. FLANDERS:  Not 3?
7        07              MR. VILKER:  No.
8        08              MR. FLANDERS:  Okay.
9        09        Q.    Okay.  Now, am I correct that the rest of
10       10   Exhibit 8, other than your signature, has no other
11       11   handwriting on it?
12       12        A.    Not that I know of.
13       13        Q.    Okay.
14       14        A.    But I don't even remember looking at this.
15       15        Q.    That was my next question.  Do you
16       16   remember looking at this document?
17       17        A.    No.  No, I just signed it, you know.
18       18        Q.    Okay.  Now, I would like to show you
19       19   Exhibit 3, which is the same basic document as
20       20   Exhibit 8 with some handwriting on the front page.
21       21   First of all, I would like to take the -- have you
22       22   look at the third page of Exhibit 3 --
23       23        A.    Yeah.
24       24        Q.    -- and ask if that's also your signature
25       25   next to Co-Owner?
```

37

```
1   00036:01    A.    Yeah.  How did all that get in there?
2        02        Q.    Okay.  That is your signature on Exhibit
3        03   --
4        04        A.    Yeah.
5        05        Q.    -- 3?
6        06        A.    How did all the rest of them get in there?
7        07        Q.    Okay.  Well, were there any other
8        08   signatures on the page at the time you signed it?
9        09        A.    Anything I signed, my signature was the
10       10   only one on all of them.  That much I remember.
11       11        Q.    Okay.  So the -- there's a signature here,
12       12   a Funds Provider, of Joseph Caramadre.  Have you
13       13   ever met Mr. Caramadre before?
14       14        A.    I wouldn't even know if I seen him, no.
15       15        Q.    Okay.  So Mr. Caramadre didn't sign any
16       16   documents in your presence?
17       17        A.    He didn't sign nothing in front of me, no.
18       18        Q.    Okay.  Now --
19       19        A.    I wouldn't even know him if I seen him.
20       20        Q.    Now, as you look at this document now, do
21       21   you -- does this document look familiar to you?
22       22        A.    This -- this looks like the same thing to
23       23   me.  This all looks the same to me as I -- as I'm
24       24   looking at it.
25       25        Q.    Right.  But as you're looking at it now,
```

38

```
1   00037:01   do you remember signing that document that day?
2        02        A.    I don't remember signing the same document
3        03   over and over.
4        04        Q.    Okay.
5        05        A.    Because if I -- I had signed it, I would
6        06   remember seeing this.  In other words, if you give
7        07   me two documents and I signed this and I'm looking
8        08   at this, it's not that I'm gonna say all I'm gonna
9        09   look at is this anyway.  I would remember seeing
10       10   this looking the same as that.
11       11        Q.    Okay.
12       12        A.    You know.
13       13        Q.    Now, I want to draw your attention to
14       14   paragraph 1 of this document.
15       15              MR. TRAINI:  Which document?
16       16              MR. VILKER:  Excuse me, Government Exhibit
17       17   3.
18       18        Q.    It says, "The Funds Provider and the
19       19   Co-Owner" -- and you are identified as the co-owner
20       20   --
21       21        A.    Uh-hum.
22       22        Q.    -- "are joint tenants with rights of
23       23   survivorship in the above-referenced Brokerage
24       24   Account."  Did you remember reading any language
25       25   about you opening up a -- a brokerage account?
```

39

```
1   00038:01    A.    Me?
2        02        Q.    Yes.
3        03        A.    No, man, I don't know about no brokerage
4        04   account.
5        05        Q.    Okay.  This indicates that Mr. Caramadre
6        06   and you would be joint tenants with rights of
7        07   survivorship in a brokerage account.
8        08        A.    First I've seen of that, man.
9        09        Q.    Okay.
10       10              MR. TRAINI:  Excuse me, Mr. Vilker.  I just
11       11   want to lodge an objection to the whole line of
12       12   questioning relative to these two documents because
13       13   it appears, and maybe I'm wrong, but it appears that
14       14   you're trying to establish that he signed Exhibit 8
15       15   in blank and then Exhibit 8 became Exhibit 3 when the
16       16   information was filled in later on.  Is that what --
17       17              MR. VILKER:  That's not what I'm trying to
18       18   establish.  These appear to be similar documents and
19       19   there's two different signatures.
20       20              MR. TRAINI:  Right.
21       21              MR. VILKER:  So I just --
22       22              MR. TRAINI:  I just want to make sure that
23       23   -- that you're not suggesting to the witness that
24       24   Exhibit 8 is the blank version of what later became
25       25   Exhibit 3.
```

40

1  00039:01        MR. VILKER:  No.  There are two different
2  02  documents, obviously very similar.  The text is
3  03  identical but they're -- they're two different
4  04  documents.
5  05        MR. TRAINI:  Well, the order in which the
6  06  questions were being asked seemed to suggest that
7  07  that's what you were doing and I just want to make
8  08  sure that's not the case.
9  09        MR. VILKER:  No, that's -- I apologize if
10 10  that's confusing.
11 11        MR. TRAINI:  Thank you.
12 12     Q.   Now, the -- if I could direct your
13 13  attention to paragraph 7 of Government Exhibit 3,
14 14  and I just want to read a line to you that starts
15 15  here, that the -- the final sentence in paragraph 7.
16 16  Excuse me, the final sentence on the first page as
17 17  in paragraph 7 that reads, "As a result of the
18 18  optional redemption feature, the securities could
19 19  yield a substantial profit for the Funds Provider if
20 20  the Co-Owner dies before the Funds Provider and the
21 21  securities are in the Account at the time of the
22 22  Co-Owner's death."
23 23        And my question is what, if anything, did
24 24  Raymour say to you about the possibility that someone
25 25  else could make any money upon your death?

Bradshaw, Leon 12.1.09 video depo

41

1  00040:01        MR. TRAINI:  Objection, leading.
2  02        MR. VILKER:  You can answer.
3  03     A.   I don't remember -- I don't know about
4  04  death.  That's the first time I heard about somebody
5  05  dying, death and all that stuff.  See, in other
6  06  words, you got me now knowing that death -- that I
7  07  got money on -- I don't know nothing about this.
8  08  That's the first time I heard that --
9  09     Q.   Okay.
10 10     A.   -- that you brought that out to me.
11 11     Q.   Okay.
12 12     A.   You got me into something I don't know
13 13  nothing about.
14 14     Q.   Okay.  Now, I'd like to show you,
15 15  Mr. Bradshaw, Government Exhibit 4.  Okay.
16 16  Government Exhibit 4 is entitled "Complete
17 17  Investment Account Application" from a company known
18 18  as E*Trade Financial.  And before I ask you about
19 19  the -- the first page of the document, if you could
20 20  first turn to Page 3.
21 21        THE WITNESS:  That's this right here?
22 22        MR. VILKER:  Yes.  Yup, that's the page.
23 23  Let me just see.  Yes, this is Page 3.
24 24     Q.   Now, do you -- do you see your signature
25 25  on that page above "Signature of Co-Account Holder"?

Bradshaw, Leon 12.1.09 video depo

42

1  00041:01     A.   Yeah.
2  02     Q.   Okay.  Do you see the date next to your
3  03  signature of 08-13-2008?
4  04     A.   Yeah.
5  05     Q.   Okay.  Did you -- is that date in your
6  06  handwriting?
7  07     A.   No, I didn't -- no, that's not my
8  08  handwriting, no.
9  09     Q.   Okay.  Do you see the signature of the one
10 10  to the left of your -- your signature, "Primary
11 11  Account Holder," and there's a signature apparently
12 12  of Joseph Caramadre?
13 13     A.   Yeah.
14 14     Q.   Okay.  Do you see the date there of
15 15  08-13-2008 next to Mr. Caramadre?
16 16     A.   Yeah, I see it.
17 17     Q.   Okay.
18 18     A.   I see it now, yeah.
19 19     Q.   Is that date in your handwriting?
20 20     A.   No, that's not me.
21 21     Q.   Okay.  When you signed this form --
22 22     A.   Yeah.
23 23     Q.   -- was Mr. Caramadre's signature already
24 24  on the form?
25 25     A.   Hey, that's a good question.

Bradshaw, Leon 12.1.09 video depo

43

1  00042:01     Q.   If you can remember.
2  02     A.   I don't remember seeing it, no.
3  03     Q.   Okay.  Now, if you turn to the next page,
4  04  the fourth page of this document.  Okay.  Do you see
5  05  your signature on the bottom right?
6  06     A.   Yeah.  The bottom right?
7  07     Q.   Well, the --
8  08     A.   This one?
9  09     Q.   Yes.  Do you see your signature above
10 10  where it says --
11 11     A.   Yeah.
12 12     Q.   -- "Signature of Co-Account Holder"?
13 13     A.   Yeah.
14 14     Q.   Okay.  And do you see the date --
15 15     A.   Yeah.
16 16     Q.   -- next to your signature of 08-13-08?
17 17     A.   That's not me, no.
18 18     Q.   Okay.  That's not your handwriting?
19 19     A.   No.
20 20     Q.   Okay.  And do you see the signature of
21 21  "Primary Account Holder, Joseph Caramadre"?
22 22     A.   Yeah.
23 23     Q.   And do you see the date of 08-13-2008?
24 24     A.   That's not me either.
25 25     Q.   Okay.  That's not your handwriting?

Bradshaw, Leon 12.1.09 video depo

45

```
 1  00043:01    A.    No.
 2      02      Q.    Okay.  Now, if you could turn to the front
 3      03  page of this document.  Do you recall seeing the
 4      04  front page of this document when you met with
 5      05  Raymour?
 6      06      A.    Not like this.
 7      07      Q.    Okay.  When you say not like this, what do
 8      08  you mean?
 9      09      A.    Well, you got a lot of stuff on there.
10      10      Q.    You don't remember seeing any document
11      11  that had all this information handwritten in it?
12      12      A.    No.
13      13      Q.    Okay.  Well, this paragraph number 2 --
14      14      A.    It could have been on there but I don't
15      15  remember seeing it.
16      16      Q.    Okay.
17      17      A.    I don't remember seeing this.
18      18      Q.    Okay.  Paragraph number 2 has information,
19      19  the Primary Account Holder on the left --
20      20      A.    Yeah.
21      21      Q.    -- of Joseph A. Caramadre?
22      22      A.    See, see this Caramadre, right, you know,
23      23  I see his name is coming up a lot, and his name
24      24  didn't come up, you know what I mean, and all of a
25      25  sudden, I'm seeing it come up a lot, you know.
```

Bradshaw, Leon 12.1.09 video depo

45

```
 1  00044:01    Q.    Okay.
 2      02      A.    And I'm wondering, you know.
 3      03      Q.    Okay.  Now, this document lists
 4      04  Mr. Caramadre as the Primary Account Holder in this
 5      05  E*Trade account --
 6      06      A.    Yeah.
 7      07      Q.    -- and you as the Co-Account Holder --
 8      08      A.    Yeah.
 9      09      Q.    -- in the E*Trade account.  What, if
10      10  anything, did Raymour say to you about opening up a
11      11  joint account with Mr. Caramadre in a brokerage
12      12  firm?
13      13      A.    No.
14      14      Q.    Okay.  Do you recall him mentioning the
15      15  name of the company --
16      16      A.    No.
17      17      Q.    -- E*Trade Financial?
18      18      A.    No, we didn't talk about nothing like
19      19  that.
20      20      Q.    Okay.  Now, if you turn to -- you see your
21      21  name written on the first page of this document?
22      22      A.    I see it up here.
23      23      Q.    Okay.  Now --
24      24      A.    But that don't look like me though.
25      25      Q.    Okay.  Now --
```

Bradshaw, Leon 12.1.09 video depo

46

```
 1  00045:01    A.    That's not mine.
 2      02      Q.    That's not your handwriting?
 3      03      A.    No.
 4      04      Q.    Okay, but it is your name.  Was that your
 5      05  address at the time?
 6      06      A.    Yeah.
 7      07      Q.    Okay.  Now, at the time -- you see how
 8      08  there's a box under your address?
 9      09      A.    Yeah.
10      10      Q.    It says "Home Phone"?
11      11      A.    Yeah.
12      12      Q.    And it's blank?
13      13      A.    Yeah.
14      14      Q.    Did you have a home phone at the time?
15      15      A.    I got a home phone.
16      16      Q.    Okay.  And had you provided that number to
17      17  Raymour?
18      18      A.    Yeah.  He knows my home phone.
19      19      Q.    Okay.
20      20      A.    But that's not it.
21      21      Q.    Well, next to "Home Phone" there's a box
22      22  called "Business Phone," and it lists a phone number
23      23  of 401-941-9273.
24      24      A.    Yeah, but I don't have a business phone.
25      25      Q.    Okay.  Well, that was my next question.
```

Bradshaw, Leon 12.1.09 video depo

47

```
 1  00046:01  Did you have any kind of business at the time?
 2      02      A.    No.
 3      03      Q.    Okay.  And was that phone number your
 4      04  phone number in any way?
 5      05      A.    This has nothing to do with me.
 6      06      Q.    Okay.  Now, I'd like to show you Exhibit
 7      07  5.  All right.  Exhibit 5, Mr. Bradshaw, is entitled
 8      08  "Options Trading Application," and it's again with
 9      09  E*Trade Financial.  My first question is do you know
10      10  what options trading is?
11      11      A.    Options trading?
12      12      Q.    Right.
13      13      A.    No, I don't know what it is.  Options
14      14  means what, you got options trading, something like
15      15  that?
16      16      Q.    Okay.
17      17      A.    Option?  Is that the real word, option?
18      18      Q.    It's whatever you -- you -- it's -- my
19      19  understanding of --
20      20      A.    Well, if you would come to me about
21      21  options trading, I would think that I got a option
22      22  to trade something.
23      23      Q.    Okay.  But do -- do you remember having
24      24  any conversations with Raymour --
25      25      A.    No.  We never had no -- no --
```

Bradshaw, Leon 12.1.09 video depo

48

```
1   00047:01        MR. VILKER:  If you could just let me
2   02   finish the question.
3   03        THE WITNESS:  Oh, I'm sorry.
4   04   Q.   Did you have any conversations with
5   05   Raymour about anything to do with options trading?
6   06   A.   No.  That didn't even come up.  The
7   07   options trading thing didn't even come up with him
8   08   and me.
9   09   Q.   Okay.  Now, if you look at the second page
10  10   of this document.  Okay.  Do you see your signature
11  11   there?
12  12   A.   Yes.
13  13   Q.   Okay.  Next to your signature there's a
14  14   date of 08-13-08.  Did you -- is that date in your
15  15   handwriting?
16  16   A.   That's not me, no.
17  17   Q.   Okay.  Now, next to the signature of the
18  18   Primary Account Holder, Joseph Caramadre --
19  19   A.   Right.
20  20   Q.   -- there's a date of 08-3-2008 (sic).  Is
21  21   that date in your handwriting?
22  22   A.   No, that's not me.
23  23   Q.   Okay.  Now, if you turn back to the first
24  24   page, there's a section on the right called
25  25   "Co-Account Holder, If Applicable"?
```

49

```
1   00048:01   A.   Yeah, I see it.
2   02   Q.   Okay.  Now, the first thing it asks --
3   03   well, did you -- did -- let me -- before I ask this,
4   04   did Raymour ask you any questions in which he was
5   05   putting x's on a form after your answers?
6   06   A.   I -- you know what, I don't remember.  No,
7   07   I don't remember none of this.
8   08   Q.   Okay.
9   09   A.   No.
10  10   Q.   Let me --
11  11   A.   No.  The --
12  12   Q.   The first question asks --
13  13   A.   Go ahead.
14  14   Q.   Okay, I'm sorry.  The first question it
15  15   asks under "Co-Account Holder, If Applicable," is
16  16   "Marital Status" and it's "Single."  Is it -- that
17  17   is correct, you're single?
18  18   A.   That don't even sound like me because I
19  19   would have told them divorced.
20  20   Q.   Okay.  You're divorced?
21  21   A.   Yeah.
22  22   Q.   Okay.  Now, if you go down two -- two
23  23   rows, it says, "Options Investment Knowledge" and
24  24   there's a box marked "Good."  First of all, let me
25  25   ask, did you make that "x" in that box?
```

50

```
1   00049:01        THE WITNESS:  In which box?  I see "Covered
2   02   Calls" here.
3   03        MR. VILKER:  Okay.  One line up.
4   04        THE WITNESS:  Oh, here, yeah.
5   05        MR. VILKER:  One line up where it says,
6   06   "Options --
7   07        THE WITNESS:  Right, right.
8   08        MR. VILKER:  -- "Investment Knowledge,
9   09   Good."
10  10   A.   Let me say this.  I don't -- I don't make
11  11   no x's in none of these boxes.
12  12   Q.   Okay.  Well, is it --
13  13   A.   So --
14  14   Q.   -- is it accurate that you had -- you
15  15   would describe yourself as having a good knowledge
16  16   of option investments?
17  17   A.   I don't even know what option investments
18  18   are.  No, I don't have no knowledge of none of that,
19  19   no.
20  20   Q.   Okay.  Now, the next box below says,
21  21   "Options Trading Experience," and the boxes are
22  22   marked -- well, let me ask you one at a time.  Do
23  23   you have options trading experience in covered
24  24   calls?
25  25   A.   I don't have no trading experience in
```

51

```
1   00050:01   nothing.
2   02   Q.   Okay.  The next box is "Covered puts," and
3   03   there's an "x" in that box.  Do you have any options
4   04   trading experience in covered puts?
5   05   A.   Covered puts?  What is that?  What are
6   06   they?  I don't even know what that is, covered puts,
7   07   whatever it is.
8   08   Q.   Okay.  Do you have options trading
9   09   experience in purchases?
10  10   A.   I don't even know what that means to be
11  11   honest with you.
12  12   Q.   Okay.  Now, below that asks questions on
13  13   years of experience, and it says both for stocks,
14  14   bonds, options and futures --
15  15   A.   Uh-hum.
16  16   Q.   -- that you have ten years of experience
17  17   with all these different types of investments.  Is
18  18   that true?
19  19   A.   No, that's not true.
20  20   Q.   Okay.
21  21   A.   As a matter of fact, if you add it up,
22  22   none of this stuff is true here.
23  23   Q.   Okay.  Do you recall Raymour ever asking
24  24   you anything about your investment experience?
25  25   A.   No.  No, nobody asked me none of that
```

52

```
 1   00051:01  stuff.
 2       02       Q.    Okay.
 3       03       A.    Because I'd cut that right out.  I don't
 4       04   have no investments.  Investments in what, you know
 5       05   what I mean?  I mean that's a laugh.
 6       06       Q.    Okay.  Mr. Bradshaw, I would like to now
 7       07   show you Government Exhibit 6.
 8       08       A.    Okay.
 9       09       Q.    Now, Exhibit 6 -- it seems like I'm
10       10   missing the original here.  Exhibit 6 is a document
11       11   from E*Trade Financial that's entitled, "Power of
12       12   Attorney," and in parentheses, "With provisions for
13       13   durable."  And before I ask you about this document,
14       14   if you could turn to the second page, and do you
15       15   see, in the middle of the second page, above where
16       16   it's typed in, "Signature of Co-Account Holder,"
17       17   your signature?
18       18            THE WITNESS:  Over here?
19       19            MR. VILKER:  Yes.
20       20       A.    Yeah, right there.
21       21       Q.    Okay.  That's your signature?  Now, do you
22       22   see next to your signature the date 08-13-08?
23       23       A.    Yeah.  That's not me though.
24       24       Q.    Okay.  That's not your handwriting?
25       25       A.    No.
```

Bradshaw, Leon 12.1.09 video depo

53

```
 1   00052:01       signature of Joseph Caramadre, there's a date
 2       02   08-13-2008.  Is that your handwriting?
 3       03       A.    No, that not mine.
 4       04
 5       05       Q.    Now, at any time when you signed
 6       06   these documents with Raymour, was there a notary
 7       07   public that was there notarizing your signature?
 8       08       A.    There was nobody there.  Him and me,
 9       09   that's all.
10       10       Q.    Okay.  The next section identifies a
11       11   notary public by the name of Danielle Rousseau.
12       12   Have you ever met Miss Rousseau, to your knowledge?
13       13       A.    No.
14       14       Q.    Okay.  And there was no one there that was
15       15   notarizing your signature?
16       16       A.    No.
17       17       Q.    Okay.  Now, if you turn back to the front,
18       18   first page, this provides a limited power of
19       19   attorney to Raymour Radhakrishnan.  What, if
20       20   anything, did Mr. Radhakrishnan, or Raymour as -- as
21       21   you knew him, say to you about you providing him
22       22   with power of attorney?
23       23       A.    That was never mentioned to me about I'm
24       24   providing nobody with power of attorney.
25       25       Q.    Okay.  Is that something that you would
```

Bradshaw, Leon 12.1.09 video depo

54

```
 1   00053:01  have remembered?
 2       02       A.    Sure.  Sure I would have remembered.
 3       03       Q.    Okay.
 4       04       A.    If I had been approached with something
 5       05   like that, I wouldn't be sitting here.  You'd still
 6       06   have your money and I'd be sitting over here.
 7       07       Q.    Okay.  Now, I would like to show you
 8       08   Government Exhibit 7.  Okay.  Government Exhibit 7
 9       09   is a statement from September 1st, 2009 through
10       10   September 30th, 2009 from E*Trade Securities.
11       11       A.    Yeah.
12       12       Q.    And it's addressed to Joseph Caramadre and
13       13   Leon Bradshaw --
14       14       A.    Uh-hum.
15       15       Q.    -- at 90 Beechwood Drive in Cranston,
16       16   Rhode Island.
17       17       A.    Wow.
18       18       Q.    Have -- is that -- 90 Beechwood Drive in
19       19   Cranston, Rhode Island, is that your residence?
20       20       A.    I don't even know where it is.
21       21       Q.    Okay.  Have you ever received any
22       22   statements in the mail from E*Trade Securities?
23       23       A.    No, not that I know of.
24       24       Q.    Okay.
25       25       A.    Not that I know of because all this -- all
```

Bradshaw, Leon 12.1.09 video depo

55

```
 1   00054:01  this stuff I just -- I rip up a lot of mail.  No, I
 2       02   never had nothing, no.
 3       03       Q.    Okay.  Prior to meeting with the
 4       04   Government in this case, did you have any knowledge
 5       05   that there was an account opened in your name at
 6       06   E*Trade Securities?
 7       07       A.    No, no.
 8       08       Q.    Okay.
 9       09       A.    No.
10       10       Q.    Now, in the middle of the first page it
11       11   lists the balance, as of September 30th of 2009, is
12       12   $360,148.48.  Do you see that?
13       13       A.    I see it here, yeah.
14       14       Q.    Okay.  Now, what knowledge, if any, did
15       15   you have or do you have of having more than $360,000
16       16   in an account in your name in E*Trade Securities?
17       17       A.    I got $360 (sic) in an account for me?
18       18       Q.    This is an account in your name and
19       19   Mr. Caramadre's name.
20       20       A.    And I don't know nothing about it?
21       21       Q.    Right.  That's what I'm asking.  Do you
22       22   know anything about it?
23       23       A.    That's the first I heard of it.  It's the
24       24   first I heard of it.  Give me some of it.
25       25       Q.    Okay.
```

Bradshaw, Leon 12.1.09 video depo

56

```
1   00055:01    A.    That's the first -- 300 -- you gotta be
2   02   kidding me.
3   03      Q.    Okay.
4   04      THE WITNESS:   How come I don't know nothing
5   05   about it?
6   06      MR. VILKER:   Okay.  I have no further
7   07   questions at this time, Mr. Bradshaw.  At this time
8   08   I'm going to switch seats, if you want to --
9   09      THE VIDEOGRAPHER:   I'm just going to turn
10  10   the mic down for a second.
11  11         EXAMINATION
12  12   BY MR. PINE:
13  13      Q.    Mr. Bradshaw, my name is Jeffrey Pine.  I
14  14   am an attorney for Raymour Radhakrishnan.
15  15      A.    Yeah, good.
16  16      Q.    And I would like to be able to ask you a
17  17   few questions about --
18  18      A.    Go ahead.
19  19      Q.    -- a few things that you talked about with
20  20   Mr. Vilker.  You said that you were first introduced
21  21   to Mr. -- by Raymour by your nurse, Cathy; is that
22  22   right?
23  23      A.    Introduced?  Yeah, she told me about him.
24  24      Q.    She first mentioned about --
25  25      A.    When you say introduced, what do you mean,
```

Bradshaw, Leon 12.1.09 video depo

57

```
1   00056:01   introduced hands or what?
2   02      Q.    She first mentioned his name to you?
3   03      A.    Yeah.
4   04      Q.    Okay.  And after she mentioned his name to
5   05   you, did you call -- do you know whether you called
6   06   him or he called you?
7   07      A.    No, I didn't call him.
8   08      Q.    Okay.
9   09      A.    He called me.
10  10      Q.    He called you?
11  11      A.    Yeah.
12  12      Q.    Do you know when that was?
13  13      A.    No.
14  14      Q.    Would you be --
15  15      A.    No.  I don't know the date, no.
16  16      Q.    Okay.  Do you know what month it was?
17  17      A.    What month.  Now, let me see.  It's -- it
18  18   could have been around October, I don't know --
19  19      Q.    Of what year?
20  20      A.    -- September.  It could have been
21  21   September or October.
22  22      Q.    Of what year?
23  23      A.    Of -- wow, it could have been last year.
24  24      Q.    Okay.
25  25      A.    Yeah.
```

Bradshaw, Leon 12.1.09 video depo

58

```
1   00057:01    Q.    So it could have been September, October
2   02   of 2008?
3   03      A.    Yeah.  It could have been around there
4   04   somewhere.
5   05      Q.    But you're not sure as you sit here today?
6   06      A.    No.
7   07      Q.    In fact, how is -- how would you say your
8   08   memory is with respect to the -- all the meetings
9   09   that you had with Raymour back in 2008?
10  10      A.    How's my memory?  Okay, my memory is right
11  11   on the money to when I cashed the check.
12  12      Q.    Right on the money?
13  13      A.    He gave me the check and I cashed it,
14  14   boom.  The date they got there, that's right on the
15  15   money.
16  16      Q.    And it sounded to me when you were being
17  17   asked questions by Mr. Vilker that --
18  18      THE WITNESS:   Mr. who?
19  19      MR. PINE:  Lee Vilker, the pros --
20  20      THE WITNESS:  Oh, okay.
21  21      MR. PINE:  From the Federal Government.
22  22      THE WITNESS:  Yeah.
23  23      Q.    It sounded to me when you were asked
24  24   questions, and you said it a few times, the money
25  25   was your focus?
```

Bradshaw, Leon 12.1.09 video depo

59

```
1   00058:01    A.    That's what it is.  That's what it is
2   02   right now.
3   03      Q.    If we put a thousand dollars on the table
4   04   now, you'd take it?
5   05      A.    You wanna know something?  If you put a
6   06   thousand dollars on the table now, I'll take it.
7   07   You're absolutely right.
8   08      Q.    Okay.
9   09      A.    You got that right.
10  10      Q.    And if I signed you -- if I asked you to
11  11   sign some documents to accept that money, would you
12  12   sign them?
13  13      A.    Not now because I don't trust -- no, I
14  14   don't trust you.
15  15      Q.    Okay.  Would you have signed them in 2008,
16  16   if we just met in 2008 because we were introduced --
17  17      A.    Not in this setup, no.
18  18      MR. VILKER:  Objection.
19  19      A.    No, not in this setup because I don't
20  20   trust you now.
21  21      Q.    Okay.  You don't trust me or any of the --
22  22      A.    Well, I don't -- I don't trust what's
23  23   going down --
24  24      Q.    Okay.  All right.
25  25      A.    -- period, you know what I mean?  And --
```

Bradshaw, Leon 12.1.09 video depo

60

```
 1   00059:01   and so the -- the fact that -- that I don't know
 2      02      what's going down --
 3      03         Q.    Okay.
 4      04         A.    -- and I don't know what went down or
 5      05      whatever.  I don't trust any of you.  The only thing
 6      06      I can tell you is my part of it, you know what I
 7      07      mean, and that's how I'm going to end up.
 8      08         Q.    Okay.  But in 2008, when you met with
 9      09      Raymour on more than one occasion --
10      10         A.    Right.
11      11         Q.    -- your interest was -- at that time was
12      12      in the money that he was offering on behalf of some
13      13      wealthy guy?
14      14         A.    Well, my -- my interest, my interest was
15      15      first to -- to -- to -- to hear what he had to say,
16      16      you know, why did he want to see me.
17      17         Q.    Okay.  And did be tell you that?
18      18         A.    Well, he told me that but what be said to
19      19      me -- once I heard the word money, that's all I
20      20      needed to hear.
21      21         Q.    Okay.
22      22         A.    I didn't need to hear nothing else.
23      23         Q.    The first time you met with him, do you
24      24      know how long you met?
25      25            THE WITNESS:  You mean how long I was with
```

61

```
 1   00060:01   him?
 2      02            MR. PINE:  Uh-bum.
 3      03         A.    No, not really.  No.
 4      04         Q.    Do you have any approximation how long be
 5      05      spent with you?
 6      06         A.    No, because I could be lying, you know.
 7      07         Q.    Okay.
 8      08         A.    I could be just thinking --
 9      09         Q.    You don't recall it?
10      10         A.    I'd rather not saying nothing when I don't
11      11      really know.
12      12         Q.    Okay.
13      13         A.    I didn't look at my watch --
14      14         Q.    Okay.
15      15         A.    -- to see, you know what I mean?  I don't
16      16      know.
17      17         Q.    But you met with him at your apartment
18      18      here in this building, right?
19      19         A.    Every time I seen him it was here --
20      20         Q.    Okay.
21      21         A.    -- in my place.
22      22         Q.    So be came to your apartment, and did be
23      23      explain why he was there to offer you some money?
24      24      What do you remember about that?
25      25         A.    What do I remember about that?  Oh, wow.
```

62

```
 1   00061:01   The only thing I remember about that is, you know,
 2      02      what comes right out of my head right now is that be
 3      03      said things to me which -- which went over my head
 4      04      which I wasn't interested in anyway.
 5      05         Q.    Okay.
 6      06         A.    Okay?  But then when the word -- this
 7      07      person, you know, money and stuff, you know, now my
 8      08      ears perk up.
 9      09         Q.    Right.
10      10         A.    You know what I mean?
11      11         Q.    And --
12      12         A.    Yeah.
13      13         Q.    And clearly --
14      14         A.    The word money --
15      15         Q.    Right.
16      16         A.    -- brought me to my senses, you know.
17      17         Q.    Okay.  And so as a result of that meeting,
18      18      you understood that he was going to offer you a sum
19      19      of money, $2,000?
20      20         A.    I didn't know what be was gonna offer me.
21      21      I -- I wasn't -- I didn't know if he was gonna offer
22      22      me money.
23      23         Q.    Okay.  But at some point --
24      24         A.    But I know -- I know what be was getting
25      25      ready to say to me had to do with money --
```

63

```
 1   00062:01   Q.    Right.
 2      02         A.    -- you know.
 3      03         Q.    At some point in that meeting, the subject
 4      04      of money came up?
 5      05         A.    Well, yeah.  Yeah, sure.
 6      06         Q.    Okay.  And that had your interest?
 7      07         A.    Sure, money got my interest.
 8      08         Q.    Okay.
 9      09         A.    Sure it does.
10      10         Q.    Okay.  And you just said if something went
11      11      over your head, you didn't really ask him any
12      12      questions about it because you were more concerned
13      13      about getting the money?
14      14         A.    Let me say this to you, and this is where
15      15      my frame of mind was, all right?  The fact that I
16      16      might be getting money, I could care less about what
17      17      he said to me --
18      18            Uh-bum.
19      19         A.    -- other than he was -- if be was gonna
20      20      take my life away from me --
21      21         Q.    Right.
22      22         A.    -- cut my arms off you, you know, you know
23      23      what I mean, be had where be could do what he wanted
24      24      to do with me.  If I was under that impression, just
25      25      we would never be here.
```

64

```
1   00063:01   Q.   Right.
2      02   A.   You know what I mean, like if I had no
3      03   say-so in my life or no nothing or no nothing, what
4      04   you guys call power of attorney --
5      05   Q.   Uh-hum.
6      06   A.   -- all right?  Now, if I was under the
7      07   impression with that, we would never be here, you
8      08   know, if I had known that, period.
9      09   Q.   Well, is it possible he mentioned it to
10     10   you but you didn't pay much attention to it?
11     11   A.   Anything is possible, but power of
12     12   attorney, yes.
13     13   Q.   Okay.  What about the other --
14     14   A.   Yeah.
15     15   Q.   -- documents, the other applications?  I
16     16   think you said he went over them but not necessarily
17     17   word by word.  Is that accurate?
18     18   A.   Over them, over them, over them, boom.
19     19   Q.   Well, did he talk to you about them?
20     20   A.   No.  No, he didn't talk to me.  He might
21     21   have said a couple of words or something which meant
22     22   --
23     23   Q.   Would be --
24     24   A.   -- which meant nothing, and I can't -- I
25     25   can't tell you because I don't remember what he
```

Bradshaw, Leon 12.1.09 video depo

65

```
1   00064:01   said.
2      02   Q.   Okay.
3      03   A.   You know, I mean he didn't take it and
4      04   explain it to me.
5      05   Q.   Did the documents --
6      06   You know what I mean?
7      07   Q.   Did the documents look like they do now?
8      08   Did it say E*Trade in bold print and it did say
9      09   other things that are printed on it?
10     10   A.   They just looked like --
11     11   Not necessarily that one.
12     12   A.   The only thing -- the only thing that I
13     13   can actually identify would be there.
14     14   Q.   Okay.  So --
15     15   A.   You asked me how it looked.  That's how it
16     16   looked to me.
17     17   Q.   Right.
18     18   With something on here.
19     19   Q.   Do you recall whether or not the writing
20     20   was on there at the time that you signed?
21     21   A.   No.  I don't remember seeing writing.
22     22   Q.   Okay.  Is it possible he filled it out
23     23   with you while you went through it?
24     24   A.   I don't know what he -- I don't know what
25     25   be done.  I don't know what be done if anything.
```

Bradshaw, Leon 12.1.09 video depo

66

```
1   00065:01   Q.   Well, my question is do you have a memory,
2      02   sitting here today, of your meeting with him at the
3      03   time that you signed it?  In other words, how much
4      04   do you remember about that time that you signed it?
5      05   A.   You asked me.  I don't see him fill
6      06   nothing out.
7      07   Q.   I'm sorry?
8      08   A.   I don't see him fill nothing out.
9      09   Q.   Okay.  But you signed on -- for instance,
10     10   on page --
11     11   He gave me --
12     12   Q.   -- on Exhibit 5 --
13     13   A.   -- he gave me --
14     14   Q.   -- hold on one second.  On Exhibit 5, you
15     15   signed on Page 2.  That's your signature?
16     16   A.   Yeah.  I don't know what page it is.  He
17     17   just said sign here, sign here, sign here.  I'm
18     18   signing.
19     19   Q.   Okay.
20     20   A.   I could care less what page it is.  I
21     21   wasn't even looking at the page.
22     22   Q.   Did you ask him any questions about it?
23     23   A.   I had no questions to ask him.  No, I
24     24   didn't need to ask him no questions.
25     25   Q.   Okay.  You didn't --
```

Bradshaw, Leon 12.1.09 video depo

67

```
1   00066:01   A.   I got no questions to ask him.  All I
2      02   know is he's giving me money.  I could care less.
3      03   Q.   Right.
4      04   A.   As long as he's not taking my life or
5      05   taking me --
6      06   Q.   Did he ever tell you not to read them?
7      07   A.   No.
8      08   Q.   He didn't prevent you from reading
9      09   it, did he?
10     10   A.   No.  What did I need to read it for?
11     11   Q.   Okay.  That was your -- your mind-set was
12     12   that you didn't need to read them?
13     13   A.   Yeah.  I'm no lawyer.  I didn't need to
14     14   read it.
15     15   Q.   Okay.
16     16   A.   All I know is he's giving me money.  Give
17     17   it to me.
18     18   Q.   Okay.  And so you didn't object to signing
19     19   those documents at all, did you?
20     20   A.   No, because I -- that's out of trust and
21     21   that's no good, you know.
22     22   Q.   Right.  But I'm saying he didn't --
23     23   A.   I learned that in the street, but I let --
24     24   I went for it there.
25     25   Q.   And, in fact, he paid you the money?
```

Bradshaw, Leon 12.1.09 video depo

68

```
 1   00067:01    A.    Yeah.  I went for that in the street.  I
 2   02   got -- I got beaten here from what I learned in the
 3   03   street, you know, and so that's right.  I guess
 4   04   that's what you get for not going to college, right?
 5   05        Q.    Well, he paid you on two occasions, right?
 6   06        A.    Yeah.
 7   07        Q.    A total of $2,000 and then --
 8   08        A.    Yeah.
 9   09        Q.    -- $4,000?
10   10        A.    Yes.
11   11        Q.    And you cashed those checks?
12   12        A.    Yes.
13   13              MR. PINE:  I'm going to ask that these two
14   14   exhibits be marked for the defense, please.  I'm just
15   15   going to show you a couple of documents.
16   16              MR. VILKER:  I'd like to put on the record
17   17   that these are exhibits the Government hasn't seen
18   18   yet, that the defense or the targets are under an
19   19   obligation, as is the Government, to provide any
20   20   documents before the testimony is to take place or
21   21   they are in admissible.
22   22              MR. PINE:  For the record, they were
23   23   received today and I am providing them to counsel.
24   24              MR. VILKER:  Well, we are objecting to
25   25   their use in this deposition but you can proceed.
```

Bradshaw, Leon 12.1.09 video depo

69

```
 1   00068:01         (Defendants' Exhibits B and C were marked
 2   02   for identification.)
 3   03        Q.    Showing you what's been marked B and C.
 4   04   I'll show you C first.
 5   05        A.    Yes.
 6   06        Q.    Do you recognize the check that's --
 7   07        A.    Let me see.
 8   08        Q.    -- shown on that?
 9   09        A.    Yup.  $2,000.
10   10        Q.    Okay.  And in the middle of the page, it's
11   11   depicted -- there's a signature there.
12   12        A.    Yeah.
13   13        Q.    Is that your signature?
14   14        A.    Yup, that's me.
15   15        Q.    Okay.  And, in fact, you -- you cashed
16   16   that check when it was given to you on April --
17   17   on --
18   18        A.    I don't know --
19   19        Q.    -- strike that -- August 4th?
20   20        A.    I don't know these dates.  I don't know
21   21   these dates but I cashed it.
22   22        Q.    All right.  Well, the date on the check is
23   23   August 4th, 2008?
24   24        A.    So that's probably when I cashed it, as
25   25   soon as I got it.
```

Bradshaw, Leon 12.1.09 video depo

70

```
 1   00069:01    Q.    And the stamp from the bank seems to say
 2   02   August 4th, 2008?
 3   03        A.    Yeah.  Whenever I got it, I cashed it.
 4   04        Q.    Okay.  All right.  And with respect to
 5   05   Exhibit B, showing you that, does that depict the
 6   06   $4,000 check?
 7   07        A.    Let me see it.  Yeah, okay.
 8   08        Q.    And is that your signature --
 9   09        A.    That's me, yeah.
10   10        Q.    -- that appears?  Okay.  And the date on
11   11   that check is September 2nd --
12   12        A.    Whenever I got it --
13   13        Q.    -- 2008?
14   14        A.    -- I cashed it.
15   15        Q.    And you went to Citizens Bank and you
16   16   cashed that one too?
17   17        A.    Yup.
18   18        Q.    So as a result of meeting with Raymour,
19   19   you were paid $6,000?
20   20        A.    Yup.
21   21        Q.    Right?
22   22        A.    Yup.
23   23        Q.    You never had to pay him anything?
24   24        A.    No.
25   25        Q.    Okay.  And you signed some documents?
```

Bradshaw, Leon 12.1.09 video depo

71

```
 1   00070:01    A.    Yeah.
 2   02        Q.    And he showed you -- he presented the
 3   03   documents to you?
 4   04        A.    Yeah.
 5   05        Q.    You signed on the pages where it asked for
 6   06   your signature?
 7   07        A.    Yeah.
 8   08        Q.    And do you recall how long he spent with
 9   09   you on the day that you signed the documents?
10   10        A.    No, no, no.  I wasn't keeping no time, you
11   11   know.
12   12        Q.    Okay.  Did you -- when he -- when he came
13   13   over, did he just talk -- did you and he just talk
14   14   about things or did you talk about other things?
15   15        A.    I didn't talk at all.  We didn't talk
16   16   about nothing, no.
17   17        Q.    You don't remember talking about anything
18   18   with him?
19   19        A.    I had nothing to talk to him about.
20   20        Q.    Okay.
21   21        A.    I was waiting for him to hurry up and get
22   22   out of there after he got me the money.
23   23        Q.    Okay.  Your interest again was --
24   24        A.    That's right, that's my interest.
25   25        Q.    Okay.  In fact, you said -- you told
```

Bradshaw, Leon 12.1.09 video depo

72

```
1   00071:01   Mr. Vilker the -- the exact words that he may have
2      02      said during the course of the meeting were not that
3      03      important to you, the money was important to you?
4      04   A.   That's true.
5      05   Q.   Okay.
6      06   A.   Yeah.  You got that right, yeah.
7      07   Q.   And if he said things that went over your
8      08      head, why is it that you didn't ask him any
9      09      questions about the things that went over your head?
10     10   A.   I don't need to.  What do I need to for?
11     11   Q.   You didn't feel you needed to?
12     12   A.   No.
13     13   Q.   Okay.  Now, with respect to Exhibit 4,
14     14      that also has the bold print of E*Trade Financial,
15     15      correct?
16     16   A.   That's what it says on there, yeah.
17     17   Q.   Okay.  And it has "Complete Investment
18     18   Account Application"?
19     19   A.   That's what it says on there, yeah.
20     20   Q.   Okay.  Do you remember whether or not this
21     21   was filled out at all while you were with Raymour?
22     22   A.   No, no, it wasn't filled out.  I don't
23     23   remember it being filled out.
24     24   Q.   Okay.  And is it that you don't remember
25     25   it being filled or it wasn't?
```

73

```
1   00072:01   I don't remember it being filled out.
2      02   Q.   Okay.  And with respect to the information
3      03   that appears in the column with your name, how did
4      04   it come about that you -- your Social Security
5      05   number, is that on there?
6      06   A.   Let me see it.
7      07   Q.   Is that --
8      08   A.   That's on there, yeah.
9      09   Q.   That's your number?
10     10   A.   Yeah.  It's not my writing but it's my
11     11   number.
12     12   Q.   Okay.  And you gave him that information
13     13   during the course of your meetings?
14     14   A.   Not that I remember.
15     15   Q.   How did he find out your Social Security
16     16   number?
17     17   A.   I don't know.
18     18   Q.   -- do you know?
19     19   A.   I don't know.
20     20   Q.   Okay.  Is it possible that in the course
21     21   of discussing with him various things --
22     22   A.   I mean -- I mean you figure somebody like
23     23   me, it's not hard to find out nothing about me.
24     24   Q.   Right, but I'm asking whether or not you
25     25   remember talking to him about it.
```

74

```
1   00073:01   A.   No.  I don't talk to him about nothing
2      02   like what you're talking about now.
3      03   Q.   In any of the meetings, you didn't talk to
4      04   him about anything?
5      05   A.   I had no reason to, no good reason.  He's
6      06   giving away money.  What do I need to talk to him
7      07   for, you know.
8      08   Q.   Well --
9      09   A.   Like I said, the only reason that I would
10     10   have to talk to him would be if I thought he was
11     11   threatening my life --
12     12   Q.   Right.
13     13   A.   -- or something like that.  I mean the man
14     14   was giving away money.  Why do I need to talk about?
15     15   Q.   But he --
16     16   A.   I wanted to tell him to get the heck out
17     17   and give me the money and go.
18     18   Q.   Well, but --
19     19   A.   You know what I mean?
20     20   Q.   -- at what point in the conversation did
21     21   the money come up?  It didn't come up right when he
22     22   walked through the door.
23     23   A.   At what point, who knows?  I don't know.
24     24   Q.   You don't remember?
25     25   A.   No.
```

75

```
1   00074:01   Q.   All right.  Is it fair to say that he
2      02   would have sat down, you would have had a
3      03   conversation, and the money would have come up
4      04   sometime --
5      05   A.   Conversation about what?
6      06   Q.   What's that?
7      07   A.   A conversation about what?
8      08   Q.   About anything.
9      09   A.   I don't need to talk to him.
10     10   Q.   Do you remember --
11     11   A.   What would I need to talk to him -- huh?
12     12   Q.   But do you remember, sitting here, what
13     13   was discussed?
14     14   A.   I never discussed anything with him,
15     15   nothing.
16     16   Q.   Well, but you told us --
17     17   A.   Zero, zero.
18     18   Q.   You told us before that your memory for
19     19   these meetings is not very good, in fact, you told
20     20   Mr. Vilker that an hour from now --
21     21   A.   My memory --
22     22   Q.   -- you might not recall.
23     23   A.   My memory is not -- I'm 73 years old.
24     24   Q.   Right.
25     25   A.   I only remember what I -- what I need to
```

76

```
 1   00075:01   remember.
 2       02      Q.    Okay.
 3       03      A.    So what I -- what I need to remember him
 4       04   for?
 5       05      Q.    All right.
 6       06      A.    He gave me the money, bye, see ya later.
 7       07      Q.    So what you remember -- what's important
 8       08   to you and what you remember from these meetings is
 9       09   that Raymour was paying you some money, isn't that
10       10   --
11       11      A.    He wasn't paying me, he was giving me
12       12   money.
13       13      Q.    Giving you money?
14       14      A.    Yeah.
15       15      Q.    He was writing out a check to you?
16       16      A.    Well, he wrote it out.  It was already
17       17   written out.
18       18      Q.    Okay.  All right.  And he gave it to you?
19       19      A.    Yeah.
20       20      Q.    Okay.  And whatever was said was not as
21       21   important to you as what was actually being given to
22       22   you?
23       23      A.    The only thing I was interested in, that
24       24   the check was good and I could cash it --
25       25      Q.    Right.
```

77

```
 1   00076:01      A.    -- at Citizens Bank.
 2       02      Q.    Right.
 3       03      A.    That's all I was interested in.  I
 4       04   couldn't care less about anything else because I had
 5       05   no reason to care about anything else.
 6       06      Q.    Okay.  And you don't -- you don't deny on
 7       07   Exhibit 8 the --
 8       08      A.    What about Exhibit 8?  What about it?
 9       09      Q.    That's your signature on --
10       10      A.    Sure it's my --
11       11      Q.    -- the third page --
12       12      A.    Sure.
13       13      Q.    -- right?
14       14      A.    Yeah.  It went right down the papers, sign
15       15   here, sign here.
16       16      Q.    Okay.  And it would have said in bold
17       17   type, "Agreement and Acknowledgment Brokerage
18       18   Account"?
19       19      A.    Yeah, if it was on there, probably so.  I
20       20   don't know.
21       21      Q.    Okay.
22       22      A.    Sure.
23       23      Q.    But you didn't pay much attention to it?
24       24      A.    I didn't need to.
25       25      Q.    Okay.  Now, did you -- after -- after you
```

78

```
 1   00077:01   were paid -- given the 2 -- the $4,000 by Raymour --
 2       02      A.    Yeah.
 3       03      Q.    -- after you were given that money, that
 4       04   was in, according to the check, it was in September
 5       05   of 2008?
 6       06      A.    Yeah.
 7       07      Q.    Did you ever see Raymour again?
 8       08      A.    No, I don't think so.
 9       09      Q.    Did you see him this year?
10       10      A.    No.
11       11      Q.    You never saw him this year?
12       12      A.    I don't think so.
13       13      Q.    Well --
14       14      A.    I don't remember.  I don't remember seeing
15       15   him no more, no.
16       16      Q.    So since of September of 2008, did you
17       17   have any contact with Raymour?
18       18      A.    No.  I don't know.  Maybe he called me.  I
19       19   don't know.
20       20      Q.    All right.
21       21      A.    Yeah, he could have called me.
22       22      Q.    He could have called you afterwards?
23       23      A.    He could have, yeah.
24       24      Q.    And do you remember what the conversation
25       25   would have been about?
```

79

```
 1   00078:01      A.    Well, he just said how was I.
 2       02      Q.    Okay.  He was --
 3       03      A.    Was I all right, boom --
 4       04      Q.    -- checking in?
 5       05      A.    -- see you later.
 6       06      Q.    Okay.  Do you remember how many times he
 7       07   called you?
 8       08      A.    I only remember getting but one call.
 9       09      Q.    Okay.  Do you remember him coming to your
10       10   apartment at all --
11       11      A.    No.
12       12      Q.    -- this year?
13       13      A.    Not to my -- no.
14       14      Q.    Okay.  We're in December, it's December
15       15   1st.  Do you have any memory of him coming to see
16       16   you this past summer?
17       17      A.    No.  Nobody come to see me, no.
18       18      Q.    Okay.  Did anybody ever tell you that you
19       19   did anything wrong in any of this?
20       20      A.    That I done anything wrong?
21       21      Q.    Yeah.  Did anybody suggest that to you?
22       22      A.    No.  If somebody suggested that, that I
23       23   was doing something wrong, I'd never be sitting here
24       24   now.
25       25      Q.    Okay.  Did you have a meeting with a
```

80

```
1   00079:01   member of the Postal Inspector's office, a Mr --
2        02     A.    No.
3        03     Q.    -- Souza?  Do you remember meeting with
4        04   him?
5        05     A.    Well, I don't know.  When the postal
6        06   people came, it's been here recently.
7        07     Q.    Right.
8        08     A.    They told me they were postal people.
9        09     Q.    Okay.
10       10     A.    Yeah.
11       11     Q.    And do you remember who it was?
12       12     A.    I don't know, a couple of guys.  Yeah, if
13       13   I seen them I probably would know them, yeah.
14       14     Q.    Okay.  Do you see any of them in the room
15       15   today?
16       16     A.    There's the one guy there and --
17       17     Q.    Okay.
18       18     A.    -- there was another guy.  Was you with
19       19   him?  I don't know.  Yeah, he was there.
20       20     Q.    Okay.  So Mr. McAdam (sic) and Mr. Souza
21       21   --
22       22     A.    Now, you see, I know them here and I don't
23       23   even know their names.
24       24          MR. PINE:  Okay.  But those two gentlemen
25       25   --
```

81

```
1   00080:01          THE WITNESS:  Yeah.
2        02          MR. PINE:  -- the record will reflect he
3        03   pointed out Mr. McAdam (sic) and Mr. Souza.
4        04          THE WITNESS:  But I know they was in my
5        05   house.
6        06          MR. PINE:  Okay.
7        07          THE WITNESS:  That's how my brain is.
8        08   You're gonna see how my brain is.  That's the way it
9        09   is.
10       10          MR. PINE:  Okay.  All right.
11       11     Q.    And they -- they paid you a visit a couple
12       12   of weeks ago?
13       13     A.    A couple of weeks, a couple of days ago --
14       14     Q.    Okay.
15       15     A.    -- weeks or whatever, yeah.
16       16     Q.    And did they ask you some questions on
17       17   that day?
18       18     A.    Yeah.  Don't ask me what it was because I
19       19   don't remember.
20       20     Q.    You don't remember what they asked you?
21       21     A.    That's what -- see, in other words, I'm
22       22   trying to get you to understand how I'm thinking.
23       23     Q.    Right.
24       24     A.    All right.  You know, like -- like they
25       25   come and see me.  They said they wanted to talk to
```

82

```
1   00081:01   me, same way you're talking to me --
2        02     Q.    Right.
3        03     A.    -- all right?  So, hey, what did I do, you
4        04   know what I mean?  Nobody said you done nothing
5        05   wrong.
6        06     Q.    Okay.
7        07     A.    So I could care less.  They asked me
8        08   questions the same way you --
9        09     Q.    Did they -- did they say that anybody did
10       10   anything wrong?
11       11     A.    Nobody said anything about nobody doing
12       12   nothing wrong.
13       13     Q.    Okay.
14       14     A.    I still don't know that's somebody's done
15       15   something wrong.
16       16     Q.    Okay, fair enough.
17       17     A.    Except, except, except that what I'm
18       18   thinking, you know, that -- that whatever's
19       19   happening is coming to me, and I'm thinking that
20       20   from the street, you see.
21       21     Q.    What do you mean coming to you?
22       22     A.    Well, I mean if something's going down,
23       23   they're trying to dump it on me.  That's the way I
24       24   feel.
25       25     Q.    Well, did they ever say that that was
```

83

```
1   00082:01   happening?
2        02     A.    They -- they haven't said anything.
3        03     Q.    Well, we haven't said that.
4        04     A.    No, but I'm getting this from the street,
5        05   man.
6        06     Q.    All right.
7        07     A.    I grew up in the street --
8        08     Q.    All right.
9        09     A.    -- all right?  I grew up in the street.
10       10   When this many people jam -- jam up on me --
11       11     Q.    Right.
12       12     A.    -- something's wrong.
13       13     Q.    Well, did you understand that you are just
14       14   a witness in a case, that's --
15       15     A.    No, I don't know that.
16       16     Q.    -- all it is?
17       17     A.    I don't --
18       18     Q.    Well, that's why you're being deposed.
19       19   You're a witness.
20       20     A.    You guys are lawyers and doctors --
21       21          MR. VILKER:  I object to that question.
22       22     A.    Yeah, you guys are lawyers and whatever
23       23   you are.  I'm not in that frame of mind.
24       24     Q.    All right.
25       25     A.    Okay?  I'm not -- I don't what you're
```

84

```
 1  00083:01  here.  I don't know who you are or what you are.
 2      02   And to be honest with you, and I'm not trying to be
 3      03   funny, I don't -- I don't really care --
 4      04      Q.   All right.
 5      05      A.   -- you know, because it don't make me no
 6      06   smarter or no dumber.
 7      07      Q.   Uh-hum.  When you were shown -- I think it
 8      08   was Exhibit 2 -- no, it wouldn't have been Exhibit
 9      09   2.  Hold on.  Yeah, Exhibit 2, in the memo section,
10      10   it said "New Account Setup."  And I think you told
11      11   Mr. Vilker you couldn't care less what it said on
12      12   the check, what was important to you was the $4,000.
13      13   Is that --
14      14      A.   Two -- two things on there was important
15      15   to me.
16      16      Q.   Okay.
17      17      A.   The $4,000 and the Citizens Bank.
18      18      Q.   Okay.
19      19      A.   The $4,000 because it represents money,
20      20   the Citizens Bank because I could cash it.
21      21      Q.   Okay.  And with respect to the documents
22      22   that you were shown, am I correct in thinking that
23      23   you weren't very concerned with the -- with the
24      24   writing on the documents, you were concerned about
25      25   --
```

Bradshaw, Leon 12.1.09 video depo

85

```
 1  00084:01      A.   I wasn't concerned at all.
 2      02      Q.   Okay.
 3      03      A.   You want me to tell you why I wasn't
 4      04   concerned?  Because I trusted him --
 5      05      Q.   Okay.
 6      06      A.   -- you know, as to what was going on was
 7      07   okay.
 8      08      Q.   Right.
 9      09      A.   All right?  I didn't have no reason to be
10      10   concerned.
11      11      Q.   Okay.
12      12      A.   You know what I mean?
13      13      Q.   Right.
14      14      A.   If that's makes any sense to you.
15      15      Q.   It makes sense.
16      16      A.   It's dumb.  You know, if I had went to
17      17   college maybe I would have been concerned, I would
18      18   have thought, you know --
19      19      Q.   Well --
20      20      A.   -- but I'm not -- I'm not living in your
21      21   world.
22      22      Q.   I guess -- I guess my question --
23      23      A.   You know.
24      24      Q.   My question is, as I asked you earlier, he
25      25   never prevented you from asking questions, he never
```

Bradshaw, Leon 12.1.09 video depo

86

```
 1  00085:01   prevented you from reading the documents if you
 2      02   wanted to or if you chose to --
 3      03      A.   I had --
 4      04      Q.   -- am I right?
 5      05      A.   I had -- you're right.
 6      06      Q.   All right.
 7      07      A.   But I had no reason to ask questions.
 8      08      Q.   Okay.
 9      09      A.   Give me one good reason why I should ask a
10      10   question.
11      11      Q.   And you don't know to what extent he
12      12   talked to you about these documents because your
13      13   memory from those meetings is not very clear?
14      14      A.   If any extent.
15      15      Q.   Right.  You don't know one way or the
16      16   other?
17      17      A.   I don't even know if he talked to me to
18      18   any extent.
19      19      Q.   Okay.
20      20      A.   You know what I mean so --
21      21      Q.   He might have, you don't remember?
22      22      A.   Anything is possible, man.  Anything is
23      23   possible --
24      24      Q.   All right.
25      25      A.   -- I mean if you want to talk that way,
```

Bradshaw, Leon 12.1.09 video depo

87

```
 1  00086:01   you know?
 2      02          MR. PINE:  Okay.  Do you need to take a
 3      03   break?
 4      04          THE WITNESS:  No.
 5      05          MR. PINE:  Okay.
 6      06          THE WITNESS:  I'm just putting this on,
 7      07   that's all.  I'm all right.
 8      08          MR. PINE:  All right.  I just want to make
 9      09   sure.
10      10          THE WITNESS:  I get to coughing a little
11      11   when I...
12      12      Q.   And as we sit here today, do you remember
13      13   how many times you met with him in 2008 --
14      14          THE WITNESS:  With Raymour?
15      15      Q.   -- the total number of times?
16      16          THE WITNESS:  With Raymour?
17      17          MR. PINE:  With Raymour, yeah.
18      18      A.   No.  To -- to -- to really say and be
19      19   honest about it how many times we met, no, but I --
20      20   but I can remember three times that we met.
21      21      Q.   Three, okay.
22      22      A.   Yeah.  I mean I'm not saying that's how
23      23   many times we met, I'm saying I remember three times
24      24   that I can honestly say we met.
25      25      Q.   Okay.  Three in '08 and none, as far as
```

Bradshaw, Leon 12.1.09 video depo

88

```
1   00087:01   you can remember, in '09?
2        02      A.    Right.
3        03            MR. PINE:   Okay.  If I can just have a
4        04   minute.
5        05      Q.    Do you have any -- I'm showing you Exhibit
6        06   3 and Exhibit 8 --
7        07      A.    Right.
8        08      Q.    -- which appear to be the same --
9        09      A.    Yeah.
10       10      Q.    -- typed-out documents.
11       11      A.    Yeah.
12       12      Q.    Any idea why your signature is on both and
13       13   one is filled out and one is not?  Do you have any
14       14   explanation for that?
15       15      A.    I have no idea, no.
16       16      Q.    Do you remember signing Exhibit 3?
17       17      A.    When I signed those exhibits, all that
18       18   wasn't on there.
19       19      Q.    Okay.  It's your signature?
20       20      A.    Yeah, that's my signature.
21       21      Q.    But you don't know if you signed Exhibit 3
22       22   in '08 or '09, do you?
23       23      A.    There's other -- are these the same --
24       24   same things?
25       25      Q.    Well, you can look at them.
```

Bradshaw, Leon 12.1.09 video depo

89

```
1   00088:01      A.    No, no, I'm not questioning you, I'm
2        02   asking you --
3        03      Q.    Right.
4        04      A.    -- are these the same thing.  All right.
5        05   Are they both signed?
6        06      Q.    They're both signed but it looks like --
7        07      A.    I don't know -- I don't know which is
8        08   which, so if I signed two of them, I don't know.
9        09      Q.    Okay.
10       10      A.    I can't -- I can't tell you that because I
11       11   don't know.  I just signed.
12       12      Q.    Okay.
13       13      A.    I could have signed two of them.  I don't
14       14   know, you know.
15       15      Q.    And you don't have any memory of seeing
16       16   Raymour this year about that?
17       17      A.    If I seen Raymour right at this table, I
18       18   wouldn't know him if I seen him.
19       19      Q.    Well, is he sitting at this table?
20       20      A.    Oh, that's Raymour.
21       21      Q.    Right.
22       22      A.    Yeah, but I was thinking about the other
23       23   guy that you mentioned.  What was the other guy you
24       24   mentioned?  You mentioned another guy.  I forget his
25       25   name.
```

Bradshaw, Leon 12.1.09 video depo

90

```
1   00089:01      Q.    Don't know.
2        02      A.    I'll hear it again.  I'll know who it is.
3        03      Q.    Other than today, put today to the side,
4        04   and other than the time that you met with the postal
5        05   inspector --
6        06      A.    Right.
7        07      Q.    -- and the attorney for the -- for the
8        08   Government --
9        09      A.    Uh-hum.
10       10      Q.    -- did you ever meet with anybody else to
11       11   talk about these things --
12       12      A.    No.
13       13      Q.    -- these topics?
14       14      A.    No.  They're the first guys that I met.
15       15      Q.    Okay.
16       16      A.    Yeah.
17       17      Q.    So you don't have any memory of meeting
18       18   with anybody else other than --
19       19      A.    No.
20       20      Q.    -- what we've talked about?
21       21      A.    Those two guys are the only guys I met
22       22   with, you know.
23       23      Q.    Okay.  Before that, were you ever -- were
24       24   you ever visited by anybody else --
25       25      A.    No.
```

Bradshaw, Leon 12.1.09 video depo

91

```
1   00090:01      Q.    -- to talk about this?
2        02      A.    No.
3        03      Q.    Okay.  And I think you said -- I think you
4        04   said earlier that this was never that big a deal to
5        05   you --
6        06      A.    No.
7        07      Q.    -- until --
8        08      A.    Until money was mentioned.
9        09      Q.    Until the money was mentioned, right.
10       10      A.    Yeah.
11       11      Q.    And even after the money was mentioned,
12       12   you didn't give it another -- another -- another
13       13   thought, did you?
14       14      A.    Well, I -- I gave it a thought as to
15       15   whether I was gonna get any or not, yeah.
16       16      Q.    Right.  When Raymour spoke to you, you
17       17   said that he called once that you remember?
18       18      A.    Yeah.  That I remember, yeah.
19       19      Q.    Did the subject of more money or other
20       20   programs come up in that discussion over the phone?
21       21      A.    Yeah.  Well, yeah, there might be more
22       22   money or more programs, yeah.
23       23      Q.    Right.
24       24      A.    Yeah.
25       25      Q.    What did he -- what do you remember him
```

Bradshaw, Leon 12.1.09 video depo

92

```
1   00091:01   saying about that?
2        02        A.   Well, I don't know.  He said a few things
3        03   but -- but the only thing I got out of that was
4        04   maybe there was another program that was giving more
5        05   money or whatever.
6        06        Q.   Not just -- not just the programs that you
7        07   were involved in already but there might be
8        08   something else?
9        09        A.   Another program, yeah.
10       10        Q.   Okay.
11       11        A.   Yeah, yeah.  So naturally that represents
12       12   money so, yeah, I'm interested.
13       13        Q.   Right.  So you told him that you were
14       14   interested?
15       15        A.   Sure.
16       16        Q.   Okay.
17       17        A.   Yeah.
18       18        Q.   And how did you leave it with him after he
19       19   told you that there might be another program that
20       20   you could --
21       21        A.   Well, I left it --
22       22        Q.   -- get involved with?
23       23        A.   I left it -- I left it that maybe he'd get
24       24   in touch -- that he'd get in touch with me if that
25       25   was, you know, if that happens, you know.
```

93

```
1   00092:01        Q.   Okay.  When he called you, did he say, "I
2        02   think I may have another program that you might be
3        03   interested in"?
4        04        A.   No.  He didn't say that to me, no.
5        05        Q.   Words to that effect or --
6        06        A.   No.  I don't know what he said to me but
7        07   it wasn't nothing like that, no, no.
8        08        Q.   All right.  But he talked about another
9        09   program and some money that might be available?
10       10        A.   Well, you see, I don't know the exact
11       11   words he said but --
12       12        Q.   Right.
13       13        A.   -- but, yeah, that the $4,000, that's when
14       14   the 4,000 came through, yeah.
15       15        Q.   Right.
16       16        A.   That's -- yeah.
17       17        Q.   Right.  That was after the initial $2,000?
18       18        A.   Yeah.
19       19        Q.   And when he called you afterwards, after
20       20   the 4,000 had been paid --
21       21        A.   Yeah.
22       22        Q.   -- he called you at least once afterwards
23       23   that you remember?
24       24        A.   He just asked me was I all right, that's
25       25   all.
```

94

```
1   00093:01        Q.   And did he talk about additional money at
2        02   that time?
3        03        A.   No, no.  No additional money, no.
4        04        Q.   Okay.
5        05        A.   If he did, I didn't hear it.
6        06        Q.   You still -- you still have contact with
7        07   Cathy?  Is she -- is she still your --
8        08        A.   Cathy's my nurse.
9        09        Q.   Right.
10       10        A.   Yeah.
11       11        Q.   After you met with Raymour on the times
12       12   that you did --
13       13        A.   Yeah.
14       14        Q.   -- you said that you trusted him, correct?
15       15        A.   Well, yeah, I had no reason not to.
16       16        Q.   Right.  Did you tell her that you had a
17       17   favorable opinion about him?
18       18        A.   No.  I didn't tell her anything.  I told
19       19   her -- if it was a favorable opinion, it would have
20       20   been about her.  It would have been towards her.
21       21        Q.   Right.  Why?
22       22        A.   Why?  Because I knew her.
23       23        Q.   Oh, okay.  What about -- did you ever have
24       24   a discussion with Cathy about Raymour?
25       25        A.   Well, yeah, yeah.  Well, not a discussion,
```

95

```
1   00094:01   like you would think a discussion.
2        02        Q.   Right.
3        03        A.   My -- my thing with her was where was this
4        04   money coming from?
5        05        Q.   And after you met with Raymour, did you
6        06   ever tell her that it went -- went pretty well, you
7        07   got paid $6,000?
8        08        A.   No.  That wasn't -- you know -- you know,
9        09   when you come to me with $6,000, and I'm gonna say
10       10   this to you and I know it's gonna sound crazy to
11       11   you, but $6,000 ain't no money, man.  All that is is
12       12   -- not to a guy like me.  6,000 -- you know what I
13       13   done with the $6,000?  See these pants I got on?
14       14   They're $100 apiece.
15       15        Q.   Uh-hum.
16       16        A.   When I went down there, I bought pants
17       17   like this, $100 apiece.  $6,000 is no -- no money.
18       18   I bought 50, $100 shirts.  $6,000 go in two minutes,
19       19   you know, so -- so that -- that he was nothing,
20       20   so I -- I'm not at all jumping up in the air --
21       21        Q.   No, I understand.
22       22        A.   -- over $6,000.
23       23        Q.   I'm just -- I'm just -- I understand that.
24       24   I'm just wondering did you ever talk to Cathy --
25       25        A.   No, no.
```

96

```
00095:01    Q.    -- and express the fact that --
02          A.    The only thing -- the only thing that I --
03    I talked to Cathy was it was more or less trying to
04    get things out of Cathy about what's going on.
05          Q.    Uh-hum.
06          A.    You know what I mean?  Like if you come to
07    me and you introduce me to something, two guys, I
08    want to find out from you what are these guys about.
09          Q.    Right.
10          A.    So I'm trying to get it from you.  That --
11    that was my conversation with Cathy.
12          Q.    All right.  And did she tell you when you
13    asked her?
14          A.    She didn't actually tell me because I
15    don't think she knew.
16          Q.    Okay.
17          A.    Cathy didn't know what to tell me.  She
18    don't know.  So -- so, you know, so what I -- I mean
19    she convinced me enough that everything was legit,
20    everything was okay.
21          Q.    Uh-hum.
22          A.    And so I -- that's how I left it.
23          Q.    Okay.
24          A.    You know, because, you know, Cathy, she --
25    she never done nothing wrong.  She's been good to
```

Bradshaw, Leon 12.1.09 video depo

97

```
00096:01    me, you know.  And she kept saying -- the thing that
02    -- the thing that really stayed in the back of my
03    mind was there was seven or eight more people.  You
04    know, I was on the end of --
05          Q.    Right.
06          A.    -- seven or eight more people.  I wasn't
07    the only --
08          Q.    Did she tell you that or did Raymour tell
09    you that or did both?
10          A.    Oh, no, everybody.  Everybody said --
11          Q.    Right.
12          A.    -- you know, I was lucky to get in on it.
13          Q.    Right.  And that's how you felt?
14          A.    And that's how I felt.  I was lucky to get
15    in on this thing, you know.
16          Q.    So you were glad --
17          A.    They're running out -- oh, yeah, he did
18    say one thing, I just thought about it, that they
19    were running out of money.
20          Q.    Okay.
21          A.    Yeah.  That came to me just like that.
22          Q.    And you were one of the last ones to get
23    this --
24          A.    I was one of the last ones.
25          Q.    -- benefit?
```

Bradshaw, Leon 12.1.09 video depo

98

```
00097:01    A.    They were running out of money.
02          Q.    Okay.
03          A.    And that's why they were rounding the
04    figures off.
05          Q.    And you were glad about that?
06          A.    Sure I want a piece of it.  Yeah, don't
07    let me out.
08          Q.    Okay.
09          A.    Sure.
10          Q.    You weren't -- you weren't arguing with
11    them?
12          A.    No, I'm not arguing.  You put some.  You
13    give me some --
14          Q.    Okay.
15          A.    -- and I'll take that too, as long as you
16    don't wanna cut me up and take my life and take all
17    that, I -- yeah, sure.
18          Q.    And he clearly didn't want to do that.
19          A.    Yeah, well, I mean I'm telling you like it
20    is.
21                MR. PINE:  Thank you.  I have nothing
22    further.
23                THE VIDEOGRAPHER:  The time is now 2:25.
24    We are now off the record.
25                    (Off the record.)
```

Bradshaw, Leon 12.1.09 video depo

99

```
00098:01          THE VIDEOGRAPHER:  The time is now 2:26.
02    We are now back on the record.
03                    EXAMINATION
04    BY MR. FLANDERS:
05          Q.    Hi, Mr. Bradshaw.
06          A.    Hey.
07          Q.    My name is Bob Flanders and I represent
08    Mr. Caramadre.
09          A.    Yeah, how you doing?
10          Q.    Good.  How are you?
11          A.    All right.
12          Q.    You've mentioned that you trusted Raymour;
13    is that right?
14          A.    Sure.
15          Q.    Why did you trust him?
16                THE WITNESS:  Why?
17                MR. FLANDERS:  Uh-hum.
18          A.    Well, when you say trust, man, you know,
19    you're putting that in a broad sense of trust.  I
20    wouldn't trust him that way.  I mean when you say
21    trust him, trust him in what, you know what I mean?
22    In other words, I trust him to wherein I don't think
23    he's doing nothing wrong to me.
24          Q.    And do you still -- still hold that
25    opinion?
```

Bradshaw, Leon 12.1.09 video depo

100

```
1  00099:01     A.   Do I hold that?  Well, I don't know him.
2   02   He don't know me.  I never done nothing to him.
3   03        Q.   Has he ever done anything wrong to you?
4   04        A.
5   05        MR. VILKER:  Objection.
6   06        A.   No.  I never done nothing to him.  Why
7   07   shouldn't I trust him, right?  What is he gonna do,
8   08   you know, why should he do something to me?
9   09        Q.   All right.  And when he came to you and
10  10   gave you the money and -- and you cashed the check
11  11   the first time for $2,000, you saw that he lived up
12  12   to what he said he would do, right?
13  13        A.   Yeah.
14  14        Q.   And then you had a further meeting with
15  15   him where you saw there was a possibility of -- of
16  16   making even more money; is that right?
17  17        A.   Yeah.
18  18        Q.   And now when you met with him that second
19  19   time, he asked you to sign certain documents?
20  20        A.   He had documents to sign, yeah.
21  21        Q.   And were you willing to sign those
22  22   documents to get the additional money?
23  23        A.   Well, sure, after he said this, this, this
24  24   and this, he ran through something real fast to me,
25  25   yeah, yeah.
```

Bradshaw, Leon 12.1.09 video depo

101

```
1  00100:01     Q.   Okay.  And you told us that he talked to
2   02   you about what the documents were for?
3   03        A.   Hey, when you say talked to me and what
4   04   they were for, if that's what you call talking to me
5   05   what they were for, boom, boom, boom, boom, bang,
6   06   sign here, all right.
7   07        Q.   But he did -- he did make some statements
8   08   about the documents, didn't he?
9   09        A.   He might have said a few words.
10  10        Q.   Okay.
11  11        A.   A few words.  Very few, yeah.
12  12        Q.   Right.  But as you told us earlier, you
13  13   don't remember what those words were --
14  14        A.   Not all of them.
15  15        Q.   -- because you were focused on the money?
16  16        A.   Not all of them, no.
17  17        Q.   You don't remember any of them?
18  18        A.   Well, no, no.  Not -- not -- not what --
19  19   not what's going on here, no, no.
20  20        Q.   All right.  So, you know, let's just take
21  21   a look at some of these documents for a minute.
22  22   Take a look at Exhibit 8, if you would.  This is the
23  23   document that you signed on Page 3 --
24  24        A.   Yeah.
25  25        Q.   -- that says, "Agreement and
```

Bradshaw, Leon 12.1.09 video depo

102

```
1  00101:01  Acknowledgement"?
2   02        A.   Yeah.
3   03        Q.   Is this what the document looked like when
4   04   you signed it?
5   05        A.   Yeah, I guess so.  That one right there.
6   06        Q.   So everything that's on Exhibit 8 was
7   07   there when you were asked to sign it; is that right?
8   08        A.   Well, I guess so.
9   09        MR. VILKER:  Objection.
10  10        A.   I didn't even look at it.  I didn't even
11  11   -- didn't read it.  Didn't even read it.
12  12        Q.   Is this one of the documents that Raymour
13  13   asked you to sign?
14  14        A.   Well, I think so.  That's my signature.
15  15        Q.   All right.  And did he tell you about why
16  16   he was asking you to sign this?
17  17        A.   No.  Not really, no.
18  18        Q.   Did you understand that to get the money
19  19   you had to sign the documents that Raymour was
20  20   presenting to you?
21  21        A.   No, no.
22  22        Q.   In fact, didn't he present you with the
23  23   documents --
24  24        A.   I knew -- I knew --
25  25        Q.   -- before -- before -- let me finish.
```

Bradshaw, Leon 12.1.09 video depo

103

```
1  00102:01  Didn't he present you with the documents before he
2   02   gave you the check for $4,000 and asked you to sign
3   03   them?
4   04        A.   Well, yeah, yeah.
5   05        Q.   And you were willing to do that, weren't
6   06   you?
7   07        A.   Sure.
8   08        Q.   You were willing to sign the documents
9   09   that Raymour presented to you so you could get your
10  10   money?
11  11        A.   Right, yeah.
12  12        Q.   And you didn't even really care what was
13  13   in the documents?
14  14        A.   Well, sure I cared.
15  15        Q.   Well, did you --
16  16        A.   Sure, you care.
17  17        Q.   Did you read what was in the documents?
18  18        A.   There's nothing to read.  When you -- when
19  19   -- when -- when the guy tell you to sign here, sign
20  20   here, sign here, it's all right, sign here, sign
21  21   here, what do I need to -- what do I need to read?
22  22        Q.   Well, did you read in paragraph 1 where
23  23   you are going to be a co-owner in a joint account
24  24   with him?
25  25        A.   No, no, no.  That didn't -- that didn't
```

Bradshaw, Leon 12.1.09 video depo

**104 / 105**

```
104                                                              105
1  00103:01  even -- that's as far away as from what went on with   1  00104:01  A.   No, that's my signature.
2       02   me.                                                    2       02      Q.   Do you deny that was there?
3       03      Q.   Right.                                         3       03      A.   I don't know.  I don't even know if this
4       04      A.   That's as far away from what actually          4       04   was the paper.
5       05   happened as you can get.                               5       05      Q.   Well, you --
6       06      Q.   Well, how far away is it when your             6       06      A.   I don't deny it.  I don't know nothing.  I
7       07   signature is on a line that says "Co-Owner"?           7       07   don't even know if it was there.
8       08      A.   I didn't even -- no, I don't think about       8       08      Q.   All right.
9       09   that.  Didn't even think about that.                   9       09      A.   I mean I'm all excited.  I'm signing.  I
10      10      Q.   You didn't think about it --                  10       10   don't really see it.
11      11      A.   Didn't see it.                                11       11      Q.   Well, were you willing to be a co-owner on
12      12      Q.   -- but it was --                              12       12   an account to get your money?
13      13      A.   Didn't even see it.                           13       13      A.   No.  I'm gonna -- I'm gonna want to ask
14      14      Q.   But you don't deny that it was there, do      14       14   more about that.  If I'm -- if that's coming down,
15      15   you?                                                  15       15   I'm gonna ask Raymour more about that and I'm gonna
16      16      A.   You wanna know something, you wanna know      16       16   -- I'm gonna want to know more about what's going on
17      17   something, you wanna know something, you wanna know   17       17   with that, okay?
18      18   something.  This don't even have to be the paper     18       18      Q.   Has it cost you any money to be a co-owner
19      19   that I signed, you know what I mean?  This, this     19       19   in this account?
20      20   right here, I don't even see this.  I don't even see 20       20      THE WITNESS:  Has it cost me any money?
21      21   it.  I'm just signing papers, two or three papers    21       21      MR. FLANDERS:  Yeah.
22      22   I'm signing.                                          22       22      A.   It never cost me nothing, no, no.
23      23      Q.   I understand that but you don't deny that    23       23      Q.   In fact, after you signed this document
24      24   that lettering was there that says "Co-Owner's       24       24   agreeing to become a co-owner, you were paid
25      25   Signature" when you signed it, do you?               25       25   $4,000 --
```

Bradshaw, Leon 12.1.09 video depo

```
106                                                              107
1  00105:01  A.   Yeah.                                             1  00106:01  Q.   So it didn't matter to you?
2       02      Q.   -- is that right?                              2       02      A.   Didn't matter at all, no.
3       03      A.   Yeah.                                          3       03      Q.   Okay.
4       04      Q.   And you were also paid $4,000 after you        4       04      A.   Didn't matter.
5       05   signed these other documents that Raymour presented   5       05      Q.   And when Mr. Vilker asked you whether you
6       06   to you, right?                                        6       06   wrote in that date of 8-13-2008 --
7       07      A.   Yeah, yeah.                                    7       07      A.   Yeah.
8       08      Q.   And one of them was a document entitled,      8       08      Q.   -- and you told him you didn't --
9       09   "Complete Investment Account Application"?           9       09      A.   No, I didn't write that.
10      10      A.   Yeah.  We see all of that, yeah.  I don't   10       10      Q.   -- but isn't that at or about the time
11      11   know.  That's the first, you pointing that out to    11       11   when you signed it?
12      12   me.  Go ahead.                                       12       12      A.   Could have been.  I don't know.
13      13      Q.   And when you signed this document --        13       13      Q.   So you don't deny that you signed it
14      14      A.   Yeah.                                        14       14   sometime --
15      15      Q.   -- and put your signature on this page      15       15      A.   I don't -- I don't deny anything.  Even
16      16   here, you did it over a line that says, "Signature  16       16   the stuff that I don't know I don't deny.
17      17   of Co-Account Owner;" is that right?                17       17      Q.   Okay.
18      18      A.   I don't even see it, don't even know it,    18       18      A.   Because if I don't know it, how can I deny
19      19   just sign here, sign here, sign here, all the x's,  19       19   it?  I don't know.
20      20   sign here.                                          20       20      Q.   So you don't know, as you sit here,
21      21      Q.   I know you're telling us, sir, that you    21       21   whether, in fact, you signed this on or about August
22      22   didn't see it, but you don't deny that that was    22       22   13th, 2008; you just don't know?
23      23   there when you signed it, do you?                   23       23      A.   I don't know, right.  I know one thing, I
24      24      A.   I don't know if it was there.  I didn't    24       24   know the day that I cashed that check.
25      25   pay no attention to it.  I don't know.             25       25      Q.   Okay.
```

Bradshaw, Leon 12.1.09 video depo

108

```
 1  00107:01     A.   We know that day.
 2      02       Q.   And what's that day?
 3      03       A.   Well, I don't know.  It's on the check.
 4      04  The bank's got it.  It's no problem  I can always
 5      05  go to the bank and find that out.
 6      06       Q.   Now, I'm going to show you Exhibit 5,
 7      07  which is a document entitled, "Options Trading
 8      08  Application."
 9      09       A.   Yup.
10      10       Q.   And this is another document with your
11      11  signature on it.
12      12       A.   Yeah, I know.
13      13       Q.   It says, "Signature of Co-Account Holder."
14      14       A.   Right.
15      15       Q.   Now, was this the document that was shown
16      16  to you that you signed before you got your $4,000,
17      17  or one of them?
18      18       A.   That's my signature on there.
19      19       Q.   Okay.  But was this the document?
20      20       A.   I don't know.  It could have been, yeah.
21      21  I don't know.
22      22       Q.   All right.
23      23       A.   I don't know for sure if it was or not.
24      24       Q.   So I mean when you signed it, did the
25      25  document have "Options Trading Application" --
```

109

```
 1  00108:01     A.   I don't know.
 2      02       Q.   -- in block letters at the top?
 3      03       A.   I have no idea.  All I -- all I'm doing is
 4      04  looking for the "x."
 5      05       Q.   Okay.
 6      06       A.   I'm going down the paper like this.
 7      07       Q.   All right.  And was --
 8      08       A.   Like that.
 9      09       Q.   Before they signed this, did Raymour talk
10      10  to you about these documents?
11      11       A.   Not the way you're talking.  Not about
12      12  what you're talking about.
13      13       Q.   But he -- he asked you to sign them and
14      14  you understood you had to sign them to get the
15      15  money?
16      16       A.   He told me to sign these documents, that's
17      17  all.
18      18       Q.   And --
19      19       A.   You're saying it -- what you're saying to
20      20  me is that he's telling me that I gotta sign
21      21  documents to get money, but that's not the way it
22      22  was.
23      23       Q.   Well, did --
24      24       A.   He's just telling me sign -- sign the
25      25  documents.  I'm going boom, sign documents, boom.
```

110

```
 1  00109:01     Q.   But --
 2      02       A.   And he handed me a check.
 3      03       Q.   But you --
 4      04       A.   That's the end of the conversation.
 5      05  That's the way it was.
 6      06       Q.   But you were willing to sign the documents
 7      07  to get your money?
 8      08       A.   Sure I signed them for the money.  Sure I
 9      09  would.
10      10       Q.   And you were also willing to give Raymour
11      11  certain information about yourself to get the money?
12      12       A.   Like what?
13      13       Q.   Like your Social Security number?
14      14       A.   I don't --
15      15       Q.   Like your mother's maiden name?
16      16       A.   I don't give him my Social Security.
17      17       Q.   All right.  Take a look at this for a
18      18  second.
19      19       A.   I see it on there.  I seen that on there.
20      20            THE WITNESS:  What's this?
21      21            MR. FLANDERS:  This is a document that I
22      22  want to have marked as Exhibit D.
23      23            (Whereupon, Defendants' Exhibit D was
24      24  marked for identification.)
25      25       Q.   Now, this is a document that has certain
```

111

```
 1  00110:01  information about you on it; is that right?
 2      02            THE WITNESS:  What's all this stuff here?
 3      03  What is that in there?  What's that say?  Can you
 4      04  make that out?
 5      05            MR. FLANDERS:  It looks like --
 6      06            THE WITNESS:  Can you make -- right there.
 7      07            MR. FLANDERS:  -- mother's -- Lillie --
 8      08            THE WITNESS:  That right there.
 9      09            MR. FLANDERS:  Lillie Ragland.
10      10            THE WITNESS:  No.  What does that say right
11      11  there?
12      12            MR. FLANDERS:  It's crossed out.  I don't
13      13  know.
14      14            THE WITNESS:  You wanna know something?  I
15      15  don't know what it is either.
16      16       Q.   Is your mother's name Lillie Ragland?
17      17       A.   No.  That wasn't my mother's name.
18      18       Q.   That's not your mother's name?
19      19       A.   No.
20      20       Q.   Do you know who that is?
21      21       A.   I don't know who this is.  My mother is
22      22  Lillie Bradshaw.
23      23       Q.   Was her maiden name Ragland?
24      24       A.   Her mother's name was Ragland.
25      25       Q.   Her mother's name?
```

112

```
 1   00111:01      A.     Yeah.
 2        02       Q.     So if her mother's name was Ragland --
 3        03       A.     But this name is all --
 4        04       Q.     -- that would be her maiden name; isn't
 5        05   that right?
 6        06       A.     This name is all screwed up.  Yeah, but
 7        07   this name is all screwed up, man.  What's that in
 8        08   here?
 9        09       Q.     Did -- did you tell Raymour that your
10        10   mother's maiden name was Ragland?
11        11       A.     I don't tell him nothing like this.
12        12   Nothing, period, period.
13        13       Q.     Is this accurately --
14        14       A.     And this is pissing me off and I'm gonna
15        15   tell you why, because you got some names and a whole
16        16   lot of bullshit in here that ain't even true.  It
17        17   ain't even -- nothing I see --
18        18       Q.     What's not true?
19        19       A.     Well, this.  What is that?  I'm asking you
20        20   what it is.  Tell me what it is.
21        21       Q.     I'm telling you it's a crossed-out
22        22   reference so I don't know what it is.  I'm asking
23        23   you is that your mother's name, Ragland?
24        24       A.     That's not my mother's name, no.
25        25       Q.     I thought you just told us that that was
```

Bradshaw, Leon 12.1.09 video depo

113

```
 1   00112:01   your mother's --
 2        02       A.     My mother's name was Lillie Bradshaw.
 3        03   That's my --
 4        04       Q.     What was her name before she was married?
 5        05       A.     Ragland was her last name.
 6        06       Q.     Okay.  So her name was --
 7        07       A.     But --
 8        08       Q.     Was Lillie her first name?
 9        09       A.     Yeah.  But what's that got to do with my
10        10   mother's name?
11        11       Q.     Well, I'm asking you was Lillie her first
12        12   name?
13        13       A.     Yeah.
14        14       Q.     So her name was Lillie Ragland?
15        15       A.     Yeah, but what is that?  What is that?
16        16       Q.     I'm -- that's -- that's --
17        17       A.     You would have to put that in there to
18        18   have a name, man.
19        19       Q.     Yeah.  It says Lillie Ragland.
20        20       A.     You don't just say Lillie Ragland and
21        21   that's her name.  That's not my mother's name.
22        22       Q.     Did you tell Raymour that your mother's
23        23   name -- maiden name, was Lillie Ragland?
24        24       A.     No, no, no, no, you know.
25        25       Q.     Okay.  Is your date of birth ████████
```

Bradshaw, Leon 12.1.09 video depo

114

```
 1   00113:01   ████████
 2        02       A.     Yeah.
 3        03       Q.     Did you tell Raymour that?
 4        04       A.     Maybe I did, yeah.
 5        05       Q.     Did you tell him what your Social Security
 6        06   number was?
 7        07       A.     I don't think so.
 8        08       Q.     Did you give him your driver's license?
 9        09       A.     Yeah.  I could have done that, yeah.
10        10       Q.     And -- and that has certain information
11        11   about you on the driver's license?
12        12       A.     Yeah.  I gave him the driver's.  I gave
13        13   him the driver's, yeah, I did do that, yeah.
14        14       Q.     So you were willing to give him
15        15   identifying information about yourself?
16        16       A.     I gave him what he asked me for, yeah.
17        17       Q.     Okay.  Whatever he asked you about your
18        18   identity, you gave it to him?
19        19       A.     About me, yes.
20        20       Q.     Yeah.  And you were willing to do that?
21        21       A.     Yeah.
22        22       Q.     And you were willing to have him take that
23        23   identifying information and -- and -- and use it for
24        24   his purposes?
25        25       MR. VILKER:  Objection.
```

Bradshaw, Leon 12.1.09 video depo

115

```
 1   00114:01      A.     No, no, no, no.  See, yeah, I see what
 2        02   you're doing but no, that's not true at all, no.
 3        03       Q.     Didn't he tell you he needed that --
 4        04       A.     That's not true.
 5        05       Q.     Did he --
 6        06       A.     You forget about that.  It's just not
 7        07   true.
 8        08       Q.     Did he ask you for the identifying
 9        09   information --
10        10       A.     That's not true.
11        11       Q.     -- that you gave him?
12        12       A.     That's not true, see, because I'm gonna
13        13   ask you what was his purpose to see --
14        14       Q.     Did he ask you for the identifying
15        15   information you gave him?
16        16       A.     No, no.  Yeah, he asked me for it, yeah,
17        17       Q.     And did he walk out of the room with it?
18        18       A.     No.  He didn't walk out of the room with
19        19   it, no.
20        20       Q.     Did he leave your presence with it?
21        21       A.     No.
22        22       Q.     Well, did he leave it behind?
23        23       A.     He gave it to me back.
24        24       Q.     He gave you the driver's license back but
25        25   he kept the information, right?
```

Bradshaw, Leon 12.1.09 video depo

116

```
 1   00115:01      A.   I think he did, yeah.
 2      02      Q.   Yeah.  And you knew he kept the
 3   03   information and used it?
 4      04      A.   It didn't bother me.  Why --
 5      05      Q.   I know it didn't bother you because you
 6   06   were --
 7      07      A.   Why should it bother me?
 8      08      Q.   It didn't bother you because he was paying
 9   09   you to --
10      10      A.   For what?
11      11      Q.   -- for -- to give you --
12      12      A.   He was paying me for my -- for my -- for
13   13   that information.
14      14      Q.   For the information so he could use it and
15   15   put it on the documents.
16      16      A.   I've got a --
17      17           MR. VILKER:  Objection.
18      18      A.   I've got a question for you.  Why was he
19   19   -- why was he -- why did he want it?  That's my
20   20   question to you.
21      21      Q.   Well, did he tell you why he wanted it?
22      22      A.   The documents that I know nothing about.
23      23      Q.   Didn't he tell you why he wanted to do it?
24      24      A.   No, no, no, no.  That's what's pissing me
25   25   off with you.
```

Bradshaw, Leon 12.1.09 video depo

117

```
 1   00116:01           MR. FLANDERS:  Well, that's your problem,
 2   02   sir.
 3      03           THE WITNESS:  It ain't my problem.  It's
 4   04   not my problem.  I don't have a problem.  I should
 5   05   have been a lawyer, that's what I should have been.
 6      06      Q.   Now, this nurse, Cathy, is she a Hospice
 7   07   nurse?
 8      08           THE WITNESS:  Hospice?
 9      09           MR. FLANDERS:  Yeah.
10      10      A.   I don't know, man.  Cathy -- you would
11   11   have to ask Cathy about what she is and what she's
12   12   not.  The only thing I know about is her being a
13   13   nurse.  I'm not gonna speak for Cathy.  Let Cathy
14   14   speak for herself.
15      15      Q.   Did she -- did Cathy mention to you a
16   16   lawyer for Hospice named Jeffrey Chase-Lubitz?
17      17      A.   I don't know.  You -- you ask Cathy them
18   18   questions.  I'm not gonna say nothing about Cathy.
19   19   Let Cathy answer her own questions.
20      20      Q.   Well, I'm asking you --
21      21      A.   I don't --
22      22      Q.   -- did Cathy mention to you a lawyer --
23      23      A.   I'm -- I'm talking about --
24      24      Q.   -- from Hospice named Jeffrey
25   25   Chase-Lubitz?
```

Bradshaw, Leon 12.1.09 video depo

118

```
 1   00117:01           THE REPORTER:  Sorry.  Could you re --
 2   02   could you speak one at a time, please.
 3      03           THE WITNESS:  Go ahead.
 4      04      Q.   Did you -- did Cathy mention to you a
 5   05   lawyer for Hospice named Jeffrey Chase-Lubitz?
 6      06      A.   No.
 7      07      Q.   Now, the documents that you signed for
 8   08   Raymour, six or seven of them I think you told us,
 9   09   did you ever ask him to provide you with copies of
10   10   those?
11      11      A.   No.  I don't want no copies.  What do I
12   12   need them for?
13      13      Q.   So you didn't even want copies?
14      14      A.   What would I need them for?
15      15      Q.   I don't know but I'm just finding --
16   16   asking you if you ever asked him for copies.
17      17      A.   I didn't ask him for nothing.  I didn't
18   18   even think I needed them.
19      19           THE WITNESS:  After we finish this, can we
20   20   take the time so I can go to the bathroom?
21      21           MR. FLANDERS:  Oh, absolutely.  You can do
22   22   it right now.  Why don't you do that
23      23           THE WITNESS:  No, I'll wait for you.
24      24           MR. FLANDERS:  Okay.  But if you want to
25   25   take a break, that's -- we're happy to do that.
```

Bradshaw, Leon 12.1.09 video depo

119

```
 1   00118:01           THE WITNESS:  I've just got to -- I have to
 2   02   do a stool.  I've gotta do a poo-poo.
 3      03           MR. FLANDERS:  Well, I mean --
 4      04           THE WITNESS:  Go ahead.  I'll give it a
 5   05   quick -- I'll try to hold on for a minute.
 6      06           MR. FLANDERS:  Okay.  Believe me, that's
 7   07   the last thing I'd want to happen here.
 8      08           THE WITNESS:  But I don't want it to come.
 9   09   You see me squirming.  That's why I'm -- I'm not
10   10   squirming 'cuz I'm nervous, I'm squirming because
11   11   I've gotta go and do a stool.  That's what I'm
12   12   saying.  Let me do that real fast, all right?
13      13           MR. FLANDERS:  Please.
14      14           THE VIDEOGRAPHER:  Do you have more than 20
15   15   minutes of questions?
16      16           MR. FLANDERS:  Pardon me?
17      17           THE VIDEOGRAPHER:  Do you have more than 20
18   18   minutes of questions?
19      19           MR. FLANDERS:  I don't think so.
20      20           THE VIDEOGRAPHER:  Are you the last person?
21      21           MR. FLANDERS:  I believe so.
22      22           THE VIDEOGRAPHER:  Okay.  I'll just go off
23   23   the record.
24      24           THE WITNESS:  Go ahead, I'll try to make
25   25   it.
```

Bradshaw, Leon 12.1.09 video depo

120

```
 1   00119:01        THE VIDEOGRAPHER:  No, no, no.  The time is
 2   02   now 2:42.  We are now off the record
 3   03              (Recess)
 4   04        THE VIDEOGRAPHER:  The time is it now 2:53.
 5   05   We are now back on the record.
 6   06   BY MR. FLANDERS:
 7   07        Q.    Showing you, Mr. Bradshaw, Exhibit 6, this
 8   08   is one of the documents that you identified that you
 9   09   signed for Raymour.  Do you remember that?
10   10        A.    Yeah, I remember that.  I remember that
11   11   name, yeah.
12   12        Q.    Okay.  The name being the E*Trade
13   13   Financial?
14   14        A.    Yeah.  Just -- yeah, see I remember, all
15   15   that there is what I remember.
16   16        Q.    Okay.
17   17        A.    It jumps out at me.
18   18        Q.    Did this document look the way it now
19   19   looks or were there any differences when you signed
20   20   it?
21   21        A.    I just signed this.  Where is my name?
22   22   Yeah.
23   23        Q.    Okay.
24   24        A.    I didn't see all that on it.
25   25        Q.    And did you sign it on or about August
```

Bradshaw, Leon 12.1.09 video depo

121

```
 1   00120:01  13th, 2008?
 2   02        A.    See this?  That ain't me.  I don't know.
 3   03   That's not me.
 4   04        Q.    When you say that's not me, you didn't
 5   05   write --
 6   06        A.    This is me.
 7   07        Q.    I'm asking you --
 8   08        A.    The dates.  I don't know what date it was.
 9   09   I don't know.
10   10        Q.    Okay.
11   11        A.    But if that's the date, yes, that's the
12   12   date.
13   13        Q.    And did it have, at the top, "Power of
14   14   Attorney" on it?
15   15        A.    Oh, man.  Not that I know, nah.  Like I'm
16   16   telling you and like I'm saying to you, anything
17   17   power of attorney and all that stuff, I wouldn't be
18   18   here now.  I wouldn't --
19   19        Q.    When you say you wouldn't be here, what do
20   20   you mean?
21   21        A.    Any of this stuff here, any of these
22   22   documents you got, if you had power of attorney and
23   23   I had seen it or if I had known anything of power of
24   24   attorney, we wouldn't be in this -- you would have
25   25   had that money and I wouldn't be here now.
```

Bradshaw, Leon 12.1.09 video depo

122

```
 1   00121:01        Q.    When you say we would have had that money,
 2   02   what do you mean?
 3   03        A.    Well, what am I saying is the $6,000 that
 4   04   I got, I wouldn't have taken it is what I'm saying.
 5   05        Q.    Do you --
 6   06        A.    I wouldn't have taken the money and I
 7   07   wouldn't have been here.
 8   08        Q.    Do you understand that power of attorney
 9   09   is somebody getting control of your life?
10   10        A.    Well, that's what -- that's what -- to me
11   11   power of attorney, that's what it sounds like to me.
12   12        Q.    But do you understand that there are more
13   13   limited powers of attorney --
14   14        A.    I don't know.
15   15        Q.    -- just to trade an account?
16   16        MR. VILKER:  Objection.
17   17        A.    I don't know trading accounts or whatever,
18   18   trading of anything.  Any power of attorney over me
19   19   is zero.  I don't care what -- you can cut it down
20   20   any way you want it and divide it any way you want
21   21   to divide it.  Just the word power of attorney is
22   22   not for me.
23   23        Q.    All right.  But you don't deny that this
24   24   -- the words power of attorney were on the document
25   25   --
```

Bradshaw, Leon 12.1.09 video depo

123

```
 1   00122:01        A.    I don't know if it was on there.
 2   02        Q.    -- when you signed it?
 3   03        A.    I have no idea whether it was on there.  I
 4   04   didn't see it.
 5   05        Q.    Okay.
 6   06        A.    So I don't know if it was on there or not,
 7   07   okay?  I can't say it was on there, I can't say it
 8   08   wasn't on there because I -- well, let me put it
 9   09   this way, I didn't see it.  Let me put it that way.
10   10   That's the only way I can answer that.
11   11        Q.    Did you have any objection to allowing
12   12   Raymour to use your name in terms of trading on an
13   13   account?
14   14        A.    I have objections of anybody using my name
15   15   to do anything.
16   16        Q.    All right.
17   17        A.    Anything.
18   18        Q.    But you would -- you were willing to have
19   19   your name signed on these documents?
20   20        A.    No, no, no.
21   21        Q.    Yeah, you were.
22   22        A.    Well, yeah, according to what you're
23   23   saying, yeah.  Yeah, I can see that, yeah, because I
24   24   signed them.
25   25        Q.    Right.
```

Bradshaw, Leon 12.1.09 video depo

124

```
 1  00123:01      A.    I can understand that.  But if I'd known
 2      02   what you're presenting to me now, no, my name
 3      03   wouldn't have been on there.
 4      04      Q.    Okay.  Did you have conversations with
 5      05   Raymour --
 6      06      A.    And even though -- let me put it to you
 7      07   this way now that you're coming to me like that.  If
 8      08   my name -- let's just say I agreed to put my name on
 9      09   there, it wouldn't have been $6,000, it would have
10      10   been $60,000.
11      11      Q.    You would have asked for more?
12      12      A.    All right?  Yeah.  If you want to play
13      13   money games --
14      14      Q.    But you were willing --
15      15      A.    -- or how much did I want money, all
16      16   right?
17      17      Q.    But you were willing to have your name
18      18   used for money?
19      19      A.    No.
20      20      Q.    Oh.  Just you would have charged more?
21      21      A.    No, no.  If I -- if I -- if I had known
22      22   about power of attorney and all this crap, it would
23      23   have never been on there.
24      24      Q.    I thought you told us it would have cost
25      25   them 60,000 instead of 6,000?
```

Bradshaw, Leon 12.1.09 video depo

125

```
 1  00124:01      A.    No.  I said if, if I was into it and I had
 2      02   wanted to do that, I would have charged you $60,000.
 3      03   That's what I said.  We can play with words all you
 4      04   want --
 5      05      Q.    Isn't it --
 6      06      A.    -- you know.
 7      07      Q.    Isn't it the case though that once you
 8      08   heard that you stood a chance to make some money
 9      09   here, you were willing to sign whatever documents
10      10   Raymour put in front of you?
11      11      A.    Not make some money.  See, we can play
12      12   with words.  We can play with words all you want to.
13      13      Q.    Get some money?
14      14      A.    No, no, no, no.  No, no.  This thing
15      15   starts off with somebody giving money to somebody
16      16   that can use money, all right, of a good deed.  Not
17      17   nobody making money, nobody trying to make money,
18      18   give it away.  No, these are terms.
19      19      Q.    Right.  But then he came back to you with
20      20   another program --
21      21      A.    Another program, somebody giving some
22      22   money away, sure.
23      23      Q.    And you were willing to sign the documents
24      24   to get the money for this other program?
25      25      A.    Well, I gotta sign something.
```

Bradshaw, Leon 12.1.09 video depo

126

```
 1  00125:01      Q.    Yeah, and you did?
 2      02      A.    Yeah.  But I don't know -- you don't tell
 3      03   me nothing about all this.  I'm not even sure it was
 4      04   on there, okay, you know, since -- since -- since
 5      05   you wanna put it that way because I -- because --
 6      06   because I didn't see it.
 7      07      Q.    You didn't care what was on there, you
 8      08   were willing to sign whatever he was putting in
 9      09   front of you?
10      10      A.    You're telling me that I don't care about
11      11   my power of attorney?  Are you kidding?
12      12      Q.    Well --
13      13      A.    You think I'm that stupid?
14      14      Q.    I don't if you do or you're not, but you
15      15   did sign a power of attorney.
16      16      A.    For six lousy thousand dollar -- thousand
17      17   dollars?  That's what I'm saying.  I would have
18      18   charged you 60.  That's what I'm saying to you.
19      19      Q.    But you're -- you're assuming --
20      20      A.    This here.
21      21      Q.    -- that the power of attorney is control
22      22   over your life, right?
23      23      A.    It don't make no difference what it's
24      24   controlled over.  Power of attorney is power of
25      25   attorney.  You got some control over me in some
```

Bradshaw, Leon 12.1.09 video depo

127

```
 1  00126:01   phase or some -- some -- some -- some denomination
 2      02   or whatever, all right?
 3      03      Q.    Do you -- do you deny that the words power
 4      04   of attorney were on this document when you signed
 5      05   it?
 6      06      A.    I can't deny it.  I didn't know -- I
 7      07   didn't see it.
 8      08      Q.    Okay.
 9      09      A.    I didn't see it.
10      10      Q.    All you saw was the $4,000 --
11      11      A.    I did not --
12      12      Q.    -- and you've got a blind spot for
13      13   everything else?
14      14      A.    That's right.  You put 4,000 here,
15      15   blinders.
16      16      Q.    Suddenly I disappear and everybody else?
17      17      A.    Everybody else.
18      18      Q.    You grab the money and you're out of here?
19      19      A.    I'm gone, that's right, unless you show me
20      20   a power of attorney and then I give you the $4,000
21      21   back.
22      22      Q.    And then you want that $60,000, right?
23      23      A.    Yeah.  Now, you put $60,000, now we can --
24      24      Q.    Now we're talking power of attorney?
25      25      A.    Right, yeah.  I'm just being honest with
```

Bradshaw, Leon 12.1.09 video depo

128



```
1  00127:01  you, man.  I don't remember seeing that.
       02        Q.    All right.
2      03        A.    I really don't.
       04            MR. FLANDERS:  Thank you.
3      05            THE WITNESS:  You're a nice guy.  Thank
       06  you, man.
4      07            MR. MacFADYEN:  John MacFadyen ████████
       08  ██████████  For the reasons that I previously stated,
5      09  I have no questions at this deposition.
       10            MR. TRAINI:  Anthony Traini ████
6      11  ████████████         I adopt Mr. MacFadyen's statement,
       12  and for all the reasons that he has stated at the
7      13  previous depositions, I also have no questions at
       14  this deposition.
8      15            MR. VILKER:  Okay.  The Government has no
       16  further questions.  I believe this deposition is
9      17  completed.
       18            THE VIDEOGRAPHER:  Stand by, folks.  The
10     19  time is now 3:00 p.m.  This is the end of tape one,
       20  the conclusion of the deposition.  We are now off the
11     21  record.
       22            (Whereupon, the deposition was concluded at
12     23  3:00 p.m.)
       24
13     25
   00128:01         C E R T I F I C A T E
14     02
       03      I, Diane J. DeStefano, a Notary Public, do
15     04  hereby certify that I am expressly approved as a
       05  person qualified and authorized to take depositions
16     06  pursuant to Rules of Civil Procedure of the Superior
       07  Court of Rhode Island, especially, but without
17     08  restriction thereto, under Rule 30(e) of said Rules;
       09  that the witness was first sworn by me; the
18     10  transcript contains a true record of the
       11  proceedings; that a review of the transcript by the
19     12  witness was not requested.
       13
20     14
       15  IN WITNESS WHEREOF, I have hereunto set my hand
21     16  this_____day of_____,2009.
       17
22     18  _____
       19  DIANE J. DESTEFANO, RPR, NOTARY PUBLIC
23     20
       21
24     22
       23
25     24
       25
```