UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| JOSEPH CARAMADRE | ) | Criminal No. 11-186-S |
| | ) | |
| and | ) | |
| | ) | |
| RAYMOUR RADHAKRISHNAN | ) | |
| Defendants | ) | |

DEFENDANT JOSEPH CARAMADRE'S INITIAL PRETRIAL MEMORANDUM[1]

Defendant Joseph Caramadre submits this initial pretrial memorandum in response to that

portion of the Court's pretrial Order relative to identifying legal issues which may arise during

trial.  Although the defendant cannot be certain that there will not be other issues which will arise

as trial progresses, there are several legal issues which can be flagged for the Court now.  To the

extent that the defendant is able to identify and articulate other legal issues as they arise prior to

trial, he will do so.

The issues raised here relate primarily to various items of financial data, including the use

of summaries of financial information and an expert opinion concerning some of this

information, which the government intends to offer into evidence, and which were discussed, in

part, at the last pretrial conference.  This includes, in response to a question posed by the Court

and answered by the government, a potential issue involving the applicability of the holding in

---

[1]The summaries of financial data which are referenced in this memorandum as Exhibit A and Exhibit B will be the
subject of a Motion to Seal and therefore have been redacted from this filing.  The redacted materials consist of
documents the government seeks to introduce into evidence, but the admissibility of which has not yet been ruled
upon by the court, and which are in fact the subject of this Memorandum (at least in part).

  Additionally, defense counsel have not yet had an opportunity to meet and confer with the government in an effort
to resolve some of the issues related to the government's proposed financial summaries and they will make every
effort to do so as soon as possible.  Since this Memorandum was due to be filed today, defense counsel thought it
best to flag these potential issues for the court even while trying to resolve them with the government.

<u>Southern Union Company v. United States</u>, 132 S.Ct. 2344 (2012).  Finally, there are potential

legal issues concerning the use of certain handwriting evidence, as well as a certain requests for

continuing objections to the admission of certain evidence, and related requests for limiting

instructions.

      1.      <u>The Financial Data</u>.

Although somewhat difficult to articulate, there is a question as to whether and to what

extent the recent decision of the Supreme Court in <u>Southern Union</u> may be at issue here in the

context of the application of the alternative fine statute—18 U.S.C. §3571(d).  It is helpful to set

the background.

One of the aspects of all the statutes at play in this case with the exception of 18 U.S.C.

§1028A(a)(1) (aggravated identity theft)[2], and 18 U.S.C. §1512(b)(3) (witness tampering) [3], is

the availability of the alternative fine provisions of 18 U.S.C. §3571(d), which allow for the

court to substitute for the regular felony fine of $250,000 [as provided for in  §3571(c)], a fine

equal to twice the gain or loss derived from the specified criminal activity.  Each of the statutes

under which offenses are charged in the Indictment provides for a penalty of either "a fine under

this Title [Title 18]", or a term of imprisonment, or both.[4]  Calculation of the alternative fine

---

[2]The provisions of 18 U.S.C. §1028A(a)(1) (which applies only to Counts 60-64) are not at issue because the penalty provision of that statute is a mandatory two-year prison sentence which must be imposed consecutively to the sentence imposed for its underlying offense.  In this case, if there were convictions on those counts, the court would be able to impose prison terms of 2 years on each of those 5 counts to run consecutively to their underlying wire/mail fraud counts.  There is no separate monetary penalty provided for by this statute.

[3]The provisions of 18 U.S.C. §1512(b)(3) (which applies only to Count 66), while providing for a fine pursuant to 18 U.S.C. §3571, is limited to the felony fine amount of $250,000 [provided by 18 U.S.C. §3571(c)] because there is (at least in this case) no gain or loss associated with this offense, and therefore no occasion for the imposition of an alternative fine.

[4]The 26 wire fraud counts are governed by 19 U.S.C. §1343; the 6 mail fraud counts by 18 U.S.C. §1341; and the single conspiracy count by 18 U.S.C. 371, which use the penalties for the object offenses (the highest of which in this case are the wire/mail fraud penalties of 20 years' imprisonment and the Title 18 fines).  The 26 identity fraud counts are governed by 18 U.S.C. §1028(a)(1) and the single money laundering count by 18 U.S.C. §1957(a) and

provided by Section 3571(d), requires a determination of a gain or loss amount. This statutory landscape raises the issue of whether the alternative fine provisions of §3571(d) create a penalty that is in excess of the statutory maximum of $250,000.00. Recently, in Southern Union, the Supreme Court held that any determination of a penalty which is in excess of the amount provided for by statute must be made by the jury beyond a reasonable doubt.[5] At least one case decided since Southern Union finds the Supreme Court's rationale applicable to the very similar circumstances in this case. See, United States v. Sanford, 2012 WL 2930770 (D.D.C. 7/19/2012).

At the last pretrial conference, the court inquired as to whether the government's request to the defense to stipulate to certain financial calculations implicated Southern Union, and the government's response was that the "loss amount" (i.e., the end product of one of the summaries) was strictly a sentencing issue and impacted only the loss table ranges delineated in U.S.S.G. §2B1.1.[6] If, in fact, Southern Union is applicable in this case, Mr. Caramadre would find it difficult, if not impossible, to stipulate to what is essentially an element of the offense (for purposes of sentencing). If not, then there is a question about whether or not any "gain/loss" evidence, while arguably relevant, is material. Moreover, whether or not Southern Union

---

(b)(1) and (2). There are therefore a total of 60 felony counts for which the Title 18 fine is $250,000 each (or $15 million in the aggregate).

[5] While Southern Union itself contemplated that its application could be to gain or loss (and not only to the number of days of the violation, which was the issue in that case) [132 S.Ct. at 2356], the difference between Southern Union and this case is that here the statute of (putative) conviction leads the court to the general fine statute [(§3571(c)] for determination of the "statutory" fine. In Southern Union, the fine was set (at a per diem figure) by the statute expressing and defining the violation itself. This raises the question of whether the alternative fine, as it would be determined under subsection (d) of §3571 is in excess of the "statutory" fine for a felony set by operation of subsection (c).

[6] As will be discussed further below, Mr. Caramadre objects to the government's characterization of these matters as "losses". Mr. Caramadre expects the evidence to show that all of the payments at issue here were made pursuant to formulas and provisions contained in annuity and bond contracts that were solely drafted by the various insurance companies and bond issuers. Characterizing these payments as "losses" unfairly prejudices Mr. Caramadre because it presumes that the payments were improper, which is solely for the jury's determination.

3

applies, the government's financial evidence is so overwhelmingly prejudicial that, under a Rule 403 analysis, it should be excluded or at least limited.  This was the solution the court in <u>Sanford</u> found appropriate under very similar circumstances.

In addition to this issue, there are other points which relate to the use of the government's summaries which are described below.  These include issues relating to the use of summaries generally in these circumstances, as well as the problems with respect to the particular summaries the government wishes to use here.  Also in conjunction with the "loss figures" is the government's proposed use of an expert witness concerning the "losses" allegedly associated with the survivor bond accounts.  This will, in the first instance, require a <u>Daubert</u> hearing, and is also subject to the Rule 403 analysis mentioned above.

Mr. Caramadre suggests some possible resolutions for the court and the government to consider.  One is to keep these determinations for the jury (if required by <u>Southern Union</u>), but bifurcate the gain/loss issues from the guilt phase of the trial.  The alternative of bifurcation of these events would be effective in part because the defendant would, for purposes of determination of the gain/loss figure, even under a reasonable doubt standard applied via the Rules of Evidence, renew his request to waive they jury for that determination, to which the government could consent.  Another issue to consider on this point is that Mr. Caramadre, given his peculiar knowledge of the investment vehicles at issue in the case, may choose not to testify at the guilt/innocence phase of trial, but would desire to testify with respect to the whole issue of loss calculations.[7]

---

[7]This is at least part of the rationale behind the favoring of bifurcation of guilt/innocence vs. forfeiture phases in RICO trials.  <u>See</u>, <u>e.g.</u>, <u>United States v. Feldman</u>, 853 F.2d 648, 661-662 (9th Cir. 1988), discussing <u>United States v. Sandini</u>, 816 F.2d 869, 874 (3d Cir. 1987).  As the court is aware, there are also forfeiture allegations in this Indictment.  Bifurcation has also been used, for example, in felon-in-possession cases to insulate a defendant from the prejudice associated with the prior criminal conviction element of those cases.  This issue was the focus of the First Circuit's decision in <u>Untied States v. Tavares</u>, 21 F.3d 1 (1st Cir. 1994).

A second possibility is a two-part stipulation between the parties providing that for purposes of trial, the parties could agree that (a) the $1,000 threshold required by 18 U.S.C. § 1028(b)(1)(D)[8] is satisfied, and the $10,000 qualification required by 18 U.S.C. §1957(a)[9] has been met, and the jury can be so instructed as to both; and (b) that the "loss" figure for sentencing purposes (including for the calculation of a fine under the guidelines or under the alternative fine statute) can be sorted out at the sentencing hearing by the methods and standards of proof applicable to that proceeding (as opposed to using evidentiary and reasonable doubt standards at trial).

Obviously, the defendant is very concerned about the impact that these exorbitant "gain" or "loss" figures will have on the jury's consideration of guilt or innocence. If <u>Southern Union</u> does not apply, and as the government suggests, the gain/loss figures are relevant only to the guideline table and ranges of offense levels, then there is no harm in excluding this evidence from the trial altogether. Doing so will eliminate a significant period of trial time and confusion on the part of the jury, as well as the need for any expert witnesses.

    2.    <u>The Government's Financial Summaries.</u>

The government's financial summaries are in two parts. The first is a group of summaries[10] prepared by the government which reference various items of financial information,

---

[8]The statute requires proof that the identity theft resulted in the defendant's obtaining anything of value in excess of $1,000 in any one year.

[9]The statute requires proof of a monetary transaction in criminally derived property of a value greater than $10,000.

[10]The summary charts consist of (1) "Summary of Profits and Losses from Variable Annuities", (2) "Summary of Monies Invested and Earned on Death Put Bonds by Account", (3) "Summary of Amount Paid vs. Amount Earned by Terminally-Ill Individual, (4) "Summary of Amounts Given to Terminally Ill vs. Profits Made" and (5) "Summary of Total Losses on Bonds and Annuities".

some of which relate to annuity transactions.[11]  The second is a summary prepared by a proposed

government expert, Dr. Andrew Kalotay, and concerns financial information related to the

various survivor bond transactions.[12] Dr. Kalotay's summary is entitled the "Estimate of Loss to

Bond Issuers from Exercise of Survivor's Option".   Mr. Caramadre objects to the use of these

materials at trial, and/or their submission to the jury, absent the satisfaction of certain conditions

as described below.

As the Court is aware, the introduction of expert witness testimony is governed by

Fed.R.Evid. 702 and 703.  The sole purpose of Dr. Kalotay's testimony will be to give his

opinion as to the "losses" allegedly suffered by the bond issuers when the survivor option was

exercised in the various bond transactions that are at the heart of this case.  Mr. Caramadre will

object to Dr. Kalotay's testimony on several grounds.

a.      Dr. Kalotay does not qualify as an expert on loss calculation.

It is axiomatic that before one provides expert testimony, one must first qualify as an

expert on the subject matter upon which the evidence is being offered.  Fed.R.Evid. 702.  See

also Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579  (1993) and Kumho Tire Co. v.

Carmichael, 526 U.S. 137  (1999).  While Dr. Kalotay may have experience, education and

training in "valuing" bonds, there is no indication in his materials that he is similarly qualified to

_____

[11]A copy of the summaries is included under Exhibit A but has been redacted from the public filing filed with the
Court for a number of reasons including that the proposed summaries consist of "drafts" prepared by government
agents which the government may seek to introduce as evidence at trial and will likely require this court to pass
upon the admissibility of those summaries or subsequent drafts of those summaries.  Exhibit A will be filed with the
Court in conjunction with a Motion to Seal filed by Mr. Caramadre.   Some of the information contained in the
summaries was prepared by the government's IRS agent based on certain business records, presumably provided by
the respective insurance companies.  Part of the information, as was discussed at the last pretrial conference, was
created by the insurance companies for use in this trial.  This information also concerns the calculation that the
government has asked the defense to stipulate to avoid the necessity of bringing in a number of witnesses to testify
concerning the calculations.

[12]A copy of this summary is included under Exhibit B for the Court's reference but is likewise redacted from this
filing similarly to Exhibit A.  The appropriate Motion to Seal will also address Exhibit B.

calculate the actual "loss" to bond issuers when a survivor option is exercised.  Moreover, there

is no indication that Dr. Kalotay's methodology is reliable or that it has gained general

acceptance in the financial community.[13]  For these reasons, Mr. Caramadre requests that the

Court conduct a so-called <u>Daubert</u> hearing to determine whether Dr. Kalotay qualifies as an

expert in the areas upon which he is expected to testify.

> b.  <u>The probative value of Dr. Kalotay's proffered testimony is far outweighed by its prejudicial effect on the jury</u>.

Rule 403 empowers the Court to exclude relevant evidence when its prejudicial effect

outweighs its probative value.  The amount of an alleged victim's loss is not an element of either

mail or wire fraud.[14]  <u>See</u>, <u>e.g.</u>, <u>United States v. Haque</u>, 315 Fed.Appx. 510, 526 (6th Cir. 1009).

While the government, subject to Rule 403, may introduce evidence of an alleged victim's "loss"

to show motive or intent to defraud, it need not show that the alleged victim suffered any loss to

prevail.

In this case the government contends that the defendants engaged in a scheme to defraud

certain bond issuers, among others, by purchasing bonds with a survivor option in the joint name

of an investor and a terminally-ill individual.  The bonds were purchased on the open market at

an amount less than their face value.  Upon the death of the joint account owner, the bonds could

be redeemed, or "put back" to the bond issuer at their full face value.

The problem with Dr. Kalotay's testimony is that it is not based upon actual data and/or

information that was gathered from the various bond issuers.  It is merely an estimate or a guess

as to what the bond issuers' alleged consequential "losses" were.  Dr. Kalotay admits that he

---

[13]Dr. Kalotay appears to be an inventor who has patented his valuation calculator.  While he describes the steps that he goes through in determining his valuation, he does not actually provide the backup calculations that support his final opinion.

[14]Loss is also not an element of money laundering, identity theft, aggravated identity theft or witness tampering.

does not know the bond issuers' financial information that might allow him to calculate their actual consequential "losses".  As a result, Dr. Kalotay must resort to making <u>assumptions</u> in order to <u>estimate</u> the value of the various bonds, not to determine an actual "loss" to an issuer.[15]

The net effect of Dr. Kalotay's testimony is that it will lead to unnecessary confusion for the jury.  Mr. Caramadre contends that these fundamental flaws in Dr. Kalotay's opinion make his testimony not only unreliable, but highly prejudicial as the jury will be given estimates, guesses and speculation that will have the imprimatur of an expert witness.  This is particularly true given the amounts at issue and the simple fact that these consequential "losses" are not an element of any offense in this case.  Accordingly, Dr. Kalotay's testimony should be prohibited as being overly prejudicial.

        c.     <u>The summaries offered by the government are incomplete</u>.

The government's proposed summaries are unfairly prejudicial because they are incomplete.  The variable annuity summary does not indicate how the "loss" or "gain" columns were calculated and does not list payments made on the annuities or the market value of the accounts at the time the payments were made.[16]  To the defenses' knowledge, the "loss" and "gain" figures found on the government's annuity summary are only mathematical calculations performed by a government employee.  The government's bond summary is also flawed as it

---

[15] It is important to note that the bond issuers are apparently not cooperating with the government or Dr. Kalotay as it appears from Dr. Kalotay's report that no bond issuer has provided him with actual data on the alleged consequential costs that might enable Dr. Kalotay to make an actual calculation of "loss".  Dr. Kalotay's opinions are even more questionable given this utter lack of cooperation by the bond issuers.

[16] The underlying annuity transactions are fairly straightforward.  A premium amount was paid by the investor, which amount is shown on the government's summary.  The premium was then invested in various financial vehicles during the term of the annuity.  When a measuring life passed away the policy owner was entitled to a death benefit that was generally the greater of (i) the account value at the time of death, or (ii) a payment equal to the original premium paid, plus other contractual extras.  Additionally, the insurance company would pay a commission to its agent at the time the annuity was opened.  In addition to the commissions and fees reflected on the government's summary, to calculate "loss" or "gain", to either the insurance company or the defendants, one also needs to know the market value of the account at the time the death claim was submitted to the insurance company and the amount paid out by the insurance company.  Neither is shown on the government's summary.

merely lists the "total gain/loss on bonds" and the "total gain less fees/adj". There is no explanation of these columns, or any way to determine their method of calculation. Moreover, the bond summary does not appear to take into consideration the borrowing costs incurred by the investor, which leads to artificially larger "gains".

The summaries are unfairly prejudicial because the jury is being presented with an incomplete picture of the basic facts underlying these transactions. They are, instead, merely presented with columns of alleged "losses" and "gains" without any linkage to the underlying accounts. For these reasons the bond and annuity account summaries proffered by the government should not be allowed into evidence or presented to the jury.

      d.     The summaries offered by the government are prejudicial.

In addition to the specific flaws discussed above, the government's summaries are facially unfairly prejudicial to the defendant. Throughout the summaries the government characterizes various calculations as "losses" and "gains". The use of these terms, in and of themselves, is unfairly prejudicial to the defendants as it presupposes that the payments involved were somehow improper.[17] See United States v. Milkiewicz, 470 F.3d 390, 398 fn. 16 (1st Cir. 2006) where it was noted that the trial court required the government to change its proposed summaries to eliminate headings "Profit by Margin" and "Profit by Shortage" and replace them with "Price Difference" and "Quantity Difference". To the extent the court allows the

---

[17]It is unclear whether the government is offering these summaries under Rule 1006, Rule 611(a) or under Rule 703. If offered under Rule 1006, the underlying documents which are being summarized must be too voluminous to readily review in court and they must be facially neutral (i.e., non-argumentative). See United States v. Milkiewicz, 470 F.3d 390, 397-398 (1st Cir. 2006). To be admissible under Rule 1006 the summary must accurately summarize admissible evidence, although the evidence need not be admitted, and it must be neutral and non-prejudicial. Id. Summaries admitted under Rule 1006 are considered substantive evidence and are submitted to the jury. On the other hand, summaries admitted under Rule 611(a) are pedagogical aids that may only summarize admitted evidence, may be less neutral, but they are not substantive evidence and they are not, absent agreement of the parties, submitted to the jury. Id. The same applies to summaries of expert witness evidence, which are admitted under Rule 703. Id.

government to use summaries in this case, it should be required to make the summaries neutral so as to avoid unfair prejudice to the defendant.

The government is also intending to use two other summaries entitled "Amount Paid vs. Amount Earned by Terminally-Ill Individual" and "Total Amounts Given to Terminally Ill vs. Profits Made". These two summaries are wholly inappropriate and unfairly prejudicial and are not designed to aid the jury in its determination of the issues in this case. The information contained in these summaries is not relevant or material to any issue in this case. The government's indictment is premised upon the allegation that the defendants made material misrepresentations to the terminally ill individuals, either by commission or omission. A comparison between the amounts paid to the terminally ill and the alleged profits to the investor does not tend to prove or disprove whether the terminally ill individual gave informed consent to the use of their identifying information. Surely the government is not suggesting that had the terminally ill been paid more there would be no crime? Instead, these summaries are solely designed to inflame the passions of the jury by playing to their sympathies for the terminally-ill individuals. For these reasons these summaries should be excluded.

Moreover, the summaries do not accurately reflect the "loss" attributable to the annuity transactions. It appears that the government is contending that the difference between the market value of an account and the amount paid by the insurance company to the investor is a "loss" attributable to the transaction and that this "loss" is attributable to the defendant. Mr. Caramadre objects to this assertion by the government because it fails to take into consideration that the market value in the account was not due to Mr. Caramadre, but was due to market forces over which Mr. Caramadre had no control. Attributing these "losses" to Mr. Caramadre is unfairly prejudicial as he is not the cause of the "loss". In fact, had the market not crashed in 2008, and

all of the government's loss figures shown on its summary were actually net gains to the

insurance companies, there would likely be no criminal case.

Finally, the aggregation of all of the accounts into summaries is unfairly prejudicial to the

defendant and they significantly outweigh any probative value that they may have.  By

summarizing all of the accounts and creating totals that exceed $125,000,000 the government is

creating unfair prejudice based upon the dollar value of the transactions and the economic status

of Mr. Caramadre.  While there is no question that the jury will hear evidence concerning these

transactions, it is completely unnecessary for the government to aggregate all of the transactions

together as they have done in its proposed summaries.

The amounts of the "losses" and/or "gains" is not material to whether or not the

defendant committed the crimes for which he is charged.  While the "losses" and/or "gains" may

be relevant to motive or intent, aggregation is not required, particularly when it will be unfairly

prejudicial.  Accordingly, the government should not be allowed to use the summaries or to

present evidence of the aggregate values of the transactions.

3.      The Forgery Allegations.

The Indictment charges that the defendants committed 5 counts of Aggravated Identity

Theft (Counts 60-64).  Although Paragraphs 175-179 allege that the signatures of the terminally-

ill joint bond account holders were forged, there is no allegation that the forgeries were made by

either of the defendants.  However, in the paragraph related to the scheme to defraud, the

government specifically alleges that the defendants forged the signatures of identified terminally-

ill individuals on various documents.[18]  Indictment, at ¶90.  The government has provided in

---

[18]This allegation is not transferred to the following paragraphs, in which the statements are that the defendants filed
or submitted brokerage applications which contained the forged signatures of these individuals.  See, Indictment, at
¶¶92, 93, 96, 98 and 99.  More specifically, the Indictment alleges that both defendants caused the signature of
Bertha Howard to be forged five times on an application for an Ameritrade brokerage account (Indictment, at ¶92);

discovery no expert or scientific evidence which it intends to introduce on the issue of these "forgeries" and the defense therefore presumes there is none.  Under these circumstances, it is inappropriate for any reference to "forgeries" to be made before the jury, or for any documentary evidence to be introduced with the suggestion that the signatures thereon are forgeries.  To the extent that the government intends to introduce testimony from family members of these terminally-ill individuals that the handwriting in those signatures does not appear to be that of the terminally-ill persons, such evidence should not be allowed because it unfairly creates an inference that the signatures were forged by or at the direction of the defendants.[19]  Clearly this is different than circumstances where a lay witness who is familiar with a signer's handwriting (such as a family member) is allowed to testify that a signature is in fact that of the signer.  See, United States v. Scott, 270 F.3d 30, 48 (1st Cir. 2001)

     4.     Continuing Objections and Limiting Instructions.

Another concern of the defendant is that the Indictment charges a wire/mail fraud scheme to defraud which is alleged to commence in or about 1995 and continue through 2010. Curiously, the Indictment alleges, in the description of the scheme to defraud, that the scheme began, at the latest, in 1995, and that it was devised by both Mr. Caramadre and Mr. Radhakrishnan.  This is, of course, impossible, since Mr. Radhakrishnan was in elementary or junior high school in 1995.  However, the lone conspiracy count (Count 33 [Indictment, at pp.

---

that both defendants submitted an application to Ameritrade which contained forgeries of Dennis Flori's signature (Indictment, at ¶93); that both defendants submitted an application to Ameritrade which contained forgeries of Sonia Gonzalez' signature (Indictment, at ¶96); that both defendants submitted an application to Ameritrade which contained forgeries of John Kivalos' signature (Indictment, at ¶98); and that both defendants caused the signature of Pia Bernardo to be forged five times on an application for an Ameritrade brokerage account (Indictment, at ¶99).

[19]Unlike some check forgery prosecutions, where the evidence may consist of expert testimony that a defendant "probably" forged a check and there is other direct or circumstantial evidence from which a jury may conclude, together with the expert testimony, that a defendant actually forged a check, here the only evidence (of which the defendant is aware) that the government will offer on the signatures is that family members of the purported signer will testify that the signature at issue "does not look like" that of the signer.  Compare, e.g., United States v. Rosario, 118 F.3d 160 (3d Cir. 1997).

58-59]), which charges a conspiracy to commit those very mail and wire fraud offenses, is expressly limited to the period from July of 2007 through August of 2010—the period of time during which Mr. Radhakrishnan was employed by Mr. Caramadre. Clearly, there is a great deal of evidence which the government intends to introduce at trial related to a period of time during which Mr. Radhakrishnan was not in any way associated with Mr. Caramadre, the financial services industry, any of the insurance companies or brokerage houses, or with any of the measuring lives or their families.[20]

The Indictment attempts to be consistent with this rationale in that it incorporates by reference into the conspiracy count, as objects and overt acts, only those events from the scheme to defraud which are alleged to have occurred during the period from 2007 to 2010. See, Indictment, at ¶¶169, 170, and 171.[21] The government could have charged a conspiracy which began in or about 1995, and tried the case on the theory that Mr. Radhakrishnan joined that conspiracy in 2007, but it chose not to do so. It also could have brought the case as a RICO conspiracy (the scheme to defraud is practically drafted that way already), and could thereby have included events as far back as 1995, but it chose not to do that either. Instead, it has expressly limited the period of time for which it must prove a specific criminal agreement between these two defendants, and charged a particular conspiracy which is alleged not to have begun until July 2007 (and therefore a different conspiracy than the one which [according to the scheme to defraud] embraced Mr. Caramadre's conduct [presumably with Mr. Maggiacomo and

_____

[20]This circumstance was, at least in part, the basis for Mr. Radhakrishnan's motion to sever, previously denied by the court. Although counsel for Mr. Caramadre do not represent and are not advising Mr. Radhakrishnan, we anticipate that he will be moving the court for appropriate limiting instructions concerning this very same evidence for the reasons stated above, and will likely be renewing his severance motion as this evidence is admitted, with or without limitations.

[21]Moreover, all 26 of the substantive wire fraud counts (Counts 1-26), as well as all 6 of the substantive mail fraud counts (Counts 27-32), are events which are alleged to have occurred within the temporal parameters of the charged conspiracy.

Mr. Hanrahan]), prior to Mr. Radhakrishnan's employment by Estate Planning Resources.  Mr.

Caramadre believes that, under these circumstances, although the evidence of the scheme to

defraud may be relevant and admissible with respect to the mail and wire fraud counts, to the

extent that it includes what occurred prior to 2007, it should not be admissible on the conspiracy

count, and requests that the court allow him a standing objection as to the conspiracy count to all

evidence of events or transactions which preceded the time period of the conspiracy as charged.

Furthermore, the jury should be instructed that in considering the evidence and in making

their determination as to the conspiracy charged in the indictment, they may not consider any

evidence of what occurred prior to 2007.  As a practical matter, the defense believes that it will

be impossible for the jury to follow these instructions.  Alternatively, in order to avoid this issue

altogether, the court (or the government) might consider dismissing Count 33.[22]

Respectfully submitted,
JOSEPH CARAMADRE
By and through his Attorneys,
/s/ *Anthony M. Traini*
Anthony M. Traini (#4793)
56 Pine Street, Suite 200
Providence, RI 02903-2819
Tel: (401) 621-4700
Fax: (401) 621-5888
Email: amt@trainilaw.com

/s/ *Michael J. Lepizzera, Jr.*
Michael J. Lepizzera, Jr. (#4995)
LEPIZZERA & LAPROCINA, LTD.
117 Metro Center Boulevard, Suite 2001
Warwick, Rhode Island 02886
Tel. (401) 739-7397
Fax (401) 691-3558
Email:  mlepizzera@leplap.com

---

[22]The defendant does not have a sufficient basis upon which to move to dismiss the conspiracy count.  The law is well-settled that conspiracy is a separate crime and is not duplicative of its charged object offenses.  There seems to be little negative impact on the government by proceeding without the conspiracy count.

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 12, 2012, a copy of the foregoing Defendant Joseph Caramadre's Initial Pretrial Memorandum was filed electronically the ECF system and served electronically on counsel for all parties.

*/s/ Anthony M. Traini*
Anthony M. Traini

# Exhibit A

## (redacted)

# Exhibit B

## (redacted)