UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | Criminal No. 11-186-S |
| v. | ) | |
| | ) | |
| JOSEPH CARAMADRE | ) | |
| and | ) | |
| RAYMOUR RADHAKRISHNAN | ) | |
| | ) | |
| Defendants. | ) | |

## GOVERNMENT'S PRETRIAL MEMORANDUM

The United States of America, by and through its undersigned attorneys, submits this pretrial memorandum in order to inform the Court of the nature of the case and to identify certain legal and factual issues which may arise at trial. Where relevant, the government has incorporated its response to issues raised by Defendant Joseph Caramadre in his Pretrial Memorandum.

## I. Summary of the Indictment

The Indictment alleges that Joseph Caramadre ("Caramadre"), later joined by Raymour Radhakrishnan ("Radhakrishnan"), devised and executed a scheme, and conspired to do so, to obtain money from insurance companies and corporate bond issuers by making material misrepresentations and omissions to various parties.

1

These parties include: (1) terminally ill people and their family members, in order to obtain their identity information for use in furtherance of the scheme; (2) various intermediaries including retail brokerage houses and registered broker dealer firms; and (3) the insurance companies themselves.

The Indictment further alleges that Caramadre and Radhakrishnan used the identity information of terminally ill people in furtherance of the scheme, without their consent. The Indictment also alleges that the defendants engaged in a financial transaction over $10,000 using the proceeds of the fraud. Caramadre is also charged with one count of witness tampering.

Caramadre is a licensed attorney and certified public accountant. Caramadre specializes in insurance products and was a licensed insurance producer from the early 1990s until approximately 2003. Caramadre operated through an entity called Estate Planning Resources ("EPR"). Radhakrishnan was an employee of EPR hired by Caramadre in 2007.

The indictment alleges that the defendants executed a fraudulent scheme to exploit death benefits available on two types of financial products: variable annuities and "death-put" bonds.

The Indictment alleges that Caramadre and Radhakrishnan obtained the identity information of a number of terminally ill people by deceiving them and their families, through misrepresentations and material omissions.  These misrepresentations took various forms.  The Indictment alleges that as early as 1994, Caramadre used terminally ill individuals as annuitants without their consent. In the fall of 2007, Caramadre and Radhakrishnan placed an advertisement in the *Rhode Island Catholic* newspaper, offering a $2,000 gift to terminally ill people.  The Indictment alleges that when Radhakrishnan met with respondents to the ad, he made numerous misrepresentations and material omissions regarding the investment program in order to induce them to provide their identity information and execute investment documents.

In addition, the Indictment alleges that Caramadre and Radhakrishnan made numerous misrepresentations to broker-dealers, brokerage houses, and insurance companies in order to execute their scheme.  These include false information regarding the terminally ill people's finances, investment backgrounds and contact information.  The indictment also alleges the defendants lied to the companies about the relationship between themselves and the terminally ill people.  In addition, the indictment alleges Caramadre used Radhakrishnan and others as nominees or

3

straws, investing in their names in order to conceal from the companies his actual interest.

To establish the misrepresentations, the government will play the depositions of several terminally ill people and call numerous family members and social workers or nurses who were present when Radhakrishnan explained the program, as well as representatives from various companies who had direct interactions with Caramadre and/or Radhakrishnan.

## II.   Breakdown of Specific Counts in the Indictment

The Indictment contains sixty-six counts. Caramadre is charged in all sixty-six counts.  Radhakrishnan is charged in sixty-one of the counts. They break down as follows:

- Counts 1-26 -- Both defendants are charged with twenty-six (26) counts of wire fraud; that is, causing material to be sent in interstate commerce by means of wire communication in furtherance of the fraud scheme.

- Counts 27-32 -- Caramadre is also charged with six (6) counts of mail fraud; that is, causing the mails to be used in furtherance of the fraud scheme.  Radhakrishnan is charged with in three (3) of those same counts of mail fraud. (Counts 28, 29 and 31).

- Count 33 -- Both of the defendants are charged with one (1) count of Conspiracy to commit offenses against the United States, (to wit: mail fraud, wire fraud, identity theft and aggravated identity theft)

- Counts 34-59 -- Caramadre is charged with twenty-six (26) counts of identity theft.  Radhakrishnan is charged in 25 of those same counts (Counts 35-59).

- Counts 60-64 -- Both Caramadre and Radhakrishnan are each charged with five (5) counts of aggravated identity theft.

- Count 65 -- Both defendants are also charged with one (1) count of engaging in a monetary transaction derived from specified unlawful activity, commonly referred to as "money laundering."

- Count 66 -- Caramadre is also charged with one count of witness tampering.  (Radhakrishnan is not charged with witness tampering).

- The indictment also contains forfeiture allegations which allege that certain assets derive proceeds traceable to the fraud scheme.

## III. <u>Legal Issues</u>

### A. <u>Evidence of Loss</u>

In Caramadre's Pretrial Memorandum, he argues that the Government should be prohibited from introducing evidence concerning the amount of loss incurred by the companies he is alleged to have defrauded.  (Def. Mem. at 2-11).  Caramadre offers a number of arguments as to why this evidence should be kept from the jury.  For the reasons discussed below, none of these arguments have merit.

The First Circuit has observed that "Courts have held repeatedly that loss is relevant in fraud cases to demonstrate a defendant's knowledge or intent to commit fraud. <u>United States v. Munoz-Franco</u>, 487 F.3d 25, 62 (1st. Cir 2007).  "While technically the success or failure of a scheme to defraud is

5

irrelevant in a mail fraud case, realistically, when the contested issue is intent, whether or not victims lost money can be a substantial factor in a jury's determination of guilt or innocence." Id., quoting United States v. Heimann, 705 F.2d 662, 669 (2d Cir. 1983). Thus, while "an ultimate purpose of either causing some financial loss to another or bringing about some financial gain to oneself is not the essence of fraudulent intent," United States v. Kenrick, 221 F.3d 19, 29 (1st Cir. 2000) (citation and internal quotation marks omitted), the knowledge that one's actions are, in fact, bringing about such losses may demonstrate one's intent to commit fraud." Munoz-Franco, 487 F.3d at 62 (1st. Cir 2007).

As an initial matter, the amount of loss in this case is directly relevant to the defendants' fraudulent intent and motive: greed.  Since a person can only die once, the key to Caramadre's scheme was a steady supply of terminally ill people. This need for more and more terminally ill people led directly to Caramadre's placing of the misleading advertisement in the *Rhode Island Catholic*.  It also helps explain to the jury why Radhakrishnan left out important details when explaining the program to terminally ill people and their families: the more they understood about what Caramadre and Radhakrishnan were doing, the more likely they were to refuse to participate.

6

Rather than make less money by dealing honestly with the terminally ill, the defendants chose to make misrepresentations.

Evidence of the amount of losses in this case is also material because the defendants have regularly maintained that the companies involved did not suffer any "losses" attributable to the defendants outside of market forces that were beyond the defendants' control. (See Def Mem. at 10.)   The government will show that this argument is simply wrong, as the whole point of Caramadre's strategy with respect to variable annuities was to shift the risk of investment away from himself (and his clients) onto the insurance company.   Caramadre intentionally selected high-risk funds, and advised his clients to do so, knowing that any losses would be borne by the companies involved.   In addition, some of the loss sustained by the companies included direct costs such as bonuses and commissions, which were churned by reinvesting the same principal each time an annuitant died.   In short, the amount of loss suffered by the companies and how that loss took place is directly probative of the defendants' motive and course of conduct in this case.

## 1. **The Alternative Fines Act**

Caramadre suggests that evidence of loss implicates the recent Supreme Court case of Southern Union Company v. United States, 132 S. Ct. 2344 (2012).  In Southern Union, the Supreme

Court held that the rule of Apprendi applies to criminal fines and that the amount of a criminal fine "beyond the statutory maximum must be submitted to a jury and proved beyond a reasonable doubt." Id. at 2350, quoting Apprendi v. New Jersey, 530 U.S. 466, 120 S. Ct. 2348 (2000). In this case, Caramadre is charged with 60 felony counts that contain fines, each of which contains a maximum statutory fine of $250,000, making the total maximum statutory fine equal to $15 million. The applicable statutes, however, also contain alternative fine provisions, which allow for a fine equal to twice the gain or loss derived from the criminal activity. As the total loss in this case is approximately $45 million, the alternative fine provisions could, in theory, come into play.

The United States agrees with Caramadre that the Southern Union holding would apply to this case if the Government were to seek alternative fines beyond the $15 million statutory maximum. If that were the case, the jury would need to determine the amount of loss as that would be a question of fact that could increase the maximum statutory fines applicable. However, to alleviate any concerns under Southern Union, the United States is willing to agree that it will not pursue any alternative fines, thereby capping the maximum statutory fine at $15 million. By agreeing to forego the alternative fine provisions,

there is no question of fact concerning the amount of loss that would need to be decided by the jury as the fines could not exceed the otherwise proscribed statutory maximum penalties. Indeed, this solution was deemed appropriate by the Sanford court, cited by the defendant.  See Sanford – F.Supp 2nd --, 2012 WL2930770 at *7, f.n. 4 ("If, however, the government chooses not to pursue an alternative fine under 18 U.S.C. § 3571(d) . . . evidence of the [loss] figure would be admissible at trial for the purpose of proving motive.")

      If, however, the Court wishes to keep the alternative fine provision applicable, the solution could not be to prohibit the government from introducing evidence concerning the amount of loss.  Rather, the solution would be to provide the jury with a special verdict form in which the jury would determine the amount of loss.  Of course, if the jury is to be asked to make a finding concerning the amount of loss, the evidence of the losses sustained becomes even more relevant to the jury's deliberations.  The United States is agreeable to this proposed solution as well.  Under either scenario, there can be no question that the United States should be permitted to prove the amount of loss sustained in a fraud case.

2. **Calculation of Certain Fees Charged by the Insurance Companies Related to Variable Annuities**

One of the issues the United States seeks to prove at trial is the amount of loss incurred by the insurance companies as a result of the issuance of variable annuities in this case. Much of the data necessary to make this calculation is available in the business records of the companies that have been produced to the defense. The business records of the companies contain information concerning the amount invested, the amount paid out, the amount of commissions paid and other pertinent data necessary to determine the losses. A summary witness from the government is therefore able to use these business records to provide a quick summary of the losses incurred by each company on each annuity.

However, in providing an analysis of how much each insurance company lost on each annuity, it also will be necessary to demonstrate how much each insurance company gained in fees received on each annuity. Indeed, the defense has made clear that part of its strategy will be to argue that the insurance companies garnered significant fees. It will therefore be necessary to present the jury with accurate information concerning the amount of fees received by the companies in relation to the losses incurred. The evidentiary

10

problem arises, however, because the insurance companies do not keep, in the ordinary of their businesses, records concerning how much they receive in fees on any given annuity.  A small percentage of fees are deducted from the account value on a daily basis consistent with the terms of each annuity contract.

At the United States' request, each of the insurance companies (about 15) has gone back and performed calculations on an annuity by annuity basis of the amount of fees collected. This calculation required the companies to apply the fees specified in the contract to the amount invested and derive a close estimate of the amount of fees received.  As this information was not kept by the companies in the ordinary course of their business, it may be argued that it falls outside the rules prohibiting the admission of hearsay evidence.  Therefore, the defense may argue that the United States should be required to call actuaries from each of the companies to testify as to how they calculated the fees received on each annuity.  This testimony, in addition to being tedious, is likely to be lengthy, adding significant time to an already lengthy trial.

In an effort to significantly shorten the overall length of the trial, the United States has proposed to the defense that the Government be permitted to introduce a summary witness who will testify, among other things, as to the information provided

by each of the companies concerning the amount of fees received. By allowing this evidence to be admitted through a single summary witness, significant time can be saved in this trial. In addition, although this is not necessarily the concern of the defense, significant resources can be saved if the Government can avoid flying these insurance company employees into Rhode Island from throughout the country.  Given these concerns, we have sent a proposed stipulation to the defense (attached as Exhibit 1) in which the defendants agree that the fee information can be presented through a summary witness. The stipulation provides that by so agreeing, the defense by no means agrees with the testimony to be provided, only that the defendants have no objection to fee information being presented through a summary witness. To date, the defense has declined to agree to this proposed stipulation.

   3. **Expert Testimony on Amount of Loss Related to Bonds**

      Caramadre next argues that the Government should be prohibited from calling an expert witness to testify on the highly complicated subject matter of how much money was lost by the bond issuers as a result of the defendants' early redemption of "death put" bonds.

      During its case-in-chief, the United States intends to call Andrew Kalotay, Ph.D., as a finance and mathematics expert with

particular expertise in valuing death-put bonds.  The purpose of Dr. Kalotay's testimony is to provide an analysis of the amount of loss sustained by the issuers of corporate bonds as a result of this scheme.  Dr. Kalotay's expected testimony will focus on the loss incurred by the bond issuers as a result of having to redeem the Caramadre owned "death-put" bonds years prior to the maturity date of the bonds.

On April 27, 2012, the United States provided defendant with notice under Rule 16 of the Federal Rules of Criminal Procedure that it intended on calling Dr. Kalotay as an expert witness to testify as to the losses incurred by the bond issuers. On July 23, 2012, the United States disclosed to the defense an advanced draft of Dr. Kalotay's expert report. Moreover, on August 6, 2012, at the request of defense counsel, the United States disclosed to the defense the back-up materials utilized by Dr. Kalotay in arriving at his conclusions.

Under F.R.E. 702, an expert's testimony may be admitted if it is shown that: (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.  If the expert's testimony rests upon good grounds, based on what is known, it should be tested by the adversary process---competing

expert testimony and active cross-examination---rather than excluded from jurors' scrutiny for fear that they will not grasp its complexities or satisfactorily weigh its inadequacies. Carlucci v. CNH America LLC, 2012 WL 4094347 at *3 (D. Mass. 2012).  Once the trial court determines the expert's opinion meets the threshold of reliability in methodology and validity in reasoning, the expert should be permitted to testify as to inferences and conclusions he draws for the finder of fact to afford the opinion such weight as it chooses. United States v. Mooney, 315 F.3d 54, 63 (1st Cir. 2003).

Dr. Kalotay's curriculum vitae (attached hereto as Exhibit 2) reflects that he is a leading authority on the valuation of municipal, agency and corporate bonds and is a renowned expert on the practice of debt management.  Dr. Kalotay received his Ph.D. in Mathematics from the University of Toronto in 1968 and served as a Professor of Finance at various times at the Polytechnic Institute, Fordham University, Columbia University and the Wharton School of the University of Pennsylvania.  He has spent the bulk of his career specializing in debt management and bonds.  He is the author of numerous articles concerning municipal and corporate bonds.  In the last decade, much of Dr. Kalotay's work has been focused on corporate bonds with "death-put" provisions.  Indeed, in 2006, he published an article on

death-put bonds entitled: "Some Bonds Are Worth More Dead Than Alive."  Dr. Kalotay has assisted entities in issuing bonds with death-put provisions and has served as an expert witness on bond related issues on a number of occasions.  Dr. Kalotay's expertise in valuing death-put bonds is perhaps best reflected by the fact that in September 2010 he acquired a United States patent entitled: "Method And A System For Valuing And Analyzing Bonds With Estate Put Features."  (A copy of Dr. Kalotay's patent is attached as Exhibit 3).  In short, there can be no doubt that Dr. Kalotay is one of the world's leading experts on the subject of valuing death-put bonds.

The United States is calling Dr. Kalotay because his expertise will help the jury to understand a fact in issue, i.e., the losses sustained by the bond issuers.  (See Federal Rule of Evidence 702.)  As Dr. Kalotay will testify, the calculation of the loss incurred on each of the hundreds of death-put bonds purchased by Caramadre is highly complex as factors that must be considered include the maturity date, the date of redemption, the issuer's borrowing cost, the volatility of interest rates and the value of embedded call options.  Dr. Kalotay spent a significant amount of time reviewing each of the hundreds of transactions in which Caramadre purchased and redeemed death-put bonds.  Using his expertise, Dr. Kalotay

15

considered all of the above factors and calculated the loss incurred by each issuer on each bond that Caramadre redeemed prior to the maturity date of the bonds.

The analysis conducted by Dr. Kalotay is a product of his years of education and expertise.  It is extremely complex in nature as it takes into account a wide variety of economic factors, including each company's borrowing rate at a certain point in time.  His expert opinion is necessary to assist the jury in determining whether the defendant's conduct caused financial losses to the companies involved.

Defendant argues that Dr. Kalotay's testimony should be barred because it is "confusing" and based merely on "estimates." While the United States disagrees with these assertions, the defendants are free to cross-examine Dr. Kalotay on how he arrived at his conclusions and any assumptions that he made in his analysis.  They cannot, however, seek to preclude his testimony merely because they do not agree with the conclusions he reached.

Finally, Caramadre argues that Dr. Kalotay's testimony is prejudicial as it will reveal that the bond issuers suffered significant losses.  As argued above (supra at 5-6), evidence concerning the amount of loss in a fraud case is highly relevant to defendant's motive and intent to commit the crimes alleged.

16

4. **Use of Summaries**

In another effort to prevent the Government from proving to the jury the amount of loss sustained, Caramadre takes issue with the Government's use of summary charts.  As is common in complex white-collar cases, the United States intends on calling a summary witness who will testify as to the amount of profits made by the defendants and the amount of losses sustained by the companies involved.  This summary is based on a review of voluminous business records provided by the companies. As the Court is aware, Federal Rule of Evidence 1006 specifically provides for the admission of summary charts "to prove the content of voluminous writings, recordings or photographs that cannot be conveniently examined in court."  Such is the case here, as the financial summaries in this case were derived from an examination of tens of thousands of pages of documents.

Federal Rule of Evidence 1006 provides, in pertinent part:

> The contents of voluminous writings ... which cannot conveniently be examined in court may be presented in the form of a chart, summary, or calculation. The originals or duplicates shall be made available for examination or copying, or both, by [the other party].

As long as summary or charts meet the following requirements, they are admissible:

17

1) the underlying documents must be
   admissible, even if they are never
   admitted;

2) the underlying documents must be too
   voluminous for convenient in-court review;

3) the charts must accurately summarize the
   underlying documents;

4) the summary charts and the underlying
   documents must have been made available at
   a reasonable time and place for inspection
   by the opposing side; and

5) the person who prepared the charts must
   have been made available for cross
   examination.

See e.g., United States v. Milkiwiecz, 470 F.3d 390 (1st Cir., 2006);

Air Safety Inc. v. Roman Catholic Archdiocese of Boston, 94 F. 3d 1

(1st Cir. 1996), United States v. Bertoli, 854 F.Supp. 975, 1051

(D.N.J. 1994).

Caramadre next argues that the proposed summaries are incomplete

because they do not contain every mathematical variable that was

considered in making the necessary calculations.  That is precisely why

the documents are summary charts, so that they can provide the jury

with a summary of the documents provided rather than a detailed

accounting of every mathematical variable that was utilized.  The

Government will ask the summary witness to testify in detail as to how

he arrived at the conclusions presented in the summary charts.  If the

defendants believe these conclusions are incorrect, they, of course, will have an opportunity to cross-examine the summary witness.

Defendant next argues that the Government should be prohibited from using the terms "losses" and "gains" in its summary charts, arguing that these terms are too prejudicial.  While defendants are free to make any argument they wish as to the reasons why the companies lost the money they did (including blaming the companies for failing to close a loophole), they cannot dispute the math involved.  That math will show quite clearly that the companies lost millions of dollars and that the defendants simultaneously gained millions of dollars.  There is nothing prejudicial about the word "loss" as it accurately depicts the undeniable fact that the companies involved lost money.

Finally, Caramadre argues that the Government should be prohibited from introducing summaries comparing the amount of money provided to the terminally-ill individuals with the amount of profits made by the defendants.  These summaries are highly probative as they go directly to the intent and motive of the defendants, that is to provide relatively small sums of money to terminal individuals for the purpose of making substantial profits off of their deaths.  The comparison of the amounts provided to the terminally ill with the amounts earned by the defendants is also highly probative of what, if anything, was told to the terminally-ill individuals concerning the potential profits that could be made when they died.  A critical issue in this case will be

whether the terminally-ill individuals were informed that substantial profits could be made by Caramadre and others.   Information concerning the amount that was made on each account is therefore highly probative.

## B. **Testimony of Edwin Rodrigues**

On October 5, 2009, the United States took the deposition of Edwin Rodriguez ("Rodriguez") pursuant to the Court's order under Rule 15 of the Federal Rules of Criminal Procedure.   Rodriguez is partially paralyzed and suffers from a condition called osteomyelitis, a disorder in which his bones are slowly deteriorating.   During his deposition, Rodriguez testified that in 2007, doctors advised him that he had between six months and three years to live.

Miraculously, Rodriguez is still alive as of the date of this Memorandum and has expressed a willingness to testify at trial. However, he remains in serious medical condition as complications from his illness continue to arise.   In September 2012, he underwent 14 hours of surgery and was placed in a rehabilitation center thereafter. This was one of numerous surgeries that Rodriguez has had to endure in the last few years.   Within the last few weeks, in October, 2012, Rodriguez fell from his bed, broke his femur bone, and was hospitalized.   In short, it is unknown at this time whether Rodriguez will be physically able to provide live testimony during the trial.   If he is so able, accommodations will need to be made as Rodriguez is in a wheelchair as a result of his partial paralysis.   The United States may

also need to request from the Court that a witness be taken out of order to accommodate Rodriguez's availability and health status.

Although the United States hopes that Rodriguez is able to provide live testimony during the trial, the nature of his condition is unpredictable and may render him unable to do so.  If, after consulting with Mr. Rodriguez and/or his doctors, the United States believes that Rodriguez is unable to testify at trial or that testifying at trial could endanger his health, the United States will notify the Court and the defendants that the United States instead intends to introduce Rodriguez's deposition into evidence.  Rule 804(b)(1) provides that former testimony in which a similar motive for cross-examination existed is not hearsay "if the declarant is unavailable as a witness." As the Advisory Committee Note to this Rule indicates, both "death and infirmity find general recognition as grounds."  See Advisory Committee Note to Rule 804(b), citing McCormick on Evidence §§ 234, 257, 297. Therefore, if Rodriguez's illness prevents him from testifying, he will be an "unavailable" witness, rendering his prior testimony in this case admissible.  The United States will keep the Court and the defendants apprised of Rodriguez's condition.

C. **Forgery Allegations**

Caramadre also argues that the Government should be barred from introducing evidence that the defendants forged the signatures of some of the terminally-ill individuals.  (Def. Mem at 11-12).  Counts 60-64

of the Indictment charge the defendants with five counts of Aggravated Identity Theft based in part on their submission of application forms that contained forgeries of terminally-ill individuals.  In a case involving allegations of identity theft and aggravated identity theft, it is difficult to conceive of evidence more probative than the forgery of signatures.  Defendant curiously argues that because the United States does not intend to introduce an expert handwriting witness, the government should be prohibited from asking witnesses if the signatures on the account opening documents are genuine.  This argument is spurious as the evidence of the family members (and, in some instances, the deponents) that the signatures are forgeries is highly probative of a critical issue in this case - whether the defendants used the identity information of terminally-ill individuals (including their names and signatures) without their consent.  The law is clear that lay witnesses may testify as to their opinion regarding someone's handwriting if the testimony meets the strictures of F.R.E 701 and F.R.E 901(b)(2) and have a familiarity with the handwriting which has not been acquired solely for purposes of the litigation at hand. United States v. Scott, 270 F.3d 30, 49 (1st Cir. 2001).

   D. **Preclusion of Evidence of Specific Acts of Conduct**

      The Government intends to call as a witness James Lamonte. Lamonte is Caramadre's brother-in-law.  In 2004 and 2005, Caramadre used Lamonte's father-in-law, Alfred Lamonte, as an annuitant on a

number of variable annuities.  Lamonte will testify regarding representations Caramadre made in order to obtain Alfred Lamonte's signature and identity information.  During that period, James Lamonte was a principal in a firearm storage business located in North Attleboro, Massachusetts.  In connection with operating this business, in December 2005 James Lamonte was charged with three state firearms violations, all of which were ultimately dismissed.  Specifically, Lamonte was charged with failure to report a lost or stolen firearm; that charge was continued without a finding, then dismissed on April 17, 2007.  LaMonte was also charged with possession of a sawed off shotgun and possession of a firearm with an obliterated or defaced serial number; those charges were both dismissed on May 16, 2006.

Since none of the charges resulted in a conviction, they are not admissible under Federal Rule of Evidence 609.

F.R.E. 608(b) states in pertinent part that:

> Except for a criminal conviction under Rule 609, extrinsic evidence is not admissible to prove specific instances of a witness's conduct in order to attack or support the witness's character for truthfulness. But the court may, on cross-examination, allow them to be inquired into if they are probative of the character for truthfulness or untruthfulness of:
>
> (1) the witness; or
>
> (2) another witness whose character the witness being cross-examined has testified about.

"Rule 608(b) only permits inquiry into prior conduct if the conduct is probable of the witness's character for truthfulness or untruthfulness." <u>United States v. Bunchan</u>, 580 F.3d 66 at 71 (1st Cir. 2009).  "So long as the trial court affords the defendant a fair opportunity for effective cross-examination, it may impose reasonable restrictions based on concerns such as undue prejudice, confusion of the issues, witness badgering, redundancy, or questioning that appears to be of marginal relevance. The trial court's latitude in shaping such restrictions is wide." <u>United States v. Molina</u>, 407 F.3d 511, 523 (1st Cir. 2005); <u>United States v. Rivera-Rodriguez</u>, 617 F.3d 581 at 591-592 (1st Cir. 2010)(same).  The charges are not probative of the Lamonte's character for truthfulness; they are firearms charges related to the failure to comply with regulatory requirements in the operation of a firearms storage business.  Accordingly, the defendants should be precluded from cross-examining Lamonte regarding these charges.

In addition, Caramadre represented Lamonte as his attorney in the dissolution of Lamonte's interest in the firearms business. Accordingly, Caramadre and Lamonte had an attorney-client relationship. Caramadre therefore should not cross examine Lamonte regarding privileged information he learned in the context of the attorney-client relationship.

E. **Use of Transcripts As Jury Aid**

The United States intends on introducing into evidence approximately eighteen recordings made by the insurance companies and brokerage houses.  These recordings were made in the ordinary course of the business operations of the respective companies.  These recordings consist of conversations between company representatives and Caramadre, Radhakrishnan and co-conspirator Edward Maggiacomo, Jr.  The United States has provided transcripts of the recordings it intends to introduce at trial to the defense and the Court.

During trial, the United States intends to introduce both the recordings and the transcripts into evidence.  The United States will seek to introduce a binder containing all of the transcripts into evidence so that the jury can have a copy of the transcripts during its deliberations.  See United States Rengifo, 789 F.2d 975, 983 (1st Cir. 1986).  However, as the recordings are being played during trial, the United States will not request that copies of the transcripts be provided to the jury.  Rather, to aid the jury, the United States intends to synchronize the recordings with the transcripts that will appear on the screens in front of each juror.

25

## CONCLUSION

The foregoing is a summary of points the government anticipates may arise at trial.  Should additional legal issues arise that have not been addressed in this memorandum, the government respectfully requests leave to file a supplemental memorandum of law.


Respectfully submitted,


PETER F. NERONHA
UNITED STATES ATTORNEY

/s/ John P. McAdams
JOHN P. McADAMS
Assistant U.S. Attorney

LEE H. VILKER
Assistant U.S. Attorney

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 18th day of October, 2012, I caused the within *Government's Pretrial Memorandum* to be served via the Court's Electronic Filing System on:

For Joseph Caramadre:
Michael J. Lepizzera, Esq.
Anthony M. Traini, Esq.

For Raymour Radhakrishnan:
Raymour Radhakrishnan, *Pro Se*
Olin Thompson, Esq., Standby Counsel

<u>/s/John P. McAdams</u>
John P. McAdams
Assistant U.S. Attorney
United States Attorney's Office
50 Kennedy Plaza, 8th Floor
Providence, RI 02903
John.p.mcadams@usdoj.gov