**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | ) |
| | ) **Criminal No. 11-186-S** |
| **v.** | ) |
| | ) |
| **JOSEPH CARAMADRE** | ) |
| | ) |
| **and** | ) |
| | ) |
| **RAYMOUR RADHAKRISHNAN** | ) |
| | ) |
| **Defendants.** | ) |

**GOVERNMENT'S RESPONSE IN OPPOSITION
TO DEFENDANT CARAMADRE'S MOTION TO PRECLUDE
THE EXPERT TESTIMONY OF ANDREW KALOTAY**

On November 8, 2012, defendant Joseph Caramadre
("Caramadre") filed a motion to preclude the expert testimony of
Andrew Kalotay, Ph.D., or, in the alternative, to hold a _Daubert_
hearing.  The United States has no objection to Caramadre's
request that a _Daubert_ hearing be held as it is confident that
the Court will determine that Dr. Kalotay is one of the
preeminent experts in the world on death-put bonds and that he
employed reliable methodology to determine the losses sustained
by the bond issuers in this case.  The United States strongly
objects to defendant's motion to preclude Dr. Kalotay's expert
testimony.

1

<u>Subject Matter of Dr. Kalotay's Expert Opinion</u>

The United States sought Dr. Kalotay's expertise to assist the jury in determining a fact relevant to the issues in this case, that is the amount of loss sustained by bond issuers as a result of defendant Caramadre's early redemption of bonds with survivorship clauses.  Based on a review of business records, it is clear that Caramadre and his associates made more than $12 million by purchasing bonds at discounted values and then redeeming them at full value shortly after the terminally-ill co-owners of the bonds had passed away.  What cannot be determined from a simple review of the account statements, however, is the amount of loss sustained by the bond issuers.

Caramadre has maintained, and indeed continues to maintain, that the bond issuers suffered no losses as a result of his early redemption of the bonds in this case.  <u>See</u> Caramadre Memorandum at 12 ("[T]he government should be precluded from introducing Dr. Kalotay's testimony, not only for all the reasons stated herein, but quite importantly because there is no loss.").  Apparently, Caramadre intends to argue to the jury that although he and his associates made more than $12 million in profits from the early redemption of these bonds, for some unknown magical reason, there was no loss incurred by any entity on the other side of the transaction.

It turns out that the calculation of the loss sustained by the bond issuers involves highly complicated mathematical analyses which are, in essence, aimed at determining the time value of money to the particular bond issuers.  By having to pay back the full value of the bonds years or decades earlier than they otherwise would have been required to do so, the bond issuers obviously sustained an economic loss.  A precise calculation of that loss, however, must consider the time value of money to each and every issuer based upon that particular issuer's borrowing costs.  Dr. Kalotay has performed these calculations using his expertise and determined that the loss sustained by the bond issuers to be roughly equivalent to the profits earned by Caramadre, i.e., more than $12 million.

ARGUMENT

Pursuant to Federal Rule of Evidence 702, an expert's testimony may be admitted if it is shown that: (1) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue, (2) the testimony is based upon sufficient facts or data, (3) the testimony is the product of reliable principles and methods, and (4) the witness has applied the principles and methods reliably to the facts of the case.  If the expert's testimony rests upon good grounds, based on what is known, it

3

should be tested by the adversary process---competing expert
testimony and active cross-examination---rather than excluded
from jurors' scrutiny for fear that they will not grasp its
complexities or satisfactorily weigh its inadequacies. Carlucci
v. CNH America LLC, 2012 WL 4094347 at *3 (D. Mass. 2012). Once
the trial court determines the expert's opinion meets the
threshold of reliability in methodology and validity in
reasoning, the expert should be permitted to testify as to
inferences and conclusions he draws for the finder of fact to
afford the opinion such weight as it chooses. United States v.
Mooney, 315 F.3d 54, 63 (1st Cir. 2003). Dr. Kalotay's proposed
expert testimony falls squarely within Fed. R. Evid. 702 and the
dictates of Daubert v. Merrell Dow Pharmaceuticals, 509 U.S. 579
(1993).

   A. Dr. Kalotay Has Technical and Specialized
      Knowledge of a Fact in Issue

   Dr. Kalotay is one of the world's preeminent experts on
the subject of death-put bonds. Indeed, Caramadre himself
appears to have relied on the expertise of Dr. Kalotay. An
article Dr. Kalotay wrote in 2006 concerning death-put bonds was
found in Caramadre's own hard-drive. (See Exhibit 1, "Some
Bonds Are Worth More Dead Than Alive.") Having himself relied

4

on Dr. Kalotay's expertise on death-put bonds, it is ironic that Caramadre now challenges Dr. Kalotay's expertise.

Dr. Kalotay's curriculum vitae (attached hereto as Exhibit 2) reflects that he is a leading authority on the valuation of municipal, agency and corporate bonds and is a renowned expert on the practice of debt management. Dr. Kalotay received his Ph.D. in Mathematics from the University of Toronto in 1968 and served as a Professor of Finance at various times at the Polytechnic University, Fordham University, Columbia University and the Wharton School of the University of Pennsylvania. Dr. Kalotay was the Director of the Financial Engineering program at the Graduate School of Polytechnic University (now part of New York University). He has spent the bulk of his career specializing in debt management and bonds. He is the author of numerous articles concerning municipal and corporate bonds. In the last decade, much of Dr. Kalotay's work has been focused on corporate bonds with "death-put" provisions. Indeed, in 2006, he published an article on death-put bonds entitled: "Some Bonds Are Worth More Dead Than Alive." In 2009, Dr. Kalotay published another article concerning death-put bonds entitled: "With Estate Puts, Beauty is in the Eye of the Beholder" (CFA Institute, August 2009). Dr. Kalotay has assisted entities in issuing bonds with death-put provisions and has served as an

5

expert witness on bond related issues on a number of occasions. Dr. Kalotay's expertise in valuing death-put bonds is perhaps best reflected by the fact that in September 2010 he acquired a United States patent entitled: "Method And A System For Valuing And Analyzing Bonds With Estate Put Features." (A copy of Dr. Kalotay's patent is attached as Exhibit 3.) In short, there can be no doubt that Dr. Kalotay is one of the world's leading experts on the subject of valuing death-put bonds.

The United States is calling Dr. Kalotay because his expertise will help the jury to understand a fact in issue, i.e., the losses sustained by the bond issuers. (See Federal Rule of Evidence 702.)  As Dr. Kalotay will testify, the calculation of the loss incurred on each of the hundreds of death-put bonds purchased by Caramadre is highly complex as factors that must be considered include the maturity date, the date of redemption, the issuer's borrowing cost, the volatility of interest rates and the value of embedded call options.  Dr. Kalotay spent a significant amount of time reviewing each of the hundreds of transactions in which Caramadre purchased and redeemed death-put bonds.  Using his expertise, Dr. Kalotay considered all of the above factors and calculated the loss incurred by each issuer on each bond that Caramadre redeemed prior to the maturity date of the bonds.

6

The analysis conducted by Dr. Kalotay is a product of his years of education and expertise.  It is complex in nature as it takes into account a wide variety of economic factors, including each company's borrowing rate at a certain point in time.  His expert opinion is necessary to assist the jury in determining whether the defendants' conduct caused financial losses to the companies involved.

    B.  <u>The Loss Sustained By The Bond Issuers is Relevant to Motive</u>

Caramadre next recycles his argument that the amount of loss sustained by the victim of a financial crime is irrelevant and inadmissible.  Apparently Caramadre wishes to argue to the jury that although he and his associates earned more than $12 million by exercising the death-put options in the bonds, the bond issuers themselves suffered no loss whatsoever.  The Government must be able to prove to the jury that this argument is nonsense, that the early redemption of bonds caused significant losses to the bond issuers.

While defendant is correct that the amount of loss is not an element of the charged offenses, the law is clear that evidence of loss is relevant to prove the motive and intent of the defendant.  The First Circuit has observed that "Courts have held repeatedly that loss is relevant in fraud cases to

demonstrate a defendant's knowledge or intent to commit fraud."
United States v. Munoz-Franco, 487 F.3d 25, 62 (1st. Cir 2007).
"While technically the success or failure of a scheme to defraud
is irrelevant in a mail fraud case, realistically, when the
contested issue is intent, whether or not victims lost money can
be a substantial factor in a jury's determination of guilt or
innocence." Id., quoting United States v. Heimann, 705 F.2d 662,
669 (2d Cir. 1983). Thus, while "an ultimate purpose of either
causing some financial loss to another or bringing about some
financial gain to oneself is not the essence of fraudulent
intent," United States v. Kenrick, 221 F.3d 19, 29 (1st Cir.
2000) (citation and internal quotation marks omitted), the
knowledge that one's actions are, in fact, bringing about such
losses may demonstrate one's intent to commit fraud." Munoz-
Franco, 487 F.3d at 62 (1st. Cir 2007).

With respect to the losses sustained by the bond issuers in
this case, it is particularly critical that the government be
permitted to prove that the issuers sustained heavy losses.
Without this evidence, the defendants will be free to continue
to make the absurd argument that the bond issuers did not suffer
any losses even though they had to pay the full value of the
bonds years or decades earlier than they otherwise would have.
Caramadre would thus be free to argue that there was no "scheme

to defraud" as there is no evidence that the bond issuers
sustained any losses.  Caramadre was well aware that he could
not make money out of thin air – that the bond issuers were
suffering losses equivalent to the gains he was making.  He is
entitled to argue to the jury that he discovered a "loophole"
and therefore acted legally.  He is not entitled, however, to
prevent the Government from calling an expert witness to prove
that actual losses were sustained by the bond issuers.  Those
losses will be directly relevant to Caramadre's motive and
intent, <u>i.e.</u>, that he was well aware his actions were causing
losses to the companies involved and that he acted with the
intent to cause those losses.[1]

> C.  Dr. Kalotay's Testimony is Based on Sufficient Facts
>     <u>and Data and is the Product of Reliable Principles</u>

---

[1] Caramade erroneously cites to two interpleader complaints
brought in 2009 by one of the brokerage-houses as evidence that
the bond issuers suffered no losses.  (<u>See</u> Caramadre Memorandum
at 11.) In those complaints, the brokerage-house, TradeKing,
sought an order from the Court directing how it should
distribute the assets held in accounts owned by Caramadre and
Radhakrishnan.  In those cases, the two owners reached an
agreement as to how the funds were to be distributed and the
Court entered an order reflecting those agreements.  At that
time, the bond issuers had no way of knowing that the bonds were
purchased with terminally-ill individuals, that
misrepresentations had been made by the defendants or that the
bonds were otherwise products of a fraud scheme.  It is
therefore unsurprising that they did not claim at that early
date that they had incurred losses.

Caramadre next argues that Dr. Kalotay's testimony should be precluded because it is not based on sufficient facts and data and is not the product of reliable principles and methods.  The crux of defendant's argument, as the Government understands it, is that in calculating the time-value of money to the issuers, Dr. Kalotay relied on each issuer's prevailing borrowing cost on the date in question instead of the actual "replacement costs" to the bond issuers.  (See Caramadre Memorandum at 6.)  Dr. Kalotay will testify as to why, in his expertise, he utilized the prevailing borrowing costs of each issuer on the relevant dates to determine losses.  If Caramadre has a reasoned argument as to why he disagrees with this analysis, he can utilize the adversarial process and cross-examine Dr. Kalotay as to the methodology he employed.  The law is clear that if the expert's testimony rests upon good grounds, it should be tested by the adversary process---competing expert testimony and active cross-examination---rather than excluded from jurors' scrutiny for fear that they will not grasp its complexities or satisfactorily weigh its inadequacies.  Carlucci v. CNH America LLC, 2012 WL 4094347 at *3 (D. Mass. 2012).

Dr. Kalotay is expected to testify, based on his expertise, that determining each issuer's prevailing borrowing costs is the only reasonable way to determine the losses sustained.  He is

10

expected to testify that the loss to the issuers is directly
attributable to the time-value of money to each issuer, i.e.,
how much money it cost each issuer to pay the full value of the
bonds years before it otherwise would have been required to do
so.  He will further testify that the time value of money varies
from issuer to issuer based upon how much it would cost that
issuer to borrow the funds it was prematurely required to pay
Caramadre.  His testimony on this point is the product of
decades of experience in the bond market, including his
acquisition of a patent designed to measure the value of death-
put bonds.  Once again, if Caramadre believes Dr. Kalotay's
analysis to be faulty, he will be afforded an opportunity to
cross-examine him at trial and, if he chooses, to present his
own expert witness on this point.  He cannot, however, preclude
the admission of Dr. Kalotay's testimony so that he can be free
to argue that the bond issuers suffered no losses.


      D.  Dr. Kalotay's Testimony Will Not Be Unduly Confusing
          or Cause any Undue Delay or Waste of Time

     In a final attempt to preclude Dr. Kalotay's testimony,
Caramadre argues that his testimony will be unduly confusing,
cause undue delay and waste time.  (See Caramadre Memorandum at
10.)  The United States does not expect to spend much time at

all during trial on the issue of the losses sustained by the companies involved.  It is expected that Dr. Kalotay's direct testimony will be about an hour long, in which he will briefly summarize his expertise, his methodology and then present the conclusions he reached.  While the subject matter of his testimony is indeed complex, that is precisely the reason why an expert witness is necessary: to provide an expert opinion that will assist the jury in understanding the evidence.  If the defense is willing to stipulate to the conclusions reached by Dr. Kalotay, the United States would agree to do so.  What the United States cannot agree to, however, is to allow the defense to incorrectly argue to the jury that the bond issuers sustained no losses as a result of defendants' scheme.

## Conclusion

For the reasons set forth herein, the United States objects to Caramadre's motion to preclude the testimony of Dr. Andrew Kalotay.  The United States, however, has no objection to Caramadre's request that a Daubert hearing be held.

Respectfully submitted,

12

PETER F. NERONHA
UNITED STATES ATTORNEY

/s/ Lee H. Vilker
LEE H. VILKER
Assistant U.S. Attorney

JOHN P. MCADAMS
Assistant U.S. Attorney
U.S. Attorney's Office
50 Kennedy Plaza, 8th Floor
Providence, RI 02903

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 9th day of November, 2012, I caused the within Government's *Memorandum of Law In Support of Its Objection to Defendant's Motion to Preclude the Testimony of Andrew Kalotay* to be served via the Court's Electronic Filing System on:

For Joseph Caramadre:
Michael J. Lepizzera, Esq.
Anthony M. Traini, Esq.

For Raymour Radhakrishnan:
Olin Thompson, Esq.

<u>/s/Lee H. Vilker</u>
Lee H. Vilker
Assistant U.S. Attorney
United States Attorney's Office
50 Kennedy Plaza, 8th Floor
Providence, RI 02903
Lee.Vilker@usdoj.gov

14