IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND


```
* * * * * * * * * * * * *   CRIMINAL ACTION
UNITED STATES OF AMERICA  *  11-186-S
                          *
VS.                       *  NOVEMBER 13, 2012
                          *  VOLUME I
JOSEPH CARAMADRE and      *
RAYMOUR RADHAKRISHNAN     *  PROVIDENCE, RI
* * * * * * * * * * * * *
```


HEARD BEFORE THE HONORABLE WILLIAM E. SMITH

DISTRICT JUDGE

(Jury Trial)




**APPEARANCES**:

FOR THE GOVERNMENT:          LEE VILKER, AUSA
                             and JOHN P. McADAMS, AUSA
                             U.S. Attorney's Office
                             50 Kennedy Plaza
                             Providence, RI  02903

FOR THE DEFENDANT
Joseph Caramadre:            MICHAEL J. LEPIZZERA, ESQ.
                             Lepizzera & Laprocina
                             117 Metro Center Blvd.
                             Suite 2001
                             Warwick, RI  02886

                             ANTHONY M. TRAINI, ESQ.
                             56 Pine Street
                             Providence, RI  02903

**APPEARANCES**: (Continued)

FOR THE DEFENDANT
Raymour Radhakrishnan:        RAYMOUR RADHAKRISHNAN, pro se

                              OLIN THOMPSON, ESQ.
                              Federal Defender's Office
                              10 Weybosset St.
                              Providence, RI  02903

Court Reporter:               Anne M. Clayton, RPR
                              One Exchange Terrace
                              Providence, RI  02903

Proceeding reported and produced by computer-aided
stenography

I N D E X

| WITNESS | PAGE |
|---|---|
| RICHARD WILEY  (By Video): | 68 |

GOVERNMENT EXHIBITS

| 129, 158, 159, 160 & 161 - | 67 |

_____

1    13 NOVEMBER 2012 -- 9:00 A.M.

2          (Proceedings out of the presence of the jury as

3    follows:)

4          THE COURT:  Good morning, everyone.  We're ready

5    to begin trial in the matter of the United States

6    versus Joseph Caramadre and Raymour Radhakrishnan.

7          In a few moments, we'll bring the jury in but as

8    we discussed with counsel in chambers, there are a few

9    matters that we need to go over before we bring the

10   jury in.

11         So let's begin by having counsel identify

12   themselves for the record, please.

13         MR. VILKER:  Good morning, your Honor.  Lee

14   Vilker, Assistant United States Attorney.  I'm here

15   with John McAdams, fellow Assistant United States

16   Attorney.

17         MR. TRAINI:  Good morning, your Honor.  Anthony

18   Traini for Mr. Caramadre.

19         MR. LEPIZZERA:  Good morning, your Honor.

20   Michael Lepizzera on behalf of Mr. Caramadre.

21         MR. RADHAKRISHNAN:  Good morning, your Honor.

22   Raymour Radhakrishnan here with Mr. Olin Thompson as my

23   standby counsel.

24         MR. THOMPSON:  Good morning, your Honor.  Olin

25   Thompson, standby counsel for Mr. Radhakrishnan.

1        THE COURT:  All right.  So before we get

2   started, let me just remind everyone involved and

3   counsel particularly that we're going to be sticking to

4   a tight schedule here for the next few months.  I need

5   you to take whatever steps are necessary to be here on

6   time so we can start promptly at nine o'clock every

7   day.  We can't have any delays.  All right?

8        Okay.  Mr. Traini, I know you need to renew some

9   motions.

10       MR. TRAINI:  I do.  Thank you, your Honor.  As

11  we discussed at our final pretrial conference, your

12  Honor, there were several legal matters we need to put

13  on the record.

14       The matters that we needed to put on the record

15  preliminarily this morning, your Honor, prior to the

16  jury coming in to court is the Defendant, Mr. Caramadre

17  that is, is renewing his earlier motion to sever, which

18  was based on Mr. Radhakrishnan's pro se representation.

19  You originally denied that motion in a written opinion,

20  and so we are again objecting to the denial of the

21  severance and renewing the severance motion this

22  morning.

23       THE COURT:  All right.

24       MR. TRAINI:  Secondly, your Honor, as you know,

25  Mr. Caramadre filed a motion to waive jury trial, which

1    was also based on Mr. Radhakrishnan's pro se

2    representation.  You denied that in a written opinion

3    as well.  The motion is being renewed at this time, and

4    again we are objecting to the earlier denial of that

5    motion.

6          Ordinarily, Judge, we would also have to, I

7    think, for the record, make that motion again after the

8    jury was sworn, but in order to not interrupt the

9    proceedings and delay things unnecessarily, we've all

10   agreed that by making it now it's the equivalent of

11   also making it after the jury is sworn and the

12   Government hasn't objected to that.

13         THE COURT:  The Government is agreeable to that?

14         MR. VILKER:  Yes, your Honor.

15         THE COURT:  So both of those motions are denied

16   for the reasons stated in the written opinions

17   previously filed.

18         MR. TRAINI:  Thank you, your Honor.

19         With respect to the evidence, we know again from

20   our pretrial conference that the first item of evidence

21   this morning is going to be Mr. Richard Wiley's

22   deposition, which is going to be played via video to

23   the jury.  The Court will recall that previously there

24   was a motion to suppress filed by Mr. Caramadre, which

25   the Court heard and denied, and that was I believe a

1   motion to suppress all of the depositions, including

2   Mr. Wiley's.  And we now renew that motion to suppress,

3   and again object to the fact that it was denied

4   earlier.

5        And similarly, your Honor, you will recall, I'm

6   sure, that several years ago there were objections to

7   the taking of the depositions in the first place when

8   we had the extensive Rule 15 proceedings before you.

9   And again, we are objecting to the deposition being

10  shown as having been taken in the first place for all

11  of the reasons that we stated in 2009 and following

12  with respect to the Rule 15 proceedings, and again

13  object to our denial of the earlier motion that we made

14  not to take the depositions.  So we're renewing both of

15  those at this point in the trial.

16       THE COURT:  Okay.  For all the reasons stated in

17  the prior opinions, both with respect to the motion to

18  suppress and with respect to the Rule 15 matter, for

19  the reasons stated in the opinion I did in 2009, those

20  objections are all denied.

21       MR. TRAINI:  And finally, your Honor, again, in

22  order to let these proceedings move smoothly, there

23  will be evidence commencing with Mr. Wiley's deposition

24  in which the Government will be offering co-conspirator

25  statements, particularly in Mr. Wiley's deposition

1    there will be co-conspirator statements of

2    Mr. Radhakrishnan.  And pursuant to the ruling of First

3    Circuit going back to **United States versus**

4    **Petrozziello**, we would ordinarily be objecting to the

5    introduction of those statements at the time subject to

6    a determination by the Court that a conspiracy existed

7    and that the statements would be admissible against

8    Mr. Caramadre.

9         Pursuant to the First Circuit's opinion in

10   **United States versus Ciampaglia**, we are making the

11   objection now so that we don't have to interrupt the

12   actual playing of the deposition in order to do that.

13   And it's our understanding from the conference

14   yesterday that your Honor is going to follow the rule

15   of Ciampaglia and also the rule recently acknowledged

16   again in Ceresi that we will be able to have a standing

17   objection, if you will, to the introduction of all

18   co-conspirator statements, including not only Mr.

19   Radhakrishnan's but those of Mr. Hanrahan,

20   Mr. Maggiacomo, Mr. Condit, who are also unindicted

21   co-conspirators, and that you will deal with those when

22   you make your Ciampaglia finding at the end of the

23   evidence but that way we will not be required to object

24   every time a co-conspirator statement is offered in

25   order to keep the trial moving, and it's my

1    understanding the Government has no objection to that

2    process as well, Judge.

3         THE COURT:  All right.  So is that correct?  The

4    Government has no objection to the timing of the

5    Defendant's motion?

6         MR. VILKER:  That's correct.

7         THE COURT:  All right.  Very well.

8         Mr. Radhakrishnan, I take it you are joining in

9    each of these objections that have been set forth by

10   Mr. Traini?

11        MR. RADHAKRISHNAN:  Yes, that's correct, your

12   Honor.  Thank you.

13        MR. TRAINI:  Thank you, your Honor.

14        THE COURT:  You stated it correctly.  I'm going

15   to allow you to have a continuing objection, a

16   Petrozziello objection, and there won't be any need to

17   interrupt any of the testimony on that basis.

18        All right.  Then, lastly, before we bring the

19   jury in, Mr. Radhakrishnan, could you please stand up

20   with your counsel, your standby counsel.

21        I need to renew my advice to you pursuant to

22   U.S. versus Faretta, that I think it's in your best

23   interest to be represented in this case by counsel.

24   I've gone over this with you many times, both formally

25   and informally, but I want to renew to you my

1    suggestion that you accept the offer of representation

2    from the Public Defender's Office that's been extended

3    to you.  Mr. Thompson has been involved in this

4    proceeding all the way through and is ready to take up

5    your representation.  You understand that I think it is

6    in your best interest to be represented by counsel?

7              MR. RADHAKRISHNAN:  Yes, your Honor, I do.

8              THE COURT:  And do I take it from all the things

9    you've told me up to this point that you're still going

10   to insist on representing yourself?

11             MR. RADHAKRISHNAN:  That is correct, your Honor,

12   yes.

13             THE COURT:  Thank you.  I think we're ready to

14   bring the jury in.  Charlie.

15             (Proceedings in the presence of the jury as

16   follows:)

17             THE COURT:  All right.  Good morning, ladies and

18   gentlemen, and welcome.

19             As you know, you're here because today we're

20   going to begin the trial that you've been impaneled

21   for, that is the United States versus Joseph Caramadre

22   and the United States versus Raymour Radhakrishnan.

23             Now, the first thing I'd like to do, I'm going

24   to do something just a little bit different than the

25   normal trial.  Before I have you sworn in as jurors

1   this morning, I want to ask you, has anybody had any

2   kind of change in your circumstances, any sort of

3   significant new situation that has come up or any other

4   reason that makes you feel that it would be very

5   difficult or impossible for you to perform your service

6   as jurors in this case?

7          All right.  I'm seeing no hands.  All right.

8   Nobody has anything -- all right.  Very good.

9          Then the first order of business, ladies and

10   gentlemen, is to have you sworn in as the jurors in

11   this case, so I'm going to ask you all to stand and the

12   clerk will administer the oath.

13          (Jurors sworn.)

14          THE COURT:  All right.  Ladies and gentlemen,

15   let's begin by having counsel identify themselves for

16   you.  I know you recall them from the impanelment

17   process, and also I'm going to ask them to once again

18   introduce you to their clients, and then I'm going to

19   proceed to give you some preliminary instructions.

20          MR. VILKER:  Good morning, ladies and gentlemen.

21   My name is Lee Vilker.  I'll be one of two United

22   States attorneys presenting this case on behalf of the

23   Government.

24          MR. McADAMS:  Good morning, ladies and

25   gentlemen.  My name is John McAdams.

1      MR. TRAINI:  Good morning, ladies and gentlemen.

2   I'm Anthony Traini, and I'm one of the lawyers

3   representing Mr. Caramadre.

4      MR. LEPIZZERA:  Good morning, ladies and

5   gentlemen.  My name is Mr. Lepizzera, and to my right

6   is Mr. Caramadre.

7      MR. RADHAKRISHNAN:  Good morning, ladies and

8   gentlemen.  My name is Raymour Radhakrishnan.  I will

9   be representing myself in this case.  Standing next to

10  me today is Mr. Olin Thompson.  He is my

11  court-appointed standby counsel.  He will be helping me

12  along as this trial progresses.

13      Thank you very much for your time.  I really

14  appreciate it.

15      THE COURT:  Thank you, everyone.

16      All right.  So ladies and gentlemen, we're going

17  to begin now.  I'm going to give you some preliminary

18  instructions that will give you at least a start in

19  guiding you in performance of your role as the jurors

20  in this case.

21      We're going to be together for a long time.  As

22  you know, this case is going to last several months.

23  I'm going to give you updates as we go along and let

24  you know what kind of progress we're making.  I have

25  every intention to use your time efficiently and not

1    let this trial drag on any longer than it has to, and

2    I'll say a few more things about that in a few minutes.

3         The trial schedule, just so you know, we're

4    going to try this on what we refer to is a half-day

5    schedule, but it really is more like three-quarters of

6    a day.  We're going to go two hours, and then take a

7    break and then we'll go for another two hours.  So

8    we'll try it four trial hours a day.  We'll go from

9    9:00 to 1:30 each day.  There'll be a half-hour break,

10   and during that break you'll be provided with a good,

11   substantial snack.

12        Now, as a practical matter, it's important that

13   you use the facilities during that break.  And so to

14   facilitate that, I'm going to allow you to go

15   downstairs for the break and not in the jury room

16   across the hall, which is a little cramped.  It's also

17   important you have a snack so that you keep your

18   attention up and maybe some coffee or whatever beverage

19   you prefer.

20        So let me begin by giving you some preliminary

21   instructions.  So now that you've been sworn, I need to

22   tell you what your job is.  Your job is to find from

23   the evidence that is presented in this case what the

24   facts of the case are.  You, and you alone, are going

25   to be the judges of the facts, and you will then have

1    to apply those facts to the law as I give it to you at

2    the close of the case.  Now, you must follow the law

3    whether you agree with it or not.  Nothing I may say

4    during the course of this trial is intended to indicate

5    to you, nor should be taken by you, to indicate what I

6    think the facts of this case are.  That is solely your

7    job as the jury in this case.

8         Now, the evidence from which you'll find the

9    facts will consist of the following things:  The

10   testimony of witnesses who will be testifying;

11   documents and other items of evidence that will be

12   introduced during the course of the trial; and any

13   facts that the lawyers agree to or what we refer to as

14   stipulate, stipulation with respect to a particular

15   fact; and finally, any fact that I instruct you to find

16   as a fact.

17        Now, certain things are not evidence and they

18   must not be considered by you, and I'm going to list

19   those to you now.  Statements, arguments and questions

20   by the lawyers in this case are not evidence.  And in

21   that regard, I need to make a special mention of the

22   fact that Mr. Radhakrishnan, who has chosen to

23   represent himself in this case as a Defendant, you must

24   understand as I told you during the impanelment process

25   that any statements, arguments that he makes during the

1    course of the trial is not testimonial.  It is not

2    evidence.  He is -- when acting as his own attorney,

3    his statements are like the statements of any other

4    attorney, that is, they are not evidence.  Okay?  And

5    all of you need to make sure you understand and keep in

6    mind the fact that anything that Mr. Radhakrishnan says

7    in the course of questioning or arguing or giving an

8    opening statement or closing arguments, whatever the

9    case may be, is not evidence.

10         Now, secondly, objections to questions by the

11   lawyers in this case are not evidence.  Now, attorneys

12   have an obligation to their clients to make objections

13   when they believe evidence that is offered does not

14   comply with the Federal Rules of Evidence.  You should

15   not be influenced by any such objection nor by my

16   ruling on the objection.

17         If I sustain the objection, then you should

18   simply ignore the question.  If I overrule the

19   objection, then you should treat the question and the

20   answer to the question just as you would any other

21   answer to any other question.  And if you're instructed

22   at any point that some item of evidence is received for

23   a limited purpose only, then you must follow that

24   instruction.

25         Thirdly, any testimony that I've excluded or

1   I've told you to disregard during the course of the

2   trial is not evidence and must not be considered by

3   you.

4          And finally, anything that you may have heard or

5   seen outside of the courtroom from any source

6   whatsoever is not evidence and must be disregarded.

7          You are to decide this case solely on the

8   evidence that is presented here in this courtroom

9   during this trial.

10          Now, there are two kinds of evidence.  There is

11   direct evidence, and there is circumstantial evidence.

12          Direct evidence is the direct proof of a

13   particular fact, such as a witness who comes forward

14   and testifies that he or she saw something happen.

15          And then there's circumstantial evidence.

16   Circumstantial evidence is the proof of certain facts

17   from which you can infer or conclude that another fact

18   is true.  That sounds kind of complicated but it really

19   isn't.  Let me give you a very simple example.  Let's

20   say you get up in the morning, you look out the window

21   and everything you see outside your house is wet, the

22   car is wet and the streets and grass, but it's bright

23   and sunny outside.  Now, you can infer from what you're

24   observing that it rained overnight.  You didn't see it

25   rain so you don't have direct evidence of the fact that

1    it rained, but you have circumstantial evidence; that

2    is, you can see certain things from which you can infer

3    that another fact is true.  That is that it rained

4    overnight.

5            That's all circumstantial evidence is.  Now,

6    obviously, not all examples of circumstantial evidence

7    are as simple as that example that I gave you but that

8    gives you an idea of what the difference is between

9    direct evidence and circumstantial evidence.  Just keep

10   in mind that the law makes no distinction between

11   direct evidence and circumstantial evidence, and you

12   may consider both kinds of evidence in determining what

13   the facts of this case are.

14           At the end of the trial, it will be up to you to

15   decide which witnesses to believe, which witness not to

16   believe, how much of any witness's testimony to accept

17   or to reject.  And I'll try to give you some guidelines

18   that assist you with that at the end of the trial in

19   determining the credibility of witnesses, which is one

20   of the primary responsibilities of the jury.

21           Now, there are certain rules that apply in a

22   criminal case such as this.  And these are very

23   important rules.  I've gone over them with you at the

24   impanelment process and you've observed them in the

25   questionnaire that you filled out, but I want to cover

1    them with you now because they are so important.

2          So first of all, defendants in a criminal case

3    are presumed to be innocent until proven guilty.  The

4    indictment brought against the defendants in any

5    criminal case, including this case, is brought by the

6    Government only as an accusation and it is nothing

7    more.  The indictment is not proof of guilt, nor is it

8    proof of anything else.  It simply gets the case

9    started and brings it before you for a determination.

10   Therefore, defendants in a criminal case start out with

11   a completely clean slate.

12         Now, second, the burden of proof in a criminal

13   trial is upon the Government until the very end of the

14   case.  A defendant has no burden to prove his

15   innocence, nor to present any testimony or any evidence

16   of any kind, including his own testimony.

17         Since a defendant has a right to not testify and

18   to remain silent, you are prohibited from arriving at

19   your verdict by considering the fact a defendant may

20   not have testified.  Now, I don't know whether the

21   Defendants in this case intend to testify or not, but

22   what I do know is that you must not be influenced by

23   the fact that they, if they do, exercise their right to

24   remain silent and not testify.

25         Now, thirdly, the Government must prove a

1    defendant's guilt by a standard of what we call beyond

2    a reasonable doubt.  I'm going to give you some further

3    instructions at the end of the case to assist you with

4    the meaning of the term "reasonable doubt," but suffice

5    it to say at this point that you all know what "doubt"

6    is.  You have some sense as jurors what the term

7    "reasonable" means.  Bear in mind, and this is

8    important, that in this respect a criminal case is

9    different from a civil case.

10    Now I want to go over with you a short summary

11    of the charges in this case.  Now, in this case, the

12    indictment, which I mentioned to you, has no

13    significance other than it begins the case and brings

14    it before you.  The charges allege that Defendant

15    Joseph Caramadre, later joined by Defendant Raymour

16    Radhakrishnan, devised and executed a scheme, and

17    conspired to do this, to obtain money from insurance

18    companies and corporate bond issuers by making material

19    misrepresentations and omissions to various parties.

20    These parties include, one, terminally ill people and

21    their family members in order to obtain their identity

22    information for use in furtherance of the scheme; two,

23    various intermediaries, including retail brokerage

24    houses and registered broker/dealer firms; and three,

25    the insurance companies themselves.

1          Now, the indictment further alleges that

2     Mr. Caramadre and Mr. Radhakrishnan used the identity

3     information of terminally ill people in furtherance of

4     the scheme without their consent.  The indictment also

5     alleges that the Defendants engaged in financial

6     transactions over $10,000 using the proceeds of the

7     fraud.

8          Mr. Caramadre is also charged with one count of

9     witness tampering.  Mr. Caramadre is a licensed

10    attorney and certified public accountant.

11    Mr. Caramadre specializes in insurance products and was

12    a licensed insurance producer from the early 1990's

13    until approximately 2003.  Mr. Caramadre operated

14    through an entity called Estate Planning Resources,

15    which I may refer to as EPR.  Mr. Radhakrishnan was an

16    employee of EPR hired by Mr. Caramadre in 2007.

17         The indictment alleges that the Defendants

18    executed a fraudulent scheme to exploit death benefits

19    available on two types of financial products, variable

20    annuities and death-put bonds.

21         The indictment alleges that Mr. Caramadre and

22    Mr. Radhakrishnan obtained the identity information of

23    a number of terminally ill people by deceiving them and

24    their families through misrepresentation and material

25    omissions.  These alleged misrepresentations took

1    various forms.  The indictment alleges that as early as

2    1995, Mr. Caramadre used terminally ill individuals as

3    annuitants without their consent.

4         In the fall of 2007, Mr. Caramadre and

5    Mr. Radhakrishnan placed an advertisement in the

6    Providence Catholic newspaper offering a $2,000 gift to

7    terminally ill people.  The indictment alleges that

8    when Mr. Radhakrishnan met with respondents to the ad,

9    he made numerous misrepresentations and material

10   omissions regarding the investment program in order to

11   induce them to provide their identity information and

12   to execute investment documents.

13        Now, in addition, the indictment alleges that

14   Mr. Caramadre and Mr. Radhakrishnan made numerous

15   misrepresentations to broker/dealers, brokerage houses,

16   insurance companies in order to execute their scheme.

17   These include false information regarding the

18   terminally ill people's finances, investment

19   backgrounds and contact information.

20        The indictment also alleges that the Defendants

21   lied to the companies about the relationship between

22   themselves and the terminally ill people.  In addition,

23   the indictment alleges Mr. Caramadre and

24   Mr. Radhakrishnan and others as nominees or straws

25   invested in their names in order to conceal from the

1    companies his actual interest.

2         With that overview, let me go through the

3    specific details with respect to the 66 counts in the

4    indictment.  So the indictment contains 66 separate

5    counts.  Mr. Caramadre is charged in all 66 counts.

6    Mr. Radhakrishnan is charged in 61 of the counts.  And

7    the breakdown is as follows:  Counts 1 through 26, both

8    Defendants are charged with 26 counts of wire fraud;

9    that is, causing material to be sent in interstate

10   commerce by means of wire communication in furtherance

11   of the alleged fraudulent scheme.  Counts 27 through

12   32, Mr. Caramadre is also charged with six counts of

13   mail fraud; that is, causing the mails to be used in

14   furtherance of the alleged fraudulent scheme.

15        Mr. Radhakrishnan is charged with three counts,

16   three of those same counts of mail fraud, Counts 28, 29

17   and 31.

18        Count 33, both of the Defendants are charged in

19   Count 33 with one count of conspiracy to commit

20   offenses against the United States; to wit, mail fraud,

21   wire fraud, identity theft and aggravated identity

22   theft.  Counts 34 through 59, Mr. Caramadre is charged

23   with 26 counts of identity theft.  Mr. Radhakrishnan is

24   charged with 25 of those same counts, Counts 35 through

25   59.

1          Counts 60 through 64, both Mr. Caramadre and

2    Mr. Radhakrishnan are each charged with five counts of

3    aggravated identity theft.

4          Count 65, both Defendants are charged with one

5    count of engaging in a monetary transaction derived

6    from specified unlawful activity, also referred to as

7    money laundering.

8          And Count 66, in this count Mr. Caramadre is

9    charged with one count of witness tampering, and

10   Mr. Radhakrishnan is not charged in that count.

11         Now, I know that's a lot to absorb, ladies and

12   gentlemen; and I do want to tell you that we're going

13   to be doing everything possible to help you keep all of

14   this organized, both beginning with opening statements

15   and then throughout the trial, but ultimately with the

16   verdict form that you're given to fill out at the end

17   of the case will break each of these charges down and

18   you'll be asked to render a verdict of either guilty or

19   not guilty as to each of those counts.

20         Now, let me give you a few comments about your

21   conduct as jurors in this case and then some final

22   comments about how we're going to proceed.

23         First of all, you've heard me give you some

24   instructions up to this date.  I'm going to reiterate

25   them to you now.  The first one is that during the

1    course of the trial, and this is going to be a long

2    trial, as you know, you are not to discuss this case

3    with anyone or permit anyone to discuss it with you.

4    Now, until you retire to the jury room at the end of

5    the case to deliberate on a verdict, you are not to

6    have any discussions or talk to anyone about the case,

7    and that includes discussions among yourselves.

8            Now, this is going to be difficult for you, and

9    I fully recognize that.  It's going to be difficult for

10   you to not have discussions among yourselves as the

11   trial is going on especially where it's going to go on

12   for such a long period of time, and it's going to be

13   difficult for you to exercise the discipline not to

14   discuss the case with your family and your friends,

15   your co-workers, whatever the case may be.

16           You heard me say this during impanelment and I

17   want to reiterate it to you, the best way to deal with

18   this outside of the courthouse is just not to let those

19   conversations get started.

20           Now, in a minute, I'm going to tell you there's

21   going to be some media coverage of this case.  I think

22   you already know that.  We've talked about, and you no

23   doubt have seen at least the fact that there's been

24   some media coverage, and I trust you've obeyed my

25   instructions and haven't watched or listened to or read

1    anything about this case.  But your family and your

2    co-workers and your friends and others probably have,

3    and they may be curious about the fact that you're

4    serving on this jury.

5         So once again, I just emphasize to you how

6    important it is not to let yourself have those

7    conversations about the case.  Don't let them get

8    started, especially during these first early days when

9    there might be more substantial media coverage.  I'm

10   hoping that we can bore the media to death within a

11   week or two and that will dissipate.

12        All right.  So you've heard me say it before,

13   and I'll reiterate it to you.  You are to continue to

14   obey the instruction not to have any exposure to

15   anything in the media about this case.  Finally, you're

16   not to do any research of any kind about anything

17   relating to the case, any kind of research,

18   particularly computer research, but any kind of

19   research about anything.  You're to decide this case

20   only on the basis of the evidence that is presented

21   here in this courtroom.

22        And finally, you are not to form any opinion

23   about the outcome of the case until all the evidence is

24   in.  Keep an open mind until you start your

25   deliberations in this case.  And that, too, is going to

1   take some extra effort on your part where the trial is

2   going to go on for such a long time.

3        Now, I have a few more instructions I need to

4   give you.  First, I need to remind you, as I've told

5   you before, that Mr. Radhakrishnan has decided to

6   represent himself in this case.  And as I told you

7   during the impanelment process, you're not to have any

8   extra sympathy for him because he's not using an

9   attorney, nor are you to hold it against him because

10  he's not using an attorney, nor are you to let that

11  influence you in any way with respect to the

12  co-Defendant, Mr. Caramadre.

13       Also, you should understand that I've told

14  Mr. Radhakrishnan that he may exercise his right to

15  utilize counsel at any time during the course of the

16  trial.  So if he changes his mind, Mr. Thompson, who is

17  here as his standby counsel, may undertake his

18  representation if he chooses to do that.  Either way

19  it's his constitutional right, and you should simply

20  accept that.

21       Now, I told you before with respect to

22  Mr. Radhakrishnan's statements that they are not

23  evidence unless and until he testifies under oath.

24  Then what he says is evidence.  I remind you of that.

25       Now, I am giving you notepads and pens and

1  pencils, and I do want to say a couple of things about

2  note-taking.  We provide these to you as a convenience.

3  Jurors sometimes like to take notes; some jurors don't

4  like to take notes.  There's no obligation to take

5  notes.  You can rest assured that your notes will be

6  kept confidential, private.  At the end of the day we

7  collect them.  We hold them in a safe downstairs and

8  then we return them to you when trial starts the next

9  day.  You can't take your notebooks home with you.  At

10  the end of the trial, we destroy your notes.  Nobody

11  reads your notes.  They're for you only and to assist

12  you as the trial goes on and to assist you in the

13  deliberation process.

14          Just keep in mind if you are a note-taker that

15  you should not let note-taking distract you from

16  listening to what's going on with the witness on the

17  stand.  Okay?

18          Now, during the course of the trial, from time

19  to time I'm going to give you some instructions to go

20  along with what I've already told you to help you

21  understand what's happening or if a particular type of

22  evidence is to be understood or to be used only for

23  certain purposes and not for others, I just want to

24  tell you that that -- I will attempt to do that as the

25  trial goes along to make your job easier.

1          The attorneys will probably agree to certain

2     things.  We call those stipulations.  From time to time

3     during the course of the trial, a stipulation will be

4     given to you either by counsel or I'll read it to you.

5     And as I told you at the beginning, stipulations are to

6     be taken by you as a fact.

7          Occasionally, I need to talk to the lawyers at

8     what we call the side bar up here at the side.  I've

9     told counsel I want to keep those to the absolute

10    minimum.  I don't want to waste your time.  We're going

11    to do our best to do that, but please understand there

12    may be situations where I do need to talk to counsel at

13    side bar.  We'll play pleasant music for you when that

14    happens, and we'll keep it as short as possible.

15         Now, finally, as I indicated to you, I think,

16    the Defendant, of course, has no obligation to testify

17     -- neither Defendant has an obligation to testify or

18    to present any evidence or to really do anything in a

19    criminal trial.  We've done a lot of work to get ready

20    to present this case to you.  I'm informed by counsel

21    for Mr. Caramadre and also by Mr. Radhakrishnan that

22    the Defendants in this case will not be giving an

23    opening statement.  They will be what we call

24    reserving.  That means that they're going to reserve

25    their opening statement for when the Government has

1    finished the presentation of its case.  This is a

2    perfectly normal thing to do it and it's their right,

3    and I wanted to let you know that they would not be

4    giving an opening statement at the beginning, but

5    waiting for the Government to finish the presentation

6    of its case.

7           So we're ready to proceed with the trial.  The

8    order of trial is as follows:  The Government will make

9    an opening statement.  I remind you that opening

10   statements are not evidence.  It's simply an outline by

11   the Government of what the Government expects to prove

12   in this case.

13          As I've told you, the Defendants will not be

14   making an opening statement, and then we will proceed

15   to the presentation of the evidence.

16          The first evidence testimony in this case will

17   be presented by a video deposition and that will last

18   about two-and-a-half hours.  So I expect that today's

19   presentation will be the Government's opening statement

20   and then the video deposition and that will probably

21   take up the whole day.

22          Okay?  So with that, ladies and gentlemen, I'm

23   going to ask Mr. Vilker if he's ready to give his

24   opening statement.

25          MR. VILKER:  Thank you, your Honor.

1     The COURT:  Before you begin, I understand

2  there's one exhibit that's going to be used during your

3  opening statement.  Is that agreeable to the Defendant?

4     MR. LEPIZZERA:  No objection, your Honor.

5     MR. RADHAKRISHNAN:  No objection, your Honor.

6  Thank you.

7     THE COURT:  Go ahead, Mr. Vilker.

8     MR. VILKER:  Thank you, your Honor.

9     Good morning, ladies and gentlemen.  This is

10  going to be a long trial, unfortunately; and you're

11  going to hear some painful, emotional testimony

12  involving people who suffer from terminal illnesses

13  including many of whom who have since passed away.

14     You're also going to hear testimony about some

15  fairly complex financial products.  But fundamentally,

16  this case is going to boil down to an essential

17  question, did the Defendants, Joseph Caramadre and

18  Raymour Radhakrishnan, simply exploit a loophole they

19  discovered or did they commit fraud?  It's going to be

20  your job to sort through your emotions, put them aside

21  and examine the evidence that answers that key

22  question.  And the evidence will show you that these

23  Defendants committed frauds because it is not a

24  loophole if you have to lie to get through it.

25     Now, as I mentioned, this case involves some

1    very painful subject matter.  It involves large numbers

2    of people who are or were terminally ill, most of whom

3    have already passed away after struggling with

4    devastating illnesses like cancer, Lou Gehrig's disease

5    and heart disease.  You'll hear from one of those

6    people who is still alive today whose identity

7    information was used by the Defendants.  You'll see

8    videotaped testimony of some of these people who have

9    since passed on, their videotaped depositions being the

10   last words they could convey on this matter.

11        You'll hear from dedicated nurses and hospice

12   social workers whose job it is to take care of these

13   people.  And you'll hear from many family members of

14   the terminally ill individuals who have since passed

15   away.

16        Now, you'll be hearing this testimony because of

17   the scheme that was orchestrated by the Defendants in

18   this case, Joseph Caramadre and Raymour Radhakrishnan.

19   You'll hear that Mr. Caramadre is a lawyer from

20   Cranston, a certified public accountant and a former

21   insurance agent, by all accounts a very intelligent

22   individual.

23        You'll hear, as Judge Smith noted for you, that

24   he ran a business called Estate Planning Resources.

25        You'll hear that beginning in the mid-1990's

1    Mr. Caramadre developed an investment strategy that

2    depended on the use of terminally ill individuals.  On

3    his own behalf and on the behalf of investors, friends

4    and family members, Mr. Caramadre began to purchase

5    from insurance companies products called variable

6    annuities.

7         He discovered that these annuities offered

8    highly valuable death benefits upon the death of the

9    person identified in the contract as the annuitant.

10   These benefits included a guaranteed return of all

11   money that was invested, plus a guaranteed profit even

12   if the market went down, and various other kinds of

13   bonuses and enhancements.

14        None of these financial benefits, however, would

15   arrive unless one very important event took place.  The

16   person Mr. Caramadre identified as the annuitant in the

17   annuity contract had to die and had to die quickly.

18        Now, as time went on, you'll hear that

19   Mr. Caramadre discovered another financial product that

20   produced tremendous profits upon the death of an

21   individual, these so-called death-put bonds.  These

22   were corporate bonds issued by companies like General

23   Motors, Ford and Bank of America.

24        Now, normally, when you buy a bond, you have to

25   wait years or decades for the bond to mature before

1    you're able to redeem it at full value.  But

2    Mr. Caramadre discovered that with these death-put

3    bonds if two people owned a bond together and one of

4    them were to pass away, the other could immediately

5    redeem the bond at full value.  Again, this strategy,

6    which Mr. Caramadre used to make millions of dollars

7    within a short period of time could only succeed if he

8    found someone who was about to die and was about to die

9    quickly.

10        Now, I know this all sounds a bit complicated

11   when you first hear about these bonds and annuities.

12   You shouldn't be concerned now if you don't completely

13   understand them.  We know it will take some time, and

14   you'll hear plenty of testimony about them as the trial

15   proceeds.

16        What is important to understand now is that both

17   of these investment strategies depended entirely on

18   finding people who were about to die.  Once that was

19   done, the sooner that person would die, the more money

20   Mr. Caramadre, his family, his friends, his investors

21   would make.  And you'll hear that Mr. Caramadre and his

22   associates made more than $30 million this way, causing

23   millions upon millions of dollars in losses to the

24   companies involved.

25        Now, you'll hear from numerous witnesses that

1    Mr. Caramadre has repeatedly bragged to his investors

2    and others people that he found a loophole in the

3    system.  The loophole Mr. Caramadre claimed to have

4    found was that neither the insurance companies nor the

5    bond issuers asked if the individual involved was

6    terminally ill.  You'll hear that Mr. Caramadre has

7    claimed that since these companies didn't ask whether

8    the person was terminally ill, there was nothing

9    illegal about submitting annuity applications or

10   purchasing bonds using the Social Security numbers,

11   names, and dates of birth of people who were terminally

12   ill.

13       Now, I want to stop here and emphasize this

14   important point to you.  The indictment does not

15   contend that it is illegal for a terminally ill person

16   to be the annuitant on an annuity.  The insurance

17   companies wrote the annuity contracts and the bond

18   issuers set the terms of the bonds.  If they wanted to

19   make sure that terminally ill people wouldn't be used,

20   they could have written that into their contracts.  So

21   it is simply not illegal to use terminally ill people

22   on annuities or bonds.

23       In fact, even though it may be very

24   uncomfortable or troubling for you individually,

25   there's nothing per se illegal about profiting from

1    another person's death.  But that is not what this case

2    is about.  What is illegal is how the Defendants went

3    about orchestrating this scheme because, as I said

4    earlier, it is not a loophole if you have to lie to get

5    through it.

6         In this case, the evidence will show that the

7    Defendants did the following.  They repeatedly lied and

8    deceived terminally ill people in order to get them to

9    serve as annuitants or to open brokerage accounts in

10   their names.  They forged the signatures of some of the

11   terminally ill people on application forms.  They had

12   terminally ill people sign blank signature pages

13   without explaining to them what it was that they were

14   signing.  They told the terminally ill people that they

15   were just giving them a charitable gift intentionally

16   withholding and concealing from them that they were

17   using their identify information for their own profit.

18        They lied to the companies about the terminally

19   ill people's financial resources and investment

20   backgrounds, and they repeatedly lied to the companies

21   when they were asked direct questions about the

22   accounts that were being opened.

23        If Joseph Caramadre and Raymour Radhakrishnan

24   hadn't lied and deceived terminally ill people, if they

25   hadn't lied over and over again to the companies

involved, then they would have simply exploited a
loophole and we wouldn't be here.  But it's not a
loophole if you have to lie to get through it, and the
evidence will show that's exactly what the Defendants
did.

Now, as I mentioned before, none of these
millions of dollars could have been made without a
continuous supply of people who are about to die.  How
do you go about finding so many terminally ill
individuals?

You will hear that some of the terminally ill
people Mr. Caramadre found were relatives or somehow
connected to the Caramadre family.  But as you can
imagine, there weren't enough of these people to go
around.  So Mr. Caramadre had to find another way to
recruit more terminally ill people.

In the mid-1990's, Mr. Caramadre began to reach
out to total strangers on their death beds in order to
get their Social Security numbers so that he could use
their names on annuities.  You'll hear that one of the
first times Mr. Caramadre did this was with a woman
named Debra Blowers, who was terminally ill.

You'll hear that without having ever met Debra
Blowers or her husband, Kenneth, Mr. Caramadre called
the Blowers' home and told Kenneth that he was able to

1  secure some small life insurance policies on Debra's

2  life even though she was terminally ill.

3        Kenneth agreed to do so, and two very small life

4  insurance policies were, in fact, obtained on Debra's

5  life.  What neither Debra nor Kenneth knew, however,

6  was that Mr. Caramadre also used Debra's Social

7  Security number to open up four different annuities in

8  Debra's name so that he could make commissions and his

9  investors would be able to obtain death benefits when

10 Debra passed away, which unfortunately she did a few

11 months later.

12       Now, in the mid-1990's, you will hear that

13 Mr. Caramadre had another idea of how he could find

14 people who were about to die.  You'll hear that

15 Mr. Caramadre visited a house of compassion in

16 Cumberland, Rhode Island that took care of people that

17 were dying from AIDS.  You'll hear that Mr. Caramadre

18 proceeded to use the identities of these AIDS patients

19 on annuities he submitted in the mid- to late 1990's.

20 That steady supply of terminally ill people, however,

21 ran out when progress was made in the treatment of

22 AIDS.

23       You will hear that it became clear to

24 Mr. Caramadre that he had to find another way to locate

25 terminally ill individuals.

1          One of the terminally ill people Mr. Caramadre

2     then found was a man named Alfred LaMonte, who was

3     connected to the Caramadre family.  In fact, Alfred was

4     the father of Mr. Caramadre's own brother-in-law, James

5     LaMonte.  You'll hear that when Alfred LaMonte became

6     terminally ill in 2004, Mr. Caramadre invested more

7     than $3 million in annuities in Alfred's name making

8     commissions and substantial profits when Alfred passed

9     away.

10          Mr. Caramadre's own brother-in-law, James

11     LaMonte, is expected to testify before you that

12     Mr. Caramadre never said anything to him or to his

13     father about taking out any kind of annuities in his

14     father's name or making any kind of commissions or

15     profit upon his father's death.

16          Now, you'll hear that as time goes on, by 2007,

17     Mr. Caramadre was running into a lot of problems

18     finding people who were terminally ill.  Two of the

19     three terminally ill people he had at that time had

20     passed away, and Mr. Caramadre was left with only one

21     terminally ill person at his disposal.  On top of that,

22     you'll hear that he lined up a number of wealthy and

23     prominent investors who stood ready to pour millions of

24     dollars into these annuities and bonds, but none of

25     this would work, no money could be made unless

1    Mr. Caramadre was able to locate and sign up many

2    people who were at death's door.

3        It was then Mr. Caramadre made a monumental

4    decision in an effort to find terminally ill people

5    throughout Rhode Island that he could use on his

6    investments.

7        In the fall of 2007, Mr. Caramadre placed an

8    advertisement in the local Catholic paper called the

9    Rhode Island Catholic, used to be known as the

10   Providence Visitor.  The ad and the subsequent versions

11   of the ad ran until the end of 2008.  Hopefully, the ad

12   should appear on the screens before you.

13       Now, as you can see, this ad provides that there

14   was a compassionate organization that would immediately

15   give $2,000 in cash to terminally ill individuals.  All

16   that was required to receive this $2,000 was that the

17   individual be between 19 and 96 years old with a

18   terminal illness and a life expectancy of less than

19   three months.

20       As you can also see, this ad says nothing about

21   any of the terminally ill individuals being asked to

22   open any annuities or bonds, nor does it say anything

23   that would in any way suggest that the man behind the

24   ad, Joseph Caramadre, stood to make substantial profits

25   from the deaths of the people who responded to it.

1       The evidence will be clear that Joseph Caramadre

2   thought that offering $2,000 would give him immediately

3   access to terminally ill people and that he could use

4   that access to make millions of dollars for himself and

5   his investors by opening annuities and bonds in their

6   names.

7       He was right.  Dozens upon dozens of people saw

8   this ad and called the number on it.  These were either

9   people who were very sick themselves or family members

10  of people who were about to die.

11      In addition to enduring all the physical and

12  emotional pain that these end-of-life situations cause,

13  these people were also under tremendous financial

14  strain, having left their jobs to take care of their

15  loved ones or gone bankrupt paying their never-ending

16  medical bills.  You will hear that these people saw

17  this ad in the Catholic paper and thought it was a

18  God-send, that some benevolent individual perhaps

19  associated with the Catholic Church was out there

20  trying to help them.  They had no idea that that

21  individual was Joseph Caramadre or that Joseph

22  Caramadre stood to make substantial profits off of

23  their deaths.

24      And that is where Defendant, Raymour

25  Radhadrishnan comes in.  You'll hear that

1    Mr. Radhakrishnan became an employee of Mr. Caramadre

2    at Estate Planning Resources in the summer of 2007.

3    Fresh out of college with no securities or insurance

4    training whatsoever, Mr. Radhakrishnan was given by

5    Mr. Caramadre the job of meeting with the terminally

6    ill people who responded to the ad and getting them to

7    sign the account opening documents.

8         You'll hear that Mr. Caramadre and

9    Mr. Radhakrishnan intentionally decided that they would

10   not take even the most basic steps that could have

11   ensured that the terminally ill people understood what

12   they were signing, such as giving the terminally ill

13   people copies of the documents they signed or giving

14   them some time with the documents before signing them,

15   simple steps that would have given the terminally ill

16   people and their families an opportunity to review the

17   documents or perhaps ask an attorney or someone they

18   trusted for assistance.

19        You will hear that Mr. Radhakrishnan would

20   generally have one or two meetings with each terminally

21   ill person.  You will hear that Mr. Radhakrishnan

22   typically began the meeting by speaking of the great

23   charitable work being performed by Mr. Caramadre by the

24   Catholic Church and that Mr. Caramadre was doing all

25   this because he really wanted to help people who were

1    terminally ill.

2        Mr. Radhakrishnan would then often give a $2,000

3    check that he would describe as a gift.  Then after the

4    check was given, Mr. Radhakrishnan would say that there

5    was a chance that Mr. Caramadre would give them even

6    more money, this time in the amount of three to four

7    thousand dollars.  If that person appeared willing to

8    proceed further in that initial meeting,

9    Mr. Radhakrishnan would pull up signature pages for

10   them to sign and give them an additional check either

11   on that date or a later date.

12       On other occasions you will hear

13   Mr. Radhakrishnan and Mr. Caramadre would wait some

14   time after the first meeting and call back the family

15   to set up a second meeting.  In either scenario, you

16   will hear that Mr. Radhakrishnan's goals were always

17   the same, to get the terminally ill people to give him

18   their Social Security numbers and dates of birth and

19   get them to sign the blank signature pages he put in

20   front of them.

21       The evidence will show that when

22   Mr. Radhakrishnan determined that the time was right to

23   ask for signatures, he would present these people with

24   blank signature pages and point to the places where

25   they were to sign their names.  These people will tell

1    you that it is like what happens when you buy a house

2    and they're given a stack of papers to sign, that they

3    were just told to sign here and sign there, having no

4    idea what it was that they were actually signing.

5         The evidence will show that Mr. Radhakrishnan

6    would say whatever he needed to say to get these people

7    to put their signatures on these application forms.

8    What Mr. Radhakrishnan said to these dying people lies

9    at the heart of the case.  Did he truly get their

10   consent by explaining to them that an account or an

11   annuity would be opened in their name that would allow

12   Mr. Caramadre and others to reap substantial benefits

13   from their deaths?

14        You will hear their testimony.  You will see the

15   documents they signed, and you will be asked was this a

16   loophole or were these lies.

17        You will hear that these people, many of whom

18   were literally days or weeks from passing away, were

19   never told that their names, Social Security numbers

20   and dates of birth would be listed on annuities and

21   brokerage accounts, that some stranger had figured out

22   a way to profit from their deaths.  If they had been

23   informed of this crucial fact and made a decision to

24   proceed, that would have been their choice and they

25   wouldn't be victims of identity theft.  But you will

1    hear from witness after witness who will explain that

2    that is not what happened, that these dying people were

3    never made aware that the papers they were signing

4    would be used by the Defendant to make money off of

5    their deaths.

6           You will hear all kinds of different stories

7    that Mr. Radhakrishnan told these people to get them to

8    sign the account opening pages.  Many of these

9    individuals will testify that they had absolutely no

10   idea whatsoever that any kind of account was going to

11   be opened in their names or in the names of their loved

12   ones, that they were told that the pages that they were

13   to sign were just needed for Mr. Caramadre's own

14   records, just a receipt to document that that $2,000

15   check had been given.

16          They will tell you that they were presented with

17   blank signature pages and told to sign here and sign

18   there to get the money they believed was just charity.

19          One of these witnesses will be a man named

20   Eulogio Gonzalez, who's 44-year-old wife, Sonya, was

21   dying of breast cancer and was hospitalized at Women

22   and Infants Hospital here in Providence.

23          Mr. Gonzalez will testify that he was staying

24   with his wife in the hospital room around the clock

25   during the final few weeks of her life.  He will

1  testify that one day Raymour Radhakrishnan simply

2  showed up at the hospital room and gave him and his

3  wife a check, saying that it was just charity.

4  Mr. Gonzalez thought that Mr. Radhakrishnan was

5  somehow affiliated with the hospital and that the money

6  he received was a gift.  Mr. Radhakrishnan, you'll

7  hear, never mentioned a word about opening any kind of

8  an account in Eulogio Gonzalez or his wife, Sonya's,

9  name or that Joseph Caramadre or anyone else stood to

10  profit off of his wife's death.

11  Other people will explain that Radhakrishnan did

12  mention something about some kind of account being

13  opened but told them that any money that was going to

14  be made on the account would go to their surviving

15  family members, not to Joseph Caramadre or his

16  investors.

17  You'll hear, for example, from one woman who

18  lost her husband to cancer in 2008.  She will tell you

19  that Mr. Radhakrishnan did tell her that an account was

20  going to be opened in her dying husband's name, but

21  that it would be a bank account in which $5,000 would

22  be deposited that that woman could use for anything she

23  may need.  Radhakrishnan hid from this woman and many

24  others the truth, that this account would not be for

25  the benefit of the terminally ill individuals and their

1    families, it would be for the benefit of Joseph

2    Caramadre and his associates so they could profit off

3    the deaths of the terminally ill.

4         Other family members will tell you about a

5    different lie that Mr. Radhakrishnan told them to get

6    them to sign the account opening documents, that

7    Mr. Radhakrishnan told them that an account would be

8    opened but that the profits from that account would go

9    to help other people who were terminally ill.

10   Believing that they were doing a positive thing, kind

11   of paying it forward by helping other people struggling

12   with terminal illnesses, these people signed where

13   Mr. Radhakrishnan told them to sign never for a moment

14   thinking that Joseph Caramadre or his investors stood

15   to make substantial profits off of their deaths.

16        One of these witnesses that you'll hear from is

17   a woman named Sandra Cazeault, whose 42-year-old

18   husband, Robert, was dying from brain cancer in 2008.

19   Sandra Cazeault will testify that Mr. Radhakrishnan

20   told her and her late husband that an account would be

21   set up in her husband's name but that the money in that

22   account would go to a special fund that was set up to

23   help other young people struggling from terminal

24   illnesses.

25        Mr. Radhakrishnan intentionally hid the truth

1    from Robert and Sandra Cazeault that the overwhelming

2    majority of the money to be made off of her husband's

3    death would go to line the pockets of Joe Caramadre.

4              You'll hear from some witnesses that

5    Mr. Radhakrishnan occasionally threw out the word

6    "annuity" but never gave any explanation of what an

7    annuity was.

8              You'll also hear that on occasion

9    Mr. Radhakrishnan would say that there was some kind of

10   tax shelter involved.

11             The bottom line with all of these terminally ill

12   witnesses and their families is this:  They were never

13   informed of the crucial fact in this case, that other

14   people stood to make money off of their deaths or the

15   deaths of their loved ones.

16             You will hear that although some of the terms of

17   these annuities and bonds are a bit complicated, the

18   Defendants chose not to even provide the most

19   rudimentary explanation of what was occurring, that

20   investments were being purchased so that someone else

21   could make some money when the terminally ill person

22   died.

23             You will hear that rather than tell these people

24   this fundamental truth, Defendants chose to lie and to

25   mislead them.  They chose to conceal from them that

1    they were being asked to provide their names, dates of

2    birth and Social Security numbers so that someone they

3    didn't know could profit upon their deaths.

4         Now, the witnesses I just described are some of

5    the people who actually signed the signature forms that

6    were put in front of them.  Although they didn't

7    understand what it was they were signing, their

8    signatures were at least their own.  You will see that

9    even the signatures of some of the terminally ill

10   individuals were stolen from them.  The evidence will

11   show that in a number of instances when the Defendants

12   for one reason or another were unable to secure the

13   signatures of the terminally ill individuals, they

14   simply forged their signatures on the application

15   forms.

16        One of the witnesses who will testify as to the

17   false signatures on the application forms is a woman

18   named Ann Scuncio.  The Defendant, Caramadre, opened up

19   a brokerage account in his name and in the name of Ann

20   Scuncio's mother, an elderly woman named Pia Bernardo.

21        Ann Scuncio will tell you that her mother did

22   not sign any of the forms, as she was unable to at that

23   point in her life, and that she did not sign any of the

24   forms on her mother's behalf.

25        You'll see the application forms with Pia

1    Bernardo's apparent signatures on them, and you'll see

2    that the Defendants made a major blunder.  They

3    mistakenly signed the wrong first name on one of the

4    application forms.

5         You will also hear from a mother and son named

6    Kathleen Flori and Dennis Flori, Jr.  You'll hear that

7    in 2008 while Kathleen Flori's husband, Dennis, Sr.,

8    was on his deathbed with cancer an account was opened

9    up in his name with Joseph Caramadre.  Dennis, Sr. soon

10   passed away.  Mrs. Flori and her son Dennis, Jr., will

11   testify about the two meetings they had with Raymour

12   Radhakrishnan and will tell you that they had no idea

13   that a brokerage account would be opened in Dennis,

14   Sr.'s, name or that Mr. Caramadre stood to make money

15   upon Dennis, Sr.'s, death.  They will also testify that

16   Dennis, Sr.'s, apparent signatures on the application

17   forms are not his.

18        The Floris will testify that when

19   Mr. Radhakrishnan wanted Dennis, Sr. to sign one single

20   form but Dennis, Sr. was too sick to hold a pen and

21   sign his name by himself, you'll hear that his son,

22   Dennis, Jr., had to go next to his father on his death

23   bed, hold the pen in his father's hand and help him

24   sign one single document, a signature page.

25        As you can imagine, this was a very traumatic

1    moment for Dennis, Jr., having to hold his dying

2    father's hand to help him sign one single document.

3    Dennis, Jr. will testify that he's certain that he did

4    this on one and only one document, an internal document

5    that Mr. Caramadre kept for his records.

6         He will also testify that all of the five

7    supposed signatures of his father, Dennis, Sr., on the

8    brokerage account application forms are not Dennis

9    Sr.'s, and that he's certain of this fact because he

10   knows he only helped his father sign his name one

11   single time.

12        Now, we anticipate that during this case you'll

13   hear from four broad categories of witnesses, the

14   terminally ill individuals and their family members,

15   social workers and nurses, some of the insiders who

16   participated in the scheme with the Defendants; and

17   fourth, representatives of some the companies that were

18   involved.

19        Now, the first category of witnesses you'll hear

20   from are the terminally ill individuals themselves and

21   their family members, some of whom I've just described.

22        Now, you'll hear that the very people the

23   Defendants were deceiving, the terminally ill, were

24   chosen because they were supposed to die soon.  By the

25   very nature of the scheme, therefore, most of the

1    individuals the Defendants dealt with have since passed

2    away and are unable to testify on their own behalfs

3    before you.

4          You'll hear, however, that although the

5    Defendants tried their best to find people who would

6    die quickly, they got it wrong on a few occasions.

7          One of the terminally ill individuals used by

8    the Defendant, a man named Edwin Rodriguez,

9    miraculously exceeded his life expectancy and is

10   expected to testify before you.  Mr. Rodriguez is

11   suffering from a condition called osteomyelitis, a

12   terminal disease that is slowly eating away at his bone

13   structure.

14         Mr. Rodriguez will testify that he got this

15   condition after he was carjacked and shot in Providence

16   a number of years ago, an event that left him in a

17   wheelchair.  He'll testify that in 2008, a hospice

18   social worker that was helping to take care of him told

19   him about a program she had heard about in which a

20   philanthropist was giving money away to terminally ill

21   individuals.

22         Edwin Rodriguez proceeded to have a couple of

23   meetings with Mr. Radhakrishnan during which

24   Mr. Rodriguez was presented with a pile of blank

25   signature pages to sign.  Mr. Rodriguez is expected to

1    testify that he was never told that any accounts or

2    annuities would be opened in his name or that anyone

3    else stood to profit off of his death.  Like many other

4    witnesses you will hear, he thought the money he was

5    receiving was simply the gift of a local

6    philanthropist.

7         Now, you will hear that a few of the other

8    terminally ill individuals did not make it to this

9    trial, but they did live long enough to give videotaped

10   depositions three years ago concerning their

11   interactions with the Defendants.  Although they have

12   since passed away, the depositions will be played in

13   court on this screen in the video before you.  You'll

14   hear in their own words that they had no idea

15   whatsoever that any accounts or annuities would be

16   opened in their names.

17        You'll hear in their own words how they never

18   for one second thought that Joseph Caramadre or anyone

19   else stood to make money upon their deaths.

20        In fact, the first witness you will hear is a

21   man named Richard Wiley.  Richard Wiley was a

22   79-year-old man from Westerly, Rhode Island who passed

23   away from Stage IV cancer in November of 2009.  You'll

24   see the video deposition that Mr. Wiley gave in this

25   case in September of 2009, a couple of months before

1    his death.

2          In that deposition, Mr. Wiley repeatedly

3    testified that he was never informed, that he had no

4    idea that a brokerage account was opened in his name,

5    that bonds were purchased in his name or that someone

6    else stood to benefit from his death.

7          Mr. Wiley's testimony will be consistent with

8    the testimony of witness after witness in this case,

9    that they were never told that their names, dates of

10   birth and Social Security numbers would be used on any

11   type of account or annuity that would let Joseph

12   Caramadre, Raymour Radhakrishnan or anyone else make

13   money off of their deaths, that their identities were

14   stolen from them.

15         You'll also hear from numerous family members

16   and loved ones of terminally ill individuals who have

17   since passed away.  These family members were often

18   there when either Mr. Caramadre or Mr. Radhakrishnan

19   came calling.

20         These witnesses will testify about their

21   dealings with the two Defendants and what was told to

22   their loved ones before they were asked to sign the

23   papers that were put in front of them.  They will tell

24   you that no one ever told them that someone else was

25   trying to profit off the deaths of their loved ones.

1          They will also testify about the false

2     information that was written by their loved ones on the

3     application forms submitted by the Defendants in which

4     the Defendants repeatedly lied by informing the

5     companies that the terminally ill individual had

6     substantial wealth and investment experience.

7          The terminally ill individuals and their family

8     members will tell you that this was absolutely false

9     information that Mr. Radhakrishnan and Mr. Caramadre

10    provided the companies.

11         Now, the second category of witnesses you'll

12    hear from are some hospice social workers and nurses

13    who took care of some of the terminally ill people

14    involved in this case.  They will tell you that they

15    all along believed that Mr. Caramadre was simply

16    operating some kind of charity and that when they

17    referred their patients to this program they never for

18    a second thought that anyone else stood to profit from

19    their patient's death.

20         They will tell you they referred their patients

21    to this program until February of 2009 when

22    Mr. Caramadre was given an opportunity to come to Home

23    and Hospice headquarters and explain his program to the

24    social workers.  When this meeting took place, you'll

25    hear that Mr. Caramadre, who was unclear in his

1    explanation and, in fact, refused to answer some of the

2    social workers' questions.

3         At that point, you will hear the hospice social

4    workers by and large stopped referring their patients

5    to Mr. Caramadre's program.

6         Now, the third category of witnesses you will

7    hear from are some of the insiders, some people who are

8    close with Mr. Caramadre and participated in this

9    scheme with him.  Two of these people are Ed Hanrahan

10   and Ed Maggiacomo.  Both Hanrahan and Maggiacomo are

11   licensed insurance agents who work out of Caramadre's

12   office.  They were the ones who were submitting the

13   annuity applications that named terminally ill

14   individuals.

15        You'll hear that they proceeded to earn millions

16   and millions of dollars in commissions from insurance

17   companies, the majority of which they passed on to

18   Mr. Caramadre.

19        Mr. Hanrahan and Maggiacomo will explain to you

20   some of what was occurring behind the scenes at Estate

21   Planning Resources.

22        Mr. Hanrahan is expected to testify that he and

23   Mr. Caramadre both understood perfectly well that the

24   insurance companies did not want this type of business

25   and that they would be terminated by each and every

1    company once that company learned that they were

2    utilizing terminally ill individuals.  In fact,

3    Mr. Hanrahan will tell you how one by one the insurance

4    companies did discover this fact, that they were using

5    terminally ill individuals and that when they learned

6    this, the companies terminated them, prohibited them

7    from submitting any further business to that company.

8         Rather than stopping this practice when they

9    were terminated by insurance companies, Mr. Hanrahan

10   will explain that Mr. Caramadre simply found other

11   insurance companies he could exploit, companies that

12   had yet to discover that he was using terminally ill

13   individuals as annuitants.

14        You'll see one e-mail in which Mr. Hanrahan

15   refers to one of these new insurance companies as

16   "fresh meat."  And that's exactly what each new company

17   that didn't know what they were up to was to

18   Mr. Caramadre and Mr. Radhakrishnan, fresh meat they

19   could pounce upon.

20        Hanrahan will also explain to you that

21   Mr. Caramadre implemented a number of steps to trick

22   these companies, to keep the insurance companies from

23   finding out that he was using terminally ill people for

24   as long as possible.  These steps included starting out

25   with a very small deposit when the annuity applications

1    were submitted, a deposit that wouldn't really attract

2    the attention of the companies, and then adding much

3    more money to the annuities once the application had

4    been approved.

5         You'll hear that another step Mr. Caramadre took

6    to deceive the companies was to put his money into

7    accounts and annuities in other people's names so that

8    the companies wouldn't put it together that all these

9    accounts really belonged to the same person.

10        Mr. Hanrahan will tell you that Mr. Caramadre

11   knew full well that what he was doing was causing

12   tremendous losses to these companies and that he tried

13   to conceal these activities for as long as possible.

14        The other insider that you'll hear from is a man

15   named Ed Maggiacomo.  Like Hanrahan, Maggiacomo was an

16   insurance agent who was submitting these annuity

17   applications at Mr. Caramadre's request.

18        Mr. Maggiacomo will tell you how he repeatedly

19   lied to the insurance companies when they called him

20   asking questions about these annuitants, the terminally

21   ill people.  As a matter of fact, you'll hear

22   recordings of the conversations in which Mr. Maggiacomo

23   lied to the insurance companies by falsely claiming

24   that there was some kind of relationship between the

25   annuitant, the terminally ill individual, and the owner

1    of the investment, who was sometimes Mr. Caramadre and

2    sometimes one of Mr. Caramadre's investors.

3         And that brings us to the final broad category

4    of witnesses you'll hear from in this case,

5    representatives of the companies that were lied to by

6    Mr. Caramadre and by Mr. Radhakrishnan.

7         During the course of this trial, you're going to

8    see on paper lie after lie the Defendants told the

9    companies involved.  You'll see how they repeatedly

10   lied on the application forms by representing that the

11   terminally ill people had substantial wealth and

12   investments experience when they knew full well that

13   these people were in dire financial straits, that many

14   responded to the ad because they didn't even have

15   enough money to pay for their own funerals.

16        You'll also see on paper how the Defendants

17   repeatedly lied on the application forms by providing

18   false phone numbers and contact information for the

19   terminally ill people so that the companies would have

20   difficulty contacting them.

21        You'll also see on paper lie after lie that the

22   Defendants told about who these terminally ill people

23   were, falsely representing that they were clients,

24   friends or acquaintances.  And you'll see on paper how

25   Mr. Caramadre and Mr. Radhakrishnan regularly misled

1    the companies by putting other people's names on the

2    accounts in which the money really belonged to

3    Mr. Caramadre.

4         Now, as time went on, you will hear that the

5    companies involved began to figure out what was going

6    on, that Mr. Caramadre was using terminally ill

7    individuals as co-owners on the accounts or as

8    annuitants on the annuities.  And these companies

9    started to ask questions of Mr. Caramadre.

10   Mr. Caramadre was then faced with a critical choice

11   when these companies started asking him questions.  Do

12   I tell the truth that I'm making substantial profits on

13   the deaths of terminally ill individuals and run the

14   risk of these companies shutting me down, or do I lie

15   and make them think that the account was some type of

16   legitimate estate planning accounts, that the

17   terminally ill are my Estate Planning clients who I am

18   helping to manage their estates?  You'll hear that when

19   faced with this decision, Mr. Caramadre chose the

20   second option.  He chose to commit fraud by telling the

21   companies lie after lie.

22        You'll hear that one of the companies that was

23   deeply involved in this was the brokerage company TD

24   Ameritrade.  Mr. Caramadre opened up more than 30

25   Ameritrade brokerage accounts in his name and in the

1    name of terminally ill individuals in which millions of

2    dollars worth of these death-put bonds were purchased.

3         When Ameritrade wanted to know why Mr. Caramadre

4    was opening up so many accounts with so many different

5    people, they contacted and met with Mr. Caramadre and

6    Mr. Radhakrishnan.  You'll hear that Mr. Caramadre

7    proceeded to lie to them about what was happening in

8    these accounts.  Mr. Caramadre told Ameritrade

9    officials a boldface lie, that the co-owners of the

10   accounts, these terminally ill people, were his Estate

11   Planning clients and that he was helping them manage

12   their estates and that's what was going on in these

13   accounts.

14        The truth, which he deliberately lied about and

15   hid from Ameritrade, was that the co-owners were not

16   his Estate Planning clients.  They were terminally ill

17   people who had responded to the ad he had placed in the

18   Catholic paper.

19        This same pattern occurred with other companies

20   that were involved, including e-Trade and Lifemark.

21   You'll hear that these companies had concerns about the

22   fact that so many people on Mr. Caramadre's accounts

23   and annuities were dying so quickly and asked him and

24   Mr. Radhakrishnan for further information.

25        You'll hear from witnesses from these companies

1    that -- and they will tell you that they were also lied

2    to by the Defendants.

3         You will also hear evidence that Mr. Caramadre

4    and Mr. Radhakrishnan committed the crime of money

5    laundering when Mr. Caramadre purchased an $800,000

6    annuity with his money but in the name of

7    Mr. Radhakrishnan.  To make this happen, the Defendants

8    had to lie on the forms submitted with the annuity

9    applications to make it falsely appear that

10   Mr. Radhakrishnan was earning hundreds of thousands of

11   dollars from a company called Net Worth Display

12   Systems.  The evidence, however, will show that this

13   was another lie, that Mr. Radhakrishnan had no income

14   whatsoever from this company.

15        And you will hear evidence that during the grand

16   jury phase of this case, Defendant Caramadre tampered

17   with a witness by attempting to persuade that witness

18   to lie to a federal investigator and that that witness

19   did, in fact, lie as he was told to by Mr. Caramadre.

20        Now, throughout the trial you'll be shown a lot

21   of financial documents such as large checks to the

22   companies involved and checks to some of the terminally

23   ill people who responded to the advertisements.  It may

24   well appear daunting to you if you try to keep track of

25   the flow of the money involved in this case.  Please

1   keep in mind that near the end of the Government's case

2   we'll present a summary witness to you who will

3   summarize the financial transactions that Mr. Caramadre

4   and/or Mr. Radhakrishnan organized using terminally ill

5   people.  It is anticipated that you will hear from this

6   witness that the Defendants did give some money to the

7   terminally ill people totaling several hundred thousand

8   dollars.  You'll also hear evidence, however, that this

9   scheme generated more than $30 million in profits to

10   Caramadre and his investors and caused millions and

11   millions of dollars in losses to the companies

12   involved.

13          The evidence will show that Mr. Caramadre

14   treated the relatively small money he was paying to

15   terminal ill as a necessary step for him to make

16   millions of dollars off of their deaths.

17          At the end of the day, this fraud case, like all

18   fraud cases, is about lies.  As the trial proceeds,

19   you'll hear witness after witness, see document after

20   document, and hear recording after recording that

21   showed repeated lies of these two Defendants.  The

22   terminally ill individuals and their family members

23   will testify as to the lies the Defendants told them

24   and how they were deceived into signing blank pages

25   that were put in front of them, or how the signatures

1   on the account opening documents are not those of their

2   loved ones.

3         The representatives of the various companies

4   will testify about the repeated lies that Mr. Caramadre

5   and Mr. Radhakrishnan told them.  You'll see dozens of

6   account applications in which lies were told about the

7   terminally ill person's finances, investment history,

8   phone numbers and other contact information.

9         You'll see numerous documents in which false

10  information was provided to the companies about who

11  these terminally ill people were.  You'll be provided

12  with documents that show the financial machinations

13  that Mr. Caramadre went to to open a large number of

14  these accounts and annuities in other people's names to

15  deceive the companies to believing that he was not the

16  one investing all this money.  And you'll hear actual

17  recordings made by the companies as part of their

18  normal business practice in which some of the lies of

19  the Defendants and of co-conspirators are caught on

20  tape.

21         In short, ladies and gentlemen, this is a case

22  about lies and deceit, and the evidence of the

23  Defendants scheming to defraud will be overwhelming.

24  The evidence the Government will present to you in this

25  case will leave you with no doubt that Joseph Caramadre

1    and Raymour Radhakrishnan engaged in an elaborate

2    scheme to defraud and deceive terminally ill

3    individuals, insurance companies and bond issuers.

4         The evidence will leave no doubt that

5    Mr. Caramadre and Mr. Radhakrishnan committed identity

6    theft by using the names, Social Security numbers and

7    dates of birth of terminally ill individuals without

8    their knowledge or consent.

9         Joseph Caramadre did, in fact, find a way to

10   make millions of dollars upon the deaths of terminally

11   ill individuals.  The path he chose, however, was not a

12   legal loophole.  The path he chose was one of fraud,

13   deceit, and lies; lies to the companies involved and

14   lies to the terminally ill people.

15        At the close of this case, we will have an

16   opportunity to address you again.  At that time, we

17   will ask you to return a verdict of guilty on all

18   counts against both Defendants.  Thank you very much.

19        THE COURT:  Thank you, Mr. Vilker.

20        All right.  Ladies and gentlemen, we're going to

21   proceed now with the deposition testimony of

22   Mr. Richard Wiley.  I'm told the deposition lasts about

23   two-and-a-half hours.  We'll watch about one-half hour

24   of it and then we'll take our morning break, and then

25   we'll finish with the last two hours, which will take

1    us through the end of the trial day.

2         Before we begin, I do want to emphasize to you

3    something that I told you during my preliminary

4    instructions, which is to remind you that statements

5    made by counsel in an opening statement are not

6    evidence and should be understood by you as only an

7    outline of what the Government expects the case to be

8    about and particularly characterizations with respect

9    to things such as profits and losses and statements of

10   lies and that sort of thing tends toward argument to

11   you, and you're the ones that will be asked at the end

12   of this trial to decide the question of whether the

13   Defendants are guilty of the charges alleged in the

14   indictment, whether these monies are profits, whether

15   they are losses and whether things said are lies and

16   whether the fraud occurred.  That will be for you to

17   decide based on the evidence that is going to be shown

18   during the course of the trial.

19        Finally, one other thing I want to tell you

20   before we begin the deposition, the video deposition,

21   is you're going to see some references to various

22   exhibits while these video depositions are shown, and

23   they're going to appear on the screens that are in

24   front of you.  Certain numbers will be used when those

25   exhibits are shown, and those numbers may not be the

1     same as what those documents are numbered for purposes

2     of this trial.  I don't want you to get confused in

3     taking down those numbers.  We'll provide you -- at the

4     appropriate time, those documents will come into

5     evidence, and they'll be given an evidence number,

6     trial evidence number, but in deposition they're often

7     given a number for purposes of the deposition.  I just

8     want to highlight that for you so you don't get the two

9     numbers confused.  There are going to be a lot of

10    exhibits in the trial so it's important to try to keep

11    track of the numbers correctly.

12          All right.  Are we ready to proceed with the

13    deposition?

14          MR. McADAMS:  Yes, your Honor.  Before we play

15    it, at this time I would like to move into evidence the

16    exhibits that were used in the deposition of Mr. Wiley.

17    Those exhibits are for trial purposes Government

18    Exhibit 158, which is identified in the deposition as

19    Wiley Depo Exhibit 1.  It's an agreement and

20    acknowledgment form.  I'd also like to move in

21    Government Exhibit 159, which is identified during the

22    deposition as Wiley Deposition Exhibit 2, which is a

23    limited trading authorization document.  Government

24    Exhibit 160, which is identified during the deposition

25    as Wiley Deposition Exhibit Number 3, which is an

1    account statement of Richard Wiley and Paula Caramadre.

2    Government Exhibit 161, which is identified during the

3    deposition as Wiley Deposition Exhibit Number 4, a

4    TradeKing affidavit.  And Government Exhibit 129, which

5    is identified during the deposition as Wiley Deposition

6    Exhibit Number 7, which is a letter from

7    Mr. Radhakrishnan to Mr. Wiley.  And I would request

8    permission, your Honor, that the Government be

9    permitted to publish those during the playing of the

10    deposition.  Ms. Anderson will publish them at the time

11    that they are referenced during the deposition.

12    THE COURT:  All right.  Is all of that agreeable

13    to the Defendant?

14    MR. LEPIZZERA:  No objection, your Honor.

15    THE COURT:  Mr. Radhakrishnan?

16    MR. RADHAKRISHNAN:  No objection, your Honor.

17    Thank you.

18    THE COURT:  All right.  Then Exhibits 158, 159,

19    160, 161, and 129 will all be admitted in full and

20    published to the jury during the showing of the

21    deposition.

22    (Government Exhibits 158, 159, 160, 161, and 129

23    admitted in full.)

24    THE COURT:  Are we read to play the deposition?

25    MR. McADAMS:  We are, Judge.

1          (Video deposition of Mr. Wiley played.)

2          THE COURT:  Okay.  So ladies and gentlemen, it's

3     about 11 o'clock.  I'm going to take our break now.

4          I want to make a couple of comments before I

5     send you out about the video deposition that you're

6     watching.  It's important to understand that this

7     deposition, as you can see from the screen, was taken

8     about almost three years ago during some of the

9     preliminary proceedings that have eventually led to

10    this trial; and at that time, there were a number of

11    different lawyers who were involved in the process.

12    And because it was so early in the process and this

13    proceeding was somewhat unusual, the attorneys were

14    expressing a lot of objections as you can hear during

15    the course of the questioning.

16         It's a little distracting but one of the

17    problems is that the -- during a deposition, typically,

18    objections get stated to be preserved for the record if

19    the testimony is eventually used in trial.  And as you

20    can see, sometimes the answers to questions are

21    intermingled with the objections.  So it's hard to

22    extract that distracting information.  But what's

23    important for you to understand is all of that doesn't

24    mean anything for your purposes.  You're simply

25    listening to the substantive questions and answers.

1    All of those objections you should simply just

2    disregard because anything in the way of objections and

3    that sort of thing that I've needed to deal with I've

4    already dealt with.

5         So it's a distraction.  I'm just asking you to

6    disregard it and to listen to the substantive questions

7    and answers that are given during the course of the

8    deposition.

9         So we'll take our morning break at this time.

10   You, I think, will be allowed to go downstairs to have

11   your sandwich.  Charlie will lead you down there.  And

12   there's some other snacks available.  We'll take about

13   30 minutes, make sure you use the facilities, and keep

14   in mind my instruction not to talk about the case.

15   Charlie will show you out.  Thank you very much.

16        (Proceedings out of the presence of the jury as

17   follows:)

18        THE COURT:  Anything we need to take up?

19        MR. RADHAKRISHNAN:  No, your Honor.

20        MR. TRAINI:  No, your Honor.  Thank you.

21        THE COURT:  Counsel come up for one minute,

22   please.

23        (Side bar conference off the record.)

24        (Recess.)

25        (Proceedings in the presence of the jury as

1    follows:)

2         THE COURT:  Welcome back, ladies and gentlemen.

3    Hope you enjoyed your break and found a good,

4    nutritious snack downstairs for you.  I think we're

5    ready to proceed so I'm going to ask the clerk to start

6    the deposition again.

7         (Video played.)

8         THE COURT:  What page in the transcript and what

9    line?

10         MR. LEPIZZERA:  Page 42, your Honor.

11         THE COURT:  Are you sure?

12         MR. McADAMS:  On the transcript, it's 104 on the

13    side number, side page number, bottom of the page is

14    42.

15         THE COURT:  Can you just rewind it a little bit

16    to make sure we haven't lost anything.

17         (Video played.)

18         MR. McADAMS:  We may need to clean the disk.

19         THE COURT:  Sorry, ladies and gentlemen.

20         MR. McADAMS:  May be the player.  I'm not sure.

21         (Video played.)

22         MR. RADHAKRISHNAN:  Excuse me, your Honor.  I

23    have to object.

24         THE COURT:  Stop the video.  Counsel come up,

25    please.

1          (Side bar conference off the record.)

2          THE COURT:  Ladies and gentlemen, obviously,

3     there's a little bit of a technical difficulty with the

4     disk or the player, and I'm not sure which it is, but I

5     don't want to keep you here while we try to figure this

6     out.  We have about 30 to 40 minutes left, maybe 45

7     minutes left of this deposition.

8          So what I'm going to do is I'm going to let you

9     go now for the rest of the day.  I'm going to have

10    counsel and the technical people here at the courthouse

11    check everything so that we know that it all runs

12    smoothly tomorrow morning, and we'll finish this video

13    deposition in the morning and then proceed to the next

14    witness, who will be a live witness.

15         And so I just want to take a moment just to

16    remind you of all of my previous instructions not to

17    read or listen to or watch anything that appears in any

18    media.  There's no doubt there will be some media

19    coverage of this case as I mentioned to you before, and

20    you're to stay away from that.  Secondly, not to have

21    any conversations with anyone about the case and also

22    not to do any research of any kind about anything

23    related to the case.

24         Now, when you come back to the courthouse

25    tomorrow or at any time when you're out or about, we're

1    not taking lunch hours in this trial, but if you are

2    coming into the courthouse or you're leaving the

3    courthouse, you may see someone that you recognize from

4    court.  You may see them walking into the courthouse or

5    around town someplace.

6         During the trial, you've been given juror

7    buttons, I think, and you should wear those if you're

8    at any time near the courthouse, out in the vicinity.

9    That way people who are associated with the trial know

10   to stay away from you, and you need to make sure that

11   you don't inadvertently run into anybody or stand in a

12   coffee line with somebody who is connected with this

13   case.  And that's why we give you those juror buttons.

14   Okay?

15        So Charlie will show you out, and we'll see you

16   bright and early tomorrow morning, nine o'clock.  We'll

17   start nine o'clock sharp.

18        Thank you very much.  And leave your notebooks

19   behind.  We'll collect them.

20        (Proceedings out of the presence of the jury as

21   follows:)

22        THE COURT:  All right.  We'll recess for the

23   day.  Start tomorrow morning nine o'clock, and just

24   make sure all the disks are thoroughly cleaned and

25   we'll make sure, John, this player needs to have a

1        thorough cleaning so that we don't have this problem

2    again.   Okay?

3             Thanks.   We'll be in recess.

4             (Court concluded at 1:05 p.m.)

<u>C E R T I F I C A T I O N</u>

        I, Anne M. Clayton, RPR, do hereby certify that the foregoing pages are a true and accurate transcription of my stenographic notes in the above-entitled case.

/s/ Anne M. Clayton

_____

Anne M. Clayton, RPR

January 10, 2013

_____

Date