IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND


```
* * * * * * * * * * * * *  CRIMINAL ACTION
UNITED STATES OF AMERICA  *  11-186-S
                          *
VS.                       *  NOVEMBER 14, 2012
                          *  VOLUME II
JOSEPH CARAMADRE and      *
RAYMOUR RADHAKRISHNAN     *  PROVIDENCE, RI
* * * * * * * * * * * * *
```

HEARD BEFORE THE HONORABLE WILLIAM E. SMITH

DISTRICT JUDGE

(Jury Trial)




<u>**APPEARANCES**</u>:

FOR THE GOVERNMENT:          LEE VILKER, AUSA
                             and JOHN P. McADAMS, AUSA
                             U.S. Attorney's Office
                             50 Kennedy Plaza
                             Providence, RI  02903

FOR THE DEFENDANT
Joseph Caramadre:            MICHAEL J. LEPIZZERA, ESQ.
                             Lepizzera & Laprocina
                             117 Metro Center Blvd.
                             Suite 2001
                             Warwick, RI  02886

                             ANTHONY M. TRAINI, ESQ.
                             56 Pine Street
                             Providence, RI  02903

**APPEARANCES**:   (Continued)

FOR THE DEFENDANT
Raymour Radhakrishnan:      RAYMOUR RADHAKRISHNAN, Pro se

                            OLIN THOMPSON, ESQ.
                            Federal Defender's Office
                            10 Weybosset St.
                            Providence, RI  02903

Court Reporter:             Anne M. Clayton, RPR
                            One Exchange Terrace
                            Providence, RI  02903

Proceeding reported and produced by computer-aided
stenography

I N D E X

WITNESS                                                    PAGE

RICHARD WILEY  (By Video):                                   5

EDWIN RODRIGUEZ

   Direct Examination by Mr. Vilker:                         7
   Cross-Examination by Mr. Radhakrishnan:                  54
   Cross-Examination by Mr. Lepizzera:                      61

KATHLEEN FLORI

   Direct Examination by Mr. Vilker:                        63
   Cross-Examination by Mr. Radhakrishnan:                  91
   Cross-Examination by Mr. Lepizzera:                      97
   Redirect Examination by Mr. Vilker:                     102

DENNIS FLORI

   Direct Examination by Mr. Vilker:                       103
   Cross-Examination by Mr. Lepizzera:                     111

ANN SCUNCIO

   Direct Examination by Mr. McAdams:                      113
   Cross-Examination by Mr. Radhakrishnan:                 132

GOVERNMENT EXHIBITS

14   -                                                      42
46   -                                                      66
175  -                                                      71
176  -                                                      70
177  -                                                      76
178  -                                                      77
179  -                                                      80
180  -                                                      86
182  -                                                      88
183  -                                                      89
184  -                                                      90
219  -                                                     121
220  -                                                     122
221  -                                                     119
222  -                                                     124
261  -                                                      44
262  -                                                      46
263  -                                                      47
970  -                                                      17

I N D E X  (Continued)          PAGE

GOVERNMENT EXHIBITS

971  -                                        19
972  -                                        25
973  -                                        33
974  -                                        35
975  -                                        36
976  -                                        47
977  -                                        20
978  -                                        22
979  -                                        23
980  -                                        24
981  -                                        24
982  -                                        51
983  -                                        52

_____

1    14 NOVEMBER 2012 -- 9:00 A.M.

2              (Proceedings in the presence of the jury as

3    follows:)

4              THE COURT:  Good morning, ladies and gentlemen.

5    Welcome back.  I think we have solved the technical

6    difficulties that we had yesterday, and we have three

7    backup plans just in case so I think we should not have

8    any further difficulties.

9              So I think counsel are ready and unless there is

10   anything else, we're ready to proceed with the playing

11   of the last portion of the video deposition of

12   Mr. Wiley.

13             Are we ready to play it?  I think play it from

14   the beginning of this DVD.

15             MR. LEPIZZERA:  That's what we agreed, your

16   Honor.

17             THE COURT:  Okay.  Let's do that.

18             (Video deposition of Mr. Wiley played.)

19             THE COURT:  We're going to try those backup

20   plans, ladies and gentlemen.

21             So what's going to happen, ladies and gentlemen,

22   is we're going to play the video, the remainder of the

23   deposition from the laptop, which means instead of

24   displaying on this screen, it's going to display on the

25   screen you have in the jury box.  Because we can't

1    display exhibits now, we have exhibits prepared in

2    those folders for you so you can refer to them when

3    they're referred to by the attorneys and the witness.

4              (Video deposition of Mr. Wiley played.)

5         THE COURT:  That completes the videotaped

6    deposition of Mr. Wiley.  We're now going to remove

7    that screen from the witness box and the Government is

8    prepared to call its next witness, I believe.

9         MR. VILKER:  Yes, your Honor.  The Government

10   calls Edwin Rodriguez to the stand.

11        THE COURT:  Good morning, Mr. Rodriguez.

12        THE WITNESS:  Good morning.

13        THE COURT:  I just want you to know that we're

14   going to have you sworn in and Mr. Vilker is going to

15   proceed with asking you questions.  But if at any time

16   you need to take a break, you just let me know, just

17   give me the hand signal or just tell me, and we'll make

18   accommodation for whatever you need.  All right?

19        THE WITNESS:  Okay.  Thank you, your Honor.

20        THE COURT:  Okay.  The clerk will swear you now.

21        **EDWIN RODRIGUEZ**, first having been duly sworn,

22   testified as follows:

23        THE CLERK:  Please state your name and spell

24   your last name for the record.

25        THE WITNESS:  Edwin Rodriguez,

1    R-O-D-R-I-G-U-E-Z.

2    **DIRECT EXAMINATION BY MR. VILKER**

3    **Q.**    Good morning, Mr. Rodriguez.

4    **A.**    Good morning.

5    **Q.**    Mr. Rodriguez, how old are you now?

6    **A.**    I'm 35.

7    **Q.**    And what city do you currently live in?

8    **A.**    Warwick.

9    **Q.**    Do you have any children?

10   **A.**    Yes.  One daughter.

11   **Q.**    And how old is your daughter?

12   **A.**    She's right now 19.

13   **Q.**    Nineteen?  Okay.  And are you suffering from a

14   condition known as osteomyelitis?

15   **A.**    Yes, I am.

16   **Q.**    Can you just explain to the jury what

17   osteomyelitis is.

18   **A.**    Osteomyelitis eats the bone little by little until

19   it hits your spine and it kills you.

20   **Q.**    For how long have you had this disorder?

21   **A.**    This one has been almost about -- almost five

22   years, almost, since 2007.  But I have a new one in

23   this side that they found out on December last year.

24   **Q.**    The osteomyelitis has spread to a different

25   location?

1    **A.**   Yes.  In the other side, in the left side now.

2    **Q.**   Was there an event in the 1990's that triggered

3    some health problems for you?

4    **A.**   Yes.  What happened to me, the accident.

5    **Q.**   Okay.  Was there a time that you were shot?

6    **A.**   Yes.  I was carjacked and shot.

7    **Q.**   And that happened here in Providence?

8    **A.**   Yes.  On Eddy Street, Providence.

9    **Q.**   And did that lead to the osteomyelitis?

10   **A.**   No, that led to me being paralyzed.

11   **Q.**   And the osteomyelitis developed afterwards?

12   **A.**   Yes.

13   **Q.**   Now, have you been given any kind of prognosis by

14   any doctors as to how long you have to live?

15   **A.**   In the beginning, it was full-blown.  It goes

16   around your whole body.  So they gave me six months,

17   three years.  And I was in hospice for a while.  And I

18   did almost pass, and they brought me back and then they

19   gave me a lot of medicine.  And it contains it, but it

20   keeps eating you little by little, the bone.  So I

21   don't have a hip.  It's in the pelvis.

22   **Q.**   So as of now, you don't have a definite prognosis?

23   Hopefully, you can continue on for much longer?

24   **A.**   They don't know if it's going to happen tomorrow.

25   It could happen whenever.

1  **Q.**   Did you just a couple of months ago have to go

2  back for more surgery?

3  **A.**   Yes.

4  **Q.**   What happened then?

5  **A.**   It was for -- because it's so much pain that they

6  wanted to open my spine.  They opened my spine to take

7  out -- spread the nerves, so I won't feel no pain.  But

8  it didn't work.

9  **Q.**   Okay.  And did you recently have a fall in which

10 you broke a bone?

11 **A.**   Yes, I did.

12 **Q.**   That was your leg that was broken?

13 **A.**   Yes.  The left.

14 **Q.**   Are you on medications now to help you with the

15 pain?

16 **A.**   Just -- yes.  I'm on medication.

17 **Q.**   What kind of medications are you on?

18 **A.**   Right now I'm just on oxycodone.

19 **Q.**   Does that medication affect your ability to

20 understand what I'm asking you or to understand what's

21 going on today?

22 **A.**   No.

23 **Q.**   Now, I want to direct your attention to the early

24 part of 2008.  During this period, were you under the

25 care of hospice?

1    **A.**    Yes.  But I was at home.

2    **Q.**    Okay.  And there was a -- was there a hospice

3    social worker who was assigned to help take care of

4    you?

5    **A.**    Yes.

6    **Q.**    Do you remember her name?

7    **A.**    Joanie Fortin.

8    **Q.**    What kind of things did Joanie do to help take

9    care of you?

10   **A.**    She just advocated and did everything, like she'd

11   bring papers, anything that I needed.

12   **Q.**    Now, did there come a time in the beginning of

13   2008 in which Ms. Fortin said something to you about

14   some kind of way in which you may be able to get money?

15   **A.**    Yeah.  It was two persons.  It was somebody else,

16   I don't remember the name, but her and Joanie Fortin,

17   they said somebody is being real generous for people

18   that are dying and they're giving some money to help

19   you out when you die.

20   **Q.**    Did she say anything about what you might have to

21   do in order to receive this money?

22   **A.**    No.  I just asked what is it about and they just

23   told me that they just giving -- he was generous and

24   he's giving money.

25   **Q.**    And what was your financial situation like at that

1    time?

2    **A.**   I was in pain.  That's about it.  But I was okay.

3    **Q.**   I asked -- did you have any money or savings at

4    that time?

5    **A.**   No.  No.

6    **Q.**   So this was -- you were in need of some financial

7    assistance, too?

8    **A.**   Yeah.  I get SSI, I mean, but that's about it.

9    **Q.**   Now, when Ms. Fortin first mentioned this to you,

10   how did you respond?

11   **A.**   I said, Okay, that's fine with me.

12   **Q.**   And did this lead to some kind of meeting taking

13   place between you and somebody from this organization

14   that was helping people?

15   **A.**   Yes.

16   **Q.**   Okay.  And about -- if you can remember, how much

17   longer after the conversation that you had with

18   Ms. Fortin did this meeting take place?

19   **A.**   I believe it was like a month or two.

20   **Q.**   And who from this organization came to meet with

21   you?

22   **A.**   What's his name?  I'm sorry.

23   **Q.**   Does the name Raymour sound familiar to you?

24   **A.**   Yes.  I'm sorry.  Raymour.

25   **Q.**   Did you know his last name at all?

1    **A.**    No.  I just remember Raymour.  That's about it.

2    **Q.**    He introduced himself to you as Raymour?

3    **A.**    He said his last name, too, but I forgot.

4    **Q.**    Because you knew him as Raymour, I'm just going to

5    refer to him in these questions as Raymour.

6    **A.**    Yes.

7    **Q.**    Did you proceed to have some meeting with Raymour?

8    **A.**    Yes.

9    **Q.**    How many meetings do you recall having with

10   Raymour?

11   **A.**    He came to the house once, and he explained some

12   things and to sign some papers.

13   **Q.**    Before talking about what he said --

14           THE COURT:  Just hold on for one minute.

15           Are you all right, ma'am?  Do you need a break?

16   Let's take a time out.

17           Charlie, could you escort the juror out, please.

18           I'm going to send you into the jury room, ladies

19   and gentlemen.  Let's sort of take a break.

20           (Proceedings out of the presence of the jury as

21   follows:)

22           THE COURT:  Mr. Rodriguez, we're just going to

23   take a very short, five-minute break.  Do you need a

24   break?

25           THE WITNESS:  No, I'm fine.  Thank you.

1      THE COURT: Okay. Well, if you want to step out

2  for a minute, you can certainly do that. Okay?

3      THE WITNESS: Okay.

4      THE COURT: Whatever you need.

5      THE WITNESS: All right. I could stay here

6  or --

7      THE COURT: It's whatever you like.

8      THE WITNESS: Well, I'd rather just stay right

9  here.

10      THE COURT: You rather stay there?

11      THE WITNESS: Yeah, that's fine. Thank you.

12      THE COURT: If you do want to step out, that's

13  fine.

14      THE WITNESS: Okay. Thank you, your Honor.

15      THE COURT: We'll reconvene in just five minutes

16  or less.

17      (Recess.)

18      (Proceedings in the presence of the jury as

19  follows:)

20      THE COURT: Okay. Everybody's good? It's going

21  to be a long ride together, ladies and gentlemen. We

22  have to be flexible. Things happen and so no worries.

23  All right.

24      Are we ready to proceed?

25      MR. VILKER: Yes, your Honor.

1    THE COURT:  Go ahead, Mr. Vilker.

2    **Q.**   Mr. Rodriguez, before our break, I was asking you

3    about the first time that you met with Raymour.  Do you

4    recall where that meeting took place?

5    **A.**   I believe it was at my house.

6    **Q.**   Could you speak just a little closer to the

7    microphone.

8    **A.**   It was in my house.

9    **Q.**   Who was there during this meeting?

10   **A.**   My brother was there living with me and his wife.

11   **Q.**   What's your brother's name?

12   **A.**   Melvin Rodriguez.

13   **Q.**   And what's his wife's name?

14   **A.**   Amy Rodriguez.

15   **Q.**   So it was the four of you, you, Raymour, your

16   brother and your brother's wife?

17   **A.**   Yes.

18   **Q.**   Now, what, if anything, do you recall Raymour

19   saying during that meeting about the individual he was

20   working for?

21   **A.**   He just said that they're giving money, generous

22   to people that are going to pass to help them out a

23   little.

24   **Q.**   And was there a specific dollar amount that was

25   discussed during that first meeting?

1    **A.**    Dollar amount?

2    **Q.**    Yeah.  How much money?

3    **A.**    No.  No.  It wasn't.

4    **Q.**    What was your understanding of what, if anything,

5    you would need to do in order to get this money?

6    **A.**    Nothing.  Just said it was just generous because

7    I'm passing away.

8    **Q.**    Now, during that first meeting that you had with

9    Raymour, did he give you any money that day?

10    **A.**    No.  Not that day.

11    **Q.**    Did you, subsequent to that first meeting, get a

12    check from them?

13    **A.**    Yes.  I got a check after for $2,000.

14    **Q.**    And during that meeting, did Raymour give you any

15    documents that you needed to sign?

16    **A.**    Yes.  I had to sign some papers.

17    **Q.**    What did he say these documents were?

18    **A.**    They were just to say that he gave me the money to

19    help me out for the guy that he was working for.

20    **Q.**    And did you sign the documents that he gave you?

21    **A.**    Yes, I did.

22    **Q.**    Did you spend time going through and reading these

23    documents?

24    **A.**    No.  He explained to me it's just so he could know

25    that he gave me the money and just fill out the paper,

1    to sign papers.  Just told me where to sign.

2    Q.   And did he read through any of these documents for

3    you?

4    A.   No.

5    Q.   So what did he say when he gave you these

6    documents to sign?

7    A.   He just said that it was for -- to see that they

8    gave me the money and that probably they're going to

9    pay the funeral, if I pass.

10   Q.   Now, you said your brother, Melvin, was there?

11   A.   Yes.

12   Q.   Did he review any of these documents?

13   A.   Yes, he was there, but I just signed them.  We

14   didn't review nothing.

15   Q.   So he didn't look at the documents either?

16   A.   No.  No, he didn't.

17   Q.   What about his wife, Amy, did she review any of

18   these documents?

19   A.   No.

20   Q.   Now, after you signed these documents, did Raymour

21   provide you with any copies of the documents that you

22   signed?

23   A.   No, I never got copies.

24   Q.   Do you have in your possession copies of any of

25   the documents you signed that day?

1    **A.**   No.

2         MR. VILKER:  Now, I want to bring up and show

3    you, it should appear in front on the screen,

4    Government Exhibit 970, which I would move full and ask

5    that be published to the jury.

6         THE COURT:  Is there any objection to Exhibit

7    970?

8         MR. LEPIZZERA:  No objection.

9         MR. RADHAKRISHNAN:  No objection, your Honor.

10   Thank you.

11        THE COURT:  970 will be full without objection.

12   You may publish it.

13        (Government Exhibit 970 admitted in full.)

14   **Q.**   Mr. Rodriguez, this document is titled "Terminal

15   Illness Philanthropy Account Receipt," and it indicates

16   on that -- it's dated at the bottom, February 26th,

17   2008.

18        Does that appear to be about the time period

19   that you first met with Raymour?

20   **A.**   Yes.  It was around there.

21   **Q.**   And you see the signature of Melvin Rodriguez with

22   "brother" at the bottom?

23   **A.**   Yes.

24   **Q.**   Did your brother sign that form that day?

25   **A.**   I don't know if he signed it or not.  I can't tell

1     you that.  I didn't see him sign it so --

2     **Q.**    If you know, does it appear to be your brother's

3     handwriting?  You're not sure?

4     **A.**    I'm not sure.

5     **Q.**    The first paragraph says that:  I, Edwin

6     Rodriguez, acknowledge receipt of $2,000 from the

7     philanthropic program for the terminally ill account of

8     Estate Planning Resources.

9          And then it goes on to say that you're between

10    19 and 96 years old, that you've been diagnosed with a

11    terminal illness, and you have a life expectancy of

12    three months.

13         Do you remember seeing this form that day when

14    Raymour came?

15    **A.**    No.  Not this one.

16    **Q.**    Did he say anything about you needed to sign some

17    document or your brother needed to sign some document

18    as a receipt that you received the money?

19    **A.**    He talked to my brother.  Because I was in my room

20    and laying down and my brother was in the living room.

21         MR. VILKER:  Now, if we could bring up

22    Government Exhibit 971.  I would ask that be admitted

23    in full and published as well.

24         THE COURT:  Any objection?

25         MR. LEPIZZERA:  No objection.

1    MR. RADHAKRISHNAN:  No objection, your Honor.

2    Thank you.

3    THE COURT:  971 will be full.  You may publish

4    it.

5    (Government Exhibit 971 admitted in full.)

6    **Q.**   This is a check dated that same date, February 26,

7    2008, written by Joseph Caramadre, and it's for $2,000.

8    Do you recognize this check?

9    **A.**   Yes.

10   **Q.**   Is this a check that Raymour provided your

11   brother?

12   **A.**   Yes.  Because I have no bank account so --

13   **Q.**   That was my question.  Did you know why it was

14   written to your brother instead of to you?

15   **A.**   Yes.  Because I didn't have a bank account at that

16   time, so he did.

17   **Q.**   Did you see in the memo section how it's written

18   the word "philanthropy."  Was it your understanding

19   that this was a gift or charity?

20   **A.**   It was just, yeah, for charity for me.

21   **Q.**   Now, in addition to the document that I already

22   showed you, the terminal illness receipt, you indicated

23   that Raymour provided you with other documents to sign

24   that day?

25   **A.**   Yes.

1    **Q.**    Do you recall approximately how many documents

2    there were?

3    **A.**    There was about, like, five or six, I believe.

4    Something like that.  Or more.

5    **Q.**    What do you remember these documents looking like?

6    **A.**    Just a lot of paragraphs and where to sign.

7    That's about it.

8    **Q.**    Did they appear to be completed documents or

9    signature pages?

10    **A.**    No.  They were just to read it and sign the paper.

11    **Q.**    I want to show you some of the documents that bear

12    your signature.

13            MR. VILKER:  First pull up Exhibit 977.

14            I would ask that that be admitted in full and

15    published, please.

16            THE COURT:  Any objection?

17            MR. LEPIZZERA:  No objection.

18            MR. RADHAKRISHNAN:  No objection, your Honor.

19    Thank you.

20            THE COURT:  977 will be full.  You may publish

21    it.

22            (Government Exhibit 977 admitted in full.)

23    **Q.**    Do you recognize your signature at the bottom of

24    this document?

25    **A.**    Yes.

1    **Q.**   And there's an X next to your signature that's

2    circled?

3    **A.**   Yes.

4    **Q.**   Would this have been how these documents were

5    presented to you by Raymour?

6    **A.**   Yes, it was.

7    **Q.**   Now, this particular page and the application

8    page, if you can just magnify that fifth bullet point,

9    it's an application page to have an annuity opened at a

10   company called Western Reserve Life.

11        Did you read that bullet point when you were

12   signing this document?

13   **A.**   No, I never did.

14   **Q.**   Did Raymour say anything to you about any

15   annuities being opened in your name?

16   **A.**   No.

17   **Q.**   Did he say anything to you about a company called

18   Western Reserve Life?

19   **A.**   No.

20        MR. VILKER:  I'd like to show you Exhibit 978

21   and ask that be moved full and published to the jury.

22        THE COURT:  Any objection?

23        MR. LEPIZZERA:  No objection.

24        MR. RADHAKRISHNAN:  No objection, your Honor.

25   Thank you.

1          THE COURT:  978 will be full.  You may publish

2     it.

3          (Government Exhibit 978 admitted in full.)

4     **Q.**    Do you see your signature on this document?

5     **A.**    Yes, I do.

6     **Q.**    And again, would this have been one of the

7     signature pages that Raymour provided to you to sign?

8     **A.**    Yes.

9     **Q.**    Did you read through any of this fine print before

10    you signed this page?

11    **A.**    No, I did not.

12    **Q.**    Did Raymour read through any of it with you?

13    **A.**    No.

14    **Q.**    This is a form from a company called AXA

15    Equitable.  Did Raymour say anything to you about

16    opening some annuity or some other contract with a

17    company called AXA Equitable?

18    **A.**    No, he did not.

19    **Q.**    Did he read through any of this document with you

20    before you signed it?

21    **A.**    No.

22         MR. VILKER:  I want to show you now Exhibit 979

23    and ask that it be moved full and published to the

24    jury.

25         THE COURT:  Any objection?

1       MR. LEPIZZERA:  No objection.

2       MR. RADHAKRISHNAN:  No objection, your Honor.

3  Thank you.

4       THE COURT:  979 will be full.  You may publish

5  it.

6       (Government Exhibit 979 admitted in full.)

7  **Q.**   Does this appear to be another signature page that

8  you were asked to sign by Raymour that day?

9  **A.**   It appears like it's my signature, yes.

10 **Q.**   Did you read through any of the language in

11 this -- on this page before you signed it?

12 **A.**   No, I did not.

13 **Q.**   Did Raymour read anything from this page to you

14 before you signed it?

15 **A.**   No, he did not.

16 **Q.**   This part here says that it's from a company with

17 the initials PALAC.  Did Raymour say anything about a

18 company with those initials?

19 **A.**   No, he did not.  I don't know even know what is

20 that.

21 **Q.**   Did he mention anything about a company called

22 Pacific Life?

23 **A.**   No, he did not.

24      MR. VILKER:  I want to show you now Exhibit 980,

25 and I ask that be moved full and published.

1          THE COURT:  Any objection?

2          MR. LEPIZZERA:  No objection.

3          MR. RADHAKRISHNAN:  No objection.  Thank you.

4          THE COURT:  980 will be full.  You may publish

5     it.

6          (Government Exhibit 980 admitted in full.)

7     **Q.**   Does this appear to be another blank signature

8     page that you signed?

9     **A.**   Yes.

10    **Q.**   And did you read through anything on this page

11    before you signed it?

12    **A.**   No, I did not.

13         MR. VILKER:  I'd like to show you Exhibit 981

14    and ask that that be moved full and published.

15         THE COURT:  Any objection?

16         MR. LEPIZZERA:  No objection.

17         MR. RADHAKRISHNAN:  No objection, your Honor.

18         THE COURT:  981 will be full.  You may publish

19    it.

20         (Government Exhibit 981 admitted in full.)

21    **Q.**   Does 981 appear to be another signature page that

22    you signed that day?

23    **A.**   Yes.  It looks like my signature.

24    **Q.**   Again, did you read through any of the fine print

25    on this document before you signed it?

1    **A.**   No, I did not.

2    **Q.**   Did Raymour read it or explain to you what was on

3    this form?

4    **A.**   No.  He just explained that it was to let the one

5    he was working for, that he was giving me the charity

6    of the money.  That's about it.

7    **Q.**   So am I correct that your understanding when you

8    signed these forms was that they were needed for the

9    records of the person who was giving the money?

10   **A.**   Yes.  Just for the charity, to let him know that

11   he did give me the money.

12        MR. VILKER:  Okay.  Now, I want to bring up

13   Exhibit 972 and ask that that be moved full.

14        THE COURT:  Any objection?

15        MR. LEPIZZERA:  No objection.

16        MR. RADHAKRISHNAN:  No objection, your Honor.

17   Thank you.

18        THE COURT:  972 will be full.  You may publish

19   it.

20        (Government Exhibit 972 admitted in full.)

21   **Q.**   Now, Mr. Rodriguez, this is a three-page document.

22   The first page is entitled "Agreement and

23   Acknowledgment."

24        Do you see any of your handwriting on this first

25   page?

1    **A.**    No.

2         MR. VILKER:  If we could turn to the second page

3    of this document.

4    **Q.**    There's no handwriting on this page at all,

5    correct?

6    **A.**    Yes.

7         MR. VILKER:  Turn to the third page of this

8    document.

9    **Q.**    Do you see your signature next to where it says

10   "Co-owner signature"?

11   **A.**    Yes.

12   **Q.**    And there's an X there?

13   **A.**    Yes.

14   **Q.**    Does that appear to be one of the pages that you

15   signed at Raymour's request?

16   **A.**    Yeah.  I believe so.  Yes.

17   **Q.**    When you signed this particular page, what did you

18   think this document was for?

19   **A.**    It was just for charity and to let them know.

20   **Q.**    Going back to the first page of this document,

21   when Raymour was with you, did he show you this first

22   page?

23   **A.**    No.  I have never seen that page.

24   **Q.**    Prior to being shown this document by the

25   Government, you had never been shown this page?

1  **A.**   No.

2  **Q.**   Okay.  Now, this first page starts out --

3          MR. VILKER:  If you can just enlarge the first

4  paragraph there.

5  **Q.**   It says that there's going to be a brokerage

6  account that's going to be opened between Joseph

7  Caramadre, who's identified as the funds provider, and

8  yourself, Edwin Rodriguez, as the co-owner.

9          What, if anything, did Raymour say to you about

10  opening up any kind of brokerage account?

11  **A.**   He never said nothing about that.

12  **Q.**   What, if anything, did he say about opening up any

13  kind of account in your name?

14  **A.**   He never said anything about that.

15  **Q.**   Did he say anything about -- did you have an

16  understanding of who Joseph Caramadre was?

17  **A.**   Yes.

18  **Q.**   What was your understanding?

19  **A.**   That they just said that he was really generous,

20  had money, and he was just giving out money to the

21  people that were dying, in hospice.  Just to help them

22  out.

23  **Q.**   So you understood from Raymour that Mr. Caramadre

24  was the person that was giving out this money?

25  **A.**   Yes.

1  **Q.**   Did you have any understanding that, in addition

2  to giving out this money, that your name was going to

3  be put on some kind of account with Mr. Caramadre?

4  **A.**   No.

5  **Q.**   Now, paragraph number one says the funds provider,

6  who is identified as Mr. Caramadre, and the co-owner,

7  yourself, are joint tenants with right of survivorship

8  in the above-referenced brokerage account.

9      Did Mr. Radhakrishnan say anything about having

10 some kind of account with some kind of right of

11 survivorship?

12 **A.**   No.

13 **Q.**   Do you understand what a right of survivorship is?

14 **A.**   No.

15 **Q.**   Would you understand that if there's two people on

16 an account and one of them were to pass away that the

17 other one may be able to get the money in the account?

18 **A.**   Yes.  I understand that now.

19 **Q.**   Well, did he say anything, whether he used that

20 term "right of survivorship" or not, anything that at

21 all suggested that Mr. Caramadre would be able to get

22 the full money in the account if you passed away?

23 **A.**   No.

24 **Q.**   Now, if you go down to paragraph four, it says,

25 the co-owner, which is yourself, may, but is not

1    obligated to, deposit funds in the account and direct

2    the broker to purchase certain securities with these

3    funds.  Any securities purchased will be held in the

4    account.

5         Did Raymour say anything to you about there's

6    going to be some account and if you want to deposit

7    funds into it, you can go ahead and do that?

8    **A.**   No.

9         MR. VILKER:  If you could bring up paragraph

10   five.

11   **Q.**   It says:  As joint tenants, each of the funds

12   provider and the co-owner has the right without the

13   consent of the other to direct the broker to sell the

14   securities, to withdraw the securities or the cash

15   proceeds thereof from the account and to otherwise deal

16   with the account.

17        Did Raymour say anything to you along the lines

18   that there's going to be some account that's going to

19   be opened, money is going to be put in it; and if you

20   want to withdraw the money, you can go ahead and do so?

21   **A.**   No, he did not.

22   **Q.**   In fact, did he say anything to you at all about

23   any kind of account being opened in your name?

24   **A.**   No.

25   **Q.**   Paragraph number seven indicates that the

1    securities in the account may contain an optional

2    redemption feature, which provides that in the event of

3    one joint tenant's death, the surviving joint tenant is

4    allowed to sell the securities in the account back to

5    the issuer in exchange for the par value of the

6    securities plus accrued interest. In order to exercise

7    the option redemption feature, the funds provider and

8    the co-owner must be joint tenants with right of

9    survivorship in the account at the time of either

10   party's death. As a result of the optional redemption

11   feature, the securities could yield a substantial

12   profit for the funds provider if the co-owner dies

13   before the funds provider.

14          Now, do you understand what it is that I just

15   read to you?

16   **A.**   Yes.

17   **Q.**   I know it's a lot of legalese, but what's your

18   understanding of what it is that I just read?

19   **A.**   I believe that if I died, they get the money, I

20   guess?

21   **Q.**   Well, it indicates that there could be securities

22   purchased, and there could be a substantial profit to

23   Mr. Caramadre if you were to be the one who would die

24   before Mr. Caramadre.

25          Did Raymour say anything, whether in these words

1    or any other words, that indicated to you that

2    Mr. Caramadre stood to make a substantial profit upon

3    your death?

4    **A.**   No.  I would have never done that.

5    **Q.**   Why wouldn't you have done this?

6    **A.**   I have a daughter.  Why would I give him my money

7    of death?  I would never do that.  I wouldn't have

8    never done that.

9            MR. VILKER:  If you could turn to the next page,

10   please.

11   **Q.**   I'm just going to read to you, I'm not going to go

12   through this whole agreement but paragraph number eight

13   says:  Both the funds provider and the co-owner have

14   executed this agreement and acknowledgment and the

15   joint brokerage account agreement dated of even date

16   herewith freely and voluntarily without coercion,

17   undue influence or fraudulent inducement of any kind

18   and with full knowledge and understanding of the

19   contents.  The funds provider and the co-owner have had

20   the opportunity to ask questions about the matters set

21   forth in these documents and to consult with an

22   attorney of their own choice.

23          Did you have an opportunity to have copies of

24   these documents and show them to an attorney or anybody

25   else that you wanted to show them to?

1  **A.**  No.

2  **Q.**  Did Mr. Radhakrishnan or Raymour give you copies

3  of the documents that you signed?

4  **A.**  No.

5  **Q.**  How much time would you estimate that you had with

6  these documents?

7  **A.**  Probably 20 minutes just to sign them, things like

8  that.  Ten, 20 minutes.

9  **Q.**  If you can recall, as you had these documents in

10  front of you, what was happening?  What was Raymour

11  saying to you as you were signing them?

12  **A.**  He was just saying sign in this part; it's only to

13  let know the one that he was working with that he

14  didn't take the money.  He gave me the money.

15  **Q.**  And you just signed the various places where he

16  told you to sign?

17  **A.**  Yes, I did.

18       MR. VILKER:  Now, I'd like to show you now

19  Government Exhibit 973, and I'd ask that be admitted

20  full and published to the jury.

21       THE COURT:  Any objection?

22       MR. LEPIZZERA:  No objection.

23       MR. RADHAKRISHNAN:  No objection, your Honor.

24       THE COURT:  973 will be full.  You may publish

25  it.

1          (Government Exhibit 973 admitted in full.)

2     **Q.**    Okay.  Government Exhibit 973 is an account

3     application to open up a brokerage account at a company

4     called TD Ameritrade.

5          First of all, did Raymour say anything to you

6     about opening up any kind of brokerage account in your

7     name?

8     **A.**    No, he did not.

9     **Q.**    Did he say anything to you about a company called

10    TD Ameritrade?

11    **A.**    No, he did not.

12    **Q.**    Now, the co-owner -- the owner of the accounts in

13    this brokerage account is Joseph Caramadre and the

14    co-owner is yourself.

15         Again, did you have any understanding that you

16    would be a co-owner on any kind of account with

17    Mr. Caramadre?

18    **A.**    No.

19         MR. VILKER:  If you could go to the next page,

20    please.

21    **Q.**    Do you see your signature at the bottom of this

22    document?

23    **A.**    Yes.

24         MR. VILKER:  If you can just magnify that,

25    please.

1  **Q.** So you see here where that's your signature, Edwin

2  Rodriguez?

3  **A.** Yes.

4  **Q.** And you see the signature above that, apparently

5  Joseph Caramadre?

6  **A.** Yes.

7  **Q.** Do you know if that was on the document at the

8  time that you signed it?

9  **A.** No.  Nothing was on.  He said he'll put the date.

10 That's about it.  I just signed it.

11 **Q.** And did you read -- this has some language in

12 there.  It says, "Account Agreement."  Did you read any

13 of that language?

14 **A.** No, I did not.

15 **Q.** Did Raymour read it to you or say anything about

16 opening up any kind of account in your name?

17 **A.** No, he didn't.

18 **Q.** Now, next to your signature is a date 3/4/2008 and

19 next to Mr. Caramadre's signature is a date 3-4-2008.

20 Are either of those dates in your handwriting?

21 **A.** No.

22     MR. VILKER:  Now I'd like to show you Exhibit

23 974, please.  I would ask that that be moved full and

24 published.

25     THE COURT:  Any objection?

1      MR. LEPIZZERA:  No objection.

2      MR. RADHAKRISHNAN:  No objection, your Honor.

3      THE COURT:  974 will be full.  You may publish

4  it.

5      (Government Exhibit 974 admitted in full.)

6  **Q.**   Do you see, I'll point to you on the screen, your

7  signature?

8  **A.**   Yes, I do.

9  **Q.**   There's an X next to that.  Would this document

10  have been completed at the time you signed it, or would

11  it have been another one of these blank signature

12  pages?

13  **A.**   No.  It was blank.

14  **Q.**   This document is entitled "Limited Trading

15  Authorization."  And it provides that by signing it

16  below you, as a co-owner, are agreeing that there'll be

17  an authorized agent who can conduct transactions in

18  that account and that authorized agent would be Raymour

19  Radhakrishnan.

20      Did Mr. Radhakrishnan say anything to you about

21  I need you to sign a document that authorizes me to

22  make trades in the account that's going to be opened?

23  **A.**   No.

24  **Q.**   Did he spend any time explaining this form to you?

25  **A.**   Who, Raymour?

1    **Q.**    Yes.

2    **A.**    No.

3    **Q.**    Okay.  Now, it says the account owner is Joseph

4    Caramadre.  Have you ever met with Joseph Caramadre?

5    **A.**    No, I did not.

6    **Q.**    And your dealings in this case were solely with

7    Raymour Radhakrishnan?

8    **A.**    Yes.

9    **Q.**    Did you have any knowledge at the time that you

10   met with Raymour that any kind of financial product was

11   going to be purchased in your name?

12   **A.**    No.

13          MR. VILKER:  I'd like to show you now Government

14   Exhibit 975.  I'd ask that that be moved full and

15   published for the jury.

16          MR. LEPIZZERA:  No objection.

17          MR. RADHAKRISHNAN:  No objection, your Honor.

18          THE COURT:  975 will be full.  You may publish

19   it.

20          (Government Exhibit 975 admitted in full.)

21   **Q.**    975 is another Ameritrade form, and it's a

22   Margin/Options Account Upgrade form.  The first page

23   provides information on the account owner,

24   Mr. Caramadre.

25          MR. VILKER:  If you could turn to the second

1    page, please.

2    **Q.**   And the second page has information about yourself

3    as the co-owner.

4         MR. VILKER:  Turn to the third page.

5    **Q.**   Does that appear to be your signature at the

6    bottom of this third page?

7    **A.**   Yes, I believe so.

8    **Q.**   And do you know if the form was -- the rest of the

9    form was completed at the time you signed it or if it

10   was blank?

11   **A.**   No.  It was just blank.

12        MR. VILKER:  Turn to the next page please.  If

13   we could magnify from "account co-owner" down.

14   **Q.**   First of all, do you see your signature on this

15   page?

16   **A.**   Yes.

17   **Q.**   Now, this section asks some questions about the

18   account co-owner, this Ameritrade account, which is

19   you.  The first question it asks is number of

20   dependents, zero.

21        Was that accurate that you had no dependents at

22   the time?

23   **A.**   No.

24   **Q.**   You have a daughter, right?

25   **A.**   Yes.  I have my daughter.

1  **Q.**   Okay.  The next box indicates, it says:  Funds

2  available for options trading, and it's marked X and it

3  says $50,000 plus.

4       My question is did you mark that box X?

5  **A.**   No, I did not.

6  **Q.**   Did you -- do you know if these boxes were already

7  marked in at the time that you signed the form?

8  **A.**   No.

9  **Q.**   You don't know one way or the other?

10 **A.**   No.

11 **Q.**   Is it true that you had at that time more than

12 $50,000 available for options trading?

13 **A.**   No.

14 **Q.**   Did Raymour ask you anything about how much money

15 that you have and how much money you wanted to put into

16 this account?

17 **A.**   No.

18 **Q.**   Now, the next box over says -- the next category

19 over says years of investment experience, and it says

20 six through nine.

21       Did you mark that six through nine box?

22 **A.**   No, I did not.

23 **Q.**   Is that true, that you had six -- between six and

24 nine years of investment experience?

25 **A.**   No.

1   **Q.**   Do you have any investment experience?

2   **A.**   No, I don't.

3   **Q.**   Did Raymour even ask you if you had any investment

4   experience?

5   **A.**   No, he did not.

6   **Q.**   The next category over says, "Investment

7   Knowledge," and it's marked "Extensive."  Would that be

8   an accurate description of your investment knowledge?

9   **A.**   No.

10   **Q.**   You don't have extensive investment knowledge?

11   **A.**   No.

12   **Q.**   The next category says, "Average Transaction

13   Size," and it says between $2,001 and $5,000.  Am I

14   correct in assuming that that's not accurate?

15   **A.**   No.

16   **Q.**   I'm not correct or I am correct?

17   **A.**   It looks like it but I didn't X it.

18   **Q.**   I phrased that badly.  My question is did you

19   conduct an average amount of transactions over the

20   years of between $2,000 and $5,000?

21   **A.**   No.

22   **Q.**   Okay.  Going down to this row, it says that the

23   number of transactions a year that you conduct are

24   between 10 and 19.

25         Did you conduct between 10 and 19 stocks and

1     bonds and those type of transactions a year?

2     **A.**   No, I did not.

3     **Q.**   The next box says types of transactions that you

4     conduct, and it's marked that you conduct transactions

5     in stocks and bonds and options.

6           Is that true that you conduct these type of

7     transactions?

8     **A.**   No.

9     **Q.**   Do you even know what "options" is in the

10    financial sense?

11    **A.**   No, not really.

12    **Q.**   Then it says what are your investment objectives,

13    check all that apply.  And it's checked growth, income

14    and conservation of capital.

15          Did you have any conversations with Raymour

16    about there's going to be some kind of account that's

17    going to be opened in your name, and we want to know

18    what your objectives are in this account?

19    **A.**   No.

20    **Q.**   And finally, it says what type of activity do you

21    plan to conduct in your options account, and it says

22    purchase options.

23          Again, did you have any discussion with Raymour

24    about options or purchasing options or what options

25    even were?

1    **A.**    No, I did not.

2         THE COURT:  Mr. Vilker, when you get to a good

3    break point, we can --

4         MR. VILKER:  This is a good time.

5         THE COURT:  This is a good time?

6         All right.  Ladies and gentlemen, I think we'll

7    take our scheduled break at this time.  So Charlie will

8    show you out, and you'll find a snack for you

9    downstairs in the jury room.  We'll reconvene in about

10   30 minutes.  Please keep in mind all of my

11   instructions.

12        (Proceedings out of the presence of the jury as

13   follows:)

14        THE COURT:  Mr. Rodriguez, you'll be able to

15   step down and take a break during this time as well.

16        (Recess.)

17        (Proceedings in the presence of the jury as

18   follows:)

19        THE COURT:  Welcome back, ladies and gentlemen.

20   Mr. Rodriguez will be back in in a moment, and we'll

21   get restarted.

22        (Discussion off the record.)

23        THE COURT:  Welcome back, Mr. Rodriguez.  And

24   once again, anything you need, just let me know.  If

25   you need another break or anything, okay?

1          THE WITNESS:  Thank you, your Honor.

2          THE COURT:  You're welcome.

3          Mr. Vilker, you may proceed with your

4     examination.

5          MR. VILKER:  Thank you.

6     Q.   Mr. Rodriguez, I'd like to show you Government

7     Exhibit 14, please.

8          MR. VILKER:  Move this full as a certified

9     business record.

10         THE COURT:  Is there any objection?

11         MR. LEPIZZERA:  Can we have a moment, your

12    Honor, because we weren't expecting this.

13         THE COURT:  Yes.

14         (Pause.)

15         MR. LEPIZZERA:  No objection.

16         MR. RADHAKRISHNAN:  No objection, your Honor.

17    Thank you.

18         THE COURT:  Thank you.  Government 14 will be

19    full.  You may publish it and inquire.

20         (Government Exhibit 14 admitted in full.)

21    Q.   Mr. Rodriguez, are you able to see this document

22    in front of you?

23    A.   Yes.

24    Q.   This is a document that's titled "Summary of TD

25    Ameritrade Bond Holdings," and it's dated --

1    MR. THOMPSON:  Sorry to interrupt.  At least one

2    of the juror's screens -- it's been fixed.  Thank you.

3    THE COURT:  Usually if a screen goes off,

4    there's a high-tech solution to that, just turn it off

5    and turn it back on and usually that fixes the problem.

6    Okay?

7    Go ahead.

8    **Q.**   This document is called "Summary of TD Ameritrade

9    Bond Holdings, 6/17/08."  And the second line down,

10    I'll point to it for you, says JAC, Joseph Caramadre,

11    and Edwin Rodriguez, and its account number.  It says

12    total deposits $200,000, bond face value $557,000.

13    Did you have any idea that $200,000 was

14    deposited into an account with your name on it?

15    **A.**   No.

16    **Q.**   Did you have any idea that $557,000 worth of bonds

17    were purchased in that account?

18    **A.**   No.

19    **Q.**   Did you have any idea that these bonds had a

20    death-put provision that would allow someone else to

21    profit upon your death?

22    **A.**   No.

23    **Q.**   Now, in addition to this account, what, if

24    anything, did Raymour say to you about any kind of

25    annuities being opened in your name?

1    **A.**   He never said nothing like that.

2    **Q.**   Could you speak a little closer to the microphone.

3    **A.**   I'm sorry.  He never said nothing like that.

4    **Q.**   So you had no idea that any annuities would be

5    opened in your name?

6    **A.**   No, he never told me that.

7          MR. VILKER:  I'd like to show you Government

8    Exhibit 261 and ask that this be moved full and

9    published to the jury.

10          THE COURT:  Is there any objection to 261?

11          MR. LEPIZZERA:  No objection.

12          MR. RADHAKRISHNAN:  No objection, your Honor.

13          THE COURT:  All right.  261 will be full.  You

14    may publish it to the jury.

15          (Government Exhibit 261 admitted in full.)

16    **Q.**   Mr. Rodriguez, this is an application for a

17    company called Nationwide Life Insurance Company for an

18    annuity.

19          Did Raymour say anything to you about a company

20    called Nationwide?

21    **A.**   No.

22    **Q.**   Did he say anything to you about some annuity

23    being opened up using your name?

24    **A.**   No.  I didn't even know what's that.  No.

25    **Q.**   The owner of this annuity is a woman named Paula

1    Bizier.  Do you have any idea who she is?

2    **A.**   No.  This is the first time I heard of --

3    **Q.**   But did Raymour say anything about you being the

4    annuitant on some annuity that's going to owned by this

5    woman, Paula Bizier?

6    **A.**   No.

7    **Q.**   If you go down to your section, the section that

8    says "annuitant" with your name in it, and then it says

9    Social Security number and it's been redacted, the

10   first part of it, but the last four digits are 9634.

11   Is that your Social Security Number?  Are those the

12   last four digits of your --

13   **A.**   9634, yes.

14   **Q.**   Do you know how Raymour obtained your Social

15   Security number?

16   **A.**   No.  I really don't know.  I don't know if he

17   asked me.  Probably he did.

18   **Q.**   Do you recall giving it to him, or you just can't

19   remember?

20   **A.**   I think he asked me about it.  That's about it.

21   **Q.**   If you can turn to page three of this exhibit, it

22   indicates that there's a purchase payment of $250,000

23   that was made with this annuity.  Was anything close to

24   that dollar amount discussed with you?

25   **A.**   No.

1    **Q.**    In fact, was anything discussed with you

2    concerning money that would go into some annuity using

3    your name?

4    **A.**    No.

5    **Q.**    The next paragraph has a section on death

6    benefits.

7    **A.**    Where?

8    **Q.**    This, where it says "3a" here?

9    **A.**    Okay.

10   **Q.**    And it's marked that the person is electing the

11   highest anniversary enhanced death benefit option.

12         What, if anything, did Raymour say to you about

13   any kind of death benefits resulting from your death in

14   this or any annuity?

15   **A.**    Nothing.  He never said nothing like that.

16         MR. VILKER:  If I could bring up Exhibit 262,

17   please.  I would move that full.

18         MR. LEPIZZERA:  No objection.

19         MR. RADHAKRISHNAN:  No objection, your Honor.

20         THE COURT:  262 will be full.  You may publish

21   it.

22         (Government Exhibit 262 admitted in full.)

23   **Q.**    This is a check that accompanied that annuity by

24   Paula Bizier for $250,000.  Did you have any idea that

25   this amount of money would be sent into this annuity?

1    **A.**   No.

2         MR. VILKER:  Can I bring up Exhibit 263, please.

3    Move that full.

4         MR. LEPIZZERA:  Also no objection, your Honor.

5         MR. RADHAKRISHNAN:  No objection, your Honor.

6         THE COURT:  263 will be full.  You may publish

7    it.

8         (Government Exhibit 263 admitted in full.)

9    **Q.**   Mr. Rodriguez, this an additional check into that

10   annuity for 1.75 million.

11        Did you have any idea that such a huge amount of

12   money would be put into some annuity at Nationwide in

13   your name?

14   **A.**   No.

15        MR. VILKER:  Now I'd like to show you Exhibit

16   976.  I'd move 976 full.

17        MR. LEPIZZERA:  No objection.

18        MR. RADHAKRISHNAN:  No objection, your Honor.

19        THE COURT:  976 will be full.  You may publish

20   it.

21        (Government Exhibit 976 admitted in full.)

22   **Q.**   976 is entitled "Annuitant Acknowledgment Form."

23   And before I go through the first page, if you can just

24   turn to the second page.

25        Do you see next to the X your signature?

1  **A.**   Yes.

2  **Q.**   Okay.  And was this one of the signature pages

3  that Mr. Radhakrishnan gave you to sign that day?

4  **A.**   I believe so.

5  **Q.**   Okay.  And did he say anything to you when you

6  signed this form that your name would be used, your

7  Social Security number would be used on any kind of

8  annuity that was going to be opened?

9  **A.**   No.

10       MR. VILKER:  If we can go back to the first

11  page, please.

12  **Q.**   The first page says that -- first of all, is the

13  writing, other than the initials on the left, is any of

14  the other writing on this page yours?

15  **A.**   No.  It was blank.

16  **Q.**   So your memory is this form was blank?

17  **A.**   Yes.  I don't -- it was blank.

18  **Q.**   But are those your initials that you wrote on that

19  page where it says "ER"?

20  **A.**   Yes.  He told me just to write the initials right

21  there.

22  **Q.**   Did you read this document before you signed your

23  initials to it?

24  **A.**   No.  I was going to read "I understand" and

25  Raymour, I believe he said something like that I

1   understand that he gave me the money from the other --

2   who he was working for.

3   **Q.**   But you initialed next to that because Raymour

4   told you that that was just saying that you understand

5   that you were getting this money?

6   **A.**   Yes.

7   **Q.**   Now, you said you had this first meeting with

8   Raymour.  Did you meet with him again?

9   **A.**   Yes, I did.

10   **Q.**   Where did that meeting take place?

11   **A.**   Where?

12   **Q.**   Yes.

13   **A.**   I was in New Bedford Nursing Home.

14   **Q.**   And about how much after the first meeting did the

15   second meeting take place?

16   **A.**   Because I seen him before that, anyways.  I was in

17   the hospital, and he gave me $250 I believe it was.

18   **Q.**   So before the New Bedford Nursing Home, you were

19   in another hospital?

20   **A.**   Yes.  I was in the hospital, and I believe my

21   brother told him.  I don't know if he went.  I believe

22   it was for the funeral thing with my brother.  I don't

23   know.  But he gave me 250 --

24   **Q.**   How did this second meeting in the hospital get

25   set up?

1   **A.**   He just came in and visit and just said hi and
2   good luck, and he gave me $250.
3   **Q.**   Was that a check or cash?
4   **A.**   No.  Cash.
5   **Q.**   Did he have you sign any other documents that day?
6   **A.**   No.
7   **Q.**   Did he say why he was giving you this $250?
8   **A.**   No.  Just said, Good luck and here's some money.
9   **Q.**   You said there was one final time that you met
10  with Raymour after that?
11  **A.**   Yes.
12  **Q.**   And where was that?
13  **A.**   That was in New Bedford Nursing Home.
14  **Q.**   Okay.  And do you know how that meeting got set
15  up?
16  **A.**   Yes.  My brother called me saying that since I'm
17  still alive they wanted to help me out again with I
18  believe it was the funeral or something, if I died.
19  But my brother had to come because Raymour didn't know
20  how to get there.
21  **Q.**   And what happened at this third meeting?
22  **A.**   It was the same thing.  I just signed a couple of
23  papers, and then he -- my brother was there, and my
24  brother's wife.  And I signed the papers, and I believe
25  he gave me $200 cash.

1   Q.   Did he explain to you what these additional papers

2   were for?

3   A.   He said it was like for the funeral, that they'll

4   pay my funeral when I pass away.

5   Q.   Did he say anything in that meeting or in any

6   meeting about any kind of accounts or annuities that

7   would be opened in your name?

8   A.   No.

9        MR. VILKER:  Now, I want to show you Exhibit

10  982.  And I'd ask that that be admitted full.

11       MR. LEPIZZERA:  No objection.

12       MR. RADHAKRISHNAN:  No objection, your Honor.

13       THE COURT:  982 will be full without objection.

14  You may publish it.

15       (Government Exhibit 982 admitted in full.)

16  Q.   Now, Mr. Rodriguez, this is a check -- Melvin

17  Rodriguez is your brother?

18  A.   Yes, he is.

19  Q.   So this is a check that's written to your brother

20  by Mr. Caramadre dated March 7th of 2008.  Did you know

21  at that time that your brother received this check?

22  A.   No.  Not at that time right there, no.

23  Q.   When did you find out about that check?

24  A.   When they said that they paid for the funeral, my

25  brother.

1    Q.    Your brother told you that he had paid -- what did

2    your brother tell you about paying for the funeral?

3    A.    He just said that they gave him some -- he was

4    going to pay for the funeral.  That's about it.

5    Q.    Do you know if that's, in fact, what your brother

6    did with some of this money?

7    A.    Yes.

8              MR. VILKER:  Can I bring up 983, please.  Ask

9    that be moved full.

10             THE COURT:  Any objection?

11             MR. LEPIZZERA:  No objection.

12             MR. RADHAKRISHNAN:  No objection, your Honor.

13             THE COURT:  983 will be full.  You may publish

14   it.

15             (Government Exhibit 983 admitted in full.)

16   Q.    This is a receipt for a funeral home in Warwick,

17   Rhode Island, dated March 7th, 2008, and that says:

18   Received from Edwin Rodriguez with Melvin Rodriguez,

19   $2,000.

20             So that March 7, 2008, was the same day as the

21   check I just showed you and some cash.

22             What did your brother tell you about how he was

23   putting $2,000 to this funeral home?

24   A.    He just said he's going to the funeral.  That's

25   about it, to the place.  He went with a friend of his.

1    **Q.**    Now, I showed you a bunch of documents in this

2    last hour that had your signature on them.

3    **A.**    Yes.

4    **Q.**    How much time would you say that you and Raymour

5    spent actually looking at the documents, going through

6    them before you signed them?

7    **A.**    Probably like 15, 20 minutes only.  I just had to

8    sign.

9    **Q.**    Well, could you describe what the scene was like.

10   When you would sign these documents, where were you?

11   **A.**    The first time?

12   **Q.**    Yes.  The first time when he came to your

13   apartment.

14   **A.**    Yes.  I was in my bed.  He was talking with my

15   brother, and then he explained to me the same thing,

16   why he's giving the money, the charity, just in case

17   when I die, just to do something with the family.

18   That's about it.

19   **Q.**    Did he give you -- how did he give you the

20   documents?  Did he give you them one at a time or were

21   there a bunch of documents together?

22   **A.**    They were all together, a couple of them.  They

23   were just --

24   **Q.**    What did he say when he gave you these bunch of

25   documents?

1    **A.**    Just to sign to let know his partner know that

2    they gave me the money and it's for charity only.  The

3    whole thing was signing that it was for charity.

4    **Q.**    What, either in that meeting or in the other two

5    meetings with Raymour, what understanding, if any, did

6    you have that any kind of account or annuity would be

7    opened in your name?

8    **A.**    Never.  Nothing.

9    **Q.**    I'm sorry.  I didn't hear that.

10   **A.**    Nothing.  Never.

11   **Q.**    What understanding, if any, did you have that

12   someone else stood to profit upon your death?

13   **A.**    I did not have no knowledge about that.

14          MR. VILKER:  I have no further questions, your

15   Honor.

16          THE COURT:  Thank you, Mr. Vilker.

17          Are you in agreement that Mr. Radhakrishnan

18   should go first?

19          MR. LEPIZZERA:  We are.  We've worked that out,

20   your Honor.

21          THE COURT:  All right.  Mr. Radhakrishnan, you

22   may proceed with your cross-examination.

23          MR. RADHAKRISHNAN:  Thank you, your Honor.

24          <u>**CROSS-EXAMINATION BY MR. RADHAKRISHNAN**</u>

25   **Q.**    Good afternoon, Mr. Rodriguez.

1    **A.**   Good afternoon.

2    **Q.**   I wanted to start off by apologizing to you that

3    you had to be dragged here today.  I know that this is

4    your second time having to testify.

5          MR. VILKER:  Objection, your Honor.

6    **Q.**   And I'm sorry about that.

7    **A.**   That's fine.

8          THE COURT:  Mr. Radhakrishnan, just ask

9    questions.  Okay?

10         MR. RADHAKRISHNAN:  Yes, your Honor.

11   **Q.**   I'll be very brief.

12         Mr. Rodriguez, you had mentioned that you had a

13   relationship with Ms. Joanie Fortin.

14   **A.**   Yes.  She was the social worker.

15   **Q.**   She was your social worker.  Do you still

16   currently have a relationship with her?

17   **A.**   No.

18   **Q.**   You had testified that we first met in March of

19   2008, and you remember that meeting?

20   **A.**   Yeah.  Something like that.  One of the dates.

21   **Q.**   Okay.  Do you remember your brother, Melvin, being

22   there?

23   **A.**   In my apartment, yes.

24   **Q.**   Are you still close to your brother, Melvin?

25   **A.**   Yes, we are.

1    **Q.**   At that time, you had testified that you were

2    having him cash your checks; is that correct?

3    **A.**   Yes.  Because I didn't have a bank account.

4    **Q.**   Okay.  And did you -- do you still have him cash

5    your checks?

6    **A.**   No.

7    **Q.**   So that was just in 2008?

8    **A.**   Yes.  Because I was in the hospital, I didn't open

9    an account.

10   **Q.**   In 2009, then, as well, was he still cashing your

11   checks for you?

12   **A.**   No.

13   **Q.**   Okay.  Your brother used to cash any checks you

14   received; is that correct?

15   **A.**   Any cash that I received?

16   **Q.**   If you were to receive any checks, he would cash

17   any and all of those checks; is that correct?

18   **A.**   In that time, yes, but no, not --

19   **Q.**   Back in 2008?

20   **A.**   2008, no.  Just the ones that you gave me.

21   **Q.**   So your brother would only cash the checks that I

22   gave you in 2008?  He wouldn't cash anything else for

23   you?

24   **A.**   No.  I would just get that signed, pay the bills,

25   that's about it.

1    **Q.**    How would you cash your SSI checks, then?

2    **A.**    I had opened an account already and it was going

3    on deposit.

4    **Q.**    Okay.  Like a direct deposit?

5    **A.**    Yeah.  Like direct deposit after that happened.

6    **Q.**    So bringing you back to that 2008 meeting, do you

7    remember me being polite?

8    **A.**    Yes, you was.

9    **Q.**    And very respectful to you?

10   **A.**    Yes, you was.

11   **Q.**    Okay.  During that meeting in 2008, you signed

12   some papers; is that correct?

13   **A.**    Yes, I did.

14   **Q.**    Okay.  And you also received some money at various

15   points in time; is that correct?

16   **A.**    Yes.  After that.

17   **Q.**    Okay.  What did you spend the money on?

18   **A.**    I just bought my brother, I remember, a Blu -- he

19   wanted a Blu-Ray and bought some things for my

20   daughter, and that's about it.

21   **Q.**    Okay.  But it was useful to you?

22   **A.**    Yeah.  I just gave it to them, bought things for

23   them, and that's about it.

24   **Q.**    Okay.

25        MR. RADHAKRISHNAN:  If I could have Exhibit 973

1    pulled up, please.  The next page, please.

2    **Q.**   Mr. Rodriguez, if you look at that exhibit there

3    on the bottom, you had signed that document; is that

4    correct?

5    **A.**   Yes.  Seems like it, yes.

6    **Q.**   And when you signed that document, was the words

7    "account co-owner" there?

8    **A.**   I believe so, yes, they were.

9    **Q.**   And right above that, there's a paragraph.  It's

10   very, very small print, very fine print.  And there's a

11   numerical number, I believe it's number 9 if I'm

12   reading correctly.  And it says, "Account Agreement."

13   Was that there when you signed the document?

14   **A.**   I believe so, but I didn't know nothing about it.

15   **Q.**   Thank you.

16       MR. RADHAKRISHNAN:  If we could go to the next

17   page, please.

18   **Q.**   And Mr. Rodriguez, here again, we have, I believe,

19   your signature.  There's an X and then you signed

20   there.  Do you see that under "account co-owner"?

21   **A.**   Yes, I see.

22   **Q.**   Okay.  And right at the top of the page, it says,

23   "Limited Trading Authorization."  Were those words

24   there when you signed that document?

25   **A.**   Yes, they were, probably.

1    **Q.**   And then "account co-owner" right above your

2    signature, a couple of lines above, was that there when

3    you signed the document?

4    **A.**   I believe so.  I didn't read it but --

5    **Q.**   Thank you.

6          MR. RADHAKRISHNAN:  Can you please put up 975,

7    Ms. Anderson.  Sorry.  The next page, please.  And one

8    more.  Sorry.  Thank you.

9    **Q.**   And once again, same thing here, Mr. Rodriguez.

10   If you go ahead and see your signature there below?

11   **A.**   Yes, I do.

12   **Q.**   Was the words I believe this time it says,

13   "Account owner/authorized signatory" or "signature,"

14   was that there at the time you signed that document?

15   **A.**   Yes, it had to be.

16   **Q.**   Thank you for that.  One moment, please.

17          You had mentioned that we had met a few times,

18   and it wasn't just that meeting inside March of 2008;

19   is that correct?

20   **A.**   Yes.  You went to the hospital.  I seen you there.

21   **Q.**   You remember me coming to meet with you at the

22   hospital in 2009; is that correct?

23   **A.**   Yes, it was.

24   **Q.**   And you mentioned that you might have signed some

25   additional documents in 2009 as well; is that correct?

1    **A.**   Yes.

2         MR. RADHAKRISHNAN:  Could you please pull up

3    Exhibit Number 977, please, Ms. Anderson.

4    **Q.**   Mr. Rodriguez, you signed here below; is that

5    correct?

6    **A.**   Yes.  It looks like my signature, yes.

7    **Q.**   Do you remember if you signed this -- do you

8    specifically remember if you signed this in 2008 or

9    2009?

10   **A.**   I believe that was the second time, I think,

11   because I didn't read none of the papers.

12        MR. RADHAKRISHNAN:  If you could please pull up

13   978, Ms. Anderson.  Thank you.

14   **Q.**   Mr. Rodriguez, then once again your signature is

15   here.  Is that your signature?

16   **A.**   Yes.  Seems like it, yes.

17   **Q.**   And do you believe you signed this in 2008 or

18   2009?

19   **A.**   I don't know if -- it didn't have no date or

20   nothing so I don't know.

21   **Q.**   Okay.  That's fine.

22        Your brother -- you have a close relationship

23   with your brother or you had a close relationship with

24   your brother in 2008; is that correct, Mr. Rodriguez?

25   **A.**   Yes.

1    **Q.**   Did your brother ever tell you to sign the

2    documents?  Did your brother ever tell you to sign the

3    documents that I was meeting with you about?

4    **A.**   No.  No.

5    **Q.**   Okay.  So you chose to sign the documents; is that

6    correct, Mr. Rodriguez?

7    **A.**   Yes.

8         MR. RADHAKRISHNAN:  Okay.  Thank you very much

9    for your time.  I really appreciate it.

10        THE WITNESS:  You're welcome.

11        THE COURT:  Thank you, Mr. Radhakrishnan.

12        Mr. Lepizzera.

13        MR. LEPIZZERA:  Thank you.

14        **CROSS-EXAMINATION BY MR. LEPIZZERA**

15   **Q.**   Good afternoon, Mr. Rodriguez.  My name is Michael

16   Lepizzera.  I represent Mr. Caramadre.  I have a couple

17   of questions for you.  Okay?

18   **A.**   Okay.  No problem.

19   **Q.**   You did give Mr. Radhakrishnan your Social

20   Security number, didn't you?

21   **A.**   I believe so.  I don't really remember that, but I

22   believe so.

23   **Q.**   You believe you did?

24   **A.**   I believe I did, yes.

25   **Q.**   And you testified that you met with

1    Mr. Radhakrishnan three times, correct?

2    **A.**    Yes.

3    **Q.**    Once at your house?

4    **A.**    Yes.

5    **Q.**    That would have been at 17 Euclid Avenue in

6    Warwick?

7    **A.**    Yes.

8    **Q.**    And the second time would have been in the

9    hospital?

10   **A.**    Yes, it was a nursing home.

11   **Q.**    The third time would have been in New Bedford?

12   **A.**    Yes.

13   **Q.**    Mr. Caramadre wasn't at any of those meetings, was

14   he?

15   **A.**    No, he wasn't.

16   **Q.**    And you testified that you signed a bunch of

17   documents you told the jury, correct?

18   **A.**    Yes.

19   **Q.**    The documents that you signed you went over with

20   Mr. Radhakrishnan, correct?

21   **A.**    Yes, I did.

22   **Q.**    Mr. Caramadre didn't go over those documents when

23   you signed them, correct?

24   **A.**    No.

25   **Q.**    Because Mr. Caramadre wasn't there, isn't that

1    correct?

2    **A.**   Yes.

3         MR. LEPIZZERA:  Thank you.

4         THE COURT:  All right.  Thank you,

5    Mr. Lepizzera.

6         Mr. Vilker, redirect?

7         MR. VILKER:  No further questions.

8         THE COURT:  Okay.  Then thank you very much,

9    Mr. Rodriguez.  That completes your testimony.  So you

10   may step down.  Thank you very much.

11        THE WITNESS:  Thank you, your Honor.

12        THE COURT:  Your next witness, Mr. Vilker.

13        MR. VILKER:  My next witness is Kathleen Flori.

14        THE COURT:  Good afternoon, Ms. Flori.  You'll

15   be sworn by the clerk.

16        **KATHLEEN FLORI**, first having been duly sworn,

17   testified as follows:

18        THE CLERK:  Please state your name and spell

19   your last name for the record.

20        THE WITNESS:  Kathleen Flori, F-L-O-R-I.

21        THE COURT:  You may inquire, Mr. Vilker.

22        **DIRECT EXAMINATION BY MR. VILKER**

23   **Q.**   Good afternoon, Mrs. Flori.

24   **A.**   Good afternoon.

25   **Q.**   If you can do me a favor and just speak into the

1   microphone so everybody can hear you.

2          Mrs. Flori, what city do you live in?

3   **A.**   Cranston.

4   **Q.**   How long have you been a Rhode Islander?

5   **A.**   Fifty-six years.

6   **Q.**   And was your late husband named Dennis?

7   **A.**   Yes.

8   **Q.**   I'm going to ask you some questions about Dennis,

9   and before I do I want to offer you our condolences for

10  your loss.

11         When did your husband, Dennis, pass away?

12  **A.**   April 26, 2008.

13  **Q.**   And what was he suffering from at the time?

14  **A.**   Bladder cancer.

15  **Q.**   And for approximately how long had he been

16  suffering with bladder cancer?

17  **A.**   He had surgery two years before, 2006; and they

18  thought they got it all, but he just kept getting

19  sicker and sicker.  And they gave him two years to

20  live, but he just passed away in four months.

21  **Q.**   They gave him two years to live at the end of

22  2007?

23  **A.**   Yeah.

24  **Q.**   And he passed away at the end of April of 2008?

25  **A.**   Yes.

1    **Q.**   Now, I want to turn your attention to the few

2    weeks before your husband passed away in April of 2008.

3          Was there a time during this period in which you

4    heard about some kind of program that was giving money

5    to people who were terminally ill.

6    **A.**   Yes.

7    **Q.**   And how did you hear about that?

8    **A.**   Judy, she was the nurse that came every day.

9    **Q.**   So Judy was a nurse.  What did she tell you about

10   this program?

11   **A.**   She just came in one day with a clipping from the

12   newspaper.  And she found it and she was telling me

13   about it, and she said she would look into it for me.

14   **Q.**   Did she show you the clipping from the newspaper?

15   **A.**   Yes.

16         MR. VILKER:  I want to bring up Exhibit 46 and

17   ask that that be moved into evidence.

18         THE COURT:  Any objection?

19         MR. LEPIZZERA:  Partial objection, your Honor.

20         THE COURT:  To the --

21         MR. LEPIZZERA:  To the entire page being shown.

22         MR. VILKER:  This is how the page appeared to

23   people who read the paper.

24         THE COURT:  I'll overrule the objection.  I take

25   it, Mr. Radhakrishnan, you object as well?

1    MR. RADHAKRISHNAN:  Yes, your Honor.

2    THE COURT:  Your objection is noted.  It's

3    overruled.  You may publish the exhibit.

4    (Government Exhibit 46 admitted in full.)

5    **Q.**   Exhibit 46 is a page from the Rhode Island

6    Catholic, and the bottom section of it is an

7    advertisement.  Is this the advertisement that you were

8    shown by Judy?

9    **A.**   Yes.

10   **Q.**   And you read through this advertisement?

11   **A.**   Yes.  She just brought in that piece.  She cut it

12   out and brought it in.

13   **Q.**   Speak into the microphone, please.

14   **A.**   Yes.

15   **Q.**   When you read through this advertisement, what was

16   your understanding of what this money was supposed to

17   be for?

18   **A.**   At first, I didn't believe it.  And then she

19   talked more about it and told me about it.  And it was

20   just mine to help out in the house.

21   **Q.**   You say at first you didn't believe it?

22   **A.**   No.

23   **Q.**   Why didn't you believe it?

24   **A.**   At the time I never heard of anybody just coming

25   up to you and giving you money.  I wasn't brought up

1    that way.

2    **Q.**    So you had some concerns when you first saw this

3    ad?

4    **A.**    When I first saw it, I did.  But then she was

5    talking to me about it and very nice guy, helps a lot

6    of people like Dennis and their families.

7    **Q.**    There's a phone number on this ad.  Did you call

8    the number on the ad?

9    **A.**    No, I didn't.  She did it all.

10    **Q.**    Did she set up a meeting between someone from this

11    program and yourself?

12    **A.**    To come to the house, yes.

13    **Q.**    Who was it that came to the house?

14    **A.**    The young guy, Raymour.

15    **Q.**    And I don't know if you can see.  Do you recognize

16    that young man there?

17    **A.**    Yes.  Right there sitting there.

18    **Q.**    That was the person that came to your house?

19    **A.**    Yes.

20         MR. VILKER:  Your Honor, may the record reflect

21    that the witness has identified the Defendant, Raymour

22    Radhakrishnan.

23         THE COURT:  The record will so reflect.

24    **Q.**    So Raymour came to your house back in April 2008?

25    **A.**    Yes.

1    **Q.**    How many times did he come in total?

2    **A.**    I want to say three.

3    **Q.**    Okay.  So let's talk about the first time.

4    **A.**    All right.

5    **Q.**    Who was there during this first meeting?

6    **A.**    I think Judy was there, and me and my husband and

7    my children.

8    **Q.**    Okay.  So how many children do you have?

9    **A.**    Three.

10   **Q.**    And was one of these children Dennis, Jr?

11   **A.**    Yes.

12   **Q.**    Okay.  And during that first meeting, what was

13   your husband's condition like?

14   **A.**    He was in bed.  He couldn't get up anymore.  He

15   could -- like if I asked him if he needed any more pain

16   medication, he would moan to me and shake his head a

17   little.  He couldn't speak that good anymore.

18   **Q.**    Was he on a lot of medication at that point?

19   **A.**    Yes.

20   **Q.**    Was he having difficulty understanding what was

21   going on?

22   **A.**    At that time, no.  Only because when I said to

23   him:  Do you need more medication, how do you feel, do

24   you want me to turn you, he would kind of moan and

25   shake his head a little.  So I believe that he still

1    heard me.  He still understood what I was saying.

2    **Q.**    So during this first meeting, was your husband

3    able to participate in this conversation with Raymour?

4    **A.**    No.  We sat near him in the hospital bed.

5    **Q.**    Okay.  Where was the hospital bed located?

6    **A.**    It was in my parlor.

7    **Q.**    So in that room was your husband in the hospital

8    bed, Raymour, yourself and some of your children?

9    **A.**    Yes.

10   **Q.**    So what do you remember Raymour saying during that

11   first meeting?

12   **A.**    There was a paper, which I don't remember the

13   paper but I knew we read it out loud.  My son read it.

14   I think my son, I'm not sure, read it out loud to my

15   husband, and asked us to sign it, and he handed me a

16   check.

17   **Q.**    Before I show you that piece of paper, did he

18   start out by saying why he was there?

19   **A.**    Well, he said who he was, and like the ad said,

20   they helped people that were dying.  And that was

21   basically it on the first meeting.

22   **Q.**    I want to show you now Government Exhibit 175.

23          MR. VILKER:  Actually, could you bring up 176

24   first.  I would ask that that be moved full.

25          MR. LEPIZZERA:  No objection.

1       MR. RADHAKRISHNAN:  No objection, your Honor.

2       THE COURT:  176 will be full.  You may publish

3   it.

4       (Government Exhibit 176 admitted in full.)

5   **Q.**   176 is entitled "Terminal Illness Philanthropy

6   Account Receipt."  And does it have your signature at

7   the bottom?

8   **A.**   Yes.

9   **Q.**   Is that the document you were talking about that

10  Raymour had you sign that day?

11  **A.**   I think it is.

12  **Q.**   Again, you've got to speak into the microphone.

13  **A.**   Yes, it is.

14  **Q.**   So you remember this form being presented to you

15  by Raymour and him asking you to sign it?

16  **A.**   Yes.

17  **Q.**   This indicates essentially in the first paragraph

18  that:  "I, Dennis Flori, acknowledge receipt of $2,000

19  from the philanthropic program of Estate Planning

20  Resources."

21       So was that your understanding, that this was a

22  gift, this $2,000?

23  **A.**   Yes.

24  **Q.**   Did Raymour actually give you a check that day as

25  well?

1    **A.**   I think he did.  I'm not sure if he came back with

2    it, but, yeah, I got it that day.

3          MR. VILKER:  Can you bring up Exhibit 175,

4    please.  Ask that this be moved full.

5          MR. LEPIZZERA:  No objection.

6          MR. RADHAKRISHNAN:  No objection, your Honor.

7          THE COURT:  175 will be full.  You may publish

8    it.

9          (Government Exhibit 175 admitted in full.)

10   **Q.**   Does this appear to be the $2,000 check that you

11   received from Raymour on that day?

12   **A.**   Yes.

13   **Q.**   And it's dated it looks like either April 14th or

14   April 19th of 2008.  It's hard to tell.  Would that be

15   around the right time this happened?

16   **A.**   Yes.

17   **Q.**   And your husband ended up passing away April 26th,

18   a short time thereafter?

19   **A.**   Yes.

20   **Q.**   Now, did you -- the terminal illness receipt, the

21   document that I showed you before, did you receive a

22   copy of this document that you signed?

23   **A.**   No, we received no copies of anything.

24   **Q.**   Did you ask Raymour for a copy of the document?

25   **A.**   I did ask him.

1    **Q.**   What did he say when you asked him for a copy?

2    **A.**   He said everything goes back in the vault locked

3    up.

4    **Q.**   So he refused to give you a copy?

5    **A.**   I guess, yes.

6    **Q.**   Now, during this first meeting, what, if anything,

7    did Raymour say about any kind of accounts that would

8    be opened up in your husband's name?

9    **A.**   He didn't say anything in that first meeting about

10   that.

11   **Q.**   Did he say anything about what your husband would

12   need to do in exchange for getting any money during

13   that first meeting?

14   **A.**   No.

15   **Q.**   How did that first meeting end?

16   **A.**   Like I said, I'm not sure if he handed me the

17   check then or came back and, good-bye, nice meeting

18   you, and that was that.

19   **Q.**   Now, did there come a point in time in which you

20   had a second meeting with Raymour?

21   **A.**   Yes.

22   **Q.**   How did that second meeting come about?

23   **A.**   Judy, again.  I was having a hard time making ends

24   meet, worrying about the funeral and everything, and

25   she said, I can get you another $2,000 from them.

1   **Q.**   And did you call or did Judy call?

2   **A.**   Judy called.  And he came, Raymour came by.  He

3   didn't come in that day.  He knocked on the door and

4   handed me the check and left.

5   **Q.**   Okay.  And was there -- so there was a third

6   meeting then?

7   **A.**   Yes.

8   **Q.**   So skipping ahead to that third meeting then, did

9   Raymour come back to the house again?

10   **A.**   Yes.

11   **Q.**   Did he at that occasion have a document that he

12   wanted your husband to sign?

13   **A.**   Yes.

14   **Q.**   Okay.  During this third meeting, what, if

15   anything, did Raymour say about any kind of account

16   that was going to be opened up?

17   **A.**   He said to me, and my children were there, if

18   Dennis can live until Monday -- I'm sorry.

19         THE COURT:  That's all right.  Take your time.

20   If you need a glass of water, Kleenex, just don't --

21   **A.**   We would set up an account --

22   **Q.**   Just take a minute to relax.

23   **A.**   I just want to do it.  He said, We would set up an

24   account for the family.  He said, And let's say we put

25   5,000 in the account and you use it, we will continue

1    to put that money back.

2    **Q.**   So he told you that some account was going to be

3    opened up --

4    **A.**   A bank account.  Signed all the papers, took

5    Dennis's Social Security number and everything.  And at

6    first I thought, well, this is too good to be true.

7    And he said to me, Your husband has to sign this paper.

8    And I looked over at him.  He said, I don't care how

9    you get him to sign it; I'll be back in a half hour.

10         My son went over and talked to him, and he's

11   telling him, Dad, you got to sign this paper.  He did

12   put his hand up and my son put the pen in his hand, and

13   he did help him sign his name.

14   **Q.**   Was your husband able -- and I know this is very

15   painful for you, but was your husband able to

16   understand what was happening at that point?

17   **A.**   I want to say a little bit because he did put his

18   hand up to take the pen, but he could not sign it on

19   his own.

20   **Q.**   So your son, Dennis, Jr., went and helped sign?

21   **A.**   Yes.

22   **Q.**   Do you recall how many pieces of paper he signed?

23   **A.**   You know, I think it was just that one.

24   **Q.**   Okay.  Did you look over that piece of paper

25   before your husband signed it?

1    **A.**    You know, I think my daughter, Heidi, did because

2    I didn't quite understand it, and I think that she did.

3    And she said, Well, what he just told us, Ma, sounds

4    right.  They're going to open up a bank account.

5    **Q.**    You thought the money in that account would go to

6    help you?

7    **A.**    Yes.

8    **Q.**    He specifically mentioned that they put $5,000 in

9    that account that you could use?

10   **A.**    And I can use.  And he said, If you use whatever,

11   and they would continue to keep it up to $5,000.

12   **Q.**    After your son, Dennis, Jr., helped your husband

13   sign that form, did Raymour come back?

14   **A.**    He came back and got the papers, yes.

15   **Q.**    So he came back, and he was given that piece of

16   paper that your husband signed?

17   **A.**    Yes.

18   **Q.**    And your husband ended up passing away just a few

19   days afterwards?

20   **A.**    Yes.

21             MR. VILKER:  Okay.  I want to show you Exhibit

22   177.  And ask that that be admitted full.

23             MR. LEPIZZERA:  No objection.

24             MR. RADHAKRISHNAN:  No objection, your Honor.

25             THE COURT:  177 will be full.  You may publish

1      that.

2               (Government Exhibit 177 admitted in full.)

3      **Q.**    Mrs. Flori, is this the second check that you got

4      from Raymour?

5      **A.**    This is the second one.

6      **Q.**    It's dated April 28th?

7      **A.**    28th.

8      **Q.**    Was that after your husband passed away?

9      **A.**    He passed away on the 26th.

10     **Q.**    Do you remember how it came about that you got

11     this second check?

12     **A.**    I think it was through Judy because I did call him

13     Monday, Raymour, and told him that he passed away

14     because he said if goes until Monday this account will

15     be opened.  We signed all the papers.  But he passed

16     away Saturday.  So I did call him Monday and tell him

17     that he passed away, thank you.  And that was the end

18     of it, I thought.

19     **Q.**    What was your understanding at that point about

20     whether that bank account --

21     **A.**    That there wasn't going to be anything because he

22     passed away Saturday.

23     **Q.**    Now, when you received this check, did you notice

24     that in the memo section it's written "Philanthropy -

25     new account setup"?

1  **A.**   You know, I think I do remember that.  I remember

2  asking my daughter what that meant.

3  **Q.**   And did you have any understanding of --

4  **A.**   I didn't think anything else of it.

5  **Q.**   Okay.  Now, I want to show you Exhibit 178.

6        MR. VILKER:  Ask for 178 to be admitted full.

7        MR. LEPIZZERA:  No objection.

8        MR. RADHAKRISHNAN:  No objection, your Honor.

9        THE COURT:  178 will be full.  You may publish

10  it.

11        (Government Exhibit 178 admitted in full.)

12  **Q.**   178 is a three-page document called "Agreement and

13  Acknowledgment."  And I'd like to just turn your

14  attention -- first of all, on this first page that

15  you're looking at, is any of the handwriting in that

16  either yours or your husband's or your son's?

17  **A.**   No.

18  **Q.**   If you could just turn to the second page, there's

19  obviously no handwriting on this page at all.  If you

20  could turn to the third page, it says that this is

21  dated April 22nd, which would have been four days

22  before your husband passed away.  And it says the funds

23  provider signature, and there's a signature of Joseph

24  Caramadre.  And then it says co-owner's signature.

25  Does that appear to have been the document your husband

1   signed?

2   **A.**   This is the one that Dennis helped him sign, yes.

3   **Q.**   And how do you know that's the one that he helped

4   him sign?

5   **A.**   Because I can see some of the -- my son, Dennis, I

6   can see some of his handwriting in there.

7   **Q.**   Now, this is a three-page document.  Do you know

8   whether you were provided with this just one page to

9   sign, or were you provided with the full three-page

10  document and told that he had to sign the third page?

11  **A.**   You know, I don't honestly remember.

12  **Q.**   Okay.  So let me bring you back to the first page

13  of this document.

14       The first big paragraph says -- titled

15  "Brokerage Account," and it says there's an agreement

16  and acknowledgment made this 22nd day of April by and

17  between Joseph Caramadre and with an address, who's

18  identified as the funds provider and your husband,

19  Dennis, who's identified as the co-owner.  And then

20  paragraph one says:  The funds provider and the

21  co-owner are joint tenants with rights of survivorship

22  in the above-referenced brokerage account.

23       Did Raymour say anything to you about there

24  being some kind of brokerage account that was going to

25  be opened up?

1      **A.**    No.

2      **Q.**    Did he say anything about your husband, Dennis,

3      entering into an agreement with Joseph Caramadre to

4      open up some kind of account?

5      **A.**    No.

6      **Q.**    Or for that matter with anybody to open up some

7      kind of account?

8      **A.**    Yes.

9      **Q.**    You thought there was just going to be a bank

10     account?

11     **A.**    A bank account.

12     **Q.**    With your name on the bank account or your

13     husband's name?

14     **A.**    My name.

15     **Q.**    Now, if you go down to paragraph seven, I'll just

16     read from the part that starts with -- it says --

17     actually, let me start from the beginning so it makes

18     sense.  It says:  The securities in the account may

19     contain an optional redemption feature, which provides

20     that in the event of one joint tenant's death, the

21     surviving joint tenant is allowed to sell the

22     securities in the account back to the issuer in

23     exchange for the par value of the securities, plus

24     accrued interest.  In order to exercise the optional

25     redemption feature, the funds provider and the co-owner

1    must be joint tenants with rights of survivorship in

2    the account at the time of either party's death.  As a

3    result of the optional redemption feature, the

4    securities could yield a substantial profit for the

5    funds provider if the co-owner dies before the funds

6    provider.

7         So my question to you is -- first of all, do you

8    understand some of what I just said?

9    **A.**   No.  I'm sorry.  I didn't understand it.

10   **Q.**   I know it's a lot of legalese, but did Raymour say

11   something about something being purchased in an account

12   that could allow Mr. Caramadre to make a substantial

13   profit upon your husband, Dennis's, death?

14   **A.**   No.

15   **Q.**   Did you have any idea that what was going to

16   happen in this account or any other account was that

17   someone else stood to make money after your husband

18   passed away?

19   **A.**   No.

20        MR. VILKER:  Now, I'd like to show you Exhibit

21   179 and ask that that be moved full.

22        MR. LEPIZZERA:  No objection.

23        MR. RADHAKRISHNAN:  No objection, your Honor.

24        THE COURT:  179 will be full without objection.

25        (Government Exhibit 179 admitted in full.)

1  **Q.** Mrs. Flori, this is an account application with

2  Ameritrade for a brokerage account to be set up in the

3  names of the account owner being Joseph Caramadre and

4  the account co-owner being your husband, Dennis.

5      First of all, is any of the handwriting on this

6  page from anyone in your family?

7  **A.** No.

8  **Q.** The second part of this concerns the information

9  about your husband, Dennis.

10     MR. VILKER: If that could just be magnified.

11 **Q.** We've redacted some of the personal information,

12 but it indicates that he was born in the year 1950; is

13 that correct?

14 **A.** Yes.

15 **Q.** Would this have been information that you would

16 have provided to Raymour, his date of birth?

17 **A.** Yes.

18 **Q.** I don't know if you recognize it, does that appear

19 to be the last four digits of his Social Security

20 number?

21 **A.** Yes.

22 **Q.** And did you provide that information to Raymour?

23 **A.** Yes.

24 **Q.** And that address is your home address in Cranston?

25 **A.** Yes.

1    **Q.**   Okay.  What about -- that says work phone number,

2    941-9273.  Do you recognize that number?

3    **A.**   No.

4    **Q.**   Was that your work phone number?

5    **A.**   No.

6    **Q.**   Or Dennis's number?

7    **A.**   No.  Dennis didn't work for years.

8    **Q.**   Do you know what that number is?

9    **A.**   No.

10        MR. VILKER:  If you could please bring up

11   Exhibit 46 again.

12   **Q.**   Do you see the phone number to call on the ad?

13   **A.**   Oh, yes.

14   **Q.**   Does that appear to be the same phone number

15   that's listed for your husband, the 941-9273?

16   **A.**   Yes.  The one I just looked at?  Yes.

17        MR. VILKER:  If you could go back to Exhibit

18   179.

19   **Q.**   Again, was anything said during this meeting about

20   an Ameritrade account being opened up?

21   **A.**   No.

22        MR. VILKER:  If you could turn to page two of

23   this document and magnify the bottom section.

24   **Q.**   Do you see where it says "account co-owner," and

25   there's a signature above the line right here?

1    **A.**    Yes.

2    **Q.**    Does that appear to be your husband, Dennis's,

3    signature?

4    **A.**    No.

5    **Q.**    And your memory is that your husband, Dennis,

6    signed one single piece of paper?

7    **A.**    That was it, yes.

8    **Q.**    With your son's assistance?

9    **A.**    Yes.

10   **Q.**    That's not one of the papers that was signed?

11   **A.**    No.

12   **Q.**    If you could turn to the next page of this

13   document, please.

14        Again, this is -- what about that signature?

15   **A.**    No.

16   **Q.**    That's not your husband's?

17   **A.**    No.

18   **Q.**    Now, above that where it says "account co-owner,"

19   it asks -- the account co-owner in this particular

20   account is your husband, Dennis, and asks a number of

21   questions.  And there's a bunch of boxes that are

22   marked with Xs.

23        Did you or anyone in your family that you know

24   of fill out these boxes and mark the Xs?

25   **A.**    No.

1    **Q.**   The first one says "Funds Available for Options

2    Trading," and it says --

3            MR. VILKER:  Just magnify the whole paragraph.

4    **Q.**   It says, "Funds Available for Options Trading,"

5    and it says $50,000 plus.  Did you and your husband

6    have that kind of money?

7    **A.**   No.

8    **Q.**   Did Raymour -- did he ask you how much money you

9    have or anything about your assets?

10   **A.**   No.

11   **Q.**   The next box over says, "Years of Investment

12   Experience," and it says six through nine.  Your

13   husband, was he an investor?  Was he into buying stocks

14   and bonds and that kind of thing?

15   **A.**   No.

16   **Q.**   What did he do for a living?

17   **A.**   He worked in the post office, and then he had odd

18   jobs before he really started to get sick with his

19   arthritis and everything, then he didn't work for a

20   good 20 years.

21   **Q.**   He wasn't trading in the stock market or anything

22   like that?

23   **A.**   No.

24   **Q.**   The next one says investment knowledge is

25   extensive.  The third box over.  Did your husband have

1    extensive investment knowledge?

2    **A.**   No.

3    **Q.**   The next one over says average transaction size

4    between $2,001 and $5,000.  Did your husband make

5    trades in the financial market of that size?

6    **A.**   No.

7    **Q.**   Was anything asked by Raymour about I want to get

8    some information about, you know, Dennis's investment

9    history or his experience, making trades in the stock

10   market or anything like that?

11   **A.**   No.

12   **Q.**   And if you go down to the row below that, it says

13   number of transactions per year, 10 through 19.  Would

14   that have been accurate, that he engaged in that many

15   stocks and bonds, financial transactions?

16   **A.**   No.

17   **Q.**   And then it says type of transactions, stocks,

18   bonds and options.  Would your husband have known what

19   an option is in a financial market?

20   **A.**   I think he would have known what it was but --

21   **Q.**   He wasn't engaged in those things?

22   **A.**   No.

23   **Q.**   And then there's a section on investment

24   objectives.  It says growth, income, conservation of

25   capital.

1              Was anything discussed -- did Raymour say, like,

2      we want to know Dennis's or your, like, objectives

3      about what your goals are for this account?

4      A.   No.

5      Q.   Again, your understanding was that this was just a

6      bank account that $5,000 was going to be put in for

7      your use?

8      A.   Yes.

9              MR. VILKER:  Okay.  If you could bring up

10     Exhibit 180.  Move that full.

11             MR. LEPIZZERA:  No objection.

12             MR. RADHAKRISHNAN:  No objection, your Honor.

13             THE COURT:  180 is full.  You may publish it.

14             (Government Exhibit 180 admitted in full.)

15     Q.   Mrs. Flori, this is a document, an Ameritrade

16     document called "Limited Trading Authorization."

17             MR. VILKER:  At the top, if you magnify that

18     section.  Thank you.

19     Q.   Under account co-owner is the name Dennis Flori

20     and then there's a signature.  Does that appear to be

21     your husband's signature?

22     A.   No.  That's his name, but he didn't write that.

23     Q.   Again, the only document -- he signed one single

24     document that day?

25     A.   Yes.

1  **Q.**   Did Raymour say anything that he needs to get your

2  consent so that he is able to make trades on some

3  account?

4  **A.**   No.

5  **Q.**   Okay.  Thank you.

6       MR. VILKER:  Now if you could bring up again

7  Exhibit 14, which has already been admitted.

8  **Q.**   This is a document that's entitled "Summary of TD

9  Ameritrade Holdings."

10 **A.**   I see it.

11 **Q.**   It says account, TD Ameritrade account with JAC,

12 which is Joseph Caramadre, and Dennis Flori, gives an

13 account number and it has $350,000 in deposits and

14 $1,089,000 of bonds that were purchased in the account.

15      Did you know that there was an account opened

16 that had this amount of money put into it?

17 **A.**   No.

18 **Q.**   Did Raymour say anything about bonds being

19 purchased in your husband's name?

20 **A.**   No.

21 **Q.**   Did he say anything that someone else, namely

22 Mr. Caramadre, stood to benefit by exercising death

23 options in these bonds?

24 **A.**   No.

25      MR. VILKER:  Now I want to show you Government

1    Exhibit 182 and ask that that be admitted full.

2              THE COURT:  Is there any objection?

3              MR. LEPIZZERA:  No objection.

4              MR. RADHAKRISHNAN:  No objection, your Honor.

5              THE COURT:  182 will be full.

6              (Government Exhibit 182 admitted in full.)

7    **Q.**   So Mrs. Flori, this is a letter from Joseph

8    Caramadre dated May 7th of 2008, so a couple of weeks

9    after your husband passed way.  And it says, Dear Sir

10   or Madam:  Please accept my request for redemption of

11   my General Motors bonds under the provision of the

12   survivor option available for each note.  I am

13   requesting redemption of the following issues.  And it

14   indicates a $200,000 bond.

15             Again, did you have any knowledge that bonds

16   were purchased in your husband's name or that Joseph

17   Caramadre was seeking to redeem them?

18   **A.**   No.

19   **Q.**   The last page of this document is another letter

20   from Joseph Caramadre and it says:  I own these bonds

21   with Dennis Flori as joint tenant with right of

22   survivorship.  Dennis died on April 26th, 2008, as

23   evidenced by the enclosed death certificate."

24             So that term, "joint tenant with right of

25   survivorship," did Raymour say anything like that to

1  you?

2  **A.**   No.

3  **Q.**   And then it says, "As evidenced by the enclosed

4  death certificate."

5       Did Raymour or anyone from his office ever ask

6  you for a copy of your husband's death certificate?

7  **A.**   No.

8  **Q.**   Do you have any idea how they were able to get a

9  copy of your husband's death certificate?

10  **A.**   How they were?

11  **Q.**   Yes.

12  **A.**   I understand that they went to city call.

13  **Q.**   You understand that from documents the Government

14  showed you in preparation for your testimony?

15  **A.**   Yes.

16  **Q.**   But you didn't know that at the time?

17  **A.**   No.

18       MR. VILKER:  I'm going to show you then Exhibit

19  183 and ask that be moved full.

20       MR. LEPIZZERA:  No objection.

21       MR. RADHAKRISHNAN:  No objection, your Honor.

22       THE COURT:  183 will be full.

23       (Government Exhibit 183 admitted in full.)

24  **Q.**   This is a letter from Joseph Caramadre dated May

25  6th, 2008, to Cranston City Hall.  And he writes, "We

1    would like to obtain 27 copies of the death certificate

2    of Dennis Flori, who passed away on April 26th, 2008."

3         Did you have any idea that Mr. Caramadre was

4    going to Cranston City Hall to request death

5    certificates for your husband?

6    **A.**    No.

7         MR. VILKER:  Now, I want to show you now Exhibit

8    184 and ask that that be moved full.

9         MR. LEPIZZERA:  No objection.

10         MR. RADHAKRISHNAN:  No objection, your Honor.

11         THE COURT:  184 will be full.  You may publish

12    it.

13         (Government Exhibit 184 admitted in full.)

14    **Q.**    Mrs. Flori, this is the application that was

15    submitted to Cranston City Hall to obtain copies of

16    your husband's death certificate.  The first part is

17    your husband's name, Dennis Flori, and his date of

18    death, April 26th in Cranston.  And the second part

19    says:  Complete one of the following.  It says, I am

20    applying for the death record of, and the X is marked

21    my clients.  I am an attorney representing Dennis

22    Flori.  The name of the law firm is Estate Planning

23    Resources.

24         Was your husband ever represented by -- did he

25    ever have an attorney, Joseph Caramadre?

1    **A.**    No.

2    **Q.**    Did he ever have Estate Planning Resources as his

3    attorney?

4    **A.**    No.

5    **Q.**    Did he ever do any estate planning at that company

6    at all?

7    **A.**    No.

8    **Q.**    Section number 3, it says why do you need this

9    record.  Then it says in parentheses, we ask this

10   question so that we can supply to you with a certified

11   copy that will be suitable for your needs.  And then it

12   says:  Other estate planning.

13          Again, did Mr. Caramadre or his law firm or

14   anyone at Estate Planning Resources do any kind of

15   estate planning for your husband or your family?

16   **A.**    No.

17          MR. VILKER:  I have no further questions, your

18   Honor.

19          THE COURT:  Thank you.

20          Mr. Radhakrishnan.

21          **CROSS-EXAMINATION BY MR. RADHAKRISHNAN**

22   **Q.**    Good afternoon, Mrs. Flori.  Thank you for coming

23   in today.  I'll be very brief.

24          You mentioned that we first met sometime in

25   2008?

1    **A.**    Yes.

2    **Q.**    And you remember that meeting?

3    **A.**    Yes.

4    **Q.**    And who, again, was present during that first

5    meeting?

6    **A.**    Judy was there, I was there, and my kids were in

7    the house.

8    **Q.**    Okay.  And who are your kids again?  Could you

9    list them for me, please.

10   **A.**    Dennis, Heidi and Ashley.

11   **Q.**    And all three of them were there, Dennis, Heidi

12   and Ashley?

13   **A.**    They what?

14   **Q.**    All three of them were there for that first

15   meeting?

16   **A.**    Yes.

17   **Q.**    Okay.  Do you remember if that meeting was in the

18   morning or the afternoon?

19   **A.**    I think it was late morning.

20   **Q.**    Okay.  Thank you.  And your son, Dennis, Jr., was

21   definitely there?

22   **A.**    Yes.

23   **Q.**    And your husband was there, correct?

24   **A.**    Yes.

25   **Q.**    I was very respectful to your family?

1    **A.**    Yes, you were.

2    **Q.**    Polite and well-mannered?

3    **A.**    Yes, you were.

4    **Q.**    My mother taught me well?

5    **A.**    Yes, she did.

6    **Q.**    Thank you.

7          Then another meeting came about; is that

8    correct?

9    **A.**    Yes.

10   **Q.**    All right.  And how long after that first meeting

11   did the second meeting occur?

12   **A.**    A few weeks.  I can't remember the date.

13   **Q.**    Okay.  And during that second meeting, I left you

14   some documents; is that correct?

15   **A.**    No.  The second meeting was when Judy called you

16   again, and you came to the door with another check.

17   You didn't come in the house that second meeting.

18   **Q.**    Okay.  So the first meeting --

19   **A.**    You came in the house.

20   **Q.**    Did you receive a check that very first meeting?

21   **A.**    I think you came back with it, I want to say.

22   **Q.**    Okay.  I'm just trying to be clear here.  So you

23   received a check during the first meeting?

24   **A.**    Yes.

25   **Q.**    Yes?  And then did you receive a check during that

1   second meeting?

2   **A.**   Yes.  But you did not come in the house.

3   **Q.**   Okay.  And then was there a third meeting?

4   **A.**   Yes.

5   **Q.**   Okay.  And did you receive a check at that third

6   meeting?

7   **A.**   No.

8   **Q.**   Okay.  When I came in for that meeting, the third

9   meeting, did I leave you some papers?  Is that correct?

10  **A.**   You left me some papers, yes.

11  **Q.**   Okay.  And you mentioned you didn't know how many

12  papers it was, but some type of packet of papers; is

13  that correct?

14  **A.**   Yeah.

15  **Q.**   Okay.  Do you remember me mentioning to you that I

16  may have had another appointment that day and I had to

17  run off?

18  **A.**   No.

19  **Q.**   Okay.  So but I left you the papers, that's

20  correct?

21  **A.**   Yes.

22  **Q.**   And then I left the house; is that correct?

23  **A.**   Yes.

24  **Q.**   Okay.  So I did leave the house?  All right.

25  **A.**   You left the house.

1    **Q.**    And I did leave you with the papers, that's

2    correct?

3    **A.**    You left me with the papers.

4    **Q.**    Okay.  And then do you remember if that third

5    meeting was in the morning or in the afternoon?

6    **A.**    I think it was in the afternoon.

7    **Q.**    Okay.  And so then at some point in time, after I

8    initially dropped off the papers, I came and picked

9    those papers up; is that correct?

10   **A.**    Came back a half hour later.

11   **Q.**    Okay.  And you're clear it was a half an hour?

12   **A.**    Yes.

13   **Q.**    Okay.  So you had those papers for that half hour;

14   is that correct?

15   **A.**    I had that one paper.

16   **Q.**    Okay.

17   **A.**    That Dennis had to sign.

18   **Q.**    I have to back up then because you just mentioned

19   that there was a packet of papers originally.

20   **A.**    Yes.  There was a packet of papers when you sat

21   down at the table with me.  And then you handed me the

22   paper that Dennis had to sign.

23        THE WITNESS:  Can I speak?

24        THE COURT:  Yes.

25   **A.**    And your words were "Have him sign it any way you

1   can, and I will be back in a half hour."

2   **Q.**   All right.  Ms. Flori, just to be clear, I thought

3   you had just testified that I didn't come in the house

4   during that third meeting.

5   **A.**   No.  The second meeting you didn't come in the

6   house.

7   **Q.**   Okay.  That's fine.  I just want to be clear.  I'm

8   not trying to confuse you by any means.  I'm just

9   trying to get clear here.  Sorry about that.  Okay.

10       You did receive some money so I guess you

11   received some money at some point, some time; is that

12   correct?

13   **A.**   Yes.

14   **Q.**   And what did you spend that money on?

15   **A.**   It was mostly for Dennis.  Got the flowers, his

16   outfit.

17   **Q.**   So it was very useful for you?

18   **A.**   Yes, it was.

19   **Q.**   Very good.  Okay.

20       And just to be clear, Mrs. Flori, I never forced

21   your husband to sign any documents, did I?

22   **A.**   No, you didn't.

23       MR. RADHAKRISHNAN:  Okay.  Ms. Flori, I really

24   appreciate your time.  Thank you.

25       THE WITNESS:  You're welcome.

1    THE COURT:  Thank you, Mr. Radhakrishnan.

2    Mr. Lepizzera?

3    MR. LEPIZZERA:  Thank you, your Honor.

4    **CROSS-EXAMINATION BY MR. LEPIZZERA**

5    **Q.**  Good afternoon, Mrs. Flori.  I represent

6    Mr. Caramadre.  I'll be brief.

7    MR. LEPIZZERA:  Can we pull up, Ms. Anderson,

8    Exhibit 46, please.

9    **Q.**  Mrs. Flori, you testified that Judy had showed you

10   that, correct?

11   **A.**  The clipping.  She cut out the clipping.

12   **Q.**  Could you look in the left-hand corner,

13   Mrs. Flori, and take a look at the date.

14   **A.**  Up on the top?

15   **Q.**  Yes.

16   **A.**  June 19th.

17   **Q.**  It says, Thursday, June 19th, 2008, correct?

18   **A.**  I'm going to say yes, but I can't see that small

19   print.

20   THE COURT:  We can have it blown up.

21   Would you please blow it up.

22   **A.**  Okay.  Yes.

23   **Q.**  You met with Mr. Radhakrishnan in April of 2008,

24   correct?

25   **A.**  Mr. Who?

1    **Q.**   Raymour?

2    **A.**   Raymour.  I'm sorry.

3    **Q.**   I'll refer to him as Raymour if that's how you

4    know him.

5    **A.**   Thank you.

6    **Q.**   You met with Raymour two or three times, correct?

7    **A.**   Yes.

8    **Q.**   And all of those meetings were in April 2008?

9    **A.**   Yes.

10   **Q.**   Your husband passed away April 26, 2008?

11   **A.**   Yes.

12   **Q.**   And the first check that he gave you was April

13   14th, 2008, correct?

14   **A.**   Yes.

15   **Q.**   So Judy didn't show you this particular ad, did

16   she?

17   **A.**   She cut it out of the paper and that's the ad that

18   I remember.

19   **Q.**   Mrs. Flori, you also testified that --

20        MR. LEPIZZERA:  If I could pull up Exhibit 178,

21   please.

22   **Q.**   Do you see that, Mrs. Flori?

23   **A.**   What do you want me to look at?

24   **Q.**   Do you see it says, "Agreement Acknowledgment

25   Form"?

1   **A.**   Yes.

2   **Q.**   And on the third page, you testified that that's

3   the document that your husband signed with the help of

4   your son, correct?

5   **A.**   Yes.

6   **Q.**   Okay.  I think you also testified that your

7   daughter, Heidi, read this particular document before

8   your husband signed the document, correct?

9   **A.**   Yes.  She looked it over.

10   **Q.**   She looked it over?

11   **A.**   Yes.

12   **Q.**   And she said to you --

13   **A.**   It sounds like -- I mean, we didn't understand it,

14   but it sounded like what he was saying, they'll open up

15   a bank account.

16   **Q.**   And an account would be opened up, right?

17   **A.**   Yes.

18   **Q.**   And Mr. Vilker asked you some questions whether

19   you had the complete document or not.  You agree that

20   your daughter read a document, correct?

21   **A.**   Yes.

22   **Q.**   She didn't just read this signature page, page

23   three, did she?

24   **A.**   You know, I don't remember.

25   **Q.**   Is there anything on that page three that says

1    anything about an account being opened up, just by

2    looking at that page?

3    **A.**    I don't think so.  No.

4    **Q.**    And next to your husband's signature, it says

5    co-owner's signature; is that correct?

6    **A.**    Yes.

7         MR. LEPIZZERA:  Could you go back to page one,

8    please.  If we could just blow up the first paragraph

9    where it says "Brokerage Account."

10   **Q.**    Mrs. Flori, if you could quickly take a look at

11   this.  It says on this agreement that Joseph Caramadre,

12   an individual with an address of 90 Beechwood Drive,

13   Cranston, Rhode Island, and he's defined as the funds

14   provider.  Do you see that?

15   **A.**    Yes.

16   **Q.**    And then it also has your husband's name there,

17   Dennis Flori, right?

18   **A.**    Yes.

19   **Q.**    And it says with an individual with an address of

20   1415 New London Avenue, Cranston, Rhode Island,

21   correct?

22   **A.**    Yes.

23   **Q.**    That was your address back then, correct?

24   **A.**    Yes.

25   **Q.**    And it defines him as a co-owner, correct?  It has

1    "co-owner" next to his name, correct?

2    **A.**   Of the house you're talking about?

3    **Q.**   No.   Just this document refers to him as a

4    co-owner.   Do you see that in this document?

5    **A.**   Yes.

6          MR. LEPIZZERA:   If we could go down to paragraph

7    six, please.

8    **Q.**   Mr. Vilker went over paragraph five and paragraph

9    seven with you.   I'd like to go over paragraph six with

10   you.

11         Do you see where it says:  Assuming that there

12   will be no withdrawals from the account, upon the death

13   of either the funds provider, which as we just went

14   over is Mr. Caramadre, correct --

15   **A.**   Yes.

16   **Q.**   -- or the co-owner, which in this case was your

17   husband, Dennis, correct?

18   **A.**   Yes.

19   **Q.**   It says:  The survivor will be entitled to the

20   account and all securities and cash in the account.

21         Do you see that?

22   **A.**   Yes.

23   **Q.**   Did Mr. Radhakrishnan explain that to you at all?

24   **A.**   No.

25   **Q.**   Did he tell you at all that if Mr. Flori dies or

1    your husband dies, I know this is difficult for you, if

2    your husband died, that Mr. Caramadre would get all the

3    money in the account?  Did he explain that to you?

4    **A.**   No.

5    **Q.**   Did he explain to you that if Mr. Caramadre died

6    before your husband, that your husband would get all

7    the money in the account?  Did he explain that to you?

8    **A.**   No.

9         MR. LEPIZZERA:  I have nothing further.

10         THE COURT:  Mr. Vilker, any redirect?

11         MR. VILKER:  I have a question or two.

12         **REDIRECT EXAMINATION BY MR. VILKER**

13    **Q.**   Mrs. Flori, the attorney for Mr. Caramadre just

14    showed you that the top corner of that ad was from a

15    paper in June of 2008.  That was obviously after your

16    husband passed away?

17    **A.**   Yes.

18    **Q.**   Could it be that you saw a copy of the ad from an

19    earlier edition of the paper?

20    **A.**   Judy explained to me that that ad was in all the

21    time.

22    **Q.**   So it could have been that it was the same ad that

23    you saw that was in a previous edition?

24    **A.**   Yes.

25         MR. VILKER:  I have nothing further.

1           THE COURT:  Thank you.  Any recross?

2           MR. LEPIZZERA:  No, your Honor.

3           MR. RADHAKRISHNAN:  No, your Honor, thank you.

4           THE COURT:  All right.  Mrs. Flori, your

5    testimony is complete.  Thank you very much for being

6    here.  You may step down.

7           Next witness.

8           MR. VILKER:  United States calls Dennis Flori,

9    Jr.

10          **DENNIS FLORI, JR.**, first having been duly sworn,

11   testified as follows:

12          THE CLERK:  Please state your name and spell

13   your last name for the record.

14          THE WITNESS:  Dennis Flori, F-L-O-R-I.

15          THE COURT:  Good afternoon, Mr. Flori.  You can

16   just scoot your chair up a little bit and speak into

17   the microphone.  Thank you.

18          And you may inquire, Mr. Vilker.

19          MR. VILKER:  Thank you, your Honor.

20          **DIRECT EXAMINATION BY MR. VILKER**

21   Q.   Good afternoon, Mr. Flori.

22          Mr. Flori, was your late father also named

23   Dennis?

24   A.   Yes.

25   Q.   Okay.  If you could just speak into the

1    microphone.

2    **A.**    Yes.

3    **Q.**    You're, in fact, Dennis, Jr?

4    **A.**    Um-hum.  (Affirmative.)

5    **Q.**    You have to say yes or no.

6    **A.**    Yes.

7    **Q.**    And did your father pass away from cancer on April

8    26th of 2008?

9    **A.**    Yes.

10   **Q.**    Now, in the few weeks before your father passed

11   away, did you come to learn that there was some kind of

12   program out there that was giving money to people who

13   were terminally ill?

14   **A.**    Yes.

15   **Q.**    How did you learn that?

16   **A.**    We had hospice for my father and we -- the nurse

17   that came to the house recommended it.  She said she

18   had read it in the newspaper, and she recommended it.

19   **Q.**    And did you attend two meetings with someone who

20   came from that program?

21   **A.**    Yes.

22   **Q.**    And do you remember that person's name?

23   **A.**    Ray, something like that.

24   **Q.**    If I said Raymour, does that sound familiar to

25   you?

1  **A.** Yeah.

2  **Q.** So I want to talk about these two meetings.  The

3  first meeting, this was at the family home in Cranston?

4  **A.** (Witness nods head in the affirmative.)

5  **Q.** Again, you have to say yes for the record.

6  **A.** Yes.

7  **Q.** Who was there during that first meeting?

8  **A.** Who was there?

9  **Q.** Yes.

10  **A.** Me, my mother and Raymour.

11  **Q.** What do you remember Raymour saying during that

12  first meeting?

13  **A.** He said that he's a philanthropist and he had --

14  they helped people that were in hospice situations that

15  needed extra money, extra help, and that they donated

16  money to the families that needed it.

17  **Q.** Okay.  So he was describing that he was part of

18  this program that helped people who were terminally

19  ill?

20  **A.** Yes.

21  **Q.** And did he give your family a $2,000 check that

22  day?

23  **A.** Yes.  Two thousand.

24  **Q.** Now, did there come a point in time when you

25  attended a second meeting in which Raymour was there?

1   **A.**   Yes.

2   **Q.**   Do you know how that second meeting got -- how

3   that came about?

4   **A.**   I'm not sure who called who, but he came back to

5   the house and said that he could give some more money

6   with --

7   **Q.**   Let me just stop you for a second.  At the time of

8   this second meeting, was that pretty close to the end

9   of your father's life?

10   **A.**   Yeah.

11   **Q.**   What was his condition like at that time?

12   **A.**   He was laying in the bed, couldn't move, couldn't

13   really do anything.  He couldn't open his eyes too

14   much.  He didn't know who was there.  He couldn't talk.

15   **Q.**   So during this second meeting, who do you recall

16   being there when Raymour came?

17   **A.**   The same.  Myself, my mother and Raymour.

18   **Q.**   So what do you remember Raymour saying in that

19   second meeting about any other money that your family

20   could receive?

21   **A.**   He said that he could give us some more money, I

22   think it was another two thousand.  And then he

23   mentioned about an account that they could set up, him,

24   and that as long as my father lived until that Monday

25   that he could set up an account with $5,000 in it and

1    said that every time we used it they could replenish

2    it.

3    **Q.**    Your understanding is that this would be an

4    account that would be for your mother's benefit?

5    **A.**    Yeah.  Because we needed the money at the time.

6    **Q.**    You needed the money because of the situation your

7    dad was in?

8    **A.**    Yeah.

9    **Q.**    Okay.  Now, did Raymour have any documents with

10   him that he wanted your father to sign?

11   **A.**    Yes.  One.

12   **Q.**    Do you recall it being one document?

13   **A.**    Yeah.  One signature, one document, yeah.

14   **Q.**    Was your father able to sign his name by himself

15   that day?

16   **A.**    No.  We told him that, Raymour.  And he told me

17   that it didn't matter how I got him to sign the paper,

18   that he would leave for half an hour and then come back

19   when we had it signed.  So I told my father, even

20   though he probably couldn't hear me, I told him I'm

21   going to make you sign this, Dad, we need this.  And I

22   took his hand and signed it with his hand.

23   **Q.**    He was in a hospital bed?

24   **A.**    Yeah.

25   **Q.**    In your parlor there?

1    **A.**   Yeah.

2    **Q.**   So you actually put a pen in his hand?

3    **A.**   Um-hum.  (Affirmative.)

4    **Q.**   How were you able to get the signature?

5    **A.**   I helped him.  I moved his hand.

6    **Q.**   You helped move his hand?

7    **A.**   Yeah.

8    **Q.**   Had you ever done that before in your life?

9    **A.**   No.

10   **Q.**   Have you ever done that since?

11   **A.**   No.  Just once.

12   **Q.**   So it's very clear to you that one and only one

13   time did you help your father sign his name?

14   **A.**   Oh, yeah.  Just once.

15   **Q.**   Now, did you read the document that you were

16   helping your father sign his name to?

17   **A.**   Yeah.  I don't remember what it said.

18   **Q.**   Do you recall if it was a single page?  Was it a

19   signature page or was it a document that had multiple

20   pages?

21   **A.**   It was more than one page, and then it had a

22   signature page to it.

23   **Q.**   Okay.  You don't recall what it was?  What was

24   your understanding of the purpose of your father

25   signing this document?

1    **A.**   They were going to set up an account with a

2    certain amount of money in it if he lived until that

3    Monday.  And they would set up the account and we could

4    use it.  And whatever we used, that they would

5    replenish it.

6    **Q.**   I'm going to show you now Exhibit 178, which is

7    already admitted full.  This is a three-page document.

8    If you could turn to the third page.

9          Does that signature on the third page appear to

10   be the one that you helped your father sign?

11   **A.**   Yeah.  I think so.

12   **Q.**   Is it difficult because it's not his normal

13   signature?

14   **A.**   Yeah.  That's the problem.  Yeah.

15   **Q.**   So that looks like that's the one that you helped

16   him sign?

17   **A.**   Yes.

18   **Q.**   Okay.  If you can turn to the front page of this

19   document.  The first page of this says it's an

20   agreement and acknowledgment to open up a brokerage

21   account between Joseph Caramadre and your dad.

22         Did Raymour say anything about opening up some

23   kind of brokerage account with Joseph Caramadre?

24   **A.**   No.  Just the account I explained.

25   **Q.**   Okay.  And I'm not going to go through all this

1    again, but there's language in this agreement that says

2    that Joseph Caramadre may be able to make substantial

3    profits upon the death of your father.

4         Did Raymour say anything that would in any way

5    suggest that by your father signing this document that

6    Joseph Caramadre could make substantial profits from

7    his death?

8    **A.**   No.  He never mentioned him.

9    **Q.**   Or anyone else?  Did he say anyone else could make

10   money off your father's death?

11   **A.**   No.

12        MR. VILKER:  I want to show you now Exhibit 179,

13   which is an Ameritrade account application.

14   **Q.**   Do you recall seeing this document at all?

15   **A.**   No.

16        MR. VILKER:  Okay.  If you can turn to the next

17   page and magnify the bottom portion.

18   **Q.**   Next to "Account Co-owner," does that appear to be

19   your father's signature?

20   **A.**   No.

21        MR. VILKER:  Okay.  Go to the next page, please.

22   **Q.**   Does that appear to be your father's signature?

23   **A.**   No.

24        MR. VILKER:  Okay.  If we can pull up exhibit

25   180, just magnify the account co-owner.

1    **Q.**   Does that appear to be your father's signature?

2    **A.**   No.

3         MR. VILKER:  Pull up Exhibit 181.  That next

4    page, please.  Next page.

5    **Q.**   Does that appear to be your father's signature on

6    this Ameritrade form?

7    **A.**   No.

8         MR. VILKER:  The next page, please.

9    **Q.**   Does that appear to be your father's signature?

10   **A.**   No.

11        MR. VILKER:  I have no further questions, your

12   Honor.

13        THE COURT:  Thank you.  Mr. Radhakrishnan.

14        MR. RADHAKRISHNAN:  I have no questions for this

15   witness, your Honor.

16        THE COURT:  Mr. Lepizzera.

17        MR. LEPIZZERA:  Thank you.

18        <u>**CROSS-EXAMINATION BY MR. LEPIZZERA**</u>

19   **Q.**   Good afternoon, Mr. Flori.

20   **A.**   Good afternoon.

21        MR. LEPIZZERA:  If we could bring up Exhibit

22   178, please, third page.  Thank you.

23   **Q.**   Mr. Flori, so you testified on direct examination

24   that this is the document that you helped your dad

25   sign, correct?

1    **A.**   Yeah.  To the best of my knowledge, yes.

2    **Q.**   Okay.  And I think you also testified that there

3    were a number of documents with this signature page,

4    correct?

5    **A.**   Like one or two.

6    **Q.**   Okay.  So you weren't just handed a signature

7    page, correct?  There were a number of documents with

8    this page, correct?

9    **A.**   Yes.

10        MR. LEPIZZERA:  Nothing further.

11        THE COURT:  Any redirect?

12        MR. VILKER:  No, your Honor.

13        THE COURT:  Okay.  Mr. Flori, your testimony is

14   complete.  You may step down.  Thank you very much.

15        Next witness.

16        MR. McADAMS:  Your Honor, the Government calls

17   Ann Scuncio.

18        **ANN SCUNCIO**, first having been duly sworn,

19   testified as follows:

20        THE CLERK:  Please state your name and spell

21   your last name for the record.

22        THE WITNESS:  Ann Scuncio, S-C-U-N-C-I-O.

23        THE COURT:  Good afternoon, Ms. Scuncio.

24        You may inquire, Mr. McAdams.

25        MR. McADAMS:  Thank you, your Honor.

### DIRECT EXAMINATION BY MR. McADAMS

1

2  **Q.** Good afternoon, Mrs. Scuncio.

3  **A.** Hello.

4  **Q.** Where are you from?

5  **A.** North Providence.

6  **Q.** How long have you been a resident of North

7  Providence?

8  **A.** Thirty-five years.

9  **Q.** Are you a life-long Rhode Islander?

10 **A.** Yes.

11 **Q.** Mrs. Scuncio, what do you do for a living?

12 **A.** I'm a homemaker.

13 **Q.** Homemaker.  And are you married?

14 **A.** Yes.

15 **Q.** What's your husband's name?

16 **A.** Edward.

17 **Q.** His name is Edward Scuncio?

18 **A.** Yes.

19 **Q.** How long have you been married?

20 **A.** Fifty-seven years.

21 **Q.** Congratulations.

22 **A.** Thank you.

23 **Q.** Now, what was your maiden name?

24 **A.** Bernardo.

25 **Q.** Is your late mother Pia Bernardo?

1    **A.**    Yes.

2    **Q.**    Approximately when did your mother pass away?

3    **A.**    Four years ago.

4    **Q.**    Was it June 18th, 2008?

5    **A.**    Yes.

6    **Q.**    How old was she when she passed away?

7    **A.**    Ninety-four.

8    **Q.**    Now, how long had she been sick before she passed

9    away?

10   **A.**    About two or three years.

11   **Q.**    What was she suffering from?

12   **A.**    Her esophagus, and then she ended up having a

13   stroke.

14   **Q.**    And where was she living at the time in the period

15   leading up to her --

16   **A.**    Mineral Spring Gardens on Mineral Spring Avenue.

17   **Q.**    Did there come a point in time when she was

18   receiving some type of hospice care or anything of that

19   nature.

20   **A.**    Not hospice but she had aids going in every day.

21   **Q.**    Visiting nurses?

22   **A.**    Visiting nurses.

23   **Q.**    Now, was she also a life-long North Providence

24   resident?

25   **A.**    Not really, no.  Providence and North Providence.

1  **Q.**   And what did she do during her lifetime?

2  **A.**   Worked in a mill.

3  **Q.**   Was she also a homemaker?

4  **A.**   Homemaker.

5  **Q.**   Now, were you the primary caregiver for your

6  mother during that time period?

7  **A.**   Yes.

8  **Q.**   Do you also have power of attorney for her?

9  **A.**   Yes.

10  **Q.**   Now, did there come a point in time when you

11  learned about an opportunity to receive some money on

12  behalf of your mother?

13  **A.**   Yes, I did.

14  **Q.**   How did that come about?

15  **A.**   I went to make funeral arrangements for her, and

16  the undertaker said, Ann, I think your mom is entitled

17  to this $2,000 because of her condition.  And he showed

18  me the Providence Visitor, the ad that was in there.

19  And he gave me a copy, and I took it home and I called.

20  **Q.**   So you had met with somebody at the funeral

21  parlor?

22  **A.**   Yes.  It was the funeral director.

23  **Q.**   He pointed you to the ad in the Rhode Island

24  Catholic newspaper?

25  **A.**   Yes.

1      MR. McADAMS:  Could we have Government Exhibit

2  46, which is already in evidence.

3  **Q.**    Do you recognize that?

4  **A.**    Yes, I do.

5  **Q.**    Does that appear to be the ad that you saw?

6  **A.**    Yes.

7  **Q.**    What was your understanding of what this program

8  was at the time you saw that ad?

9  **A.**    She was terminally ill and she had no insurance,

10  so I looked into it and received a $2,000 check.

11  **Q.**    When you say you looked into it, what did you do?

12  **A.**    I called the number.

13  **Q.**    Who did you speak to?

14  **A.**    The secretary, whoever answered.  I don't know who

15  it was, but then a gentleman did come to my mother's

16  apartment.

17  **Q.**    How many times did you end up meeting with this

18  gentleman?

19  **A.**    I want to say two times.

20  **Q.**    Do you happen to remember what his name was?

21  **A.**    Raymour.

22  **Q.**    Does Raymour Radhakrishnan --

23  **A.**    Excuse me.

24  **Q.**    Did he tell you his last name as well?

25  **A.**    I'm sure he did.

1  **Q.**   Do you recognize him in the courtroom today?

2  **A.**   I see him there.

3       MR. McADAMS:  Let the record reflect the

4  Defendant has been identified.

5       THE COURT:  The record will so reflect.

6       MR. McADAMS:  Thank you.

7  **Q.**   Mrs. Scuncio, you indicated that you believe you

8  met with Raymour two times?

9  **A.**   Yes.

10  **Q.**   How far apart were these two meetings?

11  **A.**   Within a couple of days, I would say.

12  **Q.**   Let's focus on the first meeting.  Where did it

13  take place?

14  **A.**   Mineral Spring Gardens on Mineral Spring Avenue.

15  **Q.**   That would be at the apartment where your mother

16  was living?

17  **A.**   My mom's, right.

18  **Q.**   You weren't living with her at that time?

19  **A.**   No.

20  **Q.**   And who was present for the meeting?

21  **A.**   Just the two of us.

22  **Q.**   Yourself and Raymour?

23  **A.**   Yes.

24  **Q.**   And was your mother present as well?

25  **A.**   My mother was like in a semi-coma.

1    **Q.**    So she was incapacitated?

2    **A.**    Um-hum.  (Affirmative.)

3    **Q.**    First of all, how long did that first meeting

4    last?

5    **A.**    I can't remember.  Twenty minutes, probably.

6    **Q.**    What do you remember Raymour saying at that

7    meeting?

8    **A.**    He looked at my mom.  She was in bed, and he said

9    she definitely qualified for the $2,000.

10   **Q.**    Did he say who was providing the $2,000?

11   **A.**    No.  I had asked him.  He said it was a

12   philanthropist, because I wanted to thank him for it.

13   He said no, he would thank him for me.

14   **Q.**    So he didn't give you the name of the

15   philanthropist?

16   **A.**    No.

17   **Q.**    And did he give you any money at that meeting?

18   **A.**    The $2,000 check.  No, maybe it was the second

19   time I saw him I got the check.

20         MR. McADAMS:  Now, I'd like to show you

21   Government Exhibit 221, which I'd like to move as a

22   full exhibit.

23         MR. LEPIZZERA:  No objection.

24         MR. RADHAKRISHNAN:  No objection, your Honor.

25         THE COURT:  221 will be full.  You may publish

1     it.

2              (Government Exhibit 221 admitted in full.)

3     **Q.**   Mrs. Scuncio, these are notes, records in the

4     files of Estate Planning Resources.  And is that your

5     handwriting on those notes?

6     **A.**   No.

7     **Q.**   Does that contain information regarding your

8     mother?

9     **A.**   Name -- yeah.

10    **Q.**   You see where it says Pia Addorado Bernardo?

11    **A.**   Yeah.

12    **Q.**   Was that her maiden name or her middle name?

13    **A.**   They spelled it wrong, but it is her middle name.

14    **Q.**   And that's the address that she was living at at

15    that time?

16    **A.**   Correct.

17    **Q.**   And it's redacted, but is that the year of her

18    date of birth, 1914?

19    **A.**   Yes.

20    **Q.**   Are those the last four numbers of her Social

21    Security number?

22    **A.**   I don't remember that.

23    **Q.**   Do you remember Raymour asking you for that

24    information?

25    **A.**   I don't remember.

1  **Q.**   Now, what, if anything, did Raymour say that you

2  needed to do or your mother needed to do in return for

3  the money that you were being given?

4  **A.**   He said nothing.

5  **Q.**   Did he say anything to you in that initial meeting

6  about opening up any type of account in your mother's

7  name?

8  **A.**   No.

9  **Q.**   Did you sign any documents at that first meeting?

10  **A.**   I don't remember.

11  **Q.**   Did you end up signing documents at some point?

12  **A.**   I might have signed when I received the check.

13  **Q.**   So you remember signing some type of receipt when

14  you received the check?

15  **A.**   Um-hum.  (Affirmative.)

16  **Q.**   You're not sure whether you received the check at

17  the first meeting or a later point?

18  **A.**   Had to be very close because I think my mother

19  died a day after the check was issued, or two days

20  after.

21  **Q.**   So you indicated that second meeting took place

22  within a couple of days of the first one; is that

23  right?

24  **A.**   (Witness nods head in the affirmative.)

25  **Q.**   And how long did this second meeting take?

1    **A.**    Ten, 15 minutes.

2            MR. McADAMS:  I'd like to show you Government

3    Exhibit 219 and move that into evidence.

4            MR. LEPIZZERA:  No objection.

5            MR. RADHAKRISHNAN:  No objection, your Honor.

6            THE COURT:  219 will be full without objection.

7    You may publish it.

8            (Government Exhibit 219 admitted in full.)

9    **Q.**    Do you recognize that?

10   **A.**    Yes, I do.

11   **Q.**    Is that the check for $2,000?

12   **A.**    Made out to me, right.

13   **Q.**    And it was made out to you?

14   **A.**    Right.

15   **Q.**    And this was dated on it appears June 17th, 2008?

16   **A.**    Correct.

17   **Q.**    So that would have been the day before your mother

18   passed away?

19   **A.**    Correct.

20   **Q.**    Does that refresh your recollection as to when the

21   meeting took place?

22   **A.**    That would be the day.

23   **Q.**    That would be the second meeting?

24   **A.**    Um-hum.  (Affirmative.)

25   **Q.**    Now, this second meeting, your mother obviously

1    was still unable to participate in the meeting?

2    **A.**   Right.

3    **Q.**   Now, the corner memo line of the check indicates

4    that it's philanthropy.  Did you recognize that at the

5    time?

6    **A.**   Yes.

7    **Q.**   Was that consistent with your understanding of

8    what the money was for?

9    **A.**   Yes.

10        MR. McADAMS:  Can I bring up Government Exhibit

11   220, please, and move that as a full exhibit.

12        MR. LEPIZZERA:  No objection.

13        MR. RADHAKRISHNAN:  No objection, your Honor.

14        THE COURT:  220 will be full without objection.

15   You may publish it.

16        (Government Exhibit 220 admitted in full.)

17   **Q.**   Do you recognize that?

18   **A.**   I do.  I signed it.

19   **Q.**   At the bottom, you recognize that as your

20   signature?

21   **A.**   Yes.

22   **Q.**   And you had -- let me back up.  It says Ann

23   Scuncio, "daughter" in parentheses, power of attorney.

24   Is that your handwriting as well?

25   **A.**   No.

1    **Q.**   Other than your signature, is any of the

2    handwriting on the document yours?

3    **A.**   No.

4    **Q.**   So you indicated that you had signed some type of

5    receipt when you received the check.  And this

6    indicates that it's a terminal illness philanthropy

7    account receipt; is that correct?

8    **A.**   Um-hum.  (Affirmative.)

9    **Q.**   Do you believe this is the document you signed at

10   the time?

11   **A.**   Yeah.  My signature is on it.

12   **Q.**   Now, at that meeting, did Raymour ask you for

13   permission to open up any type of account in your

14   mother's name?

15   **A.**   No.

16   **Q.**   Did he ask you to sign any other documents on

17   behalf of your mother?

18   **A.**   No.

19        MR. McADAMS:  Now, I'd like to pull up

20   Government Exhibit number 222.  And I'd like to move

21   that into evidence, please.

22        MR. LEPIZZERA:  No objection.

23        MR. RADHAKRISHNAN:  No objection, your Honor.

24   Thank you.

25        THE COURT:  222 will be full.  You may publish

1    it.

2         (Government Exhibit 222 admitted in full.)

3    **Q.**   Mrs. Scuncio, this is an Ameritrade account

4    application, and it identifies the account owner as

5    Joseph Caramadre and the account co-owner as Pia A.

6    Bernardo.

7         Did Raymour say anything to you about opening up

8    a joint brokerage account between Mr. Caramadre and

9    your mother?

10   **A.**   No.

11        MR. McADAMS:   Now, if you could highlight the

12   second section where it says account co-owner.

13   **Q.**   Does that appear to be your mother's date of birth

14   and Social?

15   **A.**   Social, I'm not sure of, but 4/17 was her date of

16   birth.

17   **Q.**   Do you know if that was her correct maiden name,

18   your mother's maiden name?

19   **A.**   Bernardo?

20   **Q.**   If you look on the right, it says --

21   **A.**   My mother's maiden name was Pezzullo.

22   **Q.**   Your mother's maiden name was Pezzullo?

23   **A.**   Yes.

24   **Q.**   So you wouldn't have told somebody that your

25   mother's maiden name DelGennio?

1    **A.**   No.   That was my grandmother's maiden name.

2    **Q.**   That was your grandmother's maiden name?  So that

3    would have been your mother's mother's maiden name?

4    **A.**   Yes.

5    **Q.**   Do you remember telling that to Raymour?

6    **A.**   No.

7    **Q.**   Now, there's a number listed as a work number,

8    401-785-0286.

9         Did your mother have a work number at that time?

10   **A.**   No.

11   **Q.**   Are you familiar with that phone number in any

12   way?

13   **A.**   No.

14        MR. McADAMS:  Go to the next page.

15   **Q.**   I'd like to go to the bottom section.

16        First of all, do you recognize this document?

17   Did Raymour show you an application document for

18   Ameritrade when he met with you?

19   **A.**   I don't think so.

20   **Q.**   You just remember signing the one document?

21   **A.**   Um-hum.  (Affirmative.)

22   **Q.**   Okay.  Does that appear to be your mother's

23   signature at the bottom underneath where it says Pia A.

24   Bernardo?

25   **A.**   How could she sign it?

1  **Q.**   Well, I'm asking you.

2  **A.**   No.

3  **Q.**   Did you sign your mother's name?

4  **A.**   That looks something like my signature.  It does.

5  **Q.**   Would you sign your mother's name Pia A. Bernardo?

6  **A.**   That was her name.

7  **Q.**   Did you sign your mother's name for her?

8  **A.**   I don't remember.

9  **Q.**   Do you remember Mr. Raymour asking you to open up

10  some type of account and asking you to sign documents

11  on your mother's behalf to do that?

12  **A.**   No.

13        MR. McADAMS:  Can we go to the next page,

14  please.

15  **Q.**   At the very bottom, again, there's a signature.

16        So you see where it says at the top of the page

17  it says "Options Account"?

18  **A.**   (Witness nods head in the affirmative.)

19  **Q.**   Did Raymour say anything to you about opening any

20  type of options account?

21  **A.**   No, he didn't.

22  **Q.**   Now, it says "Account co-owner."  And that would

23  refer to your mother?

24  **A.**   Um-hum.  (Affirmative.)

25  **Q.**   And there's a series of questions here that ask

1    about the account co-owner, and it says funds available

2    for options trading.  Do you see that?

3  **A.**    Yes.

4  **Q.**    It's marked $50,000 plus available.  Do you

5    remember Raymour asking you whether you had money

6    available or your mother had money available for

7    investing?

8  **A.**    No.

9  **Q.**    Did your mother have $50,000 available?

10  **A.**    No.

11  **Q.**    Did you?

12  **A.**    No.

13  **Q.**    The next question says years of investment

14    experience, and it's marked six to nine.  Did he ask

15    you about your mother's investment experience?

16  **A.**    No.

17  **Q.**    Did she have any investment experience?

18  **A.**    No.

19  **Q.**    Now, the next one it says investment knowledge,

20    and it's marked extensive.  Do you recognize that?  Did

21    she have extensive investment knowledge?

22  **A.**    No.

23  **Q.**    And then it asks about average transaction size

24    and it says 2,001 to $5,000.  Did she engage in any

25    type of financial transactions like that?

1    **A.**   No.

2    **Q.**   Down below it says the number of transactions per

3    year, and it's indicated 10 to 19.  Do you recognize

4    that?

5    **A.**   No.

6    **Q.**   Did she do any type of transactions like that?

7    **A.**   No.

8    **Q.**   All right.  And then it says in the next category

9    types of transactions, stocks, bonds, options.  Did she

10   engage in any type of transactions like that?

11   **A.**   No.

12   **Q.**   Did Raymour ask you any questions about her

13   financial history or background?

14   **A.**   No.

15   **Q.**   Do you recognize that signature?

16       First of all, did your mother sign that

17   document?

18   **A.**   No, she didn't.

19   **Q.**   Did you sign that document for your mother?

20   **A.**   I don't think so.

21       MR. McADAMS:  Can we go to the next page,

22   please.  And the next page.

23   **Q.**   This indicates that it is a limited trading

24   authorization and, again, there's a signature line.

25   Did you sign this for your mother?

1    **A.**   No.

2    **Q.**   Now, what this document does is it says by

3    signing -- by our signatures below, the account owners

4    and authorized agents agree to the provisions of this

5    document and attest that this authorization precedes

6    any prior trading authorization the account owner may

7    have executed with regard to the account.

8         So did Raymour say anything to you about we're

9    going to open some type of an account, and I need the

10   ability to make trades or I need you to authorize me to

11   conduct --

12   **A.**   No, he didn't.

13   **Q.**   Did he say anything about an account?

14   **A.**   No.

15        MR. McADAMS:  Let's go to the next page, please.

16   **Q.**   I'd like to focus on the bottom portion of this.

17   It says, "Account Agreement."  Do you see where it

18   says, "Account Owner"?

19   **A.**   Yes.

20   **Q.**   All right.  What's the signature that's written

21   there?

22   **A.**   Ann J. Bernardo.

23   **Q.**   Is that your mother's name?

24   **A.**   No. That was my maiden name.

25   **Q.**   When was the last time you used your maiden name?

1   **A.**    Fifty-seven years ago.

2   **Q.**    Do you sign documents using your maiden name?

3   **A.**    No, I don't.

4   **Q.**    Did you sign this document using your maiden name?

5   **A.**    No, I didn't.

6   **Q.**    Any of the other handwriting on this page yours?

7   **A.**    No.

8           MR. McADAMS:   Could we go to the next page,

9   please.

10   **Q.**    Now it's signed Pia Bernardo again.   Did you sign

11   that?

12   **A.**    No.

13   **Q.**    Obviously, your mother was unable to sign any

14   documents at that point in time?

15   **A.**    Correct.

16   **Q.**    Did you receive any additional money from Raymour

17   after you met with him and he gave you that initial

18   $2,000?

19   **A.**    No, I didn't.

20   **Q.**    Did he ask you to execute any other documents

21   apart from the receipt that you signed?

22   **A.**    No.

23   **Q.**    Did you have any other interaction with him after

24   your meeting with him?

25   **A.**    No.

1  **Q.**   Did you let him know that your mother had passed

2  away?

3  **A.**   Yes, I did.

4  **Q.**   How did you do that?

5  **A.**   I called the office and told him that she had

6  passed away.

7  **Q.**   What, if anything, did he say?

8  **A.**   I didn't talk with him.

9  **Q.**   Who did you speak to?

10  **A.**   I just left word.

11  **Q.**   You left a message on the machine?

12  **A.**   Not on a machine.  I spoke to the secretary.

13  **Q.**   Did anybody tell you that an account had been

14  opened up in your mother's name?

15  **A.**   No.

16  **Q.**   Did you have any idea prior to being interviewed

17  by the Government that an account had been opened in

18  your mother's name?

19  **A.**   No.

20  **Q.**   Did you ever give Raymour or Mr. Caramadre any

21  consent to profit financially or otherwise from your

22  mother's dying?

23  **A.**   No.

24       MR. McADAMS:  No further questions.

25       THE COURT:  Thank you.

1      Mr. Radhakrishnan?

2      MR. RADHAKRISHNAN:  One moment, please, your

3  Honor.

4      (Pause.)

5      **CROSS-EXAMINATION BY MR. RADHAKRISHNAN**

6  **Q.**  Good afternoon, Mrs. Scuncio.

7  **A.**  Hello.

8  **Q.**  Is that correct?  Is it Mrs. Scuncio?

9  **A.**  Scuncio.

10  **Q.**  I'm sorry.  Scuncio?  Sorry about that.  Thank you

11  for coming in today.

12      So you remember me coming in and meeting with

13  you?

14  **A.**  Yes, I do.

15  **Q.**  Okay.  Do you remember me being respectful and

16  polite?

17  **A.**  Extremely.  Extremely polite and respectful.

18  **Q.**  May I ask, do you have any siblings?

19  **A.**  Yes.

20  **Q.**  Okay.  And who are those siblings, please?

21  **A.**  Brother and a sister.

22  **Q.**  What's your brother's name?

23  **A.**  James Bernardo.

24  **Q.**  When we first met, was there anybody else present

25  when we first met?

1  A.   No family member.  I think one of the CNA's might

2  have been in the room with my mom.

3  Q.   Okay.  And do you have a relationship with James

4  Bernardo, or do you communicate with your brother

5  often?

6  A.   Yes.  Yes.

7       MR. RADHAKRISHNAN:  If I could please have

8  Exhibit Number 222, the TD Ameritrade application

9  pulled up, please.  We can start with page one, please.

10 Sorry.  If we could actually go to the next page.

11 We'll start here.  Thank you.

12 Q.   Ms. Bernardo -- excuse me, Ms. Bernardo.

13      Mrs. Scuncio, when you -- you testified here

14 that that's not your mother's signature; is that

15 correct?

16 A.   Correct.

17 Q.   And that's -- do you ever remember providing me

18 with a power of attorney that you had for your mother?

19 Actually, let me ask you this.  Pardon me.  Strike

20 that.

21      Do you have power of attorney for your mother?

22 A.   Yes, I do.

23 Q.   Okay.  And could you describe what a power of

24 attorney is?  What is a power of attorney?

25 A.   Giving me the jurisdiction to make decisions for

1    my mom that she probably couldn't make.

2    Q.   I'm sorry.  Say that again.  You could do what for

3    your mom?

4    A.   Make decisions for her.

5    Q.   You can make decisions for your mom because you're

6    authorized power of attorney; is that correct?

7    A.   Right.

8    Q.   Okay.  At any point in time, did you provide me

9    with a power of attorney document?

10   A.   No.

11   Q.   Okay.  But one does exist; is that correct?

12   A.   Yes.

13   Q.   Okay.  And can you just describe that document?

14   Is that a short document, is it a long document, does

15   it have many pages?

16   A.   Short document.

17   Q.   Okay.  And is it something that your mother signs

18   and you sign, or who signs off on that, and how do you

19   obtain a power of attorney?

20   A.   A lawyer.

21   Q.   Okay.  And that's how you obtained your power of

22   attorney?

23   A.   Yes.

24        MR. RADHAKRISHNAN:  I'm sorry, Ms. Anderson.

25   Could you actually pull up Exhibit 220, please.

1  **Q.**   Below there in the bottom right-hand corner,

2  that's your signature; is that correct?

3  **A.**   Yes.

4  **Q.**   Okay.  And that's Ann Scuncio?

5  **A.**   Yes.

6  **Q.**   And below that, can you read what it says there?

7  I know it's not your handwriting.

8  **A.**   Ann Scuncio, daughter.

9  **Q.**   What's below that?

10  **A.**   POA, power of attorney.

11  **Q.**   So you believe that means power of attorney?

12  **A.**   I would assume it does.

13  **Q.**   Is that your handwriting there?

14  **A.**   No.

15  **Q.**   Okay.  Is it possible that you told me you were

16  the power of attorney for your mother?

17  **A.**   Possibly.

18  **Q.**   All right.  And that is your signature, Ann

19  Scuncio, there?

20  **A.**   Yes.

21  **Q.**   Okay.  Thank you.

22      MR. RADHAKRISHNAN:  Now, can we please go back

23  to 222, please.  Thank you.  All right.  Could we go to

24  the next page, please.

25  **Q.**   And you're saying that that's not your mother's

1    signature, that's correct?

2    **A.**   Correct.

3    **Q.**   Okay.   And that's not you who signed that; is that

4    correct?

5    **A.**   Correct.

6         MR. RADHAKRISHNAN:   Could we go to the next

7    page.   And again, please.

8    **Q.**   And then right there in this limited trading

9    authorization form, there's an account co-owner and

10   below that, that's not your signature there?   It says,

11   Pia A. Bernardo.   It's not something that you signed on

12   behalf of your mother?

13   **A.**   No, I didn't sign it.

14        MR. RADHAKRISHNAN:   Could we go to the next

15   document, please.   And the next one, please.   And one

16   more, please.

17   **Q.**   And then right down below here, that signature

18   there, it says Ann J. Bernardo.   If you could look

19   closely at that "Ann," are you sure you didn't sign

20   that?

21   **A.**   I'm positive I didn't.   Why would I sign Ann J.

22   Bernardo?

23   **Q.**   You didn't sign that?

24   **A.**   No.

25        MR. RADHAKRISHNAN:   Was there one more page

1    there?

2    **Q.**   Okay.  And then right there on that document,

3    that's not your signature?

4    **A.**   No.

5    **Q.**   Okay.  You did receive some money; is that

6    correct?

7    **A.**   Correct.

8    **Q.**   What did you spend that money on, Ms. Scuncio?

9    **A.**   To help bury my mom.

10   **Q.**   It was useful to you?

11   **A.**   Excuse me?

12   **Q.**   The funds were useful to you?  They provided you

13   value?

14   **A.**   Yes, they did.  Yes, they did.

15           MR. RADHAKRISHNAN:  Thank you for your time.

16   Sorry you had to come in.  Thank you.

17           THE COURT:  Mr. Lepizzera?

18           MR. LEPIZZERA:  No questions, your Honor.

19           THE COURT:  Any follow-up, Mr. McAdams?

20           MR. McADAMS:  No, your Honor.

21           THE COURT:  Okay.  Ms. Scuncio, your testimony

22   is complete.  You may step down.  Thank you very much.

23           Well, ladies and gentlemen, I think that should

24   do it for the day.  I did want to finish this witness

25   so she didn't have to come back tomorrow.  So we'll

1    call it a day.  We'll reconvene tomorrow morning, nine

2    o'clock.  Please keep in mind all of my prior

3    instructions to you, which I won't repeat again.  Just

4    keep in mind particularly no discussion about the case

5    with anyone and no observation of any media accounts of

6    any kind.  You know the drill.

7            So we'll see you tomorrow morning, nine o'clock

8    sharp.  Thank you very much.

9            (Proceedings out of the presence of the jury as

10   follows:)

11           THE COURT:  If there's nothing further, we'll be

12   adjourned for the day.  See you tomorrow morning.

13           (Court concluded at 1:35 p.m.)

14

15

16

17

18

19

20

21

22

23

24

25

<u>C E R T I F I C A T I O N</u>

        I, Anne M. Clayton, RPR, do hereby certify that the foregoing pages are a true and accurate transcription of my stenographic notes in the above-entitled case.


/s/ Anne M. Clayton

_____

Anne M. Clayton, RPR


January 10, 2013

_____

Date