IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND


```
* * * * * * * * * * * * *    CRIMINAL ACTION
UNITED STATES OF AMERICA  *  11-186-S
                          *
VS.                       *  NOVEMBER 15, 2012
                          *  VOLUME III
JOSEPH CARAMADRE and      *
RAYMOUR RADHAKRISHNAN     *  PROVIDENCE, RI
* * * * * * * * * * * * *
```

HEARD BEFORE THE HONORABLE WILLIAM E. SMITH

DISTRICT JUDGE

(Jury Trial)




**APPEARANCES**:

FOR THE GOVERNMENT:          LEE VILKER, AUSA
                             and JOHN P. McADAMS, AUSA
                             U.S. Attorney's Office
                             50 Kennedy Plaza
                             Providence, RI  02903

FOR THE DEFENDANT
Joseph Caramadre:            MICHAEL J. LEPIZZERA, ESQ.
                             Lepizzera & Laprocina
                             117 Metro Center Blvd.
                             Suite 2001
                             Warwick, RI  02886

                             ANTHONY M. TRAINI, ESQ.
                             56 Pine Street
                             Providence, RI  02903

**APPEARANCES**:   (Continued)

FOR THE DEFENDANT
Raymour Radhakrishnan:        RAYMOUR RADHAKRISHNAN, Pro se

                             OLIN THOMPSON, ESQ.
                             Federal Defender's Office
                             10 Weybosset St.
                             Providence, RI  02903

Court Reporter:              Anne M. Clayton, RPR
                             One Exchange Terrace
                             Providence, RI  02903

Proceeding reported and produced by computer-aided
stenography

I N D E X

WITNESS                                                      PAGE

ANA URENA

   Direct Examination by Mr. McAdams:                          5
   Cross-Examination by Mr. Radhakrishnan:                    26
   Cross-Examination by Mr. Lepizzera:                        48
   Redirect Examination by Mr. McAdams:                       54
   Recross-Examination by Mr. Lepizzera:                      55

MARNITO LUCAS

   Direct Examination by Mr. Vilker:                          57
   Cross-Examination by Mr. Radhakrishnan:                    92
   Redirect Examination by Mr. Vilker:                       110

KENNETH BLOWERS

   Direct Examination by Mr. McAdams:                        111
   Cross-Examination by Mr. Lepizzera:                       148

LORRAINE MARSHALL

   Direct Examination by Mr. Vilker:                         153
   Cross-Examination by Mr. Radhakrishnan:                   178

GOVERNMENT EXHIBITS

24    -                                                       63
25    -                                                       68
26    -                                                       73
27    -                                                       74
28    -                                                       75
29    -                                                       76
30    -                                                       77
31    -                                                       79
32    -                                                       82
33    -                                                       86
34    -                                                       87
35    -                                                       89
36    -                                                       90
185   -                                                      162
186   -                                                      166
187   -                                                      168
188   -                                                      170
189   -                                                      172
190   -                                                      174
191   -                                                      176

I N D E X   (Continued)          PAGE

GOVERNMENT EXHIBITS

| | | |
|---|---|---|
| 192 | - | 177 |
| 276 | - | 122 |
| 277 | - | 118 |
| 279 | - | 120 |
| 281 | - | 124 |
| 282 | - | 128 |
| 283 | - | 129 |
| 284 | - | 130 |
| 286 | - | 139 |
| 287 | - | 140 |
| 288 | - | 131 |
| 290 | - | 135 |
| 291 | - | 133 |
| 293 | - | 136 |
| 294 | - | 10 |
| 295 | - | 14 |
| 296 | - | 12 |
| 297 | - | 15 |
| 298 | - | 19 |
| 299 | - | 20 |
| 300 | - | 22 |
| 301 | - | 11 |
| 989 | - | 112 |
| 990 | - | 113 |
| 991 | - | 127 |

_____

1    15 NOVEMBER 2012 -- 9:00 A.M.

2              (Proceedings in the presence of the jury as

3    follows:)

4              THE COURT:  Good morning, ladies and gentlemen.

5    Welcome back.  And I think we're ready to proceed.  We

6    had a little technical issue as you were coming

7    upstairs, but I think we got it resolved.

8              Are we ready to proceed?

9              MR. McADAMS:  Yes, your Honor.

10             The Government calls Ana Urena.

11             **ANA URENA**, first having been duly sworn,

12    testified as follows:

13             THE CLERK:  Please state your name and spell

14    your last name for the record.

15             THE WITNESS:  Ana Urena, U-R-E-N-A.

16             THE COURT:  All right.  Good morning, Ms. Urena.

17             And you may inquire, Mr. McAdams.

18             MR. McADAMS:  Thank you, your Honor.

19             **DIRECT EXAMINATION BY MR. McADAMS**

20    **Q.**   Good morning, Ms. Urena.

21    **A.**   Good morning.

22    **Q.**   Ms. Urena, where are you from?

23    **A.**   Originally?

24    **Q.**   Now.

25    **A.**   I live in Johnston, Rhode Island.

1  **Q.**   And how long have you been a resident of Rhode

2  Island?

3  **A.**   Three years.  Rhode Island?  I'm sorry.  Since

4  1988.

5  **Q.**   So you've been a Rhode Islander for 20 plus years?

6  **A.**   Yes.

7  **Q.**   Okay.  Was your mother Maria Nina?

8  **A.**   Yes.

9  **Q.**   And did she pass away?

10  **A.**   Yes.

11  **Q.**   Approximately when did she pass away?

12  **A.**   About two years ago.

13  **Q.**   April of 2010?

14  **A.**   2010, yes.

15  **Q.**   How old was she at that time?

16  **A.**   Like 85.

17  **Q.**   What was she suffering from?

18  **A.**   She had leukemia.

19  **Q.**   Now, if I could turn your attention to

20  approximately the summer of 2008, did there come a

21  point in time when you learned that there was an

22  opportunity to get some money because of her sickness?

23  **A.**   No.

24  **Q.**   Okay.  Do you have any memory of at some point

25  getting an opportunity to get some money because of

1    elderly people or people with a terminal illness?

2    **A.**    Yes.  Yes.

3    **Q.**    Do you recall when that was?

4    **A.**    The date?

5    **Q.**    Was it in approximately 2008?

6    **A.**    Yes.  I believe so.

7    **Q.**    Okay.  Now, how did you learn about this program?

8    **A.**    It was my mother got a phone from one of her

9    nurses for her to call.  I don't know how she got the

10   number.

11   **Q.**    What was your understanding as to what this

12   program was?

13   **A.**    To my understanding, it was like a gift.

14   **Q.**    Do you know who the gift was from?

15   **A.**    From --

16   **Q.**    Who it was that was giving the gift?

17   **A.**    I never met the one but --

18   **Q.**    Did you end up calling the phone number?

19   **A.**    Yes.

20   **Q.**    What happened when you called the phone number?

21   **A.**    Someone came over.

22   **Q.**    Do you remember who it was that came over?

23   **A.**    The name?

24   **Q.**    Does the name Raymour Radhakrishnan sound

25   familiar?

1    **A.**   Yes.

2    **Q.**   What happened when you met this man, Raymour?

3    **A.**   He said that they were giving out -- that someone

4    was giving out money to elderly.

5    **Q.**   What did he say about who this person was that was

6    giving out money?

7    **A.**   Not much.

8    **Q.**   Did he tell you the person's name?

9    **A.**   Yes.  I believe so.

10   **Q.**   Do you remember what it was?

11   **A.**   Caramadre?

12   **Q.**   Joseph Caramadre?

13   **A.**   Yes.

14   **Q.**   Okay.  Now, so you had this meeting with

15   Mr. Radhakrishnan.  Where did that take place?

16   **A.**   At my mother's house.

17   **Q.**   Where did your mother live at that time?

18   **A.**   200 Gordon Ave. in Providence.

19   **Q.**   Who was present for that meeting?

20   **A.**   Just me and my mom.

21   **Q.**   Now, did your mother speak English?

22   **A.**   No.

23   **Q.**   What language did she speak?

24   **A.**   Spanish.

25   **Q.**   Could she read or write?

1    **A.**    No.

2    **Q.**    So was Raymour speaking English or Spanish at this

3    meeting?

4    **A.**    English.

5    **Q.**    So you were acting as like an interpreter?

6    **A.**    Yes.

7    **Q.**    What do you remember him saying at that meeting?

8    **A.**    He said that somebody was giving out money for

9    elderly people.  It was a gift.  So we asked if -- my

10   mother asked if that had had to do with anything with

11   SSI, and he said no.

12   **Q.**    Your mother was on SSI?

13   **A.**    Yes.

14   **Q.**    And she was concerned about whether it would

15   affect her SSI?

16   **A.**    Yes.

17   **Q.**    So you translated that question for her?

18   **A.**    Yes.

19   **Q.**    What did Raymour say in response to that?

20   **A.**    No.

21   **Q.**    Did he explain why or why not or what effect it

22   would have on SSI?

23   **A.**    He said that -- I don't remember.  I know he say

24   it won't.  It didn't.

25              MR. McADAMS:  At this time, I'd like to move

1    into evidence, Government Exhibit Number 294.

2            THE COURT:  Is there any objection to 294?

3            MR. LEPIZZERA:  I actually don't have that

4    handy.  If I could --

5            THE COURT:  Sure.

6            MR. LEPIZZERA:  No objection.

7            MR. RADHAKRISHNAN:  No objection, your Honor.

8    Thank you.

9            THE COURT:  294 then will be full without

10   objection.  You may publish it to the jury.

11           (Government Exhibit 294 admitted in full.)

12   **Q.**   Can you see that, Ms. Urena?

13   **A.**   Yes.

14   **Q.**   Do you recognize that check?  Is it payable to

15   you?

16   **A.**   Yes.

17   **Q.**   And you see that the date of the check is

18   approximately July 28th of 2008?

19   **A.**   Yeah, I can see that.

20   **Q.**   Does that refresh your recollection as to when

21   this meeting with Mr. Radhakrishnan occurred?

22   **A.**   Probably, yes.

23   **Q.**   Can you see in the memo line it indicates

24   philanthropy?

25   **A.**   Over here?  That's what it says.

1    **Q.**   Do you know what philanthropy is?

2    **A.**   No.

3    **Q.**   Did Raymour say anything about Mr. Caramadre being

4    a philanthropist or explaining anything of that nature?

5    **A.**   No.

6    **Q.**   Now, what, if anything, did Raymour say that you

7    needed to do in return for this money?

8    **A.**   Nothing.

9    **Q.**   Did he indicate that he would ask that your mother

10   participate in any type of investment opportunity with

11   Mr. Caramadre?

12   **A.**   No.

13   **Q.**   Now, you eventually received another check in the

14   amount of $4,000; is that correct?

15   **A.**   I think so.

16        MR. McADAMS:  I'd like to move into evidence

17   Government Exhibit 301 if there's no objection.

18        MR. LEPIZZERA:  No objection.

19        MR. RADHAKRISHNAN:  No objection, your Honor.

20        THE COURT:  301 will be full.  You may publish

21   it.

22        (Government Exhibit 301 admitted in full.)

23   **Q.**   Do you recognize that?

24   **A.**   I don't know.

25   **Q.**   It's a check payable to you?

1    **A.**    Yep.

2    **Q.**    You see that the date is approximately September

3    2nd or September 7th of 2008?

4    **A.**    Um-hum.  (Affirmative.)

5    **Q.**    In this instance, it says "New account setup."  Do

6    you see that?

7    **A.**    I see it, yes.

8    **Q.**    Did Raymour say anything to you about opening up

9    any type of account in exchange for the money that

10   you'd be receiving?

11   **A.**    No.  No.

12   **Q.**    Now, I'd like to return your attention to that

13   meeting that you had in your house when you were

14   translating for your mother.  Did Mr. Radhakrishnan ask

15   you for any type of identity information or anything of

16   that nature on behalf of your mother?

17   **A.**    Any ID you say?  Yes.

18          MR. McADAMS:  At this time I'd like to move into

19   evidence Government Exhibit Number 296.

20          MR. LEPIZZERA:  No objection.

21          MR. RADHAKRISHNAN:  No objection, your Honor.

22          THE COURT:  296 will be full.  You may publish

23   it.

24          (Government Exhibit 296 admitted in full.)

25   **Q.**    Is this your mother's Rhode Island identification?

1    **A.**    Yes.

2    **Q.**    Okay.  And you gave this to Mr. Radhakrishnan or

3    gave him a copy of it?

4    **A.**    Probably.  Yes, I think so.

5    **Q.**    What do you remember him telling you as to the

6    reason why he needed this?

7    **A.**    I don't remember.  To have it on record?

8    **Q.**    Now, there's some handwriting underneath that.  It

9    indicates Maria Nina, and it has the ID number and an

10   address of 200 Gordon Avenue, Apartment 508.

11          Is that the apartment that your mother was

12   living in at that time?

13   **A.**    Yes.

14   **Q.**    Was she still in Apartment 508, or was she on the

15   fourth floor at that point?

16   **A.**    No, they moved her to the fourth floor.

17   **Q.**    When did they move her to the fourth floor?

18   **A.**    Exactly the day, I don't remember.

19   **Q.**    Do you recall when you had this meeting with

20   Mr. Radhakrishnan whether it occurred in her apartment

21   on the fourth floor or the fifth floor?

22   **A.**    I believe it was on the fourth floor because she's

23   been there for years.  It would have been on the fourth

24   floor.

25          MR. McADAMS:  Now, at this point, I'd like to

1    move into evidence Government Exhibit 295.

2             MR. RADHAKRISHNAN:  No objection, your Honor.

3             MR. LEPIZZERA:  No objection.

4             THE COURT:  295 will be full.

5             (Government Exhibit 295 admitted in full.)

6    **Q.**   Do you recall Mr. Radhakrishnan taking notes when

7    he met with you?

8    **A.**   I don't remember.

9    **Q.**   Okay.  Do you remember if he asked for your

10   mother's Social Security number?

11   **A.**   I don't remember.

12   **Q.**   What, if anything, did he say to you about opening

13   any type of account in your mother's name?

14   **A.**   I'm sorry?

15   **Q.**   What, if anything, did he say to you about opening

16   an account in your mother's name?

17   **A.**   No.  He didn't mention nothing about any accounts.

18   **Q.**   Did he have some papers for your mother to sign?

19   **A.**   I don't remember.

20            THE COURT:  I need you to keep your voice up

21   just a little bit.

22   **A.**   I'm sorry.  I don't remember.

23   **Q.**   You don't remember?

24   **A.**   I don't remember.

25   **Q.**   I'm sorry.  What did you say?

1      **A.**    I don't remember.

2      **Q.**    Okay.  Let me show you Government Exhibit 297.

3            MR. McADAMS:  And I'd like to move that into

4      evidence, if I could.

5            MR. LEPIZZERA:  No objection.

6            MR. RADHAKRISHNAN:  No objection, your Honor.

7            THE COURT:  297 will be full.

8            (Government Exhibit 297 admitted in full.)

9      **Q.**   Ms. Urena, this is an application to open up a

10     joint account.

11           MR. McADAMS:  If you could zoom up this section

12     here.  Above it.

13     **Q.**   It indicates it's a joint account with rights of

14     survivorship, and it says if one owner dies -- I'm not

15     sure what it says, but essentially the interest goes to

16     the surviving owners.

17           Did Raymour say anything to you about opening up

18     some type of joint account with another person in which

19     your mother would be a co-owner and another person

20     would be the other owner and whichever one of them

21     lived longer would receive the benefit of that?

22     **A.**   No.

23           MR. McADAMS:  Could we go to the second section,

24     please.

25     **Q.**   This indicates that the owner of the account will

1    be Joseph A. Caramadre, and the co-owner will be Maria

2    Nina, your mother.

3         First of all, is that the address she was at,

4    200 Gordon Ave?

5    A.   Yes.  The apartment, no.

6    Q.   The wrong apartment.  There's an address or a

7    mailing address, 1000 Chapel View Boulevard in

8    Cranston, Rhode Island.  Do you know what that address

9    is?

10   A.   No, I don't.

11   Q.   There's a section for date of birth, and you can

12   see that it's partially redacted, but was that the year

13   of her birth, 1925?

14   A.   Yes.

15   Q.   Do those appear to be the last four numbers of her

16   Social Security number?

17   A.   I don't remember it by heart.

18   Q.   You don't remember it by heart?

19   A.   No.  No, I don't.

20        MR. McADAMS:  Could we go to the next page,

21   please.

22   Q.   This is the third page of that application.  Do

23   you see on the right-hand side there's a signature

24   block with an X marked in it?

25   A.   Yes.

1   **Q.**   Okay.  Does that appear to be your mother's

2   signature?

3   **A.**   No.  My mother didn't make her "M"s like that.

4   **Q.**   So you're not sure if it's your mother's

5   signature?

6   **A.**   I'm not sure, no.

7   **Q.**   Did Mr. Radhakrishnan at any point ask you to go

8   through a document like this and translate it for your

9   mother so that she could understand that she might be

10  signing onto a brokerage account?

11  **A.**   No.

12  **Q.**   If we could go back to the first page of that

13  exhibit.  There's a phone number down here for the

14  business phone of your mother, 401-941-9273.  Do you

15  recognize that number?

16  **A.**   No.

17         MR. McADAMS:  Could we pull up side by side with

18  Exhibit 46.

19  **Q.**   See that that number is the number that was listed

20  for -- to call to get the $2,000 gift?

21  **A.**   I never seen that before.  I never seen that

22  before.

23  **Q.**   So you didn't know that that phone number was

24  listed on some type of application as a contact phone

25  number for your mother?

1  **A.**   No.  No.

2        MR. McADAMS:  Could we go back to the third page

3  of Exhibit 297.  Could you just blow up the top of it.

4  **Q.**   It indicates here that this is a portion of the

5  application that is going to add margin borrowing and

6  overdraft protection.  Do you have an understanding of

7  what that is?

8  **A.**   No.

9  **Q.**   Did Raymour say anything to you about opening up

10  an account and part of that account would be the

11  ability to use margin or borrow money to invest?

12  **A.**   No.

13        MR. McADAMS:  Could we go to the fourth page,

14  please.  Could you also blow up the signature block

15  here.

16  **Q.**   See there's a -- on the right-hand side, there's,

17  again, a signature block with an X and a circle on it?

18  **A.**   Um-hum.  (Affirmative.)

19  **Q.**   Does that appear to be your mother's signature?

20  **A.**   No.  I have my mother's signature with me.  But

21  no.

22  **Q.**   I'm sorry.  Could you repeat that?

23  **A.**   That doesn't look like hers.  I have mom's

24  signature.

25  **Q.**   You have your mom's signature, and it doesn't look

1    like hers?

2            MR. McADAMS:  Now, could we go to Government

3    Exhibit 298, please.  Could you blow up the top here.

4            If I could move this into evidence.

5            MR. LEPIZZERA:  No objection.

6            MR. RADHAKRISHNAN:  No objection, your Honor.

7            THE COURT:  298 will be full.

8            (Government Exhibit 298 admitted in full.)

9    **Q.**   This is an options trading application associated

10   with that E-Trade account we just looked at that was

11   opened up in your mother and Mr. Caramadre's name.

12           Did Raymour say anything to you about options

13   trading or explain anything of that nature?

14   **A.**   No.

15   **Q.**   Now, it indicates with respect to your mother, the

16   co-owner, that she was widowed.  Was that correct at

17   the time?

18   **A.**   I'm sorry?

19   **Q.**   Your mother was widowed at the time, your father

20   had passed away?

21   **A.**   Yeah.

22   **Q.**   And it indicates that she has number of dependents

23   and it's marked one.  Was that true?

24   **A.**   It was just herself.

25   **Q.**   She had no minor children, she was 85 years old?

1    **A.**   No.

2    **Q.**   The next section indicates options investment

3    knowledge and it's marked good.  Did your mother have

4    any type of investment knowledge?

5    **A.**   Not at all.  No.

6    **Q.**   Did she understand what options are?

7    **A.**   No.

8    **Q.**   Now, it also indicates years of experience, and

9    there's different categories.  It says stocks, ten

10   years; bonds, ten years; options, ten years; and

11   futures, ten years.

12        I take it from your previous answer that your

13   mother didn't have any type of experience like that.

14   **A.**   No.

15   **Q.**   Do you remember Raymour saying anything like that

16   to you or asking about that?

17   **A.**   No.

18        MR. McADAMS:  At this time I'd like to move into

19   evidence Government Exhibit Number 299.

20        MR. LEPIZZERA:  No objection.

21        MR. RADHAKRISHNAN:  No objection, your Honor.

22   Thank you.

23        THE COURT:  299 will be full.

24        (Government Exhibit 299 admitted in full.)

25   **Q.**   Okay.  This is a power of attorney document for

1    purposes of that particular E-Trade brokerage account.

2         Did Raymour Radhakrishnan explain anything to

3    you about opening an account and then him needing to

4    have some type of power of attorney in order to conduct

5    activity in that account?

6    A.   No.

7         MR. McADAMS:  Could we turn to the next page,

8    please.

9    Q.   If you look in the signature block, it indicates

10   that there's a signature for Joseph Caramadre and it

11   says 8-11-2009.  Then there's a block with a circle

12   with an X on it.  Does that appear to be your mother's

13   signature there?

14   A.   No.

15   Q.   Now, if you look below, it indicates that this is

16   notarized by a notary.  Did Mr. Radhakrishnan bring a

17   notary public with you to notarize your mother's

18   signature?

19   A.   No.

20   Q.   Was your mother's signature notarized on any

21   documents?

22   A.   No.

23   Q.   Now, this is dated August 11th, 2008.  And I

24   believe if we look back at Government Exhibit Number

25   294, the date of that check was July 28th, 2008.  How

1    many meetings do you remember having with

2    Mr. Radhakrishnan?

3    **A.**   I think we saw him twice.

4    **Q.**   And would it have been --

5         MR. McADAMS:  If we could have Government

6    Exhibit Number 301 side by side with that.

7    **Q.**   Did he provide you money on both the occasions

8    that you met with him?

9    **A.**   I think so.

10   **Q.**   Exhibit 301 is dated in September of 2008, and

11   Exhibit 294 is dated in July of 2008.  Is that your

12   memory of when those meetings occurred?

13   **A.**   I don't remember the days, but it could be.

14        MR. McADAMS:  Now, I'd like to move into

15   evidence Government Exhibit Number 300.

16        MR. LEPIZZERA:  No objection.

17        MR. RADHAKRISHNAN:  No objection, your Honor.

18        THE COURT:  300 will be full.  You may publish

19   it.

20        (Government Exhibit 300 admitted in full.)

21        MR. McADAMS:  Could we go to the third page of

22   this document.

23   **Q.**   This is the third page of a three-page document

24   and, again, there's a circle with an X in it and it

25   says "Maria Nina."

1          Does that appear to be your mother's signature?

2      **A.**   No.

3      **Q.**   You're not sure?

4      **A.**   She don't make her "M"s like that, the first M.

5      The A -- no.

6          MR. McADAMS:  Could we go back to the first page

7      of that document.

8      **Q.**   Now, you testified that your mother didn't speak

9      any English and that you translated at the meeting with

10     Mr. Radhakrishnan?

11     **A.**   Yes.

12     **Q.**   Did he give you a document that looked like this

13     and ask you to translate it for her?

14     **A.**   No.

15     **Q.**   I'd like to go through some of the paragraphs in

16     this document.

17          First of all, the very top indicates that it's

18     an agreement and acknowledgment with respect to a

19     brokerage account.  And it says it's an agreement and

20     acknowledgment made and entered into on the 11th day of

21     August 2008, between Joseph Caramadre, an individual

22     with an address, and it lists Beechwood Drive in

23     Cranston, and Maria Nina, an individual with an address

24     of 200 Gordon Ave., Apartment 508 in Providence.

25          Now, it says that -- it defines Mr. Caramadre as

1    the funds provider and your mother, Mrs. Nina, as the

2    co-owner.

3        MR. McADAMS:   If we could go to paragraph two.

4    **Q.**   It says that in exchange for the co-owner's

5    agreement to become a joint tenant in the account, the

6    funds provider has paid the co-owner the sum of $4,000.

7        Was it your understanding that the money that

8    you received from Mr. Radhakrishnan was in exchange for

9    any type of agreement for your mother to be a co-owner

10    on a joint brokerage account with Mr. Caramadre?

11    **A.**   No.

12    **Q.**   What did you think it was?

13    **A.**   The money?

14    **Q.**   Yes.

15    **A.**   A gift.

16        MR. McADAMS:   Now, I'd like to go to paragraph

17    seven, please.

18    **Q.**   It reads:   The securities in the account may

19    contain an optional redemption feature which provide

20    that in the event of one joint tenant's death, the

21    surviving joint tenant is allowed to sell the

22    securities in the account back to the issuer in

23    exchange for the par value of the securities plus

24    accrued interest.   In order to exercise the optional

25    redemption feature, the funds provider and the co-owner

1    must be joint tenants with rights of survivorship in

2    the account at the time of either party's death.  As a

3    result of the optional redemption feature, the

4    securities could yield a substantial profit for the

5    funds provider if the co-owner dies before the funds

6    provider.

7         So the first question I have is do you

8    understand any of what I just read?

9    **A.**   No.

10   **Q.**   Did Mr. Radhakrishnan, whether in those types of

11   words or any other type of words, say anything to you

12   to indicate that what you were being asked, what your

13   mother was being asked was that in exchange for this

14   money that you were being given, that her name would be

15   placed on an account, and that account would be used to

16   purchase some type of investment bonds or something

17   else and that those bonds would have some type of death

18   benefit associated with them so that when your mother

19   passed away, Mr. Caramadre could potentially earn a

20   profit?

21   **A.**   Absolutely not.

22   **Q.**   Did you have any understanding that in return for

23   this money you were receiving that Mr. Caramadre or any

24   other person could financially benefit from your

25   mother's passing away?

1    **A.**  No.

2          MR. McADAMS:  No further questions.  Thank you.

3          THE COURT:  Mr. Radhakrishnan?

4          **CROSS-EXAMINATION BY MR. RADHAKRISHNAN**.

5    **Q.**  Good morning, Ms. Urena.  Thank you for coming in

6    today.

7          Okay.  So you mentioned that your mother did not

8    speak English; is that correct?

9    **A.**  Correct.

10   **Q.**  And you remember that we did meet sometime in

11   2008?  Do you remember meeting me sometime in 2008?

12   **A.**  You look a little different.

13   **Q.**  Pardon me?

14   **A.**  You look a little different.

15         THE COURT:  Keep your voice up, ma'am.  Okay?

16   Keep your voice up.

17   **Q.**  So you don't remember meeting me in 2008?

18   **A.**  Yeah, but --

19   **Q.**  Okay.  All right.  Just want to -- I might have

20   gotten a little taller since then.  It has been quite a

21   while.

22         All right.  So when we first met in 2008, do you

23   remember where we met?

24   **A.**  At my mother's house.

25   **Q.**  Okay.  And who was present at that meeting?

1     **A.**    My mother, myself and you.

2     **Q.**    Okay.  So just us three, that's correct.  Okay.

3     And do you remember at any point in time me talking

4     about a $2,000 check?

5     **A.**    Yes.

6     **Q.**    Okay.  And what did I tell you about that $2,000

7     check, do you remember?

8     **A.**    To my knowledge, it was a gift for elderly people?

9     **Q.**    Right.  That $2,000 check was a gift.  That's

10    correct?  That's your memory today?

11    **A.**    Yes.

12    **Q.**    And I believe --

13          MR. RADHAKRISHNAN:  If I can actually pull up an

14    exhibit, please, Ms. Anderson, Exhibit 294, please.

15          So this check that's here, it's dated July 28,

16    2008.  Do you see that, Ms. Urena?

17    **A.**    Yes.

18    **Q.**    Okay.  And do you see in the memo section there it

19    says "philanthropy;" is that correct?

20    **A.**    I see it, yes.

21    **Q.**    Do you know what "philanthropy" means, Ms. Urena?

22    **A.**    I don't.

23    **Q.**    Okay.  But you do remember there being

24    conversations that this a gift and this is charity,

25    that $2,000 check that you signed and subsequently

1   cashed; is that correct?

2   **A.**   Yes.

3   **Q.**   And you did cash that check, correct?

4   **A.**   Yes.

5   **Q.**   Ms. Urena, do you remember during that meeting if

6   I mentioned that there may be a Plan B program, a way

7   of getting some additional money?  Do you remember

8   that?

9          MR. TRAINI:  Objection, your Honor.

10  **A.**   No.

11         THE COURT:  Don't answer.  If you hear the word

12  "objection," then just hold off your answer.

13         What's your objection?

14         MR. TRAINI:  There are several, your Honor, but

15  one of them is that it's hearsay and it may be

16  construed as testimonial.  We've had this conversation

17  to some degree earlier.

18         THE COURT:  Why don't you come up.

19         (Side-bar conference.)

20         THE COURT:  If the question is, if I remember it

21  correctly, that does she recall anything about

22  something about Plan B, and the answer is no, well then

23  she doesn't recall.  I think that's what she just said.

24         MR. TRAINI:  I tried to lodge the objection

25  before her answer but the difficulty, and I suspect

1   this will be a recurring problem, Judge, is that, first

2   of all, I want to make sure the record is clear that if

3   these kinds of questions are going to be allowed, that

4   those statements themselves are really repetitions and

5   out-of-court statements so they should be covered by a

6   Petrozziello objection.

7          Secondly, and more importantly, I think, is the

8   fact that this was the basis or one of the bases for

9   the motion to sever was that we were concerned about

10  the fact that Mr. Radhakrishnan would be testifying

11  without taking the stand and without our ability to

12  cross-examine him either, notwithstanding the

13  Government's inability to do it.  And the questions are

14  very likely to be interpreted by the jury as

15  testimonial because I know you instructed them that

16  questions are not evidence, but these are questions

17  that are including statements that were made outside of

18  court that I think can very easily be construed as

19  testimonial in nature, and so they're hearsay.

20         THE COURT:  But I'm not sure how that varies

21  from, say, Mr. Thompson was asking a question and the

22  question was do you remember Mr. Radhakrishnan saying

23  anything to you about a so-called Plan B; and if she

24  answers yes, I do recall that, then how is that any

25  different than Mr. Radhakrishnan asking that same

1     question?

2          MR. TRAINI:  I think it would be objectionable

3     because it would be basically making a hearsay

4     statement.  It's an out-of-court statement.

5          THE COURT:  Well, that may be true, but it also

6     may be --

7          MR. TRAINI:  Just to answer your question more

8     directly, Judge, I do want to answer the best way I

9     can.  The difference is that Mr. Thompson is not asking

10    the questions.  Mr. Radhakrishnan is asking the

11    questions, and it's very easy for the jury to interpret

12    this as testimony.  That's my concern.

13         THE COURT:  Right.  I can deal with that.  I can

14    give them an instruction.

15         MR. TRAINI:  You can give them a limiting

16    instruction.  That's fine.  I just want to make sure

17    the record is clear, and I want to make sure our

18    objection is in place because I think it's going to

19    happen a lot and I don't want to have to keep

20    interrupting and coming up here every time.

21         THE COURT:  That's why I wanted you to come up

22    now.

23         MR. TRAINI:  So I'd rather have a continuing

24    objection.  If you want to give them a limiting

25    instruction about testimony --

1          THE COURT:  I can do that.  How do you deal with

2     the hearsay problem?

3          MR. RADHAKRISHNAN:  Your Honor, I specifically

4     asked her if she recalled that I had asked her that.

5     She can answer yes or no.

6          THE COURT:  If the answer is yes -- I'm asking

7     these questions looking forward to other potential

8     questions, not just for this question, but if she

9     answers yes, then she's essentially adopting a

10    statement that you've made which is an out-of-court

11    statement and, therefore, it's hearsay and it doesn't

12    come in under the statements against interest or the --

13    do you have an answer to that?

14          Do you have an answer to that?

15          MR. THOMPSON:  I do have an answer to that,

16    Judge.  The question of -- I'm looking to you for

17    guidance here.  I can respond to the objection or not.

18          THE COURT:  Go ahead.

19          MR. THOMPSON:  The response to the objection,

20    Judge, is the issue of whether Mr. Radhakrishnan said

21    there was a Plan B available has nothing to do with the

22    truth of the matter of whether there was a Plan B

23    available.  The entire basis of the Government's direct

24    examination was did Mr. Radhakrishnan say this, did

25    Mr. Radhakrishnan say this.  It all goes to the

1    impression on the listener of what they were aware of

2    at the time they signed it, not to whether that stuff

3    was true or not.

4         And it's the same thing as to whether there was

5    a Plan B or not.  We're not trying to prove there was a

6    Plan B.  What we're trying to prove is that she may

7    have heard other options along the road and that she

8    was more aware of what she was doing.  It has nothing

9    to do with the truth of the matter.  It has to do with

10   the truth of what was said to her at the time or not

11   said to her at the time, which is the entire basis of

12   the Government's direct examination.

13        THE COURT:  I think that may be true for the

14   time being, but I can very easily see this morphing

15   into questions for the truth.

16        MR. TRAINI:  That's more my concern, Judge.

17        THE COURT:  So the way we're going to leave it

18   is I'm going to overrule the objections.  I'm going to

19   give the jury further instruction to remind them of my

20   prior instruction, and I'm just going to monitor the

21   hearsay aspect of this carefully, and I think it's very

22   possible we may cross that line.  And this is why you

23   need counsel representing you.

24        I'm giving you a break here by letting

25   Mr. Thompson articulate a response to these objections.

1     I can cut that off at any time.  I probably shouldn't

2     be allowing him to do this, to step in, because you

3     really can't have hybrid representation.  You either

4     have to represent yourself or you have to have

5     representation.  And this is what I tried to tell you

6     about at the beginning.  You're going to very early

7     start to get into trouble here.  And you're there.

8     Because you have no idea how to deal with the Rules of

9     Evidence.

10          So I want you to think about what you're doing.

11    I'm giving you a little room here, but you are -- I'm

12    not necessarily going to allow Mr. Thompson to step

13    forward every time and bail you out.  Okay?

14          MR. RADHAKRISHNAN:  Yes, your Honor.

15          MR. TRAINI:  Judge, before we break, since this

16    is occurring in a relatively discrete set of

17    circumstances, may I have a continuing objection so

18    that I don't have to keep doing it?  I mean, you'll see

19    it.  You'll know --

20          THE COURT:  On hearsay or on Petrozziello or

21    what?

22          MR. TRAINI:  Well, the Petrozziello objection, I

23    think, is already an objection but I meant in terms of

24    this whole raising of the testimonial issue.

25          THE COURT:  I think if you feel that he's

1  crossing the line on the hearsay issue and getting into

2  questions for the truth, I'd like to have you state the

3  objection.

4       MR. TRAINI:  Well, I think the problem is that

5  regardless of what Mr. Thompson said, whenever

6  Mr. Radhakrishnan is asking a questions and when she

7  includes something that he says he said --

8       THE COURT:  You can have a continuing objection

9  on that.

10      MR. TRAINI:  On those, because that's a

11  confrontation problem for us.  I just want to make sure

12  we're clear on that so that I don't have to keep

13  interrupting because I don't want to do that.

14      THE COURT:  Sure.  But on hearsay issues, I

15  prefer that you state an objection.

16      MR. TRAINI:  The hearsay issue really is the

17  Petrozziello objection, so I think we already have that

18  covered, Judge.

19      MR. McADAMS:  I disagree that the Petrozziello

20  is the hearsay.  I don't think they're completely

21  hundred percent overlapped there because that goes to

22  whether or not their statement is in furtherance of a

23  conspiracy and whether they're statements of a party

24  opponent in the conspiracy context.  That's where

25  Petrozziello fits in.  So I think if it's just a

1    straight hearsay question that relates to the

2    confrontation issue, then I think that we'd all be

3    benefited by if you have an objection --

4          THE COURT:  You may have one, too.

5          MR. TRAINI:  I'm not sure there's a way to

6    separate those, Judge, because all of his conversations

7    with these people are all part of the conspiracy and

8    everything that he does with them the Government is

9    going to argue is in furtherance of the conspiracy.

10         THE COURT:  Listen, I don't want this to go on

11   forever.  I've given you a standing objection here,

12   Petrozziello objection.  That's in place.  I'd like all

13   counsel's assistance.  If you feel that there's

14   inadmissible hearsay being offered, I think you should

15   state an objection, and I'm going to, frankly, be

16   watching for it myself and do the best we can.

17         MR. TRAINI:  You'll give the limiting

18   instruction now?

19         THE COURT:  Right.

20         (End of side-bar conference.)

21         THE COURT:  I apologize, ladies and gentlemen,

22   for that long side bar, but we stumbled into an area

23   that I suspected we would at some point, and I wanted

24   to bring counsel up and cover a few issues.

25         I don't need to bore you with the legal details

1    of some of these things, but I do want to remind you of

2    one of the instructions that I gave you at the

3    beginning of the trial regarding Mr. Radhakrishnan's

4    representation of himself.  I told you at the beginning

5    of the trial that statements made by Mr. Radhakrishnan

6    in the context of his acting as his own attorney are

7    not testimonial.  He's not testifying.  He's acting as

8    an attorney.

9         Now, that becomes an issue now and potentially

10   in the future when questions are asked by

11   Mr. Radhakrishnan about potentially -- I don't know

12   what his questions are going to be exactly but, you

13   know, do you remember something being said, do you

14   remember if I said this to you or I said that to you.

15   So it starts to rise up as an issue.

16        So what you have to keep in mind is that just as

17   if any attorney was asking the question, do you

18   remember if somebody said this to you, if the answer is

19   yes, then the witness's answer is evidence.  Okay?

20   Because the witness is under oath testifying from the

21   stand.

22        But let's say the answer to that was no from

23   Mr. Radhakrishnan.  Do you remember if I said this and

24   that to you, and the answer was no.  What you need to

25   remember to keep in mind is that Mr. Radhakrishnan's

1  statement of whether he said that when he's asking the

2  witness that question, do you remember if I said this

3  to you, well, his statement in that question is not

4  testimony.  And that's the point I'm trying to get

5  across to you.  And it gets a little -- might seem a

6  little complicated.  It might be a little complicated

7  except the main thing for you to remember is that the

8  only things that are testimonial statements are those

9  things said from the witness stand.  Okay?  And that's

10  what I want you to keep in mind.  Okay?

11       All right.  You may proceed, Mr. Radhakrishnan.

12       MR. RADHAKRISHNAN:  Thank you, your Honor.

13       THE COURT:  So with respect to that last

14  objection, I'm going to overrule the objection and

15  allow the witness's previously stated answer to stand.

16  Now you may proceed.

17       MR. RADHAKRISHNAN:  Thank you, your Honor.

18  **Q.**    Sorry about that, Ms. Urena.

19       All right.  So let me actually back up a little

20  bit and ask you about where you work.  Are you

21  currently employed?

22  **A.**    Now, yes.

23  **Q.**    And were you employed back in 2008 when we met?

24  **A.**    Yes.

25  **Q.**    Okay.  And where were you working?

1    **A.**    Women's Care.

2    **Q.**    Women's Care.  And where is that located, please?

3    **A.**    The office?  It's in Providence, but I don't

4    remember the address off the top of my head.

5         MR. RADHAKRISHNAN:  Can you please pull up

6    Exhibit 295, please, which are listed as Estate

7    Planning Resources Notes, Maria Nina.

8    **Q.**    Down in the bottom of this document --

9         MR. RADHAKRISHNAN:  If you could possibly,

10   please, Ms. Anderson, zoom in on the bottom half of

11   this document.  Thanks.

12   **Q.**    Down on the bottom there, does that address look

13   familiar, 18 Imperial Place, Providence?

14   **A.**    Yes.  That's the one.

15   **Q.**    That's where you used to work; is that correct?

16   **A.**    Yes.

17   **Q.**    Okay.  At that office, did you happen to have a

18   copy machine?

19   **A.**    Yes.

20   **Q.**    Okay.  That you had access to; is that correct?

21   **A.**    Correct.

22   **Q.**    Okay.  And, do you -- also, while we have this

23   exhibit up, that work number -- excuse me.  It says

24   work and then it has a number, 273-7361.  Does that

25   number look familiar?

1 **A.** I don't remember.  I know it's 273 but --

2 **Q.** Okay.  Does that look familiar to you as far as

3 being a work number for -- that 273, does that remind

4 you of Women's Care's number; is that correct?  Could

5 that be Women's Care's number?

6 **A.** It could be.

7 **Q.** I'm not going to call it right now, but it could

8 be?  That's correct?  Okay.  That's fine.

9   Do you remember why you gave me -- actually, let

10 me back up.

11   MR. RADHAKRISHNAN:  Could you please pull up

12 Exhibit 296, please.  Thank you.

13 **Q.** Here you testified that this is an ID card of your

14 mother; is that correct?

15 **A.** Yes.

16 **Q.** Okay.  Do you still have that ID card, Miss?

17 **A.** Yes, I do.

18 **Q.** That ID card, do you remember making a copy at

19 your office -- excuse me.  Let me back up.

20   Is it true to say that you did not have a copy

21 machine, your mother did not have a copy machine at her

22 home?

23 **A.** No.

24 **Q.** Okay.  Do you remember making a copy of this at

25 your office?

1   **A.**   I don't remember.

2   **Q.**   Okay.  But it's possible that you could have made

3   a copy of that document at your office; is that

4   correct?

5   **A.**   Yes.

6   **Q.**   Okay.  Do you ever remember me coming into your

7   office inside 2008?  Is it possible that I came into

8   your office to pick up that copy of that ID?  Do you

9   have any memory of that?  It was a long time ago.

10       It's all right if you don't remember.

11  **A.**   I don't remember.

12  **Q.**   Okay.  No problem.  Okay.  If we could go back to

13  that first meeting where we met and you received that

14  $2,000 check.

15       Do you remember how long that meeting was?  Do

16  you have any memory of how long that meeting was?

17  **A.**   Like how many minutes?

18  **Q.**   Yes.  Like, how long did that meeting last for?

19  **A.**   It wasn't that long.

20  **Q.**   Okay.  So could you put a time frame on it like 15

21  minutes, a half an hour, an hour?  What's your memory?

22  **A.**   I would say no more than 30 minutes.

23  **Q.**   Okay.

24       MR. RADHAKRISHNAN:  And then if you could please

25  pull up, Ms. Anderson, Exhibit 301, please.  If you

1    could please zoom in on that check.  I just want to

2    point out a few things.  Thank you.

3    Q.   Ms. Urena, this is a check and it's dated, I

4    believe, it's September 2nd or September 7th, I'm not

5    quite sure, 2008.

6         Do you see that in front of you?

7    A.   Yes.

8    Q.   And this is a check you received, isn't that

9    correct?

10   A.   Yes.

11   Q.   Okay.  And you cashed this check or deposited this

12   check; is that correct?

13   A.   I believe so.

14   Q.   Okay.  So at some point in time as you had

15   testified when the Government was directing you, we met

16   a second time.  Do you remember that second meeting?

17   A.   No.

18   Q.   Okay.  When did you receive this check here dated

19   9/7/2008?

20   A.   I don't remember dates.

21   Q.   Okay.  You don't remember.  So are you saying you

22   don't remember meeting me a second time?

23   A.   At my mother's house?

24   Q.   At your mother's house, yes, that's correct.

25   A.   I don't know.  I have such a bad memory.  It's

1    been a long time.

2    **Q.**    It's okay.  I understand it.  It was many years

3    ago.  Take your time.  You just don't remember?

4    **A.**    I don't remember the date.

5    **Q.**    Okay.  Is it possible that we met at some point in

6    time?  Is it possible that we met, granted there was a

7    second check there that you received and you testified

8    to cashing or depositing?

9    **A.**    Yes, I guess.

10   **Q.**    Okay.

11        THE COURT:  Try to keep your voice up, ma'am.

12   Okay?  Try to keep your voice up.

13        THE WITNESS:  Okay.

14   **Q.**    Ms. Nina -- excuse me, Ms. Nina.

15        Ms. Urena, when we met that second time, and I

16   don't want to confuse you because you did just testify

17   that you don't remember me coming to your office, but

18   it was possible, okay, so I don't want to confuse you,

19   but for that second meeting, do you remember how long

20   that second meeting may have occurred?

21   **A.**    No.

22   **Q.**    Okay.  You don't remember if it was 15 minutes, 20

23   minutes, 30 minutes, an hour?

24   **A.**    No.

25   **Q.**    Okay.  What's the reason -- why do you believe you

1    received this check for $4,000 with the term "new

2    account setup" inside the memo section?  Why do you

3    believe you received this check?

4             MR. TRAINI:  Objection, your Honor.

5             THE COURT:  Grounds?

6             MR. TRAINI:  Calls for hearsay.

7             THE COURT:  Well, Mr. Radhakrishnan, why don't

8    you ask her if she has any knowledge of why she

9    received this check.

10            MR. RADHAKRISHNAN:  I'll rephrase that question,

11   your Honor, sorry.

12   **Q.**   Ms. Urena, do you have any recollection, do you

13   remember why you received this check for $4,000?

14   **A.**   That was part of the gift.

15            MR. TRAINI:  Objection, your Honor.

16            THE COURT:  It's just a yes or no question.  Do

17   you have some basis for knowing why you received that

18   check?

19            THE WITNESS:  I guess, yes.

20            THE COURT:  Okay.  How do you think you know why

21   you received the check?  Not what you know but how do

22   you know it.

23            THE WITNESS:  Because it was part of the gift

24   that my mother received.

25            THE COURT:  No.  No.  From where did you

1    learn -- I'm sorry.  I'm not trying to be tough on you.

2    We have to run the trial in accordance with certain

3    rules.  So how would you know how you received that

4    check?  Would you have learned that from somebody?

5         THE WITNESS:  What do you mean?  I'm kind of

6    confused.

7         THE COURT:  Okay.  You received the second

8    check; is that right?

9         THE WITNESS:  Yes.

10        THE COURT:  And you think you know why you

11   received it, some reason why you received it?

12        THE WITNESS:  Yes.

13        THE COURT:  What I'm asking you is how would you

14   have learned why you received it?  Did someone tell you

15   that?

16        THE WITNESS:  It was part -- he told me --

17        THE COURT:  No.  No.  I'm not asking what they

18   told you.  I'm asking you did that come from

19   Mr. Radhakrishnan?  Did he tell you something?

20        THE WITNESS:  Yes.

21        THE COURT:  Okay.  That's all I want to know.

22   So I'm going to sustain the objection.

23   **Q.**   Ms. Urena, I'm not trying to confuse you so I

24   don't want you to -- this was a long time ago and you

25   may not remember.  I understand that.  So let me ask

1    you this, Ms. Urena.

2           Is it -- you testified to a lot of different

3    things to the Government when they were asking you

4    questions.  Is it fair to say that you don't have a

5    clear memory of what happened with these two meetings?

6    Is that correct to say?

7    **A.**   The thing is that I have the -- you mean the

8    details of the meeting?

9    **Q.**   There were two meetings, yes.  The two meetings.

10   Do you have a clear memory of those two meetings?

11          MR. McADAMS:  I object.

12          THE COURT:  Sustained.  She stated she didn't

13   recall whether there was a second meeting so sustained.

14   **Q.**   So Ms. Urena, you don't have -- and it's okay, but

15   it was many years ago.  Do you have a clear memory of

16   what was said at those meetings?

17   **A.**   At those meetings, no.

18          MR. McADAMS:  Objection.

19          MR. RADHAKRISHNAN:  At that first meeting, your

20   Honor.

21   **A.**   The first meeting --

22          THE COURT:  Hold it.  Hold it.  You can only

23   speak one at a time.  Okay?

24          So the objection is sustained.  You rephrase

25   question.

1      MR. RADHAKRISHNAN:  Pardon me, your Honor.

2   **Q.**   Ms. Urena, at that first meeting, is it fair to

3   say that you do not have a clear memory of what was

4   said?

5   **A.**   No.

6   **Q.**   Okay.  So you do not have a clear memory, that's

7   correct, of that first meeting?

8   **A.**   I do.

9   **Q.**   You do have a clear memory?

10  **A.**   (Witness nods head in the affirmative.)

11  **Q.**   Okay.  So during that meeting, how long was it,

12  that very first meeting?  Do you remember how long it

13  was?

14  **A.**   I wasn't taking the time.  I know it didn't take a

15  long time.  I mean, you wasn't there for a long time,

16  but I wasn't taking minutes.  That was years ago.

17  **Q.**   Okay.  Let's back up here.  Thank you for that.  I

18  appreciate it.

19      All right.  So you did testify that you gave me

20  a copy of your mother's ID; is that correct?

21  **A.**   No.  That I testified?

22      MR. RADHAKRISHNAN:  Okay.  Could you please pull

23  up Exhibit Number 296, please, Ms. Anderson.  Thank

24  you.

25  **Q.**   So this ID here, you do remember giving me a copy

1    of this ID, Ms. Nina -- Ms. Urena?

2    **A.**   We show the ID, yes.  We gave you the ID.

3    **Q.**   All right.  And do you remember if this document

4    was given during the first meeting or the second

5    meeting?

6         MR. McADAMS:  Objection.

7         THE COURT:  Sustained.

8    **Q.**   You do remember giving me this document though,

9    that's correct, Ms. Urena?

10   **A.**   The ID.

11   **Q.**   Yes.  This ID.  Okay.

12        Your mother lived by herself; is that correct,

13   Ms. Urena?

14   **A.**   Yes.

15   **Q.**   And how often would you go to see her?  Because

16   you didn't live with her, that's correct?

17   **A.**   Every other day.

18   **Q.**   All right.  And it's fair to say that you did

19   receive money and nothing was taken from you; is that

20   correct, Ms. Urena?

21        MR. McADAMS:  Objection.

22        THE COURT:  Overruled.

23   **A.**   What do you mean, nothing taken?

24   **Q.**   Is it fair to stay that you received money and

25   that I didn't take anything from you?  Is that fair to

1    say, Ms. Urena?

2    A.    I guess, yes.

3         MR. RADHAKRISHNAN:   Okay.   Thank you very much

4    for your time.   I apologize about the inconvenience.

5    Thank you.

6         THE COURT:   All right.   Mr. Lepizzera.

7         MR. LEPIZZERA:   Thank you, your Honor.

8         **CROSS-EXAMINATION BY MR. LEPIZZERA**

9    Q.    I represent Joseph Caramadre.   I have a couple of

10   questions for you.   Okay?   Thank you.

11        Ms. Urena, you never met Mr. Caramadre, have

12   you?

13   A.    No.

14   Q.    The only person you met with was

15   Mr. Radhakrishnan, correct?

16   A.    Who?

17   Q.    Mr. Raymour?

18   A.    Raymour, yes.

19        MR. LEPIZZERA:   Ms. Anderson, can we bring up

20   Exhibit 294, please.

21   Q.    Ms. Urena, you acknowledge receiving this $2,000

22   check, correct?

23   A.    Yes.

24   Q.    And in fact, you cashed this check, correct?

25   A.    Yes, I did.

1  **Q.**  And the check is made out to you?

2  **A.**  Yes.

3  **Q.**  Did Mr. Radhakrishnan, do you remember if he wrote

4  out the check in front of you when he met with you?

5  **A.**  Yes.

6  **Q.**  So Mr. Radhakrishnan had a blank check and he

7  filled it out and then gave you the check, correct?

8  **A.**  Yes.

9  **Q.**  At the first meeting?

10  **A.**  Yes.

11  **Q.**  And in the memo section in the left-hand corner,

12  see where it says "philanthropy"?

13  **A.**  Yes.

14  **Q.**  You told the jury today you don't know what the

15  word "philanthropy" means, right?

16  **A.**  No.

17  **Q.**  You don't know what that means, right?

18  **A.**  No.

19  **Q.**  But your understanding was you received this check

20  as a gift, correct?

21  **A.**  Yes.

22  **Q.**  You didn't have to do anything to receive this

23  check, correct?

24  **A.**  No.

25  **Q.**  Didn't have to sign any papers, correct?

1    **A.**   Me sign papers?

2    **Q.**   Yes.  Did you have to sign any papers to receive

3    this $2,000 check?

4    **A.**   No.  Not myself, no.

5    **Q.**   And your mother, likewise, didn't have to do

6    anything, correct?

7    **A.**   Correct.

8    **Q.**   Because this $2,000 was a gift, wasn't it?

9    **A.**   To my knowledge, yes.

10   **Q.**   Thank you.

11        MR. LEPIZZERA:  If we could please bring up

12   Exhibit 301.

13   **Q.**   Now, this, Ms. Urena, this exhibit right here,

14   this is the second check that you received, correct?

15   **A.**   Yes.

16   **Q.**   And this check is for $4,000, correct?

17   **A.**   Yes.

18   **Q.**   And the date on that, it looks like September 7th,

19   2008?

20   **A.**   Yes.

21   **Q.**   Do you recall how you received this check?  In

22   other words, did you receive it by mail, did you

23   receive it in person?  Do you recall?

24   **A.**   I'm having trouble remembering the reason.  I

25   don't remember.

1    **Q.**   Let me ask you this, see if I can refresh your

2    memory.  You didn't -- Ms. Urena, if you could take a

3    look at this exhibit.  The date on this first check is

4    July 28th, 2008, correct?  Do you see that?

5    **A.**   Yes.

6    **Q.**   And the date on the $4,000 check was September

7    7th, 2008, correct?  It's not in front of you right

8    now, but the date on the check was September 7th, 2008,

9    correct?

10   **A.**   Okay.

11   **Q.**   Did you receive one check or two checks at the

12   first meeting?

13   **A.**   At the first meeting?

14   **Q.**   On the first day you met with Raymour.

15   **A.**   I think it was only this one.

16   **Q.**   You only received the first $2,000 check, correct?

17   **A.**   I think, yes.

18   **Q.**   And you didn't receive the second $4,000 check at

19   that first meeting, did you?

20   **A.**   I don't believe so.

21   **Q.**   You just don't recall how you received it, whether

22   it was by mail or in person, right, as you sit here

23   today?

24   **A.**   No.  By mail?  I don't think so.  I don't

25   remember.

1    **Q.**   You don't remember?

2    **A.**   I'm sorry.

3    **Q.**   But you did receive the second $4,000 check,

4    right?

5    **A.**   I think so.

6    **Q.**   And the top of this check, looking at the $2,000

7    check now, says from the Law Offices of Joseph

8    Caramadre, correct?

9    **A.**   Yes.

10        MR. LEPIZZERA:  If I could bring up Exhibit 301,

11   please.

12   **Q.**   This is the second check, Ms. Urena, for $4,000,

13   right?

14   **A.**   Yes.

15   **Q.**   And at the top of that check, that check was also

16   written from the account of Joseph Caramadre, correct?

17   **A.**   Yes.

18   **Q.**   And you acknowledged you either cashed or

19   deposited this check, right, this $4,000 check?

20   **A.**   That I cashed it?

21   **Q.**   Cashed or deposited it.  You received the money,

22   right?

23   **A.**   Yes.

24   **Q.**   You received a total of $6,000 from Mr. Caramadre,

25   right?  The first check was for $2,000?

1      **A.**    I remember the first check.

2      **Q.**    For $2,000.  And the second check is for $4,000,

3      right?

4      **A.**    Okay.  Yes.

5      **Q.**    And in the corner, you see where it says, "New

6      account setup"?  That's what that check states, right,

7      in the left-hand corner?

8      **A.**    Um-hum.  (Affirmative.)

9      **Q.**    Doesn't say "philanthropy," does it?

10     **A.**    No.

11     **Q.**    It says "New account setup," doesn't it?

12     **A.**    Yes.

13           MR. LEPIZZERA:  If we could bring up, please,

14     Exhibit 300, Ms. Anderson.  If you could bring up

15     paragraph two.

16     **Q.**    Ms. Urena, paragraph two, could you just follow

17     along with me.  It states:  In exchange for the

18     co-owner's agreement to become a joint tenant in the

19     account, the funds provider has paid the co-owner the

20     sum of $4,000.  Do you see that?

21     **A.**    Yes.

22     **Q.**    That number, that $4,000, that's the same number

23     that's in the second check; isn't that correct?

24     **A.**    Yes.

25           MR. LEPIZZERA:  Thank you.  Nothing further.

1    THE COURT:  Mr. McAdams?

2    MR. McADAMS:  Very briefly, your Honor.

3    **RECROSS-EXAMINATION BY MR. McADAMS**

4    **Q.**   That agreement, Exhibit 300, that indicates, as

5    Mr. Lepizzera just pointed out, a $4,000 payment,

6    that's dated on the 11th of August, 2008; is that

7    correct, on the top?

8    **A.**   Yes.

9    **Q.**   Okay.  And it says in paragraph two, as

10   Mr. Lepizzera just read to you:  In exchange for the

11   co-owner's agreement to become a joint tenant in the

12   account, the funds provider has paid the co-owner the

13   sum of $4,000.

14   MR. McADAMS:  Can we go to the third page.

15   **Q.**   It's once again dated August 11th, 2008.

16   MR. McADAMS:  Could we go to that check, Exhibit

17   301.

18   **Q.**   This check is dated in September of 2008.  So this

19   check, this $4,000 is not even dated until three weeks

20   or so after this document purports to have already paid

21   $4,000; is that correct?

22   **A.**   Yes.

23   **Q.**   Now, Ms. Urena, did you have any understanding

24   that any of the money that you or your mother received

25   would in any way result in an agreement that an account

1    could be opened in your mother's name?

2    **A.**    No.

3    **Q.**    Your mother didn't speak English or read or write

4    in either language, correct?

5    **A.**    No.  My mother was not educated, no.

6         MR. McADAMS:  No further questions.

7         THE COURT:  Thank you.  Mr. Radhakrishnan, any

8    recross?

9         MR. RADHAKRISHNAN:  No, your Honor.  Thank you.

10        THE COURT:  Mr. Lepizzera?

11        <u>**RECROSS-EXAMINATION BY MR. LEPIZZERA**</u>

12   **Q.**    We don't need to bring up the check again, but,

13   Ms. Urena, you agree that you accepted a check for

14   $4,000, correct?

15   **A.**    No.  I have not agreed.  For the 2,000, yes, we

16   did.

17   **Q.**    You also received a check for $4,000, correct?

18   **A.**    That's what I'm trying to remember.  It's just

19   weird.  I don't remember.  I don't remember.  Did I

20   cash the check?  I don't remember.

21   **Q.**    You don't remember?

22   **A.**    The $2,000, yes, I do remember that, because I

23   deposited it to my account.

24   **Q.**    You don't recall if you received $2,000 or $6,000?

25   **A.**    The $2,000, yes.

1    **Q.**   You're questioning whether you received the

2    $4,000?

3    **A.**   I'm sorry.

4    **Q.**   Are you today questioning whether -- you're not

5    sure if you received the $4,000 check?

6    **A.**   No.  No.

7    **Q.**   Either you know or you don't.  As you sit here

8    today, you're not sure if you received that $4,000

9    check; is that your testimony?

10   **A.**   I can't remember.

11   **Q.**   It was a long time ago, wasn't it?

12   **A.**   (Witness nods head in the affirmative.)

13   **Q.**   Right?

14   **A.**   Yes.

15         MR. LEPIZZERA:  Nothing further.

16         THE COURT:  Okay.  Thank you.  Ms. Urena, your

17   testimony is complete.  You may step down now.  Thank

18   you very much.

19         THE WITNESS:  Thank you.

20         THE COURT:  Next witness.

21         MR. VILKER:  United States calls Marnito Lucas.

22         **MARNITO LUCAS**, first having been duly sworn,

23   testified as follows:

24         THE CLERK:  Please state your name and spell

25   your last name for the record.

1      THE WITNESS:  Marnito Lucas, L-U-C-A-S.

2      THE COURT:  Good morning, Ms. Lucas.

3      THE WITNESS:  Good morning.

4      THE COURT:  Welcome.

5      Now you may inquire, Mr. Vilker.

6      **DIRECT EXAMINATION BY MR. VILKER**

7   **Q.**   Good morning, Ms. Lucas.  Where do you currently

8   live, what city?

9   **A.**   Providence.

10  **Q.**   What do you do for a living?

11  **A.**   Right now, I'm in school for medical assistant.

12  **Q.**   And are you working as well now?

13  **A.**   No, I'm not working.

14  **Q.**   You're studying to become a medical assistant?

15  **A.**   Yes.

16  **Q.**   Okay.  Were you at one point in a relationship

17  with a man named Nathan Lee?

18  **A.**   Yes.

19  **Q.**   And the two of you were a couple?

20  **A.**   Yes.

21  **Q.**   Okay.  And did Mr. Lee pass away on December 29th

22  of 2008?

23  **A.**   Yes.

24  **Q.**   And what was he suffering from at the time?

25  **A.**   Lung cancer.

1   **Q.**   How long had he been suffering with lung cancer?

2   **A.**   I guess it started I think like March or April.

3   **Q.**   That year, 2008?

4   **A.**   Yes.

5   **Q.**   And after he was diagnosed, did you move in and

6   live with him?

7   **A.**   He moved in with me.

8   **Q.**   He moved in with you?

9   **A.**   Yes.

10   **Q.**   Did you become, in essence, his primary caretaker?

11   **A.**   Yes.

12   **Q.**   Now, what type of work did Nathan do before he got

13   sick?

14   **A.**   Oh, he wasn't working.

15   **Q.**   Before he was sick, do you know what kind --

16   **A.**   Disabled.

17   **Q.**   He was disabled?

18   **A.**   Yeah.

19   **Q.**   What was his disability before he got the lung

20   cancer?

21   **A.**   He had problems with his eyes.  He was a disabled

22   vet, veteran.

23   **Q.**   Now, I want to turn your attention to November of

24   2008, about a month before Nathan passed away.  At the

25   end of November, what was Nathan's physical condition

1    like at that time?

2    **A.**   The end of November?  He was still pretty much

3    coherent at that time.

4    **Q.**   He was able to understand what was going on?

5    **A.**   Yes.

6    **Q.**   Okay.  What was his financial situation at that

7    time?

8    **A.**   Well, he was getting a disability check and that's

9    about it.

10   **Q.**   Was Nathan receiving Hospice Care at the end of

11   his life?

12   **A.**   At the end, I guess.

13   **Q.**   Was there a nurse that was coming to help take

14   care of him?

15   **A.**   Well, the nurse came in occasionally.

16   **Q.**   You were doing most of the --

17   **A.**   I was -- yeah.

18   **Q.**   And she would come in once in a while and help

19   out?

20   **A.**   Yes.

21   **Q.**   Now, at some point, did that nurse mention

22   something to you about any kind of way in which Nathan

23   may be able to get some money?

24   **A.**   Yes.

25   **Q.**   What do you remember her saying?

**A.**   That because of his condition, that if he didn't

have life insurance, that he probably wouldn't be able

to get any, you know.  And that she knew somebody or

some people that help other people that was in that

same situation, you know, that had an illness that they

knew they weren't able to, you know, get life

insurance.  And she asked him was he interested in, you

know, that.

**Q.**   Did he indicate that something like that he was

interested in?

**A.**   Yeah.  He wanted information about it.

**Q.**   And did you or he subsequently call a phone number

that was provided to you by this nurse?

**A.**   No.  I don't think she gave us a phone number.  I

think the person called.

**Q.**   The person called you?  And was there then a

meeting set up where someone came from this program

that the nurse was talking about?

**A.**   Yes.

**Q.**   And who was at that meeting, that first meeting?

**A.**   Just a guy named Raymour.  I can't remember the

last name.

**Q.**   Because you knew him as Raymour, I'm going to

refer to him as Raymour in my questions with you.

        So the individual named Raymour was there.  And

1  was Nathan there as well?

2  **A.**  Yes.

3  **Q.**  And were you there as well?

4  **A.**  Yes.

5  **Q.**  Obviously, just the three of you?

6  **A.**  Yes.

7  **Q.**  Where did this first meeting take place?

8  **A.**  It was at my apartment.

9  **Q.**  And what, if anything, did Raymour say about the

10  program that he was coming from or the person he was

11  working for?

12  **A.**  Well, the person -- well, okay.  The program or

13  whatever was supposed to be for people that had or

14  someone that had money and that was going to help, you

15  know, willing to help people that was in that

16  situation.  And I asked, you know, like who's the

17  person that's doing this nice deeds.  And he said that

18  he didn't know himself.  He wasn't allowed to know.

19  **Q.**  He didn't know who that person was?

20  **A.**  He didn't even know.

21  **Q.**  He wasn't allowed to know?

22  **A.**  No.  Or something -- he did not know.  He didn't

23  know who the person was.

24  **Q.**  He didn't tell you who the person was that was

25  giving the money?

1    **A.**   No.

2    **Q.**   And did he say anything about why Nathan had been

3    selected for this program?

4    **A.**   Um, well, he was referred by the nurse.

5    **Q.**   Did he say anything about this particular nurse

6    and why anything she said was given some weight?

7    **A.**   I guess, basically, he didn't have any insurance.

8    **Q.**   Okay.  And did Raymour say what the purpose of

9    this money was, what the reason was why you or Nathan

10   would be getting some money?

11   **A.**   Supposed to be help, you know, with the funeral

12   costs.

13   **Q.**   Did you, during that first meeting, voice any

14   concern that you had about this with Raymour?

15   **A.**   Yes.  I just couldn't understand, like, why.  Who

16   and why.

17   **Q.**   It seemed odd to you that someone would just be

18   giving money like that?

19   **A.**   Yeah.

20   **Q.**   Did you say anything to Raymour about it sounded

21   too good to be true or something like that?

22   **A.**   Yes.

23         MR. RADHAKRISHNAN:  Objection, your Honor.

24   Leading.

25         THE COURT:  Overruled.

1    **Q.**    So when you said this to Raymour, something along

2    that line, voiced your skepticism about it, how did he

3    respond?

4    **A.**    He said something like, yes, he knows that, you

5    know, it does sound too good to be true, but, you know,

6    this is, you know, what they're doing.  People are

7    helping out.  Or person, people.

8         MR. VILKER:  I'd like to bring up Exhibit 24 and

9    move that full.

10         MR. LEPIZZERA:  No objection.

11         MR. RADHAKRISHNAN:  No objection, your Honor.

12         THE COURT:  24 will be full.

13         (Government Exhibit 24 admitted in full.)

14    **Q.**    Do you see the check in front of you, Ms. Lucas?

15    **A.**    Yes.

16    **Q.**    And it's dated November 10th of 2008.  Does that

17    appear to be about the time of the first meeting that

18    you had with Raymour?

19    **A.**    Yes.

20    **Q.**    Okay.  And it's for $1,000?

21    **A.**    Yes.

22    **Q.**    Do you recall him giving you a thousand dollar

23    check that day?

24    **A.**    Yes.

25    **Q.**    And do you recall seeing in the memo section of

1   this check the word "philanthropy"?

2   **A.**   No.

3   **Q.**   You didn't notice it at the time?

4   **A.**   No, I didn't.

5   **Q.**   What was your understanding of why you were

6   getting -- you and Nathan were getting a thousand

7   dollars?

8   **A.**   Well, this thousand dollars, he said, well --

9   supposed to be like just a gift.  Whether you want to

10  go further with whatever -- you know, what this is all

11  about.  You can just keep this check and, you know,

12  that's it.  That would be the end of it.

13  **Q.**   So he told you that this thousand dollars was a

14  gift?

15  **A.**   Yes.  No strings attached, nothing.  Just -- I'm

16  leaving with this you.

17  **Q.**   After he gave you this thousand dollars, did he

18  say anything about the potential of you and Nathan

19  getting some more money?

20  **A.**   Yes, he did.

21  **Q.**   What did he say?

22  **A.**   I'm not really sure exactly what he said.  I'm not

23  really exactly sure.

24  **Q.**   Okay.  So ultimately, there was a second meeting

25  that was set up?

1    **A.**    Yeah.  A second meeting that was set up.

2    **Q.**    Before we talk about the second meeting, the first

3    meeting, after he gives you the first thousand dollar

4    check, he said something about there may be a way to

5    get you more money?

6    **A.**    Yes.

7    **Q.**    Did he go into any detail about what that way was?

8    **A.**    He would have to come back and, you know, just let

9    him know that you want to get the money, which was, I

10   think, $2,000.  And I really just didn't understand it.

11   **Q.**    So your understanding, and correct me if I'm

12   wrong, is that the first thousand dollars was a gift

13   and there was a chance you could get more money from

14   this program?

15   **A.**    Yes.  You know, like if he never heard anything

16   from him, I'm just leaving this with you.

17   **Q.**    After this first meeting, did you call Raymour?

18   **A.**    I don't remember calling him.

19   **Q.**    Do you remember him calling you?

20   **A.**    I remember him calling me.

21   **Q.**    How much after the first meeting did he call you?

22   **A.**    Wasn't very long.

23   **Q.**    Was that surprising to you to hear from him so

24   soon after this first meeting?

25         MR. LEPIZZERA:  Objection.

1        MR. RADHAKRISHNAN:  Objection.  Leading, your

2    Honor.

3        THE COURT:  Sustained.

4        MR. VILKER:  Let me just rephrase that.

5    **Q.**   What was your reaction when he called back the

6    second time?

7    **A.**   I was kind of surprised because I felt like he was

8    being pushy.

9    **Q.**   What did he say to you when he called you back?

10   **A.**   How many years has this been?

11   **Q.**   Well, the first check was at the end of 2008, so

12   it's about four years ago, so I know some time has

13   passed.

14   **A.**   I don't know.  I know it was after that check was

15   cashed.

16   **Q.**   How do you know that?

17   **A.**   How do I know?

18   **Q.**   Right.  Do you remember cashing the check and then

19   him calling you afterwards?

20   **A.**   Exactly.  Because I know it wasn't before.

21   **Q.**   It sounds like you don't remember exactly what he

22   said on the phone when he called you back?

23   **A.**   No.  I don't know exactly what he said, but he

24   wanted to know if -- you know, well, if Nate was

25   interested in if he would like to receive some more

1  money to help with the funeral home, whatever.  The

2  first time when he was there I did tell him that, you

3  know, that's something that we need to think about, you

4  know, whatever.  So he ended up coming back, though.

5  **Q.**  When he came back, was that the same place, at

6  your house?

7  **A.**  Yeah.

8  **Q.**  Is it, again, just the three of you?

9  **A.**  Yes.

10  **Q.**  And how long would you say the second meeting

11  lasted?

12  **A.**  Probably was -- I'm not sure.  Might have been --

13  I'm not really sure how long it lasted.

14  **Q.**  Generally, was it a short meeting or was it a

15  longer meeting?

16  **A.**  No, it wasn't long.

17  **Q.**  Okay.  So what do you remember Raymour saying that

18  second time when he came back and met with you and

19  Nate?

20  **A.**  That he had at the time another check he could

21  write out.  Can I just talk?

22  **Q.**  Did he give you another check that day?

23  **A.**  Yes, he did.

24      MR. VILKER:  I'd like to bring up Exhibit 25.

25      MR. LEPIZZERA:  No objection.

1    MR. RADHAKRISHNAN:  No objection, your Honor.

2    THE COURT:  25 will be full.

3    (Government Exhibit 25 admitted in full.)

4    **Q.**   And this -- does this indicate -- the date on this

5    check is November looks like it's either 14th or 19th

6    of 2008.  Again, it would be a few days after the first

7    check.  The first check that I showed you before, if we

8    could put that up again, that was Exhibit 24, that's

9    dated November 10th, a thousand dollar check.  And then

10   the second check, Exhibit 25, the $2,000 check is

11   either November 14th or November 19th of 2008.  Does

12   that seem about right to you?

13   **A.**   Closer to maybe 19.  Didn't seem like it was that

14   close, you know.

15   **Q.**   You think it was probably the 19th or nine days or

16   so after the first meeting?

17   **A.**   Yeah.  It wasn't that close from the 10th to the

18   14th, so --

19   **Q.**   Do you see this check also has written out in the

20   memo line the word "philanthropy"?

21   **A.**   Um-hum.  (Affirmative.)

22   **Q.**   Did you notice that at the time?

23   **A.**   No, I didn't.

24   **Q.**   What did you do with this?  You cashed this check

25   or deposited it?

1    **A.**    I deposited it.

2    **Q.**    Why was it made out -- both of these checks, why

3    were they made out to you instead of Nate?

4    **A.**    Because he told Nate that it should be made out to

5    someone other than himself.  Anyone other than himself.

6    **Q.**    Did Nate have a bank account?

7    **A.**    Yes.  He had a bank account.

8    **Q.**    Was he able to go out and go to the bank?

9    **A.**    He was able.

10   **Q.**    So did Raymour give a reason why the checks

11   couldn't be made out to Nate?

12   **A.**    No, he never did.

13   **Q.**    Now, what, if anything, did Raymour say was the

14   reason why he was providing the second $2,000 check or

15   the second check that was for $2,000?

16   **A.**    I guess, basically, because he was interested in,

17   you know, the hope.  By him asking him, you know, with

18   the money, he could come back over or whatever.  What I

19   assumed was just some type of good old guy.  Yeah.

20   Somebody just, you know, very good-hearted.

21   **Q.**    Now, do you remember Raymour saying something

22   about a word that he used called "annuity" during that

23   second meeting?

24   **A.**    Yes.

25   **Q.**    Do you remember him saying something about an

1    annuity?  Do you remember him explaining, or did he

2    explain to you what an annuity was?

3    **A.**    No.  I don't think he explained it, because if he

4    did, I just never got the understanding of it.  So what

5    is it?

6    **Q.**    As he gave you this $2,000, what was your

7    understanding of the reason why you and Nate were

8    receiving this money?

9    **A.**    To help for his funeral because he had no

10   insurance.

11   **Q.**    So did you understand in any way that this money

12   was being given in payment for Nate agreeing to be on

13   some kind of annuity?

14   **A.**    No.  What's an annuity?

15   **Q.**    So you don't even know what an annuity is.  Am

16   I -- what, again, is your understanding of what Nate

17   had to do, if anything, in exchange for this money?

18          MR. LEPIZZERA:  Objection.

19          THE COURT:  Grounds?

20          MR. LEPIZZERA:  It's not her understanding.

21   It's someone else's understanding.

22          THE COURT:  She can have an understanding, so

23   overruled.

24          Why don't you state the question again, though.

25          MR. VILKER:  I'll try.

1  **Q.**    What was your understanding of what, if anything,

2  Nate would need to do in order to receive this $2,000?

3  **A.**    The only thing that he did was, in my presence, he

4  was signing some papers.

5  **Q.**    So Raymour said that there's some papers he needed

6  Nate to sign?

7  **A.**    Yes.

8  **Q.**    And where in your house was this meeting taking

9  place?

10  **A.**    In the living room.

11  **Q.**    Okay.  And how is everybody, if you can remember,

12  I know it's a long time ago, how is everybody seated?

13  **A.**    Raymour was in the reclining chair, and then there

14  was probably me and then Nate on the love seat, sofa.

15  **Q.**    So like a little triangle?

16  **A.**    Just kind of like around.

17  **Q.**    So when Raymour -- he had some forms that he asked

18  Nate to sign?

19  **A.**    Yes.

20  **Q.**    Did he give the forms to you to look at, or did he

21  give them directly to Nate?

22  **A.**    No.  He gave them to me.

23  **Q.**    Did you go through the forms?

24  **A.**    Well, no, I didn't read them.  I really didn't

25  read it.

1    **Q.**    Did you see the forms at all?

2    **A.**    Yeah.  I kind of glanced.

3    **Q.**    How did the forms, just from your quick glance at

4    them, what did they look like?

5    **A.**    Just a whole lot of writing.

6    **Q.**    And did it --

7    **A.**    Well, you know, print.

8    **Q.**    What does that mean?

9    **A.**    Typed out stuff.

10   **Q.**    A lot of typed text?  And what did Raymour say

11   these forms were for?

12   **A.**    I guess that he just -- because he received the

13   money.

14   **Q.**    Did he read any of these forms to you and Nate?

15   **A.**    Did he read any?  I don't remember him actually

16   just taking a form and reading through the form.  It

17   was just basically talking about, you know, what the

18   money was, you know, to help you, whatever.  And the

19   people that wanted the help.

20   **Q.**    Do you recall -- did you watch Nate sign the

21   forms?

22   **A.**    Yes, I watched him.

23   **Q.**    I know you don't have the forms in front of you,

24   but were there a bunch of documents he had to sign?

25   **A.**    No, I don't remember a whole lot.

1    **Q.**   Okay.  Were there places where he was being asked

2    to sign, sign here or sign another location?

3    **A.**   Yes.

4    **Q.**   What do you remember Raymour saying about where on

5    these forms Nate needed to sign?

6    **A.**   I don't know.  Probably where the X is at.

7    **Q.**   So I want to now bring up some pages for you and

8    ask if you recognize Nate's signature.

9         MR. VILKER:  The first is Exhibit 26 that I'd

10   like to move full.

11        MR. LEPIZZERA:  No objection.

12        MR. RADHAKRISHNAN:  No objection, your Honor.

13        THE COURT:  26 will be full.

14        (Government Exhibit 26 admitted in full.)

15    **Q.**   This is from EPR, a record that was received and

16   it says -- there's an X, and it says next to that

17   Nathan Lee.  Does that appear to be Nate's signature?

18    **A.**   Yeah.  Somewhat.

19    **Q.**   Okay.  And this is for -- if you go to the top,

20   this says this is for -- signature page for ING USA

21   annuity.

22        Did Raymour ever say anything about a company

23   called ING or the name of any specific companies?

24    **A.**   I don't remember that, seeing anything about that.

25    **Q.**   Before you testified that there was a bunch of

1    stuff on a page and that he was asked to sign a form.

2    Is this generally what you're referring to?

3    **A.**    Yeah.

4    **Q.**    Just told to sign.  You said there was an X, and

5    you see that there's an X next to the signature.

6    **A.**    Right.

7         MR. VILKER:  If you could bring up Exhibit 27.

8    Move that full.

9         MR. LEPIZZERA:  No objection.

10        THE COURT:  Any objection, Mr. Radhakrishnan?

11        MR. RADHAKRISHNAN:  No objection, your Honor.

12   Thank you.

13        THE COURT:  27 will be full.  Go ahead.

14        (Government Exhibit 27 admitted in full.)

15   **Q.**    Does that appear to be Nathan's signature next to

16   the X with a circle?

17   **A.**    Looks a little different from the other one.

18        MR. VILKER:  Can you bring up 26 and 27 next to

19   each other.

20   **Q.**    So 26 is the one that I previously showed you that

21   you said looked like Nathan's signature; 27, the one on

22   the right you're saying looks different.  Can you tell

23   looking at them next to one another if one of them

24   is -- if they're both his signature or one is and one

25   is not?

1  **A.**   No.  It's just one is written larger than the

2  other.

3  **Q.**   As you're looking at this, you're not sure?

4  **A.**   No.

5  **Q.**   Okay.  But the one on the right is another --

6  appears to be another signature page that may have been

7  asked of Nathan to sign that day?

8  **A.**   Could have been.  Like I said, neither one of us

9  took the time to read all of this stuff.

10  **Q.**   Right.  I understand.

11       MR. VILKER:  If you could bring up Exhibit 28.

12       MR. LEPIZZERA:  No objection.

13       MR. RADHAKRISHNAN:  No objection, your Honor.

14       THE COURT:  28 will be full.

15       (Government Exhibit 28 admitted in full.)

16  **Q.**   Does that appear to be Nathan's signature at the

17  bottom, if you can tell?

18  **A.**   Yes.

19  **Q.**   Okay.  Would this have been a document that

20  Raymour would have read through before having Nate sign

21  it?

22       MR. RADHAKRISHNAN:  Objection, your Honor.

23       THE COURT:  Grounds?

24       MR. RADHAKRISHNAN:  Leading.

25       THE COURT:  Overruled.

1   **Q.**   You can go ahead and answer.

2   **A.**   Like I said, I don't really remember him reading

3   from the document.

4              MR. VILKER:  If you could bring up Exhibit 29.

5              MR. LEPIZZERA:  No objection.

6              MR. RADHAKRISHNAN:  No objection, your Honor.

7              THE COURT:  29 will be full.

8              (Government Exhibit 29 admitted in full.)

9   **Q.**   Does this appear to be another signature page with

10   the apparent signature of Nathan?  I guess the

11   question, obviously, is does that look like it's

12   Nathan's signature?

13   **A.**   Oh --

14   **Q.**   If you can tell.

15   **A.**   If I can tell.  Yes, I guess.

16   **Q.**   Do you recall if Raymour read from this document?

17   **A.**   No.

18   **Q.**   No, you don't recall; or no, you don't believe he

19   did?

20   **A.**   No, I don't believe he did.

21   **Q.**   I want to show you Exhibit 30.

22              MR. VILKER:  Move that full.

23              MR. LEPIZZERA:  No objection.

24              MR. RADHAKRISHNAN:  No objection, your Honor.

25              THE COURT:  30 will be full.

1          (Government Exhibit 30 admitted in full.)

2     Q.    Thirty is the signature page of an application to

3     open up an annuity with a company called Western

4     Reserve Life.  It says, This application is subject to

5     acceptance by Western Reserve Life Assurance Company of

6     Ohio.

7          This is dated December 10th of looks like 2009.

8     By that point, Mr. Lee had passed away.  So this is

9     apparently 2008?

10    A.    It had to be 2008.

11    Q.    That day may have been just a mistake?

12         MR. VILKER:  Can you just magnify that.

13    Q.    Maybe that is an 8.  If it's December 10th of

14    2008, the two checks that you said you received from

15    Raymour that I went through before, the first check,

16    the $1,000 check, was dated November 10th of 2008, and

17    then the $2,000 one was November 19th of 2008.  Were

18    those the only two meetings that you had with Raymour?

19    A.    Yes.

20    Q.    So this date on December 10th of 2008, could

21    Nathan have signed that form on that date?

22    A.    No.

23    Q.    He didn't come back -- the second meeting was the

24    19th.  He didn't come back two or three weeks later to

25    get more signatures?

1    **A.**    He was there twice.

2    **Q.**    Okay.  You see next to -- there's a signature next

3    to the owner's signature of Paula Caramadre.  Do you

4    recall seeing any forms, application forms that have

5    Paula Caramadre's either name or signature on it?

6    **A.**    No.  Never heard of the name.

7    **Q.**    Does that appear next to the X to be Nathan's

8    signature?

9    **A.**    If he was only there twice, how can it be his

10   signature?

11   **Q.**    Just putting aside the dates, just looking at the

12   signature, does it seem to you that is or if you're not

13   sure, you're not sure if it's his signature?

14   **A.**    No, I'm not really sure.

15   **Q.**    Okay.  Now, next to Nathan's purported signature,

16   it says, and it said on the other forms as well,

17   "Annuitant's Signature."  Do you know what that means

18   "annuitant"?

19   **A.**    No.

20   **Q.**    Did you read the word "annuitants" or did you see

21   the word "annuitant" on any of these forms before

22   Nathan signed them?

23   **A.**    No.  I don't remember seeing it on the form, but I

24   think I did hear the word but never could understand --

25   with an understanding to what it was.

1    **Q.**   You remember hearing something about the word

2    "annuitant" or "annuity," but you didn't understand

3    what he was talking about?

4    **A.**   Yeah.

5    **Q.**   What was your understanding of why you and Nate

6    were receiving both the first $1,000 check and the

7    second $2,000 check?

8    **A.**   My understanding to why?  Because someone wanted

9    to help out people that was in need.

10         MR. VILKER:  If we could bring up Exhibit 31,

11    please.  Move that full.

12         MR. LEPIZZERA:  No objection.

13         MR. RADHAKRISHNAN:  No objection, your Honor.

14         THE COURT:  31 will be full.

15         (Government Exhibit 31 admitted in full.)

16    **Q.**   This is a form entitled "Annuitant Acknowledgment

17    Form."  And first of all, do you see any -- other than

18    the initials on the left part of this form, is any of

19    the handwriting in the top either yours or Nathan's

20    handwriting?

21    **A.**   No.

22         MR. VILKER:  If we could turn to the second page

23    of this form, please.

24    **Q.**   Does that appear to be Nathan's signature next to

25    the X with the circle in it?

1    **A.**   Not really.

2    **Q.**   If you go back to the first page, do you recall

3    Nathan being asked to put his initials next to

4    something on a form?

5    **A.**   No.

6    **Q.**   Before meeting with the Government in preparation

7    for this case, do you recall seeing a form that said

8    something like "Annuitant Acknowledgment" on it?

9    **A.**   No.

10   **Q.**   Okay.  So this form indicates, first of all, at

11   the top that there's going to be an annuity opened with

12   a company called Western Reserve Life, that the owner

13   of the annuity would be Paula Caramadre and that the

14   annuitant would be Nathan Lee.

15         Did Raymour explain that was going to happen,

16   there was going to be an annuity opened naming him as

17   the annuitant in which Paula Caramadre would be the

18   owner?

19   **A.**   No.

20   **Q.**   Now, the first paragraph says that I am of sound

21   mind and I am entering into this agreement voluntarily,

22   and I consent to be the contract annuitant under my own

23   free will and without duress.  I have received no

24   compensation for allowing the owner to use me as the

25   annuitant, nor have I made any arrangement for myself

1    or anyone else that provides me with paid compensation

2    at some future point.

3         So on that day, if this form was, in fact,

4    signed by Nate, you received an additional check for

5    $2,000.

6    **A.**    Yes.

7    **Q.**    So money was paid?

8    **A.**    Yes.

9    **Q.**    So did Raymour say anything about why he was

10   having Nate purportedly sign a form that indicated that

11   he wasn't receiving compensation when, in fact, he did?

12   **A.**    No.

13   **Q.**    Okay.  Now, on the second page, it says:  My sole

14   purpose as annuitant under the annuity contract is to

15   be a measuring life for the purposes of the contract

16   death benefit guarantee.  Furthermore, I understand

17   that a death benefit guarantee will be paid to the

18   annuity contract beneficiary upon the death of the

19   contract annuitant.

20        Did Raymour read this language to you and Nate?

21   **A.**    No.  I don't remember hearing that.

22   **Q.**    Did he say anything about there being some kind of

23   death benefit that Paula Caramadre or someone else

24   would receive upon Nate's passing?

25   **A.**    I do not remember hearing that.

1   **Q.**   When you say you do not remember hearing that, is

2   that something you would have remembered?

3   **A.**   I think so.

4   **Q.**   So was there anything said that in any way

5   suggested in any of these meetings that someone else

6   stood to make money when Nate passed away?

7   **A.**   No.

8   **Q.**   What would your personal reaction have been if

9   that was said?

10  **A.**   If that was said?  I don't think that would have

11  been nice, the right thing to do.

12  **Q.**   I didn't hear the last thing you said.

13  **A.**   I don't think that would have been, you know, a

14  good thing to do, make money off of somebody's death.

15  **Q.**   So you had no understanding that anybody was going

16  to make money off of Nate's death?

17  **A.**   No.

18  **Q.**   Now, I want to show you Exhibit 32.

19          MR. VILKER:  I'd like to move that full.

20          MR. LEPIZZERA:  No objection.

21          MR. RADHAKRISHNAN:  No objection, your Honor.

22          THE COURT:  32 will be full.

23          (Government Exhibit 32 admitted in full.)

24  **Q.**   Ms. Lucas, this is an annuity application that was

25  submitted to Western Reserve Life.  And the first --

1     just magnify the first section of this.  Lists the

2     annuitant as Nate.  Was that 285 Niagara Street, was

3     that where Nate was living at the time?

4     A.   Yes.

5     Q.   I don't know if you see his Social Security

6     number, I don't know if you remember, it's just the

7     last four digits that are there?

8     A.   Yes.

9     Q.   That's his Social Security number?

10    A.   Yes.

11    Q.   Do you recall providing Raymour or Nate providing

12    Raymour with his Social Security number?

13    A.   Not really.

14    Q.   You don't remember?

15    A.   I don't remember.

16    Q.   All right.  There's a date of birth and just the

17    year 1951.  Was that the correct year that he was born?

18    A.   Yes.

19    Q.   Now, the owner is Paula Caramadre.  Did he say

20    anything about who Paula Caramadre was?

21    A.   No.

22    Q.   Did he say anything about anybody named Caramadre?

23    A.   No.

24    Q.   Okay.  And if you -- going back to the first page

25    of this, is any of the handwriting on this first page

1     yours or Nate's?

2     **A.**    Definitely not mine.

3     **Q.**    Does it look like it could be Nate's handwriting?

4     **A.**    No.

5     **Q.**    Go to the second page.  What about that?  Does any

6     of that look like it's Nate's handwriting?

7     **A.**    No.

8     **Q.**    In the middle there it says the initial purchase

9     payment was $20,000.

10         Did Raymour say anything to you about $20,000

11    being put into an annuity that had Nathan's name on it?

12    **A.**    No.

13         MR. VILKER:  If you can go to the third page.

14         I know it's just one X, but does it seem like

15    any of that is Nathan's handwriting or your

16    handwriting?

17    **A.**    No.

18    **Q.**    It says in paragraph -- it says guaranteed death

19    benefits, and it's marked double enhanced death

20    benefit.

21         Did Raymour say anything about double enhanced

22    death benefit or any kind of death benefit upon Nate's

23    death?

24    **A.**    No.

25         MR. VILKER:  Go to page four.

1   Q.   Does any of this page have yours or Nate's writing

2   on it?

3   A.   No.

4        MR. VILKER:   Go to page five.

5   Q.   What about that page?

6   A.   No.

7   Q.   Page six?

8   A.   No.  Never saw it.

9   Q.   Page seven?  Obviously, there's no writing on that

10  page.  Page eight, again there's no writing.  On page

11  nine, that's the same signature page I showed you

12  before.  So that's the one where it's dated December

13  10th, which is after the two meetings and it didn't --

14  what was your testimony about whether that signature

15  looks like it's Nate's or not?

16  A.   It looks like it could be.

17  Q.   It looks like it could be, okay.

18       My question is this last page is a signature

19  page and that's the only page that you testified has

20  Nate's writing on it.

21       So do you know whether you or Nate were shown

22  this entire nine-page application or whether you were

23  shown just the signature page and had Nate sign that

24  last page?

25  A.   I do not remember a lot of pages at all.

1          MR. VILKER:  Now, I want to show you Exhibit 33

2     and ask that be moved in full.

3          MR. LEPIZZERA:  No objection.

4          MR. RADHAKRISHNAN:  No objection, your Honor.

5          THE COURT:  33 will be full.

6          (Government Exhibit 33 admitted in full.)

7     Q.   Ms. Lucas, before I showed you that the initial

8     application had $20,000 marked on that, that was

9     December 10th.  This is an additional 980,000 that was

10    sent into this annuity on December 23rd of 2008.

11         First of all, did you have any idea that now a

12    million dollars was going to be in an annuity that had

13    Nate's name on it?

14    A.   No, sir.

15    Q.   Did you ever see a check that size before?

16    A.   No.

17    Q.   Okay.  Now, this is December 23rd.  When did Nate

18    end up passing away, a few days later?

19    A.   Huh?  No.

20    Q.   I think December 29th?

21    A.   The 29th.

22    Q.   So six days after this check?

23    A.   Yes.

24    Q.   Okay.  Now, I want to show you Exhibit 34.

25         MR. LEPIZZERA:  No objection.

1          MR. RADHAKRISHNAN:  No objection, your Honor.

2          THE COURT:  34 will be full.

3          (Government Exhibit 34 admitted in full.)

4     **Q.**   Exhibit 34 is an application to open an annuity at

5     a company called Pacific Life.

6          First of all, did Raymour say anything about

7     Pacific Life when he was there?

8     **A.**   No.

9     **Q.**   Now, again, the first paragraph lists the

10    annuitant as Nathan with the same address and date of

11    birth.  And the owner, if you can go down to paragraph

12    two, is Raymour Radhakrishnan.

13         Did Raymour say anything about him being the

14    owner on any kind of annuity that was going to be

15    opened up in Nathan's name?

16    **A.**   Definitely not.

17    **Q.**   Do you see where after Raymour's name it says

18    death benefit coverage, stepped up death benefit?

19         Did Raymour say anything about him receiving any

20    kind of death benefit upon Nathan's death?

21    **A.**   No.

22         MR. VILKER:  Now, if you can turn to the second

23    page.

24    **Q.**   It says there at the bottom number 8, it says

25    initial purchase payment $100,000.

1       Did Raymour say that he was going to be putting

2   $100,000 in an annuity in his name listing Nathan as

3   the annuitant?

4   A.   No.

5   Q.   Now, Nate passed away on the 29th of December?  Go

6   ahead.  I'm sorry.

7   A.   I was just going to say that he was supposed to be

8   basically the in-between man that doesn't know --

9        MR. LEPIZZERA:  Objection.

10       THE COURT:  Sustained.  I don't think there's

11  actually a question pending before the witness so I'll

12  strike that last statement, and you may -- and the jury

13  will disregard it.  You may ask another question.

14  Q.   Did you have, when Raymour was there, did you have

15  any understanding that he, himself, would be listed as

16  the owner on any type of contract?

17  A.   No.

18  Q.   Did he indicate that -- did he say anything to

19  indicate that he would be the owner of any kind of

20  contract?

21  A.   No.

22  Q.   Now, after Nate passed away on December 29th, did

23  you speak with Raymour again?

24  A.   Yes.

25  Q.   When was that?

1    **A.**    He called, I believe, that evening.

2    **Q.**    The day that Nate passed away?

3    **A.**    Yes.

4    **Q.**    What did he say?

5    **A.**    He just called to see how was everything going,

6    and I told him that Nate had passed.  And he said, "Oh,

7    I'm sorry to hear that."

8    **Q.**    That was the last time that you spoke with him?

9    **A.**    Yes.

10   **Q.**    During that conversation or at any other

11   conversations, did Raymour ever ask you to provide

12   copies of Nathan's death certificate?

13   **A.**    No.

14            MR. VILKER:  I'd like to bring up Exhibit 35 and

15   move that full.

16            MR. LEPIZZERA:  No objection.

17            MR. RADHAKRISHNAN:  No objection, your Honor.

18            THE COURT:  35 will be full.

19            (Government Exhibit 35 admitted in full.)

20   **Q.**    Exhibit 35, it's a letter from an individual named

21   Walter Craddock, from stationery of Estate Planning

22   Resources.  It's sent to Providence City Hall, and it

23   says:  We would like to obtain three copies of death

24   certificates for Nathan Lee, date of birth 1951, who

25   passed away on December 29th, 2008.

1          Do you know who Walter Craddock is?

2     **A.**   No.

3     **Q.**   Did you have any indication that someone out at

4     Estate Planning Resources was attempting to obtain

5     death certificates for Nathan?

6     **A.**   No.

7     **Q.**   I'd like to show you now Exhibit 36.

8          MR. VILKER:  I ask that be moved full.

9          MR. LEPIZZERA:  No objection.

10          MR. RADHAKRISHNAN:  No objection, your Honor.

11          THE COURT:  36 will be full.

12          (Government Exhibit 36 admitted in full.)

13     **Q.**   So Exhibit 36, Ms. Lucas, is an application form

14     that was filed with Providence City Hall to obtain a

15     death certificate, and the first part of it indicates

16     that the death certificate being sought is for Nathan,

17     and has his date of death as December 29th.

18          And the second part says, "Complete one of the

19     following:  I am applying for the death record of," and

20     there's a bunch of different categories and then it's

21     marked "my client," and the name of the law firm is

22     Estate Planning Resources.

23          Did Nathan ever have any legal representation

24     with anybody at Estate Planning Resources?

25     **A.**   Not that I know of.

1   **Q.**   Did he know who Walter Craddock was, as far as you

2   know?

3   **A.**   No.

4   **Q.**   What about Joseph Caramadre?

5   **A.**   No.

6        THE COURT:  Would this be a good time to break,

7   Mr. Vilker?

8        MR. VILKER:  I actually have no further

9   questions so it would be a perfect time.

10        THE COURT:  Oh, then it's a very good time.

11        All right.  We'll take our morning break now,

12   ladies and gentlemen.  Same drill.  You'll find a snack

13   for you.  Charlie will show you down to the jury room.

14   We'll reconvene in 30 minutes.

15        And Ms. Lucas, we're going to take a break now;

16   and then when we return, the other attorneys will have

17   some questions for you.  During the recess, you're not

18   to have any discussions with anyone about your

19   testimony.  Okay?

20        THE WITNESS:  Yes.

21        THE COURT:  All right.  Then, ladies and

22   gentlemen, we'll see you in 30 minutes.

23        (Proceedings out of the presence of the jury as

24   follows:)

25        THE COURT:  You can step down, too, Ms. Lucas.

1          Would counsel just come up, just for a minute,

2     please.

3          (Side bar conference off the record.)

4          (Recess.)

5          (Proceedings in the presence of the jury as

6     follows:)

7          THE COURT:  Welcome back, ladies and gentlemen.

8          So Ms. Lucas, welcome back.

9          Are we ready to proceed with the

10    cross-examination?  Mr. Radhakrishnan, are you going to

11    go first?

12         MR. RADHAKRISHNAN:  Yes, your Honor.  Thank you.

13         **CROSS-EXAMINATION BY MR.RADHAKRISHNAN**

14    **Q.**   Hi, Ms. Lucas.

15    **A.**   Hi.

16    **Q.**   Thank you for coming out today.

17         Okay.  So can you describe to me your

18    relationship with Mr. Nate -- Mr. Lee back in 2008?

19    **A.**   Describe our relationship?

20    **Q.**   Yeah.  Were you married to Mr. Lee at the time?

21    **A.**   No.  Not married.  I guess what you call

22    boyfriend/girlfriend.

23    **Q.**   Okay.  And but you guys did live together, that's

24    correct?

25    **A.**   Yes.

1    **Q.**   And you mentioned I came and visited with you at

2    some points in time inside 2008 at a certain location.

3    What location was that?

4    **A.**   Niagara.  285 Niagara.

5    **Q.**   That was your apartment or Mr. Lee's apartment?

6    **A.**   Mine.

7    **Q.**   But Mr. Lee did live there?

8    **A.**   Yes.

9    **Q.**   That's correct.  Okay.  So when I first contacted

10   you -- excuse me.  When you -- how did we first get in

11   contact?  Did you reach out to me, or how did you first

12   get in contact?

13   **A.**   I believe you called Mr. Lee.  He was given a

14   number.  The nurse that was there asked if he was

15   interested in, you know, the getting help.  And she

16   said someone would contact him.

17   **Q.**   Okay.  And so when you say "getting help," are you

18   referencing -- what help are you referencing,

19   specifically, please?

20   **A.**   The funeral costs.

21   **Q.**   Okay.  So financial help; is that correct?

22   **A.**   Yeah.

23   **Q.**   Okay.  And had you explored any options with any

24   insurance companies at trying to get some type of life

25   insurance with Mr. Lee?

1     **A.**     Had I explored it?

2     **Q.**     No.  Did you or Mr. Lee explore any life insurance

3     options at that time?

4     **A.**     He did.

5     **Q.**     Okay.  And were any of those attempts successful?

6     **A.**     No.

7     **Q.**     Okay.  So he couldn't get life insurance at that

8     time; is that correct?

9     **A.**     No.

10     **Q.**     Okay.  And so you made the decision to contact me

11     or Mr. Lee made the decision?  Which one was it, was it

12     you or Mr. Lee made the decision to contact me?

13     **A.**     Mr. Lee made the decision to talk with you, speak

14     with you.

15     **Q.**     All right.  Very good.

16     So in that first meeting, do you know if it was

17     in the morning, the afternoon or the evening, the very

18     first time I met with you and Mr. Lee?

19     **A.**     It wasn't in the morning.  Probably late

20     afternoon.

21     **Q.**     Okay.  Do you remember if it was dark out or light

22     out or -- I just want to get a real clear time or a

23     little bit clearer of a time.

24     **A.**     Probably light.

25     **Q.**     Probably light.  Okay.  And do you remember how

1   long that first meeting lasted, Ms. Marnito --

2   Ms. Lucas?  Pardon me.

3   **A.**   Either one.  It doesn't matter.  No, I couldn't

4   say.

5   **Q.**   I'm trying to get just a round-about time.  I know

6   you had testified -- excuse me, you had testified that

7   it wasn't short, but it wasn't long.  Actually, I don't

8   want to put words in your mouth.  Was it a 20-minute

9   meeting or an hour meeting or a half an hour meeting,

10  round-about?

11  **A.**   I would round it off to maybe a half an hour.

12  **Q.**   Okay.  It was about a half an hour.

13        MR. RADHAKRISHNAN:  If you could please,

14  Ms. Anderson, pull up Exhibit Number 24, please.  Could

15  we please zoom in on that.  Thank you.

16  **Q.**   So we have this check here, Ms. Lucas.  And if we

17  could leave this exhibit up while I go through this.

18        Was Mr. Lee receiving any type of benefits?  Was

19  he receiving any type of -- how was he receiving

20  income?

21  **A.**   Disability.

22  **Q.**   Disability.  Okay.  And do you remember Mr. Lee

23  mentioning anything about writing that check out to you

24  in regards to his disability or possibly affecting his

25  disability benefits?  Do you remember anything about

1    that?

2    **A.**    No.

3    **Q.**    Okay.  So what was the reason that you believe

4    that I wrote the check out to you rather than Mr. Lee?

5    **A.**    Because I remember you telling him that it should

6    be written out to someone other than him.

7    **Q.**    Okay.  So that's your memory.  And but Mr. Lee did

8    have a bank account, do you remember that?

9    **A.**    Yes.

10   **Q.**    Okay.  So did you go ahead and cash this check or

11   did you deposit it?

12   **A.**    I deposited it.  He asked me to deposit it.

13   **Q.**    And that was you that did that.  Okay.

14   **A.**    Um-hum.  (Affirmative.)

15   **Q.**    All right.  So you had originally testified to the

16   Government that we had a second meeting at some point

17   in time, correct?

18   **A.**    Yes.

19   **Q.**    Okay.  And that second meeting occurred only after

20   you had cashed that check, correct?

21   **A.**    Right.

22   **Q.**    Right.  And tell me why you didn't contact me or

23   that second meeting didn't happen until after you had

24   cashed that check.  Do you remember why -- or was there

25   any specific reason why?

1        MR. TRAINI:  I think that question is all right,

2    your Honor, if it's a yes or no question.

3        THE COURT:  I think so, too, so go ahead and

4    answer it.

5    **A.**   Was there any particular reason why?

6    **Q.**   I'll strike that question.  Le me rephrase that.

7    Sorry.  That was a little confusing.

8        You received that $1,000 check that day,

9    correct?

10   **A.**   Yes.

11   **Q.**   And you had mentioned that you were very skeptical

12   about this, isn't that correct?

13   **A.**   Yes.

14   **Q.**   Okay.  And then once you went and cashed that

15   check --

16   **A.**   Deposited it.

17   **Q.**   Pardon me.  Once you went and deposited that check

18   and confirmed that the funds were there -- excuse me,

19   did you go and confirm that the funds were actually

20   there?

21   **A.**   At some point, I realized it was there, the funds

22   was there.

23   **Q.**   So you confirmed that the check was real, the

24   money was real, and then subsequently did Mr. Lee ever

25   talk to you about wanting to get more money?  Did he

1     ever mention that to you?

2     A.   Well, he said something in regards to I guess

3     after you called again that, you know, to have you come

4     back out because, you know, he needed the money for his

5     burial.  And since someone was being generous --

6     Q.   Sure.  There's no problems with that.  I just was

7     wondering.

8          So he had actually said he wanted to get more

9     money, isn't that correct?

10    A.   After you called back, he said that just set up an

11    appointment.

12    Q.   Right.  Very good.

13         So in that second meeting that we had --

14         MR. RADHAKRISHNAN:  And could you please pull up

15    Exhibit Number 25, please.

16    Q.   Ms. Lucas, this check is dated November 19th,

17    2008.  You see that there.  I think there was a

18    question before about whether that was a 9 or a 4, but

19    you had mentioned it was definitely -- it was your

20    memory it wasn't four days, isn't that correct, only

21    four days from when you had received that check?

22    A.   Yeah.

23    Q.   Yeah.  Okay.  With that second check, Ms. Lucas,

24    there was a second meeting, isn't that correct?

25    A.   Yes.

1    **Q.**   Yes.  Okay.  And I'm not trying to state the

2    obvious, by the way, I need to get this for the record.

3         Okay.  And during that second meeting, do you

4    remember how long that second meeting went, Ms. Lucas,

5    approximately?  Was it shorter or longer than the first

6    meeting?

7    **A.**   The second time might have been a little longer.

8    **Q.**   Okay.  And do you remember if that was in the

9    morning, afternoon or evening hours?

10   **A.**   That one seemed to be a little closer to evening.

11   I don't believe it was morning.  I'm pretty sure it

12   wasn't morning.  Pretty much evening.

13   **Q.**   Okay.  And during that meeting, I had a number of

14   different documents.  Do you remember that?

15   **A.**   I remember documents.

16   **Q.**   I had a number of different documents with me.

17   Right.  And you had mentioned -- you had testified

18   previously that you were still skeptical; is that

19   correct?

20   **A.**   Yes.  But I'm skeptical about everything.

21   **Q.**   That's fair.  I understand that.

22        So subsequently, because of your skepticism,

23   isn't it true that you actually looked at the

24   documents?

25   **A.**   I didn't really read them.  I mean, it was a lot

1 to just sit there and read over.

2 Q. Sure. There was a lot to read there. I

3 understand that.

4 MR. RADHAKRISHNAN: If you could actually pull

5 up Exhibit Number 26, Ms. Anderson. Thank you.

6 Q. And is this one of the documents that I had with

7 me that day and subsequently I put in front of you and

8 Mr. Lee?

9 A. Oh, boy. Oh, boy. I can't really say exactly if

10 this was one. This one, I can't say.

11 Q. Okay. You had just testified in a previous

12 statement to the Government that this does look like

13 Mr. Lee's signature, isn't that correct?

14 A. Yeah. The thing about it is I wouldn't just sit

15 there and just exactly examine the documents because my

16 signature was not going there.

17 Q. I understand. It was not your signature that was

18 going there. That's correct. But on this document

19 there, Mr. Lee signed next to some words there.

20 MR. RADHAKRISHNAN: If we could zoom in to

21 Mr. Lee's signature, please.

22 Q. I believe it says "Annuitant's Signature;" is that

23 correct, next to Mr. Lee's --

24 A. That's what it says.

25 Q. And you being a skeptical person during this

1     meeting, isn't it correct you asked a question about

2     what does "annuitant signature" mean or what does

3     "annuity" mean, isn't that correct?

4     **A.**   Yes.

5     **Q.**   Or you would have asked that question, isn't that

6     correct?

7     **A.**   Yeah.

8     **Q.**   Yeah.  Okay.  So during that meeting, I answered

9     your questions, isn't that correct?

10    **A.**   I never felt like my questions was answered.

11    That's why I was skeptical about the second meeting.

12    **Q.**   Okay.  That's fine.  So you being a very skeptical

13    person, wouldn't you have really, you know, tried to

14    seek out the answer if you didn't think that your

15    questions were answered?

16           MR. TRAINI:  Objection.

17           THE COURT:  Sustained.

18           MR. RADHAKRISHNAN:  Let me rephrase that.

19    **Q.**   You were a skeptical person during that meeting,

20    Ms. Lucas; is that correct?

21    **A.**   Pretty much all the time.

22    **Q.**   Excuse me?

23    **A.**   Pretty much all the time.

24    **Q.**   Okay.  So if you're skeptical, you have questions

25    about something, you're going to ask questions; is that

1    correct?

2    **A.**   Yes.

3    **Q.**   Okay.  So isn't it true you asked me about this,

4    about what is an annuity, what is an annuitant

5    signature, what is my husband signing -- excuse me,

6    what is Mr. Lee signing?

7         MR. TRAINI:  Objection.

8         THE COURT:  Grounds?

9         MR. TRAINI:  That was a testimonial objection,

10   your Honor.

11        THE COURT:  I'm not sure I agree with that, but

12   it is a compound question so you need to break it down,

13   Mr. Radhakrishnan.

14        MR. RADHAKRISHNAN:  Yes, your Honor.

15   **Q.**   Let me rephrase that.  Let me back off this,

16   Ms. Lucas.  One moment, please.

17        In earlier testimony, you had mentioned that you

18   went through the papers; is that correct?

19   **A.**   That I went through the papers?

20   **Q.**   Yes.

21   **A.**   Probably glanced over it.  Between passing them

22   from you to me, to Nate.  Just glance over.  As you can

23   see, I do wear reading glasses.  So I usually don't

24   carry them around with me.

25   **Q.**   Did you have glasses back in 2008?  I know that

1    was a long time ago.

2    **A.**   Sure did.

3    **Q.**   Okay.  So when -- let me just back up for a

4    second.

5         Okay.  So during that meeting, do you remember

6    me reading from any of these documents at all,

7    Ms. Lucas?

8    **A.**   No.  I don't really remember you reading.

9    **Q.**   Do you remember me talking to you during that?

10   **A.**   Yeah, just talking.

11   **Q.**   At any point in time, did you ever express that

12   you were confused at any time about any of the

13   documents, you or your husband -- excuse me.

14        Did your husband ever express that he was

15   confused about any of the things that I was saying?

16   **A.**   My husband was not present that day.

17   **Q.**   I'm sorry.  Excuse me.  Thank you.

18        Was Mr. Lee confused about any of the things I

19   was saying?

20   **A.**   Well, he didn't express any, you know, anything

21   about being confused.  Me, I was kind of confused and I

22   never really got the understanding of it.  But it

23   wasn't my call so --

24   **Q.**   Okay.  And that's fine.  Did you or your

25   husband -- did you or Mr. Lee ever discuss whether or

1    not he should participate in this program?

2    **A.**    Not really. I kind of -- you know, we discussed

3    it, but I just told him that I just really didn't

4    understand what it was all about; and I guess he was

5    more concerned about, you know, the help that he was

6    getting, you know, to be, you know, put away. To help

7    be put away, anyway. And you're nervous.

8    **Q.**    Pardon me?

9    **A.**    You're a bit nervous.

10   **Q.**    Didn't your husband -- did your husband ever say

11   to me that he really understood the inner workings --

12   he didn't understand the inner workings of the annuity,

13   but he understood that he was going to be getting a

14   benefit? Do you ever remember Mr. Lee saying that?

15   **A.**    Mr. Lee?

16   **Q.**    Do you ever remember Mr. Lee saying that --

17   **A.**    No.

18   **Q.**    -- he didn't understand the inner workings of the

19   annuity, but he understood he would be getting a

20   benefit?

21   **A.**    Not really. I don't remember him saying that.

22   **Q.**    So you're saying that he never said he was

23   confused, okay; is that correct?

24   **A.**    He didn't understand.

25   **Q.**    Did he express that he didn't understand to me

1   during that meeting?

2   **A.**   To you?

3   **Q.**   Yes.

4   **A.**   I don't remember him doing so.  But I remember him

5   saying to me -- he did say to me, he said -- when I

6   said I didn't understand, he said, Ask him to explain

7   it.  I said, Well, he's talking, but I'm still not

8   understanding what it's all about.

9   **Q.**   Okay.  But we were all in the same room, wasn't

10   that correct?

11   **A.**   Yeah.

12   **Q.**   So was that a side conversation that I wasn't

13   present for, or was I present for that conversation?

14   **A.**   No, you wasn't there.

15   **Q.**   I was not there?

16   **A.**   No, not for that conversation.

17   **Q.**   Okay.  So when did that conversation take place,

18   was that before or after the second meeting?

19   **A.**   Probably before the second meeting.

20   **Q.**   Okay.  So how did you know what you were going to

21   be confused about if it happened before the second

22   meeting?  How would you know that you were confused

23   about papers or the contents of these papers if it

24   happened before the second meeting?

25   **A.**   Confused about where -- like probably where this

1    money was supposed to be coming from, and you didn't

2    know who it was supposed to be coming from.  You wasn't

3    allowed to know who it was coming from.  That's

4    probably what it is.  Well, why can't you know where

5    it's coming from.

6           MR. RADHAKRISHNAN:  Ms. Anderson, can you please

7    pull up Exhibit Number 27, please.  If we can zoom in

8    just on all those signatures, those four signatures,

9    please.  Thank you very much.

10   **Q.**   Okay.  Now, here we have Mr. Lee's signature; is

11   that correct?

12   **A.**   I guess.

13   **Q.**   Okay.  And below that signature, it says -- below

14   Mr. Lee's signature it says, "Proposed annuitant's

15   signature;" is that correct?

16   **A.**   Yes.

17   **Q.**   Okay.  And then above it, it says, "Proposed

18   owner's signature;" is that correct?

19   **A.**   Yes.

20   **Q.**   Okay.  Do you remember me telling your husband --

21   excuse me, telling Mr. Lee that I did not know who the

22   owner was going to be?

23          MR. LEPIZZERA:  Objection, your Honor.

24          THE COURT:  Before you answer that, I'm going to

25   overrule the objection but simply remind the jurors of

1    my prior instruction.  Okay?

2         Go ahead.  Answer that.

3    **A.**    Can you repeat that?

4    **Q.**    Sure.  Absolutely.

5         THE COURT:  The reporter will read the question

6    back.

7         MR. RADHAKRISHNAN:  Okay.  Thank you.

8         (Pending question read by the reporter.)

9    **A.**    No.  You didn't say "owner."  You said -- when I

10   asked who was giving, donating this money for people

11   that was needy people, you said you didn't know.

12        MR. RADHAKRISHNAN:  Could you please pull up

13   Exhibit number 28, please, Ms. Anderson.  Okay.  If we

14   could highlight the signature page.

15   **Q.**    All right.  So right there do you remember --

16   excuse me.  Did you ask, in this document when you

17   reviewed it, did you ask who the owner was going to be,

18   Ms. Lucas?  Did you ask me who the owner was going to

19   be?

20   **A.**    Owner of what?  I didn't know it was owner of

21   anything.

22   **Q.**    So you didn't ask me -- you reviewed the document

23   but you didn't ask me that; is that correct?

24   **A.**    I reviewed it?  I doubt it.

25   **Q.**    So you didn't review the document, is that what

1    you're testifying to?

2    **A.**    Yes.  I might have just looked at a paper but not

3    actually reading it because the owner, the owner to

4    what?

5          MR. RADHAKRISHNAN:  Okay.  So could you please

6    pull up Exhibit Number 25, again, please, Ms. Anderson.

7    **Q.**    Okay.  Ms. Lucas, you received this check on

8    November 19th, 2008; is that correct?

9    **A.**    I guess, yes.

10   **Q.**    Okay.  And did you go ahead and deposit or cash

11   this check?

12   **A.**    Deposit.

13   **Q.**    Okay.  And you and Mr. Lee understood that you

14   were receiving a benefit; is that correct?  You

15   received a benefit; is that correct?

16   **A.**    We received --

17   **Q.**    You received money; is that correct?

18   **A.**    Yes.

19   **Q.**    Okay.  And I never asked you for any money; is

20   that correct?

21   **A.**    No.

22   **Q.**    And you didn't lose anything from me; is that

23   correct?  You didn't lose any money; is that correct?

24   **A.**    Right.

25   **Q.**    At no point in time, I never asked you for any

1    money, correct?

2    **A.**    No.

3    **Q.**    Okay.  In fact, I gave you two checks in which

4    both of which you cashed; is that correct, one thousand

5    and two thousand?

6    **A.**    Yes.

7    **Q.**    Okay.  You had testified to the Government that

8    you were not exactly sure -- excuse me, you're not sure

9    about exactly what I said that day in the second

10   meeting; is that correct?

11   **A.**    The second meeting, the first meeting, correct.

12   **Q.**    So you don't remember exactly, you know, what I

13   described about an annuity; is that correct?

14   **A.**    No.

15   **Q.**    But you did receive a benefit and Mr. Lee received

16   a benefit; is that correct?  You received money?

17   **A.**    Yes.

18   **Q.**    Okay.  And that money helped him, correct?

19   **A.**    Yes, it did.

20        MR. RADHAKRISHNAN:  Okay.  Thank you very much

21   for your time.  I really appreciate it, Ms. Lucas.

22        THE WITNESS:  You're welcome.

23        MR. LEPIZZERA:  I have no questions, your Honor.

24        THE COURT:  No questions?

25        MR. LEPIZZERA:  No questions.

1      THE COURT:  Any redirect, Mr. Vilker?

2      MR. VILKER:  Just very, very briefly.

3      **REDIRECT EXAMINATION BY MR. VILKER**

4   **Q.**   Ms. Lucas, you just were asked a question by

5   Mr. Radhakrishnan that you don't remember exactly what

6   he said about an annuity.

7      Do you have any memory that he said anything

8   whatsoever that Paula Caramadre or someone else stood

9   to receive benefits off of Nathan's death?

10  **A.**   No.  No.  No.

11      MR. VILKER:  Nothing further, your Honor.

12      THE COURT:  Okay.  Thank you.

13      Any recross, Mr. Radhakrishnan?

14      MR. RADHAKRISHNAN:  No, your Honor.  Thank you.

15      THE COURT:  Okay, then, Ms. Lucas.  Your

16  testimony is complete.  You may step down.  Thank you

17  very much.

18      THE WITNESS:  You're welcome.

19      THE COURT:  Next witness for the Government.

20      MR. McADAMS:  Your Honor, the Government calls

21  Kenneth Blowers.

22      **KENNETH BLOWERS**, first having been duly sworn,

23  testified as follows:

24      THE CLERK:  Please state your name and spell

25  your last name for the record.

1    THE WITNESS:  Ken Blowers, B-L-O-W-E-R-S.

2    THE COURT:  Good afternoon, Mr. Blowers.

3    THE WITNESS:  Good afternoon.

4    THE COURT:  And you may inquire, Mr. McAdams.

5    MR. McADAMS:  Thank you, your Honor.

6    **DIRECT EXAMINATION BY MR. McADAMS**

7    Q.   Good afternoon, Mr. Blowers.

8         Mr. Blowers, where are you from?

9    A.   North Kingstown.

10   Q.   And how long have you been a Rhode Islander?

11   A.   Thirty-five years.

12   Q.   And Mr. Blowers, was your late wife Deborah

13   Blowers?

14   A.   Yes.

15   Q.   Did she pass away in November of 1995?

16   A.   Yes.

17   Q.   How old was she when she passed?

18   A.   Forty-five, I believe.

19   Q.   And what type of illness was she suffering from?

20   A.   A massive glioblastoma, brain cancer.

21   Q.   She had a brain tumor?

22   A.   Correct.

23   Q.   And approximately, if you recall, when did she

24   first get sick?

25   A.   I believe it was May of '95 or '94.

1    **Q.**   May of 1994, you think?

2    **A.**   I believe so.

3    **Q.**   Did you recently review some medical records

4    related to her illness?

5    **A.**   Yes.

6         MR. McADAMS:  Could I have Government Exhibit

7    989, please, for identification.

8    **Q.**   Do you recognize that?

9    **A.**   Yes.

10        MR. McADAMS:  I'd like to move it in full, if no

11   objection.

12        MR. LEPIZZERA:  No objection.

13        MR. RADHAKRISHNAN:  No objection, your Honor.

14        THE COURT:  989 may be full.

15        (Government Exhibit 989 admitted in full.)

16   **Q.**   Mr. Blowers, is this a record from your wife,

17   Deborah's, stay at Rhode Island Hospital in

18   approximately May of 1994?

19   **A.**   Yes.

20   **Q.**   It indicates it appears to be an admission date of

21   May 12th, 1994?

22   **A.**   Correct.

23   **Q.**   Now, was your wife hospitalized on multiple

24   occasions over that time period?

25   **A.**   Yes.

1    **Q.**    Before she passed?

2          MR. McADAMS:  I'd like to move into evidence

3    Government Exhibit 989 -- excuse me.   990.

4          THE COURT:  Why don't we put it up first.   Is

5    there any objection to 990?

6          MR. LEPIZZERA:  No objection.

7          MR. RADHAKRISHNAN:  No objection, your Honor.

8          THE COURT:  990 will be full.  You may publish

9    it.

10          (Government Exhibit 990 admitted in full.)

11    **Q.**    Mr. Blowers, do you recognize this document?

12    **A.**    Yes.

13    **Q.**    Is this another medical record related to one of

14    the hospitalizations that your wife underwent?

15    **A.**    Yes.

16    **Q.**    And it indicates that she was admitted initially

17    on July 12th, 1994?

18    **A.**    Correct.

19          MR. McADAMS:  If we could go to the third page

20    of that exhibit.

21    **Q.**    Does this indicate that on August 3rd of 1994,

22    your wife underwent a brain surgery, a right frontal

23    lobectomy?

24    **A.**    Yes.

25    **Q.**    Could you describe to the jury what the purpose of

1      that surgery was?

2  **A.**    To save her life.

3  **Q.**    Was that to remove the brain tumor?

4  **A.**    Correct.

5  **Q.**    And prior to that surgery taking place and then

6      after the surgery, was there a difference in her mental

7      abilities after she had that surgery?

8  **A.**    After the surgery.

9  **Q.**    What was the difference?

10  **A.**    The woman that came out was not the woman that

11      went in.  In other words, she had had a lobotomy.

12  **Q.**    So was her ability to understand and to express

13      herself different after the surgery took place?

14  **A.**    Yes.

15  **Q.**    Now, did there come a point in your wife's illness

16      where you ended up learning about an opportunity to get

17      some life insurance for her?

18  **A.**    Yes.

19  **Q.**    Do you recall how that came about?

20  **A.**    I don't.

21  **Q.**    Do you remember having a phone conversation with

22      somebody?

23  **A.**    Yes.

24  **Q.**    What do you remember happening in that phone

25      conversation?

1    **A.**   I remember a gentleman speaking to me, telling me

2    that there was a way that I could -- it was Physicians

3    Mutual Insurance Company that would help people like

4    myself.

5    **Q.**   And what was your reaction to that?

6    **A.**   Very favorable.

7    **Q.**   Why was that?

8    **A.**   Because of the money.  I didn't think there was

9    any way that once you were terminally ill that you

10   could receive money from a life insurance company.

11   **Q.**   You were surprised to learn that there might be a

12   possibility of getting life insurance for Deborah at

13   that point?

14   **A.**   Very surprised.

15   **Q.**   Do you recall who it was that you were speaking

16   to?

17   **A.**   He said his name was Joe Caramadre.

18   **Q.**   Joseph Caramadre?

19          MR. RADHAKRISHNAN:  Your Honor, could I request

20   a limiting instruction at this point, your Honor?

21          THE COURT:  Come up.

22          (Side-bar conference.)

23          MR. RADHAKRISHNAN:  I'm asking for a limiting

24   instruction, please.  The time frame right now is I

25   believe 1994.  If you would just mention I was ten

1    years old and was not a part of this.

2           THE COURT:  You can cover that in your

3    examination.  I'm not going to tell the jury that.  You

4    can cover -- you can ask questions about whether, you

5    know, this person ever had any contact with you and you

6    can get evidence on somehow with your age and you can

7    make the argument.  I'm not going to start instructing

8    the jury about whether you had something to do with

9    something or didn't.  That's going to have to come in

10   through evidence.

11          MR. RADHAKRISHNAN:  Okay.  Thank you, your

12   Honor.

13          (End of side-bar conference.)

14          THE COURT:  Go ahead.

15   **Q.**   Sorry, Mr. Blowers.  I believe you indicated the

16   man that you spoke to was named Joseph Caramadre?

17   **A.**   Correct.  I'm sorry.  I mispronounced the name.

18   **Q.**   What do you recall him saying to you about who he

19   was and what he was able to offer you?

20   **A.**   I thought he was a physician.

21   **Q.**   Okay.  What made you think that?

22   **A.**   I guess because of the name of the insurance

23   company.

24   **Q.**   So because it was Physicians Mutual Insurance --

25   **A.**   Right.  I thought there was some association along

1    with that.  I had no idea.

2    **Q.**    Do you recall whether he specifically told you

3    that he was a physician or whether that was just an

4    association you made?

5    **A.**    That was an association I made.

6    **Q.**    Now, did he explain anything that you would need

7    to do to get this insurance policy?

8    **A.**    No.  Just to fill out the paperwork for an

9    insurance company.

10   **Q.**    How did he know that, if you know -- let me

11   rephrase the question.  Did he indicate to you how he

12   knew that Deborah was sick?

13   **A.**    Not that I recall.

14   **Q.**    So you don't know how he happened to know --

15   **A.**    No, I don't.

16   **Q.**    Did he say anything to you about a reference?  Did

17   you know him from before?

18   **A.**    No.

19   **Q.**    So prior to that point in time, had you ever heard

20   his name before?

21   **A.**    No.

22   **Q.**    Did you ever meet him in person?

23   **A.**    Not to my knowledge.

24   **Q.**    Subsequent to that, did you ever meet him in

25   person?

1   **A.**   No.

2   **Q.**   Did you ultimately agree to get this life

3   insurance policy for Deborah?

4   **A.**   Yes.

5   **Q.**   How many policies did you end up getting?

6   **A.**   Two.

7        MR. McADAMS:  At this time, I'd like to move

8   into evidence Government Exhibit number 277.

9        MR. LEPIZZERA:  No objection.

10        MR. RADHAKRISHNAN:  No objection, your Honor.

11        MR. McADAMS:  And publish, please.

12        THE COURT:  277 will be full.  You may publish

13   it.

14        (Government Exhibit 277 admitted in full.)

15   **Q.**   Is this the policy that you referred to that you

16   bought?

17   **A.**   Yes.

18   **Q.**   This particular piece of paper, this record, is

19   this something that you, yourself, kept?

20   **A.**   Yes.

21   **Q.**   And you provided this to the Government?

22   **A.**   Correct.

23   **Q.**   So you kept it these many years?

24   **A.**   I did.

25   **Q.**   And it indicates that the insured is Deborah

1    Blowers with an address in North Kingstown, and it

2    indicates that the policy date was dated February 14th,

3    1995.  And it describes it as a modified whole life

4    policy, graded death benefit and accidental death

5    benefit during the first three policy years, premiums

6    payable during the lifetime of the insured,

7    non-participating.

8         What was your understanding of how this policy

9    worked?

10   **A.**   I don't know what you're asking.

11   **Q.**   Were you paying for the policy?

12   **A.**   Yes.

13   **Q.**   Was it a monthly premium that you paid?

14   **A.**   Yes.

15   **Q.**   Approximately how much money were you paying?

16   **A.**   I believe it was 29 and change.

17   **Q.**   So $29?

18   **A.**   Correct.

19   **Q.**   So this was one of those small 29-dollar-a-month

20   type policies?

21   **A.**   Correct.

22   **Q.**   And what was your understanding of what the death

23   benefit would be?

24   **A.**   As stated.  The first, second, third year from

25   anywhere from two to $10,000.

1    **Q.**    In other words, if Deborah had passed in the first

2    year, you understood that you would receive as a

3    beneficiary $2,000?

4    **A.**    Right.  That would be the end result because she

5    was given about six months to live after --

6    **Q.**    So your expectation was she was probably going to

7    pass in the first year?

8    **A.**    Correct.

9            MR. McADAMS:  Now, I'd like to move into

10   evidence Government Exhibit Number 279.

11           MR. LEPIZZERA:  No objection.

12           MR. RADHAKRISHNAN:  No objection, your Honor.

13           THE COURT:  279 will be full.

14           (Government Exhibit 279 admitted in full.)

15           MR. McADAMS:  May I publish it, your Honor?

16           THE COURT:  Yes.

17   **Q.**    Do you recognize this, Mr. Blowers?

18   **A.**    I do.

19   **Q.**    What is this?

20   **A.**    This is the second life insurance policy.

21   **Q.**    This was, again, a document that you happened to

22   keep yourself?

23   **A.**    Correct.

24   **Q.**    What was your understanding of this policy?

25   **A.**    Same thing.

1    **Q.**    A small monthly policy with a payout of --

2    **A.**    Right.

3    **Q.**    Do you recall how much?

4    **A.**    $1,000, I believe.

5    **Q.**    All right.  Now, did you meet with Mr. Caramadre

6    to go over the documents to open up these policies?

7    **A.**    Not to my knowledge.

8    **Q.**    Do you know how you got the paperwork?  Did you

9    fill it out in the mail or --

10   **A.**    You mean for the life insurance policy?

11   **Q.**    Yes.

12   **A.**    Yes.

13   **Q.**    Okay.  Now, did there come a point in time when

14   you were having difficulty making the payments on these

15   small life insurance policies?

16   **A.**    Yes.

17   **Q.**    Okay.  Approximately what happened?  What happened

18   with respect to that?

19   **A.**    I had another phone call with Joe, and he said

20   that he would take care of it for me.

21        MR. McADAMS:  Okay.  Now, I would like to move

22   into evidence Government Exhibit Number 276.

23        MR. LEPIZZERA:  No objection.

24        MR. RADHAKRISHNAN:  No objection, your Honor.

25        THE COURT:  276 will be full.

1          (Government Exhibit 276 admitted in full.)

2    **Q.**   Now, what is this, Mr. Blowers?

3    **A.**   This is a copy of the coupon booklet that I had

4    sent to Joe at that address to make -- to finish out

5    the payments.

6    **Q.**   It's obviously a printed coupon book, but there's

7    also some handwriting on this document.  Whose

8    handwriting is that?

9    **A.**   That's mine.

10   **Q.**   At the top where it says "Send to Joe Caramadre"

11   with an address on Jefferson Boulevard in Warwick, you

12   wrote that?

13   **A.**   That's correct.

14   **Q.**   And this handwritten notation, 29.50/month, that's

15   your notation of how much you were paying per month?

16   **A.**   Correct.

17   **Q.**   There's some numbers down at the bottom, what do

18   those mean?

19   **A.**   The numbers down there are the dates that were

20   paid, that I made payments myself.

21   **Q.**   So we had looked at it, it appeared that the

22   policy was effective February 14th and it indicates 2/3

23   so does it look like you made a payment in February of

24   that year?

25   **A.**   Um-hum.  (Affirmative.)

1    **Q.**    Is that why you wrote "paid" underneath?

2    **A.**    Correct.

3    **Q.**    And then approximately April 5th?

4    **A.**    Correct.

5    **Q.**    And then it's a little difficult to read, but it

6    looks like you have some additional writing on there?

7    **A.**    Correct.

8    **Q.**    So you spoke to Mr. Caramadre and told him you

9    were having troubling making the payments?

10   **A.**    Correct.

11   **Q.**    Even though it was 29 or $30 a month?

12   **A.**    Correct.

13   **Q.**    And what did he say?

14   **A.**    To the best of my recollection, he said just as I

15   had written, to send it to him and he would handle it

16   for me.

17   **Q.**    Did he say anything to you about asking you or

18   Deborah to do anything in return?

19   **A.**    Not to my knowledge.

20   **Q.**    Now -- so this would have occurred at least after

21   February 14th of 1995, correct?

22   **A.**    Correct.

23   **Q.**    At that point, Deborah had already had her brain

24   surgery?

25   **A.**    Correct.

1    **Q.**   Did Mr. Caramadre say anything to you about

2    getting your permission to use Deborah's name on any

3    type of insurance products or annuities that he would

4    offer to his clients?

5    **A.**   Not to my knowledge.

6    **Q.**   I'm sorry.  I think we spoke over each other.

7    **A.**   Not to my knowledge.

8    **Q.**   Did he ask you if he could use her, as it were,

9    called an annuitant?

10   **A.**   Not to my knowledge.

11   **Q.**   Did he use the term "measuring life"?

12   **A.**   No recollection of that.

13   **Q.**   Did he say anything about in one way or another

14   wanting to offer financial products, insurance products

15   to his clients in which their investment would be

16   protected by using Deborah in association with those

17   investments?

18   **A.**   No.

19         MR. McADAMS:  I'd like to move into evidence

20   Government Exhibit 281.

21         THE COURT:  Any objection?

22         MR. LEPIZZERA:  No objection.

23         MR. RADHAKRISHNAN:  No objection, your Honor.

24         THE COURT:  281 will be full.

25         (Government Exhibit 281 admitted in full.)

1    **Q.**   Mr. Blowers, this is a variable annuity product

2    offered by a company called Golden American Life

3    Insurance Company.

4         MR. McADAMS:  If we could sort of blow up the

5    top section here.

6    **Q.**   It indicates that the owner is a person named

7    George Hanrahan with an address in Greene, Rhode

8    Island, and it lists Deborah Blowers as the annuitant.

9         Did you have any knowledge that Deborah was

10   being named as an annuitant in association with an

11   investment for this Mr. Hanrahan?

12   **A.**   No.

13   **Q.**   Does that appear to be her year of birth where

14   it's redacted?

15   **A.**   Yes.

16   **Q.**   I don't know if you recall her Social at this

17   point.  It's been many years but --

18   **A.**   I don't.

19   **Q.**   Do you know how that information got on there?

20   **A.**   I don't.

21   **Q.**   It indicates that this application was received by

22   the company on April 17th, of 1995, and there's an

23   initial premium paid of $15,000; and there's an

24   investment being made, and it indicates one hundred

25   percent into emerging markets.

1    Do you have any recollection of Mr. Caramadre

2    discussing making any type of investment of that nature

3    of that amount of money?

4    **A.**   No.

5        MR. McADAMS:  Could we go to the next page,

6    please, the second page.  If we could zoom up the lower

7    half, please.

8    **Q.**   You see there are some signature lines there.

9    There's one that has an X next to it.  Does that appear

10   to be Deborah's signature?

11   **A.**   It does.

12   **Q.**   Do you know how her signature got on that

13   document?

14   **A.**   I don't.

15   **Q.**   Do you recall whether when you filled out the

16   documents in the mail for those insurance policies you

17   may have received some signature pages with X's on

18   them?

19   **A.**   I don't.

20   **Q.**   Now, it also indicates that the document was

21   signed at Warwick, Rhode Island, on April 13th, 1995.

22   Do you see that?

23   **A.**   I do.

24       MR. McADAMS:  Could we put that on the side and

25   pull up Government Exhibit 991, which I believe is in

1      evidence.

2              THE COURT:  Is that full?  No?

3              MR. McADAMS:  I'd like to move 991 into

4      evidence, please.

5              MR. LEPIZZERA:  No objection.

6              MR. RADHAKRISHNAN:  No objection, your Honor.

7              THE COURT:  All right.  991 will be full.  You

8      may put them up.

9              (Government Exhibit 991 admitted in full.)

10     **Q.**  First of all, if we could look at the date on the

11     top here.  This is another record from Rhode Island

12     Hospital.  It's called a discharge summary.  And it

13     indicates that Deborah was admitted on April 6, 1995,

14     and discharged on April 12th, 1995; is that correct?

15     **A.**  Yes.

16             MR. McADAMS:  If we could go to the physical

17     examination section and zoom that up.

18             And focusing on the physical examination

19     section, it indicates that with respect to Deborah at

20     that point in time that higher intellectual function

21     testing revealed moderate abulia but normal speech and

22     language.  Are you familiar with what "abulia" means?

23     **A.**  No.

24     **Q.**  The inability to make decisions or things of that

25     nature, do you understand it to mean that?

1    **A.**    Yes.

2    **Q.**    Now, it says:  Mrs. Blowers could recall none of

3    three objects after three minutes even with hints.

4           Is that sort of how you remember her mental

5    abilities after she had that surgery?

6    **A.**    Yes.

7    **Q.**    Did you take Deborah to Warwick, Rhode Island to

8    meet with Mr. Caramadre the day after she was

9    discharged from the hospital?

10   **A.**    No.

11   **Q.**    Do you know how her signature got on this annuity

12   application?

13   **A.**    No.

14   **Q.**    In April of 1995, was she capable of understanding

15   and consenting to an annuity application?

16   **A.**    No.

17          MR. McADAMS:  If we could go to Government

18   Exhibit 282, please.  I'd like to move that into

19   evidence.

20          MR. LEPIZZERA:  No objection.

21          MR. RADHAKRISHNAN:  No objection, your Honor.

22          THE COURT:  All right.  282 will be full.

23          (Government Exhibit 282 admitted in full.)

24   **Q.**    This indicates that on May 1st, 1995, George

25   Hanrahan was sending an additional deposit to his

1    existing deferred variable annuity in the amount of

2    $74,000.

3          MR. McADAMS:  Could we go to the next page,

4    please.

5    **Q.**   There's a copy of that check.  Did you have any

6    knowledge that this type of money was being invested in

7    an annuity that was in any way associated with Deborah?

8    **A.**   No.

9          MR. McADAMS:  Could we go to Government Exhibit

10   Number 283, please, and I'd move that into evidence.

11         MR. LEPIZZERA:  No objection.

12         MR. RADHAKRISHNAN:  No objection, your Honor.

13         THE COURT:  283 will be full.

14         (Government Exhibit 283 admitted in full.)

15   **Q.**   This is a letter dated May 9th, 1995, from Joseph

16   Caramadre identified as the registered representative

17   regarding that George Hanrahan account.  It says:

18   Please find enclosed an additional deposit of

19   $89,971.40 for deposit only into an account, and it

20   includes the account number.

21         Did Mr. Caramadre ever reach out to you and tell

22   you that he was using Deborah in connection with any

23   type of annuity?

24   **A.**   No.

25   **Q.**   Did he ever indicate to you that he could earn any

1    type of commission in connection with the use of her

2    name or identity information?

3    **A.**    Not to my knowledge.

4          MR. McADAMS:  Could we go to the next page of

5    that, please.

6    **Q.**    That's the check we just referenced there.

7          MR. McADAMS:  Could we move into evidence,

8    please, Government Exhibit Number 284.

9          THE COURT:  Any objection?

10          MR. LEPIZZERA:  No objection.

11          MR. RADHAKRISHNAN:  No objection.

12          THE COURT:  284 will be full.

13          (Government Exhibit 284 admitted in full.)

14    **Q.**    This is a letter dated May 31st, '95, including a

15    check for $6,984.54 and to deposit into the same

16    account.  I take it from your previous answers you had

17    no knowledge of this?

18    **A.**    That's correct.

19          MR. McADAMS:  Go to the next page, please.  Next

20    page.

21    **Q.**    That's a copy of that check.

22          MR. McADAMS:  Could I move into evidence

23    Government Exhibit number 288, please.

24          MR. LEPIZZERA:  No objection.

25          MR. RADHAKRISHNAN:  No objection, your Honor.

1          THE COURT:  288 will be full.

2          (Government Exhibit 288 admitted in full.)

3     **Q.**   This is a letter dated May 10th, 1995, again to

4     Golden American Life Insurance Company, and it

5     indicates it's from Joseph Caramadre, who at the time

6     was a registered representative.  And it indicates that

7     enclosed is a deposit into a Golden Select DVA,

8     deferred variable annuity, for Oliver DiPietro, the

9     contract owner, and there's a check for $143,156.66, a

10    second check in the amount of $6,843.34 for a total of

11    $150,000.  It also indicates there's another check for

12    a George Hanrahan account in the amount of $2,984.

13         MR. McADAMS:  Could you please go to the next

14    page of that exhibit.

15    **Q.**   Now, this is an application for another deferred

16    variable annuity with Golden American.

17         MR. McADAMS:  Could we blow up the top half,

18    please.

19    **Q.**   This indicates that the owner in this instance is

20    a person named Oliver DiPietro.  Do you have any idea

21    who Mr. DiPietro is?

22    **A.**   I don't.

23    **Q.**   And it indicates that Deborah Blowers is the

24    annuitant on that account.

25         Did you have any knowledge of Deborah being

1    named as an annuitant on an annuity for Mr. DiPietro?

2    **A.**   No.

3    **Q.**   Do you have any idea how her information got on

4    there?

5    **A.**   I don't.

6    **Q.**   Does that appear to be her date of birth and the

7    last four of her Social?

8    **A.**   Correct.

9    **Q.**   That was your current address at that time?

10   **A.**   Yes.

11   **Q.**   Once again, this has got an initial premium of

12   $10,000 with an investment in the Emerging Markets

13   account.  Do you have any knowledge of that?

14   **A.**   I don't.

15           MR. McADAMS:  So could we go to the next page of

16   that, please.

17   **Q.**   Once again, at the bottom, there's a signature

18   page, and there's an X next to it.  Does that appear to

19   be Deborah's signature?

20   **A.**   It does.

21   **Q.**   It's dated April 28th, 1995, once again at

22   Warwick, Rhode Island.  Do you have any recollection of

23   bringing Deborah to Mr. Caramadre's office in Warwick

24   to execute this document?

25   **A.**   I don't.

1    **Q.**    Do you know how her signature got on that paper?

2    **A.**    I don't.

3    **Q.**    April of 1995, would she have been capable of

4    entering into an agreement to participate in any type

5    of an annuity investment?

6    **A.**    No.

7    **Q.**    Thank you.

8           MR. McADAMS:  Could we go to the next page of

9    that, please.  The next page, we'll just go through

10   them, are the other checks that accompanied that letter

11   that we just described.

12   **Q.**    You had no knowledge of these checks?

13   **A.**    I didn't.

14          MR. McADAMS:  Could we go to Government Exhibit

15   291, which I'd move into evidence.

16          MR. LEPIZZERA:  No objection.

17          MR. RADHAKRISHNAN:  No objection, your Honor.

18          THE COURT:  291 will be full.

19          (Government Exhibit 291 admitted in full.)

20   **Q.**    Mr. Blowers, this is another annuity opened at

21   Golden American Life Insurance Company.

22          Could we pull up the top half of this one.

23   **Q.**    And here it indicates that the owners are the Drs.

24   Papazian, Tarro and Della Torre, Inc., Profit Sharing

25   Plan based out of Pawtucket.

1          Do you know those doctors?

2    **A.**    I don't.

3    **Q.**    Do you have any idea who that is?

4    **A.**    No.

5    **Q.**    Again, it indicates that Deborah was named as the

6    annuitant on this particular variable annuity.  Do you

7    have any idea how that came to be?

8    **A.**    I don't.

9    **Q.**    That appears to be her date of birth and Social?

10   **A.**    Correct.

11   **Q.**    This indicates that it was received by Golden

12   American on September 12th, 1995, with an initial

13   premium of $100,000, again, invested in the Emerging

14   Markets fund.

15          MR. McADAMS:  Could we go to the next page of

16   that document, please.  Could you expand the lower half

17   of the signatures.

18   **Q.**    This signature block, again there's an X.  Does

19   that appear to be Deborah Blowers -- does that appear

20   to be your wife's signature?

21   **A.**    Yes.

22   **Q.**    And it indicates in this instance that it was

23   signed in North Kingstown, Rhode Island.

24          Did Mr. Caramadre come to your home and meet

25   with you and your wife?

1    **A.**    Not to my knowledge.

2    **Q.**    Does any of the other writing on this page appear

3    to be either your handwriting or your wife's

4    handwriting, apart from her apparent signature?

5    **A.**    No.

6    **Q.**    Now, this annuity application is dated September

7    8th, 1995, which would be some several months after the

8    earlier ones we looked at and well after her surgery,

9    correct?

10   **A.**    Yes.

11   **Q.**    In fact, that's actually about two months before

12   she passed away?

13   **A.**    That's correct.

14          MR. McADAMS:  Could we have Government Exhibit

15   number 290, please.  I'd like to move that into

16   evidence.

17          MR. LEPIZZERA:  No objection.

18          MR. RADHAKRISHNAN:  No objection, your Honor.

19          THE COURT:  290 will be full.  You may publish

20   it.

21          (Government Exhibit 290 admitted in full.)

22   **Q.**    This is a letter dated September 11th, 1995, from

23   Joseph A. Caramadre to Golden American Life, New

24   Business Department.  And it indicates that there are

25   applications enclosed for a variable annuity for Norma

1    Marcantonio and an application for the application we

2    just saw, Dr. Papazian, Tarro and Della Torre, Inc.

3    Profit Sharing Plan.

4          So I guess the question is with respect to Norma

5    Marcantonio, do you have any idea who she is?

6    **A.**   I don't.

7    **Q.**   Did you have any knowledge that Deborah would be

8    associated with any type of annuity in her name?

9    **A.**   No.

10         MR. McADAMS:  Could we go to the next page of

11   that, please.

12         Could we go to Exhibit 293, please.  I'd like to

13   move that into evidence.

14         MR. LEPIZZERA:  No objection.

15         MR. RADHAKRISHNAN:  No objection, your Honor.

16         THE COURT:  293 will be full.  You may publish

17   it.

18         (Government Exhibit 293 admitted in full.)

19   **Q.**   This is an annuity application in the name of

20   Leonard Decof with an address in Newport, Rhode Island.

21   It names Deborah as the annuitant in this application.

22   Do you know who Leonard Decof is?

23   **A.**   I don't.

24   **Q.**   Did you have any knowledge that she would be --

25   that Deborah would be named as the annuitant on some

1    type of investment associated with him?

2    **A.**   I didn't.

3        MR. McADAMS:   Could we go to next page, please.

4    **Q.**   Now, this is also got an X marked on it.   Does

5    that look like Deborah's signature?

6    **A.**   It does.

7    **Q.**   Do you know how it got on that document?

8    **A.**   I don't.

9    **Q.**   This application indicates that it was signed at

10   Warwick, Rhode Island on September 28th, 1995, I guess

11   about six or seven weeks before Deborah passed.

12       Did you take her to Mr. Caramadre's office and

13   go through these documents with him?

14   **A.**   No.

15   **Q.**   Do you know how her signature got on this

16   document?

17   **A.**   I don't.

18   **Q.**   After Deborah passed, did you have any additional

19   contact with Mr. Caramadre?

20   **A.**   Not to my knowledge.

21   **Q.**   Were you able to redeem the life insurance

22   policies?

23   **A.**   Yes.

24   **Q.**   How much money did you receive from those?

25   **A.**   Three thousand.

1    **Q.**   Would that be between the two policies?

2    **A.**   Correct.

3    **Q.**   You indicated the Physician's Life policy was

4    2,000 and the Guarantee Life was 1,000?

5    **A.**   Correct.

6    **Q.**   Did you need to do anything to redeem those

7    policies?

8    **A.**   Send in the birth certificate, and I called them

9    for what they required.

10   **Q.**   The death certificate?

11   **A.**   The death certificate.  I'm sorry.

12   **Q.**   Did Mr. Caramadre ever reach out to you to see if

13   he could get copies of the death certificate for any

14   reason?

15   **A.**   No.

16   **Q.**   Did he ever indicate to you that in return for his

17   agreeing to pay that $29 a month or so that you were

18   unable to pay, that he would like your permission or

19   Deborah's permission to use her information on annuity

20   investments for his clients?

21   **A.**   No.

22        MR. McADAMS:  Could we have Government Exhibit

23   number 286, please.  I'd like to move that into

24   evidence.

25        MR. LEPIZZERA:  No objection.

1    MR. RADHAKRISHNAN:  No objection, your Honor.

2    THE COURT:  286 will be full.

3    (Government Exhibit 286 admitted in full.)

4    **Q.**   This is a letter on stationery of the Law Offices

5    of Joseph A. Caramadre, dated July 23rd, 1996,

6    addressed to Golden American Life Insurance Company and

7    regards death claim processing.  It indicates that

8    enclosed are four requests for death benefits.  All the

9    appropriate forms are enclosed in accordance with the

10   instructions from the customer service center.

11        Did you have any knowledge that Mr. Caramadre,

12   after Deborah passed way, was going to be seeking to

13   process death claims on her behalf?

14   **A.**   No.

15        MR. McADAMS:  Go to the next page, please.

16   **Q.**   This is a similar document signed by Mr. Hanrahan.

17        MR. McADAMS:  Go to the next page, please.

18   **Q.**   Again, part of the same exhibit.  Did you have any

19   knowledge that a death claim on behalf of Deborah was

20   being made by Mr. Hanrahan or any of Mr. Caramadre's

21   clients?

22   **A.**   I didn't.

23        MR. McADAMS:  Could we go to Government Exhibit

24   287.  I'd like to move that in full, please.

25        MR. LEPIZZERA:  No objection.

1              MR. RADHAKRISHNAN:  No objection.

2              THE COURT:  287 will be full.

3              (Government Exhibit 287 admitted in full.)

4    **Q.**   This indicates that this is a death benefit payout

5    record from Golden American, and it indicates that

6    around July 24th, 1996 that a check in the amount of

7    $205,185 was issued to Mr. Hanrahan, and on

8    approximately that same date a check in the amount of

9    $173,616.85 was issued to Mr. DiPietro, and similarly a

10   check for $10,000 was issued to Mr. Decof and a check

11   for $105,424.97 was issued to the profit sharing plan

12   of those doctors.

13             Did you have knowledge that anything like that

14   was going on in Deborah's name?

15   **A.**   I didn't.

16             MR. McADAMS:  No further questions.

17             THE COURT:  All right.  Would counsel come up

18   for a minute, please.

19             (Side-bar conference.)

20             THE COURT:  Now that I heard the evidence, I

21   think it would be appropriate for me to give the jury

22   an instruction that this evidence cannot pertain to

23   Count 33 for conspiracy involving Mr. Radhakrishnan,

24   which I think would obviate any need for you to conduct

25   any cross-examination on this if you would feel

1    compelled to do so.

2          But I'm looking through all my materials.  I'm

3    confused as to what count this evidence relates to, and

4    I'm sure you can clarify it for me.

5          MR. VILKER:  The fraud scheme is from that

6    period of time, 1995 through --

7          THE COURT:  So it's just evidence of the

8    background of this.

9          MR. VILKER:  Axiom of the scheme to defraud.

10         THE COURT:  But there's no specific count

11   relating to --

12         MR. McADAMS:  There's no substantive mail fraud

13   or wire fraud count, but that they are legal statute of

14   limitations that are part of the fraud scheme.  They're

15   just not substantive --

16         THE COURT:  Which is which count?

17         MR. McADAMS:  Well, if you look at the first

18   part of the indictment, it's 1 through 26.

19         THE COURT:  Reincorporate those earlier

20   paragraphs?

21         MR. McADAMS:  Right.

22         MR. TRAINI:  The correct interpretation of all

23   that, Judge, is that this evidence, and there'll be

24   other evidence like this, is really only, I guess,

25   admissible for Counts 1 through 32 because it pertains

1    to any of the other counts in the indictment.

2         THE COURT:  Right.

3         MR. McADAMS:  So there's a scheme to defraud

4    alleged and then there are subsequent wirings that are

5    alleged to have been made in furtherance of that scheme

6    and mailings that have alleged to have been made in

7    furtherance of that scheme.  This is part of that

8    scheme.  There's not a specific wire or mailing that's

9    alleged --

10        THE COURT:  But it can only be evidence of that

11   scheme as it pertains to Mr. Caramadre.  It can't --

12        MR. McADAMS:  Correct.

13        THE COURT:  Because there are counts against

14   Mr. Radhakrishnan that also incorporate paragraphs --

15        MR. McADAMS:  The incorporating paragraph

16   specifically says it only incorporates those facts

17   which occurred prior to the date in 2007 when the

18   conspiracy begins.

19        So if you look at the indictment, it says the

20   acts which occurred prior to that date in 2007 when the

21   conspiracy begins are reincorporated with respect to

22   the conspiracy.  So in other words, the indictment

23   itself specifically limits those with respect to the

24   conspiracy.

25        MR. TRAINI:  That's right.  But I mean, I did

1    some research on this, your Honor, because I was going

2    to propose a limiting instruction, as you recall, and I

3    didn't do that because I think it also needs to be

4    dealt with from Mr. Caramadre's point of view in the

5    final instructions.  But I understand what you're

6    trying to accomplish.

7          THE COURT:  I want to get it right, and I'm

8    struggling a little bit.

9          MR. TRAINI:  Well, the case law as I read it is

10   that the evidence that they presented through this

11   witness is admissible on the scheme to defraud, but,

12   obviously, the Defendants cannot conspire together in

13   2007 to commit a wire fraud that occurred in 1995.

14         So the only way this evidence is admissible is

15   that it has to be limited only to Counts 1 to 32, and

16   it's got no admissible value to the remainder of the

17   indictment.

18         THE COURT:  Let me just get to Counts 1 through

19   32.  That's what I'm trying to get to.  What page does

20   that start on?

21         MR. TRAINI:  1 through 26 is the wire, 27 to 32

22   is the mail, and 33 is the conspiracy, and 34 to 59 are

23   the identity frauds.  It doesn't pertain to anything

24   other than the scheme to defraud, which is limited to

25   the first 32 counts.

1          MR. McADAMS:  When we get to 33, when the

2    conspiracy count reincorporates prior paragraphs, it

3    only reincorporates those which are prior to -- excuse

4    me, after the date of that in the conspiracy.

5          MR. TRAINI:  So it isn't just that it doesn't

6    have anything to do with Mr. Radhakrishnan.  It doesn't

7    have anything to do with the conspiracy, Judge.

8          THE COURT:  Maybe I should say that and keep it

9    that simple.

10          MR. TRAINI:  Well, except that it also doesn't

11    have anything to do with the identity fraud counts, or

12    the ag counts, or the money laundering counts.  So I

13    think it's easier to say they can consider it only on

14    the fraudulent scheme that's alleged in Count 1 through

15    32.  If you're going to give a limiting instruction, I

16    think that's the one you have to give.

17          MR. McADAMS:  Counts 1 to 32 pertain to

18    Mr. Caramadre's scheme.

19          MR. VILKER:  What we did in the indictment in

20    the conspiracy is said the acts in furtherance of the

21    conspiracy is the object of the fraud that occurred

22    subsequent to the formation of the conspiracy in or

23    about July 2007.  So we're excluding from the

24    conspiracy all of the allegations of the fraud that

25    took place before that.  So what Mr. Traini said is

1    exactly right, that none of this is admissible at all

2    as far as the conspiracy, but it's all admissible on

3    the scheme to defraud.

4           THE COURT:  But how can it be admissible against

5    Radhakrishnan with respect to the scheme to defraud?

6           MR. VILKER:  Right.  He's not responsible for

7    those acts.  But evidence of the scheme existed, and he

8    later joined the scheme; but I think he's entitled to

9    an instruction that it's not admissible as part of the

10   conspiracy and he, obviously, was not around for that

11   time so it can't be held against him.

12          THE COURT:  I'm going to give them some type of

13   instruction now.  I'm going to keep it a little

14   generic.  I may need you all for a separate instruction

15   and then we'll hopefully get your cross done today.

16          THE CLERK:  I have a note.

17          THE COURT:  One of the jurors has written a note

18   saying that she doesn't know if it matters but her ENT

19   is Dr. Papazian and her daughter's ENT is Dr. Della

20   Torre and the firm of doctors all work at Memorial

21   where she works.

22          MR. McADAMS:  I don't know if it matters, Judge.

23   This was a retirement plan.  There's no allegation that

24   they had any knowledge that this was anything other

25   than --

1          THE COURT:  Everybody agree with that?

2          MR. LEPIZZERA:  Yes, I agree with that.

3          THE COURT:  I'll just mention that.

4          (End of side-bar conference.)

5          THE COURT:  Juror Number 3, thank you very much

6     for your note.  I appreciate that.  And I just covered

7     it with counsel, and everyone feels fine that there's

8     no difficulty at all with the fact that you're familiar

9     with those people.

10          THE JUROR:  Thank you.

11          THE COURT:  Thank you.  I'll put that in the

12     record.

13          Ladies and gentlemen, before we proceed with the

14     cross-examination, you know this is a large and

15     complicated case.  And I told you at the beginning of

16     the trial that I would from time to time give you,

17     hopefully, some helpful instructions that might assist

18     you in sort of understanding some of the evidence and

19     where it fits.  So I want to try to do that now in a

20     general sense, and I may give you some more specific

21     information on this tomorrow.

22          But what I want to tell you now is that the

23     evidence that you're hearing from this witness pertains

24     to events that occurred, obviously, in 1995 and

25     thereabouts.  And so that evidence can be considered

1    only for certain aspects of the charges in this case.

2    Obviously, it cannot be considered for purposes of the

3    conspiracy charge, which is in Count 33 and the other

4    charges involving Mr. Radhakrishnan because the

5    conspiracy charge itself alleges that the conspiracy

6    began in 2007.  So the events that occurred in 1995

7    could not be part of that alleged conspiracy that began

8    in 2007.

9          However, the events that are alleged in the

10   early parts of the indictment about what the scheme was

11   alleged to be in this case involved events that began

12   prior to 2007.  And the nature of the allegation is

13   that the scheme was developed earlier, and so this

14   evidence and other evidence like it will pertain to

15   Counts 1 through 32, and the allegation in the

16   indictment is that Mr. Radhakrishnan then joined that

17   alleged scheme at the time that he began working with

18   Mr. Caramadre.

19         I'm not sure I clarified things too much for

20   you, but I hope I clarified it a little bit, that this

21   evidence at least does not pertain to the conspiracy

22   which is alleged to have begun in 2007.  Okay?  So

23   that's at least a start of some instructions.  I may

24   try to give you a little more on this as we go through.

25         So Mr. Lepizzera, do you want to proceed with

1    your cross-examination?

2            MR. LEPIZZERA:  Thank you, your Honor.

3            THE COURT:  For obvious reasons then,

4    Mr. Radhakrishnan has no questions of this witness

5    because this was 1995.

6            <u>**CROSS-EXAMINATION BY MR. LEPIZZERA**</u>

7    **Q.**   Good afternoon, Mr. Blowers.

8    **A.**   Good afternoon.

9    **Q.**   Mr. Blowers, we're talking about your testimony

10   today pertains to things that happened about 17 years

11   ago, correct?

12   **A.**   Correct.

13   **Q.**   Long time?

14   **A.**   It is.

15   **Q.**   The Government put four applications from Golden

16   American in front of you today, correct?

17   **A.**   Yes.

18   **Q.**   And on each of those applications, you identified

19   your wife's signature, correct?

20   **A.**   Correct.

21   **Q.**   You can identify that's her signature, correct?

22   **A.**   It seems to be her signature.

23   **Q.**   You just don't recall -- you can't tell the jury

24   how her signature got on those documents, correct?

25   **A.**   Correct.

1   **Q.**   Okay.  You testified that you had a conversation

2   with an individual who identified himself as

3   Mr. Caramadre, right?

4   **A.**   Correct.

5   **Q.**   You don't recall meeting with Mr. Caramadre, do

6   you?

7   **A.**   I don't.

8   **Q.**   Okay.  And Caramadre called you, and you were able

9   to secure two life insurance policies for your wife,

10  correct?

11  **A.**   Yes.

12  **Q.**   And we talked about those today in front of the

13  jury, right?

14  **A.**   Yes.

15  **Q.**   And at some point, you weren't able to make the

16  premium payments anymore; is that correct?

17  **A.**   Yes.

18  **Q.**   And I think, looking at the coupon book, we want

19  to get you out of here today, so looking at the coupon

20  book, you made one or two monthly payments, right?

21  **A.**   Yes.

22  **Q.**   After you made those payments, you had another

23  conversation with someone who identified himself as

24  Mr. Caramadre and you told that person, "I can't make

25  any payments anymore," right?

1    **A.**    Correct.

2    **Q.**    And the other person on the line told you to send

3    that coupon book to them, right?

4    **A.**    Yes.

5    **Q.**    And you actually wrote down "Joseph Caramadre" on

6    that coupon book, right?

7    **A.**    Yes.

8    **Q.**    And you wrote down 51 Jefferson Boulevard,

9    Warwick, Rhode Island, correct?

10   **A.**    Yes.

11   **Q.**    And did you put that in the mail?

12   **A.**    Yes.

13   **Q.**    After you put that coupon book in the mail, did

14   you make any other payments to either insurance

15   company?

16   **A.**    I don't know.

17   **Q.**    Okay.  You testified that you weren't able to make

18   any more payments, any more premium payments towards

19   those life insurance policies, right?

20   **A.**    There were two policies and that coupon booklet

21   represented one.

22   **Q.**    That was the Physician Mutual, correct?

23   **A.**    Yes.

24   **Q.**    Do you know, after you placed that coupon book in

25   the mail, did you make any other premium payments

1    toward the Physician Mutual policy?

2    **A.**    No.

3    **Q.**    Did anyone else in your family make any of those

4    premium payments towards Physician Mutual?

5    **A.**    No.

6    **Q.**    Someone did, in fact, make premium payments,

7    correct?

8    **A.**    I'm assuming.

9    **Q.**    Because you were able to -- and forgive me for

10   having to ask you this, but your wife passed away in

11   November of 1995, correct?

12   **A.**    Correct.

13   **Q.**    Do you know when you sent the coupon book to

14   Mr. Caramadre?

15   **A.**    I don't.

16   **Q.**    Okay.  The last payment you made toward the

17   Physician Mutual policy was about April 1995?

18   **A.**    Yes.

19   **Q.**    So is it fair to say that sometime after April

20   1995, or about that time period, you would have sent

21   the coupon book to Mr. Caramadre?

22   **A.**    Yes.

23   **Q.**    And in fact, that policy required monthly payment

24   to be made, correct?

25   **A.**    Yes.

1    **Q.**    Approximately $29.50?

2    **A.**    Um-hum.  (Affirmative.)

3    **Q.**    When your wife passed away, you made a death claim

4    with Physicians Mutual, correct?

5    **A.**    Yes.

6    **Q.**    And you were able to collect $2,000?

7    **A.**    Yes.

8            MR. LEPIZZERA:  Nothing further.

9            THE COURT:  Thank you.  Is there any redirect?

10            MR. McADAMS:  No redirect, your Honor.  No,

11    thank you.

12            THE COURT:  Just so the record is clear,

13    Mr. Radhakrishnan, you have no questions, correct?

14            MR. RADHAKRISHNAN:  No, your Honor.  Thank you.

15            THE COURT:  All right.  Then, Mr. Blowers, your

16    testimony is complete.  You may step down.  Thank you

17    very much.

18            THE WITNESS:  You're welcome.

19            THE COURT:  Next witness.

20            MR. VILKER:  The United States calls Lorraine

21    Marshall.

22            **LORRAINE MARSHALL**, first having been duly sworn,

23    testified as follows:

24            THE CLERK:  Please state your name and spell

25    your last name for the record.

1    THE WITNESS:  Lorraine Marshall,

2  M-A-R-S-H-A-L-L.

3    THE COURT:  Good afternoon, Ms. Marshall.

4    THE WITNESS:  Good afternoon.

5    THE COURT:  You may inquire, Mr. Vilker.

6    **DIRECT EXAMINATION BY MR. VILKER**

7  **Q.**   Mrs. Marshall, in what city do you currently live?

8  **A.**   Cranston.

9  **Q.**   And how long have you been in Cranston?

10 **A.**   Over 30 years.

11 **Q.**   And was your late husband Bruce Marshall?

12 **A.**   Yes, he was.

13 **Q.**   And did your husband, Bruce, pass away on April

14 14th of 2009?

15 **A.**   Yes.

16 **Q.**   And how old was he at the time?

17 **A.**   Fifty-four.

18 **Q.**   I'm sorry to have to ask you this, but what was he

19 suffering from?

20 **A.**   Cancer.

21 **Q.**   And before your husband passed away, what were

22 your financial circumstances like?  Was he able to work

23 in that six months?

24 **A.**   No.  He was unable to work anymore, and he was

25 terminally ill.

1    **Q.**    So you had financial problems at the time?

2    **A.**    Problems, yes.

3    **Q.**    Now, was your husband, prior to his passing away,

4    was he receiving Hospice Care?

5    **A.**    Yes, he was.

6    **Q.**    He was actually staying at home.  He didn't stay

7    at hospice?

8    **A.**    No.  We kept him at home.

9    **Q.**    Was there a nurse and a social worker that was

10    coming to help take care of him?

11    **A.**    Yes.

12    **Q.**    Okay.  Now, did there come a point in time where

13    your husband was very sick in which you learned about

14    some kind of program that was out there in which he may

15    be able to get money because he was terminally ill?

16    **A.**    Yes.

17    **Q.**    How do you remember learning about this?

18    **A.**    Through hospice, one of the employees mentioned

19    it.

20    **Q.**    So what do you remember them telling you about

21    this program?

22    **A.**    That there was this man that was helping people,

23    only terminally ill people and would help them out

24    during this time.

25    **Q.**    And did you -- did the hospice person give you a

1    phone number to call?

2    **A.**    Yes.

3    **Q.**    Did you call the number?

4    **A.**    Yes.

5    **Q.**    Do you remember who you spoke with when you called

6    the number?

7    **A.**    Not initially, I don't, but then afterwards.

8    **Q.**    After that initial call, did you end up speaking

9    with somebody who represented that organization?

10    **A.**    Yes.

11    **Q.**    Do you remember his name?

12    **A.**    Raymour.

13    **Q.**    Okay.  So you spoke with Raymour on the phone?

14    **A.**    Yes.

15    **Q.**    Do you remember what was said during that initial

16    phone conversation?

17    **A.**    Not really.  I don't remember exactly what was

18    said.  Just that, you know, my husband was ill, you

19    know, terminally ill.

20    **Q.**    Did you set up a time for him to come and meet

21    with you and your husband?

22    **A.**    Yes.  I believe so.  He was going to come to the

23    home.

24    **Q.**    Okay.  And did he, in fact, after that

25    conversation come to your house in Cranston?

1    **A.**   Yes.

2    **Q.**   And who was there during that day?

3    **A.**   Me and my husband.

4    **Q.**   And just the three of you with Raymour as well?

5    **A.**   (Witness nods head in the affirmative.)

6    **Q.**   And what do you remember Raymour saying in that

7    first meeting about why he was there and this program

8    that he was affiliated with?

9    **A.**   Well, I don't remember most of it because he was

10   not -- my husband was very sick and it was, you know,

11   very hard for him to sit down, up and down.  You know,

12   he was getting morphine every hour so I just remember

13   that he mentioned something that, you know, that we

14   have a program that can help with this situation.  My

15   husband had not had any coverage.  You know, we also,

16   as well, life insurance as well.  We didn't --

17   **Q.**   Raymour said that he was able to give you and your

18   husband some financial help?

19   **A.**   Yeah.  Something to the effect that he would let

20   us know that he could --

21   **Q.**   Do you recall him speaking on the phone at all

22   that day while he was there?

23   **A.**   Not inside, no.

24   **Q.**   When you say "not inside," what do you mean?

25   **A.**   He left after and he said he would get back to us.

1    But then he came back to the door and opened the door

2    and said he spoke to I guess it was, you know, one of

3    the people there and said that, you know, he's going to

4    leave me something for now to help.

5    **Q.**    Was this all in that same meeting that he left and

6    then --

7    **A.**    The same day.

8    **Q.**    Was there a time separation or did he step outside

9    and come back in?

10   **A.**    He went outside for a few minutes and came back.

11   **Q.**    And he indicated he had spoken with somebody and

12   they approved giving you some money?

13   **A.**    He gave me an envelope, yeah.

14   **Q.**    How much do you recall him giving you that day?

15   **A.**    $1,000.

16   **Q.**    Was this check or cash?

17   **A.**    Cash.

18   **Q.**    Was this in an envelope of cash?

19   **A.**    I believe it was, yes.

20   **Q.**    So after he gave you -- you're not sure if it's an

21   envelope or not?

22   **A.**    I'm not sure.  It's a little cloudy.  I just was

23   like, huh.

24   **Q.**    Someone just shows up and gives you a thousand

25   dollars.  After you got the first thousand dollars that

1    day from Raymour, did he say anything else at that time

2    about the possibility of you and your husband getting

3    any more money?

4    **A.**   Yeah.  Well, something to the effect that he would

5    be in touch with us again and something about coming

6    back and, you know, fill out some paperwork.  And I

7    can't remember that whole part.  And plus, like I said,

8    he was going to try to get him some coverage for

9    insurance, life insurance because he was going to try

10   to, you know, help him to do that.

11   **Q.**   So Raymour indicated he was going to try to help

12   get life insurance for your husband?

13   **A.**   Right.  So he had to fill out papers for that

14   also, yes.

15   **Q.**   So a second meeting was then set up?  Did Raymour

16   came back to the house a second time?

17   **A.**   Yes.

18   **Q.**   And who was there during the second time?

19   **A.**   Just, again, the three of us.

20   **Q.**   What was, if you can remember, your husband's

21   condition like at that time?  Was he able to understand

22   what was going on?

23   **A.**   Well, he was pretty drugged up, you know.  But he

24   just, you know -- just said that whatever, you know,

25   can be done and that, you know, anything, you know,

1   make out the papers.  He signed everything, and then he

2   told him that I want everything to go to my wife, you

3   know, if I pass, and, you know, on the insurance

4   policy.

5   **Q.**   So you just said a few things, but Raymour had

6   some papers for your husband to sign?

7   **A.**   Yes.

8   **Q.**   So what do you recall Raymour saying these papers

9   were for?

10  **A.**   Well, I can't really remember everything because I

11  was in a fog myself.  I just remember him just saying

12  that he was going to -- just that this would help, you

13  know, get him, you know, the help he needs.  But I

14  didn't -- you know, just to sign the papers.

15  **Q.**   You said before that you thought this had

16  something to do with life insurance for Bruce?

17  **A.**   Yes.  Then there was papers for life insurance,

18  sign these papers to try to get insurance so that he

19  would be covered for his burial, which we were

20  concerned, you know, at this time as well.

21  **Q.**   Bruce was concerned about how you would pay for

22  his own funeral?

23  **A.**   Yes.

24  **Q.**   What was Bruce's reaction when Raymour said that

25  to him?

1    **A.**    When --

2    **Q.**    When Raymour said that he had some papers to sign

3    and that he might be able to get some insurance for you

4    or Bruce?

5    **A.**    He said, you know, you can, you know, do that.

6    That's fine.

7    **Q.**    Okay.  Did Bruce ever say -- did he ever express

8    an understanding one way or another of who was going to

9    get the money coming from whatever he was signing?

10    **A.**    Who was going to get the money?

11    **Q.**    Right.

12    **A.**    The insurance would go to me and that the money --

13    I didn't know what kind of money he was going to get.

14    We didn't know any of that.

15    **Q.**    So Bruce agreed to sign the papers at that point?

16    **A.**    Um-hum.  (Affirmative.)

17    **Q.**    He thought that whatever he was signing would end

18    up helping you after he passed away?

19    **A.**    Yeah.

20    **Q.**    Now, did you look at any of these papers that

21    Raymour was having Bruce sign?

22    **A.**    No, not really.  He just took the papers, I

23    believe, and then he said he would bring back copies.

24    I'm not sure.  I can't really remember.

25    **Q.**    If you could speak a little slowly.

1  **A.**  I think, you know, he signed the papers and then

2  he said he was going to, you know, give him copies or

3  whatever after that.

4  **Q.**  Well, did you remember where were you in your

5  house?  Where were you, your husband and Raymour?

6  **A.**  In the kitchen.

7  **Q.**  In the kitchen.  So were you sitting around a

8  table?

9  **A.**  Yes.

10  **Q.**  Your husband was able to sit up at that time?

11  **A.**  He was sitting in the chair at the time, yes, for

12  a while.  He didn't sit up too long but he was there

13  for a little bit, yeah, until he left.

14  **Q.**  Was he on a lot of different kind of pain

15  medications and that kind of thing?

16  **A.**  Yeah.  Every hour he was on morphine and other

17  things.

18  **Q.**  Was he in a condition, given his illness and the

19  medications that he was on, to understand really what

20  was happening then?

21  **A.**  I don't know.  He was -- I don't know if he

22  understood everything, no.  I don't know for sure.

23  **Q.**  So when you were at the table and Raymour pulls

24  out the documents, does he give them to you to read

25  over before Bruce signs them?

1    **A.**   No.  He gave them to Bruce.

2    **Q.**   So he just gave them to Bruce.  Did he tell Bruce

3    where to sign on the papers?

4    **A.**   Yeah.

5    **Q.**   Did Raymour read these papers or explain to Bruce

6    what they were all about?

7    **A.**   Just saying something regarding, you know, this

8    goes through the company and, you know, just bits and

9    pieces.  I don't really remember exactly, but it was

10   just, you know, to get him to get some money to help

11   him out.

12        MR. VILKER:  I want to show you Government

13   Exhibit 185 and ask that that be admitted full.

14        MR. LEPIZZERA:  No objection.

15        MR. RADHAKRISHNAN:  No objection, your Honor.

16        THE COURT:  185 will be full.

17        (Government Exhibit 185 admitted in full.)

18   **Q.**   Now, Mrs. Marshall, this is an application to open

19   a brokerage account with it indicates joint tenants

20   with rights of survivorship at a company called Charles

21   Schwab.

22        Do you remember Raymour saying that some

23   brokerage account was going to be opened at Charles

24   Schwab in your husband, Bruce's, name?

25   **A.**   No.

1  **Q.**   The owner on the left side of this is a woman

2  that's named Carlene Hanrahan.

3       Did Raymour say anything about Mrs. Hanrahan or

4  Carlene Hanrahan owning some kind of account with

5  Bruce?

6  **A.**   No.

7       MR. VILKER:  Now, if you could just bring up the

8  right side of the document.

9  **Q.**   This is a form that's submitted to Charles Schwab,

10  and it has some information about your husband on it.

11       First of all, is that your address in Cranston,

12  112 Beachmont Ave?

13  **A.**   Yes.

14  **Q.**   It then says mailing address, 1000 Chapel View

15  Boulevard in Cranston.  Do you know anything about that

16  address?

17  **A.**   I really didn't know much, no.  I'm not familiar

18  with it.

19  **Q.**   That's not your mailing address?

20  **A.**   No.

21  **Q.**   Okay.  And then it says phone number for Bruce,

22  401-941-9273.  Is that phone number familiar to you?

23  **A.**   No.

24  **Q.**   Then it says e-mail address for Bruce, it says

25  raymour@eprworld.com.  Am I correct in assuming that

1    was not Bruce's e-mail address?

2    A.    No.  That's correct.

3    Q.    Okay.  I don't know if you recall Bruce's Social

4    Security number, but the last four digits are there,

5    7440.  Do you remember if that was his Social Security

6    number that ended with those four numbers?

7    A.    No.  It's possible but I --

8    Q.    Do you remember Raymour asking for Bruce's Social

9    Security number?

10   A.    No.

11   Q.    Okay.  It then says the date of birth and it's

12   just the year that's not redacted.  It says 1955.  Is

13   that Bruce's date of birth?

14   A.    Yes.

15              MR. VILKER:  Now, if you can bring up the final

16   box at the bottom.

17   Q.    Then on this application it asks some questions

18   about Bruce's investment experience.  It says

19   investment experience, good.  Was Bruce -- what did he

20   do for a career?

21   A.    He was a toolmaker.

22   Q.    So did he have good experience investing money in

23   the stock market or anything like that?

24   A.    No.

25   Q.    It then says annual income, $100,000 or more.  Was

1    that right?

2    A.    No.

3    Q.    And then it says liquid net worth, $250,000 or

4    more.

5    A.    No.

6    Q.    You were obviously struggling for money at that

7    time so is that inaccurate?

8    A.    Yes.

9    Q.    Yes?

10   A.    Yes.

11   Q.    Thank you.

12         MR. VILKER:  Now, if you turn to page three of

13   this application, please.  If you could magnify the

14   bottom, please.

15   Q.    Do you see your husband, Bruce's, signature there?

16   A.    Yes.

17   Q.    Okay.  So this appears to be one of the forms that

18   he was asked to sign that day?

19   A.    Yes.

20   Q.    Okay.  Now, if you go over to the right, there's a

21   date next to his signature, 3/20/09.  Then above that

22   next to Carlene Hanrahan's signature, 3-20-2009.  Are

23   either of those dates in Bruce's handwriting?

24   A.    No.

25         MR. VILKER:  Now, if you could please bring up

1    Exhibit 186.

2         MR. LEPIZZERA:  No objection.

3         MR. RADHAKRISHNAN:  No objection, your Honor.

4         THE COURT:  186 will be full.

5         (Government Exhibit 186 admitted in full.)

6    **Q.**  Mrs. Marshall, this is another Charles Schwab form

7    and this is a form that says, "Add Options, Margin and

8    Short Capability Application."

9         First of all, do you remember Raymour saying

10   anything about margins or options or anything like that

11   while he was there?

12   **A.**  I don't.  I do not remember.

13   **Q.**  Now, page one lists, again, has Carlene Hanrahan

14   as the owner and your husband, Bruce, on the right side

15   of the page as the co-owner.

16        MR. VILKER:  If you could turn to page two,

17   please.

18   **Q.**  And the section here that I'm marking asks

19   questions about the additional account holder, which is

20   your husband, and this part as well.  And it indicates

21   that his approximate annual income is $250,000.  Was

22   that accurate?

23   **A.**  No.

24   **Q.**  He didn't -- did Raymour ask what your husband's

25   income was?

1    **A.**    No.

2    **Q.**    Did you know that $250,000 was put down on this

3    form as your husband's annual income?

4    **A.**    No.

5    **Q.**    It then says approximate net worth including

6    residence, and it says $500,000.  Was that accurate?

7    **A.**    No.

8    **Q.**    And that says liquid net worth, cash, stocks, et

9    cetera, $250,000.  Was that accurate?

10   **A.**    No.

11   **Q.**    Go down to the second blue mark that I made, it

12   asks for his years of experience with stocks, and it

13   says five plus and with options, five plus.  Were

14   either of those accurate?

15   **A.**    No.

16   **Q.**    Then it says trades per year, ten plus in stocks

17   and then ten plus in options.  Were either of those

18   answers accurate?

19   **A.**    No.

20   **Q.**    It then it says size of transactions, $1,000.

21   Were either of those accurate?

22   **A.**    No.

23   **Q.**    It says investment knowledge, good.  Was that

24   accurate?

25   **A.**    No.

1    **Q.**   If you go to page three of this document, do you

2    see Bruce's signature there?

3    **A.**   Yes.

4    **Q.**   Okay.  And again, the dates, the 3/20/09 and

5    3-20-2009, are either of those in Bruce's handwriting?

6    **A.**   No.

7          MR. VILKER:  If you can please bring up Exhibit

8    187 and turn to the second page.  I ask that be moved

9    full.

10         MR. LEPIZZERA:  No objection.

11         MR. RADHAKRISHNAN:  No objection, your Honor.

12         THE COURT:  187 will be full.

13         (Government Exhibit 187 admitted in full.)

14   **Q.**   Mrs. Marshall, this is a form --

15         MR. VILKER:  Go back to the first page for a

16   second.

17   **Q.**   This is a power of attorney form that gives

18   Raymour the power of attorney to make transactions in

19   this particular Charles Schwab account.

20         Did Raymour say anything that he was going to

21   need Bruce's authorization so that he can make trades

22   in some account that was being opened up?

23   **A.**   No.

24   **Q.**   Okay.  Now, after your husband signed these

25   documents, did you ask Raymour if you could have copies

1    of the documents?

2    **A.**    I believe so.

3    **Q.**    Did he, in fact, mail copies back to you?

4    **A.**    I don't know whether he mailed them or he brought

5    them over, but we got copies.

6    **Q.**    So he gave you copies of at least some of these

7    documents?

8    **A.**    Right.

9    **Q.**    Did you provide those copies to the Government?

10   When we asked you for copies of the documents, did you

11   give us a copy?

12   **A.**    Right.  Yes, I did.

13          MR. VILKER:  If you could bring up Exhibit 188.

14   **Q.**    Is this a copy -- this indicates it's M-A-R-S for

15   Marshall.  Is this a copy of the Charles Schwab form

16   that was mailed or given back to you by Raymour?

17   **A.**    Yes.

18   **Q.**    That you held onto.

19          MR. VILKER:  Now, if you could bring that to the

20   left side of the screen and bring up Exhibit 185.

21          THE COURT:  I think you haven't moved this one

22   yet.

23          MR. VILKER:  I apologize.  I'd like to move this

24   into evidence, please.

25          MR. LEPIZZERA:  No objection.

1      MR. RADHAKRISHNAN:  No objection, your Honor.

2      THE COURT:  188 then will be full.

3      (Government Exhibit 188 admitted in full.)

4  **Q.**   188 is the copy of the application form that

5  Raymour brought back to you.

6  **A.**   Yes.

7  **Q.**   Now, before I ask some questions about what was on

8  this form, when he gave it back to you, do you recall

9  if this was before or after your husband passed away?

10  **A.**   I think it was before because --

11  **Q.**   Well, putting aside the question of the date, what

12  did you do with the copies of the documents that

13  Raymour gave you?

14  **A.**   What did he do with them?

15  **Q.**   What did you do with them?

16  **A.**   I put them in the bedroom in a drawer.  Just put

17  them away.

18  **Q.**   Did you read through them?

19  **A.**   No.  Not really.

20      MR. VILKER:  If you could put on the right side

21  of this Exhibit 185.

22  **Q.**   185 is -- the right side of this document is the

23  actual form that was submitted to Charles Schwab, and

24  the left side is the copy that Raymour gave you.

25  You'll see one difference on the left side is the

1    information and it's all blank concerning the account

2    owner, Carlene Hanrahan.  Are you able to see the

3    difference between the two?

4    **A.**   Yes.

5    **Q.**   Okay.  Now, also, if you look at this section, the

6    bottom right section in which it had indicated on the

7    actual application that was submitted that Bruce had

8    good investment experience and $250,000 or more of

9    annual income, was that part of the document that

10   Raymour gave you?

11   **A.**   No.

12        MR. VILKER:  Could you just blow up the left

13   side of this document, this left document.

14   **Q.**   So the bottom part with the financial information

15   was not part -- of Bruce's financial information was

16   whited out in the copy that you got?

17   **A.**   Yes.

18   **Q.**   Now, I want to show you Exhibit 189.  And is this

19   a copy of the other form, that margin form that Raymour

20   brought to you, if you can recall?  You gave a copy of

21   this form to the Government?

22        MR. VILKER:  Excuse me.  Again, I'd like to move

23   it full.

24   **A.**   I believe so.  I --

25        THE COURT:  Just a minute.  There's no objection

1    from Mr. Caramadre.  Mr. Radhakrishnan?

2         MR. RADHAKRISHNAN:  No objection.

3         THE COURT:  189 will be full.  You may publish

4    it.

5         (Government Exhibit 189 admitted in full.)

6    **Q.**   Was this another document that Raymour gave you

7    that you put it in your drawer and you gave to us?

8    **A.**   Yes, I believe so.

9         MR. VILKER:  If you can turn to page two of this

10   document.  And if you could bring up side by side of

11   page two with document 186.

12   **Q.**   The document that's submitted to Charles Schwab

13   has all that information about Bruce that I just went

14   through of having $250,000 annual income and $500,000

15   net worth and all that.

16        Was that part of that document included in the

17   copy that Raymour brought to you?

18   **A.**   No.

19   **Q.**   It was whited out?

20   **A.**   I mean, I just -- like I said, I looked but I put

21   everything in the drawer and I just trusted him.  I

22   thought, you know, everything was --

23   **Q.**   Okay.  Now, did you notice these forms had the

24   company Charles Schwab written on them?

25   **A.**   No.

1    **Q.**   Now, what, if anything, did Raymour say in either

2    the first meeting or the second meeting about any bonds

3    that may be purchased in Bruce's name?

4    **A.**   No.

5    **Q.**   Did he say anything, whether he used the term

6    "bonds" or any other financial term, that indicated to

7    you or to your husband that someone else stood to make

8    money from Bruce passing away?

9    **A.**   No.

10   **Q.**   Now, those are two meetings you had with Raymour.

11   Did there come a time that you spoke with Raymour after

12   your husband passed away?

13   **A.**   Yes.

14   **Q.**   Okay.  Did you call him?

15   **A.**   Yes.

16   **Q.**   Was this to let him know that Bruce had passed

17   away?

18   **A.**   Yes.

19   **Q.**   Did he say anything about any insurance policy or

20   anything like that at that time?

21   **A.**   As far as the insurance policy went, he said that

22   it wasn't enough time because it was within a couple of

23   weeks after seeing him that Bruce had passed and so

24   there was no insurance available for that, and that he,

25   you know, came and gave me a little more money.

1    **Q.**    Do you recall how much more money he gave you at

2    that time?

3    **A.**    Couple of thousand.

4    **Q.**    So 2,000.  So all together you got 4,000; is that

5    right?

6    **A.**    Correct.

7    **Q.**    And he told you that because Bruce had passed away

8    so quickly there wasn't enough time to get that

9    insurance?

10   **A.**    (Witness nods head in the affirmative.)

11   **Q.**    So you never got any payments from any insurance

12   companies or anything?

13   **A.**    No.

14   **Q.**    Now, after Bruce passed away, did you write a

15   thank you note to Mr. Caramadre and to Raymour?

16   **A.**    Yes.

17   **Q.**    I'd like bring up Exhibit 190 and ask if you

18   recognize that.

19   **A.**    Yes.

20          MR. VILKER:  Move 190 full.

21          MR. LEPIZZERA:  No objection.

22          MR. RADHAKRISHNAN:  No objection, your Honor.

23          THE COURT:  190 will be full.

24          (Government Exhibit 190 admitted in full.)

25          MR. VILKER:  Magnify the top half, please.

1    **Q.**   You wrote on this letter, Mrs. Marshall, Dear

2    Mr. Caramadre and Raymour:  There are no words to

3    express your generous heart and your kindness.  I only

4    wish I could follow your footsteps.  Bruce suffered

5    tremendously as he battled cancer each day.  He was the

6    love of my life, my husband, my friend, my partner.

7    Now he is in heaven.  You'll always be in my prayers.

8    Thank you.  God bless you.  Lorraine Marshall.

9         So, obviously, you wrote this after your

10   husband, Bruce, had passed away.

11        Why did you write this letter to Mr. Caramadre

12   and to Raymour?

13   **A.**   Because I wanted to thank them for what they had

14   done.  And I appreciated it.

15   **Q.**   When you wrote that "There are no words to express

16   your generous heart and your kindness," did you have

17   any idea at this point in time that Mr. Caramadre and

18   Raymour or anyone else stood to make any money after

19   Bruce passed away.

20   **A.**   Absolutely not.

21        MR. VILKER:  Now I'd like to show you Exhibit

22   191 that I want to move full.

23        MR. LEPIZZERA:  No objection.

24        MR. RADHAKRISHNAN:  No objection, your Honor.

25        THE COURT:  191 will be full.

1          (Government Exhibit 191 admitted in full.)

2    **Q.**    191, Mrs. Marshall, is a letter from Carlene

3    Hanrahan, and it's regarding survivorship option

4    redemption of some Countrywide bonds, and it says:

5    Please accept my request for redemption of my

6    Countrywide financial bonds under the provision of the

7    survivors option available for each bond.  And she's

8    requesting redemption for the following notes, three

9    different bonds, one for 136,000 one for 64,000 and one

10   for 38,000.

11          My first question is did you have any idea that

12   your husband, Bruce, was an owner with Carlene Hanrahan

13   of bonds in this dollar amount or any dollar amount?

14   **A.**    No.

15   **Q.**    And then it says, "I owned these bonds with Bruce

16   Marshall as joint tenant with right of survivorship.

17   Bruce died on April 14th, 2009, as evidenced by the

18   enclosed death certificate."

19          Did your husband have any -- do you know if your

20   husband had any idea who Carlene Hanrahan was?

21   **A.**    No.

22   **Q.**    Did you?

23   **A.**    No.

24   **Q.**    It says that they enclosed a death certificate.

25   Did Raymour or Mr. Caramadre or anyone ever ask you for

1    a copy of your husband's death certificate?

2    **A.**   No.

3    **Q.**   Do you have any idea how they got a copy of it?

4    **A.**   No.

5            MR. VILKER:  I'd like to show you Exhibit 192

6    that I'd like to be moved full.

7            MR. LEPIZZERA:  No objection.

8            MR. RADHAKRISHNAN:  No objection, your Honor.

9            THE COURT:  192 will be full.

10           (Government Exhibit 192 admitted in full.)

11   **Q.**   Mrs. Marshall, 192 is a letter from Mr. Caramadre

12   dated April 23rd of 2009, which is a little more than a

13   week after your husband passed away, to Cranston City

14   Hall, and he's asking to obtain 15 copies of your

15   husband's death certificate.

16           Did you have any idea that Mr. Caramadre was

17   requesting copies of your husband's death certificate

18   from Cranston City Hall?

19   **A.**   No.

20   **Q.**   Did you ever authorize him or Raymour that he

21   could do that on your behalf?

22   **A.**   No.

23           MR. VILKER:  I have no further questions, your

24   Honor.

25           THE COURT:  All right.  Thank you.

1      Just a minute.  How long do you expect your

2  cross to be?

3      MR. LEPIZZERA:  I'm not going to cross-examine,

4  your Honor.

5      THE COURT:  Go ahead, Mr. Radhakrishnan.

6  **CROSS-EXAMINATION BY MR. RADHAKRISHNAN**

7  **Q.**   Good afternoon, Mrs. Marshall.  Thank you for

8  coming in today.  I'll keep this very brief so we can

9  not have to bring you in tomorrow.

10      Do you remember how long the first meeting was

11  when I met with you in 2009?

12  **A.**   No.

13  **Q.**   Approximately?

14  **A.**   It wasn't very long.

15  **Q.**   And you had testified that there was a second

16  meeting that occurred?  Do you remember how long that

17  second meeting was?

18  **A.**   Not long.

19  **Q.**   If we could just throw some -- was it longer than

20  the first meeting?

21  **A.**   Yeah.  I would say so.

22  **Q.**   Okay.  You had also testified that, rightfully so,

23  it was four years ago, that your memory is a little bit

24  foggy; is that correct?

25  **A.**   That's correct.

1    **Q.**   I'm sorry?

2    **A.**   Yes.

3    **Q.**   Yes, that's correct?

4    **A.**   Yes.

5    **Q.**   Okay.  Thank you.  As a result of this program,

6    you did receive money, correct?

7    **A.**   That's correct.  Yes.

8    **Q.**   And that money I think you had mentioned was also

9    very helpful as well; is that correct?

10   **A.**   Yes.

11   **Q.**   Okay.  And I never asked you for any money; is

12   that correct?  I never asked you for any money?

13   **A.**   You ask -- no.

14   **Q.**   No.  Or your husband?

15   **A.**   No.

16   **Q.**   Okay.  And so you didn't lose any money; is that

17   correct, from me?  I didn't ask you for any money or

18   your husband didn't lose any money from me as a result

19   of me asking you for money?

20   **A.**   No.

21         MR. RADHAKRISHNAN:  Okay.  Thank you very much.

22   I appreciate your time.  Have a nice day.

23         THE COURT:  Thank you, Mr. Radhakrishnan.

24         Do you have any follow-up, Mr. Vilker?

25         MR. VILKER:  No, your Honor.

1    THE COURT:  Okay.  Then, Ms. Marshall, your

2    testimony is complete.  You may step down.  Thank you

3    very much.

4         Ladies and gentlemen, I think we've reached a

5    good point to break for the day.  So that's what we

6    will do.  I do want to remind you to continue to keep

7    in mind all my instructions.  No watching or reading or

8    listening to any media.  No research, no contact or

9    conversations with anyone about the substance of the

10   case.

11        Tomorrow I'm going to give you a bit of a status

12   report, if you will.  Tomorrow we'll finish up the

13   first week of trial, and I'm hoping that I'll have a

14   sense of how things are going in terms of the bigger

15   timetable associated with this case.  I think,

16   generally speaking, I can tell you things are on track

17   and moving fine.  So that's good news.  And I'll try to

18   be a little more specific, and I'll try to do that as

19   we go through the trial to give you an idea of what

20   we're anticipating in terms of trial length, but so far

21   so good.  All things are going well.

22        All right?  So with that, I'll wish you a nice

23   night, and we'll see you tomorrow morning.

24        (Proceedings out of the presence of the jury as

25   follows:)

1          THE COURT:  Okay.  Counsel, is there anything we

2     need to take up?

3          MR. VILKER:  Not from the Government, your

4     Honor.

5          MR. TRAINI:  No, your Honor.

6          MR. LEPIZZERA:  No, your Honor.

7          THE COURT:  I would appreciate it if you'd think

8     about the instruction issue that we talked about.  I

9     think my instruction covered it adequately, but maybe

10    not as well as it could have.  So there will probably

11    be other opportunities as we go through the trial to

12    reiterate these points.  So if you want to give some

13    thought to that, maybe even draft something up, that

14    might be a good idea.  So maybe you could talk to each

15    other about that.

16         And I think that's it.  So I'll see you all in

17    the morning.

18         (Court concluded at 1:30 p.m.)

19

20

21

22

23

24

25

<u>C E R T I F I C A T I O N</u>

        I, Anne M. Clayton, RPR, do hereby certify that the foregoing pages are a true and accurate transcription of my stenographic notes in the above-entitled case.

/s/ Anne M. Clayton

_____

Anne M. Clayton, RPR

January 10, 2013

_____

Date