IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND


```
* * * * * * * * * * * * *    CRIMINAL ACTION
UNITED STATES OF AMERICA  *  11-186-S
                          *
VS.                       *  NOVEMBER 16, 2012
                          *  VOLUME IV
JOSEPH CARAMADRE and      *
RAYMOUR RADHAKRISHNAN     *  PROVIDENCE, RI
* * * * * * * * * * * * *
```

HEARD BEFORE THE HONORABLE WILLIAM E. SMITH

DISTRICT JUDGE

(Jury Trial)


**APPEARANCES**:

FOR THE GOVERNMENT:          LEE VILKER, AUSA
                             and JOHN P. McADAMS, AUSA
                             U.S. Attorney's Office
                             50 Kennedy Plaza
                             Providence, RI  02903

FOR THE DEFENDANT
Joseph Caramadre:            MICHAEL J. LEPIZZERA, ESQ.
                             Lepizzera & Laprocina
                             117 Metro Center Blvd.
                             Suite 2001
                             Warwick, RI  02886

                             ANTHONY M. TRAINI, ESQ.
                             56 Pine Street
                             Providence, RI  02903

**<u>APPEARANCES</u>**:   (Continued)

FOR THE DEFENDANT
Raymour Radhakrishnan:        RAYMOUR RADHAKRISHNAN, pro se

                              OLIN THOMPSON, ESQ.
                              Federal Defender's Office
                              10 Weybosset St.
                              Providence, RI  02903

Court Reporter:               Anne M. Clayton, RPR
                              One Exchange Terrace
                              Providence, RI  02903

Proceeding reported and produced by computer-aided
                        stenography

<u>I N D E X</u>

WITNESS                                                    PAGE

DANIEL FITZPATRICK

   Direct Examination by Mr. Vilker:                         6
   Cross-Examination by Mr. Radhakrishnan:                  31
   Cross-Examination by Mr. Lepizzera:                      42
   Redirect Examination by Mr. Vilker:                      52
   Recross-Examination by Mr. Lepizzera:                    53

WAYNE POWERS

   Direct Examination by Mr. McAdams:                       60
   Cross-Examination by Mr. Lepizzera:                      70
   Redirect Examination by Mr. McAdams:                     77

ELLEN HEALY

   Direct Examination by Mr. Vilker:                        80
   Cross-Examination by Mr. Radhakrishnan:                  98
   Cross-Examination by Mr. Lepizzera:                     100

EULOGIO GONZALEZ

   Direct Examination by Mr. Vilker:                       117
   Cross-Examination by Mr. Radhakrishnan:                 144
   Cross-Examination by Mr. Lepizzera:                     145
   Redirect Examination by Mr. Vilker:                     155

CAROL LARIVEE

   Direct Examination by Mr. McAdams:                      158
   Cross-Examination by Mr. Radhakrishnan:                 174
   Cross-Examination by Mr. Lepizzera:                     175

<u>GOVERNMENT EXHIBITS</u>

5      -                                                    10
6      -                                                    11
7      -                                                    17
8      -                                                    21
9      -                                                    22
10     -                                                    23
13     -                                                    27
15     -                                                    29
96     -                                                    91
97     -                                                   122
98     -                                                    94

I N D E X   (Continued)                    PAGE

GOVERNMENT EXHIBITS

99   -                                              123
100  -                                              127
103  -                                              138
104  -                                              129
105  -                                              141
106  -                                              142
107  -                                              143
856  -                                               65
987  -                                               19
1014 -                                               66


_____

1    16 NOVEMBER 2012 -- 9:00 A.M.

2              (Proceedings in the presence of the jury as

3    follows:)

4              THE COURT:  Good morning, ladies and gentlemen.

5    Welcome back.  I'm sure you're all relieved that we

6    reached the end of the first week of the trial.  By the

7    end of the day, hopefully I'll be able to give you a

8    little report like I mentioned about the progress that

9    we're making, but I think we're doing fine, but I'll

10   try to be a little more specific with you at the end of

11   the day.

12             So Counsel, are you ready to go forward, or is

13   there something we need to talk about?

14             MR. VILKER:  We're ready to proceed.

15             THE COURT:  Okay.  Good.

16             MR. VILKER:  United States calls Daniel

17   Fitzpatrick.

18             **DANIEL FITZPATRICK**, first having been duly

19   sworn, testified as follows:

20             THE CLERK:  Please state your name and spell

21   your last name for the record.

22             THE WITNESS:  Daniel Fitzpatrick,

23   F-I-T-Z-P-A-T-R-I-C-K.

24             THE COURT:  Good morning, Mr. Fitzpatrick.

25             THE WITNESS:  Good morning.

1      THE COURT:  Mr. Vilker, you may inquire.

2           **DIRECT EXAMINATION BY MR. VILKER**

3   **Q.**   Good morning, Mr. Fitzpatrick.

4        Mr. Fitzpatrick, what city do you live in?

5   **A.**   Narragansett.

6   **Q.**   What do you do for a living?

7   **A.**   I was in the bait business selling lobster bait.

8   **Q.**   Lobster bait?

9   **A.**   Yes.

10  **Q.**   And are you retired now?

11  **A.**   Yes.

12  **Q.**   Now, are you familiar with an individual who has

13  passed away who is named James Kimball?

14  **A.**   Yes.

15  **Q.**   And how did you know Mr. Kimball?

16  **A.**   He worked for me for about 30 years.

17  **Q.**   He was one of your employees?

18  **A.**   Pardon?

19  **Q.**   He was one of your employees?

20  **A.**   Yes.

21  **Q.**   And did you develop a friendship with Mr. Kimball?

22  **A.**   Yes.

23  **Q.**   How would you describe that friendship?

24  **A.**   Like two brothers.  We were pretty much

25  inseparable.

1   **Q.**   Now, did Mr. Kimball end up passing away in March

2   of 2008?

3   **A.**   Yes.

4   **Q.**   What was he was suffering from at that time?

5   **A.**   I believe it was liver cancer.

6   **Q.**   Do you know, what were James' finances like at

7   that time?

8   **A.**   Pardon?

9   **Q.**   What were his finances like, how much money did he

10   have?

11   **A.**   Nothing.

12   **Q.**   Now, before James died, did there come a point in

13   time in which you learned about some kind of program

14   that was out there that may be able to help James get

15   some money?

16   **A.**   Yes.

17   **Q.**   How did you learn about that?

18   **A.**   Through an ad that they had in the Providence

19   Visitor.

20   **Q.**   Did you see the ad?

21   **A.**   Yes.

22   **Q.**   Did you show it to James?

23   **A.**   Yes.

24   **Q.**   By reading the ad, what was your understanding of

25   what this was about?

1   **A.**    That the people that involved were going to donate

2   $2,000 to him to help him, you know, for his expenses.

3   **Q.**    Did you call the phone number that was on the ad?

4   **A.**    Yes.

5   **Q.**    And do you recall who you spoke with when you

6   called the number?

7   **A.**    The first time that I called, a young lady

8   answered the phone and said somebody would get back to

9   me.

10  **Q.**    Did somebody then get back to you?

11  **A.**    Yes.  About 20 minutes later, I believe, somebody

12  called me back, Mr. Raymour.

13  **Q.**    And you know him as Raymour was his name?

14  **A.**    Yes.  That's what he told me his name was.

15  **Q.**    I'll refer to him as Raymour throughout this

16  questioning since that's how you knew him.

17  **A.**    Yes.

18  **Q.**    Do you recall what was said during this first

19  phone call with Raymour?

20  **A.**    He asked for information about James' health.  I

21  explained to him, and he said that he was coming down

22  into South County in about an hour or so, and he'd like

23  to meet with James.

24  **Q.**    Where did James live at the time?

25  **A.**    He lived on Route 1 in South Kingstown.

1    **Q.**    So Raymour indicated he was going there anyway?

2    **A.**    Yes.

3    **Q.**    Okay.  And did Raymour come that day to meet with

4    James?

5    **A.**    Yes.

6    **Q.**    Were you there as well?

7    **A.**    Yes.

8    **Q.**    All right.  Was anybody else there or just the

9    three of you?

10    **A.**    James' companion, girlfriend was there, but she

11    was not part of the conversation.  She walked off into

12    the living room.

13    **Q.**    Okay.  So how long would you estimate this first

14    meeting with Raymour took?

15    **A.**    Maybe 15 minutes.

16    **Q.**    What do you remember Raymour saying when he

17    initially came to the house that day?

18    **A.**    He asked James a couple of questions.  He sat down

19    on one side of the table.  James sat at the other and I

20    was standing at the end of the table, and he asked him

21    and said that -- asked him about his health.  I think

22    he looked at some medical records that were there just

23    briefly.  And then he said, Okay.  And he handed James

24    a check for the $2,000.

25    **Q.**    Okay.  So I want to show you Exhibit 5.

1      MR. VILKER:  And ask that be moved full.

2      MR. LEPIZZERA:  No objection.

3      MR. RADHAKRISHNAN:  No objection, your Honor.

4      THE COURT:  Exhibit 5 will be full.

5      (Government Exhibit 5 admitted in full.)

6   **Q.**   Mr. Fitzpatrick, does this appear to be the check

7   that Raymour gave to Mr. Kimball, the first $2,000

8   check?

9   **A.**   I would assume that that's the check.

10  **Q.**   Okay.  And is it -- do you see how it's dated

11  January 17th of 2008?  Was that about the right time

12  frame?

13  **A.**   Yes.

14  **Q.**   Did you notice -- first of all, did he give this

15  check to you or to Mr. Kimball?

16  **A.**   To Mr. Kimball.  They were sitting across from

17  each other, and he slid it across the table.

18  **Q.**   Do you know what James did with this check?  Did

19  he cash it or deposit it?

20  **A.**   I took him, and he cashed the check.

21  **Q.**   Did you notice at all on the memo section of the

22  check how it's written the word "philanthropy"?

23      MR. RADHAKRISHNAN:  Objection, your Honor.

24      THE COURT:  Grounds?

25      MR. RADHAKRISHNAN:  He already said he didn't

1    know.

2           THE COURT:  Overruled.  You may answer that

3    question.

4    **A.**   I don't know.

5    **Q.**   So he received this $2,000 check.  I'd like to

6    show you Exhibit 6.

7           MR. VILKER:  Ask that that be moved full.

8           MR. LEPIZZERA:  No objection.

9           MR. RADHAKRISHNAN:  No objection, your Honor.

10           THE COURT:  Six will be full.

11           (Government Exhibit 6 admitted in full.)

12    **Q.**   Do you see the document in front of you?

13    **A.**   Yes.

14    **Q.**   This document is titled "Terminally Illness

15    Philanthropy Account Receipt."

16    **A.**   Right.

17    **Q.**   And it says that:  I, James Kimball, acknowledge

18    receipt of $2,000 from the philanthropic program for

19    the terminally ill account of Estate Planning

20    Resources.

21    **A.**   Yes.

22    **Q.**   And at the bottom it has:  In witness whereof, I,

23    Daniel Fitzpatrick -- and do you see your signature

24    there as a witness?

25    **A.**   Yes.

1    **Q.**   Is that Mr. Kimball's signature?

2    **A.**   Yes.

3    **Q.**   Do you recall signing this document?

4    **A.**   Yes.

5    **Q.**   Do you recall what Raymour said this document was

6    for?

7    **A.**   Not at that point there.  I think it was already

8    established what it was for before we even signed it.

9    **Q.**   Well, did you understand this to be a receipt for

10   that $2,000?

11   **A.**   Yes.

12   **Q.**   After -- in that same meeting, after Raymour gave

13   Mr. Kimball that $2,000 and had you and Mr. Kimball

14   sign this receipt form, did he say anything about any

15   other money that possibly could be given to

16   Mr. Kimball?

17   **A.**   Yes.

18   **Q.**   What did he say?

19   **A.**   Well, he had mentioned it to me when I was on the

20   phone when he was still wherever he was the first time

21   I talked to him.  And he said I might have additional

22   money to help Mr. Kimball out.  He said Mr. Caramadre

23   has an investment company and if they used James' name

24   as a co-signer, that he may be able to give him some

25   more funds.  But then he said, Well, don't tell James

1  until I get there.  Let me explain to him what I've got

2  to offer.  And I said, Okay, fine.

3       So when he come down, after we got the check, he

4  said to Mr. Kimball, I have another offer for you.  He

5  said, Mr. Caramadre has some investors and if you were

6  willing to sign as a co-signer, then it could mean as

7  much as $3,000 additional for you.

8  Q.   And so he told you about some kind of investment

9  in which Mr. Kimball would be a co-signer?

10 A.   Yes.

11 Q.   Did he describe what kind of investment this would

12 be?

13 A.   No.

14 Q.   And what was your reaction when Raymour said this

15 in that meeting?

16 A.   Well, he drew a picture.  He said let me show you

17 how it works.  And he drew a rectangular box and he

18 said, This is the original investment.  At the time of

19 your death, if the original -- if the stock is worth

20 less than the original investment, your signature will

21 guarantee the investor the original amount of money.

22 If it's more money, then it's to our advantage.  And

23 being a wise guy, I said, It sounds like a scheme to

24 me.  And he said, It is what it is, Mr. Fitzpatrick.

25 Q.   So he drew you a diagram?

1    **A.**    Yes.

2    **Q.**    Did you keep a copy of that diagram?

3    **A.**    Yes.  But I've given it to either Mr. -- I'm under

4    the impression Mr. Caramadre's lawyer who got in touch

5    with me long before the state did.

6    **Q.**    Okay.

7    **A.**    Or I gave it to Mr. Souza from the Postal --

8    **Q.**    We don't have a copy of that, but do you recall

9    giving a copy?

10   **A.**    Yes.

11        MR. LEPIZZERA:  Objection, your Honor, just

12   objecting to Mr. Vilker's comment.  Move to strike.

13        THE COURT:  I'll grant that.  I'll strike your

14   last comment, and you may ask a question.

15   **Q.**    Okay.  So you don't have a copy of that anymore?

16   **A.**    No.  No.  No.

17   **Q.**    So what's your memory of what Raymour wrote and

18   how that diagram looked after he wrote it?

19   **A.**    It was just a little rectangular box with a -- on

20   the left-hand side of it from where I was standing

21   there was just a line.  It said that was the

22   investment.  There was no money, there was no figures

23   put on this diagram at all.  It was just if this was

24   the original investment at the time of your death, if

25   the stock is worth less than the original investment,

1    then the investor is guaranteed his original investment

2    back.

3    **Q.**    Now, did Raymour say anything in that meeting that

4    would indicate that who ever this investor was could

5    stand to make money or make profits upon James' death?

6    **A.**    No.  At least on my part, I don't know about

7    Mr. Kimball, it was just assumed that there was -- that

8    was the purpose of the thing was to make money on it.

9    **Q.**    Well, the purpose of the account was to make

10   money, but did Raymour say -- what was your

11   understanding of why James' name would need to be on

12   this account?

13   **A.**    No.  He didn't go into detail other than what I

14   just told you, that it would guarantee the original

15   amount of money back to the investor.

16   **Q.**    So other than guaranteeing the original amount of

17   money, did Raymour say anything that a profit could be

18   made due to the fact that James would pass away?

19   **A.**    No.

20   **Q.**    After this explanation was given, did James agree

21   to sign the documents?

22   **A.**    Yes.

23   **Q.**    Documents were signed that day?

24   **A.**    Yes.  Mr. Raymour had him sign several documents.

25   He pushed the documents across the table and said, Sign

1    here.  When he brought that one back, he gave him

2    another one.  So there was a few.

3    **Q.**   Did you see the documents that James was signing

4    that day?

5    **A.**   Yes.

6    **Q.**   Did you read them?

7    **A.**   No.  No.  Because it was just that fast.  As fast

8    as he signed them, as James signed them, he took them

9    back.

10   **Q.**   So you didn't actually -- you saw the documents

11   being given to James, but you didn't get a chance to

12   read them yourself?

13   **A.**   No.

14   **Q.**   Did James appear to read through the documents?

15   **A.**   No.

16   **Q.**   Did Raymour read through the documents that he was

17   having James sign?

18   **A.**   No.

19   **Q.**   Did James or you receive copies of any of the

20   documents that were signed?

21   **A.**   No.

22        MR. VILKER:  I'd like to show you Exhibit 7 and

23   ask that that be admitted in full.

24        MR. LEPIZZERA:  No objection.

25        MR. RADHAKRISHNAN:  No objection, your Honor.

1    THE COURT:  Seven will be full.

2    (Government Exhibit 7 admitted in full.)

3  **Q.**   Mr. Fitzpatrick, Exhibit 7 is an application to

4  open up an Ameritrade account between Joseph Caramadre,

5  as the owner, and James Kimball, as the co-owner.

6    You mentioned before that Raymour said the name

7  of Mr. Caramadre?

8  **A.**   Yes.

9  **Q.**   Did he indicate that Mr. Caramadre himself would

10 be the owner?

11 **A.**   No.

12 **Q.**   Who did he say would be the owner of this account?

13 **A.**   He said that it would probably take a few days if

14 James was interested to get in touch with an investor

15 to find out if they were interested in doing it.  And

16 then about three days later, if I was to take a guess,

17 he called back and said that somebody had agreed to it

18 and that he was going to bring the second check back to

19 James.

20 **Q.**   Okay.  Did he come back with a second check?

21 **A.**   Yes.

22 **Q.**   Okay.  And did he mention -- this is a company

23 called TD Ameritrade.  Did he say anything about

24 Ameritrade?

25 **A.**   No.

1    **Q.**    And it indicates a type of account.  It says joint

2    tenants with the rights of survivorship.  If the joint

3    owner dies, his or her interest passes to the other

4    account owner.

5         Did Raymour say anything about a joint account

6    or joint tenants with rights of survivorship?

7    **A.**    No.

8         MR. VILKER:  Highlight the number 3, the second

9    part of this document.

10   **Q.**    Does that appear to -- it's information on

11   Mr. Kimball.  Does that appear to be Mr. Kimball's year

12   of birth, 1945, if you know?

13   **A.**    I can't hear you.

14   **Q.**    This says Mr. Kimball was born in 1945?

15   **A.**    Yes.

16   **Q.**    Is the last four digits of his Social Security

17   number here, do you know if that's his --

18   **A.**    I don't know.

19   **Q.**    Okay.  And was that the address he was living in,

20   in Wakefield, Rhode Island?

21   **A.**    Yes.

22   **Q.**    What about work phone number?  It says

23   401-785-4411.  Was that Mr. Kimball's number?

24   **A.**    No.  That isn't the work number at all, no.

25   **Q.**    Well, is that number familiar to you at all?

1    **A.**   It could have been his home phone number, but

2    that's not his -- Mr. Kimball worked -- towards the

3    end, the last couple of years he worked for another

4    company as well, and I would have recognized the phone

5    number immediately.  He worked for me part-time when I

6    needed him the last couple of years, but that's not the

7    phone number of the company that he worked for.

8            MR. VILKER:  Bring up Exhibit 987.

9            Exhibit 987 is a certified business record from

10   Cox Communications, and I ask that that be moved full.

11           MR. LEPIZZERA:  No objection.

12           MR. RADHAKRISHNAN:  No objection, your Honor.

13           THE COURT:  987 will be full.

14           (Government Exhibit 987 admitted in full.)

15           MR. VILKER:  If you could enlarge the bottom

16   half of this document, please.

17   **Q.**   Do you see here, this is a Cox Communication

18   record, the phone number 785-4411?

19   **A.**   Yes.

20   **Q.**   And it indicates that it belongs to Estate

21   Planning Resources, Suite 270.

22   **A.**   I'm sorry.  You're going to have to --

23   **Q.**   Let me just speak louder.  Do you see the words

24   "Estate Planning Resources" on the side of this?

25   **A.**   Yes.

1    **Q.**    So does that help you in your memory of who this

2    phone number belonged to?  Do you know what Estate

3    Planning Resources is?

4    **A.**    No.

5         MR. VILKER:  Now, if we can go back to Exhibit

6    7, please.  If you could turn to page three of this

7    document.  If you can enlarge paragraph 11 down.

8    **Q.**    This section asks some questions about the account

9    co-owner being Mr. Kimball.

10        First of all, do you recognize Mr. Kimball's

11   signature there?

12   **A.**    Yes.

13   **Q.**    What about the date, where it says after his

14   signature 1-18-2008?  Can you tell if that's his

15   handwriting?

16   **A.**    I don't know to be honest with you.

17   **Q.**    The section above asks questions about

18   Mr. Kimball.  It asks, first question, funds available

19   for options trading, and it says $50,000.  Did he have

20   that kind of money?

21   **A.**    No.

22   **Q.**    Did he have any money?

23   **A.**    No.

24   **Q.**    Okay.  Did Raymour ask any questions about how

25   much money Mr. Kimball had?

1    **A.**    No.

2    **Q.**    The next category asks years of investment

3    experience.  It says six through nine.

4         Was Mr. Kimball experienced in investing in

5    stocks or bonds or anything like that?

6    **A.**    No.

7    **Q.**    Yet he worked for you in the lobster bait

8    business?

9    **A.**    Yes.

10   **Q.**    And I won't go through each of these categories,

11   but suffice it to say Mr. Kimball did not have

12   extensive investment knowledge or a history of

13   purchasing stocks or options?

14   **A.**    I can account for about 40 years of his life, even

15   though we were only friends for 30, and James never had

16   any money to invest.

17   **Q.**    Raymour, did he ask him any questions about --

18   **A.**    No.

19   **Q.**    Let me finish the question.  Did he ask him any

20   questions about his investment experience or anything

21   like that?

22   **A.**    No.

23         MR. VILKER:  I'd like to bring up Exhibit 8,

24   please and have that moved full.

25         MR. LEPIZZERA:  No objection.

1          MR. RADHAKRISHNAN:  No objection, your Honor.

2          THE COURT:  Exhibit 8 will be full.

3          (Government Exhibit 8 admitted in full.)

4     **Q.**   Do you recognize in the top, do you recognize

5     Mr. Kimball's signature there under "Account Co-owner"?

6     **A.**   Yes.

7     **Q.**   And this is a Limited Trading Authorization that

8     gives Raymour, that's the person you met with, the

9     ability to make trades in that account, this Ameritrade

10    account that was opened between Mr. Caramadre and

11    Mr. Kimball.

12          Did Raymour say anything to you that he needed

13    to get Mr. Kimball's authorization so that he could

14    make trades in this account?

15    **A.**   No.

16          MR. VILKER:  I'd like to bring up now Exhibit 9,

17    please, and ask that that be moved full.

18          MR. LEPIZZERA:  No objection.

19          MR. RADHAKRISHNAN:  No objection, your Honor.

20          THE COURT:  Exhibit 9 will be full.

21          (Government Exhibit 9 admitted in full.)

22    **Q.**   Mr. Fitzpatrick, this is another Ameritrade form.

23    This form is an application to get margin and options

24    upgrade on the form.

25          Did Raymour say anything about adding margin or

1    options or anything like that to this account?

2    **A.**    No.

3        MR. VILKER:  If you could turn to page three of

4    this document.  If you could magnify the bottom portion

5    of this from about number eight down.

6    **Q.**    Do you see Mr. Kimball's signature there?

7    **A.**    Yes.

8    **Q.**    And this document also goes through the same

9    questions about Mr. Kimball's finances and investment

10   history.  Do you see all those answers?

11       Would your testimony still be that those answers

12   are inaccurate?

13   **A.**    Yes, yes.

14       MR. VILKER:  I'd like to show you Exhibit 10 and

15   ask that that be moved full.

16       MR. LEPIZZERA:  No objection.

17       MR. RADHAKRISHNAN:  No objection, your Honor.

18       THE COURT:  Exhibit 10 will be full.

19       (Government Exhibit 10 admitted in full.)

20   **Q.**    Okay.  Exhibit 10 is a three-page document called

21   "Agreement and Acknowledgment," and it's titled

22   "Brokerage Account."

23       Now, is any of the handwriting on this first

24   page of the document, is any of that handwriting

25   Mr. Kimball's?

1   **A.**   Pardon?

2   **Q.**   Is any of the handwriting on this first page

3   Mr. Kimball's?

4   **A.**   No.

5   **Q.**   If you could turn to the second page, please.  The

6   second page has no handwriting.  If you could turn to

7   the third page.  Do you see --

8   **A.**   I see a signature there as co-owner signature.

9   **Q.**   So you see his handwriting on the third page, but

10  you don't see his handwriting on either of the other

11  pages.

12  **A.**   Right.

13  **Q.**   Do you know if either the first page or the second

14  page of this three-page document was shown to

15  Mr. Kimball?

16  **A.**   Not for him to read.  The only time he -- that

17  anything was given to him, he put his signature on it.

18  **Q.**   So if you can go back to the first page, please,

19  of this document.

20        This document says it's an agreement and

21  acknowledgment that a brokerage account would be opened

22  on the 18th day of January between Joseph Caramadre and

23  James Kimball.  And Joseph Caramadre is identified as

24  the funds provider, and Mr. Kimball is identified as

25  the co-owner.

1              Did Raymour say anything in that meeting that

2      some kind of brokerage account was going to be opened

3      up between Mr. Caramadre and Mr. Kimball?

4      **A.**   No.  It was left so that he had to solicit or look

5      for somebody at that point that would be interested in

6      investing.

7      **Q.**   And whoever that would be, did he say that this

8      would be some kind of brokerage account?

9      **A.**   I don't know.

10             MR. VILKER:  Okay.  Now, if you bring up -- if

11     you can magnify paragraph 7.

12     **Q.**   Paragraph 7 says the securities in the account may

13     contain an optional redemption feature, which provides

14     that in the event of one joint tenant's death, the

15     surviving joint tenant is allowed to sell the

16     securities in the account back to the issuer in

17     exchange for the par value of the securities plus

18     accrued interest.  In order to exercise the optional

19     redemption feature, the funds provider and the co-owner

20     must be joint tenants with right of survivorship in the

21     account at the time of either party's death.  As a

22     result of the optional redemption feature, the

23     securities could yield a substantial profit for the

24     funds provider if the co-owner dies before the funds

25     provider.

1    Did Raymour say anything that would indicate

2    that the owner of this account, whether it be

3    Mr. Caramadre or anybody else, stood to make a

4    substantial profit from James' death?

5    **A.**    No.

6    **Q.**    Was this the only meeting that you had with

7    Raymour?

8    **A.**    There was two meetings, the first one for the

9    $2,000 and that's when all the paperwork was done, I

10   believe; and on the third time he just brought the

11   check down and asked a receipt for it and that was it.

12   The second time he wasn't there but minutes.

13   **Q.**    There were two meetings that you recall?

14   **A.**    Yes.

15   **Q.**    The first meeting is when all this paperwork was

16   signed?

17   **A.**    Yes.

18   **Q.**    And the second meeting he came back and he brought

19   another check?

20   **A.**    Right.

21   **Q.**    Did he say anything that indicated that those

22   forms needed to be signed that first day?

23   **A.**    Yes.  Going back to the original phone call when I

24   talked to him the first day, he started to tell me and

25   then he said, Let me tell Mr. Kimball about it.  Don't

1    say anything to him.  He said, But he has to make a

2    decision immediately because, he said, I had a woman

3    who called me a couple of weeks ago that her and her

4    husband had changed their mind and they would like

5    to -- and he said I had to say no to them.

6    **Q.**   So he told you that if James wanted to do this, he

7    wanted to make a decision right then?

8    **A.**   It had to be right then and there.  He didn't say

9    to Mr. Kimball it has to be done right there.  He

10   offered it to him and James said yes.

11   **Q.**   But he had told you that --

12   **A.**   He had told me that it had to be done there.

13          MR. VILKER:  Now, I'd like the bring up Exhibit

14   13 please and ask that that be moved full.

15          MR. LEPIZZERA:  No objection.

16          MR. RADHAKRISHNAN:  No objection, your Honor.

17          THE COURT:  13 will be full.

18          (Government Exhibit 13 admitted in full.)

19   **Q.**   Did this appear to be, Mr. Fitzpatrick, the second

20   check that Raymour brought to Mr. Kimball?

21   **A.**   I would assume so.

22   **Q.**   This was for $3,000?

23   **A.**   Yes.

24          MR. VILKER:  And I'd like to bring up now

25   Exhibit 14.

1    **Q.**   Exhibit 14 is a record from Estate Planning

2    Resources, and it's entitled "Summary of TD Ameritrade

3    Bond Holdings."

4         And if you look at the third line, can you see

5    that?  It says JAC and James Kimball?

6    **A.**   Yes.

7    **Q.**   Are you able to see that if you go on in the line

8    it says $230,000 deposited?

9         THE CLERK:  It's not full.

10        MR. VILKER:  This is full.

11        THE COURT:  Yes, I think it is full.  What

12   number is it?

13        MR. VILKER:  14.  14 is full.

14   **Q.**   So just to go back a second, Mr. Fitzpatrick, do

15   you see the third line, how it says account name, JAC

16   for Joseph A. Caramadre, and James Kimball?

17   **A.**   (Witness nods head in the affirmative.)

18   **Q.**   That's yes?  Do you see that?

19   **A.**   Yes.

20   **Q.**   And do you see how it says $230,000 deposited into

21   that account?

22   **A.**   Yes.

23   **Q.**   And that there's bonds worth $452,000 that were in

24   that account.

25   **A.**   Yes.

1    **Q.**   Did you have any idea that Mr. Kimball was the

2    owner of an account in which that much money was

3    deposited?

4    **A.**   No.

5    **Q.**   Did you have any idea that Mr. Caramadre was

6    purchasing bonds that would allow him to make a profit

7    upon Mr. Kimball's death?

8    **A.**   No.

9         MR. VILKER:  Now I want to show you Exhibit 15

10    and ask that that be moved full.

11         MR. LEPIZZERA:  No objection.

12         MR. RADHAKRISHNAN:  No objection, your Honor.

13         THE COURT:  15 will be full.

14         (Government Exhibit 15 admitted in full.)

15    **Q.**   Mr. Fitzpatrick, this is a letter from Joseph

16    Caramadre dated July 14th, and it concerns this

17    Ameritrade account that was opened with Mr. Kimball,

18    and he's requesting that a group of CIT bonds with

19    survivor's option to be redeemed.

20         Did you know anything about Mr. Caramadre

21    attempting to redeem bonds in James' name after James

22    passed away?

23    **A.**   No.

24         MR. VILKER:  If you could turn to page two of

25    this document.

1    **Q.**   Part of this document is a letter from

2    Mr. Caramadre and it says:  I own these bonds with

3    James D. Kimball as joint tenant with right of

4    survivorship.  James died on March 13, 2008, as

5    evidenced by the enclosed death certificate.

6         Do you know if James ever met Mr. Caramadre?

7    **A.**   Pardon?

8    **Q.**   Do you know if James knew Mr. Caramadre at all?

9    **A.**   No, he didn't.

10   **Q.**   He wasn't there at these meetings?

11   **A.**   No.

12   **Q.**   It says "the enclosed death certificate."  Did

13   Raymour reach back out to you and ask you for a copy of

14   James' death certificate?

15   **A.**   No.

16   **Q.**   Do you have any knowledge of how Mr. Caramadre was

17   able to get a copy of his death certificate?

18   **A.**   No.  The day that James died I had pretty much

19   severed my relationship with his family.  So I had no

20   way of obtaining a death certificate or knew anything

21   about it after that.

22   **Q.**   Okay.  So you don't know one way or the other how

23   this death certificate --

24   **A.**   No.  No.

25        MR. VILKER:  I have no further questions, your

1     Honor.

2          THE COURT:  Thank you.

3          Mr. Radhakrishnan.

4          **CROSS-EXAMINATION BY MR. RADHAKRISHNAN**

5     **Q.**   Good morning, Mr. Fitzpatrick.

6     **A.**   Good morning.

7     **Q.**   It's nice to see you again.  Thank you for coming

8     in.

9          Sometime inside early 2008, I believe you

10    contacted me first; is that correct?

11    **A.**   Yes.

12    **Q.**   Can you describe, how did you get in contact with

13    me?  Who told you to call me?

14    **A.**   I called the number that was on the advertisement

15    in the Providence Visitor, and I called that number and

16    a young lady said that she'd have somebody get back to

17    me shortly, and you were the one who called me back and

18    introduced yourself.

19    **Q.**   Yes.  Okay.  And when you called me, did you

20    express any skepticism about that advertisement, about

21    somebody giving out $2,000?

22    **A.**   No.  No.  Not at all.

23    **Q.**   You thought that was completely normal?

24    **A.**   Yes.

25    **Q.**   That somebody was giving out $2,000?

1    **A.**    Yes.

2    **Q.**    Okay.  All right.  Did you ask me any questions

3    about the program, about what it took to qualify or any

4    questions?  Did you ask me any questions about the

5    program?

6    **A.**    No.  No.  If I can remember right, you were the

7    one that was speaking and told me -- you asked me if I

8    knew Mr. Caramadre.  I said, no, I didn't.  And you

9    said he was the gentleman who was making these funds

10   available to cancer patients.

11   **Q.**    Okay.  So subsequently, you or I set up an

12   appointment?

13   **A.**    Um-hum.  (Affirmative.)

14   **Q.**    What did you tell Mr. Kimball after speaking to

15   me?

16   **A.**    I said that you were coming down, and you asked

17   me -- you started to explain to me that there may be

18   additional funds, but then half way through the thing

19   you said to me, Let me explain to Mr. Kimball.  Don't

20   say anything to him.

21         So I didn't.  I just said I had a fellow coming

22   down that was going to talk to him and offering some

23   money to help him through his financing because he

24   didn't even have the rent for his home at that point.

25   **Q.**    Okay.  So you set up a first meeting is what it

1    comes down to?

2    **A.**   Yes.

3    **Q.**   And you testified that there were a few meetings

4    that occurred; is that correct?

5    **A.**   Two.

6    **Q.**   Okay.  Two meetings that occurred.  All right.  In

7    that first meeting that I came to visit Mr. Kimball --

8         MR. RADHAKRISHNAN:  If I may please have Exhibit

9    6 pulled up, Ms. Anderson, please.

10   **Q.**   -- do you remember seeing this document here in

11   front of you today?

12   **A.**   To say that I remember that day, no.  I see my

13   signature on there so it had to be one of the documents

14   that I signed with you.

15   **Q.**   Okay.  And you see the date there?  What's the

16   date listed there, "In witness whereof, Daniel

17   Fitzpatrick" --

18   **A.**   The 17th day of January.

19   **Q.**   So 17th of January.

20        So I presented this document to you and

21   Mr. Kimball.  Do you remember that?

22   **A.**   Yes.

23   **Q.**   And is it true -- excuse me.  Did I read this

24   document to you?

25   **A.**   No.

1    **Q.**    Okay.  Did I give it to you to read, or did I give

2    it to Mr. Kimball to read?

3    **A.**    To read?  I don't believe so.  I don't think that

4    you said, I want you to read this.  I think it was just

5    a matter of us signing.

6    **Q.**    Okay.  Take a look at this document.  The title of

7    the document is "Terminal Illness Philanthropy Account

8    Receipt."

9    **A.**    Okay.

10   **Q.**    If you remember in that first meeting, you

11   testified that Mr. Kimball received a check for $2,000;

12   is that correct?

13   **A.**    Yes.

14   **Q.**    So take a look at it.  Is it common practice for

15   you to sign a document -- excuse me, for Mr. Kimball to

16   sign a document without reading it?  You've known him

17   for 40 years; is that correct?

18   **A.**    Yes.

19   **Q.**    Was it common practice for Mr. Kimball to sign a

20   document without reading it?

21   **A.**    Yes.

22   **Q.**    You also signed this document there, right?

23   **A.**    Yes.

24   **Q.**    Why did you sign that document?

25   **A.**    Because you had a check in your hand for $2,000

1    that you were giving to him. He had signed the

2    document. And you were like an angel that day when you

3    appeared in that house to help him out because not only

4    was he desperately sick, there were no funds in the

5    house whatsoever and they would have evicted him from

6    his home.

7    **Q.** Sure. I understand that. But if we could read

8    right here, okay --

9        MR. RADHAKRISHNAN: Ms. Anderson, could you

10   please zoom into the bottom section.

11   **Q.** Can you read the bottom paragraph there,

12   Mr. Fitzpatrick, please?

13   **A.** "I understand that I may use the monies received

14   from Estate Planning Resources for any of the following

15   purposes?"

16   **Q.** No, actually even one further. "In witness

17   whereof," where your name is.

18   **A.** "Daniel Fitzpatrick have hereunto set my hand and

19   seal on this 17th day of January, 2008."

20   **Q.** All right. Backing up for a second, all right, I

21   came and that first meeting was -- you testified was

22   very short. Isn't that correct?

23   **A.** Right.

24   **Q.** And how long was that? You said a few minutes, 15

25   minutes?

1    **A.**    Maybe 15 minutes.

2    **Q.**    Okay.  And do you remember me saying anything to

3    Mr. Kimball at that meeting, or was it just -- what did

4    I say to Mr. Kimball at that meeting?  What do you

5    remember me saying to Mr. Kimball at that first

6    meeting?

7    **A.**    Very little.  You looked at the documents and the

8    medical things that were on the table, and I think you

9    may have even touched or looked at one of the

10   prescriptions.  And you said, Well, all right, we have

11   the money available for you that we'd like to help you

12   out.  And that was about the extent of the conversation

13   while he signed for this money.

14   **Q.**    Okay.

15   **A.**    And then you said, I may be able to offer you some

16   other money.  And you went on to explain to him about

17   the investment, that Mr. Caramadre had this investment

18   company.  And if they had a client that was interested,

19   that he would -- that you would give him more money.

20   **Q.**    Okay.  And do you remember at that meeting if

21   Mr. Kimball was interested in getting more money?  Did

22   he express interest in getting more money?

23   **A.**    Yes.

24   **Q.**    And do you remember -- excuse me.  You had

25   testified that I drew some type of chart explaining

1    this; is that correct?

2    **A.**   Yes.

3    **Q.**   Okay.  Can you describe again for the jury what

4    that chart -- just describe the chart, please, to the

5    jury.

6    **A.**   It wasn't a chart.  You had drawn a rectangular

7    box.  It was about maybe two-and-a-half inches, the

8    length of it.  The side maybe an inch.  And then you

9    had taken the pen and made a little mark on the end of

10   the box.

11   **Q.**   Okay.

12   **A.**   Okay.  And you said this is the original

13   investment.  If at the time of your death the original

14   investment is less than what it was, that he would --

15   the investor would receive the original amount of money

16   that he had invested upon James' death.  And the top

17   part you said if it's higher than that, then it takes

18   care of itself.

19   **Q.**   Okay.  So just to do some quick math here, if an

20   investor purchases an investment at a lower value,

21   okay, than the par value, and then upon a death if it

22   actually triggers a death -- excuse me, if the

23   investment is triggered by a death, and they redeem it

24   at par value, wouldn't there be derived a profit if

25   you're purchasing something at a lower price and then

1   basically redeeming it at a par price?  Would there be

2   a profit?

3   **A.**   I think it's self-explanatory.  Because when you

4   said upon the death of the value of the -- if the value

5   of the original investment is less than the original

6   investment, they're guaranteed their money back.  And

7   you said if it's doing well, then it's doing well.

8   **Q.**   Okay.  That's fine.  Listen -- sorry.  That was

9   '08.  Okay.  So that was several years back.  Four

10  years back, at least.

11  **A.**   Right.  Yes.

12  **Q.**   Okay.  That's fair.  But you do remember me

13  explaining, you know, X, Y and Z about the -- excuse

14  me, explaining that there were investments and I did

15  draw a chart; is that correct?

16  **A.**   Yes.

17  **Q.**   Okay.  You had testified that Mr. Kimball didn't

18  have much experience in investing, if any at all; isn't

19  that correct?

20  **A.**   No.  Absolutely not.

21  **Q.**   Okay.  Right.  And do you ever remember

22  Mr. Kimball expressing to me that he didn't fully

23  understand all the details of the chart or the account

24  that I was explaining to him?

25  **A.**   No.

1       MR. TRAINI:  Objection.

2       THE COURT:  Grounds?

3       MR. TRAINI:  It was a hearsay objection, your

4  Honor.  I'm sorry.

5       I believe the question included a statement from

6  Mr. Kimball.

7       THE COURT:  Right.  I'm going to allow it.

8  Overruled.  Go ahead.

9       Did you answer the question?

10      MR. RADHAKRISHNAN:  Could the court reporter

11  please repeat that question, please.

12      (Pending question read by the reporter.)

13  **Q.**   You can answer that question.

14  **A.**   No.

15  **Q.**   Thank you.  All right.  One moment, please.

16      MR. RADHAKRISHNAN:  Ms. Anderson, can you please

17  pull up Exhibit Number 13, please.  Can you zoom in on

18  that, please.

19  **Q.**   Mr. Fitzpatrick, were you present at all the times

20  that I met with Mr. Kimball?

21  **A.**   Yes.

22  **Q.**   Okay.  So you remember Mr. Kimball receiving this

23  check?

24  **A.**   Yes.

25  **Q.**   Okay.  And do you see the date on there, I believe

1    it's January 23rd, 2008; is that correct?

2    A.    Yes.

3    Q.    Okay.  And do you remember the first date  --

4          MR. RADHAKRISHNAN:  If I can pull up here, if I

5    can do that side by side thing that I saw Mr. Vilker do

6    the other day where we pull up that exhibit and then

7    also I'd like to pull up the $2,000 check, which would

8    be Exhibit Number 5, please, Ms. Anderson.

9    Q.    Okay.  So you can see here that we have the $2,000

10   check and the $3,000 check on the screens there, and

11   the dates are different, correct?

12   A.    Yes.

13   Q.    The first date is the 17th of January, okay, that

14   was -- and you can see here inside the bottom corner of

15   that check --

16         MR. RADHAKRISHNAN:  Is it possible to zoom into

17   the bottom corner of the $2,000 check to the

18   philanthropy part or just zoom in, in general?  Okay.

19   Thanks.

20   Q.    You can see on the bottom corner of that check,

21   what does that say there?

22   A.    "Philanthropy."

23   Q.    Philanthropy.  And on the bottom corner of the

24   check to the left, the $3,000 check, can you read what

25   that says for me, please.

1    **A.**   "New" something.

2    **Q.**   I think it's "New account setup" or new A-C-C-T

3    spot setup?

4    **A.**   Okay.

5    **Q.**   So we're very clear that Mr. Kimball got two

6    checks, one for $2,000 for philanthropy; is that

7    correct?  And he got another check for $3,000 and you

8    can see there that was for new account setup; is that

9    correct?  You can see there in the bottom corner.

10   **A.**   Yes.

11         THE COURT:  Mr. Radhakrishnan, you have to slow

12   down a little bit.

13         MR. RADHAKRISHNAN:  Pardon me.

14         THE COURT:  Don't talk over the witness.

15         MR. RADHAKRISHNAN:  Sorry about that, your

16   Honor; and sorry about that, Mr. Fitzpatrick.

17   **Q.**   Okay.  So do you ever remember, Mr. Fitzpatrick,

18   if you ever called me up about anything else?  Do you

19   ever remember calling me up after my relationship was

20   completed with Mr. Kimball?

21   **A.**   No.

22   **Q.**   Okay.  Did you ever refer anyone else to this

23   program?

24   **A.**   No.

25   **Q.**   Okay.  But you did have conversations with

1    Mr. Kimball about the program, and did he ever tell you

2    that he was happy about receiving the money?  Did he

3    ever express that he was grateful about receiving the

4    money?

5    **A.**   Without saying, you know, it was a -- he was very

6    happy.  Again, he would have been -- there was no funds

7    in the house.  He had been sick for quite some time,

8    and the rent was due which was about $1,100 a month.

9         MR. RADHAKRISHNAN:  Sure.  Okay.  I appreciate

10   your time, Mr. Fitzpatrick.  Thank you for coming in.

11   Have a nice day.  All right?

12        Thank you, your Honor.

13        THE COURT:  Thank you.

14        Mr. Lepizzera.

15        <u>**CROSS-EXAMINATION BY MR. LEPIZZERA**</u>

16   **Q.**   I'll be brief with you.  I represent

17   Mr. Caramadre.  I have a couple of questions for you.

18        Mr. Fitzpatrick, James Kimball never met

19   Mr. Caramadre, correct?

20   **A.**   No.

21   **Q.**   In fact, you've never met Mr. Caramadre?

22   **A.**   No.

23   **Q.**   Mr. Radhakrishnan did explain during the meeting

24   with you and Mr. Kimball that there was some type of

25   investment, correct?

1    **A.**   Yes.

2    **Q.**   Okay.  And he also explained to you and

3    Mr. Kimball that he was asking Mr. Kimball if

4    Mr. Kimball could be a co-signer on some kind of

5    investment?

6    **A.**   Yes.

7    **Q.**   He did not explain to you exactly what type of

8    investment that would be, correct?

9    **A.**   No.

10   **Q.**   But he did say and he did ask Mr. Kimball to be a

11   co-signer on some type of investment?

12   **A.**   Yes.

13   **Q.**   And Mr. Kimball agreed to be a co-signer on some

14   type of investment, correct?

15   **A.**   Yes.

16   **Q.**   And he agreed to do that in return for $3,000,

17   correct?

18   **A.**   Right.

19   **Q.**   Mr. Kimball signed -- after he agreed to become a

20   co-signer in some type of investment, he signed some

21   documents, correct?

22   **A.**   Um-hum.  (Affirmative.)

23   **Q.**   Those are the ones that Mr. Radhakrishnan gave to

24   him?

25   **A.**   Yes.

1    **Q.**    He willingly signed those documents?

2    **A.**    Yes.

3    **Q.**    He willingly agreed to become a co-signer on an

4    investment?

5    **A.**    Yes.

6    **Q.**    With some investor, right?  Because

7    Mr. Radhakrishnan didn't explain who the investor was,

8    right?

9    **A.**    No.

10   **Q.**    Mr. Radhakrishnan, after Mr. Kimball signed the

11   papers, he left the meeting, correct?

12   **A.**    Right.

13   **Q.**    And the $3,000 that Mr. Kimball received, he

14   didn't receive the $3,000 at the first meeting, right?

15   **A.**    No.

16   **Q.**    Because Mr. Radhakrishnan said that he had to

17   finalize the investment first, right?

18   **A.**    Right.

19   **Q.**    Make sure the investment went through that

20   Mr. Kimball agreed to be a co-signer on, correct?

21   **A.**    Yes.

22   **Q.**    And after that investment was set up,

23   Mr. Radhakrishnan would come back with a $3,000 check,

24   right?

25   **A.**    Right.

1    **Q.**   And in fact, Mr. Radhakrishnan did come back with

2    a $3,000 check, didn't he?

3    **A.**   Yes.

4    **Q.**   Gave the check to Mr. Kimball?

5    **A.**   Yes.

6    **Q.**   Were you present?

7    **A.**   Yes.

8    **Q.**   You were present?

9    **A.**   Yeah.

10   **Q.**   How long did Mr. Radhakrishnan stay for that

11   second meeting?

12   **A.**   Minutes.  Just in order to present the check and

13   if there was a signature required, that was it.

14   **Q.**   There might have been a signature required at that

15   point, the second meeting?

16   **A.**   I can't remember right now.

17   **Q.**   But when he came back with that $3,000 check, he

18   let you and Mr. Kimball know that that investment that

19   Mr. Kimball had agreed to had been opened up, right?

20   **A.**   Yes.

21   **Q.**   And that's why he was delivering the $3,000 check?

22   **A.**   Yes.

23   **Q.**   Now, I want to go back to the $2,000 check.

24        MR. LEPIZZERA:  Ms. Anderson, can you bring up

25   Exhibit 5.

1    **Q.**    Can you see the check on the screen?

2    **A.**    Yes.

3    **Q.**    Mr. Kimball (sic), you testified on direct and

4    cross-examination, I just want to go over this point

5    again with you, on the left-hand corner of that check,

6    it says "philanthropy," doesn't it?

7    **A.**    Yes.

8    **Q.**    That $2,000 check is dated January 17th, 2008,

9    right?

10   **A.**    Yes.

11   **Q.**    That's about the time that you met with

12   Mr. Radhakrishnan, right?

13   **A.**    Yes.

14   **Q.**    That $2,000 check was given to Mr. Kimball because

15   you had responded to the ad on his behalf, right?

16   **A.**    Yes.

17   **Q.**    That $2,000 check had nothing to do with the

18   investment that Mr. Kimball had agreed to, right?

19   **A.**    Exactly.

20   **Q.**    In fact, that $2,000 check was given to

21   Mr. Kimball before Mr. Radhakrishnan then went on to

22   explain another way to make money; is that correct?

23   **A.**    Yes.

24   **Q.**    And in the left-hand corner of that check, it says

25   "philanthropy," right?

1   **A.**   Yes.

2   **Q.**   Did you happen to see yourself this check before

3   Mr. Kimball went to the bank and cashed it?  Do you

4   remember?

5   **A.**   Only when Mr. Raymour had pushed it across the

6   table, because I was standing up very close to the

7   table.  I seen the amount of money, and James took the

8   check and put it in his top pocket immediately.

9   **Q.**   So you saw the money amount on there, right?

10   **A.**   Yes.

11   **Q.**   And that was for $2,000 Mr. Radhakrishnan had

12   promised and, in fact, was promised in that ad,

13   correct?

14   **A.**   Right.

15   **Q.**   Did you happen to see what bank account this check

16   was written to when he slid it across the table?

17   **A.**   No.

18   **Q.**   You didn't -- go ahead, I'm sorry.

19   **A.**   I'm trying to think.  We went to Citizens Bank.

20   It might have been Mr. Kimball had an account there or

21   a checking account there or -- but for some reason I'm

22   thinking we went to Citizens, but I didn't notice the

23   bank that it was drawn on.

24   **Q.**   Take a look at this check right now.  See at the

25   top where it says "Joseph Caramadre" at the top of that

1    check?

2    **A.**   Yeah.

3    **Q.**   Did you happen to see Mr. Caramadre's name on the

4    check before Mr. Kimball deposited or cashed the check

5    at Citizens Bank?

6    **A.**   No.   Like I said, when Raymour gave him the check,

7    he slid it across the table and James picked it up and

8    looked at it.   That's when I had maybe two seconds to

9    look at it.   And he put it in his top pocket.   That was

10   the only time that I seen the check.

11   **Q.**   Mr. Fitzpatrick, this is the second check that

12   Mr. Kimball had received, right?

13   **A.**   (Witness nods head in the affirmative.)

14   **Q.**   Correct?

15   **A.**   You just have to answer for the stenographer, for

16   the record.

17         And this date on this check is January 23rd,

18   2008, right?

19   **A.**   Yes.

20   **Q.**   By the way, did Mr. Radhakrishnan call you or

21   Mr. Kimball to let him know that he was coming down

22   with the second check?

23   **A.**   He called me.

24   **Q.**   He called you?

25   **A.**   Yeah.   He didn't have Mr. Kimball's phone number.

1    I gave him my cell phone number, and he and I

2    communicated with each other.

3    Q.    And the arrangement was before Mr. Radhakrishnan

4    left at the first meeting, the agreement was that he

5    would call you if, in fact, he was able to open up that

6    investment account that Mr. Kimball had agreed to and

7    to return back with the $3,000 that he had promised,

8    right?

9    A.    Yes.

10   Q.    And in fact, he did that, right?

11   A.    Yeah.

12   Q.    So he called you up and he let you know, and you

13   and him made arrangements to meet with Mr. Kimball?

14   A.    Yes.

15   Q.    To deliver the $3,000 check for the account that

16   Mr. Kimball had agreed to open up, right?

17   A.    Yes.

18   Q.    Again, if you take a look at the left-hand corner

19   of that check.

20   A.    Yes.

21   Q.    Where it says "New account setup," right?

22   A.    Yes.

23   Q.    What happened with this check?  Did Mr. Kimball,

24   again, cash it, or do you recall what happened?

25   A.    I took him to the bank, and he cashed it again.

1    **Q.**   He cashed it?

2    **A.**   Yes.

3    **Q.**   So like the other check, he didn't just deposit

4    it.  He went out and cashed it, right?

5    **A.**   Right.  They were both cashed.

6    **Q.**   And that's a $3,000 check, right?

7    **A.**   Yes.

8    **Q.**   Did Mr. Kimball go to the bank the same day that

9    Mr. Radhakrishnan delivered the $3,000 check?

10   **A.**   Probably five minutes after he drove out of the

11   driveway, we were on our way.

12   **Q.**   Right away?

13   **A.**   Exactly.

14   **Q.**   By the way, did Mr. Kimball, did he drive at the

15   time?

16   **A.**   Yes.

17   **Q.**   Did you drive Mr. Kimball to the bank?

18   **A.**   Yes.  Yeah.  The last three or four months that he

19   was sick, he was terribly sick, and I spent most of my

20   time there at the house.  I brought him to all the

21   doctors, the hospitals, the pharmacy.  Anything that he

22   had to do I made myself available to.

23   **Q.**   You were close friends, right, with him?

24   **A.**   Like I said, we were like brothers.

25   **Q.**   You were like brothers?

1   **A.**   Yes.  We were inseparable.  And we worked together

2   all them years, and any time I asked him to help me,

3   whether it was three o'clock in the morning in a snow

4   storm or whatever, he was available.

5   **Q.**   That's wonderful.

6        Was Mr. Kimball grateful for receiving $5,000

7   from this program?

8   **A.**   Yes.  Yeah.

9   **Q.**   So he went to the bank.  There was no delay in

10  cashing that check, was there?

11  **A.**   No.  Just as soon as he walked in, he cashed the

12  check.

13  **Q.**   And he came out with $3,000?

14  **A.**   And he come out with the money, and then we

15  probably stopped and paid some bills or did some

16  grocery shopping right then and there.

17  **Q.**   So he was able to buy food?

18  **A.**   Yeah.

19  **Q.**   Able to pay some bills?

20  **A.**   Yes.  Primarily the rent.

21  **Q.**   So it enabled him to stay in his apartment,

22  correct?

23  **A.**   Yes.

24  **Q.**   Did it give him comfort, that $3,000?

25  **A.**   Yes.

1    **Q.**    And the $2,000 as well, right?

2    **A.**    Yes.

3    **Q.**    And did it give you some comfort as well to know

4    that your friend that was like a brother was able to

5    stay in his apartment and pay his bills?

6    **A.**    Yes.

7          MR. LEPIZZERA:  Thank you, sir.  Thank you for

8    coming in today.

9          THE COURT:  Mr. Vilker.

10         **REDIRECT EXAMINATION BY MR. VILKER**

11   **Q.**    I just have a few brief questions,

12   Mr. Fitzpatrick.

13         MR. VILKER:  Bring up Exhibit 11, please.  I'd

14   like to move that full.

15         THE COURT:  Any objection?

16         MR. LEPIZZERA:  I have a limited objection, your

17   Honor, which is beyond the scope of cross.

18         THE COURT:  It is.

19         MR. VILKER:  Okay.

20         THE COURT:  So sustained.

21         MR. VILKER:  Okay.  I'll move on.

22   **Q.**    Mr. Fitzpatrick, Mr. Caramadre's attorney just

23   asked you that if Mr. Kimball and you understood that

24   Mr. Kimball's name was going to be on some kind of

25   investment.  You indicated that both of you understood

1    that?

2    A.   Yes.

3    Q.   Did either you or Mr. Kimball ever understand that

4    Mr. Caramadre or anyone else stood to make substantial

5    profits from Mr. Kimball's death?

6    A.   No.

7         MR. VILKER:  No further questions.

8         THE COURT:  Recross?

9         MR. LEPIZZERA:  Just on that point.

10        THE COURT:  Well, Mr. Radhakrishnan, do you have

11   any?

12        MR. RADHAKRISHNAN:  No, your Honor.

13        THE COURT:  Thank you.  Mr. Lepizzera.

14        **RECROSS-EXAMINATION BY MR. LEPIZZERA**

15   Q.   I'm a lawyer.  I can't stop asking questions,

16   Mr. Fitzpatrick.

17        Mr. Vilker just asked you about whether you and

18   Mr. Kimball knew that there were going to be profits

19   made, correct?

20   A.   Yes.

21   Q.   I think you already testified today that when

22   Mr. Radhakrishnan explained the program, right, that an

23   investment would be made, right?

24   A.   Yes.

25   Q.   This is the investment that Mr. Kimball had agreed

1    to sign onto, right?

2    A.   Right.

3    Q.   And that money would be put into some investment

4    vehicle, right?

5    A.   Yes.

6    Q.   You're not sure about what type of investment

7    vehicle, but money would be put in an investment,

8    correct?

9    A.   Right.

10   Q.   Mr. Radhakrishnan asked you a question about pars

11   and redemption.  I'm going to make it simple for you.

12        You didn't know how much money was going to be

13   put into the investment, right?

14   A.   No.

15   Q.   That was never explained, right?

16   A.   Right.

17   Q.   Let me just give you an example.  Okay?  If a

18   million dollars was put into an investment vehicle,

19   okay, following me?

20   A.   Yes.

21   Q.   And if that investment dropped down to $500,000,

22   okay?

23   A.   Yep.

24   Q.   And if Mr. Kimball died, right, Mr. Radhakrishnan,

25   based on what he told you, your understanding was with

1    Mr. Kimball that the investor, that is the person who

2    put in the original million dollars, would be able to

3    get their original million dollars back although the

4    investment dropped down to 500,000, right?

5    **A.**    Yes.

6    **Q.**    And therefore, they would be able to get back

7    their original million dollars because of Mr. Kimball's

8    death, correct?

9    **A.**    Yes.

10   **Q.**    And you understood that Mr. Kimball's death would

11   serve, and I apologize for explaining it like this,

12   would serve as kind of an insurance policy or back stop

13   for that investor to save their original principal

14   investment, right?

15   **A.**    Definitely.

16   **Q.**    Definitely you understood it, and definitely

17   Mr. Kimball understood that to be, right?

18   **A.**    Yes.

19   **Q.**    He understood that his death or his life would

20   serve as some kind of back stop to some investor

21   putting in some money and investing some money,

22   correct?

23   **A.**    Right.

24   **Q.**    And he was okay with that, wasn't he?

25   **A.**    Yes.

1    **Q.**    And he got $3,000 in return for that, correct?

2    **A.**    Yes.

3    **Q.**    Now, investors normally don't invest money to lose

4    money, do they?

5    **A.**    No.

6    **Q.**    Okay.  Now, let's take the example of the person

7    who puts the million dollars in again, okay?  As

8    opposed to that money going down to 500,000, if that

9    investor puts in a million dollars and it goes up to

10   $1.5 million, okay, following me?

11   **A.**    Yes.

12   **Q.**    And Mr. Kimball dies, correct?  Who keeps the $1.5

13   million that fit into that hypothetical investment?

14   **A.**    The investor.

15   **Q.**    The investor does, right?  You don't get it,

16   right?

17   **A.**    No.

18   **Q.**    Mr. Kimball doesn't get it, correct?

19   **A.**    No.

20   **Q.**    And Mr. Kimball's family doesn't get it; is that

21   correct?

22   **A.**    No.

23          MR. LEPIZZERA:  Thank you, sir.

24          THE COURT:  Okay.  Thank you.  Mr. Fitzpatrick,

25   your testimony is complete and you may step down.

1      Thank you.

2              THE WITNESS:  Thank you.

3              THE COURT:  Next witness.

4              MR. McADAMS:  The Government calls Wayne Powers.

5              THE COURT:  While Mr. Powers is coming in, would

6      counsel come up for a minute.

7              (Side-bar conference.)

8              THE COURT:  I just want to address this hearsay

9      objection that you raised because I think this is going

10     to be a continuing issue and the question that you

11     actually objected to called for not the actual hearsay

12     statement but whether he knew about such a statement,

13     and he answered he didn't so he didn't get the next

14     question.  But there's been a bit of hearsay testimony

15     about what the deceased individual said, which is

16     coming through spouses, friends or whatever and there

17     haven't been any objections up to this point.

18             Now, I want to be consistent in my rulings here,

19     and so it's pretty early, but I was, you know, from the

20     way things have been developing, I was under the

21     impression that you all were going to let that kind of

22     testimony come in.  Maybe I'm wrong about that.  But I

23     don't want to be making rulings that are, you know,

24     selective in one way or another.  I want to get a clear

25     understanding what's going to happen with this kind of

1    testimony because I have a sense there's going to be a

2    lot more testimony.

3          MR. TRAINI:  Judge, I think my concern with that

4    testimony is that it's the -- if it's a -- let's say

5    it's a family member who is testifying to something

6    that deceased person said.  That's whatever the

7    testimony is and we have not been objecting to that,

8    that's correct.

9          When Mr. Radhakrishnan puts that testimony into

10   the context of the deceased person saying it but it

11   comes in as Mr. Radhakrishnan saying didn't that person

12   say this, now, in a case where the witness answers no,

13   as Mr. Fitzpatrick did, it doesn't make any difference.

14   But when it is, it's really the equivalent of

15   Mr. Radhakrishnan testifying himself to what the person

16   said.  And that's the part that I'm having a problem

17   with.

18         THE COURT:  Well, I didn't perceive that to be

19   what you were driving at about the objection and I'm

20   not sure that's correct.  I mean, I'm not sure I agree

21   with that.  I think my instructions dealt with that.

22   We can continue this conversation.

23         MR. LEPIZZERA:  It's a little tricky.

24         THE COURT:  Yes.  But I want consistency.

25         MR. TRAINI:  We also don't want to be objecting

1    to things for no reason.  I told you I don't want to

2    slow things down, but my only concern is that I think

3    it's a very different situation when Mr. Radhakrishnan

4    is the one who's saying what the person said, again,

5    outside of court, so it's clearly hearsay.  And he's

6    actually testifying to what the deceased person said,

7    not the witness.

8            THE COURT:  That may depend, too, on how it's

9    phrased.  Okay.  I'll keep an eye on that.

10           MR. VILKER:  The only thing I can say about that

11   issue is there's coming in a bigger issue if the

12   question is what did the deceased person say.  It's not

13   for the truth.  It's going to state of mind of what

14   they thought at the time they signed their agreements.

15   I don't think there's any hearsay independent of what

16   Mr. Radhakrishnan is sort of asking.  If they said it

17   was just charity, it's not true that it was just

18   charity but that's what they thought when they were

19   signing it.

20           THE COURT:  If they're asked whether they made a

21   statement such as I don't understand what this means or

22   I do understand what this means, then that is coming in

23   for its truth and that's pretty important.

24           MR. VILKER:  I guess it depends -- I guess it's

25   for the truth and for their state of mind at the time.

1          MR. THOMPSON:  Matter of inquiry is for the

2    truth and for the state of mind.

3          THE COURT:  Same thing.  I don't want to belabor

4    this, but I want to flag it for you because --

5          (End of side-bar conference.)

6          THE COURT:  Okay.  Let's swear the witness.

7          **WAYNE POWERS**, first having been duly sworn,

8    testified as follows:

9          THE CLERK:  Please state your name and spell

10   your last name for the record.

11         THE WITNESS:  Wayne R. Powers, P-O-W-E-R-S.

12         THE COURT:  Good morning, Mr. Powers.

13         THE WITNESS:  Good morning, Judge.

14         THE COURT:  And you may inquire, Mr. McAdams.

15         MR. McADAMS:  Thank you, your Honor.

16         **DIRECT EXAMINATION BY MR. McADAMS**

17   Q.   Good morning, Mr. Powers.

18         Mr. Powers, where are you from?

19   A.   You mean born and raised?

20   Q.   Yes.

21   A.   Born in Providence, raised in East Greenwich,

22   living in Bristol.

23   Q.   What do you do for a living?

24   A.   I'm an advertising products rep.

25   Q.   Who do you work for?

1    **A.**    Right now The Anchor, which is a Catholic paper

2    for the Fall River Diocese.

3    **Q.**    Catholic newspaper for the --

4    **A.**    Yes.

5    **Q.**    Okay.  And did there come a point in time prior to

6    your employment at the Catholic paper in Fall River

7    that you worked for the Catholic paper here in Rhode

8    Island?

9    **A.**    Yes, I did.

10   **Q.**    When was that?

11   **A.**    I worked in Providence from late October 1991,

12   through late March 2008.

13   **Q.**    What was the name of that Catholic newspaper at

14   that time?

15   **A.**    At the time, when I began it was the Providence

16   Visitor.  When I left, it was the Rhode Island

17   Catholic.  There was a name change.

18   **Q.**    The name changed from the Providence Visitor to

19   the Rhode Island Catholic?

20   **A.**    That's correct.

21   **Q.**    Approximately when did that name change take

22   place?

23   **A.**    I'm trying to -- I'm guessing 2007.

24   **Q.**    And was there any significant change in that

25   newspaper when the name changed, or is it essentially

1    the same thing?

2    **A.**    When Bishop Tobin assumed the Providence Diocese,

3    they decided to rename the paper.  When they did that,

4    there were major personnel changes as well.

5    **Q.**    When the new bishop came to Rhode Island, there

6    were changes at the Catholic paper in terms of the name

7    and --

8    **A.**    Eventually there were, yes.

9    **Q.**    And you continued to work there for that period of

10   time?

11   **A.**    Yes, sir.

12   **Q.**    Are you familiar with the readership of the Rhode

13   Island Visitor?

14   **A.**    Somewhat, yes.

15   **Q.**    Can you just describe generally to the jury what

16   the readership market is for that.

17   **A.**    The demographics, circulation is about 27,000.

18   It's direct mail.  I think publish day is still

19   Thursday.  Surveys have shown that Catholic readers

20   tend to be older, that they tend to earn a little bit

21   more money than non-Catholic people.  Non-Catholic

22   readers rather, excuse me.

23   **Q.**    So it's a weekly newspaper?

24   **A.**    It's weekly.  Every Thursday, as I recall, yes.

25   **Q.**    And the audience is generally people that are

1      practicing Catholics?

2      **A.**   That's correct.

3      **Q.**   And they receive it through the mail?

4      **A.**   Yes.

5      **Q.**   Now, do Catholic newspapers have specific

6      standards for what they publish?

7      **A.**   In what way?

8      **Q.**   With respect to content?

9      **A.**   Yes.   The way it was handled in Providence, as it

10     is in Fall River, the editor kind of gets together with

11     the executive editor, who is usually a priest, and they

12     usually decide the content, any stories, that type of

13     thing, amongst the two of them.

14     **Q.**   When you were working at the Rhode Island Catholic

15     in approximately 2007, who was responsible for the

16     content of the newspaper?

17     **A.**   When they performed the major personnel changes,

18     they hired someone named Marsha Grant O'Brien, who was

19     the editor/general manager at the time.

20     **Q.**   Was there a priest who was involved?

21     **A.**   Yes.   Father Bernard Healey, who was, I think,

22     still the current liaison for Governmental Affairs

23     here, I think, in Rhode Island.   He was the more or

24     less proofreader, so to speak.   Between Father Healey

25     and Michael Guilfoyle, who was the Director of

1    Communications, those two guys more or less proofread

2    the whole paper every week.

3    **Q.**    To make sure that --

4    **A.**    Correct.  To make sure that the stories were

5    consistent with Catholic teaching, that there was

6    nothing potentially embarrassing that could be not

7    caught, so to speak.

8    **Q.**    Now, did that include any type of supervision over

9    the advertising that was placed in the paper?

10    **A.**    Yes, sir, it did.  Again, if any advertising calls

11    came to the paper, they come to me.  Usually, the ads

12    were okay.  But if I'm not sure -- I mean, in the 21

13    years I've been doing this, if I'm not completely sure

14    about an ad's content, I will take it to my

15    supervisors.

16    **Q.**    Now, turning your attention to approximately late

17    2007, did there come a point in time when an ad was

18    submitted for publication to the Rhode Island Catholic

19    regarding money payments that could be given to

20    terminally ill people?

21    **A.**    Yes, sir.

22    **Q.**    What do you recall about that?

23    **A.**    I know the advertising call came to me.  I don't

24    know if it was directed to me by an office member or

25    whatnot.  But I believe that I spoke to a female who

1   started making the inquiries.

2   **Q.**   Did you ultimately receive like a print version of

3   the advertisement?

4   **A.**   Yes.  When the ad was discussed, I received an

5   e-mail that actually contained the ad, yes.

6         MR. McADAMS:  At this point, I'd like to move

7   into evidence Government Exhibit 856.

8         MR. LEPIZZERA:  No objection.

9         MR. RADHAKRISHNAN:  No objection, your Honor.

10        THE COURT:  856 will be full.

11        (Government Exhibit 856 admitted in full.)

12        MR. McADAMS:  Publish it, your Honor.

13        THE COURT:  Yes.

14  **Q.**   Mr. Powers, this is an e-mail from Mr. Caramadre,

15  Joseph Caramadre, sent to Raymour on Thursday, October

16  4th, 2007.  And it's got an attachment described as

17  terminal illness ad 2007.doc, and it says:  Raymour,

18  please find attached draft ad to be submitted later

19  today.  Start working on refining this ad ASAP, and

20  I'll be in the office about 10:30 a.m. today.  Thanks.

21  Joe.

22        MR. McADAMS:  Can we go to the next page,

23  please.

24  **Q.**   This is the attachment to that particular e-mail.

25  It says:  "Terminal illness in your family?  $2,000

1    immediate cash benefits.  A benevolent organization

2    will provide immediate cash of $2,000 for qualifying

3    individuals."

4              THE COURT:  I don't think you need to read the

5    whole ad.

6              MR. McADAMS:  Could we have Government Exhibit

7    Number 1014.  I'd like to move this full.

8              MR. LEPIZZERA:  No objection.

9              MR. RADHAKRISHNAN:  No objection, your Honor.

10             THE COURT:  All right.  114 -- is it 114?

11             MR. McADAMS:  1014.

12             THE COURT:  1014 will be full.  You may publish

13   it.

14             MR. McADAMS:  Thank you, your Honor.

15             (Government Exhibit 1014 admitted in full.)

16   Q.   Mr. Powers, did you maintain records of some of

17   the ads that you kept over the years at the --

18   A.   I maintain records of every ad.

19   Q.   Where did you keep those?

20   A.   What I do is I divide them into four- or five-week

21   sections.  And then at the end of any given month, I

22   have a folder that I put all the written information,

23   dates, times, people I spoke with into that folder in

24   case there's a problem down the road somewhere.

25             MR. McADAMS:  Could we go to the second page of

1    this exhibit, please.

2    **Q.**   Do you recognize that advertisement?

3    **A.**   Yes, sir.  That's the ad that came to me in the

4    e-mail, I believe.

5    **Q.**   How do you remember getting that advertisement?

6    **A.**   I'm sorry?

7    **Q.**   How do you remember getting that advertisement?

8    **A.**   It came to me from an e-mail.

9    **Q.**   What was your reaction when you saw this

10   particular advertisement?

11   **A.**   Again, you know, in 2007, I'd been doing this for

12   16 years.  And I kind of knew -- it didn't strike me as

13   being something the Catholic paper would want to

14   entertain.

15   **Q.**   It did or --

16   **A.**   It did not.  I did not.  So again, if I'm not

17   completely sure, as I stated before, about the content

18   of an ad, I will take it to my superiors.

19   **Q.**   What were your concerns?

20   **A.**   I thought about this, and I just cannot pinpoint

21   the exact reason, but it just did not read correctly to

22   me.

23   **Q.**   What, if anything, did you do about it?

24   **A.**   What I did -- again, I'm trying to remember back,

25   you know, five years ago.  But I believe Marsha Grant

1    O'Brien was not around.  She was ill, I believe, at the

2    time, which is why on that ad you placed on the screen,

3    I had taken it to Mike Guilfoyle.  And he told me to

4    talk with Father Healey about this.

5    **Q.**   You went to your supervisor, the supervisor was

6    there and they advised that you check with Father

7    Healey?

8    **A.**   That's correct.

9         MR. McADAMS:  Can we go back to the first page,

10   please.

11   **Q.**   So what did you tell Father Healey?

12   **A.**   This says it.  You know, I have an inquiry for an

13   ad.  I'm not quite sure that it's something that we

14   want to pursue.  What do you think about this?  That's

15   essentially what I wrote here.

16   **Q.**   Did you know anything about the advertisement

17   beyond the print that was actually submitted to you?

18   **A.**   No, sir.

19   **Q.**   When you spoke to somebody, whoever it was that

20   provided the ad to you, did they give any explanation

21   as to what this ad was about beyond the print?

22   **A.**   As far as I can recall, no, sir.

23   **Q.**   Did you have any knowledge that people who

24   responded to that ad would be potentially solicited for

25   investment purposes?

1      **A.**   No, sir.

2      **Q.**   When you spoke to -- well, first of all, did you

3      speak to Father Healey?

4      **A.**   Again, he okayed it, so he had to call me on

5      October 5th of '07 at 3:20, yes, so he told me the ad

6      is okay to run.

7      **Q.**   So when you spoke to Father Healey, did you say

8      anything to him to indicate that this was in any way

9      connected to an investment program?

10     **A.**   Again, I had been there -- no, sir.  No.  Again, I

11     had been there long enough he would know that if I'm

12     contacting him about something, I'm not quite sure this

13     is right.

14     **Q.**   And it was your understanding that Father Healey

15     looked at the ad and thought it was okay?

16     **A.**   Yes, sir.

17          MR. McADAMS:  Could we go to the next page,

18     please.

19     **Q.**   Did you end up having a conversation with Father

20     Healey?  Do you have any knowledge why he approved the

21     ad.

22     **A.**   Again, I do remember that -- I got the impression

23     that Father Healey actually knew Mr. Caramadre.

24     **Q.**   He was familiar with who Mr. Caramadre was?

25     **A.**   Yes, sir.

1    **Q.**   Did he indicate anything to you that he had any

2    knowledge that this involved an investment program?

3    **A.**   No, sir, he did not.

4    **Q.**   Now, Mr. Powers, if this ad had indicated that

5    recipients of -- excuse me, respondents of the ad would

6    be requested to provide Social Security numbers or

7    identity information or participate in an investment

8    program, would you have -- what would your reaction

9    have been?

10            MR. LEPIZZERA:  Objection.

11            THE COURT:  Don't answer it.  Sustained.  Calls

12   for speculation.

13            MR. McADAMS:  I have no further questions of

14   this witness.

15            THE COURT:  Mr. Radhakrishnan.

16            MR. RADHAKRISHNAN:  I have no questions for the

17   witness, your Honor.

18            THE COURT:  Mr. Lepizzera.

19            MR. LEPIZZERA:  Thank you.

20            <u>**CROSS-EXAMINATION BY MR. LEPIZZERA**</u>

21   **Q.**   Good morning, Mr. Powers.

22   **A.**   Good morning, sir.

23   **Q.**   I represent Mr. Caramadre.  I just have a couple

24   of questions for you.

25            I wasn't sure I heard this correctly.  Did you

1    start working -- what company did you work for?

2    **A.**   You mean now or before?

3    **Q.**   No.  Back then.

4    **A.**   Providence Visitor hired me.  Providence Visitor

5    was the name of the paper I worked for originally.

6    **Q.**   So you worked directly for the newspaper, correct?

7    You were employed by the newspaper?

8    **A.**   Yes, sir.

9    **Q.**   Was that 1991 through 2008?

10   **A.**   That's correct.

11   **Q.**   Okay.  Very long time, right?

12   **A.**   Correct.

13   **Q.**   And there were protocols at the newspaper as to

14   what kind of articles went into the newspaper, correct?

15   **A.**   As far as I know.

16   **Q.**   But you worked there for like 17 years, right?

17   **A.**   Advertising and editorial are two different

18   departments, sir.

19   **Q.**   And advertising as well, right?

20   **A.**   Yes, sir.

21   **Q.**   So if something came across your desk, an

22   advertisement would come to you?

23   **A.**   Any advertising-related question would come to me,

24   yes.

25   **Q.**   Would come to you?

1    **A.**    Yes.

2    **Q.**    And if you looked at it and it didn't seem right,

3    you would go to your superiors, correct?

4    **A.**    That's the rule I still follow today, sir, yes.

5    **Q.**    Because that was the protocol the Providence

6    Visitor had back then, right.

7    **A.**    It may or may not have been.  It's my protocol.

8    **Q.**    But you were the one implementing -- you were the

9    one running the program, right, in terms of -- you were

10   the one checking the ads, right?

11   **A.**    What do you mean "checking," sir?

12   **Q.**    In other words, if an advertisement came into the

13   Providence Visitor seeking to be published in the

14   Providence Visitor, it would come through you, right?

15   **A.**    That's correct.

16   **Q.**    And you would either approve it and allow it to be

17   published in the Providence Visitor, right?

18   **A.**    Not necessarily.

19   **Q.**    Or you would check with the executive director or

20   someone else, right?

21   **A.**    If we're talking about an ad for a Catholic open

22   house for a high school, that's fine.

23   **Q.**    Right.  Because you can approve that?  That on its

24   face, you can approve that on your own, right?

25   **A.**    Yes, sir.  In fact, you know, when I look for

1    various other leads in my business, if there's

2    something I'm not sure about, even if it's a brand new

3    advertiser, I'll seek permission to talk to those

4    people if I have to.

5    **Q.**   So if it wasn't something that you could just

6    automatically approve, you would go to someone else,

7    right?

8    **A.**   If I'm not a thousand percent sure of the ad

9    content, that's what I do.

10   **Q.**   What I mean by a protocol, it may not be a written

11   protocol, but it's something that you would, your

12   policy --

13   **A.**   My personal policy, that's correct.  And even if

14   an ad does make it into the newspaper, as I said

15   before, it's proofread page to page, comma to comma,

16   you know, they cross the T's, dot the I's.  And even

17   though the ad might have been in there at one point, it

18   could always be removed if the supervisors remove it.

19          MR. LEPIZZERA:  Can we bring up, please,

20   Ms. Anderson, Exhibit 1014, page two, please.

21   **Q.**   So when this proposed ad came in, Mr. Powers,

22   right, you didn't automatically approve it, did you?

23   In other words, you didn't automatically say to

24   yourself, I'm going to allow this to be published in

25   the Providence Visitor, right?

1    **A.**    That's correct.

2    **Q.**    And you followed your normal practice and

3    procedure in terms of approving or disapproving or

4    going through a routine of whether or not you're going

5    to allow --

6    **A.**    I'm trying to err on the side of caution.

7    **Q.**    In fact, you did err on the side of caution with

8    respect to this proposed ad, right?

9    **A.**    I believe I did.

10   **Q.**    The executive director was Marsha who?

11   **A.**    Marsha Grant O'Brien, I believe her name was.

12   **Q.**    And I think you testified that she wasn't

13   available at the time?

14   **A.**    You know, I can't remember that.  If I went to

15   Michael Guilfoyle, then she was not available.

16   **Q.**    That's fine.  We accept -- we understand it's a

17   long time ago.

18          So you know you went to Michael Guilfoyle,

19   right?

20   **A.**    Correct.

21   **Q.**    By the way, I don't think you told the jury, who

22   is Michael Guilfoyle?

23   **A.**    He is the director of communications for this

24   Diocese.

25   **Q.**    For the Diocese of Providence, right?

1     **A.** Yes. Last time I checked. The last I know, I

2     believe that's the case.

3     **Q.** Okay. And back in late 2007, was that also his

4     position back then?

5     **A.** You know, I cannot remember the exact date he came

6     on board.

7     **Q.** But your practice and procedure was if the

8     executive director wasn't around, that you would go to

9     Michael Guilfoyle, right?

10    **A.** That's not necessarily true. In Marsha's absence,

11    I think Michael Guilfoyle and Father -- I think Father

12    Healey would have, too. Again, Father Healey, as far

13    as I understood it, had the final say on the final

14    product. So if Marsha wasn't around, I mean, Michael

15    would come over and proof everything with Father

16    Healey.

17    **Q.** Could you just take a look at that. By the way, I

18    just want the record to be clear, that's your fax that

19    you sent to Father Healey, correct?

20    **A.** That's correct.

21    **Q.** In fact, on October 5th, 2007, right?

22    **A.** Correct.

23    **Q.** This was your fax and it was attached, and page

24    two is attaching the proposed ad?

25    **A.** That's correct.

1    **Q.**   By reading this, does this refresh your memory

2    that you went to Michael Guilfoyle first, right?

3    Correct?

4    **A.**   Correct.

5    **Q.**   And Mr. Guilfoyle told you to check with Father

6    Healey?

7    **A.**   That's what it says.

8    **Q.**   And that's consistent with your practice and

9    procedure back then, right?

10   **A.**   Yes, sir.

11   **Q.**   You followed your practice and procedure with

12   respect to this ad, right?

13   **A.**   I believe -- I hope I did.

14   **Q.**   And you forwarded the proposed ad to Father

15   Healey, right?

16   **A.**   Correct.

17   **Q.**   And look up in the right-hand corner.  Does it say

18   "Okay per Father Healey by phone, 10/5/07, 3:20 p.m?

19   **A.**   That's correct.

20   **Q.**   Is that your note that you put on this fax?

21   **A.**   Yes, sir.

22   **Q.**   So am I to take from that, that after you

23   forwarded this fax to Father Healey, at some point

24   thereafter you had a phone conversation with Father

25   Healey, right?

1    **A.**    Correct.

2    **Q.**    And Father Healey explained that he received your

3    fax and he looked at the proposed ad, right?

4    **A.**    Correct.

5    **Q.**    And he gave you the okay and the Providence

6    Visitor the okay to publish this proposed ad in the

7    Providence Visitor, right?

8    **A.**    That's what I get from this, yes.

9    **Q.**    All consistent with your practice and procedure

10   back in late 2007, correct?

11   **A.**    Yes.

12        MR. LEPIZZERA:  Thank you.

13        THE COURT:  Any redirect?

14        MR. McADAMS:  Briefly, your Honor.

15        **REDIRECT EXAMINATION BY MR. McADAMS**

16   **Q.**    Just to go back to Exhibit 1014, the first page.

17   Mr. Lepizzera just asked you some questions about this

18   fax that you had sent to Father Healey.  It indicates

19   here that you had spoken to Mr. Caramadre and he wants

20   to run this ad for two weeks; is that correct?

21   **A.**    Again, I can't remember if it was Mr. Caramadre or

22   the female I mentioned earlier calling on his behalf.

23   It might have been from him; it might not have.  I

24   don't think it was from him.

25   **Q.**    It was your understanding that the intention was

1    to run the ad for two weeks?

2    **A.**    That's correct.

3    **Q.**    How much money would that cost?

4    **A.**    That ad was $280 per insertion so you're looking

5    at $560 for the two weeks.

6    **Q.**    So $560?

7    **A.**    For those two weeks, that's correct.

8    **Q.**    How long did the ad actually run?

9    **A.**    The ad actually ran 23 weeks.

10   **Q.**    When you spoke to Father Healey, you had told him

11   that you expected it to be two weeks?

12   **A.**    That's correct.

13   **Q.**    So his approval was based on an expectation of a

14   two-week ad from a philanthropist?

15   **A.**    That is correct.  But again, usually if the ad is

16   approved, it's approved.  And if it runs twice or 22 or

17   222 times, I'm assuming that it's okay.

18   **Q.**    You don't go back and check every --

19   **A.**    No, sir.  If the content had changed, I would have

20   made a second request.  The content did not change so I

21   assumed it was okay to continue to run.

22   **Q.**    How long did you stay at the Providence Catholic

23   in 2007?

24   **A.**    I'm not sure I understand the question.

25   **Q.**    Did you continue to work at the Providence

1    Catholic the entire year?

2    **A.**   Yes.  I left in March of '08.

3         MR. McADAMS:  In March of '08.  Okay.

4         Can we pull up Exhibit 486, please.

5    **Q.**   Do you see this ad in the lower right corner?

6    **A.**   Yes, sir.

7    **Q.**   Okay.  Do you notice that there's some changes in

8    that particular version of the ad?

9    **A.**   Offhand, I don't.

10   **Q.**   It now indicates local member of the Providence

11   Diocese and church benefactor.  Do you recall that

12   that's a change as opposed to --

13   **A.**   But again, sir, I'm gone by then.

14        MR. McADAMS:  Can we go up to the upper corner

15   of this exhibit.

16   **Q.**   So this version of the ad ran in June of '08,

17   that's after you left?

18   **A.**   Yes, sir.

19   **Q.**   Do you have any idea what types of approvals were

20   made for this change?

21   **A.**   No, sir, I do not.

22        MR. McADAMS:  No additional questions.

23        THE COURT:  Thank you.

24        Recross Mr. Lepizzera.

25        MR. LEPIZZERA:  No, your Honor.

1          THE COURT:  Mr. Powers, your testimony is

2     complete.  You may step down.  Thank you.

3          Next witness.

4          MR. VILKER:  United States calls Ellen Healy.

5          THE COURT:  While we're waiting for that

6     witness, Counsel, I'm just going to assume that when

7     you offer an exhibit and when you state no objection,

8     it if it's a multi-page exhibit that you are familiar

9     with all pages of the exhibit and you're not objecting

10    to anything in the exhibit.

11         MR. LEPIZZERA:  I am, your Honor.  I'm very

12    familiar with the documents.

13         THE COURT:  I know you are, and I just want to

14    be clear that that's what's going on.

15         MR. LEPIZZERA:  Thank you, your Honor.

16         **ELLEN HEALY**, first having been duly sworn,

17    testified as follows:

18         THE CLERK:  Please state your name and spell

19    your last name for the record.

20         THE WITNESS:  Ellen Healy, H-E-A-L-Y.

21         THE COURT:  Good morning, Ms. Healy.

22         THE WITNESS:  Good morning.

23         THE COURT:  You may inquire, Mr. Vilker.

24         **DIRECT EXAMINATION BY MR. VILKER**

25    **Q**.   Good morning, Ms. Healy.

1    **A.**    Good morning.

2    **Q.**    Ms. Healy, where do you currently work?

3    **A.**    Women and Infants Hospital.

4    **Q.**    What's your position there?

5    **A.**    I'm a social worker in the inpatient and oncology

6    unit.

7    **Q.**    So you're a social worker?

8    **A.**    Yes.

9    **Q.**    How long have you been a social worker?

10   **A.**    How long have I been a social worker?  Since 1978.

11   **Q.**    How long have you been at Women and Infants?

12   **A.**    Twelve years.

13   **Q.**    You say you're on the inpatient oncology unit?

14   **A.**    Yes.

15   **Q.**    What is the inpatient oncology unit?

16   **A.**    It is an inpatient hospital unit that is dedicated

17   to the care of women with cancer.

18   **Q.**    So what do you do as a social worker to help these

19   patients that are suffering from cancer?

20   **A.**    Essentially, what I do is see the patient, do a

21   mental health assessment on her; and I work with the

22   families during the course of the illness, which is

23   usually at point of diagnosis, when there's a

24   complication, or nearing end of life.

25   **Q.**    Now, I want to turn your attention to the

1      beginning of 2008.  Did there come a point in time

2      around that time period in which you learned that there

3      was some program that might be available to give funds

4      to people who were suffering from a terminal illness?

5      **A.**    Yes.

6      **Q.**    How did you learn that?

7      **A.**    One of the physical therapists at the hospital had

8      shown me an ad that ran in the Providence Journal

9      helping people who are terminally ill.

10     **Q.**    When you say the Providence Journal --

11     **A.**    I'm sorry.  The Providence Visitor.  Excuse me.

12     **Q.**    What was your understanding of what the Providence

13     Visitor was?

14     **A.**    Catholic newspaper that was put out by the

15     Diocese.

16     **Q.**    Did you actually see a copy of the ad?

17     **A.**    Yes, I did.

18          MR. VILKER:  I'd like to bring up Exhibit 46,

19     please.  I believe it's already full.

20     **Q.**    I know the date is from June of 2008, but if you

21     look at the bottom right corner, does that appear to be

22     similar to the ad that you saw?

23     **A.**    Yes.

24     **Q.**    So when you saw this ad that first time, what was

25     your reaction?

1    **A.**   Well, I work with a lot of terminally ill people

2    who have been devastated by their cancer financially

3    and every other way, and I thought $2,000 for them

4    would be very helpful.

5    **Q.**   Did you have any concerns about this program when

6    you saw this ad?

7    **A.**   Well, you know, you have to wonder why people are

8    giving money away; but in all honesty, it was running

9    in the Visitor, and I was raised a Catholic so it

10   really didn't raise a whole lot of red flags.

11   **Q.**   Did you call the phone number on the advertisement

12   to get further information?

13   **A.**   Yes, I did.

14   **Q.**   And do you recall who you spoke with?

15   **A.**   I believe after the receptionist, I believe I

16   spoke with Raymour.

17   **Q.**   And you knew him as Raymour?

18   **A.**   Yes.

19   **Q.**   So I'll refer to him as Raymour since that's how

20   you knew him.

21   **A.**   I'm not good with having to remember last names.

22   I'm sorry.

23   **Q.**   Okay.  Sure.  So did you -- what do you remember

24   yourself asking Raymour during that phone conversation

25   when you called the number?

1    **A.**    I think I asked what was the program about, why

2    was it -- why was it being done and offered to people.

3    And I think I asked if there was a catch.

4    **Q.**    So when you asked if there was a catch, how did he

5    respond?

6    **A.**    He emphatically said, no, there was no catch, and

7    that it was simply a philan -- you know what I mean.

8    I'm not too nervous.

9    **Q.**    You don't have to be nervous.

10   **A.**    It was a program to help people, simply to help

11   people, which, you know, I thought was a very good

12   thing.

13   **Q.**    Okay.  And did he say anything in that

14   conversation that would in any way suggest that

15   patients would be asked to provide their

16   identification, like Social Security numbers and dates

17   of birth or anything like that?

18   **A.**    No.

19   **Q.**    Did he say anything in that conversation that

20   suggested that patients may be asked to have accounts

21   or annuities opened up in their names?

22   **A.**    No.

23   **Q.**    Did he say anything about who's the person funding

24   this program?

25   **A.**    He told me it was a gentleman, Mr. Caramadre, who

1     had been financially successful and wished to give back

2     to people who were terminally ill.

3     **Q.**   Had you heard of Mr. Caramadre beforehand?

4     **A.**   No.

5     **Q.**   Now, was there -- how did this conversation end,

6     this phone conversation?

7     **A.**   I'm not sure if I actually gave him a referral

8     that day or if it was at a later date.

9     **Q.**   Was there a time that you met with Raymour in

10    person?

11    **A.**   Yes.

12    **Q.**   Okay.  And how did that come about?

13    **A.**   I had a woman in need, and I called, and I

14    arranged to meet him I believe outside of her room.

15    And he came.  We sat and talked for a little bit, and I

16    brought her in, introduced him, and he explained to her

17    the program.

18    **Q.**   Let me just take it one step at a time there.  Is

19    there a particular floor at Women and Infants where the

20    oncology unit is?

21    **A.**   The fourth floor in the main building.

22    **Q.**   How would Raymour have been able to get to the

23    fourth floor to meet with you in the first place?

24    **A.**   He would have to stop at security, and then he

25    would come up to meet me.

1    **Q.**   So you would be told that someone was coming up to

2    meet with you?

3    **A.**   I believe at the time we had a different system.

4    And once you change, it's hard to remember exactly what

5    the old system was, but I believe people checked in and

6    then just came up.

7    **Q.**   So you remember him coming up to the fourth floor.

8    And that was the first time you met him?

9    **A.**   Yes.

10   **Q.**   So did you then have an additional in-person

11   conversation with him before you took him to meet your

12   patient?

13   **A.**   The first time, yes.  I think it was hi, how are

14   you, and I explained that this woman was in need.

15   **Q.**   Did you go somewhere in the hospital and sit down

16   and talk with him?

17   **A.**   Yeah.  There's a little lounge right at the end of

18   the hallway, and we sat there for a minute.

19   **Q.**   You did this before you took him to meet the

20   patient?

21   **A.**   Yes.

22   **Q.**   Why during this first time did you want to have

23   another discussion with him?

24   **A.**   Well, I felt like I was introducing him to one of

25   my patients, and I felt that I should just kind of know

1    him a little bit.

2    **Q.**   What do you remember you asking and him saying

3    during this conversation?

4    **A.**   I think we just talked a little bit about the

5    program, why Mr. Caramadre was interested in doing it;

6    and I believe I did ask him again if there was a catch,

7    and he reassured me that, no, it was simply

8    Mr. Caramadre wanting to do a kind act for people.

9    **Q.**   Did he say anything during this conversation that

10   would indicate that he may be asking the patients in

11   the oncology unit to open up some kind of account or

12   annuity in their name?

13   **A.**   No.

14   **Q.**   If he had told you that, what would your reaction

15   have been?

16   **A.**   I think I would have asked him to leave because

17   that's not what we had agreed on.

18   **Q.**   That same day, you took Raymour into the room of

19   one your patients?

20   **A.**   Yes.

21   **Q.**   And what do you remember happening when he went

22   into the room?

23   **A.**   It was very simple.  I introduced him to the

24   patient.  He had a paper that simply asked -- I think

25   it was just name and address and did a physician say

1    she had, I believe, less than four months to live.  And

2    the patient said yes, and he wrote a check for $2,000

3    and handed it to her.  And he wished her well, wished

4    her peace and left.

5    **Q.**    Did he say anything in that meeting with this

6    particular patient about any kind of investment

7    opportunity or an account being opened in her name or

8    anything like that?

9    **A.**    No.

10   **Q.**    Now, were there other patients that as time went

11   on you called Raymour about?

12   **A.**    Yes.

13   **Q.**    Approximately how many of them would you estimate?

14   **A.**    I believe four or five.

15   **Q.**    What would generally be your practice -- what kind

16   of patients would you be looking for to refer to

17   Raymour?

18   **A.**    People who were really in dire straits.  People

19   who had really been very badly financially hit by their

20   illness.

21   **Q.**    And they were also, obviously, very, very sick at

22   the time?

23   **A.**    Very ill, yes.

24   **Q.**    Okay.  So what would happen -- if you'd come

25   across another patient who was in this terrible

1    situation, you would just call Raymour again?

2    **A.**    Yeah.

3    **Q.**    Did you have his direct number or did you just

4    call the office number?

5    **A.**    I'd just call the office and was put through to

6    his voicemail.

7    **Q.**    And what would you generally tell Raymour during

8    these phone conversations?

9    **A.**    That unfortunately I had somebody else that could

10   benefit from this money.

11   **Q.**    And then would there be a meeting set up?

12   **A.**    At that point, you know, I would meet him at the

13   room and go in and introduce him to the patient or the

14   patient to him.  And that's what we did.

15   **Q.**    Was it your understanding that you would be there

16   each time that Raymour met with a patient?

17   **A.**    As far as I recall, I believe that's how we did

18   it, yeah.

19   **Q.**    What do you mean by that?

20   **A.**    I don't recall ever saying, Oh, go on up on your

21   own.  I wouldn't do that.

22   **Q.**    You would want to be there every time one of your

23   patients --

24   **A.**    Yeah.  I'm a little protective.

25   **Q.**    Were you ever made aware prior to your discussions

1    with the Government of Raymour meeting with any of your

2    patients without you being there?

3    **A.**    No.

4    **Q.**    Now, was one of your patients back in 2008 a woman

5    named Sonia Gonzalez?

6    **A.**    Yes.

7    **Q.**    And what was her situation like at that time?

8    **A.**    She was very near end of life.  Unfortunately, she

9    and her family had been devastated by her illness, and

10   I know she had young children and she was very, very

11   close to the end of her life.

12   **Q.**    And do you remember her husband being there with

13   her?

14   **A.**    Yes.

15   **Q.**    Now, did there come a point in time in which you

16   called Raymour about Sonia Gonzalez?

17   **A.**    Yes.

18   **Q.**    What would you have told him?

19   **A.**    That unfortunately I had someone who would really

20   be able to use those funds.

21   **Q.**    Because she was very sick and they were

22   struggling?

23   **A.**    Yes.  Struggling financially and, you know, her

24   family was struggling as well.

25   **Q.**    Did you set up a time where Raymour would come and

1    go with you to meet with Sonia Gonzalez and her family?

2    **A.**   Yes.

3          MR. VILKER:  I'd like to bring up Exhibit 96,

4    please, and ask that that be moved full.

5          MR. LEPIZZERA:  No objection.

6          MR. RADHAKRISHNAN:  No objection, your Honor.

7          THE COURT:  96 will be full.

8          (Government Exhibit 96 admitted in full.)

9    **Q.**   Exhibit 96, Ms. Healy, are notes that were

10   provided by Estate Planning Resources.  And the top

11   part of it appears to be an index card that says Women

12   and Infants, Sonia Gonzalez, Room 410, and then it has

13   your name, Ellen Healy, and then a phone number.

14   What's that phone number, the 274 number?

15   **A.**   The 274-1122 number is the hospital number and the

16   1616 is my extension.

17   **Q.**   What about the number above that where there's an

18   extension 2460?

19   **A.**   I have no idea.

20   **Q.**   Those are numbers that would go to Women and

21   Infants?

22   **A.**   Yeah.  I don't know about the 2460, but, yeah.

23   **Q.**   It then says Sonia Gonzalez, Room 410, noon.  Was

24   410 a room that --

25   **A.**   It's actually 4110, but yeah.

1    **Q.**    It should be 4110?

2    **A.**    Yes.

3    **Q.**    And did you tell -- when you spoke to Raymour on

4    the phone, did you tell him what room Sonia Gonzalez

5    was in?

6    **A.**    I may have.  I honestly don't remember, but I know

7    that I met him outside the room.

8    **Q.**    And it sounds right that was about 12 o'clock that

9    you met him?

10   **A.**    I don't remember.  It could have been.

11   **Q.**    Okay.  So he would have come up after going

12   through security and met with you on the fourth floor?

13   **A.**    Yes.

14   **Q.**    And then you went with him in to meet with Sonia

15   Gonzalez?

16   **A.**    Yes.

17   **Q.**    Now, the bottom part of this document has some

18   information about Sonia.  It has her name, her address,

19   her date of birth, her mother's maiden name and her

20   Social Security number.

21        Do you recall Raymour asking any questions when

22   he went in and talked to Sonia about her identity

23   information?

24   **A.**    No.  He asked her name and her address, I believe.

25   **Q.**    So that's my next question.  You're walking with

1    Raymour to this meeting with Sonia, and who else was in

2    the room?

3    **A.**    There were a lot of people in the room.  I believe

4    her husband was there.  I think one or some of her

5    children, and some other people that I'm not exactly

6    sure who all was there.

7    **Q.**    So what do you remember Raymour saying when he

8    walked into this hospital room and -- first of all,

9    I've already asked that question.  If you can remember,

10   what was Sonia's condition like that day?

11   **A.**    As I recall, she was having some difficulty

12   breathing and she had like a face mask on for oxygen

13   and was a little bit restless.

14   **Q.**    And what do you remember Raymour saying when he

15   came into the room that day?

16   **A.**    I introduced them and I believe he, you know, from

17   what I remember, the usual.  Hi, Sonia.  You know, I am

18   part of this program, and we'd like to help you.  I

19   just need to know your name and address -- I think date

20   of birth, and did a doctor tell you you have less than

21   four months to live.

22   **Q.**    Did she respond that she had that diagnosis?

23   **A.**    Yes.

24   **Q.**    In fact, she ended up passing away very soon

25   afterwards?

1    **A.**    Very soon after.

2    **Q.**    And did Raymour say anything in that meeting about

3    any kind of account being opened in her name?

4    **A.**    Not that I remember, no.

5    **Q.**    Would that have been something that would have

6    stuck in your memory?

7    **A.**    Yes.

8    **Q.**    You thought all along this is just a generous

9    person giving money to people who were very sick?

10   **A.**    Yes.

11   **Q.**    Now, did Raymour have a piece of paper that he

12   wanted Sonia to sign?

13   **A.**    Yes.

14        MR. VILKER:  I'd like to bring up Exhibit 98 and

15   ask that be moved full.

16        MR. LEPIZZERA:  No objection.

17        MR. RADHAKRISHNAN:  No objection, your Honor.

18        THE COURT:  98 will be full.

19        (Government Exhibit 98 admitted in full.)

20   **Q.**    This is a terminal illness philanthropy receipt

21   and it indicates that Sonia Gonzalez received $2,000.

22   And it indicates the date is April 3rd, 2008.  Is that

23   your recollection of about when this would have taken

24   place?

25   **A.**    As well as I can remember, yeah.  I mean, I can

1    tell you the year and probably the month.

2    **Q.**    Okay.  But around that time is when it took place?

3    **A.**    Yes.

4    **Q.**    And do you remember Raymour presenting this

5    document to Sonia to sign?

6    **A.**    Vaguely, yes.

7    **Q.**    Had you seen this type of document before with

8    your other patients?

9    **A.**    Yes.

10    **Q.**    What was your understanding of what this document

11    was for?

12    **A.**    It was simply for them to know who they were

13    giving the money to and that they were told that they

14    were terminally ill.

15    **Q.**    Okay.  Did you ever -- were you ever there when

16    Raymour presented any other documents for either Sonia

17    or any of your patients to sign?

18    **A.**    No.

19    **Q.**    So your understanding is that this receipt was the

20    only document that was being asked of your patients to

21    sign?

22    **A.**    Yes.

23    **Q.**    Now, you said this happened about four or five

24    times?

25    **A.**    Yes.

1  Q.  And was it basically the same pattern in each

2  time?

3  A.  Yes.

4  Q.  Did Raymour ever explain to any of the people that

5  you were bringing him to meet that there could be some

6  kind of account or annuity that would be opened in

7  their names?

8  A.  No.

9  Q.  Did he ever explain that someone else, whether it

10  be Mr. Caramadre or another individual, could

11  financially benefit from their deaths?

12  A.  No.

13  Q.  Now, specifically, with regard to Sonia Gonzalez,

14  you were there for that meeting.  Did you have any idea

15  one way or the other whether Raymour ever came back and

16  met with Sonia without you being present?

17  A.  I have no knowledge of that, no.

18  Q.  Would you have wanted to be present at the second

19  meeting?

20  A.  Yes.

21  Q.  Did Raymour ever call you and say, I want to meet

22  again with Sonia --

23  A.  No.

24  Q.  Let me just finish.  I want to meet again with

25  Sonia, can you be there for this meeting?

1    **A.**   No, he never did.

2    **Q.**   Did Raymour ever say anything about he was going

3    to ask Sonia or her family members to open up some kind

4    of account in her name?

5    **A.**   No.

6    **Q.**   Now, after referring these four or five patients

7    that you referred to Raymour and meeting with him when

8    he was there with your patients, was there a time,

9    after some time passed, that you called back into the

10   office and spoke with Raymour?

11   **A.**   Yes.

12   **Q.**   And why did you do this?

13   **A.**   I had somebody else that I wanted to refer.

14   **Q.**   This was some time after Sonia?

15   **A.**   Yeah.

16   **Q.**   Okay.  And did you speak with Raymour that time?

17   **A.**   Yes.  Yes, I did.

18   **Q.**   And what did he tell you about whether this

19   program was still in existence?

20   **A.**   He told me that it was put on hold, and that some

21   people were lying about their health to get the money.

22   And at one point, he told me that there were rumors

23   that Mr. Caramadre was dead so they were revamping the

24   program.

25   **Q.**   But did he tell you that these rumors were

1    inaccurate, that he wasn't actually dead?

2    **A.**    Yeah.  He told me that Mr. Caramadre was alive.

3    **Q.**    He told you that the program had been stopped

4    because some people were getting money who really

5    weren't terminally ill?

6    **A.**    Yes.

7    **Q.**    And that there were rumors out there that the

8    program had been stopped because Mr. Caramadre himself

9    had passed away?

10   **A.**    Yes.

11        MR. VILKER:  No further questions.

12        THE COURT:  Thank you, Mr. Vilker.

13        Mr. Radhakrishnan?

14        MR. RADHAKRISHNAN:  Yes, one moment, please,

15   your Honor.

16        <u>**CROSS-EXAMINATION BY MR. RADHAKRISHNAN**</u>

17   **Q.**   Good morning, Ms. Healy.  Nice to see you again.

18   Thank you for coming in this morning.

19        Very quickly, I just want to go over a couple of

20   quick facts with you, please.  You had mentioned that

21   there were a number of different people that you would

22   call me up about; is that correct?

23   **A.**    Yes.

24   **Q.**    Okay.  And one of those people was a Ms. Ora

25   Spicer; is that correct?

1   **A.**   Yes.

2   **Q.**   And you had asked me about -- you had testified

3   that you had specifically asked me if there was any

4   catch to that $2,000 check; is that correct?

5   **A.**   I believe so, yes.

6   **Q.**   And that was because you were a little bit

7   skeptical of somebody giving away $2,000; is that

8   correct?

9   **A.**   Yes.

10  **Q.**   Yes.  Okay.  And to your knowledge, was there any

11  catch for that $2,000 when somebody signed?

12  **A.**   No.

13  **Q.**   No.  Okay.  Now, let me ask you this.  You had

14  testified that when Ms. Gonzalez and I had first

15  initially met, there were other people in the room; is

16  that correct?

17  **A.**   Yes.

18  **Q.**   Okay.  And who was in the room, to the best of

19  your knowledge, if you could repeat that again, please?

20  **A.**   I think her husband.  Maybe one of her sisters.

21  I'm not really sure.  And I believe either one or some

22  of her children, but there were several people there.

23  **Q.**   Okay.  And did those people -- did they have to

24  get permission to go into that room from either the

25  hospital or the nursing staff?  Would they need to get

1    permission to be there in that room with her?

2    **A.**    They had to pass through security.

3    **Q.**    And you had mentioned that there may or may not

4    have been a change in security since back in 2008?

5    **A.**    There had been.

6    **Q.**    But at that time, they didn't need any specific

7    permission to be in a room; is that correct?  Meaning

8    Ms. Gonzalez didn't have to get permission from

9    security to have any person in that room, a guest for

10   that matter?

11   **A.**    Right.  But they did have to go through security.

12   **Q.**    Right.  Understood.

13            MR. RADHAKRISHNAN:  Okay.  Give me one quick

14   second here.

15            I think that's all.  Thank you very much.  I

16   appreciate it.

17            THE COURT:  Thank you, Mr. Radhakrishnan.

18            Mr. Lepizzera?

19            <u>**CROSS-EXAMINATION BY MR. LEPIZZERA**</u>

20   **Q.**    Good morning, Mrs. Healy -- is it Mrs. Healy?

21   **A.**    Ms.

22   **Q.**    Ms. Healy.  I just have a couple of questions for

23   you.  I represent Mr. Caramadre.  Okay?

24            Ms. Healy, you never met Mr. Caramadre, correct?

25   **A.**    Correct.

1   **Q.**   And you never spoke to Mr. Caramadre on the phone,

2   did you?

3   **A.**   Never.

4   **Q.**   All of your communications were with

5   Mr. Radhakrishnan, let me say Raymour, right?

6   **A.**   Yes.

7   **Q.**   I'm kind of bad with last names, too.

8          Now, Mr. Radhakrishnan -- you were a little

9   skeptical, and you wanted to know who was actually

10  giving the money away, correct?

11  **A.**   Yes.

12  **Q.**   And you, in fact, asked Mr. Radhakrishnan --

13  sorry, Raymour, you asked Raymour who is giving this

14  money away, right?

15  **A.**   Yes.

16  **Q.**   And Raymour freely told you it was Mr. Caramadre,

17  correct?

18  **A.**   Yes.

19  **Q.**   He identified him as a philanthropist, correct?

20  **A.**   Yes.

21  **Q.**   He identified him by name, correct?

22  **A.**   He did.

23  **Q.**   And did he mention he was a lawyer, by the way?

24  **A.**   I don't recall specifically.  I think he may have.

25  **Q.**   The point is he identified the person who was

1    giving the money away, right?

2    **A.**    Yes.

3    **Q.**    And you testified that besides Sonia Gonzalez,

4    there might have been four or five other was it women

5    or patients?

6    **A.**    All women.

7    **Q.**    They were all women.  Okay.  You referred four or

8    five other women to Raymour, correct?

9    **A.**    Yes.

10   **Q.**    And you didn't just refer anyone, correct?

11   **A.**    Correct.

12   **Q.**    In other words, you referred people that were

13   really in need, right?

14   **A.**    Yes.

15   **Q.**    At the end of their life?

16   **A.**    Yes.

17   **Q.**    And you understood that the program was that

18   Mr. Caramadre was giving money away to patients that

19   had three to six months to live?

20   **A.**    Yes.

21   **Q.**    Those were the type of patients that you thought

22   of and called Raymour to see if you could get money for

23   them, right?

24   **A.**    Yes.

25   **Q.**    Because they were at the end of their life, right?

1    **A.**    Yes.

2    **Q.**    Their family was in need of the money?

3    **A.**    Yes.

4    **Q.**    And you thought it was important for them to get

5    the money, correct?

6    **A.**    Yes.

7    **Q.**    And when you identified those people, you would

8    call Raymour, right?

9    **A.**    Yes.

10    **Q.**    And you would let him know I have an individual I

11    think would qualify for your program, right?

12    **A.**    Yes.

13    **Q.**    Besides the last time, the last patient you

14    identified for Mr. Vilker that when the program was

15    closed down, put that one aside, but the five or six

16    people that when you had called Raymour and said these

17    people are in need, Raymour came to the hospital,

18    didn't he?

19    **A.**    Yes, he did.

20    **Q.**    And Raymour came with $2,000 for those

21    individuals, didn't he?

22    **A.**    Yes, he did.

23    **Q.**    In fact, I think you testified that when Raymour

24    met with Ms. Gonzalez that he actually wrote out the

25    check, didn't he?

1    **A.**    Yes.  To my memory.  I -- yes.

2    **Q.**    It's over four-and-a-half years ago, right?

3    **A.**    Yes.

4    **Q.**    But to your memory, the best of your memory, that

5    Raymour actually took a pen and he wrote out the

6    check --

7    **A.**    Yes.

8    **Q.**    -- for $2,000, right?

9    **A.**    Yes.

10   **Q.**    She was in bad condition, wasn't she,

11   Mrs. Gonzalez?

12   **A.**    Yes.

13   **Q.**    She had a mask on at the time?

14   **A.**    Yes.

15        MR. LEPIZZERA:  Ms. Anderson, could we bring up

16   Exhibit 98, please.

17   **Q.**    Do you see that on the screen, Ms. Healy?

18   **A.**    Yes, I do.

19   **Q.**    This was the type of form that Raymour would bring

20   in to the patient you referred over to Mr. Caramadre,

21   correct?

22   **A.**    Yes.

23   **Q.**    And you were very protective of your patients,

24   right?

25   **A.**    Yes.

1  **Q.**   You actually -- I don't know if you testified to

2  this, but did you read this form before it was

3  presented to the patient?

4  **A.**   Yes.

5  **Q.**   Because you're protective of your patients, right?

6  **A.**   Yes.

7  **Q.**   And this is the very form that he would present to

8  all the patients, right?

9  **A.**   Yes.

10  **Q.**   See in the right-hand corner where it says

11  "recipient"?  Actually, let me back up.

12  **A.**   Down at the bottom?

13  **Q.**   I'm sorry.  Let me back up.  Let's go up to the

14  top.  Do you see where it says Sonia L. Gonzalez?

15  **A.**   Yes.

16  **Q.**   That's the Mrs. Gonzalez you had referred over to

17  Raymour and Mr. Caramadre, correct?

18  **A.**   Yes.

19  **Q.**   And down in the right-hand corner where it says

20  "recipient," there's a signature there, correct?

21  **A.**   Yes.

22  **Q.**   Did Mrs. Gonzalez actually sign that document?

23  **A.**   To the best of my recollection, she did, but I

24  cannot say with all certainty that she did because

25  there were a lot of people in the room that day and I

1    know I was very, very busy that day.  And I think

2    because there was so many people I cannot say with a

3    hundred -- I can't say with a hundred percent certainty

4    she did.  I believe she did.

5    **Q.**    You believe she did?

6    **A.**    But she may not -- you know.

7    **Q.**    Did Raymour -- strike that.  Raymour had a

8    conversation with Mrs. Gonzalez, right?

9    **A.**    It was very brief, yes.

10   **Q.**    Very brief.  I think you testified he went over to

11   her, said I have a check for you for $2,000, right?

12   **A.**    Yes.

13   **Q.**    He wrote the check out?

14   **A.**    Yes.

15   **Q.**    And he gives her the check, right?

16   **A.**    Yes.

17   **Q.**    And I know you're not a hundred percent sure, but

18   his practice or what you observed was that he would

19   actually present this philanthropic account receipt

20   form to the individual for signature, right?

21   **A.**    Yes.

22   **Q.**    Mr. Vilker went over this particular document with

23   you.  He went over the top part that talked about --

24   that addresses -- do you see where it says Ellen Healy?

25   **A.**    I do.

1    **Q.**    And that's you, right?

2    **A.**    It is.

3    **Q.**    And the hospital phone number?

4    **A.**    Yes.

5    **Q.**    And there's an extension there, right?

6    **A.**    Yes.

7    **Q.**    Do you see where it says "Sonia Libertad

8    Gonzalez," right?

9    **A.**    Yes.

10   **Q.**    And then it has an address, right?

11   **A.**    Yes.

12   **Q.**    And then it has underneath that, date of birth?

13   **A.**    Yes.

14   **Q.**    And then mother's maiden name?

15   **A.**    Yes.

16   **Q.**    Says De La Cruz, right?

17   **A.**    It does.

18   **Q.**    And then it has a Social Security number that the

19   first couple of digits are redacted, right?

20   **A.**    Yes.

21   **Q.**    Your memory is that when Raymour had that

22   conversation with Mrs. Gonzalez, he didn't ask her --

23   he might have asked her home address?

24   **A.**    I believe he asked her the home address, but that

25   was it.  And maybe the date of birth?

1    MR. LEPIZZERA: Can we put Exhibit 98 next to

2    this, please.

3    **Q.**    If you could take a look at the Exhibit 98. Do

4    you see where it says at the top Sonia L. Gonzalez?

5    **A.**    Yes.

6    **Q.**    It actually has the address there, right?

7    **A.**    Yes.

8    **Q.**    So does that refresh your recollection that

9    possibly Raymour had asked for her home address and she

10   gave it to him?

11   **A.**    Yes.

12   **Q.**    Because this particular form was actually

13   presented to Mrs. Gonzalez on or about April 3rd, 2008,

14   when Raymour presented the $2,000 check, correct?

15   **A.**    Yes.

16   **Q.**    And you said he may have asked for her date of

17   birth, right?

18   **A.**    He may have, but I don't remember him asking for

19   dates of birth.

20   **Q.**    That may not have happened, right?

21   **A.**    Right.

22   **Q.**    And when you say you don't remember him asking for

23   dates of birth, it's not only whether he asked

24   Mrs. Gonzalez for a date of birth, but whether he asked

25   the other four or five other patients that you had

1    referred to the program, right?

2    A.    Correct.

3    Q.    So your memory is he really didn't ask for a date

4    of birth, right?

5    A.    Yes.

6    Q.    And if you look at Exhibit 98, which is this

7    terminal illness philanthropy account receipt, I got a

8    problem saying that word, too, there's no date of birth

9    on here, right?

10    A.    Correct.

11    Q.    Now, let's go back to the exhibit to the left

12    which were the notes, okay?  See where it says mother's

13    maiden name, De La Cruz?

14    A.    Yes.

15    Q.    You don't remember Raymour asking Mrs. Gonzalez

16    for her mother's maiden name, do you, that day?

17    A.    No, I don't.

18    Q.    And in fact, you don't recall Raymour ever asking

19    that question of the other five or six patients you

20    referred, correct?

21    A.    Correct.

22    Q.    And in fact -- strike that.

23         How about Social Security number?  Do you recall

24    if Raymour would ask for the Social Security number of

25    Mrs. Gonzalez?

1    **A.**   No.

2    **Q.**   Did he ask her?

3    **A.**   No, he did not.

4    **Q.**   He did not, did he?  And he didn't ask the other

5    five or six patients that you referred to the program,

6    correct?

7    **A.**   No, he did not.

8    **Q.**   All you remember is Raymour came into the room,

9    went over to Mrs. Gonzalez, right?  You were present

10   with him?

11   **A.**   Yes.

12   **Q.**   You're protective of your patients.  You went over

13   to the bed with him.  And he said, I have a $2,000

14   check for you, right?

15   **A.**   Yes.

16   **Q.**   He gave her the $2,000 check?

17   **A.**   Yes.

18   **Q.**   She was happy, wasn't she?

19   **A.**   Yes.

20   **Q.**   Was her husband present, too?

21   **A.**   Yes.  I believe he was, yes.

22   **Q.**   He was happy, too, with the $2,000, right?

23   **A.**   This was a great relief to some people, yes.

24   **Q.**   It was really helpful to them, wasn't it?

25   **A.**   Yes.

1   **Q.**   Raymour presented the $2,000 check, right?

2   **A.**   Yes.

3   **Q.**   He presented this account receipt, she signed it,

4   she gave it back to him, right?  She gave the form

5   back?

6   **A.**   I believe she did, yeah.

7   **Q.**   Okay.  And Raymour said, you know, best of luck to

8   you.  I think you said go in peace, right?

9   **A.**   I wish you peace.

10  **Q.**   I wish you peace.  And that was the end of the

11  meeting, right?

12  **A.**   I don't remember if he left with me or not that

13  day.  I don't remember if he stayed or not.

14  **Q.**   Okay.  So your testimony is that it's possible

15  that you may have actually left the room before Raymour

16  left the room?

17  **A.**   Yes.  I may have been called out.  I don't

18  remember.

19  **Q.**   At that point, you trusted Raymour to be with the

20  patient?

21  **A.**   I think at that point I would have, yeah.

22  **Q.**   So it may be that Raymour was actually in the room

23  for a while when you weren't present, correct?

24  **A.**   It is possible, and I honestly do not remember if

25  he stayed or not.

1    **Q.**   There was actually another -- do you remember

2    Rebecca Smith?

3    **A.**   Yes, I do remember Rebecca.

4    **Q.**   Rebecca Smith was another patient that you

5    referred over to Mr. Caramadre and Raymour, right?

6    **A.**   Yes.

7    **Q.**   And Rebecca Smith was a 25-year-old woman, right?

8    **A.**   Yes, she was.

9    **Q.**   And she was dying of cancer?

10   **A.**   Yes.

11   **Q.**   And she was a single mother, right?

12   **A.**   She was.

13   **Q.**   And she had no family or friends, did she, that

14   you knew of anyway?

15   **A.**   Not that were in her life.

16   **Q.**   That were in her life.  She didn't have any money,

17   did she?

18   **A.**   She did not.

19   **Q.**   And you had decided this was a perfect candidate

20   for this program so you called Raymour up and said,

21   Raymour, I have a perfect candidate for you, and

22   Raymour came up and went through the same routine with

23   Rebecca Smith, right?

24   **A.**   Yes.

25   **Q.**   He met with you, right?

1    **A.**    Yes.

2    **Q.**    He went over to the patient in the bed, correct?

3    **A.**    Yes.

4    **Q.**    He gave the philanthropic account receipt form,

5    right?

6    **A.**    Yes.

7    **Q.**    She signed it?

8    **A.**    Yes.

9    **Q.**    She gave it back to him, right?

10    **A.**    Yes.

11    **Q.**    He gave her $2,000 as the ad stated, right?

12    **A.**    Yes.

13    **Q.**    She was very happy with it, wasn't she?

14    **A.**    She was thankful to have it.

15    **Q.**    She was thankful.  In fact, does this refresh your

16    memory that she really didn't have any family in her

17    life?  She couldn't deposit the $2,000 into any bank

18    account, could she?

19    **A.**    No.

20    **Q.**    So what I think you had arranged for was you had a

21    bank representative come to the hospital, right?

22    **A.**    From the credit union, yes.

23    **Q.**    Coastway Credit Union?

24    **A.**    Yes.

25    **Q.**    And an account was opened up for her, right?

1    **A.**    Yes.

2    **Q.**    And the account was opened in the hospital, right?

3    **A.**    Yes.

4    **Q.**    And that $2,000 check that Mr. Caramadre and

5    Raymour gave to her was actually given to the bank

6    representative and that $2,000 was deposited into that

7    account, right?

8    **A.**    Yes.

9    **Q.**    And in fact, at some point, the authorities had --

10   did you contact the authorities, or did the authorities

11   contact you, Ms. Healy?

12        THE COURT:  Mr. Lepizzera, I guess I thought you

13   were just about done.  So do we have a fair bit more

14   here, because I've been waiting to give the jury a

15   break.

16        MR. LEPIZZERA:  Two minutes, so the witness

17   doesn't have to stay any longer.

18        THE COURT:  I don't know if Mr. Vilker has a

19   line of redirect on this other person.

20        MR. VILKER:  Not so far, your Honor.

21        MR. LEPIZZERA:  It's up to the Court, your

22   Honor.  I apologize.

23   **Q.**    Trying to remember where I was now.  So the bank

24   representative came, right?

25   **A.**    Yes.

1    **Q.**    And an account was opened up?

2    **A.**    Yes.

3    **Q.**    By the way, in your capacity as a social worker,

4    these are the things that you did for these patients,

5    right?

6    **A.**    Yes.

7    **Q.**    You were a liaison to the outside world, right?

8    **A.**    Yes.

9    **Q.**    And this particular woman, she needed help because

10   she had no family or friends in her life, right?

11   **A.**    Correct.

12   **Q.**    So you arranged for a representative of Coastway

13   Credit Union to come to the hospital and $2,000 was

14   deposited into the account?

15   **A.**    Yes.

16   **Q.**    And what I asked you was, did you contact the

17   investigators related to this investigation or did they

18   contact you, do you recall?

19   **A.**    I was contacted.

20   **Q.**    You were contacted.  And at some point during the

21   investigation, you actually turned over -- you went

22   through your records and you turned over copies of the

23   Coastway Credit Union and the $2,000 deposit.  Do you

24   recall that?

25   **A.**    I vaguely recall it.

1    **Q.**    One other question.  Raymour left a business card

2    for you when you met him, correct?

3    **A.**    Yes.

4    **Q.**    And on that business card, identified his name,

5    right?

6    **A.**    Yes.

7    **Q.**    And the business card identified Estate Planning

8    Resources, didn't it?

9    **A.**    Yes.

10   **Q.**    And it had a phone number on it, right?

11   **A.**    I believe, yeah.

12   **Q.**    In fact, you knew his phone number because you

13   were able to call him, right?

14   **A.**    Yes.

15        MR. LEPIZZERA:  Thank you for coming in today.

16        THE COURT:  Thank you.  Mr. Vilker?

17        MR. VILKER:  No questions.

18        THE COURT:  All right.  Then, your testimony is

19   complete, Ms. Healy.  You may step down.  Thank you

20   very much.

21        Ladies and gentlemen, sorry for the delay in

22   taking the break.  I did want to finish with this

23   witness if possible so she didn't have to stay through

24   the break, but we'll take the full allotted time for

25   the break, and we'll reconvene in about one half hour,

1      so just keep in mind all my instructions.  Charlie will

2      show you out.  Thank you.

3            (Proceedings out of the presence of the jury as

4      follows:)

5            ( Recess.)

6            (Proceedings in the presence of the jury as

7      follows:)

8            THE COURT:  Mr. Vilker, are you ready to call

9      your next witness?

10           MR. VILKER:  Yes.  United States calls Eulogio

11     Gonzalez.

12           **EULOGIO GONZALEZ**, first having been duly sworn,

13     testified as follows:

14           THE CLERK:  Please state your name and spell

15     your last name for the record.

16           THE WITNESS:  Eulogio Gonzalez.

17           THE CLERK:  Can you spell your last name.

18           THE WITNESS:  G-O-N-Z-A-L-E-Z.

19           THE COURT:  Good morning, Mr. Gonzalez.

20           THE WITNESS:  Good morning.

21           THE COURT:  Just keep your voice up.

22           And Mr. Vilker, you may inquire.

23           **DIRECT EXAMINATION BY MR. VILKER**

24     **Q.**   Good morning, Mr. Gonzalez.

25     **A.**   Good morning.

1    **Q.**   Where do you currently live, Mr. Gonzalez?

2    **A.**   Excuse me?

3    **Q.**   What city do you live in?

4    **A.**   Cranston.  Providence.

5    **Q.**   What do you do for a career?  What's your job?

6    **A.**   Convenience store, I work.

7    **Q.**   Was your late wife named Sonia Gonzalez?

8    **A.**   Yes.

9    **Q.**   And how long had you been married before she

10   passed away?

11   **A.**   Like 21 years.

12   **Q.**   Do you have children together?

13   **A.**   Yes.

14   **Q.**   How many children?

15   **A.**   Two.

16   **Q.**   And she passed away on April 19th of 2008; is that

17   right?

18   **A.**   Yes.

19   **Q.**   Okay.  And how old was she at the time?

20   **A.**   Forty-six.

21   **Q.**   And what was she suffering from?  What was she

22   suffering from?  What did she have?

23   **A.**   Cancer.

24   **Q.**   Was it breast cancer?

25   **A.**   Yes.

1    **Q.**   Was she in the hospital during the final few weeks

2    of her life?

3    **A.**   Yes.

4    **Q.**   Was that Women and Infants Hospital here in

5    Providence?

6    **A.**   Yes.

7    **Q.**   Now, during the final few weeks of her life when

8    she was in the hospital, were you spending a lot of

9    time at the hospital?

10   **A.**   All the time.

11   **Q.**   Were you basically sleeping there as well?

12   **A.**   Um-hum.  (Affirmative.)

13   **Q.**   And did there come a time when you were in the

14   hospital when you heard something from somebody working

15   in the hospital about some kind of way in which you and

16   your wife may be able to get some money?

17   **A.**   Uh-uh.  (Negative.)

18   **Q.**   Well, did there come a point in time in which

19   someone came into the hospital room and gave money to

20   you and your wife?

21   **A.**   Yes.

22   **Q.**   Do you remember who this person was?

23   **A.**   Yes.

24   **Q.**   And what was his name?

25   **A.**   Raymour.

1    **Q.**    So you knew him as Raymour?

2    **A.**    Hum?

3    **Q.**    You knew his name to be Raymour?

4    **A.**    Yeah.

5    **Q.**    And what do you remember -- first of all, how many

6    times did you meet with Raymour?

7    **A.**    I'd say two time.  Basically, two time.

8    **Q.**    He came to the hospital once, and then he came

9    back again?

10    **A.**    Right.

11    **Q.**    So I want to first focus on the first time he came

12    to the hospital.  When he walked into the room, who was

13    there in the room that day?

14    **A.**    Only me and my wife.

15    **Q.**    And what was your wife's condition that first day?

16    Was she in pain?  Was she able to understand what was

17    going on?

18    **A.**    Not really.  She was very sick.  Very, very sick.

19    **Q.**    What do you remember Raymour saying that first day

20    when he came into the room?

21    **A.**    Well, he say I came here because somebody said to

22    me, some lawyer because he said that guy has a lot of

23    money.  And then he told me about a gift.

24    **Q.**    Okay.

25    **A.**    To help, you know, the funeral or something.

1      MR. VILKER:  Can you please bring up Exhibit 96,

2   please.

3   Q.   Exhibit 96 are notes taken from a company called

4   Estate Planning Resources.  It indicates on the top

5   part if you can see it in front of you, it says Sonia

6   Gonzalez, Room 410, Women and Infants.  Was she staying

7   on the fourth floor of Women and Infants Hospital in

8   Providence at that time?

9   A.   Yes.

10   Q.   I know the first part is blacked out, but is that

11   1963, is that the year that she was born?

12   A.   Yes.

13   Q.   Okay.  And what about her mother's maiden name,

14   was it De La Cruz?

15   A.   Yes.

16   Q.   And then I don't know if you remember, but the --

17   were the last four digits of her Social Security number

18   6127?

19   A.   Yes.

20   Q.   Do you remember during that first meeting whether

21   Raymour asked for information about your wife's date of

22   birth and Social Security number?

23   A.   Yeah.

24   Q.   And did he say why he needed that information?

25   A.   He told me somebody said to him for a gift only

1      for money.  He needed to fill out an application with

2      some information about name, Social Security and

3      everything and fill it out, you know.

4      **Q.**   Okay.  Did he give a check to you and your wife

5      that day?

6      **A.**   Not the same day.

7      **Q.**   So he came back a second day with a check?

8      **A.**   Um-hum.  (Affirmative.)

9          MR. VILKER:  Let me show you Exhibit 97 and ask

10     that that be moved full.

11         THE COURT:  Any objection?

12         MR. LEPIZZERA:  No objection.

13         MR. RADHAKRISHNAN:  No objection, your Honor.

14         THE COURT:  97 will be full.

15         (Government Exhibit 97 admitted in full.)

16     **Q.**   The date of this check is April 3rd of 2008, and

17     it's made out to Julissa Cruz.  Who is Julissa Cruz?

18     **A.**   My wife's sister.

19     **Q.**   Does that refresh your recollection she may have

20     been there that day the first day Raymour came?

21     **A.**   Um-hum.  (Affirmative.)

22     **Q.**   You just have to say yes or no for the record.

23         So this will be the check that Raymour -- the

24     first check that Raymour gave?

25         Let me show you to make it easier for you, if

1    you can pull up Exhibit 99 as well.

2              MR. VILKER:  I move that full.

3              MR. LEPIZZERA:  No objection.

4              MR. RADHAKRISHNAN:  No objection, your Honor.

5              THE COURT:  99 will be full.

6              (Government Exhibit 99 admitted in full.)

7    Q.    You have on the right side of the screen one check

8    for $2,000 that's dated April 3rd of 2008, and then on

9    the left side there's another check for $3,500 that's

10   dated April 14th of 2008.

11             Does that correspond to about the time that

12   these two meetings with Raymour took place?  Does that

13   seem about the right dates?

14   A.    I say yes.

15   Q.    Okay.  And your wife ended up passing away on

16   April 19th of 2008.  So that would be five days after

17   the second check, which was April 14th?  You see the

18   second check is April -- it's hard to read but I

19   believe's a 4.

20   A.    April 14, you say, right?

21   Q.    Right.  I believe so.

22   A.    Before she pass away, I get the two check.

23   Q.    So my first question is why were these checks made

24   out to Sonia's sister, Julissa, instead of to you or to

25   Sonia?

1   **A.**   Because I haven't a checking account at that time.

2   I wasn't working.  So she was working, you know, and

3   she has a checking account.  Easy for her, you know, to

4   sign and everything quickly.

5   **Q.**   So you asked Raymour to make the check out to

6   Julissa instead of to you?

7   **A.**   I don't say that.

8   **Q.**   How did it come about?  What was the conversation

9   like that led the checks to be written out to Julissa?

10   **A.**   Let me try to remember.

11   **Q.**   Okay.  If you can remember.

12       Let me just back up a second.  I'll withdraw

13   that question.

14   **A.**   Because the guy said, you know, it's better to put

15   Julissa's name.

16   **Q.**   Okay.  Did he say why it would be better for it to

17   be in Julissa's name?

18   **A.**   He was talking with my wife, you know.

19   **Q.**   So these with the two dates of the check.  On the

20   second date, April it looks like a 4, and I know this

21   is difficult, it was a few days before she passed away,

22   but what was her condition like on that second date?

23   **A.**   My wife?

24   **Q.**   Yeah.

25   **A.**   Very, very bad.

1    **Q.**   Was she able to understand what was going on?

2    **A.**   Almost nothing.

3    **Q.**   And you were sleeping there around the clock?

4    **A.**   All day.

5    **Q.**   What was your -- were you getting sleep?  How were

6    you dealing at that time?

7    **A.**   Not very well.  Not very well, you know.  Very,

8    very bad.

9    **Q.**   This is, obviously, a horrible, horrible time.

10       So the first time Raymour came, he gave this

11    check and your understanding was it was just a gift.

12    **A.**   Not really, because he told me -- well, he was

13    talking with my wife about somebody sent him to the

14    hospital to give.

15    **Q.**   My understanding is -- what was your understanding

16    of what both of these checks were for?  What was this

17    money for?  What did you think it was for?

18       MR. LEPIZZERA:  Objection.

19    **A.**   He said --

20       THE COURT:  Wait one second.

21       MR. LEPIZZERA:  Just in the sense that although

22    it's a single question it's really a compound question

23    because it's asking about two separate checks.

24       THE COURT:  Maybe you could break it down.

25    **Q.**   The check on the right for $2,000, what was your

1    understanding of what that check was for, why you were

2    being given that check?

3    A.   He say -- I say again, he told me that all the

4    time he said that money, some lawyer with a lot of

5    money sent him to the hospital for people like my wife,

6    you know, maybe poor people who need some money for

7    funeral, for help.

8    Q.   Now, if you look at the check, the second check,

9    the one on the left, what did you think that check was

10   for?

11   A.   I have no idea.  He say the same thing, for gift.

12   Q.   You thought all this money was a gift?

13   A.   That's he told me all the time, gift, gift.

14   Q.   Now, I want to show you Exhibit 98, which is

15   already in full, I believe.

16        This is, again, this is a date of April 3rd,

17   2008, the date of the first check.

18   A.   Um-hum.  (Affirmative.)

19   Q.   And it's called "Terminal Illness Philanthropy

20   Account Receipt."  Do you recall whether during that

21   first meeting Raymour had your wife sign some kind of

22   receipt?

23   A.   Yeah.

24   Q.   Does that look like her signature on that form in

25   front of you?

1    **A.**    Not really.  I mean, if you show me another one,

2    you know, I can't --

3    **Q.**    Could be, but you're not sure?

4    **A.**    Um-hum.  (Affirmative.)

5    **Q.**    You're not sure one way or the other?

6    **A.**    At that time, I told you she was very, very sick.

7    She wasn't doing very well, you know.

8    **Q.**    So her signature at that point might have been

9    different than -- now, I showed you the second check

10   which was on April 14th, 2008.

11        MR. VILKER:  I now want to show you Exhibit 100

12   and ask that that be moved full.

13        THE COURT:  Any objection?

14        MR. LEPIZZERA:  No objection.

15        MR. RADHAKRISHNAN:  No objection, your Honor.

16        THE COURT:  100 will be full.

17        (Government Exhibit 100 admitted in full.)

18   **Q.**    Exhibit 100 is an application to open up a

19   brokerage account at Ameritrade between Joseph

20   Caramadre as the owner and your wife, Sonia, as the

21   account co-owner.

22        When Raymour was there on either of those two

23   occasions, did he say anything about opening up any

24   kind of account in your wife's name?

25   **A.**    Never.

1        MR. VILKER:  If you could turn to the next page,

2   please.  It's dated, if you look at the -- if you can

3   magnify the bottom section, please.  There's a

4   signature, Joseph Caramadre and it's 4-7-2008.  And

5   then below that there's a signature and a date of

6   4-8-08.  Do you recognize that signature?

7   **A.**   It's not too clear.

8   **Q.**   You can't tell if it's Sonia's or not?

9   **A.**   I can't say a hundred percent.

10  **Q.**   You can't say one way or the other.  Okay.  The

11  date on it is April 7th or April 8th of 2008.  And I

12  previously showed you two checks, one, the first one

13  with the date that the receipt was signed on April 3rd

14  of 2008, and the second one on April 14th of 2008.  And

15  your memory is there were just two meetings with

16  Raymour?

17  **A.**   I say two.

18  **Q.**   So was there a meeting after he gave you the first

19  $2,000?  Did he come back a few days later and have

20  Sonia sign some more documents?

21  **A.**   I think the first check, he come twice the same

22  day.

23  **Q.**   The same day he came twice?

24  **A.**   Yeah.  In the afternoon.  At that time, my mother

25  and Julissa was there.  She get the check.

1  **Q.**   Okay.  And then he came back the second time,

2  which was April 14th time and gave the second check?

3  **A.**   Right.

4  **Q.**   So we have two days, April 3rd and April 14th.

5  Would there have been a time on April 7th or April 8th

6  where Raymour came back again?

7  **A.**   No.  I say no.

8  **Q.**   And you were basically living in the hospital room

9  at that time?

10  **A.**   Yeah.

11  **Q.**   Now, I want to show --

12       MR. VILKER:  If you can bring up Exhibit 104,

13  please.  I would move that full.

14       MR. LEPIZZERA:  No objection.

15       MR. RADHAKRISHNAN:  No objection, your Honor.

16       THE COURT:  104 will be full.

17       (Government Exhibit 104 admitted in full.)

18  **Q.**   Now, 104, Mr. Gonzalez, is a statement of the

19  account at Ameritrade.  And the account is in the name

20  of Joseph Caramadre and Sonia Gonzalez.  This is for

21  the time period of April 1st, '08, through April 30th

22  of '08, and it indicates that the current value in the

23  account is $253,769.22.

24       First of all, did you have any idea that your

25  wife's name was on the account with that kind of money

1    on it?

2    **A.**    Never, ever.  My wife never do that.  I hundred

3    percent sure.

4    **Q.**    Your understanding is that she had no idea her

5    name was on any account?

6    **A.**    Uh-huh.  (Negative.)

7    **Q.**    Okay.  Now, if you can go to page 63.  I think

8    it's like the fourth page of this document.

9         This shows at the top line that on April 8th,

10   there was $300,000 wired into this account from the Law

11   Offices of Joseph Caramadre.

12        And again, April 8th would be after the first

13   date of the first check, which is April 3rd, and the

14   date of the second check, which is April 14th, correct?

15   **A.**    Basically.

16   **Q.**    Now, if you can go back to Exhibit 100, please.

17   Now, do you see in the section on account co-owner,

18   there's a phone number for your wife, her work number,

19   says 941-9273.  Was that number familiar to you at all?

20   **A.**    She wasn't working at that time.

21   **Q.**    Was that phone number -- does that look familiar

22   to you?

23   **A.**    No.

24        MR. VILKER:  Okay.  If we can go to the next

25   page, please.  If we can just magnify from paragraph 11

1    down.

2    **Q.**   Does that look like your wife's signature?

3    **A.**   I say no.  That's too big.  She never sign like

4    that.

5    **Q.**   Okay.  But she was at the very end of her life,

6    and you're saying she had vision problems.  Is it

7    possible that --

8    **A.**   It's possible.

9    **Q.**   Is it possible she signed her name differently

10   than she would have at other points in her life?

11   **A.**   It's possible.

12   **Q.**   So above your wife's signature and above the

13   signature of Joseph Caramadre, there's some questions

14   asked about the co-owner of this account was your wife.

15   First of all, it asks number of dependents and it says

16   zero if you look at the screen in front of you.

17        You said you and your wife have kids, you have

18   children?

19   **A.**   Um-hum.  (Affirmative.)

20   **Q.**   How old were they at that time?

21   **A.**   One is 14, the other one like 19.

22   **Q.**   It then says funds available, if you look at this

23   box.  It says funds available for options trading,

24   $50,000 plus.  Did you and your wife have that kind of

25   money?

1    **A.**    No.  Never.

2    **Q.**    I mean, in fact, you were in a very tough

3    financial situation at that point in time, right?

4    **A.**    Right.  Exactly.

5    **Q.**    Then it asks years of investment experience and

6    it's marked six through nine.  Was your wife, was

7    she -- before she got sick, was she involved in

8    investing in stocks or bonds or anything like that?

9    **A.**    No.  Never.

10   **Q.**    Okay.  So is it fair to state, without going

11   through each category, that your wife wasn't an

12   individual who was very experienced in investing in

13   different products?

14   **A.**    No.

15   **Q.**    Okay.  And did Raymour ask you anything about what

16   your wife's investment experience was?

17   **A.**    I told you, you know, he was talking with my wife

18   all the time.  She filled out a lot of paper.

19   **Q.**    Where were you when she was filling out this

20   paperwork?

21   **A.**    I was beside my wife, sometime watching TV and

22   everything.

23   **Q.**    She was in her bed in her room, and you were on

24   one side of the bed?

25   **A.**    I was in the same -- you're talking about in the

1    same room or --

2    **Q.**    That's what I'm asking.  Your wife was in the

3    hospital bed?

4    **A.**    Exactly.

5    **Q.**    She was in a very difficult situation at the time?

6    **A.**    Um-hum.  (Affirmative.)

7    **Q.**    You said she was on morphine and that kind of drug

8    to help with the pain?

9    **A.**    Yeah.

10   **Q.**    So Raymour was sitting next to her and going

11   through some forms with her.

12   **A.**    He was sitting in the front.

13   **Q.**    In the front of the bed?

14   **A.**    Exactly.

15   **Q.**    Where were you?

16   **A.**    Beside the other side watching TV, sometime.

17   **Q.**    Were you hearing what Raymour was saying to your

18   wife?

19   **A.**    No.

20   **Q.**    What do you remember him saying was the reason

21   that he was there on those occasions?

22   **A.**    All I can say the time he was there, he was

23   talking about the money, gift, gift, and everything.

24   And he give me a little card and he put on the back

25   "gift."  And I lost that card.

1    **Q.**   Do you recall either time he was there him saying

2    anything about any kind of account being opened up in

3    your wife's name?

4    **A.**   Never.

5    **Q.**   You're saying part of the time you may have been

6    watching TV and not listening exactly to what he was

7    saying to your wife?

8    **A.**   I remember the second time my wife try to pick up

9    the phone.  I say, "What happened?"  She told me --

10           MR. LEPIZZERA:  Objection.  Hearsay.

11           THE COURT:  Well, come up.

12           (Side-bar conference.)

13           THE COURT:  This is the problem, again.  This

14   isn't the issue that Mr. Traini raised, right?

15           MR. LEPIZZERA:  It's not.  There's no question

16   pending.  I don't know exactly where he's going.  He's

17   going into not a conversation between Mr. Gonzalez and

18   Mr. Radhakrishnan but a conversation between him and

19   his wife.  Mr. Radhakrishnan is not there, so now we're

20   talking about the hearsay.

21           THE COURT:  Right.  Okay.  I don't know if

22   that's really a distinction, but I think this is part

23   of this issue.  You can try it again, but is that where

24   you all are drawing the line?

25           MR. LEPIZZERA:  That's where I did on that

1    question.  It just popped up, your Honor.

2           MR. TRAINI:  I think sometimes it's reflexive,

3    Judge.

4           MR. LEPIZZERA:  It was on that one.

5           (End of side-bar conference.)

6           THE COURT:  So Mr. Gonzalez, Mr. Vilker is going

7    to try his question again.  Okay?

8           THE WITNESS:  Sure.

9    Q.   Mr. Gonzalez, was your wife, even at this late

10   stage in her life, was she at all skeptical or

11   suspicious about this?

12   A.   Yes.

13   Q.   What, if anything, did she say that made you think

14   that she was suspicious about this?

15          MR. LEPIZZERA:  Objection.

16          THE COURT:  I'll sustain the objection for now.

17   Why don't you try to establish how and when first.

18          MR. VILKER:  Okay.

19   Q.   You said your wife at some point in this process

20   was suspicious.  It's just a yes or a no.

21   A.   Yes.

22   Q.   Okay.  Do you recall when she voiced some

23   suspicion about this?  Was this after the first

24   meeting, after the second meeting or some point in

25   between?

1    **A.**   The second.

2    **Q.**   It was after the second meeting?

3    **A.**   Um-hum.  (Affirmative.)

4    **Q.**   And what happened during that second meeting?

5    **A.**   When we get the second check, she tried to pick up

6    the phone --

7    **Q.**   I'm trying to get to that point.  So Raymour came

8    in and gave you the second check?

9    **A.**   Right.

10   **Q.**   Did Raymour then leave the room?

11   **A.**   He left.

12   **Q.**   And this would have been on, based on the date of

13   the check, on April 14th, 2008?  Based on the date of

14   the second check if that's right?

15   **A.**   Um-hum.  (Affirmative.)

16   **Q.**   So this was actually five days or so before she

17   passed away?

18   **A.**   Yeah.  Five or six.  I don't remember exactly.

19   **Q.**   So he came in and brought the second check and

20   left?

21   **A.**   Right.

22   **Q.**   So you're in the hospital room with her.  It's

23   just the two of you at this point?

24   **A.**   When he left.

25   **Q.**   When he left, it was just you and your wife left

1    in the room?

2    **A.**    Yeah.

3    **Q.**    And you said your wife tried to pick up the phone?

4    **A.**    Yeah.

5    **Q.**    Why did she do that?

6    **A.**    Because she was a little suspicious, you know.

7    She was thinking about something wrong about the money.

8    **Q.**    How do you know that?

9    **A.**    Because I say, "What happened?"  She told me, I

10   don't want to tell you because it's not a time to talk

11   with you about -- she was very sick.

12   **Q.**    Okay.  So she brought up some concern about the

13   money and then you wanted to move on to another

14   conversation because she was so sick?

15   **A.**    Um-hum.  (Affirmative.)

16   **Q.**    Did she say who she was trying to call?

17   **A.**    I remember.  She told me, Give me the phone.  I

18   said, What happened.  She told me, I know something

19   wrong happened here about the money.  And I was talking

20   with her.

21   **Q.**    Did she tell you like who she was going to try to

22   call?

23   **A.**    No.

24   **Q.**    Okay.

25   **A.**    She never told me that.

1    Q.    Now, I want to show you now Exhibit 103.

2         MR. VILKER:  I ask that that be moved full.

3         MR. LEPIZZERA:  No objection.

4         MR. RADHAKRISHNAN:  No objection, your Honor.

5         THE COURT:  103 will be full.

6         (Government Exhibit 103 admitted in full.)

7    Q.    Mr. Gonzalez, is any of the handwriting on this

8    front page either yours or your wife's?  Look at that.

9    Is any of that handwriting your wife's handwriting?

10   You see where I'm asking where it says Joseph

11   Caramadre, it says 90 Beechwood Drive, Cranston, Rhode

12   Island, and some further information.

13        Does that look like your wife would have written

14   that in?

15   A.    I never see it.  What's that, $4,000?

16   Q.    I'm not asking you about the contents of it yet.

17   I'm just asking you if that writing is your wife's

18   handwriting?

19   A.    I don't remember.

20        MR. VILKER:  If you could go to page three of

21   this document.

22   Q.    It says that's dated April 7th of 2008, and

23   there's a signature --

24        MR. VILKER:  If you can magnify that.

25   Q.    There's a signature that says right here next to

1  the co-owner, does that appear to be Sonia's signature?

2  **A.**   Not too clear.

3  **Q.**   Again, it was at a very difficult point in her

4  life so her signature may have been different than it

5  usually was?

6  **A.**   Excuse me?

7  **Q.**   This is at, obviously, a very bad point in her

8  life, so it's possible that her signature was a little

9  different than it was before?

10  **A.**   Um-hum.  (Affirmative.)

11  **Q.**   Okay.  Now, if we go down a little bit to the

12  bottom part, it says that on the 7th of April, Sonia

13  appeared before a notary named Walter Craddock.  Did

14  Raymour ever come with someone else to notarize Sonia's

15  signature?

16  **A.**   No.  Never.  Only alone.

17  **Q.**   Only what?

18  **A.**   He was alone all the time.

19  **Q.**   He was alone.  Okay.

20       MR. VILKER:  Now, if we can go back to the first

21  page, and just magnify the top part of that.

22  **Q.**   This says that there's going to be a brokerage

23  account that's going to be opened between Joseph

24  Caramadre and your wife, Sonia.

25       Did Raymour ever say anything about some kind of

1    brokerage account being opened in your wife's name?

2    A.    No.

3    Q.    Okay.  Now, I want to go down to paragraph seven.

4    Did Raymour ever say anything that would indicate that

5    someone else, either Joseph Caramadre or some other

6    person, stood to make substantial profits upon the

7    death of your wife?

8    A.    No.

9    Q.    Did you have any understanding that this money was

10   anything other than a gift?

11   A.    No.

12       MR. VILKER:  Okay.  I want to bring up Exhibit

13   14, please.

14   Q.    Exhibit 14 is a record that was received from

15   Estate Planning Resources and it's titled "Summary of

16   TD Ameritrade Bond Holdings."  On this line here, it

17   says -- do you see where it says JAC, Joseph A.

18   Caramadre, and Sonia Gonzalez next to where I put that

19   blue mark?

20       MR. VILKER:  Magnify that part of it.

21   Q.    Do you see the second name from the bottom is

22   Sonia Gonzalez?

23   A.    Um-hum.  (Affirmative.)

24   Q.    And it shows that there's $300,000 that was put

25   into this account and that $859,000 worth of bonds were

1   purchased.

2        Did you have any idea that Sonia's name was on

3   an account with that kind of money in it?

4   **A.**   I'm very sure hundred percent she never was in an

5   account or anything.  Very sure.

6        MR. VILKER:  I'd like to now bring up Exhibit

7   105 and ask that that be moved into evidence.  This is

8   a record from Estate Planning Resources.

9        MR. LEPIZZERA:  No objection.

10       MR. RADHAKRISHNAN:  No objection, your Honor.

11       THE COURT:  105 will be full.

12       (Government Exhibit 105 admitted in full.)

13  **Q.**   105 is another document that was from Estate

14  Planning Resources.  The top of it says "Measuring

15  Life."

16       Did Raymour ever use that term with you, that

17  Sonia would be a measuring life or anything like that?

18  **A.**   No.

19  **Q.**   Now, if you can bring up the middle part of it.

20  It says the account number, the last name is Gonzalez.

21  And it says 2008 gains, 123,000; 2009 gains, 50,000;

22  and then a total gain, if we can zoom in on that, of

23  190,000.

24       Did you have any idea that Mr. Caramadre stood

25  to make this kind of money upon Sonia's death?

1    **A.**    No.

2              MR. VILKER:  I'd like to now show you Exhibit

3    106 and ask that that be moved full.

4              THE COURT:  Any objection?

5              MR. LEPIZZERA:  No objection.

6              MR. RADHAKRISHNAN:  No objection, your Honor.

7              THE COURT:  All right.  106 will be full.

8              (Government Exhibit 106 admitted in full.)

9    **Q.**    Mr. Gonzalez, this is a form written by Joseph

10   Caramadre that says that he owned bonds with Sonia

11   Gonzalez as joint tenants with right of survivorship.

12             Did you have any idea that there were bonds that

13   were in the name of your wife, Sonia?

14   **A.**    No.

15   **Q.**    Okay.  And then it says, Sonia died on April 19th,

16   2008, as evidenced by the enclosed death certificate.

17             Did you ever -- did Raymour ever come back to

18   you and ask for a copy of Sonia's death certificate?

19   **A.**    No.

20   **Q.**    Do you have any idea --

21   **A.**    He told me if you need some more money in the

22   future, I can give you some more money.

23   **Q.**    Did you ever call him to get more money?

24   **A.**    No.  I never call him.  I was, you know, like my

25   wife, like, you know, suspicious.  I was --

1    **Q.**   I understand.  I want to show you finally Exhibit

2    107.

3          MR. VILKER:  I ask that that be moved full.

4          MR. LEPIZZERA:  No objection.

5          MR. RADHAKRISHNAN:  No objection, your Honor.

6          THE COURT:  107 will be full.

7          (Government Exhibit 107 admitted in full.)

8    **Q.**   Mr. Gonzalez, this is a letter from Joseph

9    Caramadre dated May 7th, 2008, to Providence City Hall,

10   and he's asking to obtain 20 copies of Sonia's death

11   certificate.

12         Did you have any idea that Mr. Caramadre was

13   attempting or had obtained Sonia's death certificate

14   from Providence City Hall?

15   **A.**   No.

16   **Q.**   Did you ever give consent to Raymour or to anyone

17   else to get those death certificates?

18   **A.**   No, I wasn't -- I don't know anything about this.

19   Believe me.

20         MR. VILKER:  I have no further questions.  Thank

21   you.

22         THE COURT:  Thank you.

23         THE WITNESS:  I was thinking only the gift.

24         THE COURT:  All right.  Mr. Radhakrishnan.

25

1        **CROSS-EXAMINATION BY MR. RADHAKRISHNAN**

2    **Q.**   Good afternoon, Mr. Gonzalez.  It's nice to see

3    you again.  Thank you for coming in.

4            You remember me coming and meeting with your

5    wife on a couple of different times?

6    **A.**   (Witness nods head in the affirmative.)

7    **Q.**   Pardon me?

8    **A.**   Yes.

9    **Q.**   Thank you.  And where did Sonia work before she

10   got -- before she became ill?

11   **A.**   She was living in Dominican Republic and then she

12   coming back.  She wasn't work for about ten years.

13   **Q.**   Right.  Where did she work?  What kind of

14   education did she have?

15   **A.**   She went to college.

16   **Q.**   And Ms. Gonzalez spoke English?  Did your wife

17   speak English?

18   **A.**   Hundred percent.

19   **Q.**   Hundred percent?  She spoke English very well?

20   **A.**   Very, very well.

21   **Q.**   You speak Spanish, correct?

22   **A.**   Correct.

23   **Q.**   Okay.  Is it easier for you to understand Spanish

24   or English better?

25   **A.**   Spanish better.

1    **Q.**    Spanish better, right?  Okay.

2         And when you testified in front of -- do you

3    remember testifying in front of the grand jury?

4    **A.**    Um-hum.  (Affirmative.)

5    **Q.**    Okay.  And isn't it true Mr. McAdams over there

6    was asking you questions?  Your remember that, correct?

7    **A.**    Correct.

8    **Q.**    Yes.  And during that questioning, wasn't there a

9    translator present during that questioning?

10   **A.**    Yeah.

11   **Q.**    There was.  That's correct?

12   **A.**    (Witness nods head in the affirmative.)

13   **Q.**    Okay.  And is there a reason why you don't have a

14   translator today, Mr. Gonzalez?

15   **A.**    I told them I need it because I don't know, some

16   question, you know -- very, very hard for me.

17        MR. RADHAKRISHNAN:  I understand.  I thank you

18   for your time coming in today, Mr. Gonzalez.  You have

19   a nice day.  Thank you.

20        THE WITNESS:  You're welcome.

21        THE COURT:  Mr. Lepizzera?

22        MR. LEPIZZERA:  Thank you, your Honor.

23        <u>**CROSS-EXAMINATION BY MR. LEPIZZERA**</u>

24   **Q.**    Good afternoon, Mr. Gonzalez.

25        Mr. Gonzalez, I believe you testified that you

1    were sleeping in the room with your wife, correct?

2    **A.**   Sometimes, yeah.  Yeah, sometimes.

3    **Q.**   Some nights?

4    **A.**   I mean, I was there all the time.  I say sometime

5    I sleep, sometime watching TV, sometime I was talking

6    with her.

7    **Q.**   And Mr. Vilker asked you some questions about why

8    the checks were made out to Julissa Cruz, do you

9    remember that?

10   **A.**   Um-hum.  (Affirmative.)

11   **Q.**   And Julissa Cruz was your wife's sister, correct?

12   **A.**   Correct.

13   **Q.**   And you first testified that the reason why the

14   checks were made out to her was because she had a bank

15   account and you didn't, correct?

16   **A.**   I never, yeah.

17   **Q.**   But I think you also testified that Raymour was

18   really talking to your wife, correct?

19   **A.**   Correct.

20   **Q.**   Raymour wasn't talking to you, was he?

21   **A.**   Only to my wife.

22   **Q.**   Only to your wife.  Because you were in the room

23   when Raymour was there, correct?

24   **A.**   Yeah.

25   **Q.**   You were kind of off to the side, watching TV?

1    **A.**    I say, you know, I was watching TV sometime.  But

2    in that time he was talking with my wife only.  And I

3    told you all the time, when he came the first time he

4    said I came here because some lawyer sent me.  That

5    lawyer has a lot of money.  And I came to give some

6    money for help, for your children, for your funeral.

7    And he told me we apologize.  He said I apologize the

8    situation.

9    **Q.**    And he gave -- at the first meeting, he gave

10   $2,000, correct?

11   **A.**    Yeah.

12   **Q.**    And then there was a second check for $3500,

13   correct?

14   **A.**    3500.

15   **Q.**    $3500, right?

16   **A.**    Yeah.  3500, yeah.

17   **Q.**    3500, right?

18   **A.**    Um-hum.  (Affirmative.)

19   **Q.**    And that check also, it's in front of you, a copy

20   is in front of you on the screen, Mr. Gonzalez.  That

21   $3,500 check was also made out to Julissa Cruz, who was

22   your sister-in-law, right?  Correct?  You just have to

23   say yes or no for the record.

24   **A.**    Yes.

25        MR. LEPIZZERA:  Thank you.  Could I have brought

1  up Exhibit 98, please.

2  **Q.**  If you could look to the document to the right,

3  which for the record is Exhibit 96, okay, do you see

4  where it says Sonia Libertad Gonzalez, that was your

5  wife's full name, correct?

6  **A.**  Correct.

7  **Q.**  Under that it says 44 is that Sumter Street,

8  Providence, Rhode Island, right?

9  **A.**  Yes.

10  **Q.**  And that was your home address, correct?  Whose

11  address was that?

12  **A.**  Sonia's mother.

13  **Q.**  Sonia's mother?

14  **A.**  Yeah.

15  **Q.**  Did Sonia give Raymour that address, do you know?

16  Do you remember?

17  **A.**  I don't remember.

18  **Q.**  You don't remember.  How about the date of birth?

19  Did your wife give Raymour her date of birth, do you

20  remember?

21  **A.**  I don't remember because he asked to my wife -- he

22  say I need to fill out a form with a couple of

23  question.  And he started to fill it out, a lot of

24  question.  Because he was talking with my wife, you

25  know.  My English not like my wife.

1    **Q.**    That's okay.  You're doing well.

2    **A.**    You know, he was talking fast with her so --

3    **Q.**    Okay.  So you're watching TV, your English isn't

4    that well, and he's really speaking to your wife,

5    right?

6    **A.**    Right.

7    **Q.**    And you're following along with some of it but not

8    all of it, right?

9    **A.**    Um-hum.  (Affirmative.)

10   **Q.**    So you just testified Raymour was asking for

11   information in order to put down on a form, right?  He

12   was asking your wife for information in order for him

13   to put that information down on a form, correct?

14   Right?

15   **A.**    (Witness nods head in the affirmative.)

16   **Q.**    You just have to say yes or no for the record.

17   **A.**    Yes.  Yes.

18   **Q.**    I apologize.  The stenographer is over there

19   taking this down.

20   **A.**    No.  That's okay.

21   **Q.**    Thank you.  Can you take a look at the form on the

22   left on the screen, okay, which is Exhibit 98.  And you

23   would agree with me, sir, that nowhere on that form,

24   and I'm looking at the form on your left, take a look

25   at that.  Is there anywhere on that form that requires

1   a date of birth to be put down on that document?  Can

2   you take a look at that.  Is your wife's date of birth

3   on that document at all?

4   **A.**   I don't see it.

5   **Q.**   That form doesn't require your wife's date of

6   birth, does it?  Let me strike that.

7        Your wife's date of birth isn't on the form to

8   the left, correct?

9   **A.**   Only -- not a date.

10  **Q.**   There's a date of April 3rd, 2008, right?  I want

11  to make sure we're looking at the right form.

12       There's a date of April 3rd, 2008, at the

13  bottom, right, Mr. Gonzalez?

14       MR. LEPIZZERA:  Can I approach the witness, your

15  Honor?

16       THE COURT:  Yes.

17       MR. LEPIZZERA:  Thank you.

18  **Q.**   Mr. Gonzalez, I'm pointing you to I believe

19  Exhibit 98.  Right here down at the bottom.  Do you see

20  that date, April 3rd, 2008?

21  **A.**   Um-hum.  (Affirmative.)

22  **Q.**   You have to say yes or no for the record.

23  **A.**   Yes.

24  **Q.**   That's not your wife's date of birth, correct?

25  **A.**   No.

1    **Q.**   Your wife was born in 1963.  If we look at the

2    form to the right, that's her date of birth, correct?

3    **A.**   Yes.

4    **Q.**   Your wife's date of birth is not on the form to

5    the left, correct?

6    **A.**   No.

7    **Q.**   Now, down below, looking to the form on the right,

8    do you see where it says, Mother's maiden name, De La

9    Cruz?

10    **A.**   Last name.  Yeah.  Her mother's last name only,

11    but not first name.

12    **Q.**   So that's your mother-in-law's last name, right?

13    Correct?

14    **A.**   Last name, yeah.

15    **Q.**   Now, what I want you to do is I want you to take a

16    look at the form on the left, okay, which is the

17    account receipt form, and you would agree with me that

18    De La Cruz, that name is nowhere on the form to the

19    left, is it?

20    **A.**   No.

21    **Q.**   Okay.  Now, finally, going back to the file notes

22    here to the right where it says Social Security number,

23    and there's part of the number is redacted out.  Do you

24    see the number 6127?

25    **A.**   Yeah.

1    **Q.**   Do you remember your wife's Social Security

2    number.

3    **A.**   Not at this time.

4    **Q.**   That's okay.  You would agree with me that your

5    wife's Social Security number is nowhere on the

6    philanthropy account receipt form, correct?

7    **A.**   I don't see that.

8    **Q.**   It's not there, right?  But as you testified,

9    Raymour was asking for date of birth, maiden name and

10   Social Security number in order for him to put that

11   information down on a form, correct?  Right?

12   **A.**   I tell you again, at that time he was talking only

13   with her.  So I, you know -- then, you know, maybe ten

14   minutes after, I was talking with my wife and she told

15   me, I fill it out.

16        MR. LEPIZZERA:  Could I just stop the witness.

17   There's no question pending.

18        THE COURT:  Right.

19        MR. LEPIZZERA:  Could I have Exhibit 100 pulled

20   up, please.  Sorry, page one.  If I could have that

21   sitting next to Exhibit 96.

22        May I approach the witness, again, your Honor.

23        THE COURT:  Can you do this by marking it?

24        MR. LEPIZZERA:  That's fine.  Thank you.

25   **Q.**   Mr. Gonzalez if you could look to the form to your

1  right and see where I'm pointing where it says date of

2  birth, 1963.  That was your wife's date of birth,

3  right?

4  **A.**  Yeah.

5  **Q.**  Now what I want you to do is look to the form to

6  the left, which is Exhibit 100, and do you see where it

7  says 1963?

8  **A.**  Yeah.

9  **Q.**  That's the same year, 1963 is on those two forms,

10  correct?

11  **A.**  Um-hum.  (Affirmative.)

12  **Q.**  Then what I want you to do is take a look at see

13  the form to your right, see where it says De La Cruz

14  where I'm pointing?

15  **A.**  My wife --

16  **Q.**  That's your mother-in-law's maiden name, right?

17  **A.**  Last name.

18  **Q.**  Last name.  And then look to the TD Ameritrade

19  account application, do you see where I'm pointing to

20  where it says De La Cruz?

21  **A.**  Um-hum.  (Affirmative.)

22  **Q.**  De La Cruz is on that form, correct?

23  **A.**  De La Cruz.

24  **Q.**  And finally, you see the Social Security number on

25  the form to the right where it says 6127?  Do you see

1    that?

2    **A.**    Yeah.

3    **Q.**    And then if you look to the form on the left, the

4    TD Ameritrade application number, do you see where it

5    says the Social Security number has 6127, right?

6    **A.**    Yeah.

7    **Q.**    Those are all the same information, right?

8    **A.**    Um-hum.  (Affirmative.)

9           MR. LEPIZZERA:  Could I have Exhibit 14 brought

10   up, please.

11   **Q.**    Mr. Gonzalez, see where I'm pointing to, $859,000?

12   **A.**    Um-hum.  (Affirmative.)

13   **Q.**    You testified you didn't realize that any money

14   went to any account, correct?  That's what you

15   testified to, right?

16   **A.**    Um-hum.  (Affirmative.)

17   **Q.**    You have to say yes for the record if that's your

18   answer.

19   **A.**    Yes.

20   **Q.**    Did Raymour ever tell your wife that if she died

21   Mr. Caramadre would get $859,000?  Did he ever explain

22   that to you or your wife?

23   **A.**    He never.  No, never.

24   **Q.**    And lastly, did Raymour ever explain to you or

25   your wife that if Mr. Caramadre died before your wife

1   died, that your wife would get -- your wife would get

2   $859,000?  Did he ever explain that?

3   **A.**   Never.

4         MR. LEPIZZERA:  Okay.  Thank you, sir.

5         THE COURT:  Redirect.

6         MR. VILKER:  Very brief redirect.

7         **REDIRECT EXAMINATION BY MR. VILKER**

8   **Q.**   Mr. Gonzalez, you were just asked about that for

9   some part of I guess the second meeting you were

10  watching TV and Raymour was kind of speaking with your

11  wife?

12  **A.**   Um-hum.  (Affirmative.)

13  **Q.**   You have to say yes or no.

14  **A.**   Yes.

15  **Q.**   So there could have been things that he said that

16  you didn't understand or you weren't paying attention

17  to because you were listening to --

18        MR. LEPIZZERA:  Objection.  Leading.

19        THE COURT:  Overruled.

20  **Q.**   Could there have been things that Raymour said

21  that you didn't hear because you were watching TV?

22  **A.**   Yeah, but I watching TV but not all the time.  In

23  the first time, I was thinking somebody in the

24  hospital.

25  **Q.**   You thought this was like somebody in the hospital

1    that was involved in giving this money?

2    **A.**    Or sent to me.  Because I said to my wife, Why he

3    came here?  Because somebody -- he need some permit to

4    come to the hospital.  That's why I'm feeling, you

5    know, like, why, you know.

6    **Q.**    And then you said the second time is when you --

7    was the second time part of the time you were watching

8    TV when you were right next to your wife?

9    **A.**    Little watching.  I was watching, but I all the

10   time was putting attention to my wife because she was

11   very, very sick.

12   **Q.**    But you mentioned that there was some time that

13   Raymour was talking quickly in English and your wife's

14   English was better than your English?

15   **A.**    Hundred percent, yeah.

16   **Q.**    And your wife at this point in time, she's -- I

17   hate to go through this again with you, but she was in

18   very, very bad shape, right?

19   **A.**    Um-hum.  (Affirmative.)

20   **Q.**    She was on morphine?

21   **A.**    Morphine.

22   **Q.**    And Raymour is there talking quickly to her in her

23   bed a few days before she passes away while she's on

24   serious pain medication?

25   **A.**    Um-hum.  (Affirmative.)

1    **Q.**   And then when Raymour leaves, I think you

2    testified your wife tried to pick up the phone?

3    **A.**   Yeah, the second time.

4    **Q.**   She tried to pick up the phone and she said,

5    Something's wrong with this money?

6         MR. LEPIZZERA:  Objection.  Beyond the scope of

7    cross.

8         THE COURT:  Right.  Sustained.

9         MR. VILKER:  Nothing further, your Honor.

10         THE COURT:  Any recross?

11         MR. RADHAKRISHNAN:  No, your Honor.  Thank you.

12         MR. LEPIZZERA:  No, your Honor.

13         THE COURT:  Thank you.

14         All right.  Mr. Gonzalez, I think that completes

15    your testimony.  So you may go now.  Thank you very

16    much.

17         THE WITNESS:  Sorry for my English.

18         THE COURT:  No.

19         Next witness.

20         MR. McADAMS:  Government calls Carol Larivee.

21         **CAROL LARIVEE**, first having been duly sworn,

22    testified as follows:

23         THE CLERK:  Please state your name and spell

24    your last name for the record.

25         THE WITNESS:  Carol Larivee, L-A-R-I-V, as in

1    Victor, E-E.

2            THE COURT:  Good afternoon, Ms. Larivee.

3            THE WITNESS:  Good afternoon.

4            THE COURT:  You may inquire, Mr. McAdams.

5            **DIRECT EXAMINATION BY MR. McADAMS**

6    **Q.**    Good afternoon, Mrs. Larivee.

7    **A.**    Good afternoon.

8    **Q.**    Could you speak into the mike.

9            Mrs. Larivee, where are you from?

10   **A.**    I'm from Woonsocket, Rhode Island.

11   **Q.**    How long have you been living in Rhode Island?

12   **A.**    My whole life.

13   **Q.**    Are you married?

14   **A.**    Yes, I am.

15   **Q.**    Do you have children?

16   **A.**    I have eight children.

17   **Q.**    Mrs. Larivee, was there a point in your life when

18   you were also caring for a niece of yours?

19   **A.**    Yes.  In 2003.

20   **Q.**    What was your niece's name?

21   **A.**    My niece was -- her name was Jamie Bradley.

22   **Q.**    Jamie Bradley.  You were caring for her because

23   she was sick?

24   **A.**    Yeah.  She was diagnosed with colon cancer at the

25   age of 26; and when they diagnosed it, it had already

1    metastasized to her lungs.

2    **Q.**   Was the reason you were caring for her -- what was

3    the reason for that?

4    **A.**   Well, Jamie's mother passed away when she was 11

5    years old, and at that time her father and her moved to

6    New Hampshire.  But then when she got older, her dad

7    moved down to Florida so she came back to Rhode Island.

8    And she moved with my other sister, her godmother,

9    Janice.  And she lived with Janice for about a year and

10   then we found out she had colon cancer.  So she had an

11   operation to remove the tumor in her colon, and then

12   she had to start the chemo.

13         At that point, that was too much for my sister,

14   Janice, who was working because Jamie had gotten very

15   sick from the chemo.  So my sister called me up on

16   Memorial Day in 2003 and asked me if I could care for

17   Jamie, if Jamie could live with me.  It was supposed to

18   be just for a little while but it ended up being five

19   years.

20   **Q.**   Jamie passed in 2008; is that correct?

21   **A.**   Yeah.  June 3rd.

22   **Q.**   Prior to the time when Jamie passed, did there

23   come a point when you became aware of an opportunity

24   for some funds to become available because of Jamie's

25   illness?

1  **A.**   Yes.  Actually, it was my sister-in-law.  I would

2  say maybe six months to a year prior to Jamie passing,

3  she had told me about this ad that she had seen in the

4  Rhode Island Catholic for caregivers.  And they were

5  going to give, in the ad, it said something like you

6  would receive $2,000, to call them.

7        At first, I told her no because I says, Oh, you

8  never get anything for free.  I said, There's got to be

9  a catch to this.  So I ignored it.  And then at a

10  family outing that we had, maybe six months after she

11  had told me, she asked me if I called.  I said, No, no,

12  I never did.  But then maybe I'll call.  I'll just call

13  to check it out.

14  **Q.**   If I could show Government Exhibit number 46,

15  please.  Do you recognize that?

16  **A.**   Yes, I do.  Initially, I didn't see the ad, but my

17  sister-in-law did.  But then afterwards, I looked in

18  the Rhode Island Catholic and I seen this ad, too.

19  **Q.**   So you ended up calling the phone number that was

20  on the ad?

21  **A.**   Yes.  Yes, I did.

22  **Q.**   What happened when you called that number?

23  **A.**   Actually, after the kids had gone off to school, I

24  called, maybe around nine o'clock that morning; and I

25  was just calling to see what it was about and that's

1  all I was calling for.  But then I started talking to

2  the, I guess the secretary for Mr. Caramadre and so she

3  started asking me some questions, but I was just

4  calling for information.

5  **Q.**  Okay.  So you spoke to a woman?

6  **A.**  A woman.

7  **Q.**  And what types of questions were you asked?

8  **A.**  I guess -- well, one of the main ones that I

9  remember was how long my niece had to live.  And it --

10  well, from what the doctors said, it could be any

11  matter of time.

12  **Q.**  In that telephone conversation, was anything said

13  to you about any types of accounts or being asked to

14  participate in any kind of investment program --

15  **A.**  No, not at that time.

16  **Q.**  Did you end up having some type of meeting after

17  that phone conversation?

18  **A.**  I would say within that phone call I made she told

19  that there would be someone calling me back.  And

20  Mr. Raymour called me back not too long afterwards.

21  **Q.**  What do you remember him saying in that phone

22  conversation?

23  **A.**  I can't remember the exact words, but he set up an

24  appointment, asked me if he could come over.  And he

25  was at my house within 20 minutes to a half hour from

1    that first phone call to the secretary.

2    **Q.**    So he did come and visit you at your home?

3    **A.**    Right after, yeah.

4    **Q.**    Who was at your house at that point in time?

5    **A.**    Well, when he arrived, no one was there.  But I

6    was expecting the hospice nurse, and she did arrive

7    shortly after he did.

8    **Q.**    So did you start the meeting before she got there?

9    **A.**    A little bit, yeah.

10   **Q.**    And who participated in the meeting?

11   **A.**    It was just Raymour and myself and the nurse was

12   there and she was listening.  She asked if she wanted

13   me for her to leave.  And I said, Oh, no, it's fine.

14   You can stay.  But eventually she did get up and she

15   left, and Raymour and I were left alone; and Jamie was

16   in the room, the next room over.

17   **Q.**    So Jamie didn't participate in that meeting?

18   **A.**    Jamie didn't participate.  I asked Raymour if he

19   would like to meet her, and he said, Oh, no, no, that's

20   fine.

21   **Q.**    Was Jamie able to sit up?

22   **A.**    All he had to do was walk over to the room.  She

23   wasn't too far over.  The room was, you know, just from

24   here to there, that's where the bedroom was.  And I

25   would have brought him into the bedroom to meet her,

1    but he said it wasn't necessary.

2    **Q.**   With respect to the meeting that you had with

3    Raymour, what did he say to you about why he was there?

4    **A.**   Well, I guess it went along the lines of how much

5    time Jamie had.   Then we sat down and -- oh, he had a

6    check for me.   He had a $2,000 check for me right away.

7    I was so surprised at that.   I thought we were just

8    going to talk about all of this, because I had got

9    Jamie involved with the Dream Foundation, it's the last

10   wish for adults.   And I had to go through a whole list

11   of paperwork and even the doctor had to sign papers.

12        So I thought when he came over that I would have

13   to do something like that.   And I was just so surprised

14   that he handed me a $2,000 check and I didn't have to

15   go through everything I had gone through with the Dream

16   Foundation.

17        So I was like in shock and I was happy.   You're

18   giving me $2,000.   And it was made in my name, not

19   Jamie's name.

20   **Q.**   Do you know why it was made in your name, not

21   Jamie's name?

22   **A.**   Well, I guess because of the ad.   It does say for

23   caregivers.   It doesn't say the patient itself, but--

24   **Q.**   Did he tell you who it was that was providing the

25   money?

1    **A.**   Yeah.  He did tell -- well, I did call the office

2    of Mr. Caramadre, and he did talk about Mr. Caramadre.

3    **Q.**   What did he say about him?

4    **A.**   He actually -- I actually thought he was looking

5    at my house.  It was in such disarray between the eight

6    kids and caring for Jamie, you know, it did need a

7    little painting and stuff.  From what he said, I

8    thought he was looking at the house.  And he goes, Oh,

9    Mr. Caramadre likes to help people in these kind of

10   situations.  You know, maybe we could set up something

11   like a fundraiser for Jamie.  Would you be interested

12   in that?  And I said, Well, I'd have to talk to my

13   husband and I'll let you know.  I didn't say yes right

14   away.  But he wanted to make sure, also, that I was the

15   one that had authority to sign Jamie's name, and he

16   asked me a couple of times about that.

17   **Q.**   Did he tell you why?

18   **A.**   No, he didn't tell me why.

19   **Q.**   What did he say about having a fundraiser for

20   Jamie?

21   **A.**   At that moment, it was just basically that.  I

22   said, Oh, fundraiser?  Yeah.  I definitely could use

23   the help on that.  And like I said, I told him I would

24   talk with my husband about that.  He did call me a

25   couple of days later.  He did call me and ask me --

1    **Q.**   How did the first meeting end?

2    **A.**   I did sign a paper.  I had to -- because I took

3    the check, and I don't -- the way he explained it, I

4    think it was something along the lines of maybe just to

5    prove that I received the check.  It was something like

6    that.  I'm not a hundred percent sure.

7    **Q.**   Did he say anything to you at that first meeting

8    about asking for you or Jamie to do anything in return

9    for Mr. Caramadre, for that money that was being

10   provided?

11   **A.**   No.  Not at that time.

12   **Q.**   Did he mention anything about asking her to

13   participate in any type of investment activity?

14   **A.**   No.

15   **Q.**   Anything for Mr. Caramadre along those lines?

16   **A.**   Not at that first initial meeting.

17   **Q.**   You indicated that after that first initial

18   meeting you heard from Mr. Radhakrishnan again?

19   **A.**   Yes.  He told me he would call me back after he

20   went back to the -- and talked to Mr. Caramadre about

21   Jamie and I.  He did call me back a couple of days

22   later.

23   **Q.**   What did he say when he called you back?

24   **A.**   One of the first things he asked me, he asked me

25   why I didn't cash the check right away.  He said, Oh,

1   you didn't cash the check. How come you didn't cash

2   the check? And I said, Well, with eight kids and

3   taking care of Jamie, there was no time to just run out

4   and cash that check.

5   **Q.** He actually knew that you didn't cash the check?

6   **A.** Yeah. He knew that I didn't cash the check.

7   **Q.** Did he say anything to you to indicate why it

8   mattered when you cashed the check?

9   **A.** Excuse me?

10  **Q.** Did he say anything to you to indicate why it

11  mattered whether you had cashed the check or not?

12  **A.** No. No, he didn't.

13  **Q.** What happened in that conversation beyond that

14  brief discussion about the check?

15  **A.** I'm pretty sure it was that we set up a meeting to

16  meet another time on that. He did talk with

17  Mr. Caramadre, I guess, and he was going to -- we set

18  up a meeting where he would come over and meet with me

19  and talk about that fundraiser.

20  **Q.** So he again repeated that there was a potential

21  fundraiser?

22  **A.** I don't remember. I'm just identifying it that

23  way. I don't know if the second time if he said a

24  fundraiser. I'm not quite sure.

25  **Q.** What, if anything, do you remember him saying

1    about what Mr. Caramadre had told him when you had that

2    conversation?

3    **A.**    I'm not a hundred --

4    **Q.**    You don't remember?

5    **A.**    No, I don't.

6    **Q.**    So you ended up having a second meeting?

7    **A.**    I ended up having a second meeting, and I --

8    **Q.**    Where did that take place?

9    **A.**    In my home.  In my home.  And I had -- that first

10   day that he came over, the nurse, the hospice nurse was

11   there and then also the social worker was meeting with

12   me, and I told her about, you know -- I was so excited

13   about getting $2,000.  I told a lot of people about

14   receiving the money.  So I asked Donna, the social

15   worker from hospice, if she would be with me.  Because

16   of being emotionally drained, taking care of Jamie and

17   I just wanted another set of ears there for that second

18   meeting.  And she did --

19   **Q.**    Who was present for that second meeting?

20   **A.**    My husband was there and Donna from Home and

21   Hospice Care.

22   **Q.**    Is that Donna Benoit?

23   **A.**    Yes.  Donna Benoit.  And Mr. Raymour and

24   Mr. Craddock.

25   **Q.**    A person named Walter Craddock?

1    **A.**    Yes.

2    **Q.**    And so could you describe for the jury what

3    happened at that second meeting.

4    **A.**    Well, they introduced themselves.  And when I told

5    Mr. Craddock our names, he started telling me that he

6    knew my brother-in-law.  Well, he didn't know it was my

7    brother-in-law at the time.  He asked if I was related

8    to a Bernie Larivee, and I said, Oh, yeah, that's my

9    brother-in-law.

10   **Q.**    So you had some small talk?

11   **A.**    Yeah.  You just kind of felt more comfortable, he

12   knew somebody you knew.

13   **Q.**    What did they say about this potential fundraiser

14   at this meeting?

15   **A.**    We sat down and then they started talking.  And

16   from what I best can remember, they started saying that

17   Mr. Caramadre had a bunch of investors that were

18   willing to invest money, and they wanted to open a

19   savings account for Jamie and the investors would all

20   put their money in this savings account and that they

21   would need Jamie's Social Security number.

22          And as they're saying this, I'm doing a lot of

23   thinking to myself but I'm not saying anything.  I'm

24   kind of like a little afraid to say anything.  I just

25   thank God that Donna Benoit was there, and she asked a

1    question and so then that opened me up to ask a

2    question.

3  **Q.**    What question did Donna Benoit ask?

4         MR. LEPIZZERA:  Objection.

5         THE COURT:  Sustained.

6  **Q.**    What question did you ask?

7  **A.**    The question that I -- I don't think I -- it was a

8    question.  I just said I don't understand how -- well,

9    it wasn't a question.  I don't understand how this is

10   going to help Jamie.  Because the other thing they told

11   me that the investors would put their money into this

12   account, savings account, but Jamie was never allowed

13   to touch it.  And I didn't understand how that was

14   going to help her.  If it was a fundraiser for Jamie,

15   and that was what I asked, how is this going to help

16   her if she can't touch this.  And then I was told that,

17   well, from the investment maybe we'll give you another

18   $1,000 but not more than $2,000.

19  **Q.**    So first of all, they told you there was going to

20   be some type of savings account opened?

21  **A.**    That's exactly what they said.  They said it was a

22   savings account.

23  **Q.**    Did they use the term "brokerage account"?

24  **A.**    No.  They said savings account.

25  **Q.**    And they indicated that they'd put money in it,

1    but that Jamie could not touch the money?

2    **A.**   Jamie could not touch it.

3    **Q.**   And did they say why she couldn't touch it?

4    **A.**   No.

5    **Q.**   Did they explain what the relationship would be

6    between -- let me back up a minute.  I keep saying

7    "they."  Who was doing the talking during the meeting?

8    **A.**   Mr. Craddock and Mr. Raymour.

9    **Q.**   So Raymour explained some of it and Mr. Craddock

10   explained some of it?

11   **A.**   Yeah.  Yeah.

12   **Q.**   So what did they say about the relationship that

13   Jamie would have with whoever these investors were?

14   **A.**   They didn't say she'd have any relationship.

15   **Q.**   Did they say anything about like we'd potentially

16   open up some type of an account where she would be a

17   joint owner with rights of survivorship?

18   **A.**   No.  Nothing at all.  That's why I couldn't

19   understand how this was going to help her.  They did

20   tell me that I would get -- we would get $1,000 after

21   the investment, you know, $1,000, maybe 2,000, but not

22   more than that.  I started getting upset because I just

23   started thinking, first of all, I don't see this

24   helping Jamie.  And they were asking for her Social

25   Security number, and I knew Jamie only had a few weeks

1    left.  Then I just could not believe that -- I didn't

2    see any benefit, helping Jamie, and why were they there

3    asking for her Social Security number.  She was right

4    across that wall.  They were sitting against the wall

5    and Jamie was on the other side of the wall.

6          I've taken care -- I took care of Jamie for five

7    years, and I just did not want them -- I didn't want

8    her to be used like that.  I could tell there was

9    something wrong with this picture, and I told them I

10   wasn't interested.  And then they just got up, and we

11   ended the meeting and they left.

12   **Q.**   Did you end up having any additional contact with

13   them after that?

14   **A.**   No.

15   **Q.**   What, if anything, did you do about it?

16   **A.**   I was upset and I just -- first of all, because

17   Mr. Craddock said he knew my brother-in-law, I called

18   my brother-in-law and asked him if he knew a

19   Mr. Craddock.

20   **Q.**   Without telling us what your brother-in-law may

21   have said about Mr. Craddock, what else did you do, if

22   anything?

23   **A.**   I know I contacted my priest, my pastor from All

24   Saints Parish in Woonsocket, and I told him about what

25   was going on.  I told him about the $2,000 that I was

1    given, and then I told him about the second meeting,

2    and I told him I didn't like what I was hearing.  It

3    sounded wrong.  There was something wrong with this,

4    what they were asking me.  There was something wrong

5    with it.  I didn't see how Jamie was going to benefit

6    from this where they told me it was going to be a

7    fundraiser for her.

8         So I talked with him.  And then he got back to

9    me because he talked to a few people and --

10        MR. LEPIZZERA:  Objection.  I just am

11   anticipating it's going to --

12        THE COURT:  Right.

13   Q.   Mrs. Larivee, you had initially received a $2,000

14   check from Mr. Radhakrishnan?

15   A.   Yes, I did.

16   Q.   At least at the time of when he called you after

17   that first meeting, you had not cashed it.

18        Did you end up cashing it at some point?

19   A.   I cashed it two months later.  Two months later

20   after Jamie died, my nephew was shot and killed in

21   Iraq.  And my brother lived in Tennessee.  My husband

22   and I were looking for a van before this happened; and

23   when my brother called me up on August 10th to tell me

24   my nephew had gotten shot and killed, of course I

25   wanted to go down to Tennessee.  So I still had the

1   check.  I never cashed it.  I swore I wasn't going to

2   cash it.  But I used it.  I did cash it, and I used it

3   to put a down payment on our new van so I could go down

4   to Tennessee for my nephew's funeral.

5   **Q.**  If we could go back briefly to the meeting that

6   you had with Mr. Craddock and Raymour, did you ask them

7   if you could have copies of the documents that they

8   wanted to use Jamie's Social Security number on?

9   **A.**  No, I didn't.

10   **Q.**  Did they offer to give you any of those documents

11   to review or share with an attorney or anything of that

12   nature?

13   **A.**  Did they offer me that?  No.

14   **Q.**  They didn't leave you copies of the documents to

15   think about it or anything like that?

16   **A.**  No.  I don't think so.  But I do want to say

17   after --

18       MR. LEPIZZERA:  Objection.  I don't know if

19   there's a question pending.

20       THE COURT:  Right.  You just have to answer

21   questions.

22       THE WITNESS:  Okay.

23       MR. McADAMS:  I have no further questions.

24       THE COURT:  Thank you.

25       Mr. Radhakrishnan, do you have any questions?

1      <u>**CROSS-EXAMINATION BY MR. RADHAKRISHNAN**</u>

2      **Q.**   Good afternoon, Ms. Larivee.  Thank you for coming

3      in today.  I'll be very brief.

4           You testified that you met with me a couple

5      times; is that correct?  Or more than once; is that

6      correct?

7      **A.**   Two times.

8      **Q.**   And the second time that we met, I was accompanied

9      by another gentleman; is that correct?

10     **A.**   Yes.

11     **Q.**   Okay.  And after I had finished explaining the

12     program to you, you said you were not interested; is

13     that correct?

14     **A.**   Yes.

15     **Q.**   Okay.  And isn't it true that me and the attorney

16     I was with left your house after that; isn't that

17     correct?

18     **A.**   Yes.

19     **Q.**   Okay.  And isn't it true I never called you back

20     pressuring you to do anything; is that correct?

21     **A.**   Yes.

22     **Q.**   After that.  Okay.

23          MR. RADHAKRISHNAN:  Thank you very much for

24     coming in today.  Have a good day.

25          THE COURT:  Mr. Lepizzera.

1          <u>CROSS-EXAMINATION BY MR. LEPIZZERA</u>

2     Q.    Good afternoon, Mrs. Larivee.

3     A.    Good afternoon.

4     Q.    My name is Michael Lepizzera.  I represent

5     Mr. Caramadre.  I just have a couple of questions for

6     you.  Okay?  Thank you.

7          So you wind up finding out about this ad and

8     this program, right?

9     A.    Um-hum.  (Affirmative.)

10    Q.    And you called Estate Planning Resources, right?

11    You called the number, and you wound up speaking with

12    Raymour, right?

13    A.    I was speaking with the secretary at first, and

14    then she gave me -- Mr. Raymour called me afterwards.

15    Q.    And Raymour set up a meeting with you, first

16    meeting, correct?

17    A.    He came over right away.

18    Q.    He came over right away.  And he had a check with

19    him that day, right, for $2,000?

20    A.    Yes.

21    Q.    And you testified you were surprised because --

22    what was the other program you went through?

23    A.    Dream Foundation.

24    Q.    Dream Foundation.  You had already had and

25    experience with Dream Foundation, a lot of paperwork, a

1    lot of red tape to get some help for your niece, right?

2    A.    Um-hum.  (Affirmative.)

3    Q.    And you responded to this ad, and Raymour comes to

4    your house and he has $2,000 there for you, correct?

5    A.    Yes.

6    Q.    Surprising, right?

7    A.    Yes.

8    Q.    But you were happy at the time that you received

9    the 2,000, right?

10   A.    I was.  I was so happy that I even called my

11   sister and told her about this program.

12   Q.    You told a number of people about the program,

13   right?

14   A.    Yep.

15   Q.    You didn't get a chance, obviously, you have a lot

16   of children and you were taking care of Jamie at the

17   time, you didn't have a chance to cash the check for a

18   couple of days, right?  I know it took you a couple of

19   months, but you didn't cash the check right away,

20   right?

21   A.    No, I didn't.

22   Q.    And you wound up having a follow-up conversation

23   with Raymour after the first meeting, right?

24   A.    Yes.

25   Q.    And Raymour actually mentioned to you, you didn't

1    cash that $2,000 check, right?

2    **A.**    Right.

3    **Q.**    And he asked you why, right?

4    **A.**    I don't know if he asked me why.  I told him why.

5    **Q.**    He was surprised that you hadn't cashed the check,

6    right?

7    **A.**    He was surprised, yeah.

8    **Q.**    Now, at that first meeting, Raymour never

9    mentioned anything about a savings account, did he?

10   **A.**    Not the first meeting.

11   **Q.**    He never mentioned anything about a joint

12   brokerage account?

13   **A.**    No.

14   **Q.**    Never mentioned anything about stocks or bonds,

15   right?

16   **A.**    Right.

17   **Q.**    He came there with the $2,000 and gave it to you,

18   right?

19   **A.**    First day, yeah.

20   **Q.**    First day.  And he left.  Never asked for any

21   Social Security number at that first meeting, right?

22   **A.**    No.  I signed a paper.  I don't know what that

23   paper was.

24   **Q.**    Your memory was that paper was just some kind of

25   account receipt form acknowledging that you received

1    $2,000 for Jamie?

2    **A.**    Yeah.  I think it was something like that.

3    **Q.**    That was the only form you were asked to sign that

4    day, right?

5    **A.**    Yep.

6    **Q.**    Now, it wasn't until the second meeting and,

7    again, Donna Benoit was there, correct?

8    **A.**    Yes.

9    **Q.**    She was a social worker at hospice?

10    **A.**    For hospice.

11    **Q.**    And you asked her to be there just as a second

12    ear, right?

13    **A.**    Yep.

14    **Q.**    You were present, right?

15    **A.**    Excuse me?

16    **Q.**    You were present, obviously?

17    **A.**    Yes.

18    **Q.**    Was your husband present also?

19    **A.**    Yes.

20    **Q.**    Raymour was present, right?

21    **A.**    Yes.

22    **Q.**    And Mr. Craddock?

23    **A.**    Yes.

24    **Q.**    It wasn't until that second meeting that you

25    described a savings account was discussed, right?

1    **A.**   Yes.

2    **Q.**   And they were asking for Jamie's Social Security

3    number, right?

4    **A.**   Yes.

5    **Q.**   And the reason why they were asking for Jamie's

6    Social Security number was they wanted to use her

7    Social Security number and place it on some kind of

8    savings account, right?

9    **A.**   They said they needed it to open up a savings

10   account.

11   **Q.**   Meaning that her Social Security number was going

12   to be on some savings account, right?

13   **A.**   That's what they told me.

14   **Q.**   And they explained to you that they were investors

15   that would invest money or take their money and put it

16   in that savings account, right?

17   **A.**   Yes.

18   **Q.**   Which would have had Jamie's Social Security

19   number on it, right?

20   **A.**   Yes.

21   **Q.**   So all of that was explained to you, right?

22   **A.**   Yes.   But they also said Jamie could never touch

23   that.

24   **Q.**   I'm glad you mentioned that.   Raymour and

25   Mr. Craddock told you unequivocally that this money

1   that went into this savings account that had Jamie's

2   Social Security number on it, that absolutely Jamie

3   could never touch that money; is that what they said?

4   **A.**   Yes.

5   **Q.**   You were upset by what they told you, weren't you?

6   **A.**   I was very upset.

7   **Q.**   You were actually confused, weren't you?  Did you

8   really understand what they were trying to explain to

9   you?

10   **A.**   I just can't understand how you could have a

11   savings account.  And if this was supposed to help

12   Jamie, why, you know, why she couldn't touch that if

13   this was supposed to help her.  This is the only reason

14   I allowed them to come the second time, because this

15   was supposed to be something for her, like a fundraiser

16   that was going to help her.  That's what I was told the

17   first day.  But then the second day I was told it was a

18   savings account.

19   **Q.**   This word "fundraiser," you said Raymour was

20   looking around your house and you felt --

21   **A.**   I don't know if he was looking around the house.

22   It's not hard when you walk into my house to see that.

23   My house could use some repairs.  I'm not saying that

24   he was looking around.  I felt he was looking around

25   the house and said, Boy, this house could use some

1   repairs.  And you know, he said Mr. Caramadre was a

2   good man.  He liked to help people in our situation.

3   So I'm thinking like a whole makeover or something, but

4   then the second day I was really hurt by it because I

5   didn't see it helping Jamie in any way whatsoever.  And

6   she was right in the room next door.

7   **Q.**   So they presented this proposal to you, right?  In

8   other words, they explained about the savings account

9   and investors and using Jamie's Social Security number.

10  They explained that to you, right?

11  **A.**   Yes.

12  **Q.**   And they were asking you for permission, weren't

13  they, to use Jamie's Social Security number, right?

14  **A.**   Yes.  Yes.

15  **Q.**   And you had a choice, to either allow Jamie's

16  Social Security number to be used or not allow Jamie's

17  Social Security number to be used, right?

18  **A.**   Right.

19  **Q.**   And your decision was no, wasn't it?

20  **A.**   Right.

21  **Q.**   You didn't like the sound of it?

22  **A.**   Right.

23  **Q.**   You really didn't understand it, did you?

24  **A.**   No.

25  **Q.**   And it just didn't sit right in your stomach, did

1    it?

2    **A.**    No.

3    **Q.**    So after you asked a couple of questions, you

4    ended the meeting, right?

5    **A.**    Um-hum.  (Affirmative.)

6    **Q.**    After you ended the meeting, Raymour didn't sit

7    there and say, No, give us another opportunity, we want

8    to explain a little more.  You ended the meeting,

9    right?

10   **A.**    Yes.

11   **Q.**    And Raymour and Mr. Craddock left, right?

12   **A.**    Yes.

13   **Q.**    But before they left, didn't you do one other

14   thing?  Didn't you take the $2,000 that you had not

15   cashed yet and that Raymour had given you at the first

16   meeting, didn't you say to Raymour and Walter Craddock,

17   And by the way, I also don't want this.  Didn't you

18   offer the $2,000 check back to them?

19   **A.**    I don't remember.

20   **Q.**    Is it possible that you did?

21   **A.**    I don't remember.

22   **Q.**    You don't remember?

23   **A.**    No, I don't.

24   **Q.**    But you told us here that you didn't cash it for

25   two months, did you?

1    **A.**   Right.

2    **Q.**   And in fact, and I understand this is -- you had

3    another death of another family member and this is

4    difficult for you, but you had no intention of cashing

5    that check, did you?

6    **A.**   No, I wasn't going to.

7    **Q.**   Although you don't remember offering that check

8    back to Raymour and Walter Craddock, you had no

9    intention of cashing that check, did you?

10    **A.**   I wasn't going to.

11    **Q.**   Because you didn't like what you heard, right?

12    **A.**   Right.

13    **Q.**   But that $2,000 check, Walter Craddock and Raymour

14    never asked for it back, did they, when you asked them

15    to leave your house?  They didn't ask for it back, did

16    they?

17    **A.**   No.

18    **Q.**   Mr. Caramadre didn't put a stop payment on that

19    check, did he?

20    **A.**   Obviously not.  It went through.

21    **Q.**   Because two months later, you really needed that

22    check, right?

23    **A.**   Yes.

24    **Q.**   And I think you -- you used it to buy a van?

25    **A.**   Yes.

1    **Q.**   And that allowed you to travel down south to be

2    with your family members when you really needed to do

3    that?

4    **A.**   Um-hum.  (Affirmative.)  Yes.

5    **Q.**   So that money, that $2,000 you received, right?

6    **A.**   Yeah.

7    **Q.**   And it helped you, it helped you in a time that

8    you really needed it, didn't it?

9    **A.**   Yes, it did.

10        MR. LEPIZZERA:  Thank you for coming here today.

11        THE WITNESS:  Thank you.

12        THE COURT:  Any redirect?

13        MR. McADAMS:  No, your Honor.

14        THE COURT:  Thank you, then, Ms. Larivee.  You

15   may -- why don't you just stay there for a moment.

16   Counsel come up just for a minute.

17        (Side-bar conference.)

18        THE COURT:  I have a note from Juror Number 7,

19   which says that he thinks his children went to school

20   with some of Mrs. Larivee's children and he has not

21   ever met her.  He does think his wife has met her.  I

22   don't think it presents any issue, but I just wanted to

23   bring it to your attention before she left the stand.

24   Does anybody have any issues or concerns?

25        MR. LEPIZZERA:  No.  Everyone is intact.

1          THE COURT:  Okay.  Very good.

2          (End of side-bar conference.)

3          THE COURT:  Thank you for that note, and I

4     covered that issue so I appreciate that.

5          Now, Ms. Larivee, your testimony is complete.

6     You may step down.  Thank you very much.

7          THE WITNESS:  Thank you.

8          THE COURT:  So, I think, ladies and gentlemen,

9     it probably is a good time to break now because I

10    imagine the next witness is going to take a little more

11    than ten minutes with direct and cross-examination.  So

12    to give you a ten-minute early start on the weekend and

13    just to keep things kind of orderly, I think it would

14    probably be good to let you go now.

15         And we had a conversation yesterday.  Counsel, I

16    think everything is pretty much as we thought it was

17    yesterday, correct?

18         MR. VILKER:  Yes.

19         MR. LEPIZZERA:  Yes, your Honor.

20         THE COURT:  So as I told you I'd try to give you

21    a little update today about where the schedule of the

22    trial stands, and I think it's fair to say to you that

23    we're proceeding at a good pace.  We're on track if not

24    maybe a little better than on track.  And the attorneys

25    inform me that they think I can safely tell you that

1    this trial won't last four months and we're into the

2    category of less than four months, proceeding toward

3    three months and I'm hopeful that we can continue to

4    keep a good pace.  That might even improve.

5           But I don't want to give you inflated

6    expectations only to dash them later, so I want to be

7    cautious about what I tell you.  But I do think things

8    are moving along and just my own sense of the pace of

9    things, the technology and otherwise does help a lot

10   and I think these examinations have been going smoothly

11   and we haven't had a lot of interruptions.  So things

12   are, from my perspective, moving along well.

13          So just keep in mind, ladies and gentlemen, over

14   the weekend all of the instructions that I've given

15   you, especially now that you're going to be away for a

16   few days and you may see people who have been reading

17   about this case in the newspaper or seeing things on

18   TV, and they might want to talk to you.  And I just

19   want to remind you not to have any conversations with

20   anyone or do any research or any other way do anything

21   that would expose you to anything related to the case.

22   All right?

23          And we will see you on Monday morning, 9:00 a.m.

24   sharp to start.  And I know Charlie will be working all

25   weekend on more nutritious snacks for you next week.

1           All right.  Have a good weekend.

2           (Proceedings out of the presence of the jury as

3    follows:)

4           THE COURT:  Could counsel just come up for a

5    moment.

6           (Side bar conference off the record.)

7           (Court concluded at 1:30 p.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

C E R T I F I C A T I O N

I, Anne M. Clayton, RPR, do hereby certify that the foregoing pages are a true and accurate transcription of my stenographic notes in the above-entitled case.


/s/ Anne M. Clayton

_____

Anne M. Clayton, RPR




January 10, 2013

_____

Date