**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | ) |
| | ) **Criminal No. 11-186-S** |
| **v.** | ) |
| | ) |
| **JOSEPH CARAMADRE** | ) |
| | ) |
| **and** | ) |
| | ) |
| **RAYMOUR RADHAKRISHNAN** | ) |
| | ) |
| **Defendants.** | ) |

**GOVERNMENT'S OPPOSITION TO DEFENDANT**
**CARAMADRE'S MOTION TO WITHDRAW HIS GUILTY PLEA**

The United States of America, by and through its undersigned attorneys, hereby opposes Defendant Joseph Caramadre's Motion to Withdraw His Guilty Plea.

**INTRODUCTION**

After four days and an avalanche of damning evidence in what was anticipated to be a three to fourth month trial, defendant Joseph Caramadre ("Caramadre") pled guilty on November 19, 2012, pursuant to a written Plea Agreement and signed Statement of Facts.  Almost four months later, as sentencing approaches, Caramadre has moved to withdraw his plea.  A self-proclaimed master of exploiting contractual loopholes, Caramadre's latest now seeks to find a loophole in his guilty plea by blaming, among others, his wife, his lawyers, his psychotherapist, his co-defendant, and the Court. As discussed below, every one of the factors adopted by the First Circuit

1

for evaluating a motion to withdraw a plea militates against granting the defendant's motion. Accordingly, Caramadre's motion to withdraw his guilty plea should be denied.

## PROCEDURAL BACKGROUND

### 1. PRE-TRIAL

On November 17, 2011, Caramadre and his co-defendant Raymour Radhakrishnan were charged in a sixty-six count indictment with wire fraud, mail fraud, conspiracy, identity fraud, aggravated identity theft, and money laundering. Caramadre was also charged with one count of witness tampering. The Indictment alleges that Caramadre devised and executed a fraudulent scheme, later joined by Radhakrishnan, to make millions of dollars by securing the identities of terminally ill people through material misrepresentations and omissions to be used to purchase variable annuities and corporate bonds with death benefit features.

Due to the length of the scheme and the large number of people and transactions involved, trial was anticipated to last between three and four months with seventy-five to one-hundred witnesses. From the outset, Caramadre and Radhakrishnan sought to be tried separately from each other despite the preference for joint trials in the federal criminal justice system. Initially, Caramadre demanded a speedy trial, while Radhakrishnan requested additional time to prepare. The Court balanced these requests by setting the

case for trial in the fall of 2012 and establishing a firm pre-trial schedule.  (See generally ECF Nos. 15, 16, 19, 31, 32, 33).  Both Radhakrishnan and Caramadre then moved for severances, which were denied.  (See ECF Nos. 69 and 84).  Caramadre then moved for a bench trial in order to bifurcate the fact finder.  That effort also failed.  (See ECF No. 95).

The parties, and the Court, then underwent a lengthy and vigorous process of jury selection which entailed issuing and reviewing approximately 500 questionnaires.  Jury selection itself took place over three days in October.

The government prepared for trial, including the preparation of all its witnesses, throughout the summer and fall of 2012.  This was a traumatic experience for many witnesses, who were required to relive some of the most difficult moments in their lives.  Prior to trial, at least seven government witnesses died, including three who were never deposed pre-trial.[1]

## 2. **TRIAL**

Trial began on November 13, 2012.  The government produced overwhelming evidence of both defendants' guilt.  Numerous witnesses testified, including Edwin Rodriguez, a terminally ill

---

[1] Daniel Bulpitt, Michelle Perotta and Matthew Kiely passed away without being deposed because they were not diagnosed as terminally ill and their deaths were not foreseeable to the government.  Richard Wiley, Patrick Garvey, Robert Mizzoni, Leon Bradshaw and Anthony Pittocco passed away after being deposed.  Jason Veveiros was too ill and subsequently passed away without being deposed.

paraplegic for whom testifying was both a physical and emotional gauntlet, and the widows, widowers and children of deceased victims of Caramadre's identify theft scheme.   It was obvious to all observers of the trial, including Caramadre and his wife, that both defendants were likely to be convicted of most, if not all counts, and face lengthy prison sentences.

After three days, at the instigation of Caramadre, the parties began plea negotiations.   The plea agreement and accompanying signed Statement of Facts were painstakingly negotiated throughout the weekend of November 17-18, 2012.   The agreed upon facts were repeatedly revised to accommodate changes insisted upon by Caramadre. Ultimately, counsel for Caramadre (and Radhakrishnan) successfully secured favorable plea agreements, capping the defendants' potential exposure at ten years imprisonment[2].   The government agreed to these favorable terms in order to spare the victims who had not yet testified the additional pain and suffering of enduring that experience, as well as to conserve the government and judicial resources which would be spent over the ensuing months.

On November 19, 2012, the Court conducted a hearing pursuant to Federal Rule of Criminal Procedure 11.   Caramadre, an attorney and member of the Bar of this Court, swore under oath that he had

---

[2] The preliminary draft of the Pre-Sentence Report calculates Caramadre's guideline range as calling for a life sentence.

read, understood and signed the plea agreement and Statement of

Facts.   Caramadre further represented that he was satisfied with the

representation he received from his attorneys and that that no one

had threatened or coerced him in order to get him to plead guilty.

Caramadre assured the Court that notwithstanding his history of

depression and medications, he fully understood the proceedings and

the rights that he was giving up by pleading guilty.   The Court

proceeded with a full and thorough plea colloquy.   After determining

that Caramadre's plea was voluntary, knowing, and intelligent, the

Court accepted Caramadre's plea and adjudged him guilty.   The jury

was discharged and the trial dismantled.   In the hallway after the

plea hearing, Caramadre personally thanked U.S. Attorney Peter

Neronha "for being so fair."

### LEGAL FRAMEWORK

It is a bedrock principal that having chosen to plead guilty,

a defendant possesses no absolute right to retract his plea.   United

States v. Gates, -- F.3d --, 2013 WL 765121 (1st Cir. 2013); United

States v. Negron-Narvaez, 403 F.3d 33, 36 (1st Cir. 2005); United

States v. Marrero-Rivera, 124 F.3d 342, 347 (1st Cir. 1997).

Rather, a defendant may be allowed to withdraw a guilty plea

before sentencing only for a "fair and just reason." Marrero-Rivera,

124 F.3d at 347.   The burden of persuasion rests with the defendant.

Id.   It is "a heavy burden."   United States v. Miranda-Gonzalez, 181

F.3d 164 (1st Cir. 1999).

To determine whether the defendant has met this heavy burden, the District Court must consider several factors, "the most significant being whether the plea was voluntary, intelligent and knowing, within the meaning of Rule 11." Marrero-Rivera, 124 F.3d at 347. "Other relevant considerations include (1) the plausibility and weight of the proffered reason; (2) the timing of the request; (3) whether the defendant asserted legal innocence; and (4) whether the parties had reached, or breached, a plea agreement." Id. See also United States v. Isom, 85 F.3d 831, 834 (1st Cir. 1996); United States v. Cotal-Crespo, 47 F.3d 1, 4 (1st Cir. 1995). "Assuming the defendant carries the burden of persuasion on the aforementioned considerations, the District Court must weigh in balance any demonstrable prejudice to the government were the defendant allowed to withdraw the plea." Marrero-Rivera, 124 F.3d at 347; Isom, 85 F.3d at 835; United States v. Pellerito, 878 F.2d 1535, 1537 (1st Cir. 1989).

## I.   **THE RULE 11 HEARING**

The First Circuit has repeatedly affirmed the refusal to vacate a guilty plea "when Rule 11 procedures have been assiduously observed." United States v. Ramos, 810 F.2d 308, 312 (1st Cir. 1987). "We have identified three 'core' Rule 11 concerns: 1) voluntariness, i.e., absence of coercion; 2) understanding of the charge; and 3)

knowledge of the consequences of the guilty plea." <u>Marerro-Rivera</u>, 124 F.3d at 348, n.7.   "A *total* failure to address *any* "core concern" mandates that a guilty plea be set aside." <u>Id.</u> at 348 (emphasis in original).

"The courts seem to indicate that since they are bending over backwards to make sure that a defendant is aware of what he is doing when he enters a guilty plea, they will not allow a defendant to make a mockery of the system by allowing him to withdraw his plea simply because he changes his mind and now wants a jury trial." <u>Ramos</u>, 810 F.2d 308, quoting *Withdrawal of Guilty Pleas in the Federal Courts Prior to Sentencing*," 27 Baylor L.Rev. 793, 799 (1975).

Far from a total failure to address any core concern of Rule 11, the change of plea colloquy assiduously followed Rule 11 procedures and ensured Caramadre's change of plea was intelligent, knowing and voluntary.   At the beginning of the hearing, Caramadre, an attorney and member of the bar, was placed under oath.   The Court inquired:

> THE COURT: So you've… been sworn in.   I'm going to ask you a series of questions.   You're expected to answer all of my questions truthfully.   If you fail to answer any of my questions truthfully, it could lead to additional charges against you for perjury or for making a false statement.   Do ... you understand that?
>
> MR. CARAMADRE: Yes, your Honor.

(Hearing Transcript at 4).

In order to ensure the plea was knowing, voluntary and intelligent, The Court conducted a thorough Rule 11 colloquy inquiring into multiple topics:

## 1. **COMPETENCE**

THE COURT:     Have ... you been treated recently for any mental illness or addiction to narcotic drugs?

MR. CARAMADRE: Your Honor, I have been treated for mental depression, both lately and for the last twenty years.

MR. TRAINI:    Excuse me, your Honor, if I may.  I have with me a list of Mr. Caramadre's medications so that we don't have to go through them.

THE COURT:     Sure.  Could you just bring that up.

MR. TRAINI:    The Government has seen this, your Honor.

THE COURT:     And can we just confirm, with respect to Mr. Caramadre, that you fully understand all the proceedings that are going on here, correct?

MR. CARAMADRE: That is correct, your Honor.

THE COURT:     And nothing in terms of these medications would have any effect on your ability to comprehend what's going on here?

MR. CARAMADRE: No, Sir.

THE COURT:     And counsel can just confirm that, please.

MR. TRAINI:    Yes, your Honor. That's correct.

THE COURT:     All right.

(Transcript at 5-6).

2. <u>**UNDERSTANDING OF THE CHARGES**</u>


THE COURT: You have seen a copy of the government's charges against you, is that right?

MR. CARAMADRE: That's correct, your Honor.

THE COURT: And you . . . had a full opportunity to discuss all of these charges against you with your counsel; is that right?

MR. CARAMADRE: Yes, your Honor.

(Transcript at 6-7).


3. <u>**UNDERSTANDING OF THE CONSEQUENCES OF PLEADING GUILTY**</u>


THE COURT: And did . . . you have a full opportunity to discuss all of the charges against you and the plea agreements and the consequences of these plea agreements with your counsel before you signed the plea agreements?

MR. CARAMADRE: Yes, your Honor.

***
THE COURT:     Now are … you fully satisfied – first of all, were your counsel able to answer all of your questions regarding all of the charges and the terms of the plea agreements with you?

MR. CARAMADRE: Yes, your Honor.

(Transcript at 7).


4. <u>**SATISFACTION WITH COUNSEL**</u>


THE COURT: And are… you fully satisfied with all of the representation that you've received in this case from your respective counsel?

MR. CARAMADRE: Yes, your Honor.

9

(Transcript at 7).

## 5. <u>ABSENCE OF COERCION</u>

THE COURT: Now, has anyone made any promises to you of any kind in order to get you to – other than what's contained in the plea agreement, or course in order to get you to plead guilty in these cases?

MR. CARAMADRE: No, your Honor.

THE COURT: Has anyone threatened you in any way to get you to plead guilty?

MR. CARAMADRE: No, your Honor.

(Transcript at 7-8).

The Court then proceeded at length to explain to Caramadre the maximum penalties he would face, the terms of the plea agreement, the potential effect of the sentencing guidelines, the waiver of appeal rights, and all the rights Caramadre would have at trial – the presumption of innocence, the right to counsel, the right to cross examine witnesses, the right to remain silent, the right to compel witnesses, the burden of proof, etc.  (Transcript 8-16).  The Court then inquired:

THE COURT: Now, by entering these pleas of guilty today, you're giving up all these rights that I've just described to you and you understand that there will not be or we will not complete the trial in this case.  Do you understand that?

MR. CARAMADRE: Yes, your Honor.

(Transcript at 16).

The Court then asked AUSA Vilker to read into the record the Statement of Facts which formed the basis of the plea agreement.  The Statement of Facts was explicitly negotiated by Mr. Caramadre, an attorney, over a period of days.  After AUSA Vilker read the Statement of Facts into the record the Court inquired:

> THE COURT: So I need to ask you on the record, do … you agree that these facts are true and these are the facts of the case? Mr. Caramadre?
>
> Mr. CARAMADRE: Yes, your Honor.

(Transcript at 25).

> ***
>
> THE COURT: Now I'm going to ask… you how you wish to plead to these charges, guilty or not guilty?  Beginning with you Mr. Caramadre.
>
> MR. CARAMADRE: Guilty.

(Transcript at 25-26).

The Court was and is entitled to rely on these representations by Caramadre.  Marrero-Rivera, 124 F.3d at 352. "A defendant is normally bound by the representations that he himself makes in open Court at the time of his plea."  Gates, -- F.3d. --, 2013 WL 765121 at *10.  "Such statements are more likely to be reliable than later versions prompted by second thoughts."  Id.  Moreover, "it is the

policy of the law to hold litigants to their assurances."

Marrero-Rivera, 124 F.3d at 352. The First Circuit has repeatedly

stated that "'[W]e will not permit a defendant to turn his back on

his own representations to the court merely because it would suit

his convenience to do so.'" Parrilla-Tirado, 22 F.3d at 373 (quoting

United States v. Pellerito, 878 F.2d 1535, 1538 (1st Cir. 1989)).

See also United States v. Martinez-Molina, 64 F.3d 719, 733 (1st Cir.

1995)(statements "made in open court during a plea hearing 'carry a

strong presumption of verity'")(quoting Blackledge v. Allison, 431

U.S. 63, 74 (1977)).

## II.  THE PROFFERED REASONS FOR WITHDRAWAL

Caramadre asserts numerous reasons to justify withdrawal.  He

claims (1) that he was incompetent to plead guilty due to "his

compromised mental health"; (2) "pressures created by the emotional

breakdown of his wife"; (3) his attorneys' "insistent attempts to

induce a plea" and "deficient performance at trial"; (4) "infirmity

in the Rule 11 colloquy" and (5) the existence of an "unwaivable

conflict of interest" with respect to one of his attorneys. (Mem.

In Supp't of Motion to Withdraw at 2).

Like the fraud scheme Caramadre perpetuated on terminally ill

people and financial institutions for nearly fifteen years,

Caramadre's proffered reasons for withdrawal contain numerous

misrepresentations and material omissions. Most notable are the detailed facts he painstakingly negotiated and admitted to under oath in open Court, and now denies.  But even assuming arguendo that the factual allegations made by Caramadre in support of these claims are true (a dubious proposition in light of the presumption in favor of his previous, sworn testimony to the contrary at the change of plea hearing), Caramadre still fails to meet his heavy burden of demonstrating that his guilty plea was a total failure to address any of Rule 11's core concerns.  "[W]hen the defendant's factual allegations, even if true, fail to establish a cognizable defense, they do not provide a reason for permitting withdrawal of a plea." United States v. Allard, 926 F.2d 1237, 1242 (1st Cir. 1991)(citing Barker, 514 F.2d at 220).

### 1. CARAMADRE WAS NOT INCOMPENTENT

Caramadre claims that he was mentally incompetent to plead guilty.  He cites his twenty-year history of depression, his psychologist's unavailability during the weekend that he negotiated the plea and Statement of Facts, pressures he felt as a result of his wife's emotional breakdown, his adamant refusal to plead guilty previously and the surprise of others that he decided to change his plea to guilty. He fails to meet his burden.

13

### A. **MENTAL COMPETENCE**

Nothing in the affidavits submitted by Caramadre demonstrates that Caramadre was mentally incompetent to plead guilty. The affidavit submitted by Caramadre's treating psychiatrist, Sarah L. Xavier, does not indicate that Caramadre suffered from any type of psychosis at the time of the Rule 11 hearing which would render him incapable of making a knowing and voluntary decision to plead guilty. (Defense Exhibit D). To the contrary, the affidavit demonstrates that the only urgent calls Dr. Xavier received from Caramadre occurred on "11/30/12 and 12/08/12," two and three weeks *after* Caramadre pled guilty. Moreover, the affidavit states that Caramadre "pled guilty in the context of his wife's psychological frailty" and "he was struggling with his decision." This demonstrates classic buyer's remorse and is not a valid basis for a plea withdrawal. It is quite apparent that Caramadre, having achieved his desire of stopping the trial, resumed his "intense need to declare his innocence." (See Defense Ex. D). An intense need to declare one's innocence does not mean the person is innocent.

Caramadre also submitted an affidavit from his priest and spiritual adviser, Rev. Robert Lacombe. (Defense Ex. C). Rev. Lacombe's affidavit does not claim any medical credentials or expertise in psychology or psychotherapy, and offers no medical diagnosis that Caramadre was incapable of pleading guilty on November

19, 2012.  In fact, Rev. Lacombe *advised* Caramadre to plead guilty at the time.  Rev. Lacombe writes that "I now realize that lack of a vigorous defense unduly frightened and compromised Mr. Caramadre's decision and adversely affected his family.  Had I known of the specifics of the trial, as I do now, I would not have recommended" that Caramadre plead guilty. (Defense Ex. C).  Rev. Lacombe's affidavit fails to identify his source of information regarding "the specifics of the trial" or "lack of vigorous defense."  Rev. Lacombe's affidavit does not establish incompetence.

Caramadre also submitted an affidavit from his psychotherapist, Dr. Caron Zlotnick. (Defense Exhibit E). Again, Dr. Zlotnick's affidavit offers no claim that Caramadre suffered from psychosis or was incapable of pleading guilty on November 19, 2012.  Its sole purpose is to establish that Dr. Zlotnick was in South Africa during the trial, and was "shocked" when she learned he pled guilty. It was no surprise to anyone who actually saw the evidence presented at trial that Caramadre decided to limit the damage and plead guilty.

Finally, Caramadre submits an affidavit from Dr. James Greer, his current psychiatrist.  (Defense Ex. F).  Dr. Greer's evaluation took place in February 2013, more than two months after Caramadre pled guilty.  Notably, Dr. Greer's affidavit states that "At no point in any history I reviewed or in the course of our examination was there any evidence of or history consistent with psychosis or mania."

15

(Defense Ex. F, pp. 3).  Dr. Greer's affidavit is based on records he reviewed (the statements from Dr. Zlotnick and Dr. Xavier) as well as Caramadre's representations to him.  These included Caramadre's lack of faith in his attorneys and concern for his wife.  Caramadre further told Dr. Greer "I begrudgingly went before the judge and accepted the deal."  Noticeably absent from Dr. Greer's affidavit is any report by Caramadre regarding his role in negotiating the detailed Statement of Facts which he signed, nor the lengthy Rule 11 colloquy undergone by the Court.  Far from "begrudgingly accepting the deal," Caramadre knowingly and intelligently pled guilty of his own free will, because it was in his best interest to do so at the time.

### B. MRS. CARAMADRE'S EMOTIONAL BREAKDOWN

The affidavit submitted by Caramadre's wife states "[t]he government's opening statement was very damaging to Joe's case.  It was the first time that I heard the factual allegations against Joe." (Defense Ex. M, ¶4).  "For the three and a half years prior to the date Joe pleaded guilty, he always asserted his innocence despite the great costs it had to our family.  Joe wanted to prove to our children and family that he was innocent and that he was not a criminal."  (Defense Ex. M, ¶2).  The problem for Mr. Caramadre was that he was not innocent, he is a criminal, and the evidence proved

16

it.   Nonetheless, it appears that despite a 72 page speaking

Indictment issued by the grand jury a year earlier, discovery

provided to Caramadre containing the prior statements of every

potential witness in the government's case, as well as numerous media

reports covering the case, Caramadre apparently succeeded in keeping

his wife in the dark about how he made his fortune.   It is therefore

unsurprising that within two days of observing the witnesses testify

against her husband, Mrs. Caramadre sadly suffered an emotional

breakdown.

While it is unfortunate that Mrs. Caramadre has suffered from

learning of her husband's criminal conduct, any pressure Caramadre

felt to plead guilty in order to ease the pain he caused her is

irrelevant to the plea withdrawal analysis.   As the First Circuit

has said, Caramadre "misperceives the focus of the plea-retraction

inquiry: while evidence of this stripe is probative of an accused's

*motivation* for pleading guilty, it does not necessarily show

coercion, duress, or involuntariness.   Criminal prosecutions are

stressful experiences for nearly all concerned – particularly

defendants and their families.   It is to be expected that feelings

will run strong within a family unit and that loved ones will advise,

counsel, implore, beseech and exhort defendants to take –or abjure-

myriad courses of action.   The relevant question for plea withdrawal

is not whether the accused was sensitive to external considerations

17

– many defendants are – but instead whether the decision to plead was voluntary, i.e., a product of free will." Pellerito, 878 F.2d at 1541 (emphasis in original); see also, e.g., Ramos, 810 F.2d at 314; United States v. Buckley, 847 F.2d 1000 n. 6 (1st Cir. 1988). In this case Caramadre pled guilty freely because he knew he would be convicted and he wanted to limit his exposure in prison time. A voluntary guilty plea does not transform into an involuntary one simply because the defendant wanted to spare his wife from seeing the additional evidence which would have been presented during the rest of the trial.

In sum, Caramadre has failed to meet his burden of establishing his mental health or that of his wife rendered his plea involuntary. The First Circuit is rife with decisions in which defendants have been barred from withdrawing their guilty pleas under similar circumstances.  See e.g., United States v. Sousa, 468 F.3d 42 (1st Cir. 2006)(denial of plea withdrawal where defendant's wife diagnosed with terminal illness four days before trial); Miranda-Gonzalez, 181 F.3d 164 (1st Cir. 1999)(denial of plea withdrawal where defendant took potentially mood altering medication to treat depression and anxiety); United States v. Aker, 181 F.3d 167, 171 (1st Cir. 1999)(no plea withdrawal where defendant despondent over death of his wife); Ramos, 810 F.2d at 314 (denial of plea withdrawal despite defendant claim that emotionally depressed state

18

affected voluntariness of plea); <u>Pellerito</u>, 878 F.2d at 1541 (denial

of plea withdrawal despite depressed state and family pressure);

<u>Figueroa Vazquez v. United States</u>, 718 F.2d 511, 512 (1st Cir.

1983)(denial of plea withdrawal despite claim defendant mentally

incompetent).

### 2. <u>COUNSEL WERE NOT INEFFECTIVE</u>

Caramadre next absurdly blames his decision to plead guilty on

the performance of his attorneys, Anthony M. Traini and Michael J.

Lepizzera.   The standard for evaluating ineffective assistance of

counsel claims pursuant to <u>Strickland v. Washington</u>, 466 U.S. 668

(1984), applies to pre-sentence attempts to withdraw a plea.   <u>Ramos</u>,

810 F.2d at 314.   To prevail, a defendant must show that "counsel's

representation fell below an objective standard of reasonableness."

<u>Id.</u>   The defendant must also demonstrate that "the deficient

performance prejudiced the defense."   <u>Negron-Navarez</u>, 403 F.3d at

40.

It should be noted that Lepizzera represented Caramadre

beginning at least a year prior to return of the Indictment.[3]   Traini

was added as co-counsel in July 2012.   Both Traini and Lepizzera are

---

[3] Since the inception of the investigation, Caramadre (an attorney) has been
represented by numerous lawyers.  He has been represented, in sequential order,
by Robert Flanders and Michael Connolly (plus a team of associates) from Hinckley,
Allen and Snyder; Lepizzera and his partner Scott DeMello of Lepizzera Lapricona;
James T. McCormack; Traini; and currently Randy Olen and Robert Watt.  Caramadre
also briefly appeared pro se.

well respected, veteran defense counsel, highly experienced in
practicing federal criminal law.  Hindsight being twenty-twenty, at
least for Caramadre's current counsel, Caramadre cherry picks
specific strategic and tactical decisions made by counsel during the
four days of what they believed would be a four month trial, (which
of course ended when Caramadre instructed them to initiate plea
negotiations with the government).  The defense case, had there been
one, would not have started until February 2013 at the earliest.
Traini and Lepizzera reserved opening statement so that it could be
delivered at that time.

    In the face of four days of devastating trial testimony, Traini
and Lepizzera successfully negotiated a plea agreement at the request
of Caramadre.  The plea agreement capped Caramadre's exposure to a
maximum sentence of ten years imprisonment with no mandatory minimum.
If the trial continued and Caramadre was convicted, he would have
faced a mandatory minimum sentence of two years imprisonment, maximum
statutory penalties in excess of one hundred years, and an advisory
guideline range of life.  Most defendants would consider that heroic
work.

    Caramadre first claims a failure to investigate witnesses.  As
proof, Caramadre offers an inconclusive e-mail requesting interviews
of three specific witnesses, none of whom were among those who
testified during the four days of trial.  "A defendant is entitled

to lawyerly exercise of reasonable skill and diligence, not to an unquestioning slave in a three-piece suit who will do whatever the client bids, no matter how far-fetched." <u>Pellerito</u>, 878 F.2d at 1543.

Caramadre next critiques Lepizzera's cross-examination. Ironically, Caramadre contrasts Lepizzera's cross of witnesses to the cross-examination of Richard Wiley by prior counsel Robert Flanders and Jeffrey Pine.  In an earlier pleading, Caramadre attempted to suppress the testimony of Wiley and other terminally ill deponents, arguing that Flanders and Pine had no meaningful ability to cross examine. (<u>See</u> ECF No. 52).

In one example, Caramadre particularly faults Lepizerra's failure to establish that Deborah Blowers had undergone a lobectomy, rather than a lobotomy, as Kenneth Blowers testified. Lepizzera's tactical decision not to hammer a widower regarding his understanding of the fine details of his late wife's brain surgery twenty years earlier falls far from "objectively unreasonable," particularly in light of the fact that medical records in evidence documented Mrs. Blowers' limited brain function post-surgery.

In support of his critique, Caramadre submits an affidavit from Harrison Condit.  To the extent that it proves anything, the affidavit itself corroborates Blowers' testimony that he thought he received a phone call from Caramadre without ever previously knowing

21

him.  It fills in a minor and irrelevant detail of how Caramadre got
Blowers' phone number, *i.e.*, through Condit.  It is of no assistance
to Caramadre.  Seen in this light, Lepizzera's "restraint" on
cross-examination seems wise; it is a far cry from "objectively
unreasonable."

Caramadre similarly attacks the cross-examination of other
witnesses, speculating how it could have been done better and
ignoring the inevitable rehabilitation on re-direct.  While it is
convenient for Caramadre to second guess counsel's tactical and
strategic decisions now, they bear no weight on the effectiveness
of the representation.  See United States v. Farrah, 128 F.Supp 2d
103, 116 (D.Conn 2001)(Defense attorney's decisions to forego
opening statement, to forego vigorous pursuit of line of questioning
advocated by defendant during cross-examination, and to forego
calling several witnesses advocated by defendant, were strategic
decisions supported by sound reasoning and thus could not constitute
deficient performance). All told, Caramadre's criticism amounts to
nothing more than arm-chair quarterbacking that falls well short of
ineffective assistance.

### A. ALLEGED CONFLICT OF INTEREST

Caramadre also alleges that Traini had an unwaivable conflict
of interest as a result of his prior (and future) representation of
potential government witness Edward Maggiacomo.  Caramadre makes

this astounding claim even after the Court made a finding, at his urging, that any potential conflict was waivable, and that Caramadre and Maggiacomo both made valid waivers. (ECF. No. 71). Caramadre swore under oath in open Court that he knowingly, intelligently and voluntarily waived any conflict of interest that Traini might have. As has been seen, Caramadre has a habit of reneging his sworn statements. The expiration date on Caramadre's credibility has long since passed.

Next, citing no law whatsoever, Caramadre points to his fee arrangement with Traini and complains that the Court failed to address that "unwaivable" conflict in the form of an incentive for Traini to urge Caramadre to plead guilty. Caramadre, an attorney well versed in fee-arrangements, ignores the fact that he himself was in the best position to provide that information to the Court.

Even assuming the accuracy of Caramadre's descriptions of Traini's advice to plead guilty, there is nothing ineffective or coercive about an attorney advising a client to plead guilty. "Even assuming counsel persuaded him that a guilty plea would serve [the defendant]'s best interest, the resultant plea would not be rendered involuntary." Marrero-Rivera, 124 F.3d at 349; see also Williams v. Chrans, 945 F.2d 926, 933 (7th Cir. 1991)("Advice, even strong urging, by counsel" does not invalidate a guilty plea).

"Nor can the mere fact that [defendant] and counsel may have

undervalued the merit of any potential defense render the Rule 11 plea involuntary." Marrero-Rivera, 124 F.3d at 350.  "In determining whether to arrive at a plea agreement, criminal defendants, with the assistance of counsel, must compare the merit of their defenses with the strength of the government's case, as well as the penalties likely to be imposed pursuant to a plea agreement or following trial.  Were it otherwise, the belatedly-realized mistakes in their pre-plea assessments were deemed sufficient, without more to warrant plea withdrawals, plea agreements and the pleas entered pursuant to them would become meaningless."  Id.

3. **THE TIMING OF CARAMADRE'S REQUEST**

Caramadre did not file his Motion to Withdraw until more than three months after his change of plea. "The timing of a motion to withdraw a guilty plea is significant.  Delayed requests, even if made before sentencing, are generally regarded with disfavor." Parrilla-Tirado, 22 F.3d at 373. "The rule of thumb is that the longer a defendant waits before moving to withdraw his plea, the more potency his motion must have in order to gain favorable consideration."  Id. Accord, Isom, 85 F.3d at 838 ("We have repeatedly noted that the more a request is delayed - even if made before sentence is imposed - the more we will regard it with disfavor").  "A swift change of heart reduces the likelihood of prejudice to the government from permitting withdrawal, and strongly indicates that the plea was entered in

'haste and confusion.'" Ramos, 810 F.2d at 312.  Accordingly, the First Circuit has found even small delays in the filing of a motion to withdraw pleas grounds for denying the motions.  E.g., Ramos, 810 F.2d at 313 (thirteen day delay too long); United States v. Keefe, 621 F.2d 17, 18 (1st Cir. 1980) (three week delay too long); Nunez Cordero v. United States, 533 F.2d 723, 726 (1st Cir. 1976) (two week delay too long).

Caramadre's own affidavit admits that it was not until December 20, 2012 that Caramadre raised the issue of withdrawing his plea with attorneys Lepizzera and Traini, demanding they put in writing his options.  (Defense Ex. K, ¶4). Caramadre did not even request additional time to file the Motion to Withdraw the plea until January 11, 2013.  That request came after the draft PSR was issued, identifying a guideline range of life and likely restitution in the tens of millions of dollars.  It then took an additional 6 weeks before the actual Motion to Withdraw was filed. It is quite transparent that Caramadre's "change of heart" is a calculated maneuver, and his purported justifications for withdrawal have been painstakingly assembled over many months.  "Courts need not accept a defendant's explanations uncritically." Parilla-Tirado, 22 F.3d at 373.

## 4. <u>ASSERTION OF LEGAL INNOCENCE</u>

Caramadre makes much of his loud and frequent ballyhoos of innocence.  Indeed, both his psychotherapist and his wife comment on his "intense need to declare his innocence to the world" and "to prove to his children and family he is innocent." (Defense Ex. D and M).  But "merely voicing a claim of innocence has no weight in the plea withdrawal calculus; to be given weight, it must be credible." <u>Gates</u>, -- F.3d --, 2013 WL 765121 at *9, citing <u>United States v. Sanchez-Barreto</u>, 93 F.3d 17, 24 (1st Cir. 1996).  Caramadre's claim of innocence has no credibility.  "It is contradicted by the change of plea colloquy in which he acknowledged that he committed the charged offenses.  The defendant listened to the prosecutor's opening statement and the testimony of the government's initial witnesses, heard the prosecutor vouch for that version of the case, accepted the accuracy of that version and admitted his culpability." <u>Id.</u>

"There are few if any criminal cases where the defendant cannot devise some theory or story which, if believed by a jury, would result in his acquittal.'" <u>Kobrosky</u>, 711 F.2d at 455 (<u>citing</u> <u>Nunez- Cordero</u>, 533 F.2d at 726)(<u>quoting</u> <u>Barker</u>, 514 F.2d at 221).  "Weak and implausible assertions of innocence" made long after a properly entered guilty plea cannot provide the basis for withdrawal of that plea.  <u>United States v. Sanchez-Barreto</u>, 93 F.3d 17, 24 (1st Cir.

1996).  Caramadre's assertion amounts to nothing more than a blanket denial of the very facts he himself negotiated, signed and swore to under oath.  It gets no weaker.

### III.  **PLEA AGREEMENT**

The final factor, whether the defendant and the government have reached a plea agreement, also militates against allowing the defendant to withdraw his plea.  Caramadre reached a plea agreement with the Government which ended a trial in progress.  He negotiated the Statement of Facts supporting the plea and swore to them under oath.  He ought to be held to it.

### IV.  **PREJUDICE TO THE GOVERNMENT**

As noted above, even assuming Caramadre carried his burden of persuasion, the Court would need to weigh any prejudice to the government if it were to permit withdrawal of the plea.  Here the prejudice would be significant.  As an initial matter, if the Court were to permit Caramadre to withdraw his plea, the government would be required to move to vacate co-defendant Radhakrishnan's guilty plea as well.  As the Court and both defendants are aware, and the plea agreements explicitly state in Paragraph 1(b), the defendants were offered a package plea deal. If the Court were to decline to vacate Radhakrishnan's plea, Caramadre would effectively be permitted to circumvent this Court's order denying severance.  He

will have found his "loophole," and yet again, he will have lied to get through it.

Moreover, due to the nature of the scheme Caramadre developed, numerous potential government witnesses were already deceased or dying as the investigation got underway.  Over Caramadre's hard fought objections, the Court permitted the government to depose, in the presence of Caramadre and subject to cross-examination by his counsel, several terminally ill witnesses who had outlived their diagnoses.  As noted above, several witnesses died between the time the Indictment was issued and the trial. It is unknown how many further government witnesses will be unavailable if a new trial is permitted.  One government witness, Edwin Rodriguez, is in extremely poor health and it is highly uncertain whether he would be able to testify again.  Mr. Rodriguez has already endured the physical, mental, and emotional trauma of testifying and being cross-examined (not to mention the necessary preparation) both in a Rule 15 deposition and at trial.  Other government witnesses include elderly family members of terminally ill people who have since died.  Many of these family members are themselves in poor health and may not be able to testify if a new trial were granted.

Assembling the trial and preparing the witnesses was an enormous and expensive undertaking which would need to be repeated.  The AUSAs and assigned case agents spent close to one hundred percent of their

time preparing for trial.  Repeating the exercise diverts resources from important matters.  Selecting a new jury would be time consuming and difficult, particularly in light of the defendants' well publicized guilty pleas.  The previous jurors made sacrifices in their personal and professional lives to serve on the jury; their sacrifice would be wasted and required from yet another group of citizens.  In addition, Caramadre's latest attorneys would likely request additional time to prepare since they would need to learn the case to prepare for trial.

Most importantly, Caramadre's victims deserve closure.  His pernicious scheme has done enough damage to their lives.  He invaded the sanctity of their most precious moments, the hour of their loved one's death.  He was entitled to a fair trial; he received one.  He ended the trial and pled guilty because it was in his interest to do so, knowing that he was giving up that right forever.  His victims should not need to relive the ordeal again so that Caramadre can get a second bite at the apple.

### V. NO NEED FOR EVIDENTIARY HEARING

An evidentiary hearing on Caramadre's Motion to Withdraw His Guilty Plea is unnecessary because the facts alleged by Caramadre, even if taken true, would not entitle him to relief.  United States v. Pulido, 566 F. 3d 52, 57(1st Cir. 2009).  Evidentiary hearings are not an entitlement; they are the exception, not the rule.  Isom, 85

F.3d at 838.   There is nothing in the facts submitted by Caramadre that calls into question his competency to plead guilty.   Nor does anything in Caramadre's submission change that fact that he is an attorney who knowingly, voluntarily and intelligently pled guilty after negotiating and signing a detailed Statement of facts and Plea Agreement.

Finally, by claiming ineffective assistance of counsel, Caramadre waives the attorney client privilege with respect to his representation by Attorneys Traini, Lepizzera and DeMello.   In the event the Court does decide to grant an evidentiary hearing, it will be necessary for the government to interview each of them, which in turn, requires the permission of the Court.

**CONCLUSION**

For the reasons set forth herein, Defendant Caramadre's Motion to Withdraw His Guilty Plea should be denied.


Respectfully submitted,
PETER F. NERONHA
UNITED STATES ATTORNEY


/s/ John P. McAdams
JOHN P. McADAMS
Assistant U.S. Attorney

LEE H. VILKER
Assistant U.S. Attorney

## CERTIFICATE OF SERVICE

I hereby certify that on this 12th day of March, 2013, I caused the within Government's Opposition to Defendant Caramadre's Motion to Withdraw his Guilty Plea to be served via the Court's Electronic Filing System on:

**For Joseph Caramadre:**
Randy Olen, Esq.
Robert Watt, Esq.

**For Raymour Radhakrishnan:**
Olin Thompson, Esq.

**Courtesy Copies:**
Anthony M. Traini, Esq.
Michael J. Lepizzera, Esq.
Scott DeMello, Esq.

/s/John P. McAdams
John P. McAdams
Assistant U.S. Attorney
United States Attorney's Office
50 Kennedy Plaza, 8th Floor
Providence, RI 02903
john.p.mcadams@usdoj.gov