IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND


```
* * * * * * * * * * * * *   CRIMINAL ACTION
UNITED STATES OF AMERICA  *   11-186-S
                          *
VS.                       *   APRIL 24, 2013
                          *   VOLUME I
JOSEPH CARAMADRE          *
                          *   PROVIDENCE, RI
* * * * * * * * * * * * *
```

HEARD BEFORE THE HONORABLE WILLIAM E. SMITH

DISTRICT JUDGE

(Motion to Withdraw Guilty Plea)


**APPEARANCES**:

FOR THE GOVERNMENT:    JOHN P. McADAMS, AUSA
and STEPHEN DAMBRUCH, AUSA
U.S. Attorney's Office
50 Kennedy Plaza
Providence, RI  02903

FOR THE DEFENDANT
Joseph Caramadre:    RANDY OLEN, ESQ.
Olen Law Office
55 Bradford Street
Suite 203
Providence, RI  02903

ROBERT D. WATT, JR., ESQ.
84 Ship Street
Providence, RI  02903

Court Reporter:    Anne M. Clayton, RPR
One Exchange Terrace
Providence, RI  02903


Proceeding reported and produced by computer-aided
stenography

I N D E X

WITNESS                                                      PAGE

JOSEPH CARAMADRE

  Direct Examination by Mr. Watt:                            16
  Cross-Examination by Mr. McAdams:                          99
  Continuation of Cross-Examination
  by Mr. McAdams:                                            202

JAMES GREER

  Direct Examination by Mr. Watt:                            172
  Cross-Examination by Mr. McAdams:                          177
  Examination by Mr. McAdams:                                186

CARON ZLOTNICK

  Direct Examination by Mr. Watt:                            188
  Cross-Examination by Mr. McAdams:                          193
  Redirect-Examination by Mr. Watt:                          197

GOVERNMENT EXHIBITS

1   -                                                        102
2   -                                                        104
3   -                                                        113
6   -                                                        159
8   -                                                        203
9   -                                                        211
10  -                                                        216
11  -                                                        221
12  -                                                        229

DEFENDANT EXHIBITS

A   -                                                        177
B   -                                                        192
C   -                                                        199

_____

1    24 APRIL 2013 -- 9:30 A.M.

2         THE COURT:  Good morning, everyone.  This is the

3    matter of the United States versus Joseph Caramadre.

4    We're here on the Defendant's motion to withdraw his

5    plea of guilty.

6         Let's begin by having counsel identify

7    themselves for the record, please.

8         MR. OLEN:  Good morning, your Honor.  Randy Olen

9    for Mr. Caramadre.

10        MR. WATT:  Judge, Robert D. Watt, Jr., for

11   Mr. Caramadre, co-counsel with Mr. Olen.

12        MR. McADAMS:  Good morning, your Honor.  John

13   McAdams and Stephen Dambruch on behalf of the United

14   States.

15        THE COURT:  Okay.  Thank you.  All right.  We've

16   had a number of preliminary discussions with regard to

17   how this hearing will proceed.  There are a couple of

18   matters that we should take up before we begin with the

19   presentation of any evidence, and I think the first is

20   to hear from Mr. Gerstein with respect to this request

21   for the file that Mr. Olen and Mr. Watt have made.

22        I don't want to keep you around all day so do

23   you want to talk about that now?  You're welcome to

24   stay as long as you like.  Nice to see you again,

25   Mr. Gerstein.

1    MR. GERSTEIN: With respect to their request for

2    the file, on this past Sunday at about three o'clock,

3    Mr. Olen apparently sent me an e-mail which was the

4    first request that I had received or that Mr. Traini or

5    Mr. Lepizzera had received for a copy of the entire

6    file, and the demand was that it be produced

7    immediately, which I responded to. And Mr. Olen in his

8    e-mail tied the production of the file to this Court's

9    order. And my response to that was, as I read the

10   order, you bifurcated the issues, one in terms of a

11   waiver of the attorney-client privilege with respect to

12   this hearing; and the second aspect of your order had

13   to do with document production, and the document

14   production was very defined and narrow.

15        So in response to Mr. Olen, I said two things,

16   essentially.

17        One, you're tying it to Judge Smith's order, and

18   Judge Smith's order basically restricts what can be

19   produced; and the fact that you're claiming ineffective

20   assistance of counsel in your request requires a total

21   review of everything that my clients did. That seems

22   to me contrary to what Judge Smith ordered when you

23   said it doesn't have to be production in terms of

24   things like the claim of lack of investigation, failure

25   to cross-examine, et cetera.

1          And I suggested to Mr. Olen that what he was

2     requesting at the time was, in my view, inconsistent

3     with your order and that if the Court ruled otherwise,

4     so be it.  Although I still had problems with the

5     timing of it.

6          In response to that, Mr. Olen sent me a second

7     request which now he claims that, no, he's not

8     requesting the file pursuant to the order but now he's

9     requesting the file under the Rules of Professional

10    Responsibility that would require or give his client

11    the right to ask my clients for their entire file,

12    which is a totally different animal than what he

13    presented to me on Sunday.

14          THE COURT:  Without going back and rehashing the

15    e-mail communications between you and Mr. Olen, it

16    seems to me that the client, Mr. Caramadre, is entitled

17    to the file.  There's this question of attorney work

18    product, which as I reviewed the law, and it had been a

19    lot of years since I looked in this, but we have a

20    rule, there is a rule in Rhode Island that's somewhat

21    at odds with the prevailing rules in other

22    jurisdictions and the model rules as to the retention

23    of documents that are attorney work product.  And as I

24    understand it, the Supreme Court Ethics Advisory Panel

25    opinion 92-88 in 1993 said that you could withhold

1    attorney work product, and that was acknowledged again

2    in 1996, but there really hasn't been anything since

3    then.  And the rules have kind of moved in the other

4    direction in the model rules and elsewhere.  So we have

5    this kind of odd situation.

6         So I thought the position that Mr. Traini and

7    Lepizzera were taking through you was they wanted to

8    withhold attorney work product, but it does seem to me

9    that there's nothing to prevent them, if they choose to

10   do so, from turning over attorney work product and

11   maybe they'd be willing to do that in this case so that

12   we don't have to kind of figure out whether the Rhode

13   Island rule is still a good rule even though it's 20

14   years old.

15        Would you, would they be willing to do that, to

16   turn the whole file over to Mr. Olen?

17        MR. GERSTEIN:  Well, the difficulty, your Honor,

18   and I would certainly speak with them in more detail

19   about that, the research that I have done with respect

20   to the work product privilege indicates to me that the

21   privilege in fact belongs to the attorney.  Although,

22   you know, the client might be willing to waive the

23   so-called work product privilege, ultimately, it's up

24   to the attorney to make that decision.

25        One of the difficulties with respect to

1    producing the file is, quite frankly, as the Court I'm

2    sure is well aware, the file is quite huge and it's a

3    very time-consuming task to go through the file and

4    determine what is work product, what is not work

5    product, whether there is anything in the file as often

6    happens with large files that is misfiled and relates

7    to another case.  So it's really not a simple process

8    of, okay, here's a bunch of CDs or here's a bunch of

9    disks or here's a copy of the hard drive.  That I know

10   my clients are not willing to do, just make a copy of a

11   hard drive and turn it over without having the time to

12   go through and review what it is that they're turning

13   over.

14        So I might not be directly answering your

15   question.

16        THE COURT:  Well, maybe a way around this is to

17   simply make the file available to counsel for review

18   under some kind of protective order that ensures that

19   if somehow a piece of paper was misfiled in there that

20   belonged to another case or something, that they would

21   not look at it and they would -- that way, you wouldn't

22   have to copy everything.  Maybe there's a way to do it

23   that would kind of cut through all this because I don't

24   want this to become a side show to this motion and

25   that's what I'm afraid is going to happen.

1          So as you say, it's the attorney's right to

2     assert the attorney work product privilege, but if the

3     attorney doesn't choose to exercise that privilege,

4     then simply the whole file could be either turned over

5     or made available for inspection.  There's a real

6     question, which I'm going to get to later with these

7     other folks, as to whether any of this is relevant to

8     this motion or would be relevant to this motion, but

9     it's hard to know that without giving them some access.

10         You know, they have to show that there's some

11    link to the decision of Mr. Caramadre to plead guilty,

12    and we're going to get to that with them.  But in terms

13    of facilitating this inspection of the file, I'm just

14    wondering if Mr. Traini and Mr. Lepizzera would agree

15    not to invoke the work product privilege, would make

16    the whole file available and we could kind of expedite

17    this.

18         MR. GERSTEIN:  Well, I can certainly speak with

19    them and let them know the Court's thoughts.  I just

20    don't think as I stand here at the podium right now I

21    can, you know, commit to any position because what I

22    see happening with what I call this expansion or

23    fishing expedition is changing dramatically the nature

24    of the hearing before the Court and, you know, quite

25    frankly, from reading the papers filed by the

1    Defendant, from reading the Court's decision, from

2    reading the Government's responsive papers, it was my

3    understanding and my client's understanding that with

4    respect to these allegations of ineffective assistance

5    of counsel they had been defined with some specificity

6    with respect to certain areas; and even though the

7    Court indicated that the waiver of the privilege is

8    essentially co-terminus with the representation, the

9    Court seemed to focus on the particular allegations

10   that were made on behalf of Mr. Caramadre and that is

11   what my clients have spent a fair amount of time

12   gathering information, providing information to both

13   the Defendant and the Government and to the Government

14   with the consent of the Defendant and now the door is

15   sort of being opened to what happened on day one, what

16   happened on day two, which is, you know, a totally

17   different manner of preparation and examination and the

18   course of the hearing before the Court.  I understand

19   you're the decision maker, but, again, I will speak

20   with them and I can get back to you.

21          THE COURT:  I totally understand where you and

22   where they are coming from.  I don't think that

23   actually where you're coming from is very different

24   than how I see the case.  You haven't been present in

25   the chambers conferences I've had with counsel, but

1    I've let Mr. Olen and Mr. Watt know pretty clearly that

2    I have no intention of opening this thing up into a

3    2255 kind of proceeding on ineffective assistance of

4    counsel.  That's not what it's about.

5         There is law, though, that says pretty clearly

6    that if a defendant pleads guilty as a result of

7    ineffective assistance of counsel, so, for example, in

8    response to bad advice to take a plea where a defendant

9    shouldn't have taken a plea or where a defendant has

10   felt so overwhelmed by the ineffective assistance that

11   he felt compelled to plead guilty in order to avoid a

12   bad outcome, that that can be grounds for a withdraw of

13   a plea of guilty.

14        Now, I'm not in any way suggesting that that's

15   the case here, but as I've told counsel, I don't know

16   what the evidence is going to be from the Defendant

17   about these matters so it might be that they don't meet

18   that burden and we never get to what's in that file.

19   But on the possibility that there will be evidence

20   suggesting that that's why Mr. Caramadre pled guilty,

21   then opening up the whole file could possibly be

22   relevant to that inquiry.  And that's where Defendants

23   are -- that's what they're trying to claim here.

24        So what I'm trying to do is just facilitate

25   things a little bit.  I'm not saying the rest of the

1   file would be relevant; but if at the end of today they

2   persuaded me that it is relevant, I'd like to have you

3   and Mr. Traini, Mr. Lepizzera have already considered

4   this possibility of just making the file available.

5   That's what I'm trying to get at.

6          MR. GERSTEIN:   I certainly appreciate it and I

7   will speak with Mr. Traini and Mr. Lepizzera.  Again,

8   there's going to be, I can assure the Court, there's

9   probably going to be some sort of a timing factor.  But

10  I would also comment that Mr. Caramadre who is sitting

11  in court, who has filed papers, his papers and made the

12  allegations knows exactly what it is that he's going to

13  tell the Court to try to get over this hurdle in terms

14  of having his plea vacated.  And the Court, even though

15  I can't examine Mr. Traini and Mr. Lepizzera, the Court

16  will also have the opportunity to hear from them with

17  respect to the areas and issues that Mr. Caramadre has

18  identified as the basis for his motion; and it may well

19  be that after the Court hears that, the Court will

20  decide or at that point in time might be more prudent

21  to make a decision as to whether the entire file has to

22  be opened and the course of the hearings modified and

23  the issues of privilege addressed.  Because if

24  Mr. Traini and Mr. Lepizzera agree to waive the work

25  product privilege for this hearing, it's waived for all

1    time and for all purposes and it's nothing that can be

2    called back, and Mr. Caramadre has already made plain

3    his future plans with respect to further attacks on

4    Mr. Lepizzera and Mr. Traini.

5         THE COURT:  I'm in total agreement with what

6    you're saying.  We're going to cross that bridge at the

7    end of the day, so we'll see where we are at the end of

8    the day.

9         MR. GERSTEIN:  I'll speak with my clients at

10    some point.

11         THE COURT:  Thank you, Mr. Gerstein.

12         All right.  Now, Mr. Olen you wanted to be heard

13    on the record with respect to your request for

14    additional time, which I've denied informally.  You go

15    ahead.

16         MR. OLEN:  Yes, your Honor.  I just want to put

17    on the record that we filed a motion to continue this

18    case.  We need more time, quite frankly.  We don't

19    believe we've been given enough time to go through

20    the -- let me say --

21         THE COURT:  Let's get a few things out on the

22    record, first of all.  When was the plea entered?

23         MR. OLEN:  November 19th.

24         THE COURT:  Okay.  And when did you file your

25    first filing with the Court suggesting that you were

1    considering a motion to withdraw the plea?

2           MR. OLEN:  I believe it was January 10th or

3    January 11th.

4           THE COURT:  How much time did you ask for when

5    you came in to meet with me?

6           MR. OLEN:  To submit my memorandum?  I really

7    don't recall, your Honor.  I forget.  I did ask for

8    some time to submit the memorandum.  Submitting my

9    opening memorandum in the motion to withdraw, I never

10   asked for time to actually prepare the hearing.

11          THE COURT:  You asked for a month.

12          MR. OLEN:  To file the motion, to file a memo,

13   Judge, but not to prepare for the hearing.

14          Your Honor, on February 7th, I received from

15   Mr. Lepizzera a hard drive which contains 350,000

16   documents.  And I believe that in order to prepare this

17   case properly, I'm not saying I have to read every tax

18   return or everything that's in there, but I certainly

19   need more time to prepare this case than how ever long

20   we've had since we filed the motion.  I've only had

21   their file for two months; and in fact, as it turns

22   out, I don't even have their file.  I received a -- in

23   the letter that came along with the disk on February

24   7th, the cover letter from Mr. Lepizzera said here is

25   the file.  Well, it wasn't the file.  It was part of

1    the file.

2         With respect to the time involved, Judge, I

3    asked Mr. Watt to assist me on this case because it

4    became clear to me once I got that hard drive that

5    there was no way that we could properly prepare for a

6    hearing without assistance.  Mr. Watt's time has been

7    limited for personal reasons as we indicated to you in

8    our previous discussions.

9         In addition to just the general necessity for

10   more time to go through all these documents and prepare

11   witnesses and prepare cross-examination, we now find

12   out that we don't even have everything in the file that

13   we need.  And I won't -- we're agreeable to the Court's

14   suggestion to Mr. Gerstein to let us view the file

15   under some kind of a protective order so I won't go

16   into that as deeply as I would otherwise go into it,

17   but I do want to note that Mr. Gerstein's last

18   suggestion that perhaps we could proceed with the

19   examination of the attorneys before we decide whether

20   or not we can see the file is absurd, your Honor.  We

21   need those documents in order to prepare the

22   cross-examination.  Out of the 350,000 pages of

23   documents, your Honor, I don't have one piece of paper

24   with a note of an interview.  The trial notebook is

25   referred to in the e-mails.  That's missing.  We need

1    these materials.  We need to review these materials in

2    order to properly present Mr. Caramadre's case.

3         THE COURT:  Well, what I told you in chambers

4    I'll tell you again, which I was not going to postpone

5    the hearing that we had scheduled today and I would

6    take up the issue of whether we would continue this

7    matter to another date beyond today after we get

8    through with taking of evidence today but that I was

9    not going to lose a day that I had set aside.  It seems

10   to me that you've had plenty of opportunity to prepare

11   Mr. Caramadre for his testimony.  He says you say in

12   your papers that he immediately began reconsidering his

13   decision to plead guilty right after he pled and that

14   was November.  So it's been four months, and I think

15   it's perfectly appropriate to move forward this

16   morning, this afternoon, and we'll see where we are at

17   the end of the day.

18        MR. OLEN:  That's fine, your Honor.

19        THE COURT:  All right.  So are you ready to go

20   forward?

21        MR. OLEN:  Yes, your Honor.

22        THE COURT:  This is your motion so you can call

23   your first witness.

24        MR. WATT:  Judge, we call Joseph Caramadre.

25        **JOSEPH CARAMADRE**, first having been duly sworn,

1    testified as follows:

2              THE CLERK:  Please state your name and spell

3    your last name for the record.

4              THE WITNESS:  Joseph Caramadre,

5    C-A-R-A-M-A-D-R-E.

6              THE COURT:  Good morning, Mr. Caramadre.

7              THE WITNESS:  Good morning, your Honor.

8              THE COURT:  Go ahead, Mr. Watt.

9              MR. WATT:  Thank you, Judge.

10             **DIRECT EXAMINATION BY MR. WATT**

11   **Q.**   Where do you live, Mr. Caramadre?

12   **A.**   I live in Cranston, Rhode Island.

13   **Q.**   And what address?

14   **A.**   At 90 Beechwood Drive.

15   **Q.**   And do you know where Mr. Lepizzera lives?

16   **A.**   Yes.  He lives a couple blocks down the road on

17   Beechwood Drive.

18   **Q.**   And how long has that relationship of your house

19   to his house been the case?

20   **A.**   Well, probably I would say about ten years that

21   Mr. Lepizzera moved to Beechwood Drive.

22   **Q.**   Can you tell the Court how you're trained and

23   educated.

24   **A.**   Well, I am trained in the field of finance and

25   law.  I've got an undergraduate degree from the

1   University of Rhode Island, have a law degree from

2   Suffolk University.  I've got various other credentials

3   such as a CPA, CFP, CLU, ChFC.

4   **Q.**   Could you explain those letters on the --

5   **A.**   Yeah.  A CPA is a certified public accountant; a

6   CFP is a chartered -- excuse me, certified financial

7   planner, a CLU is a chartered life underwriter, a ChFC

8   is a chartered financial consultant.  So I've at least

9   those designations.  I may have had more in the past.

10  **Q.**   Married?

11  **A.**   Yes, I'm married.

12  **Q.**   Children?

13  **A.**   Twenty-two years marriage and three children, yes.

14  **Q.**   What are the ages of your children?

15  **A.**   Yes, I have children.

16  **Q.**   How old are they?

17  **A.**   They are 19, 17 and 13.

18  **Q.**   Reside with you?

19  **A.**   Yes, they do.

20  **Q.**   Are you discharging any employment in any of the

21  fields or certifications that you've described to the

22  Court?

23  **A.**   Well, as of July of 2011, my doctors determined

24  that I -- my depression is too severe for me to be

25  functioning as an attorney and financial consultant.

1    **Q.**    So the answer to my question?

2    **A.**    The answer is I have been discharged of

3    employment, yes.

4    **Q.**    As of June of '11?

5    **A.**    As of July 2011.

6    **Q.**    Okay.  Which doctors?

7    **A.**    Dr. Lewis Weiner, who's an internist; Dr. Caron

8    Zlotnick, who is a psychologist; and Dr. Sarah Xavier,

9    who is a psychiatrist.

10   **Q.**    And any of those treat you on and after the time

11   of your disengagement from your employments?

12   **A.**    Yes.  I've seen Dr. Weiner for five or six years.

13   I've seen Dr. Zlotnick since 2009 so two years before

14   the disability.  I saw Dr. James Whalen for 15 years

15   before the disability as a psychiatrist.  He recently

16   retired from practice and Dr. Xavier took over in 2011.

17   **Q.**    Are you seeing any of them now?

18   **A.**    Yes.  I see Dr. Zlotnick every week as a

19   psychologist.  It's part of my probation requirements,

20   which I would normally see her anyway.  And I see both

21   Dr. Weiner and Dr. Xavier as needed.

22   **Q.**    Did either Mr. Lepizzera or Mr. Traini, to the

23   best of your knowledge, ever have any contact with

24   either of the doctors, Dr. Zlotnick or Dr. Xavier?

25   **A.**    Yes.  Sometime in 2010, Mr. Lepizzera accompanied

1   me to a visit for my psychological therapy with

2   Dr. Zlotnick.  The purpose of his exam was to learn how

3   I am managing severe and major depression and how he

4   could be of help to me.

5   **Q.**   And with regards to Dr. Xavier?

6   **A.**   Dr. Xavier?  Mr. Lepizzera had at least one

7   lengthy phone call with her in 2012, I believe it was

8   February, and could have spoken to her again between

9   February of 2012 and the start of the trial, which was

10  November of 2012.  However, I've been informed that

11  Mr. Lepizzera did go visit her sometime in January

12  2013.

13  **Q.**   And when you say "could have," what do you mean

14  could have?  Did he have authorization from you?

15  **A.**   Yes.  There was authorization that my doctor is

16  allowed to discuss my condition with my attorney, yes.

17  **Q.**   Can you describe the nature of the conference that

18  he had with Dr. Xavier, how that came to pass in

19  approximately February of 2012?

20  **A.**   Yes.  My counsel, Mr. Lepizzera, who was a trusted

21  friend and attorney of mine wanted to speak to

22  Dr. Xavier because I was on so many different

23  medications that it was getting in the way of me

24  thinking clearly or processing information at my normal

25  rate of acuity.  So he wanted to speak to her about the

1    medications and what they're doing to me.

2    **Q.**    Do you recall having been here giving a plea

3    before this judge on November 19th, 2012?

4    **A.**    Yes, I do.

5    **Q.**    Do you remember the tendering to the Court of a

6    list of medications.

7    **A.**    Yes.

8    **Q.**    Did you see the typewritten list of medications

9    tendered to the Court?

10   **A.**    Yes, I did.

11   **Q.**    Can you tell the Court how that list was prepared?

12   **A.**    I was asked to prepare it by counsel, and it was

13   on my computer so I printed it.

14   **Q.**    When did you do that?

15   **A.**    Days or hours before the hearing on the 19th.

16   **Q.**    Of November?

17   **A.**    Of November.

18   **Q.**    2012?

19   **A.**    '12, yes.

20   **Q.**    You described friendship with Mr. Lepizzera.  Can

21   you please indicate to the Court when your first

22   acquaintance started with Mr. Lepizzera?

23   **A.**    Well, Mr. Lepizzera and I became acquainted some

24   20 or more years ago when we both were taking the Bar

25   exam.  I had known some of Mr. Lepizzera's family since

1    the 1980's.  And we became friends and acquaintances

2    since.

3         In the last ten years, we were much closer

4    because we lived in our neighborhood.  We attended the

5    same church.  Our children played together.  Our wives

6    are both Eucharistic ministers at our church, and I

7    actually invited Mr. Lepizzera to join the Men of St.

8    Joseph's Society at our parish so that we could spend

9    more quality time together.

10   **Q.**   What is the Men of St. Joseph's?

11   **A.**   It's an organization where men of Catholic faith

12   get together to really learn about catechism and

13   preaching The Word.  It's a devotion to St. Joseph.

14   **Q.**   How long have you been connected with the Men of

15   St. Joseph's through your church?

16   **A.**   Well, our church was a late-starter as an

17   affiliate parish so maybe in total three-and-a-half

18   years.  That was the inception.  And about a year

19   later, I asked Mike to join the group.

20   **Q.**   Are you still a member of the Men of St. Joseph's?

21   **A.**   Yes, I am.

22   **Q.**   Is Mike?

23   **A.**   Yes, to my knowledge.

24   **Q.**   And can you tell the Court approximately what

25   frequency is it that the Men of St. Joseph's met during

1    the calendar year of 2012?

2    **A.**    Yes.   During 2012, we meet once a month on

3    Saturday morning for a Mass or Rosary and then a

4    discussion period, and one time during the month on a

5    weeknight so it's approximately two times a month.

6    **Q.**    In addition to your activities at the Men of St.

7    Joseph's, can you indicate whether or not you attended

8    religious services together?

9    **A.**    Yes.   Michael Lepizzera and his family would

10   generally be at the same Mass my family would be at

11   almost every Sunday morning.   And we also would see

12   each other at different functions, Holy Days of

13   Obligation.   At times I would see Michael Lepizzera at

14   morning daily Mass.   I've been there usually every day

15   and every once in a while a fellow member of the Men of

16   St. Joseph's joins me.

17   **Q.**    Moving away from religious and moving towards

18   social activities, did you ever socialize or did your

19   family socialize, that being yours and Mr. Lepizzera?

20   **A.**    Yes.   There was many occasions where Mr. Lepizzera

21   and his son or daughter or wife would be at our home.

22   There were times we would visit them at their home,

23   whether it was using the poolside or winter there would

24   be many occasions that I would invite Mr. Lepizzera and

25   his son over to watch a football game at one of our

1    homes.

2    **Q.**    How many homes was that?

3    **A.**    There were two at the time.  We had a lakefront

4    property, which had a theater, which made it exciting

5    to watch football games, so I would invite Michael and

6    his son, Mr. Lepizzera and his son to enjoy the

7    football games on the big screen.

8    **Q.**    The medications that you turned in to the Court

9    through counsel on November 19th, how long a period of

10   time had it been that those medications in those

11   dosages had been taken prior to the giving of the plea

12   on November 19th?

13   **A.**    Well, my doctors have tried for over 20 years to

14   give me a suitable cocktail of medicines that would

15   work to overcome severe and major depression, which

16   I've suffered for all these years.  You asked me how

17   long did I take them.  Well, some may have been in

18   place for years; others could have been moved in months

19   before.  I believe on the list we had given Judge Smith

20   that one of them was cancelled in October of 2012.

21   Even since that list, we have retired some medications

22   and added new medications.

23   **Q.**    Okay.  Did you ever fail to take the medications

24   as prescribed during the course of time 2012 right

25   through the giving of the plea?

1    **A.**   No.   I'm very meticulous about counting all seven,

2    eight, nine, ten pills every morning or evening when I

3    have to take them.   I know that if I don't take them as

4    prescribed, it will create a tremendous imbalance for

5    me.

6    **Q.**   As it relates to representation of a legal nature

7    by Mr. Lepizzera of you, did there come a time when

8    that started?

9    **A.**   Yes.   In 2010, Mr. Lepizzera and I discussed this

10   case and we agreed, whether it be by me asking him or

11   he offering his services, I was very happy to take

12   Mr. Lepizzera on as an attorney.   He offered something

13   that almost no one else offered, which was an insight

14   to our religious similar faith.   He knew me more as a

15   church-goer, person of faith than as just a defendant.

16   And I have a tremendous amount of respect for

17   Mr. Lepizzera and his faith.

18   **Q.**   Can you tell the Court whether or not that was a

19   paid relationship, you to him?

20   **A.**   Yes.   I paid Mr. Lepizzera for his services.   I

21   believe he was fair with his billing and would present

22   a bill that we would discuss and agree to a sum every

23   so often.

24   **Q.**   Was there any fee agreement as such, retention

25   agreement between you and Mr. Lepizzera?

1    **A.**    There was no retainer.  There came a point in time

2    that both for the benefit of myself and Mr. Lepizzera,

3    we agreed that I would pay him $25,000 a month

4    indefinitely.  So that if he put in more hours, he

5    would be getting paid less; and if he put in less

6    hours, he'd be getting paid more.  But we both could

7    agree that that was a fair amount of money for

8    Mr. Lepizzera, and it was somewhat affordable for me.

9    **Q.**    Okay.  At that time?

10   **A.**    Yes.

11   **Q.**    Can you tell the Court when it went to that

12   $25,000 a month?

13   **A.**    I'd say maybe right at the time of the indictment

14   in late 2011.

15   **Q.**    Now, at some point, did you have any co-counsel

16   working with Mr. Lepizzera on this case?

17   **A.**    Yes.  At one point, at Mr. Lepizzera's insistence

18   that we have new counsel join our team so as to give

19   him some additional support and possibly some more

20   experience.  We engaged Attorney James McCormick

21   sometime in January 2012.

22   **Q.**    And Mr. McCormick continued in a co-counsel

23   relationship with Mr. Lepizzera up until what point?

24   **A.**    Until about late May or early June 2012.

25   **Q.**    Was that a paid relationship?

1   **A.**   Yes.  It was paid, and it was my decision that

2   Mr. McCormick was not fitting the need that we needed

3   in a co-counsel.  So we left on very amicable terms.

4   **Q.**   Can you tell the Court what you did, if anything,

5   to replace Mr. McCormick?

6   **A.**   Yes.  We started a search for a senior attorney.

7   Michael Lepizzera felt that he needed someone with a

8   little bit more experience than him, although I believe

9   he was an excellent attorney.  And we went on to

10   interview different attorneys to determine, number one,

11   if they had a conflict potentially representing me;

12   number two, what was the potential affordability of

13   such attorneys.

14   **Q.**   Were there a number of attorneys that you

15   considered?

16   **A.**   Yes.  There were a number that we considered.  And

17   there was even a point where I was considering asking

18   for court-appointed counsel because we could not afford

19   the large six- or seven-figure retainers that attorneys

20   wanted.

21   **Q.**   Can you tell the Court how it came to pass that

22   Mr. Traini became involved in your representation?

23   **A.**   Well, after seeing various attorneys,

24   Mr. Lepizzera recommended to me that we should consider

25   Mr. Traini.  I had known Mr. Traini because he

1  represents Edward Maggiacomo who worked in my office

2  and was able to secure a non-prosecution agreement for

3  Ed Maggiacomo. I also knew him that he was an attorney

4  as part of the defendants in the civil lawsuits. So I

5  had known Mr. Traini maybe for two-and-a-half years at

6  that point.

7  　　　　Mr. Lepizzera recommended that we -- that I give

8  Mr. Traini an opportunity to sell his services, if you

9  will.

10  **Q.** And did that opportunity occur?

11  **A.** Yes. It happened in June of 2012.

12  **Q.** Can you describe the nature of the opportunity?

13  **A.** Well, the opportunity was we needed someone with

14  gray hair, someone who had more experience than Mike

15  did; and Mr. Traini came to my home for a meeting that

16  took an hour or two to describe what he can do for me.

17  **Q.** Can you describe the nature of the description?

18  **A.** Yes. Mr. Traini made it clear that this is

19  normally a million dollar fee that he charges, but

20  given the light that he had already researched most of

21  this defending Mr. Maggiacomo and since we were

22  Co-Defendants, he was researching the same side of this

23  case, that he would accept a half a million dollars as

24  a maximum cost to defend me. Part of what

25  Mr. Lepizzera and I were doing were asking attorneys

1      what is the highest exposure we could have in your

2      representation.  For instance --

3      **Q.**    Monetarily?

4      **A.**    Monetarily.  Mr. McCormick, we had an agreement

5      that said he will charge $200 an hour and a maximum of

6      $300,000 that goes right through trial and appeals.

7      That was the only way I could know to retain an

8      attorney because I had been liquidating assets and

9      earning no money since 2009.

10            So with Mr. Traini, he wanted a half million

11     dollars.  He explained to me that I'm his best shot

12     because he knows the case.  The Government will fear

13     him and all this.  He also said that if I cared about

14     Mike Lepizzera, I should hire him because some years

15     ago Mike almost had a heart attack being junior counsel

16     with Tony Traini on a case, something I did not know.

17     I certainly care about Mike Lepizzera, but that would

18     be another reason.

19            My concern at that meeting was a maximum

20     exposure.  And I asked Mr. Traini and explained to him

21     I am borrowing this money from family members, it's

22     money that's not available to me.  And I need to know

23     that we get presented with another six figure bill at

24     some point that this is all that can be there.  And he

25     assured me that this is the maximum exposure through

1    appeals.

2    **Q.**   Maximum exposure being what?

3    **A.**   That $500,000.

4    **Q.**   Continue, please.

5    **A.**   Okay.  I was very adamant about that because I

6    could not be caught, if I were convicted and I need to

7    come up with six figures for an appeal at that point.

8    So I would not have the money.  Mr. Traini assured me

9    this would be the maximum exposure and we -- and he

10   said he would take up the details with Mr. Lepizzera.

11        One of the things that was peculiar was that he

12   demanded all $500,000 be put up-front because he was

13   sure that the Government would move immediately to

14   forfeit my assets as soon as he entered his name.

15        Now, the Government had not moved for forfeiture

16   even during the indictment process, and I was convinced

17   they would not.  I actually told him just because you

18   enter your name is not going to change the Government's

19   position.  But he said it all has to be there in Mike

20   Lepizzera's account because he doesn't want to be

21   working for free.

22   **Q.**   I take it that Mr. Lepizzera was not at this

23   meeting at your house?

24   **A.**   No, he was not.

25   **Q.**   Subsequent to that meeting, did you obtain money?

1   **A.**   Yes.   I wrote various e-mails to Mike Lepizzera

2   saying that all I have is $450,000.  I would have

3   offered $250,000 directly and then another $250,000 in

4   two months when I could liquidate some assets with less

5   penalties.  It ended up that I agreed with Mr. Traini

6   that the figure be 450,000 as long as it all could be

7   put in up front.  So we split the difference as far as

8   penalties and so forth.

9   **Q.**   Did Mr. Lepizzera fashion a method of payment that

10  was satisfactory to you?

11  **A.**   Mr. Lepizzera assured myself, my wife and anyone

12  else who would listen that he was protecting my assets.

13  It was his responsibility to make sure he would stagger

14  the payments to Mr. Traini over the time that we expect

15  the trial and/or appeals, which would have run from

16  June through the end of February.

17  **Q.**   Of 2013?

18  **A.**   Yes.

19  **Q.**   Now, to your knowledge in the summer of 2012, was

20  that agreement reduced to written form?

21  **A.**   Well, I have acquired knowledge since.  I knew

22  there was a retainer agreement that Mr. Lepizzera had

23  told me he entered into.  He did assure me that he got

24  Mr. Traini to agree to stagger the 450,000 over nine

25  months at 50,000 a month, which was very important to

1    me.

2    **Q.**    Okay.  What form is it that that retainer

3    agreement would have taken, written or verbal?

4    **A.**    Well, I believe that Mr. Lepizzera had pointed out

5    to me that he did reach agreement with Mr. Traini on

6    staggering the payments and so forth.

7    **Q.**    In written or verbal form?

8    **A.**    No.  In a written form.  This was a lot of money

9    and it just can't be dealt -- obviously, there's parol

10   evidence -- excuse me, statute of frauds that require

11   it in writing.

12   **Q.**    Did you ever get a copy of that writing?

13   **A.**    No.  I relied a hundred percent on Mr. Lepizzera

14   who I trusted and I believed was working in my best

15   interest.

16   **Q.**    Did you ever see a copy of that agreement,

17   so-called?

18   **A.**    Yes.  I saw a copy in late December when I

19   demanded a copy of the retainer agreement and the

20   disbursements that were made to Mr. Traini from that

21   escrow amount.

22   **Q.**    You received that from whom?

23   **A.**    From Mr. Lepizzera.

24   **Q.**    When you saw that agreement, was there anything

25   there that surprised you?

1   **A.**   Yes.   Number one, it read it was a non-refundable

2   fee, which was very shocking because if it was

3   non-refundable and the amount in escrow is all payable

4   to the attorney upon early cessation of the

5   proceedings, then in theory, I could have dropped dead

6   the next day after depositing this 450 and Mr. Traini

7   would have been entitled to the whole 450.

8        Conversely, if the Government decided not to

9   bring their case, or if I made a plea agreement,

10   whether it's days, weeks or months, the way that read

11   he's entitled to all the money.   Something I would have

12   been adamantly opposed to since I was borrowing the

13   money to begin with.   In order to go through this

14   process of staggering over nine or ten months, the

15   whole goal there was to allocate fee for service over

16   time.

17   **Q.**   Would knowledge of the contents of that writing

18   have influenced your decision making in the week

19   leading up to the giving of the plea before Judge Smith

20   on November 19th, 2012?

21   **A.**   Well, if you're asking me if I knew that

22   Mr. Traini was going to drain 150 or $200,000 that I

23   believe was unearned upon me signing a plea, it may

24   very well would have influenced my decision in pleaing

25   guilty.

1   **Q.**   That was my question.  Would it have; and if so,

2   how?

3   **A.**   Yes.  Because if an attorney fails to disclose to

4   their client who is under considerable duress already

5   that they stand to gain a windfall of 150 or 200,000, I

6   should at least have known that so that I can give

7   proper weight to veracity and credibility of my

8   lawyer's recommendation to take a plea.

9   **Q.**   In the pre-Traini period, what was the nature of

10  the preparation in terms of defense of the Government's

11  indictment?

12  **A.**   In the pre-Traini period, Mr. Lepizzera worked

13  endlessly to learn the facts, identify the witnesses,

14  the players involved, the actions of Raymour

15  Radhakrishnan, the unindicted co-conspirators and so

16  forth.  Mr. Lepizzera did a lot of work on this.

17  **Q.**   How frequently would you have contact with

18  Mr. Lepizzera?

19  **A.**   I would say usually every other day.  It would be

20  a surprise if a week went by that we didn't discuss

21  some detail about the case.

22  **Q.**   About the case.  As opposed to social or as

23  opposed to religious, right?

24  **A.**   No.  About the case.

25  **Q.**   Did that change in terms of Mr. Lepizzera's

1    interactions with you after Mr. Traini came on board?

2    **A.**   Well, upon Mr. Traini coming on board, he sort of

3    set up new rules that I should only be talking to them

4    at either weekly or biweekly meetings or whenever they

5    call a meeting and let the attorneys do their work.

6    And I was comfortable if Mike Lepizzera was comfortable

7    that work is getting done and we're heading toward a

8    conclusion to defend this case.

9    **Q.**   And with regards to the defense of this case,

10   prior to Mr. Traini, what was the theory of defense, if

11   any?

12   **A.**   Well, prior to Mr. Traini, the defense was very

13   simple.  All we need to do is expose the truth.  The

14   truth that I had no knowledge of the actions that

15   Mr. Radhakrishnan had with the measuring lives; the

16   truth that I expected everything done to be right; that

17   I would never tolerate forgery or misrepresentation,

18   and the truth would set us free.  I said that from day

19   one.

20          And whether Mr. Radhakrishnan committed a crime

21   or not, which I don't believe he did, he was sloppy on

22   some work and it really comes down to his age at this

23   point.  However, the truth is clearly there was never a

24   conspiracy.  There was never -- I had gotten legal

25   opinions on what I did long before I did it, and so get

1     the truth out.

2     **Q.**   Okay.  And at any point in time pre-Traini, did

3     Mr. Lepizzera profess a belief or not in the issue of

4     your innocence?

5     **A.**   Well, Mr. Lepizzera had mentioned to many, many

6     people, both in the Men of St. Joseph's group, at my

7     home with relatives, even talking to my own mother that

8     I'm an innocent man and when we get to court we'll be

9     able to prove this.  And it was -- he has spoken to

10    priests that we know.  He's spoken to professionals

11    that are at my house.  There'd be many a time I'd get a

12    call from a colleague attorney that says, hey, I ran

13    into Mike Lepizzera, I want to wish you well.  He

14    explained to us you're completely innocent.  We hope

15    you can get through this.

16    **Q.**   Mr. Traini came on board?

17    **A.**   Yes.

18    **Q.**   In July, was there any specific e-mail

19    communication to you from Mr. Lepizzera relating to his

20    posture as how he perceived the case and the defense

21    thereof?

22    **A.**   Yes.  Mr. Lepizzera had gone on a mission with our

23    church, which I was very proud of Mr. Lepizzera to be

24    an adult chaperone on this religious mission in

25    Jamaica.  But he had come back, and he said, Okay, now

1    all the mission is over, we are now going to cast an

2    aggressive campaign to confront the Government of all

3    these false charges.  We are now getting ready to mount

4    this campaign, if you will.

5    **Q.**    Are there civil cases that are tangents or

6    adjuncts to this case outside the criminal arena?

7    **A.**    Yes.  There are seven civil lawsuits that are

8    pending in front of this Court, and there are different

9    variations of either stays or other activity going on

10    in them.

11    **Q.**    Mr. Lepizzera have anything to do with those?

12    **A.**    Not directly.  I asked Mr. Lepizzera to go to a

13    couple of the chambers hearings that Judge Smith held

14    because he was representing me on the criminal matter.

15    He may have wanted to get educated about what was going

16    on on the civil matter.

17    **Q.**    What was your understanding after Mr. Traini came

18    on board with respect to the frequency of defense

19    attorney meetings, if any?

20    **A.**    Well, I was told that they should be meeting

21    weekly and I would be invited in either weekly or every

22    other week or every three weeks when they need to

23    inform me of things.

24    **Q.**    Did Mr. Lepizzera have anyone else in his office

25    that was involved in any way in the criminal defense

1    case?

2    **A.**    Yes.  Attorney Scott DeMello was Mr. Lepizzera's

3    assistant, who was also attempting to be very

4    cooperative, too.

5    **Q.**    What was the nature of your relationship, if any,

6    to Mr. DeMello?

7    **A.**    Well, I knew Mr. DeMello.  I believe he Mike and I

8    all took the Bar together in the early 1990's.

9    **Q.**    Never practiced with him, you?

10   **A.**    No.

11   **Q.**    Did you ever make any requests of Mr. Lepizzera

12   prior to Mr. Traini with regards to what you were

13   requesting be done specifically as to any aspect of

14   this criminal defense?

15   **A.**    Well, at times I would ask Michael Lepizzera for a

16   global defense plan.  And it became somewhat convoluted

17   or gray area because we had retained Mr. McCormick,

18   who, as an experienced criminal defense counsel,

19   recommended we get a private investigator to start

20   getting some truth and some real evidence about these

21   witnesses.

22   **Q.**    In what fashion, Mr. Caramadre?

23   **A.**    Well, to interview them, to establish why do they

24   believe -- why are they testifying?  Why do they think

25   they're harmed?  What was sent to them by the

1   Government to assuage them to believe they've been

2   harmed when beforehand they were very happy with our

3   arrangement.

4   **Q.**   After that request for private investigators, to

5   your knowledge during the balance of this case, was a

6   private investigator ever retained in any aspect of the

7   defense?

8   **A.**   To my knowledge, no.  I specifically asked on at

9   least one or two e-mails, can we please get a private

10  investigator as soon as possible to get some real

11  evidence in our favor.  As the Government is preparing

12  their witnesses, we should be determining what the

13  evidence really is.

14  **Q.**   Can you tell the Court whether or not there were

15  any expert witnesses, so-called, ever employed by the

16  defense?

17  **A.**   To my knowledge, no.  There was talk that we

18  needed an expert witness to speak about annuities and

19  corporate bonds, to speak to the fact that it's

20  completely legal and this is a process that's allowed

21  by the prospectus of the bond or the prospectus of the

22  variable annuity.

23  **Q.**   Were there allegations in the indictment that

24  related to forging of signatures?

25  **A.**   Yes, there were.

1    **Q.**   Was there any discussion in terms of getting a

2    handwriting expert on board?

3    **A.**   I had asked and was told since I was not directly

4    involved with ascertaining the signatures that it was

5    really Raymour's problem.  I never met the people which

6    the Government charged with Raymour and I with forging

7    their signatures.  So they basically said we don't have

8    to go through with this.  It's not your battle.

9    **Q.**   That being Raymour Radhakrishnan, the

10   Co-Defendant?

11   **A.**   Yes.

12   **Q.**   Did you ever specifically, at least in terms of

13   e-mails that you could find, a request of the

14   Lepizzera/Traini defense team, the theory of defense?

15   **A.**   Yes.  Weeks before the trial, I wrote a letter.

16   Because I suffer from severe depression, I need to know

17   what's going on, and I urged them to give me a status

18   and what is our general game plan for defense.  What

19   are we working on?  How do we get this truth out?  And

20   I never really got a clear response.  You know, there

21   were a lot of moving parts getting ready for this

22   thing.  It seems like there was much more time spent

23   worrying about what the penalty of each count is than

24   what the real evidence is.

25   **Q.**   Stop you there, if I could.  In terms of what the

1  penalty may be for the various offenses alleged in the

2  indictment, was there communication to you from your

3  attorneys?

4  **A.**    Well, yes.  They tried to explain to me that

5  they're going to make a motion or agree with the

6  Government or have the Court agree that every count

7  only carries $250,000 penalty and there is some

8  contrast to some statutory maximum.  To me it was

9  basically irrelevant.  It would have been a very high

10  amount to begin with, something I wouldn't be able to

11  afford.  And all I wanted to do was bring forth defense

12  evidence so that we don't have to deal with --

13  **Q.**    Did they seek your permission to speak to the

14  Government in terms of initiating plea bargain

15  discussions?

16  **A.**    Absolutely.

17  **Q.**    When did that request come of you from them?

18  **A.**    Well, first of all, before Mr. Traini got on

19  board, Mr. Lepizzera at least attempted to speak to me

20  about the benefits of a plea, that it would save a lot

21  of duress on the family and that he had told me many

22  times that it wouldn't change his opinion of me one bit

23  if I were a guilty person because he knows I'm innocent

24  and maybe it would save the family resources and the

25  family itself for me to plead guilty.  I summarily

1    dismissed any such thought.

2         When Mr. Traini got on board, there was a lot of

3    pressure put on me to consider a plea.  I remember one

4    meeting that went on for maybe two hours where

5    Mr. Traini pleaded with me, with both Mr. Lepizzera and

6    Mr. DeMello at this meeting, that if he can do the

7    impossible and get me a plea with no time, would I take

8    it.  And I said absolutely not because I'd have to

9    admit to something I didn't do and would never do.  I

10   would never hurt the terminally ill poor that I have

11   spent so much time working with charities over 25

12   years.  So I'm not about to admit something I didn't

13   do.

14        It was put to me in probably a 10 or 13 page

15   memo that I understand that if the Government is

16   successful in proving this I may get life in prison and

17   I am waiving or ordering my attorneys not to engage in

18   any plea discussions.

19   **Q.**   You had the option at the end of that particular

20   document to indicate authorization to initiate or not?

21   **A.**   That's correct.  And I elected --

22   **Q.**   You signed it?

23   **A.**   I elected in September of 2012 that I am not

24   authorizing my attorneys to enter into any plea

25   negotiations where I would have to plead guilty.

1    **Q.**    During this course of time, were you reporting to

2    the Probation Department as directed?

3    **A.**    Yes.   I hopefully have had a stellar record of

4    reporting to probation every week by telephone, the

5    first Monday of each month in person, tolerating spot

6    visits by the probation officer and letting them know

7    if there are any changes of anything material.

8    **Q.**    The condition of you continuing with psychiatric

9    treatment with Dr. Zlotnick, was that maintained by

10   you?

11   **A.**    Yes.   Absolutely.   That was part of the probation

12   order by this Court, and I was going to voluntarily see

13   my doctor every week anyway, as I had for many years.

14   **Q.**    Now, leading up to the trial, so-called, in the

15   week preceding the trial, did you meet with the

16   attorneys?

17   **A.**    Well, the trial started on Tuesday, November 13th.

18   I have reason to believe we might have met that week

19   before.   I had spent so much time with Michael

20   Lepizzera taking so many different notes and answering

21   so many questions on various measuring lives, their

22   family, how did we get acquainted with them, where are

23   the checks we gave them that Mr. Lepizzera had a very,

24   very good handle.   I was quite impressed with his

25   ability to retain.   If you picked out a name of 300

1    witnesses that the FBI visited and gave us a 302

2    report, he would know exactly what they said and when

3    and how to defend it or what was wrong with it.

4    **Q.**    Besides the FBI 302s, were there video depositions

5    that had been allowed by the Court?

6    **A.**    Yes.  Yes.  There were six or seven video

7    depositions.  There was already Grand Jury testimony

8    which ran quite voluminous, as the Grand Jury process

9    was almost -- I believe it's maximum of two years.

10   **Q.**    Who conducted those depositions?

11   **A.**    The depositions, the Government was bringing these

12   depositions and Mr. Flanders was my initial attorney at

13   the time, Robert Flanders; and Mr. Pine, Jeffrey Pine

14   was the defense attorney for Raymour.

15   **Q.**    Civilly?

16   **A.**    No.  The defense attorney for criminal, criminal

17   issues.  So on these depositions they were authorized

18   by the Court in 2009, Mr. Flanders and Mr. Pine took

19   the major part of the defense.  At the time, we were

20   not formally charged.  We did not know what we might be

21   charged with and so we were at a bit of a disadvantage,

22   but I believe my attorneys just did the best they could

23   with what was presented by the Government.

24   **Q.**    Could you tell the Court whether or not to your

25   knowledge, and you may not have it, but were Mr. Pine's

1    or Mr. Flanders' files requested or turned over to

2    Mr. Lepizzera or Mr. Traini at any point in time?

3    **A.**    Yes.  As soon as Mr. Lepizzera replaced

4    Mr. Flanders as criminal counsel, all the files were

5    delivered within days.

6    **Q.**    Your expectation then in the week leading up to

7    the trial was -- how was the defense going to be

8    conducted in those initial stages?

9    **A.**    My expectation was what I had expected over

10   three-and-a-half years of the Government pursuing me,

11   which was we would present a rigorous defense that

12   would leave no doubt at all about my participation,

13   criminal or otherwise in this process, that I had no

14   criminal exposure, no criminal intent.  And the best

15   way to do that would be to confront the Government

16   witnesses as Mr. Lepizzera had wrote to me in June

17   of -- July of 2012 that he understands his mission is

18   now to confront this.

19   **Q.**    What was your expectation as to how that was going

20   to unfold in the initial stages of the trial?

21   **A.**    Well, my expectation was that my attorneys would

22   give a very aggressive posture in cross-examination and

23   be extremely aggressive in trying to expose this whole

24   investigation and this whole case.  It was very

25   important -- this case may not be unique but should be

1    one of few where no one had ever complained to any law

2    enforcement.  None of the so-called victims ever knew

3    they were victimized until the FBI went over to them

4    and gave them, in my opinion, very misleading

5    information so as to turn something that was a good and

6    favorable experience into a very bad experience.

7    **Q.**   Do you suggest by your previous answer that they

8    were victimized?

9    **A.**   They were victimized, yes, by the Government.

10   **Q.**   Prior to the trial, was there any meeting at your

11   home?

12   **A.**   Yes.  Prior to the trial -- well, on the Sunday

13   before the trial, which would have been the 11th of

14   November, we had a celebratory Mass at our home.  For

15   our intentions of getting to the truth, we had a

16   priest, a dear friend of our family come over to say

17   Mass with our family and supporter close friends.

18   **Q.**   That priest was whom?

19   **A.**   Father Robert Lacombe.

20   **Q.**   Is he in the courtroom today?

21   **A.**   Yes.

22   **Q.**   Can you tell the Court who was in attendance at

23   this celebratory Mass in your home on the day of

24   November 11th?

25   **A.**   A lot of my extended family members and siblings

1      and close friends of the family.  Also, I had invited

2      my three attorneys, Mr. Lepizzera, Traini and DeMello

3      to come.

4      **Q.**   Did any of the three attend?

5      **A.**   Yes.  Mr. Lepizzera attended, and I was very happy

6      that he did.

7      **Q.**   Did Mr. Lepizzera participate in conversations

8      that you heard relating to the case, its defense, its

9      theory, anything of that sort?

10     **A.**   No.  There were maybe 25, 30 people at the home.

11     We just got done celebrating Mass, people having

12     coffee.  Mr. Lepizzera tended to leave quickly.  He

13     needed to prepare for trial, which I understood.  So I

14     didn't discuss with him anything at that point.

15     **Q.**   Monday, holiday?  After the Mass it was a holiday?

16     **A.**   Yes.

17     **Q.**   Did you meet with Mr. Traini, Mr. Lepizzera,

18     Mr. DeMello on that date?

19     **A.**   I can't remember if I met with them.  If I did, it

20     was for a very short period of time and for nothing of

21     substance.  I'm going to say that I believe I did not

22     meet with them.

23     **Q.**   The trial started Tuesday?

24     **A.**   That's correct.

25     **Q.**   Okay.  Can you just describe in terms of your best

1    memory your recollection of what happened on Tuesday?

2    **A.**   Okay.   On Tuesday, the Court gave instructions to

3    the jury.   The Government gave an opening statement

4    that went on almost for an hour with very disparaging

5    allegations about the two Defendants, myself and

6    Mr. Radhakrishnan.   And then the first witness was a

7    videotaped deposition of Mr. Richard Wiley.   In that

8    deposition, there was direct examination and there was

9    cross-examination.   Mr. Wiley is since dead, so it's

10   hard to give him cross-examination or further discover

11   the facts.

12        Given that the Government was very disparaging

13   in their characterization of me and my actions and the

14   fact that we did not have an opening statement, we

15   looked forward with great anticipation for Wednesday,

16   because on Wednesday we would have our first

17   opportunity at a live witness, which can be

18   cross-examined.   And Mr. Lepizzera made it clear

19   there's nothing we really could have done on Tuesday.

20   There was no opening statement.   You can't

21   cross-examine a video deposition, but tomorrow, being

22   Wednesday, we have Ed Rodriguez on the stand.   We get

23   to put our game plan in.

24   **Q.**   Had a decision been made, first of all, by you as

25   to whether or not when the defense case came on that

1    you would testify?

2    **A.**    Well, I made it adamantly clear that I -- under no

3    circumstances will I not testify because I will not be

4    sitting in a jail cell if I'm convicted falsely without

5    having defended myself.

6    **Q.**    Had the issue of giving or not giving an opening

7    defense statement at the conclusion of the

8    prosecution's opening statement been made?

9    **A.**    A decision about the opening statement must have

10   been made.  I don't believe I was in great disagreement

11   that the opening statement would best be heard when we

12   present our defense case because it's going to be about

13   two months that the Government is going to drag in 100

14   witnesses, and it's going to be so convoluted and

15   confusing that it's best we re-remind the jury with an

16   opening statement when the defense puts on their case.

17   **Q.**    That idea came from whom initially, if you can

18   recall?

19   **A.**    From my attorneys.  They thought it was better.

20   **Q.**    Did you at any point in time during the course of

21   your legal career practice criminal law?

22   **A.**    No.

23   **Q.**    And your understanding of the not giving of the

24   opening statement, was that conditioned upon anything

25   as verbalized by your attorneys?

1    **A.**   No.  But it was understood or possibly said by me.

2    If as long as we are cross-examining witnesses that the

3    Government will be bringing in an effort to prove me a

4    felon, as long as we're staying afloat with diligent

5    cross-examination, then we don't need an opening

6    statement because we'll get our chance.  Also, there

7    was going to be a request for a directed verdict after

8    the Government put on their case.  So if we did a good

9    enough job on cross-examination, we would avoid a train

10   wreck scenario.

11   **Q.**   You indicated that Mr. Wiley's deposition was

12   shown Tuesday?

13   **A.**   Mr. Wiley's, yes.

14   **Q.**   Was it concluded that day?

15   **A.**   No.  The Government technician had a little bit of

16   a problem with some of the editing, so the Court

17   decided to show the last 20 minutes on Wednesday

18   morning.

19   **Q.**   Was there cross-examination of Mr. Wiley as best

20   you can recall in the videotaped deposition?

21   **A.**   Yes, there was.

22   **Q.**   And whose cross-examination was that?

23   **A.**   Mr. Flanders and Mr. Pine I believe did a

24   legitimately good job asking of Mr. Wiley what did the

25   Government say when they approached him and what were

1    the Government's actions.  And out of that, we were

2    able to ascertain that the special agent in charge,

3    Pamela McDade actually went and visited Mr. Wiley and

4    brought him cookies.  At one point she brought her son

5    to visit Mr. Wiley.  If the defense team ever went to a

6    witness with cookies, we'd be charged with witness

7    tampering.  Certainly bringing our family members over,

8    I tried to find it in the FBI handbook about whether

9    you're supposed to be bringing kids and cookies over.

10   So it revealed a lot about the investigation.

11   **Q.**   One of the counts in this indictment was witness

12   tampering on your part; is that right?

13   **A.**   That's correct.

14   **Q.**   What was the preparation done, if any, to your

15   knowledge with regards to that particular count?

16   **A.**   On that count, Mr. Lepizzera had a lot of

17   firsthand information because the alleged witness that

18   was tampered is a member of our church and we see him.

19   So Mr. Lepizzera was actually very familiar with this

20   person and that count and basically summarily dismissed

21   it from anything we have to worry about under the

22   theory that I would have to be tampering with a witness

23   to gain some benefit from it.  I get no benefit from a

24   witness deciding to tell the Government whatever they

25   want to tell them to defend themselves from their own

1    family.  So it wasn't meeting the criteria.

2    **Q.**   Did either Mr. Traini or Mr. Lepizzera make

3    comment to you apart from what you've already testified

4    with relationship to the Kiley video deposition?

5    **A.**   To the Wiley.

6    **Q.**   Excuse me.  Wiley.

7    **A.**   Yes.  Very surprising.  At the end of the first

8    day, Mr. Traini turned to me and said, "Did you see the

9    look on Judge Smith's face?  He was shocked."  This was

10   the first time the judge must have seen this video and

11   he says to me, "I also, this was the first time I've

12   actually seen it."  So I was a bit taken back that I'm

13   paying someone 50,000 a month and they don't even see

14   the video.  He said, "This looks pretty bad."  I mean,

15   that was a general commentary.  There was no speak of

16   making a plea or anything else.

17   **Q.**   When did the Court adjourn for the day?

18   **A.**   At 1:30 or so.

19   **Q.**   1:30 or so.  And what happened at the conclusion

20   of the first day's proceedings?

21   **A.**   Well, what happened was our defense counsel could

22   never put in a word on anything because we didn't have

23   an opening statement and we could not cross-examine a

24   videotape.  So the expectations from Mr. Lepizzera were

25   to me and my family, who was with me, much like they

1    are today, Don't worry, guys.  Tomorrow we get a live

2    witness.  We can do something.

3    **Q.**   Okay.  Did you meet with the defense attorneys

4    after the conclusion of court that day?

5    **A.**   I don't believe I did.  My wife was with me.  We

6    had to go pick up our son from school at St. Andrew's

7    so I believe we just took a leisurely ride to

8    Barrington and picked him up and went home.  And with

9    all the preparation that Mr. Lepizzera had done with me

10   about Mr. Rodriguez, about the payments made to him,

11   about his felony past, about why he was misled by the

12   Government as to what I was making off of him, I was

13   very enthusiastic about hitting this thing hard come

14   the next morning.

15   **Q.**   Your expectation was that Mr. Rodriguez was going

16   to be testifying?

17   **A.**   Yes.  We were told.

18   **Q.**   Okay.  You get up in the morning, Tuesday?

19   **A.**   Yes.

20   **Q.**   Excuse me.  Wednesday.  We're on Wednesday.  You

21   get up on Wednesday; you go to court?

22   **A.**   Yes.

23   **Q.**   Who was with you in court the first day on

24   Tuesday?

25   **A.**   Well, my wife and various family and friends.  My

1    wife went with me.

2    **Q.**   Who went with you to court on the second day, on

3    Wednesday?

4    **A.**   My wife as well.

5    **Q.**   And did there come a time when Mr. Rodriguez was

6    presented?

7    **A.**   Yes.  Mr. Rodriguez was presented as the first

8    live witness.  There was some mention made in the

9    opening statement by the Government that they're going

10   to start right with the best.  We're going to get a

11   videotape of Mr. Wiley, and we're going to bring in

12   Ed Rodriguez who, in their opinion, was the only single

13   living person who was still alive to talk about this,

14   notwithstanding that Mr. Buckman was also still alive

15   but the Government didn't have any use for his

16   testimony.  It was positive for us.

17   **Q.**   Did your attorneys prepare in preparation for this

18   case Mr. Bucknum?

19   **A.**   Buckman.

20   **Q.**   Buckman?

21   **A.**   They never prepared him, but we brought him in to

22   be deposed under Judge Smith's ruling that we could

23   depose the so-called victims.

24   **Q.**   And the conduct of the examination of

25   Mr. Rodriguez, how did he present in the court, by his

1  own two feet or by other means?

2  **A.**  Well, he was wheeled in in his wheelchair.  He had

3  his daughter help him and stand near him or near the

4  table.  And he looked quite credible and looked cleaned

5  up.  And you know, I had only met Mr. Rodriguez at the

6  video deposition beforehand.  I never met him other

7  than that, but I was glad to see he seemed to be

8  feeling okay, that he wasn't very sick.  He's a young

9  man.

10  **Q.**  The video deposition had been conducted also by

11  Flanders and Pine?

12  **A.**  That's correct.

13  **Q.**  And accessed by Mr. Lepizzera and Mr. Traini?

14  **A.**  Absolutely.  Yes.

15  **Q.**  At the conclusion of the Rodriguez testimony, did

16  the way the cross-examination, so-called, had been

17  conducted have any impact upon you?

18  **A.**  Yes, it did.  First of all, Mr. Rodriguez was

19  blurting out they're making money on my death and

20  telling the jury this, which is fine.  That is his

21  position.  The Government is showing that there's

22  hundreds of thousands or millions invested in his name

23  implying that I was making that as profit.  We intended

24  on straightening out these allegations or facts simply

25  by explaining to Mr. Rodriguez that there was no great

1  profit to be made here especially since he didn't die;

2  and number two, he was compensated and agreed to all of

3  this.  And the real essence of Mr. Rodriguez, the whole

4  case would have turned on Mr. Lepizzera following the

5  same cross-examination pattern that was done

6  beforehand.

7  **Q.**   Was that your expectation?

8  **A.**   Absolutely.  As a matter of fact, I expected more.

9  We reviewed the deposition of the -- the transcript of

10  the deposition.  There was 93 pages of

11  cross-examination.

12  **Q.**   Did you say anything to Mr. Lepizzera at the time

13  of his cross-examination?

14  **A.**   Yes.  When I noted that he only asked a couple of

15  questions and was not hitting the most important point,

16  which is asking Mr. Rodriguez why is he testifying, how

17  does he believe he was screwed over, if you excuse my

18  French, and who told him this.  Because the answer was

19  Ms. McDade, the FBI person was giving misleading and

20  outright false information to these people and getting

21  them all worked up, letting them feel like they were

22  part of a criminal ring.  And it was very important to

23  ask Mr. Rodriguez how were you damaged and why do you

24  end up here.  Tell me who you reported your crime to

25  because you believe you were a victim.

1    **Q.**   When and what, if at all, did you say to

2    Mr. Lepizzera relating to Mr. Rodriguez at the

3    conclusion of the cross-examination, so-called?

4    **A.**   As soon as Mr. Lepizzera came back to the table, I

5    immediately grabbed the file and said to him, Get back

6    out there and ask him about Special Agent in Charge

7    McDade.  Let's start telling the jury what we believe

8    happened here.

9    **Q.**   What did he say to you, if anything?

10   **A.**   And he said, "I don't want to beat up on a guy in

11   a wheelchair.  Plus, Joe, we'll get him on our defense

12   case.  Don't worry."

13        Now, I am an attorney.  I know that if we have

14   to recall a witness, it is direct examination that we

15   have, not cross-examination, which many times allows us

16   to treat the client as a hostile witness or have

17   leading questions.  So the only opportune time we had

18   was that first live witness to set the standard for

19   what was going to happen here.  It was shocking to me.

20   I'd say 70 percent of my life left me right after that

21   lack of cross-examination.

22   **Q.**   Can you tell the Court who came next as best you

23   recall on that day, Wednesday, the second day of trial?

24   **A.**   Yes.  Kathleen Flori came next.  And this was a

25   case in which the Government alleged aggravated

1    identity theft as well as mail fraud or wire fraud,

2    meaning the name of her husband, Dennis Flori, was

3    forged.  Now, Raymour dealt with the Floris.  I never

4    met them.  I only was presented papers with signatures

5    and told they were signed in good faith and there was a

6    good faith offer and acceptance of my cash to enroll

7    them in our program.

8    Q.   As it relates to Mr. Lepizzera, who cross-examined

9    the Flori testimony?

10   A.   Well, Mr. Radhakrishnan got to cross-examine and

11   so did Mr. Lepizzera.  I don't know who went first.  It

12   may have been Mr. Radhakrishnan because he really --

13   the Flori family did not know me except for my name on

14   a check.

15   Q.   Was there anything about the Lepizzera

16   cross-examination as it relates to the Flori testimony

17   that affected you?

18   A.   Yes.  Clearly, my attorneys had not done the

19   diligence to speak with Mr. Radhakrishnan to determine

20   how he intended to defend these allegations of forgery,

21   because the family asserted that their father could

22   only sign one piece of paper because he was too sick

23   and yet five of them needed to be signed to open up an

24   account.

25        So Raymour assured me it was absolutely

1  legitimate, that this was done on the up and up.  I was

2  not allowed to speak to Raymour after he engaged

3  court-appointed counsel and/or was his own counsel.  My

4  attorneys told me I was banned from speaking to him.

5  So I could not ascertain or discover that.

6  **Q.**   Let me back you up half a step.  At the conclusion

7  of the Rodriguez testimony, can you say whether or not

8  there was any comment made by either Mr. Traini or

9  Mr. Lepizzera relating to their perception of the

10  effectiveness or not of that testimony?

11  **A.**   At the conclusion at the next break or so,

12  Mr. Traini said, "Boy, did you see how credible Ed

13  Rodriguez is?  He looked neat.  He was really credible.

14  This is looking really bad."  And I did not disagree

15  considering we did not cross-examine him.

16  **Q.**   After the Flori testimony, was there anyone else

17  that was presented by the Government?

18  **A.**   Yes.

19        THE COURT:  Let's stop before you get into the

20  next witness and take a little break.

21        So we'll take a ten-minute break and then after

22  that we'll go to about 12:15, 12:30 and then we'll

23  break for lunch.  Okay.

24        (Recess.)

25        THE COURT:  All right.  Mr. Watt, you may

1        proceed.

2        **Q.**   Mr. Caramadre, I think we were up to the Flori

3        testimony and your reaction to that.  What came next on

4        that second day of trial, Wednesday?

5        **A.**   Well, regarding the Flori testimony, a wife of the

6        decedent came in and said her husband could not have

7        signed the forms, followed by her son who says dad was

8        incapable of signing more than one form.  I thought

9        that the signatures looked the same.  I'm not a

10       graphologist.  I don't study handwriting.  And I

11       expected my attorneys to draw a wall between that which

12       Raymour's actions were and meeting with these people

13       and regarding the information I had about them, which

14       was nothing more than they were enrolling in this

15       program for some money.  I expected more of a

16       separation.  And given the fact that Mr. Rodriguez's

17       cross-examination was very poor, my health started to

18       decline very quickly due to my severe depression that's

19       already been prevalent for so many years, and it got

20       much worse during this time.

21       **Q.**   You mentioned in earlier testimony 70 percent?

22       **A.**   Yes.

23       **Q.**   Seventy percent of what?

24       **A.**   Seventy percent of hope.  If I had a hundred

25       percent of hope expecting to hit the first witness

1    hard, try to establish a defense and the truth, and

2    it's not done, I've lost a majority of the game, in my

3    mind.  I start to become feeling very lonely and

4    starting to feel severely depressed, beyond what I

5    normally am.

6    **Q.**   Can you tell the Court after Flori, what came next

7    on that day?

8    **A.**   Well, I should say this.  After Flori, the son was

9    adamant that he worked with his father a whole half

10   hour to just sign one form and, yet, he could not

11   understand why there were five forms signed of similar

12   signature.  So my attorneys never have investigated the

13   Flori family, never having even spoken with Raymour as

14   the actor in this about what his justification was for

15   this.  We were at a great disadvantage.  I for the

16   first time figured out that Raymour may have been

17   responsible for either forgeries or just mishandling

18   this beyond what he had told me he was responsible for.

19   **Q.**   After the Flori, what came next?

20   **A.**   The last witness of the day was Ann Scuncio, and

21   she was the daughter of Pia Bernardo.  Ms. Scuncio

22   testified that she did not sign forms on behalf of her

23   mother, who was a measuring life.  Upon

24   cross-examination from Raymour, she asserted that she

25   at no time gave us or showed us her power of attorney

1    that empowered her to sign on behalf of her mother, who

2    was very sick.  And it was asked and answered in the

3    negative, no, I did not give you a power of attorney.

4         I expected my counsel, Mr. Lepizzera, to get the

5    power of attorney that was in our file in front of both

6    of us and confront the witness.  If you didn't give us

7    one, how did we get your power of attorney from your

8    attorney, that your attorney prepared, not our office,

9    an independent document.  How do you explain we have

10   this?

11        And number two, do you also know that your

12   mother died within days after the establishment of a

13   bond account.  I think it would have been noteworthy

14   that the jury hear that we lost a considerable amount

15   of money on that account because the measuring life

16   died very quickly, unfortunately for the family as well

17   as for us.  But I expected Mike to make those points.

18   When he refused to ask any questions at all, I quickly

19   went down a -- very little hope left.  It wasn't a

20   series of questions in which he skipped this.  His

21   response was, "No questions, your Honor."  I gave him

22   the thing and said, "Get back up there and please put

23   this, or do I have to do it."  And he said, "No, let's

24   just leave it alone."  No questions.  Done.

25        That set a very downward and serious spiral,

1   both on myself and my wife.

2   **Q.**   Was that the last witness on Wednesday?

3   **A.**   Yes.

4   **Q.**   At the conclusion of the Court session on

5   Wednesday, where did you go?

6   **A.**   On Wednesday, we had to get out of the court and

7   we -- I believe we went to pick up our child at

8   St. Andrew's.  However, my wife had become ill.  We

9   were both very, very saddened by this situation.  I

10   process catastrophe different than she does.

11       Throughout the day her health was decaying.  Her

12   color was turning white.  And all she heard now was the

13   first day with the Government saying her husband is a

14   felon and a felon of grand proportions and then nothing

15   to dispute any of the witnesses coming on.

16       So upon getting home, my wife was very sick and

17   needed to get into bed, which hours later to my

18   surprise she could not get out of bed.  She was

19   experiencing a form of mental breakdown, which was

20   very, very worrisome to me.  I had already reached my

21   peak of depression just how the case was going and I

22   started to get very worried about my wife who survived

23   all of Wednesday night in tears, speaking irrationally

24   in total desperation of why aren't they defending my

25   husband.  "They" being the attorneys.  It was a very

1    terrible thing.

2         The next morning she, of course, was not able to

3    get out of bed and come to court.  We agreed we would

4    call her doctor's urgent line, and I left her in the

5    hands of a friend who was responsible for checking in

6    on her, whether my wife knew or not the friend's task

7    was to check on her because we've dealt with mental

8    illness for a long time in our family.  I've suffered

9    of it 25 years.

10   **Q.**   You've moved me into Thursday quicker than I

11   wanted to get there.

12   **A.**   I'm sorry.

13   **Q.**   We'll come back to it.  That's okay.

14        Did you have any meetings or conversations with

15   either Mr. Lepizzera or Mr. Traini on Wednesday after

16   leaving the court?

17   **A.**   None.  Because my wife was very sick.  I saw her,

18   she said we have to leave immediately and I was very

19   despondent myself.  I believe I called Mr. Lepizzera on

20   Wednesday night and informed him my wife is in bed and

21   I'm very worried whether I should bring her to the

22   hospital now.  My wife had had some experience with

23   postpartum depression back 18 years ago, which required

24   hospitalization, and I've always been protective of her

25   mental state.

1    I told Mr. Lepizzera things are looking really

2  bad on the home front.  And on Thursday morning, I had

3  to take my child to school and then come here and keep

4  checking in on my wife by calling the home.

5  **Q.**   In addition to what you've described as your

6  wife's previous treatment, did you ever have any

7  hospitalizations?

8  **A.**   No.  I had general hospitalizations for blood

9  pressure, pre-diabetes, depression, but it was never at

10  a psychiatric hospital.  I've had many -- depression

11  takes a toll over all these years on many of the body's

12  organs and parts.  It can affect a lot of different

13  things.

14  **Q.**   As it relates to you directly, the major

15  depression that you've testified to, how does it affect

16  you physically?

17  **A.**   Well, having to take nine prescriptions already is

18  a daunting toll on the body.  Some make you sleepy.

19  Some make you alert.  Others make you -- give you high

20  acuity.  Others take away sharpness.  It's a sort of

21  zombie-like world and that's why in July of 2011 my

22  doctors decided unanimously that I should not be giving

23  legal or financial advice because between the

24  medications and the severity of my illness, it would

25  be --

1    **Q.**   Did your wife, Paula, ever come back into this

2    court right through the end of Monday, November 19th,

3    and the giving of the plea before Judge Smith?

4    **A.**   No.  No.  She could not come.  She was sick.  We

5    had to go visit her doctors.  That was her job, but no,

6    she could not make it here.

7    **Q.**   Okay.  Did Mr. Lepizzera or anybody from

8    Mr. Lepizzera's family ever go and see your wife during

9    the period from Wednesday, second day of trial, right

10    through the giving of the plea?

11    **A.**   Yes.  On Sunday night, Mr. Lepizzera came over my

12    house with Mr. Traini to discuss the plea.

13    **Q.**   Only time?

14    **A.**   That was the only time, yes.

15    **Q.**   Now, besides the varying regimens of multiple

16    medications to which you've given the Court some

17    indication, any other treatments?

18    **A.**   Yes.  I've had many different attempts to cure

19    long-term depression.  Depression is a chemical

20    imbalance in our brain.  It's not about the sun shining

21    or not.  It's about how our brain processes endorphins.

22    I survived a six-month session of TMS, transcranial

23    magnetic stimulation at Butler Hospital.  It was very

24    expensive and very painful.  It's the equivalent of

25    putting a football helmet on with hammers banging your

1    head.  It was so bad for me, and I don't mean to speak

2    badly of Butler Hospital because this is a cure for

3    some severely depressed people.  It might be the only

4    cure.  But it was very painful.  So painful I had to

5    bring people with me to either drive me or just help me

6    get through the 40-minute session.

7         It did stabilize the depression a little bit,

8    but then it could no longer keep me at half depressed.

9    I went back to full depression.

10        It was a very serious and, again, expensive

11   process and it was very painful, but I've always tried

12   to do everything I can to get better.  As a matter of

13   fact, the doctors recommended electroshock therapy of a

14   different type but I would lose short-term memory and

15   I'm the holder of most of the facts in this case.  So I

16   couldn't afford to not be able to guide my defense.  I

17   wouldn't have known the difference if Mike Lepizzera or

18   Tony Traini did a good job if I went under the electric

19   shock therapy because I wouldn't have remembered the

20   facts.

21   **Q.**   Did you sleep on Wednesday night?

22   **A.**   If I got a half hour, it was a lot.  My wife was

23   very sick.  I was hoping and praying with her that she

24   would feel more rational and more better by Thursday.

25   She did not.  The agreement was she would stay home.

1    We would get a friend to watch her and she would call

2    her doctor.  When someone has a quasi-breakdown that

3    they start becoming irrational, it is rather serious

4    and you need to start medicating fast.

5    **Q.**   What was your emotional state as best you can

6    describe it as of Wednesday evening?

7    **A.**   On Wednesday evening, I basically hit bottom.  On

8    Wednesday evening, I felt that for three-and-a-half

9    years I had gone through tens of millions of assets to

10   profess my innocence.  I had maintained my innocence

11   the whole time.  I put my family and myself and my

12   reputation at great risk and this was going to be the

13   day that we can help ourselves, and it did not come.  I

14   was absolutely hopeless especially with Paula going

15   down, the fact that the lawyers primed the pump so bad

16   for us that by Wednesday night I needed to start

17   worrying about my children and Paula about this trial

18   was not going well.  We can not unring a bell that's

19   been said to the jury.  We can't go back and unsay or

20   be more aggressive, and my wife is down and could be

21   down for a long time.  It could result in death if not

22   managed properly.

23         So on Thursday morning, I instructed

24   Mr. Lepizzera and Traini, given that my wife's health

25   is very serious, my children cannot go without a father

1    who would be potentially incarcerated for many, many

2    years and without a mother who is healthy or possibly

3    even alive.  So to find out what offer the Government

4    has on the table.  Clearly, we haven't defended

5    ourselves, what can we do right now.

6    Q.    Did either Mr. Lepizzera or Mr. Traini make

7    comment to you with respect to Mrs. Caramadre's

8    condition?

9    A.    Mr. Traini seemed to be -- talked sympathetically

10   saying these things are very serious, they could

11   deteriorate very quickly so you better call your wife

12   every hour on breaks and make sure -- this is no

13   laughing matter, Joe.  Not that I was laughing.  I knew

14   full well what this could be.  And he immediately

15   started saying if we're in mode of plea bargain, the

16   sooner we can do this, the better it is for you.  And I

17   said I only want to entertain what's on the table and

18   see if it makes any sense.

19   Q.    Was the Court in session on Thursday?

20   A.    On Thursday morning from what I was reported to by

21   my attorneys, the Government would be very happy to

22   stop this case if I plead two to five.

23   Q.    Two to five what?

24   A.    Two to five years.  And that would mean that I

25   would be sending a message to Judge Smith that I am

1    guilty, I deserve at least two years and would leave

2    discretion to the judge to go between two and five

3    years.  Even with being hopeless, I would not accept

4    that as an offer.  It would send the wrong message.

5    Even when you're desperate, you can still try to make

6    some judgments.  That was unacceptable.

7         I instructed my attorneys that they should

8    pursue a plea where we could argue to this Court that I

9    deserve no time when the Court actually discovers what

10   my participation in this is, or lack thereof.

11        Throughout the day on Thursday, there were

12   witnesses.  If there was any hope left for Thursday

13   morning, what little there was, it quickly got

14   dispensed on Thursday afternoon.

15   **Q.**   What happened then?

16   **A.**   Mr. Kenneth Blowers was a witness.  Mr. Blowers is

17   the only witness that had ever dealt with me directly.

18   Everyone else to that point only dealt with Raymour.

19   Our argument obviously should have been, okay, Raymour

20   may have done this but Joe would never have approved

21   it.  Mr. Blowers dealt with me in 1995.  We were

22   interviewing him 12 years later.  And of course he

23   complained to no one except for the FBI going to him

24   and creating this monster.

25        Mr. Blowers needed to be cross-examined on two

1    points.   Number one, that he had conflicting testimony

2    with the Grand Jury testimony; and number two, how he

3    was introduced to me because he did not know in his

4    testimony.   And we needed to bring up names of people

5    who could have introduced me to him back in 1995 to.

6         THE JUROR:   His memory or to at least let him

7    deny it.

8    **Q.**   What was the importance of that in your mind?

9    **A.**   The importance was Mr. Blowers left the Court and

10   the jury, at least the jury the impression that I just

11   cold-called him in 1995 out of nowhere and took

12   advantage of his wife.   His wife, who in the Grand Jury

13   proceedings he said she was capable of taking a ride

14   and going and visit an attorney in April of '95.   When

15   asked, he said yes, she was capable of doing this.   Yet

16   in his actual testimony he said no.

17        So I would have liked my attorney to ask how do

18   we get to yes, she's capable of moving to no, she's not

19   possibly capable of understanding anything.   One of

20   them has to give and that would also bring light to who

21   did you first complain to, which law enforcement agency

22   did you go to because you thought you were taken

23   advantage of.   And the answer of course is zero because

24   no one complained to anyone here.

25        I also thought that it was important that how he

1    was introduced and this was the first witness to me.

2    It was very important that we set a tone.  Now, it had

3    been a disaster.  There was no tone to set.  The

4    evidence was mounting, going unrefuted, undefended.

5    But the Blowers case took me to Ground Zero.  At that

6    point, we couldn't even -- if my attorneys were not

7    even going to ask him about whether he met me and had a

8    third person introduce us and why the distinction, why

9    the contrast or why the contradiction between his Grand

10    Jury testimony under oath two years earlier and now,

11    and I believe the answer would have been because he's

12    been better prepared now by the FBI.

13    **Q.**    Was there cross-examination of Mr. Blowers?

14    **A.**    There was very little peripheral cross-examination

15    that amounted to nothing.  There was very little.

16    Mr. Lepizzera came back, and I urged him please get up

17    there and ask him does he know Harrison Condit who may

18    have introduced us two.  He said, No, I don't want to

19    -- we'll get him later.  Don't worry about, Joe.

20         And that was it.  At Ken Blowers, the game was

21    over.

22    **Q.**    Can you say whether or not Mr. Traini made comment

23    on the process or the proceedings on Thursday before

24    this Court?

25    **A.**    I don't recall if Traini made direct comment on

1    Thursday, except that since we're in plea negotiations

2    you better consider doing it immediately because every

3    day we wait the judge will punish you with more time,

4    and the theory being the judge is going to see more

5    damning information about you.

6         Well, under the theory of let's not defend Joe

7    Caramadre, absolutely.  Any more witnesses coming in

8    would be negative.  Number two, I'd be tying up the

9    Court's resources and time and the jury, and the judge,

10    obviously, would have reason to punish me more if I

11    prolonged this.

12         So the only thing that I could comprehend was,

13    okay, this has to be done immediately, apparently,

14    because I can't risk more years.

15         And we went into -- I believe the Government --

16    again, I don't know what they discussed with my

17    attorneys.  I only know what my attorneys told me.

18    **Q.**    Okay.  So is it fair to say that from Thursday

19    until Sunday night that there were extensive

20    communications as you now know between the Government

21    and your attorneys?

22    **A.**    Yes.  I also knew on Thursday when I refused -- if

23    it was an offer, and I'm not sure it was an official

24    offer from the Government, a two- to five-year

25    sentence, I asked my attorneys to go find out what it

1     takes to have a zero at the bottom number and what

2     number we could put on top so that we could argue my

3     otherwise good character and other accomplishments to

4     the judge in the hopes of getting zero and they could

5     argue whatever my bad acts might have been.

6          And the Government at first I was told, fine,

7     you could argue zero, we'll argue 25 years.  I don't

8     know if the Government made that offer.  That's just

9     what was reported to me by my counsel.  I told them

10    that's completely out of the question.  Even a monkey

11    would understand if you're zero to 25, it does not make

12    sense compared to two to five even in rational terms.

13         Sure enough, by Friday morning or so, our goal

14    was to get a zero to ten proposition because with ten

15    there might be a chance of little or no time as it was

16    told to me by my attorneys where a judge would be

17    inclined to give you much more time if it's zero to 25,

18    knowing full well the guidelines on this case speak to

19    life in prison because of the amount of alleged losses

20    by the insurance companies as alleged victims.  So the

21    amounts and the number of insurance companies bring the

22    guideline sentencing levels to life, beyond life.

23         So zero to 25 with guidelines coming in at life

24    is not very appetizing.

25    **Q.**   How old are you?

1    **A.**    I am 53 years old.

2    **Q.**    Your wife?

3    **A.**    Is 48.

4    **Q.**    Did the level of your hopelessness change at any

5    point in time for the better from Wednesday night

6    through the time of the giving of the plea to Judge

7    Smith?

8    **A.**    No, it did not.  It maintained at zero as of

9    Thursday.  As of Friday, my job -- we had the

10   unfortunate incident on Thursday.  I rushed out of

11   here.  I was supposed to bring my wife to the doctor,

12   and we went there and there was no doctor because my

13   wife was not competent to figure out the doctor said

14   come tomorrow instead of come today.  So we had to

15   wrestle our schedule.  She cannot drive in her state;

16   she had to be brought there.  So we were frazzled as it

17   was.

18          By Thursday night, I made sure there was a

19   doctor's appointment the next day as soon as we

20   finished in court here on Friday.  I was concerned to

21   make sure Paula was okay.  I went to the doctor's with

22   her.  The doctor also noted I was quite distressed

23   myself and that I need to take care of myself, and it

24   just so happened I could not see my psychotherapist

25   because my normal appointment is Thursday at 10:00 in

1    the morning and, unfortunately, she was leaving the

2    country on that Friday and I couldn't see her over the

3    weekend.

4    **Q.**    And your normal appointment was on what days with

5    Dr. Zlotnick?

6    **A.**    Thursday at 10:00 a.m.

7    **Q.**    Okay.  Did you see any mental health provider from

8    the time of the start of trial right to the time of the

9    giving of the plea other than you've related as it

10   relates to your wife?

11   **A.**    No, I did not.

12   **Q.**    Any medication change in terms of your wife's

13   condition?

14   **A.**    Yes.  Well, she was started immediately on

15   medication as of Thursday.

16   **Q.**    Did that change on Friday?

17   **A.**    It changed on Friday.  The regimen was immediately

18   doubled, and we put in some other safeguards in place

19   to make sure that she actually takes well to the

20   medication so it can tend to stabilize the despair

21   depression within three or four days.

22   **Q.**    On Friday, what was the line-up of the

23   presentation in the court?

24   **A.**    On Friday, five witnesses came forward and they

25   told their story.  There was some cross-examination.  I

1    questioned why the Government even put in two

2    witnesses, because, at the end of the day, it was their

3    opinion that the money we gave them was very helpful to

4    them and they did sign forms and understand that an

5    account was being opened up.  But it was way too late

6    then.  The jury already wrote guilty on every single

7    pad as of the Wednesday.

8    **Q.**    That wasn't an observation of yours.  That was --

9    **A.**    I could just look from sitting at that table where

10   as soon as we were not defending these witnesses and

11   Mr. Vilker or Mr. McAdams was putting up, okay, your

12   account was this, $500,000, Joe Caramadre or Paula

13   Caramadre, there was no distinction as to whether that

14   was an investment, whether that was a loss, whether it

15   was gain.  The gains were few.  We just -- it just

16   looked like a lot of money to a jury.  And absolutely,

17   if someone is saying my dad didn't sign this, Dennis

18   Flori is saying my dad didn't sign it, but Joe

19   Caramadre opened an account, it certainly looks like

20   conspiracy unless we put a line, we determined to get

21   Raymour on the stand or get me to say I would never

22   have accepted anything that was forged or not in proper

23   form, period.  And for 30 years I ran a practice that

24   way.

25   **Q.**    Had there been any preparation of any character

1  witnesses in anticipation of a defense case to your

2  knowledge?

3  **A.**   I had a long list of character witnesses.  I sat

4  on upwards of 12 charity boards.  My family has given

5  away millions of dollars to charity.  We care about the

6  poor and those who need us.  So I was lucky enough to

7  have a rather extensive character reference if I chose

8  to go to captains of industry and ask them to speak to

9  my general character.

10  **Q.**   Any interviewing done by any of the three

11  attorneys with relationship to any of those character

12  witnesses?

13  **A.**   No.  It was, "Great.  You have a long list.  We

14  know that."  I believe Mike Lepizzera once told me that

15  Attorney Vilker said, Gee, Caramadre might take up two

16  months just with character witnesses.  As a joke, you

17  know.

18      But, no, we never prepared anyone.  We never

19  prepared an expert.  We never got an investigator.  And

20  we just -- unfortunately, I was the last to find out

21  that the obstensible plan was I guess do nothing as

22  defense.

23  **Q.**   What were the nature of your activities with your

24  family on Friday, if any?

25  **A.**   On Friday, we had to rush out of here, run to

1    Paula's doctor and try to determine if she needed

2    hospitalization or not.  He changed the dose to a

3    hundred of Zoloft, which in her weight actually helps

4    her much quicker.  My job was to manage her, manage the

5    kids and find out what the heck we're going to do with

6    us having this big hole in the courtroom that is

7    completely unexpected.

8    **Q.**    Same courtroom as we're in right today?

9    **A.**    Yes.

10   **Q.**    What happened on Saturday as a general overview as

11   it relates to you and your activities?

12   **A.**    On Saturday, I was distraught all weekend and I

13   went to have breakfast with Father Lacombe, a priest.

14   And I was distraught.  I was saying I have to stop the

15   bleeding.  This thing -- and me going away for 30

16   years, whether I'm innocent or guilty doesn't matter

17   anymore if Paula's sick.  It certainly mattered that I

18   was innocent to me, but the prospects are that this was

19   a train wreck that we were not defending.  We were in a

20   very difficult position with Raymour being his own

21   attorney.  He's unskilled at this.  My lawyers have, I

22   believe, tremendous skills.  It's their willingness to

23   defend which I'm questioning.

24   **Q.**    Did you meet with either Mr. Traini and

25   Mr. Lepizzera during the course of Saturday?

**A.**    No.  I spoke to Mr. Lepizzera, and I did write him

an e-mail after speaking with Father Lacombe, who knew

I was having tremendous problems considering a guilty

plea because I would have to be lying to the judge and

the Court.  And he recommended why don't you see your

counsel if he'll take an <u>Alford</u> plea.  This way you

won't have to lie about saying you're guilty.  Or it

was something to the effect of a nolo contendere,

throwing myself at the mercy of the Court without

admitting any guilt.  That would mean I wouldn't have

to lie.

        I put it in writing to Mr. Lepizzera on

Saturday.  Can we do an <u>Alford</u> plea so I won't have to

lie.  Everyone understood what that meant.  And it was

never answered except the Government won't accept an

<u>Alford</u> plea.

        On Sunday, the only interaction I had with Mike

Lepizzera, or even on Saturday, was that he said he was

trimming down the Government's statement of facts which

were wide-ranging which alleged this conspiracy started

in 1995 and was all-encompassing.  I asked him could he

get some names off of the so-called victims list that

were in-laws of mine.  And I guess the Government

agreed to that.  It wasn't that important to them at

this point.  And could we get AEGON Insurance off of

1    the insurance companies because they're already suing

2    civilly and well on their way of either winning or

3    losing their case. I believe that they took my in-laws

4    name off and they kept AEGON or Western Reserve Life

5    in.

6    **Q.** What was the nature of Paula's condition on

7    Saturday?

8    **A.** Paula's condition was in bed, bad, very hopeless,

9    trying to figure out what are we going to do. What are

10   we going to do if she's not well and our children need

11   attention? I cannot act as a mother and a father if

12   I'm managing a trial as well and very upset with the

13   way the trial is being managed. We did not have the

14   convenience of just stopping the trial and say let me

15   get better with my wife so I can stabilize my family.

16   We were already in and in my opinion family members

17   were calling me, please, Joe, make -- take the plea

18   because you're going down forever. The jury believes

19   you're a guilty man, even if it wasn't articulated. It

20   was inferred. It was said in an opening statement.

21   None of the witnesses except for Ken Blowers and one

22   other, which I'll speak about in a minute, ever met me

23   or knew me. So yet I was just as guilty because I was

24   the investor on these accounts under the proposed

25   conspiracy.

1        On Friday, again I don't believe there was any

2    hope left but what struck me was that the Government

3    brought in a person from the Rhode Island Catholic

4    magazine to express his lack of approval of my ad for

5    the terminally ill and how he had to go to the

6    higher-ups in the Catholic Diocese to get an okay for

7    this because in his opinion it didn't look right.

8        My attorneys should have pointed out to this

9    gentleman and the jury that because of that ad, 156

10   people received $2,000 without any obligation in any

11   account whatsoever.  And that was maybe the only ad

12   that's ever run in the Rhode Island Catholic that

13   actually helped people, that actually gave money away.

14   Of course my attorney didn't care to take that up.

15   Comes in.  It's bad.  It's bad.

16       We were done on Friday.  Friday, I had to bring

17   my wife to the doctor.  My only problem was how do I

18   lie to this Honorable Court because I have maintained

19   that I have a high degree of integrity, not

20   withstanding the allegations involved.  I've always

21   been wanting to confront them from day one.  I

22   immediately asked for a meeting with the Government.

23   As soon as I knew there was an investigation, I

24   voluntarily handed over the names of participants, the

25   insurance companies, my tax returns.  I wanted to make

1    sure they knew I was cooperating.  There was nothing

2    illegal intended and in my opinion nothing was

3    happening illegally.

4         Now, I had a moral dilemma, one that haunts me

5    to this day.  On Sunday night, Michael Lepizzera and

6    Tony Traini had to come to my house and apprise Paula

7    and I about the plea agreement and the associated

8    statement of facts.  My wife was very sick.  She was

9    barely holding her own at the dining room table and she

10   was -- I asked specifically how is it that I have to go

11   plead guilty and agree to this statement of facts that

12   is long-reaching when I deny it completely and don't

13   believe I'm guilty of anything and all of these are

14   lies and I'd be lying about it.

15        So my attorneys told me what attorneys should

16   tell people, that they cannot tell me to lie or they're

17   going to get disbarred.  Okay.  So I said, Guys, I am

18   lying.  I've maintained innocence.  Mike Lepizzera

19   espoused my innocence for two years before Traini got

20   on board.  How am I going to get around this?

21        And I asked Mr. Traini in particular since he

22   had the experience, how is it that people can justify

23   lying to the judge?  And he said something to the

24   effect that most of his clients are guilty anyway and

25   it's just a question of getting a plea bargain when

1    guilt is prevalent and obvious.  He goes, however, for

2    those who claim innocence, that even though tonight

3    being Sunday I believe I am innocent and lying to Judge

4    Smith guilty, tomorrow morning it's his experience that

5    just before I answer that I will believe I'm guilty and

6    therefore I am not lying.  Or he put it in a third

7    person reference, it's his experience that when

8    defendants answer guilt, a second before they answer it

9    they believe they're guilty so they get over their

10   moral dilemma for lying.

11        And even after that I said that's still not good

12   enough.  I will be no more guilty tomorrow than I am

13   now.  And they just said, okay, well, we'll see you

14   later.  It wasn't --

15   **Q.**   How long was the meeting?

16   **A.**   About 30 minutes.

17   **Q.**   Where was it?

18   **A.**   At our home.

19   **Q.**   And were you left with a copy of the plea bargain

20   agreement and the statement of facts?

21   **A.**   Not to my knowledge.  When this statement of facts

22   was read, I objected strongly by saying I am

23   considering pleading to two counts, one of wire fraud,

24   one of conspiracy.  Where is this -- why are they

25   getting into all this other stuff.  And they said,

1    that's just what the Government thinks they can prove.

2    You're saying guilty.  They're going to say they're

3    going to run with it with all the -- I actually said,

4    well, they didn't put that I killed President Kennedy

5    in there, so I guess I'm not guilty of that, the way

6    that the statement of facts was put together.

7    **Q.**    Was there any opinion given in terms of what their

8    belief was as to what a potential sentence would be?

9    **A.**    They reported to me, when I asked on point, what

10   is the situation here with zero to ten.  I was told by

11   Mr. Traini Judge Smith is a very reasonable and

12   generous person.  He needs to only imprison two types

13   of people.  One is public corruption, a politician on

14   the take because the public demands jail time; another

15   is violent crimes because the public want people in

16   jail who hurt others.  Joe, you don't fall into that

17   category.  As soon as the judge learns about the true

18   Joe Caramadre, what he's really about, I believe that

19   there's a very good chance you will get no time.  If

20   you get any time, it will be very little.  There's a

21   very good chance you'll get little or no time.  And

22   with that, the meeting ended.  And the next morning I

23   came in and just -- I didn't read the statement of

24   facts or the plea agreement.  I just signed it.

25   **Q.**    Where did you sign it?

1   **A.**   I signed it either on this table or in the

2   lawyers' table down the hallway.

3   **Q.**   Copy given to you at that time?

4   **A.**   No.  Because what does it matter?  I lost hope.  I

5   was completely depressed.  I could not defend myself

6   anymore.  There was no reason really to live except for

7   family.  And I betrayed my very self to save my family,

8   and I've regretted it ever since.  And I wish things

9   were different but I have lied and I must take

10  responsibility for that.

11  **Q.**   Did Mr. Lepizzera at any point in time prior to

12  Monday, I mean right through the balance of the day on

13  Sunday, prior to the giving of the plea, did he at any

14  time indicate to you that his belief in your innocence

15  had changed?

16  **A.**   No.  He basically -- after Tony Traini came on

17  board, it was very apparent that Traini's objective was

18  to get me to plea because he brought it up a lot.  And

19  Mike became a follower of, well, you have to go 66 for

20  66.  These were the criminal counts.  I have to pitch a

21  shutout to win this because even if I'm found guilty of

22  one count I'll be punished for many more, just the way

23  it works.  So the chance of walking away is going to be

24  hard.  Mike starts saying the chance of winning it all

25  is going to be hard.  And I kept saying why can't we

1   impute honesty and integrity and the truth here.  If

2   I'm guilty of one, I'm guilty of all of them.  And if

3   I'm not guilty of the one, I'm not guilty of all of

4   them.  I'm either running a criminal enterprise or I'm

5   not.

6        So Mr. Lepizzera just thought it was in my best

7   interest, especially with Paula being sick, which I

8   know he cares about Paula and our kids, that I better

9   take the plea and that is absolutely the best thing for

10  me.  Waiting any time will just cause more catastrophe.

11  There'll be more witnesses coming that will make you

12  look much worse in the judge's eyes, and the judge is

13  God almighty and he can decide if you go to jail or if

14  you don't and you got to stop the bleeding.  And I

15  believed my lawyers would not be able to defend it,

16  period.  We might as well have not had a defense if we

17  were going to move forward, just let the Government

18  bring their case forward.

19  **Q.**   What was your takeaway from the conclusion of the

20  meeting with Mr. Traini and Mr. Lepizzera jointly?

21  **A.**   My takeaway was this is the only chance I have.

22  We can't even go one more day of trial , because it

23  will get worse.  And just get ready to lie.  That was

24  my take.

25  **Q.**   They didn't say it?

1    **A.**    Oh, no.  They didn't say it.  I want to be very

2    clear that they did not say it.  But they told me that

3    there's going to be this moment, especially Mr. Traini,

4    that a defendant doesn't lie because he believes he's

5    guilty right before he says it.

6    **Q.**    Did you believe you were guilty right before you

7    said it?

8    **A.**    No, not at all.

9    **Q.**    Then why?

10   **A.**    Why what, please?

11   **Q.**    Why did you say guilty?

12   **A.**    I said guilty because I had no hope.  My

13   depression had overcome me.  I had no confidence in

14   counsel.  My wife was sick.  My psychologist is out of

15   the country, and I'm saddled with nowhere to go except

16   -- I don't know if you could get any lower than we

17   were.  So I needed to protect my family that at least

18   if I'm going to go away it won't be that long and I

19   could be here to give the protection and provide for

20   the family any many others as I have for so many years.

21   **Q.**    Sworn to by the clerk before the plea?

22   **A.**    Yes, I was.

23   **Q.**    So help you God?

24   **A.**    Help me God.

25   **Q.**    What was going on in your mind when you heard

1    those words?

2    **A.**   What was going on in my mind was God forgive me

3    for lying.  When Judge Smith asked me -- I don't know

4    if he can remember; I know I can remember.  I had to

5    wait about a second-and-a-half before I said yes.  I

6    had to answer yes to this statement of fact or to

7    guilty yes.  And he said is this, are these statements

8    of facts correct.  And I just said yes.  I couldn't

9    even look at the Honorable Court because it was a lot.

10           And I would like to just go on the record, this

11   is not about how many years I get in jail.  If the

12   judge of this court or the Government said to me, we'll

13   just keep you guilty and you'll get no time, we'll cut

14   a new deal, I'm not accepting it.  I am not guilty.  I

15   would rather go to jail for 30 years espousing my

16   innocence and fighting this case on the merits and even

17   no time.

18   **Q.**   In terms of belief in innocence by either of the

19   two attorneys, did either of the two attorneys make

20   comments to you after the taking of the plea by Judge

21   Smith?

22   **A.**   The only comment I got was that Mike Lepizzera

23   said he was never sure I was going to plead guilty

24   until I did.  In other words that until I said it, it

25   doesn't matter what was discussed.  It wasn't in until

1    it's in.

2    **Q.**   How soon, if at all, after the giving of the plea

3    did you think about the inadvisability of having done

4    it?

5    **A.**   As soon as two or three days after.  It was

6    Thanksgiving week.  There were many relatives coming to

7    pay respects to Paula, who was getting a little bit

8    better.  One of my children was out for the whole week

9    from school.  I started realizing that I am a convict,

10   a convicted felon because I said I am, not because

11   anyone proved anything, and this has to change.

12        And by December 8th, I made a public declaration

13   that I am now seeking to reverse this.

14   **Q.**   Did you have any contact with either of your

15   treating mental health providers relating to this issue

16   prior to December 8th?

17   **A.**   Yes.  I called Dr. Xavier on November 30th to

18   report that I'm having tremendous severe depression and

19   we may have to change the medication or do something,

20   possibly hospitalization.  For me, my wife was getting

21   better but I've just pled guilty, I'm at bottom.  I'm

22   at Ground Zero.  I need reasons to live.  I've got to

23   maintain my faith for my family to stay in this world.

24   **Q.**   Had the issuance of acceptance of responsible

25   declaration by you come up prior to the November 30th

1    call?

2    **A.**    No.   The attorneys said we have to go to the

3    Probation Department and we're supposed to have some

4    tax returns and some other stuff put together or we

5    have to get it at some date.  We went there.  I think

6    it was around November 30th.  And what convinced me

7    that I was dead wrong in pleaing guilty was when I was

8    at the probation office and the probation officer,

9    professional lady, Ms. Mattias I think her name is, she

10   said, Joe, I'm going to need your authorization to get

11   your tax returns, your medical records, some other

12   records.  And I said, "Absolutely.  I want to

13   cooperate."  And she put four pieces of paper in front

14   of me and said, Okay, sign over here for this, sign

15   here for this.  Four of them.  She put them back in her

16   folder.

17        It just struck me then that I said to my

18   attorneys, "Guys, what did I just do?"  You signed four

19   pieces of paper, one for medical, one for taxes, one

20   for -- some other authorization.  No.  I just did, I

21   agreed to something and I signed a blank piece of

22   paper.  Exactly that, what Raymour might have done with

23   some of these people after they agreed to something,

24   sign here.  And it became absolutely clear that the

25   basis of this case is that if the Government, if these

1    same prosecutors wanted to get this Ms. Mattias for

2    fraud, all they would have to do is go to anyone and

3    say did Ms. Mattias explain every single paragraph?

4    How about paragraph five where it says under penalty of

5    perjury?  That wasn't explained to me.  I just signed

6    them.

7         I mean, I expect to tell the truth anyway.  But

8    the point was what the Government has done is gone to

9    people who were happy with the arrangement, who wrote

10   thank you notes and agreed to something.  And then to

11   go ask them, tell them that I'm a criminal all of a

12   sudden -- if someone came to me and said Ms. Mattias is

13   a criminal and we're investigating her for fraud, and

14   she didn't even put your name on this piece of paper,

15   I would have said, yeah, right, gee whiz, I didn't know

16   I was part of a fraud ring.  It's untrue.  That's how

17   the people lined up against Raymour and I.  And at that

18   point, the truth has to be told at great risk that the

19   Court will punish me forever.  I will accept the

20   punishment, whatever.  But I have made this motion to

21   withdraw on my plea.

22   **Q.**   What happened on December 8th?

23   **A.**   On December 8th, we were at a meeting with the Men

24   of St. Joseph's.  We were praying.  It was a Holy Day

25   of Obligation, Immaculate Conception.  We have a

1     meeting at 8:00.  We go to Mass at 9:00.  And right

2     before the meeting we were having Mass Intentions and I

3     said something stupid.  And I said, Well, even though

4     suicide is a crime, sometimes it really makes sense for

5     people.

6          And we went to Mass at 9:00, and my family had

7     met me at Mass, and we were out to breakfast.  And at

8     breakfast, Mike Lepizzera comes really storming in and

9     says, "I need Joe immediately."  And I thought maybe

10    the Feds or somebody, you know, needed to see me for

11    something.  He pulls me out and he said, You said

12    suicide and this, we're having an intervention.  Mike

13    brought me back to the church where five of the Men of

14    St. Joseph were there and they say, Joe, we don't like

15    to hear this that sometimes suicide makes sense.  We

16    want to make sure that your faith is grounded.  And I

17    assured them it was.  I just wish I was dead.  I just

18    went out and lied and agreed to a crime I didn't commit

19    and the whole world was how I wished a truck had hit me

20    but I love my children and wife and parents and

21    everyone else who depends on me.  And so at that point

22    I made it clear to Mike and to everyone else, I must

23    get out of this lie and I'm going to pursue.

24    Q.   Did you have any conversation with Mr. Lepizzera

25    in the car ride?

**A.**   Yes.  He wouldn't let me drive.  I told him I am

seeking to withdraw this ill-advised guilty plea.  I am

not guilty and if I go to jail forever, that's fine.

That's how it is.  I need my integrity.  And I betrayed

myself and put a price on integrity because I had to

protect my wife and children but I'm not doing it

anymore.  My wife is much better now.  My children, God

bless them, they've been a support system.  I am so

proud of them to be able to say, Dad, you followed a

truth no matter what it cost.

**Q.**   Did anything else happen in that return meeting

from the restaurant to the group of Men of St.

Joseph's?

**A.**   Just that Mike assured me he would be my friend

for life, my brother in Christ, that he would never get

in the way of my freedom or my family security even if

I'm saying ineffective counsel.

**Q.**   Were there any phone calls made to anybody during

the course of that meeting?

**A.**   Yes.  At that meeting, the gentlemen insisted I

call my psychiatrist or I couldn't leave.  I had to

check in with the psychiatrist and tell her I am

suicide ideation, which means I'm not threatening it

but how I wish a truck would just hit me so I could be

out of this world.

1  **Q.**   Who made you call?

2  **A.**   Mike in particular.  So I had to call the doctor

3  then.  This was the second time I had called Dr. Xavier

4  to report that I had been talking about suicide, not

5  necessarily committing it, but starting to think it's

6  not the worst idea for some people.

7  **Q.**   What was your understanding as of December 8th as

8  to what disbursements had been made, if any, to

9  Mr. Traini consistent with the $450,000 total?

10  **A.**   My understanding from day one was always that Mike

11  was successful in staggering the payments over nine or

12  ten months so that Mr. Traini would be paid through the

13  end of February and we wouldn't risk losing money up

14  front, all of it.  And I expected a refund of 150 to

15  $200,000 since we were four days into what would have

16  been a four-month trial.  And I was met with very bad

17  news, that, no, it was a non-refundable contract.  I

18  would have never agreed to it.  I never saw the

19  contract.  I didn't sign it.  I didn't authorize Mike

20  Lepizzera to enter into a contract which he signed both

21  on behalf of me as my agent and individually to give

22  Traini 450,000 non-refundable that ends as soon as

23  there's a plea.

24  **Q.**   Never saw it?

25  **A.**   Never saw it before.  I demanded accountability.

1    **Q.**   Which was when?

2    **A.**   Which is in December, after the 8th.  After the

3    8th, I went out and spoke to Robert Flanders and said I

4    need a referral to get attorneys to prosecute my

5    withdrawal of a guilty plea and/or appeals, and Bob

6    Flanders as early as December 12th wrote back to me

7    about some names and other people.

8    **Q.**   Did you ever communicate to the remainder of the

9    Men of St. Joseph's who were there on your return from

10   the restaurant transported by Mr. Lepizzera?

11   **A.**   Yes.  On December 8th I wrote them a letter after

12   I spoke to my psychiatrist in the afternoon.  I said,

13   Guys, I love you, thank you for caring about me but I

14   promise you I am not leaving this world until God

15   decides when I leave it.  So don't worry about any

16   suicide and thanks for being there and know that I'm

17   always there for them.

18   **Q.**   Did you have occasion to meet with Mr. Traini or

19   Mr. Lepizzera after seeking advice from Mr. Flanders?

20   **A.**   Yes.

21   **Q.**   When?

22   **A.**   I met with them on December 14th.  It was a

23   Friday.  And I believe it was the day of the Newtown

24   shootings because that interrupted our meeting.

25         At that time, I told them that I had been very

1    disillusioned and that I want to pursue withdrawing

2    this guilty plea.  And they asked me why.  And I told

3    them I was not represented right, that all these

4    questions should have been asked.  And they summarily

5    told me you don't know anything about being an

6    attorney.  The judge would never allow us to ask

7    Ed Rodriguez who first approached them of the FBI.

8    Well, I would have liked it asked anyway because it

9    seemed no problem to ask Richard Wiley that on the

10   deposition that the judge allowed that question and the

11   Government allowed that question.  So they just told me

12   no, the deal's cut, that's it.

13        Days later, I said, Okay, I would like a refund

14   of my retainer that I'm counting on to actually pay new

15   attorneys to prosecute my withdrawal of guilt.  And

16   Traini said, Oh, no, that's done.  That was a flat fee.

17   Take it up with Mike.  He signed the contract.

18        And I've had to pursue Mike and Traini with the

19   Board of Bar Discipline in which I have an extensive

20   opinion by a very well-known attorney that they have

21   violated many different ethical standards, especially

22   entering me into a forfeiture non-refundable agreement

23   with money that I borrowed that was supposed to cover a

24   trial and appeals.  I would never agree to that.  It

25   would have been dismantled immediately.

1    **Q.**   To your knowledge, did Mr. Traini or Mr. Lepizzera

2    have any contact with your healthcare providers after

3    December?

4    **A.**   Yes.  After I told them I was planning in that

5    December meeting or a week before that or some day,

6    they had me sign a whole bunch of blank medical

7    authorizations.  Again, I agreed to medical

8    authorizations.  If Raymour did it, it's a crime

9    according to the Government.  If anybody else does it,

10   it's business as usual.  So I signed a whole bunch.

11   And much to my surprise, Mike Lepizzera went to visit

12   my psychiatrist, Sarah Xavier, to review my medical

13   records.

14   **Q.**   When was that?

15   **A.**   That was in the first week of January after he

16   knew fully well that they needed to withdraw from the

17   case and that I was going to hire at the time Mr. Olen,

18   who was highly recommended.

19   **Q.**   E-mails going back and forth in late December?

20   **A.**   Absolutely.  About it's a bad idea for me to try

21   to withdraw the plea.  The judge will only be mad.

22   He's going to massacre me.  All this.  Fine.  But I

23   told them I lied.  On Christmas Day, I sent Mike an

24   e-mail, Jesus came here to tell truth.  We all know the

25   truth is that I'm innocent and I lied when I said

1    guilty.

2    **Q.**   Did Mr. Lepizzera indicate to you before he saw

3    Dr. Xavier that he was intending to go there?

4    **A.**   No.

5    **Q.**   When did you find out?

6    **A.**   I found out the next time I saw Dr. Xavier on or

7    around January 10th that she said, By the way, your

8    lawyer was here and reviewed the file with me.

9    **Q.**   Did you ever get an explanation from Mr. Lepizzera

10   why he went out without telling you after December?

11   **A.**   He never could justify it properly.

12   **Q.**   How did he justify it?

13   **A.**   He said, Oh, I needed to go check your medical

14   records for presentencing.  Well, it wasn't about

15   presentencing, because I already made it very

16   absolutely clear there is no presentencing.  The judge,

17   His Honor will decide if my guilty plea holds, then we

18   start presentencing.  But I am not taking

19   responsibility for the crimes nor writing any letters

20   of responsibility.

21        So in my opinion he was there to hope to get

22   information that could help him and Traini.

23   **Q.**   Was he going to the Men of St. Joseph's meetings?

24   **A.**   I have not seen him since January.

25   **Q.**   Have you?

1    **A.**   I've gone to every one, and I wish Michael would

2    join us.  I don't want to make a reference in the

3    negative.  It may be he's just too busy.  I don't want

4    to assume that because I'm there -- as a matter of

5    fact, I've listed publicly a petition that we should

6    pray for Mike Lepizzera's family because he's not

7    there, as well as my own.  So --

8            MR. WATT:  Judge, may I have 15 seconds, please?

9            THE COURT:  Yes.

10           (Pause.)

11           MR. WATT:  Judge, I have no further questions.

12   Thank you.

13           THE COURT:  All right.  Thank you.  I think this

14   would be a good time to take a lunch break, and we'll

15   continue with the cross-examination of Mr. Caramadre

16   when we return from lunch.

17           So why don't we say 1:30.  All right?  We'll be

18   in recess.

19           (Lunch recess.)

20           THE COURT:  Mr. McAdams, are you ready to

21   proceed with your cross-examination?

22           MR. McADAMS:  Yes, your Honor.

23           <u>**CROSS-EXAMINATION BY MR. McADAMS**</u>

24   **Q.**   Good afternoon, Mr. Caramadre.

25   **A.**   Good afternoon.

1   **Q.**   Mr. Caramadre, you're an attorney, correct?

2   **A.**   Yes.

3   **Q.**   And you've been an attorney for over 20 years?

4   **A.**   Almost 20 years, yes.

5   **Q.**   You specialize in contract law?

6   **A.**   Yes.

7   **Q.**   You read prospectuses for various financial

8   products; is that correct?

9   **A.**   Among other things, yes.

10  **Q.**   You're an expert at this?  You read the fine

11  print, correct?

12  **A.**   Well, I've made a living of reading the fine

13  print, yes.

14  **Q.**   You've identified the loopholes that you believe

15  you found in the fine print of contracts, correct?

16  **A.**   Yes.

17  **Q.**   And you've taken the insurance company's -- you

18  make them held to their contracts that they don't even

19  know, correct?

20  **A.**   If you want to put those words in my mouth, I

21  think an insurance company should be held accountable

22  for what they offer to the public.

23  **Q.**   So if somebody enters into a contract, you believe

24  that they ought to be held to the terms of that

25  contract?

1    **A.**    Yes.

2    **Q.**    And that's what you do.  You're an expert at

3    identifying the terms of contracts and making sure that

4    you understand them correctly and then going out and

5    getting contracts that are favorable to you, correct?

6    **A.**    Yes.

7    **Q.**    Now, I want to make sure we understand this

8    correctly.  It's your testimony that you lied to this

9    Court when you pled guilty; is that correct?

10   **A.**    That is correct.

11   **Q.**    Okay.  So on November 19th, 2012, in this

12   courtroom, you were placed under oath and you lied

13   deliberately and voluntarily to the Court?

14   **A.**    I did lie, yes.

15   **Q.**    And now you're saying that that plea agreement was

16   a lie, correct?

17   **A.**    I'm saying that when I agreed to the statement of

18   facts that it was incorrect.  I don't agree that I

19   committed any of those.  It was a lie when I said yes.

20   **Q.**    Okay.  So -- well, you did more than just say yes,

21   didn't you?  You didn't just walk in here and asked one

22   question and said yes.  There was an actual procedure,

23   wasn't there?

24   **A.**    There was a procedure in which two or three

25   questions had to do with guilt or innocence.

1    **Q.**   Two or three questions.  Okay.

2        You were placed under oath and the Court

3    conducted a colloquy with you, did they not?

4    **A.**   Yes, they did.

5        MR. McADAMS:  I'd like to mark Government

6    Exhibit 1, which is your plea agreement.

7        THE COURT:  We'll take that in as Government 1

8    unless there's an objection.

9        MR. WATT:  No, objection.

10       THE COURT:  This will be full, Government 1.

11       (Government Exhibit 1 admitted in full.)

12       MR. McADAMS:  I'm just going to put the sticker

13   on the back of the last page.

14   **Q.**   Mr. Caramadre, can you see in front of you on your

15   screen?

16   **A.**   Yes.

17   **Q.**   Recognize this document?

18   **A.**   It says "Plea Agreement," yes.

19   **Q.**   All right.  This is United States versus Joseph

20   Caramadre?

21   **A.**   Yes.

22   **Q.**   And this was filed here in United States District

23   Court for Rhode Island?

24   **A.**   I believe so, yes.

25   **Q.**   I'm going to turn to the second to the last page

1    of that document.  Is that your signature?

2    **A.**    Yes.

3    **Q.**    You signed that document?

4    **A.**    Yes.

5    **Q.**    That's dated on November 19th, 2012?

6    **A.**    Yes.

7    **Q.**    And before you signed that, you read it, you read

8    that plea agreement, correct?

9    **A.**    I'm not sure if I read it.

10   **Q.**    You're not sure if you read it?

11   **A.**    No.  I knew it was a plea agreement.

12   **Q.**    You knew it was a plea agreement.  And did you

13   read it or did you not read it?

14   **A.**    I can't really answer.  It was a very difficult

15   time in my life, and I knew I had to just come here and

16   say guilty.

17   **Q.**    So when you have a question about a contract, you

18   look at the terms of the contract, correct?

19   **A.**    In ordinary course of business when I have

20   capacity, yes.

21   **Q.**    Let's look at paragraph 15.  Says:  Defendant

22   states that Defendant has read the agreement in the

23   attached statement of facts or has had each read to the

24   Defendant, has discussed each with Defendant's counsel,

25   understands each and agrees to its provisions.  Do you

1    see that?

2    **A.**   I see it, yes.

3    **Q.**   Is that what it says?

4    **A.**   Yes.

5    **Q.**   And you understand that a plea agreement is a type

6    of contract?

7    **A.**   I agree.  It's a contract.

8    **Q.**   Now, before the Court accepted this plea -- excuse

9    me, let me rephrase that.

10        In connection with this plea agreement, you also

11   executed a document you just referenced, correct,

12   called a statement of facts?

13   **A.**   That is correct.

14        MR. McADAMS:  I'd like to mark that as

15   Government Exhibit Number 2 and move for purposes of

16   the hearing into evidence.

17        THE COURT:  Any objection?

18        MR. WATT:  No objection, Judge.

19        THE COURT:  Government 2 will be full.

20        (Government Exhibit 2 admitted in full.)

21   **Q.**   Do you recognize that, Mr. Caramadre?

22   **A.**   Yes.

23   **Q.**   That's the statement of facts in this case?

24   **A.**   Yes.

25   **Q.**   And it's a six-page document.  And on the last

1  page, is that your signature?

2  **A.**   Yes.

3  **Q.**   Along with Mr. Vilker and myself and

4  Mr. Radhakrishnan?

5  **A.**   Yes.

6  **Q.**   So you read this statement of facts before you

7  signed it?

8  **A.**   I don't believe I did.

9  **Q.**   You didn't read it?

10  **A.**   No.

11  **Q.**   You didn't go over it with your attorneys?

12  **A.**   No.  It was read to me once on Sunday night while

13  my wife and I were under great duress, while I was

14  asking my attorneys how do I go about lying to the

15  judge.

16  **Q.**   So let me stop you there.  When you say "How do I

17  go about lying to the judge," you mean lying about

18  these facts?

19  **A.**   Yes.

20  **Q.**   So you knew what these facts said?

21  **A.**   They were read to me and I objected.

22  **Q.**   Did you know what they said?

23  **A.**   They said from 1995 I've been an arch criminal.

24  That's what they said.

25  **Q.**   Let's go through it.  Okay?  So page one says,

1    "The parties agree that the following facts are the

2    facts of this case:  From in or about 1995 through

3    2010, Joseph Caramadre ran a company called Estate

4    Planning Resources."

5         Do you see that first sentence?

6    **A.**   Yes.

7    **Q.**   Can you tell me where it says you're an arch

8    criminal?

9    **A.**   Doesn't say it in that way.

10   **Q.**   Doesn't say it in those statement of facts, does

11   it?

12   **A.**   It doesn't say on that page.

13   **Q.**   Do you want to review the entire document?

14   **A.**   If you want to wait a couple of minutes, I'll be

15   happy to.

16   **Q.**   We've got plenty of time.

17   **A.**   Sure.

18        MR. McADAMS:  Your Honor, may I approach?

19        THE COURT:  Yes.

20        (Pause.)

21   **A.**   I will concede that it does not have something

22   from '95 saying I'm an arch criminal.

23   **Q.**   Thank you.

24        Will you also concede that you had this

25   statement of facts read to you before you signed it?

1  **A.**    It was read to me on Sunday night by Mr. Traini

2  and it was read, yes.

3  **Q.**    So you understood what the facts were going to be

4  in this document, correct?

5  **A.**    Yes.  And I objected to them.

6  **Q.**    I understand you want to make that point, and

7  we'll get to that.  But you understood what the facts

8  actually said?

9  **A.**    Well, as best I could.

10  **Q.**    As best you could.  Were you confused about what

11  they said?

12  **A.**    I was confused about life itself.

13  **Q.**    You were confused about life?

14  **A.**    Yes.  I was completely incapacitated to even read

15  it myself.  It had to be read to me.

16  **Q.**    You were physically incapable of reading this

17  document?

18  **A.**    I was mentally incapable.

19  **Q.**    Mentally incapable of reading this document.

20  **A.**    And absorbing it with any acuity.

21  **Q.**    But yet you understood enough to say that it was a

22  lie?

23  **A.**    Well, as soon as it says I entered into a

24  conspiracy in the third or fourth paragraph, it is a

25  lie.

1  **Q.**   So you know in what paragraph it describes you

2  entering into a conspiracy?

3  **A.**   Well, the first two paragraphs merely state that I

4  used annuities and bonds and in the use of terminally

5  ill people.  All of that is correct.

6  **Q.**   So there are some facts that are correct in this

7  document, you agree with me on that?

8  **A.**   Yes.  There are some facts that state facts that

9  are correct standing alone.

10  **Q.**   So the entire document is not a lie from your

11  perspective?

12  **A.**   No.  Just the accusations of crimes are a lie.

13  **Q.**   Just the accusations of crimes?

14  **A.**   That's correct.

15  **Q.**   Okay.  We'll go through those.  So when you signed

16  this document, you understood what it said, correct?

17  **A.**   I understood to the best I could.

18  **Q.**   Okay.  Well, did you tell your attorneys that

19  you're incapable of understanding what it says or what

20  it means?

21  **A.**   I think that they knew that they had to read it to

22  me.

23  **Q.**   Okay.

24  **A.**   That I was not being able to concentrate, under a

25  lot of medication and under tremendous stress.

1    **Q.**   You think that they knew that they had to read it

2    to you, but you never communicated to them verbally

3    that you didn't understand what those facts said?  Just

4    the opposite, you said it's a lie?

5    **A.**   I objected to the parts where they say there was a

6    conspiracy or there was any defrauding of anybody and

7    all the other stuff that's in there.

8    **Q.**   Did you go through the document and take a pen and

9    mark which parts you agreed with and which parts you

10   disagreed with?

11   **A.**   No.  Because I was already beaten and had conceded

12   that it doesn't matter what the truth is, that you

13   might as well put that I caused the Boston Marathon

14   bombing in there because I need to sign this because my

15   family is at risk.  I'm not being defended.  I have

16   nowhere to go.

17   **Q.**   Because you had sat through four days of trial and

18   you had seen the evidence come in against you.  You

19   didn't like the way that evidence came in.  You

20   disagreed with some of the tactical decisions that your

21   attorneys had made.  You were convinced that you were

22   going to be found guilty by the jury and you decided

23   that it was in your best interest and in your family's

24   best interest for you to stop the bleeding, in your

25   words, correct?

**A.**   I'd like to rephrase that.  I saw the attempt of presenting negative information, and I saw no rebuttal to it.  So to that point, there was still no direct evidence to me but for the way it was being presented that I'm an investor.  But it was a train wreck. There's no question that this was a losing battle.

**Q.**   And you knew that you were going to be found guilty, correct?

**A.**   Well, I didn't know.

**Q.**   You believed that you would be found guilty?

**A.**   No, I believed that --

**Q.**   I think you testified earlier that you looked at the jury's pads and they had all written guilty on them already, didn't you?

**A.**   They should have written guilty.

**Q.**   Because you are guilty?

**A.**   No.

**Q.**   Because the evidence showed that you were guilty?

**A.**   The evidence undefended could convince a jury I'm guilty, sure.

**Q.**   And you recognized that, right?

**A.**   Well, I think anyone could recognize that.

**Q.**   Anyone, any rational person who observed the evidence that was presented over those four days of trial would come to the conclusion that you are guilty

1    of the crimes you were charged with?

2    **A.**   Yes.  Especially the way it was presented, then

3    undefended.

4    **Q.**   That included yourself.  You decided that you were

5    going to be found guilty and it was in your personal

6    best interest to limit the damage, protect yourself,

7    protect your family by entering into a plea agreement

8    with the Government; isn't that correct?

9    **A.**   When someone pleads guilty, they are trying to

10   stop the damage.  So yes, I needed to stop the bleeding

11   because I needed to protect my family.

12   **Q.**   And after the bleeding stopped, you changed your

13   mind and now you want to have a do-over?

14   **A.**   I'm going to have a trial.

15   **Q.**   Well, you had a trial, didn't you?

16   **A.**   Not really.

17   **Q.**   Not really?

18   **A.**   No.

19   **Q.**   You weren't in this courtroom on November 13th,

20   2012?

21   **A.**   You, yourself, said it wasn't much of a battle,

22   was it.

23   **Q.**   I did not say that.

24   **A.**   You said it was --

25   **Q.**   I'm going to ask you questions.  That's kind of

1    how it works.  I know you're an attorney and you're

2    familiar with the procedures, but that's how we'll do

3    it.  Okay.

4         So let's go back to your plea agreement.  Before

5    you signed the plea agreement, you agree with me you

6    did sign that statement of facts?

7    **A.**   I did sign it, yes.

8    **Q.**   In addition to that, you also executed another

9    document that was presented to you by your attorneys on

10   that same date, did you not --

11   **A.**   Well --

12   **Q.**   -- on November 19th, 2012?

13   **A.**   If you show it to me, I could tell you.

14   **Q.**   Okay.  I'll put it up for you.

15        MR. OLEN:  Your Honor, could I have

16   Mr. Caramadre complete his answer.  I'm having

17   difficulty following because of the interruptions.

18        THE COURT:  That's fair.

19        MR. McADAMS:  I'll slow down.

20        THE COURT:  Slow it down.

21   **Q.**   I'm going to put this on the screen for you.  Do

22   you recognize this letter from Mr. Traini, November

23   19th, 2012, and it has a second page with your

24   signature at the bottom?

25   **A.**   I definitely recognize my signature, yes.

1          MR. McADAMS:  I'm going to mark this, your

2     Honor, as Government's Exhibit Number 3 and move it

3     into evidence.

4          THE COURT:  Any objection?

5          MR. WATT:  No objection.

6          THE COURT:  Government 3 will be full.

7          (Government Exhibit 3 admitted in full.)

8     **Q.**   Mr. Caramadre, do you remember meeting with your

9     attorneys to discuss the plea agreement and the

10    statement of facts?

11    **A.**   I remember on Sunday night before I pled, yes.

12    **Q.**   And you had mentioned in your direct testimony

13    that before the trial started, approximately a week

14    earlier, that Mr. Traini and Mr. Lepizzera went over

15    with you the potential punishment that you might face

16    if you're convicted at trial and had you read a

17    document and you signed it, and that document

18    specifically told them they were not to enter into plea

19    negotiations with the Government?

20    **A.**   That is correct.

21    **Q.**   So that document wasn't shown to you in your

22    direct testimony but you do remember it, and it was a

23    document similar to this on Mr. Traini's letterhead?

24    **A.**   It was a rather long document, I believe, yes.

25    **Q.**   Numerous pages and it references --

1    **A.**    Maybe about 10 or 13, yes.

2    **Q.**    And it referenced each of the potential penalties

3    and what the --

4    **A.**    That's correct.

5    **Q.**    -- the potential guideline enhancements --

6    **A.**    Yes.

7    **Q.**    Before you signed the plea agreement, or at the

8    same time that you signed the plea agreement, you also

9    signed this document with Mr. Traini and Mr. Lepizzera,

10   correct?

11   **A.**    I assume so.  It says November 19th.  It is my

12   signature, yes.

13   **Q.**    Let's go through this a little bit.  It says this

14   correspondence is intended to further discharge our

15   obligations with respect to the potential sentencing

16   consequences in the above matter.  Then it references:

17   "As you know from our previous correspondence on

18   September 13th that the Supreme Court recently

19   reaffirmed the Sixth Amendment right of any criminal

20   defendant to effective assistance of counsel extends to

21   the plea bargaining process."

22          And Mr. Traini and Mr. Lepizzera explained to

23   you that their obligations under this recent Supreme

24   Court precedence is that they had to communicate to you

25   any plea agreements, correct?

1    **A.**    Yes.

2    **Q.**    That was the purpose of that original letter,

3    right?

4    **A.**    Yes.

5    **Q.**    They needed to comply with their obligations under

6    the law?

7    **A.**    That's correct.

8    **Q.**    Now, the second paragraph states:  Now -- well,

9    let me rephrase that.  The last two sentences of the

10   first paragraph where it says "On September 13th"?

11   **A.**    Yes.

12   **Q.**    It says, "We advised you in detail of the

13   potential sentencing consequences following trial

14   convictions on the pending charges and requested that

15   you allow us to open plea negotiations with the

16   Government.  You declined our request and so indicated

17   by executing our earlier correspondence."  Correct?

18   **A.**    That is correct.

19   **Q.**    You had read that at the time, and you had

20   specifically ordered them not to commence plea

21   negotiations?

22   **A.**    Whether I read it in detail or not, I did not

23   authorize plea negotiations.  I did not want them

24   negotiating any pleas.

25   **Q.**    Now, the next paragraph says, "Now, however, the

1 circumstances have change significantly.  As you know

2 from the events of the past several days, on Thursday,

3 November 15th, you authorized us to open plea

4 negotiations with the Government and we did so."  Is

5 that what it says?

6 **A.**   Yes.  It says that.

7 **Q.**   You signed that document?

8 **A.**   Yes, I did.

9 **Q.**   You came to your attorneys and authorized them to

10 commence plea negotiations, correct?

11 **A.**   I asked my attorneys to find out if we could work

12 something out given the gravity of the circumstances.

13 **Q.**   That idea came from you.  They weren't pestering

14 you that morning, Joe, can we get a plea; Joe, can we

15 get a plea?

16 **A.**   No.  They knew my wife was sick and I was very

17 concerned about her.  And as soon as I opened the door

18 for them, I think everyone was very happy.

19 **Q.**   You had specifically commanded them not to conduct

20 plea negotiations prior to this, correct?

21 **A.**   That's correct.

22 **Q.**   And this is a letter acknowledging that you were

23 revoking that command?

24 **A.**   Yes.  I did not enter into plea negotiations

25 pretrial because I assumed there would be an adequate

1    and effective defense.

2    **Q.**    You've testified to that before.  All right.

3        So it says, "Those discussions with you and the

4    Government, which continued into the following day,

5    produced the framework of a proposed plea agreement

6    which we conveyed to you and which you asked us to

7    pursue.  The proposal consisted in part of a package

8    plea including Mr. Radhakrishnan and involved lengthy

9    discussion with Mr. Radhakrishnan and Mr. Thompson, his

10   currently court-appointed standby counsel, who

11   Mr. Radhakrishnan asked to handle plea negotiations for

12   him.  We pursued this proposal as you requested, and

13   over this past weekend on Saturday and Sunday we spent

14   significant time and effort developing a plea

15   agreement, which included a negotiated statement of

16   facts, both of which you approved on Sunday night,

17   November 18th."  Correct?

18   **A.**    Well, it says that.  I objected to it on Sunday

19   night, November 18th.

20   **Q.**    You did sign this document?

21   **A.**    I did sign, yes.  No question.

22   **Q.**    You didn't write "I object" anywhere on there, did

23   you?

24   **A.**    No, I don't think I could spell "I object" on

25   Sunday night; however, I was committed to having to go

1    through with this.

2    **Q.**    So you were -- I'm very confused here because your

3    descriptions of the tactical decisions that Mr. Traini

4    and Mr. Lepizzera made are very clear that you

5    disagreed with how each particular witness was

6    cross-examined.  You wanted them to be more aggressive.

7    You had certain opinions about the effectiveness of the

8    lack of an opening statement.  You're very clear about

9    your memory as to how the trial proceeded, as to what

10   your thoughts were about the fact that you objected to

11   the statement of facts, you claimed that it was a lie,

12   and yet you tell me that you don't know how to spell

13   the word "object."  You couldn't read.  You don't know

14   if you signed it.  So which was it?

15   **A.**    It was that I was under considerable duress,

16   suffering from severe depression and I had lost hope.

17   I didn't believe my attorneys could defend me, and it

18   was the only thing I knew to do to protect my family.

19   **Q.**    Okay.  So let's turn to the second page of this

20   document.  In that last paragraph it states, "I, Joseph

21   Caramadre, with full appreciation of the possible

22   sentences which could be imposed upon me following any

23   trial conviction in the above-captioned case have

24   specifically revoked my earlier order to my counsel not

25   to engage in plea negotiations with the Government and

1    have instead requested that they attempt to reach a

2    plea agreement on my behalf in an effort to resolve the

3    above-referenced case without further trial

4    proceedings.  I understand that counsel have done so

5    and have negotiated with the Government on my behalf a

6    plea agreement and supporting statement of facts, the

7    above-referenced plea documents.  I have been

8    extensively involved in those discussions and have

9    reviewed in detail with counsel both over the telephone

10   and in person the terms of the plea documents and

11   acknowledge that they fairly and accurately express my

12   position with respect to the resolution of this case.

13        I believe it to be in my best interests to

14   execute the plea documents and proceed with the change

15   of plea.  I have read, understood and executed the plea

16   documents and incorporate them by reference into this

17   correspondence as the basis of my change my plea in

18   this matter as provided therein."

19        That's your signature, correct?

20   **A.**   That is correct.

21   **Q.**   You didn't write any objections on there?

22   **A.**   No.

23   **Q.**   I'd like to go back to Exhibit 1, which is your

24   plea agreement and cover some of the terms of that

25   document.

1           First of all, you testified on direct that

2     you've seen what the guidelines were in this case based

3     on the draft presentence report, and it turns out that

4     they're actually life, right?

5     **A.**   Yes.  They could be life, sure.

6     **Q.**   So your attorneys got you a pretty good deal?

7     **A.**   My attorneys got me a deal that they're proud of

8     but I'm not.

9     **Q.**   So you're facing a potential life sentence, and

10    they have capped your exposure at ten years?

11    **A.**   That's correct.  It's not a good deal.  If you're

12    innocent, no time --

13    **Q.**   We'll get to that part in a minute.

14    **A.**   Okay.

15    **Q.**   So let's look at paragraph 7 of the plea agreement

16    on page three.

17          Beginning with paragraph 7B -- well, 7 says,

18    "Defendant is advised and understands that," and part

19    B, "that the Defendant has the right to plead not

20    guilty or having already so pleaded to persist in that

21    plea."  Do you understand that?

22    **A.**   Yes.  That's what it says.

23    **Q.**   Do you understand what that means?

24    **A.**   Yes.  Okay.  Yes.

25    **Q.**   You could say you're not guilty and keep going and

1    keep saying you're not guilty, right?

2    **A.**    Right.

3    **Q.**    Paragraph 7C says, "The Defendant has a right to a

4    jury trial."  Do you understand that?

5    **A.**    Yes.

6    **Q.**    In fact, we were in a jury trial, correct?

7    **A.**    Yes.

8    **Q.**    They were sitting right here in this jury box and

9    it had taken literally months to pick them, correct?

10   **A.**    Yes.

11   **Q.**    And in 7D it says, "Defendant has the right to be

12   represented by counsel and if necessary to have the

13   Court appoint counsel at trial and at every other stage

14   of the proceeding."  Do you recognize that and

15   understand that?

16   **A.**    Yes, I do.

17   **Q.**    Paragraph 7E says that, "The Defendant has the

18   right at trial to confront and cross-examine adverse

19   witnesses, to be protected from self-incrimination, to

20   testify and present evidence, and to compel the

21   attendance of witnesses."

22        Do you see that?

23   **A.**    I see it, yes.

24   **Q.**    You understood what those rights were?

25   **A.**    Pretty much, yes.

1    **Q.**    Pretty much or yes?

2    **A.**    Well, yes.  I don't know if I understood it pretty

3    much when I read it, but I understand what it says.

4    **Q.**    You understood it when you went to law school,

5    right?

6    **A.**    Maybe not.  I don't know.

7    **Q.**    No?  When you took the Bar exam, you didn't know

8    that a criminal defendant in a criminal case has the

9    right to cross-examine adverse witnesses?

10   **A.**    I don't want to comment what I learned in law

11   school, even though I graduated with honors.  I don't

12   really know what I learned there.

13   **Q.**    So you've been an attorney for 20 years.  How long

14   have you been an American citizen?

15   **A.**    All my life.

16   **Q.**    And as you sit here now, you're telling us you

17   don't know if you understand that a defendant has a

18   right at trial to confront and cross-examine adverse

19   witnesses?

20   **A.**    I believe a defendant has a right to confront and

21   cross-examine.  I understand that part.

22   **Q.**    In fact, that's the large part of your complaint

23   here.  You don't like the way your attorneys

24   cross-examined your witnesses, correct?

25   **A.**    Not only don't I like, but they were not effective

1     in preparing or carrying out a defense.

2     **Q.**    That's your opinion, correct?

3     **A.**    Absolutely.

4     **Q.**    Now, you understand that paragraph 7F, it then

5     says, "Defendant waives these trial rights if the Court

6     accepts a plea of guilty."

7     **A.**    That's correct.

8     **Q.**    You understand that by signing that plea agreement

9     and going through a plea colloquy with the judge that

10    by doing that you're giving up all those rights?

11    **A.**    Yes.

12    **Q.**    And you're never going to get them back?

13    **A.**    Yes.

14    **Q.**    Again, just turning your attention to paragraph

15    15, states that, "The Defendant has read the agreement

16    and the attached statement of facts or has read each to

17    the Defendant, has discussed each with Defendant's

18    counsel, understands each and agrees to its

19    provisions."  Is that what it says?

20    **A.**    That's what it says, yes.

21    **Q.**    Do you understand what that means?

22    **A.**    I understand what it means now.

23    **Q.**    Are you saying you didn't understand that on

24    November 19th?

25    **A.**    I'm saying on November 19th I would have signed

1    anything that anyone would have put in front of me

2    without reading it or understanding it.

3    **Q.**    And you're an expert in contract law?

4    **A.**    Well, that's what you say, yes.

5    **Q.**    That's not what I say.  That's what you told

6    folks, right?

7    **A.**    Well, I understand contract --

8    **Q.**    Is that what you told reporters from the

9    ProPublica piece?

10   **A.**    Is there a question?

11   **Q.**    Withdrawn.  Now, before the Court accepted that

12   plea agreement from you, you were engaged in a

13   colloquy, correct?

14   **A.**    A colloquy is the recital of the judge of certain

15   things, yes.  I never heard the word until it came up

16   now in seeking to withdraw but, yes, I was engaging in

17   questions by the judge.

18   **Q.**    So you remember standing here at this table and

19   standing up and being placed under oath by the Court?

20   **A.**    Yes, I do.

21   **Q.**    And the judge asked you a series of questions?

22   **A.**    Yes.  Yes.

23   **Q.**    And the judge explained to you that the reason

24   that he's asking those questions was to make sure that

25   you understood what you were doing, correct?

1   **A.**   That was the reason he was asking me questions,

2   yes.

3   **Q.**   And to make sure that you wanted to enter the plea

4   agreement and you understood what rights you would be

5   giving up by doing that, right?

6   **A.**   That's correct.

7   **Q.**   And in fact, during that colloquy, the Court

8   specifically asked you, "Mr. Caramadre, so you've been

9   sworn.  I'm going to ask you a series of questions.

10  You're expected to answer all of my questions

11  truthfully.  If you fail to answer any of my questions

12  truthfully, it could lead to additional charges against

13  you for perjury or making a false statement.  Do you

14  understand that?"  And you answered, "Yes, your Honor."

15  **A.**   I'm sure I answered yes.

16  **Q.**   You weren't hallucinating at that point in time,

17  correct?

18  **A.**   No.  I knew I had to answer yes and plead guilty.

19  **Q.**   Because if you didn't, the trial would keep going

20  and you would be found guilty?

21  **A.**   If we didn't, the trial would have to keep going

22  under a different setting.  My attorneys may have to

23  withdraw, and there would be substantial disruption.

24  **Q.**   When did that come up for the first time?

25  **A.**   It didn't come up.  I didn't have any choice but

1    to plea or fire my attorneys.

2    **Q.**   When did you come to that conclusion?

3    **A.**   I came to my conclusion when I was told by counsel

4    after the fact that I should have gone to the judge and

5    just tell him that I am woefully losing because my

6    attorneys are not defending me.

7    **Q.**   Who told you that, what counsel?

8    **A.**   Some friends of mine that have some legal

9    experience.

10   **Q.**   Do they have a name?

11   **A.**   Yes.

12   **Q.**   What is it?

13   **A.**   I believe Arthur Coia told me.

14   **Q.**   Arthur Coia told you that?

15   **A.**   Yes.

16   **Q.**   Okay.  He told you you should go to the judge and

17   say what?

18   **A.**   I should have gone to the judge.

19   **Q.**   He told you you should have gone to the judge and

20   done what?

21   **A.**   And say my lawyers have not made any reasonable

22   defense of cross-examination.  They keep telling me

23   we're going to bring the witness up when it's the

24   defense case.  We're not going to get to a defense

25   case.  I have lost hope after two days.  My wife is

1    sick.  I'm under pressure.  I need to fire the

2    attorneys.

3    **Q.**    You came to the conclusion --

4    **A.**    And I cannot represent myself in my mental state

5    right now or I would have done it.

6    **Q.**    You came to the conclusion that you would not have

7    an opportunity to have a defense case?

8    **A.**    That's correct.

9    **Q.**    Who told you that?

10    **A.**    Because I was bombarded by Mr. Traini and

11    Mr. Lepizzera and being told that every day that goes

12    by I'm facing more time, and I'd have to kill this as

13    soon as possible.

14    **Q.**    We'll talk about that in a second.  But that's not

15    what my question was.  My question was who told you

16    that you would not have an opportunity to have a

17    defense case?

18    **A.**    I don't know if anyone told me except that there

19    was 60 days planned of Government witnesses; and on the

20    first three or four days, we couldn't get ourselves out

21    of the box.  It was --

22    **Q.**    Actually, the first day went pretty much as you

23    exactly expected, didn't it?

24    **A.**    The first day without an opening statement.

25    **Q.**    Which you testified on direct that you had had

1    conversations with your lawyers about reserving opening

2    statement and that you had --

3    **A.**    I was not objecting to not having an opening

4    statement.

5    **Q.**    Not only were you not objecting, you agreed with

6    it?

7    **A.**    I agreed with it on the presumption there would be

8    an adequate defense in cross-examination.

9    **Q.**    It's a tactical decision.  Some people like to

10   have their opening statement at the beginning of the

11   trial and some in a case like this where you're

12   planning on presenting a lengthy defense might reserve.

13   Do you agree with that?

14   **A.**    I agree with that.  If I would have been told, By

15   the way, we're not going to cross-examine anything more

16   than peripheral, then I would have objected to the lack

17   of opening.

18   **Q.**    That's a separate question.  We'll deal with the

19   cross-examination separately.  With respect to the

20   opening statement, Mr. Traini and Mr. Lepizzera

21   explained to you that they thought that it was best to

22   reserve opening statement, correct?

23   **A.**    I believe they explained it to me.  And let's

24   concede that I agreed with it.

25   **Q.**    Let's concede that you agreed with it.  Okay?

1    **A.**    Yes.

2    **Q.**    So this big complaint that you put in your motion

3    to withdraw your guilty plea that they were ineffective

4    because they didn't give an opening statement, you're

5    retracting that?

6    **A.**    No.  We said in the complaint that an opening

7    statement standing on its own is not reason for

8    ineffective counsel, but that combined with very weak

9    cross-examination is tantamount to an overwhelming

10   evidence coming in undefended.

11   **Q.**    That's your position.  So even though you concede

12   that you agreed with your attorneys that they shouldn't

13   do an opening statement, that they should reserve it

14   and do it at the time of the defense case, that you're

15   now standing here and saying that they should have done

16   that and that they were ineffective by not giving an

17   opening statement?

18   **A.**    No.  I'm saying that they should have put me on

19   notice that they don't plan on vigorously

20   cross-examining witnesses.

21   **Q.**    Like I said, that's a separate question, right?

22   We're talking about opening statement?

23   **A.**    However, I am saying that in conjunction with the

24   opening statement, had they properly informed me that

25   they planned on laying down, then I would have objected

1    to skipping the opening statement.

2    **Q.**   Okay.  So if they had told you "We plan on laying

3    down," then you would have said, "If you're going to

4    lay down, at least give an opening statement"?

5    **A.**   I probably would have fired them as well.

6    **Q.**   Because they didn't plan on laying down, did they?

7    **A.**   Well, they ended up laying down.

8    **Q.**   We'll talk about the first day of the trial.  It

9    went exactly as you anticipated, did it not?

10   **A.**   The first day --

11   **Q.**   You expected, correct me if I'm wrong, you

12   expected that the Government, either Mr. Vilker or

13   myself, would stand up and address the jury and give an

14   opening statement, correct?

15   **A.**   That's correct.

16   **Q.**   And that's what happened, correct?

17   **A.**   Yes.

18   **Q.**   Okay.  And you expected that your attorneys would

19   reserve their opening statement, correct?

20   **A.**   I expected that, yes.

21   **Q.**   And that's what happened, right?

22   **A.**   Day one there was nothing more we could do.

23   **Q.**   You understood that the first witness that was

24   going to be testifying from the Government was going to

25   be Mr. Wiley who had passed away and whose testimony

1    had been deposed in 2009, correct?

2    **A.**    I understood that, yes.

3    **Q.**    That was the testimony of Mr. Wiley that you had

4    moved to suppress earlier in the case, correct?

5    **A.**    That's correct.

6    **Q.**    You didn't want the jury to hear his testimony,

7    correct?

8    **A.**    Well, I don't think it was right for the jury to

9    hear his testimony when you brought so many other

10   witnesses who were not the purported victims, so why

11   would we need to preserve the testimony of people in

12   that setting; but nonetheless, we knew we could not

13   cross-examine.

14   **Q.**    You knew that his testimony would be presented?

15   **A.**    Yes.

16   **Q.**    And you knew that actually he would be

17   cross-examined, correct, because you knew that he had

18   been cross-examined by Mr. Flanders and Mr. Pine?

19   **A.**    And also I knew the jury didn't understand as well

20   as who was really cross-examining because all we had

21   was a picture of a nice old man with oxygen on.

22   **Q.**    So for all the jury knew, it may have been

23   Mr. Traini and Mr. Lepizzera conducting that

24   cross-examination, correct?

25   **A.**    For all they knew, it was you conducting the

1    cross-examination.

2    **Q.**    Okay.  Even though at the beginning of the playing

3    of the video deposition each of the parties is

4    identified and I was routinely referred to as

5    Mr. McAdams, correct?

6    **A.**    Well, you might have been.  But when there's a

7    line of questioning and you can't see the person ask a

8    question and we have to rely on this information, there

9    are risks with its true value.

10   **Q.**    So one of your problems you have with the trial

11   was maybe the jury was confused as to who was doing the

12   cross-examination?

13   **A.**    On the videotape.

14   **Q.**    But you actually liked the cross-examination that

15   was done by Mr. Flanders and Mr. Pine, correct?

16   **A.**    Well, I thought it was very effective, yes.

17   **Q.**    In fact, you insisted to Mr. Traini and

18   Mr. Lepizzera that they play it, correct?

19   **A.**    Well, yes, of course.

20   **Q.**    Because you wanted the jury to hear the questions

21   that they asked Mr. Wiley?

22   **A.**    Because when put in a position where the

23   prosecution is going to play their end of the

24   videotape, I have no choice but to insist that we put

25   the cross-examining part in it.

1  **Q.**  Well, you had a choice.

2  **A.**  I had a choice, but I had no reasonable choice.

3  **Q.**  You had a choice or didn't have a choice.  Which

4  is it?

5  **A.**  Well, I had a choice and -- let's leave it I had a

6  choice.

7  **Q.**  And you chose to have them play that

8  cross-examination?

9  **A.**  Yes.  I chose, yes.

10  **Q.**  And you liked that cross-examination so much that

11  you put in your motion to withdraw the guilty plea that

12  that's the type of cross-examination that Mr. Traini

13  and Mr. Lepizzera should have done with the other

14  witnesses?

15  **A.**  I liked that cross-examination because it exposed

16  the malicious prosecution of your office.

17  **Q.**  That's your theory.  I understand that.

18      But you liked it.  So what happened on the first

19  day of trial was you got what you expected and you got

20  what you wanted, right?

21  **A.**  I got whatever was there.

22  **Q.**  You got the Government exposed --

23      THE COURT:  One at a time, okay, Mr. McAdams.

24  **Q.**  Did you get what you wanted that day?

25  **A.**  No.  I would have liked that the whole deposition

1    not be allowed.

2    **Q.**   You would have liked that the jury never heard

3    Mr. Wiley's testimony.

4    **A.**   There were plenty of other witnesses that can be

5    dealt with.

6    **Q.**   But you liked that there was some type of

7    allegation that the Government engaged in misconduct?

8    **A.**   Yes.

9    **Q.**   You liked that?

10   **A.**   I liked it.  I don't think the jury understood it.

11   **Q.**   On balance, it was a good day, day one?

12   **A.**   No.  On balance, it was a fair day.  It was all we

13   could get.  We were waiting for day two where we get

14   our balance.

15   **Q.**   You were waiting for day two.  We'll get to that,

16   but we're still on some other issues at this point.

17          So before, we were talking about your plea

18   agreement and before the Court accepted the plea

19   agreement, you just indicated that you were placed

20   under oath and you understood that, correct?

21   **A.**   Correct.

22   **Q.**   And then the judge asked you about your mental

23   competence.  Do you remember that?

24   **A.**   The judge asked me if me taking those pills is

25   affecting my judgment.

1    **Q.**    Actually, what he asked you --

2    **A.**    Or just repeat it for me.  I don't remember.

3    **Q.**    He said, "Have you been treated recently for any

4    mental illness or addiction to narcotic drugs?"

5    **A.**    Yes.

6    **Q.**    And you answered that you had been treated for

7    mental depression both lately and for the last 20

8    years, correct?

9    **A.**    That's correct.  Yes.

10   **Q.**    Then Mr. Traini interjected and he said, "Excuse

11   me, your Honor, if I may."  And he said, "I have a list

12   with me of Mr. Caramadre's medications so that we don't

13   have to go through them."  Correct?  Do you remember

14   that?

15   **A.**    That's correct.  And Mr. Traini walked it up to

16   the judge and gave it to him.

17   **Q.**    Right.  And then the Court said, "Can we just

18   confirm with respect to Mr. Caramadre that you fully

19   understand all the proceedings that are going on here,"

20   correct?

21   **A.**    More than likely I answered yes.

22   **Q.**    You answered, "That is correct, your Honor."

23   **A.**    Yes.

24   **Q.**    You didn't say, I don't understand, I don't know

25   what "object" means.  I need things read to me.

1          You didn't do anything like that, did you?

2     **A.**    No.  Because the judge is asking me am I impaired

3     enough to not understand this.  And in my opinion, I

4     was okay.  I could answer the question.

5     **Q.**    You understood exactly what was going on?

6     **A.**    I understood to the extent that I was pleaing

7     guilty, yes.

8     **Q.**    Your free will wasn't overborne; you knew what you

9     were doing?

10    **A.**    I knew that my mission was to plead guilty, yes.

11    **Q.**    That was your mission, to plead guilty?

12    **A.**    Yes.  It was, again, in my opinion of how I felt,

13    there was no hope.  This was the only way out.

14    **Q.**    Now, the Court then asked you -- actually the

15    Court then asked your attorneys if counsel could please

16    confirm that, and they did.  Do you recall that?

17    **A.**    Yes.  I presume my attorneys are educated and

18    competent to answer whether my depression would affect

19    my judgment or capacity.

20    **Q.**    You presumed that?

21    **A.**    No.  They presumed they were.

22    **Q.**    Did you say, "Judge, I don't think they're in a

23    position to answer that question"?

24    **A.**    No.  I don't know.  I'm not a doctor.

25    **Q.**    In fact, two seconds earlier you told the judge

1    that you were competent?

2    **A.**    That I understand the proceedings.

3    **Q.**    Right.  Now, after that the judge asked you if you

4    had seen a copy of the Government's charges against you

5    and you answered, "That is correct, your Honor."

6    **A.**    Okay.

7    **Q.**    And he asked you if you had a full opportunity to

8    discuss all these charges with your counsel.  And you

9    answered, "Yes, your Honor."

10   **A.**    Yes.

11   **Q.**    You read the indictment against you?

12   **A.**    I'm sure I read it.

13   **Q.**    Right.  It was a 66-count speaking indictment?

14   **A.**    Yes.

15   **Q.**    You're familiar with that document?

16   **A.**    Somewhat, yes.

17   **Q.**    Somewhat?

18   **A.**    Yes.

19   **Q.**    Did you read it?

20   **A.**    I'm sure I did.

21   **Q.**    And you understood what it said you had done?

22   **A.**    Oh, it said a lot of things.

23   **Q.**    It accused you of some pretty bad crimes, correct?

24   **A.**    Yes.  Yes.  It was very descriptive.

25   **Q.**    So you were familiar with what those accusations

1    were?

2    **A.**    I was familiar with the accusations, yes.

3    **Q.**    You understood what those charges were?

4    **A.**    I understood them as best as I can.  I'm not a

5    criminal defense attorney, but they were on their face

6    whatever they were.

7    **Q.**    Now, then the Court next asked you if you had full

8    opportunity to discuss all the charges against you and

9    the plea agreement and the consequences of the plea

10   agreements with your attorneys before you signed them.

11   Do you remember that?

12   **A.**    Yes.

13   **Q.**    You answered, "Yes, your Honor."

14   **A.**    Yes.

15   **Q.**    Because you had?

16   **A.**    Because I was answering yes to anything that would

17   effect a guilty plea.

18   **Q.**    Because no matter what, you wanted to plead guilty

19   and move on with your life?

20   **A.**    I needed to protect my family; and if this was the

21   only way it could get done, then that's how it was

22   going to be done.

23   **Q.**    And that was a product of your free will based on

24   your decision that this was in your family's best

25   interest?

1    **A.**   Based on the fact that my depression had peaked.

2    I could not represent myself as I would have liked to

3    upon firing attorneys, and the damage was already done

4    by the lack of representation on cross.

5    **Q.**   So then we get to the next question the judge

6    asked.   Then the next thing he asked you was, "Are you

7    fully satisfied," and then he stopped and he said,

8    "First of all, were your counsel able to answer all of

9    your questions regarding all the charges and the terms

10   of the plea agreements with you."   You answered, "Yes,

11   your Honor."

12   **A.**   I'm sure I answered yes.

13   **Q.**   Then he went on to ask you, "Are you fully

14   satisfied with all the representation that you've

15   received in this case from your respective counsel?"

16   **A.**   I'm sure I answered yes to anything that the Court

17   asked me.

18   **Q.**   Right.   You said yes.   You were under oath, the

19   same oath you're under right now.

20   **A.**   Yes.

21   **Q.**   And the Court asked you questions to make sure you

22   knew what you were doing and you told him you did?

23   **A.**   Yes.   I told him that I understood I was pleading

24   guilty, yes.

25   **Q.**   And you did understand you were pleading guilty?

1    **A.**    Well, I probably did understand, yes.

2    **Q.**    You didn't think you were at Disneyland?

3    **A.**    No.  Not on Monday, no.

4    **Q.**    Now, the next question that you were asked was,

5    "Has anyone made any promises to you of any kind in

6    order to get you to" -- and then he paused and said --

7    "other than what's contained in the plea agreement, of

8    course, in order to get you to plead guilty in these

9    cases."  And you answered, "No, your Honor."

10   **A.**    Correct.  No one made any promises.

11   **Q.**    Mr. Traini didn't promise you what your sentence

12   would be?

13   **A.**    No.  He did not promise me.

14   **Q.**    Did he give you a best estimate of what the Court

15   might do after they made their arguments to the Court

16   on your behalf?

17   **A.**    Yes.  I was saddened to find out in January that

18   both my counsel thought I was going to be getting five

19   or six years when pre-signing that document I was told

20   little or no time.

21   **Q.**    Well, a minute ago I just asked you if Mr. Traini

22   didn't tell you or promise you how much jail time

23   you're going to get.  Now you're saying he promised you

24   or told you that you'd get little to no jail time?

25   **A.**    There's a difference between the word "told" and

1     "promised."

2     **Q.**   Which did he do?

3     **A.**   Told me.

4     **Q.**   What did he say exactly?

5     **A.**   He said that we could expect little to no time

6     given my otherwise outstanding citizenry, this being a

7     first-time offense, non-violent, all these other

8     characteristics, and the fact that Judge Smith had no

9     particular mandate to have to punish me because I don't

10    fall into those two categories that he enumerated that

11    there would be a mandate of sorts.

12    **Q.**   Mr. Traini's been an attorney in Federal Court for

13    many years, correct?

14    **A.**   Yes.

15    **Q.**   He's tried a number of high profile cases; is that

16    correct?

17    **A.**   Um-hum.  (Affirmative.)

18    **Q.**   And it's your testimony that he told you that this

19    judge only sends two types of criminals to prison?

20    **A.**   Well, this judge is under pressure to send only

21    two types to prison.  Now, he doesn't say he only sends

22    those.  He said -- he basically told me if I were a

23    public official and was taking a bribe, that would be

24    one where the judges in general would want to punish

25    people in jail because of the public policy interests.

1        And also, if it was a violent crime and there were

2        victims, a judge is inclined to want to punish people.

3        But anything else, you don't fall into that category.

4        **Q.** So he gave you some examples of other types of

5        defendants that might be worse off at sentencing than

6        you would be, correct?

7        **A.** Much worse off, yes.

8        **Q.** And he tried to explain that to you by way of

9        presentation that he would make and Mr. Lepizzera would

10       make to the Court on your behalf at the time of

11       sentencing, right?

12       **A.** Yes. He said that the presentencing would be

13       important because Judge Smith needs to know who I

14       really am.

15       **Q.** He explained to you that this wasn't the end of

16       the work for the attorneys. There's a whole process

17       that goes forward after the guilty plea, correct?

18       **A.** Well, that's what he said, yes.

19       **Q.** Right. And they were going to have to try to go

20       out there and reach out in the community and find

21       people that would speak on your behalf, and he was

22       confident that he would be able to do that?

23       **A.** That's what he said.

24       **Q.** And they were going to try to do everything they

25       could to put a presentation together for the Court to

1    persuade the Court within the confines of the plea

2    agreement to give you the best sentence that you could

3    get, right?

4    **A.**    That's correct.

5    **Q.**    So he didn't promise you you were going to get --

6    **A.**    I never said he promised me.

7    **Q.**    You agree with me that he didn't.

8    **A.**    I absolutely agree.  I've never said he promised.

9    **Q.**    So you had no promises as to what was going to

10   happen?

11   **A.**    No.  I had no promise.  I was just told.

12   **Q.**    Now, after that the Court went through and

13   explained to you the maximum penalties that you would

14   face in the terms of the plea agreement, correct?

15   **A.**    I assume so, yes.

16   **Q.**    He walked you through the explanation of what the

17   sentencing guidelines are.  Do you remember that?

18   **A.**    Yes.

19   **Q.**    And then, just like we looked at on your plea

20   agreement, the Court then went through some trial

21   rights that you would have.  Do you remember that?

22   **A.**    Trial what, please?

23   **Q.**    Trial rights.

24   **A.**    Trial rights.  Yes.

25   **Q.**    Such as the right to say I'm not guilty and

1    persist in that right?

2    **A.**   Yes.

3    **Q.**   And the Court reminded you that you could continue

4    in that plea?

5    **A.**   That's correct.

6    **Q.**   And that you had the right to remain silent and

7    the right to compel witnesses and so on, just the same

8    types of rights that we just saw in the plea agreement?

9    **A.**   Yes.

10   **Q.**   And then the Court after explaining all those

11   rights to you again asked you, "Now by entering this

12   plea of guilty today, you're giving up all these rights

13   that I just described to you, and you understand that

14   there will be not be or we will not complete the trial

15   in this case.  Do you understand that?"  And you

16   answered, "Yes, your Honor."

17   **A.**   I'm sure I did.

18   **Q.**   So you knew that all the year of preparation for

19   that trial, the month that went into picking that jury,

20   all the work that had been done, that once you did that

21   and if the Court agreed and accepted the plea that that

22   was over, those jurors were going home, the trial was

23   over, we weren't going to keep going with the next

24   witness and you weren't having your trial?

25   **A.**   I agreed that by me pleaing guilty it stops the

1    trial, yes.

2    **Q.**    You weren't going to have your chance to put that

3    defense case on?

4    **A.**    I was waiving or giving up that right because of

5    the desperation involved, that's correct.

6    **Q.**    You were giving up that opportunity that

7    Mr. Lepizzera had talked to you about calling

8    Edwin Rodriguez back to the stand and asking him some

9    questions, right?

10   **A.**    I absolutely was giving up that opportunity, yes.

11   **Q.**    You weren't going to be able to call Ann Scuncio

12   and ask her if she gave a copy of the power of

13   attorney, correct?

14   **A.**    Yes.    Because I already was beaten down and

15   feeling that my attorneys were not acting to my

16   interests and, therefore, we'd never be defending

17   anybody.

18   **Q.**    You talked about that a little bit on direct.    You

19   said how you had a lot of respect for their skills as

20   attorneys, correct?

21   **A.**    Yes.

22   **Q.**    And it wasn't any of their ability that you

23   questioned?

24   **A.**    I believe I'm questioning strictly their

25   willingness.

1    **Q.**    Their willingness.  So you're basically saying

2    they Cape-Feared you, right?  They did what --

3    **A.**    What does Cape Fear mean?

4    **Q.**    -- Nick Nolte did to Robert De Niro in the movie

5    *Cape Fear*.  They got you convicted on purpose.

6    **A.**    No.  I don't think it was on purpose.

7    **Q.**    Did they want you to be convicted?

8    **A.**    I think they wanted to end this.

9    **Q.**    And why would they want that?

10   **A.**    Because it was going to be a long struggle, long

11   trial.  Everyone wanted it to end.  And Tony Traini

12   gets prepaid for not finishing.

13   **Q.**    That's really what you think.  You think that

14   Mr. Traini, he had this fee agreement with you, and he

15   was going to tell you to plead guilty and keep all the

16   money, right?

17   **A.**    Well, looking back, the fact that they drew down

18   the retainer and I'm told for the first time it's a

19   non-refundable fee, it makes all the sense in the world

20   to tell me to plea.

21   **Q.**    You testified on direct that you were shocked,

22   that you had no idea that you had entered into this

23   agreement to pay him this way, correct?

24   **A.**    That's right.

25   **Q.**    And you were shocked that he might get a windfall.

1    If you got hit by a car the next day and died, he would

2    make this money, right?

3    **A.**   I was shocked, yes.

4    **Q.**   Does this sound a lot like the scam that you and

5    Mr. Radhakrishnan pulled on the terminally ill people?

6    **A.**   No.  No.  There was no scam.

7    **Q.**   Before you found out that Mr. Traini had this fee

8    arrangement, you were pretty happy with the deal,

9    weren't you?

10   **A.**   If, in fact, someone is drawing down 50,000 a

11   month of money that I have to borrow, that was what I

12   had to agree to, that's what I authorized.

13   **Q.**   You were happy with Mr. Traini because you didn't

14   have any reason to think that he had tricked you in any

15   way?

16   **A.**   No.  I didn't until --

17   **Q.**   And then when you found out that you thought maybe

18   he tricked you, you became upset?

19   **A.**   I was certainly upset that I had the right to know

20   as a consumer and a client, by the way, Mr. Client,

21   when you sign this plea agreement, I'm getting a

22   windfall.  I'm an attorney.  I do not lose my morals

23   because I'm depressed.  Okay?  A client has a right to

24   know that there could be more than uninterested advice

25   before they make a lifetime landmark decision.

1    **Q.**   You're an attorney for 20 years, expert in

2    contracts who reads the fine print, scours the fine

3    print, looks for loopholes, and you felt blind-sided

4    when you found out that maybe you didn't fully

5    understand the terms of the deal you entered into; is

6    that right?

7    **A.**   No.  I felt blind-sided that I wasn't informed.

8    It's not that I didn't understand them.  I would

9    understand "non-refundable," and I would have vetoed

10    the deal right up front, period.

11    **Q.**   Now, you did testify that you knew what the fee

12    arrangement was verbally with Mr. Lepizzera, correct?

13    **A.**   Only to the extent that Traini was drawing down

14    50,000 a month.

15    **Q.**   Well, you testified that it was supposed to be he

16    wanted a million dollars.

17    **A.**   Right.

18    **Q.**   And he agreed to take 500,000, right?  And then

19    you both agreed to make it 450,000, correct?

20    **A.**   As long as I could get all the money in up front.

21    **Q.**   Right.  So as long as you get all the money up

22    front, then he would get the money?

23    **A.**   No.  It was a deposit tendered on an escrow

24    account, on Mr. Lepizzera's escrow account who is

25    supposed to be protecting my interests.

1    **Q.**   That's your understanding of what the agreement

2    was, that you never asked to look at the actual

3    document?

4    **A.**   No.  I was quite depressed even in June back then.

5    It's in my e-mails.  Mike, I'm very depressed.  Please

6    protect that Traini gets spread out all of these

7    months.

8    **Q.**   So from June until after you pled guilty, you

9    never asked to take a look at that arrangement, that

10   written arrangement?

11   **A.**   No.  Because I was told in writing by

12   Mr. Lepizzera, Good news, we got Tony to agree to be

13   paid over nine months through the end of February 2013.

14   **Q.**   And you really wanted Tony on the case, correct?

15   **A.**   Well, I guess I did.  I don't know.

16   **Q.**   You don't know.  You sat in a box, didn't you, in

17   a hearing in this courtroom when the Government tried

18   to disqualify Mr. Traini from representing you and

19   you --

20   **A.**   I certainly wanted him.  I don't know if that was

21   a good decision, but I did want him, yes.

22   **Q.**   Once again you testified under oath to the Court,

23   right?  And you told the Court that even if the Court

24   found out at some future point that there was a

25   conflict of interest that you were waiving it.  Do you

1   remember that?

2   **A.**   I remember telling the Court that I was waiving

3   conflict-free counsel on Traini with regards to the

4   Maggiacomo issue.

5   **Q.**   And the Court explained to you that one of the

6   potential issues was the nascent nature of conflicts,

7   right, and that something might change, circumstances

8   might change and he might have to decide later that

9   Mr. Traini can no longer represent you.  Do you

10  remember that?

11  **A.**   I understood that.

12  **Q.**   You understood it and you said, That's fine with

13  me.  Mr. Lepizzera has got all my confidence and I'm an

14  attorney myself.  Remember?

15  **A.**   Yes.  Yes.  I remember that.  And it speaks

16  further to my state of mind that if the judge had to

17  take away Mr. Traini for some conflict a month or two

18  down the road, why would I be so stupid to give him

19  $450,000 non-refundable knowing full well there might

20  be a risk of recusal or removal.

21  **Q.**   I guess maybe he beat you at your own game, to put

22  it in your words.  Is that what you're suggesting?

23  **A.**   No, I'm not suggesting that.  I don't use

24  deception to beat people.  I could use the rules that

25  are made.  I don't agree with your characterization of

1    a scam.  I was not told what I needed to know for this.

2    **Q.**   That's what we're going to talk about now.  You

3    don't use deception, right?  So let's go look at the

4    statement of facts that you agreed to and swore to

5    under oath in this courtroom.  This has previously been

6    identified as Government Exhibit Number 2.  I'll put it

7    back on here.

8         Do you remember at the change of plea colloquy

9    when Mr. Vilker stood up and read all those facts in

10   the record?

11   **A.**   Yes.

12   **Q.**   After he did that, the judge asked you, "Do you

13   agree that those are the facts of the case"?

14   **A.**   Yes.  And I'm sure I said yes.

15   **Q.**   You said, "Yes, they are."

16        So we're going to look at some of those

17   statement of facts.  Let's turn to page four.

18        And you just told us that you don't use

19   deception.  This paragraph at the bottom says, "In

20   addition, Caramadre took steps to conceal his use of

21   terminally ill individuals from the insurance companies

22   including opening annuities with small deposits that

23   would not attract scrutiny, delaying the filing of

24   death claims and opening annuities in the names of

25   Radhakrishnan when the funds actually belonged to

1    Caramadre."  That was a very specific fact, correct?

2    **A.**   Yes.  I said I agree with the facts but I disagree

3    with this allegation.

4    **Q.**   So this particular fact because earlier you told

5    us --

6    **A.**   No.  Any fact that speaks to a crime I am taking

7    issue with.

8    **Q.**   Okay.  So the sentence I just read, you request --

9    **A.**   Sentence that you read, you are trying to make it

10   look like there's a concealment from the insurance

11   companies by putting in a small amount and then adding

12   more.

13   **Q.**   And you're saying that there's not?

14   **A.**   I'm saying the reason that a small amount was put

15   in was because I do read contracts and I don't trust

16   insurance companies, and I have a duty to my clients to

17   read them when there's a small amount in so I could

18   approve a larger deposit.

19   **Q.**   So that sentence that I just read into the record

20   that you signed under oath, are you saying that

21   sentence is not true?

22   **A.**   Yes.  I'm saying that it was not done to conceal,

23   yes.  I'm saying in the -- it was not done also not to

24   attract scrutiny because I know from 30 years in the

25   life insurance business that when you put in a deposit

1    of $950,000 as a second deposit, it gets more attention

2    than the million dollars up front.  Much more.

3    **Q.**   I'd like to show you what I'll mark as Government

4    Exhibit Number 4.  I'm going to show you what it is.  I

5    can give a copy to counsel.

6          MR. McADAMS:  If I could have one second, your

7    Honor.

8          If I can move this into evidence, your Honor,

9    Government's 4.  This is an e-mail from Raymour to Alan

10   Ross from NATCO, one of your clients.  Are you familiar

11   with Mr. Ross?

12   **A.**   I'm familiar with Mr. Ross, yes.

13   **Q.**   And it's an e-mail dated -- the initials at the

14   top of it are from Mr. Ross back to Raymour, but I want

15   to focus on the e-mail Mr. Radhakrishnan sent dated

16   September 15th, 2008.  It writes, "Dear Mr. Ross:  I

17   tried calling you on your cell phone this afternoon but

18   was unable to get in touch.  As I mentioned when we

19   spoke this morning, I have received your

20   Nationwide-NATCO Home Fashions contract.  Joe has

21   decided that we should put an additional $750,000 into

22   this fund as opposed to initially maxing it out at the

23   $2.8 million we had previously discussed.  This is a

24   measure that we are taking to prevent any further

25   resistance that may result if we were to send the

1    company an initial check for $2.55 million.  Once the

2    check has been received and credited to your account,

3    Joe will contact you to strategize about future

4    deposits."

5        So do you still deny that you had a strategy to

6    conceal from the insurance companies --

7    **A.**    No.  No.  There was a strategy.  First of all,

8    Raymour wrote this, and I can't speak to why Raymour

9    wrote it that way.  It could have been my instruction

10   was to Raymour, why don't we fund a million dollars

11   because we may use a different annuity.  I don't know

12   why Raymour put that.  You have to ask him.

13   **Q.**    Okay.  So then why don't we go to Government

14   Exhibit Number 5, which is an e-mail from you to

15   Mr. Ross.  Maybe we can clear that confusion up.

16   **A.**    Maybe we can.

17   **Q.**    This says from Joseph Caramadre to Alan.  That's

18   Alan Ross, correct?

19   **A.**    I presume so.

20   **Q.**    He cc's Raymour.  It's Thursday, October 9th.  And

21   it says, "Raymour did in fact discuss with me on Monday

22   night your question about a rush termination for the

23   annuities.  I made a special effort to call you on your

24   cell phone on Tuesday morning about 10:00 a.m.  Raymour

25   was under the impression I could call you before 10:30

1    a.m. on Tuesday.  I am investigating which of these

2    annuities we can put in a death claim immediately.

3          As you know, these annuities are purchased using

4    the contract terms most advantageous to the contract

5    owner.  When we entered into these annuities, there was

6    no notice of a potential need for emergency

7    withdrawal."  And then there's a redacted portion and

8    it picks up and says, "However, I must tell you that

9    filing an immediate death claim on all three of the

10   annuities would create a disadvantage for both your

11   firm and my office.  Specifically, if a claim is filed

12   right now, it will/may cause these annuity companies to

13   terminate our office's privileges to procure annuities

14   in the future.  Furthermore, if NATCO is flagged by

15   these companies as an opportunistic purchaser, they may

16   in fact demand a relationship between NATCO and the

17   policy annuitant, thereby foreclosing NATCO from

18   purchasing advantageous annuities in the future.  I

19   always try to protect all of our clients and in the

20   past I have asked other clients to wait until the

21   proper holding period to file a claim so as to protect

22   all other clients, including NATCO.  If these claims

23   are filed and the insurance companies elect not to do

24   business with EPR in the future, then most all of our

25   valued clients would be in jeopardy for future

1    business."

2         And then you go on, I'm going to skip down to

3    the bottom paragraph with your advice.  The second to

4    last paragraph says, "I would ask you to consider the

5    following."  And then you give him a strategy.  It

6    says, "File a claim on the $2 million Genworth annuity

7    ASAP.  Maintain the $250,000 Western Reserve Life

8    contract (this is a new relationship with this carrier,

9    and this immediate claim would be injurious to my

10   office and all other clients who have recently

11   purchased this annuity).  Delay the $2.8 million

12   Nationwide claim for about a month or so."  Then you

13   write in parentheses, "There were staggered deposits

14   into this annuity, which will create questions with an

15   immediate death claim."

16        You specifically underwent a strategy to conceal

17   from insurance companies by using staggered deposits.

18   Don't you admit that?

19   **A.**   No.  I don't admit that, because I have a duty to

20   my clients and my clients aggregately expect that I

21   will protect their interests.  So if it is asking

22   another client to hold off a month or two for the

23   benefit of other clients because it may have been done

24   for them, then that's -- my job is to my client.

25   That's my oath.

1    **Q.**   So it's okay to conceal and take a strategy to

2    conceal information from the insurance companies if

3    it's advantageous to your client.  That's what you're

4    saying?

5    **A.**   If it's legal and advantageous, sure.

6    **Q.**   Well, is it okay to conceal?

7    **A.**   Well, when you apply for a driver's license, they

8    don't ask you have you killed anyone.  So you don't

9    have to answer it because it's not required.  Okay?  So

10   you're asking me is it okay to conceal.

11   **Q.**   No.  I'm asking you whether --

12   **A.**   If it's legal, our clients don't have to make a

13   full confession on every application of everything

14   they've ever done if the insurance companies don't want

15   to know or don't ask about it.

16   **Q.**   That's not what I'm asking you.  I'm asking you

17   whether or not when you agreed to the statement of

18   facts which states that you took steps to conceal the

19   use of terminally ill individuals from the insurance

20   companies, including opening annuities with small

21   deposits that would not attract scrutiny, delaying the

22   filing of death claims, and we're going to get to the

23   next part, opening annuities in the name of

24   Radhakrishnan when the funds actually belonged to

25   Caramadre, are you denying that you did that?

1  **A.**   I'm denying that there was any criminality about

2  that.  And the word "conceal" is no different than me

3  opening up an annuity with 50,000 in and then I decide

4  to put more money in it.  If you open up a bank account

5  with $1,000 and then add $20,000 later, did you conceal

6  from the bank that you might put 20,000 more?  Is that

7  a crime?  Is that an intended crime?  No.  Because it's

8  allowed by the contract.

9  **Q.**   Okay.  Now, you did take steps to conceal a number

10  of things from Midland National Insurance Company,

11  didn't you?

12  **A.**   I'm not agreeing to that, no.

13  **Q.**   So let's look at an annuity you opened with Lily

14  Ianiero as the annuitant.  Do you remember Lily

15  Ianiero?

16  **A.**   Yes.  She became a dear friend of mine.

17  **Q.**   After you begged for your law license back from

18  her, right?

19  **A.**   Yes.  After Maggiacomo screwed everything up.

20  Yes.

21  **Q.**   It's always somebody else, right, Mr. Caramadre?

22  **A.**   Not always.  Just when it fits.

23  **Q.**   When it fits your purposes?

24  **A.**   No.  When it fits the facts.

25  **Q.**   So you opened up and you purchased an annuity at

1    Midland National Life Insurance Company, correct?

2    **A.**   Yes.  I opened up -- yes.  I opened up with Mrs.

3    Ianiero, correct.

4         MR. McADAMS:  I'm sorry.  I didn't mark this as

5    an exhibit.  I'm going to mark this as Government

6    Exhibit 6.

7         THE COURT:  Is there any objection to Government

8    6?

9         MR. WATT:  Not to this exhibit, Judge.

10        THE COURT:  Okay.  Six will be full.

11        (Government Exhibit 6 admitted in full.)

12   **Q.**   And I know it's kind of fine print so I'm going to

13   zoom down.

14        And it indicates that the owner of the annuity

15   is Joseph Caramadre, yourself, correct?

16   **A.**   Um-hum.  (Affirmative.)

17   **Q.**   The annuitant is Lily Ianiero?

18   **A.**   Correct.

19   **Q.**   She is an elderly terminally ill woman?

20   **A.**   Yes.

21   **Q.**   Was?

22   **A.**   Yes.

23   **Q.**   And this annuity is dated July 3rd, 2007, correct?

24   **A.**   That's what it says, yes.

25   **Q.**   That's when you applied for it?

1    **A.**    I don't know when I signed it.  I know that

2    Mr. Maggiacomo prepared these annuities, so whatever

3    date he put on it was it.

4    **Q.**    You agree it says July 3rd?

5    **A.**    It says July 3rd, yes.

6    **Q.**    Now on July 3rd, 2007, you had never met Lily

7    Ianiero, correct?

8    **A.**    I had not, no.

9    **Q.**    You had no relationship with her whatsoever?

10   **A.**    No.  I started my relationship with her -- well,

11   I'm not sure if it was June or July but I'm going to

12   assume for this application Mr. Maggiacomo procured her

13   signature, so I had not met her.

14   **Q.**    You're going to assume that Mr. Maggiacomo

15   procured her signature by giving her money, right?

16   **A.**    Yes.

17   **Q.**    And it says on this application that the

18   relationship is a client, right?

19   **A.**    That's what is typed in, yes.

20   **Q.**    But she was not your client?

21   **A.**    Not at that time, no.

22   **Q.**    You never represented her in your law practice,

23   correct?

24   **A.**    Well, I did after I got to know her.

25   **Q.**    After you begged her for your law license back.

1   **A.** I needed to beg her for my law license because

2   Mr. Maggiacomo paid her daughter who forged her

3   mother's signature and we had to cancel the annuity as

4   soon as it came to my attention. So I did go back --

5   **Q.** You didn't cancel. It got cancelled on you.

6   Isn't that what happened?

7   **A.** I would have cancelled it anyway, as I have other

8   accounts.

9   **Q.** Even though you didn't cancel the other annuities

10  that you opened in Ms. Ianiero's name with different

11  companies like Jefferson National?

12  **A.** No. I believe that was done afterwards.

13  **Q.** Okay. So after that annuity was opened in July

14  2007, you put $2.5 million in that, right?

15  **A.** Yes.

16  **Q.** How much money did you pay Mrs. Ianiero?

17  **A.** After I went to see her?

18  **Q.** Yes.

19  **A.** I paid her $9,500.

20  **Q.** How much did you think Mr. Maggiacomo paid her?

21  **A.** I thought he paid her $4,000.

22  **Q.** This is a part of Government 6. I'm going to pull

23  up a different page here. This is a correspondence

24  from Midland to you dated August 30th, 2007. And it

25  states, "On July 5, 2007, your agent, Edward

1    Maggiacomo, submitted an annuity application to Midland

2    National.  The annuity application listed you as the

3    owner and Lily Ianiero as the annuitant.  Upon

4    verification of addresses, we noted a discrepancy in

5    the annuitant's address.  We contacted Ms. Ianiero to

6    confirm her address.  Ms. Ianiero stated that she was

7    unaware that an annuity application was submitted

8    listing her as the annuitant.  In addition, she stated

9    she did not know you or Mr. Maggiacomo.  Ms. Ianiero

10   requested the application not be issued and as you know

11   the application was declined."  And then it goes on.

12       Do you remember getting that letter?

13   **A.**    Yes.  I remember it because Midland National

14   closed down the annuity and sent me back $2.5 million.

15   **Q.**    They sent your money back and said we don't want

16   your business?

17   **A.**    They said we're not going to take this

18   application.

19   **Q.**    And shortly thereafter, they told Maggiacomo he

20   can't sell any more of their products, correct?

21   **A.**    They probably did.

22   **Q.**    October 19th, 2007, which is, again, part of that

23   same Exhibit 6, is a letter from Midland.

24   **A.**    Eddie Maggiacomo is his own agent.  He's not my

25   employee.  So if they terminated his relationship, they

1    did.

2    **Q.** So if he happened to not tell the truth to an

3    annuitant, then it's his fault; and if Raymour happened

4    to not tell the truth to an annuitant, then it's his

5    fault but you have nothing to do with it, right?

6    **A.** No. No. I must take responsibility for not

7    managing Raymour correctly, but I will not take

8    responsibility for any fraudulent statements or

9    anything that was knowingly wrong.

10   **Q.** Okay. So you knew or you certainly believed that

11   Mr. Maggiacomo had paid Ms. Ianiero $4,000?

12   **A.** He came and asked me for 4,000, and I gave it to

13   him.

14   **Q.** Right. And then you later gave her what, $9500?

15   **A.** On one day, and a little more on other days.

16   **Q.** Okay. So after that letter came, you were pretty

17   unhappy with the situation with Mr. Maggiacomo; is that

18   right?

19   **A.** Yes.

20   **Q.** So you sent him an e-mail, correct?

21   **A.** I'm sure I did.

22           MR. WATT: Judge, I object to the continuation

23   of this line of questions. It seems way outside of the

24   direct which the Court had limited at least in a court

25   order as well we're into 2007, 2008, materials of which

1    neither me or my brother have seen previously in

2    preparation for this limited purpose.  I defer to the

3    Court's direction on this, but it seems to me it's way

4    outside the scope.

5         THE COURT:  I've been kind of wondering what the

6    relevance of all this is.

7         MR. McADAMS:  Mr. Caramadre denied that he

8    conducted the conduct that underlies the statement of

9    facts.  He's basically saying he didn't do it.  And

10   there's numerous evidence that shows that in fact he

11   did do it.  So I'm asking him whether or not he did it

12   or not in connection with his statement of facts.

13        THE COURT:  Well, how far is this going to go

14   then?

15        MR. McADAMS:  It literally, your Honor --

16        THE COURT:  You're really talking about the

17   whole case, aren't you?

18        MR. McADAMS:  If it was the whole case, it would

19   take a lot longer.  I could do it for literally months,

20   the number of lies that Mr. Caramadre engaged in.

21        What I'm trying to do is go through the

22   statement of facts and show a few examples, but the

23   statement of facts is very detailed.  I can move it

24   along a little bit, but I think it's going to take some

25   time.  He is claiming that he is actually innocent,

1    that he did not commit these offenses.  He swore under

2    oath that he did.  He swore to a very specific

3    statement of facts, and he's claiming that it's all a

4    lie.  And on cross-examination, I think I have a right

5    to ask him about the specifics that he's denying and to

6    show him documents that contradict those specific

7    claims.

8         THE COURT:  The statement of facts doesn't

9    reference any particular annuitants, does it, like

10   Ms. Ianiero or anyone else?  It's a more general

11   statement, isn't it?  You have the exhibits.  I don't

12   have them in front of me.  I can pull it up on --

13        MR. McADAMS:  The statement of facts does

14   identify some specific annuitants.  Mrs. Ianiero is not

15   one of the particular ones.

16        The point I'm getting at here is that

17   Mr. Caramadre and Mr. Maggiacomo were banned by Midland

18   Insurance Company because of this incident with

19   Ms. Ianiero and that because Mr. Caramadre was so fond

20   of the loopholes that he believed he found in their

21   contract, he then reverted to using Mr. Radhakrishnan

22   as a nominee to purchase annuities through Midland in

23   which there were lies about the source of the funds, in

24   which Mr. Radhakrishnan claimed to be the owner of the

25   annuity and which they essentially attempted to

1  circumvent this whole process which is an effort that

2  Mr. Caramadre engaged in to conceal from the insurance

3  companies as in that one sentence, page four of the

4  statement of facts, of how he took steps to conceal his

5  use of terminally ill people and the scheme in general.

6       So I mean, there are literally dozens and dozens

7  of specific examples that could be used to demonstrate

8  the conduct of Mr. Caramadre.

9       THE COURT:  I'm worried about how far this is

10  going to go into the trial evidence.

11       MR. McADAMS:  I mean, I would like to go as far

12  as I need to go until I can establish that it's

13  actually true that he's guilty because he's claiming

14  that he's not.  Frankly, I think I've already done that

15  for the most part, so on some level, you know, if we're

16  ready to move to argument, I'm certainly ready to argue

17  it.  I think his testimony on direct is completely

18  incredible; and on cross, also incredible.

19       THE COURT:  I don't we want to get to argument

20  yet, and I think there's a lot more to go before we get

21  to argument.  I just want to focus on this little

22  objection here.

23       THE WITNESS:  Your Honor, may I address the

24  Court?

25       THE COURT:  No.

1          THE WITNESS:  Okay.

2          MR. McADAMS:  The bulk of the remainder of the

3     cross-examination, your Honor, is going through

4     specific statements in the statement of facts and

5     asking Mr. Caramadre if he denies them and then showing

6     him some specific instances where those denials are not

7     believable.  So I appreciate what you're saying.  It

8     certainly could take a very long time to do that.

9          THE COURT:  I'm going to give you some leeway

10    because of the nature of the allegations.  I think

11    you've established what the relevance of it is, but I

12    would just encourage you to consider the fact that you

13    don't need to try the entire case in the context of

14    this proceeding.

15         MR. McADAMS:  I appreciate that, your Honor.

16    I'll do my best to expedite it.

17    Q.    So Mr. Caramadre, you observed that back and forth

18    between myself and the Court, correct?

19    A.    Correct.

20    Q.    You heard my description of your use of

21    Mr. Radhakrishnan as a nominee?

22    A.    I heard it and disagree with it, yes.

23    Q.    So you disagree with the fact that you gave

24    Raymour money and had him buy an annuity at Midland

25    using a terminally ill person as the annuitant and that

1   he did so and that when the person died and he made a

2   profit from it that he returned the money back to you?

3   **A.**   I'm not disagreeing with the transaction.   I

4   believe that you are being incomplete in your

5   questioning.   For instance, Mr. Radhakrishnan also

6   bought two other Western Reserve annuities with a

7   million dollars each.   So you're trying to establish

8   one annuity that is not in the statement of facts with

9   one annuitant, yet I'm -- I had full intent and action

10  to not conceal whose money it was because I gave

11  Mr. Radhakrishnan a check using the banking system and

12  told him to invest these monies.   He chose Midland and

13  he chose Western Reserve on the other two.

14  **Q.**   So this just --your use of giving

15  Mr. Radhakrishnan a million dollars to go and buy an

16  annuity and to invest, you just said go ahead, go

17  invest the money, have fun, kid.

18  **A.**   I wanted him to learn about how he could use these

19  two or three type of annuities.

20  **Q.**   And you wanted him to give you the money back when

21  they cashed in, right?

22  **A.**   Well, of course.   It's my money, yes.

23  **Q.**   Right.   It was your money?

24  **A.**   Yes.

25  **Q.**   So you --

1    **A.**    What's so funny?

2    **Q.**    What's so funny is you wanted an annuity from

3    Midland.  You got banned from Midland because they

4    caught you with your hand in the cookie jar because

5    they called Lily Ianiero, she said she had no idea who

6    you were.  So you turned around, you gave a million

7    dollars to your buddy, Raymour, and had him open the

8    same annuity and then he gave you the money back.

9              MR. WATT:  Objection, Judge.

10             THE COURT:  What's the objection?

11             MR. WATT:  The objection is he's testifying,

12   number one.

13   **Q.**    Isn't that true, Mr. Caramadre?

14   **A.**    No, that is not true.

15             THE COURT:  First of all, the objection is

16   overruled.

17             You say that statement is untrue.

18   **A.**    I say that because Midland National themselves has

19   given us e-mails between the executives of Midland that

20   they don't care who the annuitant is or what

21   relationship it's in, and we have these current dated

22   in 2007.  And it is because Mr. Radhakrishnan put his

23   wrong net worth and wrong address that I knew nothing

24   about that changes this.  It's because of that false

25   information on there that I knew nothing about that the

1    Government has a bone to pick.  But no, he could have

2    bought any of the three annuities.  It didn't matter to

3    me.

4    **Q.**   It was your money?

5    **A.**   It was my money, yes.

6    **Q.**   You gave him three choices what annuities to buy?

7    **A.**   I gave him $2.8 million.

8    **Q.**   This is a 27-year-old kid.  How old was he at the

9    time?

10   **A.**   Twenty-three.

11   **Q.**   Twenty-three, right?

12   **A.**   Yes.  Because he was going to invest it and he

13   could manage the sub-account investment because I was

14   doing a lot of traveling, and he was a very intelligent

15   person who I trusted to manage some of my assets.

16   **Q.**   What's $2.8 million between friends, right?

17   **A.**   Well, apparently, I don't have a problem with

18   that, and it's my money.

19   **Q.**   The real motivation, though, was you wanted that

20   Midland annuity, wasn't it?

21   **A.**   Midland was just one of many that we could take.

22   **Q.**   It was one of the ones you wanted?

23   **A.**   Well, there was a list of forty.

24   **Q.**   And it was one that you couldn't get with your own

25   name because they caught you with Lily Ianiero and said

1    get out of town.

2    **A.**   I'm not sure whether I could have gotten it or

3    not.  What I know is Maggiacomo can't get it.

4    **Q.**   You know they sent your $2.5 million check right

5    back to you, right?

6    **A.**   So I may have been able to buy it myself.

7    **Q.**   You love to say how the insurance companies love

8    to take our money.

9         THE COURT:  All right.  Mr. McAdams.  I think

10   you made the point.

11        MR. McADAMS:  I'm just going to move into

12   evidence, your Honor.

13        THE COURT:  I think this ought to be maybe a

14   good time to take a ten-minute break.  So why don't we

15   do that.  I think there are some other witnesses who

16   have arrived; is that right?

17        MR. OLEN:  That is correct, your Honor.

18        THE COURT:  Why don't counsel come up for a

19   minute.

20        (Side bar conference off the record.)

21        (Recess.)

22        THE COURT:  Counsel, based on our conversation

23   at side bar a few minutes ago, I think we've agreed

24   we'll suspend the cross-examination of Mr. Caramadre

25   and take some of the witnesses who are waiting outside,

1    one or more out of order, right?

2         MR. OLEN:  That's correct, your Honor.

3         THE COURT:  Call your witness.

4         MR. WATT:  Dr. Greer, please.

5         **JAMES GREER**, first having been duly sworn,

6    testified as follows:

7         THE CLERK:  Please state your name and spell

8    your last name for the record.

9         THE WITNESS:  Dr. James Greer, G-R-E-E-R.

10        THE COURT:  Good afternoon, Dr. Greer.

11        THE WITNESS:  Good afternoon.

12        THE COURT:  Go ahead, Mr. Watt.

13        MR. WATT:  Thank you, your Honor.

14        **DIRECT EXAMINATION BY MR. WATT**

15   **Q.**   Doctor, what is your occupation?

16   **A.**   I'm a psychiatrist.

17   **Q.**   And trained where?

18   **A.**   At Tulane University.

19   **Q.**   Any certifications?

20   **A.**   I'm certified in adult psychiatry since 1985.

21   **Q.**   Where have you practiced?

22   **A.**   I first practiced on the faculty of Tulane

23   University, then in 1985 moved back to Rhode Island.  I

24   have since that time been employed at the Providence

25   Center.  I also for 21 years have worked at the Rhode

1    Island Department of Corrections as well as doing

2    consulting work in a variety of settings and teaching

3    at Brown University.

4    **Q.**   Have you ever had the occasion to testify in court

5    within the confines of your specialty?

6    **A.**   Yes, I have.

7    **Q.**   How many times, approximately?

8    **A.**   Total I would say perhaps 12 times.

9    **Q.**   Over those 12 times, have you been qualified by

10   the Court as an expert?

11   **A.**   Yes.

12   **Q.**   Can you name the court or court systems?

13   **A.**   I also testified many times in Family Court,

14   probably upward of 30 or 40 times, as well as in

15   Federal Court, in District Court and Family Court.

16   **Q.**   And been qualified and accepted as an expert?

17   **A.**   Yes.

18   **Q.**   In psychiatry?

19   **A.**   Yes.

20   **Q.**   Have you had occasion in terms of your practice to

21   make the acquaintance of Joseph Caramadre?

22   **A.**   Yes, I have.

23   **Q.**   How did that come to pass?

24   **A.**   I was requested to evaluate him by his attorney,

25   Mr. Olen.  So I met with him, reviewed his records,

1  which were provided me and then prepared a report and

2  submitted it.

3  **Q.** Do you have a recollection of what records you

4  reviewed?

5  **A.** Yes. I reviewed letters and communications I

6  believe from Dr. Zlotnick, his therapist; and also if I

7  can refer to -- if I can refer to my notes.

8  **Q.** Do you have a memory, or do you have to refer?

9  **A.** Yeah. Dr. Linda Carpenter and Dr. Paul Malloy as

10  well and Dr. Sarah Xavier.

11  **Q.** And then did you see Mr. Caramadre?

12  **A.** Yes, I did.

13  **Q.** How many occasions?

14  **A.** Beg your pardon?

15  **Q.** How many occasions did you see him?

16  **A.** I saw him on one occasion.

17  **Q.** Where was that?

18  **A.** That was my office on Eddy Street and met with him

19  for a period of a little under two hours.

20  **Q.** At the conclusion of that session, did you have

21  occasion to see him again?

22  **A.** Not until today.

23  **Q.** Did you ask for any materials related to the

24  history he gave you at that point in time?

25  **A.** No. All the materials I required were provided.

1    **Q.**   You have not had the benefit of being here this

2    morning to hear his testimony in somewhat greater

3    detail?

4    **A.**   That's correct.

5    **Q.**   Would that be of assistance to you.

6    **A.**   Certainly in terms of any further information that

7    might help.

8    **Q.**   Okay.  At the conclusion of all of the research

9    that you did, the interview that you had with him and

10   based upon your training, at the conclusion of that,

11   did you prepare a five-page report?

12   **A.**   Yes, I did.

13   **Q.**   Did you send that to Mr. Olen?

14   **A.**   Yes.

15   **Q.**   Okay.  And did you form an opinion at the

16   conclusion of that report as to whether or not

17   Mr. Caramadre was of sufficient mental stability to

18   have exercised executive function in terms of giving

19   the plea to Judge Smith on November 19th?

20   **A.**   Yes, I did.

21   **Q.**   What was that conclusion on your part?

22   **A.**   Based on all the information available to me and

23   my interview with him, that at that time he was not

24   capable of making an informed decision.

25   **Q.**   What was it that caused him not to be able to

1    inform an intelligent decision on that date at that

2    time?

3    **A.**   In addition to his chronic refractory depressive

4    syndrome of over 25 years duration, he also was

5    experiencing acute stress, not only because of the

6    legal case that he was involved in, this case, but also

7    because of his own wife's acute psychiatric illness.

8    And he also reported to me that the advice of his

9    attorneys at the time, that in order to not abandon his

10   wife that he would -- it was in his best interest to

11   make such a plea.  He also attempted to reach out to

12   his long-term psychotherapist for support, but she was

13   out of the country and so he was unable to access his

14   normal support system.

15   **Q.**   And in your conclusion, at least on page four of

16   your report, you concluded that he was not capable of

17   making an informed and considered decision of the

18   magnitude of tending a guilty plea to this Court,

19   correct?

20   **A.**   Yes.

21   **Q.**   I ask you the magic language.  Do you hold that

22   opinion to a reasonable degree of psychiatric

23   certainty?

24   **A.**   I do.

25        MR. WATT:  Judge, I believe it's been attached

1    already to Mr. Olen's memorandum, the first submitted

2    memorandum. I'm going to seek to introduce it as a

3    full exhibit, the doctor qualified as an expert to

4    render that opinion and offer the doctor for

5    cross-examination.

6         THE COURT: All right. Thank you. Is there any

7    objection to admitting the report that was submitted by

8    Dr. Greer as an exhibit in this case?

9         MR. McADAMS: No, your Honor.

10        THE COURT: We'll make this Defendant's Exhibit

11   A. You may cross-examine him.

12        (Defendant's Exhibit A admitted in full.)

13            **CROSS-EXAMINATION BY MR. McADAMS**

14   **Q.**   Good afternoon, Dr. Greer.

15   **A.**   Good afternoon.

16   **Q.**   My name is John McAdams. I'm an Assistant United

17   States Attorney. I want to ask you a few questions.

18        First of all, you were retained by the

19   Defendant's attorney for the purposes of this

20   litigation; is that correct?

21   **A.**   That's correct.

22   **Q.**   And Mr. Caramadre had never been a patient of

23   yours before?

24   **A.**   That's correct.

25   **Q.**   You did not see him on November 19, 2012?

1  **A.**   I had never met him before the day of my

2  evaluation.

3  **Q.**   And you've never seen him since other than today?

4  **A.**   That's correct.

5  **Q.**   How much money are you being paid for your

6  evaluation?

7  **A.**   I'm going to bill for my time.

8  **Q.**   Approximately how much money is that?

9  **A.**   $250 per hour.

10  **Q.**   How many hours did you spend evaluating

11  Mr. Caramadre?

12  **A.**   Approximately between review of records, report

13  preparation and interviewing him, approximately six

14  hours.

15  **Q.**   So you testified about the record you reviewed?

16  **A.**   Yes.

17  **Q.**   Those were provided to you by the Defendant's

18  attorney?

19  **A.**   That's correct.

20  **Q.**   And your opinion is based in part on your review

21  of Mr. Caramadre's medical history?

22  **A.**   Definitely.

23  **Q.**   And you noted in your affidavit that at no point

24  in his history nor in your exam was there any evidence

25  of psychosis or mania?

1    **A.**   Yes, that's correct.

2    **Q.**   You also note in your affidavit that your

3    evaluation was based in part on the statement

4    Mr. Caramadre made to you; is that correct?

5    **A.**   Yes.

6    **Q.**   For purposes of your evaluation, you take what he

7    tells you as true; is that right?

8    **A.**   I have to weigh it.  I would not say that I would

9    automatically take anything anyone tells me in an

10   evaluation as true.  I have to exercise judgment in

11   terms of assessing as best I can the truthfulness of

12   what they're saying.

13   **Q.**   So for purposes of your opinion here with respect

14   to Mr. Caramadre, did you take his representations to

15   you to be true?

16   **A.**   Yes, I did.

17   **Q.**   Okay.  And if some of those statements it turns

18   out were not true, could that affect your opinion?

19   **A.**   It could.

20   **Q.**   So for example, in your affidavit it says that

21   Mr. Caramadre claimed to you that his attorneys

22   pressured him to plead guilty, right?

23   **A.**   Yes.  That's right.

24   **Q.**   Now, if it turned out that that were not true,

25   could that affect your opinion?

1    **A.**   It certainly might.

2    **Q.**   Now -- you don't know whether it's true or not?

3    **A.**   I only know the history that I received from

4    Mr. Caramadre.

5    **Q.**   Right.  And so if his attorneys actually had not

6    pressured him to plead guilty, then that might very

7    well affect your opinion?

8    **A.**   It could, yes.

9    **Q.**   I notice also in your affidavit that Mr. Caramadre

10   told you that he begrudgingly went before the judge and

11   accepted the deal.  That's a quote you put in your

12   report?

13   **A.**   That's right.

14   **Q.**   That's a quote you put in from what he told you?

15   **A.**   Yes.

16   **Q.**   Did he provide you with a copy of any of the

17   documents that he executed in connection with his plea

18   agreement?

19   **A.**   He did not.

20   **Q.**   You didn't see a copy of the plea agreement?

21   **A.**   No.

22   **Q.**   Or the statement of facts that he signed?

23   **A.**   No, I did not.

24   **Q.**   He didn't give you a copy of the questions and

25   answers that the judge asked him at the time that he

1    pled -- entered his guilty plea?

2    **A.**    No, he didn't provide me with that.

3         MR. McADAMS:   Thank you.   I have no further

4    questions.

5         THE COURT:   Any redirect?

6         MR. WATT:   No redirect, Judge, please.

7         THE COURT:   I have a couple of questions,

8    Dr. Greer.

9         First of all, you indicated Mr. Caramadre told

10   you his attorneys pressured him to accept the plea.   Do

11   you remember specifically what he said about that?

12        THE WITNESS:   I do, your Honor.   I recall that

13   he told me in particular that they -- his attorneys had

14   asked him to think about who would care for his wife if

15   he were to go to trial and not be successful and then

16   not be available to support her for a very long time.

17   That was one of the specific concerns that he had.   He

18   told me he experienced a great deal of guilt about

19   that.

20        THE COURT:   Anything else you remember about how

21   he described the pressure?

22        THE WITNESS:   Just that it was in his best

23   interest to do so.

24        THE COURT:   Now, this conclusion you have that

25   he was not capable of making an informed decision to

1    plead at the time, I wonder how much information were

2    you given with respect to the back and forth that

3    Mr. Caramadre had with his attorneys about whether to

4    plead guilty or not plead guilty.  Did you get a lot of

5    history of that discussion or just the --

6         THE WITNESS:  In the discussion with

7    Mr. Caramadre, I did, yes.  And the main thrust of it

8    was just that.  He told me that they had encouraged him

9    to accept the plea so that he would be able to not be

10   unavailable for potentially a very lengthy period of

11   time for his wife, who was at the time acutely --

12   experiencing acute depressive symptoms and was not

13   doing well at all.

14        THE COURT:  What I'm wondering is, did he tell

15   you about discussions he had with his attorneys earlier

16   in time where he essentially prohibited them from

17   having negotiations with the Government about a plea?

18        THE WITNESS:  Yes, he told me that up until the

19   time when this occurred, when his wife became acutely

20   ill, that he had been persistent in his refusal to

21   consider making a plea, but that at that particular

22   time, when the actual trial began, which I believe was

23   just a few days, and with the -- he told me that he

24   somewhat suddenly made the decision to reverse what had

25   been his longstanding and I guess persistent refusal to

1        consider such a thing.

2              THE COURT:  So besides the situation with his

3        wife, did he describe to you anything else about --

4        anything else that was causing him to come to that

5        conclusion, anything about the trial?

6              THE WITNESS:  No.  He didn't say that there was

7        anything happening in the trial that made him feel at

8        this point he should change his mind about it.  It was

9        specifically the concern about his wife, that his wife

10       was acutely ill at the time and that he was not going

11       to be able to provide support to her, emotional or

12       otherwise, if he were going to be -- if he were

13       convicted and then serve a long sentence.

14             THE COURT:  Okay.  Now, earlier today, you

15       weren't here, you couldn't hear the testimony of

16       Mr. Caramadre, but he said in his examination, I'm

17       going to paraphrase this, that in discussions that he

18       had with his attorneys or his attorneys had with the

19       Government and his responses to his attorneys, his

20       attorneys told him that the Government would be happy

21       with a plea agreement that had a sentencing range of

22       two to five years and that he told his attorneys that

23       that was unacceptable because it would send the wrong

24       signal to me, the judge, and that he wanted to preserve

25       his ability to ask for no time or a non-incarcerative

1    sentence and that then resulted in the discussions

2    which resulted in the plea on Monday.

3         So would knowing about that back and forth that

4    occurred between Mr. Caramadre and his attorneys in

5    terms of, you know, what instructions he was giving

6    them or guidance, if you will, would that have any

7    bearing at all on your analysis of his ability to make

8    a knowing and voluntary decision here about whether to

9    plead guilty?

10        THE WITNESS:  When I spoke with him, he told me

11   that he would not accept a plea even if it did not

12   involve jail time because his belief that he was not

13   guilty but also because he didn't want to not just send

14   a message to the Court but also to his family and that

15   he told me he was adamant that whether or not he was

16   offered an opportunity to even not do time that he

17   would not accept such a plea.

18        THE COURT:  Okay.  But that particular dialogue

19   that I just mentioned, that wasn't something that came

20   up in the context of your discussions with him about

21   what occurred at the time; is that right?

22        THE WITNESS:  Yes, in terms of at the time, he

23   did not say that -- he didn't provide any information

24   about discussions about length of sentence in terms of

25   whether or not there was the potential to not serve any

1    jail time or anything like that, but simply that he at

2    the time felt guilty about leaving his wife alone and

3    unsupported and thus reached that decision.

4            THE COURT:  Well, I guess the question that I'm

5    grappling with in this proceeding is the difference

6    between someone who makes a decision that they later

7    come to regret, someone who has buyer's remorse, so to

8    speak, and someone who makes a decision that they are

9    not competent, that they make it in a state of mental

10   incompetence or some type of cognitive deficiency that

11   prohibits them from thinking clearly enough to make

12   that decision, an important decision, knowing and

13   voluntary and intelligent.  And there's a big

14   difference between a decision you make knowingly and

15   you later come to regret and a decision you don't

16   comprehend or don't understand or you make in distress

17   that can't be considered knowing or voluntary.

18           Is that a distinction that you considered in the

19   context of examining Mr. Caramadre?

20           THE WITNESS:  Yes, it is.  I considered the

21   difference between his having made a choice which he

22   later regretted as opposed to being in an acute state

23   of distress.  And certainly while obviously all of this

24   was reported to me in retrospect, there was evidence in

25   reports from others that in fact there were multiple,

1    very severe and extraordinary stressors going on,

2    obviously the stress of the case but also the stress of

3    his wife's acute illness and then the lack of

4    availability of the normal support system that he had,

5    his psychotherapist who was not available to him.

6          THE COURT:  Okay.  Very good.  I don't have

7    anything further.

8          Do either of you have any follow-up on my

9    questions?

10         MR. WATT:  No follow-up on the Court's

11   questions, Judge.

12         MR. McADAMS:  Judge, one question, your Honor.

13         THE COURT:  Go ahead.

14         **EXAMINATION BY MR. McADAMS**

15   **Q.**   Dr. Greer, you just mentioned that Mr. Caramadre

16   said that his treating psychotherapist was out of town?

17   **A.**   Yes.

18   **Q.**   And he wasn't able to reach her?

19   **A.**   Yes.

20   **Q.**   Did he tell you what other resources in his

21   support network might have been available to him that

22   he relied on?

23   **A.**   No.  We didn't talk about that.

24   **Q.**   Did he talk about meeting with his priest over the

25   weekend?

1  **A.**   I know he told me that he had met with his priest

2  to discuss it, but I don't specifically recall talking

3  about meeting with his priest over the weekend.

4  **Q.**   Did he talk about meeting with his family members

5  at all?

6  **A.**   I don't recall.  I remember him saying that he had

7  met with his wife and was very distressed about her

8  situation.

9  **Q.**   Would it have affected your opinion if perhaps he

10  had available to him and in fact met with his priest

11  who served as a counselor and advisor to him?

12  **A.**   There's no question, I know his religious

13  background and that he describes himself as a very

14  devout man, and certainly I think an opportunity to

15  speak with his priest would have been a support.  But I

16  think his primary support, again, not to prioritize a

17  psychotherapist over the clergy, would be the person

18  that he had been working with very specifically around

19  these issues in a professional setting.

20  **Q.**   Did he tell you whether he made any attempts to

21  find her back-up person or contact 911 or any other

22  steps like that?

23  **A.**   No.  Again, if there were a back-up person

24  available or for that matter a 911 person, neither of

25  whom would have had the history with him of providing

1    support and helping him with decision making, I

2    wouldn't think that would be a very useful

3    intervention.

4         MR. McADAMS:  No more questions.

5         THE COURT:  Thank you.

6         Okay.  Dr. Greer, thank you very much.

7         Is there another witness that you'd like to take

8    out of order?

9         MR. WATT:  Judge, Dr. Zlotnick is here.

10        **CARON ZLOTNICK**, first having been duly sworn,

11   testified as follows:

12        THE CLERK:  Please state your name and spell

13   your last name for the record.

14        THE WITNESS:  Caron Zlotnick, Z-L-O-T-N-I-C-K.

15        THE COURT:  Good afternoon, Dr. Zlotnick.

16        You may inquire, Mr. Watt.

17        MR. WATT:  Thank you, Judge.  Thank you very

18   much.

19        **DIRECT EXAMINATION BY MR. WATT**

20   **Q.**   Dr. Zlotnick, where were you trained?

21   **A.**   I was trained at the University of Witwatersrand

22   in Johannesburg.  I received my master's there.  Then

23   the University of Rhode Island I received my Ph.D., and

24   then I did my internship and post-doctoral training at

25   Brown University.

1    **Q.**   And when was that, that last training at Brown

2    University?

3    **A.**   It was 1996.

4    **Q.**   Okay.  And since that time, have you practiced any

5    particular profession?

6    **A.**   Well, I have practiced as a clinical psychologist

7    and as an academic at Brown University.

8    **Q.**   And do you have any licenses?

9    **A.**   I have a license.

10   **Q.**   What license?

11   **A.**   A license to practice clinical psychology.

12   **Q.**   Okay.  And have you ever testified in court

13   before?

14   **A.**   No, I have never.

15   **Q.**   So you've never been qualified as an expert

16   before; is that correct?

17   **A.**   No, I have never.

18   **Q.**   Okay.  Let me ask you this, Doctor.  Did you have

19   an occasion to come into contact with Joseph Caramadre?

20   **A.**   Yes.

21   **Q.**   And what were the circumstances surrounding that

22   first contact?

23   **A.**   He was referred to me by Dr. Carpenter, and I saw

24   him and have been seeing him as a patient for

25   psychotherapy.

1    **Q.**   And where was that?

2    **A.**   At Butler Hospital.

3    **Q.**   And when did you start, if you started treatment

4    of Mr. Caramadre?

5    **A.**   I believe it was towards the end of '09.

6    **Q.**   And at the end of '09 to the present time, has he

7    been a continual patient of yours?

8    **A.**   He has been a patient of mine and he has seen me

9    approximately once a week for psychotherapy.

10   **Q.**   And where have those sessions taken place?

11   **A.**   They have taken place in a room at Butler

12   Hospital.

13   **Q.**   Have you prescribed any particular medications for

14   him during that time?

15   **A.**   No.  I'm a clinical psychologist.

16   **Q.**   Have you prescribed any particular types of

17   interventions for him that are not medicine?

18   **A.**   Psychotherapy.

19   **Q.**   Are you aware of any other treatment providers

20   that have provided him with any other kinds of

21   treatment during the course of your psychotherapy?

22   **A.**   There was Dr. Linda Carpenter who gave him cranial

23   magnetic stimulation.  He had been seeing Dr. Tim

24   Whalen, and he continued to see him and then he went --

25   Dr. Whalen closed his practice.  He saw Sarah

1    X-A-V-I-E-R.

2    **Q.**   And were you in possession of all of those

3    treatment providers' records as it relates to

4    Mr. Caramadre?

5    **A.**   I spoke to -- I was obviously coordinating with

6    Dr. Carpenter, and I believe I spoke to Dr. Whalen and

7    I have spoken to Sarah Xavier, or however you pronounce

8    the name.

9    **Q.**   Are you aware in terms of your treatment of

10   Mr. Caramadre that he was pending a trial situation in

11   this court?

12   **A.**   Yes.

13   **Q.**   And did you treat him right up until the trial?

14   **A.**   Well, up until I left for South Africa.

15   **Q.**   And when did you leave for South Africa?

16   **A.**   It was, I believe, the 17th of November, that week

17   just before Thanksgiving.

18   **Q.**   And you didn't see him that week on Thursday?

19   **A.**   I don't believe I did.  No.  Not on the day I

20   left.

21   **Q.**   Was there any alternative plan for that missed

22   meeting set up by you prior to the time that you

23   departed for South Africa?

24   **A.**   No.  I knew that he was being seen by others.

25   **Q.**   You didn't see him on Thanksgiving?

1    **A.**   No.  No.  I was away.

2    **Q.**   So it was a couple of weeks after you left that

3    you came back and he saw you again; is that correct?

4    **A.**   I believe he saw me on my return.

5    **Q.**   And has seen you consistently since that time?

6    **A.**   Right.

7    **Q.**   And you have submitted --

8         MR. WATT:  And Judge, it's in the submission of

9    Mr. Olen in the first memorandum and I'd ask that the

10   letter of February 21st, 2013, be admitted as an

11   exhibit, Exhibit B for the Defendants.

12        THE COURT:  Any objection?

13        MR. McADAMS:  No objection, your Honor.

14        THE COURT:  The statement or affidavit will be

15   admitted in full as Exhibit B.  Go ahead.

16        MR. WATT:  Thank you, Judge.

17        (Defendant's Exhibit B admitted in full.)

18   **Q.**   In that letter, Doctor, provided to my brother,

19   Mr. Olen, you indicated that you heard that

20   Mr. Caramadre had pled guilty when you returned; is

21   that correct?

22   **A.**   Well, I saw it on the Internet when I was in South

23   Africa.

24   **Q.**   What was your immediate reaction to finding out

25   that he pled guilty?

1    **A.**   Shocked.

2    **Q.**   Why were you shocked?

3    **A.**   Because up until then he had been steadfast in

4    saying that he would never plead guilty.

5    **Q.**   Ever indicate anything to the contrary from 2009

6    right through November of 2012?

7    **A.**   Never.

8         MR. WATT:  Judge, I have no further questions.

9         THE COURT:  Mr. McAdams.

10        **CROSS-EXAMINATION BY MR. McADAMS**

11   **Q.**   Good afternoon, Dr. Zlotnick.  My name is John

12   McAdams.  I'm an Assistant United States Attorney.

13        So when did you begin treating Mr. Caramadre?

14   **A.**   I believe it was towards the end of '09.

15   **Q.**   And how often would you treat him?

16   **A.**   Approximately once every week.  Once a week.

17   **Q.**   So weekly throughout the entire period?

18   **A.**   Yes.  Roughly on and off.

19   **Q.**   And in that entire period of time when you had

20   been treating him, he had never told you that he had

21   committed any of the crimes that he had been accused

22   of?

23   **A.**   Never.

24   **Q.**   So when he pled guilty, you were shocked by that

25   fact?

1    **A.**    Yes.

2    **Q.**    Your surprise -- you don't actually know whether

3    he's guilty or not, correct?

4    **A.**    No.  I'm a psychologist.

5    **Q.**    You have no idea whether he actually did what he

6    was accused of doing?

7    **A.**    No.

8    **Q.**    And you were in South Africa on November 19th,

9    which was the day that he pled guilty?

10   **A.**    Yes.

11   **Q.**    Now, you left for your trip on November 17th; is

12   that right?

13   **A.**    Yes.

14   **Q.**    Are you aware that the trial started on November

15   13th?

16   **A.**    Yes.

17   **Q.**    Did Mr. Caramadre attempt to reach out to you on

18   November 13th?

19   **A.**    No.

20   **Q.**    14th?

21   **A.**    No.  I don't recall.

22   **Q.**    What about November 15th?

23   **A.**    No.  I don't think so.

24   **Q.**    And do you know if he reached out to you on

25   November 16th?

1    **A.**    No.

2    **Q.**    Do you have any types of procedures when you're

3    unavailable if a patient has an emergency or really

4    needs to see somebody, do you have any type of backup

5    or colleagues?

6    **A.**    Well, he was being seen by a psychiatrist who was

7    the backup.

8    **Q.**    That would be Dr. Xavier?

9    **A.**    Xavier, yep.

10    **Q.**    And do you know whether he attempted to contact

11    Dr. Xavier?

12    **A.**    No, I do not know.

13    **Q.**    To your knowledge, he did not attempt to contact

14    her?

15    **A.**    I do not know.  I can't recall.

16    **Q.**    I'm sorry?

17    **A.**    I say I can't recall if he did or he didn't.

18    **Q.**    So you just don't know one way or the other?

19    **A.**    I think not, but I can't remember.

20    **Q.**    Now, your affidavit that was admitted as Defense

21    Exhibit B essentially doesn't express any opinion as to

22    his mental state on November 19th; is that correct?

23    **A.**    Well, other than the fact that he's been suffering

24    from chronic depression.

25    **Q.**    Which was something that he had been suffering

1    from for a long period of time, correct?

2    **A.**    Yes.

3    **Q.**    And you have no reason or knowledge that it

4    actually changed during the period when you were out of

5    the country and didn't see him?

6    **A.**    Well, I had no knowledge at the time.

7    **Q.**    So any knowledge that you have is based on what he

8    told you later?

9    **A.**    Yes.

10   **Q.**    Okay.  Now, you submitted a second affidavit; is

11   that correct?

12   **A.**    Yes.

13   **Q.**    Okay.  And what were the circumstances surrounding

14   the creation of that second affidavit?

15   **A.**    To be more specific.

16   **Q.**    Why did you write another affidavit?

17   **A.**    Pardon?

18   **Q.**    Why did you write another affidavit?

19   **A.**    Because it seemed I needed to be more specific

20   around how his depression might be related to his state

21   of mind that led him to plead guilty.

22   **Q.**    Who told you that?

23   **A.**    It was either Joe or his lawyer.  I can't recall.

24   **Q.**    They came to you in the first instance to write

25   the first affidavit, correct?

1      **A.**    Yes.

2      **Q.**    What was the purpose of that first affidavit?

3      **A.**    Well, he needed someone to attest to what his

4      mental status might have been during that period.

5      **Q.**    And you opined that you were out of the country

6      and surprised when he pled guilty?

7      **A.**    Yes.

8      **Q.**    And he came back to you some weeks later and said

9      we need you to have another opinion that's more

10     specific as to how his depression could affect his

11     mental state?

12     **A.**    Right.

13         MR. McADAMS:  Thank you.  I have no other

14     questions.

15         THE COURT:  Any redirect?

16         MR. WATT:  Yes, Judge.

17         <u>**REDIRECT EXAMINATION BY MR. WATT**</u>

18     **Q.**    Dr. Zlotnick, when you rendered that second

19     affidavit, so-called, you did not have access to any

20     information about the proceedings in the trial prior to

21     the time you left for South Africa; is that correct?

22     **A.**    I'm not sure what you're asking.

23     **Q.**    At the time that you wrote the second statement,

24     you didn't have any information regarding the

25     proceedings in the trial up to the point in time that

1    you left for South Africa?

2    **A.**   No.  Other than that Joe had pleaded guilty.

3    **Q.**   And your second statement talked in terms of at

4    least your opinion that it was possible, possibilities;

5    is that right?

6    **A.**   Yes.

7    **Q.**   Okay.  You didn't have access to trial transcripts

8    or anything else relating to the trial itself; is that

9    right, Doctor?

10   **A.**   That's correct.

11           MR. WATT:  Judge, I have no further questions.

12           THE COURT:  Is the second affidavit an exhibit?

13           MR. WATT:  Judge, I would move it as Exhibit E

14   if there's no objection.  C, I guess, Judge.

15           MR. McADAMS:  I have no objection, your Honor.

16   It was filed with Mr. Olen's supplemental memorandum

17   last night, your Honor.

18           THE COURT:  Oh, I see.  Okay.

19           MR. WATT:  The Court hadn't seen it as of this

20   morning, Judge.

21           THE COURT:  All right.  Let's put that in.

22   That's exhibit --

23           MR. WATT:  C, I think, Judge.

24           THE COURT:  It will be C, but it's attached to

25   this document as what?  I guess it's Exhibit A to the

1    memorandum, right?

2         MR. WATT:  Please, Judge.

3         THE COURT:  All right.  We'll make that Exhibit

4    C.

5         (Defendant's Exhibit C admitted in full.)

6         THE COURT:  Let me just ask you a couple of

7    questions.

8         And you may not have answers to these questions,

9    but you're familiar with -- you're very familiar with

10   Mr. Caramadre because you were his treating

11   psychotherapist and you're familiar with all of his

12   medications and so forth.  And is there anything

13   about -- putting aside what's been described as the

14   acute stress of that weekend and the condition of his

15   wife and his concerns over that for a moment, just

16   putting that aside for a moment, was there anything in

17   your view about the medications that he was taking and

18   the dosages and so forth that would give you any

19   concern about his competence, his ability to understand

20   the trial and the proceedings that he was engaged in

21   based on your very knowledgeable opinion, you were

22   seeing him once a week.

23        THE WITNESS:  I'm a psychologist so it's very

24   difficult for me to provide an opinion around his

25   medication regime because that is not part of my

1    training.

2         THE COURT:  I understand.  I'm asking you what's

3    really a fairly common-sense kind of question.  You

4    were treating him once a week.  You know that he was

5    taking a number of medications.  I understand you're

6    not a medical doctor.  I'm not asking you to opine

7    about whether the medications were correct or the

8    dosages were correct or anything like that.

9         I'm just asking you based on your ongoing

10   relationship with him in the time leading up to the

11   trial, did you have any concerns about his competence

12   and his ability to understand the proceeding that he

13   was engaged in?  Just generally speaking, did he seem

14   like he was awake and aware and understanding of the

15   predicament of the charges against him and the trial

16   and so forth, or did he seem out of it, incompetent?

17   That's what I'm asking you.

18        THE WITNESS:  While I saw Joe, he was able to

19   focus in therapy and understand what was going on in

20   therapy.  I was aware that there was work-related

21   impairment, but I wasn't present during that time; but

22   given that he does suffer from depression and one of

23   the sort of symptoms of depression is diminished

24   ability to think clearly and indecisiveness, I can say

25   that it's possible due to tremendous stress that he

1    might have not been able to -- he was compromised in

2    those areas.

3           THE COURT:  Okay.  But his functionality, again,

4    putting aside the stress of that weekend, if you will,

5    and his wife's condition, just putting that aside for a

6    minute, his functionality was appropriate for someone

7    who was suffering from severe depression and being

8    treated appropriately for it.  Would you agree with

9    that?

10          THE WITNESS:  During the time I saw him, yes.

11          THE COURT:  I'm not trying to put words in your

12   mouth but --

13          THE WITNESS:  No, I understand.  Yes.

14          THE COURT:  I just want to make sure that you

15   didn't see anything that caused red flags to go up for

16   you about his general state of understanding and

17   competence leading up to that point.  It was common,

18   typical for someone with his conditions who you would

19   be treating?

20          THE WITNESS:  Correct.

21          THE COURT:  Okay.  That's fine.  Very good.

22          So I don't have any -- either of you have any

23   follow-up questions?

24          MR. WATT:  Judge, not on the Court's questions,

25   no.

1           MR. McADAMS:  No, your Honor.

2           THE COURT:  All right.  Then your testimony is

3    complete.  You may step down.  Thank you.

4           THE WITNESS:  Thank you.

5           THE COURT:  All right.  What's next?  Is there

6    another witness out of order or should we return to

7    Mr. Caramadre?

8           MR. OLEN:  I think we can return to

9    Mr. Caramadre, your Honor.

10          THE COURT:  Okay.  Very good.  Let's do that.

11   Mr. Caramadre, would you please take the stand.

12   **JOSEPH CARAMADRE**, Resumes stand.

13     **CONTINUATION OF CROSS-EXAMINATION BY MR. McADAMS**

14          THE COURT:  Go ahead, Mr. McAdams.

15          MR. McADAMS:  Thank you, your Honor.

16   **Q.**   Hello, again, Mr. Caramadre.

17   **A.**   Hello.

18   **Q.**   When we left off, we were discussing the use of

19   Mr. Radhakrishnan to invest money that was your money.

20   Do you recall that?

21   **A.**   Yes.

22   **Q.**   And do you agree that you gave money to

23   Mr. Radhakrishnan that was your money and permitted him

24   to invest it?

25   **A.**   Yes, I did.

1    **Q.**   And in so doing, he invested in a number of

2    variable annuities?

3    **A.**   Yes, he did.

4    **Q.**   And among those variable annuities was a variable

5    annuity at Midland National Life Insurance Company?

6    **A.**   That was one of three, yes.

7         MR. McADAMS:  I'll mark Government Exhibit

8    Number 8, the Midland annuity and a series of checks

9    that was a part of that transaction.

10        THE COURT:  Any objection to Number 8?

11        MR. WATT:  Judge, same objection as before.  I

12   understand the Court is going to allow it to continue.

13        THE COURT:  Right.  So I'll overrule the

14   objection.  You may continue.  Eight will be full.

15        (Government Exhibit 8 admitted in full.)

16   **Q.**   So this is the application for the annuity, and it

17   names Mr. Radhakrishnan as the owner and Denise Egan as

18   the annuitant?

19   **A.**   That's what it says, yes.

20   **Q.**   Ms. Egan was a person who responded to the ad you

21   had placed in the Catholic newspaper?

22   **A.**   Yes.  We also knew her attorney and so that we had

23   a closer relationship with Ms. Egan.

24   **Q.**   Who was her attorney?

25   **A.**   Her attorney was Ben Paster of Paster and

1    Harpootian, who has the office space next to ours.  As

2    a matter of fact, Mrs. Egan's husband called up Ben to

3    ask him to come to one of the meetings regarding this.

4    **Q.**   And did you know Ms. Egan personally?

5    **A.**   I got to know her.  She came to my office at least

6    once, possibly twice.  Her husband came twice.

7    **Q.**   That was as a result of your interaction with her

8    in connection with this investment?

9    **A.**   Yes.

10   **Q.**   And did Raymour know her personally?

11   **A.**   Yes.  Raymour sat in at a meeting with us, and we

12   gave Mrs. Egan two checks of $5,000.

13   **Q.**   That's when Raymour met her?

14   **A.**   That's when Raymour met her, yes.

15   **Q.**   And in this annuity application, he describes her

16   as his friend; is that correct?

17   **A.**   That's how he describes her, yes.

18   **Q.**   This annuity application, which was dated on

19   December 1st, 2007, was invested with your money,

20   correct?

21   **A.**   I assume so.  I'm not really sure of the actual

22   policy.  I mean, you're showing me an application.

23   **Q.**   Okay.

24   **A.**   I assume that if it's $800,000, it's my money.

25   **Q.**   Right.  You gave Raymour $20,000 to send in with

1    the application, correct?

2    **A.**   That's correct.

3    **Q.**   That's a check from your office to

4    Mr. Radhakrishnan for $20,000?

5    **A.**   Yes.

6    **Q.**   For an annuity for Midland?

7    **A.**   Yes.

8    **Q.**   And Mr. Radhakrishnan then with the application

9    sent in that $20,000 to Midland?

10   **A.**   Yes.

11   **Q.**   And then a few weeks later, you gave Raymour a

12   check for $780,000, correct?

13   **A.**   Yes.  About two months, I think.

14   **Q.**   Right.  About two months from the original date of

15   the application?

16   **A.**   Yes.

17   **Q.**   And then after that check cleared

18   Mr. Radhakrishnan's bank account, he sent a check for

19   $780,000 to Midland?

20   **A.**   That's correct.

21   **Q.**   And you understood that in order to purchase an

22   annuity that the company that's going to issue that

23   annuity needs to do a thing called a suitability

24   review.  Are you familiar with that?

25   **A.**   No.  The broker/dealer has to do a suitability

1    review, not the company that issues the annuity.

2    **Q.**    The broker/dealer.  I stand corrected.  The

3    broker/dealer is the one who must issue a suitability

4    review, correct?

5    **A.**    The broker/dealer's responsibility is to ensure

6    that the investment is not injurious to the investor.

7    **Q.**    They have a number of requirements, do they not?

8    **A.**    That's the suitability requirement.

9    **Q.**    They're required to know their customers; is that

10   right?

11   **A.**    Yes.

12   **Q.**    And they're required to, for example, comply with

13   anti-money laundering provisions?

14   **A.**    Yes.  Yes.

15   **Q.**    Various provisions of the Patriot Act and things

16   like that?

17   **A.**    Yes, they have to do that.

18   **Q.**    And you understand that if a person wants to

19   purchase an annuity for a million dollars or for

20   $800,000 as in this case, that a broker/dealer must do

21   a suitability review for the customer and make sure

22   that that investment is suitable for that person?

23   **A.**    The broker/dealer's commitment is only to make a

24   suitability on the initial deposit because these are

25   open-ended unilateral contracts in which

1    Mr. Radhakrishnan could have put in significantly more

2    money than the 20,000 and the broker/dealer has no say

3    or can pass no judgment after the annuity is issued by

4    the issuer.

5    Q.    But to do the initial annuity, they have to do the

6    suitability review, correct?

7    A.    They have to complete a suitability form.

8    Q.    And in this case, the suitability form was for

9    Raymour?

10   A.    I presume so.

11   Q.    You would have presume so in order to get this

12   annuity purchased, right?

13   A.    I would assume that he'd be filling out some

14   forms, yes.

15   Q.    In this annuity, he lists his employer as a

16   company called Network Display Systems.  Do you see

17   that?

18   A.    I see that he lists that, yes.

19   Q.    And you're aware that Network Display Systems was

20   not a functioning company, correct?

21   A.    I'm aware now, yes.

22   Q.    And it indicates that it's in fact a digital

23   signage business based in Providence?

24   A.    Okay.

25   Q.    And that he has annual income for 250,000 plus; is

1      that correct?

2   **A.**    That's what the form indicates.

3   **Q.**    And it indicates that he has investment assets of

4      $1 million?

5   **A.**    That's what it says, yes.

6   **Q.**    And you knew Raymour at this point in time,

7      correct?

8   **A.**    I knew him, yes.  He worked for me.

9   **Q.**    You knew then that he did not have a million

10     dollars in assets.

11  **A.**    I'm not sure, but I presumed he did not.

12  **Q.**    Other than the money that you had given him?

13  **A.**    Well, I can't speak to what wealth Raymour may

14     have had through his family, but I presume he did not

15     have a million dollars because I was investing my

16     money.

17  **Q.**    He was investing money that you gave him?

18  **A.**    Yes.

19  **Q.**    Now, after Mrs. Egan passed away, Raymour filed a

20     death claim, correct?

21  **A.**    Yes, I presume so.

22  **Q.**    He indicated here that he was a family friend of

23     Mrs. Egan?

24  **A.**    Yes.  Would you like an explanation as to why he

25     put that?

1    **Q.**    You already gave us an explanation, but your

2    attorney can certainly ask you about it on redirect.

3         After that death claim was filed, Midland sent

4    Mr. Radhakrishnan a check for $883,743.72 right.

5    **A.**    That seems correct, yes.

6    **Q.**    And that check is dated February 4th, 2009?

7    **A.**    That's what it says.

8    **Q.**    And on February 10th of 2009, Mr. Radhakrishnan

9    sent you a check in the exact same amount to the penny,

10   correct?

11   **A.**    That is correct.

12   **Q.**    Now, you read the indictment in this case, right?

13   **A.**    Yes.

14   **Q.**    All right.  And you were aware that the series of

15   checks and transactions that we just described actually

16   constituted a very specific count in the indictment,

17   right?

18   **A.**    Yes.  The money laundering count.

19   **Q.**    And it described those series of transactions,

20   that you invested money in Mr. Radhakrishnan's name,

21   sent him a series of checks, he sent those checks to

22   Midland National, obtained a death claim, received the

23   benefits and sent the money back to you, correct?

24   **A.**    Those steps are all correct, but I have issue with

25   whether it's money laundering or not.

1    **Q.**   Now, we were talking earlier about Midland

2    National, but the statement of the facts actually

3    describes a number of instances that you made

4    misrepresentations that you currently disagree with.

5    But you also made misrepresentations to Jefferson

6    National, isn't that right?

7    **A.**   I don't agree with it.  I don't know what you're

8    asking.

9    **Q.**   We talked before about how it came to be that you

10   met Mrs. Ianiero, that Mr. Maggiacomo you thought gave

11   her money to purchase an annuity, and apparently there

12   was some foul up and you had to go out and beg for your

13   law license, to get it back, do you remember that?

14   **A.**   Yes.  Because I was very concerned that

15   Mrs. Ianiero was misled and I wanted her to reaffirm

16   whether she wanted to do this because I was worried.

17   It was an error.

18   **Q.**   You had testified that you would never want her

19   signature forged on an application?

20   **A.**   That's correct.  If I know about it, yes.

21   **Q.**   If you know about it.  And you would take steps to

22   prevent any other companies from using her forged

23   signature, right?

24   **A.**   Well, I had her re-sign a whole bunch of forms for

25   me.

1    **Q.**   For what?

2    **A.**   For annuities or bonds now that I was supervising

3    them.

4    **Q.**   And you also paid her money, correct?

5    **A.**   I paid her a lot of money, yes.

6         MR. McADAMS:  I'm going to mark this as

7    Government Exhibit 9.  This is a letter from

8    Mr. Caramadre that was sent to a broker/dealer Lifemark

9    regarding this Jefferson National policy and his

10   relationship with Mrs. Ianiero.

11        MR. WATT:  Objection, Judge.

12        THE COURT:  The objection is noted and

13   overruled.  This is exhibit what?

14        MR. McADAMS:  Government's 9.

15        THE COURT:  Nine?  All right.

16        (Government Exhibit 9 admitted in full.)

17   **Q.**   Now, this was after you had learned about that

18   whole situation with Midland and Ms. Ianiero and they

19   sent you back this $2.5 million.

20   **A.**   Okay.

21   **Q.**   You wrote on your law office letterhead, Joseph A

22   Caramadre, Esquire, "To whom it may concern:  With

23   regard to the application of and the subsequent

24   issuance of the above-referenced variable annuity

25   contract, I hereby acknowledge the following."  You

1    state that:  "I am the attorney representing Duckworth

2    Clancy, LLC, policyowner, and Mrs. Lily Ianiero, policy

3    annuitant."

4         In fact, you were not the attorney for

5    Mrs. Ianiero; is that correct?

6    **A.**    No, I believe I was.

7    **Q.**    Did you have a retainer with her?

8    **A.**    I don't need a retainer.  She's a very nice old

9    lady who needed help, and she called me for many

10   different legal questions as we got to be good friends.

11   **Q.**    You did legal work for Mrs. Ianiero?

12   **A.**    I gave her legal advice, yes.

13   **Q.**    On what matters?

14   **A.**    On how she has to manage her children, her estate

15   and problems she had with her daughter.

16   **Q.**    Now, you wrote in the next paragraph that neither

17   the policy annuitant and/or the policyowner received

18   any form of compensation from the registered

19   representative, Edward L. Maggiacomo, Jr., right?

20   **A.**    Correct.

21   **Q.**    Didn't you testify earlier that you gave him

22   $4,000 to give to her?

23   **A.**    I testified that for the Midland National he was

24   given $4,000.

25   **Q.**    Not for this.  This is Jefferson National.

**A.** No, not for Jefferson National because I dealt with Mrs. Ianiero myself from then on, and we developed a very good friendship over time. And we'd send her money from time to time just because she needed it.

**Q.** So you gave her $9500 to be an annuitant in this --

**A.** No. I gave her $9500 to open up a bond account and consider other annuities as well.

**Q.** So you gave her $9500 to open up a bond account, but you didn't give her any money to serve as an annuitant?

**A.** No. I probably did give her money to serve as an annuitant. However, as it relates just to National, Edward Maggiacomo didn't give her any money and I don't believe anyone else did. We played by the rules that were set. There were some companies that we would pay people for their signatures and then ask them will you sign another one, we're not going to pay you for this one but we'll pay you a lot for this other one.

**Q.** And the next paragraph says, "The annuitant did not receive any form of compensation from the policyowner, Duckworth Clancy, or any of its members, managers, shareholders, officers or employees."

**A.** That's a hundred percent correct.

**Q.** Because the money was coming from you?

1    **A.**    Yes.

2    **Q.**    So you didn't put in the letter, I'm giving

3    Mrs. Ianiero the money?

4    **A.**    I didn't have to put it.

5    **Q.**    You didn't do that in any way as misleading to

6    Jefferson National?

7    **A.**    No.    Because Jefferson National, who, by the way,

8    completely settled with our office on any issues they

9    had, we reached a full settlement, was only wanted to

10   be concerned about if the policyowner or if the

11   registered representative had given her money.

12   **Q.**    And another entity that was concerned about

13   whether the registered representative was paying was

14   the broker/dealer for Mr. Maggiacomo, Lifemark,

15   correct?

16   **A.**    They seemed to have some concern.

17   **Q.**    They were worried about Mr. Maggiacomo or you

18   paying people to serve as annuitants, correct?

19   **A.**    Well, they have no standing to worry about me.

20   **Q.**    Right.    But they have standing to worry about

21   Mr. Maggiacomo?

22   **A.**    That's correct.

23   **Q.**    And they can't issue annuities if the annuitants

24   are being paid, correct?

25   **A.**    No.    They decide which annuities they will take.

1   They must deal with their registered representative,

2   Edward Maggiacomo.

3   **Q.**   And they wanted assurances that the annuitants

4   were not being paid?

5   **A.**   From Edward Maggiacomo, yes.

6   **Q.**   So you wrote this letter and had Ed Maggiacomo

7   give a copy of it to Lifemark so that they would be

8   assured that the annuitants were not being paid?

9   **A.**   From Ed Maggiacomo or the policyowner.

10  **Q.**   Did you put anywhere in the letter that it's not

11  Ed Maggiacomo who is paying them, but it's me, Joe

12  Caramadre?

13  **A.**   No.  I also didn't put in any other irrelevant

14  information.

15  **Q.**   You were not the attorney for Sheila Battey, were

16  you?

17  **A.**   I became a friend of Sheila Battey, and she may

18  have called me for some legal advice regarding her

19  husband, but we developed a personal relationship.

20  **Q.**   Isn't a fact Mr. Caramadre, that you gave Mr. and

21  Mrs. Battey $5,000 to serve as an annuitant and you

22  told Mr. Battey that he would receive additional funds

23  upon the death of Mrs. Battey, and that was the

24  relationship you had with the Batteys?

25  **A.**   That is not correct.  Sheila Battey did not answer

1    an ad.  There was no ad at the time in 2006.  She was

2    referred to me by a friend of the office as someone who

3    was very concerned about getting her husband some money

4    because she was dying of cancer.  So I gave her $5,000,

5    and then at some other point I believe we gave them a

6    little bit more money, but there was no contract after

7    death because we wouldn't know if we would make any

8    money.

9    **Q.**   You never served as her attorney, correct?

10   **A.**   I may have given her legal advice.  I didn't say

11   it was retained as her attorney.

12        MR. McADAMS:  Government Exhibit's Number 10,

13   which is another letter I'd like to move into evidence.

14        MR. WATT:  Same objection, Judge, please.

15        THE COURT:  The objection is noted and

16   overruled.

17        (Government Exhibit 10 admitted in full.)

18   **Q.**   This is another letter that you wrote off your law

19   office letterhead, and you wrote, With regard to the

20   application and subsequent issuance of the

21   above-referenced variable annuity with Jefferson

22   National and Sheila Battey as the annuitant, that you

23   are the attorney representing Agostini Construction

24   Company, the policyowner, and Mrs. Sheila Battey, the

25   policy annuitant.

1          You were not an attorney representing her?

2     **A.**   I may have been, because I called her.  Jefferson

3     National sent out private investigators to harass the

4     Agostini Constructions and the Sheila Batteys.  And

5     when she called me, she asked me would I please

6     represent her to get the insurance company people out

7     of her hair.

8     **Q.**   She called you and asked you to represent her as

9     an attorney?

10    **A.**   She said, Can you get them out of my way.  And I

11    said --

12    **Q.**   If the Government calls her husband, her widower,

13    Greg Battey, Is his testimony going to be consistent

14    with that?

15    **A.**   I don't know what Greg Battey's testimony --

16    **Q.**   It's going to be contrary to that, isn't it?

17    **A.**   I don't know what he'd testify to.  I could show

18    you a letter that Mrs. Battey wrote me to thank me for

19    all the work I did for her.

20    **Q.**   I'm sure you can.  Look at the bottom paragraph of

21    this letter.  It says, "Please direct any further

22    communications regarding Agostini Construction Company,

23    policyowner, or Mrs. Sheila Battey, annuitant, to my

24    office."

25    **A.**   That's correct.

1  **Q.**   And that's the same language that you wrote on

2  Exhibit 9 with respect to Mrs. Ianiero, right?

3  **A.**   Yes.

4  **Q.**   As an attorney, you understand what it means when

5  you tell somebody that you represent them, correct?

6  **A.**   Yes.

7  **Q.**   What does it mean?

8  **A.**   It means that they require representation and

9  protection from whatever their issue is.

10  **Q.**   And it prevents the audience from contacting

11  Mrs. Battey and/or Mrs. Ianiero directly without going

12  through you, correct?

13  **A.**   Well, they already had contacted both these

14  people.

15  **Q.**   They had contacted Mrs. -- Midland National had

16  contacted Mrs. Ianiero?

17  **A.**   No.  No.  Jefferson National had also gone and

18  contacted Mrs. Battyand Mrs. Ianiero, and they did not

19  want to be pestered by insurance companies.

20  **Q.**   Mrs. Ianiero had been contacted by Midland and

21  Midland learned that she had no idea who you were and

22  you didn't want that mistake to happen again so you

23  sent a letter to the next company down the line,

24  Jefferson National, claiming an attorney-client

25  relationship to prevent them from reaching out and

1   speaking to Mrs. Ianiero and Mrs. Battey, isn't that

2   right?

3   **A.**   By the way, it was done at the insistence of all

4   the parties involved here, and there was no follow-up

5   from Jefferson National except for an accorded

6   satisfaction on these particular annuities.

7   **Q.**   Now, we went through all of that annuity with

8   Mr. Radhakrishnan from Midland, and you agree with me

9   that there were other annuities in which you

10  essentially did the same thing?

11  **A.**   Yes.

12  **Q.**   With Mr. Radhakrishnan?

13  **A.**   Yes.

14  **Q.**   You provided all the funds, the annuity was opened

15  in his name and he returned the funds to you?

16  **A.**   Mr. Radhakrishnan was a holder and trustee, a

17  common process that is allowed as long as you use the

18  federal banking system.  It's not cash that we are

19  transporting.  It is done through check.  And the tax

20  accounting is with complete detail and filed 1099's at

21  the end of the transaction.

22  **Q.**   That's your explanation for why you gave the money

23  to Mr. Radhakrishnan?

24  **A.**   No.  I gave it to him because I wanted him to

25  invest the money and watch it.

1   **Q.**   And you didn't want those companies to think it

2   was you and reject the annuity application?

3   **A.**   No, because I could have bought -- I did buy a

4   Western Reserve annuity the same time Mr. Radhakrishnan

5   did.

6   **Q.**   Well, you couldn't buy one from Midland, right?

7   **A.**   Again, if Raymour decided to go to Midland, I

8   don't really know.

9   **Q.**   And Pacific Life, you're familiar with that

10  company as well, right?

11  **A.**   Yes.

12  **Q.**   That was a company that had terminated you as the

13  agent in 2002, correct?

14  **A.**   Well, in 2002, they may have terminated us, but,

15  again, it didn't matter to me if Raymour could purchase

16  this.  My concern was that I learned since that there

17  was wrongful information on the application by Raymour.

18  **Q.**   You had no idea that that might happen?

19  **A.**   No, because I wouldn't have approved it.

20  **Q.**   Even though you are the guy that reads the fine

21  print on everything, right?

22  **A.**   Yes.  Yes, I do.  I read the annuity fine print,

23  yes.

24  **Q.**   And you didn't read the application fine print?

25  **A.**   There would be no need for Raymour to say he

1    worked for Network Display.  Network Display was a

2    company he was trying to start.  He was a legal

3    employee of mine.  He would testify himself that I did

4    not know that he put this down and that it was his own

5    creation.

6    **Q.**   And you used him to open up annuities with Pacific

7    Life as well, isn't that right?

8    **A.**   Looking back at the file, I believe we moved a

9    hundred thousand into Pac Life.

10         MR. McADAMS:  I'm going to mark as Government

11   Exhibit 11 the Raymour and Nathan Lee --

12         MR. WATT:  Your Honor, I renew the objection to

13   the line of questioning.

14         THE COURT:  Objection is noted and overruled.

15         (Government Exhibit 11 admitted in full.)

16   **Q.**   Can you see that application?

17   **A.**   I can just about see it, but I understand what it

18   is, yes.

19   **Q.**   And Pacific Life was a company that had terminated

20   you as an agent in 2002, right?

21   **A.**   I believe so.  I retired my licenses shortly

22   thereafter because I was getting more into the field of

23   reading contracts rather than selling them.

24   **Q.**   And you were concerned that if you got an annuity

25   from Pacific Life that it might be rejected, so you

1    used Raymour as a person?

2    **A.**   I don't even know that he had applied to Pac Life.

3    **Q.**   You didn't know this?

4    **A.**   No.  I mean I let him decide which companies, and

5    he would come to me after it's sent in and I know there

6    was $100,000 check he wanted to start one, and he

7    started it.

8    **Q.**   So you just gave a 23-year-old kid hundreds of

9    thousands of dollars, millions of dollars actually, and

10   just told him do whatever he wants with it?

11   **A.**   Well, buy the annuities and use the investments in

12   the annuities, yes.

13   **Q.**   So you knew that he was buying them an annuity?

14   **A.**   I did.  Now, whether it was Pac Life or some other

15   Life, that's just how it is.

16   **Q.**   Just a coincidence that the companies that he was

17   used as the owner are the same companies that had

18   rejected you?

19   **A.**   Well, not all the companies.

20   **Q.**   Because you used him for even more companies than

21   that?

22   **A.**   No.  Western Reserve didn't shut us down.  He

23   bought two $1 million annuities from them.  If I was

24   concerned about --

25   **Q.**   And those were also your money, correct?

1    **A.**    Yes.

2    **Q.**    The Sandra Bulpitt Western Reserve annuity?

3    **A.**    I don't remember who the annuitant was.

4    **Q.**    Now, there were other people that you put your

5    money in the names of in the course of your business

6    activities, correct?

7    **A.**    Very few, but yes.

8    **Q.**    Walter Craddock, you put money in his name, right?

9    **A.**    Water Craddock is an associate attorney in my

10   office and at times we shared an investment fund, or I

11   put all my money in his name.

12   **Q.**    You would open up a bond account with a terminally

13   ill person as the co-owner, and it would be Walter

14   Craddock and Bertha Howard, for example, and it would

15   be your money, correct?

16   **A.**    In some cases, it might have been.  Would you like

17   to know why?

18   **Q.**    I just want to know if it's true or not.

19   **A.**    It's true we opened it, yes.

20   **Q.**    You invested money in his name?

21   **A.**    Yes.  There was a specific purpose.

22   **Q.**    You also did that with other people, such as your

23   wife and your parents and other people?

24   **A.**    Hold on a second.  My parents have their own

25   money.  My wife has her own money.  So she was an

1    investor.

2    **Q.**   So the investment that you made, for example, in

3    Mr. Wiley's name with Trade King, that was your wife's

4    money independent of you?

5    **A.**   Yes.  Yes.  We were splitting up our estate for

6    estate tax purposes, yes.

7    **Q.**   And that was an investment that she decided --

8    **A.**   No.  That was an investment.  She sought advice

9    from me that I had authority to manage.  It's my wife.

10   **Q.**   You also had other corporate entities that you

11   used with respect to your money, right?

12   **A.**   There were some corporate entities that I

13   controlled corporations for some reasons, whether we

14   decided whether we would invest money or not in these

15   corporations.

16   **Q.**   Such as ADM Associates is an example, right?

17   **A.**   ADM is a wholly-owned company of my three

18   children, Amelia, Michael and Daniel, LLC.

19   **Q.**   And those are minor children, right?

20   **A.**   Yes.

21   **Q.**   All that activity that relates to ADM and

22   Associates?

23   **A.**   It's my money.  I'm a hundred percent owner of the

24   LLC.  No one's tried to conceal that.  I signed the

25   application.

1    **Q.**   Now, we talked about Lifemark.   And Lifemark is a

2    broker/dealer, correct?

3    **A.**   Yes.

4    **Q.**   They were the broker/dealer that Mr. Maggiacomo

5    was associated with?

6    **A.**   Yes.

7    **Q.**   And there came a point when complaints had been

8    made, for lack of a better word, about some of the

9    investments that you had going with various insurance

10   companies and some of those complaints were directed to

11   Lifemark; is that right?

12   **A.**   I presume so because if they were mad with the

13   type of business we were giving them, they would try to

14   get to the broker/dealer as well.

15   **Q.**   So a complaint would go to Lifemark complaining

16   and essentially complaining about Mr. Maggiacomo and

17   then he would hear about it from Lifemark?

18   **A.**   Or directly from the insurer, but yes.

19   **Q.**   Or both?

20   **A.**   Or both, yes.

21   **Q.**   All right.   Now, in April of 2008, some

22   representatives from Lifemark came out to your office,

23   didn't they, to meet with you?

24   **A.**   That's what they said, so I presume it's correct.

25   I don't remember what happened in April of 2008.

1  **Q.** Do you agree that the statement of facts that you

2  signed under oath alleges that you made

3  misrepresentations to Lifemark?

4  **A.** I do not agree with that statement of fact, no.

5  **Q.** Do you agree that it says that?

6  **A.** I agree it says that, yes.

7  **Q.** Do you remember an individual by the name of Jim

8  Prisko from Lifemark coming to visit you and

9  Mr. Maggiacomo?

10 **A.** Jim Prisko came to do his due diligence, came over

11 with Mr. Maggiacomo who was one of his registered

12 representatives. Jim Prisko had no authority over me.

13 I'm merely a client.

14 **Q.** But he did meet with you?

15 **A.** Yes, I'm sure he met me.

16 **Q.** And he asked you some questions about the

17 relationship between yourself and Mr. Maggiacomo,

18 correct?

19 **A.** Yes.

20 **Q.** He wanted to know, for example, if Mr. Maggiacomo

21 was sharing commissions with you?

22 **A.** Yes.

23 **Q.** Because you understand that sharing commissions

24 with a person that's not licensed to sell variable

25 annuities such as yourself is prohibited?

1    **A.** I understand that I cannot receive moneys for

2    transactions and securities directly.

3    **Q.** And in fact, you were receiving a portion of the

4    commissions that Mr. Maggiacomo generated on behalf of

5    terminally ill associated annuities that you had

6    identified through your ad, correct?

7    **A.** Mr. Maggiacomo had an office in my office in which

8    he received full secretarial, free rent, you name it,

9    Internet computers and my legal research on these

10   annuities. So we agreed that he can pay me some of his

11   success to me. And it mattered not to me if it was a

12   commission, if it was rent or if it was legal fees. I

13   declared it all anyway.

14   **Q.** But you had a specific agreement with

15   Mr. Maggiacomo, did you not, that you were entitled to

16   35 percent of the commissions that he generated from

17   annuities where you identified the terminally ill

18   annuitant?

19   **A.** As a referral fee, yes.

20   **Q.** You did. So you had that agreement with

21   Mr. Maggiacomo?

22   **A.** Pretty much a loose agreement, yes.

23   **Q.** A loose agreement?

24   **A.** Yes.

25   **Q.** Didn't you send a nasty e-mail to Mr. Hanrahan and

1    Mr. Maggiacomo about that agreement?

2    **A.**   I probably sent a nasty e-mail to them telling

3    them that they were screwing up something.

4    **Q.**   Right.  And you were upset with Mr. Hanrahan that

5    you were giving away 35 percent of the commissions to

6    Mr. Maggiacomo?

7    **A.**   The basis of that was to speak with my junior

8    partner, Ed Hanrahan.

9    **Q.**   So the folks from Lifemark came and they wanted to

10   know if Maggiacomo was sharing commissions with you,

11   right.

12   **A.**   Right.

13   **Q.**   And you told them no?

14   **A.**   No.  I told them from now on I'm not going to

15   accept commissions in that capacity.

16   **Q.**   And you told Ed Maggiacomo just write me a check

17   for the rent and call it rent on the check, right?

18   **A.**   I agreed with Mr. Maggiacomo that he should pay me

19   commissions.  He agreed with me that he owes me money

20   for rent and other services, and I will declare it as

21   rent.  He doesn't pay rent anyway, and he owes the firm

22   money.

23          MR. McADAMS:  I would like to mark a check dated

24   June 11, 2008, from Mr. Maggiacomo to Mr. Caramadre's

25   Law Offices as Government Exhibit 12.

1    THE COURT:  Right.  I'll note the Defendant's

2    objection and I'll take the exhibit, Exhibit 12.

3    When you finish this transaction, we'll probably

4    call it a day.

5    MR. McADAMS:  I have one more document that goes

6    with it.

7    THE COURT:  All right.  Then I'm going to want

8    to see counsel in chambers.

9    (Government Exhibit 12 admitted in full.)

10   **Q.**   So Mr. Caramadre, this is an example of a check

11   from Mr. Maggiacomo for $45,000 which he marked it as

12   rent, correct?

13   **A.**   Yes.  The law office is the major tenant, and

14   other people derived benefit from being in the office.

15   **Q.**   I'll just make it part of the same exhibit, this

16   check from Estate Planning Resources, which is your

17   company in the same office, correct?

18   **A.**   Yes.  Estate Planning Resources is one of my

19   corporations.

20   **Q.**   To Chapel Associates, which is your landlord,

21   right?

22   **A.**   Right.

23   **Q.**   For rent in that same period.  That's $12,650 or

24   38, something like that.

25   **A.**   Whatever it says.

1  **Q.**   So your rent in the same period is roughly a third

2  of the amount of money that Mr. Maggiacomo gave you and

3  called it rent, right?

4  **A.**   Well, that's not correct.  When Mr. Maggiacomo

5  pays rents to me, he's paying for overhead, very

6  expensive overhead of staff, legal attorneys that work

7  for me, my time and other overhead factors.  You want

8  to write one monthly rent check, you haven't looked at

9  the phone bill, you haven't looked at the Workers' Comp

10  bill for the people who serve Mr. Maggiacomo.

11  **Q.**   So it's your position you didn't receive

12  commissions from Mr. Maggiacomo after Lifemark asked

13  about it?

14  **A.**   After we agreed, I told him pay me rent and it was

15  perfectly fine.

16        MR. McADAMS:  We can break now.

17        THE COURT:  All right.  I think we'll stop the

18  testimony here for now and we'll continue this hearing

19  on a date that I'm going to work out with counsel

20  upstairs in a few minutes.  And so we'll recess for the

21  day and I'm also going to ask Mr. Gerstein to please be

22  kind enough to come and join us for a few minutes.

23        All right.  We'll be in recess.

24        (Court concluded at 4 :30 p.m.)

25

<u>C E R T I F I C A T I O N</u>

       I, Anne M. Clayton, RPR, do hereby certify that the foregoing pages are a true and accurate transcription of my stenographic notes in the above-entitled case.

/s/ Anne M. Clayton

_____

Anne M. Clayton, RPR

May 2, 2013

_____

Date