IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND


```
* * * * * * * * * * * * *   CRIMINAL ACTION
UNITED STATES OF AMERICA  *   11-186-S
                          *
VS.                       *   JUNE 18, 2013
                          *
JOSEPH CARAMADRE          *
                          *   PROVIDENCE, RI
* * * * * * * * * * * * *
```

HEARD BEFORE THE HONORABLE WILLIAM E. SMITH

DISTRICT JUDGE

(Motion to Reconsider Order of Detention and Motion to
Continue Sentencing )

**APPEARANCES**:

FOR THE GOVERNMENT:          JOHN P. McADAMS, AUSA
                             and LEE VILKER, AUSA
                             U.S. Attorney's Office
                             50 Kennedy Plaza
                             Providence, RI  02903


FOR THE DEFENDANT
Joseph Caramadre:            RANDY OLEN, ESQ.
                             Olen Law Office
                             55 Bradford Street
                             Suite 203
                             Providence, RI  02903

                             WILLIAM J. MURPHY, ESQ.
                             Murphy & Fay, LLP
                             127 Dorrance Street
                             2nd Floor
                             Providence, RI  02903

Court Reporter:              Anne M. Clayton, RPR
                             One Exchange Terrace
                             Providence, RI  02903

Proceeding reported and produced by computer-aided
stenography

<u>I N D E X</u>

<u>WITNESS</u>                                           <u>PAGE</u>

JAMES GREER

  Direct Examination by Mr. Olen:              4
  Cross-Examination by Mr. McAdams:            9

JOSEPH CARAMADRE

  Direct Examination by Mr. Olen:              16
  Cross-Examination by Mr. McAdams:            17

<u>GOVERNMENT EXHIBITS</u>

1     -                                          18

<u>DEFENDANT'S EXHIBITS</u>

A     -                                          21
B     -                                          21

               _____

1   18 JUNE 2013 -- 3:45 P.M.

2           THE COURT:  Good afternoon.  We're here in the

3   matter of the United States versus Joseph Caramadre.

4   We're here on Defendant's motion to reconsider the

5   order of detention as well as I'm going to hear from

6   counsel with respect to the motion to continue the

7   sentencing date.

8           So let's begin by having counsel identify

9   themselves for the record, please.

10          MR. McADAMS:  Good afternoon, your Honor.  John

11  McAdams and Lee Vilker on behalf of the United States.

12          MR. OLEN:  Good afternoon, your Honor.  Randy

13  Olen for Mr. Caramadre.

14          MR. MURPHY:  Good afternoon.  Attorney William

15  Murphy on behalf of Mr. Caramadre.

16          THE COURT:  Thank you very much.

17          Okay.  Let's begin with the motion to reconsider

18  the order of detention.

19          MR. OLEN:  Judge, I have Dr. Zlotnick and

20  Dr. Greer available for some brief questioning, if I

21  may.

22          THE COURT:  You've submitted some affidavits,

23  right?

24          MR. OLEN:  I did, Judge.

25          THE COURT:  So is there anything that's going to

1    be added to the affidavits?  I didn't know you were

2    intending to put on evidence.

3         MR. OLEN:  Certainly on the part of Dr. Greer,

4    Judge, I think his testimony will only be a couple of

5    minutes, but I think it will assist the Court.

6         THE COURT:  All right.  Go ahead.

7         **JAMES GREER**, first having been duly sworn,

8    testified as follows:

9         THE CLERK:  Please state your name and spell

10   your last name for the record.

11        THE WITNESS:  James Edward Greer, G-R-E-E-R.

12        THE COURT:  Good afternoon, Dr. Greer.

13        THE WITNESS:  Good afternoon, your Honor.

14        THE COURT:  Go ahead.

15        MR. OLEN:  Thank you, your Honor.

16          **DIRECT EXAMINATION BY MR. OLEN**

17   **Q.**   Dr. Greer, thank you for coming in.  I know you

18   appeared previously in these proceedings.

19        Could you just remind us of your field and where

20   you practice.

21   **A.**   Yes.  I'm a psychiatrist.  I practice at the

22   Providence Center, as well as being a consultant at the

23   Adult Correctional Institutions, and I also consult for

24   a couple of other social service agencies.  I am also

25   clinical assistant professor of psychiatry at the

1    Albert Medical School at Brown University.

2    **Q.**    Okay.  And you recently performed an evaluation of

3    Mr. Caramadre?

4    **A.**    Yes, I did.

5    **Q.**    For the purpose of this hearing?

6    **A.**    At the Wyatt facility.

7    **Q.**    Okay.  And you submitted a report entitled

8    "Psychiatric Evaluation of Joseph Caramadre"?

9    **A.**    Yes, I did.

10   **Q.**    Dr. Greer, your report indicates that the purpose

11   of the report is specifically with reference to

12   potential suicidal ideation, intent or behavior.  Those

13   are three different concepts.  Can you distinguish them

14   and tell me how that factors into the --

15   **A.**    Yes.  Suicidal ideation simply refers to a person

16   experiencing a thought of taking their own life.  Not

17   an uncommon phenomenon and throughout lifetime probably

18   reaching at least 50 percent of the general population.

19   Forming an intention to take one's own life is a very

20   different thing; and then if one forms an intention,

21   whether or not one develops a plan with which to do so.

22   And then of course, we consider whether or not they

23   have the means to carry out the plan.  And then

24   finally, behavior.  In other words, someone who has

25   actively engaged in a behavior with the specifically

1    stated intent of taking their own life, irrespective of

2    the degree of potential lethality of that behavior.

3    **Q.**   Okay.  Now, with respect to this evaluation, are

4    you experienced in this kind of an assessment?

5    **A.**   Yes, I am.

6    **Q.**   Can you tell us how?

7    **A.**   For the past 22 years, I have worked at the ACI

8    with the specific role of doing risk assessment around

9    safety for dangerousness to self or others with mostly

10   newly committed inmates as well as other inmates

11   identified as possibly having those issues within the

12   ACI.

13   **Q.**   And did you say how long you've been doing that?

14   **A.**   For 22 years.

15   **Q.**   Do you know, can you approximate how many times

16   you've conducted this type of assessment?

17   **A.**   I would say it would have to be in the thousands.

18   **Q.**   Can you discuss just generally the procedures that

19   you use when you do this.

20   **A.**   Typically, an inmate, either at the intake

21   facility or at the women's facility, would be referred

22   to me by the counseling staff, by the correctional

23   staff or administratively because they had been

24   identified as being at potential risk of possibly being

25   dangerous to self or others and by using certain

1    screening tools that they have in place.

2         Once they have been identified as having

3    potential risk for any potential risk factor, they're

4    then referred to me for psychiatric assessment where I

5    will review the information with them, meet with the

6    inmate and evaluate them and make a determination as to

7    whether they, in fact, rise to that level of

8    dangerousness; and if so, then direct them to

9    appropriate levels of supervision and monitoring so

10   that that won't occur.

11   **Q.**   Can you describe the procedure that you used with

12   respect to Mr. Caramadre?

13   **A.**   Yes.  I met with Mr. Caramadre.  I had already met

14   with him before, as you know, and had assessed him.  He

15   had made a statement when I had first evaluated him

16   that he had experienced thoughts of taking his own life

17   at the time of his initial trial.  And so I spoke with

18   him about -- I had spoken with him about that issue in

19   my first evaluation and had not found any evidence of

20   current suicidal ideation.  Certainly no history of

21   intention and no history of any such behavior.

22        And so I reviewed the same findings with him.

23   And certainly he reported that he was experiencing

24   depression as a result of his circumstances and also

25   because of his chronic depression.  He had been

1  receiving his prescribed medication.  Once he started

2  receiving his medication, his depression improved to

3  some degree although it was still very much active and

4  present.  He was not experiencing suicidal ideation.

5  He denied any intention of self-harm, denied any plans

6  of doing so and at no time ever had, in fact, intended

7  to.

8       We also reviewed potential reasons why he would

9  not pursue such a course of action, and he provided

10  reasons, which included his stated deep religious

11  faith, as well as his strong connections towards his

12  family and the wish not to inflict such a painful

13  experience upon them.

14  **Q.**   Dr. Greer, your evaluation concludes that

15  Mr. Caramadre does not present an acute risk of

16  suicidal behavior.  Can you elaborate on what that

17  means, "acute risk"?

18  **A.**   Yes.  In other words, certainly at the day and

19  time and surrounding when I met with him, there was no

20  evidence that he was at such risk.  The risk factors

21  that he carries, which include a history of depression

22  as well as having made a statement of suicidal ideation

23  will be risks 25 years from now, whether or not they

24  ever occur again and would, I guess, raise a red flag

25  you might say for someone to require such an

1    evaluation.  But at least right now I don't see that as

2    being a significant risk.

3    **Q.**  Can you say that -- you've said in your evaluation

4    to a reasonable degree of scientific certainty.  What's

5    your confidence level that he is not a risk of suicide?

6    **A.**  My confidence level is very, very high based on my

7    experience working with other people who have been in

8    similar circumstances and who have had similar risk

9    factors.

10        MR. OLEN:  Okay.  Thank you, Doctor.  That's

11    all.

12        THE COURT:  Mr. McAdams.

13        MR. McADAMS:  Briefly, your Honor.

14        **<u>CROSS-EXAMINATION BY MR. McADAMS</u>**

15    **Q.**  Good afternoon, Dr. Greer.

16    **A.**  Good afternoon.

17    **Q.**  I'm John McAdams.  We met before.

18    **A.**  Yes, I recall.

19    **Q.**  Dr. Greer, you were retained by Mr. Olen --

20    **A.**  That's correct.

21    **Q.**  -- for this evaluation?  How many times have you

22    worked with Mr. Olen to testify on behalf of his

23    clients?

24    **A.**  On behalf of his clients?  And this client I

25    believe there was one client previously.  Although that

1    might have been, if it was, it was years ago.  I'm not

2    a regular -- I'm not on retainer.

3    **Q.**    But you were paid for your services?

4    **A.**    Yes.

5    **Q.**    And you were paid to evaluate Mr. Caramadre?

6    **A.**    Yes.

7    **Q.**    Okay.  Now, you indicated that your evaluation of

8    him was based on many of the things that he

9    self-reported to you; is that correct?

10   **A.**    Yes.

11   **Q.**    You wrote in your affidavit some of the things

12   that he stated to you?

13   **A.**    Yes.

14   **Q.**    Okay.  And you wrote that he told you that it was

15   his belief that the Judge had ordered him to be held

16   out of fear that he might commit suicide or might

17   otherwise arrange his own demise at the hands of

18   another; is that correct?

19   **A.**    Yes.

20   **Q.**    That's what Mr. Caramadre told you?

21   **A.**    Yes.

22   **Q.**    So it was his belief that the reason he's being

23   held is because the Judge worried that he might commit

24   suicide?

25   **A.**    Yes.  That's correct.  That's what he told me.

1  **Q.**   And so you asked him a series of questions to

2  determine whether or not he was suicidal?

3  **A.**   Yes.

4  **Q.**   And he answered those questions?

5  **A.**   Yes.

6  **Q.**   Okay.  And your opinion is based largely, if not

7  entirely, on what he told you in response to those

8  questions?

9  **A.**   Not entirely.  It's based on certainly his

10  responses to the question.  And "largely" may be a fair

11  term, but also on observing him, observing his mood,

12  his affect, the way that he expresses his mood

13  comparing him to the way that he had presented at the

14  other times that I had met him.  I didn't see any

15  evidence in terms of observing him, not only the words

16  that he said but his emotional state, that suggested to

17  me that he was at higher risk.

18  **Q.**   So you ultimately determined that he is not

19  presently an acute risk?

20  **A.**   Yes, that's right.

21  **Q.**   What exactly does that mean?

22  **A.**   That means, in other words, that I don't think

23  that right now at the point in time when I saw him that

24  he was at risk, that he was at acute risk, in other

25  words, of imminent danger of harming himself or anybody

1    else.  Obviously, over time circumstances can change in

2    any person's life.  And then if there were reason to

3    believe that a person was at such risk, then a new

4    assessment might be necessary.

5    **Q.**    It's a very temporal diagnosis?

6    **A.**    It is temporal, yes, because certainly we can't

7    predict the future, what circumstances might lead a

8    person to make a choice like that.

9    **Q.**    So you have no way of knowing for certain whether

10   or not he might feel differently in the future?

11   **A.**    About any person I could not be that certain about

12   what they might do if they faced different

13   circumstances in the future, including Mr. Caramadre.

14   **Q.**    But you also said, and I don't remember your exact

15   words, but you indicated that he does have some risk

16   factors and that in 25 years he'll still have some risk

17   factors?

18   **A.**    Yes.  They will always be there simply because

19   they have occurred.  He at one point in his life made a

20   suicidal statement, and he has a history of treatment

21   for a very severe depressive disorder.

22   **Q.**    And you also indicated that I believe that one of

23   the factors in assessing the risk of a person for

24   committing suicide is, first of all, whether they've

25   expressed suicide ideation?

1    **A.**   Yes.

2    **Q.**   And Mr. Caramadre has expressed suicidal ideation

3    in the past?

4    **A.**   Yes.

5    **Q.**   Did you review the notes of Dr. Xavier that

6    reflected that suicidal ideation?

7    **A.**   I don't believe that I -- not on this occasion, I

8    did not.  I believe I previously reviewed those when I

9    initially evaluated him.

10   **Q.**   Did you ever speak to Dr. Xavier regarding --

11   **A.**   No.

12   **Q.**   You never spoke to her at all?

13   **A.**   No.  Not about that issue, no.

14   **Q.**   So you didn't seek out her opinion on the

15   potential risk that Mr. --

16   **A.**   No.  I reviewed the records, but I didn't speak

17   with her personally.

18   **Q.**   And one of the other risk factors that you

19   indicated was if a person expresses or formulates a

20   plan for how they might go about committing suicide?

21   **A.**   Yes.

22   **Q.**   That increases the risk?

23   **A.**   Yes.  If someone has developed a plan, then that

24   is another risk factor.

25   **Q.**   So if there's any type of concrete thought

1    formation as to how they would go about committing

2    suicide, a person is at a higher risk than somebody who

3    just says, you know, "I wish I were dead," or something

4    to that effect?

5    **A.**    Yes.

6    **Q.**    And Mr. Caramadre, in fact, did express some

7    specific statements as to how he would kill himself,

8    did he not?

9    **A.**    He did.

10   **Q.**    He said that he would go and have somebody else,

11   either hire somebody or get a third party to kill him,

12   correct?

13   **A.**    Right.  My understanding was that somehow that

14   might in his mind avoid committing mortal sin.

15   **Q.**    He believed that somehow he would avoid moral

16   accountability for suicide if he were to instead hire

17   somebody to commit first degree murder?

18   **A.**    That was his speculative reason for it.  And

19   again, when we're assessing such things, we also try to

20   assess whether or not someone has the means to carry it

21   out.  I don't know anything about his connection of the

22   people who would be able to do such a thing.

23   **Q.**    So you don't know whether he could find a willing

24   third party to kill him?

25   **A.**    I don't know.

1    **Q.**   Do you have any views as to whether that's a

2    rational thought, to have a third party commit first

3    degree murder?

4    **A.**   Well, I don't think that it is out of touch with

5    reality.  I wouldn't say that it's a very adaptive

6    strategy to do something, but I suppose you could say

7    is a rational thought particularly if you're trying to

8    avoid divine consequence.  I can understand the

9    rationale.  I might not agree with it.

10           MR. McADAMS:  One moment, your Honor.

11           No further questions.  Thank you.

12           THE COURT:  Thank you.  Do you have any

13   follow-up, Mr. Olen?

14           MR. OLEN:  Nothing further, your Honor.

15           THE COURT:  Thank you, Dr. Greer.  You may step

16   down.

17           MR. OLEN:  Judge, I would like to ask a few

18   questions of Mr. Caramadre regarding this particular

19   issue.

20           THE COURT:  All right.

21           **JOSEPH CARAMADRE**, first having been duly sworn,

22   testified as follows:

23           THE WITNESS:  Joseph Caramadre,

24   C-A-R-A-M-A-D-R-E.

25           THE COURT:  Good afternoon, Mr. Caramadre.

1    THE WITNESS:  Good afternoon, your Honor.

2    **DIRECT EXAMINATION BY MR. OLEN**

3  **Q.**   Mr. Caramadre, I want to ask you just a few

4  questions about this particular incident of suicidal

5  ideation.

6  **A.**   Yes.

7  **Q.**   Do you recall telling Dr. Xavier that you had some

8  type of suicidal ideation?

9  **A.**   Sure.  I remember telling her that things were

10  going very bad, I wish I were dead.

11  **Q.**   Do you remember when?

12  **A.**   In December or late November.

13  **Q.**   So it was shortly after you pleaded?

14  **A.**   Yes.  That's correct.

15  **Q.**   Okay.  And what did you say to her?

16  **A.**   What was that, please?

17  **Q.**   What did you say to her, exactly?

18  **A.**   Just that I'm feeling terrible about the guilty

19  plea and that I can't live with myself pleaing guilty

20  to something I don't believe I did.  And she adjusted

21  the medication.  It required no appointment, and

22  everything at least on her end was fine.

23  **Q.**   Did you ever think specifically or make any

24  specific plan to bring about your demise or to

25  otherwise hurt yourself?

1  **A.**   No.  Not at all.  And as a matter of fact, that

2  came up really in jest at a meeting amongst members of

3  the Men of St. Joseph's where we were talking out loud

4  about life and death.  So no, I've never made any

5  plans, never even thought of it.

6  **Q.**   Did you at any time contemplate hiring a hit man

7  to perform that task?

8  **A.**   No, not at all.

9  **Q.**   Other than that incident, have you ever had even

10  suicidal ideation?

11  **A.**   No, I've never had it.

12  **Q.**   Can you describe your mental health to us now?

13  **A.**   Well, I suffer from severe depression, but I have

14  for 20 years.  And I take multiple medications, and I

15  get through the day.

16  **Q.**   You're incarcerated at the moment.  What are you

17  thinking about the future right now?

18  **A.**   I'm thinking about very hopeful things.  I'm

19  delighted to see my family in person, and I'm thinking

20  about what I need to do to get on in life.

21       MR. OLEN:  Thank you, your Honor.  That's all.

22       THE COURT:  Thank you.

23       Mr. McAdams.

24       <u>**CROSS-EXAMINATION BY MR. McADAMS**</u>

25  **Q.**  Good afternoon, Mr. Caramadre.

1    **A.**    Good afternoon.

2    **Q.**    Mr. Caramadre, you understand that the Court is

3    considering your request to be released from prison

4    pending your sentencing?

5    **A.**    That is correct.

6    **Q.**    And you believe that if you convince the Court

7    that you're not suicidal, then you are more likely to

8    be released?

9    **A.**    I believe that if I am not suicidal, that there

10   would be no reason to hold me.

11   **Q.**    Now, you just testified that your statement at the

12   Men of St. Joseph's meeting was in jest?

13   **A.**    Pretty much.  It was at the end of a meeting when

14   people were leaving, yes.

15          MR. McADAMS:  Your Honor, I'd like to just mark

16   as Government Exhibit 1 for this hearing an e-mail

17   Mr. Caramadre sent.

18          If there's no objection, I'd move it into

19   evidence at this hearing.

20          THE COURT:  All right.  We'll take that as

21   Government's 1 without objection.

22          (Government Exhibit 1 admitted in full.)

23   **Q.**    Mr. Caramadre, do you recognize this document?

24   **A.**    Yes.

25   **Q.**    Is this an e-mail you sent to Mr. Lepizzera and

1    the Men of St. Joseph's, so to speak?

2    **A.**    Um-hum.  Yes.

3    **Q.**    And in this e-mail, you stated that you've spoken

4    with the doctor and concurred that the interaction of

5    newly prescribed drugs combined with the discontinuance

6    of other prescriptions can cause irrationality.  We

7    have adjusted the delicate drug regimen in the hopes of

8    reducing ideations which are not based on healthy,

9    clear thoughts.  Nonetheless, your care and love both

10   collectively and individually has further reinforced my

11   belief that God exists and has you gentlemen as His

12   witnesses.

13        And in the first paragraph, which I skipped

14   over, you write in part that you feel better, just

15   making a promise to all of you that I will not take any

16   action to leave this place any time sooner than God

17   planned.

18        Is that the e-mail that you wrote to them?

19   **A.**    That's correct.

20   **Q.**    You didn't write anything about sorry about that

21   bad joke that didn't go over last night?

22   **A.**    No.  Because I wrote this to four or five

23   individuals who were gathered by Mike Lepizzera at the

24   meeting because Mike never heard the comments.  It was

25   just reported him.  So he reacted to it.  So I just

1    made a promise that I'm not going to hurt myself.

2    **Q.**    Mr. Lepizzera and others were concerned about you.

3    And out of care and concern they spoke to you, and this

4    is a response, thank you essentially, from you; is that

5    fair to say?

6    **A.**    Yeah.  It's a response to thank my fellow brothers

7    for stepping up and caring about me.  But I was fine

8    then and I just wanted to give them peace of mind that

9    I promised to them that I won't do anything.

10            MR. McADAMS:  No further questions.  Thank you.

11            THE COURT:  Any redirect, Mr. Olen?

12            MR. OLEN:  No, your Honor.  Thank you.

13            THE COURT:  All right.  Thank you.

14            Mr. Caramadre, you may step down.

15            THE WITNESS:  Thank you, your Honor.

16            THE COURT:  Anything further, Mr. Olen?

17            MR. OLEN:  Yes.  May I be heard?

18            THE COURT:  Do you have any more evidence?

19            MR. OLEN:  No, I do not.

20            THE COURT:  All right.  Then I'll hear your

21    argument.

22            MR. OLEN:  I would, your Honor, ask to mark

23    Dr. Zlotnick's affidavit as Exhibit A for this hearing

24    and Dr. Greer's as Exhibit B.  I'd ask that they be

25    moved into evidence, please.

1          THE COURT:  Those will be made part of the

2     record, A and B.

3          (Defendant's Exhibits A and B admitted in full.)

4          MR. OLEN:  Thank you, Judge.

5          Your Honor, with respect to the flight risk

6     aspect of the analysis, Mr. Caramadre is 53 years old.

7     He's a life-long resident of Rhode Island with deep,

8     deep roots in our state.  He graduated from Cranston

9     West High School, University of Rhode Island and

10    Suffolk Law School.  He has no previous criminal

11    record, no defaults.  He's been married for over 20

12    years.  He has three children, age 19, 17 and 13, who

13    are in college, high school and St. Andrews

14    respectively.  He has five siblings in Rhode Island,

15    numerous extended family members.  He has elderly

16    parents who are ill and whom he supports both

17    financially and serves as a caregiver to.

18         He owns his own home.  His in-laws live in that

19    home.  He's built a special place in the home, an

20    addition to the home for them to live.  He is deeply,

21    as you know, involved in charitable activities and with

22    his church.

23         He is when at liberty before being taken into

24    custody, he's involved in food kitchens.  He teaches

25    Catechism.  He goes to Mass on a daily basis.  He

1       surrendered his passport, Judge.

2               With respect to any danger that he presents to

3       the community, both doctors through affidavit and

4       testimony, your Honor, have indicated that he's not in

5       the least suicidal.  As Dr. Greer said, probably 50

6       percent of the population has had suicidal ideation.

7       And that's important because on only one occasion did

8       he ever make a comment to Dr. Xavier that he had a

9       suicidal ideation.  Nothing beyond that.  Never thought

10      about doing it.  Never seriously considered, never got

11      beyond the ideation stage that many of us have thought.

12              If we committed everyone who had suicidal

13      ideation, had the thought of suicide pass our minds in

14      the worst of our times, then there wouldn't be room to

15      put us all, your Honor.

16              The idea that he would seriously think about

17      hiring a hit man to accomplish this task is nothing

18      short of ludicrous.  The doctors at Wyatt, when he went

19      to Wyatt, did their own analysis and have cleared him

20      of any type of risk of harm to himself.

21              He is no longer involved in the activities that

22      resulted in the initiation of the prosecution.

23      Consideration of the factors of flight risk and danger

24      to the community, your Honor, it would be utterly

25      specious to suggest that this man presents any flight

1    risk or any danger to the community.  His involvement

2    with his family, with his church and with his community

3    are remarkable, remarkably extensive.

4         Does anyone really believe that Mr. Caramadre

5    would leave his family and his elderly parents and his

6    young children to flee the jurisdiction?  That's

7    utterly absurd.

8         Since he was indicted in 2011, Judge, he has

9    complied with every condition of release.  When he

10   pleaded in November of 2012, we filed a motion to

11   withdraw the plea in February of 2013.  Those three

12   months he was in the same position he's in now.  He

13   knew that he was going to go to jail, he knew that he

14   was at risk of going to jail and he did nothing to

15   violate or hint at violating any terms of his release.

16        Judge, your decision, the Court's decision at

17   the time of the denial of the motion to withdraw the

18   plea and when he was taken into custody noted that

19   normally the Court would not require that he be taken

20   into custody and that it wasn't meant as a punitive

21   gesture but rather as a protective one and that out of

22   an abundance of caution that the Court wished that it

23   didn't have to do that.

24        Well, given the fact that there's not even a

25   hint that Mr. Caramadre presents a flight risk or

1  danger to the community and that the Court's decision

2  was based at that --

3       THE COURT:  Let me ask you a question.  Did Joe

4  Mollicone present a flight risk?

5       MR. OLEN:  Judge, I'm unfamiliar.  That's a

6  little before my time in Rhode Island.  I'm unfamiliar

7  with that case.

8       THE COURT:  Okay.

9       MR. OLEN:  Given the fact that the Court's

10 decision was based at that time at least almost

11 entirely on this concern for his suicidal ideation,

12 given the testimony from the doctors today, that issue

13 should be completely resolved in the Court's mind.

14      His sudden incarceration has worked a hardship

15 on his family.  As I said, he knows he's going to be

16 serving a prison sentence.  He's already ministering at

17 the prison, your Honor.  When I spoke with him to

18 assess my own understanding of his condition, he told

19 me that he thinks maybe this was meant -- maybe this

20 was God's will, and he's working to assist people

21 already in the facility.

22      He knows he's going to be serving a sentence,

23 your Honor.  I ask the Court to give him the

24 opportunity pending sentencing to get his affairs in

25 order.

1          I'd also say, respectfully, you have said from

2     the very instant that I got involved in this case that

3     this is not a run-of-the-mill case.  Far from it.  The

4     sentencing issues in this case are complex, and I am at

5     a loss to really address the sentencing concerns

6     without his assistance.  The Government has stated in

7     their memo that Mr. Caramadre refuses to fill out the

8     financial affidavit.  Well, that's not the case.  I've

9     been with him at the prison trying to do that.  His CPA

10     doesn't run his business.  He does.  Judge, he really

11     needs access to -- and I need his assistance in

12     preparing for sentencing.

13          THE COURT:  In some ways the sentencing aspects

14     of this case are not very complicated at all.  The

15     Government makes a point in its papers the loss numbers

16     drive the guideline range literally off the chart to a

17     point where the chart doesn't go.  But that's all

18     pretty much beside the point because the plea agreement

19     caps the sentence at ten years.  It's a binding plea

20     agreement.  I've accepted it.  So there's really

21     nothing complex about the incarceration side of the

22     sentence.

23          Now, I will say, and, you know, this sort of

24     segues into your other motion for a continuance of the

25     sentencing.  Potentially, the restitution aspects of

1    the sentence may present some complexity, but I'm not

2    positive about that.  So you can address that, if you

3    want.

4         MR. OLEN:  Judge, I've addressed it to the best

5    of my ability, which is extremely limited at this point

6    in time.

7         First of all, your Honor, the original plea was

8    November 19th, as you know, 2012.  At that time, the

9    sentencing was scheduled for February and it was a

10   tentative date.  Nobody expected that date to hold.  So

11   there was a minimum of three months, and probably four

12   or five months in which the parties were going to be

13   able to prepare for sentencing.

14        I entered this case in January and I have not,

15   as an attorney to assist in his motion to withdraw his

16   guilty plea, I have not had the occasion or the

17   opportunity to deal with sentencing issues before the

18   May 20th denial of the motion, your Honor.

19        First of all, there would be no reason to if the

20   motion were granted; but more importantly, Judge, I

21   just have not had the time and the ability to do that.

22   It's been not even four weeks since the decision.

23   These issues are complex.  And I've said since Day One,

24   Judge, as did his former attorneys, that they need an

25   expert to figure out these losses, if they are losses,

1    to figure out what they are.  The Government has Mr. or

2    Dr. Kalotay.  They've gotten their expert to provide

3    their side of the story.  These are very complex

4    issues, Judge.

5         THE COURT:  It's the Defendant's choice to go

6    down this ill-advised road of trying to withdraw the

7    plea, which his attorneys advised him strenuously

8    against and which was all but -- and maybe it was a

9    frivolous motion to begin with as I've ruled.  That's

10   the Defendant's choice.  He wants to spend his time,

11   you want to spend your time, four, five months on a

12   frivolous motion to withdraw the plea as opposed to

13   dealing with the reality of this case, which is that he

14   pled guilty and he's going to be sentenced and he's got

15   to deal with the presentence report, that's a choice

16   the Defendant has made.

17        MR. OLEN:  Your Honor, respectfully, in your

18   decision you said that it was not frivolous but it was

19   without merit, and I most respectfully disagree.  I

20   think there was merit and I think there is merit to

21   that motion.

22        In any event, Judge, I'd conclude with respect

23   to the incarceration, he's not a flight risk.  He's not

24   a danger to the community.  He's not at risk of

25   suicide.  I ask the Court to release him on whatever

1    conditions the Court deems appropriate, whether it's

2    electronic monitoring or daily reporting, but I ask the

3    Court to allow him pending sentencing to be released.

4          With respect to the motion for a continuance,

5    Judge, I can tell you that I am not interested -- and I

6    know the Government sees some sinister meaning behind

7    everything Mr. Caramadre does.  I can tell you that I

8    have no interest in being dilatory or to avoid the

9    responsibility to help Mr. Caramadre.  I just want to

10   do the best job I can on his sentencing.  We've

11   retained the services of Mr. Murphy to try and assist

12   in getting this done as quickly and as thoroughly as

13   possible.  My objections to the presentence report

14   would be due in two days, Judge.  In all fairness, it

15   just has not been enough time.

16         I'm not looking to delay anything.  I'm

17   requesting 45 more days.  I've spoken with an expert,

18   I'm waiting to hear back, who said she can accomplish

19   this in that period of time.  I'm asking for that much

20   time to properly prepare for this.

21         THE COURT:  Explain to me what this expert is

22   going to be doing.

23         MR. OLEN:  Judge, each one of the investments --

24   again, that's why we're getting an expert because I'm

25   not a mathematician.  I don't have a head for this kind

1    of stuff.  It's clearly something that a forensic

2    accountant needs to get involved in, an expert.  And I

3    believe what she's going to do is look at every one of

4    these transactions, see whether or not money was really

5    lost.  For example, this much I can get my mind around,

6    Judge, and the Government I think has tacitly conceded

7    it in their memo when they say even if we back out $12

8    million that he made on the bonds, Mr. Caramadre bought

9    those bonds on a secondary market.  So when those bonds

10   were purchased say for $100 a bond and Mr. Caramadre

11   bought it on the secondary market for $50 and when the

12   death benefit was paid out, they paid $100.  Well, they

13   paid back what was paid in.  So there's really no loss

14   there.  They're getting -- they got $100; they're

15   giving $100 back.

16        So I think -- and that's about as far as my

17   sophistication goes with respect to these issues, which

18   is why we really need an expert, but it's an example of

19   arguments or analyses that will be made by the expert.

20        THE COURT:  Okay.  Thank you.

21        MR. OLEN:  Thank you.

22        MR. McADAMS:  Your Honor, the Government opposes

23   Mr. Caramadre's motion.  The statute governing bail

24   pending sentencing is 18 U.S.C. 3143.  That statute

25   requires the Court to order a defendant who has been

1    found guilty of an offense and is awaiting imposition

2    of sentence to be detained unless the Court finds by

3    clear and convincing evidence that the defendant is

4    neither likely to flee nor pose a danger to the

5    community.  It is Mr. Caramadre's burden.  The

6    Government submits that he has failed his burden.

7         Your Honor, in **United States versus Abuhamra**,

8    which is a Second Circuit case but it's been cited in

9    First Circuit District Court opinions, the cite is 389

10   F.3d, 309, the Court stated that a defendant's liberty

11   interest pending sentencing must be weighed against the

12   Government's strong and obvious countervailing interest

13   in detaining defendants who have been found guilty

14   beyond a reasonable doubt of serious crimes.  Such

15   detention provides public safety by removing a

16   presumptively dangerous person from a community, and it

17   encourages general respect for the law by signaling

18   that a guilty person will not be able to avoid or delay

19   imposition and service of sentence prescribed by law.

20        Contrary to Mr. Olen's argument that it's

21   ridiculous to say that Mr. Caramadre is guilty because

22   he's been found guilty of white collar crimes and does

23   not have a violent past, the Supreme Court has stated

24   that by virtue of his criminal conviction there is a

25   presumption of dangerousness.  That's in **Jones versus**

1    **United States**, 463 U.S. 354.

2        Mr. Caramadre is a risk of flight.  Prior to the

3    Court's ruling on his motion to withdraw his guilty

4    plea, he was in some form of psychological state where

5    he believed he was going to avoid accountability for

6    this case.  During the brief period of time following

7    his guilty plea where he realized that he was going to

8    be held accountable, he was suicidal.  He contacted his

9    treating psychiatrist, Dr. Xavier, who had been his

10   treating psychiatrist for several years.  The defense

11   submitted an affidavit from her in support of its

12   motion to withdraw his guilty plea.  They didn't call

13   her to testify at this hearing today.  They didn't

14   submit an affidavit from her stating that she has some

15   other opinion at any point in time.  They didn't have

16   the person that they did hire to testify on

17   Mr. Caramadre's behalf talk to her.

18       They're asking you, frankly, to go out on a huge

19   limb with this very limited diagnosis from Dr. Greer

20   that at this exact moment in time that he feels

21   confident he's not a suicidal risk.  They're

22   simultaneously requesting more than a month for

23   Mr. Caramadre to be out to assist in his defense

24   pending sentencing.

25       And the Government has good reasons for our

1  skepticism of the way that Mr. Caramadre has approached

2  this.  Frankly, in virtually every move that he's made,

3  there has been some ulterior motive or some attempt to

4  avoid accountability or to delay even as recently as

5  filing the motion to continue sentencing I think it was

6  last night.  He is a defendant who has resources.  He

7  has not filed a financial affidavit.  Mr. Lepizzera was

8  trying to work with him on that back in November of

9  last year.  He still has not provided one to the

10  Probation Office.  He had significant resources.  How

11  much we don't know because he hasn't filed the

12  affidavit.  He apparently has an unlimited stream of

13  income to hire new attorneys as he keeps going through

14  them over and over and there doesn't seem to be an

15  issue there.

16      He earned millions of dollars through this

17  scheme.  Some money he has tied up in various accounts,

18  who knows where, but the bottom line is he's an

19  individual who has money.  And now that he knows based

20  on some of the statements that the Court has made and

21  the way his motion went, he knows he is going to spend

22  a significant amount of time in prison and he's had a

23  taste of it over the last few weeks, he has the

24  incentive to leave.

25      Mr. Olen argues that he wouldn't put his family

1    at risk.  He put his family at risk with this

2    ridiculous motion to withdraw his guilty plea.  He went

3    and threw away the opportunity that he had to have a

4    relatively lenient sentence in this case.  He had

5    Mr. Traini and Mr. Lepizzera working for him.  He had

6    all his history of good works, all of the type of

7    things that could have been put forth before the Court

8    to make a very convincing and compelling argument as to

9    why he ought to be treated leniently.  And he

10   demonstrated throughout that hearing what a farce a lot

11   of that is.  And he did that at the jeopardy of his own

12   family and his own children and their futures knowing

13   that he was throwing that way.

14        His own statement to the Court under oath was

15   he'd rather sit in jail for ten years.  So I think he

16   is somebody who is willing to put his family's best

17   interests at risk because he doesn't behave rationally.

18        So he is a risk of flight.  He is a danger to

19   the community.  There was testimony from Mr. Lepizzera

20   there was a very concrete statement that Mr. Caramadre

21   would seek to kill himself by having someone else do

22   it.  Does it sound crazy?  Yes, it sounds crazy.  But

23   are we supposed to just deny that he made those

24   statements?  Dr. Greer testified that that type of

25   concrete statement makes the risk higher.  It goes

1    without saying that that is a danger to the community,

2    even above and beyond Mr. Caramadre himself.  No one in

3    this case, including the Government, including the

4    attorneys for the Government want Mr. Caramadre to hurt

5    himself.  Our goal is to achieve justice in this case,

6    not for Mr. Caramadre to hurt himself.  But his

7    statements indicate that he very well may, that he may

8    put the community at jeopardy as well.

9        I don't want to sit here and articulate a

10   hypothetical parade of horribles that would happen if

11   somebody were to try to get someone else to kill

12   themselves.  He's demonstrated irrational behavior

13   throughout the course of this case.  He acts against

14   his own interest repeatedly.  He doesn't take advice

15   from people around him, and he goes forward and does

16   whatever he wants to do.  And the assessments that you

17   have are from medical professionals who are largely

18   basing their opinion on statements that he is making to

19   them.  And he has demonstrated a history of

20   manipulation and an ability to convincingly tell people

21   things that are not true.  So I think the Court should

22   have great pause in putting a lot of reliance on them.

23   And that's not to suggest that their opinions are not,

24   you know, based on their own professional experience,

25   but it's got to be a high degree of skepticism that he

1    won't do what he claims he won't do.

2         This argument that he can't assist counsel

3    really is just simply not accurate.  Every defendant

4    who is detained is given opportunities to consult with

5    their attorneys to prepare for sentencing.  As we

6    indicated --

7         THE COURT:  You would have to agree that the

8    restitution issues, the loss issues in this case are

9    going to be fairly complex, and it will be more

10   difficult for Mr. Caramadre if he's incarcerated to

11   work with an expert witness if he's at the Wyatt.  I

12   find it hard to imagine that it won't be more difficult

13   if that's the case.

14        MR. McADAMS:  It may be more difficult but that

15   doesn't necessarily mean that it's not possible to be

16   done.  And I think with respect to those loss issues

17   and the restitution issues, I do think that they could

18   be bifurcated, so to speak.  Because these arguments

19   that the defense is making regarding the loss amounts,

20   certainly the Government was not tacitly conceding

21   anything.  We're simply pointing out that even if they

22   got some expert to come in and testify that the bond

23   loss amount was zero, it wouldn't affect the guideline

24   range because the annuity amount is so large that

25   you're still in the same guideline range.

1    THE COURT:  That's true.  It won't affect the

2    guideline range, but this is something I wanted to ask

3    you about.  We have this situation in this case where

4    the issue of restitution in the criminal case is

5    actually a potentially dispositive, partially

6    dispositive as to the multiple civil cases that are

7    currently pending before me.  And so if I were to rule

8    in the context -- I think that's the case.  If I were

9    to rule in the context of restitution that all of these

10   monies were owed, it would effectively take up all of

11   the liability that's being claimed by the various

12   plaintiffs in the civil cases as to Mr. Caramadre and I

13   imagine to Estate Planning Resources and so forth.

14        You may not be that familiar with the civil

15   cases, but don't you think that's the case?

16        MR. McADAMS:  I don't have complete command of

17   the civil cases, your Honor.  I'm not sure to what

18   extent any of the litigants in the civil cases are not

19   claiming restitution in the criminal case.  I

20   understand the Court may have a different way of

21   allotting those in sort of the light of civil cases

22   than it would in the criminal cases.  I don't know

23   exactly where you would go on that.

24        I understand and recognize that that is a

25   challenge.  I do think the Court could have a

1    sentencing hearing, determine the guideline range, go

2    through the 3553 factors, and impose a sentence on

3    Mr. Caramadre and take up the specific restitution

4    order that the Court would order to victims in the

5    criminal case at a subsequent hearing.

6              THE COURT:  You think that's possible.

7              MR. McADAMS:  I think it is.  Obviously, I

8    haven't researched it or anything like that before, but

9    I think that there were some issues similar in

10   Mr. DeSimone's case where there were some restitution

11   orders that we had to deal with after the fact,

12   although I don't know exactly how similar they were.

13             THE COURT:  Let me ask you this.  You may not be

14   in a position to answer this, but there's a pretty

15   aggressive settlement process going on with respect to

16   the civil cases, but that process is pretty much on

17   hold with respect to Mr. Caramadre and the Estate

18   Planning Resources because of the criminal matter and,

19   obviously, his incarceration.  Often in criminal cases

20   the Government and the defendant end up agreeing to a

21   restitution amount.

22             Would it make sense for the Government and

23   Mr. Caramadre and perhaps what we'll call the victims

24   in the context of the criminal proceeding to be a part

25   of a negotiation to maybe arrive at some sort of agreed

1     to restitution?

2          MR. McADAMS:  Obviously, without consulting my

3     superiors I can't commit the Government, but I don't

4     see a problem with that from the Government's

5     perspective.  It's hard to imagine Mr. Caramadre if

6     he's going to say there's no loss, he's now not only

7     arguing bond numbers, which they've argued

8     historically, but now claiming that even the annuity

9     numbers aren't there, I don't if that is a realistic

10    possibility but I think from the Government's

11    perspective it probably is.  And to the extent that

12    we've had conversations with the victims that have

13    submitted restitution claims, I don't sense an enormous

14    amount of resistance from them on that side of things,

15    so we'd certainly be willing to explore that.

16          But in terms of the motion here, I think that

17    Mr. Caramadre, nonetheless, even though it may be more

18    complex than an ordinary case and even though it may

19    require additional time, he can do what he needs to do

20    from the Wyatt.  And I think that if the Court were to

21    release him, first of all, I don't know what conditions

22    could possibly assure that he won't do something that

23    would either result in him fleeing or being a danger to

24    the community.

25          The Court is familiar with many examples of

1  people who have fled or can do dangerous things after

2  being released.  And Mr. Caramadre, you know, I think

3  he's failed to meet his burden essentially.  He's an

4  individual who has a persecution complex, who has a

5  history of suicidal ideation, who has the incentive,

6  the ability to flee and who does not act in a way

7  that's in his best interest and does things, frankly,

8  that are ill-advised.  I don't think that the Court

9  should take that risk from Mr. Caramadre when in any

10  event he's looking at a very lengthy prison sentence.

11  And there's no way that the risk of him either

12  committing suicide or running or doing something that

13  hurts someone else is worth it in light of what he is

14  going to be sentenced to whether it's in six weeks or

15  in three weeks.

16          Thank you.

17          THE COURT:  Thank you, Mr. McAdams.

18          Well, my perspective on this motion is driven

19  largely by the reality that Mr. Caramadre does not

20  enjoy any credibility with me.  All of the statements

21  in the expert reports are based on self-reporting.  And

22  Mr. Caramadre, your testimony over the course of this

23  matter has -- you've testified -- I think this may be

24  the fourth time you've taken the stand, sworn to tell

25  the truth including when you entered your guilty plea,

1    including when you testified that you didn't have any

2    difficulty with Mr. Traini's conflicts, only later to

3    claim that his conflicts were part of the reason why

4    you lost trust in him and believed he breached his

5    obligation to you with respect to the plea.  Then you

6    testified at the plea hearing, and you swore to tell

7    the truth then.  Then you came back and tried to

8    withdraw your plea and got on the stand and under oath

9    you said you lied at the plea hearing.  I concluded

10   that you lied when you testified that you lied before.

11          Where that leaves you in terms of your

12   credibility in this Court is completely without any

13   credibility.  I don't know what to believe when you get

14   on the stand and testify because you've lied multiple

15   times and you have to live with that reality.

16          So maybe you're telling the truth to your

17   therapists and to the doctors and maybe you're telling

18   the truth here on the stand today, but I don't know

19   because you've gotten on the stand multiple times and

20   lied, and you've admitted that you've lied.  So you

21   just don't have any credibility with the Court and

22   that's the only way that I can view it in light of the

23   history.

24          Secondly, you have a very strong history of

25   manipulation.  The crime was a crime of manipulation.

1    The motion to withdraw the plea, and I believe, in

2    fact, the plea itself followed by the motion to

3    withdraw the plea was a manipulative act.  Like I said

4    from the bench when I denied it, I thought it was a

5    cynical and a gross attempt to manipulate the Court.

6           So I have no reason to believe that this

7    testimony in this motion and your efforts with the

8    providers is anything other than a continuation of that

9    manipulation.  It may be that it's all true what you're

10   saying but I just can't trust it.  That's the problem.

11   I can't trust what you're saying, and I can't trust

12   what you're trying to do here.  I have to balance that

13   against the risk.

14          I don't disagree with the statements that have

15   been made by your counsel that you have very strong

16   ties to the community and strong ties to your family.

17   And I think those things are true, and I do think

18   that -- and I would not attempt to take those away from

19   you.  I think those argue in your favor in terms of

20   assessing the likelihood that you would flee or that

21   you would do harm to yourself or someone in the

22   community.  But Mr. McAdams is correct.  You have taken

23   a number of steps in this case that have been

24   borderline irrational and against your self-interest.

25   The most blatant of which was filing this motion to

1    withdraw the plea, which has very much, I think, hurt

2    your situation.  And the risk is substantial because if

3    I was wrong in that assessment and released you and

4    then you did flee or you did hurt yourself or do

5    something that was against your interest, then a lot of

6    people would suffer because of that, and that's not

7    just focused on you but focused on your family and

8    others.

9         So the risk is substantial.  There certainly

10   have been examples of people who have had ties to the

11   community and who have fled in the face of a

12   substantial prison sentence.

13        So for all of those reasons and the reality that

14   you're facing a significant prison sentence, we're

15   going to move on to sentencing and you need to come to

16   grips with that, I'm going to deny the motion to

17   reconsider the order of detention.

18        Now, with respect to the motion for a

19   continuance as to the sentencing date, I do think, as

20   much as I think that the motion to withdraw the plea

21   was grossly ill-advised, I think the restitution issues

22   here, financial issues are sufficiently complex that

23   some more time should be allowed for sentencing.  And I

24   also think it would be useful to have the Government

25   and the defense consult and possibly blend that with

1    the mediation that's going on with respect to the civil

2    cases and see if a restitution amount could not be

3    agreed to.  It might not be possible.  If Mr. Caramadre

4    is claiming that there's no loss, for example, then it

5    might be very difficult to reconcile the difference

6    between whatever the amount is, 40 or $50 million or

7    zero, but I'm not sure that's what you're claiming.

8         So I'd like to give you both an opportunity to

9    adequately prepare on that issue and potentially to

10   have a negotiation or mediation with the Government to

11   try to figure out whether you can come to some sort of

12   an agreement.

13        So it seems to me the suggestion of I think you

14   requested 45 days, to the end of August, that seems to

15   be a reasonable suggestion, so I'll grant that motion.

16   And I'll ask counsel after you have some time to meet

17   with your experts to sit down with Judge Sullivan,

18   who's been overseeing the civil mediation process, and

19   see if maybe there's something that you all can work

20   toward in terms of an agreed to restitution.

21        MR. OLEN:  Judge, I don't know if you're aware,

22   there have been proposed dates at the end of August for

23   mediation.

24        THE COURT:  There are dates already set?

25        MR. OLEN:  Not yet set but they've been proposed

1   by the Judge and everyone has seemingly agreed to.

2   We're just waiting for an order.

3        THE COURT:  Should the sentencing be put off

4   past that date?

5        MR. OLEN:  I would ask that, Judge.  My 45 days

6   was from July 9th anyway.  That was my request.  With

7   him continuing to be detained, it is going to be a

8   very, very difficult task to have the forensic

9   accountant figure this all out.  So 45 days from July

10  9th would put us into the beginning of September.  I'd

11  ask that we do it after the dates of mediation.

12       THE COURT:  What are the dates that are proposed

13  for the mediation?

14       MR. OLEN:  I think the 26th and the 27th of

15  August.

16       THE COURT:  All right.  Why don't we look for a

17  date the second week of September then.  That will give

18  you enough time to work on that.

19       MR. OLEN:  Thank you, Judge.

20       THE COURT:  All right.  We'll set the sentencing

21  down for September 13th, at 9:30 a.m.

22       MR. McADAMS:  Your Honor, Mr. Radhakrishnan's

23  sentencing, are you going to be moving that as well to

24  the same date?  I think some of the restitution

25  issues --

1        THE COURT:  I think it makes sense to do them

2    together.  So let's do that.  And there are some other

3    things in play that could affect that date, but if it

4    does need to change we'll come up with a new date

5    around that range.  For now, count on that date.

6        MR. OLEN:  Could I have that again, your Honor,

7    please.

8        THE COURT:  September 13th at 9:30.

9        MR. OLEN:  Thank you.

10        THE COURT:  If there's nothing further, we'll be

11    in recess.

12        (Court concluded at 4:40 p.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

<u>C E R T I F I C A T I O N</u>

        I, Anne M. Clayton, RPR, do hereby certify that the foregoing pages are a true and accurate transcription of my stenographic notes in the above-entitled case.

/s/ Anne M. Clayton

_____

Anne M. Clayton, RPR

July 3, 2013

_____

Date