IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND


\* \* \* \* \* \* \* \* \* \* \* \* \*   CRIMINAL ACTION
UNITED STATES OF AMERICA   \*   11-186-S
                           \*
VS.                        \*   MAY 13, 2013
                           \*   **VOLUME II**
JOSEPH CARAMADRE           \*
                           \*   PROVIDENCE, RI
\* \* \* \* \* \* \* \* \* \* \* \* \*


HEARD BEFORE THE HONORABLE WILLIAM E. SMITH

DISTRICT JUDGE

(Motion to Withdraw Guilty Plea)


**APPEARANCES**:

FOR THE GOVERNMENT:          JOHN P. McADAMS, AUSA
                             and STEPHEN DAMBRUCH, AUSA
                             U.S. Attorney's Office
                             50 Kennedy Plaza
                             Providence, RI  02903

FOR THE DEFENDANT
Joseph Caramadre:            RANDY OLEN, ESQ.
                             Olen Law Office
                             55 Bradford Street
                             Suite 203
                             Providence, RI  02903

                             ROBERT D. WATT, JR., ESQ.
                             84 Ship Street
                             Providence, RI  02903

Court Reporter:              Anne M. Clayton, RPR
                             One Exchange Terrace
                             Providence, RI  02903


Proceeding reported and produced by computer-aided
stenography

<u>I N D E X</u>

| WITNESS | PAGE |
|---|---|
| JOSEPH CARAMADRE | |
| | |
| Redirect Examination by Mr. Watt: | 4 |
| Recross-Examination by Mr. McAdams: | 12 |
| | |
| MICHAEL LEPIZZERA | |
| | |
| Direct Examination by Mr. McAdams: | 14 |

<u>GOVERNMENT EXHIBITS</u>

| | | |
|---|---|---|
| 13 | - | 52 |
| 14 | - | 61 |
| 15 | - | 64 |
| 16 | - | 66 |
| 17 | - | 67 |
| 18 | - | 74 |
| 19 | - | 100 |
| 20 | - | 113 |
| 21 | - | 114 |
| 22 | - | 117 |
| 23 | - | 155 |
| 24 | - | 159 |
| 25 | - | 169 |
| 26 | - | 182 |
| 27 | - | 184 |

_____

1    13 MAY 2013 -- 9:30 A.M.

2              THE COURT:  All right.  Good morning.  This is

3    the matter of the United States versus Joseph

4    Caramadre.  We're here for continuation of the motion

5    for the Defendant to withdraw his plea.

6              Let's begin by having counsel identify

7    themselves for the record, please.

8              MR. McADAMS:  Good morning, your Honor.  John

9    McAdams and Lee Vilker on behalf of the United States.

10             MR. OLEN:  Good morning, your Honor.  Randy Olen

11   for Mr. Caramadre.

12             MR. WATT:  Robert Watt, co-counsel.

13             THE COURT:  Thank you.  I believe when we left

14   off Mr. Caramadre was still on the stand; is that

15   correct?

16             MR. WATT:  Yes.

17             MR. OLEN:  Yes, sir.

18             THE COURT:  Mr. Caramadre, would you please

19   return to the stand.

20   **JOSEPH CARAMADRE**, Resumes stand.

21             THE COURT:  Good morning, Mr. Caramadre.  Have a

22   seat.  You recall that you were sworn in at the last

23   hearing.  You're still under oath.

24             THE WITNESS:  Yes, your Honor.

25             THE COURT:  Okay.  Mr. McAdams?

1      MR. McADAMS:  Your Honor, the Government has no

2  additional cross-examination.  Thank you.

3      THE COURT:  Mr. Watt, redirect.

4      **REDIRECT EXAMINATION BY MR. WATT**

5  **Q.**  Mr. Caramadre, on questioning by Mr. McAdams at

6  our previous hearing, the issue of Raymour

7  Radhakrishnan and the term "holder in trustee" came up.

8  Could you explain to the Court in as simple language as

9  you can what that holder in trustee concept is?

10 **A.**  Yes.  A holder in trustee is when one party gives

11 money to another party for the purpose of the second

12 party investing it on behalf of the first party.  In

13 order to perfect or make it absolutely legal, they must

14 use checks that go through the Federal Reserve banking

15 system, and all tax reporting must be done in the year

16 of the transactions to return to the first party.

17      So a holder in trustee is someone who is just

18 being given money to invest on behalf of someone else.

19 **Q.**  Did you follow that outline you just gave to the

20 Court as it relates to Mr. Radhakrishnan?

21 **A.**  Yes.  Every cent that Mr. Radhakrishnan received

22 was given to me, both in cash -- excuse me, in a check

23 and the proper 1099 and 1099-Rs were issued by

24 Mr. Radhakrishnan to me so that the Federal Government,

25 especially Internal Revenue Service, would know exactly

1    whose income it is and whose assets they were.

2    **Q.**    Moving on if I can, Mr. McAdams asked you a

3    question in terms of concealment, whether putting in a

4    small amount to begin and then a large amount to follow

5    the acquisition of the annuity, whether that was a

6    concealment in a deceptive way to commit a crime.  Do

7    you remember that question?

8    **A.**    Yes, I remember the question.

9    **Q.**    Can you tell the Court whether there is any reason

10   that existed in your practice to put in a small amount

11   and then follow with a large amount?

12   **A.**    Yes.  The reason is that the only way you can know

13   what a variable annuity contract is, before you buy it,

14   is by reading a rather lengthy prospectus, many times

15   small print as much as 200 pages.  That embodies all

16   the rules of the variable annuity.  The laws provide

17   that upon receiving the actual contract, which may be

18   only 35 pages, that you have the right of a 10- or

19   20-day free look period to make sure that that

20   contract, which you thought you were buying with the

21   rules of the prospectus, are embodied in the contract

22   itself.

23          Many times the contract language is different

24   from the prospectus and that's why Consumer Protection

25   laws allowed for this 10- or 20-day free-look period.

1          The reason we put in a small amount is in the

2     event the contract does not comport to what we felt we

3     were buying, we get to free-look it.  In other words,

4     we get to exercise the 10- or 20-day free-look period.

5     I did not want my clients having a million dollars tied

6     up if the contract does not comport because it will

7     take a long time to get the money back from a company,

8     and they could be investing it in other opportunities.

9     **Q.**   And if the look during the free-look period,

10    so-called, results in you not wanting to continue with

11    the annuity as issued, what happens at that point?

12    **A.**   At that point, we inform the company that we are

13    exercising the free-look, and they will issue a refund

14    of the deposit made.

15    **Q.**   Did that ever occur in the course of your

16    business?

17    **A.**   Yes.  It happened various times, yes.

18    **Q.**   Do you recall any specific instance?

19    **A.**   I could recall one that Mr. Maggiacomo himself

20    wrote a letter to the broker/dealer explaining that we

21    are exercising the free-look because the contract does

22    not comport with the prospectus and that was a case on

23    point.  Also, there had been maybe as many as 10 or 12,

24    possibly more, contracts in which a small deposit was

25    put in and no larger deposit was ever added to it.  And

1      that was because the contract states you can put up to

2      a million or 5 million in these policies.  It's a

3      unilateral contract.  The consumer has all the say as

4      to how much money they could put in any time in the

5      future with certain limitations of time and of amount

6      that the company stipulated in the contract.

7      **Q.**   In the example that you just gave the Court as it

8      relates to Mr. Maggiacomo, did that particular instance

9      come up in conversations between you and Mr. Lepizzera?

10     **A.**   Yes, it did.  Mr. Lepizzera wrote me an e-mail

11     telling me this is fantastic.  The e-mail that he

12     found, that goes a long way of proving why we staggered

13     the deposits.  And he was very happy to see that Ed

14     Maggiacomo wrote an e-mail to the broker/dealer telling

15     them they were going to free-look the contract.

16     **Q.**   In your experience over the years, does the

17     placement of a large sum of money after an initial

18     small payment of money, does that require any

19     particular action by the insurance issuer or the

20     annuity issuer?

21     **A.**   The annuity issuer establishes underwriting

22     guidelines that say they will accept X amount of

23     aggregate deposits per contract.  Now, anything over 10

24     or 20,000 is considered an actual trade.  The minimum

25     they take is as little as 5,000, in some instances

1    1,000.  But when you start a contract with 50,000 and

2    add 950 more, it does get the attention of the issuer.

3    And it gets the attention in this fashion:  The brokers

4    will get a call and say, Oh, thanks so much for that

5    big drop of money that we didn't expect.  We only

6    expected 50,000; you put in 950,000 more.  Thanks so

7    much.  Can we give you a vacation somewhere?

8         So it makes a much bigger difference when we put

9    it on the back end.  But at the end of the day, it

10   makes no difference legally or via contract.

11   **Q.**   The term "insurable interest" came up in

12   cross-examination.  What is the difference between

13   insurance and annuities as it relates to the concept of

14   insurable interest?

15   **A.**   The concept of insurable interest in which this

16   Honorable Court has ruled on, is that insurable

17   interest is required on life insurance and not on

18   variable annuities.  And the difference being on life

19   insurance an individual cannot buy $1,000 a year

20   premium and have a million dollar term life on someone

21   else because the windfall would be substantial.  It

22   would be geometric.  As opposed to an annuity, our

23   Legislature has clearly stated that an annuity requires

24   no insurable interest because at the end of the day the

25   investor is actually putting up the whole million.

1    They're getting very little more, the fact that they're

2    using a measuring life, and it's their million dollars.

3    It's not what has been characterized wrongly by many

4    people that there's a big windfall.

5    **Q.**    You were asked whether or not on the annuities you

6    needed to do something called a suitability review,

7    quote, unquote.  What is a suitability review?

8    **A.**    A suitability review is an examination from the

9    broker/dealer to determine if the investment is in the

10   best interest of the investor.  It is a process to

11   protect the investor from themselves.  If this elderly

12   client came to my office and had $1 million to her name

13   and it was her only million, it would not be suitable

14   that she put it all in one investment because if the

15   investment goes bankrupt, she will be out of money.  So

16   suitability is there to protect the investor.

17   **Q.**    Who does the suitability review?

18   **A.**    The broker/dealer's responsibility is to make sure

19   that when an annuity is sold that the investor is not

20   at risk, does not have additional risk of being

21   under-diversified.

22   **Q.**    Where does the requirement for the conducting of a

23   suitability review come from, if you know?

24   **A.**    Come from two sources.  One by contract.  The

25   insurer tells the broker/dealer you will be responsible

1    for suitability; and also lately, the SEC, the

2    Securities and Exchange Commission and/or FINRA has

3    adopted that broker/dealers have a duty to know their

4    customer and protect their customers.

5         I should note in all our transactions there's

6    never been any complaint whatsoever by any owner

7    regarding suitability or choice of investment.

8    Q.    Okay.  You were asked as to the issue dealing with

9    Mrs. Egan and Mr. Radhakrishnan.

10   A.    Yes.

11   Q.    Do you recall that testimony?

12   A.    Yes.

13   Q.    That cross-examination wherein Mr. Radhakrishnan

14   indicated on some form that he was a family friend of

15   Mrs. Egan?

16   A.    Yes.

17   Q.    You asked Mr. McAdams whether he would like an

18   explanation as to why Mr. Radhakrishnan put that?

19   A.    Yes, I did.

20   Q.    Can you give the explanation?

21   A.    Yes.  Mrs. Egan came with her husband and their

22   attorney to our office to a meeting with myself and

23   Mr. Radhakrishnan.  Mr. Radhakrishnan had spent time

24   with her husband beforehand in a meeting with me and

25   the fact that Mrs. Egan came to the office, agreed to

1    let us set up a bond account and an annuity and

2    accepted my suggestion, as we were talking about

3    praying for her illness, that I will recommend to

4    Raymour that he would just put that he is now her

5    friend.  She's been to the office, we knew her husband,

6    she's come in through an attorney, and we just happened

7    to know mutual people.  She had no problem whatsoever.

8    It's also completely irrelevant whether she's a friend

9    or there was no relationship.

10   **Q.**   Why is it completely irrelevant?

11   **A.**   Because none is required.  This Court has made it

12   very clear in its ruling on civil matters that no

13   insurable interest is required, period.

14   **Q.**   You were asked about Walter Craddock and Bertha

15   Howard.  Do you recall those questions on

16   cross-examination?

17   **A.**   Yes.

18   **Q.**   You indicated that there was a specific purpose;

19   is that correct?

20   **A.**   Yes.

21   **Q.**   What was that specific purpose?

22   **A.**   I opened up three or four different bond accounts

23   in Walter Craddock's name because he was our in-house

24   counsel; and in the event I died, all investments in my

25   name would effectively go to the co-tenant or the

1      measuring life because it's the survivor gets all the

2      money.

3            So in order to spread my risk a little bit, we

4      diverted about three accounts or four in Walter

5      Craddock's name just as a hedge against me dying and

6      losing 25 accounts.

7            We also wanted Walter, who is our in-house

8      attorney, to get involved in the process and make sure

9      that everyone is doing everything correctly.

10     **Q.**   Your personal belief today under oath of this

11     Court is that you are guilty or not guilty of the

12     charges in the indictment?

13     **A.**   I'm one hundred percent innocent of all the

14     charges, and I feel I'm entitled to my day in court.

15            MR. WATT:  Thank you, Mr. Caramadre.

16            I have nothing further, please, Judge.

17            THE COURT:  Thank you, Mr. Watt.

18            Recross, Mr. McAdams?

19            **RECROSS-EXAMINATION BY MR. McADAMS**

20     **Q.**   Mr. Caramadre, is your testimony that the reason

21     that you put bond accounts in the name of Walter

22     Craddock was in the event that you died, you wanted to

23     make sure that the money did not flow to the terminally

24     ill person but rather went to Mr. Craddock so that he

25     could spread it to your heirs; is that right?

1    **A.** So that he could protect the assets. Whether it

2    be my assets or Walter's assets because on some of the

3    accounts he actually added in money.

4    **Q.** But you wanted to make sure it didn't go to the

5    terminally ill person if they outlived you?

6    **A.** I wanted a hedge, yes.

7         MR. McADAMS: No further questions.

8         MR. WATT: No follow-up, please.

9         THE COURT: Thank you.

10        All right. Mr. Caramadre, you may step down.

11   Thank you very much.

12        THE WITNESS: You're welcome.

13        THE COURT: Mr. Watt, do you have any further

14   witnesses?

15        MR. WATT: I do not, Judge, please.

16        THE COURT: All right. Then we'll turn to the

17   Government.

18        MR. McADAMS: Your Honor, the Government calls

19   Michael Lepizzera.

20        **MICHAEL LEPIZZERA**, first having been duly sworn,

21   testified as follows:

22        THE CLERK: Please state your name and spell

23   your last name for the record.

24        THE WITNESS: Michael J. Lepizzera, Jr. Last

25   name is L-E-P-I-Z-Z-E-R-A.

1    THE COURT:  Good morning, Mr. Lepizzera.

2    THE WITNESS:  Good morning.

3    THE COURT:  You may inquire, Mr. McAdams.

4    MR. McADAMS:  Thank you, your Honor.

5    **DIRECT EXAMINATION BY MR. McADAMS**

6  **Q.**  Good morning, Mr. Lepizzera.

7  **A.**  Good morning.

8  **Q.**  Mr. Lepizzera, you're an attorney?

9  **A.**  Yes, I am.

10 **Q.**  How long have you been an attorney?

11 **A.**  I believe I was sworn in to the Rhode Island Bar

12 in November of 1993.

13 **Q.**  And are you licensed in any other jurisdictions?

14 **A.**  Just Rhode Island.

15 **Q.**  Are you a member of the Federal Bar?

16 **A.**  I am.

17 **Q.**  Are there any other legal associations that you

18 are a member of?

19 **A.**  I believe I am admitted to the First Circuit.

20 **Q.**  And what type of law practice do you have?

21 **A.**  I own a law firm.  I have a partner.  We employ

22 approximately 20 people.  Our practice runs the gamut

23 from litigation practice to a real estate practice.  I

24 primarily focus my law practice in litigation, both

25 civil and criminal litigation.

1    **Q.**    So you have practiced as a criminal defense

2    attorney?

3    **A.**    Yes, I do.

4    **Q.**    Approximately how long have you handled criminal

5    cases?

6    **A.**    Since right after being sworn in to the Bar.

7    **Q.**    So nearly 20 years?

8    **A.**    Nearly 20 years.

9    **Q.**    Now, at some point, you became the attorney of

10   record for Mr. Caramadre; is that correct?

11   **A.**    I did.

12   **Q.**    Can you explain how that came about?

13   **A.**    I believe the indictment was returned on November

14   17th, 2011, and the arraignment might have been later

15   on that month.  And I initially entered a special

16   appearance on behalf of Mr. Caramadre.

17   **Q.**    What do you mean by that?

18   **A.**    Meaning that I had initially recommended to

19   Mr. Caramadre that he hire a sizable law firm to

20   represent him in this case because as I viewed this

21   indictment, it was a 66-count indictment involving a

22   couple years of investigation, Grand Jury

23   investigation, hundreds of thousands of pages of

24   documents, and I thought it was in his best interest to

25   hire a sizable law firm to represent him in this

1    matter.

2          So initially, I entered my appearance, what they

3    call a special appearance.  Magistrate Martin, I

4    believe, handled the original arraignment, and he

5    allowed me to enter a special appearance for

6    Mr. Caramadre to handle the arraignment because I

7    didn't want Mr. Caramadre to be unrepresented at the

8    arraignment stage.

9    Q.   Let me just take a step back on that a little bit.

10   You referenced the indictment date November of 2011?

11   A.   Yes.

12   Q.   Had you been representing Mr. Caramadre in

13   connection with the investigation prior to the

14   indictment?

15   A.   Yes.  I believe I formally began representing him

16   with respect to the Grand Jury investigation.  It may

17   have been August of 2010 and -- which is jogging my

18   memory right now.  There was an issue regarding a hard

19   drive for Estate Planning Resources, and at that point

20   I became formally engaged and took over from

21   Mr. Flanders who was representing Mr. Caramadre before

22   that point in time.

23   Q.   So Mr. Caramadre had been represented by Attorney

24   Robert Flanders; and approximately August of 2010, you

25   came on and represented Mr. Caramadre in connection

1    with the Grand Jury investigation?

2    **A.**    Yes.

3    **Q.**    And through the course of that representation, did

4    you become familiar with the nature of the allegations

5    against Mr. Caramadre?

6    **A.**    Yes.

7    **Q.**    Okay.  And did you, in fact, engage in discussions

8    with the Government, even pre-indictment, with respect

9    to your representation of Mr. Caramadre?

10    **A.**    Many discussions.

11    **Q.**    Okay.  Was it fair to say that the nature of the

12    investigation was complex?

13    **A.**    Beyond complex.  It was a very -- it is a very

14    complex case.

15    **Q.**    There were numerous witnesses; is that right?

16    **A.**    Numerous witnesses, and I believe hundreds of

17    thousands of pages of documents.

18    **Q.**    Okay.  And you were working on a daily basis with

19    Mr. Caramadre even before the indictment was returned;

20    is that correct?

21    **A.**    Well, when you say "daily" --

22    **Q.**    Let me rephrase it.  How frequently were you

23    working with Mr. Caramadre before the indictment was

24    returned?

25    **A.**    This case, I can't tell you right now whether it's

1    three days a week or five days a week, but this case

2    began to consume my practice because it was a whopper

3    of a case, for lack of a better word, which is why when

4    the indictment was returned, even though Mr. Caramadre

5    insisted that he wanted me as his lawyer, I insisted

6    back that it was in his best interest because that's

7    what attorneys need to do, they need to act in their

8    client's best interest; and it was my opinion that he

9    should have a team.  When I say a law firm, I do have a

10   law firm, but he needed a team of lawyers with a wealth

11   of experience dedicated to this case.

12   **Q.**   So for example, Mr. Flanders, who we just

13   referenced, is a partner at a law firm, Hinckley Allen

14   and Associates; is that correct?

15   **A.**   That's correct.

16   **Q.**   That is one of a handful of the biggest law firms

17   in the Providence area?

18   **A.**   That's correct.

19   **Q.**   They also have a presence in Boston.  They are

20   what would be categorized as a large law firm, correct?

21   **A.**   Yes.

22   **Q.**   In addition to Mr. Flanders, there was also

23   another partner, Michael Connelly, who was assisting on

24   behalf of Mr. Caramadre in that matter?

25   **A.**   Yes.  I believe he's located in the Boston office.

1    But yes, they were both working on the matter along

2    with other associates.

3    **Q.**    And they have a team of associates; is that right?

4    **A.**    That's correct.

5    **Q.**    Now, what type of resources would you be able to

6    offer Mr. Caramadre from your firm?

7    **A.**    My firm -- I'm losing track now.  I would say in

8    the litigation department of the lawyers that work on

9    litigation matters, and I'm going to pick a number

10   right now because I don't know what the number of

11   lawyers was back then, but let's just say we had six or

12   seven lawyers in the whole firm.  Basically, it's me

13   and I would say Mr. DeMello out of those six or seven

14   lawyers that are primarily handling civil and criminal

15   litigation.  And then we have another lawyer, Steven

16   Catalano, who was assisting us on motion practice,

17   misdemeanor stuff.

18          So basically we have three lawyers.  And my

19   concern, which I expressed to Mr. Caramadre on numerous

20   occasions, is this wasn't a money case for me.  This

21   wasn't a great case to have to promote a career.  This

22   was the client getting the best defense.  And not that

23   I'm not a very good lawyer, because I am a very good

24   lawyer; however, this needed the attention in my

25   opinion of multiple lawyers, and it needed full-time

1    attention all the time.  And if I took on the case,

2    we're going to run into a situation of it's going to

3    consume close to 100 percent of my time, maybe not a

4    hundred but 85 percent of my time, then Mr. DeMello

5    would spend a lot of time on this case and now it's

6    interfering with the practice itself.

7    **Q.**    And the obligations you have to other clients as

8    well?

9    **A.**    That's right.  That's why initially I only entered

10   a special appearance because I wanted Mr. Caramadre to

11   get a team of lawyers that could be dedicated to this

12   case.

13   **Q.**    You indicated that Mr. Caramadre did not want to

14   do that.  Could you explain what happened with respect

15   to that, how you winded up ultimately being his

16   attorney of record.

17   **A.**    Sure.  When the indictment came down,

18   Mr. Caramadre was arraigned, and I believe Magistrate

19   Martin, it's been a long time since I looked at this

20   particular issue, I believe Magistrate Martin put down

21   a determination of attorney, period.

22           And during that time period, Mr. Caramadre and I

23   attempted to get him other counsel, interviewing or at

24   least exploring other options with other lawyers.  One

25   of the issues is going to be money in terms of

1     affording a team of lawyers.

2     **Q.**   How much money were the candidates that you were

3     looking at seeking to represent Mr. Caramadre?

4     **A.**   One that comes to mind right now, I think they

5     were talking about a million dollar retainer and maybe

6     costing more.

7     **Q.**   Were there other firms that seemed to be cost

8     prohibitive?

9     **A.**   I only met with, in terms of reputable Boston

10    attorneys, one firm with Mr. Caramadre.  I know we

11    reached out to some others and Mr. DeMello may have

12    done that.  In fact, I know he did that.  I don't know

13    how far he got in terms of just phone conversations.  I

14    don't believe -- I know that I didn't meet with any

15    other lawyers besides that one law firm, but I think

16    the consensus was this was a million dollar plus case.

17    **Q.**   Were there challenges in identifying an additional

18    attorney in light of how many either witnesses or

19    companies that were potential victims of

20    Mr. Caramadre's scheme were already represented by some

21    of the quality counsel here in Providence?

22    **A.**   One of the things that we initially looked at is

23    going outside of Rhode Island.  Because of the sweeping

24    nature of this Grand Jury investigation and the

25    indictment, a lot of very good attorneys, maybe the

1    better criminal defense lawyers were already involved

2    in the case representing a witness or representing a

3    target or representing a company.

4    **Q.**   Did you ever in dealing with this problem just

5    recommend to Mr. Caramadre that he should plead guilty?

6    **A.**   Are you talking about --

7    **Q.**   To solve this problem, because you're not going to

8    afford a great attorney, I'd advise you to plead guilty

9    in this case?  Did you ever do anything like that?

10   **A.**   At that initial stage?

11   **Q.**   Yes.

12   **A.**   Absolutely not.

13   **Q.**   Why not?

14   **A.**   Because it would be remiss of any attorney to have

15   a 66-count indictment returned not get a copy of the

16   discovery, which in this case as you know, Mr. McAdams,

17   was just again, I can't come up with any other word,

18   just whopping, overwhelming.  Before an attorney can

19   give advice to a client, he needs to assess the case,

20   look at discovery, have discussions with the client.

21   And although I was involved pre-indictment, I didn't

22   have Jencks materials.  I didn't have Grand Jury 302

23   reports, postal inspector memorandum of interviews and

24   things of that nature.  So no, there were no plea

25   negotiations or plea discussions at that early stage.

1  **Q.**   So after this process occurred where the Court

2  allowed additional time and allowed you to make a

3  special appearance, did you ultimately end up entering

4  your appearance formally to represent Mr. Caramadre

5  after the indictment?

6  **A.**   I did.

7  **Q.**   Approximately when was that?

8  **A.**   I'd have to look at the Court docket, but I

9  think -- I know that Magistrate Martin -- the

10  arraignment might have been November 30th or late

11  November or early December.  I know that Magistrate

12  Martin put down a determination of attorney date in

13  late December.  I believe I would have entered my

14  appearance in December, I would stand corrected.  I'd

15  have to look at the Court docket but I think December

16  2011.

17  **Q.**   And did you ultimately end up seeking the

18  assistance of another defense attorney to help you

19  prepare the case for trial?

20  **A.**   Yes.

21  **Q.**   Who was that?

22  **A.**   That would be Mr. McCormick.

23  **Q.**   And how did that process unfold?

24  **A.**   After Mr. Caramadre and I explored other options,

25  it was determined that -- Mr. Caramadre determined that

1    Boston firms were way too expensive.  Number two, he

2    didn't believe that he needed, you know, a dream team.

3    He didn't need a Boston law firm to take on the case.

4    He had absolute faith in me.  In fact, he wanted me to

5    do the case by myself.  I recommended that we had to at

6    least get one other lawyer to assist.  And

7    Mr. Caramadre and I wound up meeting with

8    Mr. McCormick, and Mr. Caramadre decided to hire

9    Mr. McCormick.  So Mr. McCormick and I entered our

10   appearance together.  In fact, I believe -- again, I'll

11   stand corrected, I have to look at the Court docket, I

12   believe that Mr. McCormick and I entered our appearance

13   at the same time because I insisted that other counsel

14   enter with me; because in my opinion even though I

15   thought we needed a bigger team, that I needed at least

16   one other attorney outside my firm to assist in the

17   defense of this indictment.

18   **Q.**   And that's what ultimately happened.  Yourself and

19   Mr. McCormick entered on Mr. Caramadre's behalf?

20   **A.**   That's correct.

21   **Q.**   And Mr. McCormick continued to represent

22   Mr. Caramadre for several months including the filing

23   of subsequent motions on the case?

24   **A.**   Yes.

25   **Q.**   Now, you referenced that it was a 66-count

1    speaking indictment.  Fairly detailed?

2    **A.**   I didn't say speaking indictment.  But I did call

3    that speaking indictment during the course of the

4    representation.

5    **Q.**   In other words, it actually specified in great

6    detail the nature of the allegations against

7    Mr. Caramadre and Mr. Radhakrishnan and there were

8    unnamed unindicted co-conspirators; is that right?

9    **A.**   Yes.  It was thorough.  It was definitely with

10   specificity.

11   **Q.**   Did you review the indictment with Mr. Caramadre?

12   **A.**   Yes.

13   **Q.**   What steps did you take to review the indictment

14   with Mr. Caramadre?

15   **A.**   This was a long process.  For example, let me go

16   backwards.  If this was a one-count indictment, a

17   one-count wire fraud case, you would sit down with the

18   client in one sitting, maybe multiple sittings and go

19   over the indictment, and the count, what the elements

20   of the crime charged and the evidence.  Okay?  That

21   didn't happen in one or two sittings with respect to

22   this indictment because again this indictment was

23   ranging over approximately a 15-year period, involved

24   hundreds of annuity and bond transactions, was

25   complicated.

1          So I would say that that indictment was reviewed

2     with him over the course of time from the point that I

3     first received the indictment to the plea.

4     **Q.**   So in other words, this was literally a constant

5     process because of the scope of allegations?

6     **A.**   Absolutely.

7     **Q.**   To meet with Mr. Caramadre, to discuss with him,

8     for example, the Government is alleging this, this is

9     how we're going to need to defend it?

10    **A.**   Yes.

11    **Q.**   So you had those types of conversations with him

12    repeatedly; is that right?

13    **A.**   Yes.

14    **Q.**   Now, in the course of those conversations, did

15    Mr. Caramadre ever make any admissions to you?

16    **A.**   Yes.

17    **Q.**   Okay.  What were the nature of those admissions?

18    **A.**   I'm trying to think because there's so many

19    different counts.  Let me start with this.  There was

20    an issue in the case where -- and I don't recall what

21    count it was.  Actually, I do.  It's Count 65, the

22    money laundering count.  The money laundering count

23    involved an allegation that Mr. Caramadre gave Raymour

24    Radhakrishnan $800,000 to invest in an annuity with

25    Midland National Life Insurance Company.  One of the

1    things that I was looking at in terms of money

2    laundering, it was money structuring, money laundering

3    charge, was did Mr. Caramadre know that Raymour

4    invested the $800,000 in Midland.  This is why it's

5    significant.

6         I believe that transaction where

7    Mr. Radhakrishnan invested in Midland in late November,

8    November 30th, early December 2007 -- I apologize that

9    this is taking a little long, but I need to give this

10   explanation -- that transaction was charged, I believe,

11   because approximately five months beforehand, in June

12   or July of 2007, Midland National Life Insurance

13   Company had turned down, if you will, one of the

14   applications that was submitted by Mr. Maggiacomo as

15   the agent and Mr. Caramadre as the owner involved in

16   one of the annuity applications.  And that transaction

17   was Lily Ianiero, who was one of the annuitants

18   involved in this investigation.  She was named as an

19   annuitant in one of the Midland policies.

20   Mr. Maggiacomo was the agent.  It got submitted to

21   Midland.  Midland in terms of processing the

22   application turned around and I don't know if they

23   Googled Lily Ianiero but they did some investigation

24   and they wound up speaking to Lily Ianiero.  Lily

25   Ianiero, the discovery shows, said that I never signed

1    this annuity application, I don't know what this is and

2    I don't know who this Mr. Caramadre is or this

3    owner/investor.  I didn't give permission for anyone to

4    use me as an annuitant.

5         Midland wound up terminating or denying the

6    application.  It got sent back.  I think Mr. Caramadre

7    was the owner/investor.  I'd have to look at documents.

8    It got sent back.  It might have been a million dollars

9    investment on that one.  Midland terminates and says

10   we're not accepting this annuity.

11        They did a post-termination or post-denial

12   investigation.  They wound up terminating Eddie

13   Maggiacomo as their agent, meaning this:  Eddie

14   Maggiacomo worked with LifeMark.  That was his

15   broker/dealer.  And he would write through certain

16   insurance companies.  Midland said we're not taking

17   your business anymore, Mr. Maggiacomo.  Okay?

18   Mr. Caramadre knew that.  He acknowledged that he knew

19   that.  He acknowledged that the Lily Ianiero annuity

20   application got denied.  He acknowledged that Midland

21   didn't want to do this kind of business and so that was

22   that.

23        What was important for me for Count 65, this

24   money laundering count, was that four, five months

25   later after Maggiacomo gets terminated, after Midland

1     says no, we're not taking this kind of business,

2     Raymour Radhakrishnan winds up submitting an $800,000

3     annuity application to Midland.  And actually just to

4     be, so the record is clear, he initially put in $20,000

5     in late November 2007, and he put in $780,000 in

6     February 2008, but the initial annuity application was

7     made to Midland.

8          And part of what I was looking at in terms of

9     defense on that count was did Mr. Caramadre know that

10    Raymour was taking this money and submitting it to

11    Midland.  Because if Mr. Caramadre doesn't know and he

12    gives Raymour 20 or $800,000 although maybe not

13    believable, if he doesn't know that Raymour was getting

14    that money to submit it to Midland, then he can't be

15    structuring any illegal transaction because he doesn't

16    know that the $800,000 is going Midland.  Okay?

17         So it was important to me, did Mr. Caramadre

18    know.  Because I was always troubled by Count 65.  When

19    we had discussions in terms of problems with the

20    indictment, I'd always start with, and members of my

21    firm would get sick of me saying this, I'd always start

22    with Count 65, because to me that was just about a slam

23    dunk.

24         So during one of my meetings with him, meaning

25    Mr. Caramadre, I did a mock cross-examination, a

1    direct/cross with him because if my client tells me he

2    doesn't know about what Raymour is doing with the money

3    then maybe that is part of our defense.  And I was

4    shocked when Mr. Caramadre said to me, No, I knew that

5    he was investing $800,000 with Midland.  I actually

6    knew it.  In fact, not only did I know it, I wanted him

7    to invest in Midland because Midland had the best

8    product.

9         So that's one of the admissions.  And I

10   apologize for the long detail but in order to explain

11   it I needed to give you that.

12   **Q.**   I want to actually follow-up with you on your

13   concerns about Count 65.  You just referenced those.

14        In addition to an admission like that and your

15   concerns about how to defend Count 65, was it in your

16   view, was Count 65 a problem for Mr. Caramadre for the

17   broader indictment in terms of inferences that the

18   Government would be able to argue from simply those

19   facts alone?

20   **A.**   Count 65 -- my discussion I just had with you

21   right now, it wasn't just a problem on Count 65, which

22   it was, because Count 65 was going to be a serious

23   problem, but it was also indicative of the rest of the

24   nature of the indictment.  In other words, what

25   representations or omissions are being made or

1    non-disclosure being made to the insurance company.

2    One of the things I didn't say with respect to the

3    Midland application was that I don't believe it was on

4    the actual annuity application itself, but in terms of

5    a financial disclosure or a financial worksheet that

6    Mr. Radhakrishnan had given to Midland, they asked for

7    certain information, meaning Midland asked for certain

8    information.  It may have been Midland or may have been

9    Sammons.  And Sammons was the broker/dealer.  They're a

10   sister company of Midland, and they acted as the

11   broker/dealer.

12        So in the financial disclosure that

13   Mr. Radhakrishnan gave to Midland/Sammons was they

14   asked who do you work for, who is your employer.  And

15   Mr. Radhakrishnan, at least, submitted that he worked

16   for Network Display -- I think it's Systems, which was

17   an unincorporated company, New Hampshire company, I

18   guess, where Mr. Radhakrishnan's family is from, where

19   he grew up.  And I think Mr. Radhakrishnan had some

20   computer software that he was trying to develop, never

21   went anywhere, never made any money with it.  And he

22   disclosed to Midland/Sammons that he worked for Network

23   Display Systems.  He also, I believe, and I'd have to

24   take a look at the document because it's been months

25   and months since I reviewed the document, I'm going by

1     memory, I believe he disclosed on that financial form

2     that he made $250,000 a year annually from Network

3     Display Systems, I'll call it NDS for short, and I

4     believe he also said he had a net worth of a million

5     dollars.

6          So the other problem I had with this is not only

7     is Mr. Caramadre giving money to Raymour to knowingly

8     invest in an insurance company that has said no to this

9     business directly, no, that there's also

10    misrepresentations, which is kind of like the wire

11    fraud portion of the money laundering element, okay, of

12    falsehood of who you work for, how much money you make,

13    and what's your net worth.  And one of the concerns I

14    had was why isn't Raymour putting that he works for

15    Estate Planning Resources.  Why isn't he putting the

16    address of Estate Planning Resources.  I believe, I'd

17    have to take a look at it, Mr. McAdams, I believe he

18    put his New Hampshire address.

19         So you start looking at that one count and then

20    you start getting into the nature of the scheme, the

21    scope of the scheme, the pattern of the scheme, if you

22    will, in terms of putting false information on bond

23    applications, putting false financial information on

24    bond applications, putting false trading investment

25    experience on the applications, putting a phone number

1    for a joint tenant on the bonds, and I'm going to call

2    them a terminally ill person, putting the phone number

3    for Estate Planning Resources, so things of that

4    nature.  Telling an insurance company when they're

5    asking what is the relationship between owner, meaning

6    the investor of the annuity, and the annuitant putting

7    I'm a friend, it's my attorney.

8          So Count 65, even though serious concerns on

9    Count 65, what was done on Count 65 reverberated to the

10    other counts.

11    **Q.**   So in other words, you recognized that in proving

12    Count 65, the Government would in some ways be proving

13    the entire indictment in microcosm.  Would prove an

14    agreement, conspiracy, would prove the fraud, would

15    prove potentially the identity theft or aggravated

16    identity theft, and so it would be able to argue all

17    those things to the jury?

18    **A.**   It would have been damaging to the other counts.

19    Not dispositive, but it would have been pretty strong

20    evidence on the other counts and the other fact

21    patterns that supported the other counts.

22    **Q.**   Is it fair to say you spent a lot of time thinking

23    and trying to analyze how as defense strategy you would

24    defend that?

25    **A.**   You can't imagine how much time.  I don't know how

1  much time, but it consumed my practice.  It started to

2  consume my life, too.

3  **Q.**  Were you kind of -- initially, I had started

4  asking you about in an open, broad way admissions that

5  Mr. Caramadre had made.  You answered that it was hard

6  without some specificity.  You just referenced bond

7  accounts, joint bond accounts with terminally ill

8  people where Mr. Caramadre or some other person would

9  be on the application.

10        Was one of the companies that offered those bond

11  accounts Ameritrade?

12  **A.**  TD Ameritrade.

13  **Q.**  And did you have conversations with Mr. Caramadre

14  about some of the misrepresentations that were made to

15  Ameritrade?

16  **A.**  Yes.

17  **Q.**  What types of conversations did you have with him

18  about that?

19  **A.**  First of all, the form itself.  TD Ameritrade

20  had -- might have been, I forget how many pages, but I

21  think there were three parts to the TD Ameritrade

22  application.  There was the initial application to open

23  up a bond account.  Then there was, I think, a couple

24  more pages for the -- if you wanted to apply for

25  margin, and I think there might have been a couple more

1    pages if you wanted to apply for options. But I think

2    the whole form itself might have been seven or eight

3    pages. I'd have to take a look at it.

4    **Q.** This would be an application where there would be

5    two parties, one would be the owner and that would in

6    many instances be Mr. Caramadre; but in other

7    instances, someone else would respond, Mr. Craddock or

8    someone else?

9    **A.** Yes.

10   **Q.** Then the co-owner would be the terminally ill

11   person?

12   **A.** If my memory serves me correct, I'd have to take a

13   look at it, I believe that's page one of the

14   application where on the first page of the TD

15   Ameritrade application, it would usually be

16   Mr. Caramadre or Mr. Craddock, and then that would be

17   the top half of the page, and then the bottom half of

18   the page would be the joint tenant, the terminally ill

19   person.

20   **Q.** And as you reviewed the discovery that the

21   Government produced to you in connection with the case

22   and you saw those applications and when you say the

23   witness statements, the Grand Jury testimony, the

24   interview reports of the various family members of the

25   people that had been named as terminally ill who had

1    since passed and, in fact, the folks that were in the

2    depositions as well, did it come to your attention that

3    universally that they said that the information that

4    was listed regarding their finances, their experience

5    was false?

6    **A.**    Yes.  It was all false.

7    **Q.**    And that wasn't simply on the Ameritrade forms.

8    That was on other companies as well, correct?

9    **A.**    I don't know all of them right now, but E*TRADE,

10   Scottrade, TradeKing and a bevy of other

11   broker/dealers.

12   **Q.**    And some of these were applications that were

13   handwritten and submitted by fax or otherwise?  And

14   others were actually applied to online; is that

15   correct?

16   **A.**    Correct.

17   **Q.**    So did Mr. Caramadre ever offer any explanations

18   regarding how that information that was false got

19   there?

20   **A.**    Yes.

21   **Q.**    What did he say?

22   **A.**    I asked, because when you have -- I think

23   Ameritrade was approximately 39 bond applications and

24   then they went from Scottrade, E*TRADE, TradeKing, I

25   don't know exactly how many, whether 80 accounts, I

1    don't recall.  I think 39 were TD Ameritrade.  One of

2    my concerns is they're all false.  They're all wrong.

3    And in fact, I think I had done an analysis at some

4    point.  There might be ten boxes for each one maybe

5    asking for financial information or trading experience

6    for the joint tenant, and I think they're almost all

7    checked off the same.  So that was a concern.  So I

8    wanted to know.

9         What he initially told me was that it was a

10   mistake.  He was willing to stipulate, which we really

11   didn't have a choice because it is what it is, it was

12   all false.  He was willing to stipulate that all the

13   information was false.

14        What I never got a good answer on was why all of

15   this was false.  The first discussion I had with him

16   was at the first person, who might have been Denise

17   Egan, I don't recall, that was in fact their

18   information and then what happened was the interns just

19   happened to use that same information.  And I processed

20   that explanation.  I looked at the discovery again, and

21   I did some thinking.  And I said to myself, well, that

22   doesn't hold water because, number one, let's go from

23   TD Ameritrade, I don't remember what the next

24   broker/dealer they used was.  Let's pretend it's

25   E*TRADE, for example.  The forms are different.  I

1    remember, if I recall correctly, it's been a while,

2    that some of the forms actually required you to write

3    in the number of years experience.  So for example, it

4    would ask a question, how many years experience, joint

5    tenant, do you have.  It would be written in "ten

6    years."  The TD Ameritrade applications were boxes.  So

7    if it asked for information on the joint tenant, how

8    many years experience do you have, it would say -- I

9    don't remember the parameters, but zero and a box --

10   no, zero to five, six to ten, okay?

11            So if, in fact, there was a mistake, how could

12   it be a mistake when you're going from TD Ameritrade to

13   another application from another broker/dealer because

14   these are boxes, and you're writing it in.  Okay?

15            The other thing that troubled me with that

16   explanation was when you look at the files, the actual

17   hard files of Estate Planning Resources, nowhere in

18   their file are there any notes or in the jacket of

19   asking the joint tenant, the proposed joint tenant

20   their financial information or their net worth or their

21   annual income.  There's nothing in there.  So there

22   can't be a mistake.  So that was the initial

23   explanation I received from him.

24   **Q.**   You actually reviewed the notes that were in the

25   files for Estate Planning Resources that were after a

1    meeting with the terminally ill person?

2    **A.**    Yes.

3    **Q.**    And the relevant information listed there was

4    essentially date of birth and Social Security number;

5    is that correct?

6    **A.**    Might have been an address of a family member or

7    phone number, but nothing whatsoever on trading

8    information, financial information, net worth, nothing

9    like that.

10   **Q.**    So that was the initial explanation you got from

11   Mr. Caramadre.  Did you revisit that issue with him?

12   **A.**    I did.  And I'm trying to recall.  I don't think I

13   got another explanation or a substantive discussion I

14   can think of until after I spoke to Raymour

15   Radhakrishnan when I interviewed him.

16   **Q.**    And what explanation did you get?

17   **A.**    From?

18   **Q.**    From Mr. Radhakrishnan.

19   **A.**    Couple of different explanations.  Initially, he

20   told me the same thing, that it was the interns that

21   made a mistake.  And then I immediately questioned him

22   on that can't be, because -- for all the reasons I just

23   testified to.  It just can't be.  Well, how can you

24   justify -- someone is going to get cross-examined on

25   how is this written in but this is a box checked off

1  over here.  There's nothing in Estate Planning

2  Resources' files.

3      Number three, I heard that the interns copied

4  the wrong information or they're writing in

5  information.  Well, if they're writing in the

6  information, what is their basis for checking off

7  certain boxes?  And on top of it, if you're the one

8  meeting with -- this is Raymour -- if you're the one

9  meeting with the proposed joint tenants and you're

10  coming back with no information and then you're giving

11  the applications to the interns to say finish it or

12  complete it, what's their basis for completing it?

13  You've got to have a discussion with them.

14      So if anyone's going to give that explanation,

15  it's not going to fly and I'm not submitting it because

16  I'm not comfortable with that explanation because as

17  attorneys we have obligations to the court.  We can't

18  submit false information.

19      So after that, he then said the following:

20  Well, what if I told you that it was my information,

21  meaning Raymour Radhakrishnan's information.  You know,

22  I was the one doing the trading on the accounts, not

23  the joint tenant.  So, you know, it's my information.

24  So actually, it's correct if I say it's my information.

25      I immediately responded, Well, that's funny

1    because on this form it says someone has ten years

2    experience.  You're going to say that this is your

3    information and it has ten years experience?  Because I

4    knew these documents inside and out.  I immediately

5    said ten years?  You are what 24, 25, and you're going

6    to say you're trading back to 14 or 15 years old?  That

7    doesn't fly.

8         And then -- and this was, I kind of said it to

9    him maybe even a little harsher than I'm saying it to

10   you now because we're gearing up for trial and we need

11   to know what we're going to do to defend against this

12   serious allegation of this false information, which by

13   the way it was.  But what's our explanation for it?

14        And then he responded back, Well, me and Joe

15   just wanted a smooth account application process.  I

16   don't remember the exact words.  I remember he used the

17   word "smooth."  We just wanted a smooth application

18   opening process.  Something to that effect.

19   **Q.**   In other words, they wanted to make sure that the

20   application would be approved; and that if they listed

21   the actual correct information on these terminally ill

22   people who universally had zero assets, no experience,

23   they're destitute, which is why they were coming to

24   Mr. Caramadre in the first place in response to an ad

25   in the Catholic paper, then that might have led to the

1    rejection of those applications?

2    **A.**    Right.

3    **Q.**    Did you talk to Mr. Caramadre about that

4    explanation again?

5    **A.**    Yes.

6    **Q.**    What was that conversation?

7    **A.**    From what I remember, he didn't -- I explained how

8    I just explained it, the meat on the bones, so to

9    speak.  He didn't have an explanation.

10   **Q.**    Did he revert to some type of legalistic

11   explanation?

12   **A.**    Hold on, Mr. McAdams.  I had so many conversations

13   with him, it's -- I believe -- what I just testified

14   to, that's what Raymour told me, not Mr. Caramadre.  It

15   was important for me to discuss that with Mr. Caramadre

16   when he didn't have an explanation and I'm saying,

17   Well, we need to know.  You know, did you know this?

18   Did Raymour do this on his own?  We need to know.

19   Because the other thing was Joseph's signature, and

20   sometimes it was a stamp because there was a stamp of

21   Joseph's signature in the office that upon my review

22   some of those applications were stamped, which would

23   have been maybe part of the defense but a lot of them

24   were signed, we need to know what is the explanation

25   for this.  And whenever I would bring a real difficult

1     question that needed to be discussed because if we're

2     going to go to trial, we need to discuss this, he would

3     say this:  It just doesn't matter.

4     **Q.**    The truth will set him free?

5     **A.**    It just doesn't matter.  The truth -- I don't

6     recall him saying that at that particular time, but it

7     was it doesn't matter because I had -- this is what it

8     is.  My information is correct.  Whatever his

9     information was, he's worth 10 million, 20 million, he

10    had 20 years experience, whatever it was.  Who cares

11    what there was.  Who cares?  We could have put zero

12    down, and they would have opened the account anyways.

13    **Q.**    So Mr. Caramadre, who was a wealthy man who was

14    very experienced at reading the fine print in

15    contracts, had his written signature on the pages of

16    these applications right below, immediately below where

17    the false information was, correct?

18    **A.**    Yes.  And I know I had this discussion with him

19    many times, that you profess to be this speed reader

20    and genius and you've read thousands of pages of bond

21    prospectuses.  You are going to get cross-examined by

22    either Mr. Vilker or Mr. McAdams and they're going to

23    say here's you signature, sir, right underneath the

24    false information.  Are you saying that you missed it

25    on this one application?  Okay.  We'll grant you that.

1   How about the second bond application, the third one,

2   the fourth, all way to the bond application number 39

3   and then on to the other broker/dealers?  I had a

4   discussion with him on that because I knew it was

5   coming because that's what I would do if I was the

6   prosecutor.

7   **Q.**   His cross-examination at trial would have been,

8   had he can chosen to testify, would have gone on for

9   days, if not weeks, correct?

10  **A.**   It would have went on, absolutely, but that's if

11  he would have testified, because one of my

12  strategies -- one of my ways of handling this case

13  because we didn't walk into this case -- I know we

14  didn't give an opening statement.  We did not walk into

15  this case blind, like let's just see what happens.  One

16  of my strategies was how can I get Mr. Caramadre's

17  exculpatory words, because in the discovery,

18  Mr. McAdams, there were some exculpatory information.

19  I was going to put on the best defense I could for

20  Mr. Caramadre.  And one of my strategies was how can I

21  get Joseph's exculpatory words to come in through

22  Government witnesses.  And because it was my strategy

23  at the end of the Government's case to obviously get

24  up, and I think Mr. Traini probably would have handled

25  this part, get up and make a Rule 29 motion, motion for

1   judgment of acquittal, and to the extent the

2   Government's case in whole or in part stayed intact was

3   to have a conversation with Mr. Caramadre of whether or

4   not he testifies.

5        Now, it's the client's decision, just like it is

6   a client's decision to plea.  It's his decision to

7   testify or not to testify, but I was working towards a

8   goal of getting Mr. Caramadre's exculpatory remarks,

9   which there were in discovery, which I saw some, and

10  then let you close and not have Mr. Caramadre testify.

11  Because in my opinion, Mr. Caramadre would have made a

12  terrible witness.

13  **Q.**   So it's your goal as his legal advisor to present

14  his defense in the best way possible and avoid the

15  possibility that he needed to testify?

16  **A.**   Yes.  But ultimately, he probably would have

17  testified because it's his call and I can't see him not

18  testifying, but we agreed -- what we agreed to do was,

19  which is a smart thing, which is one of the reasons why

20  we didn't give what I would call a pre-Government case

21  opening statement, we didn't know if he was going to

22  testify.  I didn't know if I could put him on based on

23  some of the admissions.  So I do not want to promise a

24  jury something, get up there in this very complicated

25  case that was going to take three to four months and

1    make promises, so that's why we met.

2    **Q.**    Let's take a step back a little bit and talk about

3    that, that trial strategy.  I want to focus your

4    attention on before the trial actually started.  The

5    case was indicted in November 2011, and the trial was

6    roughly a year later.

7    **A.**    The trial was November 2012.

8    **Q.**    The trial was November 2012; the indictment was a

9    year earlier, November 2011?

10    **A.**    Yes.

11    **Q.**    And during that period of time, did you attempt to

12    develop a defense strategy?

13    **A.**    Yes.

14    **Q.**    And we've talked about it.  This was a complex

15    indictment.  There were many different counts; is that

16    right?

17    **A.**    That's right.

18    **Q.**    Many different actual criminal statutes involved?

19    **A.**    Yes.

20    **Q.**    It was going to require a multi-pronged defense;

21    is that fair to say?

22    **A.**    Yes.

23    **Q.**    We also talked about the fact that there were

24    numerous witnesses that were expected to testify?

25    **A.**    Yes.  I want to say one thing.  It's a multi-count

1    indictment, but in the federal system what counts is

2    this because we had the issue of relevant conduct:  You

3    get convicted of one count, then there's an issue

4    because when you come up for sentencing the Court takes

5    into consideration relevant conduct.

6         Now, in this case there were 66 counts,

7    conspiracy I believe is a statutory max of five years.

8    If someone gets -- and I think it's Count 33, but I

9    have to take a look at the indictment.  If he gets

10   acquitted of 65 counts and only gets convicted of Count

11   33, conspiracy, well, even though the Court takes into

12   consideration relevant conduct, the Court can only

13   impose a statutory max of five years versus a mail or

14   wire fraud 20 years, money laundering which is 10, I

15   think the obstruction is 15.

16        So, yeah, I'm developing a strategy on each of

17   the counts, but the way I viewed it, this was,

18   especially for Mr. Caramadre, this is an all-or-nothing

19   proposition.  We need to win 66 counts because  getting

20   convicted on one count is going to be problematic.

21   Q.   Because potentially the sentencing consequences,

22   even if he were convicted of one of the counts, could

23   be enormous.  So for purpose of his life, it might not

24   make much of a difference with the other 65?

25   A.   I also forgot there were five counts of aggravated

1    identity theft, which carried a mandatory minimum of

2    two years.

3    **Q.**   You developed a strategy.  Did you work with

4    Mr. Traini to develop a defense strategy as well?

5    **A.**   Hand-in-hand.

6    **Q.**   Now, did Mr. Caramadre have -- first of all, let

7    me rephrase that question.

8         In the months leading up before the trial, were

9    there efforts made to avoid a trial with

10   Mr. Radhakrishnan?

11   **A.**   Could you repeat that.

12   **Q.**   Were there efforts made to avoid a joint trial

13   with Mr. Radhakrishnan?

14   **A.**   Those efforts started from the return of the

15   indictment.

16   **Q.**   Fair to say Mr. Caramadre did not want to have a

17   joint trial with Mr. Radhakrishnan?

18   **A.**   Didn't.  But I also want to say in fairness to

19   Mr. Caramadre, neither did defense counsel because it

20   was problematic.  But, yes.

21   **Q.**   Because you looked at not only Mr. Caramadre's

22   conduct but also in a conspiracy case the evidence that

23   he would be held accountable for that Mr. Radhakrishnan

24   had committed?

25   **A.**   Right.  Now, if the Court would have granted a

1    severance, which I thought when we got to the severance

2    motions were denied was a serious draw back but

3    probably right on the law because it was a conspiracy

4    case.  But the same evidence would have came in, which

5    is why the law on conspiracy is that you're tried

6    together, because the same evidence basically is going

7    to come in.  However, I didn't want Mr. Radhakrishnan,

8    and neither did Mr. Caramadre, sitting next to him at

9    defense table because if he's not there, then our

10   strategy can change a little bit because I am going to

11   look at that jury, okay, and I'm going to point the

12   finger right at Radhakrishnan.  If he's sitting next to

13   us, it's a problem because, one, he's sitting next to

14   us and he knows what we're doing and who knows if he

15   starts pointing a finger back.

16            So I want to be clear.  It was Mr. Caramadre's

17   goal to have a separate trial but it was also -- I

18   agree with that approach.

19   **Q.**   From a defense strategy standpoint, you thought he

20   had a better chance of beating the case?

21   **A.**   I still think it would have been a very difficult

22   case to overcome.  I don't think if the severance

23   motion was granted that we'd be sitting pretty and

24   looking to win the case, but it's a better case to try

25   for the Defendant, Mr. Caramadre.

1    **Q.**   And this was something that Mr. Caramadre also

2    strongly desired?

3    **A.**   Oh, he definitely wanted a severance.

4    **Q.**   That's based on statements that he made to you?

5    **A.**   Yes.

6    **Q.**   Now, as you alluded to, that motion was denied.

7    And then there came a point in time where as a defense

8    team you requested a bench trial.  Do you recall that?

9    **A.**   Yes.

10   **Q.**   That was to separate who would find the defendants

11   either guilty or not guilty?

12   **A.**   Yes.  It became abundantly clear we weren't

13   getting a severance based on <u>Bruton</u> issues or

14   evidentiary issues or anything like that.  Although you

15   have to be careful of what you wish for in asking for a

16   bench trial because you give up the issue of unanimity

17   that's required of a jury of 12 versus the Judge as the

18   trier of facts deciding guilty or not guilty.  But I

19   thought there was a pretty good argument in terms of

20   saying, Okay, Court, Government, the law of conspiracy

21   is you have to be tried together.  It's the right thing

22   to do.  It's the law.  And you have judicial economy.

23          Well, if you have a bench trial that happened at

24   the same time as Mr. Radhakrishnan's jury trial, then

25   we have all the judicial economy in the world because,

1    your Honor, you can decide Mr. Caramadre's fate and the

2    jury can decide Mr. Radhakrishnan's fate and we're not

3    having two trials.  We're having one.

4         So I thought it was a neat way of getting a

5    built-in severance without having two trials.

6    **Q.**   So in other words, you were hoping to somehow

7    still be able to stand up and point the finger at

8    Mr. Radhakrishnan but with potentially maybe not having

9    as much damage coming back?

10   **A.**   Yes, we wanted a severance for that reason.  But

11   we also wanted a severance because, let's face it,

12   optically this was a bad optics case.  This is someone

13   investing a lot of money and basically betting on

14   people's lives.  And just the public opinion on that,

15   let's face it, it's just not a good thing.

16        One of the things that I had planned to argue to

17   the jury in closing arguments, because we can't argue

18   in opening statements is that, you know, you may not

19   like this.  You don't have to like it.  The issue is

20   whether Mr. Caramadre and Mr. Radhakrishnan conspired

21   with one another and whether they lied to insurance

22   companies and broker/dealers.  But let's face it.  That

23   was the 800-pound elephant in the room.  This was just

24   a bad optics case.

25   **Q.**   Now, with respect to the issue of the bench

1    trial --

2         MR. McADAMS:  I'd like to mark Government

3    Exhibit 13, which is --

4         THE COURT:  Is there any objection?

5         MR. OLEN:  No, your Honor.

6         THE COURT:  All right.  Government 13 will be a

7    full exhibit for this hearing.

8         (Government Exhibit 13 admitted in full.)

9    **Q.**   Mr. Lepizzera, first of all, can you see that

10   document?

11   **A.**   I just need you to zoom back out so I can see the

12   date.  Go ahead.  That's fine.

13   **Q.**   Is this a copy of your notes?

14   **A.**   Yes.

15   **Q.**   That's your handwriting?

16   **A.**   My handwriting.

17   **Q.**   Indicates September 18, 2012, follow-up meeting

18   and then circled with JAC and AMT?

19   **A.**   JAC stands for Joseph A. Caramadre and AMT is

20   Anthony M. Traini.

21   **Q.**   And there's various topics, for example,

22   references discussing the chambers conference that had

23   occurred earlier, and then the next line down it says

24   that Mr. Caramadre signed a letter rejecting plea

25   negotiations.  Do you recall that?

1    **A.**   Yes, I do.

2    **Q.**   I just want to scroll down to the bottom of the

3    note.  And it indicates a summary chart on annuities

4    and a box and then it says:  Discussion of JAC, that

5    would be Mr. Caramadre's, cross-examination of an

6    underwriter.  And then it writes:  Which segues into a

7    possible bench trial prompted by JAC.  Is that right?

8    **A.**   That's what it says.

9    **Q.**   Did the notion to come and request a bench trial

10   come from Mr. Caramadre?

11   **A.**   Could you zoom back out just so I can see the date

12   at the top of the notes.

13   **Q.**   December 18th, 2012.

14   **A.**   Can I have a moment just so I can think of that

15   meeting because I had many discussions with him.

16          I believe, which is why I wrote "which segues

17   into a possible bench trial prompted by Mr. Caramadre,"

18   I believe he brought it up at this meeting.  But I want

19   to make something clear.  We had a discussion about a

20   bench trial.  I'd have to take a look at some other

21   notes and maybe e-mails, but we had a discussion of a

22   possible bench trial which I had did some research on

23   which is rare in a conspiracy case.  I think there were

24   three cases in the country, one by Judge Pettine in the

25   '70's.

1      So I think we had a discussion about this stuff

2   back in April or May of 2012.  So I want to be fair to

3   Mr. Caramadre and the record clear that I believe he

4   brought it up at this meeting, this bench trial, but we

5   had other discussions about that earlier.

6   **Q.**   So it wasn't a new topic that you raised the

7   possibility of requesting a bench trial?

8   **A.**   That's correct.

9   **Q.**   You ultimately filed a motion for a bench trial?

10  **A.**   Yes.

11  **Q.**   Which was subsequently denied?

12  **A.**   It was denied.

13  **Q.**   Now, we've had a lengthy back and forth on the

14  defense strategy that you had.  Did Mr. Caramadre have

15  strong feelings about what the strategy should be in

16  this case?

17  **A.**   I know this issue has come up in the pleadings

18  about what the strategy was.  Mr. Caramadre really had

19  a hands-off approach with this whole thing.  In fact,

20  you know, I would meet him at times because the way I

21  operated was let's say I would take five witnesses,

22  Grand Jury, 302's, analyze the memorandum of interview

23  for the postal inspector.  And then I would think of

24  some things, some issues, some problems and I would

25  meet with him.  And he would say to me:  You worry too

1     much.  You're spending too much time on this.  You

2     know, Mike, I trust you.  I know you're working so hard

3     on this, but you just need to back off.  Don't worry

4     about -- you're worried about the Government's case.

5     You're worried about this minutia.  Don't get into the

6     minutia.  Okay?  I'm the master of the facts.  I know

7     the case.  All you need is me next to you at trial.

8     Don't worry.  We're going to win this whole case.

9          So I'm surprised about this claim about lack of

10    investigation, lack of getting an investigator because

11    that just didn't happen.  There was an issue of getting

12    an investigator late in the case, maybe October 2012,

13    but for limited witnesses, but there was never an issue

14    about where is the investigator early on.  Just the

15    opposite.  He's telling me, You're worrying too much,

16    Mike.  Don't worry about the minutia.

17         So he was really hands-off, and I think he

18    thought he was just going to get on the stand and

19    explain everything away.

20    Q.   We'll talk about the investigator and the

21    interviews in a few minutes.  But in terms of

22    Mr. Caramadre's strategy, did he have any strong

23    feelings about taking an attack-the-Government type

24    approach for defense of the case?

25    A.   He was somewhat misguided in terms of what this

1    trial was about.

2    **Q.**    What do you mean by that?

3    **A.**    This trial was about the Government proving,

4    attempting to prove beyond a reasonable doubt whether

5    he committed the 66 counts charged in the indictment.

6    That's what was at issue, because that's the

7    Government's burden.  I know that as lawyers sometimes

8    instructions are given, we pooh-pooh instructions given

9    to jury members about the Government's burden, the

10   defendant doesn't have to do anything.  They really

11   mean something.  Okay?  And you, Mr. McAdams, Mr.

12   Vilker, the United States of America needed to prove

13   beyond a reasonable doubt that Mr. Caramadre conspired

14   with Mr. Radhakrishnan and that's what the case was

15   about.

16        This case wasn't about malicious prosecution.

17   And what Mr. Caramadre continuously would get into

18   trying to prove his innocence, getting the Government's

19   skin in the game, that he wants Mr. Vilker or, Vilker's

20   and McAdams' and Souza's skin in the game.  Which meant

21   this:  Never any discussions about we're not doing this

22   or we're not investigating properly.  It was I want an

23   Office of Professional Responsibility complaint against

24   McAdams, Vilker, possibly Souza, Postal Inspector Souza

25   and possibly McDaid, but primarily against you and

1    Mr. Vilker.  It was filing disciplinary complaints.

2    One was lodged against Mr. Vilker, which I think was

3    summarily dismissed, getting a disciplinary complaint

4    filed against him in New York.

5         Mr. Caramadre frequently referred to FBI Agent

6    Pamela McDaid as Cookie McDaid.  So if I happen to slip

7    and call her Cookie McDaid, I apologize, but it's built

8    in my brain because he said it so many times.  Wanting

9    to show that the FBI agent, Cookie McDaid and Postal

10   Inspector Souza brainwashed the 30 or 40 or 50 or 60,

11   how many there are, terminally ill people or their

12   family members into believing that they really knew

13   what was going on in terms of opening up a bond

14   application, opening up a bond account, consenting to

15   be an annuitant.

16        And in summary, that's what he was interested in

17   doing.  Almost -- I think I referred to it at one

18   point, you know, he's interested in this malicious

19   prosecution claim.  There is not a malicious

20   prosecution claim.  And in fact, malicious prosecution

21   claim would be Mr. Caramadre, Joseph Caramadre versus

22   the United States of America.  But guess what?  You

23   never get to a malicious prosecution claim, which is

24   really, really rare because just because you get an

25   acquittal doesn't mean you have a malicious prosecution

1    claim because that's a very high standard.

2         But even before you get to potentially filing a

3    malicious prosecution claim, you have to go 66 for 66

4    on the indictment.  And there's no way -- I thought

5    that was complete suicide if we're going to try a

6    malicious prosecution case in the case of United States

7    of America versus Joseph Caramadre.  I wasn't going to

8    get into that game.  First of all, it was a dead loser,

9    because I don't think Cookie McDaid or Postal Inspector

10   Souza brainwashed 30 or 40 or 50 or 60 witnesses to

11   believing that, Oh, yeah, I really didn't know what was

12   going on back then.  I didn't see that as a viable

13   defense.  I thought it was complete suicide.  And it's

14   not our burden in a criminal case.  The defense

15   lawyer's job in a criminal case is to defend against

16   the charges and put the Government to the test, prove

17   your case beyond a reasonable doubt.

18        So that was his strategy, to get your skin in

19   the game and Mr. Vilker's skin in the game.

20   **Q.**   He was pretty obsessed with that, wasn't he, to

21   the point where he would disregard your advice; is that

22   fair to say?

23   **A.**   He had a lot -- this is what he expressed to me.

24   He had a lot of faith in me.  He still would go back

25   to -- he would listen to me because I'd say this is how

1    we try a case.  And then when I would do more work and

2    then have a meeting with him and bring more -- I won't

3    say bad news, but here's some challenges in the

4    evidence, here's some challenges in the case, he

5    wouldn't address them head on.  He would just say,

6    We've got to stop playing the Government's game; we've

7    got to get their skin in the came.

8    **Q.**    To the point where he actually went out, took

9    steps to have his version of the story put out through

10   a media piece; is that right?

11   **A.**    That's right.  Now that you said that, you just

12   refreshed my memory.  We spent a lot of time on this

13   press release stuff, this, you know, outside-of-court

14   statements.

15          I mean, I understand.  Mr. Caramadre has done a

16   lot of good.  He really has.  He's given to charities.

17   He's served on boards.  He's done a lot of good.  Okay?

18   And it was really important to him to get the public

19   opinion back on his side because he got thrown off

20   boards, which meant a lot to him, which he spent a lot

21   of time on.  At least that's what he told me.  I didn't

22   personally observe it, but he was on all these boards.

23   And his goal was to prove, which again that's not what

24   we do in a criminal case, prove that the Government

25   basically screwed him, that these were false

1   allegations so he could get back on boards and do his

2   thing.  And I've got to keep on reeling him back in.

3   I'm sorry, and I feel bad for him because when you've

4   got a 66-count indictment against you, that's

5   difficult.  Especially a man of his stature.  But what

6   we needed to do was we'll worry about public opinion

7   later.  In fact, I don't know if we're ever going to

8   bring the public opinion back to where it might have

9   been before, wherever it was.  We need to concentrate

10  on this case.

11          So the other thing was, his strategy was press

12  releases, documentaries.  It just had no place in this

13  court and it didn't further the defense of this case.

14  It really was difficult to deal with him, which is

15  getting back to in November when we were looking for a

16  dream team, it's not that I am not capable because I am

17  very capable.  I'm a very good lawyer.  It was the

18  issue of this was an overwhelming case with an

19  overwhelming client.  And the way I envisioned -- I

20  didn't say this but the way I envisioned, if I was

21  going to stay involved, and quite frankly my goal was

22  to be his friend instead, not get paid, sit on the

23  sidelines, have him get his counsel and just stay out

24  of it because this wasn't a career case for me.  This

25  wasn't about money.  This was about making sure that he

1    got the best defense.  But to the extent I was going to

2    be involved with a big law firm and if they wanted me,

3    which one of the firms that we talked about wanted

4    this, that I would have the client control which is why

5    I needed counsel to work with me on this case, because

6    managing hundreds of thousands of pages of documents,

7    coming up with strategy, we're talking about not only

8    66 counts.  We're talking about two or three hundred

9    business transactions that occurred over a 15-year

10   period and then having client control.

11   Q.   I just want to, just to follow-up on the point you

12   just made, I'm going to mark as Government Exhibit 14,

13   this is an e-mail, it's Bates number 461.

14          THE COURT:  Any objection to 14?

15          MR. OLEN:  Judge, could I see it again for a

16   moment, please.

17          MR. McADAMS:  Sorry.  It's an e-mail from

18   Mr. Lepizzera to Mr. Traini.

19          MR. OLEN:  No objection.

20          THE COURT:  14 will be full.

21          (Government Exhibit 14 admitted in full.)

22   Q.   It's on Mr. Traini's e-mail at the top.  The

23   e-mail says it's from you, Mr. Lepizzera, to him,

24   correct?

25   A.   Yes.

1     **Q.**   This is dated October 23rd, 2012, roughly three

2     weeks or so before the trial was to begin?

3     **A.**   Yes.

4     **Q.**   Now, you write:  Joe and I talked tonight at

5     church.  He listened to Bob's cross and he just cannot

6     give up the cross-examination.  He's absolutely stuck

7     on Mizzoni's statement that Cookie McDaid showed him a

8     list with all the names on it.  You know, the list that

9     was going to make Joe a "multi, multi-millionaire."

10          Do you recall this e-mail?

11    **A.**   Yes.

12    **Q.**   It goes on and says:  He said his wife would kill

13    him if that stuff doesn't come out at trial because

14    that's what the malicious prosecution claim is premised

15    upon.  And then you wrote:  Yes, I kid you not.

16          The question I have is, is this an example of

17    the type of communications you had with Mr. Caramadre

18    about trying to get him focused on the crime as opposed

19    to his focus on this malicious prosecution?

20    **A.**   It's the very type of discussions we would have

21    with him and what was going on.

22    **Q.**   Did you memorialize every single instance of those

23    type of conversations?

24    **A.**   I didn't.  We had multiple communications like

25    this.  If I did that, I'd be asking for a continuance.

1    We would have never gotten to trial.

2    **Q.**   We'll come back to that exhibit in a little bit,

3    but I just wanted to move on.

4            THE COURT:   We'll go to about noon and then

5    we'll take an hour-and-a-half.   If you come to a good

6    stopping point, let me know.

7            MR. McADAMS:   Okay.

8    **Q.**   Now, I just want to bring you back to a point that

9    we were discussing earlier, and that is whether or not

10   Mr. Caramadre requested that you, you meaning the

11   defense team, hire an investigator and interview any

12   potential witnesses.

13           Now, in general what was the defense's approach

14   to investigating the case, so to speak, and

15   interviewing witnesses?

16   **A.**   When Mr. McCormick came on, he was suggesting that

17   we get an investigator.   We never did.   And the reason

18   why we didn't is because Mr. Caramadre explained we

19   don't need one.   What do we need an investigator for?

20   So we never did.

21   **Q.**   Mr. Caramadre actually did not want to get an

22   investigator?

23   **A.**   Did not want to get an investigator.   I'm talking

24   about pre-October 2012.   And in fact, it jives back to

25   what I was telling you, he said why do we need that.

1    He didn't say "the master of facts," but he would say,

2    you know, I know everything.  I'm the smartest man in

3    the room.  I'm going to be the smartest man in the

4    room.  Mr. Vilker and Mr. McAdams don't know what

5    they're talking about.  I'm going to clear all this up.

6    We don't need an investigator.  We just don't need an

7    investigator.

8    **Q.**   I'm just going to mark as an exhibit, and we won't

9    go through it in great detail, but Government Exhibit

10   15, which is an e-mail from Mr. Caramadre's account and

11   it's from Mc Law.  Is that Mr. McCormick's e-mail

12   address?

13   **A.**   That's correct.

14   **Q.**   To Mr. Caramadre and yourself, June 2003.

15          MR. McADAMS:  Move that into evidence.

16          MR. OLEN:  No objection.

17          THE COURT:  This is what number?

18          MR. McADAMS:  This is Number 15, your Honor.

19          THE COURT:  All right.  15 will be full.

20          (Government Exhibit 15 admitted in full.)

21   **Q.**   Mr. Lepizzera, this is in June of 2012, where

22   Mr. McCormick is recommending that you get an

23   investigator?

24   **A.**   Yes.

25   **Q.**   And it was Mr. Caramadre who directed that that

1    not happen, it was unnecessary?

2    **A.**    Yes.

3    **Q.**    Now, you referenced that there was a later point

4    just before trial began where there was sort of a

5    renewed push by Mr. Caramadre to interview some

6    witnesses.  Do you recall that?

7    **A.**    Yes.

8    **Q.**    What do you recall the circumstances about that

9    being?

10   **A.**    My memory is I think the issue popped up in early

11   October, 2012, and I was surprised because we are in

12   crunch time now preparing for trial and he's asking for

13   let's get an investigator.

14          So his request for an investigator wasn't I want

15   to investigate 200 witnesses.  I think they concerned

16   particular witnesses.  And the reason why I believe

17   that popped up was actually a reaction because I

18   believe, and this is my memory, and I don't know what

19   the Government was doing, but the Government may have

20   been either serving subpoenas of witnesses for trial or

21   prepping witnesses for trial and word may have gotten

22   back to Mr. Caramadre that's what the Government was

23   doing.  And basically, I think the way this interview

24   situation came up for the most part was, well, if

25   they're doing that, why aren't we doing that.  We've

1    got to let them know that we're working on this and so

2    let's get an investigator.

3    **Q.**   I'd like to turn your attention to what I'll mark

4    as Government Exhibit 16, an e-mail from Mr. Caramadre

5    to yourself.  This is actually an exhibit to

6    Mr. Caramadre's motion.

7         MR. OLEN:  No objection.

8         THE COURT:  16 will be full.

9         (Government Exhibit 16 admitted in full.)

10   **Q.**   It's from Mr. Caramadre, October 8th, 2012.  It

11   says:  Mike, when are we going to discuss updates of

12   the case?  Danielle just called to inform me that an

13   FBI agent was looking for her at her home on Friday.

14   We need to get a PI on board ASAP.

15        Does that refresh your recollection as to those

16   circumstances?

17   **A.**   I forgot about this e-mail because there's

18   thousands, but, yeah, that's exactly what I'm talking

19   about.

20   **Q.**   Now, scroll down to the bottom which looks like an

21   earlier in the day e-mail where you write, Joseph:

22   Tony, Scott and I are in the middle of our weekly

23   defense team meeting right now.  We are discussing

24   amongst many things the interviews of the three

25   witnesses you indicated you may want interviewed by the

1    private investigator.  You identify those witnesses are

2    Jenny Duarte, Colette Robichaud and Liz Mizzoni.  And

3    you write you're also discussing the pretrial

4    memorandum.

5         Now, you ended up having a defense team meeting

6    that discussed this issue?

7    **A.**    Yeah.  I believe when he sent me his e-mail, I

8    think we were in the process of meeting.

9         MR. McADAMS:  I'd like to mark Government

10   Exhibit 17.  At the bottom it's Bates stamped 473 and

11   474, if there's no objection.

12        MR. OLEN:  No objection.

13        THE COURT:  17 will be full.

14        (Government Exhibit 17 admitted in full.)

15   **Q.**    Are these again your notes about a meeting?

16   **A.**    Yes, they are.

17   **Q.**    Now, you have number 2, JAC's request for

18   interviews of certain witnesses and then in parentheses

19   Jenny Duarte, Colette Robichaud and Liz Mizzoni.  And

20   underneath each of those names there's an arrow

21   pointing to a circle and two of them say no and one of

22   them says yes.  Could you explain what that means?

23   **A.**    I just want to look at the whole note for a

24   second.

25        Those are my notes depicting what we had decided

1    to do, meaning Mr. Traini and Mr. DeMello, in terms of

2    assessing whether or not these witnesses should be

3    interviewed or not at that time.

4    **Q.**   And did you discuss that with Mr. Caramadre?

5    **A.**   Yes.

6    **Q.**   And you informed him -- what was the conversation

7    with Mr. Caramadre?

8    **A.**   I believe it was an in-person meeting that we had.

9    And after we met, it was decided we weren't going to

10   do, I believe, because Liz Mizzoni flipped once or

11   twice, but in the end, I don't know how we got there,

12   I'd have to take a look at notes, but in the end it was

13   decided we weren't going to interview any of these

14   witnesses.

15   **Q.**   In general, do you recall why?

16   **A.**   Let's take Jenny Duarte, for example.  Jenny

17   Duarte is the niece of Joseph Caramadre's best friend

18   from high school.  In fact, they're still best friends.

19   They still see each other.  And Jennie's husband,

20   Donald, was an annuitant and I believe he was a

21   joint -- I think he was an annuitant on two annuities

22   and he was a joint tenant on one of the bonds.  And she

23   was interviewed by the FBI.  I believe what she did was

24   she refused to be interviewed by Mr. Souza.  I think

25   subsequently she agreed to be interviewed by Ms. McDaid

1    and maybe Mr. Souza was there, and I think she also

2    testified at the Grand Jury.  And she really didn't

3    have a memory of anyone telling her about an annuity,

4    that her husband agreed to be an annuitant.  This is my

5    memory.  I'd have to look at the 302s and the Grand

6    Jury testimony.

7          She didn't have any memory of a bond account.

8    She didn't have any knowledge of what an annuity was,

9    about what a bond was.  And this was important for me

10   because I believe -- I believe that this is -- I'll

11   call pre-Mr. Radhakrishnan.  And why this is important

12   is because Mr. Radhakrishnan was hired I think in June

13   or July of 2007 and his job duties basically rolled

14   into meeting with most of the joint tenants,

15   annuitants, mostly terminally ill people.

16         So what I wanted to see was what is

17   Mr. Caramadre doing beforehand.  What's his practice.

18   Because it's clear to me that Mr. Radhakrishnan wasn't

19   fully disclosing to these people.  So I wanted to see

20   what's being said to the terminally ill people , the

21   family members pre-Mr. Radhakrishnan.

22         And as I looked at the 302s, again I have to

23   take a look at it, but as I look at the 302s and the

24   Grand Jury testimony, she kept on saying I don't

25   remember, I don't remember, it could have been.  You

1    know, I blocked that stuff out.  Maybe they did tell me

2    that.

3          And Mr. Maggiacomo met with her and her husband,

4    and Mr. Caramadre might have met with her.  And what I

5    thought was problematic was she had no fundamental

6    concept of what an annuity was.  She had no fundamental

7    concept of what a bond was.  Now, she didn't say that

8    stuff, but that's the stuff she didn't say in her 302

9    report.  What she kept on saying was in her 302 report,

10   it was a gift.  Joseph told me this was for charity

11   purposes.  And that's a problem.  Why?  Because one of

12   the things, one of the allegations the Government had

13   made in this case, or the evidence showed, is that

14   Mr. Radhakrishnan wasn't disclosing to the terminally

15   ill people the business nature of this transaction.

16         What he was doing was, allegedly, was telling

17   people -- one of the things he would tell people is we

18   are going to open up an annuity, but this is all going

19   to go for charity and the profits of this are going to

20   go strictly to charity and this is where the $5,000

21   comes from that I'm giving to you.  So by you allowing

22   us to open up an account in your name, this enables us

23   to help other people and give other monies.  So that

24   all ties in because Duarte is saying to the Government,

25   oh, yeah, this was charity.

1          It seems like after the fact she's saying, well,

2    maybe they said about a bond, maybe they didn't.

3          I did not want an investigator to back out with

4    this witness and lay another record of -- because what

5    I would have had the investigator ask is, do you know

6    what a bond is, do you know what a joint tenant is, do

7    you know what a margin is, do you know what an annuity

8    is, do you know what an annuitant is.  I don't believe,

9    based on my review, that she knew any of that stuff.

10         So I had an investigator go out there, and now

11   kind of -- I assume the Government picked up on this,

12   but maybe you didn't -- I'm going to go lay a record of

13   this?  What am I going to get out of investigating?

14   We're not going to hire an investigator.  We're not

15   going to hire an investigator to send a message to the

16   Government, Hey, guess what, you've got your FBI agent,

17   Cookie McDaid, going out there and Postal Inspector

18   Souza, you know, interviewing people.  We're going to

19   do the same thing.  This isn't a game.  This is the

20   defense of someone's life.

21         So if it had value, we would have done it.  To

22   me it didn't have value.  And on cross-examination of

23   her, she -- my memory is anyways, and it's not as good

24   as it was back at trial, was she's saying, you know, I

25   could have blocked it out.  They might have said

1    something.

2          And the other thing I was going to do at trial

3    with her is Maggiacomo, I believe, Maggiacomo met with

4    Donald Duarte.  He visited their home in Scituate.  And

5    Jenny Duarte testified that she was in and out of the

6    room so she was there for part of the meeting.  I

7    think, and I have to look at his testimony, I think

8    Edward said he didn't explain certain things.  But I

9    think he might have said he thought Joseph did and he

10   was just there to sign the documents.

11         So one of the things that I would have done was

12   they don't know whether or not -- what was disclosed to

13   Donald.  And if there was a misunderstanding because

14   Mr. Caramadre thought Mr. Maggiacomo was doing it

15   because Mr. Maggiacomo met with him and Mr. Maggiacomo

16   thought he was just getting a signature and he thought

17   Mr. Caramadre would do it, then nothing is intentional.

18   And in fact, Mr. Caramadre's best friends with Jenny

19   Duarte's uncle.  And he's not going to go harm Jenny

20   Duarte.  He's not going to do anything.  In fact, Jenny

21   Duarte had referred over her father-in-law, which is

22   Donald's father, David Duarte, and got money.  So there

23   wasn't anything really damaging.  But on the flip side,

24   it wasn't very helpful either because what bothered me

25   about Jenny Duarte was she kept saying this was just a

1   gift.

2          This wasn't a gift.  There was a quid pro quo.

3   This was let us use your name on these accounts and

4   we'll give you $5,000.  It's not a gift.

5   **Q.**   This transaction with Jenny Duarte was before the

6   ad ever went in the Catholic paper.  This was before

7   Mr. Radhakrishnan had been hired.  And in fact, this

8   was a transaction in which the owner of the annuity who

9   was named was a very high profile political figure who

10  had never met and had no idea who the Duartes were, and

11  she said she had never heard of that person before,

12  correct?

13  **A.**   That's correct.  I'll just say this.  I know when

14  she was questioned, you know, the questions were, Do

15  you know who the investor was?  Do you know who each of

16  the investors were on these annuities and bonds?  Did

17  you know how much money was getting invested?  Okay.

18  So I thought that was problematic, but my defense to

19  that would have been does she really need to know who

20  the investor is, does she really know how much money is

21  getting invested.  As long as they know, my argument to

22  the jury would have been as long as she knows this is a

23  business transaction, there's an account being opened

24  up, they're getting $5,000 for the opening of an

25  account in her husband's name and Social Security

1    number, that's okay.  That's all they need to know.

2    Like, how far did we need to go?  She didn't even know

3    that.

4    Q.    But you also would have had to deal with

5    Mr. Maggiacomo's testimony that when called by the

6    insurance company and asked what the relationship was,

7    that Mr. Caramadre instructed him to say that this

8    person was a friend of the Duartes?

9    A.    I don't recall that, Mr. McAdams.  I thought the

10   friend issue had to do with Lily Ianiero and the

11   attorney, but my memory would have to be refreshed on

12   that point.

13   Q.    Just to follow-up on this, then we can take a

14   break, Government Exhibit 18.  It's 470 at the bottom.

15          MR. OLEN:  No objection.

16          THE COURT:  All right.  18 will be full.

17          (Government Exhibit 18 admitted in full.)

18   Q.    Just to follow-up, this is another page of your

19   notes, Mr. Lepizzera?

20   A.    Yes.

21   Q.    At the top it indicates October 10, 2012, so

22   roughly two days after Mr. Caramadre inquired about the

23   investigator?

24   A.    Yes.

25   Q.    And down at the bottom it's circled and number two

1    says, Investigator use, then an arrow, JAC doesn't want

2    to interview Liz Mizzoni but he wants to interview --

3    and there's names, Monsignor Sheehan, Tom Maltese and

4    Jenny Duarte, and on the next line Colette Robichaud.

5    And then each of them is struck out.  Can you explain

6    what that means?

7    **A.**   The striking out means that we discussed each one

8    of those potential interviewees, and it was jointly

9    decided by all after a full discussion that those

10   people would not be interviewed.

11   **Q.**   So you just testified at great length about the

12   back and forth analysis that you had with respect to

13   one particular witness and whether it was a good idea

14   to interview them.

15        Are you essentially telling us that you had a

16   similar conversation with regard to these other

17   potential witnesses with Mr. Caramadre?

18   **A.**   Yes.

19        MR. McADAMS:  Your Honor, I think it might be a

20   good time to take a break.

21        THE COURT:  I agree.

22        All right.  We'll take a break.  We're going to

23   take a break until 1:30 so that counsel has sufficient

24   time to look over the documents that I gave you to

25   review, Mr. Gerstein, with Mr. Lepizzera and Mr. Traini

1    to decide whether you're going to agree that those can

2    be turned over or whether I'll just order that and what

3    will happen from there.  All right?  So I'll give you

4    some time to talk to counsel about that, and so we'll

5    reconvene at 1:30.

6              (Side bar conference off the record.)

7              (Lunch recess.)

8              THE COURT:  Mr. McAdams, are you ready to

9    continue?

10             MR. McADAMS:  Yes, your Honor.

11             THE COURT:  Before you get going, maybe I can

12   ask Mr. Gerstein if he's had a chance to review these

13   documents.

14             MR. GERSTEIN:  I have, your Honor.  And for the

15   purposes of the record, our response is as follows:

16   These documents are clearly opinion work product, and

17   it remains our position that they are not subject to

18   disclosure absent, at a minimum, a highly persuasive

19   argument necessitating that convinces the Court that

20   they are required to be disclosed.  That being said and

21   with reserving all of our rights with the permission of

22   the Court, if the Court orders these documents

23   disclosed, we are certainly not going to file an appeal

24   and we will comply with the order of the Court, but,

25   again, I want the understanding to be clear that we are

1    not waiving the argument with respect to these

2    documents or similar documents being opinion work

3    product that would not be subject to disclosure. So I

4    trust that that adequately responds to the Court's

5    inquiry before we broke.

6         THE COURT: I think it does. And what I'm going

7    to do is -- there are a couple of additional documents

8    that I want to give a look at. I'll probably do that

9    during the break today, that I also want to have you

10   look at. And then -- or I may want to have you look

11   at. And then I think what we'll do is I'll have you

12   all come up to chambers at the end of the hearing today

13   and I'll deal with giving Mr. Olen and Mr. Watt some of

14   these or all of these additional documents, about ten

15   additional pages because, as you all know, based on our

16   earlier chambers conferences, we're not going to finish

17   this examination today so I think we have some time.

18   But what you've just told me is helpful in terms of

19   scheduling for sure. Thank you.

20        MR. GERSTEIN: Do I have a right to pull back

21   what I said scheduling the ten pages?

22        THE COURT: Yes.

23        All right. Mr. McAdams, are you ready to go?

24        MR. McADAMS: Yes, your Honor.

25        THE COURT: Just one moment. Just to expedite

1    everything, Mr. Gerstein, do you want to look these ten

2    pages over now?  You should be familiar with these

3    anyway because they're your clients' records, and then

4    just return them to me.  I'm not going to be able to

5    look at them while we're -- you can multi-task.

6              THE COURT:  Go ahead, Mr. McAdams.

7              MR. McADAMS:  Thank you, your Honor.

8    **Q.**    Good afternoon, Mr. Lepizzera.

9    **A.**    Good afternoon, Mr. McAdams.

10   **Q.**    Mr. Lepizzera, I'd like to turn your attention now

11   to the beginning of the trial, which was November 13th,

12   2012.

13   **A.**    Yes.

14   **Q.**    You alluded earlier in your testimony about the

15   decision to reserve defense's opening statement?

16   **A.**    Yes.

17   **Q.**    Could you explain what your thinking was behind

18   that decision.

19   **A.**    It was scheduled to be a three- or four-month

20   trial, and -- I think I alluded to this before, does

21   Mr. Caramadre testify or not.  What is

22   Mr. Radhakrishnan going to do in terms of -- he was

23   representing himself.  He was pro se.  What is he going

24   to do in terms of his trial strategy.

25              So Mr. Traini and I talked about this with the

1    client, and the client agreed with it, it was our

2    decision not to give an opening statement because one

3    of the worst things an attorney can do is, especially

4    with a three- or four-month trial is promise or make

5    statements to a jury in opening statements and it

6    doesn't happen.

7         So it was a thought-out process.  It was thought

8    out for a while.  This wasn't the first day of trial

9    saying, well, we're going to defer.  This is something

10   that was thought out, discussed and discussed with the

11   client.  We all agreed that no opening statement would

12   be given.  Probably an opening statement would be given

13   if we put on a case.

14   **Q.**   So you decided that you would reserve your opening

15   in case the Defendant ended up putting on its own case

16   at the conclusion of the Government?

17   **A.**   Yes.  And whether that included Mr. Caramadre's

18   testifying or other witnesses, correct.

19   **Q.**   And you discussed this with Mr. Caramadre, and he

20   agree with that thinking?

21   **A.**   Yes.

22   **Q.**   Now, with respect to the first day of trial,

23   because you had reserved opening, the way that it

24   proceeded was the Government did its opening and then

25   the videotaped deposition of Mr. Wiley was played; is

1      that correct?

2      **A.**    That's correct.

3      **Q.**    And after Mr. Wiley's direct testimony was played,

4      a cross-examination of Mr. Wiley was played for the

5      jury; is that correct?

6      **A.**    Yes.   Both by Mr. Pine on behalf of

7      Mr. Radhakrishnan and Mr. Flanders' cross on behalf of

8      Mr. Caramadre.

9      **Q.**    And you had discussions with Mr. Caramadre before

10     the trial as to whether or not to play those particular

11     cross-examinations?

12     **A.**    Yes.

13     **Q.**    What did Mr. Caramadre want to do?

14     **A.**    There were multiple conversations in terms of

15     playing part of the cross-examination, playing none of

16     the cross-examination, but ultimately on Mr. Wiley,

17     Mr. Caramadre wanted that cross-examination to go

18     ahead.   In fact, we did have a disagreement or a

19     divergence of views, I should say, on how much of the

20     cross-examination should come in because, quite

21     frankly, some of what Mr. Wiley said on

22     cross-examination, especially with Mr. Flanders because

23     I couldn't control Mr. Pine's cross-examination, was

24     damaging.   And it's been a while since I looked at

25     Mr. Wiley's video deposition.   I think I've seen it

1    since the trial when it was played.  I think at one

2    point Mr. Flanders might have asked a question, do you

3    think my client did any wrong or harm and Mr. Wiley

4    said yes.  I'm paraphrasing but there were some things

5    I wanted out of that cross-examination, references to

6    Agent McDaid, some other references I just don't

7    recall, but I wanted to at least shorten it.

8    Mr. Caramadre didn't.  And ultimately, I think the

9    whole cross was played that he wanted.

10   Q.    That included the testimony that Special Agent

11   McDaid had made some cookies and brought them to

12   Mr. Wiley?

13   A.    That's right.  And you just refreshed my memory.

14   It was she brought cookies over to Mr. Wiley.  I think

15   she might have brought her son.  I don't know how old

16   her son was.  She had a younger son.  I think she

17   brought her son at some point to go see Mr. Wiley, and

18   I think Mr. Wiley had testified that they sort of

19   developed a friendship and they were talking about

20   boats or something like that.  But part of the stuff,

21   and I don't recall, I'd have to look at the video

22   deposition transcript, some of the stuff I just didn't

23   want in because I thought it was damaging, but

24   Mr. Caramadre got his wishes and that part came in.

25   Q.    Even though you thought that it might be damaging,

1    ultimately it was Mr. Caramadre's decision and you

2    played that portion of the cross-examination?

3    **A.**    Yes.

4    **Q.**    Now, did you have similar debates with

5    Mr. Caramadre about whether or not the

6    cross-examinations of other video deponents would be

7    played at the trial?

8    **A.**    Yes.

9    **Q.**    Was it a similar sort of back and forth about

10   whether it's a positive portrayal or potentially

11   damaging?

12   **A.**    What comes to immediate mind right now is

13   Mr. Wiley's video deposition.  We had made an initial

14   decision, meaning the defense team and Mr. Caramadre,

15   that we were not going to play the cross-examination by

16   Mr. Flanders at all of Mr. Mizzoni because I must have

17   looked at Mr. Mizzoni's deposition four, five, six

18   times, maybe more but at least that.  And in my

19   opinion, and I want to preface this, Mr. Flanders did a

20   good job, but as we tried to keep the depositions out,

21   the thing was the indictment hadn't been returned yet,

22   and it was a difficult job to take someone's deposition

23   with no indictment, you don't know the whole case.  But

24   be that as it may, I viewed Mr. Flanders deposition or

25   the cross-examination as more of a civil type

1    deposition.  How you question a witness -- I handle

2    civil and criminal cases.  How you handle a deposition

3    is much different than you handle a cross-examination.

4    In a civil deposition, the goal is to get as much

5    information on the record as you can so you can

6    discover or inquire into the other side's case.  What

7    is the witness possibly going to say?  Okay?  This was

8    a little bit different.  This was, although styled as a

9    deposition, was really trial testimony.  And some of

10   the questions -- no fault of Mr. Flanders, he's a fine

11   attorney -- came across at times as a deposition

12   because it was a video deposition.  And I thought --

13   again, I'm Monday morning quarter-backing on this in

14   terms of a deposition, I thought it came across more as

15   a civil deposition.  Some of the questions were

16   open-ended.

17          At some point, again, I'd have to look at the

18   transcript or look at the video, Mr. Mizzoni said

19   something to the effect of, you know, "He stole my

20   body.  He stole my body," referring to Mr. Caramadre.

21   In terms of saying I didn't know I was a named

22   annuitant and this is just wrong and he stole my body.

23   That came out, I believe, on cross or at some point.

24   And it was just damaging.  I did not want the jury to

25   hear that.

1          So we had made a decision initially not to play

2     any cross-examination.  Then -- with the client.  Then

3     I had a communication with -- I had I think a

4     face-to-face discussion with Mr. Caramadre.  He said

5     that, no, I need that cross-examination to come in

6     because Mizzoni mentioned something about that Pamela

7     McDaid, FBI Agent Pamela McDaid showed Mizzoni a list.

8     And Mr. Mizzoni testified to that, showed him a list

9     with all these names.  And Mr. Caramadre's theory of

10    the case was, again, the Government came in, showed the

11    witnesses these lists that Mr. Caramadre was making all

12    this money, and it basically flipped the witnesses.  I

13    think he said at some point, "My wife would kill me if

14    I give up that cross.  That has to come in."

15         So he changed his mind and said, "I want that

16    cross to come in."  I don't believe we ever made a

17    final decision on that because we never reached the

18    bridge.  Mr. Mizzoni's deposition was never proffered

19    by the Government.

20    **Q.**   Because this was going to be a three- to

21    four-month trial and it ultimately ended after four

22    days of testimony?

23    **A.**   Yes.  We would have had to cross that bridge when

24    the Government was ready to put that on.

25    **Q.**   Was it ever part of your cross-examination

1    strategy to deliberately fail as a cross-examiner so as

2    to increase the pressure on Mr. Caramadre to plead

3    guilty?

4    **A.**    I find the question just morally reprehensible.

5    Absolutely 110 percent not.  I wouldn't do it to

6    anyone, and I wouldn't do it to a client who I

7    considered a friend or cared about.  Absolutely not.

8    **Q.**    You didn't do it to Mr. Caramadre in this trial?

9    **A.**    No.

10   **Q.**    Now, we just talked about a couple of video

11   depositions, but in this trial there were many

12   different types of witnesses; is that fair to say?

13   **A.**    Yes.

14   **Q.**    At least in what was anticipated to be the full

15   three- to four-month trial.  The first week was mostly

16   family members, but over the course of the three- to

17   four-month trial, there was anticipated to be various

18   categories of witnesses?

19   **A.**    I knew the case well.  There was going to be --

20   and I think the Government did a good job -- the

21   terminally ill people and their family members.  The

22   Government started out with that for a reason, to get

23   everyone's attention, and it came across pretty

24   powerful.  Then at some point it would have segued into

25   some of the professional people.  It would have segued

1    into maybe partners, Mr. Maggiacomo, Mr. Hanrahan.  It

2    would have segued into representatives from the

3    insurance company.  It would have segued then into

4    representatives from the broker/dealer houses, in terms

5    of TD Ameritrade, E*TRADE.  It would have gotten to

6    other professional witnesses like Mr. Prisko and Lori

7    Albert, what have you.

8         So I viewed the case as these pockets.  You have

9    the pockets of the terminally ill people and their

10   family members.  You've got the pocket of the

11   professional witnesses from broker/dealer houses, the

12   insurance companies, the bond companies and what have

13   you.

14   **Q.**   And would you structure your cross-examination of

15   those various pockets of witnesses differently

16   depending on who they were?  In other words, would you

17   take the same approach of cross-examining a terminally

18   ill person as you would a representative from the

19   insurance company?

20   **A.**   They would be quite different.

21   **Q.**   How so, in brief?

22   **A.**   For the people that were here from -- in November

23   during the four days of actual testimony, the witnesses

24   who were the family members of the terminally ill

25   people, it was powerful.  Okay?  Some were crying.

1    Mr. Rodriguez was still sick.

2          So your approach in terms of, as I view a

3    defense lawyer, your approach in how to approach

4    cross-examination is different.  It doesn't mean you

5    lay down, though.  If a witness is out and out lying

6    and they are a terminally ill person and they're lying,

7    you need to confront that witness because that's your

8    job as a defense lawyer.

9          In the witnesses that were presented by the

10   Government, as you can read the transcript, some

11   witnesses were cross-examined and some were not.  And

12   that was purposely done because in terms of the ones

13   who were lightly cross-examined or not cross-examined,

14   and I'd have to go back and go through each of the

15   witnesses, Mr. Caramadre, as part of our defenses,

16   Mr. Caramadre didn't deal with most of those witnesses.

17   It was Mr. Radhakrishnan.

18         So I alluded to before about pointing the finger

19   at Mr. Radhakrishnan.  I'm not sure exactly how strong

20   that would have been but my thought in this case was to

21   slowly but surely for this jury to distance

22   Mr. Caramadre from Mr. Radhakrishnan.  And to the

23   extent I could get something favorable that I saw from

24   a witness, from the family member, or terminally ill

25   person, I'd get it.  For example, I think his name is

1    Mr. Fitzpatrick or Carol Larivee.  Okay?  Carol Larivee

2    was a powerful witness for the Government.  I thought I

3    saw an opportunity, and I think she testified on

4    Friday, I thought this was a golden opportunity to kind

5    of flip this on the Government because the Government

6    presented her as she basically threw Mr. Radhakrishnan,

7    and Mr. Craddock who accompanied Mr. Radhakrishnan, out

8    of the house because she was absolutely appalled that

9    you're going to open up an account with my niece?

10   You're going to make money?  Get out of my house right

11   now.

12        What I was able to establish with her, okay,

13   slowly but surely and if this developed it would have

14   worked, at least would have had a nice argument, was

15   this:  Boy, Mr. Radhakrishnan and Mr. Caramadre aren't

16   explaining things to people?  Of course they were

17   explaining things to people.  They told Mrs. Larivee at

18   least that there was an account being opened up, that

19   they needed her niece's Social Security number, that

20   they needed to open up an account because investors

21   were going to put money in this account and that part

22   of it was this death benefit.  Okay?

23        Now, she found that offensive and threw them

24   out.  But the way I looked at it on behalf of the

25   Defendant was thank you very much, Government, because

1    Mr. Radhakrishnan is explaining stuff to the people.

2    And in fact, let me go a step further.  Part of the

3    defense was that Mr. Caramadre actually asked

4    Mr. Craddock, who was a lawyer in his office, who was a

5    former chief of police in Cranston, former colonel, he

6    actually asked Mr. Craddock to accompany that meeting,

7    go with Mr. Radhakrishnan to go meet with Carol Larivee

8    just to make sure that things were getting disclosed

9    and stuff.

10         So I took that opportunity, no one realizes it

11   because no one knows what my defense strategy was, but

12   Mr. Craddock went to that meeting with

13   Mr. Radhakrishnan and he went there and it got

14   explained to Carol Larivee and she didn't like it and

15   she threw them out.

16   **Q.**   So what you did there, what you just explained

17   there was a strategic cross-examination that you were

18   sort of banking for later in the case when you could

19   argue that point to the jury, hopefully with some other

20   instances where it's similar; is that fair to say?

21   **A.**   That's right.  Because to me, part of my theory

22   was, what I would argue to the jury ultimately and who

23   knows, because three or four months is a long trial.

24   But the way I looked at this is it makes no sense

25   whatsoever.  Is Mr. Caramadre asking Mr. Radhakrishnan

1  to go lie on Mondays, Wednesdays and Fridays, and then

2  tell the truth on Tuesdays and Thursdays?  It makes no

3  sense.  Mr. Radhakrishnan was telling the truth and

4  he's lying sometimes.  Well, it makes no sense that

5  Mr. Caramadre was directing him to do that.  So what I

6  would argue was that Mr. Radhakrishnan was doing this

7  on his own.

8  **Q.**   Of course, on rebuttal we would have pointed out

9  that after that Mr. Caramadre stopped sending

10  Mr. Craddock or anyone else with Mr. Radhakrishnan, but

11  that's neither here nor there.

12  **A.**   I understand.

13  **Q.**   Did you use that same cross-examination with

14  respect to every witness?

15  **A.**   Can you repeat that?

16  **Q.**   Would you use that same technique that you just

17  described with Mrs. Larivee with, for example,

18  Mr. Rodriguez?

19  **A.**   Yes.  I had the opportunity to see Mr. Rodriguez's

20  video deposition, which I viewed him as credible versus

21  a Mr. Garvey, who I thought was kind of, you know, not

22  so credible, I'll say.

23      It was clear to me, okay, that Mr. Caramadre

24  never met with Mr. Rodriguez.  Okay?  In fact, I think

25  with him what I pointed out was is that Raymour didn't

1    explain some of the documents to Mr. Rodriguez.  And I

2    don't know if the Government ever picked up on this

3    because everyone is probably wondering what is

4    Mr. Lepizzera doing.  I think on the bond contract, and

5    I forget what it's called, an acknowledgment contract,

6    is on there it said if Mr. Rodriguez dies, the money

7    goes to Mr. Caramadre although there's no reference on

8    the document when he signed it that Mr. Caramadre is

9    the investor.  But if by signing the document there's

10   going to be an account opened up; and if Mr. Rodriguez

11   dies, then all the money as a joint tenant goes to

12   Mr. Caramadre.  However, what I had pointed out as a

13   flip side was doesn't this contract also say that if

14   Mr. Caramadre dies, that all the money goes to

15   Mr. Rodriguez.

16         Now, I think he testified that no one explained

17   that to him.  One of the arguments that I was

18   developing, and I don't think anyone really caught on,

19   was Mr. Caramadre paid a lot of money for that contract

20   to get drafted and he's putting in the contract, he's

21   putting in the contract that if Joint Tenant B dies,

22   the terminally ill person, I get the money; but if I

23   die, then the joint tenant gets the money.

24         Now, there's some holes in that, but that's what

25   I saw as an opportunity with him.  Other than that, I

1    really didn't see any other reason to go any further

2    with him.

3    **Q.**    With each witness you'd look at that witness and

4    you have knowledge of their previous statements because

5    they've been disclosed to you, and you developed a

6    strategy consistent with your overall theory on how

7    you're going to cross-examine that witness?

8    **A.**    Yes.

9    **Q.**    And did you do that with each of the witnesses

10   that testified during that first week of trial?

11   **A.**    Yes.

12   **Q.**    Not to repeat an offensive question, but did you

13   ever intentionally not cross or intentionally structure

14   your cross-examination so that its effect would be to

15   pressure Mr. Caramadre to plead guilty?

16   **A.**    Absolutely not.

17   **Q.**    To your knowledge, did Mr. Traini ever do that or

18   suggest that you do that in your cross-examinations?

19   **A.**    Absolutely not.

20   **Q.**    Now, we talked about the first day of trial.  And

21   if I'm correct the second day of trial, we completed

22   the Wiley deposition and then Mr. Rodriguez testified.

23   **A.**    I believe that's the order.

24   **Q.**    And I don't recall whether anyone else testified

25   the second day or not, but when was the first time that

1    Mr. -- strike that.  Let me rephrase that.

2        Before the trial started you had a conversation,

3    yourself and Mr. Traini with Mr. Caramadre regarding

4    your obligations to disclose to him any potential plea

5    offers from the Government.

6    **A.**    Absolutely.

7    **Q.**    And you actually sat with him and explained the

8    potential sentencing consequences if you're convicted

9    of each of the particular charges in the indictment?

10   **A.**    Yeah.  There's a letter to that effect that we

11   actually went through in addition to the oral

12   communications.

13   **Q.**    So on December 13th, I believe it was, you had a

14   letter signed by Mr. Caramadre that memorialized those

15   conversations?

16   **A.**    I think, Mr. McAdams, the letter is dated

17   September 13th.  I think he may have signed it on the

18   18th, but he signed it in September.  I think there's a

19   note to that effect to memorialize the exact date.  I

20   don't think he signed it on the 13th.  I'd have to look

21   at my notes.

22   **Q.**    I think you're right.  I have a note of that.  But

23   that's not my question.  My question is in the context

24   of that conversation and that letter being signed by

25   Mr. Caramadre, did he instruct you not to negotiate,

1    attempt to negotiate a plea agreement with the

2    Government?

3    **A.**    He instructed us by signing that not to open up

4    plea negotiations -- no plea negotiations.  Just march

5    ahead.

6    **Q.**    And you did that?

7    **A.**    Yes.

8    **Q.**    You prepared for trial and prepared for all your

9    various witnesses and so forth?

10   **A.**    Just so we're clear, we were preparing for trial

11   beforehand.  So it was just continuing on with the

12   trial preparations.

13   **Q.**    So now I'm going to kind of fast-forward.  We're

14   back at the time of the actual trial.  When was the

15   first time during the course of that trial the topic of

16   opening up a plea negotiation with the Government came?

17   **A.**    I'm a little fuzzy on the exact date.  I believe

18   after Day 2, I believe that we had a meeting, meaning

19   with Mr. Traini and Mr. Caramadre, after Day 2.  In

20   other words, in the afternoon because we were going I

21   think until 1:30 trial testimony.

22        I think we had a meeting on Wednesday, but I

23   could stand to be corrected.  I know we had a meeting

24   and then we were talking about the way the trial was

25   developing, the powerful nature of the witnesses, and I

1    think we felt we were obligated to sit down with the

2    client and have a heart-to-heart conversation saying I

3    know we had these discussions last time in September,

4    but this is not going well, and we are obligated to

5    advise you that maybe we should try to open up

6    negotiations.

7         He left that day saying that he would think

8    about it.  Again, I think it's Wednesday, but I'm not

9    one hundred percent sure.  And I said that's fine.

10   Just think about it.  Talk to your family about it.

11   It's a family decision.  And I believe he came back

12   Thursday morning and I believe he instructed me to open

13   up the negotiations, which we did.

14   Q.   We're going to get into those negotiations.

15   Before that, I just want to kind of cover something we

16   skipped over on Tuesday, the first day of the trial,

17   Mr. Wiley's deposition.

18        After Mr. Wiley's testimony, that night did you

19   have conversations with Mr. Caramadre or his wife

20   regarding how that testimony went, Paula Caramadre?

21        MR. WATT:  Regarding, I'm sorry?

22   Q.   Regarding the Wiley testimony.

23   A.   I believe that after trial ended on Tuesday, I

24   believe that Mrs. Caramadre -- she was sitting behind

25   the defense table in the public gallery, and she kind

1    of came towards the bar.  And I don't remember her

2    exact words, okay, but she looked confused, concerned,

3    and she said something to the effect of, you know,

4    "What's going on with all this?"  Something to that

5    effect.  Those may not be her exact words, but she was

6    frazzled by the evidence.

7    **Q.**    And part of that evidence that had been played in

8    the Wiley deposition was a notarized signature page

9    that notarized both Mrs. Caramadre's signature and

10   Mr. Wiley's signature, correct?

11   **A.**    Right.  Give me one second.  There's so many

12   transactions.

13   **Q.**    From the TradeKing application?

14   **A.**    Yeah.  On the application in dispute or the bond

15   account in dispute, I should say, was Richard Wiley was

16   the joint tenant with Paula Caramadre, and I believe

17   exhibits came in during the video deposition having

18   Paula Caramadre's name on it.

19   **Q.**    Was Mrs. Caramadre upset about the fact that it

20   was not her signature, her true signature that had been

21   notarized in place of her name?

22   **A.**    I can't tell you what she was thinking because she

23   didn't say anything about signature, okay?  So I can't

24   say that.  What I can tell you is that she looked

25   distraught, frazzled, and she came up to the bar and I

1  said something to the effect of, Remember what I told

2  you Sunday night at your house, trials are a roller

3  coaster.  They're up and down.  And right now we're in

4  the Government's case-in-chief and there's going to be

5  a lot of down, a lot of down for the defense.  If we're

6  going down this road at trial, we need to hold strong

7  and let's deal with it.  Something to that effect.

8  **Q.**   Now, let's go back to I believe you said it was

9  Thursday morning Mr. Caramadre instructed you to open

10  plea negotiations with the Government.

11  **A.**   Correct.

12  **Q.**   What were your observations of his mental state at

13  that time?

14  **A.**   He was fine.

15  **Q.**   I mean, you have known him for many years; is that

16  fair to say?

17  **A.**   I've known Joe for 20 years, but we started

18  talking again probably a couple of years ago, I think

19  during the course of the start of this investigation.

20  He was down because, let's face it, he's on trial for

21  his life and the evidence was pretty powerful.  So he

22  was down, but he was coherent.  He understood what he

23  was doing.  There was no doubt in my mind that he knew

24  what he was doing.  In fact, when he came back Thursday

25  and said, I'm authorizing you and Tony to open up the

1    negotiations, I actually said to myself something to

2    the effect of he's finally making a good decision.  I

3    didn't know what was going to come of the negotiations.

4    I didn't know if the Government was going to say

5    absolutely not, we want 20 years.  Which it didn't

6    happen.  It didn't happen, but I didn't know what the

7    Government was going to do.  But I thought that it was

8    a very rational, prudent decision to say open up the

9    plea negotiations.

10          So he was fine.  He understood what was going

11   on.

12   **Q.**   Even though you know that he had had a history of

13   depression over the years, and you've had many, many

14   experiences with him during the course of this

15   representation and the days of trial, you had no

16   concerns that he might be mentally incompetent to make

17   that type of decision?

18   **A.**   None.  None.

19   **Q.**   Did he say anything to you to indicate that he was

20   incapable of making a decision or anything of that

21   nature?

22   **A.**   No.

23   **Q.**   Now, during the course of the trial as we had

24   progressed through the first two days , had he been

25   able to assist you in trying the case in the sense of

1    engaging with you regarding how witnesses were

2    testifying, having questions, passing notes, things of

3    that nature that would help, you know, as the trial

4    went on?

5    **A.**    He was kind of quiet because Joe's an active --

6    he's a very bright man.  He's intelligent.  He's

7    hands-on.  He was kind of quiet.  I do recall he was

8    paying attention.  I recall at one point he did during

9    the Edwin Rodriguez testimony, when I came back, he

10   wanted me to ask another question of Mr. Rodriguez.

11   And the question I think he wanted me to ask is:

12   Mr. Rodriguez, isn't it true that Mr. Caramadre lost

13   $105,000 in this particular bond account?  Okay?  I

14   don't know the exact number.  I'm kind of just picking

15   a number.  And my response to him was, Well, why am I

16   going to ask that question.  Number one, he denies

17   knowing about a bond account.  Number two, he doesn't

18   know about whether you lost money or you gained money.

19   Number three -- I believe he did lose money in that

20   account.  Number three, the Government is going to come

21   back in the case-in-chief and say, well, the reason why

22   you lost money is because Mr. Rodriguez didn't die

23   right away and that, therefore, it wasn't prudent to

24   keep the investment; therefore, you sold the bond short

25   because there was no death benefit to be gained because

1    Mr. Rodriguez didn't die.

2         And number four, if I asked that question, all

3    it's going to do is confirm that this man doesn't know

4    anything about a bond account.  So lack of foundation.

5    He has no knowledge.  And I'm not going to help the

6    Government confirm the case, which is what bond

7    account?  What are you talking about?  How would I know

8    about losses or gains if I don't know anything about

9    it?  So I remember that dialogue.  He was there.  He

10   understood what was going on.

11   **Q.**   Now, with respect to the plea negotiations, that

12   was a process that spanned over several days, correct?

13   **A.**   Probably Thursday through Sunday night.

14        MR. McADAMS:  I'd like to mark Government

15   Exhibit number 19, which is an e-mail communication,

16   Bates stamped page 330, 331.

17        THE COURT:  Any objection?

18        MR. OLEN:  I want to take a quick look, Judge.

19        MR. McADAMS:  E-mail from -- it's to the

20   Government from you, Mr. Lepizzera.

21        MR. OLEN:  No objection.

22        THE COURT:  19 will be full.

23        (Government Exhibit 19 admitted in full.)

24   **Q.**   It's a reply, actually, from Mr. Thompson.  Once

25   the Government and yourself and Mr. Caramadre and

1   Mr. Radhakrishnan decided to have some plea

2   negotiations, Mr. Radhakrishnan, who had been

3   representing himself, asked Mr. Thompson to step back

4   in; is that fair to say?

5   A.   Yes.

6   Q.   So he was serving in the capacity as

7   Mr. Radhakrishnan's attorney for purposes of the plea

8   negotiations?

9   A.   Yes.

10  Q.   So this is an e-mail reply from Mr. Thompson to

11  you saying thanks, but it includes a previous e-mail

12  that you sent on November 15th, Thursday night, at 9:14

13  p.m. to myself and Mr. Vilker.  Can you just review

14  this e-mail quickly.

15  A.   Can I just see the top of this page, Mr. McAdams,

16  please?  Okay.

17       Now I just want to read what I wrote.

18       (Pause.)

19       Okay.

20  Q.   Is it fair to say that the first salvo, so to

21  speak, in the plea negotiations was this proposal by

22  you on behalf of Mr. Caramadre?

23  A.   I believe so.  I know that -- I believe so.  I

24  know that at some point there was discussions about a

25  floor of two and a ceiling of five, and I don't know if

1    that came after this.

2    **Q.**    Okay.

3    **A.**    I don't remember.

4    **Q.**    It's possible there were verbal conversations that

5    were independent of this particular e-mail?

6    **A.**    Yes.  What date is this, please?

7    **Q.**    This is November 15th, Thursday night.

8    **A.**    That's Thursday.  I believe when the client came

9    to me Thursday morning and said let's open up plea

10    negotiations, one of the things I said to him was,

11    That's fine, but we're in the middle of the trial and

12    the Court is not going to take a time out.  We've got

13    to keep on marching forward, which we did.  And I know

14    that there were some discussions on Thursday.  I

15    believe Mr. Traini handled most of the communications

16    with you and Mr.  Vilker so that's why I'm a little

17    uncertain about when the two to five came about in

18    terms of this e-mail.

19    **Q.**    So there were some conversations between

20    Mr. Traini and the Government regarding -- where there

21    was potentially another version of the initial offer

22    where there might be a two-year mandatory minimum with

23    a higher ceiling perhaps; is that fair to say?

24    **A.**    When you say "mandatory minimum," we never

25    discussed pleading to an aggravated identity theft

1    count, which would have been a two-year mandatory

2    minimum.  What we talked about was the Government

3    agreeing not to ask for more than five; the Defendant

4    agreeing not to ask for less than two.  But obviously

5    Judge Smith was free to, if he wanted to, to go zero

6    months or six months or eighteen months, but the two to

7    five were the parameters and what the Government and

8    the defense would be asking for.

9    **Q.**   That was the potential that was being floated

10   among the parties in the early stages of the

11   discussions?

12   **A.**   It was a potential and I thought had ripened into

13   something the Government -- my memory is the Government

14   threw that out there, meaning it was strongly

15   considering that but that got rejected by the defense.

16   **Q.**   So you had conversations with -- how did it get

17   rejected by the defense?

18   **A.**   Well, let me say this.  It got rejected by

19   Mr. Caramadre.

20   **Q.**   What reasons did he give you for rejecting that

21   particular variation of the potential plea?

22   **A.**   Mr. Traini and I thought that was a very favorable

23   resolution because we did not believe that even though

24   we ultimately got to zero to ten, we didn't believe and

25   we have to be honest with the client that that's fine,

1    we get to argue for zero and the Government is going to

2    be arguing for ten, but it's not likely in a case of

3    this nature the Court is going to impose no jail

4    sentence.

5           So we recommended that the two to five was the

6    way to go because basically we were -- we thought the

7    Court would impose at least a two-year sentence so

8    we're really not giving up anything.  And with the

9    Government agreeing not to ask more than five, I

10   thought that was a home run because now we've basically

11   capped what you can ask for.  Again, it's subject to

12   the Court's discretion because the Court can give a

13   sentence of seven.  But based on Mr. Traini's

14   experience and my experience, we thought that with the

15   Government asking only for five that that would not be

16   dispositive on the Court because, as we know these are

17   non-binding plea agreements except the agreement that

18   we entered into, but that it holds a lot of weight with

19   the Court.

20   **Q.**   You thought that that particular potential plea

21   agreement was in Mr. Caramadre's best interest, and you

22   advised him that would be a good position to take?

23   **A.**   That's what we advised him.

24   **Q.**   He rejected that offer?

25   **A.**   He rejected it because he wanted to argue for

1    zero.  Which is fine.  Admittedly, if we're agreeing to

2    a two-year floor, then we can't breach the plea

3    agreement.  We can't ask for zero or six months.  But

4    again, in my eyes, I shouldn't say no way, but it was

5    very likely that the Court was going to impose some

6    kind of jail sentence, and I thought the upside of

7    capping the Government to at least a recommendation,

8    not the sentence but the recommendation of five, was a

9    home run.  And he absolutely said, I want to argue for

10   zero.  I want to argue for zero.  Because he didn't see

11   jail as a strong possibility.

12   **Q.**   He didn't really think he would get a prison

13   sentence, and he didn't want to give one away in the

14   context of a plea negotiation?

15   **A.**   That's right.  When Mr. Traini and I went over the

16   sentencing letter dated September 13th, which I think

17   we went over on September 18th, 2012, it has a

18   guideline range.  Again, I'd have to take a look at the

19   letter, level 53 or level 51.  It's life without

20   parole.  Now, as we know with the Supreme Court

21   pronouncements a few years ago, the guidelines aren't

22   binding anymore.  They're not mandatory, but they're a

23   guide post.  So the Court uses it as a guide post.  And

24   I think he thought that this whole level 53 or level 51

25   didn't mean anything.  In fact, he made a comment

1   during our discussions about the letter saying what's

2   Judge Smith going to give me after trial, six months, a

3   year, eighteen months, two years at the most? And I

4   said, Are you talking about after trial? He said,

5   Yeah, what's he going to give me, two years after trial

6   if I'm convicted? And I said, Well, if that's your

7   belief, you're quite mistaken, because those ranges

8   might not even be available with the plea, never mind

9   having a four-month trial and dragging all these people

10   in and him possibly testifying and the jury

11   disbelieving him. So that was his state of mind, at

12   least expressed to me.

13   Q.   But when you had this conversation with him about

14   the plea agreement, he understood what the potential

15   terms were that were being bandied about, so to speak,

16   and he was actually engaged with you and Mr. Traini in

17   terms of trying to impose his -- what he felt was the

18   best outcome for him?

19   A.   Just so I'm clear, he understood what the law was,

20   the statutes, the guidelines. He just didn't believe

21   the Court would impose that kind of sentence.

22   Q.   He essentially just didn't think the Court would

23   actually follow through and do that?

24   A.   No, he didn't.

25   Q.   So he viewed it almost as having nothing to lose

1  in that sense?

2  **A.**   I don't know if I agree with that.  His thought

3  was he's not your typical defendant that comes before

4  this court, which we obviously if we ever got to

5  sentencing we would have argued because I believe that.

6  He's done a lot of good.  It's more than just giving

7  away money.  He's served on boards.  He's done a lot of

8  good.  And what started out as maybe a loophole in

9  1995, because that would have been the other evidence,

10  maybe developed and morphed into something else.  The

11  picture would have been, he thought, he's not your

12  typical defendant that comes before this Court doing

13  bank robberies, murders, selling drugs.  He's a

14  different kind of defendant, which deserves a different

15  kind of sentence.

16  **Q.**   But you knew from your experience and advised him

17  from your experience and Mr. Traini's experience, that

18  nonetheless fraud defendants still face significant

19  potential punishment and the Court may very well impose

20  a significant prison sentence?

21  **A.**   That would be the argument on behalf of the

22  Defendant.  This was a 15-year scheme to defraud.  This

23  was, you know, the Government claims, 44 or $45

24  million.  We would disagree with some of the -- on the

25  bond losses with your expert, Kalotay, who I didn't

1    really think was an expert; but be that as it may, this

2    was a significant case and this wasn't a $200,000 loss

3    or investment under the guidelines.  It was a

4    significant amount of money.  It lasted a lot of time.

5    A lot of insurance companies took losses.  Some of the

6    bond issuers, I disagree with whether there were losses

7    or not, but it's a significant case that would have

8    called for a jail sentence, in my opinion.

9    **Q.**    That's what you advised Mr. Caramadre?

10    **A.**    Yes.

11    **Q.**    Did you pressure him that he needed to plead

12    guilty?

13    **A.**    No.

14    **Q.**    This particular exhibit, which we've just been

15    looking at is Government Exhibit 19, and this

16    communicated to the Government essentially that

17    Mr. Caramadre was prepared to enter a plea to

18    conspiracy to commit identity fraud if the Government

19    were to recommend up to a five-year maximum and the

20    Defendant was free to argue for less than jail; is that

21    right?

22    **A.**    Yes.

23    **Q.**    You communicated that -- you had a conversation

24    with Mr. Caramadre about that offer?

25    **A.**    I would not have, especially with this type of

1   case and Mr. Caramadre maintaining -- you know, wanting

2   a trial, I would never have sent this out.  We had a

3   conversation about this authorizing this.

4   **Q.**   So at some point, whether it was on the day of the

5   15th or earlier than that, he agreed to let you make

6   that offer to the Government?

7   **A.**   Yes.

8   **Q.**   Now, the Government rejected that offer; is that

9   correct?

10  **A.**   It did.

11  **Q.**   And came back with a different offer?

12  **A.**   I recall pulling up to the courthouse, getting

13  dropped off Friday morning.  There was an e-mail, I

14  believe, from Mr. Vilker, and I have not looked at this

15  e-mail in a very long time but something to the effect

16  of your offer of last night is rejected, and making a

17  counteroffer.  I think he also said in the e-mail, if

18  my memory is good, that please pass this on to your

19  client so we know your client is aware of it.

20  Something to that effect.  Because you're obligated,

21  obviously, to tell your client, which we did.

22  **Q.**   Just as Mr. Vilker and I are not authorized to

23  bind the United States without approval from our

24  superiors, you can't bind Mr. Caramadre without his

25  approval?

1    **A.**    That's right.

2    **Q.**    Now, there was a counteroffer from Mr. Vilker,

3    which essentially the terms of which were what ended up

4    being the basics of the plea agreement or no?

5    **A.**    To be honest with you, Mr. McAdams, I would have

6    to see Mr. Vilker's e-mail.  I don't have a vivid

7    memory of the e-mail.  I know that I received it just

8    as I was pulling up on my iPhone.  I just don't recall

9    the exact terms.

10   **Q.**   I don't have that particular e-mail so I'm not

11   going to ask you about that.  But is it fair to say

12   that the plea negotiations stretched out over the

13   course of that weekend, the 16th through the 17th and

14   18th?

15   **A.**    Yes.  I know that -- I think I sent an e-mail out

16   Friday night saying that the Defendant would plea,

17   would agree to enter a plea to certain terms.  I think

18   it wound up being the zero to ten, and then I think

19   that developed into a drafting of the initial plea

20   agreement Saturday morning.

21   **Q.**    And I e-mailed you copies of the draft plea

22   agreements, and you then made some changes over the

23   course of the day?

24   **A.**    Yes.

25   **Q.**    And e-mailed them back to myself and Mr. Vilker?

1    **A.**    Yes.

2    **Q.**    Then on Saturday evening -- let me ask you this.

3          What conversations, if any, did you have with

4    Mr. Caramadre throughout that period of Friday and

5    Saturday regarding what the terms of the plea agreement

6    might be?

7    **A.**    I spoke to him Friday night before sending --

8    again, I'd have to look at the e-mails, but I'm certain

9    I had a conversation with him before sending the e-mail

10   to Mr. Vilker.  This could be wrong, 9:47 p.m.  It was

11   something late, authorizing me to say, yes, we're

12   willing to agree to these terms, we're agreeing to

13   these terms.

14         The first thing that came out, I think, was a

15   draft plea agreement, and then later on came out a

16   statement of facts.  I believe that I had a

17   conversation, at least a conversation with

18   Mr. Caramadre.  I don't believe I met with him in

19   person, but I believe I had a conversation with him to

20   let him know what's going on.  And at some point when

21   everything was final, meaning the plea agreement was

22   final and the statement of facts, that at least I

23   and/or Mr. Traini would sit down and talk to him before

24   the weekend was over.

25   **Q.**    Because in order to enter into a plea agreement,

1    there would need to be a factual basis to support that

2    plea agreement; is that correct?

3    **A.**    Absolutely.

4    **Q.**    And the Government was insisting that

5    Mr. Caramadre and Mr. Radhakrishnan admit the facts

6    that underlie that plea?

7    **A.**    Just like any other plea.

8    **Q.**    Are you familiar with the term called <u>Alford</u> plea?

9    **A.**    I am.

10   **Q.**    What's your basic understanding of what that is?

11   **A.**    An <u>Alford</u> plea is basically it emanates from a

12   very old case, 1800's or 1900's, but the essence of it

13   is, is that a defendant is charged with -- it might

14   have been murder in that particular case.  He's charged

15   with murder, and what the defendant does in an <u>Alford</u>

16   plea says I'm not admitting a committed the murder, but

17   what I'm willing to agree to is that there are

18   sufficient facts necessary that exist -- sufficient

19   facts that exist that if this case proceeds to trial

20   that the Government can convict me.  And I think in the

21   <u>Alford</u> case, and it's been literally years and years,

22   maybe dating back to law school, or early on in my

23   career, that I don't know if that particular defendant

24   was facing the death penalty or not and basically to

25   save his life he was willing to say I agree that a

1    murder conviction is going to enter against me and that

2    there are sufficient facts, but I'm not agreeing that I

3    committed the murder.  So basically it's a way of

4    letting the conviction go forward without saying that I

5    did it.

6    Q.   And I'd like to show you Government Exhibit 20,

7    which is an e-mail, if there's no objection.

8         THE COURT:  Any objection?

9         MR. OLEN:  No.

10        THE COURT:  Government 20 will be full.

11        (Government Exhibit 20 admitted in full.)

12   Q.   Do you recall receiving this e-mail from

13   Mr. Caramadre?

14   A.   Yes.

15   Q.   It says:  Mike, what about an _Alford_ plea; this

16   would eliminate me needing to lie.  I don't need an

17   answer tonight.  Regards, Joe.

18   A.   Yes.

19   Q.   So Mr. Caramadre, in the course of the plea

20   negotiations that were going on, after he had

21   authorized you to have him plead guilty, sent this

22   e-mail inquiring about an _Alford_ plea?

23   A.   Yes.

24   Q.   What was your response to that e-mail?

25   A.   I don't think I spoke to him that night.

1    **Q.**   Let me show you Government Exhibit number 21.  Did

2    you forward that e-mail to Mr. Traini?

3    **A.**   I believe so.

4         MR. OLEN:  No objection.

5         THE COURT:  Government 21 then is full.

6         (Government Exhibit 21 admitted in full.)

7    **Q.**   Is this Mr. Traini's response when you told him

8    about the <u>Alford</u> plea?

9    **A.**   Yes.

10   **Q.**   He writes:  Obviously an <u>Alford</u> plea is out of the

11   question.  If he thinks he has to lie to plead, then we

12   are not going anywhere.  I don't think we can let him

13   even go that way.  Maybe you want to tell him tonight

14   it is absolutely out.  In fact, I raised this with Lee

15   Thursday or Friday.  It was already rejected at the

16   management level.  Your call.

17        Do you recall receiving that message?

18   **A.**   Yes.  It actually refreshes my memory.  Mr. Traini

19   will have to fill this in, because I don't think I was

20   the one that had -- I'm positive I'm not the one that

21   had the discussions with the Government, that I think

22   that Mr. Traini had a discussion with the Government

23   about a potential <u>Alford</u> plea.  It was out of the

24   question, but the client did raise it during the week,

25   either Thursday or Friday.  Maybe it was Thursday.  And

1    as the client asked, I told Mr. Traini we have to ask.

2    And Mr. Traini asked, and my understanding is it was

3    shot down.  Just shot down.  It's not a possibility.

4    **Q.**    United States Government policy is that the

5    Government cannot enter into a plea agreement; is that

6    your understanding?

7    **A.**    I've been practicing in this Court almost about 20

8    years.  I was on the court-appointed list for many,

9    many years.  I've never seen an <u>Alford</u> plea in the

10   Federal Court.  I'm not saying it's unheard of, but

11   I've never seen it; and I've seen it very limited in

12   the state court because it's got to be a special case

13   because it cuts against acceptance of responsibility.

14   It's an unusual ask, but we made the ask and it was

15   rejected.

16   **Q.**    And now, did you have -- is it fair to say that

17   during the course of these plea negotiations that

18   yourself and Mr. Traini were working together to try to

19   find a way to come up with, on Mr. Caramadre's behalf,

20   a plea agreement that would be acceptable to him and to

21   the Government?

22   **A.**    Yes.  That's what -- it's a contract so that's

23   needing two parties to agree.

24   **Q.**    So if the Government says no <u>Alford</u> plea, it's not

25   going to happen, then it's simply not going to happen?

1   **A.**   Contract takes two; and if one party says no, it's

2   not going to happen.

3   **Q.**   Now, in an attempt to address Mr. Caramadre's

4   concerns, did you take any steps to talk to him --

5   first of all, about this statement "That would

6   alleviate the need for me to lie," what if anything did

7   you say to Mr. Caramadre about that?

8   **A.**   I recall having a conversation with him that there

9   needs to be a factual basis for a plea, for any plea.

10  Not just in Mr. Caramadre's case -- I said in your

11  case, but in any case because the whole essence of a

12  plea is that you're agreeing to plead to these

13  particular counts and it can't just be a naked plea.

14  It can't just be, well, I'll plead to Count 9 and Count

15  33, but I'm not agreeing to the underlying facts and

16  I'm going to walk out of Court and that's it.   There

17  needs to be an admission to the facts.

18       I had a conversation with him about what happens

19  at a change of plea hearing where the Government is

20  given an opportunity to give the Court the basis for

21  the plea and what the Government would be ready to

22  prove at trial had this case proceeded on with trial.

23  And we need some facts.   And one of the things that we

24  negotiated back and forth was we need to know what the

25  Government was going to tell Judge Smith at any

1    potential change of plea hearing what's the factual

2    basis.  And that's what we worked on back and forth.

3    **Q.**    In your knowledge of the case, in your review of

4    discovery, conversations with Mr. Caramadre, did you

5    believe that facts existed that could support a guilty

6    plea?

7    **A.**    Yes.

8    **Q.**    I want to show you Government Exhibit Number 22.

9         THE COURT:  Any objection?

10        MR. OLEN:  No objection.

11        THE COURT:  22 will be full.

12        (Government Exhibit 22 admitted in full.)

13   **Q.**    This is an e-mail between yourself and Mr. Traini,

14   the top half looks like Mr. Traini's response, the

15   bottom half is yours.  This is in reply to Mr. Traini's

16   e-mail that I showed you a moment ago saying the Alford

17   plea is out of the question.

18        And I'm just focusing your attention here where

19   you're writing:  Tony, we can discuss later but we

20   don't have to call it an Alford plea.  Why can't he

21   admit lying to TD and LifeMark and in the statement of

22   facts he states that he knew there were sufficient

23   facts to establish that he knew that RR, Raymour

24   Radhakrishnan, was going out lying to people and not

25   taking appropriate steps to explain the program to

1    people, but he denies that he knew them back when RR

2    was actually meeting with these people.

3          Is this, first of all, did you have reason to

4    believe that Mr. Caramadre could admit to lying to TD?

5    **A.**   Yes.

6    **Q.**   Where did that come from?

7    **A.**   I think the first -- and I'd have to take a look

8    at documents.  I believe the first bond account with TD

9    was opened up in late 2007, either November or

10   December.  In February -- in January, a few more were

11   opened up.  TD Ameritrade at some point said -- and

12   there might have been five, six, seven.  There were a

13   number of bond accounts opened up where Mr. Caramadre

14   was the joint tenant with -- so it's Mr. Caramadre and

15   it's a stranger.  Okay?  And TD Ameritrade is looking

16   at these accounts saying how come Mr. Caramadre has

17   seven accounts opened up.  I'm just using that number.

18   I don't know the exact number.  So it's Mr. Caramadre

19   and Person A, Mr. Caramadre and Person B, Mr. Caramadre

20   and Person C, and so on.

21         So at some point TD said, What's going on?  Why

22   is this person opening up all these accounts?

23         I believe that Mr. Caramadre had conversations

24   with William Applegate, who worked at TD Ameritrade,

25   and he might have also had conversations with Logan

1    Anderson in February.  I think Mr. Applegate's

2    face-to-face meeting with Mr. Caramadre happened in

3    March 2008, and I think Logan Anderson might have had

4    phone conversation with Mr. Caramadre in February of

5    2008.  And basically, they wanted to know why are all

6    these accounts being opened up.  Like, what is this?

7         And I think Mr. Caramadre, and this is one of

8    the reasons why I didn't want him to testify, I think

9    Mr. Caramadre told him something to the effect of,

10   Well, I'm an estate planner and I'm on this account in

11   my capacity as an attorney for my client, who is the

12   other joint tenant; and basically, I'm doing estate

13   planning for them.

14        And he might have mentioned buying bonds and

15   having death benefit in those bonds.  But in any event,

16   this was part of their estate planning and not to worry

17   because I think there was a question that came up and

18   said, Well, if these people die, then the money is

19   going to go to you because this is a joint account.

20   How are you going to get the money to the other joint

21   tenants?  We got concerns about that.  And he basically

22   said we have a succession plan, the money will get to

23   the clients, not to worry about it.

24        He also might have said that some of the money

25   was his but that most of it was his clients.  So TD

1    accepted that answer, I believe.  I think that's what

2    the evidence shows.  And they let him continue opening

3    up accounts.

4         So my thing was the lie to TD Ameritrade is and

5    my rub with Mr. Caramadre was when you get on the stand

6    and you're going to tell the jury that I read contracts

7    for a living and this is all legitimate, the problem is

8    on cross-examination someone would have said to him you

9    told a nice story to the jury, but you didn't tell

10   Mr. Applegate that.  You didn't tell Logan Anderson

11   that.  You didn't tell the other brokerage houses that,

12   because that same -- even though I didn't write it

13   here, that same misrepresentation I think reverberated

14   to the other brokerage houses.  Because what happened

15   was TD Ameritrade, when they decided enough is enough

16   with this guy, they turned him off and then they jumped

17   on to -- I don't know, I don't remember which one.

18   Then went on to, for exampale, E*TRADE and Scottrade

19   and TradeKing, and the same thing kind of developed.

20   What's the purposes of these accounts.

21        So one of the pitfalls that I had with this was

22   Mr. Vilker and Mr. McAdams is going to cross-examine

23   you.  If this is all legitmate, why wouldn't you just

24   tell Logan Anderson and these other people exactly what

25   you told the jury.  You didn't tell them, sir, because

1    they wouldn't have accepted and opened up the accounts,

2    and that's the lie that I'm referring to there.

3    **Q.**    You also referenced here a lie to LifeMark.  Did

4    you have a basis to believe that Mr. Caramadre lied to

5    LifeMark?

6    **A.**    Yes.

7    **Q.**    What's the basis of that?

8    **A.**    Again, this is all subject to my memory.  In late

9    2007, I believe Jefferson National Life Insurance

10   Company filed a complaint with the Department of

11   Business Regulation.  And I think they got wind of

12   these accounts being opened up with annuitants.

13   LifeMark is the broker/dealer that Edward Maggiacomo

14   worked for I guess as an independent contractor, but he

15   had parked his license with LifeMark.  So when LifeMark

16   gets the complaint with DBR with Jefferson National,

17   they know what's going on now.  And a lot of these

18   annuities were opened up through LifeMark.  LifeMark is

19   now on notice that there's stranger annuitants being

20   used and being paid.

21        So LifeMark did a couple of things.  In January,

22   I think it was late January 2008, they created a couple

23   of forms.  The forms were called something to the

24   effect of, again, I have to look at them, an owner

25   acknowledgment form and an annuitant acknowledgment

1    form.  And basically those were forms created by

2    LifeMark that they gave to Mr. Maggiacomo and I think

3    they give to all their agents because they saw this

4    potential loophole, and they wanted both the

5    owner/investor of any new annuities and any annuitants

6    to sign that form.  And basically the form by memory

7    said the owner was acknowledging that no payment would

8    be made to the annuitants.  So an annuitant agrees to

9    become an annuitant for an owner, but the owner says I

10   have not paid the annuitant to do this for me.

11        Similarly, the annuitant had to sign a form that

12   said I've agreed to serve as an annuitant for this

13   investor, but I've acknowledged that I haven't received

14   any compensation nor will I receive any compensation in

15   the future.

16        So they create these forms and what happens is

17   that's fine and dandy, but annuities are still opened

18   up, and I believe the evidence shows that owners and

19   annuitants are signing those forms.

20   **Q.**   Even though they're being paid?

21   **A.**   Even though they're being paid.  And I think the

22   evidence showed that they're just signing them blank

23   and no one's really explained this stuff to them, but

24   how that gets into a lie to LifeMark is this.  LifeMark

25   in April, again this is subject to memory, there's a

1    lot of documents in this case, but my memory is that in

2    April of 2008, Jim Prisko, who I believe is an attorney

3    and I think he was CEO and owner of LifeMark, and Lori

4    Alberts who worked for LifeMark came down to Estate

5    Planning Resources and they did an audit of

6    Mr. Maggiacomo.  I believe the audit was a routine

7    audit, but they both came down.  I find it strange that

8    it was a routine audit because Jim Prisko is the CEO

9    and one of the questions I would have asked him was how

10   often are you doing audits.

11        But they did an audit of Mr. Maggiacomo, and

12   then after they did that audit, Mr. Maggiacomo's

13   office was within Mr. Caramadre's office, they had a

14   meeting with Mr. Caramadre and Mr. Prisko I believe

15   testified in his Grand Jury testimony, so did Lori

16   Alberts, that they asked Mr. Caramadre, Where are you

17   finding these people?  Why would an annuitant, this

18   stranger agree to serve as an annuitant for an owner?

19   There's no relationship.  Why?  Where do you find these

20   people?

21        Both Mr. Prisko and Ms. Alberts were going to

22   testify, I believe, according to discovery, that

23   Mr. Caramadre told them that he found these people

24   because the Diocese asked him to, since he had a lot of

25   money, to bury deceased people who didn't have any

1    funds to be buried and then Mr. Caramadre ran into

2    these people and that's how he came across these

3    people.

4         I asked Mr. Caramadre, that doesn't make any

5    sense because people already died and passed away. How

6    could they be annuitants? Well, they were really

7    annuitants -- they were really friends that he met of

8    deceased people he laid to rest so they kind of owed

9    him an obligation and they agreed to do it.

10        So I asked Mr. Caramadre, I need to know, did

11   you make this statement to Mr. Prisko and Ms. Alberts?

12   We need to know this. In fact, I think the Government

13   had subpoenaed someone from the Diocese to ask what

14   Mr. Caramadre paid for funerals and stuff. And the

15   answer was absolutely not. We never asked him to do

16   that. There's no such fund and we pay for ourselves

17   absent a state stipend.

18        So I asked Mr. Caramadre, Did you say this?

19        Now, my memory is, is that he said, Maybe I did

20   and maybe I didn't. Who cares? It really doesn't

21   matter. And I said, It matters to me. I need to know,

22   did you say this to them. I need to know how to

23   cross-examine these witnesses. We need to know it. If

24   you said it, then we'll have to figure out a way. And

25   I didn't know what the defense was going to be, but

1    we're going to figure out a way -- what to do with

2    that. He says, You know what, chalk it up. I said it.

3    Let's move on. You're getting into minutia, Mike.

4    You're always worrying about minutia. Don't worry

5    about it. I'll get on the stand and explain everything

6    away.

7         So to me, that was -- if he said that to

8    LifeMark and these forms are going in and they're

9    getting signed post-January 2008 with LifeMark saying

10   we'll accept it, we'll accept these forms but we'll

11   accept these annuities on these stranger annuities, but

12   absolutely not -- people have got to sign these forms

13   that they're not getting paid.

14        Now, I just want to jump to one thing. My

15   cross-examination was of LifeMark which I would have

16   hit them hard was, so what. You were just covering

17   yourself. Those forms didn't go to the insurance

18   companies and they were really an agent for the

19   insurance companies and that makes no sense because

20   whether or not the annuitants are getting paid, they're

21   getting paid or they're not getting paid, you know that

22   they're still terminally ill. You're allowing them to

23   be named as annuitants. The annuity policies are going

24   to the insurance companies. And whether or not they're

25   getting paid they're going to die very quickly, and the

1    insurance company, if the market goes down, is going to

2    get hit hard.  So that makes no sense, Mr. Prisko and

3    Ms. Alberts, about your Band-Aid approach to coming up

4    with these forms.

5         These forms did nothing to protect the insurance

6    companies.  These forms were so they could have them in

7    their files so they could protect themselves.

8         So in terms of cross-examination when we got to

9    that other category of witnesses, I was going to hit

10   them hard because everyone wanted to blame

11   Mr. Caramadre for employing this technique or this

12   method.  But guess what?  Everyone was in on it,

13   including the insurance companies, which would have

14   been part of the defense.  These insurance companies

15   accepted these policies.  The broker/dealers accepted

16   these policies.  And whether or not people are getting

17   paid, so what.  Everyone was in on it, and everyone

18   wanted the money because the annuities were a lot of

19   money.

20   Q.   So when you were working on the statement of

21   facts, you believed that Mr. Caramadre could truthfully

22   admit to lying to LifeMark?

23   A.   Yes.

24   Q.   As an attorney, you believed that that could

25   truthfully be the basis for him pleading guilty to

1    committing fraud?

2    **A.**   Yes.

3    **Q.**   Nonetheless, you're still, as you concede ready to

4    go and ready to argue the point if and when the plea

5    ever fell through?

6    **A.**   110 percent.  That's months ago and a lot of

7    things have left my mind.

8    **Q.**   So now, there were multiple documents that were

9    associated with the actual guilty plea; is that fair to

10   say, the plea agreement itself, the statement of facts,

11   Mr. Radhakrishnan also pled guilty as well to the same

12   statements of facts?

13   **A.**   Yes.

14   **Q.**   And on top of those legal documents, yourself and

15   Mr. Traini had Mr. Caramadre sign a new letter; is that

16   fair to say, memorializing the change that had taken

17   place that he had revoked his directive not to

18   negotiate a plea and described the plea agreement?

19   **A.**   Yes.  I think it was a letter dated November 19th.

20   It was the date of the plea, and we had him execute

21   that before the change of plea occurred to have a

22   written confirmation that he had revoked the prior

23   September 13, 2012, letter saying do not open up plea

24   negotiations.

25   **Q.**   So we were just talking about the statement of

1    facts.  Is it fair to say that yourself and Mr. Viler

2    were the two individuals doing the most editing to the

3    statement of facts?

4    A.    Yes.

5    Q.    Could you describe your communications with

6    Mr. Caramadre on the weekend of the -- excuse me, 17th

7    and 18th of November regarding the progress of those

8    negotiations and the facts that were ultimately agreed

9    upon.

10   A.    The one thing I want to make clear is, is that

11   there was back and forth between me and Mr. Vilker.  In

12   fact, we had a phone conversation where we actually

13   said instead of going back and forth with e-mails, we

14   were making some changes and we were making some

15   concessions back and forth.  That was the phone

16   conversation.

17        I had a communication, I believe, on Saturday

18   with Mr. Caramadre saying, you know, I got the

19   statement of facts, and I orally explained it to him.

20   I do not believe that I gave him a copy of the

21   statement of facts on Saturday, and I didn't give it to

22   him on Sunday.  He didn't see the final version until

23   Sunday night when Mr. Traini and I met with him.  But I

24   did orally explain to him what the statement of facts

25   was.  And basically the way I explained it was it's a

1  conspiracy count and it's Count -- it was Count 9 with

2  Mr. Rodriguez.  But basically when I summarized it for

3  him, it's almost like a summer of the indictment.  He

4  wasn't happy.  I said I'm going to have further

5  communications with Mr. Vilker.  And he says, I trust

6  you, Mike.  You know, I trusted you this whole way.  I

7  said, Look, I'm going to try to water this down

8  because what was important to Mr. Caramadre was the

9  perception of this.  And what I was trying to do with

10  Mr. Vilker was to water this down as much as possible.

11      Mr. Caramadre had agreed to plea to those

12  particular counts.  Now it was a matter of what was the

13  statement of facts going to look like.  And I was

14  trying to convince Mr. Vilker to -- I don't think I

15  used the words "water down," but in my brain, in my

16  mind I was trying to water that thing down as much as

17  possible.

18  Q.  On Mr. Caramadre's behalf, you were trying to

19  water down the fact that he would admit to as much as

20  possible?

21  A.  Absolutely.

22  Q.  And obviously, Mr. Vilker could only agree to so

23  much?

24  A.  As I understood it, his hands were tied, that this

25  wasn't a statement of facts that he drafted, that your

1    management was intimately involved; and I think he

2    wrote to me at some point, There's not much wiggle room

3    in this, Mike.

4    **Q.**   Now, were there some specific changes that

5    Mr. Caramadre insisted upon in those statement of

6    facts?

7    **A.**   I don't believe so at that point.  I believe,

8    getting back to the Thursday and Friday, even though we

9    didn't have a statement of facts, Mr. Caramadre

10   communicated to us that it was very important that

11   whatever the plea was that he needed certain people not

12   mentioned in the statement of facts or the plea

13   agreement.

14   **Q.**   Who were those, if you recall?

15   **A.**   One that really comes to mind is Mr. Lamonte who

16   was -- that's Mr. Caramadre's brother-in-law and

17   Mrs. Lamonte, who is his sister-in-law.  Mr. LaMonte's

18   father served as an annuitant on some transactions.  I

19   don't recall how many.  And that was a sore spot with

20   Mr. Caramadre.

21   **Q.**   He did not want to admit that he had used a family

22   member as a measuring life in that way?

23   **A.**   Yeah.  That was one that comes to mind right now.

24   **Q.**   Was AEGON Corporation another, or Western Reserve?

25   **A.**   I think you're referring to AEGON.

1    **Q.**   AEGON.  Excuse me.

2    **A.**   Yes.  But to be honest with you, Mr. McAdams, I

3    believe that came from me because I think I initiated

4    that because my concern was that there were civil cases

5    pending in this courthouse, and I wanted to see what I

6    could do, if anything, to avoid an admission in the

7    statement of facts to harm the client in an adverse way

8    in the civil proceeding.

9         Quite frankly, you know, I didn't do research on

10   this, but my gut told me that any admission was going

11   to be hurtful in the civil cases.  But to the extent

12   that I could reserve some argument or put the client in

13   the best posture possible, that I wanted AEGON and

14   Western Reserve -- it might have been their names

15   because I believe the insurance companies and the bond

16   issuers remained in the statement of facts.  It might

17   have also been any annuitants that were referenced in

18   those AEGON or Western Reserve policies I wanted

19   extracted from the statement of facts.  But that was

20   really me.  That wasn't Mr. Caramadre.

21   **Q.**   So even as you were attempting to negotiate the

22   statement of facts on Mr. Caramadre's behalf, you were

23   also trying to look out for his best interest in terms

24   of his potential financial civil liability?

25   **A.**   At all times, yes.

1    **Q.**  So we talked about the first week of the trial.

2    We talked about Friday.  We talked about Saturday,

3    communications with Mr. Caramadre.  He left you

4    Saturday night with this e-mail, What about <u>Alford</u>

5    plea.

6         Could you turn your attention to Sunday, the day

7    before the plea hearing.  What, if any, meetings did

8    you have or conversations did you have with

9    Mr. Caramadre regarding the guilty plea?

10   **A.**  I don't recall phone conversations.  There may

11   have been at this point.  I know that Mr. Caramadre and

12   I attend the same church, which is Holy Apostles in

13   Cranston; and I recall having face-to-face conversation

14   with Mr. Caramadre that, to use Mr. Vilker's phrase,

15   there wasn't much wiggle room left in the statement of

16   facts and that he needed to make a decision because we

17   were in the middle -- we were in trial.

18        And I also addressed the <u>Alford</u> plea reference

19   from Saturday night.  And I don't remember the exact

20   words but I said something to the effect of, you know,

21   you're an attorney, I'm an attorney.  You're sworn

22   under oath at a change of plea hearing.  You can't lie.

23   I'm not going to instruct you or tell you to lie

24   because I'm am officer of the Court and that cuts

25   against my professional obligations as an officer of

1    the Court and it cuts against my moral fabric.  I'm not

2    doing that.  And I'm like, I expect that you wouldn't

3    do that either.

4         Attorneys that do that can get disbarred.  It

5    wasn't my license I was concerned about.  It was doing

6    the right thing for the client.

7         And I basically told him, Look, you've got to

8    give some thought to this.  You're either going to

9    accept it or not accept it.  We're in trial.  If you

10   don't want to accept it, we'll march on with trial.

11   And I'm prepared.  I don't think it's going to end

12   well.  I've got to be honest with the client.  My

13   assessment it wasn't going to end well.  But the choice

14   is yours.  They might not be great choices right now,

15   because you know if you're seeing the same evidence I

16   am, it's going to end badly for you, but the choice is

17   yours.  And either you tell the truth and you accept

18   the statement of facts or you don't and you head on in

19   trial.

20   Q.   Did you in any way give him a wink and a nod that

21   what you were really indicating was that it would be

22   okay for him to lie at the plea and get through it?

23   A.   No.  Absolutely not.

24   Q.   Did you have any confusion about that conversation

25   with him on Sunday?

1   **A.**   No.

2   **Q.**   Did you have any observation about his mental

3   state when you had that conversation?

4   **A.**   He absolutely comprehended everything.  He

5   understood.  He was clear in his thinking.  He was

6   obviously down and depressed.  I mean, let's face it,

7   you know, he paid a lot of attorneys before me to

8   defend these allegations.  This was a burden on him.

9   And he saw the evidence at trial, and he understood.  I

10  thought he was making -- he was making a good decision

11  by pleaing, but just like -- I had conversations with

12  him, just like it's his decision to testify or not

13  even though attorneys can give advice, it's his

14  decision to plea.  And I just left it at that and said

15  give some thought to it.  I think I told him I'm going

16  to do my best to try to water down the statement of

17  facts.  I think I used the words there's not a lot of

18  wiggle room here.  I don't want to create any

19  misunderstanding with him.

20  **Q.**   Was Mrs. Caramadre present at that conversation

21  you had after church with Mr. Caramadre?

22  **A.**   I'm not sure.  I'm really not sure.  She may have

23  been part of it.  I'm not sure.

24  **Q.**   So I take it that was in the morning, after Sunday

25  Mass?

1    **A.**    Yes.   So Mass is at 11:15 so it would have been,

2    you know, after 12 o'clock.  And we were there for a

3    little bit because the one person trying to close up

4    the church, I think we were one of the last ones kind

5    of walking by, kind of giving a hint like, okay, let's

6    wrap it up.  So it would have been after 12 on Sunday.

7    **Q.**    Did you have any additional meetings with

8    Mr. Caramadre on Sunday regarding the plea?

9    **A.**    Sunday night with Mr. Traini.

10   **Q.**    And where did that meeting take place?

11   **A.**    In Mr. Caramadre's house.

12   **Q.**    Who was present for that meeting?

13   **A.**    Myself, Mr. Traini, Mr. Caramadre and

14   Mrs. Caramadre.

15   **Q.**    What was your observation of Mr. Caramadre's

16   mental state at that time?

17   **A.**    He understood.  He comprehended.  He was fine.

18   Again, he was down and depressed.  There's no doubt

19   about it.  I mean, you're making a big decision about

20   whether you're going to take a plea or not and probably

21   going to jail for some time, but there was no doubt in

22   my mind that he understood what was communicated to him

23   and what was going on.

24   **Q.**    So did you present him and show him the documents

25   in person at that point in time?

1    **A.**    Yeah.  Actually, Mr. Traini did.  We sat at the

2    dining room table.  Mr. Traini sat at the top of the

3    table.  I sat off to the side.  Across from me was

4    Mr. Caramadre, and Mrs. Caramadre was next to

5    Mr. Caramadre.

6    **Q.**    Okay.

7    **A.**    And Mr. Traini, because I made copies for everyone

8    to have because what I like to do is, I do this at

9    change of plea hearings or going over documents, it's

10   not appropriate just to be reading a document and not

11   give it to the client.  So I think I printed out in my

12   home office, I have a little office in my home, the

13   documents.  I printed out the plea agreement, which

14   wasn't completely finalized but it was close to being

15   finalized.  We made some changes to it.  I printed out

16   the statement of facts, which was just about complete,

17   for myself and Mr. Traini and Mr. Caramadre.  And I

18   remember Mr. Traini giving those two documents to

19   Mr. Caramadre and Mr. Caramadre having them in front of

20   him, then Mr. Traini went on to explain the plea

21   agreement and the statement of facts.

22   **Q.**    So Mr. Caramadre had the documents in front of him

23   and was able to read the documents?

24   **A.**    My recollection is that Mr. Traini, each of the

25   documents, he was reading from them and then

1    summarizing paragraphs and Mr. Caramadre had those

2    documents in front of him following along on paper and

3    then listening to Mr. Traini.  Mr. Traini did most of

4    the talking during that meeting.

5            Quite frankly, I was burnt out at that point so

6    Mr.  Traini basically handled the meeting.

7    **Q.**   Essentially explaining the terms of the plea

8    agreement, going through each paragraph?

9    **A.**   Going through each paragraph, going over the

10   statutory penalties.  Going over all the paragraphs.

11   And not only reading them, because even though

12   Mr. Caramadre is a lawyer, he's not a criminal defense

13   lawyer so Mr. Traini not only read them but he

14   explained the documents to him.

15   **Q.**   Did you have any doubt as to whether Mr. Caramadre

16   understood what those documents were saying?

17   **A.**   No.  He absolutely understood.

18   **Q.**   Did he indicate that to you in any way?

19   **A.**   I don't remember him saying "I understand," but

20   Mr. Traini explained the documents to him and by the

21   time -- let me say this.  By the time the meeting

22   wrapped up, I think the talking that I did, the limited

23   talking I did was to let the client know what's going

24   to happen next.  And what was going to happen next is,

25   because Mr. Caramadre and I live on the same street,

1    drive home, and I'm going to immediately when I get

2    home draft an e-mail for Judge Smith because I had sent

3    a prior e-mail to the Court saying that Mr. Traini and

4    I are going to meet with Mr. Caramadre to go over the

5    proposed plea agreements, and I told the Court I'm

6    going to get back to him one way or the other when I

7    get back.

8           So I told the client and Mrs. Caramadre I'm

9    going to go back to my office.  I'm going to e-mail the

10   Court and let the Court know that Mr. Caramadre has

11   accepted the plea agreement and the statement of facts,

12   that we are going to go ahead with the change of plea

13   tomorrow and that we need -- I don't know if I put this

14   in the e-mail, but I know we needed a couple of small

15   revisions on the plea documents and that we would be

16   ready -- I think we were supposed to meet with the

17   Court at 8:30 in the morning before any change of plea

18   hearing.  Because the one thing that needed to happen

19   was Judge Smith had indicated that he absolutely,

20   although he was okay with the nature of the proposed

21   Rule 11(c) plea with a cap of ten, he needed to see the

22   plea documents, which he had never seen the plea

23   documents or wouldn't until Monday morning.  So his

24   tentative okay on that, his imprimatur on that wasn't

25   final until he saw the plea agreement.

1   **Q.**   This plea was unusual in the sense that not only

2   did it bind the Government and the Defendants, but it

3   also would bind the Court, at least in part, in terms

4   of if the Court failed to follow the recommended

5   sentence, then Mr. Caramadre and Mr. Radhakrishnan

6   would be released from their requirements under the

7   plea agreement?

8   **A.**   Right.  This is all subject to the Court being

9   bound by, which is as I think I testified before, most

10   plea agreements are non-binding.  This was binding in

11   the sense of not binding to a specific sentence but

12   binding as to a cap as to what the sentence could be,

13   and we needed Judge Smith's approval.

14       If Judge Smith reviewed the documents on Monday

15   morning, the 19th, looked at them and said this is

16   unacceptable, then we were getting ready to call the

17   next witness.

18   **Q.**   That was something you explained to Mr. Caramadre?

19   **A.**   Absolutely.  There's no way I'm leaving

20   Mr. Caramadre's house and sending an e-mail to the

21   Court saying -- you know, I need to look at the e-mail

22   so I don't know exactly what I wrote -- to Judge Smith

23   that Mr. Caramadre and Mr. Radhakrishnan -- I think I

24   wrote that, too --  Mr. Caramadre is ready to enter a

25   plea unless he's going to do it.  Because if there's

1    any doubt in my mind, that's horrible just from a

2    reputation standpoint to tell the Court and the

3    Government, oh, yeah, we're going to plea tomorrow

4    morning and then it not happen. I left his house no

5    doubt in mind he was pleaing. And that's why I made

6    the representation to the Court and to the Government,

7    which the Government was copied on that e-mail.

8    Q.    Now, during the course of those conversations, do

9    you recall Mr. Caramadre repeatedly stating, How am I

10   going to get around the problem of lying?

11   A.    He did mention at the Sunday night meeting

12   something about lying. And I just -- I don't have a

13   vivid memory of exactly what he said so I don't want to

14   put words in his mouth because it will be unfair. He

15   might have said something to the effect of I guess I'm

16   just going to have to lie or maybe I'll just have to

17   lie or something to that effect. He did make that

18   comment.

19   Q.    What, if anything, was your response or yourself

20   or Mr. Traini to that comment?

21   A.    I didn't say anything. And no one will understand

22   it because you're not sitting in my shoes about all the

23   work that I did and dealing with Mr. Caramadre, he can

24   be a difficult client in my extensive conversations

25   with him beforehand. Mr. Traini jumped in right away.

1    And again, I don't remember exactly what Mr. Traini

2    said, and I don't want to put words into his mouth.  He

3    said something to the effect of I don't want to hear

4    anything about lying; you can't lie.  And then he said

5    something to the effect of -- again, I'm paraphrasing

6    and it's unfair, but something to the effect of, You

7    might think you're lying now but what matters is

8    whether you believe you're telling the truth tomorrow

9    because when you're under oath you've got to tell the

10   truth.  It was something to that effect.  I'm doing a

11   disservice to the words because I just don't remember.

12   It was something to that effect.

13   Q.   When you heard Mr. Traini make that explanation to

14   Mr. Caramadre, did you view that in any way as

15   Mr. Traini indicating to Mr. Caramadre that it was okay

16   to lie to plead guilty?

17   A.   No.

18   Q.   Was it any type of wink and a nod or Kabuki dance

19   that I'm saying don't lie but I really mean lie?

20   A.   No.  In fact, I had a conversation with Mr. Traini

21   afterwards because Mr. Traini and I -- like I said, I

22   live right down the street from Mr. Caramadre,

23   literally about a block away -- and we drove in the car

24   together.  And I think that comment came about -- my

25   communication with Mr. Caramadre, which not only

1       happened on Sunday, which also happened back in May,

2       April or May, and I need to put this on the record.

3       Mr. Vilker and I were talking about a potential plea.

4       I absolutely before Mr. Traini ever got involved in

5       this case had discussions with the client about a plea

6       because that's a defense attorney's obligation.  And

7       after I started looking at the evidence, I'm saying

8       I've got to at least open up discussions.  And

9       Mr. Caramadre would say, Well, I'm not going to lie.

10      He said that long ago back in May, April or May before

11      Mr. Traini ever got involved.  And I know that the

12      discussions I had with Mr. Caramadre back then, you

13      can't lie, that it's a non-starter.  We're not going to

14      bother entering the plea negotiations.  I had those

15      with him.  You can't be under oath.

16              So I was comfortable with what I had told him.

17      I think what happened was that I was comfortable with

18      all the discussions I had with Mr. Caramadre.  He's an

19      attorney.  He's a very smart man, and he understands

20      exactly what his obligations are and I think Mr. Traini

21      said that because it was a difficult situation.

22              Mrs. Caramadre was right there sitting at the

23      dining room table.  She was there from the beginning to

24      the end, my memory, of the whole meeting.  Okay?  And I

25      don't believe, okay, that Mr. Caramadre is telling the

1    truth when he's saying, Well, I guess I'm going to have

2    to lie, because I know there's an independent basis for

3    it.  I know that he made misrepresentations to

4    LifeMark.  I know that he's made misrepresentations to

5    TD Ameritrade.  I know that there are other

6    misrepresentations that we didn't talk about today.

7          So when the client is saying, Well, I guess I'm

8    going to have to lie, well, that means nothing to me

9    because I know there's an independent basis for the

10   plea.  So I believe and I think Tony believed, and

11   you'll have to ask him, that it's an uncomfortable

12   situation.  Mrs. Caramadre is right there.  And what

13   are we going to do?  Are we going to get into

14   discussions, Well, you recall you made an admission

15   about Mr. Mizzoni's annuity application about why and

16   address, why your parents' address went on there.  You

17   know, recall that you admitted that Denise Egan and

18   Raymour Radhakrishnan met with one another and you put,

19   you instructed Raymour to put "friend" on the

20   application because they met at your office and you

21   said, By the way, now you guys are friends.

22         I knew those kinds of things existed.  So this

23   wasn't a situation where I have a client who's charged

24   with murder and he's in California and I know he's in

25   California and the murder happened in Rhode Island and

1    he's charged with actually doing the murder by his own

2    hands in Rhode Island and he's saying, I was in

3    California.  And I'm going, Look, just take the plea,

4    don't worry about it, just say you were in Rhode

5    Island.

6           That's not the situation.  What the situation

7    is, is that we know there's an independent basis.  And

8    Mr. Traini knew that, I knew that because I relayed

9    that kind of evidence to Mr. Traini.  So we thought he

10   was lying.  I'll say at least I thought he was lying

11   when he said that, not to have Mrs. Caramadre know all

12   those details.  And you know what, I was exhausted.

13   Mr. Caramadre knows what he said to me.  He knows the

14   basis for the plea and you know what, it's his decision

15   and he said that he's going to plea.

16   **Q.**   So you viewed that statement of being

17   Mr. Caramadre attempting to save face with his wife by

18   not admitting it in front of her?

19   **A.**   Yes.

20           THE COURT:  Mr. McAdams, why don't we take a

21   break now.  I know you're probably getting close to the

22   end, but let's go ahead and take our break and

23   reconvene in ten minutes.

24           (Recess.)

25           THE COURT:  Mr. McAdams.

1        MR. McADAMS:   Thank you, your Honor.

2   **Q.**   Mr. Lepizzera, when we left off, I believe you

3   just testified that you believe that on the night of

4   November 18th that Mr. Caramadre may have lied when he

5   made the statement about lying to plead guilty in order

6   to save face with his wife.  Is that a fair assessment?

7   **A.**   Yes.

8   **Q.**   And in your experience as a criminal defense

9   attorney, is the presence of a loved one sometimes a

10  challenge or an obstacle in dealing with a client in

11  getting them in a position where they're prepared to

12  accept responsibility for their actions?

13  **A.**   Yes.  I was actually surprised that Mrs. Caramadre

14  was there.

15  **Q.**   Why was that?

16  **A.**   Because during the course of the representation, I

17  never got a chance to interview her or talk to her

18  about the allegations and the substance of the case;

19  and that was important because her name is all over

20  these annuities and bonds.  And although I would see

21  Mrs. Caramadre at church and in a social setting, I

22  never got a chance to talk about what happened with

23  particular annuities or bonds that she was involved in,

24  at least her name was, because Mr. Caramadre didn't

25  want me to talk to her.

1    **Q.**   Is it also not uncommon for clients to be more

2    candid, more forthcoming when they're just alone with

3    you as their attorney?

4    **A.**   Of course.

5    **Q.**   And in fact, you testified Mr. Caramadre has made

6    numerous admissions to you in the course of your

7    representation with respect to, for example, of lying

8    to TD Ameritrade or to LifeMark?

9    **A.**   Yes.

10   **Q.**   Did he also, during the course of the

11   representation, ever admit to you that he had forged

12   any documents?

13   **A.**   Only with respect to his wife's signature.

14   **Q.**   So he admitted that he had forged his wife's

15   signature?

16   **A.**   Yes.  I think it was on the Wiley documents, and I

17   had asked him, you know, did Paula sign these

18   documents?  And he said, Well, no.  And he said, That

19   was my left hand.

20   **Q.**   And those were the documents that were notarized

21   by his employee as having been signed in the presence

22   of Mrs. Caramadre?

23   **A.**   If you want to call it notarized.  There was

24   another issue in the case about the notaries weren't

25   really properly notarizing documents.  They were just

1    stamping and signing it was notarized but people

2    weren't signing in front of them, but yes.

3    **Q.**   So that was Sunday night and you mentioned earlier

4    we had to be at court at 8:30 the next morning on

5    Monday.

6         Before the Court conducted its change of plea

7    colloquy with Mr. Caramadre, did you present him with

8    the final official no more edits documents.

9    **A.**   I'm trying to remember whether we had those, and

10   I'm a little unclear on this point.  I believe that we

11   met with Mr. Caramadre before we had a chambers

12   conference with Judge Smith.  It might have happened a

13   little bit later than 8:30, but it was supposed to be

14   at 8:30.  I'm not sure -- do you know what Mr. McAdams?

15   We didn't have those documents at that point because,

16   remember, the Court still hadn't seen the documents.

17   So there'd be nothing to sign because it was subject to

18   Judge Smith's approval, and he hadn't seen the

19   documents yet.

20        So Mr. Caramadre did not sign the documents

21   during the pre-Judge Smith chambers meeting.  We did

22   meet with him very briefly and then went to chambers.

23   **Q.**   After the chambers conference, did you meet with

24   Mr. Caramadre and show him the original documents?

25   **A.**   Absolutely.

1    **Q.**    Did he voice any objection to them?

2    **A.**    No.  He executed the November 19th, 2012 letter

3    that Mr. Traini had drafted, which authorized us to

4    enter into plea negotiations revoking the September

5    13th, 2012 letter instructing us not to negotiate with

6    the Government, and he also signed the final plea

7    agreement, and he also signed the final statement of

8    facts.  I think Mr. Traini had also reviewed with him

9    the documents, not like he did on Sunday night, but in

10   a cursory manner he did review the plea agreement and

11   the statement of facts again.

12   **Q.**    Did Mr. Caramadre have those documents in front of

13   him, the plea agreement and the statement of facts?

14   **A.**    Yeah, because he was about to sign, and I think

15   Mr. Traini went over a couple of things.  Maybe some

16   changes.  I don't recall what the changes were.  But he

17   went over the documents not as he did like the night

18   before, but he went over the documents and

19   Mr. Caramadre said, Okay, let's get this done, or

20   something to that effect.  And he signed the documents

21   and we walked down the hall.  I think we were on the

22   second floor.  I can't remember where our conference

23   room was.  But we went to this courtroom and we

24   exchanged plea documents.

25   **Q.**    During that process when Mr. Traini was

1    summarizing the plea agreement, when Mr. Caramadre

2    executed the documents, what was your impression of his

3    mental state?

4    **A.**    He was absolutely fine in the sense of he

5    absolutely understood what was going on.  He

6    comprehended everything.  He communicated with us.

7    Again, he was -- I'm not saying clinically depressed,

8    but he was down.  This was the end of the road.  He

9    fought long and hard and the case was coming to an end

10   and it didn't end the way he wanted it to since the

11   beginning of time, which was get an acquittal on

12   everything and sue the Government for malicious

13   prosecution and file OPR complaints and file

14   disciplinary complaints.

15        So he was down in that sense, but he absolutely

16   understood no doubt in my mind what was going on.

17   **Q.**    Did he ever indicate to you that he wanted to

18   reach out on an emergency basis to his psychotherapist?

19   **A.**    No.

20   **Q.**    Did he ever tell you that he had tried to reach

21   his psychotherapist but she was away in Africa and what

22   was your advice, what should he do about it?

23   **A.**    No.

24   **Q.**    Did he ever tell you that he thought he needed to

25   seek medical or psychiatric attention?

1   **A.**   No.

2   **Q.**   Do you have any reason to believe that as the

3   change of plea colloquy took place on November 19th

4   that Mr. Caramadre's mental competence was in any way

5   compromised?

6   **A.**   No.  And I'm not an expert in that area, but

7   based on my knowledge of Mr. Caramadre, my experience

8   of him, did nothing whatsoever that gave me any inkling

9   that he didn't understand.  He understood what was

10  happening.

11  **Q.**   If he had indicated to you in some way or you had

12  made observations that he doesn't seem mentally fit

13  here, what would you have done?

14  **A.**   Would have called a time out.  Would have been our

15  obligation.  And we would have met with the Court and

16  said that we have concerns about the client's

17  competence to enter in a plea.

18          Now, don't forget, we're also on trial.  And

19  what I'm a little confused about and I don't know all

20  the allegations because I'm not an advocate anymore in

21  this case, but this whole thing about he didn't

22  understand, we were on trial.  He was okay to stand

23  ready for trial and be on trial.  I'm just confused

24  about him -- he's okay to be on trial, but he's not

25  okay to enter a plea.  There's nothing at all in my

1    mind, in my knowledge of him, that he didn't

2    understand.  He understood exactly what he was doing.

3    **Q.**   So you never had any doubts about his mental

4    ability from the first day of the trial through the end

5    of the plea colloquy?

6    **A.**   His ability to comprehend and participate, no.

7    **Q.**   Now, when he executed those plea documents with

8    you, did he say anything along the lines of "This is a

9    lie; I'm signing a lie here"?

10   **A.**   On November 19th?

11   **Q.**   Yes.

12   **A.**   Absolutely not.

13   **Q.**   You were present in the courtroom when

14   Mr. Caramadre went through the plea colloquy with the

15   Court?

16   **A.**   I was present.

17   **Q.**   Okay.  When he completed the plea colloquy, did he

18   say anything to you during that -- before, during or

19   after to indicate that he was lying?

20   **A.**   No.  Mr. Traini sat on -- where Mr. Vilker's table

21   is, is usually the prosecution, but because of the size

22   issues we took that table.  Mr. Traini sat on the

23   outside.  I sat next to Mr. Traini, and then to my

24   right was Mr. Caramadre.

25        Mr. Caramadre stood.  And what I do is, and I do

1    this in every case, I absolutely had the plea agreement

2    and if there's a statement of fact and sometimes there

3    isn't, but in this case there was, I had those

4    documents in front of the client. And the client -- I

5    was sitting. I think he was standing and I have them

6    in front of them because the Court -- you know, he

7    should follow along with the Court when he's

8    explaining. So there's no doubt in my mind he knew

9    what was going on and he had those documents, the

10   executed documents in front of him. In fact, I said to

11   you, John, I need the fully executed version because I

12   need to have those in front of the client. Which you

13   gave me a copy and I had them in front of him during

14   the change of plea.

15   **Q.**   Now, when the plea ended and you left the

16   courtroom, did Mr. Caramadre say that there was a lie

17   or anything of that nature?

18   **A.**   No. I later saw him -- this was Monday, November

19   19th. Our church does Thanksgiving baskets for the

20   needy. And I happened to go to church to -- I don't

21   know if I was giving money or assisting or whatever I

22   was going to do to help out with the Thanksgiving

23   baskets. And I actually ran into Mr. Caramadre at Holy

24   Apostles. And, one, I was surprised that he was there

25   because I figured, you know, it's breaking news, he

1   pled guilty, it was a difficult time for him. So I

2   figured he would just go home.

3        He was there at Holy Apostles, and he was in

4   good spirits. And I was actually pleased. I remember

5   my reaction to it at least internally that, you know,

6   he said that he's glad it's over and it's really a

7   weight off his shoulders and he's just glad it's over

8   and we had a brief chit-chat. Then someone else came

9   over and I don't want to discuss in front of someone

10  else, but I was happy. I was actually good, you know.

11  He made a good decision. He's seeing the light. He's

12  going to move on. He's going to get past this, and his

13  family can get past it. So I was actually pleased at

14  that point, although that changed.

15  Q.   Now, from the perspective of you as an attorney,

16  is the guilty plea the end of the process?

17  A.   No. And in this case it wasn't even close.

18  Q.   So just from a general perspective, what were the

19  next few things that were going to need to take place

20  after Mr. Caramadre had pled guilty?

21  A.   Normally, what happens is, at least my experience

22  is that the sentencing date is usually about 90 days

23  out, and the Court sets that date because there's a

24  presentence interview, there's a draft presentence

25  report, there's objections from both sides, if any;

1      sentencing memorandums recommending particular

2      sentences.

3          In this case, Mr. Traini and I were concerned

4      that 90 days wasn't going to be sufficient to do what

5      we needed do for Mr. Caramadre.  We needed to educate

6      this Court, okay, yes, we have a guilty person standing

7      before you.  He's now convicted of whatever his counts,

8      9 and 33, whatever the counts were.  But he is a man

9      that's done a lot of good, a lot of good.  And our job

10     was to educate this Court about all the good that

11     Mr. Caramadre did that, like I said before, he's not

12     the typical defendant that comes before this Court.

13         So we wanted to do that.  We wanted to get

14     letters from everyday, ordinary people and influential

15     people.  You know, get letters, present Mr. Caramadre

16     in the most favorable light.  To say that, you know

17     what, he had this bad moment in his life, but here's

18     the other side of Mr. Caramadre.

19         There were restitution issues as I think I

20     alluded to before.  You know, this Dr. Kalotay that was

21     the proposed expert on the bond issue.  Mr. Traini and

22     I believed we had a very good argument in terms of

23     whether there were really any losses, so to speak, that

24     should be counted for either the guideline calculation,

25     which really didn't matter because we had a ten-year

1   cap, or restitution, that that shouldn't count.  So we

2   had that issue.  Just a host of issues of educating the

3   Court about who Mr. Caramadre is.

4        So I think the Court had set down what Judge

5   Smith might have called a placeholder date.  So I think

6   we put down February, early February as the initial

7   sentencing date but it was understood, I think by the

8   Court and the parties and the Government, that, you

9   know, we would probably ask for additional time to

10  prepare.

11  **Q.**   And during that time after the guilty plea in

12  advance of that sentencing date, did you continue to

13  have discussions with Mr. Caramadre?

14  **A.**   Yes.

15  **Q.**   When was the first time that he indicated to you

16  that he was thinking about withdrawing his guilty plea?

17  **A.**   I think he did in early December.

18  **Q.**   I'd like to show you Government Exhibit Number 23,

19  which is Bates marked 469.

20       THE COURT:  Is there any objection?

21       MR. OLEN:  No, your Honor.

22       THE COURT:  Exhibit 23 will be full.

23       (Government Exhibit 23 admitted in full.)

24  **Q.**   These are your notes?

25  **A.**   They are.

1    **Q.**   Okay.  And it indicates December 14th, 2012?

2    **A.**   I think that's December 14th.

3    **Q.**   December 14th, 2012.  Okay.  You have a couple of

4    notes in there, Mr. Caramadre asks about process to

5    vacate plea.  Doesn't request that a motion to vacate

6    be filed.  Only asks about the process.

7         What do you recall about that conversation with

8    Mr. Caramadre?

9    **A.**   This would have been a meeting with Mr. Traini and

10   Mr. Caramadre and we wanted to get him in the office.

11   We met in my office in Warwick.  And we needed to get

12   this process going, meaning the sentencing process

13   because, again, we had the restitution issues.  We've

14   got to prepare for sentencing.  And there was a lot to

15   do.  And we wanted to get Mr. Caramadre's cooperation

16   because this isn't something we were going to be able

17   to do on our own.  He needed to cooperate with us, and

18   we wanted to make sure that he was invested in the

19   sentencing because we didn't just want to show up in

20   February or March or April and say, Gee, he's a nice

21   guy.  You know, give him a break.  Only give him two

22   years.  That's not what we planned to do.  We had

23   planned to do a lot of work.  So that's the reason for

24   this meeting.

25         And the only thing I recall about this, and I

1    took the note down so I thought it was important, he

2    did not ask us to file a motion to vacate.  He started

3    asking questions about the process on a motion to

4    vacate, which concerned us.  And to be perfectly frank,

5    I think Mr. Caramadre mentioned something to me

6    one-on-one maybe a week before this about a possible

7    motion to vacate.

8    **Q.**   And did he say in that conversation, either the

9    week before or this December 14th meeting, what his

10   basis would be to vacate his plea?

11   **A.**   I asked him that.  In fact, I think there's

12   e-mails later on in December but I asked him that.  I'm

13   trying to remember when he initially said that to me.

14   This was the day -- and I would have to look at a

15   calendar because there was an event at Holy Apostles.

16   This was a day where he made some -- I wasn't there,

17   but in our Men of St. Joseph's group he made some

18   reference to he wouldn't commit suicide because that

19   would be just an absolute sin but that it wouldn't be a

20   sin if he hired someone to kill him.  He said that to

21   the group and I had stepped out of the room and

22   everyone came to me in concern.

23         So I know I'm getting a little far afield, but I

24   wound up finding him at a breakfast location, at a

25   breakfast place down the street because we were looking

1    for him for about an hour.  I'm like, what's going on

2    here?  He made that statement.  It alarmed me.  I

3    actually found him at a breakfast stop.  I think it was

4    Adle's Muffin down the street.  I brought him back.  I

5    made him call I think it was Sarah Xavier, which is his

6    treating doctor.  And then I was concerned.  I asked

7    him to come to the Holy Apostles basketball game

8    because I coached the 9th and 10th graders there.  And

9    I invited him and he came.  It was him and his son.  I

10   wanted to keep an eye on him, and I wanted to have a

11   conversation with him.  He came to the game.  He

12   watched it.  Unfortunately, we lost.  But after the

13   game, he mentioned something about maybe moving to

14   vacate his plea.  And I asked him, What's the basis for

15   it?  He said something to the effect of that, you know,

16   that he did this for Paula because she was really sick

17   and he can't live with himself because it's a lie and

18   that everyone's looking at him like he's a criminal.

19   And his own household is -- he didn't use this word,

20   but I'm just going to use it -- is a wreck, is upset

21   because his own family members, like the LaMontes, the

22   LaMontes who were going to testify against

23   Mr. Caramadre, now his other relatives were kind of

24   siding with them, were now talking to them and that he

25   killed them.  And it was a strain on his family and he

1    just wanted to go back to trial.

2         He never told me, You know, you threw the case,

3    you were the worst attorney, Mr. Traini forced me to

4    plea.  He didn't mention any of those things.  That was

5    basically what he told me.

6    Q.    So he never said he was completely hopeless

7    because of your lack of cross-examination of the

8    witnesses?

9    A.    No.

10   Q.    Turn your attention to Government Exhibit Number

11   24, which is Bates numbered 441 at the bottom.

12         THE COURT:  Any objection to 24?

13         MR. OLEN:  No, your Honor.

14         THE COURT:  All right.  24 is full.

15         (Government Exhibit 24 admitted in full.)

16   Q.    This is an e-mail, Mr. Lepizzera, dated December

17   27th, 2012, a couple of days after Christmas.  And it's

18   an e-mail chain between, Mr. Traini and yourself and

19   Mr. DeMello cc'd.  It looks like you are forwarding an

20   e-mail to Tony and it includes a copy of a case,

21   federal case from West Law, **United States versus**

22   **DeSimone**.  Is that the Rocco DeSimone case?

23   A.    It is.

24   Q.    Is Rocco DeSimone a criminal defendant who came up

25   frequently during the course of your representation of

1    Mr. Caramadre?

2    **A.**   Yes.

3    **Q.**   He was a defendant who was prosecuted for fraud in

4    this Court in which myself and Mr. Vilker were

5    prosecutors.

6    **A.**   Yes.

7    **Q.**   And Judge Smith was the Judge?

8    **A.**   Yes.

9    **Q.**   And Mr. DeSimone had pled guilty prior to trial;

10   is that correct?

11   **A.**   Yes.

12   **Q.**   And then he had attempted to withdraw his guilty

13   plea?

14   **A.**   Yes.

15   **Q.**   Mr. Caramadre had followed those proceedings very

16   closely, didn't he?

17   **A.**   He followed the proceedings after Judge Smith

18   vacated the plea and he went to trial.  I don't have

19   any knowledge of Mr. Caramadre following the case while

20   the motion to withdraw the plea was involved.

21   **Q.**   Because he actually physically came and attended

22   the trial while we were trying that case; is that

23   correct?

24   **A.**   Oh, he did.

25   **Q.**   And he did that against your advice?

1    **A.**    I received a phone call from Mr. Vilker, and it

2    was like noontime, 12:30.  And I said to Lee, Boy, you

3    can't be that busy.  You're in the middle of trial and

4    you're calling me.  I mean, what's going on?

5         And he mentioned to me that Mr. Caramadre and

6    maybe Mr. Radhakrishnan were attending the trial, and

7    he was -- I think Mr. Vilker was kind of upset, and I

8    think I might have initially said, Well, you know,

9    courtrooms are -- they're open to the public just like

10   they are today, and he's got a right to be there

11   although I don't want him to be there.  And I said, I

12   am going to -- that's what I said to Mr. Vilker.

13   Inside, myself, I was kind of alarmed.

14        I actually left my office and came down here

15   because I didn't want my client here.  I didn't want

16   him -- he had a right to be here, and I don't think he

17   did anything wrong whatsoever.  He wanted to be here, I

18   think, because I don't think he's ever tried a case.

19   The two of you were prosecuting him.  I think he wanted

20   to see where people sit, how good you and Mr. Vilker

21   were trying a case, how Judge Smith handles himself as

22   a trial judge.  So but be that as it may, I came down

23   here and basically asked the client to leave, because I

24   just didn't think it was appropriate and I didn't want

25   the Court to think anything wrong of Mr. Caramadre

1    being there.  It was kind of strange, and I didn't want

2    any opportunity where any FBI agents or anyone says,

3    Well, Mr. Caramadre -- someone looked at me the wrong

4    way or what have you.  I just wanted him out of the

5    courtroom.

6    **Q.**    He came as a scouting mission, is that your view

7    of it?

8    **A.**    That's my view of it.  He never said that, but

9    that's my view of it.

10   **Q.**    Now, did there come a point in time later after

11   his own trial took place and after he had pled guilty

12   where you came to believe that he had followed the

13   Judge's decision in allowing Mr. DeSimone to withdraw

14   his guilty plea, perhaps after the fact but very

15   closely.

16   **A.**    I think this e-mail you're referring to -- what

17   date is this, please?

18   **Q.**    This is December 27th, 2012.

19   **A.**    I believe I had a meeting with Mr. Caramadre that

20   night and actually it's 12:49 a.m. Thursday.  So I

21   would have had a meeting with him Wednesday night.  And

22   I don't know if he mentioned specifically DeSimone,

23   about vacating a plea or not.  But he kept on saying, I

24   lied, I lied, I lied to the Court.  I think I need to

25   vacate my plea.  Okay?

1        And then what rang in my mind was, wait a

2    minute, he sat in for the DeSimone trial.  Not the

3    motion to vacate, but he sat along at the DeSimone

4    trial.  I think we had conversations about DeSimone

5    prior, not this point.  And he's saying he's lying.  Is

6    he trying to pigeon hole any motion to vacate now into

7    a DeSimone situation?  And to be perfectly frank with

8    you, I don't believe I ever read the DeSimone opinion.

9    I did follow along a little bit in the newspaper,

10   because I think it was reported in the Journal, but I

11   never read the actual decision, what the Judge's basis

12   was for vacating the plea.

13        So I think I left Mr. Caramadre.  I think I went

14   back home down the street.  I think I read DeSimone,

15   and it started clicking in my mind is this what

16   Mr. Caramadre is doing?  He's trying to pigeon hole

17   himself into a DeSimone situation, which then prompted

18   this e-mail to Tony -- Mr. Traini and Mr. DeMello.

19   **Q.**   You forwarded to them a copy of the decision?

20   **A.**   Yes.

21   **Q.**   I'm just going to focus a little bit.  In your

22   statements, you write, You only advise clients.  Can't

23   make the actual decisions for them.  This case is no

24   different.  I wish him the best of luck, although in my

25   opinion he is on a suicide mission.  This was his

1    decision to plea, and he exercised that decision by

2    accepting a plea.  We didn't make that decision for

3    him.

4            Then you talk about him conferring with outside

5    counsel.  And I want to go down a little bit.  You

6    write, He thinks the most the Judge will give him is

7    five years if he loses the motion and is sentenced.

8            Is that based on a statement that he made to

9    you?

10   **A.**   Yes.

11   **Q.**   Then you write, He is over-playing his hand, but

12   that's Joe.  Also, I think new counsel is really doing

13   a disservice to him because they're only entering for

14   purposes of vacating the plea.  And I'll skip down and

15   you write, He has every right like any other

16   disgruntled defendant to try to unravel the plea, but

17   he'll be the new poster child for the old adage, "Be

18   careful of what you wish for."

19           And then you write, No matter what the Court

20   does with the motion, Joe is facing an uphill battle.

21   And here you write, Also, I am starting to think we

22   along with the Government and the Court were played

23   with respect to this plea.  It sounds like he

24   manufactured the entire scenario to pull out his

25   mulligan.  He didn't like the way the evidence was

1    coming in or that RR, Raymour Radhakrishnan, was being

2    tried with him.  He wants a do-over and he thinks this

3    time RR will not be tried with him because Raymour

4    Radhakrishnan wants this over and his guilty plea will

5    remain intact.  I think that he thinks that even if he

6    loses the motion he is better off because everyone will

7    know, (or so he believes) that he is not guilty and he

8    was forced to take a plea because of his wife's

9    decision or whatever reason he will proffer.

10         Is that an accurate statement of your opinion as

11   to what you think was going on at the time?

12   **A.**   It is.

13   **Q.**   Is it still your opinion?

14   **A.**   I don't think it's appropriate -- obviously, the

15   Court can rule -- I'm a fact witness here.  I don't

16   have a stake in this proceeding.  The Court should

17   decide the motion.  Part of me says, Yeah, that's

18   exactly what's going on.  I do think it's a suicide

19   mission.  I could be wrong.

20   **Q.**   Okay.  I'll withdraw the question.

21         All right.  You did communicate with

22   Mr. Caramadre after he indicated to you that he was

23   going to get a new attorney and move to withdraw the

24   plea; is that correct?

25   **A.**   I'm sorry?

1    **Q.**   You did continue to have some communication with

2    Mr. Caramadre after he initially indicated to you that

3    he wanted to withdraw the plea and he was going to get

4    a new attorney?

5    **A.**   By the way, the independent counsel issue came

6    from me.

7    **Q.**   Explain what you mean by that.

8    **A.**   While we're having these discussions,

9    Mr. Caramadre is telling me, basically, why don't I

10   file the motion to vacate the plea.  I had written to

11   him and I discussed with him what's the basis for the

12   plea.  Just like you need a basis for -- I'm sorry.

13   What's the basis for the withdrawal of a plea.  Just

14   like you need a basis for a plea to enter, you need a

15   factual basis for the withdrawal.  And I don't see it.

16        And on top of it, I was a hundred percent honest

17   with him.  I said, On top of it, as I see it, the only

18   thing I can think of is you're going to have to attack

19   Mr. Traini and I.  I don't see what your basis is for

20   attacking us, but for me to give full disclosure,

21   you're going to have to attack us for whatever reason

22   that you can come up with.  So therefore, I cannot

23   ethically give you an opinion as to how to vacate a

24   plea, what the process is, what the law is because I

25   have a conflict.  You're going to have to attack me

1   unless you can come up with some other grounds, which

2   is fine.

3        So I'm the one that referred him to independent

4   counsel, but initially he wanted me to do it.  And on

5   top of it, he wanted me, because this doesn't jive to

6   what all the evidence that is coming in, this is a

7   train wreck, the trial, he wanted me to be the trial

8   counsel on a new trial that -- if the Judge awarded him

9   a new trial.  He didn't want Mr. Traini.  He wanted me

10  to do it.  He said, You're capable.  You can do this.

11  I want you to be my trial counsel.

12       Because one of the concerns I had was if you go

13  hire a lawyer, are they just coming in to vacate your

14  plea because we're going to have to withdraw and I

15  don't know how that's going to work with the Court, if

16  the Court is going to allow a special appearance on an

17  attorney coming in to vacate a plea.  But if these

18  lawyers that are coming in to represent him aren't

19  fully invested in trying the case if Mr. Caramadre is

20  successful, again that's for the Court to decide not

21  for me, then who is going to be trial counsel?  He

22  wanted me to be trial counsel.

23  Q.   He wanted to have you file a motion to withdraw

24  the plea; and then if it was successful and there was a

25  new trial, he wanted you to be the attorney again?

**A.** Yes. And on top of it, he wanted me as late as in January of 2013, he wanted me to enter in the civil cases for him because he said you have the most knowledge of the facts. His present attorneys, Mr. Flanders, his firm was still counsel of record. He said, I trust you implicitly. You know the facts better than anyone else. You're as good as, if not better, than all the attorneys I've hired. You're my guy, so to speak. You're my counsel. I want you to enter in the civil cases.

And I told him, I said, I can't do that for a couple of reasons. One is my reputation. You're going to file some motion to vacate, which I don't know what the basis is because he's never disclosed to me. I'm going to enter on the civil cases and my reputation is going to be tarnished because I'm entering the civil cases as your attorney and then in criminal proceeding you're potentially attacking me? I'm going to look bad.

Number two, more importantly, forget about me. Let's talk about the client. The client is going to look terrible with the Court. You're going to be attacking me in a motion to vacate a plea in a criminal case, and then you're saying I'm a great competent attorney to handle the civil case? I couldn't do it.

1    So I never entered in the civil case because I didn't

2    think it was wise for me or him.

3    Q.   I'd like to show you Government Exhibit 25, which

4    is Bates marked 459.

5         MR. OLEN:  No objection.

6         THE COURT:  25 is full.

7         (Government Exhibit 25 admitted in full.)

8    Q.   Two page e-mail 459, 460.  I want to focus on this

9    is an e-mail from yourself to Mr. Caramadre, and it's

10   dated January 20th, 2013; and you reference being at

11   the end of the first line, I have not spoken to Brooks.

12   Who's Brooks?

13   A.   That would be Brooks Magratten.  He is the

14   plaintiff's counsel in the AEGON, Western Reserve

15   cases.

16   Q.   So he's one of the attorneys for the opposing

17   party in the civil case?

18   A.   He represents the insurance companies that have

19   sued Mr. Caramadre and a host of other defendants.

20   Q.   And then you write, I think it is best that Bob

21   and Adam remain as your counsel at this point, at least

22   for the mediation.

23        That refers to Mr. Flanders and one of his

24   associates?

25   A.   Yes.  Adam Ramos.  He works with Mr. Flanders at

1    Hinckley Allen.

2    **Q.**   And then you write, Putting aside my credibility,

3    which I would never jeopardize, any participation by me

4    in the civil cases on your behalf would only cause the

5    Court to further question your credibility, possibly

6    jeopardize your position in both the civil and the

7    criminal cases.  For a variety of reasons, I also

8    cannot use the fact that you're about to file a motion

9    to withdraw your plea in the criminal case to promote

10   your interest in the civil case.

11        Then you write, I don't believe what you are

12   doing is factually or legally grounded, nor do I

13   believe that your current strategy is prudent or in

14   your best interest.  To put it crudely, you are about

15   to embark on a suicide mission which will not end well

16   for you at all.  I have stood by you as your lawyer and

17   friend for the last couple of years not for money,

18   prestige, status, or advancement of my legal career.

19   To the contrary, I stood by you as a lawyer because

20   that was my job and my duty as an officer of the Court.

21   I remain firmly planted as your friend because I have

22   considered us friends independent of our

23   attorney-client relationship.

24        Did that accurately reflect your feelings at the

25   time you wrote that e-mail?

1   **A.**   Yes.

2   **Q.**   Mr. Lepizzera, did you continue to try to take

3   steps to prepare for Mr. Caramadre's sentencing

4   proceedings up until the point in time which Mr. Olen

5   and Mr. Watt entered their appearance on his behalf?

6   **A.**   Yes.

7   **Q.**   Why did you do that?

8   **A.**   I had discussions with Mr. Caramadre about how was

9   he making out in terms of seeking independent advice,

10  and no lawyer was contacting me because my advice to

11  Mr. Caramadre was seek independent counsel so you can

12  tell your version of facts so they can give you an

13  unblemished opinion, but you should have -- any lawyer

14  that's going to -- that's worth anything that is going

15  to represent you in a motion to vacate, they should sit

16  down and discuss it with me.  I'll protect the

17  privilege.  They should at least get my version as your

18  trial counsel as to what happened, and then you can

19  make a decision with your new lawyer.

20       And he wouldn't identify who the lawyer was.  I

21  think he was interviewing multiple lawyers.  I don't

22  know who they all are.  He wouldn't identify that.  I'm

23  asking him, Can you at least identify the lawyer for

24  me?  And it's up to you.  If you don't want me to speak

25  with the new lawyer, that's fine; but I think that's

1    unwise for you and the new lawyer, and I would question

2    any lawyer who would file a motion to vacate without at

3    least talking to counsel. Now, whether they believe me

4    or not, that's okay. But at least do your due

5    diligence.

6         No one contacted me. And I was concerned that

7    -- we met with Kristen Mattias on, I think, November

8    30th, and she's preparing the draft presentence report.

9    So that's going to be coming out shortly. Mr. Traini

10   and I aren't doing anything, and we had an ethical

11   dilemma because I know that we made representations to

12   the Court about this February 2012 sentencing date

13   being a placeholder date, and I was going to file a

14   motion to continue the sentencing. The problem that I

15   had was if I filed the motion to continue, I was

16   concerned about being disingenuous with the Court.

17   Because if I'm filing a motion to continue because I'm

18   saying, Look, we're preparing for sentencing, we're

19   interviewing witnesses, whatever we're doing, we're

20   preparing memos, then there's a basis for it.

21        And Judge Smith was, I believe, and the

22   Government was expecting that to happen, but that

23   wasn't happening.

24        So Mr. Caramadre and I had a discussion about

25   whether we'd file a motion to continue, and I refused

1    to because I didn't want to indirectly mislead the

2    Court.  So I'm standing still.  Nothing is getting

3    done.  The presentence report is about to come out, and

4    it did come out.  Never mind no counsel's entered, but

5    no counsel's contacted me or even been identified

6    because Mr. Caramadre won't identify who the new lawyer

7    is.  And I'm getting concerned.

8         So I did some work on restitution issues.  At

9    least stuff that I could do.  I also met with Sarah

10   Xavier.  I went to her office, and I reviewed some

11   records.

12   **Q.**   What was the purpose of that visit?

13   **A.**   To look at the file.  Okay?  Two reasons.  One is

14   to look at the file because I wasn't convinced even

15   though I did write December 27th Joe said it's not if

16   but when, there was no action.  There was no motion

17   coming.  Okay?  And I was still his attorney of record,

18   and so I went there to view his medical records.  I

19   spoke to Sarah Xavier.  Okay?  And while doing that as

20   an attorney, I had concerns for my friend because of

21   these statements he made about suicide and hiring

22   someone to kill himself.  I was genuinely concerned for

23   my client and my friend.  I'm saying to myself, did I

24   miss anything, is he going to commit suicide, is he

25   going to do something stupid.  But it was in

1    conjunction in my capacity of, you know, viewing the

2    file, talking to Sarah Xavier for those reasons.

3         I know I worked on restitution issues, and then

4    I wrote to Joe about I had formulated a strategy with

5    Mr. Traini on restitution issues that I thought could

6    have been maybe persuasive with the Court, we'll never

7    know now, in terms of I wanted to write letters to all

8    the investors.

9         Mr. Caramadre is actually caught holding the bag

10   here because he's not the only investor.  There are a

11   lot of people that invested in these annuities and

12   these bonds and they made a lot of money.  But again,

13   Mr. Caramadre is the one that's going to wind up with a

14   big restitution award.

15        So one of the things that I had thought of was

16   to write to or contact investors that made money.  And

17   I was looking to see if we could put a pool of money

18   together, not for counsel fees but to put a pool of

19   money together not for the insurance company and not

20   for the bond-issuing companies because I still disagree

21   with you that they lost any money, but for the

22   terminally ill people and the family members because

23   that was the human factor of this case.  Those were

24   humans.  The insurance companies and the bond-issuers,

25   they're big corporations.  Okay?  And part of our

1    argument was they knew what they were getting into, at

2    least in part.  But there were these humans out there

3    that they came to testify; they felt like they got

4    trampled on, and they think that Mr. Caramadre made all

5    this money.  What I was looking to do as part of our

6    sentencing argument was can we go to the investor and

7    say, Look, you're not getting sued by the insurance

8    companies at this point for ill-gotten gains.  Because

9    the insurance companies, if I was representing the

10   insurance companies, I'd be going after the investors

11   that benefitted from this so-called scheme.  And I

12   wanted to see if I could raise a pool of money and then

13   part of the funds would be contingent upon those funds

14   going to the humans, the terminally ill people and

15   their family members.  Maybe raise 10, 15, $20,000 for

16   those people to give back to them, you know.  So that

17   was another thing we were working on.

18   **Q.**   That was an idea you had for sentencing?

19   **A.**   Yes.  Now, whether that would have worked and

20   there were some logistics about how we contact the

21   investors and what do we say to them, but I discussed

22   it with Mr. Caramadre, and I think it's on one of the

23   exhibits that you already introduced, Mr. Caramadre was

24   flat out against it, flat out against it.

25   **Q.**   You're referring to Exhibit Number 23 where it

1    says, "Restitution theories, insurance companies versus

2    measure lives," then you write with an arrow "He is not

3    in favor of our theory"?

4    A.    That's it.

5    Q.    What was Mr. Caramadre's reasons for being opposed

6    to that idea that you had?

7    A.    Mr. Caramadre is a very prideful man and part of

8    this whole thing about raising funds and this know how

9    that he developed how to make a lot of money with

10   annuities that were fool-proof was making connections

11   to rich people and so-called important people.  And I

12   think he found it offensive that Mr. Caramadre doesn't

13   need any money help from anyone.  And you cannot

14   contact these people because he didn't want to ask for

15   help and, you know, he told these people that it was

16   fool-proof, and he just didn't want to ask them for

17   money because it was his responsibility.

18   Q.    Now, we were talking a little bit about the

19   presentencing work that you would be required to do.

20        Did Mr. Caramadre ask you to communicate to the

21   Court that he was going to file a motion to withdraw

22   his guilty plea?  Did you have concerns about that?

23   A.    He -- and I don't know when during December or

24   January, because I kept saying to him we're stuck in

25   the mud.  This presentence report is going to come out.

1    I know that when I was on the court-appointed list I

2    handled just a number of cases, that you have 14 days

3    now.  There would have been, I think, not to be

4    presumptuous but there would have been an extension

5    granted because this wasn't a typical case, but we're

6    not doing anything so -- could you ---

7    Q.    Did you have concerns about alerting the Court to

8    the notion of filing a motion to withdraw

9    Mr. Caramadre's guilty plea at the same time the

10   sentencing was proceeding when you didn't have clarity

11   on that issue?

12   A.    This was another ethical dilemma that Mr. Traini

13   and I were considering.  I didn't know if Mr. Caramadre

14   was, in fact, going to file a motion to vacate.  In

15   fact, I think his counsel entered on the 10th or 11th

16   of January.  They didn't file a motion to vacate.  They

17   just filed an entry.  I didn't know that he was going

18   to file a motion to vacate, and I didn't want to be the

19   one to draw that first crack in the dam.  Because once

20   there's any whiff that he's thinking about a motion to

21   vacate, his sentencing prospects are damaged.  So if I

22   alert the Court -- because there was an issue he wanted

23   me to tell Probation, he wanted me to tell the

24   Government, he wanted me to let the Court know.  And I

25   wouldn't do it because I didn't want to harm the

1    client.  I thought that was harmful, because if I say

2    it, once that bell is rung there's no unringing it.

3    And once anyone finds out or the Court finds out, then

4    he decides not to do it, there's a question of

5    acceptance of responsibility.  If the Government finds

6    out, it's going to affect your recommendation.

7         So I didn't want to be the one to do it.  My

8    attitude was you want to file a motion to vacate and

9    let people know, you do it.  And I'm recommending that

10   you don't do it, but go get other counsel and if they

11   do it, they do it.

12   **Q.**   Do you have the authority to stop the sentencing

13   train from moving, so to speak, in the meantime?

14   **A.**   Absolutely, no, I don't, unless I file a motion

15   and it has to be approved by the Court.  And I've also

16   explained the ethical dilemma in filing a motion to

17   continue.

18   **Q.**   Now, I want to turn your attention to a different

19   topic, which is the fee arrangement that Mr. Caramadre

20   had with Mr. Traini.  Do you recall that fee

21   arrangement?  I know we're out of place here, but I

22   just want to kind of return to how that first came

23   about.

24   **A.**   Yes.

25   **Q.**   Okay.  Mr. McCormick had represented as co-counsel

1    Mr. Caramadre with you, and Mr. Caramadre decided that

2    he didn't want Mr. McCormick on the team anymore; is

3    that right?

4    A.    That's correct.

5    Q.    And you still felt that you needed at least one

6    other attorney on the case?

7    A.    At least one.

8    Q.    Okay.  And there came a point where the two of you

9    decided that Mr. Traini would be a good option.  How

10   did that come about?

11   A.    I wound up discussing it with Joe, Mr. Caramadre.

12   And I believe I was the one that initiated that, and I

13   had a conversation with Mr. Caramadre about it.

14   Q.    Okay.  And did you -- ultimately, Mr. Traini and

15   Mr. Caramadre did enter into a retainer agreement; is

16   that correct?

17   A.    The actual written agreement is actually between

18   me and Mr. Traini.

19   Q.    Okay.

20   A.    But Mr. Traini and Mr. Caramadre met alone.  And

21   Mr. Traini initially wanted $500,000, a minimum

22   non-refundable fee from Mr. Caramadre.

23   Q.    Okay.

24   A.    And there came to some discussion, and I was

25   involved in these discussions about that would be a

1    stretch for Mr. Caramadre and that something to the

2    effect of he could come up with the 500,000 but if he

3    came up with it he's going to have to pay a $100,000

4    penalty, whether it was IRAs or some kind of retirement

5    vehicle.  One of the things he asked Mr. Traini was if

6    Mr. Traini would split it with him.

7         So in other words, I'm going to take $100,000

8    hit if I liquidate some retirement accounts -- or

9    whatever he was going to liquidate.  Would you be

10   willing to take $450,000 instead of the half million

11   dollars so you could, so-called, split, you know, split

12   my penalty, which ultimately was agreed upon.

13   Q.   Was it your understanding that this was a retainer

14   that would be drawn on and any surplus would be

15   returned or that it was a non-refundable fee?

16   A.   It was a non-refundable fee.

17   Q.   And where do you get that information from?

18   A.   From discussions with Mr. Caramadre, from

19   discussions with Mr. Traini.  The one thing that

20   Mr. Caramadre, one issue he had was we're hiring

21   Mr. Traini for trial, trial prep and, obviously,

22   working with you on the trial.  I want to make sure

23   Mr. Traini is going to be standing with you on day one

24   so my concern is if I give Mr. Traini $450,000, and

25   there was no doubt it was a non-refundable fee, if I

1    give him the $450,000 on whatever, June 20th, what

2    happens if he's not there and if a bus hits him?  My

3    money is gone.

4         So Mr. Caramadre asked me to work out something

5    in writing where although it was a non-refundable fee

6    that that fee would be parked, $450,000 would deposited

7    and parked in my client account, which it was from day

8    one, and that I would pay Mr. Traini over time.

9    **Q.**   Was there any doubt in your mind that

10   Mr. Caramadre understood that fee to be a

11   non-refundable fee?

12   **A.**   There's no doubt in my mind.  In fact, I

13   negotiated with Mr. Traini a payment of $50,000 per

14   month over nine months, which is the $450,000.  And I

15   relayed that back to Mr. Caramadre and said, Look, this

16   is what I negotiated.  Mr. Caramadre said something to

17   the effect of, You know, Mike, you're always, you know,

18   you always got my best interest at heart.  You're

19   always protecting me, but you really didn't have to do

20   a nine-month of payment.  Because that's too much.  He

21   goes, Do whatever you want, but you can give Mr. Traini

22   for all I care --  he goes, As far as I'm concerned,

23   you can give Mr. Traini all the money as long as --

24   like, by day one of trial.

25   **Q.**   Okay.  Now, did you give Mr. Caramadre a copy of

1    that written retainer agreement that you executed with

2    Mr. Traini?

3    **A.**   I thought I did.  Mr. Caramadre says I didn't, and

4    I just don't recall if I did or I didn't.  So I'm

5    unclear if I did or I didn't.

6    **Q.**   But you thought you did?

7    **A.**   I thought I did.  Then Mr. Caramadre at some point

8    asked for the retainer agreement.  And he told me that

9    -- he said, I never got a copy of this.  And I

10   forwarded it to him in December.

11   **Q.**   I'd like show you what I'll mark as Government

12   Exhibit Number 26, marked 414 at the bottom.

13        THE COURT:  Is this 26?

14        MR. McADAMS:  26, your Honor.

15        THE COURT:  Any objection?

16        MR. OLEN:  I just want to look at it, please,

17   your Honor.

18        MR. McADAMS:  It's a three-page e-mail, 414.

19        MR. OLEN:  No objection.

20        THE COURT:  26 is full.

21        (Government Exhibit 26 admitted in full.)

22   **Q.**   This references December 20th, 2012,

23   Mr. Caramadre, which is approximately a month after the

24   guilty plea.  Mr. Caramadre writes to you that he needs

25   a copy of the checks paid to Tony and he writes that, I

1  know you described the payment schedule; however, I

2  require the actual checks paid to him.  I can't move

3  forward until I resolve the issue with Tony.

4  　　　　Do you recall that e-mail?

5  **A.**  Yes.

6  **Q.**  Go to the second page.  Is this a summary of the

7  fee arrangement that you just described regarding the

8  $50,000 per month?

9  **A.**  Yes.

10  **Q.**  And just focusing on the bottom paragraph, the

11  bottom, it says page four, it's from an e-mail:  The

12  fact that he agreed to accept distributions of $50,000

13  per month leading up to and over the course of the

14  trial does not convert this into anything else and,

15  therefore, this arrangement is and always was a flat

16  fee agreement.  This arrangement you struck with him

17  for $450,000 was solidified back in June of 2012.

18  　　　　That's your understanding of what that agreement

19  was?

20  **A.**  Yes.

21  **Q.**  And you provided -- at that time, you then

22  provided Mr. Caramadre with a copy of the fee

23  agreement, whether it was a duplicate or whether it was

24  the first time he saw it?

25  **A.**  I did.

1  **Q.**   Now, if we could show you Government Exhibit

2  Number 27.

3       MR. OLEN:  No objection.

4       THE COURT:  27 is full.

5       (Government Exhibit 27 admitted in full.)

6  **Q.**   This is an e-mail from Mr. Caramadre to yourself

7  and Mr. Traini, and it's dated January 2nd, 2013.  It

8  says -- it talks about the guilty plea, but I want to

9  go to the fourth bullet point.  It says, I plan on

10 contesting $150,000 of payments made to Tony on the

11 retainer agreement.

12      Having looked at the agreement, it states that,

13 A dispute reverts to Tony's rate of $400 per hour.  It

14 is my estimate that Tony did not perform 1125 hours on

15 my case, which would have consumed the entire $450,000

16 retainer amount.  If this refund of $150,000 is

17 challenged, then obviously I will request billing hours

18 spent on my case as well as billing hours Tony spent on

19 other cases from June so we can settle on a figure.

20 This is strictly business and I harbor no ill will

21 toward Tony.

22      That's from Mr. Caramadre.

23 **A.**   It is.

24 **Q.**   Does it appear he's found a loophole in this

25 retainer agreement, fair to say?

**A.**   I don't know what he did because I was shocked

that he was disputing it because everyone knew that

this was a flat fee agreement.  And he's obviously --

when I negotiated the retainer agreement that was

between Tony and I, there were some provisions in it

that talked about $400 an hour, but it had nothing to

do with any kind of -- it was if I had terminated Tony

because the agreement is between Tony and I.  I didn't

terminate Tony.  And in fact, there's another provision

in the retainer agreement that says the whole balance

is due upon a plea.  So whatever he thinks there is in

terms of a loophole or not a loophole, he's making an

issue with the agreement.

**Q.**   And nothing in this e-mail indicates that he's

actually unsatisfied with the work that you or

Mr. Traini have done, correct?  In other words, he

doesn't say anything in here about you falling down on

the case, deliberately not cross-examining witnesses,

your mistake by not giving an opening statement, any of

those things?

**A.**   No.

**Q.**   Doesn't say you told him to lie, you ruined his

life, you made him plead guilty?

**A.**   No.  That's why I was asking him -- I gave him an

opportunity to do that.  I asked him at some long

1    e-mail I sent to him, What's the factual basis for your

2    motion to vacate?  What is it?  And he never said those

3    things.

4    **Q.**   In fact he writes, This is strictly business, from

5    his perspective.

6    **A.**   He did.  And my memory is as of January 15th, when

7    we had a status conference with this Court, that

8    Mr. Olen couldn't even identify what the factual basis

9    was for the plea because he was asked and he said,

10   Well, you know, the client professes his innocence and

11   his wife was sick.  And that's all I know at this time.

12   I'm trying to get my arms wrapped around it.

13          So as of January 15th, his new counsel is not

14   even saying, you know, Mr. Lepizzera did a terrible job

15   on cross-examination.  Mr. Traini coerced Mr. Caramadre

16   to plea.  That was never said.

17   **Q.**   During the entire time that you worked with

18   Mr. Traini on this case, did he ever advocate to you

19   that the two of you ought to recommend Mr. Caramadre

20   plead guilty so that he could get a windfall from this

21   fee arrangement?

22   **A.**   Let me make one thing clear.  This was not about

23   the money.  If you look at the retainer agreement

24   between Mr. Traini and I, it called for $50,000 per

25   month.  I did not give Mr. Traini the first $50,000 I

1    think until June 24th, which was the date that --  or

2    June 23rd.  It was late June that I executed the Traini

3    agreement.  I gave him the second July check in late

4    July.  I gave him the August check I think in late

5    August.  That's my memory.  I have to look at the

6    checks.  I didn't pay Mr. Traini September because

7    according to the fee agreement between him and I, the

8    payment was due on the first of the month.  I didn't

9    pay him September 1.  I didn't pay him October 1, and I

10   didn't pay him November 1.  And it's not because the

11   money wasn't parked in my clients account, because it

12   always was.  Because Mr. Traini and I were not focused

13   on money.  We were focusing on getting this case ready

14   for trial and giving the client the best defense

15   possible in a very difficult case.

16        So at the start of trial even though

17   Mr. Caramadre told me, Mike, you didn't have to go that

18   far with him, you can give him all the money by day one

19   at trial, I not only didn't do that, but I didn't even

20   give him $150,000 in payments that the retainer

21   agreement called for and Mr. Traini didn't ask for them

22   because we weren't focused about money.  Because

23   Mr. Traini was okay with the fact that it was

24   non-refundable.  It was everyone's understanding it was

25   non-refundable and the money was in my clients account

1    so it's there.

2            MR. McADAMS:  Could I briefly, your Honor, have

3    a moment.

4            No further questions.

5            THE COURT:  Thank you.

6            Given the hour, I think what I would like to do

7    is stop the hearing at this point.  I'm going to meet

8    with counsel up in my chambers in a few minutes.  Take

9    a break, and then you can all come up to chambers.

10           My intention is to reconvene this hearing

11   tomorrow morning and to proceed with the understanding

12   that there may be a need to continue the examination of

13   Mr. Lepizzera if we reach a point where the cross can't

14   go any further because of the additional documents that

15   remain to be reviewed in camera.  And I have those

16   documents, which I'll begin reviewing tonight.  But

17   given the pace that things are proceeding at, I want to

18   keep this moving.  Tomorrow's available so we're going

19   to continue it tomorrow.  Next Monday is also

20   available.  So you should mark your calendars and keep

21   next Monday clear as well, just in case.  All right?

22   So that's what's going to happen, and I'll see you all

23   upstairs in about ten minutes.

24           (Court concluded at 4:25 p.m.)

25

C E R T I F I C A T I O N

       I, Anne M. Clayton, RPR, do hereby certify that the foregoing pages are a true and accurate transcription of my stenographic notes in the above-entitled case.

/s/ Anne M. Clayton

_____

Anne M. Clayton, RPR

June 4, 2013

_____

Date