IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

```
* * * * * * * * * * * * *   CRIMINAL ACTION
UNITED STATES OF AMERICA  *  11-186-S
                          *
VS.                       *  MAY 14, 2013
                          *  VOLUME III
JOSEPH CARAMADRE          *
                          *  PROVIDENCE, RI
* * * * * * * * * * * * *
```

HEARD BEFORE THE HONORABLE WILLIAM E. SMITH

DISTRICT JUDGE

(Motion to Withdraw Guilty Plea)


**APPEARANCES**:

FOR THE GOVERNMENT:      JOHN P. McADAMS, AUSA
                         and LEE VILKER, AUSA
                         U.S. Attorney's Office
                         50 Kennedy Plaza
                         Providence, RI  02903

FOR THE DEFENDANT
Joseph Caramadre:        RANDY OLEN, ESQ.
                         Olen Law Office
                         55 Bradford Street
                         Suite 203
                         Providence, RI  02903

                         ROBERT D. WATT, JR., ESQ.
                         84 Ship Street
                         Providence, RI  02903

Court Reporter:          Anne M. Clayton, RPR
                         One Exchange Terrace
                         Providence, RI  02903


Proceeding reported and produced by computer-aided
stenography

I N D E X

WITNESS                                                    PAGE

MICHAEL LEPIZZERA

   Cross-Examination by Mr. Olen:                    10

ANTHONY TRAINI

   Direct Examination by Mr. McAdams:              167
   Cross-Examination by Mr. Watt:                  195

DEFENDANT EXHIBITS

D    -                                                25
E    -                                                27
F    -                                                28
G    -                                                43
H    -                                                49
I    -                                                50
J    -                                                58
K    -                                               101
L    -                                               112
M    -                                               118
O    -                                               128
P    -                                               129
Q    -                                               133
R    -                                               135
S    -                                               135
T    -                                               136
U    -                                               138
V    -                                               142
W    -                                               149
X    -                                               161

                    _____

1    14 MAY 2013 -- 9:10 A.M.

2            THE COURT:  Good morning.  Good morning,

3    everyone.  Good morning, Mr. Lepizzera.

4            We're ready to continue with the testimony on

5    the matter before the Court, which is the Defendant's

6    motion to withdraw his plea.  Before we proceed with

7    the testimony, I do want to let counsel know that

8    overnight I was able to review the materials that were

9    presented yesterday on disk, which looked to be about

10   1500 pages of mostly e-mails and attachments.  And this

11   is attorney work product communications between

12   attorneys, not involving -- or mostly not involving the

13   client, although I did find some e-mails that did

14   involve communications to the client.  And of those

15   1500 or so e-mails, I think we've identified a handful

16   that I think should be turned over to counsel.  And so

17   at some point this morning, I'm going to get counsel

18   together, and we'll go through those documents.

19           One thing is clear to me is that there's nothing

20   in this group of documents that would require any

21   substantial delay in the proceedings.  That's pretty

22   clear to me.

23           The documents I've identified are tangentially

24   related, and certainly nothing seems to be of any

25   serious consequence to the claims being made in this

1 motion.  But I think in an abundance of caution, I

2 would turn them over just as I've turned over some of

3 the other documents that we've been discussing over the

4 last couple of days.  So I wanted to let you know that

5 I've been through that.

6    Now, Mr. Olen and Mr. Watt, I know you were

7 supplied with a lot of materials over the weekend that

8 were not attorney work product.  Have you made it

9 through those documents?

10    MR. OLEN:  No, your Honor, we have not.

11    THE COURT:  Have you made it through any of the

12 documents?

13    MR. OLEN:  We glanced at them, Judge, but we

14 just have not been able to take the time to look at

15 them.  In addition, we were provided with some further

16 documents by Mr. Gerstein just this morning.

17    THE COURT:  What further documents?

18    MR. GERSTEIN:  Your Honor, pursuant to the

19 Court's instruction --

20    THE COURT:  Go to the microphone.

21    Is this relating to that gap period?

22    MR. GERSTEIN:  Well, yes and no, your Honor.  We

23 went through everything that we had, and Mr. Traini

24 came upon some what I would consider really benign

25 documents that the Defendant may or may not already

1    have.  It's 17 pages of some e-mail, which is

2    meaningless.  There are two letters, one to Mr. Vilker,

3    which we believe Mr. Caramadre might have already had,

4    and one to the Court, which addresses

5    Mr. Radhakrishnan's YouTube video and, you know, a

6    request that you consider that in furtherance of the

7    motion for severance.

8         So there's nothing in here -- and I have a copy

9    for the Court if you'd like to see it.  There's nothing

10   in here that even tangentially relates to the issues at

11   hand, but out of an abundance of caution --

12        THE COURT:  If this has been turned over to

13   Mr. Watt and Mr. Olen, I don't want to see it.  I've

14   read way more than I want to see about the internal --

15        MR. GERSTEIN:  That's fine.  Also in terms of

16   the gap period, Mr. Lepizzera out of an abundance of

17   caution has instructed his office and printed out

18   everything that they have between November 19th I

19   believe was the date and I believe January 15th was the

20   conference in which Mr. Olen entered his appearance.

21        MR. LEPIZZERA:  Mr. Gerstein, can I just -- what

22   I did was November 20th, the day after the plea, to

23   January 10th, which is the day that I filed our notice

24   of withdrawal, your Honor, we had already produced that

25   post-plea e-mails that related to your order which

1    relate to plea discussions, the decision to plea, the

2    Traini fee agreement, which was the core of the Court's

3    order.  It's kind of morphed a little bit beyond that.

4    So out of an abundance of caution and based on the

5    conference we had yesterday, I told Court because the

6    Court asked is this everything, I decided out of an

7    abundance of caution to go back and check from November

8    20th to January 10th and I did find approximately 120,

9    maybe 122 pages of pages of e-mails and some

10   attachments.  Approximately half are what we consider

11   work product.  Half would be -- would go to the client.

12   Those are communications with the client, with

13   Probation and with the Government.  And those will be

14   delivered shortly.  They're going to be in paper, Not

15   on a disk so counsel can see it without putting it on a

16   disk no later than 10 o'clock today.  We'll have four

17   copies made so we can move the proceeding along.

18   That's what I did this morning.

19        THE COURT:  Okay.

20        MR. GERSTEIN:  It's also my understanding a lot

21   of the information we're waiting on relates to

22   sentencing and presentencing investigation.

23        MR. LEPIZZERA:  The other thing, your Honor, the

24   60 or so pages that are going to go to Mr. Olen, I

25   think some of them are duplicative.  They're duplicates

1    of what we've already produced; and out of an abundance

2    of caution, I just didn't have time to prepare what we

3    already produceD so out of an abundance of caution, I

4    printed it out.

5            THE COURT:  So 60 pages of non-work product,

6    right?

7            MR. LEPIZZERA:  Those are approximate.  It might

8    be 59 and 63, but I'm just --

9            THE COURT:  That's fine.  And then there must be

10   another group of work product?

11           MR. LEPIZZERA:  There's approximately 59 or 60

12   that we classified as work product.  Those are pages

13   that we're going to submit to the Court, and there are

14   approximately another 60 to 64 pages that are not work

15   product that will go to the client or Mr. Olen.

16           THE COURT:  All right.  Good.  Thank you.  So

17   this is a work in progress.  We'll deal with it as we

18   can.

19           All right.  Are you finished, Mr. McAdams?

20           MR. McADAMS:  Yes, your Honor.

21           THE COURT:  I believe you are, right?

22           So we're ready, then, to go forward.  Mr. Olen?

23           MR. OLEN:  Yes, your Honor.  If I could just

24   note regarding this new material that's come in today.

25   I've made my objection.  I'm not going to belabor it,

1   but I do want to just note that seemingly with each day

2   there are more and more and more documents that come in

3   that we haven't already been provided.  I raise it only

4   because we are going to request, as we had discussed

5   earlier, that we be permitted after we've had a chance

6   to look at these materials to continue our

7   cross-examination.

8        THE COURT:  What I said to you before I'll

9   repeat it now so there's no misunderstanding.  You're

10  going to have an opportunity to review the documents

11  that have been submitted, those that were submitted

12  over the weekend and those that will be submitted to

13  you this morning, plus any that I determine -- work

14  product documents that I determine ought to be turned

15  over.

16       Now, I've reviewed, as I said, thousands of

17  pages of documents.  I reviewed a thousand plus pages

18  over the weekend, and I've given you I forget how many

19  pages it was, maybe 20 pages that I thought should be

20  turned over at the conference we had yesterday

21  afternoon or evening, and I'll do the same with this

22  1500 e-mails that I reviewed overnight last night and

23  there'll probably be a small handful and I will review

24  this 50 or 60 pages that Mr. Lepizzera has just said is

25  going to come to me today.

1          And you can make your argument after you finish

2    reviewing what's supplied to you and what I'm going to

3    order turned over to you with respect to any further

4    examination of Mr. Lepizzera or Mr. Traini that you

5    should be allowed to conduct as a result of those

6    documents.  And I've set a day aside for that.  That's

7    next Monday.  But you're going to need to be able to

8    articulate why it is that you should be given the

9    ability to recall them.  I'll be liberal with you in

10   terms of you have the right to put on a rebuttal case

11   in favor of your motion.  So if you want to call these

12   two as part of that rebuttal case and get into this new

13   material that's been disclosed, I may allow you to do

14   that.  But I think that says it.

15          MR. OLEN:  Thank you.

16          THE COURT:  All right.  Go ahead.

17          MR. OLEN:  Your Honor, also, we have prepared a

18   joint exhibit of the e-mails and the documents that

19   we'll be using today.  I believe Mr. McAdams has no

20   objection to that being used so that we don't have to

21   individually mark each one of these exhibits.

22          THE COURT:  That's fine.

23          MR. McADAMS:  Your Honor, I just received it

24   this morning.  I expect that I don't have any

25   objections, but I haven't really had a chance go

1    through it, so if there's a particular e-mail or

2    document that I'd like to object to, I'd just reserve

3    the right to raise that objection at the time.

4              THE COURT:  Sure.

5              MR. McADAMS:  Thank you.

6    **MICHAEL LEPIZZERA**, Resumes stand.

7              **CROSS-EXAMINATION BY MR. OLEN**

8    **Q.**    Good morning, Mr. Lepizzera.

9    **A.**    Good morning, Mr. Olen.

10   **Q.**    Mr. Lepizzera, when did you first meet

11   Mr. Caramadre?

12   **A.**    Meet him in relation to this case or just meet him

13   in general?

14   **Q.**    Meet him in general.

15   **A.**    I believe that I've known Joe going back -- I'm

16   45.  Maybe 20, 25 years I've known him.

17   **Q.**    How did you know him?  How did you meet him?

18   **A.**    My brother was friends with him, and we went to

19   Olympus Gym, and I think it's in Johnston, and I think

20   I met Joe through there, my brother.

21   **Q.**    And did at some point in time you'd become pretty

22   good friends with him?

23   **A.**    My brother was more friendly with Joe.  I think

24   they would socialize and go out together.  I didn't

25   really socialize with him, but I became friends with

1    him a few years ago.  We got reacquainted and we became

2    friends and I became his attorney.

3    **Q.**   How did you that happen?  How did you become

4    reacquainted?

5    **A.**   Joe and I attend the same church, Holy Apostles,

6    which is a great church.  And Joe came up to me before

7    one of the Masses, and he came up to me and he said,

8    You're going to see some things in the newspaper;

9    they're not necessarily true.  You know, keep me in

10   your prayers.  Something to that effect.  So we started

11   talking along those lines right there.

12   **Q.**   And when did you actually become -- start working

13   for Mr. Caramadre?

14   **A.**   I formally took over the Grand Jury representation

15   of Mr. Caramadre in, I think -- I think it was August

16   of 2010, because there was an issue that arose with a

17   hard drive, whether the FBI could get a clone of Estate

18   Planning Resources' hard drive.

19          So I think that I took over the representation

20   in August of 2010, but I was conferring with Joe on the

21   case so I was his attorney even before that.  But

22   formally, August 2010, in terms of the Grand Jury

23   investigation.

24   **Q.**   Okay.  But you were consulting with him and doing

25   some work for him before that?

1   **A.**   Yes, I was.

2   **Q.**   Beginning of the year?  Okay.  Were you handling

3   the case while it was at the Grand Jury?

4   **A.**   When you say "handling the case" --

5   **Q.**   Consulting with him at that time?

6   **A.**   At what time?

7   **Q.**   During while the Grand Jury was deliberating?

8   **A.**   Yes, I was representing him.

9   **Q.**   On November 11th, the 66-count indictment was

10  returned.  November of 2011.

11  **A.**   I don't know if it's 11th or 17th.  I recall the

12  17th, but it's November of 2011 the indictment was

13  returned.

14  **Q.**   And you mentioned that you kind of reluctantly

15  agreed to represent Mr. Caramadre?

16  **A.**   I don't know if "reluctantly" is the proper

17  characterization.  As I explained, I thought Joe

18  should, even though he had a big law firm before,

19  Hinckley Allen, and he decided to disengage them on the

20  criminal case because he thought I could handle it

21  better, I thought that he'd be better off with a team

22  of lawyers, but I did enter my appearance in the case

23  and I came to an arrangement with Mr. Caramadre.

24  **Q.**   Okay.  And at some point in time, you came to the

25  conclusion that you really couldn't handle this case by

1    yourself?

2    **A.**    Before I entered my appearance and the indictment

3    came back, it was my recommendation to the client that

4    he hire a law firm who could dedicate a team of lawyers

5    really almost full-time on a case like this.  So that

6    was my recommendation to the client.

7    **Q.**    But when you did become his lawyer, for a while

8    you were his only lawyer; is that correct?

9    **A.**    You mean pre-indictment?

10   **Q.**    Or at any time around the time of the Grand Jury

11   indictment, pre or post.  There was a period of time

12   when you were his only lawyer; is that correct?

13   **A.**    That's partially correct.  When I formally took

14   over, and I'd have to look at documents, when I

15   formally took over the Grand Jury investigation, I

16   believe that was August 2010.

17           What jogs my memory is there was a major issue

18   with a hard drive and the FBI or the U.S. Attorney's

19   Office was threatening to get a search warrant because

20   there was an issue of turning over a hard drive.  I

21   believe it was August of 2010.  I believe a formally

22   took over the representation alone, and Mr. Flanders

23   disengaged.  However, Mr. Flanders and his law firm

24   continued to represent Mr. Caramadre in the civil

25   cases.

1  **Q.**   But while you took over the representation alone

2  on the criminal case at some point in time?

3  **A.**   Yes, pre-indictment.

4  **Q.**   And at some point while you were representing him

5  on your own, you determined that you needed some

6  assistance in the representation?

7  **A.**   When the indictment was returned, there's a big

8  difference between a Grand Jury investigation and a

9  return of a 66-count indictment.  When the 66-count

10  indictment was returned, I gave the client the best

11  advice I could give, which is you need to get a team of

12  lawyers because he didn't think -- he did not believe

13  that the Grand Jury was going to return an indictment.

14  He didn't believe that the U.S. Attorney's Office was

15  going to charge this case.  He thought it was a joke.

16  But when it came back and there's a 66-count

17  indictment, I'm saying it's no longer a joke.  You need

18  to hire a strong defense team for this.

19  **Q.**   And then you, in fact, hired another attorney to

20  assist you?

21  **A.**   Mr. Caramadre did.  Mr. McCormick.

22  **Q.**   That was Jim McCormick?  Do you know when you

23  brought Mr. McCormick in?

24  **A.**   I believe it's December 2011.

25  **Q.**   You testified yesterday a number of times that

1    this case wasn't about the money.  When did you start

2    billing Mr. Caramadre?

3    **A.**    I started billing Mr. Caramadre when I started

4    representing him in -- it would have been 2010, I

5    believe, Mr. Olen.

6    **Q.**    Early 2010?

7    **A.**    I would say that's fair, accurate.

8    **Q.**    And what was your fee arrangement with him?

9    **A.**    I was charging $250 an hour.

10   **Q.**    And did you have a written fee agreement?

11   **A.**    No, I did not.

12   **Q.**    Are you aware that the Rhode Island Rules of

13   Professional Conduct require written fee agreements?

14   **A.**    I know what the Rule says, and it says something

15   about if there's a prior relationship you don't need

16   one, but it does recommend that you have a written

17   retainer agreement.  It does.

18   **Q.**    Mr. Lepizzera, I'm referring to on your screen an

19   e-mail from you to Mr. Caramadre on December 14th in

20   which you discuss hours and billing.

21   **A.**    Um-hum.  (Affirmative.)

22   **Q.**    And it does state that you are billing

23   Mr. Caramadre at the rate of $250.  And as of December

24   14th, your bill was $53,850?

25   **A.**    Correct.

1    **Q.**   Now, how much did you make in the year 2010, do

2    you know?  How much did you earn from Mr. Caramadre?

3    **A.**   I don't know.  And I don't know why that's

4    relevant, but I don't know offhand.

5         MR. McADAMS:  I object to this line of

6    questioning.  There's been nothing in any of

7    Mr. Caramadre's claim related to his fee arrangement

8    with Mr. Lepizzera and bearing on his guilty plea

9    withdrawal at all.  I would understand if this were a

10   question of Mr. Traini, but it's never been raised

11   before.  It's totally irrelevant.

12        THE COURT:  Right.  What's the relevance?  This

13   is not part of your motion.

14        MR. OLEN:  Mr. Lepizzera testified yesterday

15   that this case was not about the money.  And it's a

16   part of our theory that this case was, in fact, very

17   much about the money and that as we go forward we will

18   show that Mr. Lepizzera and Mr. Traini kept this case

19   going and made over half a million dollars while as he

20   says he understood yesterday that Mr. Caramadre was

21   actually guilty.  So it's important, I believe --

22        THE COURT:  That's a totally new theory.  You've

23   made allegations in your motion about Mr. Traini and

24   his fee arrangement, but this is the first time I've

25   ever heard anything relating to some kind of conspiracy

1  between Mr. Traini and Mr. Lepizzera to drag the case

2  out in order to generate fees for Mr. Lepizzera. Where

3  is that coming from? That's not in the motion.

4  MR. OLEN: It comes from Mr. Lepizzera's

5  testimony yesterday that unbeknownst to anyone he at

6  some point in time became aware in his mind that

7  Mr. Caramadre was guilty, and it flows from that.

8  THE COURT: Well, attorneys represent guilty

9  clients all the time. The weird thing about this case

10  is that it's all getting put out in the open. Okay?

11  And it's being exposed to the light of day. And that's

12  because of the motion that's been filed and the waiver

13  of the privilege.

14  So it's not -- this is the kind of thing that in

15  filing this motion you could anticipate. You're

16  changing your theory now. I'm not going to allow it.

17  You're not going to change your theory. You filed a

18  motion, and you put in that motion what you think the

19  reason was for why Mr. Caramadre allegedly did not

20  enter a knowing and voluntary plea, and you had

21  Mr. Caramadre testify to all those things.

22  Mr. Caramadre didn't say a single thing regarding

23  thinking that Mr. Lepizzera was dragging this case out

24  to make money off of it. That's never -- it was not in

25  his testimony; it was not in your motion.

1        I'm going to hold you to the claims that you

2    made in your motion to withdraw the plea, and this is

3    not part of it.  So I'm going to sustain the objection.

4    **Q.**    Mr. Lepizzera, when you began your trial

5    preparation, I'd like to just summarize the basic

6    allegations, distill those 66 counts down to the basic

7    allegations.  The Government was generally attempting

8    to show that Mr. Caramadre was involved in a conspiracy

9    with Mr. Radhakrishnan to steal identity information

10   from terminally ill people in order to use them in an

11   investment program without their knowledge; is that

12   correct?

13   **A.**    Yes.

14   **Q.**    It was also their contention that Mr. Caramadre

15   lied to the insurance companies with respect to the

16   true nature of these investments?

17   **A.**    Yes.

18   **Q.**    That is that they were using terminally ill

19   people?

20   **A.**    Part of it, yes.

21   **Q.**    And that they also provided false information in

22   the annuity applications to the insurance companies?

23   **A.**    In part, yes.

24   **Q.**    Okay.  Now, I would imagine that when you got this

25   case, the first thing you did was you devised a theory

1    of the case?

2    **A.**    The first thing I did?

3    **Q.**    Or one of the first things you did was devise a

4    theory of the case?

5    **A.**    No, Mr. Olen.  In a case like this with what I

6    called yesterday a whopping 66-count indictment, you,

7    and I did, read the indictment over numerous times.

8    And as Mr. McAdams referred to it yesterday and I think

9    I may have called it during the course of the case a

10   speaking indictment.  You read the indictment.  You

11   look at the nature and scope of the indictment.  You

12   read it numerous times because this isn't a one-count

13   indictment, and then you go over the indictment with

14   the client.  You look at statutes.  You see what the

15   elements are that the Government has to prove beyond a

16   reasonable doubt.  You obtain discovery or Jencks

17   materials, which in this case we were very successful

18   because at the first conference with Judge Smith on

19   February 1, 2012, I was able to, I think, convince

20   Judge Smith to say, yeah, we know what the Jencks

21   statute talks about but, Government, when can you turn

22   over this information.  And we were successful to get

23   an order that basically says the Jencks materials will

24   be turned over on March -- I think it was March 1,

25   2012.

1    　　　　You gather those materials.  You read those

2    materials.  You discuss it with the client and then a

3    theory evolves around what the evidence shows, what

4    your client is telling you.  So that's when you develop

5    a theory.  You don't develop a theory on November 17th

6    or November 30th when the arraignment was as to this is

7    my theory of the case.

8    **Q.**   No one is suggesting that, Mr. Lepizzera.  But at

9    some point in time, you did devise a theory of the

10   case?

11   **A.**   Yes.

12   **Q.**   I didn't get that yesterday in your testimony.

13   Can you tell us what your theory of the case was, the

14   theory of the defense?

15   **A.**   As I stated yesterday, the Defendant doesn't have

16   to do anything and I know that the Court gives

17   instructions and people, you know, make light of it,

18   but those are serious instructions and that's the law.

19   The Government had to prove their case, which is a

20   conspiracy case, beyond a reasonable doubt.  And the

21   defense's position was there was no conspiracy between

22   Mr. Caramadre and Mr. Radhakrishnan.  And although the

23   Government was likely going to be able to prove that

24   Mr. Radhakrishnan made misrepresentations to terminally

25   ill people, it was Mr. Radhakrishnan that made

1    misrepresentations to the terminally ill people.  And

2    in fact, as I alluded to yesterday, there were some

3    witnesses who testified I think on the last day of

4    trial on Friday who acknowledged that Mr. Radhakrishnan

5    did tell them about an investment program.

6         So my basic strategy, because there's numerous

7    counts, my basic strategy is that Mr. Caramadre and

8    Mr. Radhakrishnan never entered into a conspiracy in

9    the case.  And that to the extent that Mr.

10   Radhakrishnan, to the extent he did make

11   misrepresentations that maybe he made them knowingly

12   and intentionally.  Maybe he was a young kid and maybe

13   he didn't feel well or he felt funny in terms of

14   approaching a 70-year-old terminally ill cancer person

15   that had five days left and he just felt awkward in

16   explaining what the program was.  So maybe he wasn't

17   forthright and forthcoming with them.

18        But you know what, Mr. Olen, what I would

19   explain to the jury if we ever got to a closing

20   argument?  That that doesn't prove a conspiracy.  And

21   in fact, there was other evidence to show, and I

22   believe I would have done it through cross-examination

23   with some of the other witnesses, that Mr. Caramadre

24   never instructed Mr. Radhakrishnan to lie to anyone.

25   And to the extent he did, he did it on his own.

1    Because during that same time period when Mr.

2    Radhakrishnan was telling lies to these terminally ill

3    people, Mr. Caramadre was meeting with Diane

4    Franchitto, the CEO of Hospice.  He was meeting with

5    Vince Seal; Chuck Iacono; Arthur Robbins; Jeffrey

6    Chase-Lubitz, who is a lawyer for Hospice, and a host

7    of other people.  He was talking about a Program A and

8    a Program B.

9          So my theory of the case is while there might

10   have been some misrepresentations by Mr. Radhakrishnan

11   and maybe he didn't explain it properly, at the same

12   time he's doing that Mr. Caramadre is actually telling

13   people about Program A and Program B.  So in terms of a

14   theory, that was my general theory.

15   **Q.**   So a very big part of this theory was that

16   Mr. Radhakrishnan acted on his own with respect to the

17   actions he took?

18   **A.**   I wasn't and I don't know because I don't know the

19   -- we never got to the end of the trial.  We never got

20   through all the evidence.  As I sit here today, it was

21   either that Mr. Radhakrishnan intentionally made

22   misrepresentations to the terminally ill people; and if

23   he did that intentionally with the intent to deceive,

24   he did it on his own, or that he didn't explain the

25   program properly.  He was a young, immature kid that

1   got put in the position in terms of meeting terminally

2   ill people that are on their deathbeds in Hospice and

3   asked him to explain this investment program when some

4   sophisticated lawyers that are involved in this case

5   have a difficult time understanding.

6        So maybe he just felt a little funny and maybe

7   he cut some corners, but he didn't do it intentionally.

8   I'm not ready at this point because we never got to

9   that point in the case to say that Mr. Radhakrishnan

10  did it intentionally or he was negligent and shy.  I

11  don't know, but either way my theory is, is that

12  Mr. Caramadre did instruct him to do that and again

13  through other witnesses, through other Estate Planning

14  Resources witnesses who the Government was going to put

15  up like Mr. Maggiacomo, Mr. Hanrahan, Danielle Russo,

16  who is an administrative assistant at Estate Planning

17  Resources, John Wiggins.  What I intended to do with

18  them was elicit from them on cross very carefully that

19  they weren't aware of any conspiracy.

20       So it's kind of funny when the Government is

21  claiming there's a conspiracy, but Hanrahan,

22  Maggiacomo, Russo, Wiggins, people that are inside that

23  office, I don't think the Government could elicit from

24  them that they knew about a conspiracy.  So it's kind

25  of funny how there's this conspiracy flying out there

1    but no one else in the office knows about it and it's

2    only between Mr. Caramadre and Mr. Radhakrishnan.  That

3    would have been part of the other evidence I would have

4    developed on cross.

5    **Q.**   Did you communicate this theory to Mr. Caramadre?

6    **A.**   Yes.

7    **Q.**   Do you remember receiving an e-mail from

8    Mr. Caramadre about a week before trial, November 6th,

9    in which he asks you -- tells you that I need to know

10   the general defense plan regarding how you're going to

11   defend these false charges?

12   **A.**   Could I have just have a moment?

13          MR. McADAMS:  Your Honor, could I ask that we

14   identify which subset of the general defense exhibits

15   this is?

16          THE COURT:  I don't understand what you're

17   asking.

18          MR. McADAMS:  They've provided me with a

19   multi-page document that they're calling defense

20   Exhibit 1.  It's tabbed.  I'd just like to know which

21   particular subset of it it is, which page they're on.

22          THE COURT:  Do you have a Bates number for that?

23          MR. OLEN:  Judge, why don't I introduce them

24   individually in this case so we don't have to do that.

25          THE COURT:  That's fine.

1          MR. OLEN:  Thank you, your Honor.

2     **Q.**   And I believe this is -- I'm sorry.  I'll wait for

3     your answer.

4     **A.**   Was your question -- could you repeat, Mr. Olen?

5     I'm sorry.

6     **Q.**   Do you recall receiving this e-mail?

7     **A.**   Yes.

8     **Q.**   And why is it that Mr. Caramadre would have to ask

9     you, do you think, the week before trial for your

10    explication of the general defense theory?

11    **A.**   I don't know why he was asking me that question.

12         THE COURT:  Are you moving that exhibit?

13         MR. OLEN:  Yes, your Honor.

14         THE COURT:  Any objection to that.

15         MR. McADAMS:  I have no objection to it, your

16    Honor.

17         THE COURT:  What's the number?

18         MR. OLEN:  I believe it's D.

19         THE COURT:  Defense D.

20         MR. OLEN:  I think we're starting with D.

21         THE COURT:  We'll make it full, D.

22         (Defendant's Exhibit D admitted in full.)

23         THE COURT:  Mr. Olen, put the document back up

24    on the screen so Mr. Gerstein can see what document it

25    is.

1    **Q.**    Yesterday, Mr. Lepizzera, you described this case

2    as a whopper of a case.

3    **A.**    Yes.

4    **Q.**    Sixty-six counts --

5    **A.**    Yes.

6    **Q.**    -- in the indictment.  Very complicated facts?

7    **A.**    Yes.

8    **Q.**    Approximately 100 anticipated Government

9    witnesses?

10    **A.**    I think so.

11    **Q.**    And approximately a four-month trial.

12    **A.**    That was the estimated time.

13    **Q.**    And many of these witnesses were relatives of the

14    terminally ill people, and in one case the terminally

15    ill person himself?

16    **A.**    And there was a couple of video depositions which

17    were allowed by the Court, but yes.

18    **Q.**    Does it not go without saying that a case of this

19    magnitude would require an investigation?

20    **A.**    An investigation in terms of reading the Jencks

21    materials, meeting with the client, discussing the

22    overall strategy of the case, or are you talking about

23    an investigator?

24    **Q.**    Investigator, interview witnesses, prospective

25    witness.

1    **A.**   You could use an investigator in a case like this.

2    **Q.**   And in fact, in an e-mail that you sent to

3    Mr. Caramadre on January 31st, you indicated that,

4    Starting tomorrow we need to come up with a real game

5    plan about how we're going to move this case forward in

6    the courtroom.  It is not satisfactory to me that we

7    try this case less than 100 percent prepared.  To the

8    contrary, we need to be 110 percent prepared, which for

9    now means we needs to employ an investigator as soon as

10   possible and identify those witnesses who should be

11   interviewed.

12   **A.**   Yes, I wrote that.

13   **Q.**   So you're telling Mr. Caramadre, we need to get an

14   investigator on this case?

15        THE COURT:  Are you going to move that as an

16   exhibit?

17        MR. OLEN:  Yes, your Honor, Exhibit E, please.

18        MR. McADAMS:  No objection.

19        (Defendant's Exhibit E admitted in full.)

20   **A.**   I told him that.

21   **Q.**   Your co-counsel, Mr. McCormick, also felt that

22   way, did he not?

23   **A.**   Yes, he did.

24   **Q.**   Showing you an e-mail sent by Mr. McCormick, your

25   co-counsel, to Mr. Caramadre and yourself dated June

1    4th, 2012.

2    **A.**    That's correct.

3    **Q.**    Do you remember receiving --

4              THE COURT:  Any objection?  Is this Exhibit F?

5              MR. OLEN:  It is F, your Honor.

6              THE COURT:  Any objection.

7              MR. McADAMS:  No objection, your Honor.

8              THE COURT:  Okay.  F will be full.

9              (Defendant's Exhibit F admitted in full.)

10   **Q.**    Now, this correspondence from Mr. McCormick states

11   that, We are falling behind -- and this is from June of

12   2012.  June 4th.  We are falling behind in doing the

13   basic things that need to be done in this case.  The

14   most urgent is to compile a list of potential witnesses

15   and then have an investigator talk to them.  I have an

16   investigator in mind.  Given the expected number of

17   possible witnesses, we'll probably need other

18   investigators, especially with time growing short.  In

19   addition to contacting our witnesses, we should also

20   attempt to take statements from the Government's

21   witnesses.  Even witnesses that seem hostile to our

22   side can provide helpful information, especially

23   regarding how they may have been influenced by the

24   Government's investigators in forming their opinions

25   that they were misled.  We also need to press Bob

1    Flanders for his investigator's materials, which I

2    believe we do not yet have.

3         It goes on to say that, Someone on our team

4    needs to be in charge of this. I hate to nag you, but

5    it needs to be done right away as our failure to do so

6    is making us look like a bunch of boobs. The pace of

7    this case is rapidly escalating, but right now we are

8    stuck in the mud. As things stand now, the Government

9    is prepared for trial, but we are unprepared.

10        So that was a correspondence to you from your

11   co-counsel?

12   **A.**   That was a correspondence, Mr. Olen, to me and

13   Mr. Caramadre, so the record is clear.

14   **Q.**   That's correct. And your own co-counsel was

15   telling both of you as of June, a few months before

16   trial, that you're falling behind in the case?

17   **A.**   Actually, to put it in context, he's sending the

18   e-mail to me and Mr. Caramadre. He's telling the

19   client that we're falling behind. And to jump ahead,

20   so we can move things along, the client disagreed with

21   Mr. McCormick in hiring an investigator and

22   subsequently fired him.

23   **Q.**   Well, he sent the e-mail to you also,

24   Mr. Lepizzera, did he not?

25   **A.**   Yes, he did.

1    **Q.**   So he didn't just send it to Mr. Caramadre.  He's

2    also sending it to you?

3    **A.**   He sent it to both of us, Mr. Olen, yes.

4    **Q.**   So he's probably trying to communicate to you as

5    well, since it's addressed to you?

6    **A.**   My memory back then of what Mr. McCormick was

7    doing, he sent it to both of us, he's really

8    communicating with Mr. Caramadre because me and

9    Mr. McCormick were on same page.  But Mr. Caramadre

10   didn't want to hear and that's why Mr. McCormick -- he

11   didn't want to hear from Mr. McCormick and that's why

12   Mr. McCormick got terminated by Mr. Caramadre

13   subsequent to receiving this e-mail.

14   **Q.**   You and Mr. McCormick were on same page?  You just

15   stated you were on the same page?

16   **A.**   Yes.

17   **Q.**   So then you also believed that you were falling

18   behind?

19   **A.**   What I believed is that we should employ an

20   investigator to talk to selective witnesses.  And

21   actually, let me back up in terms of being on the same

22   page.  One of the things Mr. McCormick wanted to do,

23   which I disagreed with -- I should have used that in a

24   general sense.

25        Mr. McCormick's way of defending this case was

1    character witnesses.  Because of the optics of the case

2    that I mentioned yesterday, Mr. McCormick thought that

3    really defending this case should be calling character

4    witnesses to defend Mr. Caramadre in our case-in-chief.

5    I had a disagreement with him on that.  I don't know if

6    I necessarily discussed it with him.  But my

7    disagreement with him was, first of all, in the Rules

8    of Evidence, you just can't call character witnesses in

9    to say someone's a great guy, number one.  So there's

10   evidentiary hurdles to that.  Number two, that kind of

11   testimony, even if it comes in, doesn't address the

12   merits or the non-merits of the Government's case.  We

13   needed to hit the case head-on in terms of the

14   allegations.

15          So I'm going to correct my testimony in terms of

16   being on every same page with Mr. McCormick.  So that's

17   one thing we disagreed on.

18   **Q.**   Your co-counsel was telling you and Mr. Caramadre

19   through this e-mail that it was urgent to get an

20   investigator to interview witnesses?

21   **A.**   That's what he wrote.  The e-mail speaks for

22   itself.  So if that's what he wrote, that's what he

23   wrote.

24   **Q.**   Were you on the same page with him with that, was

25   it urgent to get investigators?

1   **A.**   I thought we should employ an investigator but for

2   pointed reasons.  Not just hire an investigator to go

3   out and interview 200 or 300 witnesses just to

4   interview them.  To do it for a specific reason.  And I

5   discussed that with Mr. Caramadre, and Mr. Caramadre

6   said, What's the purpose of hiring an investigator?  I

7   know all the facts.  Mike, you're worrying about the

8   minutia in the case.  All you need to do is have me

9   sitting next to you at trial, and I'll tell you what

10  questions to ask.  Stop worrying about the minutia.

11       That's why an investigator didn't get hired.

12  And in fact, I don't believe, and I'll stand corrected

13  if you show me, I don't believe Mr. Caramadre ever

14  talked about an investigator and maybe once or twice

15  because I don't know the thousands of e-mails, but

16  Mr. Caramadre really didn't really bring up the

17  investigator issue until early October 2012 when we are

18  really getting ready for trial and really preparing for

19  trial.  And that investigator request was for three,

20  four or five witnesses, approximately.  They were

21  pointed witnesses, which I discussed yesterday, why we

22  did not.  We had a thorough discussion why not to

23  investigate those witnesses.

24  **Q.**   You just said that you really started getting

25  ready for trial in October?

1    **A.**    Gearing up for trial.

2    **Q.**    Gearing up for trial in October?  You weren't

3    gearing up for trial in June, I take it, then?

4    **A.**    I was preparing for trial, Mr. Olen, all along

5    because the client insisted on a trial.

6    **Q.**    Your own co-counsel said that you needed to get an

7    investigator right away because the failure to do so is

8    making us look like a bunch of boobs?

9    **A.**    You know what, that's why you've got to be careful

10   as a witness in terms of stating we're on the same

11   page.  I don't agree with that statement.  And I don't

12   know who's viewing us as boobs so I disagree with that

13   statement.

14   **Q.**    Were you gearing up for trial in June, or were you

15   gearing up for trial in October?

16   **A.**    Mr. Olen, I was preparing for trial all along

17   because it was my belief that Mr. Caramadre wanted a

18   trial in this case.  I did have discussions with him

19   before Mr. Traini was hired about plea discussions

20   because that's a lawyer's obligation.  And I had

21   communications with Mr. Vilker about -- I think it was

22   April or May because the case is moving along and the

23   Government -- Mr. Vilker is telling me, Look, we're

24   really going to start trial preparations, spending a

25   lot of resources on this case.  Is Mr. Caramadre --

1    would he consider a plea?  I had those discussions with

2    him.  Mr. Caramadre refused.

3           So we're going along.  This was a continuous

4    process.  But when you're in October, you're a month

5    away.  You're hunkering down and you're doing what you

6    can to prepare for trial.

7    Q.    But in June, four months before trial, you were

8    falling behind and you weren't really geared up at that

9    point?

10   A.    No, I wouldn't say I was falling behind.

11   Q.    Mr. McCormick says you were falling behind?

12   A.    If that's what he said, that's what he said.

13   Q.    Mr. McCormick also said that it's not important

14   just to investigate and interview your own witnesses,

15   but it's important to investigate the Government's

16   witnesses.

17   A.    If that's what he wrote, that's what he wrote.

18   Q.    Because they can provide helpful information.  Are

19   you on the same page with that?

20   A.    If that's what he wrote, that's what he wrote.

21   Q.    I'm asking you if you were on the same page with

22   that?

23   A.    If there's a reason to hire an investigator and

24   the investigator interviews someone and they give

25   helpful information, I guess that's a possibility.

1    **Q.**    Okay.  Now, one of the reasons Mr. McCormick

2    thought it was important to interview Government

3    witnesses is because it would be helpful to show how

4    these, especially the terminally ill surviving family

5    members, were influenced by the Government in forming

6    an opinion that they were misled.

7    **A.**    Where is that in the e-mail, Mr. Olen?

8    **Q.**    Let me get that for you.

9    **A.**    Actually, it's on the second paragraph you're

10   referring to.

11   **Q.**    Right.

12   **A.**    That's what he wrote.

13   **Q.**    And did you agree with that?  Were you on the same

14   page with that?

15   **A.**    Not necessarily.  Mr. McCormick was somewhat

16   passive, I would say, in the representation of

17   Mr. Caramadre.  Mr. Caramadre and Mr. McCormick were

18   not getting along at that point.  In fact, it really

19   began to deteriorate in -- and I don't remember the

20   date of the motion that this Court heard, the motion to

21   suppress the video depositions, April 24th or 25th.  It

22   was late April.  Mr. McCormick primarily argued the

23   motion and afterwards Mr. Caramadre had a blow-out, a

24   blow-up with Mr. McCormick.  And I was present in this

25   court in a side conference room I think on this

1    hallway, and Mr. Caramadre was basically coming pretty

2    close to done with Mr. McCormick.

3         That's coming from -- that second paragraph is

4    Mr. McCormick alluding to Mr. Caramadre's theory of the

5    case, which is Agent McDaid and Postal Inspector Souza

6    were going around influencing and brainwashing

7    witnesses about what they knew or didn't know about

8    investments.

9    **Q.**   And didn't you think that was a legitimate area to

10   explore?

11   **A.**   No.

12   **Q.**   Why didn't you?

13   **A.**   Because by that point, I think the Jencks

14   materials were delivered on March 1 or thereabouts.  As

15   soon as I got those materials, I wanted to see what

16   people were saying because obviously the Grand Jury is

17   secretive and defense lawyers don't get to see that

18   stuff.  So the Government's Grand Jury lasted 18

19   months, or I don't know if they got an extension but a

20   long time.  And I dove into those Jencks materials.

21   And if this was a case where there was one witness or

22   two witnesses, possibly a handful where you're only

23   dealing with a couple of annuities, that's fine.  You

24   know, maybe, maybe, and I'm not casting any aspersions

25   on the agent or the inspector in this case, the postal

1    inspector, maybe there was some pressing of the

2    witness, maybe.  But when you're dealing with 30, 40,

3    50, 60 individuals -- I don't remember how many, of

4    people saying the same thing.  Mr. Radhakrishnan said

5    this, he didn't say this.  I thought -- personally, I

6    thought that any lawyer that went down that path of

7    trying to get in front of that jury that was going to

8    sit in that box over there to say all these people were

9    brainwashed, that would have been a colossal mistake,

10   and I just thought it was negligent.  That's my

11   opinion.  Someone else can have a different opinion,

12   but my job is to give the client the best advice and to

13   put the client in the best position.  I thought that

14   would be completely negligent just to tell the client

15   what he wants to hear.  I wasn't going to do that.

16   **Q.**   Wasn't it possible that maybe this 30 --

17           MR. LEPIZZERA:  Could I just interrupt my

18   testimony.  That's my paralegal from my office with the

19   documents, your Honor, that we discussed this morning.

20           THE COURT:  All right.  Mr. Gerstein will get

21   them.  All right.  Thank you.

22           Proceed.

23           MR. OLEN:  Thank you.

24   **Q.**   Wasn't it possible that these 30 to 40 witnesses

25   all believed this because of what the FBI was telling

1    them?

2    **A.**    I'm going to say no for this reason, it's just my

3    opinion, this wasn't only about what Mr. Radhakrishnan

4    told the witnesses.  That could be up for debate,

5    putting aside how many there were which there were too

6    many and I just thought it was a terrible theory.  It's

7    this issue, Mr. Olen.  In the bond applications

8    themselves, there's all this false information.  Okay?

9    So there's false information on the terminally ill

10   person related to their financial information, their

11   net worth, how much money they're making, what's their

12   experience in trading.  And it was undisputed that

13   Mr. Radhakrishnan never asked these people this

14   information.

15        So this whole thing about they didn't know

16   whether there was an account, that's just one part of

17   the fraud that was alleged by the Government.  The

18   other part of the fraud is communicating

19   misrepresentations to the broker/dealers and the

20   insurance companies.

21        Another example would be when these terminally

22   ill people, they become an annuitant on an annuity

23   policy, the insurance companies asking in some

24   instances, not all the instances, what the relationship

25   is between the investor and the annuitant or the

1   beneficiary and the annuitant because the beneficiary

2   and the investor is sometimes different depending on

3   which insurance company, and the Defendants are putting

4   or someone is putting "friend."  Well, there is no

5   relationship between the investor and the annuitant.

6   They're not friends.  The investor and the annuitant

7   never met.  And in fact, to be perfectly honest, it

8   should be on the application, it should say business

9   relationship.  What's the business relationship?  I'm

10  paying this person to be an annuitant on this policy.

11  So that's a misrepresentation.  So this whole thing

12  about what Mr. Radhakrishnan said to them and whether

13  they knew there was an account or not, I don't think

14  there was full disclosure, number one; and number two,

15  you have all these other misrepresentations that were

16  basically undisputed.

17          So I didn't see how an investigator to go out to

18  interview about whether Agent McDaid and Postal

19  Inspector Souza duped these people, I don't believe it

20  happened, number one; and number two, it didn't make a

21  difference.

22  **Q.**   My question was, wasn't it possible that the 30 or

23  40 witnesses got their impression that they had been

24  wronged from the FBI investigator?  Isn't that

25  possible?

1   **A.** I guess.

2   **Q.** So it wasn't one. You said it's 30 to 40. They

3   could all have been?

4   **A.** It might have been more than 30 or 40, because

5   it's been seven months since trial and a lot has

6   escaped my mind. I guess anything is possible. But

7   guess what? Even when you argue to a jury, it's not

8   beyond any doubt; it's beyond any reasonable doubt.

9   And I do not believe that's a reasonable possibility;

10  so, therefore, I didn't think it was a reasonable

11  defense strategy to go down that road.

12  **Q.** Well, wouldn't you have been able to answer that

13  question if you had bothered to investigate and

14  interview these people?

15  **A.** As I told you why we didn't hire an investigator.

16  **Q.** My question is wouldn't you possibly have found

17  out the answer to that question if you had investigated

18  and interviewed these people?

19  **A.** Are you saying had we hired an investigator that

20  we possibly could have found out that Agent McDaid and

21  Postal Inspector Souza duped all these people? Is that

22  what you're testifying?

23  **Q.** I'm not testifying.

24  **A.** I am sorry. Is that what you're asking?

25  **Q.** That's my question.

1    **A.**   I guess it's a possibility.

2    **Q.**   And so an investigator probably could have

3    answered that question for you so you wouldn't have to

4    give your opinion about it, you would actually know

5    about it?

6    **A.**   We didn't hire an investigator, Mr. Olen.

7    **Q.**   I'm well aware of that.  What I'm trying to

8    establish is why you didn't hire an investigator when

9    you could have hired an investigator so you didn't have

10   to give your opinion as to what you think these people

11   may have said, you would have known what they were

12   saying?

13   **A.**   Your client didn't want to hire an investigator

14   either, Mr. Olen.

15   **Q.**   Well, let me ask you this, Mr. Lepizzera.  Even

16   assuming that to be true for the moment, do you think

17   that that absolved you from your responsibility to

18   handle a case that cried out for investigation?

19   **A.**   I disagree with your characterization of "cried

20   out for an investigation," first of all.  I believe

21   that we handled the case properly.

22   **Q.**   That wasn't my question, Mr. Lepizzera.  My

23   question was did you think, assuming for the moment

24   that there's some degree of truth to the fact that

25   Mr. Caramadre didn't want to investigate this case,

1    does that absolve you from your professional

2    responsibility to investigate it?

3         MR. McADAMS:  I object.  This really is

4    completely irrelevant.  Mr. Lepizzera is not on trial.

5         THE COURT:  Sustained.  Sustained.  First of

6    all, to the extent it's relevant, he's disputed your

7    characterization.  His testimony has been clear,

8    consistently clear over two days that the client didn't

9    want an investigator and that the attorneys' strategy,

10   Mr. Lepizzera's strategy or his view of the case was

11   that that would not be a wise road to go down in terms

12   of defense strategy.  You can disagree with that

13   defense strategy, but he doesn't agree with the premise

14   of your question.  So I'll sustain the objection.

15   **Q.**   Let me ask you this.  So you didn't get an

16   investigator because Mr. Caramadre told you not to get

17   an investigator?

18   **A.**   And I didn't see a need for one.

19   **Q.**   You didn't see a need to talk to any of the 100

20   Government witnesses?

21   **A.**   Nope.

22   **Q.**   And how many witnesses had you -- were you

23   prepared to call on your case-in-chief?

24   **A.**   I couldn't answer that question because we weren't

25   at our case-in-chief yet.

1    Q.   Are you familiar with this correspondence from --

2         THE COURT:  Why don't we mark the exhibit, then

3    refer to the exhibit by --

4         MR. OLEN:  This is Exhibit G, your Honor.

5         THE COURT:  All right.  So Exhibit G.  Does the

6    Government have any objection to Exhibit G?

7         MR. McADAMS:  No, your Honor.

8         THE COURT:  Exhibit G will be full.  You may

9    publish it.

10        (Defendant's Exhibit G admitted in full.)

11   Q.   Are you familiar with this correspondence by

12   Mr. Traini to Mr. Vilker?

13   A.   Can I just take a look at it, please.

14   Q.   Yes.  Let me move it.

15   A.   Thank you.

16   Q.   Dated September 11th, 2012.

17   A.   Is there a second page, Mr. Olen?

18   Q.   Yes, there is.  And a third page.  This is page

19   two.

20   A.   I think you had them backwards but --

21   Q.   Yes, I'm sorry.  That's page two?

22   A.   Can I just see the bottom of it.

23   Q.   Yes, indeed.

24   A.   Okay.  There's all names, yes.

25   Q.   Page three.

1    **A.**    Okay.

2    **Q.**    And that is the tentative potential witnesses for

3    your case; is that right?  Is that what Mr. Traini is

4    saying there on page two, Tentative potential witnesses

5    are the following individuals and such others that we

6    may identify?

7    **A.**    That's what the letter says.

8    **Q.**    I didn't count these, but between these two pages

9    there's quite a number of witnesses there that you were

10   thinking about presenting?

11   **A.**    I can tell you what that list represents,

12   Mr. Olen.  What it represents is I believe, I'd have to

13   look at the Court docket, I believe there came a point

14   in time where the Government and the Defendant were

15   supposed to disclose witnesses to one another; and I

16   think the Government disclosed their witnesses it might

17   have been July 1 or July 2, and they gave a very

18   extensive list.  I mean, a very extensive list.  We

19   kind of joked because I think they put in their letter

20   that it was a tentative list.  We were like --

21   Mr. Traini and I were saying and we might have even

22   said it to Mr. Vilker and Mr. McAdams, Boy, that's a

23   real tentative list; because if that's the list, this

24   case is going to go on for months and months.

25        What we did was in September we took the names

1    of the people we obtained in the Jencks materials, and

2    I think that's where all those names came from.  And I

3    think the Government joked back and said, you know, if

4    you're going to call all these witnesses, boy, talk

5    about a tentative list.

6         So what we did was we reserved our right to call

7    those witnesses because we didn't want to not submit a

8    list and then have the Government say, well, you didn't

9    put this particular witness on the list, and be

10   foreclosed.  Although I don't think that would have

11   happened in a case of this size and nature, but that's

12   what that list represents.  We had no idea who we were

13   going to call in our case-in-chief because we had to

14   see the Government's case first.

15   **Q.**   Do you know how many of those, how ever many

16   witnesses are on those two pages that you interviewed

17   or you had an investigator interview?

18   **A.**   Mr. Olen, we interviewed none of them.

19   **Q.**   Was that a strategic decision?

20   **A.**   We made a decision not to interview any of them.

21   **Q.**   I'm going to refer back to Exhibit F for a moment.

22   **A.**   When I say "we," I just want to correct the

23   record.  When I say "we," it's the lawyers -- it's

24   defense lawyers and the client.

25   **Q.**   I want to refer back to Exhibit F for a moment.

1          Mr. Lepizzera, in the third paragraph,

2     Mr. McCormick is telling you, We also need to press Bob

3     Flanders for his investigator's materials, which I

4     believe we do not yet have.

5     **A.**   I see that.

6     **Q.**   Are you aware that Mr. Flanders conducted an

7     investigation of his own?

8     **A.**   I didn't at first because I don't think

9     Mr. Flanders turned those materials over.  And I think

10    at some point the Government had complained to me

11    saying that they believed Mr. Flanders had interviewed

12    a couple of witnesses, which I was unaware of.  Later

13    on, I found out that he did.  So --

14    **Q.**   As of June 4th, you knew that he had conducted an

15    investigation based on this correspondence from

16    Mr. McCormick?

17    **A.**   I'm not sure, Mr. Olen.  I'm not sure by that

18    point.

19    **Q.**   Well, he's certainly telling you about it on June

20    4th, that we need to press Bob Flanders for his

21    investigator materials?

22    **A.**   I know the e-mail says that.  I just don't

23    remember what my state of mind was back then.  I know

24    that -- you're actually refreshing my memory now.  I

25    know that the Government had said to me they believed

1    Mr. Flanders had interviewed some witnesses because I

2    think the witnesses might have reported back to the

3    Government or the agent or the postal inspector.  I'm

4    not sure.  And I was surprised by that.  And then later

5    on I did learn.  So I don't know when I learned along

6    the time period about when Mr. Flanders did do some

7    interviews, but he did do some interviews.

8    Q.   Okay.  And what I'm concerned about is when you

9    found out about it.  So as of June 4th, at least, you

10   know that Mr. Flanders conducted some interviews, had

11   previously conducted some interviews?

12   A.   I don't know when I read that e-mail whether

13   Mr. McCormick is telling me this for the first time or

14   I told Mr. McCormick.  I just don't know, Mr. Olen.

15   I'm being honest with you.

16   Q.   No, I understand.  But you certainly knew at this

17   point in time, that's all I'm trying to say.  You knew

18   of the existence of Mr. Flanders --

19   A.   When I got the e-mail list, yes.

20   Q.   You said you didn't think Mr. Flanders delivered

21   them to you, the results of those investigations?

22   A.   Yes, that's what I said.

23   Q.   Did you ask him for it?

24   A.   We did.

25   Q.   You did?  Did you get them?

1    **A.** I think we got them later on after that e-mail.

2    **Q.** And what was the substance of these investigators'

3    notes?

4    **A.** Actually, they weren't investigators. They were

5    actually, I think, Michael Connelly, and it might have

6    been Bob Flanders and maybe an associate at Hinckley

7    Allen who were interviewing some witnesses. I just

8    don't recall the substance of what those were,

9    Mr. Olen, at this point.

10    **Q.** Now, I have not received those materials. Do you

11    have them?

12    **A.** I believe, Mr. Olen, that they are in the

13    materials we delivered to you on Sunday. I believe --

14    so I can help you along and move this along, I believe,

15    Mr. Olen, I believe they're in the August 2012 e-mails

16    and there were attachments, and I believe I printed out

17    the e-mail from Hinckley Allen and the attachments

18    which contain those interviews. And I think they're

19    memos to the file so whether it was Mr. Connelly or

20    Mr. Flanders or whoever wrote an internal memo to the

21    file documenting the interview, but I think you can

22    find them there.

23    **Q.** But you're not sure whether you've delivered them

24    to me?

25    **A.** I believe I did. I just -- I personally reviewed

1    I think 6500 pages of e-mails over the weekend to

2    gather this stuff for everyone, for the Court and you,

3    so I believe they're in August 2012.

4    **Q.**   But you'd be willing to check that for me,

5    wouldn't you?

6    **A.**   I'm willing to check for you to move this along,

7    but I believe if you have your associate go to August

8    2012, I believe you'll find the e-mail.  There might be

9    a couple of e-mails from Hinckley Allen and the

10   attachments are printed out and they contain the

11   internal memos that Hinckley Allen prepared of some of

12   interviews of some of witnesses.

13   **Q.**   But you can't remember who those witnesses were?

14   **A.**   No, I can't at this point.

15       MR. OLEN:  This is Exhibit H, please, your

16   Honor.

17       THE COURT:  Is there any objection?

18       MR. McADAMS:  No, your Honor.

19       THE COURT:  H will be full.  You may publish it.

20       (Defendant's Exhibit H admitted in full.)

21   **Q.**   This is an e-mail from Mr. Caramadre to you on

22   April 5th, 2012.  It says, Mike please let me know if

23   you have spoken to Tony about getting a private

24   investigator.  I believe it's something we must get on

25   as soon as possible.

1      **A.**    Yes, he wrote that, and I received it.

2      **Q.**    So Mr. Caramadre is expressing his desire to have

3      an investigator at that point in time?

4      **A.**    For particular witnesses, a handful of witnesses.

5      **Q.**    For any witnesses?

6      **A.**    For a handful of witnesses, Mr. Olen.

7      **Q.**    Do you know who those witnesses were?

8      **A.**    Let's see.  It might have changed over the course

9      of October, so I don't know which ones came in early

10     October or some might have been added in late October.

11            I believe it was Liz Mizzoni.  I believe it was

12     Tom Maltais, Colette Robichaud, Jenny Duarte, Monsignor

13     Richard Sheehan.  That's what I remember right now.

14            MR. OLEN:  This is Exhibit I, please.

15            THE COURT:  Any objection?

16            MR. McADAMS:  No objection.

17            (Defendant's Exhibit I admitted in full.)

18     **Q.**    This is an e-mail following up a couple of days --

19     another e-mail from Mr. Caramadre to you,

20     Mr. Lepizzera?

21            MR. McADAMS:  Your Honor, I object to the

22     characterization of a couple of days.  It's the same

23     day.

24            THE COURT:  All right.  Rephrase.

25     **Q.**    Well, this is October 8th.  The e-mail from

1     Exhibit H was October 5th, isn't that right?

2          MR. McADAMS:  Very well.  No objection.

3     **A.**   I think you're right, Mr. Olen.

4     **Q.**   So a few days later, Mr. Caramadre is again

5     requesting that an investigator be hired; is that

6     correct?

7     **A.**   That's what the e-mail says and there were

8     discussions -- I believe there were discussions with me

9     and Mr. Caramadre as well.  But, yes, he's expressing

10    his desire to hire an investigator.

11    **Q.**   And he tells you that, Mike, there may be more

12    witnesses we will want our PI to interrogate?

13    **A.**   That's what it says.

14    **Q.**   And you respond that, You and I will address today

15    because we will retain an investigator for one or more

16    interviews.  We're thoroughly reviewing these issues.

17    **A.**   That's what I wrote.

18    **Q.**   So you were telling him that you were going to get

19    an investigator?

20    **A.**   I'm telling him we're going to review his request.

21    That's what I'm telling him.  Because at the time,

22    Mr. Olen, I believe, and I might be off on this because

23    there's just so much information here , I believe the

24    request had to do with Liz Mizzoni initially, and then

25    developed into some other witnesses.  I might have it

1    backwards, though.

2    **Q.**   Well, you say in your e-mail, Mr. Lepizzera,

3    Because we will retain an investigator?

4    **A.**   Can I see the e-mail again, please, just so I can

5    read the whole thing.

6         That's what I wrote and I believe, and I could

7    be wrong on this, I wanted the -- if we're going to

8    hire an investigator, I wanted a purpose for it.  Okay?

9    And I believe that part of Mr. Caramadre's knee-jerk

10   reaction one month before trial to hire an investigator

11   is because the Government is either sending out

12   subpoenas or they're doing their pre-testimony trial

13   prep and he's finding out about this.

14        Let me add one more potential witness was

15   Danielle Russo, who was Mr. Caramadre's executive

16   assistant.  And I think it got back to him because I

17   think the postal inspector or the FBI agent were trying

18   to contact Ms. Russo and she initially -- she contacts

19   Joe.  This is what Mr. Caramadre tells me.  She

20   contacts Mr. Caramadre and says the FBI, they're trying

21   to interview me.  I don't want to be interviewed.

22        So Mr. Caramadre is actually saying to me, well,

23   what can we do, does Danielle need to meet with them or

24   not meet with them.  I'm instructing the client don't

25   communicate with her with regards to whether she should

1    meet or not because I don't want any claims of

2    obstruction or anything like that.  And one of the

3    things Mr. Caramadre had suggested, well, let's get an

4    investigator so we can talk to Ms. Russo and tell her

5    whether she needs to meet with the FBI or the postal

6    inspector.  And my response was that's an improper

7    purpose.

8         So that's another reason why this investigator

9    came up.  The one person I was looking to interview and

10   I think I may be referring to her and I'm not positive

11   because the time frame is difficult with all the

12   information might have been Liz Mizzoni.  And Liz

13   Mizzoni is Robert Mizzoni's wife.  Robert Mizzoni was a

14   friend of Mr. Caramadre's family.  In fact, I think he

15   was Mr. Caramadre's school bus driver when

16   Mr. Caramadre was in elementary school.

17        And Mr. Caramadre used Mr. Mizzoni, his name as

18   an annuitant, and one of the counts in this case

19   involved Mr. Mizzoni.  Mr. Mizzoni was one of the video

20   deponents that was going to be used by the Government

21   in their case-in-chief.  And part of what I discussed

22   -- I think I discussed yesterday, maybe I didn't.  Part

23   of what I discussed yesterday, or think I did, is

24   whether or not we'd use the cross-examination of

25   Mr. Mizzoni on cross.

1        One of the things I was very interested in was

2    can we not use the cross of Mr. Mizzoni, which I

3    thought was very hurtful and then Liz Mizzoni could

4    fill in the gaps with respect to what Mr. Caramadre

5    told Mrs. Mizzoni about why he was giving her money.

6    And because that was important because that annuity, I

7    think, was applied for in April of 2004 and that was

8    pre-Mr. Radhakrishnan who again began work at Estate

9    Planning Resources in June of 2007.  And that was

10   important because we didn't have Mr. Radhakrishnan

11   making misrepresentations or dealing with the

12   terminally ill person.  We had Mr. Caramadre.

13       So what I was interested in, I might be

14   referring to her in this one, is, Mr. Caramadre, you

15   had a communication with Liz Mizzoni before you told

16   her to have Mr. Mizzoni to come to your office to pick

17   up a check.  Did you tell Mrs. Mizzoni anything

18   specific about why he was going to get money?  Did you

19   tell her what an annuity was?  Did you tell her what an

20   annuitant was?  Did you tell her you were going to use

21   Mr. Mizzoni's name as an annuitant on a policy and

22   that's why he was getting money?  Did you tell her why

23   you wanted to use his name as an annuitant and what a

24   death rider was and you could make money off his name

25   and all that other stuff?

1          And we went back and forth, and ultimately we

2     never interviewed Liz Mizzoni.  I believe it's her that

3     I'm referring to there because Mr. Caramadre told me,

4     No, I didn't tell Mrs. Mizzoni all this stuff.  I

5     didn't need to.  Who cares.  They're making money.

6     It's a win/win situation.  They got money, and I used

7     their name as an annuitant.  You're getting into

8     minutia, Mike.  You're buying into the Government's

9     case.  I don't need to disclose all this stuff to

10    Mrs. Mizzoni or Mr. Mizzoni.

11          And that's why I didn't interview her, because I

12    didn't want an investigator -- that's why we later

13    decided not to interview her, because I didn't want an

14    investigator to go out and then ask her these pointed

15    questions and she says, No, he never told me this.  And

16    then Mrs. Mizzoni who had a history in this case of

17    calling the FBI, then saying, Huh, should I call Agent

18    McDaid and should I just tell them that the defense

19    just interviewed me?  And then Agent McDaid, if she's

20    doing her job is going to say what questions did the

21    investigator ask of you and what were your answers?  We

22    would have been filling the blanks for the Government.

23          So I think when I said we will retain an

24    investigator, I was hopeful about getting at any kind

25    information from Liz Mizzoni, when he had a thorough

1    discussion, which might have been October 10th and

2    later with Mr. Caramadre, it was clear to me that he

3    didn't tell her that stuff.  So if he didn't tell her

4    that stuff, we're not going to get the stuff from her.

5    **Q.**    My question, Mr. Lepizzera, way back when was did

6    you tell Mr. Caramadre that you will retain an

7    investigator?

8    **A.**    I did write that, Mr. Olen.

9    **Q.**    And you did not retain an investigator?

10   **A.**    We did not.

11   **Q.**    You did not.  So out of the hundred Government

12   witnesses and whatever that is, 150, 200 of your

13   witnesses, you didn't investigate or interview any of

14   them, not one single one?

15   **A.**    I didn't interview them.  I read all their Jencks

16   materials.  I read the Grand Jury testimony.  I read

17   the 302 reports.  I read the postal inspector's MOIs.

18   And it's not only reading the materials because I read

19   those materials not once, not twice but over and over

20   again.  And it's not just reading them.  It's then

21   putting it all in perspective and matching it up

22   against the annuities, matching it up against the bond

23   applications, matching it up against the death

24   certificates.  That's what I did.

25          So when you say "lack of investigation," I

1    disagree with that.  I will stipulate right now so we

2    can move this along, I did not hire an investigator.  I

3    agree.

4    **Q.**   And that was your decision?

5    **A.**   That was our decision.

6    **Q.**   But you agreed with it.  You didn't think an

7    investigator was necessary?

8    **A.**   I agree with Mr. Caramadre's position.

9    **Q.**   So you were, all this work you were doing, in

10   other words, you were content to rely on the

11   Government's evidence.  The FBI reports, you looked at

12   that stuff you got from the Government, but you didn't

13   think it was worthwhile to interview witnesses

14   personally?

15          MR. McADAMS:  I'm going to object.  This has

16   been asked and answered.  We've gone over and over it.

17          THE COURT:  I think you've covered it.  I agree.

18   **Q.**   Okay.  At some point in time, Mr. Lepizzera, you,

19   back in June of 2012, you retained the services of

20   Mr. Traini to assist you?

21   **A.**   Yes.

22          MR. OLEN:  This is I, your Honor, please.

23          THE COURT:  Any objection?

24          MR. McADAMS:  No objection.

25          THE CLERK:  Excuse me.  It's J.

1          MR. OLEN:  Oh, I'm sorry.  J.

2          THE COURT:  Exhibit J is full.

3          (Defendant's Exhibit J admitted in full.)

4    **Q.**    Now, did you have a pre-existing relationship with

5    Mr. Traini prior to your hiring him?

6    **A.**    When you say "pre-existing," I knew Mr. Traini.

7    **Q.**    Had you worked with him before?

8    **A.**    I've worked -- I worked on a case with him, but we

9    didn't represent -- we weren't co-counsel.

10   **Q.**    What case was that?

11   **A.**    It was a probate matter.  It actually went to the

12   Superior Court and actually went to the Rhode Island

13   Supreme Court.  That travel might have happened twice

14   during the time I was involved in the case, but it was

15   the Estate of Glen Griggs and the case started out in

16   Warwick, City of Warwick Probate Court and, again,

17   traveled to the Superior Court and the Supreme Court.

18   I represented the limited guardian and Mr. Traini

19   represented the ward in that estate.

20   **Q.**    And that's the only case you worked on together?

21   **A.**    As of that time, Mr. Olen?  In other words, as of

22   June 21, 2012?

23   **Q.**    Yes.

24   **A.**    I'm not sure of the time frame.  There may have

25   been another -- I think there were a couple other

1   matters that I worked on with him.

2   **Q.**   Representing the same person or persons?

3   **A.**   Yes.

4   **Q.**   And you can't recall who they were or what they

5   were about?

6   **A.**   I can, but I wanted to know if we could go side

7   bar.

8        THE COURT:  I don't know that it's relevant that

9   Mr. Lepizzera be asked questions about specific --

10       MR. OLEN:  I don't need to know that, Judge.

11  That's okay.

12  **Q.**   Just that you worked with him on a couple of other

13  cases?

14  **A.**   Yes.  Yes.

15  **Q.**   Would it be fair to say that you had a friendly

16  relationship, were you friends?

17  **A.**   Yes.  I consider Mr. Traini my friend.

18  **Q.**   Okay.  And at the time that you hired Mr. Traini,

19  he had been representing or I guess he still was

20  representing Mr. Maggiacomo?

21  **A.**   Yes.

22  **Q.**   And Mr. Maggiacomo was a target of this criminal

23  investigation?

24  **A.**   Yes, Mr. Olen.

25  **Q.**   And Mr. Maggiacomo -- Mr. Traini, excuse me,

1   managed to get from Mr. Maggiacomo a non-prosecution

2   agreement?

3   **A.**   That's what he was able to negotiate with the

4   Government.

5   **Q.**   Do you know when that happened, when he did that?

6   **A.**   I don't want to waste the Court's time thinking.

7   I don't recall.  I believe Mr. Hanrahan was the first

8   person to obtain a letter of non-prosecution.  I know

9   that Mr. Maggiacomo was second after him.  I just don't

10  recall the time frames.

11  **Q.**   Would May of 2011 sound right?

12  **A.**   It's possible.  If you had a document that says

13  that, I would agree with it.  I just don't have a

14  memory.

15  **Q.**   And the non-prosecution agreement was in exchange

16  for Mr. Maggiacomo's testimony against Mr. Caramadre in

17  this case?

18  **A.**   I believe so.  I'd like to see the letter of

19  non-prosecution, but I believe so.

20  **Q.**   Okay.  Now, before you hired Mr. Traini, you

21  consulted with him about the Caramadre case, did you

22  not?

23  **A.**   When you say "consulted with him," --

24  **Q.**   You had some kind of communication with him,

25  whether e-mail or in person regarding the particulars

1    of Mr. Caramadre's case?

2    **A.**   I would imagine if I took on the formal

3    representation in the Grand Jury investigation I think

4    in August of 2010, reviewing documents, but that's my

5    memory and Mr. Traini is representing Mr. Maggiacomo at

6    that time before he secured a letter of non-prosecution

7    in May 2011, I'm sure I would have communicated with

8    Mr. Traini.  I just don't recall any specifics right

9    now.  But I'm sure I would have because if we represent

10   two targets in a serious Grand Jury investigation, I'm

11   sure I would have talked to him or communicated with

12   him.

13   **Q.**   So in June of 2012, you hired Mr. Traini?

14   **A.**   I did.

15   **Q.**   And you testified yesterday that you negotiated

16   the plea agreement -- the fee agreement, excuse me.

17   **A.**   This written fee agreement, the specifics I did.

18   Mr. Caramadre and Mr. Traini met on their own to talk

19   about the actual fee, which initially Mr. Traini wanted

20   $500,000, but I negotiated this with Mr. Traini.

21          MR. OLEN:  Your Honor, I can't recall, did I

22   move this as K?

23          THE CLERK:  That's J.

24          THE COURT:  J.  Yes.

25          Why don't we take a break right now and stay on

1    track.  So we'll take a ten-minute break.

2         (Recess.)

3         THE COURT:  Mr. Gerstein, I'm going to hand

4    these to you and you can review them now and over the

5    lunch break and then we'll see where we are after that.

6         All right.  You may proceed, Mr. Olen.

7         MR. OLEN:  Thank you, your Honor.

8    **Q.**   Mr. Lepizzera, this is the fee agreement that you

9    negotiated with Mr. Traini?

10   **A.**   I can't see the other pages.  Is it signed,

11   Mr. Olen?  Okay.  Yes, this is the one.  Thank you.

12   **Q.**   I'd like to just go over some of the terms of this

13   agreement.  Moving to page two, this is written as if

14   Mr. Traini had written it; is that correct, in the

15   first person in Mr. Traini.  My fees are based upon my

16   knowledge --

17   **A.**   I think so.

18   **Q.**   Okay.  So as part of the -- well, the fee itself

19   is characterized as a non-refundable flat fee in the

20   amount of $450,000?

21   **A.**   That's correct.

22   **Q.**   And that amount was placed into your IOLTA

23   account?

24   **A.**   Yes.  My client's account, yes.

25   **Q.**   And it's further agreed that the fee will be paid

1    in installments of $50,000 per month?

2    **A.**   That's correct.  That's what the written agreement

3    says.

4    **Q.**   Between July 2012 and February 2013.

5    **A.**   That's what that particular provision says, yes.

6    **Q.**   And at the bottom of that page is a clause that

7    states, It is also expressly agreed and understood that

8    if the proceedings terminate prior to the estimated

9    completion of the trial, whether by plea or for any

10   other reason, whatever portion of the fee remains in

11   your IOLTA account will have been deemed earned and

12   will be payable to me forthwith.

13   **A.**   That's what it says.

14   **Q.**   Now, just looking at the four corners of this

15   agreement, is it not true that if Mr. Caramadre had

16   pleaded two weeks after Mr. Traini were hired, that

17   Mr. Traini would be entitled to $450,000 for two weeks'

18   work?

19   **A.**   According to the fee agreement, yes.

20   **Q.**   According to the fee agreement that you

21   negotiated.

22   **A.**   Yes.

23   **Q.**   Now, do you think that as Mr. Caramadre's attorney

24   that you have any fiduciary duty to him?

25   **A.**   Of course I do.

1    **Q.**    In fact, back in 2010, early on in the

2    representation, you had told him that he needed to

3    create a budget and watch his money, words to that

4    effect?  Do you recall that?

5    **A.**    At the beginning of the case?

6    **Q.**    Well, in 2010, early in your representation.

7    **A.**    I may have.  If you have something specific you

8    want to show me, I may have.  I know that I had

9    communications with Mr. Caramadre.  I don't want to get

10   into other fee arrangements he had with other lawyers

11   because I don't think it's appropriate or relevant but

12   I know that he was spending a lot of money and one of

13   my concerns was to have a budget, I think he should

14   have a budget.  So yes, we did have -- we had at least

15   a couple -- we had discussions about that, yes.

16   **Q.**    Do you think that ratifying a fee agreement that

17   would give Attorney Traini almost a half a million

18   dollars for potentially a week's work was in

19   Mr. Caramadre's interest?

20   **A.**    Mr. Olen, I had discussions with Mr. Caramadre in

21   April or May, I can't pinpoint it, before I retained

22   Mr. Traini to see if the case could be worked out by a

23   plea.  Because, as I said earlier, Mr. Vilker and I had

24   discussions about the Government saying, Mike, we're

25   getting late spring now.  You know, we're going to have

1    to start employing a lot of resources.  If you're going

2    to think about a plea, now is the time.

3         I had communications with Mr. Caramadre about

4    that, and he flat out said, I'm going to trial.  So

5    when I entered in that retainer agreement with

6    Mr. Traini, I didn't consider that there was going to

7    be a plea right after us hiring Mr. Traini.

8    **Q.**   But there certainly could have been?

9    **A.**   I guess there could have been, but there wasn't.

10   **Q.**   There could have been?

11   **A.**   Anything's possible.

12   **Q.**   And if there was one, Mr. Traini would have earned

13   $450,000 for a week's work?

14        THE COURT:  What is the point of this?  None of

15   this happened.  So how does this pertain to the motion

16   to withdraw the plea?

17        MR. OLEN:  Judge, the point is it could have

18   happened.  And what I'm getting to is the fact that

19   what this agreement represents with respect to

20   incentive, an incentive to plead the case.

21        THE COURT:  I think it would be better to ask

22   questions about things that actually happened if you

23   want to get anywhere with this motion.

24   **Q.**   Would you not, objectively speaking, would you not

25   say that -- first of all, would you have been more

1    comfortable creating this agreement if Mr. Caramadre

2    had signed it?

3    **A.**    Looking back on things, Mr. Olen, because no one

4    is perfect, including me of all people, that I should

5    have had Mr. Caramadre sign the agreement and maybe the

6    agreement should have been between Mr. Caramadre and

7    Mr. Traini directly, and it wasn't. Looking back in

8    hindsight, maybe that was a mistake on my part and we

9    wouldn't be talking about this issue. But the point of

10   the matter is that Mr. Traini and Mr. Caramadre were

11   the ones that discussed the half a million dollar fee

12   and then a $450,000 fee, and it was my understanding at

13   that time that that fee was for Mr. Traini to enter his

14   appearance. And anyone that does Federal Court

15   criminal work and especially in a case like this, once

16   you are in the case, you are in the case. And that was

17   the point of why Mr. Traini had negotiated such a fee

18   with Mr. Caramadre. Mr. Caramadre knew that,

19   Mr. Traini knew it, and I knew it. And there was a

20   minimum non-refundable fee.

21       What I wanted to do, although they worked it

22   out, I wanted to -- as you said, I do have a fiduciary

23   duty to the client. I wanted to get something in

24   writing with Mr. Traini to memorialize the arrangement.

25   And that's why that fee agreement says a minimum

1    non-refundable fee.

2         Now, there is a provision in there about $400 an

3    hour.  If I had turned around and let's say for example

4    in August, if I felt that Mr. Traini wasn't doing

5    anything and I was carrying the load and he wasn't

6    doing what I needed him to do to protect

7    Mr. Caramadre's interests, I would have terminated him.

8    I guess that's a possibility.  And then I would have

9    looked to hours, $400 an hour and said, Okay, you're

10   terminated Mr. Traini and you earned this amount of

11   money and the rest of the money is in my client account

12   because I was protecting Mr. Caramadre, and then I

13   would have gave the money back to Mr. Caramadre.

14        But when we -- when I engaged Mr. Traini, this

15   case was going to trial and it wasn't, well, maybe next

16   week is going to be a plea and my friend, Mr. Traini,

17   is going to make $450,000.  I would never let that

18   happen.  In fact, Mr. Caramadre was my friend, too.  I

19   wouldn't do that to anyone, friend or not.

20   **Q.**   That's what the agreement calls for then?

21   **A.**   And the client called for a trial.

22   **Q.**   But that is what the agreement called for?

23        MR. McADAMS:  Objection.  Asked and answered.

24        THE COURT:  I think we've been through this.

25   **Q.**   You understand that Mr. Caramadre is -- strike

1    that.

2         So there was no question in your mind that this

3    was a non-refundable, flat fee arrangement?

4              THE COURT:  I think this has been covered.

5              MR. OLEN:  I'll move along, Judge.

6              THE COURT:  Good.

7    Q.   Looking at that agreement objectively,

8    Mr. Lepizzera, would you not agree that itself, the

9    terms of that agreement would provide an incentive for

10   an early plea?

11             MR. McADAMS:  I object.  We've been through

12   this.  The agreement speaks for itself.  He's asked the

13   same questions over and over.  He's answered it

14   repeatedly.

15             THE COURT:  I agree.  Sustained.

16   Q.   All right.  You moved toward trial, prepared for

17   the trial?

18   A.   Yes.

19   Q.   And the Government gave their opening statement?

20   A.   They did.

21   Q.   And Mr. Vilker, in fact, spoke for about an hour

22   enumerating what he believed Mr. Caramadre's criminal

23   conduct entailed; is that right?

24   A.   I don't know the exact time, but 45 minutes to an

25   hour.

1    **Q.**    Something like that?

2    **A.**    That's fair, yes.

3    **Q.**    And he stated that Mr. Caramadre conspired with

4    Raymour to steal the identities of these people?

5    **A.**    His opening statement laid out what the Government

6    thought it could prove to the jury.  That's what an

7    opening statement is.  It gives a preview of your case.

8    **Q.**    And that he forged documents and provided

9    misinformation?

10    **A.**    I don't remember exactly what he said in the

11    opening statement.

12    **Q.**    Okay.  And you declined to give an opening

13    statement?

14    **A.**    We didn't decline.  We deferred our opening

15    statement.

16    **Q.**    You reserved your opening statement?

17    **A.**    Yes.

18    **Q.**    Okay.  And you knew there would probably be a

19    hundred Government witnesses being presented?

20    **A.**    A hundred, seventy.  There was a lot of witnesses.

21    **Q.**    A lot of witnesses?

22    **A.**    Yes.

23    **Q.**    And that there would be probably three months

24    worth of the Government submitting evidence?

25    **A.**    Two or three months.  Yeah.  More than a month

1    definitely.  Couple of months.

2    **Q.**   And I think you explained yesterday that was a

3    strategic decision on your part to reserve?

4    **A.**   Yes.

5    **Q.**   And why did you do that?

6    **A.**   Couple of reasons.  This wasn't a two-week trial

7    or a week trial.  This was expected to be, the

8    Government's case, two, three or four months.  I'm not

9    exactly sure they knew how long it was going to take.

10   In a case of this size, I did not feel comfortable

11   giving an opening statement to tell the jury what we

12   believed what the evidence would show.  I just didn't

13   think it was a wise decision.

14           Now, I'll say this, Mr. Olen, so we can move

15   this along.  Some attorneys may disagree.  And the law

16   in trying cases is not an exact science.  It's kind of

17   like an art.  So everyone has their own opinion as to

18   how to try cases.  But in that -- just so I'm clear, in

19   this situation there was a decision, which the client

20   consented to, not to give an opening statement.

21   **Q.**   And was there a second reason you mentioned?  I

22   thought you said there were two reasons.  Maybe I

23   misheard you.

24   **A.**   I'm not sure if I did.  If I did, I'd like to hear

25   it back.

1    **Q.**   Did you not think that maybe it would have helped

2    the jury to give them some idea as to what your defense

3    would be prior to listening to three months worth of

4    evidence presented by the Government?

5         MR. McADAMS:  Object to the full line of

6    questions.  He's asked.  He's given his reasons.  He

7    gave it on direct.  Mr. Caramadre testified in his own

8    testimony that he had a conversation with Mr. Lepizzera

9    and agreed they should not give an opening statement.

10   I think this is a waste of resources, judicial

11   resources.

12        THE COURT:  I'll give him a little latitude

13   here.  Go ahead.

14   **A.**   As I said, different lawyers do different things.

15   Okay?  And we made a strategic decision not to.

16   Someone else may have.  But here's part of the problem

17   because I thought this out with Mr. Traini and

18   Mr. Caramadre.  I think I alluded to this yesterday.

19   All this false information on the bond accounts, the

20   false financial information, the false trading history,

21   and to be fair I'm going to say erroneous or inaccurate

22   information, okay, no one gave me an explanation for

23   that.  So that's like the meat and potatoes of the

24   Government's case.  We didn't have an explanation for

25   that.  Why?  You can't get that from an investigator

1    who is going to interview terminally ill people.  You

2    get that from two people, Mr. Radhakrishnan and

3    Mr. Caramadre.  And no one gave me an adequate

4    explanation.

5         So that's just one example of why I wouldn't

6    give an opening statement.  And if you're going to

7    give -- because I agree.  Someone else could disagree

8    with me and say let's give an opening statement.

9    However, you would have to read all the Jencks

10   materials, all the Grand Jury testimony, all the 302s,

11   all the MOIs to make an informed decision, which I did.

12   But just one of the reasons why I didn't give an

13   opening statement is how am I going to refute, and I

14   think Mr. Vilker did cover this, I'd be surprised if he

15   didn't in his opening statement, what's our position

16   about why that erroneous information is there.  He had

17   none.  And I don't know if Mr. Radhakrishnan is going

18   to start pointing the finger at Mr. Caramadre.  I don't

19   know what Mr. Radhakrishnan is doing.  I've got a very

20   good idea what the Government is doing.

21        So for those reasons, I decided with the client

22   and Mr. Traini not to give an opening statement.  It

23   was an informed, thorough decision.

24   Q.   Well, a big part of the defense was that

25   Mr. Radhakrishnan and Mr. Caramadre had adverse

1    defenses; isn't that right?

2    **A.**   I'm not sure what Mr. Radhakrishnan was going to

3    do, to be honest with you, Mr. Olen.  That was part of

4    the problem and why we needed a severance because

5    Mr. Radhakrishnan, unlike the Government, the

6    Government's got to provide Jencks materials and all

7    this other information.  We didn't know what

8    Mr. Radhakrishnan was going to do.  Was

9    Mr. Radhakrishnan going to endorse Mr. Caramadre and

10   say, hey, by the way I didn't give false information

11   and all these people are lying?  Is he saying that, you

12   know what, I'm sorry, I didn't give full disclosure

13   because I was immature and I was shy and I was afraid

14   to talk to these people on their death beds?  Was he

15   going to say that Mr. Caramadre instructed him to lie

16   to people?  That's just the terminally ill people,

17   never mind how did the false information get on the

18   bond applications.

19        Why is it that an annuity application between

20   Raymour Radhakrishnan and Denise Egan says that their

21   relationship is "friend" when Mr. Caramadre admitted

22   that he made Mr. Radhakrishnan and Denise Egan meet in

23   a room and he said, By the way, you guys are friends

24   now and now we can put "friend" on an application?

25        There were a host of issues, 200 or 300

1    transactions.  And by the way, that's the transactions

2    themselves.  Then there's another transaction because

3    one transaction is going in and then the other one is

4    making a death claim.  So then what you do is you have

5    to take those 200 or 300 transactions and multiply it

6    times two.  This case was enormous.  Okay?  There's no

7    way -- and again, someone could disagree.  If you had

8    the case, maybe you would have given an opening

9    statement, but I'm the one that read all the Grand jury

10   materials.  I'm the one that read all the 302s and

11   MOIs.  I'm the one that met with the client and

12   discussed strategy and discussed the case.  And we,

13   that's right, we, me and Mr. Caramadre and Mr. Traini

14   made the decision not to give an opening statement.

15   Q.   Yesterday you testified that one of the reasons

16   you didn't give an opening statement was you didn't

17   want to promise the jury that Mr. Caramadre would

18   testify?

19   A.   Or make other promises that we couldn't deliver,

20   yes.

21   Q.   You certainly could have given an opening

22   statement without him needing to testify?

23   A.   I could have, Mr. Olen.  And I will stipulate that

24   another attorney may have given an opening statement.

25   I'll stipulate to it.  I was the attorney.  Not

1       Attorney John Doe down the street who didn't read all

2       the materials and who didn't communicate with the

3       client for a couple of years.  I made a conscious

4       decision.  And if you don't like it, you don't like it.

5       And if it's wrong, this Court will say it's wrong.  I'm

6       okay with it.  I'm not the decider of this case.  I'm

7       just giving you my facts.  I made a conscious decision

8       not to give an opening statement and I standby that

9       decision today.

10   **Q.**   And you would do the same thing today?

11   **A.**   I would do the same thing today.

12   **Q.**   All right.  Mr. Lepizzera, the first witness to

13   appear at trial was a video deposition of Richard

14   Wiley; is that correct?

15   **A.**   Yes.  That was the first witness by video

16   deposition.

17   **Q.**   And that video deposition was taken before he died

18   and he was deceased at the time?

19   **A.**   He did.  The Government made a motion to preserve

20   that testimony, which was granted.  There were long

21   proceedings as the Court knows in that, but yes, the

22   video deposition was played first witness.

23   **Q.**   And at the video deposition, Mr. Caramadre was

24   represented by Mr. Flanders?

25   **A.**   Yes, he was.

1    **Q.**    And Mr. Radhakrishnan by Mr. Pine?

2    **A.**    Yes.

3    **Q.**    And they conducted a cross-examination of

4    Mr. Wiley; is that correct?

5    **A.**    They did.

6         MR. OLEN:  Could I have just a moment, Judge.

7    **Q.**    That cross-examination -- and Mr. Wiley was one of

8    the terminally ill individuals who claimed not to have

9    been apprised of the true nature of his participation

10   in the investments?

11   **A.**    Yes, Mr. Olen.

12   **Q.**    Now, Mr. Pine and Mr. Flanders conducted a

13   cross-examination.  And that cross-examination raised

14   some good points for Mr. Caramadre, did it not?

15   **A.**    To be honest with you, like I said, I think it's

16   been seven months since we are on trial.  A lot has

17   left my mind.  I still have a lot in my mind.  I mean,

18   I would have to read the transcripts.  I just don't

19   recall specifically.  I recall some -- vaguely, some

20   not so great things for the defense, and I remember

21   having a conversation with Mr. Caramadre about trying

22   to strike certain things because we did have that

23   opportunity to wean down the video deposition, but I

24   just don't recall specifics.  If you have something you

25   want to put in front of me, I'll be glad to look at it.

1   **Q.**   Are you aware that the cross-examination

2   encompassed 93 pages of the transcript, so it was

3   pretty thorough.

4   **A.**   If you say it's 93 pages, I'll agree with you.

5   **Q.**   Okay.  And during the cross-examination, among

6   other things Mr. Wiley admitted that Mr. Radhakrishnan

7   told him that he needed to be matched up with someone

8   and that it was possible he actually read the

9   investment forms to him?

10  **A.**   Actually, thank you.  You just refreshed my

11  memory.  One of the good parts of that

12  cross-examination was Mr. Wiley mentioned that

13  Mr. Radhakrishnan had mentioned that he had to be

14  matched up with someone.  So that would have been

15  something to argue by the defense, yes.

16  **Q.**   And Mr. Flanders and Mr. Pine cross-examined

17  regarding the tactics that Agent McDaid employed in

18  getting Mr. Wiley to come to the conclusions that he

19  did?

20  **A.**   I don't recall specifically.  I know there was

21  something in that cross-examination of -- when I say

22  cross-examination, meaning Mr. Pine's and Mr. Flanders,

23  about Agent McDaid.  I'm not sure about Postal

24  Inspector Souza but Agent McDaid.  I think I talked

25  about it yesterday.  She came to his house.  She

1    brought cookies over.  She brought her son over at some

2    point.  I think, in fact, they talked about boats.  So

3    I know there was something about that.  I just don't

4    recall the specifics.  If I looked at the transcript

5    and read it quickly, I could tell you.  I just don't

6    recall.

7    **Q.**   Does it refresh your memory or do you recall that

8    Mr. Wiley said it was Agent McDaid who told him of the

9    illegality of his program?

10        MR. McADAMS:  I'm going to object.  The

11   testimony came in at trial.  It is what it is.  If he

12   has a question about some relevance of it to this

13   withdrawal of the guilty plea, then I think he ought to

14   get to it.  But simply to ask Mr. Lepizzera what

15   Mr. Wiley's testimony was or wasn't, frankly, it's

16   pointless.  He's not showing him a transcript.  He's

17   asking him to remember testimony that's a matter of

18   record.

19        THE COURT:  I tend to agree with that.

20        MR. OLEN:  Judge, what I'm establishing is the

21   points that with future witnesses could have been

22   brought out, and I'm going to ask it at that time.

23        THE COURT:  But if he doesn't remember the

24   details, and frankly I don't remember the details

25   either and I was presiding over the trial, of the

1    cross-examination of Mr. Flanders and Mr. Pine of

2    Mr. Wiley, a long series of questions about do you

3    remember this question or that question is not going to

4    get us anywhere.

5         MR. OLEN:  There's not going to be a long

6    series, Judge.  I'm only asking what he does remember.

7    I've got maybe three questions.

8         THE COURT:  Well, I think you need to get to

9    whatever your point is.  Go ahead.

10        MR. OLEN:  Thank you.

11   **Q.**   Did Mr. Wiley discuss the tactics employed by the

12   FBI agent?

13   **A.**   I don't know.  I'm trying to recall so I can give

14   you the testimony I can give you.

15        MR. McADAMS:  This is what I object to.

16   Mr. Wiley said what Mr. Wiley said.  And frankly, it's

17   pointless to have Mr. Lepizzera try to remember what he

18   said.

19        THE COURT:  I agree.  I think you want to get to

20   choices made by counsel with respect to

21   cross-examination strategy, so just get to it.

22        MR. OLEN:  Can I ask one question, Judge,

23   regarding if he recalls whether or not Agent McDaid

24   brought cookies to Mr. Wiley?

25        THE COURT:  I think we've already talked about

1    that.  He does recall that.

2    **Q.**   And that she brought a child along to an

3    interview?

4    **A.**   Obviously, I don't have personal knowledge of that

5    but that was alluded to in the deposition.

6         MR. McADAMS:  I object to the characterization

7    that was brought the child to an interview.  I think

8    Mr. Wiley's testimony stands on its own.

9         THE COURT:  It does.  So let's move on.

10   **A.**   Actually, I want to correct something because

11   sometimes now I realize what it is to be a witness and

12   to get lazy.  I know that there was a mention of her

13   bringing her son.  I don't know if it was an interview

14   process or not.  I know that she brought her son.  So

15   just so I'm clear.

16   **Q.**   Now, the next witness was Mr. Rodriguez?

17   **A.**   Yes.

18   **Q.**   And he was a terminally ill person who was deposed

19   through the video deposition?

20   **A.**   Yes.

21   **Q.**   But he managed to survive his illness at the time

22   of the trial.

23   **A.**   Yes.  And he testified live.

24   **Q.**   Okay.  And did you tell Mr. and Mrs. Caramadre

25   that this would be the first live witness and your

1     first real chance to get your case out there?

2     **A.**   I don't recall that, Mr. Olen.

3     **Q.**   You didn't say that?

4     **A.**   No.  I don't recall saying that.

5     **Q.**   But it was your first opportunity to directly

6     confront a witness?

7     **A.**   It was the first live witness that I got an

8     opportunity to cross-examine, yes.

9     **Q.**   Did you indicate that you were going to examine

10    him aggressively to Mr. Caramadre?

11    **A.**   I don't believe I said that.

12    **Q.**   Did you read the deposition of the video

13    deposition or see it?

14    **A.**   I watched it numerous times and I read the written

15    transcript.

16    **Q.**   And again, it was a pretty extensive

17    cross-examination by Mr. Pine and Mr. Flanders, was it

18    not?

19    **A.**   It was extensive in terms of it had some length to

20    the pages, yes.

21    **Q.**   Ninety pages of the transcript?

22    **A.**   If you say that's what it was, I'll agree with

23    you.  It went on for some bit.

24    **Q.**   Mr. Rodriguez was a terminally ill person who got

25    in touch with Raymour through a Hospice worker?

1    **A.**    I believe so.

2    **Q.**    And he received a $2,000 check from

3    Mr. Radhakrishnan?

4    **A.**    I believe he received a $2,000 -- this was part of

5    the defense, the $2,000 philanthropy check, which if it

6    was like almost all of them, it said "philanthropy" in

7    the memo section of the check, I believe he also -- at

8    least there was a $3500 check that, if it was like the

9    other ones, said in the memo section "New Account

10   Setup."

11   **Q.**    And his testimony was that he didn't realize that

12   he was involved in an investment?

13   **A.**    I believe that was the gist of his testimony, that

14   he didn't think this was an investment, yes.

15   **Q.**    Did you recall him saying that in connection with

16   Mr. Caramadre making, allegedly making a substantial

17   profit, that he said, I have a daughter, why would I

18   give him my money of death?

19   **A.**    I think what he said --

20        MR. McADAMS:  I'm going to object.  It's the

21   same objection that we had with Mr. Wiley.  The

22   testimony is what it was.  If he has a question about

23   his tactics, why he didn't cross-examine him the same

24   way Mr. Pine or Mr. Flanders did, I think we ought to

25   get there.

1          THE COURT:  Right.  I agree.  So let's get to

2     it.

3     Q.    The examination of Mr. Pine and Mr. Flanders

4     established that the -- the cross-examination

5     established that on several of the documents signed by

6     Mr. Rodriguez the words "account co-owner" appeared

7     above the signature.  Do you remember that?

8     A.    Yes.  The documents that I believe Mr. Rodriguez

9     signed, I believe it was a TD Ameritrade application,

10    if I'm remembering correctly.  And on those four to

11    seven pages, depending on if there's a margin account

12    on there, I don't recall on this one, would have been

13    TD Ameritrade, would have been co-account owner, would

14    have been account owner on those documents, yes.

15    Q.    And he testified that he had the opportunity to

16    read the document if he wanted to?

17    A.    Are you referring to the video deposition or

18    the --

19    Q.    Yes, I am.  The cross-examination of the video

20    deposition.

21    A.    I think so.

22    Q.    And that he signed a clause in the agreement

23    saying that he was of sound mind and entering the

24    agreement voluntarily?

25    A.    Can I say this, Mr. Olen, so we can move this

1    along.  I know where you're going with this.  The

2    document is a TD Ameritrade account application.

3    Mr. Rodriguez would have had to sign in numerous

4    locations on that document.  On the document says TD

5    Ameritrade.  It says co-account owner.  It says account

6    owner.  It says all those things.  Some of it is in

7    bold, your Honor.  And yes, he said those things at the

8    video deposition.  And yes, I did not cross-examine him

9    on those points.  But let me just say this.  The

10   document speaks for itself.

11        See, we're getting into this disagreement about

12   what facts need to be elicited from a witness versus

13   what inferences or things that a lawyer can argue in

14   front of a jury.  I didn't need Mr. Rodriguez, who was

15   a very powerful witness.  I wanted him off the stand.

16   I didn't need him to say those things.  Because all I

17   needed to do is pick up the documents in front of the

18   jury and say, Look, ladies and gentlemen, here's what

19   it says right above the signature, co-account owner.

20   Co-account owner.  It didn't say co-philanthropy owner.

21   It said co-account owner.  I would have argued those

22   things.  The document was admitted into evidence.  And

23   all he was going to do, if he said that, was just argue

24   because his testimony was that he did not know that

25   this was an account.

1        So I could have argued that point.  Okay?  And

2    on top of it, got to the issue of on the application

3    itself, it was clear that Mr. Radhakrishnan didn't go

4    over the whole document and a good redirect would have

5    been, which they did on direct, which is all of

6    Mr. Rodriguez's financial information and trading

7    information was false.  So you know what, I'm not going

8    to argue about a witness.  He testified he didn't know

9    what it was.  And I have now the ability and the

10   inferences to argue before that jury about what those

11   documents say.

12        So that was my strategy, so we can move this

13   along, strategy on Mr. Rodriguez.  And what I

14   established I think, and I'd have to look at the

15   transcript because I haven't, I believe I asked him the

16   question of the bond -- I forgot the name of it now,

17   but the bond contract that Mr. Caramadre had prepared

18   for the joint tenant to sign.  I also, I think with

19   him, I think, I got him to establish that

20   Mr. Radhakrishnan not only didn't explain that

21   Mr. Caramadre would get all the money in the joint

22   tenants account if Mr. Rodriguez died, but

23   Mr. Rodriguez would get all the money if Mr. Caramadre

24   died.  Mr. Radhakrishnan didn't explain that stuff.

25   But Mr. Caramadre is back at Estate Planning Resources

1    and the documents are coming back in, a contract that

2    he spent a lot of money for saying, okay, this

3    person -- Raymour's got to be at least explaining this

4    stuff because I paid a law firm to put in a contract

5    that if Mr. Caramadre dies, the joint tenant is going

6    to get the money.  So that's what I elicited from him,

7    and the rest would be for closing argument.

8         So that was my strategy.  Could someone have

9    done it differently?  Yes, they could have.

10    Mr. Flanders and Mr. Pine did it differently.  However,

11    some of the things on cross-examination that they

12    elicited, and I don't recall what it is right now, was

13    damaging because they kept -- and again, I want to make

14    this clear.  Mr. Pine and Mr. Flanders are very good

15    lawyers.  They were put in a tenuous situation of doing

16    a deposition pre-indictment, not knowing all the facts,

17    okay; and essentially, they took the strategy at that

18    point let's go hard at the witness and let's discredit

19    this witness that he's saying Raymour didn't explain

20    this stuff to him.

21         And when I viewed that video deposition numerous

22    times, it did not come Mr. Radhakrishnan explained that

23    stuff to him.  It did not come across and that was my

24    reason for my strategy.

25    Q.    There were certainly things that could not be

1    gleaned from merely holding up the application.  For

2    example, the fact that -- which Mr. Pine and

3    Mr. Flanders elicited on cross-examination.  For

4    example, that Mr. Rodriguez was not forced to sign any

5    documents and he did so voluntarily?

6    **A.**   I don't think that he testified that he was forced

7    to sign.

8    **Q.**   That he deliberately made a decision not to read

9    the forms.  He stated that he didn't read the forms.

10   Mr. Pine and Mr. Flanders established that it was his

11   decision not to read the forms.

12   **A.**   I don't remember what his direct was and what

13   Mr. Radhakrishnan may have done.  I can just tell you

14   what I recall, what I did, and why I did it; and what I

15   didn't do, and why I didn't do it.

16   **Q.**   The witness Ann Scuncio?

17   **A.**   Yes.

18   **Q.**   And Ms. Scuncio was the -- her mother was a

19   measuring life?

20   **A.**   Her mother was Pia Bernardo.  It's Pia, P-I-A.

21   **Q.**   And the crux of her testimony was that she denied

22   signing certain of the applications?

23   **A.**   As a power of attorney for her mother, yes.

24   **Q.**   Right.  And she told Raymour when he questioned

25   her that she did not give him a power of attorney.

1   **A.**   She said it emphatically.

2   **Q.**   I'm sorry?

3   **A.**   She said it emphatically.

4   **Q.**   Right.  And at that time, didn't you have the

5   power of attorney in your file, her own power of

6   attorney?

7   **A.**   Yes, I did.

8   **Q.**   Would it not have been a fruitful source of

9   examination to ask her how that power of attorney wound

10   up in your files when she said she didn't give it to

11   you?

12   **A.**   I'm glad you raised that because it's an

13   interesting issue.  We did have the power of attorney

14   in the file, and I was absolutely shocked.  I had

15   talked to Mr. Radhakrishnan beforehand who had said he

16   was going to place the power of attorney in front of

17   her.  And he didn't.  And he asked Ms. Scuncio,

18   "Mrs. Scuncio, didn't you give me a copy of the power

19   of attorney?"  She was absolutely emphatic.  I

20   shouldn't say "absolutely."  She said no.  But it was

21   emphatic.  I recall it.  I recall her making a -- I

22   recall it.  And Mr. Radhakrishnan, who said he was

23   going to plop the power of attorney in front of her,

24   didn't.  He turned around and I looked at him and he

25   just looked at me and he put his head down and he went

1    back to the table.

2         I made a strategic decision at that point not to

3    plop that power of attorney in front of her.  And I'm

4    not saying I wasn't going to in the trial, but I want

5    to explain why I didn't.  Couple of things.  One is the

6    documents that were signed, the TD Ameritrade

7    application, in my experience, a power of attorney

8    signs something like this.  For example, if Ann Scuncio

9    is signing for Pia Bernardo, which allegedly according

10   to Mr. Radhakrishnan she did, she would have signed Pia

11   Bernardo, you know, by and through Ann Scuncio, power

12   of attorney for Pia Bernardo.  Those documents didn't

13   say that, and I knew that beforehand.  But when she

14   said, "I did not give you that power of attorney," what

15   ran through my mind was, especially with all the lies

16   going on, I said to myself, Oh, my God, when did we get

17   this power of attorney.  Because I believe we did have

18   the power of attorney between her and her mother.  I

19   don't know at that point when we actually got it.  My

20   concern was this.  I go up to the podium where you're

21   standing, I get it marked as an exhibit, I plop it in

22   front of her and she says, Yeah, that's my power of

23   attorney but I never gave that to Raymour.  Now, I've

24   just jumped off the ledge and I'm free-falling.  We're

25   done.  We just embraced a potential fraud by

1    Radhakrishnan and I just embraced him.

2            So I made a decision at that point not to go

3    down that path, Mr. Olen.

4    **Q.**   Did you look at the signatures on the power of

5    attorney and on the account document?

6    **A.**   I'm sure I did, but I don't recall.

7    **Q.**   Do you recall them being similar, very similar

8    signatures?

9    **A.**   I don't recall at this point.

10   **Q.**   Did you have a handwriting expert analyze those

11   signatures?

12   **A.**   No, I did not.

13   **Q.**   And you had -- you actually asked no questions of

14   Ms. Scuncio; is that correct?

15   **A.**   I believe that's correct.  What I was going to do,

16   and we never got to it because Mr. Caramadre decided to

17   enter into plea negotiations, I was going to follow-up

18   on that issue and call her back in our direct, but

19   actually what I really should have done and we never

20   got to the point, was if I was comfortable that

21   Mr. Radhakrishnan got the power of attorney from her

22   and she had lied, I would have approached the Court

23   with the Government.  I would proffer to the Court the

24   situation I just explained now, that I believe someone

25   gave if not false testimony, misleading testimony and

1    to allow me to recall her in the Government's case and

2    cross-examine her on the point.  But we never got to

3    that point because Mr. Caramadre signed the plea.

4    **Q.**   All right.  Let me move to the actual plea itself.

5    Now, after the second day of trial, yesterday you

6    noticed that Mrs. Caramadre was in some kind of

7    distress?

8    **A.**   I'm sorry.  I just -- I dozed off for a second.

9    Could you repeat your question.

10   **Q.**   I hope I'm not that boring, Mr. Lepizzera.

11   **A.**   No.  It's the witness stand.

12   **Q.**   After the second day of trial, yesterday you

13   testified that Mrs. Caramadre was in some kind of

14   distress, appeared to be in some kind of distress.  I

15   think you said she was looking frazzled.

16   **A.**   I think it was the end of day one, which would

17   have been Tuesday, November 13th.  I think.  I think it

18   was after -- there's just so much to remember in this

19   case.  It was during the Wiley deposition, and I know

20   we had technical difficulties on the first day with the

21   Wiley deposition, and Wiley's deposition actually went

22   on to the second day.  So I'm trying to remember if it

23   happened the first or the second day.  It was

24   definitely within those two days because I don't think

25   she attended trial on Thursday or Friday.

1    **Q.**   Right.  In fact, it was Wednesday -- she was at

2    the trial on Wednesday?

3    **A.**   I think she was there Tuesday and Wednesday, yes.

4    **Q.**   In fact, apart from being frazzled, do you know

5    that Mr. Caramadre suffered some type of a serious

6    emotional breakdown?

7    **A.**   I know what was reported to me by the client.  I

8    don't know because I'm not a psychiatrist or

9    psychologist or medical doctor.  I know that she was

10   having difficulties.  What the client had reported to

11   me was that Mr. Caramadre, who is a very sweet woman,

12   she was taken back by everything.  She was here the

13   first two days, and she was crying.  She was on her

14   hands and knees, she was praying.  She was crying all

15   night and she was telling Mr. Caramadre that he's going

16   to get convicted.  I don't know.  That's what I recall.

17   That he's going to get convicted and maybe to put an

18   end to this, but I'm not positive about that last

19   point, Mr. Olen.

20   **Q.**   Well, it was Wednesday night that Mr. Caramadre

21   told you that she was very sick, after the second day

22   of trial?  Well, she was there Tuesday and Wednesday?

23   **A.**   Absolutely.  She was there Tuesday and Wednesday.

24   I know she didn't come Thursday.  She didn't come

25   Friday, and she wasn't here for the change of plea on

1    Monday either.

2    **Q.**   So it would have been Wednesday night that --

3    **A.**   But it could have been Thursday morning that he

4    told me, too.  Okay?  That's generally what he told me.

5    **Q.**   Do you recall him telling you that he might have

6    to take her to the hospital and that she was in serious

7    condition?

8    **A.**   He was very concerned for her.  He loves his wife

9    dearly.  They're very close.  He told -- I don't know

10   when he told me.  Maybe it would have been Thursday.

11   He said that she was crying hysterically and she was

12   praying on her hands and knees saying that she thinks

13   he's going to get convicted.  When he told me that,

14   because I'm friends with Mrs. Caramadre, I care about

15   her, too, I was concerned.  I don't think it was a

16   hospital.  I think he said he needed to bring her to a

17   doctor or a psychiatrist or some kind of professional

18   like that.  He did say that.

19   **Q.**   That is pretty much the exact time that

20   Mr. Caramadre brought up for the first time ever his

21   willingness to consider a plea?

22   **A.**   I know we met with him.  I think it was Wednesday

23   afternoon in the office.  We discussed a plea with him

24   because we all saw how the evidence was coming in.  I

25   didn't want him -- I think we met for a couple of hours

1    in my office, and I didn't -- he was listening, but I

2    told him to go home and to speak to his family because

3    something like this is a family decision.  And then he

4    left.  And then Thursday morning I think is when he

5    told me enter into plea negotiations and Mrs. Caramadre

6    didn't appear on Thursday.

7         So I just don't know if it was she's sick, I

8    have to plea.  But he definitely told me -- I think he

9    told me on Thursday morning that he wanted to enter in

10   plea negotiations, and he would have told me on

11   Thursday morning that his wife was sick.  So I don't

12   know if it was the same conversation, but he definitely

13   told me both those on that day.

14   **Q.**    Right around the same time?

15   **A.**    Yeah, I would agree with that.

16   **Q.**    And did he tell you that the primary reason for,

17   one of his major reasons for this complete reversal of

18   form was his wife's health?

19   **A.**    He said that he needs to put this behind him, his

20   wife -- he needs to put this behind him for his wife

21   and his family, that she was sick and he was concerned

22   for her.  I'm trying to think what else he said.

23   There's just so many conversations.  That's what he

24   told me.

25   **Q.**    So the answer is yes?

1    **A.**    He said he wanted to end this for his wife and his

2    family.  He did say that.

3    **Q.**    Okay.  On Thursday and Friday, Mrs. Caramadre did

4    not show up at the trial?

5    **A.**    Correct.

6    **Q.**    And you said she did not show up for the change of

7    plea hearing on Monday?

8    **A.**    Correct.

9    **Q.**    At that time, you and Mr. Traini were initiating

10   negotiations with the Government?

11   **A.**    Correct.

12   **Q.**    Now, up to that point, had Mr. Caramadre ever told

13   you that he was guilty of anything, any criminal

14   conduct?

15   **A.**    We need to be careful though when you use the word

16   "guilty," because the client made numerous admissions

17   to me.

18   **Q.**    Well, did he ever use the word "guilty"?  Did he

19   ever say, I'm guilty of this or guilty or that?

20   **A.**    No.  In fact, he would ask me, Mike, do you think

21   I'm guilty?  And he'd ask me that all the time.  And I

22   think that's inappropriate for a defense lawyer to say,

23   Yeah, you're guilty so plead guilty.

24         I think what's appropriate is for a lawyer to

25   say, Here's the evidence.  Here's what happens at

1    trial.  Here's the Government's proof.  Here's the

2    statutory elements.  Here's what they need to prove.

3    And here's some likely consequences or possibilities

4    what happen at trial.  And I would tell him that all

5    the time because I think he respected my opinion, and I

6    think he enjoyed our friendship and he wanted to know

7    whether I thought he was guilty.  And I kept on telling

8    him it's not my job.  It's not my answer.  That's the

9    jury's job to say whether you're guilty or not.  I can

10   only advise you, you know, as to what I think is going

11   to happen at trial.  He said it on November 19th,

12   Mr. Olen, but he never told me, "By the way, I'm

13   guilty" during the course of the representation.

14   **Q.**   Ever?

15   **A.**   I don't think he ever said that.  But he made

16   admissions about facts, which he didn't think were

17   important to whether or not he was guilty.  But some of

18   the facts he was admitting to would basically

19   equivocate would constitute guilt, but he would never

20   use the word "guilty."  I would agree with that.

21   **Q.**   Okay.  When you say he made admissions, that's

22   your interpretation of what they are, that they were

23   admissions?  He didn't think they were admissions

24   because he thought it was okay to do what he was doing?

25   **A.**   I can't say what he thought but some of these

1    admissions, like Robert Mizzoni on a mock

2    cross-examination, the issue on that was that

3    Mr. Mizzoni's address, and he was the annuitant, I

4    think Mrs. Caramadre was the owner on that small -- it

5    was a $10,000 policy that issued in April 2004.  The

6    issue in that case, one of the issues was that

7    Mr. Mizzoni's address was not put on the application.

8    In fact, it was actually crossed out.  Mr. Caramadre's

9    parents' home address was used as Mr. Mizzoni's

10   address.  And that was important because that was a

11   pre-Raymour transaction because it happened in April

12   2004, because one of the allegations by the Government

13   was you're putting down wrong addresses for these

14   people so they don't receive any materials so they

15   don't know what was going on.  That was the allegation.

16        And I did a mock cross-examination with

17   Mr. Caramadre on, you know, why is that address being

18   used?  He first told me that, well, Mr. Mizzoni moved

19   around a lot and I was afraid that he wouldn't get the

20   information.  I did a cross-examination.  I said,

21   Really.  How many times did he move?  What's his

22   different house locations?  He didn't have any.

23        Then he said, Well, sometimes I would send my

24   clients' information to my parents' address.  And then

25   I said to him on mock cross-examination, Okay.  Tell me

1    the names of the other clients.  Why would you do that?

2    You were at 400 Reservoir Avenue, Providence, Rhode

3    Island at the time.  Why wouldn't you at least put that

4    address?  Why wouldn't you send it to your home

5    address?  I was really annoying him because he would

6    get upset with me because I would be getting into what

7    he would call minutia but what I would call are serious

8    relevant facts.  And I got him so under -- he was so

9    upset with me he turned around and said, You know what,

10   Mike, it doesn't matter.  Okay.  I needed a neutral

11   address to put down on the application.  That's why I

12   did it.

13         That, Mr. Olen, if you knew the whole case would

14   be a glaring admission, a glaring admission pre-2007,

15   pre-Raymour that the Defendant was using other

16   addresses so the insurance companies wouldn't be able

17   to say, Boy, this annuitant is -- this annuitant and

18   this owner aren't related.  This is a stranger-related

19   annuitant transaction.  What's going on?  Those are the

20   kind of admissions I'm talking about.

21         So he would say it wouldn't matter and I agree,

22   okay, but it would matter because if he took the stand

23   and the Government ever got that information, it would

24   be damaging.  It would be absolutely damaging.  Okay?

25   Those are the facts.  And that's why I don't want to be

1      testifying here today and why I didn't want this motion

2      filed because now all of this is out.

3      **Q.**   As I said, Mr. Lepizzera, it's your interpretation

4      that it was an admission, not Mr. Caramadre's?

5            MR. McADAMS:  Objection.  Asked and answered.

6      We just had a lengthy response to that question.

7            MR. OLEN:  I think he has answered the question.

8      It's a simple yes or no.

9            THE COURT:  He has.  Ask another question.

10     **Q.**   Okay.  During the course of the pre-negotiations,

11     Mr. Lepizzera, you intentionally kept Mr. Caramadre out

12     of the loop while you were negotiating the plea

13     agreement?

14     **A.**   No.  But if I could speed things up, I think

15     you're going to be referring to an e-mail that I wrote

16     to Mr. Thompson and Mr. Traini that says -- again,

17     there are thousands of e-mails so --

18           THE COURT:  Well, Mr. Lepizzera, let him ask the

19     question.

20           THE WITNESS:  I'm sorry.

21     **A.**   I did not present the written form of the

22     statement of facts in the plea agreement to the client

23     right away.  I was negotiating them.  I spoke to him

24     orally about it, but I didn't give him the documents

25     because it was during the weekend, things were

1    happening fast. And what I didn't want to do was sit

2    down with the client for two or three hours, because

3    our meetings would be two or three hours, and go over

4    all the documents, then go back to my house or my

5    office, then talk to Mr. Vilker. We didn't have time

6    for that stuff.

7         So he did not see the statement of facts and the

8    plea agreement until Sunday night when Mr. Traini and I

9    met with him.

10   **Q.**  What you didn't want to do was have anything upset

11   this plea deal. That was your primary concern, wasn't

12   it? You didn't want anything to ruin this deal?

13   **A.**  No. Mr. Caramadre needed to make a final

14   decision. And I wanted to get the statement of facts,

15   as I testified to yesterday, and the plea agreement,

16   more the statement of facts because the plea agreement

17   is the plea agreement, watered down as much as I could

18   so Mr. Caramadre could at least hold his head up as

19   high as he could because he was going to leave this

20   building convicted.

21   **Q.**  Do you recall receiving an e-mail on November

22   17 --

23         MR. OLEN: This is K, your Honor, please.

24         THE COURT: Is there any objection to K?

25         MR. McADAMS: No objection.

1     THE COURT:  K is full.

2     (Defendant's Exhibit K admitted in full.)

3  **Q.**  Now, on November 17th, from Mr. Traini regarding

4  the plea, preparation of the plea agreement, Okay, I

5  think we need to send it to Lee after Olin, Olin

6  Thompson, approves it and avoid putting this in front

7  of Joe at this moment.  Joe suffers from sleep apnea,

8  among other things.  I want to send this to Lee as

9  early as possible this morning.  And if I send this to

10 Joe in the morning when he is not alert, it will throw

11 him and this process in the wrong direction.

12 **A.**  Yes, I wrote that.

13 **Q.**  Does that not refer to this process to the process

14 of getting the plea agreement done?

15 **A.**  Yes, it does.  But the e-mail was sent at 6:53

16 a.m. in the morning.  I started work Saturday morning

17 about approximately 5:00 or 5:15, working on what I was

18 trying to -- where I wanted to try to get the

19 Government to go.  And I sent that e-mail, I think, I

20 don't have it in front of me right now, it's 6:53 a.m.

21     I know that Mr. Caramadre suffers from sleep

22 apnea , at least that's what he reported to me and I

23 believe him with that.  And Mr. Caramadre would not be

24 upset but I would work late hours and I would send him

25 e-mails as reminders at one or two o'clock in the

1    morning.  And it would throw him off.  He would tell

2    me, Mike, you're sending me alarming e-mails.  So I

3    decided not to do that because I know that he has

4    trouble sleeping and I didn't want to send him an

5    e-mail at 6:53 in the morning.  That's why I wrote

6    that.

7    **Q.**   Well, it would throw him off and it would also

8    potentially throw the deal off, wouldn't it,

9    Mr. Lepizzera?

10   **A.**   I think I wrote "Throw the whole process off."

11   **Q.**   The process of working out a plea agreement?

12   **A.**   Yes, that's what I wrote.

13   **Q.**   Okay.  Now, Sunday night there was a meeting

14   around, somewhere around 7:00 p.m. at Mr. Caramadre's

15   house?

16   **A.**   I don't know the exact time, but it was in the

17   evening, Mr. Olen.

18   **Q.**   And present at that meeting were yourself,

19   Mr. Traini, Mr. Caramadre and his wife?

20   **A.**   Yes.

21   **Q.**   And that's the first time Mr. Caramadre actually

22   saw the plea agreement and statement of facts?

23   **A.**   The written version, yes.

24   **Q.**   Right.  Okay.

25        How was Mrs. Caramadre that night?  How did she

1    look that night?

2    **A.** I felt bad for Paula, Mrs. Caramadre. She was

3    sitting next to Mr. Caramadre, and she was very quiet.

4    She was fragile. I would describe her as fragile. I

5    think she had a Kleenex. She wasn't crying

6    hysterically or anything, but during the course of the

7    meeting she had tears coming down her cheek and her

8    eyes, and she would be wiping them away. She was

9    mostly quiet. She asked a couple of questions, but

10    otherwise she was just listening. She was sad. She

11    was very sad.

12    **Q.** She was there, she was witnessing the --

13    **A.** She was there for the entire meeting, yes.

14    **Q.** Can you characterize Mr. Caramadre's condition

15    that night?

16    **A.** His condition? I can only tell you what I

17    observed of Mr. Caramadre. He was sitting across from

18    me. Mr. Traini was seated at the head of the table.

19    Mr. Caramadre and Mrs. Caramadre were sitting on one

20    side. I was on the other across from Mr. Caramadre.

21    He was demur. He was quiet. He was down. This was a

22    long battle for Mr. Caramadre, and we were sitting

23    there talking about finalizing a plea agreement. So he

24    was down.

25    **Q.** Depressed?

1    **A.**   I guess you could say he was depressed.

2    **Q.**   But you knew that Mr. Caramadre suffered for years

3    from serious depression.  You did know that, did you

4    not?

5    **A.**   Yes.

6    **Q.**   In fact, you were familiar with the state of his

7    mental health in that regard?

8    **A.**   Just so I'm clear, I'm not a medical professional.

9    **Q.**   I understand.

10   **A.**   I know that Mr. Caramadre talked about his

11   depression, told me about his problems.  I know that.

12   I've talked to Dr. Xavier.  I'm trying to think of her

13   name now.  Dr. Zlotnick I've talked to.  In fact, I met

14   her once.  So yes, I know that Mr. Caramadre has

15   suffered from depression.  I just don't understand --

16   it's a complicated issue, depression.

17   **Q.**   Yes.  But over the course of your representation,

18   there's scores of e-mails where Mr. Caramadre says, I'm

19   really depressed today, I can't go to meet you.

20   Speaking about his severe depression over and over

21   again; is that a fair statement?

22   **A.**   I don't know how many e-mails there are, but there

23   are e-mails where he would say, I'm too depressed today

24   or I'm too sad to meet with you today, because I was

25   kind of pressing him at times to meet with me and talk

1  about the case, the real facts of the case.  But he did

2  write to me on occasion with that.

3  **Q.**   Were you aware Mr. Caramadre had undergone a

4  transcranial magnetic stimulation procedure?

5  **A.**   I know he told me that, and again, I'm not very

6  good with medical terms.  And something about being hit

7  over the head, wearing a helmet.  I know he reported

8  some treatment, something that sounds similar to that,

9  Mr. Olen.

10  **Q.**   Did he report that it was a treatment for severe

11  depression for treatment resistant depression?  Did he

12  make you aware of that?

13  **A.**   I'm not sure.

14  **Q.**   But you knew it was a very serious procedure, that

15  he had something like shock treatment.  Was that your

16  understanding?

17  **A.**   That's what he reported to me.  I don't know when

18  that happened, what year that happened, but he did

19  report that to me.

20  **Q.**   So on Sunday night after four years,

21  Mr. Caramadre's raison d'être was to proclaim his

22  innocence pretty much.  Would you agree with that?

23  **A.**   Sorry?

24  **Q.**   For the four years you were involved with

25  Mr. Caramadre, his raison d'être was to proclaim his

1    innocence; is that a fair statement?

2    **A.**    So we're clear, yeah, he would do that just like

3    he's doing it now, but I need to say that he's also

4    making, when I'm having these meetings with him,

5    admissions to me about certain facts.  He would say,

6    well, don't worry, it doesn't matter, you worry too

7    much.  But yes, he would say -- he never used the word

8    "guilty," and he would profess his innocence.

9    **Q.**    So on Sunday night, he had seen his wife in the

10   last few days suffer a nervous breakdown or what we're

11   calling a breakdown?

12   **A.**    I don't know if she had a nervous breakdown.  I

13   know she was very sad or what was reported to me

14   because I didn't personally observe her other than the

15   Sunday night.  I know he reported to me.  So whatever

16   was happening in the house, Mr. Caramadre lives in the

17   house with his family.  He's very close with his

18   family.  They have a great unity, the family.  So

19   whatever happened he observed.  I don't know what

20   happened in the house.

21   **Q.**    He had just experienced what has been described as

22   a train wreck of a trial?

23   **A.**    No.  The first time I ever heard train wreck of a

24   trial was when I saw it in the newspaper.  I have never

25   heard that term "train wreck of a trial" beforehand.

1    In fact, I was shocked.  So no, I don't agree with

2    that.

3    **Q.**   You wouldn't characterize it as a train wreck, the

4    trial?

5    **A.**   What I would describe it as is exactly what --

6    what I would describe it as is the Government putting

7    on its case in the first four days of a three- or

8    four-month trial.  And as I told Mrs. Caramadre and

9    Mr. Caramadre, trials, especially a three- to

10    four-month trial is going to be a roller coaster.  And

11    while the Government is putting their case up, there's

12    going to be more downs than ups.  And the first four

13    days, it was difficult.  The Government put on a very

14    good case.

15        By the way, I want to say this.  Train wreck, I

16    disagree with that statement because on Friday, I think

17    there were five witnesses, and I'd have to look at the

18    Court docket.  On Friday, Mr. Caramadre was ecstatic.

19    He basically said, We went five for five.  Those were

20    the five best witnesses and Mike just mowed them down.

21    I don't know if the "mowed down" but just -- those are

22    my words.  I don't want to put words in his mouth.

23    Mike mowed them down.  Mike did a terrific job on

24    cross-examination.  This is great.  That was the last

25    day of actual trial testimony.  So I never heard "train

1    wreck" until I read it in the newspaper.

2    **Q.**    Regardless.  It went badly; it went very badly?

3    **A.**    The evidence came in that came in.  In my opinion,

4    I was advising the client to plea because I thought the

5    evidence was going to result in a guilty verdict.  In

6    my opinion, the sooner a plea was entered, the more

7    beneficial it would be for the Defendant.

8    **Q.**    By Friday when there was a vigorous

9    cross-examination and the things did go well on Friday,

10   the horse was pretty much out of the barn by that

11   point, wasn't it, Mr. Lepizzera?

12   **A.**    The horse was out of the barn?

13   **Q.**    Did you think that the jurors had pretty much made

14   up their mind at that point?

15   **A.**    How would I know if the jurors had made up their

16   mind?

17   **Q.**    I'm asking you for your opinion.

18   **A.**    How am I supposed to know the jurors made up their

19   mind?  In fact, the Judge gives instructions they're

20   not supposed to deliberate, they're not supposed to

21   form any opinions or conclusions.

22         So -- but I'll say this, Mr. Olen.  The evidence

23   was overwhelming.  Even on some very good points that I

24   made on Friday on cross-examination, you still get into

25   why is the false information on the bond accounts.  Why

1    is there on annuity applications relationship of

2    friend.  I knew that Mr. Maggiacomo was going to

3    testify at some point, and there were admissions in

4    terms of Mr. Caramadre acknowledging about what he may

5    have instructed Mr. Maggiacomo to tell the insurance

6    company.

7            So I knew -- the decision to plea wasn't just

8    what happened on the four days of trial.  It also had

9    to do with what was expected to come in over the next

10   two or three months.  And that's what a good lawyer who

11   is informing the client makes a decision on whether to

12   plea.  Not on, boy, this four days was very difficult.

13   Of course that factors in.  But what also factors in is

14   what's coming down the pike, which was more damaging

15   evidence.

16   **Q.**   So on Sunday night, his wife had been ill.  His

17   trial had not been going well at that point.  In fact,

18   Mr. Caramadre was so distraught on Sunday night that he

19   couldn't even read the plea agreement; isn't that true?

20   **A.**   I don't agree with that.

21   **Q.**   Well, did he read the plea agreement himself, or

22   did Mr. Traini read it to him?

23   **A.**   Here's what I recall.  As I said, I live down the

24   street from Mr. Caramadre.  Mr. Traini came to my

25   house.  I printed out multiple copies of the plea

1    agreement and the statement of facts because it has

2    always been my course of conduct in reviewing a plea

3    agreement or statement of facts to put the documents in

4    front of the client because you shouldn't just be

5    reading it; it should be in front of them.  What I did

6    was I put it in a folder.  We went there.  Mr. Traini

7    gave Mr. Caramadre a plea agreement.  He gave him a

8    statement of facts.  I had them in front of me.

9    Mr. Traini had it in front of him, and then Mr. Traini

10   read the document and would pause and give a summary,

11   and Mr. Caramadre had it in front of him.

12        I know -- it's tough being a witness.

13   Mr. Caramadre definitely had the documents in front of

14   him.  They were multiple pages.  I know he was flipping

15   through the documents.  Whether he was specifically

16   reading them, he was looking at the page, but whether I

17   can say he was reading them, he didn't read them out

18   loud but he had the documents in front of him and

19   Mr. Traini explained them.

20   **Q.**   Mr. Traini read them out loud?

21   **A.**   Yes.  Mr. Traini read them out loud.  Yes.

22   **Q.**   Over the years you had had some discussions with

23   his psychiatrist, had you not?

24   **A.**   Yes.

25   **Q.**   Dr. Zlotnick and Dr. Xavier?

1    **A.**    Yes.

2    **Q.**    And you had those discussions, I presume, because

3    you had concerns about his mental health?

4    **A.**    I did.

5    **Q.**    So on Sunday night there was this momentous

6    occasion where Mr. Caramadre's after four years of

7    almost obsessively stating he was innocent turned

8    himself inside out and said I'm going to sign this plea

9    agreement and sign this statement of facts?

10   **A.**    I have to go back to the e-mails.  Mr. Caramadre

11   gave me the final okay I think on Friday night.  I

12   believe there's an e-mail from me to Mr. Vilker at

13   approximately 9:47 p.m., but in that range.  I sent him

14   an e-mail saying my client is willing to enter into a

15   plea agreement, here's the terms.

16           And I know that I had a phone conversation with

17   Mr. Caramadre before sending that out because I would

18   never send a confirming e-mail that Mr. Caramadre is

19   going to enter a plea agreement without having a

20   conversation with the client.  So he made a decision to

21   plea at least as early as Friday night.  But Sunday

22   night is when the documents are first presented to him,

23   and he's going to sign them.  He didn't sign the

24   documents that night, though, because they weren't in

25   final form.

1  **Q.**   Well, you had reached out to his doctors in the

2  past?

3  **A.**   Yes.

4  **Q.**   During this momentous occasion, did it occur to

5  you maybe I should reach out to them?

6  **A.**   No.

7  **Q.**   Never did?

8  **A.**   No, it didn't.

9  **Q.**   Now, you're aware of the affidavits that they have

10  submitted in this motion to withdraw the guilty plea?

11  You've read them?

12  **A.**   Mr. Olen, I did read them.  I don't recall what

13  they say, but I did read them at some point.

14  **Q.**   Pretty much they say they were absolutely shocked

15  by his decision to do this.  Is that a fair statement?

16  **A.**   I don't recall what the statements say.

17       MR. OLEN:  This is L, please.

18       THE COURT:  Any objection to L?

19       MR. McADAMS:  No objection, your Honor.

20       (Defendant's Exhibit L admitted in full.)

21  **Q.**   It's an e-mail sent from Mr. Caramadre to you and

22  Mr. Traini?

23  **A.**   That's correct.

24  **Q.**   You've seen that before.  "Mike, what about an

25  Alford plea.  This would eliminate me needing to lie."

1    Do you recall getting that?

2    **A.**   Yes.

3    **Q.**   So he's telling you there that he's going to lie,

4    presumably at the plea colloquy?

5    **A.**   He's saying he's going to lie, but as I went over,

6    and I don't think I discussed everything that he said

7    to me, but the crux of it is I think he's lying when

8    he's saying he's going to need to lie because he's made

9    these what I call glaring admissions, which

10   substantiate the crimes charged in the indictment.

11       So he does say that, but I just don't understand

12   it because, again, as I gave the example yesterday, if

13   a client is charged with a murder in Rhode Island,

14   doing the actual murder and he's in California and he's

15   saying, Look, I was in California but I'm going to take

16   the rap for the murder charge in Rhode Island when I

17   wasn't even in Rhode Island, I think there would be an

18   issue.  There would be a serious issue for an attorney

19   to say, yeah, just go out and lie and don't worry about

20   it.  That's a problem.  But he's admitting all these

21   other facts that we discussed here, which we shouldn't

22   be discussing here but we are because you brought this

23   motion forward.

24       So this doesn't mean anything to me.  It really

25   doesn't.  And it's ultimately his decision whether he

1   wants to plea or not.  If he wanted to keep on going on

2   with trial, we were prepared to go on with trial and we

3   would see the thing through.  I don't think that would

4   have been in his best interest.  It would have been a

5   horrible decision, but it's his decision just like it

6   was his decision to plea, which he did.

7   **Q.**   Regardless of whether or not you think he's lying

8   in that e-mail, he is telling you in that e-mail that

9   "I will be lying"?

10  **A.**   He's saying it, yes.  That's what he puts in his

11  e-mail.

12  **Q.**   And he's unequivocal about that; is he not?  Has

13  he ever said anything contrary to that to you that --

14  **A.**   We talked about all these admissions that he made,

15  so the document speaks for itself.  He says, "This

16  would eliminate me needing to lie."  It says what it

17  says.

18  **Q.**   And you responded to him, if I recall from your

19  testimony yesterday, that "We can't tell you to lie"?

20  **A.**   Yes.  Absolutely we can't do that.

21  **Q.**   Well, he probably knew that already.  Don't you

22  think?  He is a lawyer.  He probably knows that he's

23  not supposed to commit perjury.

24  **A.**   You know what, I don't know what's in his mind,

25  but I'm going to say this so we can move this along.

1    He's a very smart man.  He's an attorney and he knows

2    and I told him in a plea hearing in Federal Court,

3    because some courts are different, you're sworn under

4    oath.  So he knew that.  So he knew what he knew.

5    **Q.**    So what was left with you based on what he told

6    you is that he was going to lie at the plea colloquy?

7    **A.**    No.  Because the last communication that we had

8    with him was -- would have been in the conference room

9    in this courthouse after we met with Judge Smith at

10   that 8:30 conference, which I think started a little

11   later, where Judge Smith approved the plea documents.

12   I got a copy of the signed plea documents, because I

13   think the Government's documents were already signed.

14   I got those from, I think, Mr. McAdams.  We brought

15   them into the conference room.  We went over the

16   documents, although not as thoroughly as we did Sunday

17   night.  And Mr. Caramadre signed the November 19th,

18   2012, letter that Mr. Traini had drafted authorizing

19   the plea negotiations and withdrawing his September 13,

20   2012, letter that he signed saying not to enter plea

21   negotiations.  He signed the plea agreement, and he

22   signed the statement of facts.  He did not at any time

23   in that conference room say, Well, I'm going to lie.

24   That never came out.

25   **Q.**    That's Monday?

1    **A.**    That's Monday.

2    **Q.**    But he told you that Sunday.

3    **A.**    Sunday he made -- again, I don't want to put words

4    in his mouth.  He made this flippant remark, what I

5    would describe as a flippant remark and says, Oh, I

6    guess I'm just going to have to lie.  And then

7    Mr. Traini addressed that.  And I believe, my

8    recollection is and I don't remember, I'm not a

9    stenographer so I don't have a complete record of what

10   was said that night, then the conversation ended about

11   this lying.  He didn't then get into this huge

12   argument, I can't do this, or this would be wrong, I

13   refuse to do that.  He made a flippant remark; it got

14   addressed, and that was the end of it.  And then we

15   left, and I told Mr. Caramadre and Mrs. Caramadre what

16   I was going to do next, which was communicate to the

17   Court that Mr. Caramadre was going to plea and we told

18   them about what the process was the next morning.

19   That's what happened.  He never said after that, Oh, I

20   guess I'm going to have to lie.  He never mentioned it

21   again.

22   **Q.**    He put it in writing on Saturday?

23   **A.**    That was Saturday.

24   **Q.**    Then he stated it again on Sunday.

25   **A.**    He did make a comment on Sunday.

1    **Q.**   Why do you think that's a flippant remark?  It's a

2    pretty serious issue, isn't it?  I'm going to lie under

3    oath tomorrow?

4    **A.**   I didn't believe him, because I had the facts that

5    I had.  I didn't believe him.

6    **Q.**   I don't really think it matters what you believe.

7    He's telling you that he's going to lie under oath.

8         MR. McADAMS:  Objection.  Argumentative.

9         THE COURT:  Sustained.  What's the Bates number

10   on this?  I know it's Exhibit L.  What's the Bates

11   number, though.

12        MR. OLEN:  177.

13        THE COURT:  All right.  I think this would be a

14   good time to break for lunch, and we'll do that and

15   we'll reconvene at 1:30.

16        And over the lunch hour, I would appreciate it

17   if you would review those documents I gave to you.

18        MR. GERSTEIN:  I will.

19        THE COURT:  We can go off the record now.

20        (Discussion off the record.)

21        (Lunch recess.)

22        THE COURT:  All right.  Mr. Olen, are you ready

23   to proceed?

24        MR. OLEN:  Thank you, your Honor.

25        THE COURT:  Before we get started, Mr. Gerstein,

1    could I just ask you have you had a chance to review

2    that packet of documents that I gave to you.

3         MR. GERSTEIN:  I have reviewed them and of

4    course I have some comments, objections.

5         THE COURT:  All right.  Maybe what we'll do is

6    we'll get to the end of the day today, we probably can

7    take it up that way.  All right.

8         Go ahead.

9         MR. OLEN:  Thank you, your Honor.

10   **Q.**   When we left off, Mr. Lepizzera, I think I was

11   saying notwithstanding your opinion that Mr. Caramadre

12   might have been lying, he did tell you that he was

13   going to be lying on Monday?

14   **A.**   I just want to make sure, are we referring to the

15   Saturday night e-mail, Mr. Olen?

16   **Q.**   Yes.

17   **A.**   Yes, he wrote that in an e-mail.

18        MR. OLEN:  This is M, please.

19        MR. McADAMS:  No objection.

20        THE COURT:  M will be full.

21        (Defendant's Exhibit M admitted in full.)

22   **Q.**   After you received that e-mail from Mr. Caramadre

23   asking about an <u>Alford</u> plea and saying that he was

24   going to be lying, on that Saturday at 5:38 p.m., you

25   were sending an e-mail to the Judge in which you say in

1    the last paragraph, Defense counsel will obviously take

2    whatever steps necessary with their clients to ensure

3    to the best of our ability that the claim is truly --

4    that the client, excuse me, is truly willing to enter a

5    knowing, voluntary and intelligent plea.

6         Well, at the time that you made that statement

7    and sent that e-mail, Mr. Caramadre was telling you

8    that he was going to be lying on Monday?

9         MR. McADAMS:  I object.  He should show this

10   document to the witness.

11        THE COURT:  Show him the entire document.

12        Mr. Olen, I want to give you all the latitude

13   you wish to have in terms of your examination, but you

14   should keep in mind that I have a lot of knowledge

15   about what was transpiring during this course.  That's

16   an e-mail to me and the context of that e-mail is all

17   of the discussions that led up to it being sent.  So

18   you ought to just consider that.  I'm sure

19   Mr. Lepizzera can testify to that context, but go

20   ahead.

21   **A.**   I'm looking at this e-mail, and it's involving

22   string e-mails.  And what I believe, Mr. Olen, and I

23   could be wrong.  I need to see -- I don't know if this

24   printed out wrong, but I'm taking a look at this.  I

25   sent an e-mail to Judge Smith but on this e-mail it

1   doesn't say the time that I sent it to Judge Smith on

2   Saturday.  However, that being said, Mr. Traini is

3   sending an e-mail back to me saying, Nice job with the

4   Judge.  And Mr. Traini's e-mail to me is Saturday,

5   November 17th, 2012, at 5:38 p.m.  And Mr. Caramadre's

6   e-mail to me about -- where he states, Mike, what about

7   an _Alford_ plea.  This would eliminate me needing to

8   lie.  I don't need an answer tonight, Regards, Joe --

9   is dated Saturday, November 17th, 2012, at 8:39 p.m.

10          So again, I don't have the date and time or the

11   time that on this particular piece of paper that I sent

12   the e-mail to Judge Smith.  But if Mr. Traini is

13   responding to my e-mail at 5:38 p.m., that means my

14   e-mail to Judge Smith would have been before 5:38 p.m.

15   and clearly well before 8:39 p.m. e-mail where

16   Mr. Caramadre sent me this _Alford_ plea e-mail.

17   **Q.**   Clearly, Mr. Caramadre had told you before that,

18   before this time that he was entertaining the thought

19   of lying on Monday?

20   **A.**   No.

21   **Q.**   I guess what I'm trying to establish,

22   Mr. Lepizzera, is do you believe that if Mr. Caramadre

23   thought he was lying on Monday, could his plea be

24   knowing, voluntary and intelligent?

25          MR. McADAMS:  Objection.  That's a legal

1    conclusion.

2            THE COURT:   Rephrase your question.

3    **Q.**   If Mr. Caramadre was lying when he admitted to the

4    statement of facts on Monday, do you believe that that

5    would constitute a knowing and intelligent and

6    voluntary plea?

7    **A.**   You're talking about Mr. Caramadre's state of

8    mind, right?

9    **Q.**   Yes.

10   **A.**   I just want to get your question right.   If

11   Mr.Caramadre believes he's lying to the Judge on

12   November 19th, your question is would that be a

13   knowing, voluntary and intelligent plea?

14   **Q.**   Yes.

15           MR. McADAMS:   Your Honor, I object.   The First

16   Circuit has an analysis to determine whether something

17   is a knowing, voluntary and intelligent plea, not what

18   Mr. Lepizzera's personal opinion is about it.   I mean,

19   he's asking him to legally conclude whether or not

20   what's going on in Mr. Caramadre's mind at the time,

21   being the sole factor, would determine the legal effect

22   of him going through a plea.   The whole purpose of

23   these proceedings that we've been engaged in for almost

24   a month now are to determine that question, not what

25   Mr. Lepizzera's personal view is of it now sitting in

1    the witness box.

2          THE COURT:  I agree with that, so I'll sustain

3    the objection.  I'm not going to restate what

4    Mr. McAdams just said but he said it just right.

5    That's a legal conclusion for me to reach.  You may be

6    able to ask him other questions about whether it would

7    have been appropriate to go forward with a plea if he

8    knew that the client was going to lie, but that's I

9    don't think what occurred here but that might be an

10   area you could examine.

11   **Q.**   Mr. Lepizzera, the last word you got on the

12   subject from Mr. Caramadre was that he was going to lie

13   on Monday.  He didn't say anything to contradict that?

14   **A.**   The last word?

15   **Q.**   On Sunday.

16   **A.**   No.  That wasn't the last word.  He made what I

17   referred to as a flippant comment so he made that

18   comment or something to that effect.  Again, I don't

19   know the exact words.  It's unfair to put words in

20   Mr. Caramadre's mouth, but he said something to that

21   effect.  Mr. Traini addressed it.  The meeting went on,

22   and then he didn't make any other statements about

23   lying.  And then I think my only -- my participation in

24   the meeting because Mr. Traini ran most of the meeting

25   was to let the client know, which is what attorneys

1    need to do, is here's the process.  I'm going to go

2    back home.  I'm going to send a communication to Judge

3    Smith that I had promised to do either way, whether he

4    was going to plea or not.  I was going to send a

5    communication to Judge Smith, which I did, letting the

6    Court know that Mr. Caramadre was going to enter a plea

7    along with Mr. Radhakrishnan and then what would take

8    place the next day.  So that's how the meeting

9    concluded that I recall.

10   Q.    Well, he didn't say anything contrary to him

11   saying that he was going to lie on Monday?  In other

12   words, he left everyone with the impression that, I'm

13   going to lie on Monday.  He didn't say anything to

14   contradict that?

15   A.    Mr. Traini addressed it.  He didn't raise the

16   issue.  In fact, we left the meeting that he was

17   willing to enter in a plea.  That's where we left off

18   with.  That's where the meeting left off with.

19   Q.    Right.  But he didn't ever say anything to

20   contradict what he said about lying on Monday?

21   A.    He said that he was willing to enter into a plea.

22   Q.    Is that a yes?  Did he contradict himself?  Did he

23   ever take that back, that I'm going to lie?

24   A.    Did he contradict himself saying that -- meaning,

25   did he say he wasn't going to lie?

1    **Q.**   Or that he would not be lying.  Did he ever say he

2    would not be lying on Monday?

3    **A.**   On Sunday night I don't believe he ever said those

4    words.  You recall, his wife is there so no, I don't

5    believe he said that.

6    **Q.**   Okay.  Now, when this was discussed on Sunday

7    night, you said that -- I think your words yesterday

8    were Mr. Traini jumped in right away to discuss this

9    issue with Mr. Caramadre?

10   **A.**   Yes.  He reacted to the comment.

11   **Q.**   And I believe you said that Mr. Traini said in

12   response to this issue that you might think you are

13   lying now, but tomorrow it will be different.

14   **A.**   I don't remember exactly what I said yesterday.  I

15   think I said -- I don't want to put words in

16   Mr. Traini's mouth.  I think he said something to the

17   effect of, you know, today you're saying you're

18   lying -- I don't recall the exact words, but I'm

19   paraphrasing.  You can't lie.  You're going to be under

20   oath.  And today you might say you're lying but

21   tomorrow when you're under oath, you'll be telling the

22   truth.  Or something to that effect.

23   **Q.**   Okay.  So despite four years of proclaiming his

24   innocence, repeatedly saying that he was going to have

25   to lie on Monday, he was going to have this magic Perry

1    Mason moment on Monday that all this innocence is going

2    out the window and he's guilty now even though he's

3    saying he was innocent, told you guys he was innocent

4    on Sunday night?

5    **A.**    I think I went over this, Mr. Olen.  I didn't

6    think it was a Perry Mason moment, whatever that means.

7           I thought -- I can only talk about what's in my

8    mind.  I thought that he was not being truthful when he

9    said he had to lie.  His wife is next to him and she's

10   teary-eyed.  She's upset.  So I thought that he's

11   uncomfortable because we're having this meeting in

12   front of his wife when for the last couple of years he

13   doesn't want me to meet with his wife and talk about

14   facts and her name being on bonds and annuities and

15   stuff.

16          So that's what's in my state of mind.  And with

17   the admissions and my conversations with him over time,

18   there's a basis for the plea, and I thought he was

19   being untruthful to us for those reasons.  That's what

20   I thought, and that's all I can tell you.

21   **Q.**    But it's not really your job to make that decision

22   for him, is it, Mr. Lepizzera?  He's saying I'm lying.

23   And whether you believe him or not, the last thing he's

24   saying to you is I'm lying?

25   **A.**    It's not the last thing he said because Mr. Traini

1    addressed him.  I don't recall really the conversation

2    after that.  The meeting concluded.  I let the client

3    know what we're going to do next.  We said that a

4    change of plea hearing will take place in the morning

5    but Judge Smith needs to approve the Rule 11(c) plea

6    documents.  And if he approved it, there was a chance

7    he would say no, we'd still go on with trial, then the

8    change of plea hearing would take place.  That's how

9    the Sunday night meeting concluded.  And then Monday

10   when we met him in the conference room both -- around

11   8:30 a.m. in the morning pre-meeting with Judge Smith,

12   then we met with Judge Smith, then we met with the

13   client again.  He signed the plea agreement.  He signed

14   the statement of facts.  He signed the November 19th,

15   2012, what I'll call the Traini letter.  At no point

16   did he ever say, Well, I'm going to have to lie.  He

17   never said that again.

18       So how we concluded before starting that change

19   of plea hearing was how I just described it.

20   **Q.**   Did you ask him on Monday if he was still lying?

21   **A.**   No.

22   **Q.**   You didn't want to ask him that, did you?

23   **A.**   I didn't need to ask him that.

24   **Q.**   You just let it hang out there, he's lying?

25       MR. McADAMS:  Objection.  It's been asked and

1    answered.  It's not what he said, he left hanging.

2         THE COURT:  Sustained.

3    **Q.**   Did you ever think that you had a responsibility

4    to withdraw at that point from representation?

5    **A.**   It did not -- no, I did not consider that.

6    **Q.**   What if he was telling the truth?  I mean, I

7    understand you think he wasn't telling the truth.  But

8    what if he was telling the truth and he was lying on

9    Monday?

10   **A.**   I wouldn't have let the change of plea hearing go

11   forward.  I would not let the change of plea hearing go

12   forward because, as I explained to him beforehand, even

13   though I'm not asking questions it's a fraud upon the

14   Court that someone is going to get up there under oath

15   and lie to the Court.  I wouldn't let the plea go

16   forward.

17   **Q.**   That's what he told you, Mr. Lepizzera.  That's

18   what he told you he was going to do.  I know you don't

19   believe it, but it's not up to you for you to make that

20   decision for him.

21        MR. McADAMS:  Objection.  This is argument.

22   Mr. Olen can make this argument later.

23        THE COURT:  I agree.  Sustained.

24   **Q.**   Okay.  The day of the plea, entering of the plea,

25   and you said you did not revisit this issue?

1    **A.**    That's right.  It never came up.

2    **Q.**    And Mr. Traini handled the plea colloquy?

3    **A.**    There's not -- I mean, at a change of plea

4    hearing, there's not a lot of involvement with the

5    defense attorney, but the one thing that I believe

6    Mr. Traini did at the change of plea hearing is I think

7    he handed the Court -- I haven't seen the transcript.

8    I think he handed the Court Mr. Caramadre's medication.

9    But other than that, we were both there.

10   **Q.**    You didn't address the Court, though, did you, at

11   the plea colloquy?

12   **A.**    I don't think I addressed the Court.

13   **Q.**    Mr. Traini addressed the Court?

14   **A.**    Yes.

15   **Q.**    You just said that Mr. Traini addressed the Court

16   regarding medications?

17   **A.**    I think so.  Again, I haven't seen the transcript

18   but that's my memory.

19          MR. OLEN:  This is Exhibit O, please.

20          THE COURT:  Any objection?

21          MR. McADAMS:  No objection, your Honor.

22          (Defendant's Exhibit O admitted in full.)

23   **Q.**    Do you recognize this as the list of the

24   medications that were provided to the Court?

25   **A.**    I think it is.  I'd have to -- just to confirm but

1    if you say it is, it looks familiar.

2    **Q.**   There are three medications there for blood

3    pressure and one for reflux.  And then there are five

4    other medications for depression and depression and

5    anxiety; is that right?

6    **A.**   That's what it says here, yes.

7    **Q.**   And when the Court asked Mr. Traini or when the

8    Court asked has Mr. Caramadre been treated, Mr. Traini

9    said --

10        MR. OLEN:  This would be O please.

11        THE CLERK:  There's a confusion.  The

12   medications was O.

13        MR. OLEN:  This would be P then.  Thank you.

14        THE COURT:  Any objection to P?

15        MR. McADAMS:  No objection.

16        THE COURT:  P is full.

17        (Defendant's Exhibit P admitted in full.)

18   **Q.**   Mr. Traini responded, "Excuse me, your Honor.  If

19   I may, I have with me a list of Mr. Caramadre's

20   medications so that we don't have to go through them."

21   **A.**   That's what the transcript says.

22   **Q.**   Wouldn't it be of paramount importance to go

23   through these medications, a man who is taking five

24   medications for depression and anxiety who's had

25   transcranial stimulation, who's obviously depressed?

1    Don't you think that would be important to bring to the

2    attention of the Court?

3           THE COURT:  Mr. Olen, didn't I then ask some

4    questions of counsel about the medications?

5           MR. OLEN:  You did ask a couple of questions,

6    Judge.  I don't think I have the whole transcript here.

7           THE COURT:  Well, if you're going to make that

8    an exhibit, then the entire section of the transcript

9    will be the exhibit, not a couple of questions leaving

10   out the meaningful questions that I then asked of

11   counsel.  You're leaving out the substantive part of

12   the colloquy.  I mean, it's part of the record but I

13   think it should be in this exhibit.

14          Mr. McAdams, what, do you have it?

15          MR. McADAMS:  I have the full transcript, your

16   Honor.  We went through this with Mr. Caramadre on his

17   cross-examination.  The Court engaged in a colloquy

18   with Mr. Caramadre himself about whether these

19   medications affected his ability to understand what was

20   going on and asked counsel to confirm that.  And I

21   believe Mr. Traini said, "Yes, your Honor."  I don't

22   recall whether Mr. Lepizzera also did.  I can look it

23   up in the transcript.

24          THE COURT:  I just want the portion of the

25   transcript that's admitted as an exhibit to be a

1    complete section of the transcript, not a couple of

2    questions excerpted out in isolation.  So whatever

3    number of pages that is, that will be Exhibit P.

4            MR. OLEN:  That's fine, Judge.

5    **Q.**   My question is:  Did you not feel that this is

6    something that you should have discussed in greater

7    detail, that he was on these medications, that he's

8    severely depressed?

9    **A.**   With the Court?

10   **Q.**   Yes.  At the time that he was tendering his plea.

11   **A.**   I believe as defense counsel we had an obligation

12   to let the Court know whatever medications

13   Mr. Caramadre was on.  A list was prepared so we could

14   submit that to the Court.  I believe there was a

15   colloquy.  And again, I haven't read the transcript of

16   the change of plea hearing.  I believe there was a

17   colloquy between the Court and I think Mr. Caramadre,

18   which is standard as part of any change of plea

19   colloquy.

20   **Q.**   That's the point.  It was a standard colloquy.

21   Kind of a routine colloquy, a couple of questions.  But

22   didn't you have an unusual person here, a person who is

23   on all these medications, had this severe depression.

24   Didn't you have to go a step further and alert the

25   Court to this, maybe inquire a little further about the

1    state of his health, mental health?

2    **A.**    Outside of the change of plea colloquy that

3    normally takes place, no.

4              MR. OLEN:   This is Q.

5    **Q.**    You didn't believe you had to go ask about the

6    state of his health, but Mr. Thompson apparently did.

7    He sent you an e-mail asking, Is Joe in a good state of

8    mind?  He's clearly concerned about -- he knows

9    Mr. Caramadre's medical condition.  He's clearly

10   concerned about this issue of whether or not he's in a

11   good state of mind.

12   **A.**    Mr. Olen, I can't speak for Mr. Thompson, and I

13   don't believe that Mr. Thompson has knowledge of

14   Mr. Caramadre's medications because that's privileged

15   and I wouldn't disclose that to Mr. Thompson.  And I

16   don't believe Mr. Thompson is referring to his medical

17   condition.  Just in terms of how is he feeling about

18   pleaing in this case and the evidence and what he's

19   going to do.  But I can't speak for Mr. Thompson.

20   **Q.**    The fact is, Mr. Lepizzera, you and Mr. Traini

21   desperately wanted this plea to go through; isn't that

22   correct?

23   **A.**    Desperately?  No.

24   **Q.**    Very, very strongly wanted this plea to go

25   through.

1    **A.**   What we wanted to do was have the client get the

2    best result possible, and we felt that the best result

3    possible was for him to take the plea that we had

4    negotiated with the Government.  That's what we wanted.

5    So yes, I wanted the plea to go through because that

6    was the best outcome for the client.

7    **Q.**   And you strongly influenced Mr. Caramadre, you

8    tried to get him to understand that this was the best

9    thing for him to do?

10   **A.**   I strongly advised him to accept the plea that we

11   worked out, but ultimately it was his choice.

12         MR. OLEN:  This is R, please.

13         THE COURT:  What was Q?

14         MR. OLEN:  Q was the Olin Thompson e-mail.

15         THE COURT:  Did you want to move that?

16         MR. OLEN:  Yes.  I thought I did.

17         THE COURT:  Any objection?

18         MR. McADAMS:  No objection.

19         THE COURT:  Q will be full.

20         (Defendant's Exhibit Q admitted in full.)

21         MR. OLEN:  This is R.  This is a Saturday,

22   November 17 e-mail from Mr. Traini to you,

23   Mr. Lepizzera, in which -- sorry.

24   **A.**   Okay.

25   **Q.**   "Nicely done.  The more I think about it, the more

1    I believe that once we agree on the statement of facts"

2    -- this is from, I'm sorry, Mr. Traini to you.

3    **A.**    Um-hum.  (Affirmative.)

4    **Q.**    -- "and incorporated it by reference or put it

5    into the plea agreement, the plea has to be able to

6    work with Joe being asked if he agrees with the facts

7    as stated.  This is going to be a tough sell with these

8    facts."

9    **A.**    Yes, he wrote that.

10   **Q.**    Do you think that you had to sell this plea to

11   Mr. Caramadre?

12   **A.**    No.  We needed to go over the statement of facts

13   and the plea agreement with Mr. Caramadre, and he

14   needed to make a decision whether to take it or not.

15   **Q.**    This is Exhibit S, I believe.  This is an e-mail

16   on November 17th from Mr. Traini to you.

17          THE COURT:  Did R get moved?

18          THE CLERK:  No.

19          THE COURT:  You need to move to have the exhibit

20   admitted if you want it admitted into the record.

21          MR. OLEN:  I'll move it at the beginning so I

22   don't forget.

23          THE COURT:  Is there any objection to R?

24          MR. McADAMS:  No, your Honor.

25          THE COURT:  All right.  R will be full.

1          (Defendant's Exhibit R admitted in full.)

2          THE COURT:  Now, S, is there any objection to S?

3          MR. McADAMS:  No, your Honor.

4          THE COURT:  S will be full.  Go ahead.

5          (Defendant's Exhibit S admitted in full.)

6    **Q.**    This is another e-mail from Mr. Traini to you,

7    Mr. Lepizzera?

8    **A.**    Yes.

9    **Q.**    This says that, Right now the plea agreement says

10   that they will dismiss the remaining counts of the

11   indictment at sentencing.  Presumably that includes the

12   forfeiture count.  On the other hand, it probably is

13   going to be raised at some point and perhaps by the

14   Judge himself.  I think maybe we wait until we get the

15   final statement of facts.  Then we can say, A, that the

16   Government didn't mention the forfeiture in either the

17   plea agreement or the DID; and B, we can't go back now

18   because we already sold the client on the deal based on

19   both documents.

20         You said you didn't believe you had to sell the

21   deal but here Mr. Traini is saying you sold the deal.

22   I'll ask again.  Did you have to sell the deal to

23   Mr. Caramadre?

24   **A.**    Can you put that document back up so I can see it,

25   please.

1   **Q.**   I'm sorry.

2   **A.**   Thank you.

3        That's what Mr. Traini wrote and, unfortunately,

4   sometimes people get sloppy with e-mails.  There was no

5   deal to be sold to the client.  Ultimately, it's the

6   client's decision.  We strongly recommended the client

7   take the deal, but I do want to point out that on

8   Saturday, November 17th, 2012, at 4:19 p.m. that was

9   the date and time of this e-mail being sent, and

10  Mr. Caramadre hadn't even seen, although I went over

11  with him the actual written statement of facts so

12  nothing could have been sold to him.  Nothing could

13  have -- he didn't see the statement of facts.  That

14  didn't happen until Sunday night when we went over the

15  whole plea package documents.  I just wanted to point

16  that out to you.

17  **Q.**   So despite the fact that this says you sold the

18  plea to him, it was just a sloppy -- Mr. Traini says

19  you sold the plea, this was just a sloppy e-mail?

20  **A.**   It's a poor choice of words, I would say.

21        MR. OLEN:  T, your Honor.

22        THE COURT:  Any objection?

23        MR. McADAMS:  No objection.

24        (Defendant's Exhibit T admitted in full.)

25  **Q.**   And this is an e-mail from you to Mr. Vilker on

1    November 15th:  I can honestly tell you that this is

2    the first time we are seriously talking about a real

3    plea deal.  This case need to be disposed of now before

4    it goes any further.  If it winds up going all the way,

5    I think my case-in-chief will go most longer than

6    expected.  I will need to mount a serious defense.

7    **A.**    I wrote that.

8    **Q.**    This is another indication of this case needs to

9    be disposed of now.  We need this plea.

10        Isn't that right?

11   **A.**    The Government -- we had opened up plea

12   negotiations on Thursday morning; and Mr. Caramadre was

13   serious about plea negotiations, which was really the

14   first time, and the Government was serious about plea

15   negotiations.  And as each day goes by -- and I think

16   we explained this to the client.  As each day goes by

17   on a trial, it gets more difficult in terms of getting

18   the best deal.  Because normally what happens in this

19   Court is there's a certain time where you have to plea

20   in order to get three acceptance of responsibility

21   points.  There are rules and statutes and what have you

22   and sentencing guidelines.  And we started trial.  So

23   that's a strike against a client.  But in this kind of

24   case where I guess three days into trial right here and

25   we have a client that's seriously considering taking a

1    plea and the Government seriously considering to take a

2    plea because sometimes the Government says, hey, we

3    started trial, forget it, no deal, or we'll take a plea

4    but we're not going to give a recommended sentence.

5         So what I'm saying here is, and I did mention

6    this is to the client, so did Mr. Traini, as each day

7    goes by there's less and less of a chance of getting

8    the best deal.  And that's why I thought that we should

9    strike at the time.

10        MR. OLEN:  This is U, your Honor.  There's two

11   e-mails on this thread.  The first at the bottom.

12        Move that, your Honor.

13        MR. McADAMS:  No objection.

14        THE COURT:  This is Exhibit U, and it's full.

15        MR. OLEN:  That's U, your Honor, yes.

16        (Defendant's Exhibit U admitted in full.)

17   **Q.**   It's an e-mail from Mr. Traini to you.  Mr. Traini

18   writes, Like the $2,000 checks -- and those would have

19   been the $2,000 payments I presume that Mr. Caramadre

20   gave to the terminally ill?

21   **A.**   Those would have been the checks labeled

22   "Philanthropy" in the memo section, yes.

23   **Q.**   Like the $2,000 checks, it sound too good to be

24   true.

25        And that's referring to the plea agreement?

1  **A.**   Yes.  And underneath Mr. Traini's e-mail it looks

2  like it's an incomplete e-mail with just the heading of

3  the e-mail from me -- actually, it's Mr. Traini.

4       I think it is, Mr. Olen, because I remember I

5  sent Mr. Vilker an e-mail late Friday night, but I

6  don't know when this came to be.  So I think Mr. Traini

7  is referring to the e-mail I sent to Mr. Vilker.  I

8  think he is about a plea agreement, yes.

9  **Q.**   That Mr. Caramadre --

10  **A.**   I'm pretty sure.

11  **Q.**   -- is planning on pleading.

12       Okay.  Your response to that e-mail was,

13  Remember that each $2,000 check cleared, even from

14  Mr. Larivee two months later.  God bless that woman

15  with eight children.  Her testimony alone delivers a

16  guilty verdict.

17  **A.**   Yes, that's what I wrote.

18  **Q.**   And that's what you wanted.  You wanted it to

19  appear like there'd be a guilty verdict so that

20  Mr. Caramadre would plea?

21  **A.**   Mr. Olen, I didn't want anything or I can't have

22  anything appear what it was going to look like.  The

23  evidence was what it was, and it was overwhelming.  By

24  the way, I'm writing that to Mr. Traini, not to

25  Mr. Caramadre.

1    **Q.**   All right.  God bless that woman.  Her testimony

2    delivers a guilty verdict.

3         Are you happy about that?

4    **A.**   No.  Because the last thing I wanted to see was

5    Mr. Caramadre -- if he wanted to continue on with

6    trial, that's fine.  The last thing I wanted to see was

7    a guilty verdict after trial because Mr. Caramadre

8    would have been facing a very hefty sentence.

9    **Q.**   So you were God blessing her because she delivered

10   the plea?

11   **A.**   No.  In fact, as I testified beforehand, I thought

12   I got some very good points out of Mrs. Larivee, but

13   the point of the matter was -- what was your question?

14   I'm sorry.

15   **Q.**   God bless that woman.  Her testimony delivers a

16   guilty verdict.

17        And you're happy about that, you're blessing her

18   because now you have your plea.

19   **A.**   I am not blessing her because we have a plea.

20   What I was blessing her about, and I say this a lot to

21   people in e-mails, God bless.  Because she was a very

22   nice woman.  She had I think eight children, and she

23   had a niece that was the proposed annuitant, who they

24   rejected the particular business arrangement.  And she

25   had a niece who was, I don't know, in her 20's, maybe

1    26, and she was dying of cancer.  Maybe colon cancer,

2    something to that effect.  That's why I said God bless

3    the woman.  The woman came into court, and she was

4    balling her eyes out on direct examination.  She was

5    very upset.  And it was a sad situation.  That's what I

6    was doing.  It had nothing to do with convincing anyone

7    to plea or anything like that.

8    Q.    So sentence two has nothing to do with sentence

9    three?  God bless that woman with eight children.  Has

10   nothing to do with her testimony alone delivers a

11   guilty verdict?

12   A.    No.  I'm not blessing her because she's going to

13   deliver a guilty verdict.  That's not what I'm doing.

14   I'm blessing her because she seemed to be a very caring

15   woman with eight children and a niece that was dying of

16   cancer.

17   Q.    You just threw that in there, you're thinking of

18   what a nice woman she was.

19   A.    Like I said, Mr. Olen, beforehand, sometimes

20   people say things in e-mails and it's taken in a

21   certain way and it's really not what it purports to be.

22   But I wrote what I wrote.  But it had nothing to do

23   with -- I'm not blessing her because her testimony was

24   going to deliver a guilty verdict.  That's not why I

25   wrote that.  I said it because I meant it, God bless

1   this woman with eight children.

2         MR. OLEN:  This is V, please, your Honor.

3         THE COURT:  Any objection?

4         MR. McADAMS:  No objection.

5         THE COURT:  V will be full.

6         (Defendant's Exhibit V admitted in full.)

7   **Q.**   This is an e-mail from Mr. Traini to you I guess a

8   couple hours after the plea, later in that day?

9   **A.**   It is.

10  **Q.**   "Have you heard from Joe.  Does he have pleaders

11  remorse yet?"

12  **A.**   That's what Mr. Traini wrote.

13  **Q.**   Were you making fun of Mr. Caramadre?

14  **A.**   No, not at all.

15  **Q.**   Pleaders remorse is a take-off on the phrase

16  buyer's remorse, isn't it, same idea?

17  **A.**   I don't know about that.

18  **Q.**   You don't know that?

19  **A.**   No.

20  **Q.**   Do you know that one of the dictionary definitions

21  of buyer's remorse is an action someone regrets taking

22  because he did it as a result of undue pressure?

23        MR. McADAMS:  Objection.

24        THE COURT:  Sustained.

25  **Q.**   Mr. Lepizzera, after the plea was completed and

1    you went to sentencing, you were still working for

2    Mr. Caramadre then.  Can you tell us in your opinion

3    how he was doing, his mental state after the plea?

4    **A.**   He seemed to be the same, the same Joe that I

5    know.  He was definitely depressed and he was down.  It

6    wasn't a good time because this is something he really

7    fought hard for many years.

8          The one thing that I recall that was of concern

9    to me was when he made a comment, and I wasn't in the

10   room at the time but the other members of the Men of

11   St. Joseph's reported back to me that he made this

12   comment about he wouldn't commit suicide because that's

13   a sin.  He would never do that.  But it wouldn't be a

14   sin to hire someone to kill him.  And that alarmed me.

15   I explained yesterday I located him, I had him call

16   Dr. Xavier and then Joe reported back to me that, you

17   know, Dr. Xavier might have changed his medication and

18   he told Dr. Xavier he wasn't going to hurt himself.

19   But other than that, other than that incident, it was

20   the same Joe that I know.

21   **Q.**   Now, yesterday you testified that on November

22   27th, Mr. Caramadre notified you of a dispute with

23   Mr. Traini over the bill?

24   **A.**   What day was that, Mr. Olen?

25   **Q.**   November 27th?

1    **A.**    Okay.  Is there an e-mail to that effect?  Did

2    that come into evidence?

3    **Q.**    It's in evidence already.

4    **A.**    Okay.  I just don't recall.  If that's the date on

5    e-mail --

6    **Q.**    And he asked Mr. Traini for an accounting of his

7    bill of his time?

8    **A.**    I thought the request for an accounting came in

9    January, but I could be wrong on that.

10   **Q.**    On December 8th, you referred yesterday to a Men

11   of St. Joseph's meeting that Mr. Caramadre was

12   attending?

13   **A.**    I don't remember the date.  I think it was early

14   December because usually the meeting is on the first

15   Monday of the month.  If it's December 8th, it's

16   December 8th.

17   **Q.**    And at that meeting, this is when you heard that

18   Mr. Caramadre was thinking of perhaps suicide, he was

19   having suicidal ideation?

20   **A.**    I was at the December 8th meeting of the Men of

21   St. Joseph's.  I believe it was a holy day.  I think it

22   was Immaculate Conception.  I left the meeting to pick

23   up my son, because we were going to go to Mass after

24   that because it was a Holy Day of Obligation.  I went

25   to Mass.  We attended Mass.  The Men of St. Joseph's

1  attended the Mass.  And then afterwards when the Mass

2  ended, we went back to the meeting room and that's when

3  some of the members had reported back to me that

4  Mr. Caramadre had made these comments.  And being his

5  friend, I was concerned for him.  So I don't know if he

6  was serious when he made that statement.  I took it as

7  serious, but I didn't hear it so I don't know if he was

8  having suicidal ideations.  I don't know if he was just

9  making that statement to the other members.  That I

10  don't know.  I know that he made it because the other

11  members reported it to me and then I confronted Joseph

12  about it, and I made him call Dr. Xavier.

13  **Q.**   Concerned you enough that you went back and you

14  had him call Dr. Xavier?

15  **A.**   Absolutely.

16  **Q.**   And then on December 14th, you got an e-mail that

17  he wanted information on how to withdraw his plea?

18  **A.**   Can you say that again.

19  **Q.**   On December 14th, you first received written

20  notification that Mr. Caramadre was thinking about

21  withdrawing his plea?

22  **A.**   I don't know if it was written notification

23  because there may be notes that came into evidence

24  where I documented that Mr. Caramadre had asked

25  about -- I think the note says Mr. Caramadre asked

1    about a motion -- Mr. Caramadre asked about the process

2    about vacating a plea, but he didn't ask us to do

3    anything specifically.  The note said something to that

4    effect.  But we had a meeting, meaning Mr. Traini,

5    myself and Mr. Caramadre had a meeting about sentencing

6    issues because we needed to get going on the sentencing

7    issues.  And that issue did come up.

8    Q.    Yesterday you testified that it was about a week

9    earlier that he first told you, raised this issue of

10   withdrawing the plea.  That was the day of the Men of

11   St. Joseph's meeting?

12   A.    Yes.  I think it was in the afternoon as I said,

13   as I testified earlier.  I invited him to the

14   basketball game and afterwards he mentioned it to me,

15   Mr. Olen.

16   Q.    And then shortly after that, he advised you that

17   he was not going to sign an acceptance of

18   responsibility letter for Probation?

19   A.    At some point he did say that, Mr. Olen.

20   Q.    Now, after he advised you a number of times

21   regarding the fact that he wanted to withdraw his plea,

22   you didn't think that was a very good idea?

23   A.    I thought it was an absolute terrible idea.

24   Q.    And you told him that if he went forward with

25   this, you would have to -- you're obviously going to

1   have to withdraw?

2   **A.**    If he went forward with it.  If he wanted to file

3   a motion to vacate, I disagreed with his decision, but

4   it was his call.  He's the client.  He's the defendant

5   in the case.  He had a right to do that.  I thought

6   there was tremendous downside, very little upside.  But

7   if he did that, I couldn't file the motion to withdraw

8   so I told him to get independent counsel; and then if

9   new counsel came in, I would withdraw, yes.

10  **Q.**    And you knew that or you certainly thought that

11  one of the bases for going forward on this motion might

12  very well be to challenge your effectiveness during

13  your representation?

14  **A.**    He never let me know that.  He never said that

15  because I was asking him, and there's a long e-mail on

16  this about what's your factual basis because he wanted

17  my opinion about how he would go about filing a motion

18  to vacate.  I said I couldn't give any advice because I

19  didn't know what his factual basis was, but he never

20  told me that was based on ineffective assistance.

21      What I said to him was it would be a conflict

22  because I don't believe in the motion because we have

23  Rule 11, one thing in this court.  And there needs to

24  be a factual basis for it.  And on top of it, I

25  couldn't envision me filing the motion to vacate

1    without bringing my effectiveness or ineffectiveness in

2    issue.  So if he wanted to do that, he would have to go

3    to another lawyer to do that.

4    **Q.**   Well, you told him as a matter of fact in one of

5    the e-mails that he might be challenging your

6    effectiveness?

7    **A.**   I'm not sure if I wrote that, Mr. Olen.  I have to

8    take a look at the e-mail.  What I told him was that --

9    I'm not sure if I used "effectiveness" or

10   "ineffectiveness," but I told him it would be a

11   conflict for me to do it and that he should seek

12   independent counsel so he could talk to new counsel

13   about what the facts are.

14   **Q.**   But certainly you knew that it was very likely

15   that he would be going forward on challenging your

16   effectiveness?

17   **A.**   No, I did not.

18   **Q.**   You didn't anticipate that?

19   **A.**   No, I did not.  Because the only thing that he had

20   told me at the time was -- said he pled -- his wife's

21   condition made him plea.  It was his wife's condition

22   that made him plea, and he feels like he lied so

23   therefore he wants to undo the plea.  But we never got

24   into all the things that you've raised in your motion

25   about being ineffective.  He didn't raise those issues

1    with me.

2         MR. OLEN:  May I have just a moment, Judge.

3         (Pause.)

4         MR. OLEN:  Judge, may I have one moment, please.

5         THE COURT:  Yes.

6         MR. OLEN:  Thank you.

7         (Pause.)

8         MR. OLEN:  This will be W, your Honor, please.

9    This is an e-mail from you to Mr. Caramadre on December

10   22nd.

11   **A.**   Yes.  I remember sending this e-mail.

12        MR. OLEN:  Move that in, your Honor, please.

13        THE COURT:  Any objection?

14        MR. McADAMS:  No objection as long as the entire

15   five page e-mail is made a part of the exhibit.

16        THE COURT:  All right.  Exhibit W, five-page

17   e-mail will be admitted.

18        (Defendant's Exhibit W admitted in full.)

19   **Q.**   The second paragraph here, second page of this,

20   Mr. Lepizzera, it says, "In addition," do you see that,

21   "we truly believe there's a real likelihood that any

22   decision you make to move forward with a motion to

23   vacate may require you to challenge or attack our

24   actions as your attorney."

25   **A.**   Yes, I see that.

1    **Q.**    So you did know that he might be challenging your

2    actions?

3    **A.**    Can you just leave that up for a second, please.

4    **Q.**    Yes.

5    **A.**    Thank you.

6          No.  What I'm writing there is, is if you want

7    to -- I think he was looking to me to file the motion

8    to vacate, and what I'm writing there is if you're

9    going to file a motion to vacate, then you're going to

10   have to attack us.  But he's not telling me that I'm

11   going to attack you.  What I'm telling him is that to

12   file a real motion to vacate one of the things you're

13   going to have to do is challenge your counsel.  I don't

14   know if I was talking about effectiveness there.  But

15   he's going to have to attack us because we stood next

16   to him at the change of plea which we say was knowing,

17   voluntary and intelligent.

18          So just so you know, there's a five-page e-mail

19   that goes through the process about get independent

20   counsel.

21          So he's not telling me he's going to attack us,

22   but I'm saying if you're going to do this, there's a

23   good chance you're going to have to attack us so,

24   therefore, I can't give you advice.

25   **Q.**    But what I asked you is if you were aware that he

1    might have to attack you?

2    **A.**   If he was going to file a motion to vacate, I

3    think he would have to attack us.

4    **Q.**   Right.  So you were aware of that?

5    **A.**   I didn't know if he was going to file a motion.

6    **Q.**   I understand that.  But if he did, Mr. Lepizzera,

7    then you knew that he would be attacking you?

8    **A.**   That's not true because of the things --

9    **Q.**   Were you aware that he might be attacking you?

10   **A.**   No.  What I understood, and there's a couple of

11   e-mails after this from Mr. Caramadre, I believe it

12   says why he's actually doing this and I think he

13   references his wife's condition.

14           One of the things he could have done was just

15   file a motion to vacate saying that, and I'm just

16   giving a possibility, that he's filing a motion to

17   vacate because his wife's condition put him in distress

18   and he did it to stop the trial because that's what his

19   wife wanted.  He could have filed a motion to vacate

20   just on that without attacking us.  So that was a

21   possibility.  But I'm writing there clearly that, look,

22   if you're going to file a motion to vacate, one of the

23   things is you could be attacking us.  So I did write

24   that.  Yeah, I wanted the client to know that.

25   **Q.**   He could be attacking you?

1    **A.**    Yeah.  I wanted the client to know that.

2    **Q.**    Now, on January 2nd, Mr. Caramadre told you that

3    if you need to withdraw, withdraw if you must.  Is that

4    said accurate?

5    **A.**    What day was that, Mr. Olen?

6    **Q.**    January 2nd.

7    **A.**    I don't have an e-mail.  If you say you have an

8    e-mail -- I know at some point -- at some point I

9    discussed it yesterday about the ethical dilemmas,

10   could Mr. Traini and I file a motion to continue the

11   sentencing based on what's going on behind the scenes.

12   Could I tell Kristen Mattias that the client is

13   instructing me to tell her that she's thinking about

14   filing a motion to vacate?  So what I'm telling him is,

15   look, we're either going to proceed to sentencing and

16   we've got to work on sentencing issues, or you're going

17   to hire new counsel to file a motion to vacate.  And

18   nothing was getting done.  So he's telling me that he's

19   interviewing lawyers, but he won't tell me who they

20   are.  So I'm not sure he's really doing that and

21   there's just this ethical dilemma.

22          So I think at some point I raised, look, we're

23   going to have to withdraw because attorneys can't sit

24   idly by doing nothing.  Either we're in the case and

25   we're going to work on sentencing issues or we're going

1  to agree to disagree and you're going to go down a

2  different path. And nothing was getting done and I

3  don't think you entered until January 10th so we're

4  just sitting here and I'm getting nervous for the

5  client's sake because the probation department is

6  preparing the presentence report. It's going to come

7  out shortly and then the 14 days is going to start

8  ticking. So that's what was happening.

9  **Q.** On January 9th, yesterday you testified that you

10  went to see Dr. Xavier?

11  **A.** I think that was the date.

12  **Q.** Went to her office. And that was the day before I

13  entered my appearance. By that time, you pretty much

14  knew you were going to be out of the case, didn't you?

15  **A.** I actually wasn't sure because Mr. Caramadre said

16  that counsel was going to enter and you never entered.

17  And I'm not sure whether I knew he had identified you

18  at that point. And also, Mr. Caramadre's talking about

19  whether I can help him with the civil cases. At that

20  point, the presentence report was out. So -- but

21  January 9th is the day before you entered, Mr. Olen.

22  **Q.** And he had told you that he was going to hire

23  another lawyer at that time?

24  **A.** I think he did.

25  **Q.** Okay. Now, when you went -- yesterday you

1    testified that when you went to the office, you wanted

2    to look at his medical records.  I believe you said

3    because you were concerned about the suicidal ideation

4    and he was such a good friend of yours that you wanted

5    to check on him?

6    **A.**    I was still in the case.  It was still unclear to

7    me whether anyone was going to enter.  We're in the

8    14-day window of the presentence report.  I had already

9    made an appointment with Dr. Sarah Xavier beforehand so

10   that was a pre-scheduled -- that was a previously

11   scheduled meeting.  And so I don't know if you're going

12   to enter.  I don't know even know if I knew who you

13   were at that time, but what I was hoping was that

14   Mr. Caramadre wouldn't go ahead with the motion to

15   vacate.

16        So I'm still his attorney of record.  I didn't

17   file the withdrawal until January 10th, and I think it

18   was after seven o'clock at night.  So I looked at the

19   records.  I talked to Sarah Xavier and either

20   Mr. Caramadre is going to go ahead with the case and

21   I'm going to continue with the sentencing issues or

22   he's not.  And I was concerned for him because I

23   thought this whole thing, as I wrote, was a suicide

24   mission, and I wanted to meet with you.  So if I looked

25   at the records and I sat down with you and we discussed

1   it, we discussed it.  All in the best interest of the

2   client.

3   **Q.**  Mr. Lepizzera, you knew that Mr. Caramadre had

4   told you that you're going to be replaced?

5   **A.**  I think what he said was that you -- when I say

6   "you," he was looking to secure new counsel and he said

7   it was going to happen, and it never happened until

8   like seven o'clock at night on the 10th.

9   **Q.**  But you knew that you were probably going to have

10  to withdraw?

11  **A.**  If Mr. Caramadre was going to insist of the motion

12  to vacate, which it sounded like he was going to but I

13  wasn't positive because -- I wasn't positive he was

14  going to do it until I saw it late on the 10th that you

15  entered.

16  **Q.**  Mr. Lepizzera, didn't you really go to see

17  Dr. Xavier's records so you could see if there was

18  something in there that was an admission of guilt on

19  his part?

20  **A.**  Absolutely not.

21  **Q.**  If you had found something like that, it would

22  have been easier for you to accept him lying at the

23  plea colloquy?

24  **A.**  No.

25  **Q.**  Now, Mr. Lepizzera, you for the longest time

1    protested (sic) Mr. Caramadre's own innocence?  Didn't

2    you tell everyone that he was innocent?

3    **A.**    I don't believe that's true.  I don't know what

4    you're referring to.

5    **Q.**    Did you ever tell the Men of St. Joseph that he's

6    an innocent guy?

7    **A.**    I wish you hadn't asked this question, Mr. Olen.

8         We were at a Men of St. Joseph's group and which

9    I consider really off limits for this because it's a

10   religious group, but you asked the question.  And it's

11   a group of men that gather for prayer.  And

12   Mr. Caramadre shocked me when he asked in the middle of

13   the meeting -- I'd say at the beginning of the meeting

14   and said I want my attorney and my friend to talk about

15   my innocence.  I was absolutely shocked that he did

16   that.  He never let me know beforehand.  And I was

17   sitting in a room with there's usually 10 to 12

18   participants, members of the group that show up on a

19   regular basis.  And I sat there and I said, wow, what

20   do I do.

21        I had no idea that question was coming, and I

22   actually asked everyone to close their eyes, which they

23   did.  And I made a statement on Mr. Caramadre's behalf

24   and talked about, I think, because it came just from my

25   mind, I didn't write anything out because I never

1    thought I'd be asked a question like that.  And I gave

2    a statement on his behalf about that he's charged, this

3    is a difficult time for the family and, you know, Joe

4    intends to vigorously pursue this.  Keep him in your

5    prayers and things of that nature.

6          But I can tell you, Mr. Olen, because I wish you

7    wouldn't have asked this question, later on,

8    afterwards, Mr. Caramadre screamed at me, screamed at

9    me because he was upset that I wasn't, I don't know,

10   adamant enough or strong enough in my words on his

11   behalf with the Men of St. Joseph's and he was upset

12   with me and that's what happened.

13         So, you know, Joseph and I were friends.  We've

14   been friends, and I enjoyed my time with him, but that

15   was inappropriate what he did, and I did it for a

16   friend but I didn't go out professing his innocence

17   because that's not what lawyers do, and I think the

18   e-mails talk about that stuff.  That's not what we do.

19   **Q.**   Did you not profess at some time a belief in his

20   innocence?  Did you express to the family members that

21   you believed in his innocence?

22   **A.**   I don't know what particular conversations you're

23   referring to because I would go to his household at

24   certain times and talk with his family, but he -- and I

25   don't recall a specific instance like I did with the

1    Men of St. Joseph's, but he would make comments in

2    front of people and it would be very uncomfortable.

3    It's almost at this point me sitting on the stand right

4    now and telling this stuff is so uncomfortable.  It's

5    more uncomfortable than it was back then that we're

6    talking about these things.  But I did not go around

7    professing his innocence, walking around on my own

8    professing his innocence.  I didn't do that.

9    **Q.**   I said did you profess a belief in his innocence?

10   Did you say ever that you believed that he was

11   innocent?

12   **A.**   I don't know if I did or I didn't.  I don't know

13   if there was an instance where he introduced me to an

14   aunt, and he said this is my defense lawyer.  You know,

15   Mike's going to do a great job, and he knows I'm

16   innocent.  Aren't I innocent, Mike?  And I said, Oh,

17   yes.

18        That could have happened, Mr. Olen, but I didn't

19   go around professing his innocence.  I wish we could

20   just get off this topic because it's very

21   uncomfortable.

22   **Q.**   Mr. Lepizzera, yesterday you testified that at

23   some point in time you came to believe that

24   Mr. Caramadre had made misrepresentations to various

25   people?

1     **A.**    You mean to the insurance companies?

2     **Q.**    Yes.

3     **A.**    Yes, I did testify to that.

4     **Q.**    And that you did not believe that he was telling

5 the truth?

6     **A.**    There were many applications and stuff like that,

7 but yes, there are instances.

8     **Q.**    And that you knew that there was a factual basis

9 for the plea? I think you said that yesterday?

10     **A.**    Yes, I did.

11     **Q.**    And you thought he was lying on Sunday night just

12 to save face in front of his wife?

13     **A.**    Yes. I testified to that.

14     **Q.**    When did you come to these realizations?

15     **A.**    Which realizations?

16     **Q.**    That essentially that he was guilty.

17     **A.**    As I told the client, I don't tell clients they're

18 guilty. As I'm reading the discovery -- and again,

19 this is such a big case, you could -- let me just say

20 this. Over the course of time of reading and rereading

21 the Jencks materials and looking at, you know,

22 Mr. Caramadre's files, the applications, the bond

23 applications, the annuity applications, reading

24 information. It took a while but after a while you

25 start seeing this and saying there's a problem here.

1          I don't know at what point in time that came,

2     but there's no doubt in my mind that I said there's a

3     problem here.  We have a serious problem.  This isn't

4     what Mr. Caramadre thinks it is.  This is a serious

5     problem.  This is more than just an FBI agent handing

6     out cookies and brainwashing people.  There's a problem

7     here.  There's a lot of different misrepresentations.

8     Misrepresentations with the terminally ill people.

9     Misrepresentations to the broker/dealer houses.

10    Misrepresentations to the insurance companies.

11    Misrepresentations to the other investors.

12         So it took a while to come to that conclusion.

13    It took a lot of reading and piecing things together.

14    **Q.**   And you can't estimate when you felt that way?

15    **A.**   No.

16    **Q.**   Did you tell Mr. Caramadre not that he was guilty,

17    that you thought he was guilty, but that I think you're

18    going to get convicted and you really have to plead?

19    **A.**   Yes.

20    **Q.**   When did you do that?

21    **A.**   I know before Mr. Traini was hired that we had

22    discussions, meaning Mr. Caramadre and I because I was

23    having discussions with Mr. Vilker at the time.  And I

24    want to say April or May of 2012 that would have

25    happened.  And I think that's what prompted hiring

1    Mr. Traini because Mr. Caramadre didn't want to plea,

2    he didn't want to hear it, and he was unhappy with

3    Mr. McCormick and that's what led into hiring

4    Mr. Traini because I'm saying, okay, you're going to

5    trial.  We need to be thoroughly prepared for this.

6    **Q.**    But you did tell him that he should be

7    entertaining a plea because of the evidence against

8    him?

9    **A.**    Yes.

10       MR. OLEN:  This is X, please, your Honor.

11       THE COURT:  Any objection?

12       MR. McADAMS:  No objection.

13       (Defendant's Exhibit X admitted in full.)

14   **Q.**    This is an e-mail to Mr. Caramadre in July of

15   2012.

16   **A.**    Yes, I remember this.

17   **Q.**    In which you say -- what's the teen mission,

18   Mr. Lepizzera?

19   **A.**    Holy Apostles has a teen mission group where ten

20   teens and four chaperones travel to Jamaica to an

21   orphanage in Jamaica, which are approximately 35 or 36

22   severely mentally and physically disabled children.

23   And I went to Jamaica to take care of those children

24   with the other three chaperones and ten teens last year

25   for a week.

1    **Q.**   You went there with Mr. Caramadre?

2    **A.**   No.

3    **Q.**   In any event, it states that, The teen mission

4    will enable us to navigate through your case and give

5    you exactly what you want, a direct confrontation with

6    the Government so that the truth will come out?

7    **A.**   That's what I wrote.

8    **Q.**   The truth of his innocence, I suspect you meant.

9    **A.**   The truth of whatever the evidence was.  But yes,

10   I wrote that.

11   **Q.**   I'm sorry?  I didn't hear that.

12   **A.**   The truth of whatever the evidence showed, because

13   Joseph wanted a trial and whatever the truth was to

14   come out.  So I wrote that.  I know that I came back

15   from the mission pretty energized seeing those really

16   unfortunate children.  I was gone for a week.  I know

17   Mr. DeMello and Mr. Traini were working on the case

18   while I was gone, and I know that Joe wanted a trial

19   and that's what I wrote.

20   **Q.**   And the truth being his innocence, I presume?

21        MR. McADAMS:  Objection.  He's already answered

22   this question.

23        THE COURT:  Sustained.

24   **Q.**   Let's just go back, Mr. Lepizzera, a little bit in

25   time when I asked you about your relationship with

1    Mr. Traini.

2    **A.**   Yes.

3    **Q.**   Did you consider Mr. Traini to be a mentor in any

4    way?

5    **A.**   Sure.

6    **Q.**   And your own criminal background, you said you

7    were on the court-appointed list?

8    **A.**   Yeah, for a number of years.

9    **Q.**   How many felony cases do you think you handled?

10   **A.**   It's been a while.  I don't know when this

11   district took on the federal public defender, because I

12   know before that I was on the list.  So maybe I was on

13   the list for ten years, but I think it coincided -- I

14   got off the list when the federal public defender was

15   introduced to the District of Rhode Island, and I think

16   I would have handled 70, 80 court-appointed cases

17   maybe.  I'm guessing at this point.

18   **Q.**   Felony cases?

19   **A.**   Yeah.  They were all felony.  Maybe the first one

20   I handled, Mr. Olen, was a misdemeanor.  Might have

21   been a credit card case.  I'd be guessing so I don't

22   want to guess.  But a lot of cases.  I handled a lot of

23   cases in this courthouse on the court-appointed list

24   and some private cases as well, but more, a lot more

25   court-appointed cases.

1    **Q.**   Can you estimate in how many of those cases you

2    gave an opening statement as opposed to reserving an

3    opening statement?

4    **A.**   Wow.  I can't remember.  Most of the cases I tried

5    in this courthouse, Mr. Olen, like the first case I

6    tried, I don't know if it was my first federal jury

7    trial.  It was before Judge Pettine.  And I didn't even

8    put on any witnesses, and I closed and there was an

9    acquittal on one count and hung on the other and the

10   Government wound up dismissing the case.  But most of

11   the cases that I tried, barring one that I can think of

12   where I put on a substantial case, I think I would have

13   given opening statements because I don't think I was

14   going to put on a case-in-chief, so then it would have

15   been just closing argument so I probably would put on

16   an opening statement.  I'm not sure if I ever deferred

17   an opening statement, Mr. Olen.

18   **Q.**   Did you ever handle a case of this serious nature?

19   **A.**   No, absolutely not.

20   **Q.**   Did you ever handle a case where there was a

21   potential life sentence?

22   **A.**   I think so in the state court.  I'm not sure about

23   this case, about in this courthouse.  I know I've

24   handled a lot of cases in this courthouse, but it's

25   going back to 1994 would have been probably my first

1    court-appointed case.  So it's been a while.  I've

2    never handled a case like this.  This is just an

3    unusual case.

4    **Q.**    Do you know if Mr. Traini ever provided an

5    accounting to Mr. Caramadre of his hours as he's asked

6    him?

7    **A.**    I don't think he has.

8    **Q.**    I know you don't want to be here today,

9    Mr. Lepizzera.  I get that.  Can you tell us how you

10   prepared -- did you prepare for being here today?

11   **A.**    I spent -- I don't know if this is really

12   preparing for my testimony.  I spent a lot of time, I

13   know there's been an issue with documents, about

14   producing documents.  I can't even count how many hours

15   I spent trying to get those documents together, 50 or

16   60 hours.  So I'm reading the e-mails and that's what I

17   needed to do to produce the document so I guess I did

18   it to produce the documents not to prepare testimony

19   but I guess that would be part of familiarizing myself

20   with documents.  But I have an attorney here who's with

21   me.  So that's what I've done.

22   **Q.**    Did you read over the motions and the memos that

23   had been filed?

24   **A.**    Not for preparation of my trial testimony.  I

25   think I read your initial motion to vacate maybe on

1    March 1 because you might have filed on February 28th.

2    So I might have read that on March 1. I might have

3    read, briefly read the Government's reply. I'm sorry,

4    objection. I think I read also, Mr. Olen, I read your

5    reply and the exhibits that went along with that. I

6    did do that.

7            MR. OLEN: May I have a moment, your Honor.

8            THE COURT: Yes.

9            (Pause.)

10           MR. OLEN: Your Honor, I don't have any further

11   questions at this time, but I do wish to reserve the

12   right for further cross.

13           THE COURT: All right. We'll deal with the

14   further cross issue once all the documents are

15   reviewed. So thank you.

16           Do you have any redirect, Mr. McAdams?

17           MR. McADAMS: No redirect, your Honor. Thank

18   you.

19           THE COURT: All right. Let me just go back

20   through my notes. There might be one or two questions

21   that I have. Maybe not.

22           Actually, I don't think there are any questions.

23   So you can step down.

24           THE WITNESS: Thank you, your Honor.

25           THE COURT: We're going to take a break now.

1      Mr. Gerstein, you'll contact Mr. Traini.  I believe

2      he's the next witness.  Is that correct?

3              MR. McADAMS:  That's correct, your Honor.

4              MR. GERSTEIN:  Your Honor, I was going to ask to

5      have a 15-minute break.

6              THE COURT:  Right.  But call him right away and

7      have him come over here.  All right.  So we'll take a

8      break now.

9              (Recess.)

10             THE COURT:  Are you ready to proceed,

11     Mr. McAdams?

12             MR. McADAMS:  Yes, your Honor.  The Government

13     calls Anthony Traini.

14             **ANTHONY TRAINI**, first having been duly sworn,

15     testified as follows:

16             THE CLERK:  Please state your name and spell

17     your last name for the record.

18             THE WITNESS:  Anthony Traini, T-R-A-I-N-I.

19             THE COURT:  Good afternoon, Mr. Traini.

20             THE WITNESS:  Good afternoon, your Honor.

21             THE COURT:  Go ahead, Mr. McAdams.

22             MR. McADAMS:  Thank you, your Honor.

23             **DIRECT EXAMINATION BY MR. McADAMS**

24     Q.   Good afternoon, Mr. Traini.

25     A.   Good afternoon.

1    **Q.**    How long have you been an attorney?

2    **A.**    Thirty-eight years this year, I think.

3    **Q.**    And what states are you licensed by?

4    **A.**    Massachusetts and Rhode Island.

5    **Q.**    And you're a member of the Federal Bar of this

6    Court?

7    **A.**    Yes, I am.

8    **Q.**    Do you have your own law practice?

9    **A.**    I do.

10   **Q.**    What's the name of that practice?

11   **A.**    Anthony M. Traini, PC, Professional Corporation.

12   **Q.**    What type of law do you practice?

13   **A.**    Primarily litigation.

14   **Q.**    Do you handle criminal cases?

15   **A.**    Yes.

16   **Q.**    Do you also handle civil cases?

17   **A.**    Some, yes.

18   **Q.**    So is it fair to say that the primary part of your

19   practice is criminal defense work?

20   **A.**    Yes.

21   **Q.**    Does that include both federal courts and the

22   state courts?

23   **A.**    Correct.

24   **Q.**    And Rhode and Massachusetts?

25   **A.**    And other jurisdictions.

1    **Q.**    What other jurisdictions have you practiced in?

2    **A.**    Federal and state courts in New York, Florida,

3    Texas, Carolinas, Alabama, New Jersey, Maine, New

4    Hampshire.  I don't know how many.

5    **Q.**    And approximately how many federal jury trials

6    have you defended?

7    **A.**    I can't tell you, Mr. McAdams.  I'm sorry.  I

8    don't know.

9    **Q.**    Dozens, a fair statement?

10   **A.**    Probably, I guess.

11   **Q.**    Now, you became -- you formally entered your

12   appearance in this case on behalf of Mr. Caramadre in

13   June of 2012; is that correct?

14   **A.**    Correct.

15   **Q.**    Now, prior to representing Mr. Caramadre, you had

16   been familiar with the investigation that led to his

17   indictment; is that correct?

18   **A.**    To some degree, correct.

19   **Q.**    You had represented another individual in

20   connection with that investigation?

21   **A.**    That is correct.

22   **Q.**    In fact, when the Government had taken videotaped

23   depositions in the fall of 2009, you were representing

24   that other person?

25   **A.**    Correct.

1    **Q.**   That was Edward Maggiacomo, Jr.?

2    **A.**   That is correct.

3    **Q.**   So for example, the video deposition of

4    Richard Wiley, you were physically present at that

5    deposition?

6    **A.**   Yes, I was.

7    **Q.**   You put objections on the record on behalf of your

8    client?

9    **A.**   Some, yes.

10   **Q.**   So the first time you heard Mr. Wiley's testimony

11   wasn't in November of 2012 after it was played for the

12   jury in this criminal trial, correct?

13   **A.**   No.

14   **Q.**   Now, when you entered your appearance on behalf of

15   Mr. Caramadre in June of 2012, had you reached some

16   type of agreement with him to represent him in this

17   case?

18   **A.**   I had reached a fee agreement, yes.

19   **Q.**   How did that fee agreement come about?

20   **A.**   I had a meeting with Mr. Lepizzera initially, and

21   then I had a meeting with the Defendant at which the

22   fee was negotiated.

23   **Q.**   And in the context of that negotiation, what were

24   the terms that you and Mr. Caramadre agreed to?

25   **A.**   The terms were that the fee would be $500,000,

1    which ultimately was reduced to $450,000 and that the

2    other details of my representation would be worked out

3    with Mr. Lepizzera.

4    **Q.**   When you had your conversations with

5    Mr. Caramadre, did you make it clear to Mr. Caramadre

6    that the fee that you were asking him to pay was a flat

7    non-refundable fee?

8    **A.**   Yes.

9    **Q.**   And he understood that at the time that you had

10    that verbal agreement?

11    **A.**   I believe so.

12    **Q.**   And was that agreement subsequently memorialized

13    in a written document?

14    **A.**   Yes.

15    **Q.**   And that was executed by who?

16    **A.**   By me and by Mr. Lepizzera.

17    **Q.**   Did you ever have any questions prior to

18    Mr. Caramadre's motion to withdraw his guilty plea or

19    the week leading up to it that there was a dispute as

20    to whether or not your fee was a non-refundable fee?

21    **A.**   No.

22    **Q.**   At any time in your representation of

23    Mr. Caramadre, did the fee agreement that you had with

24    him ever affect your legal advice toward him?

25    **A.**   No.

1    **Q.**   Did you ever seek to get a windfall by recouping

2    that fee by causing Mr. Caramadre to plead guilty at

3    any point in time?

4    **A.**   No.

5    **Q.**   Did you want to avoid trial in order to be able to

6    free yourself up to keep that fee and earn other fees

7    from other clients?

8    **A.**   No.

9    **Q.**   Why not?

10   **A.**   Excuse me?

11   **Q.**   Why not?

12   **A.**   Because I had an agreement to represent

13   Mr. Caramadre in the trial of this case.

14   **Q.**   And it was your understanding that the case was

15   going to be a trial?

16   **A.**   When the fee was negotiated, it was whatever it

17   was going to be.  That's what a flat fee is for.

18   **Q.**   And you expected that it would be a trial?

19   **A.**   When I negotiated the fee, it was based upon the

20   fact that the case would likely be a trial.

21   **Q.**   Okay.  Now, the trial itself began in November of

22   2012, correct?

23   **A.**   Yes.

24   **Q.**   And after approximately two days of trial,

25   Mr. Caramadre directed yourself and Mr. Lepizzera to

1    open up plea negotiations, correct?

2    **A.**   I don't remember which day it was, and I think the

3    conversation that he had was with Mr. Lepizzera, who

4    then told me.

5    **Q.**   And so if I were to represent to you that was

6    either on Wednesday or Thursday of that trial week,

7    would that be consistent with your memory?

8    **A.**   Yes.

9    **Q.**   What portion of the plea negotiations, or what

10   role in the plea negotiations did you have?

11   **A.**   I spoke directly with Mr. Vilker about what I

12   think were most of the plea negotiations.

13   **Q.**   That would be in terms of what the terms of the

14   plea agreement would be, what potential charges

15   Mr. Caramadre would be willing to plead guilty to,

16   things of that nature?

17   **A.**   Yes.  Correct.

18   **Q.**   Could you describe for the Court what the initial

19   discussions were in terms of a plea possibility.

20   **A.**   After Mr. Lepizzera told me that the Defendant

21   wanted to open plea negotiations, I went to Mr. Vilker

22   and I asked Mr. Vilker if the Government would consider

23   a plea to a conspiracy only.  Mr. Vilker's response was

24   that it was unlikely in the current posture of the case

25   that the Government would do that, that it was likely

1   that a plea would involve multiple counts, and that it

2   probably would involve some floor of some number of

3   years.

4       And we talked about, I believe, using the

5   aggravated identity theft counts because they had a

6   two-year minimum mandatory sentence attached to them.

7       I went back to the Defendant and explained to

8   him what Mr. Vilker had responded to me. And the

9   Defendant told me that he would prefer a higher ceiling

10  rather than a floor so that we would have the ability

11  to possibly achieve a non-jail sentence.

12      I believe that I went back to Mr. Vilker and

13  advised him that the Defendant was not interested in a

14  floor and that -- I think that was all I said to him at

15  that time, if I'm not mistaken. And I believe

16  Mr. Vilker's response was that I should put something

17  in writing and submit it, and he would take it up with

18  his superiors at the U.S. Attorney's Office.

19      I think that this was on Thursday. Later that

20  evening, sometime Thursday evening, I believe that

21  Mr. Lepizzera sent an e-mail to Mr. Vilker suggesting

22  that the Defendant would offer a change of plea to one

23  count of identity theft -- identity fraud, excuse me,

24  which was the lowest offense that could be pled to in

25  this case.

1          And I believe that the following morning, I

2     guess would have been Friday morning, we got an e-mail

3     back from Mr. Vilker.  And Mr. Vilker said that his

4     office had rejected that proposal and instead told us

5     that the Government would accept a plea to the main

6     conspiracy count, which was Count 33, along with one

7     count of identity fraud, one substantive count of

8     identity fraud, one substantive count of mail or wire

9     fraud and the money laundering count, which was Count

10    65; that the Government would agree to dismiss all the

11    other counts; that the plea would have to be a tandem

12    plea with Mr. Radhakrishnan and that there would have

13    to be a restitution order, and I think he mentioned

14    that that would eliminate a floor.

15          I discussed that with -- I'm sure with

16    Mr. Lepizzera but also with the Defendant, and I think

17    I suggested that in order to move back to the

18    Government incrementally that he agreed to a plea to

19    the conspiracy count and to the money laundering count

20    because the money laundering count carried a maximum of

21    ten years, I think.  And so that would have capped the

22    ceiling at ten years.

23          The Defendant told me that he did not want to

24    plead to money laundering because, first of all, he

25    didn't want to be branded as a money launderer; and

1    secondly, a money laundering conviction would preclude

2    him from ever working in the financial industry again.

3    So he rejected the plea to the money laundering count.

4         That left only 20-year caps on anything

5    remaining. The Government had already agreed to

6    dismiss the witness tampering case so all that was left

7    was a plea to a substantive wire or mail fraud count

8    and that would have brought the ceiling to 20 years.

9         So I discussed that with the Defendant, and he

10   said that he would agree to one count of mail fraud or

11   wire fraud, but that he had a condition on that and the

12   condition was that he did not want to plead to any

13   specific fraud offense that involved certain

14   individuals, one of whom was Mr. LaMonte, one was

15   Mr. Mizzoni and I'm not sure who the third one was. I

16   think it was Mr. Duarte, but I'm not sure, because he

17   had close personal or family relationships with the

18   families of those individuals. And other than that,

19   that I should do the best I could with the plea.

20        He also agreed that, yes, there would obviously

21   have to be something done about restitution and that of

22   course he expected that the other counts of the

23   indictment would be dismissed and that we would have to

24   deal with Mr. Radhakrishnan on the tandem plea issue.

25        I went back to Mr. Vilker and advised him that

1    the substantive mail or wire fraud count would be

2    acceptable, that the Government could pick the count as

3    long as it didn't involve any of those three

4    individuals, and that the tandem plea issue was not an

5    issue if it was not an issue with Mr. Radhakrishnan.

6         As far as the restitution issue was concerned, I

7    think it was -- at that time, I told Mr. Vilker that we

8    would have to maintain the ability in the plea

9    agreement to contest all aspects of restitution, even

10   to the extent that an evidentiary hearing might be

11   necessary at sentencing; that as to the restitution

12   amount or a loss calculation that we would want to

13   contest that.

14        And I had a discussion also with Mr. Vilker

15   about the cap, because the money laundering count would

16   have provided a ten-year cap, and I still wanted to get

17   the ten-year cap if that was possible.  I believe it

18   was during this particular conversation, although I'm

19   not positive, but I think it was during this

20   conversation that I talked to Mr. Vilker about the fact

21   that I didn't want the cap to exceed ten years and that

22   the only way I could think of to achieve that was for

23   the Government to agree that they would not recommend

24   anything greater than ten years and that it might be

25   necessary to secure your Honor's agreement to a binding

1    plea in order to make that happen so that that would,

2    in effect, give us the equivalent of a ten-year cap.

3         Mr. Vilker told me that he would have to take

4    that up with the people in his office and that he would

5    let us know.  I don't specifically recall having

6    another conversation with Mr. Vilker, but I do remember

7    that later on, on Friday, I think Friday evening, I

8    think we got draft plea agreements from Mr. Vilker that

9    basically included most, if not all, of those terms.

10   Q.   Now, you referenced a number of conversations

11   during that time period that you had with Mr. Caramadre

12   where you would sort of report back to him and discuss

13   terms of a plea agreement at each stage, whether it was

14   the potential two-year one or the other variations that

15   came about.

16        What was your impressions of Mr. Caramadre's

17   ability to engage with you when you had those

18   discussions?

19   A.   He was fine.  He was perfectly engaged in the

20   conversations with me.

21   Q.   Did he ask you questions about, you know, what

22   terms can we get, what are the consequences of those

23   types of terms of the plea agreement?

24   A.   I don't know if there was a specific question

25   about consequences, per se.  The discussion that I had

1    with him was about what the terms of the plea

2    negotiations were as they were being discussed with

3    Mr. Vilker.  And he didn't appear to have any

4    difficulty understanding what I was telling him and I

5    didn't have any difficulty understanding what he was

6    telling me about what he would or would not agree to.

7    **Q.**   And he had some very specific things that he would

8    not agree to, for example?

9    **A.**   Correct.

10   **Q.**   He didn't want to agree to a two-year minimum?

11   **A.**   Correct.

12   **Q.**   What do you remember him saying about why he

13   didn't want to agree to a two-year minimum?

14   **A.**   Because he wanted to maintain the ability for us

15   to argue for a non-jail sentence.

16   **Q.**   Did he ever say anything about, well, that might

17   send a message to the Court that I'm actually guilty of

18   these offenses?

19   **A.**   He may have.  I don't specifically recall that.

20   **Q.**   What about you said that he also had some concerns

21   about pleading guilty to a money laundering charge?

22   **A.**   Correct.

23   **Q.**   What was his rationale for that?

24   **A.**   As I said, what he told me was that he believed

25   that a money laundering conviction would preclude him

1   from working in the financial industry ever again, and

2   he said that he did not want to be branded as a money

3   launderer.

4   **Q.**   So he was more willing to explore the possibility

5   of a higher statutory cap at 20 years on a fraud count

6   than the 10-year cap on a money laundering charge in

7   order to avoid that perception?

8   **A.**   Ultimately, that's correct.

9   **Q.**   Now, you were familiar with Mr. Caramadre's health

10  issues, in general?

11  **A.**   In general.

12  **Q.**   Did you have any concerns leading up to the trial

13  as to his competency to stand trial?

14  **A.**   No.

15  **Q.**   Did you have any concerns about his ability to

16  understand or assist in his defense?

17  **A.**   No.

18  **Q.**   During those several days of trial occurred, was

19  Mr. Caramadre engaged in assisting you and

20  Mr. Lepizzera in his defense?

21  **A.**   He was engaged in what we were doing.  I would say

22  that more of his conversations, most of his

23  conversations were probably with Mr. Lepizzera than

24  with me.

25  **Q.**   Did you find that unusual in any way?

1    **A.**    No.

2    **Q.**    Was that because of the relationship between

3    Mr. Caramadre and Mr. Lepizzera?

4    **A.**    That and the fact Mr. Lepizzera was conducting the

5    cross-examination of the witnesses.

6    **Q.**    You've tried a number of cases over the course of

7    your career?

8    **A.**    Yes.

9    **Q.**    Have you ever represented defendants who were

10   mentally incapable or where their mental competence was

11   an issue, either pretrial or at any other point in the

12   litigation?

13   **A.**    Yes.

14   **Q.**    In general, what steps would you take on behalf of

15   your client if you felt that was an issue that they

16   were dealing with?

17   **A.**    Bring it to the attention of the Court, and either

18   seek a competency evaluation if necessary or some other

19   relief from the Court.  Some opportunity to see if

20   there was a problem that could be relieved.

21   **Q.**    Based on your observations of Mr. Caramadre, how

22   he behaved, your interactions with him, his

23   interactions with Mr. Lepizzera, did you believe that

24   you had any reason to doubt his competency during the

25   trial?

1    **A.**    No.

2    **Q.**    Do you believe you had any reason to doubt his

3    competency on November 19th, the day that he pled

4    guilty?

5    **A.**    No.

6    **Q.**    Now, I want to turn your attention, Mr. Traini, to

7    Sunday, November 18th.  That was the day before the

8    actual change of plea colloquy?

9    **A.**    Yes.

10   **Q.**    Were you present at a meeting with Mr. Caramadre,

11   his wife, Mr. Lepizzera at the Caramadre household?

12   **A.**    Yes.

13   **Q.**    Approximately when did that meeting take place?

14   **A.**    Sometime Sunday evening.  I'm not sure what time.

15   **Q.**    And what was the purpose of that meeting?

16   **A.**    To review the terms of the plea agreement and the

17   statement of facts that we had received from your

18   office.

19   **Q.**    Could you describe for the Court what happened at

20   that meeting.

21   **A.**    As I recall, Mr. Lepizzera and I were seated at a

22   table with the Defendant and his wife.  Mr. Lepizzera

23   had copies of the plea agreement and the statement of

24   facts as they were drafted at that time and gave copies

25   to the Defendant and to me.  We had some discussion

1    about the case, about the trial.  I don't remember

2    exactly what.  About sentencing.  At some point, we

3    began to go through the documents.  We reviewed the

4    plea agreement and the statement of facts.

5         I recollect that I was reading them aloud and

6    explaining or summarizing provisions as we went

7    through.  And that ensued for a while.

8         There were -- I don't recall there being a lot

9    of questions asked.

10   **Q.**   During this process, did Mr. Caramadre appear to

11   you to be able to understand what was going on?

12   **A.**   Yes.

13   **Q.**   Did he seem like somebody who was mentally

14   incapable of understanding the terms that were in the

15   plea agreement?

16   **A.**   No.

17   **Q.**   Did he say anything to indicate to you that he was

18   incapable of reading the document himself?

19   **A.**   No.

20   **Q.**   Did he ever voice concerns that he needed you to

21   read it to him because he was so depressed, he was so

22   overwhelmed that he, himself, could not read the

23   documents?

24   **A.**   No.

25   **Q.**   Did he appear to be sitting upright at the table

1    and engaged in the process as you went through it with

2    him?

3    **A.**   Yes.

4    **Q.**   Have you had similar conversations with defendants

5    over the course of your career?

6    **A.**   Yes.

7    **Q.**   Was there anything particularly unique about the

8    way that you handled this particular explanation of the

9    plea document with the client?

10   **A.**   No.

11   **Q.**   This was something you had done many times with

12   many defendants?

13   **A.**   Yes.

14   **Q.**   And the questions that he did ask you, were they

15   appropriate questions?

16   **A.**   I don't really recall what questions he asked.

17   **Q.**   Did he ever say, I object to the statement of

18   facts, it's a lie, I'm being -- you know, I'm being

19   asked to plead to this huge conspiracy that I am

20   completely innocent of?

21   **A.**   Not in that sense, Mr. McAdams.  I can tell you

22   what I recall is that somewhere along the line during

23   that statement of facts colloquy, he made a statement

24   to the effect that -- I think he said something like

25   then I guess I'll just have to lie to the Judge.  And I

1    believe that my response was, I don't want to hear

2    about lying to the Judge.  I said that you're going to

3    be under oath when you're in the courtroom, and you'll

4    be required to tell the truth.  I believe I said to

5    him, You may have an epiphany between now and tomorrow

6    morning, but when you're in the courtroom and you're

7    under oath, I assume or I expect that you'll be

8    truthful.

9    **Q.**   Were you communicating to him with a wink and a

10    nod that although I'm telling you you can't lie, what

11    we all know and understand is you're going to go in

12    there tomorrow and lie?

13    **A.**   No.

14    **Q.**   Were you in any way intimating to him that somehow

15    magically his understanding of what was true and what

16    was false would change overnight?

17    **A.**   No.  I don't think I was addressing any concern of

18    his that he was going to be lying.  I was satisfied

19    that if he admitted to the statement of facts that he

20    was going to be telling the truth.  And this in my

21    estimation was to the benefit of his wife.

22    **Q.**   And did you have an independent basis to believe

23    that the facts that were elicited in the statement of

24    facts were, in fact, true?

25    **A.**   Yes.

**Q.** And was that independent basis formed in part by admission that Mr. Caramadre had made to you as his attorney?

**A.** To me and to Mr. Lepizzera, and related to me by Mr. Lepizzera, yes.

**Q.** Did you have any concerns as you left that meeting that Mr. Caramadre was mentally incompetent to enter in a plea the following morning?

**A.** No.

**Q.** Okay.  Did you leave that meeting thinking he's going to have to go in and lie to the Court in order to get through this plea colloquy?

**A.** No.

**Q.** Did you meet with Mr. Caramadre again on Monday morning?

**A.** Yes.

**Q.** Where did that meeting take place?

**A.** That meeting was in the meeting room that the Court had reserved for us I think on the second floor of this building.

**Q.** Now, what occurred at that meeting?

**A.** Well, at that meeting, we had the final versions of the documents, as I recall.  Mr. Vilker had some technical corrections to make to the documents so we got the final versions, and we went over the documents

1   again, briefly.  And I also had at that time a letter

2   that Mr. Lepizzera and I would be signing and that we

3   expected the Defendant to sign, which was a letter

4   containing an authorization, if you will, to negotiate

5   the plea and also essentially revoking his earlier

6   direction to us from a couple of months earlier not to

7   engage in plea negotiations with the Government.  And

8   we went through the plea agreement, we went through the

9   statement of facts, again, as I said, briefly.  He

10  reviewed the letter and I signed the letter,

11  Mr. Lepizzera signed the letter, the Defendant signed

12  the letter.  We all, I believe, signed the plea

13  agreement, and the Defendant signed the statement of

14  facts.  I don't know in which order any of these

15  documents were signed.  And I think we then went to the

16  courtroom.  I think we had already had our -- maybe we

17  had had our chambers conference or maybe we had not.  I

18  don't recall but --

19  **Q.**   Before we get to the plea colloquy, did you

20  pressure at any time Mr. Caramadre to plead guilty?

21  **A.**   No.

22  **Q.**   Was it your legal advice that it was in his best

23  interest to plead guilty?

24  **A.**   Yes.

25  **Q.**   Did you communicate that to him?

1    **A.**   Yes.

2    **Q.**   Did you have -- let me rephrase the question.

3          This was a plea that was taking place in the

4    context of a trial that was already in action, correct?

5    **A.**   Yes.

6    **Q.**   We were one week into a three- to four-month

7    trial?

8    **A.**   Yes.

9    **Q.**   Now, in your experience as a defense attorney,

10   have you had other cases where a defendant has changed

11   his plea mid-trial?

12   **A.**   Yes.

13   **Q.**   Okay.  In your experience, is it advantageous if a

14   defendant is going to change his plea mid-trial to

15   complete that process expeditiously?

16   **A.**   Yes.

17   **Q.**   Why?

18   **A.**   Well, for one thing, if you are in the middle of a

19   trial and you try to convert the case into a plea and

20   something happens to it and it doesn't go through,

21   you've now run the risk of contaminating the jury.

22   **Q.**   Are there other reasons?

23   **A.**   Well, it's always advantageous if you're going

24   to -- if a case is going to plea, that it be done

25   expeditiously because the longer the trial goes on, the

1  more evidence becomes available to the Court, which can

2  be used in sentencing.

3  **Q.**   So in other words, the ideal situation is,

4  assuming a guilty plea, is a brief pretrial plea in

5  which the facts are relatively limited and that's all

6  the Court has actual direct knowledge of at that point

7  in time?

8  **A.**   Correct.

9  **Q.**   And a situation where the Court is observing the

10  trial and watching the witnesses and hearing

11  everything, it can potentially be more damaging at

12  sentencing because the Court has just a better

13  understanding of what occurred?

14  **A.**   The longer a case goes, the more the Court becomes

15  aware of and the more risk that the sentence would be

16  more severe.

17  **Q.**   So did you think in this case that if

18  Mr. Caramadre were going to change his plea to guilty

19  that he ought to do so expeditiously?

20  **A.**   Once he made the decision that he wanted us to

21  open plea negotiations with the Government, yes.

22  **Q.**   Did you advise him that that was the proper way to

23  approach this?

24  **A.**   Yes.

25  **Q.**   Now, on the morning of the 19th when the plea

1    colloquy took place, did you have any concerns about

2    Mr. Caramadre's mental health status?

3    **A.**    No.

4    **Q.**    In those meetings that you described where he

5    executed the plea agreement, the statement of facts,

6    the letter from yourself and Mr. Lepizzera revoking

7    your earlier directive regarding plea negotiations, did

8    he make any comment then about I'm going to have to go

9    in and lie now, it's time for me to lie, anything like

10   that?

11   **A.**    No.

12   **Q.**    You were present during the plea colloquy,

13   correct?

14   **A.**    Yes.

15   **Q.**    Mr. Caramadre had some medicines that he had been

16   taking, correct?

17   **A.**    Yes.

18   **Q.**    And the Court inquired about those and you

19   provided a list?

20   **A.**    I recall providing the Court with a list of

21   medications, yes.

22   **Q.**    Now, in the course of your career and the number

23   of criminal defendants that you represented, how common

24   or uncommon is it for a criminal defendant to be taking

25   medication at the time of a Rule 11 colloquy?

1    **A.**   I wouldn't say it's uncommon.

2    **Q.**   It's fairly common?

3    **A.**   I guess maybe half and half, or something along

4    those lines.  It's not anything that strikes me as

5    uncommon.  Many people take medication these days.

6    **Q.**   And what's the basic concern that you might have

7    about whether a defendant is on medication at the time

8    of the --

9    **A.**   Whether or not the medication impairs his ability

10   to understand and appreciate what he's doing at the

11   time.

12   **Q.**   Did you have any reason to believe that any of the

13   medications that Mr. Caramadre was taking impaired his

14   ability to understand what was going on?

15   **A.**   No.

16   **Q.**   Did you believe that, in fact, he did understand

17   what was going on?

18   **A.**   Yes.

19   **Q.**   If you believed the opposite, would you have

20   informed the Court of that?

21   **A.**   Yes.

22   **Q.**   Would you have continued to try the case on a

23   daily basis if you believed that Mr. Caramadre had been

24   incompetent?

25   **A.**   If I thought something like that had happened, I

1    would have brought that to the attention of the Court.

2    **Q.**    When Mr. Caramadre entered his plea of guilty, did

3    you believe that it was in his best interest to do so?

4    **A.**    Yes.

5    **Q.**    Did you believe that he was lying to the Court by

6    admitting that he was guilty?

7    **A.**    No.

8    **Q.**    Did you believe that the statement of facts, which

9    he had signed and which were read into the record at

10   the change of plea colloquy was a lie?

11   **A.**    No.

12       MR. McADAMS:    May I have a copy of Government's

13   24, please.

14   **Q.**    Mr. Traini, this is document that's already in

15   evidence in this hearing.  It's Government's Exhibit

16   Number 24.  And it's an e-mail chain, the top e-mail is

17   yourself to Mr. Lepizzera.  It's December 27th, 2012,

18   which is well over a month after the change of plea

19   colloquy.

20       The reference below -- the lower e-mail from

21   Mr. Lepizzera is a note from Mr. Caramadre seeking to

22   move to vacate his guilty plea.  And Mr. Caramadre is

23   attaching an opinion in the case of **United States**

24   **versus Rocco DeSimone**.  Do you have a memory of

25   receiving this e-mail?

1    **A.**    I think so, yes.

2    **Q.**    If you want, you can read the whole thing.  If you

3    indicate to me you need to read it, I'll give you the

4    document to read.  If you don't I'm just going to ask

5    you, at the top it says, I agree with you, Mike, that

6    this is unfortunate and the facts here are not what

7    they were in DeSimone.  Our conversations with Joe were

8    not the same conversations that Corley had with

9    DeSimone.

10            Could you explain what you meant by that?

11   **A.**    My recollection of what had occurred in the

12   DeSimone case was that during the plea colloquy,

13   Mr. DeSimone balked at something in the statement of

14   facts or did not agree when he was asked whether or not

15   he agreed with them and had an actual conversation with

16   Mr. Corley, who, I think, told Mr. DeSimone that -- I

17   think if I remember right, Mr. DeSimone said something

18   about something not being true and Mr. Corley said to

19   him during the colloquy that's okay, you have to say

20   that it's true, everybody does it.  And he then went

21   ahead and answered the question.  And what I was

22   referring to was that this was not a case that involved

23   a conversation with the defendant in the middle of the

24   plea colloquy.

25   **Q.**    And did it also not include a conversation in

1    which counsel, whether intentionally or unintentionally

2    implied to the defendant that it was okay to falsely

3    admit facts at the plea colloquy?

4    **A.**    I'm sure it did, but that was -- you know, the

5    conversation that I was thinking of when I wrote that

6    was probably the one at the plea colloquy because

7    that's the most distinguishing characteristic of that

8    case.

9    **Q.**    Now, did you ever have any question in your mind

10   as to whether or not Mr. Caramadre was telling the

11   truth when he told the Court that he was guilty of

12   these crimes?

13   **A.**    No.

14   **Q.**    Did you have any doubt as to whether he was

15   competent to make those representations to the Court at

16   that time?

17   **A.**    No.

18   **Q.**    Did you believe that the plea was in his best

19   interest?

20   **A.**    Yes.

21           MR. McADAMS:  No further questions.

22           THE COURT:  Thank you.  Who will be conducting

23   the cross?

24           MR. WATT:  I would.

25

1           **CROSS-EXAMINATION BY MR. WATT**

2   **Q.**   Mr. Traini, I'm Robert Watt.  Good afternoon.

3   **A.**   Good afternoon.

4   **Q.**   How did you refer to Mr. Caramadre during the

5 course of your representation of him?

6   **A.**   I don't understand your question.

7   **Q.**   Did you refer to him by his first name, by his

8 last name or "the Defendant" as you've referred to him

9 here today?

10       MR. McADAMS:  Objection.  Irrelevant.

11       THE COURT:  I'll give him some latitude.

12 Overruled.  Go ahead.

13   **A.**   When I was talking about him or to him?

14   **Q.**   To him.

15   **A.**   I referred to him as Joe.

16   **Q.**   Okay.  But when you're talking about him, it's now

17 the Defendant?

18   **A.**   He is the Defendant.

19   **Q.**   Can you tell the Court how the breakdown occurred

20 between you and Mr. Lepizzera as to what your

21 respective roles were as it related to the

22 representation?

23   **A.**   My role was to assist Mr. Lepizzera in whatever

24 way Mr. Lepizzera thought was appropriate.  Generally,

25 that was more on the legal side, I guess, rather than

1    the factual side of things in terms of motions,

2    strategy, analysis of issues, protecting the record,

3    sentencing if it became necessary.  Generally, that

4    sort of thing.

5    **Q.**   And Mr. Lepizzera had been representing him for a

6    couple of years at that standpoint that you came in?

7    **A.**   Mr. Lepizzera had been representing the Defendant,

8    you mean?

9    **Q.**   Yes.

10   **A.**   Yes.

11   **Q.**   And you had been representing Mr. Maggiacomo for

12   three years since 2009 at that point?

13   **A.**   If that's when that started, yes.  I don't recall

14   specifically.

15   **Q.**   When is it that you cut the deal for

16   Mr. Maggiacomo that gave him a non-prosecution?

17   **A.**   Why?

18   **Q.**   When?

19   **A.**   Oh, when.  I don't remember the date.

20   **Q.**   Do you have an approximation as to how long it was

21   before you came on board with Caramadre?

22   **A.**   I don't.

23   **Q.**   You had your first conversation with Mr. Lepizzera

24   to represent Mr. Caramadre?

25   **A.**   I had a conversation with him at some time.  I

1    don't remember when that was.

2    **Q.**    And as a result of that conversation, what next

3    did you do?

4    **A.**    Probably had another conversation with

5    Mr. Lepizzera.  I don't think there was only one.

6    **Q.**    As a result of those two or how ever many it was,

7    what was the next thing that you did?

8    **A.**    I believe that the next thing was that I met with

9    the Defendant to negotiate the fee, I think.

10   **Q.**    And where did that take place?

11   **A.**    At his home.

12   **Q.**    How long was the meeting?

13   **A.**    I don't recall.

14   **Q.**    Okay.  And did you memorialize the discussion in

15   any piece of paper that you still have in your

16   possession as to what was talked about that day?

17   **A.**    Other than what's in the fee agreement, no.

18   **Q.**    Okay.  June 1st of 2012, did you receive via

19   Mr. Lepizzera a communication from Mr. Caramadre?

20   **A.**    I don't remember if I did.

21   **Q.**    What have you reviewed, if anything, Mr. Traini,

22   prior to your coming down here today to testify?

23   **A.**    Some of the e-mails that were produced in the

24   course of this matter.  When I say "this matter," I

25   mean this proceeding now.  I don't remember exactly

1    which ones.

2    **Q.**   How long ago did you review those?

3    **A.**   Probably within the last couple of weeks.

4    **Q.**   Okay.  And did you consult at all with

5    Mr. Lepizzera relating to this particular matter here

6    in the court today?

7    **A.**   Only in connection with my representation by

8    Mr. Gerstein.

9    **Q.**   Did you read the motion to vacate the plea?

10   **A.**   I think I did.

11   **Q.**   You think you did?

12   **A.**   I believe I did, yes.

13   **Q.**   Okay.  When did you read that?

14   **A.**   Probably shortly after I received it, which I

15   guess was not long after it was filed.

16   **Q.**   Okay.  Besides that motion, did you read any

17   supplemental memorandum?

18   **A.**   I believe I did read whatever pleadings there

19   were.

20   **Q.**   Okay.  And as a result of all the pleadings, did

21   you do any preparation now on notice that you would

22   probably be a witness in this case?

23   **A.**   Nothing in particular, other than reviewing some

24   of those e-mails.

25   **Q.**   And what is the period of time that those e-mails

1    relate to that you would have reviewed as best your

2    recollection gives you?

3    **A.**   The period of time that the e-mails covered I

4    think was from the beginning of the trial until the

5    time of the plea, if I'm not mistaken.  And then I

6    think there were some additional ones after that that

7    were outside that time frame.

8    **Q.**   And did you give an opinion of any sort as to

9    whether or not your services were advisable in

10   conjunction with Mr. Lepizzera in the defense of

11   Mr. Caramadre at the time you went out to his home?

12   **A.**   I don't think I understand your question.

13   **Q.**   Did you give an opinion to Mr. Caramadre as to the

14   advisability of your services to assist Mr. Lepizzera

15   in the defense of Mr. Caramadre?

16   **A.**   Not that I specifically recall.

17   **Q.**   Did you give Mr. Caramadre any specific facts upon

18   which you believed it was in his interest to take you

19   on as co-counsel?

20   **A.**   Not that I can specifically recollect, other than

21   the fact that we talked about my prior representation

22   of Mr. Maggiacomo.

23   **Q.**   Prior representations involving Mr. Lepizzera as

24   to other cases?

25   **A.**   I had worked with Mr. Lepizzera in one or two

1  other cases.  I don't remember specifically discussing

2  that, although I probably would have mentioned that I

3  had worked with him.  I think that would have been

4  something I probably would have said.

5  **Q.**  Did you specifically tell Mr. Caramadre that

6  Michael Lepizzera had stressed out in a previous

7  representation assisting you in the defense of another

8  person and that it was advisable that you be brought on

9  to this case to assist him?

10 **A.**  I don't specifically recall saying that.

11 **Q.**  Would there have been a basis for saying it, if it

12 were said?

13 **A.**  I don't know that there would.

14 **Q.**  But you have no specific recollection?

15 **A.**  No, I do not.

16 **Q.**  Okay.  Did you ever give Mr. Caramadre your

17 opinion as to his guilt or innocence?

18 **A.**  I don't think so.

19 **Q.**  Did Mr. Lepizzera ever give to you an opinion as

20 to his belief, that being Mr. Lepizzera's belief, in

21 Mr. Caramadre's guilt or innocence?

22 **A.**  I think in the course of the discussions that I

23 had with Mr. Lepizzera that would have been in the

24 context of various admissions that the Defendant had

25 made to him or to us about certain things in the case,

1    but not in the form that you asked it.

2    **Q.**   Okay.  Why don't we start with the admissions that

3    Mr. Caramadre made to you as opposed to Mr. Lepizzera

4    related to you by Mr. Lepizzera.  What admissions did

5    Mr. Caramadre make to you?

6    **A.**   I can't differentiate them between things that he

7    said to me and Mr. Lepizzera together or things that I

8    learned from Mr. Lepizzera.

9    **Q.**   Did you participate in a mock cross-examination of

10   Mr. Caramadre at any point in time?

11   **A.**   I recall a couple of situations where

12   Mr. Lepizzera did something like mock cross-examination

13   of the Defendant.  Not extensively.  Not in the context

14   of what you and I would know as a mock trial or

15   anything like that.  But I remember a couple of

16   occasions when Mr. Lepizzera did that in my presence.

17   **Q.**   What would be your characterization, be there one,

18   as to the amount of time that this case consumed of

19   either your practice or your life from July 1st of

20   2012, until November 13th, 2012?

21   **A.**   Quite a bit.

22   **Q.**   Can you give me an estimate in terms of how much

23   time of the time you spent on legal work you spent on

24   Mr. Caramadre's case from July 1st, 2012, to November

25   13th, 2012?

1    **A.**   No.

2    **Q.**   Did you keep time records?

3    **A.**   Some.

4    **Q.**   Did you ever provide those to Mr. Lepizzera?

5    **A.**   No.

6    **Q.**   Did you ever provide them to Mr. Caramadre?

7    **A.**   No.

8    **Q.**   Ever asked by either of the two to provide them?

9    **A.**   No.

10   **Q.**   Was it your belief at the time of the signature

11   with Mr. Lepizzera on the retainer agreement that you

12   would be entitled to the entire fee if a plea were

13   effectuated within weeks thereafter?

14   **A.**   Within weeks after the execution of the fee

15   agreement?

16   **Q.**   Um-hum.  (Affirmative.)

17   **A.**   Did I believe that?

18   **Q.**   Yes.

19   **A.**   No.

20   **Q.**   You would have believed at that point in time that

21   you would be entitled to the entire fee.

22   **A.**   Maybe I didn't understand your question correctly.

23   **Q.**   Perhaps I phrased it inartfully.

24        At the time that you signed the agreement with

25   Mr. Lepizzera, did you believe that if a plea were

1    effectuated within relatively short order, two, three,

2    four weeks, a month, month-and-a-half, that you would

3    be entitled to the entire negotiated fee of $450,000.

4    **A.**    No, I don't think I would have believed that.

5    **Q.**    But you indicated that you cut the deal with

6    Mr. Caramadre that it was non-refundable?

7    **A.**    Correct.

8    **Q.**    Would you have taken the entire fee?

9    **A.**    If there had been a disposition of the case within

10    a few weeks after --

11    **Q.**    Say a month, month-and-a-half, before the end of

12    the summer?

13    **A.**    No, I don't think I would.

14    **Q.**    Why wouldn't you?  It's a non-refundable.

15    **A.**    Because I think that would have been too severe.

16    **Q.**    You would have been within your legal rights, your

17    belief, to have taken it?

18    **A.**    I think so.

19    **Q.**    But you would not have done it?

20    **A.**    I think I probably would not have.

21    **Q.**    Can you tell the Court when you first became aware

22    from Mr. Caramadre or from Mr. Lepizzera relating

23    Mr. Caramadre's communications that there was a request

24    for money back by Mr. Caramadre?

25    **A.**    As I recollect, I received an e-mail from

1      Mr. Lepizzera at some point.  I don't remember when.

2      Maybe in December.

3      **Q.**    November 27th, nine days after the plea?  Does

4      that strike a chord as to when you might have first

5      been informed as to when Mr. Caramadre was looking for

6      money back or an accounting?

7      **A.**    No.

8      **Q.**    Does not.  Okay.

9          Now, Sunday, November 18th, how do you arrive at

10     the Caramadre residence?

11     **A.**    In my vehicle with Mr. Lepizzera.

12     **Q.**    Did you pick him up at his house down the road?

13     **A.**    Yes.

14     **Q.**    You drove there together?

15     **A.**    Yes.

16     **Q.**    And at the conclusion of the meeting, where did

17     you go?

18     **A.**    Mr. Lepizzera's house.

19     **Q.**    Did you spend any time there?

20     **A.**    I did.

21     **Q.**    What did the two of you discuss?

22     **A.**    I think we discussed, if I'm not mistaken, the

23     fact that we now should -- then rather, should notify

24     the Court as to the status of the situation for the

25     following morning; and I think, if I'm not mistaken,

1    Mr. Lepizzera sent an e-mail to the Judge at that time.

2    **Q.**   In your presence?

3    **A.**   I think so.

4    **Q.**   How long was the meeting at Caramadre's house?

5    **A.**   I don't know.

6    **Q.**   Approximation?

7    **A.**   I really can't give you one.  An hour or so maybe,

8    an hour-and-a-half.  I don't know.

9    **Q.**   You were tired on Sunday night?

10   **A.**   I'm tired every night, Mr. Watt.

11   **Q.**   You had driven back from New York?

12   **A.**   Correct.

13   **Q.**   You had left for New York early in the morning on

14   Saturday?

15   **A.**   Correct.

16   **Q.**   And you weren't even sure if you were going to

17   meet with Mr. Caramadre during the course of the

18   weekend; is that correct?

19   **A.**   Correct.

20   **Q.**   You told Mr. Lepizzera that only were it necessary

21   would you go to his house; is that correct?

22   **A.**   I think so.  I don't remember all the

23   communications that I had, but I think that's probably

24   true.

25   **Q.**   Okay.  And can you tell the Court when the issue,

1  if it ever came up, of willful blindness first came up

2  as it relates to Mr. Caramadre and this trial?

3  **A.**  I can't tell you that because -- first of all, I

4  don't remember; and secondly, I think that it came up

5  in the context of a conversation that Mr. Lepizzera had

6  with somebody not -- it didn't come up directly with

7  me.

8  **Q.**  With you.  Nor with you and Mr. Vilker or you and

9  Mr. McAdams; is that correct?

10  **A.**  I don't recall it coming up with me and Mr. Vilker

11  or me and Mr. McAdams, no.

12  **Q.**  Okay.  Now, at some point in time, did you become

13  aware of Mr. Caramadre's interest in something called

14  an <u>Alford</u> plea?

15  **A.**  Yes.

16  **Q.**  When did that happen?

17  **A.**  If I remember correctly, I think it was in an

18  e-mail that I was copied on that went from the

19  Defendant to Mr. Lepizzera.

20  **Q.**  Late Saturday night?

21  **A.**  I think it was on Saturday.  I don't remember

22  when.

23  **Q.**  What did the e-mail say, as best as you can

24  recollect?

25  **A.**  Something about an <u>Alford</u> plea eliminating his

1    having to lie, or something of that nature.

2    **Q.**   Your advice to Mr. Lepizzera as a result of having

3    gotten that copy of that e-mail was what?

4    **A.**   I think what I said was that if the Defendant

5    thought that he had to lie in order to accomplish the

6    plea, that that wasn't going anywhere and that I think

7    I also mentioned to him that I had raised the issue of

8    an <u>Alford</u> plea with Mr. Vilker earlier, and he rejected

9    it out of hand.

10   **Q.**   Did you communicate that fact to Mr. Caramadre of

11   a rejection out of hand by Mr. Vilker to you?

12   **A.**   I think I did.  It was almost inconsequential it

13   was so quickly rejected by Mr. Vilker.

14   **Q.**   Inconsequential to whom?

15   **A.**   Well, the impression that I got was

16   inconsequential to Mr. Vilker, and frankly, I didn't

17   expect that he would seriously entertain an <u>Alford</u> plea

18   when I mentioned it.

19   **Q.**   Okay.  And as a result of that e-mail on which you

20   were copied Saturday night, you advised Mr. Lepizzera,

21   if he's going to say he's innocent, then we got to go

22   to trial on Monday?

23   **A.**   I don't recall saying that.

24   **Q.**   Did you tell him to call Mr. Caramadre and

25   straighten this out?

1  **A.** I recollect that what I advised Mr. Lepizzera was

2  to tell the Defendant that an <u>Alford</u> plea had already

3  been rejected and that -- I don't remember what else,

4  but I think I told him to tell him that that was out of

5  the question or something like that.

6  **Q.** Your next communication with Mr. Lepizzera was in

7  the morning time; is that correct, on Sunday?

8  **A.** I don't know.

9  **Q.** You communicated with Mr. Lepizzera throughout the

10  day on Sunday leading up to the meeting at the

11  Caramadre household?

12  **A.** I guess I was. I don't specifically recall the

13  communications.

14  **Q.** You've checked the e-mails as it relates to this

15  period of time?

16  **A.** Well, when I say I checked them, you mean while

17  they were happening?

18  **Q.** Even getting your phone turned on in the

19  intermission at *Aida,* you would check from time to

20  time, isn't that correct?

21  **A.** I did check from time to time.

22  **Q.** Specifically, you told Mr. Lepizzera to tell

23  Mr. Caramadre that you were involved in every step of

24  this process, let him know I'm in the loop so he

25  doesn't ask for a refund?

1   **A.**   I did tell him that.

2   **Q.**   What did Mike Lepizzera respond to you?

3   **A.**   I don't remember.

4   **Q.**   Did he tell you Joe's on board?

5   **A.**   I can't tell you, Mr. Watt.  I don't remember what

6   he responded.

7   **Q.**   Let me ask you this, Mr. Traini.  Did you raise

8   the issue of a refund with Joe Caramadre during the

9   meeting at his house on Sunday night?

10  **A.**   No.  I don't think so.

11  **Q.**   So you relied upon Mr. Lepizzera as having

12  followed your instructions as to clarifying this I've

13  got to lie e-mail on Saturday night and also with

14  regards to his representation to you that Joe's on

15  board as to no refund?

16  **A.**   I don't think I relied on anything.  I don't think

17  that I -- I don't recall it coming up again.

18  **Q.**   It came up on Sunday night.  Joe said that he was

19  innocent?

20  **A.**   That wasn't my recollection of the conversation.

21  **Q.**   What's your recollection of the conversation that

22  occurred on Sunday night with regards to the word

23  "innocence"?

24  **A.**   I don't remember anything about with regards to

25  the word "innocence."  I recall, as I testified

1    earlier, the statement that he made about lying to the

2    Judge.  That was the extent of that as far as I can

3    remember.

4    **Q.**   As far as you can recall.  Did you memorialize the

5    results of the Sunday meeting in any kind of a written

6    document or notes between counsel that you reviewed in

7    terms of preparation for testimony today?

8    **A.**   No, I don't think so.

9    **Q.**   What was Mrs. Caramadre's role, if any, in the

10   meeting on Sunday night?

11   **A.**   My recollection is that it was very limited.  I

12   think she may have asked a couple of questions, but

13   otherwise I don't recall her participating much.

14   **Q.**   Okay.  You sat at the head of the dining room

15   table?

16   **A.**   I guess.  I sat somewhere at the table.

17   **Q.**   You don't remember sitting at the head of the

18   table?

19   **A.**   Not in particular, no.

20   **Q.**   And Mr. Lepizzera sitting to your right?

21   **A.**   If he did, that's where he sat.  I just don't

22   recall.

23   **Q.**   Statue, three or four foot statute of St. Joseph's

24   ten feet in back of you?

25   **A.**   I wasn't looking behind me so I don't recall what

1    was behind me.

2    **Q.**    You don't recall seeing the statute of St.

3    Joseph's in that room that night?

4    **A.**    I had been in the house previously, if you

5    remember.

6    **Q.**    One time.  And had you seen the statute then?

7    **A.**    Yes, because Mr. Caramadre pointed it out to me.

8    **Q.**    And it was in the same room as the room that you

9    sat in on Sunday night at his house?

10   **A.**    Probably.  I can't imagine that it would have

11   moved.

12   **Q.**    You didn't see a space in the wall where the

13   statue had been?

14   **A.**    I wasn't paying attention to the statue.  I don't

15   understand -- is there some reason why the statue is

16   important?

17   **Q.**    Let me ask you.  Were you aware that your

18   co-counsel and Mr. Caramadre were members of a

19   religious group together of which that statue bore a

20   significance?

21          MR. McADAMS:  Objection, your Honor.  I don't

22   know what this could possibly in any way relate to this

23   hearing.

24          THE COURT:  Well, let's give Mr. Watt a chance

25   to explain it.  I'll give him a little latitude.

1  Overruled.  Go ahead.

2  **A.**  I was aware that they were both members of -- I

3  know they were both parishioners at Holy Apostles

4  Church.

5  **Q.**  You characterized some of your reaction to

6  whatever it was that Mr. Caramadre said, you used a

7  religious term, "epiphany;" is that correct?

8  **A.**  Well, I think it's more than simply a religious

9  term.

10  **Q.**  What did it mean to you when you used the word on

11  that night?

12  **A.**  A realization is generally what I think of as an

13  epiphany.

14  **Q.**  And a realization of something previously

15  unthought of; is that correct, unexperienced?

16  **A.**  I don't know exactly, Mr. Watt.  I'm not an

17  etymologist.

18  **Q.**  Can you tell me whether or not Michael Lepizzera

19  participated in the meeting on Sunday night?

20  **A.**  As far as I recall, yeah.

21  **Q.**  How did he participate?

22  **A.**  I believe that he was also engaged in some of the

23  conversation.

24  **Q.**  How did you observe Michael Lepizzera's demeanor

25  that night during the meeting at the Caramadre house?

1     **A.**    Didn't seem to me to be different than

2    Mr. Lepizzera's demeanor generally was.

3     **Q.**    Did he look burnt out to you?

4     **A.**    I don't recall what he looked like.  I mean, he

5    was Michael.  He looked like he looks.

6     **Q.**    You've known him for a long time?

7     **A.**    I've known him for a number of years, yeah.

8     **Q.**    So if he characterized himself as burnt out in

9    testimony to this Court, would that surprise you?

10     **A.**    Not necessarily.

11     **Q.**    Have you had experience with Michael Lepizzera

12    being burnt out on other occasions in you relationship

13    with him?

14        MR. McADAMS:  Your Honor, I'm going to object.

15    I don't know what Mr. Lepizzera's being or not being

16    burnt out has to do with any of this.  It's not in any

17    motion.  It's clearly irrelevant and it's nowhere.

18        THE COURT:  I'm a little confused myself about

19    all this, but can you explain it?

20        MR. WATT:  I can, Judge.  Perhaps with an

21    additional question or two I can explain it, of

22    Mr. Traini.  If the Court wants me to give that

23    explanation to the Court, I'll do that.

24        THE COURT:  I'll give you a few questions.  Go

25    ahead.

1    **Q.**   What did you understand to be the general nature

2    of the medical or psychiatric condition of

3    Mr. Caramadre during your representation of him?

4    **A.**   That he had some various medical and psychiatric

5    issues for which he was taking medication.

6    **Q.**   Did you know what those were with any specificity?

7    **A.**   Other than depression and some physical issues,

8    which I don't recall now, not with any specificity, no.

9    **Q.**   And was Michael Lepizzera's basic responsibility

10   to have client control during this case?

11   **A.**   I don't -- I wasn't determining what Michael's

12   responsibility was.  Michael determined what his

13   responsibility was.

14   **Q.**   So if he indicated to the Court that he was the

15   client control guy, does that strike you as being

16   untrue as it relates to the characterization of how he

17   divided the responsibilities of representation?

18   **A.**   If Michael said that was one of his

19   responsibilities, then that was one of his

20   responsibilities.

21   **Q.**   Okay.  And you've indicated to the Court that, in

22   fact, it was the majority of the conversations that

23   Mr. Caramadre had with either counsel was to Michael

24   Lepizzera; is that correct?

25   **A.**   I think that's correct, yes.

1  **Q.**  You prepared like a 13-page letter, give or take,

2  in September of 2012, outlining why in your opinion it

3  was advisable to authorize you and Mr. Lepizzera to

4  enter into some sort of plea bargaining with the

5  Government; is that correct?

6  **A.**  I don't know if that's the way that I would

7  characterize it.  I recall drafting a very lengthy

8  letter with a very detailed analysis of the Federal

9  Sentencing Guidelines, and I think that without looking

10  at the letter I can't be sure, but I believe that what

11  I said at the top of that letter was that it was being

12  written consistent with some recent Supreme Court

13  decisions that had to do with obligations on the part

14  of defense counsel with respect to plea negotiations or

15  the availability of plea negotiations and that counsel

16  had certain responsibilities according to these recent

17  cases.

18  **Q.**  The Lafler case and other cases; is that correct?

19  **A.**  Correct.  I don't remember the cites now, but I

20  think so.

21  **Q.**  Can you tell the Court what was the result of that

22  letter?  Did you give it to Mr. Caramadre to consider?

23  **A.**  Yes.  We went over that letter with Mr. Caramadre

24  at a meeting.

25  **Q.**  And did he take it with him home and come back and

1     sign it later on rejecting permission to give you --

2     **A.**   I don't remember whether he took it with him and

3     signed it later or he signed it there. Ultimately, it

4     got signed.

5     **Q.**   What was his reason for rejecting your request to

6     initiate plea bargain negotiations?

7     **A.**   He said that he had no interest in a plea.

8     **Q.**   That's it?

9     **A.**   He said that he was not going to plead guilty in

10    the case, I believe.

11         There was something that -- I think if I

12    remember right, there were two separate paragraphs at

13    the end of that letter, either of which could have been

14    the signature acknowledgment, if you will. And they

15    both -- they were longer than one line. They both said

16    something in particular. And he signed the one that

17    rejected the suggestion that he consider a plea, I

18    think. I don't remember exactly what that

19    acknowledgment said, other than the fact that it -- I

20    don't want to say directed us not to enter plea

21    negotiations but I guess it did not authorize us to

22    enter plea negotiations, I think.

23    **Q.**   Can you tell the Court whether or not you ever

24    consulted with any of Mr. Caramadre's treating

25    physicians or psychiatrists or psychologists?

1    **A.**    No, I did not.

2    **Q.**    Was that ever an issue between the division of

3    your responsibilities with Mr. Lepizzera as to who, if

4    anyone, was going to monitor this depression condition?

5    **A.**    I don't think that either one of us was -- I guess

6    I'm not comfortable with your characterization of

7    "monitoring."  It wasn't a monitoring task.  If what

8    you're asking me is which one of us was in

9    communication with any treating professionals during

10   the time of trial preparation, the answer is that it

11   would have been Mr. Lepizzera, not me.

12   **Q.**    Were you aware that Mr. Lepizzera had consulted

13   with both his psychiatrist and his psychologist?

14   **A.**    I think I was.

15   **Q.**    And you were aware that he was required as a

16   condition of his release in this case to continue

17   seeing his psychologist on a weekly basis?

18   **A.**    I believe so.

19   **Q.**    Do you know what day that was?

20   **A.**    What day what was?

21   **Q.**    That he was required to see his psychologist on a

22   weekly basis?

23   **A.**    I don't.

24   **Q.**    To your knowledge, did he see his psychologist

25   during the week of trial?

1    **A.** I don't know.

2    **Q.** Can you tell the Court whether or not

3    Mr. Lepizzera made any comment during the course of the

4    trial as to his belief in what Mr. Caramadre's mental

5    status was?

6    **A.** I'm not sure I understand the question.

7    **Q.** Let me rephrase it. Did Mr. Lepizzera ever

8    indicate to you during the trial week his belief that

9    Mr. Caramadre was losing it?

10    MR. McADAMS: I'm going to object to this

11    question. Mr. Lepizzera testified. Nobody asked him

12    about this. It's irrelevant what he remembers

13    Mr. Lepizzera saying to him. It's about what they

14    communicated to Mr. Caramadre.

15    MR. WATT: I can strike that, Judge. I'll move

16    on.

17    **Q.** Did Mr. Caramadre ever indicate to you any

18    particular stress that he was feeling during the course

19    of that trial week, Tuesday, Wednesday, Thursday or

20    Friday?

21    **A.** There was one occasion when he advised us that his

22    wife had, I don't know whether he termed it a nervous

23    breakdown or that she had some psychological or

24    emotional issue of some significance. I think that was

25    Wednesday, but I'm not sure.

1    **Q.**   Okay.  And how was that communicated to you?  Were

2    the two of you together as best you can recall?

3    **A.**   As best I recall, we were downstairs in the

4    meeting room that we had on the second floor, and I

5    think that the three of us were together and I'm not

6    sure I have a recollection that either

7    Mr. Radhakrishnan or maybe Mr. Thompson was in the room

8    or in and out of the room at the time.

9    **Q.**   And had Mrs. Caramadre, to your best recollection,

10   been at trial the first day of trial?

11   **A.**   I believe she was there the first day and the

12   second day.

13   **Q.**   Did you have communication directly with her of

14   any fashion during either of those two days one on one?

15   **A.**   I recall that at the conclusion of the first day,

16   which would have been Tuesday, we were packing up and I

17   was sitting where Mr. McAdams is sitting now.  And she

18   came up to the rail, and I think this was -- I think

19   the trial day ended with us in the course of the video

20   deposition of Mr. Wiley.  And she came up to the rail

21   and when I turned around, and I don't know that she was

22   necessarily addressing herself to me because

23   Mr. Lepizzera was at the rail as well, she said

24   something about -- something about documents.  What's

25   going on with these documents, or what are these

1    documents about, or something like that.  There were a

2    number of documents that I think had been referred to

3    in the course of the video deposition, and the

4    Government had introduced a number of documentary

5    exhibits that day.

6    **Q.**    That's the limited contact that you would have had

7    with her on that day.  Any on the second day?

8    **A.**    On the second day, I don't specifically recall

9    having any contact with her.

10   **Q.**    And thereafter, none until Sunday night; is that

11   correct?

12   **A.**    I believe that's correct.

13   **Q.**    You don't recall the questions she asked, the

14   couple of questions she asked on Sunday night?

15   **A.**    My recollection is that she asked a couple of

16   questions about what I thought likely sentences might

17   be, whether after a trial or after a plea, I think.

18   **Q.**    Did you give her an opinion as to the general

19   nature of Federal Court sentencing as it relates to

20   different types of criminal defendants and the types of

21   sentences one could expect?

22   **A.**    My recollection is that I think one of the

23   questions was what I thought a likely sentence might be

24   in this case if there was a trial conviction, and I

25   think my response, if I remember, was something between

1    20 and 30 years. And I seem to recollect that the

2    other question was what my opinion was relative to a

3    sentence if there was a plea in this case or after the

4    plea. And I recall, I think, saying that -- I think I

5    said that there was a possibility that the sentence

6    could be less than five years and might possibly even

7    be no jail.

8    **Q.** Okay. When did you first get the plea bargain

9    agreement, first presentation from the Government to

10    either yourself or Mr. Lepizzera?

11    **A.** If I remember correctly, I think that it came to

12    us via e-mail from Mr. Vilker on Friday, late in the

13    day.

14    **Q.** Late in the afternoon?

15    **A.** Maybe Friday evening or something like that.

16    **Q.** Did you communicate that plea bargain agreement or

17    forward it on to Mr. Caramadre?

18    **A.** I don't think I did.

19    **Q.** Do you think Mr. Lepizzera did?

20    **A.** I think Mr. Lepizzera might have. I don't know

21    whether he did or not. I don't remember.

22    **Q.** Did you, in your review of your e-mails, have a

23    recollection of any specific e-mail to Mr. Caramadre

24    sending the plea bargain agreement at any point in time

25    from the time of the first receipt in the late

1 afternoon of Friday right through the meeting as it

2 commenced at the Caramadre household on Sunday evening?

3 **A.** I don't have any specific recollection of a

4 communication of that type.

5 **Q.** Do you remember after the plea bargain agreement

6 was first sent to you on Friday afternoon, do you

7 remember sending an e-mail to Mr. Lepizzera that you

8 were going to take a stab at the statement of facts?

9 **A.** I seem to recollect something like that.

10 **Q.** Did you ever prepare a statement of facts?

11 **A.** No.  I think I had some communication with

12 Mr. Lepizzera and I don't remember if he had had a

13 conversation with Mr. Vilker in which Mr. Vilker said

14 he was going to write the statement of facts or

15 something like that.  But ultimately, I don't think I

16 did it and I think that I didn't do it after I had a

17 conversation with Mr. Lepizzera, but I don't remember

18 exactly what that was.

19 **Q.** You were on your way to New York and I understand,

20 but do you recall when it was that the defense team

21 got, from Mr. Caramadre's standpoint, the first

22 statement of facts from the Government?

23 **A.** When the Defendant got it himself or when the

24 lawyers got it?

25 **Q.** When the defense team, you and Mr. Lepizzera or

1    either of you?

2    **A.**   I don't remember -- I would think that -- I think

3    Mr. Lepizzera probably saw it before I did.

4    **Q.**   Okay.

5    **A.**   But I don't recall specifically.

6    **Q.**   Did you ask Mr. Lepizzera to forward it on to

7    Mr. Caramadre?

8    **A.**   I don't remember if I did.

9    **Q.**   Do you know whether he did?

10   **A.**   I don't know.   I mean, I can't recall whether he

11   did or not.

12   **Q.**   Mrs. Caramadre was not in the court on Monday, the

13   day of the taking of the plea by the Judge; is that

14   correct?

15   **A.**   Yes, it is.

16   **Q.**   Okay.   Did you ask Joseph Caramadre "Do you

17   believe you are innocent or do you believe you're

18   guilty," on Monday, November 19th?

19   **A.**   I don't recall asking him that question.

20   **Q.**   Do you recall that question directly being asked

21   by Mr. Lepizzera of Mr. Caramadre:   Do you believe that

22   you are innocent or guilty?

23   **A.**   I don't recall that question being asked.

24   **Q.**   At the time of the execution of the documents on

25   the morning of November 19th, what were those technical

1   changes, if any, that had been affected by Mr. Vilker

2   between Sunday night and Monday morning?

3   **A.** I don't remember what they were, Mr. Watt. There

4   were -- my recollection is that they were not material.

5   There were a couple of things that were what we would

6   understand as technical in the sense that they were

7   either, I don't know, grammatical corrections or some

8   other things that needed to be done. Nothing that

9   impacted the substance of the documents, though.

10  **Q.** Okay. Did those technical corrections occur as a

11  result of your request?

12  **A.** I don't think so.

13  **Q.** Okay. Mr. Lepizzera's request?

14  **A.** I don't know about requests. I believe they

15  occurred as the result of a conversation between

16  Mr. Lepizzera and Mr. Vilker.

17  **Q.** And Mr. -- I didn't get the last.

18  **A.** Mr. Vilker.

19  **Q.** Mr. Vilker. Okay. Prior to the meeting with the

20  Caramadres on Sunday evening, when was the last change

21  in the plea bargain agreement made, to your best

22  knowledge, after the communication to Mr. Vilker and

23  Mr. McAdams on Saturday morning by Mr. Lepizzera?

24      MR. WATT: Let me strike that, Judge, if I

25  could.

1           THE COURT:  Let's take a pause here.  It's a

2      little late, and it's pretty clear to me that

3      Mr. Traini's examination is going to continue on to the

4      next day.  In any event, I did say to counsel that I'd

5      give you an opportunity to review this final tranche of

6      documents as well as these other documents that you've

7      received for purposes of examination.

8           So I'll stop the examination here.  You can step

9      down.

10          We're going to reconvene at nine o'clock on

11     Monday, the 20th.  You'll be back on the stand.

12          THE WITNESS:  Yes, your Honor.

13          THE COURT:  Thank you.

14          Mr. Gerstein, I'm going to distribute these

15     documents.  I know you want to put on the record your

16     objection.

17          MR. GERSTEIN:  Your Honor, with regard to the

18     documents that we discussed upstairs, if my notes are

19     correct, 701 to 705 --

20          THE COURT:  Why don't you get to the microphone.

21          MR. GERSTEIN:  I just want to be clear, your

22     Honor, that we're talking about the same documents.

23     And these were the documents that were given to you for

24     in camera inspection and according to my notes and it

25     might not be complete, it's document 701 --

1          THE COURT:  Hang on a minute.  I'll do that on

2     the record.  Pass those out.  So these are documents

3     Bates stamped number 701 through 705, 1140, 1144

4     through 1153, and 1190 through 1194.

5          MR. GERSTEIN:  I'm not going to take much of the

6     Court's time.  I've made the argument with respect to

7     work product and opinion work product before with

8     respect to other documents and with permission of the

9     Court in light of the hour, I'm just going to

10    incorporate that argument with respect to these

11    documents.  And I'll also note that when we were in

12    conference that there were other documents that the

13    Court had inquired with respect to turning over and

14    that I had lodged objections, and the Court basically

15    sustained my objections and decided not to turn them

16    over.  And that's all I have to say for today.

17         THE COURT:  That's correct.  Okay.

18         So you have the documents.  Is there anything

19    further?

20         MR. McADAMS:  Nothing from the Government, your

21    Honor.  Thank you.

22         MR. OLEN:  No, your Honor.

23         THE COURT:  Okay.

24         MR. GERSTEIN:  If my memory serves me correctly,

25    the Court indicated that we were going to deal with

1     some other documents tomorrow?

2             THE COURT:  We need to talk about that.  You're

3     going to -- I've got this last group of documents that

4     you have submitted.  You said you hadn't looked through

5     them, and I haven't had an opportunity to review them

6     fully either.  But our preliminary look, my law clerk's

7     preliminary look would indicate there are only four

8     possible documents that would even arguably fall into

9     the category where I might order them turned over.  So

10    what I propose is maybe tomorrow we could have a

11    conference call on these and I can tell you now what

12    documents those are that might qualify, but I have not

13    looked at all these.  They would be Bates stamped 193

14    and 4, 216, 217, 226, 230 -- I'm sorry, 231 and then

15    232, 234 and 244, 245.

16            All right.  So perhaps we can just have a very

17    brief conference call tomorrow, and I'll let you know

18    whether I think any of these could be relevant and

19    whether I think they should be turned over.

20            Why don't we have a conference call at say 2:30

21    tomorrow.

22            MR. GERSTEIN:  That should be fine.

23            THE COURT:  Fine, your Honor.

24            MR. OLEN:  Judge, I have a three o'clock

25    doctor's appointment.

1          THE COURT:  Can we do it at two o'clock then.

2          MR. OLEN:  Two o'clock would work.  Unless we

3     can do it by cell.

4          THE COURT:  Two o'clock.  I don't think this

5     will be more than a five-minute conversation.

6          Okay.  We'll be in recess.

7          (Court concluded at 4:50 p.m.)

<u>C E R T I F I C A T I O N</u>

        I, Anne M. Clayton, RPR, do hereby certify that the foregoing pages are a true and accurate transcription of my stenographic notes in the above-entitled case.


/s/ Anne M. Clayton

_____

Anne M. Clayton, RPR


June 4, 2013

_____

Date