IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND


```
* * * * * * * * * * * * *   CRIMINAL ACTION
UNITED STATES OF AMERICA  *   11-186-S
                          *
VS.                       *   MAY 20, 2013
                          *   VOLUME IV
JOSEPH CARAMADRE          *
                          *   PROVIDENCE, RI
* * * * * * * * * * * * *
```

HEARD BEFORE THE HONORABLE WILLIAM E. SMITH

DISTRICT JUDGE

(Motion to Withdraw Guilty Plea)


**APPEARANCES**:

FOR THE GOVERNMENT:          JOHN P. McADAMS, AUSA
                             and LEE VILKER, AUSA
                             U.S. Attorney's Office
                             50 Kennedy Plaza
                             Providence, RI  02903

FOR THE DEFENDANT
Joseph Caramadre:            RANDY OLEN, ESQ.
                             Olen Law Office
                             55 Bradford Street
                             Suite 203
                             Providence, RI  02903

                             ROBERT D. WATT, JR., ESQ.
                             84 Ship Street
                             Providence, RI  02903

Court Reporter:              Anne M. Clayton, RPR
                             One Exchange Terrace
                             Providence, RI  02903


Proceeding reported and produced by computer-aided
stenography

I N D E X

WITNESS                                                    PAGE

ANTHONY TRAINI

    Continuation of Cross-Examination
    by Mr. Watt:                                            3

FATHER ROBERT LACOMBE

    Direct Examination by Mr. Watt:                       102
    Cross-Examination by Mr. McAdams:                     105

PAULA CARAMADRE

    Direct Examination by Mr. Watt:                       112
    Cross-Examination by Mr. McAdams:                     117
    Redirect-Examination by Mr. Watt:                     123

SUSAN CARAMADRE

    Direct Examination by Mr. Watt:                       127

JOSEPH CARAMADRE

    Direct Examination by Mr. Watt:                       129

DEFENDANT'S EXHIBITS

Y    -                                                     71
Z    -                                                     72
AA   -                                                     74
BB   -                                                     90
CC   -                                                     90
DD   -                                                     92
EE   -                                                     93
FF   -                                                     99

        _____

1    20 MAY 2013 -- 9:42 A.M.

2             THE COURT:  Good morning.  Welcome.  This is the

3    continuation of the evidentiary hearing in the matter

4    of the United States versus Joseph Caramadre on the

5    motion to withdraw the plea.  All counsel are present.

6    Mr. Traini is still on the stand.  And if we're ready

7    to go forward, Mr. Watt, you may continue his

8    cross-examination.

9             MR. WATT:  Thank you, Judge.

10   **ANTHONY TRAINI**, Resumes stand.

11       **CONTINUATION OF CROSS-EXAMINATION BY MR. WATT**

12   **Q.**   Good morning, Mr. Traini.

13   **A.**   Good morning, Mr. Watt.

14   **Q.**   From the time of last week's hearing to the

15   present time, have you reviewed any additional

16   documents with regards to your preparation for

17   testimony here today?

18   **A.**   I looked through some e-mail correspondence and a

19   couple of other documents with Mr. Gerstein.

20   **Q.**   Anything with Mr. Bicki?

21   **A.**   No.

22   **Q.**   Okay.  Would that e-mail correspondence you would

23   have reviewed consist of the documents provided to the

24   Court in two submissions by Mr. Gerstein consisting of

25   around 425 or 430 pages of e-mails?

1    **A.**   I'm not sure that I understand your -- I

2    understand that there were a number of documents that

3    were provided to the Court by Mr. Gerstein, and I

4    probably reviewed some of them.

5    **Q.**   Okay.  Did you review all of them?

6    **A.**   I don't know.  I don't think so.

7    **Q.**   Okay.  Can you tell the Court whether or not you

8    instructed your attorney to withhold any e-mails?

9    **A.**   My communications with my attorney are privileged

10    Mr. Watt.

11    **Q.**   But you weren't trying to hide any e-mails; is

12    that right?

13    **A.**   As far as --

14         MR. McADAMS:  Objection, your Honor.

15         THE COURT:  Sorry?

16         MR. McADAMS:  I object.  He's asking questions

17    of the witness about what he communicated with his

18    attorney.  The witness has invoked his privilege not to

19    reveal attorney-client communications.

20         THE COURT:  Why don't you rephrase your

21    question, Mr. Watt.

22    **Q.**   Apart from the communications between you and

23    Mr. Gerstein, did you have a desire to withhold any of

24    the e-mails from the time of your representation up to

25    the time of your discharge from the Court?

1        THE COURT:  Wait a second.  There's been a lot

2    of documents in play here, and counsel through

3    Mr. Gerstein has withheld e-mail correspondence as work

4    product.  So those are the documents I reviewed.  So

5    why don't you narrow your question.

6    **Q.**    So those e-mails that you would have reviewed in

7    preparation for testimony were between what periods of

8    time, as best you can recall?

9    **A.**    Whatever period of time was covered by whatever

10    documents were produced to the Court, I guess.  I'm not

11    sure I understand your question, Mr. Watt.

12    **Q.**    I guess I'm really trying to figure out what you

13    reviewed and what you haven't reviewed in terms of the

14    preparation for this hearing.

15    **A.**    Various e-mail communications.  I don't recall

16    which ones.  I've looked at lots of documents over the

17    course of the last couple of weeks, and that's all I

18    can tell you.  And whatever I've done has been in

19    conjunction with Mr. Gerstein.

20    **Q.**    Did you review what you reviewed at your

21    initiation or at Mr. Gerstein's initiation?

22        MR. McADAMS:  Objection.

23        THE COURT:  I agree.  I think you're delving

24    into attorney-client privilege.  Maybe you're not

25    intending to but --

1          MR. WATT:  Thank you, Judge.

2     Q.   You were talking this past week about you would

3     have felt a personal obligation if the case had pled

4     soon, couple of weeks, a month, to have returned or not

5     asked for from Mr. Lepizzera part of the 450,000; is

6     that correct?

7     A.   I don't think that I used the phrase "personal

8     obligation."  But that is because as the fee agreement

9     said, the position with respect to not returning any of

10    the fee was if the proceedings terminated and what I

11    meant by that was the proceedings being the trial.

12    Q.   Didn't you use the words "too severe"?  You would

13    have thought it would have been too severe to --

14    A.   I did say that, yes.

15    Q.   What is it that would have been too severe?

16    A.   It just would have struck me, I think, as being, I

17    guess the only way I can explain it is what I said

18    before, too severe to retain all of the fee if the case

19    had turned into a plea within a couple of three weeks.

20    Q.   And was that belief on your part of the too severe

21    nature, if it pled out, ever communicated to

22    Mr. Caramadre by you?

23    A.   No.  Not that I can recall.

24    Q.   Okay.  You prepared a document in September

25    outlining the potential sentences, application of the

1    guidelines, the document we've talked about which he

2    indicated to you do not engage in plea negotiations; is

3    that correct?

4    **A.**    Yes, sir.

5    **Q.**    Now, during the course of that preparation of that

6    document, did you include any discussion as to the fee

7    to be charged to Mr. Caramadre if he were to allow you

8    to engage in plea negotiations?

9    **A.**    Did you mean in the document itself?

10   **Q.**    Yes.

11   **A.**    I don't think there's anything in the document

12   that refers to that, but I haven't seen the document in

13   a while.

14   **Q.**    There was a full meeting with Mr. Caramadre,

15   yourself, Mr. Lepizzera and Scott DeMello regarding the

16   request for authorization or non-authorization to start

17   plea negotiations; is that correct?

18   **A.**    There was a meeting at which we discussed the

19   sentencing guidelines and the subjects that were

20   covered by that piece of correspondence, yes.

21   **Q.**    Did your view as far as the severity or lack

22   thereof of the charging of the entire fee arise during

23   the context of that meeting in any fashion?

24   **A.**    Not that I can recall.

25   **Q.**    Okay.  Just to move it ahead a month or two, did

1    your view as to the severity or lack thereof of your

2    charging of the entire fee come up in the conversations

3    occurring on Sunday night, the 18th of November, at the

4    Caramadre house?

5    **A.**    Not that I can recall.

6    **Q.**    Isn't it a fact that you and Mr. Lepizzera had

7    e-mail correspondence on Saturday, the 17th, regarding

8    the fee to be charged by you?

9    **A.**    There was e-mail correspondence on Saturday in

10   which I don't think the fee itself was mentioned.  I

11   think that there was something about -- I seem to

12   remember the word "refund" somewhere in that

13   correspondence.

14   **Q.**    From you to Mike; is that right?

15   **A.**    I believe so, yes.  Again, I haven't seen the

16   e-mail in a little while so I don't know.

17   **Q.**    And did Mike respond to you by e-mail on Saturday,

18   the 17th?

19   **A.**    I think that he did.  I don't recall what his

20   response was.

21        MR. WATT:  Two seconds, Judge.  I'll try and be

22   speedy.

23        (Pause.)

24        MR. WATT:  I think I've located it, Judge.

25   **Q.**    Your best recollection as to how Mr. Lepizzera

1    responded to you in the e-mail communication on

2    Saturday the 17th as it related to the fee issue and

3    the possibility of a refund was how?

4    **A.**    I said I didn't recall how he responded to me.

5    **Q.**    Did the issue of the fee arrangement between you

6    and Mr. Lepizzera ever come up again prior to the

7    taking of the plea by this Court?

8    **A.**    Not that I recall.

9    **Q.**    Didn't come up on Sunday, as best you can recall?

10    **A.**    I don't recall that.

11    **Q.**    Okay. And didn't come up on Monday morning prior

12    to the taking of the plea?

13    **A.**    Not that I can recall, Mr. Watt.

14    **Q.**    Now, the communication with Mr. Caramadre on that

15    weekend of the 17th and 18th, how much of that was

16    Michael Lepizzera and how much of that was you, direct

17    communication with Mr. Caramadre?

18    **A.**    I think it was -- let's see. Are you talking

19    about Saturday and Sunday?

20    **Q.**    Yes.

21    **A.**    I believe Saturday it was probably all

22    Mr. Lepizzera, and Sunday up until the time of the

23    meeting it was probably all Mr. Lepizzera as well.

24    **Q.**    Did you expect to have to meet with Mr. Caramadre

25    over the weekend, Saturday or Sunday, prior to coming

1    here on Monday?

2    **A.**   I wasn't sure.

3    **Q.**   You weren't sure?

4    **A.**   No.  I was not sure.

5    **Q.**   And is that because you had left the

6    responsibility of direct communication with

7    Mr. Caramadre basically in Mr. Lepizzera's hands?

8    **A.**   I don't think I would characterize it that way.  I

9    think Mr. Lepizzera was communicating with him and he

10   was communicating with me, and to the extent that

11   something further would be necessary, we would have

12   discussed it, I guess.

13   **Q.**   At 6:30 in the morning on Saturday, prior to

14   responding to the Government on the plea bargain

15   agreement that had been prepared by them on Friday, did

16   you discuss with Mr. Lepizzera who would discuss the

17   plea bargain agreement, if either of you, with

18   Mr. Caramadre?

19   **A.**   I don't know that we had a specific discussion

20   about that because the -- we had discussed generally

21   the terms of the plea agreement on Friday, and then got

22   the actual document from the Government, I think, on

23   Friday evening.

24   **Q.**   You and Mr. Lepizzera and Mr. Olin were going back

25   and forth in the early hours of Saturday morning

1    regarding a joint response to the Government as to the

2    plea agreement proposed by them on Friday; is that

3    correct?

4    **A.**    There were communications between and among me and

5    Mr. Lepizzera and to some extent Mr. Thompson relative

6    to responding to the Government, that is correct.

7    **Q.**    And that response was eventually forwarded to the

8    Government sometime mid-morning of Saturday; is that

9    right?

10   **A.**    I believe that's correct.  I don't recall

11   specifically when.

12   **Q.**    And were those changes, as proposed by either

13   yourself or Mr. Lepizzera, discussed with Mr. Caramadre

14   prior to the response to the Government mid-morning on

15   Saturday, the 17th?

16   **A.**    I don't know.

17   **Q.**    Now, did you inquire of Mr. Lepizzera whether he

18   should check with Mr. Caramadre as to those proposed

19   changes?

20   **A.**    I don't recall if I did.

21   **Q.**    Did you communicate with Mr. Caramadre about those

22   proposed changes?

23   **A.**    No.

24   **Q.**    Did you ask Mr. Lepizzera whether he thought that

25   he should check the proposed changes with

1    Mr. Caramadre?

2    A.    I don't know if I did that.

3    Q.    Show you a document and ask if it refreshes your

4    recollection.  Just that top e-mail.

5    A.    Well, I can't tell if this is the entire e-mail --

6    I can't tell if this is the entire e-mail because it

7    doesn't have a Bates number on it.

8    Q.    I'm not going to seek, Mr. Traini, to introduce

9    the e-mail.  I'm asking if that refreshes your

10   recollection as to whether you raised with

11   Mr. Lepizzera at 6:30 approximately on Saturday morning

12   as to whether he thought he should consult with Joe

13   about these proposed changes?

14   A.    It doesn't refresh my recollection.  I see what it

15   says, but I still don't recall actually talking to him

16   about that.

17   Q.    Do you recall e-mailing him about that?

18   A.    I just recall that there was a lot of e-mail

19   communication around that time between and among the

20   three of us relative to the plea agreements.

21   Q.    The three of you being Olin Thompson,

22   Mr. Lepizzera and yourself?

23   A.    Yes.

24   Q.    Did Mr. Lepizzera tell you that he had checked at

25   any point in time with Mr. Caramadre prior to that

1    joint response written by Mr. Lepizzera to the

2    Government attorneys?

3    **A.**   I don't recall his telling me that.

4    **Q.**   Okay.  On Friday in the evening, did you send an

5    e-mail to Mr. Lepizzera in which you talked about the

6    willingness of Mr. Caramadre to entertain a plea as

7    being too good to be true?

8    **A.**   I don't know.

9    **Q.**   You don't recall?

10   **A.**   I don't recall.

11   **Q.**   Okay.  Did you review the e-mails between yourself

12   and Mr. Lepizzera prior to coming into court today as

13   it relates to November 16th of 2012?

14   **A.**   No.

15   **Q.**   Okay.  I'd ask you, Mr. Traini, if you can review

16   pages 17 and the top of 18 of e-mails between you and

17   Mr. Lepizzera as it relates to my last question.

18        (Pause.)

19   **A.**   It doesn't specifically refresh my recollection

20   about your question.  Just that it refreshes my

21   recollection that we had a lot of e-mail communications

22   at the time.

23   **Q.**   The phrase which at least one of those documents

24   shown to you purports to be from you indicating that

25   "too good to be true," you don't recall that having

1    come from your e-mail to Mr. Lepizzera?

2    **A.**    I don't recall it specifically, no.

3    **Q.**    Was it too good to be true, the change in heart by

4    Mr. Caramadre?

5    **A.**    I don't know if that's the characterization.  I

6    think that it was in the Defendant's best interest to

7    plead; and so to that extent, I thought it was a good

8    thing.  I don't know whether I might have described it

9    differently, but I'm sure that's what I thought.

10   **Q.**    You don't recall the advisability or good thing as

11   you phrased it like the 2,000 checks as being too good

12   to be true?

13   **A.**    I saw what you showed me but that doesn't refresh

14   my recollection as to what I was thinking at the time.

15   If that's what you're asking me.

16   **Q.**    Do you have a clear memory as to what you were

17   thinking at the time apart from the e-mails between the

18   two of you co-counsel for Mr. Caramadre?

19   **A.**    Only that we had made progress towards a plea.

20   **Q.**    Towards a plea?

21   **A.**    Yes.

22   **Q.**    You've been a member of the Rhode Island Bar since

23   when?

24   **A.**    I think 1992.

25   **Q.**    And a member of the Mass. Bar since when?

1    **A.**    1975.

2    **Q.**    And your last actual jury trial to verdict was

3    when?

4    **A.**    The last one that I was involved in was I think

5    the CVS trial here in this courthouse, maybe a couple

6    of years ago.

7    **Q.**    To verdict?

8    **A.**    Yes.

9    **Q.**    You were the counsel?

10   **A.**    I was co-counsel with several other lawyers.

11   **Q.**    Okay.  Was an opening statement given by the

12   defense in that particular case?

13   **A.**    I think so.  I think in that case there was.

14   **Q.**    Do you know -- let me ask you this.  As part of

15   the membership of the Rhode Island Bar, you're required

16   to do continuing legal education?

17   **A.**    Yes.

18   **Q.**    Ten credits a year?

19   **A.**    Yes.

20   **Q.**    And as part of being part of the Bar of the

21   District Court, also required to show you've done at

22   least ten credits in criminal defense related matters;

23   is that correct?

24   **A.**    I don't think so.

25   **Q.**    No?

1    **A.**   It's not my understanding that there is a

2    continuing education requirement of this court.

3    **Q.**   You're not a member of the panel here?

4    **A.**   Of the CJA panel?

5    **Q.**   CJA panel.

6    **A.**   No.

7    **Q.**   With regards to the court requirements in

8    Massachusetts, is there a CLE requirement in

9    Massachusetts?

10   **A.**   Not that I'm aware of.

11   **Q.**   Do you know Christopher Skinner?

12   **A.**   I don't think so.

13   **Q.**   As a lecturer on criminal defense strategies,

14   tactics?

15       MR. McADAMS:  Objection.  I don't know how this

16   is any way relevant to the guilty withdrawal plea of

17   Mr. Caramadre.

18       THE COURT:  I'm not sure either.  But I assume

19   you're going to get to it pretty quickly.

20       MR. WATT:  I am, Judge.

21       THE COURT:  All right.  I'll give you a couple

22   of questions.

23   **A.**   I think the answer was no, I'm not familiar with

24   Mr. Skinner.

25   **Q.**   What have you studied, if anything, with regards

1     to the giving or not giving of opening statements by

2     defense attorneys?

3          THE COURT:  Mr. Watt, maybe I'm missing

4     something, but I thought at the last hearing we went

5     over this issue and you and Mr. Olen conceded that

6     Mr. Caramadre had agreed with counsel's strategy of not

7     giving an opening statement and had waived that as an

8     argument in this motion to withdraw the plea.  Is that

9     changing?

10          MR. WATT:  No, Judge.  My understanding was, in

11    fact, Mr. Caramadre did not veto the decision by

12    defense counsel to not give an opening statement.  But

13    the question is more important than that.  It's whether

14    or not in this case any reasonable practitioner would

15    have given an opening statement without respect to what

16    a client authorized or otherwise authorized.  I'm

17    trying to get to the heart of why in this case there

18    was no opening statement given, and it really gets down

19    to the lack of preparation that we will attempt to

20    elicit on both attorneys' parts leading up to the

21    fateful day of November 19th.  I won't be long on this,

22    Judge, but I think it's crucial.

23          THE COURT:  It sounds to me like you are arguing

24    that the lack of an opening statement is part of the

25    reason supporting the motion to withdraw the plea in

1   spite of the fact that Mr. Caramadre was agreeable to

2   it.  To me, maybe I misunderstood your position last

3   week, but that sounds like a change of position on that

4   issue to me.

5           MR. WATT:  I hope it's not, Judge.  If that's

6   the way it was articulated by --

7           THE COURT:  I'll allow you to ask the questions,

8   but -- okay.  Go ahead.

9   **Q.**  So with regards to the giving of an opening

10  statement by defense counsel, what is the general

11  theory of criminal practitioners with regards to giving

12  an opening statement?

13  **A.**  I don't know what the general theory of criminal

14  practitioners is.

15  **Q.**  What have you studied with regards to professors,

16  lecturers, CLE credits or others in terms of the

17  advisability of giving or not giving an opening

18  statement by criminal defense attorneys?

19  **A.**  Nothing in particular.

20  **Q.**  You're basing this on your experience?

21  **A.**  Yes.

22  **Q.**  Can you recall a case in which you have not given

23  an opening statement?

24  **A.**  Yes.

25  **Q.**  Can you name it?

1    **A.**   I cannot name an individual case.  I can tell you

2    that there have been many cases in which I have not

3    given an opening statement.  You don't always give one.

4    At least I don't always give one.

5    **Q.**   And in this particular case, what was the reason

6    for not giving an opening statement?

7    **A.**   I don't know if I can identify for you a specific

8    reason that was the one reason why.  There was a

9    discussion about whether or not to give one, and some

10   of the considerations were whether or not the Defendant

11   would testify, and that was an open question.  And

12   another consideration was the difficulty associated

13   with not knowing what Mr. Radhakrishnan was going to

14   do, since he was representing himself, and whether or

15   not he would testify.  And so as a result of those

16   factors and I'm sure others that I don't recall now, it

17   was recommended that it would not be a good idea to

18   make an opening.

19        I think one of the other factors was that we

20   anticipated that the Government's case was going to go

21   on for some time and that the jury might not recall

22   some of the things that we said in an opening and that

23   it might be better to give it as we were about to

24   begin.

25        And so there were, as I said, a variety of

1    factors that went into that discussion.  I don't recall

2    all of them, but ultimately that decision got made.

3    **Q.**    Had you decided between you and Mr. Lepizzera who

4    would give the opening statement were one to be given?

5    **A.**    I don't remember if we did.

6    **Q.**    Okay.  Your ability to have given the opening

7    statement as it relates to any reference to

8    Mr. Maggiacomo would have been precluded by prior order

9    of the Court; is that correct?

10   **A.**    I don't know if it was by prior order of the

11   Court, but I certainly wouldn't have made any reference

12   to it.

13   **Q.**    Okay.  But your division of responsibility as

14   related to the Maggiacomo issue, you had hands-off as

15   it related to the Maggiacomo issue in your

16   representation of Mr. Caramadre; is that correct?

17   **A.**    To the extent that it was required by whatever

18   rulings the Court had made, yes.

19   **Q.**    And between the two of you, that being the two of

20   you, Mr. Lepizzera and yourself, Mr. Lepizzera was

21   doing the preparation in anticipation of the trial as

22   it related to Mr. Maggiacomo; is that correct?

23   **A.**    Yes.

24   **Q.**    Now, what was the theory of defense?

25   **A.**    As I recall, it would have been to try to separate

1  the Defendant from Mr. Radhakrishnan where it related

2  to interactions and activities with the terminally ill

3  victims.  And with respect to the professional victims,

4  the insurance companies and the brokerage companies, to

5  put forth a theory that to whatever extent possible

6  certain misrepresentations may not have been made, or

7  that other misrepresentations may not have mattered, or

8  that the insurance companies didn't actually lose any

9  money, or that if they did lose money that it was

10  essentially their own fault as the result of their own

11  participation in these transactions.  Generally, that's

12  my recollection.

13  **Q.**  And how was this theory of defense arrived at, as

14  you've generally described it today?

15  **A.**  As I recall, it was arrived at in discussions with

16  counsel and with the Defendant.

17  **Q.**  Including yourself?

18  **A.**  Yes.

19  **Q.**  And from the time you came on board in July of

20  2012, what was the percentage of time that you spent on

21  the Caramadre case as opposed to other work that you

22  were performing?

23  **A.**  I don't know.

24  **Q.**  Did you consider it to be a full-time job by a

25  twin defense team as Mr. Lepizzera referred to it?

1    **A.**   I considered it to be a significant undertaking,

2    but I can't tell you percentages of time.

3    **Q.**   So 85 percent estimated by Mr. Lepizzera, you

4    can't approximate what percentage of your time would

5    have been consumed in the defense of Mr. Caramadre?

6    **A.**   No.

7    **Q.**   Did you have other work ongoing during that time,

8    June 2012 to November of 2012?

9    **A.**   Yes.

10   **Q.**   And you had other work involving Mr. Lepizzera and

11   the Federal Government, other cases; is that correct?

12   **A.**   One that I can think of.

13   **Q.**   A case in which you even had the opportunity to,

14   during a break in the trial, the first four days of

15   trial, you and Mr. Lepizzera left Mr. Caramadre to go

16   speak to Mr. Dambruch about that other case; is that

17   right?

18   **A.**   I don't remember that.

19   **Q.**   Okay.  Did you bill other clients during the July

20   to November time frame?

21   **A.**   I suppose I did.  I haven't really looked at that.

22   **Q.**   Did you refuse other clients, new clients that

23   came to you during the July to November time frame?

24   **A.**   I don't recall.

25   **Q.**   And did you try cases between July and November of

1    2012?

2    **A.**    I don't recall trying anything during that time

3    period.

4    **Q.**    Did you represent Mr. Maggiacomo between July of

5    2012 and November of 2012?

6    **A.**    My appearance was still in for Mr. Maggiacomo in

7    the civil cases during that time period.

8    **Q.**    And you had not been supplanted as counsel on the

9    civil aspects of that case; is that correct?

10   **A.**    That's correct.

11   **Q.**    And the civil aspects flow from much the same

12   allegations as are involved in the criminal case

13   against Mr. Caramadre; is that correct?

14   **A.**    I think it's fair to say that there's a lot of

15   overlap.

16   **Q.**    And did you, in fact, in your representation of

17   Mr. Maggiacomo in January of 2013, did you indicate to

18   the court here, not this judge, but through the

19   magistrate judges, that Mr. Maggiacomo would not be in

20   attendance at a mediation conference?

21   **A.**    I think I did.

22   **Q.**    And the reason for that is because this motion to

23   vacate his guilty plea was still before the Court for

24   consideration and mediation was premature; is that

25   correct?

1    **A.**   Well, first of all, I suppose that that may

2    intrude into attorney-client communications with

3    Mr. Maggiacomo; and I secondly don't recall

4    specifically what I said to the magistrate, but that

5    makes sense to me that while this case was pending, the

6    other case might not go forward.  And also because, as

7    I understood it, the civil cases were stayed during the

8    pendency of the criminal case.

9    **Q.**   Okay.  Did the statement of facts submitted to

10   this Court in conjunction with the plea play any part

11   in your analysis as to Mr. Maggiacomo's civil

12   liability?

13   **A.**   I don't think I can answer that without intruding

14   upon my representation of Mr. Maggiacomo.

15   **Q.**   Let me just bring it down to -- well, didn't

16   Mr. Maggiacomo waive his -- any conflict you might have

17   as it related to Mr. Maggiacomo here in open court with

18   Judge Smith?

19   **A.**   I think so, but I'm actually not sure exactly what

20   that waiver entailed but --

21   **Q.**   Okay.  I'll respect that compunction you have as

22   to talking about anything about Mr. Maggiacomo.

23        Let me ask you with regards to Mr. Caramadre.

24   Did your position with regards to civil liability

25   post-plea come up in your discussion with Mr. Caramadre

1    on Sunday, November 18th, at the Caramadre household.

2    **A.**    His civil liability or somebody else's?

3    **Q.**    As it related to the liability between Caramadre

4    and Maggiacomo civilly?

5    **A.**    I don't know.  I don't recall that.

6    **Q.**    You didn't hear it mentioned at all?

7    **A.**    I just don't know, Mr. Watt.  I don't remember

8    that.

9    **Q.**    Okay.  You watched the opening statement by

10   Mr. Vilker?

11   **A.**    I did.

12   **Q.**    And you know the difference between an opening

13   statement and a closing argument; is that correct?

14   **A.**    Yes.

15   **Q.**    Okay.  What's the difference?

16   **A.**    An opening statement is generally an outline of

17   what the party intends to show as opposed to a closing

18   argument, which is an argument to the jury about what

19   results or inferences or conclusions you would like

20   them to draw from what they heard.

21   **Q.**    Persuasion, closing argument?

22   **A.**    You can characterize it that way, I suppose.

23   **Q.**    Can you characterize it that way?

24   **A.**    I don't characterize it any way.  It's an effort

25   to get the jury to draw the conclusions you want them

1    to draw.

2    **Q.**    Okay.  Whose job was it, if anyone's, to raise

3    objections during the opening statement by the

4    Government?

5    **A.**    I believe either Mr. Lepizzera or I could have

6    done that.

7    **Q.**    Would it surprise you to learn that Mr. Lepizzera

8    viewed the opening statement by Mr. Vilker as being a

9    closing argument?

10   **A.**    I don't recall his saying that to me.

11   **Q.**    I'm not suggesting he said it to you.  I'm talking

12   about whether or not you thought it was in the nature

13   of a closing argument.

14   **A.**    I don't remember that thought occurring to me when

15   I heard it.

16   **Q.**    If it had occurred to you, you would have

17   objected; is that correct?

18   **A.**    I don't know what I would have done.  It would

19   have depended on what it was I heard.

20   **Q.**    Do you recall Thursday evening of trial week, do

21   you recall communication between you and Mr. Lepizzera

22   subsequent to the communication to the Government by

23   Mr. Lepizzera of what the outlines of a potential plea

24   deal might be?  Inartfully asked?

25   **A.**    Could you ask me again.

1    **Q.**   Do you remember that Mr. Lepizzera wrote to

2    Mr. Vilker and Mr. McAdams on Thursday night of trial

3    week?

4    **A.**   Yes, I think he did.

5    **Q.**   And did you and Mr. Lepizzera thereafter have

6    communication between the two of you of a bantering

7    nature on Thursday evening subsequent to that e-mail

8    being sent?

9    **A.**   I don't remember it, if we did.

10   **Q.**   Do you remember Mr. -- do you remember you in

11   reaction to the first two words of the e-mail to

12   Mr. Vilker and Mr. McAdams, do you remember indicating

13   to Mr. Lepizzera that Mr. Caramadre was half your

14   client?

15   **A.**   I don't specifically recall that statement.

16   **Q.**   I'm going to direct your attention to pages 13 and

17   14, Mr. Traini, at the very bottom.

18   **A.**   I don't specifically remember that e-mail.

19   **Q.**   You don't deny the fact that the e-mail is true,

20   do you?

21   **A.**   I don't know if that's the entire e-mail, and I

22   don't remember saying it.

23   **Q.**   You don't remember saying, "He's at least half my

24   client"?

25   **A.**   I suppose I may have said it.  As I sit here

1    today, I don't recall that.

2    **Q.**   You don't recall.  But you reviewed the e-mails

3    prior to coming down here today?

4    **A.**   What e-mails?

5    **Q.**   The e-mails that you reflected as having studied

6    with your attorney?

7    **A.**   I said that I reviewed some e-mails.  I don't

8    recall that one.  I don't remember which ones I looked

9    at.  There are a lot of documents in this case.

10   **Q.**   Do you recall a response of Mr. Lepizzera at some

11   point during that evening of Thursday, the 15th,

12   indicating that the client is all yours, in capital

13   letters?

14   **A.**   I just saw something like that in that e-mail.

15   But as I said, I don't specifically remember this

16   exchange.

17   **Q.**   That doesn't refresh your recollection?

18   **A.**   No.

19   **Q.**   Okay.  Fair enough.

20        What was your opinion in terms of the dual of

21   the defense in terms of Mr. Caramadre's faith in

22   Mr. Lepizzera?

23   **A.**   I thought that he had confidence in Mr. Lepizzera.

24   **Q.**   Would you quibble with Mr. Lepizzera's

25   characterization of Mr. Caramadre's faith in

1    Mr. Lepizzera as being absolute faith in him?

2    **A.**    I don't have a basis to quibble or not on that.

3    **Q.**    Did you see any indication that Mr. Caramadre's

4    faith in Mr. Lepizzera was other than absolute during

5    the course of your representation of Mr. Caramadre?

6    **A.**    I don't think I have a basis to answer that.

7    **Q.**    You were present in conversations of Mr. Caramadre

8    in defense meetings?

9    **A.**    I was.

10   **Q.**    Did Mr. Caramadre ever indicate a lack of faith in

11   Mr. Lepizzera?

12   **A.**    Not that I can recall.

13   **Q.**    So you have no reason to dispute Mr. Lepizzera's

14   characterization?

15   **A.**    First of all, I don't know that that's what he

16   said because I wasn't privy to his testimony; and

17   secondly, I don't really have a basis to answer that

18   because Mr. Lepizzera and Mr. Caramadre had

19   conversations at which I wasn't present.

20   **Q.**    You indicated that the issue of Mr. Caramadre's

21   testifying was still an open issue as of the start of

22   trial; is that correct?

23   **A.**    Yes.

24   **Q.**    On whose part was the issue open?

25   **A.**    As I understand it, I think it was certainly open

1    on the part of myself and Mr. Lepizzera, and I don't

2    think that the Defendant was absolute in his intention

3    to testify.

4    **Q.**   What was his intention, as best you can recall it,

5    being stated in your presence at any time as to his

6    willingness to testify?

7    **A.**   I think he stated a willingness to testify.

8    **Q.**   And with regards to his desire to testify, what

9    was stated by Mr. Caramadre at any point in time

10   regarding his desire to testify?

11   **A.**   I think he stated a desire to testify as well.

12   **Q.**   Did he ever indicate anything to the contrary to

13   you?

14   **A.**   We had some discussions about whether or not it

15   would be advisable in spite of his intentions and his

16   desires, but I don't recall anything more than that.

17   **Q.**   You would not have precluded him from testifying?

18   **A.**   I don't know whether or not I could have done

19   that.  It's a defendant's constitutional right to

20   testify, although I may have urged him not to.  I don't

21   know --

22   **Q.**   I ask you to accept that Mr. Lepizzera stated on

23   direct exam that he didn't know if he could put him on,

24   that being Mr. Caramadre, to testify.

25   **A.**   I think that's a slightly different issue.

1    Calling the witness to testify is a little different

2    than having the witness over your objection insist that

3    they're going to testify, in which case you might have

4    to take some action with the Court.

5    Q.    So in good faith, you thought that Mr. Lepizzera

6    was referring to the advisability of testifying as

7    opposed to the constitutional right to testify?

8    A.    I can't tell you what Mr. Lepizzera was thinking.

9    All I can tell you is that, as I said, there's a

10   difference between advising a client not to testify for

11   whatever reason and actually being able to preclude

12   somebody who is a Defendant from testifying in their

13   own trial.  That may require some interaction with the

14   Court.

15   Q.    So it's not an issue, then, if you didn't know

16   what he was thinking that you had discussed with

17   Mr. Lepizzera; is that correct?

18   A.    I'm sorry, Mr. Watt.  I didn't get that question

19   at all.

20   Q.    So it's not an issue that you discussed with

21   Mr. Lepizzera if you're unable to give the opinion of

22   your own as to what Mr. Lepizzera was thinking?

23   A.    Well, Mr. Lepizzera and I certainly discussed the

24   advisability of the Defendant testifying, but I can't

25   tell you what he was thinking in his communications

1    with the Defendant at which I may not have been

2    present.

3    **Q.**    Did Mr. Lepizzera respond to your e-mail to him on

4    the evening of Saturday, November 16th, when you told

5    Mr. Lepizzera if he thinks he's got to go that way, lie

6    to the Court, then you've got to discuss with him,

7    because that's a no-go?

8    **A.**    And your question was what?

9    **Q.**    Whether or not Mr. Lepizzera told you about

10   Mr. Caramadre's state of mind as it relates to his

11   willingness to plead guilty after Saturday of that

12   week, November 17th?

13   **A.**    I'm sure that I had multiple conversations with

14   Mr. Lepizzera during that time period, and I don't know

15   which ones are which.

16   **Q.**    Do you remember the so-called <u>Alford</u> e-mail?

17   **A.**    I do.

18   **Q.**    That Saturday night?

19   **A.**    Yes.

20   **Q.**    Did you respond to Mr. Lepizzera after the <u>Alford</u>

21   e-mail?

22   **A.**    I believe I did.

23   **Q.**    What did you tell Mr. Lepizzera?

24   **A.**    As best I can recall, I told him that if the

25   Defendant thought that he had to lie for a plea to

1    occur that we weren't going to get anywhere with that.

2    And I think I also mentioned that I had raised that

3    issue with Mr. Vilker at some point at the beginning of

4    the plea negotiations I had with him, and he had

5    rejected it.   That's my best recollection of what I

6    said.

7    **Q.**   I'm going to show you a document to see if that

8    flushes out the best of your recollection as to that

9    particular issue, page 21.

10         Let me just pass on that because I've not been

11   able to find it, but after you responded to the nolo or

12   the <u>Alford</u> issue to Mr. Lepizzera, did you understand

13   from Mr. Lepizzera that he had handled that issue with

14   Mr. Caramadre at any time prior to your going to the

15   home on Sunday, the 18th?

16   **A.**   If I recall, I think Mr. Lepizzera indicated that

17   he had some conversation with the Defendant about that

18   issue, and that -- I guess that he had some

19   conversation about it.   I can't remember what it was.

20   **Q.**   You can't recall what the substance of that was as

21   related to you by Mr. Lepizzera?

22   **A.**   I cannot.

23   **Q.**   When is it that the decision was made to go to

24   Mr. Caramadre's house on Saturday -- excuse me, on

25   Sunday, the 18th?

1    **A.**   I don't remember when that decision was made.

2    **Q.**   How did that come to pass that the decision was

3    made to go to his house?

4    **A.**   Probably had a telephone conversation with

5    Mr. Lepizzera.

6    **Q.**   What was it that had changed, if anything, from a

7    mental impression of yours that it may be necessary to

8    go to his house to a decision to go to his house?

9    **A.**   I guess the only way I can answer that is to tell

10   you that it must have occurred in the context of a

11   conversation with Mr. Lepizzera.

12   **Q.**   Okay.  Was it your expectation, at least

13   theoretically, that you could have gone down to the

14   court on Monday morning, finished up whatever remaining

15   details had to be addressed and not have had to visit

16   him on Sunday evening at his home?

17   **A.**   I don't think I had a theoretical impression of

18   anything.

19   **Q.**   But you didn't have a conclusive opinion that you

20   had to go see Mr. Caramadre on Sunday, the 18th, prior

21   to the start of trial on Monday, the 19th; is that

22   correct?

23   **A.**   That was the subject of conversations between me

24   and Mr. Lepizzera during that period of time.  There

25   wasn't any predetermination one way or the other, as I

1      remember.

2      **Q.**    Can you tell the Court when the decision was made

3      by you to go to Mr. Caramadre's house on Sunday, the

4      18th?

5      **A.**    I already answered that.  I said I don't recall

6      when that decision was made.

7      **Q.**    It wouldn't have come though, however, whenever it

8      was made between you and Mr. Caramadre; is that

9      correct?

10     **A.**    I didn't speak to him so, as I said, it would have

11     been as a result of a conversation between me and

12     Mr. Lepizzera.

13     **Q.**    And when was the last time that you had spoken to

14     Mr. Caramadre prior to Sunday, the 18th?

15     **A.**    Probably on Friday.

16     **Q.**    On Friday.  Okay.  How had you and Mr. Lepizzera,

17     if at all, determined who was going to cross-examine

18     Mr. Maltais?

19     **A.**    There was a question raised by the Government

20     about whether or not Mr. Lepizzera would be -- I don't

21     want to say precluded but whether or not the Government

22     was going to object to Mr. Lepizzera cross-examining

23     Mr. Maltais as a result of some impression that the

24     Government had about -- I think it was about

25     Mr. Maltais thinking that he had gotten legal advice

1  from Mr. Lepizzera or something.

2        So we were both going to be prepared to

3  cross-examine him just in case the Government was

4  successful in precluding Mr. Lepizzera from doing it.

5  **Q.**   How early in the final preparation is it that the

6  two of you were prepared to cross-examine Mr. Maltais,

7  depending on which way the Government went on its

8  objection?

9  **A.**   Well, I don't know how to answer that.  I'm not

10  sure what you're asking me.

11  **Q.**   I'm asking you when the potential conflict of

12  Michael Lepizzera arose so as to require the two of you

13  to be prepared to cross-examine, depending upon the

14  resolution of the conflict of Mr. Lepizzera's as it

15  related to Mr. Maltais?

16  **A.**   I don't remember exactly.  It might have been

17  maybe Friday.  I don't remember when.

18  **Q.**   Friday when?

19  **A.**   I don't remember exactly when.  I'm thinking

20  Friday because I thought it would have been during

21  court, but maybe it came up later than that.  I really

22  don't recall.

23  **Q.**   Or earlier than that?  You don't have a specific

24  memory; is that correct?

25  **A.**   I do not have a specific memory, no.

1    **Q.**   When was that issue as to the potential of the

2    conflict of Mr. Lepizzera's with Mr. Maltais raised

3    with Mr. Caramadre?

4    **A.**   I don't know.

5    **Q.**   Do you know what Mr. Caramadre's belief was, who

6    was going to handle the Maltais issue?

7    **A.**   I don't know.

8    **Q.**   Did it come up at any point in time during the

9    preparation for trial after September of 2012?

10   **A.**   I don't remember if it did.

11   **Q.**   Okay.  Didn't you seek to employ an investigator

12   yourself in this case?

13   **A.**   Excuse me?

14   **Q.**   Didn't you seek to employ an investigator in this

15   case?

16   **A.**   We talked about employing an investigator in the

17   case.

18   **Q.**   Okay.  And in particular, you had a particular

19   investigator with whom you had correspondence or

20   conversations; is that right?

21   **A.**   That's correct.  Yes.

22   **Q.**   And you asked that you might need a couple of

23   interviews to be done as late as October 2012; is that

24   correct?

25   **A.**   I don't remember the date, but I think that's

1    correct.

2    **Q.**   Galligan?

3    **A.**   Yes.

4    **Q.**   The investigator?  You've used him before?

5    **A.**   I have.

6    **Q.**   The last communication between you and Mr. DeMello

7    and Mr. Lepizzera were there were three or four

8    possibility of interviews, including Maltais, isn't

9    that correct?

10   **A.**   I don't remember Mr. Maltais coming up in the same

11   context as Mr. Galligan.  I'm just not associating

12   those two together.  That's all.

13   **Q.**   How did the Maltais name appear on the list of

14   potential interviewees by the joint defense team?

15   **A.**   I don't remember.

16   **Q.**   You don't know who raised the issue?

17   **A.**   No, I don't.

18   **Q.**   That's Count 66, the last count, witness

19   tampering?

20   **A.**   Correct.

21   **Q.**   Did you have a belief yourself that Mr. Lepizzera

22   was going to handle Maltais up until some particular

23   point in time?

24   **A.**   I think I probably did.

25   **Q.**   When did you get the file for cross-examination?

1   **A.**   There wasn't a file per se.  The information was

2   available pretty much at any time.  We had it in the

3   office.

4   **Q.**   Who was keeping the trial file, trial notebook,

5   how ever you'd want to characterize that?

6   **A.**   Most of the information, the file itself was in

7   Mr. Lepizzera's office, and I had certain copies of

8   certain things depending on what they were.

9   **Q.**   And your testimony was, if I recall it correctly,

10   that you were never asked for an accounting by

11   Mr. Lepizzera; is that correct?

12   **A.**   Not that I remember, no.

13   **Q.**   Were you ever asked by Mr. Lepizzera to put on

14   hold any disbursements of monies that he had paid to

15   you?

16   **A.**   I think -- I recall some e-mail communication

17   mentioning something like that, but I don't recall it

18   being a request to me to do anything.

19   **Q.**   Do you recall the periods and payments that you

20   received during the course of representation?

21   **A.**   No.

22   **Q.**   Okay.  Isn't it a fact that you were not paid

23   anything by Mr. Lepizzera in September?

24   **A.**   I don't remember.

25   **Q.**   Isn't it a fact that you were not paid anything by

1    Mr. Lepizzera in October?

2    **A.**   Again, I don't remember when the payments were

3    made or not made.

4    **Q.**   Let me move you up to November 19th.  Do you

5    recall payments having been made to you subsequent to

6    the plea?

7    **A.**   I think there were.

8    **Q.**   And you don't have any recollection as to how much

9    was paid and when it was paid after the plea?

10    **A.**   No, I don't remember how much was before and how

11    much was after.

12    **Q.**   So if I were to suggest to you that you got

13    $150,000 two days after the plea, does that sound

14    inaccurate to you?

15    **A.**   I don't know whether it's accurate or not without

16    some kind of a record of it.

17    **Q.**   Which record you'd have or Mr. Lepizzera would

18    have?

19    **A.**   If Mr. Lepizzera gave me the money, then I assume

20    he would have a record of it.

21    **Q.**   Prior to the time of the motion to withdraw being

22    filed, did you receive another two payments of $50,000

23    each in December?

24    **A.**   I have a recollection of receiving some payments

25    in December, but I don't remember when or what they

1    were.

2    **Q.**    Okay.  When was the last change in the plea

3    bargain agreement made between you and Mr. Lepizzera

4    and the Government as best you can recollect?

5    **A.**    I think there were some technical changes that

6    might have been made as late as Sunday night or

7    thereabouts.  I seem to remember that on Sunday night

8    we did not have the final, final copies of the

9    documents, I think.  And I don't remember whether those

10   technical corrections were in the plea agreement or in

11   the statement of facts.

12   **Q.**    So my question would be the same answer generated,

13   that you don't know when the last change would have

14   been made to the statement of facts as well; is that

15   correct?

16   **A.**    It would be the same answer.

17   **Q.**    And when did you prepare the November 19th letter

18   that was signed by you, Mr. Lepizzera and

19   Mr. Caramadre, apart from the statement of facts, apart

20   from the plea bargain agreement?

21   **A.**    I'm not sure.  I think it might have been on the

22   morning of the 19th.

23   **Q.**    How did that come to be prepared?

24   **A.**    I prepared it.

25   **Q.**    You typed it?

1    **A.**   Yes.

2    **Q.**   Okay.  On your typewriter?

3    **A.**   Yes.

4    **Q.**   Okay.  Copy ever sent to Mr. Caramadre before he

5    signed it?

6    **A.**   No.  I don't believe so.

7    **Q.**   So if there are representations in your letter

8    typed by you on your typewriter that reflect

9    Mr. Caramadre's involvement in the back and forth

10   between the Government and yourself or Mr. Lepizzera,

11   that representation in that letter depends upon what

12   Mike Lepizzera was telling you; is that correct?

13   **A.**   Can you ask that again.  I'm not sure I understand

14   it.

15   **Q.**   I'll make it a little simpler.  You testified that

16   you had no communication direct, either by e-mail or by

17   telephonic conversation with Mr. Caramadre since

18   Friday; is that correct, until Sunday?

19   **A.**   That's correct.  But Friday, if I remember

20   correctly, I had communications with him in the course

21   of the plea negotiations with Mr. Vilker and then after

22   that I don't believe I spoke to him personally.

23   **Q.**   So those plea negotiations, so-called, would have

24   occurred before Mr. Vilker or Mr. McAdams sent to you

25   the first plea bargain agreement at around 4:30 or five

1    o'clock in the afternoon Friday?

2    **A.**    The last conversation -- I believe that that last

3    conversation I had with either Mr. Vilker or

4    Mr. McAdams or both of them was prior to their sending

5    that plea agreement.

6    **Q.**    So your last conversation then with Mr. Caramadre

7    would have been prior to their sending the plea as

8    well?

9    **A.**    I believe that's correct.

10   **Q.**    And that would have been the case right through

11   Sunday evening when you got to the home of

12   Mr. Caramadre?

13   **A.**    I believe that's correct, also.

14   **Q.**    So to the extent that there's a representation in

15   your November 19th letter about Mr. Caramadre's

16   involvement in the plea bargain negotiations from

17   Friday through Sunday, that would be based upon what

18   Mr. Lepizzera was telling you; is that correct?

19   **A.**    And also on the conversations that I had with the

20   Defendant while I was negotiating the plea agreement

21   with Mr. Vilker.

22   **Q.**    Prior to the issuance of the first plea bargain

23   agreement?

24   **A.**    Right.    Prior to that document being generated by

25   Mr. Vilker's office, yes.

1    **Q.**   So as to any changes in the document, either the

2    statement of facts and/or the plea bargain agreement,

3    to the extent of Mr. Caramadre being involved, that

4    would have been dependent upon what Mr. Lepizzera was

5    telling you; is that correct?

6    **A.**   I guess so.

7    **Q.**   Okay.  Fair enough.  Because it didn't come from

8    conversations with you with and Mr. Caramadre or

9    e-mails to Mr. Caramadre?

10   **A.**   Correct.

11   **Q.**   And you never sent Mr. Caramadre at any time, did

12   you, a copy of the statement of facts over that

13   weekend?

14   **A.**   I don't believe I did.

15   **Q.**   Nor the plea bargain agreement?

16   **A.**   I don't believe I did.  No, I don't think I did.

17   **Q.**   Now, bad question for a cross-examiner, but why

18   did you prepare the November 19 letter?

19   **A.**   Because I wanted to be sure that the Defendant

20   continued to be in agreement with the decision to

21   plead, and also because I wanted to make sure that

22   subsequent to the plea there would be none of what's

23   going on now.

24   **Q.**   That being your intention after the plea, within a

25   couple of hours, you're writing not to Mr. Caramadre

1    but you're writing to Mr. Lepizzera asking him if

2    Mr. Caramadre has had pleaders remorse yet, isn't that

3    correct?

4    **A.**    I recall that communication with Mr. Lepizzera,

5    yes.

6    **Q.**    And what does that phrase, "pleaders remorse" mean

7    as written by you to Mr. Lepizzera short hours after

8    the taking of the plea?

9    **A.**    It's not an uncommon phenomenon for defendants to

10   second-guess themselves.

11   **Q.**    But the question was yours to Mr. Lepizzera, not

12   yours to Mr. Caramadre.

13   **A.**    Because I assumed that Mr. Lepizzera was in

14   communication with Mr. Caramadre.

15   **Q.**    Okay.  Okay.  And pleaders remorse is a variant

16   for buyers remorse; is that correct?

17   **A.**    I guess.  I didn't invent the phrase so I'm not

18   sure how it came to be, but I think the common

19   understanding is something similar to that.

20   **Q.**    You've been around these Federal Court halls and

21   courtrooms for many years since 1992, at least since

22   you've been a member of this Bar; is that correct?

23   **A.**    Yes.

24   **Q.**    And you're intimately familiar with the way that

25   Rocco DeSimone case played out on the motion to

1    withdraw his guilty plea; is that correct?

2    **A.**   I'm not intimately familiar with any aspect of

3    that case.

4    **Q.**   Did you read that decision?

5    **A.**   I did.

6    **Q.**   Do you remember when you read it?

7    **A.**   I don't remember.  I might have read it when it

8    came out.  I may have read it later than that.  I don't

9    remember when I read it.

10   **Q.**   Did you ever discuss the Rocco DeSimone case with

11   Mr. Caramadre?

12   **A.**   I don't recall if we did.  I can't say that we

13   did, Mr. Watt.

14        MR. WATT:  Could I have two minutes, please,

15   Judge.

16        THE COURT:  Sure.

17        (Pause.)

18   **Q.**   Investigation.  In the cases that you've had, how

19   many cases have you not done investigation on by means

20   of interviewing of potential witnesses?

21   **A.**   I don't know.

22   **Q.**   Can you recall any case in particular that you've

23   not done interviews of witnesses with your own

24   investigator?

25   **A.**   Not a specific case, but I know that there have

1    been cases where I have not done that and cases where I

2    have done it.

3    **Q.**    And in this particular case, there was no

4    investigation done of particular witnesses by a

5    defense-retained investigator; is that correct?

6    **A.**    I don't know of a witness that was interviewed by

7    a defense investigator, if that's what you're asking

8    me.

9    **Q.**    And did you know of any measuring life that had

10   been defrauded of money in your review of the entire

11   facts in this case?

12   **A.**    I don't recall that being an allegation in the

13   case.

14   **Q.**    The measuring lives, the allegation in its essence

15   as to the theory of the Government's case is that there

16   was fraud perpetrated on these measuring lives by

17   failure to disclose the use of their identities, their

18   identification, their names as the measuring lives in

19   annuities and death-put bonds; is that correct?

20   **A.**    That was certainly part of the Government's case,

21   yes.

22   **Q.**    Okay.  Did you come across any evidence whatsoever

23   that Mr. Caramadre had taken money from any of these

24   measuring lives, so-called?

25   **A.**    No.

1   **Q.**   Okay.  And you didn't think that that was

2   important to put out front four square in an opening

3   statement to the jury before they heard two months,

4   three months of unrelenting Government prosecution?

5   **A.**   The Defendant wasn't accused of taking money from

6   any of those people.

7   **Q.**   So that was not part of the theory of your

8   defense, the fact that he had not taken money from the

9   measuring live decedents; is that correct?

10  **A.**   I'm not sure that I would have told the jury that

11  the Defendant didn't do something that he wasn't

12  accused of doing.

13  **Q.**   Didn't you suggest to Mr. Caramadre that you were

14  going to take a run at taking out your own annuity

15  during the course of your representation to show the

16  way in which the insurance companies actually received,

17  evaluated and issued or did not annuities?

18  **A.**   No.

19  **Q.**   Never did?

20  **A.**   No.  I remember that there was a discussion about

21  that, something similar to that at a defense meeting.

22  And it's my recollection that the Defendant was going

23  to make arrangements to either -- I don't know if it

24  was get an annuity or open a bond account.  I think it

25  had to do with a bond account, not an annuity.

1    **Q.**   When did that first come up as a defense

2    preparation strategy?

3    **A.**   I don't remember.

4    **Q.**   Was it from you or was it from Mr. Caramadre?

5    **A.**   I just remember it coming up in the course of a

6    discussion at Mr. Lepizzera's office.

7    **Q.**   Do you remember Mr. Caramadre writing to you and

8    the defense team on November 9th at 10:59 in the

9    morning asking questions about the defense and

10   particular issues that concerned him?

11   **A.**   I don't have a specific recollection of that

12   communication.

13   **Q.**   Do you remember him asking about the necessity for

14   issuing subpoenas for Hanrahan's tax returns?

15   **A.**   I vaguely recall something about tax returns, but

16   I don't have a specific recollection of the

17   communication that you're referring to, Mr. Watt.

18   **Q.**   Let me just show you so that there's no --

19        THE COURT:  How much more do you have, Mr. Watt?

20        MR. WATT:  Probably about 20 minutes, Judge.

21        THE COURT:  Why don't we take a break now.

22   We'll reconvene in about ten minutes.

23        (Recess.)

24        THE COURT:  You may proceed, Mr. Watt.

25        MR. WATT:  Thank you, Judge.

1    **Q.**   Mr. Traini, just to backtrack just half a step

2    here.  Was there any consideration given by you or

3    Mr. Lepizzera to not doing interviews of potential

4    witnesses so as not to fill in the gaps of the

5    Government's case?

6    **A.**   I don't recall specifically if that was part of

7    the discussion.  There were various discussions about

8    interviewing and not interviewing witnesses.

9    **Q.**   Okay.  Did you believe that there were gaps in the

10   Government's case that had to be maintained as gaps at

11   the commencement of the trial as best you or

12   Mr. Lepizzera could make that happen?

13   **A.**   I don't remember that now.

14   **Q.**   No gaps, as best as you can recall?

15   **A.**   I didn't say no gaps.  I said I don't remember.

16   **Q.**   But you reviewed all of the e-mails between you

17   and Mr. Lepizzera since September up until November?

18   **A.**   I think I've told you a couple of times that I

19   have not reviewed all of those documents.  I looked at

20   lots of documents.  I don't know which ones I reviewed.

21   **Q.**   Did you discuss or have conversations with

22   Mr. Thompson on the telephone from Saturday morning

23   until Sunday evening, any time during that period?

24   **A.**   I don't remember.

25   **Q.**   Okay.  Do you remember having e-mail communication

1    with Mr. Thompson during that period of time?

2    **A.**    Yes.

3    **Q.**    Okay.  And do you remember whether or not in any

4    of your e-mail conversation the issue of Joe's, that

5    being Joe Caramadre, state of mind came up between the

6    two of you in e-mail communication?

7    **A.**    I don't.

8    **Q.**    Did you ever ask Mr. Lepizzera what Joe

9    Caramadre's state of mind was on Saturday?

10   **A.**    I don't know if I did.  I don't remember doing

11   that.

12   **Q.**    Do you remember asking Mr. Lepizzera what Joe

13   Caramadre's state of mind was on Sunday?

14   **A.**    I don't remember.

15   **Q.**    Okay.  And you don't remember asking Mr. Caramadre

16   himself what his state of mind was on Sunday evening?

17   **A.**    I don't specifically, no.

18   **Q.**    And you don't remember asking Mr. Caramadre what

19   his state of mind was on Monday morning prior to this

20   Court's taking of the plea?

21   **A.**    I don't remember asking that question.

22   **Q.**    And you don't remember in your presence on either

23   Monday, the date of the giving of the plea, and/or

24   Sunday at the Caramadre house having Mr. Lepizzera ask

25   Joe directly, Joe Caramadre, what his state of mind

1    was?

2    **A.**    Do I remember having Mr. Lepizzera do that?

3    **Q.**    Do you remember Mr. Lepizzera having inquired of

4    Mr. Caramadre?

5    **A.**    No, I don't.

6    **Q.**    Okay.  Did you believe that the physical

7    presentment of the plea bargain agreement in terms of

8    its numbers of pages or density of type, size of type

9    might have an impact upon Joe Caramadre?

10   **A.**    I don't recall that.

11   **Q.**    Did you read the documents to him as best you can

12   recall on Sunday evening?

13   **A.**    I think so.

14   **Q.**    And did you see him reading the documents on

15   Sunday evening?

16   **A.**    I believe he was following as I was reading.

17   **Q.**    But you were reading, and you were looking down

18   when you were reading?

19   **A.**    I would have in order to see where I was reading.

20   **Q.**    Would you look up while you were reading and look

21   at Mr. Caramadre to see if he appeared to you to be

22   reading?

23   **A.**    I don't remember.

24   **Q.**    You do remember the questions asked by

25   Mrs. Caramadre, and you indicated that it would be

1  little and you even mentioned on examination this past

2  week or no time; is that correct?

3  **A.**   I think I said there was a possibility of that.

4  **Q.**   Okay.

5  **A.**   I think.

6  **Q.**   What was in your mind as to what would be the

7  probable sentence of Mr. Caramadre if the deal went

8  down in front of Judge Smith, the plea bargain

9  agreement?

10  **A.**   I don't think that there is a probable sentence,

11  really.

12  **Q.**   So you had -- I don't mean to interrupt.  So you

13  had no specific range in your own mind based on all of

14  your experience as to what was probable in front of

15  this Judge that Mr. Caramadre would get for a sentence

16  taking into consideration Mr. Raymour was also going to

17  be sentenced?

18  **A.**   Well, without using the word "probable," I think

19  that what I thought or maybe what I hoped was that it

20  was possible that the sentence could be, as I said,

21  maybe even no jail, a year, two years, maybe three.

22  **Q.**   Based upon a well-presented, well-documented

23  presentation to the Court at the time of sentencing?

24  **A.**   Based on an appropriate presentation and

25  depending, of course, on what Probation had to say, I

1    thought it was a possibility.

2    **Q.** Did you have extensive conversations with

3    Mr. Caramadre on Friday as to the advisability of

4    pleading because it would assist Mr. Radhakrishnan?

5    **A.** I don't recall having a conversation or having

6    said something like that.

7    **Q.** Was it your view that Mr. Caramadre's pleading

8    would help Mr. Radhakrishnan?

9    **A.** Well, I think that the both of them pleading would

10   help each the other, if you will.

11   **Q.** And do you remember using the word in

12   communication to Mr. Lepizzera or Mr. Thompson in

13   e-mails that you had "preached" to Mr. Caramadre the

14   advisability of pleaing on Friday?

15   **A.** I don't recall that.

16   **Q.** You don't recall using the word "preached;" is

17   that correct?

18   **A.** I don't recall using the word "preached."

19   **Q.** But if you had used the word, what would that have

20   signified in your own mind, the word "preached"?

21       MR. McADAMS: Objection. He said he hadn't

22   recalled doing it.

23       THE COURT: Right. I agree. If you can refresh

24   his recollection and if he recalls it, then maybe he

25   can answer that question.

1  **Q.**  Mr. Traini, I direct your attention hoping to

2  refresh your recollection to this e-mail.

3  **A.**  The one in the middle of the page?

4  **Q.**  The middle of the page, somewhat extensive.

5  **A.**  And what was your question again, Mr. Watt?

6  **Q.**  I was asking you about the use by you of the word

7  "preach" as contained in a phrase there within the body

8  of that e-mail, As you heard me preach to Joe

9  yesterday.  I'm trying to see if that refreshes your

10  recollection, first of all.

11  **A.**  Well, it doesn't refresh my recollection that I

12  said it, and the reason for that is because according

13  to this e-mail Mr. Lepizzera said it.

14  **Q.**  Referring to you as having "preached;" is that

15  correct?

16  **A.**  No.  The top of this e-mail says -- Mr. Lepizzera

17  wrote all of this, including that phrase.  So it

18  doesn't refresh my recollection that I said anything.

19  **Q.**  Do you recall it having been said by Mr. Lepizzera

20  in your presence?

21  **A.**  No.

22  **Q.**  You do not?

23  **A.**  No.

24  **Q.**  Okay.  Can you tell the Court whether or not you

25  had an opinion as to whether the statement of facts and

1    the plea bargain agreement should be presented to Joe

2    Caramadre all at once?

3    **A.**   I don't remember if I had an opinion.  If I had

4    one, I don't remember what it was.

5    **Q.**   On Saturday morning, you can't remember any

6    opinion as to whether it specifically, that being the

7    plea bargain agreement with the accompanying statement

8    of facts, should be presented to Mr. Caramadre all at

9    once?

10   **A.**   I don't recall what my opinion was.

11   **Q.**   Okay.  Directing your attention to an e-mail of

12   Saturday at approximately 6:51 in the morning, does

13   that refresh your recollection as to whether you had an

14   opinion as to whether those documents should be

15   presented to him all at once?

16   **A.**   It doesn't refresh my recollection.

17   **Q.**   Does not?

18   **A.**   No.

19   **Q.**   Do you remember having reviewed an e-mail in your

20   review of all the documents that you did review prior

21   to testifying here today?

22   **A.**   Could you say that again, please, Mr. Watt.

23   **Q.**   Do you remember having reviewed that e-mail in

24   your preparation for your testimony here today?

25   **A.**   No.

1    **Q.**   Now, your attorney provided certain documents to

2    the court in two packages.  Did you participate in the

3    preparation of those e-mails produced in response to

4    the Court's request?

5    **A.**   That would involve divulging attorney-client

6    communication, Mr. Watt.

7    **Q.**   Did you provide your attorney documents?

8    **A.**   Whatever I did with Mr. Gerstein is the subject of

9    my attorney-client privilege.

10   **Q.**   So you didn't turn any documents over to the

11   Court?

12        THE COURT:  I don't think that's what Mr. Traini

13   is saying.  It seems to me that -- I'm not sure where

14   you're going with this, but I have assurances of

15   counsel that all documents were produced by counsel to

16   Mr. Gerstein and from him to the Court or to you and

17   Mr. Olen as appropriate.

18        So given that, what reason would there be for

19   inquiring of Mr. Traini on this subject?  Are you

20   trying to ensure that everything has been turned over

21   that existed?  Is that the point?

22        MR. WATT:  No, Judge, I'm not.  What I'm seeking

23   to do is to elicit from this witness that, in fact,

24   there's no authenticity problem as to that which

25   Mr. Gerstein turned over to this Court as purporting

1    having come from the computers of either Mr. Traini

2    and/or Mr. Lepizzera or for that purpose Mr. DeMello.

3    Because if there's no objection to the authenticity,

4    then I intend to make a motion at the conclusion of

5    cross-examination that all of those e-mails with their

6    Bates pages or as otherwise numbered by Mr. Gerstein

7    come in as exhibits in this case.

8              THE COURT:  All of what e-mails?

9              MR. WATT:  What was sent to the Court in two

10   packages, first 379 pages and then a second group

11   exhibit of about 25 to 50 pages.

12             THE COURT:  Are you talking about the work

13   product e-mails?

14             MR. WATT:  No, Judge, not the work product.

15   Those pages that were sent to the Court in response to

16   its order to Mr. Gerstein to provide the e-mail

17   correspondence during the pertinent periods of time

18   related to the claim of the Defendant, my client,

19   Joseph Caramadre.  You've got two packages, Judge.

20             THE COURT:  Why would those be introduced in

21   total?  I thought that the process that we were engaged

22   in was essentially a discovery process.  I ordered

23   certain documents to be turned over.  That did not

24   presume that those documents would then be made

25   exhibits.  That's why we had a hearing.

1          MR. WATT:  Understood, Judge.  But the rationale

2     here is that the Court has had significant conferences

3     in which threads and trails of e-mails and of which

4     counsel have tried to cut through and bring down to a

5     limited number of documents those which formed

6     communications between Mr. Traini, Mr. Lepizzera,

7     Mr. Thompson, Mr. DeMello and Mr. Caramadre.

8          Mr. Traini's ability to identify particular

9     documents on cross-examination is, as may be expected,

10     not specific.  It doesn't jog his memory.  But we had

11     documents turned over by Mr. Lepizzera and Mr. Traini

12     and I assume Mr. DeMello, which directly bear upon the

13     state of mind of Mr. Caramadre as it relates to the

14     voluntariness of his plea or lack therefore on Monday,

15     the 19th of November.

16          So I'm seeking to have the Court take in all of

17     the e-mails first presented by Mr. Gerstein in those

18     two groups that he submitted them to the court in as a

19     group exhibit subject to you ordering me to try to take

20     those, Bates stamp them, Bates number them, whatever it

21     may be, put them in whatever fashion might be easier

22     for the Court to analyze the thread of all of these

23     correspondences, communications, beliefs have been

24     testified to by Mr. Lepizzera and Mr. Traini or lack

25     thereof.  I sought to elicit from this witness, Judge,

1     as whether or not he had any -- what he had turned over

2     to Mr. Gerstein to show that it came from him, not from

3     somebody else in terms of the authentication.

4          THE COURT:  I don't think anyone has disputed

5     the authenticity of any of the e-mails other than with

6     respect to the issue that we talked about in chambers

7     this morning.

8          MR. WATT:  Very good, Judge.  If that's the

9     Court's belief, then I don't have to go down the road

10    any further.

11         THE COURT:  I don't think authenticity is an

12    issue, but I'm not in agreement that the record needs

13    to be unnecessarily cluttered.  Now, Mr. McAdams was

14    about to say something.

15         MR. McADAMS:  Your Honor, I was just going to

16    object to this proposal that we have a group exhibit of

17    every potential e-mail communication for multiple

18    reasons.  One is I don't know if they are every

19    relevant communication.  Secondly, we don't know what

20    the context is.  We've had testimony from multiple

21    witnesses who have testified there have been e-mails

22    and there have been verbal conversations back and forth

23    surrounding these e-mails.  I think to just take a

24    group exhibit of a bunch of e-mails over an extended

25    period of time, some of which may be chain, some of

1    which may not be, simply is misleading in terms of what

2    it creates as a record.

3         If he wants to ask a witness about an e-mail and

4    ask him what the context was or whatever questions he

5    wants to ask that are relevant to this proceeding, then

6    he should do that and make that e-mail an exhibit.  But

7    not simply again after all the witnesses are finished

8    testifying put forward some huge group exhibit that may

9    or may not contain everything that is relevant to this

10   proceeding.

11        THE COURT:  I'm in agreement with that.  That's

12   not how we have been operating up to this point.  And I

13   would add simply because Mr. Traini does not find a

14   particular e-mail to refresh his recollection does not

15   mean he's disputing its authenticity, nor does it mean

16   that it would not be admissible.  I imagine that if he

17   looks at an e-mail that he authored or received and

18   recognizes it as his e-mail and it's relevant, then

19   it's admissible.

20        But you haven't moved any of these e-mails.

21   You've only put them in front of Mr. Traini to try to

22   refresh his recollection.  I assumed you were doing

23   that because you were trying to avoid the completeness

24   requirement that we talked about in chambers this

25   morning and that hasn't worked out.

1      So you've got to make a choice.  Do you want to

2  try to get those in as exhibits or not?

3      MR. WATT:  I do, Judge.

4      THE COURT:  All right.

5  **Q.**   Mr. Traini, I'm showing you an e-mail on page 17,

6  so-called, purporting to be from you to Michael

7  Lepizzera on November 16th.  Look at the second e-mail

8  on that page 17.

9  **A.**   I see it.

10  **Q.**   Do you recognize the e-mail?

11  **A.**   I recognize it as an e-mail or a piece of an

12  e-mail.  I can't tell you if it is an entire e-mail

13  because it's in the middle of a bunch of other alleged

14  e-mails that are all cut and pasted, and none of them

15  bears a Bates number.  So I can't tell you if it's --

16  **Q.**   Do you dispute the authenticity of that particular

17  e-mail number two from the top of page 17?

18  **A.**   All I can tell you, Mr. Watt, is that it appears

19  to be a piece of an e-mail, and I can't tell whether

20  it's complete, whether it's part of a string.  There

21  are a couple of lines that may or may not be the entire

22  e-mail because it doesn't have any Bates number on it.

23  So I cannot identify this positively as whatever it is

24  you want me to identify it as.

25      MR. WATT:  Judge, with that response, I'm going

1    to move for a three-hour continuance to go back as I

2    indicated to the Court in chambers the impossibility of

3    the cross-examination without going back and

4    deconstructing that which I prepared for the benefit of

5    the Court and had shown to my brother with Bates stamps

6    in a different format, which I think is more confusing

7    but to be able to get these exhibits in, which are

8    relevant and material, I need to be able to do that.  I

9    don't have the Bates with me here today.

10            MR. McADAMS:  Your Honor, I don't object to the

11   substitution at the conclusion of the hearing of the

12   original version of these e-mails subject to them

13   actually matching up.  I'll take Mr. Watt's good faith

14   representation or proffer that these are accurate; and

15   if he can ask the question regarding to the portion of

16   the e-mail that he has a question about and then when

17   the hearing is over, then Mr. Watt can replace in the

18   record the correct e-mail, for lack of a better word, I

19   don't have a problem with that.  I don't see any need

20   to belabor this hearing based on what Mr. Watt has told

21   me that he's cut and pasted these for simplicity sake

22   with the caveat that, obviously, if it turns out when

23   we look at the originals that there's a problem, then

24   we'll have to revisit that issue.

25            THE COURT:  Put that e-mail on the screen so I

1    can see it.  Which one?  Point to the one you're

2    referring to.

3              MR. WATT:  Judge, let me just see.

4              THE COURT:  Is it the second one?

5              MR. WATT:  It's the second one down, Judge.

6    November 16th, Tony Traini to Mike Lepizzera, 9:47 p.m.

7              THE COURT:  All right.  I see it.

8              Well, I think Mr. McAdams' suggestion is a

9    reasonable one.  It seems to me that you can ask a

10   question to Mr. Traini in a way that would authenticate

11   and allow the admission of that e-mail to be

12   supplemented by context and e-mails if necessary.

13             So the Government isn't objecting to this

14   particular e-mail I don't think, are you?

15             MR. McADAMS:  I'm not objecting to the e-mail

16   other than the caveat that, as we look at it, it's a

17   cut and paste document that purports to be a string of

18   e-mails and we don't know whether it, in fact, is.

19             As I indicated to the Court in chambers, I view

20   that as really going to the weight as opposed to the

21   admissibility of a specific area of e-mail.  If he

22   wants to inquire about that, I don't have a problem

23   with him asking any of those questions; and subject to

24   us being clear later that this was the only context of

25   the e-mail, then I don't have an objection to it.

1           I don't want to throw sand in the wheels for no

2     reason here.  I've seen these e-mails before.  They're

3     not presented to me before in this context, and it's

4     impossible to know whether there are other e-mails that

5     intervene or do not in the meantime in the format that

6     they're presented here.  I think as long as the Court

7     is aware of that and considers that when it determines

8     what weight to give the exhibit, then I don't have an

9     objection.

10          THE COURT:  I think I've seen these e-mails as

11    well in the hundreds of them that I reviewed.

12          So let's do it that way.  Can you try to

13    formulate a question that works?

14          It seems to me you can ask a question of

15    Mr. Traini -- maybe I can try asking you a question.

16          THE WITNESS:  Yes, your Honor.

17          THE COURT:  If you can accept the proposition

18    that this e-mail came from e-mails that were produced

19    by your counsel to Mr. Watt and Mr. Olen and may also

20    have been produced to the Court pursuant to the orders

21    that I issued that work product be turned over for me

22    to review, but more importantly, if you can accept the

23    proposition that it came from that set of documents and

24    is an authentic e-mail that appears to be sent from you

25    to Mr. Lepizzera, then can you tell us, I don't know if

1    this is what you want to ask, can you tell us what you

2    meant in that e-mail, in that two-sentence e-mail?

3         Is that a question that you can work with,

4    Mr. Watt?

5         MR. WATT:  Yes.

6         THE COURT:  Is that what you want to know?

7         MR. WATT:  That's correct.

8         THE COURT:  All right.

9         Can you answer that?

10        THE WITNESS:  Yes, your Honor.  I can tell you

11   whether or not it is at least part of an e-mail that I

12   sent to Mr. Lepizzera.  And if the question is, and if

13   I remember what was on the screen, if the question is

14   what did I mean, my answer would be that I'm not sure

15   because I can't tell from looking at the e-mail above

16   it whether or not there was anything else in between

17   that I might have been referring to.  So I'm not sure.

18        THE COURT:  All right.  That's fair enough.

19   Unless you're representing -- put that thing back on

20   the screen, Mr. Watt.

21        Mr. Watt, are you representing, because you put

22   this compilation together --

23        MR. WATT:  I did, Judge.

24        THE COURT:  -- are you saying that the e-mail --

25   it says "like the $2,000 checks" -- bring that down a

1    little bit.  Are you saying that that e-mail responds

2    to the e-mail right above it?  Or do you not know?

3         MR. WATT:  I can tell the Court that in terms of

4    the minute and hour, that that appears to be an

5    uninterrupted e-mail or communication chain.

6         THE COURT:  It could be, but there could have

7    been three e-mails in between, too.

8         MR. WATT:  There could have been, Judge.

9         THE COURT:  I'm asking you, you put this

10   together.  Do you know?

11        MR. WATT:  To my knowledge and belief there's no

12   gap in between those two e-mails as it relates to

13   communication between Mr. Traini and Mr. Lepizzera.

14        THE COURT:  But do you know that or do you just

15   think that's correct?

16        MR. WATT:  No, Judge.  I believe it to be

17   correct.  And I believe it with firmness, not with half

18   measures.  But, again, Judge, that's the reason that I

19   ask the Court for leave to go back and put it in exact

20   non-cut and paste fashion for the Court to take the

21   e-mails in as provided to us by Mr. Gerstein.

22        THE COURT:  All right.  Do any of you have the

23   full e-mail here?  Do you?  I don't want to have a

24   three-hour continuance.

25        MR. GERSTEIN:  Your Honor, I have some.  I don't

1    have a complete set.  I have some electronically on my

2    little mini-computer.  One thing that's also getting

3    lost in the shuffle for Mr. Watt's presentation is the

4    Court has to bear in mind that the documents I provided

5    to the Court pursuant to your orders were documents

6    that were work product, opinion work product, et cetera

7    for in camera review.  There are then other sets of

8    documents such as the 373 pages that was referenced in

9    the Defendant's motion for an extension of time that by

10   agreement were turned over to the Government that the

11   Defendant already had.  There were certain other

12   documents that were turned over to both the Defendant

13   and the Government, and then there's a disk of e-mails

14   that were just turned over to the Defendant, and the

15   Government doesn't have and I don't have a copy of that

16   with me.  Certainly I can have Mr. Lepizzera bring that

17   up.

18         THE COURT:  Okay.  I just asked a simple

19   question, which is do you have a copy of this full

20   e-mail chain?  That's all I want to know.

21         MR. McADAMS:  Your Honor, I don't have a full

22   set here.  Back at the office, I do.  I don't have an

23   objection to this particular one coming in subject to

24   Mr. Watt making sure later there's no other intervening

25   e-mails, and we can take it one by one.

1      THE COURT:  Let's do that.  Let's just do that.

2      So Mr. Traini, if Mr. Watt is representing to

3  you that your e-mail which begins "like the $2,000

4  checks" is responsive to Mr. Lepizzera's e-mail seven

5  minutes before that, which indicates the Defendant's

6  willingness to sign a plea agreement, taking that

7  representation as true, can you tell us what you meant

8  in your e-mail?  I think that's what Mr. Watt is trying

9  to get at.

10      THE WITNESS:  With all of that caveat, your

11  Honor, I suppose I would say that I thought it was a

12  good thing that the Defendant had agreed to the plea

13  agreement.

14  **Q.**  And the phraseology, "sounds too good to be true,"

15  what did you mean by that, assuming, again, that this

16  is an authentic e-mail?

17  **A.**  I don't know that I meant anything other than what

18  I just said, Mr. Watt, which is that it was a good

19  thing.

20  **Q.**  Do you see the e-mail directly below it from you

21  to Mr. Lepizzera at 9:56 p.m.?

22  **A.**  Yes.

23  **Q.**  That Joe would look at that as $200 ahead.  Do you

24  know what that references or relates to?

25  **A.**  I don't remember now what I meant by that.

1    **Q.**   And assuming that the next e-mail from

2    Mr. Lepizzera to you at 10:02 p.m., six minutes later,

3    do you know what you understood Mr. -- assuming

4    authenticity, do you know what Mr. Lepizzera meant by

5    God bless that woman with eight children, her testimony

6    alone delivers a guilty verdict?

7    **A.**   I don't know what he meant by that.

8    **Q.**   And no follow-up as best you recollect as to what

9    he meant by that?

10   **A.**   Well, I don't know.  I can't see the rest of the

11   document and I don't know if the next e-mail has

12   anything to do with that or not, but I don't recall

13   anything about that being followed up.

14   **Q.**   And in terms of the e-mails on that page 17, apart

15   from the authenticity issue, you've given us the best

16   recollection you have as to what those e-mails meant,

17   your utilization of the words and what you understood

18   as best you can recollect by Mr. Lepizzera using the

19   words to you?

20   **A.**   I can't tell you what Mr. Lepizzera was thinking.

21   **Q.**   I understand.

22   **A.**   And I don't remember anything more about that that

23   would provide any additional information.

24   **Q.**   But your understanding of the words that he's

25   using there, you don't have any more recollection than

1    that which you've already given to the Court?

2    **A.**    I don't.

3              MR. WATT:  Okay.

4              THE COURT:  We'll take that page and make it

5    exhibit whatever next in line, defense exhibit subject

6    to any supplementation during the lunch hour.

7              MR. WATT:  Let me grab the blue stickers if I

8    can.

9              (Defendant's Exhibit Y admitted in full.)

10   **Q.**    Mr. Traini, I'm going to direct your attention to

11   a document numbered 13.  We'll get to the number down

12   at the bottom here.

13   **A.**    I'd like to see the document, Mr. Watt.

14   **Q.**    Let me do that with you before I put it in its

15   entirety on the screen, then I'll attempt to make it

16   legible on the screen.

17             Just for orientation, I believe those e-mails

18   relate to November 15, the Thursday.

19             MR. McADAMS:  Your Honor, we have no objection

20   to this particular one coming in under the same

21   procedure.

22             THE COURT:  All right.  Mr. Traini, maybe if you

23   give that back to Mr. Watt, we'll put it on the screen.

24   You can review it on the screen, that way I can see it.

25             THE WITNESS:  Yes, your Honor.

1          THE COURT:  Then we'll make this Exhibit Z as

2     full.

3          (Defendant's Exhibit Z admitted in full.)

4     **Q.**   Mr. Traini, I'm directing your attention not to

5     the top but to the two e-mails at the bottom.  I hope

6     you can see those.  These are first an e-mail by you to

7     Mr. Lepizzera at 9:15 and a responder at 9:40 from

8     Mr. Lepizzera to you.  Do you see, first of all, the

9     9:15 e-mail?

10    **A.**   Yes.

11    **Q.**   And what was your intention in sending that

12    e-mail?

13    **A.**   Can you turn it back over so I can see it again?

14         I don't remember what my intention was.

15    **Q.**   "He's at least half mine."  Does that strike a

16    chord with you?

17    **A.**   No.

18    **Q.**   Let me then back you up just for a second to the

19    top e-mail, which is an e-mail from Mr. Lepizzera to

20    the Government, to Lee and John, "My client," it starts

21    off.  Does that jog your memory as to what your e-mail

22    at 9:15 had reference to?

23    **A.**   Can I see the other e-mail again?  I can't see it

24    on the screen.

25         Maybe it referred to Mr. Lepizzera's reference

1    to "my client," I suppose.

2    **Q.**    And your reference as stated in your e-mail that

3    he's at least half mine, what does that mean?

4    **A.**    I guess there were two of us.  I don't know that I

5    was thinking anything in particular.

6    **Q.**    And following that, the last e-mail on that page,

7    you received from Mr. Lepizzera an e-mail at 9:40.

8    What did you understand the single phrase with the

9    capitalized last two words to mean?

10   **A.**    I don't recall understanding it to be anything in

11   particular.  I guess he was bantering back.

12   **Q.**    To you?

13   **A.**    I suppose.

14   **Q.**    And the tenor of the two e-mails, can you

15   characterize the tenor between joint defense counsel?

16   **A.**    I can't characterize it, no.

17   **Q.**    Okay.  Did you respond to him as best your memory

18   serves you to ask, what do you mean, he's all mine?

19        THE COURT:  Mr. Watt, what does this have to do

20   with anything?  So there's a little banter going back

21   and forth between a couple of attorneys representing a

22   difficult client.

23        MR. WATT:  I think that's the answer, Judge.

24        THE COURT:  That's not -- I would be shocked if

25   it's the first time that attorneys bantered a little

1    bit in e-mail conversation.

2           MR. WATT:  I agree, Judge.

3           THE COURT:  What does it prove?  I don't get it.

4           MR. WATT:  The final argument will tie the

5    threads together, Judge, and this e-mail is crucial to

6    the Court's analysis.  I can suggest that to the Court.

7    May I tender Exhibit Z to the clerk, Judge?

8           THE COURT:  Okay.

9           (Defendant's Exhibit AA admitted in full.)

10   **Q.**   Mr. Traini, I'm showing you a document which will

11   be marked Defendant's Exhibit AA.  I'm going to show it

12   to you in physical form and then I'll put it on the

13   screen.

14          Directing your attention, Mr. Traini, to the top

15   e-mail.

16   **A.**   I'm sorry, Mr. Watt.  Which one?

17   **Q.**   The very top e-mail.  The one that says Tony

18   Traini to Mike Lepizzera, 6:30 in the morning,

19   Saturday, November 17th.

20   **A.**   Yes.

21   **Q.**   You and Mr. Lepizzera with Mr. Thompson are

22   revising a joint response on Saturday morning to the

23   Government; is that correct?

24   **A.**   I believe so.

25   **Q.**   And you have in parentheses there in that top

1    e-mail, Unless you think it has to be approved by Joe

2    first.  Close parentheses.

3        What did you mean by that parenthetical

4    statement?

5    **A.**   What it says.  If that's what I said and that

6    e-mail is complete, I guess it means unless

7    Mr. Lepizzera thought he had to have that approved by

8    the Defendant.

9    **Q.**   There's a suggestion certainly being that you

10   weren't going to make a call on whether that had to be

11   the case or not, you left that up to Mr. Lepizzera?

12   **A.**   I guess.

13   **Q.**   Okay.  Fair enough.

14       How about the second e-mail, Mr. Traini?

15   **A.**   What about it?

16   **Q.**   It says something, I agree that this has to be

17   presented to all, make him understand that what he gets

18   is essentially non-negotiable.

19       What did you mean by that e-mail?

20   **A.**   I'm not sure because there's apparently an e-mail

21   that's not here that's in between that.

22   **Q.**   You have a recollection or a feeling that maybe

23   there's an e-mail to which those comments may be

24   addressed?

25   **A.**   I don't really know, Mr. Watt.  All I can tell you

1    is the first line of that e-mail says, You can also ask

2    Olin his view of your question to me and get his take.

3            So Mr. Lepizzera must have asked me a question.

4    So I don't know to what extent what I said in that

5    e-mail -- again, if it's all I said in the e-mail --

6            THE COURT:  All right.  This set of e-mails is

7    unlike the previous one.  It appears to be incomplete.

8    And there's obviously some missing e-mail from

9    Mr. Lepizzera to Mr. Traini as Mr. Traini's just

10   identified.  And the timing, you've got those e-mails

11   set up in a way that they don't appear to be in

12   chronological order.  So I'm not going to ask him,

13   unless you can put some context to it, it would not be

14   appropriate to ask Mr. Traini to respond to that

15   question unlike the earlier question.

16           I think maybe the thing to do is to take a lunch

17   break and let you try to put together the contextual

18   e-mails that would allow you to ask this questions of

19   Mr. Traini and it would allow him to answer them.  So I

20   think that's what we'll do.  Doesn't seem to be that

21   the number of e-mails overall that you're going to try

22   to introduce are not that many, I don't think.

23           MR. WATT:  Doesn't seem to be so, Judge.

24           THE COURT:  So you should be able to put

25   together whatever the missing pieces are over the lunch

1    break.

2            So let's do that.  I'll give you to 1:30 to get

3    it all together and we'll reconvene then, hopefully

4    complete this examination.

5            All right.  We'll be in recess.

6            (Lunch recess.)

7            THE COURT:  Mr. Watt, are you ready to go

8    forward?

9            MR. WATT:  Yes, Judge.

10           THE COURT:  Do we have all the e-mails

11   straightened out?

12           MR. WATT:  Not even close, Judge, but I will

13   inform the Court that I've reduced the intended number

14   to about six or seven e-mails specifically as they

15   relate to Saturday, November 17th.  I've gone back at

16   the lunch hour and gone through the entire Bates

17   submissions to the Court and to counsel, and I have

18   identified at least three of the seven by Bates number

19   and I've got those pulled out.  I'll get into a few

20   other areas with Mr. Traini preliminarily and hopefully

21   the Bates numbers as are reflected in those six or

22   seven e-mails with the threads as best we can determine

23   them will be ready before I conclude.  I would ask for

24   a pause.  They're being examined right now, Judge.

25           THE COURT:  Okay.

1    **Q.**   Mr. Traini, let me just jump away from e-mails for

2    a second and ask you on that interviewing of witnesses

3    again, were you present at a joint defense meeting

4    between yourself, Scott deMello and Mr. Caramadre on

5    October 10th, about a month before trial?

6    **A.**   I may have been.

7    **Q.**   Were you ever not present at any of the joint

8    defense meetings, to the best of your knowledge?

9    **A.**   Well, when you say a joint defense meeting, I

10   assume that you mean a meeting that I was present at.

11   So there were meetings that Mr. Lepizzera had with the

12   Defendant that I was not present at.

13   **Q.**   Were there meetings with Mr. Lepizzera and

14   Mr. DeMello called joint defense meetings at which you

15   were not present?

16   **A.**   I don't know what they were called.

17   **Q.**   Let me just ask you.  As of July when you

18   full-fleshed came on board, what was the routine, if

19   there was one, as to how the defense team would meet?

20   **A.**   I don't know that there was a specific routine.

21   We tried to talk to each other collectively as often as

22   possible, at least -- hopefully, at least once a week.

23   I don't know that we were able to do that all the time,

24   but there was a lot of communication back and forth.

25   Sometimes in person; sometimes by e-mail; sometimes by

1    telephone.

2    **Q.**   Sometimes with Mr. Caramadre, sometimes without

3    Mr. Caramadre?

4    **A.**   That's correct.

5    **Q.**   On October 10th of 2012, isn't it a fact that

6    Mr. Caramadre discussed with the joint defense team,

7    including yourself, Mr. DeMello and Mr. Lepizzera, the

8    interviews of several witnesses?

9    **A.**   I don't remember the meetings so I don't recall

10   what was discussed there.

11   **Q.**   Did you keep notes of joint defense meetings or

12   was it just Mr. Lepizzera?

13   **A.**   I didn't.  I don't know what notes Mr. Lepizzera

14   kept.

15   **Q.**   In terms of reviewing joint defense meetings or

16   joint defense conversations, did you keep any

17   independent notes as to the progress of the joint

18   defense preparation?

19   **A.**   I think I said no.

20   **Q.**   No.  Okay.  Do you have any recollection as to the

21   witnesses discussed on October 10th in terms of

22   investigation interviewing by the defense team?

23   **A.**   I don't recall the meeting on that date, so I

24   can't tell you.

25   **Q.**   Okay.  I'm going to show you a document of

1    Mr. Lepizzera's notes of that particular meeting and

2    ask if that refreshes your recollection as to who was

3    to be interviewed and who not, if at all.  I've tried

4    to highlight in yellow what I thought was pertinent.

5    **A.**    I have a vague recollection of that discussion.

6    **Q.**    And that discussion which at least this document

7    piques a vague recollection involve four or five

8    witnesses; is that correct?

9    **A.**    I guess if those are Mr. Lepizzera's notes, then I

10   guess that's what it reflects.

11   **Q.**    Has a Bates number of 470 on the bottom.  You

12   didn't review those notes in preparation for today?

13   **A.**    No.

14   **Q.**    Okay.  Now, in your own trial notes, in bold print

15   did you not write at the end of the Government's

16   opening statement that "Maybe he will finally

17   understand the Government's theory of the case"?

18   **A.**    I don't know.

19   **Q.**    See if this document refreshes your recollection.

20   **A.**    That's my handwriting.

21   **Q.**    Do you recognize that as your handwriting, that

22   writing in particular?

23   **A.**    Can I see that again just for a second, please.

24   **Q.**    Now, that writing, in general terms, is a cursive

25   writing except for that bold print stating "Maybe he

1   will finally understand the Government's theory of the

2   case;" is that correct?

3   **A.**   That's what it says.

4   **Q.**   Can you tell the Court what that means to you.

5   **A.**   It means that as the Government explained its

6   case, perhaps the Defendant would see that the

7   Government's theory of the case was different than his.

8   **Q.**   And the Defendant's theory of the case, what was

9   the Defendant's theory?

10  **A.**   The Defendant's attitude was --

11          THE COURT:  Could you slide the mike a little

12  closer.

13          THE WITNESS:  I'm sorry, your Honor.  I was

14  asked by Anne to can keep it a little further away.

15          THE COURT:  Okay.

16  **A.**   The Defendant's attitude was that he didn't do

17  anything wrong because nobody lost any money and that

18  because the investors made money and he made money and

19  the terminally ill people made money and the insurance

20  companies made money, then no harm, no foul.

21  **Q.**   But in bold print, you thought that the opening

22  would somehow cause him to change his perception of his

23  own belief and his own theory?

24  **A.**   I don't know what I thought when I wrote it.  It

25  says what it says.

1  **Q.**   Did you have occasion later on that day to meet

2  with Mr. Caramadre and Mr. Lepizzera to talk about that

3  bold printed mental impression of yours at the end of

4  the Government's opening?

5  **A.**   I assume that we met that day.  I don't know that

6  it was for the purpose of talking about that particular

7  bold print comment.

8  **Q.**   You don't have any recollection specifically of

9  having had a conversation with Mr. Caramadre about your

10 take on what the Government's case proved contrary to

11 his own theory?

12 **A.**   I don't.

13 **Q.**   Okay.  Now, there have been introduced into

14 evidence three documents, including the September 10-

15 or 11-page non-authorization to allow you to engage in

16 plea bargaining discussions with the Government as well

17 as your November 19 two-pager that he signed here in

18 this court on the day of the giving of the plea.

19      Are you aware as having been copied with a four-

20 or five-page analysis by Mr. Lepizzera to Mr. Caramadre

21 on or about December 22nd talking about the legalities

22 of the posture of attorneys versus client, a four- or

23 five-page written document sent to Mr. Caramadre

24 relating to the question of moving to vacate his plea

25 and the ramifications or potential ramifications of

1    that?

2    **A.**    There was e-mail communication between me and

3    Mr. Lepizzera.  I don't remember what the dates were.

4    Some of it was lengthy; some of it was not.  Some of it

5    had to do with that issue, but I don't specifically

6    recall the communication you're talking about.

7    **Q.**    I'm talking about a communication by Mr. Lepizzera

8    in response to Mr. Caramadre's request to outline the

9    factors involved in moving to vacate his plea?

10   **A.**    I don't specifically recall it, and I don't know

11   whether Mr. Lepizzera sent it to me or not.  I assume

12   that he probably did, but I don't recall it.

13   **Q.**    Okay.  Can you tell me whether at any point in

14   time by you was sent to Mr. Caramadre in written form a

15   trial strategy memorandum?

16   **A.**    Did I send such a document to the Defendant

17   myself?

18   **Q.**    Um-hum.  (Affirmative.)

19   **A.**    Not that I can recall.

20   **Q.**    Did you ever send him a document in which you

21   would have opined as to the believability of his theory

22   of defense?

23   **A.**    I don't recall such a thing.

24   **Q.**    Okay.  To the best of your knowledge, did

25   Mr. Lepizzera ever send such a document to

1    Mr. Caramadre with you carbon copied?

2    **A.**   I don't know.  I don't recall seeing such a

3    document copied to me.

4    **Q.**   Okay.  Was there any comprehensive game plan set

5    forth in a written form by the defense team, including

6    yourself, Mr. DeMello and Mr. Lepizzera, presented in

7    an overview fashion in written form to Mr. Caramadre?

8    **A.**   Not that I can recall.

9    **Q.**   Okay.  You were present at a Probation interview,

10   so called, post-plea in which Ms. Mattias, Kristen

11   Mattias, yourself, Mr. Lepizzera and Mr. Caramadre were

12   in attendance?

13   **A.**   Yes.

14   **Q.**   Did you hear, yourself, Mr. Caramadre say to

15   Ms. Mattias that Paula took a nervous breakdown and

16   that precipitated the plea?

17   **A.**   I don't specifically remember that comment being

18   made.

19   **Q.**   If I could show you from page 279 to see whether

20   or not this refreshes your recollection as to what

21   Mr. Caramadre may have told Ms. Mattias on the date of

22   November 30th, 2012, as to the precipitating factor of

23   his plea.

24   **A.**   It does not.

25   **Q.**   Okay.  Did you have occasion thereafter to inquire

1    of Mr. Caramadre the reason for his plea after that

2    interview with Ms. Mattias?

3    **A.**    I don't think so.

4    **Q.**    Okay.  You met with Mr. Lepizzera and

5    Mr. Caramadre on November 14th?

6    **A.**    November 14th?

7    **Q.**    Excuse me.  December 14th.

8    **A.**    I don't know.  Did I?

9    **Q.**    Do you remember a meeting between yourself and

10   Mr. Lepizzera and Mr. Caramadre in which the issues to

11   be discussed post-plea included, among other things, an

12   acceptance responsibility statement which you were

13   going to draft?

14   **A.**    I remember that there was a meeting.  I don't

15   remember the date.  And I do recall that Probation had

16   asked for an acceptance letter as they always do, and

17   one had to be drafted.

18   **Q.**    Okay.  And did you draft such an acceptance of

19   responsibility statement in preparation for that

20   meeting of December 14th?

21   **A.**    No.

22   **Q.**    Were you aware at any point in time, Mr. Traini,

23   about the issue of suicide ideation as it related to

24   Mr. Caramadre in the post-plea period?

25   **A.**    Not specifically that I can recollect.  I don't

1    think so.

2    **Q.**   Now, I've already asked you about whether or not

3    you or Mr. Lepizzera were afraid of filling in the gaps

4    in the Government's case and that didn't spark any

5    particular memory.  Let me ask you if Michael

6    Lepizzera's characterization of what his performance

7    was in this court in your opinion accurately reflects

8    his mental impression?

9         MR. McADAMS:  Objection, your Honor.  I don't

10   know how the witness can possibly answer that question.

11        THE COURT:  I'm not even sure I understand the

12   question.

13        MR. WATT:  Let me try it again, Judge.

14   **Q.**   I ask you to assume that, in fact, Mr. Lepizzera

15   testified that nobody knew in this courtroom what he

16   was doing, quote, unquote.

17   **A.**   What who was doing?

18   **Q.**   Michael Lepizzera.

19        THE COURT:  I'm sorry.  Are you quoting from

20   Mr. Lepizzera's testimony?

21        MR. WATT:  I am.

22        THE COURT:  You're saying he said what?

23        MR. WATT:  Nobody knew what I was doing, quote,

24   unquote.

25        THE COURT:  I don't remember that and maybe it's

1    because I don't remember the context in which he said

2    that.  Do you have a transcript?

3          MR. WATT:  I don't yet, Judge, no.

4          THE COURT:  Mr. McAdams, do you know what he's

5    talking about?

6          MR. McADAMS:  I object to that, your Honor.  I

7    don't know if it's a partial response to a more lengthy

8    response.  Mr. Lepizzera when he testified, there

9    weren't a lot of very brief responses like that, and I

10   don't recall any characterization of his testimony to

11   be that nobody knew what he was doing.  I think it's

12   possible that it was part of an answer that he gave,

13   but I don't know in response to what question.

14         THE COURT:  I'm not going to let a question like

15   that -- you've got to tell me more.  I took pretty

16   comprehensive notes.  You tell me where that occurred.

17         MR. WATT:  I will, Judge, but not through this

18   witness.  If I can move on.

19         THE COURT:  All right.

20   **Q.**   You and Mr. Lepizzera agreed that this was a bad

21   optics case; is that correct?

22   **A.**   I think "bad optics" was probably a term that --

23   at least the word "optics" certainly was a term that

24   was used from time to time.

25   **Q.**   Do you know what the genesis of that phrase was,

1    "bad optics," where that came from as your best memory

2    gives us today?

3    **A.**   I really don't know where that came from or who

4    came up with that.

5    **Q.**   Okay.  And the bad optics would include, I assume,

6    correct me otherwise, the videotaped depositions of

7    terminally ill people?

8    **A.**   Among other things, I suppose.

9    **Q.**   Okay.  Was there, to your belief, the 800-pound

10    gorilla of public opinion that was the underlying fear

11    in this case from Mr. Caramadre's theory of defense

12    standpoint?

13    **A.**   I don't understand your question.

14    **Q.**   Mr. Lepizzera, if I ask you to assume said that it

15    was said the 800-pound --

16         MR. McADAMS:  I object.  He shouldn't be asking

17    a witness to assume what some other witness said and

18    then posing his opinion of whether he agrees with it or

19    not.

20         THE COURT:  I tend to agree.  Just ask him a

21    straightforward question.  Maybe that will get us to

22    it.

23    **Q.**   Can you tell us in terms of the defense or the

24    optics defense or a defense by the use of optics of

25    yourself or Mr. Lepizzera, did you prepare any

1   demonstrative charts or aids in preparation for the

2   trial?

3   **A.**   I'm not sure I understand what you mean by

4   "defense by optics."

5   **Q.**   Well, did you prepare any demonstrative aids for

6   utilization during the defense of Mr. Caramadre?

7   **A.**   I did not.

8   **Q.**   Did Mr. Lepizzera?

9   **A.**   Not to my knowledge.

10  **Q.**   Okay.  Any charts or diagrams prepared by either

11  of the two of you to the best of your knowledge

12  regarding this massive case?

13  **A.**   Not that I can recollect offhand, no.

14           MR. WATT:  Can I have a minute to check, Judge,

15  on those --

16           THE COURT:  Yes.

17  **Q.**   Mr. Traini, I'm going to show you page 119 on the

18  Bates, which contains a couple of e-mails.  One from

19  Mr. Lepizzera to you at 5:38, and one from you back to

20  Mr. Lepizzera at 6:30.

21           MR. McADAMS:  No objection, your Honor.

22           THE COURT:  All right.  What exhibit number is

23  this?

24           MR. WATT:  Judge, I think I'm up to BB.

25           THE COURT:  So this will be Defendant's BB, and

1    it will be full.  Go ahead.

2            (Defendant's Exhibit BB admitted in full.)

3    **Q.**   I'll get that stamp on there, Mr. Traini, in a

4    minute, but this is Exhibit BB in full.  And I'd direct

5    your attention, again, to the top e-mail.  And you may

6    have already testified to this as to your meaning of

7    the phrase within the parentheses.  Unless you have

8    something to add to previous testimony, I'll move on.

9    **A.**   I have nothing to add to what I said before.

10   **Q.**   Thank you very much.

11           I have pulled out, Mr. Traini, from pages 158

12   and 159 of the Bates documentation consecutive pages,

13   e-mails surrounding 6:51 in the morning.

14   **A.**   Of what date, Mr. Watt?

15   **Q.**   Saturday, the 17th.  And let me show that to you.

16   Page 159, e-mails, Mr. Traini to Michael Lepizzera and

17   back and forth.

18           MR. WATT:  Judge, I'm going to, unless there's

19   an objection move these as CC.

20           MR. McADAMS:  No objection.

21           THE COURT:  These will be full, CC.

22           MR. WATT:  Thanks, Judge.

23           (Defendant's Exhibit CC admitted in full.)

24           MR. WATT:  Permission to show this to

25   Mr. Gerstein, Judge, before I question.

1          THE COURT:  Sure.

2     **Q.**   Directing your attention to the top e-mail on page

3     158.  Mr. Lepizzera indicates that his thought is that

4     it needs not to be put in front of Joe, that being the

5     plea agreements, at this moment.  Goes on to chronicle

6     a condition of sleep apnea that he believes

7     Mr. Caramadre suffers from and believes if he sends it

8     to Joe when he's not alert it will throw him and this

9     process in the wrong direction, and in addition he's

10    waiting for the statement of facts to present the

11    entire package to Joe at one sitting.

12          Do you have a memory of having received e-mail

13    or having discussed issues contained within that e-mail

14    with Mr. Lepizzera on the morning of the 17th?

15    **A.**   I don't have a memory specifically of receiving

16    this particular e-mail at the time or talking to

17    Mr. Lepizzera at the time.  I mean, I see what the

18    e-mail says, but I don't recollect the event

19    independently.

20    **Q.**   At the very bottom, that last e-mail -- again,

21    this is Tony Traini to Mike Lepizzera at 6:30 in the

22    morning, we talked about that before but it's on the

23    Bates so it's going to be in as a duplicative

24    submission.

25          MR. WATT:  Judge, I'd move that and you accepted

1    it as CC, 158, 159.

2         THE COURT:  All right.  It's already been

3    admitted.

4    **Q.**   Are you aware of any e-mails or communication

5    between you and Mr. Thompson on that Saturday time

6    frame two days pre-plea?

7    **A.**   My recollection is that Mr. Thompson was involved

8    in some of the e-mail communications between

9    Mr. Lepizzera and myself and him.  I don't remember

10   which ones, exactly.

11   **Q.**   I'm going to show you a document that I will mark

12   as DD and ask if that particular e-mail reminds you of

13   a communication from Olin Thompson to you and

14   Mr. Lepizzera around two o'clock in the afternoon on

15   Saturday, the 17th.

16   **A.**   I can't see the whole page, Mr. Watt.  Is there

17   anything else on there?

18   **Q.**   No, there's not.  Just that one e-mail on Bates

19   298.

20        MR. McADAMS:  No objection.

21        THE COURT:  All right.  I'll make this

22   Defendant's DD.  It will be full, and you can answer

23   the question.

24        (Defendant's Exhibit DD admitted in full.)

25   **A.**   If I understood your question, Mr. Watt, it does

1    indicate that there was communication between

2    Mr. Lepizzera and myself and Mr. Thompson on that date

3    and time.

4    **Q.**   That specifically was at least referring to Joe

5    Caramadre and Olin Thompson's belief that he would

6    disagree with the statement of facts received; is that

7    right?

8    **A.**   Yes.

9    **Q.**   Okay.  Do you remember responding to Mr. Thompson?

10   **A.**   I don't specifically remember responding to

11   Mr. Thompson.

12   **Q.**   Page 213, 14 and 15 off of the Bates are a series

13   of e-mails around the time of Mr. Lepizzera's first

14   communication to the Court and e-mails thereafter.  I'm

15   going to show these to you, pages 213, 214 and 215.  As

16   a matter of fact, why don't you take a look at them.

17          (Pause.)

18          MR. McADAMS:  No objection.

19          THE COURT:  No objection to the document.  It

20   will be full EE.

21          (Defendant's Exhibit EE admitted in full.)

22   **Q.**   I'm going to direct your attention to page 214 of

23   Exhibit EE.  Just by way of background, this trial was

24   in progress now four days.

25   **A.**   I'm sorry.  Was there a question?

1    **Q.**    In terms of background, this trial was now in

2    progress four days?

3    **A.**    I guess.

4    **Q.**    And the decision to move forward with the trial or

5    not on the Court's part depended upon whether there was

6    a plea taken; is that right?

7    **A.**    I'm sorry.  I didn't understand your question.

8    **Q.**    The decision to move forward with the trial or not

9    depended upon the Judge's taking of a valid plea; is

10   that correct?

11   **A.**    Well, this was a proposed binding plea, which

12   under the Rules would have required the Court's

13   approval.

14   **Q.**    Okay.  But the Court was concerned, and you're

15   aware that the fact the Court didn't want to get

16   anything to get messed up on Monday morning; is that

17   correct?

18   **A.**    There was a concern that -- and I think it's

19   stated somewhere in this e-mail chain because I think I

20   just saw it when you showed it to me, that there was a

21   concern that if the change of plea was in progress and

22   was not completed, that there was a danger that because

23   of the press coverage, the jury would find out about it

24   and it would be very difficult to resume trial with an

25   uncontaminated jury.

1    **Q.**   Jury taint was a real concern?

2    **A.**   I think it was.

3    **Q.**   Now, this is a letter from Mr. Lepizzera to the

4    Judge at 2:28 in the afternoon?

5    **A.**   What is?  It appears to be.

6    **Q.**   Reporting as had been agreed upon by counsel and

7    by the Government for some information being tendered

8    to the Court; is that right?

9    **A.**   Well, I didn't read it just now when you put it in

10   front of me.  It was only there for a second, but I

11   assume it says whatever it says.

12   **Q.**   And the conclusion of that thread, at least it

13   appears to be the thread that relates to communication

14   back and forth of an informational nature to the Court

15   ends at about 5:12 in the afternoon by Mr. Lepizzera

16   writing to Judge Smith at about 5:12 in the afternoon.

17   **A.**   Is that a question?

18   **Q.**   Based upon that e-mail thread?

19   **A.**   The e-mail contains a statement about the concern

20   of the change of plea not being completed, I guess.

21   **Q.**   Okay.  I'm going to direct your attention -- did

22   you see this e-mail that was sent to Judge Smith as

23   carbon copied to you?

24   **A.**   I did.

25   **Q.**   Okay.  Now, directing yourself not to the last

1    line above the initials ML, but directing yourself to

2    the last full paragraph, it indicates, at least in

3    Mr. Lepizzera's words, (To the best of our ability)

4    that the client is truly willing to enter a knowing,

5    voluntary and intelligent plea.

6    **A.**    That's what it says.

7    **Q.**    Now, did you edit prior to this being sent to

8    Judge Smith this communication?

9    **A.**    Not that I know of.

10   **Q.**    Did you discuss the communication with Mike

11   Lepizzera after it was sent?

12   **A.**    You mean the language of this communication?

13   **Q.**    Yes.

14   **A.**    I probably discussed the fact that Michael

15   communicated with the Judge.  I don't recall the

16   specific conversation about the language of that

17   e-mail.

18   **Q.**    Okay.

19   **A.**    I don't remember.

20   **Q.**    Did you, in fact, make any effort to ascertain

21   from Mr. Caramadre directly whether he was truly

22   willing to enter into a knowing, voluntary, intelligent

23   plea after this e-mail was written to the Court?

24   **A.**    I guess it depends on the time frame that you're

25   talking about.  I didn't speak to the Defendant

1    immediately after that e-mail was written to the Court.

2    **Q.**    You spoke to him Sunday night?

3    **A.**    Correct.

4    **Q.**    Had some conversation on Monday morning?

5    **A.**    Correct.

6    **Q.**    Now, the use of the adverb "truly" willing, what

7    do you understand, if any, to be the distinction

8    between "willing" and "truly willing"?

9              MR. McADAMS:  I object.  This is an e-mail

10   written by Mr. Lepizzera, who has already testified.

11   He could have been asked these questions.  He

12   apparently wasn't.  He's asking Mr. Traini what it

13   means.  It's getting nowhere.

14             THE COURT:  I don't know what relevance the

15   distinction between "truly willing" and "willing" would

16   have legally anyway.  I mean, what are you getting at?

17             MR. WATT:  Judge, this particular witness

18   doesn't have any memory or knowledge or input or

19   editing functioning regarding the letter sent to the

20   Court; and so, therefore, I don't have any more

21   questions of him on this particular e-mail.

22             THE COURT:  You're not -- well, it will be in

23   the evidence, I guess, but the context of

24   Mr. Lepizzera's use of language is a response to what I

25   sent him.  You haven't put that up.  I mean, unless

1    you're --

2          MR. WATT:  Judge, we'll parse the e-mails both

3    from the Court and to the Court, but I see a tremendous

4    distinction between somebody saying, Judge, we're going

5    to do our best and make sure he's willing and somebody

6    indicating to the Court truly willing, which seems to

7    imply to the Court that they're going to go a step

8    above and beyond to ensure that this is not something

9    left to the last minute to pull out of the air.

10         THE COURT:  That's because I said in my e-mail,

11   which I haven't looked at in how ever many months it's

12   been, that I know I said to Mr. Lepizzera that I did

13   not want a plea to fall through so as to avoid jury

14   taint.

15         MR. WATT:  I think the Court is exactly correct.

16         THE COURT:  So Mr. Lepizzera is reacting to my

17   e-mail.

18         MR. WATT:  Understood.

19         THE COURT:  I guess you've withdrawn the

20   question so --

21         MR. WATT:  Yes, Judge, I have.

22   Q.   Mr. Traini, I've gotten 176 and 177 off the Bates,

23   and I'll mark it as FF and I'm going to show it to you

24   first consisting of two pages.

25         MR. McADAMS:  No objection.

1          THE COURT:  All right.  FF will be full without

2     objection.

3          (Defendant's Exhibit FF admitted in full.)

4     **A.**   I think you showed me these before, Mr. Watt.

5     **Q.**   I think I did the first page.  I don't think I had

6     the full thread.  That was part of the problem.

7     **A.**   No.

8     **Q.**   You saw both of them?

9     **A.**   You showed them both to me.

10    **Q.**   Marked as Exhibit 176, two pages, Exhibit FF is

11    the 8:49 e-mail from Mr. Traini to Mr. Lepizzera

12    talking about the <u>Alford</u> plea being out of the question

13    and you indicate, If he thinks he has to lie to plead,

14    then we are not going anywhere.  I don't think we can

15    even let him go that way.  Maybe you want to tell him

16    tonight it is absolutely out.

17          The next line, In fact, I raised this with Lee

18    on Thursday or Friday and it was already rejected on

19    the management level.  Your call.

20          What did you mean by the words, "your call"?

21    **A.**   I think I meant that it was up to Mr. Lepizzera to

22    relay that information to the Defendant at that time.

23    **Q.**   That e-mail from you to Mr. Lepizzera was in

24    response to an e-mail upon which you were carbon copied

25    or e-mail copied from Joseph Caramadre?

1    **A.**   Yes.  And I think that response was -- if you can

2    just put that back for a second, Mr. Watt.  I think

3    that answer I gave you about "your call" about

4    responding at that time was in response to the "I don't

5    need an answer tonight."

6    **Q.**   When did Mr. Lepizzera respond to you about

7    whether or not Mr. Caramadre thought that he had to lie

8    to plead and have that accepted after those e-mails of

9    Saturday night?

10   **A.**   I don't know.

11          MR. WATT:  One second, please, Judge, if I

12   could?

13          THE COURT:  Sure.

14          (Pause.)

15          MR. WATT:  No further questions, please, Judge.

16          THE COURT:  Thank you.

17          Mr. McAdams?

18          MR. McADAMS:  No redirect, your Honor.  Thank

19   you.

20          THE COURT:  All right.  Your can step down.

21   Thank you very much.

22          THE WITNESS:  Thank you, your Honor.

23          THE COURT:  Are there any further witnesses from

24   the Government?

25          MR. McADAMS:  No other Government witnesses,

1   your Honor.  Thank you.

2        THE COURT:  Does the Defendant have any rebuttal

3   evidence?

4        MR. WATT:  We do, Judge.  First of all, we'd

5   like to call Father Lacombe.

6        MR. McADAMS:  Your Honor, I'd object.  I don't

7   know that Father Lacombe has any testimony relevant to

8   this case.

9        THE COURT:  Would you give me a brief offer of

10  proof, Mr. Watt, about what this testimony would

11  entail?

12       MR. WATT:  I will, Judge.  The Father has put in

13  a statement in one of my brother's memoranda, memoranda

14  one or memoranda two, and this offer of proof relates

15  directly to Mr. Lepizzera's statement that he never

16  affirmatively represented his belief, that being

17  Mr. Lepizzera's belief in Mr. Caramadre's innocence.

18  The Father would testify to this Court that on multiple

19  occasions at both the lake house and at Mr. Caramadre's

20  house, among other conversations, Mr. Lepizzera

21  specifically used the words as to his personal belief

22  in Mr. Caramadre's innocence.

23       THE COURT:  All right.  Well, I guess in an

24  abundance of caution, I'll let you put the testimony

25  on.  Go ahead.  It sounds like this will be very brief.

1    MR. WATT:  Should be very brief, Judge.

2    THE COURT:  All right.  Go ahead.  Call the

3    witness.

4    **FATHER ROBERT E. LACOMBE**, first having been duly

5    sworn, testified as follows:

6    THE CLERK:  Please state your name and spell

7    your last name for the record.

8    THE WITNESS:  Father Robert E. Lacombe,

9    L-A-C-O-M-B-E.

10   THE COURT:  All right.  Good afternoon, Father.

11   THE WITNESS:  Good afternoon, Judge.

12   **DIRECT EXAMINATION BY MR. WATT**

13   **Q.**   Father, what is your employment?

14   **A.**   Roman Catholic priest of the Diocese of

15   Providence.

16   **Q.**   For how many years?

17   **A.**   Approximately 21 years.

18   **Q.**   In the course of those duties, have you come to

19   know both Mr. Caramadre and Mr. Lepizzera?

20   **A.**   I have, yes.

21   **Q.**   Have you known them in a religious context or

22   personal context, a blend?  Please describe the

23   relationship.

24   **A.**   A blend of both.  I have substituted at times at

25   Holy Apostles Church and have celebrated Mass on

1    several occasions there in the presence of

2    Mr. Caramadre and Mr. Lepizzera, particularly on some

3    occasions for the Men of St. Joseph's; and also

4    pursuant to that social relationship through

5    Mr. Caramadre with Mr. Lepizzera on a few occasions.

6    **Q.**   You've heard the proffer that I gave to the Court

7    as to what your testimony in my view would be.

8         Do you have specific recollection as to any

9    particular points in time where the issue of

10   Mr. Caramadre's innocence came up as it relates to a

11   conversation you had with Mr. Lepizzera?

12   **A.**   Yes.  I recall some time in the fall of 2011, the

13   reason I can cite that date is due to the fact that it

14   took place during Patriot season and the viewing of the

15   Patriot's game at Joseph Caramadre's lake house.

16   Mr. Lepizzera was seated directly to my left.  And when

17   we discussed the case in a cursory manner, he was

18   emphatic about Joe's innocence and almost appeared to

19   be on a spiritual quest to bring the truth to light and

20   to defend vigorously his friend and his client.  And on

21   that occasion, of course, he made clear to me that his

22   estimation was that Joe was innocent of the accusations

23   that were leveled against him.

24   **Q.**   Was there a subsequent occasion that comes to your

25   mind in which that same topic came up?

1   **A.**   Yes.   I had a couple of conversations with

2   Mr. Lepizzera, the second of which I'm not quite sure.

3   I believe it took place, again, at Mr. Caramadre's main

4   residence in Cranston, and there another clear

5   attestation to the innocence of Joe and kind of -- I

6   got the impression that Mr. Lepizzera was putting this

7   within the context of the spiritual brotherhood through

8   the Men of St. Joseph and that this was something he

9   was doing on a personal as well as on a professional

10  basis to vindicate his client.

11  **Q.**   On those specific memory opportunities that you

12  heard this, who was present besides yourself and

13  Mr. Lepizzera?

14  **A.**   Present on those occasions would have Joe

15  Caramadre, Joe Caramadre's children, Michael

16  Lepizzera's son and I believe Joe Caramadre's nephew,

17  Devon, I believe his name is.

18  **Q.**   And on the second occasion?

19  **A.**   On the second occasion, it was at Joe's house.

20  Again, it would have been Joe's children and Joe, and

21  possibly, I believe, a friend of Joe's by the name of

22  Joe Di Noia.

23  **Q.**   You presided over the Mass prior to the start of

24  trial at Mr. Caramadre's house?

25  **A.**   Yes, I did.

1    MR. WATT:  I have nothing further, Judge.

2    THE COURT:  Thank you.  Any cross-examination?

3    MR. McADAMS:  Yes, your Honor.

4    **CROSS-EXAMINATION BY MR. McADAMS**

5    **Q.**  Good afternoon, Father.

6    **A.**  Good afternoon.

7    **Q.**  So it's your testimony that you had this

8    conversation with Mr. Lepizzera in the fall of 2011?

9    **A.**  I believe it was the fall of 2011, yes.

10   **Q.**  That would have been before Mr. Caramadre had been

11   indicted?

12   **A.**  I'm sorry.  This would have been in the fall of

13   2012.  I'm sorry.

14   **Q.**  When in the fall of 2012?

15   **A.**  Early football season.

16   **Q.**  Early football season.  So shortly before the

17   trial began?

18   **A.**  Yes.

19   **Q.**  Now, in that conversations with Mr. Lepizzera, did

20   he tell you about the admissions that Mr. Caramadre

21   made to him?

22   **A.**  Let me rephrase this.  Now, my memory -- this took

23   place in the fall of 2011.

24   **Q.**  So it was the fall of 2011?

25   **A.**  Yes.  It was not in fall of 2012.

1   **Q.**   So it was a year before the trial took place?

2   **A.**   Correct.

3   **Q.**   In fact, it was before Mr. Caramadre had actually

4   even been indicted by the Grand Jury, correct?

5   **A.**   I believe it was right around the time that that

6   happened.

7   **Q.**   So it was before Mr. Lepizzera would have received

8   discovery from the Government, correct?

9   **A.**   I believe so, yes.

10   **Q.**   You don't actually know when the evidence was

11   given to Mr. Lepizzera, do you?

12   **A.**   I don't know.

13   **Q.**   It would have been before Jencks material were

14   provided to Mr. Lepizzera; is that right?

15   **A.**   Correct.

16   **Q.**   You understand what Jencks materials are?

17   **A.**   I believe so.

18   **Q.**   Witness statements, Grand Jury reports, interviews

19   of what the witnesses actually said.

20          Your conversation with Mr. Lepizzera would have

21   been before he received those materials; is that right?

22   **A.**   Correct.

23   **Q.**   That would have been before Mr. Lepizzera had done

24   his mock cross-examination of Mr. Caramadre, correct?

25   **A.**   I'm not sure when Mr. Lepizzera did his mock

1    cross-examination.

2    **Q.**    In that conversation, did he tell you that he had

3    conducted a mock cross-examination of Mr. Caramadre?

4    **A.**    No, he did not.

5    **Q.**    Did he tell you that Mr. Caramadre had admitted to

6    him that he lied to various representatives of

7    different companies, including LifeMark, including

8    Ameritrade?

9    **A.**    No, he did not.

10   **Q.**    Did he tell you that Mr. Caramadre admitted to him

11   that he had falsely put a terminally ill man, Robert

12   Mizzoni's address as his parents' address in order to

13   prevent the insurance company from reaching him?

14   **A.**    No.

15   **Q.**    He didn't tell you that?

16   **A.**    No.

17   **Q.**    Now, Father, you actually met with Mr. Caramadre

18   during the weekend before he pled guilty, didn't you?

19   **A.**    Correct.

20   **Q.**    It was your advice to him that he should plead

21   guilty, correct?

22   **A.**    It was my advice to him that he should be

23   following what appeared to be his counsel's direction

24   at that point, and I'm the one that proffered the

25   possibility of <u>Alford</u> plea because Joe was very clear

1    to me that he would be lying if he pled guilty.

2    **Q.**   But it was your advice to him that he should plead

3    guilty?

4    **A.**   I said an <u>Alford</u> plea, and I said you follow your

5    attorney's direction because I wasn't present for this

6    trial.  I was not in a position to offer advice.

7    **Q.**   You weren't present; you didn't see the evidence

8    come in at trial?

9    **A.**   I was familiar with the evidence through Joe.

10   **Q.**   So you knew what he told you?

11   **A.**   Correct.  What I read as well.

12   **Q.**   You didn't come and sit in the gallery and watch

13   the trial?

14   **A.**   No, I did not.

15   **Q.**   You didn't watch what the witnesses said under

16   oath?

17   **A.**   No, I did not.

18   **Q.**   You didn't watch the cross-examination of

19   Mr. Lepizzera?

20   **A.**   No, I did not.

21   **Q.**   Okay.  So your opinion of how the trial was going

22   was based on what Mr. Caramadre told you?

23   **A.**   Yes.  And what I was able to garner through the

24   newspaper and media coverage.

25   **Q.**   Now, you did submit an affidavit in this case, did

1    you not?

2    **A.**    Yes, I did.

3    **Q.**    And in that affidavit you wrote that you had

4    advised Mr. Caramadre to plead guilty?

5    **A.**    That affidavit, I believe, stated that I advised

6    Mr. Caramadre to follow the directives of his counsel

7    at the time.

8    **Q.**    And that affidavit doesn't say anything about an

9    <u>Alford</u> plea, does it?

10   **A.**    I didn't mention an <u>Alford</u> plea in the affidavit,

11   no.

12   **Q.**    But it was your advice to Mr. Caramadre that he

13   should follow the advice of his attorneys?

14   **A.**    My exact statement to him was it appears that your

15   attorneys are telling you they cannot defend you in

16   this case.  It appears.  Consequently, you should

17   probably follow their advice because it was made clear

18   to me through Mr. Caramadre that there was some

19   minatory statement on the part of his attorneys that

20   any prolongation of these processes or this process

21   would lead to increased sentence time.  So obviously,

22   time was of the essence if what he was telling me was

23   true.

24   **Q.**    But it was your advice that he should follow their

25   advice?

1    **A.**    At that time, yes.  Because I was not aware --

2    because I was not aware that there had been what

3    appeared to be a lackadaisical defense.

4    **Q.**    How did you become aware that there was a

5    lackadaisical defense?

6    **A.**    Through regular conversations with Mr. Caramadre,

7    with his family, with those who witnessed the trial

8    proceedings with Mr. Lepizzera after the fact.

9    **Q.**    So let's break those down.  So Mr. Caramadre told

10   you that there was a lackadaisical defense?

11   **A.**    Yes.

12   **Q.**    And his family members told you that there was a

13   lackadaisical defense?

14   **A.**    Yes.

15   **Q.**    Did you request that you could review the

16   transcript?

17   **A.**    I did.  Yes.

18   **Q.**    And what did Mr. Caramadre tell you?

19   **A.**    I reviewed the transcripts.

20   **Q.**    You reviewed the transcripts of the entire trial?

21   **A.**    Not the entire trial, but certain segments.

22   **Q.**    What segments did you review?

23   **A.**    First of all, I was aware that there had not been

24   an opening argument, that there was minimal

25   cross-examination.  I saw that in the initial days of

1    the trial.  I believe I only reviewed the first or

2    second day.

3    **Q.**    How did you become aware of those facts?  How did

4    you come to notice that there was no opening statement?

5    **A.**    Well, through looking at the transcript and also

6    in discussions with Mr. Caramadre and his family and

7    people who had witnessed the trial.

8    **Q.**    Are you an attorney?

9    **A.**    I am not.

10   **Q.**    So did you have some strongly-held belief as to

11   whether an attorney should give an opening statement in

12   a criminal case?

13   **A.**    Well, I believe, what I can relate to Joe is I

14   believe that first impressions are lasting impressions

15   and because there had been a plethora of information

16   presented against him, that I believe that an opening

17   statement, and I had conferred with attorney friends of

18   mine, that an opening statement would have been

19   warranted to put the matter in context.

20   **Q.**    Did you do that over the weekend before you gave

21   your advice to Mr. Caramadre to plead guilty?

22   **A.**    No.  No.  Post-facto.

23   **Q.**    You did that after, in fact, his attorneys had

24   drafted this motion to withdraw the guilty plea,

25   correct?

1    **A.**    Right.

2    **Q.**    So after they had formulated this argument, you

3    went out and spoke to other people, and you became

4    convinced that it was a good argument?

5    **A.**    Correct.

6         MR. McADAMS:  No further questions, your Honor.

7         THE COURT:  Any redirect?

8         MR. WATT:  No, your Honor.

9         THE COURT:  All right.  Father, you can step

10   down.  Thank you.

11        Any other rebuttal evidence?

12        MR. WATT:  Yes, Judge.  Paula Caramadre, please.

13        **PAULA CARAMADRE**, first having been duly sworn,

14   testified as follows:

15        THE CLERK:  Please state your name and spell

16   your last name for the record.

17        THE WITNESS:  Paula M. Caramadre,

18   C-A-R-A-M-A-D-R-E.

19        THE COURT:  Good afternoon, Mrs. Caramadre.

20        Go ahead, Mr. Watt.

21        MR. WATT:  Thank you, Judge.

22        **DIRECT EXAMINATION BY MR. WATT**

23   **Q.**    Mrs. Caramadre, how long married to Mr. Caramadre?

24   **A.**    Going on 23 years.

25   **Q.**    Children?

1    **A.**    Three.

2    **Q.**    Okay.  Were you present on Sunday, the evening,

3    November 18th, 2012, in your home?

4    **A.**    Yes.

5          THE COURT:  Before you answer, slide that mike

6    up a little bit, please.  Thank you.

7    **Q.**    Had you come to the trial of your husband after

8    its inception?

9    **A.**    I was there for two days.

10   **Q.**    Okay.  And what was the second day of the week?

11   **A.**    I think it was Thursday.

12   **Q.**    After the second day, as you best recall, when was

13   the next day you came to court?

14   **A.**    I only went the first two days.  That was it.  I

15   believe Tuesday and Wednesday.

16   **Q.**    Was there a reason you didn't go back?

17   **A.**    Yes.  I wasn't well enough to return.

18   **Q.**    Okay.  From the time that you left the court on

19   that second day, did you do anything out in the

20   community between that day and Sunday evening?

21   **A.**    I don't believe so.

22   **Q.**    Did you see any healthcare providers?

23   **A.**    I did.

24   **Q.**    Did you conduct any of your normal religious

25   activities?

1    **A.**    On Sunday, that Sunday, I went to Mass.

2    **Q.**    Okay.  Did you go with anyone?

3    **A.**    My family.

4    **Q.**    Being?

5    **A.**    Joe and the kids.

6    **Q.**    And from there, where did you go?

7    **A.**    I went home.

8    **Q.**    Okay.  Now do you recall Sunday night?

9              THE COURT:  Could we just -- could I have

10   counsel come up just for a minute.

11             (Side-bar conference.)

12             THE COURT:  I'm kind of shocked that you put

13   Mrs. Caramadre on the stand.  Before this goes any

14   further, I just want to make sure that I assume you've

15   discussed with her all the ramifications of going on

16   the stand and subjecting her to cross-examination by

17   Mr. McAdams.  I mean, have you considered whether by

18   putting her on the stand you've now waived spousal

19   privilege?  I assume you have considered that.

20             MR. WATT:  I have, Judge.

21             THE COURT:  Do you consider it waived?

22             MR. WATT:  As to the conversations that I intend

23   to elicit information about, absolutely.

24             THE COURT:  I don't think it may be as limited

25   as that and you're opening a door here that -- I mean,

1    I guess you know what you're doing, but are you sure

2    you want to do this?

3           MR. WATT:  I am, Judge.

4           MR. McADAMS:  You didn't call her in your

5    case-in-chief.

6           MR. WATT:  Her affidavits are in for purposes of

7    cross-examination if you want to use it.  This goes

8    directly to the points of what happened on Sunday night

9    as well as Mr. Lepizzera's professing of his belief in

10   Mr. Caramadre's innocence as well as Mr. Lepizzera's

11   inquiry on repeated occasions of Mrs. Caramadre we

12   can't afford to let Joe have a mental breakdown as

13   well.  So it goes to the state of mind, which is a

14   crucial question this Court is going to have to answer

15   in its own mind to determining this motion is my

16   proffer to the Court.

17          THE COURT:  Okay.  You're assuring me that you

18   have fully discussed this with her.

19          MR. WATT:  I've had her twice in the office

20   outside of Mr. Caramadre's presence, and she's going to

21   say she doesn't know a lot but she knows she heard

22   specific words come out of Mr. Traini's mouth.  She

23   knows other things that Mr. Lepizzera said to her

24   leading up to that and, yeah.

25          THE COURT:  He's going to want to go a lot of

1   other places with this examination beyond that.  That

2   depends on what your questions are.  Are you taking the

3   position that a spousal privilege continues in place

4   for some purposes or is it totally waived?  I did not

5   expect this.

6         MR. WATT:  The answer is she is not going to say

7   based upon my conversations with her anything that is

8   going to constitute an admission as to the elements of

9   this particular criminality or alleged criminality.

10        THE COURT:  All right.  We'll see where it goes.

11        (End of side-bar conference.)

12  **Q.**   Do you recall Sunday night prior to the giving of

13  the plea?

14  **A.**   Yes.

15  **Q.**   Can you tell the Court what you recollect having

16  been said during that Sunday night meeting in your

17  home?

18  **A.**   Mr. Traini and Mr. Lepizzera came and wanted Joe

19  to sign some papers and he said, "How can I do this?

20  I'll be lying to the Judge."

21        Mr. Traini said something like you may think

22  you're lying now, but right before you say it, you

23  won't be lying.  Which I didn't understand and I had

24  to -- I got up and left for a short time and came back.

25  **Q.**   How long was the entire session in your home?

1    **A.**   I think 20, 25 minutes.

2    **Q.**   Okay.  Was there any discussion, as best you can

3    recall, with regards to estimates or thoughts regarding

4    how much time your husband was facing?

5    **A.**   Well, he said the sooner we do this, the better it

6    is because we'll make the Judge angry if we continue

7    it.  And as far as time, he said it's possible very

8    little to no time.

9         MR. WATT:  Okay.  No further questions, Judge.

10        THE COURT:  Cross.

11        **CROSS-EXAMINATION BY MR. McADAMS**

12   **Q.**   Good afternoon, Mrs. Caramadre.

13   **A.**   Good afternoon.

14   **Q.**   So your husband -- you and your husband have been

15   married for 23 years?

16   **A.**   Almost.

17   **Q.**   Obviously, you love your husband very dearly?

18   **A.**   I do.

19   **Q.**   And you don't want him to be convicted of this

20   crime, correct?

21   **A.**   Well, he didn't commit any crimes so --

22   **Q.**   And you don't want him to be found guilty?

23   **A.**   That's right.

24   **Q.**   If he's found guilty, then he'll go to prison for

25   a long time and you'll lose him for a long period of

1    time?

2    **A.**    Right.

3    **Q.**    And you obviously don't want that to happen?

4    **A.**    That's right.

5    **Q.**    In fact, your family might end up owing many, many

6    millions of dollars to the various companies that come

7    after him?

8    **A.**    I don't know that.

9    **Q.**    You don't want that to happen either, do you?

10   **A.**    No.

11   **Q.**    Okay.  And obviously, when this trial occurred,

12   you were upset; is that fair to say?

13   **A.**    I was more than upset.

14   **Q.**    You filed an affidavit in the case earlier, do you

15   remember that?

16   **A.**    Yes.

17   **Q.**    Do you remember that you wrote in the affidavit

18   that the first time you had ever heard the allegations

19   against your husband was when Mr. Vilker gave his

20   opening statement?

21   **A.**    Yes.

22   **Q.**    So the years before the trial began, your husband

23   didn't tell you what the allegations of the Government

24   were?

25   **A.**    That the -- he -- some of them were that he had

1    given misinformation to the terminally ill.

2    **Q.**   That's what your husband had told you that the

3    Government was alleging?

4    **A.**   Well, he told me other things.  I didn't remember

5    everything.

6    **Q.**   Was that a true statement in your affidavit that

7    you wrote that the first time that you had heard the

8    factual allegations was when Mr. Vilker gave his

9    opening statement?

10   **A.**   Yes.

11   **Q.**   Now, you weren't present in your husband's

12   meetings with Mr. Lepizzera and Mr. Traini, were you?

13   **A.**   No.

14   **Q.**   Other than that Sunday evening conversation that

15   took place at your house?

16   **A.**   Right.

17   **Q.**   So you weren't there when your husband admitted to

18   Mr. Lepizzera that he had lied to representatives from

19   Ameritrade, were you?

20   **A.**   I don't know that to be true.

21   **Q.**   But you weren't there when they had that

22   conversation?

23   **A.**   I wasn't there at that meeting.

24   **Q.**   And you weren't there when Mr. Lepizzera did a

25   mock cross-examination of your husband?

1    **A.**   I was not there.

2    **Q.**   Okay.  Now, as you watched the testimony of the

3    trial on the first day, the opening statement,

4    Mr. Wiley's testimony, you were upset by the testimony

5    that you saw, weren't you?

6    **A.**   Yes.

7    **Q.**   You saw some documents put on the screen that had

8    your name on them?

9    **A.**   Um-hum.  (Affirmative.)

10   **Q.**   That included your signature or purported

11   signature?

12   **A.**   Yes.

13   **Q.**   And next to Mr. Wiley's signature?

14   **A.**   Yes.

15   **Q.**   And both of those signatures were notarized, do

16   you remember that?

17   **A.**   Yes.

18   **Q.**   You recognized that that wasn't your signature

19   there, correct?

20   **A.**   No.

21   **Q.**   Is it your testimony that, in fact, it was your

22   signature on that document?

23   **A.**   I am not sure if that was my signature, but it

24   looked like my signature.

25   **Q.**   It looked like your signature?

1    **A.**    Yes.

2    **Q.**    It looked like the same signature that you used to

3    sign the affidavit that you submitted in this case?

4    **A.**    You'd have to put them in front of me.

5    **Q.**    Now, on the night of November 18th when Mr. Traini

6    and Mr. Lepizzera came to meet with you and

7    Mr. Caramadre, you were very upset; is that fair to

8    say?

9    **A.**    Yes.

10   **Q.**    You had suffered an emotional breakdown a few days

11   earlier?

12   **A.**    Yes.

13   **Q.**    Were you having any memory issues?

14   **A.**    Of the days after, I may have.

15   **Q.**    So your memory isn't perfect as to what exactly

16   was said at that meeting; is that fair to say?

17   **A.**    I remember that.

18   **Q.**    You remember it exactly?

19   **A.**    That was pretty close to it.  Word-for-word?  I

20   don't think so.

21   **Q.**    What do you remember Mr. Lepizzera and

22   Mr. Traini's response being to your husband's question?

23   **A.**    Mr. Traini said, As an attorney I can't tell you

24   to lie.  And he went on to say you may think you're

25   lying now, but right before in front of the Judge you

1    won't be lying.

2    **Q.** And did you -- did the meeting continue?

3    **A.** It did.

4    **Q.** How long did it continue after that?

5    **A.** Not much longer. Maybe ten minutes or so.

6    **Q.** What was the understanding as the meeting ended?

7    **A.** That there would be -- he would be pleading guilty

8    on Monday.

9    **Q.** And your husband's decision was to plead guilty?

10   **A.** Well, he did it under stress.

11   **Q.** Did he say, "I'm doing it under stress"?

12   **A.** I know he was doing it under stress.

13   **Q.** Because you were under stress?

14   **A.** I was under stress and so was he.

15   **Q.** Did he say, "I'm under stress"?

16   **A.** He said, "I am depressed." He spoke to me, not in

17   the meeting. I knew he was depressed and wasn't able

18   to make strong decisions. And had I not -- if I wasn't

19   ill, I would have been able to help him.

20   **Q.** So he said that to you outside of the presence of

21   Mr. Lepizzera and Mr. Traini?

22   **A.** About him being depressed?

23   **Q.** Yes.

24   **A.** That was a known fact.

25   **Q.** Because he's been depressed for many years?

1  **A.**  He has.

2      MR. McADAMS:  No further questions.

3      THE COURT:  Redirect.

4      MR. WATT:  Please, Judge.

5      **REDIRECT EXAMINATION BY MR. WATT**

6  **Q.**  Does Mr. Caramadre have your authority to sign

7  your name from time to time?

8  **A.**  He does.

9      MR. WATT:  No further questions, Judge.

10      THE COURT:  Any recross?

11      MR. McADAMS:  No, your Honor.

12      THE COURT:  Okay.  Thank you.  You can step

13  down.  Thank you very much.

14      MR. WATT:  Judge, I'd like to call Susan

15  Caramadre.

16      MR. McADAMS:  I'd like to know what this is in

17  rebuttal of.  Mr. Caramadre had an opportunity to put

18  on a case.  He didn't call any of these witnesses.

19      THE COURT:  Can you give us an offer of proof,

20  please?

21      MR. WATT:  I will, Judge.

22      THE COURT:  Come on up.

23      MR. WATT:  Susan Caramadre was present in this

24  courtroom before this Court on the date of November

25  19th, among other dates, leading up to the plea in this

1    case on November 19th.  And immediately prior to the

2    taking of the plea by the Court, Joseph Caramadre and

3    Mrs. Caramadre had a conversation in which he indicated

4    to her, and I don't want to put words, that he

5    continued to profess his innocence to Mrs. Caramadre.

6    This is right juxtaposed to the taking --

7         THE COURT:  What is it in rebuttal to?

8         MR. WATT:  It's in rebuttal to the lack of

9    questioning, affirmative questioning by either of his

10   defense counsel to have ascertained the state of mind

11   of Joseph Caramadre as to, and that's where the word

12   "truly" comes in, Judge, his true state of mind as to

13   whether he believed he was innocent, believed he was

14   guilty when he came before this Court.

15        MR. McADAMS:  I object, your Honor.  That's not

16   rebuttal of any testimony that came in at this hearing.

17        THE COURT:  It doesn't sound like rebuttal

18   testimony.  What testimony did the Government put on is

19   this testimony designed to rebut?

20        MR. WATT:  It's designed to rebut the statement

21   by Mr. Lepizzera that he never professed his belief in

22   Mr. Caramadre's innocence and the way in which

23   Mr. Lepizzera finessed a question in response to the

24   nolo Alford plea raised by Mr. Caramadre on Saturday.

25   And it's come out very clearly from both Mr. Lepizzera

1    and from Mr. Traini that there was no affirmative

2    question asked to insure for this Court that it was a

3    true giving of a voluntary, knowing, intelligent plea

4    to this Court or whether it was something that

5    Mr. Caramadre had to do to protect his wife and

6    children and that the truth didn't matter.

7              THE COURT:  That's not what you just described

8    as what her testimony --

9              MR. WATT:  Her testimony, Judge, is going to be

10   in this court on the very moments prior to the giving

11   of the plea, this woman heard Mr. Caramadre say, I'm

12   going before the Court and I'm going to lie about my

13   guilt.

14             MR. McADAMS:  Your Honor, I object.  I'm sure

15   Mr. Caramadre told everybody in his family that he was

16   going to lie.  That doesn't mean he was going to lie.

17             THE COURT:  I understand, Mr. McAdams.

18             You just told me she was going to rebut

19   something that Mr. Lepizzera said.  She can't rebut

20   something Mr. Lepizzera said by testifying to something

21   Mr. Caramadre said.

22             MR. WATT:  The magic moment, so-called, Judge,

23   has been brought out by virtue of Mr. Traini leaving

24   the question hovering in the air on Sunday night that

25   was somehow supposed to magically occur to

1    Mr. Caramadre at the time of the colloquy with this

2    Court is completely and distinctly rebutted

3    affirmatively by this witness as to what was in his

4    belief or not of his counsel at the time in furtherance

5    of their candor responsibility of this court tendered

6    him before you for the plea colloquy.

7              THE COURT:  I don't think I really understood

8    what you just said, but here's the thing.  This is

9    rebuttal testimony.  If she can rebut something

10   specific that came out on the Government's case, then

11   I'll let her testify.  But what you've told me so far

12   doesn't sound like there is anything that is rebuttal

13   in nature.

14             MR. WATT:  The Court will make its ruling,

15   Judge.  I proffered what I could with regards to

16   Mrs. Caramadre.  It's going to be a bing-bang question

17   and answer.  It seems to me as though there might be

18   some extension of what might be technical rules of

19   rebuttal, but I think it goes to the heart of the

20   matter, what was in Mr. Caramadre's mind when he was

21   directly before you.

22             THE COURT:  All right.  Let's get the witness

23   sworn.  You can ask your question.  Let's see how it

24   goes.

25             **SUSAN CARAMADRE**, first having been duly sworn,

1    testified as follows:

2         THE CLERK:  Please state your name and spell

3    your last name for the record.

4         THE WITNESS:  Susan Caramadre,

5    C-A-R-A-M-A-D-R-E.

6         THE COURT:  Good afternoon, Ms. Caramadre.

7         THE WITNESS:  Go ahead.

8         THE COURT:  Go ahead.

9    **DIRECT EXAMINATION BY MR. WATT**

10   **Q.**  Mrs. Caramadre, what is your relation to

11   Mr. Caramadre?

12   **A.**  I'm his aunt by marriage.

13   **Q.**  Okay.  And did you have an occasion to be present

14   at any point in time during the trial of Mr. Caramadre?

15   **A.**  I was there all four days.

16   **Q.**  Okay.  Did you have occasion to visit

17   Mr. Caramadre after the fourth day of trial prior to

18   the plea on November 19th?

19   **A.**  No.

20   **Q.**  Were you here present in the court on November

21   19th?

22   **A.**  That's Monday?

23   **Q.**  That's Monday.

24   **A.**  Yes, I was.

25   **Q.**  And did you have occasion to have any conversation

1    with Mr. Caramadre immediately prior to the Court

2    coming and sitting and conducting the colloquy?

3    **A.**   Yes, I did.

4    **Q.**   Can you tell the Court in your best recollection

5    what was the substance of that conversation?

6    **A.**   I didn't know he was going to plead.  I came in

7    and we were standing in the corner down there, and he

8    said that this was the first lie he was telling when he

9    pled guilty because his family needed him, that he had

10   moral obligations and this is what was necessary.

11          MR. WATT:  I have nothing further, Judge.

12          THE COURT:  Cross?

13          MR. McADAMS:  No, your Honor.

14          THE COURT:  All right.  You may step down.

15   Thank you.

16          Any other witnesses?

17          MR. WATT:  Just Mr. Caramadre, Judge, and that

18   will wrap it.

19          THE COURT:  Who did you just call?

20          MR. WATT:  Joseph Caramadre, Judge.

21          THE COURT:  All right.

22          MR. WATT:  Judge, could I have perhaps a

23   five-minute break at this point in time to try to focus

24   us down within the technical and strict rules of

25   rebuttal testimony?

1          THE COURT:  No.  Let's just get through this.

2    We'll take perhaps a break after this.

3    **JOSEPH CARAMADRE**, Resumes stand.

4          THE COURT:  Mr. Caramadre, you're still under

5    oath.  You previously testified in this matter so you

6    may sit.

7          Go ahead, Mr. Watt.

8          MR. WATT:  Thank you, Judge.

9          **DIRECT EXAMINATION BY MR. WATT**

10   **Q.**  Mr. Maltais is the subject matter if I could,

11   Mr. Caramadre, at the time that the trial started, who

12   did you expect to be the individual --

13         MR. McADAMS:  I object to this line of

14   questioning.  There was nothing brought out in the

15   Government's case about Mr. Maltais.  There were a few

16   questions on cross-examination regarding an

17   investigator in which he was one of the potential

18   witnesses.  Mr. Maltais has never come up in the

19   context of this proceeding.  Apart from that, it's

20   beyond the scope.

21         MR. WATT:  Judge, I suggest, respectfully, that

22   it's not beyond the scope.  I think it goes to one of

23   the many factors that the Court may have to consider as

24   whether these attorneys did their job within the

25   confines of First Circuit law and common sense.  The

1    issue of Mr. Maltais is perhaps crucial as it relates

2    to Mr. Lepizzera.  Mr. Lepizzera said he was --

3         THE COURT:  I'll let you have some questions.

4    Go ahead.  Overruled.

5    **Q.**   Mr. Caramadre, at the point in time this trial

6    started, who did you believe was going to conduct the

7    examinations of Mr. Maltais?

8    **A.**   Mr. Lepizzera.

9    **Q.**   When did that change, if at all, in terms of your

10   awareness?

11   **A.**   It only changed after the plea and when I read the

12   e-mails between the Government and Mr. Lepizzera.

13   **Q.**   So right through and including the plea you had no

14   idea that Mr. Lepizzera was not going to do the

15   cross-examination?

16   **A.**   That's correct.

17   **Q.**   You heard Mr. Lepizzera tell this Court about

18   certain what he characterized as admissions; is that

19   correct?

20   **A.**   That's correct.

21   **Q.**   You take deference with that statement?

22   **A.**   Yes, I do.

23   **Q.**   Why?

24   **A.**   Because Mr. Lepizzera has turned statements made

25   by his client to an attorney and converted it to an

1    admission to make it sound more sensational, to make it

2    seem like there's an admission of guilt.  I take great

3    issue with Mr. Lepizzera coming up and just listing

4    admissions that he believes might speak to guilt.

5    However, when finally asked, at least he admitted that

6    I never admitted any admissions of guilt to him.

7    **Q.**   Did you hear him use the word "forgery"?

8    **A.**   Yes.  Very disappointing that Mr. Lepizzera came

9    up here and perjured himself.

10        MR. McADAMS:  Objection, your Honor.  This line

11   of questioning is just an opportunity for Mr. Caramadre

12   to pontificate about his views in the case.  He can

13   give a statement at sentencing.

14        THE COURT:  I'll overrule the objection.  Go

15   ahead.

16   **A.**   Mr. Lepizzera is a very intelligent --

17        THE COURT:  There's no question before you.

18   **Q.**   Did you ever get a defense team prepared document

19   indicating to you in written form the strengths and

20   weaknesses of your case?

21   **A.**   No.

22   **Q.**   Did you ever indicate that you would not testify?

23   **A.**   No.

24   **Q.**   Did you ever indicate that you would not or you

25   did not want to testify?

1    **A.**   No.

2          MR. WATT:  Judge, I have nothing further.

3          THE COURT:  All right.  Thank you.

4          MR. McADAMS:  No questions, your Honor.

5          THE COURT:  All right.  Thank you.  You may step

6    down.  Anything further, Mr. Watt?

7          MR. WATT:  No, Judge, subject to the

8    representations by my brother, Mr. Olen, as to the

9    admission for purposes of this hearing of the

10   attachments to memoranda one and memoranda two as well

11   as that last issue that the Court indicated would be

12   referred to as a matter under seal.

13         THE COURT:  Right.  Then are you ready to argue

14   the case or the motion.

15         MR. WATT:  Court indicated perhaps I could have

16   five minutes just to collect my thoughts.

17         THE COURT:  How long do you need to argue this?

18         MR. WATT:  Twenty minutes, Judge.

19         THE COURT:  What does the Government want?

20         MR. McADAMS:  I think 10 or 15 minutes is fine,

21   your Honor.

22         THE COURT:  All right.  Let's just go off the

23   record for a moment.

24         (Recess.)

25         THE COURT:  Go ahead, Mr. Watt.

1      MR. WATT:  Thank you, Judge.

2          Judge, I start off with a declaration that

3  whether it's legal counsel or football or hindsight in

4  general, I suppose in one sense there's nothing easier

5  than taking a shot or two at fellow counsel, long-term

6  members of the bar; and the defense bar here in Rhode

7  Island is extremely small, and I don't mean to impute

8  any ad hominum attack on anybody.

9          That being said, Judge, Mr. Lepizzera's

10  testimony, I think, should strike the Court as having

11  been more than artful, rising to the level of feigned

12  obeisance to the Court.  He was able, Judge, to ferret

13  out before Mr. Olen had even asked the question where

14  it was that he believed Mr. Olen was going with a line

15  of questioning and so as to save the Court time, he was

16  going to get right down to it and give the answer which

17  Mr. Olen had started the quest for in his questioning.

18          However, when it comes to the important facts of

19  this case, we have a man who by his own statements

20  indicates to the Court that he's burnt out, that he has

21  no vivid memory, that an over-demanding client on the

22  one hand versus a hands-off client on the other has

23  simply become too much for Mr. Lepizzera on Sunday

24  night.  And he can't really remember what it is that

25  Mr. Traini says or doesn't say, but his memory is

1    incredible with regards to converting statements into

2    his beliefs as to what they constitute, that is,

3    declarations of fact or declarations not to worry about

4    it, all of a sudden in Mike Lepizzera's mind some three

5    years into this case converts themselves into some sort

6    of quasi-admissions that may well create a conflict for

7    Mike.

8         And I think if you look at the documents, Judge,

9    in this case, that being the September plea bargain

10   request for permission to open negotiations with the

11   Government rejected out of hand by Mr. Caramadre, if

12   you look at the November 19th statement put in front of

13   Mr. Caramadre, who wasn't reading anything at that

14   point in time to sign, Mr. Traini was relying in great

15   part on Mr. Lepizzera's handing off to Mr. Traini of

16   the bringing home of the plea before this Court.

17        I indicated to the Court that I thought the

18   jocular comments on Thursday night over my client and

19   was it now Mr. Traini's half client and Mr. Lepizzera

20   saying he's all yours, in capital letters.  It's very

21   clear that Michael Lepizzera himself was undergoing an

22   enormous amount of stress.  So much stress that he

23   couldn't bring himself to do an opening statement.  He

24   couldn't bring himself to question a la Flanders and

25   Pine.  He couldn't articulate exactly where it was he

1    was going.  He talked about not investigating and

2    having an investigator examine witnesses so as not to

3    be able to fill in the blanks, whatever those may be,

4    of the Government's case.

5         He talked about the bad optics but he never

6    prepared any sort of contrary optic, and he gave the

7    jury absolutely no inkling other than standing up in

8    court and not identifying himself as Michael Lepizzera.

9    Mr. Traini was the first one that stood up at the time

10   of the introduction to the jury.  He identifies himself

11   as Mr. Lepizzera to the jury, a fairly distant way to

12   impress one's intended putting forth of your own

13   credibility before this jury and a long trial.

14        And who's the guy, Judge, who stands up at the

15   time of the taking of the plea?  Not the Christian

16   brother, not the person who was assigned client

17   control, not the person that is intimately familiar

18   with Mr. Caramadre's family, not the person who is a

19   Christian brother of the Men of St. Joseph's, not the

20   person that teaches catechism with Mr. Caramadre.  It's

21   Mr. Traini, who on a cut-and-dried plea before this

22   court, the man that he refers to in this court anyway

23   as the Defendant, gets up, pauses as he told this Court

24   and lies to the Court and has made that known to the

25   Court, subjecting himself to perjury.

1          Mr. Caramadre's wife wasn't here on Monday

2     morning.  So any of this nonsense about he's taking one

3     position in front of his wife and another position in

4     front of others is simply not borne out by the facts.

5          Mr. Lepizzera intentionally, and the e-mails

6     show it, kept Mr. Caramadre out of the loop from Friday

7     afternoon --

8          THE COURT:  I want to be clear on what you just

9     said.  Did you just say that Mr. Traini stood up,

10    paused and lied to the court, subjecting himself to

11    perjury?

12         MR. WATT:  I did not say Mr. Traini.  I said

13    Mr. Caramadre as he testified to you, Judge, he got up

14    with Mr. Traini at his side, not Mr. Lepizzera at his

15    side and he paused before he answered the question to

16    you and he said he specifically remembered it.  He said

17    so help -- I lied to the court and then he said the

18    words "guilty" to you, Judge.  That's Mr. Caramadre's

19    testimony.

20         THE COURT:  All right.

21         MR. WATT:  I didn't say Mr. Traini.  If I

22    misspoke I apologize both to him as well as the Court,

23    never in my mind even to have made the statement.

24         Mr. Lepizzera had this case for three years.

25    His memory when he was cross-examined by my brother,

1    Olen, all of a sudden he remembers the anguish that he

2    felt in front of the Men of St. Joseph's when he

3    believed that Mr. Caramadre put him in a position in

4    which he had to fumble or mumble his belief in

5    Mr. Caramadre's innocence.

6        Not so with Father Lacombe.  Not so at all.  In

7    front of his family members, in front of

8    Mr. Caramadre's family members, in social settings

9    professed his belief in Mr. Caramadre's innocence

10    multiple occasions.

11        And you look for those telltale factors, Judge,

12    that when you smell a rat, why is it that you smell a

13    rat.  You smell a rat because who knew about Joe

14    Caramadre's mental condition, severe depression, having

15    the transcranial bangers on his head and not undergoing

16    further treatment because he didn't want to lose

17    control of the short term memory of the facts.

18        Mr. Lepizzera said the job of a defense attorney

19    is to put the Government to the test.  And he's right.

20    It's not to judge your client.  And if you judge your

21    client in a sense of trying to get him to realize that

22    he's all wet in his theory, well, you put a five-page

23    memorandum in front of him telling him why it's a bad

24    idea to bring a motion to open this plea again, you put

25    a two-page memorandum in which Mr. Traini is saying

1    based upon your intensive participation in the

2    negotiations over the weekend, which ain't true, and

3    you put a 13- or 12-page letter together begging him to

4    go ahead and allow you to negotiate with the

5    Government, where's the beef.  Where's the trial

6    theory?  Where's the theory of defense?  Where's the

7    demonstrative evidence?  Where's the opening statement?

8    Where's the cross?

9         Mr. Lepizzera's knees were knocking so loud I

10   would suggest that someone next to him would have heard

11   them knocking.  But why do I say that?  Where's the

12   rat?  The rat is his lack of response on either a

13   personal, religious, moral or legal basis to Paula

14   Caramadre's going down on the second day of trial.

15        His wife, that being Mr. Lepizzera's wife, a

16   fellow Eucharistic minister, we had a trip over there

17   from Mike down the road over to the Caramadre house?

18   No, we don't get a trip.  Do we get Lepizzera going to

19   the house to say, Joe, how are you doing?  What's going

20   on?  We don't get it.  We don't get anything that would

21   show that he with his conflicted representation from

22   both a personal, religious and criminal defense

23   perspective, this was biting off more than finally he

24   could chew.

25        Let me get to the epiphany.  Now, we know the

1    epiphany is not a religious epiphany.  It's maybe

2    definition two or three.  So what's the epiphany that

3    Mr. Caramadre is supposed to have gotten in those

4    mystical seconds before answering this Court's

5    question?  Mr. Traini indicated that it was a

6    realization.  Not the first definition in Miriam's, but

7    the third definition.  What was the realization, Judge?

8    The realization is that if you want to get the plea

9    done with a chance for zero to no time, Mr. Traini's

10   words, that you got to say the word "guilty."

11        Don't ask him the question in the morningtime,

12   Joe, do you believe you're guilty or do you believe

13   you're innocent?  Don't ask him the affirmative

14   question, which is, I would suggest to the Court,

15   required of a defense attorney in this posture of this

16   case, especially, given the fact that you've got a jury

17   downstairs and you don't want and no one wants jury

18   taint.  Neither Lepizzera or Traini asked the question

19   directly to Joe Caramadre, eyeball to eyeball, Joe, do

20   you believe you're guilty or do you believe you're

21   innocent.  They don't ask him.  And the reason they

22   don't ask him is because they know what the answer is

23   going to be.  I told you guys for three years I'm

24   innocent.  I've got my theory of this case.  You may

25   not like it, but I believe I'm an innocent man and if

1    I've got to plead guilty to save my family, then I'm

2    going to do it.  I don't believe I'm guilty.

3         Because if they would have asked him the

4    question, they would have gotten that answer.  And with

5    that answer it all would have gone south, the very

6    thing the Court didn't want to have happen.

7         So no Monday morning quarterbacking here.  But

8    for a guy who is a personal friend of three years

9    earning fees for representation, not doing this pro

10   bono, for a guy to say I don't have any vivid memory of

11   what happened Sunday night, the bell doesn't ring true

12   on that one, Judge.  Thank you very much.

13        THE COURT:  Thank you, Mr. Watt.

14        Mr. McAdams.

15        MR. McADAMS:  Your Honor, as you know, I

16   represent the Government in this case.  I don't

17   represent Mr. Traini or Mr. Lepizzera, but that was one

18   of the biggest hatchet jobs I've seen in my career.  If

19   this is a credibility determination, I'll make the

20   case, I don't think I need to argue it much that the

21   Court can find Mr. Lepizzera's testimony significantly

22   more credible than Mr. Caramadre's testimony.

23        I want to refocus the Court on the issue that's

24   actually at hand, which is Mr. Caramadre's motion to

25   withdraw his guilty plea.  I would point out first of

1    all, your Honor --

2         THE COURT:  I'm focused on that.  You don't need

3    to refocus me.

4         MR. McADAMS:  I'm sorry, your Honor.  I didn't

5    mean to suggest it they way.

6         But the standard, your Honor, is that the

7    Defendant has the burden to prove his motion.  He has

8    failed to meet his burden.  As we've outlined in our

9    written response, the legal parameters, it is a heavy

10   burden.  The First Circuit looks first of all at the

11   Rule 11 colloquy, what occurred there.  Was this a

12   knowing, voluntary and intelligent guilty plea?  The

13   answer is of course it was.

14        Your Honor presided over the Rule 11 colloquy.

15   It was a typical, thorough Rule 11 colloquy.

16   Mr. Caramadre was placed under oath.  He was asked all

17   the questions about his mental competence, whether he

18   understood the charges against him, whether he

19   understood the terms of the plea agreement, whether he

20   was satisfied with the performance of his counsel,

21   whether he had any questions or concerns, whether he

22   was coerced.  He answered under oath in the affirmative

23   to all those questions.  The Court is entitled to rely

24   on those.  Nothing that the defense has put forward has

25   overcome that burden, even from what he put forward in

1    his first motion.

2         Now, that really ought to be the end of the

3    inquiry.  We spent a lot of time on some of the

4    subsidiary issues, which are only relevant if there's a

5    problem, some fundamental problem with the Rule 11

6    colloquy.  If the Court concerns of Rule 11 had been a

7    total failure as the First Circuit put it, you didn't

8    get to these other issues, which are, for example, the

9    proffered reasons that the defendant is putting forward

10   for the withdrawal of his guilty plea.  I think it's

11   fair to summarize them as essentially two reasons, his

12   pressure that he felt as a result of his wife's mental

13   breakdown and his own mental illness of depression over

14   the years, and this alleged deficiency by counsel.

15        With respect to his wife's mental health status,

16   her emotional breakdown, I spent a lot of time in the

17   Government's initial response to this outlining First

18   Circuit cases and comparing them.  I won't reiterate

19   all those, but it's very clear that family pressure are

20   typical for defendants on trial.  There are many,

21   many instances in which defendants' families feel an

22   enormous amount of stress.  They're facing what is

23   obviously a difficult situation, the potential

24   conviction of the husband to the family, if there are

25   children.  It's not surprising Mrs. Caramadre had an

1    emotional breakdown when her husband hid from her for

2    15 years all the ways that he made money.  And he

3    didn't even tell her what the allegations were.  She

4    came and watched, sat in trial.  I'm sure, and I feel

5    terrible for her, it was probably publicly humiliating

6    for her to endure that experience.  But that's

7    Mr. Caramadre's choice and those are the consequences

8    of his actions.  No one else is responsible for that

9    but him.  And that is not atypical for a criminal

10    defendant.

11          With respect to his own mental health issues,

12    nothing has been identified as to what should have been

13    done differently with respect to the Rule 11 colloquy.

14    What should have been done differently?  Mr. Lepizzera

15    was aware that Mr. Caramadre had mental health issues.

16    He was depressed.  The testimony from his psychiatrist

17    doesn't even say that he attempted to contact her.  It

18    says she was out of the country.  Doesn't say he tried

19    to reach her.  She testified here that she found out

20    about it when she got back.

21          So there's really no evidence.  The whole thing,

22    frankly, is a giant red herring that was constructed

23    after the fact.  The testimony from Mr. Lepizzera and

24    Mr. Traini is they believed based on their observances

25    of his demeanor, his engagement with them that he was

1    mentally competent.  He was mentally competent to stand

2    trial.  He was mentally competent to plead guilty.  He

3    had a lot of back and forth with them over what terms

4    of the plea agreement he was willing to accept.  He

5    didn't want a two-year mandatory minimum because that

6    would send the wrong message.  He didn't want money

7    laundering because he was concerned about his career

8    prospects.  He was okay with a wire fraud.  He didn't

9    want AEGON to be named as one of the victims because he

10   has civil liability with them.  That demonstrates a

11   person who is mentally aware and cognizant of what is

12   going on around him, who is thinking strategically,

13   who's thinking long term.  He's thinking about what's

14   going to happen after I get out.  Who am I going to owe

15   money to?  What am I going to do with my life at that

16   point?  These are all indicators that Mr. Caramadre was

17   competent and that he made this decision knowingly and

18   voluntarily and intelligently.

19          Now, with respect to some of these other

20   factors, I won't belabor the point because I think,

21   frankly, that they're all nonsense, but with respect to

22   the ineffective assistance of counsel claim, let's just

23   dispense of the opening statement argument quickly.

24   They discussed it with Mr. Caramadre.  He agreed with

25   the decision to defer opening statement.  This was

1    expected to be a three- to four-month trial.  Some

2    attorneys would have done it differently.  Mr.

3    Lepizzera admitted that on the stand.  That's the

4    decision they made.  Look at the case law.  It says

5    these types of tactical and strategic decisions are not

6    ineffective assistance of counsel.  I don't know how it

7    possibly could be when they talked about it with

8    Mr. Caramadre and he agreed with that line of thinking.

9         With respect to cross-examination of each

10   particular witness, I thought Mr. Lepizzera's

11   testimony, and your Honor can judge, was very credible.

12   This was not a routine bank robbery case where the

13   Government plays the video of the guy walking up to the

14   teller and then asks the teller is that the defendant.

15   This was a complex 15-year scheme with different sets

16   of witnesses.  There were terminally ill people; there

17   were their family members; there were professionals,

18   social workers, nurses; there were company

19   representatives.  Every type of witness and each

20   specific witness required a different approach.

21        Mr. Lepizzera testified about that.  He gave one

22   simple example, I think it was with respect to Jennifer

23   Duarte, who by the way was not a witness who actually

24   was called, but he gave a few other examples.  And he

25   talked about the analysis that he went through in

1    determining how am I going to question this witness.

2    If I ask this, what will the Government be able to do.

3    His command of the facts of the case demonstrated that

4    far from being completely unprepared, as Mr. Caramadre

5    is now suggesting, in fact he was incredibly well

6    prepared. He knew the details of the case. He knew

7    the facts. He understood the game within the game, so

8    to speak. There was a lot to this trial that was going

9    on. The Government had a strategy. We put forward

10   witnesses in a certain way to force the hand of the

11   defense to handle witnesses a certain way.

12         Mr. Lepizzera testified that his defense

13   strategy was a wait-and-see approach, so to speak, in

14   terms of let's see how the trial progresses, handle

15   each witness as it comes and handle them differently.

16   I don't think there's anything other than Monday

17   morning quarterbacking to suggest that Mr. Rodriguez,

18   who is in a wheelchair, should have been attacked and

19   hammered on cross-examination. That's just ludicrous

20   and no serious person who knows how to try a case would

21   suggest that course of action, but that's exactly what

22   has been suggested here.

23         Mr. Lepizzera understood there will be witnesses

24   to hammer. There were cooperators, Mr. Hanrahan,

25   Mr. Maggiacomo, insurance company representatives.

1    They had a plan for people to go after.  They wanted to

2    distance themselves from Mr. Radhakrishnan.  The

3    Government, frankly, was prepared to handle that.

4    That's not what the issue is before the Court.  The

5    issue is, you know, was there a defense strategy and

6    did it fall to the level of ineffective.  And I think

7    any argument that it did, frankly, is ludicrous.

8         This claim that there was some type of a

9    conflict of interest with Mr. Traini's fee I think is

10   really straightforward.  We asked him the questions,

11   did it affect his legal advice.  He answered that it

12   didn't.  It sort of dropped away.  It was the heart of

13   their motion and it dropped away over trial other than

14   the fact the payments were made.  There was some debate

15   about getting it back.  But I think if you look at the

16   exhibits, you'll see that this whole argument really

17   was concocted after Mr. Caramadre decided to withdraw

18   his plea.  You'll see that a few weeks after the change

19   of plea hearing he sends an e-mail to Mr. Lepizzera

20   where he says, Can you send me an accounting of

21   Mr. Traini's fees.  Don't worry.  I hold no ill will,

22   or something to that effect.  It's strictly business.

23        That's a classic example of Mr. Caramadre's

24   approach to everything.  It's strictly business.  He

25   sees an opportunity to get a few bucks back, and he's

1    going to take them.  And they subsequently construct

2    this whole argument around it.  If you look at all the

3    exhibits that have been submitted in this case, you

4    will not see a single e-mail from Mr. Caramadre

5    complaining about the lack of opening statement, the

6    lack of cross-examination of any of these witnesses,

7    you won't see any of those things because they came up

8    with it in January when they decided to file their

9    motion.  And they came up with it after Mr. Caramadre

10    read closely the Rocco DeSimone decision and thought he

11    saw a loophole in the Court's plea colloquy.  He

12    thought he saw a roadmap to getting out of his guilty

13    plea and he tried to exploit it.  So they looked at

14    what happened with Mr. Corley and they tried to graft

15    that type of a claim onto Mr. Caramadre's facts.  And

16    it's very different.

17         As Mr. Traini testified to, your Honor was here,

18    obviously, for the DeSimone change of plea.  There was

19    a Rule 11 concern in that case.  The testimony there

20    was that during the change of plea colloquy,

21    Mr. DeSimone objected to his attorney, Mr. Corley, at

22    the time of the change of plea colloquy about the

23    specific facts that were put there.

24         That's not the case here.  These facts were

25    presented to Mr. Caramadre at his house.  His testimony

1    that he was so mentally incapacitated he couldn't read

2    them, he couldn't understand them, he couldn't even

3    voice the word "object" is frankly laughable.

4          This is a man who is an attorney, a CPA.  He

5    listed about five or six other credential that he has.

6    He's pointed out that he graduated with honors, so

7    forth.  He's a fine-print reading expert.  That's what

8    he does.  The notion that he didn't know what was in

9    the statement of facts or what was in his plea

10   agreement lacks credibility completely.

11         And then this claim of innocence, frankly, I

12   mean, I don't even know what to say about it other than

13   it's absurd.  What is clear is what Dr. Xavier put in

14   her affidavit.  This man has a need to tell people he's

15   innocent.  That's not the same thing as being innocent.

16   He needs to tell his family, he needs to tell his wife

17   that he's innocent.  He needs to tell his priest that

18   he's innocent because he has a lot of pride and he's

19   deeply, deeply embarrassed about the things that he has

20   done.  And that's a normal human emotion, but that

21   doesn't make you actually innocent.  He can't put the

22   genie back in the bottle.  The facts are clear.  He

23   committed this fraud for 15 years.  He admitted it to

24   Mr. Lepizzera in their office.  He admitted it to me on

25   the stand as I walked through the money laundering

1    transaction.  He admitted every single fact in Count 65

2    and then at the end he said, "But I don't agree it's

3    money laundering."  That's disagreeing with a legal

4    conclusion.  That's like saying I admit I walked into a

5    bank.  I admit I pointed a gun at the teller, I admit

6    she gave me the money.  I admit I came back outside.

7    But I didn't commit bank robbery.

8          That's what Mr. Caramadre is doing.  He's

9    disagreeing with the legal conclusion of his guilt.

10   He's not disagreeing with any of the facts that he

11   actually committed.

12         And with respect to this document that's under

13   seal, I've already made my point clear on that, your

14   Honor.  I think it's inadmissible.  And even if it

15   were, it basically tells you nothing.

16         Finally, your Honor, once you get through all

17   the factors, and again I incorporate the memos by

18   reference, and look at the cases, you have to weigh the

19   prejudice to the Government in this case.  Even if

20   Mr. Caramadre had won all his points and made all his

21   cases, this is not a two-hour bank robbery trial.  This

22   was a four-month trial that took up a year of resources

23   for both the Court and the Government, that took up the

24   resources of agents and assistant U.S. attorneys, and

25   most importantly, your Honor, almost a hundred

1    witnesses.  These people who lived through this scheme,

2    they were being forced -- they were forced in witness

3    prep and at trial to relive the deaths of their loved

4    ones, the most precious moments of the hour of their

5    loved one's death, that most intimate moment that

6    Mr. Caramadre and Mr. Radhakrishnan abused in the first

7    instance.

8         He got his day in court.  He waived the white

9    flag.  It was his idea to plead guilty.  He doesn't get

10   a do-over because now he wants to tell his wife he

11   really didn't do it after all.  And that's really all

12   this is about.  Thank you.

13        THE COURT:  Thank you, Mr. McAdams.

14        MR. WATT:  Could I have two seconds to rebut.

15        THE COURT:  Sure.

16        MR. WATT:  Two points, Judge.  No inquiry with

17   regards to the mental health status by either counsel

18   of Mr. Caramadre at any point in time from the time his

19   wife went down second day of trial right through the

20   time of the giving of the plea, point number one; and

21   point number two, and most importantly, no affirmative,

22   true request or inquiry of Mr. Caramadre by either

23   counsel do you believe you're guilty or do you not

24   believe you're guilty.  Don't ask the question because

25   the willful blindness here is if you ask that question,

1    then you don't have plausible deniability.  They left

2    this Court hanging based on some mystical third meaning

3    of Miriam Webster's that he knew that he had to plead

4    to protect his wife and family.

5            Thank you, Judge.

6            THE COURT:  All right.  Thank you, Mr. Watt.

7            All right.  I'm going to give you a summary of

8    my ruling right now because I don't believe there's any

9    reason to prolong this motion any longer than it has

10   already been prolonged, which is longer, probably, than

11   it should have.

12           And I take responsibility for that, because I

13   have wanted to be sure that everything that could

14   possibly be looked at in furtherance of this motion in

15   support of the motion was explored and that the

16   Defendant had his opportunity to make out this motion

17   as best he could.

18           So it's taken up a lot more time than it

19   probably should have.  I will likely put a more

20   detailed ruling into written form following today, but

21   I don't see any reason to prolong this.  I think I can

22   give you a ruling and make a few comments so you

23   understand my ruling right now.

24           I'll start where Mr. McAdams started.  Mr. Watt,

25   you've handled a lot of matters in this Court and tried

1    a number of cases with me, but your argument that I

2    just heard was one of the most bizarre arguments and

3    one of the most vicious hatchet jobs I've ever heard

4    about another attorney in this Court.  I'm really

5    surprised by it.

6         And I guess it's fitting that you would make

7    that argument in this motion because this is a bizarre

8    motion, and it is completely without merit; and the

9    bottom line is that the motion to withdraw the plea is

10   perhaps not frivolous but it's totally meritless and

11   it's going to be denied.

12        Now, the standard, as Mr. McAdams alluded to, is

13   essentially whether the plea in this case was

14   voluntary, intelligent and knowing within the meaning

15   of Rule 11.  The First Circuit has stated in Mario

16   Rivera and Isom and several other cases that the

17   factors to look to include the plausibility and the

18   weight of the proffered reason for the withdrawal, the

19   timing of the request, whether the Defendant asserted

20   legal innocence and whether the parties reached or

21   breached the plea agreement.

22        The timing isn't at issue in this case.  It is

23   true that the Defendant is asserting his legal

24   innocence, but I find that of little relevance to the

25   merits of the motion for reasons that I'll get to in a

1    minute and that Mr. McAdams has already alluded to.

2         So the real issue is whether the argument here

3    is plausible, and also the plea agreement and the

4    effect of the plea agreement.

5         We start with, and as Mr. McAdams said, the plea

6    agreement and the plea colloquy itself. The plea

7    agreement was carefully negotiated. It was, I think,

8    painstakingly negotiated between counsel and the

9    Government. Mr. Caramadre was involved with the

10   decision to open negotiations and involved with the

11   details of the terms that he would be interested in

12   accepting. He worked closely with his attorneys about

13   what kinds of deals to ask for. He emphasized the

14   desire to have the ability to argue for zero jail time

15   as opposed to a plea agreement that, for example, may

16   have involved the identity theft count, which may have

17   carried a mandatory term to it. He was in all respects

18   thoroughly engaged in the substance of the plea

19   negotiations, much more so than the average defendant

20   in this Court, which is understandable because the

21   Defendant is an attorney, he's a CPA, he's an expert in

22   contracts and the details of documents, and so one

23   would expect that he'd be more engaged in the details

24   of the plea negotiations than the average defendant,

25   and he was.

1           There was a detailed plea agreement.  There was

2     a detailed plea colloquy that occurred in the case.

3     I'm thorough in my plea colloquies.  I was extra

4     thorough with Mr. Caramadre and Mr. Radhakrishnan to

5     make sure that they understood what the agreement was,

6     what the ramifications of it were.  They had a chance

7     to discuss it thoroughly with counsel that they were

8     satisfied with their counsel.  And Mr. Caramadre

9     answered under oath affirmatively to all of the

10    questions that I asked him, including the questions

11    that there was no coercion, that there were no

12    promises, that he agreed with the statement of facts

13    and so forth.  Now he comes forward in these

14    proceedings and gets on the stand and again under oath

15    says that he committed perjury the first time.

16          It's amazing to watch a defendant witness

17    perjure himself and say that he committed perjury the

18    first time that he swore before this Court.

19          Everything about the plea colloquy and the plea

20    agreement points to the conclusion here today that the

21    motion necessarily should be denied.

22          Now, Mr. McAdams, I think, correctly broke down

23    the Defendant's arguments into really two boxes.  One,

24    having to do with the alleged incompetence of counsel;

25    that they didn't try the case correctly; they didn't

1    develop a theory of the case; that they didn't give an

2    opening statement; they didn't cross-examine

3    effectively; they had conflicts on their minds with

4    respect to the fee arrangements and the Maggiacomo

5    representation and so forth, and the other having to do

6    with the mental duress and stress associated with

7    making the decision to plea.

8         I'll go into a little more detail in my written

9    order, but I want to make a couple of observations

10   about both of these things.

11        First of all, the first category, that is the

12   competence of counsel, the standard is clear that the

13   allegations of ineffective assistance of counsel, the

14   Defendant has to show that counsel performed in a way

15   that was below an objective standard of reasonableness

16   and that the deficient performance prejudiced the

17   defense.

18        Having presided over this case for -- since

19   before its indictment -- I think the motion to take

20   depositions of the dying witnesses, pre-indictment

21   depositions I think was in 2009, if I'm not mistaken.

22   So I've watched this case from its inception and right

23   up through all of the preparation for trial and the

24   four days of trial or so.  And I know from my own

25   observations the level of competence and care taken by

1      Mr. Lepizzera and Mr. Traini in the defense of

2      Mr. Caramadre.  It is absolute fantasy, in my view,

3      that Mr. Lepizzera and Traini, or I should say as

4      Mr. Watt said in his argument that Mr. Lepizzera was

5      lacking in concern, had his knees knocking so loud that

6      they could be heard -- whatever it was you said about

7      that, there could just be nothing further from the

8      truth with respect to the representation they provided

9      to Mr. Caramadre.

10          Their representation at every stage from my

11     observation was as good, and maybe better, than any

12     attorneys practicing in this Court.  I'll just give you

13     a couple of examples.  At every turn, for example, when

14     there needed to be a motion to sever filed, when

15     Mr. Radhakrishnan made his effort to proceed pro se,

16     they pulled out every stop to get the severance.  I

17     denied it, but they did a great job in trying to make

18     that happen.  And I think they viewed it as a very

19     important thing that could be done on Mr. Caramadre's

20     behalf because Mr. Radhakrishnan was a wild card, and

21     they were very concerned about it.  So they tried to

22     sever once and then they tried to sever again, I think,

23     when Mr. Radhakrishnan went pro se.

24          Another excellent example is the jury selection

25     process in this case.  When we selected the jury, as

1    counsel for the Government will recall, I think we

2    originally sent questionnaires to maybe 400

3    individuals, which we narrowed down to a couple

4    hundred, maybe 150.  And those individuals were to be

5    summoned to the court for individual voir dire.

6    Mr. Traini and Lepizzera produced binders to be used

7    during the jury impanelment and the voir dire that

8    contained background investigations of every single

9    juror who was brought before the Court.  And as a

10   result of that intensive background research that they

11   did on the potential jurors, things were dug up on

12   those jurors that provided a rationale for the excusal

13   of the juror or the rationale for a continued

14   examination.

15        If it wasn't for that work that they did, those

16   individuals may well have ended up on the jury.  And

17   that was the kind of above and beyond performance that

18   they provided to the Defendant in this case.

19        Now, Mr. McAdams said that maybe attorneys would

20   have, different attorneys would have done it

21   differently with respect to giving an opening statement

22   or choosing to cross-examine a witness or not

23   cross-examine a witness.  And of course, that's true

24   but all of that just boils down to nothing more than

25   tactical considerations and different styles of

1    representation.  There's nothing deficient about the

2    decision to not give an opening statement in this case.

3    There was nothing deficient about the decisions made

4    about whether and how to cross-examine the witnesses.

5    And as Mr. McAdams pointed out, there's nothing in the

6    e-mail exchanges indicating that Mr. Caramadre

7    disagreed with those tactical decisions and, in fact,

8    the evidence indicates he agreed with them.  There's

9    certainly nothing to show that he disagreed with them,

10   and I think that points to the reality that he thought

11   of these things afterwards when he was constructing his

12   rationale for a motion to withdraw the plea.

13         Now, with respect to this mental competence,

14   stress, distress over Mrs. Caramadre's condition and so

15   forth, the Court of Appeals has said unequivocally that

16   pleading guilty, being on trial and pleading guilty is

17   a stressful experience.  And the Court has said:

18   Criminal prosecutions are stressful experiences for

19   nearly all concerned, particularly Defendants and their

20   families.  It is to be expected that feelings will run

21   strong within a family unit and that loved ones will

22   advise, counsel, implore, beseech and exhort defendants

23   to take or abjure a myriad of courses of action.  The

24   relevant question for plea withdrawal is not whether

25   the accused was sensitive to external considerations.

1    Many Defendants are.  But instead whether the decision

2    to plead was voluntary; i.e., the product of free will.

3    That's **United States versus Pellerito**.

4         And so it is the case here.  Sure, it's true

5    that the Defendant has had mental health issues for

6    many years and his wife has, too.  And his wife

7    suffered, as has been pointed out in testimony in great

8    detail during this hearing, a form of emotional

9    breakdown in response to what she saw in the first

10   couple of days of trial.  That's the nature of the

11   stressful business of being accused of crimes that

12   could, frankly, result in a life sentence, and

13   especially for Mrs. Caramadre, who apparently didn't

14   know much about her husband's business.

15        But the fact that those stressors are present

16   and were present, they didn't prevent Mr. Caramadre

17   from being deeply engaged in the business issues and

18   the crimes themselves over the course of years.  They

19   didn't prevent him from being fully engaged in dealing

20   with Mr. Lepizzera and Mr. Traini in the preparation of

21   the defense.  As Mr. Lepizzera testified, his response

22   whenever he was given or asked questions was, "Don't

23   worry about the details.  I'm the master of the facts."

24        So he was fully engaged throughout the trial.

25   No one ever said anything about Mr. Caramadre being

1    incompetent, either to stand trial or to deal with this

2    motion to withdraw the plea until after the fact.

3    Suddenly now, the stressors became so significant that

4    they eliminate the knowing and voluntary nature of the

5    plea.  There's just no evidence to support that.  None

6    of the affidavits or the testimony of either the

7    healthcare providers or the Defendant himself or

8    Mrs. Caramadre or anyone else gives us any serious

9    evidence to question the competence of the Defendant at

10   the time he pled guilty and to raise any serious

11   question about whether he knew what he was doing and

12   did what he did knowingly and voluntarily.

13        Now, that raises the question of why in the

14   world would Mr. Caramadre bring this motion and perjure

15   himself on the stand and attack his attorneys and claim

16   this was a lie and it was all because of stress?  I

17   think Mr. McAdams put his finger on it, pointing to

18   some of the material in the record.

19        For some reason, this Defendant has a need to

20   blame other people for the situation that he has found

21   himself in here.  And I think that he wants to claim to

22   his family and to his friends and to his church and to

23   people in the community that he truly is innocent, that

24   he tried to tell the Court that, and he tried to tell

25   the world that but that the Judge won't let him out of

1    this ill-conceived plea that he was forced into by his

2    attorneys and that his attorneys misled him, and it's

3    all their fault and my fault.

4         Now, I think this Defendant knows that he

5    managed with his attorneys to negotiate an excellent

6    plea agreement with the Government, and he knows that

7    this motion has absolutely no merit, and he knows that

8    this motion is going to get denied, and he knows that

9    because it's going to get denied that I am capped at

10   ten years of imprisonment and he thinks that because I

11   have that cap and because there's only one count and

12   because he can do what he needs to do and believes he

13   can do at sentencing, he's going to be able to persuade

14   me that he should have a very low or light sentence

15   anyway.  And I think he, frankly, contrived an escape

16   hatch that would allow him to save face with his family

17   and community and church, and he contrived it by

18   watching and learning about what happened in the

19   DeSimone case.  He sat here through most, if not all,

20   of the DeSimone trial.  He studied what happened in the

21   DeSimone case.  So he knew that if he could claim that

22   he was lying and his attorneys either told him to lie

23   or encouraged it or gave him a wink and a nod that then

24   he could make out a DeSimone-like argument after he

25   entered his plea of guilty.  And I think that in that

1    regard, my read of the e-mail about the <u>Alford</u> plea and

2    "that will eliminate my need to lie" was the Defendant

3    laying the groundwork for this escape-hatch strategy

4    that he might need to use at some future point.

5          That's my take on why all of this has occurred.

6    Why else would he put himself on the stand and commit

7    perjury by claiming the things that he's claimed during

8    this proceeding?

9          Now, maybe I'm wrong about that, and I don't

10   think I am; but if I am, then I can think of only one

11   other reason why he would do this.  And that is because

12   he figured out that this trial with a co-defendant of

13   Radhakrishnan was going to be a disaster.  I had denied

14   every effort to sever out Radhakrishnan, and he knew

15   that there was no way out of being tried with

16   Mr. Radhakrishnan.  The only way out was to do what he

17   did here, which is to enter a plea and then execute the

18   escape plan.  And then if I let him out, he could go

19   back into trial as a sole defendant.

20         Now, maybe that's what he was thinking.  And if

21   that is the case, or if the former is the case, it

22   almost doesn't matter because either one demonstrates

23   an incredibly cynical, manipulative attitude about the

24   judicial process.

25         And the last thing I will say, then, is that

1    while I am going to, as I must, I agreed to be bound by

2    the plea agreement in this case.  It was a binding

3    plea, so I don't have any discretion under the ten

4    years or over the ten years.  We're going to wait for

5    sentencing for a final decision with respect to the

6    sentence, and there's a lot of work that will be done

7    between now and the time of sentencing.  So I don't

8    know what the sentence in this case will be, but one

9    thing that I do know is that Mr. Caramadre's perjurious

10   testimony and what I think is his manipulation of the

11   judicial process through this plea will necessarily

12   have to be taken into consideration in the

13   determination of the appropriate sentence.

14        So counsel will be asked to, at the time of

15   sentencing and in your sentencing memorandum, to

16   discuss the impact of this withdrawal of acceptance of

17   responsibility, the perjury and the obstruction of

18   justice that has occurred here, and the abuse of

19   process reflected by this motion, what effect that

20   should have on the sentence that I impose in this case.

21        So the motion the denied.  Sentencing needs to

22   be set down.

23        Is there any suggestion with respect to

24   sentencing date?  I don't know exactly where you were

25   and where Probation was in the preparation of the

1    presentence report.

2           MR. McADAMS:  Your Honor, a draft of the

3    presentence report had come out but neither party had

4    provided any objections to the report yet.  And the

5    Government would look for as soon as possible date for

6    the Court.

7           THE COURT:  I take it you two are going to be

8    representing Mr. Caramadre for sentencing?

9           MR. OLEN:  Yes, your Honor.  And my

10   understanding the proceeding was stayed when the motion

11   was filed and that's why we haven't responded.  And

12   given the complicated nature of the case, especially

13   with respect to the amount of loss and the calculations

14   that have to be done to figure that out, I'd request 60

15   days for the sentencing hearing date.

16          THE COURT:  Let's get a date at the end of June.

17          MR. McADAMS:  Your Honor, if we could avoid the

18   last week of June.

19          THE COURT:  Beginning of July.  Let's do it on

20   July 9th, two o'clock.

21          So sentencing will be set down for July 9th at

22   two o'clock.

23          MR. McADAMS:  Your Honor, may we approach?

24          THE COURT:  Sure.

25          (Side-bar conference.)

1          MR. McADAMS:  Your Honor, the Government feels

2     that Defendant is in a different position now than he

3     was at the end of trial and that he represents a risk

4     of flight and a danger to the community.

5          There's been enough testimony at this hearing

6     about his suicide ideation.  I don't mean to be

7     insensitive about it.  There was testimony that he made

8     multiple times about asserting to commit suicide that

9     at one point Mr. Lepizzera testified that he said that

10    to avoid the moral accountability that he would hire a

11    hit man to kill him.  So a lot of times I wouldn't take

12    that comment very seriously, but this is a Defendant

13    who has demonstrated a willingness to do a lot of

14    things that most people would not do to avoid

15    accountability and that represents a risk to the

16    community.  Under 18 U.S.C. I think it's 3243 the

17    burden shifts to the Defendant to prove by a

18    preponderance that he's not a risk of flight and he's

19    not a danger to the community.  I think he needs to

20    meet his burden, otherwise the Government requests that

21    he be detained facing sentencing.  He's facing a

22    significant prison sentence regardless of what --

23          MR. OLEN:  Judge, to the extent that you're

24    correct about his motivation, this man's family means

25    everything to him, and he's not going to go anywhere.

1    There's virtually a zero chance of anything like that

2    happening or killing himself. I think you may be

3    completely right that his motivation was to be able to

4    look at his family members. In the six months that

5    I've got to know him, Judge, I know that his family

6    means everything to him. He's not going anywhere.

7         MR. McADAMS: That flies in the face of the

8    evidence put forth by Mr. Caramadre at this hearing. I

9    mean, frankly, he has a bit of a martyr complex, and I

10   am concerned about him.

11        THE COURT: Normally, I would call counsel up

12   and have this conversation about whether there's a risk

13   of -- in certain types of cases whether there's a risk

14   of the defendant harming himself. And I have to say

15   that I certainly don't know, and I'm not sure either of

16   you really know either, whether he presents that kind

17   of a risk. But the testimony that we've heard here is,

18   you know, seriously concerning about his prior thoughts

19   in that regard and some of them I think kind of

20   bizarre, that whole idea that he would hire someone to

21   kill him is just really, really sort of strange.

22        So normally, I would not require that he be

23   taken into custody, but I think in this case there's

24   reason to do it. I don't mean to do it as a punitive

25   thing but really as a protection. You know, believe

1   me, I don't pretend to understand him beyond what I

2   said, and I wouldn't call that understanding him.  And

3   I would really, you know, just to really be very blunt

4   about it, I would really feel terrible if he walked out

5   of here and he did something to himself or had someone

6   do it.

7            MR. OLEN:  I understand and appreciate your

8   thoughts, Judge, but there has to be another way short

9   of detaining him to try and assuage these concerns,

10  whether it's a bracelet or some type of mandatory

11  treatment.  I don't think this man is going to do

12  anything to hurt his family.  And I don't think those

13  remarks regarding hiring a hit man are anything than

14  bluster.  I've got to know him pretty well in the last

15  six months, so if you're seriously considering

16  detaining him at this time, I would just ask the Court

17  for some type of alternative arrangement to assuage the

18  Court's concerns and not have him in custody.

19           THE COURT:  Well, I appreciate your concerns.  I

20  may be wrong, but there's going to be a jail sentence

21  in this case, and it's going to be a significant

22  sentence.  So I, frankly, as hard as it is at a hearing

23  like this to have someone taken into custody, I mean

24  it's the right thing to do, so in an abundance of

25  caution I'm going to do it.  I wish I didn't have to,

1    but it all comes out of all that testimony, all that

2    business.  I don't want it on me, I don't want it on

3    you or you.  You know, I remember well, you guys may

4    remember the case Judy Savage had when she first

5    started out as a judge, I forget the name of the

6    couple, murder conviction at Rocky Point.  They jumped

7    off the Newport Bridge, and only one of them has been

8    found.

9         So, you know, these things do happen, and I

10   don't want to live with that.  So that's what I'm going

11   to do.

12        MR. WATT:  Can you set down a motion for a

13   review of the decision, Judge?

14        THE COURT:  You can file that motion.

15        MR. WATT:  File a motion.  Sure.

16        (End of side-bar conference.)

17        THE COURT:  All right.  A motion has been made

18   by the Government and opposed by the Defendant that the

19   Defendant be taken into custody today for reasons that

20   he represents a risk of flight and/or harm to the

21   community or to himself.

22        As I just expressed to counsel at side bar, it's

23   the unusual case where I would grant that motion but

24   this is an unusual case, and I am concerned because of

25   some of the things that I've seen in this case and the

1    testimony that I've heard so I am going to order that

2    the Defendant be detained today at the close of this

3    hearing pending sentencing.

4              All right?  Is there anything further?

5              MR. McADAMS:  Nothing else, your Honor, from the

6    Government.  Thank you.

7              THE COURT:  All right.  We'll be in recess.

8              (Court concluded at 4:15 p.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

<u>C E R T I F I C A T I O N</u>

        I, Anne M. Clayton, RPR, do hereby certify that the foregoing pages are a true and accurate transcription of my stenographic notes in the above-entitled case.

        /s/ Anne M. Clayton

——————————————————————————————————————
        Anne M. Clayton, RPR

        June 4, 2010

——————————————————————————————————————
        Date