UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

_____
                                       )
UNITED STATES OF AMERICA               )
                                       )
        v.                             )    CR. No. 11-186 S
                                       )
JOSEPH CARAMADRE; and                  )
RAYMOUR RADHAKRISHNAN,                  )
                                       )
            Defendants.                )
_____)

## MEMORANDUM OF DECISION

WILLIAM E. SMITH, United States District Judge.

        Defendant Joseph Caramadre filed a Motion to Withdraw
Guilty Plea (the "Motion to Withdraw" or the "Motion") in this
matter.  (ECF No. 122.)  The Motion has been extensively briefed
and was the subject of a four-day evidentiary hearing (the
"Hearing").  For the reasons stated at the conclusion of the
Hearing, and set forth in more detail herein, the Court found
the Motion to be entirely meritless, bordering on frivolous, and
denied it from the Bench.  This memorandum explains this
conclusion in more detail.

## I.  Background

        This case has a long and tortured history, both from a
factual and procedural standpoint.[1]   A general overview is
sufficient to set the table for the discussion of this Motion.

_____

        [1] See Order and Opinion granting the government's motion to
conduct pre-indictment depositions (MC No. 09-84, ECF No. 27)

On November 17, 2011, after a lengthy investigation including pre-indictment depositions and Grand Jury proceedings, the Grand Jury returned a detailed indictment against Defendants Caramadre and Raymour Radhakrishnan.  The Indictment charged both Defendants with sixty-five counts including wire fraud, mail fraud, conspiracy, identity fraud, aggravated identity theft, and money laundering.  Caramadre was also charged with one count of witness tampering.  (See generally Indictment, ECF No. 1.)  At its core, the Indictment alleged that Caramadre devised a fraudulent scheme, later joined by Radhakrishnan, to secure the identities of terminally ill people through material misrepresentations and omissions.  Caramadre and Radhakrishnan allegedly made millions of dollars by taking these fraudulently obtained identities, making additional misrepresentations to insurance carriers, and then purchasing variable annuities and corporate bonds with death-benefit features.  Because of the vast scope of the Indictment and the number of government

---

(available in redacted form at CR. No. 11-186 S, ECF No. 51 pp. 97-126); Opinion and Order denying Defendants' motion to suppress Rule 15 depositions (ECF No. 56); Opinion and Order denying Radhakrishnan's motion to sever (ECF No. 69); Order denying the government's motion to disqualify Anthony Traini, Esq. (ECF No. 71); Memorandum and Order denying the government's motion to disqualify Anthony Traini, Esq. (ECF No. 83); Opinion and Order denying Caramadre's motion to sever (ECF No. 84); Opinion and Order denying Caramadre's motion for leave to waive a jury trial and proceed with a bench trial (ECF No. 95); Order granting in part and denying in part the government's motion for permission to issue subpoenas to Caramadre's former attorneys (ECF No. 140).

witnesses, trial was anticipated to last over three months.  The jury empanelment process was lengthy as well, involving an extensive questionnaire and individual voir dire.

Trial began on Tuesday, November 13, 2012.  After four days of trial, on Monday, November 19, 2012, Caramadre and Radhakrishnan entered guilty pleas pursuant to a package plea agreement (the "Plea Agreement") in which they both pleaded guilty to Counts Nine (wire fraud) and Thirty-Three (conspiracy to commit mail fraud, wire fraud, and identity theft).  (ECF Nos. 105 & 106, respectively.)  Sentencing was scheduled for March 2013 in anticipation of considerable disagreement over the loss amounts and restitution.  All was quiet until January 2013, when Caramadre's attorneys moved to withdraw from the case (ECF No. 113) and his new attorneys alerted the Court that Caramadre would be filing a motion to withdraw his plea (ECF. No. 114). The Motion was eventually filed on February 28, 2013.

II. Discussion

Once a defendant enters a guilty plea, he is not automatically entitled to withdraw it.  United States v. Gates, 709 F.3d 58, 68 (1st Cir. 2013).  Rather, the Court may, in its discretion, allow a defendant to withdraw his plea only if a "fair and just" reason exists.  Fed. R. Crim. P. 11(d)(2)(B); see also, e.g., Gates, 709 F.3d at 68; United States v. Marrero-Rivera, 124 F.3d 342, 347 (1st Cir. 1997).  The burden of

establishing this fair and just reason lies solely on the defendant.  Marrero-Rivera, 124 F.3d at 347.

In determining whether a fair and just reason exists, a "primary concern is whether the original guilty plea was knowing, intelligent and voluntary" under Rule 11 of the Federal Rules of Criminal Procedure.  United States v. Aker, 181 F.3d 167, 170 (1st Cir. 1999); see Fed. R. Crim. P. 11.  Other factors to consider include:  (1) the plausibility and weight of the reason given for the withdrawal; (2) the timing of the request; (3) whether the defendant is now colorably asserting legal innocence; (4) whether the original plea was pursuant to a plea agreement; and, assuming the other factors support withdrawal, (5) prejudice to the government.  Gates, 709 F.3d at 68; Marrero-Rivera, 124 F.3d at 347.  The Court will address each of these factors in turn.

A.   The Plea Was Knowing, Intelligent, and Voluntary

Caramadre's argument that his plea was not knowing, intelligent, and voluntary can be broken down into four broad categories:  he claims that (1) the Rule 11 colloquy was inadequate; (2) due to his health and the health of his wife, he was not in the proper state of mind to enter his plea, and thus not competent; (3) his trial attorneys – Michael J. Lepizzera

and Anthony M. Traini[2] – were ineffective in their representation, which had the effect of making Caramadre feel he was not being represented and thus had no choice but to plead despite his innocence; and (4) the fee agreement between Caramadre and Mr. Traini created an unwaivable conflict of interest.   In Caramadre's view, each argument on its own warrants a withdrawal of the plea, but even if each individual argument fails, the totality of the circumstances establishes a fair and just reason for withdrawal.   Caramadre is wrong on both counts.

> 1. The Rule 11 Colloquy Was Thorough and More Than Satisfied the Requirements of Rule 11

The "Rule 11 inquiry is not designed to be a test of guilt versus innocence.   The plea-taking court need only be persuaded that sufficient evidence exists to permit a reasonable person to reach a finding of guilt." United States v. Negron-Narvaez, 403 F.3d 33, 37 (1st Cir. 2005).   This is not a talismanic test, but rather a totality of the circumstances assessment to determine if the "core concerns" of Rule 11 were satisfied.   Id. at 36; United States v. Isom, 85 F.3d 831, 835 (1st Cir. 1996).   These

---

[2] Caramadre was also represented by Scott K. DeMello, an attorney in Mr. Lepizzera's firm.   Though Mr. DeMello attended most, if not all, proceedings and seems to have been heavily involved in the case's preparation, the final decisions, strategies, and approaches at issue here appear to have been made by Mr. Lepizzera and Mr. Traini.   Indeed, Caramadre has levied no specific allegations of wrongdoing or ineffective assistance at Mr. DeMello.

concerns include the absence of coercion, the defendant's understanding of the charges, and the defendant's knowledge of the consequences of the guilty plea. <u>Negron-Narvaez</u>, 403 F.3d at 36. At the November 19, 2012 change of plea hearing, the Court actively engaged Caramadre on all three of these core concerns. (<u>See</u> Changes of Plea Hr'g Tr. 6:12-17:11, Nov. 19, 2012, ECF No. 119.)

Caramadre does not seemingly dispute this fact. Nevertheless, he devotes six pages of his memorandum in support of his motion to withdraw to a section entitled "The Rule 11 Hearing Was Constitutionally Infirm." (Mem. of Law in Supp. of Def. Joseph Caramadre's Mot. to Withdraw Guilty Plea ("Mem. in Supp.") 29-34, ECF No. 122-1.) The thrust of the argument is that the Court did not probe deeply enough into Caramadre's competence upon learning that he was on multiple medications for depression and anxiety. As the First Circuit explained,

> [W]hen the defendant at a Rule 11 proceeding confirms that he is taking medication, the district court has a duty to inquire into the defendant's capacity to enter a guilty plea. [It should] identify which drugs a defendant is taking, how recently they have been taken and in what quantity, and (so far as possible) the purpose and consequences of the drugs in question. <u>The critical question is whether the drugs – if they have a capacity to impair the defendant's ability to plead – have in fact done so on this occasion.</u>

<u>United States v. Savinon-Acosta</u>, 232 F.3d 265, 268 (1st Cir. 2000) (emphasis added).

That is exactly what the Court did here.  The Court began by asking Caramadre if he has "been treated recently for any mental illness or addiction to narcotic drugs?" to which Caramadre responded, "Your Honor, I have been treated for mental depression, both lately and for the last 20 years." (Changes of Plea Hr'g Tr. 5:4-9.)  At this point, Mr. Traini provided the Court with a list of Caramadre's eight medications.  (Id. 5:10-15; Def.'s Ex. O.)  The Court reviewed the list and then had the following discussion with Caramadre:

> THE COURT:  And we can just confirm, with respect to Mr. Caramadre, that you fully understand all the proceedings that are going on here, correct?
>
> MR. CARAMADRE: That is correct, your Honor.
>
> THE COURT:  And nothing in terms of these medications would have any effect on your ability to comprehend what's going on here?
>
> MR. CARAMADRE:  No, Sir.
>
> THE COURT:  And counsel can just confirm that, please.
>
> MR. TRAINI:  Yes, your Honor.  That's correct.
>
> . . .
>
> THE COURT:  We covered the medications you're taking, Mr. Caramadre.  Beyond that, are . . . you under the influence of any drugs or medications or alcoholic beverages of any kind?
>
> MR. CARAMADRE:  No, your Honor.

(Changes of Plea Hr'g Tr. 5:16-6:10.)

Courts have commonly relied on the defendant's own assurances, and the assurances from counsel, that a defendant's mind is clear.  Savinon-Acosta, 232 F.3d at 269.  Indeed, a

defendant is normally bound by the representations he makes in open court at the time of his plea because they are "more likely to be reliable than later versions prompted by second thoughts." United States v. Padilla-Galarza, 351 F.3d 594, 598 (1st Cir. 2003). Throughout the change of plea hearing, the Court carefully observed Caramadre's demeanor and responses. At no point did he appear not to comprehend what was going on. Instead, the Court found him to be fully aware and appropriately responsive to the Court's questions. Mr. Lepizzera and Mr. Traini confirmed this conclusion when the plea was initially entered and again at the Hearing. Both attorneys stated at the evidentiary hearing, under oath, that Caramadre understood the proceedings and if they had felt that he had not, they would have alerted the Court and not allowed the plea to go through. (See Mot. to Withdraw Hr'g Tr., Vol. II, 150:2-17, May 13, 2013 (hereinafter "Day 2 Tr."), ECF No. 178; Mot. to Withdraw Hr'g Tr., Vol. III, 182:2-5, 189:25-190:3, 191:12-192:1, May 14, 2013 (hereinafter "Day 3 Tr."), ECF No. 179.) There is no reason why the Court should not credit Caramadre's sworn statements, as well as those of Mr. Traini and Mr. Lepizzera, that Caramadre fully understood the proceedings and that the medications did not affect his ability to comprehend the proceedings.[3] See

---

[3] Caramadre seemed to concede this point at the Hearing when he had the following exchange with the government:

United States v. Hardimon, 700 F.3d 940, 942-43 (7th Cir. 2012);

Miranda-Gonzalez v. United States, 181 F.3d 164, 167 (1st Cir.
1999) (approving the district court's decision to ask both the
prosecutor and defense counsel whether they had doubts about the
defendant's competence to enter a guilty plea after learning of
defendant's psychiatric history); Figueroa-Vazquez v. United
States, 718 F.2d 511, 512 (1st Cir. 1983) (relying on
"appellant's counsel's statements about appellant's ability to
participate in the proceedings").

The cases cited by Caramadre, meanwhile, are wholly
distinguishable and involve situations where the defendant
admitted taking medications but the judge asked no related
follow-up questions and/or where the defendant's competency to

---

Q. You didn't say, I don't understand, I don't know
what "object" means.  I need things read to me.  You
didn't do anything like that, did you?

A. No.  Because the judge is asking me am I impaired
enough to not understand this.  And in my opinion, I
was okay.  I could answer the question.

Q. You understood exactly what was going on?

A. I understood to the extent that I was pleading
guilty, yes.

Q. Your free will wasn't overborne; you knew what you
were doing?

A. I knew that my mission was to plead guilty, yes.

(Mot. to Withdraw Hr'g Tr., Vol. I, 135:24-136:10, Apr. 24, 2013
(hereinafter "Day 1 Tr."), ECF No. 147.)

enter a plea had been previously raised. Cf. United States v. Parra-Ibanez, 936 F.2d 588, 589-90, 594-95 (1st Cir. 1991); United States v. Cole, 813 F.2d 43, 46 (3d Cir. 1987). Neither situation applies here. Thus, the colloquy satisfied Rule 11 and in no way supports Caramadre's argument that his plea was not knowing, intelligent, and voluntary.

>    2.   The Health of Mr. and Mrs. Caramadre Did Not Affect
>         Caramadre's Competence to Enter the Plea

Despite this thorough and complete colloquy, as well as his admission that he understood what he was doing, Caramadre argues that he was not competent to enter into the plea due to his extremely depressed mental state. At the Hearing, Caramadre testified that he has suffered from depression for over twenty years and discussed his extensive treatment history, including transcranial magnetic stimulation therapy and a consideration over whether to undergo electroshock therapy. (Mot. to Withdraw Hr'g Tr., Vol. I, 23:13-16, 65:22-23, 66:12-15, Apr. 24, 2013 (hereinafter "Day 1 Tr."), ECF No. 147.) As noted above, Caramadre was taking eight different medications at the time of the plea, five of which were for anxiety and/or depression. (Def.'s Ex. O.) He also claimed that, beginning on the second day of trial and continuing through the entering of the plea on Monday, his depression worsened due to how poorly the trial was unfolding. (Day 1 Tr. 59:16-20, 60:3-5, 62:8-9, 62:20-21, 67:5-

22.)  He discussed how his wife had an emotional breakdown on the second day of trial and how he spent all of his time outside of court attending to her.  (Id. 62:16-25, 63:2-4, 74:8-22.) According to Caramadre, the combination of how poorly the trial was going along with his wife's breakdown exacerbated this long-term depression and sent him into a "downward spiral" affecting his competence.  (Id. 61:25-62:1.)

Even assuming for the moment that all of this were true, none of it supports the conclusion that Caramadre was incompetent and thus unable to enter a knowing, intelligent, and voluntary plea.  While Mrs. Caramadre's emotional breakdown is unfortunate, it did not affect the validity of the plea:

> [W]hile evidence of [family pressures] is probative of an accused's motivation for pleading guilty, it does not necessarily show coercion, duress, or involuntariness.  Criminal prosecutions are stressful experiences for nearly all concerned – particularly defendants and their families. . . .  The relevant question for plea withdrawal is not whether the accused was sensitive to external considerations – many defendants are – but instead whether the decision to plead was voluntary, i.e., a product of free will.

United States v. Pellerito, 878 F.2d 1535, 1541 (1st Cir. 1989) (rejecting the allegation that defendant's plea was the product of duress and he was "coerced by the stressful situation" resulting from being put in an agitated emotional state due to conversations with his hospitalized mother); see also United States v. Sousa, 468 F.3d 42, 46 (1st Cir. 2006) ("Although we

do not minimize the impact on Sousa of the distressing news about his wife's illness, Sousa had four days to consider the impact of his wife's condition and its relationship to his legal situation prior to making these statements. Sousa has provided us with no basis for upsetting the court's conclusion that his concern for his wife's health did not impair his ability to make a knowing and voluntary choice on the day of his plea."). Indeed, the "unenviable position" of a defendant feeling anxieties and time pressures "is common among criminal defendants, and hardly exceptional enough to evince an overbearing of his will or to have precluded a rational assessment of the available options." Marrero-Rivera, 124 F.3d at 350.

Similarly, anxiety and depression affect countless people. Medications for these disorders "are taken by millions of people, and it can't just be assumed from the fact that someone is taking them that he can't think straight." Hardimon, 700 F.3d at 944. While these medications can, in some circumstances, affect a defendant's mental state, Savinon-Acosta, 232 F.3d at 268, the fact that Caramadre "took potentially mood-altering medication is not sufficient to vitiate his plea. There must be some evidence that the medication affected his rationality." Pellerito, 878 F.2d at 1542. No such evidence has been presented.

Caramadre has two primary doctors – Caron Zlotnick and Sarah Xavier. Neither one opined that Caramadre was incompetent to plead guilty. Dr. Zlotnick, a clinical psychologist who has been regularly treating Caramadre since 2009 (Day 1 Tr. 190:6-9), submitted two affidavits and testified at the Hearing. The first affidavit, dated February 21, 2013, states that Dr. Zlotnick was "shocked" Caramadre pleaded guilty "because he had been steadfast in his assertion that he would never plead guilty." (Def.'s Ex. B ("Feb. 21 Zlotnick Aff."); see also Day 1 Tr. 193:1-4.) Missing, however, is any opinion concerning Caramadre's capacity to plead guilty.[4] Realizing this, Caramadre asked Dr. Zlotnick to submit a second affidavit. (Day 1 Tr. 196:18-23, 197:8-12.) This affidavit, dated March 22, 2013, simply states that due to Caramadre's depression, "it is possible" that Caramadre's "ability to make a well thought out decision regarding whether to enter a guilty plea" was "compromised." (Def.'s Ex. C ("Mar. 22 Zlotnick Aff.").) This is a far cry from an opinion to a reasonable degree of medical certainty that Caramadre was incompetent, and is especially telling considering Caramadre had to go back and specifically ask for this second affidavit.

---

[4] Indeed, in response to the Court's questioning, Dr. Zlotnick stated that in the course of her treatment of Caramadre, there were never any red flags regarding his general state of understanding and competence. (Day 1 Tr. 201:14-20.)

Dr. Xavier, meanwhile, submitted an affidavit detailing Caramadre's obsessive compulsive disorder and her concern that "his intense need to declare his innocence[] may have been suffocating his ability to effectively weigh the risks and benefits of all possible legal strategies." (Mem. in Supp. Ex. D ("Xavier Aff.") 2.)  She added that the only urgent calls she received from Caramadre occurred on November 30, 2012, and December 8, 2012, well after the November 19 change of plea.  In those calls, Caramadre stated that "he had changed his plea, in the context of his wife's psychological frailty . . . . [,] that his wife had stabilized and that he would seek withdrawal of his guilty plea."  (Id.)  There are two important points to take from this affidavit.  First, Dr. Xavier never stated that she was concerned with Caramadre's competence to enter a guilty plea.  Considering that her concern was whether his mental state may preclude him from acting rationally and entertaining a plea, one can infer that it is unlikely she would question his competency to do so.  Second, while Caramadre laments the fact that Dr. Zlotnick was out of the country and unavailable, he never attempted to reach Dr. Xavier, who had also been treating him for over a year.  (See id.)

Although both Dr. Zlotnick and Dr. Xavier provided affidavits and/or testimony regarding Caramadre's mental state, neither one evaluated him during the critical time period of

November 13-19, 2012.[5]   Craig Kaufmann, M.D., however, did have
the opportunity to observe him, at least at a superficial level.
Dr. Kaufmann is Mrs. Caramadre's doctor and he examined Mrs.
Caramadre on Friday, November 16.   (Mem. in Supp. Ex. B
("Kaufmann Aff.").)   At the Hearing, Caramadre testified that he
went with Mrs. Caramadre to the appointment and that the "doctor
also noted I was quite distressed myself and that I need to take
care of myself."   (Day 1 Tr. 74:20-23.)   Notably, Dr. Kaufmann's
affidavit makes no mention of concern for Caramadre's health.
(See Kaufmann Aff.)   Rather, it describes Caramadre as
"concerned for his wife.   He was distressed by her severe
symptoms and expressed concern for her future functional
capacity, including her ability to care for their children."
(Id.)   Though the primary purpose of the affidavit was to

---

[5]   While Dr. Zlotnick was out of the country beginning
November 17, she could have been reached on November 13, 14, 15,
and 16.   Likewise, there has been no indication that Dr. Xavier
was unavailable.   Yet, Caramadre never attempted to contact
either of them.   (See Day 1 Tr. 75:7-11, 194:11-195:12.)   This
is significant.   Caramadre emphasized, in the context of his
wife's condition, that "[w]hen someone has a quasi-breakdown
that they start becoming irrational, it is rather serious and
you need to start medicating fast."   (Id. 67:2-4.)   Indeed, he
spent all day Thursday and Friday outside of court taking Mrs.
Caramadre to doctor appointments.   (Id. 74:8-25.)   Caramadre's
argument is based on convincing the Court that he became so
hopeless and in such great despair during the trial that he
became irrational and unable to enter a knowing, intelligent,
and voluntary plea.   The disparity between Mrs. Caramadre's
extensive treatment and Caramadre's lack thereof is stark and,
while obviously not determinative, further casts doubt on the
veracity of Caramadre's incompetency claim.

elaborate on Mrs. Caramadre's health, the affidavit did discuss Caramadre's state of mind.   The absence of any concern for Caramadre's condition, mental state, or ability to act or think rationally is telling, since Dr. Kaufmann was the only medical provider to actually see Caramadre during the trial, in the midst of his alleged hopelessness and despair.

In fact, the only medical professional who testified that it was "reasonable to conclude" that Caramadre was incapable of making an informed decision was Dr. James E. Greer, a paid expert. (Def.'s Ex. A ("Dr. Greer Aff.") 4.)   While the Court respects Dr. Greer's credentials, it cannot accept his report and his conclusions.   First, and most importantly, Dr. Greer had never met Caramadre prior to examining him in preparation for the Hearing.   (Day 1 Tr. 173:24-25, 174:15-19, 177:18-178:2; see also Dr. Greer Aff. 1-3.)   His entire opinion is based on his review of medical records, documents, and on a two hour conversation with Caramadre held three months after the change of plea.   (Day 1 Tr. 174:3-19.)   Second, while the medical records do discuss Caramadre's history of depression, there was no evidence of prior psychosis or mania, or any other episode of irrationality.   (Day 1 Tr. 178:23-179:1; Dr. Greer Aff. 3.)   And third, much of the information provided by Caramadre to Dr. Greer can be characterized, at best, as half-truths.   For example, Caramadre told Dr. Greer that his attorneys continually

"pressured" him to plead guilty but neglected to inform Dr. Greer that Mr. Lepizzera and Mr. Traini never mentioned plea bargaining from September 12, 2012 (the day Caramadre instructed his attorneys not to entertain plea discussions) until Wednesday, November 14, 2012.   Dr. Greer also based his opinion on the fact that Caramadre's psychotherapist, Dr. Zlotnick, was out of the country, and thus Caramadre lacked his support system.   Again, Caramadre failed to inform Dr. Greer that he could have contacted Dr. Xavier, his psychiatrist, but did not, and did, in fact, meet with his priest, Reverend Robert Lacombe. At the Hearing, Dr. Greer testified that had he been told these things, his opinion may have been affected.   (See Day 1 Tr. 179:20-180:1, 187:9-12.)

Based on this evidence, the Court seriously questions the veracity of Caramadre's claim that he suffered an enhanced state of depression which affected his rationality and emotional stability.   Still, if it were all the evidence that were before the Court, the question of Caramadre's competence might be a closer one.   But that is not the case.   The Court was presented with significantly more evidence, all of which points to the conclusion that Caramadre was competent and entered a knowing, intelligent, and voluntary plea.

As already discussed, the Court conducted a thorough and searching inquiry with Caramadre and asked pointed questions

regarding his competence, his understanding of what was going on, and his ability to enter a knowing, intelligent, and voluntary plea. Caramadre was alert, answered all of the Court's questions, and interacted with his attorneys as expected in that type of proceeding. See United States v. Buckley, 847 F.2d 991, 998-99 (1st Cir. 1988) (reviewing the Rule 11 colloquy to conclude that "ample evidence" supported the district court's conclusion that the plea was knowing and intelligent); United States v. Kobrosky, 711 F.2d 449, 456 (1st Cir. 1983) (same). At absolutely no time (either during the plea colloquy, the trial, or any other proceeding) did the Court have even the slightest concern that Caramadre was incompetent to proceed.

In addition to the Court's observations, Caramadre's attorneys interacted with Caramadre on a regular basis and were in constant contact with him. Mr. Lepizzera had represented Caramadre for years and known him for much longer; Mr. Traini had represented Caramadre for months. Neither one noticed any signs that Caramadre was unable to be involved in the trial's preparation, effectively interact with his attorneys, or competently enter into the plea. (Day 2 Tr. 97:8-98:22, 135:15-23, 137:15-17, 148:25-149:8, 150:2-10, 150:18-151:6; Day 3 Tr. 109:17-20, 178:16-20, 178:25-179:6, 180:12-17, 181:21-182:5, 183:10-24, 189:25-190:3, 191:12-18, 194:14-17.) Both added that if they had noticed a difference in Caramadre's mental state or

had any concerns, they would have alerted the Court immediately, as they have done in prior cases. (Day 2 Tr. 150:11-17; Day 3 Tr. 191:19-192:1.) As they are officers of the court, the Court is entitled to credit Mr. Lepizzera and Mr. Traini's recollection and characterization of Caramadre's mental state over that of Caramadre. See Pellerito, 878 F.2d at 1542 ("The district court, we think, was entitled to believe the lawyer rather than the client."); see also Miranda-Gonzalez, 181 F.3d at 167.

The evidence regarding the back-and-forth plea negotiations beginning on Thursday, November 15, 2012, and continuing through Sunday night, November 18, further discredits Caramadre's depiction of his mental abilities that weekend, instead demonstrating an alert, competent, and actively engaged Defendant who fought for certain terms and knew exactly what he was doing. For example, the first offer from the government was for a prison sentence of between two-to-five years. (Day 1 Tr. 68:20-24.) Caramadre rejected this offer immediately because of the two-year floor. (Id. 68:24-69:6.) He believed a long prison sentence was unlikely, so he informed his attorneys he would rather have a higher ceiling so long as he could argue for no jail time at sentencing. (Id. 69:7-10, 72:25-73:5; Day 2 Tr. 104:24-105:11, 106:20-24; Day 3 Tr. 174:7-11, 179:10-15.) When the government came back with zero-to-twenty-five years,

Caramadre told his attorneys "that's completely out of the question" and "does not make sense compared to two to five even in rational terms." (Day 1 Tr. 73:6-12.) The parties eventually negotiated a zero-to-ten year range, which Caramadre consented to. (Id. 73:13-15.)

In addition to being involved in negotiation of the sentence length, Caramadre also helped negotiate certain other terms. Caramadre was adamant that he would not plead guilty to the money laundering count, Count Sixty-Five. (Day 3 Tr. 179:20-180:8.) According to Mr. Traini, Caramadre knew that if he was convicted of this count, he would be barred from ever working in the insurance industry again, and this was unacceptable to him. (Id. 175:23-176:3, 179:24-180:3.) Moreover, Caramadre specifically requested that certain people – Mr. LaMonte, Mr. Mizzoni, and Mr. Duarte – and insurance companies – Aegon – not be included in the Statement of Facts. (Day 1 Tr. 79:21-80:3; Day 2 Tr. 130:7-23; Day 3 Tr. 176:9-19.) The Lamonts were Caramadre's in-laws whereas the Mizzones and Duartes were long-time family friends, and Caramadre did not want to admit defrauding his own friends and family. (Day 1 Tr. 79:21-23; Day 2 Tr. 130:21-23; Day 3 Tr. 176:12-18.) Aegon, meanwhile, was one of the insurance companies involved in the civil litigation, so Caramadre was concerned about how an admission in the Statement of Facts could affect his civil

liability.  (Day 1 Tr. 79:25-80:3.)  Taking this a step further,
Caramadre even inquired about an _Alford_ plea (which the
government rejected).  (_Id._ 79:12-13; Day 2 Tr. 113:15, 114:10-
16; Day 3 Tr. 206:12-207:18; Gov't's Ex. 20.)  And, when the
Statement of Facts was reviewed Sunday night, Caramadre "wasn't
happy" and "objected strongly."  (Day 1 Tr. 83:21-25, 105:20-21,
107:21-25; Day 2 Tr. 128:25-129:10.)  Each and every one of
these actions was logical and well-thought-out, and reveals that
Caramadre was deeply involved in the plea negotiation process.
Any argument that he did not have the mental capacity to
understand what was going on, what was in the Plea Agreement and
Statement of Facts,[6] and what he was doing when he entered his

---

[6] Caramadre makes the claim that he was in such a distraught
state that he was unable to read the plea documents when he met
with Mr. Lepizzera and Mr. Traini Sunday night, and as a result
Mr. Traini had to read the documents to him.  Both Mr. Lepizzera
and Mr. Traini dispute this characterization.  (Mot. to Withdraw
Hr'g Tr., Vol. III, 109:17-20, May 14, 2013 (hereinafter "Day 3
Tr."), ECF No. 179.)  Mr. Traini testified that he did read and
explain the documents to Caramadre, but this had nothing to do
with Caramadre's mental state.  Rather, it is something he does
with every client because the documents are highly technical and
his clients are not criminal defense attorneys.  (_Id._ 182:19-
184:13; _see also_ Mot. to Withdraw Hr'g Tr., Vol. II, 137:7-14,
May 13, 2013 (hereinafter "Day 2 Tr."), ECF No. 178.)  Mr.
Traini added that Caramadre was following along and reading the
documents as Mr. Traini reviewed them, and both attorneys
testified unambiguously that Caramadre understood the documents.
(Day 2 Tr. 135:15-23, 137:15-17; Mot. to Withdraw Hr'g Tr., Vol.
IV, 52:14-16, May 20, 2013 (hereinafter "Day 4 Tr."), ECF No.
180.)  Mrs. Caramadre, who was also present at this meeting,
described Caramadre as being under stress but never testified
that he was incapable of reading the documents.  (Day 4 Tr.
121:5-123:1; _see also_ Mem. of Law in Supp. of Def. Joseph

plea on November 19 is implausible in the face of this evidence. See United States v. Ramos, 810 F.2d 308, 313 (1st Cir. 1987) (finding defendant was not "confused about his choice of pleading" where he attempted to renegotiate the terms of the plea).   Indeed, as compared to the mine run of defendants that appear in this Court, Caramadre was one of the most involved in the process that the Court has seen, and his understanding of the agreement, its terms, and its consequences is unsurpassed.

Lastly, and perhaps most telling, are the contemporaneous or near-contemporaneous statements made by Caramadre himself in the days leading up to the plea and the days and weeks following the plea.   On Thursday morning, November 15, Caramadre instructed Mr. Lepizzera and Mr. Traini to open plea negotiations because "my wife's health is very serious, my children cannot go without a father who would be potentially incarcerated for many, many years and without a mother who is healthy or possibly even alive." (Day 1 Tr. 67:23-68:3.)   That weekend, when speaking with Reverend Lacombe, Caramadre stated that "his primary motivation, corroborated by his attorneys at the time, was to protect his fragile wife and family from further psychological demise." (Mem. in Supp. Ex. C ("Lacombe Aff.") 1.)   According to his wife, Caramadre "permitted his

---

Caramadre's Mot. to Withdraw Guilty Plea ("Mem. in Supp.") Ex. M ("Mrs. Caramadre Aff.") ¶ 10, ECF No. 122-1.)

attorneys to negotiate a plea bargain with the Government . . . . because he was overcome by his fears and distress regarding my welfare and that of our children." (Mem. in Supp. Ex. M ("Mrs. Caramadre Aff.") ¶ 9.) Even on the day of the plea, Caramadre told his aunt, Susan Caramadre, that "he pled guilty because his family needed him, that he had moral obligations and this is what was necessary." (Mot. to Withdraw Hr'g Tr., Vol. IV, 128:8-10, May 20, 2013 (hereinafter "Day 4 Tr."), ECF No. 180.)

This rationale continued after the plea was entered. On December 8, 2012, Caramadre met with Mr. Lepizzera following a Men of St. Joseph's meeting, and stated, "I am seeking to withdraw this ill-advised guilty plea. I am not guilty and if I go to jail forever, that's fine. That's how it is. I need my integrity. And I betrayed myself and put a price on integrity because I had to protect my wife and children but I'm not doing it anymore. My wife is much better now." (Day 1 Tr. 92:24-95:7.) It was not until December 14, when he met jointly with Mr. Lepizzera and Mr. Traini, that Caramadre's reasons for withdrawal began to shift. There, Caramadre explained he wanted "to pursue withdrawing this guilty plea" because he "was not represented right, that all these questions [on cross-examination] should have been asked." (Day 1 Tr. 95:22-96:4.) Even with this shift, any suggestion that Caramadre's health and depression played a role in the decision, that he did not know

what he was doing at the time, that he was not competent to make the decision, or that the plea was involuntary is conspicuously absent.[7]

Quite simply, the evidence does not even remotely support the argument that the family pressure caused by Mrs. Caramadre's illness, the impact of this illness, the stress of the trial, and Caramadre's long-standing depression affected Caramadre's mental capacity to enter into a knowing, intelligent, and voluntary plea.  Taking all of the evidence into account, there is only one conclusion that can be drawn:  Caramadre was fully competent from the start of trial on November 13, 2012, through the Court's taking of his plea on November 19.  The Court does not doubt that Caramadre was deeply upset (and even depressed) because the trial was not going as well as Caramadre had hoped and because his wife's health was in decline.  That does not mean, however, that Caramadre was unable to enter a knowing, intelligent, and voluntary plea.  See Sousa, 468 F.3d at 46.  To the contrary, the Court finds that under the circumstances, and in light of the damning evidence of his guilt presented by the

---

[7] Reverend Lacombe's affidavit does note that he was concerned with Caramadre's psychological well-being but the Court takes this with a grain of salt.  The Reverend's concern was based solely on his perception of Caramadre and not on any statement Caramadre made regarding his motivation.  Moreover, Reverend Lacombe has no medical training, and his view that Caramadre was "on the verge of a breakdown" cannot support the claim that Caramadre did not know what he was doing.  (See Mem. in Supp. Ex. C ("Lacombe Aff.") 1.)

government, the most rational thing Caramadre could have done was exactly what he did – negotiate the best plea deal he could and end the trial.[8]

### 3.   Caramadre's Attorneys Did Not Provide Ineffective Assistance of Counsel[9]

To demonstrate ineffective assistance of counsel generally, Caramadre must "establish both that counsel's representation fell below an objective standard of reasonableness and that there exists a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  Turner v. United States, 699 F.3d 578, 584 (1st Cir. 2012); see also Strickland v. Washington, 466 U.S.

---

[8] Caramadre seems to essentially admit this, testifying that "I needed to stop the bleeding [of the trial] because I needed to protect my family."  (Day 1 Tr. 111:4-11; see also id. 80:13-20 ("We did not have the convenience of just stopping the trial and say let me get better with my wife so I can stabilize my family.   We were already in and in my opinion family members were calling me, please, Joe, make – take the plea because you're going down forever.  The jury believes you're a guilty man, even if it wasn't articulated.  It was inferred.").)

[9] Throughout these proceedings, Caramadre has continually sought to morph this Motion into a more general attack on the effectiveness of his counsel.   This strategy was improper, resulting in significant delays in the proceedings and causing multiple distractions from the true nature of the Motion. Counsel's alleged ineffectiveness is only relevant to the extent it affected Caramadre's decision to plead guilty.   Should Caramadre wish to levy a more thorough attack on his counsel, he is free to do so via a proper collateral attack, though the Court notes that, based on the evidence presented at the Hearing, which ploughed the depths of the effectiveness of the representations provided by Mr. Lepizzera and Mr. Traini, it appears that such an attack would be futile.

668, 687 (1984).  Because this claim is being raised in the plea context, Caramadre must show that "counsel's performance in advising guilty pleas fell below the standard of performance of reasonable proficient counsel" and that "by such inadequate performance, [he] was induced to enter guilty pleas which he otherwise would not have entered."  Isom, 85 F.3d at 837 (quoting United States v. Austin, 948 F.2d 783, 786 (1st Cir. 1991)).  In making this assessment, the Court must consider "the totality of the evidence."  Turner, 699 F.3d at 584 (quoting Dugas v. Coplan, 506 F.3d 1, 9 (1st Cir. 2007)).  Caramadre "bears a very heavy burden" in proving this claim, and, like every other argument he has made, it falls far short.  Id. (quoting Lema v. United States, 987 F.2d 48, 51 (1st Cir. 1993)).

As the Court stated when it gave its preliminary ruling, the attacks on Mr. Lepizzera and Mr. Traini constituted "one of the most bizarre arguments and one of the most vicious hatchet jobs [the Court has] ever heard about another attorney in this Court."  (Day 4 Tr. 153:2-4.)  Throughout the Hearing, Caramadre, through his counsel, took emails, transcripts, and former testimony out of context, attempted to introduce cut-and-pasted email chains rather than full Bates-stamped copies, and portrayed meaningless banter between co-counsel (who are also friends) as malicious, all in an attempt to insinuate that Mr.

Lepizzera and Mr. Traini entered into a secret agreement to, as the government put it, "Cape-Fear" Caramadre.[10]   (See, e.g., Day 3 Tr. 119:12-120:20, 130:7-13, 200:5-15; Day 4 Tr. 55:6-23, 62:10-24, 72:25-74:2.)

These tactics are disturbing, especially where the evidence is overwhelming that Mr. Traini and Mr. Lepizzera provided exceptional representation.[11]   During their testimony, each described the same multi-pronged strategy:  (1) there was no conspiracy between Caramadre and Radhakrishnan; (2) to the extent Radhakrishnan did make misrepresentations to the terminally ill, he did so without Caramadre's knowledge or approval; (3) some of the alleged misrepresentations to the insurance companies were not misrepresentations at all while others were not material; and (4) the insurance companies either did not lose money or lost money due to their own willful blindness.  (See Day 3 Tr. 20:20-22:14; Day 4 Tr. 20:25-21:12.) This strategy was communicated to Caramadre (Day 3 Tr. 24:5-6),

---

[10] Cape Fear is a 1962 thriller which was remade in 1991. The 1991 version, directed by Martin Scorsese, revolved around a convicted rapist (Robert De Niro) stalking and exacting revenge on his defense attorney (Nick Nolte) who purposely destroyed exculpatory evidence to ensure that his client was convicted and went to jail.  Cape Fear (Amblin Entm't, Cappa Films, & Tribeca Prods. 1991).

[11] The Court understands that the Rhode Island Supreme Court Disciplinary Council is aware of this matter; the conduct of Caramadre's current counsel in this plea withdrawal proceeding should also receive thorough review.

and every action Caramadre now challenges is consistent with that strategy.[12]

First, Caramadre half-heartedly challenges the decision not to give an opening statement, conceding that he was informed of, and agreed with, the decision but arguing that this tactic was part of the bigger deception by his attorneys to coerce a plea. (Day 1 Tr. 48:9-16, 128:18-24.)   The Court finds it odd that Caramadre would claim ineffective assistance of counsel regarding a decision in which he participated and agreed, but in any event, the decision to defer an opening statement was sound. Mr. Lepizzera explained that this decision was based on a variety of factors:  the Defense did not know if Caramadre would testify; the Defense did not know what type of defense Radhakrishnan would lodge; and Caramadre had still not provided his counsel with adequate explanations for some of his actions. (Day 2 Tr. 78:14-16; Day 3 Tr. 71:14-25.)   With all of these uncertainties, Mr. Lepizzera felt it could be devastating if they promised the jury certain evidence and theories and then

---

[12] Though he never explicitly states it, the testimony suggests that Caramadre was unhappy with his attorneys' decision not to approach the case from the standpoint that Caramadre is an innocent man being persecuted and maliciously prosecuted by the government.   (See, e.g., Day 2 Tr. 56:11-20, 57:17-58:1.) The issue in an ineffective assistance of counsel claim, however, is not whether the defendant agreed with his counsel's strategic decisions, but rather whether the attorney made strategic decisions at all.   See Strickland v. Washington, 466 U.S. 668, 690 (1984); United States v. Pellerito, 878 F.2d 1535, 1540 (1st Cir. 1989).

failed to follow through. (Day 2 Tr. 45:23-46:1; Day 3 Tr. 70:10-13.) In the Defense's view, the opening would be more effective two months down the road, as an initial response to the government's case, as opposed to a general upfront statement the jury would likely forget. Mr. Traini's testimony corroborated this strategy. (Day 4 Tr. 19:5-20:2.) The Court finds that this explanation is reasonable and demonstrates a well-thought-out maneuver consistent with the overall Defense strategy rather than a lack of preparation by an ineffective attorney. See Huffington v. Nuth, 140 F.3d 572, 583 (4th Cir. 1998) ("[A] decision [to waive opening statement] is essentially tactical in nature, and not objectively unreasonable."); Rivera-Rivera v. United States, Civil No. 10-1308(JAF), Crim. No. 05-033, 2011 WL 2670187, at *5 (D.P.R. July 5, 2011) ("To the extent we view this as a separate claim of ineffective assistance of counsel, we find that the choice to forgo an opening statement falls under the presumption of sound trial strategy."); United States v. Farrah, 128 F. Supp. 2d 103, 109-10 (D. Conn. 2001) (finding that not giving an opening statement at the start of trial was not ineffective because it "was consistent with th[e] approach of not committing to a specific strategy before the close of the government's case"); see also Fox v. Ward, 200 F.3d 1286, 1296 (10th Cir. 2000).

Next, Caramadre claims that Mr. Lepizzera and Mr. Traini provided ineffective assistance of counsel by failing to investigate witnesses.[13]   Defense counsel "has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary."  Strickland, 466 U.S. at 691.  "The decision to interview potential witnesses," meanwhile, "must be evaluated in light of whatever trial strategy reasonably competent counsel devised in the context of the particular case."  Lema, 987 F.2d at 55.   While Mr. Lepizzera conceded that he did not hire an investigator and/or interview the government witnesses, he provided a reasonable explanation for this decision.  He explained that interviewing these witnesses would have provided little or no benefit because the Defense already had these witnesses' statements through the FBI's 302 reports.  Furthermore, these witnesses had a history of cooperating with the government, so there was a high risk that if they were interviewed, they would reveal to the government what the Defense was asking, and, in effect tip off the government as to the Defense's strategy.  (Day 2 Tr. 68:15-74:3; Day 3 Tr. 55:11-22.)  More importantly, as with the decision not to give an opening statement, Mr. Lepizzera had in-

---

[13] Of course, Caramadre omits the fact that he initially told his attorneys that an investigator was not necessary because he knew all of the facts (Day 2 Tr. 63:16-64:7) and it was not until October, a month before trial, that Caramadre shifted gears and began pushing for an investigator (id. 65:3-16).

depth conversations with Caramadre regarding every witness Caramadre wanted to interview, and after Mr. Lepizzera explained why he felt it was not a good idea to interview the witness, Caramadre agreed with the decision. (Day 2 Tr. 68:6-14, 74:25-75:18; Day 3 Tr. 45:19-24.) Any one of these reasons would qualify as a reasonable explanation as to why interviews were not conducted and an investigator was not hired. Thus, the Court concludes that the decision not to hire an investigator to interview the witnesses was not ineffective assistance of counsel. See Janosky v. St. Amand, 594 F.3d 39, 49 (1st Cir. 2010) ("[A] decision to eschew investigation 'must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.'" (quoting Strickland, 466 U.S. at 691); Owens v. United States, 483 F.3d 48, 69 (1st Cir. 2007) ("It is clear that 'counsel need not interview every possible witness to have performed proficiently.'" (quoting Riley v. Payne, 352 F.3d 1313, 1318 (9th Cir. 2003)).

This argument also fails because Caramadre cannot show prejudice. Because none of these witnesses testified during the first week of trial, any lack of investigation could not have realistically impacted Caramadre's decision to plead. See Isom, 85 F.3d at 837 ("[T]o successfully challenge a guilty plea, a defendant must show that . . . 'by such inadequate performance,

Appellant was induced to enter guilty pleas which he otherwise would not have entered.'" (quoting Austin, 948 F.2d at 786)); Ramos, 810 F.2d at 314 (same).

Caramadre's final attempt to smear his counsel involved the cross-examination, or alleged lack thereof, of the witnesses that actually did testify during the four days of trial. According to Caramadre, Mr. Lepizzera intentionally failed to cross-examine any of the witnesses in an attempt to coerce Caramadre to enter a plea. He claims this tactic was successful, and he only entered his plea because this lack of a vigorous defense ensured a conviction. Mr. Lepizzera adamantly denied this accusation (see Day 2 Tr. 84:25-85:9, 92:12-19 ("I find the question just morally reprehensible. Absolutely 110 percent not.")) and provided rational, reasonable, and strategic explanations for each of his cross-examinations.

Mr. Lepizzera first explained that throughout the trial there would be different categories of witnesses, and each category would be cross-examined differently. (Id. 85:10-86:20.) During the first week of trial, the witnesses were the terminally ill people who were used as measuring lives, or their family members. Mr. Lepizzera felt that these witnesses were quite powerful and attacking them would not have been beneficial since the strategy was, in part, that "Mr. Caramadre didn't deal with most of those witnesses. It was Mr. Radhakrishnan." (Id.

87:16-17.)  That being said, Mr. Lepizzera did not just lie down and fail to conduct any meaningful cross-examination.  For example, with Edwin Rodriguez, one of the terminally ill victims, Mr. Lepizzera pointed out that the contract worked both ways, so if Caramadre died before Mr. Rodriguez (or any of the other terminally ill account co-owners), Mr. Rodriguez would have gotten all of the money.  (Id. 91:10-92:2.)  While this was not a strong possibility, it was not impossible; Mr. Rodriguez, for instance, has lived much longer than his doctors expected.  Carol Larivee's cross-examination was also effective.  There, Mr. Lepizzera established that all of the information regarding the transaction was provided to her.  This was important because, as Mr. Lepizzera planned to argue to the jury, it did not make sense that Caramadre would instruct Radhakrishnan to explain the process on some occasions but to lie on others.  Indeed, Mr. Lepizzera also established that Caramadre required Mr. Craddock to attend this meeting in order to ensure Radhakrishnan explained everything.  (Id. 87:25-90:7.)

Besides explaining why he asked the questions he did, Mr. Lepizzera also expounded on why he did not ask certain questions that Caramadre requested.  Regarding Mr. Rodriguez, Caramadre wanted Mr. Lepizzera to extract the fact that Caramadre lost money on Mr. Rodriguez's account.  (Id. 99:9-15.)  Mr. Lepizzera explained that this was a bad question to ask because: (1) Mr.

Rodriguez denied knowing about a bond account; (2) Mr. Rodriguez would not know whether Caramadre made money or not; and (3) it would allow the government to rebut the point by arguing that the reason Caramadre lost money is because Mr. Rodriguez did not die, which while perhaps not establishing guilt, would provide the jury with more "bad optics." (Id. 99:16-100:9.) Caramadre's other main gripe was that Mr. Lepizzera did not place the signed power of attorney form in front of Anne Scuncio and confront her with it. (Day 3 Tr. 87:21-88:11.) However, Mr. Lepizzera's reason for not pursuing this path makes perfect sense. As he explained, Mr. Lepizzera had spoken to Radhakrishnan beforehand, and Radhakrishnan had stated he was going to place the signed form in front of her. (Id. 88:12-24.) However, when Ms. Scuncio emphatically denied giving him a power of attorney, Radhakrishnan never confronted her; instead, he "put his head down and he went back to the table." (Id. 88:24-89:1.) Mr. Lepizzera realized at that moment that he did not know where the Defense received the signed power of attorney form from, and he was concerned that if he placed the form in front of her, she would say, "Yeah, that's my power of attorney but I never gave that to Raymour." (Id. 89:18-23.) Considering how credible Ms. Scuncio appeared, such a scenario could have been crippling for Caramadre, so Mr. Lepizzera decided to hold off and further investigate the authenticity of the power of

attorney.   If, after investigation, the power of attorney was
confirmed to be authentic, Mr. Lepizzera would have either
alerted the Court that Ms. Scuncio may have provided false
and/or misleading testimony and asked to recall her for further
cross-examination, or he would have called her as a witness in
the Defense case-in-chief. (Id. 90:15-91:3.)

Though these cross-examinations were relatively short, they
were effective, and tactically well-conceived.   Each attempted
to distance Caramadre from the process of obtaining the
signatures of the terminally ill victims, which coincided with
the global strategy outlined above.[14]   Whether this strategy
would have been successful to secure Caramadre's acquittal is an
entirely different issue and one that is not relevant to an
ineffective assistance of counsel claim.   See Phoenix v.
Matesanz, 233 F.3d 77, 83 (1st Cir. 2000) ("[C]hoices in
emphasis during cross-examination are prototypical examples of
unchallengeable strategy."); Pellerito, 878 F.2d at 1540
("'Effectiveness' does not require that counsel jump through
every conceivable hoop, or engage in futile exercises.   That

---

[14]   Though the Court was never told what the Defense's
strategy was as the trial was progressing, it did have a guess
based on what it saw:  Caramadre was trying to distance himself
from Radhakrishnan.   The fact that the Court's perception of the
strategy fit in precisely with the strategy Mr. Lepizzera
testified he was employing makes it hard for the Court to credit
Caramadre's allegations that Mr. Lepizzera failed to
meaningfully cross-examine.

another lawyer might have taken a different slant is beside the point; as the [Supreme] Court has taught, 'strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable' in ineffective assistance litigation." (quoting Strickland, 466 U.S. at 690)).

Lastly, it is especially hard to take these claims seriously when Caramadre has repeatedly praised his attorneys. Caramadre testified that Mr. Lepizzera "was an excellent attorney" and he was "quite impressed with [Mr. Lepizzera's] ability to retain." (Day 1 Tr. 26:8-9, 42:24-43:3.)  Indeed, Caramadre originally wanted Mr. Lepizzera to file the instant Motion to Withdraw, to try the case if the Motion was granted, and to enter his appearance in Caramadre's civil suits.  (Day 2 Tr. 166:8-169:2.)  These are not the actions one would expect from a client who felt his attorneys purposely threw the case in order to coerce a plea.  The bottom line is that Mr. Lepizzera and Mr. Traini provided excellent counsel to Caramadre, and his second guessing and Monday-morning quarterbacking is, as the Court has previously stated, nothing more than a cynical attempt to obstruct the judicial process.

4. The Non-Refundable Fee Arrangement Between Caramadre and Mr. Traini Did Not Create an Unwaivable Conflict of Interest

Finally, Caramadre argues that he was unaware that his fee agreement with Mr. Traini was non-refundable.  He alleges that

this created an incentive for Mr. Traini to dispose of the case as quickly as possible in order to gain a significant monetary windfall,[15] regardless of whether or not it was in Caramadre's best interest. Because Mr. Traini's interest varied from Caramadre's, he claims, this created an unwaivable conflict of interest causing Caramadre to enter into a plea that was neither knowing nor intelligent.[16]  This argument fails from a factual, legal, and logical standpoint.

Factually, the Court discredits Caramadre's testimony that he was unaware that Mr. Traini's $450,000 fee, paid out over nine-months, was non-refundable.  (Day 1 Tr. 30:23-25, 31:24-

---

[15] At the Hearing, Caramadre once again attempted to expand the nature of this Motion by accusing Mr. Lepizzera of putting his financial interests ahead of Caramadre's legal interests. Besides being totally meritless, this argument was never raised by Caramadre in his motion papers.  Thus, the Court declines to spend any significant amount of time disposing of this frivolous new attack.

[16] Caramadre emphasizes that this conflict was unwaivable, mostly because the issue of a general conflict of interest involving Mr. Traini had been previously raised by the government.  Mr. Traini represented Mr. Maggiacomo in both his civil and criminal cases and had obtained a non-prosecution agreement for Mr. Maggiacomo.  The government filed a motion to disqualify Mr. Traini based on this conflict, which Caramadre vigorously opposed.  (ECF Nos. 61 and 64, respectively.)  After briefing, a hearing, and an in camera review of documents, the Court denied the government's motion.  (ECF No. 83.) Specifically, the Court found that Caramadre had executed a written conflict of interest waiver following a thorough process with both Mr. Lepizzera and Mr. Traini which ensured that the waiver was both knowing and voluntary.  (Id. at 4-5.)  Because Caramadre's argument fails regardless of whether the specific conflict could be waived, the Court need not consider the issue.

32:16.)  First, both Mr. Traini and Mr. Lepizzera testified that
Caramadre knew the fee was non-refundable.  (Day 2 Tr. 180:13-
181:12, 185:1-8; Day 3 Tr. 171:4-11.)  Once again, the Court is
entitled to credit attorney testimony over that of their client.
See Pellerito, 878 F.2d at 1542.  Second, all of the attorneys
Caramadre interviewed (aside from Mr. Traini) sought around
$1,000,000 to take on the representation.  (Day 2 Tr. 21:4-6,
21:15-16.)  Mr. Traini, on the other hand, agreed to take
$450,000.  This discrepancy cannot be attributed to Mr. Traini
being half as expensive as every other lawyer.  The difference
must come from a mutually-beneficial bargain:  Mr. Traini would
take less money and, in exchange, the fee would be non-
refundable and paid in-full up-front.

From a legal standpoint, even assuming Caramadre was
unaware the fee was non-refundable, no conflict existed.  Courts
"have recognized actual conflicts of interest between an
attorney and his client when pursuit of a client's interests
would lead to evidence of an attorney's malpractice."  United
States v. Sanchez-Barreto, 93 F.3d 17, 20 (1st Cir. 1996)
(quoting United States v. Soldevila-Lopez, 17 F.3d 480, 486 (1st
Cir. 1994)).  The reason for this is that in such circumstances,
the attorney would have breached the duty of loyalty.
Strickland, 466 U.S. at 692.  As has already been discussed
above, there was no ineffective assistance of counsel, and thus

no legal malpractice.  Moreover, Mr. Traini testified that the
fee agreement never affected his legal advice toward Caramadre
and that he did not purposely avoid trial in order to reap a
financial windfall.  (Day 3 Tr. 171:22-172:8.)  The only reason
Mr. Traini and Mr. Lepizzera encouraged Caramadre to end the
trial and enter the plea was because they felt it was in his
best interest to do so.  (Id. 114:1-4, 187:22-24, 194:18-20.)
Indeed, once Caramadre initially instructed his attorneys not to
enter into plea discussions in September 2012, Mr. Traini and
Mr. Lepizzera prepared for trial, just as Caramadre wanted.
(Day 2 Tr. 94:3-12.)  Caramadre has not shown how this fee
arrangement in any way created a conflict or breached the duty
of loyalty.  Any hypothetical conflicts and concerns are
completely irrelevant.[17]

Lastly, Caramadre's argument fails as a matter of logic.
According to Caramadre, Mr. Traini pressured him to enter into
this plea so that Mr. Traini could reap significant monetary
gain without doing much work.  (See Day 1 Tr. 32:21-25.)
However, even if the plea had been entered immediately, Mr.
Traini and Mr. Lepizzera's work would not have ceased.  The

---

[17] Though not relevant to the outcome, it is worth noting
that Mr. Traini testified that had the scenario Caramadre
envisioned actually occurred, and Caramadre had pleaded guilty a
week after agreeing to pay Mr. Traini $450,000, Mr. Traini would
likely have returned a portion of the fee even though he was not
obligated to do so.  (Day 3 Tr. 203:8-20.)

attorneys still would have had to prepare for sentencing, which would not have occurred for at least ninety days, if not longer. (Day 2 Tr. 153:21-154:5, 155:4-10.)   They would have had to review the presentence report, lodge objections to the report, prepare a sentencing memorandum, and prepare an argument as to the proper sentence.  (Id. 153:23-154:2.)  While this may not be a burdensome amount of work in a run-of-the-mill case, this is far from a run-of-the-mill case.   Here, Mr. Traini and Mr. Lepizzera would have needed to interview and solicit statements from the many members of the community who Caramadre benefited through his charitable work.  (Id. 154:13-18.)  They also would have had to prepare extensively, and likely solicit experts, for a probable evidentiary hearing regarding the amount of loss from the scheme for restitution purposes.  (Id. 154:19-155:3.) Indeed, Mr. Lepizzera and Mr. Traini had already begun this process when Caramadre decided to hire new counsel and file the instant Motion.  While the amount of work in a three-month trial would clearly be more than that required to prepare for sentencing, it is just not the case that once Caramadre entered his plea, Mr. Traini would just walk away and do no other work. Even if a plea had been entered immediately, Mr. Traini would, in all likelihood, still be involved in the case when the final $50,000 payment was made in February 2013.  (See Day 3 Tr. 62:25-63:5 (describing the payout provision).)

B.   Caramadre Waited Too Long Before Filing the Motion

As the above discussion makes pellucid, Caramadre entered into a knowing, intelligent, and voluntary plea, and thus no just reason exists for allowing him to withdraw it.  Still, for completeness sake, the Court will briefly address the additional factors enumerated by the First Circuit.

The longer a defendant delays in moving for a withdrawal, the less likely it is to be granted.  United States v. Parrilla-Tirado, 22 F.3d 368, 373 (1st Cir. 1994).  A delay of several weeks has been held too long and indicative of a defendant's seeking to gain some type of benefit.  See Ramos, 810 F.2d at 313 ("Acevedo's 'change of heart' came . . . thirteen days after his guilty plea. . . .  Acevedo does not persuade us, as it did not the district court, that his 'change of heart' was dictated by anything but to gain personal advantage."); Kobrosky, 711 F.2d at 456 ("The interval of three weeks between the district court's acceptance of Kobrosky's guilty plea and his March 14 motion indicates as well that Kobrosky was neither confused nor unfairly pressured."); Nunez Cordero v. United States, 533 F.2d 723, 726 (1st Cir. 1976) ("The motion to withdraw was not made so soon after the plea as to indicate that the latter was made in haste . . . but after a period of two weeks.").

Caramadre entered his plea on November 19, 2012.  It was not until February 28, 2013, over fourteen weeks later (101 days

to be exact), that he filed his Motion to Withdraw.  Even giving Caramadre the benefit of the doubt, it was not until early December that he first raised the issue with his attorneys (Day 1 Tr. 92:24-93:7, 95:22-96:4; Day 2 Tr. 156:3-6, 157:4-7; Def.'s Ex. W; Mem. in Supp. Ex. K ("Caramadre Aff.") ¶4), and an additional month later (January 11, 2013) before he first alerted the Court that a motion was forthcoming (ECF. No. 114). Regardless of which date is used, this is too long to wait, especially taking into account how weak the argument is to begin with.  See Parrilla-Tirado, 22 F.3d at 373 ("The rule of thumb is that the longer a defendant waits before moving to withdraw his plea, the more potency his motion must have in order to gain favorable consideration.").  Like with Ramos, Kobrosky, and Nunez Cordero, this substantial length of time is further support that Caramadre did not hastily enter a plea after being unduly pressured and/or coerced but either simply developed pleader's remorse after having weeks to watch his wife's health improve and stew over his decision and impending sentence, or, more likely in the Court's view (as stated from the Bench and in more detail below), to carry out a plan conceived in advance, to save face with his family, friends, and church – benefitting from the plea deal while claiming his innocence and blaming the attorneys and the Court for his plight.

C.   Caramadre Has Provided No Colorable Assertion of Legal Innocence

One of Caramadre's most consistent rallying calls has been that he is innocent of the charges against him and that he pleaded guilty to.   Not surprisingly, courts "look more hospitably on a motion to withdraw a guilty plea when the motion is coupled with an assertion of innocence."   United States v. Doyle, 981 F.2d 591, 596 (1st Cir. 1992).   Of course, "[m]erely voicing a claim of innocence has no weight in the plea-withdrawal calculus" because there "'are few if any criminal cases where the defendant cannot devise some theory or story which, if believed by a jury, would result in his acquittal.'" Gates, 709 F.3d at 69; Nunez Cordero, 533 F.2d at 726 (quoting United States v. Barker, 514 F.2d 208, 221 (D.C. Cir. 1975)). To be given any weight, a claim of innocence must be credible. Gates, 709 F.3d at 69.   That is not the case here.

A defendant is normally bound by the representations he makes in open court at the time of his plea because they are "more likely to be reliable than later versions prompted by second thoughts."   Padilla-Galarza, 351 F.3d at 598.   At the change of plea hearing, the government read into the record a lengthy Statement of Facts which Caramadre had reviewed with his counsel and signed.   (See Changes of Plea Hr'g Tr. 17:24-25:17.) The Court then had the following exchange with the Defendants:

THE COURT:   So I need to ask you on the record, do each of you agree that these facts are true and these are the facts of the case?  Mr. Caramadre?

MR. CARAMADRE:  Yes, your Honor.

MR. RADHAKRISHNAN:  Yes, your Honor.

THE COURT:   I'm now going to ask each of you how you wish to plead to these charges, guilty or not guilty? Beginning with you, Mr. Caramadre.

MR. CARAMADRE:  Guilty.

MR. RADHAKRISHNAN:  Guilty, your Honor.

(Id. 25:18-26:2.)   Caramadre has not provided a compelling reason why this unequivocal acknowledgement of guilt should be ignored in favor of his current claim of innocence.  See Isom, 85 F.3d at 837 ("[W]e found that the defendant's claim of innocence lacked merit where, as here, he did not assert innocence at the change of plea hearing . . . .").

In fact, Caramadre has not provided any convincing evidence of his innocence.[18]  To be sure, he has preached his innocence to anybody who would listen.  But that is not proof.  Nor does the Court find the testimony and/or affidavits of Reverend Lacombe, Mrs. Caramadre, and Caramadre's Aunt Susan to be relevant or persuasive.  None of these people had first-hand knowledge of

---

[18]  Caramadre did provide additional evidence under seal which he claims corroborates his claim of innocence.  It is well established that this type of evidence is inadmissible due to its high degree of unreliability.  The Court finds no reason to stray from this large body of case law.  That being said, the Court notes that it did review the evidence and finds that its probative value is minimal, at best, so even if the evidence were considered, the Court's evaluation of Caramadre's claim of innocence would not change.

the facts.   Instead, they based their conclusions solely on conversations with Caramadre, which, obviously, are at best self-serving and not reliable.   (See Day 4 Tr. 108:9-24 (Reverend Lacombe testifying that his opinions are based on what Caramadre told him and what he was able to garner through the newspaper and media coverage); id. 128:6-10 (Susan Caramadre testifying that Caramadre told her that pleading guilty was the first lie he was telling; Mrs. Caramadre Aff. ¶¶ 3-4 (stating that Caramadre always asserted his innocence and the first time she heard the factual accusations was at trial).)   The only thing this evidence "proves" is what Dr. Xavier stated in her affidavit:   Caramadre is obsessed with "the need to declare his innocence to the world at large." (Xavier Aff. 1, 2.)

The government, on the other hand, provided concrete evidence to counter Caramadre's claim of innocence.   During its cross-examination of Caramadre, the government walked him through multiple transactions involving Alan Ross, Lily Ianiero, Denise Egan, and Edward Maggiacomo, Jr.   Each time, Caramadre was forced to either deny the veracity of clearly truthful facts or invent flimsy excuses as to why those facts did not amount to the misrepresentations and crimes charged in the Indictment. (See generally Day 1 Tr. 151:16-171:8, 202:18-230:15; Day 2 Tr. 4:10-7:6, 10:13-11:9.)   Then, during its subsequent direct examination of Mr. Lepizzera, the government adduced testimony

that Caramadre had actually made admissions regarding misrepresentations and that Mr. Lepizzera was extremely concerned with how to defend Count Sixty-Five, the money laundering count. Indeed, Mr. Lepizzera went into painstaking detail about why these misrepresentations and lies were troublesome and suggested, if not outright proved, that Caramadre was guilty of Count Sixty-Five specifically and the other counts through implication. (See Day 2 Tr. 26:14-33:10, 35:20-36:6, 122:1-125:14, 146:5-147:2; Day 3 Tr. 96:17-20.)  Mr. Lepizzera also explained how Caramadre and Radhakrishnan initially tried to pass this false information off as mistakes on the applications rather than intentional misrepresentations (see Day 2 Tr. 36:15-43:3) but after being pressed, Caramadre admitted making these misrepresentations intentionally (Day 3 Tr. 98:5-20).  Even then, Caramadre told Mr. Lepizzera that "it just doesn't matter" and to stop "worrying about minutia" because Caramadre would just "get on the stand and explain everything away."  (Day 2 Tr. 43:3, 125:2-6; Day 3 Tr. 98:5-20.) Finally, Mr. Lepizzera and Mr. Traini both testified that they knew there was a factual basis to support the plea and that Caramadre was not lying when he admitted the truth of the government's accusations.  (Day 2 Tr. 117:3-7, 118:3-5, 121:3-6, 126:20-127:2; Day 3 Tr. 194:9-13.)

This testimony was powerful.   Add to it the additional factor that Radhakrishnan, who was also under oath, admitted the veracity of the very same Statement of Facts Caramadre now denies (Changes of Plea Hr'g Tr. 25:14-26:2), and the Court is actually more convinced of Caramadre's guilt now than it was during the trial.[19]   Caramadre's failure to show a colorable claim of innocence just further tilts the scales against granting his Motion.

D.   Caramadre Entered into a Detailed and Heavily Negotiated Plea Agreement

Signed plea agreements cast doubt on claims that a plea was not knowing, intelligent, and voluntary.   United States v. Gonzalez, 202 F.3d 20, 24 (1st Cir. 2000), abrogated on different grounds by Padilla v. Kentucky, 559 U.S. 356 (2010). Here, Caramadre, an attorney and sophisticated investor, financial professional, and CPA, signed the Plea Agreement after having discussed it in detail with his attorneys and/or the Court on at least three occasions:   (1) at his home Sunday night with his attorneys; (2) in a conference room at the courthouse with his attorneys Monday morning prior to the change of plea hearing; and (3) with the Court during the change of plea hearing.   But not only did he discuss it, the evidence demonstrates that Caramadre had an integral role in negotiating

---

[19]   This is just another testament to the excellent representation provided by Mr. Lepizzera and Mr. Traini.

the actual terms of the agreement.  The argument that Caramadre, an extremely well-educated man and attorney known for reading the fine print and searching for loopholes in contracts,[20] did not know what he was signing and should not be held to its terms is beyond the pale, and the Court rejects it as such.

      E.   Prejudice

      The Court may also consider prejudice to the government in its determination of a motion to withdraw, see Kobrosky, 711 F.2d at 455, and here, allowing Caramadre to withdraw his plea would severely prejudice the government.  This trial was expected to last three months and the government's case alone involved over seventy witnesses, a number of whom were elderly and/or terminally ill and have since passed away.  It would be a monumental undertaking, both in terms of time and money, to once again coordinate all of these witnesses and prepare for a new trial.  Furthermore, this was (and continues to be) a highly publicized case.  The parties undertook a painstaking, months-long process (involving an extensive questionnaire and individual voir dire) to select a fair, unbiased, and impartial

---

      [20] Jake Bernstein, Death Takes a Policy:  How a Lawyer Exploited the Fine Print & Found Himself Facing Federal Charges, PROPUBLICA (Aug. 24, 2012, 10:02 a.m.), http://www.propublica.org/ article/death-takes-a-policy-how-a-lawyer-exploited-the-fine-print; 473:  Loopholes, THIS AMERICAN LIFE (Aug. 24, 2012), http://www.thisamericanlife.org/radio-archives/episode/473/ loopholes?act=1#play.

jury.   The task of selecting a second jury made up of Rhode Island residents would be daunting.

The Court is also permitted to consider any inconvenience it would suffer by permitting Caramadre to withdraw his plea. Id.   The Court blocked out four months of its trial schedule to accommodate this case the first time around, resulting in many other cases being continued and some being transferred to other judges.   A second three-month trial would once again burden the Court's docket and cause inconveniences to the Court and a whole host of litigants.[21]

F. Caramadre's Reasons for Withdrawal Are Not Plausible

The final factor to consider is the plausibility of Caramadre's proffered reasons for withdrawal.   Gates, 709 F.3d at 68.   While Caramadre has provided numerous reasons as to why he is trying to vacate his plea, the Court does not believe any are his true rationale.   To the contrary, the Court reiterates what it stated from the Bench at the conclusion of the Hearing – Caramadre's true reason for filing this motion is two-fold:   to implement what the Court will call "Plan-B" – a way to get what

---

[21] There would likely be strong prejudice to Radhakrishnan as well.   The Plea Agreement was a package deal, so if Caramadre's plea was withdrawn, the government would likely move to vacate Radhakrishnan's plea, forcing him to stand trial despite being seemingly content with his plea bargain.   The Court's ability to consider the impact of any prejudice to a co-defendant in deciding whether to grant a motion to withdraw is an interesting issue, but one which the Court need not address.

he wanted from the start, which is a trial severed from Radhakrishnan or, at the very least, to save face with his family, friends, community, and church.  Caramadre attempted on at least two occasions to sever his trial from Radhakrishnan's, once through a traditional motion to sever (ECF No. 80) and once through a more creative motion for a bench trial (ECF No. 82). When both were denied (ECF Nos. 84 & 95, respectively), Caramadre proceeded to trial.  He quickly realized that things were not going to end well, and it was at this time that he decided to implement Plan-B.  The Court believes Caramadre contrived this plan while personally observing the proceedings in United States v. DeSimone, CR. No. 09-24 S.  Caramadre sat through most of that trial (presumably to "scout" the prosecution team and the Court) and observed how Rocco DeSimone pleaded guilty but then successfully withdrew his plea after demonstrating that his attorney either condoned lying to the Court regarding his guilt or, at the very least, failed to advise him of his obligation to tell the truth.  See United States v. DeSimone, 736 F. Supp. 2d 477, 483 (D.R.I. 2010).

The Court believes Caramadre is attempting to recreate the DeSimone scenario and began planting the seeds for Plan-B as soon as plea negotiations began.  First, when he inquired about an Alford plea, Caramadre stated this would "eliminate me needing to lie." (Gov't's Ex. 20.)  Then, during the Sunday

night meeting with his attorneys to go over the Plea Agreement
and Statement of Facts, Caramadre made another comment about
having to lie. (Day 1 Tr. 82:10-23; Day 2 Tr. 140:8-18; Day 3
Tr. 184:21-25.) Unfortunately for Caramadre, his attorneys,
unlike in DeSimone, emphasized the importance and necessity of
telling the truth and not lying to the Court. Cf. DeSimone, 736
F. Supp. 2d at 483 ("[W]hile it is apparent that Corley did not
explicitly advise his client to lie to the Court, there is also
no evidence that he advised him of his obligation to tell the
unvarnished truth, even though Defendant was under oath.").
Upon receiving the Alford plea email, Mr. Traini told Mr.
Lepizzera that if Caramadre "thinks he has to lie to plead then
we are not going anywhere." (Gov't's Ex. 21; see also Day 4 Tr.
32:24-33:1.) When Mr. Lepizzera saw Caramadre at Mass on
Sunday, November 18, they discussed the issue. (Day 2 Tr.
134:24-135:6.) He told Caramadre that there needs to be a
factual basis for the plea and an admission in order for the
plea to go through. (Id. 116:8-17.) He reminded Caramadre that
Caramadre is an attorney, that he would be sworn under oath, and
that he could not lie. (Id. 132:18-134:19.) That night, Mr.
Traini reiterated the point, telling Caramadre that "I don't
want to hear about lying to the judge," that "you're going to be
under oath when you're in the courtroom and you'll be required
to tell the truth," and that "you may have an epiphany between

now and tomorrow morning, but when you're in the courtroom and you're under oath, I assume or I expect that you'll be truthful."[22]  (Day 3 Tr. 184:25-185:8; see also Day 2 Tr. 140:25-141:17.)  Indeed, both Mr. and Mrs. Caramadre testified that the attorneys told Caramadre in no uncertain terms that he could not lie to the Court.  (Day 1 Tr. 82:15-17, 87:1-2; Day 4 Tr. 121:23-122:1.)

Moreover, also unlike DeSimone, where DeSimone's attorney could not say whether or not his client was lying at the change of plea hearing, Mr. Lepizzera and Mr. Traini testified that they knew based on their investigation and based on admissions from Caramadre that the Statement of Facts was true.  Cf. DeSimone, 736 F. Supp. 2d at 482-83 ("I don't know that I would characterize it as a lie or the truth.")  As a result, both knew Caramadre was not lying when he agreed to them.  (Day 2 Tr. 117:3-7, 118:3-5, 121:3-6, 126:20-127:2, 142:24-143:10, 144:6-12; Day 3 Tr. 113:5-23, 185:22-186:13.)  In their view, Caramadre made these statements regarding his innocence and having to lie to the Court because he did not want to admit

---

[22] The Court rejects Caramadre's argument, made to support his ineffective assistance of counsel claim, that Mr. Traini deliberately used the term "epiphany" in an attempt to play off of Caramadre's religious beliefs and unduly pressure him to plead guilty.  This is a bare accusation with absolutely no evidentiary support and flies in the face of the detailed record which overwhelming proves that Mr. Traini provided exceptional legal representation.

guilt to his wife.   (Day 2 Tr. 144:9-19; Day 3 Tr. 125:8-20, 185:14-21.)   Though the Court believes Caramadre had an ulterior and more sinister motive when he made the statements, it agrees that professing his innocence in front of his wife likely also played a role.

In any event, neither being required to be tried with a co-conspirator nor wanting to save face in front of loved ones and/or one's community or church is a legitimate reason for attempting to manipulate the judicial process and withdraw a plea.

III. Conclusion

For the foregoing reasons, the Court finds Caramadre's Motion to Withdraw his guilty plea meritless and borderline frivolous, and it is therefore DENIED.

IT IS SO ORDERED.


*/s/ William E. Smith*
William E. Smith
United States District Judge
Date:  August 1, 2013