UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) Criminal No. 11-186-S |
| v. | ) |
| | ) |
| JOSEPH CARAMADRE | ) |
| | ) |
| and | ) |
| | ) |
| RAYMOUR RADHAKRISHNAN | ) |
| | ) |
| Defendants. | ) |

GOVERNMENT'S MEMORANDUM OF LAW CONCERNING
INSURANCE COMPANY RESTITUTION CALCULATION

On November 19, 2012, defendants Joseph Caramadre ("Caramadre") and Raymour Radhakrishnan ("Radhakrishnan") pled guilty mid-trial to conspiracy to commit wire fraud and identity theft as well as to one substantive count of wire fraud. When the defendants pled guilty, they admitted their participation in a complex scheme to deceive terminally-ill individuals into signing documents that were used to open brokerage accounts and to purchase variable annuities. Once these accounts and annuities were opened, the defendants purchased millions of dollars worth of annuities and death-put bonds in the names of the terminally-ill individuals, both of which generated substantial profits upon the deaths of the terminal individuals. Sentencing in this matter is scheduled for September 13, 2013 before the Hon. William E. Smith. As the amount of loss sustained by the monetary victims in this case is relevant to both the Guideline range and the amount of restitution owed by the defendants, the District Court has referred the issue of the calculation of the victims' losses to this Honorable Court to issue a report and recommendation prior to sentencing. This Memorandum of Law is limited to the losses sustained by the insurance

companies as a result of their issuance of variable annuities to the defendants, their co-conspirators and their clients. A subsequent Memorandum of Law will be submitted to address the amount of loss sustained by the bond issuers.

Overview of Variable Annuities

From 1995 through 2009, defendant Caramadre purchased on his own behalf or on behalf of his clients over 200 variable annuities naming terminally-ill individuals as annuitants. These variable annuities were offered for sale to the public by insurance companies. In many ways, these annuities operated like mutual funds, with the investor able to choose from many different "sub-accounts" in which to invest his or her funds. These annuities, however, offered one unique feature which drew the attention of Caramadre. They provided for death benefits upon the death of the individual named as the "annuitant" on the annuity contract. The death benefits varied from company to company and evolved over time. Most of the annuities guaranteed the owner a specific profit upon the death of the annuitant - often in the range of 5-7% - even if the value of the account decreased. In addition, many of the companies offered other benefits, including deposit bonuses that were placed into the accounts. Moreover, the insurance companies paid hefty commissions to the insurance brokers who submitted the annuity applications, typically 5% of the amount of premiums placed into the annuity.

Caramadre's Investment Strategy

Caramadre devised a specific investment strategy to take maximum advantage of the death benefits offered in the annuity contracts. First, he and his co-conspirators would immediately obtain commissions (about 5%) and, in some cases, deposit bonuses (5%) on the amount of money placed in the annuity. In a $1,000,000 annuity, therefore, there would often immediately be

$100,000 in profit.  Second, Caramadre would select extremely risky funds in which to invest the premiums.  He did so because he knew that there was no risk involved.  If the extreme risk paid off (which did occur on occasion), Caramadre would earn substantial profits.  If, however, the fund decreased in value (as was typically the case), he and his clients would still receive a guaranteed rate of return in the range of 5-7% upon the death of the annuitant.  Caramadre has publicly described this strategy as akin to gambling at a casino while knowing that victory is guaranteed.  The only variable Caramadre had to ensure was locating a person who would die quickly.

      The entire strategy Caramadre devised was aimed at causing maximum financial damage to the insurance companies.  Not only did he and his co-conspirators receive the commissions and bonuses offered by the companies, they intentionally chose high risk-investments, knowing that the insurance companies would be forced to bare the losses if the market went down in value or the particular fund decreased in value.  Exhibit A[1] is a chart Caramadre provided his clients that depicted the profits that would be made if they invested in variable annuities with terminally-ill annuitants.  This chart provides that the clients would make more than a 30% return if the market went up by 10% and that they would make a 6% return even if the market went down in value by 10%.  (This chart did not even include the amount of commissions that the insurance companies would be required to pay, a fact that Caramadre concealed from his investors.)

      When selecting specific sub-accounts in which to deposit the premiums, Caramadre intentionally selected high-risk funds, knowing that the insurance companies would be left to bear the loss if the funds decreased in value.  Exhibit B is an Investment Allocation Proposal that

---

[1] The exhibits referenced in this Memorandum are being submitted to the Court and to the parties via separate correspondence.

Caramadre provided to one of his clients. In this proposal, Caramadre recommended investing $2,000,000 in a "Double beta-Long" fund and $2,000,000 in a "Double beta-Short fund."[2] He also recommended that $3,000,000 be invested in an international fund, in an emerging markets fund, and in other "wildcard" funds such as oil, real estate and the Japanese Yen. Caramadre intentionally selected high-risk funds because he knew that the insurance companies had guaranteed a specific rate of return upon the death of the annuitant. The entire annuity portion of the scheme was designed to invest in incredibly risky funds knowing that the insurance companies would likely be forced to bare significant losses.

It was entirely foreseeable to Caramadre that the insurance companies would lose substantial sums if the market were to decrease in value. After all, the companies were guaranteeing a specified rate of return no matter how much the market decreased in value. What's more, on many occasions, Caramadre specifically bet against the market, positioning himself and his clients to make even more money if the market were to decline in value. As an example, Exhibit C is an e-mail from Caramadre to a client stating, in part: "We still need the Dow to go below 12,000 so that we can lock in the gain we discussed in Vegas. If you recall we needed one more bad day on the Dow to lock in. We didn't get the bad day, but hopefully the market looks ready to go south soon."

---

[2] The Double beta-Long fund essentially doubles the rate of return of the stock market if the market goes up, but doubles the losses if the market goes down. The Double beta-Short fund does the reverse; it bets on the market going down in value such that the investor earns twice the amount of the rate of loss in the market. By simultaneously investing in both double beta-long and double beta-short funds, Caramadre was guaranteeing that one fund would substantially increase in value while the other would suffer significant losses. Caramadre knew these losses would, however, be borne by the insurance companies as they had guaranteed a specific rate of return

In short, Caramadre designed this scheme knowing full well that the insurance companies were highly likely to lose substantial proceeds. He knew that the companies would immediately suffer a loss in commissions and bonuses paid. He then selected high risk funds and even bet against the market, knowing that the insurance companies would pay a guaranteed rate of return irrespective of how his investments performed. The millions of dollars in losses suffered by the insurance companies was a foreseeable and predictable consequence of defendants' conduct.

Calculation of Losses to Insurance Companies

At the upcoming hearing, the Government will call Internal Revenue Service Special Agent Troy Niro to testify as to the amount of losses sustained by the insurance companies. Agent Niro will testify as to the methodology he employed to determine each insurance companies' losses and the sources of information for the various pieces of data used in his analysis. Exhibit D is a chart depicting the formula used by Agent Niro to determine the loss sustained on each pertinent annuity. The loss was calculated by taking the amount of the payment made by the insurance company to the investor and subtracting the value of the annuity at the time of payment. From this total, the amount of bonus payments and commissions paid by the insurance companies are added. Finally, the amount of fees earned by the insurance companies is subtracted to determine the loss on each annuity.

Exhibit E is a chart utilizing the above formula to determine the amount of losses sustained in each annuity involved in this case. It concludes (on page 6) that the insurance companies sustained a total loss of $34,299,295, which includes $7,342,347 paid in commissions and $5,076,894 paid in bonus payments. Exhibit F is a chart breaking down the total losses by insurance company. Exhibit G is a chart listing the losses by insurance company for annuities

opened after July 1, 2007, when defendant Radhakrishnan began working at Estate Planning Resources, Inc. The insurance companies suffered losses totaling $21,321,092 on annuities opened during the time in which Radhakrishnan participated in the scheme.

Agent Niro is expected to testify as to how he obtained the figures used in each portion of the calculation. Some of the figures were obtained via the raw documentation provided to the Government by the insurance companies. For example, the insurance companies provided the Government with the premium checks received with each annuity as well as information on the total payout to each annuity beneficiary. As an example, Exhibit H is a series of documents provided by Genworth Insurance Company for one particular annuity that show a premium check from Caramadre for $1,200,000 and a later payout check to Caramadre for $1,423,650.03.

Agent Niro will testify that other relevant figures were provided to the Government by the Insurance Companies in summary spreadsheets. Each insurance company was asked to review their business records and provide an annuity by annuity analysis of the amount of commissions paid, the amount of bonuses paid and the account value at the time of payment. Each of these spreadsheets has been provided to the defense. For illustrative purposes, the spreadsheets provided by Security Benefit Insurance Company and Genworth Insurance Company are provided as Exhibits I and J.

The last factor to be considered in the financial analysis is the fees earned by the insurance companies on each annuity, as the amount of fees are an offset to the loss sustained. The fees charged by the insurance companies varied by company and, in some cases, by annuity. The amount and type of fees charged are delineated in the policy Specification Page that accompany each annuity. Examples of the Specification Pages from annuities issued by Midland National

Case 1:11-cr-00186-S-PAS   Document 182   Filed 08/05/13   Page 7 of 9 PageID #: 3322

Insurance Company and The Aegon Group are provided as Exhibits K and L. The fees charged by Midland National, for example, consisted of a .85% mortality and expense charge, a .45% administration fee and additional fees for the riders selected by the defendants, including a .5% fee for the enhanced minimum death benefit rider, a .30% fee for the estate planning rider and a .80% fee for the premium bonus rider. These fees were deducted from the annuity account value on a daily basis based on the value of the annuity on the day in question.

In addition to the aforementioned fees listed in the annuity contract, the Government learned that the insurance companies also received some payments from the mutual fund companies for each dollar that was invested. These payments, known in the industry, as "12b-1" payments, were typically in the area of .40% per year.

None of the insurance companies, however, kept business records of these amounts as the fees are deducted from the account value on a daily basis. The United States therefore requested that each insurance company conduct an analysis of the amount of fees and 12b-1 payments they received on each of the annuities in question based on the fee percentages laid out in the annuity contracts. Each of the insurance companies complied with this request and the spreadsheets they provided have been shared with the defense. For illustrative purposes, the fee spreadsheets prepared by Security Benefit Life Insurance Company and Nationwide Life Insurance Company are provided as Exhibits M and N.

Once Agent Niro had all of the above information, he simply had to perform mathematical calculations to determine the amount of loss sustained on each annuity. He did so by subtracting the account value at the time of payout from the total amount paid to the beneficiary. From this total, he added the commission and bonus payments made by the companies and subtracted the

fees earned.  The total loss is $34,299.295.[3]

At the upcoming hearing, the United States intends to use as exhibits the documents references in this Memorandum.  The only witness it intends to call is Agent Niro.

Respectfully submitted,

PETER F. NERONHA
UNITED STATES ATTORNEY

/s/ Lee H. Vilker
LEE H. VILKER
Assistant U.S. Attorney

JOHN P. MCADAMS
Assistant U.S. Attorney
U.S. Attorney's Office
50 Kennedy Plaza, 8th Floor
Providence, RI 02903

---

[3] It should be noted that the insurance companies view this loss total as significantly understating their actual losses.  They point to a number of fixed expenses they bore that were not dependent on any specific contract, including employee expenses and rent.  For simplicity purposes, the United States has not included any of these fixed costs in its calculations.

## CERTIFICATE OF SERVICE

I, hereby certify that on this 5th day of August, 2013, I caused the within Government's Memorandum of Law to be served via the Court's Electronic Filing System on:

**For Joseph Caramadre**:

Randy Olen, Esq.

478A Broadway
Providence, RI 02909

**For Raymour Radhakrishnan**:

Olin Thompson, Esq.

Federal Defender's Office

10 Weybossett Street, Suite 300

Providence, RI 02903

/s/ Lee H. Vilker

Lee H. Vilker

Assistant U.S. Attorney

United States Attorney's Office

50 Kennedy Plaza, 8th Floor

Providence, RI 02903