UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| **UNITED STATES OF AMERICA** | ) |
| | ) **Criminal No. 11-186-S** |
| v. | ) |
| | ) |
| **JOSEPH CARAMADRE** | ) |
| | ) |
| and | ) |
| | ) |
| **RAYMOUR RADHAKRISHNAN** | ) |
| | ) |
| **Defendants.** | ) |

### GOVERNMENT'S MEMORANDUM OF LAW CONCERNING RESTITUTION OWED TO BOND-ISSUER VICTIMS

Sentencing for defendants Joseph Caramadre ("Caramadre") and Raymour Radhakrishnan ("Radhakrishnan") is scheduled for October 9, 2013. The District Court has referred the calculation of the amount of loss to Hon. Magistrate Judge Sullivan, who has scheduled an evidentiary hearing for September 30 and October 1, 2013. On August 5, 2013, the Government filed a Memorandum of Law concerning the amount of loss sustained by the insurance companies that issued the variable annuities in question. This Memorandum of Law concerns the amount of loss sustained by the corporations which issued the "death-put" bonds that were redeemed by the defendants.

Overview of "Death-Put" Bonds

1

Corporations wishing to raise funds often issue bonds for sale to the public. These bonds typically provide a set periodic coupon payment as well as a maturity date years in the future at which point the bond is redeemed for its full face value. Beginning in the early 2000's, numerous companies issued bonds that could be owned jointly by two individuals with rights of survivorship. These corporate bonds typically had a maturity date – the date the bonds would be redeemed at full face value – that was many years, or decades, away. However, under the terms of the survivorship provisions in the prospectuses authorizing the issuance of the bonds, the bonds could be redeemed at full face value by a bond owner immediately upon the death of the bond's co-owner.

These corporate bonds with survivorship clauses became known in the industry as "death-put" bonds, as they allowed an owner to immediately "put back" the bond to the issuer for its full face value upon the death of the bond's co-owner. These death-put bonds were designed to be attractive to older couples who wished to have a steady stream of income provided by bond ownership but who also wanted their spouses or partners to have the ability to cash in the bonds upon their deaths. The "death put" bonds thus have what is akin to a life insurance component, in which one bond owner is able to receive the full face value

of the bond upon the death of the bond's co-owner.

<u>Caramadre's Use of Terminally-Ill Individuals as Co-Owners</u>

In or about 2006, Caramadre discovered that the death-put bond prospectuses did not require that the joint owners of a bond be related.  He also discovered that there was generally no requirement that a co-owner live for any length of time after the bond was purchased for it to be redeemed.  Therefore, Caramadre learned, two unrelated individuals could jointly purchase a "death-put" bond; when one of the individuals passed away, the other could immediately redeem the bond at full value. So long as the co-owner lived at least 3-4 days after the bond was purchased – during which time the bond was "settled" into a brokerage account – the co-owner could immediately begin the redemption process upon the co-owner's death.

Given the above, Caramadre came to understand that millions of dollars in profits could be made if he could come to own "death-put" bonds with terminally-ill individuals.  So long as the terminal individual lived for just 3-4 days after purchase, Caramadre would be able to redeem the bond at its full value. Caramadre's strategy involved buying low-rated bonds (including some previously high-rated bonds whose credit had deteriorated) at deep discounts in the secondary market.  He was, for example, able to purchase bonds of $100,000 face value for far less on

the secondary market (often in the range of $50,000-$70,000) and quickly redeem the bonds for the full $100,000 face value upon the death of the terminally-ill co-owner. In a 2009 proffer session with the Government, Caramadre admitted that the sooner the co-owner died (after the 3-4 day holding period expired), the more money he would make.

False Information Provided in Furtherance of Scheme to Defraud

Unfortunately for Caramadre, he quickly discovered that to effectuate this strategy, he would need to engage in one misrepresentation after the next. As the defendants have pled guilty to wire fraud, the United States does not intend to detail herein the various misrepresentations the defendants made in connection to the death-put bonds they purchased. The Statement of Facts agreed to and signed by the defendants, attached hereto as Exhibit 1, lists numerous of these misrepresentations, including deceiving the terminally-ill individuals into signing the account applications, providing false information on the applications concerning the co-owners' finances and investment history, and making numerous misrepresentations to the companies concerning the relationship between the owners and the funding of the accounts.

Brokerage Account Statements

The first raw piece of data necessary to determine both the

4

amount of gain and the amount of loss on the death-put bonds are the brokerage account statements from each joint account. The statements (all of which have been produced to the defense) detail the date and amount of each bond purchase and the date and amount of each bond redemption.

An example of statements illustrating typical bond purchases and redemptions are attached as Exhibits 2-4.  On May 9, 2008, Caramadre opened a joint brokerage account at T.D. Ameritrade ("Ameritrade") with a terminally-ill individual named Donald Bortle ("Bortle").  Soon after the account opened, Caramadre purchased numerous death-put bonds.  Exhibit 2 is the Ameritrade statement from this account from April-May 2008.  It provides (on page 6), for example, that on May 12, 2008, Caramadre purchased bonds of $200,000 face value issued by General Motors Corp., and that he paid $126,980 for those bonds. Bortle passed away on June 13, 2008.  On July 1, 2008, Caramadre submitted Exhibit 3, which requested that these General Motors bonds be redeemed for their full face value of $200,000.  The Ameritrade statement from October 2008, attached as Exhibit 4, shows (on page 4) that General Motors redeemed the bond for the full $200,000 on October 15, 2008, resulting in a profit of $73,020 on those bonds alone.  This series of documents is illustrative of the hundreds of death-put bonds that the

defendants purchased and redeemed.

Amount of Gain

As the above documents illustrate, it was relatively simple to determine the amount of money the defendants gained as a result of their redemption of death-put bonds.  All that was required to perform this calculation was a bond by bond comparison of the amount of money the defendants paid for each bond and the amount of the money they received when the bonds were either redeemed or sold.  The difference between the two figures represents the profits earned by the defendants. Attached as Exhibit 5 is a summary chart depicting the amount of money made by the defendants from bonds purchased in joint accounts with terminally-ill individuals.  It provides that the defendants received $11,959,824 in profits from their purchase of death-put bonds that named terminally-ill individuals as co-owners.[1]  Exhibit 6 is a summary chart showing the amount of gain from bonds purchased after July 1, 2007, when Radhakrishnan joined the conspiracy.  It shows that $11,539,851 was made in

---

[1] The United States believes that, with the assistance of the expert testimony of Dr. Andrew Kalotay, the losses suffered by the bond issuers can be determined.  If the Court, however, were to find that the loss cannot be determined, the Guidelines provide that the amount of gain should instead be used.  See U.S.S.G. § 2B1.1, Application Note 3(B), which provides: "The court shall use the gain that realized from the offense as an alternative measure of loss only if there is a loss but it cannot reasonably be determined."

6

profits from bonds purchased after July 1, 2007.

Determination of Amount of Loss

Determining the losses incurred by the bond issuers is a far more complicated endeavor. Under the terms of the bonds themselves, the bond issuers were obligated to pay the full value of the bonds at their maturity dates, which was typically many years or even decades in the future. Because the bonds were redeemed early, the bond issuers were forced to pay the full value of the bonds at a much earlier date. It became obvious to the Government that the losses sustained by the bond issuers would therefore be related to the time value of money, *i.e.*, how much it would cost the bond issuers to pay the maturity value of each bond at a much earlier point in time. It also became obvious to the Government that it would need to retain an expert in the field of death-put bonds to assist in that calculation.

Background of Andrew Kalotay, Ph.D.

Prior to trial, the United States retained Andrew Kalotay, Ph.D., as an expert witness to testify as to the amount of loss sustained by the bond issuers. Dr. Kalotay is one of the preeminent experts in the world on the subject of death-put bonds. Indeed, Caramadre himself appears to have relied on the expertise of Dr. Kalotay. An article Dr. Kalotay wrote in 2006

7

concerning death-put bonds was found in Caramadre's own hard-drive.  (See Exhibit 7, "Some Bonds Are Worth More Dead Than Alive.")

Dr. Kalotay's curriculum vitae (attached hereto as Exhibit 8) reflects that he is a leading authority on the valuation of municipal, agency and corporate bonds and is a renowned expert on the practice of debt management.  Dr. Kalotay received his Ph.D. in Mathematics from the University of Toronto in 1968 and served as a Professor of Finance at various times at the Polytechnic University, Fordham University, Columbia University and the Wharton School of the University of Pennsylvania.  Dr. Kalotay was the Director of the Financial Engineering program at the Graduate School of Polytechnic University (now part of New York University).  He has spent the bulk of his career specializing in debt management and bond valuation and was inducted into the Fixed Income Analysts Society Hall of Fame in 1996 for his contribution in these areas.  He is the author of numerous articles concerning municipal and corporate bonds.  In the last decade, much of Dr. Kalotay's work has been focused on corporate bonds with "death-put" provisions.  Indeed, in 2006, he published an article on death-put bonds entitled: "Some Bonds Are Worth More Dead Than Alive."  In 2009, Dr. Kalotay published another article concerning death-put bonds entitled: "With

8

Estate Puts, Beauty is in the Eye of the Beholder" (CFA Institute, August 2009).  Dr. Kalotay has assisted entities in issuing bonds with death-put provisions and has served as an expert witness on bond related issues on a number of occasions.  Dr. Kalotay's expertise in valuing death-put bonds is perhaps best reflected by the fact that in September 2010 he acquired a United States patent entitled: "Method And A System For Valuing And Analyzing Bonds With Estate Put Features."  (A copy of Dr. Kalotay's patent is attached as Exhibit 9.) In short, there can be no doubt that Dr. Kalotay is one of the world's leading experts on the subject of valuing death-put bonds.

Methodology Employed by Dr. Kalotay

Dr. Kalotay will testify that the calculation of the loss sustained by the bond issuers involves highly complicated mathematical analyses which are, in essence, aimed at determining the time value of money to the particular bond issuers.  By having to pay back the full value of the bonds years or decades earlier than they otherwise would have been required to do so, the bond issuers obviously sustained an economic loss.  A precise calculation of that loss, however, must consider the time value of money to each and every issuer based upon that particular issuer's borrowing costs.  Dr.

9

Kalotay has performed these calculations using his expertise and determined that the loss sustained by the bond issuers to be roughly equivalent to the profits earned by Caramadre, i.e., about $12 million.  He posits that the reason for this is likely the short holding period between the typical purchase and redemption by "death put" of the bonds in question.

As Dr. Kalotay will testify, the calculation of the loss incurred on each of the hundreds of death-put bonds purchased by Caramadre is highly complex as factors that must be considered include the maturity date, the date of redemption, the issuer's borrowing cost, the volatility of interest rates and the value of embedded call options.  Dr. Kalotay spent a significant amount of time reviewing each of the hundreds of transactions in which Caramadre purchased and redeemed death-put bonds.  Using his expertise, Dr. Kalotay considered all of the above factors and calculated the loss incurred by each issuer on each bond that Caramadre redeemed prior to the maturity date of the bonds.

Dr. Kalotay will testify as to why, in his expertise, he utilized the prevailing borrowing costs of each issuer on the relevant dates to determine losses.  Dr. Kalotay is expected to testify, based on his expertise, that determining each issuer's prevailing borrowing costs is the only reasonable way to determine the losses sustained.  He is expected to testify that

the loss to the issuers is directly attributable to the time-value of money to each issuer, *i.e.*, how much money it cost each issuer to pay the full value of the bonds years before it otherwise would have been required to do so.  He will further testify that the time value of money varies from issuer to issuer based upon how much it would cost that issuer to borrow the funds it was prematurely required to pay Caramadre.  His testimony on this point is the product of decades of experience in the bond market, including his acquisition of a patent designed to measure the value of death-put bonds.

The summary report prepared by Dr. Kalotay is attached as Exhibit 10.  It summarizes the methodology utilized by Dr. Kalotay and then offers his conclusion that the bond issuers lost a total of $12,482,108 from the defendants' early redemption of death-put bonds.  Dr. Kalotay prepared three tables that summarize his findings.  Exhibit 11 is a table that breaks down the losses by issuer, noting that General Motors suffered by far the greatest losses.  Exhibit 12 is a table that breaks down the losses by account holder.  Exhibit 13 is a table that breaks down the losses by brokerage house. Finally, Exhibit 14 is a summary of the losses incurred by the bond issuers on bonds redeemed after July 1, 2007, when Radhakrishnan joined the

conspiracy. It shows that bond issuers lost a total of $12,304,392 on bonds redeemed after this date.

At the upcoming hearing, the United States intends to introduce as exhibits the documents referenced in this Memorandum. The only witness it intends to call on the bond calculations is Dr. Kalotay.

                Respectfully submitted,

                PETER F. NERONHA
                UNITED STATES ATTORNEY

                /s/ Lee H. Vilker
                LEE H. VILKER
                Assistant U.S. Attorney

                JOHN P. MCADAMS
                Assistant U.S. Attorney
                U.S. Attorney's Office
                50 Kennedy Plaza, 8th Floor

```
                                        Providence, RI 02903
```

CERTIFICATE OF SERVICE

I hereby certify that on this 5th day of September, 2013, I caused the within Government's *Memorandum of Law* to be served via the Court's Electronic Filing System on:

For Joseph Caramadre:
Randy Olen, Esq.
William Murphy Esq.

For Raymour Radhakrishnan:
Olin Thompson, Esq.

/s/Lee H. Vilker
Lee H. Vilker
Assistant U.S. Attorney
United States Attorney's Office
50 Kennedy Plaza, 8th Floor
Providence, RI 02903
Lee.Vilker@usdoj.gov