UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| UNITED STATES OF AMERICA )<br><br>v. )<br><br>JOSEPH CARAMADRE and )<br>RAYMOUR RADHAKRISHNAN )<br> ) | Cr. No. 11-186-ALL-S |

**REPORT AND RECOMMENDATION
REGARDING RESTITUTION CALCULATION**

Patricia A. Sullivan, United States Magistrate Judge

Defendant Joseph Caramadre is convicted of devising an investment scheme that

depended on the use of the identities of terminally-ill people gained through misrepresentations,

layered over by a web of lies to prevent discovery, and of conspiring with Defendant Raymour

Radhakrishnan regarding the scheme.  Radhakrishnan is also convicted, based on having joined

the scheme when he was hired by Caramadre on July 1, 2007.  Caramadre and Radhakrishnan

pled guilty[1] to Counts Nine and Thirty-Three of an indictment returned on November 17, 2011

("Indictment"), which alleged that they used the fraudulently-procured identities and repeatedly

deceived insurance companies, brokerage houses, broker-dealers, bond issuers, municipal clerks

(to procure death certificates) and others to arrange investments in variable annuities and

corporate death-put bonds, with the object and goal of causing significant financial loss to the

insurance companies and bond issuers.  Their sentencing is scheduled for December 16, 2013.

---

[1] Caramadre and Radhakrishnan signed substantially identical plea agreements, each of which included an identical Statement of Facts, to which each Defendant certified he agreed.  ECF Nos. 105, 106.  The two plea agreements and the accompanying Statement of Facts will be collectively referred to as the "Plea Agreement."

Pursuant to 18 U.S.C. §§ 3556 and 3664(d)(6), the Court referred to me for report and recommendation the calculation of the insurance company and bond issuer victims' losses[2] in connection with the restitution order to be imposed as part of Defendants' sentences[3] in accordance with the Mandatory Victims Restitution Act of 1996 ("MVRA"), 18 U.S.C. § 3663A. In the face of the Government's contention that the scheme resulted in 195 annuity transactions causing insurance company losses of $34,299,295 and 54 brokerage accounts causing bond issuer losses of $12,482,108.36, I held a three-day evidentiary hearing, at which Defendants vigorously disputed which insurance companies and bond issuers are victims of the scheme, which losses are part of the scheme, whether the Government sustained its burden of proving loss and whether the Government's loss calculation methodology is reasonable.  Over the course of the hearing, the Government presented two witnesses and thirty-five exhibits; Defendants presented three exhibits.  In response to challenges from both the Court and Defendants, the Government enhanced its presentation with additional information reliably linking certain loss transactions to the scheme and withdrew certain items from consideration because of the lack of adequate evidence of a causal link to the scheme.

---

[2] It is important to note that the terminally-ill people and their families are also acknowledged victims of these crimes.  Many of the family members provided victim impact statements describing the negative, sometimes heart breaking, effects of Defendants' criminal acts on their lives.  In what may seem like a cruel irony, the Government is unable to seek restitution on their behalf because restitution awards are limited to "direct" losses and cannot include "consequential" damages, which is "such damage, loss, or injury as does not flow directly and immediately from the act of the party, but only from some of the consequences or results of such act."  United States v. Corey, 77 F. App'x 7, 9-10 (1st Cir. 2003).  Similarly, the Court cannot order restitution for compensatory damages related to pain, suffering, mental or emotional distress or for punitive damages.  United States v. Innarelli, 524 F.3d 286, 295 (1st Cir. 2008).  Restitution must only compensate a victim for financial losses actually suffered as a result of a defendant's crime.  Id.  Accordingly, this report and recommendation does not address the impact of Defendants' crimes on the terminally-ill people, and their families and caregivers, who were adversely affected by the scheme.

[3] The restitution amount need not be finalized at the December 16, 2013, sentencing hearing.  When the issue of the amount of the victims' losses requires complex calculations or the sheer number of victims makes the calculation difficult, "the court shall set a date for the final determination of the victim's losses, not to exceed 90 days after sentencing," 18 U.S.C. § 3664(d)(5), though the court can still order restitution even if it fails to complete the task within the ninety-day deadline.  See generally Dolan v. United States, 130 S. Ct. 2533 (2010); United States v. Cheal, 389 F.3d 35 (1st Cir. 2004).

Based on the parties' submissions, the evidence at the restitution hearing, reliable information from the Indictment (particularly the provisions as to which Defendants pled guilty), evidence admitted during the four days of trial, the Plea Agreement and the Presentence Investigation Reports (including the sworn victim loss declarations), I find that the insurance companies and bond issuers listed on Appendices A and B are victims of Defendants' crimes within the meaning of MVRA and are entitled to criminal restitution in the full amount of the actual losses caused by the scheme; that the amount of the actual losses incurred by these victims over the course of the scheme from its inception in 1995 is $46,289,194.84, as more particularly set out on Appendix A; and that the portion of that the amount representing losses incurred after Radhakrishnan joined the conspiracy on July 1, 2007, is $33,197,425.26, as more particularly set out on Appendix B.

I further find that the Government has not yet sustained its burden of linking to Defendants' criminal scheme three variable annuity transactions that used Gerald McGetrick and James O'Donnell as measuring lives.  The losses pertaining to these transactions, calculated using the methodology employed for annuity transactions that are within the investment scheme, are listed on Appendix C.  Mindful that "MVRA is intended 'to assure that victims of a crime receive full restitution,'" I direct the Government to produce additional evidence (if such is available) linking these transactions to the scheme within ten days following the issuance of this report and recommendation; Defendants shall respond within ten days thereafter.  See United States v. Adetiloye, 716 F.3d 1030, 1040 (8th Cir. 2013) (quoting Dolan, 130 S. Ct. at 2539).  To the extent I find that one or more of these transactions were part of the scheme, I will supplement this report and recommendation by adding the appropriate losses listed on Appendix C.

This report and recommendation does not address the question of allocation of responsibility for the loss of $33,197,425.26 (<u>Appendix B</u>) between Caramadre and Radhakrishnan.[4]   That issue must be determined before a final restitution order can be crafted.[5]

My legal analysis, proposed findings of fact and recommended disposition follow.

## I.      THE GOVERNMENT'S BURDEN

This case reflects the Government's conundrum at sentencing for complex financial crimes – how much of the trove of material that would have been presented over a three to four month trial is enough to establish who or what are the victims and what were their losses.  <u>See</u> <u>United States v. Rodriguez</u>, No. 11-15911, 2013 WL 5630962, at *5 (11th Cir. Oct. 16, 2013) (at sentencing on fraud scheme, government's submission of declarations from 42 victims and a summary chart listing 238 not authenticated by a witness and not tied to trial testimony insufficient to prove more than 50 victims); <u>United States v. Gushlak</u>, 728 F.3d 184, 188-91, 193 (2d Cir. 2013) (to set restitution, based on its decade-long supervision of case involving complex stock manipulation and mindful that defendant pled guilty to stealing a significant portion of their wealth from a large number of people, district court properly pressed government to present

---

[4] When more than one defendant has contributed to a victim's loss, "the court may make each defendant liable for payment of the full amount of restitution."  <u>United States v. Salas-Fernandez</u>, 620 F.3d 45, 49 (1st Cir. 2010) (quoting 18 U.S.C. § 3664(h)); <u>see</u> <u>United States v. Collins</u>, 209 F.3d 1, 4 (1st Cir. 1999) (defendant may be liable in restitution to victims of foreseeable acts of his co-conspirator).  However, the sentencing court may instead apportion restitution based on the relative culpability of co-conspirators, but is not required to use any particular formula or, indeed, to apportion the loss at all.  <u>Salas-Fernandez</u>, 620 F.3d at 49.  The issue of apportionment of losses incurred after July 1, 2007, (when Radhakrishnan joined the scheme) between Caramadre and Radhakrishnan has not been referred to me and will not be discussed further in this report and recommendation.

[5] While not directly pertinent to restitution, I note the difference between the loss calculation to be used for restitution and that applicable under the Sentencing Guidelines: "[w]hile the amount of loss calculation [for sentencing] looks to the greater of actual or intended loss, the amount of restitution under the MVRA cannot exceed the actual, provable loss realized by the victims."  United States Sentencing Guidelines ("U.S.S.G.") § 2B1.1, Application Note 3(A)(i); <u>United States v. Wirth</u>, 719 F.3d 911, 915 (8th Cir. 2013).  If neither actual loss nor intended loss can be gauged, a district court may use "the gain that resulted from the offense as an alternative measure of loss."  <u>United States v. Appolon</u>, 695 F.3d 44, 67 (1st Cir. 2012) (quoting U.S.S.G. § 2B1.1, Application Note 3(B)).

new restitution evidence until its burden was sustained); Adetiloye, 716 F.3d at 1038-41

(restitution for fraudulent credit card scheme involving 500 fraudulent accounts and 65 victims

that compensated only three victims because of government's failure to adequately document

losses remanded for additional proof of losses of victims and gains of defendant).  Accordingly, I

begin with a review of the Government's burden at this final phase of this case.

    The Government bears a somewhat relaxed burden – by contrast with its burden at trial –

to establish the amount of a victim's actual loss for the calculation of criminal restitution.  United

States v. Newell, 658 F.3d 1, 34 (1st Cir. 2011) (citing 18 U.S.C. § 3664(e)).  Consistent with the

policy goal of MVRA to compensate victims, "[o]nly a modicum of reliable evidence is required

to establish a restitution award."  United States v. Curran, 525 F.3d 74, 84 (1st Cir. 2008)

(quoting United States v. Mahone, 453 F.3d 68, 74 (1st Cir. 2006)); see also United States v.

Salas-Fernandez, 620 F.3d 45, 48 (1st Cir. 2010); United States v. Matos, 611 F.3d 31, 45 (1st

Cir. 2010).  If the Government produces some probative evidence of actual loss, a defendant is

required to counter it with probative evidence of his own.  See United States v. Burdi, 414 F.3d

216, 222 (1st Cir. 2005).  "Any dispute as to the proper amount or type of restitution shall be

resolved by the court by the preponderance of the evidence."  18 U.S.C. § 3664(e); cf. United

States v. Vazquez, 724 F.3d 15, 29 (1st Cir. 2013) (government's burden at sentencing is

preponderance).  When proof of restitution losses involves a complex calculation requiring

expert testimony, the government can meet its burden by articulating a sound basis for

approximation of the loss and the court may consider the lack of probative contrary evidence

presented by the defendant.  Gushlak, 728 F.3d at 202 & n.15 (not an impermissible shift of the

burden of proof to reason that the onus is on defendant to identify events other than fraud that

contributed strongly to losses).

At the restitution phase, the usual rules of evidence do not pertain, provided that the information has sufficient indicia of reliability to support its probable accuracy.  United States v. Gallardo-Ortiz, 666 F.3d 808, 811 (1st Cir. 2012); see United States v. Rodriguez, No. 12-1476, 2013 WL 5345366, at *8 (1st Cir. Sept. 25, 2013) (at sentencing court may consider hearsay that has never been subjected to cross-examination).  In setting the restitution amount, a sentencing court is not held to a standard of absolute precision, but wields considerable discretion to expeditiously make a "reasonable determination of appropriate restitution," though it cannot rely on "gossamer strands of speculation and surmise."  Salas-Fernandez, 620 F.3d at 48; United States v. Innarelli, 524 F.3d 286, 294 (1st Cir. 2008); United States v. Corey, 77 F. App'x 7, 10 (1st Cir. 2003); United States v. Vaknin, 112 F.3d 579, 587 (1st Cir. 1997).  The focus must be on "achieving fairness to the victim."  Corey, 77 F. App'x at 10.  Congress did not intend the restitution calculation to turn "into a time-consuming sideshow [of] prolonged litigation over restitution-related issues," but rather evinced clearly a "preference for rough remedial justice, emphasizing victims' rights."  Vaknin, 112 F.3d at 587.  The government need not present a mini-trial to establish the victims' rights to restitution.  Gushlak, 728 F.3d at 194 (affidavits on timing and manner of scheme may be relied on without requiring live testimony and opportunity for cross examination).

The societal goal of compensating victims is so strong that one court held restitution open for months to compel the government to produce adequate evidence to prove loss when the trial evidence was clear that many victims were injured.  Id. at 188 (eighteen months and four restitution submissions required before government met its burden); see Adetiloye, 716 F.3d at 1040 (district court should have postponed restitution for additional evidence rather than ordering compensation only for losses as to which government's proof was adequate).  Courts

6

cannot permit victims to go unremunerated due to the government's failure to compile sufficient documentation from the material that was or would have been presented at trial.  See id. at 1040-41.

## II.    LAW OF RESTITUTION

Criminal restitution compensates for losses suffered by victims as a result of a crime. United States v. Thomas, 635 F.3d 13, 21 (1st Cir. 2011); see also United States v. Robers, 698 F.3d 937, 943 (7th Cir. 2012), cert. granted, 12-9012, 2013 WL 775438 (U.S. Oct. 21, 2013).  Its purpose is to restore victims to their position prior to the crime by restoring the monetary equivalent of losses suffered from a defendant's criminal activity.  Newell, 658 F.3d at 35; Salas-Fernandez, 620 F.3d at 48.  Compulsory restitution is a societal response to criminal wrongdoing that originated over 4,000 years ago in the Code of Hammurabi and the Old Testament to prevent the societal costs associated with blood feuds and personal vengeance – it was revivified by Congress beginning in 1982 for the purpose of devising sanctions for adjudicated offenders to insure that the wrongdoer makes good the harm done to victims.  Vaknin, 112 F.3d at 582-83 (reviewing historical perspective and legislation history of MVRA precursor).

While federal courts lack inherent authority to order criminal restitution, United States v. Hensley, 91 F.3d 274, 276 (1st Cir. 1996), in 1990, Congress passed the Victim and Witness Protection Act ("VWPA"), 18 U.S.C. § 3663, et seq.  VWPA was strengthened in 1996, when Congress enacted the MVRA, which requires mandatory restitution when a defendant is convicted of "any . . . offense against property under [title 18] . . . including any offense committed by fraud or deceit . . . in which an identifiable victim or victims has suffered a . . . pecuniary loss."  18 U.S.C. § 3663A(c)(1); United States v. Witham, 648 F.3d 40, 45 (1st Cir. 2011); United States v. Richard, 234 F.3d 763, 771 (1st Cir. 2000).  Wire fraud, 18 U.S.C. §

1343, to which both Defendants pled guilty in Count Nine of the Indictment, is an offense

against property under title 18 that requires mandatory restitution.  See 18 U.S.C. § 3663A(c)(1);

United States v. Stoupis, 530 F.3d 82, 84 n.4 (1st Cir. 2008); United States v. Cheal, 389 F.3d

35, 37, 46 (1st Cir. 2004); see also United States v. Huff, 609 F.3d 1240, 1247 (11th Cir. 2010).

Likewise, conspiracy in violation of 18 U.S.C. § 371, to which Defendants pled guilty in Count

Thirty-Three of the Indictment, requires mandatory restitution when the underlying object of the

conspiracy is an offense against property.  United States v. Butler, 694 F.3d 1177, 1183 (10th

Cir. 2012).  Here, the underlying object of the conspiracy was mail fraud, wire fraud and identity

theft, which are all offenses against property.  Stoupis, 530 F.3d at 84 n.4 (wire fraud); United

States v. Holestine, Criminal Action No. 2:11-cr-00096, 2012 WL 2368408, at *5 (S.D. W. Va.

June 21, 2012) (identity theft); United States v. Miell, 744 F. Supp. 2d 961, 965 (N.D. Iowa

2010) (mail fraud).  Accordingly, in this case, the Court is required to order restitution to

identifiable victims who suffered pecuniary losses.  See Stoupis, 530 F.3d at 84 n.4; Cheal, 389

F.3d at 37, 46.

MVRA gauges restitution by the "actual loss" suffered by the victim[6] as a result of the

crime – here the investment scheme – as measured by the amount equal to: (1) the greater of (a)

the value of the property on the date of loss; or (b) the value of the property on the date of

sentencing, minus (2) the value of any part of the property that is returned.  18 U.S.C. §

3663A(b)(1)(B); see Innarelli, 524 F.3d at 294.  When a defendant's criminal conduct includes

"an offense that involves as an element a scheme, conspiracy, or pattern of criminal activity,"

MVRA defines victims as those "directly and proximately harmed as a result of the commission

of [the] offense," including "any person directly harmed by the defendant's criminal conduct in

---

[6] Each victim must be awarded full restitution without regard to the economic circumstances of the defendant.  18 U.S.C. § 3664(f)(1)(A); Cheal, 389 F.3d at 53; Richard, 234 F.3d at 771.

the course of the scheme, conspiracy, or pattern." 18 U.S.C. § 3663A(a)(2); <u>Matos</u>, 611 F.3d at

43. MVRA is interpreted expansively as requiring restitution without regard to whether the

conduct that harmed the victim is the precise conduct underlying the offense of conviction as

long as the loss fits within the scope of the scheme. 18 U.S.C. § 3663A(a)(2); <u>Matos</u>, 611 F.3d

at 43; <u>see</u> <u>United States v. Acosta</u>, 303 F.3d 78, 87-90 (1st Cir. 2002). Thus, "the outer limits of

a . . . restitution order encompass all direct harm from the criminal conduct of the defendant

which was within any scheme [or] conspiracy . . . ." <u>Matos</u>, 611 F.3d at 43 (quoting <u>Hensley</u>, 91

F.3d at 277).

       To determine what is within the scheme, the First Circuit directs district courts to

consider the totality of the circumstances, including the nature of the scheme, the identity of its

participants and victims, as well as its timing, goals and <em>modus operandi</em>, and to employ a case-

by-case fact-specific probe, using a "modified but for standard of causation," to connect a

specific loss to the scheme. <u>Newell</u>, 658 F.3d at 31; <u>United States v. Cutter</u>, 313 F.3d 1, 7 (1st

Cir. 2002). In reliance on reliable sources, the court should include in the restitution calculus all

losses caused by conduct that falls within the scope of the scheme. <u>Rodriguez</u>, 2013 WL

5345366, at *8; <u>Hensley</u>, 91 F.3d at 276-77.

       When the defendant has pled guilty, the plea agreement is the starting point for defining

the scope of the scheme and determining what losses are linked to it. <u>See</u> <u>United States v.</u>

<u>Sahlin</u>, 399 F.3d 27, 33 (1st Cir. 2005). However, as long as the plea agreement does not contain

language expressly restricting the scope of the scheme, defining the amount of restitution or

explicitly rejecting portions of the indictment, the court should not limit restitution to the four

corners of the plea agreement; rather, it should look to other reliable information beyond the plea

agreement to determine the victims of the scheme and the restitution amount. <u>See</u> <u>United States</u>

v. Emor, 850 F. Supp. 2d 176, 203 (D.D.C. 2012); see also United States v. Elson, 577 F.3d 713, 723 (6th Cir. 2009); United States v. Adams, 363 F.3d 363, 366 (5th Cir. 2004).  For example, the indictment, trial evidence, undisputed statements in the presentence report and evidence presented during the sentencing hearing are all potentially reliable sources appropriate for consideration by the court when setting restitution.  See Rodriguez, 2013 WL 5630962, at *5-6. Caramadre's and Radhakrishnan's Plea Agreement contains no language restricting this Court's consideration of any reliable information pertinent to restitution for the losses caused by their crimes.  Accordingly, other reliable sources should be considered in connection with this restitution determination.

Because Caramadre and Radhakrishnan pled guilty to two of its Counts, the Indictment, and particularly its paragraphs that are incorporated into the guilty plea, is a significant reliable source for defining the scope of the scheme and the identification of victims harmed by it for purposes of restitution.  Emor, 850 F. Supp. 2d at 203; see Acosta, 303 F.3d at 87-90; Hensley, 91 F.3d at 276-77.  Factual allegations and victims named in the indictment are deemed admitted for restitution purposes when a defendant pleads guilty to a charge in the indictment that incorporates those facts and victims.  See Matos, 611 F.3d at 43-44.  Restitution cannot be awarded to compensate for losses incurred outside of the temporal scope of the scheme as laid out in the indictment.  United States v. Inman, 411 F.3d 591, 595 (5th Cir. 2005).  However, while the sentencing court should order restitution for all losses specifically identified in the guilty counts of the indictment, it is not limited to those losses and may consider any that are reliably linked to the scheme.  See United States v. Hu, Case No. CR-09-00487-RMW, 2013 WL 4554289, at *2 (N.D. Cal. Aug. 26, 2013).

In addition to the plea agreement and the portions of the indictment admitted by the plea, the district court can rely on the trial exhibits and testimony to make its restitution findings. Rodriguez, 2013 WL 5630962, at *6.  If reliable, the trial evidence may be considered even where the trial was aborted because the defendant has pleaded guilty.  See United States v. Roberts, 464 F. App'x 796, 802 (11th Cir. 2012); United States v. Pellerito, 918 F.2d 999, 1002 (1st Cir. 1990).  Accordingly, the exhibits and testimony from the four trial days that preceded the signing of the Plea Agreement by Caramadre and Radhakrishnan, to the extent deemed reliable, provide a source of information to consider in determining the scope of the scheme and the losses it caused.

Another reliable source on which the sentencing court can rely in setting the restitution amount is the presentence report.  Rodriguez, 2013 WL 5345366, at *8.  The undisputed facts in a presentence report may be deemed admitted when they are reliable.  See Fed. R. Crim. P. 32(i)(3) ("At sentencing, the court . . . may accept any undisputed portion of the presentence report as a finding of fact . . . ."); Matos, 611 F.3d at 42.  If the defendant objects to any assertions in a presentence report and produces countervailing evidence or a proffer, the sentencing court should resolve the dispute by making factual findings by a preponderance of the evidence.  Fed. R. Crim. P. 32(i)(3)(B); United States v. Olivero, 552 F.3d 34, 40 (1st Cir. 2009); U.S.S.G. § 6A1.3.  When objections are merely rhetorical and unsupported by proof, the district court is entitled to rely on the facts in the presentence report.  Olivero, 552 F.3d at 40.  The First Circuit has upheld reliance on a presentence report's listing of victims and loss amounts for calculating restitution "[i]n the absence of rebuttal evidence beyond defendant's self-serving words."  Id. (quoting United States v. Prochner, 417 F.3d 54, 66 (1st Cir. 2005)).

Finally, as long as they clear the reliability bar, the court can consider written statements of counsel, affidavits and letters from victims and other documentary evidence, sworn and unsworn, in making the restitution determination.  See United States v. Hall, 467 F. App'x 47, 49 (2d Cir. 2012) (submission of affidavits not required to prove restitution); United States v. Dang, 492 F. App'x 730, 731 (9th Cir. 2012) ("bank records possessed sufficient indicia of reliability to support a restitution order"); United States v. Rodriguez, 336 F.3d 67, 71 (1st Cir. 2003) ("[T]he AUSA's proffer had all the earmarks of reliability and the record before us contains nothing that remotely suggests the contrary.").  For example, summary charts can meet the Government's burden when they are sponsored by a witness to explain how they were prepared.  See Rodriguez, 2013 WL 5630962, at *5 (summary charts presented by witness to explain how and by whom they were prepared can be enough for the government to satisfy its burden to prove restitution); Adetiloye, 716 F.3d at 1039-40 (summary tables should explain how losses calculated, with testimony or evidence available to support underlying facts); Curran, 525 F.3d at 84 (summary charts sufficient when accompanied by extensive evidence outlining the overall fraud).

## III.    THE SCHEME[7]

To determine which of the 249 annuity transactions and brokerage accounts proposed for restitution by the Government should be incorporated into a restitution order, this Court's touchstone is the scope of the scheme and the totality of the circumstances surrounding it, including its nature, the identity of its participants and victims, as well as its timing, goals and

---

[7] The description of the scheme in this report and recommendation is tailored to identification of the reliable information in the record regarding the indicia of the scheme and the specific names, dates and other data necessary to link specific losses to the scheme for purposes of restitution.  For a more comprehensive description see generally W. Reserve Life Assur. Co. of Ohio v. Caramadre, 847 F. Supp. 2d 329, 333-35 (D.R.I. 2012); Nationwide Life Ins. Co. v. Steiner, 722 F. Supp. 2d 179, 180 (D.R.I. 2010); W. Reserve Life Assur. Co. of Ohio v. Conreal LLC, 715 F. Supp. 2d 270, 272-75 (D.R.I. 2010); see also United States v. Caramadre, Criminal No. 11-186S, 2013 WL 3943501, at *1, 15-17 (D.R.I. Aug. 1, 2013); United States v. Caramadre, 892 F. Supp. 2d 397, 401 (D.R.I. 2012); United States v. Caramadre, 882 F. Supp. 2d 295, 299 (D.R.I. 2012).

*modus operandi*; all must be considered in order to connect a specific loss to the scheme.

Newell, 658 F.3d at 31; Cutter, 313 F.3d at 7.  This requires an in-depth review of the reliable

factual information that Defendants admitted in their Plea Agreement when they pled guilty to

Counts Nine and Thirty-Three in the Indictment, in addition to the trial evidence, the Presentence

Investigation Reports and the victim impact statements attached to them, and the evidence at the

restitution hearing.  Each will be discussed in turn.

      A.  The Plea Agreement

      The Plea Agreement's Statement of Facts lays out the basics of the scheme: Caramadre

concocted an insurance annuity investment scheme beginning in 1995 and a death-put bond

scheme in 2006; he was joined by Radhakrishnan in July 2007 and they continued until August

2010.  The purpose of the scheme was to defraud financial institutions by purchasing variable

annuities and death-put bonds with a guaranteed profit by surreptitiously including terminally-ill

individuals with no relationship to the real investor as a "measuring life" for the transaction.  The

object was to fraudulently obtain significant sums of money from insurance companies and bond

issuers by making material misrepresentations and omissions.  To execute the scheme, the Plea

Agreement describes how they fraudulently obtained the identity information and procured

signatures from terminally-ill individuals by misrepresenting the true purpose of investment

documents and concealing from the terminally-ill individuals and their family members that their

identities would be used on annuities and bonds to be purchased by Caramadre and his co-

conspirators, clients and their families, as well as by taking steps to prevent the terminally-ill

individuals from understanding the documents they were signing.  The Plea Agreement includes

the names[8] of "some of the terminally-ill people" whose identity information was used for

---

[8] They include: Antonio DeCastro, John Lang, Michael Mallane, Vincent Moretti, Pia Bernardo, John Gonsalves,
Dennis Flori, Edwin Rodriguez, James Kimball, Robert Cazeault, Hattie Strobel, Charles Perry, Maria Nina, John

transactions resulting in losses.  Defendants do not dispute that restitution is appropriate for transactions and brokerage accounts on which these individual were used as "measuring lives."[9]

Another essential indicia of the scheme, according to the Plea Agreement, was repeated deception of insurance companies, bond issuers, broker-dealers and brokerage houses to prevent them from uncovering the true nature of the transactions.  Caramadre, sometimes assisted by or acting through Radhakrishnan or the unindicted co-conspirators, lied to and manipulated his victims: telling insurance companies, broker-dealers and representatives from brokerage houses that some of the annuity owners were friends, clients or acquaintances of the terminally-ill individuals; opening annuities with small deposits that would not attract scrutiny; delaying the filing of death claims to avoid attention; opening brokerage accounts in Radhakrishan's name although the funds actually belonged to Caramadre; lying about Radhakrishan's assets and income to qualify him as an account owner; misrepresenting the purpose of the co-owner bond accounts; and falsely stating that some of the funds for the accounts came from the terminally ill. The Plea Agreement contains a list of insurance companies[10] and bond issuers[11] harmed by the

---

Kivalos, Augusto Escobar de Rodas, Sonia Gonzalez, Donna Perotta, Richard Wiley, Arthur Culotta, William Hazelwood, Linda Barbeau, Bertha Howard and Bruce Marshall.

[9] Defendants do dispute whether the Government has proven losses associated with these transactions; this is discussed *infra*.

[10] The insurance companies listed in the Plea Agreement are: Metropolitan Life Insurance Company, Genworth Life Insurance Company, Midland National Life Insurance Company, Hartford Life Insurance Company, ING Life Insurance & Annuity Company, Western Reserve Life Insurance Company, Transamerica Life Insurance Company, Jefferson National Life Insurance Company, Minnesota Life Insurance Company, Nationwide Life Insurance Company, Pacific Life Insurance Company, Golden American Life Insurance Company, Allmerica Financial Life Insurance and Annuity Company, AXA Equitable Life Insurance Company, American Skandia Life Assurance Company, Lincoln Benefit Life Company, Security Benefit Life Insurance Company, Travelers Life and Annuity Company, The Life Insurance Company of Virginia and American National Insurance Company.

[11] The bond issuers listed in the Plea Agreement are: American General Financial, Inc., Bank of America, Bank Hapoalim BM, Bear Stearns Co., Carolina First Bank, Caterpillar Financial Services, Corp., CIT Group, Inc., Compass Bank, Countrywide Financial Corp., Countrywide Home Loan, Inc., Fannie Mae, Federal Home Loan Mortgage Corp., Federal National Mortgage Association, Federated Capital Corp., First Bank Pr., Ford Motor Credit Corp., Freddie Mac, General Electric Corp., Genworth, GMAC, John Hancock Life Insurance Co., Hartford Life, Hartford Life Global, HSBC Financial, International Lease Finance Corp., Lassalle Bk

scheme, coupled with the admission that the insurance company victims collectively lost "millions of dollars" and that the intent of the scheme was to defraud both the insurance company and the bond issuer victims of "significant sums."  However, the Plea Agreement does not contain a loss calculation, either in the aggregate or individually for each named insurance company and bond issuer.  Rather, it states that "[t]here is no agreement as to the amount of restitution in this case.  The amount of restitution will be determined by the Court at an evidentiary hearing or by future agreement of the parties."  Plea Agreement ¶ 4(a).[12]

Defendants' Plea Agreement was originally accepted by the Court at the change of plea hearing on November 19, 2012, pursuant to Fed. R. Crim. P. 11(c).  Several months later, Caramadre moved to withdraw his plea.  Four days of hearings followed.  Pertinent to the restitution determination, Caramadre testified under cross examination regarding the use of two terminally-ill people (Lily Ianiero and Denise Egan) as measuring lives, thereby linking them to the scheme for the transactions on which they are named.  See United States v. Caramadre, CR 11-186 S, 2013 WL 3943501, at *16 (D.R.I. Aug. 1, 2013).  He also testified to another indicia of the scheme: Caramadre's use of Radhakrishnan as a straw buyer once Caramadre was banned from purchasing annuities from insurance companies which had become uncomfortable dealing with him.  ECF No. 165 at 165-168.  Caramadre's motion to withdraw his guilty plea was rejected by the Court.  See Caramadre, 2013 WL 3943501, at *19.

B.  The Indictment

_____

Na Chicago Ill., Lassalle Fndg LLC, Lehman Bros Holdings, Inc., Marshall & Isley Corp., MBIA Inc., Mercantile Bk Orlando Fl, Merrill Lynch Co., Protective Life, Provident Bank of Cincinnati, OH, Providian Natl Bank, Prudential Financial, SLM Corp., Standard FedBank Troy Mich., Tennessee Valley Authority and Western Bank Pr.

[12] Although not stated in the text of the Plea Agreement, the parties stipulated in open court at the change of plea hearing that the Government agreed to dismiss any right to forfeiture against Defendants at the time of sentencing. ECF No. 119 at 28.

When Defendants pled guilty to Count Nine and Count Thirty-Three, they admitted the facts incorporated in those Counts that describe the scheme in detail and specifically outline repeated misrepresentations to named terminally-ill people and their families, friends and caregivers, as well as to named insurance companies, broker-dealers and brokerage houses. These facts track the scheme as laid out in the Plea Agreement, but in far more detail, including important details that link specific transactions and brokerage accounts to the scheme with sufficient specificity as to justify an order of restitution. The description that follows – laying out the scheme and the specific accounts and transactions resulting in losses caused by the scheme – is limited to those facts in the Indictment that are deemed admitted as a result of the Plea Agreement. Collectively, these facts limn the contours of the scheme and provide sufficient detail to link a significant number of additional transactions to the scheme.

The Indictment describes how the scheme allowed Caramadre and his co-conspirators to profit on the death of the "measuring life" to the detriment of the insurance company and bond issuer victims. For the annuities, the death benefit feature of the annuity contracts ensured that the account owner – Caramadre, his co-conspirators, friends, clients and their families – would profit despite intentionally-risky investments. Indictment ¶ 15. Similarly, the death-put bonds were purchased on the secondary market for a price well below the full face value of the bond, with a right of redemption at full face value ensuring that the surviving co-owner of the brokerage account would make a quick profit as soon as the terminally-ill co-owner died. Indictment ¶ 19. Against this backdrop, the Indictment alleges that Defendants recruited or used terminally-ill individuals as annuitants and bond co-owners through fraudulent means to obtain millions of dollars from insurance companies and bond issuers for the benefit of Defendants and Caramadre's friends, family, clients and investors. Indictment ¶¶ 24, 28, 49. Overall, the

Indictment alleges that Defendants used the terminally ill as "measuring lives" to purchase over 200 annuities with over $125 million in premiums and opened approximately 77 brokerage accounts to purchase thousands of death-put bonds.  Indictment ¶ 26.

The success of the scheme depended on using the identities of large numbers of terminally-ill and elderly people who were expected to die quickly; the Indictment goes into great detail describing specific instances of misrepresentations made to the terminally-ill individuals named in the Indictment and their families and friends for the purpose of recruiting them as unwitting annuitants and bond co-owners.  Indictment ¶ 28.[13]  Defendants also lied to the caregivers of the terminally ill to induce them to refer their patients based on the belief that Defendants' intentions were philanthropic.  Indictment ¶ 48.[14]  From the mid-1990s through 2001, the Indictment describes Caramadre's deceptive use of dying AIDS patients, whom he located in Rhode Island compassion centers, to purchase variable annuities without their consent. Indictment ¶¶ 31, 70-76.  He also used the identity of clients of his firm, Estate Planning Resources, who had previously purchased life insurance policies or conducted other business with him, to purchase variable annuities without their consent.  Indictment ¶¶ 32, 77-88.  The paragraphs of the Indictment admitted by the guilty plea name these individuals who became the "measuring lives," thereby linking the transactions and brokerage accounts on which they were used to the scheme for purposes of restitution.

---

[13] Prior to July 1, 2007, when Radhakrishnan joined the scheme, the Indictment indicates that Caramadre made such misrepresentations to the following terminally-ill people: Getahun Aynalem, Deborah Blowers, Alfred LaMonte, Robert Mizzoni, Donald Duarte and Norman Robichaud.  After Radhakrishnan joined the scheme, Defendants made misrepresentations (for example recruiting through the Catholic newspaper advertisement, inducing signatures by fraud and forging signatures) to the following terminally-ill people: Bertha Howard, Dennis Flori, Sonia Gonzalez, John Kivalos, Pia Bernardo, Patrick Garvey, James Kimball, Charles Perry, Antonio DeCastro, Edwin Rodriguez, John Lang, Donna Perotta, Michael Mullane, Vincent Moretti, Augusta Escobar de Rodas, Arthur Culotta, Robert Cazeault, Hattie Strobel, Maria Nina, Sandra Bulpitt, Nathan Lee, Richard Wiley, Bruce Marshall and Linda Barbeau.

[14] Defendants admitted to deceiving caregivers from Home and Hospice Care of Rhode Island and the Visiting Nurses Association.  Indictment ¶ 48.

In October 2007, shortly after Radhakrishnan had joined the scheme, Defendants placed an advertisement in a Catholic newspaper to recruit terminally-ill people to use in furtherance of the scheme.  Indictment ¶¶ 33, 89-90.  The advertisement, which ran weekly until December 2008, promised $2,000 to terminally-ill individuals and did not indicate that the true purpose was to enlist them for use as annuitants and bond co-owners.  Indictment ¶¶ 33-34.  When the terminally ill or their families or caregivers responded to the advertisement, Defendants lied about their intentions and tried to gauge which individuals would die quickly.  In exchange for the $2,000 payment, Defendants asked the terminally ill to sign a "philanthropy" receipt; in some instances Defendants used the receipts to forge signatures to apply for annuities or open joint brokerage accounts.  Indictment ¶ 90.  Every transaction or brokerage account whose "measuring life" was a terminally-ill person lured into the scheme by this advertisement is linked to the scheme for purposes of restitution.

The Indictment names twenty insurance companies victimized by the scheme and describes how they and their broker-dealers were deceived.[15]  Indictment ¶¶ 11, 52.  For example, Defendants falsely claimed that the terminally-ill individuals named in the annuity applications had knowingly submitted the applications or that annuity account owners were friends, clients or acquaintances of the annuitants.  Indictment ¶¶ 52-53.  When certain insurance companies and broker-dealers asked questions that might uncover the scheme, Caramadre enlisted a different broker to handle them, and directed the suspected broker to target other insurance companies and broker-dealers, all to avoid suspicion.  Indictment ¶¶ 54-59.  The

---

[15] The insurance companies named in the Indictment for which the Government seeks restitution are co-extensive with those listed in the Plea Agreement.  The Indictment describes misrepresentations made by Caramadre to Golden American with Sara Peneto as the annuitant; to Midland National with Robert Carnevale, Donald Duarte, Lily Ianiero and Denise Egan as annuitants; to Midland National with Robert Carnevale as the annuitant; to Lifemark with Donald Duarte as the annuitant, all prior to Radhakrishnan's involvement.  After Radhakrishnan joined the scheme, both Defendants admitted to making misrepresentations to Lifemark with Patrick Garvey and Lucille Horton as annuitants.

Indictment provides similar details of the lies told to broker-dealers and brokerage houses in connection with the death-put bonds.[16]  For example, Defendants falsely told brokerage houses that the terminally-ill individuals had knowingly agreed to invest in death-put bonds and provided false contact information and false financial and investment histories for them; in some instances, they falsely stated that the terminally-ill individuals were Caramadre's estate planning clients and that some of the death-put redemption proceeds would flow to their estates. Indictment ¶¶ 60-63.  The Indictment lists thirty-eight bond issuers that fell victim to the scheme.[17]  The Indictment also describes the lies to municipal officials to procure the death certificates needed to claim the profit on the investments.  Indictment ¶ 64.[18]

Every terminally-ill person, insurance company and bond issuer named in the paragraphs of the Indictment incorporated into the Counts to which Defendants pled guilty are linked to the scheme with sufficient specificity to justify an order of restitution for the specific transactions in which each was involved.

C.  The Trial

The trial was originally expected to last four months.  ECF No. 115 at 12; ECF No. 118 at 186-87.  Over the four days that trial proceeded before ending with the Plea Agreement, the Government called as witnesses the terminally-ill people (most through depositions taken before

---

[16] The Indictment lays out misrepresentations to Ameritrade with Patrick Garvey, James Kimball, Antonio DeCastro, Edwin Rodriguez, Dennis Flori, Pia Bernardo and Robert Cazeault as co-owners; to E*Trade with Betty Esser and Maria Nina as co-owners; to Charles Schwab with Michael Sgambato, William Hazelwood, Bruce Marshall and Linda Barbeau as co-owners; to TradeKing with Richard Wiley as co-owner.

[17] The bond issuers named in the Indictment for which the Government seeks restitution are co-extensive with those listed in the Plea Agreement.

[18] The Indictment describes the fraudulent procurement of the death certificates of Vincent Moretti, Donna Perotta and Michael Mallane.

death), their family members, friends and caregivers.[19]  Several witnesses testified that they had

come into contact with the scheme through Defendants' advertisement in the Catholic newspaper

and that they understood that the money they received from Defendants was a philanthropic

donation or gift.  ECF No. 116 at 19, 65, 105, 122; ECF No. 117 at 24, 64, 79; ECF No. 118 at

84-98, 126.  The trial testimony established that as early as February 1995, as part of the scheme,

Caramadre met or spoke with the terminally-ill individuals himself, then used their identities to

purchase annuities without their knowledge or consent.  See, e.g., ECF No. 117 at 119-42.  By

the fourth day of trial, the Government had presented testimony from fourteen terminally-ill

witnesses and their relatives, friends and caregivers.  Exhibit 14, a summary of TD Ameritrade

bond holdings associated with Defendants, listed the names of terminally-ill co-owners.[20]  ECF

No. 116 at 42-44.  Exhibit 105, a spreadsheet from Caramadre's files, listed terminally-ill people

and the profits that account owners and clients stood to make on their death.[21]  ECF No. 118 at

141-42.

These trial witnesses and the transactions in which they, their loved ones or patients were

used as "measuring lives" are all reliably linked to the scheme.  Similarly, the details regarding

the deception used by Caramadre in the early days of the scheme beginning in 1995 are

sufficiently reliable to link the early transactions to the scheme.  Finally, the description of the

---

[19] Prior to trial, seven of the terminally ill who were used as measuring lives were deposed pursuant to Fed. R. Crim. P. 15: Richard Wiley, Edwin Rodriguez, Robert Mizzoni, Patrick Garvey, Leon Bradshaw, Anthony Pitocco and Charles Buckman.  Caramadre, 882 F. Supp. 2d at 298.

[20] Exhibit 14 listed the following terminally-ill people as "measuring lives" for death-put bonds: Michael Mallane, Denise Egan, Edwin Rodriquez, James Kimball, Lucille Horton, Donald Bortle, Antonio DeCastro, Patrick Garvey, Phyllis Santagata, Eugene Turgeon, Sheryl Stroup, Sonia Gonzalez, Nicholas Taborelli, Charles Perry, Donna Perotta, Debbie Senecal, Theresa Bastia, John Lang, Leona Cundy, Dennis Flori, Vincent Moretti, Augusta Escobar de Rodas and Michael Murphy.

[21] Exhibit 105 listed the following terminally-ill people as "measuring lives" for Defendants' scheme: Bento, Bernardo, Bortle, Cazeault, Cundy, DeCastro, Dinsmore, Garvey, Gonsalves, Gonzalez, Jusczyk, Kivalos, Murphy, Perrotta, Rodriguez, Santos, Senecal, Strobel, Taylor and Turgeon.

deception caused by the advertisement in the Catholic newspaper link transactions involving these indicia to the scheme with sufficient specificity to justify an order of restitution.

D. The Presentence Report

The United States Probation Office prepared identical Presentence Investigation Reports for Caramadre and Radhakrishnan (collectively, the "PSR"), which includes a lengthy description of the offense conduct, studded with factual details of the scheme including specific descriptions of named terminally-ill individuals who were used on transactions as measuring lives, as well as identification of the insurance companies and bond issuers injured by the scheme. Overall, the PSR identifies sixty-four terminally-ill individuals whose identities were used to fraudulently obtain money from insurance companies and bond issuers. [22] It includes sworn victim loss declarations from eight insurance companies[23] describing their losses in varying degrees of specificity, some with spreadsheets that identify the account owner and annuitant associated with the losses.[24] Four bond issuers also submitted victim declarations claiming losses, but their submissions do not identify co-owners associated with the bonds.[25]

---

[22] The terminally-ill victims identified in the PSR are: Angela Ancona, Getahun Aynalem, Linda Barbeau, Sheila Battey, Kathleen Bentley, Arnet Bento, Pia Bernardo, Deborah Blowers, Donald Bortle, Jamie Bradley, Leon Bradshaw, William Brunt, Maureen Buckman, Sandra Bulpitt, Robert Carnevale, Joseph Castillona, Robert Cazeault, Arthur Culotta, Leona Cundy, Antonio DeCastro, Rocco DiGiovanni, Sr., Donald Duarte, Augusta Escobar, Betty Esser, Helen Fernandes, Dennis Flori, Patrick Harvey, Joan George, John Gonsalves, Sonia Gonzalez, John Hazelwood, Lucille Horton, Bertha Howard, Doris Hoyle, Lilly Ianiero, James Kimball, John Kivatos, Alfred Lamonte, John Lang, Nathan David Lee, Michael Mallane, Bruce Marshall, Robert Mizzoni, Vincent Moretti, Maria Nina, Charles Perry, Anthony Pitocco, Sally Rainville, Norman Robichaud, Estella Rodriguez, Edwin Rodriguez, Henry Rose, Sr., Becky Ryals, Verna Sammartino, Alfred Sanford, Denise Santos, Debbie Senecal, Michael Sgambato, Hattie Strobel, David Taylor, Pierre Turgeon, Michael Walsh, Richard Wylie, and Bernard Zisman.

[23] The eight insurance companies that submitted declarations to the Court are Genworth Life and Annuity Insurance Company, Hartford Life, Lincoln Benefit Life Company, Met Life, Pacific Life Insurance Company, Security Benefit Life Insurance Company, Nationwide Life Insurance Company, Western Reserve Life Assurance Company and Transamerica Life Insurance Company.

[24] Hartford Life identified as annuitants Lucille Horton, John Gonsalves and Norman Robichaud. Lincoln Life Benefit Company identified as annuitants William Brunt, Henry Rose and Joseph Castillona. Met Life identified as annuitants Carl Ruggieri, Alfred Lamonte, Bernard Zisman, Henry Rose, William Brunt, Joseph Castillona, Robert Carnevale, Lucille Horton and Anthony Lancelloti. Pacific Life identified as annuitants Louse Imperatore, Sarah

21

For purposes of the identification of transactions and brokerage accounts that resulted in losses caused by the scheme, the PSR supplements the factual detail in the Indictment, the trial and the Plea Agreement with a detailed description of the first twelve years of the scheme, from 1995 until Caramadre hired Radhakrishnan in July 2007, and of the expanded scheme beginning in July 2007, when Caramadre's $10 million business venture with Hollywood movie producers Donald Kushner and Peter Locke increased the scheme's need for more terminally-ill people to use as "measuring lives."  The PSR also states that every death-put bond transaction involving a terminally-ill co-owner unrelated to the primary investor was consummated using a brokerage account opened by Defendants with concocted information to qualify the dying person as a sufficiently-sophisticated investor, including false financial resources, false contact information, false investment experience and fictional investment goals.  All of these details link transactions to the scheme for purposes of restitution.

Both Defendants lodged unresolved objections to the PSR.  None credibly challenge which transactions and brokerage accounts are within the scheme and therefore appropriate for restitution.  For example, Defendants contend that the advertisement in the Catholic newspaper was not literally false in that each person who responded was paid $2,000; this objection is belied by both the paragraphs of the Indictment incorporated into the guilty plea and by reliable trial testimony from caregivers and family members who were deceived by the advertisement. Defendants also object that most of the annuity accounts did not involve fraud and the annuitants listed on those accounts were not agreed-to victims pursuant to the Plea Agreement.  This

---

Paneto, John Proulx, Betty Esser, Rocco Conti, Anthony Pitocco, Angela Ancona and Nathan Lee.  Western Reserve Life Assurance Company and Transamerica Life Insurance Company identified as annuitants Joseph Castillona, Henry Rose, Robert Carnevale, Norman Robichaud, Lucille Horton, Rocco Digiovanni, Patrick Garvey, Betty Esser, Anthony Pitocco, Nathan Lee, Sandra Bulpitt and Maureen Buckman.

[25] The four bond issuers are Bank Hapoalim B.M., MBIA, Inc., SLM Corporation and Tennessee Valley Authority.

objection is belied by the detailed descriptions of the deception and manipulation of the terminally-ill people, the insurance companies and their broker-dealers set out in the paragraphs of the Indictment incorporated into the guilty plea. Finally, Caramadre lodges an overarching objection to everything in the PSR based on his unsuccessful attempt to withdraw his guilty plea – this nonspecific objection raises no material challenge to the facts in the PSR that are pertinent to restitution. See Olivero, 552 F.3d at 40.

     E.   The Evidence at the Restitution Hearing

During the restitution hearing, the Government introduced Exhibits 28, 29 and 33, which are relevant to the scope of the scheme because they are insurance company documents that contain the names of annuitants used in connection with the scheme.[26] The Government also presented summary charts, particularly Exhibits 12 and 24, supplemented by Exhibits 15 and 16, which itemize the individual transactions and brokerage accounts and explain how each variable annuity transaction and death-put bond for which the Government seeks restitution is linked to the scheme. For a handful of transactions, these exhibits are the only evidence linking an annuitant or terminally-ill co-owner's name to the scheme.[27]

---

[26] Exhibit 28, from Security Benefit Insurance Company, names as annuitants Robert Carnevale, William Brunt, Henry Rose, Bernard Zisman, Denise Egan, Joseph Castillona, Anthony Lancelloti, Sheila Battey and Norman Robichaud. Exhibit 29, from Genworth, names as annuitants John Proulx, Rocco Conti, Carl Ruggieri, Alfred Lamonte, Bernard Zisman, Henry Rose, William Brunt, Joseph Castilona, Robert Carnevale, Lilly Ianiero, Norman Robichaud, Maureen Buckman, Patrick O'Mally, Jason Veveiros, Charles Buckman and Rocco DiGovanni. Exhibit 33, from Nationwide Life Insurance Company, names as annuitants Angela Ancona, Sheila Battey, William Brunt, Charles Buckman, Maureen Buckman, Robert Carnevale, Joseph Castillona, Rocco DiGiovanni, Denise Egan, Betty Esser, Patrick Garvey, John Gonsalves, Lucille Horton, Lily Ianiero, Louise Imperotore, Alfred Lamonte, Norman Robichaud, Edwin Rodriguez, Henry Rose, Carl Ruggieri, Verna Sammartino, Sheryl Stroup, Jason Veveiros, Bernard Zisman and Anna Restante.

[27] The terminally-ill annuitants who appear only on Exhibit 15 are Richard Friberg, Ivy Love, Gerald McGetrick and James O'Donnell. The terminally-ill bond co-owners who appear only on Exhibit 16 are Helen Brisson, Peter Cate, Roland Daigle, Caterina Franco, Donna Logan, Gordon Rogers and Robert Ruisi.

These exhibits were presented by the Government[28] and its witness, Special Agent Troy Niro, who compiled the summary charts, credibly testified about them and was cross examined on their preparation and content.  This cross examination and the Court's inquiry resulted in deletion of certain transactions and brokerage accounts from consideration for restitution because of the insufficiency of the evidence of their linkage to the scheme.[29]  The summary charts themselves, as well as the source documents used to compile them, many of which came from Caramadre's files, were all available to Defendants for months prior to the restitution hearing. Further, the content of these summary charts is consistent with the rest of the reliable evidence linking specific transactions to the scheme.  Accordingly, I find that these summary exhibits constitute reliable evidence on which this Court may rely in determining which transactions and brokerage accounts are within the scope of the scheme.  Curran, 525 F.3d at 84; Rodriguez, 336 F.3d at 71; see Adetiloye, 716 F.3d at 1039-40 (summary charts sufficient if supported by reliable evidence to support underlying facts).

IV.    ANALYSIS

    A.  Which Losses Are Subject to Criminal Restitution

    Caramadre and Radhakrishnan argue that restitution should be limited to losses caused by the specific investments that used as "measuring lives" the twenty-three terminally-ill annuitants and account holders who are named in the Plea Agreement.  With this limitation, Defendants say that only a handful of insurance companies and bond issuers were potentially adversely affected. As a result, Defendants argue, the maximum losses suffered by this handful of insurance

---

[28] The Government's counsel supplied some of the information in Exhibits 15 and 16.  This information can be considered at the restitution phase.  See, e.g., Rodriguez, 336 F.3d at 71.

[29] For example, a transaction with Louise Imperotore as annuitant and Lynn Saccoccia as account owner was removed because they were mother-daughter so the transaction fell outside the scheme.  Similarly, transactions involving Peter DiSaro and Edwin Rodriguez as co-owners were removed because they were father-son so the transactions fell outside the scheme.  The Government also made corrections to minor errors uncovered during the hearing.

company and bond issuer victims are $1,641,737.25 and $4,190,483.35, respectively, instead of the much larger amount calculated by the Government.  This argument founders in the face of the overwhelming and reliable material to the contrary – a holistic read of the Plea Agreement, the paragraphs of the Indictment incorporated into the plea, the reliable details in the PSR, the consistent and reliable trial evidence and the evidence at the restitution hearing drowns this attempt to crimp the scope of the scheme to which Defendants admitted.  See United States v. Okoye, No. 12-2045, 2013 WL 5394287, at *3 (1st Cir. Sept. 27, 2013)  (plea agreement, read holistically, negates defendant's restitution argument; "[h]e must now live with the consequences of his bargain").  The argument is also inconsistent with the plain language in the Plea Agreement itself.

Rather fundamental is the clarity of the reference to the terminally-ill annuitants and account holders in the Plea Agreement, which crisply states that it names only "some of the terminally-ill people whose identity information was used by the defendants" and that the terminally-ill people whose identities were used without their knowledge "include, but are not limited to" the individuals named in the Plea Agreement.  Thus, the Plea Agreement expressly contemplates that the scope of the scheme should not be limited by the lack of a reference to the names of the other terminally-ill individuals who were used as the measuring lives for the balance of the investments resulting in harm to insurance companies and bond issuers.

More substantively, the Plea Agreement is not limited to defrauding the terminally-ill individuals.  Rather, consistently with the Indictment and the PSR, in the Plea Agreement, Defendants explicitly admit to having:

- o "executed a scheme to defraud financial institutions and terminally-ill individuals;"

o   "fraudulently obtained millions of dollars by making or causing to be made material misrepresentations to . . . Insurance Companies; and . . . intermediaries, including Brokerage Houses and Broker-Dealers;" and

o   "made and caused to be made material misrepresentations and omissions to . . . Insurance Companies, Bond Issuers, Broker-Dealers and Brokerage Houses."

Plea Agreement at 1, 3-4.  Further, the Plea Agreement expressly focuses on the impact of the overall scheme on the named insurance companies and bond issuers: "[i]t was the object of the scheme to defraud and the goal of the conspiracy . . . to fraudulently obtain significant sums of money from the Insurance Companies and Bond Issuers."  Id. at 2.  As to the insurance companies, the Plea Agreement describes specific misrepresentations regarding the identity of the terminally-ill annuitants.  Id. at 4.  As to the bond issuers, the Plea Agreement describes the false information provided to the brokerage houses regarding the source of funds invested and the identities, finances and investment history of the terminally-ill co-owner of the trading accounts.  Finally, restitution cases uniformly hold that as long as the plea agreement does not contain an express limitation, restitution is not limited to victims specifically named in it.  United States v. Rand, 403 F.3d 489, 494-95 (7th Cir. 2005).

Defendants also attack the sufficiency of the Government's evidence that each transaction and brokerage account resulting in a loss used to calculate restitution was caused by conduct constituting the scheme, contending that the Government's burden requires the Court to hear live testimony from every one of the fifty-one insurance companies and bond issuers, with an opportunity for cross examination, about their status as a victim and the quantum of their actual losses.  Defendants are right that the Government bears the burden of proving that each transaction as to which restitution is awarded is causally connected to the conduct involved in the scheme.  Vaknin, 112 F.3d at 589 ("modified but for standard of causation" must be shown to

connect criminal conduct to restitution).  This Court must be satisfied that each of the 54 bond

accounts and 195 annuities are arrangements that are factually linked to the scheme.  18 U.S.C. §

3663A(a)(2) (restitution to be awarded for losses incurred by those "directly and proximately

harmed" in the course of the scheme and conspiracy); Matos, 611 F.3d at 43.  However,

Defendant's contention that live testimony from every victim is necessary at the restitution phase

is simply wrong.  Gushlak, 728 F.3d at 188-91, 194 (within discretion of court at restitution

phase to refuse to expand evidentiary hearing to include live testimony from all affiants);

Vaknin, 112 F.3d at 587 (restitution calculation should not turn into "time-consuming sideshow

[of] prolonged litigation").  Rather, the Government must produce only "a modicum of reliable

evidence" to establish the restitution award.  Curran, 525 F.3d at 84.  Further, once the

Government has met this low burden, Defendants must counter with probative evidence of their

own, which they have not done.  Burdi, 414 F.3d at 222.

     Finally, Defendants contend that the mere facts that a transaction or brokerage account

involved a terminally-ill person unrelated to the other investor or co-owner does not sustain the

Government's burden because those elements, standing alone, are insufficient to link losses with

those characteristics – and no other indicia – to the scheme.  This argument is well founded: the

essential element of the scheme to which Defendants pled guilty was fraud.  Without some

evidence of fraud tainting a specific transaction or brokerage account, the Government's proof

fails as to that transaction.  To determine whether there is sufficient reliable evidence of fraud to

establish that a specific loss fits within the scheme requires reference to the totality of the

evidence, including the admitted-to portions of the Indictment, the Plea Agreement, the reliable

trial evidence, the undisputed portions of the PSR, including the attached sworn victim

declarations, and the summary charts and exhibits presented at the restitution hearing.

With respect to the bond issuer victims, the PSR, in an undisputed passage, establishes that every brokerage account with a terminally-ill person as the measuring life was opened with false information regarding that person's financial background, available assets, investment experience and investment goals.  Accordingly, I find that fraud is established for all of them.  By contrast, for the insurance annuity transactions, the use of a terminally-ill person as a measuring life, standing alone, is not enough.  Nevertheless, the overwhelming majority of the losses – but not all – are reliably linked to the scheme by some evidence of fraud. [30]  For example, many annuitants are named as victims in the Plea Agreement, many others are identified as having been victimized by fraud in the PSR or the admitted paragraphs of the Indictment, while a few annuities are linked to a fraudulent act established as an indicia of the scheme in the summary chart, Exhibit 15.[31]  Coupled with the Government's substantial evidence of fraudulent conduct directed toward preventing the insurance companies and bond issuers named in the Plea Agreement from uncovering the scheme, I find that the Government has more than sustained its burden of linking the losses listed on Appendices A and B to the scheme for purposes of establishing them as eligible for restitution.  In making this finding, I have considered Defendants' failure to rebut this evidence other than in generalities, despite their knowledge of the transactions and brokerage accounts and their access to the underlying documents for many months.  Gushlak, 728 F.3d at 202 & n.15.

---

[30] See nn.8, 13, 15, 16, 18, 19, 20, 21, 22, 24, 26, 27 and 28, *supra,* for the lists of terminally-ill individuals whose use as measuring lives falls within the scheme as established by reliable evidence.

[31] Separately for each transaction, Exhibit 15 describes the connection between each annuity transaction and the scheme.  While some of the transactions listed merely refer to a terminally-ill annuitant unrelated to the owner, which is insufficient, for others, Exhibit 15 lists a specific act of fraud linking the transaction to the scheme.  For example, Exhibit 15 indicates that certain of the named terminally-ill annuitants were recruited with the deceptive Catholic newspaper advertisement while other transactions are linked because Radhakrishnan was falsely presented as the owner of the annuity.

The Government's proof is inadequate for two terminally-ill annuitants, Gerald McGetrick and James O'Donnell. The Government posits only that they were terminally ill and unrelated to the annuity owner; it has not linked them to any misrepresentation that caused any losses to an insurance company. Further, Mr. McGetrick's variable annuity application is dated December 30, 1994, which appears to be outside the temporal scope of the scheme. See Inman, 411 F.3d at 595 (restitution limited to time period in indictment). I find that restitution should not be awarded for the transactions involving these annuitants unless the Government produces additional evidence.

B. Calculation of the Losses

The remaining issue is the calculation of the losses for the annuity transactions and the brokerage accounts linked to the scheme. This was the principal focus of the evidence at the restitution hearing; the Government presented a separate methodology for the insurance company victims and the bond issuer victims.

a. Insurance Company Victims

Internal Revenue Service Special Agent Troy Niro testified regarding the compilation of the underlying information, the preparation of the summary charts and the arithmetic calculation of the actual losses incurred by insurance company victims. See Fed. R. Evid. 1006. An experienced agent who invested over 2000 hours working with the documents in this case, Agent Niro's testimony was highly coherent, credible and reliable.[32] In addition, all of the documents underlying his summary exhibits, together with the exhibits themselves, except for Exhibits 15

---

[32] Radhakrishnan argued that Agent Niro was not the proper type of agent to serve as a summary witness in this case. I find this objection meritless – Agent Niro's credentials included experience with investigations during his fifteen-year career at the IRS. I found him eminently competent to provide the testimony presented.

and 16,[33] had been made available to all parties not just before the restitution hearing, but well in advance of the aborted trial.  See ECF No. 98 at 10, 17-20; ECF No. 100-1.

Agent Niro described the mechanics of variable annuity contracts, which operate like mutual funds, allowing investors to choose from different "subaccounts" to invest funds, but also including the unique feature of offering death benefits on the death of the individual named as the annuitant (who was not required to be the same person as the investor).  The death benefits varied between insurance companies and over time; most guaranteed the investor a specific profit upon the death of the annuitant – often in the range of 5-7% – even if the value of the investment account decreased due to market performance.  The annuities also offered other benefits, including commissions to the broker-dealers and insurance brokers who submitted the annuity applications.  An essential element of Caramadre's scheme was to invest in the riskiest of the subaccounts, knowing that the expected market loss would be sustained by the insurance company while a gain would redound to his benefit and the benefit of his investors.

In his testimony, Agent Niro explained his inclusion of deposit bonuses in his loss calculation for certain of the annuities, which had been purchased with "bonuses," typically 5% of the amount of premium paid.  This bonus was an additional amount that certain insurance companies paid into the investment account.  Defendants tried unsuccessfully to establish that these deposits should not be included as part of the loss because of vesting provisions.  This argument fails in the face of Agent Niro's testimony that the insurance companies had to fund the deposit bonuses up front, so that the bonus was lost along with the premiums if the scheme's risky investment declined in value.

---

[33] Exhibits 15 and 16 were prepared after the first hearing day in response to the Court's concern about the adequacy of the Government's evidence linking a few of the transactions to the scheme.  Accordingly, they were not made available to Defendants in advance, though the evidence underlying them was in the possession of all parties.

Agent Niro obtained the data for his calculations on the insurance companies' actual losses from two sources: (1) raw documents produced by the insurance companies, Caramadre's files and the files of third parties such as broker-dealers; and (2) summary spreadsheets prepared by the insurance companies at the Government's request.  Each insurance company victim was instructed to provide the net total paid in commissions; in instances where the insurance companies had either charged back the commissions, or not paid them at all, they were not supposed to be included in the loss calculation.  Each insurance company was also asked to accurately calculate its own fees, which were applied to reduce its loss.  Agent Niro verified the insurance companies' information against source documents whenever possible, but he was not able to do so in every instance, and he could not estimate the percentage of transactions which he was able to verify.  In response to cross examination, he testified that he did find verifiable instances where the insurance company correctly netted out charged-back commissions, but he was not able to verify every report from every insurer.  Nevertheless, I find that his testimony established sufficient reliability for this information as to include the commissions paid and fees collected as part of the insurance companies' loss calculation.

Special Agent Niro used the insurance companies' data to calculate the actual loss by taking the amount of payout at the time of the terminally-ill annuitant's death and subtracting the value of the annuity at the time of purchase.  From this total, the amount of bonus payments and commissions paid by the insurance company victims was added to the amount of the loss.  The fees earned by the insurance company victims on each annuity and any payments that insurance company victims received from mutual fund companies for money invested in those funds were subtracted from this total.  If the payout of the annuity represented the actual market value at the time of payout and the market value was lower than the premium paid by the account owner,

Agent Niro did not factor in the market value of the annuity; in those cases the insurance companies' losses were limited to commissions to insurance agents and bonus payments to account owners, minus any fees earned by the insurance companies.  I find that this simple formula provides a sound basis for approximation of the calculation of the losses of the insurance company victims.  See Gushlak, 728 F.3d at 202 & n.15.

Defendants argued, but advanced no evidence in support of the argument, that the insurance companies would have suffered losses anyway based on the collapse of the stock market.  This argument ignores the evidence that an essential element of Caramadre's scheme was to choose risky investments.  It also ignores the pervasive evidence that, but for the scheme, these annuity investments would not have been made, including the evidence of the cover-up so that insurance companies would not discover the real nature of the annuity investments, as well as the evidence that insurance companies that became suspicious tried to block the conspirators from making new investments.  Moreover, in those instances where the insurance company had a gain because the risky investment unexpectedly performed well, covering the return of premium, commissions and other benefits payable to the investor, Agent Niro's calculation netted out such gains against other transactions with the same insurance company that resulted in losses.

Defendants also attack Agent Niro's reliance on unsworn information from insurance company victims.  With no requirement that evidence be under oath at the restitution phase as long as it is reliable, I find that Agent Niro's use of unsworn information is appropriate and reliable.  Whenever possible, he checked the information against the source documents; moreover, several insurance companies submitted victim declarations attached to the PSR, which are generally consistent with the loss information they provided to Agent Niro.  Agent Niro's testimony established that he painstakingly went over each transaction, attempting to verify it

through several layers of review, both by checking and re-checking his own work and by contacting the insurance companies when he noticed inconsistencies. This evidence, coupled with the reality that Defendants have been in possession of Special Agent Niro's calculations and the underlying documents since well before trial and are well positioned to poke holes in the accuracy of the transactions because they, and particularly Caramadre, initiated each one,[34] well supports the conclusion that Agent Niro's testimony regarding the calculation of insurance company losses is adequately reliable as to constitute "a reasonable determination of appropriate restitution" for these losses. Salas-Fernandez, 620 F.3d at 48.

Accordingly, I find that, for the annuity transactions that are within the scheme, the amount of actual losses suffered by insurance company victims is $33,891,237.94, of which $20,977,184.05 is the total loss for the period after Radhakrishnan joined the scheme. 18 U.S.C. § 3664(e). For a breakdown of actual losses incurred by each Insurance Company, see Appendices A and B.[35]

        b.  Bond Issuer Victims

Andrew Kalotay, Ph.D., testified about the mechanics of the death-put bonds and the calculation of losses sustained by the bond issuer victims. Dr. Kalotay's qualifications to testify as an expert witness regarding bond valuation are impressive. He received a Ph.D. in Mathematics from the University of Toronto in 1968 and has held positions as a Professor of Finance at several universities. He specializes in debt management and bond valuation and was inducted into the Fixed Income Analysts Society Hall of Fame in 1996. Recently, much of his

---

[34] Defendants' cross examination of Agent Niro exposed an error; in that instance, the Government made the correction.

[35] One insurance company, American Skandia, had net gains arising from the scheme; it is not included on Appendix A. Another, Pacific Life, had substantial losses in the pre-Radhakrishnan period, but a small net gain in the period after July 1, 2007. Its net losses during the entire scheme appear on Appendix A but it – and its small gain – does not appear on Appendix B.

work has focused on corporate bonds with death-put provisions, including several published articles on the topic.  In 2010, Dr. Kalotay was issued a patent entitled "Method and a System for Valuing and Analyzing Bonds with Estate Put Features," which claims a complex formula for valuing bonds with a death-put option.  Dr. Kalotay has used his "bond valuation calculator" for his clients for several years; he also used it to compute the losses in this case.  I found that he is well qualified to testify as an expert witness for the purpose of determining the amount of losses incurred by bond issuer victims.  I also found his testimony clear, credible and very helpful to the Court in rendering the complex matters he addressed comprehensible.  As with Agent Niro, Defendants have been in possession of Dr. Kalotay's calculations, methodology and expert report for many months, many since prior to the trial.  See ECF No. 98 at 13; ECF No. 102-1 at 6.

Dr. Kalotay explained that a survivor-option bond, colloquially called a death-put bond, is a corporate debt instrument that includes an option whereby the bond can be redeemed at full value, or par, prior to its maturity date, on the death of the holder.  Death-put bonds can be owned jointly by two individuals as joint tenants with rights of survivorship.  Such bonds typically have a maturity date far in the future (the date the bonds would be redeemed at full face value), but under the terms of the survivorship provisions applicable to the bonds, they can be redeemed early at full face value upon the death of the bond's co-owner.  The bonds are known as "death-put" bonds because they allow an owner to immediately "put back" the bond to the issuer for its full face value upon the death of the bond's co-owner.  This ability to force the issuer to redeem the bond at par value for cash long prior to its maturity is the basis for the losses inflicted on the bond issuers by Caramadre's scheme.  Because the bonds were redeemed early – generally immediately after they were purchased – because of the use of a terminally-ill co-

34

owner, who actually had no interest in the brokerage account except to be used as the "measuring life," the bond issuer victims were forced to pay the full value of the bonds at a much earlier date than they otherwise would have been required to do, thereby sustaining an economic loss.

Using his bond valuation calculator, Dr. Kalotay calculated the loss bond-by-bond by comparing two liabilities: the amount paid to the survivor co-owner minus the fair value of the bond, taking both its call and put features into account, if it remained outstanding, including what it would cost to replace that fair value at the issuer's borrowing rate at the time of redemption.[36] The formula for the calculation of the actual loss incurred on each of the hundreds of death-put bonds purchased by Defendants uses the maturity date, the date of redemption, the issuer's borrowing cost, the volatility of interest rates and the value of embedded call options (including the death-put feature). Applying his formula, Dr. Kalotay calculated the losses sustained by the bond issuer victims.

Defendants seek to rebut Dr. Kalotay's theory of loss with the argument that the bond issuers did not actually lose money or anything of value. Relying on a bond prospectus from one of the bond issuer victims, GMAC, they point out that when a corporation chooses to include a death-put option in its bonds, bond issuers limit the total annual amount of redemptions to 1% of the total amount outstanding to protect themselves from an unexpectedly large number of death-put redemptions. Since the bond issuers had already built early redemption of bonds based on death into their financial models, the bond issuers anticipated the very puts that the Government now alleges resulted in actual loss. Far from causing loss, Defendants argue, the exercise of the death-put option simply advanced the redemption date, benefiting bond issuers by taking the face

---

[36] Dr. Kalotay used information from Standard & Poor's to calculate each bond issuer's borrowing rate. Defendants attack this approach as overly simplistic. This argument fails in light of the law of restitution, which holds that "rough remedial justice" and a reasonable determination of the restitution amount will suffice. Innarelli, 524 F.3d at 294; Vaknin, 112 F.3d at 587.

value of the redeemed bonds off their balance sheets earlier and saving the interest to be paid over the life of the bonds.

Dr. Kalotay testified that the 1% limit is set at a level that is so high that, as a practical matter, it is virtually never reached and does not provide meaningful protection to bond issuers from the requirement to redeem as a result of the scheme, rather than as a result of the random probability of death by bondholders. Also, each premature redemption not only reduced debt but also correspondingly reduced cash, which a prudent company does not keep on hand except for specific purposes. This cash reduction inflicted a loss that Dr. Kalotay measured by reference to the company's borrowing cost to return to the debt market to borrow new money to replace the cash paid to redeem. Here the scheme involved the purchase by Caramadre and his investors of every death-put bond on the secondary market for well below its face value. Dr. Kalotay testified that bonds are available for purchase on the secondary market at a discount because their interest rate is below the market rate available to the issuer to borrow new cash. Accordingly, if redeemed within a short time after the bond was purchased on the secondary market at a discount pursuant to the scheme, the issuer's cost to replace the funds needed to redeem such a bond necessarily would involve payment of a higher interest rate, necessarily resulting in a loss to the issuer for every such transaction. Based on Dr. Kalotay's testimony, I find that each death-put bond transaction valued by Dr. Kalotay involved a loss.

Defendants also argue that, while a loss was possible, it is mere speculation to state that this evidence establishes that any loss actually occurred because Dr. Kalotay did not try to discover whether any of the bond issuer victims actually borrowed at a higher interest rate to raise the cash to redeem the death-put bonds.[37] This argument was answered by Dr. Kalotay's

---

[37] Defendants also contend that the loss in this case is hypothetical because some of the bond issuer victims were not aware of the scheme. Lack of awareness has no impact on the bond issuers' entitlement to restitution. This scheme

testimony that his loss valuation was performed in accordance with standard bond valuation principles and focused on the cost of cash to a specific entity at a specific point in time and not on the decision to borrow or not.  Moreover, the Plea Agreement contains a specific admission that the bond issuers were required to pay the full face value of the bonds much earlier than they would otherwise have been required to do.  I find that Dr. Kalotay properly looked at the loss calculation from the perspective of the value of the property – cash – on the date of redemption, which is also the date of loss.  18 U.S.C. § 3663A(b)(1)(B) (restitution may be based on value of the property on the date of the damage, loss or destruction).

Finally, Defendants argue that some of the death-put instruments purchased as part of the scheme were not bonds, but were certificates of deposit ("CDs") with death-put features.  While he lacks expertise in the technicalities of CDs, Dr. Kalotay testified that there is no material distinction between a bond and a CD for purposes of the loss determination – both are debt instruments so that the methodology for measuring the loss caused by premature redemption is the same.  CDs, like death-put bonds, focus on cash flow because the companies still need to replace the funds redeemed prematurely.  I find this testimony credible and unrebutted; therefore, I find that the CDs purchased as part of the scheme with a terminally-ill person as a co-owner are not materially different from the bonds for purposes of the loss methodology.

To conclude, I find that the bond issuers' sustained losses caused by the scheme and that Dr. Kalotay's loss calculations constitute "rough remedial justice."  Vaknin, 112 F.3d at 587. Accordingly, I find that the actual losses suffered by bond issuer victims caused by the scheme is $12,397,956.90, of which $12,220,241.21 represents losses sustained after Radhakrishnan joined

---

involved sophisticated steps to avoid or decrease the likelihood of detection.  The fact that a victim with a relatively small loss did not know is consistent with the nature of the scheme.

the scheme on July 1, 2007.  18 U.S.C. § 3664(e).  For a breakdown of actual losses incurred by

each bond issuer, see Appendices A and B.

## V.       CONCLUSION

Based on the foregoing, I recommend that this Court adopt the following proposed

findings of fact and conclusions of law: (1) that the insurance companies and bond issuers listed

on Appendices A and B are victims of Defendants' crimes within the meaning of MVRA and

therefore are entitled to criminal restitution in the full amount of their actual losses caused by the

scheme; (2) that the total actual losses caused by the scheme from its inception in 1995 until it

ended in August 2010 are $33,891,237.94 for insurance company victims and $12,397,956.90 for

bond issuer victims, for a total of $46,289,194.84, as set forth on Appendix A; and (3) of those

amounts, the actual losses caused by the scheme during the period of Radhakrishnan's

participation is $20,977,184.05 for insurance company victims and $12,220,241.21 for bond

issuer victims, for a total of $33,197,425.26, as set forth on Appendix B.

I find that the Government has not yet sustained its burden of linking to the criminal

scheme the three variable annuity transactions involving Gerald McGetrick and James

O'Donnell that are listed on Appendix C.  I direct the Government to produce evidence (if such

is available) linking these transactions to the scheme within ten days following the issuance of

this report and recommendation; Defendants shall respond within ten days thereafter.  If I find

that any or all of these transactions are losses caused by the scheme for which restitution is

required, this report and recommendation will be supplemented.

Any objection to this report and recommendation must be specific and must be filed with

the Clerk of the Court within fourteen (14) days of its service.  See Fed. R. Crim. P. 59(b)(2);

DRI LR Cr 57.2(d).  Failure to file specific objections in a timely manner constitutes waiver of

the right to review by the District Court and the right to appeal the District Court's decision.  See

United States v. Guerrero, 524 F.3d 5, 14 (1st Cir. 2008); Park Motor Mart, Inc. v. Ford Motor

Co., 616 F.2d 603, 605 (1st Cir. 1980).


/s/ Patricia A. Sullivan
PATRICIA A. SULLIVAN
United States Magistrate Judge
November 6, 2013

# APPENDIX A

## TOTAL LOSSES ATTRIBUTABLE TO THE SCHEME[38]

## Losses to Insurance Companies

| Insurance Company | Total Loss |
|---|---|
| American National | 64,297.04 |
| AXA Equitable | 540,861.60 |
| Genworth | 3,965,520.76 |
| GoldenAmerica/ING | 439,068.78 |
| Hartford Life | 1,479,095.99 |
| ING | 2,811,345.73 |
| Jefferson National | 2,455,309.25 |
| Life of Virginia/Genworth | 54,304.43 |
| Lincoln Benefit | 366,575.04 |
| MetLife | 1,700,791.15 |
| Midland | 1,897,006.36 |
| Minnesota Life | 379,033.01 |
| Nationwide | 11,395,384.65 |
| Pacific Life | 1,329,694.10 |
| Security Benefit | 3,000,578.56 |
| Transamerica | 909,907.21 |
| Western Reserve | 1,102,464.28 |
| **Insurance Company Total** | **$33,891,237.94** |

---

[38] Appendix A compiles all losses over the entire period of the scheme, from January 1995 to August 2010.  For the period from January 1995 through June 30, 2007, Caramadre is solely responsible for these losses and no apportionment is necessary.  For the period from July 1, 2007, to August 2010, when Radhakrishnan joined the scheme, Caramadre continues to be responsible, but the Court may exercise its discretion to apportion these losses with Radhakrishnan.  See Salas-Fernandez, 620 F.3d at 49 (when more than one defendant has contributed to a victim's loss, court may make each defendant liable for the full amount of restitution or apportion liability based on relative culpability).  Apportionment is not addressed by this report and recommendation.

# APPENDIX A, *continued*

## TOTAL LOSSES ATTRIBUTABLE TO THE SCHEME

### Losses to Bond Issuers

| Bond Issuer | Total Loss |
|---|---|
| General Motors ACCEP Corp. | 4,703,638.83 |
| Countrywide Financial | 2,727,770.59 |
| CIT Group Inc. | 2,330,100.04 |
| Bear Stearns Co. Inc. | 511,070.31 |
| Lehman Brothers Holdings | 329,883.74 |
| Amer Genl Fin | 312,191.64 |
| Lasalle BK NA Chicago Ill | 220,050.04 |
| Hancock John Life Ins | 212,871.69 |
| Genworth | 197,330.30 |
| Bank of America Corp. | 193,381.90 |
| Standard Fed BK NA | 115,334.72 |
| Prudential Fin. | 93,096.19 |
| Marshall & Ilsley Corp. | 53,964.40 |
| Mercantile BK Orlando Fla | 50,531.21 |
| Carolina First BK | 48,717.58 |
| Caterpillar Finl Svcs Corp. | 45,420.94 |
| General Elec Cap Corp. | 44,340.15 |
| Protective Life | 34,939.61 |
| HSBC Finance CP | 25,593.47 |
| Firstbank PR | 25,089.86 |
| Westernbank PR | 24,124.11 |
| Intl Lease | 23,740.26 |
| Merrill Lynch BK USA | 17,867.77 |
| MBIA Inc. | 12,354.64 |
| Hartford Life | 9,710.72 |
| Providian Natl BK | 7,594.98 |
| Bank Hapoalim B M New York | 5,791.74 |
| Compass BK | 5,525.58 |
| Tennessee Valley Auth | 4,568.45 |
| Fed Natl Mtg Assn | 3,980.33 |
| Federal Home Ln Mtg Corp. | 3,276.73 |
| Provident Bank of Cincinnati Ohio | 2,245.23 |
| SLM Corp. | 1,859.15 |
| **Bond Issuer Total** | **$12,397,956.90** |

| Insurance Company and Bond Issuer Combined Grand Total: | $46,289,194.84 |
|---|---|

# APPENDIX B

## LOSSES ATTRIBUTABLE TO PERIOD AFTER RADHAKRISHNAN JOINED THE SCHEME[39]

### Losses to Insurance Companies

| Insurance Company | Total Loss |
|---|---|
| AXA Equitable | 32,326.37 |
| Genworth | 1,199,093.46 |
| Hartford Life | 1,479,095.99 |
| ING | 2,312,062.84 |
| Jefferson National | 1,760,532.06 |
| MetLife | 586,157.39 |
| Midland | 542,535.50 |
| Minnesota Life | 379,033.01 |
| Nationwide | 9,628,530.89 |
| Security Benefit | 1,149,426.08 |
| Transamerica | 805,926.18 |
| Western Reserve | 1,102,464.28 |
| **Insurance Company Total** | **$20,977,184.05** |

---

[39] Appendix B compiles all losses from July 1, 2007, to August 2010, the time period when Caramadre and Radhakrishnan both participated in the scheme.  Appendix B does not apportion liability for these losses between Caramadre and Radhakrishnan.  See Salas-Fernandez, 620 F.3d at 49 (when more than one defendant has contributed to a victim's loss, court may make each defendant liable for the full amount of restitution or apportion liability based on relative culpability).  Apportionment is not addressed by this report and recommendation.

# APPENDIX B, *continued*

## LOSSES ATTRIBUTABLE TO PERIOD AFTER RADHAKRISHNAN JOINED THE SCHEME

### Losses to Bond Issuers

| Bond Issuer | Total Loss |
|---|---|
| General Motors ACCEP Corp. | 4,639,275.86 |
| Countrywide Financial | 2,727,770.59 |
| CIT Group Inc. | 2,330,100.04 |
| Bear Stearns Co. Inc. | 511,070.31 |
| Lehman Brothers Holdings | 327,204.93 |
| Amer Genl Fin | 312,191.64 |
| Lasalle BK NA Chicago Ill | 208,107.81 |
| Genworth | 197,330.30 |
| Bank of America Corp. | 193,381.90 |
| Hancock John Life Ins | 163,233.73 |
| Standard Fed BK NA | 112,360.16 |
| Prudential Fin. | 93,096.19 |
| Mercantile BK Orlando Fla | 50,531.21 |
| Carolina First BK | 48,717.58 |
| General Elec Cap Corp. | 44,340.15 |
| Caterpillar Finl Svcs Corp. | 42,772.25 |
| Protective Life | 34,939.61 |
| HSBC Finance CP | 25,593.47 |
| Firstbank PR | 25,089.86 |
| Westernbank PR | 24,124.11 |
| Intl Lease | 23,740.26 |
| Marshall & Ilsley Corp | 18,144.82 |
| Merrill Lynch BK USA | 17,867.77 |
| MBIA Inc. | 12,354.64 |
| Hartford Life | 9,710.72 |
| Providian Natl BK | 7,594.98 |
| Compass BK | 5,525.58 |
| Tennessee Valley Auth | 4,568.45 |
| Fed Natl Mtg Assn | 3,980.33 |
| Federal Home Ln Mtg Corp. | 3,276.73 |
| Provident Bank of Cincinnati Ohio | 2,245.23 |
| **Bond Issuer Total** | **$12,220,241.21** |

| Insurance Company and Bond Issuer Combined Grand Total: | $33,197,425.26 |
|---|---|

# APPENDIX C

## Losses for Transactions Where Government Has Not Met Burden of Proving That They Are Linked to the Scheme[40]

| Application Date | Insurance Company | Owner | Annuitant | Loss |
|---|---|---|---|---|
| 12/30/1994 | GoldenAmerica/ING | Paula Caramadre | Gerald McGetrick | 7,147.06 |
| 7/24/1996 | Life of Virginia/Genworth | Joseph Caramadre | James P. O'Donnell | 7,812.58 |
| 12/22/1997 | Life of Virginia/Genworth | Oliver R. DiPietro | James P. O'Donnell | 33,070.19 |
| | **Total** | | | **$48,029.83** |

---

[40] Each of these variable annuity transactions occurred before Radhakrishnan's involvement in the scheme and is therefore attributable only to Caramadre. Radhakrishnan did not participate in the scheme until July 1, 2007.