UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | ) ) ) | |
| v. | ) ) | Criminal No. 1:11-cr-00186-S |
| JOSEPH CARAMADRE, and RAYMOUR RADHAKRISHNAN | ) ) ) ) | |

**MEMORANDUM OF LAW IN SUPPORT OF
DEFENDANT JOSEPH CARAMADRE'S OBJECTION TO THE REPORT AND
RECOMMENDATION REGARDING RESTITUTION CALCULATION**

On November 6, 2013, this Court issued a report and recommendation regarding the restitution calculation ("Report and Recommendation") in the above-referenced case. The report and recommendation concluded that the total actual losses caused by Mr. Caramadre are $33,891,237.94 for insurance company victims, and $12,397,956.90 for bond issuer victims. For the reasons which follow, Mr. Caramadre objects to this Court's findings.

**I.  THE GOVERNMENT FAILED TO PROVE THAT THE ACTUAL LOSSES SUFFERED BY THE INSURANCE COMPANIES AND BOND ISSUERS WERE THE RESULT OF CRIMINAL CONDUCT**

As stated in the Report and Recommendation:

> "Criminal restitution compensates for losses suffered by victims as a result of a ***crime***. United States v. Thomas, 635 F.3d 13, 21 (1st Cir. 2011); see also United States v. Roberts, 698 F.3d 937, 943 (7th Cir. 2012), cert. granted, 12-9012, 2013 WL 775438 (U.S. Oct. 21, 2013). Its purpose is to restore victims to their position prior to the crime by restoring the monetary equivalent of losses suffered ***from a defendant's criminal activity***. Newell, 658 F.3d at 35; Salas-Fernandez, 620 F.3d at 48.

1

See Report and Recommendation Regarding Restitution Calculation at 7 (emphasis added). The report also states that the Mandatory Victims Restitution Act of 1996 ("MVRA"), 18 U.S.C. § 3663A, "gauges restitution by the 'actual loss' suffered by the victim as a result of the *crime* . . ." Id. at 8 (emphasis added).

On November 19, 2012, Mr. Caramadre pled guilty to committing wire fraud in violation of 18 U.S.C. § 1343, and conspiracy to commit offenses against the United States in violation of 18 U.S.C. § 371. As part of his plea agreement, Mr. Caramadre also agreed to a five-page statement of facts that accompanied the plea agreement, which purported to fully describe Mr. Caramadre's offenses, and the victims of those offenses. The statement of facts describes Mr. Caramadre's criminal conduct as a "scheme to defraud financial institutions and terminally-ill individuals." See Plea Agreement Statement of Facts at 1. The Statement of Facts goes on to state that "[i]n order to execute the aforementioned scheme and conspiracy, Caramadre and Radhakrishnan fraudulently obtained signatures of numerous terminally-ill individuals . . . by means of false misrepresentations and omissions." Id. at 3.

Throughout the course of the three-day evidentiary hearing held to determine the losses due to the insurance company and bond issuer victims, the Government did not present any evidence of criminal activity with regard to any specific annuity transaction. Instead, the Government (and the Court in its recommendation) chose to rely on the Indictment, the Plea Agreement, the Presentence Report, and a chart submitted by the Government which purported to link each transaction to the "scheme" as defined in the Plea Agreement's attached Statement of Facts.

In its Report and Recommendation, the Court makes much of the Statement of Facts' description of Mr. Caramadre's "scheme to defraud". The Court concluded that nearly every annuity and bond transaction was included in the "scheme", and has recommended that Mr. Caramadre pay restitution on these transactions. The Court, however, reached these conclusions without hearing any reliable evidence as to any alleged criminal conduct from which those transactions resulted. The MVRA defines a "'victim' . . . in the case of an offense that involves as an element a scheme, conspiracy, or pattern of criminal activity" as "any person directly harmed by ***the defendant's criminal conduct in the course of the scheme***, conspiracy, or pattern." 18 U.S.C. § 3663A (a)(2) (emphasis added). Despite the fact that the Statement of Facts describes a "scheme", ***this Court must only order restitution to victims harmed by Mr. Caramadre's criminal conduct in the course of the scheme***, and it is the Government's burden at the restitution phase to establish that the alleged losses resulted from Mr. Caramadre's criminal conduct. See United States v. Vaknin, 112 F.3d 579, at 587 ("government must bear the burden of establishing the loss").

It is undisputed that the Government bears a low burden of proof at the sentencing stage, and must only prove a victim's loss by a preponderance of the evidence. See United States v. Curran, 525 F.3d 74, at 78 (1st Cir. 2008); see also United States v. Mahone. 453 F.3d 68, at 74 (1st Cir. 2006) ("only 'a modicum of reliable evidence' is required to establish a restitution award"). However, the First Circuit in Vaknin stated that:

> an award cannot be woven solely from the gossamer strands of speculation and surmise. See United States v. Neal, 36 F.3d 1190, 1200-01 (1st Cir. 1994). By like token, just as insisting upon a modicum of reliable evidence

3

> reinforces the specific advantages of the restitution remedy, so too does insisting upon a certain degree of causal precision. As the Supreme Court has noted, demanding a 'direct relation between the harm and the punishment gives restitution a more precise deterrent effect than a traditional fine.' <u>Kelly v. Robinson</u>, 479 U.S. 36, 49 n. 10 (1986).

112 F.3d at 587. At the evidentiary hearing, the Government presented no evidence which could be described as having any degree of causal precision other than the agreed upon Statement of Facts, which, as argued *infra*, is interpreted too liberally in the Report and Recommendation. The Government presented no new evidence reliably linking the alleged losses of the insurance companies and bond issuers to criminal conduct which was part of the scheme as outlined in the Statement of Facts.

### *The Report And Recommendation Misinterprets The Plea Agreement And Its Accompanying Statement Of Facts*

"Where a defendant has pled guilty, 'the scope of the underlying scheme is defined by the parties themselves." <u>United States v. Emor</u>, 850 F.Supp. 2d 176 (1st Cir. 2012) (citing <u>United States v. Adams</u>, 363 F.3d 363, 367 (5th Cir. 2004)); <u>see</u> <u>also</u> <u>United States v. Elson</u>, 577 F.3d 713, 723 (6th Cir. 2009) ("where a defendant is convicted after pleading guilty, a court 'may consider a plea agreement when defining the scope of the fraudulent scheme and amount of restitution'"), citing <u>United States v. Cothran</u>, 302 F.3d 279, 290 (5th Cir. 2002); <u>United States v. Rand</u>, 403 F.3d 489, 494 (where a defendant enters a guilty plea, 'examination of the conduct constituting the commission of a crime only involves consideration of the conduct to which the defendant pled guilty and nothing else'), citing <u>United States v. Randle</u>, 324 F.3d 550, 555 (7th Cir. 2003).

The Plea Agreement and the Statement of Facts therefore set forth the parameters of the "scheme to defraud." In describing the alleged "scheme", the Statement of Facts

lists the victims of Mr. Caramadre's criminal conduct[1]. Mr. Caramadre argues that the terminally-ill individuals listed in the Statement of Facts are the only victims of fraud, and therefore only those annuity and bond accounts using those individuals as annuitants or joint tenants are subject to restitution.

The Report and Recommendation refuses to limit restitution to those losses related to the 23 individuals named in the Statement of Facts. Instead, the Report points to language in the Statement of Facts stating that the names of "some of the terminally-ill annuitants . . . include, but are not limited to. . .". See Plea Agreement Statement of Facts at 3-4. The Report relies on the "clarity of the reference to the terminally-ill annuitants and account holders" in determining that the scope of the scheme should not be limited by the "lack of a reference to the names of the other terminally-ill individuals who were used as measuring lives . . ." See Report and Recommendation at 25.

Plea agreements are contracts between the defendant and the prosecution. As a result, they are interpreted using "the most relevant body of described rules and principles of private law, those pertaining to the formation and interpretation of commercial contracts." United States v. Harvey, 791 F.2d 294, 300 (4th Cir. 1984). In Harvey, the Court cautioned that in applying these rule to plea agreements, courts should keep two things in mind:

> First, the defendant's underlying 'contract' right is constitutionally based and therefore reflects concerns that differ fundamentally from and run wider than those of commercial contract law. See Mabry v. Johnson, 467 U.S. at 509 (broken government promise that induced guilty plea implicates due process clause because it impairs voluntariness and intelligence of plea). Second, with respect to federal prosecutions, the courts' concerns run

---

[1] Mr. Caramadre does not dispute that he agreed that there are 23 terminally-ill individuals whose identity information was used without their knowledge and consent. See Plea Agreement Statement of Facts at 3-4.

5

> even wider than protection of the defendant's individual constitutional rights – to concerns for the 'honor of the government, public confidence in the fair administration of justice, and the effective administration of justice in a federal scheme of government.' United States v. Carter, 454 F.3d 426, 428 (4th Cir. 1972).

Id. As a result of these two underlying concerns, the Court in Harvey went on to state that:

> both constitutional and supervisory concerns require holding the Government to a greater degree of responsibility than the defendant (or possibly than would be either of the parties to commercial contracts) for imprecisions or ambiguities in plea agreements. See, e.g., United States v. Bowler, 585 F.2d 851, 854 (7th Cir. 1978) (plea agreement not appropriate context for 'rigidly literal' construction of language); Palermo v. Warden, 545 F.2d 286, 295 (2d Cir. 1976) (government invocation of restrictive contract principles 'disingenuous'); United States v. Crusco, 536 F.2d 21, 26 (3rd Cir. 1976) (government's 'strict and narrow interpretation of its commitment . . . untenable'); Correale v. United States, 479 F.2d 944, 947 (1st Cir. 1973) (government held to 'meticulous standards of both promise and performance'). This is particularly appropriate where, as will usually be the case, the Government has proffered the terms or prepared a written agreement.

Id. at 300-01. Here, by using the words "some" and "include, but not limited to" in the Statement of Facts, the Government created imprecisions and ambiguities in the agreement that they drafted. The Government cannot deny that at the time they drafted the Plea Agreement's Statement of Facts that they had in their possession an all-inclusive list of each and every alleged terminally-ill individual who was used in Mr. Caramadre's "scheme". For some reason, they chose not to list each and every victim in the Statement of Facts, and now rely on terms like "some" and "include, but not limited to" in order to claim far more terminally-ill victims than those included in the Statement of Facts. As

6

was the case in Harvey, the Government should be held responsible for the imprecisions and ambiguities that they drafted into the Plea Agreement's Statement of Facts, and the terminally-ill victims of Mr. Caramadre's "scheme" should be limited to those 23 individuals included in the Statement of Facts.

Furthermore, given that plea agreements are to be interpreted using general contract principles, the maxim *expression unius est exclusion alterius* applies here. "The maxim instructs that, when parties list specific items in a document, any item not so listed is typically thought to be excluded." See Smart v. Gillette Co. Long-Term Disability Plan, 70 F.3d 173, 179 (1st Cir. 1995). By including only the names of the 23 terminally-ill individuals in the Statement of Facts, the Government excluded any other possible terminally-ill individuals. As such, Mr. Caramadre agreed to the 23 terminally-ill individuals in the statement of facts, and did not agree that there were additional terminally-ill individuals harmed by any criminal conduct.

***The Report And Recommendation Erroneously Relies
On The Indictment And Presentence Report***

The Report and Recommendation also relies on the Indictment and the Presentence Investigation Report as "reliable sources appropriate for consideration by the court when setting restitution." See Report and Recommendation at 10. The Report states that "[t]he paragraphs of the Indictment admitted by the guilty plea name these individuals who became the 'measuring lives,' thereby linking the transactions and brokerage accounts on which they were used to the scheme for purposes of restitution." Id. at 17. As to the PSR, the Report states that Mr. Caramadre "lodged unresolved objections to the PSR" which provided details that "link transactions to the scheme for purposes of restitution."

Where a Defendant enters a guilty plea, "'examination of the conduct constituting the commission of a crime only involves the consideration of conduct to which the defendant pled guilty and nothing else.'" United States v. Rand, 403 F.3d 489, 494 (1st Cir. 2004), citing United States v. Randle, 324 F.3d 550, 555 (7th Cir. 2003). Moreover, it is well established that "when a defendant is convicted of fraud by a ***jury verdict***, the underlying scheme to defraud is defined, in large part, by the actions alleged in the charging document." United States v. Adams, 363 F.3d 363, 366 (5th Cir. 2004). Mr. Caramadre pled guilty to Counts nine and 33 of the Indictment; therefore, this Court is bound by those Counts when utilizing the Indictment to define the scope of the scheme.

Count nine of the indictment accused Mr. Caramadre of being guilty of committing wire fraud in violation of 18 U.S.C. § 1343, specifically with respect to a bond account involving Edwin Rodriguez as a co-owner, where on June 25, 2008, Mr. Caramadre made a wire transfer of $280,000.00 from his Citizens Bank account to a TD Ameritrade account at First National Bank of Omaha. See Indictment at 54. Mr. Rodriguez' name appears in the Statement of Facts. See Plea Agreement Statement of Facts at 4. Count 33 of the Indictment accused Mr. Caramadre of conspiring with his co-defendant, Raymour Radhakrishnan, to commit offenses against the United States in violation of 18 U.S.C. § 371. Each paragraph contained within Count 33 of the Indictment (paragraphs 167-171) limits the timeframe of the conspiracy between Mr. Caramadre and Mr. Radhakrishnan as being between July 2007 and August 2010. Id. at 58-59.

In attempting to define the scope of the "scheme", this Court erroneously took into account the entire indictment, when it should have confined itself to the Counts to

which Mr. Caramadre pled guilty. This led the Court to add annuities and bond accounts into the restitution calculation which took place before the alleged conspiracy between Mr. Caramadre and Mr. Radhakrishnan began. According to the Counts pled to in the indictment, the outer limits of restitution[2] should only be allowed for the annuities and bond accounts initiated between July 2007 and August 2010.

With regard to the Presentence Investigation Report, this Court's finding that Mr. Caramadre "lodged unresolved objections to the PSR", and that "[n]one credibly challenged which transactions and brokerage accounts are within the scheme and therefore appropriate for restitution", see Report and Recommendation at 22, is clearly erroneous. Mr. Caramadre provided the following objection the PSR:

> As a threshold matter, Mr. Caramadre believes that his guilty plea was tendered in violation of constitutional guarantees, and that the District Court erred in denying his motion to withdraw the plea. He maintains his innocence of the charges against him, and will appeal the denial of the motion to the United States Court of Appeals for the First Circuit. He therefore objects to any and all language in the PSR which ascribes criminal conduct to him, and any guidelines calculation based on such conduct.

See Objection to Presentence Report at 1. This objection most certainly disputes the facts of the PSR, and as a result, this Court cannot deem the facts to be admitted. See Fed. R. Crim. P. 32 (i)(3) ("At sentencing, the court . . .may accept any undisputed portion of the presentence report as a finding of fact). Mr. Caramadre did not have to present specific evidence challenging each and every annuity or bond transaction, because he did not plead guilty to criminal conduct which involved every single annuity and bond transaction. The PSR should have only been used by the Court as it related to those 23

---

[2] Mr. Caramadre still maintains that the restitution amount is limited by the 23 individuals named in the statement of facts, and presents this argument as an alternative.

terminally-ill individuals specified in the Statement of Facts, or, in the alternative, only to those terminally-ill individuals who are related to annuities or bond transactions that took place between July 2007 and August 2010.

### *The Chart Submitted By The Government Fails To Prove That All Of The Annuity And Bond Transactions Were Linked To The Criminal Scheme*

At the evidentiary hearing, the Government produced a chart which purportedly related each and every annuity and bond account to the alleged "scheme". The chart, for the most part, however, only stated that certain annuitants or joint account holders were terminally-ill and unrelated to the owner of the annuity or other joint tenant in the bond account. This chart did not prove that any of the annuities or bond accounts were the result of any criminal conduct. It is not a crime to purchase a variable annuity or to be joint tenants in a bond account with an unrelated terminally-ill individual. The criminal conduct at issue would be the fraudulent misrepresentation and omissions alleged in the Statement of Facts as to the 23 terminally-ill individuals listed. The Government's evidence presented at the hearing failed to link each annuity and bond account to criminal conduct which occurred in the course of the "scheme."

### *Any Losses Prior To November 17, 2006 Are Barred By The Statute Of Limitations*

Any losses that occurred as a result of actions taken by Mr. Caramadre prior to November 17, 2006 are barred by the statute of limitations, as they occurred more than five years prior to the Indictment being filed on November 17, 2011. 18 U.S.C. 3282 states that:

> no person shall be prosecuted, tried, or punished for any offense, not capital, unless the indictment is found or the information is instituted within five years next after such offense shall have been committed.

The Indictment in this case was filed on November 17, 2011. As a result, pursuant to 18 U.S.C. 3282, any losses accrued due to actions taken by Mr. Caramadre prior to November 17, 2006 are barred by this statute of limitations.

## II. THE GOVERNMENT FAILED TO PRODUCE RELIABLE EVIDENCE OF ACUTAL LOSS INCURRED BY THE INSURANCE COMPANIES AND BOND ISSUERS

"The purpose of restitution is to secure to an identifiable victim who has been directly and proximately harmed the pecuniary loss he or she has suffered." United States v. Cornier-Ortiz, 361 F.3d 29, 42 (1st Cir. 2004) (citing 18 U.S.C. § 366A (a) and (c)). The Government bears the burden of proof of establishing a loss by a preponderance of the evidence. See United States v. Innarelli, 524 F.3d 286, 293 (1st Cir. 2008). The Court in Innarelli further stated that:

> This is necessarily a backward looking inquiry that takes into account what actually happened, including whether the victim managed to recover some or all of the value it originally lost. See 18 U.S.C. § 3663A (b)(1)(B); Cornier-Ortiz, 361 F.3d at 42 (victim cannot receive windfall from restitution award) . . .

524 F.3d at 294. Estimates with regard to losses are permissible; however, "courts 'must not speculate concerning the existence of a fact which would permit a more severe sentence under the guidelines.'" United States v. Rodriguez, 2012 U.S. App. LEXIS 20894, 13 (11th Cir. 2013) (citing United States v. Sepulveda, 115 F.3d 882, 890 (11th Cir. 1997). Furthermore, "[g]eneral invoices which purport to indicate the amount of the loss but do not provide further explanation are an insufficient method of proof." United States v. Adelitoye, 716 F.3d 1030, 1039 (8th Cir. 2013). In a case where a defendant has objected to the amount of loss, "the government may meet its burden of proof by introducing testimony from the investigating postal inspector . . . or a sworn statement

from the victim outlining the losses sustained as a result of the crime." Id. (citing United States v. Gibreal, 184 F.App'x 592, 593 (8th Cir. 2006) (per curiam) (unpublished); United States v. Brown, 150 F. App'x 575, 579 (8th Cir. 2005) (per curiam) (unpublished).

At the evidentiary hearing, the Government presented the testimony of Internal Revenue Service Special Agent Troy Niro and Dr. Andrew Kalotay. Agent Niro provided testimony regarding the calculations of the alleged losses on the annuity transactions, while Dr. Kalotay provided testimony as to his estimates of what losses may have been incurred by the bond issuers. Their testimony provided insufficient proof of the losses incurred by the insurance companies and bond issuers.

### *Special Agent Niro's Testimony Was Insufficient To Prove Actual Losses To The Insurance Companies*

Internal Revenue Service Special Agent Troy Niro testified as to the calculation of the losses incurred by the insurance companies on the annuity contracts. He admitted that he did not investigate any of the individual annuities, but that he was simply provided with the data by the insurance companies and could not provide the Court with an exact number of annuities on which he performed any independent investigation as to whether the numbers provided by the insurance companies were correct[3]. In sum, Agent Niro prepared a summary chart of the gains and losses of the insurance companies based on data provided to him by the companies themselves.

As discussed, *supra*, the Government may meet its burden of proof by introducing testimony of the investigating agent or by introducing sworn statements from the victims

---

[3] The Report and Recommendation indicates that "Agent Niro verified the insurance companies' information against source documents whenever possible, but he was not able to do so in every instance, and he could not estimate the percentage of transactions which he was able to verify." See Report and Recommendation at 31.

outlining losses sustained as a result of the crime. Adelitoye, 716 F.3d at 1039. The Government failed to introduce any evidence from the investigating agents. Agent Niro simply performed the calculations necessary in order to determine the losses to the insurance companies. He did not investigate these losses. Furthermore, at the evidentiary hearing, the Government failed to produce any sworn statements prepared by the insurance companies themselves. The Government therefore did not carry their burden with respect to the insurance companies' alleged losses.

Agent Niro's testimony was also silent on issues such as the fact that death claims were paid after the prosecution of Mr. Caramadre was initiated, and the fact that every death claim has been paid, except for one which remains outstanding[4]. Agent Niro also failed to provide any meaningful testimony as to when the various insurance companies were on notifice as to the use of unrelated terminally-ill individuals as annuitants, and why some insurance companies failed to ask for a signature of the annuitant on their annuity applications. Agent Niro was unable to provide this information because he was not the Agent who investigated the case, but instead simply did the calculations. As such, Agent Niro's testimony, coupled with the fact that no sworn statements from any insurance companies were introduced at the evidentiary hearing, was insufficient to prove actual loss by the insurance companies.

### *Dr. Kalotay's Estimates Of The Bond Issuers' Losses Fail To Prove Actual Loss*

The Report and Recommendation makes much of Dr. Kalotay's testimony with regard to the Bond Issuers' "losses". It is Mr. Caramadre's position that Dr. Kalotay's

---

[4] Western Reserve Life Assurance Co. of Ohio rescinded an annuity contract owned by ADM Associates, LLC with Charles Buckman as the annuitant, which was issued on September 15, 2008. A death claim has yet to be paid on this annuity, and it is subject to civil actions in this Court and at the United States Court of Appeals for the First Circuit. See Western Reserve Life Assurance Co. of Ohio v. ADM Associates, LLC, et al, No. 1:09-cv-00472-S-PAS, and 1st Cir. No. 12-2208.

opinion is based on speculation, and therefore cannot be considered as the kind of "rough remedial justice" that the First Circuit considered in <u>Vaknin</u>. The Court in <u>Vaknin</u> was clear when it stated that "an award cannot be woven solely from the gossamer strands of speculation and surmise." 112 F.3d 587. The term "rough remedial justice" does not mean that a guess as to the losses will suffice. Here, there was no evidence presented by the Government of losses sustained by the bond issuers. There was no testimony from an investigating agent, and there were no sworn statements submitted from the bond issuers. <u>See</u> <u>Adelitoye</u>, 716 F.3d at 1039. Therefore, the Government failed to carry its burden of establishing losses to the bond issuers by a preponderance of the evidence.

The First Circuit in <u>Innarelli</u> stated that loss calculations are "necessarily a backward looking inquiry that takes into account what actually happened, including whether the victim managed to recover some or all of the value it originally lost." 524 F.3d at 294. Dr. Kalotay's loss calculations are exactly the opposite of what the First Circuit envisioned in <u>Innarelli</u>. His calculations fail to take into account the prevailing borrowing rates of each of the bond issuers, and instead used estimates of the borrowing rates. Furthermore, his calculations fail to take into account the decrease in interest rates which occurred when Mr. Caramadre was taking part in these investments, and completely ignores the fact that some companies may have saved money as a result of Mr. Caramadre putting the bonds back to the companies prior to their maturity date.[5] Moreover, Dr. Kalotay could not say whether or not each bond issuer had to actually

---

[5] By way of explaining this possible gain by the bond issuers, Mr. Caramadre argued at the hearing that the bond issuers, by having the bonds put back to them, were able to take debt off of their books, or were able to borrow money at a much lower rate than they were paying to the owners of the bonds that Mr. Caramadre put back to the issuers, given decreases in interest rates which occurred in the years that Mr. Caramadre was making these investments. Mr. Caramadre put forth an example based on home mortgages. He argued that just as a homeowner who pays off or refinances their home at a lower interest rate, the bond issuers were able to save money in the long run by paying lower interest rates or no interest at all, due to the fact that Mr. Caramadre put back certain bonds to the issuers prior to maturity.

14

borrow money to pay for the bonds that Mr. Caramadre put back prior to maturity. Interestingly, Dr. Kalotay, who was an advisor the Tennessee Valley Authority (one of the bond issuers from whom Mr. Caramadre purchased bonds), could not testify as to whether or not the Tennessee Valley Authority had to borrow money in order to pay for the bonds that Mr. Caramadre put back to the company (most likely because his client did not have to borrow additional funds to make those payments).

In sum, Dr. Kalotay's testimony was not a "backward looking inquiry into what actually happened, including whether or not the victims managed to recover some or all of the value they originally lost." Instead, it was a highly speculative, incorrect estimate as to possible losses incurred by the bond issuers, which was not corroborated by any evidence either in the form of testimony by any investigative agent or sworn statements submitted by the companies. Dr. Kalotay's testimony is therefore insufficient to prove losses incurred by the bond issuers.

## **CONCLUSION**

The Government failed to carry its burden with respect to whether or not there were any losses incurred by the insurance companies, and failed to carry their burden as to whether any losses were caused by Mr. Caramadre's criminal conduct.

Respectfully submitted,
Joseph Caramadre,
By his attorneys,

/s/ William J. Murphy
_____
William J. Murphy, Esq.
Murphy & Fay, LLP
127 Dorrance Street, 2nd Floor
Providence, RI 02903
(401) 490-3200
(401) 490-3207 (fax)

/s/ Randy Olen
_____
Randy Olen, Esq.
478A Broadway
Providence, RI 02909
(401) 274-1400
(401) 274-2480 (fax)

**CERTIFICATION**

I hereby certify that on this 25th day of November, 2013, I caused to be delivered, via electronic delivery, the within *Memorandum of Law* to:

John P. McAdams, Esq.          Lee Vilker, Esq.
U.S. Attorney's Office          U.S. Attorney's Office
50 Kennedy Plaza, 8th Floor     50 Kennedy Plaza, 8th Floor
Providence, RI 02903            Providence, RI 02903

Olin W. Thompson, Esq.
Federal Defender's Officer
10 Weybosset Street, Suite 300
Providence, RI 02903

/s/ Randy Olen, Esq.
_____