IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

UNITED STATES OF AMERICA          :
                                  :
          vs.                     :          Cr. 11-186-S
                                  :
JOSEPH CARAMADRE                  :

GOVERNMENT'S SENTENCING MEMORANDUM

Defendant Joseph Caramadre ("Caramadre") is due to be
sentenced by this Court on December 16, 2013, after having pled
guilty to wire fraud and to conspiracy to commit identity theft
and wire fraud.  As the Court is well aware, Caramadre's
convictions stem from the fifteen year scheme he orchestrated to
steal the identities of terminally-ill individuals for use in
investment products that generated millions of dollars in
profit.  Caramadre, along with co-defendant Raymour
Radhakrishnan ("Radhakrishnan"), executed this scheme by
repeatedly deceiving terminally-ill individuals and their family
members into signing account opening documents and by making
numerous oral and written misrepresentations to the companies
involved.  As a result of Caramadre's criminal conduct, the
affected financial institutions lost more than $46 million and
dozens of terminally-ill individuals and their family members
were left feeling exploited and victimized.  Caramadre deserves

1

the maximum sentence allowable under the binding plea agreement the parties executed – a sentence of 10 years imprisonment.

This sentence is warranted due to a combination of factors including the serious nature of the offense, the impact it had on the victims, Caramadre's lack of remorse and his conduct in this proceeding in obstructing justice and manipulating the judicial process.  A ten year sentence of imprisonment is needed to punish the defendant and to deter him and others from committing similar crimes.

*Argument*

I. Guidelines Issues

The first step the Court must undertake to determine an appropriate sentence is to calculate the sentencing range under the United States Sentencing Guidelines.  While the Guidelines are not binding on the Court, they are advisory and must be consulted.  The Probation Department has concluded that Caramadre faces an Offense Level of 57, which calls for a sentence of life imprisonment. Caramadre has made a number of objections to the Presentence Report that the Unites States will briefly address herein.

1.  Obstruction of Justice

Caramadre first objects to the Probation Department's conclusion that a 2-level adjustment for obstruction of justice applies pursuant to U.S.S.G. § 3C1.1.  The Probation Department awarded this enhancement based on Caramadre's conduct in instructing a witness to lie to a federal agent in the course of the grand jury investigation.  See PSR ¶ 11.  This conduct was the basis of Count 66 of the Indictment, which charges Caramadre with witness tampering.  While the Government is prepared to prove that Caramadre did, in fact, obstruct justice during the investigation, it is unnecessary to do so because Caramadre continued to obstruct justice after he pled guilty.  Caramadre testified in support of his motion to withdraw his guilty plea that he had committed perjury when he pled guilty.  This Court found that Caramadre had, instead, committed perjury during his testimony in the hearing on the motion to withdraw.  As it is clear that Caramadre has committed perjury during his testimony before this Court, a 2-level enhancement for obstruction of justice applies.  See U.S.S.G. § 3C1.1, Note 4 (listing the commission of perjury as an example of the type of conduct to which the obstruction of justice enhancement applies).

2.  Amount of Loss

On September 30, 2013 and October 9, 2013, the Hon.
Magistrate Patricia A. Sullivan held an evidentiary hearing to
determine the amount of loss sustained by the bond issuers and
insurance companies.  During the hearing, the United States
presented the testimony of Andrew Kalotay, Ph.D., in which he
explained his conclusion that the bond issuers lost $12,482,108
from the early redemption of death-put bonds.  In a thorough
Report and Recommendation issued on November 6, 2013, Judge
Sullivan rejected Caramadre's contention that the companies did
not lose money when they were forced to pay the full maturity
value of the bonds years or decades earlier than they otherwise
would have been required to.

The Government then presented the testimony of IRS Special
Agent Niro, who testified as to his calculations that the
insurance companies lost a total of $33,932,120 million based on
Caramadre's use of terminally-ill annuitants.  Caramadre
apparently does not object to the methodology employed by Agent
Niro, but instead argues that the loss should be limited to the
annuities purchased in the names of the individual victims
listed in the Statement of Facts.  This claim is specious.  The
Statement of Facts was never intended to provide a comprehensive
list of all of the terminally-ill individuals who were deceived.

4

Rather, it expressly indicates that the deceived individuals "are not limited to" the 23 listed victims.  Moreover, the Statement of Facts, as well as the Indictment to which Caramadre pled guilty, provides a laundry list of other acts Caramadre took in furtherance of the fraud scheme, including providing false information on application forms, lying to the companies involved, opening annuities in the names of nominees and taking various other steps designed to deceive the insurance companies, bond issuers, brokerage houses and broker-dealers.  In short, Caramadre admitted his guilt to a wide array of criminal conduct that encompassed all the annuities he submitted using terminally-ill individuals.  The entire amount of loss to the insurance companies, $33,932,120, applies.

> 3.  Number of Victims

Caramadre next objects to the Probation Department's contention that there were more than 50 victims and therefore that a 4-level enhancement applies under U.S.S.G. § 2B1.1(b)(2)(B).  Caramadre argues that only the 23 individuals listed in the Statement of Facts should be counted and that only 2 of the insurance companies should be counted as victims (and none of the bond issuers).

Once again, the Statement of Facts was never intended to provide an exhaustive list of victims.  All of the individuals

identified in the Indictment as being victims of identity theft – totaling 26 – should be counted.[1]  In addition, there were 33 corporations that lost funds as a result of the early redemption of death-put bonds.  Finally, there are 18 insurance company victims.  The total number of victims is therefore 77.  The 4-level enhancement under U.S.S.G. § 2B1.1(b)(2)(B) applies.

### 4. <u>Charitable Organization Misrepresentation</u>

Caramadre next challenges the 2-level enhancement under U.S.S.G. § 2B1.1(b)(9)(A) that applies for offenses that involve "a misrepresentation that the defendant was acting on behalf of a charitable, educational, religious, or political organization."  This enhancement applies as Caramadre and Radhakrishnan misrepresented to the terminally-ill individuals that they were operating a charitable endeavor.

Many of the terminally-ill individuals were located by Caramadre after they read one of two advertisements that Caramadre placed in the local Catholic newspaper.  The first version of the advertisement, attached hereto as Exhibit 1, stated that a "compassionate organization" was providing $2,000 in cash to anyone with a life expectancy of three months or

---

[1]  In fact, there were numerous other individuals not named in the Indictment who were also deceived by Caramadre and his co-conspirators.  For purposes of this enhancement though, it is sufficient to include just the individuals specifically named as identity theft victims in the Indictment.

less.  After several months, this advertisement was replaced by
a second version, which is attached hereto as Exhibit 2.  This
advertisement provided that a "Local member of the Providence
Diocese and Church benefactor" was providing financial
assistance to terminally-ill individuals.  Neither of these
advertisements made any mention of the fact that accounts were
be opened in the names of the terminally-ill individuals or that
the organization behind the advertisement was engaged in a
money-making operation.  The terminally-ill individuals and
their family members uniformly advised the Government that they
believed that a charitable organization, perhaps one associated
with the Catholic Church, was offering assistance to families in
need.

Radhakrishnan, at the direction of Caramadre, fostered the
belief that he was acting on behalf of a charity when he met
with the dying individuals and their family members.  Witness
after witness, including a number who testified at trial such as
Edwin Rodriguez, advised that Radhakrishnan told them that he
was acting on behalf of a benefactor who simply wished to help
terminally-ill individuals.  Radhakrishnan then provided a
$2,000 check to these individuals with the word "philanthropy"
written in the memo line.  These individuals had no knowledge
that accounts or annuities would be opened in their names; they

7

at all times believed the money they received was a gift from a
charitable organization or a philanthropist.  As the offense
involved a misrepresentation that the defendant was acting on
behalf of a charitable organization, the 2-level enhancement
applies under U.S.S.G. § 2B1.1(b)(9)(A).

### 5. <u>Gross Receipts from Financial Institutions</u>

Caramadre next argues that he should not receive a 2-level
enhancement under U.S.S.G. § 2B1.1(b)(15)(A) that applies if the
defendant "derived more than $1,000,000 in gross receipts from
one or more financial institutions as a result of the offense."
The term "financial institution" is specifically defined to
include insurance companies.  <u>See</u> U.S.S.G. § 2B1.1, Application
Note 1.  In this case, there is no question that Caramadre
personally received more than $1,000,000 in gross receipts from
the insurance companies as a result of this scheme.  Attached
hereto is Exhibit 3, a summary chart prepared by the Government
that shows that Caramadre personally received more than $4
million in profits from the insurance companies.  This total
does not even include the millions of dollars Caramadre received
in commissions from the insurance companies.  As Caramadre
received more than $4 million in net profit from the insurance
companies, he clearly received more than $1 million in gross

receipts from those companies.  The enhancement under U.S.S.G. §
2B1.1(b)(15)(A) applies.

    II.   <u>Sentencing Factors under 18 U.S.C. § 3553</u>

Caramadre faces a Guidelines range that calls for a life
sentence.  As noted above, this sentence was triggered by a
number of enhancements applicable to this case, including the
amount of loss (more than $20 million, which triggered an
increase of 22 levels), the number of victims, the existence of
vulnerable victims, abuse of a position of trust, defendant's
role as an organizer and leader and his obstruction of justice.
The Guidelines recognize that this combination of factors
warrants a very significant sentence.  While the life sentence
called for under the Guidelines is admittedly high, it is
important to recognize that this range is the starting point
from which defendant's sentence should be determined.

After determining the Guidelines range, the Court must
consider the sentencing factors delineated in 18 U.S.C. §
3553(a):

> (1)  the nature and circumstances of the offense and
> the history and characteristics of the defendant;
>
> (2)  the need for the sentence imposed –
> (A) to reflect the seriousness of the offense, to
> promote respect for the law, and to provide just
> punishment for the offense;
> (B) to afford adequate deterrence to criminal
> conduct;

9

> (C) to protect the public from further crimes of
> the defendant; and
> (D) to provide the defendant with needed
> educational or vocational training, medical care,
> or other corrective treatment in the most
> effective manner.

18 U.S.C. § 3553(a).

A review of these factors supports imposing a sentence of 10 years imprisonment.

### 1. *Nature and Circumstance of the Offense*

The first and foremost factor in determining an appropriate sentence is the nature and circumstances of the offense. Caramadre executed a lengthy and sophisticated scheme to use the identity information of terminally-ill individuals for his own benefit by purchasing annuities and death-put bonds that contained death benefits. Caramadre realized that both of these products can produce significant profits in a very short period of time if the annuitant or co-owner were to die quickly. Caramadre may initially have believed that he had discovered "loopholes" in these products. He soon learned, however, that to actually profit from these investments, he would need to commit fraud both by deceiving terminally-ill individuals and by repeatedly lying to the companies on application forms and in person when company representatives sought truthful information as to the purpose of the investments.

10

Caramadre exploited individuals at the most vulnerable moments in their lives - when they or their family members were on their death beds.  Caramadre located many of the terminally-ill individuals by placing an advertisement in the Rhode Island Catholic newspaper indicating that a "philanthropic organization" and a "member of the local Diocese" were providing $2,000 to terminally-ill individuals, with no strings attached. The terminally-ill individuals and family members who responded to this ad were deceived into believing that Caramadre was simply operating a philanthropic endeavor.  Caramadre and Radhakrishnan intentionally concealed from these individuals that Caramadre and his investors stood to make substantial profits from their deaths.  Caramadre repeatedly intruded on the most vulnerable and private moments a family can have for one reason and one reason only: to line his own pockets.

When Radhakrishan met with and lied to the terminally-ill individuals who responded to the ad, he continued the pattern of deceiving terminally-ill individuals that Caramadre had commenced years before.  During trial, the Court heard the testimony of Kenneth Blowers ("Blowers"), who testified that Caramadre contacted him in 1996 about purchasing a small life insurance policy for his wife, who was terminally-ill after having had a lobotomy-like operation.  Blowers testified that

11

Caramadre never told him or his incoherent late wife that four annuities were to be opened in his wife's name.  Blowers' testimony was consistent with the expected testimony of a number of other witnesses who were to testify that they met directly with Caramadre and that Caramadre never informed them that he would be opening annuities in the their names or the names of their loved ones.  These witnesses include Robert Mizzoni (Caramadre's former school bus driver who gave a Rule 15 deposition), James LaMonte (Caramadre's own brother-in-law) and Getahun Aynalem (an individual who was dying from AIDS in the mid-1990's but who miraculously recovered only to learn that Caramadre had opened two annuities in his name without his consent).  In short, Radhakrishnan's conduct in deceiving the terminally-ill individuals was not an aberration.  It was a continuation of Caramadre's own pattern of misrepresentations that had been occurring for more than a decade.

The other aspect of the fraud scheme was, of course, the regular lies that Caramadre told to the insurance companies, brokerage houses and broker-dealers.  From the outset, Caramadre realized that to perpetrate this scheme, he would need to lie to the companies.  He did so on many of the annuity application forms by falsely claiming that the annuitants were related to the owners.  He did so on the brokerage application forms by

falsely claiming that the terminally-ill individuals had
substantial wealth and investment history.  And when company
representatives became concerned with the investments he was
making, Caramadre simply lied to them by telling them that the
co-owners (the terminally-ill) were his estate-planning clients
and that they were the ones making the investments.  Moreover,
he played a decade long game of cat-and-mouse with the insurance
companies.  One by one, each insurance company discovered that
it was being defrauded and proceeded to terminate Caramadre and
his co-conspirators.  Rather than stopping his criminal
activity, Caramadre opened investments in the names of other
individuals (including Radhakrishnan) so as to conceal his
ownership of the annuities and bonds.  By the time this case was
initiated, Caramadre managed to defraud the companies out of
more than $46 million.

     2. *Victim Impact*

   Caramadre' conduct had a devastating impact on the
terminally-ill individuals and their family members.  While
these people were uniformly grateful at the time to receive some
financial assistance, they now feel exploited by Caramadre and
Radhakrishnan.  The defendants went into hospital rooms, nursing
homes and private residences, in which families were holding
vigil for their dying loved ones, and pretended to be

philanthropists.  They took advantage of the grief, confusion and exhaustion that these family members were experiencing by getting them to sign documents without carefully examining them. The surviving family members were left feeling exploited and even guilty for allowing their loved ones to be taken advantage of in their dying days.

A number of the surviving family members have written to the Court to express the pain and suffering they have experienced as a result of the actions of Caramadre.  Two of these letters are particularly illustrative.  One of the individuals in whose name Caramadre opened a brokerage account was Michael Mallane, who died of cancer in 2008 at age 50.  His widow, Sherri Mallane, wrote the following to Caramadre in her victim impact statement:

> We thought you were God's gift to the dying.  Instead the dying were God's gift to you.  You call yourself a Philanthropist, but you do not have one altruistic bone in your body.
>
> When my husband Michael died, as well as your other 19 terminally ill victims that passed away, you made millions.  I don't know how the loved ones of your other victims feel, but the thought of someone using Michael that way makes me sick and very sad.  My husband died penniless and you got rich. . . .
>
> You put the families of all your victims through  this trauma in the wake of the worst thing that could have happened to us, the death of our loved ones. . . . You should be ashamed to show your face in public.  Your acts were corrupt, ghoulish, grisly and indecent.

14

Another letter was sent to the Court by Elizabeth Lang. Caramadre opened a brokerage account in her late husband John's name in 2008.  Elizabeth Lang wrote about the harm she has suffered upon learning that an account had been opened in her dying husband's name:

> To find that I let Raymour and Mr. Caramadre take advantage of my husband that I was supposed to be protecting pushed me to the end of my limits. I let them unknowingly use my husband who was the love of my life.  After I heard what was done to my John I blamed myself for letting this happen and I went into even a deeper depression, sat in the chair and did nothing but cry all the time.  I blamed myself for what was done to John. . . .
>
> What Raymour and Mr. Caramadre did to my John devastated me, I was so mentally destroyed I could no longer care for my grandchildren, take care of our house or to pay bills.  . . . I don't have any money or happiness, just always remembering how I failed my husband by not protecting him from Raymour and Mr. Caramadre and by being too stupid to realize what they were doing.

Caramadre, either directly or through Radhakrishnan, injected himself into the most private moment a family can share - the dying days of a loved one.  He bought access by posing as a philanthropist and writing checks for $2,000.  He then exploited the vulnerabilities of the dying people and their family members and deceived them into signing account opening documentation.

15

### 3.  *The Characteristics of the Defendant*

The next 18 U.S.C. § 3553(e) factor is the history and characteristics of the defendant.  In this case, the Government recognizes that there are a number of positive characteristics the Court should consider.  By all accounts, Caramadre is devoted to his family and the Catholic Church.  He has over the years donated significant sums to a number of charities, though the United States would question the motivation behind some of Caramadre's charitable giving, particularly the donation he made to Home and Hospice Care of Rhode Island.

There are, however, two strikingly negative characteristics of this defendant that must be considered: his complete inability to accept responsibility for his conduct and, relatedly, his continued recriminations at others, including law enforcement officials, financial institutions and even his own attorneys.

Despite the mountain of evidence against him and the fact that he admitted his guilt before Your Honor, Caramadre continues to demonstrate a stunning lack of remorse.  As the Court is aware, about two months after he admitted his guilt mid-trial, Caramadre moved to withdraw his guilty plea, claiming actual innocence.  He appears to have a pathological need to claim his innocence despite all evidence to the contrary.

16

During the hearing on the motion to withdraw the guilty plea,
his former attorneys testified that Caramadre admitted to them
that he had made fraudulent misrepresentation to the companies
involved but stated that there was no reason to worry because he
was "the smartest guy in the room."  The evidence was clear that
for 15 years Caramadre repeatedly lied to and deceived
terminally-ill people, provided false information on application
forms, engaged in money laundering by hiding his personal
involvement in certain investments and provided false
information in numerous in-person meetings with representatives
of the various companies.  In a fleeting moment of humility and
acceptance of responsibility, Caramadre admitted all of these
facts in his change of plea hearing in November 2012.  It is now
clear that Caramadre's decision to plead guilty was not a
sincere acknowledgment of his wrong-doing; it was simply a
cynical ploy to end a trial that was succeeding in proving his
guilt.

The second related characteristic is Caramadre's need to
blame others in lieu of accepting responsibility for his own
behavior.  During the investigation, the Government learned that
Caramadre had threatened to take action against at least three
of the companies that were inquiring into his conduct.  He has
repeatedly cast aspersions on the FBI agent who conducted the

investigation, accusing her of manipulating the victims so that they would provide favorable testimony.  He has engaged in personal attacks on the Assistant United States Attorneys who prosecuted this case.  And after Caramadre finally admitted his crimes, he launched a vicious attack on the integrity of his former defense counsel, who represented him as diligently and ethically as humanly possible.  That Caramadre is facing a maximum sentence of ten years imprisonment under the binding plea agreement (when the Guidelines call for a life sentence) is perhaps the ultimate irony that while he now blames his former attorneys, their hard work is what is still likely saving him years in prison.  In short, instead of looking inward and accepting responsibility for his own behavior, Caramadre instead has chosen to blame others for his conduct.

### 4. *Need for Individual and General Deterrence*

A significant sentence is also needed to promote individual and general deterrence.  With regard to individual deterrence, Caramadre has publicly boasted about his "creations" and how he has repeatedly been able to examine the fine print of legal documents to obtain windfalls.  He neglects to mention, however, how he has repeatedly lied to and deceived others to obtain these profits.  In short, as there has been absolutely no insight or remorse shown by Caramadre, there is every reason to

believe that he will continue to commit fraud even after he is released.  A lengthy prison sentence is necessary to send him the clear message that the commission of fraud will result in severe consequences.

Moreover, there is a strong need for general deterrence in this case.  This has been a highly publicized case in which the defendant attempted to make a mockery of the judicial system.  A significant sentence will send a strong message to other would be white-collar criminals that schemes aimed at defrauding others, particularly those that are vulnerable, will be met with harsh punishment.

*Conclusion*

Joseph Caramadre deserves the maximum sentence permitted under the terms of his plea agreement.  He posed as a philanthropist in order to gain access to dozens of terminally-ill individuals.  He then preyed upon their vulnerabilities by obtaining their identity information and opening accounts in their names without their knowledge or consent.  He repeatedly lied to and deceived the companies involved, causing more than $46 million dollars in losses.  And he has demonstrated absolutely no remorse or acceptance of responsibility whatsoever.  The United States recommends that the Court impose a sentence of 10 years imprisonment.

19

Respectfully submitted,

PETER F. NERONHA
UNITED STATES ATTORNEY

/s/ Lee H. Vilker

Lee H. Vilker
John P. McAdams
Assistant U. S. Attorneys
U. S. Attorney's Office
50 Kennedy Plaza, 8th Floor
Providence, RI 02903
401-709-5044
401-709-5001 (fax)
Lee.vilker@usdoj.gov

<u>CERTIFICATION</u>

I, hereby certify that on this 9th day of December, 2013, I caused the within Government's Sentencing Memorandum to be electronically filed with the United States District Court for the District of Rhode Island, using the CM/ECF System.  The following participant has received notice electronically:


Randy Olenn, Esq.
William Murphy, Esq.

/s/ Lee H. Vilker
Lee H. Vilker
Assistant U. S. Attorney
U. S. Attorney's Office
50 Kennedy Plaza, 8th Floor
Providence, RI 02903
401-709-5044
401-709-5001 (fax)
Lee.vilker@usdoj.gov