IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND


```
* * * * * * * * * * * * *   CRIMINAL ACTION
UNITED STATES OF AMERICA  *  11-186-S
                          *
VS.                       *  SEPTEMBER 30, 2013
                          *  VOLUME I
JOSEPH CARAMADRE and      *
RAYMOUR RADHAKRISHNAN     *  PROVIDENCE, RI
* * * * * * * * * * * * *
```

HEARD BEFORE THE HONORABLE PATRICIA A. SULLIVAN

MAGISTRATE JUDGE

(Evidentiary Hearing)


**APPEARANCES**:

FOR THE GOVERNMENT:              LEE VILKER, AUSA
                                 and JOHN P. McADAMS, AUSA
                                 U.S. Attorney's Office
                                 50 Kennedy Plaza
                                 Providence, RI  02903

FOR THE DEFENDANT
Joseph Caramadre:                WILLIAM J. MURPHY, ESQ.
                                 Murphy & Fay, LLP
                                 127 Dorrance St.
                                 2nd Floor
                                 Providence, RI  02903

                                 RANDY OLEN, ESQ.
                                 Olen Law Office
                                 478A Broadway
                                 Providence, RI  02909

**APPEARANCES**:   (Continued)

FOR THE DEFENDANT
Raymour Radhakrishnan:            OLIN THOMPSON, ESQ.
                                  Federal Defender's Office
                                  10 Weybosset St.
                                  Providence, RI  02903

Court Reporter:                   Anne M. Clayton, RPR
                                  One Exchange Terrace
                                  Providence, RI  02903

Proceeding reported and produced by computer-aided
stenography

I N D E X

WITNESS                                               PAGE

ANDREW KALOTAY

  Direct Examination by Mr. Vilker:              7
  Cross-Examination by Mr. Murphy:              54
  Cross-Examination by Mr. Thompson:           107
  Redirect Examination by Mr. Vilker:          134

GOVERNMENT EXHIBITS                        ID    FULL

1-14   -                                          21

DEFENDANTS' EXHIBITS

B      -                                    73   134

_____

1      30 SEPTEMBER 2013 -- 9:43 A.M.

2              THE COURT:  Good morning, everyone.  We are here

3      this morning in the matter of the United States of

4      America versus Joseph Caramadre and Raymour

5      Radhakrishnan.  This is criminal matter 11-186-S, and

6      the purpose of today's proceedings is an evidentiary

7      hearing so that I will be able to make a Report and

8      Recommendation to Judge Smith to assist in the

9      calculation of the restitution amount, that is the

10     amount of actual victim losses.

11             Would counsel identify yourselves for the

12     record, please.

13             MR. VILKER:  Good morning, your Honor.  Lee

14     Vilker, Assistant United States Attorney.  Alongside me

15     is John McAdams, also Assistant United States Attorney.

16             MR. THOMPSON:  Good morning, your Honor.  Olin

17     Thompson for Mr. Radhakrishnan.

18             MR. MURPHY:  Good morning, Judge.  William J.

19     Murphy on behalf of Mr. Caramadre.

20             MR. OLEN:  Good morning, your Honor.  Randy Olen

21     on behalf of Mr. Caramadre.

22             THE COURT:  All right.  A couple of minor

23     housekeeping matters before we get started.  I just

24     wanted to lay out for everyone my game plan for the

25     day.  I thought we'd go till 11:15, take a morning

1  break, short, then go till one o'clock.  I'm

2  optimistically looking at asking to have you back by

3  1:45 so we can be up and running again by 2:00, maybe

4  take a break at 3:00 and then go -- my outline of the

5  day says 4:45, but I will be mindful, Mr. Vilker, as to

6  whether your witness has a problem and needs to

7  complete testimony today, so that if we have to go past

8  5:00 I'm prepared to do that.

9        MR. VILKER:  Your Honor, my understanding is

10  Dr. Kalotay does need to have his testimony complete

11  today.  I believe he needs to catch a train to Boston

12  by late in the afternoon.  So I'm hopeful we'll be long

13  finished by then but there is some kind of issue with

14  time.

15        THE COURT:  All right.  I had recalled that,

16  but, anyway, let me just ask if there's anything that

17  any party needs to bring to my attention before I ask

18  Mr. Vilker to begin.

19        MR. MURPHY:  Judge, the defense has conferred

20  with the Government.  I do not believe it's going to

21  take all day.

22        THE COURT:  Good.  One thing that I will clarify

23  before we begin, which I think is important,

24  Mr. Radhakrishnan's brief brought to my attention and

25  indeed I just wanted to confirm that what you stated in

1    your papers, Mr. Thompson, is absolutely my impression

2    and that is that I have not been asked by Judge Smith

3    to address at all the subject of allocation of

4    restitution, and we won't have any evidence on that and

5    I will not be addressing it.  Indeed I'll be very clear

6    in my Report and Recommendation that that remains as an

7    issue to be brought up before the district judge.

8         MR. THOMPSON:  I appreciate that, your Honor.

9    Thank you.

10        THE COURT:  All right.  Mr. Vilker, if you'd

11   like to begin with a brief argument, please proceed;

12   and otherwise, you can call your first witness.

13        MR. VILKER:  Your Honor, as the Government

14   submitted in our memorandum on the subject, the issue

15   of the loss of the bonds is somewhat complicated

16   because it involved a number of economic factors

17   including the amounts of the bonds, the amount of their

18   redemption, the maturity date, the time value of money

19   to each and every company.  So it's really an area that

20   once the Government started examining it made us very

21   clear that this is way beyond our area of expertise and

22   we needed to get an expert.

23        We located Dr. Kalotay, who will be the

24   Government's only witness on this issue, who has an

25   incredible background, is world-renowned for his

1    expertise on debt management and has written

2    extensively on corporate bonds as a -- excuse me, on

3    death-put bonds, has a patent that predated his

4    retention by the Government in this case concerning how

5    to value these type of bonds.  Dr. Kalotay performed a

6    company by company evaluation to determine the amount

7    of losses and is prepared to testify and explain to

8    your Honor how he reached the conclusions that he did.

9         So with that being said, the Government would

10   call Dr. Kalotay to the stand.

11        THE COURT:  Dr. Kalotay, would you come forward,

12   please, sir.

13        **ANDREW KALOTAY**, first having been duly sworn,

14   testified as follows:

15        THE CLERK:  Could you please state and spell

16   your last name for the record.

17        THE WITNESS:  Andrew Kalotay, K-A-L-O-T-A-Y.

18        THE CLERK:  Thank you.  You may be seated.

19        **DIRECT EXAMINATION BY MR. VILKER**

20   **Q.**   Good morning, Dr. Kalotay.

21        Can you hear me okay?

22   **A.**   Yes.  I hear you fine.

23   **Q.**   Okay.  Can you speak into the microphone so we

24   can --

25   **A.**   Yes.

1    **Q.**   Dr. Kalotay, let me begin by asking you some

2    questions about your educational background.  Do you

3    have a college education?

4    **A.**   I do.

5    **Q.**   Where did you go to college?

6    **A.**   I got my undergraduate degree in mathematics at

7    Queens University in Kingston, Ontario; got my master's

8    at the same institution; and I have a Ph.D. in

9    mathematics from the University of Toronto.

10   **Q.**   And what year did you obtain your Ph.D. in

11   mathematics?

12   **A.**   1968.

13   **Q.**   Let me just ask some general questions about your

14   professional experience.  After getting your Ph.D. in

15   mathematics, where were you subsequently employed?

16   **A.**   My first job was at Bell Laboratories in New

17   Jersey.  And from Bell Laboratories, I transferred to

18   the American Telephone and Telegraph Company, which was

19   the holding company in 1973.

20   **Q.**   And did you, in 1979, did you obtain employment

21   with a company known as Dillon Read and Company?

22   **A.**   Yes.

23   **Q.**   What kind of company is that?

24   **A.**   Dillon Read was an investment bank.

25   **Q.**   What was your position at Dillon Read?

1    **A.**    I was an analyst at Dillon Read.

2    **Q.**    And what type of investment product were you

3    focused on there?

4    **A.**    It's not so much investment as borrowing, working

5    with corporations on a subject referred to as debt

6    management.

7    **Q.**    By "debt management," does that include corporate

8    bonds?

9    **A.**    It's corporate bonds.  It's corporations who issue

10   bonds.  It's more from the issuers' perspective rather

11   than from the investment perspective.

12   **Q.**    After you left -- how long did you remain at

13   Dillon Read?

14   **A.**    I was at Dillon Read from 1979 until 1981.

15   **Q.**    Where did you go in 1981?

16   **A.**    In 1981, I went to Salomon Brothers.

17   **Q.**    What was your position at Salomon Brothers?

18   **A.**    Once again, I was a bond analyst specializing in

19   corporate debt.

20   **Q.**    And did you advise a number of corporations on the

21   issuance as they were preparing to issue bonds to raise

22   funds?

23   **A.**    At Salomon Brothers?

24   **Q.**    Yes.

25   **A.**    Yes, I did.

1    **Q.**   How long did you remain employed at Salomon

2    Brothers?

3    **A.**   I was there from 1981 until 1990.

4    **Q.**   Where did you go in 1990?

5    **A.**   In 1990, I started up my own little firm, Andrew

6    Kalotay Associates.

7    **Q.**   Where is your firm based?

8    **A.**   We're in New York City, 61 Broadway.

9    **Q.**   And you're the owner of that?

10   **A.**   I'm the whole owner, yes.

11   **Q.**   Do you have a number of employees?

12   **A.**   We have a number of employees, yes.

13   **Q.**   And what does Andrew Kalotay Associates do?

14   **A.**   We do essentially two things.  One is we advise

15   issuers on debt management, and the second line of

16   business is licensing-related software.

17   **Q.**   When you say you advise issuers on debt

18   management, are you talking about bonds?

19   **A.**   It's about bonds and interest rate derivatives.

20   **Q.**   Now, in addition to your -- before I ask that, so

21   from 1990 through the present you're employed at Andrew

22   Kalotay Associates?

23   **A.**   Yes.

24   **Q.**   And have you had, in addition to your professional

25   experience, have you had academic experience?

1    **A.**   I have taught over the years.  I taught as an

2    adjunct at Wharton and at Columbia University.  And I

3    worked full-time at -- for a couple of years I taught

4    at Fordham University.  And then from 1995 to '97, I

5    was the director of the Financial Engineering Program,

6    a graduate level program at Polytechnic University,

7    which is now part of New York University.

8    **Q.**   When you say "financial engineering," what does

9    that mean?

10   **A.**   It's applying mathematical techniques to solve

11   financial problems.  The focus of my particular program

12   was in bonds because my personal interest is in bonds.

13   **Q.**   Is it fair to state, Mr. Kalotay, that you have

14   had significant experience throughout your career in

15   dealing with corporate bonds?

16   **A.**   I believe so.

17   **Q.**   Now, before I discuss more of your background, can

18   you just explain to the Court when we say "bond," what

19   are we referring to?

20   **A.**   Well, bonds are securities.  The typical sort of

21   fixed coupon bond pays interest at a stated rate over

22   its life up to its maturity.  Many of the corporate

23   bonds come with options, either issuer's options or

24   investor options that can -- the right to terminate the

25   contract prior to its maturity date.

1    **Q.**    What's the maturity date for a bond?

2    **A.**    The maturity date is the date on which the

3    principal payment, the principal must be repaid by the

4    borrower, by the issuer to the investor.

5    **Q.**    And have you assisted numerous corporations over

6    the years in their issuance of bonds?

7    **A.**    Yes.  We do two things on this debt management

8    side on a high level.  One is help with the structuring

9    of any bond, and the second is assist with the decision

10   how to retire them using options.

11   **Q.**    Now, are you familiar with a particular type of

12   bond that is known as a survivor option bond?

13   **A.**    Yes, I am.

14   **Q.**    And how did you first become familiar with

15   survivor option bonds?

16   **A.**    One of our -- our oldest client, actually, is

17   Tennessee Valley Authority, and they started issuing

18   these bonds in order to diversify their investor base,

19   and that's why I can talk about these bonds.

20   **Q.**    Do you recall approximately how long ago that was?

21   **A.**    I believe around 1994 or so.

22   **Q.**    And are survivor option bonds known kind of in the

23   vernacular as death-put bonds?

24   **A.**    They are known as death-put bonds.

25   **Q.**    And can you describe generally what a survivor

1    option or a death-put bond is?

2    **A.**   It's a regular bond in all regards with the added

3    feature that if the holder dies, the estate of the

4    deceased holder can return the bond, put the bonds back

5    to the issuer and receive the entire face amount, par

6    amount, principal amount.

7    **Q.**   So for example, if I purchased a death-put bond

8    and I were to pass away, my estate would be able to

9    then redeem the bond at the full value?

10   **A.**   Exactly.

11   **Q.**   Now, did these bonds typically have maturity dates

12   that are many years or even decades in the future?

13   **A.**   Yes.   They can be as long as 30 years.

14   **Q.**   And is there any requirement -- well, let me

15   strike that.

16        If the holder of the bond were to pass away and

17   the maturity date were not for 30 years into the

18   future, would the holder of the bond -- would the

19   estate have to wait those 30 years before redeeming it

20   at its full value.

21   **A.**   The redemption is normally in the same year as the

22   time of the death of the holder.

23   **Q.**   And are these type of bonds, are they originally

24   purchased directly from the corporation, the issuer?

25   **A.**   Well, they are purchased by the underwriter of the

1    bond, yes.

2    **Q.**    So is there a secondary market which these bonds

3    can be purchased?

4    **A.**    There is a very limited, very narrow secondary

5    market for these bonds.  These bonds by their very

6    nature are held by retail investors.  They tend to be

7    relatively small in size compared to so-called

8    institutional bonds.  There is a secondary market, but

9    it is extremely light.

10   **Q.**    It's light in comparison to let's say like the

11   regular bond market?

12   **A.**    Yes, it is.

13   **Q.**    Okay.  But given that this is a relatively small

14   market, is there the ability of a consumer or an

15   individual to go to the secondary market and purchase

16   one or more of these death-put bonds?

17   **A.**    There may be opportunities.

18   **Q.**    And does the price of the actual bond fluctuate on

19   the secondary market?

20   **A.**    The price does fluctuate due to two factors.  One

21   is the general level of interest rates as depicted by

22   the U.S. Treasury rates; and the second factor is the

23   perceived risk of the individual company that's

24   responsible for these bonds, the issuer.

25   **Q.**    Is there something called the par value of a bond?

1    **A.**    Yes.

2    **Q.**    What does that refer to?

3    **A.**    It's the principal amount.  It's the amount that

4    has to be repaid to the investor upon the maturity of

5    the bond.

6    **Q.**    So for instance, if I bought bonds with a face

7    value of $100,000, would $100,000 be the par value?

8    **A.**    Yes.

9    **Q.**    Now, on the secondary market and the price at

10    which these bonds can be purchased, can they be both

11    below or above the par value?

12    **A.**    They can be either below or above, depending on

13    the factors I've cited.

14    **Q.**    What factors in the economy would lead to a

15    survivor option bond being sold on the secondary market

16    for below par value?

17    **A.**    In essence, it could happen when the issuer's

18    borrowing rate exceeds the stated interest rate on the

19    bond.  And there are two -- as I mentioned before,

20    there are two factors that determine the issuer's

21    borrowing rate.  One of them is the general level of

22    interest rates, and the second one is the perceived

23    risk of the issuer.

24    **Q.**    Just kind of explain that.  You said a lot there.

25         If a bond -- you mentioned before these bonds

1   have coupon rates?

2   **A.**   Yes.

3   **Q.**   And the coupon rate, and correct me if I'm wrong,

4   indicates the amount of interest under the terms of the

5   bonds that the issuer is going to be paying the bond

6   holder?

7   **A.**   Yes.  It is the stated interest rate.

8   **Q.**   So it could be, for example, five percent that

9   they take per year?

10   **A.**   It could be five percent.  It could be much

11   higher.  It could be much lower.

12   **Q.**   So if you just take this five percent as an

13   example, if bonds with $100,000 par value have a coupon

14   rate of five percent, what would cause those bonds to

15   be on sale or available for purchase for less than the

16   $100,000 par value?

17   **A.**   In essence, if the prevailing interest rate of

18   this particular maturity, whatever maturity you have in

19   mind, if that interest rate exceeds five percent, the

20   price of the bond would be below par, below 100.

21   **Q.**   And by "the prevailing interest rate," are you

22   referring to the amount of money it would cost the

23   company to go out in the market itself and borrow more

24   money?

25   **A.**   The interest rate at which the company at this

1 time could be borrowing.

2 **Q.** So if the company can only get a loan at that

3 point or issue new bonds for seven percent, then the

4 bond on the market that's selling -- has a five percent

5 coupon rate would decrease in value?

6 **A.** Yes.

7 **Q.** Okay. And conversely, if the company were able to

8 issue new bonds or somehow raise funds for less than

9 the coupon rate, say this company in my example was

10 able to issue new bonds at the prevailing rate, they

11 were able to get three percent, what would happen at

12 that point to the value of the bond?

13 **A.** In that case, the price of the bond would exceed

14 the par amount.

15 **Q.** Now, are you familiar with something called a call

16 option?

17 **A.** Yes, I am.

18 **Q.** What is a call option?

19 **A.** The call option bond is arrived -- it's an option

20 held by the issuer to redeem the bond prior to maturity

21 at stated prices.

22 **Q.** When you say "stated prices," what does that mean?

23 **A.** The stated price is the so-called call prices. In

24 the case of these retail bonds, there's only one price

25 normally, which is a par amount. In more complicated

1    situations, the call price can be somewhat over par,

2    for example, could be 104 percent of par amount

3    initially and gradually decline over the life of the

4    bond to par.

5    **Q.**    Now, you mentioned when you first started

6    testifying about the survivor option bonds, that your

7    understanding was that the estate of the owner of the

8    bond were able to redeem it -- would be able to redeem

9    it at the maturity value upon the death of the owner;

10   is that correct?

11   **A.**    At the par value.

12   **Q.**    Did you become aware that in addition to the

13   estate of the owner being able to redeem it upon the

14   death of the owner that many of these bonds allowed two

15   individuals to jointly purchase the bond together and

16   for the other to be able to redeem it upon the death of

17   the owner?

18   **A.**    I had not been aware of this prior to this case.

19   **Q.**    Did you become aware of that fact in this case?

20   **A.**    Yes.

21   **Q.**    And you're saying before you were retained by the

22   Government in this case, you were unfamiliar with the

23   ability on these bonds for a co-owner to redeem the

24   bond upon the death of the owner?

25   **A.**    I had never heard of it.

1    **Q.**   What was your understanding based on your years of

2    experience of why these bonds were created by these

3    corporations?

4    **A.**   It's to facilitate the resolution of the estate

5    upon the death of the owner, and it's a convenient way

6    to recover the -- to basically sell the bond and

7    receive the par value.

8    **Q.**   Now, have you written articles in academic

9    journals about death-put bonds?

10   **A.**   I did write a couple of articles.

11   **Q.**   In 2009, did you write an article that appeared in

12   CFA Institute?

13   **A.**   Yes, I did.

14   **Q.**   What article was that?

15   **A.**   It was something like "Estate-Put Bonds Value Lies

16   in the Eyes of the Beholder," or some catchy title.

17   **Q.**   What was the subject matter of that article?

18   **A.**   The basic idea was -- this article was written for

19   the CFA publication and -- Certified Financial Analyst,

20   CFA.  And the point was that the value of these

21   death-put bonds depends on the actuarial assumptions

22   regarding the owner, and these bonds are much more --

23   they're much more valuable to investors who have a

24   shorter life expectancy than for those who have longer

25   life expectancy.

1    **Q.**   At this point I want to show you what has been

2    marked as Government Exhibit 7.

3         MR. VILKER:  And I would ask the Court for

4    permission to hand the entire binder over to

5    Dr. Kalotay.  I've handed copies to the defense, and I

6    believe your Honor has a copy and I've given the court

7    clerk the originals of the documents we would be moving

8    into evidence.

9         THE COURT:  That sounds good, Mr. Vilker.

10   Sounds like a convenient way to proceed.

11        MR. VILKER:  Thank you.

12   **Q.**   Dr. Kalotay, I'm -- you see on the screen in front

13   of you an article that you published called "Some Bonds

14   Are Worth More Dead Than Alive"?

15   **A.**   Yes, I do.

16        MR. VILKER:  Your Honor, at this point I could

17   do this with each exhibit, but if there's no objection

18   from the defense I would just move into evidence the 14

19   exhibits that were attached to the Government's

20   memorandum.

21        THE COURT:  Any objections?

22        MR. THOMPSON:  No, your Honor.

23        MR. MURPHY:  Judge, the only objection we would

24   have on behalf of Mr. Caramadre is Exhibit 1 is just

25   literally the Government's argument.  So we have no

1    objections to 2 through the remaining.

2           MR. VILKER:  I think Exhibit 1 is the statement

3    of facts.

4           THE COURT:  Yes.  I think Exhibit 1 is a portion

5    of the plea agreement.

6           MR. MURPHY:  Judge, we have no objection.

7           THE COURT:  All right.  So Exhibits 1 through 14

8    may be received full.

9           MR. VILKER:  Thank you, your Honor.

10          (Government Exhibits 1-14 admitted in full.)

11   **Q.**   Is that a picture of you on the left side of the

12   article?

13   **A.**   Yes, it is.

14   **Q.**   Okay.  Now, what was the -- first of all, I just

15   want to point out to you that this article is from

16   Estate Planning Resources' database, Mr. Caramadre's,

17   the Defendant here's own computer.

18          What year did you publish this article?  2006

19   seem right to you?

20   **A.**   Yes.  2006.  Exactly.

21   **Q.**   And what was the subject matter of this article?

22   **A.**   This article looks at these estate-put bonds from

23   the perspective of an issuer and analyzes whether or

24   not these bonds are economic to issue relative to

25   so-called institutional bonds.  The federal agency I'm

1    referring to here is the Tennessee Valley Authority.

2    **Q.**    Okay.  Well, in general, without getting into the

3    details of this article, the title "Some Bonds Are

4    Worth More Dead Than Alive," what did you mean by that?

5    **A.**    Well, obviously, it's a bit of fun here but the

6    basic -- this part of the article was written in

7    Financial Engineering News and most of finance focuses

8    on institutions and investments.  Much of my focus is

9    on what I refer to as debt management and on retail

10   investors.  So in a sense, I wanted my colleagues to

11   become aware of the existence of these bonds which are

12   very interesting from a purely mathematical

13   perspective.

14           MR. THOMPSON:  Your Honor, I hate to interrupt.

15   Can I approach for one minute with Mr. Vilker on a

16   personal issue?  It's nothing to do with the case.

17   Thank you.

18           THE COURT:  Sure.

19           MR. THOMPSON:  Thank you.

20           (Side bar conference off the record.)

21           THE COURT:  We will take a one-minute in place

22   recess and as soon as Mr. Thompson comes back we will

23   resume.

24           (Pause.)

25           MR. THOMPSON:  Judge, thank you for the recess.

1          THE COURT:  Mr. Thompson, anything that you

2     think would be appropriate here, obviously your

3     client's interests are important here, but I recognize

4     that we can be very flexible under the circumstances.

5          MR. THOMPSON:  Judge, I appreciate that.  I

6     think having spoken to Mr. Vilker and Mr. Murphy it's

7     best for me and I think it's best for everyone here we

8     continue with this today.  Frankly, I don't think it's

9     going to go to the afternoon.  If it does, we can

10     address that when we get to it.

11          THE COURT:  Okay.

12          MR. THOMPSON:  Thank you very much.

13          THE COURT:  All right.  Mr. Vilker, you can

14     proceed.

15          Sorry for the interruption, Dr. Kalotay.

16     Q.   So Dr. Kalotay, I was asking you about the premise

17     of this article that some bonds are worth more dead

18     than alive.  Under what situation would one of these

19     bonds be worth more to the holder on the bond if he or

20     she were to pass away rather than to continue living

21     from a purely economic perspective?

22     A.   Essentially, if the prevailing value of the bond,

23     price of the bond, its trading on the market is below

24     the stated value, par value.

25     Q.   Now, many of these bonds in this particular case

1    were purchased in 2008.  That was the year of the

2    financial meltdown, correct?  You just have to answer

3    yes or no for the record.

4    **A.**   Yes.  Yes, it is.

5    **Q.**   What occurred as far as the value of many of these

6    corporate bonds during the calendar year 2008?

7    **A.**   Historically, the issuers of these bonds were

8    normally very -- they were Triple A companies, very

9    credit-worthy companies.  That's why these bonds

10   appealed to retail investors.  In 2008, some of these

11   companies fell on hard times and the credit

12   deteriorated; and as a result, the cost of borrowing

13   went much higher and at the same time as a result the

14   values of these bonds fell substantially below par.

15   **Q.**   Would that mean that an individual would have been

16   able to purchase some of these bonds for well under the

17   price of the maturity value?

18   **A.**   To the extent that you could find these bonds.

19   They are not very liquid.  If they did trade, I would

20   expect that the price would have been considerably

21   below par.

22   **Q.**   Now I want to show you Exhibit 9.  It should

23   appear on the screen in front of you.

24        What is Exhibit 9, Dr. Kalotay?

25   **A.**   Yes.  I see it.  It's a patent that I received, we

1    received for the technology to value bonds with an

2    estate-put.

3    Q.   And it says here that it's filed on March 22nd,

4    2007.  Is that the time that you got this patent?

5    A.   I'm not sure when we got the patent.  I think

6    that's when we filed.  It took about -- it took several

7    years to obtain the patent.

8    Q.   Had you obtained this patent -- actually, I see it

9    says date of patent September 28, 2010?

10   A.   Yes.

11   Q.   Okay.  And was that prior to your retention by the

12   Government in this case as an expert witness?

13   A.   Yes.  It is prior to it.

14   Q.   And I just want to show you this page.  And

15   without going into the details that are in all these

16   boxes, what generally -- what formula are you

17   describing in this patent?

18   A.   Well, the general idea is to describe how to value

19   bonds with an estate-put.  One part is what is shown

20   here, which has to do with decomposing the put option

21   into annual increments.  Typically, in any given year,

22   only a certain percentage of the original face amount

23   can be put back, normally one percent, possibly two

24   percent.

25        There are other features that complicate the

1    analysis.  One is, as we discussed earlier, most of

2    these bonds are also callable so the issuer also has an

3    option; and another complicating feature, which is

4    described in my article that you have just referred to,

5    is that the underwriting fee on these bonds is usually

6    much higher than it would be for standard institutional

7    bonds.

8           So essentially, you want to have an apples to

9    apples comparison of institutional deals to these

10   estate-put bond deals, and this patent basically

11   developed the technology for that comparison.

12   **Q.**   Is this generally the technology that you used in

13   this particular case to determine what losses, if any,

14   the bond issuer suffered?

15   **A.**   Yes.  This is the technology that we used.

16   **Q.**   This wasn't a formula that you came up with for

17   the purposes of this case?

18   **A.**   No, it was not.  We had a calculator in place.  We

19   had been using this for our clients routinely for

20   several years prior to acquiring the patent.

21   **Q.**   Now, Dr. Kalotay, have you been inducted into an

22   institution called the Fixed Income Analysts Society

23   Hall of Fame?

24   **A.**   Yes, I was, in 1997.

25   **Q.**   Is there an actual physical location for this Hall

1    of Fame?

2    **A.**   No, there's no physical location.

3    **Q.**   You were inducted in 1997?

4    **A.**   1997.  I was one of the first inductees.  And it

5    was for my work in debt management.

6         MR. VILKER:  At this time, your Honor, the

7    Government would move to qualify Dr. Kalotay under

8    Federal Rule of Evidence 702 as an expert in the field

9    of valuation of bonds with estate-put features.

10        MR. THOMPSON:  No objection.

11        THE COURT:  Mr. Murphy?

12        MR. MURPHY:  No objection, your Honor.

13        THE COURT:  All right.  I find that Dr. Kalotay

14   seems eminently qualified to testify under Rule 702.

15        MR. VILKER:  Thank you, your Honor.

16   **Q.**   Now, Dr. Kalotay, in 2012, were you retained by

17   the Government as an expert witness in this case?

18   **A.**   Yes, I was.

19   **Q.**   And what was your understanding of what the

20   Government was asking you to do?

21   **A.**   My understanding was that I was asked to determine

22   how much more it costs the certain issuers to fund

23   their debt as a result of puts resulting from

24   estate-puts, early retirement of bonds from

25   estate-puts.

1    **Q.**   So correct me if I'm wrong, but you were being

2    asked to determine if any of these companies suffered

3    losses as a result of being required to redeem these

4    bonds at an earlier date?

5    **A.**   That's correct.

6    **Q.**   Now, did you have any role in the underlying

7    investigation in this case?

8    **A.**   I did not.

9    **Q.**   Did you interview any witnesses who were involved

10   in setting up these accounts or any of the account

11   owners?

12   **A.**   No, I did not.

13   **Q.**   So you were not asked in any way to assume that

14   there was fraud or other illegal conduct involved?

15   **A.**   No.   That never was asked of me.

16   **Q.**   Is it correct that you were being asked to perform

17   a mathematical computation of the amount of losses, if

18   any, for all these companies in which these death-put

19   bonds were redeemed early?

20   **A.**   Yes.   It was strictly to determine how much more

21   it would cost these corporations to carry their debt as

22   a result of the puts from these bonds.

23   **Q.**   As a general matter with these bonds, if we're

24   talking about bonds with $100,000 face value and say

25   the maturity date is 20 years away, the company has to

1    pay that $100,000 in 20 years, correct?

2    **A.**   That's correct.

3    **Q.**   And in the meantime, they have to pay a coupon

4    rate, three percent, five percent, whatever is set in

5    the prospectus of the bonds?

6    **A.**   That is correct.

7    **Q.**   If these bonds are redeemed early under the

8    death-put provisions, the company, instead of paying

9    the $100,000 back in 20 years in the example I gave,

10   would have to pay it back in the near future?

11   **A.**   That is correct.

12   **Q.**   So is that the essential dynamic that you were

13   attempting to calculate is how much loss, if any, would

14   these companies have suffered as a result of having to

15   redeem these bonds at a much earlier date?

16   **A.**   Well, that is it, but it's not quite complete

17   because you also have to take into account that in

18   order to repay that bond earlier they would typically

19   have to raise additional funds and the cost of those

20   funds have to be taken into account in computing the

21   cost.

22   **Q.**   We're going to get more into this as I show you

23   your report, but, in essence, you were determining

24   among other factors how much it would cost the company

25   to raise the amount of funds to pay back the bonds that

1    were being redeemed early?

2    **A.**    Essentially, yes.

3    **Q.**    Okay.  Now, did you review many statements of

4    brokerage accounts in this case in which these

5    survivorship bonds were being purchased?

6    **A.**    Yes, we did.

7    **Q.**    I want to show you Exhibit 2.  Exhibit 2 is an

8    Ameritrade statement of a brokerage account in the

9    names of Joseph Caramadre and Donald Bortle.

10         And you never interviewed either of those

11    individuals, correct?

12    **A.**    No, I have not.

13    **Q.**    This is from the period of April 1st, 2008,

14    through May 30th of 2008.  I want to just turn to page

15    six of nine as an example, and the top line says:

16    Transaction date 5/12/08.  It says:  By securities

17    purchased, General Motors Acceptance Corp.  And there's

18    something called a CUSIP?

19    **A.**    Yes.

20    **Q.**    What's a CUSIP?

21    **A.**    It's a name for every security has a -- call it

22    it's like a Social Security number.  It's a unique

23    number owned by this company, CUSIP, which is part of

24    Standard & Poor's.

25    **Q.**    So it identifies the specific fund?

1    **A.**    Identifies the security.

2    **Q.**    Okay.  And it says quantity 200, price 63.49, and

3    then it says amount and it's in parentheses $126,980.

4         What do those numbers tell you from this

5    Ameritrade statement?

6    **A.**    Well, looking at the price of 63.49, it tells me

7    that these bonds were trading substantially below the

8    par value, which is 100.

9    **Q.**    Two hundred, does that indicate that there were

10   $200,000 worth of bonds that were --

11   **A.**    It shows that 200 bonds each, $1,000 face amount.

12   **Q.**    Okay.  And what's the number 126,980 refer to?

13   **A.**    That was the cost of purchase, 200 times 63.49

14   times 1,000.

15   **Q.**    So this would indicate that the account owners

16   purchased General Motors bonds on that day, May 12th;

17   the bonds had a face value of $200,000, and they

18   purchased it for $126,980.

19   **A.**    Yes.  This was GMAC, General Motors Acceptance

20   Corporation.

21   **Q.**    Now I want to show you Exhibit 3.  Exhibit 3 is a

22   letter from Joseph Caramadre on July 1st of 2008, less

23   than two months later.  And it says:  Please accept my

24   request for redemption of my General Motors bonds under

25   the provision of the survivors options available for

1    each note.  Per the list below, I am requesting

2    redemption of the following issues.  It has a CUSIP

3    number and the amount is $200,000.

4          Now, that CUSIP number would refer to the

5    specific bonds I showed you earlier?

6    **A.**    I assume so.  The 370, yes, it does.

7    **Q.**    Just to make sure we're talking about the same

8    bonds, it's 3704A and then -- those are the same

9    numbers?  Do you see them on page six of Exhibit 3 and

10   Exhibit 2 with the Exhibit 3?

11   **A.**    Yes.

12   **Q.**    So he is seeking redemption to get the full

13   $200,000 maturity value of this bond that he had

14   purchased less than two months before?

15   **A.**    Yes.

16   **Q.**    Now I want to show you Exhibit 4.  Exhibit 4,

17   Dr. Kalotay, is an Ameritrade statement from this same

18   account in the period of October 1st, 2008, to October

19   31st, 2008.  And I want to go to page four of eight.

20          On the line where it says October 15th, 2008, it

21   says:  Securities sold, General Motors Acceptance Corp.

22   And it says 200,000.

23          Does that indicate that the $200,000 was

24   credited to Mr. Caramadre's account for those General

25   Motors bonds?

1  **A.**   Yes, it does.

2  **Q.**   Was what I just showed you a similar pattern that

3  happened time and time again in these various accounts?

4  **A.**   Well, we analyzed the statements.  Most of the

5  time similar thing did happened.

6  **Q.**   Were there other instances in which the bonds

7  instead of being redeemed were resold on the market or

8  not sold in the end?

9  **A.**   I'm sorry.  Could you repeat.

10  **Q.**   You're saying there were other types of

11  transactions that happened with these bonds other than

12  pure redemptions?

13  **A.**   Yes, I believe some of the bonds were sold prior

14  to the death of the holder or prior to maturity.

15  **Q.**   But for the ones that were redeemed with the death

16  of the co-holder, this would be a fairly typical

17  pattern that you saw in these statements?

18  **A.**   Yes.

19  **Q.**   Now, in determining the gain from these

20  transactions, how would you go about doing that?

21  **A.**   The gain to the investor?

22  **Q.**   Yes.

23  **A.**   Well, a simple way of doing it is look at the

24  purchase price and look at the redemption value, take

25  the difference with the caveat that you may want to

1    account for the time value of the money between the

2    purchase date and the sale date. In most of these

3    cases, these dates were very close to each other so the

4    time value of money was not a significant factor.

5    **Q.** So in determining the gain from these

6    transactions, other than the caveat you made with the

7    time value of money, it's essentially what the

8    Defendant paid for them, the difference between that

9    and what he ultimately received when the bonds were

10   redeemed?

11   **A.** Yes.

12   **Q.** So now I want to show you Exhibit 5. Is this a

13   document that was prepared by the IRS agent in this

14   case? You didn't prepare this document, did you?

15   **A.** I'm not sure I've seen this particular document.

16   **Q.** Your work was focused on the losses, not the

17   gains, correct?

18   **A.** Yes. Our analysis involved the bonds from the

19   perspective of the issuers, not from the investor.

20   **Q.** Okay. And this indicates here that the total gain

21   was $11,959,824.08?

22         MR. THOMPSON: Judge, I'm going to object. This

23   is not his exhibit. He didn't prepare it.

24         THE COURT: Well, the exhibit is in evidence so

25   I think he's just asking what the number is on the

1    page, not to characterize the number --

2          MR. VILKER:  Right.

3          THE COURT: -- since he didn't prepare the

4    exhibit.

5    **Q.**   My only question on this would be why wouldn't

6    that number just be the same number as the loss?

7    **A.**   Well, I have already alluded to one of the factors

8    that I believe this number is based strictly on the

9    purchase price and the sale price.  I haven't described

10   yet how we computed the loss so I --

11   **Q.**   It's a different calculation?

12   **A.**   It's a different method.  If I may just make one

13   small point, this analysis does not take into account

14   the change in the value of the bond between the

15   purchase date and the redemption date due to interest

16   rate changes between those two dates.

17   **Q.**   So you're saying the gain would just be determined

18   by looking at the purchase price and the redemption

19   price?

20   **A.**   I believe this is what is done here.  That's my

21   understanding.

22   **Q.**   So let me move on to what your job was in this

23   case, which was to determine how much, if any, all

24   these companies lost as a result of these early

25   redemptions of the bonds.

1          And you indicated already that these companies

2     were required to pay back the full maturity value at

3     some point in the future?

4     **A.**    That is correct.

5     **Q.**    And as we saw here, the example I showed you with

6     GMAC, they ended up redeeming these $100,000 in bonds

7     within a few months after their purchase instead of

8     some point off in the future, right?

9     **A.**    Yes.  That's correct.

10    **Q.**    So how would you generally describe the

11    methodology that you used to determine how much, if

12    anything, these companies lost as a result of these

13    bonds being redeemed years or even decades early?

14    **A.**    Just on a high level, it is basically comparing

15    two liabilities, two sets of payments.  One, what if

16    the bond remains outstanding.  It may not be until

17    maturity.  I do want to quantify it for two reasons.

18    One, these bonds are callable so if rates happen to go

19    much lower, which is not very likely, they could be

20    called but that's one factor that should be taken into

21    account; but in addition, these bonds have an

22    estate-put feature and even if they are not put today,

23    they could be put next year or the year after or the

24    year after so that would increase their value and that

25    also has to be taken into account.  And these are

1    subtle points but they should be taken into account in

2    assessing the value of the liability, the value of the

3    debt as it stands right now. Then I have to compare

4    that to what it costs to replace this debt at the

5    current rates.

6    **Q.**    Okay. So when you say the amount that it costs to

7    replace the debts, in this case, the example I gave

8    you, GMAC had $100,000 debt that the Defendant here is

9    calling, saying pay me back that money now. How do you

10   figure out how much it would cost in this particular

11   case GMAC to replace that debt?

12   **A.**    So the actual cost as you indicated is actually

13   the par value. That's what it is. But from an

14   analytical perspective, the way you handle this is to

15   look at the outstanding debt that we understand is its

16   call option, is its put option and essentially value

17   that debt based on the issuers pure end refunding

18   rates. That's the underlying analytical method of

19   doing it.

20   **Q.**    So if this bond, let's put on just an example, has

21   a five percent rate of return, five percent coupon rate

22   and it costs General Motors eight percent at this

23   period of time because of whatever fact, they're having

24   some issues and the interest rates are moving up and

25   for whatever reason it costs them more to borrow money

1    than the rate of return on the bond.  How would that

2    difference between that eight percent and five percent

3    play out in determining how much money, if any, that

4    GMAC lost on this bond?

5    **A.**    In essence, the term is discount the remaining

6    flows on the outstanding bond, on the outstanding five

7    percent bond at an eight percent rate.  There are some

8    complications that I mentioned involving the

9    optionality but that basically captures what happens.

10    All you come up is that hundred dollars really doesn't

11    matter in terms of calculating the amount of loss.

12    **Q.**    Am I correct in understanding your opinion is that

13    GMAC in this particular case would need to pay back

14    immediately $100,000 on which they had agreed to be

15    paying five percent interest but it may cost them more

16    in interest to raise $100,000 to pay back in the first

17    place?

18    **A.**    That is correct.

19    **Q.**    How would you explain this in kind of layman's

20    terms through if you would use an example of a mortgage

21    that we all have?

22    **A.**    So suppose you have a 30-year mortgage and it has

23    25 years left to maturity.  If the mortgage has, for

24    the sake of argument, a rate of five percent and

25    suddenly you are required to repay the entire principal

1   amount, if you don't have the money you'd have to go

2   out and have a new mortgage and say the new rate is

3   eight percent.  So essentially, your monthly payment

4   after the refinancing will be higher than they were

5   before.  So you look at the difference between those

6   two amounts.  It depends on the principal amount, the

7   initial principal amount of the mortgage, and you look

8   at how much more it costs over the remaining 25 years

9   and you express that amount.  You don't just add up.

10  You have to discount and express it on a so-called

11  present value basis.  That's kind of it, but again

12  even in the case of a mortgage, you may want to

13  consider that the typical mortgage can be refinanced

14  at -- can be repeated any time.

15         So even this five percent mortgage, which is

16  currently in the example, it's at below market rates.

17  Should rates ever go to four percent, you may want to

18  refinance it.  And that somehow has to be captured in

19  the analysis.

20  Q.   When you're determining the call option -- there's

21  other aspects in this calculation that you used?

22  A.   Yes.  It's not just repaying it now versus waiting

23  until maturity.  There are things that could happen in

24  the interim.

25  Q.   But would you agree with me that, although there

1    are a number of variables, a very important variable in

2    your analysis would be how much each corporation would

3    be required to pay at -- would prevailing rate be the

4    right term?

5    **A.**    Yes.  Prevailing borrowing rate.

6    **Q.**    And that would vary from company to company?

7    **A.**    Yes, it would.

8    **Q.**    There's a long list of companies here.  How did

9    you go back and determine what the prevailing rate was

10   for each of these companies back in 2007 and 2008?

11   **A.**    We did not determine those rates internally.  We

12   used some information that we obtained from Standard &

13   Poor's.  They compute these rates on a regular interval

14   by different credit classes.  We looked at only two

15   different credits.  We did not try to go for every

16   possible credit rating and investment grade and money

17   investment grade.  And we used that information in

18   terms of spreads, how much more would an investment

19   grade corporation have to pay for ten-year debt above

20   what the U.S. Treasury pays.  That's the type of

21   information, and we obtain that information from

22   Standard & Poor's and use that information to estimate

23   the borrowing costs for the relevant corporations.

24   **Q.**    Did you prepare a report summarizing your findings

25   in this case?

1    **A.**    Yes, we did.

2    **Q.**    I want to show you Exhibit 10.  Is this a copy of

3    your report that you prepared?

4    **A.**    Yes.  Yes, it is.

5    **Q.**    And it's dated July 17th of 2012?

6    **A.**    Yes, it is.

7    **Q.**    Now, page two, there's a paragraph that talks

8    about determining the loss to the issuers.  It should

9    be on the screen in front of you.

10   **A.**    Yes.

11   **Q.**    And it talks about the issuers prevailing

12   borrowing costs and the call options.  And is that

13   essentially what you just testified about here as the

14   formula you were using?

15   **A.**    Yes.  Funding curve.

16   **Q.**    And the funding curve, that referred to how much

17   it cost each issuer to borrow at a certain time?

18   **A.**    On a given date how much it costs by different

19   maturities, because the borrowing cost for five years

20   would typically be less than the cost of borrowing for

21   ten years and that, in turn, would be lower than

22   borrowing for 20 or 30 years.  So we refer to a yield

23   curve or a funding curve.

24   **Q.**    And if I turn to the final page of this report,

25   you have a little diagram summarizing the essential

1  factors that you used?

2  **A.**  Yes.

3  **Q.**  Is that basically what you are testifying about

4  here?

5  **A.**  Yes.  And the key point is the fair value of the

6  bond, which is indicated in the third box.

7  **Q.**  When it says "replacement cost to issuer," is that

8  talking about how much more it would cost then to get

9  the money to pay off the original bond?

10  **A.**  Yes.  The fair value is what the bond -- what the

11  cost of the liability is today if you leave it

12  outstanding, if you do not have to repay it today.

13  **Q.**  And then it indicates in the final paragraph that

14  based on the calculation that you performed for the

15  survivor-put options that were redeemed by

16  Mr. Caramadre and others in this case, the total loss

17  was $12.48 million?

18  **A.**  Yes.  It's not on this page.

19  **Q.**  I want to show you Exhibit 11.  Is this a chart

20  that you prepared breaking down the losses by company?

21  **A.**  Yes, it is.

22  **Q.**  And is it in order of severity?

23  **A.**  Yes.

24  **Q.**  For instance, the biggest loss was General Motors,

25  and they lost $4.76 million?

1    **A.**    Yes.  GMAC.

2    **Q.**    And it adds up to $12,482,000?

3    **A.**    Yes.

4    **Q.**    You mentioned before Tennessee Valley Authority,

5    and it indicates here that they lost $4,568?

6    **A.**    Yes.

7    **Q.**    You testified today that they were actually a

8    client of yours?

9    **A.**    They continue to be a client.  They are our oldest

10   client.

11   **Q.**    Did you have any knowledge of their role in this

12   case before any of the data were provided to you?

13   **A.**    None whatsoever.  And in fact, I brought this case

14   to their attention as I did for another client, which

15   is the Federal Farm Credit Bank System, which at the

16   time was not issuing these securities.  They began

17   issuing them a few years later.  They did not issue

18   such bonds until about I believe 2010.

19   **Q.**    Now, it says here that Tennessee Valley Authority

20   lost $4,568?  Do you see where my finger is?

21   **A.**    Yes.

22   **Q.**    Does the fact that a client of yours lost that

23   money, does that have anything to do with the opinions

24   that you reached in this case?

25   **A.**    None whatsoever.  I had not even realized that

1    they were put on this page.

2    **Q.**    Now I want to show you Exhibit 12.  Is this a

3    chart that you prepared breaking down the same loss by

4    account?

5    **A.**    Yes, it is.

6    **Q.**    And the accountholder on the far left column,

7    would that be the individual who is listed as a joint

8    account holder on these accounts?

9    **A.**    Yes.

10   **Q.**    And it's the same numbers, correct me if I'm

11   wrong, just broken down by account and adds up to the

12   same total loss of $12,482,108?

13   **A.**    Yes.

14   **Q.**    Now, I want to show you Exhibit 13.  Is Exhibit 13

15   the same total losses that's broken down by brokerage

16   house in which the accounts were opened?

17   **A.**    Yes.

18   **Q.**    And it indicates that the majority of the losses,

19   more than $7.6 million came from Ameritrade accounts?

20   **A.**    Yes.

21   **Q.**    Now, finally, were you asked fairly recently to

22   perform an analysis with these numbers to determine how

23   much of those losses came from accounts -- came from

24   bonds that were redeemed on or after July 1st of 2007?

25   I'm showing you now Exhibit 14.  Do you see that in

1    front of you?

2    **A.**   Yes, I do.

3    **Q.**   Did you just essentially go back into your data

4    and cull out the bonds that were redeemed before July

5    1st, 2007, and redo the calculations?

6         That was a bad question.

7         Did you specifically look at in preparing this

8    chart only the bonds that were redeemed after July 1st

9    of 2007?

10   **A.**   I believe so.  Yes.

11   **Q.**   And did that total equal $12,304,392.67?

12   **A.**   Yes.

13   **Q.**   And was that because an overwhelming percentage of

14   these bonds were purchased after July of 2007?

15   **A.**   Yes.

16        MR. VILKER:  Your Honor, I have no further

17   questions.

18        THE COURT:  All right.  Why don't we take our

19   morning break at this point before we proceed to

20   cross-examination.

21        Dr. Kalotay, you'll be remaining under oath

22   during our break, but for now you can step down.  We'll

23   take a short break and be back by 11:30.

24        (Recess.)

25        THE COURT:  Doctor, I just remind you that

1    you're still under oath.

2         Cross-examination, Mr. Murphy?

3         MR. MURPHY:  Judge, yes.  Judge, just a little

4    out of the ordinary, Mr. Caramadre wishes to do his own

5    cross-examination.

6         THE COURT:  All right.

7         MR. VILKER:  Your Honor?

8         THE COURT:  Yes.

9         MR. VILKER:  Mr. Caramadre is not pro se.  He

10   has an attorney.  I need to check the Local Rules, but

11   I don't think he's entitled to cross-examine witnesses.

12        MR. CARAMADRE:  Your Honor, I'd like to argue

13   against that.  I was a practicing attorney.  The

14   Government has been working on this for almost

15   four-and-a-half years.  My attorney has been only

16   working on it for three months.  I believe I am most

17   qualified to answer an expert that the Government has

18   brought here with impeccable credentials the expert

19   has.

20        THE COURT:  I'm inclined, Mr. Vilker, under the

21   circumstances to permit Mr. Caramadre to proceed.  I

22   think it is irregular.

23        It might have been preferable, Mr. Murphy, to

24   bring it to Mr. Vilker's attention before this moment.

25   And I think I'm going to permit Mr. Caramadre to do it

1      as a pro se litigant notwithstanding that he has advice

2      of counsel.  If it becomes troublesome for any reason,

3      I think we'll go the more traditional route.

4                MR. MURPHY:  Judge, I appreciate that.  For the

5      record, your Honor, I did not realize until a few

6      moments ago that Mr. Caramadre was intent on doing

7      cross-examination.

8                THE COURT:  All right.

9                THE MARSHAL:  Can I speak to you for a second,

10     Judge?

11               THE COURT:  Yes.

12               (Discussion off the record.)

13               MR. VILKER:  Your Honor, we renew our objection.

14     The case law, my understanding, and we could go back to

15     the office and find it for your Honor, is very clear

16     that there's no such thing as hybrid representation.

17     You either represent yourself or you have counsel.  And

18     if you have counsel, you're not allowed to act as your

19     own attorney.  I believe Mr. Caramadre has been

20     disbarred or is in the process of being disbarred and

21     he's not allowed to.  And our concern is ultimately

22     he's going to argue that this was error to allow him to

23     question a witness, that any statements he makes can be

24     used against him, including in his sentencing next

25     week, and this is going to cause some significant

1     obstacles down the road.  And that's part of the reason

2     why this Rule is there in the first place.  If you have

3     an attorney, your attorney acts for you.

4                THE COURT:  Thank you, Mr. Vilker.  And I would

5     just observe that I -- I'm not sure what

6     Mr. Caramadre's status as an attorney is, but in

7     contemplating his proceeding, I am not contemplating

8     that he is doing that in his capacity as an attorney.

9     It would be as a pro se litigant, albeit one

10    represented by counsel at this hearing.

11               Mr. Murphy, Mr. Vilker has raised some serious

12    concerns.  Can you address them?

13               MR. MURPHY:  Judge, yes.  It's my understanding

14    that Mr. Caramadre's license in the State of Rhode

15    Island has been suspended.  I believe that to be

16    accurate.  As part of his license here, I would say

17    that the disciplinary counsel in Rhode Island, the

18    Rhode Island Supreme Court controls his law license.

19    It's my understanding that that has been suspended.

20               Judge, this is not the trial of the matter.

21    This is a restitution hearing.  Mr. Caramadre does have

22    expertise in this area, and he has basically insisted

23    to me and Mr. Olen that he wants to conduct his own

24    cross-examination of Dr. Kalotay.

25               THE COURT:  Mr. Vilker raises a point that

1   really is the reason why I am now somewhat concerned,

2   and that is that because, if you sort of go by the

3   book, there's no question that Mr. Vilker is correct,

4   that if you have counsel then it is your counsel who

5   must proceed, not the individual as if they were pro

6   se.  You're either one or the other.

7        So I'm accepting potentially something that's

8   off the beaten path, and Mr. Vilker's concern is that

9   that could come back as a claim of error since it

10  certainly is inconsistent with what's technically the

11  right path.

12       So I think Mr. Vilker is making a good point,

13  which causes me to reconsider whether it would be

14  appropriate to allow Mr. Caramadre to engage in that

15  examination when his statements in the course of the

16  examination could be used against him and then he could

17  assert error arising from that, which is an assertion

18  that Mr. Vilker is right, it's technically off the

19  beaten path.

20       MR. MURPHY:  Judge, it is off the beaten path.

21  I know in some circumstances -- I apologize I do not

22  have the case law.  I was preparing my own

23  cross-examination so I wasn't ready for this.  This

24  case has taken some bounces off the beaten path, and

25  the Court knows the procedural history of this case.

1            Judge, I would say if Mr. Caramadre insists to

2      me and Mr. Olen that he wants to conduct his own

3      cross-examination that he could waive any right that he

4      has if this were ever to come back as to why he was

5      allowed to conduct his own cross-examination.  My

6      understanding, Judge, is he is not testifying as a

7      witness although he was listed in Mr. Olen and my

8      objection in our response to the Court.  I have no

9      intention of calling Mr. Caramadre today during the

10     furtherance of the bond hearing as a witness.  So his

11     cross-examination would be that, simply

12     cross-examination.

13            THE COURT:  Mr. Vilker.

14            MR. VILKER:  Your Honor, just to give you some

15     perspective on the history of this case, a similar

16     issue occurred a few months before trial in which

17     Mr. Caramadre had a new attorney, Anthony Traini came

18     into the case.  He was representing a Government

19     witness at the time.  Judge Smith agreed if

20     Mr. Caramadre were to waive that conflict that

21     Mr. Traini could represent Mr. Caramadre.

22            Judge Smith had an extensive colloquy with

23     Mr. Caramadre under oath in which it was explained to

24     him that this waiver could severely impact his rights

25     and Mr. Caramadre indicated he's fully aware that that

1    was a possible consequence and wanted to proceed

2    accordingly.

3         Fast forward several months and in a motion to

4    withdraw his guilty plea hearing he's arguing to the

5    Court that his attorneys, Attorney Traini was -- did

6    not represent him appropriately because his loyalties

7    were conflicted.

8         So this is a Defendant who has a history of kind

9    of doing these off the beaten path, so to speak, legal

10   maneuvers and then using them down the road as an

11   opportunity to claim error or ineffective assistance of

12   counsel.

13        So we would strongly object, your Honor.  And we

14   believe the case law that we don't have at our disposal

15   is very clear that this is impermissible.

16        MR. OLEN:  Your Honor, if I may?

17        THE COURT:  You may.

18        MR. OLEN:  I'd just like to respond to what

19   Mr. Vilker just brought up.  In the waiver hearing that

20   was held regarding Mr. Caramadre's waiving any

21   objection to Mr. Traini coming on board, that hearing

22   was -- the crux of that hearing was whether or not he

23   would waive any conflict based on his representation of

24   Mr. Maggiacomo.

25        In our motion to withdraw the guilty plea, our

1    claim of conflict was based on the fee agreement

2    itself.  It had nothing to do with Mr. Maggiacomo.  So

3    there were really two different claims.  It wasn't a

4    case where we were trying to go back on the waiver

5    itself with respect to Mr. Maggiacomo.  It was entirely

6    whether or not that fee agreement created a conflict.

7    So they're really two different issues.

8            THE COURT:  All right.  I'm going to

9    quasi-reverse myself.  Here's how I'd like to proceed.

10   Let's proceed with traditional cross-examination by

11   counsel.  I suspect we'll get to our lunch break before

12   that's completed.

13           Mr. Murphy, you indicated you had some case

14   authority to bring to my attention potentially?  No?

15           MR. MURPHY:  Judge, no, but I'm aware that there

16   have been people that have given their own summations.

17   This is not a case with a jury.  I believe Mr. Vilker

18   said that he had some case law.

19           MR. VILKER:  I need to find it but --

20           THE COURT:  Anyway, I will take into

21   consideration anything that you can bring to my

22   attention; and if after lunch we can review the law on

23   this issue, if Mr. Caramadre is not satisfied with the

24   cross-examination and believes that there are remaining

25   issues that he would like to cover, I'll revisit

1    permitting him in effect of a third, so Mr. Murphy will

2    get a shot and Mr. Thompson will get a shot and then if

3    I conclude that it appears appropriate, Mr. Caramadre.

4            I will say that Mr. Vilker's argument about a

5    latter argument coming back and asserting error arising

6    from permitting Mr. Caramadre to conduct the

7    examination is a significant concern to me.  I hear

8    Mr. Olen's presentation regarding whether or not the

9    colloquy on the Traini conflict ended up being

10   precisely the same thing and I think there clearly was

11   a difference, but this certainly is a case where there

12   was a plea colloquy and then a withdrawal so that we do

13   have some history in this case that I think justifies

14   the concern raised by the Government.

15           MR. VILKER:  The only thing I would add to that,

16   your Honor, is we disagree with what Mr. Olen said.

17   Mr. Caramadre clearly in the briefs and I believe in

18   argument attempting to withdraw the guilty plea was

19   arguing that Mr. Traini's interests were conflicted

20   because he was looking out for the interests of his

21   other client, Mr. Maggiacomo.  So I think it's pretty

22   much an apples-to-apples type situation.

23           THE COURT:  All right.  So for now we will

24   proceed down the traditional road.  Mr. Murphy?

25           MR. MURPHY:  Judge, I had one last comment based

1       on what the Court just said.

2               THE COURT:  Yes.

3               MR. MURPHY:  Judge, Mr. Caramadre pointed out to

4       the Court that I had been involved in this case for

5       approximately a little over three months.  By my count,

6       I'm either attorney number seven, eight or nine for

7       Mr. Caramadre.  I know Mr. Caramadre has jotted down

8       some notes during Mr. Vilker's direct examination of

9       Dr. Kalotay.  I would ask, Judge, for a little patience

10      from the Court, if possible, because this afternoon if

11      the Court finds that the Court will not allow

12      Mr. Caramadre to cross-examine, if during and when I'm

13      ready to complete my cross-examination if I may confer

14      with Mr. Caramadre and Mr. Olen to see if there are

15      other questions that Mr. Caramadre asks.

16              THE COURT:  Absolutely.  Including if you wish

17      to take a break before you close your

18      cross-examination, that's fine.

19              MR. MURPHY:  Thank you, Judge.

20              <u>CROSS-EXAMINATION BY MR. MURPHY</u>

21      **Q.**   Dr. Kalotay, good afternoon, sir.

22      **A.**   Good afternoon.  Morning.

23      **Q.**   It's still morning.  Feels like afternoon.

24              Doctor, you were hired by the United States

25      Attorney's Office to do your study as it pertains to

1   bonds in this case?

2   **A.**   Yes.

3   **Q.**   Okay.  And when was your first contact with the

4   United States Attorney's Office, sir?

5   **A.**   It must have been in the spring of last year

6   sometime.

7   **Q.**   The spring of 2012?

8   **A.**   2012, yes.

9   **Q.**   And to date, you have been paid how much, sir?

10   **A.**   I am not sure.  I believe it's about a total

11   probably around $24,000, I believe.

12   **Q.**   And that was paid to you at a rate of $450 an hour

13   by the Government?

14   **A.**   Some of it was paid to me at that rate, and the

15   rest of it was paid at lower rates for the people who

16   were doing the analysis.

17   **Q.**   Who were the people doing the analysis?

18   **A.**   I have two employees who were working on this,

19   Leslie Abreo and Radek Wyrwas.

20   **Q.**   So Leslie and Roderick --

21   **A.**   Radek, yes.

22   **Q.**   -- Radek are the people that actually did the

23   analysis?

24   **A.**   They are the ones who crunched the numbers.

25   **Q.**   You didn't crunch the numbers?

1    **A.**   No, I did not.

2    **Q.**   So you're just taking what they gave you?

3    **A.**   Yes.

4    **Q.**   Now, sir, Mr. Vilker on his direct examination

5    gave you an exhibit which has 14 tabs, Government's 1

6    which contains numbers 1 through 14, and you have that

7    in front of you, do you not?

8    **A.**   I do.

9    **Q.**   When was the first time that you saw this bound

10   booklet, sir?

11   **A.**   This morning.

12   **Q.**   When was the last time prior to testifying that

13   you spoke to Mr. Vilker about your testimony?

14   **A.**   I spoke with Mr. Vilker last Wednesday.

15   Wednesday, I believe.  He had a specific question about

16   a document.

17   **Q.**   Now, you were hired prior to the start of

18   Mr. Caramadre's trial in this matter?

19   **A.**   I'm not sure what the official trial date was.  I

20   can't comment on that.

21   **Q.**   Well, you said you were hired last spring, meaning

22   2012?

23   **A.**   Yes.

24   **Q.**   So you were in place working for the Government

25   prior to October and November of 2012, correct?

1    **A.**    Yes, I was.

2    **Q.**    And in 1990, you stated on direct examination that

3    you formed your own business, Andrew Kalotay and

4    Associates, correct?

5    **A.**    Yes.

6    **Q.**    And you've been based in New York City since 1990?

7    **A.**    Yes, I have been.

8    **Q.**    And part of your job with Kalotay and Associates

9    according to what you said on direct examination is

10   that you advise issuers, correct?

11   **A.**    Yes.

12   **Q.**    And that is bond issuers, correct?

13   **A.**    Bond issuers, generally, yes.

14   **Q.**    Okay.  And have you been advising bond issuers

15   since 1990?

16   **A.**    Yes, I have been.

17   **Q.**    And when you advise them, do you advise them as to

18   setting up a prospectus with a bond indenture?

19   **A.**    No, I do not get into the indenture normally.

20   That's not my area of expertise.

21   **Q.**    Do you get into the prospectus at all.

22   **A.**    I am familiar with prospectuses, but I don't

23   really look at prospectuses.  I focus on refunding

24   provisions and maturities, analytical concepts.

25   **Q.**    When you -- I'm sorry, sir.  You focus on

1    refunding?

2    **A.**    Yes.  On refunding provisions, so-called embedded

3    options in a bond.

4    **Q.**    Okay.  So you have nothing to do with getting that

5    bond from an issuer ready for market?

6    **A.**    No, I don't.

7    **Q.**    You have nothing to do with getting that bond

8    ready for sale on the retail market?

9    **A.**    None whatsoever.  I do not have any interaction

10    with the underwriters.

11    **Q.**    Just on the refund, on refund provisions, correct?

12    **A.**    Refunding and maturities.

13    **Q.**    Refunding and maturities?

14    **A.**    And maturities.  Underwriting fees.

15    **Q.**    Underwriting fees.  Okay.

16        Now, Dr. Kalotay, you would agree with me that

17    there are four ways to retire a bond, correct?

18    **A.**    I'm not sure what you mean.

19    **Q.**    Well, for a company that issues a bond, the

20    prospectus travels with that particular bond from

21    cradle to grave, correct?

22    **A.**    There's a prospectus associated, there's an

23    indenture associated with every bond, yes.

24    **Q.**    Right.  And that prospectus follows a particular

25    bond until that bond is retired, correct?

1    **A.**   I'm not sure what you mean "follows it."  It's

2    associated with the bond.

3    **Q.**   Well, the prospectus is the bible of that bond,

4    correct?

5    **A.**   That's correct.

6    **Q.**   And it follows a particular bond from cradle to

7    grave, correct?

8    **A.**   Every bond has a prospectus.

9    **Q.**   Now, you can retire a bond by when a particular

10   bond reaches maturity, correct?

11   **A.**   Correct.

12   **Q.**   A bond can be called by the issuer?

13   **A.**   Correct.

14   **Q.**   If there is an option on a bond, the owner of that

15   bond can put it to the company, correct?

16   **A.**   What you're referring to is a straight put without

17   the estate-put, correct.

18   **Q.**   And then there's the matters which are complicated

19   would be with a court or a bankruptcy court or

20   something like that, correct?

21   **A.**   Well, that's correct.  But there are some other

22   things like sinking funds and more complicated features

23   that --

24   **Q.**   We'll get to sinking funds in a minute, sir.

25   **A.**   That's fine.

1    **Q.**   Now, when you spoke about two bonds in the

2    exhibit that Mr. Vilker gave you --

3    **A.**   May I ask you a question?  Because you mentioned

4    four and I'm still at a bit of a loss.  What are those

5    four?  Just so that we're on the same --

6    **Q.**   A bond reaches maturity; it's called by the

7    issuer; in this case there's an estate-put; and fourth

8    is something that we don't have to deal with here, if

9    there's a bankruptcy proceeding or a court proceeding.

10        Now, I would ask you to look at Exhibit Number

11   12.

12        Sir, Number 12, which is part of Government's

13   Exhibit 1, says "Loss By Accountholder."  And the

14   second column it says, "Joint Accountholder," and it

15   has a person's name.  Are you the one that compiled

16   this data?

17   **A.**   I did not do this personally.

18   **Q.**   Sir, if you can look at Exhibit Number 11, where

19   it says, "Loss By Issuer" in Government's Exhibit

20   Number 1, part 11, are you the one that completed that

21   data?

22   **A.**   No, I did not.

23   **Q.**   And Government's Exhibit Number 1, Section 13 --

24        MR. MURPHY:  Judge, I'm sorry.

25        THE COURT:  Probably can do without it since

1    we've all got the compilation.

2         It's back.

3    **Q.**   Now, that Section 13 of Government's 1, it says,

4    "Loss by Brokerage."  Did you, Dr. Kalotay, compile

5    that data?

6    **A.**   No, I did not.

7    **Q.**   Now, where it says "Loss by Brokerage," that would

8    refer to the brokerage house?

9    **A.**   Well, it's the accounts with the particular

10   brokerage house.

11   **Q.**   The accounts that are held?

12   **A.**   That are held in the brokerage house.

13   **Q.**   Right.  Are you saying that the brokerage house

14   actually lost money?

15   **A.**   No, I do not.

16   **Q.**   So it shouldn't say "Loss By Brokerage"?

17   **A.**   It's the loss of accounts by brokerage.

18   **Q.**   Loss of accounts by brokerage?

19   **A.**   It's the accounts that lost money by the various

20   -- and it's sorted by the brokerage.

21   **Q.**   Well, looking at number two from the bottom,

22   Charles Schwab didn't lose money?  They made money by

23   conducting sales, correct?

24   **A.**   Schwab didn't make or lose money in this case.

25   They may have gotten some very small fees associated

1    with the trading.  The accounts residing with Schwab

2    were the ones that gained or lost money depending on

3    how you look at it.  The loss here is from the

4    perspective of the issuers whose bonds were held in

5    these accounts.

6    **Q.**    Okay.  But it's not a loss by the brokerage?

7    **A.**    It's definitely not by the brokerage.

8    **Q.**    Now, sir, going back to Exhibit Number 11, you had

9    mentioned when Mr. Vilker had asked you that you

10   represent Tennessee Valley Authority, which is the

11   fifth bond issuer listed from the bottom, correct?

12   **A.**    I am an advisor to Tennessee Valley Authority.

13   **Q.**    And there must be on that page 20-plus bond

14   issuers.  Did you look at the prospectus for the bond

15   issuers that are contained in Section 11 of

16   Government's Exhibit 1?

17   **A.**    I did not look at prospectuses.

18   **Q.**    Okay.  So as it relates to Government's Exhibit 1,

19   Section 11, Table 1 that says "Loss by Issuer," there's

20   over 20 bond issuers, correct?

21   **A.**    Yes, it is.

22   **Q.**    How many to be exact , sir?

23   **A.**    I'm not sure how many exactly.

24   **Q.**    Can you count the bond issuers quickly to

25   yourself.

1    **A.**    Looks like 33.

2    **Q.**    Thirty-three?  Okay.  Now, those are 33 bond

3    issuers?

4    **A.**    Thirty-three issuers, yes.

5    **Q.**    Sir, there are not 33 bond issuers.  Some of those

6    are CDs, correct?

7    **A.**    There are 33 corporations listed here.

8    Thirty-three names listed here.

9    **Q.**    You just said they were 33 bond issuers.

10          Let me ask you this way, Dr. Kalotay.  I'll

11   rephrase the question.

12          Are you aware of the 33 issuers that you just

13   counted that some of those issuers pertain to CDs and

14   not bonds?

15   **A.**    I believe some of them are CDs but CD structure

16   very much like --

17   **Q.**    Did you know prior to this morning that there were

18   CDs in Government's Exhibit 1, Section 11?

19   **A.**    I believe it was called to my attention before,

20   yes.

21   **Q.**    But I thought you said you weren't the one that

22   compiled this data?

23   **A.**    No, I'm not.  No, I was not the one who compiled

24   it, but I discussed it with my two colleagues who were

25   working on this.

1  **Q.**  So you just said a moment ago that CDs are the

2  same as bonds?

3  **A.**  CDs are debt instruments from the prospective of

4  the corporation.

5  **Q.**  They're not securities?

6  **A.**  They are normally not securities.

7  **Q.**  Now, sir, Mr. Vilker had showed you and I believe

8  at first you didn't recall the name of the article that

9  you wrote in 2006 of "Some Bonds Are Worth More Dead

10  Than Alive"?

11  **A.**  I recall it.  It's in here.

12  **Q.**  Right.  But at first you didn't recall the name of

13  it, did you?

14  **A.**  No.  The question, I believe, pertained to the

15  article I wrote in 2009 and not in 2006, which is a

16  longer title.

17  **Q.**  What article did you write in 2009 that's in this

18  exhibit?

19  **A.**  The article -- it's not in this exhibit but it's

20  listed under my qualifications, and the article is

21  something like "Estate-Put Bonds Value Lies in the Eyes

22  of the Beholder," or something along those lines.  But

23  that's not the 2006 article.  It's the 2009 article.

24  **Q.**  So if I can refer you to the article that you

25  wrote in 2006, "Some Bonds Are Worth More Dead Than

1    Alive," can you go through the exhibit and find that

2    article, please, sir?

3    **A.**   Can you tell me --

4    **Q.**   It's number 7.

5    **A.**   Number 7.  Yes.

6    **Q.**   Okay.  That article deals with estate-puts,

7    correct?

8    **A.**   Correct.

9    **Q.**   And estate-puts can be called death bonds or

10   death-puts, correct?

11   **A.**   Yes.  Or survivor options is another way of

12   describing them.

13   **Q.**   You don't like to use the name "death-put," do

14   you, personally?

15   **A.**   I don't personally use them, no.

16   **Q.**   I'm not saying --

17   **A.**   No. No.  I don't like to use them.  It's a way to

18   explain these bonds in terms of the old Treasury bonds,

19   which were referred to as death-put bonds.  That's kind

20   of the chronology of it.

21   **Q.**   You don't like to use that vernacular of

22   "death-put."  You like to call it an estate-put --

23   **A.**   Estate-put.

24   **Q.**   -- or survivor option, correct?

25   **A.**   Or survivor option, yes.

1    **Q.**    Now, you had mentioned that when you wrote this

2    article you were not aware that these bonds could be

3    held by joint tenants?

4    **A.**    I was not aware of that.

5    **Q.**    When did you first become aware that these bonds

6    could be held in a joint tenancy?

7    **A.**    I learned about this in the context of this

8    particular case.

9    **Q.**    So sometime in the spring of 2012?

10   **A.**    Yes.

11   **Q.**    That's the first time you became aware of it?

12   **A.**    That's the first time.

13   **Q.**    So when you wrote this article in 2006, you did

14   not know that people were using the death-put option as

15   an investment vehicle?

16   **A.**    I did not know that.  As a joint account?

17   **Q.**    Yes.

18   **A.**    I did not know that they would be having joint

19   accounts.

20   **Q.**    And you've been dealing with bonds since before

21   the 1990's, correct, sir?

22   **A.**    That's correct.

23   **Q.**    And in this article, you talk about you went back

24   to old time U.S. Treasury bonds, correct?

25   **A.**    That's correct.

1   **Q.**   And they were known as flowering bonds?

2   **A.**   Flower bonds.

3   **Q.**   And the flower bonds would come to be flowering,

4   but in 1998 they did away with them, correct?

5   **A.**   That's correct.

6   **Q.**   And you said they were similar to these bonds?

7   **A.**   In the sense that they could be put back at par,

8   or more precisely they could be used at par value

9   against estate taxes upon the death of the holder.

10   **Q.**   Well, that's a bit different because the reason

11   why flower bonds went out is because when you bought a

12   flower bond you did not buy it at par value, there was

13   an accretion rate, correct?

14   **A.**   I'm not sure.  You may be right on that but my

15   recollection is that they would be sold with below

16   market coupons so a Treasury could be -- regular

17   Treasury were issued for sake of argument at ten

18   percent, these flower bonds would bear a lower coupon,

19   say eight percent.

20   **Q.**   There was nothing illegal about flower bonds?

21   **A.**   There was nothing illegal about flower bonds,

22   that's correct.

23   **Q.**   They went away because the Government had to pay

24   face value for a bond that had sold much less than face

25   value, correct?

1    **A.**    I am not sure why they were discontinued.

2    **Q.**    Can you look through your article about "Some

3    Bonds Are Worth More Dead Than Alive" and tell me why

4    they were discontinued?

5    **A.**    I'm not sure what you're referring to here.  I'm

6    looking at the first page.  Can you direct me

7    specifically?

8    **Q.**    Yes.  I was looking at what is an estate-put where

9    you mentioned flower bonds and flower bonds actually

10   went away in 1998.  I'm asking you if you know why they

11   are not offered anymore?

12   **A.**    And I indicated that I do not know, and I thought

13   you told me that it was somewhere here and I cannot see

14   any -- maybe I'm missing some reference to it.

15   **Q.**    Now, on an estate-put bond, going back to your

16   expertise as a person who advises issuers, when a bond

17   is issued, I believe you said your expertise was in the

18   refunding of money as it pertains to the issuance of a

19   bond?

20   **A.**    Structuring of bonds and bond management, debt

21   management.  The expression I would like to use is

22   cradle to grave.

23           So when you structure the bond, you have to take

24   into account all kinds of contingencies that might

25   arise during the life of the bond, including calls if

1    it's callable, puts if it is puttable.  And all of

2    these things have to be accounted for in analyzing the

3    bond and determining what is its expected cost.

4    **Q.**    And you had just mentioned the term that was used

5    previous, cradle to grave, correct?  And that's your

6    expertise on how to advise bond issuers about debt

7    management of particular bonds, correct?

8    **A.**    Correct.

9    **Q.**    And the people that you've worked with, the

10   companies that you've worked with that have issued

11   bonds have taken your advice on debt management from

12   time to time, correct?

13   **A.**    They rely on me from time to time, yes.

14   **Q.**    And part of the debt management relates to

15   estate-puts or death-puts, correct?

16   **A.**    The decision to issue bonds with or without

17   death-puts, yes.

18   **Q.**    Well, the decision to issue bonds is not your

19   decision.  It's the company's decision, correct?

20   **A.**    The decision is the company's decision but often

21   we do the analysis that compares the expected cost of a

22   bond with an estate-put with that of a regular

23   institutional bond.

24   **Q.**    Okay.  Now, the estate-put bond or an estate-put

25   bond is not a -- it's a retail bond, correct?

1    **A.**    It is for retail, correct.

2    **Q.**    It's not an institutional bond?

3    **A.**    Correct.

4    **Q.**    There would be no reason for an institution to buy

5    a bond with a death-put, correct?

6    **A.**    Correct.

7    **Q.**    And a death-put makes a particular bond attractive

8    to a retail investor, correct?

9    **A.**    Correct.

10   **Q.**    Now, how long have you been working with companies

11   who issue bonds as an advisor who deals with risk

12   management?

13   **A.**    In general?

14   **Q.**    In general, sir.

15   **A.**    I have been working in this area since the time I

16   joined the Treasury organization of the American

17   Telephone and Telegraph Company, and that was in, I

18   believe, September of 1974.  At the time, AT&T was the

19   world's largest corporate issuer of debt.

20   **Q.**    Now, sir, can you estimate how many bond issues

21   you have worked on or have advised on?

22   **A.**    In issuance and refunding, hundreds.

23   **Q.**    Hundreds?

24   **A.**    Hundreds.

25   **Q.**    And out of those hundreds, how many have you dealt

1    with as it relates to estate-puts?

2    A.   Very few.  Very few.

3    Q.   Give me a number, please, if you can.

4    A.   I would say probably -- let me say ten, but let me

5    also add that earlier today we referred to some

6    calculators that my company developed, and those

7    calculators are made available to our clients who, in

8    turn, use those calculators to determine whether or not

9    to issue bonds with estate-put, so there's a

10   connection.

11   Q.   I haven't asked anything about your calculator.

12   A.   That's fine.

13   Q.   I'm just asking when did you first become involved

14   with companies as it relates to the issuance of bonds

15   where you provide advice and they concern estate-puts?

16   A.   Well, I have been working in this area advising

17   companies on debt management since 1974, and I have

18   been involved in analyzing the estate-put provision

19   since I believe 1994 when I first came across this

20   structure as an advisor to the Tennessee Valley

21   Authority.

22   Q.   So with the Tennessee Valley Authority in 1994,

23   that's when you first became aware of estate-put bonds?

24   A.   I believe so.  I'm not sure about the year, but I

25   became aware of estate-put bonds through my

1     association, through my consulting for the Tennessee

2     Valley Authority.

3     **Q.**    And in the market, in the economy when interest

4     rates decline, you advise issuers to call their bonds,

5     correct?

6     **A.**    Yes.

7     **Q.**    Now, sir, generically, an issuer of a bond, take

8     General Motors because that was number one on the list

9     of exhibits, when General Motors issues a bond, they

10    sell those bonds for face value, correct?

11    **A.**    These retail bonds are typically sold at face

12    value.  Other bonds, institutional bonds can be sold at

13    a different price.

14    **Q.**    But we're talking in Exhibit 1 of retail bonds,

15    correct, sir?

16    **A.**    Correct.

17          Where are we here?  Can you please direct me to

18    what section we are looking at.

19    **Q.**    Sure.  If you want to go back to a section, sir.

20          THE COURT:  Mr. Murphy, I believe each of the 14

21    items are separate exhibits.

22          MR. MURPHY:  Judge, I apologize.  I thought they

23    were part of a group exhibit.

24          THE COURT:  No problem.

25    **Q.**    Okay.  Exhibit number 11, sir, those are retail

1    bonds, correct?

2    **A.**    These are all retail bonds, yes.

3    **Q.**    Actually, we just said that some of them are CDs,

4    correct?

5    **A.**    Held by retail.

6         MR. MURPHY:  Judge, if I can have Defendant's 2

7    marked for identification.

8         THE COURT:  Maybe we should mark it as

9    Defendant's B.

10        MR. MURPHY:  As B.  That's fine, Judge.

11        And Judge, this would be in Mr. Olen's

12   submission as the 2005 General Motors prospectus.

13        THE COURT:  Okay.  Good.  I have a copy.

14        MR. MURPHY:  Thank you.

15        (Defendant's Exhibit B marked for

16   identification.)

17   **Q.**    Dr. Kalotay, I have placed in front of you and I

18   would ask if you see is a document which is a

19   prospectus from General Motors Acceptance Corporation.

20   Do you have that in front of you?

21   **A.**    I see part of it.

22   **Q.**    Is that better, sir?

23   **A.**    Yes, please.

24   **Q.**    Now, did you review this prospectus when you did

25   your analysis of losses?

1    **A.**    I did not.

2    **Q.**    And sir, a bond prospectus is a contract of

3    adhesion between the issuer and the purchaser, correct?

4    **A.**    Correct.

5    **Q.**    The bond issuer makes all the rules, correct?

6    **A.**    I'm not sure what you mean by the bond issuer

7    making --

8    **Q.**    The rules as to how the bond is going to be

9    redeemed, how it's going to be sold?

10   **A.**    Well, it's negotiated.

11   **Q.**    Well, it's negotiated in that it's sold, correct?

12   **A.**    It's a result of some negotiation.

13   **Q.**    As a hypothetical, as Mr. Vilker pointed out this

14   morning, I can't go to General Motors and say I want to

15   buy a hundred thousand dollars worth of your bonds in

16   this $15 billion indenture and say I want to change the

17   rules, can I?

18   **A.**    Not once the bonds have been issued.

19   **Q.**    Right.  So this prospectus goes from cradle to

20   grave with issued bonds, correct?

21   **A.**    Correct.

22   **Q.**    The purchaser of the bonds cannot change the

23   prospectus, correct?

24   **A.**    Nor can the issuer.

25   **Q.**    Who makes the rules for the prospectus?  Who sets

1      the terms, sir?

2      **A.**    It's negotiated prior to the issuance of the

3      bonds.

4      **Q.**    Negotiated by who?

5      **A.**    Normally, it's negotiated between the -- again,

6      this is not my area of expertise.  I do want to

7      emphasize that, but it's negotiated between the issuer

8      and the underwriter of the bonds.

9      **Q.**    Not the retail customer, correct, sir?

10     **A.**    No.  The retail customer has some indirect input

11     into this via the underwriter.

12              MR. MURPHY:  Judge, may I approach the witness?

13              THE COURT:  Yes.

14     **Q.**  Dr. Kalotay, I'm approaching you because I can't

15     seem to make the screen larger.  I'm handing you page

16     30 of Defendant's Exhibit B for identification and

17     would ask if you would look at page 30.

18              Down the bottom of the left side, sir, it deals

19     with the estate-puts, correct?

20              THE COURT:  Mr. Murphy, excuse me, just a

21     question.  On the copy of the exhibit that I have,

22     there's a page 30 that's handwritten down the bottom

23     and then there's a page 28 that's typewritten on the

24     document.  Which page number are you referring to, the

25     typewritten?

1      MR. MURPHY:  Page 30?  It should be in the

2   middle of the page, Judge, the number.

3      THE COURT:  The middle at the bottom?

4      MR. MURPHY:  Yes.

5      THE COURT:  So it's the typewritten number, not

6   the handwritten number?

7      MR. MURPHY:  Yes.

8      THE COURT:  Okay.  Thank you.

9   Q.   And there's a section in this particular

10  prospectus that deals with payment upon death, correct,

11  Doctor?

12  A.   Yes, it is.

13  Q.   And I'd ask if you could take a moment just to

14  peruse through that paragraph.

15  A.   The first paragraph immediately under --

16  Q.   Where it says "Payment upon death," that section

17  on page 30, both the left bottom paragraph and the

18  paragraphs on the right-hand side of that page.

19      (Witness read document.)

20      THE COURT:  Fair amount of material, Mr. Murphy,

21  to read on the fly.

22  A.   All right.

23  Q.   Now, Doctor, that death benefit is actually part

24  of the prospectus that travels with any tranche of

25  bonds until it's retired, correct?

1    **A.**    Yes.

2    **Q.**    Now, sir, those terms as you've just agreed with

3    me are set by the issuer and the brokerage house before

4    they're offered for sale on the open market, correct?

5    **A.**    By the underwriter and the issuer, yes.

6    **Q.**    And you've already said that myself as a purchaser

7    could not change those terms once the bond is issued

8    and the prospectus travels with it, correct?

9    **A.**    That's correct.  Nor could the issuer.  It's a

10   contract.

11   **Q.**    Okay.  I either can purchase that GMAC bond and

12   abide by the contract, or I have the choice not to buy

13   that bond, correct?

14   **A.**    That's correct.

15   **Q.**    And as it relates to a death-put or an estate-put,

16   those are the terms and conditions of how I can put

17   that bond upon the death of a joint tenant or owner,

18   correct?

19   **A.**    Correct.

20   **Q.**    And when you advise companies as part of your debt

21   management, there's always a percentage of the total

22   bond indenture that is set aside for an estate-put,

23   correct, if they are estate-put bonds?

24   **A.**    I'm not sure what you mean by "being set aside."

25   **Q.**    In other words, that prospectus on page 30 that

1    you have in front of you that deals with the October

2    7th, 2005, issuance of $15 billion of General Motors

3    bonds says that one percentage point must be set aside

4    for estate-puts during a calendar year, correct?

5    **A.**    Where do you see the phrase "being set aside"?

6    I'm not saying it's not here but --

7    **Q.**    "Set aside" is my word.

8    **A.**    That's your word.  All right.

9    **Q.**    It's one percent.

10   **A.**    Just for the sake of clarity, to the best of my

11   knowledge, no money is being, quote, unquote, set

12   aside.

13   **Q.**    Well, I'm not talking about sinking funds or

14   anything like that.  I'm just saying that one percent

15   is there as the risk that will be claimed in a calendar

16   year, correct?

17   **A.**    One percent may be put, but I think you implied

18   that the corporation assumes something in anticipation,

19   the way I hear you.  Or I'm misunderstanding what you

20   said.

21   **Q.**    The issuer and the underwriter determine the

22   prospectus, and it says:  "A survivor's option will be

23   accepted in any calendar year to one percent of the

24   outstanding aggregate principal amount of the note of

25   the end of the most recent fiscal year but not less

1    than $1,000,000 in any such calendar year."  That's the

2    amount of money that a company will allow to be

3    estate-put, correct?

4    **A.**    That is the amount according to the prospectus,

5    yes.

6    **Q.**    And the company is the one that sets that amount?

7    **A.**    Again, I'm sorry.  This is part of a contract

8    which was set prior to the issuance of this bond by the

9    underwriter and the company.  It's not the company

10   decides.  It's an agreement between the underwriter --

11   **Q.**    And the company?

12   **A.**    -- and the company.  It's just the way you express

13   it, you kind of imply that there's an arbitrariness and

14   the company is doing it.  In fact, it's the result of a

15   negotiation.

16   **Q.**    Between the company and the underwriter?

17   **A.**    If I may point out, it's one percent here.  In

18   some cases, I believe it can be as high as two percent.

19   There are some variations on this.

20   **Q.**    The one that you saw in Defendant's Exhibit B is

21   one percent, correct?

22   **A.**    Yes, please.

23   **Q.**    And there are certain rules that a company and

24   underwriter will put in the prospectus as to an amount

25   and rules that have to be followed before somebody can

1    use a death-put option, correct?

2    **A.**    Well, you call them rules.  Bonds are man-made.

3    These are results of negotiations.  The rules are

4    man-made.

5    **Q.**    Okay.  So the result of negotiations are there are

6    rules that follow a particular tranche of bonds,

7    correct?

8    **A.**    Correct.

9    **Q.**    You'd agree with me that the customer doesn't set

10   those rules, your retail customer, sir?

11   **A.**    The customer does not set -- the customer does

12   have an input into that, however, via the underwriter.

13          The customer, the buyer, the retail buyer does

14   not set those rules directly, but the buyer does

15   provide some input into the structuring via the

16   underwriter.

17   **Q.**    And the bonds that we have dealt with here in

18   Government's Exhibit 11 are retail bonds, correct?

19   **A.**    That's correct.

20   **Q.**    And these retail bonds are death-put bonds.  They

21   have that option, correct, sir?

22   **A.**    They have the option, yes, they do.

23   **Q.**    And the death-put options that are contained in

24   Government's Exhibit Number 11, those death-put options

25   are negotiated by the underwriter and the issuer,

1    correct?

2    **A.**    Yes.  Prior to issuance.

3    **Q.**    It doesn't change, does it, sir?

4    **A.**    It does not change.

5    **Q.**    Sir, there's nothing illegal about death-put

6    options, is there?

7    **A.**    Not to my knowledge.

8    **Q.**    And a death-put option assists the issuer in the

9    marketability of bonds, correct, sir?

10    **A.**    That's correct.

11    **Q.**    And estate-put options on bonds were around well

12    before your article in 2006?

13    **A.**    That's correct.

14    **Q.**    Now, sir, when you were contacted in this case,

15    who was the first person from the Government that

16    contacted you?

17    **A.**    I believe I got a phone call from Mr. Vilker.

18    **Q.**    In Exhibit Number 11, according to what you stated

19    on direct examination, what you categorized as loss is

20    approximately $12,400,000, correct?

21    **A.**    That's correct.

22    **Q.**    And you did not read the prospectus on any of

23    those bonds contained in Exhibit 11, did you, sir?

24    **A.**    That is correct.  I did not read any of them.

25    **Q.**    And prior to this morning, you did not know that

1    some of these articles in Exhibit 11 were CDs?

2    **A.**   No, actually, I did know.

3    **Q.**   You did?

4    **A.**   I believe I heard it, yeah.

5    **Q.**   Where did you hear it, sir?

6    **A.**   From my colleagues who looked at these.  I

7    couldn't swear by it but that's my recollection that I

8    did.

9    **Q.**   But you didn't say it this morning when Mr. Vilker

10   was asking you questions, did you?

11   **A.**   No, I didn't say it this morning, no.

12   **Q.**   You never saw this list prior to this morning,

13   correct?

14   **A.**   I don't believe I've seen it.

15   **Q.**   Then how do you know your colleagues were talking

16   about it?

17   **A.**   They were looking at the brokerage accounts.

18   **Q.**   Now, sir, referring back to Exhibit 11 where you

19   have "Loss by Issuer" is the headline, Table 1, what

20   issuer out of the -- well, a CD is redeemable on the

21   spot, correct?

22        Let me rephrase that.

23        MR. MURPHY:  Judge, I'll withdraw the question.

24   **Q.**   To redeem a CD on a death-put, you don't have to

25   go through the rules that are in the prospectus,

1    correct?

2    **A.**   I don't know that.  I'm not familiar with the

3    provisions, death-put provisions of CDs.

4    **Q.**   Well, a CD is controlled by the FDIC, correct?

5    **A.**   I believe it's correct, but I'm not an expert on

6    the money market instrument.

7    **Q.**   Okay.  So you're not an expert and you can't

8    answer, so out of the 33 items contained in Exhibit 11,

9    Government's Exhibit 11, you don't know how many CDs

10   there are, do you?

11   **A.**   I do not.

12   **Q.**   And you didn't take that into account when you did

13   your analysis, did you?

14   **A.**   No, I did not.

15   **Q.**   I'm sorry, sir.  I didn't hear you.

16   **A.**   No, I did not, no.

17   **Q.**   You did not.

18   **A.**   No.

19   **Q.**   Now, through your study and writing and advising

20   on death-put options, you know that companies allow a

21   percentage of the outstanding float to be put in a

22   calendar year, correct?

23   **A.**   You use the term "float."  The outstanding face

24   amount.

25   **Q.**   The outstanding face amount?

1    **A.**    Yes.

2    **Q.**    And you know that through your expertise, your

3    advisement dealing with issuers and so forth and your

4    writing on estate-put bonds, correct?

5    **A.**    I know that as I state in my article it's normally

6    one percent.  There are variations on it, but it

7    typically assumes one percent of the original face

8    amount.

9    **Q.**    But you knew that before testifying today?

10   **A.**    Sure.  That's part of our analysis.  That's one of

11   the assumptions that we use.

12   **Q.**    Okay.  And you know companies or issuers, I'm

13   using them as one, issuers also limit per estate the

14   amount of a put that can be placed, correct?

15   **A.**    That's correct.

16   **Q.**    Okay.  And that's risk that's taken into

17   consideration by a company before it sells such bond,

18   correct?

19   **A.**    That is correct.

20   **Q.**    So they know going in, companies know going in,

21   and you know this through your expertise, that a

22   company that is going to sell a bond on the retail

23   market knows in any given year percentagewise between

24   one and two percent of the bonds can be put because of

25   the estate option that is contained in those bonds,

1    correct?

2    **A.**    There's a maximum that they legally have to

3    accept, correct.

4    **Q.**    And there is a limit on the number of bonds or the

5    amount of face value of the bond that can be put by an

6    estate or a joint tenant, correct?

7    **A.**    Yes.  That's correct.

8    **Q.**    And sir, those are rules that the company knows or

9    the issuer knows ahead of time before bond one is sold,

10   correct?

11   **A.**    That is correct.

12   **Q.**    Now, in Exhibit 11, not the CDs but the bonds,

13   which company hit their annual estate-put limit in the

14   year that Mr. Caramadre, et al, redeemed his estate-put

15   bonds?

16   **A.**    I do not know.

17   **Q.**    You don't know?

18   **A.**    I don't know.

19   **Q.**    It was never researched?

20   **A.**    No.

21   **Q.**    Sir, Defendant's Exhibit B --

22        MR. MURPHY:  Judge, may I approach the witness

23   again?

24        THE COURT:  Yes.

25   **Q.**    Handing you that prospectus, sir, what is the face

1    amount of that prospectus?

2    **A.**    Fifteen million.

3    **Q.**    Excuse me?

4    **A.**    Fifteen million dollars.  Oh, I'm sorry.  It's

5    fifteen billion.  Hang on.  What's going on here?  What

6    happened here?

7    **Q.**    Fifteen billion, correct?

8    **A.**    Fifteen billion, yeah.

9    **Q.**    Now, look at Exhibit 11.  What is the first

10   company listed in Exhibit 11?

11   **A.**    GMAC, General Motors Acceptance Corporation.

12   **Q.**    What is one percent of 15 billion, sir?

13   **A.**    It's 150 million.

14   **Q.**    Well below 4 million, correct?

15   **A.**    Yes.

16   **Q.**    Can I have the exhibit back, please.

17            So sir, I'm not going to go through every one,

18   but on Exhibit 11, prior to today you never went

19   through the prospectus on the General Motors Acceptance

20   Corp bonds that were redeemed pursuant to a death-put

21   by either Mr. Caramadre or his associates, right?

22   **A.**    That's correct.  I did not go through -- in fact,

23   I didn't go through any prospectuses.

24   **Q.**    Okay.  As it relates to American General

25   Financial, which I believe is number six or seven on

1    that list, you did not go through the prospectus as it

2    relates to the put of the estate-put by Mr. Caramadre

3    or his associates, did you?

4    **A.**    No, I did not.

5    **Q.**    As to the 33 items contained in -- 33 is the

6    number you gave me in item 11, you don't know -- I'm

7    not talking about the CDs, but you don't know when

8    those bonds individually would have matured, do you?

9    **A.**    Not from here, but we did look at the individual

10   bonds that we analyzed bond by bond.

11   **Q.**    You looked at them?

12   **A.**    Oh, absolutely.  Our results are based on

13   bond-by-bond analysis.

14   **Q.**    And you didn't include that in your writings that

15   you submitted to the Government, did you?

16   **A.**    We did not.

17   **Q.**    And as we relate to the CDs contained in Exhibit

18   11, those CDs with estate-put options or death-put

19   options are redeemable upon death provided that a

20   person shows satisfactory conditions of death, correct?

21   **A.**    Evidently.  So as I indicated before, I'm not an

22   expert on CDs.

23   **Q.**    But you have CDs in what you've adopted to

24   determine loss, correct?

25   **A.**    Sure.  We use them and we computed what they would

1    cost had they not been put and computed damages based

2    on that.

3    **Q.**    Sir, we looked in Defendant's Exhibit B a $15

4    billion bond issuance from General Motors Acceptance

5    Corporation, and in Exhibit Number 11 you say that

6    there were $4 million in losses that GMAC suffered.  Do

7    you know if GMAC had to go out and borrow for the $4

8    million, sir?

9    **A.**    If I may say, that's not a $15 billion bond

10   issuance, what you showed me.  That's not a single

11   issue.

12   **Q.**    That's the prospectus?

13   **A.**    That's a prospectus for many issues.  Many, many

14   issues.

15   **Q.**    Right.  It's not a tranche, a particular tranche

16   of bonds.

17   **A.**    Yeah.  Many issues.  And they didn't have to issue

18   $15 billion.  Maybe they issued much less.  Who knows.

19   So that's a general prospectus that governs potential

20   issues.

21   **Q.**    It covers the particular tranche of bonds that are

22   sold under that prospectus?

23   **A.**    That may be sold.

24   **Q.**    Means a company doesn't have to sell all 15

25   billion?

1    **A.**    That's right.

2    **Q.**    But any amount of the bonds that that company

3    sells within that prospectus has to abide by the

4    prospectus, correct?

5    **A.**    Under that particular indenture provision, yes,

6    please.

7    **Q.**    Now, sir, today you would agree with me -- today,

8    when I say today, I mean September 30th of 2013, the

9    interest rates on bonds are lower than they were in

10   2008, correct?

11   **A.**    Treasury rates in general, yes.

12   **Q.**    And do you know, sir, if these companies listed in

13   Exhibit 11 had to go out and borrow money to satisfy

14   the estate-puts?  You don't know that, do you, sir?

15   **A.**    I don't know that.  I don't know how they -- where

16   they got the cash.

17   **Q.**    So your formula is not based on the particular

18   company's funding index?

19   **A.**    It is based on the individual company's funding

20   index, and we referred to that earlier as the yield

21   curve appropriate for the particular issuer.

22   **Q.**    But you don't know if they had to go out and

23   borrow money to satisfy the puts that were placed by

24   Mr. Caramadre and his associates , correct?

25   **A.**    We do not know where they got the quality rate for

1    cash, but we can value the liability associated with

2    the bond, which has been redeemed.  In other words, we

3    can estimate how much it would have cost them to

4    service that particular bond had it not been redeemed.

5    **Q.**   Who said they had to replace the money?

6    **A.**   They need -- companies typically need cash to run

7    their business.  The more expenses they have, the more

8    cash they need to borrow.

9    **Q.**   And it's anticipated in the prospectus with a

10   ceiling of how much cash they may have to outlay in any

11   given year because of the risk associated with the

12   selling of an estate-put, correct?

13   **A.**   For these structures, it is correct.

14   **Q.**   As it relates in Exhibit 11 to GMAC, on those

15   bonds, what was their annual put limit?

16   **A.**   Well, according to the document, our assumption

17   was it was one percent.

18   **Q.**   Do you know if the bonds that were redeemed as

19   estate-puts by Mr. Caramadre and his associates were

20   part of that tranche of bonds?

21   **A.**   Which tranche?  What are you referring to?

22   **Q.**   The ones that I showed you?  The prospectus from

23   2005?

24   **A.**   I have assumed they were, but I couldn't swear on

25   it.  I would assume so.  I assumed they were subject to

1    this one percent limit.

2    **Q.**    Could have been bonds from 2003, correct?

3    **A.**    Could be, yes.

4    **Q.**    Could have been bonds from 1998?

5    **A.**    Could be.

6    **Q.**    Sir, Mr. Vilker asked you this morning about

7    bonds, in essence, that were sold for a loss on the

8    retail market.  So if I were to buy $100,000 worth of

9    GMAC bonds with a 30-year maturity and two years from

10   now I sold them, there's a possibility that I would

11   have to sell them on the retail market for less than

12   what I paid, correct?

13   **A.**    That is correct.

14   **Q.**    And the individuals that -- and when I say Joseph

15   Caramadre, et al, that's because that's the phrase that

16   you used in your writing when you were describing JAC,

17   et al.  That's Mr. Caramadre, correct?  You've never

18   met Mr. Caramadre, have you?

19   **A.**    No, I have not.

20   **Q.**    The Government told you that Mr. Caramadre had

21   your article "Some Bonds Are Worth More Dead Than

22   Alive" on his hard drive, correct?

23   **A.**    Correct.

24   **Q.**    When did they tell you that, sir?

25   **A.**    It was certainly mentioned in the document that I

1    received a few months ago, but I believe orally

2    Mr. Vilker may have mentioned it to me earlier, but it

3    was certainly much after the initial engagement.

4    **Q.**   They told you they had the Defendant's -- the

5    Defendant had your article on his computer, correct?

6    **A.**   Correct.

7    **Q.**   So you don't know with respect to the bonds

8    indicated in Exhibit 11 whether any of those companies

9    hit their put limit in the year that they were

10   redeemed, correct?

11   **A.**   Correct.

12   **Q.**   In fact, do you know from your research that

13   Mr. Caramadre and his associates actually lost money on

14   some bond issues?

15   **A.**   What we did see in the brokerage statement is that

16   there were some sales at prices below the purchase.

17   **Q.**   Did you see it anywhere else, sir?

18   **A.**   I don't recall.

19        MR. MURPHY:  One moment, please, Judge.

20   **Q.**   So when you saw that Mr. Caramadre had lost some

21   money with bond trading with estate-puts due to your

22   investigation of brokerage statements, that's because

23   Mr. Caramadre and his associates assumed a risk when

24   they purchased the bonds, correct?

25   **A.**   I did not pay any attention to trades related to

1    other than estate-puts.  Our focus was to estimate --

2    we were asked to estimate the damage, the extra cost to

3    the issuers, so secondary market trading was irrelevant

4    for our purposes.

5    **Q.**   Well, that's where Mr. Caramadre and his

6    associates bought the bonds, on the secondary market,

7    right?

8    **A.**   Yes.  And as I'm saying, we did not care about

9    sales in the secondary market.

10   **Q.**   It was irrelevant to you?

11   **A.**   It was irrelevant to us, yes.

12   **Q.**   Now, when a bond comes for sale on the secondary

13   market, the issuer has already received full face value

14   for that bond, correct?

15   **A.**   You mean at issuance?

16   **Q.**   Yes.

17   **A.**   Well, whether or not it comes up for sale on the

18   secondary market is irrelevant.  When the bond is sold,

19   the issuer receives --

20   **Q.**   So if the bond is sold for $100,000, the company

21   receives almost $100,000 for that, right?

22   **A.**   You mean when the bond is issued?

23   **Q.**   When it's issued, sir, yes.

24   **A.**   Typically on these bonds, the corporation issuing

25   receives the full face amount, which is hundred percent

1    less of issuance fees.

2    **Q.**    Which come out to be incidental?

3    **A.**    Yes, it depends, but it's substantial.

4    **Q.**    Now, when Mr. Caramadre and his associates

5    purchase on the secondary market, they'll, according to

6    your study, they purchased bonds that were well

7    reduced, correct?  The purchase by Mr. Caramadre with

8    the example that Mr. Vilker gave you of a GMAC bond

9    that you went through the brokerage account, it was a

10   $200,000 bond which he purchased for approximately

11   $120,000, correct?

12   **A.**    That's not their estimate.  Those are statements.

13   Based on the analysis of brokerage statements, yes.

14   **Q.**    So he bought it on the secondary market for well

15   less than what the face value was, correct?

16   **A.**    Yes.

17   **Q.**    There's no crime against that, is there?

18   **A.**    Not at all.

19        If I may just add --

20   **Q.**    There's no question in front of you right now,

21   sir.

22   **A.**    Sure.

23   **Q.**    Now, sir, on the list contained in Government's

24   Exhibit 12, if we go down the top quarter of the page,

25   there are two accountholders , one is named Robert J.

1    Carnevale and the other is Edward J. Hanrahan.  Do you

2    see that?

3    **A.**    I'm sorry?  What part?

4    **Q.**    The 11th one.

5    **A.**    Carnevale.  Yes.

6    **Q.**    So that particular item was held by Robert J.

7    Carnevale and Edward J. Hanrahan, correct?

8    **A.**    Correct.

9    **Q.**    And the face amount of that instrument was just

10   under $1.9 million?

11   **A.**    Yes.

12   **Q.**    And you've determined the loss to be approximately

13   $375,000, correct?

14   **A.**    Correct.

15   **Q.**    That money didn't go to Mr. Caramadre, correct?

16          MR. VILKER:  Objection, your Honor.  It's asking

17   this witness facts that first of all he has no

18   knowledge of and seems to be getting at what the

19   underlying scheme was.  I don't think this is the

20   hearing to determine the reason why these other

21   accounts are part of the same scheme, and plus this

22   witness has no knowledge one way or the other.

23          MR. MURPHY:  Judge, that's precisely what I'm

24   trying to show is that this witness has no knowledge

25   about it, that simply they're putting in a figure of

1    $12.4 million when it can't be attributed to

2    Mr. Caramadre directly.

3          THE COURT:  I'll allow the question for that

4    purpose.

5          Go ahead and answer.

6    **A.**   Could you please repeat the question.

7    **Q.**   Sure.  The item we just looked at it is joint

8    owned by Mr. Carnevale and Mr. Hanrahan, correct?

9    **A.**   Correct.

10   **Q.**   Mr. Caramadre's name is not on that instrument, is

11   it?

12   **A.**   No, he's not.

13   **Q.**   But you included a loss based on your calculations

14   and attributed it to Mr. Caramadre and his associates,

15   correct?

16   **A.**   Well, the loss is from the prospective of the

17   corporation, how much the corporation lost as a result

18   of the put.  It has nothing to do with the holder of

19   the bond who put the bond back.

20   **Q.**   Doctor, when a corporation issues a bond, when

21   they issue that bond and it's sold, the corporation

22   receives a hundred percent of face value of that bond,

23   correct?

24   **A.**   That's correct.

25   **Q.**   Now, at the maturity date that corporation has to

1    pay the face value of that bond to the holder of it,

2    correct?

3    **A.**   That's correct.

4    **Q.**   Okay.  That corporation has a choice, depending on

5    fluctuations of interest rate in the economy whether or

6    not to exercise its call option to purchase that bond

7    at face value at a time other than maturity, correct?

8    **A.**   That's correct.

9    **Q.**   That company also accounts for, when it sells an

10   estate-put or a death-put bond, that company takes into

11   account that a certain amount of bonds will be put by

12   the holder in any calendar year, correct?

13   **A.**   No.  Some amount may be put by a holder.  Not will

14   be put by a holder.

15   **Q.**   May be?

16   **A.**   May be put by holder, not will be put by holder.

17   **Q.**   They put a ceiling on it?

18   **A.**   They put a ceiling but the ceiling is a ceiling

19   and it is entirely possible that the amount put is

20   considerably below the ceiling.

21   **Q.**   In fact, the company hopes that it is put below

22   the ceiling every year, correct?

23   **A.**   Assuming that the bond is not selling above par,

24   in which case --

25   **Q.**   Well, if it was selling above par, the company

1    would call it if they could, correct?

2    **A.**    If it's callable already.  Sometimes the bond is

3    not yet callable but it is already puttable.  There's a

4    lag.  These bonds normally, I believe, become puttable

5    one year after issuance, but the call may not be

6    exercised for several years.  So there's a period when

7    it can be put but not called.

8    **Q.**    Two to four years, correct?

9    **A.**    Correct.

10   **Q.**    In your business, you advise these companies to

11   win, correct?

12   **A.**    To win?

13   **Q.**    To win.

14   **A.**    We advise them to make the correct decision.

15   **Q.**    To make money, correct?

16   **A.**    They are trying to minimize their cost of

17   borrowing.  That's what debt management is, minimize

18   the cost of borrowing.

19   **Q.**    So these companies with your advice go out and you

20   have nothing to do with the underwriting or the

21   issuance of the bond or the development of the

22   prospectus, but you have to take into account the

23   prospectus when you advise them on debt management,

24   don't you?

25   **A.**    We focus on certain provisions included in the

1    prospectus that relate to, as I mentioned, refunding,

2    calls, puts, estate-puts, sinking funds and fees

3    associated with the issuance.  That is basically our

4    involvement in terms of assisting our clients.

5    **Q.**    Death-puts?

6    **A.**    That's one of the refunding options, yes.  It's an

7    option held by the investor in this case, and that has

8    to be taken into account.

9    **Q.**    Has to be taken into account by the issuer?

10   **A.**    By the issuer.

11   **Q.**    And it is taken into account by the issuer?

12   **A.**    It is in computing the potential cost of issuance

13   against some alternative.

14        MR. MURPHY:  Judge, may I have a moment, please?

15        THE COURT:  Sure.

16        (Pause.)

17        MR. MURPHY:  Thank you, Judge.

18   **Q.**    Now, Dr. Kalotay, your research for the United

19   States Government in this particular case deals in

20   essence with just death-put bonds, correct?

21   **A.**    Correct.

22   **Q.**    And CDs also?

23   **A.**    Correct.

24   **Q.**    Sir, where in the prospectus for the bonds that

25   are in Government's Exhibit Number 11 does it say that

1    the issuer will replace redeemed bonds with new bonds?

2    **A.**   It doesn't -- I did not look at prospectuses, but

3    I would not assume that there's any reference to how

4    the issuer raises the funds.

5    **Q.**   Is there anything in the prospectus or anywhere

6    that you looked as it relates to the 33 items in

7    Government's number 11, does it say that the investor

8    is responsible for any losses that the issuer incurred

9    due to the estate-put provision?

10   **A.**   I didn't look at it but not to my --

11   **Q.**   There wouldn't be.

12   **A.**   No.

13   **Q.**   Why wouldn't there be, sir?

14   **A.**   Why is what?

15   **Q.**   There is nothing contained in the prospectus or

16   any information that you searched when you determined

17   the bond loss in this case does it say that the

18   investor is responsible for any losses that the issuer

19   incurred due to the exercise of a death-put?

20   **A.**   Not to my knowledge, no.

21   **Q.**   Why wouldn't there be?

22   **A.**   There's no need for it.

23   **Q.**   Why isn't there a need for it?

24   **A.**   It's an option exercised by the investor and is

25   part of the prospectus.

1  **Q.**   So the issuer has already taken it into

2  consideration?

3  **A.**   It's taken into account at the time of issuance.

4  **Q.**   Now, sir, if I can direct your attention to

5  Government's Exhibit Number 12.

6        Do you have Number 12 in front of you,

7  Dr. Kalotay?

8  **A.**   Yes, I do.

9  **Q.**   Now, if we start from the bottom, if we go to the

10  R's or -- actually, the D's.  Where did you get this

11  list from, sir?

12  **A.**   These are from brokerage statements.

13  **Q.**   So the bottom of the page says "Andrew Kalotay

14  Associates."  This was produced by your firm?

15  **A.**   Yes.

16  **Q.**   Under your supervision?

17  **A.**   Under my supervision, yes.

18  **Q.**   Have you seen this document prior to today?

19  **A.**   I believe I have, yes.

20  **Q.**   Do you believe you have or have you, sir?

21  **A.**   Well, I looked at a lot of these but my

22  recollection is, again, I believe I've seen this

23  document.

24  **Q.**   Okay.  And it says, "Loss By Accountholder" at the

25  top of the page, correct?

1    **A.**    Yes.

2    **Q.**    Okay.  And the first accountholder, for instance,

3    Linda Barbeau, where is she?

4    **A.**    What do you mean "where is she"?

5    **Q.**    Where is she?  Where is she today?

6    **A.**    I don't know.  I assume she's deceased, but I

7    don't know.

8    **Q.**    Okay.  Where it says "Joint Accountholder" --

9    **A.**    Yes.

10    **Q.**    -- where is that joint holder today?

11    **A.**    I don't know.

12    **Q.**    Well, your firm prepared this list and on the left

13    side it says "Accountholders," and there's multiple

14    names, 20 plus, and then to the right there's a second

15    column called "Joint Accountholders," and there's a

16    corresponding name to each accountholder with a joint

17    accountholder, correct?

18    **A.**    Correct.

19    **Q.**    And then there's "Brokerage"?

20    **A.**    Yes.

21    **Q.**    And the first one is Schwab as it relates to Linda

22    Barbeau, and then it says "Face Amount, $853,000,"

23    correct?

24    **A.**    Correct.

25    **Q.**    Face amount of what, sir?

1    **A.**    It's face amount of bonds held in this account.

2    **Q.**    Okay.  Do you know what type of account it is?

3    **A.**    I do not.

4    **Q.**    Where it says, "Loss" next to Linda Barbeau, it

5    says $134,000.  What is that loss, sir?

6    **A.**    That loss represents the loss to the corporations

7    whose bonds had been held in this account and which

8    were put back to the corporations.

9    **Q.**    How were they put back to the corporations, sir?

10   **A.**    Under the death-put provision.

11   **Q.**    So in 12, then, where it says, "Loss by Account,"

12   the accountholders, they're all dead so the joint

13   tenant exercised the death-put?

14   **A.**    Well, I don't know anything about the

15   accountholders.  I'm explaining that the loss is from

16   the perspective of the corporation whose bonds were

17   redeemed.

18   **Q.**    And all of these bonds redeemed in Government

19   Section 12 were redeemed under the death-put or

20   estate-put option?

21   **A.**    I believe so.  This is based on the study of the

22   brokerage accounts that we had received.

23   **Q.**    Brokerage accounts that you received?

24   **A.**    From Mr. Vilker and his colleagues.  The

25   information we received.

1   **Q.**   Well, who gave you the information for Exhibit 12,

2   sir?

3   **A.**   I believe it all came from Mr. Vilker's office.

4   **Q.**   And you used that to determine the loss?

5   **A.**   The loss to the corporations whose bonds were

6   redeemed under the death-put provision.

7   **Q.**   Okay.  Well, I mean, looking down in the "R"

8   column, Edwin Rodriguez, you have him down as a loss,

9   correct?

10  **A.**   Correct.

11  **Q.**   Do you know why that is, sir?

12  **A.**   I do not know.

13  **Q.**   You see Mr. Caramadre in Court today, don't you?

14  **A.**   Yes.

15  **Q.**   Well, where is Mr. Rodriguez?

16  **A.**   I don't know.

17  **Q.**   Is he dead?

18  **A.**   I assume he's dead.

19       MR. MURPHY:  He's alive, sir.  He testified at

20  trial.

21       THE COURT:  Mr. Murphy, do you want some time to

22  consult with Mr. Caramadre?

23       MR. MURPHY:  One minute, please, Judge.

24       THE COURT:  Sure.

25       Actually I see that it's one o'clock.  Maybe

1    we'll break now for lunch, and we'll resume, we'll

2    shoot for 1:45.  The Court will be in recess.

3            And, Doctor, you'll still be under oath.

4            (Lunch recess.)

5            THE COURT:  Good afternoon, everyone.

6            Doctor, you are still under oath.  I would

7    remind you you're still under cross-examination.

8            Mr. Murphy?

9            MR. MURPHY:  Judge, I have about five more

10   minutes.

11           THE COURT:  Okay.

12   **Q.**   Dr. Kalotay, do you still have the red book in

13   front of you?

14   **A.**   Yes, I do.

15   **Q.**   Sir, if you can turn to Exhibit Number 11, and

16   that's the table that your company has labeled as "Loss

17   By Issuer"?

18   **A.**   Yes, it is.

19   **Q.**   Starting from the top, the first one, the first

20   issuer is General Motors Acceptance Corporation?

21   **A.**   Yes, it is.

22   **Q.**   Did GMAC send you information concerning their

23   alleged loss for your calculation?

24   **A.**   No, they did not.

25   **Q.**   The second one, did Country Wide Financial send

1    you information concerning their alleged loss for your

2    calculation?

3    **A.**    No.

4    **Q.**    Did Bear Stearns Company, Incorporated send you

5    information concerning their alleged loss?

6    **A.**    Nobody did.

7    **Q.**    So nobody listed on Table 1 provided you with any

8    information concerning their loss?

9    **A.**    Nobody has.  Nobody did.

10   **Q.**    So you don't know if any of those companies listed

11   in Exhibit 11 replaced the money that they had to use

12   to redeem the estate-put, correct?  You're just

13   assuming?

14   **A.**    I don't know how they funded the estate-put.

15   **Q.**    Doctor, you calculated the loss based on the time

16   of redemption that utilized the estate-put through the

17   maturity date of the bond, correct?

18   **A.**    That's correct.  I considered the expected cost

19   because I'm not sure, as I indicated before, what is

20   going to happen to this bond.  There could be more

21   estate-puts, there could be calls depending on what

22   interest rates do.

23   **Q.**    Right.  So your calculation is hypothetical?

24   **A.**    It's in accordance with standard bond valuation

25   principles.

1    **Q.**   But you don't know what was going to happen from

2    the time of redemption of the estate-put bond through

3    maturity, correct?

4    **A.**   That is correct.  I based my assumptions on the

5    prevailing interest rates.

6              MR. MURPHY:  Nothing further, your Honor.

7              THE COURT:  Mr. Thompson.

8              MR. THOMPSON:  Thank you, your Honor.

9              <u>**CROSS-EXAMINATION BY MR. THOMPSON**</u>

10   **Q.**   Dr. Katolay --

11   **A.**   Kalotay.

12   **Q.**   I apologize, sir.

13   **A.**   That's no problem.

14   **Q.**   -- you just testified, I think, in answer to the

15   last question or the second to last question that your

16   calculations were based on standard bond valuation

17   principles; is that correct?

18   **A.**   That is correct.

19   **Q.**   And that's essentially what you specialize in?

20   **A.**   That is correct.

21   **Q.**   Bond valuation.

22        You made a distinction when Mr. Vilker was

23   questioning you, he was asking you, you were hired to

24   calculate a loss amount to the corporation and your

25   answer to that would be, was:  It's not that simple.  I

1    calculated the value of the bonds and therefore the

2    money that would -- how much it would cost the

3    corporation to borrow that money.  Correct?

4    **A.**    I believe more precisely I said I calculated the

5    expected cost of the debt or the expected cost of the

6    liability.  I think those were my --

7    **Q.**    And your testimony to that is because that's not

8    the same thing as loss, correct?

9    **A.**    Well, if I may just define what I mean by "loss."

10   **Q.**    Of course.

11   **A.**    All right.  So the loss is the difference between

12   two numbers, one is this number that we have been --

13   you just mentioned, which is the expected cost of

14   servicing the debt over its life, taking into account

15   various complications arising from puts and calls

16   versus a cash payment today in the par value.  A

17   difference between those two numbers is what really we

18   call the loss.  That's our definition.

19   **Q.**    All right.  So I may have a poor understanding of

20   what you're saying then, because my sense of your

21   testimony was that you are not using the cost of a cash

22   payment today.  You are using the cash payment plus any

23   borrowing costs that come along with that cash payment

24   if you borrow that money, right?

25   **A.**    Let me clarify.  If you make $1,000 cash payment

1    today, the cost of that payment today is $1,000.

2    That's what it is.

3    **Q.**    I agree.

4    **A.**    That's what it costs -- that's the cost to

5    repurchase something which is being put back where you

6    have to pay $1,000.  The question is what if you don't

7    pay it back?  What is the cost of leaving this bond

8    outstanding and observing what might happen to it over

9    time and try to value that.  And that's the cost of

10   debt assuming that it is not being put back today, and

11   the difference between those two numbers is what we

12   call the loss to the issuer.

13   **Q.**    Exhibit 10 is your company's report on the

14   estimate of losses, correct?

15   **A.**    Yes.

16   **Q.**    And on page two of Exhibit 10, there's a paragraph

17   entitled "Determining the Loss to Issuers," correct?

18   **A.**    Yes.

19   **Q.**    And it says:  "The main challenge in estimating

20   the loss to issuers is determining what the values of

21   the bonds were."  Correct?

22   **A.**    Yes.

23   **Q.**    Parentheses, "in terms of their replacement cost"?

24   **A.**    Yes.  And replacement cost is not defined very

25   accurately but that's what it says, yes.

1    **Q.**    Okay.  Well, then you go on.  The very next

2    sentence is:  "These values depend on the issuer's

3    prevailing borrowing costs because that is how the

4    issuer has to raise the funds required to pay off the

5    bondholder."  Right?

6    **A.**    That's correct.

7    **Q.**    So the main challenge, you say in this paragraph,

8    is determining what the replacement cost is, right?

9    **A.**    The main challenge is to determine the cost of

10   leaving the bond outstanding but that cost is

11   determined taking into account the cost of replacement,

12   the cost of raising that today.

13   **Q.**    Right.

14   **A.**    That's what it is.  It's a little confusing, I

15   realize.

16   **Q.**    It is.  It's very confusing.  Because you're

17   trying to calculate what the cost to a company is to

18   raise that amount of money today to repay the bond,

19   right?

20   **A.**    Actually, what we're focusing on here, and maybe

21   it's best if you look at the following page, page C, on

22   the third box where we refer to this replacement cost

23   as the fair value of the bond.  It's probably more

24   helpful because it's less confusing, the fair value of

25   the bond.

1  **Q.**   Let me ask you what bond you're talking about, the

2  bond that just got redeemed or a new bond that has to

3  be issued?

4  **A.**   No.  No.  The bond that has just gotten redeemed,

5  what it would cost if it had not been redeemed.  That's

6  the precise statement.  What would it cost had it not

7  been redeemed.

8  **Q.**   Can we go back to page two, that sentence I was

9  showing you.

10  **A.**   Yes, please.

11  **Q.**   Why does it say that:  "The issuers prevailing

12  borrowing costs is essential because that is how the

13  issuer has to raise the funds"?

14  **A.**   Right.  Perhaps saying that that is how they must

15  raise the funds is a bit of an overstatement that for

16  analytical purpose you assume that an issuer and his

17  capital, and I don't mean to get into too much

18  complexity, it has some equity and it has some debt.

19  And you assume that the amount of debt, more precisely

20  what we call the equity-to-debt ratio is determined.

21       So if you refund -- if some of the debt

22  disappears for whatever reason, then presumably,

23  eventually it will be replaced by debt.

24  **Q.**   Why would you presume that?

25  **A.**   That's a standard corporate finance assumption and

1    we can talk about that.  That has to do with capital

2    structure and other complications.  I'm happy to --

3    **Q.**   We have a big list of companies here, right?

4    Let's go to Exhibit 11, if we could.

5         GMAC, that's a business, right?

6    **A.**   Hang on.  Exhibit 11?

7    **Q.**   Exhibit 11.  Yeah.  I'm just picking the top name

8    again, GMAC?

9    **A.**   Sure.

10   **Q.**   That's a corporation, right?

11   **A.**   It's a corporation, yes.

12   **Q.**   And the corporation's job and their responsibility

13   to the shareholders is to make money, right?

14   **A.**   Correct.

15   **Q.**   And they don't make money by issuing debt and just

16   issuing debt and delaying repaying it, do they?

17   **A.**   They do not.

18   **Q.**   They earn money by providing a service to someone,

19   correct?

20   **A.**   That's correct.

21   **Q.**   Okay.  Caterpillar is on there, too.

22   **A.**   Can we stay with GMAC?  It was a finance company

23   and so they would say for the sake of argument that we

24   finance this company, this 90 percent debt and 10

25   percent equity, just for the sake of argument.  So if

1    some of the debt disappears for whatever reason,

2    eventually it would be replaced to maintain that --

3    Q.   That's how they choose to do it.

4    A.   That's how they normally would do it.

5    Q.   That's if they choose that they want to keep that

6    ratio, right?

7    A.   That is correct.  And that's the basic assumption

8    that I make in the absence of --

9    Q.   Okay.

10   A.   That's a standard finance assumption.

11   Q.   It's a standard finance assumption that a

12   company's debt equity model is going to stay the same

13   throughout time?

14   A.   No.  But given that there's a debt-to-equity

15   ratio, you're not going to change it just because some

16   transaction occurred on this level.

17   Q.   No.  I would agree with that.  I think you already

18   testified this is up to a $15 billion debt issue and at

19   the most here we're talking about what you call a loss

20   of $4.7 million, right?

21   A.   Right.

22   Q.   That's not even a blip on the screen for GMAC, is

23   it?

24   A.   Well, it's not even the loss.  It's the amount

25   that they have to pay -- they have to somehow pay $10

1    million, and that's the amount of money that somehow

2    they have to come up with.

3    **Q.**   You're saying some day -- based on your

4    understanding of their ratios and standard finance

5    practice, you're saying some day they will have to

6    borrow money to repay that?

7    **A.**   Some other debt issue may have to be increased by

8    this amount.

9    **Q.**   May be, right?

10   **A.**   May be.

11   **Q.**   When will they borrow that money?

12   **A.**   Well, a finance company such as GMAC was in the

13   market almost continuously.

14   **Q.**   But you're saying some day they might have to

15   adjust their books, some day they're going to have to

16   borrow another $10.8 million.  When do they have to

17   borrow that?

18   **A.**   I would imagine that in the case of a company like

19   GMAC under normal conditions that extra $10 million

20   would be added to the next issue, which is in a few

21   weeks.  Within days of --

22   **Q.**   Couldn't they just pay with profits they have from

23   their regular business?

24   **A.**   Well, it's not so much profits.  Would they have

25   cash.

1    **Q.**    Yeah.  Cash.

2    **A.**    They may have cash but even very large companies

3    typically have very little cash; but even if they do,

4    they have that cash for some particular purpose.  So if

5    it is paid to service, to retire bonds under the death

6    provision, they would have to raise some money to

7    replenish the cash.

8    **Q.**    You're saying based on their model that they want

9    to mostly have their capital by borrowing, that some

10   day they're going to have to borrow this money?

11   **A.**    Exactly.  It's no different from saying if I have

12   a mortgage and suddenly I have to repay it and it's a

13   five percent mortgage and now I have to repay it.  Now,

14   I don't have the cash.  I may have the cash but --

15   **Q.**    What if you had the cash?  Would you make a

16   different -- as an advisor, a bond advisor, would you

17   make a different recommendation about repaying the

18   mortgage based on whether the person you're consulting

19   with had the cash or did not have the cash?

20   **A.**    I would look at -- when we talk about the

21   mortgage, if you do have cash, then what you have to

22   take into account is alternative investment

23   opportunities.

24   **Q.**    Right.

25   **A.**    And I would imagine, I think that under these

1    conditions that we have here, the value of the bond

2    that you are repaying is well under a hundred, well

3    under par.  So I would imagine that if I had cash, I

4    would much rather invest it in something whose value is

5    at par.  I'm not getting my money's worth by buying

6    back at par something whose value is considerably below

7    par.

8    Q.    You indicated that there's a higher underwriting

9    fee for death-put bonds; is that correct?

10   A.    That is correct.  That has to do with the retail

11   structure of these bonds.  They are in very small

12   denominations and sold in small amounts.

13   Q.    Because there's a higher underwriting fee, does

14   that enter your loss calculation?

15   A.    No, it didn't enter in this calculation.  That

16   becomes a factor when you decide between issuing bonds

17   with this feature versus issuing institutional bonds

18   where the underwriting fee is much lower.

19   Q.    So when you did your loss calculation, did you

20   calculate with the lowest possible fees?

21   A.    In our loss calculation, the fees were not taken

22   into account at all.  Reissuance fees were not

23   considered.

24   Q.    That's not part of the issuer's prevailing

25   borrowing costs that you talk about?

1    **A.**   No.  We did not take that explicitly into account.

2    **Q.**   What do you mean "explicitly"?

3    **A.**   You can say what would it cost me to issue, for

4    the sake of argument, 10-year bonds.

5         So as an example, you can ask the question what

6    would it cost for a particular corporation to issue

7    10-year bonds.  So you could say, well, the investors

8    demand four percent so you might say the borrowing cost

9    for ten years is four percent; but then an alternative

10   way of doing it you say, yes, the investors demand four

11   percent but I have to pay as an issuer two percent

12   underwriting fee, and now my cost is actually higher

13   than what the borrowers receive because of this

14   transaction cost.  We did not take into account the

15   additional issuance cost.

16   **Q.**   Mr. Murphy reviewed with you part of a prospectus

17   for the GMAC bonds.  Do you remember that?

18   **A.**   Yes.

19   **Q.**   And that prospectus included the so-called

20   estate-put or the death-put, correct?

21   **A.**   Yes.

22   **Q.**   And that option is something that GMAC chose to

23   put in as a feature of the bond, correct?

24   **A.**   Correct.

25   **Q.**   And that's a feature of the bond designed to make

1    it more attractive as an investment for retail buyers?

2    **A.**   Correct.

3    **Q.**   If a bond has a feature that makes it more

4    attractive to retail buyers, it is worth more in the

5    market, correct?

6    **A.**   Retail buyers will pay more for it, correct.

7    **Q.**   So when GMAC issued that bond, they made more

8    money, they were able to collect more money because of

9    that option in the bond, correct?

10   **A.**   Well, if I may just put it slightly differently.

11   They were able to get away with a somewhat lower

12   interest rate.

13   **Q.**   Yes.

14   **A.**   It's equivalent to what you said.

15   **Q.**   There's give and take, is there not?

16   **A.**   Yes.

17   **Q.**   Because they put in a feature that is better for

18   retail investors, they got a provision that was maybe

19   more favorable to them, correct?

20   **A.**   Correct.

21   **Q.**   So when they issued the bonds, they got something

22   in return for putting that death-put option in,

23   correct?

24   **A.**   They got a lower interest rate, nominal interest

25   rate, which presumably was sufficiently lower that even

1    after taking into account the death-put provision and

2    the higher issuance costs, it was still favorable to

3    issuing standard institutional bonds.

4    **Q.**    Right.  They made that calculation at the time of

5    issuance it was more favorable to them to include that

6    option, right?

7    **A.**    Yes.

8    **Q.**    So therefore, at the time of issuance is when they

9    collected their benefit from including that option,

10   right?

11   **A.**    Well, not exactly, if I might say, because keep in

12   mind that, again, you have to look at various interest

13   rate scenarios over the life of the bond.  And under

14   some scenarios, this, including issuing these bonds

15   with the death provision would be better than issuing

16   institutional bonds; under some other scenarios it

17   would be worse.  But when you average out all these

18   things, odds would favor issuing in this case.  So

19   that's odds would favor, but you don't collect anything

20   at the time.  It's playing the odds.

21   **Q.**    You collect the money from selling the bonds.

22   GMAC actually collected that money, right?

23   **A.**    They collected money, but if you just look at the

24   money, they actually up front they got less money than

25   if they issued institutional bonds because they have to

1    pay more fees.  So the benefit does not come at the

2    time of selling the bond.  The benefit comes over time

3    when they pay lower interest rate on these bonds.

4    **Q.**   I don't think that's correct.  I think you're

5    adding an extra variable there.  When you testified a

6    minute ago you said that there was a tradeoff, and the

7    tradeoff to the investor was that they get the

8    death-put.  And the tradeoff to the corporation was

9    that they have to pay less in interest, correct?

10   **A.**   That is correct.

11   **Q.**   There was no tradeoff to the price of the issuance

12   of the bond.

13   **A.**   My point is about you use the word "benefit."

14   What is the benefit?  It's like having one mortgage

15   with some feature over another mortgage with another

16   feature and one pays higher than the other.  The

17   benefit doesn't come when you enter into the contract.

18   The benefit comes over time when you're paying less on

19   one structure than you pay on another.  So I would not

20   say that they collected any benefit at the time of

21   issuance.

22   **Q.**   Let me give you a for-example then.  Like you

23   said, we're going to have two different mortgages or

24   two different bond issues, right?

25        Bond issue number one has an annual interest

1    rate of five percent, let's say.  Bond issue number two

2    has an annual interest rate of five percent.  Okay?

3    Identical so far, right?  Bond issue number two has a

4    death-put option, okay?  Bond issue number one does

5    not.  Which one will be easier to sell for GMAC to

6    raise their money, to raise their capital.

7    **A.**   Clearly it would be the one with the death-put

8    provision.

9    **Q.**   Right.  Clearly, B would be easier.  Because it

10   has a death-put, they will have an easier time raising

11   their capital when they issue the bond, right?  They

12   will have an easier time raising their money, right?

13   **A.**   Well, from retail investors.  But if you look at

14   the piece that I published, I made it very clear that

15   there's a substantial difference between the retail

16   bond interest rate and the institutional.  And as I

17   explained in my article, I was stunned to see this big

18   difference.

19   **Q.**   It doesn't make sense to you?

20   **A.**   Well, it did make sense once I understood what was

21   going on.

22   **Q.**   The corporations are making that decision to put

23   in that feature because it benefits them, right?

24   **A.**   Because it benefits them.

25   **Q.**   And they get the benefit, part of the benefit up

1  front because they have an easier time raising the

2  money up front?

3  **A.**  Well, normally, when we talk about "benefit," we

4  mean somehow cash flows.  To me everything here boils

5  down to cash payment.  And up front you're not

6  getting --

7  **Q.**  Two bonds with an identical interest rate and one

8  has a death-put and one doesn't, the one with the

9  death-put is more easily sellable for them, right?

10  **A.**  But that's not a fair comparison because that's

11  not what they are facing.  They are facing two

12  alternatives.  One is to issue, to sell a bond with a

13  five percent with a death-put provision or sell another

14  bond, for the sake of argument, that has a

15  five-and-a-half percent bond without a death-put

16  provision.  Those are the alternatives that they are

17  looking at, not one without and one with.

18  **Q.**  My point is having the death-put provision in

19  there helps them raise money up front.  There's other

20  ways they could try to raise money up front, but that's

21  one that they choose to include because it helps them

22  sell the bonds, right?

23  **A.**  That's correct.

24  **Q.**  Okay.

25  **A.**  But the benefit is not up front.  The benefit

1  comes over time.  This is the only point I would like

2  to make.

3  **Q.**   Okay.  The point I would like to make is that if

4  they have an easier time selling it, that means they

5  have an easier time collecting the money for it, right?

6  **A.**   I mean, that's a tautology that if something is

7  easier to sell, it's easier to sell.  It's a tautology.

8  **Q.**   Right.

9  **A.**   I can't comment on it.

10  **Q.**   You can agree?  It's a tautology.  You can agree.

11  **A.**   I can agree.

12  **Q.**   Right?

13  **A.**   I agree.

14  **Q.**   You consult companies in the structure of the

15  their bonds, correct?

16  **A.**   Yes.

17  **Q.**   And sometimes in that consultation it turns out

18  that issuing a bond is not the best way for them to

19  raise money, correct?

20  **A.**   Issuing a particular structure may not be the

21  best.

22  **Q.**   But always issuing a bond is the answer?

23  **A.**   Well, normally, I'm involved only in the issuance

24  of bonds.  There could be occasionally times when the

25  market is in turmoil for short periods and the

1    recommendation then would be stay out of the market

2    until it settles down.

3    **Q.**    You indicated earlier, I believe, that to estimate

4    the prevailing rates for these companies, you did it

5    based on some Standard & Poor's credit ratings at the

6    time?

7    **A.**    Not credit ratings.  They actually put out credit

8    spread information.  That's not a rating.  Which is

9    derived from prices of bonds that they somehow obtain

10   and analyze.

11   **Q.**    They analyze those from the market overall?

12   **A.**    From market prices, yes.

13   **Q.**    And you analyze -- I think you said you used two

14   different classes of that analysis, correct?

15   **A.**    Correct.

16   **Q.**    So you didn't figure out or find out for each

17   individual company what their finance curve was, right?

18   **A.**    That is correct.  It was a rough estimate for two

19   different classes only.

20   **Q.**    Okay.  You didn't contact each company to find

21   out --

22   **A.**    We did not.

23   **Q.**    -- their curve?

24   **A.**    No, we did not.

25   **Q.**    Did you contact each company to find out how they

1    repaid the money?

2    **A.**    We did not contact any company, and we did not

3    look at how they replace debt.  That kind of analysis

4    could have been done, but I did not think it was

5    warranted under the circumstances.

6    **Q.**    A company has to pay taxes every year, correct?

7    **A.**    Correct.

8    **Q.**    And for that reason, for accounting purposes and

9    tax-paying purposes, in any given year a company would

10    rather have high expenses and lower profits for tax

11    purposes, correct?

12    **A.**    For --

13    **Q.**    For the purpose of paying taxes?

14    **A.**    Particularly for taxes, yes.

15    **Q.**    Right.  It's generally established in the finance

16    world and in the corporate world that you'd rather --

17    if you have debts, you'd like to move them up as

18    quickly as possible; and if you have profits, you'd

19    like to push them down the road all for tax purposes?

20    **A.**    If you're talking strictly about taxes that is

21    true.

22    **Q.**    I am.

23    **A.**    At the same time, companies want to issue high

24    earnings, and earnings and taxes tend to go in opposite

25    directions.  So you have to be very gingerly when you

1    make a statement about taxes and disregard accounting

2    considerations.

3    **Q.**   Yes.  But right now I'm talking about taxes,

4    right?

5    **A.**   If you talk strictly about taxes and disregard

6    accounting, correct.  But can you disregard accounting?

7    It's questionable.  All right.

8    **Q.**   So there can be a benefit to these corporations

9    for paying back these bonds sooner, correct, for tax

10   purposes?

11   **A.**   Could you explain where the tax benefit comes

12   from?

13   **Q.**   When they have to repay a bond today rather than

14   in 20 years from now, they're able to show an expense

15   of say $100,000 today rather than putting that expense

16   off 20 years, right?

17   **A.**   That's not an expense.

18   **Q.**   What is it?

19   **A.**   That's a principal payment.  It's not interest.

20   Interest is taxes.  Principal is principal.  Principal

21   you can't deduct.  You could deduct principal if it was

22   repaid -- there would be tax ramifications if you paid

23   less or more than the so-called tax basis or par.  But

24   if you're repaying something that you're showing on

25   your books at hundred and you paid a hundred for it

1  there's no tax ramifications.

2  **Q.**   There's an accounting ramification, though,

3  employing that expense down the road off of your books,

4  correct?

5  **A.**   Well, when you say "accounting ramification," what

6  exactly are you referring to?

7  **Q.**   You referred to we have to keep in mind

8  accounting.  The accountants, it's important to them

9  how much debt is on the company's books, right?

10  **A.**   They rebooked it.

11  **Q.**   It matters in accounting how much debt is on the

12  books, right?

13  **A.**   Right.

14  **Q.**   Okay.  So if a company repays these bonds earlier,

15  that wipes some of their debt off the books, right?

16  **A.**   If they do not replace the bond, they will be

17  showing less debt on their books.

18  **Q.**   Right.  Well, they don't replace it instantly,

19  certainly.  I understand hypothetically you're saying

20  that some day they might, but certainly the day they

21  repay it they don't reissue it right then, right?

22  **A.**   That's correct.  They have less debt and they have

23  less cash.

24  **Q.**   So there's some benefit to them on the accounting

25  side in that they have less debt?

1   **A.**   I'm sorry.  I really don't understand what

2   benefits you're referring to.

3   **Q.**   If a company has less debt, is it easier for them

4   to borrow money?  Do they have better credit if they

5   have less debt?

6   **A.**   That's correct.

7   **Q.**   Okay.  So there's a benefit, right?

8   **A.**   But if they have less cash, what does that do?  If

9   a company has a lot of cash, it makes it easier for

10  them to borrow, too.

11  **Q.**   So you're saying these companies have the cash

12  available to make this repayment?

13  **A.**   All I'm saying is that you have to look at both

14  sides of the balance sheet.  That's all I'm saying.

15  **Q.**   Right.  But you're saying now they're down cash.

16  Before you were saying they have to borrow the money

17  for this cash.  Now they have the cash?

18  **A.**   Well, that was your statement, that what if I

19  replace cash.  I thought that was your assertion, what

20  happens if you use cash.

21  **Q.**   Right.

22  **A.**   Well, I'm picking up on what you said.  And if you

23  use cash, you'll have less cash.  That's all I'm

24  saying.

25  **Q.**   Okay.  You said that, obviously we've talked a

1   couple times, you represented or you consult for the

2   Tennessee Valley Authority?

3   **A.**   Yes.

4   **Q.**   And I think you said that it was you that actually

5   pointed out to them what had happened in this case?

6   **A.**   Yes.

7   **Q.**   Okay.  So before you pointed that out to them,

8   they were not aware that they had theoretically lost

9   money?

10  **A.**   They did not know about this.

11  **Q.**   So they hadn't issued any extra bonds, right,

12  based on this?

13  **A.**   Oh, you mean all these puts?  I'm sure they did

14  not.

15  **Q.**   Exhibit number 11 is entitled "Table 1, Loss By

16  Issuer," right?

17  **A.**   Yes.

18  **Q.**   Would it be more accurate to entitle that "Loss By

19  Issuer If They Reissued Bonds To Pay This Debt"?  Would

20  that be more or less accurate?

21  **A.**   I don't believe you need that qualification.

22  **Q.**   I'm not asking whether you need it.  Do you think

23  it would be more accurate?

24  **A.**   I don't believe so.  Again, let me tell you why.

25  Because the cost of the outstanding bond, the cost of

1    the liability is computed taking into account the

2    issuer's current yield curve, current borrowing rates

3    because that is a standard way of quantifying the cost

4    of a liability.  It's no different from looking at a

5    pension fund and saying, I have all these obligations

6    going out in the future and I have to make all these

7    payments, what is the cost in terms of current rate,

8    present value of this team of payments.  So that's all

9    we're doing here and we really do not get into how you

10   are replacing it, although the implicit assumption is,

11   and explicit sometimes, is that, oh, yeah, ultimately

12   you're going to be issuing more debt.

13   Q.    I mean, that is the explicit assumption.

14   A.    It is.  But kind of tangential to the issue is,

15   the main point is what is the cost of this liability.

16   And as we have discussed a number of times, if the

17   interest rate on this liability is below prevailing

18   borrowing rates, the cost of this liability is going to

19   be below a hundred.  And if I have to pay a hundred for

20   it, by hook or by crook, I'm paying more for it than

21   what it would cost me to keep this liability alive.

22   Q.    Do assumptions about interest rates over time

23   factor into your valuation of the bond?

24   A.    Yes.

25   Q.    Okay.  And so a bond that matures in 30 years is

1   more difficult to value, other things being equal, than

2   a bond that matures in 10 years?

3   **A.**   It's not more difficult to value for the computer.

4   It's the same amount of growth.  What makes the

5   valuation difficult, and again I am repeating myself,

6   is that you have to take into account that these bonds

7   could be put any time between now and maturity.  And if

8   rates stay where they are or if rates are above the

9   coupon rate, we assumed that the bonds would be put,

10  that rate is the value of these bonds, the cost of

11  servicing these bonds to the issuer and it reduces what

12  we call the loss.

13  **Q.**   So when you're calculating what you call the loss,

14  you do have to make certain assumptions about interest

15  rates in the future?

16  **A.**   We make some assumptions, yes.  And the

17  assumptions again are standard assumptions.  I'll be

18  happy to elaborate, if you'd like.

19  **Q.**   They may be standard, but they're still

20  assumptions, right?

21  **A.**   They're assumptions.

22       MR. THOMPSON:  Okay.  May I have one moment,

23  please, your Honor?

24       THE COURT:  Certainly.

25       (Pause.)

1    **Q.**  Sir, are you familiar with the fact that -- and

2    again, we're going to use the GMAC bonds just because

3    that's what we've been mostly talking about, that's

4    again at the top of Exhibit 11, today are trading for

5    above par value?

6    **A.**  I was not, but I was under the impression that

7    GMAC was gone.  I didn't even realize.  I thought they

8    became Allied Finance or Allied Bank or whatever.  Am I

9    wrong on that?

10        MR. CARAMADRE:  It's the same parent company.

11   **Q.**  Is the name GMAC gone but there's the same parent

12   company to it?

13   **A.**  I don't know enough about the corporate structure

14   I'm afraid.

15   **Q.**  If a bond was trading for more than par value

16   today, is it possible that that corporation actually

17   saved money by paying off this debt earlier?

18   **A.**  With perfect hindsight, everything is possible in

19   general.

20   **Q.**  We're trying to assess the loss today.  So we do

21   actually have the benefit of hindsight.  If these bonds

22   are trading for above par value, would these companies

23   actually today have saved money by paying off these

24   bonds in 2008, 2009?

25   **A.**  I cannot -- I have not thought about this but

1     presumably --

2     **Q.**   They would, right?

3     **A.**   It's possible.  I mean, I think CIT is here, and I

4     believe CIT has just come out of bankruptcy.  I'm not

5     familiar with exactly what happened to the bonds but --

6     **Q.**   I'm just saying generally for any of these, if

7     it's today trading for higher than par value --

8     **A.**   If rates go down, prices go up and --

9     **Q.**   It was better to pay it off back then?

10    **A.**   I wouldn't go as far as it was better then because

11    the moment they pay them off -- again, if you go back

12    to my basic premise about funding it, just think about

13    it, so they had five percent bonds and they had to

14    replace them with let's say eight percent bonds, so

15    between then and now they have been paying more

16    interest, similar to the mortgage example that I

17    mentioned.

18            MR. THOMPSON:  Okay.  Thank you.

19            THE WITNESS:  Thank you.

20            THE COURT:  Mr. Murphy, do you want to move

21    Exhibit B full?

22            MR. MURPHY:  Yes, your Honor.

23            THE COURT:  Any objection?

24            MR. VILKER:  No objection.

25            THE COURT:  All right.  Exhibit B will be

1    received full.

2              (Defendant's Exhibit B admitted in full.)

3              THE COURT:  Let me ask whether -- Mr. Caramadre,

4    do you have questions for additional cross-examination

5    on matters that are not already covered by the

6    examination that's already been conducted?

7              MR. CARAMADRE:  No, I'm fine, your Honor.  Thank

8    you.

9              THE COURT:  All right.

10             Redirect, Mr. Vilker.

11             **REDIRECT EXAMINATION BY MR. VILKER**

12   **Q.**   Good afternoon, Dr. Kalotay.

13             Dr. Kalotay, a couple of times on

14   cross-examination you referred to a couple of

15   individuals in your office, Kalotay and Associates, who

16   were working with you on this project.  And I believe

17   you stated that they were the ones who crunched the

18   numbers.  Can you state again who these individuals

19   were.

20   **A.**   Yes.  One of them is Leslie Abreo, and Leslie is a

21   man, A-B-R-E-O; and the other is Radek, R-A-D-E-K,

22   Wyrwas, W-Y-R-W-A-S.

23   **Q.**   And what is their background?

24   **A.**   Leslie Abreo was a student of mine when I ran the

25   Financial Engineering Program at Polytechnic University

1    from I believe '95 to '97.  And I think Leslie has an

2    undergraduate and master's degree, I believe, in

3    mathematics and degree in financial engineering.  He's

4    been with me for over ten years.

5    **Q.**    What about Radek?

6    **A.**    Radek is a more recent arrival.  He has a degree

7    in economics from Baruch College and he joined us about

8    a year-and-a-half ago.

9    **Q.**    So when you say that they were the ones who

10   crunched the numbers here, what do you mean by that?

11   **A.**    They looked at the information that we received

12   from you, and they put it on the computer.  They did

13   the analysis in terms of -- they obtained these credit

14   spread curves from Standard & Poor's, and they

15   collected the Treasury rates for the individual dates

16   that we needed for analyzing these bonds.  They used

17   the computer to do the calculations.

18   **Q.**    Were you supervising them as they were doing this

19   project?

20   **A.**    Absolutely.  I mean, I told them what to do, but I

21   did not actually go to the computer.

22   **Q.**    So they're the ones that went out and typed the

23   information to the computer?

24   **A.**    Yes.

25   **Q.**    But the process by which you arrived at your

1    conclusions was your own process?

2    **A.**    Yes.  And the methodology is the methodology that

3    I requested.

4    **Q.**    Now, there were some questions that you were asked

5    before about the CDs.  What's the distinction between a

6    CD with an estate-put feature and a bond with an

7    estate-put feature?

8    **A.**    Well, a bond is a security.  It has a CUSIP

9    number.  It trades -- CDs in the traditional form were

10   very simple.  They were just bank deposits.  Over time,

11   they have become more complicated.  So in the old days

12   a CD would typically be less than a year.  I understand

13   that today you have CDs that go on for five years and

14   then they made them more complicated by adding call

15   options to them and other features.

16   **Q.**    Well, for purposes of the analysis that you did,

17   was there a distinction in terms of determining the

18   loss to a company if it issued a CD with a death-put

19   feature as opposed to a bond?

20   **A.**    Not really.  It's all cash flows.

21   **Q.**    These companies would still need to replace the

22   funds?

23   **A.**    Yes.

24   **Q.**    There were some questions about the estate-put

25   limits.  And I believe you saw a prospectus which

1    indicated there was a one percent limit and that would

2    indicate that if it was a $15 million bond that up to,

3    and correct me if I'm wrong, was 1.5 million --

4    A.   No.  No.  Half a million.

5    Q.   Half a million?

6    A.   $15 million bond?  One percent --

7    Q.   That's why you have the math degree and I have the

8    law degree.  So up to a half million dollars could --

9    is subject to that maximum, correct?

10   A.   Yes.

11   Q.   Is the maximum in your experience -- first of all,

12   is that maximum in the discretion of the issuing

13   company?

14   A.   The issuing company is obliged, I believe, to pay

15   up to that one percent if bonds are actually put.  As a

16   practical matter, if more than one percent is put, they

17   may choose to also honor those.  The alternative is to

18   put these bonds in a queue.  That's my understanding.

19   Q.   Well, do you know in practice if these companies

20   were honoring the puts that went beyond the potential

21   cap in the prospectus?

22   A.   I do not know, but one observation I'd like to

23   make is that if you look at the interest rates in the

24   last 20 or so years, by and large rates have been

25   coming down so what has dominated the management of

1   these bonds has been not the puts but the calls because

2   the issuers were more often than not able to call these

3   bonds after three or four years and refund them.

4           So the puts have been, I think, until '08, '09

5   have been relatively rare.

6   **Q.**   But getting back to your analysis that you did,

7   did the fact that some of these or many of these bonds

8   had an annual cap in the prospectus, was that of any

9   significance at all to the mathematical computation you

10  had to perform?

11  **A.**   No.  And that one percent comes in going forward

12  actually and assuming that if interest rates remain

13  high, the one percent of the bonds would actually be

14  put.  As a practical matter, it may be less than one

15  percent, in which case the cost of the debt would be

16  lower than predicted by the model and the loss would be

17  also larger.

18  **Q.**   Okay.  So the bottom line with all that is that

19  the fact that these bonds had a cap in the prospectus

20  that the companies would not be obligated to redeem the

21  bonds beyond a certain amount, that had no effect on

22  the loss value to these corporations of having to pay

23  this money early?

24  **A.**   No.  We just assume that in the future, if

25  warranted, one percent of the bonds would be put.  If

1    warranted.

2    **Q.**    Now, you were asked also about these different

3    prospectuses and they go from cradle to grave with

4    these bonds I believe was the question and the answer,

5    and you indicated you hadn't reviewed the prospectuses?

6    **A.**    No.  Typically, when I look at a prospectus, and I

7    do look at prospectuses, but I immediately go to two or

8    three pages that describe call options, if any; put

9    options, if any, for estate-put; and sinking fund

10   provisions.  Those are the so-called embedded options

11   in a bond and that's, for my quantitative purposes,

12   that's all I focus on.

13   **Q.**    Okay.  The work that you did on this particular

14   case, was there anything in these prospectuses that was

15   relevant to your analysis of the loss value of the

16   funds by the corporations by having to pay back these

17   bonds early?

18        MR. THOMPSON:  Objection, your Honor.  Fact not

19   in evidence.  He didn't look at the prospectuses.

20   **A.**    I did not look at the prospectuses.

21        THE COURT:  Sustained.

22   **Q.**    Why did you not look at the prospectuses?

23   **A.**    I just didn't think I needed to.  We had the terms

24   of the bonds.  We had the bond database so we did not

25   need it.

1    **Q.**   You were asked about the transaction costs of

2    these estate-put bonds, and you indicated that they

3    were higher.  And I believe Mr. Thompson just asked you

4    if that was a factor that you took into account that to

5    reissue new bonds they would have additional increased

6    transaction costs.  And I believe you testified that

7    that was something that you didn't include in the loss

8    totals?

9    **A.**   No.  That is correct.  We did not consider

10   transaction, transaction costs coming at the time of

11   issuance in terms of choosing between alternatives.  In

12   this case, we don't assume that the replacement bond is

13   going to be another bond with an estate-put.  It could

14   be any bond.

15   **Q.**   When these corporations have to pay back in the

16   example we were talking about that $200,000 General

17   Motors bonds, the corporations have to raise that money

18   through the issuance of new bonds.  So whatever bonds

19   they may be, those bonds will have transactions costs?

20   **A.**   That's right.

21   **Q.**   Underwriting fees and lawyer fees and what have

22   you, right?

23   **A.**   That's correct.

24   **Q.**   But those fees, even though they're actual

25   additional costs to these companies, the fact that they

1    have to issue new bonds were not included in your loss

2    totals?

3    **A.**    That is correct.  We did not include those.

4    **Q.**    So is it fair to state that the totals that you

5    listed actually understate the losses that these

6    companies suffered?

7    **A.**    That is correct.  And I can tell you how if I

8    incorporated these what would have to happen and I can

9    quantify them, the extent of this additional loss.

10   **Q.**    So you haven't quantified it, but there is out

11   there if work were be done some additional amount that

12   could be determined?

13   **A.**    We did not look at underwriting fees associated

14   with reissuance of the debt.

15   **Q.**    Now, I believe Mr. Thompson was asking you also

16   questions about some assumptions that you made in your

17   analysis.  And there was an assumption on interest

18   rates going forward.  There was some assumptions about

19   they used two different classes of bonds instead of

20   looking at the exact bond, exact company and the exact

21   day.  And there were different assumptions that you

22   made in your analysis, correct?

23   **A.**    Correct.

24   **Q.**    So is it fair to state that your analysis was not

25   aimed at providing an exact down-to-the-penny dollar

1  amount of the losses but rather a rough estimate of the

2  losses in this case?

3  **A.**   That is correct.  Had we been looking at

4  individual transactions by issuer of clients when they

5  come to the market and they issue half a billion

6  dollars of debt, then of course we would have needed

7  much sharper pencils.

8  **Q.**   To refine this analysis even further and to look

9  at the individual transactions beyond making some of

10  these assumptions that you made, what amount of work

11  would have needed to have been accomplished?

12      When you say "sharpen your pencils," what else

13  would you need to have done?

14  **A.**   Well, we could have looked at each of the

15  corporations instead of just classing them as

16  investment grade and not investment grade.  We could

17  have said, all right, this issuer had a borrowing cost

18  which was 20 basis points, one-fifth of a percent

19  higher or lower than somebody else's and that all could

20  have been done.

21  **Q.**   How much additional time would that have taken?

22  **A.**   It would have taken quite a bit because you have

23  to do it by issuer and by date of transaction.

24  **Q.**   So correct me if I'm wrong, to come up with a

25  simpler way of doing this that would still provide a

1  fairly accurate total for the losses, you made some

2  working assumptions?

3  **A.**    Exactly.  And it was somewhat convenient because

4  we could obtain the required spread information from

5  Standard & Poor's; otherwise we would have had to

6  somehow come up with our own spreads based on -- I'm

7  not sure what data.

8  **Q.**    And in this particular case, we have a number of

9  bonds in these different companies that were selling

10  well below par.  Some of them even less than par.  So

11  in that instance there might be $100,000 in bonds that

12  the Defendants here were purchasing for let's say

13  $40,000 to give an example.

14       If a bond is being sold for $40,000 on the

15  market, what does that mean about the prevailing rate

16  and how much that bond is worth to the company?

17  **A.**    Well, it means that the prevailing rate for that

18  company would be significantly higher than the stated

19  interest rate on the bond.

20  **Q.**    So if that bond that's now selling for $40,000 had

21  a three percent interest rate, does the fact that it's

22  selling for $40,000 mean that the public, the

23  purchasers of these bonds are saying this three percent

24  is not enough, therefore it's driving down the price of

25  the bond?

1    **A.**   Well, what they're saying is if three percent is

2    the rate, then the price I'm willing to pay is this.

3    If you want to get a hundred, you have to raise the

4    rate.

5        I do want to emphasize, however, that in our

6    calculations we don't really care how much the investor

7    paid for the bond.  We don't care whether the investor

8    paid 40 or 20 or 150.  It doesn't matter.  All we care

9    is what that bond was worth, what the cost of debt was

10   to the issuer at the time the bond was put back.  That

11   is the relevant part for us, not the history of how we

12   got to where we are.

13   **Q.**   Okay.  But in terms of the history, and I

14   understand it's not the direct number you're using in

15   your computations, but does the fact that the bond is

16   selling for substantially under par mean that by

17   definition that the prevailing rate that the company

18   has to now borrow money from is going to be higher than

19   the rate on the bond?

20   **A.**   You're saying now at the time it's being put?

21   **Q.**   Yes.

22   **A.**   Yes.  I thought you were referring to the time it

23   was purchased.  So we have two different -- I'm sorry.

24   You're talking about two different dates.

25   **Q.**   Right.  At the time it's being put.

1    **A.**   At the time of being put, if the rates are much --

2    we did not look -- at the time of the put, we did not

3    look at the market price of the bond.  All we did was

4    we looked at the prevailing borrowing rate for the

5    issuer and from that information and from the terms of

6    the bond we imputed a cost to that bond to the issuer.

7    **Q.**   I may be misunderstanding this, but all I'm trying

8    to ask is if the value of the bond on the day it's

9    being put is substantially under par, does that mean

10   that by definition that the cost to the issuer

11   borrowing more money is going to be higher than what

12   they would be paying out in the bond?

13   **A.**   That is correct.  That's a true statement, I

14   agree, but I do want to emphasize that that's not the

15   analysis --

16   **Q.**   No.  I understand.

17   **A.**   -- that we did.  Just for the record.

18   **Q.**   That would mean that by definition there is a loss

19   whenever a death-put bond is put back if the value at

20   the time of the put is below par?

21   **A.**   Yes.  One difficulty, if I may point out, with

22   these bonds as discussed earlier, they don't trade very

23   much.  It's hard to find out what the true value is at

24   any given date.  You may see some transaction that

25   occurred.  There's no indication that the transaction

1    that just took place occurred at a quote, unquote, fair

2    price.

3            MR. VILKER:  Okay.  Your Honor, I have no

4    further questions.  Thank you.

5            THE COURT:  Mr. Murphy?

6            MR. MURPHY:  No, your Honor.  Thank you.

7            THE COURT:  Mr. Thompson.

8            MR. THOMPSON:  Nothing, your Honor.  Thank you.

9            THE COURT:  All right.  Doctor, thank you very

10   much.  You're excused.

11           Mr. Vilker, do you have another witness for

12   today, or do you want to break for today and recommence

13   tomorrow morning?

14           MR. VILKER:  I think it would be better to start

15   with the annuity portion tomorrow, your Honor.

16           THE COURT:  All right.

17           Doctor, thank you very much.  I think we all

18   understood.

19           Any business that we need to pay attention to in

20   terms of keeping the wheels on the bus going forward?

21   Any issues for the Defendants, the Government?

22           MR. VILKER:  Nothing from the Government, your

23   Honor.

24           THE COURT:  All right.  Then we will be in

25   recess for today.

1               (Court concluded at 2:50 p.m.)

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

<u>C E R T I F I C A T I O N</u>

        I, Anne M. Clayton, RPR, do hereby certify that the foregoing pages are a true and accurate transcription of my stenographic notes in the above-entitled case.

/s/ Anne M. Clayton

———————————————————————————————————————

Anne M. Clayton, RPR

December 20, 2013

———————————————————————————————————————

Date