IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND


```
* * * * * * * * * * * * *   CRIMINAL ACTION
UNITED STATES OF AMERICA  *   11-186-S
                          *
VS.                       *   OCTOBER 15, 2013
                          *   VOLUME III
JOSEPH CARAMADRE and      *
RAYMOUR RADHAKRISHNAN     *   PROVIDENCE, RI
* * * * * * * * * * * * *
```

HEARD BEFORE THE HONORABLE PATRICIA A. SULLIVAN

MAGISTRATE JUDGE

(Evidentiary Hearing)




**APPEARANCES**:

FOR THE GOVERNMENT:          LEE VILKER, AUSA
                             and JOHN P. McADAMS, AUSA
                             U.S. Attorney's Office
                             50 Kennedy Plaza
                             Providence, RI  02903


FOR THE DEFENDANT
Joseph Caramadre:            WILLIAM J. MURPHY, ESQ.
                             Murphy & Fay, LLP
                             127 Dorrance St.
                             2nd Floor
                             Providence, RI  02903

                             RANDY OLEN, ESQ.
                             Olen Law Office
                             478 Broadway
                             Providence, RI  02909

**<u>APPEARANCES</u>**:   (Continued)

FOR THE DEFENDANT
Raymour Radhakrishnan:          OLIN THOMPSON, ESQ.
                                Federal Defender's Office
                                10 Weybosset St.
                                Providence, RI  02903


Court Reporter:                 Anne M. Clayton, RPR
                                One Exchange Terrace
                                Providence, RI  02903

Proceeding reported and produced by computer-aided
                    stenography

1    15 OCTOBER 2013 -- 1:50 P.M.

2         THE COURT: Good afternoon, everyone. We're

3    here in the matter of the United States of America

4    versus Joseph Caramadre and Raymour Radhakrishnan.

5    This is criminal matter 11-186-S and the purpose of

6    today's proceeding is to hear oral argument in the

7    aftermath of an evidentiary hearing that was held on

8    September 30 and October 9.

9         Would counsel identify yourselves for the

10   record, please.

11        MR. VILKER: Good afternoon, your Honor. Lee

12   Vilker, Assistant United States Attorney, with John

13   McAdams, also Assistant U.S. Attorney.

14        MR. MURPHY: Good afternoon, Judge.

15        Judge, Attorney William J. Murphy on behalf of

16   Joseph Caramadre.

17        MR. OLEN: Good afternoon, your Honor. Randy

18   Olen for Mr. Caramadre.

19        MR. THOMPSON: Olin Thompson for

20   Mr. Radhakrishnan.

21        THE COURT: Good afternoon, everyone.

22        All right. I think, Mr. Vilker, as the party

23   with the burden, why don't you start us off.

24        MR. VILKER: Thank you, your Honor. I wanted to

25   begin by just briefly summarizing the legal principles

1    of what this hearing is about.

2          As your Honor has mentioned, restitution is

3    determined by a preponderance of the evidence standard.

4    The Government has the burden of proving that it's more

5    likely than not that a certain victim suffered a

6    certain amount of losses.  The Federal Rules of

7    Evidence do not apply to proceedings to determine

8    restitution so hearsay evidence of the type that the

9    Government introduced in this case, the agent testimony

10   and summary charts are all fully admissible and

11   sufficient to satisfy the Government's burden.

12         And finally, the law is that a reasonable

13   estimate of the harm is sufficient when a precise

14   amount cannot be determined.

15         On both the annuity side and the bond side the

16   Government has endeavored through many, many hours at

17   this task to come up with precise calculations and we

18   hope we've done so; but even if we've failed in that,

19   we believe we've provided the Court with reasonable

20   estimates of damages for both the annuities and the

21   bonds.

22         Your Honor, as this hearing began, we thought

23   that the focus of the hearing would be predominantly on

24   the calculations and the methodology used to determine

25   the amount of losses sustained by the insurance

1    companies and the bond issuers.  While there has been

2    some time spent on those issues, and I will be

3    addressing those in a short while, a large part of this

4    hearing was in our view kind of misdirected at an

5    attempt to relitigate and redefine the scope of the

6    scheme involved.

7         Defendants in this case in our view have tried

8    to relitigate this issue by arguing that the losses

9    should be limited solely to the 23 individuals only

10   that are identified in the statement of facts by asking

11   questions of witnesses such as did this annuity

12   application ask the health of the annuitant, which

13   isn't even part of the indictment or the scheme that's

14   alleged; and asking other questions that suggest an

15   effort to go back on the admissions of guilt that these

16   Defendants have made.

17        Now, these issues have already been decided in

18   this case.  The Defendants have pled guilty to

19   executing a sweeping scheme to defraud.  The Government

20   would suggest that there are three documents available

21   to this Court to set the parameters of what the scope

22   of the scheme in this case is, the indictment, the

23   statement of facts signed by these Defendants, and the

24   prosecution version that's contained in the presentence

25   report.

1          Now, the indictment charges in Counts I through

2     the remainder of the wire fraud counts a scheme to

3     defraud that began in January of 1995 and ended in

4     August 2010.  The Defendants both --

5          THE COURT:  January of 1995?

6          MR. VILKER:  January of 1995 through August of

7     2010.

8          Now, the Defendants pled guilty to one

9     substantive count of wire fraud involving a

10    communication concerning one of the annuitants, Edwin

11    Rodriguez, but what they actually pled guilty to was

12    committing this scheme to defraud and doing it through

13    the one particular wire that they pled guilty to, but

14    they pled guilty to the entire scheme.

15         The indictment charges that beginning in 1995,

16    Mr. Caramadre began investing in annuities using

17    terminally-ill individuals, paying them and not

18    informing the insurance companies that he was doing so

19    and that he did so on his own behalf, on behalf of his

20    family members, his associates and his clients.

21         For the clients, the indictment alleges that

22    Mr. Caramadre either received commissions from the

23    insurance companies or, in addition, there were a

24    number of occasions in which he shared the profits that

25    were earned in these annuities.

1          Now, paragraph 27 of the indictment describes

2     the scheme and the manner and means in which the scheme

3     was devised, and it indicates that Mr. Caramadre and

4     Mr. Radhakrishnan fraudulently obtained millions of

5     dollars by making material misrepresentations to, one,

6     terminally ill and elderly people, their family members

7     and caregivers in order to obtain the identity

8     information and signatures for use in furtherance of

9     the scheme; two, to insurance companies; three, to bond

10    issuers; and four, to intermediaries, including

11    brokerage houses and broker/dealers.

12          The indictment then goes into tremendous detail

13    about the numerous fraudulent acts that were taken by

14    these Defendants in furtherance of the scheme including

15    deceiving terminally-ill people to sign documents;

16    opening up annuities and brokerage accounts in their

17    names without their knowledge or consent; lying to the

18    companies involved, including the insurance companies,

19    brokerage houses and broker/dealers; providing false

20    information on application forms; providing false

21    information to obtain death certificates; using

22    nominees to conceal ownership, and taking other steps

23    to conceal the fraud such as staggering deposits and

24    delaying death claims.  That's the scheme that

25    Defendants admitted to orchestrating.

1    THE COURT:  Can I just -- and I didn't want to

2    interrupt what you were laying out, Mr. Vilker, because

3    that was really one of my questions that I came on the

4    bench with and you're addressing it, which is what is

5    the scope of the scheme for purposes of forging a

6    restitution award.  But is the scheme that you just

7    laid out what we would find if we limited our read of

8    the indictment to the counts and the paragraphs that

9    are incorporated by reference into the counts as to

10   which the guilty plea was made or are you more broadly

11   including the entirety of the indictment?

12   MR. VILKER:  No, your Honor.  It's only the

13   counts to which the Defendants pled guilty.  The first

14   count they pled guilty, Count IX, I believe, which was

15   the scheme to defraud, which is pages 1 through 40 of

16   the indictment all come within that one count that they

17   pled guilty to.

18   So it includes -- and this is why the argument

19   that defense is making about limiting it to the

20   specific people, terminally-ill people mentioned in the

21   statement of facts, it ignores everything else in the

22   indictment including all the other misrepresentations

23   that have nothing to do with the misrepresentations to

24   the terminally-ill people, lies to the insurance

25   companies, the brokerage houses, the money laundering

1   part of this, lies to obtain death certificates and

2   many other parts of the scheme to which they all pled

3   guilty and which they admitted specifically in the

4   statement of facts, which is the next point I wanted to

5   get to.

6        The statement of facts was signed by both

7   Defendants.  I read it pretty much verbatim at their

8   change of plea hearing in November of 2013.  Both

9   Defendants stated under oath that they listened to

10  every word I said, that they signed the statement of

11  facts and every single word in the statement of facts

12  was true.

13        In that statement of facts, which was a very

14  detailed statement of facts, the Defendants admitted to

15  making false representations to the insurance companies

16  concerning the relationship between the owners and the

17  annuitants.  They admitted taking steps to conceal from

18  the insurance companies the use of terminally-ill

19  individuals.  They admitted lying to the broker/dealers

20  about how the annuitants were found and whether they

21  were paid.  They admitted lying on the application

22  forms concerning the finances and the investment

23  history of the terminally-ill people.  They admitted

24  that Mr. Caramadre fraudulently concealed his true

25  ownership in the annuities and bonds by putting them in

1    the names of other people including Mr. Radhakrishnan;

2    and they admitted that the terminally-ill people

3    themselves were deceived into signing the annuity and

4    brokerage account applications.

5          So they've admitted already a great detail,

6    essentially all the pertinent facts that are in the

7    scheme to defraud and in the indictment.

8          And the third and final document that the

9    Government would cite to your Honor that we believe the

10   Court can rely on in determining the scope of the

11   scheme is the prosecution version that the Government

12   submitted with the presentence report.

13         Under Rule 32(f) of the Federal Rules of

14   Criminal Procedure, the parties have 14 days after the

15   issuance of the presentence report to object to any

16   facts contained therein.  The Defendants have not filed

17   any objections whatsoever to the prosecution version

18   and, therefore, those facts must be accepted as true as

19   well.  The reason this procedure exists is that if a

20   Defendant objects to a statement contained within the

21   prosecution version, the Government is then given an

22   opportunity to respond to that objection and provide

23   the Court with evidence to support the statements in

24   the prosecution version.

25         So by ignoring that procedure, the Defendants

1    have in effect deprived us of our ability to prove all

2    those facts that we would otherwise be able to prove as

3    true.  So I'm not going go through all that.  I believe

4    it's 32 pages long, the prosecution version, but it

5    provides significant additional details even beyond

6    what's included in the indictment and certainly beyond

7    the statement of facts concerning other terminally-ill

8    individuals who were deceived and other acts in

9    furtherance of the fraud scheme.

10        So those three documents in our view provide the

11   Court with the parameters of the scheme.  The scope has

12   already been litigated, admitted to and resolved in

13   this case.  And we would submit to you, your Honor,

14   that the scope in this case is any investment made by

15   Mr. Caramadre, his friends, relatives, associates,

16   clients from 1995 through 2010 in which an unrelated

17   terminally ill or elderly individual was named as a

18   co-owner or annuitant.  Given that definition, we did

19   take out a couple of the investments in which they were

20   mistakenly listed in which the two individuals were

21   related, but all the other annuities and bonds and

22   brokerage accounts that are in our documents fall

23   within that definition.

24        THE COURT:  The definition that you just

25   described from a temporal perspective for the annuities

1     goes back to 1/1/95 but not for the bonds, correct?

2            MR. VILKER:  The scheme goes back to 1995.  The

3     scheme is using terminally-ill individuals on

4     investments.  Factually, the bonds didn't come into

5     existence for purposes of this scheme until 2006.

6            So the annuities temporally are from 1995

7     through 2010, but the bonds the Defendants just began

8     investing in those in 2006.  But as a matter of

9     interpreting the indictment, any investment using

10    terminally-ill individuals would come within the scope

11    of the scheme as defined in the indictment.

12           Now --

13           THE COURT:  Let me -- something that I've been

14    kind of thinking about and it probably makes sense to

15    just ask the question now and I actually think given

16    the nature of the Rules of Evidence what you just said

17    may have solved my problem, but I don't -- clearly in

18    terms of thinking about the scope of the scheme, one of

19    the things I need to focus on is that the transactions

20    are all within the temporal scope.  As I read the

21    operative documents that you've just mentioned, the

22    scope as to the bond issuers and CD issuers begins in

23    2006.  I don't actually have an exhibit that tells me

24    what's the operative date for each of those

25    transactions, but I think I have a representation that

1    you just made to me that those are all 2006 or later

2    investments.

3         MR. VILKER:  That's correct, your Honor.

4         THE COURT:  I think that may be enough, unless

5    the Defendants raise a question as to that.  If they

6    do, then I think the Government would have to sharpen

7    its proof on that point.  On the annuity side, I have

8    dates.

9         MR. VILKER:  Right.

10        THE COURT:  But I don't on the bond side.

11        MR. VILKER:  We could very easily submit to your

12   Honor a chart listing the dates on which each of these

13   brokerage accounts were opened.  It's all from 2006 to

14   2009 but that would be a very simple thing that we

15   could do.

16        THE COURT:  I think what you just said as a

17   representation of counsel is probably enough, unless

18   the defense raises a question about that in which case

19   I think that the Government is going to have come

20   forward with something a little stronger.

21        MR. VILKER:  Sure.

22        Now, we could go back on each of these annuities

23   and each of these brokerage accounts and go through one

24   by one and provide evidence on each single one, whether

25   it's a lie on an application form, a lie by phone to

1    one of the companies, deceiving a terminally-ill person

2    that was named, putting the money in someone else's

3    account, someone else's name, staggering these

4    deposits.  We could go back in each of these and

5    provide evidence to your Honor as to why each of these

6    factually falls within the scheme.  To do so would

7    convert this hearing into a mini-trial and I think goes

8    beyond the scope given the indictment, the presentence

9    report and the --

10           THE COURT:  Statement of facts.

11           MR. VILKER:  -- statement of facts.  But to the

12   extent your Honor has any questions on any particular

13   ones or the Defendants raise one or two that they have

14   a question with, we could certainly go back and provide

15   further information on any of the transactions to your

16   Honor.

17           Now, getting to more of the mathematical part of

18   this hearing --

19           THE COURT:  Before you do, I do have a couple of

20   questions.  If I can find your -- there were a couple

21   of instances where the information that laid out the

22   connection to the scheme just raised a question in my

23   mind.  One was Charles Buckman where the description

24   says "annuitant was believed to be terminally ill."

25   And I didn't know whether that meant that he wasn't?

1          MR. VILKER:  Mr. Buckman was very ill.  To my

2     understanding, he's still alive.  He gave a Rule 15

3     deposition in this case in the investigation phase of

4     it in which it was kind of mixed testimony.  He did

5     testify that he had some knowledge that something was

6     being opened in his name with death benefits; however,

7     there was false information on various forms that he

8     signed.  He was given -- he was signed up with the

9     intention of him being terminally ill and to have death

10     benefits accrue on his death.  I think factually it may

11     have turned out that he was not terminally ill.

12          THE COURT:  Okay.  How then was there a loss?

13          MR. VILKER:  I just need to take a look at the

14     charts.

15          On the bond account, the only one that's listed,

16     even though there was a bond account with Charles

17     Buckman, there's only listed Maureen Buckman, who was

18     his wife.  She was terminally ill, and they may have

19     profited on that.

20          THE COURT:  Right.  No, it's on the annuity

21     list, and the first annuity that's listed for him is a

22     negative or a positive for the insurance company so no

23     loss but maybe ten down the first page there's a total

24     loss of $59,000 in his name.

25          MR. VILKER:  It appears from the chart, your

1    Honor, again, I'd have to go back to get precise

2    information that because he did not pass away, they

3    were unable to submit a death claim.  So it appears

4    that it was surrendered and that's why the payment to

5    the beneficiary is less than the total premiums.

6         But when you add in the $100,000 in bonuses and

7    the $110,000 in commissions, when you do that all

8    together, it comes out with the loss of $59,000.  It's

9    really the bonuses and commissions that drove that

10   particular loss.

11        THE COURT:  Right.  I understand how that works.

12        Sorry I'm taking you into the weeds, Mr. Vilker,

13   but I do have a few others.  Now, these are questions

14   on the bonds.  There were a handful.  Daigle is one

15   where there seemed to be a relationship between the

16   co-owner and the owner, a father and son; similarly,

17   Caterina Franco where the co-owner is the

18   terminally-ill mother of a client.

19        MR. VILKER:  On Mr. Daigle, they are father and

20   son, the owner and the co-owner.  There's a little bit

21   of a back story on that and, basically, even though

22   that account was in Mr. -- both the Daigles' names, it

23   was Mr. Caramadre who put his funds into the account in

24   their names.  And part of the scheme that we've alleged

25   in the indictment is that he did so to conceal his

1    ownership, in which he represented to that brokerage

2    house that he was the owner of these bonds and which he

3    really wasn't.  And he received most of the profits and

4    passed along sums to the junior Mr. Daigle.

5         It's basically the same situation with

6    Ms. Franco.  That was put in Mr. Radhakrishnan's name.

7    And neither Caterina Franco or her relatives or

8    Mr. Radhakrishnan were the owners.  And there were

9    other representations that were made to the companies

10   in terms of financial background of Ms. Franco.  But

11   those are two instances in which the individuals were

12   related but other parts of the fraud scheme came into

13   play.

14        THE COURT:  I think those were all my

15   down-in-the-weeds questions.

16        MR. VILKER:  So now in trying to calculate the

17   loss on the annuities, it was very clear in various

18   documents and also spelled out in the indictment that

19   the strategy here was to make very, very risky

20   investments.  And if the high amount of risk paid off,

21   Mr. Caramadre would be able to cash in on the annuities

22   with a significant profit.  If what happened is what

23   happened in most of the cases the risk didn't pay off,

24   the annuity would drop in value and the insurance

25   company would be left having to pay the death benefit

1    even though the account value had decreased

2    significantly.  And as a result of that dichotomy

3    between the value of the account on the date of the

4    death and the death benefit, the insurance companies

5    suffered significant losses.  To that was added the

6    bonus payments the insurance companies put into the

7    account typically shortly after application and the

8    commissions that Mr. Caramadre and his co-conspirators

9    in this case shared in this case, both of which the

10   bonuses and the commissions each typically was in the

11   range of five percent the value of the amount of the

12   money that was put into the annuities.

13        So in a $1,000,000 annuity, no matter what

14   happened in the market, there was already a $100,000

15   loss assuming the monies, the annuities that had these

16   bonus payments.

17        THE COURT:  Let me interrupt you there.  A

18   question that's concerned me and this relates to the

19   scope of the scheme and the fact that from '95 until

20   2007 we have the scheme as you've articulated it, and

21   then beginning in 2007 it becomes a conspiracy.  The

22   named conspirator of course is Mr. Radhakrishnan, and

23   there are unindicted co-conspirators.  Does the

24   analysis for the pre-conspiracy period change in terms

25   of the involvement of the unindicted co-conspirators

1    because there is not a conspiracy during that time

2    period?  How do I analytically look at scope and decide

3    what transactions are in and out for what I'll call it

4    the pre-conspiracy period where the hook involved the

5    conduct of an unindicted co-conspirator?

6         MR. VILKER:  Well, I'm virtually certain that

7    the scheme to defraud that's alleged in the indictment

8    that defense pled guilty to goes into great detail

9    about that, that the scheme was during that point in

10   time -- the primary brokers or registered

11   representatives were the two unindicted

12   co-conspirators, Mr. Hanrahan and Mr. Maggiacomo; that

13   Mr. Caramadre would on his own behalf and on behalf of

14   his clients direct them to submit annuity applications

15   to the insurance companies that had these death

16   benefits for himself and for his clients.  And then

17   over time there were different commission-sharing

18   arrangements between them, which Mr. Caramadre would

19   get a piece of the commissions depending on -- they

20   were different.  Mr. Hanrahan had an ownership interest

21   in Estate Planning Resources so that kind of flowed to

22   the corporation.  Mr. Maggiacomo had to pay

23   Mr. Caramadre a percentage of the commissions that they

24   had agreed upon.

25         So from the very beginning of the scheme, and

1    it's laid out in the indictment, the scheme was to open

2    up these annuities, find terminally-ill people and then

3    I guess what I should add to that is Mr. Caramadre was

4    the moving factor back then in locating all the

5    terminally-ill people that were used on all the

6    annuities before Mr. Radhakrishnan became involved.  He

7    visited a house of compassion in which AIDS people were

8    residing.  He located any other annuitants that were

9    somehow connected to his family and had small life

10   insurance policies and, therefore, he figured out that

11   they were terminally ill.

12        So he was the one identifying the terminally-ill

13   people.  He was instructing Mr. Maggiacomo and

14   Mr. Hanrahan to submit applications.  He'd say use this

15   terminally-ill individual with this client that you

16   have, and then he would receive a portion of the

17   commissions.

18        THE COURT:  That's all within the scope of the

19   scheme and, therefore, there isn't an aspect of the

20   conspiracy that we don't look at when we go into the

21   pre-conspiracy period?

22        MR. VILKER:  Right.  I believe the way the

23   scheme in the indictment is written in great detail and

24   the conspiracy basically incorporates -- the conspiracy

25   comes pretty quick.  It basically incorporates all the

1  allegations in the scheme to defraud count and then it

2  adds some charging language.

3        (Brief interruption.)

4        THE COURT:  Okay.  Let's take a ten-minute

5  break, see if we can fix what's broken.  If we can't,

6  given we do have a stenographic record and enough light

7  to work, we'll resume and make due.  Let's see if we

8  can solve the problem with a short delay.

9        (Recess.)

10       THE COURT:  I apologize for the interruption,

11  everyone.  It seems like the lights are back on but

12  because the microphones were still going crazy we've

13  turned them off so we will not have a recording record

14  of this hearing.  The only record will be the

15  stenographic record that Ms. Clayton is creating for

16  us.  So I understand no one has a problem with

17  proceeding on that basis.

18       MR. VILKER:  We certainly don't, your Honor.

19       MR. MURPHY:  Judge, for the record,

20  Mr. Caramadre does not have a problem with that.

21       MR. THOMPSON:  No objection, your Honor.

22       THE COURT:  Let's proceed.  Hope you remember

23  where you were, Mr. Vilker.

24       MR. VILKER:  I do, your Honor.  Actually, the

25  short break gave me a chance to go back and look at the

1    indictment to address the question your Honor raised

2    right before the break.  And I just wanted to direct

3    your Honor to paragraph 50 of the indictment which

4    talks about the sharing of commissions before the time

5    period in which Mr. Radhakrishnan became involved.  It

6    indicates that John Doe Number 1 and John Doe Number 2,

7    Mr. Magiaccomo and Mr. Hanrahan, received millions of

8    dollars in commissions from the insurance companies

9    based on the use of terminally ill and elderly

10   annuitants.  And upon receiving these commissions, they

11   shared their commission with Mr. Caramadre and that

12   after Mr. Caramadre gave up his securities license in

13   or about 2003, he was prohibited under the securities

14   laws from sharing commissions, and to disguise the fact

15   that he was sharing commissions Mr. Caramadre

16   instructed Mr. Maggiacomo to falsely indicate on checks

17   payable to him that commission sharing payments he was

18   making were for legal fees or rent.

19        Then if you proceed to paragraphs 70 through 88,

20   they provide a number of specific instances in which

21   Mr. Caramadre, both on his own and the cases where he

22   was a broker, submitted annuity applications naming

23   terminally-ill individuals.

24        In paragraph 70 he talked about one individual

25   named Mr. Aynalem, A-Y-N-A-L-E-M, who has testified

1    that he didn't know anything about any annuities being

2    opened up in his name, and then it continues to give

3    other examples of other annuitants that were submitted.

4         There's one Ms. Paneto, paragraph 73, that it

5    was submitted -- an application was submitted by John

6    Doe Number 2, who is Mr. Hanrahan, and the commissions

7    were shared with Mr. Caramadre.  And it goes on to

8    indicate that false information was submitted to Golden

9    America on the paragraph 76 in a death benefit claim.

10        There are pages of this, your Honor.  I just

11   wanted to point that out to the Court.

12        THE COURT:  That's helpful.

13        MR. VILKER:  The next point I wanted to get to

14   was the annuities.  As I mentioned before, the basic

15   formula is pretty simple from a mathematical

16   perspective.  It's the difference between the value of

17   the account and the amount being paid out to the

18   beneficiary and then adding in the bonuses, adding in

19   the commission and taking away the fees.

20        I didn't understand there to be any objection by

21   the defense as to this basic formula.  Instead my

22   understanding of defense's submission, the defense is

23   primarily arguing that the loss should be limited not

24   to all of the annuities but just to the 23

25   terminally-ill individuals that were listed in the

1    statement of facts.  The statement of facts

2    specifically says that the identities of the

3    terminally-ill individuals that were deceived include

4    but were not limited to the following 23 individuals.

5    So it was clearly contemplated at that time this wasn't

6    meant to be an exhaustive list.  The indictment names

7    many more people as does the prosecution version in the

8    presentence report.

9         Then beyond that, your Honor, the other

10   annuities, even if one of these named individuals isn't

11   there, all come within the scheme for various reasons

12   including the lies to the insurance companies, the lies

13   to the broker/dealers, sharing commissions illegally

14   and other aspects of it.

15        The Government, and particularly Agent Niro,

16   spent hundreds if not thousands of hours poring through

17   the documents provided by the insurance companies in

18   order to plug the numbers into the master chart that he

19   did.  Some of the numbers he was able to verify by

20   looking at the raw documentation provided by the

21   insurance companies such as checks being mailed out,

22   either to the beneficiaries or checks that were sent as

23   premium payments.

24        Other relevant pieces of financial data he had

25   no choice but to rely on the insurance companies

1  reporting back to him accurately what the particular

2  number was.  It included the amount of commissions they

3  received and the value of the account at the time of

4  payment and then ultimately the amount of fees that

5  they earned.

6       We went back to each of these insurance

7  companies and explained to them that we were attempting

8  to put together in well over 200 annuities an annuity

9  by annuity calculation to determine the amount that

10  each and every insurance company lost or gained on any

11  particular transaction.  The insurance companies

12  responded back to us with that information that Agent

13  Niro put in his chart.

14       The insurance companies were told on the

15  commission side that what we were looking for was the

16  actual commissions that were paid, not those that were

17  paid and then a portion of which was charged back

18  because they were paid early.  A number of them

19  indicate on the charts they submitted both columns,

20  charged back and the commissions, and we only took into

21  account the actual commissions that they paid without

22  any charge-backs or after a charge-back was taken into

23  account now, as your Honor can see from that chart,

24  there are a lot of moving pieces, both in terms of the

25  amount of material and the different things that

1    happened factually with many of these annuities.

2        Particularly after the allegations in this case

3    became public in 2009, there's a lot of different

4    activities with these different annuities and some of

5    them were being surrendered early, some were in

6    litigation, and we had to rely on the insurance

7    companies to tell us the amount that they were paying

8    out on these and commissions and the other pieces of

9    data.

10       Now, our only effort in this case is to provide

11   the Court with as accurate a list of the losses that

12   each insurance company suffered.  We've done our best

13   to do this.  I personally have gone through the numbers

14   hundreds of time.  I know our counsel has an IRS agent.

15   I can tell you almost every occasion I go through

16   specifically I find a little mistake and it gets

17   corrected.

18       We sent these charts to Mr. Caramadre's former

19   counsel before the start of trial last fall and his two

20   former attorneys went through this line by line and

21   they responded to us with some mistakes that they found

22   and they were right.  We went back and it was mistakes

23   that the annuity had been surrendered and we hadn't

24   realized it.  We contacted the insurance company, got

25   the accurate number and updated the chart.

1          In this hearing, we were frustrated by what

2     either intentionally or unintentionally was really kind

3     of an effort to play "gotcha" with the IRS agent.

4     Obviously Mr. Caramadre clearly knew and his counsel

5     knew that a mistake had been made on the chart and

6     Security Benefit gave us the wrong information and we

7     went back and looked at the raw material and found out

8     that they put down the amount of the voided check

9     instead of the actual check.

10          These charts, first of all, they were given to

11     prior counsel a year ago.  They were submitted by the

12     Government in this proceeding at the beginning of

13     August.  The Defendants have had these charts for two

14     months.  If they in some way know the ins and outs of

15     these transactions better than we ever will, if there's

16     a mistake made on it, it's incumbent on Defendants to

17     let us now.  Our only interest is to provide accurate

18     information.  We will go back, verify the information,

19     we'll get the correct numbers.  We're not interested in

20     getting the insurance companies money they're not

21     entitled to.  We want an accurate representation.

22          Again, after this hearing if the Defendants over

23     the next couple of weeks find something, I request they

24     let me know immediately.  We'll contact the insurance

25     companies; and if a change needs to be made, we're

1    going to make it.  In the end, based on the removing

2    one annuity in which the account owner and the

3    annuitant were related and shouldn't have been on the

4    chart reducing by about $400,000 the Security Benefit

5    one in which the error was made, we come up with total

6    loss attributable to Mr. Caramadre of $33,913,257.  And

7    while we completely agree with the over-arching

8    objection Mr. Thompson made, Mr. Radhakrishnan should

9    not be held responsible for things that happened long

10   before he became employed by Mr. Caramadre, the loss

11   attributable to him for annuities that were applied for

12   after July 1st, 2007, totals $2,952,069.

13          Now, we believe this is an exact calculation of

14   the losses.  Notwithstanding the possibility of human

15   error, it's our belief that's accurate.  We certainly

16   believe this calculation, this hundreds of hours that

17   went into it satisfies the Government's burden of a

18   reasonable estimate of the losses by a preponderance of

19   evidence.

20          Can I move on to the bonds now?

21          THE COURT:  Yes.

22          MR. VILKER:  The bond portion of it was much

23   more complicated from a mathematical perspective.  We

24   spent some time internally trying to come up with

25   equations and calculations.  In the end, we weren't

1    that far off, but it became clear that in order to

2    determine how much these bond issuers lost we would

3    need to retain an expert.  We went out and we retained

4    one of the leading experts in the world on evaluation

5    of corporate bonds and death-put bonds in particular.

6    This is -- I'm talking about Dr. Kalotay, of course.

7        Dr. Kalotay, the first time we typed his name

8    into our system, out popped an article that he wrote on

9    death-put bonds that was in Mr. Caramadre's computer.

10   So he seemed to be someone the Defendant relied on in

11   this case.  Mr. Caramadre (sic) wrote numerous articles

12   on death-put bonds and actually before we ever got in

13   touch with him in this case, secured a United States

14   patent that was designed specifically to measure the

15   value of death-put bonds.

16       Now, he testified as to the formula that he used

17   to determine the losses to the death-put bond issuers.

18   This wasn't a formula that he came up with in this

19   case.  He applied that formula obtained in that patent

20   to the facts of this case.

21       It's very clear to the Government that the gains

22   that Mr. Caramadre and his co-conspirators received

23   were very clear.  It's the difference between the

24   amount of money he put in and the amount of money he

25   put out, and it came very close to $12 million.

1            And it was our view, and Dr. Kalotay confirmed

2      it, you can't make $12 million out of thin air.  If

3      you're making $12 million, somebody on the other side

4      of the transaction is losing that amount.  That someone

5      in this case were the bond issuers who were required to

6      pay back the value of the death-put bonds in some cases

7      30 years or so before they otherwise would have.  So if

8      it's a $100,000 bond that they weren't going to have to

9      pay for another 30 years, they were required to pay it

10     back almost immediately.

11            On the other hand, they were relieved of the

12     obligation to pay the coupon rate, which is three to

13     five percent that they were required to pay per year.

14            So it became very clear that the difference

15     between those two, how much it cost them to pay early,

16     the time value of that money minus how much they're

17     saving by not having to pay the interest rate was

18     really going to come down to the real basic principles

19     of how much these bond issuers lost.

20            THE COURT:  Mr. Vilker, just a question on the

21     bond issuers.  On the insurance side, it's clear that

22     the insurance companies have been as victims very

23     engaged.  They provided you information so you've been

24     hearing directly from them about their losses.

25            On the bond issuers side, that doesn't seem to

1    be the case.  And there was some testimony suggesting

2    that the issuers may not even be aware of their loss

3    until it's brought to their attention by the Government

4    or by becoming aware of the case.  Is that a material

5    difference in thinking about how to calculate

6    restitution?

7          MR. VILKER:  It's really not, your Honor.  First

8    of all, I think generally you're correct.  There's been

9    much more engagement from the insurance company on the

10   loss of the annuities.  There has been some contact

11   with bond issuers, many of them submitted restitution

12   claims to the Court and they did similar type

13   calculations and they came out basically very close to

14   what Dr. Kalotay determined to be their losses.

15         These companies that issue these bonds are huge

16   financial corporations like Bank of America and GMAC,

17   and the reality is the relative small amount of money

18   that they lost here in the scope of their business was

19   relatively minor.  So they weren't actively engaged in

20   the investigation as the insurance companies were.

21         We did reach out to them and received some

22   information but, you know, the amount of effort they're

23   going to put in to recover losses is going to be in

24   some relation to how big those losses are to the

25   overall business.  From a legal perspective, it's

1    completely irrelevant.  Whether they recognize or not,

2    whether they're engaged or not, they're victims and

3    they're owed money in restitution.

4          When I was going back to Dr. Kalotay and he

5    recognized he could be somewhat difficult to understand

6    mostly because he's so far above the rest of us in this

7    area, how he explained it to me that made the most

8    sense, finally had the light go on in my head when he

9    used the analogy of being like a mortgage in which the

10   bond issuers are a homeowner and they need to borrow

11   money and they have a mortgage of three percent, four

12   percent that they're paying out to a bank.  All of a

13   sudden the bank comes in and says pay back the mortgage

14   immediately.  And they don't have the money available.

15   The only way they can pay back that mortgage is to go

16   out in the market and borrow more money.  Because as a

17   matter of necessity, because the bond values selling on

18   the market were below par, below that $100, that meant

19   that the rate that they would have to get to pay back

20   that bond would be higher than the rate of the bond,

21   which would mean that they have to be like a homeowner

22   having to pay back a four percent mortgage by going out

23   and getting a seven percent mortgage.

24         And the rate varied from bond issuer to bond

25   issuer.  Some of them had better credit than others.

1    Some of them had to get it at six percent instead of

2    seven percent.  Some had to get it at eight percent.

3    And we looked at different categories of these

4    companies and determined approximately at that time

5    what their borrowing costs were and determined how much

6    more it would have cost them to pay back that money.

7         He testified this is how those companies do

8    business.  They don't have piles of cash hanging out

9    ready to pay back whoever is cashing in a bond.  Any

10   debt that they have, they have to go back and borrow

11   more money to repay the debt.  It's unfortunately the

12   facts of American corporations as they exist now.

13        THE COURT:  And as I understand your argument,

14   it's not just speculative to say given the nature of

15   the scheme that the bond issuers experienced a loss

16   because the nature of the scheme was that these were

17   bonds that were necessarily trading at a discount below

18   par.

19        MR. VILKER:  Right.

20        THE COURT:  So if I understood Dr. Kalotay's

21   testimony correctly, that meant that in that moment,

22   that entity's cost of replacing those dollars was going

23   to be higher than what they were paying for them in

24   connection with the issuance that now is suddenly

25   prematurely due.  So you necessarily have loss, what's

1    left is how you calculate it.

2         MR. VILKER:  It took me six months to get that.

3    That's exactly what Mr. Kalotay testified to.  They

4    would not have purchased these bonds unless they were

5    far below par value, otherwise there's no profit when

6    the co-owner passes away.

7         So using those factors, the prevailing rates and

8    other factors, the likelihood that it would have been

9    put back to the issuer in any way, if someone else

10   owned it there's always a possibility that that

11   co-owner could have passed away or the owner and gone

12   into the estate.  That was factored in.  And he came up

13   with a calculation issuer by issuer and his total

14   losses that he calculated were $12,397,095 and the

15   losses after July 1st, 2007, were $12,220,241.

16        Now, Dr. Kalotay did testify that he made some

17   estimates in his calculations.  I believe the one he

18   testified was the biggest estimate was he divided the

19   companies into kind of broad categories of their

20   credit-worthiness.  And he said that in reality if you

21   want to look at a specific company on a specific date

22   they might be slightly different than the prevailing

23   rate that he used in calculations but that would have

24   required an enormous additional amount of hours spent

25   examining these bonds.

1          So we believe these numbers that Dr. Kalotay

2     testified is very, very close to the actual numbers and

3     certainly a reasonable estimate of losses that these

4     bond issuers suffered.

5          I did want to point out in my comments, unless

6     the Court has any questions, is under the guidelines,

7     which is the other part of the analysis here, the

8     guidelines are very clear that if say we fail

9     completely in giving a reasonable estimate of the

10    losses, the guidelines direct the Court to look at the

11    gains to determine the guideline total under Section

12    2B1.1.  In this case, the gain is $11,959,820.

13         THE COURT:  I do have one final question for

14    you, Mr. Vilker, and this is really to confirm my

15    understanding.  Some of the things that the Defendants

16    have filed have emphasized the victim status of the

17    terminally-ill individuals who are identified in the

18    plea agreement.  Those victims are not the subject of a

19    restitution hearing and my understanding is that is

20    because of the nature of the loss that was inflicted on

21    them is not a property loss and therefore the law of

22    restitution doesn't provide them with an economic

23    remedy.  Have I got that right?

24         MR. VILKER:  That's exactly right, your Honor.

25         THE COURT:  Okay.  Thank you, Mr. Vilker.

1        Mr. Thompson?  Mr. Murphy?

2        MR. THOMPSON:  I'll go first, your Honor.  Thank

3   you.

4        Thank you, your Honor.

5        At the outset, I would suggest to the Court that

6   the Government's suggestion that the indictment serves

7   any evidentiary value whatsoever is simply incorrect.

8   It's not true at all.  An indictment is an accusation,

9   and it's only once we've gone through the process in

10  Court that we can determine what facts have been proven

11  and what facts have not been proven.  And it is not the

12  case that when you plead guilty to a particular charge

13  you plead guilty to all the underlying facts the

14  Government initially allege support that charge.

15       In this case we know that for certain because

16  the parties as part of the plea agreement came to a

17  very specific agreement about the facts which were

18  being agreed to.  And if the Government's argument was

19  correct that the indictment had been admitted to, then

20  they wouldn't have needed an additional agreed to

21  statement of facts because they would have been of the

22  position that everything in the indictment has now been

23  deemed to be true.

24       But they weren't in that position.  That's why

25  they wanted Mr. Caramadre and Mr. Radhakrishnan to sign

1    on to an agreed statement of facts, and statement of

2    facts that was written by the Government and it was a

3    requirement of the plea that these gentlemen sign on to

4    it and agree to it.

5        And Mr. Vilker is absolutely correct.  They did

6    review it; they did sign on to it.  It was read

7    essentially by Mr. Vilker as he stated and agreed to in

8    Court.  Those are the facts of this case.

9        THE COURT:  Let me stop you there, Mr. Thompson,

10   because you're raising something there that I've given

11   a lot of thought to.  While there isn't a lot authority

12   in the First Circuit, I found a fair number of cases in

13   other circuits that seem to say differently.  They seem

14   to say that in looking to define the scope of offense

15   for purposes of setting restitution that the Court

16   considers the plea agreement, the plea colloquy, the

17   statement of offenses as you said, but also the

18   indictment.  And I'm looking now at -- this is **United**

19   **States versus Emor**, E-M-O-R, 850 F.Supp.2d, 176 from

20   the District of Columbia, 2012.  But that's just an

21   example.  We found many cases stating the same

22   proposition.

23       So I wonder if you have authority in this

24   circuit for the proposition that the statement of facts

25   in the plea agreement in effect supercedes the count of

1    the indictment as to which that same plea agreement to

2    plead guilty.

3         MR. THOMPSON:  I don't have specific authority,

4    and obviously I'm confident your Honor would have found

5    it and looked for it if there was supporting authority

6    one way or the other.  Apparently, there's not.  My

7    suggestion would simply be, frankly, review the cases

8    and see how distinguishable they are.  I don't know

9    offhand.

10        But if the Government is seeking an agreed

11   statement of facts then they should be bound to their

12   agreed statement of facts and not come in later and

13   say, yeah, but a certain number of grand jurors thought

14   such and such.  That doesn't have the evidentiary value

15   and the kind of reliability that your Honor is required

16   to have before you for evidence you consider when

17   you're making a restitution order.

18        The cases your Honor referred us to made very

19   clear that your Honor needs to be considering reliable

20   evidence.  Now, no doubt about it, your Honor, the

21   Government's burden of proof is relatively low.  It's a

22   preponderance of the evidence standard.  And at least

23   one of the cases that you referred us to, the Gushlak,

24   G-U-S-H-L-A-K, and also the -- again difficult name,

25   A-D-E-T-I-L-O-Y-E, Adetiloye, I suppose made it very

1    clear it was a very low standard.  That case suggested

2    that the Court could consider things like testimony,

3    sworn testimony of an investigating agent or sworn

4    submissions by the actual companies that suffered these

5    losses.

6          I would suggest in this case, your Honor, that

7    you received neither of those things.  To be sure, you

8    received testimony of Agent Niro, but I would suggest

9    he was not the investigating agent in this case, and he

10   made this clear as well although he spent countless

11   hours on this case.  He was essentially a calculator.

12   He would get documents from these insurance companies.

13   He would plug them in to the spreadsheets and he would

14   do the formula.  That's what he did.  And he testified

15   that he didn't double check or he didn't look to backup

16   documents.  In some of the cases he did.

17         THE COURT:  He said he did.  He said he did when

18   he could.

19         MR. THOMPSON:  Okay.  But he didn't say how

20   many.  For that reason, I would suggest that you have

21   no idea how many he was able to do that on.  And he did

22   testify, and we were standing here with that large

23   eight-by-six page document, and he testified to your

24   Honor that he didn't know whether any of the numbers on

25   that entire document were correct.

1          So I would suggest that for purposes of the case

2     that your Honor directed us to, the two cases, that

3     testimony was not sufficiently reliable because,

4     although you had an agent, he was just testifying as to

5     what the companies told him.  And the companies didn't

6     file this information under oath.  They didn't come and

7     explain and take an oath or sign an affidavit.  They

8     simply sent in the information.  And the case makes

9     clear that you need to have sworn testimony or sworn

10    evidence from the companies.  The fact that --

11         THE COURT:  I don't think you necessarily have

12    to have sworn -- I think at this phase the litmus test

13    is reliability.  And if the Government makes a

14    presentation that meets a threshold level of

15    reliability, then it then goes to the Defendant to

16    start to poke holes in the reliability of that

17    information.

18         I mean, one of the things -- I think one of the

19    teachings of those two cases was that in a circumstance

20    where a lengthy trial is averted by a plea agreement,

21    the evidence that the Government would have presented

22    at trial, which the Government has, but hasn't yet

23    converted into the form of admissible evidence, that

24    the restitution hearing is supposed to be structured so

25    that it doesn't replicate that three-month trial.  The

1    Government is being asked -- and in each case I think

2    the Court was aware that the Government had a treasure

3    trove, if you will, of potential evidence.  And at the

4    restitution phase, the Government is asked to come

5    forward with enough evidence to reliably create a way

6    to calculate the losses.  Then the Defendants can look

7    at that calculation and say that's not reliable and

8    here's why.  That's wrong.  That one is wrong.

9        MR. THOMPSON:  Yes, this <u>Adetiloye</u> case states

10   that the Government must prove restitution is warranted

11   by a preponderance of the evidence.  We all agree on

12   that.  It follows:  General invoices which purport to

13   indicate the amount of loss but do not provide further

14   explanation are an insufficient method of proof.

15       And it goes on:  Whereas here the Defendant has

16   objected to the amount of loss attributable to him, the

17   Government may meet its burden of proof by testimony

18   from the postal inspector -- and there's a citation --

19   or a sworn statement from the victim outlining the

20   losses sustained.

21       Those are the two examples of methods the case

22   provides, but the essential requirement here is that

23   the evidence has to be sufficiently specific and

24   reliable.  And I would suggest in this case you don't

25   have reliability.  And right now for the purposes of

1    this I'm talking essentially about annuities and the

2    insurance companies, your Honor.  You don't have

3    evidence of reliability.  Agent Niro is not able to

4    give a stamp of approval or a stamp of validity or

5    reliability to the claims that the insurance companies

6    are making.  And the insurance companies did not

7    provide documentation under oath to him and the

8    Government has not made any showing of what those

9    specific numbers that the insurance company provided.

10         I would suggest, your Honor, that particularly

11   when no one from the company like an actuary or an

12   accountant has actually signed onto these numbers, I

13   would suggest that financial information from an

14   insurance company inherently lacks reliability because

15   it's the purpose of every corporation to make money and

16   that would be their goal in returning restitution

17   demands is to make money.  They have a financial

18   incentive to exaggerate their loss in this case and the

19   incentive cannot go away and their claims cannot be

20   made more reliable by the fact that an agent is

21   standing up there saying those are numbers in the

22   spreadsheet as opposed to the insurance companies doing

23   it themselves.

24         THE COURT:  But, Mr. Thompson, don't the

25   Defendants have -- and I think there's some discussion

1      in one of those cases as to whether this approach, the

2      approach I'm about to articulate is an inappropriate

3      shifting of the burden to the Defendant, and the Court

4      said no, it's not.  And I ask the question in the same

5      spirit.

6              Given that the Defendants, first of all, have

7      all the documentation that the Government has relied

8      upon and have the added experience of having lived

9      through the event and therefore are really better

10     situated than the Government to poke out errors, once

11     the Government has come up with something that hits the

12     level of reliability that we've got here with Agent

13     Niro's testimony, with information provided by the

14     insurance company, with in all instances where he was

15     able to corroborate from the evidence that was

16     collected and in every instance where the Defendants

17     have raised a question, the Government has, as

18     Mr. Vilker said, gone back, examined and fixed if that

19     question raised an error, why -- how can I say it's not

20     reliable just because it doesn't -- it's not attached

21     to an affidavit?  Because I don't see that requirement

22     in the statute.  Obviously, that particular case refers

23     to affidavits as a way to reliably claim the evidence

24     in court, but I don't think that's the only way.

25             MR. THOMPSON:  I would suggest to your Honor

1　that perhaps that's not the only way but no other way

2　was achieved here.  We have a joint statement of facts,

3　we have testimony from the agent who didn't have

4　personal knowledge of the particulars, and then we have

5　hearsay testimony from companies that have a motive to

6　lie and clearly made some mistakes.  So I don't think

7　we have any indicia whatsoever of reliability.

8　　　　THE COURT:  Isn't the starting point that I have

9　here on the admission on the insurance side that the

10　scheme caused millions of dollars in losses?

11　　　　MR. THOMPSON:  Yes.

12　　　　THE COURT:  That's baseline.  I know there's

13　losses and know the losses are in the millions.

14　　　　MR. THOMPSON:  Yes.

15　　　　THE COURT:  And now the Government's burden is

16　to come forward with reliable evidence, and "evidence"

17　may be too strong a word, to perform that calculation.

18　　　　MR. THOMPSON:  And I contest that they have

19　provided reliable evidence.  They have provided, once

20　again, statements of a witness who doesn't have

21　personal knowledge and hearsay testimony by people

22　motivated to exaggerate their losses and that is not

23　enough.

24　　　　THE COURT:  What would be enough?

25　　　　MR. THOMPSON:  If they had statements from

1    accountants from these firms come in and they were

2    subject to, for example, cross-examination.  That could

3    be enough.

4          THE COURT:  But isn't that exactly what the case

5    law tells us the restitution hearing is not supposed to

6    become?

7          MR. THOMPSON:  I don't think so.  I don't think

8    so at all.  The purpose of the restitution hearing,

9    your Honor, is certainly not to retry the case that did

10   not happen.  But this idea that because it would be a

11   big burden to put on the witnesses to talk about their

12   loss or to actually verify the loss because that would

13   be a big burden therefore it's not necessary is

14   completely wrong, and I don't think it says that in any

15   of the case law.  What it says is the Defendants are

16   entitled to due process.  They are entitled to

17   cross-examine these witnesses, and they are entitled to

18   this production.  At the very least, they are entitled

19   to production to your Honor of a reliable amount of

20   evidence and that's what you don't have.

21         So I don't think the Court can get or should get

22   distracted by saying -- and I don't mean distracted in

23   a negative sense at all.  I just mean I don't think we

24   should focus on this idea that, well, this is not

25   supposed to be a trial so therefore I'm going to accept

1    the loss.  That's not what the cases say.  What the

2    cases say, if it's not necessary the Defendants are not

3    entitled to a whole extra trial.

4         Frankly, when we're making these questions and

5    the Government is saying we're trying to redo and

6    relitigate the statement of facts and that's not true

7    at all.  In my objections to the presentence report, I

8    reaffirmed once again Mr. Radhakrishnan fully agrees

9    with the statement of facts; however, in my objection

10   to the presentence report, I also stated there are some

11   things wrong in the Government's version of facts.

12        So that is not all admitted and it's just the

13   Government's version of the facts.  It has no

14   evidentiary value for that reason.

15        THE COURT:  I think the -- I'll use a strong

16   word, the uncontested facts that are articulated in the

17   presentence report are appropriate and reach that level

18   of reliability given the fact that the Defendants have

19   had an opportunity to object to them and have not.

20        MR. THOMPSON:  Well, I believe that -- I don't

21   want to speak for Mr. Murphy, but I believe that

22   Mr. Caramadre fully objected to the statement of facts

23   in his objection to the presentence report.  And on

24   Mr. Radhakrishnan's behalf, I certainly filed an

25   objection which included a Defendant's statement of

1    facts which contested many of the facts in the

2    Government's statement of facts, those which he could

3    possibly be aware of.  So I don't think the state of

4    the record is that there's an agreed to Government's

5    version of the facts.  That is essentially the

6    Government's version of the facts but it's not all the

7    parties' version of the facts.

8           THE COURT:  Suppose these insurance companies

9    came, just had somebody verify the previous submission?

10          MR. THOMPSON:  If someone came in --

11          THE COURT:  Not to come testimonial and testify

12   because otherwise I think we have 60 insurance

13   companies, 60 witnesses?

14          MR. THOMPSON:  Again, the number of witnesses --

15   because there's lots of witnesses, that doesn't go to

16   the Government's benefit.  The Government has the

17   burden that it has and the Defendants are entitled to

18   due process.  So the fact that there's lots of

19   witnesses or Defendants' restitution is complicated,

20   that doesn't go to the Government's benefit in that

21   case.  Part of the Court's job is to make sure it

22   doesn't go against the Defendant.  So if they were to

23   come here and testify under oath and we were able to

24   cross-examine, perhaps that would be deemed by your

25   Honor to be reliable.  I think it might be.  We're not

1      there.  It hasn't been presented to you.

2              We've heard from the Government about what they

3      feel they could show your Honor if they had to but they

4      haven't shown it.  They've only shown what they

5      actually have shown.

6              THE COURT:  Let me just bug you because I think

7      this is a very important point.  Isn't a lot of the

8      information that, again, on the annuity side, that

9      appears on the Government's chart information where

10     your clients, at least for the period after 1/1/07,

11     would have had some firsthand knowledge of what's going

12     on with these transactions?  So for example, the

13     premium paid is information that would have been within

14     the possession of the Defendant at the time.

15             MR. THOMPSON:  Some of it.  I'm sure that's

16     where the Government got a lot of that information

17     from.  The Defendants in this case turned over their

18     hard drives and financial information long before the

19     criminal charges in this case.  So to that extent, that

20     was fully shared.

21             THE COURT:  That being the case, as to those

22     numbers on the chart that came from the Defendants, and

23     the Defendants have now had their opportunity to review

24     what's gone onto the chart, how does that not become

25     reliable, given what "reliability" means in this

1    context?

2         MR. THOMPSON:  Because the procedure is not

3    anything that the Government throws out there that is

4    not specifically objected to is deemed reliable.  The

5    procedure as is very clear in the statute and the case

6    law is the Government must present a baseline of

7    evidence that it is reliable.  If they have done so, it

8    becomes the Defendant's burden.  It's not the

9    Defendant's burden to disagree with whatever they throw

10   out there.

11        THE COURT:  Basically, your argument is they

12   have not sustained their burden of going forward.

13        MR. THOMPSON:  That's step one of my argument.

14   But yes, that's my argument, they have not given you

15   baseline reliable evidence as to this loss amount.  If

16   we get into the specifics, your Honor, of the specific

17   transactions and specific losses, I would say the same

18   thing.  The only lives that are agreed to in the

19   statement of facts, and again we didn't hear anything

20   on the stand in testimony about any of these lives so

21   we have to go from what's in the agreed statement of

22   facts are as relates to bond losses.  I believe there's

23   three measuring lives and that was in the table that I

24   submitted, your Honor, and that was Mr. --

25        THE COURT:  Isn't the statement of facts crystal

1     clear that these are included but not limited to, I

2     think the word may be "examples"?

3          MR. THOMPSON:  I think it says included but not

4     limited to, but any time someone says that I don't

5     think it's deemed that the other party is admitting to

6     anything that the Government wants to add in the

7     future.

8          THE COURT:  It says the names of some of the

9     terminally-ill people.

10         MR. THOMPSON:  Right.

11         THE COURT:  That means not all.

12         MR. THOMPSON:  Just like the agent reviewed some

13    of the numbers to make sure they were accurate.  That

14    also means not all.  We don't have a list -- you don't

15    have a list that you can be satisfied with that you

16    have all these measuring lives.  You don't have

17    testimony from the agent that he actually verified any

18    particular number of these numbers that they got from

19    the insurance company.

20         So to that extent, your Honor, once again, you

21    do not have the reliable information.  That said, even

22    if you wanted to expand it, your Honor, that there were

23    other so-called measuring lives, you don't have

24    anything in the agreed statement of facts or in the

25    testimony that links those particular so-called

1    measuring life accounts to any particular losses

2    sustained by the insurance companies.  You don't have a

3    line to draw there.

4         Now, you do have in a table that the Government

5    provided at our most recent hearing date, there was a

6    column added.  And in the column it indicated what the

7    Government felt that account's link to the overall

8    scheme was.  For the most part, what was found in those

9    columns was whether that person was a terminally-ill

10   person, whether they were related to Mr. Caramadre, and

11   here and there there were some other facts.  But for

12   the most part, they were whether the person is

13   terminally ill and whether they are related.

14        Now, testimony that we did have on the stand was

15   that there's nothing illegal about using a

16   terminally-ill person as a measuring life.  That is

17   true.  That is in the record.  That is the case.

18   There's nothing wrong with it, and using a

19   terminally-ill person does not cause any loss.

20        THE COURT:  But isn't that an essential part of

21   the scheme in this case?

22        MR. THOMPSON:  I suppose it's what you meant by

23   "scheme."  You could just have easily called it an

24   investment strategy.  If you called it an investment

25   strategy and an investor signed on with terminally-ill

1    people and made money, that would be legal.  That's not

2    what causes the loss in this case.  That's a common

3    misunderstanding about what went on here, but it's not

4    the case that that caused any loss.

5         It's also not the case that people, the

6    annuitant and the account owner have to be related.

7    And so even though you find that on that last column

8    people that are not related to Mr. Caramadre, that

9    doesn't mean that any particular loss was caused by the

10   fact that they were not related.

11        Now, we hear from the Government first time

12   today their definition of what the scope of the scheme

13   was, I think they said their definition was an

14   investment made using a terminally-ill person and

15   someone that was not related.

16        Now, we haven't heard that anywhere else here

17   and that was not in the indictment, it was not in the

18   agreed statement of facts and that was not testified to

19   on the stand.  That's a brand new definition of the

20   scope of the scheme here.  And as far as I can tell,

21   the two principal parts of the Government's new

22   definition that someone is terminally ill and not

23   related are totally legal.

24        THE COURT:  But I'm looking at the statement of

25   facts on the first page.  "The investment strategy

1      depended on the use of terminally-ill individuals."

2              MR. THOMPSON:  Right.  Yes.

3              THE COURT:  So I think --

4              MR. THOMPSON:  It's the key to this case, your

5      Honor, to understand that the investment strategy is

6      not illegal.  Nothing happened illegal on this

7      investment strategy.  That's why the Government has

8      taken names and transactions off of their chart.

9      Because as we're able to point out particular ones or

10     they found on their own particular ones that they

11     pulled off, they were still using terminally-ill

12     people.  Some were using people that were not related,

13     but there's nothing illegal about that.

14              While it's true we agree Mr. Caramadre developed

15     this investment strategy that depended on the use of

16     terminally-ill individuals, Agent Niro testified and it

17     is fundamentally true that there is nothing illegal

18     about that.  That did not cause any losses.  Same is

19     true for whether people were related or not.

20              So I would suggest to your Honor that I believe

21     the Government prepared that last table for use to

22     address your Honor's concern that you didn't have a

23     link in each individual transaction.

24              The reason why I bring it up is the fact that a

25     column was added where it indicates someone was

1    terminally ill or someone was not related to

2    Mr. Caramadre is not that link you were looking for and

3    therefore it doesn't make that connection that you were

4    required to find for each account and it doesn't

5    somehow make that monetary loss somehow within the

6    scope of a conspiracy just because an annuitant was

7    terminally ill.  That was entirely legal and it

8    happened countless times where that was not illegal and

9    those -- and at least some of those were initially on

10   the chart or overruled or that kind of thing because it

11   is legal.

12        THE COURT:  So in those instances where the

13   connection simply has "annuitant terminally ill,"

14   "annuitant and owner unrelated," those are not enough?

15   Those transactions should drop off?

16        MR. THOMPSON:  That's certainly not enough, your

17   Honor.  I misplaced my copy of that table so I'm just

18   looking around for it.

19        If I could go on, your Honor.

20        THE COURT:  Yes.

21        MR. THOMPSON:  Although you have a general idea

22   here of how this investment plan or scheme, however you

23   want to call it, worked, again there's no showing that

24   any agreed-upon lives led to any losses.  There's no

25   showing that any of these falsehoods led to the

1    issuance of particular annuities and there's no showing

2    they led to any specific annuity accounts or bond

3    accounts specifically.  So for that reason, once again,

4    we don't have a showing as to particularized losses.

5         Just briefly, your Honor, and I'll only stay on

6    this for a moment, but I would suggest to your Honor

7    that within that annuity chart there are two columns

8    which I quarrel with and I question the accuracy of.

9    One of those columns is the column for bonuses.  And if

10   you recall, those bonuses is money put into the annuity

11   account by the insurance company and the other column

12   that I question, your Honor, and I feel it's unclear

13   and unsubstantiated in many of the individual cases is

14   the commission column.

15        The reason why both of those, your Honor, I

16   would suggest are unclear and not reliable for the

17   purposes of restitution is that there were clearly

18   certain cases where bonuses, while they were put into

19   the account for investment purposes, were not paid back

20   at the end of the transaction.  And so for example we

21   have the transaction on --

22        THE COURT:  I thought the testimony was that the

23   bonus went into whatever was the designated investment.

24        MR. THOMPSON:  Yes.

25        THE COURT:  And at the end, when the annuity

1     came to be paid out, if the total investment had

2     dropped, which was likely because it had been placed in

3     something that was very risky, both the bonus and the

4     premium were gone.  The insurance company had left only

5     what was in the investment account but had a

6     contractual obligation to pay to the beneficiary the

7     amount of the premium plus whatever were the particular

8     bells and whistles of that annuity.

9               MR. THOMPSON:  I agree with that.

10              THE COURT:  So that from the insurance company

11    perspective, the bonus is gone.

12              MR. THOMPSON:  Right.  But in certain

13    circumstances, your Honor, the bonus was not

14    necessarily lost because, for example, the account

15    dropped only small amounts less than that bonus would

16    have been or it didn't drop at all.  And I gave the

17    example with the agent, it's on page five of the

18    Government's table where the premium was -- the owner

19    was DK, LLC, the annuitant was Jason Veveiros and the

20    total premium and the payout were $2,450,000, there was

21    a bonus listed that was added on to the loss amount.

22    However, it's clear from the numbers that the bonus did

23    not, in fact, go back, get paid to the beneficiary in

24    the "payment to beneficiary" column.

25              Now, the agent speculated that that was because

1    this account was surrendered but in fact the total

2    premium was $2.45 million and payment to the

3    beneficiary was $2.45 million.  That's one example of

4    although the bonus payment was apparently made and must

5    not have vested and therefore it really shouldn't be

6    included onto the loss amount.

7         If you remember, when Mr. Vilker presented one

8    of these prospectuses, it talked about that the

9    investor would have to pay a premium of .8 percent, for

10   example, per year essentially to buy that bonus at the

11   beginning.  There's also a chart at the very bottom of

12   that page that talked about when the bonus vests.  It

13   really took over I believe 8 to 12 years, I believe it

14   was 8 but I could be wrong on that chart, to fully vest

15   and it didn't vest in the very beginning.

16        I agree with your Honor if the overall value of

17   the account went down so much, of course the bonus was

18   gone.  I absolutely agree with that.  I'm just

19   suggesting at other times it did not drop where it also

20   was not vested, was not paid to the beneficiary but for

21   some reason it still appears on that chart.  And for

22   that reason I think the bonus column is unreliable.

23        And I make the same argument generally, your

24   Honor, for the commission column because I think in

25   some cases the commissions were charged back.

1    Apparently there were some instances where the

2    insurance companies report those charge-backs; there

3    were some instances where the insurance companies did

4    not report those charge-backs.

5         THE COURT:  Let me stop you there.  I do recall

6    there were instances the charge-backs were reported by

7    the insurance companies.  I thought I recall the

8    agent's testimony that he was not aware of anywhere the

9    insurance company had failed to.  What he instead said

10   it was theoretically possible that the insurance

11   company had reported commissions and failed to pick up

12   charge-back but he wasn't aware of any instance for

13   that that happened.

14        MR. THOMPSON:  I will tell your Honor I have a

15   note but I can't say my note disagrees with your

16   interpretation either.  I interpret it one way.

17   Certainly it's your Honor's memory, but I'm not going

18   to press on that issue because frankly I'm not sure at

19   this point.

20        I'll move quickly to the bond losses.  I know

21   Mr. Murphy is going to address this a little bit more.

22   The Gushlak case, G-U-S-H-L-A-K, makes clear that the

23   restitution statute requires a showing of actual loss.

24   Doesn't have to be exact as Mr. Vilker made clear, and

25   I agree with him.  Doesn't have to be an exact precise

1    amount.  But actual loss does mean it can't merely be

2    hypothetical or speculative.

3         I would suggest that Dr. Kalotay, while he's

4    clearly very intelligent and knows bonds, I would

5    suggest inside and out his testimony about how a

6    corporation would repay bond money was entirely

7    speculative and hypothetical, and his basic premise was

8    that the only way to pay back bonds was to issue new

9    bonds.  That simply cannot be true.  Even in his own

10   example and Mr. Vilker's example of the mortgage, it is

11   true that if I had a bank call me today and say I'd

12   have to pay off my mortgage tomorrow I would have to

13   get a new mortgage to cover at that time and I would be

14   victim to whatever the prevailing rate is.  However, if

15   I had enough money, cash on hand, I could use cash on

16   hand to pay off that mortgage and maybe I would sustain

17   loss from that hypothetically and maybe I wouldn't.

18   That all depends on do I have cash on hand, and do I

19   have --

20        THE COURT:  But from a business perspective, if

21   you have cash on hand it's because it's cash that you

22   want to marshal in the business.  And if you're not

23   marshaling it in the business but you're instead using

24   it to retire debt, then the cost of cash, because cash

25   is something that when you're thinking about the world

1    from a business perspective, costs money.

2              MR. THOMPSON:  Yes.

3              THE COURT:  The fact that you're paying back

4    with a dollar that can only be replaced for more money

5    necessarily means that you've sustained a loss.

6              MR. THOMPSON:  Well, it does but we don't know

7    what that loss is.  In your example that you just gave,

8    your Honor, if you're marshaling cash, it must be for a

9    different reason.  We don't have any kind of analysis

10   of what these corporations sustained because they

11   weren't able to put capital.  We have one hypothetical

12   way they raised the money.  We have to put the cost of

13   that in the hypothetical way.

14             THE COURT:  Isn't the cost of raising money

15   always how you value the loss of cash?  I mean that's

16   not speculative.  That's a pretty standard way of

17   approaching a circumstance where we're dealing with the

18   commodity known as cash which has a time value.  And

19   the essence of this scheme is timing.  So it seems like

20   it's not speculative and it's not hypothetical.  It

21   really is becoming a way to capture a loss where the

22   loss is embedded in the time value of money.

23             MR. THOMPSON:  In a certain sense it is, your

24   Honor, but also we have to factor that they don't have

25   that debt on their books anymore.  Interest rates can

1    fluctuate.  Dr. Kalotay agreed that the numbers that he

2    came up with previously could have changed by now and

3    that in some instances based on the extraordinarily low

4    interest rates of today, it would actually be as of

5    today's dollars it was to these corporations' benefit

6    that they actually retired these debts early.  That was

7    his testimony as well.

8         THE COURT:  But in the moment, in the moment

9    when they had no choice but to either take more

10   expensive cash or go raise the money some other way, I

11   mean, obviously, a bond issuer that's issuing 15

12   billion in bonds doesn't go back into the bond market

13   to replace his losses that are this small relative to

14   the cost of doing business, but nevertheless, that cash

15   that's now gone from their operating money has value

16   and what better way to value it than to look at that

17   entity's ability to borrow that amount of money in the

18   moment when the money has to be repaid.

19        MR. THOMPSON:  My suggestion is that we don't

20   know that they have to borrow the money nor that

21   amount, and we cannot say that they have that actual

22   loss.  I would suggest it is speculative, but I

23   understand your Honor's argument on that.

24        Again, the mortgage example goes both ways, and

25   it shows, frankly, how complex this is and we can't

1      simply say how much does it cost to replace that money

2      today.  You have to look more broadly than that.  As

3      history has shown, interest rates have plummeted.  What

4      seemed as a loss then might not in fact have been a

5      loss today.  Then we get into more complexity, which is

6      when do we measure the time of loss.  I would suggest,

7      your Honor, overall as to annuities and the bonds that

8      your Honor does not have enough information to make any

9      reliable finding of the restitution due and owing in

10     this case.

11          You do not have the ability, I don't think,

12     based on reliable evidence to say which of these

13     companies lost what amount of money due to any of the

14     particular acts of the Defendants in this case.  While

15     there might have been some losses overall, you don't

16     have reliable evidence to tie that to any particular

17     accounts, any particular transactions and for that

18     reason, your Honor, I believe the case law and the

19     statute is fairly clear, I think the Court is unable to

20     issue a reliable restitution order.  Thank you.

21          THE COURT:  Thank you.

22          Mr. Murphy?

23          MR. MURPHY:  Judge, thank you.  Your Honor, on

24     behalf of Mr. Caramadre, I would incorporate and join

25     in on Mr. Thompson's arguments as it relates to

1    annuities.  I will start with bonds first and then

2    circle back briefly to the annuities.

3          Your Honor, as to the bonds, on behalf of

4    Mr. Caramadre, we're saying that there is simply no

5    loss.  One of our exhibits was the prospectus that was

6    entered from GMAC was a $15 billion bond issue.  We're

7    not sure out of that particular bond issue how many of

8    that 15 billion were actually issued.

9          However, the cross-examination of Dr. Kalotay, I

10   think, showed that his analysis, one hired by the

11   Government, was pure speculation and based on

12   hypothetical examples.

13         Now, Mr. Vilker on his redirect of Mr. Kalotay

14   asked a question about a mortgage, and I don't think

15   the mortgage example applies or should be controlling

16   your Honor.

17         Judge, Dr. Kalotay, who was qualified as an

18   expert, I think all parties agree he's a very, very

19   bright individual who has worked with bonds throughout

20   most of his professional career, and at one point

21   testified that he did not know when asked by me that

22   particular time that you could hold these death bonds

23   in joint tenancy.  He did not realize that at first,

24   and he said that from the witness stand when he first

25   began his expertise or his research for the Government

1    he did not realize at first that these bonds could be

2    held in joint tenancy.  I think that is important, your

3    Honor, because the Court has asked Mr. Thompson some

4    questions as it relates to annuities as about the

5    so-called scheme.

6         Judge, I am arguing to this Court that there is

7    nothing wrong as it relates to bonds to have a joint

8    tenant who is dying to have a bond purchased by another

9    joint tenant.  There doesn't have to be any

10   relationship between the joint tenants.  In fact, the

11   joint tenants to my knowledge do not have to know each

12   other and the bond issuers do not require that.  In

13   fact, Judge, it came from Dr. Kalotay and it is in the

14   prospectus that when a company goes to market to sell

15   bonds to raise capital that the prospectus is the

16   document that goes from cradle to grave with that

17   tranche of bonds that is issued and a purchaser of

18   bonds has to accept what is contained, the terms and

19   conditions contained in the prospectus.  A purchaser

20   cannot dictate any terms to the bond issuer.  You take

21   it or leave it as according to the prospectus.

22        And the prospectus as Dr. Kalotay admitted goes

23   from cradle to grave.

24        Judge, with the bonds and Dr. Kalotay agreed to

25   three but maybe not the fourth, there are in essence

1    four ways to retire a bond.  One is if the company

2    decides to call it, and that's important because when

3    we look globally at the economic times that were going

4    on during 2007, 2008, 2009 and today we see what

5    happened in the world economy and United States economy

6    with bonds; second is the maturity date of a bond,

7    which would be spelled out in the prospectus; third is

8    if the bond offers the feature of being a so-called

9    death-put bond; and fourth that we don't have to get

10   into is a separate kind of court action, bankruptcy, et

11   cetera.

12        But Judge, these bonds are marketed and part of

13   their attraction, as Dr. Kalotay attested to, was their

14   attractiveness is enhanced by the fact that they have a

15   death-put option in them.  And Dr. Kalotay compared

16   them to flower bonds that had previously been issued by

17   the United States of America, but I believe in 1996

18   were discontinued and the reason for their

19   discontinuance was people would not buy them at face

20   value.  They would buy them below face value.  And at

21   the time of death they could use the whole face value

22   for estate tax purposes, akin to Rhode Island with

23   historical tax credits where the face amount, $1,000

24   might be purchased for $300 but at the time of death

25   for estate tax purposes you put the whole $1,000 and

1    the United States Government, the Treasury decided to

2    do away with that.  Dr. Kalotay was familiar with that

3    and the Government got involved with death-put bonds.

4         Judge, why it's important is Dr. Kalotay was

5    qualified and he told you and he told us that his

6    expertise is in debt management, and he sits down with

7    these companies prior to the issuance of a bond to look

8    at how they are going to manage their debt, manage

9    their risk, et cetera.  And I would proffer to the

10   Court that is all taken into consideration before bond

11   one is sold.  In fact, in the prospectus that is

12   introduced as the Defendant's exhibit, there are

13   certain sections that tell the purchaser of the bond

14   that only a certain number of bonds can be put in a

15   year based on the death-put option.  There's a certain

16   limited percentage, a certain number.

17        Also, Judge, there's a certain value that each

18   decedent's estate can put forward as to the amount of a

19   death-put bond.  Why that's important is because the

20   companies when they issue them, they know actuarial

21   studies have shown and based on their prospectus that

22   there's only going to be a certain number of bonds that

23   will have the exercise of the death-put in a calendar

24   year.  And if that number gets above the level, they

25   simply will not pay that bond.  They will not accept

1    the death-put on that bond.

2         THE COURT:  I thought Dr. Kalotay testified that

3    those levels were set very, very high to avoid sort of

4    catastrophe and that they were not -- it was not

5    expected -- they were not set at a level where there

6    was an expectation that within sort of normal actuarial

7    given back and forth you would end up saying, no, that

8    we're not going to allow the next one to be redeemed

9    because that's getting to be too much, and that that

10   just didn't happen.

11        MR. MURPHY:  I actually think the death-put

12   limit is set very low in relation to the bond.

13        THE COURT:  Well, in relation to the total

14   issue, it was.  But in relation to the likelihood of a

15   per annum number of redemptions, it was set, I thought

16   he testified, very, very high so that it would be a

17   very unusual event.  And I'd have to look at the

18   testimony, I thought he said he'd never encountered it

19   happening.

20        MR. MURPHY:  Judge, and he was asked also if he

21   checked with any of the bond issuers to see if they had

22   reached their maximum level during one of the calendar

23   years when these bonds were in question.  My memory of

24   that testimony was that he said, no, he had not checked

25   with the bond issuers.

1          THE COURT:  You're right about that.

2          MR. MURPHY:  It's my understanding that that

3     level is a low level because the company is trying to

4     protect itself so they don't have a high number of

5     death-puts during any given calendar year.  In fact,

6     the person who purchases the bond irregardless of what

7     time they purchase the bond and in the maturity scale,

8     if a person knows that -- a person sometimes would not

9     know how many death-puts there were according to a

10     certain issuer of bonds in a calendar year.  The

11     company uses that going into knowing that if that level

12     is ever reached they would not accept any more.

13     But Dr. Kalotay had never checked on that, your Honor.

14     That was his testimony.  He never called into the

15     companies.

16          Why that's important, your Honor, is because the

17     companies already take into account if they do offer

18     the death-put option which makes their bond more

19     marketable.  Marketability does play a key role and the

20     insurance company through its debt management before

21     they put it out realizes that a certain percentage of

22     bonds that do have this feature will be put to be paid.

23          Importantly, too, when the company sells a bond,

24     the bond is sold at face value minus a very, very small

25     percentage of cost that it takes for the house selling

1      it, the bank that's managing it and so forth.

2            But I would add that the real loser here could

3      be the person on the secondary market that sells the

4      bond because when an owner of the bond purchases it on

5      the secondary market, there's no relationship between

6      him and the company other than he has bought a bond

7      from another individual or concern on the secondary

8      market.  It's still governed by the prospectus because

9      it goes from cradle to grave.  And if somebody is able

10     to buy that bond at 65 cents on the dollar, that's the

11     person that's lost money, not the company, because the

12     company has already received a hundred percent or close

13     thereto when it markets the bond and it's sold.  The

14     company has no concern who buys the bond on the

15     secondary market.

16           Judge, with respect to Dr. Kalotay, he said

17     simply he did not call into the companies and he didn't

18     look at that entity's borrowing costs specifically.  He

19     didn't go into GMAC.  He didn't go into some of those

20     other companies to look to see at that particular point

21     in time what their borrowing costs would have been.

22     I'm saying that's not necessary if the Court feels he

23     simply didn't do it.  I'm saying the company had

24     already taken it into consideration when they issued a

25     bond pursuant to the prospectus.

1          THE COURT:  When the company does the actuarial

2     analysis to think about what's the likelihood that

3     they're going to be seeing redemption, they're not

4     factoring in what we have with the scheme.  So they're

5     not factoring in that there would have been fraud

6     involved in procuring the terminally-ill individual,

7     fraudulent statement made to the brokers who are

8     marketing the bond, the aspect of the scheme dealing

9     with the trading houses, Ameritrade and E-Trade who as

10    I recall one by one began to understand what was going

11    on with the scheme and then tried to shut it down and

12    it was moved to another trading house.  So that's the

13    essence of the scheme and that's what the issuers don't

14    take into account and that's what's leading to these

15    premature redemptions.  And I'm using the word

16    "premature" because I'm linking it to the fraud and the

17    fraud is the essence of the scheme.

18          So these are not people who got hit unexpectedly

19    by a bus and therefore maybe the owner of a bond or a

20    bond account is an entity and the insured life is the

21    CEO and the CEO gets hit by a bus and the account --

22    the owner wanted a death-put feature because they

23    wanted to make sure if their CEO dies they would want

24    to get back the full amount.  That's not what the

25    essence of this scheme is.  The unifying theme here is

1    the fraud.

2         So I'm struggling to understand how that isn't a

3    loss, how that isn't something that's different from

4    what these bond issuers, actuaries thought about when

5    they anticipated that there's going to be a certain

6    amount of redemption.

7         MR. MURPHY:  Yes, your Honor.  Judge, first a

8    company as a legal entity would never buy a bond with a

9    death-put.  It simply doesn't happen.  Dr. Kalotay

10   testified to that.  It would be the individual where a

11   death-put becomes something that's attractive.  And

12   quite often prior to these death-put bonds would be

13   flower bonds, quite often it was the elderly who for

14   later life planning, et cetera, who would be the

15   purchasers.  There is nothing wrong in this case, I

16   don't think the Government has alleged that and it

17   simply is against the testimony, there's nothing wrong

18   with an individual to go out to find somebody who is

19   dying and to say:  "I will give you $5,000.  Let's be

20   joint tenants on a bond."  There's nothing wrong with

21   that.  That is not the fraud.  The fraud has to do with

22   whether or not there was a misrepresentation to the

23   joint tenant on the account, whether they were duped

24   into signing a document, but the mere purchase of a

25   bond by joint tenants who might not be related and

1      might not have ever met is not illegal.

2              THE COURT:  Right.

3              MR. MURPHY:  Judge, I think that the companies

4      themselves -- and I respectfully beg to differ with the

5      Court.  The companies themselves figure out in a given

6      year that they will only allow a certain percentage of

7      the bonds that have been sold to be put as part of the

8      death-put option.  And if you're just taking a number,

9      if the number is ten and one year Company A has six

10     death-puts, well, they've based the number at ten

11     figuring that is the risk or the debt management that

12     they can handle at the time.  One year it may be six,

13     one year it may be eight, one year it may be five.  I

14     believe there may have been cases when Mr. Caramadre

15     could not have put a death-put because a company may

16     have already exceeded their limit.  So I would say that

17     the companies have already taken that into

18     consideration.

19             Now, Mr. Vilker with the mortgage, I think it's

20     comparing two different things.  Obviously, if you have

21     a mortgage at three percent and a bank called that

22     mortgage in and now for you to go out and repay that

23     and if your only method of repayment is to remortgage

24     that loan and you have to get a mortgage at five

25     percent, yes, it's two percent of whatever that value

1    is and that's the percentage you're going to pay.

2    There's no evidence here that any of these companies

3    had to go out and borrow money and reissue new issues

4    of bonds to pay back what they say here is a loss

5    because of fraud.  In fact, Judge, I think

6    Dr. Kalotay's testimony was that part of his work

7    experience that he's an advisor for the Tennessee

8    Valley Authority and that they didn't even know that

9    they were part of this indictment; and no, Tennessee

10   Valley Authority according to what I believe

11   Dr. Kalotay said did not have to go and re-borrow

12   because the number is so small compared to what these

13   companies are doing that simply, Judge, on behalf of

14   Mr. Caramadre we say that there was no money lost

15   whatsoever, that the bond issuers knew this, that when

16   they sold the bond they received a hundred percent of

17   their money going in.  The only time they had to repay

18   a portion of it was during the death-put as relates to

19   this case and there's been no showing that they had to

20   go out and borrow any money to repay.  It could have

21   been money they had on hand.  They could have gotten

22   the money from different areas.  We're saying it's not

23   a loss.

24        I believe Dr. Kalotay said he didn't know and he

25   didn't look at an individual entity and do a study

1      based on that individual entity.  He did it

2      hypothetically, was simply that some of these companies

3      could have benefited by paying the bond early because

4      we're looking at the period of time in 2008 when bond

5      rates were higher and obviously today the interest rate

6      is lower so some of these companies, Judge, could have

7      actually benefited.  Again, I don't know specifically

8      each and every company.

9           THE COURT:  I thought the testimony on that

10     point was that because of the timing that the purchase

11     of the bond at a discount meant that at the time of

12     purchase, at least, that issuer's ability to replace

13     that cash in that moment was necessarily going to be

14     more expensive than what that cash had cost pursuant to

15     the bond issue.  So that if you redeem it within a

16     pretty short amount of time afterwards, you have, I

17     think his words were, by definition you have a loss.

18          MR. MURPHY:  Judge, if GMAC sold a bond last

19     year for $100 and Mr. Thompson bought it for $100 and

20     then he sold it nine months later for $65 and I

21     purchased it in joint tenancy with Mrs. Smith who is

22     about to die, GMAC already received the $100.

23     Mr. Thompson sold it at $65, suffers a loss of $35.

24     Why was it a loss to Mr. Thompson?  We don't know why

25     he sold that bond in a secondary market.  Maybe he

1    needed fast cash to be liquid in another investment.

2    There's no relationship between Mr. Thompson selling

3    the bond to me on a secondary market.  So as far as

4    GMAC, we don't know what their status is at that finite

5    point in time because Dr. Kalotay did not go into each

6    company and look at their borrowing curve to look at

7    their specific index.  He did it hypothetically.  In

8    fact, Dr. Kalotay at first I on proffering to the Court

9    did not realize that that bond list that was part of

10   the Government's big exhibit, I think it was items 1

11   through 14, didn't realize on that bond list that many

12   of those were actually CDs.  He first said, yes,

13   they're all bonds.  When I asked him on

14   cross-examination and then later when I pointed out to

15   him that they were CDs, I think his exact words were he

16   had heard it somewhere.  He wasn't sure if he heard it

17   in his office from his two associates or heard it from

18   a Government agent.

19          But again, looking at a list, I think it's

20   Exhibit 14 from the Government, your Honor, where

21   there's the category of so-called bond issuers from

22   exercise of survivors option again after July 1st,

23   2007, many of those issuers are not companies that

24   issued bonds.  They're simply CDs, certificates of

25   deposits which are controlled by the FDIC.  And

1    Dr. Kalotay, I believe, did not answer anything about

2    the CDs other than knowing afterwards that he realized

3    that some of them were here.

4           THE COURT:  I recall that, his testimony about

5    the CDs, and I thought Dr. Kalotay ultimately said that

6    for purposes of his loss analysis, there wasn't a

7    material difference.  Are you arguing there is a

8    material difference between a CD and annuity for

9    purposes of doing a loss analysis given the nature of

10   the crime?

11          MR. MURPHY:  I'm arguing that the CD is simply a

12   bank selling it to a person is controlled by a

13   different document than for instance the GMAC

14   prospectus that I showed you, and I'm not sure what the

15   bank did with their money.  So again, a bank has taken

16   that into account.  There's nothing illegal about

17   purchasing a CD in joint tenancy with one of the

18   individuals being critically ill.  As Mr. Thompson has

19   pointed out, the fraud isn't the purchase.

20          Now, if I can shift a little over to the

21   annuities, Agent Niro testified and testified correctly

22   that there is nothing wrong with an individual, an

23   owner of an annuity and an annuitant not being related,

24   not knowing each other, not having one person buying an

25   annuity and using the annuitant.  There's nothing wrong

1    with that.  In fact, when he was asked about health

2    questions, I believe his answer was he didn't know or

3    he didn't check.  Again, in the Government's exhibit as

4    it relates to annuities, there's no evidence from the

5    Government and they have the burden, I know it's a low

6    burden, but there's nothing that says any of these

7    companies had asked for a medical exam of any of the

8    annuitants.  We're proffering that they didn't and it

9    didn't matter.  They didn't care.  Things may have

10   changed today but at the time when these annuities were

11   purchased there was simply no question, no medical

12   documentation, nobody was sent for a physical.  And

13   there's nothing wrong with an owner of an annuity to

14   not be related to an annuitant.

15         With the annuities, Judge, the owners that are

16   not -- and I say this for purpose of this argument, the

17   owners of these annuity policies have not done anything

18   wrong.

19         Now, what I mean by that, so Mr. Vilker doesn't

20   object, is I'm talking about the owners who are not

21   Mr. Caramadre, Mr. Hanrahan, Mr. Maggiacomo.  I'm

22   talking about the individuals who were not charged, who

23   were simply owners of policies that found their way

24   into this case.  They did absolutely nothing wrong.  So

25   when we look at the annuities themselves, when we look

1    at the indictment and again as Mr. Thompson said and I

2    won't belabor the point, but there was a statement of

3    facts that my client and Mr. Caramadre signed last

4    November, and those facts do not list every annuity.

5    And then the plea, your Honor, was to two counts.  It

6    was to Count IX, which involves a terminally-ill person

7    who fortunately did not pass away, Mr. Rodriguez.  That

8    was one of the pled counts, Count IX, and that dealt

9    with the bond.  And Count XXXIII was the conspiracy

10   with Mr. Caramadre and his Co-Defendant.

11        But when we look at the Count XXXIII, the

12   conspiracy to commit offenses against the United

13   States, that refers to beginning on or about July 2007.

14   And one of Mr. Caramadre's arguments is that there's

15   been no proof of any fraud as to the annuities prior to

16   July 1st of 2007, that on the summary of gains and

17   losses of variable annuities provided to us by the

18   Government, there are scores and scores of annuities

19   that are listed prior in time to July 1st of 2007.  And

20   the conspiracy was from '07 forward.  And as to the

21   annuities themselves that were purchased before,

22   whether they were owned by Mr. Caramadre, Mr. Caramadre

23   and a company he controlled, or by an innocent owner

24   that there's simply been no showing of fraud that he

25   had pled to so therefore we're saying those losses

1    cannot be attributed to him.

2         THE COURT:  Let me make sure I get that point,

3    Mr. Murphy.  Your argument is that for annuities prior

4    to the beginning of the conspiracy, that there's no

5    evidence in the statement of facts, in the plea?

6    There's nothing in the statement of facts that adds the

7    element of fraud as to the pre-2007 annuities?

8         MR. MURPHY:  If I can go first from the

9    indictment, your Honor, as to Count XXXIII because that

10   was the conspiracy, it alleges paragraphs 1 through 21,

11   then it lists exactly what the frauds are:  Identity

12   fraud, wire fraud, mail fraud, aggravated identity

13   theft.  And what I'm saying, your Honor, is, again, to

14   go back to nothing being wrong with a person buying an

15   annuity, not being related to a critically-ill

16   annuitant is that the fraud itself is not that.  The

17   fraud is if you took somebody's identity as alleged in

18   paragraph 168, Section C, the object of the conspiracy

19   details the manner and means but it starts on July '07

20   to August of 2010.

21         It does say in the statement of facts, to get

22   back to her Honor's question, on page one it does say

23   in addition from 1995 through August 2010, Caramadre

24   executed a scheme.  Again, Judge, "scheme" has a

25   nefarious connotation.

1      THE COURT:  It does.

2      MR. MURPHY:  A scheme could be legal.  There are

3  other countries where a scheme is something legal.

4  Here in the United States it has a negative

5  connotation.

6      THE COURT:  And when it comes to the calculation

7  of restitution, it has a specific meaning.

8      MR. MURPHY:  Again, the Government wrote the

9  indictment.  If the statement of facts is the only

10  thing controlling, I would say that that can't be, your

11  Honor, because Mr. Caramadre pled to the counts of the

12  indictment.  He did adopt the statement of facts.  He

13  did assign to it.

14      Judge, if I may have one moment with Mr. Olen.

15  He sent me a note.  I can't read it.

16      (Pause.)

17      MR. MURPHY:  Judge, I would furthermore argue

18  that if the statement of facts is what's controlling

19  the restitution hearing or controlling on the plea,

20  along obviously with the plea to Counts IX and XXXIII,

21  and we're not talking about the PSR.  In fact, Mr. Olen

22  had made an objection to the PSR.  I know Mr. Olin

23  Thompson made objections to the PSR in which he

24  questioned some of the Government's statements of fact.

25  If the statement of facts as it relates to the plea as

1     signed by my client and the Co-Defendant is not

2     sufficiently inclusive as to what annuities were fraud

3     or what annuities they should get restitution from,

4     it's the Government's problem.  It's not the

5     Defendant's problem.

6          So I would say if there is a question as to the

7     inclusiveness in the statement of facts and there had

8     not been any showing of fraud as to the particular

9     annuity, it's not the Defendant's burden.

10          Thank you, Judge.

11          THE COURT:  All right.  We're going to take a

12    short break unless Mr. Vilker tells me he has nothing

13    more to say, which I find hard to believe.

14          MR. VILKER:  Five minutes, not more than that.

15          THE COURT:  Our stenographer is overdue for a

16    break so why don't we take five minutes.

17          (Recess.)

18          THE COURT:  Mr. Vilker.

19          MR. VILKER:  Your Honor, I'll be brief.  It's

20    been a long afternoon.

21          The most basic comments I want to make, it seems

22    like we're at a complete disconnect with the defense in

23    terms of the scope of the hearing, what's permissible

24    in evidence and the role of the indictment in this case

25    and the role of the statement of facts in the pros

1      version.  Let me start off with what Mr. Murphy said

2      about the scheme to defraud, which I think with all due

3      respect is incorrect.

4            The Defendants pled guilty to the entire scheme

5      to defraud.  There's 52 pages of fraudulent conduct

6      described in that.  They pled guilty to specific Count

7      IX, which is one of the wires sent in furtherance of

8      that scheme to defraud.  And above that in paragraph

9      164 of the indictment, it indicates:  On a date

10     specified below for the purpose of executing the

11     aforementioned scheme and artifice to defraud, the

12     Defendant did knowingly transmit and cause to be

13     transmitted the following wires.

14           So they admitted sending one wire in furtherance

15     of the scheme to defraud.  They admitted to the scheme

16     to defraud.  And the change of plea hearing, your

17     Honor, we negotiated statement of facts frankly for

18     this very moment to make sure that the Defendants were

19     on record and their own signature admitting many of the

20     critical facts of this case.

21           But the plea hearing could have been do you, the

22     Defendant, admit that you're guilty of Count IX of the

23     indictment.  If they said yes, that would have been

24     sufficient as long as the Court was satisfied there was

25     some factual basis, but the Court was because we were

1    in the middle of trial.  That would have been

2    sufficient.

3         If the indictment lays out the scheme to which

4    the Defendant pled guilty which started in 1995 and

5    ended in 2010, the indictment -- and another kind of

6    basic point we disagree with Mr. Thompson, we're not

7    saying the indictment is actual evidence against the

8    Defendants.  It's a charging document.  But for

9    purposes of this hearing, the indictment lays out the

10   scope of the scheme.

11        If you read the four corners of the indictment,

12   you see what's charged in there to the counts the

13   Defendants pled guilty.  What isn't in there they can't

14   be held responsible for.  What is in there lays out the

15   scope of the scheme.

16        I believe your Honor cited to some cases that

17   hold just that.  That was always my understanding

18   coming into this.  They could have just come into court

19   and pled guilty to Count IX or then the whole analysis

20   would have been what is in the scheme to defraud.

21        Both Mr. Thompson and Mr. Murphy indicated that

22   the Defendants had filed objections to the prosecution

23   version and the statement of facts.  Neither myself nor

24   Mr. McAdams are aware of any such objection being filed

25   to the facts of the case.  They filed objections to

1    different guideline issues.  They never objected saying

2    we don't believe Annuitant X was deceived or we didn't

3    lie to this insurance company.  If they had, we would

4    have responded factually and their objection would have

5    put us on notice that we had an issue and would have

6    given us an opportunity to present evidence of that.

7    They didn't, and every single statement of the

8    prosecution version must be accepted as true for the

9    purposes of this restitution hearing.

10          The other kind of fundamental --

11          THE COURT:  Mr. Vilker, on that point, can you

12   cite me to something that stands for the proposition

13   you just stated?

14          MR. VILKER:  Well, I know that -- I was looking

15   at this before the hearing today.  I know that Rule 32

16   gives the time by which the parties must object.

17          THE COURT:  For the objection.

18          MR. VILKER:  We never saw any objection so there

19   seems to be some kind of misunderstanding of what was

20   put in as an objection.  Since they have not objected,

21   since that time for objecting has passed, obviously we

22   have nothing to respond to, by definition it must be

23   waived.

24          Mr. Thompson made an argument that Agent Niro's

25   testimony wasn't sufficiently reliable and we should

1  have been required to bring in representatives from

2  each of these insurance companies to testify as to the

3  loss.  I would point out, your Honor, that at trial in

4  this case as we advised the Defendants in the pre-trial

5  memorandum, which was stipulated to before the trial,

6  we were going to have this exact same testimony at

7  trial of Agent Niro coming in and testifying as a

8  summary witness to the losses that each of the -- and

9  gains but also the losses that each of these insurance

10  companies sustained.  And the Federal Rules of Evidence

11  clearly provide under Federal Rule 1006 that when the

12  underlying records are voluminous, the Government can

13  introduce summary charts and summary witnesses to

14  explain it, explain the voluminous records as long as

15  they have been produced to defense beforehand, which

16  they have been.

17       So Agent Niro's testimony wasn't even hearsay.

18  It's completely admissible even at trial under the

19  Federal Rules of Evidence much less at a restitution

20  hearing where the Federal Rules of Evidence don't

21  apply.  The Government has met its burden of bringing

22  sufficient indicia of reliability when that testimony

23  would have been the actual testimony at trial and was

24  the planned testimony at trial.

25       The other kind of core objection we have is the

1    role of the statement of facts.  The list of those 23

2    people that Defendants keep pointing to was never, ever

3    intended to be exclusive, exhaustive.  And the

4    Defendants cite that.  They're just glossing over as if

5    it's not there the other five pages of the statement of

6    facts that talk about all the other aspects of this

7    scheme, including the lies to the insurance companies

8    on the application forms, the lies to the brokerage

9    houses, using financial nominees to commit money

10   laundering.  They argue as it's not there, not part of

11   the indictment and not part of the statement of facts

12   but they've admitted to this.  And that brings all of

13   these various investments within the scope of the

14   scheme.  And what they essentially seem to be arguing,

15   your Honor, is that we would need to have another trial

16   to prove that each and every annuity and each and every

17   brokerage account showed a specific fraud in each

18   transaction and that merely by saying this is a

19   terminally-ill person that's unrelated that's

20   insufficient to meet our burden.

21        The indictment, the pros version and the

22   statement of facts lays out why those accounts are all

23   within the scheme and the alternative would be simply

24   to do what we thought we succeeded in avoiding, which

25   was avoiding the rest of a lengthy trial because the

1    Defendants admitted their guilt.  We could on each of

2    these transactions call witnesses, call these family

3    members who say, "I didn't know anything about that

4    account.  That's not correct information about my

5    investment history."  Call representatives from these

6    companies, play tapes where the Defendants lie to the

7    companies.  Call the companies where they met with

8    Mr. Caramadre and Mr. Radhakrishnan and they told me

9    the terminally ill people were the ones investing and

10   it was their money.  We can go on and on and on and on.

11        As your Honor indicated, there's a treasure

12   trove of lies.  What that would basically do is

13   transform this into a trial and raise our burden beyond

14   what is necessary that would show as a scheme agreed in

15   the statement of facts as detailed in the pros version

16   these companies lost this amount of money that we can

17   show with reasonable certainty.

18        That's all I have, your Honor.

19        THE COURT:  Thank you, Mr. Vilker.

20        Anything further from either of the Defendants?

21        MR. THOMPSON:  No, thank you, your Honor.

22        THE COURT:  Mr. Murphy?

23        MR. MURPHY:  One moment, please, Judge.

24        THE COURT:  No problem.

25        (Pause.)

1          MR. MURPHY:  Thank you, Judge.  Judge, just very

2     briefly.

3          Your Honor, as to the prosecution version and

4     the Presentence Investigation Report, Mr. Olen, Randy

5     Olen does indicate that on September 30th he did submit

6     to the Probation Office an objection, and part of it is

7     that Mr. Caramadre believes that his guilty plea was

8     tendered in violation of his constitutional guarantees

9     and therefore he objects to any and all language in the

10    PSR.  I'm told by Mr. Olen it was also electronically

11    filed.

12          THE COURT:  I have a copy of that objection.

13          MR. MURPHY:  Judge, as it relates to

14    Mr. Caramadre as to the summary of gains and losses of

15    the variable annuities, I would direct the Court to the

16    indictment itself and I would point out that on page 53

17    to 55, there are only two annuities listed according to

18    Mr. Caramadre, that being Count IXX and Count V, and

19    that on page 57 there are four annuities listed and

20    that those annuities are from a period of time of 2009;

21    that on page 61, there are two annuities, and on page

22    62 there's one annuity.  So out of those roughly 59

23    counts, there's only a handful of annuities simply

24    saying according to Mr. Caramadre that if the

25    Government had proved that the earlier annuities were

1    done with fraud they would have been charged, and

2    simply now to go back and ask him to pay restitution

3    for specific ones that weren't proven to be fraudulent

4    would be incorrect.  Thank you.

5          THE COURT:  Thank you, Mr. Murphy.  Any

6    rebuttal?

7          MR. VILKER:  No, your Honor.

8          THE COURT:  I will take this under advisement.

9    In light of the teaching in the two cases that

10    Mr. Thompson struggled to pronounce and I'm not going

11    to struggle to pronounce, if I discover that there is

12    some quantum of information that based on all the facts

13    and circumstances suggests is in the possession of the

14    Government and the lack of that evidence causes me to

15    be unable to find that the Government has yet sustained

16    its burden, I will have a conference with all counsel

17    to discuss how to proceed, but hopefully I will be able

18    to keep everything on schedule and mindful of the fact

19    that the sentencing itself is coming up on the 8th of

20    November and that Judge Smith expects me to make my

21    Report and Recommendation prior to that date, that is

22    my intent.  But I will be in touch with the parties in

23    the event I run into an issue regarding whether the

24    Government's burden on a specific point has not been

25    sustained is clearly submitted.  Anything else I need

1    to be mindful of?  Mr. Vilker?

2            MR. VILKER:  No, your Honor.

3            THE COURT:  Mr. Murphy?  Mr. Thompson?

4            MR. THOMPSON:  No, your Honor.

5            MR. MURPHY:  No, your Honor.

6            THE COURT:  All right.  The Court will be in

7    recess.

8            (Court concluded at 4:50 p.m.)

C E R T I F I C A T I O N

       I, Anne M. Clayton, RPR, do hereby certify that the foregoing pages are a true and accurate transcription of my stenographic notes in the above-entitled case.


                  /s/ Anne M. Clayton

        _____

                  Anne M. Clayton, RPR


                  December 20, 2013

        _____

                  Date