IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND


* * * * * * * * * * * * *   CRIMINAL ACTION
UNITED STATES OF AMERICA   *   11-186-S
                           *
VS.                        *   OCTOBER 9, 2013
                           *   **VOLUME I**
JOSEPH CARAMADRE and       *
RAYMOUR RADHAKRISHNAN      *   PROVIDENCE, RI
* * * * * * * * * * * * *


HEARD BEFORE THE HONORABLE PATRICIA A. SULLIVAN

MAGISTRATE JUDGE

(Evidentiary Hearing)




**APPEARANCES**:

FOR THE GOVERNMENT:          LEE VILKER, AUSA
                             and JOHN P. McADAMS, AUSA
                             U.S. Attorney's Office
                             50 Kennedy Plaza
                             Providence, RI  02903

FOR THE DEFENDANT
Joseph Caramadre:            WILLIAM J. MURPHY, ESQ.
                             Murphy & Fay, LLP
                             127 Dorrance St.
                             2nd Floor
                             Providence, RI  02903

                             RANDY OLEN, ESQ.
                             Olen Law Office
                             478A Broadway
                             Providence, RI  02909

1    **APPEARANCES**:   (Continued)

2    FOR THE DEFENDANT
     Raymour Radhakrishnan:          OLIN THOMPSON, ESQ.
3                                    Federal Defender's Office
                                     10 Weybosset St.
4                                    Providence, RI  02903

5    Court Reporter:                 Karen M. Wischnowsky, CRR
                                     One Exchange Terrace
6                                    Providence, RI  02903

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**I N D E X**

**GOVERNMENT WITNESS**                                     **PAGE**

**TROY NIRO**

| | |
|---|---|
| Direct Examination by Mr. Vilker | 12 |
| Cross-Examination by Mr. Murphy | 45 |
| Cross-Examination by Mr. Thompson | 68 |
| Cont'd Cross-Examination by Mr. Murphy | 89 |
| Redirect Examination by Mr. Vilker | 98 |
| Recross-Examination by Mr. Murphy | 107 |
| Recross-Examination by Mr. Thompson | 113 |
| Further Redirect Examination by Mr. Vilker | 116 |
| Further Recross-Examination by Mr. Thompson | 117 |


**GOVERNMENT'S EXHIBITS**                          **ID**   **FULL**

| | | |
|---|---|---|
| 15 | | 6 |
| 16 | | 6 |
| 17 | | 6 |
| 18 | | 6 |
| 19 | | 6 |
| 20 | | 24 |
| 21 | | 24 |
| 22 | | 24 |
| 23 | | 24 |
| 24 | | 24 |
| 25 | | 24 |
| 26 | | 24 |
| 27 | | 24 |
| 28 | | 24 |
| 29 | | 24 |
| 30 | | 24 |
| 31 | | 24 |
| 32 | | 24 |
| 33 | | 24 |
| 34 | | 100 |
| 35 | | 103 |


**DEFENDANTS' EXHIBITS**

| | |
|---|---|
| F | 58 |
| G | 115 |

9 OCTOBER 2013 -- 10:00 A.M.

THE COURT:  Good morning, everyone.  We're here in the matter of United States of America versus Joseph Caramadre and Raymour Radhakrishnan.  This is criminal matter 11-186-S, and today we are continuing an evidentiary hearing that was started on September 30 to take up the matter referred to me by Judge Smith to make a Report and Recommendation regarding the restitution aspect of the sentencing in this matter.

Would counsel identify yourselves for the record, please.

MR. VILKER:  Good morning, your Honor.  Lee Vilker, Assistant United States Attorney.  I'm here with John McAdams, also Assistant United States Attorney.

MR. MURPHY:  Good morning, Judge.  Judge, Attorney William J. Murphy on behalf of Joseph Caramadre.

MR. OLEN:  Good morning, your Honor.  Randy Olen for Mr. Caramadre.

MR. THOMPSON:  Good morning, your Honor.  Olin Thompson for Mr. Radhakrishnan.

THE COURT:  All right.

Before we begin, I just want to go over the schedule for the day.  Because we're going to be

necessarily taking a break because both Mr. Vilker and our stenographer need to appear before Judge Lisi, I think we need to stop this morning at 12:30 and then we'll restart at 2:30.

Mr. Vilker, does that sound like it works?

MR. VILKER:  Yes, it does, your Honor.

THE COURT:  Okay.  And my hope, subject to our stenographer raising her hand and telling us that it's not a good idea, is that we just -- given that we're starting a little late this morning because we did have another attorney in front of another judge, that we'll just go straight through to 12:30 and then pick up again at 2:30.  So if anybody finds that overly arduous, just let me know and we'll accommodate.

The other thing that I would just make as an observation is, as you can all see, we have reconfigured the courtroom.  This is the first time that this courtroom has ever been configured this way. Sometimes there are unintended things that happen.  So if anyone observes anything about the way the courtroom is set up that appears problematic, please advise us and we'll try to address it.

I would hope, Mr. Caramadre, this will give you the opportunity to have immediate access to your attorney throughout his cross-examination, and I

frankly was concerned that the way the courtroom was configured before, that telling you that you had access to your attorney when, in fact, he had to cross the room to get to talk to you was not adequate.

MR. CARAMADRE:  Thank you, your Honor.

THE COURT:  Now, before we resume the testimony, is there anything that counsel need to bring to my attention?

MR. VILKER:  Your Honor, the Government prepared, after our chambers conference on Monday, five new documents that I've handed up to the clerk; and these have been marked as Exhibits 15 through 19, and these concern the connection with the various annuities and the bonds to the scheme alleged in the Indictment and some refigured calculations that we had to do.

So, first of all, I wanted to move these into evidence and then to explain to your Honor what the Government has done with these.

THE COURT:  Any objection?

MR. MURPHY:  No, your Honor.

MR. THOMPSON:  No, your Honor.

THE COURT:  Government Exhibits 15 through 19 will be received full.

(Government's Exhibits 15 through 19 were admitted in full)

MR. VILKER:  Your Honor, Exhibit 15 is a document that lists all of the annuities in a document that was previously provided to your Honor.  We took out a lot of the financial information so everything could fit on one page.  It has the insurance company, the owner, the annuitant, the total loss and the connection to the scheme that's been alleged.

And there's a lot of other facts that can be said about each of these Indictments, but we tried to keep it limited so the Court can make a finding.

As your Honor will see in going through this, many of the annuitants are mentioned in the Indictment and the PSR or in the statement of facts, and some of the owners are as well; and many of the owners that your Honor previously was unaware of, they were Mr. Caramadre's clients, and that was part of the scheme alleged in the Indictment, that Mr. Caramadre assisted his clients in purchasing these indictments (sic) and received commissions or some share of the profits.  So it explains one by one.

The one annuity that we have deleted from this calculation now is on page 5 of this chart, and it's an annuity from Pacific Life and it's from 2003, the date's not there for some reason, and the owner is Lynn Saccocia and the annuitant was Louise Imperatore.

There was some kind of relation, we believe it was a mother-daughter relationship, and that annuity should not be included in this.

So the total loss that we're going to go through with the agent today would need to be reduced by that 17,000 as would the restitution owed to Pacific Life, but the rest the Government contends are all part of this scheme.

THE COURT:  All right.  Good.  Mr. Vilker, this looks extremely helpful; and it looks to me like it, at least superficially, at first glance satisfies the Court's concern about the Government's obligation to go forward with a quantum of evidence.

The one thing that I would -- and obviously I'll hear from the Defendants, is to the extent that responding to the new information is going to require more time than what you have today, given that the sentencing has been postponed by the Court, I'll hear the Defendants on whether additional time would be required.  But appreciate it.  Thank you very much, Mr. Vilker.

MR. VILKER:  You're welcome, your Honor.

Exhibit 16 is a very similar type of chart that we put together related to the brokerage accounts.  And it has the account company, the brokerage account

company, in the second column the two owners of the
account, and in the third column the connection to the
fraud scheme.

And it's really -- there's much more, again,
that could be written about each of these accounts and
the different false statements in the application forms
and all that; but this is just to identify for your
Honor who these people were, that they were, in fact,
terminally ill or very elderly and who the owners were.

And in the Government's view, all of the ones
that are presently on Exhibit 16 are included unless --
are included as part of this fraud scheme.

On the next to last page of this document, there
is an account with Mr. Caramadre and Edwin Rodriguez
that is part of the fraud scheme.  Mr. Rodriguez was
terminally ill, in fact testified at trial; however,
there was about $120 in losses that were inadvertently
included on one of the documents that Dr. Kalotay
prepared that should not have been there.  I believe
there were some transaction fees for sales and not bond
redemptions.  So that's been removed.

And there was one other account that the
Government removed, which is owned jointly by Peter
DiSaro and Lawrence DiSaro.  They were father and son.

And although an argument could be made that the

same type of strategy was being used as part of the
scheme, because they were related and the profits went
to them, we've removed them from the analysis.

So given those changes, we had to redo some of
the numbers.

THE COURT:  Of course.

MR. VILKER:  Exhibit 17 is the damage by the
co-owner of the account from the excise of the survivor
options and taking out the Rodriguez and DiSaro
accounts, and the new total is on page 2.  It's
$12,397,956.88.

Exhibit 18 is that same total but broken down by
bond issuer.  They'll be the ones that we submit for
the restitution.

And Exhibit 19 is broken down the same way by
bond issuer, but it's just for the bonds that were
purchased after July 1st, 2007, and this totals
$12,220,241.

THE COURT:  Great.  I think you've answered all
my questions, Mr. Vilker.

MR. VILKER:  And again, your Honor, there's a
very superficial analysis that we put down in
connection to the fraud scheme.  There's a lot more
information we could provide your Honor as to how
each -- the background with each annuitant and the

co-owner and different statements that were made to the companies, but I just wanted to provide your Honor with some comfort that these are connected to the scheme.

THE COURT:  And again, my understanding of the law, and I leave it to all parties to correct me if this isn't correct, but I believe that when we're dealing with restitution under 18 U.S.C. Section 3663(a), the Government's burden of going forward is simply to produce a modicum and that modicum can be satisfied through hearsay, summaries and so forth.

And the burden then, in fact, shifts to the Defendants to come forward with some evidence; and at that point it becomes the Government's burden to genuinely prove that the challenged transaction is part of the scheme.

And as I say to the Defendants, if that articulation of the way the law shakes out here is not accurate, that's something that I will be absolutely looking to you to hear from, from you on that score.

MR. VILKER:  So with that, your Honor, the Government would call Special Agent Troy Niro to the stand.

THE COURT:  All right.  Agent Niro.

MR. MURPHY:  And, your Honor, for the record, this morning I submitted, that was handed to me, four

documents that Mr. Caramadre through his counsel will be cross-examining on.  The originals are here because the ones that I handed to the Court did not have Social Security numbers redacted, and we've provided the Government with a copy.

THE COURT:  Okay.  Great.

### TROY NIRO, GOVERNMENT'S WITNESS, SWORN

THE CLERK:  Would you please state your name and spell your last name for the record.

THE WITNESS:  Troy Niro, N-I-R-O.

THE COURT:  You may proceed, Mr. Vilker.

MR. VILKER:  Thank you, your Honor.

### DIRECT EXAMINATION

**BY MR. VILKER**:

**Q.**   Good morning, Agent Niro.  Where are you currently employed?

**A.**   I'm employed by the Internal Revenue Service, Criminal Investigations.

**Q.**   And what is your position with the IRS?

**A.**   I'm a special agent.

**Q.**   And how long have you been a special agent with the IRS?

**A.**   A little over 15 years.

**Q.**   Now, prior -- did you have a role in assisting the Government in investigating this particular case?

**A.**   I did.

**Q.**   Now, prior to your work on this case, did you have any background or experience with variable annuities?

**A.**   Limited.

**Q.**   Did you generally understand what they were but then not have real specific knowledge of them?

**A.**   That's correct.  It was more disposition of funds from an individual under investigation rather than the investigation of the annuities themselves.

**Q.**   What was your role in connection with this investigation?

**A.**   To calculate the gains and losses on the bonds and the annuities.

**Q.**   Well, you say gains and losses on the annuities, you calculated those; correct?

**A.**   That's correct.

**Q.**   And you calculated the gains on the bonds; correct?

**A.**   I recreated the bond accounts from the statements.

**Q.**   Were you the one that calculated the losses to the bond issuers?

**A.**   I was not.

**Q.**   That was Dr. Kalotay?

**A.**   That's correct.

**Q.**   Now, how many hours would you say you've spent in

this case poring over the various financial documents?

**A.** I personally put in over 2,000 hours on this case.

**Q.** Now, did you become familiar with the -- with variable annuities through your work in this case?

**A.** Yes, I have.

**Q.** And what type of companies offer variable annuities for sale to the public?

**A.** Insurance companies.

**Q.** And do these insurance companies actually manage the investments after the funds are deposited?

**A.** No, they don't.

**Q.** Who does that?

**A.** Brokerage houses.

**Q.** Mutual fund companies?

**A.** Mutual fund companies.

**Q.** And when an individual wants to purchase or put money into a variable annuity with an insurance company, are they given different options of which sub-accounts to put the money into?

**A.** Yes, they are.

**Q.** And what generally are some of the sub-accounts that are offered as possible types of investments?

**A.** They're various. There are a multitude.

**Q.** And some -- is it correct to say that some are more conservative than others?

**A.** Yes.  I mean, they can be extremely risky or very stable.

**Q.** Is it similar in nature to different mutual funds that you can put money into and they have different levels of risk associated with them?

**A.** Yes.

**Q.** Now, is there typically a surrender charge that applies to an owner who wants to withdraw his funds from the annuity at an early date?

**A.** It was typical of the annuities that I looked at. I don't know if it's industry-wide typical, but the annuities that I looked at it was.

**Q.** Annuities involved in this particular case?

**A.** That's correct.

**Q.** And there's a fee typically that the insurance company charges if the annuity owner wants to withdraw their funds at an early date?

**A.** That's correct.

**Q.** And do you recall typically what that period of time which there were surrender charges that applied in this case?

**A.** I'm not sure.  I think it was under a year.  I'm making a guess at this point.  I don't recall.

**Q.** You're not sure as you testify today?  Okay.

Now, if the -- so if an owner wanted just to

close out the annuity within whatever period of time there was a surrender fee and get the money back, am I correct that the insurance companies would deduct the surrender charge?

**A.** That's correct.

**Q.** And am I correct, then, that the annuity value can go up or down depending on how that particular account does?

**A.** That's correct.

**Q.** Now, are you familiar with the term "annuitant"?

**A.** Yes, I am.

**Q.** And what is the annuitant on an annuity contract?

**A.** The annuitant is the individual named on the annuity but can hold several roles. In the annuities that I looked at, he was the individual -- he or she was the individual that triggered the death benefit.

**Q.** That individual would not have any ownership interest in the funds deposited into the annuity?

**A.** They could; but in the annuities that I looked at, they did not.

**Q.** So in the annuities involved in this case, your understanding was that the role of the annuitant was that their death would trigger whatever death benefits were provided for in the annuity contract?

**A.** That's correct.

**Q.** Now, did you review various annuity applications and prospectuses in this case and determine what types of death benefits typically applied for the death of the annuitants in the annuities involved in this case?

**A.** I did.

**Q.** And did you observe that all of the annuities in this case involved a guarantee of a return of premiums paid no matter what happened in the market?

**A.** They did.

**Q.** So, for example, if an investor or Mr. Caramadre put in $10,000 into an annuity and the annuity went down to $7,000 and the annuitant died, would that death benefit then guarantee that he receive back the entire $10,000 that was invested?

**A.** That's correct.

**Q.** Did you also observe that numerous of these annuities included a specific feature, specific benefit that guaranteed a specific rate of return?

**A.** Yes, they did.

**Q.** And was that return in the range typically of 5 to 7 percent?

**A.** In the annuities that I looked at, yes.

**Q.** So, for example, when that -- that example I gave you of a $10,000 investment, if it went down in value, under that death benefit, the owner would be entitled

to the full return of the $10,000 plus whatever rate of return was guaranteed, 5 percent, 7 percent, whatever the case may be?

**A.** That's correct.

**Q.** Did you also observe numerous of these annuities that provided for deposit bonuses?

**A.** Yes, they did.

**Q.** And what was a deposit bonus?

**A.** It was an incentive offered by the insurance companies to put a certain dollar amount into it. If you met a limit, they'd give you matching funds.

**Q.** Was it typically the companies that did this in the amount of 5 percent?

**A.** In the annuities that I looked at.

**Q.** So say in a million-dollar annuity, the insurance company would immediately, if this bonus was elected, would immediately give $50,000 into the account?

**A.** That's correct.

**Q.** And they would guarantee a return of premiums and a specific rate of return upon the death of the annuitant?

**A.** That's correct.

**Q.** Now, were you able to determine what would happen to the investment if the owner wanted to cash in the annuity that had gone down in value if the annuitant

had not passed away?

**A.** Yes. The owner would take the loss.

**Q.** And what would happen if the owner wanted to cash in an annuity that had gone down in value or submit a death claim on an annuity that had gone down in value if the annuitant had, in fact, passed away?

**A.** The loss would be on the insurance company.

**Q.** And how would that work out?

**A.** There were specific riders in it with the death benefit that whatever the value of the annuity upon the date of death would be the value of the annuity paid out, less fees.

**Q.** Let's put this in a concrete example. If there was $1 million that was put into an annuity and it went down in value to $900,000 and a year had passed and there was a 5 percent guaranteed rate of return, how much would the insurance company be required to pay the owner in that case?

**A.** The full amount of whatever it appreciated to or the full amount of the million dollars plus the 5 percent.

**Q.** A million 50 thousand dollars?

**A.** A million 50 thousand.

**Q.** Plus whatever bonuses that applied?

**A.** Whatever incentives were placed on it, yes.

**Q.** And that difference, was that the core starting point that you applied in determining how much money the insurance companies lost on each annuity?

**A.** I started with the amount paid out.

**Q.** But that difference, I'm going to get to your formula that you used afterwards, but that difference between the amount of payout and the value of the account, was that the first critical two factors that you used in your analysis?

**A.** That's correct.

**Q.** Now, in addition, did you come to learn that insurance companies typically paid commissions to registered representatives or brokers based on the amount of the investment?

**A.** Again, in the annuities that I looked at, it was typically 5 percent.

**Q.** So in that $1 million annuity -- first of all, when would that 5 percent be paid out to the agent or the registered representative?

**A.** After the sale of the annuity.

**Q.** Very shortly after the initial deposit was made?

**A.** That's correct.

**Q.** So in the example I gave with the million-dollar annuity, the insurance company would almost immediately pay approximately a $50,000 commission to the

broker/dealer who -- whose representative submitted the annuity?

**A.** It would go to the brokerage house, and a portion of that would make it to the broker.

**Q.** In this case when you say "brokerage house," are you familiar with the term "broker/dealer"?

**A.** Yes.

**Q.** The broker/dealer in this case, would that be -- two of them that were used were LifeMark Securities and Leaders Group?

**A.** Yes.

**Q.** Okay. So they would receive the commissions from the insurance companies?

**A.** That's correct.

**Q.** And then they would pay -- a portion of those commissions would be passed on to the individual representatives involved in this case, including Mr. Maggiacomo and Mr. Hanrahan?

**A.** That's correct.

**Q.** Did you determine during the course of your investigation that Mr. Caramadre shared in many of those commissions?

**A.** Yes, he did.

**Q.** Now, am I correct based on the analysis that you just gave that if one were to know that the annuitant

were to die soon, that the investment in the annuity
essentially becomes a no-lose proposition?

**A.**    I'd say very limited risk.

**Q.**    What would happen -- if the annuity goes up in
value and it's a tremendous investment that makes 20
percent, would the owner be limited to that guaranteed
rate of return that the insurance company was offering?

**A.**    No, they would get the full benefit of the gain.

**Q.**    And what would happen if the annuitant -- the
annuity went down in value, would the annuity owner
then suffer the losses that -- the depreciation in
value of the account?

**A.**    So long as there was the death benefit, they would
get the guaranteed rate of return.

**Q.**    So in the example I gave of 5 to 7 percent, the
investor would be guaranteed 5 to 7 percent with the
potential to make much more if the investment paid off?

**A.**    That's correct.

**Q.**    So given that analysis, what did your
investigation in this case show were generally the
nature of the investments that Mr. Caramadre and others
were making in these variable annuities?

**A.**    Using a death rider making very risky investments.

**Q.**    And why did it make sense to make risky
investments in these investments?

**A.** Because if the market had gone down, he would still get the guaranteed rate of return.  If the market went up, he'd capitalize with the big gains.

**Q.** This was in addition to the millions of dollars in commissions that were earned on the submission of these annuities?

**A.** That's correct.

MR. VILKER:  Your Honor, I previously handed the Court a binder of documents that we submitted with the brief on the losses; and for some unknown reason, I identified them by letter, which your clerk has told me was not a very good thing to do.

So they're marked Exhibits A through N in the binder; and to make everybody completely confused, I'm going to move these into evidence as Exhibits 20 through 33.  And when I refer to them here, I'll try to refer both by the number and the letter so everybody can follow along.

THE COURT:  Good.  All right.

MR. VILKER:  I would ask that these be moved into evidence.

THE COURT:  Is there any objection to any of 20 through 33?

MR. MURPHY:  No objection.

MR. THOMPSON:  No, your Honor.

THE COURT:  All right.  Government's 20 through 33 may be received full; and I would very much appreciate, Mr. Vilker, that you're using the dual method of referring to them.

MR. VILKER:  I will, your Honor.

(Government's Exhibits 20 through 33 were admitted in full)

Q.   Now, if you can look at, I want to put on the screen for you, Agent Niro, Exhibit 23, which is Exhibit D in my binder.

Agent Niro, do you recognize this document?

A.   Yes, I do.

Q.   Is this a document that you created?

A.   Yes, it is.

Q.   And what information is contained in this chart?

A.   This is the formula that I used to calculate the gains and losses in the annuities.

Q.   And can you just walk through step by step how this formula worked in practice.

A.   To calculate the gains and losses on the annuities, I took the amount that was paid out by the insurance companies at the time of claim; subtracted the annuity value at the time of payment, it's an amount that was provided by the insurance companies; added back in the bonus payments, which were payments

that were provided by the insurance companies to the
annuitant holder; added in the commissions that were
paid out to the brokers and subtracted fees earned by
the insurance companies.

**Q.** When you put all those factors together, you come
up with a loss on an annuity-by-annuity basis for each
annuity involved in this case?

**A.** That's correct.

**Q.** Now, did you have discussions with a number of the
insurance companies concerning this method of
calculating losses?

**A.** Yes, I did.

**Q.** And was it their position as well that this would
be the appropriate way in which their losses should be
calculated?

**A.** The only argument the insurance companies had were
with the fees. Some of the insurance companies felt
that the fees should not be subtracted from the
calculation in that that is their overhead, the cost of
their overhead to stay in business. So some thought
that the fees should be left out of the equation, but
most agreed.

**Q.** And did you listen to those insurance companies
and not include the fees in this analysis?

**A.** No, I did not. I included them.

**Q.** So the total fees that the insurance companies received were deducted from their losses?

**A.** That's correct.

**Q.** Now, I want to show you Exhibit 24, which I've marked as Exhibit E. Are you able to see that? I know it's kind of small print.

**A.** I can.

**Q.** What is Exhibit 24?

**A.** It's a chart that I created which lists each one of the annuities using the calculation of the total loss. It's listed by insurance company and then by individual account.

**Q.** And does this basically apply one by one the formula that you just explained?

**A.** Yes. As you go right to left or left to right, the formula's worked out with the total loss on the right-hand side.

**Q.** Now, just to walk through one as an example, the first line is an annuity owned by a person named Estella Rodriguez, and the insurance company is American National, and the annuitant is Robert Carnevale. In the first column, you have total premiums of $290,000. What does that represent?

**A.** That represents all of the premiums paid into the account from the initial deposit through the life of

the account.

**Q.**   Is that number actually used by you in your
calculation?

**A.**   No, it's not.

**Q.**   The first -- and why is it not used?

**A.**   The amount paid in didn't matter as to the loss to
the insurance company.

**Q.**   The amount -- the loss would be determined,
correct me if I'm wrong, by taking the amount paid out
by the value at the time, not by the amount put into
the account?

**A.**   That's correct.

**Q.**   So the next column has payment to beneficiary
including postmortem interest, and in this case it has
$312,292?

**A.**   That's correct.

**Q.**   What does this number refer to?

**A.**   That was the amount that was paid by the insurance
company to Mr. Caramadre or others involved in the
case.

**Q.**   And where do you get that information from?

**A.**   From the records obtained through the insurance
companies and through the banking records subpoenaed in
the investigation.

**Q.**   Now, the next column has value at the time of

payment, and it's $264,974.  What did that number refer to?

**A.**   That was a number provided by the insurance company as to the value at the time of the payment made out by the insurance company, what the value of the annuity was on that date.

**Q.**   So in the account at that time was $264,974, but they had to pay out $312,000 and change?

**A.**   That's correct.

**Q.**   So you subtracted the value at the time of payment from the payment to the beneficiary to come up with the first level of the analysis?

**A.**   That's correct.

**Q.**   And then it says bonus payments are none.  There were no bonus payments in this particular annuity?

**A.**   No, there weren't.

**Q.**   And then it says total commission is $20,300. What does that number refer to?

**A.**   That's the amount of commissions that were paid out to the brokers where the annuities were purchased from.

**Q.**   Paid out by the insurance company?

**A.**   That's correct.

**Q.**   And was that number added to the difference that you had calculated between the payment to the

beneficiary and the value at the time of payment?

**A.** That's correct.

**Q.** And in the last column or next to the last column has fees earned by insurance companies, $3,320.  What does that number refer to?

**A.** Those are the fees that the insurance companies were charging for managing the account.

**Q.** So I'm going to -- and this is information that you received from the insurance companies?

**A.** Yes, it is.

**Q.** I'm going to go through some of those documents afterwards that show how you came up with that number. And then when you take all of that together, you deduct as losses the fees earned, meaning whatever the losses were, their losses are less because they received fees; correct?

**A.** That's correct.

**Q.** And it comes out to total loss including commissions of $64,297?

**A.** That's correct.

**Q.** And if I show you the whole chart, did you do this with every single annuity that was involved in this case?

**A.** I did.

**Q.** And did you come -- if I flip to page 6 to total

them up, all of these annuities, to -- if you look at total bonus payments made by the companies was $5,076,000?

**A.**   Yes, roughly.

**Q.**   And change?

**A.**   That's correct.

**Q.**   The total commissions were $7,342,347?

**A.**   That's correct.

**Q.**   The total fees earned by the insurance companies was $3,396,920?

**A.**   That is correct.

**Q.**   And again that total, $3,396,000, that was deducted from their losses?

**A.**   Yes.

**Q.**   And then the total loss of all the annuities for all the insurance companies involved was $34,299,295?

**A.**   By this chart, yes.  There was a correction made yesterday.

**Q.**   That was my next question.  The correction that was made involved an annuity on page 5 of this document that's this one here, Pacific Life annuity with Lynn Saccocia as the owner and Louise Imperatore as the annuitant.  That's the one that -- the change that was made yesterday?

**A.**   Yes.

**Q.**   And does that indicate that --

**A.**   $17,014.02.

**Q.**   This is the loss that was associated with -- that $17,014, that was associated with that particular annuity?

**A.**   That's correct.

**Q.**   So the number that you gave earlier, the last page of this chart, of $34,299,295 would need to be reduced by that $17,000?

**A.**   That's correct.

**Q.**   Now, I want to show you Exhibit 25, which is Exhibit F.  What is Exhibit 25?

**A.**   This is another chart that I created.  It's a summary of losses from the variable annuities.  It's a summary of each one of the insurance companies from the previous chart.

**Q.**   So it's taking the numbers, the raw material that you calculated on the previous chart and crunching them together by insurance company?

**A.**   That's correct.

**Q.**   And the same total applies here, $34,299,295?

**A.**   Yes, without the $17,000 difference.

**Q.**   Right.  This number here, the $1,329,694 for Pacific Life, that would need to be reduced by that $17,000 number?

**A.**    That's correct.

**Q.**    I now want to show you Exhibit 26, which I've marked as Exhibit G.  And what is this document?

**A.**    It's the same summary document as the last one but limited after the date of July 1st, 2007, which is the date we used with Mr. Radhakrishnan's arrival at the Caramadre firm.

**Q.**    And that total comes to $21,321,092.60?

**A.**    That's correct.

**Q.**    And, again, that Pacific Life wouldn't need to be reduced from this because the one that was removed was from 2003?

**A.**    That's correct.

**Q.**    I want to show you -- well, let me ask you a question about the next document.  I want you to explain a little bit about how you were able to get the numbers that went into these charts.  And, again, you said you spent thousands of hours going through data to put the numbers into the chart.

        Did the Government in this case receive thousands and thousands of business records directly from the insurance companies?

**A.**    Yes, we did.

**Q.**    And did many of these documents include raw materials, like checks that were written either to the

insurance companies or by the insurance companies?

**A.**   Yes, they did, checks, the applications, all the information.

**Q.**   So I want to show you Exhibit 27, which is Exhibit H; and is this -- it says at the bottom Genfin. Is this documents that were received by the Government from a company called Genworth?

**A.**   Yes.

**Q.**   And does it concern an annuity that was owned by Mr. Caramadre with the annuitant, that being a man named Alfred Lamonte?

**A.**   Yes.

**Q.**   And does it indicate that $1.2 million was deposited into this account?

**A.**   Yes.

**Q.**   And does it indicate that $1,423,650 was paid out on a death claim?

**A.**   Yes.

**Q.**   And, in fact, if you go to page 12 of this document, does it provide, again, the total amount of the check being -- that was paid out as that $1,423,650?

**A.**   That's correct.

**Q.**   Is this an example of some of the raw materials that you received from the insurance companies that

helped you plug in the numbers into the various parts of the chart?

**A.** Yes.

**Q.** And now I want to show you Exhibit 28, which is Exhibit I in my binder. And did you -- did the Government also subpoena the insurance companies to provide other financial information that was not readily available from the raw materials that were originally submitted?

**A.** Yes, we did.

**Q.** Exhibit I has a -- Exhibit 28 has a Bates stamp number of SB and five zeros and a one. Is that from an insurance company called Security Benefit?

**A.** Yes, it is.

**Q.** And is this a chart that Security Benefit as an example provided to the Government concerning each of the annuities in question?

**A.** Yes. This is a portion of a chart.

**Q.** This document is four pages long -- excuse me, six pages long. I just kind of want to go through one line with you just for you to explain what all the numbers refer to.

And if you start out at the first annuity that ends in 1982, it has the owner as a company called Needwood Bluffs, has the annuitant as Robert Carnavale

and it has other information.  It says it was issued on July 17th, 2006.

If I go to page 3, this chart continues with more information about this annuity.  It says there was an initial premium of $500,000, initial premium extra credit of 25,000, initial premium bonus of 10,000.  Would that be $35,000 in bonuses that Security Benefit paid into this account?

**A.**   Yes.

**Q.**   And then if you go to the last page, does it indicate that total placed into the account was 535,000, which includes the 35,000 in bonuses; right?

**A.**   That is correct.

**Q.**   It has the date of death of the annuitant, the date the death claim was processed, had the total commissions that were paid --

**A.**   That's correct.

**Q.**   -- as 32,500, and then has the payment to the beneficiary of $565,762?

**A.**   That's correct.

**Q.**   So those numbers provide all of the numbers that you needed to do the calculation with the exception of the fees earned by the insurance companies?

**A.**   That's correct.

**Q.**   And did the Government receive these type of

charts from the various insurance companies in this case?

**A.**  Yes, we did.

**Q.**  I'm not going to -- I'll just show you now another example that I won't go through in detail, Exhibit 29, and this is from -- which is Exhibit J, which is from -- Bates stamped with Genfin.  Is this from Genworth?

**A.**  That's correct.

**Q.**  Is this a similar document in which Genworth produced the total premium amounts, the total bonuses, the account value at the time of the payment and other financial information that you used in your calculation?

**A.**  That's correct.

**Q.**  Now, we mentioned the last column being -- of the chart that you did being the fees; and the Government determined that to correctly assess how much the insurance companies lost, we would need to calculate how much they gained and offset that amount?

**A.**  That's correct.

**Q.**  Did you and other parts of the -- other members of the investigation reach out to the various insurance companies and ask them to determine the amount of fees they received on each of these annuities?

**A.** Yes.

**Q.** And were the fees provided, fees that they were receiving, were they spelled out in documents that the insurance company sent to the contract owner? Not the amount of fees but the percentage of fees that were going to be taken.

**A.** As part of the contract, but not the actual fees themselves.

**Q.** Okay. So let me show you now Exhibit 30, which is Exhibit K. Is this a document received from Midland National concerning an annuity that was owned by Stephen Mesolella and the annuitant being Joseph Castillona?

**A.** Yes.

**Q.** And it indicates here what the initial premium was, and it lists the different fees that are going to apply in this case. For example, it says there's an administrative fee of point 45 percent. Above that there's a mortality and expense charge, and it indicates it varies from point 85 percent to 1.1 percent depending on the value of the account.

There's an annual maintenance fee of $30 per year, and then on page 2 it provides the fees for the different types of riders that are being purchased in this particular case; right?

**A.**    That's correct.

**Q.**    It has the enhanced guaranteed minimum death benefit rider, roll-up 6 percent interest rate as point 5 percent on 50 percent.  That would be the fee that they would charge to get the guaranteed rate of return of 6 percent in this particular annuity?

**A.**    Yes.

**Q.**    And then they have an estate planning rider, which is point 30 percent?

**A.**    Yes.

**Q.**    And then there's a premium bonus rider of point 80 percent, and that's with a 5 percent bonus that was added initially?

**A.**    That's correct.

**Q.**    So the insurance companies charged specific fees if the owner wanted to have these specific death benefits?

**A.**    That's correct.

**Q.**    So for that reason, calculating the amount of fees they received was essential in determining how much they actually lost?

**A.**    That's right.

**Q.**    And I'll show you Exhibit -- just another example, Exhibit 31, which is Exhibit L, and is this a contract specification page from Aegon Insurance Company?

**A.**   Yes, it is.

**Q.**   And does this similarly have a list of the various fees, and it says the total variable account charges for your contract is 2.1 percent?

**A.**   Yes.

**Q.**   Okay.  Now, did the Government ask the insurance companies to calculate the amount of fees they received on each of the annuities in question?

**A.**   Yes, we did.

**Q.**   Did the insurance companies have readily available information on which they could push a button and determine how much in fees they received on each annuity?

**A.**   It's my understanding they had to go back and calculate them annuity by annuity to come up with that number.

**Q.**   Is it your understanding that these fees were typically taken out of the account value on a daily basis?

**A.**   Yes.

**Q.**   Such that if there's a 1 percent fee for some administrative charge, it would be 1 percent is taken out over the course of a year, but that would be divided by 365?

**A.**   That's correct.

**Q.**   So every day when you check the account value, there's already been a slight reduction for fees?

**A.**   Yes.

**Q.**   And the insurance companies didn't maintain as a normal business practice the exact amount of fees that were taken out on a daily basis?

**A.**   That's correct.

**Q.**   So the Government asked the insurance companies to go back and perform a calculation to recreate the amount of fees that were taken out?

**A.**   That's correct, for each one of the individual annuities.

**Q.**   And did the insurance companies comply?

**A.**   Yes, they did.

**Q.**   I want to show you Exhibit 32, which is Exhibit M, and it says at the top this is prepared by Security Benefit Life Insurance Company?

**A.**   That's correct.

**Q.**   And does it provide on an annuity-by-annuity basis how much in fees they received?

**A.**   Yes.

**Q.**   The first column is rider fees.  Would that be for the specific death benefit riders of the type that we just mentioned?

**A.**   That's correct.

**Q.**     Before I ask you the other ones, am I correct, then, all these fees are based on a percentage of the amount of money that's being invested?

**A.**     Yes.

**Q.**     And that the longer the investment is being held by the insurance company or the mutual fund company, the higher the fees are going to be because they're being taken out for a longer period of time?

**A.**     That's correct.

**Q.**     So generally in a situation where you have terminally-ill individuals as annuitants and a relatively quick turnaround in the annuities, does that mean that the fees earned by these insurance companies would be diminished?

**A.**     Yes, significantly.

**Q.**     Now, the next column has M and E administrative fees.  These are other fees that was mentioned in the application pages or the contract of -- the annuity contract?

**A.**     Yes.

**Q.**     And then they're added together, have total fees?

**A.**     Yes.

**Q.**     And then there's an additional column that's called Revenue Share Received by Life Insurance Company from Fund Partners Based on Assets in the Fund,

Estimated High.  What does that column refer to?

**A.**    I believe these are referred to as 12(b)(1) fees.

**Q.**    You mentioned before that the insurance companies don't actually keep the money, they pay the money or they send the money over to a mutual fund company?

**A.**    That's correct.

**Q.**    And did you come to learn in this investigation that the mutual fund companies paid back a small fee to the insurance companies based on the amount of money that was sent to them?

**A.**    Yes.

**Q.**    And did you, therefore, determine that those numbers would also be necessary because -- to calculate in order to determine how much money the insurance companies gained from these products?

**A.**    Yes.

**Q.**    And is that what number is included in the fourth column?  Well, the fifth column?

**A.**    The last column, whichever it is.

**Q.**    That's the number?

**A.**    Yes, that's correct.

**Q.**    So you would use -- these are the fees that you used in the master chart that you did in the final column where you calculated more than $3 million in fees that these companies received, these would be the

numbers that you used for the total fees received by Security Benefit on these particular annuities?

**A.**   Yes, cumulatively.

**Q.**   And then the final document I'll show you, Exhibit 33, is this a document -- which is Exhibit N in my binder, is this a document that was prepared by Nationwide concerning the fees that they received on the various annuities?

**A.**   Yes.

**Q.**   And, again, it has M and E, which is mortality and expense fees that were associated with the annuity; and then 12(b)(1), those would be the payments that they received from the mutual company?

**A.**   That's correct.

**Q.**   And going to the last page of this, it indicates that Nationwide received a total of $628,000 in M and E fees and $80,000 plus in 12(b)(1) fees?

**A.**   Yes.

**Q.**   So those numbers were then reduced from the losses that Nationwide -- that you calculated that Nationwide sustained?

**A.**   That's correct.

**Q.**   Now, when you spoke with the various insurance companies, did they believe that these numbers were sufficient to capture their losses?

MR. MURPHY:  Objection.

MR. VILKER:  I thought hearsay was allowed in these.

THE COURT:  Well, hearsay is allowed, but it's kind of sketchy hearsay.  I'll overrule the objection, and I'll hear the answer; but I seriously question that I'm going to take it into consideration.

MR. VILKER:  Okay.  Well, let me try to rephrase it.  It was probably my fault not asking the exact question.

**Q.**  Did -- were any fixed expenses that the insurance companies had, such as rent, payment of their employees, advertising, any fixed expenses that they had that were independent of any particular annuities, were those considered in determining their losses?

**A.**  No.

**Q.**  And this information on the fees, I showed you two of them.  Is it fair to state that you received documents, similar type documents from the rest of the insurance companies as well?

**A.**  In different formats, but yes.

MR. VILKER:  I have no further questions.

THE COURT:  All right.  Thank you, Mr. Vilker.  Cross-examination, Mr. Murphy?

MR. MURPHY:  Judge, may I approach the clerk to

have four exhibits marked?

THE COURT:  Yes.

## CROSS-EXAMINATION

BY MR. MURPHY:

Q.   Agent Niro, good morning.

A.   Good morning.

Q.   Agent Niro, if an annuitant was also the owner of a policy, there's nothing wrong with that; right?

A.   So long as it was appropriately applied for, yes.

Q.   And if the annuitant who was the owner of a policy in my example passed away, would there be a loss to the insurance company?

A.   It depends.

Q.   It depends on what, sir?

A.   The riders in the contract and the amount of value at the date of death.

Q.   Does it go by year?

A.   It could.  The value on the date that the annuity is cashed in is the driving factor.

Q.   And that's how you consider whether or not there's a loss to the insurance company?

A.   Placed through the calculation I was using. There's many factors.

Q.   Now, there's nothing wrong with an owner of an annuity to not be related to an annuitant, is there?

**A.**   Not that I'm aware of.

**Q.**   In fact, you reviewed many of these annuity contracts?

**A.**   Yes, I did.

**Q.**   The ones that are on Government's Exhibit 15, which was provided to us this morning, and do you see that in front of you, sir?

**A.**   Yes, sir.

**Q.**   And this was the summary of gains and losses from variable annuities.  This was prepared by you; correct, sir?

**A.**   A portion of it was.

**Q.**   And who prepared the rest of it?

**A.**   It's my understanding the attorneys, Lee Vilker and John McAdams, prepared this.

**Q.**   And, sir, when you went through the insurance companies on this document, which contains six pages, which is Government's 15, they were done, in essence, in alphabetical order; correct?

**A.**   The chart was sorted in alphabetical order after it was compiled.

**Q.**   By insurance companies.  Exhibit 15 that I have is alphabetically, in essence, by insurance companies; correct?

**A.**   Yes.

**Q.** Now, sir, the first one on page 1 of Exhibit 15 says that the insurance company is American National, the owner of the annuity is Estella Rodriguez, and the --

**A.** I have not reviewed that document.  I don't have the whole document in front of me.  If you could pull out on that or provide me a copy.

**Q.** Sure.  It should be on your screen.

**A.** I can only see three columns.  I apologize.

**Q.** Can you see that now, sir?

**A.** It's small, but yes.

**Q.** Is that better?

**A.** Yes.

**Q.** Now, the owner of that annuity, the first one, which was -- the application date says 6/13, 2007, is Estella Rodriguez; correct?

**A.** Yes.

**Q.** The annuitant is Robert Carneval or Carnevale?

**A.** Yes.

**Q.** And then there's a column that says total loss including commissions of approximately $64,000?

**A.** That's correct.

**Q.** Now, that 64,000, that figure was arrived at by you.  You were the one that did the calculations; correct?

**A.** The numbers were received from the insurance company using the formula that we previously discussed; and I came to that number, yes, and it's the same as the other summary chart provided.

**Q.** And where you list commissions of 64,000 on that first example, all of those commissions went to who, sir?

**A.** They went to various people or various houses.

**Q.** So I have this right, when a person goes in and files an application and signs an annuity contract, it is sent to a brokerage house.  You have to do it through a brokerage house; correct?

**A.** Yes.

**Q.** And then the brokerage house will send it off to the insurance company; correct?

**A.** Yes.

**Q.** And that list on Exhibit 15 of number 1 where it says total loss of commissions, those are commissions that were paid to the broker/dealer?

**A.** The column that you're referring to isn't just the commissions.  That's the calculation which includes commissions from the previous chart.

**Q.** Okay.  And that is how you arrived at your total loss?

**A.** The commissions were included, yes.

**Q.**   Now, the commissions that went from the insurance company to the brokerage house, when Mr. Vilker had asked you, you said a portion of those commissions eventually went to Mr. Caramadre?

**A.**   Yes.   It's my understanding they were sharing commissions within his firm.

**Q.**   Do you have any data or evidence that that is what happened?

**A.**   There were e-mails and other documents that were taken during the investigation that referred to the amounts and the percentages of sharing, and there were interviews with Mr. Maggiacomo and Mr. Hanrahan in which they discussed that sharing of commissions.

**Q.**   So out of that $64,000 in total loss, which includes commissions that were paid by the insurance company to the investment house, you don't know what percentage or a dollar amount of commissions that went to Mr. Caramadre; correct?

**A.**   No.   That just refers to the total amount of commissions that were paid out by the insurance companies.   It doesn't break it down by who received those, the amount that they lost.

**Q.**   So you have no number of commissions that were paid under the six pages of annuities that found its way to Mr. Caramadre; correct?

**A.**    No.  This document refers specifically to the losses to the insurance companies.  It's not referring to anything to do with commissions to Mr. Caramadre.

**Q.**    Right.  And part of the loss from insurance companies was the commission in your calculations that they paid to broker/dealers; correct?

**A.**    That's correct.

**Q.**    But nowhere have you compiled a list of total commissions that eventually went to Mr. Caramadre; correct?

**A.**    I did create a chart.  It was not finished by the time of trial.

**Q.**    Now, sir, as it relates to contract number 1 here, the owner of that annuity from American National is Estella Rodriguez; correct?

**A.**    The owner listed on the application was Estella Rodriguez.

**Q.**    And on the right-hand side where it says connection to fraud scheme, it says "owner is Caramadre client"; correct?

**A.**    Could you enlarge that, please?

**Q.**    Sure.

**A.**    That's what it says.

**Q.**    So when these annuities were cashed in for payment, the owner of the policy received the money;

correct?

**A.**   Depended on what was on the application form who would be the recipient.

**Q.**   The owner or the owner's beneficiary; correct?

**A.**   That's correct.

**Q.**   And you were able to check the list of annuities to see ultimately where the check went; correct?

**A.**   Not on every annuity.  There was data -- some of the annuities were very old and we didn't have the information, but the payout was -- we had payout information.

**Q.**   You had payout information as to where the payout actually went?

**A.**   Not in every instance who the check was made payable to.

**Q.**   But you would agree with me that those checks all didn't go to Joseph Caramadre?

**A.**   I don't know that.  I don't know that they were all payable to him.  I don't know what ultimately arrived at -- with him.

**Q.**   Well, what I'm asking you I guess, Agent Niro, is, on paper, those checks, the majority of them did not go to Joseph Caramadre as the owner or beneficiary of these annuities; correct?

**A.**   I don't know the majority but not every one of

them.  I'll clarify that.

**Q.**   These people that are listed are individuals who are not Joseph Caramadre.  You would agree with me there; right?

**A.**   That's correct.

**Q.**   And they are the people that were listed or were the owners of the policies; correct?

**A.**   That's correct, but it's not necessarily the beneficiary.  You would have to go through it annuity by annuity.

**Q.**   You would have to go annuity by annuity?

**A.**   That's right.

**Q.**   And have you done that, sir?

**A.**   I have, but I do not have it broken down on a spreadsheet.

**Q.**   But you would agree with me that the money from the insurance company to the owner of the annuity policy after the annuitant died, most of that money did not go to Joseph Caramadre?

**A.**   Again, I can't say most or -- not all of the money made it to Joseph Caramadre.

**Q.**   But you'd agree with me that there were individuals who are bona fide owners of annuity policies who were listed in the Government's exhibits who received the money after the annuitant died?

**A.** That's correct.

**Q.** Now, sir, an annuity, take a single annuity, say from Golden American, which I have on the bottom of page 1 of Exhibit 15. I'll try to make it a little larger for you, sir.

Can you see that okay, Agent Niro?

**A.** Yes.

**Q.** That was a -- and this one goes way back. This was an application from September 8th of 1995; correct?

**A.** Yes.

**Q.** And that is prior to the date of the conspiracy to which Mr. Caramadre pled; correct?

MR. VILKER: Objection. First of all, I don't think that's accurate, but this agent wouldn't have knowledge of that.

**Q.** Well, do you have knowledge of it, sir?

**A.** I don't recall the beginning date of the conspiracy that was in the plea agreement.

**Q.** Well, do you recall a few moments ago testifying when Mr. Vilker asked you about the chart that said July 1st, 2007, which was after Mr. Caramadre's Co-Defendant got involved?

**A.** That's correct.

**Q.** So is it safe to say that September 8th of 1995 was prior to the conspiracy to which Mr. Caramadre

pled, if you know, sir?

**A.**    No.  The reference date to July 2007 was associated with Mr. Radhakrishnan.

          MR. VILKER:  I just want to clarify because I think there's some confusion.

          The scheme alleged in this case was from 1995 through 2009, I believe.  The conspiracy charge started when Mr. Radhakrishnan was involved in 2007.  So I think Mr. Murphy's technically correct, but the scheme includes that time period.

          THE COURT:  Okay.  And is there a date in '95 when the plea begins, the admitted-to scheme?

          MR. VILKER:  It included this period.  I believe it was January of 1995, but I'm not 100 percent sure.

          THE COURT:  That's where I was hesitating, because if there's a point in 1995 where transactions prior are not within what was admitted in the scheme, transactions after would be, obviously that becomes an important point.

          MR. MURPHY:  Judge, the defense can save that for argument, also.

          THE COURT:  Okay.  Good.

**Q.**    Agent Niro, I'm showing you what's been marked this morning as Defendant's F for identification, and if I can place that up on the screen.  That is a

deferred variable annuity application with the Golden
American Life Insurance Company; and I would ask you,
have you seen that before?

**A.**    I've looked at thousands of documents.  I'm not
sure if I've seen this one specifically.

**Q.**    Okay.  And it's safe to say that with the
thousands of documents that you reviewed over the 2,000
hours of work that you have conducted in this case, it
would be virtually impossible to remember every
document; correct?

**A.**    That's correct.

**Q.**    Now, on that document, the owner of the policy is
listed as who?

**A.**    Drs. Papazian, Tarro and Della Torre,
Incorporated, Profit Sharing Plan.

**Q.**    And who is the annuitant, sir?

**A.**    Debra Blowers.

**Q.**    And is there a question on that Golden American
Life Insurance Company deferred variable annuity
application that asks -- the owners are the group of
doctors; correct?

**A.**    I assume so.

**Q.**    And the annuitant is a woman by the name of Debra
Blowers.  And in column 2 or paragraph 2 or number 2
where it says "annuitant," does it ask a question as to

whether or not the annuitant is related to the owner of the policy?

**A.** Yes, it does.

**Q.** And what is the answer?

**A.** "None."

**Q.** So I think you've said it earlier, there's nothing wrong with the annuitant not being related to an owner of a policy, is there?

MR. VILKER: Objection, your Honor. This is starting to get far afield. It's not at all related to the mathematical computations.

Debra Blowers was in the Indictment. Ken Blowers testified at trial. It's in the PSR. Ken Blowers testified that Debra Blowers had a lobotomy-like operation, and he had no idea there was any kind of annuity submitted in his wife's name.

So to the extent I think that Mr. Murphy is arguing that shouldn't be included, it's, first of all, outside the scope of this witness who did mathematical computations, and I believe it's already been established by the documents and the testimony in this case.

MR. MURPHY: Judge, I'm simply trying to get at, we pulled some annuity applications to get from Agent Niro, is simply there is nothing wrong with an owner of

a policy not to be related to an annuitant.  We can clear that up with one question and one answer.

THE COURT:  I think, Mr. Murphy, you've already done it.  My notes tell me that you began with an overarching question and he said, no, nothing wrong with that.

Q.  Now, Agent Niro, I've put Government's Exhibit 15 back on the screen for you and would ask you to look at the bottom of the page, sir.  I'll make that larger for you.  And that is an application date of 9/8/95; correct?

A.  Yes.

Q.  And that's the Golden American annuity policy that I just showed you where the annuitant is Debra Blowers and the owner is doctors -- there's a group of doctors; correct?

A.  I assume that's the same one.

Q.  And the calculated loss is $6,472; correct?

A.  Yes.

Q.  Now, when that claim was paid --

MR. MURPHY:  And, Judge, I would move Defendant's F full, please.

THE COURT:  Any objection?

MR. VILKER:  No objection.

THE COURT:  Defendant's F full.

(Defendant's Exhibit F was admitted in full)

**Q.**   Agent Niro, when that claim was paid, the check would have gone to the group of doctors; correct?

**A.**   I assume so.

**Q.**   So they would have been the ones that profited from the death of the annuitant; correct?

**A.**   Presumably.  I'd have to look at the application to find out if there were directions to send it to another location.  That was common in several of these annuities.

**Q.**   Now, sir, did you receive affidavits from the insurance companies where they swore to the amount of loss that they incurred?

**A.**   Not that I'm aware of.

**Q.**   Now, sir, prior to this case, I believe you answered a question by Mr. Vilker as to your knowledge of annuities.  You've gone into annuities in different cases in your capacity as a 15-year special agent with the Internal Revenue Service; correct?

**A.**   That's correct, mainly as a disposition of funds from a fraud investigation.

**Q.**   Now, Agent Niro, you would agree with me that an annuity, a single annuity is covered by a prospectus; correct?

**A.**   Yes.

**Q.**   And that prospectus is one-sided in that the insurance company is the one that sets the terms of what will be paid, what will be charged, et cetera; correct?

**A.**   They're set and agreed upon.

**Q.**   Set by the insurance company?

**A.**   Right, and agreed upon by the purchaser.

**Q.**   And a purchaser, obviously by purchasing the annuity policy, agrees to the terms; correct?

**A.**   Yes.

**Q.**   The purchaser can't change those terms?

**A.**   Not that I'm aware of.

**Q.**   And with the annuities that have been listed in Government's Exhibit 15 and also the Government's Exhibits, which was A through N, 20 to 33, you understand during the course of your investigation in this case that the insurance company never required a health document or a medical exam on the annuitant; correct?

         MR. VILKER:  Your Honor, same objection.  This is not at all related to the computation of losses or restitution.

         THE COURT:  I think what you're really getting into now, Mr. Murphy, is the scheme; and the scheme is laid out in the plea, and it is what it is.  I don't

think that this witness is the right witness to investigate those issues.

I'm going to overrule the objection and let the witness answer; but I caution you, I'm going to start to sustain these if we keep rambling into kind of relitigating what's in the plea.

MR. MURPHY:  Yes, your Honor.

A.   Could I have you ask it again.

Q.   That was a long question.  Let me shorten it up.

Agent Niro, you're aware through your investigation in this case that the insurance companies that offer the annuities don't require the annuitant to submit to a medical examination; correct?

A.   I don't know.

Q.   Well, have you seen medical examinations in your 2,000 hours of investigation of this case?

A.   No, I have not, but it's nothing that I would look for.  I computed the numbers.

Q.   So your role was simply to compute the numbers in this case?

A.   Mainly, yes.

Q.   But you have seen the applications where they request a relationship between the owner of the annuity and the annuitant?

A.   Yes.

MR. MURPHY: Judge, if I could have one moment, please.

THE COURT: Sure.

(Pause)

**Q.** Sir, looking at Government's Exhibit H, which is now 27, Mr. Vilker a few moments ago took you through this annuity, and I'll put that on the screen for you.

In this case, the owner of the policy ending in 0394 was Mr. Caramadre; correct?

**A.** Yes.

**Q.** The agent was Mr. Maggiacomo, Jr.?

**A.** Yes.

**Q.** And the annuitant was Alfred Lamonte?

**A.** Yes.

**Q.** And the account was originally funded by a check from the law office signed -- from the Law Office of Joseph Caramadre in the amount of $1.2 million; correct?

**A.** That's what it says.

**Q.** And the amount of payout at the time was a little over $1.4 million; correct?

**A.** Yes.

**Q.** Now, as part of that exhibit, there was the application, and the owner is still Joseph Caramadre; right?

**A.**   That's correct.

**Q.**   The annuitant is Alfred Lamonte?

**A.**   Yes.

**Q.**   And the beneficiary is Ms. Caramadre; correct?

**A.**   Yes, that's correct.

**Q.**   And there's a question in box 3 where it says "relationship to owner."  Now, that's the relationship to the owner of the annuity, not the annuitant; correct?

**A.**   Yes.

**Q.**   And in that contract, is there any question as to relationship of the annuitant to the owner?

        MR. VILKER:  Same objection.

        THE COURT:  Sustained.

        MR. MURPHY:  Judge, may I have one moment with Mr. Caramadre?

        THE COURT:  Oh, absolutely.  As much as you need.

        (Defendant confers with counsel)

**Q.**   Now, sir, looking at that same exhibit, and the Bates number would be Genfin Lamonte number 17, where it says "claimant's statement" --

**A.**   Could you point out what number it is?  I'm sorry.

**Q.**   Yes.  It's Bates number 17 on the bottom, part of that same exhibit I just had.

**A.**   No, no.  The section with which you're referencing.

**Q.**   Yes, once I get it up on the screen.

MR. VILKER:  Your Honor, I realize this is my error.  I tried to redact all the Social Security numbers, but I apparently missed this one in the middle of the page.  That should be redacted.

MR. MURPHY:  Judge, the defense has no objection to the redaction of that.

THE COURT:  All right.  Given that this is a public hearing, if somebody could grab a pen and redact it on the screen, that would be great.

MR. MURPHY:  Judge, I placed my pen over it.

THE COURT:  Okay.  That's fine.

**Q.**   Agent Niro, this is the claimant's statement as it relates to that annuity we had just gone over; correct?

**A.**   Yes.

**Q.**   And on the mid to last portion of that statement, it says that the beneficiary is Paula Caramadre; right?

**A.**   Yes.

**Q.**   And there's a question, "relationship to the deceased."  Is there any answer, sir?

**A.**   No.  It's blank.

**Q.**   And this annuity was paid sometime after the death of Mr. Lamonte; correct?

**A.**    I would have to look it up to make sure that there was a payout on that one.

**Q.**    Now, sir, was there any calculation done by you as to how much money the insurance companies made from these annuities that are listed in your loss projection?

**A.**    Only the fees.

**Q.**    Now, sir, if an annuitant dies within one year of the purchase of one of these annuities, did the brokerage house have to give the commission back?

**A.**    I believe in some instances they may have.  I'm not certain.

**Q.**    And is that calculated?

**A.**    I am not certain about that.  Based upon the information that I received from the insurance companies, I have to rely upon their numbers.  If it was paid back and they didn't capture it, I wouldn't know that.

**Q.**    Now, sir, showing you Government's Exhibit E, which is now Government's 24, page 3 of the annuity tabulation, on the top of the page that I've just underlined, there is an owner called DK, LLC.  Do you see that?

**A.**    Yes.

**Q.**    And the annuitant is Jason Veveiros?

**A.**    Yes.

**Q.**    Do you know what was the deal with that annuity?

MR. VILKER:  Objection, your Honor.  I don't really understand the question.

MR. MURPHY:  One moment, please, Judge.

(Defendant confers with counsel)

**Q.**    On 8/21/08, the DK, LLC, owner of the policy with ING --

**A.**    I can't see the full document.  If you could pull back a little bit.

**Q.**    Is that better, sir?

THE COURT:  The other way, Mr. Murphy, I think.

**Q.**    Oh, you want to see the whole thing?

**A.**    I can only see portions of it.

**Q.**    I'll try to make it bigger for you.  Can you see that now, sir?

**A.**    Yes.

**Q.**    Okay.  The owner of the policy is DK, LLC; correct?

**A.**    That is correct.

**Q.**    And that application date was 8/21 of '08.  Do you see that, sir?

**A.**    I can't make it out.  I'm sorry.

**Q.**    Can you see it now?

**A.**    Yes.

**Q.** I'll just underline that for you. 8/21/08, DK,
LLC. Mr. Veveiros was the annuitant?

**A.** Yes.

**Q.** I'll make it larger for you now. The total
premium was what, sir?

**A.** One million dollars.

**Q.** And the payment to the beneficiary was what?

**A.** $818,187.35.

**Q.** So there was a loss on that one, sir?

**A.** It appears so.

**Q.** And do you know why there was a loss?

**A.** I do not.

**Q.** Now, sir, that same exhibit, that same page, page
number 3 of 6, there's a policy on July the 6th, 2007,
from -- Jefferson National is the insurance company,
the owner is a Duckworth Company, Lily Ianiero is the
annuitant?

**A.** That's correct.

        MR. MURPHY: One moment, please, Judge.

        (Defendant confers with counsel)

**Q.** Sir, on that Lily Ianiero policy, the total
premium was $500,000?

**A.** Yes.

**Q.** The value of that policy at the time of payment
was $637,000?

**A.**   Yes.

**Q.**   And why was the payment to the owner $610,000?

**A.**   I would have to look at the source documents to give you that answer.

**Q.**   Sir, what could the possible reasons be for paying less?

**A.**   It's kind of out of context for me.  I don't know.

   MR. MURPHY:  One moment, please, Judge.

   (Defendant confers with counsel)

**Q.**   Agent Niro, you had previously answered that there were no affidavits submitted by the insurance companies as to losses.

   Did you receive any affidavits from the insurance company as to fraud on the application?

**A.**   I don't recall ever seeing an affidavit from an insurance company.

   (Defendant confers with counsel)

   MR. MURPHY:  Judge, Mr. Caramadre has asked me if I could, I know it's unorthodox, to let Mr. Thompson go, and he has a list of questions that he wants me to go over.

   THE COURT:  Okay.  As long as Mr. Thompson doesn't have an objection.

   MR. THOMPSON:  No, that's fine.

   THE COURT:  All right.  I want to accommodate

Mr. Caramadre as much as possible in light of my denial of his motion.

      MR. MURPHY:  Thank you, Judge.

      THE COURT:  All right.  Mr. Thompson?

      MR. THOMPSON:  Thank you.

## CROSS-EXAMINATION

**BY MR. THOMPSON:**

**Q.**    Good morning, sir.

**A.**    Good morning.

**Q.**    On cross-examination, Mr. Murphy was asking you about commission payments.  Do you remember that?

**A.**    Yes.

**Q.**    That line of questioning?  And you're looking now at Government's Exhibit -- oh, I goofed it.  Thank you. Government's Exhibit E, which is also 24, I believe. And you testified previously that, I'm going to move it over, but that the third column from the end here is total commissions; correct?

**A.**    That's correct.

**Q.**    And those were commissions that were paid out by the insurance companies to the broker/dealers; correct?

**A.**    Yes.

**Q.**    And you testified that you didn't know where that money actually ended up, but you know that it went from the insurance company to the broker/dealers?

**A.**   That's my understanding.

**Q.**   Okay.  And on cross-examination, I believe you also said that in at least some of the cases, commissions had to be returned to the insurance companies; correct?

**A.**   I am not sure of that.  I have a vague recollection that some commissions were returned.

**Q.**   At some point the commissions vest; but if the account is closed in a short period of time, the insurance companies take back or demand back the commission from the broker/dealers; correct?

**A.**   I'm not sure of that.

**Q.**   But you have a vague recollection from your review of the evidence that there were commissions that had to be returned; correct?

**A.**   They may have been.

**Q.**   Well, do you recollect that or not?

**A.**   I vaguely recollect that there was -- at some point there was a discussion of it, but I don't have specific recollection as to the details.

**Q.**   Did the insurance companies, when you asked for documentation from them, did they tell you when commissions were -- had to be returned?

**A.**   The insurance companies provided summary documents, so I'm making the assumption that their

numbers were correct when they provided them to me.

**Q.**   So you don't know if they had commissions returned

to them, you don't know if that was subtracted from the

numbers they gave you for total commissions; right?

**A.**   There are some zeros and odd amounts in that

column, so I'm assuming that they captured it; but I

can't tell you what their summary documents are.

**Q.**   Okay.  But really, really you're just assuming.

You have no reason to think that one way or the other,

do you?

**A.**   The charts that I created were based upon summary

documents provided by the insurance companies.  I

merely compiled them into one large spreadsheet.

**Q.**   So you don't know whether this column, Total

Commissions, is total commissions that were initially

paid out or total commissions less what might have been

returned; right?

**A.**   I'm assuming they do.  I'm relying upon their

summary information.

**Q.**   Sir, I know what you're assuming, but my question

is what you know.  You don't know, do you?

**A.**   No, I don't.

**Q.**   And, therefore, because you don't know that

question for the column, Total Commissions, you don't

know the answer for the last column, which is Total

Loss Including Commissions; right?

**A.** The entire summary chart is based upon information provided from the insurance companies. I merely compiled it into a summary document. So every number on that document relied upon information provided by the insurance companies.

**Q.** So based on that, it's fair to say you don't know for any number on the entire chart, is that what you're saying, you don't know the accuracy?

**A.** It came from the source documents provided from the victim in the case.

**Q.** So the answer is, correct, you do not know?

**A.** Based upon best evidence that was collected from them, the number is correct.

**Q.** I'm also going to ask you, sir, about -- we have this column, Bonus Payments. And that is a bonus amount that the insurance company puts into the annuity; correct?

**A.** That's my understanding, yes.

**Q.** Okay. And, in fact, earlier you testified, sir, to Government's Exhibit I, which is also 28, that this was a summary form. And I apologize, I can't recollect which insurance company this is. Do you know what it is on Exhibit I?

**A.** There may be a Bates number on it.

**Q.**    I'm directed to the Bates number on the bottom, which it starts SB.  Is that Security Benefit --

**A.**    Yes.

**Q.**    -- Insurance Company?  And Mr. Vilker took you through these various columns, and on page 1 we have for contract 1982.  Do you see that?

**A.**    Yes.

**Q.**    And then he carries you through the owner, the annuitant, the beneficiary, the broker/dealer, et cetera; correct?

**A.**    That's correct.

**Q.**    And then if I go a couple more pages --

        MR. THOMPSON:  I'm sorry.  Ms. Saucier, did I hit something to make it go out, do you know?

        THE COURT:  I have it.

        THE CLERK:  I have it on here.

        MR. THOMPSON:  I don't have it.

        THE CLERK:  Did it just fall asleep?

        MR. THOMPSON:  I guess.  It was bored.

        THE COURT:  Never bored, Mr. Thompson.

**Q.**    I'm on page 3 of that same exhibit now, sir, and once again we're looking at contract 1982.  So this is just a continuance of that same contract; correct?

**A.**    Yes, it is.

**Q.**    And the initial premium amount without the extra

credit is listed as $500,000?

**A.**    Yes.

**Q.**    The initial premium extra credit is another $25,000, and then there's another initial premium bonus of $10,000; correct?

**A.**    That's correct.

**Q.**    So if you add those two credits and bonuses, that's an amount of $35,000; correct?

**A.**    Yes.

**Q.**    That would have been placed into the annuity by the insurance company; correct?

**A.**    Yes.

**Q.**    And that's reflected on the fourth page of this exhibit, and -- I'm sorry, on the fifth page of this exhibit, and we're again looking at account 1982; correct?

**A.**    Yes.

**Q.**    And so, therefore, we see that the total amount placed into the contract was $535,000; correct?

**A.**    Yes.

**Q.**    Okay.  So when we talk about the bonus amounts, that is not money that was initially paid out to the contract owners.  That was actually money placed into the annuity itself.  Correct?

**A.**    Yes.

**Q.** So -- and the company, the insurance company is holding that annuity; right?

**A.** No.  It goes out to the mutual fund company or whoever's managing it.

**Q.** Okay.  That's fair enough.  I misstated my point. That money is not held by the annuity owner.  It's held by the insurance company or its designee, the mutual fund or whoever it is; correct?

**A.** That's correct.  It's invested.

**Q.** So we're looking again at Government's E, 24.  Let me turn back to page 1 for you.  Here we are.  Here we are looking at page 1 of that same exhibit, Government's E.

And, again, looking across, we have the owner, we have the annuitant, and then we have all the columns that you created to indicate your formula; correct?

**A.** That's correct.

**Q.** And Government's E in evidence, this is my own copy of it, so Government's E doesn't have these subtractions and additions and parentheses; right?

**A.** Yes.

**Q.** I just put those in to reflect your formula. Okay?

**A.** Okay.

**Q.** And your formula is that we look at the eventual

payment to the beneficiary, plus the bonus payments, plus total commissions; right?

**A.**   Yes.

**Q.**   And you have that as all the money that's paid out to the annuitant -- the annuity owner at the end of the contract; right?

**A.**   The value at the time of payment has got to be considered as well.

**Q.**   Correct.  Well, no.  We're just -- I'm going to do all the additions that are paid out first, and then I'll do the subtractions.  Okay?

**A.**   Okay.

**Q.**   So the additions that you do, which is just money paid out by the insurance company, is the actual payment they make, plus the bonus payments, plus the commissions; correct?

**A.**   That's correct.

**Q.**   And then in order to figure out what their actual losses were, then you subtract out the actual value at the time of payment and whatever fees were earned by the insurance company?

**A.**   That's correct.

**Q.**   Now, we'll look at -- the third line here indicates a bonus payment of $2,000; correct?

**A.**   Yes.

**Q.**  Now, as we said before, that $2,000 was never actually paid out to the annuity owner.  That went into the account, the annuity at the time; correct?

**A.**  That's correct, raising the value of the annuity contract.

**Q.**  Correct.  Now, isn't it also true, however, that that didn't get paid out twice, that got paid out when the payment to the beneficiary was made?

**A.**  Could you ask that again?  I'm sorry.

**Q.**  Well, they didn't pay out the bonus payment once and then later pay it out again in the payment to the beneficiary; right?

**A.**  No.  The bonus payment was placed in the investment contract and then invested in the market, however it went, up or down, based upon the time of claim.

**Q.**  And then they paid it out at the end?

**A.**  That's correct.

**Q.**  And that was the first time they paid out that money, not the second?

**A.**  The insurance company has placed a dollar amount into the account, say the $2,000 that you referenced. The $2,000 is owned by the owner of the contract and invested however they see fit.  If the contract goes up or down, it's going to be reflected in the final

balance of the account.

**Q.** I'm looking at now, I'm showing you Government's Exhibit K, which is 30, and this -- I'll go back to page 1 again. I apologize.

This is what's called a specifications page for a Midland account; is that correct? I'll show you the bottom.

**A.** Yes.

**Q.** And as you testified on direct examination, this is essentially the contract terms as created by the insurance company; correct?

**A.** Yes.

**Q.** And just to review that for a minute, the insurance companies are the ones that are writing these contracts; correct?

**A.** I assume so.

**Q.** Well, they're the ones that determine under what terms they will accept someone's investment; correct?

**A.** That's correct.

**Q.** And so they are the ones that decide whether they're going to include -- they're the ones that decide, for example, what the expense charges are, right, the mortality and expense charges?

**A.** Yes.

**Q.** And they're the ones that decide the surrender

charge schedule?

**A.**   Yes.

**Q.**   Right?  They're the ones that decide whether they're going to offer this so-called death benefit; right?

**A.**   That's correct.

**Q.**   They're the ones that decide the questions on the application; right?

**A.**   Yes.

**Q.**   And, in fact, in all the annuity applications you reviewed, there was no question about the health of the annuitant; correct?

        MR. VILKER:  Objection, your Honor.

        THE COURT:  I'll overrule that one; but just as with Mr. Murphy, I don't want to go far into things that I think were settled by the plea.

        MR. THOMPSON:  If I may, your Honor, Government's Exhibit 15 that they submitted today repeatedly says, when they're saying connection to fraud scheme, repeatedly indicates annuitant was terminally ill.

        Terminally ill was not part of the fraud scheme in the case.  Terminally ill was part of why these companies ended up paying, but it was not part of the fraud scheme.  And, in fact, they didn't ask the health

condition.  So the fact that someone was terminally ill did not go one way or the other towards whether there was fraud created.

So when the Government proffers in this sheet as you asked them to how these individual contracts were related to the fraud scheme, the fact that the annuitant was terminally ill is not a way that it's related to the fraud scheme, and that's the question I'm trying to establish here.  This is the Government's exhibit that they entered at this hearing.

THE COURT:  Well, I think we've got two different things going on.  One is what we're going to turn to when we argue, what is within the scope of the fraud scheme and then to what extent do each of these transactions actually fall inside that circle; and that circle is going to start with an analysis of the plea agreement and the counts in the Indictment and so forth.

Then the question is what's appropriate for examination of this witness, who is not the witness to explain the overall fraud scheme.  He's a very narrow witness on a specific point.

So I'm going to let him answer that question; but I'm going to start to sustain objections if you start to get too deeply into going annuitant by

annuitant into questions like, you know, in the application, was there a box for this or that.  I think that's really getting into the nature of the scheme.

MR. THOMPSON:  I intended my question to be out of the annuity contracts that this agent reviewed and that this agent summarized and spent a considerable time reviewing, was there -- were there questions about the health of the annuitant.

THE COURT:  And I'll allow that question.  You can answer.

A.   On some of the documents, I'm certain it did not have it.  On the later variations of the document, I'm not sure.

Q.   Okay.  So as far as you know, the answer is no, that question was not there?

A.   I can't say either way.

Q.   Well, you can say that you know in some applications it was not there; correct?

A.   That's correct.

Q.   And then you can say on other applications you don't know one way or the other?

A.   That's correct.

Q.   And in either case, it was the insurance company that set those terms?

A.   That's correct.

**Q.** Okay. Looking again now at the second page of Government's K, 30, you reviewed with Mr. Vilker some of these additional benefits provided, and it's in the description of additional contract benefits; correct?

**A.** That's correct.

**Q.** And we talked about how there's a fee for a buyer purchasing the enhanced guaranteed minimum death benefit; correct?

**A.** Yes.

**Q.** And I'll skip over these. You testified about them. But there's also this premium bonus rider, and that's a -- in this particular contract, that's a 5 percent premium bonus; correct?

**A.** That's correct.

**Q.** And that's what you had just testified that I was asking questions about, that's the extra money that's deposited into the account when the account is first set up if the buyer pays this additional point 8 percent fee annually; correct?

**A.** That's correct.

**Q.** Now, if you look below as applies to this bonus rider, there's a vesting schedule. Do you see that?

**A.** Yes.

**Q.** And on the left column it says "contract year," and on the right column it says "amount of bonus

vested."  You see that; correct?

**A.**    Yes.

**Q.**    And that tells us that that additional bonus money doesn't actually vest to the buyer until the contract has gone through a certain number of years of being in existence; correct?

**A.**    Partly correct.  If the annuity is exercised, I think that goes out.

**Q.**    You think or you know?

**A.**    I believe it does.

**Q.**    Why do you believe that?

**A.**    That's my understanding of how the contract worked.

**Q.**    I'm going to direct you to Government's Exhibit E, 24, if I might.  Hold on.  It fell asleep again.

       This is Government's E, 24, and this is the overall chart of losses sorted by insurance company. Do you remember this chart?

**A.**    Yes.

**Q.**    Okay.  I'm going to direct your attention if I could -- I'll direct your attention to this transaction I'm underlining here.  Do you see that? It's an August 21st, 2008, contract between Nationwide and DK, LLC?

**A.**    Yes.

**Q.** Do you see that one?  And you can see in that contract that the total premiums paid on that contract were $2,450,000; correct?

**A.** Yes.

**Q.** And you can also see in the next column that the payment to the beneficiary at the end was $2,450,000; correct?

**A.** Yes.

**Q.** That was a return of the premium; correct?

**A.** If the contract was exercised and there was a payment, I'd have to look at the underlying documents to find out if it was a return of premium, if there was a surrendered account or if the payment was made because of the individual's death.

**Q.** All right.  So could it have just been a surrender?

**A.** Potentially.

**Q.** Potentially.  But I see in the two further columns, in the bonus payment column that there's a bonus payment indicated of $122,500; correct?

**A.** That's correct.

**Q.** But we know that that wasn't returned to the owner because the total premium and the payment to beneficiary at the end of the contract was the exact same amount, $2,450,000; correct?

**A.**    I would have to look at the underlying document to tell you what happened with that contract.  It appears from looking at it that there was some sort of surrender agreement, but I can't specifically testify to that.

**Q.**    Okay.  But it also appears from looking at it that the $122,500 listed as bonus payment was not actually paid back to the owners at any time?

**A.**    The bonus payments go into the account at the time the account is opened up.

**Q.**    But it's not a premium?

**A.**    No, it's not.  It's added to the premium.

**Q.**    Correct.  And in this case, the premium that went in is identical to the payment to the beneficiary that went out; right?

**A.**    It is.

**Q.**    So the bonus payment never got paid out to the beneficiary; correct?

**A.**    The bonus payment goes into the account.  Because the two amounts are identical, I can only make the assumption that this is an unusual account and that something -- some agreement was reached between Nationwide and the owner of the account.

**Q.**    Okay.  But -- that's fine, but the $122,500 was never paid out to the beneficiary?

**A.**    It was placed into the bank -- into the investment account --

**Q.**    Right.

**A.**    -- at the time that it was opened.  The settlement, I don't know if it reflects it or not.  I don't know if the market went up or down.  I'd have to look at the underlying documents to give you a specific answer.

**Q.**    Okay.  But it's fair to say, obviously, that the total premium and the payment to the beneficiary are identical numbers; right?

**A.**    Yes, they are.

**Q.**    And they're very, I'll say, round numbers, 2,450,000?

**A.**    That's correct.

**Q.**    So it really -- I mean, it appears that it's the exact same money going right back to the beneficiary or the owner; right?

**A.**    That's correct.

**Q.**    And so it does not appear that the bonus payment ever went out to the owner; correct?

**A.**    In the payment to the beneficiary, the actual check that was cut, it doesn't appear that it went out.

**Q.**    Well, right.

**A.**    As the calculation works, the amounts are placed

into the investment account; and as the market goes up or down, it's calculated.  This individual instance, because the amounts are exactly identical, I'm assuming that some sort of agreement was reached, that something happened to make this contract void.

Q.   So if the contract was void, that bonus payment never went out to the owner; right?

A.   I'd have to look at the underlying documents.  I'm not trying to be difficult; but the amounts as they were, the bonus payment is placed into the investment account and it is invested.

If there's some agreement a year later between the insurance company and the owner of the account that they agree to give back their premiums, there's not a check cut out for the bonus payments, but the amount was paid into the investment account.  That would be a settlement as opposed to an exercise of the annuity.

Q.   So that bonus payment never went out?  That's the question.  It never went out.  It went into the investment account, but it didn't go out to the -- payment to the beneficiary; right?

A.   I don't know.

Q.   Well, you do know that it never went out to the beneficiary because it's not listed, it's not included in the payment to beneficiary column.  You do know

that.

**A.**    You've got to look at what happened with the
specific annuity to give that answer.  The dollar
amounts are the same.  I'm assuming that a settlement
was reached on this account because it's identical,
that there was a problem with it or an agreement made;
but the amount would have been placed into the
investment account.

MR. THOMPSON:  One moment, please, your Honor.

THE COURT:  Sure.

(Counsel confers with Mr. Caramadre)

MR. THOMPSON:  One moment, please, your Honor.

THE COURT:  No problem.  Take as long as you
need.

MR. THOMPSON:  Thank you.

**Q.**    You testified, sir, that you learned during your
investigation of this case that the commission payments
went generally to -- they initially went to
Mr. Maggiacomo and Mr. Hanrahan; is that correct?

**A.**    They did receive commissions.

**Q.**    Yes.  Yes.  And I'm just saying you learned
through your investigation of the case and the time you
spent on it that those commissions initially went from
the insurance companies to those two broker/dealers,
Mr. Hanrahan and Mr. Maggiacomo?

**A.**    In some instances, yes.

**Q.**    In some instances, there were other broker/dealers involved?

**A.**    Yes, there were.

**Q.**    And in the other instances that you're referring to, it went to those other broker/dealers; correct?

**A.**    That's correct.

**Q.**    You also say that you learned that some of those commission payments were then shared with Mr. Caramadre; correct?

**A.**    Yes.

**Q.**    Through your investigation of the case, you never learned that any of those payments were shared with Mr. Radhakrishnan; correct?

**A.**    That's correct.

**Q.**    And none of these e-mails you reviewed and other things reviewed indicated that he got any of those commission payments; correct?

**A.**    That's correct.

**Q.**    And none of the things that you reviewed during this case indicated that he got any of the investment profits from these investments; correct?

**A.**    He did receive money, but I didn't see that it was related to any specific investment.

**Q.**    He got his salary; right?

**A.**   Yes.

MR. THOMPSON:  He got his salary.

One moment, please, your Honor.

THE COURT:  Sure.

(Pause)

MR. THOMPSON:  Nothing further, your Honor.

THE COURT:  Mr. Murphy?

MR. MURPHY:  Thank you, Judge.

<u>**CONTINUED CROSS-EXAMINATION**</u>

<u>**BY MR. MURPHY**</u>:

**Q.**   Agent Niro, did the insurance companies come to you or did you go to them concerning the compilation of the loss?

**A.**   Some of the loss documents existed before I came onto the investigation, and I requested further information when I came on.

**Q.**   So you went to them?

**A.**   Both.

**Q.**   Well, you just said some of them existed before you got involved in this case.

**A.**   Right.  I was not involved at the inception of the case, and some of the summary documents that were used in preparation of the chart existed before I came on. So I don't know if they were requested or provided on their behalf.

**Q.**   Now, Agent, going back to Government's Exhibit 23, the summary of losses from the annuities, if I can take you to page 3 of that, sir.  ING on the top left-hand portion of the page.  Can you see that okay, sir?

**A.**   I can now make out the ING.  If you could go out a little bit further.  I can't see the details of the one you're referencing.

**Q.**   Do you need me to enlarge it?

**A.**   Can you enlarge it, please.

**Q.**   I just drew a line under it.  Can you see that, sir?

**A.**   You're referencing DK, LLC, and Norman Robichaud?

**Q.**   Yes, I am.

**A.**   Okay.

**Q.**   And what I'll do is I'll move it over so you can see all the columns.  DK, LLC, is the owner of that annuity, and what was their total premium?

**A.**   One million dollars.

**Q.**   Let me enlarge it for you, sir.  What was the payment to the beneficiary?

**A.**   $1,031,169.55.

**Q.**   Sir, I'm sorry.  DK, LLC, go down three or four to Jason Veveiros.

**A.**   This is a different one than you were referencing before.  I'm sorry.

**Q.**    The total premium was a million dollars; correct?

**A.**    Yes.

**Q.**    The payment to the beneficiary was $818,000?

**A.**    Yes.

**Q.**    Who was the beneficiary?

**A.**    DK, LLC.

**Q.**    And do you know who that is?

**A.**    My recollection is a corporation Mr. Caramadre was involved with.

**Q.**    Or would it be Mr. Cushner's?

**A.**    Yes, but he had some relationship with him.

**Q.**    So you would agree with me that the total payment at death of Mr. Veveiros did not go to Mr. Caramadre?

**A.**    Again, I think we had discussed it earlier that several of the accounts were set up with the owner being DK, LLC, but the checks would actually have gone to Mr. Caramadre's law firm.  So I don't know who actually received the check.

**Q.**    Sir, now, on this same policy, on this same annuity, we had said that the premium was $1 million. The payment to the owner of the annuity was $818,000; correct?

**A.**    Yes.

**Q.**    And you had listed the total loss as what, sir?

**A.**    A negative $41,254.87.

**Q.** So a million was paid to the insurance company for a premium; correct?

**A.** Yes.

**Q.** $818,000 was paid out at time of death; correct?

**A.** That's correct.

**Q.** You have a bonus payment of $50,000?

**A.** Yes.

**Q.** Who was that paid to, sir?

**A.** It would have been invested into the DK, LLC, account.

**Q.** From who, sir?

**A.** From the insurance company.

**Q.** Now, you have total commissions of what on that annuity?

**A.** $60,000.

**Q.** And you have fees earned by the insurance company of what?

**A.** $151,254.87.

**Q.** So did you subtract the bonus payment and the commissions from the 151, sir?

**A.** Yes.

**Q.** Okay. So the 151 minus the 110 got you to 41; correct?

**A.** Yes. That would actually be a gain to the insurance company in this instance. That's why it's in

parentheses.

**Q.** It would be a gain to the insurance company; correct?

**A.** That's correct.

**Q.** A gain which was represented by your calculation from the fees earned minus the bonus payment out and the total commission; correct?

**A.** That's correct. Taking into consideration the payment, the value at the time of -- at the time of payment, which is a zero.

**Q.** Which was $41,000; correct?

**A.** The total loss was $41,000.

**Q.** Now, the difference from the one million that was received as a premium and $818,000 that was paid out, who kept that money, sir?

**A.** No one kept it. It appears as the value at the time of payment. It would have been lost in the market.

**Q.** It would have been lost in the market, sir?

**A.** Yes.

**Q.** Well, why did the owner only receive $818,000 on that?

**A.** I don't know.

**Q.** Sir, out of these six pages of annuities, how many of them involved fraud, sir?

MR. VILKER: Objection, your Honor.

THE COURT: Sustained.

(Defendant confers with counsel)

Q.   Sir, directing your attention to page 6 of Government's 23 and this annuity where the owner is Agostini Construction, can you see that on the screen?

A.   Yes.

Q.   The annuitant is Norman Robichaud?

A.   Yes.

Q.   The payment says $1.6 million at time of death?

A.   If you could enlarge it.  I can't make it out. It's partially crossed out.  $1,065,033.60.

Q.   At time of death?

A.   That's correct.

Q.   And the value at time of payment was $696,000?

A.   Yes.

Q.   And are you positive of that, sir?

A.   That was the information provided by the insurance company.

Q.   You're absolutely positive of that?

A.   The numbers were checked and rechecked.

Q.   Would you be able to check during the lunch recess to make sure that one is correct?

A.   I could go back and search documents, sure.

Q.   Thank you.  Sir, on the annuities, the insurance

company -- both Mr. Thompson and myself had asked you previously, the insurance company is the one that sets the terms and conditions of the contract; correct?

**A.**  That's correct.

**Q.**  And they are also the ones that accept the risk of death; correct?

**A.**  Yes.

MR. MURPHY:  Nothing further, Judge.

THE COURT:  Redirect?  Actually, do you know what, we've got five minutes to our stopping time.  If you want to get started, Mr. Vilker, that would be fine; otherwise, maybe we'll take our break and get back together again at 2:30 after you're released by Judge Lisi.

MR. VILKER:  That would be fine, Judge.

THE COURT:  Any business before we take our break?

MR. THOMPSON:  No.  Thank you, Judge.

MR. MURPHY:  Judge, Mr. Caramadre had asked me to ask the Court if it would be possible for him to meet with counsel out here.

THE COURT:  In the courtroom?

MR. MURPHY:  Yes, your Honor.

THE COURT:  Why don't we address that after we release the witness.

All right.  Agent, thank you very much.  You're released.  You'll remain under oath, of course.

I think before I address your question, Mr. Murphy, I'd probably want to have a side bar with the marshal.

(Bench conference with marshal held on the record)

THE MARSHAL:  As I said, we have the cubicles right next door.  That's what we use them for.  We would rather not.

THE COURT:  Okay.

THE MARSHAL:  If at all possible.

THE COURT:  Let me bring counsel to side bar.  Could I have counsel at side bar.

(Bench conference with counsel and the marshal held on the record)

THE COURT:  Mr. Murphy, you're really the star of the show here.  The problem is that the marshals, probably because of Government shutdown issues, are understaffed.  So, unfortunately, we're not going to be able to accommodate; but you can meet with him --

MR. MURPHY:  Judge, I'm just relaying the message.

THE COURT:  I understand, but unfortunately that's why we can't accommodate.

MR. MURPHY:  Is there a room in the marshal's office that's secure?

THE MARSHAL:  The rooms that we've always used are the ones -- he's pretty much the only one in today.

THE COURT:  So I think you've got to do it the old-fashioned way.  We tried.

MR. MURPHY:  Okay, Judge.

(End of bench conference)

THE COURT:  All right.  It being almost 12:30, we're going to take our morning recess, and we'll reconvene at 2:30 or as soon thereafter as Mr. Vilker and our stenographer are back.  So Court will be in recess.

(Recess)

THE COURT:  Good afternoon, everyone.  We're here for the continuation of our hearing in United States of America versus Joseph Caramadre and Raymour Radhakrishnan, criminal matter 11-186-S.

And we are I think at this point midway through, maybe more than midway through the examination of Agent Niro, and I think we're ready for redirect by Mr. Vilker.

MR. VILKER:  Thank you, your Honor.

THE WITNESS:  Could I clarify one point on a question Mr. Thompson had asked me?

MR. VILKER:  Okay.

THE WITNESS:  It's on the commissions.  There definitively were charge-backs on them.  I went back and looked.  I was kind of vague on it last time.  I went back and --

MR. VILKER:  That was going to be my first issue to discuss with you.

### REDIRECT EXAMINATION

**BY MR. VILKER:**

**Q.**   When the Government sought out information from the insurance companies on the amount of commissions that they received, were the insurance companies instructed to provide the information of the exact amount of loss that they had and not the amount of commissions that they initially received?

**A.**   They were asked to go back and look at what actually occurred in each one of the accounts and recreate that for the summary spreadsheet.

**Q.**   Okay.  And your understanding in receiving this information from them was those commission amounts represented amounts that were actually paid, not amounts that were paid and then some portion of which were charged back?

**A.**   That's correct.

**Q.**   And you indicated over the lunch break you went

back to your office here and reviewed some records from
these insurance companies?

**A.**    Correct.

**Q.**    And what did you find?

**A.**    From the summary spreadsheets provided from the
insurance companies, there's several -- on the chart
that was presented earlier, there are several zeros in
the commission columns, and most of those represent a
positive and a negative where the commission was paid
and then reversed.  And the summary spreadsheets
actually reference a commission charged.  There were
payments of commission and reversals by the insurance
companies as commission charge-backs.

**Q.**    So I want to show you what I'm going to mark as
Government Exhibit 34.

MR. VILKER:  If I could hand a copy up to the
clerk and to the Court.

THE CLERK:  34?

THE COURT:  Does opposing counsel have a copy?

MR. VILKER:  I'm giving them one now.  I guess I
would move Exhibit 34 full.

THE COURT:  Any objection?

MR. THOMPSON:  No, your Honor.

THE COURT:  Mr. Murphy?

MR. MURPHY:  No, your Honor.

THE COURT:   34 may be received full.

(Government's Exhibit 34 was admitted in full)

**Q.**   Agent Niro, is this a chart that was prepared by Pacific Life Insurance Company?

**A.**   Yes.

**Q.**   I want to turn your attention to the lines that say commissions and commission charge-backs and ask, what's your understanding of what a commission charge-back is?

**A.**   That is the reversal of the commission that was paid out.

**Q.**   So, for example, if we go down to, say, the bottom one, does this indicate that there was a commission paid on this particular annuity of $4,537.50?

**A.**   That's correct.

**Q.**   And that there was a charge-back of $1,662.50?

**A.**   That's correct.

**Q.**   Resulting in total commissions of $2,875?

**A.**   Yes.

**Q.**   So which number would you use in the chart to determine the total commissions?

**A.**   The total commissions column.

**Q.**   Meaning you did not include in the commissions the amounts that were charged back?

**A.**   That's correct.  In my formula, I would put both

figures in and come out with the total commissions
column.

**Q.**   Now, you were shown on cross-examination some
lines in the chart in which the numbers appeared to be
unusual in that either the payment out matched the
premiums in or the payment out was even less than the
account value.  Do you recall those questions?

**A.**   Yes.

**Q.**   And you indicated that it was your understanding
that there might have been something unusual that went
on with some of those annuities?

**A.**   Yes.

**Q.**   I want to show you going back to Exhibit 24, which
is E in the binder, and I'm going to turn to the
Jefferson National annuity you were asked about on
page 3 of this exhibit.  And, in particular, I'm
looking at the one that's the Duckworth Clancy/Lily
Ianiero -- excuse me.  And do you recall being asked
about this particular annuity, the Duckworth/Lily
Ianiero Jefferson National annuity?

        You may not recall it, but would you take my
word that this is one of the annuities you were asked
about this morning?

**A.**   I'm trying to see which one you're speaking of.
The five hundred thousand six hundred and ten, two

forty-five?

**Q.** Yes.

MR. THOMPSON: Judge, I have no objection to him asking about this one, but I don't think he has been asked about it.

MR. VILKER: I have it circled in my questions this is one of the annuities that was asked about.

THE COURT: I'm still confused as to which one we're focused on.

**Q.** I'm asking about this Duckworth Clancy/Lily Ianiero annuity with Jefferson National that was taken out on July 6th of 2007. Okay?

Do you see how it indicates that $500,000 was put in in premiums, there was a payment to the beneficiary of $610,000, and the value at the time of payment was $637,000?

**A.** Yes.

**Q.** And you were asked, in essence, this morning how could it be that the value -- the payment to the beneficiary was less than the value in the account. Do you recall?

**A.** Not specifically.

**Q.** Okay. And it ended up being a gain in this particular case of $66,475 to the insurance company. Does that refresh your recollection?

**A.**   Yes, that does.

**Q.**   So now I want to show you a document that hopefully will refresh your memory more, and I'm marking this as Exhibit 35.

          MR. VILKER:  If I could --

          THE COURT:  You may.

          MR. VILKER:  Now I would move Exhibit 35 full.

          THE COURT:  Any objection?

          MR. THOMPSON:  No, your Honor.

          THE COURT:  Mr. Murphy?

          MR. MURPHY:  No, your Honor.

          THE COURT:  35 may be received full.

          (Government's Exhibit 35 was admitted in full)

**Q.**   Exhibit 35 is from Jefferson National.  It's concerning this annuity with Duckworth Clancy and Lily Ianiero; and it indicates that there was a surrender charge, meaning the annuity was surrendered, and that $27,000 -- $27,482.31 was taken off the account value resulting in a net payment of $610,245.

**A.**   Yes.

**Q.**   Would that explain why the surrender value was -- why the payment to the beneficiary was less than the account value in that particular case?

**A.**   Yes, it would.

**Q.**   And if you go back to the chart that you prepared,

when you look at the Duckworth Clancy line, do you see
account value, payment to beneficiary of $610,000 and
value at the time of $637,728?

**A.**    Yes.

**Q.**    And that corresponds to the information provided
by Jefferson National?

**A.**    Yes, it does.

**Q.**    Now, I want to clarify one thing.  You indicated
on cross that Mr. Radhakrishnan did not receive any of
these proceeds?

**A.**    The proceeds ran through his account.

**Q.**    That's what I want you to clarify.  Some of these
annuities are in his name?

**A.**    That's correct.

**Q.**    But the payments, the payouts on these accounts
ran checks to him personally?

**A.**    That's correct.

**Q.**    So when you say that they ran through his
accounts, what do you mean?

**A.**    It was the basis for some of the money laundering
counts.  The money came from Mr. Caramadre's accounts
to Mr. Radhakrishnan's accounts, then off to an
investment house and then came back to
Mr. Radhakrishnan once there was a claim placed.

**Q.**    And then what did Mr. Radhakrishnan do with that

money once he received it back from the insurance
companies?

**A.** It was returned to Mr. Caramadre.

**Q.** So when you say that he didn't receive the
proceeds, are you saying -- testifying he wasn't the
ultimate recipient of the proceeds, but he did receive
in those instances checks from the insurance companies?

**A.** The money did flow through him, but I didn't see
him receiving a personal benefit.

**Q.** Other than his salary?

**A.** That's correct.

**Q.** Now, the last issue I want to talk to you about is
the bonus payments, and there were some questions being
asked and I think some confusion as to why the bonus
payments are included in the calculation.

And I'm putting back on the screen Exhibit 24.
And just as an example, I'm putting on the first
annuity on the third page, which is a June 20th, 2008,
annuity with ING, and the owner is Needwood Bluffs, and
the annuitant is John Gonsalves.

There's a million dollars in premiums, the
payment to the beneficiary is $1,029,621, the value at
the time of payment is $664,109, and the bonus payments
are $50,000.

Now, when you did this calculation, did you add

$50,000 that was bonus payments to the loss --

**A.**  Yes, they would have been.

**Q.**  Okay.  Now, Mr. Thompson was asking you that this bonus payment check -- it's not like the owner in this case, Needwood Bluffs, or anyone else actually got a check, here's your $50,000 bonus?

**A.**  No.  The amount in the account was increased by $50,000.

**Q.**  So when you're doing the calculation, when you see the value at the time of payment of being 664,109, what would that value at the time of payment have been if the bonus payments had not been made?

**A.**  It would be less whatever the 50,000 would have earned in the market or lost in the market.

**Q.**  So if you -- putting aside the issue that there might be some change in the value of that $50,000, but that $50,000, if the insurance company had not given that as a bonus in this particular case, the value at the time of payment would have actually been $614,109?

**A.**  I can't definitively say that.  The 50,000 would have gone into the market and lost money along with the other amount of the account at whatever percentage.

**Q.**  That 50,000 could have made money, could have lost money.  So it's not exact, is what I'm saying.

**A.**  That's correct.

**Q.**   But putting aside the issue of what may have happened to that $50,000 in that short period of time, the value at the time of payment is significantly higher because a bonus was put into the account?

**A.**   That's correct.

**Q.**   So if you're just subtracting the payment to the beneficiary minus the value at the time of payment, you would not be capturing the true loss because it would not capture the fact that the value at the time of the payment was artificially higher?

**A.**   That's correct.

**Q.**   Is that the reason why you included the bonus payments in these calculations?

**A.**   Yes.  The insurance companies put out $50,000 on that annuity.

MR. VILKER:  I think that's it for me, your Honor.  Nothing further.

THE COURT:  All right.  Any further questions by defense counsel?

MR. MURPHY:  One moment, please, Judge.

THE COURT:  All right.

(Pause)

### RECROSS-EXAMINATION

**BY MR. MURPHY:**

**Q.**   Agent Niro, this afternoon when I finished my

cross-examination, I had asked you to look on page 6 of Exhibit 24; and that was the owner of an annuity named Agostini Construction, and the annuitant was Norman Robichaud?

**A.** Yes.

**Q.** Did you have a chance over the lunch break to look at that?

**A.** I did.

**Q.** And was there a mistake with the calculation with that annuity?

**A.** No, there was not. The information that was on the summary spreadsheet that I created backed directly into the two spreadsheets provided by Security Benefit.

**Q.** So your testimony, then, is as it relates to -- and I'll put it up on the screen. As it relates to page 6 of Government's 24, the Security Benefit Insurance Company on 10/1/07 took an application from the owner, Agostini Construction, and received a premium of $1 million; correct?

**A.** Per the documents that I reviewed, yes.

**Q.** And your testimony is that the payment at the time of death of Norman Robichaud to the Agostini Construction Company was $1,065,033.60?

**A.** Again, per the document that I was provided by Security Benefit, yes.

**Q.** And it wasn't the other way around, the payment was not $696,000 to the owner, Agostini Construction?

**A.** Not per the documents that I looked at.

**Q.** And do you believe that to be a mistake or correct?

**A.** I have to rely on the document that was provided to me.

**Q.** Do you have those documents with you, sir?

**A.** I do.

MR. MURPHY: Judge, would it be possible that we could see that document maybe at the break?

MR. VILKER: I don't have any objection to him seeing it now.

THE COURT: If it's -- if it can be produced in a moment; otherwise, we'll get it at the break. Why don't we wait until the break, and we'll keep going and not have a disruption of shuffling around for documents.

**Q.** Now, on page 3, Mr. Vilker had just showed you page 3 of Government's Exhibit 24, an application date and the insurance company is ING. The annuitant is John Gonsalves. And it had a bonus payment in there, and Mr. Vilker just asked you a question about the value at time of payment. Do you recall that, sir?

**A.** Yes, sir.

**Q.** And, Agent Niro, the value at time of payment was $664,000, approximately $664,000?

**A.** Yes.

**Q.** And the bonus payment made by the insurance company, ING, into that account was how much?

**A.** $50,000.

**Q.** And do you know how much per year, what percentage per year the insurance company charges an owner of an annuity for a bonus payment?

**A.** I do not.

**Q.** Well, if it was 8 percent per year to the annuity, was that calculated in?

**A.** No, it wouldn't have been. Well, I can't definitively say that. The number was provided by the insurance company. I don't know how they arrived at it.

**Q.** So you don't know if that was calculated in?

**A.** I can't say so.

MR. MURPHY: Thank you.

MR. THOMPSON: I don't have anything else, your Honor.

THE COURT: All right, then. Agent, we need to get the document, if you could just take a moment.

(Pause)

THE COURT: All right, Agent. I see that you've

got a very large spreadsheet.  Mr. Murphy, why don't you approach.

　　　MR. MURPHY:  Judge, could I get that just to go over with my client quickly.  I promise to give it back, Judge.

　　　THE COURT:  Oh, okay.

　　　(Defendant confers with counsel)

　　　THE COURT:  Agent, why don't you take your seat.

**BY MR. MURPHY**:

**Q.**　Agent, you have just provided me with a document, and this is the document over the lunch hour that you were able to check on the Agostini Construction Company as the owner of a policy with the annuitant Norman Robichaud?

**A.**　Yes.

**Q.**　And your information is that the payment to the beneficiary was $1,065,000?

**A.**　I can't see it on the screen.  If you could go to it.  Yes.

**Q.**　And you were able to underline that in yellow? You can see it in yellow?

**A.**　Yes.

**Q.**　Where my line is?

**A.**　Yes.

**Q.**　And that number was compiled by you based on

information provided to you by the insurance company?

**A.** What you're looking at is a spreadsheet put together by the insurance company that I relied upon to create my spreadsheet.

**Q.** And this sheet, was this all from the same insurance company?

**A.** Yes. That's what they provided. It came in a several-page format, and I taped it together to make one large document so I could follow it; but that is the compliance from Security Benefit.

**Q.** This came to you from ING? I'm sorry. Security?

**A.** Security Benefit.

**Q.** And you did not see an actual check, did you, from Security Benefit to Agostini Construction in the amount of $1,065,000?

**A.** I don't recall. It would have been over a year ago if I looked at it.

**Q.** Do you think you looked at it?

**A.** I have no recollection.

**Q.** And chances are you probably wouldn't have; correct?

**A.** I have no recollection. There are several checks that I did see, both clearing from Mr. Caramadre's account and coming from Security Benefit; but I don't have a specific recollection of this one.

MR. MURPHY:  Thank you.

MR. THOMPSON:  Can I just have one moment with the exhibit?

THE COURT:  Yes.

MR. THOMPSON:  Can I just ask a couple quick questions, please, your Honor.

THE COURT:  You may.

<u>**RECROSS-EXAMINATION**</u>

<u>BY MR. THOMPSON</u>:

**Q.**  Agent, the spreadsheet that you provided you testified was documentation that you got from Security Benefit and that you taped it, you taped the pieces of paper together?

**A.**  That's correct.

**Q.**  Did the -- did they actually send you these pieces of paper or copies of these pieces of paper?

**A.**  Yes, they were provided during discovery, and I think Mr. Vilker referenced one of them this morning.

**Q.**  And is this the general format that most of the, or all of the insurance companies provided you with the information?

**A.**  Not in that size.  Some of them fit to one page; but this one, it was formatted in a manner that I had to tape it together like that to follow it.

**Q.**  And I apologize.  I don't mean the format of being

eight taped-together pages versus one. I mean the format of how the chart is laid out with the owners over on the left and then a column for annuitant, a column for beneficiary, et cetera.

A.   Similar, yes.

Q.   Is that how you requested the information or how the Government requested that information?

A.   We requested most of the fields that are on there, and they provided it in their own format.

Q.   And so essentially, as you said, when you were going over the loss amounts on Security Benefit annuity contracts, you used their numbers as they provided them on this document?

A.   That's correct.

Q.   And that's generally how you proceeded as to each of the insurance companies?

A.   That's correct, with some reliance on the actual documents that I had from the subpoenaed records.

        MR. THOMPSON:  Okay.  Thank you.  That's all, your Honor.

        THE COURT:  All right.  Mr. Vilker, do you have any redirect?

        MR. THOMPSON:  Actually, before that, your Honor, I'd like to move this into evidence.  I don't know what number we're at for Defendants.

THE COURT: Actually, I was going to bring to Mr. Murphy's attention you referenced, Mr. Murphy, Exhibits I think C, D and E but didn't present them.

MR. MURPHY: Yes, your Honor, I did not present them.

THE COURT: Can we mark them as having been marked.

MR. MURPHY: Yes. They've been marked with a pen, but they have not. So I'll get them back to the clerk.

THE COURT: Okay. Ms. Saucier doesn't have them.

MR. MURPHY: Yes, your Honor. I have them somewhere here.

THE COURT: So this exhibit would be --

MR. THOMPSON: The clerk indicates it would be G, your Honor.

THE COURT: Any objection?

MR. VILKER: No, your Honor.

THE COURT: Exhibit G full.

(Defendant's Exhibit G was admitted in full)

MR. THOMPSON: And, your Honor, if someone wanted to substitute somehow one page, I certainly wouldn't have any objection to that; but this is the format we have right now.

THE COURT: I don't know if one page would be readable.

All right. Mr. Vilker, do you have any follow-up?

MR. VILKER: Very, very briefly, your Honor.

## FURTHER REDIRECT EXAMINATION

**BY MR. VILKER:**

**Q.** Agent Niro, you were asked a little while ago about the fee that the insurance companies charged for the bonus payment. Do you recall that, the bonus -- deposit bonus?

**A.** Yes.

**Q.** I want to show you what's already been marked as Exhibit 30, which is K, and this is a document from Midland National that goes to the different fees. And I believe you were previously asked if it was 8 percent that these companies charged for that particular rider, and I just wanted to confirm that that's not correct, that's point 8 percent that they charged for the rider.

**A.** That's correct.

**Q.** And these fees are included in the calculation, whatever they collected from that point 8 percent is included in the calculation you did?

**A.** Yes, it would be.

**Q.** Now, on this big master Security Benefit chart

that you just provided, you indicated that you received similar charts from other companies?

**A.** Yes.

**Q.** Were you able to confirm independently many of the fields on the chart by looking at underlying documents such as checks that were written to the insurance companies, checks that were written back, many of the documents were you able to look at and get the -- confirm that the numbers in the chart were correct?

**A.** Wherever they were available, I checked.

**Q.** But some of the numbers weren't available because the insurance companies had to tell you what they were, such as the account value at the time of the payment and the amount of fees?

**A.** That's correct.

**Q.** And for those documents, you had to rely on what the insurance companies were providing?

**A.** That's correct.

    MR. VILKER: I have nothing else, your Honor.

    THE COURT: All right. Any follow up?

    MR. THOMPSON: Could I just ask one?

    THE COURT: Yes.

<u>FURTHER RECROSS-EXAMINATION</u>

<u>BY MR. THOMPSON</u>:

**Q.** Agent, what percentage would you say of all the

numbers on these charts you were able to independently verify by looking at the individual checks?

A.   I could not provide a percentage.  The chart was created well over a year ago.

MR. THOMPSON:  Thank you.

THE COURT:  Any more questions?

MR. VILKER:  No, your Honor.

THE COURT:  All right.  Agent Niro, thank you very much.  You're excused.

Mr. Vilker, do you have any other witnesses or evidence to present?

MR. VILKER:  No, your Honor.

THE COURT:  All right.  It shifts to the Defendant.  Mr. Murphy?

MR. MURPHY:  Yes, Judge, thank you.  Judge, I've had an opportunity to confer with my co-counsel, Mr. Olen, over the lunch break, and we would ask -- we've been provided with some additional documents today from the Government.  If we could have a period sometime next week to come back to argue.

THE COURT:  I think that probably makes sense. In fact, I was concerned that there certainly is some complexity here, actually a good deal of complexity here, and I need to complete the Report and Recommendation in advance of the sentencing hearing.

My goal would be to get it to Judge Smith a week before. And, obviously, you're going to want me to be thinking hard about what I'm going to do and not do something quickly.

So I think what would make sense, you know, I think it makes a lot of sense, your suggestion, Mr. Murphy, that counsel take a little time to digest what's gone into evidence over the past two days and that we have argument not immediately but after a short passage of time.

On the other hand, I want to keep the short passage of time as tight as I can so that I'm going to have adequate time to get something done.

So with that in mind, Ms. Saucier, how do we look for next week?

How does that work, counsel, October 15 at 2:00 p.m.?

Do we have the balance of the afternoon?

THE CLERK: Yes, the entire afternoon.

MR. VILKER: That works well with me, your Honor.

MR. MURPHY: That's fine with us, Judge.

MR. THOMPSON: That's fine.

THE COURT: Okay. We will have argument, then, on the issues pertaining to the calculation of the

restitution amount on October 15 at 2:00 p.m.; and to the extent that any side wants to submit anything in advance, I'm not going to set a briefing schedule because there really isn't enough time and I don't expect that either the Government or Defendants will take precious time to write a brief, but if you wish to submit something, I don't preclude you from doing so.

Anything else that we need to deal with?

MR. MURPHY:  Judge, I do have those exhibits.

THE COURT:  Oh, good.  Okay.

MR. VILKER:  Nothing further from the Government, your Honor.

MR. THOMPSON:  Judge, as part of my filings and the memorandum regarding restitution, I had attached two charts prepared by myself, and I would just ask that -- as far as I can tell, they're part of the record already; but if they need to be marked as exhibits, I don't think they do, but --

THE COURT:  I don't think they need to be because they were part of your prehearing submission.

MR. THOMPSON:  Thank you.

THE COURT:  All right.  Anything further?

MR. VILKER:  No, your Honor.

THE COURT:  All right.  Court will be in recess.

(Adjourned)

C E R T I F I C A T I O N


        I, Karen M. Wischnowsky, RPR-RMR-CRR, do

hereby certify that the foregoing pages are a true and

accurate transcription of my stenographic notes in the

above-entitled case.




        /s/ Karen M. Wischnowsky
        _____

        Karen M. Wischnowsky, RPR-RMR-CRR




        January 8, 2014
        _____

        Date