IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

```
* * * * * * * * * * * * * *   CRIMINAL ACTION
UNITED STATES OF AMERICA  *   11-186-S
                          *
VS.                       *   APRIL 19, 2012
                          *
JOSEPH CARAMADRE and      *
RAYMOUR RADHAKRISHNAN     *   PROVIDENCE, RI
* * * * * * * * * * * * * *
```

HEARD BEFORE THE HONORABLE WILLIAM E. SMITH
DISTRICT JUDGE
(Motion to Suppress Rule 15 Depositions)

**APPEARANCES**:

| | |
|---|---|
| FOR THE GOVERNMENT: | LEE VILKER, AUSA<br>and JOHN P. McADAMS, AUSA<br>U.S. Attorney's Office<br>50 Kennedy Plaza<br>Providence, RI  02903 |
| FOR THE DEFENDANT<br>Joseph Caramadre: | JAMES T. McCORMICK, ESQ.<br>McKenna & McCormick<br>128 Dorrance St.<br>Suite 330<br>Providence, RI  02903 |
| | MICHAEL J. LEPIZZERA, ESQ.<br>Lepizzera & Laprocina<br>117 Metro Center Blvd.<br>Suite 2001<br>Warwick, RI  02886 |
| FOR THE DEFENDANT<br>Raymour Radhakrishnan: | Olin Thompson, Esq.<br>Federal Defender's Office<br>10 Weybosset St.<br>Suite 300<br>Providence, RI  02903 |
| Court Reporter: | Anne M. Clayton, RPR<br>One Exchange Terrace<br>Providence, RI  02903 |

Proceeding reported and produced by computer-aided
stenography

1    19 APRIL 2012 -- 2:00 P.M.

2           THE COURT:  Good afternoon.  This is the matter

3    of the United States versus Caramadre and the United

4    States versus Radhakrishnan.

5           We're here on Defendants motions to suppress.

6    Let's begin by having counsel identify themselves for

7    the record, please.

8           MR. McADAMS:  Good afternoon, your Honor.  John

9    McAdams and Lee Vilker on behalf of the United States.

10          MR. McCORMICK:  James McCormick for

11   Joseph Caramadre, your Honor.

12          MR. LEPIZZERA:  Michael Lepizzera on behalf of

13   Joseph Caramadre.

14          MR. THOMPSON:  Olin Thompson for

15   Mr. Radhakrishnan, your Honor.

16          And your Honor, Mr. Radhakrishnan is not here

17   present today, but we're certainly willing to waive his

18   presence and I believe the Court is aware of the

19   circumstances.

20          THE COURT:  Yes, I am.  Is he on his way or is

21   he just not going to be here?

22          MR. THOMPSON:  He was not planning on coming and

23   that was due to a miscommunication.  If given a brief

24   moment, I could have him try to come down, but it would

25   take 45 minutes or an hour so I left it with him that I

1    was expecting he would not be needed here today.

2           THE COURT:  Okay.  That's fine.  And you're

3    waiving his right to be present, right?

4           MR. THOMPSON:  Yes.

5           THE COURT:  Okay.  So I don't think there's any

6    necessity for him to be here.

7           Let's get started.  Who is going to be arguing?

8           MR. McCORMICK:  Thank you, your Honor.

9           For the record, Mr. Caramadre is here, your

10   Honor.

11          THE COURT:  All right.  Thank you.

12          MR. McCORMICK:  Good afternoon, Judge.

13          Your Honor is certainly well familiar with these

14   issues, having issued the order which granted authority

15   for the depositions.  We're in a radically different

16   position today.  At the time the motion for depositions

17   was heard, the issue, based on my review of the papers,

18   your Honor, and talking to the attorneys, I was not a

19   participant in the case at that time, but it was

20   presented by the Government in the context of these

21   depositions being necessary for the prosecution of a

22   crime which would not be prosecuted if it were not for

23   these -- the testimony of these witnesses who were on

24   death's doorstep and because of the necessity of these

25   witnesses for the prosecution, these depositions were

1    imperative.  And that was the foundation on which the

2    Government based its application.

3         In my memorandum, I refer to numerous passages

4    from their papers and from their argument where the

5    Government talked about averting a travesty of justice.

6         THE COURT:  Let's talk about that first because,

7    you correct me if I'm wrong, but the way I'm kind of

8    breaking all of this down is that unless I agree with

9    you that there's some ground on which to revisit the

10   order I issued in 2009, then this is really an 804 and

11   a Crawford analysis that we have to engage in today.

12   But if there's reason to revisit the order in 2009

13   because it was premised on incorrect information or the

14   exceptional circumstances that I discuss in the order

15   weren't really exceptional, then that changes

16   everything.

17        MR. McCORMICK:  That is my argument.  That is my

18   argument, your Honor.

19        THE COURT:  Before you zero in on that, there

20   were two aspects to the order in 2009.  One was the

21   statutory or the analysis of Rule 15.  I understand

22   you've incorporated all of the prior arguments of the

23   Defendants on that position.  We're not going to spend

24   any time on that today, I don't think, because I'm not

25   going to go back and change my mind about how I

1    analyzed the statute.

2         MR. McCORMICK:  I didn't plan to do that, your

3    Honor.  I did rest on what would have been stated

4    before.

5         THE COURT:  All right.  You preserved that

6    argument for appeal.

7         You really are attacking the underlying premise

8    of the exceptional circumstances, right?

9         MR. McCORMICK:  Yes.

10        THE COURT:  And if I agree with you, then there

11   are issues; and if I don't, then we're into an 804

12   Crawford analysis.

13        MR. McCORMICK:  Correct.

14        THE COURT:  Okay.  Good.

15        MR. McCORMICK:  This is a -- the statute says in

16   exceptional circumstances or in the interest of

17   justice.  Taking that concept, I believe the Court has

18   the authority to revisit its decision that it

19   previously made granting the taking of the depositions

20   based on the situation as we now know it now that a

21   couple of years has gone by, there's been an indictment

22   issued and there's been discovery provided to us.

23        It's my position that the indictment and the

24   later discovery have indicated that the necessity that

25   was claimed by the Government was at that time

1    erroneous.  I don't mean that in any derogatory sense.

2    The Government just made a claim that in hindsight

3    certainly wasn't borne out.  The claim that these

4    depositions were needed to bring the prosecution, the

5    Government said in their papers the case would have

6    been in all ways unprosecutable, I think was the word

7    they used.

8         Your Honor in your decision indicated that you

9    didn't want to run the risk that a person could get

10   away with a crime he is alleged to have committed

11   simply because the persons at issue were selected

12   because they were terminal and they were going to pass

13   away.

14        So I looked at that premise and saw that in

15   hindsight it was wrong.

16        THE COURT:  Why should we be looking at it in

17   hindsight?  Now, it would be one thing if the

18   Government thought these people were going to die and

19   wanted to take their depositions to preserve trial

20   testimony and then they didn't die.  Obviously, you

21   wouldn't need the depositions then.  You'd just call

22   them as live witnesses if they're alive at the time of

23   trial.  So in that sense, in hindsight they were wrong

24   but it doesn't matter because they're going to be live

25   witnesses.  But if the exigency turned out to be

1    somewhat different than they thought it was back in

2    2009, I'm not sure how that matters.  If we know that

3    the circumstances are a little bit different in 2012

4    than they were in 2009 but they still died, why does

5    that matter?  Isn't it what they knew in 2009?

6         MR. McCORMICK:  No, your Honor.  In 2009, what

7    they knew was important for the getting of the

8    deposition itself, the taking of the deposition.  We're

9    past that point now.  Now we're at the point where the

10   admission of the depositions into evidence, the

11   suitability for introduction as evidence is what's in

12   issue.  That was also referred to in your Honor's

13   decision saying that the remedy for any problem

14   developing would be a motion to suppress.

15        Well, that's where we're at right now.  That

16   was, I think, the second selling point the Government

17   made at the time they were taking the depositions was

18   that, Look, let's take these things -- not to

19   paraphrase, but let's take them first before they die

20   and we can deal with the admissibility evidence later.

21        In other words, it was almost like a deferral of

22   getting to the real meaty issue of whether these things

23   could come into evidence.  The point being let's take

24   the depositions and we'll sort this thing out later on

25   because by then the people presumably will have died

1    and we won't have them.  This way at least the issue is

2    preserved.

3         Well, right now the issue, I think, has been

4    preserved.  We're at the point where we're deciding

5    whether these depositions were, in fact, actually

6    necessary for the prosecution of the case as the

7    Government says they were, because that was part of

8    your Honor's decision, with due respect me telling your

9    Honor what your decision said; but in the interest of

10   justice, if that premise is false, that premise turns

11   out to be incorrect, then these depositions just

12   shouldn't go into evidence.  That's the way that

13   problem is fixed.  That's the way that wrong is

14   righted.  The depositions were taken.  Now, we look at

15   the indictment, we look at the multiplicity of counts,

16   the multiplicity of alleged victims, the multiplicity

17   of there's two Defendants and three unindicted

18   co-conspirators.  And when you compare that indictment

19   to what was -- what the Government was claiming at the

20   time that they needed these six witnesses or ten

21   witnesses to make their case, you can see that whatever

22   these witnesses said, and we have their depositions,

23   doesn't alter that indictment one bit.

24        In other words, the Government could still have

25   gotten their indictment and they could still have

1    gotten the evidence that they have.  There are some 40,

2    I believe, 35 or 40 individuals that the Government is

3    claiming were the annuitants or the bondholders in

4    these allegedly fraudulent transactions.  If you take

5    out the deponents, the case is still the same.  The

6    deponents are not necessary.  The Government's

7    anticipation of their importance in hindsight is wrong.

8    Now we know they're not necessary.  The Government has

9    a very detailed indictment containing all kinds of

10   allegations with numerous other alleged victims.  The

11   deponents --

12        THE COURT:  Isn't some of the testimony, though,

13   doesn't it go to the question of whether the annuitants

14   were, for example, told that their Social Security

15   number was going to be used for a certain purpose, or

16   they were going to be used for opening an account, that

17   sort of thing?  Isn't that at the heart of both the

18   fraud and identity theft counts?

19        MR. McCORMICK:  That evidence would probably be

20   material, but it's cumulative at this point given the

21   scope of the indictment.  The evidence that these

22   deponents would offer would be cumulative at best.  The

23   Government has indicated they have other evidence

24   pertaining to these other individuals.  There are three

25   hundred some odd grand jury transcripts from testimony

1    given either by other annuitants or family members of

2    annuitants who were present when these alleged

3    representations were made or other individuals who may

4    have been present.

5         In other words, there's other evidence the

6    Government is alluding to which makes the evidence from

7    the deponents at best cumulative; and for that reason,

8    because it would not be necessary, I feel that it would

9    be in the interest of justice not to allow these

10   depositions to be introduced into evidence.

11        THE COURT:  The Government is going to say that

12   what you're really trying to do is to dilute the

13   evidence and make it much less powerful because

14   nothing's more powerful in a case of identity theft or

15   fraud allegations of this nature than the direct

16   testimony of the victims.  And they're going to say why

17   shouldn't we have the right to put on testimony of the

18   victims of the crime.  That's the best evidence of the

19   crime.

20        There are some exceptions.  For example,

21   Mr. Pitocco might -- there's nothing in the indictment

22   about Mr. Pitocco so we can kind of take him out of

23   that discussion.  But for those annuitants who are in

24   the indictment, isn't it the best evidence?

25        MR. McCORMICK:  When you say "best evidence,"

1    your Honor, it depends on I guess what side that you're

2    looking at it from.  Given their precarious health and

3    sympathetic position, first of all I think it would be

4    unduly inflammatory to hear the testimony of people who

5    are on death's doorstep.

6         Second, you say "best evidence," I don't think

7    that's the -- maybe it is or maybe it isn't.  It

8    probably shouldn't be because I think looking at a lot

9    of the testimony of these witnesses, their primary

10   response was that they just didn't hear or didn't know

11   or had a failure of memory.  A lot of times the failure

12   of memory will translate into a defendant not informing

13   us of something.  Did you know that someone was going

14   to make a lot of money on this?  No, I didn't know

15   that.

16        Well, if their memory failed and they said that,

17   it can be taken as, Well, the Defendant never told us

18   that.

19        So I think these deponents have testimony to

20   offer, but I think without it the indictment and the

21   proof of the case, basically, would stay the same.  I

22   think the depositions should not have been taken,

23   because the way it was obtained, because the premise

24   was, I think, faulty.  I think not having this

25   testimony does not work a prejudice on the Government.

1    The Government has their other evidence.  I think

2    having it does work a prejudice on the Defendants

3    because there was some -- I forget who it was.  I think

4    it was Mr. M, I don't know if we can say the names in

5    open court, but who was apparently making remarks

6    that -- you know, would be certainly stricken.

7         There's a lot of things that -- other issues

8    we'll have to raise later on, but I believe the

9    depositions were not necessary, they're not necessary

10   to the Government.  There's a prejudicial aspect to

11   them.

12        In other words, I feel that a jury seeing a tape

13   of a terminally-ill person is just -- it will have an

14   import more than it should.  So I think that tips the

15   balance in favor of not admitting them.

16        The remedy is, I believe, suppression of them,

17   and I think it's a remedy that should be applied in

18   this case, your Honor.

19        Now, the other aspect, I alluded to the

20   indictment.  There was some notice given to the

21   targets, who weren't defendants yet, some notice given

22   that these would be fraud cases, either mail or wire

23   fraud involving representations, false representations

24   to the annuitants that were then used to obtain a

25   monetary benefit from certain insurance companies.

1    There was a reference to the using of identity

2    information.  But other than that, there wasn't really

3    anything -- let's put it this way, if that were an

4    indictment, it would fail, obviously.

5          THE COURT:  But the key is if we're talking here

6    about -- what you're really driving at is the fairness

7    and the Sixth Amendment -- the vindication of the Sixth

8    Amendment right to counsel before indictment.

9          MR. McCORMICK:  Yes.

10         THE COURT:  So what is the adequacy of notice to

11   the Defendants of what the charges are, right?

12         So, okay, if that's what we're going to zero in

13   on now, then let's do that.  Are you done now talking

14   about the inadequacy of the premise for the deposition?

15         MR. McCORMICK:  Yes.

16         THE COURT:  So now we're talking about the

17   adequacy of notice.  You tell me if you disagree with

18   me.  This is really a Crawford analysis, isn't it?

19   Isn't it a question of whether you were able to --

20   whether the Defendants and their counsel were able to

21   construct a productive cross-examination, meaningful

22   cross-examination?

23         MR. McCORMICK:  Yes.

24         THE COURT:  Isn't that the question?  So it's

25   not -- I mean, that's the framework, isn't it?  Maybe

1    it's not.

2          MR. McCORMICK:  For that issue, I think it is.

3    That's right.

4          THE COURT:  All right.  So in order to have a

5    meaningful cross-examination, it would seem that the

6    Defendants are entitled to, at a minimum, to know what

7    it is that the Government is looking at charging them

8    with.  Now, you might say, well, they ought to have the

9    indictment, but we're past that point.

10         So did the Government inform the Defendants that

11   it was investigating all of the counts that are in the

12   indictment?

13         MR. McCORMICK:  No.

14         THE COURT:  There's fraud.

15         MR. McCORMICK:  Sorry.  Go ahead.

16         THE COURT:  There's fraud.  There's identity

17   theft.  There's conspiracy.  Does that cover it?

18         MR. McCORMICK:  There's actually a money

19   laundering and a witness tampering count, which I don't

20   think -- I'm not sure those are impacted by the

21   depositions or not, but there are multiple counts.

22   When you saw "fraud," fraud can mean a lot of things

23   without some kind of factual specificity.  It's not

24   just fraud.  The Government was saying this was a fraud

25   upon the measuring lives, the terminally-ill people.

1           When you read the indictment, you can see that

2     the fraud is alleged to be more far-ranging than that

3     in terms of the representations, who they were made to.

4     The Government is alleging that representations were

5     made to the securities firms that received these

6     applications or the issuing companies, the companies

7     that may have issued the accounts, which were used to

8     purchase the bonds or the annuity companies.

9           THE COURT:  That's all true, and I understand

10    that from your briefs.  But what do these depositions

11    have to do with those counts of fraud?  These

12    depositions have to do with fraud on the annuitants,

13    don't they?

14          MR. McCORMICK:  Well, that's it.  Without

15    knowing the nature of the charges beforehand, it's

16    impossible for a questioner to really anticipate what

17    issues these might relate to.  When questioning an

18    elderly or a sick person about what one of the

19    Defendants may have said to him when he filled out his

20    application, if you were to understand or if it had

21    been explained that one of the charges would be the

22    conveyance of some false information from this

23    interview to another party, say an agent or a

24    securities broker, that type of information would be

25    important in formulating a cross-examining strategy.

1        THE COURT:  I haven't read every word of every

2    deposition, but I've read a lot of excerpts of these

3    depositions, direct and cross-examination, and I have a

4    hard time understanding how any of these annuitants

5    would have had any information that could have been

6    gleaned from cross-examination that would in any way

7    relate to the fraud that is allegedly perpetrated upon

8    the other parties in this case.  These folks, many of

9    them barely knew anything about their own transactions

10   with Mr. Radhakrishnan.

11        MR. McCORMICK:  Judge, it's almost impossible to

12   try to anticipate how additional questions could have

13   been structured.  Say if you had interview notes from

14   one of the brokers, there could have been inquiry made

15   of a deponent, did you have a conversation with such

16   and such a broker at such and such a time.  The results

17   of those questions could have affected the ultimate

18   credibility of the deponent.  It could have related to

19   other counts that were brought against the Defendants.

20   I'm not trying to play dumb or be dumb, but at this

21   point it's not really possible to formulate an exact

22   defense strategy which would encompass the whole scope

23   of the case.

24        THE COURT:  I know you haven't reviewed every

25   page and item of discovery, but you've had months here

1    and have reviewed thousands of pages of the

2    Government's discovery.

3         Can you give me just one example, without

4    revealing a defense strategy, one example of some

5    question that you think you would have asked of one of

6    these deponents that relates to the fraud counts that

7    are directed at the other parties, not the annuitants?

8    Just some example based on something that's in the

9    discovery that if we had known this, we would have

10   asked that.  Can you just point to anything?

11        MR. McCORMICK:  I can't do it as I stand here,

12   Judge.  It's a painstaking process to do that.  I

13   pointed out some examples of witness testimony with

14   respect to Mr. PG and it involves painstakingly combing

15   through and I just can't stand here and do it.  But I

16   also can't stand here and articulate --

17        THE COURT:  That's the one where there were

18   payments made, that contradictory information from a

19   sister-in-law or brother- in-law, is that what you're

20   referring to?

21        MR. McCORMICK:  I don't think that was it,

22   Judge.  I refer to it in one of my memoranda, but

23   that's part of the issue.  I can't stand here and say

24   what the defense -- the theory of defense is, nor would

25   I feel comfortable doing that right now.  It's the sort

1   of thing that you don't really disclose if you don't

2   have to, and certainly not until you've actually had a

3   chance to formulate it.

4       So I agree it makes it difficult for your Honor

5   to assess this if I can't stand here and say, Oh, we

6   would have asked this question of this witness or we

7   would have asked this question of that witness.  I just

8   can't stand here and do that.  What I can say is that

9   had the questioning attorneys had the indictment before

10  they did the depositions, they could have certainly

11  used those indictments to tailor areas where they would

12  question some of the deponents as to other contacts

13  they may have had, as to other papers they may have

14  filled out, as to other persons who might have

15  information.  In other words, to do the job that they

16  should have been able to do had these deposition been

17  taken after the indictment.

18      THE COURT:  I want to -- I'm actually trying to

19  drive at something here with these questions, but let

20  me try to clear something up.

21      Can we refer to deponents' names in open court?

22      MR. McADAMS:  Your Honor, I don't see why not.

23  Their names are in the indictment.  It's publicly --

24  they're in the pleadings and --

25      THE COURT:  They're in the indictment.  All your

1      pleadings are public, right?

2           MR. McADAMS:  Yes, your Honor.

3           THE COURT:  Nothing's under seal.  All right.

4      So let's just refer to them by name.

5           In your reply brief, you argue -- you do give an

6      example I thought of what you were getting at with this

7      business and that's with respect to Edwin Rodriguez.

8      And there you talk about at the time of the deposition,

9      the Government had not yet interviewed Rodriguez's

10     brother, sister-in-law, Amy Rodriguez or Joan Horton,

11     the hospice social worker that referred Rodriguez to

12     Caramadre.

13          And then you suggest here that because of the

14     information learned from these various interviews with

15     these folks that the information they provided was

16     contrary to the deposition of Edwin Rodriguez, right?

17          MR. McCORMICK:  Yes.  That's correct, your

18     Honor.

19          THE COURT:  So I take this to mean that you're

20     making the argument that had this information been

21     known prior to these depositions, then an effective

22     cross-examiner would have been able to use this

23     information to construct some impeaching evidence with

24     Mr. Rodriguez, right?

25          MR. McCORMICK:  That's an example of that,

1      correct.

2            THE COURT:  Right.  Okay.  So isn't the

3      solution, isn't a potential solution to that to -- if I

4      were to allow the deposition of Rodriguez to be played

5      in open court and given the fact that the witness is

6      unavailable, I have the authority to structure the

7      trial testimony any way that I think is appropriate and

8      in the interest of justice.

9            So if I believed that that's a good argument,

10     and I'm not saying I would do this but I'm just using

11     this as an example, if I thought that this was a good

12     point, that if you or Mr. Flanders had had the

13     opportunity to have that information prior to the

14     deposition, clearly they would have used it in the

15     cross-examination, couldn't I allow the playing of the

16     deposition and then allow you to put on these

17     individuals or perhaps by stipulation put on

18     information directly on the heels of that deposition

19     testimony that points to this inconsistent testimony so

20     that it's presented during the trial in the same order

21     that essentially that it would have been had he been a

22     live witness at trial.  I can do that, can't I?

23           MR. McCORMICK:  That can certainly be done, your

24     Honor.  The problem is doing this after the fact does

25     not make up for what you could have done in cross at

1    the time.  Cross-examination is a dynamic process.

2    Once you confront a witness with some inconsistencies,

3    sometimes that leads to other things.

4         THE COURT:  That's not what Crawford allows for.

5    Crawford talks about a meaningful cross-examination.

6    Not a perfect cross-examination, not an ideal

7    cross-examination, not the exact cross-examination that

8    would have occurred if the witness was not unavailable

9    but actually was live on the stand, but an effective or

10    meaningful cross-examination.  And I'm talking about

11    going one step beyond that and giving you a little more

12    latitude at trial to fill in a gap that you've

13    effectively pointed to.

14         MR. McCORMICK:  What's an effective cross to

15    pass constitutional muster, I don't know where that

16    fits in a case like this.  I mean, the attorneys who

17    questioned the witnesses and had a chance to direct

18    their focus on the issues that were raised on direct

19    examination and had a chance to ask the normal type of

20    impeaching questions that you could ask any witness at

21    any time, to me, that is not -- I don't consider that

22    sort of purely reactive type of questioning to be

23    effective cross.  Effective cross is when you can

24    exploit a witness to obtain information that is maybe

25    favorable to your defense or you can obtain other

1   information that can be used to impeach him even

2   further.

3        There's more to a cross than just reacting to

4   points made on direct and then weakening the witness's

5   recollection or his memory or pointing out some bias.

6   That can be done with any witness in any case to a

7   certain degree.  I think more should be required in

8   this case given the way these depositions were

9   obtained.  I think to say that we're going to obtain

10  depositions premised on necessity and then you're going

11  to get a chance to cross-examine based on only what we

12  have now whereas if the deposition were put off until

13  after the indictment, it could have been a whole

14  different scenario, your Honor, but I can't stand here

15  now and look back and predict how things would have

16  turned out.

17       I mean, frankly, I shouldn't really have to.  If

18  we're at the point where we're trying to deconstruct

19  this to see how much harm was done to Defendants, I

20  think the answer is just not to let these things in at

21  all if they're cumulative at best.  So that's my basic

22  position on trying to analyze and look back

23  retroactively on the deposition and see how things

24  would have been done differently.

25       As I stand here now, I can't do more than what

1    we've put in the memorandum, maybe with a more

2    painstaking analysis after all the depositions that

3    could be possible but that would have been something we

4    would have been doing at trial had this case run its

5    normal course, your Honor.  And had we had that 72-page

6    indictment to work from and all the thousands of pages

7    of discovery, it could have been a very different cross

8    but I can't stand here now and tell the Court how.  And

9    it's not our fault for that.  It's just the way the

10   situation played out given the way the depositions were

11   obtained.

12        So I think the easiest way to view the effect of

13   the indictment and whether that was sufficient or not

14   is just to read it and look at what was told to us

15   first and look at what type of notice is being given

16   now.  And then when you look at that, you look at all

17   the thousands of pages of witness testimony and you try

18   to plug that in to some overall theory of defense.  And

19   I just can't do it as I stand here, Judge, and I

20   understand that.  I don't want that to work to my

21   detriment but there's just no way to undertake that

22   task at the present moment.  I feel the depositions

23   shouldn't go in at all but --

24        THE COURT:  I understand that, but I want to ask

25   you about a couple other arguments you make in your

1      papers just so I get your response to a couple of

2      things.

3             What is -- there is this claim that the

4      Defendants were not on notice about the nature of the

5      charges that would be in the indictment, but

6      Mr. Vilker's statements both in writing, and

7      Mr. McAdams as well, and orally here in Court seem to

8      go into great deal about the nature of the -- what the

9      Government was alleging was a fraudulent scheme.  They

10     seem to allude pretty clearly to the use of the

11     annuitants, and I don't know how much they alluded to

12     it, I want you to respond to this, to the identity

13     theft aspect of what came about in the indictment.  And

14     then the third thing is conspiracy.  You mentioned that

15     there's a suggestion that how could they know about the

16     allegation of conspiracy, but what's curious to me with

17     that argument is that in the depositions you had an

18     agreement that all of the attorneys' objections would

19     be for everyone, right?

20            MR. McCORMICK:  Yes, your Honor.

21            THE COURT:  And I speak of you, but it was

22     Mr. Flanders at the time.

23            MR. McCORMICK:  Agreed.  Yes.

24            THE COURT:  And in the depositions, Mr. Traini

25     made some specific Petrozziello objections, which goes

1    right to the conspiracy count.  So obviously, if his

2    objections are imputed to all Defendants, then the

3    Defendants or the targets, I should say, were thinking

4    about conspiracy.  So how can you say that the

5    Defendants had no idea that conspiracy was on the table

6    as part of the potential indictment?

7            MR. McCORMICK:  First of all, I don't believe

8    the Government alluded to conspiracy as one of the type

9    of charges.  Certainly a forward-thinking lawyer can

10   see that there's more than one defendant and say, well,

11   maybe there's some allegation that there were some acts

12   of some defendants in concert.  Nothing was spelled out

13   in terms of who conspired with whom or there was a

14   specification of the time of conspiracy, I believe,

15   from July of '07 to August of 2010.  But other than

16   that, there was no -- there was nothing put on at the

17   time the depositions were at issue, there was nothing

18   said about conspiracy or what counts or what types of

19   conspiracy or who was conspiring with whom.

20           In other words, some of this you can probably --

21   probably could have been figured out, but I don't think

22   that's sufficient to put people on notice.  And again,

23   I go back to the indictment.  If the indictment had

24   been produced prior to the depositions, the conspiracy

25   question would have been cleared up a lot because it

1      would have specified --

2              THE COURT:  Let me ask you this.  Two parts.

3      One, how does any of the testimony that was elicited

4      from the deponents relate to the conspiracy counts?

5      Second, if it does even arguably relate to the

6      conspiracy count, couldn't I cure that with an

7      instruction to the jury that the testimony is taken,

8      maybe taken only for let's say the fraud counts or

9      identity theft counts addressed directly to those

10     defendants?

11             MR. McCORMICK:  Possibly.  But it doesn't

12     retroactively make up for the lack of ability to

13     cross-examine with the conspiracy counts in mind.  For

14     example, many of these deponents had dealings

15     exclusively -- they say they had dealings exclusive

16     with Raymour, the Co-Defendant.  Had the specifications

17     of conspiracy been laid out as they were in the

18     indictment, there could have been further questioning

19     as to specific areas, specific paragraphs in the

20     indictment, which talk about some of the specifics of

21     it.  In other words, the conspiracy incorporated

22     certain of the other allegations in the indictment.

23     And it certainly in that sense provided some

24     information to the Defendants about who is the

25     conspirators and what they're conspiring for.

1          Some of this maybe could have been anticipated

2     at the time but not nearly enough to be effective on

3     cross, your Honor.  Whenever you see more than one

4     defendant you think of conspiracy.  But in this case,

5     defendants were in very -- seemed like they were in

6     very different roles, and it's not the sort of thing

7     where you could certainly foresee enough of the

8     specifics without an indictment to really have an

9     effective cross-examination.

10          So the Court can, I think, has the authority

11     certainly to try to correct problems by allowing other

12     evidence or restricting it.  But my point right now is

13     we shouldn't have to get to that point where the Court

14     is piece-mealing these depositions.  I think everyone

15     is in a position where it's not really fair for the

16     Defendant to be in.  We're trying to put Band-Aids all

17     over this case right now when really it shouldn't even

18     be before us on that.  So that's my answer on the

19     conspiracy.

20          Now, as far as -- I think you referred to money

21     laundering.  We talked about that.  And I believe on

22     the conspiracy, we just didn't have enough information

23     at the time, not nearly the information provided in the

24     indictment.  So I think that deprived us of our right

25     to cross-examine on that with those points in mind,

1        your Honor.

2              THE COURT:  Okay.

3              MR. McCORMICK:  One of the other points we

4        raised, this would go back to the necessity argument,

5        again.  I hate to backtrack but I'm looking at points I

6        had on my list here.  The Government, not to, again,

7        not to besmirch them, was overly eager in representing

8        the necessity of these depositions.  There was a

9        reference to the number of persons that comprised the

10       pool of I guess potential witnesses.  The Government

11       made the representation that there were 112 victims and

12       only 9 have survived.

13             We provided to the Court some attachments to the

14       memorandum indicating that it was we that disclosed to

15       the Government the identities of 156 individuals, 112

16       of those received the $2,000 initial payment only and

17       that was a payment where the person responded or

18       replied to an ad and they received $2,000 without any

19       conditions, without any obligation.  And some

20       individuals decided after receiving that $2,000 that

21       they didn't want to do anything further for any

22       other -- to receive any further funds.  They just

23       received the $2,000.  That was the 112.  And I don't

24       believe the Government is alleging they were the

25       victims because their names didn't appear on any

1    annuity or bond.

2            From number 45 to 156, that's some forty -- give

3    or take here.  There's approximately 40 individuals

4    that are described in the indictment as so-called

5    victims.  These are individuals who did go beyond the

6    $2,000 initial payment and seek to offer their

7    identities or their signatures to get a further

8    payment.  The numbers are probably immaterial.  Nine

9    persons alive.  There's still nine persons alive.  But

10   this is an example, I think, of the Government having a

11   false impression themselves of how necessary these

12   depositions really were.  It's not like there's 9

13   people alive out of 112.  It's 9 people alive out of

14   40.  It's still only nine people but I think my point

15   is that these depositions weren't necessary.

16           Could I have a moment, please, your Honor?

17           THE COURT:  Sure.

18           (Pause.)

19           MR. McCORMICK:  That's all I have to say, your

20   Honor.  The memorandum was drafted by myself and

21   Mr. Lepizzera.  I would ask that he be allowed to speak

22   also.

23           THE COURT:  Sure.  That's fine.

24           Mr. Lepizzera, do you want to add anything?

25           MR. LEPIZZERA:  Just a couple of things, your

1    Honor.

2              THE COURT:  All right.

3              MR. LEPIZZERA:  It's an unusual time right now

4    where we're looking back and we're trying to figure out

5    what questions would we ask.  I don't really think that

6    should be the analysis.  I think the analysis should be

7    that we had no idea what the scope of the indictment

8    was going to be.  I don't think there's any doubt about

9    it.  I think the Government can come up with

10   correspondence back in 2009 where Mr. Vilker and

11   Mr. McAdams were bantering out words of wire fraud,

12   mail fraud, maybe even identity theft, your Honor.  And

13   we'll give them that.

14             I guess the real question for Mr. Caramadre is

15   how large of an indictment is this going to be, how

16   many victims were there going to be, how many counts

17   were there going to be.

18             In this case here, I counted at least victims

19   when I hitched them to a particular substantive count,

20   I've got about 44 victims, alleged victims.

21   Mr. Caramadre, the evidence is going to show, met with

22   approximately four of them.  So that leaves about 40

23   people where Mr. Radhakrishnan met and that's what the

24   evidence is going to show.

25             So we get into the situation of it's not only

1    put a witness on the stand and having an opportunity to

2    cross-examine because an opportunity to cross-examine

3    isn't just pointing a finger and being able to ask any

4    question challenging a witness's testimony.  It's

5    looking at the indictment itself, analyzing it and

6    saying before I cross-examine this witness, what is my

7    defense to this case?  And I don't think Mr. Flanders

8    or Mr. Pine or anyone else back then knew there were

9    going to be 66 counts with 44 victims.

10             THE COURT:  That's all true, but here's the

11   thing.  It's absolutely true that the decisions you

12   make about whether to cross-examine at all and how many

13   questions to ask, what areas to go into are made in a

14   trial setting and are always made in light of

15   everything that's happened in the trial and may vary

16   depending on how things are proceeding.  I grant you

17   that.  But you haven't lost with respect to these

18   witnesses very much of that decision-making power.

19             So for example, if I allow the Government to put

20   these depositions on at trial, you can make a decision

21   at the very last moment to do no cross-examination,

22   that is, to not show the cross-examination of the

23   deponents if that's what you want to do.  You have that

24   discretion.  Even though we may have gone through the

25   videotapes, you've designated your anticipated

1   cross-examination, you can decide at the last minute,

2   stand up and say I don't want that cross-examination

3   shown.  I'd grant that.  I would not force you to show

4   a cross-examination that during the midst of trial you

5   decided you didn't want to have shown.  Just as if a

6   witness goes on the stand, you thought you were going

7   to cross-examine him and you change your mind at the

8   last minute.  So that option is always there.

9          MR. LEPIZZERA:  I'm glad you pointed that out

10  because I was a little concerned about that, that the

11  deposition has taken place and we're now stuck with the

12  entire transcript.

13         THE COURT:  I don't think you should be stuck

14  with that.  I think you have the right to designate the

15  cross-examination but you also have the right to do no

16  cross-examination.  So you have that option.  You have

17  the option to show the cross-examination that you

18  designate in advance subject to my rulings on various

19  objections, and, as I alluded to with my question to

20  Mr. McCormick, I would probably give you some latitude

21  with respect to putting on evidence out of order if you

22  could really show me that there was some area that you

23  didn't get to go into that you later became aware of by

24  virtue of the discovery the Government gives you

25  between now and trial and you could really show me that

1    you would have gone into this area, I might allow you

2    to actually put some evidence on to supplement.

3          So I don't think there's much that is lost.  The

4    only thing that potentially is lost is what

5    Mr. McCormick couldn't answer, and I don't think you

6    can either, which is to tell me that there's some big

7    area of cross-examination that we would have gone into

8    had we known then what we know today.  And nobody can

9    do that.

10         MR. LEPIZZERA:  The difficulty is, and we did

11   get early discovery in this case because it's a monster

12   of a case, as I put in the brief.  This is an

13   aggressive trial schedule and we're going forward in

14   November.  I always thought with this type of evidence

15   it could be a 2013 or 2014 case, but Mr. Caramadre has

16   requested a speedy trial and he's getting one, and

17   we'll be ready in November.

18         So we're in a difficult position obviously to

19   stand here when we're still going through all the

20   evidence.  I can quantify it.  I probably touched maybe

21   35 percent of it.  So I'm still going through that

22   stuff.  So it's kind of difficult for me to say we'd do

23   this or we'd do this differently.

24         THE COURT:  But you understand what I'm saying

25   about what is potentially lost in terms of the

1    cross-examination is pretty narrow.

2         MR. LEPIZZERA:  Yes.

3         THE COURT:  All right.  Anything else you want

4    to talk about?

5         MR. LEPIZZERA:  No.

6         THE COURT:  Okay.  Mr. Thompson?

7         MR. THOMPSON:  I'll be brief as well, your

8    Honor.  Thank you.

9         Your Honor, you made a comment about

10   Mr. Traini's Petrozziello objection, and I hadn't

11   thought of that issue and I think it's an excellent

12   question given the fact that there had been agreement

13   that an objection for one Defendant is an objection for

14   all.

15        What I would say to that is I think that type of

16   objection, the Petrozziello objection is necessarily

17   only defendant-specific because you're asking for an

18   assessment of whether a statement made in furtherance

19   of a conspiracy was actually made in furtherance of it

20   and if there, in fact, was a conspiracy.

21        So when Mr. Traini makes that objection, he has

22   to be making it only as regarded in this case his

23   client, who, as your Honor is aware, ended up not being

24   charged in the indictment at all so it may be that the

25   Government thought that that objection made sense.  It

1    could be that Mr. Traini had been in discussions

2    separately with the Government about how his client may

3    have been liable and maybe they had spoken about

4    conspiracy.  But the fact of the matter is as far as

5    the Defendants that remain standing at this time, to my

6    knowledge, and I wasn't involved in the case at this

7    time, but to my knowledge there was no discussion that

8    conspiracy may have been one of the counts or one of

9    the bases for --

10        THE COURT:  How could any of the deponents'

11   testimony have anything to do with the conspiracy

12   counts against your client or even Mr. Caramadre?

13        MR. THOMPSON:  There was certainly some

14   indication, I believe, in at least one of the

15   deponents' depositions that at least one other

16   individual was present at the deposition on behalf of

17   Mr. Caramadre's company.  I believe Mr. Craddock was

18   present for part of it.  So certainly there would be

19   some issue there with whether that could be related to

20   a conspiracy or not, whether -- this is just an example

21   off of the top of my head but whether Mr. Caramadre

22   could have been sending someone along with these

23   meetings and had knowledge about it.  That's certainly

24   an area that both Mr. Pine and Mr. Flanders could have

25   examined had they been aware that this could be an

1    allegation in the case.

2         THE COURT:  If there was anything in the

3    depositions that pertained to the conspiracy charges

4    against Mr. Radhakrishnan or Mr. Caramadre, couldn't I

5    just give the jury an instruction that says these

6    deponents' testimony may only be considered with

7    respect to the fraud and identity counts against the

8    two Defendants?

9         MR. THOMPSON:  You certainly could give an

10   instruction, your Honor, but given the nature of this

11   case that it's anticipated to be two to three months at

12   a minimum that the jury is going to be weighing all

13   this evidence and all these counts, your Honor really

14   has a Herculean task instructing the jury to begin

15   with.  And I think the jury is going to have a very

16   hard time distinguishing between counts and

17   distinguishing what's going on.  And I think this idea

18   that your Honor would instruct them that this piece of

19   evidence is only for this count, that's going to get

20   lost at the end of two or three months of direct

21   examination.

22        So frankly, I think, no, I don't think that

23   would be satisfactory, because, frankly, I just don't

24   think the jury is going to be able to understand that

25   fine a point.

1          Your Honor remarked earlier that the direct

2    testimony of the victim, there's nothing more powerful

3    than that.  There's nothing more powerful for the

4    prosecution to put that on as part of their case.  And

5    I would counter that by pointing out that that's true

6    and there's, therefore, no more valuable a defense tool

7    than what's guaranteed by the Sixth Amendment, which is

8    cross-examination and confrontation.  Allowing these

9    depositions in essentially allows the prosecution the

10   most powerful tool available to them but limits the

11   Defendant's ability to actually confront them and

12   cross-examine them.

13         You've asked several times what I think is the

14   appropriate question, what other questions would have

15   been asked.  And I'd suggest to the Court that this is

16   not an issue of just what questions would be asked, but

17   there's whole areas of cross-examination that were not

18   known to the defense and were certainly not explored by

19   the defense.

20         In Mr. Caramadre's filings in the response,

21   Mr. McCormick points out a number of those.  One is the

22   deposition of Mr. Rodriguez that you've already spoken

23   about.  That's the issue of whether his family members

24   were aware of these checks and whether, therefore,

25   Mr. Rodriguez would have been impeached with that

1    information.  And he certainly would have.

2          Another example is Mr. Wiley's deposition about

3    which the defense was unaware at the time but is now

4    aware based on discovery that Mr. Wiley had had

5    interactions with Hospice Care and conversations with

6    Hospice Care about the nature of these investment

7    programs, the fact that the first $2,000 was purely a

8    charity and the fact that there were other

9    opportunities beyond that.  A number of these

10   deponents, I believe, had those kinds of conversations

11   with Hospice Care.

12         Since the depositions, we've come to learn of

13   conversations these deponents had with healthcare

14   workers, with members of their own families.  We found

15   out what their families told to investigators over

16   time.  And these are all things that would have been

17   used and all areas that would have been examined to try

18   to find out these deponents' understanding of what

19   happened while Mr. Radhakrishnan was in the room.

20         So specifically, if Mr. Wiley, for example, had

21   had conversations with a Hospice Care worker before

22   meeting with Mr. Radhakrishnan, that would certainly be

23   relevant.  It may have refreshed Mr. Wiley's memory as

24   to, Oh, yeah, the hospice worker told me that this

25   could be about opening accounts.

1          THE COURT:  I don't remember if it was in

2     Wiley's deposition, but there were a number of

3     questions about the involvement of hospice social

4     workers and even the hospice attorney of the deponent.

5          MR. THOMPSON:  That's true, your Honor.  That's

6     absolutely true.  It's my understanding that the

7     defense attorneys on the case at the time of these

8     depositions were not in possession of specific reports

9     of investigation relating to those hospice workers.  So

10    while the defense attorneys were able to ask did you

11    speak to a hospice attorney or who referred you to this

12    program, the defense was not aware of the other end of

13    those conversations having been able to read the

14    investigations which involved what the Hospice Care

15    workers had to say, what did they tell Mr. Wiley.  And

16    that could have, as Mr. McCormick points out, that

17    could have led to all sorts of things, including the

18    possibility that each of these deponents said, Hey, you

19    know what, that's right.  I was reminded beforehand

20    and, yeah, Mr. Radhakrishnan did say something about a

21    brokerage account or something like that.

22          So I would suggest that allowing the Government

23    their most powerful tool, while at the same time

24    limiting the Defendant's most powerful tool, your Honor

25    could give an instruction, your Honor could allow

1      testimony out of order.  And certainly any time hearsay

2      comes in, the defense is entitled to try to

3      cross-examine that hearsay with whatever means they

4      would have if the person was live.  But, again, it's

5      simply not going to be as effective as if we were

6      allowed to actually confront the live witness in front

7      of the jury of these facts.

8           THE COURT:  That may be true but I just don't

9      see that that's the standard.  That's not what Rule

10     804(b)(1) or Crawford required.  Neither requires the

11     most effective cross-examination or the best

12     cross-examination or the identical cross-examination.

13     They just don't require that.

14          MR. THOMPSON:  But they require at least a true

15     opportunity at a cross-examination.

16          THE COURT:  Let's see what the First Circuit

17     says about 804(b)(1) in Bartelho.  I think this is

18     cited in the briefs.  Quoting the **United States versus**

19     **Lombard**:  "The party against whom the prior testimony

20     is offered must have had a similar, not necessarily an

21     identical motive to develop testimony in the prior

22     proceeding."

23          I mean, that's pretty broad.

24          MR. THOMPSON:  It is.  The motive prong is not

25     particularly what I'm discussing at this point in time.

1    I think your Honor by your order of -- by your order

2    allowing the depositions, you instructed the Government

3    to provide all Jencks and all Brady material as if this

4    was trial testimony, all material available to the

5    Government at that time.  And I think the reason you

6    did that had to have been in order to give the defense

7    the best opportunity to cross-examine that was

8    available at the time.  Because, obviously, if the

9    Government had provided absolutely nothing and the

10   Defendant had to cross-examine these people cold,

11   knowing nothing about the case, that would not have

12   been a full opportunity to cross-examine.

13         I think what the Defendants are putting forth

14   before you now, your Honor, is that there is so much

15   additional information that the issue should not be

16   what Jencks or Brady was available to the Defendants at

17   the day of the depositions but what additional Jencks

18   and Brady had been made available to them since then.

19   What would have been the cross-examination if we were

20   able to use that material?  And I think in this case,

21   for each of these deponents, it's substantially

22   different.

23         So the Government is allowed to present this

24   testimony based only on that limited cross-examination,

25   but the defense is not allowed the full chance to

1  demonstrate to the jury weaknesses based on the

2  additional material.

3          Thank you, your Honor.

4          THE COURT:  Okay.  Thank you.

5          All right.  Mr. McAdams?

6          MR. McADAMS:  Thank you, your Honor.  Your

7  Honor, this testimony is critical testimony.  It goes

8  right to the heart of the case.  It is the only direct

9  evidence by the victims of the identity fraud, the

10  terminally-ill people themselves who were involved in

11  this scheme.  Trials are about truth seeking.  The

12  whole purpose of a trial is so that the finder of fact,

13  the jury can decide whether or not the Defendant is

14  guilty of the crime.  And that's what -- and Rules of

15  Evidence are designed to let the jury hear the

16  evidence.  And this is material relevant evidence.  And

17  the defense has not offered any legitimate reason to

18  keep this evidence out.

19          THE COURT:  But there's also the Sixth

20  Amendment, right?

21          MR. McADAMS:  Yes, your Honor, and the Sixth

22  Amendment was well protected.  As your Honor knows,

23  that was the very reason that we brought the Rule 15

24  motion in the first instance, in order to protect the

25  Defendant's Sixth Amendment rights.  Your Honor's own

1    order quoted that the Government was doing this to

2    protect Defendants or targets Sixth Amendment rights if

3    by force, I think was the exact language used in the

4    order.

5         So the very purpose of this entire procedure was

6    it was highly unusual where you're actually going to

7    know that a witness is not going to be available.  It's

8    just not something that is normal.  Usually we're all

9    sitting here, everybody thought the witness would be

10   available and we're trying to go back and use the

11   various tests to determine whether or not the

12   cross-examination had a similar motive and opportunity,

13   whether it was a suppression hearing or some civil

14   trial or some other related deposition.

15        Here we all knew these witnesses are not going

16   to be available.  We knew that because Mr. Caramadre

17   and Mr. Radhakrishnan went out and sought people that

18   they expected to die and made misrepresentations to

19   them so that they could obtain money from these

20   financial insurance companies.  Of all the things that

21   weren't known, that was the one thing that was known at

22   the time.

23        THE COURT:  But in order to vindicate the Sixth

24   Amendment rights that are at play here, there has to be

25   notice.  You'd agree with that.

1      MR. McADAMS:  I agree, your Honor, completely.

2      THE COURT:  So what is the notice to the

3  Defendants that identity theft was part of the likely

4  counts in the indictment?  And beyond that, conspiracy.

5  Most of what I recall and what I've read about

6  Mr. Vilker's and your representations is that this was

7  a fraud case.

8      MR. McADAMS:  Yes, your Honor.  I'll take them

9  one at a time, and I'll start with the identity theft,

10  your Honor.

11      The Government, myself and Mr. Vilker,

12  specifically met with Mr. Flanders and Mr. Connolly who

13  were representing both Mr. Caramadre and

14  Mr. Radhakrishnan at the time prior to us ever filing

15  the Rule 15 motion.  At that point, we were actually

16  negotiating possibly on a voluntary basis both sides

17  going out and doing some depositions.  We specifically

18  in that meeting told them that the charges under

19  consideration were wire or mail fraud, identity theft

20  and aggravated identity theft.  I noted that in the

21  Government's response to the Defendants' memorandum and

22  that's simply what happened.

23      They were raising issues about whether or not

24  any representations that were made to terminally-ill

25  people that might have been false would be material.

1   They were raising this sort of divergence issue with

2   us.  We in response to that specifically sent them an

3   e-mail citing of a First Circuit case, **United States v.**

4   **Christopher**, that addressed that issue of materiality

5   and that's included as an exhibit in our response as

6   well.  In that e-mail it doesn't say "identity theft,"

7   but that was in the context of that meeting that we had

8   with Mr. Flanders and Mr. Connolly.

9          In addition, I mean, the basic -- and I cite in

10  our response to the original motion to suppress several

11  instances both in our written pleadings to the Court

12  and in the oral argument on September 17th, 2009, in

13  which we summarized the theory of the case.  And in all

14  of those, I believe, we basically said that the theory

15  of the case is that the Defendants, Mr. Caramadre,

16  Mr. Radhakrishnan, the other then parties at the time,

17  made material misrepresentations to terminally-ill

18  people in order to get their identity information and

19  use that to perpetrate a fraud on these financial

20  services companies.

21         Although that's note, quote unquote, the word

22  "identity theft," that's the heart of what aggravated

23  identity theft is, use of identity information in

24  furtherance of a specified crime.

25         So I think it was clear both because we directly

1    told them but also because of the context of what was

2    going on that that was part of the allegations that we

3    were making.

4         And with respect to the conspiracy, I think it

5    really is one of these -- it was so blatantly obvious

6    to everybody that we were talking about a conspiracy

7    that we didn't need to say it.  I mean, you're talking

8    about two, at the time four targets who we were saying

9    engaged in this scheme to defraud people together.  A

10   conspiracy is an agreement to commit a crime.  That's

11   what it is.

12        So we're all professionals.  Mr. Flanders,

13   Mr. Pine, Mr. Traini, these are some of the best

14   defense attorneys in Rhode Island.  I don't think that

15   anyone thought we need to tell them, Oh, by the way,

16   we're thinking about a conspiracy here.  That's the

17   reason for the Petrozziello objection.  I don't know if

18   Mr. Thompson is attempting to waive that objection that

19   we'd all agreed applied to everybody or not but we all

20   understood that Mr. Radhakrishnan's statements to each

21   of these terminally-ill people when he met with them

22   were in the Government's view co-conspirator statements

23   being made in furtherance of the conspiracy.  That's

24   why he's making that objection.  And that's why it goes

25   to the heart of the case.  The representations that are

1   being made are proof of the conspiracy.

2   Mr. Radhakrishnan is going in to meet with these

3   terminally-ill people and telling them, "Mr. Caramadre

4   sent me."

5       THE COURT:  It wouldn't be Mr. Thompson's role

6   to waive Petrozziello objections on behalf of the other

7   Defendants, right?  Because it's his client who is

8   making the statement.  It's the others who would have

9   the objection, right?  Mr. Caramadre and other targets

10  would be saying, Wait a second.

11      MR. McADAMS:  Well, yes.  But, I mean, for

12  example, Mr. Mizzoni, all the representations were made

13  by Mr. Caramadre.  So everybody understood rather than

14  have a chorus of objections throughout these

15  depositions that we would just agree that one objection

16  was for all.  We certainly never took the position

17  that, you know, that somehow Petrozziello is an

18  exception to that rule.

19      THE COURT:  All right.  Let me focus you on a

20  couple of other issues.  What do you say to the

21  suggestion that I made that if it turns out that some

22  gaps in the cross-examination can be demonstrated by

23  defense counsel prior to trial that they should be

24  allowed to structure the presentation of additional

25  evidence out of order that would have been developed in

1    the cross-examination so that the jury can have the

2    opportunity to hear that when the deposition is played

3    and not two months later?

4         MR. McADAMS:  I certainly don't disagree the

5    Court has the authority to do that.  I think probably

6    what we'd like to do in that circumstance is get an

7    attorney proffer as to what they anticipate that was

8    going to be.  With respect to the example that was

9    cited, the Rodriguez testimony, I anticipate the

10   Government will call the sister-in-law and the brother,

11   and so some of these situations may not need to get

12   there, so to speak.

13        THE COURT:  All right.  I want to focus you in

14   on the deposition testimony of Mr. Pitocco.  I have a

15   couple of concerns about that testimony.  One is

16   Pitocco is not mentioned in the indictment so I have,

17   at the threshold, I have a hard time understanding how

18   his testimony is really relevant to any of the counts

19   of the indictment.

20        Now, I expect you'll say, well, it's evidence of

21   the course of conduct and the way that they dealt with

22   these individuals and so forth.  But it seems to me

23   that the Pitocco deposition reveals a serious question

24   about his competency at the time that he was deposed

25   and would create all sorts of potential -- I think the

1    Defendants would have a pretty legitimate argument that

2    there's a 403 problem with that testimony.

3         It would also create all sorts of the need to

4    bring in people to, like the attorneys in the civil

5    case, to make clear that he did sign the document when

6    he says he didn't sign it.  I mean, are you really

7    pressing the Pitocco deposition?

8         MR. McADAMS:  I understand the concern, your

9    Honor.  We have not at this point made a determination

10   whether we would seek to introduce the Pitocco

11   deposition at trial or not because we're going through

12   that same analysis ourselves as to whether it is

13   worthwhile or not.  Essentially, the defense files a

14   motion to suppress all of the testimony.  They didn't

15   distinguish, at least in their initial pleadings, they

16   didn't distinguish between any of the depositions and

17   so we're responding to that almost as a whole.  So we

18   didn't divide that up.  But it may be that we don't

19   press the Pitocco deposition.

20        THE COURT:  There's also the business about the

21   Bradshaw deposition, which the Defendants claim you

22   don't want to put it on because it's favorable to the

23   Defendant, but I take it your position is they can use

24   it if they want to use it?

25        MR. McADAMS:  Well, they can use it if they want

1    to use it.  I certainly don't agree that it's favorable

2    to the defense.  Mr. Bradshaw testified that he had had

3    no idea that his name was on any of these accounts, but

4    I think what he also testified was basically that he

5    really didn't pay attention to anything that was being

6    said to him.  So it doesn't really add all that much if

7    he didn't listen to what was being said.  So that's

8    really the reason that we're not putting it on, not

9    because he in any way testified favorably to the

10    defense.  I think at best he's a wash.  And that was

11    the reason that we had basically come to the conclusion

12    we wouldn't push Mr. Bradshaw.

13        THE COURT:  But you don't disagree that they can

14    use the deposition if they wish?

15        MR. McADAMS:  No.  They have the right to call

16    their own witnesses.

17        THE COURT:  All right.  Anything else you want

18    to add?

19        MR. McADAMS:  Unless the Court has some specific

20    questions, I'm certainly prepared to argue all the

21    points I raised in my papers.  I won't belabor them.

22    These are critical witnesses.  They go to the heart of

23    the case.  They are the only witnesses that have direct

24    relevant testimony.  They're the only witnesses that

25    can say yes or no I gave my consent to be used as a

1    measuring life in this scheme that Mr. Caramadre and

2    Mr. Radhakrishnan executed, and so they're not

3    cumulative.  And even if they were cumulative, your

4    Honor, although this issue wasn't really raised, this

5    sort of 403 argument really wasn't raised in any of the

6    briefs that the Defendants filed, the Government has

7    the burden of proof.  We have to prove the case beyond

8    a reasonable doubt.  There's all sorts of case law out

9    there that shows that 403 is a rule of admissibility,

10   not exclusion, and that because of the Government's

11   heavy burden the Court gives leeway with respect to

12   putting on its best case, its strongest case even at

13   the risk of cumulativeness.

14        So that's really all I had to say on that point,

15   but I don't think they are cumulative but even if they

16   were, certainly we'd be requesting that the Court give

17   a little bit of leeway with respect to that.

18        Thank you.

19        THE COURT:  All right.  Thank you, Mr. McAdams.

20        Do you want to reply to anything, anyone on the

21   defense side?

22        MR. McCORMICK:  No, your Honor.

23        MR. THOMPSON:  No, thank you, your Honor.

24        THE COURT:  All right.  Thank you.

25        I'm going to take this under advisement.  I'm

1    going to give you an order.  I think I can get it done

2    in fairly short order, giving you my rulings on the

3    motion and any guidelines I may add to that.  And it's

4    possible, I'm not saying I'm going to do this, but it's

5    possible that some of the rulings may put off to a

6    future time some aspects of the admissibility of some

7    pieces.  But I'll give you an order and we'll go from

8    there.  Shouldn't take too long.

9           Okay?  Thank you.

10          (Court concluded at 3:25 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

C E R T I F I C A T I O N

   I, Anne M. Clayton, RPR, do hereby certify that the foregoing pages are a true and accurate transcription of my stenographic notes in the above-entitled case.

      /s/ Anne M. Clayton

     ——————————————————————————————————————

       Anne M. Clayton, RPR

       February 12, 2014

     ——————————————————————————————————————

         Date