IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND


* * * * * * * * * * * * *   CRIMINAL ACTION
UNITED STATES OF AMERICA   *   11-186-S
                           *
VS.                        *   DECEMBER 16, 2013
                           *
JOSEPH CARAMADRE, et al    *   PROVIDENCE, RI
* * * * * * * * * * * * *


HEARD BEFORE THE HONORABLE WILLIAM E. SMITH

CHIEF JUDGE

(Sentencing)


**APPEARANCES**:

FOR THE GOVERNMENT:        LEE VILKER, AUSA
                           and JOHN P. McADAMS, AUSA
                           U.S. Attorney's Office
                           50 Kennedy Plaza
                           Providence, RI  02903

FOR THE DEFENDANT
Joseph Caramadre:          WILLIAM J. MURPHY, ESQ.
                           Murphy & Fay, LLP
                           127 Dorrance St.
                           2nd Floor
                           Providence, RI  02903

                           RANDY OLEN, ESQ.
                           Olen Law Office
                           478 Broadway
                           Providence, RI  02909

Court Reporter:            Anne M. Clayton, RPR
                           One Exchange Terrace
                           Providence, RI  02903

Proceeding reported and produced by computer-aided
stenography

1    16 DECEMBER 2013 -- 9:30 A.M.

2         THE COURT:  Good morning.  This is the matter of

3    the United States versus Joseph Caramadre.  We're here

4    for sentencing this morning.

5         Let's begin by having counsel identify

6    themselves for the record, please.

7         MR. VILKER:  Good morning, your Honor.  Lee

8    Vilker and John McAdams.

9         MR. MURPHY:  Good morning, your Honor.  William

10   J. Murphy on behalf of Mr. Caramadre.

11        MR. OLEN:  Good morning, your Honor.  Randy Olen

12   on behalf of Mr. Caramadre.

13        THE COURT:  All right.  Thank you.

14        We'll begin as usual with the Presentence

15   Investigation Report which has been prepared by the

16   Office of Probation in this matter.

17        And Mr. Murphy and Mr. Olen, if you can just

18   confirm that you've had the opportunity to review the

19   presentence report with your client and you've been

20   able to answer all of his questions.

21        MR. MURPHY:  Judge, we've had several

22   opportunities to go over the presentence report with

23   Mr. Caramadre, and we have filed an objection to it.

24        THE COURT:  Right.  We will get to the objection

25   in a moment.

1       As a preliminary matter before we get to your

2  objection, this is an unusual case for a number of

3  reasons.  One of them is that the restitution

4  computation is so complicated.  We have a Report and

5  Recommendation from Magistrate Judge Sullivan, as well

6  as a supplemental Report and Recommendation, and you

7  filed an objection to the restitution calculation.

8       It occurred to me as I was reviewing all the

9  materials in preparation for today that it might make

10  sense to defer the restitution order to a later time in

11  order to fully consider your objections, and I believe

12  the statute allows the restitution order to be issued

13  within 90 days of the imposition of sentence.  Is that

14  correct?  I believe that's correct.

15       MR. MURPHY:  Judge, that is correct.  We would

16  have no objection to delaying that portion until

17  sometime after the sentencing today.

18       THE COURT:  And I don't think the Government has

19  actually responded to their objection.

20       MR. VILKER:  No, your Honor.  We're relying on

21  the Magistrate Judge's opinion on this.

22       THE COURT:  All right.  I just wanted to make

23  sure that you had an opportunity at least to respond to

24  it.

25       All right.  Then, I think we'll do that.  We'll

1    defer the restitution portion of the order until a

2    later time and then I'll issue a written order

3    responding to the Defendant's objections, but I will

4    note just as part of this proceeding that we have a

5    very extensive and thorough Report and Recommendation

6    from the Judge, Judge Sullivan.

7         So let's move to your objections to the

8    presentence report and deal with those.

9         MR. MURPHY:  Thank you, Judge.

10        Judge, on behalf of Mr. Caramadre, the defense

11   has submitted some objections.  Judge, we will not take

12   a long period of time to go over them as they have been

13   developed in our objection and also we've received a

14   response from the Government and from Probation.

15        Basically, Judge, the objections to the

16   presentence report are contained in a letter that

17   Mr. Olen had submitted to the Court; and in essence,

18   Judge, namely, the base offense level for the two

19   counts to which Mr. Caramadre pled last November to

20   Count IX and Count XXXIII, the base offense level of a

21   7, which carries with it a criminal history category 1,

22   which Mr. Caramadre does have, having no prior

23   offenses, a period of imprisonment or a sentence of

24   zero to six months.

25        When the specific offense characteristics along

1    with the adjustments are made, his criminal history

2    category, obviously, stays at 1 and the total offense

3    level goes from a 7 to a 51.

4         Judge, the objections that were put in by the

5    Defendant are simply that we object to the points that

6    Mr. Caramadre received for obstruction of justice.  I

7    know that Mr. Vilker on behalf of the Government had

8    submitted an answer to that where he's looking at two

9    reasons why there was obstruction of justice.  We

10   disagree and say that there should be no obstruction of

11   justice.

12        The amount of loss, which is the big one, the

13   specific offense characteristic under sentencing

14   guidelines Section 2B1.1(b)(10)(L) because the amount

15   of loss up to this point that has been focused on

16   Mr. Caramadre is greater than $20 million and less than

17   $50 million that specific offense characteristic adds

18   22 points to Mr. Caramadre's base offense level.  We

19   object to that.  We will take that up at a later date.

20        Also, your Honor, is the four-level increase.

21   We say that the statement of facts to which was

22   combined with the plea agreement that there are 22

23   victims and two insurance companies, not the over 50

24   victims.  The Government and Probation has responded to

25   that.

1       Second is the misrepresentation.  We are arguing

2   that he did not say that he was a Catholic charity,

3   rather that there was an advertisement in the Rhode

4   Island Catholic.  He did come out, he did give money to

5   the measuring lives, to their families, so we objected

6   to paragraph 18; and we've also requested, your Honor,

7   both to the objections to the presentence report and

8   our motion for a variance is based on Mr. Caramadre's

9   combination of health conditions that he should receive

10   a variance to the sentence.

11       So those were our objections.

12       THE COURT:  We'll take up the variance argument

13   in connection with your argument with respect to the

14   appropriate sentence.

15       You have a couple of other objections in the

16   letter.  I want to make sure that either you preserve

17   these or you're waiving them.

18       MR. MURPHY:  We are not waiving them, your

19   Honor.

20       THE COURT:  Paragraph 20 and paragraph 21.

21       MR. MURPHY:  Yes, your Honor.  As to 21, we

22   object to the two-level increase, Mr. Caramadre

23   deriving over a million dollars from one or more

24   financial institutions because we feel that

25   Mr. Caramadre, it has not been established that he has

1     personally received all of that money.

2          And Judge, the other objection would be in part

3     is simply from a base offense level 7 to a total

4     offense level of 51, we feel that every conceivable

5     offense characteristic, some of them were almost added

6     twice to Mr. Caramadre.  Again, for sentencing

7     purposes, we realize that there is a binding plea

8     agreement and we'll be arguing off of that.  I don't

9     want to say it's moot, your Honor, but those are our

10    large objections.

11         THE COURT:  Okay.  Thank you.

12         MR. MURPHY:  Thank you.

13         THE COURT:  Mr. Vilker?

14         MR. VILKER:  Your Honor, first I just wanted to

15    clarify that the guideline level as determined by the

16    Probation Department is a level 57 in this case, not 51

17    as I believe Mr. Murphy inadvertently indicated.

18         We believe all of the enhancements that the

19    Probation Department found were properly included.  The

20    big enhancement is 22 levels for the amount of loss,

21    that's between 20 million and 50 million.  The amount

22    of loss that was determined by Judge Sullivan, and I

23    understand your Honor is pushing the restitution aspect

24    of this case for a later decision, but that amount of

25    loss is 46 million, which is far above the 20 million

1    that qualifies for the 22-level adjustment.  Although I

2    don't think the Court needs to necessarily make an

3    exact finding of the amount of loss, I think there

4    needs to be at least a finding of a certain amount of

5    loss to put him into what I believe ultimately will be

6    a guideline range of life imprisonment.  Our view is

7    that it's far in excess of the amount necessary to have

8    a 22-level increase.

9        Moving on to the other objections, in terms of

10   the number of victims, it's very clear that there's

11   more than 50 victims.  There's 26 individuals

12   identified in the indictment, 18 insurance companies

13   and 33 bond companies, which brings the number to 77 so

14   that results in an increase of four levels.  It's very

15   clear that the Defendant was misrepresenting himself,

16   acting on behalf of a charitable organization.  The ads

17   he placed in a Catholic paper indicated the money was

18   coming from a compassionate organization and that he

19   was a church benefactor.  And this philanthropy aspect

20   of the case was repeatedly played up to the victims as

21   they met largely with Mr. Radhakrishnan.

22       The gross receipts being more than $1 million,

23   the Government submitted a chart that showed that

24   Mr. Caramadre himself received more than $4 million in

25   profits from the insurance companies.  That's just

1    profits.  That's not gross receipts and that doesn't

2    even include the commissions.  So clearly he received

3    more than a million dollars.

4         With respect to the obstruction of justice, we

5    believe that Mr. Caramadre twice obstructed justice in

6    this case.  He's only getting one two-level enhancement

7    because that's all that's allowable under the case law.

8    Once by tampering with a witness during the grand jury

9    phase of the case and once by committing perjury in his

10   testimony before your Honor.

11        We believe that Mr. Caramadre also abused his

12   position and his skill as an attorney and as an

13   insurance producer in various ways to further the

14   scheme including by representing on numerous occasions

15   falsely that he was the attorney for one of the

16   terminally-ill individuals, which prevented the

17   insurance companies and the brokerage houses from

18   reaching out directly to them.

19        And I believe those are all of the objections

20   that Mr. Caramadre's attorneys have lodged on the

21   presentence report.

22        THE COURT:  Can you just maybe spell out your

23   response to the objection with respect to the $22

24   million -- I'm sorry, the 22-point enhancement.  The

25   argument, if I understand it, is essentially that

1    Mr. Caramadre is saying that nobody really lost any

2    money, that the bond issuers -- it just advanced the

3    date of the payment on the bonds and that, in fact, the

4    bond issuers received some benefit with respect to the

5    payment on the bonds.  Can you respond to that a little

6    more thoroughly.

7        MR. VILKER:  Sure.  Well, before I talk about

8    the bond issuers, of the 46 million, 34 million comes

9    from the insurance companies, and there's no question

10   that these were actual losses.  They paid out much more

11   than they took in.  So that's 34 of the 46.

12       With respect to the 12 plus million of losses to

13   the bonds issuers, we presented before Judge Sullivan

14   the testimony of a prominent expert on death-put bonds,

15   Dr. Andrew Kalotay.  And he testified that because the

16   bonds are being redeemed years before they otherwise

17   would, that causes in effect a time value loss of money

18   to the bond issuers.  Under the terms of the

19   prospectuses if there was a bond that was a $100,000

20   bond, in the normal course of operations, they would

21   not have to redeem that bond for perhaps 20, 30 years

22   down the road.  But because of the fraudulent early

23   redemption of the bond, they were required to redeem

24   the bonds and get a full maturity value, the full

25   $100,000 twenty, thirty, forty years, whatever the case

1       may be, earlier than they otherwise would have.

2               So what Dr. Kalotay testified is -- he had a

3       patent on this long before he was retained by the

4       Government in this case -- was that when you take that

5       factor into account and you discount it by other

6       factors such as the possibility they would have had to

7       redeem it earlier in any event if someone else had

8       purchased it, someone else legitimately had passed

9       away, the bonds were redeemed and that factor was

10      discounted, and he does a very complicated mathematical

11      analysis that resulted in $12.3 million of losses,

12      which are in essence money that had to be paid out

13      earlier than they otherwise would have been.

14              THE COURT:  All right.  Thank you.

15              Well, to some degree a lot of this discussion is

16      academic because we are dealing here with a binding

17      plea agreement which caps the sentence at ten years,

18      but I am required to place on the record the advisory

19      guideline calculations and to rule on these various

20      objections.

21              I don't find that any of the objections have any

22      merit and so I'm going to deny all of the objections to

23      all of the enhancements.  I'm going to accept the

24      presentence report as it is drafted, and I'm going to

25      at this time set forth the advisory guideline

1    calculations as set forth in the report.

2         The base offense level as has been noted is a

3    level 7.  There is a 22-point adjustment because of the

4    amount of the loss.  The loss was greater than $20

5    million but not more than $50 million.

6         I do think it has been established with

7    sufficient detail in the presentence report and also in

8    the Report and Recommendation prepared by Judge

9    Sullivan that the amount of loss is at least $20

10   million and closer to the amount stated in there,

11   $47,596,000.

12        There's a four-level increase because the

13   offense involved more than 50 victims.  This is obvious

14   from all the material that has been submitted.

15        There's a two-level increase because the

16   Defendant misrepresented himself as representing a

17   charitable or educational, religious or political

18   organization.  Here he obviously and clearly described

19   the program as a special program, a philanthropic

20   program for the terminally ill.

21        There's an additional two-level increase because

22   the Defendant utilized sophisticated means in the

23   fraudulent scheme; an additional two-level increase

24   because the offense involved the unauthorized transfer

25   or use of any means of identification to produce

1    another means of identification as detailed in the

2    presence report.  Obtaining the information from the

3    terminally-ill individuals and then obtaining the

4    variable annuities and death-put bonds on those

5    individuals meets that definition.

6         There is a two-level increase because the

7    Defendant derived more than $1 million in gross

8    receipts.  There's another two-level increase because

9    the Defendant -- or the offense involved unauthorized

10   public dissemination of personal information, in this

11   case the personal information of the terminally-ill

12   individuals.

13        There's a four-level increase because the

14   offense involved a violation of securities laws.

15   There's an additional two-level increase because the

16   Defendant knew or should have known that the victims,

17   some of the victims were vulnerable, so-called

18   vulnerable victim enhancement.

19        There's a four-level increase because the

20   Defendant was the organizer or the leader of criminal

21   activity that involved five or more participants.  And

22   finally -- or not finally, but there's an additional

23   abuse of position of trust or special skill enhancement

24   of two levels; and finally, an enhancement of two

25   levels for obstruction of justice.

1          All told the adjusted offense level is 57.  The

2    Defendant has no criminal history and a level 57,

3    criminal history category of 1, the advisory guideline

4    range -- I think I need some help on this from counsel.

5    The Government has indicated that the advisory

6    guideline range would be life imprisonment.  That's

7    what the guideline manual looks to be, but I think

8    Probation said 300 months?

9          PROBATION OFFICER:  Based on the statutory

10   maximum of 20 years on one count and 5 years on the

11   other, yes, your Honor.

12         THE COURT:  All right.  Because of the statutory

13   maximum that guideline range would be restricted to 300

14   months.

15         Now, as I previously indicated, this is a

16   binding plea agreement so the agreed-upon sentence has

17   been capped at ten years, and we can move now to

18   hearing from the Government with respect to the

19   appropriate sentence.

20         MR. VILKER:  Thank you, your Honor.

21         Your Honor, as you're aware, the Court must

22   begin the analysis of the appropriate sentence by

23   examining the guideline range.  And here, as your Honor

24   just indicated, the guidelines are at a level 57, which

25   easily calls for a life imprisonment sentence under the

1    guidelines.  There's no question that the guidelines

2    are too high in this case and the Government would not

3    be advocating for a sentence of life imprisonment even

4    if we were not bound by the terms of the plea

5    agreement.

6         However, it is important to understand why the

7    guidelines are as high as they are in this case.  They

8    are as high as they are because the offense conduct

9    involved almost every single aggravating factor the

10   Sentencing Commission determined to be relevant in a

11   fraud case.  It involved a huge amount of loss.  It

12   involved a large number of victims.  It involved

13   extremely vulnerable victims.  It involved conduct that

14   constituted obstruction of justice and additional

15   factors your Honor just indicated.

16        When all these factors are present in the same

17   case the result is a guideline range that calls for

18   life imprisonment and that is the point at which the

19   sentencing analysis must begin in this case.

20        In the binding plea agreement, the Government

21   agreed to cap Defendant's sentence at ten years

22   imprisonment.  At that point in time, we concluded that

23   a ten-year sentence, not withstanding all the

24   aggravating factors in this case, was reasonable as

25   Mr. Caramadre had decided to plead guilty and had

1    apparently accepted responsibility for his conduct.

2    One of the key motivating reasons why the Government

3    agreed to this plea agreement was that it provided the

4    victims with some closure and some piece of mind in

5    this case as Mr. Caramadre was accepting

6    responsibility.

7         As the Court knows, a couple of months after he

8    entered his guilty plea, Mr. Caramadre attempted to

9    withdraw the plea and committed perjury in the process.

10   He, in effect, violated his key obligation under the

11   terms of his plea agreement as he is no longer

12   accepting responsibility for his conduct.

13        The Government, however, is still bound by the

14   terms of the plea agreement and therefore recommends a

15   ten-year sentence.

16        There are three factors we believe are

17   especially relevant to this Court's decision under 18

18   U.S.C. 3553 and that is the nature of the offense, the

19   characteristics of the Defendant and the need for

20   deterrence.  I'd like to address each of those factors.

21        As far as the nature of the offense, clearly the

22   factor that distinguishes this case from other fraud

23   cases is the exploitation of terminally-ill

24   individuals, and I'll discuss that aspect of the case

25   in a moment.  But before even discussing the fact that

1    terminally-ill individuals were involved, it's

2    important to recognize this was a massive fraud against

3    the insurances companies and bond issuers.  It was a

4    fraud in which more than $46 million was stolen over a

5    15-year period.

6         Mr. Caramadre lied to these companies over and

7    over again throughout the years to perpetrate this

8    scheme.  He provided false information on application

9    forms concerning the relationship between the

10   annuitants and the owners.  He provided false

11   information on virtually every brokerage application

12   form concerning the financial resources and investment

13   history of the co-account holders.

14        Representatives of three different companies

15   came to meet with Mr. Caramadre in person to get

16   answers as to why a lawyer was opening up all these

17   accounts and annuities with people who died soon

18   thereafter.  Mr. Caramadre lied over and over again in

19   these meetings telling the company representatives that

20   these people were all his estate planning clients and

21   that they were investing their own funds into the

22   death-put bonds to benefit their own estates.

23        Mr. Caramadre knew full well that what he was

24   doing was causing millions of dollars in losses to

25   these companies, and he took many steps to deceive the

1    companies.  One of these steps he took with regularity

2    was engaging in money laundering by opening annuities

3    and bond accounts in the names of other people,

4    including Mr. Radhakrishnan, so the companies wouldn't

5    put it together that it was all the same person who was

6    causing the millions of dollars in losses.

7         In short, your Honor, this was a massive

8    financial fraud.  What Mr. Caramadre doesn't seem to

9    realize is that when he defrauds these large companies

10   he is stealing from everyone around him.  These

11   companies have shareholders who suffer the losses.  The

12   companies also increase the prices of their products,

13   including insurance premiums, to cover the cost of

14   fraud.  The reality is that this behavior harms many

15   innocent human beings.

16        Therefore, your Honor, even if this case did not

17   involve terminally-ill individuals a large sentence

18   would be called for.  What really distinguished this

19   case, however, is the exploitation of terminally-ill

20   individuals.  Mr. Caramadre portrayed himself as I

21   philanthropist who wanted to help dying people.  He

22   placed ads in the Rhode Island Catholic paper

23   describing himself as a benefactor and from a

24   compassionate organization.  Virtually every

25   terminally-ill person and family member we interviewed

1    was told and was under the firm belief that the money

2    they were receiving was just charity, that it was just

3    a gift from a selfless philanthropist.  They were

4    stunned when they learned that brokerage account or

5    annuities had been opened in their names or the names

6    of their loved ones.  They were even more stunned when

7    they learned that some stranger had made money as a

8    result of the deaths of their loved ones.

9            After July of 2007, the Co-Defendant in this

10   case, Raymour Radhakrishnan, met with most of the

11   terminally-ill people who responded to these ads, and

12   he told them over and over again that this was just a

13   charity, never telling them that anyone else stood to

14   make money from their deaths.

15           While Mr. Radhakrishnan met with most of the

16   individuals from July of 2007 on, it was Mr. Caramadre

17   who met with most of these individuals beforehand,

18   before Raymour became his employee.  A number of

19   different people who met directly with Mr. Caramadre

20   told us the exact same version of events, that

21   Mr. Caramadre never mentioned a word to them about any

22   kind of annuity being opened in their names.  These

23   people included Kenneth Blowers, who testified at the

24   trial in this case.  Mr. Blowers testified that he nor

25   his incoherent late wife had no idea that Mr. Caramadre

1     opened four annuities in the name of his late wife who

2     had suffered a lobotomy-like operation.

3          Other individuals who similarly testified that

4     they met with Mr. Caramadre directly and he never told

5     them anything about opening any annuities include

6     Robert Mizzoni, Mr. Caramadre's former school bus

7     driver and Getahun Aynalem, a man who miraculously

8     recovered from AIDS only to discover that Mr. Caramadre

9     had opened up two annuities in his name without his

10    consent.

11         Raymour did not go off the Reservation in this

12    case in failing to disclose to dying people that

13    annuities and bonds would be purchased in their names.

14    Raymour was on the Reservation.  He continued the same

15    pattern of deception that Mr. Caramadre employed for

16    years before Raymour began his employment at EPR.

17         Simply put, Mr. Caramadre didn't care whether

18    individuals understood that annuities and bonds would

19    be purchased in their names.  As a matter of fact, the

20    evidence the Government would have presented at trial,

21    if Mr. Caramadre hadn't pled after the first week,

22    would have been that Mr. Caramadre made it very clear

23    to his co-conspirators that the less the terminally-ill

24    individuals knew about what was happening, the better.

25         There's a reason why the terminally-ill people

1   were presented with blank signature pages and were

2   denied copies of the documents they signed.

3   Mr. Caramadre made a knowing and intentional decision

4   to keep the terminally-ill individuals and their family

5   members in the dark.

6          Now, I need to spend a few minutes to talk about

7   the effect that all of this had on the victims of this

8   case.  As your Honor knows, almost all the people

9   Mr. Caramadre listed on these annuities and bonds have

10  passed away.  They therefore cannot be here to tell the

11  Court how it impacted them to learn that their

12  identities were used without their consent and that

13  substantial sums were made from their deaths.

14         We met with a number of these very ill

15  individuals before their deaths and feel an obligation

16  to speak on their behalf today.  The few terminally-ill

17  individuals who were still alive when this

18  investigation commenced expressed to us that they felt

19  completely exploited when they learned that

20  Mr. Caramadre and Raymour had opened up accounts and

21  annuities in their names and that they were trying to

22  profit from their deaths.  One of these individuals was

23  Edwin Rodriguez, who testified in the trial of this

24  case.  It took him hours to get dressed during the

25  morning of his testimony, and he was in a tremendous

1    amount of pain.  Despite being in significant pain and

2    our attempts to actually persuade him not to testify

3    because of the physical pain he was in, he insisted

4    that he would find a way to come to Court to explain to

5    the jury and to your Honor of how he had been

6    exploited.

7         Other individuals who spoke with us before they

8    passed away included Richard Wiley, Patrick Garvey and

9    Robert Mizzoni.  Despite being very ill, these

10   individuals wanted to give depositions in this case so

11   their testimony could be preserved.  All of these

12   individuals were upset and hurt to learn that

13   Mr. Caramadre had opened up accounts and annuities in

14   their names without their consent and that he was

15   trying to make money upon their deaths.

16        Most of the people we met with during the

17   investigation were the family members of the people who

18   had passed away.  These family members felt tricked and

19   exploited when they learned that Mr. Caramadre and

20   Raymour had used their loved ones deaths for their own

21   profit.  It is difficult to put into words how taken

22   advantage of these people felt.  Many of these

23   individuals have written letters to the Court

24   explaining their emotions to the Court.  They wrote

25   that they feel anger for having been deceived and

1   wounded by the fact that they let their loved ones

2   identities be used without their knowledge and consent.

3   Even in this cynical age when people are skeptical when

4   they are asked to sign blank signature pages, it was

5   simply unthinkable as they were watching their loved

6   ones die to believe that this philanthropist was

7   tricking them into opening accounts and annuities so

8   that he could make money off of their deaths.

9        When they later learned that the unthinkable had

10   happened, they felt extremely betrayed and taken

11   advantage of.  Most of these people told us that they

12   would never have let their loved ones sign these blank

13   signature pages if they were in their right minds but

14   that they did so because they were overwhelmed by grief

15   and exhaustion.

16        What Mr. Caramadre stole from the terminally-ill

17   individuals was the last thing they had, their

18   identities and the right to decide for themselves

19   whether to allow some stranger to profit from their

20   deaths.

21        The next factor under 18 U.S.C. 3553 is the

22   characteristics of the Defendant.  In this factor, the

23   Government recognizes that there clearly are a number

24   of very positive traits that Mr. Caramadre possesses.

25   He's clearly a caring father and caring husband.  He's

1    devoted to the Catholic Church, and he has given

2    significant sums of money to charity over the years.

3    He obviously has a lot of support from his family and

4    friends and this positive side of Mr. Caramadre was

5    attested to in the letters of support that he

6    submitted.

7         However, there is another side to Mr. Caramadre.

8    Rather than looking inward and accepting some

9    responsibility for his own conduct, throughout this

10   case Mr. Caramadre has time and again lashed out at

11   others when it suits his interest.  This tendency was

12   on full display in this courtroom when Mr. Caramadre

13   viciously went after his former attorneys in the motion

14   to withdraw hearing, even testifying that his friend

15   and fellow church member Michael Lepizzera had

16   committed perjury before this Court.

17        The irony, of course, is that his former

18   attorney's hard work in negotiating this plea agreement

19   and representing Mr. Caramadre for years is what may

20   well save him years of imprisonment today.

21        This was a case in which there was overwhelming

22   evidence of misrepresentation after misrepresentation

23   being made by Mr. Caramadre, many of them in writing.

24   These misrepresentations were made to a large number of

25   audiences including terminally-ill individuals and

1   numerous company representatives.  Rather than

2   acknowledge his conduct and show some remorse,

3   Mr. Caramadre instead chooses to ignore the mountain of

4   evidence of his guilt so that he can tell everyone

5   around him that he is innocent.

6            Mr. Caramadre has a stunning ability to

7   completely ignore the actual facts and to deny any and

8   all responsibility for his conduct.

9            Finally, your Honor, the Government believes

10  there's a strong need for deterrence in this case.

11  This has been a highly publicized case in which the

12  Defendant has intended to manipulate the judicial

13  process.  He's engaged in a 15-year scheme in which he

14  defrauded companies out of $46 million.  He has done so

15  by exploiting the most vulnerable members of the

16  community and he has failed to accept even a scintilla

17  of responsibility for his conduct.  A strong message

18  needs to go out to other would-be white collar

19  criminals that this kind of behavior will not be

20  tolerated.

21            In sum, your Honor, this is a case that cries

22  out for the maximum allowable sentence of ten years

23  under the plea agreement.  The Government also

24  recommends that the Court impose full restitution in

25  this case in an amount to be determined by the Court

1    that the Government submits is more than $46 million,

2    and the Government recommends that the maximum fine

3    allowable in this case of $500,000 be imposed.  And we

4    make that recommendation knowing full well that

5    Mr. Caramadre will have a large restitution order, but

6    as this was a monetary crime, we believe a monetary

7    penalty is appropriate and we do note that

8    Mr. Caramadre still has significant assets to make this

9    fine payment as provided in the presentence report.

10              THE COURT:  Let me ask you just a few questions.

11   Maybe we start at the end with respect to the

12   restitution issue.  One thing that's weighing on me in

13   determining the appropriate amount of incarceration in

14   this case is the concern with respect to restitution.

15   With many defendants, there's no hope of restitution.

16   But in this case, I think there's at least some

17   possibility that given Mr. Caramadre's talents and

18   abilities that he could possibly make a dent in

19   whatever that restitution order is.  Of course,

20   whatever amount of time that he's incarcerated would

21   prevent him from engaging in money-making activities to

22   pay back.  How do I balance that?

23              MR. VILKER:  It's an appropriate balancing act

24   that your Honor has to conduct.  The Government's view

25   is the outrageousness of the conduct and the need to

1    provide deterrence outweighs the need for prompt

2    restitution in this case as desirable as that would be.

3         My own view is in effect that would almost

4    reward Mr. Caramadre for having some resources to pay

5    some restitution, some ability to pay restitution,

6    getting a lower sentence of imprisonment just so he can

7    pay off the restitution earlier.  I think if this were

8    a close case and the guidelines were anywhere near ten

9    years that that might be a relevant factor pushing down

10   the sentence somewhat.  I think in this case the need

11   to punish this conduct, the need for deterrence is so

12   great that a lower-end sentence below ten years so that

13   these companies could get restitution earlier would be

14   a mistake.

15        THE COURT:  Another question I have for you is

16   that in some of the public descriptions of this case

17   it sounds as if Mr. Caramadre defrauded the

18   terminally-ill individuals out of these millions of

19   dollars, and of course that's not the case.  All these

20   terminally-ill individuals actually made money, which

21   makes it very unusual.  And I'm not in any way

22   attempting to minimize their status as victims but we

23   all know that the reality is that they received

24   thousands of dollars.  So the victimization of these

25   folks is more on the emotional or psychological side as

1    opposed to the monetary side.  It's just as real but

2    that's the nature of it.

3         Now, if you took out of the equation the

4    fraudulent activity with respect to the stolen

5    information, the identities and the way in which it was

6    used, in other words if Mr. Caramadre and Radhakrishnan

7    were totally up front with each of these individuals

8    and explained to them thoroughly that you're going to

9    be used as a measuring life for an annuity and somebody

10   else is going to make a lot of money off of this, and

11   this is all being done because the way these companies

12   have structured these variable life annuities allows

13   this and they went ahead and signed on and took the

14   money; and if you assume that they didn't falsely fill

15   out forms or sign signatures that weren't theirs, in

16   other words conducted this as a non-fraudulent

17   activity, then the losses here -- this would just be a

18   civil case, right?

19        MR. VILKER:  If there were no crimes committed,

20   it would be a civil case.

21        THE COURT:  Well, I'm trying to get at the point

22   that the amount of money that was lost to some degree,

23   shouldn't some of that, the weight of that be put on

24   the shoulders of the companies for designing their

25   products in this way?

1           MR. VILKER:  Certainly I think the companies

2      would look at it that perhaps they should have done

3      more at an earlier stage.  This is one of the problems

4      with the case ending after four days of trial.  The

5      evidence would have shown that from a very early stage

6      the companies picked up on what was happening, that

7      many of them terminated Mr. Caramadre, refused to let

8      him do any business.  He then submitted annuity

9      applications in other people's names so they wouldn't

10     know it was really his money, so they wouldn't know it

11     was him.  They came and questioned him, what's going on

12     here with these accounts.  And he lied to them over and

13     over again.

14           So whereas the design of the products could have

15     been better to prevent the fraud, the reality is in

16     practice after a very short period of time each of

17     these companies realized that they were being defrauded

18     and took steps to stop it, and Mr. Caramadre thwarted

19     those attempts by perpetrating the fraud.

20           But I think the bigger picture that I think your

21     Honor would be getting at is if you take away the

22     terminally ill part of this case, I think it's a very

23     different case.  There's no question about it.  You

24     have a man that's defrauding large companies and it

25     deserves punishment, deserves to have a restitution

1      order.  Does it deserve ten years imprisonment?  My own

2      view is it would be no.  My own view would be something

3      less and I would have to discuss it with my office but

4      something less would be appropriate.

5           What really makes this case extreme is that even

6      though he was paying money to these people, he had a

7      view of these people as if they were commodities, as if

8      because I'm giving you money you don't need to know

9      what's going on, you don't need to know that I'm going

10     to be putting your name on an account and annuity and

11     I'm going to be making money from your death.

12          And he went to these people and some of them

13     were literally on their death beds.  There's one

14     situation where a son -- to get the signature, the son

15     had to hold his father's hand, the first and only time

16     he ever did this to help him write a signature.

17          There's a case, a situation where a woman was

18     dying of breast cancer in Rhode Island Hospital, and

19     she was given the pitch by Mr. Radhakrishnan, thought

20     that something was wrong and used all of her energy to

21     try to reach for the phone to call 911 or the police.

22     She didn't have the energy to do it and her husband

23     said not to worry about it.  These were very traumatic

24     moments for these people.  And even the ones that

25     didn't know that anything was wrong at the time, they

1       now feel completely exploited that someone could have

2       come in on their loved one's death beds where they're

3       sitting around crying, not sleeping day after day after

4       day saying, We want to give you some money; please sign

5       these forms.  And when they were presented, there was

6       no attempt at all, as has been suggested in some of the

7       letter to the Court, to explain to these people what

8       was happening.  These people were presented with blank

9       signature pages and told, Sign here, sign here, sign

10      here.  They were not given complete copies of the

11      applications.  Some of them asked for copies of the

12      documents they were signing.  They were told they

13      couldn't, that they are kept in a special locked

14      container in Mr. Caramadre's office.

15          These people when they learned later that

16      this -- and many of them wrote thank you notes to the

17      Defendant and some of these thank you notes said, When

18      I die, which I know I will do soon, I will tell God

19      about this angel on earth who gave money to

20      terminally-ill people and asked for nothing in return.

21      These people feel now that their faith -- really their

22      faith in humanity has been shattered that someone could

23      have had the gall to come into their death beds which

24      should have taboo, an unbelievably private moment that

25      you just stay away from.  You don't go through that

1  moment and try to trick people into signing forms.  And

2  some of the signatures are like lines.  People could

3  not even come close to signing their regular

4  signatures, and then use their deaths to make money for

5  yourself.

6         So if he hadn't deceived these people, as

7  foolish as this behavior may be, it wouldn't have been

8  illegal.  But that's the whole point of this case.

9  These people have the right to make that decision.

10 They have the right to make sure that decision was not

11 taken from them.  And just giving somebody money

12 doesn't give you the right to open up accounts in their

13 names and try to make money off of their deaths.

14        THE COURT:  Okay.  Thank you very much,

15 Mr. Vilker.

16        Mr. Murphy?

17        MR. MURPHY:  Thank you, Judge.

18        Judge, this is a difficult case in the respect

19 that the Court and the Government and the Defendant are

20 well aware of the tortuous turns and the events that

21 took place and how we finally got here today, December

22 16, for sentencing.

23        Judge, as the Court is well aware, Mr. Caramadre

24 during the start of trial pled guilty last November to

25 two counts, Count IX and Count XXXIII.  And as

1     Ms. Mattias has said, that is where the 25 years comes

2     in.  Twenty years on one count and five on the other,

3     and if you run them consecutive it would be a 25-year

4     statutory penalty that Mr. Caramadre would face.

5          What's more important today, Judge, is as we're

6     here for sentencing, and Mr. Caramadre will address the

7     Court at some point this morning, and what he says may

8     not be what the Court typically hears at sentencing.

9     What I have to add to that, your Honor, is that

10    Mr. Caramadre did at one point offer his plea to two

11    counts, and again we have heard for three or four years

12    the travel of this case.

13         I think it's important to know that in the

14    beginning when the investigation was launched against

15    Mr. Caramadre that at one point he did go into the U.S.

16    Attorney's Office and provided names of the so-called

17    measuring lives, insurance companies, bond companies,

18    et cetera.  Because as the Court has just asked

19    Mr. Vilker, in a perfect scenario if Mr. Caramadre sat

20    down and videotaped people and disclosed everything, I

21    doubt there would be any objection from any of the bond

22    issuers.  In fact, Judge, to take my argument out of

23    order because there is going to be a restitution order,

24    I would look at the bond companies.  And again, Judge,

25    when a tranche of bonds is launched, the individual

1    investor has no say in the conditions of that bond.

2    It's a contract of adhesion, made by the bond company

3    and whoever is helping with the launch of the tranche

4    of bonds.

5         But on those bonds, one of the things that make

6    them marketable is the fact that many of them have what

7    is known as a death-put.  Three ways, four ways to

8    surrender bonds.  One is the maturity date or if a

9    company calls a bond or if you have a death-put on your

10   bond, and that's what Mr. Caramadre looked at.  But

11   these companies sold the bonds when they first came out

12   at face value.  They received a hundred cents on the

13   dollar.  Mr. Caramadre bought these bonds on the

14   secondary market when they were available to anybody

15   and they had the death benefit.  But these companies

16   knew what a death benefit was because that language is

17   contained in the bond prospectus, which runs with that

18   particular tranche of bonds from cradle to grave.

19        And what's important about that as was argued

20   during the restitution hearing was that these companies

21   make provisions that in any calendar year a number of

22   bonds would be put back to the company because of the

23   death-put provision.  And again, when it comes to the

24   annuities and the bonds, I would say it's analogous and

25   it's probably a very, very bad example but we're on the

1    Christmas season now and you will see in the next few

2    weeks in the Sixth Division District Court here in

3    Providence, you'll see a spike in the number of

4    shoplifting cases because bad economic times, people to

5    provide for others will go out and go to stores and

6    take goods that don't belong to them.  But what's

7    important, Judge, is the amount of money, over $45

8    million is staggering to everybody in this courtroom

9    but when we piece it out amongst these bond companies

10   and the insurance companies and look where it is to

11   relation to the amount of monies that these companies

12   operate with, it is just an ink dot on the timeline of

13   time, your Honor.  We're talking about billion-dollar

14   bonds that were sold and we're looking at $40 million

15   globally.

16           But Judge, we're here to sentence Mr. Caramadre,

17   and Mr. Caramadre, as the Court is well aware, has

18   signed a non-binding plea agreement in which the floor

19   is zero, the ceiling is ten.  And I find it interesting

20   Mr. Vilker, who I have a great deal of respect for,

21   comes in and asks for ten years and he gives the facts

22   why the Government was asking for ten years but back

23   when plea negotiations were happening as indicated by

24   the Court in one of its decisions the original plea or

25   one of the original pleas was a plea from two to five

1    years and it was put in the document that Mr. Caramadre

2    would not accept that plea because it contained a

3    minimum of two years.  However, the Government was

4    willing a year ago to offer Mr. Caramadre a plea of two

5    to five years and now today they are offering ten.

6         On behalf of Mr. Caramadre, we are arguing that

7    the ten is nowhere near what he should receive as a

8    sentence.  You'll hear, as I said, not to be redundant,

9    that Mr. Caramadre will address the Court.

10        But let's look at the crime itself, your Honor.

11   Mr. Caramadre, Judge, I can tell you beforehand is

12   probably not going to admit to the crime, but he has

13   pled to two counts.

14        So when we look at the offense conduct, your

15   Honor, there was no gun used.  There was no violence.

16   There is no financial destruction.  The victims, as the

17   Court just pointed out, the terminally ill, the

18   measuring lives, as distasteful as it is in this

19   courtroom, they did not lose anything, your Honor.  In

20   fact, they gained money.

21        Now, again, your Honor, distasteful and wrong as

22   it may be, they did not suffer any economic harm.  And

23   as the Court said, which happens to be in our notes,

24   they were hurt emotionally and anybody can agree that

25   if you're at the death bed of a loved one and you're

1    not thinking clearly and somebody comes in and the next

2    thing you know finances aren't where they are or where

3    they should be because of conditions and sickness and

4    you're handed an amount of money, well, at the time,

5    Judge, these families felt good.  A year later, two

6    years later, three years later when the FBI knocked on

7    their door or law enforcement knocked on their door and

8    said did you realize you may have gotten $5,000 but

9    somebody else profited in the six figures, obviously

10    that is going to hurt emotionally.  It doesn't make it

11    right but, again, the terminally ill who were used as

12    measuring lives suffered absolutely no economic harm.

13    And I think that's important when we decide on a scale

14    of justice what the sentence should be.

15         THE COURT:  Let me interrupt you there.  I think

16    Mr. Vilker put it really well when he said that one of

17    the really offensive things about this crime is the

18    attitude that you can treat terminally ill, poor,

19    vulnerable individuals as commodities.  And that's

20    essentially what -- I hadn't thought of it that way,

21    but I think that description by Mr. Vilker probably

22    sums it up better than anything I've heard up to this

23    point.  It really is treating these people like

24    commodities.  And in a way, I mean, isn't that worse

25    than stealing money from them?

1      MR. MURPHY:  Well, Judge, at the time I'm not

2  sure that the terminally ill, who most of them have

3  passed on, did not know that they were being -- if the

4  plea stands, which it does, your Honor, knew that they

5  were being taken advantage of as far as their personal

6  identification, their signatures, et cetera.  I don't

7  think it's worse than doing the deed where somebody

8  goes into a hospital room where there's a

9  terminally-ill person who has their belongings under

10  the hospital bed and takes the wallet out and goes and

11  opens credit cards and uses credit cards.  I think,

12  your Honor, that that's a situation where there is

13  direct, financial damage, that it's worse.

14      And again, as I said in the beginning, yes, this

15  is distasteful, but, Judge, when we look in business,

16  key-man life insurance, products like that exist.

17  They've existed for years and they will exist well

18  after this case, and I think the company is not looking

19  at the terminally-ill individuals but the companies

20  know of this.  They take precautions when they issue

21  bonds.

22      Again, Judge, there's no relationship questions

23  that we've seen during the course of this.  There's

24  nothing illegal about having joint tenants on a bond

25  who are not related.

1          Again, a terminally-ill person who is surrounded

2     by loved ones, absolutely distasteful for somebody to

3     come in to take advantage if they knew they were taking

4     advantage of those people.

5          But, Judge, when we look at the crime itself,

6     again, we have a first offender.  And the publicity

7     surrounding this case, and I think the Court did hit

8     that nail squarely on the head, was there is a

9     perception out there, when I say "out there," in the

10    public, that Mr. Caramadre took money from

11    terminally-ill people.  Well, he did not take money

12    from terminally-ill people.  He gave them money to get

13    their signature, their identifying data and stuff of

14    that nature, but they were not harmed financially.

15         Judge, this case comes down to the factors that

16    are set in 18 U.S.C. 3553 as far as what should be a

17    fair and just sentence to serve the ends of justice.

18    The Government in this case comes in and says ten

19    years.  And in their opinion, they've done their job,

20    they've asked for the maximum.  The hard job

21    unfortunately, Judge, falls in your lap because you

22    have to balance, as distasteful as these crimes are,

23    with are there other factors of Mr. Caramadre that he

24    possesses that satisfies the sentencing factors in 18

25    U.S.C. 3553, and I say there are several, your Honor.

1          Judge, as the Government pointed out in its

2     brief, characteristics of the Defendant on page 16,

3     Mr. Vilker correctly contended by all accounts

4     Caramadre is devoted to his family, the Catholic

5     Church, and he has over the years donated significant

6     sums to a number of charities.  And those are

7     donations, your Honor, that many of them were public.

8     But there's also a side of Mr. Caramadre where the

9     donations were made in private.  And Mr. Caramadre last

10    week, your Honor, on his behalf, 89 letters were sent

11    in on his behalf to this Court, to the Government and

12    to Probation to show the other Joe Caramadre.

13         Now, your Honor, you've heard from the

14    Government about the bad Caramadre.  I'm now going to

15    try and attempt to show you the good Joseph Caramadre.

16    In fact, your Honor, the question is:  Who is Joseph

17    Caramadre?  We know Mr. Caramadre is 53 years of age,

18    will be 54 in January; that he's been a life-long

19    resident of the State of Rhode Island with no prior

20    criminal contact, no arrests , no criminal history

21    before this case.

22         He's a 1978 graduate of Cranston West High

23    School, attended the University of Rhode Island where

24    he completed his bachelor's degree in less than four

25    years, started in the insurance business during the

1    early 1980's, was very, very successful.  In 1985, your

2    Honor, he was the victim of a drunk driving accident,

3    which two things happened.  It made him bedridden and,

4    second, introduced him to his wife, Paula Caramadre,

5    who first came to know Joseph in 1985.  They were

6    married in 1990, had been living together in a very,

7    very good and strong marriage for the last 23 years.

8    They have three wonderful children, your Honor.  And I

9    think the letters from the children themselves sum it

10   up best.  It shows a father who cares about his kids,

11   your Honor, a father who has spent a great deal of time

12   in his children's lives.  And the three letters were

13   different.  We had his son, Michael, write a letter who

14   now because of the change in circumstances had to

15   become the man of the family at age 19.  He is a

16   sophomore at Bentley College.

17         We have his 17-year-old daughter, who is a

18   senior in high school.  And we have his 13-year-old,

19   who is dyslexic, who needs special help in school, who

20   has wrote a very, very compassionate letter on behalf

21   of his father at a tender age when he needs his father

22   there.  We know he's had the benefit of having a large

23   extended family here in Rhode Island, combination of

24   five brothers and sisters who all reside here, four in

25   Cranston, one in Warwick.  And we know that he's had

1    the fortune of having a good, loving set of parents

2    that have been with him.  His mom, obviously, passing

3    last week but having a life-long relationship with his

4    family.

5        Judge, he's a guy who the 89 letters which have

6    come from all walks of life will attest to the good of

7    Joseph Caramadre.

8        We have a powerful letter from former Rhode

9    Island Supreme Court Judge Robert Flanders who talks

10   about this case, talks about Joe, talks about his

11   belief in Joe and talks about his expertise.  We have

12   the former United States Ambassador to the Vatican and

13   Boston Mayor, Mayor of Boston, Raymond Flynn, who

14   details in his short letter how when he played

15   basketball for Providence College in the 1960's he got

16   involved in the Big Brothers organization and that is

17   how he met Joe Caramadre.

18       We've also learned as to the award that Joseph

19   Caramadre and his family received from the Big

20   Brothers, the humanitarian award.  We have letters,

21   Judge, from people that talk about Joe Caramadre that

22   aren't public.  Joe Caramadre meeting a woman who

23   needed an operation and the operation went wrong.

24   Mr. Caramadre had no stake in the outcome of that

25   litigation but paid the legal fees.  And the case

1    turned out the wrong way for the poor woman and

2    Mr. Caramadre expended out of his own pocket over

3    $160,000 in legal fees.

4        We have the fact that there are other people,

5    there's a doctor who was a client of Mr. Caramadre, a

6    Dr. Crossman, who stated that he had purchased an

7    insurance policy where in the beginning of the terms

8    there is an annual policy provision that requires

9    several thousand dollars to be paid.  And the doctor

10   had a tough circumstance where he could not make the

11   policy premium that year and Mr. Caramadre paid the

12   premium with no benefit to himself, did not ask for a

13   signed loan document, just out of the goodness of his

14   heart.  I mean, the 89 letters are replete with stories

15   like that, where he has advanced thousands and

16   thousands of dollars to people, some that he knew well,

17   some that he didn't know well, just to help.

18       So your Honor, you almost have, and I hate to

19   use the term, but you almost have a Dr. Jekyll/Mr.

20   Hyde-type situation.  That's where the sentencing

21   balance needs to come in.  It's easy to say ten years.

22   It's harder, your Honor, to say less but there are

23   reasons to say less and I would implore the Court to

24   please say less.

25       Again, when we look at the criminal history is

1    non-existent.  It's not a crime of violence.  The

2    characteristics of the crime are distasteful but the

3    balancing effect, your Honor, are 89 citizens, most of

4    them from Rhode Island, give letters when asked, when

5    told that the letters would be published under the new

6    First Circuit decision that you will read about your

7    letter online or in the Providence Journal, and 89

8    people said, So what, we are going to put pen to paper

9    and let the Court know what Joe Caramadre has done for

10   us.  That is part of the good side of Joseph Caramadre.

11        Also, your Honor, this morning, inadvertently

12   was not included last week, the Government does have a

13   copy, are photos of some awards that Mr. Caramadre has

14   earned through the years.

15        And again, your Honor, these have nothing to do

16   with the fact that he's before you having pled to two

17   crimes.  These are out of the goodness of

18   Mr. Caramadre's heart that he has donated time and

19   significant resources to organizations.

20        The United Way, your Honor, in Rhode Island,

21   Mr. Caramadre, his and Paula's charitable foundation

22   has given over a million dollars over the course of

23   years to be used in a way that benefits Rhode

24   Islanders.

25        The list is almost exhaustive.  I am not going

1    to go through the list, your Honor, but when you look

2    it impacts everybody, the St. Edward Food and Wellness

3    Center, St. Joseph's Health Services Organization, St.

4    Mary's Home for Children, Cranston League.  We have

5    Mr. Caramadre also with Corinna's Angels, the young

6    girl who was stricken with a rare disease.

7    Mr. Caramadre out of his pocket flew to Washington to

8    try and get that group recognized.  So the amount of

9    good he has done, your Honor, is enormous.

10         As to the factors in 3553, deterrence, yes, it's

11   always been a sentencing factor.  I think any portion

12   of time in jail would be a deterrent to anybody

13   similarly situated who wants to complete a financial

14   crime would look to the Court and know that

15   Mr. Caramadre received a jail sentence for a

16   non-violent crime and that would act as a deterrence.

17         Retribution.  Retribution is always a part of

18   sentencing.  We know from the letters that we've seen,

19   from what Mr. Vilker has indicated that there are

20   families out there that have been hurt emotionally

21   because of his acts and that restitution is a tenet of

22   sentencing.  And also the rehabilitation.

23         Your Honor, in this case, on behalf of Joseph

24   Caramadre, we have made a motion for a sentencing

25   variance, and that sentencing variance is to obviously

1       be lower than the ten years that the Government is

2       asking for, but we would say several things.  We are

3       asking this Court for a four-year sentence, two years

4       to be served in confinement, followed by two years of

5       home confinement.  And the reason for that, your Honor,

6       is that Mr. Caramadre in our opinion is no longer a

7       danger to the community.  He is now a person scorned.

8       He's a person basically as former Justice Flanders'

9       letter has said, he's lost so much.  He's lost

10      reputation.  He's lost financially.  He's lost his

11      business that he worked so hard to develop.  So we

12      don't see him as a risk or a danger to the community.

13      We think, Judge, with two years in confinement of which

14      he's already served seven months in the Donald Wyatt

15      Detention Facility, which in essence, Judge, is akin to

16      a maximum facility as far as his accommodations there,

17      we think the two years of home detention would allow

18      him to get into the community and part of our condition

19      was that he perform 3,000 hours of public service

20      restitution with a Rhode Island non-profit agency while

21      he's on home confinement.  That home confinement would

22      give him the notice each and every day, your Honor,

23      that he did something that society does not accept.

24      It's a reminder to him and we think that his hours of

25      public service restitution to a non-profit would be

1   very beneficial with his expertise of finances and so

2   forth.

3        Judge, again, with the sentencing factors, we

4   look at his community service.  The fact that he gave

5   countless hours to a Providence soup kitchen, that was

6   written by a former police officer who spends time

7   volunteering with Mr. Caramadre.

8        So Judge, we think with a sentence of two years

9   with two home confinement the public would be protected

10  and that it would be an adequate deterrence.

11       Also, your Honor, the crimes themselves are

12  non-violent.  We think that goes into Mr. Caramadre's

13  favor and we think the chances from empirical studies

14  that he becomes a recidivist on these non-violent

15  crimes is simply not there.

16       Judge, the Court asked the Government as to

17  restitution and although we don't know the restitution

18  order that will be handed down today, first I would say

19  that there should be in our opinion no restitution to

20  the bond companies because the bond companies received

21  their money when the bonds were sold.  They got a

22  hundred cents on the dollar when the bond was first

23  sold.  But as to any other restitution that the Court

24  finds is necessary, that that would be better served if

25  Mr. Caramadre were on home confinement, were either

1    able to donate his time to a Rhode Island non-profit

2    and at some point thereafter was able to enter into the

3    work force.  And I'm sure with Mr. Caramadre's skill

4    set he will be able to be a wage earner again.

5          I think a long sentence would have the other

6    effect.  I think you would take him out of the

7    employment market.  He will be 54 years of age in a few

8    weeks and a long sentence would not allow him to come

9    back and work while he's still in his intellectual

10   prime.

11         Your Honor, there are also a host of medical

12   conditions that Mr. Caramadre suffers from and that was

13   part of our objection to the presentence report.

14   Ms. Mattias did answer by saying that the combination

15   may not be severe enough under the guidelines for a

16   variance but we think they should be enough to look at

17   the length of sentence.  And again, one condition alone

18   is not enough, but when we add them up, Judge, we see

19   that Mr. Caramadre has suffered from some mental health

20   issues for almost his entire life.  We see letters from

21   his doctors that he has received.

22         So we think, Judge, when the Court fashions a

23   condition, yes, the crime itself is distasteful.  There

24   is no way of getting around that.  The good news is, if

25   there is good news, is that the terminally ill were not

1    hurt financially.  There is millions of dollars that

2    the bond companies, that they say -- that the

3    Government says was lost with the bond companies

4    although we disagree, but the insurance companies, who

5    again defined the terms of the annuity contracts, those

6    insurance companies, your Honor, the amount of money

7    that was lost did not bankrupt or cause any of them to

8    collapse.

9         So I think when the Court pointed out to

10   Mr. Vilker that it may be best suited to have

11   Mr. Caramadre at some point out there in the work force

12   where he could use his skills to pay back whatever

13   restitution is ordered is appropriate.

14        So Judge, we would ask in concluding that

15   Mr. Caramadre receive a sentence of four years with two

16   in, followed by two in home confinement.

17        And Judge, we also have two other requests aside

18   from our requests for the actual jail time and home

19   confinement.  One is that, as has been explained to

20   Mr. Caramadre, the Court can't order where he would

21   serve his sentence but we would ask, Judge, considering

22   his strong family ties, the fact that he has three

23   children of young age that the Court recommend to the

24   Bureau of Prisons that he serve his sentence in a

25   facility that is close to Rhode Island, and we would

1    ask the Court if the Court would do that.  I did not

2    ask the Government but I doubt the Government would

3    have an objection to that.

4         The second thing, your Honor, is that

5    Mr. Caramadre is very appreciative that this Court,

6    Magistrate Almond allowed him to be released a few

7    weeks back to attend the services of his mother, and he

8    was placed on a GPS monitoring bracelet.

9    Mr. Caramadre has been charged with a Co-Defendant who

10   has been at liberty since this case was arraigned,

11   since the plea enter.  Mr. Caramadre would ask, Judge,

12   if it would be possible for this Court release him to a

13   surrender date.  We're not asking to surrender to a

14   prison, but to surrender to the U.S. Marshal's Office

15   when the day comes to begin his prison sentence when

16   the Bureau of Prisons has decided where he should serve

17   that sentence, is to allow him to go home on the GPS

18   monitoring system for at least a week so that he can

19   get his affairs in order, his financial affairs in

20   order and just be able to spend the Christmas holiday

21   with his family.

22        Again, the GPS system, in our opinion, Judge,

23   would prevent Mr. Caramadre from getting into any

24   further trouble.  He's never been in trouble before,

25   and we're sure he won't be in trouble afterwards.

1    Thank you, Judge.

2           THE COURT:  All right.  Thank you, Mr. Murphy.

3           Okay.  Mr. Caramadre, do you wish to say

4    anything before I impose sentence?

5           MR. MURPHY:  Judge, do you wish him to go up

6    there?

7           THE COURT:  No, he can speak from right there.

8    It's fine.

9           THE DEFENDANT:  Yes, your Honor.

10          Good morning, your Honor.  Thank you for

11   allowing me to address the Court.

12          Your Honor, I owe this Court an apology.  We got

13   off on the wrong foot.  I meant no disrespect as I've

14   always been a law-abiding citizen.  As an officer of

15   the Court, I've always had tremendous respect for the

16   Court, its authority, and certainly I did not mean any

17   disrespect to this Court.

18          I wish to apologize to the families of the

19   terminally ill.  I apologize because it is very

20   disturbing that they are upset and I feel so bad for

21   them.  I created this program to be a win-win situation

22   where the terminally ill would share in some of the

23   proceeds and it would help my clients.  But I've always

24   spent my whole life trying to help others in need.  I

25   feel very terrible that they are of the opinion that

1    somehow it was not explained to them.  I know that I

2    took great strides to explain and I don't want to

3    dispute what the Government purports, but none of this

4    really came up on the cross-examination.

5         The bottom line is I went and get a legal

6    opinion on if this is legal.  I asked lawyers to draw

7    up a contract that would be suitable.  I instructed my

8    assistant, Raymour, exactly how to follow it.  And I

9    find that there's 23 names in the plea agreement which

10   I should say only says some of these people, these are

11   some of the people but none of the 23 I had met, none

12   of the 23 I had spoken to; and it would have been a

13   more convincing case if there was even one person that

14   I met with, yet the Government chose not to put it in

15   their plea agreement.

16        So yes, there were the 23.  And of those 23,

17   there was only one person who bought an annuity,

18   everyone else bought bonds.

19        I'm not trying to makes excuses, your Honor.  I

20   understand the position I'm at, and I must take

21   responsibility for what I have done so I must take

22   responsibility because I pled guilty.  Under the worst

23   of circumstances, I have to take responsibility for

24   what I did.  I pled.  But I cannot tell you what you

25   want to hear.  I cannot tell you that I am sorry that

1    these terminally-ill people got defrauded because I

2    cannot do that.  It would be a lie.  And I am very

3    sorry.  I wish I could play the game.  I wish I could

4    follow the advice of my former attorneys and just take

5    responsibility and the Judge is going to see you're a

6    super-hero on the outside and you've paid it forward

7    for 30 years and you've forced your -- well, encouraged

8    your wife and children to take place in charities, at

9    church charity, family was always anything we ever

10   cared about.  So the Judge would have to understand

11   that you can't be this animal.

12        Well, I understand, your Honor, my credibility

13   is not high with you and I have only been trying to

14   rebuild it by hopefully, number one, thank you so much

15   for giving me the pass last week to go to my mother's

16   wake.  It was very touching.  I hopefully proved to

17   Probation that I will follow any rule that they give me

18   under any circumstance because I live for my three

19   children and wife.  My life at this point is not worth

20   anything but my value to them, the spiritual value has

21   no price.

22        So your Honor, I am here to be sentenced.  I

23   have to accept your good judgment.  I have to accept

24   it.  I would love to refute the facts but certainly you

25   don't want to hear that and I don't want to do it.  I

1    could just tell you that consider a couple of things.

2    Consider why when people would answer my ad and would

3    call up and say, Oh, my loved one already died and

4    we're sorry we didn't call you beforehand, and I would

5    just authorize payment.  Pay them $2,000.  There's a

6    letter from Mr. McCaughey (Phonetic spelling) that he

7    got $2500.  I didn't even meet him.  I just wanted to

8    share wealth.  About 150 people received money -- maybe

9    I should say 135, I'm not really sure, and never

10   participated in anything, your Honor.  We never got

11   their Social Security numbers.

12        And I am responsible, your Honor.  I'm

13   responsible for what I did.  I pled and I have to

14   accept that, but I cannot say that I would ever want to

15   defraud the poor.  There are people who called up after

16   we ended the program and I authorized money to them

17   knowing full well we can't use them anyway.  It doesn't

18   matter.

19        Your Honor, I've given away millions and

20   millions of dollars, both private and public.  I've

21   given to over 70 organizations.  Many times I'm the

22   lead giver.  They need my name to recruit other names.

23   They need me to put the first hundred thousand to help

24   raise many millions.  I've spent most of my time the

25   last five years fundraising for charities at no pay and

1    at no expectation.  My real regret is that I should

2    have supervised my Co-Defendant and just make sure he

3    was doing what he was charged to do.

4        And I'm not trying to blame responsibility on

5    him, but at the end of the day, one thing Mr. Vilker

6    said in his opening statement at trial was this case,

7    the heart of this case is what Mr. Radhakrishnan said

8    to the terminally ill.  That is absolutely the heart of

9    the case.  And I just wish that I knew something else

10   was being said or not said because when it came to my

11   desk I was assured people understood, agreed and

12   received money.  And it's that simple.

13       So I don't know if I'll ever get the chance to

14   get to cross-examine what are these people who are

15   upset that wrote letters thanking me.  There are some

16   who wrote letters that said, Mr. Caramadre, you are a

17   guardian angle for whatever it is you do with that

18   financial stuff we signed, we end up with 5 or $10,000.

19       They had knowledge.  They knew there was some

20   agreement.  And it's a little bit disingenuous for

21   people to say they didn't know there was an agreement.

22   But I can only tell what I know, your Honor.  I know

23   what was brought to my office it had to be an authentic

24   signature.  I should point out once a set of records

25   came to my office where the signature was not authentic

1   and I found out two days afterwards and I immediately

2   closed the account because that would not be right to

3   use someone's signature that isn't authentic or they

4   did not permit.

5        Your Honor, I had independent wealth before any

6   of this.  I was very gifted and I thank God.  It's a

7   curse, I guess.  I had made substantial money and given

8   substantial money away long before the 2006 and 2007

9   where most of the annuities and all of the bond

10  accounts were bought, long before the bulk was made.

11       This annuity and bond business represented five

12  percent of my income and I have lost almost a hundred

13  percent of everything I've ever earned substantially

14  more times than anything I could have made.  The

15  Government believes I made $4 million.  I don't want to

16  dispute the numbers right now.  There'll be a

17  restitution hearing, but I've lost everything.  And

18  I've lost it at the hands of the Government making

19  their investigation, which they're entitled to do.  But

20  for four-and-a-half years I've been in prison, I've

21  been unable to earn any money.  I've been, you know,

22  ostracized in the community.  I've been thrown off of

23  many, many boards of directors and trustees.  I used to

24  do heroic work for most charities.  Now only a couple

25  of courageous ones will even admit I helped them.

1          So your Honor, in closing, it is a disgrace.  It

2     is terrible if terminally-ill people were used and they

3     weren't told.  And I agree with that.  And I could just

4     tell you that somewhere down the road I can prove to

5     you or anyone else that my actions don't comport with

6     trying to take advantage of someone because there were

7     people who came back after the decedent died and said,

8     My husband said you'd take care of us.  I wrote checks

9     of $20,000, sure, whatever you want.  One family got

10    88,000 before they died because they needed money.

11    This was never about money to me, your Honor.  So I

12    just want to reach out to that point.

13          There's one other thing that's most important,

14    your Honor.  Your Honor, I need to help my family.  I

15    can't help them sitting in Wyatt where I cannot hug

16    them, cannot talk to them at regular hours.  They need

17    my tutelage right now for the next couple of weeks or

18    so just so I can prepare them for my further

19    incarceration.  We have been denied religious services

20    at Wyatt, almost all medical services.  They've been

21    worried to death about me.  I would ask that you allow

22    me to prove myself to you again as you did when you let

23    me go for the funeral; and certainly, if I make the

24    least bit of violation, I would be right there back

25    wherever you order me.  But I have no intention of

1    that.  My family needs me.  My mother died two weeks

2    ago.  My father needs me.  I need to settle their

3    estate, and I need to settle some 18 business

4    transactions or tax returns that I am the advisor for

5    when I was incarcerated.

6          So, your Honor, I only ask you to consider that.

7    I'm a father and husband first.  I thank you for your

8    courtesy and certainly your compassion toward me.

9          THE COURT:  All right.  Thank you.  Let me ask

10   you one question.  I don't want to engage in a long

11   discussion or debate about matters because I know you

12   maintain your innocence and I'm not going to rehash all

13   of the business about your attempt to withdraw your

14   plea.  But one fact that Mr. Vilker mentioned in his

15   presentation I do want to ask you about, which I think

16   speaks directly to your state of mind in this entire

17   proceeding, and that was what you did when the

18   insurance companies came to you and asked the

19   questions, what's with these programs.

20         It seems to me that was an opportunity, a gut

21   check, if you will, where you could have pulled the

22   plug, but instead you made the choice to continue to

23   purchase these annuities even though you had been cut

24   off, but used or purchased them under other people's

25   names.  So what do you say to that?

1          THE DEFENDANT:  Your Honor, the facts are not as

2     they seem.  I am saying that no insurance company came

3     to my office.  A broker/dealer did.  And a

4     broker/dealer was only concerned about not getting sued

5     and us continuing to use terminally-ill lives so they

6     could make their profit.  An insurance company, what is

7     purported is not factual.  I did not -- there was maybe

8     one or two annuities that I put in someone else's name

9     when I could buy another one the next day in my name.

10    There's one company that said they don't want my

11    business.  Okay.  They don't have to get it.  And if

12    Raymour decided to buy one there, I let him buy three

13    annuities.  The other two were purchased by companies

14    that didn't ban us.

15          My point is my actions can be easily explained,

16    and I pray for the day that I could explain this

17    because as soon as we separate what was said to the

18    measuring lives, if there was no misrepresentations

19    there, there would be no case.  There had never been a

20    case beforehand and the facts that Mr. Vilker wants to

21    come up and says Kenneth Blowers says his wife didn't

22    understand, I met with his wife personally.  It was

23    never cross-examined at that trial.  I met with them.

24    I was introduced to them.  What Mr. Blowers doesn't

25    remember 18 years later I can't help.  I can only tell

1   you that it's far-reaching for me to pay restitution

2   for every single annuity that was written when two of

3   the people wrote you letters saying their mother or

4   father understood exactly what was going on and yet

5   they're on the restitution list.  So it's misleading.

6        The answer is this.  I played by the rules, your

7   Honor.  Hopefully some day a trier of fact will see

8   that, but I need to say that I didn't have to buffalo

9   the companies.  They set it up for themselves.  They

10  wanted the business.  They kept asking me for more

11  business.  No insurance company has sued me other than

12  the one in question and Nationwide tried to not pay a

13  claim and this Court itself ruled against them.  And

14  they also ruled that they had every opportunity to ask

15  any other question.  They chose not to.  But yet

16  they're tagging along with the Government's case for

17  reimbursement on cases you've already ruled on.

18        So my point is there's a lot of misinformation,

19  and I can only tell you, your Honor, that I will take

20  any extraordinary means of detection of truth if it

21  would ever help this Court or anybody else.  That's all

22  I can say.  If you want further, I'll continue.

23        THE COURT:  No.  That's fine.  Thank you.

24        Do you have anything you need to respond with?

25        MR. VILKER:  Your Honor, we obviously disagree

1    with Mr. Caramadre on a lot of the facts that he just

2    mentioned.  One, for example, your Honor just raised

3    the question of one company, Midland Insurance Company

4    called one of the annuitants.  She indicated she had no

5    idea who Mr. Caramadre was.  Led them then to terminate

6    Mr. Caramadre's or Mr. Maggiacomo from submitting an

7    annuity.  A few months later, two-and-a-half million

8    dollars is submitted to that very same company in

9    Raymour's name.  The suggestion that this wasn't done

10   as an attempt to manipulate the company, that he wanted

11   to give Raymour some experience playing with millions

12   of dollars as a 23-year-old kid in his office is

13   ludicrous.  But the only factual issue I wanted to make

14   sure the Court understood and, I believe, because

15   Mr. Murphy wasn't representing Mr. Caramadre at the

16   time, that the Government never agreed to any kind of

17   plea agreement where it would be between two and five

18   years.  This was something that was proposed by

19   Mr. Lepizzera.  At the same time we rejected it and I

20   believe Mr. Caramadre rejected it at the same time.  I

21   just didn't want the Court to be under the impression

22   that we thought that was ever an appropriate sentence

23   in this case.

24            THE COURT:  Okay.  Thank you.

25            MR. MURPHY:  Your Honor, excuse me.  May I have

1    a moment with Mr. Caramadre?

2              THE COURT:  Sure.

3              (Pause.)

4              MR. MURPHY:  Your Honor, basically the last two

5    points Mr. Vilker raised Mr. Caramadre has some

6    objection to those.  If he could briefly have one

7    minute to explain.

8              THE COURT:  Okay.  Go ahead, Mr. Caramadre.

9              THE DEFENDANT:  Thank you, your Honor.

10             First of all, let's set the record straight.

11   Mr. Vilker said I moved two-and-a-half million dollars

12   into another ap with Radhakrishnan.  The initial

13   deposit was 20,000 followed by 780,000 some time later.

14   It was not two-and-a-half million dollars.

15             Number two, the lady in question, Ms. Ianiero,

16   you have a letter in front of you from a Joyce Anderson

17   which attests that her mother was confused, but she did

18   not authorize the first transaction of two-and-a-half

19   million.  It was closed down and then she authorized a

20   whole bunch more with me when I went there.  I wanted

21   just to make that clear.  Okay?

22             Number two, Mr. Lepizzera to the best of our

23   collective knowledge testified that the Government

24   offered two to five, and we're basing it on that.  I

25   don't speak directly to the Government.  It went

1    through attorneys.

2          THE COURT:  All right.  I understand.  Thank

3    you.

4          MR. CARAMADRE:  I just want you to know.

5          THE COURT:  I got it.  Just on that point, the

6    plea arrangement in this case was a binding plea

7    agreement with an open range of zero to ten years.

8    That's what is really important, not what was discussed

9    previously.

10          I'm going to try to keep my comments as short as

11    possible.  I do want to say just a few things.  This is

12    obviously a very complicated and difficult case for a

13    lot of reasons.  The nature of the fraud is very

14    unusual and it is in itself very complicated.  The

15    numbers are extremely high.  All the enhancements that

16    play into the case, while they're somewhat informative,

17    make the guidelines really kind of more of an academic

18    exercise particularly in light of the plea agreement

19    that has been reached, but they are informative because

20    any case that triggers so many enhancements says

21    something about the nature of the fraud.  It's

22    complicated by the fact that you continue to maintain

23    your innocence in the face of what I think is very

24    compelling evidence of your guilt, both presented at

25    the week of trial that we had as well as the plea

1    hearing.

2         It's complicated, too, because of the nature of

3    the victimization of the terminally-ill victims.  As

4    has been discussed at some length here this morning,

5    the victimization of those individuals was not

6    financial victimization but it really was very real

7    emotional and psychological victimization.  And while

8    you apologize for -- if I heard you correctly, you seem

9    to apologize that they were hurt, you don't seem to

10   recognize that you were the one that hurt them, the one

11   that put them into this situation.  And to the extent

12   that you blame Mr. Radhakrishnan or the Government for

13   that, while certainly they have their roles in either

14   the scheme to defraud or the investigation to uncover

15   the fraud, you were the one who was the architect of

16   the scheme and ultimately you're the one that's

17   responsible for the hurt and distress that's been

18   imposed upon these individuals.

19        I will grant you the fact that I think there are

20   some of these folks who were not emotionally or

21   psychologically impacted by this program.  There are

22   some who I think are probably grateful for the money

23   that you gave them.  So that makes it, as I said, very

24   unusual because usually the victims would all fall into

25   one category.  They would feel like victims.  Here we

1    have a group of people, some of who feel victimized and

2    others who feel not so much.

3         It's also complicated by the reality of the

4    person that you seem to be outside of this case, which

5    is someone who has done an enormous amount of good in

6    the community, been engaged in philanthropy, helping

7    and assisting others in need both in public and

8    organized charitable contributions as well as private,

9    anonymous quiet help to people.

10        So there's no question that you have a long and

11   established track record as a good community person

12   who's done a lot for people.

13        It's also clear that you have a terrific family

14   and a great love for your family and for your children

15   and they for you.  All of that speaks very much in your

16   favor.

17        The other thing that makes this case unusual and

18   I think has to be factored in is, as the Government

19   described it, the other side of your personality, and

20   that is as someone who really attempted to not just

21   concoct this fraud but also to manipulate the Court.

22   And I'm not going to go back through everything that I

23   said in denying your motion to withdraw your plea, but

24   I believed then and I believe now that your effort to

25   withdraw the plea was an incredibly cynical and

1  disturbing effort to manipulate the Court and the

2  criminal justice system in order to achieve a severance

3  from Mr. Radhakrishnan which you couldn't get in a

4  legitimate way and to maintain your ability to publicly

5  maintain your innocence to your community and your

6  family and others.  And in order to get there, you

7  committed perjury.  And as I said then, the great

8  ironies and oddities of this case is that you seem to

9  commit perjury by claiming you previously committed

10 perjury when you entered your plea of guilty.

11         In any event, it all amounts to obstruction and

12 has to be factored into the ultimate sentence here.

13         So finally, I think I need to give some

14 consideration to the possibility of restitution as well

15 as, obviously, considering all of the other sentencing

16 factors.  I don't want to impose a term of imprisonment

17 that destroys the possibility that there may be some

18 restitution made, and you are unusual as a Defendant in

19 that I think there really is the possibility that you

20 could have some time to pay the restitution that is

21 owed.

22         So when I factor all of these things together,

23 it strikes me that a term of imprisonment that is

24 fairly substantial is required but not one that is as

25 substantial as the Government has requested.  I think a

1    substantial term of imprisonment is called for, for a

2    number of reasons.  One is deterrence.  Crimes like

3    this have to be met with a significant enough prison

4    sentence so that you and others in your position know

5    that if you engage in this kind of behavior, if you

6    conduct this kind of fraud, you're going to go to

7    prison and that's the message that needs to be sent

8    out.  It's necessary to protect the public, and it's

9    required given the nature of the circumstances of the

10   offense as we've been talking about all morning, but it

11   has to be balanced against these other mitigating

12   factors that I mentioned including your substantial

13   good works in the community.

14        So my conclusion is that an incarcerative

15   sentence of 72 months, six years is appropriate in this

16   case.  It would be -- I'll be clear, it would have been

17   lower but for the obstruction and the manipulation of

18   the Court's process, closer to that so-called two- to

19   five-year discussion that was taking place.  It

20   probably would have been somewhere in that four- to

21   five-year range, but the added factor of the

22   manipulation and obstruction has to count for some

23   additional time.  So as I said, six years, 72 months is

24   the incarcerative sentence.

25        Now, Mr. Murphy suggested, and I agree with this

1    suggestion, that a very substantial community service

2    term is called for in this case to make up for the

3    prison time that you're not being given.  So in that

4    regard, I'm going to require that you perform 1,000

5    hours of community service for each year of supervised

6    release.  I'm going to impose a term of three years of

7    supervised release so a total of 3,000 community

8    service hours.

9         I'm going to specifically require that those

10   hours of community service being devoted in the service

11   of the elderly and particularly the terminally-ill

12   elderly, to perform works either in hospice or

13   palliative care through either the hospitals or one of

14   the various home and hospice or other types of similar

15   organizations or in doing other service to the elderly,

16   such as Meals on Wheels, that sort of thing.

17        Obviously, any service to the elderly that you

18   perform cannot involve anything that would bring you

19   into contact with confidential information of the sort

20   that was used in this case.  It has to be simply

21   service.

22        As we previously discussed, I'm going to defer

23   my final ruling on restitution to a later time.

24        With respect to the Government's request for a

25   fine, I agree with what the Government is suggesting,

1    that because it's a financial crime it normally would

2    be called for but the restitution obligation in this

3    case is so large, or will be so large that I'm going to

4    forego the fine.  There is a special assessment that

5    needs to be paid.

6         Now, you've made a couple of special requests.

7    I want to address those very briefly before I formally

8    impose sentence upon you.  I have no problem

9    recommending that you be incarcerated in a location as

10   close to Rhode Island as possible, and I will do that.

11   I'm not going to grant your release over the Christmas

12   holiday, however.  I took a big chance letting you out

13   for your mother's wake, and I was holding my breath for

14   the whole time and I'm glad it worked out.  Some

15   special arrangements had to be put in place for that to

16   work, and we can't be put in a position to make those

17   kinds of arrangements over the holiday period.  It just

18   wouldn't be fair to the people who were behind the

19   scenes who had to monitor you constantly whether you

20   knew it or not during that period of time.  So I'm not

21   going to grant that request.

22        In terms of your medical conditions that were

23   raised, I think all of those can be adequately

24   addressed by the Bureau of Prisons in determining the

25   proper location for you to be incarcerated.

1        And with respect, finally, to your issues that

2     you raised about your family and so forth, I'm not

3     insensitive to those concerns.  Every sentencing hurts

4     a family and takes typically a father away from

5     children and a husband away from their wives.  And

6     that's one of the unfortunate realities of our criminal

7     justice system in imposing sentence, but those can't

8     overcome all of the other things that I've been

9     discussing this morning.

10        So I'm going to ask you now to please rise.

11        In the matter of the United States versus Joseph

12     Caramadre, the Defendant is hereby sentenced to a term

13     of incarceration of 72 months in prison to be followed

14     by three years of supervised release.  As special

15     conditions of his supervised release, in addition to

16     the standard conditions, first, the Defendant will be

17     required to participate in a program of mental health

18     treatment as directed and approved by the Probation

19     Office and shall contribute to the cost of that

20     treatment based on his ability to pay.  Further, the

21     Defendant shall perform 1,000 hours of community

22     service for each year of his supervised release in the

23     specific areas that I previously described.  There will

24     be no fine.  Restitution will be deferred to a later

25     order, and there is a special assessment of $200 that

1   must be paid.

2        I do need to advise you of your appeal rights,

3   but I know that you already know if you wish to appeal

4   any of the issues related to your plea, your conviction

5   or your sentence, you need to file that appeal within

6   14 days of entry of judgment in this case and your

7   attorneys can assist you in getting that filed.

8        All right.  Is there anything further?

9        MR. VILKER:  Your Honor, just a couple of

10  matters.  One, the Government agreed in the plea

11  agreement to dismiss all the remaining counts against

12  Mr. Caramadre and the forfeiture allegation.  So we

13  hereby move to dismiss Counts I through VIII, X through

14  XXXII and XXXIV through LXVI, as well as the forfeiture

15  allegations.  And I did wish to point out, I think I

16  may need to say it on the record that Mr. Caramadre had

17  waived his appeal rights in the plea agreement.

18        THE COURT:  He did waive them?

19        MR. VILKER:  That's correct, your Honor.

20        THE COURT:  That will be litigated, I'm sure.

21        MR. VILKER:  I'm sure.

22        THE COURT:  Anything else?

23        MR. VILKER:  No, your Honor.  Thank you.

24        MR. MURPHY:  No, your Honor.  Thank you.

25        THE COURT:  All right.  Thank you very much.

1     We'll be in recess.

2            (Court concluded at 11:15 a.m.)

<u>C E R T I F I C A T I O N</u>

        I, Anne M. Clayton, RPR, do hereby certify that the foregoing pages are a true and accurate transcription of my stenographic notes in the above-entitled case.

/s/ Anne M. Clayton

————————————————————————————————————————

Anne M. Clayton, RPR

February 12, 2014

————————————————————————————————————————

Date